**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 1: 20-cv-03155-KLM
(consolidated with 1:20-cv-01922-RBJ-MEH and 1:20-cv-01878-RBJ)

MICHAEL ACKER,

      Plaintiff,

v.

CITY AND COUNTY OF DENVER, COLORADO,
CHIEF OF POLICE PAUL PAZEN, in his individual capacity,
DANIEL FELKINS, in his individual capacity,
DAVID ABEYTA, in his individual capacity,

      Defendants.

_____

**AMENDED COMPLAINT AND JURY DEMAND**
_____

      Plaintiff Michael Acker, by and through his attorneys Andy McNulty and Reid Allison of

KILLMER, LANE & NEWMAN, LLP, respectfully alleges for his Amended Complaint and Jury

Demand as follows:

**INTRODUCTION**

1.      "Let's start a riot."[1]

2.      This post on social media by a Denver Police Department ("DPD") officer during

the protests in the wake of the murder of George Floyd was indicative of Defendant City and

County of Denver's ("Denver") (and its police officers') true feelings toward its own mourning

_____

[1] *Controversial Instagram Post Leads To Denver Police Investigation*, CBS Denver, (June 1, 2020) available at: https://denver.cbslocal.com/2020/06/01/instagram-post-denver-police-investigation/.

community. Rather than protecting and serving, DPD officers[2] in these protests were a roving gang cosplaying as an occupying military force. They were playing dress up, living out their Call-of-Duty-fantasy of gassing and shooting protesters in the street without consequence. And, as a result, peaceful protests against police brutality experienced unprecedented brutality by DPD officers. This escalation was a feature, not a bug, of how Denver policed the protests. DPD officers wanted to start a riot.

3.      Plaintiff Michael Acker took to the streets at the outset of these protests. His story is the archetype of how DPD officers escalated the protests. From the very first day, DPD officers unleashed brutality on peaceful protesters for simply daring to raise concern about Denver's penchant for racist policing.

4.      Mr. Acker, a young, Black man, was peacefully protesting the disproportionate and systematic police killing of Black men in America on May 28, 2020. Shortly after the protests began, and while protesters were peacefully demonstrating on a sidewalk near Platte Street and Commons Park in downtown Denver, DPD officers unleashed pepper spray and projectiles, without warning, on Mr. Acker and his fellow peaceful protesters. In response, Mr. Acker began acting as a de-facto medic, pulling those who were suffering the effects of these chemical agents from the line of fire and helping them recover. He was rewarded for his altruistic behavior by DPD officers with a 40mm round to the eye. Mr. Acker was simply standing on a sidewalk, and had done nothing illegal or violent.

---

[2] The term "DPD officers" is used throughout this Complaint to refer to both actual officers of the DPD, and other officers under the DPD's control who were acting under mutual aid agreements and/or statutes. At all times relevant to this Complaint, the officers that were policing the George Floyd protests in Denver were operating under DPD control.

5.      What Mr. Acker experienced would play out again and again in the following days, as DPD officers shot "less-than-lethal"[3] rounds indiscriminately into crowds of peaceful protesters and, often, aimed those rounds at the most vulnerable parts of protesters' bodies (such as their head, chest, neck, and groin) so as to inflict permanent (and potentially lethal) damage. DPD officers consistently, and customarily, shot-to-maim.

6.      Mr. Acker seeks to hold Denver accountable for repeated violations of constitutional rights. Denver's actions, while unconstitutional in any context, are even more pernicious here because the use of excessive force specifically targeted peaceful demonstrators who assembled to protest police violence and brutality. Mr. Acker demands justice.

## **PARTIES**

7.      At all times pertinent to the subject matter of this litigation, Plaintiff Michael Acker was a citizen of the United States of America and a resident of and domiciled in the State of Colorado.

8.      Defendant City of Denver, Colorado ("Denver") is a Colorado municipal corporation.

9.      At all times pertinent to the subject matter of this litigation, Defendant Paul Pazen was a citizen of the United States and resident of and domiciled in Colorado. At all times pertinent, Defendant Pazen was acting under color of state law in her capacity as Chief of Police of Denver. Defendant Pazen was responsible for supervising Defendants John & Jane Does 1-5 and directing their actions during the protests in response to the murder of George Floyd and, specifically, their actions during the protest on May 28, 2020.

10.      At all times pertinent to the subject matter of this litigation, Defendant Daniel

---

[3] Less-than-lethal is a misnomer as these rounds have been statistically shown to cause death, and serious bodily injury, when shot at individuals head and chest.

Felkins was a citizen of the United States and resident of and domiciled in Colorado. At all times pertinent, Defendant Daniel Felkins was acting within the scope of his official duties and employment and under color of state law in their capacities as a law enforcement officer employed by the DPD. Defendant Felkins is a corporal with the DPD.

11.     At all times pertinent to the subject matter of this litigation, Defendant David Abeyta was a citizen of the United States and resident of and domiciled in Colorado. At all times pertinent, Defendant Abeyta was acting within the scope of his official duties and employment and under color of state law in their capacities as a law enforcement officer employed by the DPD. Defendant Abeyta is sergeant with the DPD.

## JURISDICTION AND VENUE

12.     This action arises under the Constitution and laws of the United States, and is brought pursuant to Title 42 U.S.C. § 1983. Jurisdiction is conferred on this Court pursuant to 28 U.S.C. § 1331. Jurisdiction supporting Plaintiff's claim for attorney fees and costs is conferred by 42 U.S.C. § 1988.

13.     Venue is proper in this District according to 28 U.S.C. § 1391(b) because the events giving rise to the claims occurred in this District and all Defendants reside in this District.

## FACTUAL ALLEGATIONS

### George Floyd's Murder And The Ensuing Uprising Against Racist Policing

14.     George Floyd was murdered on May 25, 2020.

15.     Minneapolis police officers arrested Mr. Floyd, a 46-year-old Black man, after a convenience store employee called 911 and told the police that Mr. Floyd had bought cigarettes with a counterfeit $20 bill. Those officers pinned Mr. Floyd to the ground. Then one officer, Derek Chauvin, put his knee on Mr. Floyd's neck. He would choke Mr. Floyd for eight minutes

4

and forty-six seconds while Mr. Floyd repeatedly told him that he couldn't breathe; while numerous other officers callously looked on and did absolutely nothing; while bystanders pleaded for Officer Chauvin to stop killing Mr. Floyd; while Officer Chauvin mocked Mr. Floyd. Among Mr. Floyd's final words were "please, please, please, I can't breathe." He would die in the street under the knee of the oppressor.

16.     Mr. Floyd's death was emblematic of the diseased, racist system of policing in the United States of America. Officers know that they can violate the law, and constitution, with impunity, and particularly when the victim of their abuse is a person of color. Fellow officers will do nothing more than stand by and watch. And, when someone complains, the police department, police union, and local prosecutors and politicians will circle the wagons in defense of a murderer, simply because he wears a badge and a gun.

17.     Mr. Floyd's murder, and this system, sparked millions of people to gather across this nation, and world, to mourn and call for the abolition of modern policing.

18.     Denver was among the cities where there was a strong reaction to Mr. Floyd's death with thousands taking to the streets in protest.

19.     Mr. Floyd's murder hit home for Denverites because of Denver law enforcement's repeated murder and brutalization of people of color without consequence, and its history of racist policing. In Denver, there has been George Floyd after George Floyd. From Marvin Booker to Michael Marshall, Denver law enforcement officers have murdered with near impunity. The officers who murdered these Black men still patrol the streets and jails of Denver.

20.     Denver's racist policing is borne out by statistics. Denver law enforcement officers disproportionately use force against Black people. While only 10% of Denver's

population is Black, 27% of the use of force incidents in Denver are perpetrated against Black people.

21.     Protesters in Denver held signs, and chanted names, relating to this long, sordid history of law enforcement brutality against Black men. Protesters called for an end to the racist policing that Denver has condoned for decades. Those at the protests voiced their disgust with Denver's lawless law enforcement officers.

22.     The protest against police brutality was met with the very thing it was protesting.[4]

**Plaintiff Michael Acker Takes To The Streets To Protest**

23.     Beginning at around 5:00 p.m. on Thursday, May 28, 2020, protesters gathered on the steps of the Colorado State Capitol ("Capitol") building in Denver, Colorado to protest police treatment of Black individuals. Demonstrators carried signs, knelt, and chanted.

24.     Shortly after the rally at the Capitol building started, DPD officers launched tear gas indiscriminately into the gathered crowd and then drove away in police vehicles. DPD officers did not issue the crowd a warning before launching the gas canisters. At least one canister hit a protester in the crowd.

25.     Some protesters left the Capitol building area and began marching downtown and toward I-25, a major interstate that runs through the heart of Denver.

26.     Interstates are important symbols of the historic redlining of poor communities of color. They represent systematic theft of the little assets that Black folks possessed in the post-war era of the 1940s, and subsequent white flight to the suburbs.

27.     Mr. Acker was among those who marched toward I-25.

---

[4] Denver's officers' actions in this case prove the point of those calling for the abolition of the DPD better than any protest, vigil, petition, or ballot initiative ever could. If DPD will openly assault those attending peaceful protests, what are they doing (and, particularly, to people of color) when the cameras are not rolling?

28.     Mr. Acker is a young black college student that has been profiled by the police before. He has watched his grandfather and father get wrongly harassed by law enforcement officers. Mr. Acker was compelled to join the protests after, in the span of a month, watching police officers murder multiple Black people with no punishment. He hoped that, by joining in the protest, he would inspire meaningful change so that his younger brothers will not be subject to the same police abuses that his generation, and his father's and grandfather's generations, were subject to.

29.     The group of protesters that left the Capitol building and marched toward I-25 were completely peaceful. No one damaged any property nor threatened any violence. When one protester began taking actions that could have damaged property (like pushing over trash cans), other protesters, including Mr. Acker, scolded the protester and fixed the damage he had done.

30.     Soon, the group of protesters reached I-25. As other protesters marched onto I-25, Mr. Acker watched from the pedestrian bridge over the highway.

31.     Soon thereafter, the protesters started marching back toward the Capitol building. Protesters were at the intersection of Platte Street and the pedestrian bridge that operates as an extension of 16th Street around 7:30 p.m.

32.     DPD officers formed a police line on the west side of Platte Street near the intersection of the pedestrian bridge over I-25.

33.     Mr. Acker, and other protesters, was approximately twenty feet from the police line.

34.     One protester overheard one officer say something to the effect of, "If anyone moves, light 'em up."

35.     At this point, without any warning whatsoever, DPD officers began shooting pepper balls at the protesters, including Mr. Acker.

36.     Mr. Acker watched as DPD officers pelted a woman with forty to fifty pepper balls from a range of approximately fifteen feet.

37.     A friend had given Mr. Acker a gas mask prior to the protest, but Mr. Acker had not planned on wearing it. However, Mr. Acker, seeing this woman being brutalized by the police, felt compelled to help. Mr. Acker put on the gas mask, ran into the street, and pulled the woman to safety. Mr. Acker proceeded to help her wash the chemical agents out of her eyes on the sidewalk. Mr. Acker would continue to act as medic as other protesters suffered the effects of the chemical agents unleashed by DPD officers on peaceful protesters.



*Mr. Acker, in a gas mask, helping a protester*
*who had been subjected to CS spray without warning.*

38.     While this was occurring, traffic continued to flow down Platte Street unobstructed. All of the protesters had moved to the east side of Platte Street and began retreating, including Mr. Acker, because of the indiscriminate use of both tear gas and pepper balls by DPD officers.

39.     At the time the protesters started retreating, no protester had engaged in any act of violence toward any person, or threatened violence. No protester had destroyed any property, or threatened property destruction. All of the protesters were peacefully exercising their rights to assemble and speak against police brutality.

40.     As the protesters were standing on the east side of Platte Street, Mr. Acker put his fist in the air. Mr. Acker would continue to hold his fist in the air.

41.     In response to a few bottles that were thrown in the air, a large line of DPD officers fired pepper balls at the line of protesters.

42.     After being fired upon, the protesters, including Mr. Acker, began to retreat toward Commons Park.

43.     Then, Defendant Abeyta told Defendant Felkins to shoot Mr. Acker with a Kinetic Impact Projectile ("KIP"). When Defendant Abeyta told Defendant Felkins to shoot Mr. Acker, no reasonable officer would have believed that Mr. Acker had engaged in any violence, destroyed any property, or taken any action whatsoever that would justify using any force against him. Mr. Acker was simply peacefully protesting.

44.     Without any warning whatsoever from either Defendant Abeyta or Felkins, Defendant Felkins, fired a KIP, a 40mm baton round, directly at Mr. Acker's head. No officer on scene had warned any protester before firing. There had been no instruction to the crowd to disperse.

45.    The KIP struck Mr. Acker in his right eye. It shattered the glass eye piece in his gas mask.

46.    When the KIP struck Mr. Acker in the eye, it felt like someone has hit him in the head with a baseball bat. He immediately fell to the ground and could not hear anything.

47.    Mr. Acker pulled the gas mask off and placed his hands over his eye. Blood started pouring out from between his fingers and pooled on the ground in front of him.

48.    Mr. Acker's face looked like this after being shot:



*Mr. Acker moments after being shot in the eye.*

49.    DPD officers continued to fire on the crowd of protesters.

50.    Other protesters came to Mr. Acker's aid. They helped him to a nearby bench, cleaned his eye with water, and put a bandage over it. Mr. Acker's eye, however, continued to gush blood. Mr. Acker was extremely concerned that he would lose his eye.



*Mr. Acker receiving emergency first aid from fellow protesters.*

51.     Due to an extreme fear that Mr. Acker would be permanently maimed if he did not get immediate medical attention, a few fellow protesters walked Mr. Acker through the clouds of chemical agents toward the police line.

52.     When Mr. Acker reached the police line, DPD officers questioned him and wrote a report. One Denver officer informed Mr. Acker that he had been shot in the eye with a 40mm baton round. Only after writing this report did they call for an ambulance.



*DPD officers writing a report before transporting Mr. Acker to Denver Health via ambulance.*

53.     Mr. Acker was transported to Denver Health via ambulance where he remained until approximately 3 a.m.

54.     The brutal force Mr. Acker experienced cut short his exercise of his First Amendment rights; he was forced to abandon his protest that evening.

55.     Mr. Acker received seven stitches to close a wound on his forehead, two stitches to close a wound on his nose, and three stitches to close a wound on his upper eyelid. Mr. Acker also had pieces of glass and debris in his eye that needed to be removed. Had Mr. Acker not been wearing a gas mask, he likely would have lost his eye.

56.     Even after Mr. Acker was transported away from the protests, DPD officers continued to shoot KIPs and tear gas indiscriminately at groups of largely peaceful protesters near the Capitol and in various parts of Denver. DPD officers aimed the tear gas and rubber and foam projectiles, as well as pepper balls, at the head, neck, and chest of protesters. They shot at individuals who were doing nothing more than standing and observing the officers. Multiple protesters were hit with the projectiles, and many protesters suffered pain and burning in their eyes and faces from the tear gas and pepper balls that officers shot.

57.     Over a month after the injury, Mr. Acker continued to experience foggy vision, light sensitivity, inability to read, and difficulty tracking movement in his right eye.

**DPD Officers Used Potentially Deadly Force Against Mr. Acker**

58.     DPD officers used a number of KIPs against peaceful protesters, including Mr. Acker, during the protests. These KIPs included foam bullets, beanbag rounds, pepper balls, and tear gas canisters.

59.     KIPs have a larger surface area than other ammunition, and thus they take unpredictable flight paths and reduced accuracy is inevitable.[5]

60.     It is extremely common for KIPs to cause contusions, abrasions, and hematomas.[6] Additionally, blunt impact may cause internal injuries.[7]

61.     Fatalities may occur when impact is at the head, neck, or precordium (the region of the chest immediately in front of the heart).[8]

---

[5] Rohini Haar et al., *Death, injury and disability from kinetic impact projectiles in crowd control settings: a systematic review*, 2017 BMJ Open 2, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5736036/pdf/bmjopen-2017-018154.pdf.; *Kinetic Impact Projectiles*, Physicians for Human Rights, https://phr.org/wp-content/uploads/2020/06/PHR_INCLO_Fact_Sheet_Kinetic_Impact_Projectiles.pdf.

[6] W. Bozeman & J. Winslow, *Medical Aspects of Less Lethal Weapons*, The Internet Journal of Rescue and Disaster Medicine, https://print.ispub.com/api/0/ispub-article/7142.

[7] *Id.*

62.     According to a systematic review of available literature, three percent of those injured by KIPs died from their injuries.[9] Fifteen percent of 1,984 people studied were permanently injured by them.[10]

63.     DPD uses 40mm launchers to shoot projectiles. 40mm launchers are firearms that shoot "40 mm specialty impact munitions" at a speed of 90 to 100 miles per hour.[11]

64.     DPD officers used 40mm launchers to launch foam bullets, sometimes referred to as rubber bullets, at protesters. Foam bullets are solid, spherical, cylindrical projectiles typically used to incapacitate a person and are known to leave bruising and welts.

65.     A 40mm round shot at the head, whether a beanbag, foam bullet, baton round, or tear gas canister, is deadly force.

66.      DPD officers also shot pepper balls at peaceful protesters and bystanders. Pepper balls have an immediate and incapacitating effect that creates a burning sensation to any exposed skin.[12]

67.     In addition to the burning effect of the OC contained in the pepper balls, the balls themselves can cause serious injury—even death—because of the high velocity at which they are

---

[8] *Id.*
[9] Rohini Haar et al., *Death, injury and disability from kinetic impact projectiles in crowd control settings: a systematic review*, 2017 BMJ Open 2, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5736036/pdf/bmjopen-2017-018154.pdf.
[10] *Id.*
[11] *Operations Manual*, Denver Police Department, https://www.denvergov.org/content/dam/denvergov/Portals/720/documents/OperationsManual/OMSBook/OM_Book.pdf; https://www.youtube.com/watch?v=ZUx8CkKOjH0.
[12] Florida Gulf Coast University, Weapons & Equipment Research Institute, *Less Lethal Weapon Effectiveness, Use of Force, and Suspect & Officer Injuries: A Five-Year Analysis* (2008).

shot. The launcher can shoot six to twelve pepper bullets per second at speeds up to 350 feet per second, or more than 238 miles per hour.[13]

68.     The Boston Police Department suspended use of pepper balls in 2004 after a college student was killed when a pepper ball struck her in the eye.[14]

69.     University of California, Davis police shot a pepper ball at an unarmed student while trying to break up a block party and permanently damaged his eye in 2004.[15]

70.     Denver itself has been called on, and conducted an internal investigation on, whether to end the use of pepper balls after they were used in response to Occupy demonstrations in October of 2011.

71.     DPD officers also used tear gas on peaceful protesters. Tear gas is an umbrella term for aerosolized chemical agents.[16] The two most common types of tear gas are CS and OC.[17] CS gas (o-chlorobenzylidene malononitrile) is a chlorinated, organic chemical. OC is Oleoresin Capsicum, which is derived from chiles, and is the active ingredient in pepper spray.[18]

---

[13] 2019 Product Catalog, PepperBall, https://www.pepperball.com/wp-content/uploads/2019/01/PepperBall-2019-product-catalog.pdf.
[14] Jonathan Finer, *Boston Police Suspend Use of Pepper-Ball Guns*, Wash. Post, Oct. 24, 2004, https://www.washingtonpost.com/archive/politics/2004/10/24/boston-police-suspend-use-of-pepper-ball-guns/dd773f5d-1651-4c2a-8a82-b967d77958b5.
[15] Maura Dolan, *Court rules police may be liable for pepper ball injuries*, L.A. Times, July 12, 2012, https://www.latimes.com/local/la-xpm-2012-jul-12-la-me-uc-davis-pepper-20120712-story.html.
[16] Operations Manual, Denver Police Department, https://www.denvergov.org/content/dam/denvergov/Portals/720/documents/OperationsManual/OMSBook/OM_Book.pdf.
[17] Will Stone & Carrie Feibel, *From 'Flash Bangs' To 'Rubber' Bullets: The Very Real Risks of 'Riot Control Agents'*, NPR, June 6, 2020, https://www.npr.org/sections/healthshots/2020/06/06/871423767/from-flash-bangs-to-rubber-bullets-the-very-real-risks-of-riot-control-agents.
[18] *Id.*

72.     Tear gas can be deployed in a grenade or cannister that produces a cloud of chemicals.[19] It is indiscriminate in nature.[20] Tear gas can cause severe coughing, crying, mucus production, and can make it difficult to breathe. It can also cause vision to become blurry, and eyes to tear up, become inflamed, and feel like they are burning. It can cause skin to turn red, become blistery, and develop a rash or chemical burn. It also causes disorientation.

73.     Tear gas can also cause respiratory arrest, vomiting and allergic reactions, and it can permanently damage the eyes, cause asthma symptoms, and cause traumatic brain injury. It can also have adverse effects on pregnant people and fetuses.

74.     Tear gas chemicals are banned in warfare.

75.     During the global COVID-19 pandemic, tear gas can cause people to cough and spread infectious droplets, putting people at higher risk of symptomatic or severe COVID-19.

76.     Since the protests began on May 28, 2020, at least 60 protesters nationwide sustained serious injuries from the use of "less-lethal" weapons by law enforcement, including "a broken jaw, traumatic brain injuries, and blindness."[21]

77.     DPD officers' use of these less-than-lethal projectiles against peaceful protesters was approved, condoned, and ratified by Denver and Chief Pazen. DPD officers were given specific authorization to use these less-than-lethal munitions, including KIPs, on peaceful protesters by Denver and Chief Pazen.

**DPD Officers Purposefully And Customarily Shot Protesters, And Those Assumed To Be Protesters, In The Head, Neck, Face, And Chest With KIPs**

---

[19] *Chemical Irritants*, Physicians for Human Rights, https://phr.org/wp-content/uploads/2020/06/PHR_INCLO_Fact_Sheets_Chemical_Irritants.pdf.
[20] *Id.*
[21] Kaiser Health News, *Fractured skulls, lost eyes: Police often break own rules using "rubber bullets"*, Denver Post, June 23, 2020, https://www.denverpost.com/2020/06/23/george-floyd-protests-rubber-bullet-injuries.

78.     On May 28, 2020, while he was covering the protests rally at the State Capitol.

Hyoung Chang, a credentialed press photographer for *The Denver Post*, was struck two times by

pepper-ball rounds fired by law enforcement personnel. One round cut Chang's arm. The other

shattered his press badge that was hanging around his neck. Mr. Chang was quoted after the event

as saying, "If it was one shot, I can say it was an accident. I'm very sure it was the same guy twice.

I'm very sure he pointed at me.*"*



*Hyoung Chang's arm after being shot.*

79.     On May 29, 2020, DPD officers shot Gabriel Thorn in the head with a KIP. While

at the protest, Mr. Thorn ⸬served at times as a medic. Mr. Thorn is a veteran who served in the

Armed Forces. Mr. Thorn also wore a red cross on his helmet and backpack to indicate that he

was a medic there to treat those injured. Several times while treating injured people, DPD

officers targeted him and shot pepper balls. ⸬He observed a largely peaceful protest. He

witnessed DPD officers utilize rubber bullets, tear gas, flash bang grenades, and pepper balls.

The protesters were attacked indiscriminately with these ordinances and without regard for safety. Mr. Thorn also observed DPD officers aiming at bodies and heads when firing rubber bullets. Having served in the military and been trained to use rubber bullets, Mr. Thorn was struck that these officers had not been trained to use them correctly. His training in the military made clear that these bullets were to be aimed at the ground and never directly at people, even in war zones. During the protest, Mr. Thorn was struck with pepper balls, rubber bullets, and was tear gassed multiple times. When Mr. Thorn was struck with rubber bullets, as with many others, he was struck in the head. Fortunately, he was wearing a helmet at that time.

80.     On May 29, 2020, officer shot Andy Sannier in the chest with a KIP without warning while in downtown Denver during the protests. Mr. Sannier was walking home downtown that evening, when he saw a Black man yelling at (but not threatening) officers. A white couple started arguing with the Black man who was yelling at the officers. Mr. Sannier stopped and recorded this with his cell phone from a comfortable distance. DPD officers opened fire on the people arguing, and, seeing that Mr. Sannier was filming, shot him in the chest with a pepper ball.

81.     On May 29, 2020, in the afternoon, DPD officers shot Megan Matthews in the head with a KIP while she was participating in a peaceful protest near the Capitol. When she was shot in the head, Ms. Matthews was standing alone and not engaged in any violence or property destruction. When hit with the KIP, she immediately blacked out. When she woke up, her face was covered in blood. A friend then carried Ms. Matthews to a grassy area near the State Capitol, where she was bandaged by a doctor and later loaded into an ambulance.



*Megan Matthews after being shot in the eye.*

82.     On May 29, 2020, at approximately 8:15 p.m., a credentialed cameraman for KMGH-TV/Channel 7, was struck four times by KIPs fired by DPD officers in the chest. An additional projectile paint ball hit the front lens of his conspicuous professional-grade video camera, which was at head level.



*What the camera looked like after being shot.*

83.    On May 30, 2020, Jeremy Jojola, an on-air correspondent for KUSA-TV/9News
was shot with a less-lethal projectile round while standing beside a professional cameraman from
that station. The round struck Mr. Jojola's backpack.

84.    On May 30, 2020, Lindsay Fendt, a freelance reporter and photographer was
standing in a group of press photographers when a law enforcement officer kicked a pepper gas
canister directly into her face.



*Lindsay Fendt after having a tear gas canister kicked into her face.*

85.     On May 30, 2020, DPD officers shot Michael McDaniel in the head with KIPs without warning. Mr. McDaniel attended the protest rally on Saturday afternoon to serve as a medic to attend to those injured by the police. At one point, the Police excessively tear-gassed a parking lot on the corner of Colfax and Lincoln. The tear gas was so thick, that it was

a cloud that could not be seen through. Mr. McDaniel saw a protester crawling out on his hands and knees. The protester was choking and could not breathe. Mr. McDaniel, with his back to the police, kneeled down to treat the protester, who was still on all fours. The police then proceeded to target and shoot Mr. McDaniel and the protester with pepper bullets. They shot Mr. McDaniel in the head with KIPs. Thankfully, Mr. McDaniel was wearing a helmet, so when the police aimed at his head, they did not cause any injury, other than the intense burning pain that Mr. McDaniel experienced as a result of the pepper balls.

86.     On May 30, 2020, DPD officers shot Elizabeth Epps in the face with a KIP without warning. Prior to the curfew, DPD officers shot Ms. Epps with rubber bullets during a peaceful protest in front of the Capitol, after tear gassing and pepper-spraying the crowd without warning. A rubber bullet hit her face, breaking the plastic medical-grade respirator mask she was wearing and wounding her face.



*Elizabeth Epps after being shot in the face.*

87.    On May 30, 2020, DPD officers shot Jax Feldmann in the eye with a KIP without warning. Mr. Feldmann wasn't protesting when a law enforcement officer riding on the back of a DPD truck fired a projectile at his face without warning and blinded him in one eye. Mr. Feldmann, a 21-year-old delivery driver with Denver's River Bear American Meats, was walking about 9:30 p.m. from his friend's apartment at Grant Street and Colfax Avenue to his car parked a block away on Sherman Street. It was the first night that Denver was under an 8 p.m. curfew due to ongoing protests of police brutality, but Feldmann was trying to get home. There were no large groups of protesters nearby when Mr. Feldmann was shot and no one near him yelled at or throw anything at the DPD officers on the truck, which was marked with the DPD logo. Mr. Feldmann didn't see what hit him, but that reached his hand up to his face and felt blood. His

friend called 911 and Mr. Feldmann was transported to Denver Health via ambulance. Alone in the hospital, Mr. Feldman was told by doctors that they would have to perform emergency surgery to save his eye and doctors performed that surgery, however, Mr. Feldmann will never regain his full vision. The surgeon who operated on Feldmann's eye told Mr. Feldmann's mother that the damage was consistent with a rubber bullet.



*Jax Feldmann after being shot in the eye.*

88.     On May 30, 2020, DPD officers shot former Major League Baseball star Dale Murphy's son in the eye with a KIP without warning. Mr. Murphy's son was peacefully protesting in downtown Denver. After being shot, he was taken to the emergency room.



*Mr. Murphy's son after being shot in the eye.*

89.     On May 30, 2020, DPD officers without warning shot Russell Strong in the head with a KIP. Mr. Strong was protesting near Civic Center Park and carrying a sign that read "No justice, No peace." Shortly after 6 p.m., Mr. Strong was hit in the face with a KIP. The force of the KIP knocked him out. As a result of this use of force, Mr. Strong required several facial reconstructive surgeries to repair broken bones around his eye and to realign the right side of his jaw. Mr. Strong lost his right eye because of the use of force by DPD officers. When he was shot,

Mr. Strong was simply peacefully protesting and was not engaging in any violence or property destruction.

90.     On May 31, 2020, Gabe Schlough was shot in the face with a KIP by DPD officers without warning. Mr. Slough, an individual with a degree in public health anthropology who some had medical training and had participated in protests before, attended the protests near the state Capitol with the intention of being there help anyone who was injured by the DPD officers. When Mr. Slough arrived, he saw a crowd of two or three hundred people facing down a line of police. The were standing just a little bit more than shoulder to shoulder apart with full riot gear, with their face shields and full protective armor on. Mr. Slough, sensing a conflict, moved up toward the front of the crowd and began to tell people who didn't have eye coverings to watch their eyes and protect their face. DPD officers then shot a woman in the chest with a tear gas canister right next to Mr. Slough. Mr. Slough bent down to help the woman and, while doing so, covered the tear gas canister with a cone. As soon as he did this, officers shot Mr. Slough in the face and chest with KIPs. Mr. Slough described the sensation as getting his with a baseball bat. He helped the woman back away from the line of DPD officers and, as he did so, the other individuals he had attended the protest with told him that his chin was falling off. The KIP had left a gaping wound on his chin, and blood was pouring down onto the front of his shirt. Mr. Slough went to the hospital where he required 22 stitches to close the wound on his chin. He still experiences pain from this wound and will likely require plastic surgery for it to heal properly.



*Gabriel Schlough's chin after being shot.*

91.     On May 31, 2020, Zachary Packard was shot in the head with a KIP by DPD officers without warning. Mr. Packard arrived at the protests on streets surrounding the Capitol at about 8 p.m. DPD officers formed lines on two perpendicular streets and began closing in on the groups of protesters. Mr. Packard heard a message from a SWAT vehicle that "curfew was in effect." DPD officers then started firing tear gas. Mr. Packard attempted to kick one tear gas canister away from the group of protesters near him. As he stepped off the sidewalk, Mr. Packard was hit in the head with a projectile. He was immediately knocked unconscious. DPD officers did not issue a warning before shooting Mr. Packard in the ear. Bystanders carried Mr. Packard from the sidewalk over into a patch of grass. When he returned to consciousness, a friend took him to the hospital. A CAT scan later revealed that Mr. Packard suffered a fractured skull and jaw, two fractured discs, and bleeding in his brain. Mr. Packard remained at the hospital for about one week.



*Zachary Packard after being shot in the head*

92.     On May 31, 2020, DPD officers shot Youssef Amghar in the head and chest with KIPs without warning. Well before curfew, Mx. Amghar was with other peaceful protesters on

the corner of Colfax and Lincoln. Protesters were chanting, "Hands up, don't shoot," and holding signs. Mx. Amghar was standing on the sidewalk. There was a line of DPD officers on Colfax. Mx. Amghar stood there with their hands up. Someone else not near them in the crowd threw a water bottle at the officers. The DPD officers immediately began shooting into the crowd with pepper balls. They did this without warning or giving any orders. At first, the DPD officers shot indiscriminately into the crowd, but after the crowd moved back, they began shooting directly at Mx. Amghar, even though they were standing still with their hands up. The DPD officers first shot them in the arms and legs, then in the chest, and then directly in the face, even though they continued standing still with their hands up. The DPD officers shot them approximately 14 times. The DPD officers did not give any orders before, during, or after this incident. No one told Mx. Amghar to move back or gave them any other orders. Mx. Amghar was so upset at the DPD officers' use of force on them that they began yelling words to the effect of, "I'm a goddamn U.S. Marine, what are you doing?" Then DPD officers began throwing tear gas canisters at their feet. After a couple minutes, Mx. Amghar walked away and took cover behind a tree.

93.     On May 31, 2020, Alex Burness of *The Denver Post*, was fired upon, without warning, by law enforcement and shot in the head and abdomen with KIPs. DPD officers fired at Mr. Burness just after he yelled out "PRESS." He sustained a contusion on his head and right abdomen.



*Alex Burness after being shot in the abdomen*

94.     On May 31, 2020, DPD officers shot Darian Tindall in the chest with KIPs without warning. Ms. Tindall was hit in the chest with a pepper ball while marching on Colfax Avenue. Her hands were up above her head when she was shot, and she didn't see the projectile coming or anticipate the intense pain. She was given no warning by DPD.

95.     On May 31, 2020, DPD officers shot at Trevor Hughes face with KIPs without warning. Mr. Hughes was photographing and recording the protests near Colfax and Emerson at approximately 8:30pm. While recording, with the camera near his face, DPD officers shot Mr. Hughes in the hand with a KIP. The shot broke and severed Mr. Hughes's right ring finger,

leaving it dangling. Mr. Hughes immediately left the protest and went to urgent care. Mr. Hughes

had to have his finger surgically repaired.

96.     On June 1, 2020, DPD officers shot Ambrose Cruz in the head and chest with

KIPs without warning. As a photographer and freelance journalist, Mr. Cruz wanted to document

the protests as well as the police response. Throughout the evening, he documented the protests

and police action as a photojournalist. At about 8:00 p.m., he was with protesters in front of the

Capitol. The protesters were chanting and peaceful. There were over 100 people present. There

was a line of DPD officers present on all sides of the protesters, surrounding them. Sometime

after 9:00 p.m., DPD officers moved in and began rapidly shooting tear gas and foam bullets at

the protesters. They did not give any warning or orders. Because the police had surrounded the

protesters on all sides, it was difficult for protesters to escape. Mr. Cruz ran away from the gas.

At approximately 13th Avenue, he saw a man in an electric wheelchair. The man was stuck and

Cruz tried to give him a hand. However, the wheelchair was extremely heavy. Unfortunately,

Cruz had to leave him there while he was being engulfed by tear gas. Mr. Cruz ran towards the

library. Around 13th Avenue, the DPD officers were shooting at him and protesters with tear gas

and pepper balls. There were a lot of people who were trying to leave to go home. There were

approximately 35 people at that corner, and they were all younger protesters, including

teenagers. Almost all of them were Black. One protestor was having a seizure. Mr. Cruz and

others tried to help him. Some people tried to leave, but DPD officers cornered them and shot

pepper balls at them. A white person went up to the DPD officers to ask if they could leave

because people wanted to go home. The DPD officer said that they could go home, and so people

started walking towards where the officer told them to go. That officer started firing on people

and everyone started running. Mr. Cruz ran with other protesters to a building and garage at 13th

Avenue and Lincoln. The DPD officers ran after them. The DPD officers were shooting them

with pepper balls. They did not give any orders or warnings. Mr. Cruz and others ran down to the

garage but discovered that armored vehicles blocked off both ends of the block and there was no

exit. Cruz ran up the stairs, and as he looked up, a Defendant DPD Officer shot him in the face

with pepper balls. The DPD officer hit him three times in the eye area and knocked his glasses

off. A female DPD officer told him, "If you don't fucking get on the ground, I'm going to

fucking kill you," or words to that effect. Even though Cruz stopped and was on the ground, the

other DPD officer continued firing pepper balls at him, including at the back of his head. The

DPD officer who had been repeatedly firing pepper balls at Cruz at close range taunted him,

saying things like, "What happened to you? It looks like your wife beat you. I'd say that was two

days old, this must have happened another night." Mr. Cruz's eye was bleeding, swollen shut,

and bruised. He could not open his eye. A month after the attack, he still has light sensitivity and

other problems with his eyesight.

　　　　97.　　On June 2, 2020, DPD officers shot Darrell Hampton in the face with KIPs

without warning. Mr. Hampton was peacefully protesting, and filming DPD officers, on the

sidewalk near the Capitol in the afternoon. A number of DPD officers were standing on the back

of a DPD pickup truck, carrying pepper ball guns. As the truck was driving away, one officer

decided to randomly shoot Mr. Hampton in the face with a pepper ball for no apparent reason.

There was no violence or property destruction happening; Mr. Hampton was simply standing on

the sidewalk filming the protest and the officers.

### **DPD Officers Customarily Used Indiscriminate Force Against Protesters, And Those Assumed To Be Protesters, Without Warning**

**May 28, 2020**

98.     DPD officers used indiscriminate and excessive force against protesters gathered at the Capitol building on May 28, 2020.

99.     In addition to the above-described brutality unleashed on the group of protesters, which Mr. Acker was a part of, near the intersection of Platte and 16th Street, shortly after the incident involving Mr. Acker, DPD officers also brutalized a group of protesters gathered near the intersection of 14th Avenue and Sherman Avenue. Protesters at this intersection encountered a line of DPD officers and stayed there about another hour, chanting, "Hands up, don't shoot," and "I can't breathe." Another group of protesters walked down 14th Avenue and joined this group of protesters. There were approximately 200 people. The officers tear gassed the entire crowd, without provocation or warning.

100.    DPD officers also brutalized an entire group of protesters near the Capitol building at about 6:30 p.m. At that time, DPD officers started launching tear gas canisters into a crowd of protesters without warning. At least one young man was hit with a canister. As soon as DPD officers launched the tear gas, the officers hopped on the back of a patrol van and drove away. Around 8 p.m., DPD officers returned to the Capitol building and formed a line. They slowly began advancing toward the protesters at the Capitol building. Without provocation or warning, the DPD officers launched tear gas at the crowd. At about 8:30 p.m., a crowd of protesters that was pushed down a street near the Capitol by DPD officers was tear gassed without any warning. At about 9 p.m., the crowd at that time was mostly seated on the Capitol steps talking amongst themselves. Then, without any warning or order to disperse, DPD officers deployed tear gas toward, and into, the crowd.

101.    Later that same night, DPD officers indiscriminately shot peaceful protesters with KIPs, including pepper balls and foam bullets.

**May 29, 2020**

102.     DPD officers used indiscriminate and excessive force against protesters gathered at the Capitol building on May 29, 2020. In the evening, protesters had gathered near the Capitol and were kneeling in front of police chanting "Hands up! Don't shoot!" DPD police cars drive through the group and released tear gas and shot KIPs from the vehicles at peaceful protesters.

103.     Around approximately 4 p.m., DPD officers began firing KIPs, including rubber bullets and pepper balls, into the crowd of peaceful protesters every few minutes. They also threw flash bang grenades indiscriminately into the crowd every couple of minutes, which made deafening sounds. Protesters were not throwing any objects at officers or otherwise provoking the police violence that was visited upon them. After about an hour, DPD officers formed a riot line and crossed the street towards the protesters, shooting more pepper balls and rubber bullets. When this did not disperse the crowd, DPD officers released tear gas.

104.     There was no warning about enforcement of the curfew (which was newly implemented) before the curfew began. Instead, at 8:00 p.m., DPD officers came out of the Capitol building and launched tear gas, flash bang grenades, and/or pepper spray at the protesters indiscriminately and without warning or dispersal orders.

105.     Around 8 p.m., DPD officers also shot projectiles directly at the cellphone of one protester who was using it to record and broadcast police violence to her thousands of social media followers, shattering it. Shortly after police shot this protester's phone, they deployed tear gas into the group of protesters without any warning or justification.

106.     At approximately 9 p.m., DPD officers set up a line of about ten canisters of tear gas in front of the Capitol building and set them off. DPD officers did not issue a warning before any of these weapons were used.

107.     Throughout the evening, DPD officers indiscriminately shot tear gas and KIPs at the entire group of protesters anytime any single protester moved within approximately 15 feet of the officers. DPD officers never gave any dispersal orders or warning before indiscriminately shooting protesters with KIPs or tear gas throughout the evening.

108.     Officers shot tear gas and KIPs at peaceful protesters who were kneeling on many occasions. Many of these protesters had their hands in the air and their shirts off. At many points, when peaceful protesters were on the Capitol steps with their hands up, chanting "Hands up, don't shoot," DPD officers fired flash bang grenades, tear gas, and KIPs into the crowd indiscriminately and without warning.

**May 30, 2020**

109.     DPD officers used indiscriminate and excessive force against protesters gathered at the Capitol building on May 30, 2020. In the afternoon, DPD officers sprayed tear gas over a large area by the Capitol occupied by predominantly peaceful protesters, including children. In response to a solitary protester tossing a water bottle toward the police, DPD officers deployed tear gas without first issuing a warning. At about 3:30 p.m., DPD officer shot pepper balls at a man who was kneeling in front of the officers with his arms raised. Later, DPD officers shot more pepper balls as well as flash bang grenades at protesters. Other DPD officers pulled a boy's goggles and mask off of his face before spraying him in the face with pepper spray. At 4 p.m., the crowd attempted to march north toward a line of officers at the Civic Center transit station, and, in response, DPD officers deployed tear gas into the crowd without warning, sending them running for their lives. At the same time, DPD officers dressed in riot gear standing near a DPD surveillance truck shot canisters of tear gas into the crowd. DPD officers did not offer a warning

before firing the tear gas. No protester was being violent in any way, or threatening property destruction.

110.    Later, at about 5:30 p.m., there was a large crowd gathered outside of the Capitol building. A number of the peaceful protesters were on their knees chanting "Hands up! Don't Shoot!" As soon as the crowd stood from a kneeling position, officers began shooting tear gas and KIPs at the crowd without giving any warning. Shortly thereafter, officers shot protesters with KIPs, including rubber bullets, again.

111.    At about 7 p.m., officers formed a single file line and encircled Civic Center Park, standing shoulder to shoulder. Some protesters threw near-empty plastic water bottles in the direction of the line of officers. Out of concern that the situation would escalate and to protect the people residing in a nearby homeless encampment, one protester began telling protesters to stop throwing items at police. He ushered protesters toward the sidewalk, to get them away from the line of officers, and he told officers that he only wanted to protest peacefully. As that protester was talking to other protesters, one officer got out of his place in line, pushed his way between two other officers in the line, and sprayed that protester directly in his face with pepper spray. The DPD officer did not give any warning before spraying the pepper spray in his face.

112.    At about 7:50 p.m., ten minutes before the 8 p.m. curfew that Denver had instituted for the first time that day, numerous protesters attempted to leave the Capitol area to head to their cars, but DPD officers had barricaded the exits, trapping them. Approximately five minutes later, while the peaceful protesters were still trapped and before the curfew began, officers sprayed tear gas into the crowd, again without warning or an order to disperse.

113.    At approximately 9 p.m., DPD officers started pushing protesters out of the Capitol building area. Officers began using tear gas and shooting projectiles indiscriminately at

the crowd, including at women and children. There was no provocation or threatening behavior by the crowd, and no warnings from the officers before they shot the projectiles. Later into curfew, DPD officers continued to use indiscriminate force without warning. This included pepper-spraying individuals who were standing on their own property and shooting individuals with KIPs who yelled, from their front porches, for the officers to leave the neighborhood.

114.    Throughout the night, after curfew, there were roving gangs of DPD officers in riot gear, hanging off of vans and pickups trucks, driving around shooting protesters with KIPs. These officers were randomly, and indiscriminately, drive-by shooting citizens who were outside in the areas near the Capitol, in the Capitol Hill neighborhood, and on and around Broadway. There were no warnings given before these DPD officers shot KIPs and tear gas canisters at protesters and bystanders alike.

**May 31, 2020**

115.    DPD officers used indiscriminate and excessive force against protesters gathered at the Capitol building on May 31, 2020. In the evening, while peaceful protesters were chanting and marching on the streets surrounding the Capitol, and some protesters at the front of the march were lying down in the street like George Floyd (but none were throwing items or being violent), DPD officers gassed the protesters without warning. Later, at about 9:30 p.m., a group of approximately 250 peaceful protesters were marching near the Capitol. Without warning, four SWAT cars pulled in on both sides of the marching crowd, "kettling" them between two side streets. The DPD officers in the SWAT vehicles released tear gas from both directions without warning. Most protesters remained trapped in the cloud of gas.

116.    After curfew, DPD officers consistently trapped peaceful protesters in corners or between lines of officers, so that they could pelt them indiscriminately with KIPs.

**June 1, 2020**

117.     DPD officers used indiscriminate and excessive force against protesters gathered at the Capitol building on June 1, 2020. Throughout the day and into the night, the protest was completely peaceful. At about 8:00 p.m., there were approximately 100 peaceful protesters in front of the Capitol. DPD officers formed a line in front of the Capitol and began pushing the peaceful crowd into the street and other officers surrounded the peaceful protesters on all sides. Once the protesters were successfully kettled, DPD officers released tear gas without warning. Because the police had surrounded the protesters on all sides, it was difficult for protesters to escape.

118.     Around midnight, dozens of DPD officers came out of the shadows at the Capitol building, and a group of protesters began chanting, "Why are you in riot gear, I don't see no riot here." Protesters lay down in the street with other people linking arms. There were also protesters demonstrating against the police in a line. DPD officers began marching onto the lawn. Without any warning or dispersal order or any words, the DPD officers began tear-gassing the demonstrators. DPD officers also used a noise cannon without warning.

119.     As a result, a number of individuals who were attending the protests as medics left the protest. The group of medics that fled encountered approximately 50 DPD officers at the intersection of Lincoln and Broadway. DPD officers surrounded the medics, pushed them into a corner and began dousing them with pepper spray. The medics in front were wearing gear clearly identifying them as medics.

**June 2, 2020**

120.     DPD officers used indiscriminate and excessive force against protesters gathered on June 2, 2020. That night, DPD officers again released tear gas into the crowd of protesters

without warning and shot KIPs, including pepper balls, at protesters. DPD officers utilized the same tactics they had used the previous five nights.

**Federal Judge R. Brooke Jackson Holds That Denver's Actions Violated The Constitution.**

121.    On Thursday, June 4, four persons who participated in the Denver protests since they began sued Denver, alleging that DPD officers' use of "less-lethal" weapons violated the First and Fourth Amendments. After a hearing on the matter, United States District Court Judge R. Brooke Jackson of the United States District Court for the District of Colorado issued a temporary restraining order restricting DPD and jurisdictions invited by DPD from using "less-lethal" projectiles and chemical agents on peaceful protesters.

122.    In doing so, Judge Jackson noted that "people have an absolute right to demonstrate and protest the actions of governmental officials, including police officers. It is one of the many freedoms on which this country was built." In response to the evidence presented, Judge Jackson was unequivocal about the behavior of DPD officers toward protesters, calling it "disgusting."

123.    Judge Jackson went on to conclude that there was a "strong likelihood" that DPD officers had engaged in excessive force in violation of the Fourth Amendment. Judge Jackson made this determination based on video evidence that showed "police conduct at the demonstrations" where "the officers had ample time for reflection and were not dealing with dangerous conditions" yet still "attacked [protesters[ with rubber bullets, tear gas, etc…. solely on the basis of their presence at the demonstrations, their viewpoint, or their attempts to render treatment to injured protesters." Judge Jackson found it particularly problematic that "officers specifically aimed at heads and groins, causing broken facial bones and ruptured testicles." In the

end, Judge Jackson found that DPD officers had targeted "peaceful demonstrators, journalists, and medics… with extreme tactics meant to suppress riots, not to suppress demonstrations."

124.   Judge Jackson also held that there was a "strong likelihood" that DPD officers had violated the First Amendment in their treatment of peaceful protesters. In doing so, he found that: (1) the protesters "were engaged in constitutionally protected activity through organized political protest"; (2) DPD officers' "use of excessive force likely caused injury sufficient to chill a person of ordinary firmness from continuing to engage in that political protest" because "[o]fficers used physical weapons and chemical agents to prevent not just peaceful demonstration, but also the media's ability to document the demonstrations and plaintiffs' and third parties' ability to offer aid to demonstrators" resulted in "[p]eaceful demonstrators' legitimate and credible fear of police retaliation" that was "silencing their political speech—the very speech most highly valued under the First Amendment."

125.   Judge Jackson also made it a point to note that although he did "not agree with those who have committed property damage during the protests, property damage is a small price to pay for constitutional rights—especially the constitutional right of the public to speak against widespread injustice. If a store's windows must be broken to prevent a protestor's facial bones from being broken or eye being permanently damaged, that is more than a fair trade. If a building must be graffiti-ed to prevent the suppression of free speech, that is a fair trade. The threat to physical safety and free speech outweighs the threat to property."

126.   Ultimately, Judge Jackson issued a temporary restraining order **banning** DPD officers, and those under their command, from shooting KIPs in a way that targets the "head, pelvis, or back" and from shooting KIPs "indiscriminately into a crowd." Judge Jackson also ordered that DPD were **required** to issue an order to disperse prior to using any chemical agents

and that that order had to be followed "with adequate time for the intended audience to comply" and allow for egress.

### The Actions Of The Law Enforcement Officers During The Protests Were Ordered By Denver's Final Policymakers

127.     Upon information and belief, DPD officers were given authority by Denver's final policymakers, including Chief Pazen, to use less-than-lethal weapons to shoot protesters without warning.

128.     Upon information and belief, DPD officers were given authority by Denver's final policymakers, including Chief Pazen, to use less-than-lethal weapons to shoot protesters in the head, face, and chest.

### DPD Officers Continually Violate Official Policy With No Repercussions.

129.     Denver's own use of force policy restricts the use of less lethal shotgun or 40mm projectiles to only situations where (1) it is necessary to "incapacitate a combative or physically resistive person whose conduct rises at least to the level of Active Aggression"; (2) "it is likely to prevent an officer or a third person from being seriously injured or killed" or (3) it is necessary to "incapacitate a suicidal person who cannot be safely controlled with other force options." The policy defines "Active Aggression" as "a threat or overt act of an assault, coupled with the present ability to carry out the threat or assault, which reasonably indicates that an assault or injury to any person is imminent."

130.     The use of force policy makes clear that "[u]nless deadly force is warranted, an officer shall not intentionally deploy the less lethal shotgun projectile or forty (40) mm projectile": (1) "To the head, eyes, throat, neck, breasts of a female, genitalia, or spinal column" or (2) "From a range of less than ten (10) feet with the less lethal shotgun, or less than five (5) feet with the forty (40) mm projectile."

131.     The use of force policy emphasizes that the purpose of the use of less lethal shotgun or 40mm projectiles "is to neutralize the person to the point they can be safely controlled and taken into custody." It goes on to say that the use of such force is only allowable "when other force options would be inappropriate or ineffective under the circumstances **and** it is reasonable and necessary in order to attempt to avoid having to use deadly force."

132.     DPD officers violated these policies with impunity during the protests, relegating the use of force policy to meaningless pieces of paper sitting on a dusty shelf. Upon information and belief, no officer has been disciplined for blatantly violating this policy.

133.     Denver's and Chief Pazen's continued failure to discipline, supervise, and/or reprimand its officers for their repeated violation of the use of force policy effectively communicated to DPD officers that such force was consistent with Denver's customs, policies, practices, and training.

134.     DPD officers continued flagrant violation of the use of force policy demonstrates that Denver and Chief Pazen fail to train its officers on this policy and/or provides training that this policy does not need to be followed.

135.     The existence of the use of force policy demonstrates that Denver and Chief Pazen were on notice that they needed policies in place to control the use of less than lethal weapons, but were deliberately indifferent to the actions of DPD officers who used less-than-lethal weapons in such a way as to constitute excessive force under the constitution.

**Denver's customs, policies, practices, training, and supervision caused the violation of Mr. Acker's constitutional rights.**

136.     Additionally, DPD officers customary and ongoing use of the less than lethal weapons to target protesters for demonstrating, an improper purpose under the policy, demonstrates that Denver and Chief Pazen failed to adequately train their officers that less-than-

(none)

lethal weapons cannot be used for the purpose of discouraging First Amendment activity, to punish those who engage in First Amendment activity, or to retaliate against those who engage in First Amendment activity.

137.    Denver final policymakers, including Chief Pazen, have received ample notice that DPD officers were using less-than-lethal force against protesters to control and suppress demonstrations in the absence of any imminent threat to safety, including 150 complaints about the DPD in one 72-hour period,[22] condemnation from City Council members,[23] and widely publicized videos and firsthand accounts circulated through the local, state, and international press.[24]

138.    Denver decision makers, including Chief Pazen, have also received notice that the actions of DPD officer in Denver against protesters violated the policies and procedures for the use of force outlined in the DPD's own Operations Manual.

139.    Moreover, Denver and Chief Pazen are responsible for the actions of any non-DPD officers whose services were utilized during the period in which protests were ongoing. By

[22] Jesse Paul, *Complaints about police response to Denver's George Floyd protests under investigation as demonstrations hit day 6*, Colo. Sun, June 2, 2020, https://coloradosun.com/2020/06/02/denver-police-response-protests-under-investigation/.
[23] Conrad Swanson, *Denver City Council members call for investigation into police use of force during George Floyd protests*, Denver Post, June 2, 2020, https://www.denverpost.com/2020/06/02/denver-city-council-investigate-police-force-protest/; Letter, Denver City Council, June 5, 2020, https://denver.cbslocal.com/wp-content/uploads/sites/15909806/2020/06/Denver-city-council-calls-for-review-of-DPD-use-of-force-policy.pdf.
[24] Lori Jane Gliha, *Police projectile fractures Denver protester's face; she says it was unprovoked*, KDVR, June 3, 2020, https://kdvr.com/news/local/police-projectile-fractures-denver-protesters-face-she-says-it-was-unprovoked; Alex Rose, *Local man needs eye removed after projectile hits his face during afternoon protest in Denver*, KDVR, June 3, 2020, https://kdvr.com/news/local/local-man-needs-his-eye-removed-after-projectile-hits-his-face-during-afternoon-protest-in-denver/?fbclid=IwAR2Q9RdYRmi3dp5GnuyOf6Tm6E-NoquhzKTvHSknBTmUKLuZ-17UIc4YJkA.

utilizing those services, Denver and Chief Pazen were required to ensure that all officers complied with both protesters' constitutional rights and Denver's use-of-force policies.

140.   On May 29, 2020, after only the first day of protests, Denver final policymakers, including Chief Pazen, publicly ratified DPD officers' use of less-than-lethal force for crowd control at protests without warning and DPD officers shooting less-than-lethal projectiles at protesters head, neck, and chest.[25] This ratification gave DPD officers notice that these actions were consistent with Denver custom, policy, and practice.

141.   The violations of Mr. Acker's constitutional rights are a direct result of and caused by Denver's (and Chief Pazen's) policy, practice, and custom of authorizing DPD officers to use less-than-lethal weapons to control and suppress protests. These violations are also a direct result of Denver's (and Chief Pazen's) utilization of the services of law enforcement officers from other jurisdictions, who were authorized to use less-than-lethal weapons to control and suppress protests.

## STATEMENT OF CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### 42 U.S.C. § 1983
### First Amendment Violation — Freedom Of Speech And Assembly
### (Plaintiff against Defendants)

142.   Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

---

[25] Ana Campbell, *Denver law enforcement agencies have a long history of violence. A use-of-force policy is supposed to help*, Denverite, https://denverite.com/2020/05/29/denver-law-enforcements-long-sordid-history-of-violence/; Ryan Osborne, *Denver mayor, police chief say officers showed "restraint" during George Floyd protest*, Denver Channel, May 29, 2020, https://www.thedenverchannel.com/news/local-news/denver-mayor-police-chief-say-officers-showed-restraint-during-george-floyd-protest.

143.   Defendants, acted under color of state law, and within the course and scope of their employment, in their capacities as officers of the DPD at all times relevant to the allegations in this Complaint.

144.   Defendants are "persons" under 42 U.S.C. § 1983.

145.   Plaintiff was engaged in First Amendment-protected expression by gathering to protest police brutality.

146.   The actions of Defendants – specifically, the use of excessive force against peaceful protesters – can be expected to chill a reasonable person from engaging in activity protected by the First Amendment.

147.   Plaintiff's expression was on a matter of public concern and did not violate any law.

148.   Plaintiff's expression occurred at a traditional public forum.

149.   Defendants' actions were a content-based and/or viewpoint-based restriction of Plaintiff's expression.

150.   Defendants' actions were not a reasonable time, place, and manner restriction on speech.

151.   Defendants, collectively, failed to intervene to prevent each Defendant from violating Plaintiff's constitutional rights.

152.   At the time when Defendants stopped Plaintiff from speaking and gathering, Plaintiff had a clearly established constitutional right under the First Amendment to the United States Constitution to gather, express himself, and speak freely. Any reasonable law enforcement officer knew or should have known of this clearly established right.

153.    Defendants engaged in their conduct intentionally, knowingly, willfully, wantonly, maliciously, and in reckless disregard of Plaintiff's constitutional rights.

154.    Defendants stopped Plaintiff from engaging in expressive activity in accordance with the customs, policies, and practices of Defendant Denver.

155.    Defendant Denver has a custom, practice or policy of tolerating violations of the First Amendment of the United States Constitution.

156.    The actions of the Defendants were authorized (before and during the fact), and ratified (after the fact), by final policymakers for Defendant Denver, including Chief Pazen.

157.    Defendant Denver's customs, policies, and/or practices, and the decisions of its final policymakers, were the moving force behind Defendants' violation of Plaintiff's constitutional rights.

158.    Defendant Denver and Chief Pazen failed to properly supervise and/or train its officers.

159.    As a direct and proximate cause and consequence of Defendants' unconstitutional acts and omissions, described above, Plaintiff suffered injuries, damages, and losses.

160.    Defendants' herein described acts or omissions were the moving force and the legal, direct, and proximate cause of Plaintiff's injuries and losses, including but not limited to non-economic damages, economic damages, the physical and mental pain and anguish Plaintiff suffered during and after the protest, and other compensatory and special damages.

161.    Defendants' intentional actions or inactions as described herein intentionally deprived Plaintiff of due process and of rights, privileges, liberties, and immunities secured by the Constitution of the United States of America.

**SECOND CLAIM FOR RELIEF**
**42 U.S.C. § 1983**

**First Amendment Violation — Retaliation**
**(Plaintiff against Defendants)**

162.     Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

163.     Defendants acted under color of state law, and within the course and scope of their employment, in their capacities as law enforcement officers for the DPD at all times relevant to the allegations in this Complaint.

164.     Defendants are "persons" under 42 U.S.C. § 1983.

165.     Plaintiff was engaged in First Amendment-protected expression by gathering to protest police brutality.

166.     The actions of Defendants – specifically, the use of excessive force against peaceful protesters – can be expected to chill a reasonable person from engaging in activity protected by the First Amendment.

167.     Plaintiff's expression was on a matter of public concern and did not violate any law.

168.     Plaintiff's expression occurred at a traditional public forum.

169.     Defendants jointly and on their own accord responded to Plaintiff's First Amendment protected activity with retaliation, including but not limited to use of physical force, including KIPs and chemical agents.

170.     By unlawfully using force against Plaintiff, Defendants sought to punish Plaintiff for exercising his First Amendment rights, to silence him, and to deter him from gathering and speaking in the future. Defendants' retaliatory actions would chill a person of ordinary firmness from engaging in such First Amendment protected activity.

171.     Defendants' retaliatory actions were substantially motivated by Plaintiff's exercise of his First Amendment rights.

172.     At the time when Defendants retaliated against Plaintiff for exercising his First Amendment rights, Plaintiff had a clearly established constitutional right under the First Amendment to the United States Constitution to be free from retaliation. Any reasonable law enforcement officer knew or should have known of this clearly established right.

173.     Defendants, collectively, failed to intervene to prevent each Defendant from violating Plaintiff's constitutional rights.

174.     Defendants engaged in their conduct intentionally, knowingly, willfully, wantonly, maliciously, and in reckless disregard of Plaintiff's constitutional rights.

175.     Defendants stopped Plaintiff from engaging in expressive activity in accordance with the customs, policies, and practices of Defendant Denver.

176.     Defendant Denver has a custom, practice or policy of tolerating its officers' retaliatory violations of the First Amendment of the United States Constitution.

177.     Defendant Denver and Chief Pazen failed to properly supervise and/or train its officers.

178.     The actions of Defendants were authorized (before and during the fact), and ratified (after the fact), by final policymakers for Defendant Denver, including Chief Pazen.

179.     Defendant Denver's customs, policies, and/or practices, and the decisions of its final policymakers, were the moving force behind Defendants' violation of Plaintiff's constitutional rights.

180.     As a direct and proximate cause and consequence of Defendants' unconstitutional acts and omissions, described above, Plaintiff suffered injuries, damages, and losses.

181.    Defendants' herein described acts or omissions were the moving force and the legal, direct, and proximate cause of Plaintiff's injuries and losses, including but not limited to non-economic damages, economic damages, the physical and mental pain and anguish Plaintiff suffered during and after the protest, and other compensatory and special damages.

182.    Defendants' intentional actions or inactions as described herein intentionally deprived Plaintiff of due process and of rights, privileges, liberties, and immunities secured by the Constitution of the United States of America.

### THIRD CLAIM FOR RELIEF
### 42 U.S.C. § 1983
### Fourth Amendment Violation — Excessive Force
### (Plaintiff against Defendants)

183.    Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

184.    Defendants acted under color of state law, and within the course and scope of their employment, in their capacities as law enforcement officers for the DPD at all times relevant to the allegations in this Complaint.

185.    Defendants are "persons" under 42 U.S.C. § 1983.

186.    Plaintiff had a protected Fourth Amendment interest against being victimized by the use of excessive force at the hands of law enforcement personnel.

187.    Defendants did not have, at any time, a legally valid basis to seize Plaintiff.

188.    Defendants unlawfully seized Plaintiff by means of excessive physical force, including the use of chemical agents and KIPs.

189.    Defendants had no warrant authorizing any seizure of Plaintiff.

190.    Each Defendant failed to intervene to prevent the other Defendants from violating Plaintiff's constitutional rights, and is thereby liable for such failure to intervene.

191.     Defendants' actions were objectively unreasonable in light of the circumstances confronting them.

192.     Plaintiff had committed no crime (nor could any of the Defendants have reasonably believed they had committed any crime) that would legally justify arrest or detention, Plaintiff gave the officers no reason to fear for their safety, Plaintiff was obviously unarmed, and Plaintiff was not resisting arrest or fleeing.

193.     Defendants did not have a legally valid basis to seize Plaintiff in the manner and with the level of force used under the circumstances presented.

194.     Defendants recklessly created the situation in which they used force.

195.     Defendants' actions, as described herein, were objectively unreasonable in light of the facts and circumstances confronting them.

196.     At the time when Defendants used excessive force against Plaintiff, Plaintiff had a clearly established constitutional right under the Fourth Amendment to the United States Constitution to be secure from unreasonable seizure through excessive force. Any reasonable law enforcement officer knew or should have known of this clearly established right.

197.     Defendants engaged in these actions intentionally, willfully, and wantonly, demonstrating deliberate indifference to, and a reckless disregard for, Plaintiff's constitutionally protected rights.

198.     Defendant Denver has a custom, practice or policy of tolerating violations of the Fourth Amendment of the United States Constitution.

199.     The actions of the Defendants were authorized (before and during the fact), and ratified (after the fact), by final policymakers for Defendant Denver, including Chief Pazen.

200.    Defendant Denver's customs, policies, and/or practices, and the decisions of its final policymakers, were the moving force behind Defendants' violation of Plaintiff's constitutional rights.

201.    Defendant Denver and Chief Pazen failed to properly supervise and/or train its officers.

202.    As a direct and proximate cause and consequence of Defendants' unconstitutional acts and omissions, described herein, Plaintiff suffered injuries, damages, and losses.

203.    Defendants' herein described acts or omissions were the moving force and the legal, direct, and proximate cause of Plaintiff's injuries and losses, including but not limited to non-economic damages, economic damages, the physical and mental pain and anguish Plaintiff suffered during and after the vigil, and other compensatory and special damages.

204.    Defendants' intentional actions or inactions as described herein intentionally deprived Plaintiff of due process and of rights, privileges, liberties, and immunities secured by the Constitution of the United States of America.

### FOURTH CLAIM FOR RELIEF
### 42 U.S.C. § 1983
### Fourteenth Amendment Violation — Excessive Force
### (Plaintiff against Defendants)

205.    Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

206.    Defendants acted under color of state law, and within the course and scope of their employment, in their capacities as law enforcement officers for the DPD at all times relevant to the allegations in this Complaint.

207.    Defendants are "persons" under 42 U.S.C. § 1983.

208.     Plaintiff had a protected Fourteenth Amendment Substantive Due Process interest against being unreasonably harmed by the use of excessive force at the hands of law enforcement personnel.

209.     Defendants did not have, at any time, a legally valid basis to use force against Plaintiff.

210.     Defendants' use of force was extremely disproportionate.

211.     Defendants acted with malice and/or excessive zeal amounting to an abuse of power.

212.     Defendants acted for the purpose of causing harm unrelated and unnecessary to any relevant policing objective.

213.     Defendants' actions were arbitrary and/or conscience shocking in light of the circumstances confronting them.

214.     Defendants failed to intervene to prevent each Defendant from violating Plaintiff's constitutional rights.

215.     Defendants engaged in these actions intentionally, willfully, and wantonly, demonstrating deliberate indifference to, and a reckless disregard for, Plaintiff's constitutionally protected rights.

216.     At the time when Defendants used excessive force against Plaintiff, Plaintiff had a clearly established constitutional right under the Fourteenth Amendment to the United States Constitution to be secure from excessive force. Any reasonable law enforcement officer knew or should have known of this clearly established right.

217.     The actions of the Defendants were authorized (before and during the fact), and ratified (after the fact), by final policymakers for Defendant Denver, including Chief Pazen.

218.     Defendant Denver's customs, policies, and/or practices, and the decisions of its final policymakers, were the moving force behind Defendants' violation of Plaintiff's constitutional rights.

219.     Defendant Denver and Chief Pazen failed to properly supervise and/or train its officers.

220.     As a direct and proximate cause and consequence of Defendants' unconstitutional acts and omissions, described above, Plaintiff suffered injuries, damages, and losses.

221.     Defendants' herein described acts or omissions were the moving force and the legal, direct, and proximate cause of Plaintiff's injuries and losses, including but not limited to non-economic damages, economic damages, the physical and mental pain and anguish Plaintiff suffered during and after the vigil, and other compensatory and special damages.

222.     Defendants' intentional actions or inactions as described herein intentionally deprived Plaintiff of due process and of rights, privileges, liberties, and immunities secured by the Constitution of the United States of America.

**FIFTH CLAIM FOR RELIEF**
**42 U.S.C. § 1983**
**Fourteenth Amendment Violation — Due Process**
**(Plaintiff against Defendants)**

223.     Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

224.     Defendants acted under color of state law, and within the course and scope of their employment, in their capacities as law enforcement officers for the DPD at all times relevant to the allegations in this Complaint.

225.     Defendants are "persons" under 42 U.S.C. § 1983.

226.    The orders issued by Defendants, and the authority on which those orders were based, were vague and not clearly defined.

227.    The orders issued by Defendants, and the authority on which those orders were based, offered no clear and measurable standard by which Plaintiff and others could act lawfully.

228.    Defendants lacked legal authority, through Denver municipal ordinance, state law, or otherwise, to order the dispersal of Plaintiff and, thereby, there were no explicit standards to govern the order of dispersal or limits on law enforcement's authority to order dispersal.

229.    Defendants failed to intervene to prevent each Defendant from violating Plaintiff's constitutional rights.

230.    The orders issued by Defendants, and the authority on which those orders were based, failed to provide people of ordinary intelligence a reasonable opportunity to understand what conduct they prohibited, and authorized or encouraged arbitrary and discriminatory enforcement, or both.

231.    At the time when Defendants violated Plaintiff's due process rights, Plaintiff had a clearly established constitutional right under the Fourteenth Amendment to the United States Constitution to be afforded due process of law. Any reasonable law enforcement officer knew or should have known of this clearly established right.

232.    Defendants engaged in these actions intentionally, willfully, and wantonly, demonstrating deliberate indifference to, and a reckless disregard for, Plaintiff's constitutionally protected rights.

233.    The actions of the Defendants were authorized (before and during the fact), and ratified (after the fact), by final policymakers for Defendant Denver, including Chief Pazen.

234.     Defendant Denver's customs, policies, and/or practices, and the decisions of its final policymakers, were the moving force behind Defendants' violation of Plaintiff's constitutional rights.

235.     Defendant Denver and Chief Pazen failed to properly supervise and/or train its officers.

236.     Defendants' intentional actions or inactions as described herein intentionally deprived Plaintiff of due process and of rights, privileges, liberties, and immunities secured by the Constitution of the United States of America.

237.     Defendants' herein described acts or omissions were the moving force and the legal, direct, and proximate cause of Plaintiff's injuries and losses, including but not limited to non-economic damages, economic damages, the physical and mental pain and anguish Plaintiff suffered during and after the vigil, and other compensatory and special damages.

238.     Defendants' intentional actions or inactions as described herein intentionally deprived Plaintiff of due process and of rights, privileges, liberties, and immunities secured by the Constitution of the United States of America.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff respectfully requests that this Court enter judgment in his favor and against each Defendant, and award him all relief allowed by law, including but not limited to the following:

A.     All appropriate relief at law and equity;

B.     Injunctive relief, including:

   a.   Enjoining Defendants from using chemical agents, including pepper spray, against those exercising their rights of free speech and assembly;

    b.   Enjoining Defendants from shooting projectiles indiscriminately into crowds of those exercising their rights of free speech and assembly;

    c.   Enjoining Defendants from shooting projectiles at protesters unless there is an immediate threat of bodily injury to the protester, or others;

    d.   Requiring all Defendant law enforcement officers deployed to police demonstrations must have their body-worn cameras recording at all times, and forbidding officers from intentionally obstructing the camera or recording;

    e.   Requiring that all Defendant law enforcement officers deployed to police demonstrations must create a use of force report documenting every single deployment of KIPs, tear gas, or any other less-than-lethal weapon;

    f.   Requiring that any and all orders to disperse must only be given when there is imminent danger of harm to persons (not property);

    g.   Requiring that any and all orders to disperse must be followed by adequate time for the intended audience to comply, and officers must leave room for safe egress; if it appears the intended audience did not hear the order, the order must be repeated multiple times before the crowd is dispersed.

C.    Declaratory relief and other appropriate equitable relief;

D.    Economic losses on all claims as allowed by law;

E.    Compensatory and consequential damages, including damages for emotional distress, humiliation, loss of enjoyment of life, and other pain and suffering on all claims allowed by law in an amount to be determined at trial;

F.    Punitive damages on all claims allowed by law and in an amount to be determined at trial;

G.    Attorneys' fees and the costs associated with this action under 42 U.S.C. § 1988, including expert witness fees, on all claims allowed by law;

H.    Pre-and post-judgment interest at the lawful rate; and

I.    Any other appropriate relief at law and equity that this Court deems just and proper.

**PLAINTIFF HEREBY DEMANDS A JURY TRIAL ON ALL ISSUES SO TRIABLE**

DATED this 12th day of February 2021.

KILLMER, LANE & NEWMAN, LLP

*/s/ Andy McNulty*
Andy McNulty
Reid Allison
1543 Champa St., Ste. 400
Denver, CO 80202
Phone: (303) 571-1000
Facsimile: (303) 571-1001
amcnulty@kln-law.com
rallison@kln-law.com

ATTORNEYS FOR PLAINTIFF