IN THE UNITED STATES DISTRICT COURT
OF THE DISTRICT COURT OF COLORADO

Civil Action Nos. 1:20-cv-01878-RBJ & 1:20-cv-01922-RBJ-MEH (consolidated)

BLACK LIVES MATTER 5280, *et al.*,  )
Plaintiffs                           )    **FITOURI PLAINTIFFS' MOTION**
v.                                   )    **FOR CLASS CERTIFICATION AND**
CITY AND COUNTY OF DENVER, *et al.*, )    **APPOINTMENT AS CLASS COUNSEL**
Defendants                           )

On May 25, 2020, George Floyd was murdered by then-Minneapolis police officer Derek Chauvin. This sparked numerous protests against police violence and in support of Black lives across the nation, including in Denver. Beginning on May 28, 2020, thousands of citizens took to the streets and parks in the downtown Denver area to express their outrage and to exercise their right to free expression. Although the protests were overwhelmingly peaceful, the Denver Police Department (DPD) used extreme and violent crowd control tactics.

The DPD (and officers under DPD's command) used force indiscriminately—including throwing tear gas into peaceful crowds, shooting pepperballs, foam/rubber bullets, and using other "less-lethal" weapons on the protestors—and without adequate or any warnings at all. The officers' actions were excessive under the Fourth Amendment, stopped and chilled individuals from exercising their First Amendment rights, including their right to assemble and express dissent, and directly suppressed protected speech. Officers also used force with deliberate indifference, in a manner that shocks the conscience. The officers engaged in this conduct pursuant to DPD policies, practices, and widespread customs. Additionally, the Defendant City and County of Denver ("City") imposed a citywide nighttime curfew from May 30 through June 4, 2020 and arrested protestors for violating this curfew but did not arrest citizens who were not engaged in constitutionally protected behavior. These actions violated protestors' rights under the First, Fourth, and Fourteenth Amendments.

1

Plaintiffs filed this lawsuit on behalf of themselves and others similarly situated. Plaintiffs now move to certify this case as a class action pursuant to Federal Rule of Civil Procedure 23(b)(3).

The proposed Direct Force Classes are as follows:

1. Those persons who were present on May 28, 2020 at the intersection of N. Washington St. and E. Colfax Ave., in Denver, Colorado, or the immediately adjacent areas, including on N. Washington St. from E. Colfax Ave. south to E. 14th Ave., at any time between 8:20 p.m. and 8:50 p.m., who were not engaged in any behavior that would pose an immediate and specific threat to the safety of officers or others, and who were shot by police with projectiles or inhaled aerosolized chemical agents.

2. Those persons present who were present on May 28, 2020 at the intersection of E. 14th Ave. and Sherman St., in Denver, Colorado, or the immediately adjacent areas, including on E. 14th Ave. between Grant St. and Lincoln St., at any time between 8:45 p.m. and 9:15 p.m., who were not engaged in any behavior that would pose an immediate and specific threat to the safety of officers or others, and who were shot by police with projectiles or inhaled aerosolized chemical agents.

3. Those persons who were present on May 30, 2020 at the parking lot at the north intersection of 16th St. and Welton St., in Denver, Colorado, or the immediately adjacent areas, at any time between 4:40 p.m. and 4:55 p.m., who were not engaged in any behavior that would pose an immediate and specific threat to the safety of officers or others, and who were shot by police with projectiles or inhaled aerosolized chemical agents.

4. Those persons who were present on May 30, 2020, at the intersection of Lincoln St. and E. Colfax Ave., in Denver, Colorado, or the immediately adjacent areas, bounded by Broadway (on the west), E. Colfax Ave. (on the north), Grant St. (on the east), and E. 14th Ave. (on the south), at any time between 6:00 p.m. and 8:00 p.m., who were not engaged in any behavior that would pose an immediate and specific threat to the safety of officers or others, and who were shot by police with projectiles or inhaled aerosolized chemical agents.

5. Those persons present on May 31, 2020, on E. Colfax Ave. between Pennsylvania St. (on the east) and Logan St. (on the west) in Denver, Colorado, or the immediately adjacent areas, at any time between 9:30 p.m. and 9:45 p.m., who were not engaged in any behavior that would pose an immediate and specific threat to the safety of officers or others, and who were shot by police with projectiles or inhaled aerosolized chemical agents.

Plaintiffs further seek to certify an Arrest Class under Rule 23(b)(3), defined as follows:

> Those persons who were present at or during the protests in downtown Denver, Colorado, from May 30, 2020 through June 5, 2020, who were arrested for violation of emergency curfew (D.R.M.C. 1-13), including an accompanying charge of failure to obey a lawful order (D.R.M.C. 38-31(c)), but who were not charged with any other violations, and whose charges were dismissed.

## FACTS

The Supreme Court has directed courts making decisions about class certification to do so with the relevant evidence in mind. *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013); *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455, 466 (2013) (discussing the difference between a showing that questions of liability are common to the class, which is required, and a showing that the answer to those questions will be in the class's favor, which is not required). Accordingly, Plaintiffs set forth the relevant facts and supporting evidence that establish some of the relevant common proof that will be tested at a trial on the classes' claims.

### I. The First Day of Protests: May 28, 2020

On May 28, 2020, after crowds started gathering in downtown Denver to protest, DPD officers were deployed to the area at around 4:30 p.m. Ex. 1. The protests were peaceful and conducted with little police intervention until shortly after 7:00 p.m., when police officers deployed tear gas and used other less-lethal weapons on groups of protestors at several locations, including the Highland Bridge over I-25 and 16th and Platte. *See* Ex. 2 ¶ 4; Ex. 3 ¶¶ 3-4; Ex. 4 ¶¶ 3-4; Ex. 8 ¶¶ 3-4; Ex. 6 ¶ 6; Ex. 96 ¶¶ 2-5; Ex. 93 ¶¶ 2-10.

**Colfax and Washington:** At about 8:30 p.m., over 100 people,[1] including Plaintiff Claire Sannier,[2] were gathered at the intersection of Colfax and Washington, near the police station. Ex. 2 ¶ 5. Supervisory officers instructed police officers to disperse the crowd and to move the crowd away from the area. Ex. 9 at 69:4-10. To do so, officers deployed less-lethal weapons on the

---

[1] One witness estimated 200-300 people. Ex. 89 ¶ 3.
[2] Sannier's legal name is presently Andrew Sannier. However, she is in the process of changing her name.

3

protestors, including pepperballs, tear gas, and smoke grenades. *Id.* at 69:14, 71:16-25; Ex. 2 ¶¶ 6-7; Ex. 89 ¶ 4; Ex. 11 at 2:33:42-2:40:00[3]; Ex. 10; Ex. 12 at 2:33:42-2:40:00;[4] Ex. 18. Command officer Lt. Canino ordered the use of tear gas on protestors. Ex. 55 at DEN 2832 ("I called for large canisters of gas to be deployed as officers were being struck with rocks and bottles."); *see also id.* at DEN 2878; Ex. 15 at 2:38:48-2:39:00. No warnings or orders were given to the crowd prior to deploying force; none are heard in the officers' BWC footage. *See generally* Exs. 11-15; Ex. 9 at 70:7-71:15; Ex. 19 at 124:14-126:17 (noting that "you should be able to hear" the dispersal order on the BWC "if there was something being said"); *see also* Ex. 2 ¶ 6. At the time tear gas was thrown at the intersection, there was no provocation to warrant the use of force. *See, e.g.*, Ex. 13 (tear gas thrown for no apparent reason at 8:38:48 p.m.).

**Sherman and 14th:** From about 8:45 p.m. to 9:15 p.m., Plaintiff Kelsey (Elle) Taylor was with hundreds of protestors on 14th Avenue and Sherman Street peacefully protesting and chanting messages such as "hands up, don't shoot," and "I can't breathe" when officers teargassed the entire crowd without provocation or adequate warning. Ex. 6 ¶¶ 4-8; Ex. 93 ¶¶ 12-20; Ex. 89 ¶¶ 7-11; Ex. 95 ¶¶ 2-7; Ex. 107 ¶¶ 12-17; Ex. 20 at 50:23-51:4, 53:7-24, 54:3-56:13, 65:2-21 (confirming crowd was peaceful, did not hear any announcements, and tear gas was thrown);[5] Exs. 21 & 22 at 9:10:15 p.m; Ex. 28. Command officers Lt. James Williams and Lt. Thomas Pine ordered the use of force, including tear gas, pepperballs, and smoke grenades, to disperse the protestors. Ex. 55 at DEN 3019 (Williams: "Around 2110 hours, I gave the order for officers to move forward and began pushing the crowd back. … Metro 2 ordered the deployment

---

[3] The date/time stamp displayed in the upper right-hand corner on DPD BWC video is Greenwich Mean Time, six hours ahead of Mountain Time.
[4] *See also* Exs. 13-18; Ex. 29 at 55:49-1:08:00.
[5] Beall's BWC shows that at least one protestor yelled, "We can't hear you" with respect to anything that the police were saying to the crowd. Ex. 27 at 7:29.

4

of chemical weapons to include Smoke Grenades and Pepper Ball followed by CS."); Ex. 1 at DEN 4 (identifying Pine as METRO 2); Ex. 20 at 63:14-66:12; Ex. 26 at 3:05:05-39 (Lt. Williams giving instructions to Sgts. Beall, Abeyta, Horton and another supervisor); Ex. 27 at 3:05:10-34. The protestors were not engaged in any behavior justifying the use of force.[6]

## II. May 30, 2020: Officers Deploy Force Prior to Curfew and Use Force Indiscriminately on Protestors

The City imposed an emergency nighttime curfew beginning at 8:00 p.m. on May 30, 2020. Ex. 30. The curfew began at 9:00 p.m. on June 1. These were express city policies. *Id.*

**16th and Welton:** Between 4:40 and 4:55 p.m. that day, Plaintiff Sannier was with roughly 100 or more protestors near the 16th Street Mall, between California and Welton. Ex. 2 ¶ 10. The protestors stood in front of a line of Aurora police officers and peacefully demonstrated. Without warning or provocation, at 4:49 p.m., Denver officers arrived and immediately shot at the protestors. *Id.*; Ex. 88 ¶¶ 8-13; Ex. 32; Ex. 33 at 5:00-11:17; Ex. 34 at 16:49:12-16:50:00; Ex. 92 ¶¶ 2-10. Denver officers, commanded by Lt. Vince Porter, used pepperballs and 40 mm launchers to disperse the approximately 200-300 protestors from the empty parking lot. No orders or warnings were given before shooting, and none are heard on video. Ex. 34 at 16:49:12-16:50:00; Ex. 35;[7] Ex. 55 at DEN 3382, 3282, 3421, 3469.

**Lincoln and Colfax:** Another major excessive force incident occurred on May 30, 2020 at the intersection of Lincoln and Colfax, between 6:00 and 8:00 p.m. Ex. 3 ¶¶ 11-13; Ex. 8 ¶¶ 5-9; Ex. 5 ¶¶ 10-18; Ex. 7 ¶¶ 14-15. Several teams of officers were deployed to that location, including Lt. Williams and his teams, Officer Bolton's gang unit team led by Lt. Michael

---

[6] *See* Ex. 23; Exs. 25-28; Ex. 29 at 1:35:25-1:40:30.
[7] *See also* Exs. 36-41; Ex. 39 at 16:49:54 (Smick saying to his officers, "no, no, no, no, … that's Denver shooting").

O'Donnell,[8] Aurora Captain Stephen Redfearn and his officers, and Denver METRO SWAT. Ex. 55 at DEN 3022-23; Ex. 20 at 82:4-25; Ex. 9 at 78:8-79:20; Ex. 42 at 21:20-23:9. There were hundreds of protestors at this intersection, including each of the Fitouri Plaintiffs. Some people were chanting, others kneeling with their hands up, and others holding signs. Ex. 43 at 45:21-46:11; Ex. 105.[9] During this time before curfew, officers did not give warnings or orders to disperse before indiscriminately using "less-lethal" weapons on protestors, including tear gas, pepperballs, foam/rubber bullets, and flashbangs. Ex. 43 at 46:12-50:16; Ex. 42 at 20:16-21:5, 45:24-49:9, 53:21-56:18; 59:2-20; Ex. 105.[10] Denver command officers either directly ordered or authorized skirmish lines and uses of force. Ex. 55 at DEN 3023,[11] 3298, 3245, 3330; Ex. 43 at 55:4-21; Ex. 9 at 61:12-63:14. The Aurora officers took directions from Denver command staff. *See e.g.*, Ex. 50 at 19:19:38-19:20:18 (Sgt. Brukbacher getting direction from Lt. Williams);[12] Ex. 44 at 18:01:20; Ex. 54 at 18:28:28-59; *see also* Ex. 56 at 19:07:40-48 (a Denver METRO/SWAT corporal giving Spano tear gas canister to throw)).[13]

### III. May 31, 2020: Police Officers Kettle Protestors and Deploy Less-Lethal Munitions Indiscriminately and Without Justification

On May 31, from approximately 9:30 to 9:45 p.m., hundreds of protestors were marching near the Basilica on Colfax between Logan and Pennsylvania, including Plaintiffs Sannier,

---

[8] In his deposition on 4/23/21, DPD Corporal John Sampson confirmed that he and other officers from the gang unit had red stickers on the backs of their helmets and vests. Plaintiffs will supplement when they receive the transcript.
[9] *See also* Ex. 6 ¶¶ 9-13; Ex. 7 ¶¶ 4-5; Ex. 4 ¶¶ 11-13; Ex. 5 ¶¶ 11-18; Ex. 8 ¶¶ 5-8; Ex. 88 ¶¶ 14-32; Ex. 90 ¶¶ 3-10; Ex. 89 ¶¶ 12-19; Ex. 98 ¶¶ 23-27; Ex. 95 ¶¶ 8-16; Ex. 93 ¶¶ 21-33; Ex. 94 ¶¶ 20-25; Ex. 92 ¶¶ 11-23.
[10] *See also* Exs. 44-48, 50-54, 57-62; Ex. 49 at 1:32-3:01:00; Exs. 57-71, 85-87, 97; Ex. 107 ¶¶ 18-23. Exhibit 105 contains a detailed description of each time "less-lethal" weapons were used on protestors during this incident.
[11] According to Lt. Williams, Lt. Michael O'Donnell (TAC 2) and other commanding officers took control of the southeast side of the skirmish line "and had to deploy chemical munitions several times to disperse the crowd and stop them from throwing items at officers." Ex. 55 at DEN 3023; Ex. 103 at DEN 38 (identifying TAC 2 as Lt. O'Donnell). Williams had received instructions from the supervisor/command staff briefing the day before that "CS canisters would only be used when ordered by a command officer." *Id.* at DEN 3021. That is how he instructed his officers. Ex. 20 at 41:3-11.
[12] The time stamps on the APD BWC video is Mountain Time.
[13] Aurora officers did not have pepperball guns or flashbangs at this time or location. Ex. 42 at 18:3-21:5. Because it was Denver and Aurora officers in the skirmish line, use of flashbangs or pepperballs was by Denver officers.

6

Duran, Parkins, and Fitouri.[14] Commander Phelan, via radio, directed one team of officers to push west on Colfax to Pennsylvania and another team to push east to make arrests by trapping protestors in the middle. Ex. 73 at 21:38:01-21:40:00. This crowd-control technique is known as "kettling."[15] On the radio, Phelan is known as A9 or Adam 9 and Lt. Williams is 100.[16] Aurora Captain Redfearn had been directed by the Command Post to use his officers to push protestors west on Colfax from Washington to Pennsylvania, and he carried out the orders given to him by Phelan. Ex. 43 at 22:24-23:12, 98:1-102:8, 103:11-123:25. At 9:38 p.m., Phelan tells the team pushing east, led by Williams, to "make some arrests." Ex. 73 at 21:38:01. Williams asks where Phelan wants him to come in from and says that they are at Colfax and Broadway. *Id.* at 21:38:14-21:38:18.[17] Phelan tells Williams that there's another team pushing towards him and that they should try to make some arrests. *Id.* at 21:38:21. Phelan checks in with Redfearn, and Redfearn reports that his officers have pushed to Pennsylvania. *Id.* at 21:38:59-21:39:13. Phelan tells Redfearn to hold at Pennsylvania and that there are officers pushing west (from the other direction) to assist. *Id.* at 21:39:21. Williams tells Phelan that they are at Colfax and Grant and can push towards the APD officers "but we're gonna be pushing into each other." *Id.* at 21:39:49. Phelan responds, "we'll push 'em there, we'll get 'em, make some arrests." *Id.* at 21:40:00. *See also* Ex. 72 at 21:37:45-21:40:30 (overheard radio communications); Ex. 75 at 9:37-9:44 p.m. (showing APD officers pushing west with "less-lethal" weapons on Colfax), Ex.

---

[14] Ex. 2 ¶¶ 15-27; Ex. 3 ¶¶ 21-37; Ex. 4 ¶¶ 21-37; Ex. 5 ¶¶ 21-35.
[15] Kettling is a controversial police tactic for controlling large crowds during protests. It involves trapping or containing protestors within a limited area in order to arrest them and/or prevent them from leaving. *See, e.g.*, Colin Groundwater, "What is Kettling?," *GQ*, Jun. 5, 2020 (available at: https://www.gq.com/story/what-is-kettling).
[16] Phelan was A9; Williams was 100. Ex. 103 at DEN 38; Ex. 24 at DEN 60.
[17] Based on the discovery conducted to date, Plaintiffs believe that the commanding officer that Phelan is communicating with in this segment is Lt. Williams leading Impact Teams 180 and 380. Lt. Williams led Sgts. Beall and Abeyta and their teams, Impact Teams 180 and 380, at the kettling incident. Ex. 104 at 15-16; Ex. 55 at DEN 3025; Ex. 20 at 19:10-17; 28:4-29:21; 30:16-32:2.

76 at 9:35-9:43 p.m.; Ex. 20 at 101:23-116:24 (Beall testifying about the Basilica incident and noting that the skirmish line(s) formed would have been an order from Commander Phelan).[18]

No warnings were given before the officers shot chemical weapons and projectiles at the protestors, and there was no justification for the use of force. The protestors were terrified. They were hemmed in by a metal fence, large buildings, and lines of police officers on two sides, firing weapons at them. Ex. 3 ¶¶ 21-37; Ex. 4 ¶¶ 21-37; Ex. 5 ¶¶ 27-34; Ex. 90 ¶¶ 11-30; Ex. 91 ¶¶ 7-22; Ex. 92 ¶¶ 24-43; Ex. 42 at 119:11-125:2; Ex. 43 at 127:6-21; Ex. 84 at 25:05-28:50; Ex. 83 at 1:37:11-1:39:11; *see* Exs. 78-82.

### IV.   Command Staff, Led by Commander Phelan, Directed When and What Kind of Force to Use on the Protestors

DPD operated under the Incident Command System during the protests, which "is a standardized approach to the command and control of an emergency response that provides a common hierarchy for first responders, including police." Ex. 99 at 49; *see also* Ex. 43 at 21:20-22:23; Exs. 100-102. Accordingly, each day of the protests, command staff met for a briefing about what actions to take that day and supervisors communicated the plan to their respective teams. Ex. 55 at DEN 3021, 3022, 3025; Ex. 20 at 33:3-18. Supervisors briefed officers on the guidelines for deployment of "less lethal" munitions and use of force. Ex. 55 at DEN 2799, 2834, 2854, 2896, 3403.

During the protests, "CS canisters would only be used when ordered by a command officer." *Id.* at DEN 3021. Pepperballs and chemical weapons could be used "only at the order of a sergeant or above." *Id.* at DEN 2926. The Command Post directed the movements and actions of the officers in the field. *See, e.g.*, *id.* at DEN 2832, 3024. As such, no action was taken without

---

[18] Notably, Sgt. Beall did not turn on his BWC until *after* the kettling incident. See Ex. 77. The HALO camera at Colfax and Logan shows massive use of tear gas and other weapons on protestors between 9:35-9:44 p.m. Ex. 76.

8

being directed by or attributed to Command and leadership. *See e.g.*, Ex. 19 at 40:21-45:7.[19] And specifically, as the Incident Commander over all days of the protest, Commander Phelan was delegated final policymaking authority by the City to make decisions regarding the police response to the protests. *See Brammer-Hoelter v. Twin Peaks Charter Acad.*, 602 F.3d 1175, 1189-90 (10th Cir. 2010).[20]

## LEGAL STANDARD

To obtain class certification, Plaintiffs must demonstrate that the proposed class satisfies the four requirements of Rule 23(a)—numerosity, commonality, typicality, and adequacy of representation—as well as one of the requirements of Rule 23(b). Fed. R. Civ. P. 23(a)-(b); *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). Plaintiffs seek certification under Rule 23(b)(3), which is appropriate when common questions of law or fact predominate over individualized ones and proceeding as a class action is superior to other available methods of adjudication. Fed. R. Civ. P. 23(b)(3); *Tabor v. Hilti, Inc.*, 703 F.3d 1206, 1230 (10th Cir. 2013). Plaintiffs bear the burden of showing compliance with Rule 23. *Treviso v. Adams*, 455 F.3d 1155, 1162 (10th Cir. 2006).

"A district court has broad discretion in determining whether a suit should proceed as a class action." *Kurlander v. Kroenke Arena Co., LLC*, 276 F. Supp. 3d 1077, 1083 (D. Colo. 2017) (citing *Milonas v. Williams*, 691 F.2d 931, 938 (10th Cir. 1982)). This determination involves some, but limited, consideration of the merits: "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage. Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether

---

[19] Tak testified that officers were directly authorized to use pepperball guns to disperse crowds, through the chain of command. Ex. 19 at 47:1-18. Tear gas canisters were thrown by team leaders or supervisors. *Id.* at 53:2-54-3.
[20] *See also Vodak v. City of Chicago*, 639 F.3d 738, 747-51 (7th Cir. 2011) (police superintendent was delegated final policymaking authority for responses to demonstrations).

9

the Rule 23 prerequisites for class certification are satisfied." *Amgen Inc.*, 568 U.S. at 466; *Shook v. Bd. of Cnty. Commissioners of Cnty. of El Paso*, 543 F.3d 597, 612 (10th Cir. 2008) (noting "while a district court may not evaluate the strength of a cause of action at the class certification stage, it must consider, without passing judgment on whether plaintiffs will prevail on the merits, whether remedying the harm alleged can be done on a class-wide basis").

## ARGUMENT

Class certification is proper because the classes are easily ascertainable and the classes satisfy the numerosity, commonality, typicality, and adequacy requirements under Rule 23(a). Furthermore, the classes satisfy Rule 23(b)(3)'s predominance and superiority requisites.

## I.      The Classes Are Easily Ascertainable

In addition to the requirements of Rule 23(a), courts require a class to be ascertainable. *Warnick v. Dish Network LLC*, 301 F.R.D. 551, 555 (D. Colo. 2014). A class is sufficiently ascertainable if it is "administratively feasible for the court to determine whether a particular individual is a member." *Davoll v. Webb*, 160 F.R.D. 142, 143 (D. Colo. 1995). If the class "can be ascertained by reference to objective criteria," then it is adequately defined. *Edwards v. Zenimax Media Inc.*, 2012 WL 4378219, at *4 (D. Colo. Sept. 25, 2012).

Here, each of the Direct Force Classes is easily ascertainable. The Court will be able to identify the members of each class using the following objective criteria: (1) presence at one of the protest locations, (2) within a specified period of time, (3) in a specific geographical area, (4) not engaged in behavior that would pose an immediate and specific threat to the safety of officers or others, and (4) shot by police with projectiles or inhaled aerosolized chemical agents. Other courts have certified classes with similar parameters. *See Puente v. City of Phoenix*, 2019 WL 4849613, at *5 (D. Ariz. Sept. 30, 2019) (certifying class of persons present at a designated

protest area, within a specific period of time, who did not throw objects or attempt to breach barrier, and who were subjected to police force); *see also Multi-Ethnic Immigrant Workers Org. Network v. City of Los Angeles* ("*MIWON*"), 246 F.R.D. 621, 625 (C.D. Cal. 2007) (certifying damages class with nearly identical parameters as proposed here).

The proposed Arrest Class is straightforward and clearly ascertainable. This is especially true because the City maintained records of these arrests, thereby making it easy to determine which persons were arrested solely for violating the curfew order. *See* Ex. 31. There will be no concern that a person who was arrested and engaged in conduct that would warrant exclusion from the class would be included. Accordingly, the classes are sufficiently ascertainable.

## II.  Class Certification Is Appropriate Under Rule 23(a)

### A.  The Classes Are Sufficiently Numerous

The numerosity requirement is satisfied where "the class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1); *Colorado Cross Disability Coal. v. Abercrombie & Fitch Co.*, 765 F.3d 1205, 1214 (10th Cir. 2014). "In determining class size, the exact number of potential members need not be shown." *Neiberger v. Hawkins*, 208 F.R.D. 301, 313 (D. Colo. 2002). Other practical considerations, including the economy gained from avoiding multiple actions, geographic diversity of class members, and financial resources of class members, may be relevant to the Court's decision. *Id.* Courts should use common sense when determining whether a class satisfies numerosity. *Kurlander*, 276 F. Supp. 3d at 1085.

Although the exact number of potential class members is unknown, the proposed classes satisfy the numerosity requirement because each Direct Force Class has roughly 100 or more members. *See* Exs. 2-8.[21] And the Arrest Class consists of nearly 300 people. *See* Ex. 31.

---

[21] Plaintiffs also submit the declarations of several putative class members related to one or more of the classes. Exs. 88-95, 98, 107, as well as the declaration of someone who witnessed similar uses of force during other times during

Further, joinder in this case would be impracticable for other reasons. Given the vast diversity among the protest participants, including differences in age and socioeconomic status, many class members will have limited financial means and limited access to adequate representation, and will not be able to file their own lawsuits unless the classes are certified. For these reasons, the proposed classes satisfy Rule 23's numerosity requirement.

### B. The Classes Satisfy the Commonality Requirement

Rule 23(a)(2) directs that there must be "questions of law or fact common to the class." Commonality requires that the class claims "must depend upon a common contention," meaning that the determining the "truth or falsity" of the common contention "will resolve an issue that is central to the validity of each one of the claims." *Decoteau v. Raemisch*, 304 F.R.D. 683, 688 (D. Colo. 2014) (quoting *Wal-Mart Stores Inc.*, 564 U.S. at 350). Rule 23 does not require that every question be common, rather "for purposes of Rule 23(a)(2) [e]ven a single [common] question will do." *Wal-Mart Stores Inc.*, 564 U.S. at 359 (citation and internal quotation marks omitted).

#### 1. Arrest Class

The summons/complaint forms and the statement of probable cause for the arrest class members are identical. Ex. 31. The statements of probable cause were pre-printed. *Id.*; Ex 106 at 43:23-45:19, 46:22-49:22. It is undisputed that they were all arrested for violation of the emergency curfew order, an express official policy of the City. Exs. 30-31. Success on the Arrest Class's claims hinges on whether officers enforced the curfew in a discriminatory manner against protestors, and whether they did so pursuant to an official city policy. Further common questions include: (1) whether the curfew violated the First Amendment by failing to provide an exception for protected activity; (2) whether the City's policy surrounding the enactment and

---

the protests, Ex. 96. The videos also show numerosity is satisfied for each of the proposed Direct Force Classes. Exs. 10-18, 21-23, 25-29, 32-41, 44-54, 56-72, 75-87, 97.

enforcement of the curfew was designed to suppress class members' First Amendment rights; and (3) whether the curfew arrests violated class members' rights to be free from unreasonable seizure. Thus, the answers to these common questions of fact and law definitively "drive the resolution of the litigation." Courts have consistently certified classes of mass arrestees in protest cases. *Hickey v. City of Seattle*, 236 F.R.D. 659, 664-65 (W.D. Wash. 2006); *Chang v. United States*, 217 F.R.D. 262, 270 (D.D.C. 2003); *Vodak v. City of Chicago*, 2006 WL 1037151 (N.D. Ill. Apr. 17, 2006).

    2. *Direct Force Class 1*

The common questions include: (1) whether command staff, including Commander Phelan and Lt. Canino, dispersed the protest without warning and without providing directions, means, and opportunity to disperse before taking aggressive and injurious police action by ordering the use of tear gas at approximately 8:30 p.m.; (2) whether command staff, including Commander Phelan and Lt. Canino, dispersed the protest through the use of force without regard to whether the individuals against whom such force was used were engaged in conduct justifying such force; (3) whether command staff, including Commander Phelan and Lt. Canino, while dispersing the protest, authorized use of force that caused people to be hit with projectiles or inhale aerosolized chemical agents, although those people were not engaging in conduct justifying such force; (4) whether the conduct described above was a result of the City's policies, practices, or widespread customs; (5) whether the conduct described above violated the First and/or Fourth Amendments. These questions drive the resolution of Direct Force Class 1's claims and are similar to other common questions identified by courts in protest cases where the class was certified. *See, e.g.*, *MIWON*, 246 F.R.D. at 631 ("The LAPD's command decisions to declare an unlawful assembly, disperse the crowd, and authorize the use of force constitute the 'common core of salient facts' that support commonality.").

### 3. Direct Force Class 2

This class has the same common questions to Direct Force Class 1, except that the command staff involved were Lts. Williams and Pine; they ordered the use of force to disperse protestors, and their orders were carried out at 9:10 p.m. The resolution of Direct Force Class 2's constitutional claims are intricately intertwined with the common questions and thus certification is appropriate as to this class.

### 4. Direct Force Class 3

This class has the same common questions to Direct Force Class 1, except that the command staff involved were Commander Phelan and Lt. Porter; they authorized the use of force to disperse peaceful protestors in the parking lot, and the orders were carried out at 4:49 p.m. These common questions drive the resolution of Direct Force Class 3's claims.

### 5. Direct Force Class 4

This class has the same common questions to Direct Force Class 1, except that the command staff involved were Commander Phelan and Lt. Williams, who authorized the use of force on protestors from 6:00-8:00 p.m. CS canisters had to be approved by command staff; this is corroborated by officer statements and video showing supervisors throwing tear gas. Common proof of the DPD's intentions in utilizing force over a period of roughly two hours, without warnings or executing a plan to disperse the crowd, are central to the class claims. Here, a jury could find that the use of tear gas, flash bangs, smoke grenades, pepperballs, and other less-lethal munitions "had the effect [the DPD] intended—dispersal of the crowd," even if just for a temporary period, thus requiring several rounds of the use of force. *Puente*, 2019 WL 4849613, at *6. And a jury could find that the officers' actions were based on centralized decisions by Commander Phelan and Lt. Williams. Thus, commonality is satisfied as to this class.

*6. Direct Force Class 5*

The same reasoning applied to the other classes justifies finding commonality here. This class has similar common questions to Direct Force Class 1. However, the command decisions were by Commander Phelan and an additional common question includes: whether officers (under Lt. Williams's and Capt. Redfearn's command) executed a uniform plan, directed by Commander Phelan, to kettle protestors.

In sum, each class has common questions directly relevant to the classes' claims, including important common questions of both law and fact. Because resolving these questions on a class-wide basis would substantially assist in driving the litigation forward and resolving disputes, the Fitouri Plaintiffs have satisfied the commonality requirement.

### C. The Class Representatives' Claims Are Typical of the Claims of the Class

To satisfy the typicality requirement, the claims of the Fitouri Plaintiffs must be "typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). Rule 23(a)(3) "do[es] not require that every member of the class share a fact situation *identical* to that of the named plaintiff" so long as the class representative's claims and class members' claims "are based on the same legal or remedial theory." *Colorado Cross Disability Coal.*, 765 F.3d at 1216 (internal quotation marks omitted). "The rationale behind the requirement that the class representative's claims be typical of the class claims is recognition that a plaintiff with claims typical of the class will, in pursuing and defending his own self interest in the litigation, be concomitantly advancing or defending the interests of the class." *Dubin v. Miller*, 132 F.R.D. 269, 274 (D. Colo. 1990).

Here, the Fitouri Plaintiffs' claims are typical of the Direct Force Classes and Arrest Class. Their claims arise from the same course of conduct that gives rise to the claims of the other class members in their class and they are based on the same legal theory. Each of them was

15

subjected to DPD's use of force throughout the protests and their experiences, while not identical, are similar not only to one another but to those of other putative class members in their class. Specifically, Plaintiff Sannier's claims are typical to those in Direct Force Classes 1, 3, 4, and 5, and the Arrest Class. The claims of Plaintiffs Fitouri, Parkins, and Duran are typical to those in Direct Force Classes 4 and 5. Plaintiff Taylor's claims are typical to those in Direct Force Classes 2 and 4, and the Arrest Class. Plaintiff Amghar's claims are typical to those in Direct Force Class 4. And finally, Plaintiff Deras's claims are typical to those in Direct Force Class 4. *Compare* Exs. 2-8 *with* Exs. 88-95, 98, 107.

### D. The Class Representatives Will Fairly and Adequately Protect the Interests of the Class

Rule 23(a)(4) requires that representative parties must "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). Adequacy of representation involves two inquiries: "(1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" *Kurlander*, 276 F. Supp. 3d at 1087 (quoting *Rutter & Wilbanks Corp. v. Shell Oil Co.*, 314 F.3d 1180, 1187-88 (10th Cir. 2002). "Once the plaintiffs have made a *prima facie* showing of adequate representation, the burden shifts to the defendant." *Decoteau*, 304 F.R.D. at 689. A presumption of adequate representation is invoked unless the defendants show evidence to the contrary. *Id.*

Here, proposed class counsel, Loevy & Loevy, have significant experience litigating complex federal civil rights cases and class actions. *See* Ex. 74. The Fitouri Plaintiffs' counsel have worked for the past 11 months to identify, investigate, and develop the different classes' claims. Counsel have spent hundreds of hours investigating the facts of this case, conducting extensive factual and legal research, propounding and pursuing discovery requests, reviewing

16

hundreds of hours of video footage from the protests as well as other documentary evidence, drafting pleadings and various motions, deposing several DPD and outside law enforcement personnel relevant to the case, and identifying and interviewing potential class members.

Furthermore, there are no known conflicts between counsel for the Fitouri Plaintiffs and the proposed classes. And the Fitouri Plaintiffs are committed to pursuing the claims of their classes. They have diligently participated in providing information to their attorneys in support of the case and they are prepared to remain informed and involved with the case, and to testify at deposition or trial if needed. They understand and will fulfill their obligation to pursue the best interests of the Class. Accordingly, Rule 23(a)(4) is satisfied, and the Court should appoint Loevy & Loevy as class counsel and the Fitouri Plaintiffs as the class representatives.

### E. Class Certification Is Appropriate under Rule 23(b)(3)

Finally, this Court should grant class certification to each proposed class because the predominance and superiority requirements of Rule 23(b)(3) are satisfied.

#### 1. Common Questions Predominate Over Individualized Ones.

Rule 23(b)(3) "permits certification only if the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members." *Comcast Corp.*, 569 U.S. at 30 (internal quotation marks and citation omitted). "It is not necessary that all of the elements of the claim entail questions of fact and law that are common to the class, nor that the answers to those common questions be dispositive." *CGC Holding Co., LLC v. Broad & Cassel*, 773 F.3d 1076, 1087 (10th Cir. 2014). The predominance inquiry asks only whether "the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues." *Id*.

The common questions described above pertaining to each proposed class predominate over any individualized issues that may arise during the course of this litigation. Notably, while not required, the common questions presented in the Arrest Class will be dispositive of the common constitutional claims: if the answer to these questions is in Plaintiffs' favor, then the Defendant is liable to each member of the class; if the answer to these questions is in Defendant's favor, then no member of the class may prevail against them. And common proof of uniform command decisions and authorizations of dispersal orders and uses of force—particularly the use of tear gas, an indiscriminate weapon—predominate over any individual issues in the Direct Force Classes. *See MIWON*, 246 F.R.D. at 634-35.[22]

Presumably, the City will argue for denial of class certification on the basis that use of force inquiries require an individualized assessment of the reasonableness of the force used and the behavior of the individual against whom force was used. However, each Direct Force Class was subjected to the use of tear gas, pepperballs, and other less-lethal munitions *after* officers were directed to disperse the crowd and use force *by command staff*. Further, even if some officers state that they intended to target specific persons or groups, "the very nature of the use of gas is that it is not contained to a certain individual or a small area." *Puente*, 2019 WL 4849613, at *6. Thus, no individualized inquiries are required to resolve the classes' claims. In cases like this one where a policy or widespread practice is challenged, federal courts routinely find that common questions predominate. *DG ex rel. Stricklin v. Devaughn*, 594 F.3d 1188, 1195-98 (10th Cir. 2010);[23] *Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750, 756 (7th Cir. 2014); *Parson v. Ryan*,

---

[22] *See also Puente*, 2019 WL 4849613, at *7 ("Plaintiffs thus have shown that both factual and legal questions as to the propriety of Defendants' use of gas and chemical agents are common among the proposed class members and predominate over any individual questions."); *Chua v. City of Los Angeles*, 2017 WL 10776036, at *10 (C.D. Cal. May 25, 2017) ("Whether the dispersal order was *per se* adequate is a common question that predominates….").
[23] While the court's analysis was on commonality, its reasoning applies equally to predominance.

754 F.3d 657, 678 (8th Cir. 2014); *Ross v. Gossett*, 2020 WL 1472072 (S.D. Ill. Mar. 26, 2020); *Hill v. County of Montgomery*, 2108 WL 3979590, at *14 (N.D.N.Y. Aug. 20, 2018); *Floyd v. City of New York*, 283 F.R.D. 153, 163-64, 173-74 (S.D.N.Y. 2012).

The Fitouri Plaintiffs also anticipate that the City will argue against certification because the Court may have to conduct individualized inquiries into the damages of each class member. But the "[r]ecognition that individual damages calculations do not preclude class certification under Rule 23(b)(3) is well nigh universal." *Comcast Corp.*, 569 U.S. at 42 (Ginsburg, J. and Breyer, J., dissenting). Thus, "the presence of individualized damages cannot, by itself, defeat class certification under Rule 23(b)(3)" so long as the plaintiffs can "show that their damages stemmed from the defendant's actions that created the legal liability." *Leyva v. Medline Indus. Inc.*, 716 F.3d 510, 514 (9th Cir. 2013); *see also Wallace B. Roderick Revocable Living Tr. v. XTO Energy, Inc.*, 725 F.3d 1213, 1220 (10th Cir. 2013) (noting "there are ways to preserve the class action model in the face of individualized damages"). Certification of a liability class is appropriate "even though other important matters will have to be tried separately, such as damages …." *Tyson Foods, Inc.*, 577 U.S. 442, 452 (2016).

In sum, common questions predominate over individual ones, and any individualized assessments of damages could be managed through various means. This Court should find that the Fitouri Plaintiffs have satisfied the predominance prong.

### F.  Proceeding as a Class Is Superior to Proceeding Individually

Rule 23(b)(3) also requires that a class action is "superior to other available methods for fairly and efficiently adjudicating the controversy." "[C]lass treatment is superior [when] it will achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable

19

results." *CGC Holding Co., LLC*, 773 F.3d at 1096. Here, many potential plaintiffs would not, and financially could not, bring their own claims because of the generally small individual recovery.[24] It would also be quite difficult to find an attorney to represent them in a case seeking redress for these kinds of harms, unless a plaintiff is fortunate enough to obtain pro bono representation. And because common questions predominate, the judicial system would be flooded with cases if every one of the hundreds of putative class members brought their own lawsuit. The probability of inconsistent verdicts if class members are required to bring and litigate their claims individually also supports certification.[25] Judicial and party resources will actually be served best through certification, given the number of individual cases that will result if certification is denied. *Id.* For these reasons, a class action is the most efficient method of adjudication.

## CONCLUSION

For the following reasons, the Fitouri Plaintiffs respectfully request that this Court certify the proposed classes pursuant to Federal Rule of Civil Procedure 23(b)(3) and appoint undersigned counsel to represent the class.

|  | Respectfully submitted,<br>By: s/ Makeba Rutahindurwa |
|---|---|
| Elizabeth Wang, Loevy & Loevy<br>2060 Broadway, Ste. 460, Boulder, CO 80302<br>elizabethw@loevy.com; O: 720.328.5642 | Makeba Rutahindurwa, Loevy & Loevy<br>311 N. Aberdeen St., Chicago, IL 60607<br>makeba@loevy.com; O: 312.243.5900 |

## CERTIFICATE OF SERVICE

I, Makeba Rutahindurwa, an attorney, hereby certify that on April 26, 2021, I served via CM/ECF the foregoing Motion for Class Certification on all counsel of record.

s/ Makeba Rutahindurwa

---

[24] *Kerner v. City & Cnty. of Denver*, 2012 WL 7802744, at *12 (D. Colo. Nov. 30, 2012), report and recommendation adopted, 2013 WL 1222394 (D. Colo. Mar. 25, 2013) (describing this "compelling rationale[]" as the "existence of a negative value suit").

[25] *Seabron v. Am. Fam. Mut. Ins. Co.*, 2013 WL 3713652, at *12 (D. Colo. July 16, 2013) ("A class action may be appropriate if there is a clear threat of multiplicity and a risk of inconsistent adjudications.").