UNITED STATES DISTRICT COURT

DISTRICT OF COLORADO

--------------------------------------------------------

Black Lives Matter 5280 et al.,


            Plaintiffs,


     vs.                    Case Number 1:2020cv01878

                            Cons w/ 1:2020cv01922


City and County of Denver et al.,


            Defendants.

--------------------------------------------------------

Deposition of Patrick Shaker

Friday

March 12th, 2021


-at-


Zoom Remote Deposition

Exhibit 5, LLC

Exhibit 42

```
 1                    APPEARANCES

 2

 3           For the Fitouri Plaintiffs:

 4              Elizabeth C. Wang

 5               Loevy & Loevy

 6                2060 Broadway

 7                 Suite 460

 8            Boulder, Colorado 80302

 9


10

11           For the Fitouri Plaintiffs:

12            Makeba Rutahindurwa

13               Loevy & Loevy

14          311 North Aberdeen Street

15                 3rd Floor

16            Chicago, Illinois 60607

17

18

19         For Plaintiff Michael Acker:

20              Andrew McNulty

21          Killmer, Lane & Newman, LLP

22              1543 Champa Street

23                 Suite 400

24            Denver, Colorado 80202

25
```

```
 1        For the Black Lives Matter 5280 Plaintiffs:

 2                 Gerardo Mijares-Shafai

 3            Arnold & Porter Kaye Scholer LLP

 4               601 Massachusetts Ave, NW

 5                 Washington, DC 20001

 6

 7        For the Black Lives Matter 5280 Plaintiffs:

 8                  Michael J. Sebba

 9            Arnold & Porter Kaye Scholer LLP

10                 250 West 55th Street

11               New York, New York 10019

12

13                 For the Defendants:

14                   Robert C. Huss

15            Denver City Attorneys Office

16               201 West Colfax Avenue

17               Denver, Colorado 80202

18

19                 For Patrick Shaker:

20                   Isabelle Evans

21                   Megan E. Platt

22        City Attorney's Office, City of Aurora

23             15151 East Alameda Parkway

24              Aurora, Colorado 80012

25
```

Exhibit 5, LLC

```
 1            RECORDER:  Zoom is now recording.  Good

 2  morning.  We are now on the record.  Today is Friday,

 3  March 12th, 2021.  The time is now 10:03 a.m.  We are

 4  meeting remotely today for the deposition of Lieutenant

 5  Patrick Shaker in the matter of Black Lives Matter 5280

 6  et al. v. City and County of Denver et al., case number

 7  1:20cv01878-RBJ cons with 1:20cv01922-RBJ-MEH.  The

 8  venue is U.S. District Court, District of Colorado.

 9  Lieutenant Shaker, my name is Brenda Portillo.  I'm a

10  notary public, and I'm recording this deposition on

11  behalf of Exhibit 5, LLC.  This deposition is being

12  recorded remotely via Zoom in accordance with Illinois

13  Public Act 101-0640.  Lieutenant Shaker, would you

14  please confirm your identity by placing a valid picture

15  ID in front of the camera briefly?  Thank you.  At this

16  time, would all attorneys in the virtual room please

17  stipulate that it is okay to administer the oath to

18  Lieutenant Shaker even though he is not currently

19  located in the state of Illinois?

20            MS. WANG:  Stipulated on behalf of the

21  Fitouri Plaintiffs.

22            MR. MIJARES-SHAFAI:  Stipulated on behalf of

23  the BLM 5280 Plaintiffs.

24            MR. MCNULTY:  Stipulated on behalf of

25  Plaintiff Michael Acker.
```

```
1          MR. HUSS:  Stipulated on behalf of the City

2   and County of Denver.

3          MS. EVANS:  Stipulated on behalf of the

4   deponent.

5          RECORDER:  Would that be all of the attorneys

6   in the virtual room?  Thank you.  At this time,

7   Lieutenant Shaker, would you please raise your right

8   hand for the oath?

9               (Witness sworn)

10         RECORDER:  Thank you.  Would the attorneys

11  please state their appearances for the record?

12         MS. WANG:  Elizabeth Wang for the Fitouri

13  Plaintiffs.

14         MS. RUTAHINDURWA:  Makeba Rutahindurwa for

15  the Fitouri Plaintiffs.

16         MR. MIJARES-SHAFAI:  Gerardo Mijares for the

17  BLM 5280 Plaintiffs.

18         MR. MCNULTY:  Andy McNulty for Plaintiff

19  Michael Acker.

20         MR. SEBBA:  Michael Sebba --

21         MR. HUSS:  Robert --

22         MR. SEBBA:  -- for the BLM 5280 Plaintiffs.

23         MR. HUSS:  Robert Huss on behalf of the

24  Defendant City and County of Denver.

25         MS. EVANS:  Isabelle Evans on behalf of the
```

Exhibit 5, LLC

```
 1   deponent.

 2          MS. PLATT:  And Megan Platt on behalf of the

 3   deponent.

 4          RECORDER:  That completes the required

 5   information.  We can proceed.

 6                      EXAMINATION

 7   BY MS. WANG:

 8       Q.   Lieutenant Shaker, could you please state and

 9   spell your name please?

10       A.   Patrick Shaker, S-h-a-k-e-r.              0:02:49

11       Q.   Okay.  And you're a lieutenant now?

12       A.   I am.

13       Q.   Okay.  When did you become a lieutenant?

14       A.   November 21st of 2020.

15       Q.   Okay.  Have you ever been deposed before?

16       A.   I thought so, but now I can't remember.

17       Q.   Okay.  So as you can see, we are here to ask

18   you some questions relating to your involvement in the

19   events underlying this lawsuit.  I represent one group

20   of the Plaintiffs.  Your attorneys may -- may be able

21   to make objections to any of my questions, but because

22   there is no judge here to rule on those objections, you

23   will largely be required to answer those questions, do

24   you understand?

25       A.   Yes.
```

```
 1        Q.    Okay.   Please make sure, you know, as -- as

 2   when you testify in court, please make sure that you

 3   answer questions verbally with a "yes" or "no" as

 4   opposed to a shaking of the head or a nodding of the

 5   head, that way the court reporter can take everything

 6   down, is that fair?

 7        A.    Yes.                                      0:03:56

 8        Q.    Okay.   And it seems like we're -- we're --

 9   because we are doing this virtually, if we have any

10   sort of internet issues or connection issues, or you

11   can't hear me or understand me, or my video freezes up

12   or vice versa, we'll just -- you know, let -- let me

13   know and ask me to -- to repeat the question, and if we

14   have a technological issue that we need to resolve,

15   then we'll go off the record and resolve that, is that

16   fair?

17        A.    Yes.

18        Q.    Okay.   You are free to take a break at any

19   time except when a question is pending, do you

20   understand?

21        A.    Yes.

22        Q.    Okay.   What documents have you reviewed --

23   what documents or video have you reviewed in

24   preparation for this deposition?

25        A.    The only documents or video I have reviewed
```

1  have been the -- specifically the one video file

2  footage from my body-worn camera from the night of May

3  30th -- or the day of May 30th, 2020.

4      Q.   Okay.  And was that when you were at the

5  intersection of Lincoln and Colfax in Denver?

6      A.   Yes.                                    0:05:09

7      Q.   Okay.  Have you -- did you review anybody

8  else's body-worn camera footage?

9      A.   No.

10     Q.   Okay.  Did you review any reports that you

11  wrote in this case?

12     A.   Not for this particular deposition, no.

13     Q.   Have you reviewed the reports that you wrote

14  relating to your involvement in the policing of the

15  Denver protests for any other case?

16     A.   No.

17     Q.   Okay.  And did you do anything to prepare for

18  your deposition -- or did you meet with your attorneys

19  in preparation for your deposition?

20     A.   I did.

21     Q.   Okay.  And how long was the meeting?

22     A.   Approximately two hours.                 0:06:02

23     Q.   Okay.  And when was that?

24     A.   It would have been, I believe -- I would have

25  to check my calendar, but this Monday -- this past

```
 1   Monday.  I don't have the date handy with me, but this
 2   past Monday.
 3        Q.   Monday of this week?
 4        A.   Yes.
 5        Q.   Okay.  Now how long have you been with the
 6   Aurora Police Department?
 7        A.   19 years and it would be almost four months
 8   now, so almost 19 and a half years.
 9        Q.   Okay.  And let me back up for just a second.
10   Is there anybody else in the room with you there?
11        A.   No.
12        Q.   Okay.  Do you have any documents or anything
13   in front of you?
14        A.   No.                                    0:06:59
15        Q.   Okay.  All right.  Can you just briefly walk
16   me through your -- the positions that you have held in
17   the Aurora Police Department since you were hired
18   there, just -- just a brief history of the positions
19   you have had?
20        A.   I started in 2001, attended our basic academy
21   for police applicants, graduated in early 2002, spent
22   time on our patrol division in both a graveyard and a
23   swing -- swing shift capacity, would have been until
24   2005 -- spring of 2005.  From 2005 until 2008, I was
25   the community policing community resource officer with
```

Exhibit 5, LLC

1   the department.  From 2008 to current -- well until

2   2020 -- November of 2020, I was a sergeant -- got

3   promoted to sergeant in 2008, and I've held as a

4   sergeant a position as a patrol sergeant, a community

5   policing sergeant, an internal affairs sergeant, the

6   sergeant over our bicycle unit or our neighborhood

7   policing unit, and then once again, back on our patrol

8   division.

9        Q.   Okay.  And then you became a lieutenant in

10  November of last year, correct?

11       A.   Yes.                              0:08:34

12       Q.   And was lieutenant a position that you -- you

13  wanted to -- that you had to apply for?

14       A.   It was.

15       Q.   Okay.  And why -- why is that?

16       A.   Additional responsibilities, additional

17  tasks, job career progression and development.

18       Q.   Okay.  Have you ever -- it -- it's fair to

19  say -- strike that.  It's fair to say that the Aurora

20  Police Department sent officers to Denver during the

21  protests in Denver in May and June of 2020 to assist

22  the Denver Police Department with -- with their

23  response to the protests, correct?

24       A.   Yes.                              0:09:19

25       Q.   Okay.  And so when I refer to "protests"

Exhibit 5, LLC

1    through this deposition today, I will be referring to

2    the protests that occurred in Denver at -- beginning on

3    May 28th, 2020, is that fair?

4         A.   Yes.

5         Q.   Okay.  Have you ever been involved in

6    assisting Denver in policing any other protests, you

7    know, prior to this one last year?

8         A.   We have on occasion.

9         Q.   Okay.  Can you tell me about those incidents?

10        A.   The only one that I remember or recall would

11   have been -- I could not tell you the dates on it, it

12   was so many years ago, but when there was a rally for,

13   I believe, it was President Trump, during the -- one of

14   the -- or his election down in Denver, we stood by as

15   an assist for them.

16        Q.   This was in -- was this in 2016?            0:10:19

17        A.   I believe so, but again, it was a long time

18   ago, so I couldn't even tell you the exact dates.

19        Q.   Okay.  And what -- when you say you stood by,

20   what -- what do you mean by that?

21        A.   We were asked to be there as an extra force

22   or amount of bodies in case they needed somebody to --

23   to help them with the protests.

24        Q.   Okay.  And were you given any kind of

25   instruction by the DPD for that protest as to what the

1    APD's responsibilities would be or what they were

2    supposed to do during that protest?

3        A.    I don't recall if we were or not.                0:11:18

4        Q.    What do you recall doing during that protest?

5        A.    Sitting in the meeting hall and just waiting

6    in case they needed us.

7        Q.    Okay.  So you were not out on the street?

8        A.    No, not for that one.

9        Q.    Okay.  So you were -- you were just waiting

10   to see if they -- you were there and waiting to see if

11   DPD actually needed you and the other Aurora officers

12   out on the street?

13       A.    And we're talking about the two thousand --

14   possibly 2016 protest, correct?

15       Q.    The Trump -- the Trump one that you

16   mentioned.

17       A.    Yes, we were just there as standby measures

18   in case they needed extra assistance.

19       Q.    Okay.  Did you have any interactions with any

20   protesters or citizens of Denver during that particular

21   protest?

22       A.    Not that I recall.                               0:12:15

23       Q.    Okay.  When did you first learn that the --

24   the Aurora Police Department would be assisting Denver

25   during the protests at issue in this case?

```
 1        A.   If memory serves correctly, it was the Friday

 2   before, so it would have been May 29th.

 3        Q.   Okay.  And so how did you learn what APD's

 4   role would be?

 5        A.   At that time, I didn't learn what APD's role

 6   was -- was going to be, I just know that -- I just was

 7   informed that we were going to be participating in some

 8   fashion.

 9        Q.   Okay.  And who were you informed by?

10        A.   Lieutenant -- then Sergeant Brukbacher who

11   was coordinating ERT resources.

12        Q.   Okay.  And tell me what ERT resources are.        0:13:29

13        A.   ERT is an acronym for emergency response

14   team, and that's our Aurora Police Department

15   contingent that specializes in several different areas.

16        Q.   And then so when -- when you were informed by

17   Lieutenant Brukbacher that APD would be assisting, that

18   was on Friday, May 29th that you had that conversation

19   with him?

20        A.   I believe so, yes.

21        Q.   Okay.  And was it a conversation or was it a

22   written communication that you learned this from then

23   Sergeant Brukbacher?

24        A.   A conversation.

25        Q.   Okay.  And where did this conversation take
```

```
 1  place?

 2       A.   I have no idea.

 3       Q.   Okay.  Do you recall if it was at the Aurora

 4  Police Department?

 5       A.   I believe so or at least one of our

 6  substations of there.

 7       Q.   Okay.  Was it a face-to-face conversation?

 8       A.   From what I recall, yes.                    0:14:42

 9       Q.   Okay.  And what exactly did Lieutenant -- or

10  Sergeant -- I'm just going to call him "Sergeant"

11  because he was sergeant back then, if that's all right,

12  what -- what did he tell you then -- what was the

13  substance of what he said to you?

14       A.   So the substance of what he had told me at

15  that time was we had been aware, obviously, that there

16  were riots going on in Denver, there had been media

17  about it for the last couple of days, and we figured

18  that if it got bad enough, they would be asking for our

19  assistance, so the substance of the conversation I had

20  with then Sergeant Brukbacher was, "We're going to be"

21  or "We're planning on being," and I don't know how that

22  was phrased or what the exact details of it were, but

23  we were planning on heading down to Denver to assist

24  them and we needed to get together a large contingent

25  of our emergency response team members for that.
```

```
 1        Q.    Okay.  And so did -- did then Sergeant

 2   Brukbacher give you instruction as to what you were

 3   supposed to do next in terms of gathering the resources

 4   that you needed and the personnel that you needed?

 5        A.    Yes.                                  0:15:58

 6        Q.    And what did he tell you?

 7        A.    He and I actually worked closely on it, it

 8   was more of a mutual -- between the two of us, who were

 9   then sergeants, getting all the resources together,

10   putting together as many bodies as we could find that

11   were available from our emergency response team to send

12   down to Denver for a possible multiple-day deployment.

13        Q.    Okay.  And so how did you go about gathering

14   the personnel for this assignment?

15        A.    We sat in one of our conference rooms at our

16   police headquarters for a significant part of Friday,

17   into the evening, making phone calls, and I believe a

18   few emails were sent out over city email as well,

19   getting people together, and we may have used our --

20   I'm pretty -- I -- well, I can't say definitively one

21   way or not, because I know we had had issues with it,

22   but we also used maybe our Everbridge, which is our

23   paging system, our automatic paging system for the city

24   -- at that time it was anyway, to notify members and

25   basically finding out availability and getting lists
```

```
 1   and names of people who were there --

 2       Q.   Okay.                                    0:17:17

 3       A.   -- or going to be there.

 4       Q.   Right.  And were the personnel who were

 5   gathered to assist -- from Aurora to assist Denver,

 6   were they all from the emergency response team?

 7       A.   Primarily, yes, but I can't be 100 percent

 8   sure if all of them were actually on the emergency

 9   response team at that time.

10       Q.   Okay.  Did the people who were -- do the

11   people who were on the emergency response team have any

12   kind of particular training with respect to crowd

13   control situations?

14       A.   Yes.

15       Q.   Okay.  Can you describe what that is?

16       A.   Everybody on the emergency response team is

17   required to -- within the first, I believe, year of

18   their initial time on the team, to go through what we

19   -- what is called the EMCADY (phonetic), and I don't

20   have the name of the acronym, it's the FEMA federal

21   recommended crowd management system, go through the --

22   the basic training for that, which is a three-day

23   course, and that is usually taught in-house.

24       Q.   Okay.  And so it's just a -- it's a course

25   that the people who are on the ERT have to go through
```

```
 1   once?
 2        A.   At least once.                              0:18:36
 3        Q.   Okay.  Is there -- is there, like, an initial
 4   training and then follow-up training or, like, yearly
 5   certifications or regular certifications of some kind?
 6        A.   Yes, for the emergency response team, we
 7   schedule, depending on the year, anywhere between six
 8   to 12 trainings, and we -- the expectation is that, at
 9   least the majority of the trainings, they attend.
10        Q.   Okay.  And does that training include
11   training on the use of less lethal weapons?
12        A.   For some people, it does.
13        Q.   And why for some people?                    0:19:14
14        A.   Our less lethal munitions are primarily used
15   by those that are not only certified through the
16   department to be authorized to carry them, but also
17   have gone through additional training to make sure that
18   they are certified, or they are able to carry them with
19   our ERT or crowd management contingents.
20        Q.   Okay.  What kind of less lethal munitions did
21   Aurora officers bring with them to -- to assist Denver
22   in policing the protests?
23        A.   We brought two basic types of less lethal
24   devices or munitions with us.  One was the -- would be
25   the -- the chemical portion of it, and then the -- the
```

1  other portion would have been the kinetic impact or KIP

2  portion of it.

3     Q.   Okay.  And can you tell me exactly what kind

4  of -- what kind of weapons?  And -- and what I'm

5  interested in knowing is just, you know, did the Aurora

6  officers have PepperBall guns, you know, OC canisters,

7  40mm launchers, you know, that kind of thing?

8     A.   For Aurora, for our chemical munitions, it's

9  primarily divided up -- everything that we have for

10 crowd management is hand-thrown munitions,

11 chemical-wise for gas canisters.  We don't -- we don't

12 deploy any launchable munitions, and we haven't -- or

13 haven't at -- since I have been on our emergency

14 response team, ever deployed launchable ones, which

15 means they are fire -- launchable chemical munitions

16 from any of our devices.  They are all hand-thrown

17 canisters, or they are the pepper foggers or pepper --

18 pepper spray canisters that we use, so we use either

19 those that are hand-thrown, gas canister munitions or

20 the chemical pepper sprays that you would see in a

21 bottle normally.  The other types of munitions, the

22 kinetic impact projectiles that we use -- we only use

23 two systems in -- in Aurora, we use the 40 millimeter

24 less lethal launchable system and we use the 12 gauge

25 less lethal sock round munition bean -- or bean bag as

```
 1  it's sometimes called.

 2       Q.   Okay.  Did Aurora have any flash-bangs?

 3       A.   Initially, no.                           0:21:51

 4       Q.   Okay.  And when you say, "Initially, no," do

 5  you recall -- what -- what do you mean by that?

 6       A.   Initially for, I believe, it was at least the

 7  first -- it was for the -- at least the first day, and

 8  I don't believe until late evening Sunday or possibly

 9  Monday -- and I -- again, I couldn't tell you the exact

10  date, we didn't have any because we never bought any.

11       Q.   Okay.  And so just to orient you to the days,

12  the first day of the protest in Denver began on -- it

13  was on Thursday, May 28th, Friday was the 29th,

14  Saturday was the 30th, so was the 30th -- was Saturday

15  the 30th the first day that Aurora went to the Denver

16  protests?

17       A.   Yes.

18       Q.   Okay.  And on Saturday, May 30th, Aurora

19  officers did not have any flash-bangs?

20       A.   No, they did not.                         0:22:49

21       Q.   Okay.  Did -- on Saturday, May 30th, did

22  Aurora officers have PepperBall guns?

23       A.   No, they did not.

24       Q.   Okay.  On Sunday, May 31st, did Aurora

25  officers have any PepperBall guns?
```

Exhibit 5, LLC

```
 1        A.    No.

 2        Q.    Okay.  At any time that Aurora policed the

 3   protest in Denver in May and June of last year, did

 4   Aurora officers have PepperBall guns?

 5        A.    Not to my knowledge, no.                    0:23:39

 6        Q.    And so the -- with respect to flash-bangs,

 7   Aurora officers did not have flash-bangs during the

 8   protests in Denver until likely the late, late evening

 9   Sunday May 31st?

10        A.    Yeah, likely -- it would have been likely the

11   late evening of Sunday the 31st.

12        Q.    Okay.  Great.  So on Saturday, May -- and so

13   you had a chance to review the -- your body-worn camera

14   for Saturday, May 30th, correct?

15        A.    I did.                                      0:24:24

16        Q.    Okay.  So can you just -- just enumerate for

17   me the -- the kinds of less lethal munitions or weapons

18   that Aurora officers had on Saturday, May 30th when

19   they were at the intersection of Lincoln and Colfax

20   between 6:00 and 8:00 p.m.?

21        A.    At that time frame for that particular day,

22   the less lethal munitions that the emergency response

23   team crowd management officers had available to them

24   were the 40 millimeter launcher, the 12 gauge less

25   lethal bean bag launcher, OC pepper spray in whatever
```

1    form it took, and CS gas canisters.

2        Q.   Okay.  Great.  And the CS gas canisters were

3    hand thrown, you didn't have launchers to launch the

4    canisters, correct?

5        A.   Correct.                                    0:25:20

6        Q.   Okay.  On Sunday, May 31st -- or let me

7    strike that.  At any time that Aurora came to assist

8    Denver during the protests last summer, did Aurora have

9    any weapons that allowed them to launch gas canisters?

10       A.   Not to my knowledge.

11       Q.   Okay.  So when Aurora used gas canisters

12   during the protests in Denver last summer, they were

13   hand thrown?

14       A.   Yes.

15       Q.   If there were officers that were firing

16   PepperBall guns on Saturday, May 30th at the

17   intersection of Lincoln and Colfax, those were not

18   Aurora officers, correct?

19       A.   Correct.                                    0:26:11

20       Q.   What other agencies were present at the -- at

21   the intersection of Lincoln and Colfax between 6:00 and

22   8:00 p.m. on May 30th?

23       A.   From my recollection, the agencies that were

24   there -- or at least that I know of that were there

25   were -- were obviously Denver Police Department, they

```
 1   were there, state patrol was also there, and outside of

 2   those two agencies, I don't recall specifically any

 3   other agencies being in that area --

 4        Q.   Great.

 5        A.   -- with Aurora.

 6        Q.   Correct.  Was there a particular -- so with

 7   respect to the state patrol, do you recall -- and let's

 8   just focus on Saturday, May 30th, at the intersection

 9   of Lincoln and Colfax between 6:00 and 8:00 p.m., okay?

10   Do you recall where Colorado State Patrol officers were

11   stationed in that area?

12             MS. EVANS:  Object as to foundation.          0:27:18

13        Q.   And -- and let me -- let me try to just be a

14   little bit more specific, all right?  So -- and -- and

15   -- and you can let me know if I'm incorrect about this,

16   but it appeared from the video that I've -- I've seen

17   that during the time period of 6:00 to 8:00 p.m. on

18   Saturday, May 30th, the -- at the intersection of

19   Lincoln and Colfax, officers had formed a line at

20   Colfax facing south.  They were on the south side of

21   the street facing south, there were a large number of

22   protesters on Lincoln, and the line went east-west --

23   the line of officers, and so from what I could tell

24   from your body-worn camera, it appeared that you were

25   mostly on the southwest corner of that intersection,
```

1   you know, a little bit further away, closer to the park

2   than the Capitol, and so what I am trying to understand

3   is were there Colorado State Troopers in that

4   intersection with your officers, or were the Colorado

5   State Troopers closer to the lawn of the Capitol?

6        A.   That I couldn't tell you, I have -- I have no

7   recollection of them being -- or I had it -- I don't

8   have any knowledge, rather, of them -- where they were

9   at at that time.

10       Q.   Great.  Okay.  The Denver Police Department

11  officers who were present at the intersection of

12  Lincoln and Colfax between 6:00 and 8:00 p.m. on

13  Saturday, May 30th, were they from the metro SWAT team?

14            MS. EVANS:  Object as to foundation.          0:28:57

15       A.   So some of them were, I believe.

16       Q.   Okay.  Do you recall what units other --

17  Denver officers were from?

18       A.   No, I don't.

19       Q.   Okay.  So after you had -- let's go back to

20  your conversation with then Sergeant Brukbacher.  The

21  two of you collaborated in gathering the resources and

22  the personnel that you needed to respond to the Denver

23  protest, correct?

24       A.   Correct.

25       Q.   Okay.  And then did you have -- and then was

1    the -- the first day that Aurora assisted with the

2    Denver protests was the next day, on the 30th, correct?

3        A.   From my knowledge, yes.

4        Q.   Okay.  And did you attend any kind of

5    briefing or information session or meeting with anybody

6    at the Denver Police Department before they sent you

7    out there to assist them?

8        A.   We did.                                0:30:01

9        Q.   Yes?

10       A.   Yes.

11       Q.   Okay.  Can you tell me about when that

12   meeting was and who was there?

13       A.   I don't recall the exact time of it, it was

14   immediately upon our initial arrival down in Denver,

15   and it was at one of the Denver stations, and I believe

16   headquarters, but I can't be 100 percent sure on that

17   either, but I'm pretty sure it was in headquarters.  As

18   to the people who were there in the meeting, I can only

19   speak to who I remember from Aurora being there and

20   that is it.

21       Q.   Okay.  Who from Aurora do you recall being

22   there?

23       A.   From Aurora's contingent, there was then

24   Captain Redfearn, Lieutenant McClelland, I believe

25   Lieutenant Carlson was present for that as well, then

```
 1   Sergeant Brukbacher, Sergeant Serrant as well -- may --

 2   he may have been, I know he was with our contingent,

 3   but I couldn't be as sure if he was in the meeting or

 4   not, Sergeant Carrigan Bennett, and myself are all I

 5   specifically recall being at that.

 6        Q.   Okay.  Do you recall if Lieutenant -- Denver

 7   Police Department Lieutenant James Williams was

 8   present?

 9        A.   I don't.                              0:31:45

10        Q.   Okay.  Do you recall the names of any of the

11   Denver officers or supervisors who were present?

12        A.   I don't.  I'm not very familiar with Denver

13   PD staffing.

14        Q.   Sure.  Okay.  And tell me about what was

15   discussed at this meeting.

16        A.   From what I recall of the -- the meeting, it

17   was primarily on where we were going to be and what

18   roles we had in Denver's -- in -- in the -- the riots

19   that they were having downtown.

20        Q.   Okay.  What did Denver tell you about what

21   your role would be?

22        A.   I don't remember specifically, I had -- I do

23   remember it being a crowd management function and they

24   had us set up in various places downtown.

25        Q.   Did you receive any instruction, at that
```

1    time, from Denver about the circumstances under which

2    less lethal munitions could or should be used?

3         A.   I know there was a conversation held with

4    Denver at a pay grade higher than mine, so --

5    otherwise, higher-ranking Aurora officers had that

6    conversation with Denver, but I don't remember if I was

7    privy to that or not.

8         Q.   Okay.  And do you know who from Aurora would

9    have had those conversations with Denver?

10        A.   Our captain, Captain -- then Captain Redfearn

11   and I don't know if one of our division chiefs was in

12   the meeting or not, but if they were there, that would

13   have been their responsibility, as well.

14        Q.   Okay.  So then -- so there was a Division

15   Chief Darin Parker, do you recall if he was present

16   during the meeting with Denver?

17        A.   I don't recall specifically.  I want to say

18   that I believe he was there from what I recollect.  I

19   think he was there, but with all of the dates that we

20   had and the coming and goings and the changing of

21   personnel, I couldn't definitively say that he was

22   there.

23        Q.   Sure.  So how did you learn that

24   higher-ranking Aurora officers had a conversation with

25   Denver about the circumstances under which less lethal

1    munitions could be used?

2        A.   I specifically remember us talking at one

3    point about less lethal shotguns, as I don't think

4    Denver wanted us to use them, but again, I can't be 100

5    percent sure on this, but there was a conversation

6    revolving around less lethal shotguns and us explaining

7    that we had -- we had to use less lethal shotguns

8    because they were part of our -- our less lethal

9    contingent that we brought down.

10       Q.   What are less lethal shotguns?                0:35:16

11       A.   A less lethal shotgun is a standard -- for

12   our department, for Aurora, standard 12 gauge Remington

13   870 pump action shotgun that has been modified with a

14   high-visibility orange forend and orange stock that

15   designated it -- designates it as a less lethal launch

16   -- launcher only, which means that for these particular

17   shotguns, the only munitions used in them are less

18   lethal, nothing else, and only the less lethal approved

19   through the department, which for ERT is a 12 gauge

20   bean bag sock round either from CTS, Combined Tactical

21   Solutions, or from a company that I do not believe is

22   in business any longer, West Coast Ammunition.

23       Q.   So you were part of a conversation where

24   there -- there was a discussion about whether or not

25   Denver wanted you to -- to use your less lethal

1    shotguns, and what was the outcome of that

2    conversation?

3        A.   The end result was, after talking to whoever

4    it was from our command staff that -- when we were

5    discussing this, was we are keeping the less lethal

6    shotguns and we are going to be using them.

7        Q.   Okay.  And so this was -- your understanding

8    was that Denver did not want you to use the less lethal

9    shotguns, but after a conversation with your command

10   staff at Aurora, they agreed to it?

11       A.   Yes, either they did not want us or they had

12   some concerns about it.

13       Q.   Okay.  But ultimately, if they had told you

14   that they did not want you to use a certain kind of

15   weapon, is that something that you -- that -- that the

16   Aurora command staff would have agreed to?

17           MS. EVANS:  Object to --

18           MR. HUSS:  Object to foundation.              0:37:29

19           MS. EVANS:  -- foundation.

20           MR. HUSS:  Same objection.

21       A.   I would have no idea if they would agree to

22   it or not, way above my -- my rank at that time.

23       Q.   Okay.  Are there any other conversations that

24   you're aware of where -- actually, strike that.  So

25   prior to actually going out into the field in -- in

1  Denver to assist them in policing the protests, is

2  there anything else that you learned about what

3  Denver's parameters were for when less lethal weapons

4  could be used?

5       A.   Not specifically that I recall.

6       Q.   Okay.                                    0:38:21

7       A.   I'm sure there were conversations, but

8  substance-wise, I couldn't tell you what they were.

9       Q.   Okay.  Did they give you -- did -- did you --

10  did you ever have any conversation with either your

11  command staff or anybody at Denver about whether or not

12  Aurora officers should follow Aurora's use of force

13  policies or Denver's use of force policies?

14       A.   I don't recall ever having those

15  conversations.

16       Q.   Okay.  Did Denver ever provide the Aurora

17  officers with any sort of guidance as to what the rules

18  of engagement should be with the protesters?

19            MS. EVANS:  Object to foundation.

20            MR. HUSS:  Object to foundation.          0:39:04

21       A.   I'm pretty sure there were conversations that

22  were had that we -- about the use of force and -- and

23  what type of force is allowed and when.  I know we were

24  operating off from what we had trained on.  Whether or

25  not that is within Denver's policy, I couldn't say, but

1   it was consistent with what we had trained on.

2       Q.   Okay.  So let me know if I'm describing this

3   accurately, but your -- your understanding is that

4   there was a conversation between higher-ranking Aurora

5   officers and Denver personnel about the rules of

6   engagement with protesters, but you were not part of

7   that conversation with Denver directly, correct?

8       A.   From what I recall, yes.                     0:40:05

9       Q.   Okay.  But you -- the substance of the

10  conversation was communicated to you by the

11  higher-ranking Aurora officers?

12      A.   Yes.

13      Q.   Okay.  And the purpose of that would be so

14  that you would know what the rules of engagement were

15  and that you could then communicate that to the rest of

16  your team, correct?

17          MS. EVANS:  Object to foundation.

18      A.   Correct.

19      Q.   Is there -- are there any other meetings that

20  you recall being a part of with any Denver personnel

21  prior to being sent out to police the protests?

22      A.   Not that I recall.                           0:41:00

23      Q.   Okay.  So after this meeting that we had

24  earlier talked about with you and other supervising

25  officers at Aurora and Denver personnel, what did you

```
 1  do next with respect to the protests?

 2      A.   After this initial meeting, we gathered into

 3  our respective squads for our deployment to whatever

 4  positions they had sent us to.

 5      Q.   Okay.  And where did you go?

 6      A.   I specifically could not tell you.  My

 7  position and role changed frequently throughout the

 8  day.

 9      Q.   Okay.  How many people did you have on your

10  squad on May 30th?

11      A.   Exact number, I couldn't tell you due to

12  staffing -- I'd have to find the actual roster, but it

13  would have been anywhere between ten and 12 people

14  specifically on my squad.

15      Q.   Okay.  All right.  Do you recall going to the

16  16th Street Mall during the afternoon on May 30th?

17      A.   Not specifically.                         0:42:26

18      Q.   Okay.  Were you -- Cassidee Carlson is also

19  sergeant -- or she was a -- she was a sergeant at the

20  time, correct?

21      A.   Negative, she was a lieutenant.

22      Q.   Oh, she was a lieutenant.  I'm sorry.  Okay.

23  Okay.  Were you with Cassidee Carlson on the afternoon

24  of May 30th?  And by "afternoon," I mean before 5:00

25  p.m.
```

```
 1      A.   I could have been.  I know I talked to her

 2  throughout the day on a couple of different points, but

 3  I couldn't tell you exact -- what exact times they

 4  were.

 5      Q.   Okay.  Do you recall if you were present for

 6  an incident with protesters on the 16th Street Mall in

 7  a parking lot next to a Target between Welton and

 8  California on the afternoon of May 30th at

 9  approximately 4:45 p.m.?

10      A.   I don't recall that, no.                  0:43:29

11      Q.   Okay.  What are your policies with respect to

12  when your body-worn camera is supposed to be turned on?

13           MS. EVANS:  Object to foundation.

14      A.   The primary policy -- and it's a little

15  lengthy, but the synopsis of the policy is, generally

16  speaking, when in contact with the public.

17      Q.   Okay.  And it -- did you have your body-worn

18  camera with you all -- all day on May 30th?

19      A.   Yes.

20      Q.   Did you have it turned on at any time that

21  you were interacting with members of the public?

22      A.   From my recollection, yes.               0:44:14

23      Q.   Okay.  Did you give any specific instruction

24  to the officers on your squad with respect to what the

25  rules of engagement were on how less lethal weapons
```

1  should be used against protesters in Denver?

2      A.   From my recollection, the guidance I had

3  given those on my squad for less lethal was to be

4  consistent with Aurora Police Department's policy and

5  procedure on use of force.

6      Q.   Okay.  And did your -- did Aurora's policies

7  require the giving of any kind of warning before the

8  use of less lethal weapons?

9      A.   Situationally dependent, cannot -- I cannot

10  give a definitive yes or no on that.

11      Q.   Okay.  Can you describe how it would be

12  situationally dependent?

13      A.   Aurora trains and our policies reflect that

14  if possible -- and I would have to review our exact

15  policies again, but we -- if it's not in policy, our

16  training is, when possible or if feasible, to try to

17  give a warning prior to deploying a less lethal device.

18      Q.   And what are some circumstances under which

19  it might not be possible or feasible to give a warning?

20          MS. EVANS:  Object as to form.              0:46:20

21      A.   Distance, inability to hear, time as in

22  immediate threats or something that is potentially a

23  threat to the individual officer, other officers, or

24  the general public.

25      Q.   Was the use of force by the members of your

1   squad on -- sorry, strike that.  With respect to your

2   assistance in the -- strike that.  With respect to the

3   use of force that you observed your officers deploy on

4   Saturday, May 30th, at the intersection of Lincoln and

5   Colfax between 5:30 and 8:00 p.m., was the use of force

6   by your officers consistent with Aurora's policies and

7   practices?

8           MS. EVANS:  Object to form and foundation.        0:47:23

9       A.   All of the uses of force that I observed were

10  within policy and procedure for the Aurora Police

11  Department.

12      Q.   And were all the uses of force that you

13  observed by your officers consistent with the rules of

14  engagement that you had been provided by the Denver

15  Police Department?

16          MS. EVANS:  Object to form and foundation.

17          MR. HUSS:  Object to form and foundation.

18      A.   From my understanding, yes.

19      Q.   Okay.  And your understanding was from -- you

20  -- you gained your understanding of what the rules of

21  engagement that Denver was giving -- strike -- strike

22  that.  Your understanding of what the rules of

23  engagement were -- that were being provided to you by

24  Denver, that came from your command staff, who had, in

25  turn, spoken to Denver, correct?

```
 1              MS. EVANS:  Object to foundation.

 2              MR. HUSS:  Object to foundation.

 3       A.    That is correct.                      0:48:24

 4       Q.    How many Aurora squads were at the

 5  intersection of Lincoln and Colfax between 6:00 and

 6  8:00 p.m. on May 30th?

 7              MS. EVANS:  Object to foundation.

 8              MR. HUSS:  Same objection -- objection.

 9  Excuse me.

10       A.    Depending on the time, two for sure.  At one

11  point, there were three, and at one point, there may

12  have been four, but I couldn't give an exact number,

13  but two for sure.

14       Q.    Okay.  So that would have been your squad and

15  one other for sure?

16       A.    Correct.                              0:49:33

17       Q.    And what was the other -- who was the

18  supervising officer on the other squad?

19       A.    Sergeant Pat Serrant.

20       Q.    Okay.  And then would he have had between --

21  do you know how many people would have been on his

22  squad?

23              MS. EVANS:  Object to foundation.

24       A.    Depending on the day, again, the makeup was,

25  generally speaking, between ten and 12 people.
```

1      Q.   Did then Sergeant Brukbacher have his own

2  squad?

3           MS. EVANS:  Object to foundation.

4      A.   I don't recall if he had a squad or not that

5  day, I believe he was working in a -- an advisory

6  capacity for our chain of command.

7      Q.   Okay.  With respect to -- sorry, strike that.

8  Can you tell me who were the -- the supervising

9  officers?  And by that -- by "supervising," I mean

10  sergeant or above.  Can you tell me who were the

11  supervising officers from Aurora who were present at

12  the intersection of Lincoln and Colfax on May 30th,

13  between 6:00 and 8:00 p.m.?

14           MS. EVANS:  Object to foundation.          0:50:48

15      A.   The ones I recall are Captain Redfearn --

16  then Captain Redfearn, Lieutenant Mike McClelland,

17  Sergeant Pat Serrant, Sergeant -- then Sergeant Matthew

18  Brukbacher, and then myself.

19      Q.   And do you recall Lieutenant Carlson being

20  present?

21      A.   She was present down there, but I couldn't

22  tell you what the hours were that she was down there.

23  I do remember having conversations with her.

24      Q.   Okay.  And then was there somebody who was,

25  like, a liaison with -- somebody in -- amongst these

```
1   supervisors who were present for Aurora, was there

2   somebody there who was a liaison with the Denver

3   officers?

4           MS. EVANS:  Object to form and foundation.

5           MR. HUSS:  Same objection.              0:51:53

6       A.   I don't recall there being a designated

7   officer as a liaison with Denver from our department

8   specifically.

9       Q.   Okay.  What were you -- and so who was the --

10  in terms of the chain of command, these officers that

11  you mentioned, Redfearn, McClelland, Serrant, yourself,

12  and Lieutenant Brukbacher, and also Lieutenant Carlson,

13  was Captain Redfearn the most senior officer in -- in

14  the chain of command there?

15          MS. EVANS:  Object to form.

16      A.   Depending on the time of day and whether or

17  not Division Chief Parker was present on scene as he

18  had been -- I knew he was present at least at one point

19  in that area, either Captain Redfearn would have been

20  the ranking officer or Division Chief Parker.

21      Q.   Okay.  And then what about amongst -- between

22  yourself, McClelland, Serrant, Brukbacher, and Carlson?

23  I guess you were sergeant at that time, right?

24      A.   Correct.                              0:53:01

25      Q.   Okay.  And then so then did the other -- did
```

1   the lieutenants -- Lieutenant McClelland, Serrant,

2   Brukbacher, and Carlson, were they above you in the

3   chain of command?

4       A.   At that time, the only two that were

5   lieutenants were Lieutenant McClelland and Lieutenant

6   Carlson.

7       Q.   Oh, right.  Okay.  Brukbacher was a sergeant?

8   All right.  All right.

9       A.   Correct.  It's very confusing, there has been

10  a lot of changes in rank for some of us.

11      Q.   Have been promoted.  Okay.  So do you recall

12  there being any Denver Police sergeants who were

13  assigned to your contingent?

14          MS. EVANS:  Object to --

15          MR. HUSS:  Object to found --

16          MS. EVANS:  -- foundation.

17          MR. HUSS:  Object to foundation.

18      A.   We were all having -- or we all had some

19  Denver officer or somebody from Denver assigned to each

20  of our individual contingents from Aurora, but I don't

21  recall if it was a sergeant or not.

22      Q.   Okay.  And who -- who was assigned -- what

23  Denver officer was assigned to your contingent on -- on

24  May 30th between 6:00 and 8:00 p.m.?

25      A.   I have no idea who it was.              0:54:22

```
 1       Q.    Do you remember having -- well what was the

 2  -- do you recall what the purpose was of having a

 3  Denver officer assigned to your contingent?

 4            MS. EVANS:  Object to foundation.

 5            MR. HUSS:  Object to foundation.

 6       A.    I can only speak to my understanding of it,

 7  and my understanding of it was we were going to have a

 8  Denver officer assigned to each of our contingents as a

 9  type of liaison officer to help facilitate

10  communication, make sure that we got good communication

11  back and forth, and for our chain of command to have

12  somebody to speak to who had direct lines with Denver.

13       Q.    Aurora had access to -- or did -- did Aurora

14  officers communicate with Denver -- with Denver's

15  command post via the -- the radio?

16            MS. EVANS:  Object to foundation.

17            MR. HUSS:  Same objection.

18       A.    Yes.                              0:55:11

19       Q.    Okay.  And were you on the radio on May 30th?

20       A.    I had my radio with me, but I don't recall

21  ever getting on the radio.

22       Q.    All right.  Was there -- so can you tell me

23  how it is that Denver -- or that Aurora officers

24  communicated with the Denver command post via the

25  radio?  And what -- what I want to know is, you know,
```

```
 1   did -- did all of the Aurora officers who were present

 2   have access to the radio channel and could communicate

 3   with the command post, or was it that there were

 4   certain officers in Aurora that were designated so that

 5   we didn't have a whole bunch of people on the radio?

 6          MS. EVANS:  Form and foundation.              0:55:52

 7      A.   So I couldn't tell you if everybody on the

 8   line had access to the Denver channel because I'm not

 9   sure what channel we were using that day, but most --

10   the majority of us did have access to it, but only a

11   few of us were actually speaking on it.

12      Q.   Okay.  And so what was the purpose of -- of

13   -- well, strike that.  Do you recall speaking on the

14   radio with the Denver command post on May 30th?

15      A.   Not specifically, but I could have.

16      Q.   Okay.  Do you recall if there were particular

17   supervising officers from the Aurora contingent who

18   were communicating or more with the Denver command post

19   or taking the lead in communicating with the Denver

20   command post?

21          MR. HUSS:  Object to foundation.              0:56:48

22      A.   I couldn't tell you who from our chain of

23   command was actually directly communicating with

24   Denver, but my assumption was that yes, somebody from

25   our chain of command was communicating with our -- with
```

1    the Denver command post.

2        Q.   Okay.  Did you have a radio ID number or, you

3    know, some sort of call sign for radio communications

4    that you used?

5        A.   Nothing specifically assigned for this

6    particular event, I either used my Aurora assigned call

7    sign at the time or plain English.

8        Q.   What was your Aurora call sign?            0:57:35

9        A.   During this time period, it would have been

10   Aurora cruiser 9.

11       Q.   Okay.  Just give me a moment, I'm -- I'm

12   finding a document.  Do you recall -- does the call

13   sign for -- for an Aurora officer P621 mean anything to

14   you?

15       A.   I'm not aware of anybody in Aurora having a

16   call sign of P621.

17       Q.   Do you recall what Brukbacher's call sign

18   was?                                               0:58:51

19       A.   I don't, but it would have been an Aurora --

20   probably would have been an Aurora cruiser something

21   call sign.

22           MS. WANG:  Okay.  All right.  Okay.  Can we

23   take a quick five-minute break?

24           RECORDER:  Sure.  Off the record, 11:02 a.m.

25               (Off the record)

```
 1              RECORDER:  Back on the record, 11:13 a.m.

 2         Q.   Did you ever receive any instruction at any

 3    time from Denver as to whether or not your officers

 4    should give warnings before using less lethal weapons?

 5         A.   I don't recall ever getting those

 6    instructions.

 7         Q.   Did you ever receive any instructions from

 8    Denver with respect to giving protesters a chance to

 9    disperse before using less lethal weapons?

10              MR. HUSS:  Object to foundation.        1:00:06

11         A.   I don't recall ever getting any instructions

12    of that nature either.

13         Q.   Right.  And when I am asking about

14    instructions that you received from Denver, I mean not

15    only directly from somebody in the Denver Police

16    Department, but I mean also communicated to you by

17    somebody in your department who communicated with

18    Denver.  Is that -- do you understand that?

19         A.   Yes.

20         Q.   Okay.  Did you ever receive any instruction

21    from Denver with respect to the appropriate use of 40mm

22    launchers?

23              MR. HUSS:  Foundation.                  1:00:49

24         A.   I don't recall ever getting any specific

25    instruction from Denver on how we are to use our 40
```

Exhibit 5, LLC

1   millimeter, no.

2       Q.   Okay.  The 40 millimeter launchers that

3   Aurora had, were they -- did they launch, like, the

4   foam or rubber bullets from batons?

5       A.   So the Aurora launchers -- the ones we

6   utilize specifically, they launch -- we don't use any

7   rubber bullets, we use what are called foam baton

8   rounds, and what it is is a piece of soft foam that is

9   attached to a plastic casing that is fired from the

10  launching system, and we use either a DefTech blue nose

11  40 millimeter foam baton round or a CTS black nose 40

12  millimeter round, and it's just different manufacturer

13  company in the way they produce them.

14      Q.   Okay.  And did Aurora officers have those

15  foam baton rounds and the 40mm launchers at the

16  intersection of Lincoln and Colfax on May 30th?

17          MS. EVANS:  Object to form and foundation.        1:02:00

18      A.   Yes.

19      Q.   How many -- do you know how many officers in

20  your squad have those launchers?

21      A.   I can't be 100 percent positive, but I

22  believe if one of my officers was -- I believe one of

23  my officers was assigned a 40 millimeter launcher on

24  that date.

25      Q.   Do you know which officer that was?

Exhibit 5, LLC

```
 1       A.   I believe it was Officer Cory Budaj, but I

 2  cannot be sure.

 3       Q.   Okay.  Do you know what Aurora officers from

 4  other squads who were present on May 30th at Lincoln

 5  and Colfax had the 40mm launcher?

 6            MS. EVANS:  Object to foundation.         1:02:53

 7       A.   I couldn't give a complete list of names, I

 8  do recall Sergeant Brukbacher having a 40 millimeter

 9  launcher assigned to him, I believe Officer Spano had a

10  40 millimeter launcher as well and he was down there,

11  and Officer Runyon had a 40 millimeter launcher.

12       Q.   Okay.  Did you ever receive any instruction

13  from Denver at any time that 40mm launchers should not

14  be aimed at people's heads?

15            MR. HUSS:  Object to foundation and form.

16       A.   I'm not sure if I understand the question

17  right.  Are you saying -- are you -- could you rephrase

18  it for me, maybe clarify --

19       Q.   Sure.                                     1:03:53

20       A.   -- it a little bit?  I'm a little confused as

21  to -- to what it means -- what -- what you're trying to

22  -- to ask me.

23       Q.   Sure.  Is it fair to say that you are not

24  supposed to aim a 40mm launcher at somebody's head?

25            MR. HUSS:  Objection.
```

```
 1            MS. EVANS:  Form and --

 2            MR. HUSS:  Form and found -- form and

 3   foundation.

 4      A.    Correct, the training is to aim for the major

 5   muscle areas and certain large body mass areas of your

 6   -- of your target.

 7      Q.    Okay.  And what are the -- the certain large

 8   body mass areas?

 9      A.    Primarily for us, the lower or mid-abdomen

10   area, avoiding the heart, the head, the neck, the

11   groin, and another area that we target as well is the

12   large muscle mass of the thigh.

13      Q.    Did you --

14      A.    There are other target areas as well, but

15   those are the primary ones that we try to aim for.

16      Q.    And what -- with respect to Aurora training

17   and policies, what kind of threat does a person have to

18   pose in order for an officer to be justified in using

19   the 40mm launcher on them?

20            MS. EVANS:  Foundation.                    1:05:07

21      A.    A threat to the safety of officers or

22   civilians or creating a possibility of -- or creating a

23   danger of some kind of violence towards us.

24      Q.    And so did you see any Aurora officers use a

25   40mm launcher at the intersection of Lincoln and Colfax
```

1   on May 30th between 6:00 and 8:00 p.m.?

2       A.   I don't remember any specific uses of the 40

3   millimeter launcher, although I do know that we were

4   utilizing them on that date -- that intersection.

5       Q.   Okay.  Did you see at -- at that

6   intersection, Lincoln and Colfax, on May 30th between

7   6:00 and 8:00 p.m., did you see any Aurora officer use

8   their 40mm launcher in a way that was inconsistent with

9   Aurora's training and policies?

10          MS. EVANS:  Form and foundation.            1:06:06

11      A.   I never saw any of our Aurora officers

12  utilize the launchers other than in the -- the fashion

13  that they were trained to do so.

14      Q.   Did you see any Denver police officers use

15  40mm launchers at the intersection of Lincoln and

16  Colfax on May 30th between 6:00 and 8:00 p.m.?

17          MR. HUSS:  Objection.  Foundation.

18      A.   I don't recall what any of the Denver

19  officers had for less lethal devices specifically on

20  them.

21      Q.   Did you see any Aurora police officers use

22  tear gas at the intersection of Lincoln and Colfax on

23  May 30th between 6:00 and 8:00 p.m. in a way that was

24  inconsistent with Aurora police training policies?

25          MS. EVANS:  Foundation.                     1:07:04

1    A.   I did not.

2    Q.   Did you see any Denver police officers use

3  PepperBall guns at the intersection of Lincoln and

4  Colfax on May 30th between 6:00 and 8:00 p.m.?

5         MR. HUSS:  Objection.  Foundation.

6    A.   Specifically, no, but I do know they were

7  being utilized.

8    Q.   Okay.  Do you recall if there were any --

9  sorry, strike that.  The force that you -- sorry,

10 strike that.  Did you observe any use of force by

11 members of the Denver Police Department at the

12 intersection of Lincoln and Colfax on May 30th between

13 6:00 and 8:00 p.m. that was inconsistent with what

14 Aurora policies were on the use of force?

15        MR. HUSS:  Objection.  Form and foundation.      1:08:14

16   A.   I did not specifically see any of that, no.

17   Q.   Did you have a conversation with other

18 sergeants at the intersection of Lincoln and Colfax on

19 May 30th about Denver's use of force?

20        MR. HUSS:  Objection.  Foundation.

21   A.   Specifically about use of force, no.

22   Q.   Right.  I am going to -- how many police

23 reports do you recall -- did you review -- you didn't

24 review any police reports prior to this deposition, did

25 you?

```
 1      A.   No, I did not.                              1:09:08

 2      Q.   Okay.  What do you recall about what your --

 3 what -- what -- what was Aurora -- what were Aurora

 4 police officers assigned to do at the intersection of

 5 Lincoln and Colfax on May 30th?

 6           MS. EVANS:  Objection.  Foundation.

 7      A.   Our basic direction was to provide a crowd

 8 management function at that intersection.

 9      Q.   And what were you assigned to do to manage

10 the crowd?

11           MS. EVANS:  Foundation.                     1:09:55

12      A.   We were assigned to hold a line in specific

13 areas and other times, to move forward.  It was all

14 dependent on specifically when and -- and what was

15 happening around us.

16      Q.   Okay.  And who provided you and your team

17 with direction about when to hold the line or when to

18 move forward?

19      A.   Primarily, the -- the information that I was

20 getting was either through my chain of command or

21 through observation of the other line officers and what

22 was happening further down the line.

23      Q.   And what was your chain of command on that

24 day, on May 30th at the intersection of Lincoln and

25 Colfax between 6:00 and 8:00 p.m.?
```

1    A.   My direct supervisor at -- on that date was

2  Lieutenant McClelland, and his direct supervisor on

3  that date was Captain Redfearn.  Excuse me.

4    Q.   Do you recall having any conversations with

5  Denver Police Lieutenant James Williams at the

6  intersection of Lincoln and Colfax on May 30th between

7  6:00 and 8:00 p.m.?

8    A.   I don't recall ever having a conversation

9  with him, no.

10   Q.   Okay.  Do you recall any conversations with

11 any Denver police officers at the intersection of

12 Lincoln and Colfax May 30th between 6:00 and 8:00 p.m.?

13   A.   Not specifically.  There were a potential for

14 a number of officers to have been inserted in areas of

15 the line where is at -- where I was at, but those would

16 have been conversations of "are you doing okay?" and

17 that would be about it.

18   Q.   Protesters have a right to protest in the

19 street, correct?

20       MS. EVANS:  Foundation.                    1:12:22

21   A.   It's situationally dependent.  Unfortunately,

22 the question is too broad to give a definitive answer

23 yes or no on that.

24   Q.   Okay.  Let's -- let's assume that we had a

25 large crowd of protesters in the street on Lincoln just

1   south of Colfax and that they were not throwing

2   anything or issuing any kind of threats or assaultive

3   behavior on officers or on anybody else, do they have a

4   right to be there?

5           MS. EVANS:  Form.                          1:12:59

6           MR. HUSS:  Form and foundation.

7       A.   Given the limit of the scope of the -- the

8   hypothetical situation we're talking about here,

9   hypothetically speaking, based upon that, it would,

10  again, be dependent.  If they're in the street and they

11  don't have proper permits to be blocking the street or

12  to be blocking a roadway, then no, they don't have the

13  right to be there.  However, if they have applied for

14  the proper permits, they got street closure approval

15  through the city, or municipality, or county, or

16  whatever jurisdiction that is governing over that, and

17  gotten the approval to do so, then they would be able

18  to do that, again, situationally dependent on what

19  exactly they had gone through, what channel they had

20  gone through, but given the circumstances, blocking the

21  street without getting the proper approval permitting

22  would be illegal, so.

23      Q.   You understand that protests can be

24  spontaneous and frequently are, correct?

25          MS. EVANS:  Form and foundation.

```
1              MR. HUSS:  Same objection.                1:14:03

2        A.   I understand that protests can be

3   spontaneous, but the statement of "frequently are" is

4   way too broad.  In my career, I can speak to numerous

5   times when we've had planned protests.

6        Q.   Okay.  It's fair to say that the protests

7   that arose in Denver and -- and other places around the

8   country last summer in response to the murder of George

9   Floyd were largely spontaneous, correct?

10             MS. EVANS:  Foundation.

11             MR. HUSS:  Objection.  Form and foundation.

12        A.   Many of the protests surrounding the George

13   Floyd incident were indeed spontaneous, yes.

14        Q.   Okay.  The First Amendment protects

15   spontaneous protests, correct?

16             MR. HUSS:  Objection.

17             MS. EVANS:  Foundation.

18             MR. HUSS:  Foundation.                1:14:58

19        A.   The First Amendment protects the rights of

20   the individuals to freedom of speech, however, there

21   are rules and regulations that do surround it.  I don't

22   believe -- and I am not a law enforcement -- or law

23   expert when it comes to higher court decisions on

24   freedom of speech rulings, but from my understanding is

25   -- there are limitations on what freedom of speech is
```

1  allowed and how it is allowed to be carried out.

2       Q.   It's fair to say that with respect to the

3  crowd of protesters who were at the intersection of

4  Lincoln and Colfax on May 30th between 6:00 and 8:00

5  p.m., you were not instructed by the Denver Police

6  Department to clear the street, right?

7            MR. HUSS:  Objection.  Foundation and form.

8       A.   There actually was a point when we initially

9  arrived where -- when we did clear the street.

10      Q.   That was at 5:30, right?                    1:16:03

11      A.   I wouldn't be sure on the exact time.  I'd

12 have to actually review the body-worn camera footage to

13 specifically narrow down the time.

14      Q.   Okay.  There was a point in time when there

15 were protesters further north in the intersection of

16 Lincoln and Colfax closer to that RTD bus turnaround,

17 right?

18           MR. HUSS:  Foundation.

19      A.   Could you repeat the question for me, please?

20      Q.   Okay.

21      A.   Just want to make sure I understand it right.

22      Q.   On May 30th at the intersection of Lincoln

23 and Colfax at approximately 5:30 p.m., there was a

24 large crowd that was in the bus turnaround -- the bus

25 turnaround that's on Colfax between Broadway and

```
 1    Lincoln.

 2            MS. EVANS:  Form --

 3        Q.   Do you recall that?

 4            MR. HUSS:  Form.  Foundation.            1:16:56

 5        A.   I don't recall the bus turnaround, but there

 6    was a large crowd in the street in that area.

 7        Q.   Okay.  And there was a point when Denver

 8    requested you to push the -- to move the protesters

 9    south?

10        A.   Yes.

11            MR. HUSS:  Form.

12        Q.   Okay.  And your instruction was to move the

13    protesters south of Colfax away from the bus

14    turnaround?

15        A.   If there is a bus turnaround in that area,

16    then possibly, but no, specifically -- specifically, I

17    don't remember any direction on a bus turnaround, but I

18    do remember us being directed to assist in pushing

19    protesters specifically out of a -- southbound down the

20    street.

21        Q.   Okay.  And then you and your officers and

22    Denver police officers held the line at Colfax facing

23    south, correct?

24            MS. EVANS:  Foundation.                  1:18:03

25        A.   I believe that's the street that we were
```

1   sitting on, yes.

2        Q.   Right.  And you were not instructed by Denver

3   -- after pushing the protesters south -- south of

4   Colfax so that they were closer to the Capitol, you

5   were not instructed by Denver or given any other kind

6   of instructions to get the protesters out of the street

7   entirely, correct -- at least not before 8:00 p.m.?

8             MR. HUSS:  Form and foundation.

9        A.   Not that I recall, no.

10       Q.   Okay.  And so what was your assignment at

11  that time, what was -- what were -- what were you and

12  your officers assigned to do at the intersection of

13  Lincoln and Colfax between 6:00 and 8:00 p.m.?

14       A.   Crowd management.

15       Q.   Okay.  And so what -- I'm trying to

16  understand what "crowd management" means.  You have a

17  -- you have a -- you had a large number of protesters

18  who were chanting, kneeling, protesting, and so what

19  were you assigned to do to manage that crowd?

20            MS. EVANS:  Form.  Foundation.            1:19:13

21       A.   We were assigned to hold a fixed line

22  position or a semi-fixed line position, again,

23  situationally dependent, in that area.  At that time,

24  from my recollection, they were removing a large amount

25  of landscaping debris, construction material, I

```
 1   believe, from somewhere in that area, as well as

 2   keeping the peace and -- and preventing there being any

 3   further acts of violence against officers and

 4   civilians.

 5        Q.   Did you deploy tear gas on the protesters at

 6   the intersection of Lincoln and Colfax between 6:00 and

 7   8:00 p.m. on May 30th?

 8        A.   What were the times again?              1:20:19

 9        Q.   Between 6:00 and 8:00 p.m.

10        A.   I believe so.

11        Q.   Did you give a warning prior to each

12   deployment?

13             MR. HUSS:  Objection.  Foundation.

14        A.   No, I did not.

15        Q.   Why not?

16        A.    In those specific instances, the warning was

17   not required, nor was it, at this point, appropriate.

18        Q.   Why wasn't it required or appropriate?   1:21:01

19        A.   There is no -- for the appropriate side of

20   it, there -- every time that I had deployed a CS gas

21   canister on the -- on the crowd that -- or at that

22   point, the violent riot that was ensuing, it was to

23   support the Denver officers, specifically the Denver

24   contingent or Denver's overall goal when other tear gas

25   canisters had been thrown.
```

1    Q.   Okay.  So are you saying that you threw tear

2  gas in response to Denver throwing tear gas?

3    A.   Not specifically just for that factor, but in

4  support of that.

5    Q.   Okay.  So when you observed a Denver police

6  officer using a chemical weapon, you did so as well, in

7  order to support them?

8         MS. EVANS:  Object to form.                1:22:07

9    A.   Not 100 percent of the time.

10   Q.   Okay.  And so -- but most of the time?

11        MS. EVANS:  Form.

12   A.   I wouldn't even say most of the time in -- in

13  this particular case.

14   Q.   What percentage of the time?

15   A.   I could not even give an accurate percentage

16  on that, that's way too specific, I'd have to go

17  through and have a much broader overview of what all

18  Denver did on that day.

19   Q.   So why wasn't it necessary -- or I'm sorry,

20  the words you used, I believe, were "appropriate" or

21  "required," correct me if I'm wrong, why wasn't it

22  appropriate or required to give warnings before the

23  deployment of tear gas on the protesters at the

24  intersection of Lincoln and Colfax between 6:00 and

25  8:00 p.m. on May 30th?

```
 1            MS. EVANS:  Form and foundation.              1:23:20

 2            MR. HUSS:  Form and foundation.

 3      A.   Depending on the time frame and the specific

 4   usages -- obviously, each usage is, in and of itself, a

 5   separate incident, it would have been basically for the

 6   overall violent response -- continued violent response

 7   from the rioters in the field.

 8      Q.   There was a crowd of several thousand

 9   protesters, correct?

10            MS. EVANS:  Foundation.

11      A.   From my understanding, yes.

12      Q.   Okay.  Was everybody in the crowd violent and

13   riotous?

14            MS. EVANS:  Foundation.                       1:24:15

15      A.   I couldn't tell you if each and every

16   individual was violent or not.

17      Q.   Well did you observe each and every

18   individual in the crowd being violent or riotous?

19            MS. EVANS:  Foundation.

20      A.   I did not observe each and every individual

21   in the crowd at all.

22      Q.   If there is -- if there are isolated

23   individuals in a crowd of otherwise peaceful protesters

24   who are throwing rocks or doing other kinds of things

25   that are violent, is it justified to use tear gas on
```

1    the entire crowd?

2              MS. EVANS:  Form and foundation.

3              MR. HUSS:  Form and foundation.              1:25:01

4         A.    Situationally dependent.

5         Q.    And tell me why -- what -- why it would be

6    situationally dependent.

7         A.    If there is a large crowd or a large group of

8    people and you're receiving violence from that crowd,

9    be it for -- from individuals or from overwhelmingly

10   the majority of the crowd, depending, if possible, if

11   feasible and safe for the officers to do so, the

12   attempt would be -- it would be -- if the attempt would

13   be possible to do so, the goal is always to take a --

14   take those individuals out of that crowd so that we

15   remove that violent contingent.  However, given

16   protester tactics, the dynamics of crowd management,

17   this is, generally speaking, not feasible due to the

18   number, size, and scope of the crowd and the overall,

19   for lack of better terms, hatred towards the officers

20   on the line, safety would not have been able to be

21   maintained by trying to go in and take out individual

22   people in the crowd.

23        Q.    You are describing the crowd at the

24   intersection of Lincoln and Colfax on May 30th between

25   6:00 and 8:00 p.m. as violent and riotous, correct?

```
 1        A.   From my perception, yes.                   1:26:27

 2        Q.   Okay.  Why didn't you just disperse the

 3   entire crowd?  Why were you there for -- you were there

 4   for several hours until curfew, correct?

 5             MS. EVANS:  Foundation.

 6        A.   Yes, we were.

 7        Q.   Right.  And after the Denver emergency curfew

 8   at 8:00 p.m., it was at that time that officers moved

 9   forward and pushed the crowd south and out of the park,

10   correct?

11             MR. HUSS:  Foundation.

12        A.   Correct.

13        Q.   Okay.

14        A.   Correct.

15        Q.   Why didn't the officers -- why didn't you or

16   the other officers do that before then?

17             MS. EVANS:  Foundation.

18             MR. HUSS:  Foundation.

19        A.   That decision was made well above my rank, so

20   I could not tell you why.

21        Q.   Okay.  Did you ever make any attempt to

22   identify, or locate, or isolate any individuals in the

23   crowd who you believed were committing acts of

24   violence?

25             MS. EVANS:  Form.                           1:27:34
```

Exhibit 5, LLC

```
 1        A.   I never had the ability to do so.

 2        Q.   You did not do so, correct?

 3             MS. EVANS:  Form.

 4        A.   No, I did not do so.

 5        Q.   Did you see any other officer, Aurora or

 6   Denver, make any attempt to isolate any allegedly

 7   violent individuals in the crowd at the intersection of

 8   Lincoln and Colfax on May 30th between 6:00 and 8:00

 9   p.m.?

10             MS. EVANS:  Foundation.

11             MR. HUSS:  Same.

12        A.   Not specifically, no.

13        Q.   Were there announcements given -- any

14   announcements given, prior to the curfew after 6:00

15   p.m. and prior to the curfew, telling the crowd, "This

16   is a riot, it's an unlawful assembly, you must disperse

17   or we'll use chemical weapons on you," is there any

18   kind of announcement like that?

19             MS. EVANS:  Foundation.                    1:28:36

20             MR. HUSS:  Form and foundation.

21        A.   I don't know if that specific verbiage was

22   used, but I do know announcements were made.

23        Q.   Announcements were made before the crowd was

24   moved south of Colfax, correct?

25        A.   From my recollection, yes.
```

```
 1        Q.   After the crowd had been moved south of

 2   Colfax, were there any announcements made ordering the

 3   crowd --

 4             MS. EVANS:  Foundation.

 5        Q.   -- ordering -- ordering the crowd to

 6   disperse?

 7             MS. EVANS:  Sorry.  Foundation.

 8        A.   I don't recall if there were or not.

 9        Q.   I am going to show a document.  Can you see

10   this, Lieutenant Shaker?

11        A.   I can.                                1:29:46

12        Q.   Okay.  I am showing you what's been Bates

13   stamped as COA BLM 55 to 56.  Is this a report that you

14   wrote?  I can -- I can scroll down a little bit.

15        A.   Yes, this is a report -- one of the reports I

16   wrote.

17        Q.   Okay.  Now did you write this report -- when

18   did you write this report?

19        A.   By looking at the date, I wrote that on June

20   4th.

21        Q.   Okay.  This submission -- submission date

22   right here?

23        A.   Correct.                              1:30:34

24        Q.   Okay.  Were you asked to write a report about

25   your -- your actions in Denver, or was this just part
```

```
 1   of your normal procedures?
 2       A.   It's both part of our normal procedures, but
 3   we did specifically ensure that -- or remind all of the
 4   officers in Aurora that they needed to complete reports
 5   for this incident.
 6       Q.   And why is it part of your procedures to
 7   complete reports --
 8            MS. EVANS:  Foundation.
 9       Q.   -- like this?
10       A.   It's documentation to go along with all the
11   other -- other evidentiary -- anything else of
12   evidentiary nature that might be contained or to
13   document an incident when it happens.
14       Q.   Is it important to document uses of force
15   close in time to when the force is used?
16            MS. EVANS:  Form and foundation.          1:31:37
17       A.   If possible, yes.
18       Q.   Now you state in the second paragraph of this
19   report, "On this date, I was involved in several crowd
20   control events throughout the city of Denver.  During
21   my shift, I was stationed at the Capitol building and
22   the adjoining park.  I was assigned to a riot line
23   where several thousand protesters were gathered.  While
24   working this line, the crowd had become extremely
25   violent and riotous.  The rioters were throwing
```

```
 1  numerous items at the officers working the crowd line.

 2  Rocks, bottles, chunks of concrete, and explosive

 3  devices were thrown at officers."  When you reviewed

 4  your body cam video prior to this deposition, did you

 5  see any evidence of explosive devices being thrown at

 6  officers?

 7      A.   Yes.                              1:32:44

 8      Q.   Okay.  What kind of explosive devices were

 9  thrown at the officers?

10           MS. EVANS:  Form and foundation.

11      A.   Unknown on the exact makeup of them because

12  they exploded, but from our recollection, or from what

13  we were able to ascertain, large commercial-grade

14  fireworks.

15      Q.   Was this prior to curfew -- prior to 8:00

16  p.m.?

17      A.   From my recollection, yes, there were two

18  instances that were prior to 8:00 p.m.

19      Q.   Okay.  Did you make any effort or did anybody

20  else, to your knowledge, make any effort to identify or

21  isolate those individuals who were responsible for

22  that?

23           MS. EVANS:  Form and foundation.     1:33:36

24      A.   I don't know if anybody did or not.

25      Q.   Okay.  Did you decide to disperse the crowd
```

1   at that point?

2           MS. EVANS:  Form and foundation.

3       A.   I did not decide to disperse the crowd, no.

4       Q.   No decision was made to disperse the crowd

5   until after curfew, correct?

6           MS. EVANS:  Foundation.

7           MR. HUSS:  Foundation.

8       A.   Again, those decisions were made at a rank

9   higher than mine, so I had no idea what discussions or

10  decisions were made and when they were made.

11      Q.   You state, "During this deployment, I threw

12  an unknown number of canisters of CS gas in conjunction

13  with Denver officers to keep the riotous crowd from

14  overtaking set lines," do you see that?

15      A.   I do.                                    1:34:38

16      Q.   What does that mean?

17      A.   The statement, in and of itself, is I

18  deployed CS gas canisters, along with Denver officers,

19  during the riot.

20      Q.   Why did you write, "in conjunction with

21  Denver officers"?

22      A.   The majority of my -- and from my

23  recollection, I believe all of my use of CS gas

24  canisters was after Denver had already -- or other

25  officers had already thrown gas canisters.

1    Q.   Why was the majority of your CS gas

2  deployment only after Denver -- other officers had

3  thrown it?

4    A.   I had no indications of specifically what the

5  goal, objective was in the overall mission, and I was

6  not privy to any of the discussions on actual specific

7  movements of the line and what we were doing, so this

8  was done in conjunction with Denver, rather than

9  operating individually on my own.

10    Q.   So is it -- is it fair to say that you were

11  following the lead of the Denver officers since you

12  were in their jurisdiction?

13        MR. HUSS:  Objection.  Form.                    1:36:06

14    A.   Yes, it would be fair to say that.

15    Q.   What was the riotous crowd doing to attempt

16  to overtake set lines?

17        MS. EVANS:  Foundation.

18    A.   Throwing rocks, bottles, large chunks of

19  concrete, metal -- metal canisters, explosive devices,

20  and there were a couple of times where they came up in

21  large groups extremely close -- way too close to our

22  line formations.

23    Q.   There were numerous protesters who were in

24  that crowd who were peacefully chanting, some on their

25  knees, correct?

```
 1            MS. EVANS:  Form and foundation.

 2            MR. HUSS:  Same objection.              1:37:03

 3       A.   Unfortunately, the -- the statement's pretty

 4  subjective depending on the time, specific instance

 5  when it was happening and when it was occurring, there

 6  were some people that were chanting on their knees at

 7  given times, there were also other times when they were

 8  not.

 9       Q.   When you decide to use force on a crowd of

10  individuals and there is many of them in the crowd who

11  are peaceful but some who are not being peaceful, is

12  the force against the peaceful people justified?

13            MS. EVANS:  Form and foundation.

14       A.   Depending on the force that is used, it can

15  be.

16       Q.   And can you explain?                    1:37:51

17       A.   If a crowd becomes a riot -- riotous or there

18  is severe potential for serious bodily injury, or

19  bodily injury, or danger to the officers or other

20  people, the crowd needs to be dispersed for the safety

21  of everybody.  Given that, with the lower number of

22  officers, the overwhelmingly large amount of people in

23  given crowds, and the safety considerations with an

24  attempt -- even attempting to try and take individuals

25  out of it, use of force, such as a chemical munition,
```

1    would be acceptable, yes.

2        Q.   If the crowd was riotous, why were you there

3    for two hours using less lethal weapons on them before

4    dispersing them?

5             MS. EVANS:  Form and foundation.

6             MR. HUSS:  Form and foundation.               1:38:49

7        A.   I have no answer for that because that was,

8    again, made above my decision-making ability.

9        Q.   Okay.  We are going to -- I am going to show

10   you a video -- your body-worn camera video that's Bates

11   stamped COA BLM 317.  Give me a moment.  Can you see

12   this?

13       A.   Yes, I can.  I can.                            1:39:43

14       Q.   Okay.  I am going to play it for about 20

15   seconds starting now at this time stamp which is

16   18:01:00.

17             (Video COA BLM 317 played)

18       Q.   Okay.  Could you hear that?

19       A.   I could.

20       Q.   Okay.  So is that -- that's you saying,

21   "Dress it up"?

22       A.   It is.

23       Q.   All right.  And just for the record, I

24   stopped it at 18:01:24.  And what does that mean,

25   "dress it up"?

```
 1      A.   "Dress it up" is just terminology used to

 2 keep our lines straight, consistent, as even as

 3 possible.

 4      Q.   Okay.  And this is Sergeant -- then Sergeant

 5 Brukbacher right here, correct?

 6      A.   Correct.                                1:40:54

 7      Q.   Who is the other person standing next to you

 8 who just asked, "My only question is we're here, what

 9 are we doing?"

10      A.   That would be Lieutenant -- then Lieutenant

11 McClelland.

12      Q.   Okay.  Let me go back and play this

13 conversation between McClelland and Brukbacher.

14              (Video COA BLM 317 played)

15      Q.   Okay.  So McClelland says to you and

16 Brukbacher, "We're here, what are we doing?" and then

17 Sergeant Brukbacher says, "It's Denver's call,"

18 correct?

19      A.   Yeah, from what I -- I heard, yes.

20      Q.   Okay.  And then you state, "I think we're

21 keeping them -- keeping them in the park, it sounds

22 like," correct?

23      A.   Correct.                                1:41:51

24      Q.   Okay.  So Denver was deciding what you guys

25 were doing and what actions you would take, correct?
```

Exhibit 5, LLC

```
 1            MS. EVANS:  Form and foundation.

 2            MR. HUSS:  Objection.  Foundation.

 3       A.   For the overall plan as to what was going to

 4  be done with the crowd, yes, that was Denver's

 5  decision.

 6       Q.   And that's what -- what -- that's what you

 7  understood Brukbacher to mean when he said, "It's

 8  Denver's call," correct?

 9       A.   Correct.

10       Q.   And you responded with, "I think we're

11  keeping them in -- in the park, it sounds like," right?

12       A.   Correct.                              1:42:34

13       Q.   And how did you know that?

14       A.   I don't recall where the specific information

15  came from or if it was just a -- a general overall

16  thought based upon where everybody was positioned and

17  how we were positioned as to what we were doing.

18       Q.   Okay.  I am going to forward to another

19  section of the video.  I am going to play a few seconds

20  starting at 18:16:12.

21            (Video COA BLM 317 played)

22       Q.   Did you hear that?

23       A.   I did.                                1:43:30

24       Q.   So Brukbacher instructs somebody to go talk

25  to a Denver sergeant to ask them what they want -- what
```

1   they want Aurora to do, right?

2       A.   Yes.

3       Q.   And what was your -- what was your

4   understanding of why Brukbacher was telling -- do you

5   know who he was instructing to go talk to the Denver

6   sergeant?

7       A.   I couldn't tell from the video who it was.

8       Q.   Okay.  Do you know what Denver sergeant he

9   was referring to?

10      A.   I don't specifically.  I'm just assuming one

11  down the line.

12      Q.   Okay.  And so again, the Denver supervisors

13  were calling the shots with respect to what they wanted

14  Aurora to do, correct?

15          MR. HUSS:  Objection.  Form and foundation.

16      A.   Overall in the broad sense for the

17  deployment, yes.

18      Q.   Was there some narrow sense in which you were

19  not doing what Denver wanted you to do?

20          MR. HUSS:  Objection.  Form and foundation.     1:44:44

21      A.   Not specifically not doing what Denver want

22  -- didn't want us to do, but more autonomy in our

23  individual actions.

24      Q.   Okay.  I am going to forward it to another

25  clip.  Okay.  I'm going to start playing for a few

```
 1   seconds at 18:21:00.
 2              (Video COA BLM 317 played)
 3      Q.   I'm pausing it at 18:21:13.  This -- this
 4   officer over here was firing something, correct?
 5      A.   From what I could see, it looked like they
 6   were at least pointing something in that general
 7   direction.
 8      Q.   Okay.  These officers who have the little red
 9   sticker on the back of their helmet, were they Aurora
10   officers or Denver officers?
11              MS. EVANS:  Foundation.              1:46:20
12      A.   Some of them could have been Aurora officers.
13   The red stickers, I don't believe, had any specific
14   meaning, but I could be mistaken on that.
15      Q.   Okay.  I'm going to continue playing it for a
16   few seconds.
17              (Video COA BLM 317 played)
18      Q.   I'm pausing it at 18:21:38.  So there is a
19   large amount of tear gas that's been fired into the
20   intersection, correct?
21              MS. EVANS:  Form.
22      A.   I wouldn't say, "A large amount," but there
23   was an amount --
24      Q.   Okay.                                 1:47:19
25      A.   -- sent out into the intersection, yes.
```

Exhibit 5, LLC

```
 1        Q.   So this is at eight -- I've -- rewind it just

 2   so we're at a still shot of 18:21:29.  This, to you, is

 3   not a large amount of tear gas, correct?

 4        A.   From that particular still, no.

 5        Q.   Okay.  What was the reason why this tear gas

 6   was fired at that time?

 7             MS. EVANS:  Foundation.

 8        A.   I couldn't specifically tell you why whoever

 9   threw that wanted to throw that.

10        Q.   The protesters seem pretty far back at this

11   point from -- from Colfax, right?

12             MS. EVANS:  Form.

13             MR. HUSS:  Form.

14        A.   Some of them are, yes.

15        Q.   Well were there -- was there any warning to

16   move back further given to the protesters before the

17   tear gas was used?

18             MS. EVANS:  Foundation.

19             MR. HUSS:  Foundation.

20        A.    Not being directly involved in it, I couldn't

21   tell you what direction was given, if any.

22        Q.   Okay.  So what was the threat that was posed

23   by the protesters at the time that this tear gas that's

24   depicted here was used?

25             MS. EVANS:  Foundation.
```

```
 1       A.   I have no idea.                              1:48:40

 2       Q.   All right.  Let's continue.  I am going to

 3   start playing it for a few seconds at 18:26:12.

 4                (Video COA BLM 317 played)

 5       Q.   I have paused it at 18:26:56.  At this

 6   moment, the crowd is chanting, and they are peaceful,

 7   correct?

 8                MS. EVANS:  Foundation.                   1:49:56

 9       A.   They are chanting.  As to the peaceful nature

10   of them, I can't specifically say due to the frequency

11   and the amount of objects and things that were thrown

12   at us --

13       Q.   Did you see --

14       A.   -- over a given period.

15       Q.   Did you see anything thrown in the clip that

16   we just watched?

17                MS. EVANS:  Form and foundation.

18       A.   From my body-worn camera perspective, I did

19   not.

20       Q.   Okay.  We're going to continue playing it for

21   a little bit.  We're at 18:26:56.

22                (Video COA BLM 317 played)

23       Q.   I have paused it at 18:27:12.  There is

24   PepperBalls being fired from officers on the left side

25   of this line, correct?
```

```
 1            MS. EVANS:  Foundation.                          1:51:00

 2            MR. HUSS:  Foundation.

 3       A.   I can't be 100 percent positive that that's

 4  what those are, but it appears to be consistent with

 5  PepperBalls.

 6       Q.   Do you know what -- what justification there

 7  was for the firing of that weapon?

 8            MS. EVANS:  Foundation.

 9            MR. HUSS:  Form and foundation.

10       A.   Not being that individual officer and knowing

11  what they saw, I can't say.

12       Q.   All right.  We'll continue playing it.

13                (Video COA BLM 317 played)

14       Q.   I have stopped it at 18:27:28.  You just

15  threw a tear gas canister, correct?

16       A.   Correct.                                      1:51:48

17       Q.   What was your reason for throwing that?

18       A.   If you back up the -- the footage a little

19  bit, you can clearly see objects being thrown at our

20  lines, demonstrating a violent encounter, not a

21  peaceful protest.

22       Q.   Did you give any kind of warning before

23  throwing your tear gas?

24       A.   No, I did not.

25       Q.   The object that was thrown was thrown after
```

1   the officers on the left flank had PepperBalled

2   protesters without any apparent justification, correct?

3           MR. HUSS:  Objection.

4           MS. EVANS:  Form and --

5           MR. HUSS:  Form and foundation.              1:52:36

6       A.   Again, the justification of the individual

7   officers who deployed those PepperBalls I cannot speak

8   to because I was not over there.  However, timing-wise,

9   the objects specifically that precipitated me throwing

10  tear gas, it does seem like it was after the initial

11  PepperBalls were fired.

12      Q.   Tear gas is, by its nature, an indiscriminate

13  weapon, correct?

14          MS. EVANS:  Form and foundation.

15          MR. HUSS:  Form and foundation.

16      A.   Not a weapon at all, in fact, it's a

17  deterrent.

18      Q.   Oh, tear gas is not a weapon?

19      A.   By my definition, no, it is not a weapon,

20  it's a deterrent used in crowd management.

21      Q.   Can tear gas cause injury?

22          MS. EVANS:  Foundation.                      1:53:33

23      A.   It possibly can.

24      Q.   What level -- you're familiar with -- strike

25  that.  Is it your belief that tear gas is not -- does

1    not count as -- that -- that an officer who uses tear

2    gas on a civilian is not using any kind of force at

3    all?

4         MS. EVANS:  Form and foundation.

5         MR. HUSS:  Form and foundation.

6    A.   No, that is not my belief.

7    Q.   Okay.  So if we were talking about uses of

8    force and whether a particular use of force is

9    justified or not, you would have to have some sort of

10   justification to use tear gas, correct?

11        MR. HUSS:  Foundation.

12   A.   Correct.                                    1:54:31

13   Q.   And based on your training and your

14   experience, what kinds of -- under what circumstances

15   is the use of tear gas on a crowd justified?

16   A.    When a crowd becomes riotous, such as this

17   crowd right here, the injury to officers is extremely

18   high, be it serious bodily injury, SBI, or even

19   possibly death as we have -- has been documented before

20   in -- in riotous situations.  Tear gas is the lowest

21   level of force we, as a police department or as law

22   enforcement agencies, can use, with the minimal amount

23   of risk of injury to those in the crowd, based on its

24   nature.

25   Q.   So based on your training, is it permissible

Exhibit 5, LLC

```
 1   to use tear gas, which is an indiscriminate use of

 2   force, on a crowd which has some peaceful people and

 3   some non-peaceful people?

 4         MS. EVANS:  Form and foundation.              1:55:39

 5         MR. HUSS:  Objection.  Form and foundation.

 6      A.   Depending on the crowd, the makeup of the

 7   crowd, and how it is reacting to the officers, it could

 8   be.

 9      Q.   So you are not required to justify your use

10   of force on any particular individual in a crowd of

11   protesters, is that right?

12         MS. EVANS:  Form and --

13         MR. HUSS:  Form and foundation.

14         MS. EVANS:  -- foundation.

15      A.   Not particular selected individuals, no.

16      Q.   Normally, when you're acting -- interacting

17   with civilians and you're deciding whether or not to

18   use a certain level of force, you have to ask yourself

19   whether -- what -- what is the -- whether the force

20   that you are using is appropriate in response to

21   whatever that individual was doing, correct?

22         MS. EVANS:  Foundation.

23      A.   Correct.

24      Q.   Okay.  But based on your training and your

25   understanding of the policies of your police
```

Exhibit 5, LLC

1  department, you do not have to justify your actions

2  with respect to any particular individual when you're

3  in a crowd management situation?

4       MS. EVANS:  Form.                              1:56:43

5    A.   Depending on the situation and the type of

6  force you use, you may have to.

7    Q.   And -- and when might you have to?

8    A.   Instances such as kinetic impact projectiles

9  or direct impact munitions that we use, because those

10  are targeting individuals and have a more -- more of a

11  potential for injury to the -- the person who is being

12  affected by them.

13   Q.   Okay.  So PepperBalls count as a kinetic

14  impact projectile, correct?

15       MS. EVANS:  Form and foundation.

16   A.   We don't use them at the Aurora Police

17  Department, so I could not tell you what Denver

18  classifies them as.

19   Q.   Okay.  And so with respect to the kinetic

20  impact projectiles that Aurora uses, you -- you can't

21  just shoot those indiscriminately into a crowd, right?

22   A.   The ones that Aurora uses, no, you cannot

23  shoot them indiscriminately into a crowd.

24   Q.   And what are the circumstances under which

25  Aurora police officers are allowed to use kinetic

```
 1   impact projectiles?

 2          MS. EVANS:  Foundation.                          1:57:56

 3      A.   Aurora officers are trained, and our policies

 4   dictate that, when we are using kinetic impact

 5   projectiles or our direct impact munitions, be it the

 6   40 millimeter or the 12 gauge less lethal bean bag

 7   launcher, each individual officer who is operating that

 8   device has to have justification for the force against

 9   the selected individual, and that is, again, dependent

10   upon what the officer sees and reasonably believes is

11   occurring at the time.

12      Q.   Okay.  Okay.  I am going to start playing it

13   at eighteen thirty eight -- 18:37:10.

14              (Video COA BLM 317 played)

15      Q.   Stop it at 18:37:21.  Did you hear that sound

16   coming from the left side, the popping sound?

17      A.   I did.                                          1:59:25

18      Q.   Okay.  Do you know if those were PepperBalls?

19          MS. EVANS:  Foundation.

20      A.   I could only venture a guess at this point.

21      Q.   What is your belief?

22      A.   My belief is it sounds like PepperBalls.

23      Q.   Do you know what was the reason that those

24   PepperBalls were used at that time?

25      A.   Given the proximity of the PepperBalls to me,
```

 1   I would have no idea what the individual officers were

 2   seeing or were encountering at that instance.

 3        Q.   Okay.  I'm going to play another clip from

 4   18:50:30.

 5             (Video COA BLM 317 played)

 6        Q.   All right.  I am pausing it at 18:51:15.  Is

 7   it fair to say that what this depicts is that there

 8   were officers on the left flank again who began firing

 9   PepperBalls, and then other officers began throwing

10   tear gas and other munitions?

11             MS. EVANS:  Form and foundation.            2:01:26

12        A.   From what I can see from the clip, that seems

13   to be a correct assessment of it.

14        Q.   And you threw a tear gas canister at that

15   time as well, correct?

16        A.   Correct.

17        Q.   What was your reason for throwing the tear

18   gas at that time?

19        A.   In this particular instance, not only was it

20   in support of Denver's tear gas, having the -- the

21   availability -- at least the -- the line of sight to

22   put it where the other tear gas was, I believe, but

23   I'll have to refresh my memory.  I'd have to look at

24   the totality of the other body cameras because mine

25   doesn't catch all of the things being thrown, but this

```
 1   is one of the times when things were starting to be

 2   thrown at us again.

 3       Q.   Okay.  The officers on the left flank who

 4   began firing munitions were Denver police officers,

 5   correct?

 6       A.   I have no idea who it was.                2:02:27

 7       Q.   Were the Denver police officers, the Denver

 8   metro SWAT guys, the guys in green?

 9       A.   Some of them were on the line, yes.

10       Q.   There were other Denver officers who were not

11   in green, correct?

12       A.   Correct.

13       Q.   But the officers who were in green were from

14   Denver metro SWAT, right?

15       A.   That's my understanding, yes.

16       Q.   And the Denver metro SWAT guys were to your

17   left on the southeast corner of this intersection,

18   correct?

19       A.   I'm not sure if that's where they were

20   positioned at this time or not.

21       Q.   Okay.  Let's go to -- we'll start playing at

22   18:57:29.

23                (Video COA BLM 317 played)

24       Q.   Stopped it at 18:57:59.  Tell me what it is

25   that you were telling Sergeant Brukbacher in this clip.
```

Exhibit 5, LLC

1    A.   He and I were having a discussion about our

2  munition levels and how much we had left.

3    Q.   And you told Sergeant Brukbacher that the

4  reason you are low on gas is because you keep having

5  PepperBalls ignite from -- and you point to the -- your

6  left flank, correct?

7    A.   One of the reasons, yes.                    2:04:36

8    Q.   And that having PepperBalls being shot by the

9  officers over there results in other officers using

10 their own -- using tear gas or other weapons, correct?

11   A.   Correct.

12   Q.   During the instances when Denver police

13 officers were using PepperBalls or other munitions at

14 this intersection and then you or your Aurora officers

15 followed up with your own munitions, did you see what

16 it was that Denver was reacting to?

17        MS. EVANS:  Foundation.

18        MR. HUSS:  Foundation.                       2:05:30

19   A.   Their initial reaction, no.

20   Q.   So why would you -- did you -- I mean did you

21 just then throw tear gas or use munitions because

22 Denver was doing so or because you assumed that

23 whatever Denver was doing was appropriate?

24        MS. EVANS:  Form.

25        MR. HUSS:  Form.

1     A.   Again, sometimes the gas was thrown to

2 support Denver, and by "support Denver," I mean add

3 more gas to the quantity so that we had a sufficient

4 amount given the large dispersal area, and other times

5 because of direct violence from the crowd.

6     Q.   You would agree that you need a specific

7 reason to use a munition such as tear gas, correct?

8          MS. EVANS:  Foundation.                    2:06:24

9     A.   Depending on the circumstances, yes.

10    Q.   Okay.  And so when -- when you were talking

11 about supporting Denver, you were saying that it's to

12 make sure that there is enough gas.  If they are

13 throwing gas, then you are going to throw gas to make

14 sure there is enough, right?

15    A.   Sometimes, yes.

16    Q.   Okay.  But you didn't always see why it was

17 that Denver was throwing gas in the first place, right?

18    A.   Correct.

19    Q.   And yet you decided to support them by

20 throwing gas yourself?

21    A.   On a couple occasions, I believe I did.

22    Q.   Why did you do that?                        2:07:07

23    A.   Under good faith of what the officers were

24 seeing, they were encountering violent resistance of

25 some kind that would have caused serious bodily injury

1   -- bodily injury, harm to the officers -- had the

2   potential for doing so, and again, under crowd

3   management, with the gas being the lowest level of

4   force we can use to overcome the violent resistance of

5   a -- of a crowd such as this size, getting the more gas

6   out there as possible is the best course of action.

7       Q.   Okay.  So you -- you just assumed that Denver

8   was -- was utilizing an appropriate amount of force and

9   you followed suit?

10          MS. EVANS:  Form.                      2:07:55

11      A.   In this particular incident, I can't recall

12  if that was the case or if this was one of the many

13  instances where action was taken because of the direct

14  threat to myself and other officers on the line by

15  thrown objects.

16      Q.   I'm going to start playing another clip at

17  19:15:31.

18              (Video COA BLM 317 played)

19      Q.   Did you hear that?                    2:09:12

20      A.   I did.

21      Q.   I stopped it at 19:15:53.  Why were you

22  telling Brukbacher that, "We need to watch these metro

23  guys -- Denver metro guys"?

24      A.   I had an incident where a Denver officer or a

25  Denver metro guy appeared to want to use force on

```
 1   somebody that I did not believe it was appropriate on.

 2        Q.   What was the situation?                        2:09:44

 3        A.   While I was on the line, what I later learned

 4   was a Denver metro SWAT guy, based upon the green

 5   uniform only, I never got a name, came up to me and

 6   told me to spray an individual that was in front of our

 7   lines.  I asked him why, what the person was doing, why

 8   we needed to spray them.  He didn't give me a good

 9   answer or any answer at all that I recall and just said

10   that he needed to be sprayed again, and I told -- I,

11   again, asked him, "Why do we need to use force on this

12   individual?"  I did not get a reason.  At that point,

13   he tried to grab the -- the OC can -- the OC fogger

14   canister or the large OC canister that I was using or

15   had in my hand out of my hand to spray the individual,

16   and I had to physically pull it away.

17        Q.   Do you recall who that person was?             2:10:41

18        A.   I have no --

19        Q.   I -- but --

20        A.   -- idea who that person was.

21        Q.   And I don't mean the -- the individual, I

22   mean the Denver -- the Denver guy, the Denver metro

23   SWAT guy, do you recall who he was?

24        A.   I don't recall who the -- I never got a name

25   on the Denver metro SWAT guy.
```

```
 1        Q.    Okay.  And then when you wouldn't give him

 2   your OC canister -- or your -- I'm sorry, what was it,

 3   spray -- OC spray?

 4        A.    OC spray, yes.

 5        Q.    When you wouldn't give it to him, did he say

 6   anything else?

 7        A.    I don't recall him saying anything else.         2:11:13

 8        Q.    Okay.  So why did you feel the need to bring

 9   this up to Sergeant Brukbacher?

10        A.    This type of behavior is something that, as a

11   supervisor, we need to be aware of and we need to make

12   sure we monitor closely, especially in crowd management

13   situations.  The propensity for long duration periods,

14   you know, officers overextending their -- their

15   physical and their mental -- mental capabilities is

16   great, so one of the things that we always train on is

17   to watch your people and watch people, make sure that

18   they're not getting mentally -- physically and mentally

19   exhausted through the very violent nature of the crowd

20   that they're dealing with.

21        Q.    Well you said to Brukbacher, "They're getting

22   out of control and they're starting to cause problems,"

23   correct?

24        A.    Correct.                                         2:12:21

25        Q.    Okay.  And what -- so you weren't just
```

Exhibit 5, LLC

1  referring to one metro SWAT guy, you said, "Metro guys,

2  they are getting out of control, they are starting to

3  cause problems," you were referring to them generally,

4  correct?

5      A.   Yes.

6      Q.   And so why were you referring to them

7  generally?

8      A.   It was an overgeneralization on my part,

9  based on an individual's actions.

10     Q.   And what were the problems that they were

11  starting to cause, the Denver metro SWAT guys?

12          MR. HUSS:  Objection to form and foundation.    2:13:04

13     A.   Again, this specific instance where I had the

14  Denver metro SWAT guy attempt to use force on somebody

15  who I do not believe it was reasonable to use force on.

16     Q.   Okay.  I am going to play another clip from

17  19:18:16.

18              (Video COA BLM 317 played)

19     Q.   I have stopped it at 19:18:33.  So who are

20  you talking to?

21     A.   One of the other officers on the line, and

22  I'm not sure who specifically that was.

23     Q.   And what you said to him is that you have a

24  couple of the Denver guys -- "just keep your cool, I've

25  already had a couple of the Denver guys get a little

1    out of hand," right?

2         A.   I -- I'm sorry, I was -- think there was a

3    question attached to it.  So you're just asking me

4    that?

5         Q.   Yeah.  You were referring to a couple of the

6    Denver guys getting offhand -- out of hand, right?

7         A.   Correct.                               2:14:55

8         Q.   Okay.  And so why -- why were you having this

9    conversation with one of your officers?

10        A.   Frustration on my part.

11        Q.   And what were you frustrated with?

12        A.   The totality of the circumstances.

13        Q.   What do you mean by "the totality of the

14   circumstances"?

15        A.   Long hours in a gas mask and a long

16   deployment, meeting a very violent and very resistive

17   crowd, where many of us had been subjected to physical

18   bodily injury at that point.

19        Q.   If the crowd was so violent, why didn't you

20   just disperse them all like you did after curfew?

21             MS. EVANS:  Form and foundation.          2:15:47

22        A.   Again, as I stated before, this is a decision

23   that is made at the command levels way above my -- at

24   that time, my -- my rank, so that was not a discussion

25   that I was a part of or I had any input in.

1      Q.   You would agree that if Denver officers use

2   unnecessary or unjustified force on protesters, it

3   could make the situation worse, right?

4           MS. EVANS:  Foundation.

5           MR. HUSS:  Objection.  Foundation.

6      A.   Unnecessary force by anyone could make a

7   situation worse, yes.

8      Q.   Right.  So if a Denver metro SWAT guy or any

9   Denver officer decided to spray a guy -- or spray a

10  protester in the face for no good reason, that could

11  make that protester and the other protesters angry,

12  right?

13          MS. EVANS:  Form and foundation.

14          MR. HUSS:  Form.  Foundation.

15     A.   It could potentially, yes.                    2:16:44

16     Q.   And one of the things that you have to be

17  cognizant -- cognizant of in a crowd control situation

18  is making sure that everybody keeps calm and uses only

19  the force that is necessary so that the protesters

20  don't overreact?

21          MS. EVANS:  Foundation.

22     A.   I can't go so far as to say, "Everyone,"

23  because it would be impossible -- physically impossible

24  for one individual to keep track of that many

25  individual -- many individual officers on a line, but

1    within your short span of control, you do your best to

2    make sure they aren't -- you're aware and at least

3    cognizant of the other officers on the line and making

4    sure that they're not getting mentally fatigued.

5        Q.   And do you think that the Denver officer who

6    wanted to spray a protester in the face for no good

7    reason was just getting fatigued?

8            MS. EVANS:  Form and foundation.

9            MR. HUSS:  Form.  Foundation.              2:17:40

10       A.   I cannot speak at all to that individual

11   officer's mentality or state of mind or his physical

12   well-being.

13       Q.   Okay.  I am going to play another clip.

14   We're at 19:22:17.

15               (Video COA BLM 317 played)

16       Q.   I stopped it at 19:22:48.  What was the shit

17   that you saw Denver officers do they shouldn't have

18   been doing?

19       A.   Specifically referring to that one particular

20   incident where the officer -- the Denver officer tried

21   to take the OC out of my hand.

22       Q.   And why were you having this conversation

23   with sergeant -- or Lieutenant Carlson?

24       A.   Because she is -- or, at that time, she was

25   in charge of a platoon or multiple squads of

1  individuals and just now coming up on the line, or at

2  least from what I knew, she was up on the line

3  relatively shortly, just to keep her aware of the

4  potential for some of the problems we may have.

5      Q.   Why did you say you've "had a couple of them

6  do shit that they shouldn't have been doing," you

7  weren't just referring to one?

8      A.   Again, overgeneralization on my part.          2:20:01

9      Q.   She responded with, "Yeah, they keep chasing

10  people."  Do you know what she was referring to?

11          MS. EVANS:  Foundation.

12      A.   I can only speculate --

13      Q.   What is your belief?

14      A.   My only speculation would be we had -- I

15  could see -- and I didn't know if it was Denver

16  specifically, but from what she had told me, she must

17  have had more information on what was going on, but

18  from up at the left -- what would have been the left

19  side of my flank, there were people going out into the

20  -- there was a large group that would go out

21  occasionally into the crowd or I'd see them moving

22  forward -- forward of our line occasionally, but I

23  don't know the reasoning behind it.

24      Q.   All right.  Let me find another clip.  Just a

25  moment.  I'm going to play it -- play the video from

```
 1   19:28:46.

 2              (Video COA BLM 317 played)

 3      Q.   I stopped it at 19:29:11.  So this

 4   conversation is one that you're having with Lieutenant

 5   McClelland, correct?

 6      A.   Correct.                              2:22:05

 7      Q.   Okay.  And he is saying that he told Cassidee

 8   to watch herself around Denver, right?

 9      A.   Correct.

10      Q.   Do you know what he is referring to?

11      A.   I can only speak to the -- what I know of the

12   one individual incident, is the one that I had brought

13   to his attention.

14      Q.   That you had brought to McClelland's

15   attention?

16      A.   Correct.

17      Q.   Did you -- do you know whether he witnessed

18   something else involving the Denver officers that you

19   had to watch yourself around?

20           MS. EVANS:  Foundation.

21      A.   I don't know of anything specifically that he

22   saw, no.

23           MS. WANG:  All right.  Let's take a

24   five-minute break.

25           RECORDER:  Off the record, 12:37 p.m.        2:23:11
```

```
 1                     (Off the record)

 2              RECORDER:  Back on the record, 12:52 p.m.

 3         Q.    Lieutenant Shaker, you had earlier mentioned

 4    that it was not feasible to enter the crowd or to

 5    identify specific individuals causing problems because

 6    their hatred of police officers on the line made it

 7    unsafe.  Do you recall saying that?

 8         A.    Something similar to that, yes.

 9         Q.    Okay.  What made you believe that the

10    protesters hated police officers?

11         A.    Specifically, the individuals in the crowd

12    that were throwing things at us that could potentially

13    cause SBI or death, also based upon the fact that some

14    of the chants that we were getting -- some of the --

15    the reactions of the crowd, specifically the things

16    that were said at the officers, "I F" -- you know, well

17    to be very blunt, "I fucking hate you, I hope you die,"

18    some of the other things that were said to us of,

19    "You're disgraceful, we hate you," the things that were

20    said by the particular protesters in this case towards

21    the officers at the line.

22         Q.    These protests that occurred last summer were

23    -- arose because of the police killing of George Floyd

24    in Minneapolis, correct?

25              MS. EVANS:  Foundation.                    2:24:46
```

```
 1        A.   The incident with George Floyd is what
 2   precipitated many of these protests, yes.
 3        Q.   Correct.  And the protesters' view was that
 4   the police routinely use excessive force, particularly
 5   on people of color, right?
 6             MS. EVANS:  Form and foundation.
 7        A.   Are we asking overall generally or --
 8        Q.   What was the message --
 9        A.   -- specifically with this protest?
10        Q.   Let's talk about this protest in Denver,
11   their message was one of protesting, they were
12   protesting the police, right?
13             MS. EVANS:  Form and foundation.
14        A.   I believe the police were part of the protest
15   -- what they were protesting, but also, I thought there
16   were other issues with other -- other functions of city
17   government that they were also protesting.
18        Q.   Well they -- they wanted justice for victims
19   of police violence, right, that was a message that you
20   heard?
21             MS. EVANS:  Form and foundation.          2:25:59
22        A.   One of the many messages, yes.
23        Q.   Okay.  Tell me what the messages were that
24   you heard at the Denver police -- at the Denver
25   protests in May and June of 2020, the messages from --
```

1   being communicated by the protesters.

2       A.   Some of the varying messages that I recall at

3   least hearing about was the government is corrupt, that

4   the police are violent, that the police are taking away

5   people's civil liberties and rights, among other

6   things.

7       Q.   Would you describe this protest as different

8   than -- have you -- you've policed other -- have you

9   policed other protests, whether in Denver or Aurora or

10  other places?

11      A.   This is actually the first protest that I was

12  personally involved in, where I was actually

13  encountering people on the street.

14      Q.   Okay.  Do you know if this protest was --

15  felt different to you as a police officer because the

16  message of the protesters was -- was anti-police?

17          MS. EVANS:  Form and foundation.            2:27:11

18      A.   Specifically for me, this was no different

19  than any other protest.  Again, not having the basis to

20  found it on, I couldn't tell you if I would have felt

21  differently if I had been under a different -- or been

22  involved in different protests in a working capacity

23  for different issues or situations, but being this is

24  the first real life scenario that pretty much all of us

25  from Aurora contingent had faced, I can just tell you

1  that, for me, it was a mission, a specific job, and the

2  way I felt about it was I had a job and a task at hand

3  and I needed to do it, and that was it.

4      Q.   You had a belief that the protesters were

5  particularly violent because of their message and that

6  it would be unsafe to go into the crowd to isolate

7  specific individuals because of the message that the

8  protesters were communicating to you, correct?

9          MS. EVANS:  Form and foundation.            2:28:11

10     A.   The specific messages and actions directed at

11 our individual officers and at our officers as a whole

12 who are out there specifically on this line, yes.  I

13 believe that there was a severe safety issue with

14 trying to go into the crowd.

15     Q.   And so your perception of whether it would be

16 safe to attempt to isolate specific individuals in the

17 crowd was formed, in part, based on your belief that

18 these protesters would be more dangerous to officers

19 given their hatred for police?

20         MS. EVANS:  Form and foundation.            2:28:49

21     A.   Given the message that was conveyed to us,

22 yes.

23     Q.   Did -- did the message that the protesters

24 were communicating to you and your officers, that

25 police officers are violent and police officers violate

```
 1   people's rights and police -- you know, police officers

 2   -- their -- did their message about police officers

 3   anger you?

 4       A.   Specifically me, no.                        2:29:35

 5       Q.   Did -- did you see it anger other officers

 6   who were in your squad who policed the protests?

 7            MS. EVANS:   Foundation.

 8       A.   Nobody specifically that I saw, no.

 9       Q.   Did you ever have any conversations with any

10   supervising officer from the Denver Police Department

11   on May 30th, 2020?

12       A.   Not that I recall, no.

13       Q.   Did you police the protests in Denver on May

14   31st, Sunday?

15       A.   I did.                                       2:30:24

16       Q.   Okay.  And what do you recall doing on that

17   day?

18       A.   I recall having several different stations or

19   assignments throughout the given course of the day and

20   it was dependent on the time of the day and -- and

21   where we were stationed at the time as -- what we were

22   doing.

23       Q.   Did you view any body camera -- any body-worn

24   video for yourself for May 31st?

25       A.   I did not.
```

```
 1      Q.   Okay.  I'll represent to you that we have not
 2  been produced any from you for May 31st.  Was your
 3  body-worn camera on, were you -- and were you wearing
 4  it?
 5      A.   My body-worn camera was actually on my person
 6  and I was wearing it, but it did not capture any video.
 7      Q.   Why not?
 8      A.   It had a malfunction at the beginning of my
 9  shift where I noticed that my body-worn camera had not
10  charged at all or very little at the very least.
11      Q.   When you are wearing a body-worn camera, do
12  you decide when to turn it on and off?
13      A.   Generally speaking, yes.                    2:31:35
14      Q.   And what do you mean by "generally speaking"?
15      A.   "Generally speaking," I mean, basically, if I
16  am going to have it on -- it -- and it depends on your
17  -- what you're talking about "on and off."  Like,
18  turning the whole camera on and off as a whole, like
19  the whole set, or actually activating it to record
20  video, because it -- the camera actually will function
21  in two different modes and it -- my answer is going to
22  have to depend kind of on what you mean with that one.
23      Q.   Sure.  I mean to have it record.
24      A.   So to record it, yes, you have some
25  discretion -- limited discretion in -- in when you can
```

1  and cannot turn off your body-worn camera.

2      Q.   And what are the guidelines or the rules?        2:32:17

3      A.   Generally speaking, the guidelines are you

4  turn it on when you're in contact with the public, you

5  can turn it off for specific private conversations,

6  conversations involving tactics that may not be

7  something that they want on body-worn camera, or for

8  other unrelated police matters, and occasionally, as

9  well at -- we have the discretion, depending on the

10 circumstances and approval from a supervisor, to turn

11 it off at the request of a citizen if they wish us to

12 not record.

13     Q.   Now do you recall being on -- on May --

14 sorry, strike that.  On Sunday, May 31st, from 8:30 to

15 10:00 p.m., do you recall being in the Colfax quarter,

16 you know, between the -- the Denver Police Department

17 at Colfax and Washington towards the west -- towards

18 the Capitol, do you remember being on Colfax?

19     A.   I believe I was.  Is that the Denver district

20 six that you are referring to?

21     Q.   Correct.  So Denver district six is at the

22 intersection of Colfax and Washington.

23     A.   I do remember being there, yes.             2:33:35

24     Q.   Okay.  So what do you recall -- in that time

25 period from about 8:30 to 9:45 p.m. on Sunday, May

1  31st, what do you recall being your assignment?

2     A.   My initial assignment when I went down there

3  to that specific location, my squad was -- we had set

4  up on a side street bordering the police station to

5  give extra protection or -- or additional protection

6  along the sides of the -- the department or that

7  particular building, so they had more bodies out there

8  to keep people or specifically large protest groups

9  from getting access to the main body of the police

10 station.

11    Q.   So I'll represent to you that the Denver

12 Police Department is between -- that district six is on

13 Colfax between Washington and Clarkson, and so

14 Washington is on the west side and Clarkson is on the

15 east side.  Do you recall if your -- if you were

16 stationed on -- on Washington or on Clarkson?

17    A.   I don't.  I -- I will apologize, I have very

18 little knowledge of downtown Denver and my geography

19 skills when it comes to the interior of Denver are not

20 great.

21    Q.   Sure.  Okay.  So generally speaking, though,

22 on Sunday, May 31st, do you recall your assignment to

23 be -- to assist in guarding the -- district six?

24    A.   Yes.                                    2:35:15

25    Q.   Okay.  And so you don't recall -- well what

1   do you recall doing to -- to assist in that task?

2       A.   I recall I had my squad or at least portions

3   of my squad set up along a side street, not one of the

4   main -- main thoroughfares, and we were watching

5   several alley access points that would gain access to

6   close to the police department from -- from the side.

7       Q.   Okay.  And did you -- was there -- do you

8   recall there being a large group of protesters who were

9   marching -- at about 8:30 p.m. on Sunday, May 31st, do

10  you recall there being a large group of protesters who

11  were marching from the Capitol east on Colfax past the

12  police station?

13      A.   I don't recall them specifically doing that,

14  but I know there was a large group of people out there

15  in that area.

16      Q.   Okay.  Well so you said you set up on a side

17  street, you and your squad?

18      A.   Yes.                                2:36:28

19      Q.   And do you recall what street that was?

20      A.   I do not, no.

21      Q.   Okay.  Since we don't have body-worn camera

22  for you for this date, I will pull up Google Maps just

23  to see if you might recall what street you were on.  So

24  actually, let me go back to the overhead map.  So I'm

25  sure -- can you see this map?

Exhibit 5, LLC

```
 1       A.   I can.

 2       Q.   Okay.  This is -- I am showing you Google

 3  Maps, an overhead satellite view, this is Colfax here,

 4  Washington, and Clarkson, district six is over here,

 5  and -- right here, and there is a large parking lot

 6  between 16th and Colfax, where the police department

 7  is.  So just to orient you a little bit, I'm zooming

 8  out, the Colorado State Capitol is to the west of the

 9  police station.  So what I would like to know is, if

10  you recall -- I am doing a street view now of Colfax

11  and Washington, and I just want to try to orient you a

12  little bit to the landmarks that are here to see if it

13  jogs your recollection.  So we are now facing -- this

14  street view, we are now facing south on Washington,

15  facing south and Colfax is in front of us, there is a

16  SliceWorks and an Argonaut on the southeast corner of

17  this intersection, and then there is a Romantix adult

18  boutique on the northwest intersection, and then the

19  police department is over here on the northeast

20  intersection of Washington and Colfax.  Does this at

21  all jog your recollection as to whether you were at the

22  intersection of Colfax and Washington on Sunday, May

23  31st?

24       A.   It does, it helps.                    2:38:47

25       Q.   Okay.  Were you at this intersection?
```

Exhibit 5, LLC

```
 1      A.   I don't recall actually ever being in that
 2  physical intersection there, but we were close by to
 3  it.
 4      Q.   Okay.  Let me go down one block to Clarkson,
 5  okay?  We're now still on street view on Google Maps.
 6  Now at Colfax at Clarkson, there is a Good Times across
 7  the street to the south, there is the Fillmore
 8  Auditorium across the street to the north, and again,
 9  the police department here is to the northwest of this
10  intersection.  Does this refresh your recollection at
11  all as to whether you were at this intersection of
12  Colfax and Clarkson or Colfax and Washington?
13      A.   I would have been closer to the Colfax and
14  Washington intersection, not Colfax and Clarkson.  That
15  doesn't look familiar to me at all.
16      Q.   Okay.  Thank you very much for that.  So do
17  you recall -- let's go back to the overhead map,
18  actually, and so let me pull that up again.  Here is a
19  satellite view of police -- Denver Police district six.
20  Now when you say you were set up on a side street, do
21  you recall what side street you were at?
22      A.   From looking at the overhead map, I believe
23  the side street that I'm referring to is actually
24  Washington Street.
25      Q.   Okay.  All right.  So at some point on
```

Exhibit 5, LLC

Page 104

```
 1    Sunday, May 31st at about 8:30 p.m., there was a line
 2    of -- I'll represent to you there was a line of police
 3    officers who are were wearing riot gear who are -- who
 4    are -- who have formed a line right here across Colfax
 5    and Washington, do you recall if that was your squad?
 6         A.   I do recall that there were -- there was a
 7    bunch of officers down there, and at one point, I
 8    believe, I sent maybe one or two of my squad members
 9    down there to assist in when they asked for more bodies
10    down there, but my whole squad was not committed down
11    there.
12         Q.   Okay.  Do you know who else was part of this
13    line of officers who were set up at Colfax and
14    Washington at 8:30 p.m., on Sunday, May 31st?
15         A.   I do not.                               2:41:04
16         Q.   Okay.  Do you recall, were there other
17    agencies, other outside agencies besides Aurora, who
18    were assisting Denver in protecting district six on
19    Sunday, May 31st at 8:30 p.m.?
20              MS. EVANS:  Foundation.
21         A.   From what I can remember, there was another
22    outside agency and I want to say Douglas County -- but
23    I don't think that's right, but I believe there was
24    another outside agency that was helping with district
25    six.
```

Exhibit 5, LLC

1      Q.   Is it Jefferson County SWAT team?

2      A.   It could have been.                          2:41:45

3      Q.   Okay.  Were they in green fatigues?

4      A.   I don't recall if they were or not, and I

5  don't think we had any interaction with them

6  specifically.

7      Q.   Okay.  All right.  So then from 8:30 p.m. on

8  Sunday, May 31st until 10:00 p.m. Sunday, May 31st,

9  what do you recall you and your squad doing?

10     A.   From what I recall from those time periods,

11 some of it was spent up on that side -- or Washington

12 Street, as it looks like to me on the map, blocking

13 some of those alley accesses from the -- yeah, from the

14 west, the next -- the alley just to the west, there is

15 some -- several alley accesses between the buildings

16 there to get onto Washington Street and just having

17 posted officers up there in those alley access points.

18     Q.   Okay.  And at some point, did you and your

19 squad move west on Colfax?

20     A.   We did.                                       2:42:52

21     Q.   Okay.  Were you with sergeant -- then

22 Sergeant Brukbacher at this time?

23     A.   I remember him being down there, but I don't

24 know how much interaction he and I had.  I don't think

25 we had a whole lot of interaction on this one.

```
 1        Q.   Okay.   The -- and how many officers were on

 2   your squad at that time?

 3        A.   More than likely, between ten or 12.

 4        Q.   Okay.  And would -- what about Sergeant

 5   Brukbacher, do you know how many were on his squad?

 6             MS. EVANS:   Foundation.

 7        A.   I don't think he had a squad assigned to him

 8   --

 9        Q.   Okay.

10        A.   -- specifically on this day.

11        Q.   Do you recall having -- what other Aurora

12   supervisors do you recall having interactions with or

13   conversations with between 8:30 and 10:00 p.m. on

14   Sunday, May 31st?

15        A.   I remember having interactions with Captain

16   Redfearn specifically.

17        Q.   What interactions do you recall having with

18   him?                                          2:43:51

19        A.   His request for additional bodies in various

20   staging points and at one point, asking me to come up

21   and help him, assist him when they did a push for crowd

22   management.

23        Q.   Okay.  And tell me about the push for crowd

24   management.

25        A.   From what I recall of it, I was -- I happened
```

Exhibit 5, LLC

1    to cross him as I was managing my team and he had asked

2    me and requested me specifically to come over and --

3    and help him with -- they were taking and they were

4    pushing back a good bulk of people that were somewhere

5    in -- near that alleyway intersection of Washington

6    Street, Colfax Avenue that had become extremely

7    violent.

8        Q.   Okay.  So there were protesters who were --

9    I'm showing you the Google Maps again, and so now we're

10   looking at Colfax between Washington and Logan Street,

11   we've got Washington, then Pearl, then Pennsylvania,

12   then Logan.  So at some point, did Captain Redfearn ask

13   you to assist -- you and your squad to assist in

14   pushing protesters west on Colfax away from the

15   station?

16       A.   Yes, he did.                          2:45:06

17       Q.   And how did you and your squad go about

18   pushing the protesters west?

19       A.   And I believe -- and just for the record, I

20   don't think it was my entire squad.  We had gotten

21   broken up at that point, as far as we had -- you know,

22   different people had ended up on different places and

23   we had kind of lost contact with each other, but I do

24   know some of my squad was with me, but I couldn't even

25   tell you who it was, but --

```
 1      Q.    Okay.  So how did you go about pushing the

 2  crowd west?

 3      A.    So from what I recall, we had entered -- or

 4  entered onto Colfax from the alleyway between -- just

 5  to the west of Washington Street, and from that

 6  alleyway, we had entered onto Colfax westbound, and

 7  utilizing a line formation along with the Bear, we

 8  moved forward across westbound Colfax.

 9      Q.    The BearCat -- the Aurora BearCat?

10      A.    Yes.

11      Q.    That was the same BearCat that was at the

12  intersection of Lincoln and Colfax from 5:30, correct?

13      A.    Yes.                                 2:46:14

14      Q.    Okay.  So I mean, did you -- when you formed

15  a line -- I mean, how did you go about making the crowd

16  go -- you know, how did you go about making the crowd

17  push forward, was it just with your bodies, like,

18  walking forward in a line, were there munitions fired,

19  how was it done?

20          MS. EVANS:  Form.

21      A.    There were a lot -- there were a lot of

22  munitions -- or there were munitions fired, I should

23  say, at the crowd as we pushed them back.

24      Q.    Okay.  And what kind of munitions did you --

25  did the Aurora officers have at that time?
```

Exhibit 5, LLC

```
 1      A.   At this point, I can't speak to specific

 2  officers and what they were carrying or utilizing, but

 3  they -- we would still have -- at this point, have been

 4  carrying our 40 millimeter and 12 gauge less lethal and

 5  then our CS gas, as well as our OC sprays.

 6      Q.   Okay.  So you had earlier told me the

 7  individuals that you believe that -- from Aurora that

 8  you believe had a 40mm launcher, and the names you had

 9  given me before were Cory Budaj -- how do you pronounce

10  his name?

11      A.   Budaj.                                   2:47:24

12      Q.   Budaj, Brukbacher, Spano, and Runyon.  Were

13  those the same officers who had 40mm launchers on

14  Sunday, May 31st, between 8:30 and 10:00 p.m.?

15          MS. EVANS:  Foundation.

16      A.   That I don't know.

17      Q.   Okay.  Who do you recall having -- who -- who

18  from Aurora do you recall having 40mm launchers on

19  Sunday, May 31st, between 8:30 and 10:00 p.m.?

20      A.   On that date, I don't recall anybody

21  specifically who had launchers.

22      Q.   Okay.  But some people did, right?

23      A.   Correct.

24      Q.   Okay.  And did you throw chemical munitions,

25  tear gas at that time?
```

```
 1        A.   I don't recall if I did or not on this

 2   particular day.

 3        Q.   Okay.  Were there warnings given to the

 4   protesters or orders telling them to -- to -- to, you

 5   know, back up or to disperse before munitions were used

 6   on them?

 7             MS. EVANS:  Foundation.              2:48:36

 8        A.   From my recollection, there were orders given

 9   and warnings given, I believe, over the PA system of

10   our armored vehicle, but I can't tell you the time

11   frame of when those occurred.

12        Q.   Do you recall what the -- what the orders or

13   the warnings were?

14        A.   I do not.

15        Q.   At some point, you and the other officers

16   from Aurora stopped at Pennsylvania, is that right?

17        A.   Yes.

18        Q.   Okay.  And why did you stop there?

19        A.   The order was given to stop at that point,

20   and my understanding of the reasoning behind it, again,

21   it was a decision made above my -- my current rank, but

22   the decision to stop there was we had pushed to a point

23   where the crowd was far enough back and we were no

24   longer -- we were outstretching or stretching out our

25   -- our forces too far, and manpower did not allow for
```

1    us to have anybody further, at least that's my

2    understanding.

3         Q.   Okay.  Who communicated that to you?          2:49:53

4         A.   I don't think that was ever directly

5    communicated and it was just more my observation.

6         Q.   Okay.  How did you learn what your assignment

7    would be in terms of, you know, "our job right now is

8    to push this crowd west"?

9         A.   From what I recall, Captain Redfearn had told

10   me, "We're going to be pushing the crowd west."

11        Q.   Okay.  And did he tell you whether he got

12   that information from Denver's command post?

13             MS. EVANS:  Foundation and form.

14        A.   I don't recall there being a conversation

15   involving that portion of it at least.

16        Q.   Do you recall receiving any radio

17   communications on that day, Sunday, May 31st, between

18   8:30 and 10:00 p.m., with regard to what Denver command

19   post wanted you to do?

20        A.   No, I don't.                                  2:50:46

21        Q.   Is it fair to say, based on your experience

22   of the protests in Denver of last summer, that the

23   Denver command post gave instruction to the various

24   outside agencies who were assisting them in policing

25   the protests through the radio?

```
 1              MS. EVANS:  Foundation.

 2              MR. HUSS:  Form -- form and foundation.

 3         A.   I have very limited knowledge of that, so I

 4    couldn't tell you exactly what they had told them or

 5    what instructions, and generally speaking, I can only

 6    speak to what Aurora was told, and most of our

 7    instruction came from our command staff or -- or

 8    senior-level members that were on the department that

 9    were there at the protests.

10         Q.   Sure.  And as a police officer, there is a

11    chain of command that you follow, correct?

12         A.   Correct.                              2:51:38

13         Q.   What did you do at the intersection of Colfax

14    and Pennsylvania after you stopped there with you --

15    your -- with your -- with your officers?

16         A.   Once we had stationed at that -- from my

17    recollection, we held a static line at Colfax and

18    Pennsylvania or wherever that was that we stopped, and

19    we waited there until the crowd had dispersed

20    completely or to the extent that we no longer felt that

21    it would be a threat to anybody else.

22         Q.   Now there was a church right there at the

23    intersection of -- do you recall there being a church

24    at the intersection of -- between Logan and

25    Pennsylvania on Colfax?
```

```
 1        A.    I do not specifically, no.

 2        Q.    Okay.  Okay.  Can you see this?

 3        A.    I can.                              2:52:43

 4        Q.    Okay.  I am going to show you COA BLM 371,

 5   which is a body-worn camera from then Sergeant

 6   Brukbacher.  This is from May 31st, 2020, at 9:45:35

 7   p.m.  Right now, it's a still shot of this screen, do

 8   you see this spire in front?

 9        A.    I do.

10        Q.    Okay.  Do you recall that being a church at

11   this -- at the intersection of Pennsylvania and Colfax?

12        A.    I don't.

13        Q.    Okay.  I'm going to play a clip for you, and

14   then I'll ask you a question.

15              (Video COA BLM 371 played)

16        Q.    Oh, wait.  Can you hear the sound?

17        A.    I can.                              2:53:24

18        Q.    Okay.  I'm going to play it starting at

19   21:45:15.

20              (Video COA BLM 371 played)

21        Q.    I stopped it at 21:45:50.  Did you hear when

22   Sergeant Brukbacher said, "Shaker, go to the other

23   side, tell them your plan, get them on board"?

24        A.    I do.  I did.

25        Q.    Do you --
```

```
 1        A.   I did.                                    2:54:21

 2        Q.   Do you recall what that was about?

 3        A.   From my recollection, that was when we were

 4   blocking off the street and we were going to position

 5   the Bear so that we could block street traffic and we

 6   wouldn't have to utilize as many foot officers to block

 7   that intersection, or at least portions of it.

 8        Q.   What -- what did he mean by "go to the other

 9   side"?

10        A.   Where we were standing, if this memory serves

11   me correctly, we were on the left side of the Bear, so

12   positioning on the street would be on the south side of

13   -- you know, more southern part of Colfax Avenue to --

14   from the Bear was positioned east and west.  Going to

15   the other side just meant going to the other side of

16   the Bear because we had no line of sight or visual or

17   auditory communication with anybody on the other side

18   of the -- the Bear.

19        Q.   Okay.  Let me just find a clip involving the

20   BearCat so that we can -- all right.  I'm playing this

21   COA BLM 371 again at 9:44:57.  We'll just play it for a

22   little bit, and then I'll ask you a question.

23             (Video COA BLM 371 played)

24        Q.   Was that you talking, saying, "We're going to

25   move a line up there, we're going to move the Bear"?
```

Exhibit 5, LLC

```
 1       A.   It sounds like me, yes.                    2:56:20

 2       Q.   Okay.  So the Bear is right -- right here?

 3  Right here, I'm showing you is nine -- 21:45:24, this

 4  is the BearCat, right, this vehicle?

 5       A.   Correct.

 6       Q.   So now tell me what it is you were saying

 7  about you had no line of sight?

 8       A.   So on -- if you -- just by looking at the --

 9  the still footage here, if you see behind the officer

10  with all the gold hash marks there, there is the -- the

11  armored vehicle, it's positioned facing east and west

12  on the street.  We've got a line of officers on the

13  left side of the vehicle north and south and on the

14  right side of the vehicle north and south, and there

15  you can see he is part of the -- the line of officers

16  on the right side of the vehicle.

17       Q.   Okay.  Just for the record, this is 21:38:19,

18  this is before the BearCat has arrived at the

19  intersection of Pennsylvania, but there is officers,

20  you're saying, on the left side and the right side?

21       A.   Correct.                                    2:57:27

22       Q.   Okay.  Go ahead.

23       A.   So speaking to the line of sight and line --

24  and -- and auditory communication with the officers on

25  the other side, there was no way to directly
```

Exhibit 5, LLC

```
 1   communicate with them on any movement and coordinate

 2   any kind of movement or plan between any of the

 3   officers without physically going over there and

 4   talking to them.

 5        Q.   Okay.  Now there was a large group of

 6   protesters at the intersection of Pennsylvania and

 7   Colfax in front of the church, right?

 8        A.   Correct.

 9        Q.   And what kind of -- while you -- you and your

10   -- your officers were pulled up to -- pulled up to

11   Pennsylvania, were there munitions fired on those

12   protesters in front of the church?

13            MS. EVANS:  Foundation.                    2:58:19

14        A.   I don't remember any munitions being fired at

15   that specific moment.

16        Q.   Do you know if there were officers on the

17   other side of the church -- let me pull up the map

18   again.  I'm showing you Google Maps, this is -- the

19   church is called the Cathedral Basilica of Immaculate

20   Conception, it is at the intersection of Logan and

21   Colfax, and Logan is on the west side, Pennsylvania is

22   on the east side, so do you recall if -- oops.  Do you

23   recall if -- so your officers were stopped here at

24   Pennsylvania and Colfax, correct?

25        A.   From what I recall, yes.                  2:59:07
```

```
 1        Q.   Right.  Do you recall if there was a separate

 2   contingent of officers who were coming up -- moving

 3   east on Colfax towards Logan?

 4        A.   I don't remember if they were specifically

 5   moving east, but I do know there was eventually a

 6   separate contingent of officers on the east side of

 7   Colfax.

 8        Q.   Do you mean the west side of Colfax?

 9        A.   I'm sorry, the east side of -- yes, I'm

10   sorry, the west side of Logan at -- well it would be

11   Colfax, somewhere in that area, there were officers

12   over in that area, a separate contingent west of our

13   position --

14        Q.   Okay.  And --

15        A.   -- heading eastbound.

16        Q.   I'm sorry, go ahead, heading --

17        A.   Okay.  Heading eastbound.  I'm sorry.          3:00:00

18        Q.   Right.  So there was a separate contingent of

19   officers heading eastbound on Colfax while your -- you

20   and your officers were heading west on Colfax, correct?

21        A.   I don't know if it happened simultaneously,

22   but at some point, there were officers on the west --

23   or west of our position that ended up somewhere in the

24   area of Logan and Colfax.

25        Q.   And do you know if officers -- if those other
```

Exhibit 5, LLC

1   officers who were at Logan and Colfax were firing

2   munitions on the protesters in front of the church and

3   at the same --

4          MS. EVANS:  Foundation.

5      Q.   -- at the same time that your officers were

6   firing munitions on the protesters in front of the

7   church?

8          MS. EVANS:  Sorry.  Foundation.

9      A.   I can't speak to anything that was going on

10  with the officers that were outside of my immediate

11  control.

12     Q.   Are you familiar with the term "kettling"?

13     A.   Yes.                                    3:01:02

14     Q.   What is it?

15     A.   My understanding that kettling, and I could

16  be mistaken on this one because it's been a while since

17  I've actually reviewed the definition of it, but it's

18  basically having a group of people, specifically with

19  crowd management, boxed in almost to a certain extent

20  where there is no escape route or little escape route

21  for them.

22     Q.   Is that a permissible tactic in Aurora?

23     A.   No, it is not.

24     Q.   Why not?

25          MS. EVANS:  Foundation.                  3:01:38

```
 1        A.   The ultimate goal in any crowd management
 2   function, regardless of what is going on, is to get the
 3   majority of those that may not be as violent or as
 4   committed to doing harm to others as -- as the other
 5   protesters out of the area with as little amount or the
 6   least amount of force possible, that's always the goal.
 7   And by kettling people, you do not give them the out
 8   that they need to do that.  Those individuals that
 9   would wish to no longer partake in illegal riotous
10   behavior have the ability to leave if they so choose.
11        Q.   Okay.  I am going to play some radio -- radio
12   dispatch for you, just give me a moment.  Okay, hold
13   on, I have to figure out how to do this.  Okay, I
14   figured it out.  Let me -- let me try to share this.
15   All right.  I am going to play a radio dispatch
16   produced by Denver from May 31st, 2020, starting at
17   21:38:59.
18             (Radio dispatch audio played)
19        Q.   Okay.  I paused it.  The last one where the
20   person said, "We've pushed the crowd to Pennsylvania, I
21   think we can hold at Pennsylvania," do you recognize
22   that voice, what -- who -- which Aurora officer that
23   is?
24        A.   Listening to it, it sounds like Captain
25   Redfearn.                                    3:05:15
```

```
 1        Q.    Okay.  Let me continue playing it.

 2              (Radio dispatch audio played)

 3        Q.    Okay.  I have paused it at 21:48:06.  So

 4   could you hear that?

 5        A.    I could.                              3:06:12

 6        Q.    Okay.  So Adam 9 is Commander Phelan.  Are

 7   you aware of that?

 8        A.    No, I was not aware of that.

 9        Q.    Great.  So is it fair to say that Adam 9 --

10   it -- the clip started with, "Adam 9 to Aurora, calling

11   for an Aurora officer to respond," and then Captain

12   Redfearn responds saying, "We've pushed the crowd to

13   Pennsylvania.  I think we can hold at Pennsylvania.

14   We're on the street at Pennsylvania."  Do you recall

15   hearing that?

16        A.    I do.                                 3:06:46

17        Q.    Okay.  Then Adam 9 again responds, "Hold

18   there, you got resources coming up from the west, let's

19   make some arrests," and he asks if Aurora has mobile

20   resources, and Captain Redfearn responds that, "Aurora

21   cannot, it's going to have to be other resources

22   mobile."  Then Adam 9 says, "Hey 200, can you get up

23   and mobile?"  200 responds.  Another officer, 100,

24   says, "We can come in, we're at Colfax and Grant right

25   now, but we're going to be pushing into each other,"
```

1   and then Adam 9 responds, "Yeah, we'll push them, we'll

2   get them and make some arrests."  Let's assume -- first

3   of all, did you hear any of that on the radio at the

4   time?

5        A.   I don't recall hearing any of that on the

6   radio at the time.

7        Q.   Okay.  Now I'm showing you Google Maps again,

8   we've got -- we're looking now at Grant and Colfax,

9   Logan and Colfax, and Pennsylvania and Colfax.  So

10   there is the Aurora officers at Pennsylvania and

11   Colfax, and then the officer with the radio call sign

12   100, who is Lieutenant Williams, is at -- says that

13   he's at Grant and Colfax and that he is pushing from

14   the west to the east.  If there is two units of

15   officers, one pushing to the east and another pushing

16   to the west and there is a bunch of protesters trapped

17   in the middle, would that be an appropriate use of

18   force?

19             MS. EVANS:  Form and foundation.         3:08:24

20             MR. HUSS:  Form and foundation.

21        A.   Assuming all the given scenarios from what --

22   from what you have laid out there and given the

23   geographic area of it, there is a potential for many of

24   the protesters actually, and from what I recall is,

25   there are quite some pretty decent sized alleyways

```
 1   running north and south throughout there, so that

 2   actually gives quite a bit of an out for people who

 3   want to escape.  And depending on how long it takes for

 4   -- say the stationary force is already set in place,

 5   and for your example, the hypothetical situation of us

 6   being at Colfax and Pennsylvania for this hypothetical

 7   situation, using that as the stationary force, it also

 8   depends on how long it takes for that mobile force that

 9   is coming up there, because if there is an out like

10   there are alleyways in this, and there is access points

11   through the buildings and -- or around the buildings,

12   not actually directly through the buildings, but around

13   the buildings, if it takes them any length of time or

14   they have sufficient length of time to get people out

15   of there, then there would be more than enough time for

16   those people that were not committed or who are not

17   willing to engage in illegal acts to -- to leave.

18        Q.   So if there is a bunch of protesters in front

19   of the church on Colfax between Logan and Pennsylvania,

20   and there is officers firing munitions on them from

21   Pennsylvania, and there is a separate group of officers

22   firing munitions on them from Logan, you are saying

23   that that's not necessarily inappropriate kettling if

24   they have an escape route?

25        MS. EVANS:  Form and foundation.          3:10:05
```

```
 1              MR. HUSS:  Form and foundation.

 2       A.    Given that there is an out for them and they

 3  have an egress where they can take -- they can leave if

 4  they so choose, and they are unwilling to take that

 5  egress, then yes.  If we need to use force on a

 6  particular incident on individuals that are violent and

 7  riotous and they choose not to leave after multiple

 8  orders, then, unfortunately, the onus on them is that

 9  they are staying there and that is their choice to

10  become involved in that.

11       Q.    Did you or any other member of the Aurora

12  Police Department give any orders to the protesters who

13  were gathered in front of the church at 9:30 p.m. on

14  May 31st, 2020, did you give any orders to them to

15  disperse?

16              MS. EVANS:  Foundation.                     3:10:56

17       A.    I don't know if any of our officers had any

18  contact at all with the group in front of the church.

19       Q.    Right.  So you're not aware of any dispersal

20  orders given to the people who were gathered in front

21  of the church, right?

22       A.    I am not aware of it, no.

23       Q.    This -- I am showing you a Google street view

24  map -- a Google street view of the church between Logan

25  and Pennsylvania.  You see this fence right here?
```

 1       A.    I do.

 2       Q.    It's kind of pointy, right?

 3             MS. EVANS:  Form.

 4       A.    Hard to tell from the pictures, but there are

 5   something coming up from the top.

 6       Q.    Now let's assume that this fence was there on

 7   May 31st of 2020, it went the length of the block.

 8   There is the church, there is a bunch of buildings on

 9   the other side, and there is this small alley.  If

10   there is officers on Logan and there is officers on

11   Pennsylvania, and both sides are firing on protesters

12   who are in this block, and they've got the fence here

13   and the building is here, is this alleyway a sufficient

14   exit point for them?

15             MS. EVANS:  Form and foundation.          3:12:14

16             MR. HUSS:  Form and foundation.

17       A.    Talking in a hypothetical world, this

18   question -- unfortunately, it's -- it's too broad to

19   give a definitive yes or no answer.  Again, the -- the

20   dictation would be what the officers are encountering

21   at the time, how many people are in a crowd, what the

22   makeup of the crowd is, what pushes has been made, how

23   long time has been, since they know that other officers

24   were coming up between the two groups, for them to out

25   of there -- get the -- all those factors are going to

1  play into whether or not there is sufficient time for

2  people to get down that alleyway.

3      Q.   At the intersection of Colfax and

4  Pennsylvania on May 31st at 9:30 p.m., did your

5  officers have any flash-bangs?

6      A.   I don't believe they had them at that point,

7  but I could be mistaken on that.  That was about the

8  time when munitions had arrived from a separate vendor.

9      Q.   So just to try to refresh your recollection,

10 the -- Sunday, May 31st, would have been the second day

11 that Aurora was assigned to the Denver protests, and so

12 we're talking about the evening of the second day.  Do

13 you recall if the flash-bangs arrived in time for the

14 evening of the second day or it wasn't until Monday,

15 June 1st?

16     A.   It was when the -- the protest -- or protest

17 and riots -- the -- the violence was actually occurring

18 that the extra munitions that we had requested had

19 arrived, so it was actually while this push was going

20 on, if I remember --

21     Q.   Okay.                              3:13:57

22     A.   -- correctly.

23     Q.   So were you outfitted with the flash-bangs

24 while you were out in the field?

25     A.   I don't believe any of us were outfitted with

1  flash-bangs, at least not to my knowledge --

2      Q.   Okay.

3      A.   -- from Aurora anyway.

4      Q.   Okay.  And your officers did not have

5  PepperBall guns, correct?

6      A.   Correct.

7      Q.   So on Sunday, May 31st, at the intersection

8  of Colfax and Pennsylvania at 9:30 p.m., can you just

9  tell me what weapons your officers had?

10         MS. EVANS:  Foundation.

11     A.   The weapons systems that we would have had

12 would have been the 40 millimeter launchers, the 12

13 gauge bean bag rounds, the OC vapor sprays or the OC

14 sprays, be it the larger canisters or the smaller

15 canisters, and of course, our CS gas canisters.

16         MS. WANG:  Okay.  Let me just -- let's just

17 take a break so I can look at my notes, and then I just

18 want to make sure that I'm done.  Just give me two

19 minutes.

20         RECORDER:  Okay.  Off the record, 1:44 p.m.      3:15:13

21              (Off the record)

22         RECORDER:  Back on the record, 1:46 p.m.

23         MS. WANG:  I have no further questions.

24                  EXAMINATION

25 BY MR. MIJARES-SHAFAI:

Exhibit 5, LLC

```
 1      Q.   Hi Lieutenant, my name is Gerardo Mijares,

 2  nice to meet you.  You have covered a lot of ground in

 3  the past three hours and 45 minutes.  I am going to be

 4  as direct and concise as I can.  I want to go back to

 5  when you guys arrived at what I think you believe was

 6  headquarters.  Just correct me if I'm wrong, jump in,

 7  it's totally fine.  You came in, your team is there,

 8  some of the other supervisors that are there between, I

 9  believe, Captain Redfearn, Lieutenant McClelland,

10  Sergeant Brukbacher, yourself, and Sergeant Serrant --

11  you guys are there, some of them, but not yourself, do

12  coordinate with DPD and have a discussion about less

13  lethal munitions, you have a discussion about what's

14  the appropriate use of force.  When I say, "You," I am

15  referring to those officers.  You learn about that

16  conversation after the fact when your team comes back,

17  and you guys discuss specifically some of the

18  discussions regarding whether to utilize the less

19  lethal shotgun.  It's at that time, if I understood

20  correctly, that you were essentially debriefed on the

21  conversation that happened with the DPD officials, do I

22  have that correct?

23          MS. EVANS:  Form and foundation.          3:16:47

24          MR. HUSS:  Form.  Foundation.

25      A.   From the way you said it, it does sound like
```

Exhibit 5, LLC

1   it somewhat is correct, but the -- the only confusion I

2   have is with specifically, like, when you're talking

3   the team, are you talking about my squad of officers

4   specifically that was with -- with me?  Because they

5   were not present during that conversation.

6        Q.   No, sir, apologies.  I mean specifically the

7   supervisory officials, so whether it was Captain

8   Redfearn -- I -- I don't think you were able to

9   identify who specifically had gone and talked with DPD

10  earlier in the depo, so I just wanted to clarify that

11  it was somebody within that group of the named five

12  individuals that I had just stated a few moments ago.

13       A.   Presumably so, but I couldn't tell you who or

14  if it was somebody else that I don't recall being at

15  the -- the meeting, who was there who may have had that

16  conversation as well.

17       Q.   Okay.  Pursuant and subsequent to that

18  conversation, you told your team that in terms of --

19  and when I say, "Team," I am now referencing your squad

20  of approximately ten to 12 officers.  You told your

21  team, "Okay, the way we are going to manage crowd

22  control and the protests is utilizing our policy," is

23  that correct?

24       A.   Correct.                              3:18:06

25       Q.   Okay.  And what -- was it your understanding

```
 1   at that point, based off the information that had been

 2   presented to you from the moment you arrived at

 3   headquarters to that moment, that by doing that, you

 4   would essentially be in line and following DPD's

 5   directive for the day, May 30th?

 6           MR. HUSS:  Foundation.

 7       A.   From my recollection, yeah, that would be --

 8   our policies would dictate our response, which was

 9   approved through somebody in -- in Denver, whoever that

10   happened to be.

11       Q.   Okay.  Can we turn specifically to -- you --

12   you were describing ERT earlier and I want to get a

13   better sense of something that you brought up.  You

14   mentioned that with respect to warnings as it relates

15   to deployment of least -- sorry, with respect to

16   deployment of less lethal munitions, that it's

17   situational and you actually listed off a couple of

18   factors, can you repeat those factors for us?

19       A.   Those two specific factors -- I'm not sure

20   which ones I repeated -- or I listed off for you, but

21   -- because it -- there are a multitude of factors that

22   go into any decision for the use of force, so I'd

23   actually have to figure out what -- or have somebody

24   replay for me what exactly I said because none of these

25   are in -- all-encompassing when it comes to use of
```

1   force.

2        Q.   So let me read back the three that I found,

3   and then if I misconstrue anything, correct me.  I

4   heard distance of the threat, the time of the threat,

5   and the magnitude of the threat.  Did I -- just correct

6   me, did I get anything wrong?

7        A.   Based upon what you just told me, I don't

8   know if that's how I specifically stated it, but it

9   does sound like that was something that -- you know,

10  close to what I at -- at least said or if not, those

11  all can be factors to take into consideration when

12  using force, but they're not all-inclusive.

13       Q.   Totally.  Any other key factors, like if you

14  had to sort of say in the moment when you're dealing

15  with a situation and you have to make the decision

16  whether or not to deploy a least -- a less lethal

17  munition, is there an order of priority that you go

18  through when you are determining "okay, factor X, Y,

19  Z," and if there is, will you explain it to us?

20            MS. EVANS:  Form and foundation.            3:20:39

21       A.   There is no one particular priority that you

22  would place on any of the factors -- and again, this is

23  all situationally dependent, and this is a general -- a

24  general statement about use of force.  You -- every

25  officer is trained, and the way that we are trained to

1    use -- or to look at force is what is reasonable for us

2    at the time as a reasonable officer, what we would

3    believe would be the appropriate amount of force given

4    a totality of the circumstances known to us at the

5    time, no hindsight 20/20.

6        Q.   Okay.  To confirm, is -- is there a different

7    analysis that takes place for kinetic versus chemical?

8            MS. EVANS:  Form and foundation.              3:21:26

9        A.   Based upon the general overview, no, but

10   again, it's the totality of all the circumstances

11   dictating what level of force and when to use it.

12       Q.   Okay.  I'm going to play a video clip real

13   quick, and then I'm going to have a couple more

14   questions that stem from it.  Just give me one second

15   and I'll pull it up for you.  Okay.  Actually, give me

16   one second, because I don't think I gave you sound on

17   that, that's my fault.  Okay.  Can you see the video?

18       A.   I can.                                        3:22:09

19       Q.   Excellent.  Okay.  Time stamp is 17:41:39,

20   I'm going to go ahead and press play.

21               (Video played)

22       Q.   I'm stopping the video at 17:42:51.

23   Lieutenant, you proceed to go down the line and

24   continue to provide, I guess, that advanced warning to

25   your team that this is going to happen.  Earlier,

```
 1  sergeant -- and again, my apologies if I mispronounce
 2  his name, Sergeant Brukbacher at the time, lieutenant
 3  now, tells you, "Have your gas ready."  Knowing that
 4  there is a chance that you might be deploying the gas,
 5  you've been put on active notice by your colleague to
 6  have it ready, how does that change the framework of
 7  the warning?
 8          MS. EVANS:  Object to form and foundation.
 9          MR. HUSS:  Form and foundation.            3:24:19
10      A.   For me, it's an indication that there is a
11  potential for some kind of violent resistance against
12  us.
13      Q.   And as soon as you have that indication,
14  would you not convey that to the protesters and tell
15  them, you know, "X, Y, you need to move back," or would
16  you start giving direction?  Like what happens then, as
17  soon as you have that realization or that direction
18  that "look, this might become violent"?
19          MS. EVANS:  Form and foundation.            3:24:53
20      A.    Me personally, I stand by and wait for orders
21  from those who are above from me who are actually
22  directing and coordinating the total effort.
23      Q.   One final question on warning before I move
24  to the next video clip.  Under the protocol and the
25  procedures that you follow, when you issue a warning
```

1   and you know that there is the potential that you will

2   be deploying less lethal munitions as is the case here,

3   do you explicitly state to the protesters or the crowd,

4   "Get back or we will utilize X force, less lethal, tear

5   gas," or can you -- are you allowed, under the rules

6   and the procedures that you were following, to be a

7   little bit more vague or general?

8           MS. EVANS:  Form and foundation.

9           MR. HUSS:  Form and foundation.            3:25:45

10      A.   Speaking to generalizations for the policy or

11   for standard practices, when you're talking about

12   orders, pre-SB217 is what I am going to go off from, or

13   Senate Bill 217 in the State of Colorado, because

14   that's when this occurred, so everything post -- after

15   is not even a consideration at this point.  So

16   pre-SB217, if you give warnings, give lawful orders to

17   a group of people and they fail to obey those lawful

18   orders, then you can use the force reasonable and

19   appropriate -- that you believe to be reasonable and

20   appropriate to take whatever action you need to as a

21   law enforcement officer.

22      Q.   So if I understand correctly, you don't have

23   to tell them that you will be utilizing certain less

24   lethal munitions or tear gas.  If they don't follow

25   your orders, you can utilize the forces you deem

```
 1  appropriate without providing notice of that?
 2         MS. EVANS:  Form and foundation.              3:26:53
 3      A.   We don't have to give a specific "if you
 4  don't do X, we will use specifically Y," because
 5  situationally, it may change.
 6      Q.   Okay.  Thank you.  All right.  Let's switch
 7  over to the video again, and I promise you I am almost
 8  done.  Okay.
 9                   (Video played)
10      Q.   So the video is now at 17:48:43, can you hear
11  the officer over the loudspeaker saying, "Please head
12  back to the park, and if you don't, you will be
13  arrested"?
14      A.   Yes.                                        3:28:07
15      Q.   Okay.
16      A.   Or at least portions of it.
17      Q.   Okay.  Now we're going to bump up just a
18  little bit further and we're going to head to video
19  mark 17:49.  I'm actually just going to go ahead and --
20  it's kind of close, so I'm just going to let it ride.
21                   (Video played)
22      Q.   Okay.  Lieutenant, you can see that people
23  have started to move, correct?  This is at 17:49:03.
24         MS. EVANS:  Form.                             3:29:01
25      A.   I see a few people that have moved, but not
```

Exhibit 5, LLC

```
 1   everybody.
 2        Q.   Not many?  I'm going to continue.
 3                  (Video played)
 4        Q.   Okay.  Looks like the rest of the folks that
 5   were part of that large gathering have started moving
 6   towards the park, correct?
 7             MS. EVANS:  Form.
 8        A.   Correct.                              3:29:30
 9        Q.   Okay.  I'm going to just go back a little bit
10   because I want to understand what happens in the next
11   eight seconds, all right?  We'll start here.
12                  (Video played)
13        Q.   I ended the video at 17:49 and 17 seconds.
14   Sergeant Shaker -- excuse me, Lieutenant, from the time
15   that the protesters started moving towards the park,
16   which was the instruction that was provided by the
17   officer in the vehicle, to the time when you threw your
18   canister, approximately eight seconds have passed.  Can
19   you tell me what were the factors that you were
20   examining at that moment that allowed you to make the
21   decision that it was appropriate to throw that tear
22   gas?
23             MS. EVANS:  Form.                     3:30:47
24             MR. HUSS:  Form and foundation.
25        A.   So based on what I saw in the video and my
```

1    recollection of events, we had been receiving and

2    getting quite a bit of things thrown at us -- or at

3    least a few things that started getting thrown at us,

4    so throwing that tear gas canister was force in order

5    to get that crowd to disperse as fast as possible, as

6    quickly as possible, so that we wouldn't have to

7    effectively touch anybody, although some of them and

8    even a good portion of them had -- not all of them had

9    retreated, unfortunately, so I had to make a decision

10   on use of force.

11       Q.   And in the video that we just played, did you

12   see any of those protesters who hadn't retreated yet?

13           MS. EVANS:   Form.                          3:31:32

14       A.   There's a couple of them off to the side, and

15   keep in mind, scope of a body-worn camera is very

16   narrow and very limited, and asking for the totality of

17   where everybody is at, based upon footage alone, can't

18   be answered.

19       Q.   One last question on this video, how does the

20   protocol change -- and you sort of hinted at it

21   already, you sort of answered it, I just want to be

22   clear.  How does the protocol deploying less lethal

23   munitions change when, one, they are now following the

24   order, and two, their back is turned towards you?

25           MS. EVANS:   Form and foundation.

1          MR. HUSS:  Form and foundation.          3:32:10

2      A.   The protocol has changed slightly in that we

3  are giving different orders as far as specifically what

4  munitions could potentially be used against you, and

5  that's just for us here in Aurora, specifically I know

6  we are doing that.

7      Q.   My last question actually goes back to some

8  stuff that you covered with Ms. Wang earlier, and it's

9  at the intersection of Colfax and Lincoln, and there

10  were a number of video clips, I think three that we

11  went through, where you and Ms. Wang discussed that you

12  either saw or were hearing commotion specifically what

13  you thought were pepper bullets, but you weren't sure,

14  from your left flank, and that the pepper bullets, from

15  what those three video clips showed, were consistently

16  coming from your left flank, is that correct?

17          MS. EVANS:  Form.                          3:33:08

18      A.   From what I remember of the video, yes, to

19  the -- to the left of me is where I was hearing the

20  PepperBalls coming from.

21      Q.   And you pointed that out to Sergeant

22  Brukbacher when he came over and you guys were having a

23  conversation about why your munition levels,

24  specifically the gas, was so low?

25          MS. EVANS:  Form.

```
 1        A.   That was part of the conversation, yes.

 2        Q.   At any point, would it have been appropriate,

 3   and I don't know, I am actually looking to you for the

 4   answer here, for either you or a member of the team

 5   that was a part of that line, with whoever those other

 6   officers were, to go over and see what exactly was it

 7   that was causing the recurring event of pepper bullets

 8   being shot from that particular location?

 9            MS. EVANS:  Form and foundation.            3:34:08

10            MR. HUSS:  Form and foundation.

11        A.   Given the relatively broad range of the

12   question, from my particular position as a sergeant

13   watching my line, it would not have been appropriate,

14   in fact, it would have been a very bad idea to actually

15   go over there, because now I am leaving my section of

16   the line without direct supervision in order to be

17   concerned about what other officers who are not

18   currently involved in what we are facing are dealing

19   with.

20        Q.   But you all are operating pursuant to DPD's

21   instruction.  You are all doing the same event, you're

22   working the same line together, and if I understood

23   correctly from earlier, Sergeant Brukbacher was there

24   to sort of provide additional assistance, he didn't

25   have his own squad.  Would it not have been possible
```

Exhibit 5, LLC

1    for Sergeant Brukbacher to go over and see what was

2    going on and report back?

3              MS. EVANS:  Form and --

4              MR. HUSS:  Form and foundation.              3:35:06

5              MS. EVANS:  -- foundation.

6        A.   I can't speak to what Sergeant Brukbacher was

7    duty -- doing specifically and what his duties entailed

8    and what he was dealing with, so I have no idea what

9    his ability to do that would be or not.

10       Q.   Last question then.  Did it ever give you

11   pause or concern, notwithstanding your duties, which

12   you performed and you stayed where you were supposed

13   to, but at any point during that, did you think it

14   would have been a good idea to have someone go over

15   there and see if those officers needed backup,

16   considering the level of activity that was going on

17   over there?

18             MS. EVANS:  Form and foundation.

19             MR. HUSS:  Form and foundation.

20       A.   It really never occurred to me because it was

21   outside of my scope of what I was dealing with in my

22   narrow focus of my duties.

23             MR. MIJARES-SHAFAI:  Thank you very much,

24   Lieutenant, appreciate the time.

25             MR. MCNULTY:  I have a few questions if -- if

1   you don't mind, I'd like to jump in.

2           WITNESS:  Are we done --

3           MR. MCNULTY:  Turn my video on here.          3:36:10

4           WITNESS:  I'm confused.  Are we done at 1:00?

5   I was told only four hours for this deposition.

6           MS. WANG:  There is a -- the time that we

7   spent taking breaks off the record doesn't count, so we

8   have a few more minutes.

9                       EXAMINATION

10  BY MR. MCNULTY:

11      Q.   I just have a few questions for you,

12  Lieutenant.

13      A.   Okay.  Very well, I just wanted to make sure.

14  I've got other --

15      Q.   Thank you.

16      A.   -- engagements, I just want to make sure I

17  make arrangements for them if I need to.

18      Q.   Sure.  Yeah, I'm -- it's -- this is going to

19  be short.  I appreciate your time.  I'm just going to

20  ask you about a particular time and location, I'm going

21  to ask you some questions about that.  You said you

22  were at -- near Colfax and Washington on May 31st at

23  8:30 p.m., is that right?

24      A.   Colfax and Washington, May 31st at 8:30 p.m.

25  is what you asked?

```
 1      Q.    Correct.

 2      A.    It sounds about right.

 3      Q.    Okay.  And what were the protesters doing at

 4  that particular point in the evening on May 31st at

 5  Colfax and Washington?

 6           MS. EVANS:  Foundation.                    3:37:08

 7      A.    In a general overview sense, at some point

 8  during that time frame, and I can't give you an exact

 9  of "at 8:30 p.m., they were doing X, Y, or Z" or "at

10  8:31, they were doing this," but in a general overview

11  of it, around that time frame is when things became

12  very violent and large amounts of rocks, debris,

13  explosive devices were thrown at us.

14      Q.    Okay.  Anything else that would have

15  justified using force at that point that you saw?

16           MS. EVANS:  Foundation.

17      A.    Aside from the rocks, the debris, the

18  explosive devices that caused permanent hearing damage

19  in many of us, I can't think of anything else

20  specifically offhand that would have caused us to use

21  any additional force.

22      Q.    Did you provide any warning prior to using

23  force at that point?

24      A.    I do not know if anybody had provided any

25  warning or not.
```

```
 1        Q.   Did you hear anyone provide any warning?

 2        A.   Not to my recollection.                    3:38:17

 3        Q.   Was your team the -- I think you testified

 4   that your team wasn't the only team at that

 5   intersection, is that right?

 6        A.   Correct, sir.

 7        Q.   Of the members of your team, who was there at

 8   that point?

 9        A.   I don't recall specifically who was there

10   from my team as we all got broke up.

11        Q.   Okay.  Do you remember any specific officers

12   that were at that intersection at that point?

13        A.   Other than the ones that I could see on

14   body-worn camera, the conversation I had with Sergeant

15   Brukbacher, obviously, he was somewhere there in the

16   intersection, and I believe Captain Redfearn had to

17   have been somewhere close to that intersection as well,

18   as he was coordinating our efforts.

19        Q.   Okay.  Any other officers that you can think

20   of?

21        A.   Specifically, no.                           3:39:13

22        Q.   Do you remember folks getting shot with 40

23   millimeter projectiles at that intersection at 8:30 on

24   May 31st at Colfax and Washington?

25             MS. EVANS:  Form and foundation.
```

```
 1            MR. HUSS:  Form and foundation.
 2       A.   I don't recall any specific uses of force
 3  against any specific individuals, but overall, I know
 4  40 millimeters were deployed on that line.
 5       Q.   Do you remember seeing a man who was filming
 6  the protest at that intersection?
 7       A.   I remember seeing a bunch of people who had
 8  cell phone cameras out at various stages and various
 9  times during it -- people videotaping snippets of it,
10  so I'm not sure if that's what you're referring to or
11  not.
12       Q.   And someone who was filming at that
13  intersection at that point and hadn't thrown a bottle
14  or a rock or a firework or engage in any -- you know,
15  anything that could be assumed violence against the
16  police, can you think of any reason why force would be
17  justified against a person at that intersection at that
18  time?
19            MR. HUSS:  Form and --
20            MS. EVANS:  Form.                      3:40:23
21            MR. HUSS:  -- foundation.
22       A.   Speaking to just the generalities, I couldn't
23  tell you what force would or would not be used against
24  somebody based upon the limited scope.
25       Q.   I'm not saying --
```

1      A.   There would be --

2      Q.   I apologize, I didn't mean to cut you off,

3  but I wasn't asking you what force was used, I was

4  asking you whether force would be justified against

5  such a person?

6           MS. EVANS:  Form and foundation.

7      A.   Again, it would be situationally dependent on

8  what the person is doing, what their actions are, what

9  the officer perceives their actions to be at that given

10 moment at that given time.

11     Q.   So you're telling me you can't answer the

12 question of if there is a person who is at that

13 intersection and was filming the protest and hadn't

14 engaged in anything that could be construed by an

15 officer as being violent and had not engaged in any

16 violence of any nature, whether just -- force would be

17 justified.  Is that what you're telling me?

18          MS. EVANS:  Form and foundation.

19          MR. HUSS:  Same.                        3:41:18

20     A.   In the very limited scope of what you had

21 said, there is not a definitive answer, because there

22 is other factors that could take -- potentially take

23 place in it.  Any guess or any statement I make to that

24 would be, at best, an off guess on just very limited

25 information of a very distinct scenario, so I couldn't

1  definitively say one way or another because this is all

2  part of, once again, totality of the circumstances.

3      Q.   Well you were at that intersection, right?

4      A.   Yes.

5      Q.   And you know what was happening at that

6  point, correct?

7          MS. EVANS:  Form and foundation.

8      A.   I had a general overview of what was going on

9  in that intersection, yes.

10     Q.   Okay.  And I just gave you a situation, as an

11 officer standing at that intersection where you see

12 someone who is filming the protests who hasn't engaged

13 in any violence, you haven't seen them engage in any

14 violence, you haven't seen them engage in anything that

15 could even be construed as being violent, and I asked

16 you whether force would be justified against that

17 person, what is your answer to that question?

18         MS. EVANS:  Form and foundation

19         MR. HUSS:  Same.                    3:42:27

20     A.   I guess my other -- I'm -- in order to best

21 answer that, what is the -- the definition of violence

22 you're looking at?  Because I can think of -- I know

23 there is a lot of different people who have different

24 opinions on it.  To a reasonable officer, is that

25 person aggressing on them?  Maybe that person with a

1    camera may not appear to be taking any direct, overt,

2    official -- violent acts towards that officer, such as

3    throwing rocks or bottles, but say if they're

4    aggressing on them or moving towards them in a quick

5    fashion at night with something dark in their hands,

6    lawful orders have been given numerous times, that

7    could potentially be a reasonable use of force at that

8    point against that individual, even though they, in and

9    of themselves, may not have used violence on -- against

10   anybody, because of the fact that they've been given

11   numerous orders, or they've been given orders, or the

12   totality of it is we've got a violent crowd that has

13   been throwing stuff at us and this person is coming

14   directly towards an officer on the line, that could

15   potentially be it.  And that's just one of the

16   circumstances, and that's why it's very hard to

17   definitively say in a hypothetical what force should or

18   should not be used reasonably against this person.

19        Q.   So you're saying it would be reasonable force

20   if a person was just, you know, filming in part -- as

21   part of that crowd and was moving towards the officers,

22   is that what you just told me?

23             MS. EVANS:  Form and foundation.          3:43:45

24             MR. HUSS:  Form and foundation.

25        A.   No, actually, that wasn't what I told you.  I

Exhibit 5, LLC

1   gave a very lengthy explanation, that's a synopsis and

2   -- and condensing down quite a bit of what I'd actually

3   asked --

4        Q.   Okay.  Let's assume the person isn't --

5        A.   -- or what I had actually --

6        Q.   Let's assume the person isn't aggressing

7   towards an officer, let's assume the person is just

8   standing on the sidewalk, filming what is happening,

9   would force be justified against that person at that

10  intersection at that time?

11          MS. EVANS:  Form and foundation.

12          MR. HUSS:  Form and foundation.

13       A.   Again, based upon very limited information,

14  the fact -- having somebody just standing there

15  filming, without any other factors in play, to make it

16  very, very clear, no other factors, completely isolated

17  in a vacuum of their own being filming during -- on

18  that intersection, then I don't see personally how

19  there would be any force authorized to be used against

20  them.

21          MR. MCNULTY:  Okay.  Those are all my -- all

22  my questions.  Thank you, Lieutenant.

23          WITNESS:  You're welcome.              3:44:49

24          MS. WANG:  I have nothing further.

25          MS. EVANS:  I don't have any questions.

```
 1   Thank you.

 2           MR. MIJARES-SHAFAI:  Thank you again,

 3   Lieutenant.  Appreciate it.

 4           MR. HUSS:  No questions.  Thank you.

 5           MS. EVANS:  Okay.  I'm going to go ahead and

 6   assume then that we're done, but -- fair?

 7           MS. WANG:  Yes.

 8           MS. EVANS:  Great.

 9           MS. WANG:  Megan and Isabelle, could we start

10   at 1:30?  I mean, I just need 15 minutes.

11           RECORDER:  Okay.  Off the record, 2:15 p.m.

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    CERTIFICATION

 2   I certify that the deponent was duly sworn by me and

 3        that the foregoing is a true and correct

 4        transcript from the record of proceedings

 5             in the above-entitled matter.

 6

 7

 8                  Brenda L. Portillo

 9                   April 14, 2021

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```