UNITED STATES DISTRICT COURT

DISTRICT OF COLORADO

--------------------------------------------------------

Black Lives Matter 5280 et al.,


          Plaintiffs,


     vs.                    Case Number 1:2020cv01878

                            Cons w/ 1:2020cv01922


City and County of Denver et al.,


          Defendants.

--------------------------------------------------------

Deposition of Stephen Redfearn

Friday

March 12th, 2021


-at-


Zoom Remote Deposition

Exhibit 5, LLC

Exhibit 43

```
 1                    APPEARANCES

 2

 3          For the Fitouri Plaintiffs:

 4             Elizabeth C. Wang

 5              Loevy & Loevy

 6               2060 Broadway

 7                Suite 460

 8           Boulder, Colorado 80302

 9

10

11          For the Fitouri Plaintiffs:

12           Makeba Rutahindurwa

13              Loevy & Loevy

14         311 North Aberdeen Street

15                3rd Floor

16          Chicago, Illinois 60607

17

18

19        For Plaintiff Michael Acker:

20             Andrew McNulty

21        Killmer, Lane & Newman, LLP

22            1543 Champa Street

23                Suite 400

24          Denver, Colorado 80202

25
```

Exhibit 5, LLC

```
 1        For the Black Lives Matter 5280 Plaintiffs:

 2                    Michael J. Sebba

 3            Arnold & Porter Kaye Scholer LLP

 4                   250 West 55th Street

 5               New York, New York 10019

 6

 7                   For the Defendants:

 8                     Robert C. Huss

 9             Denver City Attorneys Office

10                 201 West Colfax Avenue

11                Denver, Colorado 80202

12

13                  For Patrick Shaker:

14                    Isabelle Evans

15                    Megan E. Platt

16        City Attorney's Office, City of Aurora

17              15151 East Alameda Parkway

18                 Aurora, Colorado 80012

19

20        RECORDER:  Zoom is now recording.  Good

21 afternoon.  We are now on the record.  Today is Friday,

22 March 12th, 2021.  The time is now 2:34 p.m.  We are

23 meeting remotely today for the deposition of Commander

24 Stephen Redfearn in the matter of Black Lives Matter

25 5280 et al. v. City and County of Denver et al., case
```

1  number 1:20cv01878-RBJ cons with 1:20cv01922-RBJ-MEH.

2  The venue is U.S. District Court, District of Colorado.

3  Commander Redfearn, my name is Brenda Portillo.  I'm a

4  notary public, and I'm recording this deposition on

5  behalf of Exhibit 5, LLC.  This deposition is being

6  recorded remotely via Zoom in accordance with Illinois

7  Public Act 101-0640.  Commander Redfearn, would you

8  please confirm your identity by placing a valid picture

9  ID in front of the camera briefly?  Thank you.  And at

10  this time, would all attorneys in the virtual room

11  please stipulate that it is okay to administer the oath

12  to Commander Redfearn even though he is not currently

13  located in the state of Illinois?

14           MS. WANG:  Stipulated for the Fitouri

15  Plaintiffs.

16           MR. SEBBA:  Stipulated for the BLM 5280

17  Plaintiffs.

18           MR. HUSS:  Stipulated for the Defendants,

19  City and County of Denver.

20           MR. MCNULTY:  Stipulated for Plaintiff

21  Michael Acker.

22           MS. EVANS:  Stipulated on behalf of the

23  deponent.

24           RECORDER:  Thank you.  At this time, would

25  you please raise your right hand for the oath?

```
 1                    (Witness sworn)

 2          RECORDER:  Thank you.  Would the attorneys

 3  please state their appearances for the record?

 4          MS. WANG:  Elizabeth Wang for the Fitouri

 5  Plaintiffs.

 6          MS. RUTAHINDURWA:  And Makeba Rutahindurwa

 7  for the Fitouri Plaintiffs.

 8          MR. SEBBA:  This is Michael Sebba for the BLM

 9  5280 Plaintiffs, and I'll also appear on behalf of

10  Gerardo Mijares-Shafai.

11          MR. MCNULTY:  Andy McNulty on behalf of

12  Plaintiff Michael Acker.

13          MR. HUSS:  Rob Huss on behalf of the

14  Defendants.

15          MS. EVANS:  Isabelle Evans on behalf of the

16  deponent.

17          MS. PLATT:  Megan Platt on behalf of the

18  deponent.

19          RECORDER:  That completes the required

20  information.  We can proceed.

21                    EXAMINATION

22  BY MS. WANG:

23      Q.  Commander Redfearn, could you please state

24  and spell your name for the record?

25      A.  Sorry, I had a weird notification on there.
```

```
1   My name is Stephen Redfearn.   Stephen is S-t-e-p-h-e-n,

2   last name is R-e-d-f-e-a-r-n.

3       Q.   Have you ever been deposed before?              0:02:40

4       A.   I believe I was years ago, but I -- I -- this

5   may be the first time, I -- I -- I can't tell you for

6   sure.

7       Q.   Okay.  So we're here to ask you some

8   questions relating to your involvement in the policing

9   of the Denver protests last summer.  If you have any

10  trouble hearing me or don't understand a question that

11  I ask, please let me know, and I'll be happy to

12  rephrase.  Is that fair?

13      A.   Yes, ma'am.  Yes, ma'am.

14      Q.   If you answer my question, I'll assume that

15  you understood the question that I asked.  Is that

16  fair?

17      A.   Yes.

18      Q.   We can take a break at any time, except when

19  a question is pending.  Do you understand?

20      A.   I do.

21      Q.   Okay.  Could you make sure that your answers

22  are verbal, such as "yes" or "no," as opposed to

23  shaking your head or nodding your head so that the

24  record is clear?

25      A.   Yes.
```

Exhibit 5, LLC

1      Q.   Okay.  And -- all right.  When did you become

2  a commander?

3      A.   I was promoted to commander June 1st of 2020.

4      Q.   Oh.  Okay.  And so you were a commander --

5  oh, you -- what was your position before commander?

6      A.   I held the rank of -- I held the rank of

7  captain.                                          0:03:49

8      Q.   Okay.  And could you just give me a brief

9  rundown of the positions -- of when you started at the

10  Aurora Police Department and the positions that you've

11  held there in the years?

12      A.   Sure.  So I started with the Aurora Police

13  Department in 1999.  At that time, I was hired as a

14  police officer.  I attended the basic police academy,

15  which is -- I think at that time, was just shy of about

16  30 weeks.  I then went into field training.  I was

17  about three and a half months with three different

18  field training officers.  I graduated field training

19  and was a solo patrol officer for about two years.  I

20  then was selected to work in our community policing

21  unit, our PAR unit is the acronym for that.  I did that

22  for about a year, and then I was selected to work in

23  our pattern crimes unit, which was, at the time, a

24  plain clothes investigative assignment main -- mainly

25  focusing on pattern crimes, auto theft, other related

1   crimes.  I did that for a couple years, and then I --

2   in -- in about 2007 was promoted -- tested and promoted

3   to the rank of sergeant, which, in our department, is

4   the first line supervisor for sworn members.  As a rank

5   of sergeant, I held a patrol sergeant, a field training

6   team sergeant, I supervised, for about two years, the

7   undercover vice and narcotics section, the east metro

8   auto theft team, I was the sergeant of that as well.

9   That was a grant funded, multi-jurisdictional team,

10  plain clothes team, and we did investigations into

11  major auto theft rings and patterns and things like

12  that.  After that, I was promoted to the rank of

13  lieutenant, which is a -- it's kind of our mid-level

14  supervisory rank in the department.  I -- I was

15  promoted to lieutenant, worked a year as a patrol watch

16  commander, and then was selected to go to our district

17  one sector commander, which oversees everything that's

18  not patrol, community policing, directed enforcement,

19  interpreter programs, some other things.  After that --

20  I did that for about a year, and then was selected to

21  go be the commanding officer of the major crimes

22  homicide unit.  I supervised seven teams during that

23  time, our homicide unit, sex crimes, crimes against

24  children, special victims unit, fraud unit, our victim

25  advocate program, I think I'm forgetting one, but I

1  think you get the drift.  I did that for two years, and

2  then tested and was promoted to the rank of captain.  I

3  did that in 2018 and through 2019 up until summer of

4  2020.  As a captain, I was promoted, it was a neat

5  opportunity, I was the first ever night shift duty

6  captain.  So I got to work patrol as the senior member

7  of the department, working nights and overseeing all

8  operations in the city, which was -- which was a fun

9  assignment.  And then as part of that, as captain, I

10  was also the commanding officer of our emergency

11  response team, which I believe you're familiar with

12  based on this.  That's our crowd management team.  I

13  did that as well, and then I was promoted -- well it's

14  actually an appointment, it's not a tested rank, it's

15  an appointment, so I was appointed to commander around

16  June 1st of 2020.  I currently hold the rank of

17  commander, I'm the commanding officer of our district

18  one station, which has -- I have about 170 employees,

19  and I oversee all of the operations of that district.

20  That district is -- for reference, is everything west

21  of I -- I-225.  So that is -- that's kind of the

22  rundown of all the assignments that I've held, kind of

23  the broad view of that.

24      Q.   Have you ever worked for any other police

25  department?

```
 1        A.   I did, not as a police officer, but when I
 2   was -- well first of all, I was a police explorer in
 3   high school with the -- a couple different -- or the
 4   Arapahoe County Sheriff's Office.  And then I was a
 5   police cadet, which was a paid program at the Jeffco
 6   Sheriff's Office.  And then around just shy of 19, I
 7   became a 911 dispatcher at Jeffco Sheriff.  I did that
 8   until I was hired in Aurora in '99.
 9        Q.   Okay.  At the time that you were involved in
10   assisting Denver in policing the protests last summer,
11   you were a captain?
12        A.   Yes, ma'am.                         0:08:16
13        Q.   Okay.  And what documents or videos did you
14   review in preparation for this deposition?
15        A.   In preparation for this deposition, I
16   reviewed the police report that I wrote for, I believe
17   it's two days of the deployment to Denver.  And then I
18   reviewed the majority of my body-worn camera footage.
19        Q.   Okay.  On -- was May 30th -- Saturday, May
20   30th, the first day that you assisted with Denver in
21   its -- in policing its protests?
22        A.   I believe so, yes.
23        Q.   Okay.  Tell me how it was you learned that
24   Denver Police wanted Aurora to assist.
25        A.   So we -- we knew that Denver was experiencing
```

1   protests.  We were getting information from Denver that

2   they were having violence and rioting-type behavior and

3   that it was going to likely continue throughout that

4   weekend.  I can't tell you with certainty from whom I

5   learned that we were going to be deployed to Denver.  I

6   assume it was my supervisors, but we were told that

7   Denver had requested emergency mutual aid for these

8   incidents and that Aurora was going to send a

9   contingency of -- of -- of folks there and that I was

10  going to be heading down to supervise that group.

11      Q.   The Aurora officers that were sent to assist

12  Denver, were they only officers from the ERT?  Or did

13  -- did they include officers outside of the ERT, as

14  well?

15      A.   I believe -- well I know for sure there was

16  also some of our SWAT members that deployed with us and

17  there might have been some other ancillary members that

18  came down that weren't part of ERT, but the majority, I

19  think, of the large group that we sent were ERT and

20  then a few SWAT members to supplement that.

21      Q.   Okay.  Do SWAT members receive -- in Aurora,

22  receive training in crowd management?

23      A.   Yes.                                    0:10:18

24      Q.   Okay.  And what kind of training do they

25  receive?

```
 1            MS. EVANS:  Foundation.
 2       Q.   I'm sorry, for -- so for -- with respect to
 3  objections during a deposition, your counsel may make
 4  objections from time to time, but you'll still need to
 5  answer the question.
 6       A.   Okay.  I understand.  Sorry, it wasn't clear.
 7  So I -- I can't tell you with certainty what exact
 8  training our SWAT members have.  I have not been a
 9  member of that team, but I can tell you that every
10  commissioned officer in Aurora gets crowd control
11  training, probably, if I recall correctly, yearly, but
12  it is something we continue to train on in our
13  in-service training and whatnot.  I don't know if SWAT
14  gets additional crowd control training outside of -- of
15  what a normal officer will get.
16       Q.   So what -- did you have your own squad that
17  you were supervising when you went to assist in Denver?
18       A.   No, ma'am, I was the commanding officer of
19  the entire team, so I was kind of overseeing
20  everything.
21       Q.   Okay.  And who were the supervising officers
22  under your command?
23       A.   Without having a roster in front of me, I'm
24  going to be remembering this the best I can.
25  Definitely had Sergeant Matt Brukbacher, our team
```

1   coordinator, Sergeant Pat Shaker, Lieutenant Mike

2   McClelland was there, Lieutenant Cassidee Carlson.

3   There were several other sergeants that were there as

4   team commanders, I -- I remember Sergeant Pat Serrant,

5   Sergeant Dale Leonard, I'm trying to recall off the top

6   of my head and then who I might have seen on my body

7   camera.  And then we -- on -- on each day, there was

8   also a division chief, higher ranking than I -- I was

9   at the time, that was deployed down there with us as

10  well.  So I'm probably missing some supervisors, but

11  that's who I recall without having a roster in front of

12  me.

13      Q.   Okay.  And did you have a meeting with people

14  from the Denver Police Department with respect to what

15  they wanted Aurora to do before they sent you out

16  there?

17           MS. EVANS:  Form and foundation.  You can

18  answer.

19      A.   Okay.  I wasn't sure if I talked over

20  somebody.  Essentially, we did.  We had a briefing that

21  we attended shortly before we were deployed out on the

22  street.

23      Q.   And so was the briefing on May 30th?

24      A.   Yes.                                    0:12:47

25      Q.   And what time was the meeting at?

1        A.    Late afternoon, I believe, and I'm

2   spitballing here, probably 3:00-ish.  I'm -- I believe

3   we were deployed out on the street around 4:00 or 5:00,

4   so it was prior to that.

5        Q.    Okay.  And who was at the meeting?

6        A.    There were a lot of people at the meeting.

7   It was supervisors from every mutual aid department,

8   which there were a lot, multiple members of Denver

9   command staff, members of my team, a lot of people I

10  don't even know who they were.  It was just a packed

11  room of -- of representatives from many different

12  entities.

13       Q.    Who from your -- from your department were --

14  were present?

15       A.    I don't recall everyone who was there.  I do

16  recall myself, the chief of police, Chief -- Division

17  Chief Parker, Sergeant Brukbacher, there might have

18  been a couple other supervisors there, as well.

19       Q.    Okay.  And what was discussed at the meeting?        0:13:51

20       A.    So again, this is to the best of my

21  recollection, but I know some background information

22  was given on what the city of Denver had experienced

23  the prior days and nights.  We were kind of given a

24  little bit of background on what -- what they had

25  experienced.  They discussed some intel that was given,

1    I can't remember specifics, but kind of what they'd

2    been picking up on social media, what they'd been

3    learning from -- from other -- excuse me, other

4    sources, and then really it was just kind of a rundown

5    of what the -- the goals and objectives for the evening

6    was.  And then we were all given our assignments and

7    areas that Denver PD wanted us to cover.

8         Q.   Okay.  What was communicated to you about

9    what goals and objectives were?

10        A.   I can't recall specifically what the goals

11   and objectives were.  There was an operations plan that

12   -- that Denver handed us, and I believe those items

13   were contained therein.  Ultimately, our goals and

14   objectives, though, without remembering specifics, were

15   to, you know, protect life and property, allow for

16   peaceful expressions of speech, and -- and basically

17   just to keep order and prevent crime and you know,

18   injury to property and persons.

19        Q.   Okay.  Were you given any guidance at this

20   meeting about the circumstances under which less lethal

21   munitions should be used?

22        MS. EVANS:  Foundation.                    0:15:27

23        A.   I don't recall if they specifically went

24   through, "Here's all of the -- if this happens, this is

25   what you can do."  We were -- we knew we were there on

1 a mutual aid agreement, and we were informed that we

2 would use the -- the tactics that we were trained,

3 which is good because we weren't wanting to go down

4 there and be told we had to do something we hadn't

5 trained on.  But -- but we -- we knew what those rules

6 of engagement were prior.  We knew that we were able to

7 -- to act in line with our training.  I believe that it

8 was discussed that if gas was going to be deployed,

9 that that would be the decision of the command post,

10 which is -- is -- is common practice.  But I don't -- I

11 don't believe we -- and I don't even want to say I

12 don't believe, I don't recall specifically if we went

13 through exact circumstances of when force would be

14 authorized.

15     Q.   Okay.  So -- so were you told by the Denver

16 command staff at this meeting that the rules of

17 engagement that you were to follow was to follow your

18 own training and your own policies, your own use of

19 force policies?

20     A.   I'm trying to recall.  That was my -- that's

21 the impression that I remember having, so I don't know

22 if that was told by Denver command staff or my bosses,

23 but that -- that's the premise I remember as we headed

24 out on the street that we were operating under, of we

25 would -- we would operate in accordance with our

1    training and policies.

2        Q.    Okay.  And were you given any -- I mean, in

3    other words, at this meeting with the Denver command

4    staff and the members of other law enforcement agencies

5    who were providing assistance to Denver, Denver did not

6    give out its use of force policies for other agencies

7    to follow, correct?

8            MS. EVANS:  Foundation.

9            MR. HUSS:  Foundation.

10       A.    I don't recall if they were in -- included in

11   the operations plan or not.

12       Q.    Okay.  Is it fair to say that the Denver --

13   Denver command staff approved the outside agencies

14   using their own -- following their own use of force

15   policies?

16           MS. EVANS:  Foundation.

17           MR. HUSS:  Foundation.                    0:18:07

18       A.    I -- I would say that's fair to say,

19   obviously, it -- you know, we knew that Denver -- this

20   was Denver's incident and we were there to assist.

21       Q.    Right.  And so you're there to -- to -- to

22   follow the lead of the -- of the -- I mean, you're

23   there to -- to assist Denver in policing in -- in their

24   jurisdiction, correct?

25       A.    Correct.

 1      Q.   Okay.  And so one example that you gave is

 2  that the decision to use gas on protesters was a

 3  decision of the Denver command post, correct?

 4      A.   Yes and no.  That was -- I believe that was

 5  the decision, but we also knew that based on our

 6  training and in line with best practices, if there was

 7  an emergency situation that arose, we would -- it --

 8  where life and -- there was a life safety issue, that

 9  we would still deploy that, but if it was just in the

10  -- in the interest of crowd management and moving

11  people to disperse an unlawful assembly, that kind of

12  thing, that would -- would have come from the command

13  post.

14      Q.   Okay.  Is it fair to say that Denver officers

15  were present with you and your officers the entire time

16  and Denver command dictated your movements?

17          MS. EVANS:  Foundation.                    0:19:23

18          MR. HUSS:  Form and foundation.

19      A.   And my answer is, it's fair to say with the

20  caveat there may have been times when things were kind

21  of getting chaotic that there may not have always been

22  a Denver person with us.  We had two Denver sergeants

23  that were assigned to our squads, but the way that

24  things developed, there might have been times when

25  Denver was not with us.  But yes, overall they -- they

```
 1  maintained control of the operational control of the

 2  incident.

 3       Q.   Can you see this document on the screen?

 4       A.   I can.

 5       Q.   Okay.  I'm showing you COA BLM 41 to 42.  Is

 6  this your report for May 30th, 2020?

 7       A.   Yes.                                    0:20:17

 8       Q.   Okay.  Did you review this report prior to

 9  your deposition today?

10       A.   I did.

11       Q.   Okay.  And so on the third paragraph of your

12  report, you state, "Upon arrival into Denver, we were

13  briefed by Denver Police command staff and informed

14  that our area of responsibility was going to be the

15  16th Street Mall and two blocks north and south.  APD

16  was asked to provide a visible presence in the area, as

17  well as respond to assist Denver and other units should

18  the need arise."  You then state that you were

19  partnered with Sergeant Brukbacher, who is the ERT

20  coordinator, and also Division Chief Darin Parker.  You

21  state, "We were also assigned two Denver PD sergeants,

22  Sergeants Lopez and Salas to be with our contingent."

23  Do you see that?

24       A.   I do.                                   0:21:00

25       Q.   Do you recall their first names, those
```

1  sergeants?

2      A.   I believe Sergeant Lopez's first name is

3  Tony, Tony Lopez Jr., and I believe Sergeant Salas'

4  first name was, I don't know the full name, but I -- we

5  called him Abe, maybe short for something.

6      Q.   Okay.  Can you tell me what was the role that

7  the two -- these two Denver police sergeants had in

8  relation to your team?

9          MS. EVANS:  Foundation.

10     A.   So --

11         MR. HUSS:  Foundation.

12         WITNESS:  Sorry.

13     A.   So each -- each contingent of Aurora ERT was

14  assigned at least one or two Denver personnel.  They

15  were kind of there to escort us around, they know --

16  it's their city, they know it better than, you know, I

17  would say the majority of any outside agency member.

18  And they were -- basically just said, "Hey, we're --

19  you know -- these -- we're going to assign two people

20  to you to be your liaisons from -- from Denver PD."

21     Q.   Did they give you guidance on when -- when

22  less lethal munitions should be deployed?

23     A.   I don't think they did, no.

24         MR. HUSS:  Foundation.

25     Q.   Did you have any discussions with them at any

1   time on May 30th, 2020 about the circumstances under

2   which less lethal munitions should be deployed?

3        A.   I don't recall.                              0:22:23

4        Q.   Were you on the radio communicating with

5   Denver Police command staff on May 30th, 2020?

6        A.   Yes, at times, I was.

7        Q.   Okay.  And what were you communicating with

8   them about?

9        A.   I'm -- I'm -- I'm sorry, I'm not trying to be

10  difficult, but that's a very broad question because we

11  were down there for so long, so there were different

12  times when I was communicating, mostly I recall

13  communicating on the radio for -- requesting more

14  resources, asking about different things, letting the

15  command post know what we were seeing on the ground,

16  whether it was a suspect that had done something, we

17  were talking to the helicopter, so there was a lot of

18  things that I remember communicating with the command

19  post.

20       Q.   Right.  And what was the purpose of you

21  letting the command post know about what you were

22  seeing on the ground?

23       A.   So, with any operation such as this, the

24  command post contains the incident commander, and that

25  is the person under what we all train under, ICS or

```
 1   Incident Command System.  That person is the one that

 2   makes the calls on -- on what's going on.  Now granted,

 3   there's all -- a lot of bosses typically in there and

 4   there's a lot of people that have input on that, but we

 5   train to not operate independently, we want to know --

 6   unless there's an emergency, but we want to be in

 7   communication with the command post, so there's no

 8   surprises.  We -- we get guidance from the command post

 9   on next steps or "hey, this happened, how do you want

10   us to proceed?"  That kind of thing.  Ultimately, in a

11   perfect world, absent some sort of emergency that we

12   have to deal with right at the moment, the command post

13   should be the one dictating the overall progress and

14   movement of the operation, as well as they -- they have

15   the big picture of what's going on such as we only had

16   a very small chunk of -- depending on where we were at

17   during the incident, we only knew what was going on at

18   our specific location.  There could be something going

19   on blocks away that would affect us that the command

20   post should be aware of based upon their overall bigger

21   view of the incident.  So it's imperative to

22   continuously communicate with them so everybody's on

23   the same page.

24        Q.   Who was in the Denver command post?          0:24:44

25        A.   Like I said earlier, a lot of people were in
```

1   there initially when -- when we briefed in the command

2   post and then I left, so I can't tell you all the --

3   the people that were there.  I know there was

4   representatives from a bunch of different -- different

5   entities, but we were only dealing with mainly one

6   Denver command staff member that was on the radio that

7   I believe was the incident commander, and -- and I, for

8   the life of me, can't remember his name.

9       Q.   Patrick Phelan?

10      A.   That sounds right.

11      Q.   Okay.  He came on the radio as Adam 9 or A9?

12      A.   Yes.  I remember Adam 9.

13      Q.   Okay.  Did you have a radio ID or call sign

14  when you were doing these communications in Denver?

15      A.   Trying to remember what my call -- I did have

16  an assigned call sign at the time.  I believe I was

17  Captain 8.

18      Q.   Does APD P621 sound familiar to you at all?

19      A.   No.

20      Q.   No.  Okay.  You said what -- what did you

21  think it was?

22      A.   At the time, I had an assigned call sign as a

23  command member, and it was Captain 8, and that's --

24  that's the only call sign I would have used.

25      Q.   Okay.  Now was there anybody else from Aurora

```
 1   -- so it sounds like -- actually, let me ask it this

 2   way.  Did all of the Aurora officers who were out there

 3   assisting have access to the radio?

 4           MS. EVANS:  Foundation.                        0:26:19

 5       A.   No.  Everybody would have been issued a

 6   radio, but for specific reasons, which I can explain,

 7   only the squad leaders and team commanders are the ones

 8   that are typically on the radio because the line level

 9   officers that are on the front of a crowd management

10   line are only really dealing with what they need to be

11   dealing with that's directly in front of their eyes.

12   So if something emergent -- an emergency happened, they

13   could get on the radio, but we train so really only the

14   supervisors are on the radio to, number one, limit

15   radio traffic because there's a lot of it in an

16   incident like this, but then number two, really the

17   line level officers need to be listening to what their

18   supervisors are telling them.  They all had radios, but

19   the majority of them may have not been actively

20   monitoring them.

21       Q.   Okay.  And so, who from Aurora were -- were

22   the ones that were on the radio with Denver?

23           MS. EVANS:  Foundation.2                       00:27:1

24       A.   It could have been any -- any number, but

25   mostly, it was myself, I remember Sergeant Brukbacher,
```

1    it -- it really should have, in practice, been just the

2    supervisors, but again, I -- I haven't listened to all

3    two or three days of radio traffic.  So there -- there

4    might be times when other members were on the radio

5    that I'm not aware of.

6         Q.   Did you listen to any of the radio traffic in

7    preparation for this deposition?

8         A.   No.  Unless it was radio traffic that was

9    audible when I reviewed body-worn camera.

10        Q.   Sure.  Okay.  Now you used the term earlier

11   when you were talking about how the incident commander

12   makes the call about what's going on, I think you said

13   something about how there's an incident -- there's some

14   term for the -- the system where you have the incident

15   commander calling the shots.  What's that called?

16        A.   So we train under Incident Command System.

17   It's a federal system, the abbreviation is ICS.

18   There's multiple different levels of training you can

19   go to.  I've gone to all of them.  And it -- it works

20   in conjunction with another acronym called NIMS, which

21   is National Incident Management System.  And the reason

22   all the agencies train on that is so exactly, for

23   instance, like this, when you have a bunch of agencies,

24   police, fire, outside resources coming together, we

25   have some common terminology and common understanding

1   of how when we say we're operating an incident using

2   ICS, everybody kind of knows what that means and -- and

3   that there will be different positions and things like

4   that.

5        Q.   And you'd mentioned earlier that you -- it's

6   -- you train not to operate independently, and what do

7   you mean by that?

8        A.   So in a premise of crowd management, a

9   premise of other things we do in law enforcement, you

10  know, the day-to-day police officer on the street takes

11  independent action all of the time, but when we're in a

12  crowd control situation, we don't want officers taking

13  individual action.  We have a -- you know, a lot of

14  training, we have a line of officers that are

15  protecting, or you know, keeping a crowd back, and if

16  one officer runs off to -- to do something, it -- it

17  breaks down all of that, so we train to do things in --

18  as a group and wait for commands to move, commands to

19  -- you know, to do a number of things.  We don't -- we

20  really train our officers not to take individual action

21  unless they see, you know, "Oh my god, that -- there's

22  something -- there's a life or death thing that, as a

23  police officer, I have to intervene."  We try to do

24  things uniformly as a -- as a -- as a unit instead of

25  individuals.

1    Q.   And why is that important?                          0:29:46

2    A.   It's important so, number one, everybody

3  knows what everybody else is doing, it's -- which is

4  easier said than done, but the way we train in crowd

5  management in a group, it shouldn't even matter if the

6  person next to me is not from my department.  With the

7  national standards and consistency of training,

8  everybody in a crowd management situation should know

9  what the person next to them is -- is likely to do.

10 And like I said, when -- if one person decides, "Hey,

11 I'm going to go" -- I'll give you -- I'll give you an

12 example.  Let's say somebody throws something at the

13 line.  We're trained not to react, except for maybe

14 returning with a less lethal or something.  If one

15 officer runs off and chases after somebody that does

16 that, that's not the intent to what we're doing, and

17 then everybody else has to, you know, kind of look to

18 the supervisor and say, "Okay, now what do we do?"  We,

19 just for the sake of consistency, especially in a high

20 -- high stress environment, we train that don't take

21 individual action unless it's a life safety issue.  And

22 for the most part, it -- it works fairly well.

23    Q.   Okay.  And so the incident commander for

24 Denver was the one who was at the top of this chain of

25 command for the protests?

```
 1            MS. EVANS:  Foundation.                    0:31:03

 2       A.   Yes and no.  I think I understand your

 3   question, but ultimately, the chief of police would

 4   have been the top of the chain of command.  However, if

 5   Incident Command is working properly, the incident

 6   commander still speaks with the voice of the chief of

 7   police and may be getting input and recommendation from

 8   that person.  I -- I don't know what went on in the

 9   command post.  I'm speaking generally because I've been

10   in the command post on other incidents I'm aware of.

11       Q.   Okay.  Thank you for that.  Have you ever

12   been involved in policing -- assisting Denver in

13   policing any other protests?

14       A.   Yes.

15       Q.   Which ones?

16       A.   During the 2008 Democratic National

17   Convention, I was a sergeant at the time and I was

18   assigned to a crowd control team on the 16th Street

19   Mall.

20       Q.   Okay.  Did you or anybody on your team deploy

21   any less lethal weapons at that time?

22       A.   Yes.4                                       00:31:5

23       Q.   And can you tell me the circumstances?

24       A.   So if I remember --

25            WITNESS:  Oh, sorry.
```

```
 1              MS. EVANS:  Go ahead.  Foundation.

 2        A.    Okay.  I remember at the time, there was one

 3   night, and again, this is a long time ago, but there

 4   was one night where there was activity that took place

 5   around 15th and Court Place where Denver and Aurora

 6   crowd control teams ended up deploying some PepperBall

 7   and pepper spray.  We made some arrests.  But it was

 8   really nothing like we experienced in 2020.  It was

 9   much -- much more -- lower numbers of people and -- and

10   not nearly as violent.

11        Q.    Okay.  At that time, did you have a briefing

12   with Denver before -- before you were sent out into the

13   field to police those protests?

14        A.    I don't remember.  I would assume we did, but

15   that's -- that's a long time ago, I'm sorry.

16        Q.    Sure.  Do you recall if you were instructed

17   by Denver at -- in -- during that protest to follow

18   your own use of force policies, or if they -- they gave

19   you a different instruction?

20              MS. EVANS:  Foundation.

21              MR. HUSS:  Foundation.                0:33:08

22        A.    I -- I don't -- I -- I don't have an

23   independent recollection of that.

24        Q.    Okay.  On -- on May 30th, 2020, after you

25   went to this briefing with the Denver command staff,
```

Exhibit 5, LLC

 1   where did you deploy?

 2       A.   So our -- I decided that I was going to go

 3   with the team, a particular group with Sergeant

 4   Brukbacher that was down on the 16th Street Mall.

 5   Basically, Aurora was told we were going to take

 6   different sections so we had some Aurora teams on

 7   different parts of the mall.  I just rolled with one

 8   team and we initially staged down kind of middle, if

 9   you will, the 16th Street Mall, I can't tell you the

10   exact cross streets, but kind of by the old May-D&F

11   Tower is initially where -- where our team deployed to,

12   and at that point, weren't involved in anything, we

13   were just kind of staged in the area.

14       Q.   Were you with Cassidee Carlson when you were

15   down there on the 16th Street Mall?

16       A.   No, her team was further to the east, and

17   then I didn't see her until later on when we were all

18   down at Colfax.

19       Q.   Okay.  When you and your team were at the

20   16th Street Mall on May 30th, was -- did -- did you

21   observe any use of PepperBalls or any other less lethal

22   weapons?

23       A.   Specifically on the 16th Street Mall, I don't

24   believe I did.

25       Q.   Okay.  After you were at the 16th Street

```
 1  Mall, where did you go next on May 30th?

 2       A.   So I don't remember the specific time, but we

 3  had heard that -- a little bit after we got out on the

 4  mall, we heard some Aurora officers further to our

 5  east, it may have been Lieutenant Carlson's team,

 6  saying that they were getting surrounded and pushed up

 7  against a wall by a crowd and they were asking for

 8  assistance.  And so we started to go down in that

 9  direction, and then that incident resolved itself.  So

10  we were mobile, and then a short time later, Denver

11  officers down at Colfax and Broadway, Colfax and

12  Lincoln, asked for help because they were being

13  surrounded by protesters and saying they were getting

14  hit with large rocks and items like that.  So at that

15  time, the group I was with responded there to assist.

16       Q.   Okay.  You did not observe what occurred with

17  the group of officers that was with Cassidee Carlson on

18  the 16th Street Mall, correct?

19       A.   Correct.                              0:35:53

20       Q.   I'm showing you your report again from May

21  30th.  At the bottom of the first page, you state,

22  "Initially, the teams deployed around to different

23  areas on the 16th Street Mall.  At around 1730 hours,

24  several Aurora ERT teams responded to the area of East

25  Colfax Avenue and North Broadway Street to assist
```

1    Denver officers who had advised on the radio that they

2    were surrounded by protesters and that they were being

3    hit with rocks and bottles."  So does that refresh your

4    recollection that you went to the area of Colfax and

5    Broadway at about 1730 hours?

6         A.   Yes, ma'am.

7         Q.   Okay.  And what did -- what did you observe

8    when you got there?

9         A.   So when -- when we arrived, we came in from

10   the north and we came down Lincoln and met in -- met up

11   with some Denver teams that were kind of on the north

12   curbline of Colfax.  There was a fairly large crowd

13   south of them completely blocking Lincoln.  There was a

14   large crowd in Civic Center Park and then a decent

15   crowd up by the Capitol.  The Denver officers that were

16   there at the time were kind of holding a line.  There

17   weren't a lot of them.  Appeared to be trying to keep

18   the crowd south of -- of Colfax.

19        Q.   Do you recall who were the -- who were the

20   Denver officers who were there at that time?

21        A.   I -- I don't, and -- and full disclosure,

22   it's going to be very difficult for me to remember any

23   of the Denver officers that I interacted with by name

24   because of just how many of -- of them were there and

25   the fact that I don't -- I don't know most of them, so

1   just -- I just wanted to let you know that.

2        Q.   Sure.  And so are you able to say, like, what

3   unit they were from, you know, were they metro SWAT or

4   did they seem to be from some other identifiable unit

5   that you could tell?

6        A.   Hard to say because they're in crowd control

7   gear.  It's -- everybody looks the same for the most

8   part.  I did, at one point, know there were metro SWAT

9   there because they do wear a different uniform.

10       Q.   They're the ones in the green fatigues?        0:38:05

11       A.   They do wear green fatigues, but Jeffco

12   Sheriff was there and they also wear very similar green

13   fatigues.  So at times, it could have been one or the

14   other.

15       Q.   Okay.  Was Jeffco SWAT at the intersection of

16   Lincoln and Colfax on May 30th?

17       A.   I'm not sure.  There was a lot of people

18   there.

19       Q.   Okay.  All right.  So you're not sure when

20   Jeffco SWAT was there?

21       A.   I'm not.  I know I interacted with them

22   because I actually do know a member of their team.  I

23   did see them up at -- at district six one of the nights

24   that we were up there, but they -- they could have been

25   anywhere around me and I just didn't notice.

1   Q.   Right.  So on Sunday, May 31st, in the

2   evening starting at about 8:30 p.m., you and other

3   members of the Aurora team were at district six at

4   Colfax and Washington, correct?

5   A.   That sounds correct, yes.

6   Q.   And then during the course of that evening,

7   you and your team pushed protesters west on Colfax,

8   right?

9   A.   That's correct.                          0:39:09

10   Q.   Okay.  And at that time, Jeffco SWAT was with

11   you?

12   A.   I believe so, yes.  I -- I remember -- I

13   remember interacting with their commander, who I'm

14   familiar with, on the west side of district six prior

15   to that push down Colfax.

16   Q.   Okay.  And what was their commander's name?

17   A.   At the time, I don't know if he's still

18   there, his name is Brad Ingermann.

19   Q.   Okay.  And so the Jeffco SWAT team members

20   were wearing green fatigues, correct?

21   A.   Correct.

22   Q.   Okay.  Now going back to May 30th at the

23   intersection of Lincoln and Colfax, so I'm going to

24   pull up your report again.  On page 2, which is COA BLM

25   42, when you had arrived, there had already been some

1  sort of tear gas or other chemical that had been

2  deployed?  Is that fair to say?

3      A.   Yes.                                      0:40:05

4      Q.   And do you know anything about why tear gas

5  had already been deployed?

6           MS. EVANS:  Foundation.

7      A.   I was informed that protesters were accessing

8  there a large area by the RTD bus station that was

9  filled with river rocks and that they were throwing

10 those at officers, hitting them in the head with rocks,

11 bottles, and other items, and -- and I was told that is

12 why, number one, they needed help, but number two, they

13 had deployed less lethal options at that point.

14     Q.   Okay.  So it was your understanding that it

15 was Denver officers who had deployed tear gas or other

16 chemicals before you arrived?

17     A.   Essentially, yes.                          0:40:54

18     Q.   Okay.  Was there any other -- and we're

19 talking about 5:30 p.m. on May 30th at the intersection

20 of Lincoln and Colfax or Lincoln -- or Lincoln and

21 Broadway -- I'm sorry, Colfax and Broadway.  Were there

22 any other outside agencies present at that location at

23 that time?

24          MS. EVANS:  Foundation.

25     A.   So that's tough.  I don't remember exactly at

1    what point some of the other agencies arrived, and to

2    be -- to be frank, I was never at Colfax and Broadway.

3    We really stayed at Colfax and Lincoln for several

4    hours.  I do know that at -- at some point to our west,

5    some -- there was Commerce City, there may have been

6    other agencies there, and then I know that the state

7    patrol was to our southeast around the Capitol.  But I

8    -- I don't know what time specifically.  They may have

9    already been down there when we arrived, but I never

10   made it there to -- to confirm that.

11        Q.   Okay.  So during the period of time from

12   approximately 5:30 to 8:00 p.m., you were at the

13   intersection of Lincoln and Colfax, correct?

14        A.   Correct.                                    0:42:00

15        Q.   Okay.  And your recollection is that Colorado

16   State Patrol was around, but they were to the

17   southeast, closer to the Capitol?

18        A.   Correct.  And I -- you know what, now -- now

19   that you said that, I -- I actually think there might

20   have been some to our west as well.  I remember at some

21   point somebody mentioning they might have been to the

22   west, as well as Commerce City.

23        Q.   Okay.  Who -- what other -- so there were --

24   as far as the agencies who were present at the

25   intersection of Lincoln and Colfax on May 30th between

1  6:00 and 8:00 p.m., it was Aurora officers and Denver

2  officers.  Is that right?

3          MS. EVANS:  Foundation.

4      A.  Correct.  I think we had some Denver sheriffs

5  there at some point, and I know that if we're speaking

6  agencies, Denver Health paramedics came in more than

7  once to take an injured person away.

8      Q.  Okay.  Did the Denver sheriffs have any less

9  lethal weapons?

10          MS. EVANS:  Foundation.                      0:43:00

11     A.  I -- I'm not sure.

12     Q.  Okay.  What munitions or less lethal weapons

13  were your officers from Aurora carrying?  And I'm

14  talking about at the intersection of Lincoln and Colfax

15  between 6:00 and 8:00 p.m. on May 30th.

16     A.  Okay.  So we carried everything we normally

17  will deploy with, that starts with, obviously, our side

18  arms.  We have -- per policy, every officer will have a

19  taser or pepper spray on their belt or both.  Our ERT

20  grenadiers had 40 millimeter less lethal launchers.  We

21  had members that were carrying a -- you might see them

22  in the video, they're in orange, bean bag shotgun, for

23  lack of a better term.  We also had thrown munitions,

24  such as Sting-Ball grenades, white smoke canisters,

25  Triple-Chasers, which are a throwable munition less

```
 1   lethal that deploys CS gas or tear gas.  I'm trying to

 2   think any other systems that we would have had with us.

 3   Oh, well I said pepper spray, but then we also had some

 4   larger handheld pepper foggers that deploy the same

 5   spray, but are -- are used for crowd control because

 6   they -- they're -- they're larger.  That's -- if I

 7   recall correctly, that's everything we would have had

 8   with us.

 9       Q.   Did any of your officers from Aurora have a

10   PepperBall gun?

11       A.   No.  We don't use PepperBall.  It's not a

12   part of our crowd control system, and we don't use it

13   on patrol.  We -- we don't have -- we don't deploy it

14   at all in Aurora.

15       Q.   Okay.  What's a Sting-Ball?                    0:44:44

16       A.   So a Sting-Ball is a throwable munition.

17   It's less lethal.  It -- when it is -- it's a -- it's a

18   -- it looks like a grenade, it's just a rubber ball.

19   When it's thrown, it has a percussion, it deploys small

20   little rubber pellets that will -- that will sting and

21   -- and usually cause people to stop doing whatever it

22   is that they're doing.  It also has a flash and it has

23   a loud bang that goes off.  It's specifically meant to

24   disrupt somebody from doing something that we deem

25   they're not supposed to be doing or to -- you know, we
```

Exhibit 5, LLC

```
 1   may throw it to protect ourselves, protect others.

 2   It's a -- it's a pretty versatile less lethal option

 3   that we use.

 4        Q.   Do you recall which of the officers from

 5   Aurora were carrying the 40 mm launchers?

 6        A.   No.  I would have to look at a roster and I

 7   don't have that with me.

 8        Q.   Okay.  Did any of your officers from Aurora

 9   have flash-bangs?

10        A.   I would suspect yes, but I don't -- I don't

11   recall specifically.  Normally, our SWAT guys carry

12   those.  We do -- we do have some available for crowd

13   control use, but I don't -- I don't remember

14   specifically seeing any, but that doesn't mean we

15   didn't have any there.

16        Q.   Okay.  Do you recall seeing any of your

17   Aurora officers throwing a flash-bang at the

18   intersection of Lincoln and Colfax between 6:00 and

19   8:00 p.m. on May 30th?

20        A.   I don't recall seeing that, no.

21        Q.   Okay.  What weapons did you -- what less

22   lethal weapons did you see the Denver officers have?

23   And again, we're talking about May 30th, Lincoln and

24   Colfax between 6:00 and 8:00 p.m.

25             MR. HUSS:  Foundation.              0:46:31
```

1      A.   So I recall seeing the Denver officers with

2  PepperBall, that's a system they use -- sought out

3  quite a bit.  I know they had similar thrown munitions,

4  but it's hard to see when somebody's throwing

5  something, what specifically it is.  So I'm not going

6  to speculate as to what they had.  I'm not -- I'm not

7  trying to skirt the question, but it would be better

8  suited to ask them what they had.  I -- I did see

9  PepperBall, maybe some less lethal launchers, but

10  again, when we're in that environment, it's sometimes

11  hard to see specifically who might be Aurora or Denver

12  because we're all in crowd control gear.

13      Q.   Okay.  If there's a tear gas -- if there's a

14  -- if there's a gas canister that's thrown that

15  releases yellow-colored gas, do -- do you know what

16  kind that is?

17      A.   That's likely going to be tear gas, be -- or

18  something similar, but I'm -- I'm not a -- not a less

19  lethal munitions expert.  I can just speak to my

20  general experience, and normally, the white smoke is

21  just -- just that, smoke.  But again, not knowing every

22  system that every agency might have, I -- I don't want

23  to -- I don't want to -- I don't want to specifically

24  say it's always this or always that.  I'm not 100

25  percent sure on that.

1    Q.   Okay.  What was your assignment?  What were

2  you assigned to do?  And when I say, "You," I mean you

3  and your officers, what were you assigned to do while

4  you were at the intersection of Lincoln and Colfax on

5  May 30th between 6:00 and 8:00 p.m.?

6    A.   So it changed a bit.  Initially, it was we

7  were just going to supplement Denver with holding a

8  line.  What I was informed is the big concern at that

9  point was the large amount of rocks on the north side

10  of Colfax between Broadway and Lincoln.  I'm not sure

11  if it was RTD property, but adjacent to the RTD

12  station.  And so what we were told was that we were

13  going to hold a line and -- at a bare minimum until

14  bulldozers came in and removed all of those rocks

15  because that was a big concern, they could seriously

16  injure somebody.  So that was the initial plan, and

17  then as we were standing there, things changed.  It was

18  not a peaceful protest.  We began to get hit with lots

19  of objects, up to and including Molotov cocktails, road

20  -- lit road flares, bricks, bottles, large rocks,

21  chunks of concrete, pieces of rebar, and I'm only

22  sharing this because it -- this dictated a little bit

23  of having to take a little bit more of an offensive

24  standpoint.  And so as the night progressed and we were

25  waiting for the rocks and all that stuff to be

1   collected, we ended up pushing a little further south.

2   The main goal was to get, initially, everybody into

3   Civic Center Park, and the Denver officers were -- were

4   making multiple announcements saying, "You can continue

5   your protest, just stop blocking the street."  It's

6   obviously illegal to block a main thoroughfare.  The

7   goal was to get everybody into the park, stop having

8   them advance on officers, and so it was kind of this

9   rapidly evolving scrimmage line where we would -- we

10  would have to move forward, move back, do -- do a

11  little bit of adjustment based upon what the crowd was

12  doing, but if I had to put a title on it, essentially

13  we were assisting Denver with crowd control at that

14  point.

15      Q.   In the body cam video that you watched in

16  preparation for this deposition, did you see or did you

17  -- sorry, did you hear any announcements from Denver

18  police officers telling protesters that they had to get

19  into the park?  Any -- at anytime --

20      A.   Yes.

21      Q.   -- between 6:00 and 8:00 p.m.?

22      A.   Yes.                                    0:50:14

23      Q.   And was this when the crowd was in front of

24  -- was still north of Colfax?

25      A.   No, this was when the -- the crowd was south

1   of Colfax.  They continued to come up to Colfax where

2   the line of officers was, and -- and there was an

3   officer sitting almost the entire time in a -- in a

4   Denver truck that was right behind me, continually

5   making announcements.  I mean, hundreds of

6   announcements.

7       Q.   Okay.  So on your body cam that you watched,

8   you're saying that you heard hundreds of announcements

9   made by Denver, at some point between 6:00 and 8:00

10  p.m., telling protesters that they had to get out of

11  Lincoln and get into the park?

12      A.   No, that's not what I'm saying.  I'm saying

13  that's what I personally heard.  I do remember hearing

14  some of those on my body cam, but I'm not saying I

15  heard hundreds on my body cam.  I'm saying during the

16  time I was there, I would -- I would estimate easily

17  more than a hundred orders were given for people to,

18  number one, get out of the street, number two,

19  specifically saying, "Hey, continue your protests, just

20  move into the park, get out of the street, stop

21  throwing things at us," those kind of things.  There

22  was a bunch of different orders given.

23      Q.   Okay.  So you're not saying that you heard

24  this on your body cam?

25      A.   I'm saying I heard some orders on my body

```
 1    cam, but again, some of this is -- is different.  I'm

 2    -- I'm -- I'm recalling independently outside of my

 3    body cam in the several hours I was there, as well.

 4         Q.   Okay.  So tell me your -- your -- your

 5    testimony, based on your presence at the intersection

 6    of Lincoln and Colfax on May 30th, is that between 6:00

 7    and 8:00 p.m., Denver Police made hundreds of

 8    announcements telling protesters to get out of the

 9    street and get into the park?

10         MS. EVANS:  Form.

11         Q.   Is that your testimony?

12         A.   Yes.

13         Q.   Okay.  And you're not sure if all of that

14    made it onto your body cam, but you remember it

15    happening?

16         A.   That's correct.

17         Q.   Okay.  And Denver Police Department was

18    making these announcements from a vehicle?

19         A.   Yes, the majority of the announcements were

20    from a loudspeaker PA system from a Denver truck that

21    was behind our line.

22         Q.   Did you see any evidence of Molotov cocktails

23    or any other explosive devices being thrown while you

24    watched your body cam video?

25         A.   Yes, I did.                            0:52:47
```

```
 1      Q.   What time was it?
 2      A.   I'm not sure a specific time.  If we're -- if
 3   we're talking only what I observed on body cam, I don't
 4   believe you can see the Molotov cocktails that were
 5   thrown.  I saw those personally, but at least at one
 6   point during the body -- body cam footage, I reference
 7   a guy that actually threw a lit road flare at us.  It
 8   came -- the large kind we use to -- to block streets,
 9   it burns -- it's got white phosphorus and it extremely
10   -- burns very, very hot, would have maimed or worse if
11   it would have hit us.  That came flying from the
12   southwest side of Colfax.  You -- you hear me on the
13   body cam say, "Hey guys, watch out."  I then get on the
14   radio and -- and notify command that -- and gave a full
15   description of the guy that just threw it and say, "If
16   somebody can contact him, he needs to be arrested."  So
17   some of those things, you know, you can hear it, you
18   may -- I don't know if you could specifically see the
19   flare tumbling at us, but you definitely hear me
20   referencing it on there.
21      Q.   Okay.  It's fair to say there was a very
22   large crowd of hundreds or perhaps over a thousand
23   protesters who were at that intersection at that time,
24   correct?
25            MS. EVANS:  Foundation.                    0:53:59
```

Exhibit 5, LLC

```
 1        A.    Yes.

 2        Q.    And there were protesters who were being

 3   peaceful, correct?

 4              MS. EVANS:   Foundation.

 5        A.    Yes.  Not everyone there was throwing things

 6   and -- and being violent.  There -- there were people

 7   that were -- were not doing those behaviors.

 8        Q.    Some of the protesters there, especially

 9   those in the front line, were on their knees holding

10   signs and or chanting, right?

11        A.    I did see that, yes.

12        Q.    Okay.  And you -- your officers and Denver

13   police officers used less lethal weapons -- or sorry,

14   strike that.  Used tear gas on the protesters,

15   including the ones who were being peaceful, correct?

16              MR. HUSS:   Objection.  Foundation.          0:54:59

17        A.    So tear gas was used.  It wasn't used

18   specifically on peaceful protesters, but it was

19   deployed, and I can't speak to every single instance,

20   but after numerous orders were given to disperse, we

21   were getting hit with multiple objects, unlawful

22   behavior was -- was going on, tear gas was deployed.

23   If there were people that were not being violent or

24   aggressive that were more peaceful, that chose not to

25   leave after the orders of the Denver Police Department,
```

Exhibit 5, LLC

```
 1   it is possible that they were still there and present

 2   when that occurred.

 3       Q.   Okay.  So is it your testimony that before

 4   every use of tear gas, at the intersection of Lincoln

 5   and Colfax on May 30th between 6:00 and 8:00 p.m., was

 6   preceded by an order to disperse?

 7           MS. EVANS:  Foundation and form.

 8           MR. HUSS:  Form and foundation.

 9       A.   I can't say that with accuracy.  I -- I was

10   not -- I'm not privy to every single use of the tear

11   gas.  I was only in a -- in a small area there.  So I

12   can't say that with certainty, that every single order

13   was -- or every single deployment was preceded with an

14   order.  I can't say that with certainty.

15       Q.   Is it justified to use tear gas on peaceful

16   protesters if they're not given any sort of warning

17   that tear gas is going to be used or given any sort of

18   warning that they should disperse?

19           MS. EVANS:  Form and foundation.

20           MR. HUSS:  Form and foundation.

21       A.   Will you repeat the question?  I'm sorry.

22       Q.   Before you use tear gas on protesters, are

23   you required to give them an order to disperse?

24       A.   Yes.  Absent a -- an immediate life safety

25   issue where we have to use tear gas to stop something
```

1  that's an immediate threat to life or limb, it is -- it

2  is common practice and -- and it is preferred,

3  obviously, to -- to -- to give orders before doing so.

4      Q.   Okay.  And the use of tear gas on people in a

5  crowd who are not doing anything violent would not be

6  justified if they hadn't disobeyed an order to

7  disperse?

8          MS. EVANS:  Foundation.                    0:57:10

9          MR. HUSS:  Form and foundation.

10     A.   And again, I'm sorry, can you repeat it one

11  more time?  I -- I -- I missed a "had" or "had not,"

12  I'm sorry.

13     Q.   Sure.  So in a protest situation, you may

14  have a number of peaceful protesters, but also some

15  people in there who are not peaceful and who are

16  throwing things, right?

17     A.   Sure.

18     Q.   Okay.  And so tear gas, by its nature, is an

19  indiscriminate weapon, right?

20          MS. EVANS:  Foundation.

21     A.    More or less.  I mean, there's a lot of

22  factors that go into it, wind.  Yeah, it's not a --

23  it's not a directed weapon where we're focusing on one

24  individual necessarily.  It's mainly used to disperse a

25  crowd.  And that could -- that could go in -- in an --

1   any number of directions, but that's why we typically

2   give an order to disperse, so if people are there and

3   remaining unlawfully, they understand that they could

4   be subject to that chemical irritant.

5       Q.   Right.  So tear gas -- you can't target tear

6   gas at a particular person because it just releases

7   into the air, right?

8       A.   No.  You can.  I mean, you can throw a tear

9   gas canister at an individual if they're doing

10  something that is illegal or unlawful, but there are

11  better weapons that we prefer to use in that scenario,

12  such as a launchable munition or something like that.

13      Q.   Right.  But tear gas will disperse into the

14  air, and then people who were in the vicinity, who may

15  not have done anything wrong, would be exposed to it,

16  right?

17          MS. EVANS:  Foundation.                    0:58:41

18          MR. HUSS:  Form and foundation.

19      A.   That -- that is a potential, yes.

20      Q.   Okay.  So every use of force that a police

21  officer uses has to be justified with respect to what

22  was the person doing that justified this use of force,

23  right?

24          MS. EVANS:  Foundation.

25      A.   Yes.  What -- yes, what you're saying is --

1    is accurate but in crowd control and riotous

2    situations, it -- it doesn't always work that way

3    because once it reaches a threshold of there's violence

4    going on, there's property damage, all of those things,

5    we may deploy something like tear gas to clear the

6    area, and again, if people have not heeded warnings to

7    leave, they're not listening to officers' commands,

8    they're illegally blocking a street, unfortunately,

9    that's not peaceful protesting if they're doing those

10   sort of things, and they may be subject to being

11   exposed to that tear gas.  I -- I would hope that most

12   reasonable people, when they see officers and tear gas,

13   and are hearing announcements and seeing that things

14   are escalating, would -- would depart the area if they

15   didn't have ill intent.

16       Q.   Okay.  So let's say that you had a crowd of

17   people who were protesting in the street.  You'll --

18   you would agree with me that the First Amendment

19   protects protests in the street, right?

20            MS. EVANS:  Foundation.

21            MR. HUSS:  Foundation.                    1:00:02

22       A.   To an extent, but it is a crime to block a

23   public roadway.

24       Q.   Okay.  So did somebody decide that it was a

25   crime for the hundreds of protesters who were present

Exhibit 5, LLC

1   on Lincoln between 6:00 and 8:00 p.m. on May 30th, that

2   they were committing a crime by blocking the street?

3          MS. EVANS:  Form and foundation.

4          MR. HUSS:  Form and foundation.

5      A.   Well I'd say the -- the legislators who

6   enacted the laws that prohibit blocking a public street

7   would have decided that that was unlawful.  We don't

8   pick and choose, "okay, this law's applicable at this

9   time, it's not at this time," but you can't block a

10  public thoroughfare.

11     Q.   Okay.  So, but this -- this -- this -- this

12  interaction with the protesters at the intersection of

13  Lincoln and Colfax between 6:00 and 8:00 p.m. lasted

14  for hours, right?

15     A.   Yes.

16     Q.   The curfew in Denver was not until 8:00 p.m.

17  that day, correct?

18     A.   That's correct.

19     Q.   And it was only after 8:00 p.m. that you and

20  the other officers decided to push forward and push

21  people out of the street and out of the park?

22          MS. EVANS:  Form and foundation.            1:01:03

23     A.   Well, that's not entirely accurate, because

24  at -- at more than one point before 8:00 p.m., we did

25  move forward to push, we moved back, but there was

 1  different movements.  So the big push was when we were

 2  told that, excuse me, 8:00 p.m. is -- we're done, it's

 3  now curfew, everyone remaining is in violation, we're

 4  going to, at this point just push and get everybody out

 5  of the area.

 6      Q.   Okay.  So is it your testimony that anybody

 7  who was standing in the street protesting -- before

 8  curfew, okay, before 8:00 p.m., that anybody who was

 9  standing in the street protesting was violating the law

10  against blocking the street?

11          MS. EVANS:  Form and foundation.

12      A.   Yeah, I mean, I -- I don't have the exact

13  statute in front of me for -- for blocking a public

14  roadway, but you -- regardless of your intent, we had

15  people pulling barricades, blocking a street that cars

16  need to go through.  They didn't have a permit to --

17  you know, it wasn't like a -- one of our permitted --

18  permitted protests where the police are escorting, that

19  kind of thing.  Whether we chose to address it or not

20  or whether we had the resource to address it is a whole

21  separate issue, but yeah, there -- at that time, on

22  that date and time, it was illegal to block a public

23  roadway.

24      Q.   Okay.  Everybody who was in the street,

25  standing in the street, protesting, whether they were

 1   holding a sign, kneeling and chanting, they were

 2   violating the law, right?

 3        A.   In my opinion, yes.                          1:02:32

 4             MS. EVANS:  Foundation.

 5        Q.   Okay.  And because they were violating the

 6   law, you and the Denver police officers were allowed to

 7   use whatever force you desired against them if they

 8   would not move?

 9             MR. HUSS:  Form and foundation.

10             MS. EVANS:  Form and foundation.

11        A.   So, I -- I -- I don't want to answer that yes

12   or no because there's a lot more that goes into it.  We

13   weren't just pushing people and using force because

14   they were blocking a roadway, that's -- that's a

15   low-level offense.  We had people -- and I personally

16   got hit with serious objects, bricks, bottles, rocks,

17   officers getting hit with all kinds of things, people

18   throwing Molotov cocktails, we had all kinds of things

19   being hurled at us.  That is not the same as just

20   blocking a public roadway.

21        Q.   But I'm not talking about the people throwing

22   things at you.  I'm talking about the people who were

23   standing in the street or kneeling in the street,

24   chanting and holding signs, okay?  I'm talking about

25   those people.  If you used less lethal weapons on those

```
 1   people without warning, was that an appropriate use of

 2   force?

 3            MS. EVANS:  Form and foundation.              1:03:36

 4            MR. HUSS:  Form and foundation.

 5       A.   I can't answer that specifically because it's

 6   -- multiple things are going on.  I can only speak to

 7   what I personally observed, and every time I saw less

 8   lethal munitions or gas being deployed, it was because

 9   people were violently attacking or throwing things, so

10   if there is a person that's peacefully protesting

11   that's in the mix of that and I -- let me preface this,

12   too, is we had multiple peaceful protests.  I had

13   protesters at different points come up and give me a

14   hug.  It's a lot different than what was going on at

15   Colfax and Lincoln.  You know, if somebody is seeing

16   those things -- if you're standing next to somebody

17   that throws a Molotov cocktail at a line of police

18   officers and you don't think that there's going to be a

19   reaction, you know, I don't believe anybody, and I

20   can't speak for everybody, but I never saw somebody

21   purposely targeting peaceful protesters.  We were -- a

22   lot of times, the officers were responding to things

23   that were being done against them or because they saw

24   something that went on that they -- that required them

25   to take action.  I can't also testify to the decisions
```

1  that went into deploying gas or didn't go into

2  deploying gas because I wasn't in the command post when

3  those decisions were being made.

4      Q.   Okay.  And the command post was telling you

5  when to deploy gas when you were at the intersection of

6  Lincoln and Colfax on May 30th, correct?

7      A.   Not me specifically.  I was told on more than

8  one occasion, a Denver supervisor would say, "Hey,

9  okay, in a minute, we're going to -- we're going to get

10  ready to push south.  We're going to go, you know, take

11  some section of this roadway, and -- and when we do

12  that, if people don't leave, we're going to deploy

13  gas," so I -- some of those directions were coming

14  from, I guess, third hand to us from the command post.

15      Q.   Okay.  But it was coming down from command

16  post to a Denver supervisor, and then to you, right?

17          MS. EVANS:  Foundation.                    1:05:24

18      A.   Some of the time.  There might have been

19  other times when officers deployed gas because they saw

20  something that they needed to immediately address.  I

21  can't speak for every instance that it was deployed.

22      Q.   Was all the use of force that you witnessed

23  at the intersection of Lincoln and Colfax between 6:00

24  and 8:00 p.m. in accordance with Aurora policies and

25  procedures?

1      A.   I don't recall seeing anything that was out

2  of our policy and procedures, if that -- if that

3  answers your question.

4      Q.   Was all of the use of force that you observed

5  by Denver police officers at the intersection of

6  Lincoln and Colfax on May 30th in accordance with what

7  you believe to be the appropriate use of force?

8           MR. HUSS:   Foundation.

9           MS. EVANS:   Form and foundation.          1:06:08

10     A.   So I don't know their policy.  I've not read

11 their use of force policy, so I can't attest to whether

12 there was officers out of compliance with their policy,

13 but I -- I saw nothing that took me aback and said,

14 "Oh, that's an -- that's an unlawful use of force."  I

15 never saw anything concerning in that regard, that I

16 recall, but obviously, again, I didn't have a

17 bird's-eye view of everything that was going on, I can

18 only speak to -- to my area of focus.

19     Q.   If there was a protester standing on the

20 sidewalk with their hands up, and they hadn't thrown

21 anything or yelled any threats at the police, would it

22 be an appropriate use of force for an officer to shoot

23 PepperBalls at them?

24          MS. EVANS:   Form and foundation.          1:06:55

25          MR. HUSS:   Same.

1    A.   I don't know, because I don't know -- these

2  scenarios, there's a lot of variables that go into

3  them, and I can't -- I can't be inside that officer's

4  mind, I can't see from their perspective of -- of what

5  they saw preceding the use of force or what else was

6  going on.  I mean, I can -- I can speak in general

7  terms, but every use of force is different, and every

8  officer perceives things differently, so it's very --

9  it's very hard to answer broad, general questions.

10  It's -- it's much easier, if we're talking in this

11  specific instance, did I feel something was -- was

12  reasonable and appropriate, but again, I can't -- I

13  can't attest to everything that officer saw.  I mean, I

14  literally could be standing next to somebody that uses

15  force and I may have chose not to use force, but I

16  didn't see or perceive what they saw.

17    Q.   I'm not asking you to tell me what other

18  people saw.  I'm asking you a hypothetical, okay?

19    A.   Okay.                              1:07:53

20    Q.   Let's --

21    A.   Perfect.

22    Q.   -- assume that you were at the intersection

23  of Lincoln and Colfax on May 30th and you saw a

24  protester who was standing on the sidewalk, with their

25  hands up, and who had not thrown anything or made any

```
1   kind of threats against the police or anybody else.

2   Would it be appropriate -- appropriate use of force to

3   shoot that protester with PepperBalls?

4            MS. EVANS:  Form and foundation.

5            MR. HUSS:  Form and foundation.

6       A.   I guess I'll ask, appropriate under what

7   circumstance?  Again, I don't know Denver's policies.

8       Q.   Let's -- let -- well, let's say -- let's

9   start with Aurora Police policy, okay?  If you got a

10  protester standing on the sidewalk with their hands up,

11  hasn't thrown anything, hasn't made any threats against

12  anybody, police officer or otherwise, would it be

13  appropriate to just shoot that person in the body and

14  in the face with PepperBalls?

15           MS. EVANS:  Form and foundation.          1:08:52

16           MR. HUSS:  Form and foundation.

17      A.   I can't answer that either, because we don't

18  have PepperBall, and so I don't know -- I don't know

19  what -- if we had a policy on PepperBall, I could tell

20  you yes or no.  I could -- I don't want to answer a

21  question about PepperBall.  It's not a system I'm

22  familiar with.

23      Q.   Okay.  Do you think it should be appropriate?

24  Do you think that should be an appropriate -- I know

25  that you don't use PepperBalls, but do you think that
```

Exhibit 5, LLC

```
 1  should be -- you're a commander, right?  You've been

 2  with the police department a real long time, correct?

 3      A.   Yes.                                    1:09:21

 4      Q.   Okay.  If you were developing a policy for

 5  PepperBalls, would you deem that -- would you instruct

 6  your officers that that would be an appropriate use of

 7  force?

 8           MS. EVANS:  Form and foundation.

 9           MR. HUSS:  Same objection.

10      A.   Based upon what you described, absent

11  anything else, no.

12      Q.   Okay.  Based on what you understand of the

13  Fourth Amendment, which prohibits unreasonable force

14  used on civilians, would it be a violation of the

15  Fourth Amendment to shoot a protester with PepperBalls

16  when he had just been standing there with their hands

17  up?

18           MS. EVANS:  Form and foundation.

19           MR. HUSS:  Same.

20      A.   Potentially, it could, yes.

21      Q.   It could potentially be an appropriate use of

22  force, under your understanding of the Fourth

23  Amendment, to shoot a protester with PepperBalls when

24  they were standing there with their hands up?

25           MS. EVANS:  Form and foundation.
```

```
 1              MR. HUSS:  Same.

 2        A.    I'm sorry, I thought your question was, could

 3   it be a violation of the Fourth Amendment --

 4        Q.    Oh, sorry, maybe I did.  Okay.  It could be a

 5   violation of the Fourth Amendment, correct?

 6        A.    Potentially, it could.                    1:10:27

 7        Q.    Okay.  Would that use of force -- would that

 8   use -- kind of use of force tend to deter a person from

 9   exercising their First Amendment rights?

10              MS. EVANS:  Form and foundation.

11              MR. HUSS:  Form and foundation.

12        A.    Potentially.

13              MS. WANG:  Okay.  Let me -- how long have we

14   been going here?  All right.  Let me take a quick

15   break, and I'll -- I'll pull up some videos, okay?

16              WITNESS:  Okay.

17              MS. WANG:  Just five -- two minutes.  Two

18   minutes.

19              WITNESS:  Okay.  I'm going to step away for

20   just a second while we do that.

21              MS. WANG:  Okay.

22              RECORDER:  Off the record, 3:45 p.m.

23                   (Off the record)

24              RECORDER:  Back on the record, 3:50 p.m.

25        Q.    Okay.  Commander Redfearn, I'm showing you
```

```
1   COA BLM 296.  It's one of your body cam videos from May

2   30th.  I'm going to play a clip and then ask you some

3   questions about it.

4        A.   Okay.                                    1:11:29

5             (Video COA BLM 296 played)

6        Q.   Okay.  I stopped it at 18:04:16.  So in this

7   clip, Sergeant Brukbacher was asking you if you had any

8   Sting-Balls?

9        A.   That appears to be the case, yes.

10       Q.   Okay.  And why did you say, "Fuck yeah, I'm

11  on body cam"?

12       A.    I don't think those were -- I don't think

13  that was one consistent statement.  I can't tell you

14  why I said the explicative at that point.  I'm not sure

15  why I said that, and I'm not actually clear on exactly

16  what my statement was about my body cam, but I don't

17  have independent recollection of either one.

18       Q.   Let's rewind it.

19       A.   Sure.

20       Q.   I'm playing from 16:03:48.

21            (Video COA BLM 296 played)

22       Q.   You said, "Fuck yeah.  I'm on body cam."

23  What did you mean by that?

24       A.   I don't recall, at the time, why I said

25  either of those things.
```

1    Q.   You then said to Sergeant Brukbacher that you

2  were going to ask Denver if it's okay to throw it,

3  right?

4    A.   Correct.

5    Q.   Why?

6    A.   So the majority of -- unless it was something

7  that my officer saw that was an instant, we gotta deal

8  with this right this moment, most of those decisions I

9  was trying to run through Denver because it was their

10  jurisdiction.

11    Q.   Okay.  Let's pull up another video.  Just a

12  moment.  I'm showing you COA BLM 297.  We'll -- we'll

13  play it for a few seconds.

14              (Video COA BLM 297 played)

15    Q.   I'm pausing it at 18:28:53.  So Sergeant

16  Brukbacher comes up to you and shows you a

17  Triple-Chaser, and then you go to ask a Denver sergeant

18  whether it's okay to use it, is that correct?

19    A.   Yes.                                    1:15:29

20    Q.   Who was this Denver sergeant?

21    A.   I have no idea.  There were multiple

22  different -- it could have even been a lieutenant,

23  there were several down there.

24    Q.   Okay.  Let's actually rewind it because I

25  think, at some point, you say -- you ask if it's okay

```
 1   to throw from Matt.  I'm playing it again from

 2   18:28:37.

 3                 (Video COA BLM 297 played)

 4        Q.   I paused it.  Did you just say, "Matt, you

 5   good if we toss a couple tripper -- Triple-Chasers?"

 6        A.   I said the second part for sure, but I can't

 7   -- I can't understand the name that I'm saying, and I

 8   don't remember -- I actually don't remember that I knew

 9   any of their first names, so I'm -- I'm sorry, I can't

10   tell you what that first word I'm saying is.

11        Q.   Okay.  Do you know if that was Lieutenant

12   Matt Canino from the Denver Police Department?

13        A.   As I stated, I'm not sure who that was.          1:16:41

14        Q.   Okay.  And so you wanted to get approval from

15   them to throw it?

16        A.   Essentially, yes.

17        Q.   Why?

18        A.   Again, it was their jurisdiction.  I -- if it

19   was my city, I would want outside agencies to -- you

20   know, if possible, and it wasn't a -- an emergent

21   situation, run those things by us.  I'm a big fan of

22   not stepping on their toes, for lack of a better term,

23   because we were there to assist them.

24        Q.   Okay.  Let's play it for another few seconds.

25   Okay.  So this gang unit sergeant from Denver tells you
```

```
 1    to throw it over them, correct?

 2              MS. EVANS:  Not to interrupt, I -- I don't

 3    believe you shared your screen before playing that.  I

 4    didn't see it.

 5              MS. WANG:  Oh, whoops.  Sorry.  Can you see

 6    it now?

 7              MS. EVANS:  Yes, thank you.

 8         Q.   Okay.  Let's go back.  We're at 18:29:00.

 9              (Video COA BLM 297 played)

10         Q.   Wait.  I have to go back farther.  Okay.

11    We're at 18:28:48.

12              (Video COA BLM 297 played)

13         Q.   Okay.  I've paused it at 18:28:56.  This

14    guy's a sergeant from the gang unit of DPD, correct?

15         A.   That appears to be, yes.                      1:18:30

16         Q.   Okay.  And you can tell because he's got the

17    arrows on his -- on his arms, right?  On his shoulder?

18         A.   That's correct.

19         Q.   Okay.

20              (Video COA BLM 297 played)

21         Q.   Okay.  We've played it to 18:29:00.  So you

22    express a concern about being too close, and then the

23    sergeant from Denver tells you to throw it over them,

24    is that right?

25         A.   That appears to be correct, yes.              1:18:57
```

1    Q.   Okay.  What was your concern about it being

2  too close?

3    A.   Specifically, at that moment, I don't

4  remember.  I -- I -- I can speculate that if we were

5  trying to disperse the crowd, it would have been better

6  to get it further back, but I'm not -- again,

7  obviously, I've reviewed this, but I don't have a lot

8  of independent recollection of what was going through

9  my head at that time.

10    Q.   Okay.  So let me ask you, you've had training

11  on the use of tear gas, correct?

12    A.   Yes.                                    1:19:32

13    Q.   If you -- if you're trying to use tear gas to

14  disperse people, you want to throw it in a place where

15  it will cause them to run in one direction, right?

16    A.   That could be a potential use, yes.

17    Q.   Okay.  Well, and I don't -- I haven't had

18  this training, so I would just like to know, if you

19  have a crowd of people and you throw tear gas into the

20  middle of the crowd, then naturally, the crowd is going

21  to disperse in all directions away from the tear gas,

22  correct?

23         MS. EVANS:  Form and foundation.          1:20:07

24    A.   There's many -- there's many possible

25  outcomes, and that is one of them.

```
 1        Q.    Okay.  But if you want them to go back or you

 2   want to move a crowd in a certain direction, in one

 3   direction, you're going to roll the tear gas or throw

 4   it in a way that doesn't land in the middle of the

 5   crowd and would not cause them to go in all sorts of

 6   directions, correct?

 7             MS. EVANS:  Form and foundation.

 8        A.    If you have -- let's say there's -- okay, you

 9   -- you say, "I want them all to go south," then yes,

10   you may want to do that.  If it's a "we gotta -- we

11   have to disperse this now," you may just toss it and

12   you'll still get the same effect.  Everybody will run

13   the -- the opposite direction, hopefully, but again,

14   there's -- human behavior's difficult to gauge, and

15   there's all kinds of different responses that -- that

16   might be elicited when we throw that.

17        Q.    Okay.  So I'm showing you again COA BLM 297.

18   What was the crowd doing at this time that warranted

19   the throwing of this Sting-Ball?

20             MS. EVANS:  Foundation.              1:21:15

21        A.    I don't recall that specific moment.  We were

22   down there for quite a while.  There was multiple

23   different things that occurred during this time frame,

24   and -- so in this specific clip, I don't recall exactly

25   what -- obviously, Sergeant Brukbacher saw something
```

Exhibit 5, LLC

1   that concerned him, but I don't -- I don't know what

2   that was.

3        Q.   Okay.  Let -- let's play this for a few

4   seconds.  I'm going to ask you to tell me what it is

5   this crowd is doing that would warrant the use of a

6   Sting-Ball on them.

7                  (Video COA BLM 297 played)

8        Q.   Okay.  I've stopped it at 18:29:29.  So the

9   -- the -- the munition in question has been thrown at

10  this point, correct?

11       A.   It appears to be, yes.  You could see the

12  reaction of people running away, so I believe that was

13  the -- the reaction from the munition.

14       Q.   What were they doing?  What was the crowd

15  doing that warranted the throwing of that munition at

16  that time?

17             MS. EVANS:  Foundation.                    1:22:36

18       A.   Again, I can't accurately answer that.  I'm

19  not sure -- obviously, you see people at the front with

20  their hands up.  It's a common protester tactic, but

21  there could have been any number of things that -- that

22  they were doing at that exact moment.  I saw things

23  throughout the entire night at different times, again,

24  this is just one little piece of that, and I don't have

25  a -- the body cam's a very narrow view, I don't have a

1   good world view of everything that was going on, and

2   Sergeant Brukbacher is probably our furthest -- our

3   utmost expert on crowd control, so I trust his judgment

4   if he or any of the other supervisors saw something

5   that -- we weren't just doing it for fun.

6       Q.   Okay.  So this guy right here, in the middle

7   of the screen, with his hands up, you called that a

8   tactic.  Is that a tactic?

9       A.   I didn't call that --

10          MS. EVANS:  Form and foundation.          1:23:25

11          WITNESS:  Sorry.

12      A.   I didn't call that guy a tactic, I said that

13  you see people at the front initially with their hands

14  up, and -- and in our -- in our trainings, we've been

15  told that if a group is organized and they're wanting

16  to make it appear that law enforcement is targeting

17  peaceful protests, the -- the people that are being

18  violent and throwing things and doing nefarious

19  activities will hide behind those -- those folks that

20  appear to be peaceful.  So I don't know about that

21  gentleman in particular.

22      Q.   Well we didn't see anybody throwing anything

23  before that munition was launched, right?

24          MS. EVANS:  Form.                          1:23:58

25      A.   We, in this body cam, I -- I didn't see

1   anything, but clearly it's a very narrow focus.

2       Q.   Do you recall from being there that there was

3   anything thrown or anything at all from the crowd that

4   justified the throwing of that munition at that time?

5           MS. EVANS:  Form.

6       A.   I recall being hit by all kinds of things.  I

7   don't know if this was one of those -- those moments.

8       Q.   Well, we just watched about 45 seconds of

9   this video.  Were you hit by anything at that time?

10      A.   I'm not sure.                         1:24:28

11      Q.   This guy right here, he's got a PepperBall

12  gun, correct?

13      A.   I can't tell what he's holding.  He's got his

14  arm up like he's aiming something, but I can't tell

15  what it is.

16      Q.   Let -- let's play it.

17              (Video COA BLM 297 played)

18      Q.   Okay.  Do you see that pepper spray that was

19  being deployed at this guy standing there with his

20  hands up?

21      A.   It appears to be, yes.

22      Q.   Was he doing anything that justified that?

23      A.   I'm not sure.                         1:25:15

24      Q.   Did you see anything in this video that

25  indicated he was doing anything that justified that?

1    A.   In that short clip, not necessarily, but

2  there's a lot more that goes into that than just that

3  short little clip that -- we don't have a -- a big view

4  of what's going on.

5    Q.   And just for the record, this is at 18:29:46.

6  This officer on the left-hand side, he's holding a

7  PepperBall gun, correct?

8    A.   Yes, that I can tell is a PepperBall gun.

9    Q.   Okay.  And so that would be a Denver police

10 officer, correct?

11   A.   Presumably, because Aurora didn't have any.

12   Q.   Let me -- let me take you to another video.

13 Just a moment.  All right.  I'm showing you COA BLM

14 294.  This clip is going to start at 19:07:14, and

15 we're just going to watch it for a moment, and then

16 I'll ask you some questions.

17            (Video COA BLM 294 played)

18   Q.   Okay.  Do you see this individual?  I've

19 paused it at 19:07:17.  Do you see this individual over

20 here on the right-hand side, who is standing on the

21 sidewalk with their hands up?

22   A.   I do.                                1:27:08

23   Q.   Okay.  I want you to watch that individual

24 and tell me if you see him doing -- see them doing

25 anything that warrants the use of force on -- on them.

1   Okay?  We're going to play it.

2              (Video COA BLM 297 played)

3       Q.   Did you just point at them and say, "Look at

4   this shit"?

5       A.   That is what it sounded like I said, yes.

6       Q.   It's at 19:07:30.  Why did you say that?

7       A.   Good question.  I'm not sure what -- there's

8   a lot of potential things I could be pointing at over

9   there.  I'm not sure if it's people on the ground.

10  They're doing something.  Again, I can only go with

11  what I'm seeing here.  Don't have an independent

12  recollection of this moment.

13      Q.   Okay.  So you don't know if you were

14  referring to this individual with their hands up on the

15  sidewalk?

16      A.    I doubt it.  I surely wouldn't be just

17  referring to him as -- in saying that kind of

18  statement.  That's not in my character.

19      Q.   Okay.  Let's continue, and -- and then -- and

20  then -- and then I'm going to ask you if you see them

21  doing anything that warrants the use of force on them,

22  okay?

23              (Video COA BLM 297 played)

24      Q.   I paused it at 19:07:44.  Somebody rolled a

25  tear gas canister at this person's feet, correct?

```
 1              MS. EVANS:  Foundation.

 2         A.   I don't know what the canister was.  It could

 3    be tear gas.  I -- I didn't see who rolled it or what

 4    it was.

 5         Q.   Is it a chemical weapon of some kind?

 6         A.   It's a less -- some sort of less lethal

 7    munition, yes.

 8         Q.   Right.  And it's not white smoke, because

 9    it's yellow, right?

10         A.   It definitely is yellow, yes.            1:29:07

11         Q.   Okay.  And so it is the kind of chemical

12    munition that would irritate you if you were to inhale

13    it, right?

14         A.   If it is a -- if it's not smoke and is a CS

15    gas, then -- then yes, but again, I don't -- I didn't

16    throw that, so I don't know what it is.

17         Q.   Okay.  But did you see that person who was

18    standing there on the sidewalk with their hands up do

19    anything that warranted an officer rolling a chemical

20    weapon at them?

21              MS. EVANS:  Foundation.

22         A.   In the context of this video, I did not.

23         Q.   All right.  Let's continue.

24              (Video COA BLM 297 played)

25         Q.   I'm pausing it at 19:09:10.  Did you see this
```

```
 1  officer in the green fatigues who just threw a tear gas

 2  canister?

 3      A.   I did.                                    1:31:18

 4      Q.   What was the crowd doing that warranted that?

 5           MS. EVANS:  Foundation.

 6           MR. HUSS:  Foundation.

 7      A.   I have no idea.

 8      Q.   Can you say -- can you give any justification

 9  for the throwing of that tear gas canister?

10           MS. EVANS:  Foundation.

11      A.   I can't, but it would be up to that

12  individual officer to have to justify his deployment of

13  that.

14      Q.   Do you recall anything from being there that

15  day that -- that's not depicted on video that would

16  justify this officer in throwing this tear gas

17  canister?

18      A.   Oh, I --

19           MS. EVANS:  Foundation.

20      A.   I recall all kinds of things that would

21  justify the use of less lethal or chemical agents.  I

22  can list them off, if you'd like, but there was -- the

23  entire time we were there, we were being hit with

24  objects.

25      Q.   Okay.  Let -- I'm asking you about this
```

```
 1  moment.

 2       A.   Oh, I'm --

 3       Q.   This moment right here.

 4       A.   Gotcha.

 5       Q.   Do you --

 6       A.   In this moment, I -- I don't know.  I don't

 7  know what he saw or did that precipitated that.  That

 8  would be up to him to have to justify.

 9       Q.   Okay.  Do you see this individual still --

10  the same individual we talked about earlier, who's

11  still standing here on the sidewalk with their hands

12  up?

13       A.   I do.

14       Q.   Okay.  We're going to watch -- watch them for

15  a moment, and then I'm going to play it and we'll ask

16  you some more questions.

17       A.   Okay.                              1:32:34

18            (Video COA BLM 297 played)

19       Q.   Do you see this individual here still on the

20  sidewalk with their hands up?

21       A.   I do.

22       Q.   Okay.  The officers here, in front of you,

23  are now shooting at them with PepperBalls.  Did you see

24  anything that justified that use of force?

25            MS. EVANS:  Foundation.
```

1      A.   I'll ask you to clarify.  Did I see anything

2  in the video, or did I see anything that day?

3      Q.   Either one.

4      A.   So in the video, no, but again, that day, I'm

5  -- I'm not sure if I did or not.  The video only shows

6  a very narrow focus, so I can't commit to -- to one way

7  or the other.

8      Q.   Okay.  Do you recall anything about that

9  particular individual who's standing there with their

10 hands up on the sidewalk?

11     A.   I don't.                                    1:33:45

12     Q.   Can you say what that person was doing that

13 -- let's assume that that person was shot with

14 PepperBalls at this intersection at this time.  Can you

15 tell me anything that that person was doing that would

16 have justified that use of force?

17          MS. EVANS:  Foundation.

18     A.   Today, sitting here independently, I have no

19 recollection of any interaction with this individual.

20     Q.   Okay.  Did you see anything in any of the

21 body cam video of yours that you watched that revealed

22 anything about that individual and whether that

23 individual did something that warranted the use of

24 PepperBalls on them at that time?

25          MS. EVANS:  Form and foundation.

1        A.    Again, no, I don't.  In fact, I remember

2   watching my body cam to get ready for this, and I don't

3   remember anything sticking out about this individual at

4   all.

5        Q.    Okay.  Now, this officer in green fatigues

6   has a PepperBall gun, correct?

7        A.    Yes.

8        Q.    And this is a Denver metro SWAT officer?

9            MS. EVANS:  Foundation.

10            MR. HUSS:  Foundation.

11       A.    I can only speculate that it is.

12       Q.    It's not one of your officers, right?

13       A.    Correct.                              1:34:51

14       Q.    And this officer right here, with a

15   PepperBall gun, is not an -- this officer in the -- in

16   the black with the red sticker on their helmet, they're

17   not Aurora either, right?

18       A.    Does not appear to be, no.

19       Q.    Okay.  This person is also a Denver police

20   officer, correct?

21            MS. EVANS:  Foundation.

22       A.    I -- I -- again, I presume so.  It appears to

23   be.

24       Q.    Do you recall any other agencies at this

25   intersection at this time besides Denver and Aurora?

```
 1        A.   I think as I mentioned earlier, the -- at --

 2   at that particular time, it was mostly all Denver and

 3   Aurora.  Some Denver Sheriff arrived, some Denver

 4   Health paramedics.

 5        Q.   The paramedics wouldn't have been shooting

 6   people with PepperBall guns, right?

 7        A.   Right, but that's not what you asked.  I'm

 8   trying to respond to your question, ma'am.

 9        Q.   Okay.  So just narrowing down the

10   possibilities of where these officers are from, if

11   they've got PepperBall guns, they're not Aurora, right?

12        A.   That's safe to say, yes.                 1:35:50

13        Q.   Okay.  And they're not Denver paramedics,

14   right?

15        A.   Correct, those are police officers.

16        Q.   Those are police officers.  And do you recall

17   seeing the Denver sheriffs doing anything during the

18   protests other than taking away people who had been

19   arrested?

20             MS. EVANS:  Foundation.

21        A.   Not that I personally observed, no.       1:36:13

22        Q.   Okay.  You did not see any Denver sheriffs

23   using PepperBall guns at this intersection at this

24   time, correct?

25        A.   I did not.
```

 1      Q.   So in all likelihood, these officers -- this

 2   officer in the green fatigues with the PepperBall gun

 3   and this officer in the black with the red sticker on

 4   their helmet, they're Denver police officers, correct?

 5      A.   That's -- that's the likely -- likely

 6   scenario, yes.  I believe they probably are.

 7      Q.   All right.  Let me pull up a different video.

 8   Okay.  I'm showing you COA BLM 299.  We're going to

 9   play it for a little bit starting at 19:53:11.

10             (Video COA BLM 299 played)

11      Q.   I paused it at 19:53:34.  Okay, so you had

12   your cell phone out, and what were you doing with it?

13      A.   So, as the team commander, we'd been training

14   a lot over the last year for crowd management

15   scenarios, and so when we were actually in the middle

16   of one, I wanted to grab some pictures, mainly for

17   training purposes and just for -- for the prosperity of

18   the team, because again, this was kind of

19   unprecedented, and the officers that were on -- on

20   front of the line, you know, doing that kind of thing,

21   they -- there's no way they would have been able to do

22   that, so I took an opportunity to document that with

23   some -- some photos, and I took a few, yes.

24      Q.   What did you do with the photos?

25      A.   I believe we shared them just with the team

1  later.  When we were debriefing the Denver incident, we

2  talked about, you know, just different aspects of it

3  and shared some of those with the guys that were on the

4  line.

5      Q.   Did you text with people, other officers,

6  during the protests?

7      A.   Probably.                                1:39:44

8      Q.   Who would you have been texting with?

9      A.   So I know for sure I was texting with -- so

10 Chief Parker -- Division Chief Parker was there.  He

11 showed up later on in the -- in the action there at

12 Colfax and Broadway.  At times, I was receiving texts

13 from him, texts from some of my other supervisors.  I

14 do remember that, but I can't tell you, you know, this

15 -- this far away from that day, what and who I was

16 texting.  I could have very well been getting texts

17 from my family checking on me, who knows.

18     Q.   What were you texting with the other officers

19 about during the protests?

20     A.   I don't remember.

21     Q.   Do you still have those text messages?

22     A.   I do not.  My text message auto-delete.

23     Q.   What's the time -- what's the setting that

24 you have it on that it auto-deletes?

25     A.   I believe it's 30 days, but it's -- yeah, I

Exhibit 5, LLC

1   -- they don't last longer than that.

2        Q.   Did you take any photos at the protests other

3   than ones that we saw you taking in that body cam

4   footage?

5        A.   I don't think so.                          1:40:48

6        Q.   Why couldn't you just show your -- if you

7   were using it for training, why wouldn't you just show

8   your officers the body cam footage and have a

9   discussion based on that?

10            MS. EVANS:  Form and foundation.

11       A.   I'm not sure.  At -- at the time, I thought

12   it would be a good thing to take some pictures to show

13   them at a later time.

14       Q.   After curfew on May 30th, is it fair to say

15   that officers pushed the crowd south and out of the

16   park and out of Lincoln?

17       A.   Yes.

18            MS. EVANS:  Foundation.

19       Q.   Where did you and your team go next?

20       A.   So we pushed out of the park, and then we

21   continued to -- I think the -- the goal and direction

22   at that point was just to get all of the rioters out of

23   in and around the Capitol and Civic Center, so we

24   continued to push south to 12th, and then we pushed --

25   and I don't know if we pushed or they decided to go,

```
 1   but we -- we got to 12th and the crowd went east up

 2   into Capitol Hill where they started setting things on

 3   fire and -- and doing other various activities.

 4        Q.   On May 31st -- Sunday, May 31st, what time

 5   did you -- did you arrive in Denver to assist in

 6   policing the protests?

 7        A.   I think it was around the same time.  It

 8   might have been a little earlier that day.  One of the

 9   two days, we were supposed to get down a little later,

10   but we got called to head down earlier because things

11   were starting to develop, but I recall early

12   afternoon-ish.  I -- I'm sorry, I don't have a specific

13   time for you.

14        Q.   Did you have another briefing with Denver

15   Police command on May 31st?

16        A.   We did.                            1:42:56

17        Q.   Okay.  What was discussed during that

18   briefing?

19        A.   I believe it was similar to almost everything

20   I described at the briefing the day before.  I don't --

21   I don't recall each briefing completely separate from

22   the other or what -- which one had different

23   information, but to be frank, it might be easier to get

24   that answer from the people that were running the

25   briefing.  I don't remember it very specifically.
```

```
 1        Q.   Okay.  Did you receive any guidance at that

 2   time, again, about the use of force?

 3        A.   I don't independently recall.

 4        Q.   I'm showing you COA BLM 114 to 116.  Do you

 5   see this?

 6        A.   I do.

 7        Q.   This is your report for May 31st?

 8        A.   Yes.

 9        Q.   Okay.  And is the "submitted on" date on this

10   report the date that you completed the report and

11   submitted it to your -- whoever you were submitting it

12   to?

13        A.   Yes.  The submitted date would be the day it

14   was completed and uploaded into our report system.

15        Q.   Okay.  What does this "checked by" mean?

16        A.   I'm not sure.  I know -- the "approved by"

17   means that -- that's the person that finally said,

18   "Yes, it's approved" and sent it through the system.  I

19   don't know what -- what "checked by" is that's

20   different than that.  I've honestly never noticed that

21   until you pointed it out.

22        Q.   Who's -- who's Todd Renner?

23        A.   Todd Renner is a sergeant with Aurora PD.        1:44:35

24        Q.   Okay.  And then what does he do to approve

25   your report?  Do you know?
```

1      A.   Yeah.  So any supervisor can go in -- when

2  anybody approves a report, we -- it gets electronically

3  submitted.  It goes into a report approval queue, and

4  normally, supervisors will go in and approve their

5  employees' reports on a -- you know, on a nightly basis

6  or daily basis.  But anybody can go in -- in as a

7  supervisor, read the report, and hit "approve" if

8  they're good with it, or they can hit "correct" if

9  there's things that -- they can send it back to the

10  officer to correct anything that they feel needs to be

11  corrected.

12      Q.   All right.  In your report, you state in the

13  fourth paragraph, "At 1400 hours, we were briefed by

14  Denver PD command and advised that, again, we would be

15  responsible for the area around the 16th Street Mall,

16  and that they wanted us to be more mobile and able to

17  respond to incidents."  Was this briefing on May 31st

18  similar to the briefing that you attended the day

19  before?

20      A.   I believe so.  Yeah, I think it was.

21      Q.   Would, like -- was it the same group of

22  people there?  Meaning, like, supervisors and

23  command-level staff from outside agencies, as well as

24  Denver Police command?

25      A.   I believe so, yes.                        1:45:56

1     Q.   Were you given any handouts or paperwork at

2  that meeting?

3     A.   I'm assuming we were given another operations

4  plan.  I -- I think that -- that would have been

5  normal, but I can't -- I don't have a clear

6  recollection on that.

7     Q.   Do you recall being given any other

8  paperwork?

9     A.   Not specifically.

10    Q.   Were you told that Denver's policy was to

11 allow outside agencies to follow their own use of force

12 policies?

13    A.   I don't recall if I was told that on that day

14 or not.

15    Q.   Was that your understanding?

16    A.   As I -- as I remember it now, yes, that's my

17 understanding.

18    Q.   Who else from Aurora was at this meeting on

19 5/31?

20    A.   It would have been myself, Sergeant

21 Brukbacher, probably the other supervisors that were

22 there, which I believe were fairly consistent with the

23 prior day, and then on this day, on -- on the 31st,

24 Division Chief Terry Brown was the chief that was with

25 us.

```
 1        Q.   Was Terry Brown out on the street with you

 2   and your team at any time on May 31st?

 3        A.   He was.                              1:47:11

 4        Q.   Okay.  Was he on Colfax between Pennsylvania

 5   and Washington between 8:30 and 10:00 p.m.?

 6        A.   I believe so.

 7        Q.   And then the day before, you had division

 8   chief -- who was the division chief you had the day

 9   before?

10        A.   Division Chief Darin Parker.

11        Q.   Darin Parker.  Was Darin Parker at the

12   intersection of Lincoln and Colfax on May 30th between

13   6:00 and 8:00 p.m.?

14        A.   Yes.

15        Q.   Was Darin Parker or Terry Brown doing any

16   kind of coordinating with the Denver Police command

17   staff, or was that more your job?

18             MS. EVANS:  Foundation.

19             MR. HUSS:  Foundation.             1:48:10

20        A.   I'm not -- I'm not sure exactly what they

21   were and were not doing that day.

22        Q.   Were they getting -- in other words, were

23   they getting on the radio and communicating with Denver

24   Police command staff about, you know, where they --

25   they wanted the Aurora officers to go and what they
```

```
 1  wanted them to do?

 2          MS. EVANS:  Foundation.

 3          MR. HUSS:  Foundation.

 4      A.   And -- and again, I'm sorry, I'm not -- I'm

 5  not sure what exactly they did or did not do that day.

 6      Q.   In your report from May 31st, you state, "At

 7  about 1810 hours, Denver Command asked Aurora units to

 8  respond to Denver Police District 6 Station to assist

 9  with violent subjects who were -- who were trying to

10  access the station for nefarious purposes."  Do you see

11  that?

12      A.   I do.                               1:48:57

13      Q.   So what do you recall about what you were

14  doing that evening in Denver at -- at District 6?

15      A.   So I -- I recall arriving to District 6, and

16  there were -- we were told that people were trying to

17  climb up onto the building, to jump the fence into the

18  secure parking lot.  I don't remember what else we were

19  told had happened prior, but when we got there, we just

20  stood on the -- I don't remember what street it was,

21  but on the -- the west side of District 6 and assisted

22  in keeping the crowd from either overtaking or -- or

23  damaging the police station.

24      Q.   Okay.  So it looks from your report, which

25  I'm showing you again, that you responded to District 6
```

1   at 1810 hours and you were there, "assisted in holding

2   a skirmish line, and then remained on the scene for

3   about 30 minutes before things calmed down and went

4   back on patrol in our assigned area."  Do you see that?

5        A.   I do.                                      1:50:00

6        Q.   Okay.  "And then at around 8 -- 2040 hours,

7   we were asked to respond emergent back to Denver

8   District 6 to assist officers who were being struck

9   with rocks, bottles, and other objects."  Do you see

10  that?

11       A.   I do.

12       Q.   Okay.  What do you recall about what was

13  going on when you returned to District 6 at 2040 hours?

14       A.    I remember when we arrived back at that time,

15  it was more violent than had -- I'd seen it before.

16  There was a lot more objects that appeared that they'd

17  been thrown, and again, I -- at that point, I think we

18  were told that it -- the -- they appeared -- the -- the

19  crowd appeared to be wanting to actually overrun or

20  access the -- the police station, which is obviously a

21  problem.

22       Q.   Well did you see people trying to overrun or

23  access the police station, or this is what you were

24  told?

25       A.   So that's what I was told, and -- and when we

1  got there, we held the skirmish line, basically, so

2  they couldn't do that.  There was a crowd that was --

3  appeared to want to get towards the station, but

4  because of the skirmish line, obviously, they couldn't

5  do that.

6      Q.   What was it that the crowd was doing that

7  made it appear to you that they wanted to get into the

8  station?

9      A.   So instead of, you know, marching down the

10  street, they were focused on the police station.  They

11  were -- again, this is my opinion based on everything I

12  saw, but it appeared that if we weren't there, they --

13  they were going to try to access the police station.

14  The only thing that was stopping them was the skirmish

15  line.  They were saying very mean things to the

16  officers, they were, you know, being very angry,

17  aggressive, things were being thrown at us, all that

18  kind of stuff.

19      Q.   They were saying mean things?

20      A.   Yes.                                    1:51:43

21      Q.   What kind of mean things were they saying?

22      A.   I remember people telling us to kill

23  ourselves, you know, making different statements about

24  just -- just nasty things.  I had female officers that

25  were being targeted that we ended up pulling off the

1  line at different points because there was just vile

2  language being directed at them.  At -- at one point,

3  I'm not sure if it was the first or second time at

4  District 6, we had a couple of our African-American

5  officers were targeted by the crowd, lots of

6  inappropriate things being said at them, hurtful things

7  as well.  So, those things, I recall happening in and

8  around District 6.  I can't tell you the exact time,

9  but yeah, there was -- there was some pretty vile

10  behavior.

11      Q.   Were you at -- now how do you know it was

12  8:40, 2040?

13      A.   I'm sorry, I don't understand your question.

14      Q.   Your report says that, "At around 2040 hours,

15  we were asked to respond emergent back to Denver

16  District 6."  So I'm just wondering how you knew what

17  the time was?

18      A.   How I knew what the time was for what?          1:52:48

19      Q.   For -- for putting it down in your report.

20      A.   Oh.  I don't recall where I -- if I received

21  that from dispatch, if I received that from, you know

22  -- with my body cam.  I -- I don't know where I got

23  that time from.  In writing the report, I would have

24  tried to have found some resource to -- it could have

25  even been another officer, of "hey, what time did we go

1  up there?"  I don't remember, though.

2       Q.   Okay.  Do you recall if you were at the

3  intersection of Colfax and Washington at 8:30 p.m. on

4  5/31?

5       A.   If I could review my report, it might help.

6       Q.   Sure.  Let me pull it up.

7       A.   Are you ready for me to respond?

8       Q.   Yes.

9       A.   Okay.  So -- did you say, "2030 hours"?

10      Q.   Well, I'm just trying to establish exactly

11 what time it was that you got to District 6 on 5/31.

12 There was the earlier incident where you said in your

13 report that at 1810, you were there, and then you left,

14 and then you came back, and that's what I'm focused on,

15 is this 2040 hours.  How do you know it was 2040?

16      A.   I would have -- I mean, obviously, I didn't

17 just pull that out of the air.  I would have done some

18 sort of research to figure that out, and again, the

19 reason I'm putting "around" in a report is it's not an

20 exact.  So some time around 2040.  I'm sorry, that's

21 the best -- the best answer I can give you now.  I

22 don't remember specific.

23      Q.   Okay.  So it looks like, according to your

24 report, you say, "We responded to Washington and Colfax

25 and again assisted units on a skirmish line."  Do you

1  see that?

2      A.   Yes.                                    1:54:44

3      Q.   What units were you assisting?

4      A.   I couldn't tell you specifically, you know,

5  who it was, other than there were Denver officers

6  there, there were -- I think that's the time when I

7  remember Jeffco being there.  There were -- it was

8  pretty chaotic.  I don't remember every single unit or

9  agency that was there

10      Q.   Okay.  Let's -- I'm going to share my screen.

11  I'm showing you HALO camera footage from Denver, from

12  the intersection of Colfax and Washington on May 31st,

13  and this is starting at 8:28:56 p.m.,  And we'll play

14  it for a little bit, and then I'll ask you some

15  questions.  Can you see it?

16      A.   I can.

17      Q.   Okay.

18                 (HALO video played)

19      Q.   Oh, actually, let's go back a little bit.

20  We're going to go back to 8:28:50.

21                 (HALO video played)

22      Q.   Actually, sorry.  We need to go back farther

23  than that.  Okay.  8:28:11 is what I'm going to play it

24  from.

25                 (HALO video played)

```
 1      Q.   So at this point, from where you can see in

 2   the video, the crowd is just marching down the street,

 3   right?

 4      A.   Correct.                                   1:56:22

 5      Q.   Do you see anybody doing anything -- at least

 6   from what you can see in this video, do you see anybody

 7   doing anything that would warrant the use of tear gas?

 8      A.   It's -- you know, obviously, it's -- it's

 9   hard to say.  I can't see every person and all their

10   individual actions, but I -- I -- I mean, there's

11   nothing that's glaring in the video, but I don't want

12   to commit to a yes or no because there very well could

13   have been, it's just not visible in the video.

14      Q.   Okay.  So I'm going to pause it at 8:28:52,

15   so that -- so, what we just saw was the crowd was

16   marching, and then at some point, they started backing

17   up, and you -- you -- the camera view was not on what

18   was causing them to back up, but then the camera is

19   going to begin to pan over.

20               (HALO video played)

21      Q.   So let me ask you some questions about that.

22   Do you see the crowd backing up now?

23      A.   I do.

24      Q.   Okay.  So now the camera has moved over to

25   the intersection.  This is 8:28:00.  And we're going to
```

Exhibit 5, LLC

```
 1   play it for a little bit.

 2                    (HALO video played)

 3       Q.   Okay.  So let me pause it.  Do you recall --

 4   so there's these officers that are right here.  They're

 5   obscured a little bit by smoke, but do you recall if it

 6   was your officers who are there at just north of Colfax

 7   and Washington at this time?

 8       A.   I -- I can't tell from that, and I don't

 9   recall.                                        1:57:49

10       Q.   Okay.  I'll continue playing it for a little

11   bit, and then you can let me know if this at all

12   refreshes -- refreshes your recollection as to whether

13   it's Aurora officers who are here.

14                    (HALO video played)

15       Q.   Okay.  I'm going to pause it at 8:28:54.  Did

16   you see on this side of the screen there were some

17   cloud -- little puffs of dust that were hitting the

18   sidewalk here?

19       A.   I did.                                1:59:00

20       Q.   Okay.  Are you familiar that that comes from

21   PepperBall guns?

22            MS. EVANS:  Foundation.

23       A.   I -- yeah, I can't tell you accurately what

24   that was.  I'm not sure.  I -- I don't think I was here

25   at that time.
```

```
 1        Q.    Okay.  Aurora officers don't carry PepperBall

 2   guns, correct?

 3        A.    Correct.

 4        Q.    So if these officers, who were just north of

 5   the intersection right here, were shooting PepperBalls

 6   at these protesters, they were not Aurora officers,

 7   correct?

 8        A.    Correct.  Aurora does not carry PepperBall,

 9   and we didn't deploy any PepperBall at all.

10        Q.    Okay.  Did this -- I'm going to keep playing

11   it --

12                    (HALO video played)

13        Q.    -- for a few -- a few more seconds, but does

14   this at all refresh your recollection?  Does this make

15   you think that these are not Aurora officers right

16   there?

17        A.    I -- I have no idea which officers those are.

18   I just can't tell from that angle.

19        Q.    Okay.  But do you recall being with a

20   contingent of officers from another agency who had

21   PepperBall guns on May 31st near District 6 station?

22        A.    I -- well, I -- I assume that the Denver

23   officers that were there would have had PepperBall,

24   because most of them did that were deployed on these

25   lines.
```

```
 1        Q.   Okay.  Later in the evening, on May 31st, did

 2   you and your officers begin to push protesters west on

 3   Colfax?

 4        A.   We did.                            2:00:55

 5        Q.   Okay.  And why did you do that?

 6        A.   I don't remember everything that led up to

 7   that, but -- and I -- I -- I'm not clear on where the

 8   final word came that we were going to do the push, but

 9   at that time, when we were trying to keep the skirmish

10   line there and protect District 6, we had people

11   climbing up on buildings, throwing things at us, there

12   was windows being broken out, fires being set.  You saw

13   in the video there that large explosion, that was an

14   aerial firework that is meant to -- to go up like on a

15   4th of July display, and those were being thrown at

16   officers.  It was just very riotous behavior and again,

17   not 100 percent clear on where that final word came

18   from of "let's push folks further west to keep them

19   coming from District -- to District 6," but that call

20   was eventually made, and we attempted to do that as

21   best as we could.

22        Q.   Was there a point where you stopped at

23   Pennsylvania?

24        A.   There was, and I -- let me preface this, too,

25   with -- I actually departed that area a little bit and
```

```
 1  came back, and I was doing some different things, so I
 2  was there for a lot of it, but not all of it, just --
 3  just to -- to be clear.
 4      Q.   Okay.  And so when -- so let me just tell you
 5  that the -- the Aurora -- what Sergeant Shaker told us
 6  earlier today was that he and the other Aurora officers
 7  pushed the crowd west from District 6 to Pennsylvania,
 8  but they stopped at Pennsylvania.  So were you with the
 9  officers during that period of time, where you -- you
10  got all the way to Pennsylvania?
11      A.   I believe I was.  I think I might have left
12  to -- to take someone to another area and then come
13  back, but we were there for quite a while, so I do
14  remember being there, you know, in the middle of Colfax
15  around Pennsylvania.
16      Q.   Okay.  And do you know why you stopped at
17  Pennsylvania?
18      A.   I don't remember specifically.          2:03:02
19      Q.   What kind of direction or instructions were
20  you getting from Denver command post at this time?
21      A.   To the best of my recollection, the -- the --
22  the main goal there was to keep people away from
23  District 6, and then I don't -- I don't recall if we
24  ever got a firm "here's our end goal."  I -- I suspect
25  we did, I just don't remember specifically what it was.
```

```
1        Q.    Okay.  So do you recall at what time you were

2    present at the intersection of Pennsylvania and Colfax

3    on May 31st?

4        A.    Sometime after 8:40, and I'm -- I'm not

5    trying to be smart, I just --

6        Q.    Sure.

7        A.    -- the body cam footage would likely be the

8    best reference for me.  We were there for a decent

9    amount of time.  It seemed like a couple hours at that

10   point.

11           MS. WANG:  Okay.  Let me --

12           WITNESS:  And ma'am, can I just ask that if

13   we get to a --

14           MS. WANG:  Yes.

15           WITNESS:  -- a good point here for a break

16   sometime in the near future, I just need --

17           MS. WANG:  Yeah, yeah, let's -- I'm going to

18   pull up some -- some footage, so why don't we take a

19   quick break then?

20           WITNESS:  Thank you.  I'm just going to

21   refresh my water and --

22           MS. WANG:  Sure.

23           RECORDER:  Off the record, 4:43 p.m.

24                   (Off the record)

25           RECORDER:  Back on the record, 4:49 p.m.
```

1    Q.   All right.  I'm going to play for you now

2  some radio dispatch from May 31st, starting at 9:37

3  p.m. and then -- we'll listen to it, and then I'll ask

4  you some questions, okay?

5    A.   Sounds good.

6    Q.   Wait, let me make sure I shared the audio

7  here.  Okay.

8              (Dispatch audio played)

9    Q.   Okay.  I'm going to pause it.  Was that you?

10    A.   The -- when he says, "Adam 9 to Aurora," and

11  then the response, that is me, and this actually is

12  very helpful to refresh my memory.

13    Q.   Okay.  So up to this point in time, what does

14  it refresh your recollection about in terms of what the

15  direction was from the Denver command staff?

16    A.   So we -- I just -- I guess I'll -- I'll --

17  I'll -- I'll rephrase it.  Refreshes my memory in

18  regard to moving up to Pennsylvania and Colfax, because

19  then I remember looking back and we had the entire

20  stretch of Colfax, all the way back to Clarkson, and

21  that's what I'm referencing there.  Leading up to that,

22  and again, the actual "hey, let's go ahead and get onto

23  Colfax and move westbound," I can't -- I still can't

24  remember specifically how that came about.  Obviously,

25  we did it, and I just can't -- I can't remember exactly

```
 1   the direction or decision-making that -- that went into

 2   that.

 3        Q.   Okay.  So Adam 9 was Commander Phelan from

 4   the DPD, correct?

 5             MS. EVANS:  Foundation.

 6        A.   I believe so, yes.                    2:07:43

 7        Q.   Okay.  And you were communicating directly

 8   with Commander Phelan, right?

 9        A.   At that point that we listened to, yes.

10        Q.   Yes.  And is it fair to say that Commander

11   Phelan was giving you guidance and direction as to what

12   he wanted you and your unit to do?

13        A.   Yes, that's fair to say.

14        Q.   Okay.  There was another officer who came on,

15   100, who said, "All right.  Which way do we need to

16   come in from?"  He said, "We're at Colfax and Broadway

17   now."  And then Adam 9 responded, "Aurora's pushing

18   them towards you."  Let's -- and then he says something

19   about, "coming up on both sides, try to make some

20   arrests."  Do you recall hearing that?

21        A.   Yes.                                  2:08:30

22        Q.   Okay.  And so what do you recall the plan

23   being at that time?

24        A.   So I do remember -- I mean, we -- we wanted

25   to continue just to hold Colfax due to all the violence
```

1  and -- and riotous behavior that was happening around

2  the station, businesses, windows getting shot or broken

3  out, all that, so the goal was to keep the area that we

4  had already gained by pushing people west.  And then I

5  recall that there were other teams, as you heard -- I'm

6  not sure who 100 was, but there were other teams coming

7  east on Colfax from Broadway, and basically sandwiching

8  these people at this point that were being riotous and

9  violent in between our team and theirs, and as you can

10 hear on the radio, at that point, we were hours into

11 this unlawful behavior.  I believe the goal, at that

12 point, as you heard, was to make some arrests for --

13 for people that were continuing to cause problems.

14      Q.   The goal was to sandwich the protesters and

15 arrest them, right?

16      A.   That was part of it.  I -- I -- I'm not sure

17 that was the goal, there were ways they could have

18 gotten out.  There were several streets in between

19 Broadway and where we were, but as you -- as you heard,

20 the guidance was, "Let's try to arrest some people."  I

21 can only assume that at that point, it was hoping if we

22 started making some arrests, people would finally go

23 home.

24      Q.   Is it fair to say that Adam 9 was giving you,

25 as well as unit 100 -- or officer 100, direction as to

1  how to deal with this group of protesters at that time?

2      A.   Sure, that's fair to say.                    2:10:00

3      Q.   Okay.  Let's continue playing it.  We're now

4  on 21:39:21.

5                   (Dispatch audio played)

6      Q.   Okay.  I've paused it there.  So 100 says,

7  "We can come in, we're at Colfax and Grant right now,

8  but we're going to be pushing into each other."  And

9  then Adam 9 responds, "Yeah, we'll push them in there.

10  We'll get them and make some arrests."  Correct?

11      A.   Sorry, I was muted.  Yeah, that -- that's

12  what I heard.

13      Q.   Okay.  What do you recall occurring on Colfax

14  between Pennsylvania and Logan once your unit and the

15  other unit that was coming from the west pushed the

16  protesters into that block?

17      A.   I'm trying to recall specifically.  I know

18  that somewhere around that time, maybe

19  contemporaneously or prior, we were getting hit with

20  large fireworks and other dangerous items.  A big

21  homemade explosive type thing was thrown at us, it

22  actually blew windows out of a 7-Eleven.  It was pretty

23  chaotic.  And then when that other team was

24  approaching, I think most of the people started to run

25  away, because I think our attention was then drawn to

```
 1   some alleys and things.  We were afraid people were

 2   going to come back and try to -- try to come up our

 3   flank.  But I do remember posting there for, it seemed

 4   like a little bit of time, you know, trying to hope --

 5   in my opinion, hoping -- hoping people would -- would

 6   leave, and then we would essentially have all of Colfax

 7   contained, because that seemed to be where most of the

 8   issues were.

 9       Q.   Okay.  So I'll represent to you that your

10   body camera for -- video for May 31st, at this period

11   in time, 8:30 to 9:30 or so p.m., is without sound.  Do

12   you know why that would be?

13       A.   I can only speculate.  It was not

14   intentional.                                    2:12:58

15       Q.   Okay.  Do you -- do you know reasons why your

16   body cam may not have recorded sound?

17       A.   So best guess, there's no way that the user

18   can turn it off, the -- there's no way that I could

19   have said, "Oh, you know what, I'm not going to record

20   sound today."  My guess is, based upon some of the

21   things we were being hit with, I didn't have a chest

22   protector on because I was behind the line, but more

23   than once later in the night on the 30th, I was hit

24   with objects, and one of those included a large

25   firework.  My best guess is that it somehow fried the
```

1   audio.  I'm not sure.  I -- I -- when I found out after

2   I -- we finished our weekend in Denver, I docked my

3   body camera, which uploads all the footage.  When I

4   went in to review it after the fact, I -- I noticed the

5   same thing that you did, that there was no audio for

6   all of the second day.  I reported that to our

7   electronic support section.  They took my camera, and

8   then provided me a new one.  So they -- they really --

9   they never got back to me with an explanation as to

10  what happened with the audio.

11      Q.   Okay.  Let me pull up another video.  I'm

12  showing you Denver HALO camera footage from May 31st at

13  the intersection of Colfax and Pennsylvania.  This clip

14  is going to be in at 9:36 p.m.  And just to orient you,

15  this camera right now is facing east.  There's a -- and

16  this is at the intersection -- this is Colfax, the

17  street that we see, and then the intersection of

18  Pennsylvania.  So we're going to watch it for a little

19  bit, and then I'll ask you some questions.

20      A.   Okay.                                2:15:16

21                  (HALO video played)

22      Q.   So this -- do you see this line of police

23  officers in the distance?

24      A.   Yes.

25      Q.   Okay.  That's your officers, Aurora officers,

1  correct?

2      A.   I believe at least a decent percentage of

3  those were us, that was us in Aurora that -- but I -- I

4  think there were other people with us.

5      Q.   Okay.  Jefferson County SWAT was with you,

6  right?

7      A.   I believe they were still with us at that

8  time, but I -- I can't tell from here, sorry.

9      Q.   Okay.  This vehicle that you see in the

10  distance with the very bright headlights is the Aurora

11  BearCat, right?

12     A.   I think so, yes.  It looks like it.

13     Q.   Okay.  We're going to fast forward it just a

14  little bit.

15                    (HALO video played)

16     Q.   So there's protesters in the street, right?

17  A few of them, from this view?

18     A.   Correct.                                2:16:23

19     Q.   And your officers start moving forward and

20  firing munitions, correct?

21     A.   The -- the officers in the video do.  I can't

22  tell you if they're my guys or -- or they're other

23  agencies, but yes, the -- the group of officers is

24  doing that.

25     Q.   Okay.  I've stopped it at 9:39:08.  Now

1    there's big clouds of tear gas here in the camera -- in

2    the -- in the view of the camera, correct?

3            MS. EVANS:  Foundation.

4        A.   There is a cloud.  I -- I can speculate that

5    it's probably tear gas, but I can't -- I can't say that

6    with certainty.

7                (HALO video played)

8        Q.   Well, what else do you think it might be?

9        A.   It could be the white smoke, it could be

10   other munitions deployed, but it -- you know, the --

11   like I said, it probably was tear gas.  I'm not able to

12   say it with certainty, though.

13       Q.   Okay.  I'm going to pause it at 9:40:05.  So

14   we have a better view of the officers.  There's some

15   officers in green fatigues, and then there's some

16   officers in the regular black or dark blue riot gear,

17   correct?

18       A.   Correct.

19       Q.   Okay.  And there's some officers that are

20   holding these weapons with the orange stock?

21       A.   Correct.                               2:17:30

22       Q.   What are those?

23       A.   My best guess, I can -- I'm -- I'm not even

24   going to speculate what the -- the gentlemen in green

25   have, because I -- I'm -- I'm not 100 percent sure, but

1    I can tell you if it's the Aurora guys, those are our

2    less lethal shotguns.

3        Q.   Okay.  And those are the ones that deploy the

4    beanbag rounds?

5        A.   Yes.  That's -- in layman's terms, it's a --

6    it's a sock round that is deployed from there.

7        Q.   Okay.  And as you and your officers were

8    pushing forward at this time, were you all firing

9    munitions?

10       A.   Are -- are you asking if everyone was firing

11   munitions?

12       Q.   Just the group of you.

13       A.   Members of the group appeared to be, yes.

14       Q.   Okay.  And you were aware at this time that

15   there was another group of officers who were coming in

16   from the other side, on the other block, right?  Coming

17   in from the east -- or, I'm sorry, coming in from the

18   west?

19            MS. EVANS:  Foundation.                  2:18:28

20       A.   Yeah.  It -- it -- based on the radio

21   transmission, that's what I understood, and then I

22   believe, eventually, we saw them come from the west.

23       Q.   Okay.  And they were firing munitions on the

24   protesters, as well, correct?

25            MS. EVANS:  Foundation.

```
 1              MR. HUSS:   Foundation.

 2         A.   I -- I can't tell you that.  I'm not sure.  I

 3    wasn't with them.

 4         Q.   Okay.  We're going to watch another video.

 5    Do you see this?

 6         A.   I do.

 7         Q.   Okay.  This is Denver HALO camera footage at

 8    Colfax and Logan on May 31st, 2020.  This is going to

 9    start at 9:36 p.m., so to orient you, this is -- this

10    camera is -- is at -- at Logan facing Colfax, facing

11    west.

12         A.   Okay.

13         Q.   And we're going to play it, and then I'll ask

14    you some questions.

15                     (HALO video played)

16         Q.   Actually, I'm going to fast forward it a

17    little bit.

18                     (HALO video played)

19         Q.   So it's fair to say at this time, at 9:37

20    p.m., a large number of protesters are gathering in --

21    in this block, right?

22         A.   That's fair to say, yes.                2:19:45

23         Q.   And at this same time, your officers were on

24    the other side, on -- on Washington, correct?  Not

25    Washington, on Pennsylvania, correct?
```

Exhibit 5, LLC

```
 1       A.   I think, yes, based on -- yeah, I believe

 2  you're correct.

 3       Q.   Based on that other video we just watched,

 4  right?

 5       A.   Right.

 6       Q.   So let me go back and play this at regular

 7  speed, because people start running.  I'm going back to

 8  9:38:02 p.m.

 9                    (HALO video played)

10       Q.   I'm going to pause at 8:38:45 (sic).  It's

11  fair to say that people start running towards the

12  camera, or west, right?

13       A.   Right.  Yeah, if you're telling me this

14  camera is pointing east, then they would be coming

15  west, yes.

16       Q.   Okay.  Do you see the --

17                    (HALO video played)

18       Q.   -- clouds of tear gas in the distance at

19  Pennsylvania?

20            MS. EVANS:  Foundation.

21       A.   And I'll go back to my prior.  I see a cloud

22  of gas that could be tear gas.

23       Q.   Is there anything that you see this crowd of

24  people doing that warrants the use of munitions at this

25  time?  This is at 8:39:06 (sic) p.m.?
```

```
 1              MS. EVANS:  Foundation.

 2              MR. HUSS:  Foundation.

 3       A.   So it's hard to tell from this video, but I

 4   can tell you during that time we were making that push

 5   down Colfax, there was a lot of reasons why using gas

 6   and munitions was justified.

 7       Q.   What about on these people right here who

 8   were at the intersection of Colfax and Logan in front

 9   of this church?

10       A.   I was never down there, so -- and again, for

11   this -- I'm -- I'm sorry.  I was not at Colfax and

12   Logan, but from the -- you know, from this angle, there

13   could be people doing things in the crowd.  I just --

14   it's -- it's hard to say.

15       Q.   You can't say, right?                    2:22:14

16       A.   Yeah, I can't form -- I can't form an

17   educated opinion because it's -- it's a -- it's a --

18   you know, it's a very broad view.

19       Q.   You can't give us any factual basis for why

20   the use of munitions on this crowd at this time at

21   Logan, between Logan and Pennsylvania was justified,

22   correct?

23              MS. EVANS:  Foundation

24              MR. HUSS:  Foundation.

25       A.   Well, again, not necessarily, because where
```

Exhibit 5, LLC

1    we were at Pennsylvania on the other side of this

2    crowd, we were getting hit with explosives, fireworks,

3    all kinds of stuff, so it was coming from somebody in

4    this group and -- again, from this angle, though, it's

5    a little bit -- this was not the view I had.  I was on

6    the other side and -- and there was -- it was -- it was

7    literally a war zone for a little while with some of

8    the stuff that was getting launched at us, so yes,

9    there was -- can I say it's -- it's these specific

10   people on the screen right now?  I can't.

11        Q.   There was a lot of people on this block, who

12   were gathering on this block at this time, 9:40 p.m.,

13   correct?

14        A.   There are a lot of people blocking Colfax,

15   yes.                                              2:23:14

16        Q.   There were people in this crowd who weren't

17   doing anything that justified the use of munitions on

18   them at that time, correct?

19             MS. EVANS:  Form and foundation.

20             MR. HUSS:  Foundation.                  2:23:29

21        A.   I -- I can't answer that in yes or no,

22   either, because all I -- like, if you see that giant

23   firework that just exploded, that was -- that was on my

24   people, okay?  So we were -- we -- we have 40 plus

25   officers right now with hearing loss from this specific

1  incident, so there was all kinds of really horrible

2  things being done here.  Can I say that there were

3  people in here that were not the ones doing the

4  horrible things?  Sure.  This was also an hour and 41

5  minutes after curfew, so again, I mean, some of that is

6  just -- it was -- there was a lot of things going on

7  there that were chaotic.  There -- there were people in

8  there that probably weren't actively doing things.  I

9  don't think any -- the church right there was closed, I

10  don't think any of those folks were there to -- to

11  attend the church.

12      Q.   Okay.  So you're telling me that 40 plus of

13  your officers suffered hearing loss from this incident?

14      A.   From the continued incident over the weekend,

15  but I can tell you from personally being hit with

16  explosives and things in this particular incident, it

17  is my opinion that a lot of that probably was here,

18  because out of all the rest of the time, this was the

19  time when they were homemade explosives.  Like I said,

20  we had a -- a thing lobbed at us.  It looked like a

21  firework, but it wasn't.  It exploded near my guys and

22  blew out windows to a 7-Eleven, so I mean, there was --

23  it was unlike anything I've ever experienced in 22

24  years.

25      Q.   Okay.  So there's tear gas -- we've stopped

```
 1   the video at 9:42:26.  There's tear gas being -- that

 2   has been deployed from west, as well as from the east,

 3   on the crowd, correct?

 4           MS. EVANS:  Foundation.                      2:25:12

 5       A.   I don't know if they deployed it from the

 6   west, I -- I can only attest to what we did, and there

 7   was tear gas deployed from our position on the east.

 8       Q.   Okay.  Did you see, in the video, tear gas

 9   from this side?  From the Logan side?

10       A.   I -- I never saw it launched from anybody.

11   There's a lot of tear gas there.  But I -- I'm not

12   seeing it launched.  It could have been coming from

13   either direction.

14       Q.   So you're saying the tear gas that we see on

15   this side, from the Logan view, could have come all the

16   way from your officers?

17           MS. EVANS:  Foundation and form.            2:25:44

18       A.   Yeah, I -- I didn't say that.  I -- I'm

19   saying from this video clip, I can't see from whom the

20   tear gas is being deployed.

21       Q.   Let's assume that the protesters who were in

22   front of this church at that time tried to escape the

23   tear gas coming in from both sides by attempting to

24   climb the fence, the fence -- the six-foot high fence

25   that was in front of the church.  Would it have been
```

```
 1    appropriate for somebody -- for an officer to shoot

 2    PepperBalls at a person who is trying to climb the

 3    fence to escape?

 4            MS. EVANS:  Form and foundation.

 5            MR. HUSS:  Form and foundation.

 6        A.   If someone was trying to climb a six-foot

 7    fence and committing the act of trespassing to get into

 8    a secure area, which would be the church, then

 9    potentially pepper spray would be -- or I'm sorry,

10    PepperBall could be appropriate.  Again, we don't

11    deploy PepperBall, so I don't have a clear policy on

12    when and when not.  I can attest that in this -- when

13    you're looking at this video, on either side here,

14    there should be an alley.  There's definitely an alley

15    to the south and a clear escape route, so if there's an

16    assertion that there was no way to get out of the area,

17    that's just not the case.

18        Q.   Well, let's take a look at the fence, okay?

19        A.   Sure.                            2:26:55

20        Q.   So you are telling me that if protesters who

21    were being -- let's assume that there were protesters

22    in front of the church at that time and they were

23    experiencing tear gas from both sides, from Logan and

24    Pennsylvania.  You're telling me that if they tried to

25    escape by climbing the fence to get out of there, that
```

```
 1   an officer would have been justified in firing

 2   PepperBalls at them?

 3           MS. EVANS:  Form and foundation.

 4           MR. HUSS:  Form and foundation.

 5       A.   I can't answer your question in a yes or no.

 6   Again, I will tell you that in the chaos that was in

 7   existence, you can see it for your own eyes there, we

 8   don't -- I -- I don't know if an officer would be able

 9   to stop and differentiate why someone's trying to climb

10   a fence.  We'd already seen multiple businesses broken

11   into, looted, explosives thrown, windows broken out, so

12   it's not appropriate for us to sit there while we're

13   being pelted with harmful objects to ponder why someone

14   might be climbing a fence to trespass into an area that

15   clearly that's why the fence is there, so again, you're

16   asking me to opine on something that has so many

17   variables that I can't -- I can't give you a specific

18   yes or no answer.

19       Q.   Okay.  We are viewing Google Maps.  This is

20   the church on Colfax, between Logan and Pennsylvania,

21   and there is a metal fence -- six-foot high metal fence

22   around the church.  Do you see that?

23       A.   I do see a fence, yes.              2:28:24

24       Q.   Okay.  So there's a fence that goes all the

25   way down to the end of this block, right?
```

```
 1        A.    It appears so, yes.

 2        Q.    And then there's the church, right?

 3        A.    There is.  And I should just -- I should just

 4   clarify that I don't know if this is the way that that

 5   church looked on the night of this event.  I'm -- I'm

 6   not sure.  I -- I don't have the proper foundation to

 7   say if this is what it looked like that night.

 8        Q.    You didn't see anybody going into the church,

 9   right?

10        A.    I was never close enough to the church to see

11   that.  I was, again, as I've stated multiple times, to

12   the east side.

13        Q.    Okay.  So on the other side of the -- so on

14   the one side of the street, we have this massive church

15   and a six-foot high metal fence that goes all the way

16   to the end of the block.

17        A.    With -- yeah.

18        Q.    On the other side of the --

19        A.    Sorry.

20        Q.    I'm sorry?

21        A.    I was just going to say, there -- I was going

22   to say there's also open gates there, and I don't know

23   if those were open that night or not.

24        Q.    Let's assume they were closed.

25        A.    Sure.                              2:29:23
```

Exhibit 5, LLC

1    Q.   On the south side of the street, we have

2    buildings and a narrow alleyway.  Do you see this

3    alleyway?

4    A.   I do.

5         MS. EVANS:  Form.

6    Q.   Okay.  There were hundreds -- hundreds of

7    protesters in this block at that time, correct?

8    A.   "Protesters" is your word.  At that point,

9    I'm calling them "rioters," but yes, there was

10   hundreds.

11   Q.   Now not everybody in the crowd was committing

12   a violent act, correct?

13        MS. EVANS:  Foundation.

14   A.   Sure, I suppose there were people there that

15   were not the ones doing the violent things towards us.

16   I'll just point out again, it was well after curfew.

17   Q.   Okay.  So we're going to unpack this in a

18   minute.  But let's assume that you have that crowd of

19   -- of hundreds of people who are in the street between

20   Logan and Pennsylvania, and on one side, they've got a

21   church, which they can't go into, and a fence, and on

22   the other side, they've got buildings, and they've got

23   officers on Pennsylvania shooting things at them, and

24   officers on Logan also shooting things on them.  Would

25   that be a reasonable use of force, given that the only

```
 1   exit was this narrow alley for the hundreds of people

 2   who were there?

 3          MS. EVANS:  Form and foundation.

 4          MR. HUSS:  Form and -- form and foundation.    2:30:42

 5      A.   And I need to clarify.  Would what be a

 6   reasonable use of force?

 7      Q.   Firing tear gas on the protesters trapped in

 8   that block from both sides.

 9          MS. EVANS:  Form and foundation.

10          MR. HUSS:  Form and foundation.

11      A.   Based upon my experience that night, it was

12   -- it was a reasonable use of force, yes.

13      Q.   And that was what Commander Phelan ordered

14   you and the other unit to do, correct?

15          MR. HUSS:  Form and foundation.

16      A.   Commander Phelan ordered the units to move

17   in, be mobile, and try to make arrests.

18      Q.   Okay.  And how you executed his order was to

19   fire munitions on the crowd, right?

20          MS. EVANS:  Form and foundation.

21          MR. HUSS:  Form and foundation.          2:31:20

22      A.   So I did not fire munitions on the crowd, and

23   some of the decisions to fire munitions were likely due

24   to getting hit with flares, fireworks, concrete,

25   bricks, rebar, lots of things.  At that point, we were
```

```
 1   taking both a defensive and an offensive posture.  I
 2   had officers getting hit in the head with chunks of
 3   concrete, so --
 4        Q.   Can you just answer the question that I asked
 5   you?  First of all, do you have documents in front of
 6   you?
 7        A.   I do not.
 8        Q.   What are you looking at?
 9        A.   I have a thing of Chapstick and a thing to
10   clean my glasses.
11        Q.   Okay.
12        A.   And I'm --
13        Q.   Your --
14        A.   -- I'm sorry, I was -- I was doing my best to
15   answer your question.  I'm sorry if I upset you.
16        Q.   Your actions at -- between 9:35 and 9:40 p.m.
17   at the intersection of Colfax and Pennsylvania were
18   consistent with what Commander Phelan had asked you to
19   carry out, correct?
20            MS. EVANS:  Form and foundation.  And I'd ask
21   that we let the witness finish his answer before
22   interrupting.  Thank you.
23            MR. HUSS:  Form and foundation also.        2:32:18
24        A.   Can you restate -- reask the question?  I'm
25   sorry.
```

```
 1        Q.   The -- your actions and the actions of your
 2   officers from Aurora, at the intersection of Colfax and
 3   Pennsylvania between 9:35 and 9:40 p.m. on May 31st,
 4   were consistent with what you -- what Commander Phelan
 5   communicated to you, correct?
 6             MS. EVANS:  Form and foundation.
 7             MR. HUSS:  Same.
 8        A.   Thank you for restating.  I -- I don't
 9   believe they were inconsistent with what he was
10   communicating, you know.  Yeah, obviously, officers may
11   have done things on their own if they saw different
12   things that required that, but I feel like we were
13   consistent with the -- the game plan at that point.
14        Q.   Okay.  And your officers firing less lethal
15   weapons on the crowd at that time was consistent with
16   what Denver command post wanted you to do, correct?
17             MS. EVANS:  Form and foundation.
18             MR. HUSS:  Form and foundation.          2:33:08
19        A.   I believe it was consistent, but again, some
20   of those actions are individual based upon what those
21   officers are seeing or encountering.
22        Q.   The actions that you witnessed your officers
23   take at the intersection of Colfax and Pennsylvania
24   between 9:35 and 9:40 p.m. were appropriate uses of
25   force, in your opinion?
```

```
 1      A.   Yes.

 2      Q.   Okay.  The individuals who were in -- the

 3  protesters who were in that block at that time were in

 4  violation of curfew, correct?

 5      A.   Yes.

 6      Q.   Was being in violation of curfew a reason to

 7  fire munitions on somebody?

 8           MR. HUSS:  Form --

 9           MS. EVANS:  Form --

10           MR. HUSS:  -- and foundation.

11      A.   Violation of curfew, in and of itself,

12  probably not, but as I've stated, there's a lot of

13  other things that were going on.

14      Q.   Okay.  So if an individual protester was in

15  that block on Colfax between Pennsylvania and Logan

16  between 9:35 and 9:40 p.m., and all they had done was

17  just be there in violation of curfew, was that

18  sufficient reason to have fired on them less lethal

19  munitions?

20           MS. EVANS:  Form and foundation.

21           MR. HUSS:  Same.                    2:34:42

22      A.   Again, if the sole reason why we were

23  deploying munitions was a -- was only because there was

24  curfew violations, no, that probably would not be

25  appropriate, but again, there was a lot of other
```

```
1   things, very dangerous things occurring, that if

2   someone chose not to disperse or stay in the area,

3   walking down the middle of Colfax, it is possible that

4   they were -- would be subject to being exposed to some

5   of the munitions that were used, but again, I don't

6   believe any of the people that were just there to walk

7   down Colfax were the ones that were the justification

8   behind why we were using force.  I've explained all of

9   the reasons and things -- the violent, dangerous things

10  that I experienced that were the reason that we were

11  deploying gas and less lethal munitions.  It wasn't a

12  peaceful group at all.

13       Q.   Did you give any warnings or orders to

14  disperse to the crowd before you began firing on them

15  at Colfax and Pennsylvania?

16           MS. EVANS:  Form and foundation.

17       A.   Again, just to clarify, I never fired on

18  anyone and I did not get --

19       Q.   When I say, "You," I mean you and your team,

20  you and your officers under your command.

21           MS. EVANS:  Form and foundation.  Again, I'd

22  ask that you not interrupt the witness when he's

23  answering.

24       A.   And I guess I need you to restate that

25  because I'm hearing two different questions.
```

 1      Q.   I understand you're saying you did not

 2  personally fire any less lethal munitions at Colfax and

 3  Pennsylvania.  That's your testimony, correct?

 4      A.   Yes, ma'am.                              2:36:19

 5      Q.   But you had all these Aurora officers under

 6  your command at Colfax and Pennsylvania, correct?

 7      A.   Yes.

 8      Q.   And what I'm asking you is, did you give any

 9  orders to disperse or warnings to the crowd before your

10  officers fired less lethal munitions at the

11  intersection of Colfax and Pennsylvania between 9:35

12  and 9:40 p.m.?

13          MS. EVANS:  Form and foundation.

14      A.   I did not.

15      Q.   Okay.  Are you aware of any officer who gave

16  any warnings or orders to disperse?

17      A.   I'm not aware.  It's possible, but I don't

18  remember.

19      Q.   Okay.  Did you have any communication with

20  the other unit that was on the other side of the block,

21  on -- at Logan and -- and Pennsylvania -- I'm sorry,

22  Logan and Colfax?

23      A.   I'm not sure -- I don't think I was

24  communicating with them.  It's possible, but I don't

25  remember -- nothing sticks out to that.

```
 1        Q.   Okay.  You don't recall having any direct

 2   communication with them, correct?

 3        A.   No, I had the ability to via radio, but I

 4   don't specifically have a recollection of -- of doing

 5   it.

 6        Q.   Okay.  So if there was a communication from

 7   you to the unit on the other side of the church, it

 8   would be on the radio dispatch, correct?

 9        A.   I would -- it should be, yes.  That's all

10   recorded.                                      2:37:57

11        Q.   What was your understanding of how Commander

12   Phelan wanted you to go about executing arrests in that

13   block at that time?

14             MR. HUSS:  Foundation.

15        A.   So you -- I mean, you -- you heard on the

16   tape the exact same thing I heard.  It was, "Let's move

17   in there and make arrests."  So that's -- I mean,

18   that's fairly general, but at that point, we knew what

19   we had the ability to arrest for and what we did not,

20   so to me, it was, "Get in there and anybody who

21   continues to remain here will be arrested."  At that

22   point, we were arresting people for curfew, because it

23   was well after the 8:00 curfew that had been pushed out

24   on every smartphone and -- and blasted all over the

25   place.
```

```
 1      Q.   Were you given any instruction from any

 2  Denver supervisors or the Denver Command Post as to who

 3  you were supposed to arrest for curfew violations?

 4      A.   I don't -- I guess I don't understand the

 5  question.

 6      Q.   So, you know, were you told anything about

 7  whether there were any exceptions to the curfew?

 8          MR. HUSS:  Foundation.

 9      A.   Not that -- no, I mean, I -- I don't think

10  so.  It was if people were in the area after 8:00 p.m.

11  and they were -- you know, didn't have a valid reason

12  to be out, my interpretation was that, you know, the

13  curfew was -- nobody should be out by -- you know,

14  after 8:00 p.m., based on a well-publicized curfew

15  order.

16      Q.   And what -- what -- what was the -- what were

17  the valid reasons that somebody could be out?

18          MS. EVANS:  Foundation.                    2:39:39

19          MR. HUSS:  Foundation.

20      A.   And -- and I'm sorry, I'd have to read the

21  curfew order.  I don't recall what -- the specifics of

22  it at this point.  It's not something that we still

23  have, so it's not something I'm fresh on.

24      Q.   You -- were you ever informed at any time

25  that members of the media, credentialed members of the
```

1  media, were exempt from the curfew?

2      A.   I don't know if I was informed that.  It

3  would make sense that they would be exempt, but I don't

4  -- I don't have a -- I don't have a recollection of

5  being informed of that.

6      Q.   Did you or any of your officers, when you

7  were pushing protesters from Colfax and Washington to

8  Colfax and Pennsylvania, did you ever make any attempt

9  to determine whether there were any credentialed

10  members of the media on that street at that time?

11      A.   I did not, and I didn't see any of my people

12  doing that.  I'm not sure how that would have been

13  accomplished.

14      Q.   Okay.  So the action that you took between

15  Washington and Pennsylvania on Colfax at that time was

16  simply to fire munitions on anybody who remained in the

17  area, correct?

18          MS. EVANS:  Form and foundation.

19          MR. HUSS:  Form and foundation.           2:41:02

20      A.   No, that -- that's not correct.  That was one

21  piece of it, but that was -- there was -- the main goal

22  was to -- to get the people out of there that were

23  causing property damage and being destructive and

24  throwing things at officers.

25      Q.   How did you go about isolating those

1    individuals?                                    2:41:17

2        A.   So anybody who was in that block at that

3    point, as we formed a skirmish line saying, "Move back,

4    clear out the area," should have cleared out of the

5    area.  Just because somebody might be media or

6    something else doesn't mean they can lawfully remain in

7    an area that we're cordoning off.  But yeah, I mean,

8    the main -- the main goal at that point is we're going

9    to clear all of Colfax, push everybody out, and I can

10   just -- again, I'll reiterate, the people we were

11   encountering there were -- there was no casual

12   encounters.  Everyone that was running up or had

13   shields, umbrellas, all those things, they were

14   actively engaging in behavior that was illegal and

15   dangerous.

16       Q.   During the time that you were pushing the

17   crowd west on Colfax between Washington and

18   Pennsylvania, are you saying that you gave orders to

19   people to disperse before each push forward?

20           MS. EVANS:  Form.                         2:42:17

21       A.   So as when -- any time we're on a skirmish

22   line and we're moving forward, and I know -- I know you

23   have to -- have likely heard it on the -- the body cam

24   footage, we -- we -- as we're moving and stepping, the

25   entire line of officers chants very loudly, "Move back,

1  move back," with each -- each movement, and so I -- I

2  believe we were doing the same thing as we were heading

3  west on Colfax.  I know we did it at Civic Center,

4  that's -- that's the way we practice when we're moving

5  a crowd.

6      Q.   If you were chanting in that way when -- if

7  you and the other officers were giving that warning

8  when you were pushing the crowd back west on Colfax,

9  then that would be -- you would expect that to be

10 captured on somebody's body cam, right?

11         MS. EVANS:  Form and foundation.

12     A.   I would suspect it would be, yes.              2:43:06

13     Q.   And so if we don't hear any of those warnings

14 or orders on any Aurora police officers' body cam from

15 the evening of May 31st, then the reasonable inference

16 is that those orders were not given, correct?

17         MS. EVANS:  Form and foundation.

18     A.   I'm not -- I'm not comfortable speculating to

19 that, because there -- there are reasons why we

20 wouldn't do that, but if you didn't hear it, then it's

21 possible it was not done.

22     Q.   What were -- what would be the reasons for --

23 for not giving an order at that time?

24     A.   So based on the things we were dealing with,

25 it may not have been practical when we're getting hit

1  with explosives and fireworks.  Yelling "move back" is

2  probably not the appropriate course of action.

3  However, if it's a point where there's just people

4  standing around and not moving, we may be saying that.

5  However, if it's a situation like where we're taking

6  rocks, bottles, all that stuff, we may just be firing

7  munitions and gaining whatever ground we can to push

8  the crowd out of the area.  So there's a lot of

9  variables here, and I haven't watched every single body

10  camera of every officer that was there.

11      Q.   If there were peaceful protesters in front of

12  the church between Logan and Pennsylvania on Colfax

13  between 9:35 and 9:40 p.m., who were doing nothing

14  other than being outside in violation of curfew, was it

15  warranted for you or any officer to fire munitions on

16  them?

17          MS. EVANS:  Form and foundation.          2:44:43

18      A.   So I know -- I -- I think you're getting at a

19  hypothetical.  I -- I never observed that.  I was never

20  at the church, and so I -- I hate to speculate on

21  something I have no personal knowledge of.

22      Q.   Well you were on the east side of that crowd

23  at Pennsylvania, and so what I'm asking you is, if

24  there were hundreds of people there, in front of the

25  church between Pennsylvania and Logan on Colfax at that

```
 1   time, and there were a large number of people who were

 2   being peaceful and who had not done anything other than

 3   violate the curfew, was it warranted for you or your

 4   officers to fire munitions on them at that time?

 5            MS. EVANS:  Form and foundation.          2:45:32

 6       A.   And I'm going to answer it the exact same

 7   way.  I cannot speculate to something that I didn't

 8   have personal observation of.  I -- I -- I never saw

 9   anyone peaceful near the church.  I can tell you

10   everything that I observed was quite the opposite from

11   peaceful, it was riotous.  If there were peaceful

12   protesters in that group, I'm not sure why they didn't

13   get the -- the indication that they shouldn't be there.

14   I -- I don't know.  Again, there's a lot going on.

15       Q.   You didn't give them any warnings before you

16   fired that you were going to fire weapons on them, did

17   you?

18            MS. EVANS:  Form and foundation.

19       A.   I'm sorry, can you repeat your question, if

20   there was one?

21       Q.   You did not give them any warning that you

22   were going fire weapons on them before doing so at

23   Colfax and Pennsylvania at approximately 9:36 p.m.?

24            MS. EVANS:  Form and foundation.

25       A.   I personally did not.
```

Exhibit 5, LLC

```
 1       Q.   And you didn't hear anybody else giving any

 2   sort of warnings, correct?

 3       A.   I don't recall whether I did or not.  I don't

 4   know.

 5       Q.   Do you have an understanding of whether

 6   Denver command staff approved of your actions and the

 7   actions of your officers that -- during the protests on

 8   May 30th and 31st?

 9            MR. HUSS:  Foundation.

10       A.   I -- I don't -- I -- I don't know.  I don't

11   know whether they approved of our actions or not.  I

12   have not heard that they didn't.

13       Q.   Have you ever been given any indication at

14   any time from anybody in the Denver command staff that

15   the actions of your officers from Aurora during the

16   protests was inappropriate or an inappropriate use of

17   force?

18            MR. HUSS:  Form and foundation.

19       A.   I don't believe I have, no.              2:47:20

20       Q.   Did you arrest anybody between 9:30 and 10:00

21   p.m. on Colfax on May 31st?

22       A.   I don't remember.  I did arrest someone that

23   night, but I don't -- I don't remember the specific

24   time.

25       Q.   Did you see individuals who were out on the
```

Exhibit 5, LLC

```
 1    street in violation of curfew, but who did not appear

 2    to be associated with the protesters?

 3        A.   I don't recall seeing anybody there that was

 4    doing anything other than being part of the group of --

 5    of rioters.

 6        Q.   What do you consider to be a riot?

 7             MS. EVANS:  Form and foundation.

 8        A.   I would assert that everything that we've

 9    looked at on the -- the body cam from Colfax there was

10    a riot.  It was unlawful assembly, it was after curfew,

11    people were breaking windows, people were looting

12    stores, people were setting fires, people were throwing

13    objects at my officers, fireworks, mortars, explosives.

14    People were rolling flaming dumpsters down the street,

15    people were engaged in all kinds of different illegal

16    behavior.  I don't know the -- the Webster's definition

17    of a riot, but that was as much of a riot as I've ever

18    seen.

19        Q.   Did you -- in the footage that we've watched

20    during your deposition today, would you characterize

21    all of it as a riot?

22        A.   All of the footage that we've looked at

23    today?

24        Q.   Yes.

25        A.   No.                                    2:48:58
```

1    Q.   Okay.  What have you seen during our

2  deposition today that you believed was peaceful?

3    A.   Are you asking that I go through every body

4  camera and define which is a riot and which is

5  peaceful?

6    Q.   Well, let's isolate May 31st.  The footage

7  that we've watched from May 31st, you do not believe

8  that any of it was peaceful, correct?

9        MS. EVANS:  Form.

10   A.   I'm -- I'm sorry.  I'm trying to remember

11  which was from the 31st.  Everything we just --

12   Q.   The 31st is just the -- what we've watched

13  for the 31st is the intersection of Colfax and

14  Pennsylvania and Logan, in front of the church.

15   A.   Oh, yeah, none -- no, that was not peaceful

16  by any stretch of the imagination.

17   Q.   Okay.  What about earlier on on May 31st at

18  Colfax and Washington at 8:30 p.m.?

19   A.   No, that was not peaceful.            2:49:48

20   Q.   Okay.  Even when the protesters were marching

21  down the street?

22   A.   I'm not speaking to the video, I'm speaking

23  to my personal experience there that night, which to

24  me, is more appropriate if I'm the one that's giving

25  the testimony than just watching a video I've never

1   seen before.  I'm telling you, standing there at 8:30

2   or whatever we were there, Colfax and Washington was

3   not peaceful.

4       Q.   With respect to May 30th, at the intersection

5   of Lincoln and Colfax between 6:00 and 8:00 p.m., was

6   there a point in time when the crowd there was

7   peaceful?

8       A.   There were times where the crowd -- there was

9   a lull, there wasn't active items being thrown, it --

10  yeah, there were times when it wasn't active

11  aggression, and it was more peaceful, yes.

12      Q.   Are you aware that Sergeant Brukbacher is

13  being criminally investigated by the Denver Police

14  Department for his actions during the Denver protests

15  last summer?

16          MS. EVANS:  Form and foundation.

17          MR. HUSS:  Form and foundation.          2:50:54

18      A.   I am aware that there was some sort of

19  investigation.  I don't know the status or -- or what

20  the details are of that.

21      Q.   What is -- what is your knowledge of what

22  that investigation is about?

23          MS. EVANS:  Form.

24      A.   I don't have knowledge of the investigation

25  in and of itself.  I'm aware that there was some sort

1   of investigation into use of force that he did, but I

2   don't have any details of that at all.

3        Q.   How do you know that there is an

4   investigation into the use of force by Sergeant

5   Brukbacher?

6             MS. EVANS:  Form.                        2:51:23

7        A.   I believe it came up in conversation at some

8   point.  I've been an acting division chief at several

9   times over the next -- over the last month.  I'm being

10  promoted to division chief a week from today, and so in

11  the time as acting division chief, when I've been

12  working in the chief's office, we've had conversations

13  about things, and at some point, it came up and I -- I

14  can't tell you exactly who it came up in conversation

15  with.

16       Q.   Well, do you know if there's a specific

17  incident that Sergeant Brukbacher is being investigated

18  for?

19       A.   Well --

20            MS. EVANS:  Form.

21       A.   -- well clearly, there's an incident he's

22  being investigated for, but I -- I -- I don't know what

23  it is.

24       Q.   Okay.  Do you know if it has anything to do

25  with the events that we've discussed today, that you

```
 1   were present for on the 30th and 31st?

 2           MS. EVANS:  Form and foundation.

 3      A.   I don't.                              2:52:11

 4      Q.   Is there -- is there any other Aurora police

 5   officer that's being criminally investigated, to your

 6   knowledge, for their actions during the Denver protests

 7   last summer?

 8           MS. EVANS:  Form.

 9      A.   Not to my knowledge.

10      Q.   Why was this investigation of Sergeant

11   Brukbacher a topic of discussion between you and

12   whoever else you discussed it with at Aurora?

13           MS. EVANS:  Form and foundation.

14      A.   I -- I can't answer that because I don't

15   remember the context of the discussion.  I -- it came

16   to my knowledge, but I don't -- as I've just stated, I

17   don't recall with whom I spoke.  It would be normal

18   that that would come up in conversation in the chief's

19   office, based upon one of our personnel having an

20   investigation, but I can't tell you why or -- or at

21   what point it came up.

22      Q.   Do you recall who you've had a conversation

23   with about this?

24      A.   As I just stated, no.

25           MS. WANG:  Let's take a five-minute break.
```

```
 1              RECORDER:  Off the record, 5:38 p.m.

 2                    (Off the record)

 3              RECORDER:  Back on the record, 5:49 p.m.

 4         MS. WANG:  I have no further questions.

 5                     EXAMINATION

 6   BY MR. SEBBA:

 7      Q.   Hi, this is Mike Sebba, representing the BLM

 8   5280 Plaintiffs.  I just have just a few questions.  So

 9   I just want to clarify.  At any time during the

10   protests, were you told by the Denver chain of command

11   to not use less lethal munitions?

12              MR. HUSS:  Objection.  Foundation.

13      A.   I think you're asking if, you know, in the

14   middle of this -- as this was going on, if they ever

15   said, "Hey, stop, don't use more munitions"?  No, I --

16   I don't believe that occurred.

17      Q.   Okay.  And did you ever hear -- and I'm

18   sorry, step back.  To be clear, I'm asking for both

19   days you were there.  Same answer?  Okay.

20      A.   Yes, sir.  Sorry, I -- I didn't verbalize.

21   Yes.

22      Q.   Thank you.  And so did anyone in the Denver

23   chain of command express any dissatisfaction with

24   Aurora PD's actions in those two days?

25              MS. EVANS:  Foundation.
```

```
 1          MR. HUSS:  Objection.  Foundation.

 2     A.   Not that I have knowledge of.  It could have

 3  happened but I'm not aware of it.

 4     Q.   And just a little more specifically, did you

 5  hear from anyone in the Denver chain of command --

 6  excuse me, in the Denver Police chain of command, that

 7  Aurora police officers were using less lethal munitions

 8  inappropriately?

 9          MR. HUSS:  Foundation.

10     A.   I did not hear that, no.                    2:55:10

11          MR. SEBBA:  Okay.  No further questions.

12                     EXAMINATION

13  BY MR. MCNULTY:

14     Q.   I have a few questions for you, Commander.

15  Hello.

16     A.   Hi.

17     Q.   I'm Andy McNulty.  I'm finally on the screen.

18  And it's, you know, nice to meet you.  Nice -- good

19  afternoon to you.

20     A.   You as well, sir.

21     Q.   Commander, you know, there were points during

22  the protests when you chose not to use or authorize

23  force to be used against protesters, isn't that

24  correct?

25     A.   Sure, yeah.  I mean, it wasn't a continuous
```

1    use of force.  There was a lot of times where there

2    were -- it wasn't -- the circumstances didn't justify

3    us using force at -- at times.  It wasn't a continuous

4    use of force.

5         Q.   So for example, when protesters were

6    peacefully gathered in Civic Center Park, they -- that

7    happened at one point during the protests, is that

8    right?

9              MS. EVANS:  Foundation.

10        A.   In -- I'm sorry, can you clarify for me or --

11   or rephrase?

12        Q.   Sure.  There was a point in the -- during --

13   when you were out there at the protests when there were

14   protesters gathered, demonstrating in Civic Center Park

15   and on the lawn in front of the Capitol, correct?

16        A.   Yes.                                   2:56:23

17        Q.   And when you saw those folks who were

18   protesting in the park and on -- on the Capitol, there

19   were points where you chose not to use force against

20   them, correct?

21        A.   Correct.

22        Q.   And you chose to do that because you know

23   that peacefully protesting in a park is clearly

24   activity protected by the First Amendment, correct?

25             MS. EVANS:  Form and foundation.

Page 139

```
 1      A.   Maybe I can answer -- I'm trying to figure

 2  out an appropriate way to answer, because I don't want

 3  to -- I don't know what I'm getting at here, sorry.  I

 4  -- there were -- there --

 5      Q.   I think it's a simple question.

 6      A.   Yeah, you're --

 7      Q.   I can ask it again.  It -- you know, you know

 8  that protesting in a park is clearly First Amendment

 9  protected activity, right?

10      A.   Sure.

11      Q.   And you know that it would violate the First

12  Amendment to break up a peaceful protest in -- in a

13  park, right?  Without any justification?

14          MS. EVANS:  Form and foundation.            2:57:21

15      A.   If we're -- if we're just being

16  hypothetically, if it's just people sitting in a park

17  peacefully protesting, absent any other violence or

18  anything going on, then -- then yeah, most likely, we

19  wouldn't even do that.

20      Q.   Right.  And you know that ordering the

21  dispersal of a protest in a park like that, or you

22  know, any other public forum based on the topic of the

23  protest would also violate the First Amendment, right?

24      A.   Correct.  We are trained to pay attention to

25  conduct, not content, if you will, so in all reality,
```

Exhibit 5, LLC

1    it really shouldn't matter what the people are

2    protesting, we have to pay attention to actions versus

3    -- quite honestly, I -- I don't even -- it doesn't

4    matter what -- what's being protested.  We're trained

5    to look at what's happening, what -- what are public

6    safety issues, that kind of thing.

7        Q.   Yeah.  And -- and in the same vein, it would

8    be -- it would violate the First Amendment to consider

9    whether those at the protests are, for example,

10   Socialists, in making a decision about whether to break

11   up a protest, right?

12            MS. EVANS:  Form and foundation.            2:58:24

13       A.   Yeah, I mean, kind of like my previous

14   answer, it's -- it's not up to us to say, "Okay, this

15   group is protesting this and I like this particular

16   thing, so I'm not going to break it up."  It's --

17   again, we have to be neutral and -- and go based upon

18   actions, content, law violations.

19       Q.   Yeah, and so even if members of the protests

20   were -- looked like members of Antifa, it would violate

21   the First Amendment to consider that fact in a decision

22   of whether to break up the protest, correct?

23       A.   If that's the sole thing we're going on, then

24   -- then yes, that's not appropriate.

25       Q.   It's not appropriate to even take that into

 1   account in any way, right, because the political

 2   affiliation of a protest is something that you can't

 3   take into account when determining whether to break it

 4   up, if you're going to comply with the First Amendment,

 5   correct?

 6          MS. EVANS:  Form and foundation.              2:59:14

 7      A.   Yeah, that's -- I don't know if I agree with

 8   you, only because if -- in certain groups, if we've

 9   dealt with them before or we're aware that a certain

10   group has a propensity for inciting violence, it may be

11   something that we're interested in.  If we see a group

12   show up that in the past has caused issues, it may be

13   something like, "Okay, we're going to -- you know, we

14   need to take that into account."  But if they're just

15   standing there dressed in an attire, you say Antifa, if

16   they're just standing there in Antifa garb, that in and

17   of itself is also -- that would not be the sole factor

18   to disperse a crowd, in my opinion.

19      Q.   Okay.  You know that dressing in -- in

20   certain garb is -- is protected activity under the

21   First Amendment, right?  The right to express yourself

22   by associating with a particular political persuasion

23   is -- is something that the First Amendment protects,

24   right?

25          MS. EVANS:  Form.                             3:00:01

```
 1        A.   Yes, that's safe to say.

 2        Q.   Okay.  Commander, you also know that it

 3   violates the Constitution to use force indiscriminately

 4   on a crowd, right?

 5             MS. EVANS:  Form.

 6        A.   Yes, we are -- we are not allowed to

 7   indiscriminately use force against people.

 8        Q.   So for example, if there's a protest of,

 9   let's say, 100 people and there's five people in the

10   crowd who are engaging in illegal activities, it would

11   be unconstitutional to use force on the entire crowd,

12   right?

13             MS. EVANS:  Form and foundation.

14        A.   I think there's more that goes into it.  I

15   think if -- it those five people are creating such a

16   hazardous situation or committing violent crimes, you

17   know, our goal will be not -- to -- to deal with those

18   five individuals, but unfortunately, if there's other

19   actions going on there that -- there's -- there's

20   peaceful people near the five that are doing something

21   that's -- we've got to take action on, the reason that

22   we use less lethal munitions and other things that are

23   irritants is because if there is -- let's say the wind

24   changes and goes in a different direction and exposes

25   other people, it's not the intent, necessarily, but
```

 1   things -- things like that do occur, but we're not

 2   targeting the whole group in -- generally, in those

 3   scenarios.  We're trying to stop whatever is occurring

 4   with that group that is causing the problem, if that

 5   makes sense.

 6       Q.   Well, my -- my question was a little

 7   different, Commander.  You know, if there's an entire

 8   -- if there's a crowd of 100 people and there's five

 9   people who are acting unlawfully, it would be

10   unconstitutional to use indiscriminate force on the

11   entire crowd, right?

12           MS. EVANS:  Form.

13       A.   It -- it could be.  I'm not -- not a lawyer,

14   but it could be, depending on the circumstances.

15       Q.   And dispersing that entire crowd on the --

16   based on the actions of a few people would also be a

17   violation of the free speech rights of the other folks

18   who were not engaging in unlawful activity, correct?

19           MS. EVANS:  Form and foundation.          3:02:01

20       A.   I suppose it could be.  Again, lots of

21   factors that go into it that we have to evaluate,

22   including is the conduct of some so egregious and

23   dangerous that it necessitates us shutting down an

24   entire event.  That could -- that could happen, and

25   unfortunately, all that does is cause the people who

1   are there to peacefully protest to not be able to do

2   that, and that's -- I would -- I would say that is --

3   the -- the onus of that is on the people that are

4   acting illegally, and -- and if it's -- it rises to a

5   level where it's a public safety issue, we may have to

6   shut down an entire event because of the actions of

7   some, and that's -- that's -- that's not good.

8        Q.   All right.  Well give me -- let me give you a

9   hypothetical -- let's say we have a couple people who

10  are, you know, clearly -- discreet within the crowd and

11  throwing some rocks at a police -- at some police

12  officers, and there's a crowd of 150 folks there.  In

13  that situation, it wouldn't be appropriate to disperse

14  the entire crowd, right?  Because of the actions of a

15  few?

16          MS. EVANS:  Form.                        3:02:59

17       A.   In your scenario, if it's two people that are

18  throwing rocks and everybody else is peaceful, I would

19  hope we'd be able to address those individuals.  I

20  think what we're -- if we're talking about this

21  incident, though, it was -- it was a heck of a lot more

22  people than -- than 100 people, so it's situation --

23       Q.   I was not -- I was not asking about this

24  incident.  I'm not -- I'm -- you know, I'm giving you a

25  hypothetical, so please just assume for the purpose of

1    the hypothetical that my hypothetical is true.  I just

2    -- you know, a crowd of about 150 people and there's

3    five folks in there who are, you know, engaging in

4    things like throwing water bottles and rocks at -- at

5    the police, it would be inappropriate in that

6    circumstance to disperse the entire crowd, correct?

7            MS. EVANS:  Form.

8        A.   I hate this answer, but it depends.          3:03:42

9        Q.   Well I -- what does it depend on?  What are

10   the other factors that you have to consider?  I just

11   gave you the entire hypothetical.

12       A.   Yes, you did.  And I'm just saying it

13   depends.  Every -- every situation -- it's why we have

14   to try to evaluate each situation.  None -- none of

15   these are the same, and it -- it depends.  If the -- if

16   the five people's actions are so outrageous that we

17   have to determine, "Okay, is this safe, are the other

18   people that -- that are not involved in the illegal or

19   dangerous behavior, are they at risk?"  If we -- we may

20   deem that "yeah, it's only five people, but their

21   conduct is such," or we get information that there's

22   other stuff going on, if they're conduct is such that

23   --

24       Q.   Well --

25       A.   -- we deem --

```
 1      Q.   Let me just stop -- let me just stop you

 2 there, because I'm -- I'm not asking you about other --

 3 other information.  I asked you on the hypothetical

 4 that I just gave you.  150 people, five people are

 5 throwing rocks and bottles, that's it.  That's the only

 6 things that are happening.  Is it appropriate to

 7 disperse the crowd in that situation?  The entire

 8 crowd?

 9           MS. EVANS:  Form and foundation.

10      A.   It depends.

11      Q.   Well, I just gave you the entire

12 hypothetical.  How -- how can it depend?  It's a yes or

13 no answer.  Is it -- is it -- is it appropriate to

14 disperse that crowd under that hypothetical?

15           MS. EVANS:  Form.

16      A.   It could be.

17      Q.   All right.  Commander, you know that before

18 using force or dispersing a crowd, you have to give

19 clear warnings and the opportunity to disperse,

20 correct?

21           MS. EVANS:  Form.

22      A.   I believe -- I mean, yes, you're correct, but

23 there could be emergency circumstances where that's not

24 appropriate.

25      Q.   And those warnings have to be objectively
```

1  able to be heard by all of the folks in that crowd,

2  correct?

3          MS. EVANS:  Form.

4      A.  Yes, that's the goal.  We would -- we would

5  -- we would -- every time we do that, our goal is that

6  everyone present is able to hear those.

7          MR. MCNULTY:  Okay.  Those are all my

8  questions, thank you.

9          MS. WANG:  I have nothing further.

10         MR. SEBBA:  Nothing further.

11         MS. EVANS:  Nothing from me.

12         MR. HUSS:  I have no questions.

13         RECORDER:  Okay.  Signatures?

14         MS. EVANS:  I will take a copy for review on

15  behalf of the deponent.

16         RECORDER:  Okay.  Off the record, 6:02 p.m.

17

18

19

20

21

22

23

24

25

```
 1                    CERTIFICATION
 2   I certify that the deponent was duly sworn by me and
 3        that the foregoing is a true and correct
 4        transcript from the record of proceedings
 5             in the above-entitled matter.
 6
 7
 8             Brenda L. Portillo
 9             April 9, 2021
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Exhibit 5, LLC

Caption:
Witness name:
Proceeding date:

# ERRATA SHEET
## CHANGES IN TESTIMONY

| PAGE | LINE | FROM | TO |
|------|------|------|-----|
| 40 | 2-3 | "sought out quite a bit" | Unsure but this doesnt' make sense and not sure what I actually said |
| 42 | 9 | Scrimmage | Skirmish |
| 57 | 15 | Chose | Chosen |
| 81 | 3 | Various | Nefarious |

SIGNATURE OF WITNESS                    DATE

041521

Exhibit 5, LLC
635 North Dearborn Street, Suite 901
Chicago, IL 60654

Caption: _____
Witness name: Stephen Redfearn
Proceeding date: 03/12/2021
STATE OF Colorado
COUNTY OF Denver

## SIGNATURE PAGE

I, Stephen Redfearn , state that I have read the foregoing transcript of the testimony given
    (WITNESS NAME)

by me at my deposition on 03/12/2021 and that said transcript constitutes a true and
                        (DATE OF DEPOSITION)

correct record of the testimony given by me at said deposition except as I have so indicated on the
errata sheets provided herein.

Stephen Redfearn _____        04/15/21
              (WITNESS NAME)              (DATE)

No Corrections (please initial) _____

Subscribed and sworn to before
me this 15th day of April , 2021.

_____
NOTARY PUBLIC

AFFIX NOTARY SEAL HERE

ASHLEY DICKENS
NOTARY PUBLIC
STATE OF COLORADO
NOTARY ID# 20044028273
MY COMMISSION EXPIRES 12/15/2021