IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 20-cv-01878-RBJ (consolidated with 20-cv-01922-RBJ-MEH and 20-cv-03155-KLM)

BLACK LIVES MATTER 5280, *et al.*,
Plaintiffs,

v.

CITY AND COUNTY OF DENVER, *et al.*,
Defendants.

## DEFENDANTS' AMENDED RESPONSE IN OPPOSITION TO FITOURI PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

Defendants, through their undersigned counsel, submit their Response to Fitouri Plaintiffs' Motion for Class Certification and Appointment as Class Counsel ("Plaintiffs' Motion"):

## INTRODUCTION

The Fitouri Plaintiffs ("Plaintiffs") fail to meet the rigorous requirements for class certification pursuant to Fed. R. Civ. P. 23. Plaintiffs seek to certify a class, the "Direct Force Class", concerning the tactics and use of force by the Denver Police Department ("DPD") from May 28, 2020, to June 2, 2020 in response to protests resulting from the killing of George Floyd by a former Minneapolis police officer. Additionally, Plaintiffs seek to certify a class, "Arrest Class", related to the enactment and enforcement of the City and County of Denver's ("Denver") emergency curfew laws. The proposed "Direct Force" classes are broadly defined and not ascertainable. Moreover, common questions do not predominate, and a class action is not a superior litigation method here. "It is axiomatic that a class action is an exception to the general rule that 'litigation is conducted by and on behalf of the individual named parties only.'" *Morris*

*v. DaVita Healthcare Partners, Inc.,* 308 F.R.D. 360, 365 (D. Colo. 2015) (Jackson, J.) (quoting *Wal-Mart Stores, Inc. v. Dukes,* 564 U.S. 338, 349 (2011).  Because the Fitouri Plaintiffs have not and cannot meet their burden of establishing the propriety of a class action, Defendants respectfully request that their Motion for Class Certification be denied.

## FACTUAL BACKGROUND[1]

Beginning on May 28, 2020, and continuing for several days, large crowds participated in demonstrations in downtown Denver. (Doc. 37, ¶1).  Unfortunately, the events devolved into riots with violence directed at police officers and private and public property.  (Doc. 91-42, at 14:15-17; Doc 91-55). Demonstrators unlawfully attempted to block traffic on local roads and Interstate 25 ("I-25"), creating extremely dangerous situations to drivers, protesters, and officers.  (Doc 91-42, at 8:28 PM). Additional violent, criminal acts occurred at various locations throughout Denver, which included projectiles and homemade explosives being thrown or launched at officers and millions of dollars of property destruction. (Doc. 91-21, at 9:10:26 PM; Doc. 91-55).

The dangerous situations caused by these illegal activities resulted in a need to disperse crowds. Officers responded by issuing dispersal orders and, in some instances, deployed various chemical agents and/or other less lethal force. The force used depended on the circumstances. (Doc. 91-55).[2]  Officers were injured during these protests, and many feared for their lives, the lives of their fellow officers, and the well-being of peaceful protestors.  (Doc. 91-55).  In response to the continued violence, the Mayor of Denver issued a mandatory nighttime curfew, taking effect

---

[1] Due to the voluminous nature of this case, the Court's extensive knowledge of the record and the sake of brevity, Defendants have not attached additional exhibits. Should the Court prefer additional content for consideration the Defendants will provide further exhibits upon request.

[2] Plaintiffs submitted over 30 videos, when watched in their entirety depict instances of active aggression against the police, issuances of dispersal orders and destruction of property.

2

on May 30, 2020 at 8:00 P.M. The local emergency curfew was a lawful restriction issued pursuant to C.R.S. § 24-33.5-70 I, *et seq*. DPD enforced the emergency curfew consistently and lawfully, allowing protesters ample time to disperse and comply with the curfew.

## STANDARD OF REVIEW

The class action is "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Dukes*, 564 U.S. at 348 (citing *Califano v. Yamasaki*, 442 U.S. 682, 700-701 (1979)); *see also Gen. Tel. Co. v. Falcon*, 457 U.S. 147, 161 (1982). Cases suitable for the class action certification are those where homogeneity among the class members is such that the few can fairly and adequately stand for the many, and where the device is the most effective and efficient procedural tool. *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 593 (1997).

Before certifying a class, this Court must ensure all the requirements of Fed. R. Civ P. 23 are met. *Vallario v. Vandehey*, 554 F. 3d 1259, 1266 (10th Cir. 2009). First, Plaintiffs must satisfy the following four (4) prerequisites of Rule 23(a):

> (1) The class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

If Plaintiffs satisfy all these requirements, they must also establish the proposed classes meet one of the requirements of Rule 23(b). Here, Plaintiffs seek class certification pursuant to Rule 23(b)(3) requiring common questions of fact and law predominating over those questions affecting individual members and also mandating a class action is superior to any other method of fairly and efficiently resolving the controversy.

The parties seeking class certification bear a "strict burden of proof" to ensure each prerequisite is satisfied. *Reed v. Bowen*, 849 F. 2d 1307, 1309 (10th Cir. 1988). This involves a

"careful certification inquiry," considering the facts of the particular matter at hand. *Vallario*, 554 F.3d at 1269 (citing *Unger v. Amedisys Inc.*, 401 F. 3d 316, 319 (5th Cir. 2005); *Trevizo v. Adams*, 455 F.3d 115, 1163 (10th Cir. 2006). The burden is met only if, "after a rigorous analysis," this Court is convinced the Rule 23 requirements are satisfied. *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013) (quoting *Dukes*, 564 U.S. at 330-351), *see also Shook v. El Paso Cnty.*, 386 F.3d 963, 968 (10th Cir. 2004) ("*Shook I*") (quoting *Gen. Tel. Co.*, 457 U.S. at 161).

A party's failure to satisfy even one of the requirements by a preponderance of the evidence precludes certification. *Comcast Corp.,* 569 U.S. at 33. Here, rigorous analysis of the evidence offered in support of certification demonstrates Plaintiffs' proposed classes fail.

## ARGUMENT

**I.    The Proposed "Direct Force" Classes are not Easily Ascertainable**.

In addition to meeting the explicit requirements of Rule 23, parties seeking class certification must satisfy "threshold" requirements, namely, those establishing identifiable classes exist and the representative plaintiffs' members of the proposed classes. *See* 5 *Moore's Federal Practice* § 23.20 (3d ed. 1997) (citing, *inter alia*, *In re A.H. Robins Co., Inc.,* 880 F.2d 709, 728 (4th Cir. 1989)). "The issue of adequacy must generally be determined before the court addresses the prerequisites of Rule 23(a). *Warnick v. Dish Network LLC*, 301 F.R.D. 551, 556 (D. Colo. 2014), appeal dismissed (Oct. 7, 2015) (citation omitted).

A class definition "must be 'precise, objective, and presently ascertainable' before the class action can proceed." *Daniel F. v. Blue Shield of California*, 305 F.R.D. 115, 121 (N.D. Cal. 2014) (quoting *Manual for Complex Litigation, Fourth* § 21.222 (2004)). "Ascertainability mandates a rigorous approach at the outset because of the key roles it plays as part of a Rule 23(b)(3) class

4

action lawsuit." *Carrera v. Bayer Corp.,* 727 F.3d 300, 307 (3rd Cir. 2013) (quotation omitted). Indeed,

> "[t]he ascertainability requirement serves several important objectives…. it eliminates 'serious administrative burdens that are incongruous with the efficiencies expected in a class action' by insisting on the easy identification of class members...it protects defendants by ensuring that those persons who will be bound by the final judgment are clearly identifiable."

*Marcus v. BMW of N. Am., LLC,* 687 F.3d 583, 592-94 (3rd Cir. 2012) (citations omitted).

A class is only sufficiently defined if it is "administratively feasible for the court to determine whether a particular individual is a member." *Warnick, supra*, citing *Edwards v. Zenimax Media Inc.,* 2012 WL 4378219, at *4 (D. Colo. Sept. 25, 2012). "'Administrative feasibility means that identifying class members is a manageable process that does not require much, if any, individual factual inquiry.'" *Carrera v. Bayer Corp.,* 727 F.3d 300, 307–08 (3rd Cir. 2013) (quotation omitted). When "class members are impossible to identify without extensive and individualized fact-finding or 'mini-trials,' then class action is inappropriate." *Marcus*, 687 F.3d at 593 (citation omitted).

Plaintiffs reliance on other courts' certification of damages classes with purportedly similar parameters to have this Court certify their proposed class is misplaced. These cases are not binding and readily distinguishable. Specifically, these cases involved class members who were involved in one-day events that did not involve various locations.[3] Furthermore, certification was allowed

---

[3] *Puente v. City of Phoenix*, *Puente v. City of Phoenix*, 2019 WL 4849613, at *4 (D. Ariz. Sept. 30, 2019), involved a one-day protest on August 22, 2017 outside the Phoenix Convention Center during a rally held by former President Donald Trump. *Multi-Ethnic Immigrant Workers Organizing Network, et al. v. City of Los Angeles, et al.*, 246 F.R.D. 621 (C.D. Cal. 2007) ("*MIWON*") involved a one-day march through downtown Los Angeles with a rally at MacArthur Park.

after the courts redefined the proposed class definitions.[4] Here, Plaintiffs' "Direct Force Class" is vastly different, as the proposed class members, as well as the named Plaintiffs, were involved in events that occurred over multiple days, at various locations and times. Many of the events occurred simultaneously with members of the crowd committing varying violent acts toward law enforcement and property. Moreover, redefining Plaintiffs' proposed class definitions is not appropriate under these circumstances. In *Puente* and *MIWON*, the proposed class definitions did not include various subclasses; whereas, Plaintiffs definition of the "Direct Force Class" contains five (5) subclasses – all of which necessitate legal determinations to ascertain class members. This in and of itself shows that Plaintiffs cannot easily define the proposed class because the underlying events occurred simultaneous, varied in crowd conduct and law enforcement response and developed rapidly.

Other courts have declined certification when the classes are not adequately defined.[5] For example, in *Lyall v. City of Los Angeles*, 2010 WL 11549565, at *2-3 (C.D. Cal. May 18, 2010), the court denied certification when the proposed class-definition included individuals "who did not engage in any conduct justifying their detention by [Los Angeles Police Department] officers

---

[4] In *Puente*, the proposed class definition included language "who did not engage in any conduct justifying the Defendants' use of force against them." The court found that such language was inconsistent with "the goals of precision, objectivity, and present ascertainability in class definition," and modified the language to eliminate legal conclusions inserted as non-conclusory allegations of fact. *Puente,* 2019 WL 4849613, at *4.

[5] *See, e.g.*, *Fed. Hous. Fin. Agency v. SFR Investments Pool 1, LLC*, 2016 WL 2350121, at *3–4 (D. Nev. May 2, 2016) (class definition "impermissibly implicates the merits" and deciding membership "would result in countless hearings resembling 'mini-trials'"); *Daniel F.*, 305 F.R.D. at 125 (class definition "unworkable" because deciding membership "will essentially require resolving the merits of each individual's claim"); *Tidenberg v. Bidz.com*, 2010 WL 135580, at *3 (C.D. Cal. Jan. 7, 2010) ("Plaintiff has impermissibly incorporated the substance of her claims into her class definition" which "by itself renders the class action unmanageable" (citation omitted)); *Forman v. Data Transfer, Inc.*, 164 F.R.D. 400, 403 (E.D. Pa. 1995) (class definition "untenable" because it "requires addressing the central issue of liability to be decided in the case").

…" finding that because the class was not presently ascertainable it was therefore "unmanageable virtually by definition."

Each subclass of Plaintiffs' proposed "Direct Force" class defines its members as "those persons present…[various locations and times]…who were not engaged in any behavior that would pose an immediate and specific threat to the safety of officers or others." This language is similar to the parameters rejected in *Lyall*.[6] On its face, the definitions are inadequately defined. The definitions fail to define "behavior that would pose an immediate and specific threat," and thus, require countless "mini-trials" to determine the behavior of each potential class member ***before*** their class status could be determined. Again, redefining the definition is inappropriate here because each subclass was present at a different location, at different times, and the conduct and law enforcement response varied. There were people located near the Capitol, some marched to overtake the police station in District 6, others blocked roads and even entered the highway, while others climbed fences and destroyed property. Many unidentified individuals present at the proposed locations were engaging in active aggression towards police officers, disobeying dispersal orders, impeding traffic, or actively or passively serving as shields for others' active aggression. Others may have been trying to pass through the area and were not part of the protest activities. Therefore, it is impossible to share a definition that is common to all the subclasses.

Moreover, based on the proposed definitions, legal conclusions would be required to determine whether each individual may be included as part of the defined class. This is almost an impossible task due to the hundreds of people who were present each day and night during the

---

[6] In *Lyall*, the Court acknowledged it had to the power to modify the proposed class definitions but declined, partly due to a reluctance to intrude upon what appeared to be a strategic choice by Plaintiffs to define the classes as they did. *Lyall,* 2010 WL 11549565, at *3.

protests. Further, even if the conduct of each class member was somehow determinable, a second analysis would be necessary before the class could be certified to determine whether the force used in response to the conduct was reasonable. Again, this would require the Court to conduct extensive and individualized fact-finding hearings to determine the proposed class. This is fundamentally inconsistent with the goals of administrative feasibility and a formidable and insurmountable task for the Court – to say the least. Therefore, the "Direct Force Classes" are not readily identifiable, and Plaintiffs have failed to meet the threshold requirement for certification.

## II.     Plaintiffs Fail to Meet the Requirements of Fed.R.Civ.P. 23(a)[7]

   1. Fed.R.Civ.P. 23(a)(2): Commonality cannot be established

Commonality requires a showing that there are questions of law or fact common to the class and requires demonstrating the class members "have suffered the same injury." Fed. R. Civ. P. 23(a)(2); *Dukes*, 564 U.S. at 350 (citing *Gen. Tel. Co.*, 457 U.S. at 157). This does not mean all class members suffered a violation of the same provision of law, as violations can occur by various methods. *Dukes*, 564 U.S. at 350. Quite obviously, the mere claim by individuals who attended the same protest suffered the same injury and/or treatment does not make it so nor does it give cause to believe all their individual claims can productively be litigated at once. Instead, their claims must depend upon a common contention of a nature capable of class-wide resolution – meaning its determination resolves an issue central to the validity of *all* the claims at once. *Id.*, 131 U.S. 2251.

---

[7] In the interest of efficiency, Defendants acknowledge thousands of people attended the protests from May 28 through June 2, 2020, and do not dispute that the size of the attendance could satisfy the numerosity requirement of Rule 23(a)(1).

Here, Plaintiffs' liability theory is DPD used force indiscriminately without adequate or any warning violating the Fourth Amendment, chilled individuals from exercising their First Amendment rights, and directly suppressed protected speech through their use of force. Plaintiffs contend the force used was deliberatively indifferent to their constitutional rights and constituted a policy, practice and widespread custom of Denver. Moreover, Plaintiffs claim the enforcement of the emergency curfew was done in such a way as to violate protesters' rights under the First, Fourth, and Fourteenth Amendments. Plaintiffs propose several questions, which upon examination are not common at all and fall far short of establishing the commonality element.

As discussed at greater length below in connection with Rule 23(b)(3) predominance requirement, Plaintiffs' claims are not dependent upon a common contention with the capability of class-wide resolution. Plaintiffs' proposed questions focus solely on the Defendants' conduct and fail to address the specific behavior of the Plaintiffs (as class representatives) or proposed class members.

Plaintiffs' declarations (Docs. #91-2 to 91-9), establish there is little commonality amongst them and supports why class certification is not appropriate. For example, some of the Plaintiffs claim exposure to chemical irritants when deployed by police on protesters who entered onto I-25. The actions of the police were to negate the significant risk of harm created by being on I-25. However, despite the exposure to chemical irritants many returned the Capitol area and continued with their protest activities, clearly establishing their First Amendment activities were simply not suppressed, stopped or chilled. Meanwhile, others, including the proposed subclasses, were situated in numerous locations engaging in a variety of protest activities. The protesters' behavior and conduct were not uniform or common, as some was unlawful and others not. Police officers

were posed with varying levels of risk due to rapidly developing events. Each day of protest developed its own unique sets of circumstances, and there is no way to separate out the different types of protesters without the use of mini-trials to sort out each factual scenario.

Moreover, demonstrating the improper use of force by one officer does nothing to establish commonality of force with another. The use of projectiles and aerosol chemical agents were deployed by individual officers who made individual judgments after observing and/or experiencing certain actions by protestors. The factual questions arising from the individual officers' specific uses of force are far too individualized to support certification. The proposed "Direct Force Classes" creates questions related to location, level of force, behavior of the class members and injuries. Some were peaceful, some were not. Some were injured, some were not. Many continued to return on subsequent protest days. Simply put, the proposed class members, and the named Plaintiffs, have little in common other than their mere presence at the protests.

    2. <u>F.R.C.P. 23(a)(3) – Typicality is not present</u>

Additionally, Plaintiffs must show "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). "The commonality and typicality requirements of Rule 23(a) tend to merge. Both serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *General Tel. Co.*, 457 U.S. at 157 n.13.

As argued above, the named Plaintiffs cannot establish any of their claims are typical of class claims. While Plaintiffs assert certification is appropriate because the matter involves

"common" questions, the fact intensive and specific inquiry necessary to resolve these "common" questions for the Plaintiffs and other class members establishes atypicality. For example, not everyone was involved in peaceful protest and damages vary amongst Plaintiffs. Even if Plaintiffs were able to cast their claims broadly enough to make them appear typical on a surface level, Defendants would still need to explore the context for each claim to determine their defenses given the extremely fact-intensive nature of all individual police uses of force. *See, e.g.*, *Graham v. Conner*, 490 U.S. 386, 396-97 (1989). As such, and for all of the same reasons argued above, Plaintiffs cannot show their claims or the Defendants' defenses are sufficiently typical or applicable class-wide.

      3.  <u>F.R.C.P. 23(a)(4): Plaintiffs cannot demonstrate they represent the interests of the class</u>

Plaintiffs must also establish the proposed class representatives "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). Under the factual circumstances that exist in this case, Plaintiffs cannot serve as class representatives.

Plaintiffs' proposed classes are large. Plaintiffs estimate the "Arrest Class" consists of approximately 300 people and each of the "Direct Force Classes" consists of approximately 100 people (i.e. 500 people in total). Defendants anticipate the class numbers could be even higher than these estimates given the fundamental lack of clear, ascertainable parameters in the proposed class definitions. Given the number of potential class members and factual issues in this proceedings, conflicts of interest between members of the proposed classes are inevitable, particularly as litigation advances. Other than a blanket assertion they are dedicated to pursuing the claims of the classes, Plaintiffs provided no indication or strategy as to how they would manage conflicts. Moreover, Defendants understand other Plaintiffs consolidated here (the Black Lives Matters 5280

11

Plaintiffs and Michael Acker) have not joined the Plaintiffs' Motion, presumably believing class certification will not adequately represent their individual interests. Plaintiffs offer no explanation and no precedent to suggest class certification is appropriate in a consolidated case when not even all the named plaintiffs agree on its propriety.

### III. The Putative Classes' Common Questions Do Not Predominate Over Individual Questions and Class Certification Must be Denied.

Plaintiffs have failed to establish common issues predominate over individual ones because there is no common contention capable of class-wide resolution. The predominance requirement of Rule 23(b)(3) is far more demanding than the commonality requirement of Rule 23(a). *Amchem*, 521 U.S. at 623-624. Predominance tests whether the proposed class is sufficiently cohesive to warrant adjudication by representation. *Amcehm*, 527 U.S. at 623-24 (1997); *Monreal v. Potter*, 367 F. 3d 1224, 1237 (10th Cir. 2004).

The predominance analysis requires "identification of the relevant factual and legal issues, and the elements of the claims and defense." *Joseph v. Gen. Motors Corp.*, 109 F.R.D. 635, 641 (D. Colo. 1986). The inquiry requires demonstrating the elements essential to the claims are capable of proof at trial through evidence common to the class, rather than individual to its members. Deciding this issue calls for a rigorous assessment of the available evidence and the methods proposed to prove the elements at trial. *See In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d, 310 (3rd Cir. 2008). Plaintiffs must prove each element of their claims are capable of proof at trial through evidence common to the class rather than individual members. *Id*.

Here, as demonstrated by the already voluminous record before the Court, common questions do not predominate between class members because issues related to alleged excessive force, suppression of protected speech and curfew arrests, turn on numerous questions specific to

each involved individual. Plaintiffs claim police indiscriminately used excessive force on the protesters with inadequate warnings, but the reasonableness of the force used (and the impact it may or may not have had on the people present) is dependent upon the specific circumstances present each time the decision to use force was made. The protesting activities giving rise to this lawsuit involved hundreds of people - each day – and continued over the course of multiple days for numerous hours over a large portion of downtown Denver.

The individual conduct and the law enforcement response was not even arguably the same at these varying locations and dates. For the most part, peaceful protesting occurred during the day—without the need for use of force—while the evening brought numerous incidents of illegal conduct by some individuals who were present and a use of force response dependent upon the circumstances. The individualized response included consideration of the location and the nature of the risk. For example, protestors who entered I-25 were much more at-risk than those who remained at the Capitol and different tactics were used in response. Protestors who tried to take over the District 6 station presented different challenges and tactical considerations than those who were in Civic Center Park. Those who were blocking the road and refused to let vehicles pass were in a much different position than those on the steps of the Capitol or those who armed themselves with weapons and used those weapons against law enforcement. Due to the individualized conduct at each different location on each different date and time, the force varied from the use of verbal commands, to the use of shields and batons, to the deployment of less-lethal munitions, such as pepper ball, 40mm, and aerosol chemical irritants. Whether the use of force was excessive turns on the totality of the circumstances for each specific use. *Graham,* 490 U.S. at 394-96; *Emmett v. Armstrong,* 973 F.3d 1127, 1135 (10th Cir. 2020); *Bond v. City of Tahlequah,* 981 F.3d 808, 815

(10th Cir. 2020). In other words, for each class member alleging a police officer used excessive force, individual considerations must be examined related to the individual's conduct, the circumstances/threats perceived by each individual officer who used force, and whether the use of force was reasonable and not based upon those specific circumstances. Under these circumstances, there is no common contention capable of class-wide resolution.

As for Plaintiffs' claims that the use of force was an attempt to suppress or chill protected speech, an individualized analysis is still necessary to determine the conduct of each class member, whether each one immediately left and never returned, and/or whether each one returned day after day to continue expressing their protected speech. This is especially true since Plaintiffs' First Amendment claims are directly tied to the alleged force used by officers. An individualized assessment is necessary to determine if each potential class member was engaging in protected conduct or if they were engaged in unlawful conduct, and whether their conduct was chilled by the response by law enforcement. *See Worrell v. Henry,* 219 F.3d 1197, 1213 (10th Cir. 2000). Again, just as the use of excessive force claims, the individualized determination of the merits of each proposed member and named Plaintiffs as class representatives predominates over any common issues. Similarly, because of the "but for" causation requirement for First Amendment retaliation claims in this context, an individualized determination of each officer who allegedly used the force must also necessarily occur. *See Neives v. Bartlett,* 139 S. Ct. 1715, 1722 (2019). This too is not amenable to class determination given the large number of individual officers who used force and who Plaintiffs allege acted in retaliatory fashion based upon their specific conduct.

Further, Plaintiffs never explain how they intend to prove any elements of their various claims with evidence common to the "Direct Force" classes. Rather, they simply state common

proof of uniform command decisions and authorization of dispersal orders and uses of force predominate, which does not satisfy their burden. A uniform command decision is not common proof as to the circumstances encountered by each officer and their decision to deploy less lethal force under each specific circumstance. The mere fact that the officers were provided uniform rules of engagement is not proof every officer's actions were the same, or even that every officer encountered common circumstances.  Indeed, any command given to an officer requires the officer to determine if the command can be appropriately carried out and, if so, how to implement any reasonable use of force in response to the specific circumstances facing the on-scene officer.

Moreover, Plaintiffs' declarations (Docs. #91-2 to 91-9) confirm the evidence necessary to establish violations of protected rights are certainly not common to the named Plaintiffs, let alone the potential class members. For example, some Plaintiffs continued to attend the protests, despite the rioting going on around them – if they were not, in fact participants – and their exposure to projectiles and chemical irritants. Footage from Body Worn Cameras, and other video coverage, show throughout the days and nights of protest, most common after dark, officers were subjected to thrown rocks, bottles filled with unknown liquids, homemade explosive devices, as well as other projectiles. Without engaging in individualized assessments, how can the Court determine whether any of the proposed class members – or the proposed class representatives – may have engaged in illegal conduct which occurred immediately prior to any use of force? Further, allegations of whether protesters heard dispersals orders or officers administered dispersal orders come down to individual analysis. In sum, individual, not common evidence, related to each named Plaintiff and/or class member is necessary to establish the elements of each claim regardless of whether the First, Fourth, or Fourteenth Amendments are involved.

The "Arrest Class" also necessitates a fact-intensive investigation related to the circumstances of each arrest. In particular, the Court will need to determine if each member was arrested solely for violating curfew, or if there were other factors, such as obstructing traffic or failing to obey dispersal orders. A citation for a curfew violation is not and cannot be dispositive as to why an individual was arrested as a myriad of other factors likely drove each arrest decision. Moreover, it must be determined if the police had probable cause to investigate each arrest and add charges, prior to the charges being dismissed. Plaintiffs' Motion states the emergency curfew was only enforced on the protesters but fails to acknowledge the order included exceptions and enforcement occurred well after 8:00 p.m. to allow for compliance. An individual factual investigation is necessary to determine whether any of the arrests were used solely as a means to target protesters. Plaintiffs have offered no evidence to support such a common contention.

In addition to the individualized determination related to the merits of Plaintiffs' claims, there is a whole host of divergent issues related to the class members' damages. As part of their class damages, Plaintiffs assert they suffered a myriad of injuries. Some complain of exposure to aerosol chemical irritants and/or bruising; whereas some claim significant physical injuries. Plaintiffs' Motion seems to imply they agree that individualized inquiries into damages is needed for each class member. To overcome this hurdle, Plaintiffs improperly rely on the dissent in *Comcast Corp.*, an antitrust case.[8]  In *Comcast Corp.*, the Court held at the certification stage Plaintiffs need to establish if liability was proven, the resulting damages were capable of measurement and would not require labyrinthine individual calculations. *Id.*, at 37.

---

[8] In her dissent, Justice Ginsburg points out that "[a]s this Court has rightly observed, '[p]redominace is a test readily met' in actions alleging 'violations of the antitrust law.'" *Comcast Corp.*, 569 U.S., at 42 (*citing Amchem*, 521 U.S., at 625).

Plaintiffs' Motion lacks any theory establishing damages are capable of measurement on a class-wide basis. In fact, any damages would vary greatly among class members depending among past medical expenses, future medical care, past and future wage loss, and non-economic damages. As for the "Arrest Class," all charges were dismissed within a couple weeks of the arrests.

Therefore, each member's damages will need to be calculated on an individual basis. Thus, even assuming *arguendo,* some common liability issues are conceivable, Plaintiffs entirely fail to explain, let alone meet their burden, to establish individualized damages inquiries for each potential class member and each Plaintiff is not required. Ultimately, because the individual issues requiring factual evidentiary presentation and litigation predominate and are so central to a disposition of all the class members' claims, "class-wide treatment of even the issues on which plaintiffs seek certification would not achieve significant economies of time, effort, and expense." *Morris,* 308 F.R.D. at 375.

## IV.   Proceeding as a Class is Not Superior to Proceeding Individually

Finally, Plaintiffs must demonstrate a class action is the "best available method for the fair and efficient adjudication of the controversy." *Clark v. State Farm Mut. Auto. Ins. Co.*, 245 F.R.D. 478, 489 (D. Colo. 2007). Rule 23(b)(3) explicitly directs courts to consider "the difficulties likely to be encountered in the management of a class action." Fed. R. Civ. P. 23(b)(3)(D). The "manageability" requirement "encompasses the whole range of practical problems that may render the class action format inappropriate for a particular suit." *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 164 (1974).

Because of the necessity of individualized analysis to establish liability, Defendants' individualized defenses, potential conflicts, and the person specific damages analysis required,

17

class certification cannot be considered a superior way to resolve any of the claims asserted. Each claim is unique to the person asserting it, which is further evidenced by the fact the other Plaintiffs in the consolidated case are not joining to seek class certification. In the end, the Fitouri Plaintiffs have simply not established this matter is an exception to the general rule; thus, litigation should proceed based on the individual named parties alone. *Morris,* 308 F.R.D. at 365.

Finally, there is a realistic alternative to class certification. Namely, litigation with the Plaintiffs on all issues and the application of issue preclusion principles for the potential benefit of any other potential class members. Various courts have noted the availability of collateral estoppel to preclude a defendant from re-raising the same issues in subsequent litigation represents a viable alternative to class certification. *See, e.g., Gunnells v. Healthplan Servs., Inc.,* 348 F.3d 417, 427 (4th Cir. 2003), *cert. denied,* 542 U.S. 915 (2004); *Mulford v. Altire Grp., Inc.,* 242 F.R.D. 615, 631-32 (D.N.M. 2007); *Commander Properties Corp. v. Beech Aircraft Corp.,* 164 F.R.D. 529, 542 (D. Kan. 1995); *Morris,* 308 F.R.D. at 378. Here, application of collateral estoppel would mean the legal and factual issues common to the potential class would still only be litigated once without the need of a class action. As a result, the efficiencies of such a determination will still be present without the management logistical challenges with class decision-making in this matter.

## **CONCLUSION**

Plaintiffs' proposed class fails for several reasons. As a threshold matter, the "Direct Force Class" members are not readily identifiable, and therefore, not ascertainable. Further, Plaintiffs failed to meet all the requirements of Rule 23(a) because the claims lack commonality, typicality and the named Plaintiffs cannot demonstrate they represent the interests of the class. Plaintiffs also failed to meet Rule 23(b)(3)'s requirement because a class action is neither predominate nor a

superior method of resolving the putative class members' claims. Neither proposed class meets the requirements of Fed. R. Civ. P. 23(a) nor (b), and class certification must be declined.

DATED this 26th day of May, 2021.

Respectfully submitted,

By: *s/ Lindsay M. Jordan*
Hollie R. Birkholz, Assistant City Attorney
Lindsay M. Jordan, Assistant City Attorney
Denver City Attorney's Office
Civil Litigation Section
201 West Colfax Ave., Dept. 1108
Denver, CO 80202
Telephone: (720) 913-3100
Facsimile: (720) 913-3155
E-mail: hollie.birkholz@denvergov.org
lindsay.jordan@denvergov.org
*Counsel for the City and County of Denver and the individually named Denver Police Department Officers*

Andrew D. Ringel, Esq.
Hall & Evans, L.L.C.
1001 17th Street, Suite 300
Denver, CO 80202
Telephone: (303) 628-3453
Facsimile: (303) 628-3368
E-mail: ringela@hallevans.com

**CERTIFICATE OF SERVICE**

I hereby certify that on this 26th day of May, 2021, the foregoing **DEFENDANTS' AMENDED RESPONSE IN OPPOSITION TO FITOURI PLAINTIFFS' MOTION FOR CLASS CERTIFICATION** was filed with the Clerk of the Court using the CM/ECF system, which will serve the following:

*All Counsel of Record*

*s/ Sarah Peasley*
Denver City Attorney's Office