UNITED STATES DISTRICT COURT

DISTRICT OF COLORADO

--------------------------------------------------------

Black Lives Matter 5280 et al.,


             Plaintiffs,


       vs.                    Case Number 1:2020cv01878

                              Cons w/ 1:2020cv01922


City and County of Denver et al.,


             Defendants.

--------------------------------------------------------

Deposition of Matthew Canino

Thursday

April 28th, 2021


-at-


Zoom Remote Deposition


Exhibit 5, LLC

EXHIBIT 108

```
 1                    APPEARANCES

 2

 3            For the Fitouri Plaintiffs:

 4               Elizabeth C. Wang

 5                 Loevy & Loevy

 6                 2060 Broadway

 7                  Suite 460

 8            Boulder, Colorado 80302

 9

10

11          For Plaintiff Michael Acker:

12               Andrew McNulty

13          Killmer, Lane & Newman, LLP

14              1543 Champa Street

15                  Suite 400

16             Denver, Colorado 80202

17

18

19      For the Black Lives Matter 5280 Plaintiffs:

20             Gerardo Mijares-Shafai

21          Arnold & Porter Kaye Scholer LLP

22             601 Massachusetts Ave, NW

23               Washington, DC 20001

24

25
```

```
 1                      For the Defendants:

 2                   Andrew D. Ringel

 3                  Hall & Evans, LLC

 4                 1001 17th Street

 5                     Suite 300

 6                Denver, Colorado 80202

 7

 8          RECORDER:  Zoom is recording.  Good morning.

 9   We are now on the record.  Today is Wednesday, April

10   28th, 2021.  The time is now 10:01 a.m.  We're meeting

11   remotely today for the deposition of Lieutenant Matt

12   Canino in the matter of Black Lives Matter 5280 et al.

13   v. City and County of Denver et al., case number

14   1:2020cv01878, consolidated with 1:2020cv01922.  The

15   venue is U.S. District Court, District of Colorado.

16   Lieutenant Canino, my name is Debra Westfall, and I'm a

17   notary public.  I'm recording this deposition on behalf

18   of Exhibit 5, LLC, in accordance with Illinois Public

19   Act 101-0640.  Lieutenant Canino, would you please

20   confirm your identity by placing a valid picture ID in

21   front of the camera briefly?  Thank you.  At this time,

22   would the attorneys in the virtual room please

23   stipulate that it's okay to administer the oath to

24   Lieutenant Canino even though he's not currently

25   located in the state of Illinois?
```

```
 1            MS. WANG:  Stipulated by the Fitouri

 2   Plaintiffs.

 3            MR. MIJARES-SHAFAI:  Stipulated by the Black

 4   Lives Matter 5280 Plaintiffs.

 5            MR. MCNULTY:  Stipulated by Plaintiff Michael

 6   Acker.

 7            MR. RINGEL:  Stipulated by the Defendants.

 8            RECORDER:  Thank you.  At this time, would

 9   you please raise your right hand for the oath?

10                 (Witness sworn)

11            RECORDER:  Great.  Would the attorneys please

12   state their appearances for the record?

13            MS. WANG:  Elizabeth Wang for the Fitouri

14   Plaintiffs.

15            MR. MIJARES-SHAFAI:  Gerardo Mijares-Shafai

16   for the Black Lives Matter 5280 Plaintiffs.

17            MR. MCNULTY:  Andrew McNulty for Plaintiff

18   Michael Acker.

19            MR. RINGEL:  Andrew Ringel for the

20   Defendants.

21            RECORDER:  That completes the required

22   information.  We can proceed.

23                 EXAMINATION

24   BY MS. WANG:

25       Q.   Would you please state your name and spell it
```

1   for the record?

2        A.   My name is Matthew Canino, M-a-t-t-h-e-w,

3   last name is spelled C-a-n-i-n-o.

4        Q.   Where are you located right now?              0:02:30

5        A.   I'm at the SWAT unit, 550 East Iliff Avenue

6   in Denver, Colorado.

7        Q.   Okay.  Are you in your office?

8        A.   Yes.

9        Q.   Is there anybody else present?

10        A.   No, there isn't.

11        Q.   Okay.  Have you ever been deposed before?

12        A.   Yes.

13        Q.   Okay.  On how many occasions?

14        A.   Two, I think.

15        Q.   I'm sorry?

16        A.   Maybe two.

17        Q.   Okay.  And when was the last time you were

18   deposed?

19        A.   I don't know the exact date.

20             WITNESS:  Andrew, is that a date that you

21   remember, last time you were --

22             MR. RINGEL:  It's about two years ago, Ms.

23   Wang.

24        Q.   All right.  Have you ever been named as a

25   defendant?

```
 1      A.    Yes.                                    0:03:15

 2      Q.    On how many occasions?

 3      A.    I've been a single defendant once and a

 4  codefendant multiple times, three, four times.  I don't

 5  know.

 6      Q.    Okay.  And what -- what did those cases --

 7  what did the plaintiffs in those cases allege against

 8  you?

 9      A.    One particular case, there was a -- it was a

10  question of whether we knocked and announced on a

11  warrant when I was a technician or a corporal in the

12  SWAT unit, so that was many years ago.  Another time, I

13  made -- or didn't make a custodial arrest, but I put --

14  wrote a citation during a demonstration at the DPCA

15  (sic) during a political event and was sued for that,

16  or -- or named as a defendant, I don't know what the

17  outcome of that was.  Recently, the -- I was the

18  lieutenant in district two -- I guess not -- not

19  recently, five or six years ago, one of my officers was

20  sue -- sued, and I was a part of that lawsuit, named as

21  part of that lawsuit due to the fact that I was his

22  commanding officer at the time.  Those are the ones I

23  remember.

24      Q.    The lawsuits in which you have been named as

25  a defendant, did they involve -- you've described a
```

```
 1  couple of them, the -- a little bit about the
 2  circumstances, did the other ones involve complaints of
 3  excessive force?
 4      A.   No.                                        0:05:02
 5      Q.   You mentioned the one involving the protester
 6  demonstration?
 7      A.   Yeah, that was when -- I can't remember,
 8  George Bush was the president or afterwards, he was
 9  having a rally at the DPCA and it was -- it was a --
10  there was a group of demonstrators there who had signs,
11  and signs apparently aren't allowed on that property,
12  and so she was warned multiple times, but then
13  eventually refused to -- to remove the sign and so I
14  cited her.  It was -- the charges were dismissed, and
15  the lawsuit resulted.
16      Q.   Okay.  What's the DPCA?                    0:05:44
17      A.   That's the Denver Center for the Performing
18  Arts, it's -- or DCPA or DPCA, I'm not really sure
19  which one it is now, it's either Denver Center for the
20  Performing Arts or some variation of that.
21      Q.   Okay.  So just to go over the ground rules of
22  the deposition a little bit.  So I'll be asking you and
23  other attorneys will be asking you some questions
24  relating to the incident underlying this lawsuit.  If
25  you need to take a break at any time, you may do so
```

1   except when a question is pending, is that fair?

2       A.   Yep.

3       Q.   Okay.  All right.  If you don't understand

4   something that I asked you or you are not clear on what

5   I am asking you, you just let me know and I will be

6   happy to try to rephrase, otherwise -- otherwise, if

7   you answer the question, I will assume that you

8   understood it, is that fair?

9       A.   Yes, ma'am.

10      Q.   Okay.  What did you review in preparation for

11  this deposition?

12      A.   I reviewed -- what -- what did I review?

13      Q.   Yes.

14      A.   I reviewed my statements.

15      Q.   Anything else?

16      A.   No, that's it.

17      Q.   Did you review any body cam footage?

18      A.   I did not, no.                          0:06:51

19      Q.   Who did you meet with to prepare for your

20  deposition?

21      A.   My -- my attorney, Andrew Ringel, and I did

22  meet with the city attorneys early on before they

23  turned it over to his firm.

24      Q.   Okay.  How long was your meeting -- or how

25  many meetings did you have with Mr. Ringel in

```
 1   preparation for your deposition?

 2        A.   I had two meetings.

 3        Q.   When were they?

 4        A.   Monday and last Friday.

 5             WITNESS:  Is that right?

 6        A.   I don't know, I'd have to look at my calendar

 7   from -- let me look at it, I can tell you.

 8        Q.   So twice in the last seven days?

 9        A.   The 22nd and the 26th, yep.

10        Q.   Okay.  And how long were each of those

11   meetings?

12        A.   I don't know, roughly an hour and a half

13   maybe, two hours max.  I don't think that long even.

14        Q.   Did you have any -- and I'm not interested in

15   the content of your conversations, but did you have any

16   conversations with any of your attorneys since Monday?

17        A.   No.                                    0:07:59

18        Q.   Was there anybody else present at your

19   meetings with Mr. Ringel besides you and him?

20        A.   No.

21        Q.   Can you give me a -- you're currently a

22   lieutenant in the metro SWAT unit in the DPD, correct?

23        A.   Correct.

24        Q.   And how long have you held that position?

25        A.   Just under six years.
```

```
 1       Q.   Are there any other lieutenants in the metro

 2   SWAT unit?

 3       A.   There are -- there is one more, his name is

 4   Lieutenant -- Lieutenant Tom Pine, P-i-n-e.

 5       Q.   Okay.  And Lieutenant Thomas Pine was a

 6   lieutenant in the metro SWAT unit in May and June of

 7   2020, correct?

 8       A.   Yes, yes.                               0:08:55

 9       Q.   Okay.  And how many officers are there in

10   metro SWAT?

11       A.   There is thirty -- well there is 35 people in

12   this metro SWAT K9 unit, so if you don't count the K9s

13   and the -- the -- we have -- so there is two

14   lieutenants, four SWAT sergeants, and then each detail,

15   so we have two details, has 11 officers, if you will,

16   working for each shift or detail, so I'm in charge of

17   detail one, which is two sergeants and 11 officers, and

18   Lieutenant Tom Pine is in charge of two sergeants and

19   then 11 officers, and they were both -- we both kind of

20   manage the K9 section as well.

21       Q.   Okay.  So that's --

22       A.   It's one sergeant and six officers.      0:09:43

23       Q.   Okay.  So that -- the -- you manage two

24   sergeants and 11 officers and Lieutenant Pine does as

25   well, and then you both manage, in addition to that,
```

1  the metro SWAT K9 unit?

2      A.   Yes.  Well, they're not the SWAT K9 unit,

3  they are just the K9 unit that's -- that's assigned to

4  the SWAT unit as a whole, so we're called the metro

5  SWAT K9 section, so we have the SWAT unit and the K9

6  unit in that section together.

7      Q.   Okay.  Was this the same structure at the

8  time of the protests --

9      A.   Yes.

10     Q.   -- in Denver last summer?  Okay.

11         MR. RINGEL:  Lieutenant Canino -- I'm sorry

12  to interrupt, Liz.  Can you wait for Ms. Wang to finish

13  her question so that there is clarity, you know, when

14  she is done, so pause for a few seconds before you

15  start your answer, okay?

16         WITNESS:  Okay.                    0:10:37

17         MR. RINGEL:  Thank you.

18         MS. WANG:  Thank you.

19     Q.   Who are the sergeants and -- well, who were

20  the sergeants in the metro SWAT unit in May and June of

21  2020?

22     A.   So my two sergeants were Sergeant Marco

23  Martinez and Justin Dodge, D-o-d-g-e, and Tom Pine had

24  Sergeant Kyle Smith and Sergeant Eric Gray.

25     Q.   And so were Sergeants Martinez and Dodge

```
 1   assigned to you during the protests?

 2       A.   Yes.

 3       Q.   And --

 4       A.   Sorry, I didn't wait.

 5       Q.   I'm sorry.

 6       A.   Sorry, I didn't give -- I didn't give you a

 7   chance, I'll try to pause more.  But --

 8       Q.   Okay.                              0:11:28

 9       A.   -- yes, that's who I was in charge of.

10       Q.   And then Kyle Smith and Eric Gray were the

11   sergeants under Lieutenant Pine at the time of the

12   protests?

13       A.   Yes, correct.

14       Q.   Okay.  And do you recall who were the

15   officers under your command during the protests?

16       A.   I do.  I -- would be easier if I just looked

17   at a list so I don't repeat.  Do you mind if I look at

18   my detail just to give you the exact number of -- or

19   exact names?

20       Q.   Sure.

21       A.   I don't want to leave anybody out or repeat

22   names over and over again because I am not keeping

23   track.  Do you want first and last names?

24       Q.   Sure.                              0:12:19

25       A.   So Mark Garcia was there for the first day
```

1   and was injured the first day, so that was -- he was

2   only involved in part of the first day, Kent, K-e-n-t,

3   Pietrafeso, and I'll spell that last name,

4   P-i-e-t-r-a-f-e-s-o, Vincent Matthews, Christopher

5   Gruenther, and I'll spell his last name, it's

6   G-r-u-e-n-t-h-e-r, Richard Eberharter, and again, I'll

7   spell it, it's E-b-e-r-h-a-r-t-e-r, Joshua Bollwahn,

8   that's B-o-l-l-w-a-h-n, Frederick Jones, Christopher

9   Evans, Chad Sinnema, S-i-n-n-e-m-a, Craig, C-r-a-i-g,

10  Moen, M-o-e-n.  That's ten, so I'm missing somebody

11  that's not on my detail that I can't find.

12      Q.   These are people who were on your detail at

13  the time of the protests?

14      A.   Yes.  Now they may not have worked all or any

15  of the first protest based off of vacations, not all of

16  them were there.  When I find the 11th, I'll let you

17  know, I don't know who all is slipping my mind right

18  now.

19      Q.   Okay.  Were you known as metro 3?

20      A.   Yes.                                     0:15:27

21      Q.   Okay.  And Thomas Pine and his team were

22  metro 2 -- 2?

23      A.   Yes.

24      Q.   Okay.  And then other -- the other squad

25  officers would have been on Lieutenant Pine's detail,

```
 1    is that correct?

 2         A.   Yes.

 3         Q.   So Jonas Apala?

 4         A.   He is on Tom's detail.

 5         Q.   James Bradley?

 6         A.   Tom Pine.

 7         Q.   Adam Giggey?

 8         A.   Tom Pine.

 9         Q.   Frank Kerber?

10         A.   Tom Pine.

11         Q.   Brent Kohls?

12         A.   Tom Pine.

13         Q.   Ben Longoria?

14         A.   Tom Pine.                            0:16:20

15         Q.   John Ruddy?

16         A.   Tom Pine.

17         Q.   Carl Sessions?

18         A.   Pine.

19         Q.   Kyle Smith?  Or no, is he on yours?

20         A.   He was on -- he is a sergeant -- he was a

21    sergeant on Pine's detail, and he is a lieutenant now

22    not assigned to the unit.

23         Q.   I'm sorry, what's the last part of what you

24    just said?

25         A.   He is not currently assigned to the unit
```

Exhibit 5, LLC

1   until next -- he won't be coming back until next week.

2        Q.   Okay.  Got it.  And Jake Stevenson?

3        A.   He's Tom Pines.

4        Q.   Great.  Okay.  Thank you.  Now can you just

5   give me a brief rundown of your positions in the DPD,

6   when you started and just the different units and

7   assignments you have had?

8        A.   I started in district one when I was -- when

9   I graduated the academy, I started there.  I was --

10       Q.   What year?                              0:17:18

11       A.   I graduated in 1992, was assigned to district

12  one, which is Northwest Denver.

13       Q.   Okay.

14       A.   And in 1996, I was assigned to the SWAT unit

15  for the first time.

16       Q.   And you were -- your role -- your -- your

17  rank or your title was just officer?

18       A.   Well it's actually technician, so it's --

19       Q.   Okay.

20       A.   -- a technician rank.

21       Q.   Is that -- like, is there a hierarchy where

22  technician is above officer or it's just --

23       A.   It's --

24       Q.   -- a different name for the SWAT officers?    0:17:59

25       A.   It's not a hierarchy as far as in rank, you

1    don't outrank anyone, it's just because you are

2    specialized now in this type of training or skill, that

3    there is -- it's a pay increase for that specialty, and

4    so you are called a technician, but you don't supervise

5    anyone.

6        Q.   Got it.  Okay.  And how long were you a

7    technician in the SWAT unit since -- beginning in 1996?

8        A.   Well I was promoted to sergeant in 2004 and I

9    made corporal between that happening as well, so I was

10   a technician for maybe five years, corporal for two,

11   roughly, or three.

12       Q.   Okay.  And then --

13       A.   I was promoted to sergeant and then

14   transferred to district six.

15       Q.   All right.  And these are all within the SWAT

16   unit, is that right?

17       A.   No, when I -- when I was promoted to

18   sergeant, I was transferred to the -- a district

19   station -- a patrol station.

20       Q.   Okay.  So when you were a technician and a

21   corporal, that was --

22       A.   That was --

23       Q.   -- with the SWAT unit?

24       A.   Yes, correct.                          0:19:22

25       Q.   Okay.  And then when you were promoted to

```
 1   sergeant, you went to district six?

 2       A.   Correct.

 3       Q.   And you were a sergeant over patrol?

 4       A.   Correct.

 5       Q.   Okay.  And how long was --

 6       A.   For -- sorry.

 7       Q.   Sorry.  How long did you hold that position?

 8       A.   I held that position until 2007, but I was

 9   also -- rather than just in charge of patrol, I was

10   assigned to the downtown motorcycle unit for a couple

11   years as well while I was in district six.

12       Q.   Okay.  And then when did you have a different

13   position?

14       A.   I'm sorry, I don't understand that.

15       Q.   I mean -- sorry.  You're -- so you were a

16   sergeant in district six until 2007, what -- what was

17   your next position after that?

18       A.   I -- then I was reassigned to the SWAT unit

19   as the sergeant.

20       Q.   And how long did you hold that position?

21       A.   Until 2014 when I was promoted to lieutenant

22   and transferred to district two patrol --

23       Q.   I'm sorry, the -- 2014, you became a

24   lieutenant over and transferred to district two patrol?

25       A.   Correct.
```

```
 1        Q.   Okay.  How long were you a lieutenant in

 2   district two patrol?

 3        A.   One year.                              0:20:37

 4        Q.   Okay.  And then what was your next position

 5   after that?

 6        A.   I was reassigned to the SWAT unit, where I

 7   have remained.

 8        Q.   Okay.  And so what -- what does the SWAT unit

 9   do, what are their normal duties and responsibilities?

10        A.   Just in general, SWAT is called to assist

11   patrol or detectives with the type of calls that they

12   aren't capable necessarily of handling by themselves

13   safely with just the equipment and training that they

14   have, so that could be situations like a barricade, a

15   high-risk fugitive apprehension where the suspect is

16   wanted for serious crimes and is known to be armed and

17   dangerous, the rare -- fortunately, rare hostage

18   situations.  We also do VIP protection detail, so

19   anytime a dignitary comes in that has Secret Service

20   protection, we'll assist Secret Service with the

21   protection of that dignitary.  We do serve high-risk

22   warrants, whether it's for drugs or other evidence

23   involving crimes and investigations, so if there are

24   high-risk warrants, we'll serve those.  Those things

25   keep us pretty busy.  We also respond -- or train to
```

```
 1   respond to -- we do do a lot of training, but we do
 2   train to respond to the lower frequency but higher risk
 3   calls like active shoot -- shooter situations.
 4        Q.   Okay.  And so what is the specialized
 5   training that SWAT officers receive that is different
 6   than regular officers, patrol officers?
 7        A.   For the most part, we train tactics with the
 8   team, we have more equipment, like armored vehicles, to
 9   protect officers.  We have specialized tools that we
10   are able to use that makes it safer for us to handle
11   more dangerous calls than other officers.  But one of
12   the things that makes our SWAT team most successful is
13   the fact that we train tactics that we still teach to
14   the districts, but we train those tactics with each
15   other very frequently and we always have the same team
16   that we work together and train together with and then
17   go to deploy the actual operations on, and so that
18   continuity, I think, makes SWAT teams successful when
19   they do that, and we do, and so we do have special
20   weapons and tactics, but that's not what makes them
21   special, it's just the fact that we get the opportunity
22   to train more often with each other on those type of
23   calls that patrol just doesn't have the time, you know,
24   to train on a regular basis.  Their primary
25   responsibility is to respond to patrol -- you know, to
```

 1   calls for service, but we're not cast with that

 2   responsibility, and so we train for those calls that

 3   the district officers either don't have enough people

 4   or the proper training to handle.

 5       Q.   Okay.  What are the specialized tools or

 6   specialized weapons that you train with?

 7       A.   Well I guess it's -- like, there is nothing

 8   special about any of it really, it's just that we have

 9   -- sometimes we have things that they don't have.  For

10   example, we have a robot capable of entering a house so

11   we don't have to send people into the house to -- to

12   search it.  We can try to insert a robot in there with

13   a camera and it has audio on it, so we have tools like

14   that.  We have the ability to approach houses with our

15   -- we call them -- they're called BearCats, but they

16   are essentially armored vehicles that we can get very

17   near to a house and contain it that the officers don't

18   have.  You know, we used to have things like

19   40-millimeter launchers that were kind of exclusively

20   ours, but now patrol has gotten those too, so some of

21   the things we have, like our M4 rifles, was at one time

22   exclusively a SWAT-type use of equipment, but now

23   patrol has urban rifles and urban rifle programs, so

24   like -- when I say we're not -- when I say that they

25   are not necessarily special, some of them are

1  specialized to us, like the robot, but other things

2  aren't necessarily special because patrol has those,

3  but we just have the ability to train with those things

4  more often.

5      Q.   What -- what is the -- so does -- what -- the

6  40-mm launchers, you have mentioned that they used to

7  be just for SWAT, but now patrol has them, what does --

8  what do you normally use them for when you're in SWAT?

9      A.   We use them for -- in a couple different

10 ways.  We use them to insert gas into houses so you can

11 use project -- you have a certain projectile that you

12 can shoot into a house that releases a powder form of

13 gas, it's not really gas, it's a substance, a powder,

14 and then we have used them as a direct impact tool as

15 well for armed and dangerous people during, let's say

16 for like example, a hostage -- I mean, a barricade

17 situation.  We have used them in situations where

18 somebody was threatening suicide, they have been used

19 to -- to directly impact folks like that so that we can

20 prevent them from killing themselves, and sometimes we

21 use them as a distraction, as well, on barricade

22 situations for armed suspects, where we'll shoot them

23 -- insert them through a window, not necessarily with

24 gas, but just as a distraction.  If we can't reach a

25 window and we are going to make entry from one

1  location, you might use them as a distraction on the

2  other side of the house so that our team can enter the

3  house from the other location while we distract the

4  occupants inside in hopes to make that entry safer --

5  the entry team -- you know, for officers' safety for

6  the entry team, and occasionally, we use them to

7  disable security cameras as well on houses when we are

8  approaching a house with armed -- an armed individual

9  or individuals inside, you know, that they can monitor

10  and move from the outside using the video cameras, but

11  sometimes we'll use them to disable the cameras as

12  well.

13      Q.   With respect to 40-mm launchers, do -- do the

14  SWAT officers train -- or were they trained in how to

15  use them in crowd control or protest situations?

16      A.   I don't recall any training that we have had

17  that specifically trained -- that they were

18  specifically trained under the scenario of a crowd

19  management or crowd control situation.

20      Q.   Okay.  SWAT officers, are they trained in the

21  use of a PepperBall gun?

22      A.   Yes.                                    0:28:35

23      Q.   Okay.  And what are your normal applications

24  of a PepperBall gun in the normal SWAT duties?

25      A.   We generally use those to -- most of the

1    time, we use those to -- so we might use a

2    40-millimeter launcher to break out a window, then we

3    will follow that up with PepperBall, so if somebody's

4    in a bathroom or in a bedroom, they are barricaded and

5    they are armed and dangerous, we will break the window

6    usually first with a 40, and then deploy PepperBall

7    into that room through the broken window, and sometimes

8    we will use it to directly impact a person, an armed

9    and dangerous person --

10       Q.   And so -- go ahead.                        0:29:26

11       A.   -- well, just -- just to -- just to

12   facilitate the safe arrest of that person.  Generally,

13   when they're, you know, an armed and dangerous-type

14   individual, not necessarily armed at the time, but they

15   have the capability or they -- they have made threats

16   against, you know, not being taken alive -- they'll

17   make that threat, they'll make that, "Yeah, I'm not

18   going to be taken alive" and we know they have guns,

19   they will be used in those kinds of situations.

20       Q.   Sure.  So in the example that you gave about

21   if you had somebody who was barricaded and may be armed

22   and dangerous, you might follow up the use of a 40-mm

23   launcher with PepperBall guns in -- into, like, a --

24   through a window, is that to try to get them to come

25   out, to leave that room?

```
 1        A.   Yes, exactly, it's -- the whole idea is to

 2   get them to surrender without us ever having to use any

 3   kind of physical force against them, so yeah, that's

 4   our intention, is to make that room uninhabitable

 5   without having to contaminate the whole house.

 6   Sometimes suspects are in a house with -- and they

 7   don't live there by themselves, they live there with

 8   their parents or they might live there with somebody

 9   who is elderly or little kids, and we try not to

10   contaminate the entire house if we don't have to.  If

11   we can get them into custody safely by just

12   contaminating maybe just one portion of the house or

13   one room, then that's more ideal for us.

14        Q.   Do your SWAT officers receive training in the

15   use of PepperBall guns with respect to crowd control or

16   protest situations?

17        A.   Again, like the 40, I don't recall them

18   training in that scenario.

19        Q.   Okay.  Have your officers in SWAT received

20   crowd control management training?

21        A.   We have.                               0:31:21

22        Q.   Okay.  And is that different than -- how --

23   well, strike that.  How frequently do your officers

24   receive crowd control training?

25        A.   I would have to look at their records to see
```

```
 1   how frequently they've had it, I only looked at my own,

 2   and it's -- it's not one of those things that we train

 3   every single year.  It's -- you get -- receive that

 4   training every so often.  It's not an annual kind of --

 5   or even a monthly kind of training, you know, category.

 6        Q.   Okay.  And do SWAT officers receive training

 7   in crowd control or crowd management that's different

 8   or greater than what, you know, regular patrol officers

 9   receive?

10        A.   Not generally, not generally.  We have

11   received the same training that everybody else has

12   received.

13        Q.   Okay.  And what about the use of tear gas?

14   And when I say, "Tear gas," I mean any kind of

15   aerosolized chemical, you know, CS or OC, that -- is

16   that one of the tools -- specialized tools that SWAT

17   uses?

18        A.    It is, but once again, the districts now have

19   access to that, so I don't know if that makes it

20   special to us.  It's -- it isn't -- it's a type of tool

21   that, you know, the districts can utilize as well now.

22        Q.   Sure.  And what are the regular or normal

23   applications of the use of tear gas by SWAT officers?

24        A.   I would just say in general, we use them in

25   barricade situations where the suspect refuses to
```

```
 1   surrender and we try -- have tried negotiations and

 2   other means to get them to surrender, and it's kind of

 3   a last resort when all else fails, we try to deploy gas

 4   to force them out of the house and so we can take them

 5   into custody without injuring them using physical

 6   force.

 7        Q.   Why is the use of tear gas in that kind of

 8   situation a last resort?

 9        A.   Because we don't -- we prefer to -- to get

10   them to come out through just negotiation, talking to

11   them, convincing them that, you know, the longer they

12   stay in there, the more difficult it is going to make

13   it for them to, you know, plead their side of the case,

14   so we try to convince them, "Hey, come out, we'll talk

15   about it out here, but if you stay in there or you

16   escalate things, it is going to make it harder for you

17   to" -- you know, because generally, they have some kind

18   -- some reason why they are in there, a lot of times

19   it's just because they don't want to go to jail, so we

20   try to convince them that they are going -- they are

21   going to end up having to go to jail one way or the

22   other, and the best way to do that is just to come out

23   without us having to use any force at all, including

24   gas, but it's one of those last resort-type things

25   because right before we would want to make entry on
```

```
 1   somebody who is armed and dangerous, that would be our
 2   last resort to get them to come out prior to us to have
 3   -- physically having to go in with either a dog, K9,
 4   and SWAT team combination or just SWAT members, because
 5   that's when things can go -- go wrong for everyone
 6   involved, that's when things are at their highest risk,
 7   and now you have a possible armed confrontation, so our
 8   last resort would be to try to get them to come out by
 9   using gas munitions, and if that doesn't work, at some
10   point, we have to go in there and get them out.
11       Q.   Do SWAT officers receive any particular
12   training with respect to the use of tear gas in a crowd
13   control or protest situation?
14       A.   They have, it's -- that's part of the overall
15   gas munition training, so when they receive gas
16   munitions training, they talk about the different types
17   of gas and when it's appropriate to -- for use and how
18   -- how it should be used in those specific situations,
19   so it does cover crowd control in the general training,
20   you know, curriculum.
21       Q.   Okay.  So you're saying for the -- that the
22   SWAT officers receive general training on the use of
23   tear gas in crowd control situations, but it's the same
24   as whatever other patrol officers receive?
25       A.   No, I didn't say it was the same as -- I
```

```
 1   don't know what the patrol officers receive, I just --

 2   when our officers go -- receive the chemical munitions

 3   training, they talk about all different types of

 4   situations where that would -- for gas and when gas is

 5   deployed and when it would be appropriate, what type of

 6   gas is appropriate for those situations.

 7        Q.   Okay.                                    0:36:40

 8        A.   Yeah.

 9        Q.   So why don't you tell me what training that

10   you -- your -- you are aware that -- or that you have

11   received or that you are aware that your officers have

12   received with respect to the use of tear gas in a crowd

13   control or a protest situation?

14        A.   I believe the last training I received was

15   two years ago that I have documentation for, but as far

16   as my officers go, I -- without looking at the records,

17   I don't know what -- when theirs are.  And that's just

18   --

19        Q.   Right.  And --

20        A.   -- that's on my part, the last time I looked,

21   it's been a little while for -- since I have looked at

22   my training records.

23        Q.   Sure.  Well let -- let's just focus on your

24   training.  What -- and -- and I'm -- what I'm

25   particularly interested in is the substance -- what you
```

1   recall of the substance of the training as to how you

2   were trained on what are the appropriate uses of tear

3   gas in a protest situation.

4        A.   I don't know that I can recall training that

5   I received two years ago.  I can only tell you in

6   general, when that training is given, they discuss the

7   different munitions that are available to us and when

8   those munitions can be deployed and in what situations

9   which munitions are appropriate and which ones wouldn't

10  be.

11       Q.   Okay.  So when is use of tear gas on a crowd

12  of protesters appropriate?

13       A.   So using tear gas on a group of protesters,

14  specifically protesters, isn't appropriate.  Deploying

15  gas during unlawful assembly when lives or property are

16  at risk, then it's appropriate, but just in a group of

17  -- for a group of protesters, we're not trained to

18  deploy gas strictly for people protesting.  We have

19  responded to hundreds of protests over the last few

20  years, and we didn't deploy any gas.  It's only when a

21  -- assembly becomes unlawful is gas -- gas appropriate

22  and can be authorized.

23       Q.   All right.  Who has to authorize it?          0:39:05

24       A.   Generally speaking, they -- they like the --

25  that authorization to come from the command post, but

1  -- so that's the standard, but in emergency situations,

2  officers of any rank can make that call as long as they

3  can articulate that emergency need at the time.  So

4  generally speaking, it's the command post, incident

5  commander, and then secondly, it would be the command

6  officer on the street, so -- so like a lieutenant or a

7  commander on the street at the event, but anyone, any

8  officer has the authority to make that call in an

9  emergency situation.

10     Q.   Okay.  What's an emergency situation?          0:39:58

11     A.   Generally speaking, an emergency situation, I

12  think, in that particular -- in that -- on that

13  particular -- particular issue would be when someone's

14  life is in danger or somebody's in danger of being

15  seriously injured.

16     Q.   Okay.  When -- why is it that, generally,

17  it's the command post or perhaps the commander on the

18  street, such as a lieutenant, that has to authorize the

19  use of tear gas?

20         MR. RINGEL:  Object to the form and the

21  foundation.                                             0:40:53

22     A.   I believe in general, it's for -- it's for

23  the command and control of a situation.  If the command

24  post had -- command -- command post will generally have

25  a better idea of the big picture, and so they can

```
 1  sometimes be more -- be in a better position to make
 2  that call, unless you're in an emergency situation, and
 3  when you are, you don't -- you know you are.  It's not
 4  one of those things where you're -- you're guessing,
 5  "Hey, am I in an emergency situation?  Should I deploy
 6  gas?"  Then it's deployed, so that's why they have that
 7  -- officers on the street have that ability, but in
 8  general, you would -- the command post wants that
 9  responsibility because that might not be -- they may
10  know things or see things or have a bigger picture than
11  everyone else does, and understand that, you know, that
12  is the next tactic that they want to use, and then
13  they'll direct people on the ground to do that.  If
14  they wanted to clear an unlawful assembly, that
15  generally comes from the command post as well.  And so
16  it's for command and control for the most part, they
17  want to have -- because deploying gas munitions, as you
18  know, and the reason why we're here, it can aggravate a
19  situation as well, if not used in a proper -- you know,
20  the proper -- at the proper time and the proper
21  circumstances, and they so they want that ability to
22  try to control a situation when, you know, things are
23  kind of borderline, you know, either way.  They don't
24  want somebody on the ground possibly deploying gas when
25  it's not an emergency situation, when they maybe were
```

```
 1   on the verge of actually negotiating a very peaceful,
 2   let's say, march through downtown or whatever, and then
 3   something happens on the side and somebody deploys gas
 4   when it's not an emergency situation.  It still may be
 5   justifiable, but not necessarily an emergency
 6   situation.  They want to -- they want to have that
 7   control of -- as much as they can, you know, from their
 8   position, of that operation.
 9        Q.   Okay.  When -- what -- what -- give me an
10   example of a circumstance -- you described emergency
11   situations as including when someone's life is in
12   danger or someone is -- is in danger of being seriously
13   injured.  Can you give me some examples?
14        A.   Well I'll give you an example of I gave the
15   command to deploy gas on the street and that was on the
16   very first day of these protests on May 28th when a
17   group of people marched towards the district six
18   station and district officers had formed a skirmish
19   line in order to create a barrier between the
20   protesters and the district station, and we received
21   information that they wanted to destroy the building or
22   burn it.  So while we were holding that line, the SWAT
23   unit was behind the district skirmish line, and while
24   they were holding that line, individuals behind the
25   main group of protesters were launching bottles and
```

```
 1   rocks and whatever they could find at the officers on

 2   the line.  The officers were pretty much getting

 3   pummeled by whatever was being thrown, mostly rocks,

 4   and just literally constantly being hit and barraged

 5   with rocks and bottles, and so at that point, I knew

 6   that we were in a serious situation where we couldn't

 7   necessarily specifically find and direct munitions to

 8   those people throwing or launching the projectiles

 9   because the -- the group was large enough to where we

10   -- they were concealed by that -- by that group that

11   wasn't necessarily assaulting the officers, and so --

12   but there was so many of them that we couldn't see that

13   were involved in that assault on those officers that I

14   felt like if -- if, you know, the gas wasn't deployed

15   at that moment, we would have to completely withdraw

16   from that position and they would have access to the

17   district station.  So to keep -- in order to keep that

18   line integrity and to protect that district station and

19   the people inside it, I felt like gas needed to be

20   deployed in that situation because officers were

21   getting hit.  Even when -- I saw some of the officers

22   that were getting hit, that had helmets on, with rocks

23   so large that there -- literally, they had a dazed look

24   on their face like they -- I mean, I knew that they

25   were hit so hard that they probably sustained a
```

```
 1   concussion, so that's a serious situation where

 2   officers were either -- you know, guys were either in

 3   danger or they were in -- at risk of being seriously

 4   injured, and some of them were.

 5       Q.   So you're referring to an incident that

 6   occurred on May 28th at Colfax and Washington at about

 7   8:30 p.m., is that correct?

 8       A.   That is correct.                          0:46:16

 9       Q.   Okay.  And who were the officers in the line?

10   Not by name, but just the units they were from?

11       A.   I honestly couldn't tell you exactly what

12   units they were from.  Once everybody has their helmets

13   on and -- you know, they all look the same.  I don't

14   know, I -- I am -- my best guess would be that they

15   were probably assigned to district six and so we were

16   there to assist the district six officers that were

17   already there, but I'm fairly certain that the gang

18   unit was there at the time, now called SORT, as well,

19   possibly some impact teams, but again, I don't know

20   officially which ones were there.

21       Q.   Okay.  You were there with your officers,

22   correct, from the SWAT unit?

23       A.   Correct.

24       Q.   And how many of your officers were there?

25       A.   Well, it would have been me, both of my
```

```
 1  sergeants, and probably, roughly, seven to eight of my

 2  -- my technicians.

 3       Q.   And you were all wearing green fatigues?

 4       A.   Yes, green BDUs.

 5       Q.   Green what?                              0:47:34

 6       A.   They are called -- we call them BDUs.  I

 7  don't know.  You can call them fatigues if you want to,

 8  it's our uniform.

 9       Q.   Okay.  Battle dress uniform?

10       A.   Yes.

11       Q.   Okay.  And was there any other lieutenant

12  there besides yourself?

13       A.   That's a good question.  I do not recall.

14       Q.   Okay.  You gave the order to -- to deploy

15  tear gas at that time, correct?

16       A.   Well what I did is I got on the air and I

17  asked whoever had gas to deploy it at that time, so I

18  don't know if it was so much of a command as it was a

19  request for please somebody deploy some gas because

20  we're getting beat to death with rocks.

21       Q.   You got on the air and you asked the command

22  post for authorization to deploy tear gas?

23       A.   No, I did not.                           0:48:34

24       Q.   Okay.  Well so what are you saying you said

25  on the air?
```

```
 1      A.   I said -- I don't recall my exact words, but
 2 paraphrasing, I just said, "I need someone to deploy
 3 large canisters of gas," meaning we had tried the
 4 PepperBall at this area, shooting it at the ground
 5 trying to get that crowd to move back so we could try
 6 to address the people who were actually throwing the
 7 rocks and bottles.  It was ineffective, so at that
 8 point, I knew I need -- I needed to use the large
 9 canisters of gas, which put off the -- or they emit the
10 large clouds of the CS gas generally, and that's what I
11 was requesting.
12      Q.   You got on the radio and requested for
13 somebody else to deploy the gas?
14      A.   Correct.  I don't -- I didn't have any, so I
15 just said as a -- in general, whoever was there being
16 assaulted by rocks, I wanted them to deploy gas in that
17 situation.
18      Q.   So I'm -- where -- you were -- were you at
19 the intersection of Colfax and Washington?
20      A.   Yes.                                0:49:35
21      Q.   Okay.  So what I am trying to understand is
22 you -- you needed to get on the radio to tell your
23 officers who were there to deploy gas?
24      A.   I got on the air to ask all the -- any
25 grenadier that was there that had -- who had gas on
```

 1   them to deploy some gas, so I didn't specifically go to

 2   individual people and say, "I need you to deploy gas."

 3   I got on the air and said, "For the officers in this

 4   area, we need gas deployed -- large canisters of gas

 5   deployed."

 6        Q.   Okay.  And your radio call sign, was it metro

 7   3?

 8        A.   Metro 3.

 9        Q.   Okay.  And so any -- you were instructing any

10   officers in the area to deploy gas?

11        A.   Correct.  Not everyone that has gas -- I

12   mean, that's not a reasonable thing, but my intent was

13   to have a few of the officers that were there deploy

14   gas, yes.

15        Q.   Okay.  And did you ask anybody above you in

16   rank to authorize this?

17        A.   No, I did not.                          0:50:49

18        Q.   Okay.  Did you need to ask anybody to

19   authorize it?

20        A.   No.  As I said earlier, in an emergency

21   situation, I have the authorization to do that, the

22   authority to do that.

23        Q.   Okay.  And you had determined at the time

24   that it had become an unlawful assembly?

25        A.   No, I didn't -- I didn't -- did not declare

1  it an unlawful assembly, not at all.  Some of the

2  people that were there were not throwing rocks, a good

3  majority of them, actually, were not throwing rocks.

4  Unfortunately, by that group being there, it made the

5  ability for those who decided they wanted to assault

6  that line of officers with the rocks and bottles, it

7  made -- it facilitated that because we couldn't stop

8  those individuals from doing what they were doing and

9  officers were being injured, so I had a group -- did

10  not -- wasn't necessarily assaultive towards the

11  officers, aggressive, yes, but not assaultive, but then

12  that -- that group was preventing us from either being

13  -- having the ability to withdraw from that position or

14  try to take those people into custody that were

15  assaulting officers, and so in order to prevent us from

16  having to move from that position and to assist us in

17  stopping the assault on officers that had been

18  perpetrated by the people behind that general group, I

19  felt like gas had to be deployed to make that possible.

20      Q.   There was a large group of protesters at the

21  intersection of Colfax and Washington at approximately

22  8:30 p.m. on May 28th, correct?

23      A.   I believe that time is correct.              0:52:41

24      Q.   Okay.  And a big majority of them were

25  peaceful, correct?

```
 1        A.    Majority of them were peaceful, yes.

 2        Q.    Okay.  And there was a small number of people

 3   who were throwing rocks and other objects, correct?

 4        A.    That's incorrect, there was a large number of

 5   people throwing rocks and bottles.

 6        Q.    Okay.  How many people would you say were at

 7   that intersection at that time?

 8        A.    Honestly, I don't know.  I can't remember.

 9   It might have been 150.  I don't know, that's just a

10   wild guess.

11        Q.    Okay.  You did not declare an unlawful

12   assembly at that time, correct?

13        A.    Correct.

14        Q.    Okay.  It was not an unlawful assembly at

15   that time, correct?

16              MR. RINGEL:  Object to the form.

17        A.    I wouldn't call it an unlawful assembly under

18   those circumstances and in that context.  In general

19   though, the fact that this -- most of the assembly was

20   in the middle of the intersection, it could have been

21   declared an unlawful assembly --

22        Q.    Okay.                              0:53:55

23        A.    -- or you -- make announcements to call it an

24   unlawful assembly, because they had the entire

25   intersection blocked from vehicle traffic because the
```

1   -- the assembly was in the street, but in that context,

2   we are not going to declare that an unlawful assembly

3   based solely on the fact that they were blocking the

4   street or an intersection.

5       Q.   Right.   Okay.   So putting aside the fact that

6   they were in the street, you would agree that

7   protesting in the street in the form of a spontaneous

8   protest, as the protests last summer were, is protected

9   under the First Amendment, correct?

10          MR. RINGEL:   Object to the form and the

11  foundation.

12      A.   I would disagree.   I don't feel that the

13  First Amendment protects your right to walk in the

14  middle of the street.   There are times when we allow

15  that to happen because we don't want to escalate the

16  situation, as a general principle of the department.

17      Q.   So your -- your training --

18      A.   But also --

19      Q.   Go ahead.   Sorry, go ahead.                0:54:54

20      A.   But there are also times when we feel like it

21  is appropriate in a different context to get them to

22  move out of the street and might declare that an

23  unlawful assembly, and we have done that in the past,

24  not necessarily on this protest or these series of

25  protests, but in other protests, we have had -- we have

```
 1    had -- we have had declared an unlawful assembly merely

 2    by people moving into a street and sitting there and

 3    doing a sit-in, and you give them multiple, multiple

 4    warnings and much time to, you know, move to the

 5    sidewalk, and then unlawful assembly is declared, so

 6    sometimes it is enforced, so the -- I don't believe --

 7    and this is just me, I am not an attorney, you guys are

 8    the attorneys, but I don't believe the First Amendment

 9    gives a group of people the right to march in the

10    middle of the street.  It gives them the right to

11    peacefully protest in a lawful way.  Walking in the

12    street isn't necessarily lawful in my opinion --

13        Q.   So -- and -- and did --

14        A.   -- minor violation --

15        Q.   Go on.

16        A.   -- therefore not necessarily enforced.

17        Q.   All right.  So your training by the Denver

18    Police Department -- but -- sorry, strike that.  Based

19    on your training by the Denver Police Department, you

20    believe that protesters do not have a First Amendment

21    right to protest in the street, correct?

22             MR. RINGEL:  Object to the form and the

23    foundation.                                    0:56:18

24        A.   I don't feel like I have been trained one way

25    or another on that specific matter.  It's my opinion,
```

1   based on my limited knowledge of, you know, the law

2   pertaining to obstructing a street and the First

3   Amendment and the freedom to do that.  One person's

4   First Amendment doesn't necessarily outweigh somebody

5   else's right to their First Amendment right, so if your

6   First Amendment is impinging on somebody else's First

7   Amendment, I am not so sure I can say that that's

8   lawful, so I guess that's how I look at it.  I don't

9   necessarily say that I have received training on that

10  specific thing.

11      Q.   Okay.  So you have not received any training

12  from the Denver Police Department as to whether or not

13  the First Amendment protects spontaneous protests in

14  the street, correct?

15      A.   I have received training on First Amendment

16  issues from the department, but as it pertains to the

17  street or blocking the street, there is no hard, fast

18  rule that we have -- that the department has trained us

19  on.  That is a fluid situation based on the context of

20  that particular march or protest.  It is sometimes and

21  many times, oftentimes, allowed because the violation

22  of blocking a street isn't worth escalating a situation

23  based specifically on that -- on that one infraction.

24      Q.   Right.  So it's a matter of DPD deciding or

25  the city deciding to allow such things as a matter of

```
 1   permission as opposed to a First Amendment right to

 2   march in the street, right?

 3           MR. RINGEL:  Object to the form and the

 4   foundation.                                        0:58:08

 5      Q.   You allow it because of your own

 6   considerations, you don't want to escalate the

 7   situation, it's not a matter of the people having the

 8   right to protest and march in the street, correct?

 9           MR. RINGEL:  Object to the form and the

10   foundation.

11      A.    Correct, and that's my opinion.  I don't -- I

12   am not saying that there is a rule or a -- it's just

13   general practice that we choose not to enforce

14   obstructing the street in general during First

15   Amendment -- expressions of the first -- people's First

16   Amendment because we don't want to escalate a situation

17   based strictly on the fact that they're blocking

18   traffic.  As long as that traffic -- they don't stop in

19   an intersection and just plant themselves there for

20   hours and hours, if people just block traffic, then

21   we'll let them express their First Amendment right, but

22   their First Amendment doesn't give them, in my opinion,

23   the right to block a street with impunity.  Nothing in

24   the First Amendment or the expression of the First

25   Amendment, I -- I don't believe, allows an assembly to
```

1   do something, peaceful as it may be, while breaking the

2   law, but I'm not an attorney again, I'm -- this is my

3   opinion.

4       Q.   Okay.  The actions that you took and the gas

5   that you ordered deployed on May 28th, 2020 at the

6   intersection of Colfax and Washington was in accordance

7   with DPD policy, correct?

8       A.   I believe so, yes.                          0:59:42

9       Q.   Okay.  And you would agree that all of your

10  actions that you took and all -- and orders that you

11  gave during the protest in May and June of 2020 were in

12  accordance with DPD policy, correct?

13      A.   To the best of my ability, they were, yes.

14      Q.   And the actions that you observed from your

15  officers on your team during the protests in May and

16  June of 2020 were also in accordance with DPD policy,

17  correct?

18      A.   Yes, everything I saw was, yes.

19      Q.   Right.  And your actions and the actions of

20  your officers were consistent with what you had been

21  authorized to do and the way that you had been

22  instructed to handle the protests by the command post,

23  correct?

24          MR. RINGEL:  Object to the form.

25      A.   I don't understand the form, could you just

```
 1  repeat, please?

 2      Q.   Your actions and the actions of your

 3  officers, which you observed during the protests in May

 4  and June of 2020, were in accordance with instructions

 5  that you had received from the command post, correct?

 6      A.   Yes.                                    1:00:42

 7      Q.   Okay.  You would not expect you or any of

 8  your officers to be disciplined for any of the actions

 9  -- to be disciplined by the city for any of the actions

10  that were taken during the protests, right?

11      A.   The officers that I was in charge of

12  specifically?

13      Q.   Right.

14      A.   Right, no, I would not expect.

15      Q.   Okay.  Who was your supervisor during the

16  protests?

17      A.   My boss was Commander Patrick Phelan at the

18  time.

19      Q.   Okay.

20      A.   He was also the incident commander for most

21  of these protests.

22      Q.   Okay.  Let's go back to the question of an

23  unlawful assembly for a moment.  What were the

24  instructions that you received from the command post

25  and from Patrick Phelan with regards to when an
```

```
 1   unlawful assembly could be declared?

 2       A.   We never had a discussion about that specific

 3   topic, that was -- that's something that they -- they

 4   decided when they wanted to declare an unlawful

 5   assembly.  I never did -- declared one.

 6       Q.   Okay.  So during the protests, you never

 7   declared it unlawful assembly, right?

 8       A.   Correct.                                  1:01:54

 9       Q.   Okay.  Are you aware of anybody in the

10   command post declaring it unlawful assembly, which then

11   you had to carry out?

12       A.   I don't recall one.

13       Q.   Okay.  Were you present when somebody else

14   declared an unlawful assembly during the protests?

15       A.   Not that I recall, no.

16       Q.   What is an unlawful assembly?

17       A.   In general, an -- an unlawful assembly would

18   be a situation where the majority of people in an

19   assembly are -- are committing some type of crime.

20       Q.   Okay.  You would agree that tear gas is a

21   form of force, correct?

22       A.   Yes.

23            MR. RINGEL:  Object to the form and the

24   foundation.

25       Q.   I'm sorry, I didn't hear your answer.
```

```
 1      A.   My answer was yes.                              1:02:59

 2      Q.   Okay.  And force may only be used under what

 3 kinds of circumstances?

 4           MR. RINGEL:  Object to the form.

 5      A.   Yeah, that's pretty -- that's a pretty, you

 6 know, complex question because as short as it was,

 7 force and the type of resistance you are encountering

 8 varies greatly depending on what resistance you are

 9 receiving or noncompliance you are receiving and what

10 force you can use, so you can't really put that in

11 general terms.

12      Q.   Okay.  You would agree with me that peaceful

13 protesters should not be subjected to any use of force,

14 correct?

15           MR. RINGEL:  Object to the form and the

16 foundation.

17      A.   Correct.

18      Q.   And that would include the use of tear gas?

19           MR. RINGEL:  Object to the form and the

20 foundation.

21      A.   Correct.                                        1:04:09

22      Q.   Are you aware -- going back to the incident

23 at Colfax and Washington at approximately 8:30 p.m. on

24 May 28th, was there any -- are you aware of any other

25 supervising officer, such as a sergeant, lieutenant, or
```

1  above, who gave any sort of orders to use tear gas at

2  that intersection at that time?

3      A.   Not to my knowledge.  As far as I remember,

4  it was just me.

5      Q.   What -- how did you receive information that

6  the protesters who were at that intersection at that

7  time were trying to get into district six to burn it

8  down?

9          MR. RINGEL:  Object to the form.          1:05:21

10     A.   I don't remember exactly how we got the

11 information, probably over the radio, if I had to

12 guess, maybe a phone call.  Those are the two ways we

13 communicate with the command post and most -- mostly

14 over the radio, occasionally would be a phone call.

15     Q.   Do you recall what exactly was said about

16 that?

17     A.   No, I don't.

18     Q.   Were you using your cell phone during the

19 protests?

20     A.   Occasionally.                            1:05:55

21     Q.   And so what were the occasions when you would

22 use your cell phone as opposed to getting on the radio?

23     A.   Sometimes the radio traffic was so constant

24 you couldn't get on the air, other times, Tom Pine and

25 I would communicate with just one another, he would let

```
 1   me know where he is, I'd let him know where I am during

 2   down times or during different, you know, times -- if

 3   we're being deployed with things to keep in touch with

 4   one another.  Occasionally, someone from the command

 5   post would call with specific information about

 6   something, I don't know, any number of things.  I

 7   believe going back to -- to the question as to how we

 8   got the information about them burning the station, I

 9   believe at that time, other jurisdictions and other

10   places in the U.S. had already experienced assaults on

11   their police departments and so I think that that was

12   something that our command post was concerned with

13   based on that fact.

14        Q.   So what I am trying to understand is what --

15   the -- there was some information that there were some

16   people who may want to burn down the station or cause

17   destruction of the police station, right?

18        A.   There was concern, yes.                    1:07:29

19        Q.   Okay.  This wasn't tied to any specific

20   individuals, right?

21        A.   Not to my knowledge, no.

22        Q.   Okay.  This did not apply to every one of the

23   150-plus people who were at the intersection of Colfax

24   and Washington on May 28th at 8:30, right?

25             MR. RINGEL:  To the form and the foundation.
```

```
 1      A.   I disagree, there were some in that crowd

 2  that made it very clear they wanted to destroy our

 3  station and kill most of the cops there, if any cops

 4  there, so some of that group was absolutely intent on

 5  doing that, and they made it clear by what they were

 6  saying.

 7      Q.   I'm not saying, "Some," I am saying all of

 8  them.  There -- there was a majority of people in that

 9  crowd who was peaceful -- who were peaceful, right?

10          MR. RINGEL:  Object to the form and the

11  foundation.                                    1:08:13

12      A.   Their actions were peaceful, but they made it

13  clear that their intent was not to be peaceful once

14  they got to that station.

15      Q.   I mean, who are you -- you are just saying,

16  "They."  There is a lot of people there, right?  I

17  mean, there were a lot of people present, many, over

18  100, 150, right?

19      A.   That was my estimate, yes.

20          MR. RINGEL:  Form.

21      Q.   Okay.  Not every one of them -- sorry, just

22  -- it's not true that 150 people wanted to enter the

23  station and burn it down, right?

24          MR. RINGEL:  Object to the form and the

25  foundation.
```

```
 1       A.    I don't know if that's true at all.

 2       Q.    You -- you think all of the 150 people who

 3  were present at the intersection of Colfax and

 4  Washington on May 28th at 8:30 p.m. were intent on

 5  coming into the police station and destroying it?

 6             MR. RINGEL:  Object to the form and the

 7  foundation.                                        1:09:13

 8       A.    No, absolutely not, it -- it would be

 9  ridiculous to feel that way or think that way that --

10  not every single person there had that intention.

11       Q.    Okay.  So have you ever received any training

12  -- now is it fair to say that there may be a -- there

13  was a -- at this particular intersection at this time,

14  Colfax and Washington, on May 28th at 8:30, there was a

15  large group of protesters and there were some people in

16  the crowd who were taking aggressive action like

17  throwing things, right?

18       A.    Yes.

19       Q.    Right.  But there were a lot of people in the

20  crowd who were there to protest and were peaceful,

21  correct?

22             MR. RINGEL:  Object to the form and the

23  foundation.

24       A.    Yeah, it appeared to be peace -- peacefully

25  protest --
```

1    Q.   Okay.

2    A.   -- correct.

3    Q.   Did you -- did -- have you received specific

4  training from the Denver Police Department with respect

5  to how to deal with the fact that you have a large

6  peaceful crowd and some instigators within a crowd?

7           MR. RINGEL:   Object to the form.          1:10:12

8    A.   Yes.  Most of the time, we try to isolate

9  those people who are committing the crime or committing

10  those assaults, isolate them and capture them on, you

11  know, video on the Halo cameras, and try to follow them

12  away from the situation so we can arrest them away from

13  the -- the group, the peaceful group.  Deploying large

14  quantities of gas is a very unusual situation, has been

15  in Denver.  My career, in 29 years, other than the

16  Bronco riots or whatever you want to call those, we

17  hadn't deployed large canisters of gas in a protest

18  situation for all those years.  Generally speaking, we

19  are able to -- the number of people who are committing

20  those crimes have been small enough where we can

21  isolate those people and -- and we did that during

22  these protests as well, but generally speaking, prior

23  to the -- these -- this -- this series of protests, the

24  group of people protesting peacefully and the amount of

25  people who are committing the crimes that we wanted to

```
 1   take into custody was -- the ratio was much smaller --

 2   the ratio of people committing those crimes was much,

 3   much smaller, and we were able to follow them away and

 4   -- and arrest them without incident from -- away from

 5   the scene, and so that's our general practice.  It's

 6   unusual for us to have to deploy gas in a situation

 7   where you have a group that isn't assaulting officers

 8   or committing the -- those crimes, but the group of

 9   people that are and the fact that this group of people

10   who are peaceful at that moment are facilitating the

11   ability for the very large number of people who were

12   assaulting officers to assault officers, that's an

13   unusual situation.

14        Q.   Okay.  So if there is a large number of

15   people who are peaceful, but there are a few

16   individuals in the crowd who are assaulting or

17   attempting to assault officers, is it in accordance

18   with DPD policy to deploy gas on the entire group?

19           MR. RINGEL:  Object to the form and the

20   foundation.                                      1:12:18

21        A.   No, our intent is not to deploy gas to people

22   who are intentionally protesting, that is not the --

23   that's not our intent to gas people who are peacefully

24   protesting.  Our intent is to get those officers out of

25   a situation where their lives are in danger, and the
```

1  fact that there is a group of people there at that

2  intersection with another group of people there

3  assaulting those officers, if you don't do something

4  like deploy gas in that situation, you have to withdraw

5  from that situation or multiple officers would have

6  gone to the hospital.

7       Q.   Have you -- you haven't watched any of the

8  body-worn -- have you watched any of the body-worn

9  camera for the protests?

10       A.   I have seen some.  I haven't specifically

11  watched any video for any specific reason.

12       Q.   What -- what -- what -- when did you watch

13  some body-worn camera video?

14       A.   I think I watched some -- I spoke to the city

15  attorneys, I don't remember for sure.  I watched that

16  intersection at Colfax and Washington, and I don't

17  remember why I watched that, what circumstances we were

18  under.  It might have been, again, with the city

19  attorney.  No, it wasn't.  I just don't remember

20  exactly.  I do remember that video surprised me because

21  it looked so non-chaotic and on the -- on the ground,

22  it was absolutely chaotic.  So I'm not sure when I

23  watched that.  That wasn't body cam video, but I don't

24  think it was Halo camera video.

25       Q.   You weren't wearing a body cam at the time,

```
 1  correct?

 2       A.   No.                                        1:14:24

 3       Q.   Were any of your officers wearing body-worn

 4  cameras during the protests?

 5       A.   I think some were and some weren't.  We

 6  weren't required to at the time.

 7       Q.   Why do you say you weren't required to at the

 8  time?

 9       A.   SWAT was one of the last units to be required

10  for the -- the tactical security, if you will, I don't

11  really know.  We -- we didn't start wearing -- we

12  didn't start wearing body cameras for everything before

13  we -- let me back up.  So we started wearing our

14  cameras for tactical events probably, like, in 2018 or

15  '19 or something, so we started wearing them for our

16  tactical operations, and then -- but we're -- yeah, we

17  didn't -- weren't required to wear them for other

18  activities.  We don't do patrol in general, and so some

19  of the officers had them on and some of them didn't,

20  and lieutenants -- I can speak only for myself on -- as

21  far as the reason why I wasn't wearing mine, was we

22  weren't, at that time, required to wear them unless we

23  were working off-duty, and so it never even crossed my

24  mind to put my camera on.  And honestly, it's one of

25  those situations where we never had any idea how this
```

```
 1    was -- where this was going and how it was going to end

 2    up, you know, turning out in the long run.  We were

 3    responding to a protest like I have done hundred --

 4    like, a hundred times prior to, right, so I didn't feel

 5    like, in the beginning, this was going to be anything

 6    other than a typical protest that we have seen in

 7    Denver multiple times that were for the -- by and

 8    large, you -- you know, for the most, part rather

 9    peaceful.

10        Q.   You would agree that in 2017, the police

11    department -- the -- the city required metro SWAT

12    officers to begin wearing their -- to -- to wear body

13    cams, correct?

14        A.   Yeah, I don't know if that -- it was 2017.

15    It sounds like it could be right.  I don't know that

16    for sure.

17        Q.   There is a period of time some years ago when

18    metro SWAT did not have to wear body cams at all,

19    right?

20        A.   Yes.                                    1:16:57

21        Q.   Okay.  Then there were some recommendations

22    made by the Office of Independent Monitor recommending

23    that metro SWAT wear body cams, right?

24        A.   I don't know where that came from.  I got

25    orders from Commander Phelan that we are going to start
```

```
 1   wearing them and -- and we did.  I don't know when that

 2   started or where it originated or why it happened.

 3        Q.   Okay.

 4        A.   I can't -- I don't know.

 5        Q.   You just know that Commander Phelan, at some

 6   -- at some point some years ago, told you that metro

 7   SWAT needs to wear body cams, right?

 8        A.   For tactical operations, yes.

 9        Q.   Okay.  Only for tactical operations?

10        A.   No, we were -- we were wearing them, however,

11   we weren't wearing them for tactical operations for

12   some time.

13        Q.   Sorry, I'm not -- you were wearing them for

14   tactical operations or not for tactical operations?

15        A.   We were issued body cams to wear, but we

16   didn't have to wear them during tactical operations,

17   for just normal other functions.

18        Q.   Right.                              1:18:02

19        A.   Tactical operations were exempt for some time

20   until Commander Phelan said, "We are wearing them for

21   tactical operations as well."

22        Q.   Okay.  And do you know when it was that

23   Commander Phelan told you you are going to wear them

24   for tactical operations as well?

25        A.   I don't remember.
```

```
1        Q.   Do each of your officers have a body cam

2   that's assigned to them?

3        A.   Yes, they do.

4        Q.   And did they have them at the time of the

5   protests?

6        A.   I don't know if they had them or not.  I am

7   assuming that they did only because they are supposed

8   to.

9        Q.   Your officers were supposed to have their

10  body cams during the protests?

11       A.   I don't know --

12            MR. RINGEL:  Object to the form.        1:18:52

13       A.   I don't know if they were -- you know, I

14  don't know.  I don't even know.  That's one of those

15  situations I would say yes, they probably should have

16  had them on if they didn't.

17       Q.   Okay.  Okay.  What was your understanding

18  during the protests of whether or not your officers

19  should have their body cams on and turned on?

20       A.   My understanding would have been that they

21  should have had them on and turned on.

22       Q.   Okay.  Do -- do you know one way or another

23  whether or not any of your officers had their body cams

24  on and turned on?

25       A.   I would have to look.
```

```
 1      Q.   Okay.  And you did not have yours on because

 2  you weren't sure how the protests were going to turn

 3  out?

 4      A.   No, I didn't have mine on because at that

 5  time, lieutenants weren't required to have theirs on

 6  unless they were working off-duty.

 7      Q.   Got it.  Okay.  Sergeants, including the

 8  sergeants in your unit, were required to have their

 9  body cams, correct?

10      A.   They would have been, yes.                1:19:58

11          MS. WANG:  Okay.  Did you have any --

12  actually, let's take -- let's take a quick five-minute

13  break.

14          WITNESS:  Okay.

15          MS. WANG:  And then -- just a bathroom break.

16          RECORDER:  Record, 11:21 a.m.

17               (Off the record)

18          RECORDER:  On record, 11:33 p.m. -- a.m.

19          MS. WANG:  Central Time.

20          RECORDER:  Central Time.

21      Q.   So at -- at the intersection of Colfax and

22  Washington at 8:30 p.m. on May 28th, did you give any

23  dispersal orders before the use of tear gas?

24      A.   No, I don't believe I did.

25      Q.   Why not?                                  1:20:47
```

1    A.   Because it became very apparent very quickly

2  that there was no time for that.  Officers were getting

3  injured, and I needed to make an immediate decision.

4    Q.   How long did it take after you gave the order

5  to deploy tear gas and the tear gas was deployed?

6    A.   You know, I don't remember, a minute or two.

7    Q.   Do you recall that at that intersection, at

8  that time, there was a point at which officers moved

9  forward into -- off -- let me back up.  Just prior to

10  8:30, officers had formed a line across Washington

11  facing south on Colfax, right?

12    A.   Correct.                                    1:21:57

13    Q.   Okay.  And at some point, officers -- there

14  was a large crowd in the intersection, correct?

15    A.   Correct.

16    Q.   Officers at first used PepperBall guns on

17  them, right?

18        MR. RINGEL:  Object to the form and the

19  foundation.

20    A.   The officers didn't use PepperBall on the

21  crowd that is -- had assembled there, they were trying

22  to use PepperBall to engage those individuals who were

23  -- they could pick out from the group that were

24  throwing rocks and bottles, so not in the -- at the

25  crowd in general, no.

```
 1        Q.   Okay.  Do you know which of the officers

 2   assigned to you had PepperBall guns at that time?

 3        A.   I believe Corporal Eberharter was my

 4   PepperBall person that I assigned to PepperBall

 5   throughout.  I don't recall if he had it that very

 6   first day, but I know he had it every day for the most

 7   part after that.

 8        Q.   Okay.  So Corporal Eberhart (sic) is a

 9   corporal, correct?

10        A.   Correct.                              1:23:07

11        Q.   He had two arrows on his sleeve, right?

12        A.   Chevrons, yep.

13        Q.   Chevrons.  Okay.  Chevrons, all right.  And

14   he had a PepperBall gun throughout the protest,

15   correct?

16        A.   Yes, correct.

17        Q.   Including on May twenty -- on May 30th,

18   right?

19        A.   On -- you know, without being 100 percent

20   certain, like, I would say yes, based off the fact that

21   he had it the majority of the time.

22        Q.   Sure.  And you -- were you assigned to work

23   on May 30th, too?

24        A.   Yes, I was.

25        Q.   Okay.  Were there any of your other officers
```

```
 1   who had PepperBall guns on May 30th?

 2       A.   I don't know if anyone else on my team had

 3   one.  I don't believe so.  I try to keep it to one

 4   person per, you know, team, so like, I -- if Tom had

 5   one on his, I had one on mine.

 6       Q.   Okay.                              1:24:12

 7       A.   I don't recall anybody else having one.

 8       Q.   All right.  And -- and then so generally

 9   speaking, during the protests, who -- so you -- your --

10   for your team, you had one person with a PepperBall

11   gun, that was Eberhart (sic), right?

12       A.   Correct.

13       Q.   And then the other -- your other officers,

14   what kind of munitions or weapons did they have?

15       A.   Most of them didn't have anything else as far

16   as like a piece of equipment that disperses gas or

17   shoots project -- projectiles.  Most of them didn't

18   have anything like that, they -- the lethal weapons

19   that they had would have been their sidearm and then I

20   know we had -- each day of the protest, we had a couple

21   rifles that were in the cases inside the vehicle in

22   case --

23       Q.   Okay.

24       A.   -- we had an active shooter situation or a

25   terrorist event or something like that, you know, using
```

```
 1   the cover of a protest to engage in that kind of

 2   situation.

 3       Q.   Did your officers all have -- did the

 4   officers on your team all have tear gas canisters on

 5   them that they could throw?

 6       A.   They all did, yes.                      1:25:27

 7       Q.   Okay.  Back to Washington and Colfax on May

 8   28th at 8:30 p.m., why did you feel there was not time

 9   to give a dispersal order before deploying chemical

10   munitions?

11       A.   It was the sheer volume of projectiles that

12   are impacting the line and the officers I watched and

13   my personally, you know, being struck with multiple

14   projectiles, there just simply wasn't time prior to --

15   you know, it -- in order to get that -- that assault on

16   that line of officers to cease as quickly as possible,

17   there was -- I -- you know, that was just an emergency,

18   in my mind, an emergency situation.  I was authorized

19   to -- to give that command at that point just to

20   protect those officers.

21       Q.   But when you say you were authorized to give

22   that command at that point, you were authorized by

23   whom?

24       A.   Just by policy.                         1:26:32

25       Q.   Okay.  So I was talking about -- I was asking
```

1  about the -- the officers on the line, we were talking

2  about the PepperBall gun used, and you said it was to

3  try to get the people who were throwing things?

4      A.   Yes, correct.

5      Q.   Okay.  At some point then, the officers who

6  were just north of Colfax moved forward into the

7  intersection.  Do you recall that?

8      A.   I do recall moving.  I don't know what

9  specific instance in time that you are talking about.

10     Q.   Sure.  I mean, do you recall -- I mean, do

11  you recall an instance where your officers or officers

12  who were under your command at that intersection moved

13  forward into the intersection and then moved back --

14  back north of Colfax?

15     A.   Yeah, no, I don't -- I don't remember that

16  maneuver --

17     Q.   Okay.  All right.                          1:27:43

18     A.   -- specifically.

19     Q.   Let's talk about the first day of the

20  protests and how you were assigned to the protests.

21  When did you first learn about being assigned to the

22  protests?

23     A.   So Tom Pine's team was assigned to the

24  protest and we were assigned to normal activities that

25  day, and we worked our shift, we arrested -- high-risk

```
 1   fugitive apprehension, and on our way home, we were

 2   recalled to the protest.

 3       Q.   Okay.  Did you attend the -- and this was --

 4   this on Thursday, May 28th, the first day of the

 5   protests?

 6       A.   Yes.                                    1:28:21

 7       Q.   And so about what time was it?

 8       A.   I'm guessing 5:30, 6:00, some -- somewhere in

 9   there, just because we worked our normal hours.  I

10   think we were 8:00 to 4:00 that day, we had an hour of

11   overtime, we were on our way home, so I'm guessing,

12   like, it's at 5:00, 5:30, 6:00, somewhere in there.

13       Q.   Okay.  Did you attend any briefing before

14   being -- did you attend a briefing at 4:00 p.m. on May

15   28th regarding the protests?

16       A.   No, I did not.                          1:29:16

17       Q.   Okay.  Are you aware of a supervisor briefing

18   -- a briefing with team supervisors being provided at

19   4:00 p.m. on May 28th?

20       A.   No, I wasn't.  I just -- I wasn't assigned to

21   the protests.

22       Q.   Okay.  So what -- so you said 5:00 or 6:30

23   p.m., you were called to do what?

24       A.   I was called to go and assist the officers at

25   20th and Chestnut -- 20th and Chestnut because a large
```

```
 1  number of people were moving toward the highway and

 2  they wanted assistance with trying to prevent them from

 3  -- to move -- moving out on the I-25 -- preventing them

 4  from moving on the I-25.

 5       Q.   Okay.  So you were with your -- who was with

 6  you at that time?

 7       A.   So as I said, we were all working our normal

 8  shift, and so therefore, we all responded in our

 9  individual cars, we didn't have one vehicle to respond

10  with, so I had my team, but we weren't all necessarily

11  in the same place at the same time in the beginning.

12       Q.   All right.  And what did you deal with at

13  20th and Chestnut?

14       A.   They just kind of filled in the line, there

15  was a scrimmage line there preventing the group from

16  going up at -- and over the 20th Street viaduct so they

17  could access I-25, so we just kind of augmented the

18  line that was already in place there and the group

19  stopped there for a little while, then moved down

20  Chestnut.

21       Q.   Okay.  And what -- did you end up get -- did

22  you -- were you and your team on I-25 when the

23  protesters got onto I-25?

24       A.   We responded down there, yes.              1:31:14

25       Q.   Okay.  So well tell me what happened after
```

1   you were done at 20th and Chestnut.

2       A.   So the group moved down to the Millennium

3   Bridge at -- at 16th and Chestnut and crossed the

4   bridge, so a good portion of the group crossed the

5   bridge and then crossed back over the bridge into

6   downtown, so we used -- we kind of maneuvered our

7   vehicles back and forth between, like, 20th and

8   Chestnut, and then Little Raven and -- like, the 1500

9   block of Little Raven where we were trying to prevent

10  them from crossing Commons Park right there and get

11  onto the highway, but the group kind of moved back and

12  forth and eventually made their way across Commons

13  Park, so we had to make that -- we had to kind of

14  maneuver back and forth a couple times, they -- there

15  was some uncertainties in the group, it felt like, as

16  to where they were going.

17      Q.   Okay.  So when you were assigned to -- when

18  you were first assigned to deal with the protesters at

19  20th and Chestnut, it was just a phone call to you by

20  Commander Phelan, correct?

21      A.   Correct.                                1:32:31

22      Q.   Okay.  And you met up with Lieutenant Pine

23  and his team, as well, at 20th and Chestnut, right?

24      A.   Correct.

25      Q.   Okay.  And then when you got to I-25, what --

```
 1   what was going on at I-25?

 2       A.   So initially, the group moved back and forth.

 3   When we -- when the group climbed out on -- down the

 4   embankment and then took I-25, occupied I-25, we came

 5   down the wrong way ramp on 20th -- from 20th onto I-25,

 6   so we came down the exit ramp to 20th onto northbound

 7   I-25 in the southbound direction.

 8       Q.   Okay.  So your -- your -- you and your team

 9   were in the -- your green battle dress uniform,

10   correct?

11       A.   Correct.                                1:33:24

12       Q.   And who were the other officers -- there were

13   other officers who were in different uniforms there at

14   that time, too, right?

15       A.   There were.  There were district officers

16   from wherever -- I don't know where they were from.

17       Q.   Okay.  And you had -- Eberhart (sic) was

18   assigned to the PepperBall?

19       A.   I don't believe he had the PepperBall at that

20   time, no.  That was early on before we knew things were

21   going to kind of go the way they did, and so he didn't

22   deploy with that initially.

23       Q.   Okay.  But --

24       A.   We didn't really know what we would expect to

25   expect, you know, so we didn't have PepperBall at that
```

1   time.  We weren't assigned to the protests and

2   therefore, didn't really have the -- you know, the

3   preparations to have that stuff deployed.

4       Q.   All right.  So when you -- you -- you said a

5   few times, you were not assigned to the protest on that

6   first day, is that because you -- you were just -- you

7   were just assigned by Commander Phelan to -- to respond

8   to specific events?

9       A.   No, we were -- so Tom Pine has his -- a

10  shift, a team, and I have a team.  My team -- because

11  back when this -- before this all started, we didn't

12  have any information that would indicate these protests

13  were going to be as large scale as they were, and so

14  only Tom's team was assigned to the protest activity

15  that day.  That's why he probably went to the

16  supervisor briefing.  My team was just told, "You guys

17  are working your regular shift, your regular duties,

18  Tom's team is handling the protest, your team work --

19  is working regular duty."  That's why I didn't go to

20  the supervisor briefing because I wasn't involved in

21  the protest initially.

22      Q.   Okay.  I get it now.  Do you have a way of --

23  so I have my volume turned all the way up on my

24  computer, but I still -- you are, like, a little bit

25  soft, do you have a way of turning up the section of

```
 1   your microphone on your computer?

 2        A.   How do I do that?  I'm not good at this

 3   stuff.                                        1:35:20

 4        Q.   It may be in your settings --

 5             MR. RINGEL:  So it may help, Lieutenant, if

 6   you sit closer to your computer.

 7             WITNESS:  Okay, I'll just sit closer, that

 8   sounds good.  Can you hear me better if I sit closer?

 9             MS. WANG:  Sure -- sure.  Actually, let me

10   get my headphones, that might --

11             MR. RINGEL:  Yeah, I -- I agree with Ms.

12   Wang, it is sometimes -- you kind of break in and out,

13   Lieutenant, so if you can --

14             WITNESS:  Okay.                      1:35:53

15             MR. RINGEL:  -- sort of figure out where your

16   microphone is and be -- talk into it as best as you

17   can, that would be helpful for all of us who are

18   listening to your responses.

19             WITNESS:  Okay.  Sounds good, I -- I am

20   looking at it and it's not letting me -- I don't know.

21   Oh, "audio settings."  Hang on a second, maybe I

22   figured this out.  "Volume."  All right.  Well, it's

23   almost maxed out, but it won't let me go any further,

24   so anyway, I will stay closer to the microphone.

25             MS. WANG:  I think this might help, let me --
```

```
 1   can you hear me?

 2           WITNESS:  Yes.                              1:36:45

 3           MS. WANG:  Okay.  Oh, that's great actually,

 4   I can hear you much better now.  All right.  Thank you.

 5      Q.   So -- okay.  So now I understand Tom's team

 6   was assigned to the protests the first day, and that's

 7   why you did not attend the supervisor briefing,

 8   correct?

 9      A.   That is correct.

10      Q.   Okay.  Now when you got to -- so when you got

11   to I-25, were there protesters already on the highway

12   or you -- you saw them get on the highway?

13      A.   No, they were already on the highway.

14      Q.   Okay.  And what did you do when you got

15   there?

16      A.   When I got there, by the time I got there,

17   because we were fighting traffic, that area was really

18   congested that day, and so I got there a little bit

19   behind some of my officers and the district officers,

20   so they were already kind of ushering them off the

21   highway, and so by the time I got down there, the

22   majority of the protesters who had -- who had blocked

23   the highway were already moving back up the embankment.

24   Some of them were already on the stairs to the -- the

25   pedestrian bridge right there, the Highlands Bridge or
```

```
 1   something I think it's called.

 2        Q.   Right.                                    1:38:04

 3        A.   So when I got there, I just -- I was kind of

 4   the tail end, and kind of just was supervising that,

 5   you know, getting them off the highway.

 6        Q.   Did you give any orders or authorize any of

 7   your officers to use any kind of force on the

 8   protesters who had left the highway but were trying to

 9   get up back onto the bridge?

10        A.   No, I didn't authorize any use of force or

11   any PepperBall or anything like that at the time.  I

12   know that some of the other officers that were there

13   from my team, and I don't remember who they were

14   specifically, but I know that they were SWAT guys,

15   directed the -- and this is why I don't believe Rick

16   Eberharter had a PepperBall at the time because they

17   were directing the district officers to deploy

18   PepperBall up near the people that were on the stairs

19   who were throwing now rocks and bottles at the officers

20   that were now -- so they had high ground and they were

21   throwing rocks and bottles at the officers that were

22   still down now at -- on the edge of the highway.

23        Q.   Is this something that you -- you saw happen

24   or you -- it's just your understanding of -- that this

25   happened?
```

Exhibit 5, LLC

```
 1        A.    No, I saw it happen.                        1:39:15

 2        Q.    Okay.  So you saw people who were on the

 3   bridge throwing items at the officers below on the

 4   highway, and then other SWAT officers ordered district

 5   officers who had PepperBall guns to shoot?

 6        A.    Yes, correct.

 7        Q.    Okay.  And it's your belief that the

 8   PepperBalling of the protesters on the bridge was only

 9   in response to items being thrown?

10        A.    Yes, correct

11        Q.    Okay.  Did you see officers, whether the --

12   they were your officers or -- or district officers,

13   shoot PepperBall guns at people who were already

14   getting off the highway and getting onto the -- back

15   onto the -- the -- the little stairway ramp to the

16   bridge?

17        A.    They -- they shot PepperBall at the bridge, I

18   remember seeing it -- impacts of PepperBall on the

19   bridge for people who were using the high ground and

20   the cover of the bridge to throw things down at the

21   officers, and then I saw officers impacting people

22   specifically who were in the act of throwing things.  I

23   saw both, yeah.

24        Q.    Did you see officers PepperBalling people who

25   were -- who had their backs turned and were trying to
```

```
 1   get back onto the bridge?

 2        A.   No, I did not see that, mm-mm.          1:40:30

 3        Q.   Did you ever watch any body-worn camera from

 4   that day from that incident?

 5        A.   No, I did not.

 6        Q.   Have you seen any video of that incident?

 7        A.   No, I haven't seen any video, no.  Not that I

 8   recall, no.

 9        Q.   Okay.  Was Thomas Pine and his team present

10   at this I-25 incident?

11        A.   I don't remember seeing his team there.  No,

12   I think it was mostly my team and district officers

13   that were there.

14        Q.   Okay.  On 5/29 -- well, actually let me back

15   up.  On the first day of the protests, did you receive

16   any direction from anybody as to what use of force

17   statements should be completed?

18        A.   Say that again?  I'm sorry.              1:41:22

19        Q.   Okay.  On the first day of the protests on

20   May 28th, did you receive any direction from Commander

21   Phelan or anybody else as to what kind of police

22   reports or kind of use of force statements or officer

23   statements should be completed regarding your

24   involvement in the protests?

25        A.   No, I don't think that -- I don't recall any
```

```
 1   conversations about --

 2        Q.   Okay.

 3        A.   -- use of force reporting, no.

 4        Q.   You wrote a statement on May twenty -- or

 5   regarding May 28th -- the events of May 28th, correct?

 6        A.   Yes, I did.

 7        Q.   Okay.  And you wrote it, and it's dated June

 8   11th?

 9        A.   Yes.

10        Q.   When did you first begin writing it?

11        A.   If it's dated June 11th, that's the day I

12   wrote it.

13        Q.   Okay.  So you did not -- if you -- if it's --

14   if it's got a handwritten date of June 11th, you wrote

15   it all in -- in one sitting on that day?

16        A.   Yes.                               1:42:21

17        Q.   Okay.  And is this something that you type up

18   on a computer at a computer terminal, this statement?

19        A.   Yes.

20        Q.   Okay.  And then there is a handwritten

21   signature, so do you -- you type it up into the

22   computer and then you print it out and sign it?

23        A.   Yeah, exactly.

24        Q.   Okay.  Why did you write it on June 11th?

25        A.   That's when we were directed to do that, we
```

```
 1   were -- I don't know if it was that day, but we were
 2   directed to do it after the fact, and it was something
 3   you do after.
 4       Q.   Okay.  So we have four officer statements
 5   from you, one for May 28th, one for May 29th, one for
 6   May 30th, and one for May 31st, are those all the ones
 7   that you did?
 8       A.   Yes.                                  1:43:12
 9       Q.   Okay.  And they're all dated June 11th, they
10   have slightly different times, one is 22:15, one is
11   23:05, one is 23:35 and one is 00:00 -- June 12th,
12   actually.  Is that because you wrote them consecutively
13   at those times on those days?
14       A.   I don't remember doing it, but it sounds like
15   it, yeah.
16       Q.   Okay.  And who directed you to write the
17   statements -- these statements over a week after the
18   events?
19       A.   I can only say probably Commander Phelan,
20   that's who gives me directions, so.
21       Q.   Right.  Okay.  Do you recall any specific
22   conversation that you had with Commander Phelan about
23   the completion of officer statements a week after the
24   events?
25       A.   No, just, "Get them done."
```

```
 1       Q.   So what is the -- what is -- what is your

 2  understanding of DPD policy regarding when use of force

 3  statements should be completed?

 4       A.   They are supposed to be completed by the end

 5  of your shift, in general.

 6       Q.   Why?                                    1:44:24

 7       A.   That's our policy, just, you know, you --

 8  generally, when you complete a use of force or you --

 9  there is a use of force incident, you want to complete

10  that when all witnesses are there, and you can capture

11  those statements and stuff before opening -- doing an

12  investigation, because supervisors will conduct an

13  investigation in most circumstances when the use of

14  force is -- when there is a use of force incident.

15       Q.   Okay.  What is the -- is there -- is it

16  important to document uses of force and any

17  authorizations that you may have given as to use of

18  force shortly after the events occurred?

19       A.   When it's reasonable and practical.  In this

20  situation, when no specific arrests were made and there

21  was deployments of PepperBall, generally, one over --

22  overarching use of force would be completed at that

23  time.

24       Q.   Did you ever have any conversations with

25  Commander Phelan or any other command staff about that
```

```
 1   -- that you -- you did not need to fill out any use of

 2   force reports contemporaneous with the incidents?

 3        A.   We didn't have a discussion that I recall,

 4   no.                                             1:46:00

 5        Q.   Okay.  When is the first day that you have

 6   attended a supervisor briefing?

 7        A.   The 29th.

 8        Q.   Okay.  When was that briefing?

 9        A.   I don't remember the time.

10        Q.   Was it at 11:00 a.m.?

11        A.   I don't remember.  It might have been.

12        Q.   Who was at that briefing?

13        A.   Tom and I would have both been there,

14   Commander Phelan would have been there.  Other than

15   that, it would have been other command officers and

16   supervisors from whatever units were called upon to

17   assist with the protests --

18        Q.   Okay.  And when you say -- sorry, go ahead.

19        A.   I don't know specifics.  I don't remember who

20   --

21        Q.   Sure.                                  1:46:56

22        A.   -- who was there.

23        Q.   Sure.  And so what -- when you say, "Other

24   command officers," do you mean lieutenants or sergeants

25   or what -- what, like, rank are we talking about?
```

```
 1      A.   Yeah, so lieutenants and commanders, chiefs,

 2  division chiefs or whatever, so a command officer is

 3  lieutenant and above, so when I say, "Command

 4  officers," it could be anyone lieutenant or above.

 5  Supervisory officers were generally considered

 6  sergeants and corporals.

 7      Q.   Got it.  Okay.  Okay.  So the supervisor

 8  briefing was for the level of what, command officer and

 9  above or supervisor and above?

10      A.   Supervisor and above.

11      Q.   Okay.  So that -- that could include

12  sergeants and corporals?

13      A.   Yes.                            1:47:45

14      Q.   Okay.  With respect to the people on your

15  team, was it just you -- or in -- in terms of SWAT, was

16  it just you and Lieutenant Pine?

17      A.   Yeah, I think it was.  I don't think we had

18  our sergeants -- and we generally don't have our

19  sergeants attend that because space is limited, and

20  plus we were dealing with the COVID thing, too, so we

21  try to keep that to a minimum.

22      Q.   Sure.  And so whatever information you

23  learned at the supervisor briefings, you would just --

24  you and Lieutenant Pine would just communicate that to

25  your team?
```

```
 1        A.   Yes, exactly.

 2        Q.   Okay.  Now did you attend supervisor

 3   briefings for May 30th and May 31st as well?

 4        A.   Yes, I believe I did.                    1:48:24

 5        Q.   Was Lieutenant Pine present for those as

 6   well?

 7        A.   Yes, I believe he was.

 8        Q.   Okay.  And Commander Phelan was present at

 9   those briefings?

10        A.   Yes, he was.

11        Q.   What about -- what do you recall about who

12   the operations chiefs were on, let's say, the -- the --

13   the first supervisor briefing that you attended on May

14   29th?

15        A.   I think it might -- it -- I think it was

16   Commander Aaron Sanchez, but that's just a vague

17   memory.  I don't know for sure.

18        Q.   Okay.  So you have described lieutenant -- or

19   I'm sorry, Commander Phelan as the person who you

20   directly reported to during the protests, right?

21        A.   Yes.                                     1:49:07

22        Q.   What was the role of operations -- the

23   operations chief?

24        A.   So the role of operations chief is,

25   generally, to be the command person that's on the
```

 1  ground that's in charge of field operations, if you

 2  will, so the incident commander is running the entire

 3  incident from command post via, you know, Halo camera

 4  and -- and information that they are able to gather

 5  from, you know, all of the different units that are out

 6  there.  The command chief is more of an

 7  on-the-ground-type incident commander, so it's -- they

 8  are kind of an incident commander, but not necessarily

 9  -- you know, they can't be everywhere at once, so they

10  are in command of a specific incident, you know, in the

11  field.  Problem with this situation was that there was

12  multiple locations where we were responding back and

13  forth, so it would have been hard for a -- you know,

14  that person to -- you know, to be in command of all of

15  those situations, so incident command kind of gave most

16  of the direction --

17      Q.   Okay.                              1:50:19

18      A.   -- to get to my point.

19      Q.   You -- you just used the word "command

20  chief," you meant operations chief --

21      A.   Operations chief.

22      Q.   -- the operations -- okay.

23      A.   Yes.

24      Q.   Okay.  So the operations chief is on the

25  ground, but it's difficult for them to know what all is

```
 1   going on everywhere, so most of the direction is given

 2   by the command post?

 3       A.    Correct.

 4       Q.    Okay.  Was there anybody else, in terms of

 5   command-level staff, who were in the command post other

 6   than Commander Phelan?

 7       A.    There were -- there were other people there,

 8   and I don't remember, you know, who all was there at

 9   any given one -- briefing in one day, but I know that I

10   saw most of the division chiefs there at some point and

11   the deputy chief as well.

12       Q.    Did -- were you ever in the command post

13   during the protests?

14       A.    Yes.

15       Q.    Oh, okay.  When were you in the command post?

16       A.    Like, that Tuesday after the 28th, so that

17   following week.

18       Q.    Okay.  And so let me just ask you, do you

19   recall Lieutenant Robert Wyckoff being in the command

20   post?

21       A.    Yes.                                1:51:33

22       Q.    And was Lieutenant Wyckoff ever out on the

23   scene, do you know, or he was just in the command post?

24       A.    I don't remember.

25       Q.    Okay.  Did you see Aaron Sanchez -- Commander
```

 1    Aaron Sanchez out on the -- or in the field during the

 2    times you were out in the field?

 3         A.   I did see him on occasion, yes.

 4         Q.   Okay.  All right.  Now what -- what were --

 5    you said the Tuesday, May 29th, in the afternoon, you

 6    were in the command post?

 7              MR. RINGEL:  Object to the form.  I believe

 8    he said, "Tuesday, the next week."

 9              MS. WANG:  Oh, the next week?  So --

10              MR. RINGEL:  The 29th would have been Friday.

11    Tuesday, I think, would be the 2nd.

12              MS. WANG:  Okay, the 2nd?                1:52:41

13         Q.   June 2nd, Tuesday afternoon?

14         A.   Yeah, that sounds right.

15         Q.   Okay.  What were you doing there then?

16         A.   I was the incident commander in place of

17    Commander Phelan.

18         Q.   Why were you the incident commander in place

19    of Commander Phelan?

20         A.   He just took that day off.  He was, I think,

21    probably emotionally and mentally exhausted, so I think

22    they were trying to give him a break, but I don't know.

23    That's my assumption, I guess.

24         Q.   Okay.

25         A.   I don't --

```
 1      Q.   Were you the -- sure.  Were you the incident

 2   commander for that whole day?

 3      A.   For the -- yeah, for the whole incident, if

 4   you will, all of the protests that occurred that

 5   afternoon, or --

 6      Q.   Did you ever serve a -- as incident commander

 7   for any other days during the protest?

 8      A.   No, that was it.                      1:53:34

 9      Q.   Okay.  And Commander Phelan resumed his duty

10   as incident commander after that?

11      A.   He did.  There were other officers, I think,

12   that came in for him from time to time, but I -- you

13   know, you have to check with them.  Like, Wyckoff, I

14   think, did a day, and they tried to give him breaks

15   here and there, so they called upon other lieutenants

16   to go up there and act for him.

17      Q.   Okay.  Now let's go back to the supervisor

18   briefing, what was discussed at the supervisor

19   briefings?

20      A.   I don't recall a lot of it.  You know, it's

21   just after that first day, a lot of it is just kind of

22   a blur, so I know things were discussed as far as, you

23   know, they are trying to make sure that we -- we -- you

24   know, our goal is always to try to de-escalate and

25   manage a group, not do crowd control, but crowd
```

```
 1   management, and so we discussed things like, you know,

 2   if officers are on the line and they're getting just,

 3   you know, verbally beat down for a while and you see

 4   maybe an officer that's starting to maybe lose their

 5   composure a little bit or had enough, you know, they'll

 6   tap them out, take their place, things like that.

 7   Those are some of the things that stood out, but -- and

 8   I believe, not 100 percent, but I believe that second

 9   day, we had other jurisdictions come in as well, so we

10   discussed, you know, some of the things that have

11   occurred prior to, on the day before, things like that,

12   with those groups.  But you know, it's -- like I said,

13   it's -- it's -- it's hard to recall exactly what was

14   discussed.  I know there was a big emphasis -- emphasis

15   on, you know, de-escalation, we were going to try to

16   not provoke any kind of, you know, violence from the

17   crowd and that we needed to, you know, look after each

18   other and make sure that nobody was getting out of line

19   and make sure that we were monitoring ourselves, you

20   know, and then there was an emphasis on that, but I

21   don't remember a lot of the substance of that.

22        Q.   Was there a discussion about the

23   circumstances under which less lethal weapons should be

24   used?

25        A.   Again, I don't remember.  I don't know.  It
```

```
 1   would be -- it would sound reasonable to me that we

 2   would have discussed that, but since I don't actually

 3   remember that -- us discussing it, I can't say that I

 4   remember.

 5       Q.   Okay.  And that -- you said that there was

 6   discussion of crowd management and de-escalation and

 7   how we should try to de-escalate situations, correct?

 8       A.   Yeah, in general terms, yeah, that's correct.    1:56:37

 9       Q.   What -- what -- what was discussed about

10   that?

11       A.   Well I can't -- again, like I said, it's not

12   something I can remember in specifics, it's just I know

13   -- I just remember in general terms that's -- those

14   were kind of the overall, you know, message trying to

15   be conveyed by the upper command that -- you know, I

16   can't remember specifics, just it would be impossible

17   to remember that.

18       Q.   So with respect to the -- on the second day,

19   other jurisdictions were brought in to assist, correct?

20       A.   I believe it was that next day.

21       Q.   Right.  And so were there -- to your memory,

22   were there -- there were command-level officers or

23   supervising officers from those jurisdictions who were

24   present at these briefings?

25       A.   Yes, yes, there were -- there were, yep.
```

```
 1        Q.   And were the officers from -- was the message

 2   that was conveyed to the officers and the supervisors

 3   from the other jurisdictions that, you know, "These

 4   guidelines that we're setting forth, the things that

 5   we're talking about as to how to do de-escalation, how

 6   to manage a crowd, these things were" -- the other

 7   jurisdictions were expected to follow these guidelines

 8   as well, correct?

 9           MR. RINGEL:  Object to the form and the

10   foundation.                                 1:57:51

11       A.   Yeah, they would be expected to follow the --

12   yeah.

13       Q.   Okay.  So during these supervisor briefings,

14   the -- well, was Chief Pazen there?

15       A.   I don't remember.  I just don't remember.

16       Q.   Okay.  All right.  During the supervisor

17   briefings -- strike that.  Is it fair to say that

18   during the supervisor briefings, Commander Phelan gave

19   direction to DPD officers, as well as the officers from

20   other jurisdictions, as to how they should conduct

21   themselves during the protests?

22       A.   Yes.

23       Q.   And the officers from other jurisdictions

24   were expected to follow the guidelines that the DPD was

25   setting forth, right?
```

```
 1          MR. RINGEL:  Object to the foundation.

 2     A.   Yes.

 3     Q.   Did you receive a copy of an operations plan

 4  during these supervisor briefings?

 5     A.   Yes, I did.

 6     Q.   Okay.  And there was an operations plan for

 7  each -- given out at each briefing on each day?

 8     A.   Yes, there was.                         1:59:13

 9     Q.   Okay.  And so did you guys -- did you all go

10  over the operations plan during the meeting?

11     A.   Yes, every day that's one of the things that

12  we do at each and every supervisor briefing, is go over

13  the entire ops plan, yes.

14     Q.   Okay.  So let me -- give me a moment, I am

15  going to pull up a document.  Excuse me.  Sorry, trying

16  to get -- okay.  Can you see that document?

17     A.   Yep.                                     2:00:39

18     Q.   All right.  So I am showing you the document

19  that's been Bates stamped Denver 1958 to 1969.  It's an

20  operations plan for May 29th of 2020.  Is this the --

21  since you -- did you attend -- you -- since you didn't

22  attend the supervisor briefing on the first day, so did

23  you ever get the operations plan for the May 28th?

24     A.   No, I -- no, I never got it.

25     Q.   Okay.  So this plan that I am showing you
```

```
 1   would have been the first operations plan that you

 2   received, correct?

 3        A.   Yes, it would have been.

 4        Q.   Okay.  Now I am showing you the page that's

 5   been Bates stamped DEN 001962, is this font large -- is

 6   this zoomed in large enough for you to read?

 7        A.   Yeah, it's fine.                          2:01:38

 8        Q.   Okay.  Now this section here on -- "after

 9   Action Reports" on this page says, "Any officer

10   deploying chemical agents or using force during the

11   events will adhere to normal use of force reporting

12   requirements," do you see that?

13        A.   Yes.

14        Q.   Okay.  "Arrest, use of force, and other

15   pertinent invent -- event information will be reported

16   to the incident commander as soon as practical," do you

17   see that?

18        A.   Yes.

19        Q.   So did you discuss this during the briefing?

20        A.   Yeah, that would have been discussed.

21        Q.   Okay.  And so why is it that you did not

22   complete your use of force reporting until over a week

23   after the incident?

24        A.   Because my understanding of normal use of

25   force reporting requirements would have been what we --
```

```
 1   I just said earlier, which is that in a crowd control

 2   situation where no arrests were made, that the one

 3   overarching -- overarching use of force would have been

 4   completed.

 5       Q.   And so when -- when you say, "One overarching

 6   use of force report" -- is that what you said, "report

 7   would have been completed"?

 8       A.   Mm-hmm.                                    2:02:51

 9       Q.   What -- what do you mean by that?

10       A.   I would have expected the command post --

11   someone in the command post to complete that for

12   general use of chemical munitions if no arrests were

13   made, which we didn't make any arrests, and so

14   otherwise, you would have -- if my team deployed gas,

15   and someone else's -- another supervisor, one person on

16   his team deployed a gas canister, and someone else on

17   another team, one or two people deployed, you would

18   have 15 or 20 individual use of force reports, and my

19   understanding is they do one -- one use of force for

20   the -- all of those instances when the events are the

21   same in that particular use of chemical agent.

22       Q.   Okay.  So the last sentence in this paragraph

23   says, "One after action report for the event will be

24   completed by Lieutenant Robert Wyckoff," do you see

25   that?
```

```
 1      A.   I do.                                    2:03:53

 2      Q.   Is that what you are referring to?

 3      A.   No, that's a separate report.

 4      Q.   Okay.

 5      A.   An after action and a use of force are two

 6 different things.

 7      Q.   Okay.  So explain that to -- to us.

 8      A.   So use of force is just that, it's another

 9 form and it -- it has -- has, you know, its own

10 pre-fill, you know -- whatever, and then an after

11 action report is just a general overall what did --

12 what happened after your action -- your police action,

13 you know, it is what it is, so it -- they kept -- I

14 believe they kept a timeline at the command post,

15 reporting, you know, who was deployed where at what

16 times, what happened, what occurrences, and kind of

17 kept a timeline running events of what the crowd was

18 doing, what our response to that was, if any, and then

19 a use of force would have documented in those

20 particular -- using that after action during this

21 particular event, like the one at Colfax and

22 Washington, chemical agent was deployed for whatever

23 reason, that -- my understanding is that would have

24 been documented by someone in the command post.

25      Q.   Okay.  So what -- what was communicate --
```

1   what did you communicate -- after you attended these

2   supervisor briefings, what did you communicate to your

3   officers on your team about what they should do about

4   any uses of force that they used and how they should

5   report that?

6       A.   I don't remember any specific communications,

7   but when we use force and we were able to make an

8   arrest, as I stated in one of my statements, that we

9   made an arrest after having apprehended someone that

10  threw a piece of concrete at us, we used PepperBall and

11  they were able to take him into custody, and we did a

12  separate use of force for that because we -- that was

13  our specific use of force, not a general use of force

14  by various officers deploying gas where no arrests were

15  made.  We made an arrest on that, and so we completed a

16  use of force per our policy.

17      Q.   Okay.  So in a circumstance where there is

18  authorization given by a command-level officer to use

19  gas to disperse a crowd or something like that, then

20  you would expect -- you -- you -- your -- your

21  understanding was that somebody in the command post

22  would document that in a use of force report?

23      A.   That's right.

24          MR. RINGEL:  Object to the form.              2:06:30

25      A.   Correct, that's correct.

1    Q.   Okay.  What about use of PepperBalls?  If

2  officers were -- had to use a PepperBall gun on, you

3  know, specific people during the protests if they were

4  throwing something or something of that nature, is that

5  something that they were expected to document in a use

6  of force report?

7    A.   If that person was arrested, then yes, that

8  would be a specific investigation because you have now

9  a person in custody that force was used against.

10  Without having that person in custody, it's a general

11  use of force where their use of force report would have

12  been somewhat impractical, you don't have a person that

13  you can interview or investigate.

14    Q.   I see.  So what you -- and -- and so is that

15  what you communicated to your officers?

16    A.   Again, I don't remember exactly what I

17  communicated to them.

18    Q.   Okay.  But your general understanding per the

19  directions that you received during the supervisor

20  briefings was that if an officer used a weapon like a

21  PepperBall gun on somebody who was not arrested, that

22  was not something they needed to document in a use of

23  force report?

24    A.   Well it might be.  It's not -- it's not so

25  black and white, you know, it's not necessarily that

```
 1  black and white.
 2      Q.   Okay.                                2:08:01
 3      A.   You know, it may be an occasion where you
 4  have an officer deploy PepperBall and the person isn't
 5  taken into custody, but you feel the need to
 6  specifically investigate that one incident, but you may
 7  not, so it's -- it's not cut and dry, I guess, in my
 8  mind.
 9      Q.   Okay.  So I -- I am just trying to find out
10  what -- what -- what -- what did you -- what -- I -- I
11  guess there is two things I am trying to find out and
12  I'll ask it in two parts, one is what was communicated
13  to you by Commander Phelan about what the expectations
14  were for use of force reporting during the protests,
15  and then secondly, what did you communicate to your
16  officers about that?  That's what I am trying to find
17  out, so maybe if we could just talk about the first
18  part, I am -- I'm not sure I understand what it is that
19  was communicated to you about what officers should do
20  to report their uses of force during the protest?
21      A.   Just what's in the after action, I don't know
22  that we went into any greater detail than that.  I
23  don't remember what we --
24      Q.   Okay.  All right.  So what was in here that's
25  highlighted here on page DEN 1962 was communicated to
```

```
 1   you as shown here, and you communicated that to your

 2   officers?

 3       A.   Yeah, I would say that's probably true.        2:09:29

 4       Q.   Okay.  Now also on this page Bates stamped

 5   DEN 1961 under the section that says, "Video and Halo,"

 6   it says here, "Each team will ensure videotape

 7   capability via BWC," you see that?

 8       A.   I do.

 9       Q.   Okay.  And that was communicated to you

10   during these briefings as well, right?

11       A.   Yep.

12       Q.   And you told your officers this, right?

13       A.   I'm pretty sure I would have told them that,

14   yep.

15       Q.   There is a chart here that goes from pages

16   Denver -- DEN 1963 to 1964, and it -- is it fair to say

17   that this is a sort of organizational chart showing who

18   was in command during the protests?

19       A.   Yep, yes.                                       2:10:31

20       Q.   Okay.  Okay.  So for this particular day and

21   for all of the days, incident commander was Phelan,

22   right?

23            MR. RINGEL:  Object to the form and the

24   foundation.

25       A.   Yes.
```

```
 1        Q.   Okay.  Under him was Operations Chief Aaron

 2   Sanchez, at least for May -- this day, May 29th, right?

 3        A.   Yes.

 4        Q.   Do you recall having any communications with

 5   Aaron Sanchez on May 29th about things that you were

 6   doing in the field?

 7        A.   No, I don't remember any specific

 8   conversations.  I'm sure we did, but I don't know.  I

 9   don't know if I -- I mean, I don't -- I can't recall

10   any specific conversation, no.

11        Q.   Sure.  Do you know what his radio call sign

12   was, Aaron Sanchez?

13        A.   Command 6, I think.

14        Q.   Okay.  And Phelan was A9 -- or Adam 9, right?

15        A.   Adam 9, yes.                          2:11:22

16        Q.   Okay.  And so under you on May 29th, there

17   was Sergeant Martinez?

18        A.   Yes, and I thought that Sergeant Dodge was

19   still there too.  I'll have to -- I'd have to check my

20   attendance thing to make sure he was there that day,

21   but I thought he was.

22        Q.   So my question about this is that so does

23   this indicate -- this box I have highlighted in yellow

24   here, does this indicate that you were leading a team

25   and Sergeant Martinez was leading a team of metro, or
```

```
 1   he was under you?

 2       A.   No, he was under me.  Does it have -- is

 3   there another page below that?  Because Tom's team

 4   should have been on there too, yeah, and that's not --

 5       Q.   No, not that shows any sort of chart like

 6   this, no.

 7       A.   Okay.  Yeah, I don't -- as far as I can

 8   remember, unless I -- I might have just spaced it out,

 9   I could have sworn Tom was -- Tom Pine was also

10   assigned to that -- that very next day as well.  I

11   don't think he missed any.  I didn't.  Why he's not --

12   not on there, I don't know, doesn't make sense --

13       Q.   Okay.                              2:12:39

14       A.   -- to me actually.

15       Q.   Okay.  And what does this "M5" under Sergeant

16   Martinez's name indicate?

17       A.   That's just his call sign, metro 5.

18       Q.   Okay.

19       A.   I'm --

20       Q.   And then does he -- on his sleeve, does it

21   say, "M5" -- does he have a patch that says, "M5"?

22       A.   Yes.                               2:12:54

23       Q.   Okay.  So each of your officers had a patch

24   that had "M" and whatever their number was, right?

25       A.   Well I -- not -- they don't all remember to
```

```
 1   put them on every day, but most of the time, they do,

 2   yeah.

 3       Q.   Okay.  Okay.  So I am just pulling up another

 4   document.  Can you see this?

 5       A.   Yep, I can.                              2:13:56

 6       Q.   All right.  I am showing you the Denver

 7   Police Department operations plan for May 30th, 2020.

 8   It's Bates stamped DEN 1970 through 1982.  You received

 9   a copy of this at the supervisor -- supervisor briefing

10   you attended on May 30th?

11       A.   Yes.

12       Q.   Okay.  Now similar to the other day that you

13   testified about, you went over this operations plan

14   during your supervisor briefing?

15       A.   Yes.

16       Q.   Okay.  And the law enforcement agencies who

17   were providing assistance on this day also attended, at

18   least some of their commanders?

19       A.   Yes.

20       Q.   Okay.  Now on page DEN 1973, there is a

21   section here that says, "Areas of responsibility," so

22   you are M2, and it says here that you were assigned to

23   be a rapid response team, right?

24       A.   Correct.                                 2:15:08

25       Q.   So what did that mean?
```

1      A.   So essentially, what that means is that we're

2  on one vehicle, we call them RDVs, ours are BearCats,

3  they're armored vehicles, but they have rails on the

4  side, the officers can ride on the outside or on the

5  inside depending, and then your -- your responsibility

6  is to respond -- be able to respond rapidly to whatever

7  the command post needs you to respond to.  So there

8  were times when they would have us respond to access

9  points on the highway to prevent them from blocking the

10 highway again, and they would have us respond back to

11 district two or South Broadway or wherever they needed

12 some officer presence, they would send us to those

13 locations and we were expected to get there rapidly.

14     Q.   Okay.  Going to page DEN 1974, there is this

15 similar language to the other report under "video and

16 Halo" that says, "Each team will ensure videotape

17 capability via BWC," you see that?

18     A.   I do.                                    2:16:08

19     Q.   Okay.  And you communicated -- that was

20 communicated to you during the supervisor briefing and

21 you communicated that to your officers, correct?

22     A.   I would have done that, yes.

23     Q.   Okay.  On page DEN 1976, there is another

24 chart showing the structure of the chain of command,

25 correct, for that day?

```
 1      A.   Correct.

 2      Q.   Okay.  And so do you recall having any

 3  conversations with Aaron Sanchez, the operations chief,

 4  on May 30th?

 5      A.   No, same as the day before, I would have sure

 6  -- I'm sure I would have had conversations with him,

 7  but I wouldn't have any idea what we discussed.

 8      Q.   Okay.  And then I am highlighting here you --

 9  there is -- under "rapid deployment," it's listed as

10  you, Lieutenant -- Lieutenant Pine, and then the Gang

11  Lieutenants O'Donnell and Lieutenant Carroll, correct?

12      A.   Correct.                              2:17:12

13      Q.   What do you recall about what areas of the

14  protests you were -- you were at on May 30th?

15      A.   We were primarily just responding to the

16  highway, district six, based off of where the crowds --

17  the crowds would sometimes -- the group would split,

18  you know, in different -- different groups and move

19  around differently, but we were the rapid deployment

20  team, along with the gang unit, so wherever they called

21  us to assist, there were times when certain things were

22  happening, you know, wherever, and so they would have

23  us go in there and assist with whoever else they would

24  send to that location.

25      Q.   Okay.  So and when you say, "Whenever they
```

```
 1    would -- they would call us," the command post would

 2    call you on the radio and direct you to whatever

 3    locations they needed you?

 4        A.   Yes, correct.                              2:18:12

 5        Q.   Okay.  Do you recall being at the

 6    intersection of Lincoln and Colfax on May 30th?

 7        A.   I was there so many different days, I'm

 8    certain I probably was there, I don't know for sure.

 9        Q.   Okay.  Do you recall at about 6:00 p.m. on

10    May 30th, a Saturday, there was a large crowd on

11    Lincoln at the intersection of Lincoln and Colfax and

12    there were numerous officers, including gang officers,

13    SWAT officers, and Aurora police officers, who had

14    formed a skirmish line on Colfax facing south on

15    Lincoln?

16        A.   Yeah, that sounds familiar, yes.           2:19:05

17        Q.   Okay.  And were you there with Lieutenant

18    Pine and his team or it was just you and your team, in

19    terms of SWAT people?

20        A.   I don't remember if Tom Pine was there or he

21    could have been on Broadway.

22        Q.   Okay.

23        A.   I wouldn't know for sure.

24        Q.   Okay.  And do you recall how many corporals

25    were assigned to your team on May 30th?
```

```
 1      A.    I just have one, Rick Eberharter is my only
 2  corporal.
 3      Q.    Is his name Eberhart or Eberharter?
 4      A.    Eberharter.   Eberharter.
 5      Q.    Okay.  And do you recall what sergeants you
 6  had that day, was it your two sergeants that you
 7  mentioned earlier, Martinez and Dodge?
 8      A.    Yes.                             2:19:59
 9      Q.    Okay.  And Martinez and Dodge would have had
10  three chevrons on their sleeve, correct?
11      A.    Yes, correct.
12      Q.    And was there any sort of insignia on your
13  uniform?
14      A.    The only insignia I have is just the fact
15  that my badge is gold and I have a gold lieutenant
16  marking on the back of my helmet.
17      Q.    A -- a gold lieutenant marking on the back of
18  your helmet?
19      A.    Yeah, it's just a gold bar because that's
20  just our insignia for lieutenant in Denver, and so it's
21  just, like, a gold sticker bar form on the back of my
22  helmet.
23      Q.    Okay.  So were you wearing your battle dress
24  uniform on May 30th?
25      A.    Yes.
```

```
 1        Q.   Okay.  And Rick Eberharter was the only one

 2   on your team who had a PepperBall gun on May 30th,

 3   correct?

 4        A.   As far as I can recall, yes.              2:21:09

 5        Q.   Okay.  Did you declare an unlawful assembly

 6   at any time on May 30th?

 7        A.   No, I did not.

 8        Q.   Okay.  Were you present when any other

 9   command staff or anybody else declared an unlawful

10   assembly?

11        A.   I don't recall if anybody else did that or

12   not, no.

13        Q.   Okay.  Were you present when there were --

14   there was a large -- between 5:30 and 6:00 p.m. on May

15   30th, there was a large crowd of protesters at Civic

16   Center Station, the bus turnaround on Colfax between

17   Broadway and Lincoln, were you present at that time?

18        A.   I believe I was, yeah.                    2:22:06

19        Q.   Okay.  What do you recall occurring at that

20   -- between 5:00 and -- 5:30 and 6:00 p.m. at that time?

21        A.   I don't know if it's the same incident or the

22   same time frame, but I remember that a group of

23   officers and some paramedics were surrounded by a large

24   group there and were calling for assistance because

25   they were surrounded and trapped, and they asked us to
```

```
 1   go in there and try to get them out of there.

 2           MS. WANG:  Okay.  Let me -- here, let's --

 3   let's go off the record for a minute while I pull up

 4   some -- some other -- some other material to show you,

 5   okay?  Just -- just give me, like, two minutes.

 6           RECORDER:  Off record, 12:36 p.m. Central

 7   Time.

 8                   (Off the record)

 9           RECORDER:  On record, 12:38 p.m. Central

10   Time.                                        2:23:05

11       Q.  Right.  Can you see this video?

12       A.  Yep, yes, I can.

13       Q.  Okay.  I am --

14       A.   Hard to see that right now, I don't know is

15   -- if it's video or it's -- I can see the picture.

16       Q.   Right.  I have it paused.

17       A.   Okay.

18       Q.   It's -- I am showing you Colorado State

19   Patrol footage that is file named -- I don't know, it's

20   V93 from May 30th, 2020.  I have got it at 7:13 p.m.

21   right now, and just to orient you, this is the

22   intersection of Lincoln and Colfax.  Where my mouse is

23   right here, this is Lincoln -- like, these vehicles

24   here are facing south on Lincoln, and this cross street

25   here is Colfax.  Does that look familiar to you?
```

```
 1        A.   Oh, yeah.  Yes, it does.

 2        Q.   Okay.  Now just let -- let me play it for a

 3   few seconds and ask you to confirm if you recall being

 4   at this intersection at this time on this day.

 5        A.   Okay.                               2:24:11

 6                    (Video V93 played)

 7        Q.   Okay.  I'm going to pause it at 7:14.  Does

 8   this look familiar to you?

 9        A.   It does look familiar.  I think my team was

10   west on Colfax from that particular spot, though, so we

11   would have been, just as you're looking at the screen,

12   to the right, which would be west -- west of that

13   Aurora -- there.

14        Q.   West.  Okay.  So let me play it for a little

15   bit starting at 7:15:15 p.m.  It's going a little bit

16   faster than normal speed.

17                    (Video V93 played)

18        Q.   Okay.  Let me pause it right here, I have

19   paused it at 7:16 p.m.  Do you see these officers down

20   here in the green?

21        A.   Yes.                                2:25:30

22        Q.   Okay.  And those are -- are those SWAT

23   officers?

24        A.   Yes.

25        Q.   Okay.  And do you know if Lieutenant Pine and
```

 1   his team was at this intersection at this time?

 2       A.   I don't remember.

 3       Q.   Okay.  What other lieutenants do you recall

 4   being present at that intersection at that time?

 5   That's about 7:00 p.m.

 6       A.   I don't know if I saw any other lieutenants

 7   there.  I -- I don't remember.

 8       Q.   Okay.  Do you recall having any discussions

 9   with Lieutenant Williams?

10       A.   I had multiple discussions with him over the

11   course of the series of protests.  Whether it was on

12   this particular day, I don't remember that, but I know

13   I talked to him a lot.

14       Q.   Okay.  Do you recall if Lieutenant Williams

15   was assigned general responsibility for the area

16   between Broadway and Lincoln on Colfax from about 6:00

17   to 8:00 p.m. on May 30th?

18       A.   I don't recall.  I know he was assigned to

19   headquarters a lot -- his team was, but on that

20   particular day, he could have been assigned there.  I

21   really don't remember which days he was assigned where.

22       Q.   Okay.  Let me pull up another video.  Okay.

23   Sorry, give me a moment here, I'm trying to figure this

24   out.  Okay.  Can you see this?  It's paused, but can

25   you see this video?

```
 1        A.    Yes, I can see it.                          2:28:41

 2        Q.    All right.  This is a body-worn camera from

 3   -- produced by the Aurora Police Department.  It's COA

 4   BLM 232.  I'm going to play it starting at 19 -- well,

 5   yeah, I am going to play it starting at 19:08:11, and

 6   then I'll ask you some questions.

 7        A.    Okay.

 8              (Video COA BLM 232 played)

 9        Q.    Okay.  I have paused that at 19:08:39.  Were

10   those -- the guys in green that he was talking to, were

11   those metro SWAT officers?

12        A.    Yep, yes, they were.                        2:29:49

13        Q.    Okay.  You couldn't tell who they were in

14   that clip, could you?

15        A.    I saw Sergeant Martinez there.  I'd have to

16   watch it again to see if I could pick out who else was

17   there.

18        Q.    Okay.  Let's -- I'm going to play it again.

19              (Video COA BLM 232 played)

20        A.    I -- Martinez in the middle, the other -- the

21   other ones, I can't -- I can't make out who they are.

22        Q.    Okay.  All right.  Give me a moment, I'm

23   going to pull up similar items.  Can you see this

24   video?

25        A.    Yes.                                        2:31:42
```

```
 1        Q.    Okay.  It's Bates stamped COA BLM 276, it is
 2   a body-worn camera produced to us by Aurora.  I'm going
 3   to play it for a few seconds and then ask you some
 4   questions.  I am playing it starting from 19:33:40.
 5                  (Video COA BLM 276 played)
 6        Q.    Okay.  Did -- those officers in this green
 7   battle dress uniform?
 8        A.    What was the question?
 9        Q.    These office -- you see these officers in the
10   green battle dress uniform --
11        A.    Yes.
12        Q.    -- green fatigues?  Okay.  Are -- are those
13   your officers on your team?
14        A.    Without seeing a little bit more of them, it
15   looks like that's them.  I believe that's them -- my
16   team.  I'd have to see more of it, you know, the faces
17   would help, too.
18        Q.    Okay.  Let me pull up another item.          2:32:54
19        A.    Problem is a lot of -- once the other
20   jurisdictions came in, a lot of them wear green, it was
21   very -- you know, very easy to confuse who is who at
22   times.
23        Q.    Well that other clip that we watched earlier
24   had -- you -- you saw Sergeant Martinez, right, and he
25   was wearing a Denver Police uniform patch, correct?
```

```
 1        A.    Yes.

 2        Q.    Okay.  Do you recall seeing other

 3   jurisdictions in green fatigues at that particular

 4   intersection at that time?

 5        A.    I don't recall if there were or not.        2:33:32

 6        Q.    Okay.  Okay.  Can you see this video?

 7        A.    Yes.                                         2:35:05

 8        Q.    It's Bates stamped DEN 4976, it's a body-worn

 9   camera from Officer Altman.  Okay.  I have got it at --

10   the timestamp in the top right corner, I've got it at

11   00:56:16, I am going to play it for a few seconds and

12   then I will ask you some questions, okay?

13        A.    Okay.                                        2:35:55

14              (Video DEN 4976 played)

15        Q.    All right.  Let me pause it, let me make sure

16   I have the right --

17              (Video DEN 4976 played)

18        Q.    Okay.  I have the wrong video, sorry.  Let me

19   -- let me find the right one.

20              MR. RINGEL:  There -- there are not that many

21   videos in the case, so it's easy to make the mistake.

22   I understand.  All of us lawyers have gone bleary eyed

23   with all of the videos we have watched.

24              WITNESS:  I can imagine that would be

25   overwhelming.                                           2:37:42
```

```
 1              MS. WANG:  All right.  Let's go off the

 2    record for a second while I find this video.

 3              RECORDER:  Off record --

 4              MS. WANG:  Just give me --

 5              RECORDER:  -- 12:53 p.m. Central Time.

 6                     (Off the record)

 7              RECORDER:  On record, 12:55 p.m. Central

 8    Time.

 9         Q.   All right.  Can you see this video?

10         A.   Yes.

11         Q.   It's Bates stamped COA BLM 297.  I'm going to

12    play it for a few seconds and then ask you a question.

13    This is starting at -- the timestamp in the corner is

14    18:28:34 GMT -- well I don't know why it says, "GMT,"

15    GMT minus six Mountain Time.

16                 (Video COA BLM 297 played)

17         Q.   Okay.  I have paused it at eight --

18         A.   Excuse me, can you pause it real quick?

19         Q.   Yeah.                              2:39:00

20         A.   Okay, thanks.  Tom Pine just needs to come in

21    and grab something out of the office, so I just wanted

22    to pause it, so you know he --

23         Q.   Oh.

24         A.   -- was here -- here real quick.  He is

25    leaving.
```

```
 1            MR. PINE:  Thanks, man.

 2            WITNESS:  Yeah.  Thanks, buddy.

 3       A.   Okay, and he's gone again.

 4       Q.   Okay.  I have paused it at 18:29:05.  Did you

 5  see this clip where this -- this officer from Aurora

 6  went up to a Denver officer and asked if it's okay to

 7  throw a Triple-Chaser?

 8       A.   I did.

 9       Q.   Okay.  Who is he -- did -- did you see who he

10  was talking to?

11       A.   Can you back it out a little bit more?

12       Q.   Sure.  Let me play it again.

13       A.   Okay.                              2:39:42

14            (Video COA BLM 297 played)

15       A.   I can't tell who that is, but I thought he

16  said --

17       Q.   Sorry, I can't see your face -- I can't see

18  your screen when -- when I -- I can't see you when I

19  have this video going, so did you have a question?

20       A.   Did the Aurora officer say, "Lieutenant"?  I

21  can't tell who the officer is, but does -- does he say,

22  "Lieutenant" when he addresses him?

23       Q.   I thought he said, "Matt."

24       A.   Oh.  "Matt"?

25       Q.   Was that you is my question?
```

1    A.   Oh, no, I -- I was in green the -- the entire

2  time.

3    Q.   Okay.  All right.  Do you know who this guy

4  is, this guy on the screen right here at 18:28:56, it

5  says, "Gang unit," and he's got some chevrons?

6    A.   Can you play a little more?

7    Q.   Let me -- let me back up a little bit and

8  play it again.

9           (Video COA BLM 297 played)

10    Q.   He has three chevrons.                    2:40:57

11    A.   Yeah, he is a sergeant.  I don't know who it

12  is.

13    Q.   Okay.  Do you recall having discussions with

14  a sergeant -- with a gang unit sergeant at this

15  intersection at this time?

16    A.   No.

17    Q.   Okay.  What -- what -- how long were you at

18  the intersection of Lincoln and Colfax on -- on May

19  30th during this time period?  And -- and by "this time

20  period," I mean just prior to curfew.  Curfew, just to

21  orient, you -- May 30th was the first day of curfew,

22  and the curfew was at 8:00 p.m. on that day, so during

23  the two-hour period before curfew, do you recall

24  remaining in that general location at Lincoln and

25  Colfax?

Page 113

```
 1      A.   I don't recall.  It seemed like we were there

 2  for three days, but I don't remember exactly how long

 3  we were there.

 4      Q.   Okay.  And what -- what do you recall --

 5  there -- there was no unlawful -- there was no unlawful

 6  assembly declared at that time, date, or location,

 7  right?

 8      A.   I don't know.                           2:42:02

 9      Q.   Okay.  Was the crowd at that intersection at

10  Lincoln and Colfax between 6:00 and 8:00 p.m., what do

11  you recall -- what do you recall going on with the

12  crowd at that time?

13      A.   I don't -- I don't remember the specific

14  direction or instruction as far as what we were

15  deployed there for, other than to support those other

16  officers that were there.  Yeah, I don't recall with

17  enough clarity to say what exactly the objective was.

18      Q.   I mean, the -- is it fair to say that the --

19  the -- the protesters remained in the street and on the

20  grounds of the Capitol at that -- at that location for

21  a number -- a couple of hours at least before curfew?

22      A.   That's probably fair to say, yeah.       2:43:11

23      Q.   Okay.  And then the officers had formed that

24  skirmish line facing south, but did not make any effort

25  to push the crowd away or disperse them until after
```

```
 1  curfew?

 2      A.   I -- honestly, I don't know that, you know.

 3      Q.   Okay.  Do --

 4      A.   I just don't know.

 5      Q.   Do you recall there being instructions given

 6  from the command post on May 29th that chemical

 7  munitions in the form of gas should only be deployed at

 8  the order of command staff or above?

 9      A.   I don't remember that specifically being

10  said, no.

11      Q.   Okay.  Was that your general understanding?

12      A.   My general understanding is what the policy

13  always says and that is that the incident commander

14  will generally be the person who gives me direction to

15  deploy chemical munitions once an unlawful assembly is

16  declared, otherwise, if officers feel the need to do

17  that in an emergency circumstance, they are authorized

18  to do that, but I -- I don't remember ever getting

19  direction that contradicted that.

20      Q.   Okay.  I am going to pull up another video.

21  Can you see this?

22      A.   Yes.                              2:44:31

23      Q.   This is Bates stamped COA BLM 294, it's an

24  Aurora body-worn camera.  I am starting it at 19:08:07.

25  I am going to play it for a little bit and then will
```

```
 1    ask you some questions.

 2         A.   Okay.

 3              (Video COA BLM 294 played)

 4         Q.   Okay.  I'm going to pause it here.  I stopped

 5    it at 19:08:09.  Do you know who this officer here is

 6    in the green?

 7         A.   It looks like Sergeant Martinez in metro --

 8    it looks like it has metro 5 on his shoulder patch.

 9         Q.   Okay.  Great.  I am going to continue playing

10    it and then ask you some more questions.

11              (Video COA BLM 294 played)

12         Q.   Is this Officer Eberhart -- Technician

13    Eberhart?

14         A.   Corporal Eberharter, yes.                2:45:33

15         Q.   I'm sorry, Corporal Eberhart -- Eberharter?

16         A.   Yeah -- yeah.

17         Q.   Okay.  And this is stopped at 19:08:27 and

18    he's got the two chevrons, correct?

19         A.   Yes.

20         Q.   Okay.  He had a PepperBall on this day?

21         A.   Yeah.

22         Q.   Okay.  I am going to continue playing it,

23    then ask you some more questions.

24              (Video COA BLM 294 played)

25         Q.   I'll pause it here.  Do you know if this is
```

```
 1  Martinez again?  Hello?

 2          RECORDER:  He looks frozen.                    2:46:42

 3          MS. WANG:  Right, I -- oh, the -- his screen?

 4          RECORDER:  Yes.

 5          MR. RINGEL:  Lieutenant Canino, can you hear

 6  us?

 7          WITNESS:  I can, yeah.

 8          MR. RINGEL:  Your screen -- your video is

 9  frozen.

10          MS. WANG:  Or went out.

11          RECORDER:  Maybe hit "stop" and "start" on

12  your video.

13          WITNESS:  Okay.  It's just spinning.  It

14  says, "Zoom meeting is not responding."  Are you guys

15  still hearing me?

16          MR. RINGEL:  Yes, we can --

17          MS. WANG:  We can --

18          MR. RINGEL:  -- hear you.

19          MS. WANG:  We can hear you, but your video

20  is, like, black.  Like --

21          WITNESS:  Yeah, it's kind of gone half-white

22  on my screen.

23          RECORDER:  Let's go off record, 1:05 p.m.

24  Central Time.

25                   (Off the record)
```

Exhibit 5, LLC

```
 1            RECORDER:  On record, 1:11 p.m.

 2       Q.   Great.  Let me pull up another video -- or

 3  whatever video I had.  Can you see my screen?

 4       A.   Yes.                                    2:47:39

 5       Q.   I am showing you again COA BLM 294, this is

 6  starting at 19:08:59, and I'll play it, but

 7  specifically, I want to know if you know if this is

 8  Sergeant Martinez here in the green with the three

 9  chevrons.  Oh, wait.

10            (Video COA BLM 294 played)

11       Q.   Okay.  I'm going to pause it at 19:09:05,

12  would -- do you know if that was Sergeant Martinez?

13       A.   That image is hard to tell, but it's probably

14  likely that he -- it was.

15       Q.   Okay.  Well it would have either been your

16  Sergeant Martinez or the other sergeant who is assigned

17  to you -- his name escapes me at the moment, Sergeant

18  Dodge --

19       A.   Dodge.

20       Q.   -- right?  Okay.  Now this officer right here

21  in the green with the PepperBall gun hanging off of

22  him, this is at 19:09:03, I'm going to ask you if you

23  can identify him.  I'm going to play it for a few --

24  few seconds.

25            (Video COA BLM 294 played)
```

1      Q.   Do you know if that was Officer Eberharter?      2:49:01

2      A.   It looks -- it looks like it, but it's based

3  off of his -- you know, his movements or --

4      Q.   Okay.  Now Eberharter threw a canister of gas

5  just then, correct?

6      A.   I'm not exactly sure.  It could have been

7  smoke, but I don't know what he threw.

8      Q.   What are the possibilities for what it could

9  have been?  Well let me play it for a few more seconds

10  and we'll see the -- the -- the gas or whatever it is

11  and maybe that will help.

12              (Video COA BLM 294 played)

13      Q.   I've paused it.  So let me ask you this,

14  smoke and -- well, what are the possibilities for what

15  this white smoke could be?

16      A.   It's either smoke or a chemical agent, it

17  could very easily be either one.

18      Q.   Okay.  And they both look similar in -- it's

19  just a plume of white smoke?

20      A.   Yes, you can't tell the difference.      2:50:04

21      Q.   When there is a canister --

22      A.   I can't tell the difference.

23      Q.   -- that's released that's yellow smoke or

24  yellow gas, what is that?

25      A.   I don't know if I've seen yellow gas before

```
 1   or --

 2        Q.   Okay.  This --

 3        A.   -- if I ever recognized it --

 4        Q.   Sure.  I'm sorry, go ahead.

 5        A.   -- or recognize yellow gas in the field

 6   before, I don't know.

 7        Q.   Okay.  This officer right here, I'll rewind

 8   it, and he's going to throw something as well.  Can you

 9   tell me who this is?  This is -- I am going to show it

10   from -- we'll go from 19:09:14.

11             (Video COA BLM 294 played)

12        Q.   I have paused it at 19:09:23.  Do you know if

13   that was a member of your team?

14        A.   Could have been, but I -- I don't know who it

15   is.

16        Q.   Okay.  This officer right here with the red

17   sticker on the vest and on the helmet, do you know if

18   that was a sergeant or a lieutenant in the gang unit?

19        A.   I can't tell their rank by that insignia in

20   the back, just that the "G" is a gang unit insignia,

21   but if it has a blue triangle on the back, then that

22   would be a sergeant.

23        Q.   Okay.                              2:51:25

24        A.   The blue triangular sticker -- sticker, and I

25   -- I see something green there, not really sure what
```

Exhibit 5, LLC

```
 1    that -- what that is.

 2        Q.   Okay.  Do you recall the gang unit officers

 3    all having red stickers on their vests and helmets?

 4        A.   Yes, they did.  I don't know if they all did,

 5    but I -- I believe that most of them did, yeah.

 6        Q.   Okay.  I'm going to play it for a few more

 7    seconds and then ask you some other questions.  This is

 8    starting at 19:09:23.

 9                (Video COA BLM 294 played)

10        Q.   Actually, let's go back.  All right.  I've

11    stopped it at 19:09:27.  This officer right here in the

12    green with the PepperBall gun, is this Eberharter?

13        A.   It looks like it, yeah.                  2:52:13

14        Q.   Okay.  And these officers with the red

15    stickers next to him on the right side and on the left

16    side are gang unit, correct?

17        A.   They don't have a "G" on their helmet, but I

18    -- I know that most of the gang unit officers did have

19    red tape on them, so I would make that to -- fair

20    assumption, yeah.

21        Q.   Okay.  Now we've watched a bit of this with

22    the tear gas being thrown by two -- at least two

23    officers and now there are officers shooting people

24    with PepperBall guns, do you recall there being any

25    reason for the use of force at this time?
```

Exhibit 5, LLC

```
 1        A.   I don't -- I don't know that I can speak to

 2   that.  I don't know -- I don't even believe I was there

 3   or saw this part of it, I don't know where I was.  I

 4   know I was there somewhere probably further back, but I

 5   don't know where.  No, I couldn't speak to why they

 6   were using force or PepperBall or whether they've

 7   deployed smoke or gas.

 8        Q.   Well what would be the purpose of deploying

 9   smoke?

10        A.   So that you don't contaminate a crowd of

11   people that maybe aren't necessarily all -- you know,

12   the majority of that crowd isn't involved in PepperBall

13   -- or in throwing projectiles or -- or whatever, and

14   you might want to try to disperse that group, to either

15   get to or -- disperse a group that's -- that is

16   violating the law and throwing things, you have to try

17   to disperse that group, so you can either, you know,

18   try to make an arrest in that situation, or I don't

19   know, to move that crowd back without actually

20   deploying gas.

21        Q.   Okay.  But was there any effort to move the

22   crowd back until the curfew?

23             MR. RINGEL:  Object to the form and the

24   foundation.                              2:54:02

25        A.   Yeah, I don't remember.  No, I just don't
```

Exhibit 5, LLC

```
 1   remember the exact -- like I said, the objective, I

 2   just don't recall.  So I'm trying to make myself

 3   smaller, the last thing I want to do is stare at my

 4   huge nose in this picture.

 5       Q.   The -- is it fair to say that one of the

 6   objectives of use of tear gas is to -- or the objective

 7   when using tear gas is to disperse people, you throw

 8   tear gas to -- because it's a chemical irritant, to get

 9   people to leave?

10       A.   In general.

11       Q.   Okay.  And so you use tear gas -- you throw

12   tear gas at a crowd of protesters when you want them to

13   leave or go somewhere else?

14       A.   Or to stop whatever, you know, illegal

15   actions that they're involved in.

16       Q.   By getting them to leave?              2:55:03

17       A.   By getting them to leave, generally.

18       Q.   Tear gas is an indiscriminate weapon,

19   correct?

20           MR. RINGEL:  Object to the form.

21       A.   I don't consider tear gas a weapon at all,

22   it's a tool that we use to not have to use physical

23   force, so I wouldn't consider it a weapon, no.

24       Q.   It is a form of force though, correct?

25       A.   It is, yeah.
```

```
 1              MR. RINGEL:  Object to the form.

 2       Q.   Okay.  It's indiscriminate in the sense that

 3   you can't target a specific person with tear gas

 4   because it just goes off and everybody who is in the

 5   vicinity would be exposed to it, right?

 6       A.   It is indiscriminate in that way, yes.

 7       Q.   Okay.  And so if you had a crowd of mostly

 8   peaceful protesters and a few agitators within the

 9   crowd who were doing aggressive things and you threw

10   tear gas into the crowd, that would affect everybody,

11   peaceful and non-peaceful alike, right?

12              MR. RINGEL:  Object to the form and the

13   foundation.

14       A.   It would.                          2:56:04

15       Q.   Were there any warnings given or dispersal

16   orders given prior to the use of less lethal weapons at

17   the intersection of Lincoln and Colfax on May 30th

18   between 6:00 and 8:00 p.m.?

19              MR. RINGEL:  Object to the foundation.

20       A.   I don't remember if any orders were given,

21   but in one of those first videos that you showed me, it

22   sounded like somebody was giving orders over some type

23   of PA system, but I couldn't tell what they were saying

24   necessarily, we have to go back and look.

25       Q.   Okay.  Were any of your officers wearing
```

```
 1   their body cams at the intersection of Lincoln and

 2   Colfax on May 30th?

 3        A.   I don't know.

 4        Q.   If they had been wearing body cams, then they

 5   -- they should have had them on, right?

 6        A.   Yes.                                    2:56:52

 7        Q.   Okay.  And the -- the SWAT -- SWAT was

 8   required to start wearing body cams for tactical prior

 9   to May 2020, right?

10        A.   Yes.

11        Q.   Okay.  And they were required to wear their

12   body cams during these protests, correct?

13             MR. RINGEL:  Object to the form and the

14   foundation.

15        A.   Yes.

16        Q.   You're not aware of any of your officers

17   deleting any of their body cam videos from the

18   protests, are you?

19        A.   No.

20        Q.   If we don't have any body cam videos from any

21   of the SWAT officers during the protest, then that

22   would indicate that there was no such video recorded,

23   correct?

24        A.   That's a fair assumption.               2:57:44

25        Q.   Did you ever have any discussions with any of
```

```
 1   your officers about their body cam videos from the

 2   protests?

 3       A.   No, I don't -- I don't recall having a whole

 4   lot of body-worn camera discussions until we were --

 5   until the temporary restrain -- restraining order came

 6   out, and I know it became a very talked about subject.

 7   Prior to that, I don't know that it was something that

 8   was discussed other than, like you said earlier, that

 9   -- you know, something I would repeat after the

10   briefing, but once the temporary restraining order came

11   into effect, it was -- of course became a front and

12   center kind of topic.

13       Q.   Okay.  Are you aware of any of your officers

14   -- or strike that.  Have any of your officers been

15   disciplined for failure to record any body cam video

16   during the protest?

17           MR. RINGEL:  Object to the form and the

18   foundation.

19       A.   Not to my knowledge.                    2:59:01

20       Q.   Would you expect any of them to have been

21   disciplined for that?

22           MR. RINGEL:  Object to the form and the

23   foundation.

24       A.   No, I don't know enough information to say

25   one way or the other.
```

```
 1        Q.    What's Eberhart's number, do you know?

 2        A.    His badge number?

 3        Q.    Yeah.

 4        A.    92063.

 5        Q.    Okay.  What about the M -- like, the M

 6   whatever number on his sleeve?

 7        A.    I think it's metro 15 maybe, 1-5, I'd have to

 8   check my detail again.  If you want, I can tell you

 9   right now.

10        Q.    Sure.

11        A.    16, 1-6.                              2:59:54

12        Q.    Okay.  If you have a list in front of you,

13   can you tell me the numbers for your other officers?

14        A.    Garcia is 11, Pietrafeso, 13, Matthews, 14,

15   Gruenther, 15, Eberharter, 16, Bollwahn, 22, Jones, 24,

16   Evans, 25, and Sinnema, 31, Moen is 12.

17        Q.    All right.  Do you have a list there that

18   covers the numbers for Lieutenant Pine's people?

19        A.    Yes, I do.

20        Q.    Can you tell me those?                3:00:39

21        A.    Bradley is 17, Stevenson is 18, Sanger, who

22   is a corporal, is 19, Ruddy is 21, Apala is 23, Kerber

23   is 26, Giggey is 27, Longoria is 28, Sessions is 29,

24   and Gray is 6, and Kyle Smith would have been 7 at the

25   time.
```

```
 1        Q.   Do you know who M4 was?

 2        A.   That's Sergeant Dodge.

 3        Q.   Okay.  And Marco Martinez is M5, right?

 4        A.   5, yes.                                    3:01:45

 5             MS. WANG:  All right.  Let's go off the

 6   record for a minute, and then I may turn it over to

 7   other counsel.  Just let's go off the record for a

 8   minute.

 9             RECORDER:  Off record, 1:26 p.m.

10                    (Off the record)

11             RECORDER:  On record, 1:35 p.m.

12             MR. MIJARES-SHAFAI:  So Gerardo Mijares for

13   the BLM 5280 Plaintiffs, I just want to confirm, Ms.

14   Wang, are -- are you okay with your questioning for

15   now?

16             MS. WANG:  Yeah, I have no further questions

17   at this time.                                       3:02:23

18             MR. MIJARES-SHAFAI:  Okay.  Mr. McNulty, do

19   you have a sense of how much time you would need?

20             MR. MCNULTY:  Yes, I just -- I just direct

21   messaged you about ten or 15 minutes, I think.

22             MR. MIJARES-SHAFAI:  Okay.  Yep, I see it.

23   All right.  All right.  I'll go ahead and get started,

24   and then we'll go from there.

25                         EXAMINATION
```

BY MR. MIJARES-SHAFAI:

Q.   Lieutenant Canino, thank you again for the time today, really appreciate it.  I wanted to just clarify something.  A little bit earlier in your conversation with Ms. Wang, you indicated that a few years ago, the policy with respect to the SWAT team and BWC as it related to tactical operations, it -- it became mandatory for tactical operations for BWC to be on, do you have a vague sense or an estimate of when that was?

A.   No, I really don't.

Q.   Do you recall if it was before the George Floyd protests?

A.   I -- I just don't know when it was.

Q.   Okay.                                  3:03:33

A.   It's just not something we documented, it was a word-of-mouth kind of direction, and it -- it happened, and you know, early on when it happened, we even would forget -- because, you know, most of the guys that are on the SWAT team have been here for years, right, and we -- on the job, not in SWAT necessarily, but on the department, and so we didn't -- you know, you don't take to turning on a body cam just overnight, you don't just, "Oh, I have a body camera now, I'm required to turn it on," and remember to do

```
 1  that.  It takes -- there is a learning process to make

 2  that an automatic thing, and so it took a -- took the

 3  guys a while to remember that on a regular basis.  We

 4  have gotten very good at it now because now we've done

 5  it for so long, but when we first started, it wasn't

 6  something that was remembered, you know, when it was

 7  required all the time.

 8      Q.  And that was one of the benefits of doing the

 9  supervisory briefings and then coming back and talking

10  to your sergeants and your team, right?  You could look

11  at the operational plan, it gives you a reminder, and

12  then you could relay that to your team in real time and

13  affirmatively, correct?

14      A.  In general, yeah, that would be -- that would

15  be correct, yeah.

16      Q.  So if it's okay, I'd like to go back to the

17  conversation you had with Ms. Wang about -- about the

18  supervisory briefings during the -- during the five

19  days that we have those operational plans for, I just

20  want to make sure I understand.  You were not present

21  for the May 28th briefing, you -- you actually had been

22  off duty, Commander Phelan had called you and brought

23  you back?

24      A.  Correct.                              3:05:10

25      Q.  Okay.  And during your telephone call with
```

```
 1   Commander Phelan, did he give you what was essentially

 2   the equivalent of a briefing of what you would be

 3   doing, or was it, at that time, more other information?

 4       A.   No, that he -- he didn't give a briefing, at

 5   that time, to me at all.  It was a very, very quick

 6   conversation.  I had time -- he was very busy, I had

 7   time to ask him if we had time to stop and get our --

 8   our BearCat so we would all be on one rapid deployment

 9   vehicle and he said, "No, I need you down here

10   immediately," so we went in separate cars, that's how

11   fast that conversation was.

12       Q.   All right.  And then you -- you and your

13   team, after they were notified, you know, via the

14   telephone calls on May 28th, you all reported near the

15   highway, right -- near I-28 (sic), that was the first

16   place you all showed up, or did I -- did I

17   misunderstand that?

18       A.   No, you understood correctly, it's -- we

19   responded initially to Chestnut and 20th, which is just

20   a stone's throw from I-25.

21       Q.   From that moment, once you had your team

22   together, did you and -- or did you and your team, with

23   your two sergeants and your 11 officers or the officers

24   who were able to -- to come, did you debrief before you

25   got started, was there time to do something like that?
```

Exhibit 5, LLC

```
 1       A.   To do a briefing?                          3:06:31

 2       Q.   Yeah.  I'm not sure if that's a formal term,

 3  and if it is, I -- yeah.

 4       A.   Yeah, no, we use the term "briefing," and

 5  then afterwards --

 6       Q.   Okay, go ahead.

 7       A.   -- we debrief, and so -- but no, there was no

 8  time to brief.

 9       Q.   Okay.  So immediately into action to manage

10  the situation?

11       A.   Yeah.  I mean, we didn't actually go into

12  action, but we immediately responded and deployed, I

13  guess.  We didn't come together as a group and say,

14  "Hey, this is what's going on," so we didn't know what

15  was going on, we hadn't been a part of the protests

16  leading up to that point.

17       Q.   Okay.  So the next day when you came into the

18  supervisory briefing on May 29th, I believe that you

19  said that was the first -- correct?

20       A.   Yes.

21       Q.   Did you have questions that you asked

22  Commander Phelan about what was going on with the --

23  the protests, how you guys were going to manage it, or

24  did you -- did you recap stuff from the 28th about how

25  things went when you were out on I-85 and in district
```

```
 1    six, what was the conversation with Commander Phelan

 2    for you since it was your first time in the briefing

 3    room with him?

 4              MR. RINGEL:  Object to the form.           3:07:42

 5         A.   You know, I don't recall any specific

 6    conversations I had with him.  Many of those things

 7    could have occurred, but I don't know -- I don't know

 8    that I remember any specific conversations with him.

 9    It was a very chaotic time and a lot of conversations

10    going on with a lot of people, it's just -- it's

11    impossible -- impossible for me to remember a specific

12    conversation during that time period.

13         Q.   In terms of instruction on the meetings that

14    you were able to attend, May 29th, May 30th, May 31st,

15    June 1st, do you confirm -- do you recall if there was

16    any discussion regarding whether more restraint was

17    needed on less lethal munitions?

18         A.   I don't recall, no.  I'm sorry.            3:08:35

19         Q.   Do you recall if there was any discussion

20    with respect to resource depletion, were you all

21    running out of less lethal munitions and tear gas, and

22    was that discussed during those operational meetings

23    you were able to attend?

24         A.   Yes, I do remember people were out of

25    munitions and they were trying to figure out how to get
```

```
 1   more, yes.
 2        Q.   Do you recall which day was the first day
 3   that conversation happened?
 4        A.   No, I don't.
 5        Q.   Can you recollect for me some of the -- who
 6   was the person who brought up the issue?
 7        A.   I don't know.  I don't know who brought it
 8   up.                                        3:09:17
 9        Q.   Was there a discussion during that
10   conversation or during that operational plan briefing
11   where folks discussed why the team was running out of
12   munitions?
13        A.   No, I -- other than they used what they had,
14   I don't know of any specific conversations, no.
15        Q.   Okay.  That works.  All right.  I'm going to
16   pivot a little bit.  During your conversation with Ms.
17   Wang, you actually talked about, briefly, the Office of
18   the Independent Monitor, is that correct?
19        A.   She mentioned it in a question that she had,
20   whether that was why we started wearing body cameras
21   for tactical operations, and I wasn't aware that that
22   was the -- yeah, I'm -- you know, I don't know why it
23   was originated, so.
24        Q.   Did you ever have a conversation with a
25   member of the OIM team after the George Floyd protests?
```

```
 1      A.   I did.                                    3:10:38

 2      Q.   When was that?

 3      A.   I don't remember when that was exactly.

 4      Q.   Do you recall what the conversation was

 5  about?

 6      A.   I know we discussed PepperBall to some

 7  degree, I think we discussed flash-bangs at some point.

 8  Yeah, not a lot of specifics, sorry.

 9      Q.   Do you recall the person from the OIM team

10  you were speaking with about the flash-bangs and the

11  PepperBalls?

12      A.   I don't remember their name.

13      Q.   What was your takeaway from the conversation

14  that you had regarding PepperBalls and flash-bangs?

15      A.   The reason I talked to the OIM is because it

16  -- the message that was sent to me was that they would

17  like to talk to some officers who were involved in some

18  of the protests to get our perspective on, you know,

19  where -- what our perspective was, and you know, some

20  of the reasons -- the reasoning that we had, and so I

21  just kind of explained, you know, to the best of my

22  ability to him.  There was a couple of them in there, I

23  don't remember any -- either of their names or any of

24  their names, but just, you know, our perspective on

25  things.
```

```
 1        Q.   Did anyone else from your team join you for

 2   that conversation?

 3        A.   No, it was just me.                        3:12:14

 4        Q.   Okay.  Okay.  I'm going to pivot again.  I

 5   want to learn a little bit more about how DPD and maybe

 6   specifically how metro SWAT keeps track of less lethal

 7   munitions and -- and gas that's deployed from, like, an

 8   inventory-keeping standpoint.  Can you give me a sense

 9   of what that process is like?

10        A.   So we have two bins that we keep in our rapid

11   deployment -- deployment vehicles that we have a list

12   of what's in that box in there, and that list is also

13   kept on our computer under the -- the gas munitions

14   inventory.

15        Q.   I'm sorry, I -- I didn't hear that last part,

16   I apologize.

17        A.   And -- and then that -- those gas munitions

18   and then the gas munitions that we have, like, in our

19   command post vehicle where -- that we deploy to

20   barricades or whatever, all of that gas is compiled in

21   a gas inventory on our computer.

22        Q.   Okay.  So when a member -- like, a

23   technician, goes in, pulls out either less lethal

24   munition, an OC can, maybe a tear gas canister, do they

25   input into, like, a system or a record book that they
```

1    have taken out some material?

2        A.   No, not generally, we don't do that.  So that

3    isn't something that works practically in the field, so

4    we would keep track of the inventory at -- at certain

5    points.  You know, that wouldn't necessarily be monthly

6    or quarterly or anything like that, but we would just

7    keep track, like if we got new gas, we would track it

8    again.  If we know that we used gas on a barricade or

9    two, we would do another inventory because just taking

10   it out here and there and whether it got put back or

11   not, it's just not practical to track it that way.

12       Q.   Who within the chain of command within any

13   given team is responsible at the end of the day for

14   reporting the inventory?

15       A.   So your mic cut out just for a second there.      3:14:16

16       Q.   I apologize.  My question was, who within the

17   chain of command for any particular team, like, within

18   your team for example, metro 3, who would be

19   responsible for keeping track of that inventory and

20   submitting an official report of what the current

21   levels are?

22       A.   I've never generated an official report.

23   That would fall on me to keep track of that inventory,

24   but we don't do it in official port -- report sort of

25   fashion, but the commander would, at times, request us

1  to go through our gas inventory and we would send that

2  to him, not in official form, but it would be sent to

3  him.

4       Q.   Okay.  I'm going to pull up a document real

5  quick, I just want to understand -- I think it may

6  relate to this, and I'd just like to get your insight

7  on it, so if you could just give me one moment.

8       A.   Okay.                                3:15:06

9       Q.   For the record, this is Bates number DEN

10 002763, file name is "Chemical Agent Timeline."  Okay.

11 Is that sharing for you?

12      A.   I'm not seeing anything.

13      Q.   Okay.  One moment.  Let me try one more time.

14 Sorry about that.  All right.  How about now?

15      A.   Yep, I can see it now.                3:16:36

16      Q.   Would it be helpful for me to zoom in?

17      A.   No, it's fine.

18      Q.   All right.  See -- have you seen this

19 document before?

20      A.   No, I have not.

21      Q.   Okay.  So why don't we take a, you know,

22 couple seconds, go ahead and tell me whenever you want

23 me to scroll through, and if you could review it for

24 me, that would be helpful, and let me know whenever you

25 need me to go, and then once you've got a good grasp on

```
 1   it, we can start resuming our conversation again.
 2        A.   Okay.  So who -- who is -- who generated
 3   this?
 4        Q.   This was produced to us by the city.  We --
 5        A.   Okay.
 6        Q.   We don't know who generated it and we're
 7   hoping maybe we can have a conversation with you about
 8   that.
 9        A.   Yeah, I'll do what I can.  I don't know
10   exactly what some of the things would mean.  You know,
11   there is officer injured information and that's not --
12   who knows what that is, I don't know.
13        Q.   Okay.  Would it be okay if we resume the
14   questioning?
15        A.   Yeah, go ahead.                    3:17:53
16        Q.   Is there any central authority within the DPD
17   that all parties would report to in terms of the
18   munitions that they have used or the gas that they have
19   used?
20        A.   I don't believe there was at the time.  I
21   know that they've tried to centralize that now, but I
22   don't believe that there was anybody in that -- in
23   place for that at that time, no.
24        Q.   Okay.  I'm going to highlight for you the
25   entries that are associated with you and see if those
```

 1    records jog your memory at all.  This is the first one,

 2    May 28th at the intersection --

 3         A.   Yeah, that one definitely does, we discussed

 4    that one earlier.

 5         Q.   Then for May 29th, your name again, it says,

 6    "Various," in terms of the location that we assume tear

 7    gas or less lethal munitions were utilized, although we

 8    can't say for certain, there is no trigger here that

 9    actually indicates what it was.  Then there is another

10    one, May 30th, 16th Court, another one at around 10:20

11    p.m. Mountain Standard Time, May 30th at 1266 Emerson,

12    another one at 1400 block Pearl, another one on May

13    31st at around 10:20 on 12th and Bannock, and then

14    another one on the 1200 block of Lincoln, same day at

15    10:30.  Is there -- is there anything from those

16    specific instances that, when you look at them close --

17    helped you recall why somebody would have information

18    for those seven things and not anything else?

19         A.   I don't know, based off the fact that I don't

20    know where this document came from and what the

21    information they used to compile it, I have no idea.

22         Q.   Okay.  I'm going to stop sharing the screen

23    right now.

24         A.   Okay.                              3:20:08

25         Q.   All right.  What I'd like to do is I'd like

```
 1   to pivot to a technique that I think is used and it's

 2   -- under the Denver use of force guide.  Can you -- can

 3   you explain to me a technique that is related to

 4   encircling or substantially encircling an assembly, did

 5   -- do you -- do those words have any meaning to you?

 6        A.   Your mic cut out.  Again, I'm sorry.  It's

 7   not your voice, it's -- it's the mic that just cut out.

 8             RECORDER:  I think it's your --

 9             MR. MIJARES-SHAFAI:  Okay.

10             RECORDER:  I think it's your internet,

11   Gerardo, you may want to call in.

12             MR. MIJARES-SHAFAI:  I'm sorry about that.

13   How are we doing --

14             WITNESS:  I'm catching most of it.

15             MR. MIJARES-SHAFAI:  Debra, can you hear me?    3:21:01

16             RECORDER:  So you -- you keep cutting out, it

17   might be your internet.  If you would like, I can give

18   you the call-in number and the meeting ID and passcode.

19             MR. MIJARES-SHAFAI:  Yes, sir (sic).  If --

20   if you wouldn't mind putting that into the chat for me,

21   that would be helpful.

22             RECORDER:  You got it.

23             MR. MIJARES-SHAFAI:  Thanks so much.

24   Lieutenant Canino --

25             RECORDER:  We -- why don't we go off record
```

```
 1   real quick.

 2           MR. MIJARES-SHAFAI:  Sounds good.  Thank you,

 3   Debra.

 4           RECORDER:  Off record, 1:55 p.m.

 5           MR. MIJARES-SHAFAI:  Okay.

 6                   (Off the record)

 7           RECORDER:  On record, 1:57 p.m.

 8       Q.   Lieutenant Canino, is the term "encircling"

 9   or "substantially encircling an assembly," does that

10   have any significance to you?

11       A.   Not in that context.

12       Q.   Okay.  What about a maneuver called a

13   pincher?

14       A.   A pincer?                          3:21:55

15       Q.   That might be the right way to say it.

16       A.   I was just making sure I understood, is it

17   p-i-n-c-e-r, that maneuver?

18       A.   The way that it's been conveyed to us has

19   been with an "h" in there, like "pincher," but I'm

20   curious to know what pincer is.  I have a feeling it

21   might be the same thing and we've just been using the

22   wrong word.

23       A.   Yeah, I -- I agree, I think a pincer is a --

24   from my recollection, is a field force maneuver, but

25   I'm not super familiar with it because we don't do
```

Exhibit 5, LLC

1  field force -- in metro, we don't do the -- you know,

2  the skirmish line or we try to avoid doing the skirmish

3  line stuff, so we're more of a support function, but if

4  I remember, the pincer move was more of a move to try

5  to, like, form your field force, like, if people were

6  along a fence or a wall or building, to try to move

7  them along and off that wall, but I don't know if

8  that's -- I probably shouldn't say because I really

9  honestly don't remember what it was.

10     Q.   Do you know if there's a difference between

11  the term "pincer" and the term "kettling"?

12     A.   Well kettling, I never even knew what it --

13  never even heard that term until these series of

14  protests and I had to look it up when I heard that a

15  jurisdiction somewhere else was accused of doing that.

16  I had never -- never even heard that term and so I

17  looked it up, and that's not a tactic we have ever

18  trained or employed.

19     Q.   Okay.  Going to the night of May 31st, 2020,

20  were you -- Colfax Avenue, between -- I believe between

21  Pine and Logan?

22     A.   So some of that broke up, you're -- you're

23  asking me about the evening of May 31st between Logan

24  and?

25     Q.   On -- yes, on Colfax between Logan and Pine?

```
 1      A.   Logan?                                    3:23:59

 2      Q.   I apologize, I -- I'm sorry, between -- let

 3  me -- on Colfax Avenue between Logan and Pennsylvania

 4  Avenue?  I'm sorry about that.

 5      A.   No worries.  I don't know.  I might have

 6  been, I might not have been, I don't remember.

 7      Q.   Do you now understand what a kettling

 8  maneuver is?

 9      A.   Somewhat.  I have a superficial understanding

10  of what it is, trying to surround a group of people

11  without an escape route, to the best of my knowledge.

12      Q.   So as it relates to May 31st at the location

13  -- provided you, you were not there when a maneuver

14  such as kettling or a pincer occurred?

15      A.   I don't understand the question.            3:24:59

16      Q.   On the evening of May 31st, 2020, were you --

17  were you and your team located at that address and did

18  you observe a maneuver such as kettling or pincer -- I

19  don't know what's the way to do that with an "i-n-g,"

20  maybe it's pincering?  Did you observe a tactic like

21  that occurring the evening of May 31st?

22      A.   I don't believe I did.  I don't remember.  I

23  don't recall.

24      Q.   Okay.  I'm going to go ahead, I'm going to

25  actually show you some video now --
```

1      A.   Okay.                                    3:25:38

2      Q.   -- if that's okay.   Okay.   This is Bates

3  number DEN 000 -- sorry, Bates number DEN 003874.   I am

4  going to stipulate for the record that the timestamp on

5  this video is marked on Eastern Time because of when

6  the reviewer downloaded the video.   It's two hours

7  ahead of when the video actually occurred.   Lieutenant

8  Canino, before I show you this video, I want to explain

9  what it is that we are going to be looking at, and I

10  think you were inferring it with your description of

11  kettling.   We are going to see officers coming down

12  Colfax on the side of Pennsylvania, and we are going to

13  see them start moving inwards.   You're then going to

14  see officers who are on the other side on the

15  intersection of Logan, and they are also going to start

16  moving inwards, and with -- of that action, you're

17  going to see protesters start being pushed towards the

18  middle of Logan in between these two intersections.

19  And what I'd like to do is after we have reviewed the

20  video, go through a series of questions with you about

21  this maneuver, okay?

22      A.   Okay.                                    3:27:11

23          MR. RINGEL:   Object to the form and the

24  foundation.

25      Q.   Is this showing up for you?

Page 145

```
 1       A.    Yeah, I -- I can see it.

 2       Q.    All right.  I'll note that the video is

 3  timestamped at 11:36:07 Eastern.

 4              (Video DEN 003874 played)

 5       Q.    I'm going to speed it up for you a little

 6  bit.

 7       A.    Okay.                              3:28:12

 8       Q.    I'm going to stop the video at 11:37 and 20

 9  seconds Eastern.  Lieutenant Canino, do you see the

10  officers moving down the street on the top of your

11  screen?

12       A.    Yes, I do.                         3:28:58

13       Q.    How would you describe the crowd in this

14  moment?

15       A.    Based on the fact that this video is like the

16  other videos I saw that I described earlier at Colfax

17  and Washington, you cannot, without being down there on

18  the street, have any idea what they are -- what that

19  crowd is like.  I cannot say.

20       Q.    Okay.  How many people --

21       A.    Any video -- very deceptive.

22       Q.    -- this -- I'm sorry about that, sir?

23       A.    Very deceptive.

24       Q.    Fair enough.  How many people can you see on

25  the image right now, give or take, that are protesters,
```

```
 1   not officers?

 2          MR. RINGEL:  Object to the form.

 3      A.   Like 15 or so.

 4      Q.   Okay.  Let me continue playing the video.

 5   Before I do that, you were watching the video -- just

 6   in the context of this video, did -- the 15 individuals

 7   that you have identified, did you see any of them doing

 8   anything that was life threatening or aggressive

 9   against the officers?

10          MR. RINGEL:  Object to the form and the

11   foundation.                                        3:30:10

12      A.   I didn't see anything in just that brief

13   little time I was able to watch it, no.

14      Q.   I'll resume the video.

15              (Video DEN 003874 played)

16      Q.   Stopped the video at 11:38:37 p.m. Eastern.

17   Lieutenant Canino, have the officer lines started

18   moving down the street?

19      A.   Has -- has which officers moved down the

20   street?                                            3:31:29

21      Q.   Sorry.  Has the officer line that was at the

22   intersection before started moving down the street in

23   this video?

24      A.   Yes, they have.

25      Q.   At this point, can you see any more of the
```

```
 1   protesters in the video?

 2        A.   No, I don't see anyone else.

 3        Q.   How much smoke would you say is presently --

 4   has been deployed?

 5        A.   How much?

 6        Q.   Yes, sir.

 7        A.   I don't know, several canisters, it looked

 8   like.

 9        Q.   Okay.  I'm going to switch over to another

10   video.  Okay.  Can you see that, Lieutenant Canino?

11        A.   Yes.                              3:32:42

12        Q.   All right.  I will note for you that this is

13   still Bates number DEN 003874, the timestamp is now

14   11:41:43 p.m., Halo camera is at the intersection of

15   Colfax and Penn, the officers, Lieutenant Canino,

16   appear now to be at the intersection, so they have

17   moved all the way down the street, is that correct?

18        A.   It appears that way, yes.

19        Q.   Okay.  I'm going to restart -- or replay this

20   video.

21                  (Video DEN 003874 played)

22        Q.   Lieutenant Canino, I'm going to stop the

23   video at 11:41:54 p.m.  In the video, you see the Halo

24   camera turn from the officers into the middle of Colfax

25   Avenue, was there gas or smoke dispersed in this video
```

```
 1    -- or already dispersed rather?

 2            MR. RINGEL:  Object to the form and the

 3    foundation.                                  3:33:45

 4       A.   It appears there is gas or smoke somewhere in

 5    the back, yes.

 6       Q.   And what do you observe with these protesters

 7    who are presently in front of you on the screenshot

 8    right now?

 9            MR. RINGEL:  Object to the form and the

10    foundation.

11       A.   Yeah, there is no possible way to know what

12    any of -- any of those people are doing.

13       Q.   Okay.  Okay.  We're going to switch to a

14    different video to show you what's going on on the

15    other side of the street.  Can you see that video right

16    now, Lieutenant Canino?

17       A.   Yes, I can.                          3:34:44

18       Q.   I'll note that this is Bates DEN 003873, the

19    timestamp is 11:36:48 p.m. Eastern.  I'm going to

20    resume the video now.

21            (Video DEN 003873 played)

22       Q.   Stopping the video at 11:38:36 p.m. Eastern.

23    Lieutenant Canino, best guess in your experience, how

24    many people are out on this intersection right now?

25            MR. RINGEL:  Object to the form and the
```

 1  foundation.                                          3:36:27

 2      A.   I can't give you a number, I have no

 3  expertise in doing that, but it's a bunch.

 4      Q.   It's a pretty heavily crowded street, right?

 5      A.   Yeah, it's a lot of people there.

 6      Q.   Okay.  I'm going to resume the video.

 7               (Video DEN 003873 played)

 8      Q.   Now you see -- both are trying to disperse in

 9  different directions, right?

10          MR. RINGEL:  Object to the form and the

11  foundation.

12      A.   Yeah, I can't really tell what they're doing.

13      Q.   I'm going to pause the video.  Can you see in

14  the top right hand corner that there is gas being

15  deployed at the other end of the street?

16          MR. RINGEL:  Object to the form and the

17  foundation.                                          3:37:20

18      A.   Looks like something was deployed down there,

19  yes.

20      Q.   Okay.  And actually, while we were on the

21  other side of the street, do you recall that there was

22  a vehicle that was actually moving with the officers

23  down the line?

24      A.   Yes.

25      Q.   What vehicle was that?

```
 1        A.   That was the Aurora Bear.

 2        Q.   Okay.  So that was not a vehicle that you

 3   were -- that your team was affiliated -- affiliated

 4   with?

 5        A.   We were not in that vehicle.

 6        Q.   Okay.  And to confirm, your team was not at

 7   this event that I am showing you right now with all of

 8   these protesters in the middle of the street?

 9        A.   I don't know if this is all part of the same

10   one, but I don't recall this particular thing, so maybe

11   as I see more, I will be able to tell you if I can --

12        Q.   Okay.

13        A.   -- see ourselves there or whatever.

14        Q.   I'm going to bump up a little ahead, okay?

15        A.   Okay.                                3:38:18

16        Q.   We're now at 11:41:10 p.m. Eastern on the

17   video.  The protesters have now actually coalesced into

18   the center of Logan between these two intersections, do

19   you agree?

20        A.   So I'm trying to orient myself here.  You --

21   you're saying this is Logan?

22        Q.   That's correct, this -- this road right here

23   is Logan.  Excuse me.  This road right here is Colfax.

24        A.   Yeah, okay.

25        Q.   Right here is Logan --
```

```
 1      A.   That --

 2      Q.   -- on the left side is where we watched the

 3  -- yeah.

 4      A.   Okay.  That's what it looks like, yeah.

 5      Q.   Okay.  So the protesters have -- have now

 6  come together.  Okay.  I'm going to switch to another

 7  video now because you can't really see what's going on

 8  in the corner that's closest to us.  Can you see this

 9  video?

10      A.   Yes.                              3:39:35

11      Q.   Okay.  For the record, this is Bates number

12  DEN 5109.  The time on the video when I started is at

13  3:41:18 Greenwich Mean Standard Time.

14                  (Video DEN 5109 played)

15      Q.   So with -- video I have a few last questions,

16  then I am going to hand this over to Mr. McNulty.  I'll

17  represent to you that the body-worn cam footage is at

18  the intersection of Logan and Colfax, it basically is

19  meant to provide you with the perspective of what was

20  going on right beneath the Halo camera off to the side

21  that we couldn't see.  Have you ever -- oh, strike

22  that.  This is the tactic that I was talking about

23  earlier, which I had named as kettling, would you agree

24  that this is kettling from your understanding of the

25  term?
```

```
 1          MR. RINGEL:  Object to the form and the

 2   foundation.                                    3:41:29

 3      A.   I don't think that that's kettling, I think

 4   that that is multiple teams moving into an area and it

 5   makes it appear that we were trying to kettle or group

 6   up -- get those people up.  You can -- hopefully, you

 7   believe me when I say we just wanted to go home, the

 8   last thing we wanted was a group of protesters we had

 9   to deal with in the middle of the street.

10      Q.   I don't doubt that, sir.  I -- I guess my

11   question is, when you have a bunch of protesters who

12   are trapped in the middle of the street -- you know,

13   you've got officers on both sides, and I think you saw

14   that gas was being thrown into the -- into the street

15   the protesters were and they have nowhere to go, how do

16   you categorize that, what is that in terms of official

17   DPD terminology?

18          MR. RINGEL:  Object to the form and the

19   foundation.                                    3:42:26

20      A.   Well, I saw numerous protesters walking with

21   their hands up right past the officers, there is

22   officers on this side -- on the Logan Street side

23   appear to be a small contingent of officers.  It's not

24   a field force, it's not a line of officers that, you

25   know, would be able to contain anybody.  There was
```

Exhibit 5, LLC

```
 1   multiple protesters that I saw leave the area and Logan

 2   was wide open, there was vehicles moving down it, so

 3   they didn't appear to be trapped to me.

 4       Q.   And in that same video, did you hear multiple

 5   officers shooting PepperBall bullets or less lethal

 6   munitions without warning?

 7           MR. RINGEL:  Object to the form and the

 8   foundation.

 9       A.   I saw what appeared to be people -- officers

10   deploying less lethal, yes.

11       Q.   And did you hear any warning prior to them

12   shooting those PepperBalls?

13       A.   I didn't.

14           MR. RINGEL:  Object -- object to the form and

15   the foundation.

16       A.   Sorry, answer is no, I did not.

17       Q.   Did you hear any warning before certain of

18   the officers deployed tear gas?

19       A.   No, I did not.                        3:43:22

20           MR. MIJARES-SHAFAI:  Okay.  Thank you very

21   much, Lieutenant Canino, that ends my -- sorry for the

22   hold over, Mr. McNulty.

23           MR. MCNULTY:  No worries.

24                     EXAMINATION

25   BY MR. MCNULTY:
```

```
 1      Q.   Hi, Lieutenant.

 2      A.   Hello.

 3      Q.   My name is Andy McNulty, and I represent one

 4  of the Plaintiffs in this matter, and I just have a few

 5  questions for you.  I want to direct you back to a -- a

 6  time that Ms. Wang asked you about, it's the first day

 7  of the protest on May 28th near I-25 and you were --

 8  you were present at that location, is that right?

 9      A.   Yes.

10      Q.   What other officers were there with you at

11  that location at that time?

12      A.   Well, other than my team, the only other

13  person that I know for sure was there was an officer by

14  the name of Chris Parton, and he was rendering aid to

15  one of my guys, and that's the only reason why he stuck

16  out.

17      Q.   Okay.  And so you wrote a -- you wrote a

18  statement from that day, do you remember that?

19      A.   Yes.                             3:44:32

20      Q.   And I think Ms. Wang showed you that

21  statement, is that right?

22      A.   She didn't show it to me, but she referenced

23  it a couple times.

24      Q.   Okay.  Let -- let me -- let me show you your

25  statement from that day and let me share this with you
```

```
 1    real quick.  Do you see that, Lieutenant?

 2         A.   Yes, I do.

 3         Q.   Okay.  And do you recognize that as your

 4    statement from that day?

 5         A.   Yes.

 6         Q.   Do you stand -- stand by it as an accurate

 7    description of what you saw?

 8         A.   I do.  To the best of my recollection, yes.

 9         Q.   Okay.  Now, Officer, you -- you know, you

10    said in that statement that -- and you're -- you --

11    you've wrote in that statement things that you observed

12    from both the protesters and the actions that were

13    taken by your fellow officers on that day, is that

14    correct?

15         A.   I don't know that I wrote as to what my

16    officers did, mostly just what I remember and what I

17    did, if I recall.

18         Q.   Okay.  Well you -- you wrote, for example,

19    "Some officers on scene deployed PepperBall at -- at

20    suspects who were throwing objects at officers."  Do

21    you see that -- that state -- that sentence in there

22    that's here at the bottom of the statement that's

23    displayed --

24         A.   Yes.                              3:45:49

25         Q.   -- to you right now?  So generally speaking,
```

Exhibit 5, LLC

1  you were trying to document everything that you thought

2  was of importance at that time, right, that would be

3  relevant to later looking back at this for determining

4  whether uses of force were appropriate within Denver

5  policy, is that a fair statement?

6      MR. RINGEL:  Object to the form.

7    A.   I try to write everything that I recall that

8  would be relevant, yes.

9    Q.   And that's because that's what you're trained

10  to do, right, you are trained to document every action

11  that would be taken by a potential suspect or protester

12  or another officer that might be relevant later on, is

13  that right?

14      MR. RINGEL:  Object to the form.          3:46:32

15    A.   I don't know about every action, that would

16  be impossible to do, but I think you -- I try to write

17  in a way that if significant things happen, that is

18  documented.  If -- you know, yeah, that's it.

19    Q.   And significant things would include

20  protesters throwing objects at police officers, right?

21    A.   Well in the beginning, that was a pretty

22  significant thing because it hadn't happened in years

23  as -- if you were to ask me that now, I guess it

24  wouldn't be so significant because it's pretty common.

25    Q.   At the time you were documenting this,

```
 1    though, you -- you thought that was something of

 2    significance that should be documented in -- in one of

 3    your statements, right?

 4         A.   Yes, I did.

 5              MR. RINGEL:  Object to the form.

 6         Q.   And that's -- in fact, that's why you wrote

 7    about it, about protesters throwing objects at -- at

 8    officers while they -- you know, while they were on the

 9    highway, right?

10         A.   Correct.                                 3:47:27

11         Q.   And then you followed the group as they --

12    they left the highway -- the group of protesters that

13    is, as they left the highway and walked down -- I think

14    it's 16th Street there down towards the Capitol, is

15    that correct?

16         A.   No, that is not correct.  We didn't follow

17    them there, they kind of dispersed into smaller groups.

18    We didn't have any idea where they were going, we were

19    thinking that the protest was over and we were wrong

20    about that.  We were then directed to district six, so

21    that group we didn't deal with again -- well, not at

22    that time, we were directed to district six to assist

23    over there.

24         Q.   Okay.  So you didn't -- you didn't walk up

25    towards Platte Street and 16th Street after the
```

 1  protesters had left the highway?

 2      A.   Well we -- we drove up that way, we -- we

 3  were all in our separate cars, and I was trying to

 4  collect my team.  As I said earlier, we didn't have one

 5  vehicle, so we were all kind of scattered about, so I

 6  tried to collect them up, and then we were directed to

 7  district six.

 8      Q.   Okay.  Because you wrote a report that once

 9  the -- the highway was cleared, your team paralleled

10  the group as they moved back up toward the Capitol, so

11  is that incorrect?

12      A.   Yeah, I don't remember paralleling the group,

13  we were -- I just remember them -- they were -- well, I

14  mean, my memory at the time I wrote this is probably

15  better than my memory now, so if we did or some of us

16  did, you know, we might have paralleled them back up

17  there until they collect -- I think they did merge with

18  the other group that was going to six, so that -- you

19  know, I'll stand by what I wrote in my statement

20  because I -- I would remember -- remember better then

21  what we -- than what I probably remember now.

22      Q.   Sure.  That -- and that makes sense.  You

23  know, obviously our memories don't necessarily get

24  better over time, so I understand that.

25      A.   Not really.                          3:49:20

```
 1        Q.   Fair enough.  Fair enough.  Lieutenant, you

 2   know, one thing you didn't write is that once, you

 3   know, the -- the protesters cleared the highway, you

 4   didn't write that you saw anyone throw any objects at

 5   police officers, and that's because you didn't, right?

 6           MR. RINGEL:  Object to the form.

 7        A.   I must not have, no.

 8        Q.   Okay.  You didn't see those protesters do

 9   anything else that's illegal because if you did, you

10   probably would have documented it in -- in this

11   statement, correct?

12        A.   I don't know, I guess it would depend on the

13   level of illegality on that.  I -- if it would have

14   been throwing things, I probably would have documented

15   it, if it would have been something more minor, maybe

16   not.

17        Q.   Okay.  So something that would have

18   jeopardized the safety of officers or others, you would

19   have documented, is that correct?

20        A.   I feel like I would have, yes.            3:50:10

21        Q.   Okay.  You know, did -- did -- do you

22   remember seeing the protesters at the intersection of

23   16th Street and Platte Street?

24        A.   I don't think I was ever down at 16th and

25   Platte, and I'll tell you the reason why I don't
```

```
 1   believe that is because that Highlands Bridge was a

 2   bridge I was completely unaware of until this series of

 3   protests and us going down to protect the highway, I

 4   didn't know that existed down there, and so I don't

 5   remember being down at 16th and Platte, no.

 6           MR. MCNULTY:  Okay.  I have no further

 7   questions for you then, Lieutenant.  Thank you.

 8           WITNESS:  Okay.

 9           MS. WANG:  And Andrew, I just have one

10   question, is that okay?

11           MR. MCNULTY:  Of course.                3:51:03

12                     EXAMINATION

13   BY MS. WANG:

14       Q.   Okay.  Lieutenant Canino, if you had seen

15   anybody throw any Molotov cocktails at any time during

16   the protests, is that something you would have

17   documented?

18       A.   Yes, I would have documented that.

19           MS. WANG:  Okay.  I have no further

20   questions.

21           MR. RINGEL:  Anybody else?  I have no

22   questions for Lieutenant Canino today.  All right.  I

23   think we're done.

24           MS. WANG:  Thank you.

25           WITNESS:  Okay.  Thank you.
```

```
 1            MS. WANG:  We can go off the record.

 2            MR. MCNULTY:  Thank you.

 3            MR. RINGEL:  Debra, I'll take care of review

 4  and signature for Lieutenant Canino, okay?

 5            RECORDER:  Okay.  So will we -- you say -- or

 6  are you going to waive or reserve?

 7            MR. RINGEL:  I am going to reserve, so please

 8  -- please make arrangements for me to get the

 9  transcript to send to him.

10            RECORDER:  Thank you very much.  Off record,

11  2:28 p.m.

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    CERTIFICATION

 2   I certify that the deponent was duly sworn by me and

 3         that the foregoing is a true and correct

 4         transcript from the record of proceedings

 5              in the above-entitled matter.

 6

 7

 8                    Debra Westfall

 9                    May 13, 2021

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```