1              IN THE UNITED STATES DISTRICT COURT

2                FOR THE DISTRICT OF COLORADO

3
   Civil Action No. 20-CV-01616-RBJ
4

5    AGAZI ABAY, on behalf of himself and other
     similarly situated individuals; et al.,
6

7              Plaintiffs,

8              vs.

9    CITY OF DENVER,

              Defendant.
10
   ----------------------------------------------------------------
11
                      REPORTER'S TRANSCRIPT
12                    Preliminary Injunction

13 ----------------------------------------------------------------

14         Proceedings before the HONORABLE R. BROOKE JACKSON,
   Judge, United States District Court for the District of
15 Colorado, commencing on the 25th day of June, 2020, via video
   teleconference from Courtroom A902, United States Courthouse,
16 Denver, Colorado.

17                        APPEARANCES

18 For the Plaintiffs:
   EDWARD MILO SCHWAB, Ascend Counsel, LLC, 3000 Lawrence St.,
19 Denver, CO 80205

20 ROSS I. ZIEV, Law Office of Ross Ziev, PC, 6795 East Tennessee
   Ave., Ste. 210, Denver, CO 80224
21
   For the Defendant:
22 CONOR D. FARLEY and MELANIE B. LEWIS, Denver City and County
   Attorney's Office, 201 W. Colfax Ave., Denver, CO 80202
23

24
      Sarah K. Mitchell, RPR, CRR, 901 19th Street, Room A252,
25              Denver, CO 80294, 303-335-2108

        Proceedings reported by mechanical stenography;
          transcription produced via computer.

                                              EXHIBIT 114

20-CV-01616-RBJ     Preliminary Injunction                    2

1                      I N D E X

2

   PLAINTIFFS' WITNESSES                               PAGE
3

   KEVIN KREEGER
4      Direct Examination By Mr. Ziev                    66
       Cross-Examination By Mr. Farley                   75
5  MEGAN MATTHEWS
       Direct Examination By Mr. Ziev                    84
6  GABRIEL THORN
       Direct Examination By Mr. Schwab                  85
7      Cross-Examination By Ms. Lewis                    92
   ZOEY HARSHMAN
8      Direct Examination By Mr. Ziev                    97
       Cross-Examination By Mr. Farley                  100
9

10 DEFENDANT'S WITNESSES                               PAGE

11 PATRICK PHELAN
       Direct Examination By Mr. Farley                  12
12     Cross-Examination By Mr. Ziev                     26
       Redirect Examination By Mr. Farley                42
13 THOMAS PINE
       Direct Examination By Mr. Farley                  42
14     Cross-Examination By Mr. Ziev                     47
   CARLA HAVARD
15     Direct Examination By Ms. Lewis                   54
       Cross-Examination By Mr. Ziev                     58
16

17

             PLAINTIFFS'
18           EXHIBITS                    RECEIVED

19           F                               62

20           L                               48

21

22           DEFENDANT'S
             EXHIBITS                    RECEIVED
23
             8                               19
24
             9                               19
25

                  Sarah K. Mitchell, RPR, CRR

20-CV-01616-RBJ     Preliminary Injunction     06/25/2020     3

1              *        *        *        *        *

2        (The proceedings commenced at 1:32 p.m.)

3              THE COURT:  This is the Abay case, 20CV1616, set for

4   a hearing this afternoon by VTC.  Who's appearing for the

5   plaintiff?

6              MR. ZIEV:  Your Honor, Ross Ziev and Milo Schwab for

7   the plaintiffs.

8              THE COURT:  Defendant?

9              MS. LEWIS:  Your Honor, Melanie Lewis and Conor

10  Farley for the defendants.

11             THE COURT:  All right.  You know the ground rules.

12             Plaintiff, you have five minutes to make an opening

13  statement starting now.

14             MR. ZIEV:  Thank you, Your Honor.  The people of

15  Denver showed up in masses to protest against acts of violence

16  perpetrated on people of color by law enforcement in this

17  country, and the City of Denver responded.  Peaceful

18  protesters were met with tear gas, rubber bullets --

19             THE COURT:  Too fast.  Slow down, please.

20             MR. ZIEV:  Yes, Your Honor.  Tear gas, rubber

21  bullets, flash bang grenades, and pepper spray.  The Supreme

22  Court has repeatedly held that police may not interfere with

23  orderly nonviolent protests merely because they disagree with

24  the content of the speech or because they simply fear possible

25  disorder.  Plaintiffs acknowledge that the police have a very

20-CV-01616-RBJ     Preliminary Injunction     06/25/2020    4

1   difficult, often thankless job where they're called on to make

2   split-second decisions.  The egregious behavior by the City of

3   Denver and its invited officers was not in response to

4   split-second decisions.  What we saw was a pattern of

5   preemptive domination and intimidation by the Denver Police

6   against largely peaceful protesters.

7          THE COURT:  Mr. Ziev, you're wasting your time.

8          MR. ZIEV:  Yes, Your Honor.  Okay.  Let me get to it.

9   Throughout this process the city has declined to engage in

10  meaningful discussions on how to promote safety toward these

11  protesters until the legislature passed legislation

12  restricting the city.  Only then did they express such

13  measures to be included in the extended TRO.  That TRO expires

14  tomorrow.  Plaintiffs have attempted to confer on a

15  preliminary injunction for weeks.  Continuously plaintiffs

16  have reached out to the city to seek compromise and clarity on

17  issues.  We were regularly met with a lack of authority, an

18  inability to offer alternatives, and requests to negotiate

19  against ourselves.

20          Plaintiffs agreed first to allow DPD to lower the

21  rank necessary to approve force from captain to lieutenant,

22  and then from lieutenant (audio distortion).  Plaintiffs

23  agreed to include language excluding exigent circumstances to

24  require that leaders personally witness violence or

25  destruction of property.  Denver won't even agree to the

                    Sarah K. Mitchell, RPR, CRR

20-CV-01616-RBJ     Preliminary Injunction     06/25/2020   5

1    requirement that other jurisdictions invited into Denver must

2    limit themselves to Denver's policy on use of force.  After

3    the Court's last e-mail, plaintiffs called the city to ask if

4    there was any language at all that they would stipulate to for

5    a preliminary injunction.  We received a clear no.  Then

6    15 minutes before the hearing we got a call agreeing to the

7    same language that was included in the disputed language for

8    the last extension of the TRO.

9         The City of Denver resists any check on its power

10   asking the Court and the people of Denver to just trust the

11   city to do the right thing, but as the Court found in its TRO,

12   the Denver Police Department has failed in its duty to police

13   its own.  We ask the Court to enter a preliminary injunction

14   to protect the citizens of Denver against the excessive force

15   that we've already seen used against those trying to exercise

16   their constitutional rights to free speech, free assembly, and

17   to be free from excessive force by their government.

18        We also request that the Court create a monitoring

19   mechanism that requires the city to disclose relevant reports

20   and video footage within a reasonable time period after force

21   has been used on protesters.  Defendants had concerns about

22   such a disclosure.  We offered a protective order as a

23   solution.  That solution was rejected.  We've only been made

24   aware of one instance so far following the entry of the TRO

25   that needed these records to review.  On June 12th defendant

20-CV-01616-RBJ    Preliminary Injunction    06/25/2020    6

1    pointed us to the discretionary CCJRA to get the records, and

2    they said that they forwarded that request to the records

3    custodian.  We've heard nothing since.

4            The city is prepared to present body-worn camera

5    evidence to this Court today on a different incident that they

6    believe supports its position.  Because the city holds all the

7    cards, has all the ability to get the body-worn camera,

8    plaintiffs are left in the dark regarding the pepper spray

9    incident after the TRO.  Your Honor, we have witnesses and

10   evidence prepared.  However, it seems that you have a clear

11   idea on what you want to hear about, so we would like your

12   guidance on how you would like us to proceed and what evidence

13   and testimony you would like to hear.  Thank you.

14           THE COURT:  All right.  Thank you.

15           Defendant.

16           MS. LEWIS:  Your Honor, Denver comes to this hearing

17   today willing to agree on several items and entry of a

18   preliminary injunction as reflected by the parties' previous

19   agreements and as noted by the Court.  Specifically, these

20   include --

21           THE COURT:  Pardon me?  You cut out on one thing you

22   said.  What are you willing to do?

23           MS. LEWIS:  We are willing to do the items regarding

24   -- that track the new Colorado law.  The item that was

25   regarding all officers deployed to demonstrations or engaged

20-CV-01616-RBJ    Preliminary Injunction    06/25/2020    7

1   in the demonstrations must have their body-worn cameras

2   recording any and all acts of confrontation between police

3   officers and others.  And then officers shall not --

4           THE COURT:  Why are you telling me that?  You don't

5   have any choice but to agree with what the law requires.  What

6   else do you agree to?

7           MS. LEWIS:  Right.

8           THE COURT:  I mean, you're not giving me anything

9   when you say we agree that we'll follow the law.  You darn

10  well better follow the law.  Now, what else?

11          MS. LEWIS:  Of course Denver will follow the law.

12  The item that we are talking about in addition to this is the

13  supervisor sergeant -- presence of the sergeant on the scene.

14  As the Court pointed out, the point of contention --

15          THE COURT:  So you're agreeing to sergeant on the

16  scene?

17          MS. LEWIS:  The provision regarding DPD or any person

18  acting on behalf of DPD shall not use chemical agents or

19  kinetic impact projectiles unless an on-scene supervisor at

20  the rank of sergeant or above specifically authorizes such use

21  of force in response to specific acts of violence or

22  destruction of property absent exigent circumstances.

23          THE COURT:  So that goes even further than what

24  Farley's brief said, right?

25          MS. LEWIS:  That is what we're willing to agree to.

Sarah K. Mitchell, RPR, CRR

20-CV-01616-RBJ     Preliminary Injunction     06/25/2020    8

1    The Court in its recent e-mail to the parties expressed that

2    -- recognizing that there might need to be an exception when a

3    sergeant does not personally witness the use of violence that

4    would require (audio distortion) or to use one of these

5    devices, and so what we would propose is that it could require

6    the sergeant be personally present, because we also agree that

7    it is appropriate to have a supervisor in the position of a

8    sergeant present during such situations, but we would need an

9    exception when the sergeant on scene is present but does not

10   personally see the act of violence or destruction that

11   warrants the use of one of these devices and could rely on

12   information from a fellow officer.

13            THE COURT:  Okay.

14            MS. LEWIS:  And that is what we are willing to agree

15   to today.

16            THE COURT:  Yeah, and how do you wish to express your

17   agreement other than telling me about it?

18            MS. LEWIS:  Well, Your Honor, I think that the

19   parties are primarily in agreement on the main terms of this

20   injunction; and therefore, if we can reach an agreement, we

21   would not need to go to a hearing as you said in your minute

22   order; and therefore, we'd like the Court's guidance on

23   whether the Court is considering entering an injunction on

24   those terms that the parties have agreed upon.

25            THE COURT:  I'm not even sure the plaintiff is going

                    Sarah K. Mitchell, RPR, CRR

20-CV-01616-RBJ    Preliminary Injunction    06/25/2020    9

1   to be able to establish the elements for a preliminary

2   injunction, but let's set that aside for a moment.  What

3   you're telling me is that, number one, although this seems

4   silly to me, Denver would agree to a preliminary injunction

5   that requires the same things that the new law requires; and,

6   number two, in addition, you would agree to put in the

7   injunction that the chemicals and the projectiles would not be

8   used unless a sergeant or above is physically present and

9   approves the reasonable need for the use with the proviso that

10  if the sergeant or above is not physically present -- is

11  physically present but does not personally witness whatever it

12  was that allegedly requires the use of chemicals or

13  projectiles, he can be informed by officers who saw the

14  incident and then make his decision as to whether to approve.

15          MS. LEWIS:  That is absolutely correct.

16          THE COURT:  You want that in an injunction.

17          MS. LEWIS:  Yes, we are.

18          THE COURT:  Okay.  I have no idea why we're here

19  having a hearing then.  Is there anything else you want to say

20  in your five minutes?

21          MS. LEWIS:  Excuse me, Your Honor.  If I could have

22  one second to confer with my co-counsel?

23          THE COURT:  You've got a minute left.

24          MS. LEWIS:  Okay.  Your Honor, the only other issue

25  that's not among agreement between the parties is the use of

20-CV-01616-RBJ     Preliminary Injunction     06/25/2020    10

1    force requiring non-Denver officers who are not parties to

2    this case to comply with Denver's use-of-force policy before

3    -- or be trained and familiar with it before they come to

4    assist Denver in emergency situations.  We are not willing to

5    agree to that.

6         THE COURT:  I have to stand up and move around a

7    little bit for the lights to come back on.  I'm here by

8    myself, and if there's no movement, the lights go off.

9         MS. LEWIS:  I'm sorry, Your Honor.  I thought we lost

10   you for a second.

11        THE COURT:  No, you didn't.  I heard you.  What you

12   said was that you're not in a position to agree to enforce the

13   same requirements on non-Denver police officers.

14        MS. LEWIS:  Right.  And we are willing to agree that

15   Denver requires outside assisting agencies to use only the

16   same amount of less-lethal devices that they have been trained

17   on themselves, that those agencies have received training on.

18   The only other item upon which the parties cannot agree --

19        THE COURT:  Your time is -- your time is up.  Thank

20   you.

21        MS. LEWIS:  Okay.

22        THE COURT:  All right.  Plaintiff, I'm going to, as I

23   said yesterday, permit the defendant to go first with whatever

24   evidence they want to present because I'm a little tired of

25   hearing Mr. Farley complain and whine about not getting enough

20-CV-01616-RBJ   Preliminary Injunction   06/25/2020   11

1   opportunity to speak for Denver.

2            Go ahead, Mr. Farley.  Call a witness, but don't

3   waste my time, please.

4            THE COURTROOM DEPUTY:  Mr. Farley, we can't hear you.

5            MR. FARLEY:  There we go.  Thank you, Your Honor, and

6   I welcome the opportunity to put evidence into the record on

7   behalf of Denver.  My first witness will be Commander Phelan,

8   Commander Patrick Phelan.

9            THE COURT:  So hello again, Mr. Phelan.

10           THE WITNESS:  Good afternoon, Your Honor.  How are

11   you?

12           THE COURT:  I'm good.  You would have no way of

13   knowing, but one of your former colleagues, a retired Denver

14   officer with whom you served and who knows you well and who

15   speaks very highly of you, by the way, was picketing my house

16   -- was picketing my house after I issued that order, walking

17   back and forth in front of my house with the big -- what do I

18   call it -- not red, white, and blue, but police version, and I

19   had a nice chat with him while he was out alarming the

20   neighbors and others.  But he was a perfectly nice fellow, and

21   he thought highly of you, sir.

22           Raise your hand, please.

23                        PATRICK PHELAN

24   was called as a witness and, having been duly sworn, was

25   examined and testified as follows:

                        Sarah K. Mitchell, RPR, CRR

20-CV-01616-RBJ    Preliminary Injunction    06/25/2020    12

 1          THE COURT:  By the way, you told me you were soon to

 2  retire.  I was sorry to hear that.

 3          THE WITNESS:  Three months, Your Honor.

 4          THE COURT:  Well --

 5          THE WITNESS:  Maybe tomorrow.  Maybe tomorrow.

 6          THE COURT:  You're the kind of cop that I like to

 7  have.

 8          Go ahead, Mr. Farley.

 9          MR. FARLEY:  Thank you, your Honor.

10                       DIRECT EXAMINATION

11  BY MR. FARLEY:

12  Q.  Commander Phelan, how long have you been with the Denver

13  Police Department?

14  A.  I'm in my 40th year.

15  Q.  And that's since 1980?

16  A.  Yes, sir.

17  Q.  And you currently hold the rank of commander?

18  A.  Yes, sir.

19  Q.  And what is your primary responsibility as the -- in your

20  current position?

21  A.  I'm commander of the special operations division.  The

22  special operations division is responsible for large advance

23  parades, protests.  Some examples are, obviously, the Women's

24  March, Black Lives Matter.  Whatever march in the last --

25  whatever protest is a large event, we'll cover that.  The

20-CV-01616-RBJ    Preliminary Injunction    06/25/2020    13

1    presidential debates, just anything, sporting events, whatever

2    large events within the city.

3    Q.  Commander, I'm going to touch on some of the terms that we

4    just addressed that were disputed by plaintiffs' counsel.  One

5    of those was having a sergeant on scene.  Plaintiffs' counsel

6    has proposed that the sergeant needs to personally witness

7    every single act of aggression or property damage in order to

8    order a dispersement or order the deployment of less-lethal

9    weapons.  What is the difficulty that that proposition

10   presents to police officers responding in crowd control

11   situations, crowd management situations?

12   A.  Well, I think it's a good idea.  Obviously, we want a

13   supervisor to observe that, if we can.  Unfortunately, the

14   span control of a sergeant is usually six to eight officers,

15   so you can't always be omnipresent.  But it's just like, you

16   know, you can't see everything that happens around.  If I'm

17   riding with you in a car, you say, Did you see that?  No, what

18   are you looking at?  I didn't see that.  So it's difficult for

19   everybody to do that.  But I think it's more efficient to have

20   a sergeant there because there's more sergeants on the street,

21   and their span control is smaller so they have a better chance

22   of seeing what's going on.

23   Q.  In that dynamic and fluid crowd management situation, one

24   sergeant isn't going to -- even present won't be able to see

25   every single thing that takes place, correct?

Sarah K. Mitchell, RPR, CRR

20-CV-01616-RBJ     Preliminary Injunction     06/25/2020    14

1   A.  Correct.  It would be difficult.

2   Q.  And it's fair for a sergeant to rely on the -- a statement

3   from an officer looking the other direction -- I just got hit

4   by a rock from this direction, those people just set a car on

5   fire, those type of examples or whatever it is on the spectrum

6   -- that sergeant can go then process that information, take

7   that information as true, and order an appropriate response of

8   use of force?

9   A.  Correct.

10          THE COURT:  Plaintiffs, you (audio distortion) at the

11  wheel.  I thought I was hearing the testimony of Commander

12  Phelan.  Maybe we should have the lawyer take the stand if

13  he's going to testify.

14          MR. ZIEV:  We object, Your Honor.

15  Q.  (By MR. FARLEY) Commander Phelan, my understanding is you

16  also had concerns regarding outside jurisdictions having to

17  comply or having to use the same less-lethal devices as what

18  Denver has issued.  What is your concern with that?

19  A.  Our concern is this.  It's what they're trained on.

20  Obviously other jurisdictions -- and I'm sure they're pretty

21  similar, use-of-force policies are pretty similar, their crowd

22  management policies are probably pretty similar.  They

23  determine what less lethal options they want to use, what less

24  lethal platforms they want to use.  They select those

25  platforms, and so they train on those platforms.  So for them

                    Sarah K. Mitchell, RPR, CRR

20-CV-01616-RBJ     Preliminary Injunction     06/25/2020     15

1   to use a platform they're not trained on makes no sense.

2   Q.  So you wouldn't want to issue a Denver less-lethal device

3   to an outside agency?

4   A.  We wouldn't do that.  We just wouldn't do that.  They're

5   not trained on that device.  It doesn't make sense.  It's

6   dangerous.

7   Q.  And plaintiffs have also asked for the outside agencies to

8   comply with Denver's specific use-of-force policy.  What is

9   the concern with that approach?

10  A.  Well, they have their own use-of-force policies, their own

11  procedures, their own policies.  They handle all use-of-force

12  complaints.  They handle reports necessary with resistances.

13  So it made sense -- we used that during the DNC.  We used the

14  same type of process.  They get their reports, their policies,

15  their procedures, and follow those reports.

16  Q.  And Denver -- and Denver has already agreed to make sure

17  or confirm, rather, with an outside agency that they have

18  use-of-force policies and use-of-force training in place

19  before they come to assist, correct?

20  A.  Correct.

21        MR. ZIEV:  Objection, Your Honor, leading.

22        THE COURT:  Sustained.  Stricken.

23  Q.  (By MR. FARLEY) Is Denver willing to enter into an

24  agreement that would require the confirmation that an outside

25  agency has a use-of-force policy in place before they're

20-CV-01616-RBJ     Preliminary Injunction     06/25/2020     16

1   called in to assist?

2   A.  Yes, of course.

3   Q.  The Court's order, temporary restraining order said the

4   Denver Police Department failed to police itself.  Do you

5   agree?

6   A.  I disagree.

7   Q.  And why do you disagree?

8   A.  Because at the Denver Police Department we have a lot of

9   experience doing protests, hundreds of protests, peaceful

10  protests.  We take pride in doing that.  And on these

11  situations -- especially we understood in this protest

12  specifically, you know, there's a lot of anger.  There's a lot

13  of potential there, so what we would do is we create an ops

14  plan.  With that ops plan we devise what we need to do with

15  that.  Our main mission there is obviously safety of life,

16  protection of property, provide safety for the protesters, and

17  that's what we do, despite the protesters walking on the

18  street, which we let them do.  They go counterflow against

19  traffic, which is dangerous, but we want to provide that for

20  them so they can safely protest.

21  Q.  And does the Denver Police Department have internal

22  processes to investigate individual incidences of misconduct

23  that are out of compliance with policies and training?

24  A.  Absolutely.  People that -- citizens are able to make a

25  complaint either through internal affairs, through the

Sarah K. Mitchell, RPR, CRR

20-CV-01616-RBJ     Preliminary Injunction     06/25/2020     17

1    monitor's office, through the mayor's office, wherever they

2    want to make a complaint.  Those complaints are processed in

3    internal affairs and processed, so...

4    Q.  And is it -- is it reasonable for the reporting -- the

5    internal reporting to be completed within the timeframe that

6    plaintiffs have requested be directly sent to their attorneys

7    as opposed to via the internal processes?

8    A.  I think the reality is it would be very difficult.  You

9    know, even officers that have worked for me, I would have a

10   hard time getting those reports in that amount of time.  It's

11   just -- days off, amount of time to write it, different

12   shifts.  It takes some time.  Downloading videos, charging

13   cameras, you know, getting those loaded and filed.  It would

14   be a challenge.

15   Q.  And do you understand that Dikran Kushdilian has submitted

16   a declaration in this case addressing those concerns?

17   A.  Yes.

18   Q.  Commander Phelan, I'm going to step back and talk a little

19   bit about some of the use-of-force policies and use-of-force

20   training that are provided to Denver Police Department

21   officers.  When does a Denver Police officer or recruit first

22   learn of Denver's use-of-force policy and its procedures?

23   A.  When he enters the police academy.  They probably receive

24   -- I think use of force, they'll probably receive 300 hours of

25   use-of-force training, which includes obviously the legal

20-CV-01616-RBJ     Preliminary Injunction     06/25/2020     18

1    guidelines for that, in addition to the use-of-force policy

2    and arrest control tactics.  So it's a total of about

3    300 hours for use of force.

4    Q.  And does that training on use of force extend after the

5    academy?

6    A.  Right.  They go through a PTO program, a training program.

7    They've got 12 to 16 weeks.  I don't want you to quote me on

8    the time, but they spend that with the training officer, and

9    that's additional training there.  And periodically we give

10   training for use-of-force bulletins and crowd control issues

11   also.

12   Q.  And so that's ongoing training for officers --

13   A.  Ongoing training.  Additionally they receive probably

14   120 hours -- well, probably 60 hours on constitutional law,

15   another 60 hours on law from the city attorney's office on

16   civil liability, and they get the constitutional law 60 hours

17   from -- the DA's office provides that training.

18   Q.  And that's training both on use of force and the right to

19   free speech and free assembly?

20   A.  Exactly.  Constitutional law is 60 hours.

21   Q.  When there's trainings on force tactics and force weapons,

22   are use-of-force guidelines incorporated into that training as

23   well typically?

24   A.  Yes, they are.

25          MR. FARLEY:  I'm going to have Commander Phelan

                     Sarah K. Mitchell, RPR, CRR

20-CV-01616-RBJ     Preliminary Injunction     06/25/2020     19

1  preview what's been marked as Exhibit 8 and Exhibit 9.  These

2  have both been submitted to the Court and counsel for

3  plaintiff.

4  Q.  (By MR. FARLEY) Commander Phelan, can you identify what

5  Exhibit Number 8 is?

6  A.  Exhibit Number 8 is the operations manual for Denver

7  Police Department.  It's the use-of-force related policies,

8  105.01, use-of-force policy.

9  Q.  And then the second part of that document?

10  A.  Additionally the operations manual for Denver Police

11  Department, 105.02, force and control options.

12  Q.  So this is the Denver Police Department -- two different

13  provisions within the operations manual?

14  A.  Correct, correct.

15        MR. FARLEY:  I would move at this time to have

16  Exhibit Number 8 and Exhibit Number 9 admitted into the

17  record.

18        MR. ZIEV:  No objection, Your Honor.

19        THE COURT:  All right.  Admitted.

20     (Defendant's Exhibits 8 and 9 admitted into

21     evidence.)

22  Q.  (By MR. FARLEY) Are Denver police officers trained on --

23        MR. FARLEY:  And I actually want to step back, and I

24  appreciate the consideration of plaintiffs' counsel.  We did

25  not address Exhibit 9.  It's the crowd management manual.

20-CV-01616-RBJ    Preliminary Injunction    06/25/2020    20

1   But, you know, if you want me to go through it again, I'm

2   happy to, or if it's admitted to plaintiffs' counsel no

3   objection, then we can move forward.

4           MR. ZIEV:  No objection, Your Honor.

5           MR. FARLEY:  I appreciate it.

6   Q.  (By MR. FARLEY) Denver police officers are trained on the

7   use-of-force policy, correct?

8   A.  Correct.

9   Q.  Okay.  When are they trained on the use-of-force policy?

10  A.  While they're in the academy.

11          THE COURT:  You just went through that.

12  Q.  (By MR. FARLEY) Is it a controlling document?  Is the

13  training consistent -- on use of force consistent with the

14  policy itself?

15  A.  Yes, it is.

16  Q.  Okay.  As far as use of less-lethal weapons, specifically

17  the 40-millimeter -- well, strike that -- specifically all

18  less-lethal weapons, I would direct your attention into the --

19  into the operations manual that -- I'm sorry -- into the crowd

20  management manual where it addresses communication for the use

21  of a -- on the less-lethal policy, may I direct your attention

22  to Section 4.  Can you explain to me how the less-lethal

23  policy interacts with the crowd management manual?

24  A.  Well, the point of less lethal -- the reason less lethal

25  was developed is obviously to alleviate the use of lethal

20-CV-01616-RBJ    Preliminary Injunction    06/25/2020    21

1    weapons in a case of different circumstances, whether it's a

2    suicide by cop, whether it's an edge weapon, whether it's a

3    male person having some issues, being able to have that

4    option, that tool to use less lethal and alleviate that

5    situation without using the lethal option is what -- why the

6    less lethal was developed.  As far as it's done in -- how it's

7    done on the street, how it's done in crowd management is

8    similar.  If it rises to the threat of the defense of

9    resistance or active aggression against an officer or a third

10    party, we're able to use those in that same type of manner.

11   Q.  Are there any areas that are restricted from using a

12   less-lethal weapon against?

13   A.  Yes.  Yes.  There's many trainings provided.  There's

14   certain target areas.  It's advised on the 40-millimeter to

15   hit what's called large mass muscle area, meaty areas, which

16   is the legs, buttocks.  Stay away from the head, throat, the

17   genitals, the spine.  So those are areas we target -- excuse

18   me -- also we can target.  Secondary target location probably

19   would be an upper body, shoulders, and probably the shins

20   would be a secondary point of aim.

21   Q.  And is that true for a pepper ball?

22   A.  Not quite the same as a pepper ball.  A pepper ball

23   doesn't have the kinetic energy that a 40 does, so that point

24   of aim is probably from the torso down.

25   Q.  Who's authorized to carry and deploy a 40-millimeter or a

20-CV-01616-RBJ    Preliminary Injunction    06/25/2020    22

1    pepper ball?

2    A.   To carry a 40-millimeter or pepper ball you have to be

3    selected by your commander.  It goes up the chain of command

4    and is signed off by the division chief of patrol, and then

5    they receive the training for that weapons platform.

6    Q.   Can an officer firing a 40-millimeter or a pepper ball

7    fire indiscriminately?

8    A.   No.  You're responsible -- whether it's a less lethal or a

9    lethal weapon, you're responsible for every time you pull the

10   trigger.  Everything you send on range, that's your

11   responsibility.

12   Q.   When you say responsible, you mean -- well, what do you

13   mean by that?

14   A.   What I chose to target, I chose to pull the trigger and

15   send that less-lethal projectile downrange, so I'd be

16   responsible for what I did.

17   Q.   Are there considerations of innocent persons being struck

18   unintentionally?

19   A.   Absolutely.  It's unacceptable.

20   Q.   How -- what were the first -- in the broadest sense and

21   briefly, what were the first few days of the protests that

22   started in late May in response to the death of George Floyd

23   in police custody in Minnesota?

24   A.   You know, obviously, we were aware that that happened, the

25   murder of George Floyd by a police officer up in Minneapolis,

Sarah K. Mitchell, RPR, CRR

 1   and we knew there was a protest coming.  We made an ops plan

 2   for that protest.  We were hoping, as we always hope, it's a

 3   peaceful protest, which we usually count on.  It started --

 4   those protests, those first few days, they started peaceful.

 5   I think the majority of people there are there to exercise

 6   their First Amendment right, which is great, and I think

 7   there's a lot of people there that were very angry and wanted

 8   confrontation, they wanted confrontation which -- with the

 9   police, which we were there.  Based on our operations plan we

10   took that into consideration.  Part of our deployment was low

11   profile, avoid confrontation, low visibility, you know, try to

12   help them get through their protests and in a peaceful way.

13   Q.  All right.  There were incidents of violence and property

14   destruction in the early days of the protests in May, correct?

15   A.  Correct.

16   Q.  Can you describe those.

17   A.  Well, initially too what we wanted to prevent too -- we

18   allowed them to have a peaceful protest -- what I wanted to

19   prevent is them going onto the highway.  That's such a

20   dangerous situation where cars are going 55 miles an hour and

21   there's people on the highway.  They try to force their way on

22   the highway.  We try to prevent that, deny them the highway.

23   Officers receive rocks and balls there.  A couple officers

24   were pretty seriously hurt.  We responded with some pepper

25   ball munitions there to try to get them off the highway.

20-CV-01616-RBJ    Preliminary Injunction    06/25/2020    24

1        We also tried to deny them -- we didn't want anybody

2   setting fires (audio distortion), we didn't want anybody

3   taking over police departments or public buildings, so we try

4   to prohibit that too.  There was some looting going on.  There

5   was a lot of criminal mischief.  We try to -- based on our

6   operations plan we try to have a lot of mobile responses to

7   those so we were able to at least address those, go to those

8   locations and get that behavior stopped.  Unfortunately once

9   we got there, the police became the target of that -- of that

10  -- I want to make sure I differentiate between protesters and

11  rioters.  These are people -- there's a lot of people down

12  there just protesting.  We get it all the time.  It's great.

13  I've been involved in it myself in the past.  But this wasn't

14  the same faction.  There's people there that wanted

15  confrontation for whatever reason.  I can't say why.  Wanted

16  to confront the officers.

17  Q.  Did the use of force that the Denver Police Department was

18  authorized to use consider the viewpoint or the message of the

19  protesters?

20  A.  No, not at all.  You're able to protest.  It is a First

21  Amendment right.  You're able to protest, you're able to

22  assemble.  Whatever your issue is, that's fine.

23  Q.  And so it's the conduct of the --

24  A.  Absolutely.

25  Q.  -- violence and other issues that you just raised?

                        Sarah K. Mitchell, RPR, CRR

20-CV-01616-RBJ     Preliminary Injunction     06/25/2020     25

1   A.  Their behavior dictates our response is what it comes down

2   to.

3   Q.  Have conditions changed since the end of May, beginning of

4   June?

5   A.  Yes, yes.  As a matter of fact, the conditions changed

6   probably after the first three or four days.  We were trying

7   to avoid any confrontation with them and things seemed to calm

8   down.

9   Q.  You saw less acts of violence and less --

10  A.  We tried -- we moved that direction.  We are trying the

11  same thing.  Low visibility.  Try to avoid any type of

12  confrontation, yet trying to facilitate them while they

13  protest and go on their march.

14  Q.  Are you aware of any recent 40-millimeter or pepper ball

15  firing by the Denver Police Department?

16  A.  No.  Not after the first few days, no.

17          MR. FARLEY:  That's all the questions I have for

18  Commander Phelan.  I'm happy to call my next witness or will

19  cross-examination happen now?

20          THE COURT:  Cross-examination.

21          MR. FARLEY:  Okay.

22          MR. ZIEV:  Thank you, Your Honor.  Just let me know

23  when you're ready.

24          THE COURT:  What did you say?

25          MR. ZIEV:  I said just let me know when you're ready,

20-CV-01616-RBJ    Preliminary Injunction    06/25/2020    26

1    Your Honor.

2            THE COURT:  I'm ready.  You're consuming Mr. Farley's

3    time.  Get on with it.

4            MR. ZIEV:  Yes, Your Honor.

5                        CROSS-EXAMINATION

6    BY MR. ZIEV:

7    Q.  Commander Phelan, have you reviewed the videos that have

8    been part of the original complaint filed?  I can't hear you,

9    Commander.  I can't hear you, Commander.  You're on mute.

10   A.  I apologize.  Can you hear me now?

11   Q.  Yes.  Thank you.

12   A.  No, I have not.  I have not viewed any videos at all

13   actually.

14   Q.  You haven't seen any videos that have been included in

15   this case at all?

16   A.  No, sir, I have not.

17   Q.  Okay.

18   A.  I've been on vacation.  I'm sorry.

19   Q.  No.  Go ahead.

20   A.  I've been on vacation.  I'm due a lot of time off.  I'm

21   trying to take that time off before I retire.

22   Q.  So do you know whether any of the videos included in the

23   complaint have been investigated?

24   A.  Sir, I couldn't hear you very clearly.  One more time,

25   please.

                    Sarah K. Mitchell, RPR, CRR

20-CV-01616-RBJ     Preliminary Injunction     06/25/2020     27

1   Q.  Do you know if any of the videos that have been included

2   in the complaint have been investigated by the Denver Police

3   Department?

4   A.  I know there's several videos that are being investigated.

5   I couldn't tell you if those were the ones.  I haven't seen

6   those.

7   Q.  So, Commander, as you sit here, have you seen any conduct

8   by the Denver Police Department that occurred in -- as part of

9   the Denver downtown demonstrations that violated Denver

10  policies?

11  A.  No.  I haven't seen any videos.

12  Q.  So are you here to say -- are you saying that Denver's

13  response during these protests was reasonable?

14  A.  Yes, based on the total circumstances.

15  Q.  How can you say that without seeing any of the videos that

16  have been presented in this case?

17  A.  I was the incident commander of the situation, so I knew

18  when officers were deployed, where they were deployed to, and

19  what actions they took.

20  Q.  Okay.

21  A.  I wasn't privileged to see every type of deployment, no.

22  Q.  Okay.  I'd like to show --

23  A.  I haven't seen anything.

24  Q.  Okay.

25          MR. ZIEV:  Your Honor, I'm going to present to the

20-CV-01616-RBJ     Preliminary Injunction     06/25/2020     28

1   witness what's been previously marked as Exhibit M.

2   Q.   (By MR. ZIEV) Commander, please let me know that you can

3   see the video.  Can you see the screen, Commander?

4   A.   Yes, I can.

5        (Video played.)

6   Q.   (By MR. ZIEV) Commander, was that a reasonable response by

7   the police in downtown Denver?

8           MR. FARLEY:  Objection, it calls for speculation.

9           THE COURT:  The objection is overruled.  I'd like to

10   know his answer.

11   A.   That's the first time I saw that video.  What I see is

12   there's a confrontation obviously between looks like citizens

13   and police.  It looks like pepper ball -- from my vantage

14   point it looks like a pepper ball was deployed.  To use that

15   -- I don't have the 360 of that whole scene, what happened,

16   but I couldn't say if that was -- that application was illegal

17   or not.  But there are situations -- if that individual

18   thought, you know, that he shouldn't have been hit with a

19   pepper ball, then a complaint should be made on that.  I can't

20   judge that right now.  That has to be investigated, and if

21   it's investigated and determined that was illegal or wasn't a

22   proper application of a pepper ball, then that's the

23   situation.

24   Q.   (By MR. ZIEV) Okay.  Let's talk about that, Commander.

25   You say that the -- that incident, if that individual didn't

20-CV-01616-RBJ    Preliminary Injunction    06/25/2020    29

1    believe that it was proper, that that event should be

2    investigated, correct?

3    A.   Correct.

4    Q.   Okay.  Is that a quick process?

5    A.   I'm sorry?

6    Q.   Is that a quick process?

7    A.   They'll make the complaint, if they want to make the

8    complaint.  It's filed with the internal affairs bureau.  They

9    investigate that complaint.  I'm sure there's a timeline when

10   they have to get those complaints finished.  I couldn't answer

11   that question, as far as quick, what are you determining is

12   quick.  I think I consider it as being more thorough.  It

13   would be a thorough investigation.  I don't know how long it

14   would take, sir.

15   Q.   Commander, if it was found that that officer did not

16   follow police department policy, would you expect that the

17   investigation would get him off the street within a week?

18        MR. FARLEY:  Objection.  It, again, calls for

19   speculation and incomplete evidence.

20        THE COURT:  Sustained.

21   Q.   (By MR. ZIEV) Commander, speaking of those -- speaking of

22   investigations, are you familiar with an OIM investigation

23   into the way that the Denver Police Department handled the

24   Occupy movement back in 2011?

25   A.   No, I'm not.

Sarah K. Mitchell, RPR, CRR

20-CV-01616-RBJ    Preliminary Injunction    06/25/2020    30

1   Q.  Are you aware that the police department -- that the OIM,

2   Office of Independent Monitor, determined that the police did

3   not have an adequate response to that protest and encouraged

4   the Denver Police Department to further investigate it?

5   A.  No, I wasn't aware of that.  I wasn't a commander in 2011.

6   Q.  Are you aware that -- you've been on the force since 1980,

7   correct?

8   A.  Correct.

9   Q.  Are you aware that Denver failed to investigate the prior

10  protests back in 2011 that the OIM said that they should

11  investigate?

12          MR. FARLEY:  Objection, misrepresents the testimony.

13          THE COURT:  I don't know if it misrepresents

14  testimony or not, but it's irrelevant to what I'm dealing with

15  today.  That video, though, is not irrelevant, and I want to

16  ask the Commander a question.  What we saw on the video -- and

17  I understand the videos might miss things.  There may be other

18  things going on behind the camera that we don't see.  I

19  understand that.  But based on just what we saw, we saw (audio

20  distortion) this guy outside his car yelling and screaming,

21  and then we saw pepper balls or whatever those clouds were all

22  over him.  Now, if that's all that happened, wouldn't you

23  agree that that was inappropriate?

24          THE WITNESS:  Your Honor, if that's all that

25  happened, I would agree that's inappropriate.  I just don't

Sarah K. Mitchell, RPR, CRR

20-CV-01616-RBJ    Preliminary Injunction    06/25/2020    31

1    know what happened before that or -- I can't -- that should be

2    investigated.  He's hit with an OC pepper ball.  That's

3    obvious to me.  Why he was hit with it, I don't know.

4         THE COURT:  Right.  I mean, isn't it pretty obvious

5    that there were protesters, and then there were people who

6    crossed the line into violence, into destruction, into

7    looting.  On the other side of the line, there were the

8    majority of peaceful cops doing their job, and then there are

9    people who got out of line.

10        THE WITNESS:  That's a possibility, Your Honor.

11        THE COURT:  I think it's a fact.  It's not a

12   possibility.  It's a fact.  And I don't want to -- I don't

13   want to doubt your credibility, so I want you to admit what

14   needs to be admitted.  I understand where you're coming from.

15        Onward.  Any other cross?

16        MR. ZIEV:  Yes, Your Honor.  I'd like to show another

17   video.  This has previously been marked as Exhibit F.  One

18   second.

19        THE COURT:  What exhibit is this one?

20        MR. ZIEV:  This is Exhibit F, Your Honor.  F as in

21   frank.

22        MR. FARLEY:  Your Honor, I would object to the extent

23   he's asking for Commander Phelan's opinions on videos he

24   hasn't seen and had time to review.

25        THE COURT:  Nonsense.  Go ahead and show the video.

20-CV-01616-RBJ    Preliminary Injunction    06/25/2020    32

1          MR. ZIEV:  Thank you, Your Honor.

2      (Video played.)

3          THE COURT:  That video showed me absolutely nothing.

4          THE WITNESS:  I had my glasses on, but I really

5  didn't see anything.

6          MR. ZIEV:  Okay.  Let me replay it, Your Honor.

7  We're looking for a pepper ball being fired at a bystander at

8  the very end of the video.

9          THE COURT:  Okay.

10          MR. FARLEY:  Your Honor, to expedite this, we have a

11  witness here today who was on that vehicle.

12          THE COURT:  You're using up your time.  You're using

13  up your time.

14          MR. FARLEY:  I'm hoping to have -- plaintiff is

15  showing videos.  I don't know when he intends to stop showing

16  videos.  I have two other witnesses to call, but he's showing

17  Commander Phelan videos, which he's already testified he

18  hasn't seen.  I'm just proposing that the witness who was on

19  scene be the appropriate person to testify as to that

20  incident.

21          THE COURT:  Okay.  Thank you for that assistance.

22  Now, show the video again, if you want to.

23          MR. ZIEV:  Okay.  Well, Your Honor, I'd like to move

24  -- I'd like to move that the videos listed in the complaint

25  are moved into evidence.

                        Sarah K. Mitchell, RPR, CRR

20-CV-01616-RBJ    Preliminary Injunction    06/25/2020    33

 1          MR. FARLEY:  We would object, Your Honor.  We've

 2    repeatedly asked for the time --

 3          THE COURT:  Sustained.

 4          MR. FARLEY:  -- date, location of those.

 5          THE COURT:  Sustained.  We'll go one at a time if we

 6    have to.

 7          MR. ZIEV:  Thank you, Your Honor.

 8          THE COURT:  The first one was impressive to me.  The

 9    second one was not.

10          MR. ZIEV:  My apologies, Your Honor.  Can you see it?

11        (Video played.)

12          MR. FARLEY:  We don't see anything.

13          MR. ZIEV:  You don't see anything?

14          MR. FARLEY:  No.

15          THE COURT:  By the way, Mr. Ziev, why aren't you

16    wearing a mask?  You're right by your colleague.

17          MR. ZIEV:  Yes, Your Honor.  I have a mask.

18          THE COURT:  He's wearing a mask.  Why aren't you?

19          MR. ZIEV:  Yes, Your Honor.  Are you able to see my

20    screen?

21          MR. FARLEY:  We do not see anything.

22          MR. ZIEV:  Your Honor, I would ask to reserve this

23    period of time when they are having technical difficulties to

24    be able to use for a witness.

25          THE COURT:  Okay.

                  Sarah K. Mitchell, RPR, CRR

20-CV-01616-RBJ     Preliminary Injunction     06/25/2020     34

1          MR. ZIEV:  Can you see anything now?

2          MR. FARLEY:  No.

3          MR. ZIEV:  I don't know what's going on with the

4    technical part of this.  I'll move on in my cross-examination,

5    Your Honor.

6    Q.  (By MR. ZIEV) Commander Phelan, you had mentioned that you

7    believed the police have adequately policed themselves; is

8    that right?

9    A.  Yes.

10   Q.  How many complaints were there filed by an officer against

11   a fellow officer as part of these downtown Denver

12   demonstrations?

13         MR. FARLEY:  Objection, calls for speculation.

14         THE COURT:  It does not call for speculation.  It

15   probably calls for something he doesn't know.

16         MR. FARLEY:  I'll make a foundation objection as

17   well.

18   Q.  (By MR. ZIEV) Commander?

19   A.  I don't know.  I couldn't tell you.  I don't know.

20   Q.  Let me ask you this.  Commander, have you heard of one

21   single complaint from one officer against another officer as

22   part of these downtown Denver demonstrations?

23   A.  No, sir, I haven't.

24   Q.  Now, you had mentioned the use-of-force policy and the

25   training that these officers get on the use-of-force policy,

                        Sarah K. Mitchell, RPR, CRR

20-CV-01616-RBJ    Preliminary Injunction    06/25/2020    35

1  correct?

2  A.  Correct.

3  Q.  And what Denver would like is that each individual officer

4  on scene is able to make their own determination on use of

5  force without having a sergeant personally witness the act of

6  violence or destruction, correct?

7  A.  Those officers make those decisions every day.  They're on

8  the street by themselves.

9  Q.  Okay.  Commander, are you familiar with a news article

10  that ran with an Instagram picture of a Denver police officer

11  that was tagged, Who wants to start a riot?  Are you familiar

12  with that post?

13  A.  I did see that, yes, sir.

14  Q.  And that was a Denver police officer, correct?

15  A.  That was a probation officer that was immediately fired,

16  yes, sir.

17  Q.  And he had joined the force in October of 2019?

18  A.  I believe so.  I don't know.  He was a probationary

19  officer.

20  Q.  And that probationary officer, had he not been fired,

21  would have been on scene for those downtown demonstrations,

22  right?

23  A.  It's possible.

24  Q.  And that officer would have been able to make his own

25  determination -- the officer that posted let's start a riot,

Sarah K. Mitchell, RPR, CRR

20-CV-01616-RBJ    Preliminary Injunction    06/25/2020    36

1    he would have been able to make his own determination on when

2    to use sponge rounds, correct?

3    A.  If he was trained in that, and he wasn't trained because

4    he's a probation officer, but if he was trained on that

5    platform, and I'm not -- and I'm not sure why he posted what

6    he posted.

7    Q.  So you're saying right now that this officer that was on

8    the force since October 2019 was not trained?

9         THE COURTROOM DEPUTY:  Mr. Ziev, can you take it off

10   of screen share, please?  Thank you.

11        MR. FARLEY:  Objection, that mischaracterizes the

12   testimony.

13   Q.  (By MR. ZIEV) Commander, did you hear the question?

14   A.  Do you mind repeating it?  I'm sorry.

15   Q.  Are you testifying that this officer who had been on the

16   force since 2019 had not been trained?

17   A.  No.  I'm saying he wouldn't have been trained in the use

18   of a 40-millimeter or a pepper ball, a less-lethal impact

19   weapon.  He wouldn't have been trained.  He wasn't a first

20   officer yet.

21   Q.  When does that --

22   A.  It takes four years for an officer to become a first-grade

23   patrol officer, so he wouldn't even be eligible -- he's barely

24   with a TO, if he's even off training with the training

25   officer.  He still might be with the training officer.  So he

Sarah K. Mitchell, RPR, CRR

20-CV-01616-RBJ     Preliminary Injunction     06/25/2020     37

1   wouldn't be qualified to carry anything like that.

2   Q.  Would he have been qualified to carry pepper spray?

3   A.  Personal pepper spray he would be qualified.  The officers

4   are issued what's called personal pepper spray.  You see it on

5   the utility belts.

6   Q.  A further-trained officer would be in a better position to

7   make a call on when to use force?

8   A.  They receive the same training.  They might have more

9   experience, but it's still the same training consistent with

10  the use-of-force policy and the crowd management policy.  So I

11  couldn't say if he would be more qualified or less qualified.

12  He'd have more experience.

13  Q.  What about a higher rank officer like a sergeant?  Would

14  they have more experience on when the appropriate use of force

15  is?

16  A.  It's the same training which is consistent.

17  Q.  Would you trust higher rank officers to make that

18  determination?

19  A.  I would trust hopefully every officer to make that

20  determination.

21  Q.  Are you familiar with -- you're familiar with the incident

22  that happened, I guess it was the Sunday after -- the incident

23  where a group of protesters were pepper sprayed after the

24  Court's temporary restraining order went into place?

25  A.  You'd have to give me more information on that.  Was that

20-CV-01616-RBJ    Preliminary Injunction    06/25/2020    38

1    -- was that during the protests?  I don't recall anything

2    during the protests, anybody getting pepper sprayed.

3    Q.  Are you familiar with any demonstrations of force by the

4    Denver Police Department after this temporary restraining

5    order was entered?

6            MR. FARLEY:  Objection to the ambiguity of that term.

7            THE COURT:  I think you should rephrase that

8    question.

9            MR. ZIEV:  Yes, Your Honor.

10   Q.  (By MR. ZIEV) Commander Phelan, you were on the hearing

11   with the Court when the Court was -- well, when the Court had

12   a hearing on the temporary restraining order; is that correct?

13   A.  Yes, sir.

14   Q.  And you were familiar that that order entered that night,

15   correct?

16   A.  Correct.

17   Q.  Are you familiar -- are you familiar with any incidences

18   where pepper spray was -- was unleashed on demonstrators after

19   that TRO was entered?

20   A.  No.  No, I'm not.  Not any demonstration I was involved

21   in.  There was none when we had an operation plan and we set

22   up a command post.  There was none -- I'm not saying there

23   wasn't pepper spray used, but it wasn't used in one of our

24   operations.

25   Q.  Commander Phelan, the video with the gentleman in the car

20-CV-01616-RBJ    Preliminary Injunction    06/25/2020    39

 1  that you just saw, was he a protester or a rioter?

 2         MR. FARLEY:  Objection to the foundation.

 3         THE COURT:  He was a loud-spoken gentleman.  No

 4  indication that he was a rioter.  He was a protester on the

 5  video.  He might have been a rioter otherwise, but not on the

 6  video.

 7  Q.  (By MR. ZIEV) Now, Commander, you said that the behavior

 8  of the individual dictates the response by the police

 9  department; is that right?

10  A.  Correct.

11  Q.  Of what you saw on the video that was shown, what was the

12  behavior that dictated that response from the police

13  department?

14  A.  Well, I don't know.  From what I saw on the video, I can't

15  say what happened prior to that.  And I'm with the judge too.

16  They fired a pepper ball on him.  It shocks the conscience a

17  little bit why they did that.  I don't know.

18  Q.  Okay.  Let me rephrase that question, Commander.  Did you

19  see anything that that gentleman did that dictated that

20  response of the pepper balls by the Denver Police Department?

21         MR. FARLEY:  Objection to the foundation.

22         THE COURT:  He's already said --

23  A.  I can respond to that.  It was a short video clip --

24         THE COURT:  He already said what he has to say about

25  it.  I think he and I understand perfectly well what the facts

                    Sarah K. Mitchell, RPR, CRR

20-CV-01616-RBJ    Preliminary Injunction    06/25/2020    40

1    are, and I think that he and I understand that if that's all

2    that occurred, it was inappropriate.

3            Onward.

4    Q.  (By MR. ZIEV) Do you agree with that statement, Commander?

5    A.  Yes.

6            MR. FARLEY:  It's been asked and answered repeatedly.

7            THE COURT:  Sustained.

8    Q.  (By MR. ZIEV) Okay.  Commander, do you take responsibility

9    for the actions -- I'm sorry -- does the City of Denver take

10   responsibility for the actions of other jurisdictions in how

11   they acted during the downtown demonstrations?

12           MR. FARLEY:  Object to the ambiguity of that question

13   to the extent it calls for a legal conclusion as opposed to a

14   factual conclusion from this witness.

15           THE COURT:  Overruled.  I'd like to have his

16   statements about his view of the conduct of other officers

17   from other jurisdictions.

18           MR. FARLEY:  I would just also like to make a record

19   that this is not a 30(b)(6) deposition.  He's not a 30(b)(6)

20   witness.  That he's not testifying on behalf of Denver as an

21   entity as opposed to a fact witness for Denver right now.

22           THE COURT:  Okay.  We have lawyers teamed up on both

23   sides to help us with all these explanations and objections.

24   Somewhere I want to hear what the guy has to say, because this

25   guy has a lot to say that I'm interested in.

                        Sarah K. Mitchell, RPR, CRR

20-CV-01616-RBJ    Preliminary Injunction    06/25/2020    41

1  A.  Can you repeat your question after that?  It was about an

2  outside jurisdiction.  I apologize.  Go ahead.

3  Q.  (By MR. ZIEV) Commander Phelan, does the City of Denver

4  take responsibility for the actions of other jurisdictions at

5  the downtown Denver demonstrations?

6  A.  Yes.  They're working as an agent for the Denver Police

7  Department.  We ask them for help, and they come to help us.

8  They're acting as an agent for us.

9  Q.  Do you think it's appropriate for outside jurisdictions to

10  use a different use-of-force policy than the Denver Police

11  Department itself is required to use?

12  A.  Well, I think I talked about that.  They are trained on

13  their use-of-force policy.  They're trained on their

14  less-lethal munitions, and they're trained on the policy and

15  the report.  So, yes, I think they should be doing that.

16  Q.  I'm sorry.  You think they should be doing what?

17  A.  Using their own use-of-force policy, using their own

18  less-lethal munition.

19          MR. ZIEV:  If I may just have a moment, Your Honor.

20          THE COURT:  All right.  The moment is over.

21          MR. ZIEV:  Yes.

22          THE COURT:  Redirect examination?

23          MR. FARLEY:  Thank you, Your Honor.

24

25

                    Sarah K. Mitchell, RPR, CRR

20-CV-01616-RBJ   Preliminary Injunction   06/25/2020   42

1                          REDIRECT EXAMINATION

2     BY MR. FARLEY:

3     Q.  Commander Phelan, who made the determination to call in an

4     outside agency?

5     A.  It would be the chief of police, management of safety.

6     Q.  And so their determination of the legal relationship

7     between the City of Denver and outside agencies is what

8     controls as opposed to your determination?

9     A.  Yes.

10          MR. FARLEY:  That's all the questions I have for

11    Commander Phelan.  I appreciate it.

12          THE COURT:  All right.  Next witness.

13          MR. FARLEY:  Your Honor, I would call Lieutenant

14    Thomas Pine.

15                            THOMAS PINE

16    was called as a witness and, having been duly sworn, was

17    examined and testified as follows:

18          THE COURT:  Thank you.  I like your hairstyle.

19          THE WITNESS:  I like yours as well.  And I also like

20    to be brief, which I know you like as well.

21          THE COURT:  I sure do.

22                          DIRECT EXAMINATION

23    BY MR. FARLEY:

24    Q.  Lieutenant Pine, can you state your current position and

25    the length of that position?

                         Sarah K. Mitchell, RPR, CRR

20-CV-01616-RBJ     Preliminary Injunction     06/25/2020     43

1    A.  I have been a lieutenant in the Metro SWAT canine section

2    for seven years.

3    Q.  And did you have a role in response to the protests and

4    resulting crowd activities following the death of George Floyd

5    in Minneapolis?

6    A.  Yes, I did.  As a result -- as the Commander spoke, as

7    part of the special operations I responded as part of the

8    respond -- department's response to the situation.  I was

9    specifically assigned and the Metro SWAT section was assigned

10   as rapid deployment vehicles.  Obviously our overall mission

11   was the protection of property, the preservation of life, the

12   protection of people's right to freely assemble, the

13   protection of their First Amendment rights.  And also, like I

14   said, protection of property and life safety.

15   Q.  Lieutenant Pine, where were you deployed on those first

16   few nights?

17   A.  So as the rapid deployment vehicle, we were essentially

18   deployed everywhere that a hotspot came up.  If there was a

19   violent incident going on, if officers were taking rocks,

20   that's where we went.

21   Q.  Did you see any rocks thrown?

22   A.  Absolutely.

23   Q.  Did you get hit with any rocks?

24   A.  Multiple times.

25   Q.  Do you have rocks that hit you with you today?

Sarah K. Mitchell, RPR, CRR

20-CV-01616-RBJ     Preliminary Injunction      06/25/2020     44

1   A.  Yes, I do.

2   Q.  Can you show them to the Court?  Now, how big are those

3   rocks?

4   A.  About the size of my hand.

5   Q.  Okay.  I want to address an exhibit that plaintiff

6   submitted with their complaint, Exhibit L.  You're depicted in

7   that exhibit, aren't you?

8   A.  Yes, I am.

9   Q.  And I'm not going to try to play it to the Court, but

10  Exhibit L, can you describe to me what is shown in that video?

11  A.  So what's shown in the video is a field force line (audio

12  distortion) district officers from District 1 and District 5

13  backed up by a Metro RDV, which is rapid deployment vehicle,

14  which we initially responded to that specific location from

15  for a 911 call for a citizen trapped in a car by protesters.

16  The video shows me pointing towards a crowd.  I was pointing

17  at an area of the crowd where I was receiving rocks and

18  bottles.  I was hit in the face with a bottle right in front

19  of that RDV, and there's a couple rocks and bottles visible on

20  the ground right in the video as well.  I pointed towards the

21  section of the crowd where the bottles and rocks were coming

22  from.  We had made repeat announcements -- Lieutenant J.D.

23  Williams actually did it -- over the PA requesting the crowd

24  leave.  We needed to get those cars out of that crowd.

25          During our -- during our initial response, we tried

1   to get in there, just the Metro guys, and get those people

2   out.  We were fought.  We had to make three arrests.  We were

3   assaulted.  We called for help.  That's when District 1 and

4   District 5 showed up.  We began making announcements.  We gave

5   them ten minutes warning, orders to disperse.  We told them

6   which direction we wanted them to leave, and we gave them five

7   minutes warning, three minutes warning, and continually took

8   rocks and bottles until we did throw the initial gas that is

9   shown being thrown, and that was actually a smoke.  It was not

10  any kind of chemical irritant.

11  Q.  And so plaintiffs have characterized Exhibit L as, quote,

12  video of police throwing tear gas unprompted into a peaceful

13  crowd.  Is that an accurate representation of the

14  circumstances as you were there on scene?

15  A.  100 percent no.

16  Q.  Were the protesters -- in response to the 10-minute,

17  5-minute, 3-minute warnings to disperse, were they given an

18  opportunity to leave that area?

19  A.  Absolutely.

20  Q.  And where would they have been directed to leave?

21  A.  We directed them to leave to the east down 14th or to the

22  south down Sherman.

23  Q.  And were the violent protesters the ones that you see in

24  the front line of the protesters or somewhere else?

25  A.  No.  They were back behind from the State Capitol area.

20-CV-01616-RBJ    Preliminary Injunction    06/25/2020    46

1   Q.  Hidden in the crowd behind the front?

2   A.  Correct.

3   Q.  Was there anything notable about the uniforms that the

4   District 1 and District 5 patrol officers were wearing?

5   A.  They were not in their full riot gear.  They had their

6   helmets on and their gas masks on, but they were still in

7   their patrol uniforms, which means essentially they came down

8   rather quickly, were called to the situation, and at no time

9   did they have time to get their full riot gear with them.  So

10  it was the first night of the protests, so they were not

11  prepared for that kind of violence.

12  Q.  And have you seen a change in the type of violence and

13  violent protests that were occurring in that first few days of

14  protest activity in May and early June?

15  A.  Yes.  I've been out on the street and in the command post,

16  and since the Sunday, so the fourth night, since then we have

17  not had any confrontations.  We've done exactly what the

18  Commander spoke about, protecting their First Amendment

19  rights.  We've protected -- blocked streets for them so they

20  don't get run up on by traffic.  So, no -- and I'm not aware

21  of any violent confrontation after Sunday, which would have

22  been the 1st, I believe.

23       MR. FARLEY:  That's all the questions I have for

24  Lieutenant Pine.

25       THE COURT:  Cross-examination.

                    Sarah K. Mitchell, RPR, CRR

20-CV-01616-RBJ    Preliminary Injunction    06/25/2020    47

1                        CROSS-EXAMINATION

2   BY MR. ZIEV:

3   Q.  Lieutenant Pine, have you seen the videos that have been

4   part of the complaint filed in this case?

5   A.  Yes.

6   Q.  Okay.  Have you seen all of them?

7   A.  I'm not sure if I've seen all of them.  I've seen several.

8   Q.  Okay.  Can you describe some of the videos that you have

9   seen?

10  A.  I know I saw the one that you brought up with the RDV --

11  the last one that you brought up that we could see I saw.  I

12  saw the car video.  I saw one of the lady blocking our RDV

13  where we were trying to get to a call for help where we pepper

14  balled the ground beneath her, and she left, and it

15  accomplished its purpose.

16  Q.  Let me -- I'm going to try this one more time to see if we

17  can figure out how to do this, so just bear with me.  I

18  appreciate it.

19          MR. ZIEV:  Your Honor, I'll start by moving Exhibit L

20  into evidence.

21          THE COURT:  Exhibit L.  Okay.

22          MR. ZIEV:  This is the one --

23          THE COURT:  Admitted.  Yes, it's the one that he just

24  said your description was 100 percent wrong.

25          MR. ZIEV:  Right.

                    Sarah K. Mitchell, RPR, CRR

1          THE COURT:  It's admitted.

2       (Plaintiff's Exhibit L received.)

3          MR. ZIEV:  Are you able to see this?

4          THE WITNESS:  No.

5          MR. ZIEV:  I don't know what's going on.

6          MR. FARLEY:  We just have a white screen.

7          MR. ZIEV:  I don't know what to do about this.  Your

8  Honor, I thought there was an IT person on the line; is that

9  right?

10          THE COURTROOM DEPUTY:  Yes, that's correct.

11          MR. ZIEV:  Is there any way we can get a little bit

12  of help here?  I don't understand why it stopped working, and

13  these videos are very important for us to enter into evidence.

14          THE COURTROOM DEPUTY:  I can see it on my screen, so

15  I'm wondering if it might be an issue with the defendant.

16          THE COURT:  I can see them also.

17          MR. FARLEY:  We know what Exhibit L is.  We can

18  probably show it internally.  We just can't see if you point

19  to specific things.

20          THE COURT:  I can see one guy standing there.  I can

21  only see him from the shoulders down holding some long object.

22          MR. ZIEV:  And that's fine, Your Honor.  If we can

23  have the witness see Exhibit A somehow?  You know, Conor, can

24  you get Exhibit A out in front of him?

25          MR. FARLEY:  Exhibit A or Exhibit L?

20-CV-01616-RBJ    Preliminary Injunction    06/25/2020    49

1           MR. ZIEV:  A as in apple.

2           THE COURT:  Oh.

3           THE WITNESS:  Would you like me to try to pull it up

4    on my cell phone?

5           MR. ZIEV:  Do you have access to all the exhibits on

6    your cell phone?

7           MR. FARLEY:  They were e-mailed to him.

8           THE WITNESS:  I can pull them up.  I haven't seen it.

9           THE COURT:  Well, I also thought he said L.  Now he's

10   saying he said A.

11          MR. ZIEV:  Yes, Your Honor.

12          THE COURT:  So I admitted L.  I didn't admit A.

13          MR. ZIEV:  Your Honor, we did ask for L to be

14   admitted.  I'm just going back to A now.

15          THE COURT:  Oh.  So you're zigging and zagging on

16   your exhibits.

17          MR. ZIEV:  That's right, Your Honor.  I'm going to

18   try to lay the foundation on these, but I need -- I can't do

19   it unless the witness can see the video.

20          THE COURT:  Well, he can probably --

21          MR. FARLEY:  We have pulled up Exhibit A.

22          MR. ZIEV:  Okay.

23          THE COURT:  It's a cop standing there with pink boots

24   on.

25          MR. FARLEY:  Yes.  We've pulled it up.

                    Sarah K. Mitchell, RPR, CRR

20-CV-01616-RBJ    Preliminary Injunction    06/25/2020    50

1   Q.  (By MR. ZIEV) Lieutenant, have you seen this video?

2   A.  Yes.

3   Q.  All right.  Is this -- can you -- did this happen at the

4   downtown Denver demonstrations?  Can you confirm that this

5   officer is a Denver or a jurisdiction that Denver has invited?

6   A.  I can't determine that at all actually.  I don't know

7   where the video -- it's very short video.  I can't even hardly

8   make out the badge.

9          THE COURT:  Well, let's be clear here.  It's not a

10  video.  At this point it's just a still.

11         MR. ZIEV:  Right, Your Honor.  Okay.

12         THE COURT:  And you can't see the guy's head.

13     (Video played.)

14         THE COURT:  But it makes sense that he's either a

15  Denver police officer or one of the ones that came in from

16  another jurisdiction.  He doesn't look like one of the

17  protesters.

18  Q.  (By MR. ZIEV) Lieutenant Pine, can you confirm that that

19  is a Denver officer or an officer from an outside jurisdiction

20  at the Denver protests?

21  A.  I'm not going to say for sure because I can't tell exactly

22  where it is.  It sure looks like it because of the RDV in the

23  background, but I don't know, and I can't tell if it's a

24  Denver cop because he's wearing his full turtle gear, so it's

25  obviously the second day.  But I can't for sure say it's a

                    Sarah K. Mitchell, RPR, CRR

20-CV-01616-RBJ    Preliminary Injunction    06/25/2020    51

1    Denver officer or somebody called in to help.

2    Q.  Okay.  Can you confirm it's one of the two, either a

3    Denver officer or an officer called in to help?

4    A.  As long as the video came from downtown, but I don't know

5    that.

6    Q.  Do you see anything you can --

7        (Video played.)

8    Q.  (By MR. ZIEV) Can you not tell from that video whether it

9    happened downtown?

10   A.  It could have happened anywhere.  It's a street.

11   Q.  All right.  I'll move on.

12       (Video played.)

13   Q.  (By MR. ZIEV) Okay.  Now, I'm showing what's been marked

14   as Exhibit B.  Can you bring up Exhibit B?

15   A.  Is there a video being played?

16   Q.  No.  I'm asking you can you see video B.

17   A.  Go ahead.

18   Q.  Can you confirm Exhibit B took place at the downtown

19   Denver demonstration?

20   A.  Yes.  That looks like one of the streets downtown, and

21   there's RDVs there.

22   Q.  Okay.

23       MR. ZIEV:  Your Honor, we'd like to admit Exhibit B

24   into evidence.

25       MR. FARLEY:  I'm going to object to the --

Sarah K. Mitchell, RPR, CRR

20-CV-01616-RBJ    Preliminary Injunction    06/25/2020    52

1           THE COURT:  I can't see it.

2           MR. FARLEY:  We don't know the time of that video.  I

3     don't think there's any foundation for that video to be

4     admitted, other than he admits that it's --

5           THE COURT:  I can't tell.  I can't see it anyway.

6     It's not showing to me.

7        (Video played.)

8           THE COURT:  Well, I saw that.  It didn't tell me

9     anything at all.  So I'm not going to admit it because it's --

10    it was a nothingburger, as far as I could see.

11          MR. ZIEV:  Yes, Your Honor.

12          THE COURT:  Wrap up your cross.  Mr. Farley's hour is

13    already more than past --

14    Q.  (By MR. ZIEV) Lieutenant Pine --

15          THE COURT:  -- largely because of the plaintiffs'

16    cross-examination.

17    Q.  (By MR. ZIEV) Lieutenant Pine, did you see any conduct by

18    any officers downtown at the downtown Denver demonstrations

19    that would violate Denver's use-of-force policy?

20    A.  No, I did not.

21    Q.  Did you see any conduct at the downtown Denver

22    demonstrations that you believe was inappropriate coming from

23    officers?

24    A.  No.

25          MR. FARLEY:  Objection.

                    Sarah K. Mitchell, RPR, CRR

20-CV-01616-RBJ    Preliminary Injunction    06/25/2020    53

1   Q.  (By MR. ZIEV) Now, you said you did review several of the

2   videos as part of the complaint.  None of those videos struck

3   you as inappropriate uses of force?

4        MR. FARLEY:  I object to the foundation, and it calls

5   for speculation on an incomplete basis.

6        THE COURT:  Overruled.  He may answer.

7   A.  I've seen the videos, and without knowing all the facts

8   and totality of the circumstances, I can't say one way or the

9   other.

10  Q.  (By MR. ZIEV) Lieutenant Pine, have you heard of any

11  officers making complaints against other officers for their

12  use of force as part of the downtown demonstrations?

13  A.  No, I have not.

14        MR. ZIEV:  Okay.  I have nothing further for this

15  witness right now, Your Honor.

16        THE COURT:  All right.  Mr. Farley.

17        MR. FARLEY:  Your Honor, I would -- I have no

18  redirect, Your Honor.  I would request since we only used

19  29 minutes of our allotted hour --

20        THE COURT:  I'll give you a little more time.

21        MR. FARLEY:  I appreciate it.

22        THE COURT:  Call your next witness.  Make it brief.

23        MR. FARLEY:  I'm going to pass to co-counsel to call

24  the next witness.

25        MS. LEWIS:  Your Honor, we call Sergeant Carla

Sarah K. Mitchell, RPR, CRR

```
         20-CV-01616-RBJ      Sgt. Carla Havard      06/25/2020    54
```

 1   Havard.

 2           THE COURT:  Havard, H-a-v-v?

 3           MS. LEWIS:  H-a-v-a-r-d.

 4           THE COURT:  Okay.  Hi there, Sergeant.

 5           THE WITNESS:  Hello, sir.

 6                       CARLA HAVARD

 7   was called as a witness and, having been duly sworn, was

 8   examined and testified as follows:

 9           THE COURT:  Okay.

10                    DIRECT EXAMINATION

11   BY MS. LEWIS:

12   Q.  Sergeant Havard, who's your current employer?

13   A.  I'm a sergeant with the Denver Police Department.

14   Q.  And how long have you been employed there?

15   A.  22 years.

16   Q.  And what's your current title?

17   A.  I supervise the Citywide Impact Team.

18   Q.  What's the Citywide Impact Team?

19   A.  It's a crisis mitigation, community engagement team under

20   Chief Pazen.

21   Q.  Were you involved with the police response to protests

22   that occurred on May 30th, 2020?

23   A.  I was.

24   Q.  And could you briefly describe your role in the protest

25   response that day.

                       Sarah K. Mitchell, RPR, CRR

20-CV-01616-RBJ    Preliminary Injunction    06/25/2020    55

1   A.  My team was partnered with the citywide secondary team,

2   Sergeant Stinson and his officers, as a rapid deployment team,

3   and we were operating on an RDV.  That's one of those vehicles

4   where you see the officers standing on the side.

5   Q.  Okay.  And earlier you were present while video was played

6   showing one of those vehicles with a bunch of officers

7   standing on the sides?

8   A.  Yes, I did see a clip of that.

9   Q.  Did you recognize that video?

10  A.  I did.

11  Q.  And that was Exhibit F to plaintiffs' complaint, do you

12  know?

13  A.  There was quite a few videos.  I can't remember exactly.

14  Q.  Okay.  How did you recognize the video?

15  A.  It appeared to be myself and my team on one of the

16  deployments.

17  Q.  Do you know when it was taken?

18  A.  It had to be taken on the 30th, on May 30th.

19  Q.  About what time of day?

20  A.  You know, I'm not exactly sure.  Maybe 6-ish.

21  Q.  Can you explain what was going on with your unit at the

22  time that video was taken?

23  A.  At the time of that small clip of video that I saw?

24  Q.  Explain the small clip of the video first, what was going

25  on in that video as we saw it.

Sarah K. Mitchell, RPR, CRR

20-CV-01616-RBJ     Preliminary Injunction     06/25/2020     56

1   A.  On that video we were retreating.

2   Q.  Okay.

3   A.  We had come under attack.  We were taking rocks and

4   bottles, and we were overwhelmed, and we were retreating from

5   that area.

6   Q.  And can you explain what happened immediately before that

7   video clip which is not depicted on the video?

8   A.  Yes.  Initially we were deployed to the 1400 block of

9   Lincoln on the south side of it to serve as a barrier for that

10  street.  We were told that the officers from the north end of

11  the street were going to deploy smoke and/or gas in an effort

12  to clear the protesters and violators off of the street, and

13  our role was to form a barrier or a skirmish line to prevent

14  them from continuing south on the street and either going to

15  Civic Center Park or to the Capitol to exit off the roadway.

16  Q.  Were you able to be successful in forming a skirmish line?

17  A.  Very briefly.  We were completely overwhelmed, and we only

18  had eight officers on the line, most of whom did not even have

19  less lethal tools with them, and we quickly became overwhelmed

20  and under attack with rocks and bottles and other debris.

21  Q.  Can you explain what you mean a little more by under

22  attack?

23  A.  Well, when we got out of the vehicle we only had eight

24  officers, and that portion of the street is very lengthy, so

25  we stretched them as widely as we can.  When the force of the

20-CV-01616-RBJ    Preliminary Injunction    06/25/2020    57

1    hundreds of protesters started running toward us from the

2    north to the south, we just became overwhelmed and enveloped.

3    Then they started throwing rocks at us, collapsed the line.  I

4    called in the vehicle to come and pick us up so we can retreat

5    from that area.  It wasn't safe for us.

6    Q.  Was there any other items thrown at you besides rocks?

7    A.  Yes.  A few items that they had -- they had water bottles

8    filled with some sort of tan liquid.  We don't know if it was

9    iced tea or gasoline or urine, but that was being thrown at

10   us.  I personally got hit with a can of soup, because it hit

11   my leg, and then it hit the ground, and it burst open, and my

12   pants leg was filled with that.  We got hit with rocks and

13   other chunks of cement.  I don't know where exactly that came

14   from, but that was pretty much it.

15   Q.  Did officers under your supervision at that time use

16   pepper balls?

17   A.  Yes.

18   Q.  And did you feel that was an appropriate use of the pepper

19   ball?

20   A.  Yes, absolutely I did.

21   Q.  And do you know -- could you tell who they were aiming the

22   pepper balls at?

23   A.  Well, we were aiming the pepper balls at the direction and

24   at the people that we saw and we identified that was throwing

25   rocks.

                        Sarah K. Mitchell, RPR, CRR

20-CV-01616-RBJ    Preliminary Injunction    06/25/2020    58

1    Q.  Okay.

2    A.  And other debris.

3            MS. LEWIS:  All right.  Those are the only questions

4    I have.

5            THE COURT:  Cross-examination.

6                        CROSS-EXAMINATION

7    BY MR. ZIEV:

8    Q.  Good afternoon, Sergeant Havard.  Did you see any conduct

9    -- did you see any conduct at the downtown Denver

10   demonstrations that you believed was inappropriate by the

11   officers there?

12   A.  No, I did not.  Not by -- certainly not by my officers,

13   and I wasn't aware of anything else.

14   Q.  Are you aware of any complaints by an officer against

15   another officer for any of the conduct that happened at the

16   downtown Denver demonstrations?

17   A.  I wasn't aware that those were coming in.  No, I'm not

18   aware of that.

19   Q.  Sergeant, how long have you been on the force?

20   A.  22 years.

21   Q.  In those 22 years have you been made aware of a report

22   from an officer against another officer for excessive use of

23   force?

24   A.  In 22 years have I been made aware that an officer filed a

25   complaint on some other officer?

                        Sarah K. Mitchell, RPR, CRR

20-CV-01616-RBJ    Preliminary Injunction    06/25/2020    59

1   Q.  For an excessive --

2   A.  I think I'm unclear on that question.

3          MS. LEWIS:  Objection as beyond the scope of direct.

4          THE COURT:  Okay.  Overruled.  Go ahead and answer.

5   Q.  (By MR. ZIEV) Would you like me to ask it again, Sergeant?

6   A.  Yes, if you don't mind.

7          THE COURT:  She knows the question.

8          MR. ZIEV:  Okay.

9   A.  Over 22 years I've heard rumors -- when officers file

10  complaints, of course the rumor mill happens, but I don't know

11  of any personal officer who has filed complaints.  But sure, I

12  hear of complaints eventually that have been filed against

13  officers for various things.

14  Q.  (By MR. ZIEV) By another officer for excessive use of

15  force?

16  A.  I'm sorry.  That didn't come through.

17  Q.  By an officer against another officer for excessive use of

18  force?  Are you familiar with --

19  A.  I can't recall that.  Most of the time it's because of

20  some sort of domestic situation that I recall hearing about

21  different complaints.

22  Q.  When you said that pepper balls were shot at the incident

23  that you just described, how confident are you that you hit

24  the wrongdoers?

25  A.  Well, certainly that was our goal and that was our intent,

20-CV-01616-RBJ    Preliminary Injunction    06/25/2020    60

1    and I can tell you that after those sporadic rounds of pepper

2    balls were fired, the rocks stopped coming and the debris

3    ceased from hitting us, so I would imagine that it was very

4    successful.

5    Q.  How many pedestrians -- or I'm sorry -- how many peaceful

6    protesters would be an appropriate amount to hit with the

7    pepper balls in order to prevent somebody else from throwing

8    one of those rocks?

9          MS. LEWIS:  Objection, Your Honor.  Calls for

10   speculation.

11         THE COURT:  Okay.  Overruled.

12   A.  Actually, we don't -- we don't target peaceful protesters.

13   One of the main criteria for using those tools are for people

14   who are engaged in civil unrest, so we wouldn't target a

15   peaceful protester.  So the answer would be none is

16   appropriate.

17   Q.  (By MR. ZIEV) Do you believe that you hit pepper balls on

18   anyone that wasn't being violent?

19   A.  There's always that possibility, but it certainly wasn't

20   our intent.  It was a very fluid situation.  People -- it was

21   very chaotic.  People were moving around, but that was not the

22   intent, but certainly a possibility.

23   Q.  And you just fired in the direction of where you believed

24   the rocks came from, correct?

25   A.  No.  We fired at the individuals that we saw that was

                    Sarah K. Mitchell, RPR, CRR

20-CV-01616-RBJ     Preliminary Injunction     06/25/2020     61

1   throwing the rocks.

2   Q.  How many rounds did you fire?  I'm sorry.  Go ahead.

3   A.  I personally didn't fire any rounds.

4   Q.  How many rounds do you remember being fired?

5   A.  I don't have -- I don't have a number for that.  I know it

6   was not continuously.

7   Q.  Was it more than ten?

8   A.  I can't give a specific number.

9   Q.  Okay.  Sergeant Havard, do you believe that the police

10  adequately police themselves?

11  A.  Absolutely.  I think we have systems and processes in

12  place to -- and checks and balances in place.  Absolutely.

13  Q.  Now, Sergeant -- Sergeant Havard, in 2011 the city settled

14  a lawsuit in which you were involved and you were accused of

15  excessive force while you were off duty, correct?

16  A.  Yes.  I do have -- I did have a case like that.  I wasn't

17  sure if it was 2011, but yes.

18  Q.  And that got settled out of court, correct?

19          MS. LEWIS:  Objection, relevance.

20          THE COURT:  Sustained.

21          MR. ZIEV:  Your Honor, if you'd give me just a little

22  leeway.

23          THE COURT:  Sustained.

24          MR. ZIEV:  Yes, Your Honor.

25  Q.  (By MR. ZIEV) Can you pull up Exhibit F with your counsel,

20-CV-01616-RBJ     Preliminary Injunction     06/25/2020     62

1   Sergeant Havard, please.

2   A.  It's up.  I'm watching it.

3   Q.  Is this the vehicle that you were on?

4   A.  Yes, it is.

5   Q.  Okay.  Let's watch this.

6           MR. ZIEV:  Your Honor, I move Exhibit F into

7   evidence.

8           MS. LEWIS:  No objection.

9           THE COURT:  I thought I already admitted it, but it's

10  admitted.

11      (Plaintiff's Exhibit F received.)

12      (Video played.)

13  Q.  (By MR. ZIEV) Sergeant?

14  A.  Yes.

15  Q.  Are you familiar with the officer that fired that shot?

16  A.  Not so much.  That was my first time working with him.

17  Q.  What's that officer's name?

18  A.  Allred.

19  Q.  Allred?

20  A.  Yes.

21  Q.  Were you in a position to see what that shot was in

22  response to?

23  A.  Let me refresh my memory.  I know that we were taking

24  rocks and bottles from the west.  I was actually pointing and

25  directing the less lethal officers to engage people that I saw

                    Sarah K. Mitchell, RPR, CRR

20-CV-01616-RBJ     Preliminary Injunction     06/25/2020     63

1   that were throwing rocks and other debris at us.

2   Q.  I'm sorry.  Are you watching the video again?  Is that

3   what's going on?

4   A.  Yes.

5   Q.  Okay.  As part of that video do you see any rocks coming

6   from the direction that that officer shot in that video?

7   A.  At that time I wasn't facing toward that way.  I was

8   facing the opposite way trying to get the driver to get us

9   actually the heck out of there, but I know that we had been

10  continually taking rocks and other debris.  But, no, I did not

11  see.

12  Q.  Do you see any -- do you see any action in the video that

13  you just saw that would make it appropriate to shoot a pepper

14  ball at that person filming?

15          MS. LEWIS:  Objection, foundation.

16          THE COURT:  Overruled.

17          MS. LEWIS:  There's been no discussion of who's

18  filming.

19          THE COURT:  It doesn't make any difference who was

20  filming.

21  A.  I think I lost your question, Counselor, if you don't

22  mind.

23  Q.  (By MR. ZIEV) That's okay.  Thank you, Sergeant.

24  Sergeant, my question is do you see actions in that video that

25  would make it appropriate to shoot a pepper ball in the

Sarah K. Mitchell, RPR, CRR

20-CV-01616-RBJ    Preliminary Injunction    06/25/2020    64

1   direction of where that video was filming?

2   A.  Absolutely.  I know that we were taking rocks from that

3   west side, and it looked like the pepper ball was fired to the

4   west, so that answer would be yes.

5   Q.  Okay.  So you believe that was appropriate without seeing

6   anything else there, correct?

7   A.  Yes.

8   Q.  Okay.

9           MR. ZIEV:  I don't have anything further, Your Honor.

10          THE COURT:  Okay.  All right.  That will conclude the

11  defendant's presentation.

12          Now, does the plaintiff have any presentation?

13          MR. ZIEV:  Yes, Your Honor.

14          THE COURT:  All right.  Go -- or first, let me ask

15  the court reporter, do you want to break here?  Let's take ten

16  minutes here and resume.

17          THE COURTROOM DEPUTY:  Court is in recess.

18          THE COURT:  We'll resume at 3:14.

19      (Break was taken from 3:04 p.m. to 3:14 p.m.)

20          THE COURTROOM DEPUTY:  Court is in session.

21          THE COURT:  All right.  Plaintiff, go.

22          MR. ZIEV:  Thank you, Your Honor.  Plaintiff calls

23  John Reed, if you're on the phone, John.  John Reed, are you

24  on the phone?  John Reed, will you please take yourself off

25  mute?

                    Sarah K. Mitchell, RPR, CRR

20-CV-01616-RBJ    Preliminary Injunction    06/25/2020    65

1              THE COURT:  In case he does show up, how do you spell
2    his name?
3              MR. ZIEV:  J-o-h-n.  His last name is Reed, R-e-e-d.
4              John Reed, are you on the phone?
5              My co-counsel will figure that one out.  I'll call
6    Kevin Kreeger.
7              THE COURT:  Spell the name.
8              MR. ZIEV:  K-e-v-i-n K-r-e-e-g-e-r.
9              Kevin, are you there?  I see you're there.  I see you
10   on mute.  Kevin, if you can take yourself off mute.
11             THE WITNESS:  There.  Did that work?
12             MR. ZIEV:  Yeah, that works.  Thank you.
13             THE WITNESS:  Sorry about the delay.  It was for some
14   reason switching from my headset to my computer.
15             MR. ZIEV:  Mr. Kreeger, will you please introduce
16   yourself to the Court.
17             THE COURT:  Well, just a minute.  I have to swear him
18   in.  Hold on.  I don't see him, though.  I see Mr. Farley.
19   It's probably a good idea to call Mr. Farley.  There he is.
20             Kevin, raise your hand, please.
21                             KEVIN KREEGER
22   was called as a witness and, having been duly sworn, was
23   examined and testified as follows:
24             THE COURT:  Thank you.  Go ahead.
25

                    Sarah K. Mitchell, RPR, CRR

20-CV-01616-RBJ    Preliminary Injunction    06/25/2020    66

1                           DIRECT EXAMINATION

2    BY MR. ZIEV:

3    Q.  Mr. Kreeger, will you please introduce yourself to the

4    Court.

5    A.  Sure.  My name is Kevin Kreeger.  I live in Broomfield,

6    Colorado.  I'm not sure what else you want to know.

7    Q.  Mr. Kreeger, have you ever served on government, any sort

8    of government?

9    A.  I have.  I was a city council member and county

10   commissioner here in the City and County of Broomfield for

11   four years.

12   Q.  Mr. Kreeger, have you been able to attend any of the

13   downtown Denver demonstrations?

14   A.  I did.  I went on one day.  I went on the first Saturday,

15   maybe the third day of protests or so.

16   Q.  Okay.  Mr. Kreeger, I'm going to walk you through your

17   experience there.  What brought you out to the protest?

18   A.  Well, what brought me out was wanting to participate in a

19   movement that stood for something that I very much stand for,

20   which is complete equality for all people in government and

21   under the law.

22   Q.  What -- about what time did you get down there?

23   A.  About 2:30, I think.  In the afternoon.

24   Q.  If you'll just walk us through what you saw when you first

25   got down there.

Sarah K. Mitchell, RPR, CRR

20-CV-01616-RBJ    Preliminary Injunction    06/25/2020    67

1   A.  Sure.  So -- well, I went to the State Capitol, and there

2   were really a large number of people around the Capitol

3   Building on the west side.  I had a cardboard sign, you know,

4   saying to get rid of corruption in government and the police,

5   and many other people did too.  So there were a couple of

6   people on the steps of the Capitol that were trying to speak

7   to the crowd using a very tiny speaker, like a home karaoke

8   speaker, and no one could hear them, but people were looking

9   at them and just kind of milling around, standing around

10  chatting.  You want me to keep --

11  Q.  I'll walk you through it.  At any point did you see the

12  protest move from that spot?

13  A.  Yeah, twice.  Once everybody kind of went down onto

14  Lincoln from the Capitol and from the lawn, and, you know,

15  some people set up cones and led the crowd kind of in some

16  chants, basic chants.  And then the crowd moved again -- it

17  would be north towards Colfax, and so both times I went with

18  the crowd.  The second time was a little confusing.  I didn't

19  know where everybody was going.  I just had gotten there.  But

20  I followed the crowd down Colfax going to the east, and so I

21  went that way too.  There seemed to be a plan, and people

22  seemed to know where everyone was going.  And we went for five

23  blocks down and took a left -- I think that was Washington,

24  and then we were on a street adjacent to a police department,

25  and we would have been on the west side of the police

1   department, and we stopped there because there were police in

2   the road.

3   Q.  So why don't you tell me what you observed as far as the

4   police go at that intersection.

5   A.  Well, so it wasn't really an intersection.  We had started

6   -- we went about half a block down Washington, so it was right

7   in the middle of the block of Washington.  It would have been

8   between Colfax and 16th, and there was just a tremendous, a

9   tremendous police presence.  There was something that looked

10  like a small tank with somebody standing out of it with a gun

11  and SWAT type -- just kind of heavy armor stuff.  And I

12  thought, oh, okay, this is where everybody was walking to is

13  this police station, a protest or something.  I didn't know

14  the crowd I think had been doing a regular circuit, like just

15  a big circle or something, leaving the Capitol and coming

16  back.  I thought the point was to go to the police department,

17  and since the police were across the road blocking everybody

18  stopped, and everybody just kind of started doing some basic

19  chants, Black Lives Matter or, Say Their Name, or, you know,

20  Say His Name, stuff like that, and just kind of milling around

21  on the other side of the street from the police department.

22  There's actually a bunch of homes.  It's residential.  Those

23  people came out and were clapping or cheering or filming with

24  their phones, and everybody just kind of was milling about

25  basically.

Sarah K. Mitchell, RPR, CRR

20-CV-01616-RBJ    Preliminary Injunction    06/25/2020    69

1    Q.  Mr. Kreeger, I want to know what was your observation as

2    far as like the energy level of the crowd, how was the crowd?

3    A.  The crowd, you know, clearly by their presence was angry

4    and wanted to show it at some of the racial injustice we've

5    seen, but nobody felt angry.  I mean, honestly people were

6    just kind of chatting.  Somebody we would hear while we were

7    walking there was a young woman maybe in her 20s talking to

8    another young woman about a date she had.  Very casual.

9    People were chanting, and there was some energy behind that,

10   but no real outward anger, no feelings that anyone was going

11   to lose control.  I didn't see anyone lose control.  I didn't

12   see anybody on the verge.  I didn't feel in danger.  And in

13   fact, I was not even going to go to this because I didn't want

14   to be around anything that could turn dangerous.  I was

15   complete dangerous averse and felt very comfortable.

16        It was actually fairy relaxed, and it also was not

17   very dense.  I walked more or less to the front because it was

18   so easy because it wasn't dense, and people were just kind of

19   either standing and chatting or just milling a little bit,

20   just kind of moving around.  It was fairly calm.  People

21   certainly cared, but it was -- it was calm, and I thought this

22   is where we had arrived, and this is what we had arrived to

23   do.

24   Q.  And, Mr. Kreeger, I do understand there were some acts of

25   aggression from the police after that, and we're going to get

20-CV-01616-RBJ    Preliminary Injunction    06/25/2020    70

1  to that in a second, but before we do, did you hear before --

2  before there was conflict, did you hear any warnings or did

3  you hear anything from the police?

4  A.  No.  No, absolutely nothing, and I was way up in front.

5  It's a skinny one-way street, Washington there.  So, I mean, I

6  was right there by the police.  There were a couple of times

7  that a protester would say -- would come across and say,

8  Please leave more room for the police, not that it looked like

9  anything was spilling over or the police had asked, but people

10  left room.  I was right there.  There was absolutely no

11  warning of any kind at all.  Nothing -- not even an indication

12  that something was about to happen.

13  Q.  Tell us what happened next.

14  A.   Well, there was a police officer that was part of this

15  line that was standing on the east sidewalk, so it would be

16  the sidewalk directly adjacent to the police department, and

17  he had something that looked like a rifle.  I don't believe it

18  to be an actual rifle, but I think it's one of these pepper

19  ball rifles, and he was shooting shots down the sidewalk, just

20  one after another .  Bam, bam, bam, bam.  And as I was looking

21  and just processing, it just took like a second to process,

22  like, what the heck, I was seeing really in a half second then

23  all of a sudden somebody screamed something, said he's going

24  to shoot or something, then there was some -- a flash bang

25  thrown into the middle of the crowd that exploded close to me,

20-CV-01616-RBJ     Preliminary Injunction     06/25/2020    71

1   and then more flash bangs.  The crowd surged, and because they

2   were coming into the middle of the crowd, the police I think

3   wanted everybody to go back south towards Colfax, south on

4   Washington to Colfax, but if you were up kind of anywhere in

5   the upper part of this crowd, you were being pushed the wrong

6   way.

7           So the crowd surged.  There was a tremendous amount

8   of panic.  People screamed.  People ran.  At some point during

9   all that or around that time tear gas was deployed.  I moved

10  with the surge, which was back away from the police department

11  across the other side of Washington, but unfortunately

12  slightly to the north too away from Colfax, just because

13  everybody went out in a radius from whatever explosion, you

14  know, whatever flash grenade or a canister of gas.  And then,

15  you know, as soon as it was -- I was mainly in protection

16  mode, and as soon as it was clear enough, I ran with the crowd

17  towards Colfax, and ran through the tear gas to do that, and

18  then the crowd stopped at Colfax.  Some people just ran and

19  scattered.  There were people that were throwing up or dry

20  heaving.  There were people pouring milk on other people's

21  faces.  My eyes and skin were stinging.  I couldn't breathe.

22  Some people stopped and waited there at Colfax.  I was one of

23  them.  I don't know if you want me to tell what happened after

24  that or not.  There was more after that.  I don't know.

25  Q.  Go ahead, Mr. Kreeger.

                        Sarah K. Mitchell, RPR, CRR

20-CV-01616-RBJ    Preliminary Injunction    06/25/2020    72

1   A.  So everybody was on Colfax except for the people that had

2   left, so it was a smaller crowd.  And, by the way, before it

3   all happened, we'd been standing by this police department for

4   a substantial amount of time, maybe like 15 minutes or

5   something.  You know, could have even been 20 minutes.  There

6   just was no indication at all that anybody was doing anything

7   wrong or there was any problem.  So when people amassed back

8   at Colfax, after about just a few minutes, maybe five, the

9   police starting coming up Washington towards people, and as

10  soon as they started walking even towards Colfax, they were

11  firing tear gas ahead of them towards Colfax and as far as

12  Colfax.  It was coming out -- you know, coming down

13  Washington, and the gas was in the intersection of Colfax.

14          So then like with a lot of people, I started moving,

15  jogging as quickly as the crowd allowed, back to the west

16  towards the State Capitol where we had come from.  We were

17  backtracking.  And the tear gas was going right down the

18  street between the buildings just being carried by the wind.

19  Everybody was in a cloud of it.  And to be honest, it's not

20  just the tear gas that makes you cry and irritates your eyes.

21  I did not really know what it was before.  You cannot actually

22  breathe it.  It is a chemical that your lungs won't let you

23  breathe.  It isn't a matter of breathing hard but burning.

24  You can't even suck it in.  When you're in a cloud of it,

25  there's almost nothing that you can possibly do to get out of

20-CV-01616-RBJ    Preliminary Injunction    06/25/2020    73

1    it except hope that you're running fast enough to get out of

2    the cloud before you're done holding your breath.  And so

3    everybody just ran back towards the Capitol, and people were

4    kind of spread at that point throughout Colfax, the Capitol,

5    and maybe Washington a bit.  Some people had certainly left

6    already.

7             And then after another period of about 10 or

8    15 minutes the police actually started backtracking.  They

9    started retreating, moved backwards north down Washington.

10   Somebody had made the decision that the protesters could go

11   through after all.  So after all that, the police backed up

12   down Washington, all the protesters came down Washington and

13   started cheering, and then we did this big loop with about

14   four or five stops where people would chant and things like

15   that, and they would set up cones and have flags.  And I guess

16   I learned that this was just maybe one of the stops on the

17   entire loop at that point.  And so we finished the loop.  It

18   was like a mile, mile and a half loop or whatever, three,

19   four, five stops, ended up back at the Capitol Building.

20   Q.  Mr. Kreeger, have you been back to downtown Denver

21   demonstrations since then?

22   A.  No.

23   Q.  Why not?

24   A.  Well, I think for two reasons.  I mean, one is that, you

25   know, honest to God, even though it seemed mostly peaceful, I

1   was very leery of going to anything that even could turn

2   violent thinking that it would be the protesters turning

3   violent.  I didn't want to be caught up in it.  I didn't want

4   to be part of it.  I didn't want to be injured.  I didn't want

5   anything like that.  And my kids actually advised at dinner

6   that I should go down the next day.  They said just go in the

7   daytime.  If there's bad stuff, it will happen at night.  I

8   said, I'll go down.  I don't know if I'll stay.  But after

9   that, I realized it wasn't the protesters where I was, and

10  I've heard some of the other stories about protesters acting

11  badly in other place, and I'm positive that's happened, but it

12  was not the protesters where I was.  It felt unsafe.  It felt

13  like it was now not just me being part of a group of people

14  expressing our opinion and demanding change, but it was

15  actually two groups confronting, and that's not what I ever

16  wanted in the first place.

17          I was there to be part of a peaceful protest, to make

18  my voice heard.  I was not there and nor do I believe almost

19  any of those people were there to confront police and actually

20  have it turn into a battle like this, and that's not what I

21  was interested in.  That was not what I wanted to participate

22  in.  I wasn't willing to repeat that.  To be honest, my skin,

23  my arms and face burned for the rest of the day.  My voice was

24  so hoarse for three days that by the end of the day for three

25  straight days I could barely speak.  I had no interest in

20-CV-01616-RBJ    Preliminary Injunction    06/25/2020    75

1   going back for a number of reasons.  And I'm not, you know, a

2   young angry kid anymore that, you know, is going to go down

3   every day and spend hours or go down at night and cause a

4   ruckus or anything like that.  So I was never going to be down

5   there every day anyway, but I did want to participate and

6   encouraged other people to, and was kind of happy and proud

7   that my kids encouraged me to.  But after that experience,

8   that's not what I was looking for.  That's not anything close

9   to what I was looking for.  That's not what I wanted to

10  participate in.  I wouldn't go back.

11        MR. ZIEV:  Mr. Kreeger, Mr. Farley may have some

12  additional questions for you.

13        THE COURT:  All right.  Cross-examination.

14        THE COURTROOM DEPUTY:  Mr. Farley, we can't hear you.

15        THE WITNESS:  I cannot hear you.

16        THE COURT:  Sir, when you can't hear a lawyer, just

17  count your blessings.

18        MR. FARLEY:  How about now?

19        THE WITNESS:  Yes.

20        MR. FARLEY:  Thanks.

21                    CROSS-EXAMINATION

22  BY MR. FARLEY:

23  Q.  Thank you, Mr. Kreeger.  Did you file a complaint with the

24  Denver Police Department regarding this incident?

25  A.  No, I did not.

                    Sarah K. Mitchell, RPR, CRR

20-CV-01616-RBJ    Preliminary Injunction    06/25/2020    76

1   Q.  You never told anybody at the police department or the

2   city about this incident?

3   A.  Correct.

4   Q.  That day, I think it's May 30th, is that correct?  That

5   first Saturday?

6   A.  I do not know the date.  It would have been about the

7   third day of protest.  I'll trust you on the date offhand.

8   Q.  Okay.  After the initial retreat from the District 6

9   police department, you said you continued the protest route

10  that day?

11  A.  After -- after all of this tear gas deployment and

12  everything, the police did end up moving to the north down

13  Washington to let people through, and it apparently alerted

14  maybe a couple of the leaders of this whole group to that

15  fact, and we did at that point continue to go on the loop that

16  had been planned, correct.

17  Q.  Okay.  So you didn't just go home immediately?

18  A.  That is correct.

19  Q.  Okay.  And the police didn't give you that --

20  A.  I am sorry.  I was going to say, to be honest, at that

21  point I was absolutely and utterly infuriated.  I was not

22  going to be going home at all.  My entire demeanor had

23  changed.  I was very angry.

24  Q.  The police did give you an egress route after the chemical

25  deployment?

                        Sarah K. Mitchell, RPR, CRR

20-CV-01616-RBJ     Preliminary Injunction     06/25/2020     77

1    A.  Well, they let us go back to finishing the loop.  Is that

2    what you mean?

3    Q.  Yeah.  You were not trapped where you had been?

4    A.  That is correct.

5    Q.  Did you see any fireworks being thrown by protesters?

6    A.  No.

7    Q.  Did you see any bottles or rocks being thrown by

8    protesters?

9    A.  No.

10   Q.  What would be -- were you able to see behind you between

11   Colfax and the District 6 police station what was happening

12   behind you prior to the deployment of chemicals -- of chemical

13   less-lethal weapons?

14   A.  Well, you know, so I was up near the front by the police.

15   I was, you know, in the very, very front of the crowd.  That

16   was about half a block north of Colfax.  Certainly there were

17   enough people in the street that I would not have been able to

18   see Colfax generally.  Now, the crowd wasn't very dense, like

19   I said.  People were all kind of just milling about.  I might

20   have been able to get a glimpse of Colfax, but probably I

21   could not see that entire half block from my vantage point.

22   As far as who was behind me, I mean, you know, I was just kind

23   of standing there looking in different directions.  Anybody

24   could have been behind me at any point.  But as far back as I

25   could see, which was a pretty good distance, you know, maybe

20-CV-01616-RBJ    Preliminary Injunction    06/25/2020    78

1    half of that entire crowd, all I saw was people kind of

2    standing around, taking turns, leading chants, sometimes

3    waving a sign, generally holding signs, a lot of people.

4    Q.   What time of day were you at the District 6 police

5    station?

6    A.   Well, I got downtown in Denver at super roughly 2:30.

7    Maybe it was 2:45 or something.  I had to walk for a while

8    because I couldn't park by the capitol.  Then we went to

9    Lincoln.  Then we went to the police district, so I just have

10   to estimate the time, you'll understand.  But I'm going to say

11   if I was down there parking at about 2:30 or maybe a little

12   after, that maybe by that point it could have been 3:30-ish.

13   Q.   Okay.  The sun was still up?

14   A.   It could have been 3:30.  It could have even been as late

15   as 3:45 or 4 o'clock, in that timeframe.

16   Q.   Okay.  But the sun was still out at that time?

17   A.   Yes.  It was daytime.  It was afternoon.

18   Q.   Did you see any property damage or vandalism?

19   A.   Not there.  When we finished the loop I did see one person

20   spray paint some wood boards on the side of a building, and

21   somebody else ran up and pushed him, and he yelled and ran

22   off.  That was not near -- that was on the 16th Street

23   pedestrian mall.

24   Q.   One protester pushed another protester?

25   A.   I presume so, yeah.  There was -- well, there was somebody

Sarah K. Mitchell, RPR, CRR

20-CV-01616-RBJ     Preliminary Injunction     06/25/2020     79

1   -- there was this huge march, and part of our loop was to go

2   down the mall, and at one point on the mall, since you asked

3   about damage or whatever, there was a person that had spray

4   paint that was spray painting like some boards that was over a

5   business or something, and then somebody ran up and like

6   shoved him hard, and he kind of fell back and yelled and then

7   ran off.

8   Q.  You're not a plaintiff in this lawsuit, are you?

9   A.  Well, I am not sure of my exact title, to be honest.  It's

10  for the lawyer.  When I saw the story in the paper, I did

11  reach out to say that I was there, and this was wrong, and I

12  wanted to be a part of this.  Now, I'm not one of like the

13  four main named people.  I don't know actually what my legal

14  status is on the case, to be honest.

15  Q.  Okay.  Have you reviewed the complaint and the videos

16  submitted with the complaint?

17  A.  I did review the complaint.  Not -- you know, I'm not sure

18  if I reviewed a video submitted with the complaint.  Several

19  videos.  I'm not sure.  You'd have to reference the one -- I'm

20  not sure if I've seen the one you're talking about.

21  Q.  Well, I guess you didn't take any videos, did you, that

22  were submitted with the lawsuit?

23  A.  Oh, none of the videos are mine.  That's correct.  I do

24  have videos on my phone.  They were not submitted as part of

25  this complaint, I don't believe, no.

Sarah K. Mitchell, RPR, CRR

20-CV-01616-RBJ    Preliminary Injunction    06/25/2020    80

1    Q.  And you don't know of any video submitted with this

2    complaint that depict you or a scene that you were in, do you?

3    A.  That is -- well, I don't even know how many videos are in

4    the complaint, let alone, you know, could attest that I've

5    seen them all.  I've seen three or four videos.  None of those

6    were the scene I was describing.  I could imagine since we

7    were adjacent to the police station that there should be video

8    of that block, especially with the massive police force there.

9    There should be tremendous amounts of video from both the

10   station and body cameras, as well as bystanders, because, as I

11   said, across from the station it's residential.  Tons of

12   people were out with cell phones or participating like me with

13   cell phones, so there's video of us standing right there on my

14   cell phone.  I do not believe that it was submitted.  I'm not

15   even sure that I've turned it over, so I don't think it's part

16   of the complaint.

17   Q.  Okay.  Did you -- were you hit with any sort of impact

18   device?

19   A.  No.

20   Q.  Did you see anybody else get hit with an impact device?

21   A.  I saw a woman on the ground who appeared to have been.  It

22   could have been something else, but as the crowd was kind of

23   surging towards Colfax, she was on the ground holding her

24   back, and there were about four people trying to help her up.

25   She had kind of pulled herself it seemed a little onto the

20-CV-01616-RBJ    Preliminary Injunction    06/25/2020    81

1    curb on the west side of Washington.  That is -- I did not see

2    anything else that appeared to be people being directly hit.

3    Q.  Okay.  If a protest gets violent or people are destroying

4    things, should the police let them?

5              MR. ZIEV:  Objection, Your Honor, speculation.

6              THE COURT:  Overruled.

7              THE WITNESS:  I am sorry.  Should I answer?

8              THE COURT:  Yes.

9    A.  Well, I think there's obviously, you know, great judgment

10   calls.  In general, first of all, the protesters never should

11   get violent, and I wanted to take the utmost precaution that I

12   was not entering into something where I could be participating

13   in anything that could be violent.  Never.  If they do, and

14   they sometimes do, that's clear, if they do turn violent, I

15   think it's a judgment call, just like I might have to make

16   with one of my kids.  You know, if I find out that a teenage

17   kid is drinking alcohol, you know, what do you do about it?

18   It's not as easy as just a quick answer.  It depends on a lot

19   of circumstances.  I would say in general the police do not

20   want to encourage it or let people do that.  However, it has

21   been stated that a broken window can be fixed.  That, you

22   know, scorching my throat with a chemical cannot.

23              So there are cases I think where even if it is minor,

24   the violence itself is smaller than the violence of the police

25   in some cases.  Now, where I was I was not aware of any

                    Sarah K. Mitchell, RPR, CRR

20-CV-01616-RBJ    Preliminary Injunction    06/25/2020    82

1   violence, and maybe there was something that happened I didn't

2   see or alluded to something way behind me, but I was up by the

3   police.  I was up right in front, and the police never seemed

4   to be under any siege or feeling threatened.  I didn't feel

5   anybody was threatening.  There was never an ask of any type

6   for anybody to move back or retreat or to stop standing there,

7   so this was not an example of that.  But if this had become

8   bad enough that police use of force is actually less

9   destructive and less harmful than whatever the protesters are

10  doing, at that point use of force is probably the right call.

11  Q.  So, Mr. Kreeger, if a police officer is hit by a rock from

12  a slingshot, what do you think he or the police officers

13  around him should be able to do?

14  A.  Certainly at that point if they -- if that had, let's say,

15  happened in the crowd I was in, I think at that point the

16  police should address the crowd with a speaker or bullhorn or

17  even stand there just in front of them yelling and tell the

18  crowd we cannot have this, that a peaceful protest is fine,

19  but if there was any type of projectile thrown, they have to

20  disband everybody, and I think they'd have the right to do

21  that.  I think if something is growing in danger for anyone,

22  they need to stop it and nip it in its bud before it goes too

23  far.  I think the police have a right to tell people they want

24  them to disband.  If somebody hits a police officer with a

25  slingshot, and I have nothing to do with it, and I am not

Sarah K. Mitchell, RPR, CRR

20-CV-01616-RBJ    Preliminary Injunction    06/25/2020    83

1   remotely a part of it, and I am going out of my way to make

2   sure I am not caught up in anything like that, I do not expect

3   to be treated like I shot a police officer with a slingshot.

4   Now, again, if the police can't distinguish, the crowd is

5   turning mob mentality, it's a bit frenzied, everything is

6   dangerous, they might have to cut it off, move everybody out,

7   I understand that could definitely be the case.  This was not

8   the case in any resemblance where I was.  Maybe other places.

9          MR. FARLEY:  Thank you, Mr. Kreeger.  That's all the

10   questions I have.

11          THE COURT:  Redirect?

12          MR. ZIEV:  No redirect, Your Honor.

13          THE COURT:  Okay.  Thank you, sir.

14          Next witness.

15          MR. ZIEV:  Your Honor, we call Megan Matthews.

16          THE COURT:  You know that your guy Reed, he showed up

17   on the screen during the examination.

18          MR. ZIEV:  I see that, Your Honor.

19          THE COURT:  Megan, would you raise your hand, please.

20                        MEGAN MATTHEWS

21   was called as a witness and, having been duly sworn, was

22   examined and testified as follows:

23          THE COURT:  Thank you.

24

25

Sarah K. Mitchell, RPR, CRR

20-CV-01616-RBJ    Preliminary Injunction    06/25/2020    84

1                      DIRECT EXAMINATION

2    BY MR. ZIEV:

3    Q.  Good afternoon, Ms. Matthews.

4    A.  (audio distortion).

5    Q.  Will you -- will you tell the Court what day you went down

6    to the downtown Denver demonstrations, please?

7    A.  Yeah, I was down there Thursday and Friday.  The 28th and

8    the 29th of May.

9    Q.  Great.  I want to talk to you specifically about the 29th,

10   that Friday.  Now, I will -- we are aware that you got hit by

11   a KIP, and we're going to get to that, but will you tell us

12   what you were doing before that?

13   A.  Right before or much earlier?

14   Q.  Just a little bit earlier.  Kind of tell us what was going

15   on at the demonstrations.

16   A.  Okay.  We for most of the day (audio distortion) we just

17   -- we brought large cases of water, granola bars, apples,

18   stuff like that, and some (audio distortion).

19        THE COURT:  We're having difficulty picking her up.

20   It's in and out.

21        MR. ZIEV:  Megan, can you ask other people at home to

22   get off the Internet for a second?  That might help.

23        THE WITNESS:  Yes, I can.  Let's see.  Okay, try

24   that.  Can you hear me okay right now?

25        MR. ZIEV:  Yes.

                      Sarah K. Mitchell, RPR, CRR

20-CV-01616-RBJ   Preliminary Injunction   06/25/2020   85

1            THE WITNESS:  Okay.  All through (audio distortion).

2            MR. ZIEV:  It seems like you're cutting out again,

3    Megan.

4            THE WITNESS:  Okay.

5            MR. ZIEV:  How about this, why don't you work on

6    that.  I'll call the next witness, and we'll come back to you,

7    okay?

8            THE WITNESS:  Okay.  I'm going to get an ethernet

9    cable.

10           MR. ZIEV:  Sounds good.

11           THE WITNESS:  Okay.

12           MR. ZIEV:  Thanks.

13           Thank you, Your Honor.  My co-counsel will take the

14   next witness.

15           MR. SCHWAB:  Good afternoon.  I'd like to call

16   Gabriel Thorn.

17           THE WITNESS:  Hey, Milo.  You got me?

18           THE COURT:  Okay.  Now, what's this gentleman's name?

19           MR. SCHWAB:  Your Honor, this is Gabriel Thorn.

20           THE COURT:  Okay.  Mr. Thorn.

21                     GABRIEL THORN

22   was called as a witness and, having been duly sworn, was

23   examined and testified as follows:

24           THE COURT:  Okay.  Go ahead.

25                   DIRECT EXAMINATION

              Sarah K. Mitchell, RPR, CRR

20-CV-01616-RBJ    Preliminary Injunction    06/25/2020    86

1    BY MR. SCHWAB:

2    Q.  Mr. Thorn, can you tell me what your present job is?

3    A.  I currently work for the State of Colorado.  I manage the

4    vital records office.

5    Q.  Okay.  And can you tell me what your background is, your

6    education and other previous work?

7    A.  Yes.  I'm a retired army officer, and I have a masters of

8    public policy from the University of Denver.

9    Q.  What day did you go to the downtown demonstrations?

10    A.  I went on Friday the, I believe, 29th, and I went on

11    Sunday, the 1st.

12    Q.  Okay.  And what were you there to do and -- yeah, what

13    role were you there in?

14    A.  I went down there to serve as a medic because I had heard

15    about a lot of injuries that had been sustained through

16    various protests around the nation, and then I had friends who

17    had gone down there and told me about a lot of injuries that

18    had been sustained on Thursday night.  So I have some pretty

19    extensive experience with medical training through my long

20    career in the military, so I went down there Friday night to

21    provide medical aid to protesters on the -- on the ground.

22    Q.  Okay.  So why don't you run me through a little bit of

23    what you experienced on Friday night -- or Saturday night

24    while you were down there.

25    A.  Friday night.

Sarah K. Mitchell, RPR, CRR

20-CV-01616-RBJ    Preliminary Injunction    06/25/2020    87

1   Q.  I apologize.  Friday night?

2   A.  Yeah.  So I got down there around 5:30-ish, and it was

3   mostly peaceful.  I caught up with the main group as they were

4   around the city hall area, and they were just assembled,

5   listening to speakers who were on the steps of city hall.  It

6   was mostly peaceful, almost an entirely peaceful crowd when I

7   was at city hall.  And what I noticed, though, was there was

8   commotion coming from the north side, so I went over there,

9   and I witnessed police doing drive-bys on the crowd.  They

10  were driving by shooting pepper balls at the crowd.

11          And so, yeah, the police testimony is correct that

12  people are throwing water bottles at them because I would see

13  cop cars driving past shooting into the crowd with pepper

14  balls, and, yes, the crowd would throw water bottles back at

15  them.  I didn't see them throwing rocks at this point because

16  there were no rocks over around the area that they were

17  shooting at.  But, yeah, they were throwing water bottles,

18  plastic water bottles back at police cruisers that were

19  shooting them with pepper balls.  I didn't see any provocation

20  for this.  I did see police shooting into the crowd with what

21  looked like an intent to just rile them up.

22          So after that, the -- the speech -- the speeches kind

23  of wrapped up, and the protests moved up to straddle Lincoln

24  and Civic Center Park and the Capitol.  And the police were

25  over on the other side where, you know, the buses line up, and

Sarah K. Mitchell, RPR, CRR

20-CV-01616-RBJ     Preliminary Injunction     06/25/2020     88

 1    it was just kind of a standoff there.  There were a bunch of

 2    police cruisers lined up.  Police were all kitted up in riot

 3    gear.  Occasionally what looked like SWAT would show up, and

 4    it was just kind of a back and forth at that point with a

 5    bunch of protesters on one side, a bunch of cops on the other.

 6         The cops were shooting across the street with pepper

 7    balls and rubber bullets and throwing flash bangs and throwing

 8    just the occasional tear gas at them.  And then some

 9    protesters would occasionally respond by throwing a rock back

10    at the cops or water bottles, and there didn't seem to be any

11    real discernment between the protesters who were just over

12    there chanting and the protesters who were throwing rocks.

13    But it was -- they were far enough away that protesters who

14    were actually, like, trying to do anything against the police

15    had to come out of the crowd.  Like, they had to actually go

16    out into Colfax to throw anything at the cops.  So they were

17    easy to shoot at if you were trying to shoot pepper balls at

18    them, but the police didn't seem to be doing that.  They were

19    just still just shooting into the crowd and throwing tear gas

20    into the crowd.  So it wasn't -- the line that I keep hearing

21    about how they were just shooting at people who were attacking

22    them doesn't ring true to me because that's not what I saw at

23    all.

24         What I saw was shooting pepper balls -- I mean, I got

25    shot plenty of times with pepper balls, and I got shot in the

1   head with a rubber bullet.  I was wearing a helmet, thank God,

2   but I was just in the crowd, and, you know, I wasn't running

3   out throwing rock at anyone.  I still got shot a bunch of

4   times.  I mean, so that kept happening until around 9 o'clock

5   when the atmosphere really changed from the police, and they

6   just decided that it was time to push all the protesters off,

7   and they just started throwing pepper -- or throwing tear gas

8   and flash bangs just one after the other into the crowd to

9   push us off of the Capitol and civic center -- or, yeah, Civic

10   Center Park grounds, and shooting pepper balls, just throwing

11   the smoke into the crowd, and they just started advancing onto

12   the Capitol grounds, pushing us off around the Capitol.

13          At one point they -- I am told of police officers on

14   the balcony of the Capitol shooting down at protesters.  And

15   after that, we had kind of just dispersed, and I didn't hear

16   any order to disperse.  It was just clouds and clouds of

17   pepper or tear gas and just shooting out of flash bangs

18   everywhere .  The crowd kind of just went all over the place

19   at that point, and I left after that because there was really

20   no way to follow any sort of protest at that point.

21          The majority of people there were there chanting

22   Black Lives Matter, Hands up, Don't shoot.  But that didn't

23   seem to be what the cops wanted to do.  It was we're here to

24   show you we're in charge.  We're here to show -- to accomplish

25   dominance, and we're here to make a point.  And the point was

20-CV-01616-RBJ    Preliminary Injunction    06/25/2020    90

1    these are our streets, and you don't belong here.  That's

2    really the point that I got.  Because just --

3    Q.  Just to jump in, did you ever throw anything at any

4    officer?

5    A.  No, not at all.  Never.  Never once.

6    Q.  That day did you violate any laws that you're aware of?

7    A.  Not that I'm aware of at least.

8    Q.  Tell me about every dispersal order you heard.

9    A.  I didn't hear a dispersal order.

10   Q.  Did you ever see the police shooting from a unique

11   position?

12   A.  Yeah.  The Capitol balcony on the south side.

13   Q.  You saw them shooting from the Capitol balcony?

14   A.  Yeah.

15   Q.  What were they shooting?

16   A.  Pepper balls.

17   Q.  When things escalated, did you see a reason, did you see a

18   provocation from the protesters?

19   A.  Are you talking about like around 9 o'clock when the tear

20   gas all came in, and they just got -- not really, no.  I

21   didn't see -- I didn't see any, like, uptick in rocks or water

22   bottles getting thrown or anything.  It just seemed like some

23   invisible signal had been given, and it was like, hey, it's

24   bedtime.  We're going to get rid of these people.

25   Q.  Do you want to tell me just briefly a little bit about the

Sarah K. Mitchell, RPR, CRR

20-CV-01616-RBJ    Preliminary Injunction    06/25/2020    91

1    injuries you saw as a medic?

2    A.  It was mostly -- it was mostly tear gas injuries and

3    pepper ball injuries.  A lot of -- a lot of bruises from

4    pepper balls.  A lot of people who were having breathing

5    problems from tear gas.  Eye problems.  I had one photographer

6    who I treated who was just doubled over for probably 10 or

7    15 minutes who he just couldn't move from the tear gas, and he

8    didn't -- we kept treating him with milk and baking soda, and,

9    you know, he was -- he was just trying to get out of there.

10   Q.  And how many people approximately would you say you saw

11   tear gassed or pepper balled or pepper sprayed?

12   A.  Oh, God.  The entire crowd got tear gassed.  So several

13   hundred people, you know.  I think -- I joke that, you know,

14   tear gas is going to be the Scentsy scent of 2020 because it's

15   going -- you know, I feel like I still smell like tear gas.

16   Q.  And let me ask just two more last questions.  Did you see

17   the police targeting any particular people?

18   A.  It seemed -- it seemed to me that medics were being

19   targeted.  If you had a cross on you --

20          MS. LEWIS:  Objection --

21   A.  -- it seemed like --

22          MS. LEWIS:  Objection.  Sorry.  Sorry, I was on mute,

23   and I couldn't get in my objection, but I want to object to

24   foundation.

25          THE COURT:  Okay.  Overruled.

                        Sarah K. Mitchell, RPR, CRR

20-CV-01616-RBJ    Preliminary Injunction    06/25/2020    92

1   A.  It seemed to me that medics -- if you are clearly marked

2   with a red or white cross taped on you, you drew more fire.

3   Now, I can't say for sure if that's -- if that is the case,

4   but it seemed that way to me.

5   Q.  (By MR. SCHWAB) Were you ever hit with projectiles while

6   tending to someone?

7   A.  Oh, yes.

8   Q.  And last thing, did you see any particular body parts that

9   seemed to be -- were being targeted with rubber bullets or

10  pepper balls?

11  A.  Well, I know for sure that I was getting hit on particular

12  body parts.  I don't know if they were aiming for them, but I

13  know that I got hit in the head.  I got hit on the legs a lot.

14  Thankfully my groin didn't get hit.  But, yeah, I was just

15  kind of getting hit all over, but, yeah, my head definitely

16  got hit quite a few times in the helmet area.

17          MR. SCHWAB:  All right.  Thank you, Your Honor.

18          THE COURT:  All right.  Cross-examination.

19                      CROSS-EXAMINATION

20  BY MS. LEWIS:

21  Q.  Good afternoon, Mr. Thorn.  So I want to go back to the

22  first part of your testimony.  You said that you were in front

23  of city hall at about 4:30 on May 29th, which would be the

24  Friday; is that correct?

25  A.  Yes.

                    Sarah K. Mitchell, RPR, CRR

20-CV-01616-RBJ    Preliminary Injunction    06/25/2020    93

1   Q.  And at that time you said that there were drive-bys as you

2   called it, right?

3   A.  Yeah.

4   Q.  And what were you doing?  Were you listening to a speaker

5   at that time?

6   A.  At first, yeah.  I was -- as I said, I was there as a

7   medic.  So I was -- you know, I was just kind of following the

8   crowd because I wanted to be there where the people were.  And

9   so there was a speaker -- there were several speakers on the

10  steps of city hall, and I was kind of in the middle of the

11  crowd, and then I started hearing shouts from the north side.

12  So I made my way over there, and I started -- and I heard

13  pepper balls going off.  So I got over there, and I kept

14  seeing police cruisers driving past and shooting out -- either

15  shooting out of the window, or they would have those cars

16  where the cops are hanging off the sides, and they were just

17  shooting.

18  Q.  Okay.  So, Mr. Thorn, when this was occurring you were in

19  a crowd of people listening to a speaker; is that correct?

20  A.  At first when I first heard it, yes, but by the time I

21  made my way over there, I could see what was happening, yeah.

22  Q.  And was it a large crowd of people?

23  A.  It was a very large crowd.

24  Q.  All right.  Were you -- where were you positioned in the

25  crowd?

Sarah K. Mitchell, RPR, CRR

20-CV-01616-RBJ     Preliminary Injunction     06/25/2020     94

1   A.  At the beginning I was in the middle of the crowd, but

2   then I made my way over to the north side on the Colfax side

3   of it.

4   Q.  And so as being in the middle of the crowd you didn't have

5   a good vantage point of everything that was going on among

6   everybody in the crowd, did you?

7   A.  At the beginning I didn't, but once I moved over to the

8   Colfax side, I had a very good vantage.

9   Q.  So can you -- you can't testify here today that there was

10  nobody in that crowd who was throwing objects or doing

11  anything, acts of violence towards police officers that

12  preceded the use of pepper spray, can you?

13  A.  Well, there was to my knowledge no use of pepper spray.

14  There was the use of pepper balls, and what I did witness was

15  police cruisers driving down Colfax shooting into a crowd.  So

16  I don't know what could possibly warrant that, because those

17  are police officers that are inside cars driving down a street

18  shooting into a crowd.

19  Q.  So your testimony is that police officers were inside

20  patrol cars shooting out the windows; is that right?

21  A.  Yes.  I saw that, as well as police officers driving down

22  the street on the vehicles that they hang off of shooting into

23  a crowd as they're driving.

24  Q.  Have you filed a complaint about this with internal

25  affairs?

Sarah K. Mitchell, RPR, CRR

20-CV-01616-RBJ     Preliminary Injunction     06/25/2020     95

1    A.  No.  I filed a lawsuit against the city to make it stop

2    happening.

3              THE COURT:  What did you say?  I missed that.

4    A.  I said I --

5              THE COURT:  You filed a complaint?  I didn't hear his

6    answer.

7    Q.  (By MS. LEWIS) You mentioned that you saw officers

8    shooting from the balcony of the Capitol Building --

9    A.  Yes, I did.

10   Q.  -- right?  And do you know whether those were members of

11   the Colorado State Patrol that were manning the Capitol

12   Building?

13   A.  No.  I have no idea.  I know that they were dressed the

14   same way that as the Denver SWAT, what I assumed is Denver

15   SWAT.  They were in green body armor fatigues with Ops-Core

16   helmets, which, by the way -- those are really --

17   Q.  So you said that you saw several hundred people subjected

18   to tear gas on the evening of May 29th; is that correct?

19   A.  Yes.

20   Q.  How many people do you estimate were present total?

21   A.  Somewhere between -- I ballpark between 500 to 1,000

22   there.  I mean, that (audio distortion) Civic Center Park to

23   the Capitol.

24   Q.  And you don't know what every person was doing at the time

25   that the order of -- every person in the protest crowd was

                    Sarah K. Mitchell, RPR, CRR

20-CV-01616-RBJ     Preliminary Injunction     06/25/2020     96

1   doing at the time the order to disperse and tear gas was

2   given, do you?

3   A.   I don't know what every person was doing.  I -- as I said

4   during my testimony, yes, there were some throwing rocks.  I

5   agree with the officer's testimonies that there was rock

6   throwing and water bottle throwing.

7   Q.   Now, did you go back to the protest on May 31st, 2020?

8   A.   Sunday, yeah.

9   Q.   Yeah, okay.  Have you returned any other days?

10  A.   I haven't been back since, no.

11  Q.   Okay.  If you can just give me a moment to confer with my

12  co-counsel, please.

13  A.   Sure, yeah.  Take your time.

14  Q.   Mr. Thorn, do you have any plans to go back to continue

15  protesting in Denver?

16  A.   I do.  I meant to go on Juneteenth, but I had a sick baby,

17  so I couldn't go.  But we are -- some friends of mine are

18  planning to go back again.  It is really nice having this

19  order in place because (audio distortion) right now.

20  Q.   And you're aware that a new law was passed in Colorado --

21  A.   I am.

22  Q.   -- regarding protests -- okay.

23          MS. LEWIS:  I have no other questions.

24          THE COURT:  Okay.  Redirect?

25          MR. SCHWAB:  No redirect, Your Honor.

                    Sarah K. Mitchell, RPR, CRR

20-CV-01616-RBJ   Preliminary Injunction   06/25/2020   97

1              THE COURT:  Next witness.

2              THE WITNESS:  Thank you.

3              MR. ZIEV:  Thank you.  Your Honor, we call Zoey

4    Harshman.  Zoey, are you there?

5              THE COURT:  Kelly somebody?

6              MR. ZIEV:  Zoey, Z-o-e-y.

7              THE COURT:  D-o-e-y?

8              MR. ZIEV:  Z as in zebra.

9              THE COURT:  Oh, Z.  Zoey.  Zoey whom?

10             MR. ZIEV:  Harshman, H-a-r-s-h-m-a-n.

11             THE COURT:  All right.

12                        ZOEY HARSHMAN

13   was called as a witness and, having been duly sworn, was

14   examined and testified as follows:

15             THE COURT:  Go ahead.

16                     DIRECT EXAMINATION

17   BY MR. ZIEV:

18   Q.  Ms. Harshman, I want to ask you specifically about an

19   incident that happened outside the Capitol Building where you

20   got pepper sprayed.  Do you know what date that happened?

21   A.  It was about two Thursdays ago, I believe.  I don't

22   remember the date exactly.

23   Q.  Was it after the temporary restraining order was entered

24   by this Court?

25   A.  Yes, it was.

                    Sarah K. Mitchell, RPR, CRR

20-CV-01616-RBJ    Preliminary Injunction    06/25/2020    98

1   Q.  Okay.  Ms. Harshman, if you could tell us what you -- what

2   you experienced on that day.

3   A.  It was -- for the most part it was just a normal day.  We

4   marched the streets a bit, chanted a few different things.

5   But we -- at one point I ended up getting hit by a car, and my

6   girlfriend -- everyone was telling my girlfriend that we need

7   to press charges, and so my girlfriend called 911 to get

8   someone down there to file a report because I got hit by a car

9   while I was on the sidewalk.  And they said that they were

10  unable to come to us, and that if we wanted help we had to go

11  somewhere else, and the car ended up driving off.

12         And after that we went up about a block, and (audio

13  distortion) holding the traffic for eight minutes and

14  46 seconds, the time that George Floyd was choked to death,

15  and at one point officers showed up.  They just -- they just

16  started arresting one of my friends who was in the crosswalk

17  while the crosswalk sign was on.  They were just arresting

18  him.  And we were trying to ask why he was being arrested.  A

19  couple people were chanting, Let him go.  And they just kept

20  arresting him.  And then one dude came out with a can of mace

21  and just started spraying everybody.  I then was trying -- I

22  was blind, and so was my girlfriend.  I was trying to find my

23  girlfriend, and I got hit with a second spray then, and then

24  right when I finally found her, he sprayed her and just her

25  and I with pepper spray.  So I pulled her out of the --

Sarah K. Mitchell, RPR, CRR

20-CV-01616-RBJ     Preliminary Injunction     06/25/2020     99

1    Q.  When your girlfriend got sprayed, what was she doing at

2    the time?

3    A.  Sorry.  What was that?

4    Q.  When your girlfriend got sprayed, what was she doing at

5    the time?

6    A.  Which time?  When she got sprayed the second or third

7    time?

8    Q.  Why don't you tell me all three times what she was doing

9    in each one of those instances.

10   A.  All right.  So the first time she was trying to ask the

11   officers why they were arresting our friend, and that's when

12   the first spray hit.  The second time she was trying to pull

13   out other people that were being sprayed.  And then the third

14   time she was just kind of disoriented and blinded and couldn't

15   really figure out how to -- like, where the sidewalk was to

16   get to safety.  And then when I finally found her, I pulled

17   her away after she got hit by the third spray.

18   Q.  Did you hear a warning to disperse during any of those

19   three times?

20   A.  I did not hear any such warning.

21   Q.  Okay.  Ms. Harshman, did you see what the officers'

22   reactions were to you getting sprayed?

23   A.  At one point once I could finally see again I saw two of

24   the officers like pointing at me and a couple other people had

25   been sprayed and just laughing.

                              Sarah K. Mitchell, RPR, CRR

20-CV-01616-RBJ     Preliminary Injunction     06/25/2020     100

1   Q.  Okay.  Did you -- did you try to find out the identity of

2   these officers?

3   A.  When we asked for badge numbers, they just ignored it and

4   did not -- like, we asked for name and badge numbers, they

5   just ignored what we were saying and just acted like they

6   didn't even hear us.

7          MR. ZIEV:  Okay.  Thank you, Ms. Harshman.  I don't

8   have any further questions.

9          THE COURT:  Cross-examination.

10                      CROSS-EXAMINATION

11  BY MR. FARLEY:

12  Q.  Hello, Ms. Harshman.  I want to understand these events.

13  Where had you been struck by the car?

14  A.  It was on Colfax and Lincoln while I was on the southeast

15  corner on the sidewalk.

16  Q.  And was there any protest activity going on at that

17  intersection?

18  A.  Yes, there was.

19  Q.  Was the street blocked?

20  A.  For eight minutes and 46 seconds.

21  Q.  Okay.  And so when you called 911 was the street blocked

22  there?

23  A.  Not anymore, no.

24  Q.  Did you understand that when the 911 operator asked you to

25  move somewhere else for assistance it was because of

                    Sarah K. Mitchell, RPR, CRR

20-CV-01616-RBJ    Preliminary Injunction    06/25/2020    101

1  difficulty for the first responders to come to you?

2  A.  I understood that was what it was at the time, but then

3  when they were able to show up an hour later to mace me it

4  seemed to be a false statement.

5  Q.  Was there emergency medical response?  Was there an

6  ambulance that came or any fire department that came or was it

7  just police officers?

8  A.  Just police officers.

9  Q.  Okay.  And so just so I understand, you had -- there was

10  an eight-minute-and-46-second street blockage when you got

11  struck by the car, and then was that -- were you repeating

12  that protest at a different location?

13  A.  Yes, we did.

14  Q.  Okay.  So when the police arrived an hour later that was

15  at another time where that protest was happening?

16  A.  Yes, it was.

17  Q.  Okay.  And my understanding from what you just testified

18  to, there was somebody being arrested during that protest?

19  A.  Yes, he was.

20  Q.  And who was that?

21  A.  I don't -- I actually know his name.  He's a friend of

22  ours, but, like, I don't know his actual name.

23  Q.  Okay.  Do you know what he was being arrested for?

24  A.  I believe what he said the next day was that he was

25  arrested for obstructing traffic even though he was in a

Sarah K. Mitchell, RPR, CRR

20-CV-01616-RBJ    Preliminary Injunction    06/25/2020    102

1   crosswalk with -- like, with a walk sign at the time.

2   Q.  How big of a group were you with at that time?

3   A.  I'd say it was probably about still 30 strong.

4   Q.  Okay.  How many officers were involved in the arrest of

5   that other protester?

6   A.  The two specifically arresting or every officer there?

7   Q.  The number of officers there.

8   A.  It looked to be like 15, 20.

9   Q.  Did the 30 protesters approach the officers who were

10  making the arrests?

11  A.  Yeah, questioning as to why they were arresting him.

12  Q.  I think you dropped off there at the end.

13  A.  Yeah.  They were approaching him asking why he was being

14  arrested.

15  Q.  Did you approach as well?

16  A.  Yes, I did.

17  Q.  And how close did you get?

18  A.  I was right there the whole time.  He was -- the guy they

19  arrested was standing right next to me and my girlfriend.

20  Q.  Okay.  And so while they were taking -- I'm sorry,

21  Ms. Harshman.  I didn't hear that last sentence.

22  A.  I said initially -- so initially they had actually

23  approached us.

24  Q.  Okay.  Did the police officers --

25  A.  And then I --

Sarah K. Mitchell, RPR, CRR

20-CV-01616-RBJ    Preliminary Injunction    06/25/2020    103

 1   Q.  Did the police officers ask you to move away while they

 2   were taking the other protester into custody?

 3   A.  I did not hear that, no.

 4   Q.  Did you see a -- when you -- did you see the officer

 5   remove the spray from his belt?

 6   A.  No.  The first time I saw it was when it was up in the air

 7   like half a second before it started spraying.

 8   Q.  Okay.  How big was that canister?

 9   A.  Like a can of spray paint, that big, and it had like a

10   little handle coming off of it.

11   Q.  Okay.  Did you file a complaint with the Denver Police

12   Department?

13   A.  Not yet, but I do plan to.  Now that I know about -- of

14   the process how to do it.

15   Q.  Okay.  Have you requested any of the documentation related

16   to this incident from the Denver Police Department?

17   A.  Not -- no, but I believe that Milo had.  That was my

18   understanding.

19   Q.  Okay.  And you're not a plaintiff in this lawsuit, are

20   you?

21          MR. FARLEY:  I've lost the witness.  Has everybody

22   else?

23          THE COURT:  I have, yes.

24          MS. LEWIS:  Yes.

25          MR. ZIEV:  Looks she's out of the room.  What would

                    Sarah K. Mitchell, RPR, CRR

20-CV-01616-RBJ    Preliminary Injunction    06/25/2020    104

1    you like us to do, Your Honor?

2            THE COURTROOM DEPUTY:  Can she try again and log back

3    in?

4            MR. ZIEV:  She can try.  In the meantime, Your Honor,

5    I have another witness I can call.  It will take a very small

6    amount of time.

7            THE COURT:  Well, your time is over.

8            MR. ZIEV:  Yes, Your Honor.

9            THE COURT:  Finish up with the witness you've got if

10   you want, but your time is up.

11           MR. ZIEV:  Yes, sir.

12           MR. FARLEY:  Your Honor, we can be done with this

13   witness.  If -- we don't want to delay this anymore.  I have

14   no further questions.

15           THE COURT:  Maybe he's got some redirect.

16           MR. FARLEY:  Okay.

17           MR. ZIEV:  That's okay, Your Honor.  We can move on.

18           THE COURT:  Then we're done with the evidence.

19           Now, I allowed 15 minutes a side for argument, and

20   I'll let you go ahead and use your 15 minutes, but I still am

21   where I was when we began the hearing.  What you've presented

22   today -- have I lost the defendants now too?  No.  There they

23   are.

24           MS. LEWIS:  No, Your Honor.

25           THE COURT:  What you've presented today is this:  The

Sarah K. Mitchell, RPR, CRR

20-CV-01616-RBJ    Preliminary Injunction    06/25/2020    105

1  police officers testified, and the substance of their

2  testimony is, with the exception of the one video perhaps,

3  they didn't detect any inappropriate conduct.  They've been

4  trained in the use of force, and they basically don't need any

5  further supervision from the Court.  That I infer from their

6  testimony.  But their testimony was pretty clear.  What they

7  saw, what they experienced, what they knew, the officers were

8  responding to violence, responding appropriately, they weren't

9  aware of anything wrong.

10       On the other hand, the plaintiffs have presented

11 witnesses from people who were there protesting, and a couple

12 of the witnesses at least, the fellow from Broomfield and the

13 medic, credibly said that where they were people were peaceful

14 and the officers were not.  The medic said that he saw rocks

15 and bottles being thrown, but in response to being hit with

16 pepper balls and so forth.  The young woman is angry, let's

17 say, and she witnessed a situation where a friend was

18 arrested, and it didn't seem like there was an appropriate

19 basis for it.

20       All of this relates to the timeframe, with the

21 exception of the last woman, May 28th through May 31st.  And

22 the incident as described on the Thursday after that, to me,

23 still seems vague as to what happened and why it happened.

24 But you're all talking about history now.  You're all talking

25 about things that occurred back then.  This order came after

20-CV-01616-RBJ   Preliminary Injunction   06/25/2020   106

1    most of that.  The new statute came after all of that.

2         You're talking about an injunction going forward, and

3    it is not at all clear to me why you're trying to convince me

4    of things that I've already been convinced of.  I wouldn't

5    have issued the temporary restraining order if I didn't think

6    that there was instances of police misconduct, and I still

7    think so, and I think your witnesses who testified for the

8    police have blinders on to some extent.

9         On the other hand, there is no question but that

10   people were violent, some of them.  People were throwing large

11   rocks, small rocks, water bottles, chunks of cement,

12   vandalizing, starting fires.  The two sides here just won't

13   see what the other side is saying.  But right now I have to

14   deal with the situation where somebody wants an injunction,

15   and you're going to have to tell me why I should issue one

16   given what's happened since I issued the order that I did.

17        All right, plaintiff, you may go first.  You have

18   15 minutes max.

19        MR. ZIEV:  Yes, Your Honor.  As the Court said, the

20   Court has already found the elements for the TRO, which are

21   basically identical to the elements of a preliminary

22   injunction, so the question --

23        THE COURT:  Yes.  I find that based -- I found that

24   based on what was presented at that time.

25        MR. ZIEV:  Yes.

                    Sarah K. Mitchell, RPR, CRR

20-CV-01616-RBJ    Preliminary Injunction    06/25/2020    107

1              THE COURT:  Things have changed.

2              MR. ZIEV:  Yes, Your Honor, and we have a

3    chicken-or-the-egg scenario.  The defendant would like you to

4    believe that things have changed because the protesters have

5    gotten better.  The plaintiffs will say things have changed

6    because this lawsuit was filed, the injunction was entered,

7    and the police are now scared to violate these laws.

8              THE COURT:  Things have changed because the

9    legislature of the State of Colorado on a very rush, rush

10   basis passed a new law that enacted the basics of what my

11   order required.

12             MR. ZIEV:  That's right, Your Honor.

13             THE COURT:  That's what's happened.  It could be that

14   my order was a motivator.  I don't know that.  What I do know

15   is that it took an act of Congress, so to speak, as well as an

16   act of a Court to get these things done.  And for the police

17   to say that they police their own and there was nothing wrong

18   is nonsense.  But their attention has been gotten.  The

19   legislation has been passed, and I don't really understand why

20   this Court or any other Court has any basis to keep

21   interfering in something that's over and that hasn't been

22   dealt with by the statute.

23             I also don't understand why you won't accept what the

24   defendants have offered, and that is, believe it or not,

25   they've offered a preliminary injunction.  They've offered an

                     Sarah K. Mitchell, RPR, CRR

20-CV-01616-RBJ    Preliminary Injunction    06/25/2020    108

1  injunction that requires not just compliance with the statute,

2  but some additional things, and you don't seem interested.

3  I'm just -- I don't get it, so explain it to me.

4          MR. ZIEV:  Yes, Your Honor.  I will say --

5          THE COURT:  What more do you want?

6          MR. ZIEV:  We do appreciate that the defendant has

7  come to the table and has agreed to the injunction.  There's

8  only two disputes right now as far as the language of the

9  injunction.  The first is that the sergeant has to personally

10 witness it, and we even agreed to the defendant's language

11 absent exigent circumstances which should cover the Court's

12 concerns and should cover defendant's concerns that if there's

13 an emergency situation, that a sergeant can't view the

14 specific thing happen, that the officer is allowed to act.

15 That's what exigent circumstances means.

16         THE COURT:  They've agreed to that.  They've agreed

17 to that.

18         MR. ZIEV:  No, they haven't.  They have not agreed

19 to the --

20         THE COURT:  They absolutely have.  That's what the

21 testimony of Phelan was.

22         MR. ZIEV:  Your Honor, I will say I've had this

23 specific conversation.  They did not agree to personally

24 witnessing what happened, even with the exigent circumstances

25 situation.

                    Sarah K. Mitchell, RPR, CRR

20-CV-01616-RBJ    Preliminary Injunction    06/25/2020    109

1    THE COURT:  Let me remind you what Phelan said, and

2    he's the highest officer that represents Denver in this

3    matter.  I've got it right in my notes.  He said a couple of

4    things that I thought were pretty significant.  One thing,

5    just so it doesn't slip my mind, that he said that was very

6    significant was that Denver does take responsibility for the

7    actions of non-Denver officers whom they bring in to assist

8    because they are -- Phelan said -- our agents.  I thought that

9    was quite significant.

10    And he said also that the, quote, sergeant on the

11    scene, closed quote, is a good idea, and it is desirable that

12    their sergeant be there, and if possible, personally see what

13    happened, but there are situations where a sergeant is there,

14    yes, but he just didn't happen to see whatever it was, and so

15    he needed to rely on what he was told.  He said that.

16    MR. ZIEV:  Okay.

17    THE COURT:  You've got that.

18    MR. ZIEV:  Okay, Your Honor.  Then I'll move on with

19    that understanding.  The other discrepancy --

20    THE COURT:  What is it that you want that you don't

21    have them agreeing to or the legislature requiring of them?

22    What else do you want?

23    MR. ZIEV:  The use of force, that the City has

24    refused to agree that other officers that come into the city

25    of Denver have to follow Denver's use of force.  And let me

Sarah K. Mitchell, RPR, CRR

20-CV-01616-RBJ    Preliminary Injunction    06/25/2020    110

1    just speak to that for a second, Your Honor.  The Denver

2    Police Department is accountable to the citizens of Denver.

3    They're accountable to the city council.  They're accountable

4    to the mayor, who's elected by the citizens.

5            THE COURT:  He said that.  Phelan said, They are our

6    agents.  We're responsible for them.  He also said they've

7    trained their officers in use of force.  We train our officers

8    in use of force.  Their officers have to follow their

9    training.  But Denver is responsible.  He said that.

10           MR. ZIEV:  Yes, Your Honor.  I agree, as to Denver

11   officers.  He also said that if Arapahoe County or Aurora

12   comes in, they get to follow their own procedures which are

13   not accountable to the citizens of Denver.

14           THE COURT:  Okay.

15           MR. ZIEV:  And that plaintiffs would like everything

16   to filter down to Denver's use-of-force policy.

17           THE COURT:  Well, now we're speculating that some

18   future event is going to occur where Denver calls in the

19   officers from Arapahoe County, and the officers from Arapahoe

20   County have different training, and so they're going to be

21   acting inappropriately even though Denver will be trying to do

22   things right.

23           MR. ZIEV:  Your Honor --

24           THE COURT:  I don't issue injunctions based on what

25   might happen.

                    Sarah K. Mitchell, RPR, CRR

20-CV-01616-RBJ   Preliminary Injunction   06/25/2020   111

1          MR. ZIEV:  Your Honor, this is not a what might

2     happen.  Commander Phelan said they have contracts with other

3     jurisdictions outside of Denver, and that he does not expect

4     those outside jurisdictions to follow Denver's use-of-force

5     policy.

6          THE COURT:  Okay, sir, what are the use-of-force

7     standards for Arapahoe County?

8          MR. ZIEV:  As I sit here, I don't know the answer to

9     that.

10         THE COURT:  You don't know whether they're the same

11    as Denver's or not, right?  You just don't know that.  You

12    don't know whether these local jurisdictions are in any way,

13    shape, or form different from Denver.  And more importantly,

14    now that they know what the legislature required of Denver,

15    you don't know whether these other agencies are going to, to

16    the extent if at all their procedures are different, change

17    their procedures to fit what the legislature clearly wants.

18    You don't know.

19         MR. ZIEV:  Your Honor, the use-of-force provision in

20    SB 20-217 doesn't go into effect until September 1st.

21         THE COURT:  I don't think that's true.  I don't think

22    that's true.  I thought the statute said it's effective

23    immediately.

24         MR. ZIEV:  It says except for -- let me try to find

25    the correct statute, Your Honor.  It does say except -- let me

Sarah K. Mitchell, RPR, CRR

20-CV-01616-RBJ    Preliminary Injunction    06/25/2020    112

1    see -- right here I have it --

2           THE COURT:  I thought it absolutely went into effect

3    immediately.  You're telling me it doesn't?

4           MR. ZIEV:  There's different effective --

5           THE COURT:  They don't have to follow it until

6    September?

7           MR. ZIEV:  There's different effective dates for

8    different provisions of the bill.  Section 4 of the bill

9    doesn't take effect until September 1st, 2020.  Section 5 of

10   the bill doesn't take effect until September 1st, 2020, except

11   for the chokehold provision.

12          THE COURT:  Well, I don't even know what those

13   different sections are.  I don't have the thing in front of

14   me.  Why aren't you asking them to agree that they will

15   implement these things immediately then?

16          MR. ZIEV:  I believe we've come to agree to that.

17   That's part of what they've agreed to for a preliminary

18   injunction.  It's the use --

19          THE COURT:  If that's the case, why are you asking

20   for an injunction?

21          MR. ZIEV:  And I'll --

22          THE COURT:  If they agreed to it.  If they agreed to

23   it, I'll issue the injunction.  I don't think you've shown me

24   that you're entitled to an injunction.

25          MR. ZIEV:  Your Honor, one of the things --

                    Sarah K. Mitchell, RPR, CRR

20-CV-01616-RBJ    Preliminary Injunction    06/25/2020    113

1          THE COURT:  If they've agreed to an injunction, I'll

2    issue it.

3          MR. ZIEV:  Yes, Your Honor.  One of the things that

4    you've stated in your order is that different laws existed

5    prior to this and the constitutional rights existed prior to

6    this, and your quote was, Officers would continue to use force

7    secure in the knowledge that respective claims take a

8    significant amount of time, effort, and money to pursue.  And

9    that hasn't changed.  This law has passed, and that's great.

10   But in order to start this again, if Denver starts again

11   tomorrow, and they start shooting rubber bullets at people

12   tomorrow, and these protests are still going on, but nothing

13   stops them from shooting rubber bullets, and then the

14   claimants have to file a lawsuit, wait for discovery, wait for

15   jury verdict, and that shows irreparable harm under the

16   standard.

17         THE COURT:  And if that happens, you can come back

18   and ask this Court or some other Court for another restraining

19   order.  I don't think that the Denver Police Department is

20   going to go willy-nilly violating that new statute, especially

21   since they've done away with qualified immunity and made the

22   officers individually liable.  And I think there's a provision

23   in there also that if you're caught doing something contrary

24   to the order, you're going to lose your ability to be a police

25   officer.  I don't think those are minor things.

                    Sarah K. Mitchell, RPR, CRR

20-CV-01616-RBJ    Preliminary Injunction    06/25/2020    114

1      MR. ZIEV:  Okay.  Your Honor, we -- we've made our

2  arguments of the changes we want.  However, if the Court

3  believes that the changes as the -- as the defendant has

4  stipulated to are appropriate, we will agree to enter into

5  that preliminary injunction.

6      THE COURT:  What I'm asking is what do you want

7  besides what they're already ordered to do or willing to do,

8  and so far what you've told me is you want them to require

9  non-jurisdiction officers to follow the Denver Police

10  standards.

11      MR. ZIEV:  That's correct.

12      THE COURT:  So far that's the only thing you've said.

13      MR. ZIEV:  And there's only one other thing, Your

14  Honor, and that is an enforcement mechanism, and what I mean

15  by the enforcement mechanism is you described the incident

16  that Zoey Harshman described as vague, and we agree with you.

17  We're not saying one way or the other that it was

18  inappropriate, because all of the cards are in the hands of

19  the police department.  They have -- they have sent us to the

20  CCJRA to get those records, which is full of discretion for

21  the police department.  They have said that they have sent

22  that request to the records custodian.  That happened like two

23  weeks ago.  We have not heard a peep from any records

24  custodian.  All we would like to do is have a process in place

25  to be able to get a disclosure that force of the type that was

20-CV-01616-RBJ    Preliminary Injunction    06/25/2020    115

1   prohibited was used, to get the reports that were involved in

2   the incident, and to get the body camera footage involved.

3   Now, we've offered --

4            THE COURT:  Who anointed you, Mr. Ziev -- who

5   anointed you or those people that you represent as the

6   overseers of the Denver Police Department?

7            MR. ZIEV:  Your Honor, you're right.  Nobody has

8   enforced that, but we've asked for other mechanisms, and we

9   haven't gotten any suggestions on how we can -- we have people

10  claiming to us that that was an inappropriate use of force in

11  violation of the TRO, but without any sort of mechanism to

12  monitor it, the plaintiffs are blind as to whether the

13  defendant violates the TRO or not.

14           THE COURT:  Okay.

15           MR. ZIEV:  The defendants haven't offered any

16  alternatives.

17           THE COURT:  All right.  Let me hear from the other

18  side now.

19           MS. LEWIS:  Thank you, Your Honor.  We believe --

20  just to be clear, we believe there's no need for a preliminary

21  injunction to be entered.  First of all --

22           THE COURT:  You agreed to it.  You've already agreed

23  to it.

24           MS. LEWIS:  We offered that as a compromise to avoid

25  the -- to obviate the need for a hearing today.  Since we had

Sarah K. Mitchell, RPR, CRR

20-CV-01616-RBJ    Preliminary Injunction    06/25/2020    116

1    to put on evidence and hearing the evidence that was presented

2    by the plaintiffs, we did not -- we did not concede in the

3    first place that the elements were met, and certainly through

4    the presentation of evidence today the plaintiffs did not meet

5    their burden of demonstrating the elements that they're

6    entitled to a preliminary injunction.

7         THE COURT:  So you're going -- you're representing

8    the City and County of Denver and the Denver Police

9    Department, and you're going to renege on a deal.  You made a

10   deal, you offered it, and now you're going to take it back?

11   Your deal is the reason I'm saying that I'm not inclined to

12   issue an injunction because I think between the statute and

13   what you agreed to do, we're there.  But now you're reneging.

14   Wow, I can't believe it.

15        MS. LEWIS:  Let me clarify, because that is not what

16   I'm intending to say, and it sounds like my message is being

17   miscommunicated.  So what I'm saying is Denver, of course, is

18   going to follow the new law.  That's -- statute 24-31-905 is

19   the section that regard -- that addresses kinetic impact

20   projectiles, chemical agents and irritants, and that section

21   goes into effect immediately.  The section that Mr. Ziev was

22   talking about is another section of the law.  So the section

23   that is at issue, and that we agreed to, and of course we will

24   follow the law is in effect as of last Friday when the

25   governor signed the bill, June 19th.

                    Sarah K. Mitchell, RPR, CRR

20-CV-01616-RBJ    Preliminary Injunction    06/25/2020    117

1           So the other item that we're willing to agree to was

2   -- and we can enter a stipulation with them -- about the use

3   of body cameras in moments of -- I can't remember what the

4   word -- of confrontation with other people.  We can enter a

5   stipulation with them about that.

6           THE COURT:  Okay.  Let me stop you there, please.

7   Maybe we're hung up or you're hung up or your client is hung

8   up on the word injunction.  It doesn't have to be an

9   injunction.  I mean, we're not here to parse words now.  You

10  -- if you lawyers could only stop being antagonists for a

11  moment, why can't you enter into an agreement, an enforceable

12  written, signed agreement where you put forward these things

13  that you've agreed to do in a way that you're bound but it's

14  not called an injunction?  Why haven't you done that?

15          MS. LEWIS:  We have agreed to -- what I'm saying is

16  you're absolutely right, Your Honor.  We do not want to

17  concede that the elements of an injunction have been made

18  here, primarily the likelihood of success on the merits, the

19  specter of irreparable harm .  Also, we don't believe there's

20  standing, and there's mootness issues as well from the new

21  bill.  We are willing to enter a stipulation with the opposing

22  side about the time -- the items that we've been able to reach

23  agreement on.

24          THE COURT:  And also about the things that Phelan

25  testified to in his testimony.

                        Sarah K. Mitchell, RPR, CRR

1            MS. LEWIS:  Well, let me address --

2            THE COURT:  You cannot back away from that.

3            MS. LEWIS:  One of the -- one of the -- let me

4    address one thing that you've talked about with regard to

5    Commander Phelan's testimony, and that is in regard to the

6    question of whether other law enforcement agencies are agents

7    and Denver is claiming responsibility for every one of their

8    actions.  Now, as Commander Phelan testified to, the chief of

9    police is the one -- and above him the executive director of

10   the department of safety is the person who can bind the city

11   on those types of things, and so Commander Phelan giving his

12   opinion on that matter does not bind the city on that.  In

13   fact, under Colorado law, independent jurisdictions are not

14   agents under another government.  It depends on whether

15   there's a right to control the other, and that case is *Clark*

16   *vs. Colbert* --

17           THE COURT:  I don't want to hear about that case,

18   ma'am.  If you're going to back away from what Phelan said,

19   and he's the guy you put on the stand twice now, two different

20   hearings, if you're going to back away from his testimony,

21   I'll order that they're agents.  I already have, and I'm not

22   going to back away from that.  So let's get real here.  I'll

23   issue an injunction and put all this stuff in there that

24   you've agreed to, and you'll be bound by it, and then you can

25   appeal it.  Or you can sit down with the lawyers -- I've been

20-CV-01616-RBJ    Preliminary Injunction    06/25/2020    119

1    trying to get you to do that for two weeks -- and reach a

2    stipulation, put it in writing, and it will bind everybody but

3    not be called an injunction.  Now, instead, if you want to

4    cite your cases and say that they don't have standing and this

5    and that, fine.

6            MS. LEWIS:  Well, Your Honor --

7            THE COURT:  Talk to the Tenth Circuit about what it

8    means to renege on a deal.

9            MS. LEWIS:  Your Honor, one of the terms that we

10   could not agree on which is why we went to the hearing today

11   was this issue of expedited discovery that the plaintiffs have

12   insisted be included into any sort of stipulation that we've

13   had, and so --

14           THE COURT:  I'm not going to require that no matter

15   what kind of an order I issue, so you don't have to worry

16   about it.

17           MS. LEWIS:  Okay.  As for standing and mootness, as

18   we stated in our brief, we don't believe the plaintiffs have

19   shown their risk of imminent harm which is necessary to

20   establish standing.  All they've alleged is a past injury.

21   Notably they do have a damages claim in this case, so they can

22   continue on that.  The passage of the law recently changed the

23   circumstances in Colorado dramatically.  As I've said, Denver

24   is going to comply with the law.  Also, we've heard testimony

25   that nothing that has existed in the city like the violence of

                    Sarah K. Mitchell, RPR, CRR

20-CV-01616-RBJ     Preliminary Injunction     06/25/2020     120

1    the first few days of the protests, and the nature of the harm

2    the plaintiffs are seeking is only speculative, and that is

3    not sufficient to establish standing for a preliminary

4    injunction or to meet the irreparable harm component of the

5    injunction.

6            Also, as far as the likelihood of success on the

7    merits, we would like to point out that this is a municipal

8    liability claim against Denver, and their burden is to

9    demonstrate that there's a custom, policy, or practice of

10   Denver that has violated the constitutional rights of the

11   individually named plaintiffs.  There's been no evidence --

12           THE COURT:  I'm very familiar with Monell law.

13   You're just reading your argument off your notes, and it's not

14   communicating.  You're not listening to me, and maybe you just

15   don't care.  I'm suggesting that you've agreed on certain

16   things, you can put them into writing, you can sign it, it's

17   binding, the Court wouldn't issue an injunction.  They've got

18   what they need, you've agreed to what they really need, and we

19   all go home.  No, you won't do that.

20           MS. LEWIS:  Yes, we can agree to a stipulation, yes,

21   on the terms that we've talked about.

22           THE COURT:  All right.  Then have it on my desk by

23   10 o'clock in the morning, signed.

24           MS. LEWIS:  Okay.  We can do that on the terms we've

25   agreed to, yes.  So --

                      Sarah K. Mitchell, RPR, CRR

20-CV-01616-RBJ    Preliminary Injunction    06/25/2020    121

 1              THE COURT:  Will you plaintiff lawyers sit down with

 2      her and bang out a stipulation that says what I've said I'd

 3      agree to?

 4              MR. ZIEV:  Absolutely, Your Honor.

 5              THE COURT:  That's your best chance right now.

 6              MR. ZIEV:  Absolutely.

 7              THE COURT:  That's your best chance.

 8              MR. ZIEV:  Yes, Your Honor.

 9              THE COURT:  All right.  Then get to work and see if

10      you can have something by mid-morning tomorrow.

11              MR. ZIEV:  Thank you.

12              THE COURT:  All right.

13              MS. LEWIS:  Thank you, Your Honor.

14              THE COURT:  Okay.  Thank you.  Good night.

15              THE COURTROOM DEPUTY:  Court is in recess.

16          (The proceedings were concluded at 4:44 p.m.)

17

18

19

20

21

22

23

24

25

                        Sarah K. Mitchell, RPR, CRR

1                              REPORTER'S CERTIFICATE

2

3               I, SARAH K. MITCHELL, Official Court Reporter for the

4     United States District Court for the District of Colorado, a

5     Registered Professional Reporter and Certified Realtime

6     Reporter, do hereby certify that I reported by machine

7     shorthand the proceedings contained herein at the time and

8     place aforementioned and that the foregoing pages constitute a

9     full, true and correct transcript.

10              Dated this 10th day of March, 2021.

11

12

13

14              _____ /s/ Sarah K. Mitchell _____

15                       SARAH K. MITCHELL
                         Official Court Reporter
16              Registered Professional Reporter
                     Certified Realtime Reporter
17

18

19

20

21

22

23

24

25

                        Sarah K. Mitchell, RPR, CRR