IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:20-CV-1922-RBJ-MEH (consolidated with lead case *Epps, et al. v. City and County of Denver, et al.*, 1:20-CV-1878-RBJ)

SARA FITOURI,
JACQUELYN PARKINS,
YOUSSEF AMGHAR,
CLAIRE SANNIER,
KELSEY TAYLOR,
JOE DERAS,
JOHNATHEN DURAN,

      Plaintiffs

v.

CITY AND COUNTY OF DENVER, COLORADO,
SERGEANT ANTHONY E. TAK, # 00018,
COMMANDER PATRICK PHELAN,
LIEUTENANT MATTHEW CANINO,
LIEUTENANT JAMES D. WILLIAMS,
LIEUTENANT THOMAS PINE,
LIEUTENANT VINCENT PORTER,
LIEUTENANT MICHAEL O'DONNELL,
LIEUTENANT KEVIN CARROLL,
SERGEANT RICK BEALL,
SERGEANT DAVID ABEYTA,
SERGEANT MARCO MARTINEZ,
SERGEANT JUSTIN DODGE,
CORPORAL RICHARD D. EBERHARTER,
OFFICER TANA CUNNINGHAM,
OFFICER JOHN SAMPSON,
CITY OF AURORA, COLORADO,
OFFICER CORY BUDAJ,
BOARD of COUNTY COMMISSIONERS of the COUNTY OF JEFFERSON, COLORADO,
JEFF SHRADER, SHERIFF of JEFFERSON COUNTY, COLORADO, and
DOE DEFENDANTS 1-10,

      Defendants.

---

**SECOND AMENDED CLASS ACTION COMPLAINT AND JURY DEMAND**

---

Exhibit B

Now come Plaintiffs, Sara Fitouri, Jacquelyn Parkins, Youssef Amghar, Joe Deras, Johnathen Duran, and Class Representatives Claire Sannier and Kelsey Taylor, through their attorneys, LOEVY & LOEVY, and hereby complain of Defendants City and County of Denver, Colorado, Sergeant Anthony E. Tak, # 00018, Commander Patrick Phelan, Lieutenant Matthew Canino, Lieutenant James D. Williams, Lieutenant Thomas Pine, Lieutenant Vincent Porter, Lieutenant Michael O'Donnell, Lieutenant Kevin Carroll, Sergeant Rick Beall, and Sergeant David Abeyta, Sergeant Marco Martinez, Sergeant Justin Dodge, Corporal Richard D. Eberharter, Officer Tana Cunningham, Officer John Sampson, City of Aurora, Colorado, Officer Cory Budaj, Board of County Commissioners of the County of Jefferson, Colorado, Jeff Shrader, Sheriff of Jefferson County, Colorado, and Doe Defendants 1-10, as follows:

## INTRODUCTION

1.      This action arises out of protests in Denver and across the nation following the murder of George Floyd on May 25, 2020, by Minneapolis police officers. The events in Minneapolis brought out millions of people around the country at once to peacefully protest the deaths of Black and Brown people by law enforcement and vigilantes condoned by local law enforcement as well as the systemic racism that oppresses Black, Indigenous, and people of color. Despite the COVID-19 pandemic, thousands of people came out to demonstrate in Denver and elsewhere in Colorado.

2.     Although the protests were overwhelmingly peaceful, the Denver Police Department ("DPD") and officers from other agencies in DPD's mutual-aid network (collectively, "Defendant Officers") used violent crowd control tactics against these peaceful protestors. Over the course of several days, the Defendant Officers deployed constitutionally unlawful crowd control tactics, including kettling, indiscriminate and unwarned launching of tear gas and flashbangs into crowds and at individuals, and shooting projectiles at protestors. These protestors included many young Black and Brown people.

3.     Defendant Officers knowingly placed these protestors in physical danger through indiscriminate use of excessive force.

4.     Defendant Officers intentionally used force on peaceful protestors with no lawful justification.

5.     Not only did this excessive use of force injure many protestors, journalists, and bystanders, but it chilled individuals from exercising their First Amendment rights and suppressed speech.

6.     Defendant Officers targeted journalists and others simply documenting their conduct. They targeted medics who were seeking to give aid to those harmed.

7.     Although the protests were overwhelmingly peaceful, the DPD arrested over 350 people over the course of several days beginning on May 28, 2020, the first day of the protests in Denver, most of whom were arrested solely for violating Denver's emergency nighttime curfew order, which was in effect from May 30 through June 5, 2020.

8.      For numerous days beginning on May 28, 2020, Defendants used methods of "less-lethal" force to discourage and suppress peaceful protest in public places (including streets, sidewalks, and parks) in Denver, particularly in the downtown area.

9.      The actions of the Defendants infringed on the rights of protestors, journalists, and bystanders to be free from unreasonable seizures and use of force under the Fourth and Fourteenth Amendments.

10.     The purpose and effect of this excessive use of force was to prevent, deter, and suppress protestors from exercising their First Amendment right to exercise freedom of speech, peaceably assemble, and petition for redress of grievances.

11.     In addition, Defendant Denver's citywide nighttime curfew, which was applied discriminatorily against protestors, violated protestors' rights under the First, Fourth, and Fourteenth Amendments.

12.     Plaintiffs bring this action seeking to restrain the Defendant Denver and DPD from further violence and unconstitutional conduct and seeking damages on behalf of themselves individually, and with respect to Plaintiffs Sannier and Taylor, others similarly situated to them, to redress the harms caused by Defendant Denver and DPD's violent and unconstitutional conduct.

## Jurisdiction

13.     This court has jurisdiction of this action pursuant to 28 U.S.C. § 1331.

14.     Venue is proper under 28 U.S.C. 1391(b). All parties reside in this judicial district, and the events giving rise to the claims asserted herein occurred in this judicial district.

## The Parties

15.     Plaintiff Sara Fitouri is a lawyer and resident of Denver, Colorado.

16.     Plaintiff Jacquelyn Parkins is a union organizer and resident of Denver, Colorado.

17.     Plaintiff Youssef Amghar is a former U.S. Marine and resident of Denver, Colorado.

18.     Plaintiff Joe Deras is a union organizer and a resident of Denver, Colorado.

19.     Plaintiff Johnathen "De La Vaca" Duran (henceforth referred to as "De La Vaca"), is a journalist and magazine editor at Yellow Scene magazine. He is a resident of Boulder County, Colorado.

20.     Plaintiff Claire Sannier is a software engineer and resident of Denver, Colorado.

21.     Plaintiff Kelsey ("Elle") Taylor is a small business owner and a resident of Denver, Colorado.

22.     Defendant City and County of Denver ("Denver") is a Colorado municipal corporation. The DPD is an agency of the Defendant City and County of Denver, and all actions of the DPD are the legal responsibility of the City and

County of Denver. Denver is sued on the basis of its policies, customs, and practices which gave rise to Plaintiffs' federal rights claims.

23.    Defendant Sergeant Anthony E. Tak, # 00018, is or was at all relevant times an employee of the DPD and acting within the scope of his employment and under color of law. Defendant Tak is sued in his individual capacity.

24.    Defendant Commander Patrick Phelan was at all relevant times a supervisory employee of the DPD and acting within the scope of his employment and under color of law. Defendant Phelan is sued in his individual capacity.

25.    Defendant Phelan was the Incident Commander during the protests, except for June 2, 2020, when Defendant Canino served as the Incident Commander.

26.    Denver delegated to Defendant Phelan, as Incident Commander, final decision- and policymaking authority over the protests and the police response to the protests. Phelan was in charge of coordinating the officers in the field and directed when and what kinds of force officers could use on protestors.

27.    Defendant Lieutenant Matthew Canino is or was at all relevant times a supervisory employee of the DPD and acting within the scope of his employment and under color of law. Defendant Canino is sued in his individual capacity.

28.    Defendant Lieutenant James D. Williams is or was at all relevant times a supervisory employee of the DPD and acting within the scope of his employment and under color of law. Defendant Williams is sued in his individual capacity.

29.     Defendant Lieutenant Thomas Pine is or was at all relevant times a supervisory employee of the DPD and acting within the scope of his employment and under color of law. Defendant Pine is sued in his individual capacity.

30.     Defendant Lieutenant Vincent Porter is or was at all relevant times a supervisory employee of the DPD and acting within the scope of his employment and under color of law. Defendant Porter is sued in his individual capacity.

31.     Defendant Lieutenant Michael O'Donnell is or was at all relevant times a supervisory employee of the DPD and acting within the scope of his employment and under color of law. Defendant O'Donnell is sued in his individual capacity.

32.     Defendant Lieutenant Kevin Carroll is or was at all relevant times a supervisory employee of the DPD and acting within the scope of his employment and under color of law. Defendant Carroll is sued in his individual capacity.

33.     Defendant Sergeant Rick Beall is or was at all relevant times a supervisory employee of the DPD and acting within the scope of his employment and under color of law. Defendant Beall is sued in his individual capacity.

34.     Defendant Sergeant David Abeyta is or was at all relevant times a supervisory employee of the DPD and acting within the scope of his employment and under color of law. Defendant Abeyta is sued in his individual capacity.

35.     Defendant Sergeant Marco Martinez is or was at all relevant times a supervisory employee of the DPD and acting within the scope of his employment and under color of law. Defendant Martinez is sued in his individual capacity.

36.     Defendant Sergeant Justin Dodge is or was at all relevant times a supervisory employee of the DPD and acting within the scope of his employment and under color of law. Defendant Dodge is sued in his individual capacity.

37.     Defendant Corporal Richard D. Eberharter is or was at all relevant times a supervisory employee of the DPD and acting within the scope of his employment and under color of law. Defendant Eberharter is sued in his individual capacity.

38.     Defendant Officer Tana Cunningham is or was at all relevant times an employee of the DPD and acting within the scope of her employment and under color of law. Defendant Cunningham is sued in her individual capacity.

39.     Defendant Officer John Sampson is or was at all relevant times an employee of the DPD and acting within the scope of his employment and under color of law. Defendant Sampson is sued in his individual capacity.

40.     At all material times herein, Defendant Denver was responsible for supervising, enacting, and enforcing the DPD's conduct, policies, and practices; the absence of necessary policies and practices; and for the hiring, retention, supervision, and training of employees and agents of the DPD.

41.     Defendant Denver requested the assistance of other law enforcement agencies in responding to the protests, pursuant to mutual-aid agreements. These agencies included the Aurora Police Department ("APD") and the Jefferson County Regional SWAT Team ("JCRS").

42.     A DPD supervisor was embedded with each team of outside officers from the DPD's mutual-aid network.

43.     The DPD reviewed its "rules of engagement" with the outside officers from its mutual-aid network before allowing them to provide assistance to the DPD.

44.     As Incident Commander, Defendant Phelan was in charge of the officers from the other law enforcement agencies who provided mutual aid. Phelan gave the same direction, guidance, and rules of engagement to the officers from other agencies as he did to DPD officers.

45.     Thus, Defendant Denver was responsible for the actions of the members of its mutual-aid network, including the actions of officers from APD and JCRS.

46.     Defendant City of Aurora, Colorado ("Aurora"), is a Colorado municipal corporation. The Aurora Police Department ("APD") is an agency of Defendant Aurora, and all actions of the APD are the legal responsibility of Aurora. Defendant Aurora is sued on the basis of its policies, customs, and practices which gave rise to Plaintiffs' federal rights claims.

47.     Defendant Cory Budaj is or was at all relevant times an employee of the APD and acting within the scope of his employment and under color of law. Defendant Budaj is sued in his individual capacity.

48.     Defendant Board of Commissioners of the County of Jefferson, Colorado, is or was at all relevant times a governmental entity within the State of Colorado, and is one of the proper parties for a suit against Jefferson County,

Colorado. Jefferson County is responsible for paying any judgment entered against the Sheriff of Jefferson County, Colorado, or any Jefferson County Sheriff's officer, including JCRS officers. The Board is sued in its official capacity.

49.     Defendant Jeff Shrader is the Sheriff of Jefferson County, Colorado. He is sued in his official capacity.

50.     Plaintiffs are informed, believe, and thereupon allege that Does 1 through 10 were the agents, servants, and/or employees of the DPD or officers of other jurisdictions who were acting with the authorization of the DPD. Plaintiffs are ignorant of the true names of these Doe Defendants and therefore sue these Defendants by such fictitious names. Plaintiffs will amend this Complaint to allege their true names when ascertained. The individual Doe Defendants are sued in their individual capacities.

51.     The individual Defendant Officers, named and unnamed, are henceforth referred to as the "Defendant Officers."

52.     At all times relevant hereto, Does 1 through 10, in addition to the named Defendants, are responsible for the damages and injuries alleged herein.

53.     At all times relevant hereto, Defendant Officers were the agents, servants, and/or employees of Defendant Denver and were acting at all times under color of law and within the scope of their agency or employment and with the knowledge and consent of their principal or employer.

54.     The acts and omissions of all Defendant Officers were at all material times pursuant to the customs, policies, practices, and/or procedures of Defendant Denver and DPD.

55.     The acts and omissions of Defendant Budaj were at all material times pursuant to the customs, policies, practices, and/or procedures of the Defendant Aurora and APD.

56.     The acts and omissions of the as-yet-unidentified JCRS officers were at all material times pursuant to the customs, policies, practices, and/or procedures of the Defendants Board of County Commissioners, Sheriff Shrader, and the Jefferson County Sheriff's Office.

57.     The official and express policy of Defendant Denver was to allow the members of its mutual-aid network, including APD and JCRS, to follow their own policies, practices, and/or customs regarding the use of "less-lethal" weapons and use of force during the protests.

## Factual Background

58.     On Monday, May 25, 2020, a Minneapolis police officer brutally murdered George Floyd, an unarmed and non-resisting Black man, while other police officers stood by and watched.

59.     Innumerable people held peaceful protests across the world condemning police brutality and systemic racism in the wake of the state-sponsored and/or sanctioned/excused murders of George Floyd, Breonna Taylor, Ahmaud Arbery, Elijah McClain, Tony McDade, and countless others.

60.     These constitutionally protected and essential protests occurred amid an unprecedented public health crisis. Novel coronavirus, COVID-19, has killed over 500,000 Americans, infected millions of Americans, and continues to spread. The virus is commonly understood to be transmittable through exposure to respiratory droplets. At the time of the protests, public health and government officials, including in Denver, advised people to wear masks if they were outside and to stay six feet apart.

61.     At or around 5:00 p.m. on May 28, 2020, hundreds of protestors gathered at the Colorado State Capitol in downtown Denver to protest police brutality and racism against Black people in the United States. Protestors carried signs, chanted, and knelt.

62.     Thousands of protestors assembled to demonstrate in Denver every day for many days.

63.     Protestors frequently assembled at the Colorado State Capitol building, but they also marched down streets, primarily in the downtown Denver area.

64.     During the protests, the Defendants employed violent crowd control tactics to corral, intimidate, and suppress the speech of protestors.

65.     Defendant Officers used a variety of "less-lethal" weapons, including tear gas, flashbang grenades, pepper balls, rubber bullets, and other projectiles fired directly at protestors.

66.     Defendant Officers used these tactics on protestors who were demonstrating peacefully, without first issuing adequate (or any) warnings, lawful (or any) orders, or giving protestors adequate time to disperse.

67.     Tear gas is a general term for aerosolized chemical agents. Tear gas generally includes CS (o-chlorobenzylidene malonitrile) and OC (oleoresin capsicum).

68.     Tear gas activates pain receptors and leads to intense burning pain in the eyes, throat, lungs, skin and mucus membranes. It also causes disorientation, severe coughing, crying, and difficulty breathing.

69.     Defendant Officers also used kinetic impact projectiles ("KIPs") during the protests on peaceful protestors.

70.     KIPs refer to a range of projectiles used in crowd control settings that are made from combinations of rubber, plastic, PVC, various metals, wood, hard foam, and wax, which are often generically referred to as "rubber bullets." These include foam batons and rubber pellets. (The term "rubber bullet" used henceforth has the meaning provided in this paragraph.)

71.     DPD, APD, and JCRS use 40mm launchers to shoot KIPs.

72.     The 40mm launchers shoot projectiles at a speed of 90 to 100 miles per hour.

73.     KIPs frequently cause contusions or welts.

74.     When shot at close range, KIPs can cause serious bodily injury or death.

75.     When shot from farther range, KIPs have reduced accuracy.

76.     In addition, the use of riot control face gear makes the targeting of these weapons even more difficult.

77.     Defendant Officers consistently wore riot gear while present during the protests in Denver beginning on May 28, 2020.

78.     Pepper ball guns are air-powered launch devices that fire rounds containing plastic sphere projectiles filled with OC powder. These spheres explode OC powder onto the person who gets hit, causing not only physical pain from the impact, but also causing the person to struggle to breathe.

79.     Pepper balls and pepper spray have an immediate and incapacitating effect that creates a burning sensation to any exposed skin.

80.     Flashbang grenades, also known as noise flash diversionary devices ("NFDDs"), are explosives that make a loud noise and/or flash of light and are made to temporarily blind and/or deafen people and to disorient them.

81.     Flashbang grenades can cause serious bodily injury, including damage to hearing, burns, or even death.

82.     "Stinger" or rubber-ball grenades are high-risk explosive devices that, when detonated, explode 8 grams of flash powder to propel up to 180 rubber-balls in 360 degrees as far as 50 feet. They also emit a bright flash and an approximately 175-decibel noise. When exploding outwards, the rubber balls cause physical pain and sometimes serious injury, and the light and sound from the blast can be extremely disorienting.

83.     Defendant Officers from Denver's mutual-aid network, including APD and JCRS, also used other weapons, such as shotguns that fire beanbag rounds. These "beanbags" are generally filled with #9 lead shot. One manufacturer warns that "[s]hots to the head, neck, thorax, heart, or spine can result in fatal or serious injury."

84.     Over the course of several days, beginning on May 28, 2020, Defendant Officers shot tear gas, pepper balls, flashbang grenades, Stinger grenades, and KIPs at groups of largely peaceful protestors near the Capitol and in the downtown Denver area.

85.     Defendant Officers used these weapons indiscriminately and without any or adequate warning, even at times when the crowd was merely chanting, kneeling, or standing with their hands up.

86.     Many people were hit with projectiles and thousands inhaled tear gas or suffered pain and burning in their eyes, nose, mouth and throat from pepper balls and tear gas used by the officers.

87.     Defendant Officers also used "kettling" as a tactic against the protestors. Kettling, which derives from a German military term referring to an army surrounded by a much larger force, is a police tactic whereby officers confine a large group of people to a designated space by surrounding them on all sides so that there is no escape. By doing so, the officers effectively control people's movements.

88.     Kettling leads to the unlawful seizure of people without a reasonable basis, creates panic, elevates tensions, and chills speech. Defendant Officers

accomplished this by forming police lines around protestors. They also kettled protestors before using "less-lethal weapons" on them such as tear gassing, pepper spraying, throwing flashbangs, and shooting rubber bullets at them.

89.     One tactic used by Defendant Officers during the protests was to chase nonviolent protestors into alleys, trap them, and then shoot chemical weapons such as tear gas or pepper spray at them, and/or flashbang grenades.

90.     On Friday, May 29, 2020, peaceful protestors again gathered at the Capitol. Defendant Officers near the protest site at the Capitol wore riot gear. Protestors chanted, "Why are you in riot gear, I don't see no riot here." Without provocation or warning, Defendant Officers fired "less-lethal" weapons into the crowd of protestors.

91.     Throughout the hours that followed, Defendant Officers continued to engage in other violent and intimidating tactics, including shooting protestors who were kneeling and chanting with their hands up.

92.     Defendant Officers also used "less-lethal" weapons on members of the press as well as individuals recording or photographing their activities.

93.     On Saturday, May 30, 2020, peaceful protestors assembled at the Capitol in the afternoon. In response and over the next several hours, Defendant Officers intimidated protestors with "less-lethal" weapons.

94.     Some Defendant Officers fired KIPs, pepper balls, or pepper spray directly at protestors' heads, faces, and/or groins.

95.     Other Defendant Officers fired at protestors while hanging off of the side or back of moving police vans or trucks.

96.     Defendant Officers also shot "less-lethal" weapons at protestors peacefully kneeling on the ground and chanting.

97.     On May 30, 2020, at around 1:00 p.m., the Mayor of Denver declared an "emergency" and announced a curfew order for the entire city, set to begin at 8:00 p.m. that evening.

98.     Denver did not have sufficient justification under the law to declare a "state of local emergency" and issue a citywide "emergency" curfew order.

99.     The curfew was issued while thousands of individuals peacefully marched and demonstrated in Denver.

100.    The curfew was imposed in all public places within the City and County of Denver, including streets and public rights-of-way, from 8:00 p.m. on May 30, 2020 to 5:00 a.m. on Sunday, May 31, 2020, and from 8:00 p.m. on May 31, 2020 until 5:00 a.m. on June 1, 2020.

101.    On June 1, 2020, the Mayor of Denver extended the curfew for four more days. The curfew was in effect each night from 9:00 p.m. to 5:00 a.m. on the evenings of June 1, 2, 3, and 4, 2020, ending at 5:00 a.m. on June 5, 2020.

102.    The text of the curfew order provided that, during the curfew hours, "all persons" were "prohibited from using, standing, sitting, traveling or being present on any public street or in any public place, including for the purpose of

travel," with certain exceptions, including "credentialed members of the news media." However, there was no exception for First Amendment activity.

103.   A violation of the curfew order was a criminal violation punishable by a fine up to $999.00 or imprisonment up to 300 days.

104.   Defendant Denver directed its officers to enforce the curfew only against individuals engaged in protest activity, and not against other persons who were in violation of the curfew order.

## Factual Allegations Relating to Plaintiffs

## Plaintiffs Sara Fitouri, Jacquelyn Parkins, and Joe Deras

105.   Plaintiffs Sara Fitouri and Jacquelyn Parkins participated in the protests every day beginning on May 28, 2020, for numerous days. Plaintiff Joe Deras participated in the protests from May 28 through May 31, 2020. They attended to protest police brutality against Black and Brown people.

*May 28, 2020*

106.   On or around 5:00 p.m. on May 28, 2020, Parkins went to the Capitol building and participated in the protests. When some of the protestors began marching north, Fitouri joined Parkins as Parkins marched with them. The protest was peaceful.

107.   Fitouri, Parkins, and Deras marched through Confluence Park toward I-25 with the rest of the marchers. At about 7:00 p.m., some of the protestors got onto the highway. DPD Officers arrived a few minutes later, and the protestors on the highway ran off the highway onto the pedestrian walkway that led up to the

pedestrian bridge. Fitouri, Parkins, and Deras, were standing peacefully on the pedestrian bridge over the highway.

108.   DPD Officers fired dozens of pepper balls on the group of protestors who were standing on the walkway leading up to the pedestrian bridge.

109.   In addition, Defendant Dodge directed DPD Officer Kyle McNabb to shoot pepper balls at the pedestrian bridge, where numerous protestors were standing.

110.   Defendant Dodge directly participated in, and/or facilitated, ordered, or approved the use of force on protestors.

111.   Defendant Canino and his team were present, and he directly participated in and/or facilitated, ordered, or approved the use of force on protestors.

112.   No orders to disperse, warnings, or other announcements were given before the Defendant Officers used less-lethal weapons on the protestors.

113.   Defendants Canino and Dodge set in motion a series of events that they knew or reasonably should have known would cause others to deprive Plaintiffs of their constitutional rights. They knew of and acquiesced in the constitutional violations committed by his subordinates. In so doing, Defendants Canino and Dodge knowingly created a substantial risk of constitutional injury and disregarded known or obvious consequences of their actions, exhibiting deliberate indifference to the rights of Plaintiffs.

114.    Plaintiffs Fitouri, Parkins, and Deras inhaled chemical irritants from the weapons fired by DPD Officers.

115.    When Plaintiffs rejoined the march heading back downtown, they inhaled tear gas and/or pepper spray that Doe Defendant DPD Officers had used on protestors in the area of 16th and Platte.

116.    Plaintiffs had not thrown anything at the officers or committed any act that justified the use of force.

*May 29, 2020*

117.    In the afternoon on May 29, 2020, Fitouri, Parkins, and Deras arrived at or near the Capitol to join the protest and march. They marched with the other protestors, who were peaceful. The march went to several locations, including the City and County Building and the jail.

118.    Between approximately 8:00-8:45 p.m., Fitouri and Parkins and other protestors were at the intersection of Colfax and Broadway. The group was peaceful. At one point, someone in the group may have lofted a water bottle into the air. Rather than investigate and isolate that person, Doe Defendant DPD Officers indiscriminately opened fire with tear gas and pepper balls at the entire group of protestors, including Fitouri and Parkins, without warning or order to disperse.

119.    Defendants Carroll and O'Donnell and their respective teams were present, and Defendants Carroll and O'Donnell directly participated in and/or facilitated, ordered, or approved the use of force on protestors. As Incident

Commander, Defendant Phelan directed when and what kinds of force to use on the protestors.

120.    On this day, and throughout the protests, DPD policy required use of chemical munitions, including tear gas, to be authorized by the Command Post (i.e., Defendant Phelan), unless there were exigent circumstances, in which case a command-level officer at the scene could authorize the use of chemical munitions.

121.    Defendant Phelan authorized the use of chemical munitions at the area of Colfax and Lincoln/Broadway on May 29, 2020.

122.    Once the initial pepper spray rounds were fired, the Doe Defendant DPD Officers continued to use pepper balls, tear gas, and flashbang grenades on the protestors, including Fitouri and Parkins, from the corner of Broadway and Colfax, as well as multiple other locations on and around the Capitol.

123.    At one point, the Doe Defendant DPD Officers used pepper balls, tear gas, and flashbang grenades to push protestors southeast of the Capitol into the surrounding neighborhoods. Fitouri and Parkins, along with another group of protestors, inhaled significant amounts of pepper spray and tear gas during this offensive move.

124.    All of this was done under the orders and/or authorization of Defendant Phelan.

125.    Defendants Carroll, O'Donnell, and Phelan set in motion a series of events that they knew or reasonably should have known would cause others to deprive Plaintiffs of their constitutional rights. They knew of and acquiesced in the

constitutional violations committed by his subordinates. In so doing, Defendants Carroll, O'Donnell, and Phelan knowingly created a substantial risk of constitutional injury and disregarded known or obvious consequences of their actions, exhibiting deliberate indifference to the rights of Plaintiffs.

126.   Fitouri and Parkins saw many injured protestors at this time, including one woman who was unable to see or breathe and was caught in the gas.

127.   The Doe Defendant DPD Officers did not close any of the streets and their actions pushed protestors into active oncoming traffic.

128.   Fitouri and Parkins left the protest on or around 10:30 p.m., after experiencing significant exposure to tear gas fired by Doe Defendant DPD Officers very close to their persons. Doe Defendant DPD Officers used pepper balls, tear gas, and flashbang grenades on protestors consistently throughout the evening and were still using pepper balls, tear gas, and flashbang grenades at the time Fitouri and Parkins left.

129.   The Doe Defendant DPD Officers used pepper balls, tear gas, and flashbang grenades across Colfax while the street was filled with traffic waiting at the red light. Many cars had pepper balls, tear gas, and flashbang grenades hit their cars or the ground immediately next to the cars.

130.   On the evening of May 29, 2020, Fitouri and Parkins also observed that Doe Defendant DPD Officers indiscriminately shot tear gas and/or pepper balls at the entire group of protestors any time protestors moved within approximately 15 feet of the Officers.

131.   The Doe Defendant Officers never gave any warnings or dispersal orders before shooting tear gas and/or pepper balls at protestors.

132.   The Doe Defendant Officers shot tear gas and/or pepper balls at peaceful protestors who were kneeling on many occasions. Many of these protestors had their hands in the air and their shirts off.

133.   At many points in the evening of May 29, 2020, when Fitouri and Parkins and other peaceful protestors were on the Capitol steps with their hands up, chanting "Hands up, don't shoot," Doe Defendant DPD Officers fired flashbang grenades, tear gas, and pepper balls into the crowd indiscriminately and without warning or orders.

*May 30, 2020*

134.   On the evening of May 30, 2020, Parkins saw Doe Defendant DPD Officers hanging off the sides of police trucks and shooting at protestors as fast as they could.

135.   Around approximately 5:00 to 6:00 p.m., Fitouri and Parkins arrived at the Capitol building for the protests. They began at the west steps of the Capitol building.

136.   The area was already saturated with tear gas when Plaintiffs arrived.

137.   From about 6:00 to 8:00 p.m. on May 30, 2020, DPD Officers and Aurora police officers formed a skirmish line across Colfax, just north of Lincoln.

138.    DPD Gang Unit and Metro SWAT Officers were standing in the skirmish line across the intersection of Lincoln and Colfax, starting from the southwest curb line.

139.    Aurora police officers were standing in the skirmish line west of the DPD officers, from the southwest curb line west to Broadway.

140.    Only DPD Metro SWAT officers had flashbang grenades.

141.    Numerous DPD Gang Unit officers had pepper ball guns.

142.    Aurora police officers did not have any pepper ball guns.

143.    Aurora police officers did not have any flashbang grenades.

144.    Aurora police officers threw chemical munitions only at the direction or authorization of DPD supervisors, including Defendant Phelan.

145.    Thousands of protestors were on the Capitol grounds, on Lincoln, and in Veterans Park and Civic Center Park, south of the skirmish line.

146.    The protestors were largely peaceful.

147.    Many protestors were chanting, holding signs, standing with their hands up, or kneeling in front of the officers.

148.    At 6:28 p.m., a Doe Defendant DPD Gang Unit sergeant standing at the skirmish line in the intersection of Lincoln and Colfax threw a canister of chemical munitions into the large crowd of peaceful protestors who were chanting, "Hands up, don't shoot."

149.    Before curfew at 8:00 p.m. that day, a DPD Metro SWAT Officer standing on Colfax north of the protestors on Lincoln threw a flashbang grenade

24

into the crowd, which exploded at Fitouri's foot. This officer is believed to be either Defendant Martinez or Defendant Eberharter. Fitouri's foot went numb and she suffered minor burns. The flashbang grenade also exploded near Deras, injuring his eardrum and causing sharp pain in his ear for several days afterwards.

150.    While peacefully protesting with other peaceful protestors before curfew at the intersection of Lincoln and Colfax, Doe Defendant DPD Officers shot at Deras with pepper balls and another kind of KIP. The officers also used tear gas and smoke on Deras and other protestors, and Deras was caught in the smoke and tear gas multiple times before curfew.

151.    Deras saw Doe Defendant DPD Officers routinely throw tear gas at the protestors on Lincoln near the Capitol periodically, for no apparent reason. Deras did not once hear any warnings or orders (including dispersal orders) given by the police.

152.    On this day, and throughout the protests, DPD policy required use of chemical munitions, including tear gas, to be authorized by the Command Post (that is, Defendant Phelan), unless there were exigent circumstances, in which case a command-level officer at the scene could authorize the use of chemical munitions.

153.    Doe Defendant DPD supervisors repeatedly threw tear gas into the crowd of protestors at the intersection of Lincoln and Colfax on May 30, 2020 between 6:00 and 8:00 p.m. without justification or warning.

154.    Defendant Eberharter threw approximately ten tear gas canisters into the crowd of protestors, without justification or warning.

25

155.   At 7:07 p.m., Defendant Eberharter handed a tear gas canister to an Aurora police officer and told him to throw it into the crowd of protestors, without justification or warning. Following the chain of command, the Aurora police officer did as he was told.

156.   In another example, at 7:09 p.m., Defendant Martinez threw tear gas into the crowd of protestors, without justification or warning.

157.   Command-level staff present at the intersection of Lincoln and Colfax between 6:00 to 8:00 p.m. on May 30, 2020, included Defendants Williams, Pine, Canino, O'Donnell, and Carroll.

158.   The use of tear gas was authorized by command-level DPD staff, including Defendants Phelan, Pine, Canino, O'Donnell, and Carroll.

159.   No warnings, orders, or announcements were given before the use of force on protestors at the intersection of Lincoln and Colfax between 6:00 and 8:00 p.m. on May 30, 2020.

160.   Parkins and Fitouri saw Doe Defendant DPD Officers shoot tear gas, flashbang grenades, and/or pepper spray into the crowd of protestors without warning or dispersal orders.

161.   Deras was very badly gassed, as described below.

162.   At about 7:00 p.m., Doe Defendant DPD Officers threw multiple canisters of tear gas onto the Capitol lawn. Deras was close to the steps of the Capitol at this time, near Lincoln. He did not see the tear gas coming until his breathing was adversely affected. Deras ran towards the south side of the Capitol,

towards Sherman and 14th Avenue. Deras almost lost consciousness because he could not catch his breath, his vision was blurred, his face was on fire, and he was very disoriented. Another person saw Deras struggling and was able to put milk and magnesia on his face. Deras struggled to breathe for approximately half an hour.

163.   All of this occurred before the 8:00 p.m. curfew on May 30, 2020.

164.   Defendants Williams, Canino, Pine, O'Donnell, Carroll, and their respective teams were present, and Defendants Williams, Canino, Pine, O'Donnell, and Carroll directly participated in and/or facilitated, ordered, or approved the use of force on protestors. As Incident Commander, Defendant Phelan directed when and what kinds of force to use on the protestors.

165.   Defendants Phelan, Williams, Pine, Canino, O'Donnell, and Carroll set in motion a series of events that they knew or reasonably should have known would cause others to deprive Plaintiffs of their constitutional rights. They knew of and acquiesced in the constitutional violations committed by their subordinates. In so doing, these Defendants knowingly created a substantial risk of constitutional injury and disregarded known or obvious consequences of their actions, exhibiting deliberate indifference to the rights of Plaintiffs.

166.   There was no warning that officers would enforce the curfew on the protestors through the use of force or chemical agents. Shortly after 8:00 p.m., Doe Defendant Officers ominously and without warning marched out of the Capitol building in riot gear and launched tear gas, flashbang grenades, and/or pepper

spray indiscriminately at the protestors, including Fitouri, Parkins, and Deras. There were no warnings or orders prior to the officers' use of force.

167. During the time they were at the intersection of Lincoln and Colfax and the area of the Capitol, Plaintiffs did not throw anything at the officers or commit any act that justified the use of force.

168. Fitouri, Parkins, and Deras then marched with a group of protestors. Southeast of the Capitol, Doe Defendant DPD Officers began shooting pepper balls at the protestors without warning or giving any dispersal or other orders. Fitouri, Parkins, and Deras were with a group of approximately 30 people who ran into an alley in order to avoid being hit. Doe Defendant DPD Officers chased the protestors both on foot and on SWAT vehicles into the alley in order to trap them and continue shooting at them. Fitouri was hit with pepper balls. Fitouri, Parkins, and Deras felt the effects of chemical agents.

169. Doe Defendant DPD Officers threw tear gas and flashbang grenades at Deras and other protestors trapped in an alley. This was very traumatic to Deras and others because people were scared, trying to run away, and some people were getting trampled.

170. Eventually, Plaintiffs were able to get to their cars to leave.

171. At the time that Fitouri and Parkins were present in public places in Denver after curfew on May 30, 2020, the Doe Defendant DPD Officers "enforced" the curfew against them and other protestors by shooting pepper balls or throwing

tear gas at them and/or chasing them into alleys in order to use "less-lethal" weapons on them.

172.   The Doe Defendant DPD Officers did not give any warnings or dispersal orders and appeared only interested in intimidating and punishing protestors with their "less-lethal" weapons.

173.   Fitouri, Parkins, and Deras saw many non-protestors present in public places in Denver after curfew on May 30, 2020 and/or May 31, 2020 who were ignored by the Doe Defendant DPD Officers and were not shot at, tear gassed, pepper sprayed, or arrested.

174.   After they left the protest, Fitouri, Parkins, and Deras returned to their place of work at 15th Avenue and Grant Street where their cars were parked, in order to go home. Plaintiff Youssef Amghar was with them. They were standing in a private parking lot of their workplace. A group of protestors came by. Suddenly, one or more police vehicles screeched to a halt, many Doe Defendant Officers got out of their vehicles and began shooting pepper balls and/or tear gas at the protestors without warning or dispersal orders. Plaintiffs attempted to hide behind their own vehicles. The officers shot at them and other protestors running through the parking lot from approximately 20 feet away.

*May 31, 2020*

175.   On Sunday, May 31, 2020, in the early evening, Fitouri, Parkins, Deras, and Youssef joined the protest, which was peaceful. They marched with the other protestors.

176.   At approximately 8:30 p.m., when Fitouri, Parkins, Deras, Amghar, and other protestors marched near the police precinct on Washington and Colfax, JCRS officers intentionally allowed half the group to pass and then began tear gassing, throwing flashbangs at, and pepper spraying the middle of the protest march. There were likely several thousand protestors in the march at this time.

177.   As Incident Commander, Defendant Phelan directed and authorized the actions of the JCRS officers at this time.

178.   Defendant Phelan had ordered JCRS to form a skirmish line off Colfax at the police precinct.

179.   JCRS was under the command of Defendant Phelan. The force used by them was authorized by Defendant Phelan, as Incident Commander.

180.   Upon information and belief, there was a DPD sergeant present with and embedded with JCRS at this time.

181.   Plaintiffs did not witness protestors do anything violent or that would otherwise justify the force used by JCRS.

182.   Plaintiffs did not do anything violent or commit any act that would otherwise justify the force used by JCRS.

183.   The officers gave no warnings or orders prior to their use of force.

184.   Deras was hit three times with projectiles thrown or shot out of "less-lethal" weapons by JCRS officers. Deras was hit once in his head, once in his hand, and once in his back.

185.     Plaintiffs have not yet been able to identify the exact JCRS officers who shot Deras, but, upon information and belief, these officers fired beanbag shotguns and, in some instances, other "less-lethal" munitions such as Arwen rubber ball grenades and Stinger grenades.

186.     The JCRS officers who shot Deras are believed to be one or more of the following individuals: Deputy Sheriff Timothy Dreith, Sergeant Timothy Stegink, Deputy Sheriff Michael Pitton, Deputy Sheriff Jordan Bybee, Deputy Sheriff Anthony Hamilton, and Deputy Sheriff Brown.

187.     The firing of beanbag shotguns, Arwen rubber ball grenades, and Stinger grenades at a person's head or spine can cause serious bodily injury or death.

188.     The JCRS officers knew that firing their weapons in this manner can cause seriously bodily injury or death.

189.     At and prior to the time he was shot, Deras was not committing any act of aggression or any other act that warranted the use of force that could cause him serious bodily injury or death.

190.     The JCRS officers fired their weapons at protestors and civilians, including Deras, through thick clouds of heavy tear gas and/or smoke, which reduced their visibility.

191.     The actions of the JCRS officers against Plaintiff Deras were consistent with the policies, practices, and customs of the Defendants Board of County Commissioners, Sheriff Shrader, and the Jefferson County Sheriff's Office.

192.    The actions of the JCRS officers against Plaintiff Deras were also consistent with the policies, practices, and customs of Defendant Denver.

193.    Deras was seriously injured and immediately left to seek treatment at a nearby hospital. Deras's hand became severely swollen and felt like it was broken. He could not bend his thumb or move his hand. In the weeks that followed, it was difficult to do normal things such as writing, typing, and cooking. Deras also had pain in his back, which made it difficult to sleep, and also made it difficult to stand or sit for very long.

194.    The serious injury inflicted on Deras suppressed and cut short his ability to exercise his First Amendment rights, not only on that day but on several days afterwards.

195.    Deras feared the weapons and excessive force that the Doe Defendant Officers were using and did not return to the protests for several days as a result.

196.    At approximately 9:35 to 9:45 p.m. on May 31, 2020, Fitouri and Parkins were marching with hundreds of other protestors east on Colfax. They were stopped at the Basilica on Colfax between Logan and Pennsylvania, because there was a line of APD and JCRS officers that had formed a skirmish line on Pennsylvania. As hundreds of protestors gathered in the block of Colfax between Logan and Pennsylvania, a contingent of DPD Officers, led by Defendants Williams, Abeyta, and Beall, formed a line with their bodies and vehicles from the west, at Logan.

197.   Plaintiffs Claire Sannier and Johnathen De La Vaca Duran were also in the group of protestors at this time.

198.   The protestors were largely trapped between the APD and JCRS officers on the east, the DPD officers on the west, a tall, spiky metal fence in front of the Basilica and its grounds, and large buildings to the south.

199.   Indiscriminately and without warning or orders, the APD, JCRS, and DPD officers shot tear gas, flashbang grenades, and pepper balls into the crowd from every direction. It was difficult for protestors to escape, although many ran down a narrow alleyway to the south or around the corners of Logan and Pennsylvania to the north.

200.   Defendant Phelan had ordered an Aurora captain to push protestors west on Colfax from Washington to Pennsylvania, while simultaneously ordering Defendant Williams to push protestors east on Colfax from Grant to Logan.

201.   This kettling of and use of force on protestors was directed by Defendant Phelan, as Incident Commander. Defendant Phelan's orders were carried out by Defendants Williams, Abeyta, Beall, the Aurora captain, and their respective teams of officers.

202.   Defendants Phelan, Williams, Abeyta, and Beall directly participated in and/or facilitated, ordered, or approved the use of force on protestors.

203.   Defendants Phelan, Williams, Abeyta, and Beall set in motion a series of events that they knew or reasonably should have known would cause others to deprive Plaintiffs of their constitutional rights. They knew of and acquiesced in the

constitutional violations committed by their subordinates. In so doing, these Defendants knowingly created a substantial risk of constitutional injury and disregarded known or obvious consequences of their actions, exhibiting deliberate indifference to the rights of Plaintiffs.

204.    At the direction of or with the authorization of his supervisors, including, ultimately, Defendant Phelan, Defendant Budaj threw a tear gas canister into the crowd of protestors in front of the Basilica at approximately 9:41 p.m.

205.    There was no lawful justification for the Defendant Officers' use of force described in the preceding paragraphs.

206.    The actions of the APD officers between 9:35-9:45 p.m. on May 31, 2020, were consistent with the policies, practices, and customs of the Defendant Aurora.

207.    The actions of the JCRS officers between 9:35-9:45 p.m. on May 31, 2020, were consistent with the policies, practices, and customs of the Defendants Board of County Commissioners, Sheriff Shrader, and the Jefferson County Sheriff's Office.

208.    The actions of the APD, JCRS, and DPD officers between 9:35-9:45 p.m. on May 31, 2020, were also consistent with the policies, practices, and customs of the Defendant Denver.

209.    On days when they attended protests in Denver and during the events described above, Fitouri, Parkins, and Deras experienced tear gas and/or pepper spray on numerous occasions, as described above, which caused coughing, difficulty

34

breathing, irritation and burning in the eyes, nose, throat, and mouth and a burning sensation on the skin.

### Plaintiff Claire Sannier

210.    Plaintiff Claire Sannier participated in the protests from May 28, 2020 to June 7, 2020. She attended to protest police brutality against Black and Brown people, provide eyewash, food and water to protestors, and to be a witness.

*May 28, 2020*

211.    On May 28, 2020, Sannier joined the protests at around 5:00 or 6:00 p.m. She marched with other peaceful protestors near the Capitol and on streets downtown. They marched to I-25, but Sannier did not get on I-25. She saw Doe Defendant DPD Officers using "less-lethal" weapons on people on I-25, and bystanders who were on the pedestrian bridge were exposed to massive doses of tear gas and/or pepper spray.

212.    Within two hours of joining the protests on that first day, Sannier had been pepper sprayed for no lawful reason.

*May 29, 2020*

213.    On May 29, 2020, Sannier protested with other peaceful demonstrators in downtown Denver. At one point, there were lines of Doe Defendant DPD Officers facing protestors. The protestors were yelling at the officers, but the protestors were peaceful. The officers repeatedly deployed tear gas on the protestors at no provocation and without warning. The chant that most often preceded a tear gassing was "Why are you in riot gear? I don't see no riot here."

214.    When Sannier was walking home downtown that evening, she saw a Black man yelling at (but not threatening) a group of Doe Defendant DPD Officers. A white couple started arguing with the Black man who was yelling at the Doe Defendant DPD Officers. Sannier recorded this with her cell phone from a comfortable distance. The officers opened fire on the people arguing, and, seeing that Sannier was filming, shot her in the chest with a pepper ball.

215.    Sannier's act of recording the Doe Defendant DPD Officers did not interfere with the officers in any way.

216.    Sannier had a constitutionally protected right to record police officers' official actions in a public place.

217.    At the time, Sannier was exercising her constitutionally protected right to record police officers' official actions in a public place.

*May 30, 2020*

218.    On May 30, 2020, at approximately 4:00 p.m., Sannier marched with other peaceful protestors in the downtown area. There were approximately 1,000 protestors. While Sannier and other protestors were near the 16th Street Mall, between California and Welton, DPD Officers, led by Defendant Porter, began shooting pepper balls at the protestors. There was no provocation by the protestors. At the time, Sannier and other protestors were kneeling before the Officers and chanting "Hands up, don't shoot," and other protestors were laying down in front of her.

36

219.     Defendant Porter directly participated in and/or facilitated, ordered, or approved the use of force on the protestors at the intersection of 16th Street and Welton on May 30, 2020 at approximately 4:48-4:49 p.m. Defendant Porter authorized his officers to use "less-lethal" weapons, including pepper balls and 40mm launchers.

220.     Defendant Porter set in motion a series of events that he knew or reasonably should have known would cause others to deprive Plaintiffs of their constitutional rights. He knew of and acquiesced in the constitutional violations committed by his subordinates. In so doing, Defendant Porter knowingly created a substantial risk of constitutional injury and disregarded known or obvious consequences of their actions, exhibiting deliberate indifference to the rights of Plaintiffs.

221.     Sannier inhaled chemical irritants at this time. She had eye irritation and was in respiratory distress.

222.     No warnings, orders (including dispersal orders), or announcements were made prior to the use of force.

223.     Between 6:00 and 8:00 p.m., Sannier was with the hundreds of other people peacefully protesting the police lined up at the intersection of Lincoln and Colfax.

224.     Sannier was teargassed repeatedly during this time.

225.     At one point, at about 7:06 p.m., Sannier was kneeling with other protestors in front of the officers and chanting, with her hands up. The protestors

were peaceful. One or more Doe Defendant DPD Officers throw chemical munitions into the crowd for no apparent reason.

226.   Sannier did not throw anything or commit any act that justified the use of force on her.

227.   Sannier saw DPD Officers shoot unarmed protestors in the back with pepper balls.

228.   A Doe Defendant DPD Metro SWAT officer threw a flashbang grenade into the crowd. This exploded near Sannier's head and caused ringing in her ears and caused her head to hurt. Sannier was very disoriented and in shock. Another protestor came, grabbed her arm, and led her away.

229.   Later in the evening on May 30, 2020, Sannier marched with other protestors to the District 6 police station at Colfax and Washington. When they got closer to the police station, Doe Defendant Officers used tear gas on the protestors to disperse them.

230.   On one or more days when the curfew was in effect, Sannier saw many non-protestors present in public places in Denver after curfew who were ignored by Doe Defendant Officers and were not shot at, tear gassed, pepper sprayed, or arrested.

*May 31, 2020*

231.   Sannier arrived at the Capitol area to join the protests at about 3:00 or 4:00 p.m.

232.    During the daytime, the police stayed away from the protestors, and the protests were peaceful.

233.    Sannier was present during the kettling of protestors in front of the Basilica on Colfax between Logan and Pennsylvania between 9:35 and 9:45 p.m. on May 31, 2020. She had been marching east from the Capitol with other protestors. She crossed Logan, but marchers had to stop because there were police in front of them.

234.    All of a sudden, there were police lights in front and behind the marchers.

235.    During this kettling incident, Sannier experienced the worst tear gassing of all the days that she attended the protests.

236.    Defendant Officers shot tear gas, pepper balls, flashbang grenades, and other projectiles at the protestors.

237.    There were no announcements, warnings, or dispersal orders before the use of force on protestors.

238.    Sannier ran to the north with a friend.

*June 1, 2020*

239.    On June 1, 2020, Sannier joined other protestors who marched downtown. Sannier was with a few hundred other protestors on the Capitol lawn until midnight. The protest was peaceful.

240.    At midnight, dozens of Doe Defendant Officers came out of the shadows at the Capitol, and protestors began chanting, "Why are you in riot gear, I don't see no riot here."

241.    Sannier laid down in the street with other people linking arms. There were also protestors demonstrating against the police in a line.

242.    Doe Defendant Officers began marching onto the lawn. Without any warning or dispersal order or any words, the officers began tear gassing the demonstrators. The Doe Defendant Officers also used a noise cannon or some weapon that created an irregular strobing sound that was extremely disorienting.

243.    As Incident Commander, Defendant Phelan directed when and what kinds of force to use on the protestors.

244.    Sannier decided to go home and left.

245.    When Sannier got to Lincoln and Broadway and approximately 13th Avenue, there were approximately 50 Doe Defendant Officers there. At least some of these officers were DPD Gang Unit Officers under the supervision of Defendant Tak.

246.    The Officers surrounded Sannier and other medics in a corner and began shooting them with pepper balls. The medics in front of Sannier were wearing gear clearly identifying them as medics.

247.    Defendant Tak was present and directly participated in and/or facilitated, ordered, or approved the use of force on protestors.

248.     Sannier was tackled from behind by a Doe Defendant DPD Gang Unit Officer, under the supervision of Defendant Tak. The officer said words to the effect of "Get on the fucking ground!"

249.     Defendant Tak was under the supervision of his lieutenant, Defendant O'Donnell. Defendant O'Donnell was, in turn, following the orders of Defendant Phelan.

250.     Defendants Phelan, O'Donnell, and Tak set in motion a series of events that they knew or reasonably should have known would cause others to deprive Plaintiffs of their constitutional rights. They knew of and acquiesced in the constitutional violations committed by their subordinates. In so doing, these Defendants knowingly created a substantial risk of constitutional injury and disregarded known or obvious consequences of their actions, exhibiting deliberate indifference to the rights of Plaintiff.

251.     The Doe Defendant DPD Gang Unit Officer arrested Sannier for curfew violation and failure to obey a lawful order.

252.     Sannier and the other individuals she was with at the time she was arrested were clearly identifiable as protestors.

253.     Sannier's arrest was the result of the Defendant Denver's policy of enforcing the curfew only against individuals engaged in protest activity.

254.     Neither Defendant Tak nor any other Officer gave Sannier any lawful orders.

255.     Defendant Tak did not give Sannier multiple orders.

256.    Sannier was handcuffed and placed into a police van. There was a younger protestor next to her who was also handcuffed and who was sobbing, saying he could not breathe and needed his inhaler. Sannier tried to get him to calm down. The younger protestor asked officers for his inhaler; officers heard him and opened and closed the door numerous times, but they ignored him.

257.    Sannier was detained in the jail until June 3, 2020 at approximately 9:00 a.m.

258.    During all the days that Sannier attended the protests, she never heard any officer say anything to protestors before using "less-lethal" weapons on them. The only time that she heard an officer say anything was when she was arrested on June 1, 2020 and the officer tackled her to the ground, saying words to the effect of "Get on the fucking ground!"

259.    There was no lawful justification for the Defendant DPD Officers' use of force described in the preceding paragraphs.

260.    On one or more days when she attended protests in Denver and during the events described above, Sannier experienced tear gas and/or pepper spray on numerous occasions, as described above, which caused coughing, difficulty breathing, irritation and burning in the eyes, nose, throat, and mouth and a burning sensation on the skin.

**Plaintiff Kelsey Taylor**

261.    Plaintiff Kelsey ("Elle") Taylor protested in Denver on May 28 and 30, 2020 and other days. She protested the murder of George Floyd.

42

*May 28, 2020*

262.    On May 28, 2020, Taylor marched with protestors in the downtown
area and north towards I-25. After the protestors got off the highway, they headed
back towards the Capitol. There were likely over 100 people.

263.    Around Platte and the pedestrian bridge near Confluence Park,
protestors stood there. Taylor heard one Doe Defendant DPD Officer say something
to the effect of, "If anyone moves, light 'em up." The officers began shooting pepper
balls at the protestors without warning or any orders. Many people were injured.

264.    Taylor marched back to the Capitol with other protestors. At 14th
Avenue and Sherman, there was a line of Defendant DPD Officers on 14th Avenue.

265.    Taylor and the other protestors stayed there about another hour,
chanting, "Hands up, don't shoot," and "I can't breathe." Another group of protestors
walked down 14th Avenue and joined Taylor's group of protestors. There were
approximately 200 people.

266.    At about 9:10 p.m., the Doe Defendant DPD Officers tear gassed the
entire crowd, without provocation. They also shot pepper balls at the protestors.
Taylor did not see anyone throw anything or get aggressive with the police. The
officers gave no audible warning or orders. Taylor inhaled tear gas, which caused
breathing and vision problems.

267.    Defendants Williams and Pine were present and ordered the officers to
use tear gas and "less-lethal" weapons on the group of protestors. As Incident

Commander, Defendant Phelan authorized and ordered Defendants Williams and Pine to use tear gas on the protestors.

268.   Defendants Phelan, Williams, and Pine set in motion a series of events that they knew or reasonably should have known would cause others to deprive Plaintiffs of their constitutional rights. They knew of and acquiesced in the constitutional violations committed by their subordinates. In so doing, these Defendants knowingly created a substantial risk of constitutional injury and disregarded known or obvious consequences of their actions, exhibiting deliberate indifference to the rights of Plaintiff.

*May 30, 2020*

269.   On May 30, 2020, Taylor went to the Capitol at around 5:00 or 6:00 p.m. to protest. She stood with other peaceful protestors on 14th Avenue in front of the Capitol building.

270.   Any time there was the slightest agitation in the crowd, even if it was non-violent, the Doe Defendant DPD Officers started shooting pepper balls and throwing tear gas without giving any warnings or orders. The Doe Defendant DPD Officers also shot into the crowd whenever protestors walked forward closer to Colfax.

271.   Taylor was hit by pepper balls, which caused bruises. She also inhaled tear gas.

272.   After curfew, at 14th Avenue and Broadway by the public library, Taylor was with approximately 100 other demonstrators peacefully protesting the

curfew itself. Taylor and the other demonstrators knelt in the intersection of 14th Avenue and Broadway. The Doe Defendant DPD Officers, believed to be from the Gang Unit, formed a line.

273.    Defendant O'Donnell was a supervisor on the scene. Defendant O'Donnell was following the orders of Defendant Phelan. The Officers were in full riot gear and had batons or truncheons. They advanced towards the protestors, at the direction, order, or authorization of Defendant O'Donnell, and in turn, Defendant Phelan. Taylor and the others remained kneeling. Defendant Officers began jabbing people, including Taylor, with batons.

274.    Taylor saw one officer hit a Black man across his chest with his baton. Taylor said words to the effect of, "You can't do that, he's not hurting you, he's unarmed." Another Doe Defendant DPD Gang Unit Officer grabbed Taylor's arm and told her that she was under arrest. Taylor heard another officer say, "Get me three more."

275.    Taylor was arrested by Doe Defendant DPD Gang Unit Officers for violation of curfew and failure to obey lawful order.

276.    Taylor and the other individuals she was with at the time she was arrested were clearly identifiable as protestors.

277.    Taylor's arrest was the result of the Defendant Denver's policy of enforcing the curfew only against individuals engaged in protest activity.

278.    No officer gave Taylor any lawful orders.

279.    No officer gave Taylor multiple orders.

280.    After Taylor's arrest, she was eventually put into a police van. It was very hard for her to breathe because she has asthma and had been hit by tear gas and pepper balls.

281.    Taylor was taken to jail. She was released from jail the next morning.

282.    There was no lawful justification for the Defendant Officers' use of force described in the preceding paragraphs.

283.    On one or more days when she attended protests in Denver and during the events described above, Taylor experienced tear gas and/or pepper spray on numerous occasions, as described above, which caused coughing, difficulty breathing, irritation and burning in the eyes, nose, throat, and mouth and a burning sensation on the skin. This was especially difficult for Taylor because she has asthma.

**Plaintiff Youssef Amghar**

284.    Plaintiff Youssef Amghar participated in the protests on May 29 and 30, 2020. Amghar wanted to protest police brutality against Black and Brown people.

285.    On May 30, 2020, about an hour or so before curfew, Amghar was with other peaceful protestors on the corner of Colfax and Lincoln. Protestors were chanting, "Hands up, don't shoot," and holding signs.

286.    There was a line of Doe Defendant DPD Officers on Colfax. Defendant Williams, Canino, Pine, and O'Donnell were supervisors present at that intersection with their respective teams.

287.    Amghar was standing on the sidewalk.

288.    Amghar stood there with their hands up.

289.    Someone else in the crowd not near Amghar threw a water bottle in the general direction of the officers.

290.    Without attempting to investigate or isolate that person, the Doe Defendant DPD Officers (who were in riot gear) immediately began shooting into the crowd with pepper balls. These officers included Defendants Eberharter, Cunningham, and Sampson.

291.    The Defendant DPD Officers did this without warning or giving any orders.

292.    At first, the Defendant DPD Officers shot indiscriminately into the crowd, but after the crowd moved back, they began shooting directly at Amghar, even though they were standing still with their hands up.

293.    Amghar was approximately 10-15 feet from the Defendant DPD Officers at the time.

294.    Defendants Cunningham, Sampson, and Eberharter, shot Amghar in the arms and legs, then in the chest, and then directly in the face, even though they continued standing still with their hands up.

295.    Defendants Cunningham, Sampson, and Eberharter shot Amghar approximately 14 times.

296.    Amghar had many bruises from the pepper balls shot at them.

297. Defendants Cunningham, Sampson, and Eberharter did not give any orders before, during, or after shooting Amghar. No one told Amghar to move back or gave them any other orders.

298. Amghar was so upset at the officers' use of force on them that they began yelling words to the effect of, "I'm a goddamn U.S. Marine, what are you doing?"

299. When Amghar yelled this, Defendant Cunningham shot them in the face.

300. Doe Defendant DPD Officers threw canisters of chemical munitions at Amghar's feet. After a couple minutes, Amghar walked away and took cover behind a tree.

301. After curfew, in a different location, Doe Defendant DPD Officers kettled Amghar with other protestors and then opened fire with pepper balls without giving any orders or warnings. Amghar did not see protestors do anything to provoke or warrant this use of force.

302. Doe Defendant DPD Officers also chased Amghar and other protestors into alleys, trying to force them into places where they were cornered, so that they could shoot "less-lethal" weapons at them.

303. There was no lawful justification for the Doe Defendant DPD Officers' use of force described in the preceding paragraphs.

304. On one or more days when they attended protests in Denver and during the events described above, Amghar experienced tear gas and/or pepper

spray on numerous occasions, as described above, which caused coughing, difficulty breathing, irritation and burning in the eyes, nose, throat, and mouth and a burning sensation on the skin.

### Plaintiff Johnathen "De La Vaca" Duran

305.    Plaintiff Johnathen "De La Vaca" Duran attended the protests in Denver on May 30 and 31, 2020, as a journalist and editor from Yellow Scene magazine. Yellow Scene magazine is a publication based in Boulder County which provides coverage of local and regional news, politics, art, culture, entertainment, and cuisine. De La Vaca is a credentialed member of the media with a press pass.

*May 30, 2020*

306.    On May 30, 2020, De La Vaca documented the protests as a member of the media.

307.    In the late afternoon, De La Vaca was in Civic Center Park. Even though it was hours before curfew, Doe Defendant DPD Officers, including Officers under the command of Defendants Carroll, O'Donnell, and Williams, appeared to be attempting to disperse peaceful protestors from Civic Center station.

308.    Defendants Carroll, O'Donnell, and Williams, were, in turn, acting under the orders of Defendant Phelan, who authorized the use of force on protestors at this time.

309.    Doe Defendant DPD Officers used chemical agents, including smoke bombs, pepper balls, and flashbang grenades on protestors. The officers did not give any warnings or orders before they started shooting things at the protestors.

310.   De La Vaca, who was photographing the police, was shot with pepper balls at that time.

311.   At the time, De La Vaca was wearing his press pass, which is very large and visible.

312.   Defendants Phelan, O'Donnell, Carroll, and Williams set in motion a series of events that they knew or reasonably should have known would cause others to deprive Plaintiffs of their constitutional rights. They knew of and acquiesced in the constitutional violations committed by their subordinates. In so doing, these Defendants knowingly created a substantial risk of constitutional injury and disregarded known or obvious consequences of their actions, exhibiting deliberate indifference to the rights of Plaintiff.

313.   De La Vaca then went over to the Capitol, where he was teargassed.

314.   There was no apparent reason or justification for the Doe Defendant DPD Officers' use of tear gas at that time. De La Vaca's face was red and painful from the tear gas.

315.   De La Vaca went to the corner of Lincoln, east of Civic Center station, but there was another police assault at that time and he inhaled a big waft of tear gas. It was painful and difficult to breathe. He choked and threw up.

316.   The tear gas used at the intersection of Lincoln and Colfax between 5:30 and 8:00 p.m. was authorized by Defendant Phelan.

*May 31, 2020*

317.   On May 31, 2020, De La Vaca went to document the protests at about 4:00 or 5:00 p.m. There were multiple marches and rallies that occurred downtown.

318.   De La Vaca was wearing his press pass and a hard hat that said "media" in large letters all over it.

319.   After curfew, De La Vaca continued documenting the protests as a credentialed member of the media by taking photos and recording videos.

320.   At Colfax and Emerson, Doe Defendant DPD Officers began throwing explosive devices and/or tear gas canisters at the protestors. An explosive device was thrown at a large group of peaceful protestors when the protestors were chanting, "March with us! March with us!"

321.   The Defendant DPD Officers were under the supervision of Defendants Carroll and O'Donnell. Defendant Carroll and O'Donnell were, in turn, following the commands of Defendant Phelan.

322.   De La Vaca was standing towards the front of the crowd of protestors at Emerson and recording the events as a journalist when the DPD threw an explosive device and/or tear gas canister into the crowd, causing De La Vaca and the protestors to flee.

323.   Defendants Phelan, Carroll, and O'Donnell set in motion a series of events that they knew or reasonably should have known would cause others to deprive Plaintiffs of their constitutional rights. They knew of and acquiesced in the constitutional violations committed by their subordinates. In so doing, these

Defendants knowingly created a substantial risk of constitutional injury and disregarded known or obvious consequences of their actions, exhibiting deliberate indifference to the rights of Plaintiff.

324.   Doe Defendant DPD Officers were also shooting pepper balls from the rooftops.

325.   There were no warnings or orders from the Doe Defendant DPD Officers.

326.   This police assault caused the protestors to spread out in different directions. Some protestors were providing medical aid to other protestors.

327.   A march went down a side street, and De La Vaca followed it, continuing to do his job as a journalist.

328.   Then, De La Vaca walked back towards the Capitol. De La Vaca was trying to document by recording the protest and the police.

329.   De La Vaca was facing a line of police, there was some kind of commotion, and he and others backed away from the police. At 9:34 p.m., De La Vaca was covering the events as a journalist when he was shot in the groin with a foam/rubber bullet by an Aurora police officer, Defendant Budaj. De La Vaca was standing just west of the intersection of Colfax and Pearl.

330.   Defendant Budaj was acting under the ultimate supervision and direction of Defendant Phelan, the Incident Commander, who had ordered Aurora police to push protestors west on Colfax.

331.   In shooting De La Vaca, Defendant Budaj followed his training by the APD, and he followed the policies, practices, and customs of the Defendant Aurora.

332.   The actions of Defendant Budaj were consistent with the policies, practices, and customs of the Defendant Aurora.

333.   The actions of Defendant Budaj were also consistent with the policies, practices, and customs of the Defendant Denver.

334.   Denver's express and official policy was to allow officers from mutual-aid agencies, such as Defendant Budaj, to follow their own policies, practices, customs and training.

335.   The pain from being shot in the groin was some of the worst pain De La Vaca had ever felt. He thought that he was going to lose a testicle.

336.   De La Vaca walked west to the Basilica at Logan and Colfax, in order to take shelter, and while also trying to continue to film.

337.   DPD and Aurora officers, under the supervision and command of Defendants Phelan (via radio), Williams, Beall, and Abeyta, kettled protestors at the Basilica. The officers shot tear gas, chemical agents, including pepper balls, and flashbang grenades, at the protestors, including De La Vaca, a journalist.

338.   De La Vaca did not see the protestors do anything to provoke or warrant the chemical agents.

339.   There were hundreds of people at that location at that time.

340.   Eventually, De La Vaca left that location and tried to get back to his car to go home. He was limping and holding himself. He ran into two medics, who

provided him with acetaminophen and ice packs and asked him for a ride out of the area. He gave them a ride.

341.   De La Vaca's testicles were severely swollen. It took two to three days before he could walk normally, but he continued to have pain for a period of time.

342.   There was no lawful justification for the use of force described in the preceding paragraphs.

343.   The Defendants' use of force cut short De La Vaca's exercise of his First Amendment rights. The serious injury inflicted on him by Defendants suppressed and cut short his ability to exercise his First Amendment rights, not only on that day but on several days afterwards.

344.   On one or more days when he attended protests in Denver and during the events described above, De La Vaca experienced tear gas and/or pepper spray on numerous occasions, as described above, which caused coughing, difficulty breathing, irritation and burning in the eyes, nose, throat, and mouth and a burning sensation on the skin.

## Class Allegations

345.   **Class Definition, Rule 23(b)(3):** Named Plaintiffs Sannier and Taylor bring this action individually and on behalf of a class of all other persons similarly situated pursuant to Federal Rule of Civil Procedure 23(b)(1), (b)(2), and (b)(3). The class is defined as:

> Those persons who were present at or during the protests in Denver, Colorado, from May 30, 2020 through June 5, 2020, who were arrested

and detained for a period of time for violation of emergency curfew (D.R.M.C. 1-13), or failure to obey a lawful order (D.R.M.C. 38-31(c)), but who were not charged with any other violations, and whose charges were dismissed.

346.   Plaintiffs and the class members were subjected to the constitutional violations described in this Complaint. The legal and factual issues are common to the class and affect all class members.

347.   Plaintiffs define the class consistent with the Court's order granting certification of the Arrest Class.

348.   The Arrest Class is approximately 312 members.

349.   Defendant Denver imposed the curfew without accommodating, or attempting to accommodate, the right to peaceable assembly and protest.

350.   The Defendant Denver and its officers enforced the curfew in a viewpoint- and content-discriminatory manner against protestors.

351.   Defendants' arrest of curfew violators thus constituted an unreasonable seizure under the Fourth Amendment and unconstitutionally interfered with the protestors' First Amendment rights.

### Numerosity

352.   Consistent with Federal Rule of Civil Procedure 23(a), the members of the class are so numerous that joinder of all members is impracticable. The Arrest Class exceeds 300 people.

## Common Issues of Fact or Law

353. There are questions of law and fact common to the class and they predominate over individualized questions. These common questions of fact and law include but are not limited to:

  a. The curfew ordinance and "failure to obey orders" ordinance under which protestors were charged;

  b. The identical wording of the probable cause statements;

  c. The similar treatment of protestors by police, namely taking them to a local precinct and detaining them for some period of time;

  d. Whether the curfew order was facially constitutional;

  e. Whether officers enforced the curfew only against protestors and not against other civilians out past curfew;

  f. Whether any discriminatory enforcement was done pursuant to an official city policy;

  g. Whether the curfew arrests violated class members' First Amendment rights and rights to be free from unreasonable seizure.

354. Defendant Denver caused the seizure, detention, and/or arrest of the Arrest Class as a group and treated all similarly, acting on grounds applicable to the class. Plaintiffs Taylor's and Sannier's claims that the First, Fourth, and Fourteenth Amendment rights were violated raise common questions of law and fact.

## Typicality

355.    Consistent with Federal Rule of Civil Procedure 23(a), the claims of the representative Plaintiffs are typical of the class. Plaintiffs Taylor and Sannier were present at the protests in the City of Denver; were arrested for violation of emergency curfew and failure to obey a lawful order, taken into police custody and detained for some period of time, but not charged with any other violations, and their charged were dismissed.

356.    Plaintiffs Sannier and Taylor have the same interests and have suffered the same type of damages as the class members. Their claims are based upon the same or similar legal theories as the claims of the class members. Each class member suffered actual damages as a result of being subjected to one or more of the violations enumerated above. The actual injuries suffered by Plaintiffs Sannier and Taylor are similar in type to the actual damages suffered by each class member although the severity of those injuries may vary among class members.

357.    Consistent with Federal Rule of Civil Procedure 23(a), the representative Plaintiffs will fairly and adequately protect the interests of the class. The interests of the representative Plaintiffs are consistent with and not antagonistic to the interests of the class.

## Adequate Representation

358.    Plaintiffs Sannier and Taylor will fairly and adequately represent the common class interest. They have a strong interest in achieving the relief requested

in this Complaint, they have no conflicts with members of the class, and they will fairly and adequately protect the interests of the class.

359.    Plaintiffs Sannier and Taylor are represented by counsel, Loevy & Loevy, who are well-experienced in civil rights and class action litigation and are familiar with the issues in this case. Loevy & Loevy has successfully litigated numerous class action cases, including for civil rights violations. Loevy & Loevy has tried two class actions to verdict and has successfully litigated other class action cases as class counsel. This includes *Young v. County of Cook*, Case No. 06-CV-552 (N.D. Ill.), concerning unconstitutional strip searches of inmates, and a related case against Cook County's former insurers, in which Loevy & Loevy secured $107 million in settlements after winning a trial on liability and multiple damages trials in the original case and another trial in the case against the insurance companies for improperly denying coverage. Other examples include: Loevy & Loevy obtained a $7.2 million settlement in *Flood v. Dominguez*, Case No. 08-CV-153 (N.D. Ind.), and a $16.5 million settlement in *Dunn v. City of Chicago*, No. 04-CV-6804 (N.D. Ill.), both concerning the unconstitutional treatment of inmates held in lockup.

360.    Counsel for the named Plaintiffs know of no conflicts among the between members of the class, Plaintiffs Sannier or Taylor, or the attorneys in this action.

### Maintenance and Superiority

361.    Consistent with Federal Rule of Civil Procedure 23(b)(1)(A), prosecutions of separate actions by individual members of the class would create a

risk that inconsistent or varying adjudications with respect to individual members of the class would establish incompatible standards of conduct for the parties opposing the class.

362.   Consistent with Federal Rule of Civil Procedure 23(b)(1)(B), prosecutions of separate actions by individual members of the class would create a risk of adjudications with respect to individual members of the class which would, as a practical matter, substantially impair or impede the interests of the other members of the class to protect their interests.

363.   Consistent with Federal Rule of Civil Procedure 23(b)(2), Defendants have acted on grounds generally applicable to the class.

364.   Consistent with Federal Rule of Civil Procedure 23(b)(3), the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and this class action is superior to other available methods for the fair and efficient adjudication of the controversy between the parties. Plaintiffs are informed and believe, and allege thereon, that the interests of class members in individually controlling the prosecution of a separate action is low in that most class members would be unable to individually prosecute any action at all. Plaintiffs are informed and believe, and thereon allege, that the amounts at stake for individuals are such that separate suits would be impracticable in that most members of the class will not be able to find counsel to represent them. Plaintiffs are informed and believe, and thereon allege, that it is desirable to concentrate all litigation in one forum because all of the claims arise in

the same location, *i.e.*, the City and County of Denver. It will promote judicial efficiency to resolve the common questions of law and fact in one forum rather than in multiple courts.

365.     Class members are ascertainable through DPD and court records, including the Summons and Complaints for all putative class members that were arrested.

366.     Plaintiffs know of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action. The class action is superior to any other available means to resolve the issues. Liability and general damages can be determined on a classwide basis.

## Damages

367.     As a direct and proximate cause of the conduct described herein, the named Plaintiffs and the class members have been denied their constitutional rights as stated herein, and have suffered damages, including but not limited to, loss of liberty, mental and emotional distress, physical injuries and bodily harm, pain, fear, humiliation, embarrassment, discomfort, and anxiety, and other damages.

368.     Defendants' actions were done with conscious or reckless disregard for, and deliberate indifference to, Plaintiffs' and class members' rights.

369.     One or more named Plaintiffs have a reasonable fear of attending protests in Denver in the future due to the cumulative effect of the violence and misconduct by the Defendants. Without intervention by this Court, Plaintiffs, who

have participated in and wish to participate or attend protest activities, particularly related to police brutality, are at risk of having their rights violated in the future due to the Defendants' demonstrated pattern of constitutional violations and threatened future actions. Plaintiffs have no adequate remedy at law to protect the future lawful exercise of their constitutional rights, and, without action by this court, will suffer irreparable injury, thereby entitling them to injunctive and declaratory relief.

370. Defendants' policies, practices, customs, conduct, and acts alleged herein resulted in, and will continue to result in, irreparable injury to the Plaintiffs, including but not limited to violation of their constitutional and statutory rights. Plaintiffs have no plain, adequate, or complete remedy at law to address the wrongs described herein. The Plaintiffs intend in the future to exercise their constitutional rights of freedom of the press, speech, and assembly by engaging in expressive activities in the City and County of Denver. Defendants' conduct described herein has created uncertainty among Plaintiffs with respect to their exercise now and in the future of these constitutional rights, and it has chilled their exercise of these rights.

371. Specifically, Plaintiffs are concerned that they will be subjected to unreasonable and excessive force by the DPD and/or unreasonable seizures.

372. Plaintiffs are also concerned that, when engaged in or documenting protest activities, Defendants will impose curfews without accommodating or attempting to accommodate First Amendment rights; will not provide adequate

notice before attempting to disperse assemblies; will not provide adequate means and opportunity to disperse; and will again employ indiscriminate, unreasonable or excessive force, injuring and terrifying protestors.

373.   Plaintiffs therefore seek injunctive relief from this court to ensure that Plaintiffs and persons similarly situated will not suffer violations of their rights from Defendants' illegal and unconstitutional policies, customs, and practices described herein.

## Defendant Denver's Polices, Practices, and Customs

374.   Defendants have engaged in repeated, widespread violations of law, as outlined above, over the course of several nights, shutting down the exercise of First Amendment activities through the use of indiscriminate and unreasonable force against thousands of protestors; imposing citywide curfews without accommodating, or even attempting to accommodate, the right to peaceable assembly and protest; at times dispersing lawful and peaceful assemblies without warning and without providing both directions, means, and opportunity to disperse before taking aggressive police action; hitting at least hundreds of protestors with "less-lethal" weapons and/or tear gassing or pepper spraying them; selectively enforcing the curfew against protestors by arresting them for violation of an unlawful curfew and thereby placing them at great risk of exposure to COVID-19;[1] and harassing, intimidating, and/or using force on individuals attempting to record or document

---

[1] The Van Cise-Simonet Detention Center, where arrestees were taken, was the site of one of the largest COVID-19 outbreaks in the country.

police activity in public. In conjunction with a history of protest-related constitutional violations, Defendant Denver's repeated widespread and unlawful acts over several nights and involving many locations constitute an unlawful custom and policy of violating protest participants' constitutional rights.

375.   Defendant Denver failed to train its officers in the constitutional responses to peaceful demonstrations, despite the history of such violations in the past and despite the obvious need for such training. The recurrence of the same violations with respect to these protestors indicates an intentional refusal to preserve the constitutional rights of protestors.

376.   Defendant Denver failed to adequately train its officers in the use of "less-lethal" weapons, including 40mm launchers, pepper balls, and chemical munitions. The training provided by Defendant Denver was outdated, insufficient, and inconsistent with generally accepted standards and practices, as well as the DPD Crowd Management Manual. Defendant Denver had knowledge of the importance of training on the proper use of "less-lethal" weapons, and its failure to adequately train officers in the use of these weapons constituted deliberate indifference.

377.   In its report completed after an investigation into the use of force by DPD during the protests, the Office of Independent Monitor concluded that, during the protests, Defendant Denver allowed some DPD officers who were not trained or certified in the use of "less-lethal" weapons to use those weapons against protestors.

378. Defendant Denver failed to provide *any training* whatsoever to its officers in the use of flashbang grenades or Stinger grenades. These explosive devices can cause serious injuries. They are not intended for the direct application of force against a person and should not be thrown directly at a person. Despite this, flashbang grenades and Stinger grenades were used repeatedly during the protests, frequently thrown into crowds. Defendant Denver's failure to train its officers on the use of flashbang grenades and Stinger grenades directly caused injury to Plaintiffs.

379. Defendant Denver failed to provide any training to the law enforcement officers from outside agencies, including Aurora and JCRS, and did not conduct any joint training exercises with the outside agencies, which was necessary in order to ensure that outside law enforcement officers would not violate the constitutional rights of citizens in Denver.

380. Defendant Denver failed to adopt adequate policies in the constitutional responses to peaceful demonstrations, despite the history of such violations in the past and despite the obvious need for adequate policies. The recurrence of the same violations with respect to these protestors indicates an intentional refusal to preserve the constitutional rights of protestors.

381. Defendant Denver failed to adopt *any* policies whatsoever on the use of flashbang grenades or Stinger grenades. In light of the serious and obvious risk of bodily injury and danger posed by flashbang grenades or Stinger grenades, Denver's

failure to provide any policies or training on their use posed an obvious risk of violation of the constitutional rights of Plaintiffs and protestors.

382.    Defendant Denver's failure to provide adequate training or policies that were obviously needed constituted deliberate indifference.

383.    For instance, the DPD and Defendant Denver have been called on numerous times dating back at least to 2011 to investigate its use of pepper balls and other chemical agents against protestors.

384.    After Denver police fired pepper balls at peaceful protestors on October 29th, 2011 during the Occupy Denver demonstrations in Civic Center Park, Defendant Denver received several complaints and conducted an internal debriefing.

385.    Despite receiving notice of the DPD's unconstitutional actions, Defendant Denver and DPD deliberately chose not to conduct any further review of the department's less-than-lethal force policy, despite the patently unlawful way in which pepper ball guns had been used against protestors and against the recommendation of the Office of the Independent Monitor, which described the decision not to examine the incident and the underlying policies as a "missed opportunity."

386.    Despite receiving citizen complaints about DPD officers' excessive use of force during protests in the past, Defendant Denver has not disciplined any officer for their behavior at prior protests in at least the last five years.

387.    Defendant Denver's policy, practice, and custom of authorizing officers to use "less-lethal" weapons to control and suppress protests was the moving force behind the violations of Plaintiffs' constitutional rights.

388.    These violations are also a direct result of Defendant Denver's use of the services of law enforcement officers from other jurisdictions, who were also authorized to use "less-lethal" weapons to control and suppress protests.

389.    Defendant Denver's policy was to allow the law enforcement officers from outside jurisdictions providing mutual aid to follow their own use of force policies.

390.    The use of force policies of JCRS were "in line with DPD's Use of Force Policy."

391.    Additionally, Defendant Denver approved and "verified" the use of the "less-lethal" weapons used by JCRS, including beanbag shotguns, Arwen rubber ball grenades, and Stinger grenades.

392.    Defendant Denver and its final policymakers acted with deliberate indifference to the constitutional rights of protestors by authorizing, both explicitly and implicitly, the use of "less-lethal" force against protestors who do not pose any safety threat; by failing to properly train, supervise, and discipline officers regarding the proper use of force against protestors; by failing to rectify the unconstitutional custom of officers using "less-lethal" force to control and suppress demonstrations; and by failing to provide adequate policies. This constituted a

conscious choice by Defendant Denver not to properly train, supervise, discipline, rectify, or provide adequate policies on these issues.

393.    Moreover, Defendant Denver is responsible for the actions of any non-DPD officers whose services were used during the protests. By using those services, Defendant Denver was required to ensure that all officers complied with civilians' constitutional rights.

394.    DPD Chief of Police Paul Pazen was fully knowledgeable and apprised of the actions of Defendant Officers described above and, upon information and belief, was on site on one or more days of the protest, observing this DPD operation, without repudiating or stopping the actions of the Defendant Officers, thereby ratifying them.

395.    DPD operated under the Incident Command System during the protestors. Defendant Phelan was the Incident Commander throughout the protests, and as such, no action was taken during the protests without being directed by or attributed to Defendant Phelan and command-level supervisors.

396.    Moreover, on May 29, 2020, Mayor Michael Hancock and Chief Pazen publicly praised Defendant Officers for their "great restraint" and "tremendous restraint" during protests in Denver and said that the actions of the DPD in the use of "less-lethal" weapons against protestors was proper.

397.    Thus, Defendant Denver, through its final policymakers, ratified the conduct of the Defendant Officers.

398. This caused the violence and misconduct by Defendant Officers to continue that day and in the days after the Mayor and the Chief of Police made these comments.

399. Defendant Denver's final policymakers received ample notice that officers were using "less-lethal" force against protestors to control and suppress demonstrations in the absence of any imminent threat to safety, including 150 complaints about the DPD in one 72-hour period, and widely publicized videos and firsthand accounts circulated through the local, state, and international press.

400. Of the dozens of citizen complaints regarding officer use of excessive force during the protests, Defendant Denver has disciplined only two officers and fired one probationary officer.

401. In addition, Defendant Denver's policy at the time of the protests was that officers were not required to complete use of force reports after using "less-lethal" weapons at a protest. During the protests, DPD officers believed that they were not required to complete use of force reports accounting for their use of force against civilians. It was not until *weeks* later, after a lawsuit was filed against the DPD in *Abay v. City and County of Denver*, that the DPD command staff at the highest levels ordered DPD commanders and administrative lieutenants to have their officers complete use of force reports documenting their use of "less-lethal" weapons.

402. Defendant Denver knew and understood, prior to the protests, that timely and complete use-of-force reporting is essential for officer accountability and

transparency, as well as organizational credibility. Defendant Denver's knowledge of this is reflected in the DPD Operations Manual, which sets forth detailed use-of-force reporting requirements during day-to-day policework. Despite this, Defendant Denver inexplicably applied a different policy to protests.

403.   Defendant Denver's failure to require timely use-of-force reporting allowed DPD officers to escape accountability for use of excessive force during the protests. Officers were aware during the protests that they would not have to account for their use of force, and they were not required to write use of force reports or officer statements after the fact until weeks later, when their memories of the events were no longer fresh.

404.   Defendant Denver did not have a written policy that specifically governed the use of body-worn cameras ("BWC") during the protests. Despite the fact that the DPD has had BWC for several years, DPD lieutenants have demonstrated confusion about whether their officers were required to activate their BWC during the protests. As a result, many officers did not activate their BWC, including during events when officers used excessive force on protestors, such as during the kettling incident on the evening of May 31, 2020 in front of the Basilica on Colfax.

405.   Furthermore, Defendant Denver's curfew described above was an official policy of the City which was unconstitutional.

406.     It was also the official policy of Defendant Denver to apply the curfew in a content- and viewpoint-discriminatory manner only protestors and not non-protestors who were in violation of the curfew order.

407.     The violations of the constitutional rights of Plaintiffs and class members were a direct result of Defendant Denver's unconstitutional policies, practices, or widespread customs.

**Policies, Practices, and Customs of Defendants City of Aurora, Board of County Commissioners of Jefferson County, and Jefferson County Sheriff**

408.     Defendants Aurora, Board of County Commissioners, and Sheriff Shrader failed to adequately train its officers in the constitutional responses to peaceful demonstrations.

409.     Defendants Aurora, Board of County Commissioners, and Sheriff Shrader failed to adequately train its officers in the use of "less-lethal" weapons, including 40mm launchers, beanbag shotguns, Arwen rubber ball grenades, Stinger grenades, and chemical munitions. The training provided by Defendants was inordinately focused on crowd control (as opposed to crowd management) and was outdated, insufficient, and inconsistent with generally accepted standards and practices. Defendants had knowledge of the importance of training on the proper use of "less-lethal" weapons, and its failure to adequately train officers in the use of these weapons constituted deliberate indifference.

410.     Defendants Aurora, Board of County Commissioners, and Sheriff Shrader failed to adopt adequate policies in the constitutional responses to peaceful demonstrations.

411.    Defendants Aurora, Board of County Commissioners and Sheriff Shrader also failed to adopt policies on the circumstances under which specific "less-lethal" weapons, such as 40mm launchers, beanbag shotguns, Arwen rubber ball grenades, flashbang grenades, and Stinger grenades, can be used against civilians, including during protests or demonstrations.

412.    APD's use of force policy and policy on use of "less-lethal" weapons rely on reprinting Colorado statutes. APD does not provide specific policies on the circumstances under which specific "less-lethal" weapons, such as 40mm launchers, may be used against civilians, including during protests or demonstrations. APD's policies fail to provide adequate and clear guidance to officers on the appropriate use of force and use of "less-lethal" weapons that protects the constitutional rights of citizens.

413.    In addition, after the protests, APD supervisors suggested that APD officers write their use of force statements using language that would state that their uses of force were within or consistent with policy.

414.    The policy of the Defendants Board of County Commissioners and Sheriff was that JCRS did not have to wear BWC during the protests. As a result, there is no BWC from JCRS officers capturing their excessive use of force on protestors, including Plaintiff Deras, on May 31, 2020, at Washington and Colfax.

415.    JCRS officers fired dangerous "less-lethal" weapons at protestors, including Plaintiff Deras, through heavy tear gas and/or smoke. Plaintiff Deras was

not the only civilian who was seriously injured as a result of the actions of these officers.

416.    Despite this, the after-action report reviewing the actions of the JCRS during the protests concluded that the actions of the officers during the protests were "reasonable" and compliant with Jefferson County Sheriff's Office policy.

417.    The use of force by JCRS officers on Plaintiff Deras on May 31, 2020, at 8:30 p.m., at the intersection of Colfax and Washington, when Deras was hit with three projectiles, was consistent with and authorized by the Defendants Sheriff and Board of County Commissioners.

418.    Because Defendant Denver authorized agencies providing mutual aid to utilize their own policies—and because Denver expressly approved JCRS's weapons—the use of force by the JCRS officers on Plaintiff Deras was also consistent with and authorized by Defendant Denver.

419.    Similarly, Defendant Aurora conducted a review of the use of force by APD officers at the protests and found that all uses of force, including use of force by Defendant Budaj, were authorized by and compliant with the policies of Defendant Aurora.

420.    Defendant Budaj's use of force on Plaintiff De La Vaca (shooting him in the groin on May 31, 2020 at the intersection of Colfax and Pearl at 9:34 p.m.), was consistent with and authorized by Defendant Aurora.

421.    Because Defendant Denver authorized agencies providing mutual aid to utilize their own policies, the use of force by Defendant Budaj on Plaintiff De La Vaca was also consistent with and authorized by the Defendant Denver.

422.    Defendants Aurora, Board of County Commissioners, and Sheriff's policy, practice, and custom of authorizing officers to use "less-lethal" weapons to control and suppress protests was the moving force behind the violations of Plaintiffs' constitutional rights.

423.    Defendants Aurora and Board of County Commissioners and their final policymakers, and Defendant Sheriff acted with deliberate indifference to the constitutional rights of protestors by authorizing, both explicitly and implicitly, the use of "less-lethal" force against protestors who do not pose any safety threat; by failing to properly train, supervise, and discipline officers regarding the proper use of force against protestors; by failing to rectify the unconstitutional custom of officers using "less-lethal" force to control and suppress demonstrations; and by failing to provide adequate policies. This constituted a conscious choice by Defendants not to properly train, supervise, discipline, rectify, or provide adequate policies on these issues.

424.    Defendant Aurora has not disciplined any APD officers for their use of force during the protests.

425.    Upon information and belief, Defendants Board of County Commissioners and Sheriff have not disciplined any JCRS officers for their use of force during the protests.

## Count I: 42 U.S.C. § 1983 – First Amendment

426.    Plaintiffs incorporate by reference each of the paragraphs in this Complaint as if restated fully herein.

427.    In the manner described more fully above, Defendants violated Plaintiffs' and class members' rights under the First Amendment of the United States Constitution.

428.    In the manner described more fully above, Defendant Denver's curfew was unconstitutionally applied to protestors. Denver had adopted an official policy of selectively enforcing the curfew against protestors. This was designed to further suppress Plaintiffs' and the Arrest Class members' protected First Amendment activities including the right to free speech, expression, and assembly, and it violated the First Amendment.

429.    Defendant Denver's curfew also violated the First Amendment in that it provided no exceptions for First Amendment-protected activity.

430.    In the manner described more fully above, Defendants violated Plaintiffs' First Amendment rights when they attempted to control and break up the peaceful protests by using "less-lethal" weapons on and/or kettling the Plaintiffs without warning, dispersal orders, adequate time to disperse, or any lawful justification whatsoever. These actions were undertaken in order to discourage, suppress, and retaliate against the exercise of Plaintiffs' First Amendment rights.

431.    Furthermore, the right to gather, receive, record, and disseminate information is grounded in the Free Speech Clause of the First Amendment, as well

as the Petition Clause, if the purpose of gathering, receiving, or recording the information is to use it to petition the government for redress of grievances, and the Free Press Clause, if the purpose of gathering, receiving, or recording the information is to publish and disseminate it to other people.

432.    The First Amendment right to gather, receive, record, document, and disseminate information includes the right to photograph, audio and video record police officers performing their duties in public, as well as the right to photograph, audio and video record demonstrations.

433.    Police officers performing their public duties in public places have no reasonable expectation that their conduct is private and will not be recorded, documented, published, and disseminated.

434.    Defendant Officers' actions in using "less-lethal" weapons on individuals recording or documenting police officers performing their public duties in public places violated Plaintiffs' First Amendment rights.

435.    Defendant Officers' actions in using "less-lethal" weapons on protestors in order to control and suppress their speech violated Plaintiffs' First Amendment rights.

436.    The misconduct described in this Count was undertaken pursuant to the policies, practices, and customs of Defendants Denver, Aurora, Board of County Commissioners, and Sheriff Shrader. The policies, practices, and customs of Defendants Denver were the moving force behind the misconduct described in this Count and the violation of Plaintiffs' and class members' rights. The policies,

practices, and customs of Defendants Aurora, Board of County Commissioners, and Sheriff Shrader were the moving force behind the misconduct described in this Count and the violation of Plaintiffs' rights.

437. Defendant Denver is liable because the violation of Plaintiffs' and class members' rights as described in this Count was caused by the policies, practices, or customs of the relevant policymakers for Defendant Denver, or caused by the unconstitutional actions of final policymakers for Defendant Denver.

438. Defendants Aurora, Board of County Commissioners, and Sheriff Shrader are liable because the violation of Plaintiffs' rights as described in this Count was caused by the policies, practices, or customs of the relevant policymakers for these Defendants.

439. In the manner described more fully above, the need for policies, training, and supervision of officers on how to handle the use of force on protestors was so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of Defendants Denver, Aurora, Board of County Commissioners, and Sheriff Shrader can reasonably be said to have been deliberately indifferent to the need.

440. In the manner described more fully above, Defendants Tak, Phelan, Canino, Williams, Pine, Porter, O'Donnell, Carroll, Beall, Abeyta, Martinez, Eberharter, and Dodge were personally involved in or personally directed, controlled, or authorized the actions of their subordinate officers which violated the constitutional rights of Plaintiffs. These Defendants' actions, direction, and control

caused the constitutional violations complained of herein; they set in motion a series of events that they knew or reasonably should have known would cause others to deprive Plaintiffs of their constitutional rights. These Defendants knew of and acquiesced in the constitutional violations committed by their subordinates. In so doing, these Defendants knowingly created a substantial risk of constitutional injury and disregarded known or obvious consequences of their actions, exhibiting deliberate indifference to the rights of Plaintiffs.

441.   As a direct and proximate result of Defendants' actions, Plaintiffs' and class members' constitutional rights were violated, entitling them to relief.

## Count II: 42 U.S.C. § 1983 -- Fourth Amendment

442.   Plaintiffs incorporate by reference each of the paragraphs in this Complaint as if restated fully herein.

443.   In the manner described more fully above, Defendants violated Plaintiffs Sannier, Taylor, and the class members' rights to be free from unreasonable seizure when they arrested Plaintiffs and class members without any lawful justification.

444.   In the manner described more fully above, Defendants violated Plaintiffs' rights to be free from unreasonable and excessive force under the Fourth Amendment when Defendant Officers kettled them, or used "less-lethal" weapons on them while they presented no threat and without an individualized determination of individual conduct justifying such force, or used such weapons specifically to suppress their expressive activity.

445.   The misconduct described in this Count was undertaken pursuant to the policies, practices, and customs of the Defendants Denver, Aurora, Board of County Commissioners, and Sheriff Shrader. The policies, practices, and customs of Denver were the moving force behind the misconduct described in this Count and the violation of Plaintiffs' and class members' rights. The policies, practices, and customs of Defendants Aurora, Board of County Commissioners, and Sheriff Shrader were the moving force behind the misconduct described in this Count and the violation of Plaintiffs' rights.

446.   Defendant Denver is liable because the violation of Plaintiffs' and class members' rights as described in this Count was caused by the policies, practices, or customs of the relevant policymakers for Defendant Denver, or caused by the unconstitutional actions of final policymakers for Defendant Denver.

447.   Defendants Aurora, Board of County Commissioners, and Sheriff Shrader are liable because the violation of Plaintiffs' rights as described in this Count was caused by the policies, practices, or customs of the relevant policymakers for these Defendants.

448.   In the manner described more fully above, the need for policies, training, and supervision of officers on how to handle the use of force on protestors was so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the Defendants Denver, Aurora, Board of County Commissioners, and Sheriff Shrader can reasonably be said to have been deliberately indifferent to the need.

449.   In the manner described more fully above, Defendants Tak, Phelan, Canino, Williams, Pine, Porter, O'Donnell, Carroll, Beall, Abeyta, Martinez, Eberharter, and Dodge were personally involved in or personally directed, controlled, or authorized the actions of their subordinate officers which violated the constitutional rights of Plaintiffs. These Defendants' actions, direction, and control caused the constitutional violations complained of herein; they set in motion a series of events that they knew or reasonably should have known would cause others to deprive Plaintiffs of their constitutional rights. These Defendants knew of and acquiesced in the constitutional violations committed by their subordinates. In so doing, these Defendants knowingly created a substantial risk of constitutional injury and disregarded known or obvious consequences of their actions, exhibiting deliberate indifference to the rights of Plaintiffs.

450.   As a direct and proximate result of Defendants' actions, Plaintiffs' and class members' constitutional rights were violated, entitling them to relief.

## Count III: 42 U.S.C. § 1983 -- Fourteenth Amendment
## Due Process and Equal Protection

451.   Plaintiffs incorporate by reference each of the paragraphs in this Complaint as if restated fully herein.

452.   In the manner described more fully above, Defendants violated Plaintiffs' rights to due process when they affirmatively and indiscriminately used "less-lethal" weapons and/or kettled Plaintiffs without any lawful justification. Furthermore, this conduct was deliberately indifferent to the Plaintiffs' rights,

shocks the conscience, and violated the decencies of civilized conduct, under the Fourteenth Amendment.

453.    In the manner described more fully above, Defendants violated Plaintiffs Sannier, Taylor, and class members' rights to due process and equal protection when they arrested them for violation of the curfew.

454.    The misconduct described in this Count was undertaken pursuant to the policies, practices, and customs of Defendants Denver, Aurora, Board of County Commissioners, and Sheriff Shrader. The policies, practices, and customs of Defendants Denver were the moving force behind the misconduct described in this Count and the violation of Plaintiffs' and class members' rights. The policies, practices, and customs of Defendants Aurora, Board of County Commissioners, and Sheriff Shrader were the moving force behind the misconduct described in this Count and the violation of Plaintiffs' rights.

455.    Defendant Denver is liable because the violation of Plaintiffs' and class members' rights as described in this Count was caused by the policies, practices, or customs of the relevant policymakers for Defendant Denver, or caused by the unconstitutional actions of final policymakers for Defendant Denver.

456.    Defendants Aurora, Board of County Commissioners, and Sheriff Shrader are liable because the violation of Plaintiffs' rights as described in this Count was caused by the policies, practices, or customs of the relevant policymakers for these Defendants.

457.    In the manner described more fully above, the need for policies, training, and supervision of officers on how to handle the use of force on protestors was so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of Defendants Denver, Aurora, Board of County Commissioners, and Sheriff Shrader can reasonably be said to have been deliberately indifferent to the need.

458.    In the manner described more fully above, Defendants Tak, Phelan, Canino, Williams, Pine, Porter, O'Donnell, Carroll, Beall, Abeyta, Martinez, Eberharter, and Dodge were personally involved in or personally directed, controlled, or authorized the actions of their subordinate officers which violated the constitutional rights of Plaintiffs. These Defendants' actions, direction, and control caused the constitutional violations complained of herein; they set in motion a series of events that they knew or reasonably should have known would cause others to deprive Plaintiffs of their constitutional rights. These Defendants knew of and acquiesced in the constitutional violations committed by their subordinates. In so doing, these Defendants knowingly created a substantial risk of constitutional injury and disregarded known or obvious consequences of their actions, exhibiting deliberate indifference to the rights of Plaintiffs.

459.    As a direct and proximate result of Defendants' actions, Plaintiffs' and class members' constitutional rights were violated, entitling them to relief.

**Count IV: 42 U.S.C. § 1983 – Failure to Intervene**

460.    Plaintiffs incorporate each of the paragraphs in this Complaint as if restated fully herein.

461.    In the manner described more fully above, during the constitutional violations described herein, one or more of the Defendant Officers stood by without intervening to prevent the violation of Plaintiffs' constitutional rights, even though they had the opportunity to do so.

462.    The misconduct described in this Count was undertaken pursuant to the policies, practices, and customs of Defendants Denver, Aurora, Board of County Commissioners, and Sheriff Shrader. The policies, practices, and customs of Defendants Denver were the moving force behind the misconduct described in this Count and the violation of Plaintiffs' and class members' rights. The policies, practices, and customs of Defendants Aurora, Board of County Commissioners, and Sheriff Shrader were the moving force behind the misconduct described in this Count and the violation of Plaintiffs' rights.

463.    Defendant Denver is liable because the violation of Plaintiffs' and class members' rights as described in this Count was caused by the policies, practices, or customs of the relevant policymakers for Defendant Denver, or caused by the unconstitutional actions of final policymakers for Defendant Denver.

464.    Defendants Aurora, Board of County Commissioners, and Sheriff Shrader are liable because the violation of Plaintiffs' rights as described in this Count was caused by the policies, practices, or customs of the relevant policymakers for these Defendants.

465.    In the manner described more fully above, the need for policies, training, and supervision of officers on how to handle the use of force on protestors was so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of Defendants Denver, Aurora, Board of County Commissioners, and Sheriff Shrader can reasonably be said to have been deliberately indifferent to the need.

466.    In the manner described more fully above, Defendants Tak, Phelan, Canino, Williams, Pine, Porter, O'Donnell, Carroll, Beall, Abeyta, Martinez, Eberharter, and Dodge were personally involved in or personally directed, controlled, or authorized the actions of their subordinate officers which violated the constitutional rights of Plaintiffs. These Defendants' actions, direction, and control caused the constitutional violations complained of herein; they set in motion a series of events that they knew or reasonably should have known would cause others to deprive Plaintiffs of their constitutional rights. These Defendants knew of and acquiesced in the constitutional violations committed by their subordinates. In so doing, these Defendants knowingly created a substantial risk of constitutional injury and disregarded known or obvious consequences of their actions, exhibiting deliberate indifference to the rights of Plaintiffs.

467.    As a direct and proximate result of Defendants' actions, Plaintiffs' and class members' constitutional rights were violated, entitling them to relief.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs respectfully requests that the Court enter judgment in their favor and against Defendants City and County of Denver, Colorado, Sergeant Anthony E. Tak, # 00018, Commander Patrick Phelan, Lieutenant Matthew Canino, Lieutenant James D. Williams, Lieutenant Thomas Pine, Lieutenant Vincent Porter, Lieutenant Michael O'Donnell, Lieutenant Kevin Carroll, Sergeant Rick Beall, and Sergeant David Abeyta, Sergeant Marco Martinez, Sergeant Justin Dodge, Corporal Richard D. Eberharter, Officer Tana Cunningham, Officer John Sampson, City of Aurora, Colorado, Officer Cory Budaj, Board of County Commissioners of the County of Jefferson, Colorado, Jeff Shrader, Sheriff of Jefferson County, Colorado, and Doe Defendants 1-10, awarding as follows:

468.    An order certifying the class defined herein pursuant to the Federal Rules of Civil Procedure 23(b)(2) and (3);

469.    An order appointing Plaintiffs Sannier and Taylor as class representatives and their undersigned counsel as class counsel;

470.    A preliminary and permanent injunction restraining Defendants from engaging in the unlawful and unconstitutional actions detailed above and retaining court jurisdiction to enforce the terms of the injunction;

471.    A declaratory judgment that Defendants' conduct detailed herein was a violation of the rights of the Plaintiffs and class members under the United States Constitution;

472.    Compensatory damages for Plaintiffs, and the class, for the violations of their federal constitutional rights, pain and suffering;

473.   Punitive damages for Plaintiffs against the individual Defendants;

474.   An award of attorneys' fees pursuant to 42 U.S.C. § 1988, and costs;

475.   Pre- and post-judgment interest as permitted by law;

476.   Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury pursuant to Federal Rule of Civil

Procedure 38(c) on all issues so triable.

Respectfully submitted,

/s/ Elizabeth Wang

Elizabeth Wang
LOEVY & LOEVY
2060 Broadway, Suite 460
Boulder, CO 80302
O: 720.328.5642
elizabethw@loevy.com
*Counsel for Plaintiffs*

Makeba Rutahindurwa
LOEVY & LOEVY
311 N. Aberdeen St.
Chicago, IL 60607
O: 312.243.5900
makeba@loevy.com

## CERTIFICATE OF SERVICE

I, Elizabeth Wang, an attorney, hereby certify that on August 24, 2021, I
served the foregoing on all counsel of record electronically via CM/ECF.

/s/ Elizabeth Wang