Page 1

```
 1            IN THE UNITED STATES DISTRICT COURT
                OF THE DISTRICT COURT OF COLORADO
 2
     Civil Action Nos. 1:20-cv-01878-RBJ & 1:20-cv-01922-RBJ-MEH
 3   & 1:20-cv-03155-KLM (Consolidated)
     _____
 4
 5   BLACK LIVES MATTER 5280, et al.,
 6           Plaintiffs,
 7   vs.
 8   CITY AND COUNTY OF DENVER, et al.,
 9           Defendants.
     _____
10
             VIDEO VIDEOCONFERENCED DEPOSITION OF
11                   NICHOLAS ETHAN MITCHELL
                        June 25, 2021
12   _____
13   VIDEOCONFERENCED APPEARANCES:
14   ON BEHALF OF THE PLAINTIFFS BLACK LIVES MATTER 5280:
             MICHAEL J. SEBBA, ESQ.
15           Arnold & Porter Kaye Scholer LLP
             777 South Figueroa Street, 44th Floor
16           Los Angeles, California  90017
             Phone:  213-243-4229
17           Email:  michael.sebba@arnoldporter.com
18   ON BEHALF OF THE PLAINTIFFS BLACK LIVES MATTER 5280:
             EDWARD ARO, ESQ.
19           Arnold & Porter Kaye Scholer LLP
             1144 15th Street, Suite 3100
20           Denver, Colorado  80202
             Phone:  303-863-2380
21           Email:  ed.aro@arnoldporter.com
22   ON BEHALF OF THE PLAINTIFFS BLACK LIVES MATTER 5280:
             PATRICK C. REIDY, ESQ.
23           Arnold & Porter Kaye Scholer LLP
             70 West Madison Street, Suite 4200
24           Chicago, Illinois  60602
             Phone:  312-583-2424
25           Email:  patrick.reidy@arnoldporter.com
```

```
 1   VIDEOCONFERENCED APPEARANCES (Cont'd):
 2   ON BEHALF OF THE CONSOLIDATED PLAINTIFFS SARA FITUORI,
     JACQUELYN PARKINS, KELSEY TAYLOR, YOUSSEF AMGHAR,
 3   ANDY SANNIER, FRANCESCA LAWRENCE, JOE DERAS, AND
     JOHNATHEN DURAN:
 4            MAKEBA RUTAHINDURWA, ESQ.
              Loevy & Loevy
 5            311 North Aberdeen, 3rd Floor
              Chicago, Illinois  60607
 6            Phone:  312-243-5900
              Email:  makeba@loevy.com
 7
     ON BEHALF OF THE CONSOLIDATED PLAINTIFF MICHAEL ACKER:
 8            ANDREW JOSEPH McNULTY, ESQ.
              Killmer Lane & Newman LLP
 9            1543 Champa Street, Suite 400
              Denver, Colorado  80202
10            Phone:  303-571-1000
              Email:  amcnulty@kln-law.com
11
     ON BEHALF OF THE DEFENDANT CITY AND COUNTY OF DENVER AND
12   CONSOLIDATED DEFENDANTS JACQUELINE A. VELASQUEZ, M. DAVIS,
     ANDREW NIELSEN, ZACHARY MOLDENHAUER, JACOB VAPORIS,
13   KEVIN BEASLEY, CHELSEA NOVOTNY, CHRISTOPHER COCHRAN,
     PAUL HOGAN, HEATHER R. JOSSI, ANTHONY E. TAK, AND J. LNU:
14            ANDREW D. RINGEL, ESQ.
              Hall & Evans
15            1001 17th Street, Suite 300
              Denver, Colorado  80202
16            Phone:  303-628-3300
              Email:  ringela@hallevansrobert.com
17
18   ALSO PRESENT: Joseph Kolber, Videographer
19
20
21
22
23
24
25
```

Page 8

1              THE VIDEOGRAPHER:  We're back on the
2     record at 12:39 p.m.
3              Q.   (By Mr. Sebba)  Okay.  Mr. Mitchell, prior
4     to this -- prior to the role you just described, what was
5     your job?
6              A.   I was the independent monitor for the City
7     and County of Denver.
8              Q.   Okay.  And as the independent monitor, what
9     were your job responsibilities?
10             A.   So I provided oversight of the Denver
11    Police Department and Denver Sheriff's Department.  More
12    specifically, I oversaw all internal affairs
13    investigations.  And those agencies issued reports to the
14    mayor, the City Council, other municipal leaders, and the
15    public reflecting my assessments of policies and
16    practices and disciplinary outcomes in those agencies.
17    And I managed a team of employees in that office who
18    helped me to discharge those duties.
19             Q.   And how long were you in that role?
20             A.   About eight and a half years, maybe.
21    Somewhere -- north of eight years.
22             Q.   Starting -- okay.  Starting from about when
23    did you have that job?
24             A.   I was appointed to the role in
25    August 2012.

Page 9

```
 1        Q.   And you were there until when?
 2        A.   I resigned in December of last year.
 3        Q.   Okay.  That's December 2020?
 4        A.   Correct.
 5        Q.   Okay.  And did you review the Denver Police
 6   Department in connection to its behavior during the George
 7   Floyd protests?
 8             MR. RINGEL:  Object to the form.
 9        A.   I reviewed and issued a report consistent
10   with my duties as monitor the police response to the
11   George Floyd protest that took place in Denver in the
12   summer of 2020.
13        Q.   (By Mr. Sebba)  Okay.  And to be clear,
14   when you say "summer of 2020," you mean -- withdraw.
15             To be clear, when I say "the George Floyd
16   protests" today, I'm going to be referring to the protests
17   that occurred in Denver from May 28th through about June 6
18   of 2020.
19             Will you understand it if that's -- if I
20   refer to them that way?
21        A.   I will.  I mean, I think, you know,
22   whether June 6 was the ending date -- I may have a
23   different understanding of when they ended, precisely,
24   but I will understand that we're generally talking about
25   those protests that began on May 28th, 2020, and extended
```

Page 144

1             EXAMINATION
2  BY MR. RINGEL:
3        Q.   Good afternoon, Mr. Mitchell.  How are you?
4        A.   I'm well.  Thank you.
5        Q.   I've got a few questions that I wanted to
6  ask you.
7             When was the last time that you reviewed an
8  unredacted version of any of the memos that you were shown
9  by Mr. Sebba this morning -- earlier in this deposition?
10       A.   Presumably -- sometime in the fall of
11 2020.  What the particular month was I don't remember.
12 Perhaps in October, maybe November.  But I think more
13 likely October 2020, as I was drafting this report.
14       Q.   Okay.  And you are not -- you were not
15 involved in any of the review of those memos for purposes
16 of making the redactions, correct?
17       A.   I was not.
18       Q.   And you understand that the
19 deliberative-process privilege, to the extent that it's
20 been asserted in this case, is asserted by the City and
21 County of Denver, right?
22            MR. MCNULTY:  Objection.  Calls for a
23 legal conclusion.
24       A.   I would presume that as counsel for the
25 City and County of Denver, to the extent that you or your

Page 145

1   team have asserted the privilege, it is being asserted by
2   the City and County of Denver, yes.
3           Q.   (By Mr. Ringel)  And it's a privilege that
4   belongs to the City, not you, right?
5                MR. MCNULTY:  Objection.  Calls for a
6   legal conclusion.
7           A.   Yes.  That's my understanding of the
8   privilege.
9           Q.   (By Mr. Ringel)  And you don't have any
10  ability to waive that privilege, correct?
11               MR. MCNULTY:  Objection.  Calls for a
12  legal conclusion.
13          A.   Generally speaking, no.
14               You know, one of the interesting features
15  of the position of independent monitor is that the
16  monitor has to speak candidly in reports and City Council
17  meetings and presentations about disciplinary matters and
18  conclusions and evaluations and analysis of disciplinary
19  cases that could at times implicate the City's
20  deliberative-process privilege.
21               And so the way that that is worked out is
22  sort of an ongoing work in progress and dialog between,
23  you know, the City Attorney's Office and the independent
24  monitor, whoever that is.
25               In the context of a piece of litigation

Page 146

1   like this one, yes, I have nothing to do with nor any
2   authority over decisions about whether or not to waive
3   the disciplinary -- deliberative-process privilege.
4         Q.   (By Mr. Ringel)  I understand the
5   distinction, Mr. Mitchell.  And I appreciate that.
6              Turning to your report that -- that both
7   counsel asked you about.  There's no conclusion in your
8   report that any particular action taken by the Denver
9   Police Department violated anyone's constitutional rights,
10  correct?
11        A.   I think that's right.  Yeah.  We did not
12  comment -- or I did not comment on specific incidents or
13  specific uses of force as they related to potential
14  violations of constitutional rights.  So I think that's
15  right.
16        Q.   There's also no conclusion in your report
17  that any policy of the Denver Police Department was a
18  cause of a violation of anyone's constitutional rights,
19  correct?
20        A.   We did not draw that conclusion in the
21  report, no.
22        Q.   And that both of those sort of
23  constitutional questions -- and in this case, liability
24  questions -- are beyond the scope of what you were looking
25  at in your report, true?

Page 149

```
 1   testified earlier that you ended your tenure as the
 2   monitor in December of 2020, correct?
 3           A.   Correct.
 4           Q.   Okay.  And between December -- between the
 5   date that you left being the monitor and today, have you
 6   spoken or had any communications with anyone who
 7   represents any of the plaintiffs in this litigation?
 8           A.   I have.
 9           Q.   How many times?
10           A.   I probably talked to Tim McDonald on the
11   phone a couple of times, and I had a meeting at one point
12   with Tim McDonald, who I understand represents some group
13   of plaintiffs here, and a law partner or two of his.  I
14   think someone from another firm who may represent other
15   plaintiffs in this case.
16           Q.   Okay.  Do you remember the names of any of
17   the other people that you had this meeting with?
18           A.   The gentleman who began the examination
19   today, Michael, was a part of that meeting.  And I think
20   someone else from Arnold & Porter.  And then a woman from
21   a firm whose name I can't remember.  Elisabeth, maybe,
22   was also part of that meeting.
23           Q.   Okay.  When did that meeting take place?
24           A.   I'm not sure that I recall.  A couple
25   of -- probably a couple months ago.  But the particular
```

1  date I don't remember.
2          Q.   Was it a meeting in person or was it a
3  meeting with some kind of technology, either video or
4  telephone or --
5          A.   It was -- it was a video meeting.
6          Q.   Okay.  Is there a record of the date of
7  that meeting that you have somewhere?
8          A.   I could look at my calendar to see if I
9  have a record of the date of the meeting.
10         Q.   Okay.  Do you believe it was in the month
11 of May of this year?
12         A.   It's possible.  Probably April or May, I
13 would -- I would suspect, but I'm not totally sure.
14         Q.   Okay.  Can you just -- how long was that
15 meeting?
16         A.   I don't really remember, but I would
17 imagine somewhere between half an hour and 45 minutes or
18 an hour, at the very outside.  But I don't have a
19 particular memory.
20         Q.   Okay.  And what do you remember about what
21 was discussed during the meeting?
22         A.   I remember there were questions about the
23 report, questions about the investigation that I
24 conducted.  I remember there were particular questions
25 about body-worn cameras and conclusions that I drew about

Page 151

1  body-worn cameras, and maybe some of the interview memos
2  or sort of interview process.  And the process for
3  creating interview memos may have come up, or maybe I
4  talked about that with Tim on the phone at a different
5  point.
6           Q.   Were you shown any documents or video
7  during the meeting that you had with the lawyers for the
8  plaintiffs?
9           A.   I don't remember seeing any video.  I
10 don't think I was shown any documents.  If I was, it may
11 be -- the report, I -- they may have shown me, but I
12 don't think so.
13          Q.   Okay.  Was there any record of the
14 conversation that you made?  Did you take any notes?  Did
15 you record it in any fashion?
16          A.   I didn't record it, and I took no notes.
17          Q.   Do you know whether or not any of the other
18 participants recorded it in any fashion?
19          A.   I suspect that it was not video-recorded.
20 Usually when something is being video-recorded, you can
21 see a notation in the corner of the screen, as I see as I
22 sit here now.  And I don't remember seeing that.  And
23 I -- you know, I think I would have made note of that.
24 So I doubt it was video-recorded.
25               Whether anyone created notes associated

Page 152

```
 1   with it or not, I don't know.
 2           Q.   Okay.  Could it have been audio recorded
 3   from the other side?  Would you have known that, whether
 4   that had occurred or not?
 5           A.   I would not have known.
 6           Q.   Okay.  With respect to the discussions of
 7   the memos, based on the conversation that you had, did you
 8   have an understanding that the other participants in the
 9   meeting had seen the memos?
10              MR. SEBBA:  Objection to form.
11           A.   I -- I -- well, it's hard for me to -- I
12   know I spoke with Tim about the memos by phone, and it
13   was clear to me that he had seen the memos.  And when I
14   say "Tim," I mean Tim McDonald.
15              I don't remember if we discussed the memos
16   in particular in the meeting that you've asked me to
17   describe.  It's possible, but I just don't recall for
18   sure.  But it was clear to me that Tim McDonald had seen
19   the memos, and we spoke by phone.
20           Q.   (By Mr. Ringel)  Okay.  So let's talk about
21   the conversation that you're referencing with
22   Mr. McDonald.
23              Did that conversation happen before the
24   meeting that you had described with at least three lawyers
25   or after that meeting?
```

Page 153

1        MR. SEBBA:  Objection.  Form.
2        A.   I think maybe both.  I think we talked a
3   couple of times.  He reached out by phone.  And I think
4   we spoke at least once before the meeting and at least
5   once after that meeting.
6        Q.   (By Mr. Ringel)  Okay.  So let me -- let me
7   be a little bit more specific.  I apologize.
8             You indicated in an answer a little bit ago
9   that you had a conversation with Mr. McDonald that led you
10  to conclude that he had seen the memos, right?
11       A.   Correct.
12            MR. SEBBA:  Objection.  Form.
13            THE DEPONENT:  I'm sorry.
14       A.   I could conclude, on the basis of the
15  conversation, that he had seen the redacted memos, yes.
16       Q.   (By Mr. Ringel)  Okay.  And --
17            MR. MCNULTY:  Andrew, where is this going?
18  Like, how is this relevant to the issues in the case in
19  any way, shape, or form?  That's my question.
20            You know, you can't just go fishing.
21            MR. RINGEL:  I can ask any question that
22  may lead to the discovery of relevant evidence, Counsel.
23            MR. MCNULTY:  What is --
24            MR. RINGEL:  As relevant as the questions
25  about the redactions.

Page 154

1        MR. McNULTY:  I don't understand the
2   relevance of asking about conversations with people.  You
3   know, the redactions were about actual evidence in the
4   case, not about conversations with lawyers.  So I'm just
5   trying to figure out what the relevance of this is.  And
6   I'd object to this line of questioning.
7        MR. RINGEL:  Okay.  So thank you.  You can
8   object.  I'm going to finish my examination.
9        MR. MCNULTY:  Sure.
10       MR. RINGEL:  As you are well aware,
11  Mr. McNulty, relevance isn't an appropriate objection in
12  a deposition.  You can save that objection for trial.
13       Q.   (By Mr. Ringel)  Okay.  Before I was
14  interrupted, Mr. Mitchell, was -- you had -- you reached
15  the conclusion that in at least one of the conversations
16  you had with Mr. McDonald, that he had reviewed
17  redacted memos.
18            Is that a correct understanding on my part?
19       A.   Yes.
20       Q.   And put the conversation where you reached
21  that conclusion about -- or put that conversation with
22  Mr. McDonald in a time frame in relationship to the
23  meeting that we've already been discussing.
24       MR. SEBBA:  Objection.  Form.
25       A.   I'm not sure that I can.  I remember

Page 155

1    talking with Mr. McDonald after that meeting, and it was
2    clear that he had viewed redacted memos.  And it was
3    clear that there was a discovery dispute, you know,
4    related to the material contained in those memos.
5                 But I -- you know, so he described that.
6    He was very clear about that.  I don't remember if we
7    talked about that at the meeting also, but in subsequent
8    conversation, it was very clear that there was a live
9    discovery dispute related to the memos.
10         Q.    (By Mr. Ringel)  Okay.  And you understood
11   that the discovery dispute related to the assertion by the
12   City of the deliberative-process privilege?
13         A.    I do.
14         Q.    Okay.  Did you subsequently discuss the
15   deliberative-process privilege with Mr. McDonald?
16         A.    I can't really remember.  I mean, we --
17               THE DEPONENT:  I'm sorry.
18               MR. SEBBA:  No, no, I'm sorry.  Go ahead.
19               THE DEPONENT:  Okay.
20               THE REPORTER:  Just a moment.  Was there
21   an objection?
22               MR. SEBBA:  You know what?  Objection.
23   Form.  Sorry.
24               You can continue, Mr. Mitchell.
25         A.    I think we may have, you know, discussed

Page 156

1   the privilege in general, but I don't remember.  He
2   described for me that the memos had been very heavily
3   redacted and that his team was concerned about that.
4   Whether we got into the specific contours of the
5   privilege or not, I'm not sure.
6           Q.   (By Mr. Ringel)  Was there a discussion
7   about the deliberative-privilege process during the
8   meeting that you had with Mr. McDonald and the other two
9   lawyers?
10          A.   I'm not sure.  It's possible, but I don't
11  think so.  I remember a lot of discussion about body-worn
12  cameras and conclusions that it appeared the lawyers
13  maybe were hoping that I had reached or would reach
14  related to issues around body-worn cameras.
15               We may have touched on -- or they may have
16  touched on the privilege or the memos that we're
17  discussing, but I don't -- I don't specifically remember
18  that.
19          Q.   Okay.  What -- what are you remembering
20  about the discussion related to body-worn cameras and
21  conclusions that you perceived the lawyers hoped that you
22  would reach that you just mentioned?
23               MR. SEBBA:  Objection.  Form.
24          A.   I think --
25               THE DEPONENT:  Sorry.  I'll give a little