# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT
OF THE DISTRICT COURT OF COLORADO

Civil Action Nos. 1:20-cv-01878-RBJ & 1:20-cv-01922-RBJ-MEH (consolidated)

ELISABETH EPPS, *et al.*

Plaintiffs,

v.

CITY AND COUNTY OF DENVER, *et al.*,

Defendants

## EXPERT REPORT OF NORMAN STAMPER

### Experience and Qualifications

1. I have been actively involved in police policies and practices, and law enforcement research and education since 1966. I have held numerous leadership roles in two police organizations, including the following:

- From 1969 to 1982, I served as sergeant, lieutenant, and captain, as well as organizational ombudsman and special advisor to the police chief within the San Diego Police Department.

- From 1983 to 1986, I was Deputy Chief of Police in charge of the Office of Field Operations in San Diego.

- From 1986 to 1988, I was Deputy Chief of Police in charge of the Office of Personnel Services in San Diego.

- In 1988, I served as Deputy Chief of Police in charge of the Office of Special Operations (Investigations Bureau).

- From 1989 to 1994, I was the Executive Assistant Chief of the San Diego Police Department. As second-in-command to the Chief of Police, I was responsible for all day-to-day operations of the 2,834-member agency in the nation's then-sixth largest city.

- From 1994 to 2000, I was Chief of Police of the City of Seattle. I was responsible for the executive leadership of the 1,800-member organization and in charge of all policies and practices of the agency.

1

2.     I have extensive experience in developing policies and procedures and providing training to police agencies. As Chief of Police of the City of Seattle, I oversaw the police response to about two dozen protests and demonstrations. This included the World Trade Organization protests in November-December 1999, which involved approximately 40,000-60,000 protesters. During my tenure in San Diego, I served as incident or field commander in approximately two dozen protests and demonstrations.

3.     My experience, training, and background is more fully described in my C.V., attached as Exhibit A. This also includes testimony that I have given in the last four years at trial or deposition. A list of materials I was provided for review is attached as Exhibit B.

4.     My opinions are based upon the totality of my specialized knowledge, experience, and training in the field of police practices, in addition to the materials identified in Exhibit B and mentioned specifically below. My expertise has been developed during my decades of experience in law enforcement and my continued experience as a trainer and consultant.

5.     There is a large body of knowledge and literature about the practices and standards that modern, reasonably managed and administered police agencies across the United States should follow and apply to their operations. Standards of training and practice may include caselaw; federal, state, and municipal statutes; departmental policies and procedures; applicable statewide police training programs; model policies, training and research from such organizations as the International Association of Chiefs of Police (IACP), Police Executive Research Forum (PERF), and the Police Foundation.

**Relevant Background Facts**

6.     On May 25, 2020, Minneapolis police officers arrested George Floyd after receiving a complaint that he had attempted to pass a counterfeit twenty-dollar bill. While restrained by other officers, Officer Derek Chauvin knelt on Mr. Floyd's neck until he died. Afterwards, the officers involved were criminally charged. In April 2021, Officer Chauvin was found guilty of murder and manslaughter charges. Trials for the other officers are pending.

7.     The death of Mr. Floyd, a Black man, at the hands of police, was only one of many similar deaths in the months preceding May 2020. In the aftermath of Mr. Floyd's death, protests erupted throughout the country, first in Minneapolis but quickly spreading to other cities across the United States. Beginning on May 28, 2020, protests (referred to herein as GFP, for George Floyd Protests) began in Denver, lasting for weeks. The first several days of protests were largely peaceful, but there were also incidents of property destruction and violence.

8.     On May 28, protesters began to gather at the State Capitol at about 5:00 p.m. (Office of Independent (OIM) Report, p. 2.) The Denver Police Department (DPD) established a Command Post, and appointed as the Incident Commander Patrick Phelan, who assumed primary command responsibility. (OIM Report, p. 2.) Commander Phelan was the Incident Commander for the majority of the protests (with the exception of one day, June 2, 2020, on which Lt.

DPD and mutual aid agency officers on May 31. (OIM Report, pp. 2-5.) The DPD did not create rosters for most protest days and nights during the first five days of the GFP. (OIM Report, pp. 12, 20; Mitchell Deposition pp. 66-67.) The OIM concluded that the creation of such rosters would "permit the incident commander and others to determine where they have enough resources and where they may be deficient in resources. It would … be very helpful for investigations into individual incidents to have information about officer assignments and who was assigned to do what where, given the challenges that we experienced in identifying officers…in investigations into allegations of excessive force." (Mitchell Deposition, p. 68.) I agree. Creation of such rosters is a very basic task and function of police management and administration. It is my opinion that the failure to do so prior to the GFP was contrary to generally accepted police practices. (OIM Report, p. 20 (citing IACP Law Enforcement Policy Center, *Incident Command System Model Policy*, p. 3 (2009) (recommending the creation of a 'master record of all personnel and components involved in the response to a critical incident,' including, among other items, personnel rosters.)) For example, in both Seattle and San Diego, we used a scribe in the Command Post. This position is referred to by the IACP as a recorder. The responsibilities of the scribe included documenting everything that was done during the protests—all munitions deployed were to be tracked, all personnel deployed were to be tracked, and so on. This was essential to any kind of after-action report and for officer accountability. It is my opinion that the DPD's failure to have rosters contributed to its failure to hold accountable officers who used excessive force or violated the constitutional rights of protesters.

### Patterns in the Use of Force during the GFP

18. In my opinion, there were several disturbing patterns in DPD's use of force during the GFP, which was contrary to generally accepted police practices, standards, and training.

1. **DPD exhibited a widespread practice and custom of failing to give dispersal orders or audible dispersal orders prior to use of force**

19. It is generally accepted police practice to provide dispersal orders, warnings, or announcements before use of chemical munitions or other less-lethal weapons on individuals. (See, OIM Report, p. 25 (citing IACP Law Enforcement Policy Center, *Crowd Management Model Policy*, § IV.F.3).) As explained further below, the evidence shows that such orders, warnings, or announcements were rarely provided. Of the numerous videos that have been provided for my review, very few contain any evidence of announcements or dispersal orders given by DPD prior to use of less-lethal weapons on protesters. I am very familiar with the capabilities of body-worn cameras, and, as explained further below, I believe that if warnings were given when the DPD says they were given, the microphones on the cameras would have picked it up. That no warnings are audible reveals that no warnings were given or that only inaudible warnings were given. My review of the declarations submitted by Plaintiffs and other protesters shows that they consistently stated that orders, warnings, and announcements were not given. There was also little documentation of dispersal orders given prior to use of less-lethal

announcements, dispersal orders, or warnings about the use of force at the intersection of Lincoln and Colfax during this time period.

56. In my opinion, the DPD's use of less-lethal weapons at this location and time was inconsistent with generally accepted police practices, standards, and training because there were no audible warnings given and no attempt to isolate non-peaceful from peaceful protesters. The failure of command to provide audible and adequate warnings, dispersal orders, or announcements prior to the use of less-lethal weapons on protesters was a failure of supervision and leadership. There was also no strategy for the deployment of tear gas, discussed in further detail below.

2. **Indiscriminate and inappropriate use of chemical munitions such as tear gas**

57. Chemical munitions such as tear gas are indiscriminate weapons which affect peaceful and non-peaceful protesters alike. This—in addition to the fact that tear gas is a serious level of force—is one of the reasons that its use must be authorized by command staff (and during the GFP, it was frequently authorized by Commander Phelan himself).

58. It is my opinion that in each of the specific incidents discussed above, and the one described below (May 31 kettling incident at the Basilica), DPD indiscriminately and inappropriately used chemical munitions such as tear gas. There was no attempt to isolate non-peaceful from peaceful protesters. Tear gas was also frequently thrown into the middle of a crowd, which made it difficult for protesters to determine where to go, especially if they were faced with a line of officers on one side and tear gas on the other side. The appropriate use of tear gas is to disperse a crowd in a specific direction. DPD's use of tear gas was contrary to generally accepted police practices, standards, and training. The DPD's failure to provide adequate training, and its widespread custom and practice of indiscriminate and inappropriate use of chemical munitions, caused in significant part the violation of the constitutional rights of the plaintiffs.

59. DPD's use of tear gas was also not consistent with the DPD Crowd Management Manual. The DPD Crowd Management Manual states:

> The policy of the Denver Police Department is to appropriately direct and control public gatherings so as to protect life and property, maintain public peace and order, ensure compliance with the law and respect all constitutional rights including those of free speech and assembly. *Efforts will be made to isolate and arrest violators from a crowd before declaring an assembly as unlawful*. (Emphasis added.) (DPD Crowd Management Manual, p. 4, DEN 71.)

The Manual also states: "If identifiable participants engage in disorderly conduct or violence and if circumstances allow, the Denver Police Department must respond by dispersing, controlling, or arresting the specific persons engaging in the conduct; *not* by issuing a general order to disperse." (Emphasis added.) (DPD Crowd Management Manual, p. 8, DEN 75.)

majority of protesters, DPD should have made attempts to isolate the individuals throwing objects from the crowd. Lt. Williams testified that it was too dangerous to send officers, though teamed up and protected from head to foot by "hard gear," into a crowd to isolate and apprehend aggressors.

69.  Not only was there a general failure to give dispersal orders or warnings before the use of less-lethal weapons on protesters during the GFP, but there was a failure to ensure that dispersal of crowds using less-lethal weapons was in compliance with the Crowd Management Manual.

70.  A written policy is only effective if it is followed. There is little to no evidence that the written crowd management policies of the DPD were consistently adhered to—by Commander Phelan, and his lieutenants, sergeants, and officers throughout the GFP.

3.  **Indiscriminate and inappropriate use of PepperBalls and inadequate training**

71.  According to the DPD Crowd Management Manual, PepperBall use is allowed only against targeted individuals whose conduct rises to the level of "Defensive Resistance." (DPD Crowd Management Manual, p. 19, DEN 86.) "Defensive resistance" is defined in the DPD Operations Manual as "Physical actions that attempt to prevent an officer's control, including flight or attempt to flee but do not involve attempts to harm the officer …." (DPD Operations Manual, § 105.01(3)(d).) According to Commander Phelan, Lt. Williams, and other DPD officers, "defensive resistance" included failure to obey orders to disperse. (Williams Deposition, pp. 122-23; Phelan Deposition, p. 78.)

72.  The actual use of PepperBall during the GFP was in stark contrast to DPD policy. The evidence (including video footage) shows a practice of deploying DPD officers deploying PepperBall guns on protesters even though they were not engaged in "physical actions that attempt to prevent an officer's control." The video also shows many officers deploying PepperBalls in an indiscriminate fashion without regard to whether they were aiming at a person or at the ground or an object near a person. A few examples include:

- A BWC video from May 28, 2020, at 8:30 p.m. at Colfax and Washington shows officers shooting PepperBalls at individuals who did not appear to be engaged in any "physical action" that "attempt[ed] to prevent an officer's control." (DPD BWC videos, including DEN 4043; DEN 4044; DEN 4050.)

- On May 29, 2020, in the vicinity of the intersection of 14th and Sherman at approximately 9:04 p.m., Plaintiff Elisabeth Epps was shot with PepperBalls as she crossed 14th Ave. (BLM 1019; DEN 4180.) According to Officer Christian, Epps was peaceful, not making any disturbance, and not holding a weapon. (Christian Deposition, p. 72.) According to Christian, Epps was not taking any "physical action" in which she "attempted to prevent an officer's control."

35

- According to the declarations of several plaintiffs and other witnesses, there were numerous occasions on which police shot PepperBalls at protesters without warning and not in response to any "physical action" by protesters that "attempt[ed] to prevent an officer's control." (Sannier Declaration, ¶¶ 8, 10, 13; Duran Declaration, ¶¶ 6-10, 14-16; Fitouri Declaration, ¶¶ 5, 7-11; Parkins Declaration, ¶¶ 5-12; Taylor Declaration, ¶¶ 9-13; Amghar Declaration; Deras Declaration, ¶¶ 5-6; Blades Declaration, ¶¶ 11, 17; Helmick Declaration, ¶ 18; Sanchez Declaration, ¶¶ 31-32, 35, 39-40; Stebleton Declaration, ¶¶ 6, 11, 16; Kelly Declaration, ¶¶ 4, 7, 19, 22.)

- In some instances, officers shot individuals who were dispersing. (*E.g.*, DEN 5109 at 9:44:57 p.m. MT; Sanchez Declaration, ¶ 31; Helmick Declaration, ¶ 18.)

- Officers shot credentialed members of the press. (Duran Declaration, ¶ 7.)

73. As discussed above, DPD witnesses, including command-level officers, uniformly testified that their actions and the actions of other officers during the GFP were consistent with DPD policy, training, and instructions from the Command Post. In addition, the DPD Crowd Management Manual provides that, during crowd control situations, "[t]he Pepper Ball projectile will not be deployed against a <u>specific individual</u> in a crowd without the approval of the Division or Unit supervisor. Additionally, the Pepper Ball system will not be used against a group or crowd without prior authorization from the Incident Commander." (DPD Crowd Management Manual, p. 19, DEN 86.)

74. Thus, I conclude that (1) use of PepperBalls as a crowd control or crowd dispersal measure was authorized by the Incident Commander; (2) use of PepperBalls on specific individuals was approved by DPD supervisors; and (3) DPD policy, training, and instructions from the Command Post (i.e., the Incident Commander) resulted in the indiscriminate use of PepperBalls during the GFP, which affected the rights of peaceful and non-peaceful protesters alike. Furthermore, in my opinion, the video and other evidence show that DPD officers were not appropriately or adequately trained in the use of PepperBalls. For instance, appropriately or adequately trained officers acting in a reasonable manner would not have deployed their PepperBall guns as described in the above-listed examples. The widespread nature of these examples—and the lack of discipline of DPD officers who engaged in this conduct—shows that the actual practice of DPD officers is quite different than what the DPD's policy is in writing (which is that PepperBall will be used in response to a "physical action" by a protester that "attempts to prevent an officer's control.").

4. **Dangerous Kettling Incident on May 31, 2020**

75. On May 31, 2020, between approximately 9:36-9:42 p.m., hundreds of protesters gathered in front of Cathedral Basilica of the Immaculate Conception, on Colfax between Logan and Pennsylvania. (DEN 3874 - HALO; DEN 3873 - HALO; Fitouri 228 at 25:00-28:24 min.)

46

79. Assuming that the emergency curfew could be validly enforced (and validly enforced only against protesters), that was not a reason to kettle protesters in order to arrest them for violation of the curfew, or to use less-lethal weapons on them in an enclosed space for violation of the curfew.[2]

80. A law enforcement agency may use only that amount force necessary to accomplish a legal purpose. As documented throughout the materials I reviewed, there is evidence that DPD personnel are well aware of this policy. They are also aware that DPD requires specific dispersal orders and up to three warnings, where possible, in order to give protesters the opportunity to disperse. This did not appear to happen in front of the Basilica before protesters were hit with heavy clouds of tear gas. Aurora Sergeant Brukbacher can be heard saying on his BWC at 9:43:17 p.m. MT (after the use of force had already begun), "everybody hold your fire for a minute, they're going to give dispersal orders." (COABLM 371.) Yet, no such orders can be heard on the video. (COABLM 371.) And, according to the declarations of Plaintiffs and other protesters who were present during this incident, because no dispersal orders were heard, the protesters felt trapped and scared. (Sannier Declaration, ¶¶ 15-27; Fitouri Declaration, ¶¶ 21-36; Parkins Declaration, ¶¶ 21-36; Duran Declaration, ¶¶ 27-35; Cousik Declaration, ¶¶ 14-30; Smedberg Declaration, ¶¶ 7-23; Zinman Declaration, ¶¶ 26-43.) These protesters were able to run away from the tear gas, but only after having to choose between running toward officers firing less-lethal weapons, climb a metal fence, or run down a narrow alleyway with hundreds of other protesters.

5.  **Inappropriate use of 40mm launchers and other projectiles and inadequate training**

81. An appropriately-trained police officer acting in a reasonable manner would not indiscriminately fire a potentially lethal projectile into a crowd, or toward persons who are not engaged in conduct that could be construed as posing a danger to the officer, others, or themselves. During the GFP, there were many press reports of individuals who were seriously injured by inappropriate use of 40mm launchers and other projectiles. Even innocuous-sounding "foam batons" fired from a 40mm launcher can cause loss of vision, broken bones, brain damage, even death. The DPD's inadequate training and widespread practice of inappropriate use of 40mm launchers caused in significant part the violation of the constitutional rights of the plaintiffs.

82. **May 31, 2020 shooting of Plaintiff Jonathen Duran:** According to Plaintiff Duran's declaration, he was documenting the GFP as a credentialed member of the press on the evening of May 31, 2020. He alleges that he was wearing a white helmet with "MEDIA" visibly written on it on all sides. (Duran Declaration, ¶ 19.) While he was standing at the intersection of

---

[2] It is important to note that there were certain exceptions to the curfew, such as for "credentialed members of the news media." (Emergency Curfew Order, DEN011302-11303.) According to his declaration, Plaintiff Duran was a credentialed member of the news media; if that is true, there would have been no basis to enforce the curfew (or use force) against him whatsoever.

BLM_00001771 (left), BLM_0000042 (right)



BLM_00001769

### 6. Inappropriate use of pepper spray and inadequate training

90. Under the DPD Crowd Management Manual, pepper spray is considered a chemical munition. (DPD Crowd Management Manual, p. 22, DEN 89.) The Manual states, "The use of a chemical agent for crowd control or riot control must be authorized by the Division or Unit Supervisor, except in the event of an emergency…." (DPD Crowd Management Manual, p. 23, DEN 90.) The Manual further states that chemical agent use may be appropriate in the following circumstances:

- To prevent an injury to an officer or a third person.
- To subdue a person who is threatening or attempting physical harm to himself or another.
- Against subjects resisting arrest.
- To quell rioting.
- Against subjects interfering with an arrest.
- Any situation with the officer can clearly articulate the need for deployment.

91. There are numerous examples of DPD's inappropriate use of pepper spray during the GFP. The widespread nature of these examples—and the lack of discipline of DPD officers who engaged in this conduct—shows that the actual practice of DPD officers is quite different than what the DPD's policy is in writing. It also shows that DPD officers were inappropriately and inadequately trained in the use of pepper spray. For example:

92. On May 28, 2020, at approximately 9:35 p.m. in the vicinity of the intersection of 14th and Lincoln, the BWC produced at DEN 4021 shows an officer deploying pepper spray on individuals who were simply standing in the intersection when the officers decided it was time

54



DEN5034 at 8:20:38 p.m.

99. There is no evidence that any of the officers involved in these incidents were disciplined, or that these incidents were even investigated. The DPD's policy and widespread practice caused in significant part the violation of the constitutional rights of plaintiffs.

7. **Inappropriate use of flash bangs and failure to train**

100. According to Plaintiffs Fitouri, Parkins, Deras, and Sannier, flash bangs—also known as noise-flash diversionary devices (NFDD)—were used by DPD on numerous occasions, including on May 29, 2020 at the intersection of Colfax and Broadway, on May 30, 2020 at the intersection of Lincoln and Colfax, and on May 31, 2020 at the intersection of Colfax and Washington. (Fitouri, Parkins, Deras, and Sannier Declarations.) Plaintiff Fitouri states that, at the intersection of Colfax and Lincoln on May 30, 2020, police threw a flash bang which landed at her foot and exploded, causing minor burns and her foot to go numb. (Fitouri Declaration, ¶ 12.) Plaintiff Deras states that a flash bang exploded near his face, injuring his eardrum and causing him sharp pain in his ear for several days afterwards. (Deras Declaration, ¶ 6.) Plaintiff Sannier states that a flashbang went off near her head, causing disorientation and ringing in her ears. (Sannier Declaration, ¶ 14.)

101. Aurora officers did not have flash bangs or PepperBall guns. (Shaker Deposition, pp. 19-20.) However, DPD Metro/SWAT had flash bangs. (Bolton Deposition, p. 39.)

102. Assuming that a jury credits Plaintiffs' testimony, the DPD's use of flash bangs under the described circumstances was contrary to generally accepted police practices, standards, and training. Notably, the DPD Crowd Management Manual does not contain any discussion of



DEN 5110 at 9:09:44 p.m. MT

**Additional Opinions on DPD's Policies, Practices, and Customs**

1. **DPD policy did not require timely use of force reports and the effect on officer accountability**

    108.   As the OIM recognized in its report on the GFP:

    National standards emphasize the importance of documenting uses of force during large protests to enhance accountability. … The IACP recommends that all uses of force during crowd control be reported consistent with agencies' normal force reporting policies. All use of force reports should be as comprehensive as practicable and provide the degree of specificity necessary to fully document and evaluate the force. Incomplete, vague, or boilerplate language in use of force reports could allow violations to go unchecked and cripple investigations, so this type of language should not be permitted. (OIM Report, p. 23; IACP *Crowd Management Model Policy*, § IV.E.3.j, Apr. 2019; IACP *Reporting of Use of Force Concepts and Issues Paper*, p. 4, Mar. 2017.)

    109.   I completely agree. Timely and complete use-of-force reporting is essential for officer accountability and transparency, as well as organizational credibility. The IACP provides, "Use-of-force reporting requirements apply equally to policing demonstrations and civil disturbances. It is very important for law enforcement agencies to document and investigate uses of force during these events, not only for managerial and accountability reasons, but also to respond effectively to potential complaints alleging excessive force following an event." (*Crowd Management: Concepts & Issues Paper*, Fitouri 18375.)

- Some officers included very detailed information verbatim from the DPD Crowd Management Manual. (*See* DEN 3438-39, Sgt. Simmons Statement.)

121. Clearly, the District Commanders and Administrative Lieutenants to whom Lt. Berdahl directed his email communicated this information down through the ranks. The result was Officer Statements generated weeks after the GFP that were essentially a cover-up, not a serious attempt to document uses of force on civilians and hold officers and their superiors accountable for improper or excessive uses of force.

2. **DPD policy gap in BWC activation during crowd control situations, failure to train, and effect on officer accountability**

122. According to the OIM, "Best practices emphasize the important role of BWCs during police crowd control and recommend that all uniformed officers use BWCs during such operations." (OIM Report, p. 20 (citing Police Foundation, *Managing Large-Scale Security Events: A Planning Primer for Local Law Enforcement Agencies*, pp. 30, 39 (Apr. 2018).) However, "[g]aps in the DPD's policies and practices … resulted in a substantial number of DPD officers recording no BWC footage during their assignments at the GFP." (OIM Report, p. 20.) Moreover, "[u]tilization of BWCs improves transparency and accountability by providing video evidence that allows police agencies to exonerate officers who are falsely accused or to identify officers engaging in misconduct and take corrective action when force is used inappropriately." (OIM Report, p. 21 (citing PERF, *Implementing a Body-Worn Camera Program: Recommendations and Lessons Learned*, US Department of Justice Office of Community Oriented Policing Services, pp. 5-7 (2014); Mitchell Deposition, p. 70.) I completely agree. In addition, officers know that the purpose of BWC is to provide objective evidence of officer-citizen interactions. It is as much for the officer's protection as for the citizen's protection.

123. DPD has had BWC since 2015. The Operations Manual states that the BWC is "an 'on-the-body' audio and video recording system assigned to an officer as an additional means of documenting specific incidents in the field." (DPD Operations Manual, § 119.04.) The Operations Manual contains a policy regarding when BWCs must be activated and how officers are required to use them. (DPD Operations Manual, § 119.04.) In relevant part, BWC is required to be activated "prior to any officer initiated contacts involving actual or potential violations of the law including: … Pedestrian, citizen, and/or vehicle contacts … Any encounter that becomes adversarial… All arrests and/or citations…" and "Any situation that the officer believes the use of the BWC would be appropriate or would provide valuable documentation if not already activated per policy." (DPD Operations Manual, § 119.04(3)(a)(1)(b), (g), (k), (m).)

124. There is no written policy that specifically governs the use of BWC during protests. However, it would seem that, under the existing policy, BWC activation should have been required under any of the subsections referenced above. Indeed, DPD officers generally agreed that their BWC should have been activated during use of force events on protesters during the GFP.

3. **Failure to discipline**

134. Of the hundreds of DPD officers who policed the GFP and the numerous citizen complaints about officer use of force, only three officers have been disciplined for their actions during the GFP (Officers Streeter, Archuleta, and McClay). (Streeter and Archuleta IA files, DEN 12010-12073; Pazen Deposition, pp. 13-14.)

135. Many citizens filed complaints about officers' conduct during the GFP. Most were complaints about uses of force. I reviewed the "decline" letters, and they indicate that the City did not appear to take the complaints seriously. The tone of the letters (see letter to Plaintiff Duran, discussed above) was largely to cast doubt on the veracity of the allegations made by the complainant. The City also suffered from a problem of its own making, namely, as cited previously, the difficulty in identifying officers alleged to have committed misconduct.

136. In addition, a review of citizen complaint data from prior protests reveals that no DPD officer has been disciplined for any allegations of use of excessive force at those protests.[3] This, combined with the widespread inappropriate uses of force at the GFP—including those authorized by command staff—show that the City has a custom and practice of failing to discipline officers who use excessive force against protesters. This contributed to the violation of the constitutional rights of the plaintiffs. Based on the DPD's practices, DPD officers had little or no reason to believe that they would be disciplined for excessive force against, or for violation of the First Amendment rights of, protesters at the GFP.

137. Moreover, it has taken an exceptionally long time for the DPD to investigate complaints of alleged police misconduct during the GFP. Long delays in internal investigations affect the quality of those investigations and undermine organizational credibility; witnesses disappear, or their memories fade; complainants and officers alike are kept in limbo; officers guilty of misconduct, or worse, are (too often) kept on the job, their conduct ultimately excused; the "code of silence" is strengthened; public and internal cynicism flourishes. At his deposition, Chief Pazen testified that there are currently 20-30 open investigations of citizen complaints stemming from the GFP. (Pazen Deposition, pp. 13-14.) I believe, based on my experience, it is more likely than not that this extraordinary delay is attributable to: inadequate staffing and/or supervision of Internal Affairs and/or inadequate management controls and/or a low priority assigned by the City and DPD to the essential function of accurate, thorough, and timely internal investigations of citizen complaints. In my professional experience, these internal investigations should have been completed long ago. In both San Diego and Seattle, from receipt of a complaint, Internal Affairs investigators have 180 days to complete the investigation. If that benchmark cannot be met (exceptions are granted, but only if justified for cause), it would point

---

[3] Excerpts from past complaint protest files, P2015-0288, P2015-0318, P2015-0339, P2015-0408, P2015-0361 (DEN 12174-79, 12447-51, 12681-86, 12699-706, 12771-73, 12811-14, 12831, 12854, 12867-72, 12855-59.)

to one or more of these systemic failures. In any case, DPD's handling of these complaints is contrary to generally accepted police practices and standards.

4. **DPD was responsible for excessive use of force by mutual aid agencies; failure to train**

138.   DPD requested the assistance of numerous outside law enforcement agencies during the GFP, understandable given the size and scope of the national protest. Inexplicable, however, was DPD's policy to allow outside agencies to follow their own use of force policies during the protests. (Phelan Deposition, pp. 94-95; Pazen Deposition, pp. 32-33, 38.) However, according to Chief Pazen, there was a DPD supervisor embedded with every unit from an outside agency, and there were "rules of engagement" provided by DPD to the outside agencies. (Pazen Deposition, pp. 29-30, 34.) These two positions appear to be contradictory, and throughout the record, there is evidence of the confusion caused by the contradiction.

As police chief during the World Trade Organization protests in Seattle, my staff and I reached out to all our "mutual aid" partners. Our message was clear: when you are on our streets, you are under the command of the Seattle Police Department (SPD). We received signed agreements from each agency and the pact worked flawlessly through an otherwise fraught week during the "Battle in Seattle." Notably, the agreement was tested twice, with acts of misconduct committed by officers from outside agencies. In the first, an officer shot a beanbag round into a retreating, nonviolent protester then kicked him in the groin. In the second, a deputy ordered two young women to roll down the window of the car in which they were seated as they filmed some of the action. When the driver complied, the deputy filled the vehicle with pepper spray. Both officers were immediately removed from the streets and sent home. One lost his SWAT job and was suspended from his department, the other was fired. In sum, simply because mutual aid personnel work for other agencies does not mean they get a "free pass." As the requesting agency, DPD was ultimately responsible for the actions of officers from other agencies who were in the City of Denver to help police its streets. The Incident Command System must memorialize this reality, and all member agencies must be thoroughly familiar with operational provisions of the agreement.

139.   Video and reports of members of the outside agencies confirm that they were aware of their status in the city. A few examples include:

- COABLM 231 at 19:19:49: APD Sgt. Brukbacher takes direction from Lt. Williams

- COABLM 330 at 19:07:39: DPD Metro/SWAT Corporal hands APD Ofc. Spano a tear gas canister and tells him to throw it

- COABLM 317 at 18:01:20: APD Sgt. McClelland and Sgt. Brukbacher discuss what the objective or plan is, and Brukbacher says, "It's Denver's call."

5.  **Leadership approval of officers' use of force**

143. In my experience, law enforcement officers are keenly interested in what their leaders tell them—whether they agree or disagree with what they hear. During the GFP the most prominent, conspicuous leaders of the DPD were the police chief and the mayor. They set the tone.

144. On May 29, 2020, the second day of the protests, Mayor Hancock and Chief Pazen gave a press conference in the early afternoon. They were asked questions about the DPD's use of force on protesters the day before. Chief Pazen commended members of the DPD, saying they demonstrated "extreme restraint" and performed in an "exemplary manner." (9News video, 5-30-2020 12 at 12:20 min.) When a reporter asked whether officers followed the use of force policy regarding use of tear gas and PepperBalls, Pazen replied that they did, and that officers were under attack. (9News video, 5-30-2020 12 at 19:10-21:11 min.) When asked by a reporter if he was satisfied with how the officers handled the protests the day before and how he would suggest that they handle it today, the Mayor replied that he had watched the "video feed" of the protests, saw how the officers responded, and thought that they showed "tremendous restraint and discipline." (9News video, 5-30-2020 12 at 37:15-37:52 min.)

145. In my experience, officers follow the lead of the Chief of Police. If the Chief says that officers are doing a great job, the officers will keep doing what they have been doing. The effect of the Mayor and Chief's comments at the May 29, 2020 press conference would have been exactly that. Officers were praised for their performance on May 28—which, as discussed above, included indiscriminate and inappropriate use of chemical munitions on protesters. They were expressly told by the Mayor to keep doing what they were doing. This caused in significant part the violation of the constitutional rights of the plaintiffs.

6.  **Failure to prepare for GFP**

146. Several DPD officers testified at their depositions that they had never seen protests in Denver as disruptive or violent as the GFP. The implication is that the DPD was unprepared for protests of this scale, and nature. It is my opinion that this represents a failure of imagination and of preparation. Mr. Floyd's death was only one in a long line of recent, highly publicized deaths of Black people at the hands of (mostly) white police officers. The DPD should have been much better prepared for a protest like the GFP—a protest directed not at pro- or anti-immigration forces, Covid-19 policies, labor issues, or political campaigns but at police conduct itself. The less often protests of this nature and scale happen, the greater the consequences of failure to plan, and of omissions and miscalculations in the plan. It is inherent in the mission of emergency services, police work in this instance, to be adequately prepared for big, infrequent events. It is my opinion that the city and its police department should not have been surprised by the scope and nature of GFP, that it should have been prepared for what it faced. The failure to adequately prepare caused in significant part the violation of the constitutional rights of the plaintiffs.

147. Having adequate policies and training in crowd control and crowd management is fundamental to the work of police departments. Even if protests as large as the GFP are not an everyday occurrence, they are not rare—in Denver, or any other major city. It is foreseeable that, without adequate policies and training in the use of less-lethal weapons and field force tactics, officers will more likely than not continue to violate the constitutional rights of citizens—even as they undermine their own mission to protect life and property.

7. **Inappropriate delegation of weapon assignment to officer discretion; failure of supervision**

148. During the GFP, officers were allowed to choose which weapons (such as PepperBall or 40mm launcher) they wanted to use. Officer Bolton testified that officers were initially assigned a specific weapon, but that they could change out as they wished throughout the day. (Bolton Deposition, p. 40.) In my opinion, this was an inappropriate delegation of weapon assignment to officers. Supervisors should have been assigning the specific less-lethal weapons to officers, based on their determination of need and whether specific officers were more competent with specific weapons. This DPD practice of allowing officers to choose their own weapons indicates that supervisors were not appropriately supervising their officers and making decisions based on needs of the protest, as determined by the Incident Commander and command-level supervisors.

\* \* \*

149. It is my opinion that the duty and responsibility of police officers is to protect the rights and safety of its citizens, including business owners, shoppers, residents, visitors, and protesters. Police officers should serve as a model of lawful and constitutional behavior; not the opposite. Unfortunately, the material I have reviewed in this case offers strong evidence that the DPD did not live up to its obligations to protect the constitutional rights of its citizens, or even to follow the most basic and generally accepted police policies, practices, standards, and training. As discussed in more detail above, the DPD's policies, practices, and training failures caused in significant part the violation of the constitutional rights of the plaintiffs and protesters at the GFP.

150. My rate of compensation for review is $450/hour. I am aware that discovery is ongoing in this case. My opinions may be added to, or amended, upon review of any additional information that becomes available.