# EXHIBIT C

IN THE UNITED STATES DISTRICT COURT
OF THE DISTRICT COURT OF COLORADO

Civil Action Nos. 1:20-cv-01878-RBJ & 1:20-cv-01922-RBJ-MEH (consolidated)

ELISABETH EPPS, *et al.*

Plaintiffs,
v.
CITY AND COUNTY OF DENVER, *et al*.,

Defendants

---

## EXPERT REPORT OF DR. EDWARD R. MAGUIRE

### Experience and Qualifications

1. I am a Professor of Criminology and Criminal Justice at Arizona State University, where I also serve as director of the Public Safety Innovation Lab. I earned a Ph.D. in criminal justice from the State University of New York at Albany in 1997. I have been involved in studying, teaching, training, providing technical assistance for, and collaborating with police for more than 25 years. My work focuses primarily on policing and violence. One of the areas I specialize in is the study of policing crowds, including protests.

2. I have authored or edited seven books or monographs, and published more than 100 scientific journal articles and book chapters on a variety of criminal justice issues. Most of that work focuses on policing and violence, with much of my recent work focusing specifically on policing crowd events and protests.

3. In January 2020, I published a guidebook for police entitled *Policing Protests: Lessons from the Occupy Movement, Ferguson, and Beyond.*[1] The guidebook presents a summary of scientific evidence from criminology and social psychology on crowds and the police response to crowd events. It also provides an analysis of the police response to Occupy Wall Street and other protests by law enforcement agencies in the United States and abroad. Finally, the guidebook provides a detailed framework for handling police protests in a manner that seeks to prevent conflict and violence and minimize harm to protesters, police, and bystanders. The research featured in the guidebook was funded by the Office of Community Oriented Policing Services, a component of the United States Department of Justice.

---

[1] Maguire, E.R., & Oakley, M. (2020). *Policing Protests: Lessons from the Occupy Movement, Ferguson, and Beyond*. New York: Harry Frank Guggenheim Foundation. https://www.hfg.org/s/Policing-Protests.pdf

4. I also serve as Chair of the Police Executive Research Forum's ("PERF") Research Advisory Board (the "Board"), which is composed of a group of researchers, and law enforcement practitioners who advise PERF's efforts to advance police research and innovation. The Board assists PERF's staff in identifying potential research topics; coordinating research efforts with other organizations; assisting with human subjects review; and disseminating findings to the academic and policing professions. As part of my duties as Chair of the Board, I engage in communications with law enforcement leaders throughout the country in identifying and helping to implement evidence-based practices associated with leadership and management, community policing, patrol and criminal investigation practices, and crowd management.

5. In addition, I serve as the senior researcher for law enforcement for CrimeSolutions.gov, an effort coordinated by the National Institute of Justice, a component of the U.S. Department of Justice. The purpose of the website is to provide policymakers and practitioners with an easy-to-follow resource for understanding scientific evidence associated with improving criminal justice practices and reducing crime and violence. My role is to coordinate all reviews of research associated with law enforcement and policing for this U.S. government website.

6. Much of my research and consulting in recent years has focused on crowd management and the police response to protests. I am currently working with the Columbus Police (OH) and the Phoenix Police (AZ) assessing their responses to the protests following the death of George Floyd and providing recommendations for reform. I am performing similar services for the Seattle Office of the Inspector General regarding the Seattle Police Department's response to protests. I was also commissioned by the Inter-American Development Bank to write a guide for police in Latin America and the Caribbean on appropriate police responses to protests. I have also been invited to speak or provide training on policing crowd events for police in four countries (Australia, Honduras, the U.K., and the U.S.).

7. My experience, training, and background is more fully described in my C.V., attached as Exhibit A. A list of materials I was provided for review is attached as Exhibit B. I have not testified at trial or deposition in the last four years.

8. My opinions are based upon the totality of my specialized knowledge, experience, and my expertise in the field of criminology generally, and policing and violence more specifically. My expertise has been developed during my decades of research of and engagement with law enforcement and my continued experience as a professor, researcher, author, and consultant to governments and law enforcement agencies. Moreover, my expertise is based on an intimate familiarity with standards of training and police practices that have been examined and/or adjudicated in case law; departmental policies and procedures; applicable federal, state and local police training programs; model policies; and training and research from scholars and police professional organizations.

**Relevant Background Facts**

9. On May 25, 2020, Minneapolis police officers arrested George Floyd after receiving a complaint that he had used counterfeit money. Officer Derek Chauvin knelt on Mr. Floyd's neck until he stopped breathing and died. Beginning on May 28, 2020, protests over the death of Mr. Floyd began in Denver. During the first day of the protests, the Denver Police Department ("DPD") was solely responsible for monitoring and managing the protests. In the days that followed, outside law enforcement agencies were brought in at the request of DPD to assist in crowd management and control.

10. The purpose of this report is to examine and assess the crowd management and crowd control policies, training, strategies, and tactics of the Denver Police Department ("DPD") at the time of the George Floyd protests (referred to herein as "GFP") as compared to nationally accepted police standards and practices at the time of the GFP. For purposes of this report, my analysis will focus on DPD policies, training, strategies and tactics that were in place at the time of the GFP, or that occurred during the GFP, defined here as the first six days of protests that occurred from May 28, 2020 through June 2, 2020.

**DPD Policies, Training, Strategies, and Tactics**

**A. Insufficient and Outdated Training in Crowd Management and Control**

11. Below is a table listing the training materials produced by the City of Denver in this case, which lists the title of the document, the date of creation/publication (where available), and the purpose of the document. This table is not intended to analyze the documents, but to set forth the scope of documents that helped inform the analysis to be undertaken in this section of the report.

| Title and Bates Number | Date | Purpose |
|---|---|---|
| Denver Police Department Crowd Management Manual - DEN000068 | February 13, 2019 | The manual serves as a guide for crowd management and control operations. |
| Crowd Management and Control for Supervisors Part 1 and Part 2 - DEN000235 | May 14, 2008 | This presentation covers protestor tactics and police preparation for civil disturbance. |
| Chemical Agents: O.C. Pepperspray - DEN000317 | September 2008 | A presentation detailing what are chemical agents and when can they be used in the field. |

wide array of DPD operations. For instance, it includes general policies and procedures associated with using force, making arrests, managing traffic, investigating crimes, and many other topics. The *Crowd Management Manual* is 44 pages long and focuses specifically on policies associated with handling crowd events, including protests.[7]

14. The DPD's *Crowd Management Manual* divides the police response to crowds into two categories: crowd management, and crowd control. The DPD's *Crowd Management Manual* defines crowd <u>management</u> as "Techniques used to address lawful public assemblies before they begin and during the event for the purpose of guaranteeing a safe and lawful assembly. This can be accomplished in part through coordination with event planners and group leaders, permit monitoring, past event critiques and future planning" (p. 5).

15. The *Crowd Management Manual* defines crowd <u>control</u> as "Techniques used to protect lawful public assemblies and free speech activities and prevent unlawful conduct. The techniques could include a display of formidable numbers of police officers, crowd containment tactics, crowd dispersal tactics, and individual or group arrest procedures" (p. 6). The *Crowd Management Manual* notes, "When possible, crowd management tactics will be used prior to implementing crowd control tactics. Crowd control tactics are generally intended for use when efforts to manage a crowd or event have been unsuccessful or simply require a greater level of intervention. Some situations, both planned and spontaneous, may require a combination of management and control" (p. 4). Although I do not use the crowd management/crowd control dichotomy in my guidebook on policing protests, the framework that I recommend based on the research evidence is consistent with the idea that some crowd events require the simultaneous use of crowd management and crowd control approaches.

16. Consistent with best practices in policing, the DPD *Crowd Management Manual* states that "the overriding goal of police actions at the onset of civil disturbance problems is the de-escalation of violence" (p. 8). A key element of de-escalation is communication and dialogue between police and crowd members. The *Crowd Management Manual* emphasizes this point, noting, "The preferred use of uniformed and non-uniformed police officers is to communicate as much as possible to demonstrators and their leaders that police officers are present in order to facilitate the peaceful and lawful expression of First Amendment rights." In my opinion, the *Crowd Management Manual* does a good job of setting the tone for an appropriate police response to crowd events, one that relies heavily on "communication, mediation, and negotiation" (p. 11).

17. Unfortunately, the aspirational language used in the *Crowd Management Manual* to emphasize the importance of de-escalation and communication strategies for avoiding conflict and violence does not match the content of the training materials I reviewed. Those training materials focus primarily on crowd control rather than crowd management. They focus very little

---

[7] The copy of the DPD *Crowd Management Manual* provided by the city contained redacted text. As a result, I was unable to review the full document. Portions of the text on pp. 9-11 and pp. 25-26 were redacted. In addition, the full text of pp. 27-41 was redacted.

to use (p. 29). Proper training is essential to reduce the risk of injury or death among people struck by the kinetic impact projectiles fired by these weapons.[16]

27. Third, the OIM report notes that the DPD provides no training on certain "high-risk explosive devices" such as rubber-ball grenades. These are dangerous devices because when they explode, the rubber balls or pellets spray indiscriminately striking anyone located nearby. They cannot be carefully aimed, and for that reason, they should only be used under very restrictive conditions. Proper training on their use is essential to minimize the risk of injury or death.

28. Finally, the OIM review found that "there has been a decline in the volume and frequency of crowd control and field force training in recent years" (p. 51). The report concluded that the DPD "needs to substantially increase its investments in crowd control and field force training to properly prepare officers for the possibility of other mass protest events in the future." I agree with this assessment.

29. To summarize, at the time of the GFP, the DPD used deficient training for crowd control and crowd management. That training was inconsistent with the DPD's own *Crowd Management Manual*. It devoted insufficient attention to crowd management strategies, including de-escalation, communication, mediation, and negotiation. It provided almost no coverage of crowd psychology and behavior, and what coverage it did provide was dated and inaccurate. Finally, as noted in the OIM report, the crowd control training provided by the DPD was insufficient in content, volume, and frequency and therefore did not adequately prepare officers for the challenges they faced during the GFP. The foreseeable consequence of DPD's failure to provide adequate training to its officers was officers' use of inappropriate tactics on, and violation of the constitutional rights of, the Plaintiffs and other protestors.

## B. Insufficient Reliance on Crowd Management Strategies

30. Consistent with my findings regarding the DPD's training on crowd management and control, the DPD's response to the GFP involved an insufficient reliance on crowd management strategies. Instead, the evidence reveals that the DPD relied primarily on crowd control tactics, particularly the use of skirmish lines, less lethal weapons, and arrests. This heavy reliance on crowd control and insufficient use of crowd management is inconsistent with nationally accepted police standards and practices, and the DPD's own *Crowd Management Manual*.

31. The materials I reviewed provide no evidence that the DPD relied on dialogue-based de-escalation strategies to reduce tension and prevent conflict and violence with crowds during the GFP. Instead, the DPD relied on militaristic crowd control tactics. The *Crowd Management Manual* states, "The policy of the Denver Police Department is not to choose a standard police

---

[16] Haar, R.J., Iacopini, V., Ranadive, N., Dandu, M., & Weiser, S.D. (2017a). Death, injury and disability from kinetic impact projectiles in crowd-control settings: A systematic review. *BMJ Open*, doi:10.1136/bmjopen-2017-018154

36. In addition to the need to issue verbal warnings or dispersal orders before using force against a crowd, police also have an obligation to ensure that these warnings are loud enough for the crowd to hear them. Crowd events tend to be loud, and the amplification devices used by police are sometimes not loud enough to enable the full crowd to hear police announcements. The materials I reviewed suggest that when warnings were issued, they were often made without amplification or were amplified using a public address system in a police vehicle. The video footage reveals that some of these announcements were not loud enough to reach the full crowd. Moreover, evidence from the depositions reveals that DPD officers were not particularly sensitive to this issue. For instance, in their depositions, both Lt. Pine and Lt. Williams stated that they did not do anything to ensure that the crowd could hear the announcements by police. When asked why he didn't do anything, Lt. Pine said it was because he was busy. When asked the same question, Lt. Williams stated, "I don't really know what we could have done to… verify it" (p. 107). Evidence of protesters not being able to hear announcements made by police is also present in the depositions of Sergeant Beall (pp. 57-58) and Mr. Mitchell (pp. 72-75). I conclude from the available evidence that the DPD did not take seriously the question of whether the crowd could hear their warnings or orders to disperse. As a result, some protesters were "subjected to less lethal munitions before hearing any warning or order" (OIM report, p. 26).

37. To summarize, at the time of the GFP, the DPD did not rely sufficiently on crowd management strategies to reduce tensions and prevent conflict and violence. Instead, the DPD appears to have defaulted to the use of crowd control tactics, including the use of skirmish lines, less-lethal weapons, and arrests in an effort to control the crowds. Moreover, the DPD did not follow nationally accepted standards or its own policies regarding warnings and dispersal orders before launching chemical agents or less-lethal munitions at crowds. These approaches are deficient in relation to nationally accepted standards and practices in policing, and they are inconsistent with the DPD's *Crowd Management Manual*. Unfortunately, these approaches are consistent with the training reviewed in the previous section, which focused heavily on crowd control and did not train officers sufficiently on either crowd management or crowd control. The crowd control approach used by the DPD at the GFP very likely had the effect of inflaming tensions between protesters and police rather than de-escalating tensions and preventing conflict and violence.

## C. Use of Inappropriate Crowd Control Tactics

38. In addition to not relying sufficiently on crowd management strategies during the GFP, the DPD also relied on a variety of inappropriate crowd control tactics. For instance, although Commander Phelan noted in his deposition (p. 31) that his principal concern was the safety of the protesters, I could find little evidence substantiating this claim. The DPD engaged in a custom or practice of using aggressive crowd control tactics during the GFP that unnecessarily endangered peaceful protesters and others who were not committing crimes. Moreover, these tactics very likely had the effect of inflaming tensions and escalating conflict and violence between police and protesters.

of these impact munitions. The OIM report quotes the manufacturer of one of these devices: "rubber-ball grenades can result in serious bodily injury and should only be deployed by officers who have received specialized training" (OIM report, p. 34) Moreover, due to the risk of injury, the manufacturer recommends that these grenades be used as a last resort when chemical agents and other types of impact munitions have failed to achieve their objective. Because these devices cannot be carefully aimed, and because they spread their payload indiscriminately, they run the risk of injuring and endangering not only people who are engaging in violent or destructive behavior, but also people who are behaving peacefully and lawfully. I agree with the OIM's conclusion, which states that if these devices are to be used for crowd control, "it is incumbent on the DPD to regulate their use with clear and explicit policy, which it did not do before the GFP" (OIM report, p. 35).

45. In one egregious incident that occurred on May 31, police trapped protesters between two lines of officers and fired chemical agents and impact munitions at them from both sides (see depositions of Sergeant Abeyta, Sergeant Beall, and Commander Redfearn). Chief Stamper discussed this incident in detail in his expert report, so I will not restate the details here. I concur with his assessment that this use of kettling or encirclement tactics was "contrary to generally accepted police practices and standards" and violated the constitutional rights of the plaintiffs and other protesters.

### D. Insufficient Internal Controls for Addressing Officer Misconduct

46. As pointed out by Chief Stamper in his expert report, the DPD appears to have "circled the wagons" and sought to shield its officers from discipline for misconduct that occurred during the GFP. I reach this conclusion for several interconnected reasons. First, my review of the video footage from the GFP identified numerous inappropriate uses of force against peaceful protesters who were not given any warning or order to disperse. Moreover, I did not find any evidence that the officers involved in these inappropriate uses of force were ever disciplined.

47. Second, as noted earlier, several protesters were struck with impact munitions in vulnerable parts of the body where the projectile could have caused serious injury or death. Once again, I did not find any evidence that the officers involved in these inappropriate uses of force and violations of DPD policy were ever disciplined.

48. Third, the video footage in this case revealed numerous instances of officers not behaving with an appropriate professional demeanor. For instance, one officer called a protester a "fucking faggot" [see DEN 4995]. Another celebrated a peaceful protester being shot in the face with a 40mm round by yelling, "Motherfucker! That's what you get! Fuck you!" (DEN 4136 @ 7:23 p.m.). Another said, "that was fun" after throwing tear gas at protesters (COABLM @ 20:47:22). These utterances are contrary to professional standards in policing and the DPD's own *Crowd Management Manual*, which states, "police personnel must maintain a professional demeanor, despite unlawful or anti-social behavior on the part of crowd members" (p. 8). When officers