## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

**Civil Action Nos. 1:20-cv-01878-RBJ (consolidated with *Fitouri, et al. v. City and County of Denver, Colorado, et al.*, 1:20-cv-1922-RBJ-MEH)**

**ELISABETH EPPS,**
**ASHLEE WEDGEWORTH,**
**AMANDA BLASINGAME,**
**MAYA ROTHLEIN,**
**ZACH PACKARD,**
**HOLLIS LYMAN,**
**CIDNEY FISK, and**
**STANFORD SMITH,**

**Plaintiffs,**
**v.**

**CITY AND COUNTY OF DENVER, CITY OF AURORA, JONATHAN CHRISTIAN, KEITH VALENTINE, DAVID MCNAMEE, PATRICIO SERRANT, MATTHEW BRUKBACHER, JOHN AND JANE DOES 1–100, and JOHN AND JANE BOES 1–50,**

**Defendants.**

---

### FIRST AMENDED COMPLAINT

Plaintiffs Elisabeth Epps, Ashlee Wedgeworth, Amanda Blasingame, Maya Rothlein, Zach Packard, Hollis Lyman,  and Stanford Smith ("Plaintiffs") submit this amended complaint against Defendants the City and County of Denver ("Denver"), the City of Aurora ("Aurora"), Jonathan Christian, Keith Valentine, David McNamee, Patricio Serrant, Matthew Brukbacher, and John and Jane Does 1–100, and John and Jane Boes 1–50 and allege as follows:

**INTRODUCTION**

1.       Plaintiffs seek to hold the City of Denver and the City of Aurora and certain individual officers accountable for repeated violations of constitutional rights during mass protests in late May and early June and to force the City of Denver and the City of Aurora to abandon their policy, practice, or custom of allowing police officers to use so-called "less-lethal" weapons and tactics to suppress, deter, or injure individuals and organizations that exercise their First Amendment rights. Denver and Aurora's actions, while unconstitutional in any context, are even more pernicious here because the use of excessive force has specifically targeted peaceful demonstrators who assembled to protest police violence and brutality, including in particular police brutality that disproportionately targets African Americans. Plaintiffs demand that Denver and Aurora and their police departments accept and act in accordance with the principle that Black lives matter equally in our society and stop using indiscriminate or unlawfully targeted force against peaceful protesters exercising their First Amendment rights to assemble, speak, and petition their government for a redress of grievances.

2.       Just after 8:00 PM on May 25, 2020, George Floyd, a 46-year-old Black man, was accused of a non-violent offense and arrested by officers of the Minneapolis Police Department. During the course of his arrest, Mr. Floyd was handcuffed and fell to the pavement.  Less than ten minutes after the police arrived, one of the four police officers who arrested Mr. Floyd placed his knee and the weight of his body on Mr. Floyd's neck as Mr. Floyd lay on the ground. For eight minutes and forty-six seconds, the officer held his knee on Mr. Floyd's neck.  As Mr. Floyd pleaded for his life, three more officers either held his legs or stood by and watched while he died. Among Mr. Floyd's final words were "please, please, please, I can't breathe."

3.      These words echo the final words spoken by Eric Garner.  Eric Garner was killed in 2014 after a New York police officer put Mr. Garner in a chokehold during an arrest for a non-violent offense.

4.      More recently, Breonna Taylor, a Black woman, was shot eight times and killed on March 13, 2020, by three plainclothes officers in Louisville, Kentucky, who entered her home in the middle of the night to execute a no-knock warrant.

5.      Tragically, Mr. Floyd, Mr. Garner, and Ms. Taylor are far from the only Black men, women, and children who have unjustifiably been killed by law enforcement officers in recent years.  This is true in Denver and across the country.

6.      Elijah McClain, twenty-three, was killed by Aurora police officers in August 2019 after walking down a street unarmed.  De'Von Bailey, nineteen, was shot in the back and killed by Colorado Springs police as he ran from them in August 2019.  David Baker, a thirty-two year old Navy veteran, was killed by Aurora police in December 2018 after officers discharged a Taser on him 11 times and held him face down for 90 seconds.  Michael Marshall was killed by Denver sheriff deputies after asphyxiating on his own vomit while being restrained for 11 minutes.  Marvin Booker was killed in 2010 by Denver sheriff deputies who shocked him with a Taser, put him in a sleeper hold and hit him with nunchucks as they pinned him to the floor.[1]

7.      Tony McDade, thirty-eight, was fatally shot by a member of the Tallahassee Police Department on May 27, 2020.  Laquan McDonald, seventeen, was fatally shot on October 20, 2014, by a Chicago police officer.  Freddie Gray, twenty-five, died on April 19, 2015, a week after

---

[1]  Noelle Phillips, *Say their names: A look at controversial police killings in Colorado*, Denver Post, June 6, 2020, https://www.denverpost.com/2020/06/06/controversial-police-deaths-in-colorado/.

suffering a severe spinal injury in a Baltimore Police Department van.  Aiyana Stanley-Jones, a seven-year-old, was shot and killed, in her home, in a raid by the Detroit Police Department, on May 16, 2010.  Botham Jean, twenty-six, was fatally shot in his apartment by an off-duty officer of the Dallas Police Department, on September 6, 2018.  Michael Brown, eighteen, was fatally shot by a police officer, in Ferguson, Missouri, on August 9, 2014.  Yvette Smith, forty-seven, was fatally shot by a sheriff's deputy, in Bastrop County, Texas, on February 16, 2014.  Alton Sterling, thirty-seven, was fatally shot on July 5, 2016, by an officer in the Baton Rouge Police Department. Walter Scott, fifty, was shot and killed by a North Charleston police officer on April 4, 2015, after being stopped for a nonfunctioning brake light.  Tamir Rice, a twelve-year-old, was killed on November 22, 2014, by a Cleveland police officer.  Philando Castile, thirty-two, was fatally shot during a traffic stop on July 6, 2016, by a police officer from St. Anthony, Minnesota. Stephon Clark, twenty-two, was shot and killed in the back yard of his grandmother's house on March 18, 2018, by two officers of the Sacramento Police Department.[2]

8.     The list of Black men, women, and children who have lost their lives at the hands of law enforcement goes on and on.

9.     The list of police officers who took the lives of Black men, women, and children, and suffered either little or no punishment in return, also, appallingly, goes on and on.  The vast majority of the police officers responsible for these unjustified, brutal deaths, have escaped punishment or any real consequences for their actions.  The families of many of those killed have yet to see justice for the loved ones they have lost.

---

[2] *Kadir Nelson's "Say Their Names*, The New Yorker, June 14, 2020, https://www.newyorker.com/culture/cover-story/cover-story-2020-06-22.

10.     Mr. Floyd's death, captured on video and seen by millions around the world, sparked many to take to the streets and to demand change, justice, and a collective determination that Black lives do matter.  Notwithstanding the ongoing threat posed by the global pandemic of COVID-19, groups of demonstrators throughout the United States and the world, including in Denver, Colorado, gathered to protest the brutality and systemic injustices perpetrated by law enforcement officers against Black people and people of color.

11.     Law enforcement officers, including the Denver Police Department ("DPD"), Denver Sheriff's Department, the Aurora Police Department ("APD"), those from other jurisdictions who assisted the Denver and Aurora police, as well as the Colorado State Patrol ("CSP") (collectively, "Officers in Denver"), responded repeatedly with an overwhelming and unconstitutional use of force.  This excessive use of force injured many protesters and discouraged others from exercising their constitutional rights, suppressed the protesters' speech, and infringed on the rights of legal observers, journalists, and medical personnel attempting to perform their duties at protest sites.

12.     DPD invited and/or allowed neighboring jurisdictions, including Aurora, to send their law enforcement officers to Denver to participate in and assist the DPD in responding to protesters' speech and activities.  DPD expressly authorized the neighboring jurisdictions to follow their own policies, practices, and/or customs regarding the use of less lethal force during the protests.  DPD also failed to conduct any joint training exercises with neighboring jurisdictions. As such, t Denver is responsible for the actions of the law enforcement officers from other jurisdictions who participated in the DPD's actions, including APD.

13.     Specifically, every day from Thursday, May 28, 2020 through at least Tuesday, June 2, 2020, Officers in Denver used methods of "less-lethal" force to discourage and suppress peaceful protest in public spaces throughout the City of Denver.  These methods of "less-lethal" force included the use of tear gas and chemical irritants, kinetic impact projectiles of various kinds, grenades, pepper spray, and weapons intended to stun with light and sound.  The use of these "less-lethal" methods constituted excessive force.

14.     The purpose and effect of this excessive force by Officers in Denver has restricted, frustrated, and deterred protesters from exercising their rights under the First Amendment to peacefully assemble, petition for redress of grievances, and exercise freedom of speech.  It has also infringed on protesters' rights under the Fourth and/or Fourteenth Amendments to be free from unreasonable seizures and excessive use of force.

15.     As a result of the excessive force perpetrated by Officers in Denver, Plaintiffs have suffered a variety of physical injuries, including but not limited to: skull, jaw, and disc fractures; a brain bleed; bruising on the back, limbs, and face; burning in and on the eyes, throat, and face; and lost vision.  Plaintiffs have also suffered disorientation; sleeplessness; and extended and continuing periods of fearfulness and anxiety.

16.     Plaintiffs have been—and still want to be—part of the movement to protect Black lives.  They want to participate in demonstrations against police brutality in the City without fear that law enforcement agents working on behalf of the City will endanger their physical safety and freedom of expression with the unjustified and indiscriminate use of "less-lethal" weapons.  Plaintiffs bring this action to seek accountability, to vindicate their constitutional rights, and to restrain local law enforcement from continuing to respond to peaceful protest with unconstitutional

and indiscriminate force.  In addition to injunctive and declaratory relief, Plaintiffs also seek damages for the physical and emotional injuries they have suffered because of the policies and/or customs of the Cities of Denver and Aurora and at the hands of law enforcement officers that attacked the demonstrators.

## PARTIES

17.     Plaintiff Elisabeth Epps is a resident of Colorado who participated peacefully in demonstrations in Denver on Thursday, May 28; Friday, May 29; Saturday, May 30; Monday, June 1; and Tuesday, June 2, 2020.

18.     Plaintiff Ashlee Wedgeworth is a resident of Colorado who participated peacefully in demonstrations in Denver from Thursday, May 28 through Wednesday, June 3, 2020.

19.     Plaintiff Amanda Blasingame was previously a resident of Colorado, and is now a resident of California who participated peacefully in demonstration in Denver on Thursday, May 28, and Saturday, May 30, 2020.

20.     Plaintiff Maya Rothlein was previously a resident of Colorado, and is now a resident of California who participated peacefully in demonstrations in Denver on Thursday, May 28, and Saturday, May 30, 2020.

21.     Plaintiff Zach Packard is a resident of Colorado who was participated peacefully in demonstrations in Denver on Saturday, May 30, and Sunday, May 31, 2020.

22.     Plaintiff Hollis Lyman is a resident of Colorado who participated peacefully in demonstrations in Denver from Thursday, May 28 through Wednesday, June 3, 2020.

23.     Plaintiff Stanford Smith is a resident of Colorado who participated peacefully in the demonstration in Denver on Saturday, May 30, 2020.

24.    All Plaintiffs intend to continue participating peacefully in future demonstrations that protest racism and police violence.

25.    Defendant City and County of Denver is a home-rule municipality incorporated in the State of Colorado.

26.    Defendant City of Aurora is a home-rule municipality incorporated in the State of Colorado.

27.    Defendant Sergeant Patricio Serrant is or was at all relevant times a supervisory employee of APD and acting within the scope of his employment and under color of law. Defendant Serrant is sued in his individual capacity.

28.    Defendant Sergeant Matthew Brukbacher is or was at all relevant times a supervisory employee of APD and acting within the scope of his employment and under color of law.  Defendant Brukbacher is sued in his individual capacity.

29.    Defendant Officer David McNamee is or was at all relevant times an employee of the APD and acting within the scope of his employment and under color of law. Defendant McNamee is sued in his individual capacity.

30.    Defendant Officer Jonathan Christian is or was at all relevant times an employee of the DPD and acting within the scope of his employment and under color of law. Defendant Christian is sued in his individual capacity.

31.    Defendant Keith Valentine was at all relevant times an employee of the DPD and acting within the scope of his employment and under color of law. Defendant Valentine is sued in his individual capacity.

32.     Defendants John and Jane Does 1–100 are officers of the DPD, APD, Denver Sheriff's Department, or officers of other jurisdictions who were acting with the tacit or express authorization of the DPD, who gave orders for and/or participated in the attacks on peaceful protesters, including on Plaintiffs, in Denver beginning on Thursday, May 28, 2020.  They are sued in their individual capacities.

33.     Defendants John and Jane Boes 1–50 are officers of the Colorado State Patrol (CSP) who gave orders for and/or participated in the attacks on peaceful protesters, including on Plaintiffs, in Denver beginning on Thursday, May 28, 2020.  They are sued in their individual capacities.

34.     At all times relevant to this Complaint, all Defendants were acting under color of state law.

## JURISDICTION AND VENUE

35.     The Court has subject matter jurisdiction over this case under 28 U.S.C. § 1331 because this action presents federal questions and seeks to redress the deprivation of rights under the U.S. Constitution.

36.     Venue is proper in this District under 28 U.S.C. 1391(e)(1) because the events giving rise to the claims took place in the District of Colorado.

## FACTUAL BACKGROUND

37.     Beginning on Thursday, May 28, 2020, demonstrators gathered at the Colorado State Capitol building to protest police brutality against Black people in the United States.  The protests were a response specifically to the recent murders of George Floyd, a Black man who was

killed by police officers in Minnesota on May 25, 2020, and of Breonna Taylor, a Black woman who was killed by police officers in Kentucky on March 13, 2020.

38.     The protests continued day after day.  Though protesters often assembled at or near the Capitol building, protesters also marched down major city streets and gathered in other parts of the city.  Throughout the course of the protests, Denver and Aurora employed increasingly violent law enforcement tactics to corral, intimidate, and silence protesters.  Law enforcement dressed in riot gear, carried riot shields, released tear gas, unleashed flash bombs and grenades, and shot rubber, foam, and pepper bullets directly at protestors.  Officers used these tactics on protesters who were demonstrating peacefully, without first issuing warnings or giving them adequate time to disperse according to their illegal orders.  In doing so, officers repeatedly violated not only the Constitution but also the official Operations Manual of the DPD.[3]

### Weapons Used

39.     Beginning on Thursday, May 28, 2020, Officers in Denver used at least the following on peaceful protestors:  tear gas and smoke cannisters; kinetic impact projectiles (KIPs) including rubber bullets, foam bullets, and pepper balls; grenades including flash bangs and rubber-pellet grenades (and some that also released tear gas and pepper spray); and pepper spray.[4] APD officers used "less lethal shotguns" including so-called "sock rounds" or "bean bag rounds."

---

[3] Operations Manual, Denver Police Department,
https://www.denvergov.org/content/dam/denvergov/Portals/720
/documents/OperationsManual/OMSBook/OM_Book.pdf.
[4] Conor McCormick-Cavanagh, *All the "Less-Lethal" Munitions Used by Law Enforcement at Protests*,
Westword, June 11, 2020, https://www.westword.com/news/denver-protests-the-list-of-less-lethal-
munitions-used-by-law-enforcement-11724452.

40.     One person photographed and posted online the below collection of weapons that were used at the protests.[5]



41.     First, Officers in Denver used tear gas.  Tear gas is an umbrella term for aerosolized chemical agents.[6]  The two most common types of tear gas are CS and OC.[7]  CS gas (o-

---

[5] "A collection of flash bang hand grenades, 40mm foam rounds, rubber bullets tear gas canisters and pepper balls all fired at the crowd last night 5/30," https://www.reddit.com/r/DenverProtests/comments/gu6zlm/a_collection_of_flash_bang_hand_grenades_40mm/.
[6] Operations Manual, Denver Police Department, https://www.denvergov.org/content/dam/denvergov/Portals/720 /documents/OperationsManual/OMSBook/OM_Book.pdf; Will Stone & Carrie Feibel, *From 'Flash Bangs' To 'Rubber' Bullets: The Very Real Risks of 'Riot Control Agents'*, NPR, June 6, 2020, https://www.npr.org/sections/health-shots/2020/06/06/871423767/from-flash-bangs-to-rubber-bullets-the-very-real-risks-of-riot-control-agents.
[7] Will Stone & Carrie Feibel, *From 'Flash Bangs' To 'Rubber' Bullets: The Very Real Risks of 'Riot Control Agents'*, NPR, June 6, 2020, https://www.npr.org/sections/health-shots/2020/06/06/871423767/from-flash-bangs-to-rubber-bullets-the-very-real-risks-of-riot-control-agents.

chlorobenzylidene malononitrile) is a chlorinated, organic chemical and OC is Oleoresin

Capsicum, which is derived from chiles, and is the active ingredient in pepper spray.[8]

    42.    Tear gas can be deployed in a grenade or cannister that produces a cloud of

chemicals.[9]  It is indiscriminate in nature.[10]  Photos of OC and CS tear gas cannisters and grenades

used during the protests, and an area filled with tear gas in Denver, are below.[11]

  

 

A tear gas canister left after Denver Police officers filed the entire block with the gas to disperse protesters. May 29, 2020. (Kevin J. Beaty/Denverite)

A woman holding a sign outside of Denver Police District Six headquarters on Washington Street disappears into a cloud of tear gas. May 30, 2020. (Kevin J. Beaty/Denverite)

---

[8] *Id.*

[9] Chemical Irritants, Physicians for Human Rights, https://phr.org/wp-content/uploads/2020/06/PHR_INCLO_Fact_Sheets_Chemical_Irritants.pdf.

[10] *Id.*

[11] Francie Swidler & Jim Hill, *What 4 Days Of Protest Over George Floyd's Death Looked Like in Denver*, CPR News, June 1, 2020, https://www.cpr.org/2020/06/01/photos-denver-protests-george-floyd-death/.

43.     Tear gas can cause severe coughing, crying, mucus production, and can make it difficult to breathe.[12]  It can also cause vision to become blurry, and eyes to tear up, become inflamed, and feel like they are burning.[13]  It can cause skin to turn red, become blistery, develop a rash or chemical burn.[14]  It also causes disorientation.[15]

44.     Tear gas can also cause respiratory arrest, vomiting and allergic reactions, and it can permanently damage the eyes, cause asthma symptoms, and cause traumatic brain injury.[16]  It can also have adverse effects on pregnant people and fetuses.[17]

45.     Tear gas chemicals are banned in warfare.[18]

46.     During the global COVID-19 pandemic, tear gas can cause people to cough and spread infectious droplets, putting people at higher risk of symptomatic or severe COVID-19.[19]

---

[12] Will Stone & Carrie Feibel, *From 'Flash Bangs' To 'Rubber' Bullets: The Very Real Risks of 'Riot Control Agents'*, NPR, June 6, 2020, https://www.npr.org/sections/health-shots/2020/06/06/871423767/from-flash-bangs-to-rubber-bullets-the-very-real-risks-of-riot-control-agents.
[13] *Id.*
[14] *Id.*
[15] Chemical Irritants, Physicians for Human Rights, https://phr.org/wp-content/uploads/2020/06/PHR_INCLO_Fact_Sheets_Chemical_Irritants.pdf.
[16] Will Stone & Carrie Feibel, *From 'Flash Bangs' To 'Rubber' Bullets: The Very Real Risks of 'Riot Control Agents'*, NPR, June 6, 2020, https://www.npr.org/sections/health-shots/2020/06/06/871423767/from-flash-bangs-to-rubber-bullets-the-very-real-risks-of-riot-control-agents.
[17] Chemical Irritants, Physicians for Human Rights, https://phr.org/wp-content/uploads/2020/06/PHR_INCLO_Fact_Sheets_Chemical_Irritants.pdf.
[18] Will Stone & Carrie Feibel, *From 'Flash Bangs' To 'Rubber' Bullets: The Very Real Risks of 'Riot Control Agents'*, NPR, June 6, 2020, https://www.npr.org/sections/health-shots/2020/06/06/871423767/from-flash-bangs-to-rubber-bullets-the-very-real-risks-of-riot-control-agents.
[19] *Id.*

47.     Like tear gas, smoke cannisters contain slow burning and high volume amounts of smoke and discharge grey-white smoke, making it difficult to see and breathe.[20]  Here is a picture of a smoke cannister that a protestor in Denver collected on Friday night, May 29, 2020:



48.     Next, officers shot kinetic impact projectiles.  Photos of officers shooting projectiles out of  "less-lethal" weapons are below.[21]



Denver police fire projectiles across Colfax Avenue into a crowd on the west lawn of the state Capitol. Denver protesters angry about the death of African American George Floyd at the hands of a white Minneapolis police officer took the streets for a second day Friday, May 29, 2020 (Hart Van Denburg/CPR News)



A state trooper aims a weapon at protesters from a Capitol balcony. May 29, 2020. (Kevin J. Beaty/Denverite)

---

[20] Maximum Smoke HC Military-Style Canister, Defense Technology™, https://www.defense-technology.com/products/chemical-agent-devices/chemical-grenades/maximum-smoke-hc-military-style-canister-1011576.html#start=7.

[21] Francie Swidler & Jim Hill, *What 4 Days Of Protest Over George Floyd's Death Looked Like in Denver*, CPR News, June 1, 2020, https://www.cpr.org/2020/06/01/photos-denver-protests-george-floyd-death/.



A protester kneels and puts his hands in the air as Denver police officers start firing pepper ball into a crowd of protesters gathered near Colfax Ave and Broadway on the third day of George Floyd protests in Denver May 30, 2020. Protesters are outraged over the death of George Floyd, a 46-year-old black man who was killed by a Minnesota police officer who pinned him to the ground with his knee on his neck.

49.     Kinetic impact projectiles have a larger surface area than other ammunition, and thus they take unpredictable flight paths and reduced accuracy is inevitable.[22]

50.     It is extremely common for kinetic impact projectiles to cause contusions, abrasions, and hematomas.[23]  Additionally, blunt impact may cause internal injuries.[24]

51.     Fatalities may occur when impact is at the head, neck, or precordium (the region of the chest immediately in front of the heart).[25]

52.     Officers in Denver injured protestors with inappropriate shot placement.

53.     A Lakewood man was struck with a projectile Saturday, May 30, 2020, during the protest and his eye has to be surgically removed.[26]

---

[22] Rohini Haar et al., *Death, injury and disability from kinetic impact projectiles in crowd control settings: a systematic review*, 2017 BMJ Open 2, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5736036/pdf/bmjopen-2017-018154.pdf.; Kinetic Impact Projectiles, Physicians for Human Rights, https://phr.org/wp-content/uploads/2020/06/PHR_INCLO_Fact_Sheet_Kinetic_Impact_Projectiles.pdf.
[23] W. Bozeman & J. Winslow, *Medical Aspects of Less Lethal Weapons*, The Internet Journal of Rescue and Disaster Medicine, https://print.ispub.com/api/0/ispub-article/7142.
[24] *Id.*
[25] *Id.*
[26] Amber Fisher, *Denver Protests Day 7: Marches, Sit-Ins, Injured Rally-Goers*, Patch, June 3, 2020, https://patch.com/colorado/denver/denver-protests-day-7-marches-sit-ins-injured-rally-goers.

54.     In Denver, a 21-year-old delivery driver who was not protesting, but walking from a friend's apartment to his car, was hit in the eye with a projectile and blinded in one eye.[27] Additionally, a 22-year old woman was shot in the face with a foam projectile on Friday afternoon, May 29, 2020, and was treated for a large laceration on the scene.[28]  A man was also shot in his torso with a projectile at a 15-foot range on Saturday, May 30, 2020 in Denver.[29]  Hyoung Chang, a staff photographer for the Denver Post was hit in the chest with projectiles on Thursday, May 28, 2020 during protests at the state Capitol.[30]

55.     According to a systematic review of available literature, three percent of those injured by kinetic impact projectiles died from their injuries.[31]  Fifteen percent of 1,984 people studied were permanently injured by them.[32]

56.     DPD uses 40 mm launchers to shoot projectiles.  40 mm launchers are firearms that shoot "40 mm specialty impact munitions" at a speed of 90 to 100 miles per hour.[33]

---

[27] Elise Schmelzer, *Denver protest bystander blind in one eye after being hit by police with "less lethal" projectile*, Denver Post, June 9, 2020, https://www.denverpost.com/2020/06/09/denver-protest-bystander-blinded/.

[28] Lori Jane Gliha, *Police projectile fractures Denver protester's face; she says it was unprovoked*, KDVR, June 3, 2020, https://kdvr.com/news/local/police-projectile-fractures-denver-protesters-face-she-says-it-was-unprovoked.

[29] Danielle Chavira, *Colorado Man Describes Injury From Police Confrontation*, CBS 4 Denver, June 2, 2020, https://denver.cbslocal.com/2020/06/02/colorado-man-injury-police-confrontation/?utm_campaign=true_anthem&utm_medium=facebook&utm_source=social.

[30] Marc Tracy & Rachel Abrams, *Police Target Journalists as Trump Blames 'Lamestream Media' for Protests*, N.Y. Times, June 1, 2020, https://www.nytimes.com/2020/06/01/business/media/reporters-protests-george-floyd.html.

[31] Rohini Haar et al., *Death, injury and disability from kinetic impact projectiles in crowd control settings: a systematic review*, 2017 BMJ Open 2, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5736036/pdf/bmjopen-2017-018154.pdf.

[32] *Id.*

[33] Operations Manual, Denver Police Department, https://www.denvergov.org/content/dam/denvergov/Portals/720/documents/OperationsManual/OMSBook/OM_Book.pdf; https://www.youtube.com/watch?v=ZUx8CkKOjH0.

57.     Officers in Denver used 40 mm launchers to launch foam bullets, sometimes referred to as rubber bullets, at protestors, which are solid, spherical, cylindrical projectiles typically used to incapacitate a person and are known to leave bruising and welts. [34]   They also shot projectiles containing Oleoresin Capsicum (OC) powder and flash bangs from 40 mm launchers.

  

58.     Smaller rubber bullets were also shot by Officers in Denver at the protests.



59.     Additionally, pepper balls, including those that DPD officers shot during the protests, came from air-powered launch devices that deploy plastic sphere projectiles filled with

---

[34] https://www.youtube.com/watch?v=ZUx8CkKOjH0; https://phr.org/wp-content/uploads/2020/06/PHR_INCLO_Fact_Sheet_Kinetic_Impact_Projectiles.pdf.

powdered Oleoresin Capsicum (OC).[35]  The plastic spheres explode powder onto the person who

gets hit, causing the person to struggle to breathe and be covered in the powder.  The images below

show both the PepperBall projectiles and the devices used to deploy them.[36]

 



      60.      Pepper balls have an immediate and incapacitating effect that creates a burning

sensation to any exposed skin.[37]

---

[35] Operations Manual, Denver Police Department,
https://www.denvergov.org/content/dam/denvergov/Portals/720/documents/OperationsManual/OMSBook
/OM_Book.pdf.
[36] https://www.youtube.com/watch?v=ZUx8CkKOjH0.
[37] Florida Gulf Coast University, Weapons & Equipment Research Institute, *Less Lethal Weapon
Effectiveness, Use of Force, and Suspect & Officer Injuries: A Five-Year Analysis* (2008).

61.     In addition to the burning effect of the OC contained in the pepper bullets, the bullets themselves can cause serious injury—even death—because of the high velocity at which they are shot.  The launcher can shoot six to twelve pepper bullets per second at speeds up to 350 feet per second or more than 238 miles per hour.[38]

62.     The Boston Police Department suspended use of pepper balls in 2004 after a college student was killed when the projectile struck her in the eye.[39]

63.     University of California, Davis police shot a pepper ball at an unarmed student while trying to break up a block party and permanently damaged his eye in 2004.[40]

64.     Denver Police themselves have been called on and conducted an internal investigation on whether to end the use of pepper balls after they were used in response to Occupy demonstrations on October 29, 2011.

65.     The photograph below, supplied by Plaintiff Amanda Blasingame, shows the pepper ball shells Ms. Blasingame recovered from outside her apartment complex:



---

[38] 2019 Product Catalog, PepperBall, https://www.pepperball.com/wp-content/uploads/2019/01/PepperBall-2019-product-catalog.pdf.

[39] Jonathan Finer, *Boston Police Suspend Use of Pepper-Ball Guns*, Wash. Post, Oct. 24, 2004, https://www.washingtonpost.com/archive/politics/2004/10/24/boston-police-suspend-use-of-pepper-ball-guns/dd773f5d-1651-4c2a-8a82-b967d77958b5.

[40] Maura Dolan, *Court rules police may be liable for pepper ball injuries*, L.A. Times, July 12, 2012, https://www.latimes.com/local/la-xpm-2012-jul-12-la-me-uc-davis-pepper-20120712-story.html.

66.     The pictures below show a parking lot near the Capitol after many pepper bullets were shot, and some pepper ball bullets found at the protest sites.

 

67.     Officers in Denver also shot grenades at protestors, including flash bang grenades and rubber-pellet grenades, some of which also released tear gas and pepper spray.

68.     Flash bangs are explosives that make a loud noise and/or flash of light, and are made to temporarily blind and/or deafen people and to disorient people.[41]  In rare circumstances, they can blow off fingers or hands, spray tiny sharp fragments, or cause fires.[42]

---

[41] Will Stone & Carrie Feibel, *From 'Flash Bangs' To 'Rubber' Bullets: The Very Real Risks of 'Riot Control Agents'*, NPR, June 6, 2020, https://www.npr.org/sections/health-shots/2020/06/06/871423767/from-flash-bangs-to-rubber-bullets-the-very-real-risks-of-riot-control-agents; "Flash Bang" Distraction Grenade, NonLethal Technologies, http://www.nonlethaltechnologies.com/DD-FB.htm.

[42] Will Stone & Carrie Feibel, *From 'Flash Bangs' To 'Rubber' Bullets: The Very Real Risks of 'Riot Control Agents'*, NPR, June 6, 2020, https://www.npr.org/sections/health-shots/2020/06/06/871423767/from-flash-bangs-to-rubber-bullets-the-very-real-risks-of-riot-control-agents.




69.     Rubber pellet grenades are grenades that detonate, cause a loud sound and bright flash of light, and cause small rubber pellets to explode out of the grenade.[43]

70.     Some of the rubber pellet grenades used against protestors not only detonated rubber pellets, but also detonated tear gas and/or pepper spray.[44]




---

[43] Stinger 32-Caliber Rubber Balls w/ Safety Clip, Defense Technology, https://www.defense-technology.com/products/tactical-devices/stinger-32-caliber-rubber-balls-w-safety-clip-1152928.html#q=stinger&start=16&sz=12.

[44] Conor McCormick-Cavanagh, *All the "Less-Lethal" Munitions Used by Law Enforcement at Protests*, Westword, June 11, 2020, https://www.westword.com/news/denver-protests-the-list-of-less-lethal-munitions-used-by-law-enforcement-11724452.

71.     Officers in Denver also used pepper spray, spraying it directly at protestors (in addition to releasing pepper spray in projectiles, grenades, and tear gas).  The pictures below show pepper foam found at the protest site and an officer shooting pepper spray at a person.[45]

 

72.     The active ingredient in pepper spray is Oleoresin Capsicum, which is derived from chile peppers.[46]

73.     When aerosolized streams of irritants are sprayed directly, higher doses of the chemical agent directly strike the person.[47]

---

[45] Jesse Paul, *Federal judge orders police not to use chemical weapons, projectiles against peaceful Denver protesters*, Colo. Sun, June 5, 2020, https://coloradosun.com/2020/06/05/denver-george-floyd-protests-federal-order/.

[46] Will Stone & Carrie Feibel, *From 'Flash Bangs' To 'Rubber' Bullets: The Very Real Risks of 'Riot Control Agents'*, NPR, June 6, 2020, https://www.npr.org/sections/health-shots/2020/06/06/871423767/from-flash-bangs-to-rubber-bullets-the-very-real-risks-of-riot-control-agents.

[47] Chemical Irritants, Physicians for Human Rights, https://phr.org/wp-content/uploads/2020/06/PHR_INCLO_Fact_Sheets_Chemical_Irritants.pdf.

74. Pepper spray can cause vision to become blurry, and eyes to tear up, become inflamed, and feel like they are burning.[48] It can cause skin to turn red, become blistery, develop a rash or chemical burn.[49]

75. Since protests began on May 28, 2020, at least 60 protesters nationwide have sustained serious injuries from the use of "less-lethal" weapons by law enforcement, including "a broken jaw, traumatic brain injuries, and blindness."[50]

**Timeline of Law Enforcement Response to Protests in Denver**

76. Beginning at about 5 PM on Thursday, May 28, 2020, protesters gathered on the steps of the state Capitol building in Denver, Colorado. Protesters included members of BLM 5280 and other advocacy organizations. To protest police treatment of Black individuals, demonstrators carried signs, knelt, and chanted.

77. Shortly after the rally at the Capitol building started, law enforcement officers launched tear gas indiscriminately into the gathered crowd and then drove away in police vehicles. Officers did not issue the crowd a warning before launching the gas canisters. At least one canister hit a protester in the crowd.

78. Some protesters left the Capitol building area and began marching downtown and toward I-25, a major highway in the Denver area. As one group of peaceful protesters gathered near a pedestrian bridge by I-25, officers, without warning, again fired tear gas into the crowd, and

---

[48] Will Stone & Carrie Feibel, *From 'Flash Bangs' To 'Rubber' Bullets: The Very Real Risks of 'Riot Control Agents'*, NPR, June 6, 2020, https://www.npr.org/sections/health-shots/2020/06/06/871423767/from-flash-bangs-to-rubber-bullets-the-very-real-risks-of-riot-control-agents.
[49] *Id.*.
[50] Kaiser Health News, *Fractured skulls, lost eyes: Police often break own rules using "rubber bullets"*, Denver Post, June 23, 2020, https://www.denverpost.com/2020/06/23/george-floyd-protests-rubber-bullet-injuries/

at least one officer fired a 40 mm launcher into the crowd, hitting one protester in the eye with a foam bullet and causing his eye to bleed and for him to need emergency medical attention.

79.     At approximately the same time, as protests continued near the Capitol, an individual driving a vehicle attempted to hit protesters by turning the vehicle suddenly into the crowd.  In contrast to the violence they used to suppress protesters by the Capitol and throughout the City, on-duty officers who observed the car attempt to strike protesters did not respond to the assault.[51]

80.     For the next several hours, Officers in Denver shot both tear gas and projectiles at groups of largely peaceful protesters near the Capitol and in various parts of the City.  Officers aimed the tear gas and rubber and foam projectiles, as well as pepper balls, at crowds of protesters indiscriminately, even at times when the crowd was doing nothing more than standing and observing the officers.  Multiple protesters were hit with the projectiles, and many protesters suffered pain and burning in their eyes and faces from the tear gas and pepper balls that officers shot.

81.     Peaceful protesters gathered again on Friday, May 29, 2020.  Officers near the protest site at the Capitol were clothed in riot gear.  Protesters began chanting, "Why are you in riot gear, I don't see no riot here."  Without provocation or warning, officers fired rubber and foam bullets and pepper balls into the crowd of protesters.  Throughout the hours that followed, officers continued to engage in other violent and intimidating tactics.  They also used flash bang devices.  One officer sprayed pepper spray into an open car sunroof while the car was stopped next to the

---

[51] Associated Press, *Shots Fired During Denver's Protest over George's Floyd's Death*, KTLA 5, https://ktla.com/news/nationworld/shots-fired-during-denver-protest-over-george-floyds-death/.

Capitol with passengers inside.[52]  Other officers in police vehicles released tear gas and shot pepper balls at a group of protesters who were kneeling and chanting "Hands up! Don't Shoot!"

82.     Not all victims of these violent and intimidating tactics were protesters.  Multiple members of the press were hit by tear gas and pepper balls, suffering physical injury as well as damage to their recording equipment.[53]

83.     Starting in the early afternoon on Saturday, May 30, 2020, peaceful protests resumed in broad daylight.  In response and over the next several hours, Officers in Denver continued to intimidate protesters with chemical-irritant sprays and projectiles, and flash bangs. Some officers fired projectiles and sprayed pepper spray directly at protesters' faces.  Other officers fired at protesters from the back of moving police vehicles.  And again, as a group of protesters knelt on the ground chanting "Hands up! Don't Shoot!," officers began shooting pepper bullets, tear gas, and rubber bullets at the crowd.

84.     That night, Denver declared a city-wide curfew, which required residents—with the exception of essential personnel—to be off the streets by 8 PM.  The blanket city-wide curfew provided no exception for peaceful First Amendment activity.  Some protesters chose to remain out past curfew, in part to peacefully protest the curfew itself.  After 8 PM, officers began using grenades against protesters, in addition to the tear gas, rubber bullets, pepper bullets, and pepper spray already in use.  Officers also physically assaulted and verbally intimidated protesters by

---

[52] https://twitter.com/Dizzle14Double/status/1266615473816260609.
[53] https://twitter.com/AdiGTV/status/1266554320717099008; Colorado Freedom of Information Coalition, *CFOIC, journalism groups decry law enforcement targeting of reporters and photographers during George Floyd protests*, Colo. Independent, https://www.coloradoindependent.com/2020/06/01/denver-floyd-protests-law-enforcement-targeting-reporters-photographers/.

threatening to shoot them with pepper spray, even when they were on their own property.  They also shot multiple rounds of pepper bullets at people who were complying with the curfew order by remaining at their homes, on their own property.

85.     Officers even shot pepper balls at bystanders stopped in traffic.  One driver, out of concern for his pregnant girlfriend—his passenger—got out of his car and demanded that officers in riot gear stop shooting pepper balls at the car, explaining that his pregnant girlfriend was in the car.  Officers continued to shoot the car with the pepper balls, causing the pregnant passenger to suffer a fractured hand after attempting to cover her face.[54]

86.     Members of the press were again targets of the Officers in Denver.  One journalist with local station 9 News was hit with a projectile shot by a CSP officer after the journalist was identified to the officer as a member of the media.[55]   Another journalist, a photographer, was thrown by police to the ground immediately next to a live fire.[56]

87.     On Sunday, May 31, 2020, as protests continued, Officers in Denver continued their use of chemical irritants, flash-bang devices, and projectiles against protesters.  Officers shot protesters with projectiles at close ranges without warnings, knocking unconscious and severely injuring at least one protester, Plaintiff Zach Packard.

---

[54] Jeremy Jojola, *Man and pregnant fiancée sprayed by pepper balls want police held accountable*, 9 NEWS, https://www.9news.com/article/news/local/man-and-pregnant-fiancee-sprayed-by-pepper-balls-want-police-held-accountable/73-9fd11168-c1f3-4c65-967b-171c767583f1.
[55] https://twitter.com/jeremyjojola/status/1267536778577100800.
[56] https://twitter.com/tessrmalle/status/1266945413258653696.

88.     Officers in Denver also employed the "kettle" tactic to control the protesting crowd, by blocking the crowd on the east and west sides with SWAT trucks and/or police lines and firing tear gas into the trapped crowd with no warning.

89.     Officers in Denver continued to use these same tactics on Monday, June 1 and Tuesday, June 2.

90.     On Thursday June 4, four persons who participated in the Denver protests between May 28 and Monday, June 1, sued the City, alleging that officers' use of "less-lethal" weapons violated the First and Fourth Amendments.  On Friday, June 5, 2020, United States District Court Judge R. Brooke Jackson of the United States District Court for the District of Colorado issued a temporary restraining order restricting DPD and jurisdictions invited by DPD from using "less-lethal" projectiles and chemical agents on peaceful protestors.

**Defendants' Illegal Actions Caused Injuries to Plaintiffs**

<u>Plaintiff Elisabeth Epps</u>

91.     Elisabeth Epps is a resident of Colorado.

92.     From 2016 to 2020, Ms. Epps was involved in a committee that helped rewrite Denver's use of force policy. In the wake of the Michael Brown shooting and other police misconduct, the community demanded that the DPD create a committee to rewrite their use of force policy. Former Denver Police Chief Rob White invited Ms. Epps to join the committee.  Ms. Epps was on an editing subcommittee that at points met twice per week to edit the use of force policy, line by line.  They looked at draft policies from other cities and settlement agreements in lawsuits.  They discussed proportionality, authority, necessity, reasonableness, and the factors an officer needs to consider when using force, including the severity of the crime and availability of

cover for officers.  Given Ms. Epps' personal involvement in revising the use of force policy, she was disgusted and disheartened to witness the actions of the DPD in exercising indiscriminate, unconstitutional, and unreasonable force against peaceful protesters, herself included.

93.     On the evening of Thursday, May 28, 2020, Ms. Epps attended the protest to stand in solidarity with those demonstrating against police violence and to exercise her own First Amendment right to protest.  At about 9 PM, she was standing near the steps of the Colorado state Capitol building.  The crowd at that time was mostly seated on the Capitol steps talking amongst themselves.  Then, without any warning or order to disperse, officers deployed tear gas toward the crowd resulting in Ms. Epps experiencing extreme eye pain, which continued for approximately two weeks.

94.     Later that same night, while Ms. Epps remained near the Capitol building, other protesters who were not close to Ms. Epps returned empty cannisters of tear gas in the general direction of the officers.  Even though Ms. Epps was nowhere near these protesters, officers shot Ms. Epps at least twice with pepper bullets.  She was hit on her back and became disoriented.  Her partner was also shot with rubber bullets.

95.     The next night, on Friday, May 29, at around 9:04 PM, Ms. Epps was shot with a pepper ball by DPD Officer Jonathan Christian as she crossed 14th Ave by herself, filming the police and protest activity near the Capitol.  Officer Christian provided no warning to Ms. Epps before targeting and firing his pepperball gun at her.  There was no justification Officer Christian's conduct.

96.     Later that same night, at around 9:16 PM, officers again shot Ms. Epps and her partner with rubber bullets without warning or provocation, leaving marks on her back and legs.

Officers also shot projectiles directly at her cellphone which she had been using to record and broadcast police violence to her thousands of social media followers.   A projectile shattered her cellphone.   Shortly after police shot her phone out of her hand, they deployed tear gas into the group of protesters without any warning or justification. Ms. Epps was immediately unable to see, and breathing became almost impossible; she felt like she was choking every time she tried to take a deep breath.   Ms. Epps, who has been hospitalized numerous times because of asthma, was terrified and unable to see even to obtain her inhaler from her bag. Other protesters who had masks and were not suffering as acutely from the tear gas had to search Ms. Epps' bag to find her inhaler so she could recover.

97.     On Saturday, May 30, 2020, Ms. Epps again participated peacefully in protests in Denver.  That afternoon, Ms. Epps witnessed officers spray tear gas over a large area by the Capitol occupied by predominantly peaceful protesters, including children.   At about 7:17 PM at the intersection of Lincoln and Colfax, a solitary protester tossed a water bottle toward several police officers standing in the intersection, including DPD Officer Keith Valentine.  The water bottle did not hit the police officers. In retaliation, Officer Valentine fired several rounds from his pepperball gun in the direction of the protester, who ducked for cover.  Officer Valentine was not aiming at the ground near the protestor who threw the water bottle, but was instead aiming high and in the direction of the protester and several individuals standing near the protester. At this point in time, Plaintiff Epps was standing about 10-15 feet behind the protester and directly in Officer Valentine's line of fire. Plaintiff Epps was struck in the face with what appears to have been a pepperball.   On information and belief, one or more of the rounds from Officer Valentine's pepperball gun struck Plaintiff Epps in the face.  Officer Valentine gave no warning to the protester

who threw the water bottle, let alone to anyone else standing in the vicinity including Plaintiff Epps, that he was going to deploy several rounds from his pepperball gun.  At the time of the incident, neither Officer Valentine nor any of the officers near officer Valentine were facing any imminent risk of serious injury or death from anyone, including Plaintiff Epps, when he fired several rounds of his pepperball gun in her direction.  Officer Valentine did not take reasonable precautions to ensure that his use of force was reasonable or proportional under the circumstances, and that his use of force would only impact the individual he was targeting.  The pepperball broke the plastic medical-grade respirator mask she was wearing and wounded her face.  At about 7:50 PM, ten minutes before the 8 PM curfew that the City had instituted for the first time that day, Ms. Epps tried to leave the Capitol area to head to her car, but officers had barricaded the exits, trapping her.  Approximately five minutes later, while Ms. Epps was still trapped and before the curfew began, officers sprayed tear gas into the crowd, again without warning or an order to disperse.

98.     The photos below show the injuries Ms. Epps sustained at the protests:



99.     Ms. Epps still had marks on her back and legs three weeks after the protests.

100.     Ms. Epps intends to continue protesting peacefully at future protests and seeks to do so without the threat of retaliatory police actions such as tear gassing and the use of "less-lethal" weapons.

<u>Plaintiff Ashlee Wedgeworth</u>

101.     Ashlee Wedgeworth is a resident of Colorado.

102.     Ms. Wedgeworth participated peacefully in protests in Denver every day from May 28, 2020 through June 4, 2020, and witnessed Officers in Denver exerting excessive force on several days she attended.  She attended protests to stand in solidarity with those demonstrating against police violence and to exercise her own First Amendment rights.

103.     On the evening of Friday, May 29, 2020, Ms. Wedgeworth and a friend arrived near the Colorado state Capitol building to participate in the protest.  Ms. Wedgeworth observed some individuals, who were standing far away from Ms. Wedgeworth, throw something in the direction of officers.  In response, officers began shooting projectiles at those individuals, but then also turned and shot at Ms. Wedgeworth and her friend with pepper balls.  The pepper balls hit Ms. Wedgeworth's friend, and the resulting dust rendered Ms. Wedgeworth unable to breathe.  Ms. Wedgeworth and her friend were not standing anywhere near the individuals who had thrown the objects.  Officers did not offer a warning prior to shooting.

104.     On Sunday, May 31, 2020, Ms. Wedgeworth experienced tear gas at night, when she was marching with a crowd of protesters on the streets surrounding the Capitol.  The protesters were chanting and marching.  Some protesters at the front of the march were laying down in the street, like George Floyd, but none were throwing items or being violent.  Officers did not issue a

warning before releasing the tear gas.  Due to the tear gas, Ms. Wedgeworth's face, eyes, nose, and mouth felt like they were burning; she could not see; and she was coughing a lot.

105.    On the evening of Monday, June 1, 2020, when Ms. Wedgeworth was protesting at the Capitol, officers formed a line in front of the Capitol and began pushing crowds into the street. Ms. Wedgeworth felt as though officers were trying to corral all of the protesters into one area. Then, once the protesters were corralled, officers released tear gas without warning.  Ms. Wedgeworth again could not see, she was coughing, and her face felt like it was burning.

106.    Ms. Wedgeworth attended the protests again on Tuesday, June 2, 2020.  That night, officers again released tear gas into the crowd of protesters.  Ms. Wedgeworth also witnessed officers shoot projectiles that appeared to be pepper balls at protesters.

107.    As a result of the tear gas and pepper ball dust Ms. Wedgeworth inhaled on May 29, May 31, June 1, and June 2, 2020, Ms. Wedgeworth suffered pain and difficulty breathing, as well as burning in her nose, eyes, and on her face for a few hours after being gassed.  She remains fearful of being tear gassed or being hit by a projectile if she exercises her right to protest in the future.  Ms. Wedgeworth intends to continue protesting peacefully at future protests and seeks to do so without the threat of retaliatory police actions such as tear gassing and the use of "less-lethal" weapons.

### Plaintiff Amanda Blasingame and Plaintiff Maya Rothlein

108.    Plaintiff Amanda Blasingame and Plaintiff Maya Rothlein were residents of Colorado during the George Floyd Protests, but have since moved and are now residents of California.

109.     At about 8 PM on Thursday, May 28, 2020, Ms. Blasingame and Ms. Rothlein were gathered in a crowd of protesters outside of a police station near the Capitol. They were there to exercise their First Amendment right to protest and to stand in solidarity with those demonstrating against police violence. Though they witnessed some protesters throw things at the building, they did not observe any protesters throw anything at officers. As police marched from the station parking lot into the street, they released pepper balls, tear gas, and shot rubber bullets into the crowd. Officers did not issue any warnings prior to using these tactics.

110.     Later that night, at about 9:10 PM, a large group was chanting in the street at the intersection of 14th Ave and Sherman Street. Shortly after they witnessed one individual throw a single plastic water bottle toward the police standing in the intersection, the officers tear-gassed the entire crowd and continued using tear gas to move the group up the street.

111.     On Saturday, May 30, 2020 at about 5:30 PM, Ms. Blasingame was gathered in a large crowd outside of the Colorado State Capitol building. Ms. Blasingame, along with the rest of the crowd, was on her knees chanting "Hands up! Don't Shoot!" As soon as the crowd stood from a kneeling position, officers began shooting tear gas and pepper bullets at the crowd without giving any warning.

112.     Ms. Blasingame returned home to comply with the 8 PM curfew. She and Ms. Rothlein gathered in their front yard with some neighbors. When a police car followed by a line of SWAT vehicles drove down their street, one neighbor yelled at the police car. The police car and the SWAT vehicles stopped and the officers exited their vehicles. While the officers in SWAT gear stood in the street holding weapons, one officer came up to Ms. Blasingame and Ms. Rothlein's fence and began threatening to pepper spray them while they sat on the steps of their

own home.  While holding the pepper spray up and pointing it at them, the officer stared directly at Ms. Rothlein, who was the only Black person in the front yard.  Only after Ms. Blasingame reminded the officer of their First Amendment rights did the officer leave.

113.    Later that night, a SWAT vehicle drove down the street in front of Ms. Blasingame and Ms. Rothlein's home.   Someone again shouted at the SWAT vehicle to leave their neighborhood.  From the SWAT vehicle, officers shot pepper bullets directly at Ms. Blasingame and Ms. Rothlein where they were sitting on the front steps of their apartment.  Pepper bullets hit the front door and even entered the apartment building.   Ms. Blasingame and Ms. Rothlein retreated to the mail room of their apartment complex out of mortal fear only to find the mail room filled with what appeared to be a gas-like substance.  They could not enter the mail room for several days thereafter.  Another pepper bullet hit one of Ms. Blasingame and Ms. Rothlein's neighbors, who was coughing and vomiting for over an hour after being hit.

114.    Since their experiences, Ms. Blasingame and Ms. Rothlein have felt anxious and nervous.  In particular, Ms. Rothlein felt targeted by the actions of the officers because she is Black and transgender, and she has become particularly sensitive to loud noises and sirens.  The tear gas and pepper bullets irritated both Ms. Blasingame and Ms. Rothlein's throats for several days.  They remain fearful of additional violent acts by the police, but they intend to continue to participate in demonstrations demanding meaningful change to protect Black lives if they can do so safely and without police abuse.

<u>Plaintiff Zach Packard</u>

115.    Zach Packard is a resident of Colorado.

34

116.    On Saturday, May 30, 2020, Mr. Packard gathered in the area of the state Capitol building with a large group of protesters to exercise his First Amendment right to protest and to stand in solidarity with those demonstrating against police violence.  At about 9 PM, Officers started pushing protesters out of the Capitol building area.  Officers began using tear gas and shooting projectiles indiscriminately at the crowd, including at women and children.  Mr. Packard did not observe any provocation or threatening behavior by the crowd, and he did not hear any warnings from the officers before they shot the projectiles.

117.    On Sunday, May 31, 2020 at about 9 PM, Mr. Packard was protesting at the south side of the intersection of Colfax Avenue and Washington Street.  At this time, a group of APD officers, including APD Sergeant Patricio Serrant and APD Officer David McNamee, were in an east-west line on Washington on the north side of Colfax and facing south into the intersection. They were armed with less-lethal weapons. Cannisters of tear gas or smoke were being deployed into the intersection.  Officer David McNamee was armed with a less-lethal shotgun loaded with so-called "sock-" or "bean bag-" rounds.  At approximately 9:12 p.m., APD Sergeant Patricio Serrant instructed the APD officers on the line, including Officer David McNamee, to target and hit any protesters that kicked one of the gas/smoke cannisters being deployed into the intersection.

118.    Moments later, while Mr. Packard was still across the street from the APD officers on the south side of the intersection, Mr. Packard attempted to kick one tear gas cannister away from the group of protesters near him.  He was almost immediately struck in the head with a projectile and knocked unconscious.  At this same moment in time, APD officer McNamee had fired multiple rounds from his shotgun.The following photographs from a bystander show the attack by the APD officers on Mr. Packard.  On information and belief Mr. Packard was struck in

the head by a sock round from Officer McNamee's shotgun or a different less lethal round fired by one of the APD officers on the line.

 

 

119.   Mr. Packard heard a message from a SWAT vehicle that "curfew was in effect," but Mr. Packard did not hear a warning from officers before being shot in the head.  On information and belief, none of the APD officers in the line provided any warnings to Mr. Packard before firing their less lethal munitions at him.  On information and belief, APD officers knew the sock rounds from a less-lethal shotgun may be lethal.  On information and belief, APD officers knew that

kicking a tear gas cannister did not pose a serious threat of injury or death to any APD officer on the scene.  On information and belief, neither Officer McNamee nor any other APD officer on the line took reasonable measures to mitigate the risk of serious bodily injury to Plaintiff Packard.  On information and belief, at the time of the George Floyd Protests, it was the policy, custom, and/or practice of APD to target protesters with sock rounds despite facing no threat of serious bodily injury.  Furthermore, APD officers were not properly trained in the use of such munitions. Minutes after Zach Packard was hit, APD Sergeant Matthew Brukbacher was asked by another APD officer on the line at Colfax and Washington, "if they touch our cannisters, bag 'em or no?"  Sergeant Brukbacher responded, "Oh fuck yeah, yeah without a doubt, they touch any of our gas, they get hit."   On information and belief, Sergeant Brukbacher was one of two less-lethal weapons instructors at APD at the time of the George Floyd Protests and was one of the sergeants, including Sergeant Serrant, leading APD's emergency response team.

120.    Bystanders carried Mr. Packard from the sidewalk over into a patch of grass.  When he returned to consciousness, a friend took him to the hospital.

121.    A CAT scan later revealed that Mr. Packard suffered a fractured skull and jaw, two fractured discs, and bleeding in his brain.  Mr. Packard remained at the hospital for about one week.  He has been prescribed anti-seizure medication, muscle relaxers, and oxycodone.  He currently must wear a neck brace and is in a significant amount of pain.



122.    Since his experience protesting, Mr. Packard has been trying to process what happened.  If he were confident in the future that law enforcement would not use force on protesters like they did in late May and early June 2020, he would be less fearful to exercise his right to protest.  Mr. Packard intends to continue protesting peacefully at future protests and seeks to do so without the threat of retaliatory police actions such as tear gassing and use of "less-lethal" weapons.

### Plaintiff Hollis Lyman

123.    Hollis Lyman is a resident of Colorado.

124.    On Thursday, May 28, 2020, at about 8:30 PM, Ms. Lyman arrived at the area of the State Capitol to exercise her First Amendment right to protest and to stand in solidarity with those demonstrating against police violence.  She joined a crowd of protestors by the Capitol, but was quickly pushed down a street near the Capitol by Officers.  Officers tear gassed the entire crowd and Ms. Lyman felt like the tear gas was everywhere around her.  Her eyes watered, and

she coughed and gagged several times.   Ms. Lyman did not hear officers issue a warning before releasing the tear gas.

125.    On Friday, May 29, 2020, protesters had gathered near the Capitol and were kneeling in front of police chanting "Hands up! Don't shoot!"  Ms. Lyman observed police cars drive through the group and release tear gas and pepper balls from the vehicles. Ms. Lyman's eyes began to burn, and she ran away from the group to rinse her eyes with milk.  Later, after returning to the protest, she used her sign as a shield to protect her from pepper balls.  One pepper ball pierced through the sign, hitting Ms. Lyman and bruising her arm.

126.    On Saturday, March 30, 2020, Ms. Lyman heard protest organizers encouraging peaceful protests.  At about 3:30 PM, Ms. Lyman observed officers shooting pepper balls at a man who was kneeling in front of the officers with his arms raised.  Later, officers shot more pepper balls as well as grenades at protesters.  One grenade hit Ms. Lyman's friend in the leg and made a deafeningly loud sound.  Ms. Lyman became disoriented from the sound.  Ms. Lyman and her friend had difficulty hearing for the rest of the night.  Ms. Lyman also observed officers pull a boy's goggles and mask off of his face before spraying him in the face with pepper spray.

127.    Because Ms. Lyman desired to protect the people of color who were attempting to pro-test, Ms. Lyman returned to the protest area on Saturday night, at times placing herself between the police and people of color who were protesting.  As Ms. Lyman and a friend were walking toward a group of protestors at the Capitol that night, Officers in Denver routed them through a particular street.  Ms. Lyman and her friend complied with the directions, but Officers shot Ms. Lyman in the back repeatedly with pepper balls anyway, as she tried to protect her friend.  She

struggled with gagging and nausea after inhaling gas, and after she returned home that night, Ms. Lyman threw up.

128.    Since her experiences protesting, Ms. Lyman has had difficulty sleeping and has remained anxious.  Though she felt fearful when protesting, she believed it was important for her to do so.  If she were confident in the future that law enforcement would not use force on protesters like they did in late May and early June 2020, she would be less fearful to exercise her right to protest.  Ms. Lyman intends to continue protesting peacefully at future protests and seeks to do so without the threat of retaliatory police actions such as tear gassing and the use of "less-lethal" weapons.

Plaintiff Stanford Smith

129.    Stanford Smith is a resident of Colorado.

130.    On Saturday, May 30, 2020, Mr. Smith arrived at the protests near the Capitol at about 4 PM.  He was there to stand in solidarity with those who were demonstrating against police violence and to exercise his own First Amendment right to protest.  When he arrived, he joined a large crowd of protesters chanting, "I can't breathe" and "Don't shoot!"  Most protesters had their hands in the air.  Mr. Stanford did not see anyone throw anything at officers.

131.    About five minutes after Mr. Smith arrived, officers dressed in riot gear standing near a Denver Police Department surveillance truck shot cannisters of tear gas into the crowd. Officers did not offer a warning before firing the tear gas.  Because of the effect of the tear gas, Mr. Smith left the immediate area.

132.    At about 7 PM, Mr. Smith was standing with a group of protesters near Civic Center Park.  Mr. Smith became fearful as officers formed a single file line and encircled the area, standing

shoulder to shoulder.  Some protesters threw near-empty plastic water bottles in the direction of the line of officers.  Out of concern that the situation would escalate and to protect the people residing in a nearby homeless encampment, Mr. Smith began telling protesters to stop throwing items at police.  He ushered protesters toward the sidewalk, to get them away from the line of officers, and he told officers that he only wanted to protest peacefully.  One Black officer thanked Mr. Smith for trying to keep the peace.

133.    As Mr. Smith was talking to protesters, one officer got out of his place in line, pushed his way between two other officers in the line, and sprayed Mr. Smith directly in his face with pepper spray.  The officer did not give any warning before spraying the pepper spray in his face.  On information and belief, the officer was an APD officer.

134.    Mr. Smith feared for his life: he could not see, and he felt as though his face was on fire.  He tried to run for safety, and protesters grabbed him by the arms and led him to the grass. They poured milk in his eyes and on his face.  This picture shows Mr. Smith immediately after getting pepper sprayed in the face:



2 of 41
Stanford Smith is helped after receiving pepper spray to the face during a protest after the killing of George Floyd Ð the Minneapolis man, who was killed by
an officer, while being detained Ð in downtown Denver on Saturday, May 30, 2020. Thousands gathered to protest as police enforced an 8 p.m. citywide
curfew. As officers advanced, protesters began throwing objects as officers returned non-lethal fire into the crowd.

135.    Mr. Smith felt severe pain.  His vision remained blurry, and he tripped on the curb on the way home.  A bystander called paramedics, who poured solution on Mr. Smith's face to help with the burning.  At first, Mr. Smith was fearful of the paramedics because he thought they were the police.  He collapsed on the floor when he finally got home and needed his roommate to pour more water on his face.  His face remained red for several days, and his skin eventually peeled.

136.    The pepper spraying Mr. Smith experienced on May 30, 2020 cut short his exercise of his First Amendment rights; because of the pepper spray, he was forced to abandon his protest that evening.  Since then, Mr. Smith has been fearful of attending protests in Denver.  Mr. Smith intends to continue protesting peacefully at future protests and seeks to do so without the threat of retaliatory police actions such as tear gassing and the use of "less-lethal" weapons.

## Denver's Policies, Practices, and/or Customs

137.    The violations of Plaintiffs' constitutional rights are a direct result of and caused by Denver's policy, practice, and/or custom of authorizing Officers in Denver to use "less-lethal" weapons to control and suppress protests.  These violations are also a direct result of Denver's utilization of the services of law enforcement officers from other jurisdictions, including Aurora, who were authorized to use "less-lethal" weapons to control and suppress protests.

138.    Denver policy makers have acted with deliberate indifference to the constitutional rights of protesters and would-be protesters by authorizing, both explicitly and implicitly, the use of "less-lethal" force against protesters who do not pose any safety threat; by failing to properly train, supervise, and discipline DPD officers and APD officers, respectively, regarding the appropriate use of force against protesters; and by failing to rectify the unconstitutional custom of

DPD officers and APD officers of using "less-lethal" force to control and suppress demonstrations. Denver has a custom and practice of violating their own written policies regarding the use of less "lethal-force" and crowd dispersal.

139.    DPD knew its officers were using extensive amounts of less-lethal force during the first few days of the protests.  DPD's use of less lethal force was so extensive and widespread that DPD ran out of less-lethal munitions almost immediately. DPD was also receiving many complaints about the inappropriate use of force during the first few days of the protests.  Yet DPD did nothing to curb the use of less-lethal force and was deliberately indifference to its officers' unconstitutional use of force, and instead made multiple special trips to acquire more munitions to deploy.

140.    Notwithstanding DPD's written policies regarding the use of force during the protests, DPD's actual policy and practice during the protests was to use less-lethal weapons without providing warning and in circumstances that could not be justified under DPD's written policies.  The inappropriate use of less-lethal force by DPD officers during the protests was so widespread that it was manifestly the actual policy and practice of DPD during the protests to use less lethal force without warning and absent any threat to the safety of officers or others.

141.    DPD failed to train its officers regarding crowd management and crowd control techniques in a manner that does not violate citizens' constitutional rights.  DPD's training is not consistent with or up to date with its written policies regarding crowd management and crowd control techniques.

142.    DPD's policy during the George Floyd Protests was that officers would not need to document their individual uses of less-lethal force during the protests.  DPD understood before the

protests that use of force reports serve an important role in ensuring accountability for officers' use of force. Indeed, DPD's written policies require officers to prepare a use of force report in the ordinary course of their duties for precisely this reason. Yet, despite knowing that the consequence of not requiring use of force reports would lead to a lack of accountability and transparency in the use of force, DPD's policy during the protests was not officers would not need to prepare them.

143.     DPD also failed to implement and train its officers on a coherent policy regarding the use of body-worn camera during the protests. This failure is evidence of a policy or practice of unlawful conduct and an attempt to avoid accountability. DPD knew prior to the protests that body-worn cameras serve an important role in providing accountability for officer use of force. Yet, during the protests, DPD officers were given the discretion to turn their body-worn cameras on or off as they saw fit. This predictably has led to an inability to hold individual officers responsible for their use of less lethal weapons during the protests. Indeed, shortly before DPD Officer Keith Valentine fired several rounds from his pepper ball gun in the direction of Plaintiff Epps, he had inexplicably turned off his body-worn camera simply because he thought the officer standing next to him told him to turn it off.

144.     DPD has received many complaints regarding the use of less-lethal weapons during the protests, and to date, only two officers have been disciplined for such conduct.

145.     Moreover, Denver's policy of authorizing neighboring jurisdictions to use their own policies, practices, and/or customs with respect to the use of less lethal force, as well as Denver's failure to conduct any joint training exercises with them, caused  the unlawful and unconstitutional actions of any non-DPD officers whose services were utilized during the period in which protests were ongoing, including those of the APD officers. By utilizing those services,

Denver was required to ensure that all officers complied with both protestors' constitutional rights and Denver's use-of-force policies.

146. After the killing of George Floyd, Denver publicly ratified the use of "less-lethal" force for crowd control at protests.[57]

147. Denver decision makers have received ample notice that Officers in Denver were using "less-lethal" force against protesters to control and suppress demonstrations in the absence of any imminent threat to safety, including 150 complaints about the DPD in one 72-hour period,[58] condemnation from City Council members,[59] and widely publicized videos and firsthand accounts circulated through the local, state, and international press.[60]

---

[57] Ana Campbell, *Denver law enforcement agencies have a long history of violence. A use-of-force policy is supposed to help*, Denverite, https://denverite.com/2020/05/29/denver-law-enforcements-long-sordid-history-of-violence/; Ryan Osborne, *Denver mayor, police chief say officers showed "restraint" during George Floyd protest*, Denver Channel, May 29, 2020, https://www.thedenverchannel.com/news/local-news/denver-mayor-police-chief-say-officers-showed-restraint-during-george-floyd-protest.

[58] Jesse Paul, *Complaints about police response to Denver's George Floyd protests under investigation as demonstrations hit day 6*, Colo. Sun, June 2, 2020, https://coloradosun.com/2020/06/02/denver-police-response-protests-under-investigation/

[59] Conrad Swanson, *Denver City Council members call for investigation into police use of force during George Floyd protests*, Denver Post, June 2, 2020, https://www.denverpost.com/2020/06/02/denver-city-council-investigate-police-force-protest/; Letter, Denver City Council, June 5, 2020, https://denver.cbslocal.com/wp-content/uploads/sites/15909806/2020/06/Denver-city-council-calls-for-review-of-DPD-use-of-force-policy.pdf.

[60] Lori Jane Gliha, Police projectile fractures Denver protester's face; she says it was unprovoked, KDVR, June 3, 2020, https://kdvr.com/news/local/police-projectile-fractures-denver-protesters-face-she-says-it-was-unprovoked; Alex Rose, Local man needs eye removed after projectile hits his face during afternoon protest in Denver, KDVR, June 3, 2020, https://kdvr.com/news/local/local-man-needs-his-eye-removed-after-projectile-hits-his-face-during-afternoon-protest-in-denver/?fbclid=IwAR2Q9RdYRmi3dp5GnuyOf6Tm6E-NoquhzKTvHSknBTmUKLuZ-17UIc4YJkA; https://twitter.com/DoughertyKMGH/status/1266181364396761089; https://twitter.com/AdiGTV/status/1266554320717099008; https://twitter.com/Dizzle14Double/status/1266615473816260609; https://twitter.com/heyydnae/status/1267139396278661121; https://twitter.com/jeremyjojola/status/1267536778577100800; https://twitter.com/tessrmalle/status/1266945413258653696;

148.     Denver decision makers have also received notice that the actions of the Officers in Denver against protesters violated the policies and procedures for the use of force outlined in the DPD's own Operations Manual.[61, 62]

**Aurora's Policies, Practices, and/or Customs**

149.     The violations of Plaintiff Packard's and Smith's constitutional rights are a direct result of and caused by Aurora's policy, practice, and/or custom of authorizing APD Officers to use "less-lethal" weapons to control and suppress protests without legal justification.  These violations are also a direct result of Denver's utilization of the services of law enforcement officers from other jurisdictions, including Aurora, who were authorized to use "less-lethal" weapons to control and suppress protests.

150.     Aurora policy makers have acted with deliberate indifference to the constitutional rights of protesters and would-be protesters by authorizing, both explicitly and implicitly, the use of "less-lethal" force against protesters who do not pose any safety threat; by failing to properly train, supervise, and discipline APD officers regarding the appropriate use of force against protesters; and by failing to rectify the unconstitutional custom of APD officers of using "less-lethal" force to control and suppress demonstrations.  Aurora has a custom and practice of violating their own written policies regarding the use of less "lethal-force" and crowd dispersal.

---

https://twitter.com/Mr_Blue_sky_II/status/1266631773191942145;
https://twitter.com/Tipton007/status/1267331062314627072;
https://twitter.com/SchwabStrong/status/1267340233781080065.
[61] Operations Manual, Denver Police Department,
https://www.denvergov.org/content/dam/denvergov/Portals/720
/documents/OperationsManual/OMSBook/OM_Book.pdf.
[62] Noelle Phillips, *Denver declares its new police use-of-force police to be innovative and progressive*, Denver Post, Aug 9, 2018, https://www.denverpost.com/2018/08/09/denver-police-use-of-force-policy-announcement.

151.    APD knew before the protests that less-lethal shotguns are potentially fatal if used inappropriately.  Yet, APD's use of force policy in effect during the protests permitted the use of less-lethal shotguns and so-called "sock" or "bean bag rounds" in situations where an officer was not under any threat of serious harm or injury.

152.    Aurora has ratified  in real time the the use of "less-lethal" force by its officers during the protests.[63]  The City was aware of its officers' behavior and continued to encourage it.

153.    Aurora decision makers received ample notice that APD Officers in Denver were using "less-lethal" force against protesters to control and suppress demonstrations in the absence of any imminent threat to safety.  APD had representatives in DPD's command center during the protests and knew that its officers were deploying extensive amounts of less-lethal munitions during the protests.

154.    Aurora decision makers have also received notice that the actions of the APD Officers in Denver against protesters violated the policies and procedures for the use of force outlined in APD's own Operations Manual.Aurora's written policies regarding the use of less lethal force in effect at the time of the George Floyd Protests were deficient in several respects. On information and belief, APD's use force policy does not require officers to evaluate proportionality in deciding when and how to deploy force, does not require officers to use objectively reasonable force under the circumstances, does not expressly prohibit retaliatory use of force, does not expressly prohibit the use of pepper spray without warning on non-violent

---

[63] https://kdvr.com/news/problem-solvers/aurora-officers-used-force-736-times-over-2-days-of-george-floyd-protests-new-police-video-released/

protesters or for the mere purpose of dispersal.  Moreover, Aurora failed to sufficiently train its officers in de-escalation techniques.

## CLAIMS FOR RELIEF

### CLAIM 1:
**Violation of Plaintiffs' First Amendment Rights by Denver, Christian, Valentine, and McNamee, John and Jane Does 1-100, Jon and Jane Boes 1-100**

155.    Denver's policy, practice, and/or custom of using "less-lethal" weapons to control and suppress demonstrations have deprived and caused Plaintiffs to be deprived of their rights under the First Amendment to freedom of speech, freedom of assembly, and freedom to petition the government for a redress of grievances.

156.    Defendants Christian and Valentine violated Plaintiff Epps' rights by engaging on the individual unconstitutional acts enumerated above.

157.    Defendant McNamee violated Plaintiff Packard's rights by engaging on the individual unconstitutional acts enumerated above.

158.    Defendants John and Jane Does 1–100 and John and Jane Boes 1–50 violated Plaintiffs' rights by engaging in the individual unconstitutional acts enumerated above.  The actions will be further specified when the officers in question are identified and Plaintiffs are able to attribute specific acts to specific officers.

159.    The actions of Defendants Christian, Valentine, and McNamee—namely, the use of excessive force against peaceful protesters—can reasonably be expected to chill a reasonable person from engaging in activity protected by the First Amendment.

160.    The actions of Defendants John and Jane Does 1–100 and John and Jane Boes 1–50—namely, the use of excessive force against peaceful protesters—can reasonably be expected to chill a reasonable person from engaging in activity protected by the First Amendment.

161.    The actions of Defendants Christian and Valentine had the purpose and effect of suppressing the protest activity of Plaintiff Epps.

162.    The actions of Defendant McNamee had the purpose and effect of suppressing the protest activity of Plaintiff Packard.

163.    The actions of Defendants John and Jane Does 1–100 and John and Jane Boes 1–50 has had the purpose and effect of suppressing large, continuous protests.

164.    Denver deliberately violated well-established limitations on the permissible interference by the government in the exercise of speech and assembly in public places.

165.    Denver's authorization of the use of "less-lethal" force against protesters was motivated by the viewpoint being expressed by the demonstrators.

166.    Denver's policy, practice, and/or custom of using "less-lethal" weapons to control and suppress demonstrations is not a reasonable regulation of the time, place, or manner of Plaintiff's First Amendment protected activity.

167.    Individual Defendants Christian and Valentine acted with reckless or callous indifference to the First Amendment rights of Plaintiff Epps and therefore are liable for punitive damages.

168.    Individual Defendant McNamee acted with reckless or callous indifference to the First Amendment rights of Plaintiff Packard and therefore are liable for punitive damages.

169.    Individual Defendants John and Jane Does 1–100 and John and Jane Boes 1–50 acted with reckless or callous indifference to the First Amendment rights of Plaintiffs and therefore are liable for punitive damages.

170.    As stated below in Claims 3 and 4, Aurora is responsible for the violation of the rights of Plaintiffs Packard and Smith.  For the avoidance of doubt, however, Plaintiffs Packard and Smith also contend that the City of Denver is liable for the violation of the rights of Plaintiffs Packard and Smith because Denver expressly authorized Aurora to follow its own policies, practices, and/or customs with respect to the use of less lethal force during the protests and failed to conduct any joint training exercises with Aurora to ensure Aurora's policies, practices, and/or customs with respect to the use of force were lawful and constitutional.

## CLAIM 2:
**Violation of Plaintiffs' Fourth and/or Fourteenth Amendment Rights by Denver, Christian, Valentine, and McNamee, John and Jane Does 1-100, Jon and Jane Boes 1-100**

171.    The actions of Defendants John and Jane Does 1–100 and John and Jane Boes 1–50—namely, the use of physical force, including but not limited to chemical agents, "less-lethal" projectiles, frightening loud munitions, and batons and shields, without a warrant or probable cause to arrest, and absent an immediate threat to the safety of the public—violated the rights of Plaintiffs under the Fourth and/or Fourteenth Amendments to the United States Constitution to be free from unreasonable seizures and excessive use of force.

172.    The actions of Defendants Christian and Valentine—namely, the use of physical force, including but not limited to "less-lethal" projectiles such as pepperballs, without a warrant or probable cause to arrest, and absent an immediate threat to the safety of the public—violated

50

the rights of Plaintiff Epps under the Fourth and/or Fourteenth Amendments to the United States Constitution to be free from unreasonable seizures and excessive use of force.

173.    The actions of Defendant McNamee—namely, the use of physical force, including but not limited to "less-lethal" projectiles such as "sock-" or "beanbag" rounds from a shotgun, without a warrant or probable cause to arrest, and absent an immediate threat to the safety of the public—violated the rights of Plaintiff Packard under the Fourth and/or Fourteenth Amendments to the United States Constitution to be free from unreasonable seizures and excessive use of force.

174.    The actions of Denver—namely, its implementation of the policy, custom and/or practice of using such force, without a warrant or probable cause to arrest, and absent an immediate threat to the safety of the public—violated and caused the violation of the rights of Plaintiffs under the Fourth and/or Fourteenth Amendments to the United States Constitution to be free from unreasonable seizures and excessive use of force.  The excessive use of force by DPD and APD Officers in Denver was intentionally applied, objectively unreasonable, and shocks the conscience.

175.    Individual Defendants Christian and Valentine acted with reckless or callous indifference to the federally protected rights of Plaintiff Epps and therefore are liable for punitive damages.

176.    Individual Defendant McNamee acted with reckless or callous indifference to the federally protected rights of Plaintiff Packard and is therefore liable for punitive damages.

177.    Individual Defendants John and Jane Does 1–100 and John and Jane Boes 1–50 acted with reckless or callous indifference to the federally protected rights of Plaintiffs and therefore are liable for punitive damages.

178.    As stated below in Claims 3 and 4, Aurora is responsible for the violation of the rights of Plaintiffs Packard and Smith.  For the avoidance of doubt, however, Plaintiffs Packard and Smith also contend that the City of Denver is liable for the violation of the rights of Plaintiffs Packard and Smith because Denver expressly authorized Aurora to follow its own policies, practices, and/or customs with respect to the use of less lethal force during the protests and failed to conduct any joint training exercises with Aurora to ensure Aurora's policies, practices, and/or customs with respect to the use of force were lawful and constitutional.

### CLAIM 3:
### Violation of Plaintiffs Packard's and Smith's First Amendment Rights by Aurora and McNamee, John and Jane Does 1-100

179.    Aurora's policy, practice, and/or custom of using "less-lethal" weapons to control and suppress demonstrations have deprived and caused Plaintiffs Packard and Smith to be deprived of their rights under the First Amendment to freedom of speech, freedom of assembly, and freedom to petition the government for a redress of grievances.

180.    Defendants John and Jane Does 1–100 violated Plaintiff Packard's and Smith's rights by engaging in the individual unconstitutional acts enumerated above.  These actions will be further specified when the officers in question are identified and Plaintiffs Packard and Smith are able to attribute specific acts to specific officers.

181.    Defendant McNamee violated Plaintiff Packard's rights by engaging on the individual unconstitutional acts enumerated above.

182.    The actions of Defendants John and Jane Does 1–100—namely, the use of excessive force against peaceful protesters—can reasonably be expected to chill a reasonable person from engaging in activity protected by the First Amendment.

183.    The actions of Defendant McNamee—namely, the use of excessive force against peaceful protesters—can reasonably be expected to chill a reasonable person from engaging in activity protected by the First Amendment.

184.    The actions of Defendants John and Jane Does 1–100 has had the purpose and effect of suppressing large, continuous protests.

185.    The actions of Defendant McNamee had the purpose and effect of suppressing the protest activity of Plaintiff Packard.

186.    Aurora deliberately violated well-established limitations on the permissible interference by the government in the exercise of speech and assembly in public places.

187.    Aurora's policy, practice, custom, and authorization of the use of "less-lethal" force against protesters was motivated by the viewpoint being expressed by the demonstrators.

188.    Aurora's policy, practice, and/or custom of using "less-lethal" weapons to control and suppress demonstrations is not a reasonable regulation of the time, place, or manner of Plaintiff Packard's or Smith's First Amendment protected activity.

189.    Individual Defendants John and Jane Does 1–100 acted with reckless or callous indifference to the First Amendment rights of Plaintiffs Packard and Smith and therefore are liable for punitive damages.

190.    Individual Defendant McNamee acted with reckless or callous indifference to the First Amendment rights of Plaintiff Packard and therefore are liable for punitive damages.

191.    The City of Denver is also liable for the violation of the rights of Plaintiffs Packard and Smith because Denver, in conformity with its policy, custom, or practice, authorized Aurora to follow its own policies, practices, and/or customs with respect to the use of less lethal force

during the protests and failed to conduct any joint training exercises with Aurora to ensure Aurora's policies, practices, and/or customs with respect to the use of force were lawful and constitutional.

## CLAIM 4:
### Violation of Plaintiff Packard's and Smith's Fourth and/or Fourteenth Amendment Rights by Aurora and McNamee

192.     The actions of Defendants John and Jane Does 1–100—namely, the use of physical force, including but not limited to chemical agents, "less-lethal" projectiles, frightening loud munitions, and batons and shields, without a warrant or probable cause to arrest, and absent an immediate threat to the safety of the public—violated the rights of Plaintiffs Packard and Smith under the Fourth and/or Fourteenth Amendments to the United States Constitution to be free from unreasonable seizures and excessive use of force.   The actions of Aurora—namely, its implementation of the policy, custom and/or practice of using such force, without a warrant or probable cause to arrest, and absent an immediate threat to the safety of the public—violated and caused the violation of the rights of Plaintiffs Packard and Smith under the Fourth and/or Fourteenth Amendments to the United States Constitution to be free from unreasonable seizures and excessive use of force.   The excessive use of force by APD Officers in Denver was intentionally applied, objectively unreasonable, and shocks the conscience.

193.     The actions of Defendant McNamee—namely, the use of physical force, including but not limited to "less-lethal" projectiles such as "sock-" or "beanbag" rounds from a shotgun, without a warrant or probable cause to arrest, and absent an immediate threat to the safety of the public—violated the rights of Plaintiff Packard under the Fourth and/or Fourteenth Amendments to the United States Constitution to be free from unreasonable seizures and excessive use of force.

194.    Individual Defendants John and Jane Does 1–100 acted with reckless or callous indifference to the federally protected rights of Plaintiffs Packard and Smith and therefore are liable for punitive damages.

195.    Individual Defendant McNamee acted with reckless or callous indifference to the federally protected rights of Plaintiff Packard and is therefore liable for punitive damages.

196.    The City of Denver is also liable for the violation of the rights of Plaintiffs Packard and Smith because Denver, in conformity with its policy, practice, or custom, expressly authorized Aurora to follow its own policies, practices, and/or customs with respect to the use of less lethal force during the protests and failed to conduct any joint training exercises with Aurora to ensure Aurora's policies, practices, and/or customs with respect to the use of force were lawful and constitutional.

## CLAIM 5
### § 1983 Supervisory Liability against Defendants Serrant and Brukbacher for the violation of Plaintiff Packard's Constitutional Rights

197.    In the manner described above, Defendants Serrant and Brukbacher were personally involved in or personally directed, controlled, or authorized the actions of their subordinate officers which violated Plaintiff Packard's constitutional rights described in Claims 3 and 4. Defendant Serrant's and Brukbacher's actions, direction, and control caused Plaintiff Packard's constitutional violations complained of in Claims 3 and 4; they set in motion a series of events that they knew or reasonably should have known would cause others to deprive Plaintiff Packard of his constitutional rights. Defendants Serrant and Brukbacher knew of and acquiesced in the constitutional violations committed by their subordinates. In so doing, these Defendants

disregarded known or obvious consequences of their actions, exhibiting deliberate indifference to Plaintiff Packard's rights.

198.     As a direct and proximate result of Defendant Serrant and Brukbacher's actions, Plaintiff Packard's constitutional rights were violated, entitling him to relief.

## RELIEF REQUESTED

**WHEREFORE**, Plaintiffs respectfully pray that the Court:

199.     Issue a judgment declaring that the acts of Defendants described herein violated the U.S. Constitution;

200.     Issue an injunction ordering Defendants Denver and Aurora and their agents to cease engaging in the unlawful acts described herein;

201.     Award compensatory damages to Plaintiffs Epps, Wedgeworth, Blasingame, Rothlein, Packard, Lyman, and Smith according to proof at trial, including damages for pain and suffering;

202.     Award punitive damages to Plaintiffs Epps, Wedgeworth, Blasingame, Rothlein, Packard, Lyman, and Smith based on the actions of individual Defendants John and Jane Does 1–100 and John and Jane Boes 1–50;

203.     Award punitive damages to Plaintiffs Epps based on the actions of Defendants Christian and Valentine.

204.     Award punitive damages to Plaintiff Packard based on the actions of McNamee, Serrant, and Brukbacher.

205.     Award costs of suit and attorney's fees; and

206.    Provide such other and further relief as the Court may deem just, proper, and appropriate.

## JURY DEMAND

207.    Plaintiffs request a trial by jury on any and all issues raised by this Complaint which are triable by right of a jury.

Dated: October 19, 2021                    Respectfully submitted,

      By: /s/ *Timothy R. Macdonald*
           Timothy R. Macdonald
           Matthew J. Douglas
           Ed Aro
           Colin M. O'Brien
           Kathleen K. Custer
           Mollie DiBrell
           ARNOLD & PORTER KAYE SCHOLER LLP
           1144 Fifteenth Street, Ste. 3100
           Denver, Colorado 80202
           Telephone: (303) 863-1000
           Facsimile: (303) 863-2301
           Timothy.Macdonald@arnoldporter.com
           Matthew.Douglas@arnoldporter.com
           Ed.Aro@arnoldporter.com
           Colin.Obrien@arnoldporter.com
           Katie.Custer@arnoldporter.com
           Mollie.DiBrell@arnoldporter.com

           Gerardo Mijares-Shafai
           Leslie C. Bailey
           ARNOLD & PORTER KAYE SCHOLER LLP
           601 Massachusetts Ave., NW
           Washington, DC  20001-3743
           Telephone: (202) 942-5000
           Facsimile: (202) 942-5555

Gerardo.Mijares-Shafai@arnoldporter.com
Leslie.Bailey@arnoldporter.com

Patrick C. Reidy
ARNOLD & PORTER KAYE SCHOLER
LLP
70 West Madison Street
Suite 4200
Chicago, IL 60602
Telephone: (312) 583-2300
Facsimile: (312) 583-2360
Patrick.Reidy@arnoldporter.com

Michael J. Sebba*
ARNOLD & PORTER KAYE SCHOLER
LLP
777 South Figueroa Street, 44th Floor
Los Angeles, CA  90017
Telephone: (213) 243-4000
Facsimile: (213) 243-4199
Michael.Sebba@arnoldporter.com

*Admitted only in New York; not admitted
to the practice of law in California.

In cooperation with the American Civil
Liberties Union Foundation of Colorado

Mark Silverstein
Sara Neel
Arielle Herzberg
American Civil Liberties Union Foundation
of Colorado
303 E. Seventeenth Ave., Suite 350
Denver, Colorado 80203
Telephone: (303) 777-5482
Facsimile: (303) 777-1773
Msilverstein@aclu-co.org
Sneel@aclu-co.org
Aherzberg@aclu-co.org

Counsel for Plaintiffs

## CERTIFICATE OF SERVICE

I hereby certify that on October 19, 2021, the foregoing **PLAINTIFFS' FIRST AMENDED COMPLAINT** was filed with the Clerk of the Court using the CM/ECF system, which will serve the following:

Daniel Moore Twettendan
Elizabeth C. Wang
Tara Elizabeth Thompson
Makeba Rutahindurwa
**Loevy & Loevy**
dan@loevy.com
elizabethw@loevy.com
tara@loevy.com
makeba@loevy.com

*Attorneys for Consolidated Plaintiffs Sara Fituori, Jacquelyn Parkins, Kelsey Taylor, Youssef Amghar, Andy Sannier, Francesca Lawrence, Joe Deras, and Johnathen Duran*

Sarah B. Peasley
Robert Huss
Katherine Field
Emily Dreiling
Hollie Birkholz
Lindsay Jorday
**Denver City Attorney's Office**
Sarah.Peasley@denvergov.org
Robert.Huss@denvergov.org
Kate.Field@denvergov.org
Emily.Dreiling@denvergov.org
Hollie.Birkholz@denvergov.org
Lindsay.Jordan@denvergov.org

Andrew David Ringel
**Hall & Evans LLC**
ringela@hallevans.com

*Attorneys for Defendant City and County of Denver and Consolidated Defendants Jacqueline A. Velasquez, M. Davis, Andrew Nielsen, Zachary Moldenhauer, Jacob Vaporis, Kevin Beasley, Chelsea Novotny, Christopher Cochran, Paul Hogan, Heather R. Jossi, Anthony E. Tak, and J. Lnu*

*/s/ Noemi Sanchez*