# EXHIBIT 4

Page 1

1              IN THE UNITED STATES DISTRICT COURT
                OF THE DISTRICT COURT OF COLORADO

2

    Civil Action Nos. 1:20-cv-01878-RBJ & 1:20-cv-01922-RBJ-MEH

3   & 1:20-cv-03155-KLM (Consolidated)

    _____

4

5   BLACK LIVES MATTER 5280, et al.,

6           Plaintiffs,

7   vs.

8   CITY AND COUNTY OF DENVER, et al.,

9           Defendants.

    _____

10

              VIDEO VIDEOCONFERENCED DEPOSITION OF

11                 NICHOLAS ETHAN MITCHELL

                      June 25, 2021

12  _____

13  VIDEOCONFERENCED APPEARANCES:

14  ON BEHALF OF THE PLAINTIFFS BLACK LIVES MATTER 5280:

            MICHAEL J. SEBBA, ESQ.

15          Arnold & Porter Kaye Scholer LLP

            777 South Figueroa Street, 44th Floor

16          Los Angeles, California  90017

            Phone:  213-243-4229

17          Email:  michael.sebba@arnoldporter.com

18  ON BEHALF OF THE PLAINTIFFS BLACK LIVES MATTER 5280:

            EDWARD ARO, ESQ.

19          Arnold & Porter Kaye Scholer LLP

            1144 15th Street, Suite 3100

20          Denver, Colorado  80202

            Phone:  303-863-2380

21          Email:  ed.aro@arnoldporter.com

22  ON BEHALF OF THE PLAINTIFFS BLACK LIVES MATTER 5280:

            PATRICK C. REIDY, ESQ.

23          Arnold & Porter Kaye Scholer LLP

            70 West Madison Street, Suite 4200

24          Chicago, Illinois  60602

            Phone:  312-583-2424

25          Email:  patrick.reidy@arnoldporter.com

Page 2

1  VIDEOCONFERENCED APPEARANCES (Cont'd):
2  ON BEHALF OF THE CONSOLIDATED PLAINTIFFS SARA FITUORI,
   JACQUELYN PARKINS, KELSEY TAYLOR, YOUSSEF AMGHAR,
3  ANDY SANNIER, FRANCESCA LAWRENCE, JOE DERAS, AND
   JOHNATHEN DURAN:
4     MAKEBA RUTAHINDURWA, ESQ.
      Loevy & Loevy
5     311 North Aberdeen, 3rd Floor
      Chicago, Illinois  60607
6     Phone:  312-243-5900
      Email:  makeba@loevy.com
7
   ON BEHALF OF THE CONSOLIDATED PLAINTIFF MICHAEL ACKER:
8     ANDREW JOSEPH McNULTY, ESQ.
      Killmer Lane & Newman LLP
9     1543 Champa Street, Suite 400
      Denver, Colorado  80202
10    Phone:  303-571-1000
      Email:  amcnulty@kln-law.com
11
   ON BEHALF OF THE DEFENDANT CITY AND COUNTY OF DENVER AND
12 CONSOLIDATED DEFENDANTS JACQUELINE A. VELASQUEZ, M. DAVIS,
   ANDREW NIELSEN, ZACHARY MOLDENHAUER, JACOB VAPORIS,
13 KEVIN BEASLEY, CHELSEA NOVOTNY, CHRISTOPHER COCHRAN,
   PAUL HOGAN, HEATHER R. JOSSI, ANTHONY E. TAK, AND J. LNU:
14    ANDREW D. RINGEL, ESQ.
      Hall & Evans
15    1001 17th Street, Suite 300
      Denver, Colorado  80202
16    Phone:  303-628-3300
      Email:  ringela@hallevansrobert.com
17
18 ALSO PRESENT: Joseph Kolber, Videographer
19
20
21
22
23
24
25

Page 3

1          PURSUANT TO WRITTEN NOTICE and the
2  appropriate rules of civil procedure, the video
3  videoconferenced deposition of NICHOLAS ETHAN MITCHELL,
4  called for examination by the Plaintiffs, was taken
5  remotely, commencing at 12:34 p.m. on June 25, 2021,
6  before Laurel S. Tubbs, a Registered Professional
7  Reporter, Certified Realtime Reporter and Notary Public
8  in and for the State of Colorado.
9              INDEX
10 EXAMINATION:                         PAGE
11 By Mr. Sebba                      6, 160
   By Mr. McNulty                    97, 158
12 By Mr. Ringel                        144
13 EXHIBITS:                            PAGE
14 Exhibit 1  The Police Response to the 2020      10
              George Floyd Protests in Denver, an
15            Independent Review, Report by Mr.
              Mitchell
16
   Exhibit 2  Master Interview Guide Dated July 16,   14
17            2020
18 Exhibit 3  Interview of SWAT Lieutenant Matt       17
              Canino
19
   Exhibit 4  Interview of Lieutenant Kim Lovate      32
20
   Exhibit 5  Interview of Lieutenant John Coppedge   42
21
   Exhibit 6  Interview of Deputy Chief Barb Archer   49
22
23
24
25

Page 4

1              P R O C E E D I N G S
2          THE VIDEOGRAPHER:  Good afternoon.  We are
3  going on the record at 12:34 p.m. on June 24th, 2021.
4  This deposition is being conducted using Veritext virtual
5  technology, and all participants are attending remotely.
6  Audio and video recording will continue to take place
7  unless all parties agree to go off the record.
8          This is Media Unit 1 of the video-recorded
9  deposition of Nicholas Mitchell taken by counsel for the
10 Plaintiff [sic] in the matter of Black Lives Matter,
11 5280, et al. versus the City and County of Denver, et
12 al., filed in the United States District Court of
13 Colorado, Case Number 1:20-cv-01878-RBJ.
14         My name is Joseph Kolber from the firm
15 Veritext, and I'm the videographer.  The court reporter
16 is Laurel Tubbs from the firm Veritext.  I'm not related
17 to any parties in this action, nor am I financially
18 interested in the outcome.
19         If there are any objections to the
20 proceeding, please state them at the time of your
21 appearance.  And we will begin with the noticing
22 attorney.
23         THE REPORTER:  Mr. Sebba, that's you.
24         MR. SEBBA:  Oh, i'm sorry.  I'm sorry.
25 This is Michael Sebba on behalf of the BLM

Page 5

1  5280 and Epps plaintiffs, here from Arnold & Porter,
2  along with Ed Aro and Patrick Reidy.
3          MS. RUTAHINDURWA:  Hi.  This is Makeba
4  Rutahindurwa on behalf of the Fituori plaintiffs.
5          MR. MCNULTY:  Andy McNulty on behalf of
6  Plaintiff Michael Acker.
7          MR. RINGEL:  This is Andrew Ringel on
8  behalf of the defendant.
9          THE VIDEOGRAPHER:  Will the court reporter
10 please swear in the witness.
11         THE REPORTER:  One moment, please.
12         The attorneys participating in this
13 deposition acknowledge that I am not physically present
14 in the deposition room and that I will be reporting this
15 deposition remotely.  They further acknowledge that in
16 lieu of an oath administered in person, the witness will
17 verbally declare his testimony in this matter is under
18 penalty of perjury.  The parties and their counsel
19 consent to this arrangement and waive any objections to
20 this manner of reporting.
21         Please indicate your agreement by stating
22 your name and your agreement on the record, beginning
23 with the noticing attorney.
24         MR. SEBBA:  Michael Sebba, and I agree.
25         MS. RUTAHINDURWA:  Makeba Rutahindurwa.  I

2 (Pages 2 - 5)

1 agree.

2          MR. MCNULTY:  Andy McNulty, and I agree.

3          MR. RINGEL:  Andrew Ringel, and I agree.

4               NICHOLAS ETHAN MITCHELL,

5 having been first duly sworn or affirmed, was examined and

6 testified as follows:

7               EXAMINATION

8 BY MR. SEBBA:

9          Q.  Mr. Mitchell, thank you for being here

10 today.

11          A.  You got it.

12          Q.  My name is Mike Sebba.  I'm just going

13 to -- well, we're going to go through a few rules.  But

14 first, could you please state your name for the record.

15          A.  Nicholas Ethan Mitchell.

16          Q.  And have you been deposed before?

17          A.  I have been.

18          Q.  Okay.  So you're familiar with the rules,

19 but just to go over a couple basic ones.  First, as you

20 can see, there's a court reporter here taking down

21 everything we say.  So please give verbal answers, no head

22 nods, no head shakes.

23          You understand?

24          A.  I do.

25          Q.  Okay.  And I'm happy to take breaks today

1 as you want them or need them.  Just I only ask if there's

2 a question pending, please answer that before we go on a

3 break.

4          A.  Thank you, sir.

5          Q.  Is that all right?

6          A.  Yep.

7          Q.  Okay.  Great.

8          What is your current job title?

9          A.  I'm currently the court-appointed

10 independent monitor of a federal consent decree between

11 the Department of Justice and the City of Los Angeles and

12 the Los Angeles Sheriff's Department.

13          Q.  Okay.  And, Mr. Mitchell --

14          THE REPORTER:  It looks like Mr. Mitchell

15 is frozen.

16          Could we go off the record?

17          MR. SEBBA:  Yeah.  Mr. Mitchell, I think

18 your -- your video is frozen.  I don't know about your

19 audio.

20          THE REPORTER:  Could we go off the record?

21          MR. SEBBA:  Yeah.

22          MR. RINGEL:  Yes.

23          THE VIDEOGRAPHER:  Okay.  Going off the

24 record at 12:39 p.m.

25          (Discussion off the record.)

1          THE VIDEOGRAPHER:  We're back on the

2 record at 12:39 p.m.

3          Q.  (By Mr. Sebba)  Okay.  Mr. Mitchell, prior

4 to this -- prior to the role you just described, what was

5 your job?

6          A.  I was the independent monitor for the City

7 and County of Denver.

8          Q.  Okay.  And as the independent monitor, what

9 were your job responsibilities?

10          A.  So I provided oversight of the Denver

11 Police Department and Denver Sheriff's Department.  More

12 specifically, I oversaw all internal affairs

13 investigations.  And those agencies issued reports to the

14 mayor, the City Council, other municipal leaders, and the

15 public reflecting my assessments of policies and

16 practices and disciplinary outcomes in those agencies.

17 And I managed a team of employees in that office who

18 helped me to discharge those duties.

19          Q.  And how long were you in that role?

20          A.  About eight and a half years, maybe.

21 Somewhere -- north of eight years.

22          Q.  Starting -- okay.  Starting from about when

23 did you have that job?

24          A.  I was appointed to the role in

25 August 2012.

1          Q.  And you were there until when?

2          A.  I resigned in December of last year.

3          Q.  Okay.  That's December 2020?

4          A.  Correct.

5          Q.  Okay.  And did you review the Denver Police

6 Department in connection to its behavior during the George

7 Floyd protests?

8          MR. RINGEL:  Object to the form.

9          A.  I reviewed and issued a report consistent

10 with my duties as monitor the police response to the

11 George Floyd protest that took place in Denver in the

12 summer of 2020.

13          Q.  (By Mr. Sebba)  Okay.  And to be clear,

14 when you say "summer of 2020," you mean -- withdraw.

15          To be clear, when I say "the George Floyd

16 protests" today, I'm going to be referring to the protests

17 that occurred in Denver from May 28th through about June 6

18 of 2020.

19          Will you understand it if that's -- if I

20 refer to them that way?

21          A.  I will.  I mean, I think, you know,

22 whether June 6 was the ending date -- I may have a

23 different understanding of when they ended, precisely,

24 but I will understand that we're generally talking about

25 those protests that began on May 28th, 2020, and extended

1 until whatever date they ended on.

2     Q. Okay. Great. Thank you.

3       MR. SEBBA: I would like to introduce for

4 the record the document bearing the Bates stamp DEN003925

5 as Exhibit 1.

6     Q. (By Mr. Sebba) And so -- do you have your

7 exhibit share open, Mr. Mitchell?

8     A. I don't think so.

9     Q. Okay. In that case, I will share my screen

10 so you can see it.

11       Were you provided with an exhibit share or

12 an exhibit share log-in, I should say?

13     A. Not to my knowledge.

14     Q. Okay.

15     A. May -- it may have been in an email I

16 received, but if it was, I didn't take note of it.

17     Q. All right. I'll share my screen so you

18 have it.

19       MR. SEBBA: Mr. Ringel, do you have access

20 to the exhibit share?

21       MR. RINGEL: I may, but I'm not signed

22 into it right now.

23       (Exhibit 1 was marked.)

24     Q. (By Mr. Sebba) Okay. All right. Can you

25 see on your screen this Exhibit 1 bearing the Bates stamp

1 DEN003925?

2     A. I can.

3     Q. Okay. And do you recognize this document?

4     A. I do.

5     Q. And what is this?

6     A. This is the report that I've already

7 mentioned that I issued as Denver's independent monitor

8 concerning the police response to the George Floyd

9 protests.

10     Q. Okay. Great.

11       And in preparing this report,

12 what -- withdrawn.

13       What did you do to prepare this report?

14     A. So, generally speaking, I requested

15 documents from the Denver Police Department and other

16 government entities in the Denver metro region. I think

17 there's specificity about what I requested somewhere in

18 this report. I don't remember all the particulars.

19       But I requested documents, reviewed

20 documents associated with the police response. I

21 obtained all available body-worn camera video from the

22 Denver Police Department associated with its response and

23 viewed all of that video. I led a team of employees in

24 my office who were assisting in the review. And

25 ultimately, we interviewed many members of the Denver

1 Police Department as well as the public and people who

2 worked in other government agencies who were involved in

3 the response to the protests to formulate our conclusions

4 and our analysis of -- of the police response and make

5 recommendations for how it could be -- you know, how the

6 police response could be improved in the event of future

7 or similar protests.

8     Q. Okay. Great.

9       And did you -- in preparing this report,

10 did you talk to -- you spoke with police officers,

11 correct?

12     A. I did.

13     Q. Okay. I'll stop the share for a moment.

14       And what was your procedure for speaking

15 with these officers?

16     A. So I think we interviewed about two dozen

17 or so police officers -- I could be wrong about the

18 number, but it was not an insignificant number of

19 officers -- at multiple kind of layers of the hierarchy

20 in the DPD. And given the number, although I personally

21 wanted to be present for all the interviews. I had a

22 member of my staff join me for each interview, and we

23 would pose questions to each interviewee, receive their

24 responses, ask follow-up questions. And ultimately, we

25 prepared interview memos documenting each interview that

1 we conducted.

2     Q. Okay. Thank you.

3       And I'm sorry. Before we continue, I see

4 some issues with real-time. Could we go off the record

5 while we sort those out?

6       THE REPORTER: Sure.

7       THE VIDEOGRAPHER: Going off the record at

8 12:47 p.m.

9       (Recess from 12:47 p.m. to 12:59 p.m.)

10       THE VIDEOGRAPHER: We are back on the

11 record at 12:59 p.m.

12     Q. (By Mr. Sebba) So, Mr. Mitchell, you said

13 that your team drafted memos summarizing officer

14 interviews; is that correct?

15     A. That's correct.

16     Q. Okay. And prior to the interviews, did you

17 prep -- did you and your team prepare questions to ask

18 the officers?

19     A. So I don't remember all of the

20 particulars, given that, you know, we're now going back a

21 year or a little bit less. My recollection is that we

22 prepared sort of a master list of questions that we would

23 ask officers that we adapted for different interviews,

24 depending upon the particular duties and responsibilities

25 of each interviewee.

Page 14

1    So I think we did have a list, but it was
2 not -- you know, we didn't follow it, you know, line by
3 line for each interview.  It was a flexible approach that
4 we took to conducting the interviews.
5        MR. SEBBA:  Okay.  I would like to
6 introduce as Exhibit 2 the document bearing the Bates
7 stamp DEN011801.
8        (Exhibit 2 was marked.)
9    Q.  (By Mr. Sebba)  Can you see this document,
10 Mr. Mitchell?
11   A.  I can.
12   Q.  Does this look like the document you
13 described?
14   A.  Can you page down through it for me so I
15 can see more of the document, please?
16   Q.  Absolutely.  And I'll also zoom in a bit.
17 Let me know if I'm going at an okay speed or if you need
18 me to --
19   A.  You can speed up.
20   Q.  Okay.
21   A.  You can stop.
22   Q.  Okay.
23   A.  I think it is the document.  My
24 recollection is that we had, you know -- there were
25 multiple versions created as we were, you know, launching

Page 15

1 this investigation and then conducting it.  So I don't
2 know whether this version is the one that we sort of used
3 at the time we were conducting the interviews, but it
4 certainly looks like the document that I remember.
5    Q.  Okay.  So I'd like to just go through a
6 couple of these sections.  So right now, on page 5 of this
7 document bearing the Bates stamp 11805, there's a heading,
8 it says Officer Deployment, correct?
9    A.  Yes.
10   Q.  And underneath that heading, there's a
11 question, What is the role of the arrest teams?  Correct?
12   A.  Yes.
13   Q.  And then below that, Was the majority of
14 arrests curfew violations or dot, dot, dot, correct?
15   A.  Yes.  Yes.
16   Q.  And, What is role of shadow teams?
17 Correct?
18   A.  Yes.
19   Q.  All right.  Were these all the types of
20 questions you were asking officers?
21   A.  Yes.  We were asking questions, you
22 know -- I guess, if -- can you expand on what you mean by
23 that question before I -- before I answer it?
24   Q.  Sure.
25       So if you were asking an officer about

Page 16

1 officer deployment, would you be asking him about the role
2 of an arrest team?
3    A.  I may have, you know, depending on who I
4 was interviewing.  So it -- you know, I would not ask
5 that question of every officer that I interviewed, but if
6 that question related to the role that a particular
7 officer played, then it's certainly a question that I may
8 have asked, and any follow-up questions that would have
9 naturally, you know, flowed from the answer I received.
10   Q.  Okay.  And would it be fair to say that
11 this document -- excuse me.  Withdrawn.
12       Would it be fair to say that the questions
13 shown on this document are the types of questions you were
14 asking officers if they had -- if you thought they would
15 have information relevant to those types of questions?
16   A.  Yeah.  I think we would have asked some of
17 the questions that are on this document and possibly
18 other questions that were similar and may have related to
19 the information we were learning from each witness.
20   Q.  Okay.  Great.
21       Now, you mentioned that you created memos
22 of these interviews, correct?
23   A.  My team created memos of the interviews.
24 I -- I don't remember creating any myself, although I
25 reviewed each memo after it was drafted.

Page 17

1    Q.  Okay.  I'd like to show you a few of these
2 memos, if that's all right.
3    A.  Sure.
4        MR. SEBBA:  All right.  So I'd like to
5 introduce as Exhibit 3 a document bearing the Bates stamp
6 DEN011698.
7        (Exhibit 3 was marked.)
8    Q.  (By Mr. Sebba)  All right.  Can you see
9 this -- can you see my screen?
10   A.  I can.
11   Q.  Okay.  Do you recognize this document?
12   A.  I recognize the first page, yes.
13   Q.  Okay.  And what is this document?
14   A.  This is an interview memo drafted by one
15 of my deputy monitors named Nate Fehrmann reflecting an
16 interview that I conducted of a lieutenant in the Metro
17 S.W.A.T. division, Matt Canino, on September 2nd, 2020.
18   Q.  Okay.  Great.
19       And now, within this memo, there's a number
20 of headings with text underneath them, right?
21   A.  Yes.
22   Q.  All right.  So I'd like to go to the
23 heading that reads Differences From Previous Similar
24 Events.
25       Do you see that heading?

5 (Pages 14 - 17)

Page 18

A. I do.
Q. And below that there's a paragraph that's entirely redacted, correct?
A. Yes.
Q. Okay. So here you would expect that under this heading was a summary of Lieutenant Canino's views on the differences between the George Floyd protests and previous similar events; is that correct?
MR. RINGEL: Object to the form and the foundation.
A. I would expect that it would be a summary of information that we learned from Lieutenant Canino about his views about the differences between the George Floyd protest and previous similar events.
Q. (By Mr. Sebba) Okay. Would it be mixed with your thoughts on what Lieutenant Canino told you?
MR. RINGEL: Object to the form and the foundation.
A. Well, I am answering this question mindful of the fact that I can't see the content under the redaction, so I can't speak to anything that has been redacted in this document.
So, speaking generally, when we prepared these memos, the guidance that I gave my team was to reflect statements from each witness in response to the

Page 19

questions that we posed. I did not advise my team and nor did we generally include opinions or assessments related to those statements. So again, I don't have all of the interview memos before me, so I can't speak to whether or not there are any exceptions. I'm sharing our general approach to these memos with you.
Q. (By Mr. Sebba) Understood.
And what is the probability that this -- every word in this section includes mental impression?
MR. RINGEL: Object to the form and the foundation.
A. When you say "mental impression," can you be more specific about what you mean?
Q. (By Mr. Sebba) Sure.
What's the probability that every single word in this section includes the opinion of you are -- withdrawn.
What's the probability that every single word in this section includes an opinion of yours or your team's? Yeah.
MR. RINGEL: Objection. Excuse me. Form. Foundation.
To the extent that this is designed to invade the deliberative-process privilege, the question is improper because the assertion of the

Page 20

deliberative-process privilege that's been made by the City and County of Denver in this case is broader than the question articulates, as Counsel knows, because that was argued in front of the judge and the judge ruled that this information didn't have to be provided to the plaintiff.
You can answer if you understand the question, Mr. Mitchell.
THE DEPONENT: Can the court reporter repeat the question for me, please.
(The last question was read.)
A. I think it's likely that many, if not all, of the words in that section could include or relate to observations or opinions from the witness related to that issue. I think it's unlikely that every single word reflected in that section relates to opinions from either me or members of my team related to that subject.
Q. (By Mr. Sebba) When you say "unlikely," would you say 20 percent chance?
A. I think there's a 0 percent chance that every single word in that section reflects an opinion from me or a member of my team.
Q. Okay. Next there's a -- next in this document, below the redacted photograph we were just discussing, there's a heading First Day of Protests,

Page 21

correct?
A. I see that. Yes.
Q. Okay. And nothing in the paragraph underneath that heading is redacted, correct?
A. Not that I can see, no.
Q. Okay. Next, on page -- the page bearing the Bates stamp ending in 11699, there's a heading Commentary on Participants, correct?
A. Yes.
Q. And below that, the entire paragraph is redacted, correct?
A. It appears so, to me, yes.
Q. Okay. And what kind of information would you'd expect to be in that paragraph?
MR. RINGEL: Object to the form and the foundation.
A. I would expect that that paragraph would include any commentary about protests participants that we heard from Lieutenant Canino when we conducted the interview of the lieutenant.
Q. (By Mr. Sebba) Okay. And would you expect that section to include the opinions of you or your team?
MR. RINGEL: Object to the form and the foundation.
A. I don't have any recollection of

Page 22

1 interspersing those kinds of opinions into these memos.
2 Again, I'm speaking generally, not about this specific
3 memo. So, no, I would not expect there to have been my
4 opinions or the opinions of a member of my team
5 interspersed into this section.
6      Q. (By Mr. Sebba) And what's the probability
7 that every single word in this section included an opinion
8 of you or your team?
9          MR. RINGEL: Objection to the form and the
10 foundation. Mischaracterizes the deliberative-process
11 privilege and the dispute and the ruling of the Court.
12      Q. (By Mr. Sebba) You can answer.
13      A. I think it's very likely that the words in
14 that section including -- included the opinions or
15 perceptions of the witness related to the issue that
16 you've described. I think it's unlikely that every
17 single word reflected my opinions or an opinion of a
18 member of my team.
19      Q. Would you say there's a
20 less-than-20-percent chance?
21          MR. RINGEL: Object to the form and the
22 foundation. And object on the basis of a
23 mischaracterization of the applicability of the
24 deliberative-process privilege and the ruling of the
25 Court.

Page 23

1          You can answer, if you understand the
2 question.
3          THE DEPONENT: Can you repeat the question
4 for me, please.
5      Q. (By Mr. Sebba) Would you say there's --
6          MR. SEBBA: Oh. I'm sorry, Laurel. Could
7 you, please.
8          THE REPORTER: Just one moment.
9          (The last question was read.)
10          THE DEPONENT: And, Counsel, could you
11 finish the end of that sentence so that I know precisely
12 what "less than 20 percent chance" refers to?
13          MR. SEBBA: Sure.
14      Q. (By Mr. Sebba) Would you expect that
15 there's a less-than-20-percent chance that every single
16 word of this section includes an opinion of yours or your
17 team's?
18          MR. RINGEL: Same objections.
19      A. I would say that, yes.
20      Q. (By Mr. Sebba) So is it fair to say that
21 it's likely that everything redacted here reflects a
22 factual statement of what was said by the officer?
23          MR. RINGEL: Same objections.
24      A. I'm not sure that I understand the
25 question or what you mean by "factual statement" in the

Page 24

1 question. I've testified to the fact that we did receive
2 opinions from witnesses. So I guess I'm not sure that I
3 understand what you mean by "factual statement" in this
4 question.
5      Q. (By Mr. Sebba) Would it be fair to say
6 that everything underneath these redactions is likely a
7 summary of what was said by Lieutenant Canino?
8          MR. RINGEL: Same objections.
9      A. I think that's likely, yes.
10      Q. (By Mr. Sebba) And that your
11 team -- withdrawn.
12          Would you say it's likely that your team
13 recorded what the officers told you?
14          Withdrawn.
15          Would you say it's likely that in this
16 section, you and your team recorded what Lieutenant Canino
17 told you?
18          MR. RINGEL: Same objections.
19          THE REPORTER: Can you repeat the
20 question?
21          Just a moment. Can you repeat the
22 question, please?
23          MR. SEBBA: Sure.
24      Q. (By Mr. Sebba) I said, would you think
25 it's likely that underneath these redactions you recorded

Page 25

1 what Lieutenant Canino -- you or your team recorded what
2 Lieutenant Canino told you?
3          MR. RINGEL: Same objections.
4          THE DEPONENT: Can I answer that question?
5          MR. RINGEL: Yes.
6      A. I think it's likely that throughout the
7 memo, in redacted or unredacted portions of the document,
8 we recorded our understanding of what we learned from
9 this particular witness. So statements that the witness
10 made to us, as we understood and interpreted them, we
11 summarized throughout this document in the redacted and
12 the unredacted portions.
13      Q. (By Mr. Sebba) Thank you.
14          Okay. So next there's a heading Initial
15 Lessons Learned, correct?
16      A. I see that. Yes.
17      Q. And underneath that, there's an
18 entire -- the entire section is redacted, correct?
19      A. It appears to be. I see a few little
20 chunks of white throughout there, but all of the text
21 appears to be redacted, yes.
22      Q. Okay. And those little chunks of white do
23 not include any words, correct?
24      A. No, they do not.
25      Q. Okay. So would you expect that underneath

7 (Pages 22 - 25)

Page 26

1 these redactions would be a summary of what
2 Lieutenant Canino told you and your team?
3          MR. RINGEL:  Object to the form and the
4 foundation.
5     A.  I would, yes.
6     Q.  (By Mr. Sebba)  And would you expect
7 opinions of you or your team to appear underneath these
8 redactions?
9          MR. RINGEL:  Object to the form and the
10 foundation.
11     A.  I would not expect that, no.
12     Q.  (By Mr. Sebba)  Okay.  Let's go to the next
13 section, which is titled Officer Fatigue/Welfare, correct?
14     A.  Yes.
15     Q.  And here we have one, two -- three
16 paragraphs that are entirely correct -- withdrawn.
17          Here we have three paragraphs that are
18 entirely redacted, correct?
19     A.  I see that, yes.
20     Q.  Okay.  And underneath these redactions, you
21 would expect a summary of the information that
22 Lieutenant Canino provided, correct?
23          MR. RINGEL:  Object to the form and the
24 foundation.
25     A.  I would expect a summary of the

Page 27

1 information -- excuse me -- and possibly opinions
2 of -- that we learned from the witness during the
3 interview, yes.
4     Q.  (By Mr. Sebba)  And would you expect your
5 team's opinions to appear underneath these redactions?
6          MR. RINGEL:  Object to the form and the
7 foundation.
8     A.  I would not.
9     Q.  (By Mr. Sebba)  All right.  Next there's a
10 heading GFP Briefings, correct?
11     A.  Yes.
12     Q.  And here -- first there's an unredacted
13 paragraph and then a redacted paragraph, correct?
14     A.  Yes.
15     Q.  And after that redacted paragraph, there's
16 a partially redacted paragraph and then an entirely
17 redacted paragraph, correct?
18     A.  Yes.
19     Q.  And here -- underneath these redactions,
20 you'd expect a summary of what Lieutenant Canino told your
21 team about the GFP briefings; is that correct?
22          MR. RINGEL:  Object to the form and the
23 foundation.
24     A.  Yes.
25     Q.  (By Mr. Sebba)  And would you expect the

Page 28

1 opinions of you or your team to appear underneath these
2 redactions?
3          MR. RINGEL:  Object to the form and the
4 foundation.
5     A.  I would not.
6     Q.  (By Mr. Sebba)  Okay.  Next there's a
7 section titled Use of -- withdrawn.
8          Next there's a heading that says, Use of
9 Pepperballs, correct?
10     A.  Yes.
11     Q.  And underneath this heading, we have three
12 entirely redacted paragraphs followed by a partially
13 redacted paragraph, correct?
14     A.  Yes.
15     Q.  And if we go to the partially redacted
16 paragraph, it reads -- the unredacted portion reads, He
17 said there were times they were getting assaulted with
18 rocks, but they could not see who was throwing them, so
19 they would use gas to move the rock throwers, correct?
20     A.  I see that, yes.
21     Q.  And then it says, He had assigned an
22 officer to watch his back just before being struck in the
23 back of the leg with a large rock.  He asked the officer
24 about it, and the officer indicated that he never saw the
25 rock, correct?

Page 29

1     A.  Yes.
2     Q.  Then it says, He mentioned at one point
3 that he had a large number of bruises from being hit in
4 places not covered by his body armor, correct?
5     A.  Yes.
6     Q.  Would you expect these to be -- withdrawn.
7          Would you expect underneath these
8 redactions to -- withdrawn.
9          Do you -- would you expect the text
10 underneath these redactions to reflect a summary of what
11 your team learned from Lieutenant Canino?
12          MR. RINGEL:  Object to the form and the
13 foundation.
14     A.  I would expect the text to reflect a
15 summary of information that we learned from
16 Lieutenant Canino about the use of pepperballs during the
17 George Floyd protests.
18     Q.  (By Mr. Sebba)  And would you expect the
19 opinions of you or your team to appear underneath these
20 redactions?
21          MR. RINGEL:  Object to the form and the
22 foundation.
23     A.  I would not.
24     Q.  (By Mr. Sebba)  And would you expect that
25 these four unredacted sentences that we reviewed to be the

8 (Pages 26 - 29)

1 only portions of this section that do not include opinions
2 of you and your team?
3        MR. RINGEL:  Object to the form and the
4 foundation.  Misstates the deliberative-process
5 privilege, the assertion of it in this case, and the
6 ruling of the Court.
7        Q.  (By Mr. Sebba)  You can answer.
8        MR. RINGEL:  You can answer, if you
9 understand the question.
10        THE DEPONENT:  Can you repeat or read the
11 question back to me, please?
12        Ms. Reporter?
13        (The last question was read.)
14        A.  No, I would not have that expectation.
15        Q.  (By Mr. Sebba)  Okay.  Great.
16        Let's -- I'm going to scroll through the
17 rest of the document.  There's a heading with --
18 withdrawn.
19        There's a heading that says Arrests, with a
20 redacted paragraph underneath it, correct?
21        A.  Yes.
22        Q.  And then there's a heading Flash Bangs and
23 Other Concussion Devices, which also -- the section below
24 that includes a number of redactions, correct?
25        A.  Yes.

1        Q.  And here we've got a heading Sting Ball
2 Grenades, which also has a number of redactions?
3        A.  Yes.
4        Q.  And then Other Devices, which has some
5 redactions?
6        A.  It appears to have one redaction, as far
7 as I can tell.
8        Q.  Yeah.
9        And then as we scroll, there's a number of
10 more headings and number of sections that are largely or
11 entirely redacted, correct?
12        A.  Yes.
13        Q.  Okay.  In each of these sections, you would
14 expect that to -- withdrawn.
15        In each of these sections underneath the
16 redactions, you would expect there to be a summary of the
17 topic and what Lieutenant Canino said about it; is that
18 correct?
19        MR. RINGEL:  Object to the form and the
20 foundation.
21        A.  That would be my expectation, yes.
22        Q.  (By Mr. Sebba)  And you and your team wrote
23 down what Lieutenant Canino told you about each of these
24 topics, correct?
25        MR. RINGEL:  Object to the form and the

1 foundation.
2        A.  We wrote down a summary of our
3 understanding of what we learned from Lieutenant Canino
4 about each of these topics, yes.
5        Q.  (By Mr. Sebba)  Okay.  And would you expect
6 the opinions of you and your team to appear underneath any
7 of these redactions?
8        MR. RINGEL:  Object to the form, the
9 foundation.  Mischaracterizes the deliberative-process
10 privilege and its applicability and assertion in this
11 case.  And mischaracterizes the Court's order.
12        You can answer, if you understand the
13 question.
14        A.  I would not have that expectation.
15        Q.  (By Mr. Sebba)  Okay.  Great.
16        I'm going to stop sharing my screen, and
17 I'm going to introduce another document -- another one of
18 these memos.  This is -- well -- I'm introducing as
19 Exhibit 4 the document bearing the Bates stamp DEN011730.
20 I'll share my screen in just a moment.
21        (Exhibit 4 was marked.)
22        Q.  All right.  Can you see this document?
23        A.  I can.
24        Q.  Okay.  Do you recognize this document?
25        A.  I do.

1        Q.  What is this document?
2        A.  This is an interview memo prepared by my
3 former deputy, Carri Weyman, reflecting an interview that
4 I conducted of DPD Lieutenant Kim Lovato on
5 September 2nd, 2020.
6        Q.  Okay.  And do you -- have you seen this
7 document before?
8        A.  I have.
9        Q.  Okay.  You helped prepare this document,
10 correct?
11        A.  I reviewed it in draft form and gave
12 feedback and possibly edits to Ms. Weyman about the draft
13 of this interview memo before it was finalized.
14        Q.  Okay.  Great.
15        So in this memo we have a number of
16 headings with paragraphs underneath them, correct?
17        A.  Yes.
18        Q.  All right.  I'd like to scroll to the
19 bottom of the first page of the memo.  There's a heading
20 here, GFP Briefings, correct?
21        A.  Yes.
22        Q.  And underneath, we have an entirely
23 redacted paragraph followed by an unredacted paragraph,
24 correct?
25        A.  Correct.

9 (Pages 30 - 33)

Page 34

1    Q.   Okay.  And underneath these redactions, you
2  and your team would have written down what
3  Lieutenant Lovato told you about the GFP briefings,
4  correct?
5        MR. RINGEL:  Object to the form and the
6  foundation.
7     A.   We would have summarized our understanding
8  of what the witness said about the GFP briefings, yes.
9     Q.   (By Mr. Sebba)  And would you expect your
10  opinions or the opinions of your team to appear underneath
11  these redactions?
12        MR. RINGEL:  Object to the form and the
13  foundation.
14     A.   I would not have that expectation.
15     Q.   (By Mr. Sebba)  What's the probability that
16  your opinions or the opinions of your team appear
17  underneath these redactions?
18        MR. RINGEL:  Object to the form and the
19  foundation.
20     A.   I think it's extremely probable that our
21  understanding of the things that the witness told us
22  appear under those redactions.  I think it's unlikely
23  that our opinions are reflected in -- in this interview
24  memo.
25     Q.   (By Mr. Sebba)  And -- and what's the

Page 35

1  probability that every single word in this paragraph
2  includes an opinion of you or your team?
3        MR. RINGEL:  Object to the form, the
4  foundation.  Mischaracterizes the deliberative-process
5  privilege and its assertion in this case and the ruling
6  of the Court.
7        You may answer, if you understand the
8  question.
9        MR. SEBBA:  Please keep your objections to
10  form.  Speaking objections are improper.
11        MR. RINGEL:  Okay.  Mr. Sebba, I'm about
12  to shut down this deposition because you're violating a
13  court order and you're wasting time and you're abusing
14  the deposition process.  So please don't tell me how to
15  conduct the deposition.
16        If you want me to instruct the witness not
17  to answer your questions that are, in my opinion,
18  violating the court order, I will.  But don't tell me
19  what to do, please.
20        MR. MCNULTY:  Andrew, he's allowed to make
21  those objections -- this is Andy McNulty -- to you the
22  way that you're instructing the witness not -- of how to
23  answer the question and the way that you're making
24  speaking objections.  So he's allowed to make that
25  record, and I fully support him doing so.

Page 36

1        And if you want to instruct the witness
2  not to answer, it's your right to do so, but you haven't
3  done that so far.
4        So please do not berate Mr. Sebba for
5  simply making that objection on the record.
6        Thank you.
7        MR. RINGEL:  Okay.  Mr. McNulty, Mr. Sebba
8  did not object to what I did; he told me what to do.
9  That is inappropriate.  He can -- he can make any record
10  he wants to.  I agree with you about that there.  But
11  that's not what he did.
12        So if you want to characterize my actions,
13  it would be appropriate for you for characterize them
14  accurately.
15        MR. SEBBA:  All right.  Ms. Tubbs, do you
16  mind repeating my last question?
17        (The last question was read.)
18        MR. RINGEL:  Same objections.
19     A.   I think it's very unlikely.  I don't
20  know -- it's hard for me to give a numeric probability,
21  but that would not be my expectation about the content of
22  this memo in the redacted or the unredacted portions.
23     Q.   (By Mr. Sebba)  Thank you.
24        Next we have a heading Team Briefings,
25  correct?

Page 37

1     A.   Yes.
2     Q.   And underneath that, there's an unredacted
3  paragraph, followed by one, two -- three redacted --
4  entirely redacted paragraphs, correct?
5     A.   I see that, yes.
6     Q.   And you would expect that underneath these
7  redacted paragraphs there's a summary of what you and your
8  team were told by Lieutenant Lovato, correct?
9        MR. RINGEL:  Object to the form and the
10  foundation.
11     A.   That would be my expectation, yes.
12     Q.   (By Mr. Sebba)  And would you expect the
13  opinions of you or your team to appear underneath these
14  redactions?
15        MR. RINGEL:  Object to the form and the
16  foundation.  Incorrect assertion of the content of the
17  deliberative-process privilege and the Court's ruling in
18  this case.
19        THE DEPONENT:  Can I have the question
20  back, please, Ms. Reporter?
21        (The last question was read.)
22     A.   I would not have that expectation.
23     Q.   (By Mr. Sebba)  All right.  Next we've got
24  the heading GFP Crowd Behavior, correct?
25     A.   Yes.

10 (Pages 34 - 37)

Page 38

1    Q.   And here we have -- and following that
2 heading, there's one -- two entirely redacted paragraphs.
3        Withdrawn.
4        Following that heading, there's an entirely
5 redacted paragraph followed by a paragraph with one
6 unredact- -- unredacted sentence followed by a third
7 entirely redacted paragraph, correct?
8    A.   I think it's followed by a second entirely
9 redacted paragraph, which happens to be the third
10 paragraph in that section.
11    Q.   Thank you for clarifying.
12        And the one unredacted sentence reads,
13 Lieutenant Lovato also described the crowd throwing rocks
14 and bottles at the officers, correct?
15    A.   Yes.
16    Q.   All right.  In this section, underneath
17 these redactions, you'd expect that you or your team wrote
18 down a summary of what Lieutenant Lovato told you,
19 correct?
20        MR. RINGEL:  Object to the form and
21 foundation.
22    A.   That is my expectation, yes.
23    Q.   (By Mr. Sebba)  And you would not expect
24 the opinions of you -- withdrawn.
25        You would not expect the opinions of you or

Page 39

1 your team to appear underneath these redactions, correct?
2        MR. RINGEL:  Object to the form,
3 foundation, the mischaracterization of the applicability
4 of the deliberative-process privilege and the Court's
5 order in this case.
6    A.   That would not be my expectation, no.
7    Q.   (By Mr. Sebba)  Okay.  Next there's a
8 heading Radio Communication, correct?
9    A.   Yes.
10    Q.   All right.  And we've got two entirely
11 redacted paragraphs, correct?
12    A.   Yes.
13    Q.   And you would expect here that you -- you
14 and your team wrote down a summary of what
15 Lieutenant Lovato told you about radio communication
16 during the George Floyd protests, correct?
17        MR. RINGEL:  Object to the form and
18 foundation.
19    A.   That is my expectation, yes.
20    Q.   (By Mr. Sebba)  And you would not expect
21 that you or your team wrote down your opinions,
22 correct -- withdrawn.
23        You would not expect the opinions of you or
24 your team to appear underneath these redactions, correct?
25        MR. RINGEL:  Object to the form,

Page 40

1 foundation, the mischaracterization of the applicability
2 of the deliberative-process privilege in this case and
3 the Court's order.
4    A.   That's correct.
5    Q.   (By Mr. Sebba)  Okay.  I'd like to scroll
6 through the rest of the document.  There's a heading -- or
7 here we see a number of more headings with a number of
8 entirely redacted paragraphs, correct?
9        MR. RINGEL:  Object to the form.
10    A.   I see several headings in the memo after
11 the point in the memo that we just discussed that have
12 some entirely redacted paragraphs, yes.
13    Q.   (By Mr. Sebba)  Okay.  And you would expect
14 that -- and you would expect that underneath those
15 redactions would be a summary of what Lieutenant Lovato
16 told you and your team, correct?
17        MR. RINGEL:  Object to the form and
18 foundation.
19    A.   Correct.
20    Q.   (By Mr. Sebba)  And you would not expect
21 the opinions of you or your team to appear underneath
22 those redactions, correct?
23        MR. RINGEL:  Object to the form, the
24 foundation, the mischaracterization of the
25 deliberative-process privilege and its applicability in

Page 41

1 this case and the Court's order.
2    A.   Correct.
3        MR. SEBBA:  Okay.  I'm going to stop my
4 screen share for a moment.
5        And before we continue, now might be a
6 good time for a five-minute break, if that's okay with
7 everyone.
8        THE DEPONENT:  It's fine with me.  Yep,
9 that's fine.
10        MR. SEBBA:  Let's go off the record.
11        THE VIDEOGRAPHER:  Going off the record at
12 1:36 p.m.
13        (Recess from 1:36 p.m. to 1:45 p.m.)
14        THE VIDEOGRAPHER:  We are back on the
15 record at 1:45 p.m.
16        MR. SEBBA:  All right.  Before we get back
17 to questioning, Andrew, I just want to say, it's my
18 understanding that objections to this district should be
19 limited to form.  I'm sorry we got crosswise on that.
20        I also was just wondering -- I'd
21 appreciate your explanation on how my questions are
22 misapplying, as you say, the court order and the
23 privilege.
24        MR. RINGEL:  Because the assertion of the
25 privilege in this case is not just the opinions of the

11 (Pages 38 - 41)

1 Office of the Independent Monitor; it's the opinions of
2 the officers who gave information.  And that was very
3 clear.  And none of your questions have asked that.  And
4 Mr. Mitchell's answers have noted the officers' opinions.
5        But there are two parts of the
6 deliberative-process privilege that are at issue in this
7 case.  One, the opinions and thought processes of the
8 interviewers, but also the interviewees in this context.
9        And the Court ruled that they were
10 appropriate redactions.  You asked him to reconsider, he
11 said No, and now we're spending a lot of time in a
12 deposition on the issues that the Court has already
13 decided.
14        But it's your deposition, and you can do
15 that if you so choose.
16        MR. SEBBA:  Okay.  All right.
17        Mr. Mitchell, welcome back.
18        I'd like to introduce as Exhibit 5 a
19 document bearing the Bates stamp DEN011714.  I will share
20 my screen in just a moment.
21        (Exhibit 5 was marked.)
22        Q.  (By Mr. Sebba)  All right.  Can you see
23 this document?
24        A.  I can.
25        Q.  Okay.  Do you recognize this document?

1        A.  It appears to be an interview memo
2 prepared by my former deputy, Kevin Strom, documenting an
3 interview that we conducted of Lieutenant -- or perhaps
4 former Lieutenant John Coppedge on September 9th, 2020.
5        Q.  Okay.  Did you participate in the
6 preparation of this document?
7        A.  I believe that I reviewed it when it was
8 in draft form and may have made edits or suggestions
9 associated with its content.
10        Q.  Okay.  Great.
11        If we scroll down on this first page,
12 there's a section titled Leadership Failure, correct?
13        A.  Yes.
14        Q.  And we've got -- an entire section is
15 redacted, correct?
16        A.  Can you scroll down to the next page,
17 please?
18        Yes.  The entire section is redacted.
19        Q.  Okay.  And you would expect that you and
20 your team wrote down a summary of -- I'm sorry.
21        You would expect that you and your team
22 wrote down a summary of what Lieutenant Coppedge told you;
23 is that correct?
24        MR. RINGEL:  Object to the form and the
25 foundation.

1        A.  I would expect that we wrote down a
2 summary of what Lieutenant Coppedge told us about this
3 particular subject, yes.
4        Q.  (By Mr. Sebba)  Okay.  And would you expect
5 that in this section there were no factual statements?
6        Withdrawn.
7        Would you expect that in this section there
8 were no sentences that reflected only factual statements
9 from Lieutenant Coppedge?
10        MR. RINGEL:  Object to the form and the
11 foundation.
12        A.  I'm not sure that I understood the
13 question.
14        Q.  (By Mr. Sebba)  Would -- would you expect
15 that every word of these re- -- underneath these
16 redacted -- withdrawn.
17        Would you expect that every word underneath
18 these redactions reflect a statement of opinion by
19 Lieutenant Coppedge?
20        MR. RINGEL:  Object to the form and the
21 foundation.
22        A.  It's hard to know.  Given the subject
23 discussed here, leadership failure, is, by its nature, you
24 know, slightly -- it's more likely in a section like this
25 that much of the information that we recorded were

1 statements of opinion or perception by the witness.
2        So I would distinguish this section from
3 some others that we've discussed today that appear, to
4 me, to be more factual in nature, whereas this, based on
5 the heading, is suggestive of opinion, to some extent.
6        Q.  (By Mr. Sebba)  Okay.  And would you expect
7 that every word of this section reflects a statement of
8 opinion by you or your team?
9        MR. RINGEL:  Object to the form and the
10 foundation and the mischaracterization of the
11 deliberative-process privilege and the court order.
12        A.  I would not expect our opinions to be
13 reflected in the memo -- in this section of the memo, no.
14        Q.  (By Mr. Sebba)  Okay.  Let's go to the next
15 section.  This section is titled Change in Emphasis on
16 Training, correct?
17        A.  Yes.
18        Q.  And we have -- in this entire section,
19 which is one, two, three -- four paragraphs long, is
20 entirely correct -- entirely redacted -- excuse me --
21 correct?
22        A.  It appears to be, yes.
23        Q.  Okay.  And you would expect that you and
24 your team wrote down a factual summary of what the witness
25 told you about a change in emphasis on training, correct?

1      MR. RINGEL:  Object to the form and the
2  foundation.
3      A.  That is my expectation, yes.
4      Q.  (By Mr. Sebba)  And would you expect that
5  every word in this section reflects a statement of opinion
6  by the officer you were interviewing?
7      MR. RINGEL:  Object to the form and the
8  foundation.
9      A.  No.  I would not expect that every word in
10  this subsection would reflect a statement of opinion by
11  the lieutenant, no.
12      Q.  (By Mr. Sebba)  And would you expect that
13  every word of -- withdrawn.
14      Would you expect in any of these
15  redactions, to find the opinions of you or your team?
16      MR. RINGEL:  Object to the form and the
17  foundation.
18      A.  I would not expect to find my opinions in
19  this section or opinions of members of my team.
20      Q.  (By Mr. Sebba)  Okay.  Next we have a
21  section titled Less Lethal, Crowd Management, and Field
22  Force Training, correct?
23      A.  Yes.
24      Q.  And here we have one, two, three, four,
25  five, six -- seven paragraphs that are entirely redacted,

1  correct?
2      A.  Yes.
3      Q.  So would you -- sorry.  Withdrawn.
4      You would expect that underneath these
5  redactions would be a factual summary of what the witness
6  told you and your team, correct?
7      MR. RINGEL:  Object to the form and the
8  foundation.
9      A.  Correct.
10      Q.  (By Mr. Sebba)  And would you expect that
11  every word of this document reflects an opinion by the
12  officer that you were interviewing?
13      MR. RINGEL:  Object to the form and the
14  foundation.
15      A.  I would expect that the words in that
16  section would reflect factual information shared by the
17  lieutenant with me and Mr. Strom, and may have also
18  included some amount of his perceptions or his
19  interpretations of that factual information.
20      I would not expect, though, that those
21  perceptions, interpretations, or opinions would comprise
22  all of the words in this subsection.
23      Q.  (By Mr. Sebba)  And would you expect the
24  subsection to include the opinions of you and your team?
25      MR. RINGEL:  Object to the form and the

1  foundation.
2      A.  No.
3      Q.  (By Mr. Sebba)  All right.  And then next
4  we have a heading Training Academy Role in GFP, correct?
5      A.  Yes.
6      Q.  And underneath that heading, there's one
7  entirely redacted paragraph, correct?
8      A.  Yes.
9      Q.  And you would expect, underneath those
10  redactions, that you and your team wrote -- withdrawn.
11      You expect that underneath those
12  redactions would include a factual summary of what the
13  witness told you and your team, correct?
14      MR. RINGEL:  Object to the form and the
15  foundation.
16      A.  Yes.
17      Q.  (By Mr. Sebba)  And would you expect that
18  every word in that redacted paragraph reflects a statement
19  of opinion by the officer that you were interviewing?
20      MR. RINGEL:  Object to the form and the
21  foundation.
22      A.  I think that's unlikely.
23      Q.  (By Mr. Sebba)  Okay.  And would you
24  expect, underneath those redactions, to find the opinions
25  of you or your team?

1      MR. RINGEL:  Object to the form and the
2  foundation.
3      A.  No.
4      Q.  (By Mr. Sebba)  Okay.  All right.  And just
5  for the record, for this memo of Lieutenant Coppedge,
6  which is Exhibit 5, we've gone through every heading
7  except for the opening and the one titled Introductions,
8  correct?
9      MR. RINGEL:  Object to the form and the
10  foundation.
11      A.  I believe that's correct, though I'd have
12  to -- if you don't mind scrolling down, I can confirm.
13      Q.  (By Mr. Sebba)  Sure.  Let me know if I'm
14  going too fast or slow.
15      A.  Yeah, I believe that's correct.
16      Q.  Great.
17      MR. SEBBA:  I'm going to stop sharing my
18  screen for a moment.
19      Okay.  I would like to introduce as
20  Exhibit 6, the document bearing the Bates stamp DEN011695.
21      (Exhibit 6 was marked.)
22      Q.  I'll share my screen in a moment.
23      All right.  Can you see this document?
24      A.  I can.
25      Q.  Do you recognize in document?

13 (Pages 46 - 49)

1    A.  I do.
2    Q.  What is this?
3    A.  This is an interview memo prepared by my
4  former deputy, Kevin Strom, reflecting an interview that
5  I conducted of DPD Deputy Chief Barb Archer on
6  September 3rd, 2020.
7    Q.  And did you participate in the preparation
8  of this document?
9    A.  Like the other memos that we've discussed,
10  I expect that I reviewed it in draft form and made edits
11  and changes to the document before it was finalized.
12    Q.  Okay.  Great.
13    Here there's -- the first heading is
14  Introductions, correct?
15    A.  Yes.
16    Q.  And next there's a heading Size and Scope
17  of the Demonstrations, correct?
18    A.  Yes.
19    Q.  And underneath that there's an entirely
20  redacted paragraph?
21    A.  Correct.
22    Q.  Okay.  And you would expect that underneath
23  these redactions there's a factual summary of what the
24  witness told you and your team, correct?
25    MR. RINGEL:  Object to the form and the

1  foundation.
2    A.  Correct.
3    Q.  (By Mr. Sebba)  And would you expect that
4  every word underneath these redactions reflects a
5  statement of opinion by Chief Archer?
6    MR. RINGEL:  Object to the form and the
7  foundation.
8    A.  I would not expect that, no.
9    Q.  (By Mr. Sebba)  And would you expect,
10  underneath these redactions, to find statements of opinion
11  by you or your team?
12    MR. RINGEL:  Object to the form and the
13  foundation.
14    A.  I would not expect that, no.
15    Q.  (By Mr. Sebba)  Okay.  Next there's a
16  heading Crowd Engagement, correct?
17    A.  Yes.
18    Q.  And we have one, two -- three entirely
19  redacted paragraphs, correct?
20    A.  Yes.
21    Q.  Underneath these paragraphs, you would
22  expect to find a factual summary of what Chief Archer told
23  you and your team, correct?
24    MR. RINGEL:  Object to the form and the
25  foundation.

1    A.  I would.
2    Q.  (By Mr. Sebba)  And would you expect that
3  every word underneath these redactions reflects a
4  statement of opinion by Chief Archer?
5    MR. RINGEL:  Object to the form and the
6  foundation.
7    A.  I would not.
8    Q.  (By Mr. Sebba)  And underneath these
9  redactions, would you expect to find the opinions of you
10  or your team?
11    MR. RINGEL:  Object to the form and the
12  foundation.
13    A.  I would not expect that.
14    Q.  (By Mr. Sebba)  Okay.  Next there's a
15  heading Officer Mental Health, correct?
16    A.  Yes.
17    Q.  And that's an entirely
18  redacted paragraph -- withdrawn.
19    Underneath that heading, there's an
20  entirely redacted paragraph, correct?
21    A.  Correct.
22    Q.  And would you expect, underneath that
23  paragraph, to find a factual summary of what Chief Archer
24  told you about officer mental health?
25    MR. RINGEL:  Object to the form and the

1  foundation.
2    A.  I would expect to find, as the second in
3  command of the Denver Police Department, that
4  Chief -- that underneath those redactions, there is a --
5  there may be a factual summary and there may also be her
6  opinions or perceptions about officer mental health.  So
7  I would expect to find both facts and opinion in that
8  section.
9    Q.  (By Mr. Sebba)  Okay.  Would you expect
10  that every word in that paragraph would reflect the
11  opinions of Chief Archer?
12    MR. RINGEL:  Object to the form and
13  foundation.
14    A.  I doubt it.  But given the subject matter
15  of that subsection, which, you know, necessarily involves
16  some of that perception and opinion, I can't be as
17  particular about this subsection as I have been regarding
18  others that we've discussed.
19    Q.  (By Mr. Sebba)  Understood.
20    And would you expect to find the opinions
21  of you or your team underneath those redactions?
22    MR. RINGEL:  Object to the form and the
23  foundation.
24    A.  I would not.
25    Q.  (By Mr. Sebba)  Okay.  Next there's a

1 heading Command Post Structure Communications and
2 Dissemination of Information, correct?
3    A.  Correct.
4    Q.  And underneath that, there are two entirely
5 redacted paragraphs, correct?
6    A.  Yes.
7    Q.  All right.  Would you expect that
8 underneath those paragraphs there's a factual paragraph of
9 what Chief Archer told you and your team?
10       MR. RINGEL:  Object to the form and the
11 foundation.
12    A.  Yes.
13    Q.  (By Mr. Sebba)  And would you expect that
14 every word of these two paragraphs reflects a statement of
15 opinion by Chief Archer?
16       MR. RINGEL:  Object to the form and the
17 foundation.
18    A.  No.
19    Q.  (By Mr. Sebba)  And would you expect that
20 every word of this paragraph -- withdrawn.
21       Would you expect, underneath these
22 redactions, to find the opinion -- statements of opinion
23 by you or your team?
24       MR. RINGEL:  Object to the form and the
25 foundation.

1    A.  No.
2    Q.  (By Mr. Sebba)  Okay.  And next there's a
3 heading Lessons Learned and Takeaways, correct?
4    A.  Yes.
5    Q.  And after that, there's one, two -- three
6 entirely redacted paragraphs, correct?
7    A.  Yes.
8    Q.  And you would expect in those paragraphs --
9 that those paragraphs would include a factual summary of
10 what Chief Archer told you and your team, correct?
11       MR. RINGEL:  Object to the form and the
12 foundation.
13    A.  Yes.
14    Q.  (By Mr. Sebba)  Would you expect that every
15 word of these paragraphs reflects a statement of opinion
16 by Chief Archer?
17       MR. RINGEL:  Object to the form and the
18 foundation.
19    A.  I think -- I think it's unlikely that
20 every word would reflect a statement of opinion.
21       This subsection, though, necessarily
22 involves perceptions and interpretations.  And so it -- I
23 think it's likely that her opinions are reflected in this
24 section.
25    Q.  (By Mr. Sebba)  Okay.  Would you expect

1 that it's entirely her opinion -- withdrawn.
2       Would you expect her -- that this section
3 is entirely comprised of Chief Archer's opinions?
4       MR. RINGEL:  Object to the form and the
5 foundation.
6    A.  It's hard for me to know without seeing
7 the document.  I think it's unlikely, but not impossible,
8 given the subject of this subsection.
9    Q.  (By Mr. Sebba)  And would you expect to
10 find the opinions of you or your team underneath these
11 redactions?
12       MR. RINGEL:  Object to the form and the
13 foundation.
14    A.  No.
15    Q.  (By Mr. Sebba)  Okay.  And that's the last
16 section of this document, correct?
17    A.  Correct.
18    Q.  All right.  So I just want to go back to
19 the beginning.  And once again, for this memo, except for
20 the opening paragraph and the section titled Introduction,
21 we have discussed each -- each subsection of this
22 document, correct?
23    A.  Yes.
24    Q.  Okay.  I'm going to stop sharing my screen.
25       So I have a number of -- you know, there's

1 a number of these memos, but rather than going through
2 each one, let me ask more generally.
3       It was your practice in these memos to
4 include factual summaries of what witnesses told you,
5 correct?
6       MR. RINGEL:  Object to the form and
7 foundation.
8    A.  Yes.
9    Q.  (By Mr. Sebba)  And I'm sorry.  Let me
10 clarify that for the record.
11       It was your practice in the memos you wrote
12 summarizing interviews with DPD officers in preparation of
13 your report for the GFP protests to include factual
14 summaries of what the officers told you; is that correct?
15       MR. RINGEL:  Object to the form and
16 foundation.
17    A.  It was my practice, and it was my guidance
18 to my team, as reflected in the guidance that I issued to
19 them about these memos, that they should include
20 summaries of information, facts, and potentially
21 opinions, if opinions were shared with us, by the
22 witnesses.  And so that's what I would expect to be
23 reflected in these memos.
24    Q.  (By Mr. Sebba)  Okay.  Would you expect
25 there to be many sections that reflected entirely officer

1 opinions and did not include any factual information
2 relayed by officers?
3          MR. RINGEL:  Object to the form and
4 foundation.
5     A.   I would not expect there to be many
6 sections that included only officer opinions.  Though in
7 looking through some of the memos, some of the sections,
8 like Lessons Learned, for example, might be comprised of
9 entirely, you know, summaries of officer opinion.
10          Other sections that are more factual in
11 nature, it's unlikely that there was much, if any,
12 officer opinion reflected in those subsections.
13    Q.   (By Mr. Sebba)  Okay.  And would you expect
14 to find the opinions of you or your team in these memos?
15          MR. RINGEL:  Object to the form and the
16 foundation.
17    A.   I would not.
18    Q.   (By Mr. Sebba)  Okay.  You mentioned that
19 you issued guidance to your team in relation to these
20 interview memos; is that correct?
21    A.   Yes.
22    Q.   What form did that guidance take?
23    A.   I sent a memo to -- to the team.  And
24 it's -- you know, it's quite a while, so I don't remember
25 the particulars.  But before we began -- actually, it was

1 an email to the members of the team who would be
2 assisting me in the interviews that discussed my
3 expectations for how they should assist me as I was
4 conducting these interviews and the content that I
5 expected to be included in the interview memos as well as
6 guidance about organization of the material that we
7 learned from each -- from the witnesses as -- as it
8 should be organized in the interview memos.
9          MR. SEBBA:  Okay.  Counsel, we -- I'd like
10 to request that memo -- or that email -- excuse me -- be
11 produced.
12          MR. RINGEL:  I believe that's been
13 produced, but if you want to send me an email, I'll look
14 into it.
15          MR. SEBBA:  Thank you.
16    Q.   (By Mr. Sebba)  Okay.  I would like
17 to -- I'm going to go back to marked Exhibit -- or
18 Exhibit 1.  I'll pull it up and share my screen.
19          Okay.  Can you see this document?
20    A.   Yes, I can.
21    Q.   Okay.  And this is the -- as you noted
22 earlier, this is Exhibit 1, which is the report that you
23 and your office prepared regarding the police response to
24 the 2020 George Floyd protests in Denver, correct?
25    A.   Yes.

1    Q.   Over what period of time did you work on
2 this report?
3    A.   I would have to -- if you want specific
4 dates, I'm not sure that I can recall.  I can give you
5 sort of, you know, general dates.  But I think inside the
6 report is a methodology section that may include specific
7 dates, if that's what you're interested in.
8    Q.   Okay.  What were the general dates that you
9 worked on this report?
10    A.   So I think we began -- and actually, I'm
11 sorry.  If I can clarify the question.  When you say
12 "this report," do you mean the investigation, plus the
13 preparation of this report?  Or are you just referring to
14 drafting and editing of the document itself?
15    Q.   Sure.
16          What were the rough dates that you worked
17 on the investigation relating to this report and preparing
18 the report?
19    A.   So I believe that we were asked to do the
20 investigation in June of 2020, and we began the
21 investigation in June 2020.  I think the investigation
22 took us several months.
23          And I can't remember precisely when we
24 began drafting the report, but I think we -- you know,
25 it's my -- it was my practice as the monitor to share

1 drafts of reports before they were issued with the City
2 Attorney's Office, with the police chief, or the sheriff
3 and the director of safety.  And I believe that we had a
4 sort of -- you know, a document that was in a state to be
5 shared with those stakeholders by probably sometime in
6 November of 2020.
7    Q.   And how many man-hours would you say were
8 spent on this report between you and your team?
9    A.   I couldn't even estimate, but it was a
10 tremendous amount of labor to review every piece of
11 body-worn-camera footage, every piece of radio traffic,
12 to conduct these interviews and prepare the memos, to
13 review voluminous records, and then, of course, writing
14 is always time-consuming.
15          So I couldn't even begin to calculate how
16 long it took, but it was a substantial investment of time
17 and labor by both me and my team.
18    Q.   Okay.  Do you feel that you and your team
19 invested enough time to figure out what happened -- how
20 the DPD behaved -- withdrawn.
21          Do you feel that you and your team invested
22 enough time to figure out what happened during the George
23 Floyd protests?
24          MR. RINGEL:  Object to the form.
25    A.   I think we -- it would have been

16 (Pages 58 - 61)

Page 62

1 impossible to figure out everything that happened during
2 the George Floyd protests or investigate every incident.
3 And that wasn't fundamentally the -- our charge from City
4 Council and what we set out to do with this report.
5          We set out to understand the way in which
6 the department organized its response to the protests and
7 the policy framework that the department was operating
8 within and identify weaknesses or deficiencies that may
9 have contributed to some of the problems and challenges
10 that we observed during the protests.
11          And I think we -- there may have been
12 issues that we were not able to address, but I think that
13 we invested sufficient time to analyze many of the issues
14 that came up as we conducted the investigation.  There
15 was a whole separate process involving Internal Affairs
16 investigations that were opened to evaluate the conduct
17 of officers in individual incidents.
18          And while we also invested a tremendous
19 amount of time into overseeing those investigations, much
20 of that work is not reflected in the report that you've
21 marked as Exhibit 1 here.
22     Q.  Understood.
23          So as part of this report, you made a
24 number of conclusions and recommendations, correct?
25     A.  Yes.

Page 63

1     Q.  And you take -- do take these conclusions
2 and recommendations seriously?
3     A.  What do you mean?
4     Q.  I guess you understand that these
5 recommendations can influence DPD policy, correct?
6     A.  I should hope so.
7     Q.  And as a result, they can influence the
8 life of Denver citizens?
9     A.  Yes.
10    Q.  -- correct?
11         And so do you feel like you and your team
12 spent enough time and effort to properly reach the
13 conclusions and the recommendations you made in this
14 report?
15         MR. RINGEL:  Object to the form.
16    A.  I'm not sure that I understand.
17    Q.  (By Mr. Sebba)  I suppose I'm asking -- do
18 you feel that you've -- that the time and effort you put
19 into investigating and researching for this report led you
20 to -- withdrawn.
21         I'm asking if you would stand by your
22 recommendations in this -- let's take this a step at a
23 time.
24         Would you stand by the recommendations you
25 made in this report?

Page 64

1     A.  I would, and I do.
2     Q.  And is that because you and your team spent
3 enough time that you feel that you can confidently say
4 that these recommendations would improve the DPD?
5         MR. RINGEL:  Object to the form.
6     A.  In my view, yes.
7     Q.  (By Mr. Sebba)  Okay.  I would like to turn
8 to page -- this is page 53 of the report, bearing the
9 Bates stamp DEN003985.
10        Do you recognize this portion of the
11 report?
12    A.  I believe this may be a list of all the
13 recommendations that we made that -- I believe it may
14 appear at the conclusion of the sections that reflect our
15 analysis in the report.
16    Q.  Okay.  Here, the first recommendation is
17 that, The OIM recommends the DPD amend its operations and
18 crowd management manuals to require the creation of a log
19 or tracking system for the distribution and deployment of
20 all less lethal munitions during crowd control events,
21 correct?
22    A.  Yes.
23    Q.  Do you recall what facts led you to this
24 conclusion?
25        MR. RINGEL:  Object to the form and the

Page 65

1 foundation.
2     A.  Well, what -- what specific facts?  I
3 dispute -- I recall that we learned in interviews with
4 DPD personnel at various levels as well as responses that
5 we received to our document requests for any tracking
6 information about the distribution and deployment of less
7 lethal during the George Floyd protests, as well as best
8 and common practices for police departments responding to
9 large-scale protest events, that we concluded that the
10 DPD did not have a sufficient -- or adequate log or
11 tracking system to monitor the distribution and
12 deployment of less-lethal munitions that were being used
13 by officers in the field during these protests.
14    Q.  And what were the consequences of the DPD
15 not having this log or tracking system in place?
16        MR. RINGEL:  Object to the form and the
17 foundation.
18    A.  It's hard to answer that question.  I'm
19 not sure that we answered that, specifically, in the
20 report.  I don't remember if we do.  But it's -- it's --
21 you know, when you're doing this kind of analysis,
22 causation is often a challenge because there are so many
23 things that are influencing the behavior of the crowd as
24 well as the behavior of officers who are policing the
25 crowd.

17 (Pages 62 - 65)

Page 66

1       So the specific consequences of the lack
2   of a log or tracking system are, to some extent, hard to
3   say, as I sit here today.  But it was clearly a gap, and
4   we recommended that it be filled.
5       Q.  (By Mr. Sebba)  Okay.  Let me rephrase the
6   question a little bit, then.
7           What would the -- what would the benefit of
8   creating such a log or tracking system be?
9           MR. RINGEL:  Object to the form.
10      A.  Well, police management with an effective
11  log or tracking system in place, managers of the police
12  department who are overseeing the response would have a
13  better sense of, you know, which officers or which teams
14  were utilizing which kinds of munitions and at what
15  rates.  It would facilitate an investigation into any
16  allegations of inappropriate force that might be raised.
17  It would allow for supervisory intervention if one team
18  in particular, for example, is using particular kinds of
19  munitions at disproportionate rates.
20          So developing a log or tracking system
21  would enable, you know, more proactive management to make
22  sure that less-lethal munitions are being used in
23  conformity with the policies of the Denver Police
24  Department.
25      Q.  Okay.  Now, Bullet Number 2 in this -- on

Page 67

1   this page of the memo is, The OIM recommends the DPD amend
2   its crowd management manual to require the creation of
3   rosters of all officers who are assigned to crowd control
4   events and that the DPD ensure that such rosters are
5   created in the future, correct?
6       A.  Yes.
7       Q.  All right.  And what -- what facts led you
8   to this recommendation?
9           MR. RINGEL:  Object to the form.
10      A.  The fact that they told us that they
11  didn't have rosters for most of the days and
12  nights -- most of the protest days and nights during the
13  first five days of the George Floyd protests.
14      Q.  Okay.  And what would --
15          THE REPORTER:  I'm sorry.  Can you repeat
16  the answer, please?
17          THE DEPONENT:  Yeah.
18      A.  We were told that they had not
19  prepared -- and when I say "they," I mean the Denver
20  Police Department -- had not prepared rosters reflecting
21  which officers were assigned to work the protests and
22  where each officer was working, with what assignments,
23  for many of -- I believe, four of the first five days of
24  the George Floyd protests.
25      Q.  (By Mr. Sebba)  Okay.  And what would the

Page 68

1   benefit of require -- of the creation of such rosters be?
2           MR. RINGEL:  Object to the form and the
3   foundation.
4       A.  Well, again, it relates to the ability to
5   kind of proactively manage personnel.  It would permit
6   the incident commander and others to determine where they
7   have enough resources and where they may be deficient in
8   resources.  It would enable -- it would be very helpful
9   for investigations into individual incidents to have
10  information about officer assignments and who was
11  assigned to do what where, given the challenges that we
12  experienced in identifying officers who -- in
13  investigations into allegations of excessive force.
14          So it would have been a tool that would
15  have been useful for managers within the police
16  department as well as investigators after the fact
17  attempting to look into allegations of inappropriate
18  force that were filed.
19      Q.  (By Mr. Sebba)  Okay.  The third bullet or
20  third recommendation here is that, The OIM recommends the
21  DPD amend its operations and crowd management manuals to
22  require that all sworn personnel working in the field
23  during protest operations be required to wear BWCs,
24  regardless of rank.  Further, the OIM recommends that
25  protest operations plans assign a supervisor to conduct

Page 69

1   regular spot-check comparisons between rosters and the BWC
2   database to identify any gaps in officer recording that
3   must be addressed, correct?
4       A.  Yes.
5       Q.  And first, BWC here means body-worn camera,
6   correct?
7       A.  Yes.
8       Q.  And OIM means officer of the -- I'm
9   sorry -- Office of the Independent Monitor, correct?
10      A.  Correct.
11      Q.  Okay.  What facts led you to make this
12  recommendation?
13          MR. RINGEL:  Object to the form.
14      A.  The fact that many of the officers who
15  responded to the George Floyd protests in Denver -- and
16  to clarify, when I say "officers," I mean DPD officers,
17  not officers from other jurisdictions, because we did not
18  evaluate body-worn camera usage by officers from other
19  jurisdictions who were working in Denver, excuse me --
20  but many of the DPD officers who worked the protests did
21  not -- either did not wear or did not activate body-worn
22  cameras while they were policing the protests.
23      Q.  Okay.  And what would be the benefit of
24  implementing this recommendation?
25          MR. RINGEL:  Object to the form and the

1 foundation.
2      A.   Body-worn cameras are an important
3 accountability tool.  And there's research that suggests
4 that the presence of an active body-worn camera can
5 impact officer behavior and citizen behavior.  So, may
6 make a conflict and uses of force less likely.  So that's
7 one potential benefit.
8           Having body-worn cameras activated during
9 a large and chaotic protest would also, again, enable
10 supervisors to make determinations about whether or not
11 the protest is being managed appropriately,
12 whether -- and whether or not force is being used
13 consistent with the policies of the department.  And the
14 footage would also assist the OIM and Internal Affairs
15 and any other, you know, regulatory or prosecutorial
16 entities in investigating and reacting to particular
17 incidents involving allegations of excessive force.
18      Q.   (By Mr. Sebba)  Okay.  I'll scroll down a
19 little bit.
20           The next bullet or recommendation is Number
21 4, and that is -- that reads, The OIM recommends the DPD
22 amend its operations and crowd management manuals to
23 detail the specific requirements for use-of-force
24 reporting and review during crowd control operations.
25           The OIM also recommends that the DPD ensure

1 that use-of-force reports are promptly created by officers
2 and reviewed by supervisors and IAB during future crowd
3 control events to identify possible divergences from the
4 use-of-force policy, correct?
5      A.   Yes.
6      Q.   And here, what does IAB stand for?
7      A.   The Internal Affairs Bureau of the Denver
8 Police Department.
9      Q.   Thank you.
10           And so what facts led you to make this
11 recommendation?
12           MR. RINGEL:  Object to the form.
13      A.   The fact that DPD policy, consistent with
14 national standards in policing, generally requires
15 officers to prepare a report as soon as or shortly after
16 they have finished any -- any engagement that results in
17 a use of force and for there to be some level of
18 supervisory review of the use-of-force report and any
19 evidence that reflects the force that was used by the
20 officer, like video or witness statements, in order to
21 determine whether or not the force was used in conformity
22 with agency policy.  Coupled with the fact that during
23 the George Floyd protests, police officers generally did
24 not prepare use-of-force reports until several weeks
25 after the events at issue, which we were concerned about.

1      Q.   (By Mr. Sebba)  Okay.  And what would the
2 benefit of this recommendation be?
3           MR. RINGEL:  Object to the form and the
4 foundation.
5      A.   Well, in my view, requiring officers to
6 report any force that they used and -- or any force that
7 they used and alerting them to the fact that there will
8 be a meaningful review of those reports and the evidence
9 by supervisors may have an impact on officer behavior and
10 may help encourage officers to use force in conformity
11 with agency policy.
12           And the use-of-force reports, also like
13 body-worn-camera footage, are also extremely useful in
14 any Internal Affairs investigations conducted after the
15 fact.  And so the benefit of implementing this
16 recommendation could be that it may impact officer
17 behavior in future protest events and officer
18 decision-making about when to use force.
19           And certainly, it would help with any
20 investigations that need to be conducted into allegations
21 of excessive force.
22      Q.   (By Mr. Sebba)  Okay.  The next
23 recommendation, Number 5 here reads, The OIM recommends
24 that during future protest events, the DPD ensure that its
25 supervisors routinely issue multiple dispersal orders

1 before using force to disperse crowds when time and
2 circumstances permit, correct?
3      A.   Yes.
4      Q.   And what facts led you to make this
5 recommendation?
6           MR. RINGEL:  Object to the form.
7      A.   My recollection is that DPD policy
8 requires supervisors to issue dispersal orders before
9 using chemical munitions or other force to disperse
10 crowds, which is consistent with First Amendment guidance
11 for police departments to -- in these circumstances.
12           My recollection -- and again, we're now,
13 you know, many months past the time that I was reviewing
14 this evidence, so I don't recall all of the particulars,
15 as I sit here today.  But my recollection is that in
16 reviewing body-camera video and other video
17 from -- recorded by citizens' cell phones, we saw a
18 number of engagements -- what the -- what the specific
19 number was, I don't know -- in which force was used
20 against crowds by police officers to disperse and used
21 for the purpose of crowd dispersal, and we were unable to
22 hear dispersal orders being issued by supervisors before
23 that force was used.
24           And I think -- if I can just add to my
25 answer before you ask the next question.  I believe that

Page 74

1  we also had community members who complained to us that
2  they were gassed without being warned that gas would be
3  deployed. And I think -- though I don't recall the
4  particulars -- that we got inconsistent answers from
5  police officers and police leaders about that subject
6  when we asked about the frequency with which supervisors
7  were issuing orders for crowd dispersal before using gas
8  on crowds.
9      Q. (By Mr. Sebba) And what would be the
10  benefit if this recommendation was implemented?
11          MR. RINGEL: Object to the form and the
12  foundation.
13      A. Well, consistent again with First
14  Amendment guidance, it's in the public interest to reduce
15  the number of people who are exposed to chemical
16  munitions at a protest event.
17          And so the benefit and the reason why
18  departments are generally required to provide warnings
19  before they deploy -- when we say "force" here, usually
20  what we're talking about is chemical munitions, like gas
21  into a crowd to disperse it -- is that some people will
22  leave. There are people who are -- who may be peacefully
23  demonstrating who will adhere to guidance from a police
24  department to clear a particular area if the announcement
25  is provided, you know, with sufficient time and with

Page 75

1  sufficient specificity.
2          So the benefit is that you can -- or the
3  department could reduce the number of peaceful protestors
4  who are being exposed to chemical munitions.
5      Q. (By Mr. Sebba) Okay. The -- the next
6  recommendation, Number 6, reads, The OIM recommends that
7  the DPD ensure that crowd dispersal orders are
8  consistently audio or video-recorded and documented in
9  writing during future crowd control events, correct?
10      A. Yes.
11      Q. What facts led you to make this
12  recommendation?
13          MR. RINGEL: Object to the form.
14      A. So I believe that DPD policy, there is a
15  requirement that the department audio or video record the
16  dispersal orders that we've been discussing so there's a
17  contemporaneous sort of authoritative record reflecting
18  that the orders were given.
19          It was my understanding from interviews
20  that I conducted of supervisors in the department that
21  videographers were not generally deployed during the
22  George Floyd protests to record those dispersal orders,
23  and that to the extent that dispersal orders were given,
24  the department expected that they would be recorded on
25  body-worn cameras.

Page 76

1          And so we -- well, I'll stop there.
2      Q. (By Mr. Sebba) And what would the -- the
3  benefit of following this recommendation be?
4          MR. RINGEL: Object to the form and the
5  foundation.
6      A. The benefit of following the
7  recommendation is that we could ensure that the Denver
8  Police Department was -- or would routinely issue those
9  crowd-dispersal orders that we've been discussing.
10      Q. (By Mr. Sebba) I'm going to scroll a
11  little bit.
12          Item Number 7 here reads, The OIM
13  recommends the DPD ensure that all officers have their
14  badges and badges numbers prominently displayed and easily
15  visible on the exterior of their uniforms or protective
16  gear at all times during future crowd control events.
17          The OIM also recommends that supervisors
18  should be required to verify compliance for each member of
19  the teams under their command, correct?
20      A. Yes.
21      Q. And what facts led you to make this
22  recommendation?
23          MR. RINGEL: Object to the form.
24          THE REPORTER: Sorry. Can you repeat the
25  question, please?

Page 77

1      Q. (By Mr. Sebba) What facts led you to make
2  this recommendation?
3          MR. RINGEL: Object to the form.
4      A. The fact that we were alerted by citizen
5  participants in the protests that they often had a hard
6  time identifying officers who they had interacted with
7  because they did not see badge numbers visible on the
8  exterior of officer uniforms, coupled with interviews
9  that we conducted of personnel in the Denver Police
10  Department who told us that they did not -- or were not
11  able to attach their badges to the exterior -- excuse
12  me -- of their protective equipment that they were
13  wearing during the protests.
14      Q. (By Mr. Sebba) And what would the benefit
15  of the DPD following this recommendation be?
16          MR. RINGEL: Object to the form and the
17  foundation.
18      A. Well, a hypothetical benefit -- and
19  may- -- "hypothetical" may be slightly too weak a
20  word -- is that we generally expect in policing that when
21  people are -- when officers are identifiable and not
22  anonymous, they, you know, are more likely to behave in
23  appropriate ways and use force in appropriate ways. So
24  one benefit may be on officer behavior.
25          Another benefit would be that it would

20 (Pages 74 - 77)

Page 78

1  make it much easier for the OIM, the Internal Affairs
2  Bureau, the Denver District Attorney's Office, and any
3  other oversight or prosecutorial entities to identify
4  specific officers who may have been alleged to have used
5  excessive force or inappropriate force during these
6  events.  And so the lack of identifying information
7  during these protests made the post-protest
8  investigations much more difficult.
9      I guess a third benefit that really,
10  frankly, applies to many of these recommendations, though
11  I haven't cited it yet, is that in policing, the police
12  department -- you know, policing of mass protests, the
13  police officers are responding to crowd behavior, but the
14  crowd is also responding to behavior of the officers who
15  they're interacting with.  And -- and to the extent that
16  people in a protest crowd perceive that they're being
17  treated unfairly or that the officers are acting in ways
18  that are inappropriate or are anonymous as it relates to
19  this specific recommendation, it can have a sort of
20  inflammatory effect on crowd behavior.
21      Just like when -- when a crowd engages in
22  certain kinds of behavior, it may have an inflammatory
23  effect on police behavior, the reverse is also true.  So
24  that sort of benefit applies to many of these
25  recommendations.

Page 79

1      And, you know, if a crowd is interacting
2  with cops who are identified -- unidentifiable, it may be
3  inflammatory for the crowd.
4      Q.  (By Mr. Sebba) Okay.  Going -- going to
5  the next page.  Recommendation 8 here is, The OIM
6  recommends that the DPD ensure that only officers who have
7  been trained and certified on the use of pepperball and
8  40-millimeter launchers be permitted to use them during
9  future crowd control events.
10      The OIM also recommends that the DPD amend
11  its crowd management manual to specify that only
12  authorized officers will be allowed to use pepperball and
13  40-millimeter launchers during crowd control operations,
14  correct?
15      A.  Yes.
16      Q.  And what facts led you to make this
17  recommendation?
18      MR. RINGEL:  Object to the form.
19      A.  The fact that some officers who used
20  pepperball and 40-millimeter launchers during the
21  protests -- we could find no record that they had
22  received the specialized training in how to use those two
23  less-lethal tools safely.  Because there are very
24  particular guidelines for how to use them and make them
25  as safe as possible.

Page 80

1      And in fact, we found records indicating
2  that some officers were given pepperball or 40-millimeter
3  launchers when they arrived at the protests on particular
4  days and given some kind of emergency field training on
5  those -- on those tools rather than going through the
6  more comprehensive training that the DPD offers.
7      We thought that may have raised the level
8  of risk associated with the use of those tools during the
9  protests, and, therefore, we made this recommendation.
10      Q.  And what would be the benefit of the DPD
11  following this recommendation be?
12      MR. RINGEL:  Object to the form and
13  foundation.
14      A.  It would reduce risk.  It would help the
15  department ensure that officers who are using those tools
16  are using them in conformity with the particular guidance
17  about what areas of the body can be targeted and what
18  areas of the body cannot be targeted, and particular
19  individuals who may be at -- being at, you know,
20  particular risk from being targeted with those tools.
21      So it would largely serve to reduce risk
22  associated with the use of pepperball or 40-millimeter
23  launchers.
24      Q.  (By Mr. Sebba) Okay.  The next
25  recommendation, Number 9, reads, To enhance transparency,

Page 81

1  the OIM recommends the DPD evaluate how to most
2  effectively operationalize each of the internal controls
3  on the use of force decided in this report, and report
4  back to the public with an explanation of how they will be
5  employed during future protests, correct?
6      A.  Yes.
7      Q.  And what facts led you to make this
8  recommendation?
9      MR. RINGEL:  Object to the form.
10      A.  I'm not sure that there were particular
11  facts that led to that recommendation.  It was more my
12  sense of the need for the DPD to be transparent in its
13  responses with the public to the recommendations in the
14  report.
15      And so I wanted to convey a clear
16  expectation to the department that it had a duty to
17  report back to the public on how it was resolving the
18  issues that we raised in the report.
19      Q.  (By Mr. Sebba) Okay.  And what would the
20  benefits of the DPD following this recommendation be?
21      MR. RINGEL:  Object to the form and the
22  foundation.
23      A.  I think the benefits would be that the
24  department would be incentivized -- if it knew that it
25  had to report to the public, it would be incentivized to

21 (Pages 78 - 81)

Page 82

1 meaningfully grapple with the recommendations and make
2 meaningful change in response to them.
3          And I think it would also benefit the
4 public to learn more about how the DPD was responding to
5 the issues raised in the report.
6     Q.  (By Mr. Sebba)  Okay.
7     A.  I -- before you ask your next question,
8 can we take a quick bathroom break?
9          MR. SEBBA:  Absolutely.  Let's take five
10 minutes.
11          THE DEPONENT:  Thank you.
12          MR. SEBBA:  We can go off the record.
13          THE VIDEOGRAPHER:  Okay.  Going off the
14 record at 2:43 p.m.
15     (Recess from 2:43 p.m. to 2:50 p.m.)
16          THE VIDEOGRAPHER:  Back on the record at
17 2:50 p.m.
18     Q.  (By Mr. Sebba)  Welcome back, Mr. Mitchell.
19     A.  Thank you.
20     Q.  I'm going to share my screen again.  This
21 is the same document, Exhibit 1, and we are still on the
22 page bearing the Bates stamp DEN003986.
23          Can you see this document -- can you see
24 this page?
25     A.  Yes, I can.

Page 83

1     Q.  Okay.  So this is the -- as we were
2 discussing earlier, this is the list of recommendations
3 that the OIM made in its report on the George Floyd
4 protests, correct?
5     A.  Yes.
6     Q.  All right.  Next I'd like to look at Bullet
7 10 or Recommendation 10.  This reads, The OIM recommends
8 that the DPD disallow the use of rubber-ball grenades
9 during crowd control operations.  The OIM further
10 recommends the DPD articulate clear and specific standards
11 for when rubber-ball grenades may be used, by whom, and
12 when their use is prohibited in its operations manual,
13 correct?
14     A.  Yes.
15     Q.  And what facts led you to make this
16 recommendation?
17          MR. RINGEL:  Object to the form.
18     A.  The fact that rubber-ball grenades
19 are -- or can be extremely dangerous; that they are
20 nondirectional.  They cannot be used to target a specific
21 individual in a crowd, but may impact more than
22 just -- they may impact a number of people in the
23 vicinity of the det-- detonation.  And the fact that
24 the DPD was unable to produce a policy, as I recollect,
25 about when rubber-ball grenades could be used and when

Page 84

1 they could not be used.  And in our view, the use of
2 rubber-ball grenades during crowd control under any but
3 the most extreme circumstances would be too dangerous and
4 would be inappropriate.
5     Q.  (By Mr. Sebba)  Great.
6          And what would the benefits of the DPD
7 following this recommendation be?
8          MR. RINGEL:  Object to the form and the
9 foundation.
10     A.  It would limit risk.  It would limit the
11 risk that people who are not being targeted in connection
12 with specific threatening actions that they were taking
13 would be struck by rubber-ball projectiles.  And so it
14 would limit risk for community members, it would limit
15 risk to the City, and it would, hopefully, make protests
16 safer in general.
17     Q.  (By Mr. Sebba)  Okay.  The next bullet or
18 recommendation is Number 11, and it reads, The OIM
19 recommends that the DPD articulate clear and specific
20 standards for when NFDDs may be used, by whom, and when
21 they are prohibited in its operations manual, correct?
22     A.  Yes.
23     Q.  And what does NFDDs mean -- stand for here?
24     A.  NFDDs are commonly referred to as flash
25 bangs.  I think "NFDD" is noise, flash, diversionary

Page 85

1 device, but in common parlance, they're just called flash
2 bangs.
3     Q.  Okay.  And what facts led you to make this
4 recommendation?
5          MR. RINGEL:  Object to the form.
6     A.  Flash bangs can be very useful to police
7 departments in certain kinds of tactical applications.
8 They were used during the George Floyd protests in
9 certain situations, and they can be very risky.  They
10 burn at several thousand degrees.  They can detonate near
11 people, and they have a concussive effect.  They can
12 cause damage of a variety of types.  They can cause
13 hearing damage, they can cause soft-tissue injury, they
14 can cause burns.
15          And we were unable to -- there was no
16 clear policy from the Denver Police Department that was
17 produced to us that appeared to provide clear guidance
18 for police officers and supervisors about who could use
19 NFDDs and when they could be used and when they should be
20 prohibited, and so we wanted the department to fill that
21 gap.
22     Q.  (By Mr. Sebba)  And what would the benefits
23 of following this recommendation be?
24          MR. RINGEL:  Object to the form and the
25 foundation.

22 (Pages 82 - 85)

Page 86

1    A.   It would make protests safer, and it
2   would -- you know, any -- any sort of highly dangerous
3   tool needs to be clearly regulated in a police
4   department.  And so having clear standards for NFDDs
5   would simply be safer for citizens and, and
6   theoretically, for officers as well.
7       Q.   (By Mr. Sebba)  Okay.  The next bullet or
8   recommendation is Number 12.  And it reads, The OIM
9   recommends the DPD revise its standards for pepperball use
10  during crowd control situations to limit direct-fired
11  applications to only circumstances in which a person is
12  displaying act of aggression or aggravated act of
13  aggression, correct?
14      A.   Yes.
15      Q.   And what facts led you to make this
16  recommendation?
17          MR. RINGEL:  Object to the form.
18      A.   Primarily, we relied there upon lots of
19  video that we reviewed from body cams as well as video
20  recorded by citizen cell phones showing pepperball being
21  used in -- in sort of two ways.  We saw pepperball being
22  used in -- in area-saturation methodology, so firing
23  pepperball at a hard fixed object in order to disperse
24  the chemicals, the chemical irritant.
25          And we also saw quite a bit of video of

Page 87

1   protestors or individuals who were part of protest crowds
2   being struck directly with pepperball.  And when we
3   looked at the policy governing pepperball use in the
4   department, it -- the policy did not distinguish between
5   those two types of applications, which are different,
6   from a risk perspective.  Direct fire is more risky, it's
7   more dangerous.  It can cause soft-tissue damage and
8   other injury.
9           And so we wanted the policy to distinguish
10  between those types of applications and be more
11  restrictive about when police officers could direct fire
12  pepperball at persons who are part of a protest crowd.
13      Q.   (By Mr. Sebba)  And what would the benefit
14  of implementing this recommendation be?
15          MR. RINGEL:  Object to the form and the
16  foundation.
17      A.   It would make protests safer for persons
18  who were participating.
19      Q.   (By Mr. Sebba)  Okay.  For the next
20  recommendation is Number 13, and it reads, The OIM
21  recommends that the DPD develop mutual aid agreements with
22  neighboring jurisdictions that address potential crowd
23  control assistance.  These agreements should adhere to
24  best practices, including but not limited to, specifying
25  the circumstances under which assistance may be requested

Page 88

1   and provided, acceptable request methods, forms of
2   assistance be provided, and an agreed-upon command and
3   control structure, correct?
4       A.   Yes.
5       Q.   And what facts led you to make this
6   recommendation?
7           MR. RINGEL:  Object to the form.
8       A.   The fact that the DPD did not have
9   mutual-aid agreements in place with many or all of the --
10  I think 18 law enforcement agencies that provided mutual
11  aid during the protests, coupled with the best practices
12  in policing that suggest that departments develop those
13  agreements in advance.
14      Q.   (By Mr. Sebba)  And what would the benefits
15  of implementing this recommendation be?
16          MR. RINGEL:  Object to the form and the
17  foundation.
18      A.   Well, it would ensure a sort of common
19  approach to a protest among agencies that were
20  cooperating to police it.  It would ensure that the same
21  equipment was being used, the same standards were being
22  used for when force was appropriate and when force would
23  be inappropriate, the same munitions were being used.
24          And so it would, theoretically, make the
25  protests -- or the police response more well coordinated

Page 89

1   and hopefully, safer.
2       Q.   (By Mr. Sebba)  Okay.  And the next
3   recommendation is Number 14, and it reads, The OIM
4   recommends that during future mutual aid deployments in
5   Denver, the DPD require its mutual aid partners to adhere
6   to the DPD's use-of-force policy and to utilize only types
7   of weapons and munitions approved for use by the DPD,
8   correct?
9       A.   Yes.
10      Q.   And what facts led you to make this
11  recommendation?
12          MR. RINGEL:  Object to the form.
13      A.   We were told, in almost every
14  interview -- or maybe every interview of command officers
15  in the DPD -- that the DPD permitted its mutual-aid
16  partners to use their -- each agency to use its own
17  use-of-force policy and training and to use whatever
18  types of equipment are -- that it issued to its own
19  officers rather than requiring those agencies to adhere
20  to the DPD standards about force and to only use types of
21  equipment munitions approved for use by the DPD.
22      Q.   (By Mr. Sebba)  And what would the benefit
23  of implementing this recommendation be?
24          MR. RINGEL:  Object to the form and the
25  foundation.

23 (Pages 86 - 89)

1       A.  Like my prior answer, it would improve
2   coordination among responding police or sheriff
3   departments.  More specifically, that the DPD has tighter
4   use-of-force standards, when I last checked, than many
5   neighboring police departments, and so requiring officers
6   from outside jurisdictions to adhere to the DPD standards
7   would potentially be a benefit to citizens in Denver.
8       And -- and again, the DPD has determined
9   in its judgment that certain types of weapons munitions
10  are not appropriate for use by DPD officers.  And if
11  that's true, the same rationale would apply to those
12  weapons and munitions when they're in the hands of
13  other police agent -- officers from other police agencies
14  who are working in Denver.  So, again, a lot of it has to
15  do with reducing risk.
16      Q.  (By Mr. Sebba)  Okay.  I'm going to go to
17  the next page now, which bears the Bates stamp DEN003987.
18      And here we have the next recommendation,
19  which is Number 15, and it reads, The OIM recommends that
20  the DPD seek to participate in periodic joint trainings
21  and exercises with its potential mutual aid partners to
22  ensure a unified and consistent response during future
23  mutual aid deployments in Denver, correct?
24      A.  Yes.
25      Q.  And what facts led you to make this

1   recommendation?
2       MR. RINGEL:  Object to the form.
3       A.  The fact that we learned through
4   interviews that DPD had not generally been -- while it
5   may have -- you know, it cooperated with its neighboring
6   jurisdictions in a variety of ways, it had not been
7   consistently doing joint trainings on mutual aid and
8   protest response with those other agencies.  And best
9   practices in policing suggest that -- that it should be;
10  that that is a way to ensure unified and consistent
11  response among cooperating agencies during large-scale
12  deployments.
13      Q.  (By Mr. Sebba)  And what would the benefit
14  of implementing this recommendation be?
15      MR. RINGEL:  Object to the form and the
16  foundation.
17      A.  It would help to ensure a unified and
18  consistent response among the agencies who are responding
19  to a large-scale protest in Denver.
20      Q.  (By Mr. Sebba)  Okay.  And then the next
21  recommendation, which is Number 16, reads, The OIM
22  recommends that the DPD convene internal stakeholders to
23  evaluate possible operational issues that arose during the
24  GFP, including but not limited to, concerns raised by some
25  supervisors and officers.

1       One, that they received little guidance
2   from an on-the-ground field commander or operations chief
3   conveying clear, tactical, and strategic objectives.
4       Two, the single radio channel used by all
5   officers was often overcrowded and inaccessible for
6   communication with the command post.
7       And three, that the DPD needs to
8   substantially increase its investments in crowd-control
9   and field-force training to properly prepare officers for
10  the possibility of other mass protest events in the
11  future.  Correct?
12      A.  Yes.
13      Q.  And what facts led you to make this
14  recommendation?
15      MR. RINGEL:  Object to the form.
16      A.  Well, I'll have to maybe break that down,
17  since there's sort of three separate buckets.
18      Bucket 1 there, that they receive little
19  guidance from on-the-ground field commander or operations
20  chief conveying clear, tactical, and strategic
21  objectives.
22      This was a theme that we heard and we
23  learned in many of the interviews that we conducted of
24  line officers, as well as first-level supervisors, like
25  sergeants, and to some extent, even from lieutenants who

1   we spoke with during the investigation, that while they
2   may have had a sense from the command post of certain
3   overarching objectives, they often did not have a clear
4   sense of specific goals within, you know, a particular
5   area that they were assigned to work and that that gap
6   made their work much more difficult.
7       And so as we -- as we evaluated the incident
8   command system and determined that a big component that
9   appeared to us to be missing was a clear on-the-ground
10  field commander, which is often called the operations
11  chief, working at -- at -- on each protest day.
12      In terms of the second bucket, that again
13  primarily related to things that we heard from officers
14  as well as supervisors working the protests who
15  complained almost -- well, maybe not uniformly, but we
16  heard it from many people that they had a very hard time
17  getting -- getting on the radio to communicate with the
18  command post given the amount of traffic.
19      We also made our own observations, because
20  we obtained and listened to and evaluated all of the
21  radio traffic from each of the first five protest days.
22  And that, too, contributed to this recommendation that we
23  made here in Bucket Number 2.
24      And Bucket Number 3 again relates to
25  communications from officers and supervisors in the DPD

24 (Pages 90 - 93)

Page 94

1  who raised concerns about the frequency of crowd-control
2  and field-force training in the DPD and the length of
3  time that had elapsed since -- in their perception, they
4  had received comprehensive refreshers on those skills,
5  which are not often practiced.  It's very rare for police
6  officers to practice those skills during day-to-day
7  parole.  And so we heard a strong desire from cops for
8  more of that training.
9           We also evaluated records from the
10  training academy reflecting the frequency with which that
11  training had been provided over a three- or five-radio
12  period -- I don't remember which -- and it was
13  corroborative of the accounts that we heard from police
14  officers.
15       Q.  (By Mr. Sebba)  And what would the benefit
16  of implementing this recommendation be?
17           MR. RINGEL:  Object to the form and the
18  foundation.
19       A.  Well, again, as I alluded to, those are
20  perishable skills that are not often practiced in the
21  field.
22           The benefit would be to make sure that DPD
23  officers know what to do in a crowd-control situation,
24  they know what techniques to use and what techniques not
25  to use, they know how to communicate with other officers

Page 95

1  who are part of a skirmish line, they know the
2  choreography of skirmish lines, if you will.
3           And the benefit of all of that would be to
4  hopefully make protests safer for community members and
5  for officers.
6       Q.  (By Mr. Sebba)  And to be clear, is that
7  the benefit of all three, as you called them, buckets?  Or
8  is that solely for that last Bucket Number 3?
9       A.  I think it's a -- it's a potential benefit
10  of all three buckets.
11       Q.  Okay.  All right.  Let me stop sharing my
12  screen.
13           So we've just been through 16
14  recommendations that you made in your report on the GFP
15  protests, correct?
16       A.  Yes.
17       Q.  Do you believe that if these
18  recommendations had been implemented prior to the George
19  Floyd protests, that there would have been less violence
20  during the events of the George Floyd protests?
21           MR. RINGEL:  Object to the form and the
22  foundation.
23       A.  It's a little bit speculative, you know,
24  what you're asking me here.  I think it's entirely
25  possible that had they been implemented, it could have

Page 96

1  had a -- it could have reduced the amount of conflict or
2  the amount of force being used by police officers.
3           But it's -- you know, I'm generally pretty
4  careful to base my recommendations on things that I can
5  prove and demonstrate.  And it's very hard to do that
6  with that kind of question.  So I'm not sure that I could
7  say for sure.
8           I guess I suspect that it would have
9  helped to reduce violence and conflict, but it's hard for
10  me to say with 100 percent certainty.
11       Q.  (By Mr. Sebba)  You -- did you make these
12  recommendations because you felt that they may prevent
13  another event like the George Floyd protests?
14           MR. RINGEL:  Object to the form.
15       Q.  (By Mr. Sebba)  You know what?  Let me
16  rephrase -- let me -- I apologize.  Let me rephrase that.
17           Did you make these recommendations because
18  you felt they might prevent violence at another event
19  similar to the George Floyd protests?
20           MR. RINGEL:  Object to the form.
21       A.  I made the recommendations because I
22  believed that they would help to mitigate risk to
23  citizens and officers at future large-scale protests in
24  Denver; that they would help mitigate risk to a city; and
25  that, yes, they could reduce the level of force used

Page 97

1  during future protest events in Denver, both in terms of
2  the quantity of force, the frequency of force, as well as
3  the severity, if you will, of the force being used at
4  future protests in Denver.
5           MR. SEBBA:  Okay.  Thank you.
6           I appreciate you being here today.  I have
7  no more questions right now, but I think one of
8  the -- it's possible that counsel from some of our
9  consolidated cases may have some questions for you.
10           THE DEPONENT:  Sure.
11           EXAMINATION
12  BY MR. MCNULTY:
13       Q.  Good afternoon, Mr. Mitchell.  My name is
14  Andy McNulty.  Good to see you again.  And I'll be asking
15  some questions of you on behalf of Michael Acker.
16           Do you need to take a break or anything, or
17  are you good to go?
18       A.  I'm good.
19       Q.  Great.
20           So, Mr. Mitchell, how long were you
21  independent monitor?
22       A.  Eight or eight and a half years.  I think
23  it's been closer to eight and a half years.
24       Q.  And, you know, what -- can you explain to
25  me, generally, what your role was as independent monitor?

25 (Pages 94 - 97)

Page 98

1    A.   It was to oversee Internal Affairs
2  investigations and make recommendations to improve the
3  quality of the work being done by the Internal Affairs
4  Bureau in response to citizen complaints.  It was to
5  enhance transparency about that process, which is
6  traditionally pretty opaque inside police departments, in
7  general, and even inside the Denver Police Department, in
8  particular, and to, hopefully, in some ways, help to
9  encourage the department to change and adapt practices
10  and policies that, in my view, were outdated or unsafe or
11  needed to be changed or adapted.
12       That's -- that's a pretty high-level
13  summary.  We could -- there's, you know, probably a lot
14  more we could talk about in many of those buckets.
15    Q.   Yeah.  Sure.  And I'll break -- I guess
16  I'll ask you some more specific questions then too.
17    A.   Go ahead.
18    Q.   As independent monitor, you're required to
19  review individual police use of forces in individual
20  circumstances and comment on whether those -- those
21  instances were appropriate under national police
22  guidelines; is that right?
23       MR. RINGEL:  Object to the form and the
24  foundation.
25    A.   And that's partially right.  There are

Page 99

1  different -- there are sort of two different processes
2  that are in place for reviewing allegations or for
3  reviewing uses of force.  One is that any time a police
4  officer use -- uses force in the DPD, he or she is
5  required to prepare a use-of-force report that triggers a
6  chain-of-command review of that incident to determine
7  whether or not the incident will be referred for
8  additional investigation.
9       As independent monitor, my role was, not
10  customarily, to review all of those -- to review every
11  use of force, which was subjected to that internal kind
12  of chain-of-command review.  However, any time an
13  allegation was made about a particular use of force that
14  was alleged to be improper, it was required to be shared
15  with the OIM, and either myself or one of my former
16  deputies would review it and make recommendations to the
17  department about, you know, how it should be investigated
18  and appropriate disposition for that incident.
19    Q.   (By Mr. McNulty)  Sure.  Yeah.  And I don't
20  mean that, you know, in the use of force within the Denver
21  Police Department or Denver Sheriff's Department.
22       But as a -- as a part of your duties, one
23  of those duties could be, if you were -- if the matter was
24  referred to you -- would be to review -- to review
25  individual police use of forces in individual

Page 100

1  circumstances to determine whether they were in compliance
2  with national police standards or the Denver -- Denver
3  policies or constitutional standards; is that right?
4       MR. RINGEL:  Object to the form.
5    A.   Yes.  Yes.  That's correct.
6    Q.   (By Mr. McNulty)  And you were also tasked
7  with, you know, in a more macro view of the department in
8  analyzing whether, customarily, the DPD's actions complied
9  with, you know, national standards or its own policies or
10  constitutional standards; isn't that right?
11       MR. RINGEL:  Object to the form.
12    A.   Yes.  That's right.
13    Q.   (By Mr. McNulty)  And you were -- you were
14  tasked with analyzing whether, you know, the policies,
15  practices, and training of the DPD generally comported
16  with national police standards when your office was given
17  a particular instance of -- to investigate; is that
18  correct?
19    A.   Generally, when we were looking at a
20  particular incident, we would be, you know, generally
21  looking at the conduct of the officer or -- officer
22  involved in light of the policies of the department
23  rather than national standards.
24       When -- national standards would sort of
25  come into play when we were looking at the policies of

Page 101

1  the department in general.  But when we were focused on
2  an individual incident, we were doing sort of a
3  disciplinary review, if you will, and so we were largely
4  using the policies of the department as our reference
5  point.
6    Q.   Fair enough.
7       Would you also use constitutional standards
8  in making that determination?
9       MR. RINGEL:  Object to the form.
10    A.   We certainly would use that in our sort of
11  macro-level review of the policies of the department.
12  And, you know, the constitution obviously is kind of the
13  prime legal documents.  It would also inform our
14  viewpoint on particular incidents, although as you likely
15  know, the constitutional standards on use of force are
16  not always particularly exacting.
17    Q.   (By Mr. McNulty)  That's fair.  That's
18  fair.  I do know that well.
19       MR. RINGEL:  That's why Mr. McNulty and I
20  have jobs, Mr. Mitchell.
21       MR. MCNULTY:  Fair enough.  Fair enough.
22  Yeah.
23       I'm sure -- I'm sure Andrew has a
24  different view on -- on the -- on some of the
25  constitutional standards than I do.

26 (Pages 98 - 101)

Page 102

1 Q. (By Mr. McNulty) But -- yeah. Is it fair
2 to say that as independent monitor, you served as a sort
3 of expert for Denver in analyzing how its customary
4 practices were happening, in effect, when judged against
5 national police standards and constitutional standards for
6 policing?
7 MR. RINGEL: Object to the form and the
8 foundation.
9 A. I'm not sure that I understand the
10 question.
11 Q. (By Mr. McNulty) Sure.
12 Do you feel like you have some expertise in
13 constitutional standards for -- for example, policing
14 protests?
15 MR. RINGEL: Object to the form and the
16 foundation.
17 A. I'm -- so I'm not a police officer or a
18 police commander, but I am an educated lawyer who has
19 spent years around police departments, immersed in
20 policies and standards associated with policing of
21 protests. So from that perspective, I do have some
22 expertise.
23 Q. (By Mr. McNulty) Would you say that you're
24 an expert in determining whether policies within an
25 individual police department comport with national

Page 103

1 policing standards and constitutional standards?
2 MR. RINGEL: Object to the form and the
3 foundation.
4 A. I guess I'm not sure what you mean by
5 "expert." I -- I think I have some -- I have experience
6 and some expertise in making those -- making those
7 judgments, yes.
8 Q. (By Mr. McNulty) And were you tasked by
9 Denver to make those judgments as independent monitor?
10 MR. RINGEL: Object to the form.
11 A. I believe that the ordinance that
12 empowered the Office of the Independent Monitor included
13 some discussion -- I don't remember the particulars, but
14 it included some charge or mandate to make some of those
15 assessments on behalf of the OIM, and I suppose, to some
16 extent, on behalf of the City, yes.
17 Q. (By Mr. McNulty) In your role as
18 independent monitor, would you say that Denver tasked you
19 for your expertise as to whether both individual uses of
20 force were compliant with the constitution and whether
21 global police policies and practices within the Denver
22 Police Department were with -- in line with constitutional
23 standards?
24 MR. RINGEL: Object to the form and the
25 foundation.

Page 104

1 A. When you say "Denver," if Denver asked,
2 who -- are you referencing a specific entity or part of
3 Denver? That would help me to sort of understand the
4 question.
5 Q. (By Mr. McNulty) Sure.
6 I guess my -- my -- my -- the basis of my
7 question is, you know, when you were performing
8 these -- these reviews as independent monitor, in your
9 role as independent monitor, do you believe you were
10 acting as a sort of expert to give Denver your expertise
11 and guidance as to whether its policies and practices and
12 training were in compliance with the constitution?
13 MR. RINGEL: Object to the form and the
14 foundation.
15 A. Yeah. I think it would be fair to look at
16 it that way. Not everyone might agree, but I think
17 that's a fair assessment.
18 Q. (By Mr. McNulty) And would you say the
19 same as to individual officers' actions that you were
20 tasked with reviewing as the independent monitor? Or were
21 you basically consulted as an expert by Denver in your
22 role as independent monitor when you were tasked with
23 these investigations to determine whether individual
24 officer's use of force was compliant with constitutional
25 standards?

Page 105

1 MR. RINGEL: Object to the form and the
2 foundation.
3 A. Was I consulted?
4 THE DEPONENT: Can you repeat the question
5 or -- Ms. Reporter?
6 THE REPORTER: Would you like me to read
7 back?
8 MR. MCNULTY: That would be great.
9 THE DEPONENT: Yeah.
10 (The last question was read.)
11 Q. (By Mr. McNulty) Let me rephrase that a
12 little bit. I've been told I can get a little lost in my
13 own mind when I ask questions, so that's a good example of
14 that.
15 Would you say, as independent monitor when
16 you were tasked with reviewing individual officer's use of
17 force, you were being consulted as an expert as to whether
18 those individual uses of force were compliant with the
19 constitution?
20 MR. RINGEL: Object to the form and the
21 foundation.
22 A. I'm not sure that I would frame it that
23 way, in particular. I don't know that that's an
24 inaccurate framing. That's not how I would have defined
25 my -- my role.

27 (Pages 102 - 105)

Page 106

1    I viewed my role as making assessments,
2 based on my experience and my expertise, of the conduct
3 of individual officers that were independent of any other
4 assessments being made by the department. They were not
5 informed or influenced by the internal politics of the
6 police department or the Department of Safety. And so
7 from that perspective, yes, I was reviewing individual
8 incidents and individual uses of force and sharing my
9 perceptions and perspective and expertise with the
10 department and with the public.
11    Q. (By Mr. McNulty) Thank you for the
12 clarification. That's fine.
13    Fair to say that you executed your duties
14 as independent monitor that we just talked about with
15 respect to the George Floyd protests? Is that fair to
16 say?
17    MR. RINGEL: Object to the form.
18    A. Yes.
19    Q. (By Mr. McNulty) So you -- as independent
20 monitor, you analyzed whether the customary actions of
21 Denver police officers and the Denver Police Department
22 comported with national police standards; is that right?
23    MR. RINGEL: Object to the form.
24    A. Yes.
25    Q. (By Mr. McNulty) And did you analyze

Page 107

1 whether the customary actions of the Denver Police
2 Department and Denver police officers comported with
3 constitutional standards during the George Floyd protests?
4    MR. RINGEL: Object to the form and the
5 foundation.
6    A. When you say "customary actions," do you
7 mean the specific actions that we observed from the
8 department and responding officers during the protests?
9    Q. (By Mr. McNulty) Correct. I do.
10    A. Yes. We -- we used the constitution
11 as -- as one of our reference points for evaluating the
12 response of the police department to the protests.
13    Q. And you summarized those factual findings
14 and conclusions in a report that's already been admitted
15 in this deposition as Exhibit 1, correct?
16    MR. RINGEL: Object to the form and
17 foundation.
18    A. We summarized everything that we could
19 prove with a high degree of certainty, yes.
20    Q. (By Mr. McNulty) Would you change anything
21 about that report, as you sit here today?
22    A. I -- you know, as I sit here today -- I
23 briefly scanned through the report before this
24 deposition. But it's been over half a year since I
25 really spent any time with the evidence or with the

Page 108

1 report, so as I sit here today, I don't -- there's
2 nothing that comes to mind that I would change.
3    But it's been quite a long time since I
4 looked at the evidence, and, frankly, the evidence
5 has -- has developed since I issued that report. There
6 are more Internal Affairs investigations that have
7 been -- I presume have been closed with findings of
8 various kinds. There may be more evidence that's
9 available now than there was then. So it's a little hard
10 for me to make that, you know, determination as I sit
11 here today.
12    Q. Fair enough.
13    In authoring that report, you were not
14 analyzing individual incidents during the protests, but
15 you were looking at the broader-scale systemic and
16 customary issues you saw with the way the Denver Police
17 Department policed the protests; is that fair to say?
18    MR. RINGEL: Object to the form.
19    A. That's fair. We -- I commented on -- I
20 recall there was a section of the report that discussed
21 some trends that we saw in individual use-of-force
22 incidents that we were concerned about. But generally
23 speaking, the report is not a reflection of our analysis
24 of the individual use-of-force incidents; it is a
25 reflection of our understanding of gaps or deficiencies,

Page 109

1 in our view, of policies and practices that were
2 operating in the police department during these protests.
3    Q. (By Mr. McNulty) Did you find that there
4 were customary policies and procedures and actions by DPD
5 officers during the George Floyd protests that were
6 contrary to national police standards?
7    MR. RINGEL: Object to the form and the
8 foundation.
9    A. Yeah, we did. You know, I think we've
10 talked about some of those today. There may be
11 differences of opinion about what national police
12 standards are, but we cited the ones that we relied upon
13 in the report and we did make findings that there were
14 areas in which the department was not in conformity with
15 those standards as we defined them.
16    Q. (By Mr. McNulty) And -- and just going
17 back a little bit, back to the report, you know, that was
18 introduced as Exhibit 1. Do you stand behind all of those
19 findings and conclusions that you issued?
20    MR. RINGEL: Object to the form.
21    A. Yeah. I was asked that, I think, earlier,
22 and I said yes. And I still -- I still stand behind the
23 report and its conclusions.
24    Q. (By Mr. McNulty) Did you also find that
25 there were customary actions by Denver police officers and

28 (Pages 106 - 109)

1 policies within Denver that were contrary to
2 constitutional standards in your report?
3          MR. RINGEL: Object to the form and the
4 foundation.
5      A. You know, I think we made reference to
6 constitutional standards at various points in the
7 report -- most notably, I think, the First Amendment, if
8 my memory serves. But I don't remember making specific
9 constitutional findings in -- in our findings or
10 recommendations in the report.
11     Q. (By Mr. McNulty) Is it fair to say that
12 the national police standards that you cite in the report
13 are -- are issued in accordance with constitutional
14 standards?
15         MR. RINGEL: Object to the form and
16 foundation.
17     A. I think they cannot conflict and most
18 likely do not conflict with constitutional standards.
19         You know, national standards in policing
20 are often developed -- they often emerge from the
21 practice of policing. So it's not necessarily the same
22 thing as constitutional standards, but I think they
23 certainly cannot and do not usually, in my experience,
24 conflict with constitutional standards.
25     Q. (By Mr. McNulty) Sure.

1          THE REPORTER: Could we go off the record
2 for a moment? I'm sorry.
3      MR. MCNULTY: Sure.
4          THE REPORTER: Videographer, could we go
5 off the record?
6          THE VIDEOGRAPHER: Yes. We're going off
7 the record at 3:31 p.m.
8          (Recess from 3:31 p.m. to 3:39 p.m.)
9          THE VIDEOGRAPHER: We're back on the
10 record at 3:39 p.m.
11     Q. (By Mr. McNulty) All right. Mr. Mitchell,
12 I'm going to share my screen with you real quick here and
13 kind of go through your report a little bit. I don't have
14 the Bates-numbered version of this on my computer
15 currently, but I will represent to you that this is the
16 same report that is in the Bates-numbered version.
17     A. Okay.
18     Q. So -- all right. We're starting here on
19 page 19 of your report. And I think on this page,
20 you've -- did you find that Denver police officers, during
21 the George Floyd protests, customarily failed to track
22 their less-lethal munitions?
23         MR. RINGEL: Object to the form and
24 foundation.
25     A. We found that the department did not have

1 an effective tracking system or log for the deployment or
2 distribution of munitions into the field. So I guess I
3 would just, you know, quibble with your question a little
4 bit, that it wasn't -- this finding wasn't aimed so much
5 at individual officers; it was more evaluating the
6 procedures of the department as it was distributing
7 munitions to officers in the field.
8      Q. (By Mr. McNulty) Okay. Let me -- let me
9 rephrase that.
10         Did you find that the Denver Police
11 Department, during the George Floyd protests, customarily
12 failed to track its officers' use of less-lethal
13 munitions?
14         MR. RINGEL: Object to the form and
15 foundation.
16     A. When you say "customarily," what do you
17 mean?
18     Q. (By Mr. McNulty) Throughout the entirety
19 of the protests as a matter of the way that they did
20 business the entire time or the way that the department
21 operated on a macro level.
22         MR. RINGEL: Object to the form.
23     A. I think the answer is we found that they
24 were not effectively tracking munitions being deployed
25 into the field. I think the word "customarily" as you've

1 defined it is throwing me a little bit because I seem to
2 remember at some point during the protest, they began to
3 implement a tracking log.
4          So when you say "throughout the protest,"
5 when you incorporate that notion into your definition of
6 "customarily," I -- you know, I'm not sure if that's true
7 given that I have a recollection that they began tracking
8 at some point during the protests. They just -- they
9 just didn't do it soon enough, from my perspective, and
10 the system that they were using needed -- needed a lot of
11 work.
12     Q. (By Mr. McNulty) Okay. What problems does
13 the failure to track the use of less-lethal munitions
14 pose?
15         THE REPORTER: I'm sorry. One more time,
16 please.
17     Q. (By Mr. McNulty) What problems does the
18 failure to track the use of less-lethal munitions pose?
19     A. Well, if you're not tracking it, it's very
20 hard to manage the way in which less-lethal munitions are
21 being used by officers in the field. You -- you know, to
22 manage the use of less-lethal munitions, police leaders
23 need to be tracking them, you know, reviewing who's using
24 what and at what rates. If there's disproportionality in
25 the way that they're being used, asking questions about

29 (Pages 110 - 113)

Page 114

1 why.
2         And -- and this part may be a little bit
3 speculative, but I don't think I'm out on too far a limb
4 to say that in terms of creating a culture of how force
5 is being used, not tracking the munitions that are being
6 deployed and used might have an impact on the ways in
7 which cops are using them.
8         So I think there are a variety of
9 potential consequences that might flow from the lack of
10 an effective tracking system.
11         Q.   Did the lack of an effective tracking
12 system allow for a lack of accountability among officers
13 who were using less-lethal weapons?
14         MR. RINGEL:  Object to the form and the
15 foundation.
16         A.   When you say "accountability," do you mean
17 disciplinary accountability for acts of inappropriate or
18 excessive force?
19         Q.   (By Mr. McNulty)  Yes.
20         A.   It may have, although I'm not sure.
21 It's -- it would be hard to -- a tracking log would not
22 necessarily prove who used force in a particular
23 incident.  So while many of -- or a number of the
24 findings in the report relate squarely to questions of
25 accountability -- like -- like the finding about

Page 115

1 body-worn cameras -- it's not clear to me what role a
2 better tracking system would have had on individual cases
3 involving allegations of excessive force.
4         Q.   Did the lack of a tracking system result in
5 a lack of supervision of officers on the ground during the
6 George Floyd protests using less-lethal weapons?
7         MR. RINGEL:  Object to the form.
8         A.   I think it -- a tracking system would have
9 been one data point that supervisors could have used to
10 supervise officers who were working at the protests.  And
11 the fact that that data was not available may have
12 impacted the kind of supervision being provided by
13 supervisors or managers of the police response.
14         Q.   (By Mr. McNulty)  All right.  I'm turning
15 to page 20 and 21 of your report.  I just scrolled down
16 there.
17         Did you find that DPD officers, during the
18 George Floyd protest, customarily failed to turn on their
19 body-worn cameras?
20         MR. RINGEL:  Object to the form and the
21 foundation.
22         A.   There were some officers who turned on
23 their body cameras for some portions of their response,
24 but they were the exception rather than the rule.  And
25 more often than not, officers were not wearing or

Page 116

1 activating body-worn cameras when they were policing the
2 protests.
3         When I say "officers" here, I'm referring
4 to DPD officers.  Because as I think I pointed out
5 to -- earlier, we didn't evaluate body-worn camera usage
6 by officers from other jurisdictions who were working in
7 Denver.
8         Q.   (By Mr. McNulty)  Did the failure of DPD
9 officers to turn on or wear their body-worn cameras allow
10 for a lack of accountability among officers using force
11 during the George Floyd protests?
12         MR. RINGEL:  Object to the form and the
13 foundation.
14         A.   The lack of body-worn-camera footage made
15 it harder to determine what happened at what -- what
16 conduct preceded individual uses of force by the citizen
17 and by the police officer, and to make
18 determinations -- to identify officers who were
19 responsible for particular uses of force, and to make
20 determinations about whether those uses of force were
21 compliant with DPD policy.
22         So to the extent -- if that's what you're
23 asking, the answer is yes.
24         Q.   (By Mr. McNulty)  Okay.  So it's fair to
25 say that the lack -- the DPD officers' failure to wear or

Page 117

1 turn on their body-worn cameras allowed for a lack of
2 accountability among officers using force during the
3 George Floyd protests, correct?
4         MR. RINGEL:  Object to the form and the
5 foundation.
6         A.   Allowed for a lack of accountability.  I
7 think it -- I think it made it harder for there to be
8 accountability for complaints of excessive force that I
9 received when I was independent monitor and that I became
10 aware of that were received by other entities when I was
11 independent monitor.
12         Q.   (By Mr. McNulty)  Did you find that there
13 was a, quote/unquote, footage gap during the George Floyd
14 protests among Denver Police Department officers?
15         MR. RINGEL:  Object to the form.
16         A.   I did.
17         THE REPORTER:  I'm sorry.  Quote/unquote
18 footage?
19         MR. McNULTY:  Gap.
20         THE REPORTER:  App?
21         MR. McNULTY:  Gap, g-a-p.
22         THE REPORTER:  Gap.  Sorry.
23         MR. RINGEL:  And I objected to the form,
24 and I believe Mr. -- Mr. Mitchell said "I did."
25         THE DEPONENT:  That's correct.

Page 118

1      THE REPORTER:  Thank you.
2      Q.  (By Mr. McNulty)  What did you mean by
3  that?
4      MR. RINGEL:  Object to the form.
5      A.  What I -- what I meant was that when I
6  looked at the number of DPD officers who were working on
7  each protest day or at least the best estimates of the
8  number of DPD officers working on the protest days --
9  because again, there were no rosters created for most of
10  those days -- there was a substantial gap between the
11  number of DPD officers who were working the protests and
12  the number of officers who -- there was any
13  body-worn-camera footage recorded for each of those
14  protest days.  So we called that -- that -- that gap, if
15  you will, in this report the footage gap for each protest
16  day.
17      Q.  (By Mr. McNulty)  You would agree with me
18  that Denver and the Denver Police Department do not have a
19  policy addressing when body-worn cameras should be
20  activated during protest events, correct?
21      MR. RINGEL:  Object to the form and the
22  foundation.
23      A.  As we sit here today, I don't know the
24  answer.
25      At the time of the protests, it's my

Page 119

1  recollection that the policy -- the body-worn-camera
2  policy was ambiguous as to the department's expectations
3  for when officers should turn on the body-worn camera
4  during mass protest events.
5      Today, it's my understanding that the
6  department has adopted the recommendations in the report,
7  so there may be a policy that exists today.  But at the
8  time of these events, I believe that the policy was
9  ambiguous about those subjects.
10      Q.  (By Mr. McNulty)  Did the lack of
11  body-worn-camera footage from the George Floyd protests
12  result in a lack of supervision by DPD supervisors and
13  officers on the ground during those protests?
14      MR. RINGEL:  Object to the form and the
15  foundation.
16      A.  It -- it's hard to say, specifically.  I
17  would think that in general we've already talked in this
18  deposition about the general process that exists in the
19  DPD for command-level review of uses of force.  So an
20  officer uses force, completes a use-of-force report, and
21  the command -- the immediate supervisor and then up the
22  chain of command review that use-of-force report and
23  associated evidence, like body-worn-camera footage, to
24  determine whether or not the force was appropriate.
25      The fact that footage was not available

Page 120

1  here for many uses of force may have complicated the
2  ability of supervisors to evaluate uses of force by their
3  officers.  And to that extent, that is a type of
4  supervision, and to that extent, I would agree with your
5  question.
6      But in the policing of mass protests, you
7  generally don't have supervisors spending a lot of time
8  reviewing hour and hour -- hours and hours of footage
9  from officers on the skirmish line.  Supervision usually
10  means, you know, sergeants or maybe lieutenants being in
11  the lines with cops and providing sort of coaching and
12  supervision while events are happening.  It does not
13  often mean spending lots of time pouring over
14  body-worn-camera footage.
15      So I think where the impacts were really
16  felt here within that use of -- the supervision of uses
17  of force, in particular, rather than supervision of the
18  way policing was being done in general at the protests.
19      Q.  (By Mr. McNulty)  You could see how a lack
20  of body-worn-camera footage could lead an officer to
21  escape disciplinary action if she or he used excessive
22  force during the protests, right?
23      MR. RINGEL:  Object to the form and the
24  foundation.
25      A.  It's -- that is certainly possible.  An

Page 121

1  officer could go unidentified due to the lack of
2  body-worn-camera footage that would lead to identifying
3  the person responsible for a particular deployment of a
4  less-lethal munition or projectile.  An officer could not
5  be held accountable, from a disciplinary perspective
6  because no footage exists.  And on the flip side, an
7  officer could end up with a not-sustained finding on
8  their record when their behavior might have been
9  exonerable under the policies of the department.
10      So I think it may have had a whole variety
11  of impacts on disciplinary outcomes in the department.
12      Q.  (By Mr. McNulty)  And a reasonable officer
13  on the scene would know that that scenario is possible if
14  they don't turn on or wear their body-born camera,
15  correct?
16      MR. RINGEL:  Object to the form and the
17  foundation.
18      A.  I think officers are aware, generally
19  speaking, of the impacts of body-worn-camera footage on
20  complaints, including complaints of inappropriate force.
21      Q.  (By Mr. McNulty)  And you know that based
22  on your eight years as internal [sic] monitor; is that
23  right?
24      MR. RINGEL:  Object to the form.
25      A.  Independent monitor.  But, yes.

31 (Pages 118 - 121)

1    MR. McNULTY: Oh, did I say something
2 different? Did i say "internal" --
3    MR. RINGEL: You said -- you said
4 "internal monitor," yeah.
5    MR. McNULTY: That's a different thing,
6 probably.
7    Q. (By Mr. McNulty) All right. I'm going to
8 move to page 26 of your report. And this part of the
9 report, did you find that DPD officers, during the George
10 Floyd protests, customarily failed to give dispersal
11 orders prior to deploying less-lethal munitions, chemical
12 agents, and other projectiles?
13    MR. RINGEL: Object to the form and the
14 foundation.
15    A. We -- we found examples of deployments of
16 chemical and other munitions into crowds for the purpose
17 of crowd dispersal that were not accompanied by dispersal
18 orders, and we saw enough of them that it merited
19 inclusion in this report.
20    I'm sure that we also viewed -- and I
21 remember viewing instances in which supervisors did
22 provide warnings. And I remember viewing body-camera
23 footage in which warnings were audible in the footage
24 before munitions were used or deployed into crowds. But
25 we saw enough instances in which that was not happening

1 that I was concerned about it, as the independent
2 monitor, and I wanted to make sure the police department
3 took action to correct it in the event of future or
4 similar protests.
5    Q. (By Mr. McNulty) Okay. So is it fair to
6 say it was concerning to you, as the independent monitor,
7 the number of times where you saw Denver police officers
8 during the George Floyd protests deploy chemical munitions
9 or less-lethal munitions to disperse crowds without
10 providing a dispersal order?
11    MR. RINGEL: Object to the form and the
12 foundation.
13    A. Yes.
14    Q. (By Mr. McNulty) What problems does the
15 failure to provide a dispersal order prior to using
16 less-lethal munition pose?
17    MR. RINGEL: Object to the form.
18    A. Well, as we discussed earlier, it could
19 result in peaceful protestors who might be willing to
20 clear a particular area if -- if warned in advance being
21 exposed to chemical munitions unnecessarily.
22    So it -- it raises the level of risk to
23 protest participants. It possibly raises the level of
24 risk to the City. And so I was concerned about it, as
25 the monitor, and hence, my analysis and recommendations

1 in this section.
2    Q. (By Mr. McNulty) Did you see, in any of
3 the evidence that you reviewed as the monitor, any
4 upper-level command telling the lower-level officers that
5 they needed to issue warning prior to deploying
6 less-lethal munitions?
7    MR. RINGEL: Object to the form.
8    A. I don't remember seeing that, but I'm not
9 sure what evidence I would have seen that would have
10 included that information.
11    I do remember asking -- you know, one of
12 the things that you think about when you're evaluating
13 this kind of response is what we like to call officer
14 priming. So what messages are being conveyed to officers
15 and supervisors before they're deployed into the field,
16 how are they being primed?
17    And I do remember asking some of the
18 command officers in the command post about priming,
19 what -- what messages were being conveyed at the
20 briefings before deployment? And I believe that one of
21 the questions that we would ask in connection with
22 priming was about dispersal orders. And I seem to recall
23 being told by command personnel that they were reminding
24 people to issue dispersal orders, but I don't remember
25 any of the particulars associated with that.

1    Q. (By Mr. McNulty) All right. Moving on to
2 page number 32 in your report.
3    Did you find that DPD officers deploying
4 less-lethal munitions at the George Floyd protests
5 customarily deployed them at the head, face, and groin
6 area of protestors?
7    MR. RINGEL: Object to the form and the
8 foundation.
9    A. I don't believe we made that finding.
10    Q. (By Mr. McNulty) Did you observe during
11 your review instances where DPD officers deployed
12 less-lethal munitions at the head, face, and groin area of
13 protestors?
14    A. We did.
15    Q. Do you remember how many instances you saw
16 where that happened?
17    A. I do not.
18    Q. Do you remember being concerned enough
19 about it that you put it into your report?
20    A. I do.
21    Q. And why was that concerning to you, as the
22 independent monitor?
23    MR. RINGEL: Object to the form and the
24 foundation.
25    A. Because there are guidelines for the use

32 (Pages 122 - 125)

Page 126

1  of each of these munitions that are intended to reduce
2  the level of risk.  There's an appropriate -- an
3  appropriate usage for each of the tools discussed in this
4  report that were used at the protest and there are uses
5  that are inappropriate.  And firing projectiles at
6  prohibited areas of the body like the head, face, and
7  groin raises the level of risk associated with how the
8  tools are being used.
9          And I was concerned about that,
10 particularly given that I was aware that there were a
11 number of injuries, including very serious injuries, that
12 resulted from these protests.
13     Q.  (By Mr. McNulty)  Specifically why is
14 shooting someone in the head with a 40-millimeter
15 less-lethal round during a protest problematic?
16         THE REPORTER: I'm sorry.  You're cutting
17 out.  Just a moment.
18         I didn't hear the end of the question.
19         MR. McNULTY:  Okay.  I can -- I can reask
20 it.
21     Q.  (By Mr. McNulty)  Why is shooting someone
22 in the head with a 40-millimeter round during a protest
23 problematic?
24         MR. RINGEL:  Object to the form and the
25 foundation.

Page 127

1      A.  Well, there are a lot of ways to answer
2  that question.  I'm not a doctor.  But medically, it's
3  problematic because a 40-millimeter round is an extremely
4  high-velocity round that is ejected at tremendous
5  velocity from the launcher.
6          And it's called less lethal for a reason.
7  It's not called nonlethal; it's called less lethal.  So a
8  40-millimeter round can do -- it can break bones.  It can
9  do significant soft-tissue injury.  Again, I'm not a
10 doctor, but I presume it could cause concussion or even,
11 potentially, traumatic brain injury and cause damage to,
12 you know, sensitive portions of the face, like the eyes
13 and nose and, you know, other small bones in the face.
14         So there are many medical reasons which,
15 again, I'm not really qualified to render, but I've read
16 enough about the impacts of 40-millimeter to share with
17 you why firing a 40-millimeter at someone's head or face
18 would be extremely dangerous and is contraindicated by
19 the company.
20         There are other reasons why.  You know, it
21 would be -- people have a right to assemble, of course,
22 under the First Amendment.  And one could imagine a
23 chilling effect in which people who are interested in
24 participating in a protest event pursuant to their First
25 Amendment rights are learning about uses of force that

Page 128

1  are injurious and damaging.  And so it could have a
2  chilling effect that might impact on sort of the First
3  Amendment rights of participants and potential
4  participants.
5          But I think the sort of primary reason and
6  risk has to be the medical risk associated with the
7  potential damage that such a round could cause.
8      Q.  Is shooting someone in the head with a
9  40-millimeter round considered deadly force under DPD
10 policy?
11         MR. RINGEL:  Object to the form.
12     A.  So I'd have to look at the policy, which I
13 don't have before me, to give you an answer to that
14 question.  I -- I believe -- well, I really would prefer
15 to answer that having looked at the policy.
16     Q.  (By Mr. McNulty)  Okay.  That's fair.
17         In your experience as the monitor, can you
18 think of any scenario where it would be appropriate to
19 shoot a protester in the head with a 40-millimeter round?
20         MR. RINGEL:  Object to the form and the
21 foundation.
22     A.  If a -- if -- if a person who was in a
23 protest crowd -- so I'll be careful about using the label
24 "protestor" -- had a firearm, for example, and was
25 brandishing it and pointing it or shooting it at

Page 129

1  individuals, a police officer would have a duty to
2  attempt to prevent either officers or citizens from being
3  struck or injured or killed by a protester, you know,
4  brand- -- or a participant brandishing or using a
5  firearm.
6          That would be a situation in which it
7  would be appropriate to use deadly force, like striking
8  someone in the head or face with a 40-millimeter round to
9  interrupt that situation.
10         And of course, there were -- as I
11 mentioned in this report, there were many firearms seized
12 from arrestees in this crowd.  And I think on the first
13 day, there was a significant discharge of firearms at the
14 state capital.
15     Q.  (By Mr. McNulty)  Outside of the context of
16 someone using or threatening deadly force against others
17 who's in a protest crowd, can you think of any other
18 scenario where shooting someone in the head with a
19 40-millimeter round in a protest setting would be
20 appropriate under the circumstances?
21         MR. RINGEL:  Object to the form and
22 foundation.
23     A.  Offhand, no, I can't.
24     Q.  (By Mr. McNulty)  We talked a little bit in
25 your answer earlier about this, but you said that shooting

33 (Pages 126 - 129)

1 someone in the head with a 40-millimeter round is
2 contraindicated, I think, by the manufacturer standards;
3 is that correct?
4 　　A.　I think I said that, yes.
5 　　Q.　And you know that because you're the
6 monitor, right, and you've read those standards?
7 　　A.　I have.
8 　　Q.　Did you also find, during your review of
9 the George Floyd protests, that DPD officers on several
10 occasions continued to deploy impact munitions after
11 crowds had already begun to disperse and leave an area?
12 　　　　MR. RINGEL:　Object to the form and the
13 foundation.
14 　　A.　So I think the specific finding -- and I'm
15 looking at the report here -- was, Continued to deploy
16 chemical, gas, impact or explosive munitions after their
17 use had already caused people to disperse and leave a
18 particular area.
19 　　　　So not only impact munitions, but we were
20 looking at sort of all of those munitions together.　And
21 when we discussed that particular issue, that we were
22 concerned about.
23 　　Q.　(By Mr. McNulty)　Why would that be
24 problematic?
25 　　　　MR. RINGEL:　Object to the form.

1 　　A.　It would be problematic because the
2 munitions have authorized uses, and they have,
3 potentially, unauthorized uses.　And to the extent that
4 they are authorized to move a crowd -- and I'll just sort
5 of assume that's true in particular instances for the
6 sake of the question.　Once a crowd is moving and is
7 clearing from an area, continued use of those munitions
8 would no longer be appropriate.
9 　　　　At that point, it would be appropriate to
10 wait, allow the crowd to continue leaving, and not
11 increase risk to participants by continuing to deploy
12 munitions once a crowd was already vacating the area.
13 　　Q.　(By Mr. McNulty)　Fair enough.　Thank you
14 for -- thank you for that answer.
15 　　　　All right.　I'm going to direct you to the
16 last recommendation in your report here.　You talk about
17 DPD needing to substantially increase its investments in
18 crowd-control and field-force training to properly prepare
19 officers for the possibilities of other mass protest
20 events in the future; is that right?
21 　　A.　Yes.
22 　　Q.　Is it fair to say that you issued that
23 recommendation because you found that during the George
24 Floyd protests DPD officers were deployed lacking adequate
25 training in crowd-control tactics and lethal force?

1 　　　　MR. RINGEL:　Object to the form.
2 　　A.　That wasn't the specific finding that we
3 made.　We -- to make that finding, we would have had to
4 compare the DPD's training or the amount of training that
5 the specific officers who worked at the protests received
6 against a body of standards about how much training they
7 should have received.　And I'm not sure that we ever
8 found a clear definitive answer about how much
9 crowd-control and field-force operations training should
10 be given to officers who are out of the academy.
11 　　　　What we did find was a demand from
12 officers who we talked to who had worked with the
13 protests, who told us, I don't feel personally that I've
14 been given enough of this training.　I remember receiving
15 some training in the academy; that was many years ago.　I
16 think I got some kind of refresher, but I don't remember
17 all that well.　And if I'm going to be effective in
18 responding to protests, I need to receive more of this
19 training.
20 　　　　As we looked at the records of the
21 training academy, it did appear to us that there were
22 significant gaps in the training that was provided and
23 that it should be provided with greater frequency and in
24 greater amounts to cops in the DPD.
25 　　Q.　(By Mr. McNulty)　Okay.　So I want to break

1 that down a little bit.　You had officers come to you who
2 said, I felt unprepared to respond to this protest due to
3 a lack of training from DPD; is that fair to say?
4 　　　　MR. RINGEL:　Object to the form.
5 　　A.　I'd have to look kind of specifically at
6 the notes.　But, yeah, I think that's -- that's probably
7 a pretty fair assessment of the kinds of things we heard
8 from cops.
9 　　Q.　(By Mr. McNulty)　And then you went back
10 and looked at the training records, after hearing that
11 from officers, and you thought to yourself, there's some
12 significant gaps in the training on crowd control and use
13 of field force.　Is that fair to say?
14 　　　　MR. RINGEL:　Object to the form and the
15 foundation.
16 　　A.　That is -- that is fair to say.
17 　　Q.　(By Mr. McNulty)　Okay.　And then so based
18 on that, you issued this recommendation that DPD
19 substantially increase its investments in crowd-control
20 and field-force training for its officers so that in the
21 future they could police the protests better than they did
22 during the George Floyd protests?
23 　　A.　Correct.
24 　　Q.　Okay.　All right.　I'm going to play you a
25 video here.　And I'm going to stop it at a couple of

1 different points and ask you questions about it. Okay?
2      A. Okay.
3      Q. Great. I'll share my screen.
4         (Video played.)
5         MR. RINGEL: I assume you're going to
6 identify it by number and what it is.
7         MR. MCNULTY: I am. Yes, I am. Because
8 I'm a good lawyer. You know, I -- I got this lawyering
9 thing down a little bit. I don't know. Maybe I don't.
10 Some would disagree.
11      Q. (By Mr. McNulty) Yeah. This is the
12 McDermott body-worn camera, and it's DEN4136. This has
13 previously been entered into the record as an exhibit in
14 Sergeant Daniel Abeyta's deposition. So I'm going to --
15 I'm going to --
16         MR. RINGEL: Just for the record, this is
17 from May 29th of 2020.
18         MR. MCNULTY: I was just about to go
19 there, yeah. May 29th, 2020.
20      Q. (By Mr. McNulty) I'm sure you're aware,
21 Mr. Mitchell, that the body-worn cameras are on Greenwich
22 Mean Time and that, therefore, this body-worn camera is
23 starting at 7:17 p.m. on May -- it's actually May 28th
24 because of the difference in time.
25      A. Okay.

1      Q. And can you see this on your screen, I'm
2 hoping?
3      A. I can. Yes.
4      Q. Great. All right.
5         I'm going to fast-forward a little bit here
6 and start it around -- let me see -- we're going to start
7 it right at 7:20 and 20 seconds. Okay?
8         (Video playing.)
9      Q. So, Mr. Mitchell, do you see there's a
10 crowd of protestors on the street there?
11         And I'll represent to you that this is at
12 the intersection of 16th and Platt in downtown Denver.
13      A. I do see that, yes.
14      Q. All right.
15         (Video playing.)
16      Q. All right. I'll stop it right here because
17 you see someone come into the screen right in the middle
18 there. It's a man wearing a gas mask.
19         Do you see him in a red shirt?
20      A. I think so, yeah. Mm-hmm. Kind of a
21 whitish-colored mask there, sort of to the side of the
22 stop sign or -- at least in the perspective of this
23 camera?
24      Q. Correct. So I want you to pay attention to
25 that man.

1      A. Okay. Can I just -- I'll say the quality
2 of this video seems worse than I would expect. And I
3 don't know if it's because we're seeing it over streaming
4 internet, but I feel like there's some frame issues
5 that -- you know, I'm sort of seeing people jump, moving
6 around on the screen, jump a little bit, and there are
7 some frames that don't appear to be coming through.
8         I don't know if that's just because of the
9 way it's streaming, but the body camera usually doesn't
10 look this bad when you see it in general.
11      Q. That's fair. It doesn't look that bad on
12 my end.
13      A. Okay.
14      Q. So I appreciate that caveat. And I guess
15 we'll try and soldier through and see if maybe it
16 improves. But if not --
17      A. Okay.
18      Q. If not, we'll -- I can talk you through it.
19      A. Okay.
20         (Video playing.)
21      Q. All right. I'm going to stop it there.
22 And we're at 7:22 and 23 seconds.
23         Mr. Mitchell, did you hear pepperballs
24 being deployed there?
25      A. I'm not sure I did. I was -- if you go

1 back, I would listen again.
2      Q. Sure. Happy to do so. And I'm going to go
3 back to 7:15.
4         (Video playing.)
5      Q. Did you hear the pepperballs being deployed
6 there?
7      A. I did.
8      Q. Did you hear any dispersal order in that
9 video?
10      A. Not that I could hear in this video, no.
11      Q. Is that consistent with your finding of a
12 lack of dispersal orders prior to using munitions and
13 chemical agents like that --
14         MR. RINGEL: Object to the form and the
15 foundation.
16         THE REPORTER: I -- I did not hear the
17 whole question.
18         MR. McNULTY: Sure.
19      Q. (By Mr. McNulty) Was the lack of warning
20 in this video consistent with the reports where you found
21 there was a lack of dispersal orders prior to
22 disperse -- prior to use of chemical agents and other
23 munitions during the George Floyd protests?
24         MR. RINGEL: Object to the form.
25      A. I can't say on the basis of what I've seen

35 (Pages 134 - 137)

1 so far because I don't know why the pepperballs were
2 being deployed. If pepperball was deployed, for example,
3 at a specific individual who, you know, was holding a
4 rock and was about to throw it, no dispersal order would
5 have been required. So on the basis of what you've shown
6 me so far, I can't make that assessment.
7       Q. (By Mr. McNulty) Okay. I'm going to keep
8 playing the video. And if you wouldn't mind continuing to
9 focus on the man who's currently in the middle of the
10 screen. You can see him with the mask on and the
11 red-and-black T-shirt.
12       A. Got it.
13          (Video playing.)
14       Q. Did you see the man in the gas mask turn
15 away there?
16       A. I did.
17          MR. RINGEL: Object to the form and the
18 foundation.
19       Q. (By Mr. McNulty) I'll represent to you
20 that that man was shot in the face with a 40-millimeter
21 round. And on the basis of that representation and what
22 you've seen in this video, do you believe that that was an
23 appropriate use of force under the circumstances?
24          MR. RINGEL: Object to the form and the
25 foundation.

1       A. Well, I -- I -- generally, when I'm
2 assessing a use of force, I would want to know as much
3 information as possible. Like I want to have a statement
4 from the officer, I'd want to be able to look at other
5 angles of video that may have reflected what was
6 happening in the incident.
7          So it's -- you know, you're asking me a
8 question on the basis of one sort of short clip of video.
9 That's very hard to answer. I did not see in this clip
10 behavior that seemed obviously threatening or dangerous
11 from the individual wearing the gas mask. But again,
12 it's a very small window into what's happening there.
13          Certainly, to the extent that what you've
14 told me is accurate in that he was struck there by a
15 40-millimeter round in the face, I did not see anything
16 in this video that showed me that he was threatening
17 anyone else in a way that could have suggested that
18 potentially deadly force would have been authorized or
19 justified against that person.
20       Q. (By Mr. McNulty) Okay. Let me -- let me
21 ask the question just one more time.
22          Just -- just based on this video and what
23 I've told you, that he was hit in the face with a
24 40-millimeter round, do you believe that that was an
25 appropriate use of force under the circumstances?

1          MR. RINGEL: Object to the form and the
2 foundation.
3       A. I would never make a determination like
4 that based just on one small snippet of video. So all I
5 can -- all I can really say is I did not see anything in
6 this one video that would justify or authorize the
7 use -- the potentially deadly force against him, like
8 shooting in the face with a 40-millimeter round, but I'm
9 not aware if there's any other evidence that would cause
10 me to question that conclusion. But in this video, I did
11 not see any evidence that would justify the use of
12 potentially deadly force against him.
13       Q. (By Mr. McNulty) And that's totally fair.
14 You know, my question isn't, you know, if you -- in an
15 ideal world, what would you want to look at? Or what --
16 what -- you know, what videos would you want to see?
17 Would you want to see officer statements or any of that?
18          My question is just, based on this video
19 and the fact that I've told you that he was shot in the
20 face with a 40-millimeter round, do you believe that that
21 was an appropriate use of force under the circumstances?
22          MR. RINGEL: Object to the form and the
23 foundation.
24       A. And I guess what I'm saying to you is,
25 baked into the word "appropriate" and "appropriate use of

1 force" is a recognition that there is a larger body of
2 evidence that -- to make a judgment about whether use of
3 force is appropriate or not, one would have to look at a
4 larger body of evidence. I don't think one could make a
5 determination on the basis of just this one video alone.
6          So I'm trying to answer a slightly
7 narrower question that I think I can kind of reasonably
8 answer consistent with my kind of professional
9 responsibilities. That on the basis of this video, I
10 don't see any evidence that would justify the use of
11 potentially deadly force against him.
12          But to make a determination about
13 appropriateness in general, which again, is a weighted
14 term of art, I would need to see all of the evidence
15 that's relevant and available to this person to make that
16 determination.
17       Q. (By Mr. McNulty) Fair enough.
18          We're going to keep watching here. And if
19 you wouldn't mind listening to the audio, and I'm going to
20 ask you some questions about what is said. Okay?
21       A. Okay.
22          (Video playing.)
23       Q. Did you hear a person say, Motherfucker,
24 that's what you get, fuck you?
25       A. Can you play it back for me? I'm going to

1 turn up the sound here.

2     Q. Happy to do so.

3     (Video playing.)

4     Q. I'll ask the question again. Did you hear

5 someone say, Motherfucker, that's what you get. Fuck you?

6     A. I did.

7     Q. I'm going to represent to you that that was

8 a sergeant on the scene. His name is Sergeant Daniel

9 Abeyta. And he stated during his deposition that he

10 yelled that at that particular point.

11     You know, based on your experience as a

12 monitor, do you believe that it was appropriate for

13 Sergeant Abeyta to yell that in that scenario?

14     MR. RINGEL: Object to the form.

15     A. No. To the extent that what you

16 have -- and I presume that you've made accurate

17 representations -- no, that would not be appropriate.

18     Q. (By Mr. McNulty) Yeah.

19     At the point that the individual in the gas

20 mask is shot with a 40-millimeter round, the crowd had

21 largely dispersed, correct?

22     MR. RINGEL: Object to the form and the

23 foundation.

24     A. Sorry. Correct.

25     Q. (By Mr. McNulty) You didn't see anything

1 in this video showing that individual attempting to engage

2 in any property destruction, correct?

3     A. Not that I could see in this video, no.

4     Q. You didn't see that individual fleeing from

5 officers, correct?

6     A. I did not.

7     Q. You didn't see that individual threaten

8 violence towards officers or anyone else, correct?

9     MR. RINGEL: Object to the form.

10     A. I did not see that.

11     Q. (By Mr. McNulty) You didn't see that

12 individual commit any crime in that video, correct?

13     A. Not that I could see, no.

14     MR. MCNULTY: Okay. I think those are all

15 the questions I have for you, Mr. Mitchell. I appreciate

16 your time today. And I don't know if my cocounsel have

17 other questions or not. You might still be on the hot

18 seat. Who knows? But thanks for taking the time to

19 answer my questions.

20     THE DEPONENT: You got it.

21     MR. RUTAHINDURWA: I don't have any

22 questions on behalf of the Fitouri plaintiffs. Thank

23 you.

24     MR. SEBBA: And I have nothing further.

25     MR. RINGEL: I've got some questions.

1     EXAMINATION

2 BY MR. RINGEL:

3     Q. Good afternoon, Mr. Mitchell. How are you?

4     A. I'm well. Thank you.

5     Q. I've got a few questions that I wanted to

6 ask you.

7     When was the last time that you reviewed an

8 unredacted version of any of the memos that you were shown

9 by Mr. Sebba this morning -- earlier in this deposition?

10     A. Presumably -- sometime in the fall of

11 2020. What the particular month I don't remember.

12 Perhaps in October, maybe November. But I think more

13 likely October 2020, as I was drafting this report.

14     Q. Okay. And you are not -- you were not

15 involved in any of the review of those memos for purposes

16 of making the redactions, correct?

17     A. I was not.

18     Q. And you understand that the

19 deliberative-process privilege, to the extent that it's

20 been asserted in this case, is asserted by the City and

21 County of Denver, right?

22     MR. MCNULTY: Objection. Calls for a

23 legal conclusion.

24     A. I would presume that as counsel for the

25 City and County of Denver, to the extent that you or your

1 team have asserted the privilege, it is being asserted by

2 the City and County of Denver, yes.

3     Q. (By Mr. Ringel) And it's a privilege that

4 belongs to the City, not you, right?

5     MR. MCNULTY: Objection. Calls for a

6 legal conclusion.

7     A. Yes. That's my understanding of the

8 privilege.

9     Q. (By Mr. Ringel) And you don't have any

10 ability to waive that privilege, correct?

11     MR. MCNULTY: Objection. Calls for a

12 legal conclusion.

13     A. Generally speaking, no.

14     You know, one of the interesting features

15 of the position of independent monitor is that the

16 monitor has to speak candidly in reports and City Council

17 meetings and presentations about disciplinary matters and

18 conclusions and evaluations and analysis of disciplinary

19 cases that could at times implicate the City's

20 deliberative-process privilege.

21     And so the way that is worked out is

22 sort of an ongoing work in progress and dialog between,

23 you know, the City Attorney's Office and the independent

24 monitor, whoever that is.

25     In the context of a piece of litigation

37 (Pages 142 - 145)

Page 146

1 like this one, yes, I have nothing to do with nor any
2 authority over decisions about whether or not to waive
3 the disciplinary -- deliberative-process privilege.
4        Q.  (By Mr. Ringel)  I understand the
5 distinction, Mr. Mitchell.  And I appreciate that.
6              Turning to your report that -- that both
7 counsel asked you about.  There's no conclusion in your
8 report that any particular action taken by the Denver
9 Police Department violated anyone's constitutional rights,
10 correct?
11       A.  I think that's right.  Yeah.  We did not
12 comment -- or I did not comment on specific incidents or
13 specific uses of force as they related to potential
14 violations of constitutional rights.  So I think that's
15 right.
16       Q.  There's also no conclusion in your report
17 that any policy of the Denver Police Department was a
18 cause of a violation of anyone's constitutional rights,
19 correct?
20       A.  We did not draw that conclusion in the
21 report, no.
22       Q.  And that both of those sort of
23 constitutional questions -- and in this case, liability
24 questions -- are beyond the scope of what you were looking
25 at in your report, true?

Page 147

1        A.  I think it sounds accurate to say that to
2 the extent there were constitutional violations alleged
3 in this lawsuit, those are kind of jury questions.  Those
4 are not the questions that we were attempting to analyze
5 or resolve in that report.
6        Q.  Well, more broadly, separate from this
7 lawsuit, you weren't attempting to analyze whether
8 anyone's constitutional rights were violated by the Denver
9 Police Department as part of the George Floyd protests
10 response in your report, right?
11       A.  Not in the report, though certainly
12 in -- as I mentioned earlier, there was, you know, north
13 of 100 Internal Affairs investigations opened in response
14 to allegations of inappropriate force.  And we did, in
15 the context of all of that work, which we were doing
16 simultaneously as we were doing this investigation, we
17 were concerned with and looking at potential violations
18 of policy or potential constitutional violations that
19 arose in connection with individual incidents.
20             So for me, since I was doing both things
21 at the same time, they blend together a little bit.  But
22 in the report, I agree with you, those were not the
23 questions that we were evaluating.
24       Q.  Okay.  And someone in the Denver Police
25 Department is disciplined not because they violate

Page 148

1 someone's constitutional rights, but because they violate
2 Denver Police Department policy, correct?
3        A.  Correct.
4        Q.  The standard that is imposed in the
5 disciplinary process is whether the actions were in
6 conformance with Denver Police Department policy, not
7 whether the actions were in conformance with the United
8 States Constitution, right?
9              MR. MCNULTY:  Objection to form.
10       A.  Sorry.
11             That's right.  There may be, and often is,
12 overlap between those questions.  But you're -- you're
13 right.  The standard that we're using when evaluating
14 officer behavior in the disciplinary process is whether
15 or not officers complied with policy.
16       Q.  (By Mr. Ringel)  Right.
17             And during your conversation a little bit
18 ago with Mr. McNulty, you talked -- one of the areas that
19 he was asking you about was training.
20             There's nothing in your report that talks
21 about a deficiency in training being the moving force or
22 cause of the violation of anyone's constitutional rights,
23 correct?
24       A.  Correct.
25       Q.  Okay.  When did you leave -- I believe you

Page 149

1 testified earlier that you ended your tenure as the
2 monitor in December of 2020, correct?
3        A.  Correct.
4        Q.  Okay.  And between December -- between the
5 date that you left being the monitor and today, have you
6 spoken or had any communications with anyone who
7 represents any of the plaintiffs in this litigation?
8        A.  I have.
9        Q.  How many times?
10       A.  I probably talked to Tim McDonald on the
11 phone a couple of times, and I had a meeting at one point
12 with Tim McDonald, who I understand represents some group
13 of plaintiffs here, and a law partner or two of his.  I
14 think someone from another firm who may represent other
15 plaintiffs in this case.
16       Q.  Okay.  Do you remember the names of any of
17 the other people that you had this meeting with?
18       A.  The gentleman who began the examination
19 today, Michael, was a part of that meeting.  And I think
20 someone else from Arnold & Porter.  And then a woman from
21 a firm whose name I can't remember.  Elisabeth, maybe,
22 was also part of that meeting.
23       Q.  Okay.  When did that meeting take place?
24       A.  I'm not sure that I recall.  A couple
25 of -- probably a couple months ago.  But the particular

38 (Pages 146 - 149)

1 date I don't remember.

2     Q. Was it a meeting in person or was it a

3 meeting with some kind of technology, either video or

4 telephone or --

5     A. It was -- it was a video meeting.

6     Q. Okay. Is there a record of the date of

7 that meeting that you have somewhere?

8     A. I could look at my calendar to see if I

9 have a record of the date of the meeting.

10     Q. Okay. Do you believe it was in the month

11 of May of this year?

12     A. It's possible. Probably April or May, I

13 would -- I would suspect, but I'm not totally sure.

14     Q. Okay. Can you just -- how long was that

15 meeting?

16     A. I don't really remember, but I would

17 imagine somewhere between half an hour and 45 minutes or

18 an hour, at the very outside. But I don't have a

19 particular memory.

20     Q. Okay. And what do you remember about what

21 was discussed during the meeting?

22     A. I remember there were questions about the

23 report, questions about the investigation that I

24 conducted. I remember there were particular questions

25 about body-worn cameras and conclusions that I drew about

1 body-worn cameras, and maybe some of the interview memos

2 or sort of interview process. And the process for

3 creating interview memos may have come up, or maybe I

4 talked about that with Tim on the phone at a different

5 point.

6     Q. Were you shown any documents or video

7 during the meeting that you had with the lawyers for the

8 plaintiffs?

9     A. I don't remember seeing any video. I

10 don't think I was shown any documents. If I was, it may

11 be -- the report, I -- they may have shown me, but I

12 don't think so.

13     Q. Okay. Was there any record of the

14 conversation that you made? Did you take any notes? Did

15 you record it in any fashion?

16     A. I didn't record it, and I took no notes.

17     Q. Do you know whether or not any of the other

18 participants recorded it in any fashion?

19     A. I suspect that it was not video-recorded.

20 Usually when something is being video-recorded, you can

21 see a notation in the corner of the screen, as I see as I

22 sit here now. And I don't remember seeing that. And

23 I -- you know, I think I would have made note of that.

24 So I doubt it was video-recorded.

25     Whether anyone created notes associated

1 with it or not, I don't know.

2     Q. Okay. Could it have been audio recorded

3 from the other side? Would you have known that, whether

4 that had occurred or not?

5     A. I would not have known.

6     Q. Okay. With respect to the discussions of

7 the memos, based on the conversation that you had, did you

8 have an understanding that the other participants in the

9 meeting had seen the memos?

10     MR. SEBBA: Objection to form.

11     A. I -- I -- well, it's hard for me to -- I

12 know I spoke with Tim about the memos by phone, and it

13 was clear to me that he had seen the memos. And when I

14 say "Tim," I mean Tim McDonald.

15     I don't remember if we discussed the memos

16 in particular in the meeting that you've asked me to

17 describe. It's possible, but I just don't recall for

18 sure. But it was clear to me that Tim McDonald had seen

19 the memos, and we spoke by phone.

20     Q. (By Mr. Ringel) Okay. So let's talk about

21 the conversation that you're referencing with

22 Mr. McDonald.

23     Did that conversation happen before the

24 meeting that you had described with at least three lawyers

25 or after that meeting?

1     MR. SEBBA: Objection. Form.

2     A. I think maybe both. I think we talked a

3 couple of times. He reached out by phone. And I think

4 we spoke at least once before the meeting and at least

5 once after that meeting.

6     Q. (By Mr. Ringel) Okay. So let me -- let me

7 be a little bit more specific. I apologize.

8     You indicated in an answer a little bit ago

9 that you had a conversation with Mr. McDonald that led you

10 to conclude that he had seen the memos, right?

11     A. Correct.

12     MR. SEBBA: Objection. Form.

13     THE DEPONENT: I'm sorry.

14     A. I could conclude, on the basis of the

15 conversation, that he had seen the redacted memos, yes.

16     Q. (By Mr. Ringel) Okay. And --

17     MR. MCNULTY: Andrew, where is this going?

18 Like, how is this relevant to the issues in the case in

19 any way, shape, or form? That's my question.

20     You know, you can't just go fishing.

21     MR. RINGEL: I can ask any question that

22 may lead to the discovery of relevant evidence, Counsel.

23     MR. MCNULTY: What is --

24     MR. RINGEL: As relevant as the questions

25 about the redactions.

39 (Pages 150 - 153)

Page 154

1       MR. McNULTY: I don't understand the
2   relevance of asking about conversations with people. You
3   know, the redactions were about actual evidence in the
4   case, not about conversations with lawyers. So I'm just
5   trying to figure out what the relevance of this is. And
6   I'd object to this line of questioning.
7       MR. RINGEL: Okay. So thank you. You can
8   object. I'm going to finish my examination.
9       MR. MCNULTY: Sure.
10      MR. RINGEL: As you are well aware,
11  Mr. McNulty, relevance isn't an appropriate objection in
12  a deposition. You can save that objection for trial.
13      Q.  (By Mr. Ringel) Okay. Before I was
14  interrupted, Mr. Mitchell, was -- you had -- you reached
15  the conclusion that in at least one of the conversations
16  you had with Mr. McDonald, that he had reviewed
17  redacted memos.
18      Is that a correct understanding on my part?
19      A.  Yes.
20      Q.  And put the conversation where you reached
21  that conclusion about -- or put that conversation with
22  Mr. McDonald in a time frame in relationship to the
23  meeting that we've already been discussing.
24      MR. SEBBA: Objection. Form.
25      A.  I'm not sure that I can. I remember

Page 155

1   talking with Mr. McDonald after that meeting, and it was
2   clear that he had viewed redacted memos. And it was
3   clear that there was a discovery dispute, you know,
4   related to the material contained in those memos.
5       But I -- you know, so he described that.
6   He was very clear about that. I don't remember if we
7   talked about that at the meeting also, but in subsequent
8   conversation, it was very clear that there was a live
9   discovery dispute related to the memos.
10      Q.  (By Mr. Ringel) Okay. And you understood
11  that the discovery dispute related to the assertion by the
12  City of the deliberative-process privilege?
13      A.  I do.
14      Q.  Okay. Did you subsequently discuss the
15  deliberative-process privilege with Mr. McDonald?
16      A.  I can't really remember. I mean, we --
17      THE DEPONENT: I'm sorry.
18      MR. SEBBA: No, no, I'm sorry. Go ahead.
19      THE DEPONENT: Okay.
20      THE REPORTER: Just a moment. Was there
21  an objection?
22      MR. SEBBA: You know what? Objection.
23  Form. Sorry.
24      You can continue, Mr. Mitchell.
25      A.  I think we may have, you know, discussed

Page 156

1   the privilege in general, but I don't remember. He
2   described for me that the memos had been very heavily
3   redacted and that his team was concerned about that.
4   Whether we got into the specific contours of the
5   privilege or not, I'm not sure.
6       Q.  (By Mr. Ringel) Was there a discussion
7   about the deliberative-privilege process during the
8   meeting that you had with Mr. McDonald and the other two
9   lawyers?
10      A.  I'm not sure. It's possible, but I don't
11  think so. I remember a lot of discussion about body-worn
12  cameras and conclusions that it appeared the lawyers
13  maybe were hoping that I had reached or would reach
14  related to issues around body-worn cameras.
15      We may have touched on -- or they may have
16  touched on the privilege or the memos that we're
17  discussing, but I don't -- I don't specifically remember
18  that.
19      Q.  Okay. What -- what are you remembering
20  about the discussion related to body-worn cameras and
21  conclusions that you perceived the lawyers hoped that you
22  would reach that you just mentioned?
23      MR. SEBBA: Objection. Form.
24      A.  I think --
25      THE DEPONENT: Sorry. I'll give a little

Page 157

1   pause after the questions.
2       A.  I think there were -- there were questions
3   about culture around body-worn cameras and whether there
4   was a culture inside the DPD to not activate body-worn
5   cameras before the use of force. That sort of sticks
6   out. There may have been questions about use of force in
7   general.
8       But a question that I remember was, Does
9   the DPD have a culture in which officers are expected or
10  permitted not to turn on body cameras before using force
11  against citizens?
12      Q.  (By Mr. Ringel) So does the DPD have such
13  a culture, Mr. Mitchell, in your experience as the
14  independent monitor?
15      A.  No, I wouldn't say that.
16      Q.  Okay.
17      A.  There are incidents that people have --
18  the officers have been disciplined for, and I have made
19  policy recommendations concerning the way body cameras
20  are used in the department. But I have not and would not
21  conclude that there is a culture of failing to turn on
22  body cameras.
23      MR. RINGEL: Those are my questions. I
24  appreciate your time today, Mr. Mitchell.
25      MR. MCNULTY: I have a few follow-ups

40 (Pages 154 - 157)

Page 158

1 based on that.
2        EXAMINATION
3 BY MR. MCNULTY:
4        Q.  You know, on the subject of body-worn
5 cameras, Mr. Mitchell, I showed you that body-worn camera,
6 that incident earlier.  Do you remember that, the
7 McDermott body-worn camera, the man being shot in the face
8 with a 40-millimeter round who was wearing a mask?
9        A.  I do.
10       Q.  If I were to tell you that the person who
11 shot the individual in the face with the mask had not
12 turned on his body-worn camera and/or was not wear-- you
13 know, had not turned on his body-worn camera, would that
14 be problematic, from your perspective?
15               MR. RINGEL:  Object to the form and the
16 foundation.
17       A.  Can you clarify what you mean by
18 "problematic"?
19       Q.  (By Mr. McNulty)  Would that be, you know,
20 in violation of Denver Police Department policy?
21               MR. RINGEL:  Object to the form and the
22 foundation.
23       A.  It would be concerning for all the reasons
24 we've already discussed about body cameras.  But I think,
25 as we've also discussed, the policy was somewhat

Page 159

1 ambiguous at the time of the protests as -- as to whether
2 or not officers should activate cameras during a response
3 to a mass protest and, if so, when and for how long.
4               And so I would view it as problematic from
5 an accountability perspective.  But whether or not it
6 violated policy.  I think is a -- sort of a separate
7 question, and that's a little bit less clear.
8        Q.  (By Mr. McNulty)  I appreciate that.  Yeah,
9 that's a good distinction.  So --
10       A.  But I -- before you -- if I may.
11       Q.  Yeah.
12       A.  Though a use of force -- just as a -- as
13 sort of a normative statement, uses of force -- if an
14 officer is going to use force, he or she should activate
15 the body camera.  You know, that's a statement I'm
16 comfortable making.
17               So while if the policy may have been
18 ambiguous about protest response in general, it is
19 reasonably clear that when using force, the body camera
20 is supposed to be activated.
21       Q.  (By Mr. McNulty)  The fact that that
22 officer did not activate his body-worn camera is
23 problematic from an accountability perspective, true?
24               MR. RINGEL:  Object to the form and
25 foundation.

Page 160

1        A.  Yes.
2        Q.  (By Mr. McNulty)  And the officer -- or
3 sorry -- let me strike that.
4               Also in that video, the sergeant who
5 yelled, Motherfucker, that's what you get, fuck you, did
6 not activate his body-worn camera.
7               Is that problematic from an accountability
8 perspective?
9               MR. RINGEL:  Object to the form and the
10 foundation.
11       A.  Yes.
12               MR. McNULTY:  Okay.  I have no further
13 questions.  Thank you.
14               MR. SEBBA:  I just have a couple questions
15 of follow-up.
16               EXAMINATION
17 BY MR. SEBBA:
18       Q.  Mr. Mitchell, you mentioned that you spoke
19 to Tim McDonald a number of times, correct?
20       A.  Correct.
21       Q.  And did any of these conversations occur
22 while you were still working at the Denver OIM?
23       A.  I don't think so, no.
24       Q.  Okay.  And the meeting that you described
25 with Mr. McDonald and other counsel, did that occur while

Page 161

1 you were still working at the OIM?
2        A.  Certainly not.
3               MR. SEBBA:  Okay.  No further questions.
4               MR. RINGEL:  I think we're done, unless,
5 Makeba, you have any.
6               MS. RUTAHINDURWA:  No questions.  Thanks
7 for checking.
8               MR. RINGEL:  Thank you, Mr. Mitchell.
9 You're free to --
10               THE REPORTER:  Just a moment.  Wait.
11 Wait.
12               THE VIDEOGRAPHER:  I've got to take
13 everybody off the record first.  Give me one moment to
14 conclude.
15               This concludes today's testimony given by
16 Nicholas Mitchell.  The total number of media units used
17 was seven.  All media will be retained by Veritext in a
18 local secured drive and will be formally stored in
19 Veritext-managed Amazon S3 cloud services for
20 preservation purposes.
21               We're now off the record at 4:52 p.m.
22               THE REPORTER:  Your order, please?
23               MR. SEBBA:  Yeah.  Can we order a
24 transcript and video, and can we get a rough transcript?
25 I don't know.  Whenever those are available.

Page 162

1        THE REPORTER:  Mr. Ringel, your order,
2 please.
3        MR. RINGEL:  I will take just a
4 transcript.  And I will take care of review and signature
5 by Mr. Mitchell.
6        THE REPORTER:  Mr. McNulty, your order?
7        MR. MCNULTY:  Yeah, I'll just have an
8 Etran.
9        THE REPORTER:  Do you also want
10 exhibits?
11       MR. SEBBA:  Yes, please.
12       THE REPORTER:  All counsel?
13       MR. MCNULTY:  Yes.
14       MR. RINGEL:  I'll take exhibits.  That's
15 fine.
16              * * * * * * *
17       WHEREUPON, the foregoing deposition was
18 concluded at the hour of 4:53 p.m.  Total time on the
19 record was 3 hours and 43 minutes.
20
21
22
23
24
25

Page 163

1        REPORTER'S CERTIFICATE
2
3
4        I, Laurel S. Tubbs, a Registered
5 Professional Reporter, Certified Realtime Reporter, and
6 Notary Public within the State of Colorado, do hereby
7 certify that previous to the commencement of the
8 examination, the deponent was duly sworn by me to testify
9 to the truth.
10       I further certify that this deposition was
11 taken in shorthand by me remotely and thereafter reduced
12 to a typewritten form; that the foregoing constitutes a
13 true and correct transcript.
14       I further certify that I am not related
15 to, employed by, nor of counsel for any of the parties or
16 attorneys herein, nor otherwise interested in the result
17 of the within action.
18       My commission expires September 1, 2023.
19
20       _____
         LAUREL S. TUBBS
21       Registered Professional Reporter
         Certified Realtime Reporter
22       and Notary Public
23
24
25

Page 164

1            Veritext Legal Solutions
             1100 Superior Ave
2              Suite 1820
             Cleveland, Ohio 44114
3            Phone: 216-523-1313
4
   June 29, 2021
5
   To: MR. RINGEL
6
   Case Name: Black Lives Matter 5280 Et Al. v. City And County Of Denver
7  Et Al.
8  Veritext Reference Number: 4665525
9  Witness:  Nicholas Ethan Mitchell      Deposition Date:  6/25/2021
10
   Dear Sir/Madam:
11
12 Enclosed please find a deposition transcript.  Please have the witness
13 review the transcript and note any changes or corrections on the
14 included errata sheet, indicating the page, line number, change, and
15 the reason for the change.  Have the witness' signature notarized and
16 forward the completed page(s) back to us at the Production address
   shown
17
   above, or email to production-midwest@veritext.com.
18
19 If the errata is not returned within thirty days of your receipt of
20 this letter, the reading and signing will be deemed waived.
21
   Sincerely,
22
   Production Department
23
24
25 NO NOTARY REQUIRED IN CA

Page 165

1        DEPOSITION REVIEW
         CERTIFICATION OF WITNESS
2
         ASSIGNMENT REFERENCE NO: 4665525
3        CASE NAME: Black Lives Matter 5280 Et Al. v. City And County
   Of Denver Et Al.
         DATE OF DEPOSITION: 6/25/2021
4        WITNESS' NAME: Nicholas Ethan Mitchell
5        In accordance with the Rules of Civil
   Procedure, I have read the entire transcript of
6  my testimony or it has been read to me.
7        I have made no changes to the testimony
   as transcribed by the court reporter.
8
   _____
9  Date         Nicholas Ethan Mitchell
10       Sworn to and subscribed before me, a
   Notary Public in and for the State and County,
11 the referenced witness did personally appear
   and acknowledge that:
12
       They have read the transcript;
13     They signed the foregoing Sworn
          Statement; and
14     Their execution of this Statement is of
          their free act and deed.
15
   I have affixed my name and official seal
16
   this _____ day of_____, 20____.
17
   _____
18 Notary Public
19
   _____
20 Commission Expiration Date
21
22
23
24
25

42 (Pages 162 - 165)

Page 166

1        DEPOSITION REVIEW
         CERTIFICATION OF WITNESS
2
         ASSIGNMENT REFERENCE NO: 4665525
3        CASE NAME: Black Lives Matter 5280 Et Al. v. City And County
Of Denver Et Al.
         DATE OF DEPOSITION: 6/25/2021
4        WITNESS' NAME: Nicholas Ethan Mitchell
5        In accordance with the Rules of Civil
Procedure, I have read the entire transcript of
6    my testimony or it has been read to me.
7        I have listed my changes on the attached
Errata Sheet, listing page and line numbers as
8    well as the reason(s) for the change(s).
9        I request that these changes be entered
as part of the record of my testimony.
10
         I have executed the Errata Sheet, as well
11   as this Certificate, and request and authorize
that both be appended to the transcript of my
12   testimony and be incorporated therein.
13   _____
     Date            Nicholas Ethan Mitchell
14
         Sworn to and subscribed before me, a
15   Notary Public in and for the State and County,
the referenced witness did personally appear
16   and acknowledge that:
17       They have read the transcript;
         They have listed all of their corrections
18       in the appended Errata Sheet;
         They signed the foregoing Sworn
19       Statement; and
         Their execution of this Statement is of
20       their free act and deed.
21       I have affixed my name and official seal
22   this _____ day of_____, 20____.
23   _____
         Notary Public
24
     _____
25       Commission Expiration Date

Page 167

1        ERRATA SHEET
         VERITEXT LEGAL SOLUTIONS MIDWEST
2        ASSIGNMENT NO: 4665525
3    PAGE/LINE(S) /      CHANGE      /REASON
4    _____
5    _____
6    _____
7    _____
8    _____
9    _____
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17   _____
18   _____
19
     _____     _____
20   Date            Nicholas Ethan Mitchell
21   SUBSCRIBED AND SWORN TO BEFORE ME THIS _____
22   DAY OF _____, 20_____ .
23   _____
         Notary Public
24
     _____
25       Commission Expiration Date

43 (Pages 166 - 167)

[& - able]                                                                    Page 1

| & |
| --- |

**&**   1:2,3,15,19,23
   2:4,8,14 5:1
   149:20

| 0 |
| --- |

**0**   20:20
**01878**   1:2 4:13
**01922**   1:2
**03155**   1:3

| 1 |
| --- |

**1**   3:14 4:8 10:5,23
   10:25 59:18,22
   62:21 82:21 92:18
   107:15 109:18
   163:18
**10**   3:14 83:7,7
**100**   96:10 147:13
**1001**   2:15
**11**   84:18
**1100**   164:1
**1144**   1:19
**11699**   21:7
**11805**   15:7
**12**   86:8
**12:34**   3:5 4:3
**12:39**   7:24 8:2
**12:47**   13:8,9
**12:59**   13:9,11
**13**   87:20
**14**   3:16 89:3
**144**   3:12
**15**   90:19
**1543**   2:9
**158**   3:11
**15th**   1:19
**16**   3:16 91:21
   95:13
**160**   3:11
**16th**   135:12

**17**   3:18
**17th**   2:15
**18**   88:10
**1820**   164:2
**19**   111:19
**1:20**   1:2,2,3 4:13
**1:36**   41:12,13
**1:45**   41:13,15

| 2 |
| --- |

**2**   3:16 14:6,8
   66:25 93:23
**20**   20:19 22:20
   23:12,15 115:15
   135:7 165:16
   166:22 167:22
**2012**   8:25
**2020**   3:14,17 9:3
   9:12,14,18,25
   17:17 33:5 43:4
   50:6 59:24 60:20
   60:21 61:6 134:17
   134:19 144:11,13
   149:2
**2021**   1:11 3:5 4:3
   164:4
**2023**   163:18
**21**   115:15
**213-243-4229**   1:16
**216-523-1313**
   164:3
**22402**   163:19
**23**   136:22
**24th**   4:3
**25**   1:11 3:5
**26**   122:8
**28th**   9:17,25
   134:23
**29**   164:4
**29th**   134:17,19
**2:43**   82:14,15

**2:50**   82:15,17
**2nd**   17:17 33:5

| 3 |
| --- |

**3**   3:18 17:5,7
   93:24 95:8 162:19
**300**   2:15
**303-571-1000**   2:10
**303-628-3300**   2:16
**303-863-2380**   1:20
**3100**   1:19
**311**   2:5
**312-243-5900**   2:6
**312-583-2424**   1:24
**32**   3:19 125:2
**3:31**   111:7,8
**3:39**   111:8,10
**3rd**   2:5 50:6

| 4 |
| --- |

**4**   3:19 32:19,21
   70:21
**40**   79:8,13,20 80:2
   80:22 126:14,22
   127:3,8,16,17
   128:9,19 129:8,19
   130:1 138:20
   139:15,24 140:8
   140:20 142:20
   158:8
**400**   2:9
**42**   3:20
**4200**   1:23
**43**   162:19
**44114**   164:2
**44th**   1:15
**45**   150:17
**4665525**   164:8
   165:2 166:2 167:2
**49**   3:21
**4:52**   161:21

**4:53**   162:18

| 5 |
| --- |

**5**   3:20 15:6 42:18
   42:21 49:6 72:23
**5280**   1:5,14,18,22
   4:11 5:1 164:6
   165:3 166:3
**53**   64:8

| 6 |
| --- |

**6**   3:11,21 9:17,22
   49:20,21 75:6
**6/25/2021**   164:9
   165:3 166:3
**60602**   1:24
**60607**   2:5

| 7 |
| --- |

**7**   76:12
**70**   1:23
**777**   1:15
**7:15**   137:3
**7:17**   134:23
**7:20**   135:7
**7:22**   136:22

| 8 |
| --- |

**8**   79:5
**80202**   1:20 2:9,15

| 9 |
| --- |

**9**   80:25
**90017**   1:16
**97**   3:11
**9th**   43:4

| a |
| --- |

**aberdeen**   2:5
**abeyta**   142:9,13
**abeyta's**   134:14
**ability**   68:4 120:2
   145:10
**able**   62:12 77:11
   139:4

**absolutely**  14:16
82:9
**abusing**  35:13
**academy**  48:4
94:10 132:10,15
132:21
**acceptable**  88:1
**access**  10:19
**accompanied**
122:17
**accountability**
70:3 114:12,16,17
114:25 116:10
117:2,6,8 159:5,23
160:7
**accountable**  121:5
**accounts**  94:13
**accurate**  139:14
142:16 147:1
**accurately**  36:14
**acker**  2:7 5:6
97:15
**acknowledge**  5:13
5:15 165:11
166:16
**act**  86:12,12
165:14 166:20
**acting**  78:17
104:10
**action**  1:2 4:17
120:21 123:3
146:8 163:17
**actions**  36:12
84:12 100:8
104:19 106:20
107:1,6,7 109:4,25
148:5,7
**activate**  69:21
157:4 159:2,14,22
160:6

**activated**  70:8
118:20 159:20
**activating**  116:1
**active**  70:4
**acts**  114:17
**actual**  154:3
**adapt**  98:9
**adapted**  13:23
98:11
**add**  73:24
**additional**  99:8
**address**  62:12
87:22 164:16
**addressed**  69:3
**addressing**  118:19
**adequate**  65:10
131:24
**adhere**  74:23
87:23 89:5,19
90:6
**administered**  5:16
**admitted**  107:14
**adopted**  119:6
**advance**  88:13
123:20
**advise**  19:1
**affairs**  8:12 62:15
70:14 71:7 72:14
78:1 98:1,3 108:6
147:13
**affirmed**  6:5
**affixed**  165:15
166:21
**afternoon**  4:2
97:13 144:3
**agencies**  8:13,16
12:2 88:10,19
89:19 90:13 91:8
91:11,18
**agency**  71:22
72:11 89:16

**agent**  90:13
**agents**  122:12
137:13,22
**aggravated**  86:12
**aggression**  86:12
86:13
**ago**  132:15 148:18
149:25 153:8
**agree**  4:7 5:24 6:1
6:2,3 36:10
104:16 118:17
120:4 147:22
**agreed**  88:2
**agreement**  5:21,22
**agreements**  87:21
87:23 88:9,13
**ahead**  98:17
155:18
**aid**  87:21 88:9,11
89:4,5,15 90:21,23
91:7
**aimed**  112:4
**al**  1:5,8 4:11,12
164:6,7 165:3,3
166:3,3
**alerted**  77:4
**alerting**  72:7
**allegation**  99:13
**allegations**  66:16
68:13,17 70:17
72:20 99:2 115:3
147:14
**alleged**  78:4 99:14
147:2
**allow**  66:17
114:12 116:9
131:10
**allowed**  35:20,24
79:12 117:1,6
**alluded**  94:19

**amazon**  161:19
**ambiguous**  119:2
119:9 159:1,18
**amcnulty**  2:10
**amend**  64:17 67:1
68:21 70:22 79:10
**amendment**  73:10
74:14 110:7
127:22,25 128:3
**amghar**  2:2
**amount**  47:18
61:10 62:19 93:18
96:1,2 132:4
**amounts**  132:24
**analysis**  12:4
64:15 65:21
108:23 123:25
145:18
**analyze**  62:13
106:25 147:4,7
**analyzed**  106:20
**analyzing**  100:8
100:14 102:3
108:14
**andrew**  2:8,12,14
5:7 6:3 35:20
41:17 101:23
153:17
**andy**  2:3 5:5 6:2
35:21 97:14
**angeles**  1:16 7:11
7:12
**angles**  139:5
**announcement**
74:24
**anonymous**  77:22
78:18
**answer**  7:2 15:23
16:9 20:7 22:12
23:1 25:4 30:7,8
32:12 35:7,17,23

36:2 65:18 67:16
73:25 90:1 112:23
116:23 118:24
127:1 128:13,15
129:25 131:14
132:8 139:9 141:6
141:8 143:19
153:8
**answered** 65:19
**answering** 18:19
**answers** 6:21 42:4
74:4
**anthony** 2:13
**anyone's** 146:9,18
147:8 148:22
**apologize** 96:16
153:7
**app** 117:20
**appear** 26:7 27:5
28:1 29:19 32:6
34:10,16,22 37:13
39:1,24 40:21
45:3 64:14 132:21
136:7 165:11
166:15
**appearance** 4:21
**appearances** 1:13
2:1
**appeared** 85:17
93:9 156:12
**appears** 21:12
25:19,21 31:6
43:1 45:22
**appended** 166:11
166:18
**applicability**
22:23 32:10 39:3
40:1,25
**applications** 85:7
86:11 87:5,10

**applies** 78:10,24
**apply** 90:11
**appointed** 7:9
8:24
**appreciate** 41:21
97:6 136:14
143:15 146:5
157:24 159:8
**approach** 14:3
19:6 88:19
**appropriate** 3:2
36:13 42:10 77:23
77:23 88:22 90:10
98:21 99:18
119:24 126:2,3
128:18 129:7,20
131:8,9 138:23
139:25 140:21,25
140:25 141:3
142:12,17 154:11
**appropriately**
70:11
**appropriateness**
141:13
**approved** 89:7,21
**april** 150:12
**archer** 3:21 50:5
51:5,22 52:4,23
53:11 54:9,15
55:10,16
**archer's** 56:3
**area** 74:24 86:22
93:5 123:20 125:6
125:12 130:11,18
131:7,12
**areas** 80:17,18
109:14 126:6
148:18
**argued** 20:4
**armor** 29:4

**arnold** 1:15,19,23
5:1 149:20
**arnoldporter.com**
1:17,21,25
**aro** 1:18 5:2
**arose** 91:23
147:19
**arrangement** 5:19
**arrest** 15:11 16:2
**arrestees** 129:12
**arrests** 15:14
30:19
**arrived** 80:3
**art** 141:14
**articulate** 83:10
84:19
**articulates** 20:3
**asked** 16:8,16
28:23 42:3,10
60:19 74:6 104:1
109:21 146:7
152:16
**asking** 15:20,21,25
16:1,14 63:17,21
95:24 97:14
113:25 116:23
124:11,17 139:7
148:19 154:2
**assaulted** 28:17
**assemble** 127:21
**asserted** 144:20,20
145:1,1
**assertion** 19:25
30:5 32:10 35:5
37:16 41:24
155:11
**assessing** 139:2
**assessment** 104:17
133:7 138:6
**assessments** 8:15
19:2 103:15 106:1

106:4
**assign** 68:25
**assigned** 28:21
67:3,21 68:11
93:5
**assignment** 165:2
166:2 167:2
**assignments** 67:22
68:10
**assist** 59:3 70:14
**assistance** 87:23
87:25 88:2
**assisting** 11:24
59:2
**associated** 11:20
11:22 43:9 80:8
80:22 102:20
119:23 124:25
126:7 128:6
151:25
**assume** 131:5
134:5
**attach** 77:11
**attached** 166:7
**attempt** 129:2
**attempting** 68:17
143:1 147:4,7
**attending** 4:5
**attention** 135:24
**attorney** 4:22 5:23
**attorney's** 61:2
78:2 145:23
**attorneys** 5:12
163:16
**audible** 122:23
**audio** 4:6 7:19
75:8,15 141:19
152:2
**august** 8:25
**authoring** 108:13

**authoritative**
  75:17
**authority**  146:2
**authorize**  140:6
  166:11
**authorized**  79:12
  131:2,4 139:18
**available**  11:21
  108:9 115:11
  119:25 141:15
  161:25
**ave**  164:1
**aware**  117:10
  121:18 126:10
  134:20 140:9
  154:10

**b**

**back**  8:1 13:10,20
  28:22,23 30:11
  37:20 41:14,16
  42:17 56:18 59:17
  81:4,17 82:16,18
  105:7 109:17,17
  111:9 133:9 137:1
  137:3 141:25
  164:16
**bad**  136:10,11
**badge**  77:7
**badges**  76:14,14
  77:11
**baked**  140:25
**ball**  31:1 83:8,11
  83:18,25 84:2,13
**bangs**  30:22 84:25
  85:2,6
**barb**  3:21 50:5
**base**  96:4
**based**  45:4 106:2
  121:21 133:17
  139:22 140:4,18
  142:11 152:7

158:1
**basic**  6:19
**basically**  104:21
**basis**  22:22 104:6
  137:25 138:5,21
  139:8 141:5,9
  153:14
**bates**  10:4,25 14:6
  15:7 17:5 21:7
  32:19 42:19 49:20
  64:9 82:22 90:17
  111:14,16
**bathroom**  82:8
**bearing**  10:4,25
  14:6 15:7 17:5
  21:6 32:19 42:19
  49:20 64:8 82:22
**bears**  90:17
**beasley**  2:13
**began**  9:25 58:25
  60:10,20,24 113:2
  113:7 149:18
**beginning**  5:22
  56:19
**begun**  130:11
**behalf**  1:14,18,22
  2:2,7,11 4:25 5:4
  5:5,8 97:15
  103:15,16 143:22
**behave**  77:22
**behaved**  61:20
**behavior**  9:6
  37:24 65:23,24
  70:5,5 72:9,17
  77:24 78:13,14,20
  78:22,23 121:8
  139:10 148:14
**believe**  43:7 49:11
  49:15 59:12 60:19
  61:3 64:12,13
  67:23 73:25 75:14

95:17 103:11
104:9 117:24
119:8 124:20
125:9 128:14
138:22 139:24
140:20 142:12
148:25 150:10
**believed**  96:22
**belongs**  145:4
**benefit**  66:7 68:1
  69:23 70:7 72:2
  72:15 74:10,17
  75:2 76:3,6 77:14
  77:18,24,25 78:9
  78:24 80:10 82:3
  87:13 89:22 90:7
  91:13 94:15,22
  95:3,7,9
**benefits**  81:20,23
  84:6 85:22 88:14
**berate**  36:4
**best**  65:7 87:24
  88:11 91:8 118:7
**better**  66:13 115:2
  133:21
**beyond**  146:24
**big**  93:8
**bit**  13:21 14:16
  66:6 70:19 76:11
  86:25 95:23
  105:12 109:17
  111:13 112:4
  113:1 114:2
  129:24 133:1
  134:9 135:5 136:6
  147:21 148:17
  153:7,8 159:7
**black**  1:5,14,18,22
  4:10 138:11 164:6
  165:3 166:3

**blend**  147:21
**blm**  4:25
**body**  11:21 29:4
  61:11 69:5,18,21
  70:2,4,8 72:13
  73:16 75:25 80:17
  80:18 86:19 115:1
  115:19,23 116:1,5
  116:9,14 117:1
  118:13,19 119:1,3
  119:11,23 120:14
  120:20 121:2,14
  121:19 122:22
  126:6 132:6
  134:12,21,22
  136:9 141:1,4
  150:25 151:1
  156:11,14,20
  157:3,4,10,19,22
  158:4,5,7,12,13,24
  159:15,19,22
  160:6
**bones**  127:8,13
**born**  121:14
**bottles**  38:14
**bottom**  33:19
**brain**  127:11
**brand**  129:4
**brandishing**
  128:25 129:4
**break**  7:3 41:6
  82:8 92:16 97:16
  98:15 127:8
  132:25
**breaks**  6:25
**briefings**  27:10,21
  33:20 34:3,8
  36:24 124:20
**briefly**  107:23
**broader**  20:2
  108:15

**broadly** 147:6
**bruises** 29:3
**bucket** 92:18
　93:12,23,24 95:8
**buckets** 92:17
　95:7,10 98:14
**bullet** 66:25 68:19
　70:20 83:6 84:17
　86:7
**bureau** 71:7 78:2
　98:4
**burn** 85:10
**burns** 85:14
**business** 112:20
**bwc** 69:1,5
**bwcs** 68:23

**c**

**c** 1:22 4:1
**ca** 164:25
**calculate** 61:15
**calendar** 150:8
**california** 1:16
**call** 124:13
**called** 3:4 85:1
　93:10 95:7 118:14
　127:6,7,7
**calls** 144:22 145:5
　145:11
**camera** 11:21
　61:11 69:5,18
　70:4 72:13 73:16
　116:5,14 118:13
　119:1,3,11,23
　120:14,20 121:2
　121:14,19 122:22
　134:12,22 135:23
　136:9 158:5,7,12
　158:13 159:15,19
　159:22 160:6
**cameras** 69:22
　70:2,8 75:25

115:1,19,23 116:1
116:9 117:1
118:19 134:21
150:25 151:1
156:12,14,20
157:3,5,10,19,22
158:5,24 159:2
**cams** 86:19
**candidly** 145:16
**canino** 3:18 17:17
　18:12,16 21:19
　24:7,16 25:1,2
　26:2,22 27:20
　29:11,16 31:17,23
　32:3
**canino's** 18:6
**capital** 129:14
**care** 162:4
**careful** 96:4
　128:23
**carri** 33:3
**case** 4:13 10:9
　20:2 30:5 32:11
　35:5 37:18 39:5
　40:2 41:1,25 42:7
　144:20 146:23
　149:15 153:18
　154:4 164:6 165:3
　166:3
**cases** 97:9 115:2
　145:19
**causation** 65:22
**cause** 85:12,12,13
　85:14 87:7 127:10
　127:11 128:7
　140:9 146:18
　148:22
**caused** 130:17
**caveat** 136:14
**cell** 73:17 86:20

**certain** 78:22 85:7
　85:9 90:9 93:2
**certainly** 15:4
　16:7 72:19 101:10
　110:23 120:25
　139:13 147:11
　161:2
**certainty** 96:10
　107:19
**certificate** 163:1
　166:11
**certification** 165:1
　166:1
**certified** 3:7 79:7
　163:5,21
**certify** 163:7,10
　163:14
**chain** 99:6,12
　119:22
**challenge** 65:22
**challenges** 62:9
　68:11
**champa** 2:9
**chance** 20:19,20
　22:20 23:12,15
**change** 45:15,25
　82:2 98:9 107:20
　108:2 164:14,15
　166:8 167:3
**changed** 98:11
**changes** 50:11
　164:13 165:7
　166:7,9
**channel** 92:4
**chaotic** 70:9
**characterize** 36:12
　36:13
**charge** 62:3
　103:14
**check** 69:1

**checked** 90:4
**checking** 161:7
**chelsea** 2:13
**chemical** 73:9
　74:15,20 75:4
　86:24 122:11,16
　123:8,21 130:16
　137:13,22
**chemicals** 86:24
**chicago** 1:24 2:5
**chief** 3:21 50:5
　51:5,22 52:4,23
　53:4,11 54:9,15
　55:10,16 56:3
　61:2 92:2,20
　93:11
**chilling** 127:23
　128:2
**choose** 42:15
**choreography**
　95:2
**christopher** 2:13
**chunks** 25:20,22
**circumstances**
　73:2,11 84:3
　86:11 87:25 98:20
　100:1 129:20
　138:23 139:25
　140:21
**cite** 110:12
**cited** 78:11 109:12
**citizen** 70:5 77:4
　86:20 98:4 116:16
**citizens** 63:8 73:17
　86:5 90:7 96:23
　129:2 157:11
**city** 1:8 2:11 4:11
　7:11 8:6,14 20:2
　61:1 62:3 84:15
　96:24 103:16
　123:24 144:20,25

145:2,4,16,23
155:12 164:6
165:3 166:3
city's  145:19
civil   1:2 3:2 165:5
166:5
clarification
106:12
clarify   57:10
60:11 69:16
158:17
clarifying  38:11
clear   9:13,15 42:3
74:24 81:15 83:10
84:19 85:16,17
86:4 92:3,20 93:3
93:9 95:6 115:1
123:20 132:8
152:13,18 155:2,3
155:6,8 159:7,19
clearing  131:7
clearly  66:3 86:3
cleveland  164:2
clip  139:8,9
closed  108:7
closer  97:23
cloud  161:19
coaching  120:11
cochran  2:13
cocounsel  143:16
colorado  1:1,20
2:9,15 3:8 4:13
163:6
colored  135:21
come  100:25 133:1
135:17 151:3
comes  108:2
comfortable
159:16
coming  136:7

command  53:3
54:1 76:19 88:2
89:14 92:6 93:2,8
93:18 99:6,12
119:19,21,22
124:4,18,18,23
commander  68:6
92:2,19 93:10
102:18
commencement
163:7
commencing  3:5
comment  98:20
146:12,12
commentary  21:8
21:18
commented
108:19
commission
163:18 165:19
166:25 167:25
commit  143:12
common  65:8 85:1
88:18
commonly  84:24
communicate
93:17 94:25
communication
39:8,15 92:6
communications
54:1 93:25 149:6
community  74:1
84:14 95:4
company  127:19
compare  132:4
comparisons  69:1
complained  74:1
93:15
complaints  98:4
117:8 121:20,20

completed  164:16
completes  119:20
compliance  76:18
100:1 104:12
compliant  103:20
104:24 105:18
116:21
complicated  120:1
complied  100:8
148:15
component  93:8
comport  102:25
comported  100:15
106:22 107:2
comprehensive
80:6 94:4
comprise  47:21
comprised  56:3
58:8
computer  111:14
concerned  71:25
108:22 123:1,24
125:18 126:9
130:22 147:17
156:3
concerning  11:8
123:6 125:21
157:19 158:23
concerns  91:24
94:1
conclude  153:10
153:14 157:21
161:14
concluded  65:9
162:18
concludes  161:15
conclusion  64:14
64:24 140:10
144:23 145:6,12
146:7,16,20
154:15,21

conclusions  12:3
62:24 63:1,13
107:14 109:19,23
145:18 150:25
156:12,21
concussion  30:23
127:10
concussive  85:11
conduct  35:15
61:12 62:16 68:25
100:21 106:2
116:16
conducted  4:4
13:1 17:16 21:19
33:4 43:3 50:5
62:14 72:14,20
75:20 77:9 92:23
150:24
conducting  14:4
15:1,3 59:4
confidently  64:3
confirm  49:12
conflict  70:6 96:1
96:9 110:17,18,24
conformance
148:6,7
conformity  66:23
71:21 72:10 80:16
109:14
connection  9:6
84:11 124:21
147:19
consent  5:19 7:10
consequences
65:14 66:1 114:9
considered  128:9
consistent  9:9
70:13 71:13 73:10
74:13 90:22 91:10
91:18 137:11,20
141:8

**consistently** 75:8
91:7
**consolidated** 1:3
2:2,7,12 97:9
**constitutes** 163:12
**constitution**
101:12 103:20
104:12 105:19
107:10 148:8
**constitutional**
100:3,10 101:7,15
101:25 102:5,13
103:1,22 104:24
107:3 110:2,6,9,13
110:18,22,24
146:9,14,18,23
147:2,8,18 148:1
148:22
**consulted** 104:21
105:3,17
**consuming** 61:14
**cont'd** 2:1
**contained** 155:4
**contemporaneous**
75:17
**content** 18:20
36:21 37:16 43:9
59:4
**context** 42:8
129:15 145:25
147:15
**continue** 4:6 13:3
41:5 131:10
155:24
**continued** 130:10
130:15 131:7
**continuing** 131:11
138:8
**contours** 156:4
**contraindicated**
127:18 130:2

**contrary** 109:6
110:1
**contributed** 62:9
93:22
**control** 64:20 67:3
70:24 71:3 75:9
76:16 79:9,13
83:9 84:2 86:10
87:23 88:3 92:8
94:1,23 131:18,25
132:9 133:12,19
**controls** 81:2
**convene** 91:22
**conversation**
148:17 151:14
152:7,21,23 153:9
153:15 154:20,21
155:8
**conversations**
154:2,4,15 160:21
**convey** 81:15
**conveyed** 124:14
124:19
**conveying** 92:3,20
**cooperated** 91:5
**cooperating** 88:20
91:11
**coordinated** 88:25
**coordination** 90:2
**coppedge** 3:20
43:4,22 44:2,9,19
49:5
**cops** 79:2 94:7
114:7 120:11
132:24 133:8
**corner** 151:21
**correct** 9:4 12:11
13:14,15 15:8,11
15:14,17 16:22
18:3,8 21:1,4,8,11
25:15,18,23 26:13

26:16,18,22 27:10
27:13,17,21 28:9
28:13,19,25 29:4
30:20,24 31:11,18
31:24 33:10,16,20
33:24,25 34:4
36:25 37:4,8,24
38:7,14,19 39:1,8
39:11,16,22,24
40:4,8,16,19,22
41:2 43:12,15,23
45:16,20,21,25
46:22 47:1,6,9
48:4,7,13 49:8,11
49:15 50:14,17,21
50:24 51:2,16,19
51:23 52:15,20,21
54:2,3,5 55:3,6,10
56:16,17,22 57:5
57:14 58:20 59:24
62:24 63:5,10
64:21 67:5 69:3,6
69:9,10 71:4 73:2
75:9 76:19 79:14
81:5 83:4,13
84:21 86:13 88:3
89:8 90:23 92:11
95:15 100:5,18
107:9,15 117:3,25
118:20 121:15
123:3 130:3
133:23 135:24
142:21,24 143:2,5
143:8,12 144:16
145:10 146:10,19
148:2,3,23,24
149:2,3 153:11
154:18 160:19,20
163:13
**corrections** 164:13
166:17

**corroborative**
94:13
**council** 8:14 62:4
145:16
**counsel** 4:9 5:18
20:3 23:10 59:9
97:8 144:24 146:7
153:22 160:25
162:12 163:15
**county** 1:8 2:11
4:11 8:7 20:2
144:21,25 145:2
164:6 165:3,10
166:3,15
**couple** 6:19 15:6
133:25 149:11,24
149:25 153:3
160:14
**coupled** 71:22
77:8 88:11
**course** 61:13
127:21 129:10
**court** 1:1,1 4:12
4:15 5:9 6:20 7:9
20:9 22:11,25
30:6 35:6,13,18
41:22 42:9,12
45:11 165:7
**court's** 32:11
37:17 39:4 40:3
41:1
**covered** 29:4
**created** 14:25
16:21,23 67:5
71:1 118:9 151:25
**creating** 16:24
66:8 114:4 151:3
**creation** 64:18
67:2 68:1
**crime** 143:12

**crosswise** 41:19
**crowd** 37:24 38:13
46:21 51:16 64:18
64:20 65:23,25
67:2,3 68:21
70:22,24 71:2
73:21 74:7,21
75:7,9 76:9,16
78:13,14,16,20,21
79:1,3,9,11,13
83:9,21 84:2
86:10 87:12,22
92:8 94:1,23
122:17 128:23
129:12,17 131:4,6
131:10,12,18,25
132:9 133:12,19
135:10 142:20
**crowds** 73:1,10,20
74:8 87:1 122:16
122:24 123:9
130:11
**culture** 114:4
157:3,4,9,13,21
**curfew** 15:14
**current** 7:8
**currently** 7:9
111:15 138:9
**customarily** 99:10
100:8 111:21
112:11,16,25
113:6 115:18
122:10 125:5
**customary** 102:3
106:20 107:1,6
108:16 109:4,25
**cutting** 126:16
**cv** 1:2,2,3 4:13

**d**

**d** 2:14 4:1
**damage** 85:12,13
87:7 127:11 128:7
**damaging** 128:1
**dangerous** 83:19
84:3 86:2 87:7
127:18 139:10
**daniel** 134:14
142:8
**data** 115:9,11
**database** 69:2
**date** 9:22 10:1
149:5 150:1,6,9
164:9 165:3,9,19
166:3,13,25
167:20,25
**dated** 3:16
**dates** 60:4,5,7,8,16
**davis** 2:12
**day** 20:25 93:11
94:6,6 118:7,16
129:13 165:16
166:22 167:22
**days** 67:11,12,13
67:23 80:4 93:21
118:8,10,14
164:19
**deadly** 128:9
129:7,16 139:18
140:7,12 141:11
**dear** 164:10
**december** 9:2,3
149:2,4
**decided** 42:13
81:3
**decision** 72:18
**decisions** 146:2
**declare** 5:17
**decree** 7:10

**deed** 165:14
166:20
**deemed** 164:20
**defendant** 2:11
5:8
**defendants** 1:9
2:12
**deficiencies** 62:8
108:25
**deficiency** 148:21
**deficient** 68:7
**defined** 105:24
109:15 113:1
**definition** 113:5
**definitive** 132:8
**degree** 107:19
**degrees** 85:10
**deliberative** 19:24
20:1 22:10,24
30:4 32:9 35:4
37:17 39:4 40:2
40:25 42:6 45:11
144:19 145:20
146:3 155:12,15
156:7
**demand** 132:11
**demonstrate** 96:5
**demonstrating**
74:23
**demonstrations**
50:17
**den003925** 10:4
11:1
**den003985** 64:9
**den003986** 82:22
**den003987** 90:17
**den011695** 49:20
**den011698** 17:6
**den011714** 42:19
**den011730** 32:19

**den011801** 14:7
**den4136** 134:12
**denver** 1:8,20 2:9
2:11,15 3:14 4:11
8:7,10,11 9:5,11
9:17 11:15,16,22
11:25 20:2 53:3
59:24 63:8 66:23
67:19 69:15,19
71:7 76:7 77:9
78:2 85:16 89:5
90:7,14,23 91:19
96:24 97:1,4 98:7
99:20,21 100:2,2
102:3 103:9,18,21
104:1,1,3,10,21
106:21,21 107:1,2
108:16 109:25
110:1 111:20
112:10 116:7
117:14 118:18,18
123:7 135:12
144:21,25 145:2
146:8,17 147:8,23
148:2,6 158:20
160:22 164:6
165:3 166:3
**denver's** 11:7
**department** 7:11
7:12 8:11,11 9:6
11:15,22 12:1
53:3 62:6,7 66:12
66:24 67:20 68:16
70:13 71:8 74:24
75:3,15,20,24 76:8
77:10 78:12 80:15
81:16,24 85:16,20
86:4 87:4 98:7,9
99:17,21,21 100:7
100:22 101:1,4,11
102:25 103:22

106:4,6,6,10,21
107:2,8,12 108:17
109:2,14 111:25
112:6,11,20
117:14 118:18
119:6 121:9,11
123:2 146:9,17
147:9,25 148:2,6
157:20 158:20
164:22
**department's**
119:2
**departments** 65:8
73:11 74:18 85:7
88:12 90:3,5 98:6
102:19
**depending** 13:24
16:3
**deploy** 74:19
123:8 130:10,15
131:11
**deployed** 74:3
75:21 112:24
114:6 122:24
124:15 125:5,11
131:24 136:24
137:5 138:2,2
**deploying** 122:11
124:5 125:3
**deployment** 15:8
16:1 64:19 65:6
65:12 112:1 121:3
124:20
**deployments** 89:4
90:23 91:12
122:15
**deponent** 20:9
23:3,10 25:4
30:10 37:19 41:8
67:17 82:11 97:10
105:4,9 117:25

143:20 153:13
155:17,19 156:25
163:8
**deposed** 6:16
**deposition** 1:10
3:3 4:4,9 5:13,14
5:15 35:12,14,15
42:12,14 107:15
107:24 119:18
134:14 142:9
144:9 154:12
162:17 163:10
164:9,12 165:1,3
166:1,3
**deputies** 99:16
**deputy** 3:21 17:15
33:3 43:2 50:4,5
**deras** 2:3
**describe** 152:17
**described** 8:4
14:13 22:16 38:13
152:24 155:5
156:2 160:24
**designed** 19:23
**desire** 94:7
**destruction** 143:2
**det** 83:23
**detail** 70:23
**determination**
101:8 108:10
140:3 141:5,12,16
**determinations**
70:10 116:18,20
**determine** 68:6
71:21 99:6 100:1
104:23 116:15
119:24
**determined** 90:8
93:8
**determining**
102:24

**detonate** 85:10
**detonation** 83:23
**develop** 87:21
88:12
**developed** 108:5
110:20
**developing** 66:20
**device** 85:1
**devices** 30:23 31:4
**dialog** 145:22
**difference** 134:24
**differences** 17:23
18:7,13 109:11
**different** 9:23
13:23 87:5 99:1,1
101:24 122:2,5
134:1 151:4
**difficult** 78:8 93:6
**direct** 86:10 87:6
87:11 131:15
**directly** 87:2
**director** 61:3
**disagree** 134:10
**disallow** 83:8
**discharge** 8:18
129:13
**disciplinary** 8:16
101:3 114:17
120:21 121:5,11
145:17,18 146:3
148:5,14
**disciplined** 147:25
157:18
**discovery** 153:22
155:3,9,11
**discuss** 155:14
**discussed** 40:11
44:23 45:3 50:9
53:18 56:21 59:2
108:20 123:18
126:3 130:21

150:21 152:15
155:25 158:24,25
**discussing** 20:25
75:16 76:9 83:2
154:23 156:17
**discussion** 7:25
103:13 156:6,11
156:20
**discussions** 152:6
**dispersal** 72:25
73:8,21,22 74:7
75:7,16,22,23 76:9
122:10,17,17
123:10,15 124:22
124:24 137:8,12
137:21 138:4
**disperse** 73:1,9,20
74:21 86:23 123:9
130:11,17 137:22
**dispersed** 142:21
**displayed** 76:14
**displaying** 86:12
**disposition** 99:18
**disproportionality**
113:24
**disproportionate**
66:19
**dispute** 22:11 65:3
155:3,9,11
**dissemination**
54:2
**distinction** 146:5
159:9
**distinguish** 45:2
87:4,9
**distributing** 112:6
**distribution** 64:19
65:6,11 112:2
**district** 1:1,1 4:12
41:18 78:2

**divergences** 71:3
**diversionary**
  84:25
**division** 17:17
**doctor** 127:2,10
**document** 10:4
  11:3 14:6,9,12,15
  14:23 15:4,7
  16:11,13,17 17:5
  17:11,13 18:22
  20:24 25:7,11
  30:17 32:17,19,22
  32:24 33:1,7,9
  40:6 42:19,23,25
  43:6 47:11 49:20
  49:23,25 50:8,11
  56:7,16,22 59:19
  60:14 61:4 65:5
  82:21,23
**documented** 75:8
**documenting**
  12:25 43:2
**documents** 11:15
  11:19,20 101:13
  151:6,10
**doing** 35:25 65:21
  91:7 101:2 147:15
  147:16,20
**dot** 15:14,14,14
**doubt** 53:14
  151:24
**downtown** 135:12
**dozen** 12:16
**dpd** 12:20 33:4
  50:5 57:12 61:20
  63:5 64:4,17 65:4
  65:10,14 67:1,4
  68:21 69:16,20
  70:21,25 71:13
  72:24 73:7 75:7
  75:14 76:13 77:15

79:6,10 80:6,10
81:1,12,20 82:4
83:8,10,24 84:6,19
86:9 87:21 88:8
89:5,7,15,15,20,21
90:3,6,8,10,20
91:4,22 92:7
93:25 94:2,22
99:4 100:15 109:4
115:17 116:4,8,21
116:25 118:6,8,11
119:12,19 122:9
125:3,11 128:9
130:9 131:17,24
132:24 133:3,18
157:4,9,12
**dpd's** 89:6 100:8
  132:4
**draft** 33:11,12
  43:8 50:10
**drafted** 13:13
  16:25 17:14
**drafting** 60:14,24
  144:13
**drafts** 61:1
**draw** 146:20
**drew** 150:25
**drive** 161:18
**due** 121:1 133:2
**duly** 6:5 163:8
**duran** 2:3
**duties** 8:18 9:10
  13:24 99:22,23
  106:13
**duty** 81:16 129:1

**e**

**e** 2:13 4:1,1
**earlier** 59:22 83:2
  109:21 116:5
  123:18 129:25
  144:9 147:12

149:1 158:6
**easier** 78:1
**easily** 76:14
**ed** 5:2
**ed.aro** 1:21
**editing** 60:14
**edits** 33:12 43:8
  50:10
**educated** 102:18
**edward** 1:18
**effect** 78:20,23
  85:11 102:4
  127:23 128:2
**effective** 66:10
  112:1 114:10,11
  132:17
**effectively** 81:2
  112:24
**effort** 63:12,18
**eight** 8:20,21
  97:22,22,23
  121:22
**either** 20:16 69:21
  99:15 129:2 150:3
**ejected** 127:4
**elapsed** 94:3
**elisabeth** 149:21
**email** 1:17,21,25
  2:6,10,16 10:15
  59:1,10,13 164:17
**emerge** 110:20
**emergency** 80:4
**emphasis** 45:15,25
**employed** 81:5
  163:15
**employees** 8:17
  11:23
**empowered**
  103:12
**enable** 66:21 68:8
  70:9

**enclosed** 164:12
**encourage** 72:10
  98:9
**ended** 9:23 10:1
  149:1
**enforcement**
  88:10
**engage** 143:1
**engagement** 51:16
  71:16
**engagements**
  73:18
**engages** 78:21
**enhance** 80:25
  98:5
**ensure** 67:4 70:25
  72:24 75:7 76:7
  76:13 79:6 80:15
  88:18,20 90:22
  91:10,17
**entered** 134:13
  166:9
**entire** 21:10 25:18
  25:18 43:14,18
  45:18 112:20
  165:5 166:5
**entirely** 18:3
  26:16,18 27:16
  28:12 31:11 33:22
  37:4 38:2,4,7,8
  39:10 40:8,12
  45:20,20 46:25
  48:7 50:19 51:18
  52:17,20 54:4
  55:6 56:1,3 57:25
  58:9 95:24
**entirety** 112:18
**entities** 11:16
  70:16 78:3 117:10
**entity** 104:2

epps   5:1
equipment   77:12
  88:21 89:18,21
errata   164:14,19
  166:7,10,18 167:1
escape   120:21
esq   1:14,18,22 2:4
  2:8,14
estimate   61:9
estimates   118:7
et   1:5,8 4:11,11
  164:6,7 165:3,3
  166:3,3
ethan   1:11 3:3 6:4
  6:15 164:9 165:4
  165:9 166:4,13
  167:20
etran   162:8
evaluate   62:16
  69:18 81:1 91:23
  116:5 120:2
evaluated   93:7,20
  94:9
evaluating   107:11
  112:5 124:12
  147:23 148:13
evaluations
  145:18
evans   2:14
event   12:6 74:16
  96:13,18 123:3
  127:24
events   17:24 18:8
  18:14 64:20 65:9
  67:4 71:3,25
  72:17,24 75:9
  76:16 78:6 79:9
  92:10 95:20 97:1
  118:20 119:4,8
  120:12 131:20

everybody   161:13
evidence   71:19
  72:8 73:14 107:25
  108:4,4,8 119:23
  124:3,9 140:9,11
  141:2,4,10,14
  153:22 154:3
exacting   101:16
examination   3:4
  3:10 6:7 97:11
  144:1 149:18
  154:8 158:2
  160:16 163:8
examined   6:5
example   58:8
  66:18 102:13
  105:13 128:24
  138:2
examples   122:15
exception   115:24
exceptions   19:5
excessive   68:13
  70:17 72:21 78:5
  114:18 115:3
  117:8 120:21
excuse   16:11
  19:21 27:1 45:20
  59:10 69:19 77:11
executed   106:13
  166:10
execution   165:14
  166:19
exercises   90:21
exhibit   3:14,16,18
  3:19,20,21 10:5,7
  10:11,12,20,23,25
  14:6,8 17:5,7
  32:19,21 42:18,21
  49:6,20,21 59:17
  59:18,22 62:21
  82:21 107:15

109:18 134:13
exhibits   3:13
  162:10,14
exists   119:7,18
  121:6
exonerable   121:9
expand   15:22
expect   18:5,11
  21:14,17,21 22:3
  23:14 25:25 26:6
  26:11,21,25 27:4
  27:20,25 29:6,7,9
  29:14,18,24 31:14
  31:16 32:5 34:9
  37:6,12 38:17,23
  38:25 39:13,20,23
  40:13,14,20 43:19
  43:21 44:1,4,7,14
  44:17 45:6,12,23
  46:4,9,12,14,18
  47:4,10,15,20,23
  48:9,11,17,24
  50:10,22 51:3,8,9
  51:14,22 52:2,9,13
  52:22 53:2,7,9,20
  54:7,13,19,21 55:8
  55:14,25 56:2,9
  57:22,24 58:5,13
  77:20 136:2
expectation   30:14
  31:21 32:14 34:14
  36:21 37:11,22
  38:22 39:6,19
  46:3 81:16
expectations   59:3
  119:2
expected   59:5
  75:24 157:9
experience   103:5
  106:2 110:23
  128:17 142:11

157:13
experienced   68:12
expert   102:3,24
  103:5 104:10,21
  105:17
expertise   102:12
  102:22 103:6,19
  104:10 106:2,9
expiration   165:19
  166:25 167:25
expires   163:18
explain   97:24
explanation   41:21
  81:4
explosive   130:16
exposed   74:15
  75:4 123:21
extended   9:25
extent   19:23 45:5
  66:2 75:23 78:15
  92:25 103:16
  116:22 120:3,4
  131:3 139:13
  142:15 144:19,25
  147:2
exterior   76:15
  77:8,11
extreme   84:3
extremely   34:20
  72:13 83:19 127:3
  127:18
eyes   127:12

f

face   125:5,12
  126:6 127:12,13
  127:17 129:8
  138:20 139:15,23
  140:8,20 158:7,11
facilitate   66:15
fact   18:20 24:1
  67:10 68:16 69:14

71:13,22 72:7,15
77:4 79:19 80:1
83:18,23 88:8
91:3 115:11
119:25 140:19
159:21
**facts** 53:7 57:20
64:23 65:2 67:7
69:11 71:10 73:4
75:11 76:21 77:1
79:16 81:7,11
83:15 85:3 86:15
88:5 89:10 90:25
92:13
**factual** 23:22,25
24:3 44:5,8 45:4
45:24 47:5,16,19
48:12 50:23 51:22
52:23 53:5 54:8
55:9 57:4,13 58:1
58:10 107:13
**failed** 111:21
112:12 115:18
122:10
**failing** 157:21
**failure** 43:12
44:23 113:13,18
116:8,25 123:15
**fair** 16:10,12
23:20 24:5 101:6
101:17,18,21,21
102:1 104:15,17
106:13,15 108:12
108:17,19 110:11
116:24 123:5
128:16 131:13,22
133:3,7,13,16
136:11 140:13
141:17
**fall** 144:10

**familiar** 6:18
**far** 31:6 36:3
114:3 138:1,6
**fashion** 151:15,18
**fast** 49:14 135:5
**fatigue** 26:13
**features** 145:14
**federal** 7:10
**feedback** 33:12
**feel** 61:18,21 63:11
63:18 64:3 102:12
132:13 136:4
**fehrmann** 17:15
**felt** 96:12,18
120:16 133:2
**field** 46:21 65:13
68:22 80:4 92:2,9
92:19 93:10 94:2
94:21 112:2,7,25
113:21 124:15
131:18 132:9
133:13,20
**figueroa** 1:15
**figure** 61:19,22
62:1 154:5
**filed** 4:12 68:18
**fill** 85:20
**filled** 66:4
**finalized** 33:13
50:11
**financially** 4:17
**find** 46:15,18
48:24 51:10,22
52:9,23 53:2,7,20
54:22 56:10 58:14
79:21 109:3,24
111:20 112:10
115:17 117:12
122:9 125:3 130:8
132:11 164:12

**finding** 112:4
114:25 121:7
125:9 130:14
132:2,3 137:11
**findings** 107:13
108:7 109:13,19
110:9,9 114:24
**fine** 41:8,9 106:12
162:15
**finish** 23:11 154:8
**finished** 71:16
**fire** 87:6,11
**firearm** 128:24
129:5
**firearms** 129:11
129:13
**fired** 86:10
**firing** 86:22 126:5
127:17
**firm** 4:14,16
149:14,21
**first** 6:5,14,19
17:12 20:25 27:12
33:19 43:11 50:13
64:16 67:13,23
69:5 73:10 74:13
92:24 93:21 110:7
127:22,24 128:2
129:12 161:13
**fishing** 153:20
**fitouri** 143:22
**fituori** 2:2 5:4
**five** 41:6 46:25
67:13,23 82:9
93:21 94:11
**fixed** 86:23
**flash** 30:22 84:24
84:25 85:1,6
**fleeing** 143:4
**flexible** 14:3

**flip** 121:6
**floor** 1:15 2:5
**flow** 114:9
**flowed** 16:9
**floyd** 3:14 9:7,11
9:15 11:8 18:7,14
29:17 39:16 59:24
61:23 62:2 65:7
67:13,24 69:15
71:23 75:22 83:3
85:8 95:19,20
96:13,19 106:15
107:3 109:5
111:21 112:11
115:6,18 116:11
117:3,13 119:11
122:10 123:8
125:4 130:9
131:24 133:22
137:23 147:9
**focus** 138:9
**focused** 101:1
**follow** 12:24 14:2
16:8 157:25
160:15
**followed** 28:12
33:23 37:3 38:5,6
38:8
**following** 38:1,4
76:3,6 77:15
80:11 81:20 84:7
85:23
**follows** 6:6
**footage** 61:11
70:14 72:13
116:14 117:13,18
118:13,15 119:11
119:23,25 120:8
120:14,20 121:2,6
121:19 122:23,23

**[force - fuck]**                                                                                          Page 13

**force** 46:22 66:16
68:13,18 70:6,12
70:17,23 71:1,4,17
71:18,19,21,24
72:6,6,10,12,18,21
73:1,9,19,23 74:19
77:23 78:5,5 81:3
88:22,22 89:6,17
89:20 90:4 92:9
94:2 96:2,25 97:2
97:2,3 99:3,4,5,11
99:13,20 101:15
103:20 104:24
105:17,18 106:8
108:21,24 114:4
114:18,22 115:3
116:10,16,19,20
117:2,8 119:19,20
119:20,22,24
120:1,2,17,22
121:20 127:25
128:9 129:7,16
131:18,25 132:9
133:13,20 138:23
139:2,18,25 140:7
140:12,21 141:1,3
141:11 146:13
147:14 148:21
157:5,6,10 159:12
159:13,14,19
**forces** 98:19 99:25
**foregoing** 162:17
163:12 165:13
166:18
**form** 9:8 18:9,17
19:10,21 21:15,23
22:9,21 26:3,9,23
27:6,22 28:3
29:12,21 30:3
31:19,25 32:8
33:11 34:5,12,18

35:3,10 37:9,15
38:20 39:2,17,25
40:9,17,23 41:19
43:8,24 44:10,20
45:9 46:1,7,16
47:7,13,25 48:14
48:20 49:1,9
50:10,25 51:6,12
51:24 52:5,11,25
53:12,22 54:10,16
54:24 55:11,17
56:4,12 57:6,15
58:3,15,22 61:24
63:15 64:5,25
65:16 66:9 67:9
68:2 69:13,25
71:12 72:3 73:6
74:11 75:13 76:4
76:23 77:3,16
79:18 80:12 81:9
81:21 83:17 84:8
85:5,24 86:17
87:15 88:7,16
89:12,24 91:2,15
92:15 94:17 95:21
96:14,20 98:23
100:4,11 101:9
102:7,15 103:2,10
103:24 104:13
105:1,20 106:17
106:23 107:4,16
108:18 109:7,20
110:3,15 111:23
112:14,22 114:14
115:7,20 116:12
117:4,15,23 118:4
118:21 119:14
120:23 121:16,24
122:13 123:11,17
124:7 125:7,23
126:24 128:11,20

129:21 130:12,25
132:1 133:4,14
137:14,24 138:17
138:24 140:1,22
142:14,22 143:9
148:9 152:10
153:1,12,19
154:24 155:23
156:23 158:15,21
159:24 160:9
163:12
**formally** 161:18
**former** 33:3 43:2,4
50:4 99:15
**forms** 88:1
**formulate** 12:3
**forward** 135:5
164:16
**found** 80:1 111:25
112:23 122:15
131:23 132:8
137:20
**foundation** 18:10
18:18 19:11,22
21:16,24 22:10,22
26:4,10,24 27:7,23
28:4 29:13,22
30:4 31:20 32:1,9
34:6,13,19 35:4
37:10,16 38:21
39:3,18 40:1,18,24
43:25 44:11,21
45:10 46:2,8,17
47:8,14 48:1,15,21
49:2,10 51:1,7,13
51:25 52:6,12
53:1,13,23 54:11
54:17,25 55:12,18
56:5,13 57:7,16
58:4,16 65:1,17
68:3 70:1 72:4

74:12 76:5 77:17
80:13 81:22 84:9
85:25 87:16 88:17
89:25 91:16 94:18
95:22 98:24 102:8
102:16 103:3,25
104:14 105:2,21
107:5,17 109:8
110:4,16 111:24
112:15 114:15
115:21 116:13
117:5 118:22
119:15 120:24
121:17 122:14
123:12 125:8,24
126:25 128:21
129:22 130:13
133:15 137:15
138:18,25 140:2
140:23 142:23
158:16,22 159:25
160:10
**four** 29:25 45:19
46:24 67:23
**frame** 105:22
136:4 154:22
**frames** 136:7
**framework** 62:7
**framing** 105:24
**francesca** 2:3
**frankly** 78:10
108:4
**free** 161:9 165:14
166:20
**frequency** 74:6
94:1,10 97:2
132:23
**front** 20:4
**frozen** 7:15,18
**fuck** 141:24 142:5
160:5

**fully** 35:25
**fundamentally**
  62:3
**further** 5:15 68:24
  83:9 143:24
  160:12 161:3
  163:10,14
**future** 12:6 67:5
  71:2 72:17,24
  75:9 76:16 79:9
  81:5 89:4 90:22
  92:11 96:23 97:1
  97:4 123:3 131:20
  133:21

**g**

**g** 4:1 117:21
**gap** 66:3 85:21
  93:5 117:13,19,21
  117:22 118:10,14
  118:15
**gaps** 69:2 108:25
  132:22 133:12
**gas** 28:19 74:2,7
  74:20 130:16
  135:18 138:14
  139:11 142:19
**gassed** 74:2
**gear** 76:16
**general** 19:6 60:5
  60:8 84:16 98:7
  101:1 119:17,18
  120:18 136:10
  141:13 156:1
  157:7 159:18
**generally** 9:24
  11:14 18:23 19:2
  22:2 57:2 71:14
  71:23 74:18 75:21
  77:20 91:4 96:3
  97:25 100:15,19
  100:20 108:22

120:7 121:18
139:1 145:13
**gentleman** 149:18
**george** 3:14 9:6,11
  9:15 11:8 18:7,13
  29:17 39:16 59:24
  61:22 62:2 65:7
  67:13,24 69:15
  71:23 75:22 83:3
  85:8 95:18,20
  96:13,19 106:15
  107:3 109:5
  111:21 112:11
  115:6,18 116:11
  117:3,13 119:11
  122:9 123:8 125:4
  130:9 131:23
  133:22 137:23
  147:9
**getting** 28:17
  93:17,17
**gfp** 27:10,21 33:20
  34:3,8 37:24 48:4
  57:13 91:24 95:14
**give** 6:21 36:20
  60:4 104:10
  122:10 128:13
  156:25 161:13
**given** 12:20 13:20
  44:22 53:14 56:8
  68:11 75:18,23
  80:2,4 93:18
  100:16 113:7
  126:10 132:10,14
  161:15
**global** 103:21
**go** 4:7 6:13,19 7:2
  7:16,20 13:4 15:5
  17:22 26:12 28:15
  41:10 45:14 56:18
  59:17 82:12 90:16

97:17 98:17 111:1
111:4,13 121:1
134:18 136:25
137:2 153:20
155:18
**goals** 93:4
**going** 4:3 6:12,13
  7:23 9:16 13:7,20
  14:17 30:16 32:16
  32:17 41:3,11
  49:14,17 56:24
  57:1 59:17 76:10
  79:4,4 80:5 82:13
  82:20 90:16
  109:16 111:6,12
  122:7 131:15
  132:17 133:24,25
  134:5,14,15 135:5
  135:6 136:21
  137:2 138:7
  141:18,19,25
  142:7 153:17
  154:8 159:14
**good** 4:2 41:6
  97:13,14,17,18
  105:13 134:8
  144:3 159:9
**governing** 87:3
**government** 11:16
  12:2
**grapple** 82:1
**great** 7:7 10:2
  11:10 12:8 16:20
  17:18 30:15 32:15
  33:14 43:10 49:16
  50:12 84:5 97:19
  105:8 134:3 135:4
**greater** 132:23,24
**greenwich** 134:21
**grenades** 31:2
  83:8,11,18,25 84:2

**groin** 125:5,12
  126:7
**ground** 92:2,19
  93:9 115:5 119:13
**group** 149:12
**guess** 15:22 24:2
  63:4 78:9 96:8
  98:15 103:4 104:6
  112:2 136:14
  140:24
**guidance** 18:24
  57:17,18 58:19,22
  59:6 73:10 74:14
  74:23 80:16 85:17
  92:1,19 104:11
**guide** 3:16
**guidelines** 79:24
  98:22 125:25

**h**

**half** 8:20 97:22,23
  107:24 150:17
**hall** 2:14
**hallevansrobert....**
  2:16
**hands** 90:12
**happen** 152:23
**happened** 61:19
  61:22 62:1 116:15
  125:16
**happening** 102:4
  120:12 122:25
  139:6,12
**happens** 38:9
**happy** 6:25 137:2
  142:2
**hard** 36:20 44:22
  56:6 65:18 66:2
  77:5 86:23 93:16
  96:5,9 108:9
  113:20 114:21
  119:16 139:9

152:11
**harder**  116:15
  117:7
**head**  6:21,22
  125:5,12 126:6,14
  126:22 127:17
  128:8,19 129:8,18
  130:1
**heading**  15:7,10
  17:23,25 18:6
  20:25 21:4,7
  25:14 27:10 28:8
  28:11 30:17,19,22
  31:1 33:19 36:24
  37:24 38:2,4 39:8
  40:6 45:5 48:4,6
  49:6 50:13,16
  51:16 52:15,19
  54:1 55:3
**headings**  17:20
  31:10 33:16 40:7
  40:10
**health**  52:15,24
  53:6
**hear**  73:22 126:18
  136:23 137:5,8,10
  137:16 141:23
  142:4
**heard**  21:19 92:22
  93:13,16 94:7,13
  133:7
**hearing**  85:13
  133:10
**heather**  2:13
**heavily**  156:2
**held**  121:5
**help**  72:10,19
  80:14 91:17 96:22
  96:24 98:8 104:3
**helped**  8:18 33:9
  96:9

**helpful**  68:8
**hi**  5:3
**hierarchy**  12:19
**high**  98:12 107:19
  127:4
**highly**  86:2
**hit**  29:3 139:23
**hmm**  135:20
**hogan**  2:13
**holding**  138:3
**hope**  63:6
**hoped**  156:21
**hopefully**  84:15
  89:1 95:4 98:8
**hoping**  135:2
  156:13
**hot**  143:17
**hour**  120:8,8
  150:17,18 162:18
**hours**  61:7 120:8,8
  162:19
**hypothetical**
  77:18,19

**i**

**iab**  71:2,6
**ideal**  140:15
**identifiable**  77:21
**identified**  79:2
**identify**  62:8 69:2
  71:3 78:3 116:18
  134:6
**identifying**  68:12
  77:6 78:6 121:2
**illinois**  1:24 2:5
**imagine**  127:22
  150:17
**immediate**  119:21
**immersed**  102:19
**impact**  70:5 72:9
  72:16 83:21,22
  114:6 128:2

130:10,16,19
**impacted**  115:12
**impacts**  120:15
  121:11,19 127:16
**implement**  113:3
**implemented**
  74:10 95:18,25
**implementing**
  69:24 72:15 87:14
  88:15 89:23 91:14
  94:16
**implicate**  145:19
**important**  70:2
**imposed**  148:4
**impossible**  56:7
  62:1
**impression**  19:9
  19:12
**improper**  19:25
  35:10 99:14
**improve**  64:4 90:1
  98:2
**improved**  12:6
**improves**  136:16
**inaccessible**  92:5
**inaccurate**  105:24
**inappropriate**
  36:9 66:16 68:17
  78:5,18 84:4
  88:23 114:17
  121:20 126:5
  147:14
**incentivized**  81:24
  81:25
**incident**  62:2 68:6
  93:7 99:6,7,18
  100:20 101:2
  114:23 139:6
  158:6
**incidents**  62:17
  68:9 70:17 101:14

106:8 108:14,22
  108:24 146:12
  147:19 157:17
**include**  19:2 20:13
  21:18,22 25:23
  30:1 47:24 48:12
  55:9 57:4,13,19
  58:1 60:6
**included**  22:7,14
  47:18 58:6 59:5
  103:12,14 124:10
  164:14
**includes**  19:9,16
  19:19 23:16 30:24
  35:2
**including**  22:14
  87:24 91:24
  121:20 126:11
**inclusion**  122:19
**inconsistent**  74:4
**incorporate**  113:5
**incorporated**
  166:12
**incorrect**  37:16
**increase**  92:8
  131:11,17 133:19
**independent**  3:15
  7:10 8:6,8 11:7
  42:1 69:9 97:21
  97:25 98:18 99:9
  102:2 103:9,12,18
  104:8,9,20,22
  105:15 106:3,14
  106:19 117:9,11
  121:25 123:1,6
  125:22 145:15,23
  157:14
**index**  3:9
**indicate**  5:21
**indicated**  28:24
  153:8

indicating 80:1
164:14
individual 62:17
68:9 83:21 98:19
98:19 99:25,25
101:2 102:25
103:19 104:19,23
105:16,18 106:3,7
106:8 108:14,21
108:24 112:5
115:2 116:16
138:3 139:11
142:19 143:1,4,7
143:12 147:19
158:11
individuals 80:19
87:1 129:1
inflammatory
78:20,22 79:3
influence 63:5,7
influenced 106:5
influencing 65:23
inform 101:13
information 16:15
16:19 18:12 20:5
21:13 26:21 27:1
29:15 42:2 44:25
47:16,19 54:2
57:20 58:1 65:6
68:10 78:6 124:10
139:3
informed 106:5
initial 25:14
injured 129:3
injuries 126:11,11
injurious 128:1
injury 85:13 87:8
127:9,11
inside 60:5 68:15
98:6,7 157:4

insignificant 12:18
instance 100:17
instances 98:21
122:21,25 125:11
125:15 131:5
instruct 35:16
36:1
instructing 35:22
intended 126:1
interacted 77:6
interacting 78:15
79:1
interest 74:14
interested 4:18
60:7 127:23
163:16
interesting 145:14
internal 8:12
62:15 70:14 71:7
72:14 78:1 81:2
91:22 98:1,3
99:11 106:5 108:6
121:22 122:2,4
147:13
internet 136:4
interpretations
47:19,21 55:22
interpreted 25:10
interrupt 129:9
interrupted
154:14
intersection
135:12
interspersed 22:5
interspersing 22:1
intervention 66:17
interview 3:16,18
3:19,20,21 12:22
12:25,25 14:3
17:14,16 19:4
21:20 27:3 33:2,3

33:13 34:23 43:1
43:3 50:3,4 58:20
59:5,8 89:14,14
151:1,2,3
interviewed 11:25
12:16 16:5
interviewee 12:23
13:25
interviewees 42:8
interviewers 42:8
interviewing 16:4
46:6 47:12 48:19
interviews 12:21
13:14,16,23 14:4
15:3 16:22,23
57:12 59:2,4
61:12 65:3 75:19
77:8 91:4 92:23
introduce 10:3
14:6 17:5 32:17
42:18 49:19
introduced 109:18
introducing 32:18
introduction
56:20
introductions 49:7
50:14
invade 19:24
invested 61:19,21
62:13,18
investigate 62:2
100:17
investigated 99:17
investigating
63:19 70:16
investigation 15:1
60:12,17,20,21,21
62:14 66:15 93:1
99:8 147:16
150:23

investigations
8:13 62:16,19
68:9,13 72:14,20
78:8 98:2 104:23
108:6 147:13
investigators
68:16
investment 61:16
investments 92:8
131:17 133:19
involved 12:2
100:22 144:15
involves 53:15
55:22
involving 62:15
70:17 115:3
irritant 86:24
issue 20:15 22:15
42:6 71:25 72:25
73:8 76:8 124:5
124:24 130:21
issued 8:13 9:9
11:7 57:18 58:19
61:1 73:22 89:18
108:5 109:19
110:13 131:22
133:18
issues 13:4 42:12
62:12,13 81:18
82:5 91:23 108:16
136:4 153:18
156:14
issuing 74:7
item 76:12

**j**

j 1:14 2:13
jacob 2:12
jacqueline 2:12
jacquelyn 2:2
job 7:8 8:5,9,23

**jobs** 101:20
**joe** 2:3
**john** 3:20 43:4
**johnathen** 2:3
**join** 12:22
**joint** 90:20 91:7
**joseph** 2:8,18 4:14
**jossi** 2:13
**judge** 20:4,4
**judged** 102:4
**judgment** 90:9
  141:2
**judgments** 103:7,9
**july** 3:16
**jump** 136:5,6
**june** 1:11 3:5 4:3
  9:17,22 60:20,21
  164:4
**jurisdictions**
  69:17,19 87:22
  90:6 91:6 116:6
**jury** 147:3
**justice** 7:11
**justified** 139:19
**justify** 140:6,11
  141:10

**k**

**kaye** 1:15,19,23
**keep** 35:9 138:7
  141:18
**kelsey** 2:2
**kevin** 2:13 43:2
  50:4
**killed** 129:3
**killmer** 2:8
**kim** 3:19 33:4
**kind** 12:19 21:13
  65:21 68:5 80:4
  96:6 99:11 101:12
  111:13 115:12
  124:13 132:16

133:5 135:20
141:7,8 147:3
150:3
**kinds** 22:1 66:14
  66:18 78:22 85:7
  108:8 133:7
**klm** 1:3
**kln** 2:10
**knew** 81:24
**know** 7:18 9:21
  12:5 13:20 14:2,2
  14:17,24,25 15:2
  15:22 16:3,4,9
  23:11 36:20 44:22
  44:24 49:13 53:15
  56:6,25 58:9,24
  60:5,24 61:4
  65:21 66:13,21
  70:15 73:13,19
  74:25 77:22 78:12
  79:1 80:19 86:2
  91:5 93:4 94:23
  94:24,25 95:1,23
  96:3,15 97:24
  98:13 99:17,20
  100:7,9,14,20
  101:12,15,18
  104:7 105:23
  107:22 108:10
  109:9,17 110:5,19
  112:3 113:6,21,23
  118:23 120:10
  121:13,21 124:11
  127:12,13,20
  129:3 130:5 134:8
  134:9 136:3,5,8
  138:1,3 139:2,7
  140:14,14,16
  142:11 143:16
  145:14,23 147:12
  151:17,23 152:1

152:12 153:20
154:3 155:3,5,22
155:25 158:4,13
158:19 159:15
161:25
**knowledge** 10:13
**known** 152:3,5
**knows** 20:3 143:18
**kolber** 2:18 4:14

**l**

**label** 128:23
**labor** 61:10,17
**lack** 66:1 78:6
  114:9,11,12 115:4
  115:5 116:10,14
  116:25 117:1,6
  119:10,12 120:19
  121:1 133:3
  137:12,19,21
**lacking** 131:24
**lane** 2:8
**large** 28:23 29:3
  65:9 70:9 91:11
  91:19 96:23
**largely** 31:10
  80:21 101:3
  142:21
**larger** 141:1,4
**launcher** 127:5
**launchers** 79:8,13
  79:20 80:3,23
**launching** 14:25
**laurel** 3:6 4:16
  23:6 163:4,20
**law** 88:10 149:13
**law.com** 2:10
**lawrence** 2:3
**lawsuit** 147:3,7
**lawyer** 102:18
  134:8

**lawyering** 134:8
**lawyers** 151:7
  152:24 154:4
  156:9,12,21
**layers** 12:19
**lead** 120:20 121:2
  153:22
**leaders** 8:14 74:5
  113:22
**leadership** 43:12
  44:23
**learn** 82:4
**learned** 18:12 25:8
  25:15 27:2 29:11
  29:15 32:3 55:3
  58:8 59:7 65:3
  91:3 92:23
**learning** 16:19
  127:25
**leave** 74:22 130:11
  130:17 148:25
**leaving** 131:10
**led** 11:23 63:19
  64:23 67:7 69:11
  71:10 73:4 75:11
  76:21 77:1 79:16
  81:7,11 83:15
  85:3 86:15 88:5
  89:10 90:25 92:13
  153:9
**left** 149:5
**leg** 28:23
**legal** 101:13
  144:23 145:6,12
  164:1 167:1
**length** 94:2
**lessons** 25:15 55:3
  58:8
**lethal** 46:21 64:20
  65:7,12 66:22
  79:23 111:22

112:12 113:13,18
113:20,22 114:13
115:6 121:4
122:11 123:9,16
124:6 125:4,12
126:15 127:6,7
131:25
**letter** 164:20
**level** 71:17 80:7
92:24 96:25 98:12
101:11 112:21
119:19 123:22,23
124:4,4 126:2,7
**levels** 65:4
**liability** 146:23
**lieu** 5:16
**lieutenant** 3:18,19
3:20 17:16 18:6
18:12,16 21:19,20
24:7,16 25:1,2
26:2,22 27:20
29:11,16 31:17,23
32:3 33:4 34:3
37:8 38:13,18
39:15 40:15 43:3
43:4,22 44:2,9,19
46:11 47:17 49:5
**lieutenants** 92:25
120:10
**life** 63:8
**light** 100:22
**limb** 114:3
**limit** 84:10,10,14
84:14 86:10
**limited** 41:19
87:24 91:24
**line** 14:2,3 92:24
95:1 103:22 120:9
154:6 164:14
166:7 167:3

**lines** 95:2 120:11
**list** 13:22 14:1
64:12 83:2
**listed** 166:7,17
**listen** 137:1
**listened** 93:20
**listening** 141:19
**listing** 166:7
**litigation** 145:25
149:7
**little** 13:21 25:19
25:22 66:6 70:19
76:11 92:1,18
95:23 105:12,12
108:9 109:17
111:13 112:3
113:1 114:2
129:24 133:1
134:9 135:5 136:6
147:21 148:17
153:7,8 156:25
159:7
**live** 155:8
**lives** 1:5,14,18,22
4:10 164:6 165:3
166:3
**llp** 1:15,19,23 2:8
**lnu** 2:13
**local** 161:18
**loevy** 2:4,4
**loevy.com** 2:6
**log** 10:12 64:18
65:10,15 66:2,8,11
66:20 112:1 113:3
114:21
**long** 8:19 45:19
61:16 97:20 108:3
150:14 159:3
**longer** 131:8
**look** 14:12 59:13
68:17 83:6 104:15

128:12 133:5
136:10,11 139:4
140:15 141:3
150:8
**looked** 87:3 108:4
118:6 128:15
132:20 133:10
**looking** 58:7
100:19,21,25
108:15 130:15,20
146:24 147:17
**looks** 7:14 15:4
**los** 1:16 7:11,12
**lost** 105:12
**lot** 42:11 90:14
98:13 113:10
120:7 127:1
156:11
**lots** 86:18 120:13
**lovate** 3:19
**lovato** 33:4 34:3
37:8 38:13,18
39:15 40:15
**lower** 124:4

**m**

**m** 2:12
**macro** 100:7
101:11 112:21
**madam** 164:10
**madison** 1:23
**majority** 15:13
**makeba** 2:4,6 5:3
5:25 161:5
**making** 35:23 36:5
72:18 101:8 103:6
103:6 106:1 110:8
144:16 159:16
**man** 61:7 135:18
135:25 138:9,14
138:20 158:7

**manage** 68:5
113:20,22
**managed** 8:17
70:11 161:19
**management**
46:21 64:18 66:10
66:21 67:2 68:21
70:22 79:11
**managers** 66:11
68:15 115:13
**mandate** 103:14
**manner** 5:20
**manual** 67:2 79:11
83:12 84:21
**manuals** 64:18
68:21 70:22
**manufacturer**
130:2
**marked** 10:23
14:8 17:7 32:21
42:21 49:21 59:17
62:21
**mask** 135:18,21
138:10,14 139:11
142:20 158:8,11
**mass** 78:12 92:10
119:4 120:6
131:19 159:3
**master** 3:16 13:22
**material** 59:6
155:4
**matt** 3:18 17:17
**matter** 1:5,14,18
1:22 4:10,10 5:17
53:14 99:23
112:19 164:6
165:3 166:3
**matters** 145:17
**mayor** 8:14
**mcdermott** 134:12
158:7

mcdonald   149:10
149:12 152:14,18
152:22 153:9
154:16,22 155:1
155:15 156:8
160:19,25
mcnulty   2:8 3:11
5:5,5 6:2,2 35:20
35:21 36:7 97:12
97:14 99:19 100:6
100:13 101:17,19
101:21 102:1,11
102:23 103:8,17
104:5,18 105:8,11
106:11,19,25
107:9,20 109:3,16
109:24 110:11,25
111:3,11 112:8,18
113:12,17 114:19
115:14 116:8,24
117:12,19,21
118:2,17 119:10
120:19 121:12,21
122:1,5,7 123:5,14
124:2 125:1,10
126:13,19,21
128:16 129:15,24
130:23 131:13
132:25 133:9,17
134:7,11,18,20
137:18,19 138:7
138:19 139:20
140:13 141:17
142:18,25 143:11
143:14 144:22
145:5,11 148:9,18
153:17,23 154:1,9
154:11 157:25
158:3,19 159:8,21
160:2,12 162:6,7
162:13

mean   9:14,21
15:22 19:13 23:25
24:3 60:12 63:3
67:19 69:16 84:23
99:20 103:4 107:7
112:17 114:16
118:2 120:13
134:22 152:14
155:16 158:17
meaningful   72:8
82:2
meaningfully   82:1
means   69:5,8
120:10
meant   118:5
media   4:8 161:16
161:17
medical   127:14
128:6
medically   127:2
meeting   149:11,17
149:19,22,23
150:2,3,5,7,9,15
150:21 151:7
152:9,16,24,25
153:4,5 154:23
155:1,7 156:8
160:24
meetings   145:17
meh   1:2
member   12:22
20:22 22:4,18
76:18
members   11:25
20:17 46:19 59:1
74:1 84:14 95:4
memo   16:25 17:14
17:19 22:3 25:7
33:2,13,15,19
34:24 36:22 40:10
40:11 43:1 45:13

45:13 49:5 50:3
56:19 58:23 59:10
67:1
memory   110:8
150:19
memos   12:25
13:13 16:21,23
17:2 18:24 19:4,6
22:1 32:18 50:9
57:1,3,11,19,23
58:7,14,20 59:5,8
61:12 144:8,15
151:1,3 152:7,9,12
152:13,15,19
153:10,15 154:17
155:2,4,9 156:2,16
mental   19:9,12
52:15,24 53:6
mentioned   11:7
16:21 29:2 58:18
129:11 147:12
156:22 160:18
merited   122:18
messages   124:14
124:19
methodology   60:6
86:22
methods   88:1
metro   11:16 17:16
michael   1:14 2:7
4:25 5:6,24 97:15
149:19
michael.sebba
1:17
middle   135:17
138:9
midwest   164:17
167:1
mike   6:12
millimeter   79:8,13
79:20 80:2,22

126:14,22 127:3,8
127:16,17 128:9
128:19 129:8,19
130:1 138:20
139:15,24 140:8
140:20 142:20
158:8
mind   36:16 49:12
105:13 108:2
138:8 141:19
mindful   18:19
minute   41:6
minutes   82:10
150:17 162:19
misapplying   41:22
mischaracterizat...
22:23 39:3 40:1
40:24 45:10
mischaracterizes
22:10 32:9,11
35:4
missing   93:9
misstates   30:4
mitchell   1:11 3:3
3:15 4:9 6:4,9,15
7:13,14,17 8:3
10:7 13:12 14:10
20:8 42:17 82:18
97:13,20 101:20
111:11 117:24
134:21 135:9
136:23 143:15
144:3 146:5
154:14 155:24
157:13,24 158:5
160:18 161:8,16
162:5 164:9 165:4
165:9 166:4,13
167:20
mitchell's   42:4

**mitigate**  96:22,24
**mixed**  18:15
**mm**  135:20
**moldenhauer**  2:12
**moment**  5:11
  12:13 23:8 24:21
  32:20 41:4 42:20
  49:18,22 111:2
  126:17 155:20
  161:10,13
**monitor**  7:10 8:6,8
  9:10 11:7 42:1
  60:25 65:11 69:9
  97:21,25 98:18
  99:9 102:2 103:9
  103:12,18 104:8,9
  104:20,22 105:15
  106:14,20 117:9
  117:11 121:22,25
  122:4 123:2,6,25
  124:3 125:22
  128:17 130:6
  142:12 145:15,16
  145:24 149:2,5
  157:14
**monitors**  17:15
**month**  144:11
  150:10
**months**  60:22
  73:13 149:25
**morning**  144:9
**motherfucker**
  141:23 142:5
  160:5
**move**  28:19 122:8
  131:4
**moving**  125:1
  131:6 136:5
  148:21
**multiple**  12:19
  14:25 72:25

**municipal**  8:14
**munition**  121:4
  123:16
**munitions**  64:20
  65:12 66:14,19,22
  73:9 74:16,20
  75:4 88:23 89:7
  89:21 90:9,12
  111:22 112:2,7,13
  112:24 113:13,18
  113:20,22 114:5
  122:11,16,24
  123:8,9,21 124:6
  125:4,12 126:1
  130:10,16,19,20
  131:2,7,12 137:12
  137:23
**mutual**  87:21 88:9
  88:10 89:4,5,15
  90:21,23 91:7

**n**

**n**  4:1
**name**  4:14 5:22
  6:12,14 97:13
  142:8 149:21
  164:6 165:3,4,15
  166:3,4,21
**named**  17:15
**names**  149:16
**narrower**  141:7
**nate**  17:15
**national**  71:14
  98:21 100:2,9,16
  100:23,24 102:5
  102:25 106:22
  109:6,11 110:12
  110:19
**naturally**  16:9
**nature**  44:23 45:4
  58:11

**near**  85:10
**necessarily**  53:15
  55:21 110:21
  114:22
**need**  7:1 14:17
  72:20 81:12 97:16
  113:23 132:18
  141:14
**needed**  98:11
  113:10,10 124:5
**needing**  131:17
**needs**  86:3 92:7
**neighboring**  87:22
  90:5 91:5
**never**  28:24 140:3
**newman**  2:8
**nfdd**  84:25
**nfdds**  84:20,23,24
  85:19 86:4
**nicholas**  1:11 3:3
  4:9 6:4,15 161:16
  164:9 165:4,9
  166:4,13 167:20
**nielsen**  2:12
**nights**  67:12,12
**nods**  6:22
**noise**  84:25
**nondirectional**
  83:20
**nonlethal**  127:7
**normative**  159:13
**north**  2:5 8:21
  147:12
**nos**  1:2
**nose**  127:13
**notably**  110:7
**notarized**  164:15
**notary**  3:7 163:6
  163:22 164:25
  165:10,18 166:15
  166:23 167:23

**notation**  151:21
**note**  10:16 151:23
  164:13
**noted**  42:4 59:21
**notes**  133:6 151:14
  151:16,25
**notice**  3:1
**noticing**  4:21 5:23
**notion**  113:5
**november**  61:6
  144:12
**novotny**  2:13
**number**  4:13
  12:18,18,20 17:19
  29:3 30:24 31:2,9
  31:10 33:15 40:7
  40:7 56:25 57:1
  62:24 66:25 70:20
  72:23 73:18,19
  74:15 75:3,6
  76:12 80:25 83:22
  84:18 86:8 87:20
  89:3 90:19 91:21
  93:23,24 95:8
  114:23 118:6,8,11
  118:12 123:7
  125:2 126:11
  134:6 160:19
  161:16 164:8,14
**numbered**  111:14
  111:16
**numbers**  76:14
  77:7 166:7
**numeric**  36:20

**o**

**o**  4:1
**oath**  5:16
**object**  9:8 18:9,17
  19:10 21:15,23
  22:21,22 26:3,9,23
  27:6,22 28:3

29:12,21 30:3
31:19,25 32:8
34:5,12,18 35:3
36:8 37:9,15
38:20 39:2,17,25
40:9,17,23 43:24
44:10,20 45:9
46:1,7,16 47:7,13
47:25 48:14,20
49:1,9 50:25 51:6
51:12,24 52:5,11
52:25 53:12,22
54:10,16,24 55:11
55:17 56:4,12
57:6,15 58:3,15
61:24 63:15 64:5
64:25 65:16 66:9
67:9 68:2 69:13
69:25 71:12 72:3
73:6 74:11 75:13
76:4,23 77:3,16
79:18 80:12 81:9
81:21 83:17 84:8
85:5,24 86:17,23
87:15 88:7,16
89:12,24 91:2,15
92:15 94:17 95:21
96:14,20 98:23
100:4,11 101:9
102:7,15 103:2,10
103:24 104:13
105:1,20 106:17
106:23 107:4,16
108:18 109:7,20
110:3,15 111:23
112:14,22 114:14
115:7,20 116:12
117:4,15 118:4,21
119:14 120:23
121:16,24 122:13
123:11,17 124:7

125:7,23 126:24
128:11,20 129:21
130:12,25 132:1
133:4,14 137:14
137:24 138:17,24
140:1,22 142:14
142:22 143:9
154:6,8 158:15,21
159:24 160:9
**objected**   117:23
**objection**   19:21
22:9 36:5 144:22
145:5,11 148:9
152:10 153:1,12
154:11,12,24
155:21,22 156:23
**objections**   4:19
5:19 23:18,23
24:8,18 25:3 35:9
35:10,21,24 36:18
41:18
**objectives**   92:3,21
93:3
**observations**
20:14 93:19
**observe**   125:10
**observed**   62:10
107:7
**obtained**   11:21
93:20
**obviously**   101:12
139:10
**occasions**   130:10
**occur**   160:21,25
**occurred**   9:17
152:4
**october**   144:12,13
**offers**   80:6
**offhand**   129:23
**office**   8:17 11:24
42:1 59:23 61:2

69:9 78:2 100:16
103:12 145:23
**officer**   13:13 15:8
15:25 16:1,5,7
23:22 26:13 28:22
28:23,24 46:6
47:12 48:19 52:15
52:24 53:6 57:25
58:6,9,12 67:22
68:10 69:2,8 70:5
71:20 72:9,16,17
77:8,24 99:4
100:21,21 102:17
116:17 119:20
120:20 121:1,4,7
121:12 124:13
129:1 139:4
140:17 148:14
159:14,22 160:2
**officer's**   104:24
105:16
**officers**   12:10,15
12:17,19 13:18,23
15:20 16:14 24:13
38:14 42:2,4
57:12,14 58:2
62:17 65:13,24
66:13 67:3,21
68:12 69:14,16,16
69:17,18,20 71:1
71:15,23 72:5,10
73:20 74:5 76:13
77:6,21 78:4,13,14
78:17 79:6,12,19
80:2,15 85:18
86:6 87:11 89:14
89:19 90:5,10,13
91:25 92:5,9,24
93:13,25 94:6,14
94:23,25 95:5
96:2,23 104:19

106:3,21 107:2,8
109:5,25 111:20
112:5,7,12 113:21
114:12 115:5,10
115:17,22,25
116:3,4,6,9,10,18
116:25 117:2,14
118:6,8,11,12
119:3,13 120:3,9
121:18 122:9
123:7 124:4,14,18
125:3,11 129:2
130:9 131:19,24
132:5,10,12 133:1
133:11,20 143:5,8
148:15 157:9,18
159:2
**official**   165:15
166:21
**oh**   4:24 23:6 122:1
**ohio**   164:2
**oim**   64:17 67:1
68:20,24 69:8
70:14,21,25 72:23
75:6 76:12,17
78:1 79:5,10 81:1
83:3,7,9 84:18
86:8 87:20 89:3
90:19 91:21 99:15
103:15 160:22
161:1
**okay**   6:18,25 7:7
7:13,23 8:3,8,22
9:3,5,13 10:2,9,14
10:24 11:3,10
12:8,13 13:2,16
14:5,17,20,22 15:5
16:10,20 17:1,11
17:13,18 18:5,15
20:23 21:3,6,13,21
25:14,22,25 26:12

26:20 28:6 30:15
31:13 32:5,15,24
33:6,9,14 34:1
35:11 36:7 39:7
40:5,13 41:3,6
42:16,25 43:5,10
43:19 44:4 45:6
45:14,23 46:20
48:23 49:4,19
50:12,22 51:15
52:14 53:9,25
55:2,25 56:15,24
57:24 58:13,18
59:9,16,19,21 60:8
61:18 64:7,16
66:5,25 67:14,25
68:19 69:11,23
70:18 72:1,22
75:5 79:4 80:24
81:19 82:6,13
83:1 84:17 85:3
86:7 87:19 89:2
90:16 91:20 95:11
97:5 111:17 112:8
113:12 116:24
123:5 126:19
128:16 132:25
133:17,24 134:1,2
134:25 135:7
136:1,13,17,19
138:7 139:20
141:20,21 143:14
144:14 147:24
148:25 149:4,16
149:23 150:6,10
150:14,20 151:13
152:2,6,20 153:6
153:16 154:7,13
155:10,14,19
156:19 157:16
160:12,24 161:3

once  56:19 131:6
  131:12 153:4,5
ones  6:19 109:12
ongoing  145:22
opaque  98:6
open  10:7
opened  62:16
  147:13
opening  49:7
  56:20
operated  112:21
operating  62:7
  109:2
operational  91:23
operationalize
  81:2
operations  64:17
  68:21,23,25 70:22
  70:24 79:13 83:9
  83:12 84:21 92:2
  92:19 93:10 132:9
opinion  19:16,19
  20:21 22:7,17
  23:16 35:2,17
  44:18 45:1,5,8
  46:5,10 47:11
  48:19 51:5,10
  52:4 53:7,16
  54:15,22,22 55:15
  55:20 56:1 58:9
  58:12 109:11
opinions  19:2
  20:14,16 21:22
  22:1,4,4,14,17
  24:2 26:7 27:1,5
  28:1 29:19 30:1
  32:6 34:10,10,16
  34:16,23 37:13
  38:24,25 39:21,23
  40:21 41:25 42:1
  42:4,7 45:12

46:15,18,19 47:21
  47:24 48:24 52:9
  53:6,11,20 55:23
  56:3,10 57:21,21
  58:1,6,14
order  32:11 35:13
  35:18 39:5 40:3
  41:1,22 45:11
  71:20 86:23
  123:10,15 137:8
  138:4 161:22,23
  162:1,6
orders  72:25 73:8
  73:22 74:7 75:7
  75:16,18,22,23
  76:9 122:11,18
  124:22,24 137:12
  137:21
ordinance  103:11
organization  59:6
organized  59:8
  62:6
outcome  4:18
outcomes  8:16
  121:11
outdated  98:10
outside  90:6
  129:15 150:18
overarching  93:3
overcrowded  92:5
overlap  148:12
oversaw  8:12
oversee  98:1
overseeing  62:19
  66:12
oversight  8:10
  78:3

| p |
| --- |

p  4:1 117:21
p.m.  3:5 4:3 7:24
  8:2 13:8,9,9,11

41:12,13,13,15
  82:14,15,15,17
  111:7,8,8,10
  134:23 161:21
  162:18
page  3:10,13 14:14
  15:6 17:12 21:6,6
  33:19 43:11,16
  64:8,8 67:1 79:5
  82:22,24 90:17
  111:19,19 115:15
  122:8 125:2
  164:14,16 166:7
  167:3
paragraph  18:2
  21:3,10,14,17
  27:13,13,15,16,17
  28:13,16 30:20
  33:23,23 35:1
  37:3 38:5,5,7,9,10
  48:7,18 50:20
  52:18,20,23 53:10
  54:8,20 56:20
paragraphs  26:16
  26:17 28:12 33:16
  37:4,7 38:2 39:11
  40:8,12 45:19
  46:25 51:19,21
  54:5,8,14 55:6,8,9
  55:15
parkins  2:2
parlance  85:1
parole  94:7
part  62:23 87:1,12
  95:1 99:22 104:2
  114:2 122:8 147:9
  149:19,22 154:18
  166:9
partially  27:16
  28:12,15 98:25

participant 129:4
participants 4:5
21:8,18 77:5
123:23 128:3,4
131:11 151:18
152:8
participate 43:5
50:7 90:20
participating 5:12
87:18 127:24
particular 13:24
16:6 25:9 44:3
53:17 66:18,18
70:16 74:24 79:24
80:3,16,18,20
81:10 93:4 98:8
99:13 100:17,20
101:14 105:23
114:22 116:19
120:17 121:3
123:20 130:18,21
131:5 142:10
144:11 146:8
149:25 150:19,24
152:16
particularly
101:16 126:10
particulars 11:18
13:20 58:25 73:14
74:4 103:13
124:25
parties 4:7,17 5:18
163:15
partner 149:13
partners 89:5,16
90:21
parts 42:5
patrick 1:22 5:2
patrick.reidy 1:25
paul 2:13

pause 157:1
pay 135:24
peaceful 75:3
123:19
peacefully 74:22
penalty 5:18
pending 7:2
people 12:1 74:15
74:21,22 77:21
78:16 83:22 84:11
85:11 93:16
124:24 127:21,23
130:17 136:5
149:17 154:2
157:17
pepperball 79:7
79:12,20 80:2,22
86:9,20,21,23 87:2
87:3,12 138:2
pepperballs 28:9
29:16 136:23
137:5 138:1
perceive 78:16
perceived 156:21
percent 20:19,20
22:20 23:12,15
96:10
perception 45:1
53:16 94:3
perceptions 22:15
47:18,21 53:6
55:22 106:9
performing 104:7
period 60:1 94:12
periodic 90:20
perishable 94:20
perjury 5:18
permit 68:5 73:2
permitted 79:8
89:15 157:10

person 5:16 86:11
121:3 128:22
139:19 141:15,23
150:2 158:10
personally 12:20
132:13 165:11
personnel 65:4
68:5,22 77:9
124:23
persons 87:12,17
perspective 87:6
102:21 106:7,9
113:9 121:5
135:22 158:14
159:5,23 160:8
phone 1:16,20,24
2:6,10,16 149:11
151:4 152:12,19
153:3 164:3
phones 73:17
86:20
photograph 20:24
physically 5:13
piece 61:10,11
145:25
place 4:6 9:11
65:15 66:11 88:9
99:2 149:23
places 29:4
plaintiff 2:7 4:10
5:6 20:6
plaintiffs 1:6,14
1:18,22 2:2 3:4
5:1,4 143:22
149:7,13,15 151:8
plans 68:25
platt 135:12
play 100:25
133:24 141:25

played 16:7 134:4
playing 135:8,15
136:20 137:4
138:8,13 141:22
142:3
please 4:20 5:10
5:11,21 6:14,21
7:2 14:15 20:10
23:4,7 24:22
30:11 35:9,14,19
36:4 37:20 43:17
67:16 76:25
113:16 161:22
162:2,11 164:12
164:12
plus 60:12
point 29:2 40:11
101:5 113:2,8
115:9 131:9
142:10,19 149:11
151:5
pointed 116:4
pointing 128:25
points 107:11
110:6 134:1
police 3:14 8:11
9:5,10 11:8,15,20
11:22 12:1,4,6,10
12:17 53:3 59:23
61:2 65:8 66:10
66:11,23 67:20
68:15 71:8,23
73:11,20 74:5,5,23
76:8 77:9 78:11
78:13,23 85:6,16
85:18 86:3 87:11
88:20,25 90:2,5,13
90:13 94:5,13
96:2 98:6,7,19,21
99:3,21,25 100:2
100:16 102:5,17

102:18,19,25
103:21,22 106:6
106:21,21,22
107:1,2,12 108:16
109:2,6,11,25
110:12 111:20
112:10 113:22
115:13 116:17
117:14 118:18
123:2,7 129:1
133:21 146:9,17
147:9,24 148:2,6
158:20
**policed** 108:17
**policies** 8:15 66:23
70:13 98:10 100:3
100:9,14,22,25
101:4,11 102:20
102:24 103:21
104:11 109:1,4
110:1 121:9
**policing** 65:24
69:22 71:14 77:20
78:11,12 88:12
91:9 102:6,13,20
103:1 110:19,21
116:1 120:6,18
**policy** 62:7 63:5
71:4,13,22 72:11
73:7 75:14 83:24
85:16 87:3,4,9
89:6,17 116:21
118:19 119:1,2,7,8
128:10,12,15
146:17 147:18
148:2,6,15 157:19
158:20,25 159:6
159:17
**politics** 106:5
**porter** 1:15,19,23
5:1 149:20

**portion** 28:16
64:10
**portions** 25:7,12
30:1 36:22 115:23
127:12
**pose** 12:23 113:14
113:18 123:16
**posed** 19:1
**position** 145:15
**possibilities**
131:19
**possibility** 92:10
**possible** 71:3
79:25 91:23 95:25
97:8 120:25
121:13 139:3
150:12 152:17
156:10
**possibly** 16:17
27:1 33:12 123:23
**post** 54:1 78:7
92:6 93:2,18
124:18
**potential** 70:7
87:22 90:21 95:9
114:9 128:3,7
146:13 147:17,18
**potentially** 57:20
90:7 127:11 131:3
139:18 140:7,12
141:11
**pouring** 120:13
**practice** 57:3,11
57:17 60:25 94:6
110:21
**practiced** 94:5,20
**practices** 8:16
65:8 87:24 88:11
91:9 98:9 100:15
102:4 103:21
104:11 109:1

**preceded** 116:16
**precisely** 9:23
23:11 60:23
**prefer** 128:14
**prep** 13:17
**preparation** 43:6
50:7 57:12 60:13
**prepare** 11:13
13:17 33:9 61:12
71:15,24 92:9
99:5 131:18
**prepared** 12:25
13:22 18:23 33:2
43:2 50:3 59:23
67:19,20
**preparing** 11:11
12:9 60:17
**presence** 70:4
**present** 2:18 5:13
12:21
**presentations**
145:17
**preservation**
161:20
**presumably**
144:10
**presume** 108:7
127:10 142:16
144:24
**pretty** 96:3 98:6
98:12 133:7
**prevent** 96:12,18
129:2
**previous** 17:23
18:8,14 163:7
**previously** 134:13
**primarily** 86:18
93:13
**primary** 128:5
**prime** 101:13

**primed** 124:16
**priming** 124:14,18
124:22
**prior** 8:3,4 13:16
90:1 95:18 122:11
123:15 124:5
137:12,21,22
**privilege** 19:24
20:1 22:11,24
30:5 32:10 35:5
37:17 39:4 40:2
40:25 41:23,25
42:6 45:11 144:19
145:1,3,8,10,20
146:3 155:12,15
156:1,5,7,16
**proactive** 66:21
**proactively** 68:5
**probability** 19:8
19:15,18 22:6
34:15 35:1 36:20
**probable** 34:20
**probably** 61:5
98:13 122:6 133:6
149:10,25 150:12
**problematic**
126:15,23 127:3
130:24 131:1
158:14,18 159:4
159:23 160:7
**problems** 62:9
113:12,17 123:14
**procedure** 3:2
12:14 165:5 166:5
**procedures** 109:4
112:6
**proceeding** 4:20
**process** 19:24 20:1
22:10,24 30:4
32:9 35:4,14
37:17 39:4 40:2

40:25 42:6 45:11
62:15 98:5 119:18
144:19 145:20
146:3 148:5,14
151:2,2 155:12,15
156:7
**processes**  42:7
99:1
**produce**  83:24
**produced**  59:11
59:13 85:17
**production**  164:16
164:17,22
**professional**  3:6
141:8 163:5,21
**progress**  145:22
**prohibited**  83:12
84:21 85:20 126:6
**projectile**  121:4
**projectiles**  84:13
122:12 126:5
**prominently**  76:14
**promptly**  71:1
**properly**  63:12
92:9 131:18
**property**  143:2
**prosecutorial**
70:15 78:3
**protective**  76:15
77:12
**protest**  9:11 18:14
65:9 67:12 68:23
68:25 70:9,11
72:17,24 74:16
78:7,16 87:1,12
88:19 91:8,19
92:10 93:11,21
97:1 113:2,4
115:18 118:7,8,14
118:15,20 119:4
123:23 126:4,15

126:22 127:24
128:23 129:17,19
131:19 133:2
159:3,18
**protester**  128:19
129:3
**protestor**  128:24
**protestors**  75:3
87:1 123:19 125:6
125:13 135:10
**protests**  3:14 9:7
9:16,16,25 11:9
12:3,7 18:7 20:25
21:18 29:17 39:16
57:13 59:24 61:23
62:2,6,10 65:7,13
67:13,21,24 69:15
69:20,22 71:23
75:22 77:5,13
78:7,12 79:21
80:3,9 81:5 83:4
84:15 85:8 86:1
87:17 88:11,25
93:14 95:4,15,19
95:20 96:13,19,23
97:4 102:14,21
106:15 107:3,8,12
108:14,17 109:2,5
111:21 112:11,19
113:8 115:6,10
116:2,11 117:3,14
118:11,25 119:11
119:13 120:6,18
120:22 122:10
123:4,8 125:4
126:12 130:9
131:24 132:5,13
132:18 133:21,22
137:23 147:9
159:1

**prove**  96:5 107:19
114:22
**provide**  74:18
85:17 122:22
123:15
**provided**  8:10
10:11 20:5 26:22
74:25 88:1,2,10
94:11 115:12
132:22,23
**providing**  120:11
123:10
**public**  3:7 8:15
12:1 74:14 81:4
81:13,17,25 82:4
106:10 163:6,22
165:10,18 166:15
166:23 167:23
**pull**  59:18
**purpose**  73:21
122:16
**purposes**  144:15
161:20
**pursuant**  3:1
127:24
**put**  63:18 125:19
154:20,21

**q**

**qualified**  127:15
**quality**  98:3 136:1
**quantity**  97:2
**question**  7:2 15:11
15:23 16:5,6,7
18:19 19:24 20:3
20:8,10,11 23:2,3
23:9,25 24:1,4,20
24:22 25:4 30:9
30:11,13 32:13
35:8,23 36:16,17
37:19,21 44:13
60:11 65:18 66:6

73:25 76:25 82:7
96:6 102:10 104:4
104:7 105:4,10
112:3 120:5
126:18 127:2
128:14 131:6
137:17 139:8,21
140:10,14,18
141:7 142:4
153:19,21 157:8
159:7
**questioning**  41:17
154:6
**questions**  12:23,24
13:17,22 15:20,21
16:8,12,13,15,17
16:18 19:1 35:17
41:21 42:3 97:7,9
97:15 98:16
105:13 113:25
114:24 124:21
134:1 141:20
143:15,17,19,22
143:25 144:5
146:23,24 147:3,4
147:23 148:12
150:22,23,24
153:24 157:1,2,6
157:23 160:13,14
161:3,6
**quibble**  112:3
**quick**  82:8 111:12
**quite**  58:24 86:25
108:3
**quote**  117:13,17

**r**

**r**  2:13 4:1
**radio**  39:8,15
61:11 92:4 93:17
93:21 94:11

**raised** 66:16 80:7
81:18 82:5 91:24
94:1
**raises** 123:22,23
126:7
**rank** 68:24
**rare** 94:5
**rates** 66:15,19
113:24
**rationale** 90:11
**rbj** 1:2,2 4:13
**reach** 63:12
156:13,22
**reached** 153:3
154:14,20 156:13
**reacting** 70:16
**read** 20:11 23:9
30:10,13 36:17
37:21 105:6,10
127:15 130:6
165:5,6,12 166:5,6
166:17
**reading** 164:20
**reads** 17:23 28:16
28:16 38:12 70:21
72:23 75:6 76:12
80:25 83:7 84:18
86:8 87:20 89:3
90:19 91:21
**real** 13:4 111:12
**really** 78:9 107:25
120:15 127:15
128:14 140:5
150:16 155:16
**realtime** 3:7 163:5
163:21
**reask** 126:19
**reason** 74:17
127:6 128:5
164:15 166:8
167:3

**reasonable** 121:12
**reasonably** 141:7
159:19
**reasons** 127:14,20
158:23
**recall** 60:4 64:23
65:3 73:14 74:3
108:20 124:22
149:24 152:17
**receipt** 164:19
**receive** 12:23 24:1
92:18 132:18
**received** 10:16
16:9 65:5 79:22
92:1 94:4 117:9
117:10 132:5,7
**receiving** 132:14
**recess** 13:9 41:13
82:15 111:8
**recognition** 141:1
**recognize** 11:3
17:11,12 32:24
42:25 49:25 64:10
**recollect** 83:24
**recollection** 13:21
14:24 21:25 73:7
73:12,15 113:7
119:1
**recommendation**
64:16 67:8 68:20
69:12,24 70:20
71:11 72:2,16,23
73:5 74:10 75:6
75:12 76:3,7,22
77:2,15 78:19
79:5,17 80:9,11,25
81:8,11,20 83:7,16
84:7,18 85:4,23
86:8,16 87:14,20
88:6,15 89:3,11,23
90:18 91:1,14,21

92:14 93:22 94:16
131:16,23 133:18
**recommendations**
12:5 62:24 63:2,5
63:13,22,24 64:4
64:13 78:10,25
81:13 82:1 83:2
95:14,18 96:4,12
96:17,21 98:2
99:16 110:10
119:6 123:25
157:19
**recommended**
66:4
**recommends**
64:17 67:1 68:20
68:24 70:21,25
72:23 75:6 76:13
76:17 79:6,10
81:1 83:7,10
84:19 86:9 87:21
89:4 90:19 91:22
**reconsider** 42:10
**record** 4:3,7 5:22
6:14 7:16,20,24,25
8:2 10:4 13:4,7,11
35:25 36:5,9
41:10,11,15 49:5
57:10 75:15,17,22
79:21 82:12,14,16
111:1,5,7,10 121:8
134:13,16 150:6,9
151:13,15,16
161:13,21 162:19
166:9
**recorded** 4:8
24:13,16,25 25:1,8
44:25 73:17 75:8
75:24 86:20
118:13 151:18,19
151:20,24 152:2

**recording** 4:6 69:2
**records** 61:13 80:1
94:9 132:20
133:10
**red** 135:19 138:11
**redacted** 18:3,22
20:24 21:4,11
23:21 25:7,11,18
25:21 26:18 27:13
27:15,16,17 28:12
28:13,15 30:20
31:11 33:23 36:22
37:3,4,7 38:2,5,7,9
39:11 40:8,12
43:15,18 44:16
45:20 46:25 48:7
48:18 50:20 51:19
52:18,20 54:5
55:6 153:15
154:17 155:2
156:3
**redaction** 18:21
31:6
**redactions** 24:6,25
26:1,8,20 27:5,19
28:2 29:8,10,20
30:24 31:2,5,16
32:7 34:1,11,17,22
37:14 38:17 39:1
39:24 40:15,22
42:10 44:18 46:15
47:5 48:10,12,24
50:23 51:4,10
52:3,9 53:4,21
54:22 56:11
144:16 153:25
154:3
**reduce** 74:14 75:3
80:14,21 96:9,25
126:1

**reduced** 96:1
163:11
**reducing** 90:15
**refer** 9:20
**reference** 101:4
107:11 110:5
164:8 165:2 166:2
**referenced** 165:11
166:15
**referencing** 104:2
152:21
**referred** 84:24
99:7,24
**referring** 9:16
60:13 116:3
**refers** 23:12
**reflect** 18:25 29:10
29:14 44:18 46:10
47:16 53:10 55:20
64:14
**reflected** 20:16
22:17 34:23 44:8
45:13 55:23 57:18
57:23,25 58:12
62:20 139:5
**reflecting** 8:15
17:15 33:3 50:4
67:20 75:17 94:10
**reflection** 108:23
108:25
**reflects** 20:21
23:21 45:7 46:5
47:11 48:18 51:4
52:3 54:14 55:15
71:19
**refresher** 132:16
**refreshers** 94:4
**regarding** 53:17
59:23
**regardless** 68:24

**region** 11:16
**registered** 3:6
163:4,21
**regular** 69:1
**regulated** 86:3
**regulatory** 70:15
**reidy** 1:22 5:2
**relate** 20:13
114:24
**related** 4:16 16:6
16:18 19:3 20:14
20:17 22:15 93:13
146:13 155:4,9,11
156:14,20 163:14
**relates** 20:16 68:4
78:18 93:24
**relating** 60:17
**relation** 58:19
**relationship**
154:22
**relayed** 58:2
**relevance** 154:2,5
154:11
**relevant** 16:15
141:15 153:18,22
153:24
**relied** 86:18
109:12
**remember** 11:18
13:19 15:4 16:24
58:24 60:23 65:20
94:12 103:13
110:8 113:2
122:21,22 124:8
124:11,17,24
125:15,18 132:14
132:16 144:11
149:16,21 150:1
150:16,20,22,24
151:9,22 152:15
154:25 155:6,16

156:1,11,17 157:8
158:6
**remembering**
156:19
**reminding** 124:23
**remotely** 3:5 4:5
5:15 163:11
**render** 127:15
**repeat** 20:10 23:3
24:19,21 30:10
67:15 76:24 105:4
**repeating** 36:16
**rephrase** 66:5
96:16,16 105:11
112:9
**report** 3:15 9:9
11:6,11,13,18 12:9
57:13 59:22 60:2
60:6,9,12,13,17,18
60:24 61:8 62:4
62:20,23 63:14,19
63:25 64:8,11,15
65:20 71:15,18
72:6 81:3,3,14,17
81:18,25 82:5
83:3 95:14 99:5
107:14,21,23
108:1,5,13,20,23
109:13,17,23
110:2,7,10,12
111:13,16,19
114:24 115:15
118:15 119:6,20
119:22 122:8,9,19
125:2,19 126:4
129:11 130:15
131:16 144:13
146:6,8,16,21,25
147:5,10,11,22
148:20 150:23
151:11

**reporter** 3:7,7
4:15,23 5:9,11
6:20 7:14,20 13:6
20:9 23:8 24:19
30:12 37:20 67:15
76:24 105:5,6
111:1,4 113:15
117:17,20,22
118:1 126:16
137:16 155:20
161:10,22 162:1,6
162:9,12 163:5,5
163:21,21 165:7
**reporter's** 163:1
**reporting** 5:14,20
70:24
**reports** 8:13 61:1
71:1,24 72:8,12
137:20 145:16
**represent** 111:15
135:11 138:19
142:7 149:14
**representation**
138:21
**representations**
142:17
**represents** 149:7
149:12
**request** 59:10 88:1
166:9,11
**requested** 11:14
11:17,19 87:25
**requests** 65:5
**require** 64:18 67:2
68:1,22 89:5
**required** 68:23
74:18 76:18 98:18
99:5,14 138:5
164:25
**requirement**
75:15

requirements
70:23
requires  71:14
73:8
requiring  72:5
89:19 90:5
research  70:3
researching  63:19
resigned  9:2
resolve  147:5
resolving  81:17
resources  68:7,8
respect  106:15
152:6
respond  133:2
responded  69:15
responding  65:8
78:13,14 82:4
90:2 91:18 107:8
132:18
response  3:14 9:10
11:8,20,22 12:3,4
12:6 18:25 59:23
62:6 66:12 82:2
88:25 90:22 91:8
91:11,18 98:4
107:12 115:13,23
124:13 147:10,13
159:2,18
responses  12:24
65:4 81:13
responsibilities
8:9 13:24 141:9
responsible
116:19 121:3
rest  30:17 40:6
restrictive  87:11
result  63:7 115:4
119:12 123:19
163:16

resulted  126:12
results  71:16
retained  161:17
returned  164:19
reverse  78:23
review  3:15 9:5
11:24 61:10,13
70:24 71:18 72:8
98:19 99:6,10,10
99:12,16,24,24
101:3,11 119:19
119:22 125:11
130:8 144:15
162:4 164:13
165:1 166:1
reviewed  9:9
11:19 16:25 29:25
33:11 43:7 50:10
71:2 86:19 124:3
144:7 154:16
reviewing  73:13
73:16 99:2,3
104:20 105:16
106:7 113:23
120:8
reviews  104:8
revise  86:9
right  7:5 10:17,22
10:24 15:6,19
17:2,4,8,20,22
27:9 32:22 33:18
36:2,15 37:23
38:16 39:10 41:16
42:16,22 48:3
49:4,23 54:7
56:18 67:7 83:6
95:11 97:7 98:22
98:25 100:3,10,12
106:22 111:11,18
115:14 120:22
121:23 122:7

125:1 127:21
130:6 131:15,20
133:24 135:4,7,14
135:16,16,17
136:21 144:21
145:4 146:11,15
147:10 148:8,11
148:13,16 153:10
rights  127:25
128:3 146:9,14,18
147:8 148:1,22
ringel  2:14 3:12
5:7,7 6:3,3 7:22
9:8 10:19,21 18:9
18:17 19:10,21
21:15,23 22:9,21
23:18,23 24:8,18
25:3,5 26:3,9,23
27:6,22 28:3
29:12,21 30:3,8
31:19,25 32:8
34:5,12,18 35:3,11
36:7,18 37:9,15
38:20 39:2,17,25
40:9,17,23 41:24
43:24 44:10,20
45:9 46:1,7,16
47:7,13,25 48:14
48:20 49:1,9
50:25 51:6,12,24
52:5,11,25 53:12
53:22 54:10,16,24
55:11,17 56:4,12
57:6,15 58:3,15
59:12 61:24 63:15
64:5,25 65:16
66:9 67:9 68:2
69:13,25 71:12
72:3 73:6 74:11
75:13 76:4,23
77:3,16 79:18

80:12 81:9,21
83:17 84:8 85:5
85:24 86:17 87:15
88:7,16 89:12,24
91:2,15 92:15
94:17 95:21 96:14
96:20 98:23 100:4
100:11 101:9,19
102:7,15 103:2,10
103:24 104:13
105:1,20 106:17
106:23 107:4,16
108:18 109:7,20
110:3,15 111:23
112:14,22 114:14
115:7,20 116:12
117:4,15,23 118:4
118:21 119:14
120:23 121:16,24
122:3,13 123:11
123:17 124:7
125:7,23 126:24
128:11,20 129:21
130:12,25 132:1
133:4,14 134:5,16
137:14,24 138:17
138:24 140:1,22
142:14,22 143:9
143:25 144:2
145:3,9 146:4
148:16 152:20
153:6,16,21,24
154:7,10,13
155:10 156:6
157:12,23 158:15
158:21 159:24
160:9 161:4,8
162:1,3,14 164:5
ringela  2:16
risk  80:8,14,20,21
84:10,11,14,15

87:6 90:15 96:22
96:24 123:22,24
126:2,7 128:6,6
131:11
**risky** 85:9 87:6
**rock** 28:19,23,25
138:4
**rocks** 28:18 38:13
**role** 8:4,19,24
15:11,16 16:1,6
48:4 97:25 99:9
103:17 104:9,22
105:25 106:1
115:1
**room** 5:14
**rosters** 67:3,4,11
67:20 68:1 69:1
118:9
**rough** 60:16
161:24
**round** 126:15,22
127:3,4,8 128:7,9
128:19 129:8,19
130:1 138:21
139:15,24 140:8
140:20 142:20
158:8
**routinely** 72:25
76:8
**rubber** 83:8,11,18
83:25 84:2,13
**rule** 115:24
**ruled** 20:4 42:9
**rules** 3:2 6:13,18
165:5 166:5
**ruling** 22:11,24
30:6 35:5 37:17
**rutahindurwa** 2:4
5:3,4,25,25 143:21
161:6

**s**

**s** 3:6 4:1 163:4,20
164:16 166:8,8
167:3
**s.w.a.t.** 17:17
**s3** 161:19
**safe** 79:25
**safely** 79:23
**safer** 84:16 86:1,5
87:17 89:1 95:4
**safety** 61:3 106:6
**sake** 131:6
**sannier** 2:3
**sara** 2:2
**saturation** 86:22
**save** 154:12
**saw** 28:24 73:17
86:21,25 108:16
108:21 122:18,25
123:7 125:15
**saying** 140:24
**says** 15:8 28:8,21
29:2 30:19
**scale** 65:9 91:11
91:19 96:23
108:15
**scanned** 107:23
**scenario** 121:13
128:18 129:18
142:13
**scene** 121:13
142:8
**scholer** 1:15,19,23
**scope** 50:16
146:24
**screen** 10:9,17,25
17:9 32:16,20
41:4 42:20 49:18
49:22 56:24 59:18
82:20 95:12
111:12 134:3

135:1,17 136:6
138:10 151:21
**scroll** 30:16 31:9
33:18 40:5 43:11
43:16 70:18 76:10
**scrolled** 115:15
**scrolling** 49:12
**seal** 165:15 166:21
**seat** 143:18
**sebba** 1:14 3:11
4:23,24,25 5:24,24
6:8,12 7:17,21 8:3
9:13 10:3,6,19,24
13:12 14:5,9 17:4
17:8 18:15 19:7
19:14 20:18 21:21
22:6,12 23:5,6,13
23:14,20 24:5,10
24:23,24 25:13
26:6,12 27:4,9,25
28:6 29:18,24
30:7,15 31:22
32:5,15 34:9,15,25
35:9,11 36:4,7,15
36:23 37:12,23
38:23 39:7,20
40:5,13,20 41:3,10
41:16 42:16,22
44:4,14 45:6,14
46:4,12,20 47:10
47:23 48:3,17,23
49:4,13,17 51:3,9
51:15 52:2,8,14
53:9,19,25 54:13
54:19 55:2,14,25
56:9,15 57:9,24
58:13,18 59:9,15
59:16 63:17 64:7
66:5 67:25 68:19
70:18 72:1,22
74:9 75:5 76:2,10

77:1,14 79:4
80:24 81:19 82:6
82:9,12,18 84:5,17
85:22 86:7 87:13
87:19 88:14 89:2
89:22 90:16 91:13
91:20 94:15 95:6
96:11,15 97:5
143:24 144:9
152:10 153:1,12
154:24 155:18,22
156:23 160:14,17
161:3,23 162:11
**second** 38:8 53:2
93:12
**seconds** 135:7
136:22
**section** 19:9,16,19
20:13,16,21 21:22
22:5,7,14 23:16
24:16 25:18 26:13
28:7 30:1,23
38:10,16 43:12,14
43:18 44:5,7,24
45:2,7,13,15,15,18
46:5,19,21 47:16
53:8 55:24 56:2
56:16,20 60:6
108:20 124:1
**sections** 15:6
31:10,13,15 57:25
58:6,7,10 64:14
**secured** 161:18
**see** 6:20 10:10,25
13:3 14:9,15 17:8
17:9,25 18:20
21:2,5 25:16,19
26:19 28:18,20
32:22 37:5 40:7
40:10 42:22 49:23
59:19 77:7 82:23

82:23 97:14
120:19 124:2
135:1,6,9,13,17,19
136:10,15 138:10
138:14 139:9,15
140:5,11,16,17
141:10,14 142:25
143:3,4,7,10,11,13
150:8 151:21,21
**seeing**   56:6 124:8
136:3,5 151:9,22
**seek**   90:20
**seen**   33:6 124:9
137:25 138:22
152:9,13,18
153:10,15
**seized**   129:11
**send**   59:13
**sense**   66:13 81:12
93:2,4
**sensitive**   127:12
**sent**   58:23
**sentence**   23:11
38:6,12
**sentences**   29:25
44:8
**separate**   62:15
92:17 147:6 159:6
**september**   17:17
33:5 43:4 50:6
163:18
**sergeant**   134:14
142:8,8,13 160:4
**sergeants**   92:25
120:10
**serious**   126:11
**seriously**   63:2
**serve**   80:21
**served**   102:2
**serves**   110:8

**services**   161:19
**set**   62:4,5
**setting**   129:19
**seven**   46:25
161:17
**severity**   97:3
**shadow**   15:16
**shakes**   6:22
**shape**   153:19
**share**   10:7,9,11,12
10:17,20 12:13
32:20 41:4 42:19
49:22 59:18 60:25
82:20 111:12
127:16 134:3
**shared**   47:16
57:21 61:5 99:14
**sharing**   19:5 32:16
49:17 56:24 95:11
106:8
**sheet**   164:14 166:7
166:10,18 167:1
**sheriff**   61:2 90:2
**sheriff's**   7:12 8:11
99:21
**shirt**   135:19
138:11
**shoot**   128:19
**shooting**   126:14
126:21 128:8,25
129:18,25 140:8
**short**   139:8
**shorthand**   163:11
**shortly**   71:15
**shot**   138:20
140:19 142:20
158:7,11
**show**   17:1
**showed**   139:16
158:5

**showing**   86:20
143:1
**shown**   16:13 138:5
144:8 151:6,10,11
164:16
**shut**   35:12
**sic**   4:10 121:22
**side**   121:6 135:21
152:3
**sign**   135:22
**signature**   162:4
163:19 164:15
**signed**   10:21
165:13 166:18
**significant**   127:9
129:13 132:22
133:12
**signing**   164:20
**similar**   12:7 16:18
17:23 18:8,14
96:19 123:4
**simply**   36:5 86:5
**simultaneously**
147:16
**sincerely**   164:21
**single**   19:15,18
20:15,21 22:7,17
23:15 35:1 92:4
**sir**   7:4 164:10
**sit**   66:3 73:15
107:21,22 108:1
108:10 118:23
151:22
**situation**   94:23
129:6,9
**situations**   85:9
86:10
**six**   46:25
**size**   50:16
**skills**   94:4,6,20

**skirmish**   95:1,2
120:9
**slightly**   44:24
77:19 141:6
**slow**   49:14
**small**   127:13
139:12 140:4
**snippet**   140:4
**soft**   85:13 87:7
127:9
**soldier**   136:15
**solely**   95:8
**solutions**   164:1
167:1
**someone's**   127:17
148:1
**somewhat**   158:25
**soon**   71:15 113:9
**sorry**   4:24,24 13:3
23:6 41:19 43:20
47:3 57:9 60:11
67:15 69:9 76:24
111:2 113:15
117:17,22 126:16
142:24 148:10
153:13 155:17,18
155:23 156:25
160:3
**sort**   13:5,22 15:2
60:5 61:4 75:17
78:19,24 86:2,21
88:18 92:17 99:1
100:24 101:2,10
102:2 104:3,10
120:11 128:2,5
130:20 131:4
135:21 136:5
139:8 145:22
146:22 151:2
157:5 159:6,13

sound 142:1
sounds 147:1
south 1:15
speak 18:21 19:4
  145:16
speaking 11:14
  12:14 18:23 22:2
  35:10,24 108:23
  121:19 145:13
specialized 79:22
specific 19:13 22:2
  60:3,6 65:2 66:1
  70:23 73:18 78:4
  78:19 83:10,20
  84:12,19 93:4
  98:16 104:2 107:7
  110:8 130:14
  132:2,5 138:3
  146:12,13 153:7
  156:4
specifically 8:12
  65:19 90:3 119:16
  126:13 133:5
  156:17
specificity 11:17
  75:1
specify 79:11
specifying 87:24
speculative 95:23
  114:3
speed 14:17,19
spending 42:11
  120:7,13
spent 61:8 63:12
  64:2 102:19
  107:25
spoke 12:10 93:1
  152:12,19 153:4
  160:18
spoken 149:6

spot 69:1
squarely 114:24
staff 12:22
stakeholders 61:5
  91:22
stamp 10:4,25
  14:7 15:7 17:5
  21:7 32:19 42:19
  49:20 64:9 82:22
  90:17
stand 63:21,24
  71:6 84:23 109:18
  109:22
standard 148:4,13
standards 71:14
  83:10 84:20 86:4
  86:9 88:21 89:20
  90:4,6 100:2,3,9
  100:10,16,23,24
  101:7,15,25 102:5
  102:5,13,20 103:1
  103:1,23 104:25
  106:22 107:3
  109:6,12,15 110:2
  110:6,12,14,18,19
  110:22,24 130:2,6
  132:6
start 135:6,6
starting 8:22,22
  111:18 134:23
state 3:8 4:20 6:14
  61:4 129:14 163:6
  165:10 166:15
stated 142:9
statement 23:22
  23:25 24:3 44:18
  45:7 46:5,10
  48:18 51:5 52:4
  54:14 55:15,20
  139:3 159:13,15
  165:13,14 166:19

166:19
statements 18:25
  19:3 25:9 44:5,8
  45:1 51:10 54:22
  71:20 140:17
states 1:1 4:12
  148:8
stating 5:21
step 63:22
sticks 157:5
sting 31:1
stop 12:13 14:21
  32:16 41:3 49:17
  56:24 76:1 95:11
  133:25 135:16,22
  136:21
stored 161:18
strategic 92:3,20
streaming 136:3,9
street 1:15,19,23
  2:9,15 135:10
strike 160:3
striking 129:7
strom 43:2 47:17
  50:4
strong 94:7
struck 28:22 84:13
  87:2 129:3 139:14
structure 54:1
  88:3
subject 20:17 44:3
  44:22 53:14 56:8
  74:5 158:4
subjected 99:11
subjects 119:9
subscribed 165:10
  166:14 167:21
subsection 46:10
  47:22,24 53:15,17
  55:21 56:8,21

subsections 58:12
subsequent 155:7
subsequently
  155:14
substantial 61:16
  118:10
substantially 92:8
  131:17 133:19
sufficient 62:13
  65:10 74:25 75:1
suggest 88:12 91:9
suggested 139:17
suggestions 43:8
suggestive 45:5
suggests 70:3
suite 1:19,23 2:9
  2:15 164:2
summaries 57:4
  57:14,20 58:9
summarized 25:11
  34:7 107:13,18
summarizing
  13:13 57:12
summary 18:6,11
  24:7 26:1,21,25
  27:20 29:10,15
  31:16 32:2 37:7
  38:18 39:14 40:15
  43:20,22 44:2
  45:24 47:5 48:12
  50:23 51:22 52:23
  53:5 55:9 98:13
summer 9:12,14
superior 164:1
supervise 115:10
supervision 115:5
  115:12 119:12
  120:4,9,12,16,17
supervisor 68:25
  119:21

supervisors 70:10
71:2 72:9,25 73:8
73:22 74:6 75:20
76:17 85:18 91:25
92:24 93:14,25
115:9,13 119:12
120:2,7 122:21
124:15
supervisory 66:17
71:18
support 35:25
suppose 63:17
103:15
supposed 159:20
sure 13:6 15:24
17:3 19:14 23:13
23:24 24:2,23
44:12 49:13 60:4
60:15 63:16 65:19
66:22 81:10 94:22
96:6,7 97:10
98:15 99:19
101:23,23 102:9
102:11 103:4
104:5 105:22
110:25 111:3
113:6 114:20
122:20 123:2
124:9 132:7
134:20 136:25
137:2,18 149:24
150:13 152:18
154:9,25 156:5,10
suspect 96:8
150:13 151:19
sustained 121:7
swat 3:18
swear 5:10
sworn 6:5 68:22
163:8 165:10,13
166:14,18 167:21

system 64:19
65:11,15 66:2,8,11
66:20 93:8 112:1
113:10 114:10,12
115:2,4,8
systemic 108:15

**t**

t 138:11
tactical 85:7 92:3
92:20
tactics 131:25
tak 2:13
take 4:6 6:25
10:16 58:22 63:1
63:1,22 82:8,9
97:16 149:23
151:14 161:12
162:3,4,14
takeaways 55:3
taken 3:4 4:9
146:8 163:11
talk 12:10 98:14
131:16 136:18
152:20
talked 106:14
109:10 119:17
129:24 132:12
148:18 149:10
151:4 153:2 155:7
talking 9:24 74:20
155:1
talks 148:20
target 83:20
targeted 80:17,18
80:20 84:11
tasked 100:6,14
103:8,18 104:20
104:22 105:16
taylor 2:2
team 8:17 11:23
13:13,17 16:2,23

18:24 19:1 20:17
20:22 21:22 22:4
22:8,18 24:11,12
24:16 25:1 26:2,7
27:21 28:1 29:11
29:19 30:2 31:22
32:6 34:2,10,16
35:2 36:24 37:8
37:13 38:17 39:1
39:14,21,24 40:16
40:21 43:20,21
45:8,24 46:15,19
47:6,24 48:10,13
48:25 50:24 51:11
51:23 52:10 53:21
54:9,23 55:10
56:10 57:18 58:14
58:19,23 59:1
61:8,17,18,21
63:11 64:2 66:17
145:1 156:3
team's 19:20
23:17 27:5
teams 15:11,16
66:13 76:19
techniques 94:24
94:24
technology 4:5
150:3
telephone 150:4
tell 31:7 35:14,18
158:10
telling 124:4
tenure 149:1
term 141:14
terms 93:12 97:1
114:4
testified 6:6 24:1
149:1
testify 163:8

testimony 5:17
161:15 165:6,7
166:6,9,12
text 17:20 25:20
29:9,14
thank 6:9 7:4 10:2
13:2 25:13 36:6
36:23 38:11 59:15
71:9 82:11,19
97:5 106:11 118:1
131:13,14 143:22
144:4 154:7
160:13 161:8
thanks 143:18
161:6
theme 92:22
theoretically 86:6
88:24
thing 110:22 122:5
134:9
things 34:21 65:23
93:13 96:4 124:12
133:7 147:20
think 7:17 9:21
10:8 11:16 12:16
14:1,23 16:16
20:12,15,20 22:13
22:16 24:9,24
25:6 34:20,22
36:19 38:8 48:22
55:19,19,23 56:7
60:5,10,21,24
61:25 62:11,12
73:24 74:3 81:23
82:3 84:25 88:10
95:9,24 97:7,22
103:5 104:15,16
109:9,21 110:5,7
110:17,22 111:19
112:23,25 114:3,8
115:8 116:4 117:7

117:7 119:17
120:15 121:10,18
124:12 128:5,18
129:12,17 130:2,4
130:14 132:16
133:6 135:20
141:4,7 143:14
144:12 146:11,14
147:1 149:14,19
151:10,12,23
153:2,2,3 155:25
156:11,24 157:2
158:24 159:6
160:23 161:4
**third** 38:6,9 68:19
68:20 78:9
**thirty** 164:19
**thought** 16:14
42:7 80:7 133:11
**thoughts** 18:16
**thousand** 85:10
**threaten** 143:7
**threatening** 84:12
129:16 139:10,16
**three** 26:15,17
28:11 37:3 45:19
46:24 51:18 55:5
92:7,17 94:11
95:7,10 152:24
**throw** 138:4
**throwers** 28:19
**throwing** 28:18
38:13 113:1
**tighter** 90:3
**tim** 149:10,12
151:4 152:12,14
152:14,18 160:19
**time** 4:20 13:4
15:3 35:13 41:6
42:11 60:1 61:14
61:16,19,22 62:13

62:19 63:12,18,23
64:3 73:1,13
74:25 77:6 93:16
94:3 99:3,12
107:25 108:3
112:20 113:15
118:25 119:8
120:7,13 134:22
134:24 139:21
143:16,18 144:7
147:21 154:22
157:24 159:1
162:18
**times** 28:17 76:16
123:7 145:19
149:9,11 153:3
160:19
**tissue** 85:13 87:7
127:9
**title** 7:8
**titled** 26:13 28:7
43:12 45:15 46:21
49:7 56:20
**today** 6:10,25 9:16
45:3 66:3 73:15
97:6 107:21,22
108:1,11 109:10
118:23 119:5,7
143:16 149:5,19
157:24
**today's** 161:15
**told** 18:16 24:13
24:17 25:2 26:2
27:20 31:23 34:3
34:21 36:8 37:8
38:18 39:15 40:16
43:22 44:2 45:25
47:6 48:13 50:24
51:22 52:24 54:9
55:10 57:4,14
67:10,18 77:10

89:13 105:12
124:23 132:13
139:14,23 140:19
**tool** 68:14 70:3
86:3
**tools** 79:23 80:5,8
80:15,20 126:3,8
**topic** 31:17
**topics** 31:24 32:4
**total** 161:16
162:18
**totally** 140:13
150:13
**touched** 156:15,16
**track** 111:21
112:12 113:13,18
**tracking** 64:19
65:5,11,15 66:2,8
66:11,20 112:1,24
113:3,7,19,23
114:5,10,11,21
115:2,4,8
**traditionally** 98:6
**traffic** 61:11 93:18
93:21
**trained** 79:7
**training** 45:16,25
46:22 48:4 79:22
80:4,6 89:17 92:9
94:2,8,10,11
100:15 104:12
131:18,25 132:4,4
132:6,9,14,15,19
132:21,22 133:3
133:10,12,20
148:19,21
**trainings** 90:20
91:7
**transcribed** 165:7
**transcript** 161:24
161:24 162:4

163:13 164:12,13
165:5,12 166:5,11
166:17
**transparency**
80:25 98:5
**transparent** 81:12
**traumatic** 127:11
**treated** 78:17
**tremendous** 61:10
62:18 127:4
**trends** 108:21
**trial** 154:12
**triggers** 99:5
**true** 78:23 90:11
113:6 131:5
146:25 159:23
163:13
**truth** 163:9
**try** 136:15
**trying** 141:6 154:5
**tubbs** 3:6 4:16
36:15 163:4,20
**turn** 64:7 115:18
116:9 117:1 119:3
121:14 138:14
142:1 157:10,21
**turned** 115:22
158:12,13
**turning** 115:14
146:6
**two** 12:16 26:15
37:3 38:2 39:10
42:5 45:19 46:24
51:18 54:4,14
55:5 79:22 86:21
87:5 92:4 99:1
149:13 156:8
**type** 120:3
**types** 15:19 16:13
16:15 85:12 87:5
87:10 89:6,18,20

90:9
**typewritten**
163:12

**u**

**ultimately** 11:25
12:24
**unable** 73:21
83:24 85:15
**unauthorized**
131:3
**underneath** 15:10
17:20 21:4 24:6
24:25 25:17,25
26:7,20 27:5,19
28:1,11 29:7,10,19
30:20 31:15 32:6
33:16,22 34:1,10
34:17 37:2,6,13
38:16 39:1,24
40:14,21 44:15,17
47:4 48:6,9,11,24
50:19,22 51:4,10
51:21 52:3,8,19,22
53:4,21 54:4,8,21
56:10
**understand** 6:23
9:19,24 20:7 23:1
23:24 24:3 30:9
32:12 35:7 62:5
63:4,16 102:9
104:3 144:18
146:4 149:12
154:1
**understanding**
9:23 25:8 32:3
34:7,21 41:18
75:19 108:25
119:5 145:7 152:8
154:18
**understood** 19:7
25:10 44:12 53:19

62:22 155:10
**unfairly** 78:17
**unidentifiable**
79:2
**unidentified** 121:1
**unified** 90:22
91:10,17
**uniformly** 93:15
**uniforms** 76:15
77:8
**unit** 4:8
**united** 1:1 4:12
148:7
**units** 161:16
**unnecessarily**
123:21
**unprepared** 133:2
**unquote** 117:13,17
**unredact** 38:6
**unredacted** 25:7
25:12 27:12 28:16
29:25 33:23 36:22
37:2 38:6,12
144:8
**unsafe** 98:10
**upper** 124:4
**ups** 157:25
**usage** 69:18 116:5
126:3
**use** 28:7,8,19
29:16 70:23 71:1
71:4,17,18,24
72:10,12,18 77:23
79:7,8,12,22,24
80:8,22 81:3 83:8
83:12 84:1 85:18
86:9 87:3 89:6,7
89:16,16,17,17,20
89:21 90:4,10
94:24,25 98:19
99:4,5,11,13,20,25

101:7,10,15
104:24 105:16
108:21,24 112:12
113:13,18,22
119:20,22 120:16
125:25 129:7
130:17 131:7
133:12 137:22
138:23 139:2,25
140:7,11,21,25
141:2,10 157:5,6
159:12,14
**useful** 68:15 72:13
85:6
**uses** 70:6 99:3,4
103:19 105:18
106:8 116:16,19
116:20 119:19,20
120:1,2,16 126:4
127:25 131:2,3
146:13 159:13
**usually** 74:19
110:23 120:9
136:9 151:20
**utilize** 89:6
**utilizing** 66:14

**v**

**v** 164:6 165:3
166:3
**vacating** 131:12
**vaporis** 2:12
**variety** 85:12 91:6
114:8 121:10
**various** 65:4 108:8
110:6
**velasquez** 2:12
**velocity** 127:4,5
**verbal** 6:21
**verbally** 5:17
**verify** 76:18

**veritext** 4:4,15,16
161:17,19 164:1,8
167:1
**veritext.com.**
164:17
**version** 15:2
111:14,16 144:8
**versions** 14:25
**versus** 4:11
**vicinity** 83:23
**video** 1:10 3:2 4:6
4:8 7:18 11:21,23
71:20 73:16,16
75:8,15 86:19,19
86:25 133:25
134:4 135:8,15
136:2,20 137:4,9
137:10,20 138:8
138:13,22 139:5,8
139:16,22 140:4,6
140:10,18 141:5,9
141:22 142:3
143:1,3,12 150:3,5
151:6,9,19,20,24
160:4 161:24
**videoconferenced**
1:10,13 2:1 3:3
**videographer** 2:18
4:2,15 5:9 7:23
8:1 13:7,10 41:11
41:14 82:13,16
111:4,6,9 161:12
**videographers**
75:21
**videos** 140:16
**view** 64:6 72:5
84:1 98:10 100:7
101:24 109:1
159:4
**viewed** 11:23
106:1 122:20

155:2
viewing 122:21,22
viewpoint 101:14
views 18:6,13
violate 147:25
148:1
violated 146:9
147:8 159:6
violating 35:12,18
violation 146:18
148:22 158:20
violations 15:14
146:14 147:2,17
147:18
violence 95:19
96:9,18 143:8
virtual 4:4
visible 76:15 77:7
voluminous 61:13
vs 1:7

**w**

wait 131:10
161:10,11
waive 5:19 145:10
146:2
waived 164:20
want 7:1 35:16
36:1,12 41:17
56:18 59:13 60:3
132:25 135:24
139:2,3,4 140:15
140:16,17 162:9
wanted 12:21
81:15 85:20 87:9
123:2 144:5
wants 36:10
warned 74:2
123:20
warning 124:5
137:19

warnings 74:18
122:22,23
wasting 35:13
watch 28:22
watching 141:18
way 9:20 35:22,23
62:5 91:10 104:16
105:23 108:16
112:19,20 113:20
113:25 120:18
136:9 139:17
145:21 153:19
157:19
ways 77:23,23
78:17 86:21 91:6
98:8 114:6 127:1
we've 31:1 37:23
39:10 43:14 45:3
49:6 50:9 53:18
75:16 76:9 95:13
109:9 119:17
154:23 158:24,25
weak 77:19
weaknesses 62:8
weapons 89:7 90:9
90:12 114:13
115:6
wear 68:23 69:21
116:9,25 121:14
158:12
wearing 77:13
115:25 135:18
139:11 158:8
weeks 71:24
weighted 141:13
welcome 42:17
82:18
welfare 26:13
went 133:9
west 1:23

weyman 33:3,12
white 25:20,22
whitish 135:21
willing 123:19
window 139:12
withdraw 9:14
withdrawn 11:12
16:11 19:17 24:11
24:14 26:16 28:7
29:6,8 30:18
31:14 38:3,24
39:22 44:6,16
46:13 47:3 48:10
52:18 54:20 56:1
61:20 63:20
witness 5:10,16
16:19 18:25 20:14
22:15 25:9,9 27:2
34:8,21 35:16,22
36:1 45:1,24 47:5
48:13 50:24 71:20
164:9,12 165:1,4
165:11 166:1,4,15
witnesses 24:2
57:4,22 59:7
witness' 164:15
woman 149:20
wondering 41:20
word 19:9,16,19
20:15,21 22:7,17
23:16 35:1 44:15
44:17 45:7 46:5,9
46:13 47:11 48:18
51:4 52:3 53:10
54:14,20 55:15,20
77:20 112:25
140:25
words 20:13 22:13
25:23 47:15,22
work 60:1 62:20
67:21 93:5,6 98:3

113:11 145:22
147:15
worked 12:2 60:9
60:16 69:20 132:5
132:12 145:21
working 67:22
68:22 69:19 90:14
93:11,14 115:10
116:6 118:6,8,11
160:22 161:1
world 140:15
worn 11:21 61:11
69:5,18,21 70:2,4
70:8 72:13 75:25
115:1,19 116:1,5,9
116:14 117:1
118:13,19 119:1,3
119:11,23 120:14
120:20 121:2,19
134:12,21,22
150:25 151:1
156:11,14,20
157:3,4 158:4,5,7
158:12,13 159:22
160:6
worse 136:2
writing 61:13 75:9
written 3:1 34:2
wrong 12:17
wrote 31:22 32:2
38:17 39:14,21
43:20,22 44:1
45:24 48:10 57:11

**y**

yeah 7:17,21
16:16 19:20 31:8
49:15 67:17 98:15
99:19 101:22
102:1 104:15
105:9 109:9,21
122:4 133:6

134:11,19 135:20
142:18 146:11
159:8,11 161:23
162:7
**year**   9:2 13:21
107:24 150:11
**years**   8:20,21
97:22,23 102:19
121:22 132:15
**yell**   142:13
**yelled**   142:10
160:5
**yep**   7:6 41:8
**youssef**   2:2

**z**

**zachary**   2:12
**zoom**   14:16

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

## VERITEXT LEGAL SOLUTIONS
## COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.