# LOEVY & LOEVY

2060 Broadway, Suite 460, Boulder, Colorado 80302

Elizabeth Wang
elizabethw@loevy.com
direct 720.328.5642

January 14, 2022

*Via CM/ECF*
The Honorable R. Brooke Jackson
Alfrad A. Arraj United States Courthouse A938/Courtroom A902
901 19th Street
Denver, CO 80294

      Re: *Elisabeth Epps v. City and County of Denver, et al.*, 20-CV-1878-RBJ (consolidated)

Dear Judge Jackson:

      Consistent with this Court's Practice Standards, Plaintiffs provide this response to the notice of intent to file for summary judgment filed by the Denver Defendants [Dkt. 237]. Plaintiffs allege that their constitutional rights under the First, Fourth, and Fourteenth Amendments were violated by the Denver Defendants. Genuine disputes of material fact preclude summary judgment for the Denver Defendants, and the individual "supervisory" defendants will not be entitled to qualified immunity. Defendants' assertions otherwise in their letter rely on ignoring disputed material facts.[1]

      As an initial matter, Defendants state that they are not moving for summary judgment "on any individual event where excessive force was allegedly used in violation of the Fourth Amendment for any Defendant who the evidence shows personally participated in the use of force." Dkt. 237 at 2. It is unclear what they are referring to. Every one of the individual defendants named by both the Epps and Fitouri Plaintiffs personally participated in using force, either by using force themselves or by directing their subordinate officers to use force on plaintiffs. For example (and these are merely highlights):

- Defendants Cunningham, Sampson, and Eberharter shot Plaintiff Youssef Amghar with pepperballs while Amghar was standing peacefully on a sidewalk.
- Defendant Valentine shot Plaintiff Epps in the face with pepperballs while she was exercising her First Amendment right to film the protest. Defendant Christian shot Plaintiff Epps with pepperballs while she was peacefully crossing a street.
- On numerous occasions, Defendant Phelan, the Incident Commander, ordered the teargassing of Plaintiffs. Lieutenants Canino, Porter, Pine, Williams, O'Donnell, and Carroll also ordered their subordinate officers to use of tear gas and/or other less-lethal weapons on Plaintiffs. Sergeants Beall and Martinez were also directly involved in using less-lethal weapons.
- Commander Phelan, Lieutenant Williams, and Sergeant Beall were involved in kettling (trapping) protestors and using less-lethal weapons on them (including Plaintiffs).

---

[1] With respect to Plaintiffs' claims against some of the individual Defendants and the *Monell* claim, Defendants state that Plaintiffs cannot meet the "legal requirements." It is unclear what they are referring to. The law in this case with respect to the central constitutional claims is clearly established.

WWW.LOEVY.COM        CHICAGO | BOULDER

- This evidence demonstrates that it was Denver's policy, practice, or custom to use less-lethal munitions against peaceful protesters. Furthermore, it establishes that there are, at the very least, genuinely disputed material facts as to the issues on which the Denver Defendants seek summary judgment.

### Facts relating to *Monell* claim against Defendant City and County of Denver

- There is *extensive* evidence that Denver's policies, practices, and widespread customs were the moving force behind the constitutional violations against Plaintiffs. Plaintiffs' experts, Norman Stamper and Edward Maguire, opine that Denver's policies and training were woefully deficient, outdated, and inconsistent with generally accepted police practices and standards. *See, e.g.*, Dkts. 172-2 (Stamper report); Dkt. 172-3 (Maguire report). Defendants' expert, Steve Ijames, did not even respond to Stamper's and Maguire's *Monell*-related opinions.

- Denver's policy at the time of the protests was that officers were not required to complete use of force reports after using less-lethal weapons at a protest. It was not until weeks later, after the *Abay* lawsuit was filed against Denver, that the DPD command staff at the highest levels ordered DPD commanders and administrative lieutenants to have their officers complete use of force reports documenting their use of less-lethal weapons. And even then, Denver's approach was to ensure that officers were not held accountable, not to ensure that officers who used excessive or unreasonable force were held accountable.

- Denver did not have a written policy that specifically governed the use of BWC during the protests. The evidence shows that many officers did not have their BWC activated during periods of the use of less-lethal force, including during incidents involving the Plaintiffs. And, the BWC policy did not apply to Metro/SWAT officers *at all*, because every deployment of a Metro/SWAT officer was "tactical" in nature and therefore did not require BWC activation, even though the Metro/SWAT officers were routinely using their less-lethal weapons on protestors during the protest. Even outside of Metro/SWAT, DPD lieutenants demonstrated confusion about whether their officers were required to activate their BWC during the protests. The fact that Denver's policy did not require its Metro/SWAT officers to wear or activate their BWCs during the protests and did not discipline any of them for failure to do so allowed officers to escape accountability and was a moving force behind the misconduct.

- As explained by Denver's own witnesses who testified under Rule 30(b)(6), DPD's written policies are merely "guides" that do not set any firm limits on officer discretion in their use of less-lethal weapons in a crowd control or crowd management situation. The written policies also do not provide any firm rules on when announcements, warnings, or dispersal orders are required.

- Denver failed to train its officers in the constitutional responses to peaceful demonstrations, despite the history of such violations in the past and the obvious need for such training. Denver also failed to adequately train its officers in the use of less-lethal weapons, including any training *whatsoever* on dangerous weapons such as Stinger and flashbang grenades. In addition, Denver failed to provide any training to the law enforcement officers from outside agencies who provided mutual aid. Instead, contrary to generally accepted police practices, Denver allowed officers providing mutual aid to follow their own policies in use of force and less-lethal weapons.

- Denver failed to adopt any policies at all on the use of Stinger or flashbang grenades, despite the serious and obvious risk of bodily injury and danger posed by them.

- Denver failed to discipline its officers. Despite receiving citizen complaints about officers' excessive use of force during protests in the past, Denver has not disciplined any officer for their behavior at prior protests in at least the last five years. And, few officers were disciplined as a result of complaints arising from these protests.
- Extensive video evidence shows that Denver officers regularly failed to give proper dispersal orders or other warnings prior to use of force. This was consistent with Denver's written policies, according to their own witnesses. And, it is contrary to best practices and is evidence of a widespread practice and custom that violates protesters' constitutional rights.
- After and during the protests, Denver sanctioned and ratified the misconduct of its officers by failing to discipline them for their excessive use of force, and also by the Mayor and Chief of Police's public praise of them on May 29, 2020 for their "great restraint," which caused the officers to continue using excessive force on subsequent days.
- To the extent Denver seeks to excuse its officers' misconduct by claiming the protests were difficult to manage, Denver's final policymakers received ample notice that officers were using their weapons against protesters to control and suppress demonstrations in the absence of any imminent threat to safety. Yet, it did nothing to hold officers accountable.
- Each of the above deficiencies led to the constitutional violations.

### Claims of the Curfew Arrest Class

- The curfew was a regulation of speech—Division Chief Ron Thomas testified that the purpose of the curfew was to remove protesters from the street. That is why (he explained), officers did not simply ticket people for violating curfew. Officers arrested protesters because Denver wanted people off the streets. Plaintiffs engaged in their speech on a matter of public concern in public places—the streets, sidewalks and parks of Denver. "Such space occupies a 'special position in terms of First Amendment protection.'" *Snyder v. Phelps*, 562 U.S. 443, 456 (2011) (quoting *United States v. Grace*, 461 U.S. 171, 180 (1983)). "[P]ublic streets" are "the archetype of a traditional public forum…time out of mind, public streets and sidewalks have been used for public assembly and debate." *Id.* (internal quotation marks and citations omitted).
- Denver enforced the curfew only against protesters. This was an express policy and an action by a final policymaker or his delegee. After meeting and conferring with Chief Pazen and other Division Chiefs on how the curfew would be enforced, Division Chief Thomas sent text messages directing his commander to "[m]ake sure your troops understand this is only to be used in relation to protest activity either downtown or elsewhere in the City." Dkt. 122-2 at 1; *see also id.* at 4 ("Please advise all your officers that this curfew ordinance is to be used only for enforcing protest-related behavior regardless of location in the city."). This direct and specific targeting of protesters violated both the First and Fourteenth Amendments. It will be subject to strict scrutiny under both, and it will not survive strict scrutiny. What level of scrutiny applies to the curfew and whether it survives strict scrutiny are legal questions for the Court to resolve; however, there are some factual issues that a jury must resolve.

In sum, there are numerous genuine disputes of material fact that preclude summary judgment for the Denver Defendants.

Sincerely,
s/ Elizabeth Wang                             s/ Michael Sebba
Counsel for Fitouri Plaintiffs                Counsel for Epps Plaintiffs