IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 20-cv-1878-RBJ

ELISABETH EPPS, *et al.,*

Plaintiffs,

v.

CITY AND COUNTY OF DENVER, *et al.,*

Defendants.

## PLAINTIFFS' MOTION TO LIMIT THE EXPERT OPINION TESTIMONY OF STEVE IJAMES

The Fitouri and Epps Plaintiffs, through their attorneys, respectfully move this Court for an order excluding certain testimony of Steve Ijames, the Denver Defendants' proffered police practices expert. In support thereof, Plaintiffs' state as follows:

### CERTIFICATE OF CONFERRAL

Pursuant to D.C. Colo. LCivR 7.1(a), undersigned counsel conferred with counsel for the Denver Defendants regarding the relief sought herein. Defendants oppose the motion.

### OPINIONS TO BE EXCLUDED

Plaintiffs were subjected to brutal and unnecessary force on numerous occasions by Denver Defendants and their mutual aid agencies during the protests in Denver last summer. Defendants disclosed a report from Steve Ijames that contained dozens of opinions based on different versions of assumed facts. Ex. 1 (Ijames Report). Generally, Ijames reviews each of the alleged incidents of excessive force and opines that the police use of chemical munitions/teargas/less-lethal weapons "**may or may not** have been consistent with consistent

1

with contemporary police training, policy, and practice." Ex. 1 at 52-54, 57-58, 60-61, 64-69, 71, 76-78 (emphasis added). Ijames's opinions about whether a particular use of force was or was not "consistent with contemporary police training, policy, and practice" depends on what facts are assumed. For instance, whether or not a plaintiff committed an act that warranted use of force, and whether other people standing near a plaintiff was engaged in an act that warranted use of force—even if that plaintiff wasn't doing anything that warranted any force at all.

The problem is that many of Ijames's opinions are based upon complete speculation because he assumed facts that don't exist in the record and cannot be established through any testimony or evidence at trial, thus making these opinions unreliable and not helpful to the jury. There is **no evidence whatsoever** that Plaintiffs were engaged in any acts that warranted any use of force on them at all. For example, Plaintiffs Fitouri and Deras will testify that they were protesting peacefully at the intersection of Lincoln and Colfax on May 30 when, without warning, a flashbang grenade or other explosive device was thrown at Fitouri's feet and exploded. This caused severe ringing in Deras's ears and injured both of them.

There is no officer or anyone else who is going to testify that Fitouri or Deras were doing *anything* that warranted throwing an explosive at their feet. The same is true of each of the incidents of excessive force alleged by Plaintiffs. That is, there is not a competing version of facts regarding any of Plaintiffs' conduct that will be presented at trial. This is not a case where plaintiffs give one version of events and defendant officers give a different version of events. In that (the usual) case, competing experts often assume the truth of one side's version or the other and then provide opinions based on those assumed facts. But this is not the usual case. Here, there is only one version of events: Plaintiffs'. No officers have provided any testimony whatsoever to contest Plaintiffs' testimony about what they were doing at the time they were

teargassed or shot with a projectile, and there are no videos or other evidence that contradict Plaintiffs. Ijames cannot provide opinions on a hypothetical set of facts that don't exist.

The following opinions of Ijames are inadmissible under Rule 702(a), (b), and (d):

1. **Fitouri, Parkins, Deras Allegation 1 (May 28th incident on bridge at I-25)**
   If it is assumed that the plaintiffs were participating in behavior that justified the no warning use of chemical munitions/area pepper ball by DPD policy and as described by Commander Phelan, then their exposure and related discomfort would have been the result of a force application that was consistent with contemporary police policy, training, and practice. Ex. 1 at 52.

2. **Fitouri, Parkins, Deras Allegation 2 (May 28th incident at 16th and Platte)**
   If it is assumed that the plaintiffs were participating in behavior that justified the no warning use of chemical munitions/area pepper ball by DPD policy and as described by Commander Phelan, then their exposure would have been the result of a force application that was consistent with contemporary police policy, training, and practice. *Id.* at 53.

3. **Fitouri and Parkins Allegation 3 (May 29th incident at Colfax and Broadway)**
   If it is assumed that the plaintiffs were participating in behavior that justified the no warning use of chemical munitions/area and direct fire pepper ball by DPD policy and as described by Commander Phelan, then their exposure would have been the result of a force application that was consistent with contemporary police policy, training, and practice. *Id.*

4. **Fitouri and Parkins Allegation 4 (May 29th incident at Colfax and Broadway (additional tear gas and flashbangs))**
   If it is assumed that the plaintiffs were participating in behavior that justified the use of chemical munitions/area and direct fire pepper ball by DPD policy and as described by Commander Phelan, then their exposure would have been the result of a force application that was consistent with contemporary police policy, training, and practice. *Id.* at 54.

5. **Fitouri and Parkins Allegation 5 (May 29th incident southeast of the Capitol and surrounding neighborhoods)**
   If it is assumed that the plaintiffs were participating in behavior that justified the use of chemical munitions/area and direct fire pepper ball by DPD policy and as described by Commander Phelan, then their exposure would have been the result of a force application that was consistent with contemporary police policy, training, and practice. *Id.* at 55.

6. **Fitouri and Deras Allegation 6 (May 30th flashbang incident at Lincoln and Colfax)**
    If it is assumed that the plaintiffs … were involved in activity that reasonably justified the use of an explosive device (NFDD or blast ball) to terminate or deter such activity, and the device was unintentionally deployed in a manner that resulted in physical contact with a person …, then that application of force would be the accidental and unintended consequence of an appropriate police activity. *Id.* at 56.

7. **Deras Allegation 7 (May 30th pepperball incident at Lincoln and Colfax)**
    If it is assumed that Deras was participating in behavior that justified the use of chemical munitions and direct fire pepper ball/impact rounds by DPD policy and as described by Commander Phelan, then his exposure would have been the result of force applications that were consistent with contemporary police policy, training, and practice. *Id.* at 57.

8. **Deras Allegation 8 (May 30th teargassing incident at Lincoln and Colfax)**
    If it is assumed that Deras was participating in behavior that justified the use of chemical munitions by DPD policy and as described by Commander Phelan, then his exposure would have been the result of a force application that was consistent with contemporary police policy, training, and practice. *Id*.

9. **Fitouri, Parkins, Deras Allegation 9 (May 30th alley incident)**
    If it is assumed that the plaintiffs were participating in behavior that justified the no warning use of chemical munitions and pepper balls by DPD policy and as described by Commander Phelan, then their exposure would have been the result of force applications that were consistent with contemporary police training, policy, and practice. *Id.* at 58.

10. **Sannier Allegation 1 (May 28th incident on pedestrian bridge over I-25)**
    If it is assumed that Ms. Sannier was acting in a manner consistent with defensive resistance or higher, then the use of OC spray would [sic] consistent with contemporary police training, policy, and practice. *Id.* at 61.

11. **Sannier Allegation 3 (May 30th incident at 16th and Welton)**
    If it is assumed that Ms. Sannier was participating in behavior that justified the no warning use of chemical munitions by DPD policy and as described by Commander Phelan, then her exposure and related discomfort would have been the result of a force application that was consistent with contemporary police policy, training, and practice. *Id.* at 64.

12. **Sannier Allegations 4 and 5 (May 30th incidents at Lincoln and Colfax)**
    If it is assumed that Ms. Sannier was participating in behavior that justified the no warning use of chemical munitions by DPD policy and as described by Commander Phelan, then her exposure and related discomfort would have been

4

the result of a force application that was consistent with contemporary police, policy, training, and practice. (Allegation 4). *Id.*

If it is assumed that Sannier was participating in behavior that justified the no warning use of chemical munitions by DPD policy and as described by Commander Phelan, her exposure and related discomfort would have been the result of a force application that was consistent with contemporary police policy, training, and practice. (Allegation 5). *Id.* at 65.

13. **Sannier Allegation 6 (May 31st Basilica kettling incident)**
    If it is assumed that Sannier was participating in behavior that justified the no warning use of chemical munitions by DPD policy and as described by Commander Phelan, then her exposure and related discomfort would have been the result of a force application that was consistent with contemporary police policy, training, and practice. *Id.* at 66-67.

14. **Sannier Allegation 7 (June 1st incident)**
    If it is assumed that Sannier was participating in behavior that justified the no warning use of chemical munitions/pepper spray by DPD policy and as described by Commander Phelan, then her exposure and related discomfort would have been the result of a force application that was consistent with contemporary police policy, training, and practice. *Id.* at 68.

15. **Taylor Allegation 1 (May 28th incident at 14th Ave and Sherman)**
    If it is assumed that Taylor was participating in behavior that justified the use of chemical munitions and area pepper ball by DPD policy and as described by Commander Phelan, then the exposure would have been the result of a force application that was consistent with contemporary police policy, training, and practice. *Id.* at 69.

16. **Taylor Allegation 2 (May 30th incident at 14th Ave in front of the Capitol)**
    If it is assumed that Taylor was participating in behavior that justified the use of chemical munitions/area and direct fire pepper ball by DPD policy and as described by Commander Phelan, then the exposure to chemical munitions and pepper ball would have been the result of force applications that were consistent with contemporary police policy, training, and practice. *Id.*

17. **De La Vaca (Duran) Allegation 1 (May 30th pepperball incident at Colfax and Lincoln)**
    If it is assumed that Mr. De La Vaca was participating in behavior that justified the use of a pepper ball without warning as described by Commander Phelan- regardless of apparent press status-then using the pepper ball against him would have been consistent with agency policy and training, and consistent with contemporary police training, policy, and practice. *Id.* at 76.

18. **De La Vaca (Duran) Allegation 2 (May 30th teargassing at Colfax and Lincoln)**
    If it is assumed that the plaintiff was participating in behavior that justified the use of chemical munitions by DPD policy and as described by Commander Phelan, then his exposure and related discomfort would have been the result of a force application that was consistent with contemporary police policy, training, and practice. *Id.*

19. **De La Vaca (Duran) Allegation 3 (May 31st 40mm shooting incident at Colfax and Pearl)**
    If it is assumed that the plaintiff was participating in behavior that justified the use of an impact round, then that use would have been consistent with contemporary police training, policy, and practice.

    If it assumed that the appropriate justification existed to use an impact round, and the round was properly deployed (appropriate round selection, distance, point of aim) but accidently struck the plaintiff in the groin, then striking that area was not force intentionally applied, but the accidental and unintended consequence of a force application that was consistent with contemporary police policy, training, and practice. *Id.* at 78.

20. **Epps Allegation 1 (May 28th teargassing incident at Capitol Building)**
    If it is assumed that Ms. Epps was participating in behavior that justified the no warning use of chemical munitions by DPD policy, and as described by Commander Phelan, then her exposure and related discomfort would have been the result of a force application that was consistent with contemporary police training, policy, and practice. *Id*. at 8.

21. **Epps Allegation 2 (May 28th pepperball incident near State Capitol Building)**
    If it is assumed that Ms. Epps was participating in behavior …. that justified the use of a pepper ball as described by Commander Phelan, then the two rounds that reportedly struck her in the back would be consistent with agency policy and training, and consistent with contemporary police standards, training and policy. *Id*. at 13.

22. **Epps Allegation 3 (May 29th pepperball incident at 14th)**
    If it is assumed that Ms. Epps was in violation of Sec. 38-86 (Obstruction of streets or other public passageways), then the use of a pepper ball to compel her to stop obstructing traffic and or immediately get out of the trafficway would have been consistent with the letter of DPD force policy and training. *Id.* at 22.

    If it is assumed that Ms. Epps was in violation of Sec. 38-86 (Obstruction of streets or other public passageways), then the use of a pepper ball that was NOT directed at her (close-area fired) to compel her to stop obstructing traffic would have been consistent with the letter of DPD force policy and training. *Id.*

23. **Epps Allegation 4 (May 29th rubber bullet incident)**
    If it is assumed that Ms. Epps was participating in behavior …. that justified the use of a pepper ball round (which based on the wound signature appears most likely to be the round involved), then the deployment that reportedly struck her in the legs and back would be consistent with contemporary police policy, training, and practice. *Id*. at 25.

24. **Epps Allegation 5 (May 29th cell phone projectile incident)**
    If it is assumed that Ms. Epps was participating in behavior …. that justified the use of a pepper ball or other impact round, and then rounds were fired in response to adequate cause and basis that accidently struck her cell phone, then that damage would be the accidental and unintended consequence of a force application that was consistent with contemporary police training, policy and practice. *Id*. at 26.

25. **Epps Allegation 6 (May 29th tear gassing incident)**
    If it is assumed that Ms. Epps was participating in behavior that justified the no warning use of chemical munitions by DPD policy and as described by Commander Phelan, her exposure and related discomfort would have been the result of a force application that was consistent with contemporary police training, policy, and practice. *Id*. at 27.

26. **Epps Allegation 7 (May 30th pepperball incident at Lincoln and Colfax)**
    If it is assumed that Officer Valentine fired the pepper ball round(s) that hit Ms. Epps, and that he was engaging a viable target that was in close proximity or had non-targets behind, and that he took adequate precautions to prevent an accidental contact with a non-suspect as referenced above-yet still accidently hit Ms. Epps- then his pepper ball deployment would have been appropriate and consistent with contemporary police standards, training, policy, and practice. *Id*. at 30.

27. **Epps Allegation 8 (May 30th tear gassing incident near Capitol Building)**
    If it is assumed that Ms. Epps was participating in behavior that justified the no warning use of chemical munitions by DPD policy and as described by Commander Phelan, her exposure and related discomfort would have been the result of a force application that was appropriate and consistent with contemporary police standards, training, policy, and practice. *Id*. at 31.

28. **Wedgeworth Allegation 1 (May 29th pepperball incident near Capitol Building)**
    If it is assumed that Ms. Wedgeworth's friend was participating in behavior consistent with the information provided above, and that justified the use of pepper ball rounds as described by Commander Phelan, then the rounds that reportedly struck her friend would be consistent with agency policy and training, and an appropriate application of force. The secondary OC/PAVA exposure that was reported by Ms. Wedgeworth was not force intentionally applied to or

directed at her, but the accidental and unintended consequence of appropriate police activity. *Id*. at 32.

29. **Wedgeworth Allegation 2 (May 31st tear gassing incident near Capitol Building)**
    If it is assumed that Ms. Wedgeworth was participating in behavior that justified the no warning use of chemical munitions by DPD policy and as described by Commander Phelan, then her exposure and related discomfort would have been the result of a force application that was consistent with contemporary police training, policy, and practice. *Id*. at 33.

30. **Wedgeworth Allegation 3 (June 1st tear gassing incident at Capitol Building)**
    If it is assumed that Ms. Wedgeworth was participating in behavior that justified the no warning use of chemical munitions by DPD policy and as described by Commander Phelan, her exposure and related discomfort would have been the result of a force application that was consistent with contemporary police training, policy, and practice. *Id*. at 34.

31. **Wedgeworth Allegation 4 (June 2nd tear gassing incident)**
    If it is assumed that Ms. Wedgeworth was participating in behavior that justified the use of chemical munitions and pepper balls by DPD policy and as described by Commander Phelan, her exposure and related discomfort would have been the result of a force application that was consistent with contemporary police training, policy, and practice. *Id*. at 35.

32. **Blasingame and Rothlein Allegation 1 (May 28th tear gassing incident at 14th and Sherman)**
    If it is assumed that Blasingame and Rothlein were participating in behavior that justified the use of chemical munitions by DPD policy and as described by Commander Phelan, then their use would have been generally consistent with contemporary police training, policy, and practice. *Id*. at 36.

33. **Blasingame Allegation 2 (May 30th tear gassing and pepperball incident at Capitol Building)**
    If it is assumed that Blasingame and Rothlein were participating in behavior that justified the no warning use of chemical munitions and or pepper balls by DPD policy and as described by Commander Phelan, then their use would have been generally consistent with contemporary police training, policy, and practice. *Id*. at 37.

34. **Blasingame and Rothlein Allegation 3 (May 30th incident in front yard)**
    If it is assumed that a person(s) within that group of citizens had participated in behavior that justified being contacted by an officer, then that contact-including a warning and or perception by the citizens that pepper spray might be used-may have been consistent with contemporary police training, policy, and practice, depending on the totality of circumstances presented. *Id*. at 39.

35. **Blasingame and Rothlein Allegation 4 (May 30th drive-by pepperball incident)**
    If it is assumed that a person(s) within that group of citizens had participated in behavior that justified the use of pepper balls by DPD policy and as described by Commander Phelan, then that use may have been consistent with contemporary police training, policy, and practice-depending on the totality of circumstances presented. *Id*. at 40.

36. **Packard Allegation 1 (May 31st projectile incident at Colfax and Washington)**
    If it is assumed that Mr. Packard was kicking a tear gas cannister back towards the police officers or other persons, then the proper (appropriate round selection, distance, point of aim, proximity to other persons) use of an impact projectile to stop and or deter him from doing so would be consistent with contemporary police training, policy, and practice. *Id*. at 44.

    If it is assumed that Mr. Packard was kicking a tear gas cannister back towards the police officers or other persons, and the officer properly deployed an impact round (appropriate round selection, distance, point of aim, proximity to other persons) but accidently struck Mr. Packard in the head, then that specific application of force (to the head-a vital body part) was not intentionally applied, but the accidental and unintended consequence of a force application that was consistent with contemporary police policy, training, and practice. *Id*.

37. **Lyman Allegation 1 (May 28th tear gassing incident near Capitol Building)**
    If it is assumed that Ms. Lyman was participating in behavior that justified the no warning use of chemical munitions by DPD policy and as described by Commander Phelan, then her exposure and related discomfort would have been the result of a force application that was consistent with contemporary police policy, training, and practice. *Id*. at 45.

38. **Lyman Allegation 2 (May 29th tear gassing and pepperball incident near Capitol Building)**
    If it is assumed that Ms. Lyman was participating in behavior that justified the no warning use of chemical munitions by DPD policy and as described by Commander Phelan, then her exposure and related discomfort would have been the result a force application that was consistent with contemporary police policy, training, and practice. *Id*. at 46.

    If it is assumed that Ms. Lyman was participating in behavior that justified the use of pepper balls as described by Commander Phelan, then the use against her and her shield would be consistent with contemporary police training, policy, and practice. *Id*.

39. **Lyman Allegation 3 (May 30th grenade incident)**
    If it is assumed that Ms. Lyman and her friend, or others in close proximity, were involved in activity that reasonably justified the use of an explosive device

(NFDD or blast ball) to terminate or deter such activity, and the device was unintentionally deployed in a manner that resulted in physical contact with a person (Ms. Lyman and or her friend), then that application of force would be the accidental and unintended consequence of an appropriate police activity. *Id*. at 48.

40. **Lyman Allegation 4 (May 30th pepperball incident at Capitol Building)**
If it is assumed that Ms. Lyman was participating in behavior that justified the use of a pepper ball as described by Commander Phelan, then the rounds that reportedly struck her in the back would generally be consistent with agency policy, training, and practice. *Id*. at 49.

41. **Smith Allegation 1 (May 30th tear gassing incident at Capitol Building)**
If it is assumed that Mr. Smith was participating in behavior that justified the no warning use of chemical munitions by DPD policy and as described by Commander Phelan, then his exposure and related discomfort would have been the result of a force application that was consistent with contemporary police policy, training, and practice. *Id*.

42. **Smith Allegation 2 (May 30th pepper spray incident at Capitol Building)**
If it is assumed that Mr. Smith was acting in a manner that justified the use of pepper spray, then the use [would] be consistent with contemporary police training, policy, and practice. *Id*. at 51.

All of the above opinions assume that plaintiffs were committing some act that justified the use of force, but there is no factual basis for this assumption. The only evidence in the record—and that could be presented at trial—is that plaintiffs were *not* participating in any behavior that justified the use of chemical munitions or any impact munitions (such as pepper ball or 40mm launchers), with or without warning, in any of the above-referenced incidents. Thus, Ijames's testimony would not be based on sufficient facts or data, as required by Rule 702(b). Nor has he reliably applied his principles and methods to the facts of the case, as required by Rule 702(d). Moreover, if these opinions were allowed, they would surely mislead and confuse the jury. *See* Fed. R. Evid. 403. Accordingly, these opinions should be excluded.

10

# ARGUMENT

Expert testimony is only admissible if it helps the jury "understand the evidence or … determine a fact in issue," "is based on sufficient facts or data," "is the product of reliable principles and methods," and "the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702. Defendants, as the proponents of Ijames's testimony, bear the burden of proving its admissibility for each component of Rule 702. *Bourjaily v. U.S.*, 483 U.S. 171, 175 (1987); *U.S. v. Nacchio*, 555 F. 3d 1234, 1241 (10th Cir. 2009). "The trial court plays a 'gatekeeping' role, but it has discretion as to how to perform that role." *Davies v. City of Lakewood*, 2016 WL 614434, at *1 (D. Colo. Feb. 16, 2016) (Jackson, J.) (citing *Goebel v. Denver and Rio Grande Western R.R. Co.*, 215 F.3d 1083, 1087 (10th Cir. 2000)). Under Rule 702, the trial court "ensures that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993).

Even if an expert is deemed qualified on a certain subject matter, he is still prohibited from expressing opinions based on speculation, subjective belief, or facts not supported by, or inconsistent with, the evidence. *See Mitchell v. Gencorp, Inc.*, 165 F.3d 778, 781 (10th Cir. 1999) (finding a party must show that the "method employed by the expert in reaching the conclusion is scientifically sound and that the opinion is based on facts which sufficiently satisfy Rule 702's reliability requirements"); *Conroy v. Vilsack*, 707 F.3d 1163, 1170 (10th Cir. 2013) (affirming district court's decision to exclude expert testimony because he failed to show his testimony reliably applied the facts of the case).

Courts generally allow police practices experts "to state an opinion on whether the conduct at issue fell below accepted standards in the field of law enforcement," *Zuchel v. City & Cnty. of Denver*, 997 F.2d 730, 742 (10th Cir. 1993), as "a jury of lay persons might be assisted

11

by the testimony of a person who has specialized knowledge in the area of police procedures in deciding from the perspective of a reasonable officer whether there was excessive force." *Estate of Smart v. City of Wichita*, 2020 WL 3618850, at *5 (D. Kan. July 2, 2020) (internal quotations and citation omitted). But opinions must be based on the facts and the evidence. *Mitchell*, 165 F.3d at 781 ("Under *Daubert*, the proposed expert testimony must be supported … based on what is known."). Because Ijames proffered the above-listed opinions by assuming facts that no witness will testify to, these opinions must be excluded under Rule 702. They are also inadmissible under Rule 403 because any probative value is substantially outweighed by a danger of confusing the issues, misleading the jury, or wasting time.

To be clear, some of Ijames's opinions are based on facts that a jury might find a trial; Plaintiffs do not seek to exclude those. For example, with respect to several incidents of use of force, Ijames opines that if Plaintiffs did not commit acts that justified use of less-lethal weapons, but other people in the vicinity were committing such acts, then the use of force that affected Plaintiffs were merely "the accidental/unintended consequence of a force application that was consistent with contemporary police training, policy, and practice." Ex. 1 at 57; *see also id.* at 52-56, 59-60, 64-65-70, 76, 78. Whether other people in the vicinity of Plaintiffs were committing acts that would justify the "accidental/unintended" use of force on Plaintiffs is a question of fact.[1] There is at least some evidence for some of the incidents that such an opinion by Ijames could be based on facts that a jury could find to be true.

---

[1] It will be up to the jury to decide whether to believe Defendants' story that dozens of incidents of use of force on multiple plaintiffs over the course of multiple days were all simply regretful accidents instead of a concerted effort to suppress First Amendment-protected activity. This story only advances Plaintiff's *Monell* claim against the Defendant City for failure to train.

However, the same cannot be said for Ijames's opinions that assume that Plaintiffs themselves (and not others nearby) engaged in any behavior that justified the use of force against them in the above-mentioned incidents. A review of the list of materials that Ijames reviewed to come to his opinions only confirms this, because there is nothing in any of the materials reviewed that could possibly provide any factual foundation (any facts or data) upon which Ijames may base his opinions. *See* Ex. 2 (Attachment A to Ijames's report). An expert witness may assume one party's version of events and evaluate what flows from it, and experts do so routinely. *See Williams v. Illinois*, 567 U.S. 50, 57 (2012) ("Under settled evidence law, an expert may express an opinion that is based on facts that the expert assumes, but does not know, to be true.") But this is not what Ijames did with the opinions listed above, because there is no competing version of facts to Plaintiffs'. As a result, any opinions based on speculation or hypothetical facts are inadmissible under *Daubert*. *See Daubert*, 509 U.S. at 590 (expert's testimony that is nothing more than an expert's "subjective belief" is inadmissible); Fed. R. Evid. 702(b), (d). These opinions are also inadmissible under Rules 402 and 403.

As the proponents of Ijames's testimony, Defendants have the burden of proving that his opinions are admissible under Rule 702 and *Daubert*. They have not met that burden.

## CONCLUSION

Plaintiffs respectfully request an Order excluding Steve Ijames's testimony that has no basis in fact, including his opinions based on the speculation that Plaintiffs participated in any behavior that justified the use of force in any of the above-referenced incidents.

RESPECTFULLY SUBMITTED,

/s/ Makeba Rutahindurwa
*One of Plaintiffs' Attorneys*

13

| | |
|---|---|
| Elizabeth Wang | Makeba Rutahindurwa |
| LOEVY & LOEVY | LOEVY & LOEVY |
| 2060 Broadway, Suite 460 | 311 N. Aberdeen St. |
| Boulder, CO 80302 | Chicago, IL 60607 |
| O: 720.328.5642 | O: 312.243.5900 |
| elizabethw@loevy.com | makeba@loevy.com |
| *Counsel for Fitouri Plaintiffs* | |

s/ Timothy R. Mcdonald
*Counsel for Epps Plaintiffs*

Patrick C. Reidy
ARNOLD & PORTER KAYE SCHOLER LLP
70 West Madison Street
Suite 4200
Chicago, IL 60602
Telephone: (312) 583-2300
Patrick.Reidy@arnoldporter.com


Timothy R. Macdonald
Matthew J. Douglas
Ed Aro
R. Reeves Anderson
Colin M. O'Brien
Kathleen K. Custer
ARNOLD & PORTER KAYE SCHOLER LLP
1144 Fifteenth Street, Ste. 3100
Denver, Colorado 80202
Telephone: (303) 863-1000
Timothy.Macdonald@arnoldporter.com
Matthew.Douglas@arnoldporter.com
Ed.Aro@arnoldporter.com
Reeves.Anderson@arnoldporter.com
Colin.Obrien@arnoldporter.com
Katie.Custer@arnoldporter.com


Michael J. Sebba*
ARNOLD & PORTER KAYE SCHOLER LLP
777 South Figueroa Street, 44th Floor
Los Angeles, CA  90017
Telephone: (213) 243-4000
Michael.Sebba@arnoldporter.com

      *Admitted only in New York; not admitted to the practice of law in California.

In cooperation with the American Civil
Liberties Union Foundation of Colorado

Mark Silverstein
Sara Neel
Arielle Herzberg
American Civil Liberties Union Foundation of Colorado
303 E. Seventeenth Ave., Suite 350
Denver, Colorado 80203
Telephone: (303) 777-5482
Msilverstein@aclu-co.org
Sneel@aclu-co.org
Aherzberg@aclu-co.org
*Counsel for Epps Plaintiffs*

## Certificate of Service

I, Makeba Rutahindurwa, an attorney, hereby certify that on January 19, 2022, I served the foregoing Motion on all counsel of record via CM/ECF.

        /s/ Makeba Rutahindurwa
        One of Plaintiffs' Attorneys