Exhibit 1

11-22-21

Denver City Attorney's Office
Hall and Evans, LLC

     RE:   1.  Civil Action No. 1:20-CV-1922-RBJ-MEH (consolidated with lead case *Epps, et al. v. City and County of Denver, et al.*, 1:20-CV-1878-RBJ), involving the following plaintiffs:

ELISABETH EPPS
ASHLEE WEDGEWORTH
AMANDA BLASINGAME
MAYA ROTHLEIN
ZACH PACKARD
HOLLIS LYMAN
CIDNEY FISK
STANFORD SMITH

2. Civil Action Nos. 1:20-cv-01878-RBJ (consolidated with *Fitouri, et al. v. City and County of Denver, Colorado, et al.*, 1:20-cv-1922-RBJ-MEH), involving the following plaintiffs:

SARA FITOURI
JACQUELYN PARKINS
YOUSSEF AMGHAR
CLAIRE SANNIER
KELSEY TAYLOR
JOE DERAS
JOHNATHEN DURAN

     Please accept the attached report, which contains my expert opinions in the above referenced cases.

Steve Ijames

1

Expert Report and Opinions

My name is Steve Ijames. I have been retained by the Denver City Attorney's Office and Hall and Evans, LLC, to review the material provided and offer objective opinions concerning the police practices involved, in consideration of the issues raised in the following civil actions:

1. Civil Action No. 1:20-CV-1922-RBJ-MEH (consolidated with lead case *Epps, et al. v. City and County of Denver, et al.*, 1:20-CV-1878-RBJ), involving the following plaintiffs:

ELISABETH EPPS
ASHLEE WEDGEWORTH
AMANDA BLASINGAME
MAYA ROTHLEIN
ZACH PACKARD
HOLLIS LYMAN
CIDNEY FISK
STANFORD SMITH

2. Civil Action No. 1:20-cv-01878-RBJ (consolidated with *Fitouri, et al. v. City and County of Denver, Colorado, et al.*, 1:20-cv-1922-RBJ-MEH), involving the following plaintiffs:

SARA FITOURI
JACQUELYN PARKINS
YOUSSEF AMGHAR
CLAIRE SANNIER
KELSEY TAYLOR
JOE DERAS
JOHNATHEN DURAN

**General case considerations:**

Interactions between police officers and citizens often result in conflicting opinions, statements, and or testimony concerning what occurred. In these situations, the trier of fact must determine the weight and credibility of the persons and information, as that is beyond the role of a police practices expert. Likewise, for an expert to offer opinions concerning the police practices involved, certain assumptions must be made concerning the conflicting information.

Contemporary is defined as "marked by characteristics of the present period, modern, current".[1] In professional police practice there are various organizations, including the International Association of Chiefs of Police (IACP) and the Police Executive Research Forum (PERF), that create model policy/guidelines for police agencies that are recognized and generally accepted as reflective of "contemporary" and best police practices. There are also thousands of police agencies nationwide that collectively contribute to the policing process and assist in shaping the practices that are reflective of those "marked by

---

[1] https://www.merriam-webster.com/dictionary/contemporary

characteristics of the present period, modern, current". This is likewise not to suggest that police agencies are bound by the "model policies" of national organizations, or the practices of other agencies. Managing public order is one area of policing where significant differences in process and problem solving are often observed.  The IACP acknowledges this in their Crowd Management Concepts and Issues paper:

"Understandably, crowd control and management policy, procedure, and tactics vary somewhat between jurisdictions. Tactics that must be used to protect vital assets, the ability to conduct essential business, and the free movement of critical personnel and equipment in one location will sometimes differ from practices used in other jurisdictions that are not similarly affected. The nature of crowd management and control also varies somewhat by the cultural differences between jurisdictions. It is not within the scope of this document to identify the many differences associated with managing and controlling all possible events. Rather, this document is intended to identify some of the common principles of crowd policing that have been shown to serve the best interest of law enforcement agencies, their communities, and those who participate in peaceful crowds or potentially volatile protests."[2]

I have formulated my opinions in this report by reviewing the material provided, making and referencing assumptions when necessary, considering my understanding of contemporary police training, policy, and practices, and then drawing upon the totality of my knowledge, training, and 43-year police experience.

Upon this review and consideration, I offer the following opinions and information/basis concerning the plaintiffs named in Civil Action No. 1:20-CV-1922-RBJ-MEH, Civil Action No. 1:20-cv-01878-RBJ, and the allegations made that involved them personally.

---

[2]IACP Crowd Management Concepts and Issues Paper, page 2

**Plaintiff Elisabeth Epps**

**Epps allegation 1**-Ms. Epps alleges being exposed to tear gas without warning or given a dispersal order, resulting in her experiencing extreme eye pain.

- On May 28, 2020, at approximately 9 PM, while at the State Capital Building, officers deployed tear gas "towards the crowd" without warning or order to disperse. This resulted in her experiencing extreme eye pain.[3]

### Considerations in response to Epps allegation 1:

The International Association of Chiefs of Police (IACP) was founded in 1893 and is the largest and most respected police organization in the world-representing thousands Police partnered with the Department of Justice and created the National Law Enforcement Policy Center (NLEPC). The NLEPC is made up of a diverse law enforcement advisory board and IACP staff, and with the input of leading subject matter experts they create model law enforcement policies and related documents that are reflective of contemporary and best police practices. The IACP NLEPC has a model policy on Crowd Management, and it was referenced as "best practices literature from a law enforcement leader" by the Denver Office of the Independent Monitor.[4] The IACP model addresses chemical agent CS as follows:

> CS (2-chlorobenzalmalononitrile) chemical agents are primarily offensive weapons that shall be used with the utmost caution. CS may be deployed defensively to prevent injury when lesser force options are either not available or would likely be ineffective. Such munitions shall be deployed at the direction of the IC and only when avenues of egress are available to the crowd. When reasonably possible, their use shall be announced to the crowd in advance.[5]

The Denver Police Department use of force policy addresses "chemical agents and munitions" as follows:

b. Chemical Agents and Munitions:

1. The minimum type of resistance for application of a chemical agent or munition is Defensive Resistance. Deployment of any chemical agent or munition requires that the officer be an authorized user for that item. Chemical agents and munitions may provide an effective force option and may be used in the following situations:
   - To quell rioting/disperse unlawful crowds.

2. The use of a chemical agent or munition for crowd/riot control will be in accordance with the DPD Crowd Management Manual.[6]

---

[3] Civil Action No. 1:20-CV-1922-RBJ-MEH (consolidated with lead case *Epps, et al. v. City and County of Denver, et al.*, 1:20-CV-1878-RBJ), paragraph 93

[4] Officer of the Independent Monitor, Police Response to the George Floyd Protests report, page 18

[5] IACP crowd management model policy, page 6, section "h"

[6] DPD Use of Force Policy, 105.1, page 11

The Denver Police Department Crowd Management Manual makes the following reference to chemical agent:

> The use of a chemical agent for crowd control or riot control must be authorized by the Division or Unit Supervisor. Chemical agents will not be used prior to issuing an order to disperse in a sufficient manner to ensure the order is heard, and repeated, if necessary, followed by sufficient time and space to allow compliance with the order. Chemical agent use in crowd control situations may be appropriate in the following circumstances:
>
> - To prevent an injury to an officer or a third person.
> - To subdue a person who is threatening or attempting physical harm to himself or another.
> - Against subjects resisting arrest.
> - To quell rioting.
> - Against subjects interfering with an arrest.
> - Any situation where the officer can clearly articulate the need for deployment.[7]

| Types of Behavior (Individual or Crowd) | Behavior Defined | Strategy | Level of Force or Tactic | Who Authorizes Use? | Does behavior support criminal charge of resisting arrest? | Application (individual or group) |
|---|---|---|---|---|---|---|
| Riot/Mob | • Intense excitement or agitation<br>• Loss of sense of reason and respect for law (mob mentality)<br>• Follow leaders in lawless acts<br>• Attempts to subdue individuals will likely be ineffective<br>• Attempts to subdue individuals will likely be unsafe | Address unlawful behavior of the<br><br>Permanently disperse the crowd<br><br>Regain control and order | Crowd Dispersal<br>Field Force Tactics<br>Less-Lethal Munitions<br>Force Utilized by Organized Squad<br>Chemical Agent (OC Based)<br>Riot Control Agents (CS Gas**) | Incident Commander<br><br>*In Emergency Circumstances only: Division or Unit Supervisor, Squad Leader or Affected Officer* | No<br><br>(Other more serious charges may apply) | Against a Group |

*OC Chemical Agent: Oleoresin Capsicum (O.C.) based chemical munitions such as personal issue OC, Mark 9, Mark 46 Foggers and OC Blast Ball

**CS Gas: Chemical irritant in pyrotechnic grenades used primarily by grenadiers when authorized by the Incident Commander. CS gas leaves a powdery residue.

Per DPD O.M.S. 105.02 (6)c5c: Authorization for use of a chemical agent, other than personal/individual issue, may not ordinarily be given by an officer below the rank of sergeant. The use of a chemical agent for crowd control or riot control must ordinarily be authorized by an officer of the rank of lieutenant or higher, except in the event of an emergency where the officer in charge of a field situation cannot reasonably contact higher authority.

[8]

Commander Patrick Phelan was the Denver Police Department Incident Commander during the protests, and he gave deposition testimony concerning the use of "tear gas" by DPD officers.

Q· · Okay. There were occasions during the protests when you determined that it was -- that officer in the field should deploy tear gas, correct?
A· · It could be. Could be.
Q· · You recall that you did authorize the use of tear gas during the protests, right?[9]

---

[7] DPD crowd control manual, page 23
[8] Ibid page 18
[9] Phelan deposition page 34, lines 30-35

A· · Authorized -- even at the briefing, I authorized the use of chemical agent, yes.

Q· · And you determined -- as the incident commander, you determined, based on the information that you were getting from your officers in the field, you determined how and when tear gas would be used, right?

A· · No.· I delegated it to each command, area command. If the need be for use of chemical agent, they were allowed to use chemical agent based on circumstances they were confronting.

Q· · You had the authority to delegate to your area commanders when and how to use tear gas; is that right?

A· · Yes.

Q· · Okay. And you delegated that authority to your area commanders?

A· · I -- I had authority, and they also had authority, if need be, based on the circumstances they confronted.

Q· · CS canisters were used, when ordered by a command officer, during the protests, right?

 A· · CS was used, yes.

Q· · The use of CS canisters had to be authorized by a command officer, correct?

A· · Or designee, depending on the emergency situation. If they were under attack, if they're in a[10] situation, they could be deployed by a unit supervisor if it's a safety issue.[11]

The Denver Police Department created a "chemical agent timeline" that provided some information concerning the date, time, location, officer, munition type, dispersal order, supervisor/commander, officer injury, and arrest made during incidents in which a chemical agent was reportedly used.[12] The document has several references to the use of "chemical agents" on 5-28-20 in the area near the State Capital Building, after 2000. Ms. Epps alleged that on that date and location at approximately 9 PM, officers deployed tear gas "towards the crowd" without warning or order to disperse.[13]

| | | | | | | |
|---|---|---|---|---|---|---|
| 2020-05-28 | 2000 hrs. | 14th - Logan | Niccum 17051 | | PB | Noted |
| 2020-05-28 | | Colfax - Lincoln | Niccum 17051 | | PB | |
| 2020-05-28 | | Colfax - Lincoln | Hayes 18055 | | PB | |
| 2020-05-28 | | 12th - Broadway | Hayes 18055 | | PB | |
| 2020-05-28 | | Colfax - Sherman | Hayes 17060 | | PB | |
| 2020-05-28 | | Colfax - Broadway | Hayes 17060 | | PB | Noted (By Ofc) |
| 2020-05-28 | | Colfax - Broadway | Vaporis 16003 | | OC Spray | |
| 2020-05-28 | | 1400 Blk Broadway | Vaporis 16003 | | 40 | |
| 2020-05-28 | · | Colfax - Washington | Beasley 13066 | | PB | |
| 2020-05-28 | | 1300 Blk Broadway | Beasley 13066 | | PB | |
| 2020-05-28 | | 1300 Blk Broadway | Beasley 13066 | | OC Spray | |

[14]

I have not reviewed any additional information concerning the totality of circumstances presented during each of the chemical agent deployments referenced above. Accordingly,

---

[10] Ibid 35, 1-25

[11] Ibid 36 line 1

[12] DEN 2763-2776 Chemical Agent Timeline - George Floyd Protest

[13] Civil Action No. 1:20-CV-1922-RBJ-MEH (consolidated with lead case *Epps, et al. v. City and County of Denver, et al.*, 1:20-CV-1878-RBJ), paragraph 93

[14] DEN 2763-2776 Chemical Agent Timeline - George Floyd Protest (1), page 1

there is no objective information that indicates which of these reported deployments-if any-reflects the specific chemical agent exposure alleged by Ms. Epps.

The IACP model policy says that warnings should be given "when reasonably possible" prior to the deployment of tear gas" (CS) chemical agents:

Such munitions shall be deployed at the direction of the IC and only when avenues of egress are available to the crowd. When reasonably possible, their use shall be announced to the crowd in advance.[15]

The DPD Crowd Management Manual references dispersal orders/warnings prior to the deployment of tear gas (CS) chemical agents:

A general dispersal order will only be given under the following circumstances:

1. A "significant number or percentage" of participants fail to adhere to time, place and manner restrictions and voluntary compliance, targeted citation and/or targeted arrest actions have not resulted or are not "reasonably likely" to result in "substantial compliance"; or

2. A "significant number or percentage" of participants are engaging in, or are about to engage in, tumultuous and violent conduct which creates grave danger of damage or injury to property or person or substantially obstructs the performance of any governmental function.[16]

Commander Phelan provided deposition testimony concerning the use of warnings/dispersal orders prior to the deployment of tear gas against a crowd.

Q· · Do you agree or not that before officers use tear gas on protesters, they need to be -- the protesters need to be given a dispersal order or a warning?
A· · It all depends on the situation, the time and situation.
Q· · Okay. What documentation have you seen of dispersal orders that were given by Denver police officers during the protests last summer?
A· · What documentation? I've heard them giving orders over the radio.
Q· · Have you seen any documentation of any dispersal orders that were given by Denver police officers before the use of chemical weapons on protesters?
A· · I just heard it over the radio, that they were going to give announcements and then deploy chemical agent.
Q· · Okay. And so you have not seen any written documentation; is that correct?
A· · I haven't been able to review all of the use of force records, so I don't know if there is -- I[17] haven't seen documentation.[18]

---

[15] IACP crowd management model policy, page 6, section "h"
[16] DPD Crowd Management Manual, page 8
[17] Phelan deposition page 71, lines 4-23
[18] Ibid 72 line 1

If you have a situation where officers are under attack, there -- there's no need. It wouldn't be prudent to give announcements. We have to make sure that that behavior stops. Their behavior dictates our response. That's what the bottom line is. Their behavior -- if there's a peaceful protest, it's a peaceful protest. Their behavior dictates police response.[19]

Q· · What do you mean by "under attack"?
A· · People throwing -- throwing things at officers.[20]

Q· · How long before DPD deploys tear gas is it necessary to issue warnings?
A· · Well, it's not always necessary to issue warnings, but we -- in a perfect world, where people are stationary, not assaulting the police, we usually give them five minutes. We'll make announcements, three announcements, within five minutes, and give them an area, which way to exit, and give announcements. If they don't, then we could deploy chemical agent.[21]

**Opinion in response to Epps allegation 1:**
　　If it is assumed that Ms. Epps allegation accurately characterizes what occurred, then the police use of chemical munitions without warning or dispersal order-resulting in her experiencing extreme eye pain-may or may not have been an appropriate application of chemical agent force.

- If it is assumed that Ms. Epps was participating in behavior that justified the no warning use of chemical munitions by DPD policy, and as described by Commander Phelan, then her exposure and related discomfort would have been the result of a force application that was consistent with contemporary police training, policy, and practice.
- If it is assumed that Ms. Epps was participating in behavior that justified the use of chemical munitions by DPD policy and as described by Commander Phelan, and that the totality of circumstances would have allowed the issuance of warnings as outlined in DPD policy, then warnings should have been given before chemical munitions were used.
- If it is assumed that Ms. Epps was NOT participating in behavior that justified the no warning use of chemical agents, but others in the immediate area were, then her exposure would have been the regretful and accidental/unintended consequence of a force application that was consistent with contemporary police training, policy, and practice.
- If it is assumed that Ms. Epps and others were NOT participating in behavior that justified the use of chemical munitions, then the force application was inconsistent with contemporary police training, policy, and practice.

---

[19] Ibid 72, 18-25
[20] Ibid 73, 1-3
[21] Ibid 162, 1-9



CS chemical munitions are very prone to secondary contamination (exposure outside of the immediate intended area)-which can be beneficial or problematic-depending on the totality of circumstances presented. The photograph above shows the primary area of contamination (CS device) at ground level depicted by the yellow arrow. The white arrow shows the area of "secondary contamination", which is a considerable distance from where the CS device was deployed.

**Basis for my opinions in response to Epps allegation 1:**

The police use of chemical munitions in public disorder is generally recognized as an appropriate tool for de-escalating potential violence and the destruction of property. It likewise has the potential to contaminate large areas and expose persons that are not involved in the criminal behavior that justified the use-including persons physically close to the suspects, and in some cases those out of the immediate area. Accordingly, contemporary police training, policy, and practice involves using tear gas "with the utmost caution[23] as it relates to the decision to use, and then the manner/type/amount of chemical munitions used. Based on the material reviewed and limited objective information referenced above, I am unable to offer more definitive opinions and related basis in response to Epps allegation 1. Please see the "consideration" information above for additional basis.

**<u>Epps allegation 2</u>**-Shot twice in the back with pepper balls, resulting in her becoming disoriented.

- Later on the evening on May 28, 2020, while Ms. Epps remained near the Capitol building, other protesters who were not close to Ms. Epps returned empty cannisters of tear gas in the general direction of the officers. Even though Ms. Epps was nowhere near these protesters, officers shot Ms. Epps at least twice with pepper bullets. She was hit on her back and became disoriented.[24]

---

[22] OfficerJonathanMichaelChristian_3_Pdf at about 1:08
[23] IACP crowd management model policy, page 6, section "h"
[24] Civil Action No. 1:20-CV-1922-RBJ-MEH (consolidated with lead case *Epps, et al. v. City and County of Denver, et al.*, 1:20-CV-1878-RBJ), 94

**Considerations in response to Epps allegation 2:**

The IACP model policy on crowd control management references impact projectiles generally-which would technically include pepper ball munitions-though the model does not specifically mention pepper ball type munitions by name. It is important to note that pepper balls are nothing more than an high tech "paint ball gun" system, propelling a .68 caliber frangible projectile that can be inert or filled with an a "pepper powder" known as PAVA. The pepper ball rounds deliver between 7–20-foot pounds of energy, depending on the weapon and distances involved. [25] More "conventional" impact projectile systems such as "bean bags" (specifically referenced in the IACP model policy) rounds deliver far more energy-with a correspondingly increased potential for causing death or serious injury. By comparison, the "bean round" delivers approximately 120-foot pounds of energy, and the 40mm Exact Impact round delivers approximately 112-foot pounds of energy.

The IACP model policy has a section that provides the following information on impact projectiles.

Direct-fired impact munitions, to include beanbag and similar munitions, should be deployed in a manner that recognizes the distinct factors involved, including the potential risk of hitting an unintended target due to officer-subject range and crowd density. Accordingly, direct-fire munitions are generally used against specific individuals who[26] are engaged in conduct that poses an immediate threat of death or serious injury or significant levels of property damage. A verbal warning should be given prior to the use of impact munitions when reasonably possible.[27]

The Denver Police Department has information and guidelines concerning the use of the pepper ball system in their force policy and Crowd Management Manual. The Denver Police Department Use of Force Policy provides the following information concerning pepper ball munitions:

f. PepperBall® system:
   1. Acceptable uses of the PepperBall® system may include:
      - To incapacitate, safely control, or take into custody an individual whose conduct rises to Defensive Resistance; or
      - When its use is likely to prevent an officer or a third person from being injured by an individual; or
      - To incapacitate an individual who is threatening or attempting suicide; or
      - When ordered by a field force commander or other command officer in crowd control or riot situations.[28]

---

[25] www.pepperball.com/products/vks/
[26] IACP crowd control model policy, page 8 "Impact Projectiles"
[27] Ibid page 9
[28] DPD use of force policy, page 4

The Denver Police Department Crowd Management Manual provides the following information concerning pepper ball munitions:

**Pepper Ball System:** An air-powered launch device that deploys plastic sphere projectiles filled with powdered Oleoresin Capsicum (OC).[29]

**Pepper Ball System**
Use of the Pepper Ball projectile shall be considered a use of force and must meet the requirements of all Department policies and procedures and Colorado Revised Statutes. In general, an officer may deploy the Pepper Ball projectile without supervisory authorization against a specific individual who is not part of a civil disturbance. The behavior of the targeted individual must rise to at least the level of Defensive Resistance. The Pepper Ball projectile will not be deployed against a specific individual in a crowd without the approval of the Division or Unit supervisor. Additionally, the Pepper Ball system will not be used against a group or crowd without prior authorization from the Incident Commander.  Use of the Pepper Ball system in crowd control situations may be appropriate in the following circumstances:

- To support the skirmish line.
- To use stand-off force application to encourage individuals to come down from trees, fences, walls, poles or signs when their elevated position or actions pose a threat to the field force. (The safety of targeted subjects must be considered in the event that Pepper Ball strikes cause them to fall.)
- Against subjects within a crowd who are actively throwing objects at police officers.
- To mark individuals for future identification and arrest.
- To provide cover while Arrest Teams penetrate a crowd, or against individuals who attack the Arrest Team or violently interfere with the movement of the team or arrest process.

Pepper Ball operators are responsible for every round they fire. They must ensure that innocent persons are not struck unintentionally by not firing projectiles indiscriminately into a crowd. Unless lethal force is warranted, an officer shall not intentionally deploy the Pepper Ball projectile:[30]

- To the head, eyes, throat, neck, back, breasts of a female, genitalia, pelvis, or spinal column.
- To a pregnant female, if the officer has knowledge of or should reasonably know of the pregnancy.
- On or in an open wound if the officer has knowledge of the open wound.
- When practical, officers shall communicate to other officers that they are about to discharge a less lethal weapon prior to its use or clearly and audibly announce the same to officers in the immediate area unless urgent circumstances prevent this from occurring.

---

[29] DPD crowd management policy, page 25
[30] Ibid 19

- If possible, immediate evaluation by medical personnel is required to determine the degree of injury suffered by the suspect. However, in crowd control situations this may not be feasible or appropriate.[31]

| Types of Behavior (Individual or Crowd) | Behavior Defined | Strategy | Level of Force or Tactic | Who Authorizes Use? | Does behavior support criminal charge of resisting arrest? | Application (individual or group) |
| --- | --- | --- | --- | --- | --- | --- |
| Defensive Resistance (Toward police) | • Physical actions<br>• Attempt to prevent officer's control<br>• Does not involve attempts to harm officer<br>• Includes flight or attempt to flee | Gain Compliance | *All of the above plus:*<br><br>Chemical Agent (OC Based*)<br><br>Pepper Ball System | Affected Officer | Yes | Against a Specific Individual |

[32]

Commander Phelan testified at deposition concerning the Denver Police Department use of pepper balls:

Q· · Does the DPD use of force policy with respect[33] to the use of pepper balls differ in a protest situation from normal patrol?

A· · No.

Q· · Does the DPD use of force policy with respect to the use of 40-millimeter launchers differ with respect to the use -- with respect to protest situations as opposed to patrol?

A· · In protest situations with the pepper ball, any impact weapon, it's based on defensive resistance or active aggression. So that -- that could be different from a patrol application. You would have to be specific in each application, what the situation is, what the circumstances are with -- with that situation. And it's based on the whole circumstances, total circumstances.

Q· · So defensive resistance could be somebody who does not obey an order to move back or get out of the street, right?

A· · Correct, correct.

Q· · Okay. DPD policy allowed the use of pepper ball -- balls directly on that person if they did not obey, right?

A· · Directly on that person, or area of saturation would probably be a better application.

Q· · But it also allowed shooting somebody with[34] pepper balls directly?

A· · If it allows that deployment of that chemical agent to that person, yes.

Q· · If you had a large number of protesters who were peaceful, gathered and chanting or protesting, and then there were a small number of people in the crowd of protesters who may have been throwing rocks or throwing other things at the officers, what does DPD policy require with respect to how to respond to that situation?

A· · The response would be determined by, obviously, the area command there who's supervising that situation. But based on that information, that's why we use pepper balls. Pretty accurate. So the first line, I imagine, would be to deploy area saturation so people would get back, so they weren't able to injure officers by throwing rocks and bottles

---

[31] Ibid 20
[32] DPD Crowd Management Manual, page 16
[33] Phelan deposition page 60, line 25
[34] Ibid page 61, 1-25

and explosives at them. So you want to get that crowd back. The best application could be area saturation for the main crowd, and then probably direct fire at the agitators, if possible.[35]

**Opinion in response to Epps allegation 2:**

    If it is assumed that Ms. Epps allegation accurately characterizes what occurred, then the deployment of pepper balls against her may or may not have been an appropriate application of pepper ball force.

- If it is assumed that Ms. Epps was participating in behavior consistent with the information provided above, and that justified the use of a pepper ball as described by Commander Phelan, and then the two rounds that reportedly struck her in the back would be consistent with agency policy and training, and consistent with contemporary police standards, training and policy.
- If it is assumed that Ms. Epps was NOT participating in behavior consistent with the information described above, and that justified the use of pepper ball as described by Commander Phelan, then the two rounds that reportedly struck her in the back would have been inconsistent with contemporary police training, policy, and practice.

**Basis for the opinions in Epps allegation 2:**

    Ms. Epps acknowledged in her complaint that "other protesters who were not close to Ms. Epps returned empty cannisters of tear gas in the general direction of the officers". Throwing object at officers or "in the direction of officers" is one of the primary reasons that impact rounds generally, and pepper ball rounds in particular are appropriate to use. Please see the "consideration" information above for additional opinion basis.

**Epps allegation 3**-Shot with a pepper ball by Officer Jonathan Christian without warning or justification.

- On Friday, May 29, at around 9:04 PM, Ms. Epps was shot with a pepper ball by DPD Officer Jonathan Christian as she crossed 14th Ave by herself, filming the police and protest activity near the Capitol. Officer Christian provided no warning to Ms. Epps before targeting and firing his pepper ball gun at her. There was no justification Officer Christian's conduct.[36]

**Considerations in response to Epps allegation 3:**

    I reviewed the deposition testimony of Officer Jonathan Christian that provides his perspective on the interaction that is the focus of allegation 3:

Q. Officer Christian, do you recognize yourself in that video?
A. Yes.
Q. Who are you?
A. I was the officer kneeling down.

---

[35] Ibid page 62, 1-25
[36] Civil Action No. 1:20-CV-1922-RBJ-MEH (consolidated with lead case *Epps, et al. v. City and County of Denver, et al.*, 1:20-CV-1878-RBJ), 95

Q. Were you also the officer who shot Ms. Epps[37] with a pepperball?

A. I do not recall shooting Ms. Epps.

Q. (By Mr. Moffett) Do you recall kneeling down?

A. Yes.

Q. So you recall kneeling down that night, but you don't recall shooting Ms. Epps?

A. Am I allowed to ask a clarifying question?

Q. (By Mr. Moffett) Sure.

A. So the reason that I'm able to identify myself is because that was one of the clips of body-worn footage that I've seen. But otherwise, I did not remember that incident.[38]

A. Again, based solely off of this video -- because I don't remember the situation specifically -- most likely the fact that Ms. Epps is standing in the road with cars going around her making it a safety violation for not only herself, but also the vehicles in the roadway.

Q. All right. Did you warn her at all?[39]

A. I did.

Q. Before or after the shot?

A. In this clip, it sounds like I made one shot, made the warning.

Q. Let's listen to it again. (Video playing.)

Q. So to clarify, did you shoot the pepperball first?

A. Yes.

Q. And did you warn her after?

A. Yes.[40]

Q. Why did you shoot Ms. Epps with a pepperball gun?[41]

A. In both of those figures, neither -- or in her video nor in my video did I see myself shoot Ms. Epps with the pepperball. I saw that the pepperball was deployed. And based off of the video and what I would assume I would do at the time is I would shoot at Ms. Epps in order to disperse the particle in order for her to leave the roadway.

Q. So why did you shoot at Ms. Epps with your pepperball gun?

A. Because she was standing in the roadway in violation of the laws -- a pedestrian in the roadway, causing a safety hazard for herself and the vehicles lawfully traveling down that road.

Q. So if a pedestrian's in the roadway, you can shoot them with a pepperball gun?

A. Are you talking about the use-of-force policy before George Floyd or after George Floyd?

Q. Let's say at the time of this video.

A. Yes.

Q. Is that the DPD's policy?

---

[37] Christian deposition page 67, lines 8-25
[38] Ibid 68, lines 1-13
[39] Ibid 70, lines 19-25
[40] Ibid 71, 1-11
[41] Ibid 72, line 24-5

A. It is my understanding that it is.[42]



Sec. 38-86. Obstruction of streets or other public passageways.

(1) It shall be unlawful for any person to knowingly: (a) Obstruct a highway, street, sidewalk, railway, waterway, building entrance, elevator, aisle, stairway, or hallway to which the public or a substantial group of the public has access or any other place used for the passage of persons, vehicles, or conveyances, whether the obstruction arises from the person's acts alone or from the person's acts and the acts of others; or

(2) For purposes of this section, "obstruct" means to render impassable or to render passage unreasonably inconvenient or hazardous.[44]

---

[42] Ibid 73, 1-22
[43] DPD force policy, page 9
[44] May 28 operations plan, DEN001956

Commander Phelan was shown the video and then asked questions about this interaction during his deposition, and he provided the following information:

Q· · I want you to take a moment and focus on this officer who just dropped to his knee. We'll back up for a second in the video, but I want you to focus on this officer (indicating). I want to back up to the two minute and 51 second in the video.

Q· · Did you hear that? The person taking the video, her name is Plaintiff Elisabeth Epps, and she said that somebody just shot her, right? Did you hear that?

A· · Yes.

Q· · Okay.

Q· · Now, Ms. Epps is identifying the person who is on his knees as the person who shot her, right?

A· · Yeah. That's -- that's what she's saying, yes.[45]

 Q· · Okay. So based on that video that we just watched, is there anything that you saw that would have justified shooting pepper ball at Plaintiff Epps?

A· · Based on the -- the short clip I have there, I -- I -- all I could tell you is this: I don't know if he deployed or not. I saw him go down on a knee, and then the other officer came and helped him up. Whether he deployed or not, I -- I -- I -- I can't confirm that.

Q· · If he had shot Plaintiff Epps in that circumstance, is there anything in this video that you saw that would have justified the use of pepper ball on Plaintiff Epps?

A· · Yeah, there's not -- Yeah, there's not enough information there to make that determination.[46]

Denver -- or I'm sorry, DEN 004180.· It's body-worn camera for Officer Christian. They're starting the video at -- time stamp is 2020530, 30415.

Q· · I want you to notice that in a moment, this officer is going to drop to his knee. And pausing it at 30437. Did you see that this officer just dropped to his knee?

A· · Yes, sir.

Q· · Do you recognize this as the same location as the video that we just watched with Plaintiff Epps?

A· · It could be, yes. It looks like it is.

Q. · Okay. Was that clicking sound the sound of Officer Christian deploying his pepper ball gun?

A· · Yes, it was.[47]

Q· · Was Officer Christian's use of less lethal force in that moment consistent with DPD's policies, practices, and customs?

A· · Based on the information he had or what the situation was, I don't know, I couldn't answer whether it was or not. With that length of tape, I don't know what was going on there. Was she told to get out of the street?· Because we could use, you know, defensive resistance to move her if she didn't. So I don't know.

Q· · Okay.

---

[45] Phelan deposition, page 167, lines 1-17
[46] Ibid 168, lines 1-21
[47] Ibid 170, lines 1-19

A· · Could be within policy, or it could be out of policy. Without the full -- I don't know without having the full story.[48]

Q· · So you hear him say "Get out of the street" after he fires pepper ball, right?
A· · Correct.
Q· · Okay. Did you hear the officer who came over to talk to Officer Christian and he said, "Sarge said, Don't hit her'"?
A· · Yes, I heard that.
Q· · So it sounds like a sergeant told Officer Christian not to hit Plaintiff Epps, right?
A· · That's what it sounds like, yes.[49]

Q· · Having watched the videos that we just watched; would you submit a complaint to internal affairs?
A· · No.[50]

I reviewed the video that was taken by Ms. Epps and noted that an officer can be seen taking a kneeling position, and he appears to be shouldering and aiming a long gun in the direction of the camera.  This video was shown to Officer Christian at deposition, and he acknowledged that it was him in that position.[51]


Christian 3 Pdf [52]

I also reviewed the video footage that was reportedly taken by Officer Christian's body worn camera.[53] I saw what appeared to be several persons standing on the opposite side of the street from the body worn camera recording position (attached to Officer Christian).[54] The yellow arrow points to the persons, and it is assumed that one of them was Ms. Epps.

[48] Ibid 171, 11-25
[49] Ibid 172, 4-17
[50] Ibid 173, 3-8
[51] Christian deposition page 67, lines 8-11
[52] OfficerJonathanMichaelChristian_3_Pdf at about 00:56
[53] OfficerJonathanMichaelChristian_4_Pdf
[54] Ibid at about 00:21



Ms. Epps can be heard coughing at about 00:16 on her video, as a cloud of apparent CS gas moves towards her from the right-as she faces the officers across the street.  She appears to look both ways down the street, as cars pass in front of her from left to right.

---

55 Ibid
56 OfficerJonathanMichaelChristian_3_Pdf at about 00:16



It is not clear from this video perspective whether Ms. Epps was standing on the street or on the sidewalk. Seven cars pass in front of her, and then the video perspective indicates she walks across the street toward the officer's side.



At approximately 00:54 Officer Christian can be seen dropping to his knee and raising his launcher. At approximately 00:58 Ms. Epps moved across the street and to her left, and Officer Christian can be seen moving his point of aim from the center of the street to his right-and apparently towards Ms. Epps. At approximately 00:59 Ms. Epps says, "look at him". Contemporaneous to that a single report can be heard from a pepper ball launcher. At 01:03 Ms. Epps says, "he just shot me". She says that again at approximately 01:09, and then she laughs.[58] Her voice was calm as she made both "shot" statements, she laughed after, and there was no verbal indication of pain or discomfort following the sound of the device being discharged. The calm voice, laughter, and no verbal response ("ouch") is very uncharacteristic for a person that had just been shot by a pepper ball round.

---

[57] Ibid 00:42
[58] Ibid 01:03-6



On the BWC Officer Christian can be seen raising the launcher to his shoulder at about 00:20, which blocked the camera view of the street-and an objective assessment of what happened while Mr. Epps was on the roadway. He moved his point of aim to the right at about 00:24, and the shot can be heard at about 00:26. Cars are honking during this time and three cars are observed moving from right to left-but they and Ms. Epps are obscured by Officer Christian on the video. [59]



Ms. Epps appeared to the right of Officer Christian at about 00:30. Officer Christian can be heard yelling "get out of the street" at about 00:32.

I then reviewed Hastings[61] body worn camera footage, that offered a different angle and perspective on the interaction between Officer Christian and Ms. Epps.

---

[59] OfficerJonathanMichaelChristian_3_Pdf at about 00:28
[60] Ibid at about 00:30
[61] DEN5029 HASTINGS_RIOT-2



Ms. Epps can be seen in the middle of the road.



A white "puff" can be seen at Ms. Epps right heel, indicating that the pepper ball round has contacted the ground or her foot.

---

[62] Ibid 03:13
[63] Ibid several frames later



Ms. Epps continues walking, and the small cloud of pepper ball dust can be seen behind and to her right.

**Opinion in response to Epps allegation 3:**

Officer Christian deployed a pepper ball round without warning that either struck Ms. Epps foot or contacted the ground very close to her.

- If it is assumed that Ms. Epps was in violation of Sec. 38-86 (Obstruction of streets or other public passageways), then the use of a pepper ball to compel her to stop obstructing traffic and or immediately get out of the trafficway would have been consistent with the letter of DPD force policy and training.[65] Absent a totality of circumstances that indicate an urgent and or immediate need to deploy a round in these or similar circumstances, a warning should be given first. The DPD force policy references actions that are designed to increase the likelihood of safely handling a potential use of force situation-while attempting to reduce the need for force or the amount of force necessary. This reference includes "advisements and warnings".[66]

- If it is assumed that Ms. Epps was in violation of Sec. 38-86 (Obstruction of streets or other public passageways), then the use of a pepper ball that was NOT directed at her (close-area fired) to compel her to stop obstructing traffic would have been consistent with the letter of DPD force policy and training.[67] Absent a totality of circumstances that indicate an urgent and immediate need to deploy a round, a warning should be given first.

---

[64] Ibid, three frames later
[65] DPD force policy, page 9
[66] DPD force policy, page 2
[67] DPD force policy, page 9

- If it is assumed that Ms. Epps was NOT in violation of Sec. 38-86 (Obstruction of streets or other public passageways), then the use of a pepper ball in any manner would not have been appropriate, and would have been inconsistent with contemporary police training, policy, and practice.

**Basis for the Opinion in response to Epps allegation 3:**

The use of a pepper ball to deter, prevent, or stop persons from obstructing traffic (Sec. 38-86. Obstruction of streets or other public passageways) generally during public order events is consistent with DPD policy and training, and with contemporary police policy, training, and practice nationwide. In the immediate case Officer Christian testified that he has no memory of what occurred. Ms. Epps testified at deposition as follows:

Q· · ·All right. Describe for me what your experience was at that -- with respect to Event Number 3.
A· · ·I -- my experience. I had recently – I had just recently got downtown. And behind and to my sort of left were a bigger number, more protestors. And ahead of me on a hill, slight hill of the side of the capitol were some police officers. And my experience in that moment, that was a moment of documenting, of -- it felt kind of surreal to see them. So I'm just appreciating what I'm watching.· I'm filming.· I was walking relatively slowly as opposed to my usual gait.· I don't think I was talking much.· And one of the officers went to a knee and shot at me with something.[68]

A single pepper ball round was fired in the direction of Ms. Epps without warning, which may or may not have been appropriate based on the totality of circumstances the trier of facts assumes to be true. Please see the "consideration" information above for additional opinion basis.

**Epps allegation 4**-Shot with rubber bullets without warning or provocation.
- Later on the evening of May 29 at around 9:16 PM, officers again shot Ms. Epps and her partner with rubber bullets without warning or provocation, leaving marks on her back and legs.[69]

**Considerations in response to Epps allegation 4:**

Epps allegation 4 is outlined as follows: Later in the night on May 29, 2020 at approximately 9:38 PM, Plaintiff was live streaming and a police officer shot at her cellphone, causing it to fall to the ground and break. The video produced at BLM_00001019 shows the moment the police officers shot Plaintiff's phone out of her hand. Plaintiff was also hit several times with rubber and pepper bullets on her back and legs. During this time, protestors were standing in the street behind dumpsters with their hands raised and chanting. Police officers were down the street in a line facing the protestors. Plaintiff had walked in front of the protestors to film them. After a few minutes,

---

[68] Epps deposition page 128, lines 5-19
[69] Civil Action No. 1:20-CV-1922-RBJ-MEH (consolidated with lead case *Epps, et al. v. City and County of Denver, et al.*, 1:20-CV-1878-RBJ), paragraph 96

and without justification, officers began to deploy rubber and pepper bullets at Plaintiff and the protestors.[70]

Please see Considerations in response to Epps allegation 2, specifically as it relates to the use of impact projectiles ("rubber bullets").

 

BLM 00000020          BLM 00000021

I reviewed the photographs provide by Ms. Epps, that reportedly document the injuries she received after being "shot with rubber bullets" on the evening of May 29 at around 9:16 PM. It is unclear on what basis Ms. Epps believes that she was "shot with rubber bullets", as opposed to pepper ball rounds-which her wounds appear reflective of. The significance ("rubber bullets" vs pepper ball) being the general difference in justification and basis for use between the two rounds. Pepper ball rounds have less energy, are less likely to result in serious injury, and are generally justified for use by DPD and other contemporary agencies in response to defensive resistance. The term "rubber bullets" is not instructive as it relates to a specific munition, though the general classification that includes rubber baton and exact impact rounds (often referred to as "rubber bullets") are the less lethal (impact) munitions. This class of munition delivers approximately ten times the energy of a pepper ball round, generally creates a wound signature far more significant than those reflected in the above photographs and are most often used in response to active aggression. Please see the "Considerations in response to Epps allegation 2", specifically as it relates to impact projectiles and pepper ball justification and use.

The Denver Police Department Crowd Management Manual addresses the use of the 40mm impact projectile launcher, which is the only platform that the agency uses to deliver large caliber "less lethal" rounds. The manual says that in general, an officer may deploy 40mm rounds without supervisory authorization against a specific individual who is not part of a civil disturbance. The behavior of the individual must rise to at least the level of Active Aggression. The 40mm launcher will not be used against a specific individual in a crowd without the approval of the Division or Unit supervisor. Additionally,

---

[70]   BLACK LIVES MATTER 5280'S AND DR. APRYL ALEXANDER'S RESPONSE TO INTERROGATORY NO. 1, response 4

the 40mm system will not be used against a group or crowd without prior authorization from the Incident Commander. Use of the 40mm launcher in crowd control situations may be appropriate in the following circumstances:

- Against violent individuals within a crowd.
- Against subjects who are actively throwing objects at police officers.
- Against subjects who are at risk of causing imminent bodily injury to other persons.
- To mark individuals for future identification and arrest for illegal acts that include active aggression.
- To provide cover while Arrest Teams penetrate a crowd, or against individuals who attack the Arrest Team or violently interfere with the movement of the team or arrest process.

40mm operators are responsible for every round they fire. They must ensure that innocent persons are not struck unintentionally by not firing projectiles indiscriminately into a crowd. Unless lethal force is warranted, an officer shall not intentionally deploy the 40mm projectile as follows:

- To the head, eyes, throat, neck, back, breasts of a female, genitalia, pelvis, or spinal column.
- Against a pregnant female (if the officer has knowledge of or reasonably should know of the pregnancy). [71]

**Opinions in response to Epps allegation 4:**

     If it is assumed that Ms. Epps was shot with "rubber bullets" without warning, then that deployment may or may not have been consistent with contemporary police training, policy, and practice.

- If it is assumed that Ms. Epps was participating in behavior consistent with the information provided above, and that justified the use of a pepper ball round (which based on the wound signature appears most likely to be the round involved), then the deployment that reportedly struck her in the legs and back would be consistent with contemporary police policy, training, and practice.
- If it is assumed that Ms. Epps was NOT participating in behavior consistent with the information provided above, and that justified the use of a pepper ball or less lethal munition, then the deployment that reportedly struck her in the legs and back would be inconsistent with contemporary police training, policy and practice.

**Basis for the Opinion in response to Epps allegation 4:**

     Please see the considerations in response to Epps allegation 4 above.

**Epps allegation 5**-Officers shot projectiles directly at her cellphone, which was shattered by a projectile.

---

[71] Denver Police Crowd Control Manual

- May 29-Officers also shot projectiles directly at her cellphone which she had been using to record and broadcast police violence to her thousands of social media followers. A projectile shattered her cellphone.[72]

**Considerations in response to Epps allegation 5:**

Please see the Considerations in response to Epps allegation 2, specifically as it relates to the use of pepper balls and impact projectiles.

**Opinions in response to Epps allegation 5:**

If it is assumed that police officers intentionally targeted Ms. Epps cell phone with impact projectiles of some type, then that would have been inconsistent with contemporary police training, policy, and practice, and potentially a property damage crime.

- If it is assumed that Ms. Epps was participating in behavior consistent with the information provided previously above that justified the use of a pepper ball or other impact round, and then rounds were fired in response to adequate cause and basis that accidently struck her cell phone, then that damage would be the accidental and unintended consequence of a force application that was consistent with contemporary police training, policy and practice.
- If it is assumed that Ms. Epps was NOT participating in behavior consistent with the information provided previously above that justified the use of a pepper ball or other impact round, and then rounds were fired at her that accidently struck her cell phone, then the rounds fired would have been inconsistent with contemporary police training, policy, and practice.

**Basis for the Opinions in response to Epps allegation 5:**

Please see the considerations in response to Epps allegation 2 above.

**Epps allegation 6**-Exposed to tear gas without warning or justification.

- May 29-Shortly after police shot her phone out of her hand, they deployed tear gas into the group of protesters without any warning or justification. Ms. Epps was immediately unable to see and breathing became almost impossible; she felt like she was choking every time she tried to take a deep breath. Ms. Epps, who has been hospitalized numerous times because of asthma, was terrified and unable to see even to obtain her inhaler from her bag. Other protesters who had masks and were not suffering as acutely from the tear gas had to search Ms. Epp's bag to find her inhaler so she could recover.[73]

**Considerations in response to Epps allegation 6:**

Please see the considerations in response to Epps allegation 1, which outlines the policy and training issues involved in the decision(s) to use chemical agents, and issue dispersal orders and warnings. I reviewed the Denver Police Department "chemical agent timeline" that provided information concerning the date, time, location, officer, munition type, dispersal order, supervisor/commander, officer injury, and arrest made during

---

[72] Civil Action No. 1:20-CV-1922-RBJ-MEH (consolidated with lead case *Epps, et al. v. City and County of Denver, et al.*, 1:20-CV-1878-RBJ)

[73] Ibid

incidents in which a chemical agent was reportedly used.[74] The document has numerous references to the use of "chemical agents" on 5-29-20, and I did not find any additional information that proved instructive in determining the specific circumstances presented to officers when Ms. Epps was reportedly exposed to chemical munitions and that resulted in the complaint made in allegation 6.

**Opinion in response to Epps allegation 6:**

If it is assumed that Ms. Epps allegation accurately characterizes what occurred, then the police use of chemical munitions without warning or dispersal order-resulting in her experiencing extreme eye pain-may or may not have been a force application that was consistent with contemporary police training, policy, and practice.

- If it is assumed that Ms. Epps was participating in behavior that justified the no warning use of chemical munitions by DPD policy and as described by Commander Phelan, her exposure and related discomfort would have been the result of a force application that was consistent with contemporary police training, policy, and practice.
- If it is assumed that Ms. Epps was participating in behavior that justified the use of chemical munitions by DPD policy and as described by Commander Phelan, and that the totality of circumstances presented would have allowed the issuance of warnings/orders as outlined in DPD policy, then warnings/orders should have been given before chemical munitions were deployed.
- If it is assumed that Ms. Epps was NOT participating in behavior that justified the no warning use of chemical munitions, but that others in her proximity were, then her exposure would have been the regretful and accidental/unintended consequence of a force application that was consistent with contemporary police training, policy, and practice.
- If it is assumed that Ms. Epps and others were present and participating in behavior that did NOT justify the use of chemical munitions, then the use her exposure and related discomfort would have been inconsistent with contemporary police training, policy, and practice.

**Basis for the Opinions in response to Epps allegation 6:**

Please see the considerations in response to Epps allegation 1 above.

**Epps allegation 7**-Struck in the face with a pepper ball round fired by Officer Keith Valentine, that had apparently been directed at a protestor who had thrown a water bottle at officers.

- May 30, 2020, Ms. Epps again participated peacefully in protests in Denver. That afternoon, Ms. Epps witnessed officers spray tear gas over a large area by the Capitol occupied by predominantly peaceful protesters, including children. At about 7:17 PM at the intersection of Lincoln and Colfax, a solitary protester tossed a water bottle toward several police officers standing in the intersection, including DPD Officer Keith Valentine. The water bottle did not hit the police officers. In retaliation, Officer Valentine fired several rounds from his pepper ball gun in the

---

[74] DEN 2763-2776 Chemical Agent Timeline - George Floyd Protest

direction of the protester, who ducked for cover. Officer Valentine was not aiming at the ground near the protestor who threw the water bottle, but was instead aiming high and in the direction of the protester and several individuals standing near the protester. At this point in time, Plaintiff Epps was standing about 10-15 feet behind the protester and directly in Officer Valentine's line of fire. Plaintiff Epps was struck in the face with what appears to have been a pepper ball. On information and belief, one or more of the rounds from Officer Valentine's pepper ball gun struck Plaintiff Epps in the face. Officer Valentine gave no warning to the protester who threw the water bottle, let alone to anyone else standing in the vicinity including Plaintiff Epps, that he was going to deploy several rounds from his pepper ball gun. At the time of the incident, neither Officer Valentine nor any of the officers near officer Valentine were facing any imminent risk of serious injury or death from anyone, including Plaintiff Epps, when he fired several rounds of his pepper ball gun in her direction. Officer Valentine did not take reasonable precautions to ensure that his use of force was reasonable or proportional under the circumstances, and that his use of force would only impact the individual he was targeting. The pepper ball broke the plastic medical-grade respirator mask she was wearing and wounded her face.[75]

**Considerations in response to Epps allegation 7:**

Please see the considerations in response to Epps allegation 2, which addresses the agency policy and training as it relates to using the pepper ball system. Specific to this allegation, the Denver Police Department Crowd Management Manual makes the following reference to pepper ball munitions:

"Pepper Ball operators are responsible for every round they fire. They must ensure that innocent persons are not struck unintentionally by not firing projectiles indiscriminately into a crowd.[76]

Keith Valentine was named by Ms. Epps as the officer that fired the rounds at a protester who had thrown a water bottle at the police, and subsequently struck her in the face with some of those rounds. He testified concerning his use of the pepper ball as follows:

Q. When you're training to use your pepperball gun, are you trained that you need to have an independent justification for firing a pepperball gun each time you pull the trigger?
A. Independent justification for each individual pepperball?
Q. (By Mr. Reidy) That's right.[77]
A. No, that's not my recollection.
Q. How do you decide how many pepperballs to fire at an individual, like the individual who threw an object at you from the curb?

---

[75] Civil Action No. 1:20-CV-1922-RBJ-MEH (consolidated with lead case *Epps, et al. v. City and County of Denver, et al.*, 1:20-CV-1878-RBJ), 97
[76] DPD Crowd Management Manual, 19
[77] Valentine deposition page 92, 17-25

A. I mean, given my experience and just the -- the use of the pepperball as a tool, I mean, it's a chemical agent that's used to either prevent or overcome resistance or assaults, dispersal of a crowd. And so that's situationally dependent, and it would be impossible for me to apply that definition to a generality of situations.[78]

Q. Having watched the video again, does that refresh your recollection as to whether you were firing directly at that individual or, for example, at the ground?

A. Yeah. It appears I was firing directly at that individual.

Q. Were you concerned at all for the individuals standing to the left, to the right, or behind that individual when firing your pepperball at them?

A. Of course. It would never be my intent to[79] harm anybody that wasn't intended -- or wasn't the intended target.

Q. (By Mr. Reidy) Do you receive training specifically on deploying pepperballs in situations like this where you've got multiple individuals standing in close proximity to one another?

A. I don't remember.[80]

Q. So what I see in the video we're watching at BLM1021, is a video of a person standing behind the individual who threw an object at you and the individual you fired at with a pepperball. Do you agree?

A. I generally agree with that, yes.

Q. Let's keep watching this video for another moment starting again at 53:27.

Q. Do you see that this person has white residue on their cheek?[81]

A. Yes.

Q. Is that consistent with your understanding of, you know, what the residue would look like if somebody had gotten hit in the face with a pepperball?

A. I mean, yeah, it would leave a white marking.

Q. Now, if this person were standing behind the person you were firing a pepperball at, isn't it possible that one of the pepperballs you were firing at that individual hit this person in the face?

A. Yeah. I'm not going to completely discount the fact -- I mean, if you listen to the video carefully, whether it's half speed or not, you can hear countless pepperballs being fired. So to narrow it down and say that my pepperball is the one that hit this person in the face, that's -- you -- I mean, there's countless pepperballs being fired in that direction.

Q. Yeah. Impossible to prove, right? We can't trace this pepperball that landed on her face back to your gun, right?

A. Correct.

Q. But you agree she was standing directly[82] behind the person you were firing at, right?

A. I don't know.[83]

---

[78] Ibid 93, 1-11
[79] Ibid 96, 15-25
[80] Ibid 97, 1-7
[81] Ibid 99, 14-25
[82] Ibid 100, 1-25
[83] Ibid 101, 1-2

**Opinion in response to Epps allegation 7:**
- Pepper Ball operators are responsible for every round they fire, and they must take adequate steps to ensure that innocent persons are not struck unintentionally. They do this by directing discriminate fire within the limits of the pepper ball system, directing rounds to low center body mass on suspects, or holding fire when interacting with suspect targets that are in close proximity to non-suspect targets.
- If it is assumed that Officer Valentine fired the pepper ball round(s) that hit Ms. Epps, and that he was engaging a viable target that was in close proximity or had non-targets behind, and that he took adequate precautions to prevent an accidental contact with a non-suspect as referenced above-yet still accidently hit Ms. Epps-then his pepper ball deployment would have been appropriate and consistent with contemporary police standards, training, policy, and practice.
- If it is assumed that Officer Valentine fired the pepper ball round(s) that hit Ms. Epps, and that he was engaging a viable target that was in close proximity or had non-targets behind, and that he failed to take adequate precautions to prevent an accidental contact with a non-suspect as referenced above, then his pepper ball deployment would have been inconsistent with contemporary police standards, training, policy, and practice.

**Epps allegation 8**-Officers deployed tear gas without warning or a dispersal order, against persons "trapped" and before curfew.
- At about 7:50 PM, ten minutes before the 8 PM curfew that the City had instituted for the first time that day, Ms. Epps tried to leave the Capitol area to head to her car, but officers had barricaded the exits, trapping her. Approximately five minutes later, while Ms. Epps was still trapped and before the curfew began, officers sprayed tear gas into the crowd, again without warning or an order to disperse. [84]

**Considerations in response to Epps allegation 8:**

Please see the considerations in response to Epps allegation 1, which outlines the policy and training issues involved in the decision(s) to use chemical agents, and issue orders and warnings.

**Opinion in response to Epps allegation 8:**

If it is assumed that Ms. Epps allegation accurately characterizes what occurred, then the police use of chemical munitions without warning or dispersal order may or may not have been an appropriate application of chemical agent force. Under no circumstances would it be appropriate for police officers to deploy chemical munitions without ensuring that the persons exposed had adequate exit routes from the contaminated area. If it is assumed that chemical munitions were deployed without ensuring the crowd had avenues of escape, that would have been inconsistent with contemporary police training, policy, and practice.

---

[84] Civil Action No. 1:20-CV-1922-RBJ-MEH (consolidated with lead case *Epps, et al. v. City and County of Denver, et al.*, 1:20-CV-1878-RBJ)

- If it is assumed that Ms. Epps was participating in behavior that justified the no warning use of chemical munitions by DPD policy and as described by Commander Phelan, her exposure and related discomfort would have been the result of a force application that was appropriate and consistent with contemporary police standards, training, policy, and practice.
- If it is assumed that Ms. Epps was participating in behavior that justified the use of chemical munitions by DPD policy and as described by Commander Phelan, and that the totality of circumstances presented would have allowed the issuance of warnings/orders as outlined in DPD policy, then the warnings/orders should have been given before munitions were deployed.
- If it is assumed that Ms. Epps was NOT participating in behavior that justified the no warning use of chemical munitions, but that others in the area were, then her exposure would be a regretful and accidental/unintended consequence of an application of chemical munitions force that was consistent with contemporary police training, policy, and practice. .
- If it is assumed that Ms. Epps and others were present and participating in behavior that did NOT justify the no warning use of chemical munitions, then the use and her exposure and related discomfort would have inconsistent with contemporary police training, policy, and practice.

**Basis for the Opinions in response to Epps allegation 8:**

Please see the considerations in response to Epps allegation 1 above.

### **Plaintiff Ashlee Wedgeworth**

**Wedgeworth allegation 1-**Exposed to OC dust from a pepper ball that struck her friend, rendering her unable to breathe. Officers did not give a warning before shooting.

- On the evening of Friday, May 29, 2020, Ms. Wedgeworth and a friend arrived near the Colorado state Capitol building to participate in the protest. Ms. Wedgeworth observed some individuals, who were standing far away from Ms. Wedgeworth, throw something in the direction of officers. In response, officers began shooting projectiles at those individuals, but then also turned and shot at Ms. Wedgeworth and her friend with pepper balls. The pepper balls hit Ms. Wedgeworth's friend, and the resulting dust rendered Ms. Wedgeworth unable to breathe. Ms. Wedgeworth and her friend were not standing anywhere near the individuals who had thrown the objects. Officers did not offer a warning prior to shooting. [85]

**Considerations in response to Wedgeworth allegation 1:**

Please see considerations in response to Epps allegation 2, which addresses the criteria and justification for using pepper balls.

---

[85] Civil Action No. 1:20-CV-1922-RBJ-MEH (consolidated with lead case *Epps, et al. v. City and County of Denver, et al.*, 1:20-CV-1878-RBJ), 103

**Opinions in response to Wedgeworth allegation 1:**

If it is assumed that Ms. Wedgeworth's allegation accurately characterizes what occurred, then the deployment of the pepper ball rounds against her friend-that resulted in her (Wedgeworth) being accidentally exposed to OC/PAVA dust-may or may not have been an appropriate application of pepper ball force.

- If it is assumed that Ms. Wedgeworth's friend was participating in behavior consistent with the information provided above, and that justified the use of pepper ball rounds as described by Commander Phelan, then the rounds that reportedly struck her friend would be consistent with agency policy and training, and an appropriate application of force. The secondary OC/PAVA exposure that was reported by Ms. Wedgeworth was not force intentionally applied to or directed at her, but the accidental and unintended consequence of appropriate police activity.

- If it is assumed that Ms. Wedgeworth's friend was NOT participating in behavior consistent with the information provided above, and that justified the use of pepper ball rounds as described by Commander Phelan, then directing rounds at her friend would have been inconsistent with agency policy and training, and inconsistent with contemporary police training, policy, and practice. Accordingly, the secondary OC/PAVA exposure that was reported by Ms. Wedgeworth was not force intentionally applied to or directed at her, but the accidental and unintended consequence of police activity that was inconsistent with contemporary police training, policy, and practice.

**Basis for the opinions in Wedgeworth allegation 1:**

Please see the Considerations in response to Epps allegation 2:

**<u>Wedgeworth allegation 2</u>**-Exposed to "tear gas" without warning, causing her face, eyes, nose, and mouth to feel like they were burning. She could not see; and she was coughing a lot.

- On Sunday, May 31, 2020, Ms. Wedgeworth experienced tear gas at night, when she was marching with a crowd of protesters on the streets surrounding the Capitol. The protesters were chanting and marching. Some protesters at the front of the march were laying down in the street, like George Floyd, but none were throwing items or being violent. Officers did not issue a warning before releasing the tear gas. Due to the tear gas, Ms. Wedgeworth's face, eyes, nose, and mouth felt like they were burning; she could not see; and she was coughing a lot.[86]

**Considerations in response to Wedgeworth allegation 2:**

Please see the considerations in response to Epps allegation 1, which outlines the policy and training issues involved in the decision(s) to use chemical agents, and issue orders and warnings.

---

[86]Civil Action No. 1:20-CV-1922-RBJ-MEH (consolidated with lead case *Epps, et al. v. City and County of Denver, et al.*, 1:20-CV-1878-RBJ), 104

**Opinion in response to Wedgeworth allegation 2:**

If it is assumed that Ms. Wedgeworth's allegation accurately characterizes what occurred, then the police use of chemical munitions without warning or dispersal order may or may not have been consistent with contemporary police training, policy, and practice. .

- If it is assumed that Ms. Wedgeworth was participating in behavior that justified the no warning use of chemical munitions by DPD policy and as described by Commander Phelan, then her exposure and related discomfort would have been the result of a force application that was consistent with contemporary police training, policy, and practice.
- If it is assumed that Ms. Wedgeworth was participating in behavior that justified the use of chemical munitions by DPD policy and as described by Commander Phelan, and that the totality of circumstances presented would have allowed the issuance of warnings/orders as outlined in DPD policy, then the warnings/orders should have been before deployed.
- If it is assumed that Ms. Wedgeworth was NOT participating in behavior that justified the no warning use of chemical munitions, but that others in the area were, then her exposure would have been the regretful and accidental/unintended consequence of a force application that was consistent with contemporary police training, policy, and practice.
- If it is assumed that Ms. Wedgeworth and others were present and participating in behavior that did NOT justify the no warning use of chemical munitions, then the use and her exposure and related discomfort would have been inconsistent with contemporary police training, policy, and practice.

**Basis for the Opinions in response to Wedgeworth allegation 2:**

Please see the considerations in response to Epps allegation 1 above.

**Wedgeworth allegation 3-**She perceived being "corralled" by officers into one area, then "tears gas" was released without warning. Ms. Wedgeworth again could not see, she was coughing, and her face felt like it was burning.

- On the evening of Monday, June 1, 2020, when Ms. Wedgeworth was protesting at the Capitol, officers formed a line in front of the Capitol and began pushing crowds into the street. Ms. Wedgeworth felt as though officers were trying to corral all of the protesters into one area. Then, once the protesters were corralled, officers released tear gas without warning. Ms. Wedgeworth again could not see, she was coughing, and her face felt like it was burning.[87]

**Considerations in response to Wedgeworth allegation 3:**

Contemporary police training, policy, and practice recognizes that general containment (corralling) of protestors to an area without ensuring exit and egress routes is inappropriate. There are certain limited scenarios in which a crowd may be contained and or blocked to prevent accessing a particular area (highway, railroad track, bridge, counter protest groups, etc.), but in no case should a crowd be encircled or physically denied

---

[87] Ibid 105

exit/egress from an area. The IACP model policy on Crowd Management says that "Officers shall ensure that a means of egress for all individuals is present at all times."[88]

Please see the considerations in response to Epps allegation 1, which outlines the policy and training issues involved in the decision(s) to use chemical agents, and issue orders and warnings.

**Opinion in response to Wedgeworth allegation 3:**

If it is assumed that Ms. Wedgeworth's allegation accurately characterizes what occurred, then the police movement of the crowd into one area and the subsequent use of chemical munitions without warning or dispersal order, may or may not have been consistent with contemporary police policy, training, and practice.

- I am not aware of the totality of circumstances presented and or reasonably believed being presented to officers at the time in which Ms. Wedgeworth says she was being "corralled". According, I am unable to render an opinion concerning whether the movement and positioning by the officers was appropriate. If it is assumed that the officers "corralled" the protesters and did not provide for and allow exit from the area, then that would have been inconsistent with contemporary police policy, training, and practice.
- If it is assumed that Ms. Wedgeworth was participating in behavior that justified the no warning use of chemical munitions by DPD policy and as described by Commander Phelan, her exposure and related discomfort would have been the result of a force application that was consistent with contemporary police training, policy, and practice.
- If it is assumed that Ms. Wedgeworth was participating in behavior that justified the use of chemical munitions by DPD policy and as described by Commander Phelan, and that the totality of circumstances presented would have allowed the issuance of warnings/orders as outlined in DPD policy, then the warnings/orders should have been given before the munitions were deployed.
- If it is assumed that Ms. Wedgeworth was NOT participating in behavior that justified the no warning use of chemical munitions, but that others in the area were, then her exposure would be a regretful and accidental/unintended consequence of force application that was consistent with contemporary police training, policy, and practice.
- If it is assumed that Ms. Wedgeworth and others were present and participating in behavior that did NOT justify the no warning use of chemical munitions, then the use of the munitions and her exposure and related discomfort would have been inconsistent with contemporary police, training, policy, and practice.

**Basis for the Opinions in response to Wedgeworth allegation 3:**

Please see the considerations in response to Epps allegation 1 above.

**Wedgeworth allegation 4**-Officers released "tear gas" into the crowd, and she witnessed officers shoot what she says appeared to be pepper balls at protestors.

---

[88] IACP crowd management policy, section C-10

- Ms. Wedgeworth attended the protests again on Tuesday, June 2, 2020. That night, officers again released tear gas into the crowd of protesters. Ms. Wedgeworth also witnessed officers shoot projectiles that appeared to be pepper balls at protesters.[89]

As a result of the tear gas and pepper ball dust Ms. Wedgeworth inhaled on May 29, May 31, June 1, and June 2, 2020, Ms. Wedgeworth suffered pain and difficulty breathing, as well as burning in her nose, eyes, and on her face for a few hours after being gassed.[90]

**Considerations in response to Wedgeworth allegation 4:**

Please see the considerations in response to Epps allegation 1, which outlines the policy and training issues involved in the decision to use chemical agents, and issue orders and warnings, and considerations in response to Epps allegation 2, which outlines the policy and training issues involved in the decision to use pepper balls.

**Opinion in response to Wedgeworth allegation 4:**

If it is assumed that Ms. Wedgeworth's allegation accurately characterizes what occurred, then the use of chemical munitions and pepper balls may or may not have been a force application that was consistent with contemporary police training, policy, and practice.

- If it is assumed that Ms. Wedgeworth was participating in behavior that justified the use of chemical munitions and pepper balls by DPD policy and as described by Commander Phelan, her exposure and related discomfort would have been the result of a force application that was consistent with contemporary police training, policy, and practice.
- If it is assumed that Ms. Wedgeworth was NOT participating in behavior that justified the use of chemical munitions and pepper balls, but that others in the area were, then her exposure would be a regretful and accidental/unintended consequence of a force application that was consistent with contemporary police training, policy, and practice.
- If it is assumed that Ms. Wedgeworth and others were present and participating in behavior that did NOT justify the use of chemical munitions and pepper balls, then the use of chemical munitions and pepper balls and her exposure and related discomfort would have been inconsistent with contemporary police training, policy, and practice.

**<u>Plaintiff Amanda Blasingame and Plaintiff Maya Rothlein</u>**

**<u>Blasingame and Rothlein allegation 1</u>**-They witnessed a person throw a plastic water bottle towards police. In response, the officers tear-gassed the entire crowd and continued using tear gas to move the group up the street.

- Later that night, at about 9:10 PM, a large group was chanting in the street at the intersection of 14th Ave and Sherman Street. Shortly after they witnessed one

---

[89] Civil Action No. 1:20-CV-1922-RBJ-MEH (consolidated with lead case *Epps, et al. v. City and County of Denver, et al.*, 1:20-CV-1878-RBJ), paragraph 106
[90] Ibid 107

individual throw a single plastic water bottle toward the police standing in the intersection, the officers tear-gassed the entire crowd and continued using tear gas to move the group up the street.[91]

**Considerations in response to Blasingame and Rothlein allegation 1:**

Please see the considerations in response to Epps allegation 1, which outlines issues addressing the use of chemical munitions.

**Opinion in response to Blasingame and Rothlein allegation 1:**

If it is assumed that Blasingame and Rothlein were exposed to chemical munitions in this situation, then that may or may not have been an appropriate application of force.

- If it is assumed that Blasingame and Rothlein were participating in behavior that justified the use of chemical munitions by DPD policy and as described by Commander Phelan, then their use would have been generally consistent with contemporary police training, policy, and practice.
- If it is assumed that Blasingame and Rothlein were NOT participating in behavior that justified the use of chemical munitions by DPD policy and as described by Commander Phelan, but others in the immediate area were, then their exposure would have been a regretful and accidental/unintended consequence of a police crowd control technique that was generally consistent with contemporary police training, policy, and practice.
- If it is assumed that Blasingame, Rothlein, and others were present in a crowd, and "a person throw a plastic water bottle towards police and in response, the officers tear-gassed the entire crowd and continued using tear gas to move the group up the street", then that that use of chemical munitions would have been disproportionate to the threat presented, and inconsistent with contemporary police standards, training, policy, and practice.

**Blasingame allegation 2**-She witnessed the crowd stand from a kneeling position, and officers then shooting tear gas and pepper bullets at the crowd without giving any warning.

- On Saturday, May 30, 2020 at about 5:30 PM, Ms. Blasingame was gathered in a large crowd outside of the Colorado State Capitol building. Ms. Blasingame, along with the rest of the crowd, was on her knees chanting "Hands up! Don't Shoot!" As soon as the crowd stood from a kneeling position, officers began shooting tear gas and pepper bullets at the crowd without giving any warning.[92]

**Considerations in response to Blasingame and Rothlein allegation 2:**

Please see the considerations in response to Epps allegations 1 and 2, which outline issues addressing the use of chemical munitions and pepper balls, and related warnings.

**Opinion in response to Blasingame and Rothlein allegation 2:**

If it is assumed that Blasingame and Rothlein were exposed to chemical munitions and or pepper balls in this situation, then that may or may not have been consistent with contemporary police training, policy, and practice.

---

[91] Ibid 110
[92] Ibid 111

- If it is assumed that Blasingame and Rothlein were participating in behavior that justified the no warning use of chemical munitions and or pepper balls by DPD policy and as described by Commander Phelan, then their use would have been generally consistent with contemporary police training, policy, and practice.
- If it is assumed that Blasingame and Rothlein were participating in behavior that justified the use of chemical munitions and or pepper balls by DPD policy and as described by Commander Phelan, and that the totality of circumstances presented would have allowed the issuance of warnings/orders as outlined in DPD policy, then the warnings/orders should have been given before the chemical munitions and or pepper balls were deployed.
- If it is assumed that Blasingame and Rothlein were NOT participating in behavior that justified the no warning use of chemical munitions or pepper balls by DPD policy and as described by Commander Phelan, but others in the immediate area were, then their chemical munition exposure would have been a regretful and accidental/unintended consequence of police crowd control techniques that were generally consistent with contemporary police training, policy, and practice.
- If it is assumed that Blasingame, Rothlein, and others were present in a crowd, and "as soon as the crowd stood from a kneeling position, officers began shooting tear gas and pepper bullets at the crowd without giving any warning", then that use of chemical munitions and pepper ball would have been inconsistent with contemporary police training, policy, and practice.

**Blasingame and Rothlein allegation 3**-While gathering in their front yard, a neighbor yelled at a passing police car. The officers stopped and exited. One came to their fence and pointed pepper spray at them and threatened to spray while they sat on their steps. While pointing it at them, the officer looked directly at Ms. Rothlein-who was the only black person in the yard. Ms. Blasingame reminded the officer of their first amendment rights, and he left.

- Ms. Blasingame returned home to comply with the 8 PM curfew (May 30). She and Ms. Rothlein gathered in their front yard with some neighbors. When a police car followed by a line of SWAT vehicles drove down their street, one neighbor yelled at the police car. The police car and the SWAT vehicles stopped and the officers exited their vehicles. While the officers in SWAT gear stood in the street holding weapons, one officer came up to Ms. Blasingame and Ms. Rothlein's fence and began threatening to pepper spray them while they sat on the steps of their own home. While holding the pepper spray up and pointing it at them, the officer stared directly at Ms. Rothlein, who was the only Black person in the front yard. Only after Ms. Blasingame reminded the officer of their First Amendment rights did the officer leave.[93]

**Considerations in response to Blasingame and Rothlein allegation 3:**

I reviewed the deposition of Ms. Blasingame and a video tape (Blasingame deposition exhibit F) that reportedly was taken during this interaction. Ms. Blasingame discussed what occurred at deposition:

---

[93] Ibid 112

"And then at one point, there was a line -- we had yelled or someone had yelled, a combination of the two, had yelled. And there was a line of police vehicles that were coming down our road. And they -- the whole line of them stopped. And there -- the people who were on the SWAT vehicle like got off and stood in the street. And one of the officers that was in the first vehicle, he got out of his car. He walked across the sidewalk, right up to our fence. We were behind the fence on our apartment's property the entire time. And he said, Get the fuck back. And we were -- we said, We're not doing anything. We're not doing anything. We're not violating curfew. We're on private property. And then he pulled -- he had a big pepper spray canister. And at this point it was -- Maya stood back because she has had -- she's Black and a trans woman and has not good interactions with police and was scared. Breck and I are -- feel otherwise. And so we were in front of the fence. And the officer went right up to me and Breck and pointed the pepper spray[94] in our faces and was saying, Get the fuck back. I don't know where he wanted me to go. I was already on private property. I wasn't violating anything. I told him, This is -- I said, This is private property. I have a First Amendment right to speech. I'm not doing anything wrong. And then Breck had said to him, Go ahead and spray me, I dare you. And then our neighbors next door were yelling at the police to leave us alone. And they we recording what was happening while it was happening. And eventually the officer got back in his car and walked away. And then they drove off.[95]"

 

96

The frames from this video appear to show an officer in a gas mask walking back towards a white unmarked police car, with red/blue lights on the dash.

---

[94] Blasingame deposition page 123, lines 4-25
[95] Ibid 124, 1-13
[96] Blasingame Exhibit F, at about :08 and :18 seconds

**Opinions in response to Blasingame and Rothlein allegation 3:**

- If it is assumed that a police officer exited his patrol car and approached citizens that were sitting on their steps, and then pointed a cannister of pepper spray and said "get the fuck back" without any provocation beyond persons yelling at the passing police car, then that would be inappropriate and inconsistent with contemporary police training, policy, and practice.
- If it is assumed that a person(s) within that group of citizens had participated in behavior that justified being contacted by an officer, then that contact-including a warning and or perception by the citizens that pepper spray might be used-may have been consistent with contemporary police training, policy, and practice, depending on the totality of circumstances presented.
- If it is assumed that the officer in that justifiable contact used profanity and or pointed a pepper spray device at a citizen without adequate cause, then that would inappropriate, and inconsistent with contemporary police training, policy, and practice.

**Blasingame and Rothlein allegation 4-**A SWAT vehicle drove in front of their home. Someone again shouted for them to leave their neighborhood. Officers inside the vehicle shot pepper bullets directly at them as they sat on their front steps. Rounds hit the front door and entered the apartment building. They fled to the mailroom and found the room filled with a gas like substance. They count not enter the room for several days.

- Later that night (May 30), a SWAT vehicle drove down the street in front of Ms. Blasingame and Ms. Rothlein's home. Someone again shouted at the SWAT vehicle to leave their neighborhood. From the SWAT vehicle, officers shot pepper bullets directly at Ms. Blasingame and Ms. Rothlein where they were sitting on the front steps of their apartment. Pepper bullets hit the front door and even entered the apartment building. Ms. Blasingame and Ms. Rothlein retreated to the mail room of their apartment complex out of mortal fear only to find the mail room filled with what appeared to be a gas-like substance. They could not enter the mail room for several days thereafter. Another pepper bullet hit one of Ms. Blasingame and Ms. Rothlein's neighbors, who was coughing and vomiting for over an hour after being hit.[97]

**Considerations in response to Blasingame and Rothlein allegation 4:**

Please see the considerations in response to Epps allegations 1 and 2, which outline issues addressing the use of chemical munitions and pepper balls.   In addition, Ms. Blasingame was deposed in this case, and testified as follows concerning what occurred:

A· So as they drove by, it was officers that were hanging off the SWAT vehicle I don't know how many of them, but they just started shooting pepper balls at us. And someone had just one of the neighbors that I don't know well was just about to go inside and had her key in the door and so then she kind of like turned the key and tried to get in, and one of the pepper balls like hit our door, and some of them ended up in our mailroom.[98]

---

[97] Civil Action No. 1:20-CV-1922-RBJ-MEH (consolidated with lead case *Epps, et al. v. City and County of Denver, et al.*, 1:20-CV-1878-RBJ), paragraph 113
[98] Blasingame deposition page 131, lines 24-5

Q·Did they say anything prior to firing?
A· No[99]

**Opinions in response to Blasingame and Rothlein allegation 4:**

- If it is assumed that police officers shot pepper balls from inside their vehicle at persons sitting on their front steps, without provocation beyond persons yelling at the passing police car, then that would have been inappropriate and inconsistent with contemporary police training, policy, and practice.

- If it is assumed that a person(s) within that group of citizens had participated in behavior that justified the use of pepper balls by DPD policy and as described by Commander Phelan, then that use may have been consistent with contemporary police training, policy, and practice-depending on the totality of circumstances presented.

## Plaintiff Zach Packard

**Packard allegation 1-**He attempted to kick a tear gas cannister away and was then struck in the head with a projectile and knocked unconscious.

- On Sunday, May 31, 2020 at about 9 PM, Mr. Packard was protesting at the south side of the intersection of Colfax Avenue and Washington Street. At this time, a group of APD officers, including APD Sergeant Patricio Serrant and APD Officer David McNamee, were in an east-west line on Washington on the north side of Colfax and facing south into the intersection. They were armed with less-lethal weapons. Cannisters of tear gas or smoke were being deployed into the intersection. Officer David McNamee was armed with a less-lethal shotgun loaded with so-called "sock-" or "bean bag-" rounds. At approximately 9:12 p.m., APD Sergeant Patricio Serrant instructed the APD officers on the line, including Officer David McNamee, to target and hit any protesters that kicked one of the gas/smoke cannisters being deployed into the intersection.[100]

- Moments later, while Mr. Packard was still across the street from the APD officers on the south side of the intersection, Mr. Packard attempted to kick one tear gas cannister away from the group of protesters near him. He was almost immediately struck in the head with a projectile and knocked unconscious. At this same moment in time, APD officer McNamee had fired multiple rounds from his shotgun. The following photographs from a bystander show the attack by the APD officers on Mr. Packard. On information and belief Mr. Packard was struck in the head by a sock round from Officer McNamee's shotgun or a different less lethal round fired by one of the APD officers on the line.[101]

- Mr. Packard heard a message from a SWAT vehicle that "curfew was in effect," but Mr. Packard did not hear a warning from officers before being shot in the head. On information and belief, none of the APD officers in the line provided any

---

[99] Ibid page 132, lines 1-2
[100] Ibid 117
[101] Ibid 118

warnings to Mr. Packard before firing their less lethal munitions at him. On information and belief, APD officers knew the sock rounds from a less-lethal shotgun may be lethal. On information and belief, APD officers knew that kicking a tear gas cannister did not pose a serious threat of injury or death to any APD officer on the scene. On information and belief, neither Officer McNamee nor any other APD officer on the line took reasonable measures to mitigate the risk of serious bodily injury to Plaintiff Packard. On information and belief, at the time of the George Floyd Protests, it was the policy, custom, and/or practice of APD to target protesters with sock rounds despite facing no threat of serious bodily injury. Furthermore, APD officers were not properly trained in the use of such munitions. Minutes after Zach Packard was hit, APD Sergeant Matthew Brukbacher was asked by another APD officer on the line at Colfax and Washington, "if they touch our cannisters, bag 'em or no?" Sergeant Brukbacher responded, "Oh fuck yeah, yeah without a doubt, they touch any of our gas, they get hit." On information and belief, Sergeant Brukbacher was one of two less-lethal weapons instructors at APD at the time of the George Floyd Protests and was one of the sergeants, including Sergeant Serrant, leading APD's emergency response team.[102]

A CAT scan later revealed that Mr. Packard suffered a fractured skull and jaw, two fractured discs, and bleeding in his brain. Mr. Packard remained at the hospital for about one week. He has been prescribed anti-seizure medication, muscle relaxers, and oxycodone. He currently must wear a neck brace and is in a significant amount of pain.[103]

**Considerations in response to Packard allegation 1:**
The IACP model policy on crowd control management references impact projectiles generally, and says that:

> Direct-fired impact munitions, to include beanbag and similar munitions, should be deployed in a manner that recognizes the distinct factors involved, including the potential risk of hitting an unintended target due to officer-subject range and crowd density. Accordingly, direct-fire munitions are generally used against specific individuals who[104] are engaged in conduct that poses an immediate threat of death or serious injury or significant levels of property damage. A verbal warning should be given prior to the use of impact munitions when reasonably possible.[105]

If it is assumed that the officer that fired this impact projectile was not with the Denver Police Department (the complaint says on information and belief that an APD officer deployed the round), then his/her decision to use the round and manner of use would have been influenced by the officers' training, policy, and practice.

Photographs were provided that indicate Mr. Packard was kicking a hot gas cannister, and contemporaneous to that he was struck in the head with an impact projectile.

---

[102] Ibid 120
[103] Ibid 121
[104] IACP crowd control model policy, page 8 "Impact Projectiles"
[105] Ibid page 9



BLM-00001072



BLM-00000042



BLM-00000041

Mr. Packard provided a deposition in this case and testified concerning what happened when he was injured.

Q. So tell me -- tell me what happened. Like ow -- how did you -- how did you get injured?
A· I was, like, in the very front of the protest. And police started firing less lethals. And a canister came across the street, like basically right up to my feet. And so I kicked it out into the street, like out away from the protestors. And that was when I got hit in the, I lost vision. I heard ringing in my ears. And I could feel that I was falling to the ground. And then the next thing I know I was waking up in, like, someone's arms, like a block away.
Q· Did you see the officer that had deployed the canister that landed at your feet?
A· I did not.
Q·  And when you kicked the canister, did you intend to just kick it away from you or kick it at the police officer?
A· I intended to kick it away.
Q· How long after you -- or strike that. Did you actually kick it -- did your foot make contact with the canister?
A· Yes.
Q·  And then how long after your kicking the canister did you get hit with the less lethal?
A·  Almost immediately.
Q· And do you recall where on your body you were hit?
A· Right here in my temple, like right by my ear.[106]

It appears that Mr. Packard was hit in the head by a large caliber (12 gauge "bean bag" round or 37/40mm) impact projectile, based on his immediate incapacitation and grounding. It also appears that when he fell his head contacted the road/curb, which would have likely contributed to the injuries sustained. Mr. Packard was admittedly kicking a chemical munitions gas cannister just prior to being was hit by the round. I do not know what the shooting officer observed, perceived, or was attempting accomplish when he/she deployed the round that struck Mr. Packard.  I also do not the specific munition involved, the distances between the shooting officer and Mr. Packard, and the direction in which he

---

[106] Packard deposition pages 29-20, lines 21-25

(Packard) was kicking the gas round-each of which are significant factors when rendering an opinion concerning the decision to fire.

**Opinions in response to Packard allegation 1:**

- If it is assumed that Mr. Packard was kicking a tear gas cannister back towards the police officers or other persons, then the proper (appropriate round selection, distance, point of aim, proximity to other persons) use of an impact projectile to stop and or deter him from doing so would be consistent with contemporary police training, policy, and practice.
- If it is assumed that Mr. Packard was kicking a tear gas cannister away from himself and others, and not back towards the police officers, then the use of a large caliber impact projectile would be generally inconsistent with contemporary police standards, training, policy, and practice.
- If it is assumed that Mr. Packard was kicking a tear gas cannister back towards the police officers or other persons, and the officer properly deployed an impact round (appropriate round selection, distance, point of aim, proximity to other persons) but accidently struck Mr. Packard in the head, then that specific application of force (to the head-a vital body part) was not intentionally applied, but the accidental and unintended consequence of a force application that was consistent with contemporary police policy, training, and practice.
- If it is assumed that Mr. Packard was kicking a tear gas cannister back towards the police officers or other persons, and the grenadier improperly directed a large caliber impact projectile at him (inappropriate round selection, distance too far, improper point of aim, etc.), then that use of force would be inconsistent with contemporary police standards, training, policy, and practice.
- If it is assumed that Mr. Packard was kicking a tear gas cannister back towards the police officers or other persons, and the grenadier purposely directed a large caliber impact projectile at his head, that would be an unjustified application of deadly force.

### **Plaintiff Hollis Lyman**

**Lyman allegation 1-**exposed to tear gas, causing her eyes to water. She coughed and gagged several times. She did not hear a police warning before the gas was released.

- On Thursday, May 28, 2020, at about 8:30 PM, Ms. Lyman arrived at the area of the State Capitol to exercise her First Amendment right to protest and to stand in solidarity with those demonstrating against police violence. She joined a crowd of protestors by the Capitol, but was quickly pushed down a street near the Capitol by Officers. Officers tear gassed the entire crowd and Ms. Lyman felt like the tear gas was everywhere around her. Her eyes watered, and she coughed and gagged several times. Ms. Lyman did not hear officers issue a warning before releasing the tear gas.[107]

---

[107] Civil Action No. 1:20-CV-1922-RBJ-MEH (consolidated with lead case *Epps, et al. v. City and County of Denver, et al.*, 1:20-CV-1878-RBJ), paragraph 124

**Considerations in response to Lyman allegation 1:**

Please see the considerations in response to Epps allegation 1, which outlines the policy and training issues involved in the decision(s) to use chemical agents, and issue orders and warnings.

**Opinions in response to Lyman allegation 1:**

If it is assumed that Ms. Lyman's allegation accurately characterizes what occurred, then the police use of chemical munitions without warning or dispersal order may or may not have been consistent with contemporary police training, policy, and practice.

- If it is assumed that Ms. Lyman was participating in behavior that justified the no warning use of chemical munitions by DPD policy and as described by Commander Phelan, then her exposure and related discomfort would have been the result of a force application that was consistent with contemporary police policy, training, and practice.
- If it is assumed that Ms. Lyman was participating in behavior that justified the use of chemical munitions by DPD policy and as described by Commander Phelan, and that the totality of circumstances allowed the issuance of warnings as outlined in DPD policy, then warnings should have been given before the chemical munitions were deployed.
- If it is assumed that Ms. Lyman was NOT participating in behavior that justified the no warning use of chemical munitions, but others in her proximity were, then her exposure would be a regretful and accidental/unintended consequence of an appropriate police crowd control technique.
- If it is assumed that Ms. Lyman and others in the crowd were NOT participating in behavior that justified the no warning use of chemical munitions, then their use would have been inconsistent with contemporary police, training, policy, and practice.

**Lyman allegation 2**-exposed to tear gas and pepper balls from police vehicles, causing her eyes to burn. She was later hit with a pepper ball that had pierced her sign, causing a bruise on her arm.

- On Friday, May 29, 2020, protesters had gathered near the Capitol and were kneeling in front of police chanting "Hands up! Don't shoot!" Ms. Lyman observed police cars drive through the group and release tear gas and pepper balls from the vehicles. Ms. Lyman's eyes began to burn, and she ran away from the group to rinse her eyes with milk. Later, after returning to the protest, she used her sign as a shield to protect her from pepper balls. One pepper ball pierced through the sign, hitting Ms. Lyman and bruising her arm.

**Considerations in response to Lyman allegation 2:**

Please see the considerations in response to Epps allegation 1 and 2, which outlines the policy and training issues involved in the decision(s) to use chemical munitions and pepper balls, and issue orders and warnings.

45

**Opinions in response to Lyman allegation 2:**

If it is assumed that Ms. Lyman's allegation accurately characterizes what occurred, then the police use of chemical munitions without warning or dispersal order, and the deployment of pepper balls, may or may not have been an appropriate application of chemical munition force.

- If it is assumed that Ms. Lyman was participating in behavior that justified the no warning use of chemical munitions by DPD policy and as described by Commander Phelan, then her exposure and related discomfort would have been the result a force application that was consistent with contemporary police policy, training, and practice.

- If it is assumed that Ms. Lyman was participating in behavior that justified the use of chemical munitions by DPD policy and as described by Commander Phelan, and that the totality of circumstances allowed the issuance of warnings as outlined in DPD policy, then warnings should have been given before the chemical munitions were deployed.

- If it is assumed that Ms. Lyman was NOT participating in behavior that justified the no warning use of chemical munitions, but others in her proximity were, then her exposure would be a regretful and accidental/unintended consequence of an appropriate application of chemical munition force.

- If it is assumed that Ms. Lyman and others in the crowd were NOT participating in behavior that justified the no warning use of chemical munitions, then the use of such munitions would have been inconsistent with contemporary police training, policy, and practice.

- If it is assumed that Ms. Lyman was participating in behavior that justified the use of pepper balls as described by Commander Phelan, then the use against her and her shield would be consistent with contemporary police training, policy, and practice.

- If it is assumed that Ms. Lyman was NOT participating in behavior that justified the use of pepper balls as described by Commander Phelan, then the use of pepper balls against her would not have been inconsistent with contemporary police training, policy, and practice.

**<u>Lyman allegation 3</u>**-She was seeing officers shooting pepper balls at people, when a grenade hit a friend causing a deafening loud sound. She became disoriented from the sound and had difficulty hearing for the rest of the night.

- On Saturday, March 30, 2020, Ms. Lyman heard protest organizers encouraging peaceful protests. At about 3:30 PM, Ms. Lyman observed officers shooting pepper balls at a man who was kneeling in front of the officers with his arms raised. Later, officers shot more pepper balls as well as grenades at protesters. One grenade hit Ms. Lyman's friend in the leg and made a deafeningly loud sound. Ms. Lyman became disoriented from the sound. Ms. Lyman and her friend had difficulty hearing for the rest of the night. Ms. Lyman also observed officers pull a boy's

goggles and mask off of his face before spraying him in the face with pepper spray.[108]

**Considerations in response to Lyman allegation 3:**

Based on the material reviewed, it is unclear exactly what munition Ms. Lyman is referring to when she said that her friend was hit with a "grenade", as there are several devices that can be hand or launcher deployed that create a very loud noise upon ignition. Ms. Lyman testified at deposition concerning what she observed:

A   So as the police approached, they started firing pepper bullets, throwing gas, throwing concussion grenades. One of the concussion grenades laterally hit Alicia in the leg and exploded right at our feet.[109]

Q   And when the -- let me try that again. When the concussion grenade went off, I think you said that you and Alicia were having a hard time hearing; is that correct?
A   Yes.
Q   Did that improve as the night went on?
A   I would say we regained our hearing about percent that night. It took several days for it to recover fully.
Q   But several days later, it did recover fully?
A   Yes.  As far as I know.  No one has told  me I have bad hearing yet.
Q   That's fair.[110]

There is limited guidance and direction (training, policy) at a national police level that addresses the use of explosive devices in managing public disorder, and correspondingly their safe and effective use. Noise flash diversionary devices (NFDD) are tools that "create a bright flash and loud report designed to temporarily divert the attention of persons in the immediate vicinity, giving tactical teams a window of opportunity to exploit to their advantage."[111] A closely related device is the "blast ball" which generally has the same explosive payload, but is housed in a separating round rubber body as opposed to steel (most common with the NFDD). The "sting ball" grenade is a "blast ball" that is surrounded by rubber balls, that are distributed in a 360-degree arc if ignited in the air. All three devices are pin activated hand deployed tools that create a loud noise, bright flash, and slightly elevated atmospheric pressure (1.7 PSI at five feet) upon ignition. The NFDD is most often used by tactical teams during the execution of elevated risk police operations. The "blast" and "sting" balls are most often used in public order management and custody (jail/prison) situations. These devices are not mentioned in the IACP Crowd Management Policy, or DPD Crowd Management Manual. The Police Executive Research Forum (PERF) document "The Police Response to Mass Demonstrations", makes reference only to "sting ball" grenades in a proposal for unified command escalation of force.[112]  They are

---

[108] Civil Action No. 1:20-CV-1922-RBJ-MEH (consolidated with lead case *Epps, et al. v. City and County of Denver, et al.*, 1:20-CV-1878-RBJ), paragraph 126
[109] Lyman deposition page 88, lines 4-8
[110] Ibid page 89, lines 12-25
[111] ntoa.org/pdf/swatstandards.pdf (FSDD)
[112] PERF, The Police Response to Mass Demonstrations", page 83,
www.policeforum.org/assets/PoliceResponseMassDemonstrations.pdf

likewise used by many agencies to varying degrees during public disorder management situations. These explosive devices have a proven history of causing people to react and move, but extreme caution must be used to ensure the explosive energy is not discharged on or in close proximity to human beings. The energy levels involved are sufficient to cause death or serious injury if ignition occurs in intimate contact with a person generally, and on a vital body part in particular.

**Opinions in response to Lyman allegation:**
- Explosive devices (NFDD, Blast balls) are used to varying degrees by some police agencies in the public order management environment.
- If used, they should only be deployed in a manner that ensures they will not ignite in close proximity (under five feet) to persons.
- If it is assumed that an explosive device (NFDD or blast ball) was intentionally deployed in a manner likely to result in physical contact with a person (Ms. Lyman and or her friend), then that application of force-absent deadly force justification- would be inappropriate, and inconsistent with contemporary police training, policy, and practice.
- If it is assumed that Ms. Lyman and her friend, or others in close proximity, were involved in activity that reasonably justified the use of an explosive device (NFDD or blast ball) to terminate or deter such activity, and the device was unintentionally deployed in a manner that resulted in physical contact with a person (Ms. Lyman and or her friend), then that application of force would be the accidental and unintended consequence of an appropriate police activity.

**Lyman allegation 4-** Police routed Ms. Lyman and her friend, and she complied with the directions. Officers then shot Ms. Lyman in the back repeatedly with pepper balls as she tried to protect her friend. She struggled with gagging and nausea after inhaling gas, and after she returned home that night, Ms. Lyman threw up.
- Because Ms. Lyman desired to protect the people of color who were attempting to pro-test, Ms. Lyman returned to the protest area on Saturday night, at times placing herself between the police and people of color who were protesting. As Ms. Lyman and a friend were walking toward a group of protestors at the Capitol that night, Officers in Denver routed them through a particular street. Ms. Lyman and her friend complied with the directions, but Officers shot Ms. Lyman in the back repeatedly with pepper balls anyway, as she tried to protect her friend. She struggled with gagging and nausea after inhaling gas, and after she returned home that night, Ms. Lyman threw up.[113]

**Considerations in response to Lyman allegation 4:**
Please see considerations in response to Epps allegation 2, which addresses the criteria and justification for using pepper balls.

---

[113] Civil Action No. 1:20-CV-1922-RBJ-MEH (consolidated with lead case *Epps, et al. v. City and County of Denver, et al.*, 1:20-CV-1878-RBJ), paragraph 127

**Opinion in response to Lyman allegation 4:**

If it is assumed that Ms. Lyman's allegation accurately characterizes what occurred, then the deployment of pepper balls against her may or may not have been consistent with contemporary police training, policy, and practice.

- If it is assumed that Ms. Lyman was participating in behavior that justified the use of a pepper ball as described by Commander Phelan, then the rounds that reportedly struck her in the back would generally be consistent with agency policy, training, and practice.
- If it is assumed that Ms. Lyman was NOT participating in behavior that justified the use of pepper balls as described by Commander Phelan, then the rounds that reportedly struck her in the back would have been inconsistent with agency training and policy.

### Plaintiff Stanford Smith

**Smith allegation 1**-On Saturday, May 30, 2020, Mr. Smith arrived at the protests near the Capitol at about 4 PM. He did not see anyone throw anything at officers. He was exposed to tear gas that police fired into the crowd. No warning was given, and he left due to the effects of the gas.[114]

**Considerations for Smith allegation 1:**

Please see considerations for Epps allegation 1, which addresses the basis for using chemical munitions and the issuing of warnings/dispersal orders.

**Opinion in response to Smith allegation 1:**

If it is assumed that Mr. Smith's allegation accurately characterizes what occurred, then the police use of chemical munitions without warning or dispersal order may or may not have been consistent with contemporary police training, policy, and practice.

- If it is assumed that Mr. Smith was participating in behavior that justified the no warning use of chemical munitions by DPD policy and as described by Commander Phelan, then his exposure and related discomfort would have been the result of a force application that was consistent with contemporary police policy, training, and practice.
- If it is assumed that Mr. Smith was participating in behavior that justified the use of chemical munitions by DPD policy and as described by Commander Phelan, and that the totality of circumstances allowed the issuance of warnings as outlined in DPD policy, then warnings should have been given before the chemical munitions were deployed.
- If it is assumed that Mr. Smith was NOT participating in behavior that justified the no warning use of chemical munitions, but others in close proximity were, then his exposure would be a regretful and accidental/unintended consequence of a force application that was consistent with contemporary police policy, training, and practice.

---

[114] Civil Action No. 1:20-CV-1922-RBJ-MEH (consolidated with lead case *Epps, et al. v. City and County of Denver, et al.*, 1:20-CV-1878-RBJ), paragraph 130 and 131

- If it is assumed that Mr. Smith and others were NOT participating in behavior that justified the no warning use of chemical munitions, then the use of these munitions would have been inconsistent with contemporary police policy, training, and practice.

**Smith allegation 2**-As Mr. Smith was talking to protesters, one officer got out of his place in line, pushed his way between two other officers in the line, and sprayed Mr. Smith directly in his face with pepper spray. The officer did not give any warning before spraying the pepper spray in his face. On information and belief, the officer was an APD officer. [115] Mr. Smith feared for his life: he could not see, and he felt as though his face was on fire. Mr. Smith felt severe pain. His vision remained blurry, and his face remained red for several days, and his skin eventually peeled.[116]

**Considerations for Smith allegation 2:**

    If it is assumed that the officer deploying the pepper spray was not with the Denver Police Department (the complaint says on information and belief that an APD officer deployed the round), then his/her decision to use the OC spray and manner of use would have been influenced by the officers' agency training, policy, and practice.

    Mr. Smith gave the following deposition testimony concerning this complaint:

Q    Did you make any observations of the officer who Maced you?
A    No.  I don't know.  I just saw white -- white just coming at me.
Q    Did you make any observations of what the officer was doing prior to deploying Mace?
A    I saw him -- I saw somebody walking up. I saw somebody walking up.  Like I was by these police officers that I had been by for a good while.  We -- they even thanked me for helping -- like helping being -- for what I was doing.  I can't tell you what they were thanking me for, but they said, Thank you. And I saw somebody just come from behind their lines and spray me with Mace.  I just saw them -- I saw something.  And I saw somebody walking. It kind of caught my attention, because he was walking aggressively. He was walking fast, and nobody was really walking right there near me.   And so I looked over.  And then right when I looked, I saw something, like a black release of white.  And the white hit me in the face, and I[117] couldn't see for a long time after that.

Q  All right.  And you referenced the officer as a "he."  Were you able to make an observation that who -- whichever officer Maced you was male?
A  I believe it was a white male.  It was a split second.  I think it was a white male.  And I'm not trying to generalize anything, but I think it was a young, white male.  But if – I couldn't even be able to point the person out in a lineup or anything like that.[118]

[115] Ibid 133
[116] Ibid 134
[117] Smith deposition page 107, lines 9-25
[118] Ibid 108, 1-10

**Opinion in response to Smith allegation 2:**

If it is assumed that Mr. Smith's allegation accurately characterizes what occurred, then the use of OC spray may or may not have been consistent with contemporary police training, policy, and practice.

- If it is assumed that Mr. Smith was acting in a manner that justified the use of pepper spray, then the use be consistent with contemporary police training, policy, and practice.
- If it is assumed that Mr. Smith was NOT acting in a manner that justified the use of pepper spray, then the use would be inconsistent with contemporary police training, policy, and practice.

### Plaintiffs Sara Fitouri, Jacquelyn Parkins, and Joe Deras

**Fitouri, Parkins, and Deras allegation 1**-On May 28, 2020, at around 7:00 p.m., officers fired pepper balls at protestors on a pedestrian bridge over I-25. No dispersal orders or warnings were given. Plaintiffs Fitouri, Parkins, and Deras inhaled chemical irritants from the weapons fired by DPD Officers.[119]

- DPD Officers fired dozens of pepper balls on the group of protestors who were standing on the walkway leading up to the pedestrian bridge. In addition, Defendant Dodge directed DPD Officer Kyle McNabb to shoot pepper balls at the pedestrian bridge, where numerous protestors were standing. Defendant Dodge directly participated in, and/or facilitated, ordered, or approved the use of force on protestors.[120] Defendant Canino and his team were present, and he directly participated in, and/or facilitated, ordered, or approved the use of force on protestors. No orders to disperse, warnings, or other announcements were given before the Defendant Officers used less-lethal weapons on the protestors. Defendants Canino and Dodge set in motion a series of events that they knew or reasonably should have known would cause others to deprive Plaintiffs of their constitutional rights. They knew of and acquiesced in the constitutional violations committed by his subordinates. In so doing, Defendants Canino and Dodge knowingly created a substantial risk of constitutional injury and disregarded known or obvious consequences of their actions, exhibiting deliberate indifference to the rights of Plaintiffs.[121]

**Considerations for Fitouri, Parkins, and Deras allegation 1**

Please see the considerations for Epps allegation 1, which addresses the issues and related justification for chemical munitions use-which would include the use of pepper ball in an indirect area contamination mode.

**Opinion in response to Fitouri, Parkins, and Deras allegation 1:**

If it is assumed that plaintiff's allegations accurately characterize what occurred, then the police use of chemical munitions/pepper balls in an area contamination mode

---

[119] Civil Action Nos. 1:20-cv-01878-RBJ (consolidated with *Fitouri, et al. v. City and County of Denver, Colorado, et al.*, 1:20-cv-1922-RBJ-MEH, paragraph 106-7, and 114
[120] Ibid 108-9-10
[121] Ibid 111-12-13

without warning or dispersal order, may or may not have been consistent with contemporary police training, policy, and practice.

- If it is assumed that the plaintiffs were participating in behavior that justified the no warning use of chemical munitions/area pepper ball by DPD policy and as described by Commander Phelan, then their exposure and related discomfort would have been the result of a force application that was consistent with contemporary police policy, training, and practice.
- If it is assumed that the plaintiffs were participating in behavior that justified the use of chemical munitions by DPD policy and as described by Commander Phelan, and that the totality of circumstances would have allowed the issuance of warnings as outlined in DPD policy, then warnings should have been given before the chemical munitions were deployed.
- If it is assumed that the plaintiffs were NOT participating in behavior that justified the no warning use of chemical munitions, but other persons in close proximity were, then their exposure was the accidental/unintended consequence of a chemical munitions application that was consistent with contemporary police training, policy, and practice.
- If it is assumed that the plaintiffs and other persons in close proximity were NOT participating in behavior that justified the use of chemical munitions, then the use would have been inconsistent with contemporary police training, policy, and practice.
- If it is assumed that the involved officers reasonably believed that persons on the pedestrian walkway and in the immediate area were attempting to get on I-25, then the use of chemical munitions to prevent this would have been consistent with contemporary police training, policy, and practice, for the safety of the pedestrians and the motoring public. If the totality of circumstances in this situation would have allowed the issuance of warnings as outlined in DPD policy, then warnings should have been given before the chemical munitions were deployed.

**Fitouri, Parkins, and Deras allegation 2**-When Plaintiffs rejoined the march heading back downtown, they inhaled tear gas and/or pepper spray that Doe Defendant DPD Officers had used on protestors in the area of 16th and Platte. Plaintiffs had not thrown anything at the officers or committed any act that justified the use of force.[122]

**Considerations for Fitouri, Parkins, and Deras allegation 2**

Please see the considerations for Epps allegation 1, which addresses the issues and related justification for chemical munitions use-which would include the use of pepper ball in an indirect area contamination mode.

**Opinion in response to Fitouri, Parkins, and Deras allegation 2:**

If it is assumed that plaintiff's allegations accurately characterize what occurred, then the police use of chemical munitions/pepper balls in an area contamination mode may or may not have been consistent with contemporary police training, policy, and practice.

---

[122] Ibid 115-16

- If it is assumed that the plaintiffs were participating in behavior that justified the no warning use of chemical munitions/area pepper ball by DPD policy and as described by Commander Phelan, then their exposure would have been the result of a force application that was consistent with contemporary police policy, training, and practice.
- If it is assumed that the plaintiffs were NOT participating in behavior that justified the no warning use of chemical munitions, but other persons in close proximity were, then their exposure was the accidental/unintended consequence of a chemical munitions application that was consistent with contemporary police training, policy, and practice.
- If it is assumed that the plaintiffs and other persons in close proximity were NOT participating in behavior that justified the use of chemical munitions, then the use would have been inconsistent with contemporary police training, policy, and practice.

**Fitouri and Parkins allegation 3**-On May 29, 2020, at approximately 8:00-8:45 p.m., Fitouri and Parkins and other protestors were at the intersection of Colfax and Broadway. The group was peaceful. At one point, someone in the group may have lofted a water bottle into the air. Rather than investigate and isolate that person, Doe Defendant DPD Officers indiscriminately opened fire with tear gas and pepper balls at the entire group of protestors, including Fitouri and Parkins, without warning or order to disperse.[123]

**Considerations in response to Fitouri and Parkins allegation 3:**

Please see the considerations for Epps allegation 1 and 2, which addresses the issues and related justification for chemical munitions use-which would include the use of pepper ball in an indirect area contamination mode-as well as pepper ball in the direct fire mode.

**Opinion in response to Fitouri and Parkins allegation 3:**

If it is assumed that plaintiff's allegations accurately characterize what occurred, then the police use of chemical munitions/pepper balls in an area contamination and direct fire mode may or may not have been consistent with contemporary police training, policy, and practice.

- If it is assumed that the plaintiffs were participating in behavior that justified the no warning use of chemical munitions/area and direct fire pepper ball by DPD policy and as described by Commander Phelan, then their exposure would have been the result of a force application that was consistent with contemporary police policy, training, and practice.
- If it is assumed that the plaintiffs were participating in behavior that justified the use of chemical munitions/area and direct fire pepper ball by DPD policy and as described by Commander Phelan, and that the totality of circumstances allowed the issuance of warnings as outlined in DPD policy, then warnings should have been given before the chemical munitions/area and direct fire pepper ball munitions were deployed.

---

[123] Ibid 117-18

- If it is assumed that the plaintiffs were NOT participating in behavior that justified the use of chemical munitions/area and direct fire pepper ball by DPD policy and as described by Commander Phelan, but other persons in close proximity were, then their chemical munitions exposure was the accidental/unintended consequence of a force application that was consistent with contemporary police training, policy, and practice. Contact with direct fire pepper ball munitions in this situation would be inconsistent with contemporary police training, policy, and practice.
- If it is assumed that the plaintiffs and others in close proximity were NOT participating in behavior that justified the use of chemical munitions/area and direct fire pepper ball by DPD policy and as described by Commander Phelan, and at one point "someone in the group may have lofted a water bottle into the air", then the use of chemical munitions/area and direct fire pepper ball would have been disproportionate to the threat presented, and inconsistent with contemporary police training, policy, and practice.
- If it is assumed that the plaintiffs and others in close proximity were NOT participating in behavior that justified the use of chemical munitions/area and direct fire pepper ball by DPD policy and as described by Commander Phelan, then their use would have been inconsistent with contemporary police training, policy, and practice.

**Fitouri and Parkins allegation 4-**Both were exposed to additional pepper balls, tear gas, and flashbang grenades from the corner of Broadway and Colfax, as well as multiple other locations on and around the Capitol.[124]

**Considerations in response to Fitouri and Parkins allegation 4:**

Please see the considerations for Epps allegation 1 and 2, which addresses the issues and related justification for chemical munitions use-which would include the use of pepper ball in an indirect area contamination mode-as well as pepper ball in the direct fire mode. Please also see considerations in response to Lyman allegation 3, which addresses issues and related justification concerning the use of explosive munitions.

**Opinions in response to Fitouri and Parkins allegation 4:**

If it is assumed that the plaintiffs' allegations accurately characterize what occurred, then the police use of chemical munitions/pepper balls in an area contamination and direct fire mode, and flashbangs/blast balls may or may not have been consistent with contemporary police training, policy, and practice.

- If it is assumed that the plaintiffs were participating in behavior that justified the use of chemical munitions/area and direct fire pepper ball by DPD policy and as described by Commander Phelan, then their exposure would have been the result of a force application that was consistent with contemporary police policy, training, and practice.
- If it is assumed that the plaintiffs were NOT participating in behavior that justified the use of chemical munitions/area and direct fire pepper ball by DPD policy and as described by Commander Phelan, but other persons in close proximity were, then

---

[124] Ibid 122

their chemical munitions exposure was the accidental/unintended consequence of a force application that was consistent with contemporary police training, policy, and practice. Contact with direct fire pepper ball munitions in this situation would be inconsistent with contemporary police training, policy, and practice.

- If it is assumed that the plaintiffs and or others in close proximity, were involved in activity that reasonably justified the use of an explosive device (NFDD or blast ball) to terminate or deter such activity, and the device was deployed in an appropriate manner, then that application of force would be generally consistent with contemporary police policy, training, and practice.

- If it is assumed that the plaintiffs and or others in close proximity, were NOT involved in activity that reasonably justified the use of an explosive device (NFDD or blast ball) to terminate or deter such activity, then that application of force would be inconsistent with contemporary police policy, training, and practice.

**Fitouri and Parkins allegation 5-**Doe Defendant DPD Officers used pepper balls, tear gas, and flashbang grenades to push protestors southeast of the Capitol into the surrounding neighborhoods. Fitouri and Parkins inhaled significant amounts of pepper spray and tear gas.[125]

**Considerations in response to Fitouri and Parkins allegation 5:**

Please see the considerations for Epps allegation 1 and 2, which address the issues and related justification for chemical munitions use-which would include the use of pepper ball in an indirect area contamination mode-as well as pepper ball in the direct fire mode. Please also see considerations in response to Lyman allegation 3, which addresses issues and related justification concerning the use of explosive munitions.

**Opinions in response to Fitouri and Parkins allegation 5:**

If it is assumed that the plaintiff's allegations accurately characterize what occurred, then the police use of chemical munitions/pepper balls in an area contamination and direct fire mode, and flashbangs may or may not have been consistent with contemporary police policy, training, and practice.

- If it is assumed that the plaintiffs were participating in behavior that justified the use of chemical munitions/area and direct fire pepper ball by DPD policy and as described by Commander Phelan, then their exposure would have been the result of a force application that was consistent with contemporary police policy, training, and practice.

- If it is assumed that the plaintiffs were NOT participating in behavior that justified the use of chemical munitions/area and direct fire pepper ball by DPD policy and as described by Commander Phelan, but other persons in close proximity were, then their chemical munitions exposure was the accidental/unintended consequence of a force application that was consistent with contemporary police training, policy, and practice. Contact with direct fire pepper ball munitions in this situation would be inconsistent with contemporary police training, policy, and practice.

---

[125] Ibid 123

- If it is assumed that the plaintiffs and or others in close proximity, were involved in activity that reasonably justified the use of an explosive device (NFDD or blast ball) to terminate or deter such activity, and the device was deployed in an appropriate manner, then that application of force would be generally consistent with contemporary police policy, training, and practice.
- If it is assumed that the plaintiffs and or others in close proximity, were NOT involved in activity that reasonably justified the use of an explosive device (NFDD or blast ball) to terminate or deter such activity, then that application of force would be inconsistent with contemporary police policy, training, and practice.

**Fitouri and Deras allegation 6**-On May 30, 2020, before 8:00 PM at the west steps of the Capitol building,[126] a DPD Metro SWAT Officer standing on Colfax north of the protestors on Lincoln threw a grenade into the crowd, which exploded at Fitouri's foot. This officer is believed to be either Defendant Martinez or Defendant Eberharter. Fitouri's foot went numb and she suffered minor burns. The flashbang grenade also exploded near Deras, injuring his eardrum and causing sharp pain in his ear for several days afterwards.[127]

**Considerations in response to Fitouri and Deras allegation 6:**

Please see considerations in response to Lyman allegation 3, which addresses issues related to the use of explosive munitions.

**Opinions in response to Fitouri and Deras allegation 6:**

- If it is assumed that a "grenade" (explosive device-NFDD or blast ball) was intentionally deployed "into the crowd", and in a manner that resulted in an explosion "at the foot" of Fitouri, then that application of force-absent deadly force justification-would have been inconsistent with contemporary police training, policy, and practice.
- If it is assumed that the plaintiffs or others in close proximity, were involved in activity that reasonably justified the use of an explosive device (NFDD or blast ball) to terminate or deter such activity, and the device was unintentionally deployed in a manner that resulted in physical contact with a person (Ms. Lyman and or her friend), then that application of force would be the accidental and unintended consequence of an appropriate police activity.

**Deras allegation 7**-While peacefully protesting at the intersection of Lincoln and Colfax, Officers shot at Deras with pepper balls and another kind of KIP. Deras was also caught in smoke and tear gas multiple times before curfew.[128]

**Considerations in response to Deras allegations 7:**

Please see the considerations for Epps allegation 1 and 2, which address the issues and related justification for chemical munitions use-which would include the use of pepper ball in an indirect area contamination mode-as well as pepper ball and impact munitions in the direct fire mode.

---

[126] Ibid 135
[127] Ibid 149
[128] Ibid 150

**Opinions in response to Deras allegation 7:**

If it is assumed that plaintiff's allegations accurately characterize what occurred, then the police use of chemical munitions, pepper balls, and impact projectiles may or may not have been an application of chemical agent and impact projectile force that was consistent with contemporary police training, policy, and practice.

- If it is assumed that Deras was participating in behavior that justified the use of chemical munitions and direct fire pepper ball/impact rounds by DPD policy and as described by Commander Phelan, then his exposure would have been the result of force applications that were consistent with contemporary police policy, training, and practice.

- If it is assumed that Deras was NOT participating in behavior that justified the use of chemical munitions/area and direct fire pepper ball/impact rounds by DPD policy and as described by Commander Phelan, but other persons in close proximity were, then his chemical munitions exposure was the accidental/unintended consequence of a force application that was consistent with contemporary police training, policy, and practice. Contact with direct fire pepper ball or impact munitions in this situation would be inconsistent with contemporary police training, policy, and practice.

**Deras allegation 8**-At about 7:00 p.m., Officers threw multiple canisters of tear gas onto the Capitol lawn. Deras was close to the steps of the Capitol at this time, near Lincoln. He did not see the tear gas coming until his breathing was adversely affected. Deras almost lost consciousness because he could not catch his breath, his vision was blurred, his face was on fire, and he was very disoriented. Deras struggled to breathe for approximately half an hour.[129]

**Considerations in response to Deras allegation 8:**

Please see the considerations for Epps allegation 1, which addresses the issues and related justification for chemical munitions use.

**Opinions in response to Deras allegation 8:**

If it is assumed that the plaintiffs allegation accurately characterizes what occurred, then the police use of chemical munitions may or may not have been consistent with contemporary police training, policy, and practice.

- If it is assumed that Deras was participating in behavior that justified the use of chemical munitions by DPD policy and as described by Commander Phelan, then his exposure would have been the result of a force application that was consistent with contemporary police policy, training, and practice.

- If it is assumed that Deras was NOT participating in behavior that justified the use of tear gas, but others in close proximity were, then his exposure was an accidental/unintended consequence of a force application that was consistent with contemporary police policy, training, and practice.

---

[129] Ibid 162

- If it is assumed that Deras and others in close proximity were NOT participating in behavior that justified the use of tear gas, then the use was inconsistent with contemporary police policy, training, and practice.

**Fitouri, Parkins, and Deras allegation 9**- Plaintiff's marched with a group of protestors Southeast of the Capitol, DPD Officers began shooting pepper balls at the protestors without warning or giving any dispersal or other orders. Fitouri, Parkins, and Deras were with a group of approximately 30 people who ran into an alley in order to avoid being hit. DPD Officers chased the protestors both on foot and on SWAT vehicles into the alley in order to trap them and continue shooting at them. Fitouri was hit with pepper balls. Fitouri, Parkins, and Deras felt the effects of chemical agents.[130]

- DPD Officers threw tear gas and flashbang grenades at Deras and other protestors trapped in an alley. This was very traumatic to Deras and others because people were scared, trying to run away, and some people were getting trampled.[131]
- DPD Officers did not give any warnings or dispersal orders and appeared only interested in intimidating and punishing protestors with their "less-lethal" weapons.[132]

**Considerations in response to Fitouri, Parkins, and Deras allegation 9:**

Please see the considerations in response to Epps allegations 1 and 2, which outline the policy and training issues involved in the decision(s) to use chemical munitions, the issue of orders and warnings, and the use of pepper balls in the direct fire mode. Please also see considerations in response to Wedgeworth allegation 3, which addresses the issue of ensuring that protestors always have an exit/egress route when interacting with officers. Please see considerations in response to Lyman allegation 3, which addresses issues related to the use of explosive munitions.

**Opinions in response to Fitouri, Parkins, and Deras allegation 9:**

If it is assumed that the plaintiffs allegations accurately characterizes what occurred, then the police response to the alley and subsequent use of chemical munitions, pepper balls, and flashbangs without warning or dispersal order, may or may not have been consistent with contemporary police training, policy, and practice.

- If it is assumed that the officers "trapped" the protesters in the alley and did not provide for and allow exit, then that would have been inconsistent with contemporary police policy, training, and practice.
- If it is assumed that the plaintiffs were participating in behavior that justified the no warning use of chemical munitions and pepper balls by DPD policy and as described by Commander Phelan, then their exposure would have been the result of force applications that were consistent with contemporary police training, policy, and practice.
- If it is assumed that the plaintiffs were participating in behavior that justified the use of chemical munitions and pepper balls by DPD policy and as described by Commander Phelan, and that the totality of circumstances presented would have

---

[130] Ibid 168
[131] Ibid 169
[132] Ibid 172

allowed the issuance of warnings/orders as outlined in DPD policy, then the warnings/orders should have been given before the chemical munitions and pepper balls were deployed.

- If it is assumed that the plaintiffs were NOT participating in behavior that justified the no warning use of chemical munitions and pepper balls, but that others in the immediate area were, then their exposure to chemical munitions would have been the regretful and accidental/unintended consequence of an application of force that was consistent with contemporary police training, policy, and practice. Contact with direct fire pepper ball rounds in this situation would be inconsistent with contemporary police training, policy, and practice.

- If it is assumed that the plaintiffs and others present were participating in behavior that did NOT justify the no warning use of chemical munitions and or pepper ball rounds, then their use would have been inconsistent with contemporary police training, policy, and practice.

- If it is assumed that the plaintiffs and or others in close proximity, were involved in activity that reasonably justified the use of an explosive device (NFDD or blast ball) to terminate or deter such activity, and the device(s) was deployed in a reasonable manner, then that application of force would have been generally consistent with contemporary police training, policy, and practice.

**Deras allegation 10**-On Sunday, May 31, 2020, in the early evening, Fitouri, Parkins, Deras, and Youssef marched with the other protestors. Deras was hit three times with projectiles thrown or shot out of "less lethal" weapons by JCRS officers. Deras was hit once in his head, once in his hand, and once in his back.[133] Deras was seriously injured and immediately left to seek treatment at a nearby hospital.[134]

- At approximately 8:30 p.m., when Fitouri, Parkins, Deras, Amghar, and other protestors marched near the police precinct on Washington and Colfax, JCRS officers intentionally allowed half the group to pass and then began tear gassing, throwing flashbangs at, and pepper spraying the middle of the protest march. There were likely several thousand protestors in the march at this time.[135]

- Plaintiffs did not witness protestors do anything violent or that would otherwise justify the force used by JCRS.[136] The officers gave no warnings or orders prior to their use of force.[137]

- At and prior to the time he was shot, Deras was not committing any act of aggression or any other act that warranted the use of force that could cause him serious bodily injury or death.[138]

**Considerations in response to Deras allegation 10:**

If it is assumed that the officer(s) involved were not with the Denver Police Department (the complaint says on information and belief that the officers were with the

---

[133] Ibid 184
[134] Ibid 193
[135] Ibid 176
[136] Ibid 181
[137] Ibid 183
[138] Ibid 189

JCRS) then their decision(s) to use the munitions and manner of use would have been influenced by the officers' agency training, policy, and practice.

**Opinions in response to Deras allegation 10:**

If it is assumed that the plaintiffs allegations accurately characterize what occurred, then the police use of chemical munitions/pepper balls in an area contamination and direct fire mode, potentially another type of impact round, and flashbangs may or may not have been consistent with contemporary police training, policy, and practice.

- If it is assumed that Deras was participating in behavior that justified the use of chemical munitions/area and direct fire pepper ball and or impact rounds, then his exposure would have been the result of a force application that was consistent with contemporary police policy, training, and practice.
- If it is assumed that Deras was NOT participating in behavior that justified the use of chemical munitions/area fire pepper ball, or direct fire pepper ball, but others in close proximity were, then his chemical munitions exposure was the accidental/unintended consequence of a force application that was consistent with contemporary police policy, training, and practice. Contact with direct fire pepper ball rounds in this situation would be inconsistent with contemporary police training, policy, and practice.
- If it is assumed that Deras and or others were participating in behavior that justified the use of chemical munitions/pepper balls, and that the totality of circumstances presented would have allowed the issuance of warnings/orders, then the warnings/orders should have been given before the chemical munitions and pepper balls were deployed.
- If it is assumed that Deras and others in close proximity were NOT participating in behavior that justified the use of chemical munitions/area fire pepper ball, or direct fire pepper ball, then the use of force would be inconsistent with contemporary police training, policy, and practice.
- If it is assumed that Deras or others in close proximity were involved in activity that reasonably justified the use of an explosive device (NFDD or blast ball) to terminate or deter such activity, and the device was deployed in an appropriate manner, then that application of force would be generally consistent with contemporary police, policy, training, and practice.
- If it is assumed that Deras and or others in close proximity, were NOT involved in activity that reasonably justified the use of an explosive device (NFDD or blast ball) to terminate or deter such activity, then that application of force would be inconsistent with contemporary police training, policy, and practice.

## **Plaintiff Claire Sannier**

**Sannier allegation 1**-On May 28, 2020, Sannier joined the protests at around 5:00 or 6:00 p.m. She marched with other peaceful protestors near the Capitol and on streets downtown. They marched to I-25, but Sannier did not get on I-25. She saw DPD Officers using "less-lethal" weapons on people on I-25, and bystanders who were on the pedestrian bridge were

exposed to massive doses of tear gas and/or pepper spray.[139] Sannier had been pepper sprayed for no lawful reason.[140]

**Considerations in response to Sannier allegation 1:**

The DPD Crowd Management Manual addresses the use of personal issue chemical munitions, the type of which was allegedly used in this complaint (OC-Mark 9, Mark 46 Foggers). The manual says that these devices are a use of force and must meet the requirements of all Department policies and procedures and Colorado Revised Statutes. In general, an officer may deploy chemical munitions without supervisory authorization against a specific individual who is not part of a civil disturbance. The behavior of the individual must rise to at least the level of Defensive Resistance.[141]

**Opinions in response to Sannier allegation 1:**

If it is assumed that Ms. Sannier's allegation accurately characterizes what occurred, then the police use of OC spray may or may not have been an appropriate application of chemical agent force.

- If it is assumed that Ms. Sannier was acting in a manner consistent with defensive resistance or higher, then the use of OC spray would consistent with contemporary police training, policy, and practice.
- If it is assumed that Ms. Sannier was NOT acting in a manner consistent with defensive resistance or higher, then the use of OC would be inconsistent with contemporary police training, policy, and practice.
- If it is assumed that the involved officers reasonably believed that persons on the pedestrian walkway and in the immediate area were attempting to get on I-25, then the use of force-including pepper spray-to prevent this would have been consistent with contemporary police training, policy, and practice, for the safety of the pedestrians and the motoring public.

**Sannier allegation 2**-On May 29, 2020, Sannier was walking home downtown. She saw a Black man yelling at (but not threatening) a group of DPD Officers. A white couple started arguing with the Black man. Sannier recorded this with her cell phone. The officers opened fire on the people arguing, and, seeing that Sannier was filming, shot her in the chest with a pepper ball.[142]

- Sannier's act of recording the Doe Defendant DPD Officers did not interfere with the officers in any way. Sannier had a constitutionally protected right to record police officers' official actions in a public place. At the time, Sannier was exercising her constitutionally protected right to record police officers' official actions in a public place.[143]

---

[139] Ibid 211
[140] Ibid 212
[141] DPD CMM, page 22
[142] Civil Action No. 1:20-CV-1922-RBJ-MEH (consolidated with lead case *Epps, et al. v. City and County of Denver, et al.*, 1:20-CV-1878-RBJ), paragraph 214
[143] Ibid 215-17

**Considerations in response to Sannier allegation 2:**

Please see the considerations for Epps allegation 2, which addresses the issues and related justification for using the pepper ball in the direct fire mode.



Officers shooting the "white" couple with pepper ball rounds in the back, as they engage in an argument with a subject that is out of view of the camera.



A Pepper ball round can be seen hitting the light post, while fired in a volley apparently directed towards persons around and potentially including Sannier.

---

I reviewed the video in this case and saw that a white female in the street was reacting to a subject off camera, who is referring to her as a "bitch" and "American Idol". The female turned towards the antagonistic subject several times, and her male companion grabbed her arm and tried leading her away from the argument.  At approximately 06:01 officers engage the couple in the back with pepper ball rounds. I did not hear any warning or directive prior to the pepper balls being fired. Someone near the recording device reacts with surprise, yelling "what the fuck". The couple then ran down the street, as persons near the recording device can be heard yelling, "back up-back up". Pepper ball fire can be heard for approximately 15 seconds. A round is heard and observed striking the light pole between the recording device (Sannier) and the officers. At approximately 06:19 a person close to the recording device can be heard exclaiming "Ahhh", consistent with being hit by an impact round. It does not appear that Sannier was singled out for pepper ball deployment, as other persons near her could be seen and heard reacting to the incoming pepper ball fire. The video ended at 06:25

Please see the considerations for Epps allegation 2, which addresses the issues and related justification for the use of pepper ball in the direct fire mode.

DPD policy and training state that pepper ball rounds are generally authorized when officers are facing suspects that demonstrate defensive resistance or higher. In this case I did not observe any interaction between the officers and persons targeted with pepper ball rounds.

**Opinion in response to Sannier allegation 2:**
- In the absence of information from the involved officers that might provide an unknown/unobserved basis for the pepper ball deployment, the use against the persons on the video-including Sannier-appears to be inconsistent with DPD policy and contemporary police policy, training, and practice.
- The material reviewed does not suggest that Sannier was "singled out" because she was videotaping the officers, as the video indicates that others in the area were targeted as well.

**Sannier allegation 3**-On May 30 at approximately 4:48 pm, at the intersection of 16th Street and Welton, Sannier inhaled chemical irritants. She had eye irritation and was in respiratory distress. No warnings, orders (including dispersal orders), or announcements were made prior to the use of force.[146]

**Considerations for Sannier allegation 3:**
Please see considerations for Epps allegation 1, which addresses the basis for giving warnings/dispersal orders, and the deployment of tear gas.

**Opinion in response to Sannier allegation 3:**
If it is assumed that Ms. Sannier's allegation accurately characterizes what occurred, then the police use of tear chemical munitions without warning or dispersal order may or may not have been consistent with contemporary police training, policy, and practice.

---

[146] Ibid 221-22

- If it is assumed that Ms. Sannier was participating in behavior that justified the no warning use of chemical munitions by DPD policy and as described by Commander Phelan, then her exposure and related discomfort would have been the result of a force application that was consistent with contemporary police policy, training, and practice.
- If it is assumed that Ms. Sannier was participating in behavior that justified the use of chemical munitions by DPD policy and as described by Commander Phelan, and that the totality of circumstances would have allowed the issuance of warnings as outlined in DPD policy, then warnings should have been given before the munitions were deployed.
- If it is assumed that Ms. Sannier was NOT participating in behavior that justified the no warning use of tear gas, but others in close proximity were, then her exposure was a regretful and the accidental/unintended consequence of a force application that was consistent with contemporary police policy, training, and practice.
- If it is assumed that Ms. Sannier and others in the immediate area were NOT participating in behavior that justified the use of chemical munitions, then her exposure would have been inconsistent with contemporary police policy, training, and practice.

**Sannier allegation 4**-Between 6:00 and 8:00 p.m., Sannier was with the hundreds of other people peacefully protesting the police lined up at the intersection of Lincoln and Colfax. Sannier was teargassed repeatedly during this time.[147]

**Considerations for Sannier allegation 4:**
Please see considerations for Epps allegation 1, which addresses the basis for giving warnings/dispersal orders, and the deployment of chemical munitions.

**Opinion in response to Sannier allegation 4:**
If it is assumed that Ms. Sannier's allegation accurately characterizes what occurred, then the police use of chemical munitions without warning or dispersal order may or may not have been consistent with contemporary police policy, training, and practice.

- If it is assumed that Ms. Sannier was participating in behavior that justified the no warning use of chemical munitions by DPD policy and as described by Commander Phelan, then her exposure and related discomfort would have been the result of a force application that was consistent with contemporary police, policy, training, and practice.
- If it is assumed that Ms. Sannier was participating in behavior that justified the use of chemical munitions by DPD policy and as described by Commander Phelan, and that the totality of circumstances would have allowed the issuance of warnings as outlined in DPD policy, then warnings should have been given before the chemical munitions were deployed.
- If it is assumed that Ms. Sannier was NOT participating in behavior that justified the no warning use of chemical munitions, but others in close proximity were, then her

---

[147] Ibid 223-24

exposure would be a regretful and accidental/unintended consequence of a force application that was consistent with contemporary police policy, training, and practice.

- If it is assumed that Ms. Sannier and others in the immediate area were NOT participating in behavior that justified the use of chemical munitions, then her exposure would have been inconsistent with contemporary police policy, training, and practice.

**Sannier allegation 5-**At about 7:06 PM, Sannier was kneeling with other protestors in front of the officers and chanting, with her hands up. DPD Officers threw chemical munitions into the crowd for no apparent reason. A Doe Defendant DPD Metro SWAT officer threw a flashbang grenade into the crowd. This exploded near Sannier's head and caused ringing in her ears and caused her head to hurt. Sannier was very disoriented and in shock.[148] Sannier did not throw anything or commit any act that justified the use of force on her.[149]

**Considerations for Sannier allegation 5:**

Please see considerations for Epps allegation 1, which addresses the basis for giving warnings/dispersal orders, and the deployment of chemical munitions. Please also see considerations in response to Lyman allegation 3, which addresses issues and related justification concerning the use of explosive munitions.

**Opinion in response to Sannier allegation 5:**

If it is assumed that Sannier's allegation accurately characterizes what occurred, then the police use of chemical munitions without warning or dispersal order may or may not have been consistent with contemporary police policy, training, and practice.

- If it is assumed that Sannier was participating in behavior that justified the no warning use of chemical munitions by DPD policy and as described by Commander Phelan, her exposure and related discomfort would have been the result of a force application that was consistent with contemporary police policy, training, and practice.
- If it is assumed that Sannier was participating in behavior that justified the use of chemical munitions by DPD policy and as described by Commander Phelan, and that the totality of circumstances would have allowed the issuance of warnings as outlined in DPD policy, then warnings should have been given before the chemical munitions were deployed.
- If it is assumed that Sannier was NOT participating in behavior that justified the no warning use of chemical munitions, but others in close proximity were, then her exposure would have been a regretful and accidental/unintended consequence of a force application that was consistent with contemporary police policy, training, and practice.
- If it is assumed that Sannier and others in the immediate area were NOT participating in behavior that justified the use of chemical munitions, then her

---

[148] Ibid 225-28
[149] Ibid 226

exposure would have been inconsistent with contemporary police policy, training, and practice.

- If it is assumed that Sannier and or others in close proximity, were involved in activity that reasonably justified the use of an explosive device (NFDD or blast ball) to terminate or deter such activity, and the device was deployed in an inappropriate manner (too close), then that application of force would be inconsistent with contemporary police, policy, training, and practice.
- If it is assumed that Sannier or others in close proximity, were NOT involved in activity that reasonably justified the use of an explosive device (NFDD or blast ball) to terminate or deter such activity, then that application of force would be inconsistent with contemporary police, policy, training, and practice.

**Sannier allegation 6**-On May 31, 2020, between 9:35 and 9:45 p.m., Sannier was marching east from the Capitol with other protestors. She crossed Logan, but marchers had to stop because there were police in front of them. All of a sudden, there were police lights in front and behind the marchers. During this kettling incident, Sannier experienced the worst tear gassing of all the days that she attended the protests. Defendant Officers shot tear gas, pepper balls, flashbang grenades, and other projectiles at the protestors. There were no announcements, warnings, or dispersal orders before the use of force on protestors.[150]

**Considerations for Sannier allegation 6:**

Please see considerations for Epps allegation 1 and 2, which address the basis for giving warnings/dispersal orders, and the deployment of chemical munitions and impact rounds. Please also see considerations in response to Lyman allegation 3, which addresses issues and related justification concerning the use of explosive munitions. Please also see considerations in response to Wedgeworth allegation 3, which addresses the issue of ensuring protestors always have an exit/egress route when interacting with officers.

**Opinion in response to Sannier allegation 6:**

If it is assumed that Sannier's allegations accurately characterizes what occurred, then the police positioning and use of chemical munitions and pepper balls/impact projectiles without warning or dispersal order may or may not have been consistent with contemporary police policy, training, and practice.

- In the absence of police information that addresses the totality of circumstances presented at the time in which Sannier says she was "kettled", and the level of containment created by officers positioning "front and back" of the crowd, I am unable to offer an opinion concerning whether the position by officers was consistent with contemporary police training, policy, and practice. If it is assumed that the officers did not provide/allow for exit/egress from the area, then that would have been inappropriate and inconsistent with cotempary police policy, training, and practice.
- If it is assumed that Sannier was participating in behavior that justified the no warning use of chemical munitions by DPD policy and as described by Commander

---

[150] Ibid 233-37

Phelan, then her exposure and related discomfort would have been the result of a force application that was consistent with contemporary police policy, training, and practice.

- If it is assumed that Sannier was participating in behavior that justified the use of chemical munitions by DPD policy and as described by Commander Phelan, and that the totality of circumstances would have allowed the issuance of warnings as outlined in DPD policy, then warnings should have been given before chemical munitions were deployed.

- If it is assumed that Sannier was NOT participating in behavior that justified the no warning use of chemical munitions, but others in close proximity were, then her exposure would have been a regretful and accidental/unintended consequence of a force application that was consistent with contemporary police policy, training, and practice.

- If it is assumed that Sannier and or others in close proximity were NOT participating in behavior that justified the use of chemical munitions, then her exposure would have been inconsistent with contemporary police policy, training, and practice.

- If it is assumed that Sannier and or others in close proximity were involved in activity that reasonably justified the use of an explosive device (NFDD or blast ball) to terminate or deter such activity, and the device was deployed in an inappropriate manner (too close), then that application of force would be inconsistent with contemporary police policy, training, and practice.

- If it is assumed that Sannier and or others in close proximity were NOT involved in activity that reasonably justified the use of an explosive device (NFDD or blast ball) to terminate or deter such activity, then that application of force would have been inconsistent with contemporary police policy, training, and practice.

**Sannier allegation 7**-On June 1, 2020, Sannier was tackled from behind by a DPD Gang Unit, and arrested for curfew violation failure to obey a lawful order.[151]

- Sannier and the other individuals she was with at the time she was arrested were clearly identifiable as protestors. Sannier's arrest was the result of the Defendant Denver's policy of enforcing the curfew only against individuals engaged in protest activity.[152]

- On one or more days when she attended protests in Denver and during the events described above, Sannier experienced tear gas and/or pepper spray on numerous occasions, as described above, which caused coughing, difficulty breathing, irritation and burning in the eyes, nose, throat, and mouth and a burning sensation on the skin.[153]

**Considerations for Sannier allegation 7:**

Please see considerations for Epps allegation 1, which addresses the basis for the deployment of chemical munitions/pepper spray.

---

[151] Ibid 248 and 251
[152] Ibid 252-53
[153] Ibid 260

**Opinions in response to Sannier allegation 7:**

I have no opinion as it relates to custodial arrests.

If it is assumed that Sannier's allegation accurately characterizes what occurred as it relates to the deployment of chemical munitions/pepper spray without a warning or dispersal order, then that may or may not have been an application of force that was consistent with contemporary police policy, training, and practice.

- If it is assumed that Sannier was participating in behavior that justified the no warning use of chemical munitions/pepper spray by DPD policy and as described by Commander Phelan, then her exposure and related discomfort would have been the result of a force application that was consistent with contemporary police policy, training, and practice.
- If it is assumed that Sannier was participating in behavior that justified the use of chemical munitions by DPD policy and as described by Commander Phelan, and that the totality of circumstances would have allowed the issuance of warnings as outlined in DPD policy, then warnings should have been given before chemical munitions were deployed
- If it is assumed that Sannier was NOT participating in behavior that justified the no warning use of chemical munitions, though others in close proximity were, then her exposure would have been the regretful and accidental/unintended consequence of a force application that was consistent with contemporary police policy, training, and practice.
- If it is assumed that Sannier and others in close proximity were NOT participating in behavior that justified the use of chemical munitions, then her exposure would have been inconsistent with contemporary police policy, training, and practice.

## Plaintiff Kelsey Taylor

**Taylor allegation 1-**On March 28 at about 9:10 p.m., Taylor marched back to the Capitol with other protestors. At 14th Avenue and Sherman, DPD Officers tear gassed the entire crowd, without provocation. They also shot pepper balls at the protestors. Taylor did not see anyone throw anything or get aggressive with the police. The officers gave no audible warning or orders. Taylor inhaled tear gas, which caused breathing and vision problems.[154]

**Considerations in response to Taylor allegation 1:**

Please see the considerations for Epps allegations 1, which address the issues and related justification for chemical agent use-which would include the use of pepper ball in an indirect area contamination mode.

**Opinions in response to Taylor allegation 1:**

If it is assumed that Taylor's allegations accurately characterize what occurred, then the police use of chemical munitions/pepper balls in an area contamination mode may or may not have been consistent with contemporary police policy, training, and practice.

---

[154] Ibid 266

- If it is assumed that Taylor was participating in behavior that justified the use of chemical munitions and area pepper ball by DPD policy and as described by Commander Phelan, then the exposure would have been the result of a force application that was consistent with contemporary police policy, training, and practice.
- If it is assumed that Taylor was participating in behavior that justified the use of chemical munitions by DPD policy and as described by Commander Phelan, and that the totality of circumstances would have allowed the issuance of warnings as outlined in DPD policy, then warnings should have been given before chemical munitions were deployed.
- If it is assumed that Taylor was NOT participating in behavior that justified the use of chemical munitions, though others in close proximity were, then the exposure would have been a regretful and accidental/unintended consequence of a force application that was consistent with contemporary police policy, training, and practice.

**Taylor allegation 2**-On May 30, 2020, Taylor went to the Capitol at around 5:00 or 6:00 p.m. to protest. She stood with other peaceful protestors on 14th Avenue in front of the Capitol building. Any time there was the slightest agitation in the crowd, even if it was non-violent, the Doe Defendant DPD Officers started shooting pepper balls and throwing tear gas without giving any warnings or orders. The Doe Defendant DPD Officers also shot into the crowd whenever protestors walked forward closer to Colfax. Taylor was hit by pepper balls, which caused bruises. She also inhaled tear gas.[155]

**Considerations in response to Taylor allegation 2:**
    Please see the considerations for Epps allegations 1 and 2, which address the issues and related justification for chemical munitions-which would include the use of pepper ball in an indirect area contamination mode-as well as pepper ball in the direct fire mode.

**Opinions in response to Taylor allegation 2:**
    If it is assumed that Taylor's allegations accurately characterize what occurred, then the police use of chemical munitions/pepper balls in an area contamination and direct fire mode may or may not have been force applications that were consistent with contemporary police policy, training, and practice.
- If it is assumed that Taylor was participating in behavior that justified the use of chemical munitions/area and direct fire pepper ball by DPD policy and as described by Commander Phelan, then the exposure to chemical munitions and pepper ball would have been the result of force applications that were consistent with contemporary police policy, training, and practice.
- If it is assumed that Taylor was participating in behavior that justified the use of chemical munitions by DPD policy and as described by Commander Phelan, and that the totality of circumstances would have allowed the issuance of warnings as outlined in DPD policy, then warnings should have been given before chemical munitions were deployed.

---

[155] Ibid 269-271

- If it is assumed that Taylor was NOT participating in behavior that justified the use of chemical munitions/area and direct fire pepper ball, though others in close proximity were, then the chemical munitions exposure would have been a regretful and accidental/unintended consequence of a force application that was consistent with contemporary police policy, training, and practice. Contact with direct fire pepper ball rounds in this situation would be inconsistent with contemporary police training, policy, and practice.
- If it is assumed that Taylor and others were NOT participating in behavior that justified the use of chemical munitions/area and direct fire pepper ball, then the use of such force would be inconsistent with contemporary police training, policy, and practice.

**Taylor allegation 3**-After curfew, Taylor was protesting the curfew itself. Officers advanced towards the protestors, who remained kneeling. Officers began jabbing people, including Taylor, with batons. Taylor saw one officer hit a Black man across his chest with his baton. Taylor said words to the effect of, "You can't do that, he's not hurting you, he's unarmed." Another DPD Gang Unit Officer grabbed Taylor's arm and told her that she was under arrest.[156]

- Taylor was arrested by Doe Defendant DPD Gang Unit Officers for violation of curfew and failure to obey lawful order. Taylor and the other individuals she was with at the time she was arrested were clearly identifiable as protestors. Taylor's arrest was the result of the Defendant Denver's policy of enforcing the curfew only against individuals engaged in protest activity. No officer gave Taylor any lawful orders. No officer gave Taylor multiple orders.[157]

On one or more days when she attended protests in Denver and during the events described above, Taylor experienced tear gas and/or pepper spray on numerous occasions, as described above, which caused coughing, difficulty breathing, irritation and burning in the eyes, nose, throat, and mouth and a burning sensation on the skin. This was especially difficult for Taylor because she has asthma.[158]

**Considerations in response to Taylor allegation 3:**

Please see the considerations for Epps allegations 1 and 2, which address the issues and related justification for chemical agent use-which would include the use of pepper ball in an indirect area contamination mode.

The DPD use of force policy addresses the use of the baton for defensive resistance, when used in a non-striking mode to apply a come along or escort.[159] The DPD Crowd Management Manual authorizes the use of the baton to push and make contact with an uncooperative individual in the crowd.[160]

---

[156] Ibid 272-74
[157] Ibid 275-79
[158] Ibid 283
[159] DPD use of force policy, 3, A, 1
[160] DPD Crowd Management Manual, page 22

**Opinions in response to Taylor allegation 3:**

I have no opinion as it relates to custodial arrests.

If it is assumed that Taylor's allegations accurately characterize what occurred, then the police use of a baton in a "jabbing" mode, and chemical munitions/pepper balls in an area contamination mode may or may not have been force applied that was consistent with contemporary police training, policy, and practice.

- If it is assumed that Taylor was demonstrating defensive resistance in a crowd control situation, then the use of the baton in a "jabbing" mode to push and or make her move would be consistent with contemporary police crowd control policy, training, and practice.
- If it is assumed that she was not demonstrating defensive resistance as described above, then the use of the baton would have been consistent with contemporary police crowd control policy, training, and practice.
- If it is assumed that Taylor was participating in behavior that justified the use of chemical munitions/area pepper ball by DPD policy and as described by Commander Phelan, then the exposure would have been the result of a force application that was consistent with contemporary police policy, training, and practice.
- If it is assumed that Taylor was NOT participating in behavior that justified the use of chemical munitions/area pepper ball, though others in close proximity were, then the exposure would have been the regretful and accidental/unintended consequence of a force application that was consistent with contemporary police policy, training, and practice.
- If it is assumed that Taylor and others were NOT participating in behavior that justified the use of chemical munitions/area fire pepper ball by DPD policy and as described by Commander Phelan, then the exposure was an application of force that was inconsistent with contemporary police policy, training, and practice.

## Plaintiff Youssef Amghar

**Amghar allegation 1-**On May 30, 2020, about an hour or so before curfew, Amghar was with other peaceful protestors on the corner of Colfax and Lincoln. He was then shot with pepper ball rounds and had a tear gas cannister deployed at his feet.

- Amghar was standing on the sidewalk. Amghar stood there with their hands up. Someone else in the crowd not near Amghar threw a water bottle in the general direction of the officers. Without attempting to investigate or isolate that person, the DPD Officers (who were in riot gear) immediately began shooting into the crowd with pepper balls. These officers included Defendants Eberharter, Cunningham, and Sampson. The DPD Officers did this without warning or giving any orders. At first, the Defendant DPD Officers shot indiscriminately into the crowd, but after the crowd moved back, they began shooting directly at Amghar, even though they were standing still with their hands up. Amghar was approximately 10-15 feet from the DPD Officers at the time. Defendants Cunningham, Sampson, and Eberharter, shot Amghar in the arms and legs, then in the chest, and then directly in the face, even though they continued standing still with their hands up. Defendants Cunningham, Sampson, and Eberharter

71

shot Amghar approximately 14 times. Amghar had many bruises from the pepper balls shot at them.[161]

- Defendants Cunningham, Sampson, and Eberharter did not give any orders before, during, or after shooting Amghar. No one told Amghar to move back or gave them any other orders. Amghar was so upset at the officers' use of force on them that they began yelling words to the effect of, "I'm a goddamn U.S. Marine, what are you doing?" When Amghar yelled this, Defendant Cunningham shot them in the face. DPD Officers threw canisters of chemical munitions at Amghar's feet. After a couple minutes, Amghar walked away and took cover behind a tree.[162]

**Considerations in response to Amghar allegation 1:**

Please see the considerations for Epps allegations 1 and 2, which address the issues and related justification for chemical agent use, as well as the pepper ball in the direct fire mode.


[163]

Mr. Amghar is in shorts with his hands up on the left.

---

[161] Ibid 287-296
[162] Ibid 297-300
[163] DEN5022 ESPINOSA_AXON_Body_2_Video_2020-05-30_1905, at about 3:01





Mr. Amghar appears to be getting hit with pepper balls on the head.

Mr. Amghar was deposed in this case, and he offered the following information concerning what occurred as it relates to being shot with pepper balls.

A  All right. Well, why I was there specifically was because that's where the protest was happening.   I did not believe I was breaking any laws at the time by being on the sidewalk an hour before curfew.  I was not threatening in any way.  Like I said, I was telling protesters to stand down. At one point, the first -- the first shot was to my leg, my right thigh. There was a brief pause, and then I was hit sort of here (indicating) on the arm, under

---

[164] Ibid at about 3:02
[165] Ibid

the arm shoulder area; and that was a wound that is only visible with my hand up. After that, I was -- it was another minute or so that went by before I was struck about -- at least six times in my chest, which guaranteed me there were multiple shooters. And still, after the entire time of this assault, I was on the sidewalk with my hands up.  Then they proceeded to shoot me in the face multiple times. I remember my eye protection that I was wearing, like, shook from the impact on my head, on my face.  So if I wasn't wearing that, I would have[166] been blinded.[167]

Q    And then the shot that hit you in the face, where in the face did it hit you?
A    Well, there were multiple shots that hit me in the face.  One of them hit my eyewear. One of them hit my nose, and there's evidence of that in the picture.  And there were also two marks on the facemask that I was wearing on the sort of neck/mouth area (indicating). So I was hit four or five times in the face.[168] 60

Corporal Eberharter was deposed, and he provided the following information in response to questions about using the pepper ball launcher.

Q.   Okay.  So let me be more specific then. Based on your training and understanding of DPD policy, under your understanding of the training you've been provided by the Denver Police Department and the policies of the Denver Police Department, was the shooting of this person standing on the sidewalk with their hands up, under the circumstances depicted here in this video, consistent with DPD policy and training?
A.   At the time --
Q.   Yes.[169]
A.   -- of this incident? Probably within policy.
Q.   Okay.  And that includes shooting them in the face, right?
A.   No, the area of deployment is the -- the chest area and lower body.
Q.   Okay.  So beside -- if -- other than the shooting of the person in the face, shooting of this person standing on the sidewalk with their hands up in the chest, and if they're hit in the legs, would have been consistent with DPD policy at the time?
A.   I believe so.
Q.   Okay.  And you would not expect any officer to be disciplined for their use of PepperBall against this person as depicted in this video?
A.   I wouldn't have an answer to that. I don't know.
Q.   Okay.  Did you shoot that person standing on the sidewalk with their hands up?
A.   I do not believe so, no.
Q.   You don't believe so?
A.   I mean, I -- I -- I didn't -- I don't recall shooting that person on the corner.[170]

Officer Cunningham was deposed, and she provided the following information in response to questions about using the pepper ball launcher.

---

[166] Amghar deposition page 56, lines 3-25
[167] Ibid 57 page 1
[168] Ibid 60, lines 10-18
[169] Eberharter deposition page 109, lines 16-25
[170] Ibid 110, 1-25

A.   You can use pepper-ball, like I said, defensive resistances used to disperse individuals or crowds.

Q.   And a protester standing with his hands up would constitute defensive resistance?

A.   If he's refusing to leave the area, yes.

Q.   And how would he know to leave the area if no warnings or commands were given prior to pepper-balling him?

A.   I don't know if commands were or were not given to that individual.

Q.   Okay. And if no commands were given prior to using pepper-ball on an individual who was standing with his hands up and doing nothing else, would that use of pepper-ball be prohibited?

A.   Again, since I was not the individual to pepper-ball him, I can't speak for the actions of another officer and why they determined that was justified for them specifically.

Q.   But it's your testimony that you can use pepper-balls to disperse a crowd, you can shoot pepper-balls directly at people to disperse the crowd?[171]

A.   Correct.[172]

**Opinion in response to Amghar allegation 1:**

- Mr. Amghar was standing with his hands raised. It does not appear that he was given a dispersal order or warned that pepper balls were going to be used against him-which would have been appropriate in this circumstance. The video suggests and Mr. Amghar testified that he was then shot several times about the head with pepperball rounds.

- The officer that deployed the pepper ball rounds against Mr. Amghar has not been identified. Accordingly, there is no statement or direct information concerning the totality of circumstances perceived by him/her at the time the rounds were deployed.

- If it is assumed that the behavior of Mr. Amghar was not reflective of defensive resistance, then the direct fire use of the pepper ball would be inconsistent with DPD policy and training, and inconsistent with contemporary police training, policy, and practice.

- If it is assumed that the behavior of Mr. Amghar was reflective of defensive resistance, then the manner of pepper ball use (point of aim-if intentional) was inconsistent with DPD policy and training, and inconsistent with contemporary police training, policy, and practice.

## Plaintiff Johnathan "De La Vaca" Duran

**De La Vaca allegation 1**-On May 30 at Colfax and Emerson, De La Vaca was shot with pepper balls. This was without warning or orders being given. He was wearing his press credentials.[173]

- On May 30, 2020, De La Vaca documented the protests as a member of the media. Doe Defendant DPD Officers used chemical agents, including smoke bombs,

---

[171] Cunningham deposition page 109, lines 1-25
[172] Ibid 110, line 3
[173] Ibid 306-11

pepper balls, and flashbang grenades on protestors. The officers did not give any warnings or orders before they started shooting things at the protestors. De La Vaca, who was photographing the police, was shot with pepper balls at that time. At the time, De La Vaca was wearing his press pass, which is very large and visible.[174]

**Considerations in response to De La Vaca allegation 1:**

Please see the considerations for Epps allegation 2, which addresses the issues and related justification for using pepper ball in the direct fire mode, as well as warnings and orders prior to their use.

**Opinion in response to De La Vaca allegation 1:**

If it is assumed that Mr. De La Vaca was struck with pepper balls without warning, then that deployment may or may not have been consistent with contemporary police policy, training, and practice.

- If it is assumed that Mr. De La Vaca was participating in behavior that justified the use of a pepper ball without warning as described by Commander Phelan-regardless of apparent press status-then using the pepper ball against him would have been consistent with agency policy and training, and consistent with contemporary police training, policy, and practice.
- If it is assumed that Mr. De La Vaca was NOT participating in behavior that justified the use of pepper ball as described by Commander Phelan, then this use would have been inconsistent with agency policy and training, and inconsistent with contemporary police policy, training, and practice.

**De La Vaca allegation 2-**De La Vaca then went over to the Capitol, where he was tear gassed. There was no apparent reason or justification for the Doe Defendant DPD Officers' use of tear gas at that time. De La Vaca's face was red and painful from the tear gas.[175]

**Considerations in response to De La Vaca allegation 2:**

Please see the considerations for Epps allegation 1, which addresses the issues and related justification for using chemical munitions.

**Opinion in response to De La Vaca allegation 2:**

If it is assumed that the plaintiffs allegation accurately characterizes what occurred, then the use of chemical munitions may or may not have been consistent with contemporary police policy, training, and practice.

- If it is assumed that the plaintiff was participating in behavior that justified the use of chemical munitions by DPD policy and as described by Commander Phelan, then his exposure and related discomfort would have been the result of a force application that was consistent with contemporary police policy, training, and practice.
- If it is assumed that the plaintiff was NOT participating in behavior that justified the use of chemical munitions, but persons in close proximity were, then his exposure would have been a regretful and accidental/unintended consequence of force

---

[174] Ibid
[175] Ibid 311-14

application that was consistent with contemporary police policy, training, and practice.

- If it is assumed that the plaintiff and others in the immediate area were not participating in behavior that justified the use of chemical munitions, then his exposure would have been inconsistent with contemporary police policy, training, and practice.

**De La Vaca allegation 3-** On May 31, 2020, at 9:34 PM, De La Vaca was covering the events as a journalist when he was shot in the groin with a foam/rubber bullet by an Aurora police officer, Defendant Budaj. De La Vaca was standing just west of the intersection of Colfax and Pearl.

- On May 31, 2020, De La Vaca went to document the protests at about 4:00 or 5:00 p.m. There were multiple marches and rallies that occurred downtown. De La Vaca was wearing his press pass and a hard hat that said "media" in large letters all over it.[176]
- Then, De La Vaca walked back towards the Capitol. De La Vaca was trying to document by recording the protest and the police.[177]
- De La Vaca was facing a line of police, there was some kind of commotion, and he and others backed away from the police. At 9:34 p.m., De La Vaca was covering the events as a journalist when he was shot in the groin with a foam/rubber bullet by an Aurora police officer, Defendant Budaj. De La Vaca was standing just west of the intersection of Colfax and Pearl.[178]
- In shooting De La Vaca, Defendant Budaj followed his training by the APD, and he followed the policies, practices, and customs of the Defendant Aurora. The actions of Defendant Budaj were consistent with the policies, practices, and customs of the Defendant Aurora.[179]
- The pain from being shot in the groin was some of the worst pain De La Vaca had ever felt. He thought that he was going to lose a testicle.[180]
- De La Vaca's testicles were severely swollen. It took two to three days before he could walk normally, but he continued to have pain for a period of time.[181]
- There was no lawful justification for the use of force described in the preceding paragraphs.[182]
- On one or more days when he attended protests in Denver and during the events described above, De La Vaca experienced chemical munitions/or pepper spray on numerous occasions, as described above, which caused coughing, difficulty breathing, irritation and burning in the eyes, nose, throat, and mouth and a burning sensation on the skin.[183]

---

[176] Ibid 317-18
[177] Ibid 328
[178] Ibid 329
[179] Ibid 331-32
[180] Ibid 335
[181] Ibid 341
[182] Ibid 342
[183] Ibid 344

**Considerations in response to De La Vaca allegation 3:**

If it is assumed that the officer deploying the pepper spray was with the Aurora Police Department, then the decision to use an impact round and manner of use would have been influenced by the Aurora Police raining, policy, and practice.

**Opinion in response to De La Vaca allegation 3:**

If it is assumed that the plaintiffs allegation accurately characterizes what occurred, then the deployment of an impact round may or may not have been consistent with contemporary police policy, training, and practice.

- If it is assumed that the plaintiff was participating in behavior that justified the use of an impact round, then that use would have been consistent with contemporary police training, policy, and practice.
- If it assumed that the appropriate justification existed to use an impact round, and the round was properly deployed (appropriate round selection, distance, point of aim) but accidently struck the plaintiff in the groin, then striking that area was not force intentionally applied, but the accidental and unintended consequence of a force application that was consistent with contemporary police policy, training, and practice.
- If it assumed that the appropriate justification existed to use the impact round, and that the groin was intentionally targeted, then that would be inconsistent with contemporary police policy, training, and practice.
- If it is assumed that the plaintiff was NOT participating in behavior that justified the use of an impact round, then that would be inconsistent with contemporary police policy, training, and practice

Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is a true and correct statement of my opinions in this case. It is my expectation that additional information will be provided in this case, and that a scene visit with the involved officers is forthcoming. Accordingly, these opinions are preliminary and subject to modification, and made with a reasonable degree of professional certainty.

Steve Ijames