# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

Civil Action No. 20-cv-1878-RBJ

ELISABETH EPPS, *et al.,*

Plaintiffs,

v.

CITY AND COUNTY OF DENVER, *et al.,*

Defendants.

## JEFFERSON COUNTY DEPUTIES' MOTION FOR SUMMARY JUDGMENT

Defendants Jefferson County Deputy Sheriffs Anthony Hamilton and Timothy Dreith (the "Jeffco Deputies"), by and through counsel, move for summary judgment pursuant to FED. R. CIV. P. 56 because the evidence shows that they are entitled to qualified immunity on the claim asserted against them in the Third Amended Complaint (the "TAC") [ECF No. 219].

### Movants' Statement of Undisputed Facts

The following material facts are undisputed or accepted as true for this Motion:

1. In the aftermath of the killing of George Floyd, protests sprung up in Denver, Colorado starting on May 28, 2020. (**Exhibit A**, Jeffco SWAT After Action Report, 6.) Over the course of four nights, from May 29, 2020 through June 1, 2020 members of the Jefferson County Regional SWAT Team (JCRS) were called upon to provide mutual aid to the Denver Police Department (DPD) to provide crowd control and security. (*Id.*)

2. The protests were large-scale, numbering in the thousands. (**Exhibit B**, Deras Dep. 151:15-18, Aug. 11, 2021.) While many of the protestors were peaceful, there were also numerous instances of protestors targeting law enforcement, including JCRS officers. (**Ex. A**, 7.)

3. On May 29, 2020, while providing mutual aid, protestors threw projectiles at JCRS officers and their vehicles. (**Exhibit C**, Golden Police Department Reports, 2.) Protestors started fires and threw mortar style fireworks at law enforcement. (*Id.* at 3.) There was at least one occasion where a Molotov cocktail was thrown at law enforcement. (*Id.* at 4.)

4. At the beginning of their shift on May 31, 2020, JCRS officers were briefed about the increasing violence of the protestors, including the use of sling shots and lacrosse sticks to increase the velocity of the projectiles hurled at police. (**Ex. C**, 4.) Protestors had thrown rocks, glass bottles, Molotov cocktails, and large fireworks at police, resulting in injuries to officers. (**Ex. A**, 11.) Additionally, there had been extensive property damage including a large number of business and buildings whose windows had been shattered. (**Exhibit D**, Jefferson County Sheriff Office Report 20-10539, 3.)

5. JCRS officers were called to assist with protecting the Denver Police District 6 building Substation (District 6), near the intersection of Colfax Avenue and North Washington Street. (**Ex. A,** 15.) The day prior, District 6 had been surrounded and vandalized. (**Ex. C,** 4.)

6. There were seventeen officers and three commanders present with the JCRS Swat team on May 31, 2020. (**Exhibit E**, Hamilton Dep. 20:19-21:12, Dec. 9, 2021.) Together with a medic, there were 21 total officers. (*Id.*)

7. JCRS officers formed a line across Washington Street near the intersection of Colfax and Washington. (**Exhibit F**, Dreith Dep. 29:20-21, Nov. 9, 2021.) The line was

approximately 20-30 feet back from the crosswalk. (**Ex. E**, 31:5-9.) The skirmish line was formed to prevent protestors from traveling north on Washington Street, to prevent further damage to District 6. (**Ex. D**, 3.)

8. Dreith was one of the JCRS officers called to protect District 6 that evening. (**Ex. F**, 24:14-17.) Hamilton was another JCRS officer who assisted in protection of District 6 on May 31, 2020. (**Ex. E**, 17:17-21.)

9. When JCRS gathered near the substation there was a large crowd of highly agitated protestors, who were screaming and cursing at officers. (**Ex. D**, 8.) The crowd of protestors was marching east on Colfax Avenue. (**Exhibit G**, Deras Dep. 23:17-22, Nov. 23, 2021.) The thousands of protestors, far outnumbering the officers (**Ex. C**, 5), began to congregate near the skirmish line protecting the DPD substation. (**Ex. A**, 13.)

10. Just after 8:00 p.m., JCRS officers observed one protester assault another protester by stomping on the man's face while he laid on the ground. (**Ex. A**, 12, 15, 25.) JCRS officers had to deploy less lethal munitions to stop the assault and the victim was taken via ambulance to the hospital with serious injuries. (*Id.*)

11. Dreith deployed four rounds of his bean bag shotgun, hitting the assailant four times in the green zone area of the right buttock, who ran away before he was able to be apprehended. (**Ex. D**, 4.)

12. JCRS was attacked with rocks, glass bottles, golf balls and other projectiles by the protestors. (**Ex. C**, 5, 10, 14.)

13. Multiple officers received injuries from these projectiles, including Hamilton who was struck on his left arm by a golf ball and on his left shin by a rock. (**Ex. A**, 23.) Dreith was

struck with a rock on his forearm and two unknown objects on his legs. (**Ex. D**, 4.) The other JCRS officers in the skirmish line were struck by metal, golf balls, glass bottles, paintballs, and bricks causing bruises, swelling, abrasions, cuts, and numbness. (**Ex. A**, 21-23.) Additionally, a rock was thrown through the window of the ambulance, shattering the glass. (*Id.* at 4)

14. JCRS officers attempted to use gas canisters to disperse the crowd; however, many of the canisters were picked up and thrown back at JCRS, in addition to the other projectiles being thrown. (**Ex. A**, 15; **Exhibit H**, May 31, 2020 Halo video from the intersection of Colfax and Washington maintained by the City and County of Denver, 8:29:02-8:34:09.)

15. Neither Dreith nor Hamilton threw the gas canisters. (**Exhibit I**, Decl. of Timothy Dreith; **Exhibit J**, Decl. of Anthony Hamilton)

16. Fearing for their safety, based on the volume of protestors and the aggressive actions of some of the protestors, JCRS officers began deploying less lethal munitions targeted at individuals who were kicking or throwing projectiles at them. (**Ex. D**, 4, 8, 12, 16, 21, 25, 29, 34; **Ex. C**, 5-6, 14; **Exhibit K**, Arvada Police Department Reports 60, 65, 69, 79, 83.)

17. All deployed less lethal munitions were target specific and only deployed at protestors who were throwing or kicking items at officers. (**Ex. D**, 8.)

18. With the number of people in the crowd, the officers determined it would not have been safe to attempt to bring anyone into custody. (**Ex. E**, 62:13-21.)

19. Dreith attempted to give verbal commands to the crowd of protestors. However, Dreith was wearing a gas mask and the noise level was high, with thousands of protestors yelling and screaming at officers. (**Ex. D**, 4; **Ex. F** 37:17-23.)

4

20. Dreith was armed with a less-lethal Remington 870 shotgun. (**Ex. F**, 27:11-14.) Each time Dreith observed an individual pick up an object and throw it and he had a clear line of sight, he aimed for a green zone and deployed a bean bag round. (**Ex. D**, 4; **Ex. F** 37:6-10, 65:1-13.) Dreith shot his bean bag shotgun approximately 15 times at people who were kicking and throwing gas canisters, rocks, and other items at officers. (**Ex. F**, 37:24-39:3.) Dreith does not recall shooting Mr. Deras. (*Id.* at 56:8-24.)

21. Hamilton was armed with a less lethal shotgun utilizing 12ga "Super Sock," a drag-stabilized impact munition. (**Ex. D**, 25.) Hamilton engaged three or four individuals with his less lethal shotgun who were actively aggressing towards officers. (*Id.* at 25.) Hamilton did not discharge his less lethal shotgun once he could not identify specific targets who were throwing objects at him. (**Ex. D**, 26.) Hamilton does not recall shooting Deras. (**Ex. E**, 29:16-30:25.)

22. The SWAT After Action Report recites that over the course of several days of the JCRS deployment to Denver, 239 rounds of less lethal munitions were used. (**Ex. A**, 26.) Sixty-six of them were "Bean Bag" rounds, making the chance that a particular round that was utilized was a "Bean Bag" round such as those used by Dreith and Hamilton only 27.62%. (*Id.*)

23. Dreith and Hamilton targeted individuals taking aggressive action toward the JCRS line. (**Exs. I** and **J**.) In every instance, the Jeffco Deputies targeted green zones, and not an individual's back or head. (*Id.*) In every instance in which either of the Jeffco Deputies discharged a round, they could clearly see their target. (*Id.*) In no instance did either Jeffco Deputy fire at an individual after they began to retreat from the JCRS line of officers. (*Id.*)

24. There were 15-20 JCRS officers on the line, all of whom were armed with less-lethal munitions, and at least 10 of whom acknowledge using various forms of less-lethal

5

munitions on protestors who were throwing and/or kicking gas canisters and other projectiles towards the officers. (**Ex. D**, 4, 8, 12, 16, 21, 25, 29, 34; **Ex. C**, 5-6, 14; **Ex. K**, 60, 65, 69, 79, 83.) For instance, Deputy Colley stated that projectiles were thrown and gas canisters kicked at JCRS and "[w]e engaged the specific individuals who did this." (**Ex. D**, 40.) Sergeant Donahue stated, "I fired approximately 5 rounds of 37mm sting balls . . . . The sting balls were used as a means to disperse the crowd." (**Ex. C**, 7.) Lieutenant Williams observed officers firing to push the crowd, which was throwing and kicking canisters, back. (**Ex. C**, 16) Officer DiDominico "observed . . . individuals which were throwing items towards operators and kicking gas canisters back towards our line. . . . I targeted specifically individuals who were *involved in a current act of aggression*, was in the act of throwing an item *or* was picking up items to throw." (**Ex. K**, 21 (emphasis added).) Officer Neidig stated, "I continued to utilize less lethal sponge rounds to protect myself and other officers from active assaults." (*Id.* at 31.)

25. After the initial gas canister was deployed, at least 37 additional instances of individuals throwing items or kicking gas canisters at JCRS were captured on Halo video maintained by the City and County of Denver. (**Ex. H**, 8:29:02–8:34:09.) That does not include fireworks launched and traffic cones thrown by individuals in the crowd.

26. There are at least six instances where video captured individuals kicking gas canisters toward the officers. (**Ex. H**, 8:30:16 8:30:33, 8:30:36, 8:31:11, 8:31:28, 8:32:58.)

27. Among the protestors was Plaintiff Joe Carlos Deras. (**Ex. G**, 32:23-33:6.) Mr. Deras was wearing a white hard hat, orange goggles, a dark long sleeve, dark jeans, and a green backpack. (**Ex. B**, 143:22-144:1; **Ex. G**, 23:4-8.)

28. Mr. Deras was present when the officers initially utilized gas canisters to disburse the crowd. (**Ex. G**, 24:3-13; **Ex. H**, 8:28:32.) About one minute and fifteen seconds later, having been present for the ongoing confrontation between JCRS and individual aggressors, Mr. Deras approached from the south side of Colfax Avenue, ran towards the police line, and kicked a canister approximately 30 feet towards the officers. (*Id.* at 8:30:16.) Fifteen to twenty seconds later, Deras again ran out of the crowd towards the officers and kicked another gas canister multiple times back towards the officers.[1] (**Ex. H**, 8:30:30-39.)

29. Upon review of video of the interaction during his deposition, Dreith interpreted Mr. Deras's actions to be actively aggressive because he was kicking the gas canisters. (**Ex. F**, 65:19-66:1.)

30. In his own deposition, Hamilton identified Mr. Deras's behavior as one that posed a risk of serious bodily injury after viewing the video. (**Ex. E**, 32:6-20.)

31. Mr. Deras claims he was initially hit with less lethal force in his hardhat, in the forehead area. (**Ex. G**, 34:5-11.) Mr. Deras was uninjured by this hit. (*Id.* at 37:15-20.) Mr. Deras did not see who shot the munition, only that it came from the police line. (*Id.* at 34:15-17.) Mr. Deras does not know what the original projectile was, but originally believed it to be a tear gas canister. (*Id.* at 37:1-4.)

32. Mr. Deras was then hit by less lethal force on the inside of his hand. (*Id.* at 38:8-9.) Mr. Deras did not see the projectile that hit his hand, and has no knowledge of its size, shape, or

---

[1] Mr. Deras has been identified by his counsel as this individual at various times, including during the deposition of Josh Garcia (**Exhibit L**, Garcia Dep. 76:10-22, Jan. 6, 2022; **Exhibit M**, Video of Garcia Dep. at 1:45:24–1:46:26.)

7

color. (*Id.* at 38:19-39:23.) However, Mr. Deras believes that object left a burn on his hand and, at least initially, believed it to be a gas canister. (**Ex. B**, 147:24-148:16; **Ex. G**, 16:13-21.)

33. Mr. Deras was hit by the third and last projectile underneath his waistline on the left side on his buttock. (**Ex. G**, 40:25-41:9.) Mr. Deras did not see the projectile that hit him in his buttock region. (*Id.* at 42:4-6.)

34. Mr. Deras was not able to identify from which direction, in the line of officers, any of the three projectiles originated. (**Ex. G**, 42:25-43: 9.) Mr. Deras does not know what any of the three munitions were that hit him. (**Ex. B**, 153:16-22.) Mr. Deras does not know if the munitions he was hit with are the same type or three different types of munitions. (**Ex. G**, 42:10-13.)

35. Bean bag rounds are not hot. (**Ex. I**; **Ex. J**.)

36. Green zones (preferred target areas for bean bag rounds) are the arms, legs, and buttocks. (**Ex. F**, 23:1-9.) Green zones are the least likely target areas to cause serious injury or death. (*Id.* at 24:4-5.) Yellow zones are the back and stomach, and red zones are the chest, neck, face, and groin. (*Id.* at 23:10-12.)

## Standard of Review

"One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims . . . ." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323-24 (1986). "[S]ummary judgment is proper if, viewing the evidence in the light most favorable to the non-moving party, there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Patel v. Hall*, 849 F.3d 970, 978 (10th Cir. 2017) (quotations omitted); *see* FED. R. CIV. P. 56(a). "The nonmoving party is entitled to all reasonable inferences from the record; but if the nonmovant bears the burden of persuasion on a claim at trial, summary

judgment may be warranted if the movant points out a lack of evidence to support an essential element of that claim and the nonmovant cannot identify specific facts that would create a genuine issue." *Patel*, 849 F.3d at 978 (quotations omitted). The Court is not required to adopt a plaintiff's version of the facts "to the extent that there is clear contrary video evidence of the incident at issue." *Thomas v. Durastanti*, 607 F.3d 655, 659 (10th Cir. 2010).

When qualified immunity is raised in a motion for summary judgment, the motion is treated differently than other summary judgment motions. *Farrell v. Montoya*, 878 F.3d 933, 937 (10th Cir. 2017). After the defense is asserted, "the plaintiff must meet the 'heavy two-part burden,' . . . of showing that '(1) a reasonable jury could find facts support a violation of a constitutional right, [and] (2) [the constitutional right] was clearly established at the time of the defendant's conduct.'" *Id*. (internal citations omitted). "If the plaintiff fails to satisfy either part of the inquiry, the court must grant qualified immunity." *Knopf v. Williams*, 884 F.3d 939, 944 (10th Cir. 2018) (quoting *Carabajal v. City of Cheyenne*, 847 F.3d 1203, 1208 (10th Cir. 2017)). In considering whether a plaintiff "has satisfied the necessary two-pronged qualified immunity showing," a court typically accepts the facts as plaintiff alleges so long as the plaintiff's version finds support in the record. *A.M. v. Holmes*, 830 F.3d 1123, 1136 (10th Cir. 2016) (internal citations omitted); *Estate of Bleck ex rel. Churchill v. City of Alamosa*, 540 Fed. App'x. 866, 871 (2013) ("we stress that we are obliged to accept [plaintiff's] version of the facts, insofar as that version finds support in the record.") Nevertheless, "evidence, including testimony, must be based on more than mere speculation, conjecture, or surmise. Unsubstantiated allegations carry no probative weight in summary judgment proceedings." *Cardoso v. Calbone*, 490 F.3d 1194, 1197 (10th Cir. 2007) (internal citations omitted). "If the plaintiff fails to show that either the defendants violated a

constitutional or statutory right or that the asserted violation was clearly established under the law, the defendant is entitled to qualified immunity." *Oliver v. Woods,* 209 F.3d 1179, 1185 (10th Cir. 2000) (citing *Albright v. Rodriguez,* 51 F.3d 1531, 1535 (10th Cir. 1995)).

## Argument

### I. The Jeffco Deputies are entitled to qualified immunity.

The only claims stated against the Jeffco Deputies in the TAC are that they shot Plaintiff Joe Deras. TAC ¶ 185. The Jeffco Deputies appear to be included as defendants to the First Claim for Relief (First Amendment retaliation) and Second Claim for Relief (Fourth Amendment excessive force), both brought pursuant to 42 U.S.C. § 1983. TAC ¶¶ 429, 443. The Jeffco Deputies are entitled to qualified immunity.

#### A. Deras cannot establish personal participation by the Jeffco Deputies.

Deras cannot show that either Dreith or Hamilton used any force against him. "Individual liability under § 1983 must be based on personal involvement in the alleged constitutional violation." *Foote v. Spiegel*, 118 F.3d 1416, 1423 (10th Cir. 1997). "It is not merely enough for a plaintiff to allege a violation. The law is clear that in the Tenth Circuit that an individual plaintiff must allege which officer or officers personally participated in the violation of that plaintiff's rights." *Panaderia La Diana, Inc. v. Salt Lake City Corp.*, 342 F. Supp. 2d 1013, 1031-32 (D. Utah 2004), *aff'd, Trevizo v. Adams*, 455 F.3d 1155 (10th Cir. 2006).

The TAC alleges that "Defendant Hamilton and/or Dreith shot Mr. Deras." TAC ¶185. However, Deras has no evidence to support this claim. Neither Dreith nor Hamilton have any recollection of specifically targeting or striking Mr. Deras. (**Ex. E**, 29:16–19; **Ex. F**, 56:8-24.) There were 15-20 JCRS officers on the line, all of whom were armed with less-lethal munitions,

and at least 10 of whom acknowledge using various forms of less-lethal munitions on protestors who were throwing and/or kicking gas canisters and other projectiles towards the officers. (**Ex. D**, 4, 8, 12, 16, 21, 25, 29, 34; **Ex. C**, 5-6, 14; **Ex. K**, 60, 65, 69, 79, 83.)

Mr. Deras initially claimed that he was hit with gas canisters. (**Ex. B**, 147:24-148:2.) He claimed to have been burned by the object that hit his hand. (*Id.* at 148:14–16.) Bean bag rounds are not hot. (**Ex. J**.) Deras acknowledges that he does not know what he was shot with or even if they were the same or different types of munitions. (**Ex. B**, 153:16-23; **Ex. G**, 42:10-13.) He cannot identify where in the officer line the projectiles were coming from. (**Ex. G**, 43:5-9.) Quite simply, Deras cannot identify who shot him from among the 21 officers and commanders who were protecting the DPD substation on May 31, 2020.

Dreith and Hamilton were both armed with shotguns shooting "Bean Bag" rounds (as were other individuals). The SWAT After Action report recites that over the course of several days of the JCRS deployment to Denver, 239 rounds of less lethal munitions were used. (**Ex. A**, 26.) Sixty-six of them were "Bean Bag" rounds, making the chance that a particular round that was utilized was a "Bean Bag" round only 27.62%. (*Id.*)

It is anticipated that Deras will argue that there is evidence he was hit by Dreith and Hamilton because their reports and deposition testimony indicate they may have targeted individuals kicking gas canisters. However, other JCRS members either indicated the same or did not specify their targets. For instance, Deputy Colley stated that projectiles were thrown and gas canisters kicked at JCRS and "[w]e engaged the specific individuals who did this." (**Ex. D**, 40.) Sergeant Donahue stated, "I fired approximately 5 rounds of 37mm sting balls . . . . The sting balls were used as a means to disperse the crowd." (**Ex. C**, 7.) Lieutenant Williams observed officers

firing to push the crowd, which was throwing and kicking canisters, back. (**Ex. C**, 16) Officer DiDominico "observed . . . individuals which were throwing items towards operators and kicking gas canisters back towards our line. . . . I targeted specifically individuals who were *involved in a current act of aggression*, was in the act of throwing an item *or* was picking up items to throw." (**Ex. K**, 21 (emphasis added).) Officer Neidig stated, "I continued to utilize less lethal sponge rounds to protect myself and other officers from active assaults." (*Id.* at 31.)

Simply because Dreith and Hamilton may have been among those officers targeting people kicking gas canisters does not mean they targeted Deras. A review of the Halo video demonstrates at least 6 instances of kicking gas canisters—and that is just the individuals caught on camera.

Further, a single operator can fire multiple times at a target. Dreith's report indicates that he personally targeted and impacted an individual with 4 bean bag rounds just minutes before the events in question. (**Ex. D**, 4.) Even if there was sufficient evidence to exclude the other 19 team members as potential shooters and demonstrate that only Dreith or Hamilton could have been the shooter, Deras cannot demonstrate that either is more likely than the other to have targeted him.

Accordingly, Plaintiffs' Fourth Amendment claim against the Jeffco Deputies fails as a matter of law because Deras cannot demonstrate that either Dreith or Hamilton personally participated in using force against him.

### B.    The Jeffco Deputies did not violate Deras's First Amendment's rights.

Deras claims that the injuries he received on May 31, 2020 by JCRS officers suppressed his ability to exercise his First Amendment rights. More broadly, Deras claims that the use of less lethal force was intended to discourage, suppress, and retaliate against the exercise of Deras' First Amendment rights.

A First Amendment retaliation claim requires a showing "(1) that the plaintiff 'was engaged in constitutionally protected activity'; (2) that the defendant's actions caused the plaintiff 'to suffer' an injury that would chill a person of ordinary firmness from continuing to engage in that activity'; and (3) that the 'defendant's adverse action was substantially motivated as a response to the plaintiff's exercise of constitutionally protected conduct." *Worrell v. Henry*, 219 F.3d 1197, 1212 (10th Cir. 2000) (citations omitted). The third element requires a showing "that the defendants' alleged retaliatory motives were the 'but for' cause of the defendant's actions," which requires allegations of specific facts showing retaliation motivated by the exercise of plaintiff's constitutional rights." *Peterson v. Shanks*, 149 F.3d 1140, 1144 (10th Cir. 1998).

JCRS officers were lined up to protect District 6 from further property damage. (**Ex. A**, 15.) JCRS officers used no force against protestors, less lethal or otherwise, until they began to be attacked by protestors throwing rocks and glass bottles at them. (*Id.* at 21-23.) Even after members of the crowd began to engage in violence, JCRS only targeted those individuals acting aggressively that were a danger to the safety of officers and other protestors. (**Ex. D**, 8; *see also* **Exs. I** and **J**.)

Deras is required to show that he was shot with less lethal force "*because of* [,] not merely in spite of" his message. *Pahls v. Thomas*, 718 F.3d 1210, 1224 (10th Cir. 2013) (emphasis original). There were thousands of protestors along Colfax Avenue. (**Ex. B**, 151:18.) It was only the protestors who posed a threat to officers that were targeted with less-lethal munitions. (**Ex. C**, 6.) Other than a conclusory statement that it occurred, Deras has not shown that (1) the less lethal force used against him was done in a retaliatory manner or (2) any particular officer violated his First Amendment rights. TAC ¶429.

13

### C. The Jeffco Deputies did not violate Deras's Fourth Amendment rights.

Fourth Amendment claims of excessive force are evaluated under a standard of objective reasonableness from the perspective of a reasonable officer at the scene, without the benefit of 20/20 hindsight. *Tenorio v. Pitzer*, 802 F.3d 1160, 1164 (10th Cir. 2015); *Graham v. Connor*, 490 U.S. 386, 396-97 (1989). We thus "allo[w] for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396-397; *Plumhoff v. Rickard*, 572 U.S. 765, 775 (2014). What may later appear to be unnecessary when reviewed from the comfort of a judge's chambers may nonetheless be reasonable under the circumstances presented to the officer at the time" *Phillips v. James*, 422 F.3d 1075, 1080 (10th Cir. 2005).

Whether an officer acted reasonably, and in accordance with the Fourth Amendment, is determined by looking at the totality of the circumstances. *See Plumhoff*, 572 U.S. at 774. The factors bearing on this determination may include "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396.

An analysis of the *Graham* factors shows that the force used against Deras was objectively reasonable. Looking at the first *Graham* factor, Deras's conduct at the time of his interaction with JCRS officers could have resulted in a criminal assault charge. Under COLO. REV. STAT. § 18-3-203(1)(c) and § 18-2-101, a person who attempts to prevent one whom he knows to be a peace officer from performing their lawful duty by intentionally causing bodily injury is guilty of Attempted Second Degree Assault, a class five felony. In the video, it can be seen that Deras ran

14

toward the police line and kicked one of the gas canisters approximately 30 feet towards the line of officers. (**Ex. H**, 8:30:16-21.) A few second later, Deras again ran out of the crowd towards the officers and kicked yet another gas canister multiple times back towards the officers. (*Id.* at 8:30:30-8:30-39.) The fact that law enforcement was so outnumbered by protestors that JCRS officers could not safely arrest every individual who posed this sort of threat does not change the severity of Deras's behavior.

The second *Graham* factor further supports the objective reasonableness of the force used. JCRS officers reported injuries from various projectiles thrown at them as the reason they dispersed CS gas into the crowd. (**Ex. A**, 13.) Deras's undisputed conduct as evidenced in the video, posed a serious threat of physical harm to the Defendant JCRS officers. (**Ex. F**, 65:19-66:1; **Ex. E**, 32:6-20.) During the course of that night, as well as the previous nights of protests, there were numerous accounts of officers being injured by aggressive protestors. (**Ex. A**, 13; **Ex. D**, 8.)

Prior to Deras approaching the intersection at Colfax and Washington, officers were already under attack by numerous protestors throwing rocks, glass bottles, fireworks, and other projectiles at law enforcement. Deras kicked gas canisters toward the same officers multiple times while those officers were being pelted with other objects. It is at this point in time that Mr. Deras was struck by the less-lethal munitions. In this particular incident, a reasonable officer would perceive that Deras posed a threat to officers at the time less-lethal munitions were deployed. When shown Deras's actions on video, both officers confirmed that based on their training and perception, he was showing active aggression and posed a threat of serious bodily injury.

At no time did officers use lethal force. Both Dreith and Hamilton targeted only green zones, which include the hands and buttocks. (**Exs. I** and **J**.) While Deras claims he was struck in

15

his helmet, neither Dreith nor Hamilton targeted that area. (**Exs. I** and **J**.) The fact that rounds may unintentionally strike other areas of the body of the intended target does not render the decision to use the force unreasonable.

Based on the injuries they had already sustained, the aggression of certain protestors, and the fact that JCRS officers were so far outnumbered by protestors in a tense and escalated situation, a reasonable officer in this position would have had probable cause to believe that Deras posed an immediate threat of serious physical harm, thus justifying the use of less lethal force. *See Tennessee v. Garner,* 471 U.S. 1, 11 (1985).

As for the third *Graham* factor, Deras evaded arrest by running away from the skirmish line after kicking the canister at officers. JCRS officers had noted that protestors throwing and kicking projectiles towards law enforcement would constitute assault and grounds for arrest in other circumstances. It is undisputed that Deras kicked a projectile toward officers who were positioned in front of the District 6 police station.

However, in the middle of the protests where law enforcement was grossly outnumbered by thousands of protestors, JCRS officers simply didn't have the capacity to arrest every individual who posed this sort of threat.

Further, JCRS officers had deployed gas canisters as a utilization of force to control the violent elements in the crowd. By kicking those gas canisters back at the officers, Deras was actively resisting a valid use of force, and in fact was directly undermining it.

The *Graham* factors are met in this case as shown by the video and other evidence, and summary judgment is appropriate.

### D. Deras cannot show that the Jeffco Deputies violated his clearly established rights.

For the purposes of qualified immunity, to be clearly established, "a constitutional right must be sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Redmond v. Crowther*, 882 F.3d 927, 935 (10th Cir. 2018) (quotation omitted). "A case clearly establishes a right 'when a Supreme Court or Tenth Circuit decision is on point, or if the clearly established weight of authority from other courts shows that the right must be as [the] plaintiff maintains." *Id.* (quotation omitted); *see also Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (existing precedent "must have put the question of the reasonableness of the officer's conduct 'beyond debate'"). "Put simply, qualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Mullenix*, 577 U.S. at 12 (quoting *Malley v. Briggs,* 475 U.S. 335, 341 (1986)).

"The Supreme Court has 'repeatedly told courts not to define clearly established law at a high level of generality since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced.'" *Estate of B.I.C. v. Gillen*, 761 F.3d 1099, 1106 (10th Cir. 2014) (quoting *Plumhoff,* 572 U.S. at 779). The dispositive question is "whether the violative nature of *particular* conduct is clearly established." *Mullenix*, 577 U.S. at 12 (quotations omitted). Especially in the context of claims of Fourth Amendment violations, here excessive force, "[s]pecificity is especially important." *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018).

There is no clearly established law prohibiting officers from targeting an individual with less-lethal force when the individual is displaying aggressive behavior towards officers and the officers perceive that individual to be a risk to their personal safety. In fact, there is little reported

17

law regarding the use of less-lethal munitions in the context of demonstrations. What case law does exist has largely come about after the George Floyd protests and would not have been available to the Jeffco Deputies at the time of the events in question. Yet that law recognizes the inherent difficulty in drawing an enforceable line that is sensitive to officers' ability to quell violence and prevent the destruction of property while protecting individuals' free speech rights. *Alsaada v City of Columbia,* 536 F. Supp. 3d 216, 251-252 (S.D. Ohio 2021). In this situation, Mr. Deras was not simply peacefully marching with other protestors. By his own admission, he repeatedly kicked gas canisters toward the police line. Officers had to make the decision regarding whether to engage based on the fact that he had twice ran towards the police line, which was there to defend the municipal property, while they were being repeatedly hit and struck with numerous projectiles. Their actions were not clearly unconstitutional. Rather, they were lawful.

## Conclusion

There is no evidence that the Jeffco Deputies targeted Mr. Deras as a result of exercising his constitutional rights. Nor did the Jeffco Deputies violate a clearly established law. Accordingly, the Jeffco Deputies are entitled to qualified immunity and request that the Court grant summary judgment in their favor and dismiss Plaintiffs' claims against them for the reasons set forth herein.

Dated: January 28, 2022.                    JEFFERSON COUNTY ATTORNEY'S OFFICE

By: */s/ Eric Butler*
Eric Butler, #29997
Deputy County Attorney
100 Jefferson County Parkway, Suite 5500
Golden, Colorado 80419
Telephone: 303.271.8932
Facsimile: 303.271.8901
ebutler@jeffco.us
*Attorneys for Defendants Dreith and Hamilton*

# CERTIFICATE OF SERVICE

I hereby certify that on January 28, 2022, I filed the foregoing JEFFERSON COUNTY DEPUTIES' MOTION FOR SUMMARY JUDGMENT via CM/ECF which will serve a true and correct copy upon the following:

Colin Michael O'Brien, colin.obrien@arnoldporter.com
Edwin Packard Aro, ed.aro@arnoldporter.com
Matthew J. Douglas, matthew.douglaw@arnoldporter.com
Michael J. Sebba, Michael.sebba@arnoldporter.com
Mindy Amanda Gorin, mindy.gorin@arnoldporter.com
Patrick Conor Reidy, Patrick.reidy@arnoldporter.com
Timothy R. Macdonald, timothy.macdonald@arnoldporter.com
Reeves Anderson, reeves.anderson@arnoldporter.com
ARNOLD & PORTER KAYE SCHOLER LLP-DENVER
*Attorneys for Plaintiffs Epps, Wedgeworth, Blasingame, Rothlein, Packard, Lyman, Fisk, and Smith*

Arielle Kay Herzberg, aherzberg@aclu-co.org
Mark Silverstein, msilverstein@aclu-co.org
Sara R. Neel, sneel@aclu-co.org
AMERICAN CIVIL LIBERTIES UNION-DENVER
*Attorneys for Plaintiffs Epps, Wedgeworth, Blasingame, Rothlein, Packard, Lyman, Fisk, and Smith*

Daniel Moore Twetten, dan@loevy.com
Elizabeth C. Wang, elizabethw@loevy.com
LOEVY & LOEVY-BOULDER
*Attorneys for Plaintiffs Fitouri, Parkins, Taylor, Amghar, Sannier, Deras, and Duran*

Makeba Rutahindurwa, makeba@loevy.com
LOEVY & LOEVY-CHICAGO
*Attorney for Plaintiff Fitouri Parkins, Taylor, Amghar, Sannier, Deras, and Duran*

Andrew David Ringel, ringela@hallevans.com
Katherine Hoffman, hoffmank@hallevans.com
HALL & EVANS LLC-DENVER
*Attorneys for Defendant Denver, Felkins, Abeyta, Tak, Lnu, and Pazen*

Hollie Renee Birkholz, hollie.birkholz@denvergov.org
Lindsay Michelle Jordan, lindsay.jordan@denvergov.org
Robert Charles Huss, Robert.huss@denvergov.org
DENVER CITY AND COUNTY ATTORNEY'S OFFICE
*Attorneys for Defendants Denver, Felkins, Abeyta, Tak, Lnu, and Pazen*

Isabelle Sabra Evans, ievans@auroragov.org
Peter Ruben Morales, pmorales@auroragov.org
AURORA CITY ATTORNEY'S OFFICE
*Attorneys for Defendants Aurora, Brukbacher, Serrant, and McNamee*

David M Goddard, dgoddard@brunolawyers.com
Michael T. Lowe, mlowe@brunolawyers.com
BRUNO, COLIN & LOWE, P.C.
*Attorneys for Defendants Budaj, McNamee, Serrant, and Brukbacher*

*/s/ Briana McCarten*