IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 20-cv-01878-RBJ
(consolidated with 20-cv-01922-RBJ-MEH)

ELISABETH EPPS, *et al.*,

    Plaintiffs,

v.

CITY AND COUNTY OF DENVER, *et al.*,

    Defendants.

---

## DENVER DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

---

Defendants City and County of Denver, Colorado ("Denver"), Patrick Phelan, Matthew Canino, James D. Williams, Thomas Pine, Vincent Porter, Michael O'Donnell, Kevin Carroll, Rick Beall, David Abeyta, Marco Martinez, Justin Dodge, Richard D. Eberharter, Tana Cunningham, John Sampson, Jonathan Christian, and Keith Valentine ("Denver Defendants"), through undersigned counsel, hereby respectfully submit this Motion for Summary Judgment, as follows:

### INTRODUCTION

Plaintiffs Sara Fitouri, Jacquelyn Parkins, Youssef Amghar, Claire Sannier, Kelsey Taylor, Joe Deras and Jonathan Duran, along with approximately 310 other class members ("Fitouri Plaintiffs") assert the following claims pursuant to 42 U.S.C. § 1983 against Denver and the individual Denver Defendants other than Officers Christian and Valentine: (1) Denver's curfew orders violated the First Amendment, both facially and as-applied; (2) violations of the Fourth

Amendment based on the arrest of class members and based on the use of force; (3) violations of the Due Process Clause and the Equal Protection Clause of the Fourteenth Amendment based on the use of force; and (4) failure to intervene. [ECF 219].

Plaintiffs Elisabeth Epps, Ashlee Wedgeworth, Amanda Blasingame, Maya Rothlein, Zachary Packard, Hollie Lyman, Cidney Fisk, and Stanford Smith ("Epps Plaintiffs") assert the following claims pursuant to 42 U.S.C. § 1983 against Denver and Officers Christian and Valentine: (1) violations of the First Amendment based on the use of force; and (2) violations of the Fourth and Fourteenth Amendments based on the use of force. [ECF 178].[1]

Denver Defendants move for summary judgment for the following reasons: (1) on its face, the Emergency Curfew Orders were constitutional, and the Arrest Class cannot prove those similarly situated that were not engaged in protesting were not arrested; (2) class representatives and members' Fourth Amendment rights were not violated because probable cause the curfew arrests; (3) DPD's use of force did not violate the First Amendment because there is no viable First Amendment excessive use of force claim and insufficient evidence exists anyone was substantially motivated to use less lethal force during the protests in response to anyone's exercise of their First Amendment rights; (4) Plaintiffs' Fourteenth Amendment substantive due process claim fails because the Fourth Amendment governs or alternatively because Plaintiffs cannot meet the extremely high threshold necessary for a substantive due process claim; (5) Plaintiffs' Fourteenth Amendment Equal Protection use of force claim fails because there was not selective enforcement

---

[1] Denver Defendants use "Plaintiffs" to refer to all the Plaintiffs collectively.  Epps Plaintiffs and Fitouri Plaintiffs are used to refer to the Plaintiffs in those to actions when appropriate.

against the Arrest Class; (6) Plaintiffs' supervisor liability claims against the individual Denver Defendant supervisors fail because Plaintiffs cannot meet the required elements for such a claim; (7) Plaintiffs' failure to intervene claim fails because no evidence exists anyone witnessed another officer use excessive force and failed to take reasonable measures to prevent further excessive use of force; (8) Plaintiffs' municipal liability claim fails because Plaintiffs cannot met the culpability and causation requirements; (9) the individual Denver Defendants are entitled to qualified immunity because Plaintiffs have not established any of the individual defendants violated their constitutional rights nor have they shown that the law was sufficiently clear that reasonable officers in the individual Denver Defendants' positions would have known their alleged conduct was unconstitutional.

## **STATEMENT OF UNDISPUTED MATERIAL FACTS[2]**

Overview of George Floyd Protests in Denver

1.  Following the death of George Floyd in Minneapolis, on May 27, 2020, the Denver Police Department ("DPD") learned of possible protest activity in Downtown Denver. [Phelan Dep., at 108:8-18, **Exh. A**].

2.  DPD prepared by engaging Special Operations Commander Patrick Phelan as the Incident Commander, overseeing the DPD response. Commander Phelan was responsible for developing the response plan, allocate available resources, and make overall decisions concerning the DPD response. [Phelan Dep., at 26:9-25; 27:11-19; 29:7-13, **Exh. A**].

3.  Commander Phelan created the rules of engagement, whereby protesters would be

---

[2] Denver Defendants have not presented all the facts related to the George Floyd Protests in this Motion because they are not specifically relevant to their arguments related to the Plaintiffs' claims. All these facts are assumed to be true only for the purpose of summary judgment.

allowed to go into the street with DPD assisting to block traffic, but DPD would not permit crimes including looting, criminal mischief, setting fires, entering I-25, taking over a District Station, or any Denver buildings. [Phelan Dep., at 116:20-117:6, **Exh. A**].

4.      The afternoon of May 28, 2020, protesters flocked downtown gathering near the State Capitol, but then splintered into different groups. Attempts were made to overtake I-25 and the District 6 Police Station. [Canino Dep., at 65:22-66:4, 32:14-34:8; **Exh. B**].

5.      As early as the first day of the protests, many protesters engaged in criminal acts resulting in substantial property destruction and endangering public safety. [Canino Dep., at 32:14-34:8; **Exh. B**].

6.      DPD officers faced a challenging environment in responding to the protests. Individuals with the protests engaged in violent conduct towards the police including throwing a variety of different types of projectiles at the police such as chunks of concrete, rocks, canned items, bottles, golf balls, fireworks, and mortars. [O'Donnell Dep., at 29:3-16, **Exh. C**; Beall Dep., at 22:11-12, **Exh. D;** Martinez Dep., at 77:4-15, **Exh. E;** Carroll Dep., at 115:8-16, **Exh. F**].

7.      Individuals used lacrosse sticks to launch landscape rocks at officers and several officers were hit by those rocks. [O'Donnell Dep., at 109:6-23, **Exh. C**].

8.      DPD officers perceived the situation at different times during the protests as a riotous mob condition. [O'Donnell Dep., at 98:19-23, **Exh. C**].

9.      Many officers were injured during the protests as a result of the actions of the protesters. [Chart of Officer Injuries at DEN032674-76; **Exh. V**; Table of Officer Injuries, DEN032670-73, **Exh W**; Table of Officer Injuries at DEN032701-11, **Exh. X**].

10.     Commander Phelan described the George Floyd protests as unlike any other crowd control event in his forty-year history with DPD; including the 2008 Democratic National Convention, which had some violence and riotous behavior. [Phelan Dep., at 11:15-22; 140:14-21; 141:3-13, **Exh. A**].

DPD Operations Responding to George Floyd Protests

11.     DPD drafted Operations Plans for each day of the protests from May 28, 2020, through June 2, 2020, describing DPD's plans for responding to the protests and related activities. [Phelan Dep., at 33:21-33, **Exh. A**; DPD Operations Plan, 5/28/20, **Exh. G**; DPD Operations Plan, 5/29/20, **Exh. H**; DPD Operations Plan, 5/30/20, **Exh. I**; DPD Operations Plan, 5/31/20, **Exh. J**; DPD Operations Plan, 6/1/20, **Exh. K**; DPD Operations Plan, 6/2/20, **Exh. L**].

12.     Commander Phelan conducted daily briefings concerning the Operations Plan and the daily Operations Plans were handed out at the daily briefings attended by command staff and supervisors from DPD and any outside agencies assisting DPD. [Phelan Dep., at 46:1-3; 46:23-47:4, **Exh. A**].

13.     The purpose of the daily briefings was to explain the Operational Plan and how the deployment of DPD and other resources would work. [Phelan Dep., at 47:10-13, **Exh. A**].

14.     Adjustments to the daily Operations Plans were made based on the information and experience learned during the prior day. [Phelan Dep., at 120:19-21, **Exh. A**].

15.     DPD used less lethal munitions as part of their response to the protests and related activities. Less lethal force is a force application which meets an operational or tactical objective that is not intended to and has a reduced likelihood of causing death or serious bodily injury. [Pepper Ball Operator Course, at DEN000587, **Exh. M**].

16.     DPD used 40mms to respond to crowd management situations as follows: (1) against violent individuals within a crowd; (2) against subjects who were actively throwing objects at police officers; (3) against subjects who are at risk of causing imminent bodily injury to other persons; (4) to mark individuals for future identification and arrest for illegal acts that include active aggression; and (5) to provide cover while arrest teams penetrate a crowd, or against individuals who attack the arrest team or violently interfere with the movement of the team or arrest process. [40mm Operator Course, at Den 000351, **Exh. N**].

17.     Pepper Ball is appropriately used in a crowd management situation as follows: (1) to support the skirmish line; (2) to use stand-off force application to encourage individuals to come down from trees, fences, walls, poles or signs when their elevated position or actions pose a threat to the field force; (3) against subjects within the crowd who are actively throwing objects at police officers; (4) to mark individuals for future identification and arrest; and (5) to provide cover while arrest teams penetrate a crowd, or against individuals who attack the arrest team or violently interfere with the movement of the team or arrest process; and (6) for area saturation for crowd dispersal purposes. [Pepper Ball Operator Course, at DEN 000599, **Exh. M**].

18.     Chemical agents were used for crowd dispersal purposes including in emergency situations for officer safety purposes when crowds engaged in active aggression and violent behavior towards the police. [Canino Dep., at 30:11-15; 30:22-31:19; 35:23-36:11; 53:21-54:5, **Exh. B;** O'Donnell Dep., at 30:13-19; 31:9-14, **Exh. C**].

19.     Commander Phelan was not in the field and did not specifically direct officers when to deploy less lethal munitions; rather, in accordance with DPD policy, supervisors and officers on the ground determined when to respond. Command level approval is not required to deploy gas or

smoke; the authority was delegated to those on scene. [Phelan Depo, 35:3-10; 38:5-7; 62:4-63:20, **Exh. A**].

Emergency Curfew

20.    On May 30, 2020, as a result of a State of Local Disaster Emergency, Michael Hancock, Mayor of Denver, enacted an Emergency Curfew ("Curfew") subject to authority granted to him pursuant the State Constitution, the Colorado Revised Statues, the Charter of the City and County of Denver, and the Denver Revised Municipal Code ("DRMC"). [Emergency Curfew Issued to DRMC Section 2-98, 5/30/20, **Exh. O**].

21.    The Curfew noted civil disturbances had occurred within Downtown and surrounding areas of Denver resulting in significant and extensive damage to people and property with the majority of the destruction and violence occurred at night. [Curfew Order at DEN000112 **Exh. O**].

22.    DRMC Section 2-98 vests the Mayor with the authority to adopt emergency rules such as the Curfew to protect the public health, safety or welfare. [Curfew Order at DEN000112 **Exh. O**].

23.    Mayor Hancock imposed a nighttime Curfew in all public places within Denver, including streets and public right-of-ways, during the following times (a) From 8:00 PM on Saturday, May 30, 2020 until 5:00 AM on Sunday, May 31, 2020; and (b) From 8:00 PM on Sunday, May 31, 2020 until 5:00 AM on Monday, June 1, 2020. [Curfew Order at DEN000113 **Exh. O**].

24.    During the Curfew, all persons were prohibited from using, standing, sitting, travelling or being present on any public street or in any public place, including from the purpose

of travel, with the exceptions of: (a) all law enforcement, fire, paramedics or other medical personnel, Colorado National Guard as well as any other emergency response personnel authorized by Denver, and credentialed members of the news media; (b) individuals traveling directly to and from work, traveling directly to and from the Denver International Airport, seeking exempt care, fleeting dangerous circumstances, or experiencing homelessness; (c) any person to whom permission is specifically granted by a Denver official. [Curfew Order at DEN000113 **Exh. O**].

25.     On June 1, 2020, Mayor Hancock extended the Curfew. [Emergency Curfew Issued to DRMC Section 2-98, 6/1/20, **Exh. P**].

26.     The scope of the extended Curfew remained the same as the initial regulation; however, the time the Curfew would go into effect was amended as follows: (a) From 9:00 PM on Monday, June 1, 2020 until 5:00AM on Tuesday, June 2, 2020; (b) From 9:00 PM on Tuesday, June 2, 2020 until 5:00AM on Wednesday, June 3, 2020; (c) From 9:00 PM on Wednesday, June 3, 2020 until 5:00AM on Thursday, June 4, 2020; and (d) From 9:00 PM on Thursday, June 4, 2020 until 5:00AM on Friday, June 5, 2020. [Extended Curfew Order at DEN000115 **Exh. P**].

Enforcement of the Curfew

27.     Arrests were made on all days of the protests, and DPD used the Curfew to manage the violent and destructive behavior that increased when darkness fell. [Thomas Dep., at 22:11-.23:5, **Exh. Q**; Arrest table, at DEN32691-32697, **Exh. EE**].

28.     DPD Senior Leadership discussed strategies for using the Curfew and sought to ensure DPD understood the Curfew was a tool to help manage the violence and destruction, as DPD was interested in enforcing the Curfew against those individuals engaged in violent and destructive acts. [Thomas Dep., at 24:4-14; 24:24-25:4; 57:24-58:11, **Exh. Q**].

29.     Protesters who were complaint with lawful orders to leave the area were allowed to go home and were not arrested for Curfew. Arrests were used for people out after the Curfew who were not compliant. [Canino Dep., at 118:24-119:2; **Exh. B**].

30.     Of those arrested for violation of Curfew and/or failure to obey a lawful order, many were also charged with additional unlawful acts, including public fighting, eluding, weapons offenses, disturbing the peace, and graffiti, to name a few. [Arrest table, at DEN32691-32697, **Exh. EE;** Citations with Additional Charges, **Exh. R**].

31.     While Downtown was the focus of arrests during the Curfew, arrests were also made in Cherry Creek where protests did not occur. [Message Summarizing Police Activity and Arrests, **Exh. S**].

32.     DPD operates under a chain of command system, consisting of Chief of Police ("Chief"), responsible for overall operations, a Deputy Chief, and three Division Chiefs who oversee the administration, investigations and parole functions of the DPD. [Phelan Dep., at 39:11-20 **Exh**. **A**; Ops Manual, §§2.69-2.72 at DEN 981, **Exh. T**]

33.     Division Chief Ron Thomas was the Division Chief of Patrol in May and June 2020, and managed DPD's patrol functions under the supervision of the Deputy Chief and the Chief. [Thomas Dep., at 7:8-16; 8:18-9:15; 9:19-25, **Exh. Q**; Ops Manual, §§ 2.69, 14.07 & 14.10 at DEN 981 and 1010, **Exh. T**].

34.     Following the discussion of Curfew enforcement with DPD leadership, Division Chief Thomas passed along the message of enforcement to the district commanders so they could inform officers. [Thomas Dep., at 24:14-16; 25:5-8, **Exh. Q**].

35.     After the Curfew was extended, Commander Bancroft communicated to three of her subordinates the following text message "From DC Thomas, all just to reiterate, the city curfew in effect this week begins at the 2100. As has occurred previously, everyone will receive an emergency announcement on their cell phone at 20:45 as a notification. Please advise all your officers that this curfew ordinance is to be used only for enforcing protest-related behavior regardless of location in the city. Do not allow officers cite for curfew just for being out after 21:00. Unless they are actively engaged in protest activity, some other charge of justification must be used. Thanks." [Thomas Dep., at 26:18-27:4, **Exh. Q**].

36.     Chief Pazen did not tell Division Chief Thomas to send the message, nor did Division Chief Thomas share the message with the Chief. [Pazen Dep., at 74:16-75:2, **Exh. U**; Thomas Dep., at 27:11-16, **Exh. Q**].

37.     Division Chief Thomas's message was not disseminated to the entire group of officers policing the protests, for numerous reasons including that he is over patrol, and other officers are under other Division Chiefs. [Canino Dep., at 118:5-119:5; **Exh. B**].

38.     Division Chief Thomas intended to communicate to district commanders that individuals involved in violent and destructive activities were the enforcement priority for Curfew violations and believed the recipients of his communication would have understood his intention. [Thomas Dep., at 27:16-20; 34:6-19, **Exh. Q**].

39.     Division Chief Thomas did not communicate with the Mayor or the Mayor's office about Curfew enforcement. [Thomas Dep., at 42:15-18, **Exh. Q**].

40.     In practice, the Curfew was enforced by DPD officers as stated in the Curfew-- against anyone out on the streets after the stated time and not compliant with orders to go home,

whether Downtown or elsewhere in Denver, and whether people were engaged in destructive activity and violence or merely those who remained out after the Curfew. [*Supra*, ¶¶33-34].

<u>Destruction and Officer Injuries Resulting from Protests</u>

41.     Approximately 80 DPD Officers were injured during the protests, and of those approximately 60 DPD Officers were specifically injured by projectiles, including rocks, bottles, bricks, chunks of concrete, and other unknown projectiles, thrown at them by individuals with protestors that were thrown at DPD Officers' faces, necks, chest/stomach, groin, and extremities and injured officers as such. [Chart of Officer Injuries at DEN032674-76; **Exh. V**; Table of Officer Injuries, DEN032670-73, **Exh W**; Table of Officer Injuries at DEN032701-11, **Exh. X**].

42.     Two DPD Officers were injured during the protests after being intentionally struck by vehicles, one DPD Officer was punched in the face, and two DPD Officers had unknown substances thrown at them. [Chart of Officer Injuries at DEN032674-76; **Exh. V**].

43.     There were 238 property damage incidents reported between May 30, 2020, and June 1, 2020, in the Downtown Denver Business Improvement District. 130 of these incidents were reported by establishments on the Sixteen Street Mall claiming damages to private and public property, such as graffiti tags, vandalism, broken windows, theft, and arson. [Summary Data of Property Damage at DEN009737-842, **Exh Y**].

44.     For example, the following acts of destruction to private businesses occurred: on May 30, 2020, a Downtown Walgreens was firebombed, a Solestreet Shoes in Downtown was vandalized, and $20,000 worth of merchandise was stolen, the Denver Post building was tagged with graffiti, and all the first-floor windows were broken; on May 31, 2020, establishments in the area of 16th and Stout Street were tagged with graffiti and covered with firebomb markings; and

on June 1, 2020, the Seven-Eleven on 16th and Champa was vandalized with broken glass and merchandize stolen. [Summary Data of Property Damage at DEN009763, 009770, 009800, 009840 **Exh Y**]

45.     Extensive public property damage was reported, including but not limiting, approximately 106 City building windows were broken and numerous Denver buildings were tagged with graffiti. [Summary Data to City Buildings at DEN009859, 9858, **Exh Z**].

46.     Approximately 76 DPD cruisers were vandalized totaling $48,620.48 in damages. [Property Damage Table at DEN32668-69, **Exh AA**; Property Damage – Glass at DEN032712-13, **Exh. BB**; Damage Photos at DEN32313, **Exh. CC**].

47.     Denver initiated the Denver Capital Complex Vandalism Repair Project to identify repair, replace, and clean damages caused by individuals during the protests. The total cost of the project was $1,112,661.72. [Damage Quote at DEN32679-32682, **Exh DD**].

## ARGUMENT

### I. THE CURFEW[3] ORDERS  WERE FACIALLY CONSTITUTIONAL

**a.   The Curfew did not regulate speech, instead it provided   temporary and reasonable public safety measures.**

The First Amendment prohibits the enactment of laws "abridging the freedom of speech." *See* U.S. Const. Amend. 1. Political demonstrations and protests lie at the heart of the First Amendment concerns. *See **Boos v. Barry***, 485 U.S. 312, 318 (1988). The Curfew challenged here was strictly a temporary public safety regulation with no reference to any First Amendment

---

[3] Reference to "Curfew" in the argument section includes both the initial curfew in effect from May 30, 2020, through June 1, 2020, and the extended curfew in effect from June 1, 2020, through June 5, 2020.

protected activity. The Curfew restricted conduct and was implemented to stop the violent, destructive, and riotous behavior jeopardizing public and officers' safety and resulted in over a million dollars in property damage, which included both public and private buildings. Many nearby businesses were vandalized. The temporary order clearly states the restrictions were imposed to promote safety within the community, not regulate speech.

As such, the Curfew need only pass rational basis review to be constitutional. Denver has a legitimate interest in utilizing tools to stop illegal and riotous activity posing significant threats to public safety. Based on the number of officers injured, the extent of property damage, complaints from nearby residents, and safety issues faced by responding firefighters and EMTs, the Curfew was rational and served legitimate governmental interests.

**b.   Any indirect restriction on speech was content neutral, reasonable, and narrowly tailored.**

Even assuming *arguendo* if the Curfew regulated speech it still survives First Amendment analysis because any speech restriction was content neutral, as the restriction applied to all speech, not just speech criticizing police. To determine content neutrality, one must determine whether the government has adopted a regulation of speech because of disagreement with the message it conveys. *Ward v. Rock Against Racism*, 491 U.S.781, 791 (1989) (*citing* *Clark v. Cmty. for Creative Nonviolence*, 468 U.S. 288, 295 (1984)). The text of the Curfew is content neutral. The Curfew applied to all citizens except those whose services were urgently required during the night hours, such as first responders. There were  also exceptions for credentialed news media, individuals traveling directly to and from work, traveling directly to and from the airport, seeking exempt care, fleeing dangerous circumstances, or experiencing homelessness. The Curfew barred *all* large nighttime gatherings regardless of the reason for the gathering or any message to be

conveyed. Because no specific group or message was targeted, any restrictions on speech was content-neutral.

Governmental regulations that are content-neutral, such as the subject Curfew, do not violate the First Amendment if it is a reasonable restriction "on time, place, or manner of protected speech." *See Ward*, 491 U.S at 791; *see also Doe v. City of Albuquerque*, 667 F.3d 1111, 1130-31 (10th Cir. 2012). "In a designated public forum, the government may only impose content-neutral time, place, and manner restrictions that: (a) serve a significant government interest; (b) are narrowly tailored to advance that interest; and (c) leave open ample alternative channels of communication." *Id.*, at 1130-1131 (*citing Ward*, 491 U.S. at 791). In this inquiry, Denver has the burden of proof. *See Doe*, 667 F.3d at 1331. Although a time, place, or manner restriction must be narrowly tailored to serve a significant governmental interest, "it need not be the least restrictive or least intrusive means of doing so." *Ward*, 491 U.S. at 798.

The time, place, and manner restrictions of the Curfew (a) served a significant government interest; (b) were narrowly tailored to advance that interest; and (c) left open ample alternative channels of communication. The Curfew's significant government interest was providing a tool to assist Denver in stopping the riotous behavior occurring the two nights prior to its implementation. The violent public disturbances occurring in Downtown Denver on May 28 and 29, 2020, involved substantial destruction of property and endangered public safety. Denver has a substantial interest in protecting its citizens, business owners and private/public property from riots.

The Curfew was narrowly tailored because it was not substantially more restrictive than necessary. To satisfy this standard, a regulation need not be the least speech-restrictive means of advancing Denver's interests. "Rather, the requirement of narrow tailoring is satisfied 'so long as

the ... regulation promotes a substantial government interest that would be achieved less effectively absent the regulation.'" Narrow tailoring in this context requires that the means chosen, do not "burden substantially more speech than is necessary to further the government's legitimate interests." *Turner Board. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 662 (1994) (quoting *Ward*, 491 U.S., at 799). Although the Curfew prohibited protesters' ability to assemble and protest during the overnight hours, the scope of the restrictions appropriately targeted the misbehavior Denver sought to stop – the riots occurring after dark. It is undisputed during this period, the riotous behavior mostly occurred in areas where large groups of people gathered. Speech and/or assembly were not targeted; eliminating the unlawful behavior occurring was the purpose.

Finally, the Curfew allowed for alternative channels for protesters to get out their message. Although the Curfew was a complete ban on protesting during the night, individuals were allowed to gather and protest from 5:00AM until 8:00PM (or 9:00PM, depending on the day) allowing protesters more than 13-14 hours a day to communicate their message. In July 2021, the Southern District of New York, upheld the constitutionality of similar emergency curfew orders. *See In re New York City Policing During Summer 2020 Demonstrations*, No. 20-CV-8924 (CM)(GWG), 2021 WL 2894764 (S.D.N.Y. July 9, 2021). Although the ruling in the New York case is not binding, it is persuasive and should be followed.

On June 1, 2020, after four days of demonstrations that devolved into unlawful nighttime activities, New York City's Mayor issued an emergency curfew order. Like Denver's Curfew, the New York City curfew banned all citizens, except those exempted, from gathering during the night. The New York federal court held the curfew orders were reasonable time, place, and manner restrictions. *Id.* Specifically, it found it significant the protesters were not restricted from gathering

to exercise their First Amendment rights during the day. In fact, the District Court pointed out the protesters had over 12 hours every day during which to communicate their message – the daylight hours, during which government officials could well have had reason to believe fewer acts of vandalism and looting would take place, and during which period they could more easily protect residents and business owners from anything untoward happening. Therefore, the District Court found no one was denied the right to protest by virtue of the temporary restrictions. *Id.*

Denver's Curfew is subject to the same analysis. The measures taken were temporary, not permanent. No one was denied the right to protest from May 30, 2020, to June 6, 2020. Having individuals assemble, protest, and demonstrate from 5:00AM until 8:00PM or 9:00PM, is nothing more than a temporary imposition of reasonable time, place, and manner restrictions and did not violate Plaintiffs' First Amendment constitutional rights.

      **c.**    <u>**Reliance on Division Chief Thomas' Message to Establish Discriminatory Enforcement of the Curfew Fails Because Thomas Is Not a Final Policymaker.**</u>

A municipality is not liable under 42 U.S.C. § 1983 simply because it employs a person who violates another's constitutional rights. to hold Denver liable, the Arrest Class must demonstrate Denver had a policy or custom that directly caused the deprivation of constitutional rights. *City of Canton v. Harris*, 489 U.S. 378, 385 (1989); *Bryson v. City of Okla. City*, 627 F.3d 784, 788 (10th Cir. 2010).

The Arrest Class argues the Curfew was discriminatorily enforced against protestors pursuant to official Denver policy. The Arrest Class heavily relies on a text messages sent by Commander Bancroft summarizing instructions from Division Chief Thomas, who was, in turn, articulating his subjective understanding of DPD's curfew enforcement strategy following a meeting with senior leadership. Division Chief Thomas believed the intent of DPD was to apply

the Curfew against individuals embedded with the protestors engaged in violent and destructive acts. In the message, he stated, "Please advise all your officers that this curfew ordinance is to be used only for enforcing protest-related behavior regardless of location in the City." Notwithstanding his use of the phrase "protest-related behavior," Division Chief Thomas intended to communicate and believed the recipients would understand his message to mean: enforce the Curfew against individuals engaged in violent and destructive acts, based on DPD training and other contemporaneous conversations about Curfew enforcement.

Plaintiffs argue this message establishes Denver's motive to apply the Curfew against protestors. In so arguing, Plaintiffs ignore DPD's lawful Curfew enforcement strategy—to target individuals engaged in violent and destructive acts, not protestors—and instead focuses on the wording of Division Chief Thomas' *transmittal*. However, whether Division Chief Thomas' transmittal was a complete and accurate representation of Denver's Curfew enforcement strategy is of no consequence; the critical inquiry is what was Denver's *policy* on enforcement. Fatal to the Arrest Class' argument, the wording of Division Chief Thomas' text message does not represent official Denver policy.

Not every decision by an individual automatically subjects the municipality to 42 U.S.C. § 1983 liability. "Municipal liability attaches only where the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481 (1986). Whether a person possesses final policymaking authority is an issue for the Court to determine based on state and local law. *See City of St. Louis v. Praprotnik*, 485 U.S. 112, 123 (1988). In making this determination, courts consider:  (1) whether the official is meaningfully constrained by policies *not* of the official's own making; (2) whether the official's

decisions are *final* or are instead subject to any meaningful review; and (3) whether the policy decision purportedly made by the official is within the realm of the official's grant of authority. *See **Sekerak v. City and County of Denver***, 1 F. Supp. 2d 1191, 1198 (D. Colo. 1998) (citing ***Praprotnik***, 485 U.S. at 127) (emphasis in original).

Here, Division Chief Thomas is not a final policymaker for Denver. Division Chief Thomas oversees DPD's patrol division, managing patrol functions for DPD's six patrol districts. Division Chief Thomas reports to supervisory officers pursuant to a chain of command structure, including the Deputy Chief and the Chief. The strategy for curfew enforcement was not determined by Division Chief Thomas alone, rather it was determined by a group of DPD commanders. Division Chief Thomas simply relayed his subjective understanding of those discussions to his subordinates. Whether in doing so he accurately relayed the Denver's Curfew enforcement strategy in his text message is a red herring; it is irrelevant to establishing Denver's liability. Instead, the only relevant evidence in this case is the actual policy, not the choice in words by a non-final policymaker in relaying the policy to others. Here, DPD policy was to enforce the Curfew against those committing violent or destructive actions. Division Chief Thomas' incorrect text message does not create Denver policy.

Notwithstanding his lack of final policymaking authority, there are two ways the Arrest Class may establish Division Chief Thomas' message constituted official Denver policy, but the Arrest Class fails on both attempts. First, if the text message, including its content, was sent at the direction of Chief Pazen, DPD's final policymaker. *See, e.g., **Bryson***, 627 F.3d at 788. No evidence exists this is what occurred. Alternatively, by establishing the text message was ratified by Denver. It plainly was not. Pursuant to the chain of command structure, Division Chief Thomas'

supervisors had the authority to review his instruction (and the underlying substance thereof) and edit, amend, and/or rescind as they believed appropriate, *had they known about the message*. However, there is no evidence any of Division Chief Thomas' supervisors were aware of, reviewed, or approved this message, making ratification impossible. *Id.*; *see Bryson*, 627 F.3d at 790 ("a municipality will not be held liable under a ratification theory unless a final decisionmaker ratifies an employee's specific unconstitutional actions, as well as the basis for these actions"). Because Division Chief Thomas' recital of the policy was never ratified it cannot create Denver policy here.

### d.   <u>Protestors Were Not Treated Differently Than Similarly Situated Individuals in the Enforcement of the Emergency Curfews.</u>

The Equal Protection Clause prohibits selective enforcement of the law based on race, ethnicity, or other impermissible considerations. *Whren v. United States*, 517 U.S. 806, 813 (1996). To bring a selective enforcement claim, the challenging party must establish: (1) different treatment from others similarly situated; and (2) the differing treatment was based on clearly impermissible or invidious grounds "such as race, religion, or the desire to prevent the exercise of constitutional rights." *United States v. Salazar*, 720 F.2d 1482, 1487 (10th Cir. 1983). Individuals are similarly situated "when their circumstances present no distinguishable legitimate prosecutorial factors that might justify making different prosecutorial decisions with respect to them." *United States v. DeBerry*, 430 F.3d 1294, 1301 (10th Cir. 2005) (quoting *United States v. Olvis*, 97 F.3d 739, 744 (4th Cir. 1996)). The standard for proving a violation of Equal Protection based on selective enforcement is a "demanding" one, *see United States v. Armstrong*, 517 U.S. 456, 463 (1996), which has not been established here.

While most people charged with violating the Curfew were individuals in the general

vicinity of protest-related activity in Downtown Denver, it does not follow Denver's Curfew orders were discriminatorily applied to target protestors. Indeed, this result logically flows from the facts: thousands of individuals flocked Downtown from May 28, 2020, to June 5, 2020 to protest, and with this protected protest activity came individuals seeking to take advantage of the circumstances to engage in violent and destructive acts. The majority of law enforcement activity was focused Downtown responding to the unprecedented levels of activity— some peaceful, some not— thus the higher numbers of individuals cited with violations were Downtown. Put simply, more people were out in Downtown after Curfew, thus more people there were cited for violating the Curfew.

The Arrest Class' discriminatory enforcement claim is undercut for multiple reason.  Not all protesters who were violating Curfew were arrested, including thirteen of the Plaintiffs. In some circumstances officer instructed Curfew violators to leave and they left, not subjecting themselves to arrest. Other individuals not protesting but engaged in suspicious activities were also arrested for Curfew. For instance, on May 31, 2020, a group was observed in the Cherry Creek area of Denver after Curfew.  Upon seeing officers, the group fled. Officers were able to locate two individuals and cited them with violating the Curfew. A third individual was observed in the area of West 3rd Avenue and North Clayton Street and arrested, cited with violating the Curfew, and detained. These individuals were not protesting but were engaged in unknown suspicious activity after Curfew. Individuals causing damage and destruction to property were also arrested, as were those possessing weapons. These examples illustrate the Curfew was used as a tool against individuals engaged in criminal or suspicious conduct after Curfew or otherwise not in compliance with the Curfew, disproving the Arrest Class' claim. These facts are undisputed and show the Curfew was not enforced against protesters only in a discriminatory manner. The protestors were

treated in the same manner as similarly situated non-protesting individuals, therefore, the Arrest Class cannot establish a selective enforcement claim.

## II. THE ARRESTS DID NOT VIOLATE THE FOURTH AMENDMENT RIGHTS BECAUSE PROBABLE CAUSE EXISTED

The existence of probable cause is a complete defense to a viable Fourth Amendment wrongful arrest claim. *Devenpeck v. Alford,* 543 U.S. 146, 152 (2004); *Atwater v. City of Lago Vista,* 532 U.S. 318, 354 (2001) ("If an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender."). "Probable cause exists 'where facts and circumstances within an officer's knowledge and of which he had reasonably trustworthy information are sufficient to warrant a prudent man in believing that an offense has been or is being committed.'" *Marhsall v. Columbia Lea Reg'l Hosp.,* 345 F.3d 1157, 1166 (10th Cir. 2003) (quoting *Karr v. Smith,* 774 F.3d 1029, 1031 (10th Cir. 1985)). Probable cause is evaluated at the time of the arrest. *United States v. Rodriquez,* 739 F.3d 481, 485 n. 2 (10th Cir. 2013); *Bledsoe v. Garcia,* 742 F.2d 1237, 1243 n. 3 (10th Cir. 1984). Even if this Court concludes the Curfew was unconstitutional, probable cause to support the arrests may still have existed at the time. *Pierson v. Ray,* 386 U.S. 547, 555 (1967); *Roska v. Peterson,* 328 F.3d 1230, 1251 n. 29 (10th Cir. 2003).

Here, there is no dispute the Arrest Class Plaintiffs were arrested for violating the Curfew because they were in violation of the Curfew. As a result, probable cause existed to arrest each one and the Arrest Class Plaintiffs' Fourth Amendment claim fails as a matter of law.

## III. THE USE OF FORCE DID NOT VIOLATE THE FIRST AMENDMENT

Initially, Plaintiffs appear to attempt a First Amendment claim alleging the Denver Defendants' use of force violated their First Amendment constitutional rights. [ECF 178, ¶¶ 155-

170; ECF 219, ¶¶ 425-440]. However, no such First Amendment use of force claim exists. Instead, the viable First Amendment theory for the Plaintiffs is a First Amendment retaliation theory premised on the assertion force was used on the Plaintiffs in retaliation for their engaging in First Amendment protected activity. *Compare* ***Maron v. City of New York,*** 15-cv-2017 (PKC), 2016 U.S. Dist. LEXIS 28466 at *30-37 (S.D.N.Y. Mar. 7, 2016) (analyzing claim of being subjected to excessive use of force in violation of the First Amendment as First Amendment retaliation claim).

To establish a First Amendment retaliation claim, Plaintiffs must prove: (1) they were engaged in constitutionally protected activity; (2) the defendant's actions caused the plaintiff to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity; and (3) that the defendant's adverse action was substantially motivated as a response to the plaintiff's exercise of constitutionally protected conduct. ***Worrell v. Henry,*** 219 F.3d 1197, 1212 (10th Cir. 2000).

Denver Defendants assume for purposes of this Motion the Plaintiffs can meet the first two elements. However, Plaintiffs lack sufficient evidence to establish the third element. Plaintiffs have not and cannot prove the actions of the Denver Defendants were substantially motivated as a response to any exercise of First Amendment rights. The Tenth Circuit has described the third element of ***Worrell*** as a causation requirement. ***Hedquist v. Beamer,*** 763 F.App'x 705, 712 (10th Cir. 2019). Plaintiffs are required to establish "but-for" causation to meet this element. ***McBeth v. Himes,*** 598 F.3d 708, 719 (10th Cir. 2010); ***Carbajal v. St. Anthony Cent. Hosp.,*** 12-cv-02257-REB-KLM, 2015 U.S. Dist. LEXIS 80896 at *44-49 (D. Colo. Apr. 7, 2015), *aff'd,* 2015 U.S. Dist. LEXIS 81302 (D. Colo. June 23, 2015). Here, Plaintiffs cannot meet the "but-for" causation

requirement. Plaintiffs' evidence is as follows: they and others were protesting, Denver Defendants used force; Plaintiffs as protestors were impacted by the force. Without more, Plaintiffs concluded the use of force occurred because they were protesting. However, Plaintiffs' ultimate conclusion is not supported by evidence in the summary judgment record. ***Worrell's*** third element requires proof of a subjective intent to retaliate by each Denver Defendant involved in each use of force involving each Plaintiff. The uses of force by Denver Defendants occurred not because protest activity or because protestors were targeted, but rather because along with the protestors there were others engaged in violence who were attempting to injure the police or engaged in destruction of public and private property.  These people posed safety concerns for both the responding police officers and the public. Any detrimental impact of force on any of the Plaintiffs occurred based on their own inappropriate actions or because of inadvertence resulting from the unintended consequence of uses of force directed at those engaging in violent and destructive conduct. Plaintiffs have not established a cognizable First Amendment retaliation claim on the basis of the use of force event because there is no specific evidence demonstrating a specific use of force by a specific Denver Defendant impacting a specific Plaintiff was substantially motivated by that particular Plaintiff's First Amendment activity supported by the subjective intent to retaliate of the individual Denver Defendant involved.

### IV. PLAINTIFFS' FOURTEENTH AMENDMENT DUE PROCESS CLAIMS FAIL BECAUSE THE FOURTH AMENDMENT PROVIDES THE APPROPRIATE BASIS TO EVALUATE THE ALLEGED USE OF FORCE AND ALTERNATIVELY PLAINTIFFS CANNOT MEET THE THRESHOLD FOR A SUBSTANTIVE DUE PROCESS CLAIM

Claims of excessive use of force by police officers are properly analyzed under the Fourth Amendment and not the substantive component of the Fourteenth Amendment's Due Process Clause. *See, e.g.,* ***Graham v. Connor,*** 490 U.S. 386, 391-95 (1989); ***Berry v. Muskogee,*** 900 F.2d

1489, 1493 (10th Cir. 1990); *Mwangi v. Norman,* 16-cv-00002-CMA-NYW, 2016 U.S. Dist. LEXIS 172076 at *32 n. 7 (D. Colo. Dec. 13, 2016); *Burnham v. Rable,* 13-cv-01194-RBJ-KLM, 2014 U.S. Dist. LEXIS 87018 at *17-19 (D. Colo. Mar. 27, 2014) (rejecting Fourteenth Amendment claim in favor of analysis under more specific Eighth Amendment), *adopted by,* 2014 U.S. Dist. LEXIS 87020 (D. Colo. June 26, 2014). Similarly, claims of wrongful arrest are also analyzed under the Fourth Amendment and not substantive due process respecting the initial seizure which is at issue. [ECF 219, ¶ 452]. *Albright v. Oliver,* 510 U.S. 266, 273 (1994); *Pierce v. Gilchrest,* 359 F.3d 1279, 1285-89 (10th Cir. 2004);

Alternatively, Plaintiffs' cannot meet the extremely high shocks the conscience standard for a viable Fourteenth Amendment substantive due process claim. *See, e.g., Cnty. of Sacramento v. Lewis,* 523 U.S. 833, 847 (1998) ("The substantive component of the Due Process Clause is violated by executive action only when it can properly be characterized as arbitrary, or conscience shocking, in a constitutional sense."); *Uhlrig v. Harder,* 64 F.3d 567, 574 (10th Cir. 1995) ("a plaintiff must do more than show that the government actor intentionally or recklessly caused injury to the plaintiff by abusing or misusing government power."); *Hewitt v. City of Truth or Consequences,* 758 F.2d 1375, 1379 (10th Cir. 1985) (force inspired by malice or unwise excessive zeal amounting to an abuse of official power that shocks the conscience may be redressed under the Fourteenth Amendment).

## V. PLAINTIFFS' FOURTEENTH AMENDMENT EQUAL PROTECTION USE OF FORCE CLAIM FAILS

The Equal Protection Clause of the Fourteenth Amendment precludes governmental decision-makers from treating differently persons who are in all relevant respects alike. *Nordinger v. Hahn,* 505 U.S. 1, 10 (1992); *Soskin v. Reinerston,* 353 F.3d 1242, 1247 (10th Cir. 2004). "In

other words, the government may not treat any person or class of persons differently than any other similarly-situated persons or class of people without providing adequate justification." ***Browne v. City of Grand Junction,*** 136 F.Supp.3d 1276, 1295 (D. Colo. 2015). Plaintiffs must establish the actions had a discriminatory effect and were motivated by intentional discrimination. ***Marshall v. Columbia Lea Reg. Hosp.,*** 345 F.3d 1157, 1168 (10th Cir. 2003); ***Jemaneh v. Univ. of Wyo.,*** 82 F.Supp.3d 1281, 1299 (D. Colo. 2015).

The equal protection claim is brought only by the Arrest Class. [ECF 219, ¶ 452]. As a result, the same analysis contained in Section I(d) above also applies. The Curfew arrests did not occur based on any selective enforcement in violation of the Equal Protection Clause of the Fourteenth Amendment.

### VI. PLAINTIFFS' SUPERVISOR LIABILITY CLAIMS ARE NOT COGNIZABLE

Individual supervisors may be liable for a violation of someone's constitutional rights based on their personal participation in the violation. ***Fogarty v. Gallegos,*** 523 F.3d 1147, 1162 (10th Cir. 2008); ***Butler v. City of Norman,*** 992 F.2d 1053, 1055 (10th Cir. 1993). In the absence of personal participation, a supervisor may only be held liable under limited circumstances. The basic elements for supervisory liability are: (1) the defendant promulgated, created, implemented or possessed responsibility for the continued operation of a policy that (2) caused the complained of constitutional harm, and (3) acted with the state of mind required to establish the alleged constitutional deprivation. ***Durkee v. Minor,*** 841 F.3d 872, 877 (10th Cir. 2016); ***Dodds v. Richardson,*** 614 F.3d 1185, 1199 (10th Cir. 2010). Although a defendant can be liable based on her supervisory responsibilities, a claim of supervisory liability must be supported by allegations that demonstrate personal involvement, a causal connection to the constitutional violation, and a

culpable state of mind. *Schneider v. City of Grand Junction,* 717 F.3d 760, 767-69 (10th Cir. 2013). If a supervisory liability claim is predicated on the supervisor's creation or maintenance of a custom or policy that caused the underlying constitutional violation the same standards for a municipal liability claim—a causal connection between the policy or custom and the underlying violation and deliberate indifference—apply to the supervisory liability claim. *Burke v. Regalado,* 935 F.3d 960, 998-99 (10th Cir. 2019).

Fitouri Plaintiffs generally allege the individual Denver Defendants supervisors were either personally involved in violations of their constitutional rights or are liable on a supervisory liability basis. [ECF 219, ¶ 448]. To prove the liability of these individuals, Plaintiffs must set forth specific facts establishing either personal participation or each of the elements required by a supervisory liability theory for each individual supervisor concerning each event involving each Plaintiff. Denver Defendants maintain Plaintiffs cannot meet this burden respecting the individual supervisors. In particular, Plaintiffs lack evidence establishing the requisite state of mind for each of the supervisors to support their claims against them.

Finally, with respect to the supervisor claims against Commander Phelan in the absence of his personal participation in a particular event involving a specific Plaintiff, which Denver Defendants do not believe exists, the supervisor liability claims against him as the Incident Commander responsible for coordinating the overall response to the events requires proof of the *Monell* elements.

## VII. FITOURI PLAINTIFFS' FAILURE TO INTERVENE CLAIMS FAIL

Courts have recognized an individual defendant may be held liable for failing to intervene in another's excessive use of force. To establish a failure to intervene theory requires: (1) the

defendant officer was present at the scene; (2) the defendant officer witnessed another officer applying force; (3) the application of force was such that any reasonable officer would recognize that the force being used was excessive under the circumstances; and (4) the defendant officer had a reasonable opportunity to intercede to prevent the further application of excessive force but failed to do so. *Nilges v. Gilmour,* 16-cv-00884-MEH, 2018 U.S. Dist. LEXIS 56240 at *33-34 (D. Colo. Apr. 2, 2018); *Martinez v. City & Cty. of Denver,* 11-cv-00102-MSK, 2013 U.S. Dist. LEXIS 137588 at *5 (D. Colo. Sept. 25, 2013).

Fitouri Plaintiffs include a failure to intervene theory. [ECF 219, ¶¶ 459-466]. Fitouri Plaintiffs appear to pled their failure to intervene claim as one encompassing the violation of any constitutional rights. However, the law on failure to intervene is clearly limited to excessive use of force claims. Denver Defendants have not located any precedent applying a failure to intervene theory outside of an excessive use of force context in the Tenth Circuit. Further, a failure to intervene is limited to the ability of an individual law enforcement officer who is present and witnesses excessive force being used to intercede to prevent the further application of excessive force by a fellow officer if the officer had the opportunity to do so. Here, the allegations of use of force against the Fitouri Plaintiffs are not of the type or nature where a failure to intervene theory has applicability. Presumably, Fitouri Plaintiffs contend the use of force generally on protestors was excessive and therefore each of the individual officers had the duty to intervene to present its further application once one use of force occurred. However, this is not the analytical framework for a failure to intervene claim. Instead, a failure to intervene claim requires a law enforcement officer to witness a specific use of force on a specific person, conclude it is excessive, have the opportunity to prevent further excessive use of force, and then fail to take reasonable measures

seeking to prevent a further excessive use of force from occurring. Properly understood, a failure to intervene theory simply is inapplicable to the uses of force experienced by the Fitouri Plaintiffs.

## VIII. PLAINTIFF'S MUNICIPAL LIABILITY CLAIMS AGAINST DENVER FAIL

Municipal liability under § 1983 mandates a constitutional violation "attributable to the municipality itself" and requires a plaintiff to demonstrate (1) the existence of a municipal custom or policy and (2) a direct and causal link between the custom or policy and the violation alleged. *Jenkins v. Wood*, 81 F.3d 988, 993 (10th Cir. 1996). There are five principal ways a plaintiff may establish the existence of a municipal policy or custom: (1) a formal regulation or policy statement; (2) an informal custom amounting to a widespread practice; (3) a decision of an employee with final policymaking authority; (4) a ratification by final policymakers of the decisions of subordinates; and (5) the failure to adequately train or supervise employees, so long as that failure results from deliberate indifference to the injuries that may be caused. *Bryson v. City of Oklahoma City*, 627 F.3d 784, 788 (10th Cir. 2010). Regardless of the plaintiff's specific theory of municipal liability, the burden is on the plaintiff to demonstrate the essential policy or custom. *Bd. of Cty. Com'rs of Bryan Cty., Okla. v. Brown*, 520 U.S. 397, 403 (1997)

A custom is a "persistent and widespread" practice which "constitutes the standard operating procedure of the local governmental entity." *Mitchell v. City & Cty. of Denver*, 112 Fed. Appx. 662, 672 (10th Cir. 2004). It may also be a series of decisions by a subordinate official of which the supervisor must have been aware. *City of St. Louis v. Praprotnik*, 485 U.S. 112, 130 (1988). Liability attaches in such a case because "the supervisor could realistically be deemed to have adopted a policy that happened to have been formulated or initiated by a lower-ranking official." *Id*. "But the mere failure to investigate the basis of a subordinate's discretionary

28

decisions does not amount to a delegation of policymaking authority." *Id*. Consistent with the plain meaning of custom, proof of an isolated incident does not show a custom. ***Lankford v. City of Hobart***, 73 F.3d 283, 286 (10th Cir. 1996); ***Gates v. Unified Sch. Dist. No. 449***, 996 F.2d 1035, 1041 (10th Cir. 1993). "Proof of a single incident of unconstitutional activity is not sufficient to impose liability under ***Monell***, unless proof of the incident includes proof that it was caused by existing, unconstitutional municipal policy." ***City of Oklahoma City v. Tuttle***, 471 U.S. 808, 823-24 (1985).

In addition, Plaintiffs must establish the requisite degree of culpability on the Denver's part – namely, the alleged municipal practices were carried out with "deliberate indifference" to their known or obvious consequences. ***City of Canton v. Harris***, 489 U.S. 378, 388 (1989); ***Bryan Cty.***, 520 U.S. at 400.

> The deliberate indifference standard may be satisfied when the municipality has actual or constructive notice that its action or failure to act is substantially certain to result in a constitutional violation, and it consciously or deliberately chooses to disregard the risk of harm. In most instances, notice can be established by proving the existence of a pattern of tortious conduct. In a narrow range of circumstances, however, deliberate indifference may be found absent a pattern of unconstitutional behavior if a violation of federal rights is a highly predictable or plainly obvious consequence of a municipality's action or inaction[.]

***Schneider v. City of Grand Junction Police Dep't***, 717 F.3d 760, 771 (10th Cir. 2013) (citations and internal quotes omitted).

Plaintiffs must also demonstrate a direct causal link between the municipal policy and the constitutional injury. ***Canton***, 489 U.S. at 385; ***Bryan Cty.***, 520 U.S. at 404. This requirement is satisfied if the plaintiff shows "the municipality was the 'moving force' behind the injury alleged." ***Bryan Cty.***, 520 U.S. at 404. As the Supreme Court has made increasingly clear, proof of a policy claim requires a tight causal connection between the alleged policy and the

constitutional injury. In ***Monell***, the Court held a plaintiff had to identify a causal nexus between his injury and the municipality's alleged custom or policy. ***Monell,*** 436 U.S. at 693-94. In ***City of Canton***, the Court held a viable municipal liability claim required the identified deficiency in a city's training program must be "closely related to the ultimate injury." ***Canton,*** 489 U.S. at 391. And in ***Bryan County***, the Court articulated an even more demanding standard as to causation: A "mere probability" the alleged policy will cause any officer to inflict a constitutional injury is insufficient; a plaintiff must show "***this*** officer was highly likely to inflict the ***particular*** injury suffered by the plaintiff" (emphases in original), and the injury must have been the "plainly obvious consequence" of the alleged policy. ***Bryan Cty.,*** 520 U.S. at 412. "The causation element is applied with especial rigor when the municipal policy or practice is itself not unconstitutional, for example, when the municipal liability claim is based upon inadequate training, supervision, and deficiencies in hiring." ***Schneider***, 717 F.3d at 770; ***Barney,*** 143 F.3d at 1307.

"In limited circumstances," a municipality may be liable under §1983 for a failure to train. ***Canton***, 489 U.S. 378. "A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." ***Connick v. Thompson***, 131 S.Ct. 1350, 1359 (2011).  Municipal liability hinges on whether the failure to train reflects a conscious choice by the municipality based on the Supreme Court's adoption of the deliberate indifference standard. ***Canton,*** 489 U.S. at 389. Deliberate indifference involves an obvious need for more or different training where the inadequacy of training is likely to result in the violation of constitutional rights. ***Id***. at 390. Before liability can attach, the municipality must be on notice of the deficiency and have a high degree of culpability; its practices must be obviously deficient and so likely to result in a constitutional injury the municipality's policymakers could be reasonably deemed to be

deliberately indifferent. *Barney,* 143 F.3d at 1307-08. A pattern of similar constitutional violations by untrained employees is "ordinarily necessary" to demonstrate deliberate indifference for purposes of failure to train. *Bryan Cty.*, 520 U.S. at 409. Without notice a course of training is deficient in a particular respect, decision makers can hardly be said to have deliberately chosen a training program causing constitutional violations. *Connick*, 131 S. Ct. at 1359-1360. And finally, the identified deficiency must be closely related to the plaintiff's actual injury. *Canton*, 489 U.S. at 385.

Denver faced an unprecedented circumstance with the George Floyd Protests. Never before had DPD faced a combination of protests along with individuals engaged in significant property destruction and violence towards responding police officers. Never before had DPD faced direct and sustained violence specifically directed at police based on police misconduct in another jurisdiction over an unscheduled protest lasting multiple days. Both public and private property sustained millions of dollars of damage. Many police officers were injured. Given the unprecedented nature of the activities occurring in Downtown Denver during the protests, DPD faced significant logistical, operational, and tactical challenges. No similar or analogous event of this magnitude had ever occurred in Denver. Plaintiffs' effort to analogize the circumstances to Occupy Denver or the 2008 Democratic National Convention prove unavailing. Neither of those prior events were of the same size, scale, or duration or involved the amount of property destruction and violence directed at police as occurred during these 2020 protests.

Based on the unprecedented nature of what occurred, Plaintiffs' municipal liability claims fail on the requirements for establishing Denver acted with deliberate indifference and any act by

Denver was the moving force underlying a constitutional violation.[4] The unprecedented nature of the activities and the need for an unprecedent response means Denver simply could not have been deliberately indifferent to a known likely situation in creating its response to the protests. Moreover, Plaintiffs will undoubtedly argue DPD should have modified its response as the protests progressed and that the protests cannot be considered a singular event. However, the nature of what occurred, the length and duration of the needed response, and how DPD officers and command staff were required to work lengthy shifts over multiple days in a row made the event one where DPD reacted to an ongoing fluid and chaotic situation and did not have the ability to reshape in wholesale fashion its policies, procedures, operations, strategies, and tactics.

Plaintiffs also cannot establish causation. Insufficient evidence exists before this Court of any action or omission legally attributable to Denver being the moving force behind any specific constitutional violation suffered by any of the Plaintiffs. To date, Plaintiffs' municipal liability theories are general and diffuse. They have yet to marshal any evidence establishing causation in the necessary moving force terms required to establish viable claims. This Court must require Plaintiffs to come forward with specific evidence establishing causation for each of their municipal liability theories with a specific causal evidentiary connection to underlying constitutional violations suffered by Plaintiffs. General and abstract arguments and conclusory assertions are insufficient to meet Plaintiffs' summary judgment burden.

Denver anticipates Plaintiffs will rely on the failure of DPD to require its officers to complete contemporaneous use of force reports concerning each and every deployment of less

---

[4] Plaintiffs also have to establish the underlying constitutional violation was caused by someone with the DPD and not another jurisdiction to support a municipal liability theory against Denver.

lethal munitions supports their municipal liability claims. However, whether or not a police officer completed a use of force report about any incident after it occurred does not and cannot cause the incident. *Durkee v. Minor,* 841 F.3d 872, 877 (10th Cir. 2016) (discussing how evidence of what occurred after a use of force cannot establish municipal liability); *Henderson v. City \* Cnty. of Denver,* 12-cv-0625-WJM-BNB, 2014 U.S. Dist. LEXIS 7140 at \*28 (D. Colo. Jan. 21, 2014) ("The Court fails to see how inadequate reporting of a use of force is directly causally connected to the decision to use excessive force in the first instance."). Perhaps if Plaintiffs identified a failure to require use of force reports under such circumstances prior to the protests than this could be a plausible theory. However, no such evidence of any pervasive custom, policy or practice existing prior to May 2020.

Denver also anticipates Plaintiffs will argue the failure to discipline officers for their uses of force during the protests supports municipal liability. The Tenth Circuit addressed this specific argument and rejected it. "As for any failure to discipline Officer Aragon, basic principles of linear time prevent us from seeing how conduct that occurs *after* the alleged violation could have somehow caused that violation." *Cordova v. Aragon,* 569 F.3d 1183, 1194 (10th Cir. 2009). Again, perhaps a pervasive or systematic failure to discipline for use of force arising from the protests, which Denver specifically denies exists, could form the factual predicate for claiming a *future* unconstitutional use of force was caused by Denver's failure. However, it defies logic to suggest the failure to discipline anyone after they used force caused them to use force in the first place.

Further, Plaintiffs are likely to argue the failure of DPD officers to activate their body worn cameras consistently during the initial phase of the protests supports municipal liability. Yet, any failure by Denver to ensure its officers consistently activated their body worn cameras during the

protests did not create any excessive use of force. Rather, the failure of a police officer to activate a body worn camera only limits the available evidence to assess whether there was a use of force it does not create an excessive use of force itself. Moreover, not only do Plaintiffs not have a separate claim for failure by DPD to use body worn cameras, no provision of constitutional law requires officers to use body worn cameras.  In the absence of bad faith, the fact not all the incidents involving Plaintiffs were recorded on body worn cameras fails to establish any constitutional violation. ***Durr v. Slator,*** 20-cv-00662 (MAD/TWD), 2021 U.S. Dist. LEXIS 166716 at *58-59 (N.D.N.Y. Sept. 2, 2021) (police officer's failure to activate a body-worn camera alone does not constitute a constitutional violation in the absence of bad faith); ***Beitch v. Magnus,*** CV-18-0067-TUC-BGM, 2020 U.S. Dist. LEXIS 96565 at *24 (D. Ariz. June 1, 2020) ("The violations of TPD's policy regarding report writing and failing to turn on a body worn camera are not constitutional violations."); ***Baldwin v. Colley,*** 15-cv-02762-KAW, 2015 U.S. Dist. LEXIS 134946 at *13 (N.D. Cal. Oct. 2, 2015) ("It cannot be said, then, that the failure to use body cameras constitutes deliberate indifference to constitutional rights as a matter of law."); ***Santos v. Welty,*** 20-cv-205-BQ, 2021 U.S. Dist. LEXIS 87276 at *13-14 (N.D. Tex. Mar. 25, 2021) (noting there is no constitutional right to the police either writing a report or using body worn cameras).

Denver Defendants anticipate Plaintiffs will heavily rely on the report of the Office of the Independent Monitor ("OIM") prepared, after the fact, as an inquiry into the DPD's response to the protests. Despite the evidentiary problems with the OIM report, unless Plaintiffs can demonstrate any Denver policy-maker possessed such information ***before*** the protests began the report establishes nothing. The OIM's policy change suggestions, which have been implemented by DPD, do not meet the Supreme Court's stringent requirements for municipal liability.

## IX. THE INDIVIDUAL DENVER DEFENDANTS
## ARE ENTITLED TO QUALIFIED IMMUNITY

When an individual defendant raises qualified immunity, a presumption of immunity is created and the Plaintiffs must meet a strict two-part test showing: (1) the official's actions ran afoul of a federal constitutional right, and (2) the federal constitutional right was clearly established at the time of the allegedly unlawful actions. *Estate of Taylor v. Salt Lake City,* 16 F.4th 744, 757-58 (10th Cir. 2021); *Cillo v. City of Greenwood Vill.,* 739 F.3d 451, 460 (10th Cir. 2013). Defendants argue the first prong of qualified immunity in all the above arguments addressing whether Plaintiffs have established a violation of their constitutional rights.

On the second prong, the "clearly established issue" asks whether it would have been clear to the officials their conduct was unlawful in the situation confronting them. *Saucier v. Katz,* 533 U.S. 194, 202 (2001); *Wilson v. Layne,* 526 U.S. 603, 615 (1999) (right "must be defined at the appropriate level of specificity."). More particularly, the federal constitutional right asserted is "clearly established" only when a Supreme Court or Tenth Circuit decision "is on point, or if the clearly established weight of authority from other courts shows the right must be as the plaintiff maintains." *Thomas v. Kaven,* 765 F.3d 1183, 1194 (10th Cir. 2014). "While the facts of the cases compared need not be identical, they must be sufficiently analogous to satisfy the particularized context necessary to support liability." *Id.* The essence of the inquiry is "every reasonable official" must have received "fair warning" from the state of the law at the time as to the alleged conduct's unconstitutionality. *Tolan v. Cotton,* 572 U.S. 650, 655-56 (2014); *Kerns v. Bader,* 663 F.3d 1173, 1180 (10th Cir. 2011) (quoting *Ashcroft v. al-Kidd,* 563 U.S. 731, 743 (2011)).

Even so, as the Supreme Court repeatedly reminds lower courts, "the law is not defined at a high level of generality," because "doing so avoids the crucial question whether the official acted

reasonably in the particular circumstances that he or she faced." *Plumhoff v. Rickard,* 572 U.S. 765, 779 (2014); *White v. Pauly,* 137 S.Ct. 548, 551 (2017). "Such specificity is 'especially important in the Fourth Amendment,' context where it is 'sometimes difficult for an officer to determine how the relevant doctrine, here excessive force, will apply to the factual situation the officer confronts.'" *City of Tahlequah v. Bond,* _____ U.S. _____, 2021 U.S. LEXIS 5310 at *4 (Oct. 4, 2021) (quoting *Mullenix v. Luna,* 577 U.S. 7, 12 (2015)). "We have stressed the 'specificity' rule is 'especially important in the Fourth Amendment context.'" *District of Columbia v. Wesby,* 138 S.Ct. 577, 590 (2018). "[E]xisting precedent" must place the constitutional question the official faced "beyond debate." *Kisela v. Hughes,* 138 S.Ct. 1148, 1153 (2018).

Application of the second prong of the qualified immunity inquiry here demonstrates, the individual Denver Defendants are entitled to qualified immunity unless Plaintiffs provide this Court with prior Supreme Court, Tenth Circuit or the overwhelming weight of authority from other federal courts: (1) precedent supporting each of the Plaintiffs' claimed constitutional violations under the First, Fourth, and Fourteenth Amendments (both equal protection and substantive due process); and (2) precedent demonstrating the specific conduct of each individual Defendant respecting each individual Plaintiff (as that varies for each event being claimed a constitutional violation) was previously determined to violate someone's constitutional rights.

Denver Defendants have not located any such specific and particularized precedent. Denver Defendants anticipate Plaintiffs will present this Court with general precedent concerning the importance of protests under the First Amendment, how law enforcement cannot chill protest activity, and how using force on protestors is inappropriate. However, the above precedent, and

particularly ***Bond*** and ***Wesby*** requires this Court to focus on the factual context in which any precedent provided by Plaintiffs arises. Absent sufficient factual congruity between prior precedent and the facts before this Court here, the individual Denver Defendants are entitled to qualified immunity. Based on the unprecedented nature of the Downtown Denver activity underlying this case, Denver Defendants respectfully submit no specific and particularized precedent actually exists thereby requiring this Court to grant qualified immunity to the individual Denver Defendants.

<u>**CONCLUSION**</u>

In conclusion, for the foregoing reasons, Defendants City and County of Denver, Colorado, Patrick Phelan, Matthew Canino, James D. Williams, Thomas Pine, Vincent Porter, Michael O'Donnell, Kevin Carroll, Rick Beall, David Abeyta, Marco Martinez, Justin Dodge, Richard D. Eberharter, Tana Cunningham, John Sampson, Jonathan Christian, and Keith Valentine respectfully request this Court grant them summary judgment on all of Plaintiffs' claims, dismiss them in their entirety with prejudice, and for all other and further relief as this Court deems just and appropriate.

DATED this 28th day of January, 2022.

Respectfully submitted,

*s/ Andrew D. Ringel*                              .
Andrew D. Ringel, Esq.
Katherine N. Hoffman, Esq.
Hall & Evans, L.L.C.
1001 17th Street, Suite 300
Denver, CO 80202
Telephone: (303) 628-3453
Facsimile: (303) 628-3368
E-mail: ringela@hallevans.com
hoffmank@hallevans.com

Hollie R. Birkholz, Assistant City Attorney
Lindsay M. Jordan, Assistant City Attorney
Denver City Attorney's Office
Civil Litigation Section
201 West Colfax Ave., Dept. 1108
Denver, CO 80202
Telephone: (720) 913-3100
Facsimile: (720) 913-3155
E-mail: hollie.birkholz@denvergov.org
lindsay.jordan@denvergov.org

*Counsel for the City and County of Denver and the individually named Denver Police Department Officers*

**<u>CERTIFICATE OF SERVICE (CM/ECF)</u>**

I hereby certify that on this 28th day of January, 2022, the foregoing was filed with the Clerk of the Court using the CM/ECF system, which will serve the following all counsel of record in this matter.

In addition, the foregoing was placed in the United States Mail, first-class postage prepaid and addressed to the following non-CM/ECF participant:

Cidney Fisk
5100 Leetsdale Dr., Apt. 438
Denver, Colorado 80246

and

Cidney Fisk
14362 E. Road
Delta, Colorado 81416

*s/Nicole Marion*, Legal Assistant to
Andrew D. Ringel, Esq.
Katherine N. Hoffman, Esq.
of Hall & Evans, L.L.C.
1001 17th Street, Suite 300
Denver, CO 80202
Phone: 303-628-3300
Fax: 303-628-3368
ringela@hallevans.com
hoffmank@hallevans.com

**ATTORNEYS FOR DENVER DEFENDANTS**