

# EXHIBIT A

**CIVIL ACTION NO. 1:20-CV-01878-RBJ**

**(CONSOLIDATED WITH 1:20-CV-01922-RBJ-MEH)**

**BLACK LIVES MATTER 5280, ET AL.**

**V.**

**CITY AND COUNTY OF DENVER, ET AL.**

**DEPONENT:**

**COMMANDER PATRICK PHELAN**

**DATE:**

**MAY 25, 2021**




```
 1      Q    Was it a case where a plaintiff was alleging
 2   that you violated his civil rights?
 3      A    Yes.
 4      Q    What was the allegation?
 5      A    Violation of civil rights.
 6      Q    What was he alleging that you did?
 7      A    It was a female.  It was a prostitute.  I
 8   really don't recall.  It was the use of force, I
 9   believe, or just violation of civil rights.
10      Q    You were not disciplined for that, correct?
11      A    Correct.
12      Q    And are there any other times that you've been
13   named as a defendant in a lawsuit?
14      A    No.  No, ma'am.
15      Q    How long were you with the Denver Police
16   Department?
17      A    Forty years.
18      Q    When did you begin working there?
19      A    February 1980.
20      Q    Did you work for DPD continuously from
21   February 1980 until September 2020?
22      A    Yes, ma'am.
23      Q    Why did you decide to retire in September
24   2020?
25      A    That was a date that was selected based on our
```



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   somebody made a complaint that I didn't know about or I
 2   wasn't aware of and there was -- there was evidence that
 3   they violated policy, I would expect them to be
 4   disciplined.
 5        Q    Okay.  But you have no knowledge of any use of
 6   force that was outside of policy, right?
 7        A    I didn't -- I didn't see -- wasn't aware of
 8   any use of force that was outside policy.
 9        Q    You were the incident commander for the
10   protests, right?
11        A    Yes.
12        Q    And when I'm referring to "protests," you
13   understand that I'm referring to the George Floyd
14   protests that began in Denver on June 28 -- or on May
15   28th of 2020, correct?
16        A    Yes.
17        Q    Okay.  So what was your role as an incident
18   commander?
19        A    My role as incident commander is to develop a
20   plan, deployment plan, for resources based on
21   information we knew about the protests.
22        Q    Okay.  You were in charge of coordinating the
23   officers in the field and moving resources around to
24   address issues that were emerging, correct?
25        A    That -- part of my responsibility, yes.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1      Q    Okay.  And you were given the responsibility
 2   to make policy decisions regarding the patrol of the
 3   protests, correct?
 4           MR. RINGEL:  Object to the form.
 5      A    No.  I wasn't making policy decisions, no.
 6      Q    You were making --
 7      A    Policies --
 8      Q    I'm sorry?
 9      A    Policies are in place.  I didn't make any
10   policy decisions.
11      Q    Okay.  You were given the responsibility, as
12   incident commander, to make decisions regarding how the
13   police would respond to the protesters, right?
14      A    Correct.
15      Q    Okay.  And you were authorized to make final
16   decisions regarding control of the protests and the
17   police response to it, right?
18           MR. RINGEL:  Object to the form.
19      A    Correct.
20      Q    Who designated you incident commander?
21      A    Designated by my position as special
22   operations commander.  That's part -- excuse me, that's
23   part of my responsibility in that position.
24      Q    Okay.  So did the -- did -- at some point when
25   the protests began in Denver, did the chief of police,
```



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    Q    Okay.  So part of your responsibility as
2  commander in the special operations section is to be an
3  incident commander during protests, right?
4    A    Yes.
5    Q    Okay.  So tell me about what your job was as a
6  commander in the special operations section.
7    A    So based on this protest, my responsibility
8  was to get assets, personnel from the districts, from
9  special operations division, develop a plan in response
10 to the protests, and that would include deploying --
11 deploying commanders, deploying supervisors, deploying
12 units to certain areas of the city or area that I
13 determined needs to be deployed to.
14   Q    What kind of coordination did you have with
15 the chief of police with respect to how units would be
16 deployed during the protests?
17   A    Oh, he would -- he would be advised how they
18 were deployed.
19   Q    Okay.  So you would advise the chief of
20 police?
21   A    He probably attended a briefing where he
22 learned of the deployment.
23   Q    Okay.  But you were in charge, right?
24   A    Yes.
25   Q    Okay.  And perhaps this may seem like a silly

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1  A   Yes.
2  Q   Does the chief of police report to him in some
3  way?
4  A   I believe so.
5  Q   Okay.  What role do you know, if any, does the
6  director of public safety have in the making of policies
7  for the police department?
8  A   I -- I can't -- I couldn't answer that.  I'm
9  sure he has to approve policy.  I couldn't answer that.
10 Q   Okay.  During the day-to-day operation of the
11 protests, you were not required to seek approval from
12 the chief of police, or anyone else, over how you were
13 going to have your officers respond, correct?
14 A   I developed an operations plan.  He would see
15 that operations plan and probably be at the -- at the
16 briefing and understand the operations plan.
17 Q   Okay.  And were there occasions on which the
18 chief of police gave you input into the operations plan?
19 A   I think there was times he made comments on
20 certain things.
21 Q   Okay.  But you created the operations plan,
22 right?
23 A   Yes.
24 Q   Did the chief of police defer to you as to
25 what should be in the operations plan?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        A    Authorized -- even at the briefing, I
 2   authorized the use of chemical agent, yes.
 3        Q    And you determined -- as the incident
 4   commander, you determined, based on the information that
 5   you were getting from your officers in the field, you
 6   determined how and when tear gas would be used, right?
 7        A    No.  I delegated it to each command, area
 8   command.  If the need be for use of chemical agent, they
 9   were allowed to use chemical agent based on
10   circumstances they were confronting.
11        Q    You had the authority to delegate to your area
12   commanders when and how to use tear gas; is that right?
13        A    Yes.
14        Q    Okay.  And you delegated that authority to
15   your area commanders?
16        A    I -- I had authority, and they also had
17   authority, if need be, based on the circumstances they
18   confronted.
19        Q    CS canisters were used, when ordered by a
20   command officer, during the protests, right?
21        A    CS was used, yes.
22        Q    The use of CS canisters had to be authorized
23   by a command officer, correct?
24        A    Or designee, depending on the emergency
25   situation.  If they were under attack, if they're in a
```



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

```
 1      A    Yes.
 2      Q    And you maintained operational control the
 3 entire time during the protests, right?
 4      A    Yes.
 5      Q    Did lieutenants have to get authorization for
 6 the use of tear gas from you?
 7      A    No.
 8      Q    Did they have to justify their use of tear gas
 9 with you afterwards?
10      A    They had to justify the use of tear gas based
11 on use of force policy.  So they were given -- at the
12 briefing, they were told rules of engagement.  And they
13 were able to -- based on if it was necessary, officer
14 safety, whatever the circumstances were at that
15 location, at that time, under attack, they were allowed
16 to use chemical munitions, based on their decision.
17      Q    And why did tear gas have to be authorized by
18 command staff?
19      A    Because it has to be -- by policy, it has to
20 be command staff, unless it's an emergency situation.
21      Q    Well, but why is the policy the way it is?
22      A    Because they have a more -- they have a view
23 of what the situation is.  They have a bigger picture of
24 what the situation is.  They make the determination
25 based on their training, based on their experience that
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   chemical agent needs to be used.
 2        Q    Okay.  Why can't you just have a -- you know,
 3   a line officer, just standing in a skirmish line, make
 4   the decision to deploy tear gas?
 5        A    Because he's not a command officer.  We're a
 6   quasi-military organization, so there's a chain of
 7   command.
 8        Q    Okay.  And you're at the top of that chain of
 9   command for the protests, right?
10        A    Correct.
11        Q    Okay.  And the DPD followed the National
12   Incident Management System and the Incident Command
13   System, correct?
14        A    ICS, correct.
15        Q    Can you tell me what that is?
16        A    It's part of the NIMS, National Incident
17   Management System.  So basically what it is, is it shows
18   a hierarchy of command -- command.  So it's a -- kind of
19   a -- it's a chart, basically.  So it's who's in charge
20   of what and where.
21        Q    All right.  And why is that a system that you
22   use during protests?
23        A    Because it's easy to identify.  It's an
24   organizational assistance that we use so we know where
25   people are and who their -- who their supervisors are
```



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1       Q    Was the operations plan given out at the
 2  supervisor briefings?
 3       A    Yes.
 4       Q    Were there any other documents given out at
 5  those briefings?
 6       A    There could have been, but nothing --
 7  sometimes there's maps we include with that.
 8       Q    Was a copy of the DPD use of force policy
 9  given out at the briefings?
10       A    No.
11       Q    Was a copy of the DPD crowd management manual
12  given out at the --
13       A    There's part --
14       Q    -- supervisor briefings?
15       A    There's parts of that I think we do sometimes
16  include with that.  The first few days was pretty -- the
17  ops plan was pretty skinny.
18       Q    Okay.  So let's focus on the first five days
19  of the protests.
20            Do you recall -- you had briefings every
21  single day, right?
22       A    Yes.
23       Q    And during those briefings, the -- there would
24  be command staff from DPD present as well as command
25  staff from the outside agencies who were providing
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA COURT REPORTERS

```
 1  assistance, right?
 2       A    And supervisors.  Sergeants --
 3       Q    And supervisors?
 4       A    Sergeants were also there, yes, and corporals.
 5       Q    DPD sergeant corporals, or were they outside
 6  agency sergeants?
 7       A    They -- they were all {INAUDIBLE} in there.  If
 8  they brought -- if they brought some sergeants and
 9  corporals, they would be in that briefing also.
10       Q    Okay.  And what was the purpose of these
11  briefings?
12       A    To make sure we knew what the operation plan
13  was, we knew what the deployment was.
14       Q    Okay.  And was the DPD crowd management manual
15  given out at this -- these briefings?
16       A    No.  The DPD crowd management is about 60
17  pages long.  No, it wouldn't be given out.
18            COURT REPORTER:  I'm sorry.  Your video and
19       audio went out, Commander.  No.  The DPD crowd
20       management...
21            THE WITNESS:  I'm sorry.  No, it's not given
22       out.  Some -- some sections are copied that are
23       relevant to the operations, but the whole crowd
24       management policy is -- obviously is not given out.
25  BY MS. WANG:
```


Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  pepper balls directly?

2  A   If it allows that deployment of that chemical
3  agent to that person, yes.

4  Q   If you had a large number of protesters who
5  were peaceful, gathered and chanting or protesting, and
6  then there were a small number of people in the crowd of
7  protesters who may have been throwing rocks or throwing
8  other things at the officers, what does DPD policy
9  require with respect to how to respond to that
10 situation?

11         MR. RINGEL:  Object to the form.

12  A   The response would be determined by,
13 obviously, the area command there who's supervising that
14 -- that situation.  But based on that information,
15 that's why we use pepper balls.  Pretty accurate.  So
16 the first line, I imagine, would be to deploy area
17 saturation so people would get back, so they weren't
18 able to injure officers by throwing rocks and bottles
19 and explosives at them.

20         So you want to get that crowd back.  The best
21 application could be area saturation for the main crowd,
22 and then probably direct fire at the agitators, if
23 possible.

24  Q   Okay.  So if you saturated an area with pepper
25 balls, that would expose peaceful and non-peaceful


Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   protesters to the OC and the pepper balls, right?
2       A    It's possible, yes.
3       Q    Okay.  And that was permitted by DPD policy,
4   right?
5       A    If they're under attack.  It depends on the
6   circumstances.  So if officers are being attacked and we
7   -- obviously, I don't think we want to see officers
8   injured, although we had 80 officers injured in this --
9   the situation -- would -- I -- I would expect that the
10  area commander would make sure that we deploy chemical
11  agent.  Make sure that that crowd gets back a safe
12  distance and are not able to harm officers.
13      Q    Okay.  So DPD policy -- strike that.  If there
14  was a large crowd of protesters, most of whom were
15  peaceful, but there were a few individuals in the crowd
16  who were acting aggressively by throwing objects, say,
17  at the officers, DPD policy allowed for area saturation
18  to push everybody back, right?
19      A    If -- if officers were under attack by a
20  crowd, okay, then area saturation would be allowed.
21      Q    Well, I'm trying to understand what you mean
22  by "under attack by a crowd."  Because the example that
23  I'm giving you -- let me -- the example that I'm giving
24  you involves a vast majority of people who are peaceful
25  with a few people in the crowd who are acting

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1       briefly to talk about that?
2               VIDEOGRAPHER:  Sure.  The time is 11:21. We'll
3       go off the record.
4                       (OFF THE RECORD)
5               VIDEOGRAPHER:  We'll go back on the record.
6       The time is 11:22 a.m.
7  BY MR. REIDY:
8       Q    Okay.  Commander Phelan, when was the first
9  time that you learned about the possibility of the
10 George Floyd protests occurring in Denver?
11      A    You know, we -- obviously, like everyone else,
12 we were kind of monitoring the situation up in
13 Minneapolis, and, you know, we were concerned.  Weren't
14 sure if it was going to go -- the way it did go
15 nationwide.  So we're always looking at it and looking
16 at social media and getting any information we can.  So
17 probably a day before, maybe a day-and-a-half before,
18 possibly thinking we might start having some issues in
19 Denver.
20      Q    Is it fair to say that by the morning of May
21 27, 2020, you had learned about the possibility of the
22 George Floyd protests occurring in Denver?
23      A    Yeah, we -- you know, we frequently have
24 protests.  The size of the protest is probably what we
25 weren't expecting that way, because we have a -- you

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case No. 1:20-cv-01878-RBJ   Document 255-1   filed 01/28/22   USDC Colorado   pg 15 of 19
The Deposition of COMMANDER PATRICK PHELAN , taken on May 25, 2021
116

1  their supervisors, you know, if there's any questions
2  that they have about it.
3       Q    So prior to the afternoon of May 28, 2020, did
4  you prime or remind any police officers about the city's
5  policies, practices, and customs regarding the
6  appropriate use of less lethal force?
7       A    At the briefing, we talked about the use of
8  less lethal force.
9       Q    Can you answer my question?  Yes or no?
10           MR. RINGEL:  Object to the form and the
11      foundation.
12      A    If -- I thought I answered it.  Yes, we --
13  they were briefed.
14      Q    Okay.  So at the briefings, you told the
15  commanding officers or any officers who were at the
16  briefings, you informed them about the city's policies,
17  practices, and customs regarding the appropriate use of
18  less lethal force?
19           MR. RINGEL:  Object to the form.
20      A    At the briefing, we do rules of engagement,
21  like I spoke prior.  We'll talk -- we'll brief them on
22  certain things.  Number one, you know, they have --
23  we're going to let them go into the street.  We're going
24  to let them -- we're going to assist them by blocking
25  traffic.  We're -- we're going to respond to any crimes

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   as far as looting, criminal mischief, setting fires.
 2           We're going to -- we're not going to allow
 3   them onto the I-25 thoroughfare where people are -- 80
 4   miles an hour.  We'll not let them take over a district
 5   station.  We're not going to let them take over the city
 6   and county building.  We're not going to let them -- I
 7   think whatever else we needed to talk about that
 8   particular day and that the use of chemical weapon will
 9   be permitted to -- to achieve that goal.
10           MR. REIDY:  Move to strike as nonresponsive.
11           MR. RINGEL:  Objection.
12      Q    At the briefings, did you prime or remind
13   officers regarding the training on less lethal weapons?
14      A    Yes.
15      Q    How did you do that?
16      A    They're allowed to use their less lethal
17   weapons.  Remember that pepper ball is defensive
18   resistance.  Reporting on meter is an act of aggression.
19      Q    Did you do anything else to remind or prime
20   officers about their training regarding the use of less
21   lethal weapons?
22      A    Well, officers that deploy less lethal weapons
23   are trained, so I'm not sure if I understand your
24   question.
25      Q    Did you do anything else to remind or prime
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1  received by the city about the use of excessive force by
 2  police officers?
 3       A    I don't recall.  If -- if I had knowledge of
 4  that, we probably would have discussed it, but I can't
 5  recall.
 6       Q    Did the briefings between May 28th and June
 7  2nd include any discussions about errors made on the
 8  previous day?
 9       A    I don't recall.  If there was some, if it was
10  brought to my attention, we would discuss it, some
11  tactics or anything like that.  It's been a year, but
12  I'm sure we would have -- if someone brought it up to my
13  attention, we -- we do discuss that at briefings.
14       Q    So on May 29th, what did the city do to
15  correct or address complaints of excessive force by
16  police officers that occurred on May 28th?
17            MR. RINGEL:  Object to the form and the
18       foundation.
19       A    Every day we made adjustments to the operation
20  plan based on the information we had and what we
21  experienced the day before on the after action.  So to
22  answer your question, any problems that came up, we
23  would address, not only deployment problems, any other
24  type of complaints or -- if we had that information, we
25  would address that information.
```


Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  explained that officers received 18 -- 16 hours of
2  training on crowd control and field force training in
3  the academy.  A refresher course was offered in 2019,"
4  which I recollect, "but he was uncertain about the
5  details and suggests we should speak with academy staff
6  who does the training," so...
7       Q    Did you talk to the OIM about protests, crowd
8  behavior during the George Floyd protests?
9       A    I have to look at this again.  It's possible
10 one of these -- some of these answers might have
11 included something on crowd control.
12      Q    My question was about George Floyd protest
13 crowd behavior.
14           Did you talk to the OIM about the crowd's
15 behavior during the George Floyd protests?
16      A    I imagine I did.
17      Q    What did you tell the OIM about the crowd
18 behavior at the George Floyd protests?
19      A    Without being informed, I imagine we talked
20 about the violent nature of the crowd, the rioters,
21 towards the police that I hadn't experienced prior.
22      Q    Okay.  So you're assuming that's what you told
23 the OIM?
24      A    Let me -- let me silence that.
25      Q    Was that Bad to the Bone, Commander Phelan?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1       A    It is maybe.  Come on, whatever it is.  It's
 2  nothing I found.  It just came with it.
 3       Q    How did the George Floyd protests -- sorry.
 4  Strike that.  How did the crowd at the George Floyd
 5  protests compare to the crowds at the Democratic
 6  National Convention?
 7       A    The crowds at the Democratic National
 8  Convention were peaceful.  We didn't have really any
 9  confrontation.  I was the chair of the location at -- at
10  the Pepsi Center at the time.  We had several protests
11  come by there and through there.  But they were peaceful
12  marchers, and there was no confrontation with the
13  police.
14       Q    Did you talk to the OIM about how many arrests
15  were made during the George Floyd protests?
16       A    It looked like there's -- there's some
17  conversation about curfew.  I -- I talked about -- we
18  probably referred to some communication about arrests,
19  yes.  It says "curfew" --
20       Q    Do you recall --
21       A    It says "curfew arrests" here on his report,
22  but it's all redacted.  So I imagine we talked about
23  that.
24       Q    Do you have an understanding of why it's
25  redacted?
```



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com