January 20, 2022

Eric Butler, esq.
Deputy County Attorney
Jefferson County Attorneys Office
100 Jefferson County Parkway, Suite 5500
Golden, CO 80419

Re: Elizabeth Epps, et al versus City and County of Denver

Dear Mr. Butler:

    I respectfully submit the following regarding the complaint concerning the use of force by Deputy Drieth and Sergeant Hamilton on May 31, 2021.

Report of Peter Davidov

<strong><u>Qualifications</u></strong>

I have been a police officer for 30 years and am currently employed as a police lieutenant by the Montgomery County Department of Police (MCPD) in Montgomery County, Maryland. I am currently assigned as the Homeland Security Deputy Director of the Special Operations Division. Units under my command include the Canine Section and the Operational Support Section (OSS). The Special Events response Team (SERT) is a component of the OSS. The primary function of the approximately 200 de-centralized members of the team is crowd management and control. I hold a Bachelor of Science in Foreign Service from Georgetown University and a Master of Arts in National Security Studies also from Georgetown University. I am a graduate of the 279th Session of the Federal Bureau of Investigation's National Academy. I have prior law enforcement experience with the Metropolitan Police Department, the United States Capitol Police, the Scottsdale (AZ) Police Department and as a Special Agent for the United States Drug Enforcement Administration.

I have extensive training in investigations, crowd management, weapons of mass destruction (WMD) response, less lethal weapons systems, chemical agents, de-escalation, firearms, active shooter response and incident command. I am a Department of Homeland Security (DHS) and Maryland Police and Corrections Training Commission (MPTC) certified instructor and an MPTC firearms instructor. I hold several instructor certifications in crowd management, WMD response and less lethal and chemical weapons systems.

I am a member of the National Institutes of Justice (NIJ) Special Technical Committee for Personal Protective Equipment used during Violent Unrest. I am the current the Chairman of the Metropolitan

Exhibit 1

Washington Council of Governments Civil Disturbance Unit Subcommittee and a consultant/instructor in crowd management and control for the DHS. I served as a subject matter expert and trainer for the Gainesville, Florida Police Department in preparation for the National Policy Institute Demonstration in 2017. Prior to the event I spent two days providing training and I provided tactical advice in the command post during the event. I was sent by NIJ to England and Germany in 2017 to research best practices in personal protective equipment (PPE) used in violent disorder and tactics to combat violent disorder. In 2018 I was sent by MCPD as a subject matter expert to work with the International Association of Chiefs of Police (IACP) with delivering use of force and firearms instruction to the U.S. Virgin Islands Police Department which was subject to a Federal Consent Decree which required the instruction. I delivered a lecture on public order best practices at the IACP conference in 2018 in Orlando, FL. I served as a member of the National Tactical Officer's Association Public Order Working Group in 2021. I also serve as an NTOA instructor and delivered instruction on public order at the 2021 conference in Kansas City, MO. I was quoted in an article about protest management by Dr. Tamara Herold in Police Chief Magazine, December 2021 edition.

I have attended several instructor courses for crowd management, incident command, SWAT, less lethal impact munitions and chemical agents including:

DC Metropolitan Police Department (MPD) Civil Disturbance Unit (CDU) Training, 1992
MPTC Firearms Instructor School, 2001
MPTC Enhanced Instructor School, 2001
ODP (MCATI) Basic CDU Instructor 40-hour Training 2002
DefTech OC, Specialty Impact Munitions, Distraction Device and Chemical Munitions Instructor Course, 2004
DHS Office of Domestic Preparedness (ODP) Protestor Device Course, 2003
Advanced Taser M26 Instructors Course, 2002
FBI Chemical Agents for Law Enforcement (2004)
Combined Tactical Systems Chemical Munitions Instructor Course, 2006
Montgomery County Basic SWAT School, 2006
Advanced Taser M26/X26 Instructor Course, 2007
Safariland /DefTech OC, Specialty Impact Munitions, Distraction Device and Chemical Munitions Instructor Course, 2013
PepperBall Instructor/Armorer, 2014
LRAD Operator Course 2014
CDP Field Force Command and Planning, 2015
Safariland /DefTech OC, Specialty Impact Munitions, Distraction Device and Chemical Munitions Instructor Course, 2015
FN 303 Instructor, 2015
Safariland Crowd Management/Mobile Field Force Basic Instructor, 2015
Survival Edge Tactical Systems (SETS) Foundation Course for Public Order Civil Disorder Unit, 2015
SETS Foundation Course for Public Order Civil Disorder Unit, 2016
TEEX IMT-314 Enhanced Incident Management and Unified Command, 2016

SERT Grenadier School, 2017
National Tactical Officers Association (NTOA) SWAT Command I, 2017
SETS Level 1 Public Order-Civil Disturbance Unit Commander's Course, USSS 2020

I served as lead trainer and one of the founding members of the MCPD's Special Events Response Team (SERT) in 2004. I have served in numerous large scale special events, protests and civil disturbances during my tenure as a Montgomery County police officer including:

Presidential Inaugurations in 2001, 2005, 2009, 2013, 2017 and 2021. I deployed as a member of the MCPD contingent in support of the Metropolitan Police Department. I served as a line officer (2001) SERT Coordinator/Detail command staff (2005) and squad leader (2013). I worked with and trained United States Park Police in preparation for the 2017 Inauguration. I commanded the advanced public order platoon that deployed to the civil unrest that occurred during the Inauguration. I received an award from the U.S. Park Police for my work preparing them for the 2017 Inauguration.

International Monetary Fund, Washington, DC 2000. I served as a member of our crowd control unit that responded.

G20 Summit in Pittsburg, PA 2009, served as a squad leader on our SERT team during a multi-day deployment.

G8 Summit Thurmont, MD 2012, served as a squad leader during our SERT deployment.

ADAPT/Persons with Disabilities Protest Silver Spring, MD 2013. I was the deputy incident commander and coordinated response to an approximately 8-hour long protest that resulted in the arrest of approximately 30 individuals for blocking traffic.

Baltimore, MD Riots 2015, Baltimore erupted into civil unrest which devolved into a riot in April of 2015 following the in-custody death of Freddie Gray. Governor Hogan declared a state of emergency Monday April 27, 2015. MCPD had responded to a mutual aid request from the Baltimore Police Department. The deployment began April 25th and ended May 3rd. I served as our SERT Coordinator and was a leader of the multi-day deployment to support Baltimore City Police. I served as deputy platoon commander and was in tactical command of the grenadiers during the riots.

Friendship Heights, MD June 2020. I commanded an advanced public order platoon that responded to the DC line and prevented looters and rioters from entering Montgomery County.

George Floyd Protests June 2020. I commanded a multi-platoon deployment over a one-month period that responded to over 100 protests and marches in Montgomery County and other jurisdictions in the National Capitol Region.

Friendship Heights, MD October 2020. I commanded and advanced public order platoon that responded to the DC line in response to looting and protest following a purported in custody death involving MPD 4th District officers. The detail led to the arrest of nine subjects for looting a Saks 5th Ave store.

January 6th, 2021, U.S. Capitol Riots. I commanded the public order unit that responded to assist U.S. Capitol Police on January 6th. Montgomery County was the first foreign jurisdiction to reach the Capitol on that day and was extensively engaged with rioters. The Montgomery County contingent was awarded medals of valor from the Metropolitan Police Department and Congressional Gold Medals for our response that day. MCPD had honored a request from the Metropolitan Police Department to provide a crowd control team for January 5th & 6th, 2021. The deployment was extended through January 9th after the riot at the Capitol.

January 2021 assistance to U.S. Capitol Police. I led a multi-day response by Montgomery County to assist the U.S. Capitol Police at the end of January in support of the 2021 Inauguration.

Climate Protest Chevy Chase, MD June 2021. I was the incident commander for a protest of several hundred demonstrators that picketed the home of White House Chief of Staff Ron Klain. MCPD arrested approximately 50 protestors.

September 18, 2021. I led the Montgomery County response to assist U.S. Capitol Police with a planned protest.

## Materials Reviewed

I have reviewed the following materials in forming my opinion(s) in this matter:

1. Video 3242-7 Colfax and Pearl
2. Video Den 3871 Colfax and Washington 5-31-21
3. JCSO 2 Media (IMG _0131)
4. JCSO Media 4 (IMG _9102)
5. JCSO Media 5 (IMG_9103)
6. JCSO Media 6 (IMG_9104)
7. Jefferson County Regional SWAT AAR Mutual Aid – Denver Police Department "March in Honor of George Floyd Protest" May 29, 2020, to June 06, 2020
8. Jefferson County Sheriff Office Report 20-10539 written by Anthony Hamilton
9. Jefferson County Sheriff Office Report 20-10539 written by Timothy Dreith
10. Jefferson County Sheriff Office Report 20-10539 written by Timothy Stegink
11. Arvada Police Department Incident report AR20009346 authored by J. Griffin
12. Civil Action NO. 1:20-CV-01878-RBJ Elisabeth Epps v. City and County of Denver, Et Al. Deponent: Drieth
13. Civil Action NO. 1:20-CV-01878-RBJ Elisabeth Epps v. City and County of Denver, Et Al. Deponent: Deras

4

14. Civil Action NO. 1:20-CV-01878-RBJ Elisabeth Epps v. City and County of Denver, Et Al. Deponent: Hamilton
15. DEN 4584_Confidential BWC - Stack
16. Golden Police Department Report GN20001932 authored by Mark Donahue
17. JCSO PP 230 – Use of Force
18. Graham v. Connor (490 U.S. 386 (1989))
19. U.S. Const. amend. I.
20. CTS Product Specification Model 2581 12GA Super Sock Bean Bag
21. Safariland/ Defense Technology (Deftech) Crowd Management and Mobile Field Force Instructor Program REV100115.
22. Defense Technology Impact Munitions Operator Course Rev 3.15

### Brief Summary of Facts

This summary is based on information provided in applicable police reports, depositions of involved parties and video of the incident.

On May 31, 2020, members of the Jefferson County Regional SWAT (JCRS) were deployed to the City of Denver to assist the Denver Police Department with the management of protests and violent unrest. One of their missions that night was to protect the Denver Police Department's 6th District Station located at 1566 N Washington Street. District 6 had been vandalized throughout the week by criminal actors operating within protests. At approximately 2010 hours the JCRS formed a skirmish line of approximately 21 law enforcement officers adjacent to the police station on N Washington Street on the north side of E Colfax Ave. A large march was proceeding eastbound on Colfax Ave approaching N Washington St. The group appeared to have an anti-police focus, based on the numerous signs caried by individuals in the crowd. Examples of the verbiage on the signage included "Hex Police", "Fuck Police", "FTP", All Cops Are Bastards "ACAB" and other anti-police slogans. Several individuals in the crowd were carrying traffic cones and some individuals were wearing helmets. At approximately 2028 hours individuals in the crowd began assaulting the JCRS line by throwing objects, such as rocks, bottles and other projectiles such as golf balls, at deputies. Some of these projectiles caused injury to the deputies. Law enforcement officers in the skirmish line responded by deploying pyrotechnic CS gas and less lethal impact munitions. Individuals in the crowd continued aggressive acts and threw and kicked back the burning munitions towards the skirmish line. Some of those individuals who were throwing and kicking back the pyrotechnic munitions were engaged by less lethal impact projectiles. After approximately twenty minutes, the crowd discontinued their assaults on the skirmish line and the march continued eastbound on Colfax Ave.

### Opinion(s)

The basis and reasons for my opinions are premised upon my education, training, and experience as a law enforcement trainer and practitioner in the area of use of force, crowd management/ crowd control, the deployment of less lethal impact munitions during civil unrest, the

facts of the case presented, and materials reviewed. I am specifically addressing the use of force by two Jefferson County deputies who used less lethal impact munitions on individuals who were kicking and throwing police pyrotechnic munitions back at the JCRS skirmish line.

I presently hold the following opinions to a reasonable degree of professional certainty:

Deputy Timothy Drieth and Sergeant Anthony Hamilton were lawfully deployed to the incident pursuant to their duties and responsibilities as Jefferson County Sheriff's deputies and as such were governed by the Jefferson County Sheriff's Office Use of Force policy (JCSO PP230) and the presiding legal standard of objective reasonableness in police use of force as defined in Graham v. Conner 490 U.S, 386 (1989).

The Jefferson County Sheriff's Office Use of Force Policy cites the objectively reasonable standard delineated in Graham v. Conner and is consistent with the ruling. The policy states specifically:

*"Deputies will only use the amount of force that is objectively reasonable and necessary to effectively bring an incident under control based on the totality of the circumstances at hand."*

Regarding less lethal impact weapons, the policy use of force model suggests the appropriate level of resistance that justifies their use is active aggression which the policy defines as:

*"Physical actions/assaults against the deputy or another person with less than deadly force (e.g. punching, kicking, grabbing, wrestling, etc.). Subjects may be actively aggressive towards a third party or a deputy. The goal of the deputy in active aggression encounters is to gain control of the subject while minimizing the risk of injury to the deputy, subject, or third party."*

The question at hand is: Does the act of kicking or throwing a law enforcement deployed munition back at a law enforcement line meet the definition of active aggression and is the use of less lethal impact munitions to prevent someone from throwing or kicking the object back towards police line objectively reasonable based on the totality of the circumstances? In addition, is it a law enforcement best practice to use less lethal impact munitions, including bean bag rounds, to target individuals attempting to kick or throw pyrotechnic munitions back at law enforcement lines? In my opinion kicking or throwing an ignited pyrotechnic CS cannister at a law enforcement line does meet the definition of active aggression and the use of less lethal impact munitions to respond to this aggressive act is objectively reasonable and a best practice for law enforcement.

Throwing a pyrotechnic CS canister at a police line is a serious criminal offense. The action poses a real threat of injury to the law enforcement officers on the line, to bystanders, to property and to the maintenance of public order. The threat posed by an ignited pyrotechnic CS munition to bystanders and officers is clear. The munition works by igniting a pyrotechnic charge which burns and carries micro pulverized solid CS particles into the air. The CS then works as an inflammatory agent affecting the lungs, skin, eyes, nose and throat causing irritation. This irritation is widely recognized as a use of force. In

6

addition, the burning munition posed a thermal threat as it burns at over 700 degrees. Law enforcement is trained to deploy pyrotechnic munitions in a manner to avoid direct contact with anyone in the crowd or any property that may burn. The deployment of CS by the JCRS skirmish line clearly was to unoccupied areas of pavement with no risk of conflagration. Additional threats to officers from a pyrotechnic munition thrown at them include the impact hazard from a thrown object and the loss of vision due to the smoke projected from the device. The law enforcement officers on the JCRS skirmish line were vulnerable to all these effects. This vulnerability was exacerbated by their lack of task specific PPE. As noted in several of the reports by Jefferson County deputies describing the encounter outside of the 6th District, the deputies were equipped with PPE designed for a SWAT function. The PPE they utilized is not designed to protect the wearer from thrown rocks, bricks, bottles or any type of threat from burning objects. The helmet and ballistic vest are both designed to mitigate ballistic threats from firearms. Impact attenuation from objects with higher mass and slower speed requires different PPE. PPE designed for use in violent unrest generally covers a much greater area of the body than SWAT PPE. Especially vulnerable areas are the head from impact, the face, the groin and the metatarsal bones in the feet. The injury reports detailed in the Jefferson County AAR evidence the lack of protection afforded by the SWAT PPE the unit deployed in that night. In addition, the threat of burn injuries was not at all mitigated by the PPE they were wearing. The full-face air purifying respirators they were wearing are not designed to mitigate impact but only to filter the CS particles. Thus, the returning CS cannisters did pose a real threat to the officers.

Additionally, throwing or kicking back pyrotechnic CS cannisters substantially interferes with efforts by law enforcement to disperse violent criminal actors whose actions present a clear danger to public order and the health and welfare of the general public.  The fact that the force of the kick or throw is insufficient to reach the law enforcement line is irrelevant. It is patently unreasonable for a law enforcement officers to try and gauge the force of the kick or throw before deploying a less lethal impact munition such as a bean bag round. The deputies from Jefferson County were deployed to assist the Denver Police Department in dealing with this violent and dangerous situation. The unlawful actions of those interfering create a risk to not only those directly involved in the incident but to the health and safety of the entire community. History is replete with examples of substantial harm caused to individuals and the community at large when large scale civil unrest and rioting occurs. Lives have been lost and billions of dollars of property damage have been documented as a result of large-scale civil unrest. The government has a substantial interest in maintaining order and interference with legitimate efforts to quell violent disorder poses a significant threat to the entire community. The rights of protestors must be balanced with the rights of the community to safely go about their daily lives. Individuals who commit violent acts voluntarily step outside of the protections of the First Amendment which requires actions taken must be peaceable.

The First Amendment:

*Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.*

The actions of those actively interfering with law enforcement must be considered in this light and in addition to the immediate threat posed by their criminal assaults.

Given the threat to the deployed personnel, it is reasonable to deploy an impact munition at an individual who is actively throwing or kicking the munition towards them. In fact, the use of such munitions to prevent subjects in the crowd from assaulting officers is a best practice for crowd control units and is taught by several manufactures of chemical and less lethal agents. The two of the largest manufactures of less lethal impact munitions in the Unites States DefTech and CTS both recommend using impact projectiles, including bean bag rounds. to keep criminal actors in a violent crowd from redeploying the munitions back at law enforcement lines.

The deputies deployed on the JCRS skirmish line had very limited options to address the violent criminal actions of those throwing projectiles at them other than attempting to deny access to the area and disperse the crowd with CS and using less lethal impact munitions, including bean bag rounds, to target individuals in the crowd committing violent criminal actions and assaults. The approximately 21 law enforcement officers on the skirmish line were equipped to perform a SWAT function. They lacked task specific PPE for crowd control. In addition, they were not deployed with arrest teams and had not specific training to move a crowd through the use of crowd control formations or to make physical arrests of violent individuals in the crowd. They utilized the only options they had to perform their lawfully assigned task to protect the 6th District and to attempt to stop the assaults on themselves and to mitigate the violent unrest that was occurring.

In this case the deployment was estimated to be 88' which is beyond the manufacturer recommended maximum effective range of 75'. The 75' maximum range is a recommendation based on several factors. One reason the recommendation is based on decreased accuracy. It is possible for a well-trained operator to hit targets at a further distance as is evidenced by the fact that Mr. Deras was in fact struck by the bean bag rounds fired by one or more of the deputies.  Equally important is the fact that the projectile loses kinetic energy as it travels further from the barrel of the launcher. According to the CTS the manufacturer of the bean bag round utilized the round may become less effective due to the decrease of energy at impact. I believe the deployment of the bean bag round at this range to be objectively reasonable and within the effective operational effectiveness of the bean bag round.

Dep. Drieth clearly delineates his thought process in his written report of the incident. He articulates the threat from assaultive individuals in the crowd, the specific active aggression posed by the violent criminal actors who were kicking and throwing the pyrotechnic cannisters back at the JCRS skirmish line to justify his use of the less lethal impact munitions he deployed. It is clear from his written report, deposition and the video evidence, that he was very discerning in his target selection and had objectively reasonable grounds to deploy less lethal impact munitions in those circumstances in order to prevent the active aggression and to protect himself and fellow law enforcement officers.  He states in his report:

8

"I was not able to specifically identify any shooters, and therefore did not engage anyone with force." This clearly shows that he was not indiscreetly deploying the less lethal impact rounds but was engaging in critical decision making throughout the incident.

Sgt. Hamilton clearly describes his mindset on May 31 and shows that he was engaged in clear evaluation of his use of force. He describes reviewing less lethal force policy on May 30 and target zones for less lethal impact and rules of engagement. He described the crowd advancing on the JCRS skirmish line and the objects being thrown at the skirmish line. Sgt. Hamilton specially describes the level of active aggression being met by the violent criminal actors assaulting the skirmish line with the pyrotechnic CS cannisters.

My opinion is not swayed by allegation of less lethal projectiles possibly striking complainant Deras in non-optimal target areas. The so-called red areas described by Sgt. Hamilton and Dep. Drieth are areas of the body that should not be intentionally targeted absent justification to use deadly force. During a highly chaotic situation such as the one that occurred on May 31 outside of the 6th District station, reasonable law enforcement officers target the recommended green and yellow areas. The fact that rounds may unintentionally strike other areas of the body of the intended target does not render the decision to use the force unreasonable. Deputies in this case, as described above made, made affirmative efforts to identify individuals who were posing a threat to themselves and other deputies and to aim for safe areas of the body. The actions of the intended target cannot be ignored and the suspect in this case bears some responsibility for his own safety. Mr. Deras was in active motion, in intentional violation of the published curfew, and committing armed assault on law enforcement officers in the performance of their duties. Rather than follow police direction which was at least implied by the use of CS gas, he stayed in the area and actively assaulted law enforcement officers who were enforcing the law and attempting to quell violent unrest. He is not an uninvolved party and must bear some responsibility for the injury he suffered due to his violent criminal behavior and failure to comply with the curfew and lawful instruction from law enforcement. The deputies were aware to the intended target areas and made reasonable effort to target them. The actions of the defendant, including obscuring the vision of the deputies on the skirmish line, cannot be used as an excuse that he was subjected to unreasonable force without examining the effects of his decisions and actions.

The judgement of the deputies in this incident was clearly objectively reasonable based on their written reports, the video and their depositions. They deployed less lethal impact munitions in accordance with law enforcement best practices, manufacturer recommendation, their agencies use of force policy and the constraints of Graham v. Conner given the actions of their intended target and the operational circumstances. They acted as any similarly trained and equipped reasonable prudent officer would have in the same situation.

9

Sincerely,

Peter Davidov
7212 Old Stage Road
North Bethesda, Maryland 20852