IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 20-cv-01878-RBJ
(consolidated with 20-cv-01922-RBJ-MEH)

ELISABETH EPPS, *et al*.,

      Plaintiffs,

v.

CITY AND COUNTY OF DENVER, *et al*.,

      Defendants.

---

**DENVER DEFENDANTS' REVISED MOTION FOR SUMMARY JUDGMENT**

---

Denver Defendants,[1] through counsel, hereby respectfully submit this Revised Motion for Summary Judgment, as follows:

**STATEMENT OF UNDISPUTED MATERIAL FACTS**

Overview of George Floyd Protests in Denver

1.    Following George Floyd's death on May 27, 2020, the Denver Police Department ("DPD") learned of possible protest activity in Downtown Denver. [Phelan Dep., at 108:8-18, **Exh. A**].

2.    DPD prepared by engaging Special Operations Commander Patrick Phelan as the Incident Commander, who oversaw the DPD response, including creating the rules of

---

[1]   Denver Defendants are the City and County of Denver ("Denver"), Patrick Phelan, Matthew Canino, James D. Williams, Thomas Pine, Vincent Porter, Michael O'Donnell, Kevin Carroll, Rick Beall, David Abeyta, Marco Martinez, Justin Dodge, Richard D. Eberharter, Tana Cunningham, John Simpson, Jonathan Christian, and Keith Valentine.

engagement of protesters being allowed to go into the street with DPD assisting to block traffic, but not permitting crimes including looting, criminal mischief, setting fires, entering I-25, taking over a District Station, or any Denver buildings. [Phelan Dep., at 26:9-25; 27:11-19; 29:7-13; 116:20-117:6, **Exh. A**].

3.      The afternoon of May 28, 2020, protesters mainly gathered near the State Capitol, but attempts were also made to overtake I-25 and the District 6 Station. [Canino Dep., at 65:22-66:4, 32:14-34:8; **Exh. B**].

4.      The first day, many protesters engaged in criminal acts resulting in substantial property destruction and endangering public safety. [Canino Dep., at 32:14-34:8; **Exh. B**].

5.      DPD officers faced a challenging environment in responding to the protests which DPD officers perceived as a riotous mob condition at different times. Individuals within the protests engaged in violent conduct towards the police including throwing a variety of different types of projectiles at the police such as chunks of concrete, rocks, canned items, bottles, golf balls, fireworks, and mortars, as well as using lacrosse sticks to launch and strike officers with landscape rocks. [O'Donnell Dep., at 29:3-16, 98:19-23, 109:6-23, **Exh. C**; Beall Dep., at 22:11-12, **Exh. D;** Martinez Dep., at 77:4-15, **Exh. E;** Carroll Dep., at 115:8-16, **Exh. F**].

6.      Commander Phelan described the George Floyd protests as unlike any other crowd control event in his forty-year history with DPD. [Phelan Dep., at 11:15-22; 140:14-21; 141:3-13, **Exh. A**].

DPD Operations Responding to George Floyd Protests

7.      DPD drafted daily Operations Plans. [Phelan Dep., at 33:21-33, **Exh. A**; DPD Operations Plan, 5/28/20, **Exh. G**; DPD Operations Plan, 5/29/20, **Exh. H;** DPD Operations Plan,

5/30/20, **Exh. I**; DPD Operations Plan, 5/31/20, **Exh. J**; DPD Operations Plan, 6/1/20, **Exh. K**; DPD Operations Plan, 6/2/20, **Exh. L**].

8.      Commander Phelan conducted daily briefings on the Operations Plan to DPD command staff, supervisors, and outside agency supervisors to explain the Plan and how the deployment of DPD and other resources would work, and the Plans were distributed. [Phelan Dep., at 46:1-3; 46:23-47:4; 47:10-13, **Exh. A**].

9.      Adjustments to the Operations Plans were made based on the information learned and experiences of the prior day. [Phelan Dep., at 120:19-21, **Exh. A**].

10.     DPD used less lethal munitions as part of their response to the protests and related activities. Less lethal force is a force application which meets an operational or tactical objective that is not intended to and has a reduced likelihood of causing death or serious bodily injury. [Pepper Ball Operator Course, at DEN000587, **Exh. M**].

11.     DPD used 40mms to respond to crowd management situations as follows: (1) against violent individuals within a crowd; (2) against subjects who were actively throwing objects at police officers; (3) against subjects who are at risk of causing imminent bodily injury to other persons; (4) to mark individuals for future identification and arrest for illegal acts that include active aggression; and (5) to provide cover while arrest teams penetrate a crowd, or against individuals who attack the arrest team or violently interfere with the movement of the team or arrest process. [40mm Operator Course, at Den 000351, **Exh. N**].

12.     Pepper Ball is appropriately used in a crowd management situation as follows: (1) to support the skirmish line; (2) to use stand-off force application to encourage individuals to come down from trees, fences, walls, poles or signs when their elevated position or actions pose a threat

to the field force; (3) against subjects within the crowd who are actively throwing objects at police officers; (4) to mark individuals for future identification and arrest; and (5) to provide cover while arrest teams penetrate a crowd, or against individuals who attack the arrest team or violently interfere with the movement of the team or arrest process; and (6) for area saturation for crowd dispersal purposes. [Pepper Ball Operator Course, at DEN 000599, **Exh. M**].

13.    Chemical agents were used for crowd dispersal purposes including in emergency situations for officer safety purposes when crowds engaged in active aggression and violent behavior towards the police. [Canino Dep., at 30:11-15; 30:22-31:19; 35:23-36:11; 53:21-54:5, **Exh. B;** O'Donnell Dep., at 30:13-19; 31:9-14, **Exh. C**].

14.    Commander Phelan was not in the field and did not specifically direct officers when to deploy less lethal munitions; rather, in accordance with DPD policy, field supervisors and officers made those determinations. Command level approval is not required to deploy gas or smoke; the authority was delegated to those on scene. [Phelan Depo, 35:3-10; 38:5-7; 62:4-63:20, **Exh. A].**

Emergency Curfew

15.    On May 30, 2020, as a result of a State of Local Disaster Emergency, Michael Hancock, Mayor of Denver, enacted an Emergency Curfew ("Curfew"). [Emergency Curfew Issued to DRMC Section 2-98, 5/30/20, **Exh. O].**

16.    The Curfew noted civil disturbances had occurred in Denver resulting in significant and extensive damage to people and property with the majority of the destruction and violence occurring at night. [Curfew Order at DEN000112 **Exh. O**].

17.     DRMC Section 2-98 vests the Mayor with authority to adopt emergency rules like the Curfew to protect the public health, safety or welfare. [Curfew Order at DEN000112 **Exh. O**].

18.     The Mayor imposed a nighttime Curfew in all public places within Denver, including streets and public right-of-ways from 8:00PM until 5:00AM starting on May 30, 2020, until June 1, 2020. [Curfew Order at DEN000113 **Exh. O**].

19.     During the Curfew, all persons were prohibited from using, standing, sitting, travelling or being present on any public street or in any public place, including for the purpose of travel, with the exceptions of: (a) all law enforcement, fire, paramedics or other medical personnel, Colorado National Guard as well as any other emergency response personnel authorized by Denver, and credentialed members of the news media; (b) individuals traveling directly to and from work, traveling directly to and from the airport, seeking exempt care, fleeting dangerous circumstances, or experiencing homelessness; (c) any person to whom permission is specifically granted by a Denver official. [Curfew Order at DEN000113 **Exh. O**].

20.     On June 1, 2020, the Mayor extended the Curfew through June 5, 2020, from 9:00PM through 5:00AM each night. [Emergency Curfew Issued to DRMC Section 2-98, 6/1/20, **Exh. P**].

Enforcement of the Curfew

21.     Arrests were made on all days of the protests, and DPD used the Curfew to manage the violent and destructive behavior that increased when darkness fell. [Thomas Dep., at 22:11-.23:5, **Exh. Q**; Arrest table, at DEN32691-32697, **Exh. EE**].

22.     DPD Senior Leadership discussed strategies for using the Curfew and sought to ensure DPD understood the Curfew was a tool to help manage the violence and destruction and

would be enforced against those individuals engaged in violent and destructive acts. [Thomas Dep., at 24:4-14; 24:24-25:4; 57:24-58:11, **Exh. Q**].

23.     Protesters who were compliant with lawful orders to leave public areas after Curfew were allowed to go home and were not arrested, those who were non-compliant were arrested. [Canino Dep., at 118:24-119:2; **Exh. B**].

24.     Of those arrested for violation of Curfew and/or failure to obey a lawful order, many were also charged with additional unlawful acts, including public fighting, eluding, weapons offenses, disturbing the peace, and graffiti, to name a few. [Arrest table, at DEN32691-32697, **Exh. EE;** Citations with Additional Charges, **Exh. R**].

25.     While Downtown was the focus of arrests during the Curfew, arrests were also made in Cherry Creek where no protests occurred. [Message Summarizing Police Activity and Arrests, **Exh. S**].

26.     DPD's chain of command consists of Chief of Police ("Chief"), a Deputy Chief, and three Division Chiefs who oversee the administration, investigations and parole functions. [Phelan Dep., at 39:11-20 **Exh. A**; Ops Manual, §§2.69-2.72 at DEN 981, **Exh. T**]

27.     Division Chief Ron Thomas was the Division Chief of Patrol in May and June 2020, managing patrol functions under the supervision of the Deputy Chief and the Chief. [Thomas Dep., at 7:8-16; 8:18-9:15; 9:19-25, **Exh. Q**; Ops Manual, §§ 2.69, 14.07 & 14.10 at DEN 981 and 1010, **Exh. T**].

28.     Following the discussion of Curfew enforcement with DPD leadership, Division Chief Thomas passed along the message of enforcement to the district commanders so they could inform officers. [Thomas Dep., at 24:14-16; 25:5-8, **Exh. Q**].

29.     After the Curfew was extended, Commander Bancroft communicated to three of her subordinates the following text message "From DC Thomas, all just to reiterate, the city curfew in effect this week begins at the 2100. As has occurred previously, everyone will receive an emergency announcement on their cell phone at 20:45 as a notification. Please advise all your officers that this curfew ordinance is to be used only for enforcing protest-related behavior regardless of location in the city. Do not allow officers cite for curfew just for being out after 21:00. Unless they are actively engaged in protest activity, some other charge of justification must be used. Thanks." [Thomas Dep., at 26:18-27:4, **Exh. Q**].

30.     Chief Pazen did not tell Division Chief Thomas to send the message, nor did Division Chief Thomas share the message with the Chief. [Pazen Dep., at 74:16-75:2, **Exh. U**; Thomas Dep., at 27:11-16, **Exh. Q**].

31.     Division Chief Thomas's message was not disseminated to the entire group of officers policing the protests. [Canino Dep., at 118:5-119:5; **Exh. B**].

32.     Division Chief Thomas intended to communicate to district commanders that individuals involved in violent and destructive activities were the enforcement priority for Curfew violations and believed the recipients of his communication would have understood his intention. [Thomas Dep., at 27:16-20; 34:6-19, **Exh. Q**].

33.     The Curfew was enforced by DPD officers as stated in the Curfew-- against anyone still out on the streets and not compliant with orders to go home, whether Downtown or elsewhere in Denver, and whether people were engaged in destructive activity and violence or merely those who remained out after Curfew. [*Supra*, ¶¶15-20 and exhibits].

<u>Destruction and Officer Injuries Resulting from Protests</u>

34.     Approximately 80 DPD Officers were injured during the protests, and of those approximately 60 DPD Officers were specifically injured by projectiles. [Chart of Officer Injuries at DEN032674-76; **Exh. V**; Table of Officer Injuries, DEN032670-73, **Exh W**; Table of Officer Injuries at DEN032701-11, **Exh. X**].

35.     There were 238 property damage incidents reported between May 30, 2020, and June 1, 2020, in the Downtown Denver Business Improvement District. 130 of these incidents were reported by establishments on the Sixteen Street Mall claiming damages to private and public property, such as graffiti tags, vandalism, broken windows, theft, and arson. [Summary Data of Property Damage at DEN009737-842, **Exh Y**].

36.     Extensive public property damage was reported, including but not limiting, approximately 106 City building windows were broken and numerous Denver buildings were tagged with graffiti. [Summary Data to City Buildings at DEN009859, 9858, **Exh Z**].

37.     Approximately 76 DPD cruisers were vandalized totaling $48,620.48 in damages. [Property Damage Table at DEN32668-69, **Exh AA**; Property Damage – Glass at DEN032712-13, **Exh. BB**; Damage Photos at DEN32313, **Exh. CC**].

38.     Denver initiated the Denver Capital Complex Vandalism Repair Project to identify repair, replace, and clean damages caused by individuals during the protests. The total cost of the project was $1,112,661.72. [Damage Quote at DEN32679-32682, **Exh DD].**

**<u>ARGUMENT</u>**

**I. THE CURFEW ORDERS WERE FACIALLY CONSTITUTIONAL**

a.     **<u>The Curfew did not regulate speech, instead it provided temporary and reasonable public safety measures</u>**.

8

The Curfew challenged here was strictly a temporary public safety regulation with no reference to any First Amendment protected activity. The Curfew restricted conduct and was implemented to stop the violent, destructive, and riotous behavior jeopardizing public and officers' safety and significant property damage. The Curfew need only pass rational basis review to be constitutional. Denver has a legitimate interest in stopping illegal and riotous activity for public safety reasons. The number of officers injured, the extent of property damage, complaints from nearby residents, and safety issues faced by responding firefighters and EMTs, demonstrates the Curfew was rational and served legitimate governmental interests.

**b. <u>Any indirect restriction on speech was content neutral, reasonable, and narrowly tailored</u>.**

The Curfew also survives First Amendment scrutiny because any speech restriction was content neutral, applying to all speech, not just speech criticizing police. To determine content neutrality, one must determine whether the government has adopted a regulation of speech because of disagreement with the message it conveys. ***Ward v. Rock Against Racism***, 491 U.S.781, 791 (1989). The text of the Curfew is content neutral. The Curfew applied to all citizens except for legitimate and necessary exceptions.  The Curfew barred ***all*** large nighttime gatherings regardless of purpose or message. No specific group or message was targeted.

The Curfew was also a reasonable time, place and manner restriction.  ***Ward***, 491 U.S at 791; ***Doe v. City of Albuquerque***, 667 F.3d 1111, 1130-31 (10th Cir. 2012).  The Curfew (a) served a significant government interest; (b) was narrowly tailored to advance that interest; and (c) left open ample alternative channels of communication. The Curfew's significant government interest was providing a tool to assist Denver in stopping the riotous behavior occurring the two nights

prior to its implementation. The violent public disturbances occurring Downtown on May 28 and 29, 2020, involved substantial destruction of property and endangered public safety. Denver has a substantial interest in protecting its citizens, business owners and private/public property.

The Curfew was narrowly tailored because it was not substantially more restrictive than necessary. Although the Curfew prohibited protesters' ability to assemble and protest at night, the scope of the restrictions appropriately targeted the misbehavior Denver sought to stop – the riots occurring after dark. The Curfew also allowed for alternative channels for protesters to get out their message. Although the Curfew was a complete ban on protesting during the night, individuals were allowed to gather and protest for more than 13-14 hours a day to communicate their message. In July 2021, the Southern District of New York, upheld the constitutionality of similar emergency curfew orders. *See In re New York City Policing During Summer 2020 Demonstrations*, No. 20-CV-8924 (CM)(GWG), 2021 WL 2894764 (S.D.N.Y. July 9, 2021). Although the ruling in the New York case is not binding, it is persuasive and should be followed by this Court.  The New York federal court analyzed a similar nighttime curfew imposed by New York City's Major and concluded it did not violate anyone's First Amendment rights.

    **c.**    <u>**Reliance on Division Chief Thomas' Message to Establish Discriminatory Enforcement of the Curfew Fails Because Thomas Is Not a Final Policymaker.**</u>

A municipality is not liable under 42 U.S.C. § 1983 simply because it employs a person who violates another's constitutional rights. To hold Denver liable, the Arrest Class must demonstrate Denver had a policy or custom that directly caused the deprivation of constitutional rights. *City of Canton v. Harris*, 489 U.S. 378, 385 (1989); *Bryson v. City of Okla. City*, 627 F.3d 784, 788 (10th Cir. 2010). The Arrest Class argues the Curfew was discriminatorily enforced against protestors. The Arrest Class heavily relies on a text message sent by Commander Bancroft

summarizing instructions from Division Chief Thomas, who was, in turn, articulating his subjective understanding of DPD's curfew enforcement strategy following a meeting with senior leadership. Division Chief Thomas believed DPD intended to apply the Curfew against individuals embedded with the protestors engaged in violent and destructive acts. In the message, he stated, "Please advise all your officers that this curfew ordinance is to be used only for enforcing protest-related behavior regardless of location in the City." Notwithstanding his use of the phrase "protest-related behavior," Division Chief Thomas intended to communicate and believed the recipients would understand his message to mean: enforce the Curfew against individuals engaged in violent and destructive acts, based on DPD training and other contemporaneous conversations about Curfew enforcement.

Plaintiffs argue this message establishes Denver's improper motive. However, Plaintiffs ignore DPD's lawful Curfew enforcement strategy—to target individuals engaged in violent and destructive acts, not protestors—and instead focus on the wording of Division Chief Thomas' *transmittal*. However, this transmittal is of no consequence; the critical inquiry is Denver's *policy* on enforcement. Division Chief Thomas' text message does not represent official Denver policy.

Not every decision by an individual automatically subjects the municipality to 42 U.S.C. § 1983 liability. Whether a person possesses final policymaking authority is an issue for the Court to determine based on state and local law. *City of St. Louis v. Praprotnik*, 485 U.S. 112, 123 (1988). In making this determination, courts consider: (1) whether the official is meaningfully constrained by policies *not* of the official's own making; (2) whether the official's decisions are *final* or are instead subject to any meaningful review; and (3) whether the policy decision purportedly made by the official is within the realm of the official's grant of authority. *Sekerak v.*

*City & Cty. of Denver*, 1 F. Supp. 2d 1191, 1198 (D. Colo. 1998) (emphases in original).

Here, Division Chief Thomas is not a final policymaker. Division Chief Thomas oversees DPD's patrol division, managing patrol functions for DPD's six patrol districts and reports to the Deputy Chief and the Chief. The Curfew enforcement strategy was not determined by Division Chief Thomas alone, rather it was determined by a group of DPD commanders. Division Chief Thomas simply relayed his subjective understanding of those discussions to his subordinates. Whether in doing so he accurately relayed the Curfew enforcement strategy in his text message is a red herring. The actual policy is relevant, not the choice of text message words by a non-final policymaker in relaying the policy to others.

The text message, including its content, was not sent at Chief Pazen's direction, nor was it ratified by Chief Pazen or Denver. *Bryson*, 627 F.3d at 788. Under the chain of command, Division Chief Thomas' supervisors had the authority to review his instruction (and the underlying substance thereof) and edit, amend, and/or rescind as they believed appropriate, ***had they known about the message***. However, there is no evidence either the Deputy Chief or the Chief were aware of, reviewed, or approved the text message, making ratification impossible. *Id.* at 790.

### d.   Protestors Were Not Treated Differently Than Similarly Situated Individuals in the Enforcement of the Emergency Curfews.

The Equal Protection Clause prohibits selective enforcement. ***Whren v. United States***, 517 U.S. 806, 813 (1996). A selective enforcement claim requires establishing: (1) different treatment from others similarly situated; and (2) the differing treatment was based on clearly impermissible or invidious grounds "such as race, religion, or the desire to prevent the exercise of constitutional rights." ***United States v. Salazar***, 720 F.2d 1482, 1487 (10th Cir. 1983). The standard for proving a violation of Equal Protection based on selective enforcement is a "demanding" one, *see **United***

***States v. Armstrong***, 517 U.S. 456, 463 (1996), which has not been established here.

While most people charged with violating the Curfew were individuals in the general vicinity of protest-related activity Downtown, it does not follow Denver's Curfew orders were discriminatorily applied. Thousands were Downtown from May 28, 2020, to June 5, 2020 to protest, and with this protected protest activity also came individuals engaging in violence and destruction. Law enforcement activity was focused Downtown responding to the unprecedented levels of activity— some peaceful, some not— thus the higher numbers of individuals cited with violations were Downtown.

The Arrest Class' discriminatory enforcement claim is undercut for multiple reasons.  Not all protesters who were violating Curfew were arrested, including 13 of the Plaintiffs. In some circumstances, officers instructed Curfew violators to leave and they left, not subjecting themselves to arrest. Other individuals not protesting but engaged in suspicious activities were also arrested for Curfew. For instance, on May 31, 2020, a group was observed in Cherry Creek after Curfew.  Upon seeing officers, the group fled. Officers were able to locate two individuals and cited them with violating the Curfew. A third individual was observed in the area of West 3rd Avenue and North Clayton Street and arrested, cited with violating the Curfew, and detained. These individuals were not protesting but were engaged in unknown suspicious activity after Curfew. Individuals causing damage and destruction to property were also arrested, as were those possessing weapons. These examples illustrate the Curfew was used as a tool against individuals engaged in criminal or suspicious conduct after Curfew or otherwise not in compliance with the

Curfew, disproving the selective enforcement claim.[2]

## II. THE ARRESTS DID NOT VIOLATE THE FOURTH AMENDMENT BECAUSE PROBABLE CAUSE EXISTED

Probable cause is a complete defense to a Fourth Amendment wrongful arrest claim. ***Devenpeck v. Alford,*** 543 U.S. 146, 152 (2004); ***Atwater v. City of Lago Vista,*** 532 U.S. 318, 354 (2001). "Probable cause is evaluated at the time of the arrest. ***United States v. Rodriquez,*** 739 F.3d 481, 485 n. 2 (10th Cir. 2013); ***Bledsoe v. Garcia,*** 742 F.2d 1237, 1243 n. 3 (10th Cir. 1984). Even if this Court concludes the Curfew was unconstitutional, probable cause to support the arrests may still have existed at the time. ***Pierson v. Ray,*** 386 U.S. 547, 555 (1967); ***Roska v. Peterson,*** 328 F.3d 1230, 1251 n. 29 (10th Cir. 2003).  Here, there is no dispute the Arrest Class Plaintiffs were arrested for violating the Curfew because they were out in public after the Curfew. As a result, probable cause existed.

## III. THE USE OF FORCE DID NOT VIOLATE THE FIRST AMENDMENT

Initially, Plaintiffs appear to attempt a First Amendment claim alleging the Denver Defendants' use of force violated their First Amendment constitutional rights. [ECF 178, ¶¶ 155-170; ECF 219, ¶¶ 425-440]. However, no such First Amendment use of force claim exists. Instead, the viable First Amendment theory for the Plaintiffs is a First Amendment retaliation theory premised on the assertion force was used in retaliation for engaging in First Amendment protected activity. *Compare **Maron v. City of New York,*** 15-cv-2017 (PKC), 2016 U.S. Dist. LEXIS 28466

---

[2]   The Arrest Class appears to bring a selective enforcement theory under both the First Amendment and the Equal Protection Clause of the Fourteenth Amendment.  The above analysis applies to both theories.

at *30-37 (S.D.N.Y. Mar. 7, 2016) (analyzing claim of being subjected to excessive use of force in violation of the First Amendment as First Amendment retaliation claim).

To prevail, Plaintiffs must prove: (1) they were engaged in constitutionally protected activity; (2) the defendant's actions caused the plaintiff to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity; and (3) that the defendant's adverse action was substantially motivated as a response to the plaintiff's exercise of constitutionally protected conduct. *Worrell v. Henry,* 219 F.3d 1197, 1212 (10th Cir. 2000).

Assuming for purposes of this Motion Plaintiffs can meet the first two elements, Plaintiffs have not and cannot prove the actions of the Denver Defendants were substantially motivated as a response to any exercise of First Amendment rights to establish the third element. The Tenth Circuit has described the third element of *Worrell* as a causation requirement. *Hedquist v. Beamer,* 763 F.App'x 705, 712 (10th Cir. 2019). Plaintiffs are required to establish "but-for" causation to meet this element. *McBeth v. Himes,* 598 F.3d 708, 719 (10th Cir. 2010).  Plaintiffs' evidence is as follows: they and others were protesting, Denver Defendants used force; Plaintiffs as protestors were impacted by the force. Without more, Plaintiffs concluded the use of force occurred because they were protesting. However, Plaintiffs lack proof of a subjective intent to retaliate by each Denver Defendant respecting each use of force involving each Plaintiff. Force was used not because protest activity or protestors were targeted, but due to the others in the crowds engaged in violence, attempting to injure police or destroy property, and the safety concerns their actions posed. Any detrimental impact of force on any of the Plaintiffs occurred based on their own inappropriate actions or was an unintended consequence of uses of force directed at those engaging in unlawful conduct. Plaintiffs' First Amendment retaliation claim fails because no specific

evidence demonstrates any use of force by a specific Denver Defendant impacting a specific Plaintiff was substantially motivated by that particular Plaintiff's First Amendment activity supported by the subjective intent to retaliate of the individual Denver Defendant involved.

### IV. PLAINTIFFS' FOURTEENTH AMENDMENT DUE PROCESS CLAIMS FAIL

Claims of excessive use of force by police officers are properly analyzed under the Fourth Amendment and not the substantive component of the Fourteenth Amendment's Due Process Clause. *See, e.g., **Graham v. Connor,*** 490 U.S. 386, 391-95 (1989); ***Berry v. Muskogee,*** 900 F.2d 1489, 1493 (10th Cir. 1990); ***Mwangi v. Norman,*** 16-cv-00002-CMA-NYW, 2016 U.S. Dist. LEXIS 172076 at *32 n. 7 (D. Colo. Dec. 13, 2016). Similarly, claims of wrongful arrest are also analyzed under the Fourth Amendment and not substantive due process respecting the initial seizure which is at issue. [ECF 219, ¶ 452]. ***Albright v. Oliver,*** 510 U.S. 266, 273 (1994); ***Pierce v. Gilchrest,*** 359 F.3d 1279, 1285-89 (10th Cir. 2004).

Alternatively, Plaintiffs' cannot factually meet the extremely high shocks the conscience standard for a viable Fourteenth Amendment substantive due process claim. ***Cnty. of Sacramento v. Lewis,*** 523 U.S. 833, 847 (1998); ***Uhlrig v. Harder,*** 64 F.3d 567, 574 (10th Cir. 1995); ***Hewitt v. City of Truth or Consequences,*** 758 F.2d 1375, 1379 (10th Cir. 1985).

### V. PLAINTIFFS' SUPERVISOR LIABILITY CLAIMS ARE NOT COGNIZABLE

Individual supervisors may be liable for a violation of someone's constitutional rights based on their personal participation in the violation. ***Fogarty v. Gallegos,*** 523 F.3d 1147, 1162 (10th Cir. 2008). In the absence of personal participation, a supervisor may only be held liable under limited circumstances. The basic elements for supervisory liability are: (1) the defendant promulgated, created, implemented or possessed responsibility for the continued operation of a

policy that (2) caused the complained of constitutional harm, and (3) acted with the state of mind required to establish the alleged constitutional deprivation. *Durkee v. Minor,* 841 F.3d 872, 877 (10th Cir. 2016); *Dodds v. Richardson,* 614 F.3d 1185, 1199 (10th Cir. 2010). Although a defendant can be liable based on supervisory responsibilities, such a claim must be supported by allegations that demonstrate personal involvement, a causal connection to the constitutional violation, and a culpable state of mind. *Schneider v. City of Grand Junction,* 717 F.3d 760, 767-69 (10th Cir. 2013).

Fitouri Plaintiffs generally allege the individual Denver Defendants supervisors were either personally involved in violations of their constitutional rights or are liable on a supervisory liability basis. [ECF 219, ¶ 448]. Plaintiffs must set forth specific facts establishing either personal participation or each of the elements required by a supervisory liability theory for each individual supervisor concerning each event involving each Plaintiff. Denver Defendants maintain Plaintiffs cannot meet this burden. In particular, Plaintiffs lack evidence establishing the requisite state of mind for each of the supervisors to support these claims.

Finally, with respect to the supervisor claims against Commander Phelan in the absence of his personal participation in a particular event involving a specific Plaintiff, which Denver Defendants do not believe exists, the supervisor liability claims against him as the Incident Commander responsible for coordinating the overall response to the events requires proof of the *Monell* elements, which Plaintiffs have not established as outlined below. *Burke v. Regaldo,* 935 F.3d 960, 998-99 (10th Cir. 1999).

## VI. FITOURI PLAINTIFFS' FAILURE TO INTERVENE CLAIMS FAIL

Courts have recognized an individual defendant may be held liable for failing to intervene in another's excessive use of force if : (1) the defendant officer was present at the scene; (2) the defendant officer witnessed another officer applying force; (3) the application of force was such that any reasonable officer would recognize that the force being used was excessive under the circumstances; and (4) the defendant officer had a reasonable opportunity to intercede to prevent the further application of excessive force but failed to do so. ***Nilges v. Gilmour,*** 16-cv-00884-MEH, 2018 U.S. Dist. LEXIS 56240 at *33-34 (D. Colo. Apr. 2, 2018); ***Martinez v. City & Cty. of Denver,*** 11-cv-00102-MSK, 2013 U.S. Dist. LEXIS 137588 at *5 (D. Colo. Sept. 25, 2013).

Fitouri Plaintiffs include a failure to intervene theory. [ECF 219, ¶¶ 459-466]. Fitouri Plaintiffs appear to plead their failure to intervene claim as one encompassing the violation of any constitutional rights. However, failure to intervene claims are limited to excessive use of force claims. Counsel has located no precedent applying a failure to intervene theory outside of an excessive use of force context in the Tenth Circuit.  Presumably, Fitouri Plaintiffs contend the use of force generally on protestors was excessive and therefore each of the individual officers had the duty to intervene to prevent its further application once one use of force occurred. This is not the proper analysis. A failure to intervene claim requires a law enforcement officer to witness a specific use of force on a specific person, conclude it is excessive, have the opportunity to prevent further excessive use of force, and then fail to take reasonable measures seeking to prevent a further excessive use of force from occurring. A failure to intervene theory simply is inapplicable here.

### VII. PLAINTIFFS' MUNICIPAL LIABILITY CLAIMS AGAINST DENVER FAIL

Municipal liability under § 1983 mandates a constitutional violation "attributable to the municipality itself" and requires a plaintiff to demonstrate (1) the existence of a municipal custom or policy and (2) a direct and causal link between the custom or policy and the violation alleged. *Jenkins v. Wood*, 81 F.3d 988, 993 (10th Cir. 1996). There are five principal ways a plaintiff may establish the existence of a municipal policy or custom: (1) a formal regulation or policy statement; (2) an informal custom amounting to a widespread practice; (3) a decision of an employee with final policymaking authority; (4) a ratification by final policymakers of the decisions of subordinates; and (5) the failure to adequately train or supervise employees, so long as that failure results from deliberate indifference to the injuries that may be caused. *Bryson v. City of Oklahoma City*, 627 F.3d 784, 788 (10th Cir. 2010).

A custom is a "persistent and widespread" practice which "constitutes the standard operating procedure of the local governmental entity." *Mitchell v. City & Cty. of Denver*, 112 Fed. Appx. 662, 672 (10th Cir. 2004). It may also be a series of decisions by a subordinate official of which the supervisor must have been aware. *City of St. Louis v. Praprotnik*, 485 U.S. 112, 130 (1988). Liability attaches in such a case because "the supervisor could realistically be deemed to have adopted a policy that happened to have been formulated or initiated by a lower-ranking official." *Id*.

In addition, Plaintiffs must establish the requisite degree of culpability on Denver's part – namely, the alleged municipal practices were carried out with "deliberate indifference" to their known or obvious consequences. *City of Canton v. Harris*, 489 U.S. 378, 388 (1989); *Bd. of Cty. Com'rs of Bryan Cty., Okla. v. Brown*, 520 U.S. 397, 400 (1997); *Schneider*, 717 F.3d at 771.

Plaintiffs must also demonstrate a direct causal link between the municipal policy and the constitutional injury. This requirement is satisfied if the plaintiff shows "the municipality was the 'moving force' behind the injury alleged." *Bryan Cty.*, 520 U.S. at 404. As the Supreme Court has made increasingly clear, proof of a policy claim requires a tight causal connection between the alleged policy and the constitutional injury. *Monell,* 436 U.S. at 693-94; *Canton,* 489 U.S. at 391; *Bryan Cty.,* 520 U.S. at 412. "The causation element is applied with especial rigor when the municipal policy or practice is itself not unconstitutional, for example, when the municipal liability claim is based upon inadequate training, supervision, and deficiencies in hiring." *Schneider*, 717 F.3d at 770; *Barney,* 143 F.3d at 1307. "In limited circumstances," a municipality may be liable under §1983 for a failure to train. *Canton*, 489 U.S. 378. "A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick v. Thompson*, 131 S.Ct. 1350, 1359 (2011). Before liability can attach, the municipality must be on notice of the deficiency and have a high degree of culpability; its practices must be obviously deficient and so likely to result in a constitutional injury the municipality's policymakers could be reasonably deemed to be deliberately indifferent. *Barney,* 143 F.3d at 1307-08.

Denver faced an unprecedented circumstance with the George Floyd Protests. Never before had DPD faced a combination of protests along with individuals engaged in significant property destruction and violence towards responding police officers. Never before had DPD encountered violence specifically directed at police based on police misconduct in another jurisdiction over an unscheduled protest lasting multiple days. Both public and private property sustained millions of dollars of damage. Many police officers were injured. Given the unprecedented nature of the activities occurring Downtown during the protests, DPD faced significant logistical, operational,

and tactical challenges. No similar or analogous event of this magnitude had ever occurred in Denver. No prior event was of the same size, scale, or duration or involved the amount of property destruction and violence as occurred during these 2020 protests.

Plaintiffs' municipal liability claims fail because Plaintiffs cannot establish Denver acted with deliberate indifference and any act by Denver was the moving force underlying a constitutional violation.[3] The unprecedented nature of the activities and the need for an unprecedent response means Denver simply could not have been deliberately indifferent to a known likely situation in creating its response to the protests. Plaintiffs will undoubtedly argue DPD should have modified its response as the protests progressed and that the protests cannot be considered a singular event. However, the nature of what occurred, the length and duration of the needed response, and how DPD officers and command staff were required to work lengthy shifts over multiple days in a row made the event one where DPD reacted to an ongoing fluid and chaotic situation and did not have the ability to reshape in wholesale fashion its policies, procedures, operations, strategies, and tactics.

Plaintiffs also cannot establish causation. Insufficient evidence exists before this Court of any action or omission legally attributable to Denver being the moving force behind any specific constitutional violation suffered by any of the Plaintiffs. To date, Plaintiffs' municipal liability theories are general and diffuse. They have yet to marshal any evidence establishing causation in the necessary moving force terms required to establish viable claims. This Court must require Plaintiffs to come forward with specific evidence establishing causation for each of their municipal

---

[3] Plaintiffs also have to establish the underlying constitutional violation was caused by someone with the DPD and not another jurisdiction.

liability theories with a specific causal evidentiary connection to underlying constitutional violations.

Denver anticipates Plaintiffs will rely on the failure of DPD to require its officers to complete contemporaneous use of force reports concerning each and every deployment of less lethal munitions to support their municipal liability claims. However, whether or not a police officer completed a subsequent use of force report does not and cannot cause the incident. *Durkee v. Minor,* 841 F.3d 872, 877 (10th Cir. 2016); *Henderson v. City & Cnty. of Denver,* 12-cv-0625-WJM-BNB, 2014 U.S. Dist. LEXIS 7140 at *28 (D. Colo. Jan. 21, 2014). Perhaps a previous failure to require use of force reports under such circumstances could lead to a plausible theory. However, no such evidence of any pervasive custom, policy or practice exists prior to May 2020.

Plaintiffs will likely argue the failure to discipline officers for their uses of force during the protests supports municipal liability. The Tenth Circuit has rejected this argument. "As for any failure to discipline Officer Aragon, basic principles of linear time prevent us from seeing how conduct that occurs *after* the alleged violation could have somehow caused that violation." *Cordova v. Aragon,* 569 F.3d 1183, 1194 (10th Cir. 2009). Again, perhaps a pervasive or systematic failure to discipline for use of force arising from the protests, which Denver specifically denies exists, could form the factual predicate for claiming a *future* unconstitutional use of force was caused by Denver's failure.

Further, Plaintiffs will argue the failure of DPD officers to activate their body worn cameras consistently during the initial phase of the protests supports municipal liability. Yet, any failure by Denver to ensure its officers consistently activated their body worn cameras during the protests did not create any excessive use of force. Moreover, not only do Plaintiffs not have a

separate claim for failure by DPD to use body worn cameras, but no provision of constitutional law requires officers to use body worn cameras other than potentially in circumstances involving bad faith.   *Durr v. Slator,* 20-cv-00662 (MAD/TWD), 2021 U.S. Dist. LEXIS 166716 at *58-59 (N.D.N.Y. Sept. 2, 2021); *Beitch v. Magnus,* CV-18-0067-TUC-BGM, 2020 U.S. Dist. LEXIS 96565 at *24 (D. Ariz. June 1, 2020); *Baldwin v. Colley,* 15-cv-02762-KAW, 2015 U.S. Dist. LEXIS 134946 at *13 (N.D. Cal. Oct. 2, 2015); *Santos v. Welty,* 20-cv-205-BQ, 2021 U.S. Dist. LEXIS 87276 at *13-14 (N.D. Tex. Mar. 25, 2021)

## VIII. THE INDIVIDUAL DENVER DEFENDANTS ARE ENTITLED TO QUALIFIED IMMUNITY

When an individual defendant raises qualified immunity, a presumption of immunity is created and the Plaintiffs must meet a strict two-part test showing: (1) the official's actions ran afoul of a federal constitutional right, and (2) the federal constitutional right was clearly established at the time of the allegedly unlawful actions. *Estate of Taylor v. Salt Lake City,* 16 F.4th 744, 757-58 (10th Cir. 2021). Defendants argue the first prong of qualified immunity in all the above arguments addressing whether Plaintiffs have established a violation of their constitutional rights.

On the second prong, the "clearly established issue" asks whether it would have been clear to the officials their conduct was unlawful in the situation confronting them. *Saucier v. Katz,* 533 U.S. 194, 202 (2001). More particularly, the federal constitutional right asserted is "clearly established" only when a Supreme Court or Tenth Circuit decision "is on point, or if the clearly established weight of authority from other courts shows the right must be as the plaintiff maintains." *Thomas v. Kaven,* 765 F.3d 1183, 1194 (10th Cir. 2014). "While the facts of the cases compared need not be identical, they must be sufficiently analogous to satisfy the particularized context necessary to support liability." *Id.* The essence of the inquiry is "every reasonable official"

must have received "fair warning" from the state of the law at the time as to the alleged conduct's unconstitutionality. *Tolan v. Cotton,* 572 U.S. 650, 655-56 (2014); *Kerns v. Bader,* 663 F.3d 1173, 1180 (10th Cir. 2011) (quoting *Ashcroft v. al-Kidd,* 563 U.S. 731, 743 (2011)).

Even so, as the Supreme Court repeatedly reminds lower courts, "the law is not defined at a high level of generality," because "doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced." *Plumhoff v. Rickard,* 572 U.S. 765, 779 (2014); *White v. Pauly,* 137 S.Ct. 548, 551 (2017). "Such specificity is 'especially important in the Fourth Amendment,' context where it is 'sometimes difficult for an officer to determine how the relevant doctrine, here excessive force, will apply to the factual situation the officer confronts.'" *City of Tahlequah v. Bond,* 2021 U.S. LEXIS 5310 at *4 (Oct. 4, 2021) (quoting *Mullenix v. Luna,* 577 U.S. 7, 12 (2015)). "We have stressed the 'specificity' rule is 'especially important in the Fourth Amendment context.'" *District of Columbia v. Wesby,* 138 S.Ct. 577, 590 (2018). "[E]xisting precedent" must place the constitutional question the official faced "beyond debate." *Kisela v. Hughes,* 138 S.Ct. 1148, 1153 (2018).

Application of the second prong of the qualified immunity inquiry here demonstrates, the individual Denver Defendants are entitled to qualified immunity unless Plaintiffs provide this Court with prior Supreme Court, Tenth Circuit or the overwhelming weight of authority from other federal courts: (1) precedent supporting each of the Plaintiffs' claimed constitutional violations under the First, Fourth, and Fourteenth Amendments (both equal protection and substantive due process); and (2) precedent demonstrating the specific conduct of each individual Defendant respecting each individual Plaintiff (as that varies for each event being claimed a constitutional violation) was previously determined to violate someone's constitutional rights.

Denver Defendants have not located any such specific and particularized precedent. General precedent concerning the importance of protests under the First Amendment, how law enforcement cannot chill protest activity, and how using force on protestors is inappropriate is insufficient. The above precedent, and particularly ***Bond*** and ***Wesby***, requires this Court to focus on the factual context in which any precedent provided arises. Absent sufficient factual congruity between precedent and these facts, the individual Denver Defendants are entitled to qualified immunity.

<u>**CONCLUSION**</u>

In conclusion, for the foregoing reasons, Denver Defendants respectfully request this Court grant them summary judgment on all of Plaintiffs' claims, dismiss them in their entirety with prejudice, and for all other and further relief as this Court deems just and appropriate.

DATED this 1st day of February, 2022.

Respectfully submitted,

*s/ Andrew D. Ringel*                            .

| | |
|---|---|
| Andrew D. Ringel, Esq. | Hollie R. Birkholz, Assistant City Attorney |
| Katherine N. Hoffman, Esq. | Lindsay M. Jordan, Assistant City Attorney |
| Hall & Evans, L.L.C. | Denver City Attorney's Office |
| 1001 17th Street, Suite 300 | Civil Litigation Section |
| Denver, CO 80202 | 201 West Colfax Ave., Dept. 1108 |
| Telephone: (303) 628-3453 | Denver, Colorado 80202 |
| Facsimile: (303) 628-3368 | Telephone:  (720) 913-3100 |
| E-mail: ringela@hallevans.com | Facsimile:  (720) 913-3155 |
| hoffmank@hallevans.com | Email: hollie.birkholz@denvergov.org |
| | lindsay.jordan@denvergov.org |

*Counsel for the City and County of Denver and the individually named Denver Police Department Officers*

## CERTIFICATE OF SERVICE (CM/ECF)

I hereby certify that on this 1st day of February, 2022, the foregoing was filed with the Clerk of the Court using the CM/ECF system, which will serve the following all counsel of record in this matter.

In addition, the foregoing was placed in the United States Mail, first-class postage prepaid and addressed to the following non-CM/ECF participant:

Cidney Fisk
5100 Leetsdale Dr., Apt. 438
Denver, Colorado 80246

and

Cidney Fisk
14362 E. Road
Delta, Colorado 81416

_s/Nicole Marion_, Legal Assistant to
Andrew D. Ringel, Esq.
Katherine N. Hoffman, Esq.
of Hall & Evans, L.L.C.
1001 17th Street, Suite 300
Denver, CO 80202
Phone: 303-628-3300
Fax: 303-628-3368
ringela@hallevans.com
hoffmank@hallevans.com

**ATTORNEYS FOR DENVER DEFENDANTS**