## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

| |
|---|
| Elisabeth Epps, *et al.*, |
| v. |
| City and County of Denver, *et al*. |

Civ. No. 1:20-cv-1878-RBJ (consol.)

## OPPOSITION TO DENVER DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

The facts of this case preclude summary judgment. The evidence strongly supports Plaintiffs' excessive-force claims under the 4th and 14th Amendments and their retaliation claims under the 1st Amendment. The evidence demonstrates that officers used excessive and retaliatory force, motivated at least in part by Plaintiffs' protected 1st Amendment activity. Defendants' conduct (targeting isolated and peaceful protestors, shooting protestors filming events, shooting at protest signs, and indiscriminately firing on innocent protestors) and Defendants' words (directing officers to selectively enforce the curfew) constitute overwhelming evidence that free speech and peaceful assembly were under assault. Officers conducted drive-by PepperBall shootings of peaceful protestors, fired at protestors' heads, and used so much chemical munition that the DPD ran out of supplies *on the first day of the protests*.

Denver does not even dispute that Plaintiffs can prove their 4th Amendment excessive-force claims. Instead, the city seeks to escape liability under *Monell*. But Denver's defense distorts the law and ignores the facts. Plaintiffs' experts extensively document the evidence and explain precisely how Denver's policies, customs, and failure to train its officers led directly to Plaintiffs' constitutional injuries. Denver's argument that nothing could have been done to prepare its officers for a purportedly "unprecedented" protest is fodder for opening statement, not summary judgment.

Denver also ignores evidence showing that its policy was to selectively enforce the curfew only against protestors and was approved by Chief Pazen. Division Chief Thomas communicated the policy in messages to district commanders. Thomas denies that his messages mean what they say, but his credibility is a question for the jury. An enforcement policy that targeted only protestors was content-based, discriminated against curfew violators for exercising a fundamental right, and was not narrowly tailored to serve a compelling governmental interest.

Lastly, Denver's claim of qualified immunity for Officers Valentine and Christian ignores binding Circuit precedent involving materially identical circumstances: the shooting of a peaceful protestor "with a pepper ball or some other type of projectile" when there was "no suggestion that he posed an immediate threat to the safety of officers or others." *Fogarty v. Gallegos*, 523 F.3d 1147, 1159–62 (10th Cir. 2008). The law has been clearly established for over a decade.

## <u>RESPONSE TO DEFENDANTS' STATEMENT OF FACTS ("RSF")</u>

Plaintiffs, without conceding materiality, do not dispute the facts stated in ¶¶ 1–2, 6–8, 15–20, 26–27, 29, 34–38 for purposes of this Motion and otherwise respond as follows:

3.      Disputed. Unsupported by citation. Protestors did not attempt to "overtake" I-25. Ex. 1 (Sannier Dep.) at 34–44; Ex. 2 (Fitouri Dep.) at 41–42; Ex. 3 (Parkins Dep.) at 56–59.

4.      Disputed. Unsupported by citations.

5.      Disputed. Police used indiscriminate force on peaceful protestors, irrespective of whether items were thrown or individuals engaged in any violence or destruction. Ex. 3 at 90–91; Dkts. 91-3–91-9, 91-100–91-108, 91-110, 91-115; PSF ¶¶ 1–11.

9.      Disputed. The operations plans used throughout the protests were vague and nearly identical. Dkts. 255-7–255-12; Ex. 4 (Wyckoff OIM Memo) at 011777.

2

10.     Disputed. These weapons caused serious bodily injury to Plaintiffs. PSF ¶¶ 3–4, 10.

11.     Disputed. DPD had inadequate training on 40mm launchers and repeatedly used them against peaceful protestors, which was consistent with Denver's policy of providing unlimited discretion to officers. Ex. 5 (Fitouri228) at 21:24–22:43; Ex. 6 (Stamper Report) ¶¶ 67, 81–89; Ex. 7 (Stamper Rebuttal Report) ¶¶ 6–7, 8a–b, 8g; Ex. 8 (O'Donnell 10/15/21 Dep.) at 16–30, 40, 49–50, 55–56; Ex. 9 (Pazen Dep.) at 92–94, 129–33, 146–53.

12.     Disputed. DPD had inadequate training on PepperBalls, repeatedly used them against peaceful protestors, and afforded officers nearly unfettered discretion to use PepperBalls and less-lethal weapons under DPD policies, as promulgated by Commander Phelan. Ex. 10 (Coppedge OIM Memo) at 011716; Ex. 6 ¶¶ 71–74; Ex. 7 ¶¶ 8b, 8f, 9e, 9h, 10c; Ex. 11 (Grothe Dep.) at 38; Ex. 8 at 43; Ex. 12 (Eberharter Dep.) at 107–09; Ex. 13 (Knutson OIM Memo) at 011728; Dkts. 91-8, 91-100–91-101, 91-105–91-106, 91-110.

13.     Disputed. Chemical agents were routinely used against peaceful protestors, including Plaintiffs, without warning or apparent justification, notwithstanding any contrary policy, and DPD provided inadequate training on the use of CS gas and OC (pepper) spray, including the need for warning or a dispersal order before deploying CS gas. Ex. 6 ¶¶ 19–70, 90–99; Ex. 14 (Martinez Dep.) at 86–87; Ex. 7 ¶¶ 8d, 9i, 10d, 12d; Ex. 15 (Knutson Dep.) at 48–51, 53; Ex. 11 at 59–62, 67–68; Dkts. 91-3–91-6; Ex. 5 at 23:06–29:00.

14.     Disputed. Phelan directed officers to gas protestors and his authorization was generally required. Phelan made final decisions in managing the protest. Ex. 9 at 16–18, 22; Ex. 16 (Phelan Dep.) at 26–29, 32–39, 67, 91, 153–65; Ex. 6 ¶¶ 9, 11; Ex. 17 (Porter Dep.) at 30–35; Ex. 18 (Pine Dep.) at 85; Ex. 14 at 92–93; Ex. 19 (Abeyta Dep.) at 45–46; Ex. 20 (Williams Dep.) at 61.

21.     Undisputed that arrests were made on all days of the protest; otherwise disputed. The curfew's purpose was to enforce it against protestors regardless of whether they were involved in criminal acts. Denver used the curfew to "clear . . . the area." Ex. 21 (Thomas Dep.) at 22, 35–36, 38–39, 91; Ex. 20 at 128–30, 134–36; Ex. 17 at 91–97; Ex. 75 (Stadler OIM Memo) at 011769.

22.     Undisputed that DPD senior leaders discussed strategies for using the curfew; otherwise disputed. The curfew was not enforced only against individuals engaged in violence and destruction. Chief Pazen, Deputy Chief Archer, and the Division Chiefs discussed curfew enforcement, and after that meeting, Thomas "communicated to the district commanders exactly what we had discussed," Ex. 21 at 27—to enforce curfew only against people engaged in protest activity. Ex. 22 (text messages) at 13035, 13053; Ex. 21 at 24–31, 39–47; Ex. 23 (DPD emails).

23.     Disputed. Unsupported by citations.

24.     Disputed. The Curfew Arrest Class includes only curfew arrestees not charged with other violations. Dkt. 127; Ex. 24 (Swift Decl.); Ex. 25 (Taylor Arrest Docs.); Ex. 27 (Sannier Arrest Docs); Ex. 26 (Taylor Dep.) at 63; Ex. 1 at 154.

25.     Disputed. Those arrestees are not class members. *See* Dkt. 158-1.

28.     Undisputed that Thomas passed along the message. *See* RSF ¶¶ 21–22.

30.     Disputed. Chief Pazen approved the message. RSF ¶ 22.

31.     Disputed. Unsupported by citations. *See* RSF ¶ 21; Ex. 17 at 95–97.

32.     Admitted DC Thomas offered this explanation; otherwise disputed as to intent, scope of DPD leadership discussions, and understanding of the communications. *See* RSF ¶¶ 21–22, 30.

33.     Disputed. DPD selectively enforced the curfew against protestors. *See* RSF ¶¶ 21–22, 24; Ex. 1 at 128–30, 132–37, 141–45, 171–72; Ex. 26 at 59–63; Ex. 2 at 147–48; Dkt. 91-3–91-5; Ex.

28 (COABLM395) at 23:44:28–34 (arresting protestors with BLM sign); Ex. 29 (DEN8056) at

4:24:04–08 (arresting protestors but not woman thanking officers).

## PLAINTIFFS' STATEMENT OF MATERIAL FACTS ("PSF")

### Plaintiffs Were Shot and Gassed While Peacefully Exercising Their Rights

1.      Police repeatedly used force on protestors without any apparent provocation and without

giving protestors any direction or warning, including launching tear gas canisters into crowds and

shooting PepperBalls indiscriminately. Ex. 1 at 85–89; Dkt. 91-114; Ex. 30 (COABLM294) at

19:07:00–43, 19:09:05–28. On May 28, 2020, only DPD officers policed the protests. Ex. 16 at

41. Only Denver officers had PepperBall guns. Only Metro/SWAT had flashbangs. Ex. 31 (Shaker

Dep.) at 18–20, 125–26; Ex. 32 (Redfearn Dep.) at 38–40, 93–94; Ex. 12 at 115–16.

2.      When Claire Sannier peacefully protested, officers gassed her repeatedly, shot her with

PepperBalls, threw flashbang grenades at her (one of which exploded by her head), and kettled

her, all without warning. Dkt. 91-3; Ex. 1 at 82–95, 97–100, 103–04, 112–18, 128, 170–72.

3.      Sara Fitouri and Jackie Parkins protested peacefully several days during the protests.

Without warning, Denver officers gassed them repeatedly, threw flashbang grenades at them,

kettled them, and shot Fitouri with PepperBalls. Dkts. 91-4–91-5; Ex. 2 at 41–46, 60–68, 73–75,

82–91, 99–101, 114–21, 125–28, 143–46; Ex. 3 at 69–79, 88–90, 96–101, 109–15, 121–24, 129–

33, 136–42, 158–62, 165–67.

4.      In response to Joe Deras' peaceful protesting, Denver officers gassed him repeatedly, threw

flashbang grenades at him (one of which injured his ear), and shot him with PepperBalls. He was

also shot in the head, hand, and back with projectiles and severely injured. Dkt. 91-9; Ex. 33 (Deras

Dep.) at 82–104, 119–23, 145–49, 152–58, 174–75, 181–82, 185–87.

5.      For Kelsey Taylor's peaceful protesting, Denver officers repeatedly gassed her, shot at her with PepperBalls, and arrested her for curfew. Dkt. 91-7; Ex. 26 at 36–45, 50–66, 69–70, 73–76.

6.      Amanda Blasingame and Maya Rothlein verbally protested the police from their property. Ex. 34 (Rothlein Dep.) at 50. An officer walked up to their property, threatened them with chemical munitions, and told them to "[g]et the fuck inside." *Id.* at 51. Just over an hour later, officers drove by their home and fired PepperBalls at them while they were sitting on their porch. Ex. 35 (Blasingame Dep.) at 131–32; Ex. 34 at 53–55; Ex. 36 (photos); Ex. 37 (IA investigation file). Officers also gassed them repeatedly without any warning or justification. Ex. 35 at 57, 72–75, 79, 82–84, 87–92, 102, 105–07, 109–14, 141, 145–47; Ex. 34 at 28–30, 39–40, 44, 65.

7.      Elisabeth Epps was livestreaming the aggressive police response against protestors when, without any warning or justification, Defendant Christian shot her with a PepperBall while she was crossing the street. Ex. 38 (Epps Dep.) at 128; Ex. 39 (Epps video) at 2:50–3:10. Later that night, officers shot Epps in the back and legs and shot Epps' iPhone out of her hand while she was documenting the protests; officers teargassed her and other peaceful protestors without warning; and officers detonated a flashbang grenade mere feet from her. Ex. 38 at 42–45, 139–40; Ex. 39 at 14:20–14:32; Ex. 40 (CSP video); Ex. 41 (DEN4164). Epps' legs were covered with severe bruises. Ex. 42 (Epps photos). On a separate occasion, Defendant Valentine shot Epps in the face with a PepperBall while she was peacefully protesting and documenting the protest, also causing severe bruising. Ex. 38 at 100; Ex. 42. Officers gassed Epps on numerous other occasions without warning or justification. Ex. 38 at 23, 27–28, 34, 36, 48–54, 90–96.

8.      Hollis Lyman was shot with pepperballs and teargassed numerous times while peacefully protesting, including as part of a group kneeling and chanting, "Hands up, don't shoot." Ex. 43

(Lyman Dep.) at 68–69; *see also id.* at 42–45, 54–58, 80, 88–89, 93–94, 106, 118. Another day, Lyman peacefully protested by holding a sign listing innocent people of color who had been killed by police. *Id.* at 65. Without warning, an officer standing about 20 feet from her shot her with a PepperBall through the sign, bruising her forearm. *Id.* at 69–70, 76–77; Ex. 44 (Lyman photo).

9.      On numerous occasions, police either fired pepperballs or deployed flashbang grenades and tear gas at Ashlee Wedgeworth while she was peacefully protesting. Ex. 45 (Wedgeworth Dep.) at 52–54, 61–64, 82–86, 100–03; Ex. 5 at 5:05–5:35.

10.     Without warning, an officer shot Zachary Packard in the head shortly after he had moved to "the very front of the protest" and kicked a gas canister away from other protestors. Ex. 6 ¶ 89; Ex. 46 (Packard Dep.) at 29–30, 58; Ex. 47 (photos). The shot to Packard's head fractured his skull, broke two discs in his neck, and caused brain bleeding, disrupting his employment. Ex. 46 at 35, 41, 44, 46, 60–66, 78–80; Ex. 47.

11.     Among other troubling incidents, Stanford Smith had his hands in the air when an officer pepper-sprayed him in the face without warning. Ex. 48 (Smith Dep.) 106–07; Ex. 49 (CSP video) at 7:33:25–7:33:45; *see also* Ex. 48 at 77, 90–98, 114, 116, 120–22, 128, 130–31.

**Denver's Official Policy, Widespread Practice or Custom, and Failure to Train**

12.     Officers were provided inadequate field force training and were not trained on how to handle protests where some individuals are throwing objects, which caused protestor (and officer) injuries. Ex. 50 (Sich OIM Memo) at 011772–74; Ex. 13 at 011726–29; Ex. 10 at 011714–17; Ex. 51 (Maguire Report) ¶¶ 11–45; Ex. 52 (Maguire Rebuttal Report) ¶¶ 3–24; Ex. 75 at 011770. Under Chief Pazen, "the prevailing attitude is that training is not important." Ex. 10 at 011715. Denver provides no training on the contents of the DPD Crowd Management Manual. Ex. 15 at

51–53. These training failures caused the uses of force on Plaintiffs. Ex. 7 ¶ 10e.

13.     Denver engaged in widespread inappropriate use of flashbang grenades and provided no training or policies on the use of those or other explosive devices, which caused the violation of Plaintiffs' rights. Ex. 7 ¶¶ 9c, 9d, 10a, 12b, 13m; Ex. 6 ¶¶ 100–07; Ex. 11 at 17–21, 47; Ex. 53 (Levens Dep.) at 61–64; Ex. 14 at 21, 24; Ex. 12 at 116–17, 141–42.

14.     Although CS gas was normally authorized by the Incident Commander (IC), officers are trained that they have discretion to use CS without IC approval. Ex. 11 at 36; Ex. 54 (O'Donnell OIM Memo) at 011740. The use of CS gas was authorized by Denver policy. Ex. 7 ¶ 9f.

15.     Denver policies expressly permit encircling or kettling protestors to attempt arrest, a dangerous practice that is contrary to generally accepted police practices and violated Plaintiffs' rights. Ex. 6 ¶¶ 77–80; Ex. 16 at 76; Ex. 55 (DEN3873) at 9:36–9:45 p.m.; Ex. 53 at 95–99.

16.     In 2011, after DPD had injured several people through use of PepperBalls and other less-lethal weapons to clear a protest, OIM recommended a comprehensive tactics review "to determine whether different methods could prevent similar confrontations in the future." Ex. 56 (OIM 2012 Report) at 15. Denver declined OIM's recommendations, which the OIM called a "missed opportunity" at "improving outcomes at future demonstrations." *Id.* at 15–16.

17.     Despite recognizing that use-of-force reporting is essential for officer accountability and transparency, longstanding DPD policy was that officers need not complete reports for protests. Ex. 6 ¶¶ 108–11; Ex. 16 at 102; Ex. 17 at 43–47, 51, 60–62; Ex. 9 at 62–64; Ex. 7 ¶ 11f; Ex. 15 at 62, 65–67; Ex. 53 at 60; Ex. 20 at 15, 18–20. This had a serious adverse effect on protecting constitutional rights, because *during the protest*, officers believed that they need not document their uses of force. Ex. 6 ¶ 113; Ex. 7 ¶ 12c; Ex. 20 at 15; Ex. 12 at 48–53, 82–83.

18.     Aside from training officers how to operate their cameras, Denver provided no training or policy to officers on the proper use of BWC or when they are required to activate it during a protest. Ex. 7 ¶¶ 11a, b, 12a; Ex. 6 ¶¶ 122–31; Ex. 15 at 22–28, 69–70. Denver's policy and training is that Metro/SWAT officers are not required to wear BWC when using their weapons, or even when arresting people, which is contrary to generally accepted police practices. Ex. 15 at 71, 77; Ex. 7 ¶¶ 11c, 12b; Ex. 12 at 55–62, 74–82; Ex. 14 at 43, 49, 53–54. Only one video from a Metro/SWAT officer was produced in this litigation, even though Metro/SWAT used less-lethal weapons during the protest. Ex. 57 (Resp. to RFA 16) at 22. Other units of DPD also believed BWC was unnecessary in a protest, even when using less-lethal weapons. Ex. 20 at 90–91.

19.     This is Denver's policy even though, in 2014 and 2017, the OIM criticized DPD for not requiring that Metro/SWAT use BWC. Ex. 58 (OIM 2014 Report at 25, 34–35; OIM 2015 Policy Highlight; OIM 2017 Report at 36, 45). Denver knew BWC is essential to accountability and preventing violations in the first instance. Ex. 9 at 39–41; Ex. 6 ¶¶ 128–31; Ex. 12 at 59–61.

20.     Failing to require officers to account for their uses of force on protestors meant that "officers could (and apparently did) use inappropriate force on protestors with impunity." Ex. 6 ¶ 114. DPD requires such reports for patrol functions. *Id.* ¶¶ 113–14; *see* Ex. 12 at 49–51.

21.     DPD did not require officers to complete use-of-force statements until the day after the *Abay* TRO. DPD leadership sought to ensure that the after-the-fact reports avoided inconsistencies and problematic language and wanted the reports prepared to protect officers from lawsuits. Ex. 59 (DPD emails) at 11380, 11383; Ex. 17 at 49, 52–56; Ex. 16 at 103–04, 106. DPD wanted to protect itself and cover up any problematic uses of force rather than protect the constitutional rights of Denver's citizens. Ex. 6 ¶¶ 119, 121; Ex. 52 ¶¶ 25–42; Ex. 51 ¶¶ 46–51.

22.     Because officers did not write their statements until several weeks afterward, it was difficult for officers to recall what force they used, where, and on whom. Ex. 17 at 62–64; Ex. 20 at 29; Ex. 6 ¶ 120; Ex. 12 at 43–44, 48, 51–52; Ex. 61 (Beall Dep.) at 95–101, 105–15, 122–23; *compare* Ex. 62 (DEN5085) *with* Ex. 55 at 9:36–9:45 p.m. Their reports were vague and generically stated that their uses of force were consistent with DPD policy and training. Ex. 6 ¶¶ 112, 120; Ex. 60 (Officer Statements).

23.     Denver's use-of-force reporting and BWC policies led directly to officers acting with impunity to violate Plaintiffs' civil rights, as well as the inability to identify officers who used force, failure to discipline, and ratification of the officers' conduct. Ex. 53 at 54–55; Ex. 7 ¶ 13k; Ex. 6 ¶¶ 132–33; *see* Ex. 9 at 67–68.

24.     Denver was responsible for the excessive use of force by mutual-aid agencies, including use of less-lethal shotguns approved by Pazen or Phelan. Ex. 8 at 60–61; Ex. 16 at 42, 93–95. Denver provided rules of engagement to mutual-aid agencies and its policy was to allow them to use their own policies. Ex. 63 (DEN6501). A DPD supervisor was embedded with every mutual-aid unit during the protest. Ex. 9 at 27–31; Ex. 64 (9News video, 6/1/2020) at 3:00. Denver also failed to conduct joint training with outside agencies. Ex. 6 ¶¶ 138–42; Ex. 10 at 011716.

25.     Because Denver knew that crowd control and use of force during a protest are recurring situations that its officers would have to face, it was foreseeable that, without adequate policies and training, officers are likely to violate citizens' constitutional rights. Ex. 6 ¶ 147; Ex. 52 ¶ 43; Ex. 51 ¶¶ 52–53; Ex. 9 at 121–25.

26.     Commander Phelan authorized use of CS gas on May 28, 2020, at 14th and Sherman, Colfax and Washington, and Colfax and Lincoln. Denver did not give dispersal orders or warnings

at any location before less-lethal weapons were used, except for 14th and Sherman on May 28, and even then, officers knew that the announcement could not be heard. RSF ¶ 13; Ex. 6 ¶¶ 21–22, 36; Ex. 65 (Resp. to 4th Interrogs.) at 3–4; Ex. 66 (DEN4021) at 7:29–9:45; Ex. 61 at 51–60.

27.     The use of CS gas and other less-lethal weapons, including PepperBalls, at the intersection of Lincoln and Colfax on May 30, 2020, was authorized by Phelan. That use, and the actions of the DPD gang unit and Metro/SWAT unit members during this incident, were consistent with DPD training and policy. Ex. 67 (IAB Letters); Ex. 14 at 92–93, 102–10; Ex. 20 at 59, 64–70; Ex. 8 at 38; Ex. 68 (Carroll Dep.) at 26–27; Ex. 18 at 13–15.

28.     On May 31, 2020, Phelan authorized teams of officers to kettle a group of mostly peaceful protestors (including Plaintiffs) into a confined space in front of a cathedral, where they were gassed and shot with less-lethal weapons between 9:36–9:42 p.m. Ex. 6 ¶¶ 75–80; Ex. 69 (DEN3874); Ex. 55; Ex. 5 at 25:00–28:24; Dkts. 91-3–91-6, 91-102–91-104; Ex. 32 at 34, 98–110; Ex. 16 at 75; Ex. 20 at 77–88. This "encircling" was expressly permitted by DPD policy. Ex. 6 ¶ 77; Ex. 70 (DPD Crowd Management Manual) at 9; *see also* Ex. 16 at 76; Ex. 20 at 84–85.

29.     Denver received complaints of officers suppressing First Amendment rights of protestors at the beginning of the protest. Ex. 71 (Thomas 10/13/21 Dep.) at 30–31. The response of the Mayor and Chief Pazen during a press conference on May 29, 2020, was that officers acted with "extreme restraint," performed in an "exemplary manner," and showed "tremendous restraint" and "tremendous discipline." *Id.* at 34–35; Ex. 72 (9News video, 5/29/2020) at 12:20, 37:15–37:52; *see* Ex. 16 at 23–25. The Mayor and Chief told them to continue doing what they were doing. This caused the violation of Plaintiffs' rights on subsequent days of the protests. Ex. 6 ¶¶ 143–45.

30.     If DPD has not disciplined an officer for their conduct, then their actions were deemed

within DPD policy. Numerous incidents of use of force, including ones at which Plaintiffs were present, were deemed consistent with DPD training and policy. Ex. 7 ¶¶ 5, 8c, 8e, 8g–h, 13o–s; Ex. 6 ¶ 87; Ex. 8 at 15, 41; Ex. 16 at 20–26; Ex. 17 at 82–83; Ex. 20 at 37–39. Denver refused to take a position on other uses of force on Plaintiffs. Ex. 53 at 81–109; Ex. 76 (incident dep. topics).

31.     There were 123 complaints alleging officer misconduct at the protests. Ex. 53 at 34. Of these, one probationary officer was fired, two were disciplined for inappropriate use of force, and one was disciplined for failure to activate BWC. *Id.* at 39–47. None of these involved Plaintiffs' incidents. No one has been disciplined for failure to appropriately document use of force. *Id.* at 63–64. Other instances of failure to activate BWC were not investigated or disciplined. Ex. 7 ¶¶ 13g–j; Ex. 6 ¶¶ 125–31; Ex. 53 at 50–59.

32.     The small number of officers disciplined for their actions at the protest is "extremely disturbing." Ex. 7 ¶ 14a. This failure to discipline amounts to an approval of the officers' conduct and allowed officers to escape accountability. *Id.* ¶¶ 14b–c, 14e; Ex. 6 ¶¶ 134–37.

33.     On June 6, 2020, Executive Director of the Department of Public Safety, Murphy Robinson, sent an email to the entire DPD about this Court's TRO in *Abay*. He thanked the officers for their service and approved of their conduct during the protest. Ex. 73 (email) at DEN7004–05; Ex. 16 at 174–81. Robinson is above Chief Pazen in the chain of command. Ex. 16 at 32–33.

## ARGUMENT

### I.     Factual Disputes Preclude Summary Judgment on the 1st Amendment Claims

Plaintiffs' First Amendment claim requires proof of three elements: (1) protected activity, (2) government conduct that chills the protected activity, and (3) motive. *Worrell v. Henry*, 219 F.3d 1197, 1206 (10th Cir. 2000). Defendants contest only the third element: whether Plaintiffs'

participation in protected activity was a substantial or motivating factor in Defendants' actions.[1]

Motivation is a highly factual inquiry that "may be met with either direct or circumstantial evidence" and "involves questions of fact that normally should be left for trial." *Index Newspapers LLC v. United States Marshals Serv.*, 977 F.3d 817, 827 (9th Cir. 2020). Motive "is not easily ascertained and requires inferences drawn from the [defendant's] behavior" such that "summary judgment may be precluded." *Seamons v. Snow*, 206 F.3d 1021, 1027–28 (10th Cir. 2000).

A factual dispute exists as to whether officers' actions were motivated, at least in part, by Plaintiffs' protected activity or, rather, exclusively "due to [the unprotected activity of] others in the crowds," MSJ 15. The requisite motive is supported by a wide swath of evidence, including that officers used force against individual Plaintiffs, often without warning, while they engaged in *peaceful* protest activity. *See* PSF ¶¶ 1–11. Defendants do not contend that Plaintiffs engaged in violent or destructive activity or had any purpose other than to peacefully protest. MSJ 14–16. The indiscriminate use of force on peaceful protestors supports a reasonable inference that Plaintiffs' protected activity was a substantial or motivating factor for Defendants' actions. *Black Lives Matter Seattle-King Cnty. v. City of Seattle*, 466 F. Supp. 3d 1206, 1214 (W.D. Wash. 2020).

The nature, timing, and targeting of force buttress this inference. An officer shot *through* Ms. Lyman's "Black Lives Matter" protest sign, and officers threw tear gas on her and other peaceful protestors shortly after they knelt and began chanting, "Hands up, Don't Shoot." PSF ¶ 8. Officers targeted Ms. Epps twice while she peacefully filmed the protests, shooting her iPhone out of her hands. *Id.* ¶ 7. Plaintiffs Sannier, Fitouri, Parkins, Deras, and Taylor testified that

---

[1] Defendants mischaracterize the third element, claiming that retaliation must have been "substantially motivated" by Plaintiffs' protected activity (omitting the disjunctive "or"). MSJ 14. *See Worrell*, 219 F.3d at 1206.

Defendants repeatedly shot, gassed, kettled, or threw explosives at them without warning while they engaged in peaceful protest activity such as chanting, marching, or kneeling. *Id.* ¶¶ 2–5. Officers pepper-sprayed Mr. Smith in the face while he had his hands in the air, *id.* ¶ 11, and threw flashbang grenades and tear gas towards Ms. Wedgeworth and other peaceful protestors, *id.* ¶ 9. A DPD officer told Plaintiffs Blasingame and Rothlein to "get the fuck inside" after they voiced their protest message; soon after, officers targeted their house with a barrage of PepperBalls. *Id.* ¶ 6. This and similar evidence raises a genuine fact dispute regarding officers' motives. *See, e.g.*, *Anti Police-Terror Project v. City of Oakland*, 477 F. Supp. 3d 1066, 1088 (N.D. Cal. 2020); *Don't Shoot Portland v. City of Portland*, 465 F. Supp. 3d 1150, 1155–56 (D. Or. 2020).

DPD officers' communications—at the highest levels—reinforce this dispute. Division Chief Thomas relayed a message from the Chief and Deputy Chief that the "curfew ordinance is to be used only for enforcing *protest-related* behavior" and not to allow officers to cite individuals for curfew violations "*[u]nless they are actively engaged in protest activity*." Ex. 22 at 013053 (emphases added). Denver may argue these instructions meant something different than what the actual words say, but that's a question for the jury, not for summary judgment.

## II.   Factual Disputes Preclude Summary Judgment on the 14th Amendment Claims

Denver does not dispute that Plaintiffs have viable 4th Amendment excessive-force claims. Instead, the city challenges Plaintiffs' right to assert alternative claims under the 14th Amendment. MSJ 16. This necessity is a product of Denver's own making. An excessive force claim is analyzed under the 4th Amendment if it involves a seizure and the 14th Amendment if it does not. *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 843 (1998); *Roska v. Peterson*, 328 F.3d 1230, 1243 (10th Cir. 2003). Plaintiffs may pursue alternative theories of excessive force under both constitutional

provisions. *Lewis*, 523 U.S. at 843; *Roska*, 328 at 1243. Unless Defendants concede Plaintiffs were seized, Plaintiffs are entitled to maintain their 14th Amendment claims as an alternative theory.

Defendants also assert in one sentence that Plaintiffs cannot prove a 14th Amendment claim. That undeveloped argument is waived, but incorrect in any event. Defendants unleashed lethal force against Plaintiffs engaged in peaceful protest activity, caused significant injury, and acted with improper motive and malice towards Plaintiffs based on their protest activity against police use of force. PSF ¶¶ 1–11. Defendants threw explosive devices at Plaintiffs, including flashbang grenades, gassed them, shot at them with PepperBalls and "less-lethal" shotguns, including in the face and head. *Id.* Plaintiffs suffered serious injuries, with one plaintiff feeling like they would "die right there," Ex. 48 at 107, and another plaintiff suffering a fractured skull, fractured discs, and brain bleeding from being shot with munitions. *See* PSF ¶¶ 1–11. As for malice, officers told two Plaintiffs—protesting from their home—to "get the fuck inside" after they vocalized a protest message, with officers returning later to conduct *a drive-by shooting* of PepperBalls as they sat outside. *Id.* ¶ 6. A jury can conclude this behavior shocks the conscience and constitutes a clear abuse of government authority. *See e.g.*, *Porro v. Barnes*, 624 F.3d 1322, 1326 (10th Cir. 2010); *Edrei v. Maguire*, 892 F.3d 525, 537–38 (2d Cir. 2018).

## III.    Factual Disputes Preclude Summary Judgment on the *Monell* Claims

Plaintiffs' § 1983 claims against Denver require proof of (1) a city policy or custom and (2) a causal link "between the policy or custom and the injury alleged." *Waller v. Denver*, 932 F.3d 1277, 1283–84 (10th Cir. 2019).[2] Conceding the first element, Defendants argue only that

---

[2] Denver adds a blanket third requirement, arguing that Plaintiffs must show all city policies or customs were carried out with "deliberate indifference." MSJ 19. That is incorrect. The deliberate-indifference requirement applies only to a *Monell* theory based on failure to train or inadequate hiring, which all of Denver's authorities involve. Other *Monell* theories lack that scienter requirement. *See Waller*, 932 F.3d at 1284; *Bryson v. City of Oklahoma City*, 627 F.3d 784,

Plaintiffs cannot establish causation. Genuine disputes preclude summary judgment.

### A.    Denver's Policies, Practices, and Customs

A policy or custom can be established in numerous ways, including by formal pronouncement, informal custom that amounts to a widespread practice, decisions of final policymakers, ratification by final policymakers of the decisions of subordinates, or a failure to adequately train employees with deliberate indifference to the attendant effects. MSJ 19; *Hinkle v. Beckham Cnty. Bd. of Cnty. Comm'rs*, 962 F.3d 1204, 1239–40 (10th Cir. 2020).

The multiple expert reports of Norman Stamper and Edward Maguire identify and provide extensive evidentiary support for the following non-exhaustive list of DPD policies or practices that underlie Plaintiffs' claims: failure to give audible dispersal orders before the use of force, Ex. 6 ¶¶ 19–56; indiscriminate and inappropriate use of chemical munitions such as tear gas, *id.* ¶¶ 57–70; indiscriminate and inappropriate use of PepperBalls, including as a crowd control/dispersal measure or on anyone disrupting traffic and without warning, and inadequate training thereon, *id.* ¶¶ 71–74; dangerous "kettling" tactics, *id.* ¶¶ 75–80; inappropriate use of 40mm launchers and other projectiles, including authorized use based on any "articulatable" need, and inadequate training thereon, *id.* ¶¶ 81–89; inappropriate use of pepper spray and inadequate training thereon, *id.* ¶¶ 90–99; inappropriate use of flashbangs and Stinger grenades and failure to train thereon, *id.* ¶¶ 100–07; failure to require officers to complete timely use-of-force reports, which negatively impacted officer accountability, *id.* ¶¶ 108–21; inadequate BWC activation during crowd-control situations and failure to train thereon, *id.* ¶¶ 122–31; failure to discipline officers for the excessive use of force, *id.* ¶¶ 134–37; and dictating the rules of engagement for mutual assistance agencies

---

788 (10th Cir. 2010); *Trujillo v. City & Cty. of Denver*, 2017 WL 1364691, at *4 (D. Colo. Apr. 14, 2017).

from outside jurisdictions while simultaneously allowing agencies to follow their own policies, *id.* ¶¶ 138–42. Numerous DPD officers, including Denver's Rule 30(b)(6) witness, testified that *all* police action taken during the protests was consistent with DPD policy, including one of "nearly unlimited discretion to use their less-lethal weapons as they see fit." Ex. 7 ¶ 8b; *id.* ¶ 7h (citing O'Donnell Dep. at 41). DPD's Internal Affairs Bureau broadly declined to condemn officers' use of force on protestors because their actions were "consistent with the Denver Police Department's training and use of force policy." *Id.* ¶ 13q. The evidence also establishes Denver's inadequate training on crowd management, crowd control, use of less-lethal weapons, and field force tactics.[3]

### B.    The Facts Show That Denver's Policies or Customs Caused Plaintiffs' Injuries

For causation, Plaintiffs must show that the challenged policy or custom is "closely related to the violation of the plaintiff's federally protected right" so as to be the moving force that caused the injury. *Hinkle*, 962 F.3d at 1241. Here, there is substantial evidence supporting causation.

As an initial matter, Denver steadfastly refuses to take a position about whether the uses of force on Plaintiffs in this case were consistent with or contrary to DPD policy. PSF ¶ 30. That unsettled factual question alone precludes summary judgment. If the use of force imposed upon Plaintiffs was pursuant to DPD policy (as many DPD command staff agreed), then *a fortiori* the same underlying policies directly caused Plaintiffs' injuries. That is, Denver does not deny that the officers who injured Plaintiffs were doing exactly what they were trained and told to do. And because Denver does not contest the viability of Plaintiffs' 4th Amendment excessive-force claims for purposes of summary judgment, both elements of *Monell* liability are established (viz. a

---

[3] A policy need not be unconstitutional to be actionable. *City of Canton v. Harris*, 489 U.S. 378, 387 (1989). A plaintiff need only show that the policy was the moving force behind the constitutional violation. *Chew v. Gates*, 27 F.3d 1432, 1444 (9th Cir. 1994); *Monistere v. City of Memphis*, 115 F. App'x 845, 850 (6th Cir. 2004) ("[A] municipality may be liable if an employee's application of an otherwise constitutional policy leads to an unconstitutional result.").

municipal policy that caused a violation of Plaintiffs' rights).

The jury can reach that same conclusion based on the evidence. *McDaniels v. Philadelphia*, 234 F. Supp. 3d 637, 654 (E.D. Pa. 2017) (causation is a jury question); *Lance v. Morris*, 985 F.3d 787, 803–04 (10th Cir. 2021). Each of Plaintiffs' injuries can be traced directly to a Denver policy, custom, or its failure to train. PSF ¶¶ 12–13. Each Plaintiff was shot or targeted repeatedly and indiscriminately with PepperBalls, 40mm rounds, tear gas, pepper spray, flashbangs, and/or Stinger grenades, was subjected to excessive force without warning and/or opportunity to disperse, and was targeted in retaliation for their exercise of protected 1st Amendment activity. *Id.* ¶¶ 1–11. And each excessive use of force was made more likely to occur—and less likely to be detected after the fact—by DPD's policies and practices that eschewed officer accountability, including foregoing individual use-of-force reports during protests and officers' failure to activate BWC. Indeed, Denver's purported inability to identify the officers responsible for shooting Plaintiffs *in this case* illustrates the direct effect (and effectiveness) of Denver's policy of impunity.[4]

With respect to Denver's failure to require use of force reports and BWC activation, Denver misunderstands the import of the evidence. The issue is not whether a particular officer's failure to complete a particular report after the fact *caused* the particular injury that went unreported. The point is that Denver has a policy or custom of *not requiring* such reports or activation of BWC— a policy or practice that officers understood *before and during the protests*. That policy or custom minimized the likelihood that officers would be held accountable for their use of force (excessive or otherwise), which in turn led to unlawful excessive force and Plaintiffs' injuries. Elsewhere,

---

[4] Denver asserts in an unsupported footnote that it can be held liable only for violations committed by DPD officers. That is incorrect. *Monell* requires (1) a policy or custom and (2) a resulting constitutional violation—no more. If a Denver policy or custom is the moving force behind a violation committed by visiting officers, nothing in § 1983 or elsewhere immunizes Denver from the consequences of its own policies. A material fact question exists on this issue.

Denver concedes the point, acknowledging that "a *previous* failure to require use of force reports under such circumstances could lead to a plausible [*Monell*] theory." MSJ 22. The City contends that "no such evidence of any pervasive custom, policy or practice exists prior to May 2020," *id.*, but Denver's Rule 30(b)(6) witness testified the opposite, as did numerous lieutenants. PSF ¶¶ 16–17. This is another disputed material fact that precludes summary judgment.[5]

### C.   Denver Was Deliberately Indifferent to the Effects of Its Failure to Train

Because a failure-to-train theory under *Monell* is based on municipal *inaction* (unlike affirmative decisions to adopt or ratify specific policies or practices), the Supreme Court requires plaintiffs also to show that a failure to train "amounts to deliberate indifference to the rights of persons with whom the police come into contact." *Harris*, 489 U.S. at 388. Deliberate indifference requires "proof that a municipal actor disregarded a known or obvious consequence of his action." *Connick v. Thompson*, 563 U.S. 51, 61 (2011). It can be established by proving (1) that "the municipality has actual or constructive notice that its action or failure to act is substantially certain to result in a constitutional violation, and it consciously or deliberately chooses to disregard the risk of harm," *Barney v. Pulsipher*, 143 F.3d 1299, 1307 (10th Cir. 1998), or (2) "a violation of federal rights is a highly predictable or plainly obvious consequence of a municipality's action or inaction," *Waller*, 932 F.3d at 1284.

Denver's only defense is that the 2020 protests purportedly were "unprecedented." MSJ

---

[5] The same applies to DPD's failure to discipline offending officers. MSJ 22. When officers confronted protestors, they did so knowing that *existing* DPD policy or custom was not to punish officers for constitutional violations. The City's failure to discipline officers also constitutes ratification of their conduct, which is another way to establish policy. *See Valdez v. Macdonald*, 2019 WL 1651857, at *4–5 (D. Colo. Apr. 17, 2019) (denying Denver's motion for summary judgment on ratification theory). The ratification theory does not require proof of a pattern or custom. Ratification of a single violative act can suffice for municipal liability to attach. *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986). A jury could conclude that DPD's policy of impunity was a direct cause of Plaintiffs' injuries.

20. Denver implies it could not have anticipated the circumstances its officers would confront, and thus was not deliberately indifferent when failing to adequately train officers on how to manage the protests without violating constitutional rights. *Id.* at 20–21. That is a quintessential fact question, and a highly disputed one in this case. DPD had confronted large-scale protests in the recent past, including the 2008 DNC; cities nationwide were experiencing mass protests; protests often include both violent and non-violent participants; and Denver understood that its failure to train officers for these circumstances could result in depriving protestors of their constitutional rights. Ex. 74 (O'Neill OIM Memo) (describing "months of preparation prior to Y2K that helped [DPD officers] handle the Broncos and Avalanche 'riots'"); Ex. 6 ¶¶ 146–47. The jury could conclude that DPD's decision to deemphasize training reflects deliberate indifference. PSF ¶ 12.[6]

## IV.    Denver's Curfew Enforcement Violated the 14th and 1st Amendments

The curfew regulated expressive activity (protesting and assembly) because it prohibited any person from being present in any public place anywhere in Denver. Public streets, sidewalks, and parks are public fora that "occupy a special position in terms of First Amendment protection." *McCullen v. Coakley*, 573 U.S. 464, 476 (2014). Thus, even though the curfew "says nothing about speech on its face, there is no doubt … that it restrict[ed] access to traditional public fora and is therefore subject to First Amendment scrutiny." *Id.*; *Frisby v. Schultz*, 487 U.S. 474, 480 (1988). Regulation of speech in a traditional public forum "is subject to the highest scrutiny." *Int'l Soc'y For Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 678 (1992).

Although the curfew order was content-neutral on its face, Denver's policy—as determined

---

[6] On causation, evidence shows that DPD's failure to train led directly to violations of Plaintiffs' rights. *E.g.*, Ex. 50 at 011773 (wondering "why lines weren't moving, or why they weren't disciplined, and she kept thinking 'what are they supposed to do without training or supervision?'"); Ex. 75 at 011770 (because there was no "strategy regarding less lethal deployment … teams were … throwing gas just to deploy gas instead of making tactical decisions.").

by Chief Pazen during a meeting—was to enforce it only against protestors. RSF ¶ 22. Pazen was a final policymaker. While Thomas claims Denver intended to enforce the curfew only against those engaged in violence and destruction, the text messages speak for themselves: they instructed officers to enforce the curfew only "in relation to protest activity" and conversely, not to let officers cite for curfew unless the person is "actively engaged in protest activity." Ex. 22. This was exactly how the message's recipients, including command staff, understood it. RSF ¶¶ 21–22, 32.

Denver contends that Chief Pazen did not direct or approve the text, but a reasonable jury could conclude otherwise. Thomas admitted he communicated to the commanders (in these texts) "exactly what we had discussed" in the meeting with the Chief. Command staff understood the curfew was a tool against protestors. *Id.* Evidence also shows officers targeted protestors or apparent protestors. *Id.* ¶ 33. Thus, there is a genuine dispute on whether Denver's enforcement policy was selective. *See Menotti v. City of Seattle*, 409 F.3d 1113, 1147–49 (9th Cir. 2005).

### A.      The Curfew Enforcement Policy Violated the Fourteenth Amendment

Classifications burdening fundamental rights like the First Amendment must meet strict scrutiny under the Equal Protection Clause. *Save Palisade FruitLands v. Todd*, 279 F.3d 1204, 1210 (10th Cir. 2002); *Kitchen v. Herbert*, 755 F.3d 1193, 1218–19 (10th Cir. 2014) (classification must be precisely tailored to compelling interest). Content-based speech restrictions in public fora are presumptively unconstitutional. *Police Dep't of Chicago v. Mosley*, 408 U.S. 92, 96 (1972).

"Discriminatory intent can be proved directly or circumstantially." *Ashaheed v. Currington*, 7 F.4th 1236, 1250 (10th Cir. 2021). Here, there is direct proof that Denver's enforcement policy targeted only protestors: Pazen's message communicated by Thomas's texts; DPD command-staff emails; and testimony from Williams and Porter. RSF ¶¶ 21–22, 30–32.

There is also circumstantial proof. *Id.* ¶ 33. The fact that Denver did not arrest every protestor who violated curfew and that some arrested were not protesting does not show that the policy was not *intended* to target protestors. Nor does the fact that some individuals arrested committed other crimes. There is plentiful evidence of both discriminatory intent and an adverse effect. There were 313 people arrested for curfew who did not commit any other crime. Williams and Porter admitted that the purpose of the curfew was to enforce it against protestors, regardless of whether they committed any other crime, and Thomas admitted that DPD senior leaders wanted to "clear … the area"—of protestors, since that was who was filling the streets. *Id.* ¶ 21. Denver arrested curfew violators (rather than citing and releasing them) to remove them and stop them from demonstrating. *Id.* This is unconstitutional. *Collins v. Jordan*, 110 F.3d 1363, 1375–76 (9th Cir. 1996).

Denver had a legitimate interest in preventing violence and property damage. But it cannot prove that its policy of enforcing the curfew only against protestors was precisely tailored to achieving its interest. *Ashaheed*, 7 F.4th at 1251 (observing government bears burden). Denver cannot meet this burden because enforcing the curfew only against protestors, as opposed to those who were engaged in violence and destruction, was not tailored at all, much less precisely tailored, to achieve that interest. "Only the most exact connection between justification and classification survives." *Kitchen*, 755 F.3d at 1219. There is no connection between the means (enforcing curfew only against protestors) and the ends (preventing violence and destruction). Denver "must justify the specific means it has chosen rather than relying on some other characteristic that correlates loosely with the actual restriction at issue." *Id.* at 1221. Moreover, Denver had numerous laws and ordinances it could and did use, *see* Dkt. 255-28, to arrest those engaged in criminal activity, RSF ¶ 21. When asked what purpose the curfew served in relation to other enforcement tools, Thomas

replied only that Denver wanted to arrest people for multiple offenses. Ex. 21 at 32–33.

Denver has not explained why a policy of enforcing the curfew only against protestors was precisely tailored to prevent violence and instead denies a selective-enforcement policy at all. Given the factual disputes, the jury must decide what Denver's policy was.

### B. The Curfew Violated the First Amendment

**As-Applied Challenge:** A policy of enforcing the curfew only against protestors is content-based, because the restriction targeted only individuals who sought to communicate about a particular topic. *Frisby*, 487 U.S. at 481; *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). (Given the protestors' message in support of Black Lives Matter, the enforcement policy was also viewpoint-based.) Content-based restrictions are subject to strict scrutiny. *Reed*, 576 U.S. at 163; *Republican Party of Minn. v. White*, 536 U.S. 765, 774–75 (2002) (observing state bears burden). Denver cannot satisfy this burden, as explained above. "[T]he proper response to potential and actual violence is for the government to ensure an adequate police presence, and to arrest those who actually engage in such conduct, rather than to suppress legitimate First Amendment conduct as a prophylactic measure." *Collins*, 110 F.3d at 1372. *In re NYC Policing During Summer 2020 Demos.*, 2021 WL 2894764, at *21–22 (S.D.N.Y. July 9, 2021) (cited by Denver), is inapposite because there were no facts showing that the curfew was intended to retaliate against protestors or enforced selectively against protestors. The evidence here shows the opposite.

**Facial Challenge:** On its face, the curfew is content-neutral but even so does not survive intermediate scrutiny under *Ward v. Rock Against Racism*, 491 U.S. 781 (1989). The curfew was not narrowly tailored to serve a significant governmental interest. The curfew encompassed the entire city, an area of 154 square miles, even though Denver admits that the crimes it was seeking

to curb took place downtown. *See Collins*, 110 F.3d at 1370–73 (curfew banning protests in entire county unconstitutional). While Denver argues that the curfew targeted "riots" "after dark," MSJ 10, the curfew did not merely target nighttime riots downtown; it banned all presence in public places in a 154 square mile area. Nor did the curfew contain a First Amendment exception. Because the means chosen were substantially broader than necessary to achieve Denver's interest in stopping riots, the curfew does not survive intermediate scrutiny. *See Nunez by Nunez v. City of San Diego*, 114 F.3d 935, 949–52 (9th Cir. 1997) (juvenile nighttime curfew unconstitutional).

## V.    Officers Christian and Valentine Are Not Entitled to Qualified Immunity

The only remaining claims against individual Denver defendants are Ms. Epps' claims against Officers Christian and Valentine, both of whom shot Ms. Epps while she was peacefully protesting. Under binding precedent, qualified immunity is unavailable on those claims.

Defendants do not dispute that Ms. Epps (or the other plaintiffs) have sufficient evidence to support a Fourth Amendment claim. And rightly so. PSF ¶ 7. Officer Christian shot Ms. Epps with a PepperBall without any warning or justification while she was documenting the protests and isolated on a public street. Ex. 39; Ex. 6 at ¶¶ 71–72. A day later, Ms. Epps was filming the protests when Officer Valentine suddenly began firing PepperBalls into the crowd, striking Ms. Epps in the face. Ex. 6 at ¶ 72; Ex. 42. And as explained above, the officers' actions also constitute a 1st Amendment violation, *supra* Part I; *see also* PSF ¶ 7.

It was clearly established in this Circuit as of May 2020 that firing less-lethal munitions, including PepperBalls, at a peaceful protestor under similar circumstances is unlawful. In *Fogarty v. Gallegos*, 523 F.3d 1147, 1159–62 (10th Cir. 2008), the court analyzed a near-identical fact pattern and held that an officer is not entitled to qualified immunity for "shooting [a protestor]

with a pepper ball or some other type of projectile," when there was "no suggestion that he posed an immediate threat to the safety of the officers or others," the protestor "was neither actively resisting arrest nor attempting to evade arrest by flight," the protestor had committed (at most) "a petty misdemeanor," and the "police may have contributed to the need to use force." These facts— which mirror Ms. Epps' experience—constituted a clearly established violation of the protestor's constitutional rights. *See also Buck v. City of Albuquerque*, 549 F.3d 1269, 1289–92 (10th Cir. 2008) (same regarding 1st and 4th Amendment claims); *Hartman v. Moore*, 547 U.S. 250, 256 (2006) ("[T]he law is settled that … the First Amendment prohibits government officials from subjecting an individual to retaliatory actions ... for speaking out."); *Boos v. Barry*, 485 U.S. 312, 318 (1988) (protest is "classically political speech"); *Van Deelen v. Johnson*, 497 F.3d 1151, 1157 (10th Cir. 2007); *Nelson v. City of Davis*, 685 F.3d 867 (9th Cir. 2012). Fourteen years after *Fogarty* and *Buck*, every reasonable officer would have understood that Officers Christian's and Valentine's conduct was unlawful.[7]

Dated: February 11, 2022                Respectfully submitted,

By: /s/ Elizabeth Wang_____            By: /s/ Timothy R. Macdonald_____
    Elizabeth Wang                           Timothy R. Macdonald
    LOEVY & LOEVY                            ARNOLD & PORTER KAYE SCHOLER LLP
    2060 Broadway, Suite 460                 1144 Fifteenth Street, Suite 3100
    Boulder, CO 80302                        Denver, Colorado 80202
    Telephone: (720) 328-5642                Telephone: (303) 863-1000
    elizabethw@lovey.com                     Timothy.Macdonald@arnoldporter.com

## CERTIFICATE OF SERVICE

I hereby certify that on February 11, 2022, I served via CM/ECF the foregoing **Opp'n to Denver Defendants' Motion for Summary Judgment** on all counsel of record. /s/ Elizabeth Wang_____

---

[7] While *Fogarty* and *Buck* are squarely on point, "[a] prior case need not have identical facts. Rather, the pertinent question is whether it would have been clear to a reasonable officer that his or her conduct was unlawful in the situation." *Patel v. Hall*, 849 F.3d 970, 980 (10th Cir. 2017).