## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 20-cv-1878-RBJ

ELISABETH EPPS, *et al.,*

Plaintiffs,

v.

CITY AND COUNTY OF DENVER, *et al.,*

Defendants.

---

### DECLARATION OF NORMAN STAMPER

---

Pursuant to 28 U.S.C. § 1746, I, Norman Stamper, declare as follows:

1.    I am over 18 years old and competent to make this declaration.

2.    My expert reports in the above-captioned case are attached hereto.

3.    The contents of my reports are true and accurate to the best of my knowledge, and the opinions offered therein are each to a reasonable degree of professional certainty. If called to testify, I would testify consistently with the opinions offered in my reports.

I declare under penalty of perjury that the foregoing is true and correct.

2/9/22
Date

Norman Stamper

Exhibit 6

IN THE UNITED STATES DISTRICT COURT
OF THE DISTRICT COURT OF COLORADO

Civil Action Nos. 1:20-cv-01878-RBJ & 1:20-cv-01922-RBJ-MEH (consolidated)

ELISABETH EPPS, *et al.*

Plaintiffs,

v.

CITY AND COUNTY OF DENVER, *et al*.,

Defendants

---

## EXPERT REPORT OF NORMAN STAMPER

### Experience and Qualifications

1.      I have been actively involved in police policies and practices, and law enforcement research and education since 1966. I have held numerous leadership roles in two police organizations, including the following:

- From 1969 to 1982, I served as sergeant, lieutenant, and captain, as well as organizational ombudsman and special advisor to the police chief within the San Diego Police Department.

- From 1983 to 1986, I was Deputy Chief of Police in charge of the Office of Field Operations in San Diego.

- From 1986 to 1988, I was Deputy Chief of Police in charge of the Office of Personnel Services in San Diego.

- In 1988, I served as Deputy Chief of Police in charge of the Office of Special Operations (Investigations Bureau).

- From 1989 to 1994, I was the Executive Assistant Chief of the San Diego Police Department. As second-in-command to the Chief of Police, I was responsible for all day-to-day operations of the 2,834-member agency in the nation's then-sixth largest city.

- From 1994 to 2000, I was Chief of Police of the City of Seattle. I was responsible for the executive leadership of the 1,800-member organization and in charge of all policies and practices of the agency.

1

2.        I have extensive experience in developing policies and procedures and providing training to police agencies. As Chief of Police of the City of Seattle, I oversaw the police response to about two dozen protests and demonstrations. This included the World Trade Organization protests in November-December 1999, which involved approximately 40,000-60,000 protesters. During my tenure in San Diego, I served as incident or field commander in approximately two dozen protests and demonstrations.

3.        My experience, training, and background is more fully described in my C.V., attached as Exhibit A. This also includes testimony that I have given in the last four years at trial or deposition. A list of materials I was provided for review is attached as Exhibit B.

4.        My opinions are based upon the totality of my specialized knowledge, experience, and training in the field of police practices, in addition to the materials identified in Exhibit B and mentioned specifically below. My expertise has been developed during my decades of experience in law enforcement and my continued experience as a trainer and consultant.

5.        There is a large body of knowledge and literature about the practices and standards that modern, reasonably managed and administered police agencies across the United States should follow and apply to their operations. Standards of training and practice may include caselaw; federal, state, and municipal statutes; departmental policies and procedures; applicable statewide police training programs; model policies, training and research from such organizations as the International Association of Chiefs of Police (IACP), Police Executive Research Forum (PERF), and the Police Foundation.

**Relevant Background Facts**

6.        On May 25, 2020, Minneapolis police officers arrested George Floyd after receiving a complaint that he had attempted to pass a counterfeit twenty-dollar bill. While restrained by other officers, Officer Derek Chauvin knelt on Mr. Floyd's neck until he died. Afterwards, the officers involved were criminally charged. In April 2021, Officer Chauvin was found guilty of murder and manslaughter charges. Trials for the other officers are pending.

7.        The death of Mr. Floyd, a Black man, at the hands of police, was only one of many similar deaths in the months preceding May 2020. In the aftermath of Mr. Floyd's death, protests erupted throughout the country, first in Minneapolis but quickly spreading to other cities across the United States. Beginning on May 28, 2020, protests (referred to herein as GFP, for George Floyd Protests) began in Denver, lasting for weeks. The first several days of protests were largely peaceful, but there were also incidents of property destruction and violence.

8.        On May 28, protesters began to gather at the State Capitol at about 5:00 p.m. (Office of Independent (OIM) Report, p. 2.) The Denver Police Department (DPD) established a Command Post, and appointed as the Incident Commander Patrick Phelan, who assumed primary command responsibility. (OIM Report, p. 2.) Commander Phelan was the Incident Commander for the majority of the protests (with the exception of one day, June 2, 2020, on which Lt.

2

Matthew Canino was the Incident Commander). (Phelan Deposition, p. 26; Canino Deposition, pp. 45, 83.)

9.      The DPD uses the Incident Command System (ICS), which is a standardized approach to the command and control of an emergency response that provides a common hierarchy for first responders, including police. (OIM Report, p. 49.) Commander Phelan was responsible for the overall management of the GFP. (Phelan Deposition, pp. 26-29.) This is the role of an Incident Commander under the ICS and also part of Phelan's responsibilities as Commander of the Special Operations Division. (Phelan Deposition, pp. 26-29; OIM Report, pp. 49-50.) Phelan made final decisions regarding the police response to the protesters, including coordinating officers in the field, developing an operations plan and a deployment plan for personnel and materiel based on information the DPD knew about the protests. It was Commander Phelan's responsibility to authorize the use of chemical munitions to disperse protesters. (Phelan Deposition, pp. 26-29.) Although Chief of Police Paul Pazen was advised of the plans developed by Commander Phelan, Phelan was in charge of managing the police response to the protests, including the response of outside law enforcement agencies that provided assistance to the DPD during the GFP. (Phelan Deposition, pp. 26-29, 32-33, 41-44.) Commander Phelan gave the same direction, guidance, and rules of engagement to the officers from the outside agencies as to his own officers in the DPD. (Phelan Deposition, pp. 43-44.) As Commander Phelan explained at his deposition, it is especially important for officers to follow the chain of command during protests so that there is an organized and coordinated police response that does not cause confusion. (Phelan Deposition, pp. 40-41.) The DPD Crowd Management Manual states: "In all situations it is critical that command officers and supervisors lead, direct and control the police response. Strong command and control elements are essential to maintaining a unified, measured and effective police response. A team-based response with strong leadership is the key to maintaining control and safety. Impulsive actions by involved officers must be managed." (DPD Crowd Management Manual, p. 7, DEN 74.)

10.      As Incident Commander, Phelan was stationed in the Command Post. (Phelan Deposition, pp. 42-43.) While in the Command Post, he received information from his officers through radio communications, Air One (the police helicopter), observation of HALO camera and traffic camera footage, and information from social media. (Phelan Deposition, pp. 55-58.) On the first day of the protests (May 28), DPD had three radio channels but then switched to a single radio channel for communication of information to and from the Command Post and officers in the field. (Phelan Deposition, p. 56.) However, the single radio channel became overcrowded and officers frequently experienced "bonking," or a tone on the channel indicated that it was already occupied. (Phelan Deposition, p. 56; OIM Report, p. 50.)

11.      During the protests, the use of chemical munitions (such as tear gas) had to be authorized by command staff. (E.g., Phelan Deposition, pp. 35-37; Canino Deposition, pp. 29-30; Abeyta Deposition, p. 46.) During many of the major teargassing incidents in which Plaintiffs were involved during the GFP, Commander Phelan himself authorized the use of chemical munitions on protesters. (See Phelan Deposition, pp. 34, 67, 161, 165; Pine Deposition, p. 85.)

3

As Commander Phelan explained it, DPD policy requires command authorization of chemical munitions use because command staff "have a view of what the situation is. They have a bigger picture of what the situation is. They make the determination based on their training, based on their experience that chemical agent needs to be used." (Phelan Deposition, pp. 38-39.) According to Sergeant Abeyta, command authorization was required for tear gas deployment because tear gas is a "serious level of use of force." (Abeyta Deposition, p. 46.) DPD officers consistently testified that tear gas is an indiscriminate weapon which is used to disperse everyone in the area, whether they are peaceful or non-peaceful. (See Canino Deposition, pp. 122-23; Williams Deposition, p. 61.)

12.     In this section, I will highlight some of the events during the GFP in which Plaintiffs were involved. Additional specific events will be described below. These are not exhaustive lists of all the events during which Plaintiffs were allegedly dispersed, thus denied their right to engage in free expression and free assembly. Nor are all of the events during which officers used force on Plaintiffs captured here.

13.     As noted earlier, the protests began on May 28. They continued on May 29, 2020. At between 8:00-9:30 p.m., there was a large number of protesters in the park south of Colfax between Lincoln and Broadway, across from the State Capitol. There were also many protesters on the Capitol lawn. Body-Worn Camera (BWC) video shows DPD officers, including Metro/SWAT officers, in the parking lots north of Colfax on either side of Lincoln. Some objects are thrown at the police. However, the police deployed large amounts of chemical munitions, including tear gas and PepperBalls at protesters across the street (south of Colfax).



14.     On May 30, 2020, Mayor Hancock announced a citywide curfew in effect from 8:00 p.m. to 5:00 a.m. (Emergency Curfew Order, DEN 011302-011303.) According to text messages received by Lt. Porter, per Division Chief Thomas, the curfew was only to be used for "enforcing protest-related behavior." Lt. Williams testified that the purpose of the emergency curfew to begin with was to enforce it against protesters. (Williams Deposition, pp. 135-36; Text messages to Lt. Porter, DEN 13035, 13053; Porter Deposition, pp. 91-97.) On May 30 and 31, the curfew began at 8:00 p.m. The curfew was extended through June 5, 2020. It began at 9:00 p.m. on those days. (Extended Emergency Curfew Order, DEN 114-16.)

15.     According to the Office of Independent Monitor (OIM), there were "compounding munitions shortages," which resulted in the Colorado State Patrol flying to Wyoming to purchase less-lethal munitions from a manufacturer, including some munitions that had been ordered by DPD. (OIM Report, pp. 4-5.) That the DPD ran out of chemical munitions within the first couple days of the protests is troubling. It suggests that there were not enough munitions on hand or that there was a misuse of available munitions. A combination of those two factors is also possible. Based on the amount of chemical munitions I saw deployed on the evening of May 28 alone, I believe it was likely a product of the excessive use of chemical munitions. Relatedly, DPD did not track its munitions used during the GFP. (OIM Report, p. 53.) The OIM recommended that DPD amend its manuals to require the creation of a log or tracking system for the distribution and deployment of all less-lethal munitions during crowd control events. (Mitchell Deposition, pp. 64-65.) Former Independent Monitor Nicholas Mitchell testified at his deposition:

> [P]olice management with an effective log or tracking system in place, managers of the police department who are overseeing the response would have a better sense of … which officers or which teams were utilizing which kinds of munitions and at what rates. It would facilitate an investigation into any allegations of inappropriate force that might be raised. It would allow for supervisory intervention if one team in particular, for example, is using particular kinds of munitions at disproportionate rates.

> So developing a log or tracking system would enable, you know, more proactive management to make sure that less-lethal munitions are being used in conformity with the policies of the Denver Police Department. (Mitchell Deposition, p. 66.)

I agree. In addition, it is my opinion that the DPD should have had a tracking system in place before the GFP, and the failure to do so was contrary to generally accepted police practices prior to May 2020. (OIM Report, p. 19 (citing Police Foundation, *Managing Large-Scale Security Events: A Planning Primer for Local Law Enforcement Agencies*, p. 30 (2018).)

16.     By May 30, a large number of officers from outside law enforcement agencies were providing assistance to the DPD. (OIM Report, pp. 4-5.)

17.     According to the OIM, an estimated 150-200 officers worked the GFP on the first day, 100-150 on May 29, 450-500 DPD and mutual aid agency officers on May 30, and 450-500

DPD and mutual aid agency officers on May 31. (OIM Report, pp. 2-5.) The DPD did not create rosters for most protest days and nights during the first five days of the GFP. (OIM Report, pp. 12, 20; Mitchell Deposition pp. 66-67.) The OIM concluded that the creation of such rosters would "permit the incident commander and others to determine where they have enough resources and where they may be deficient in resources. It would … be very helpful for investigations into individual incidents to have information about officer assignments and who was assigned to do what where, given the challenges that we experienced in identifying officers…in investigations into allegations of excessive force." (Mitchell Deposition, p. 68.) I agree. Creation of such rosters is a very basic task and function of police management and administration. It is my opinion that the failure to do so prior to the GFP was contrary to generally accepted police practices. (OIM Report, p. 20 (citing IACP Law Enforcement Policy Center, *Incident Command System Model Policy*, p. 3 (2009) (recommending the creation of a 'master record of all personnel and components involved in the response to a critical incident,' including, among other items, personnel rosters.)) For example, in both Seattle and San Diego, we used a scribe in the Command Post. This position is referred to by the IACP as a recorder. The responsibilities of the scribe included documenting everything that was done during the protests—all munitions deployed were to be tracked, all personnel deployed were to be tracked, and so on. This was essential to any kind of after-action report and for officer accountability. It is my opinion that the DPD's failure to have rosters contributed to its failure to hold accountable officers who used excessive force or violated the constitutional rights of protesters.

**Patterns in the Use of Force during the GFP**

18.     In my opinion, there were several disturbing patterns in DPD's use of force during the GFP, which was contrary to generally accepted police practices, standards, and training.

**1.     DPD exhibited a widespread practice and custom of failing to give dispersal orders or audible dispersal orders prior to use of force**

19.     It is generally accepted police practice to provide dispersal orders, warnings, or announcements before use of chemical munitions or other less-lethal weapons on individuals. (See, OIM Report, p. 25 (citing IACP Law Enforcement Policy Center, *Crowd Management Model Policy*, § IV.F.3).) As explained further below, the evidence shows that such orders, warnings, or announcements were rarely provided. Of the numerous videos that have been provided for my review, very few contain any evidence of announcements or dispersal orders given by DPD prior to use of less-lethal weapons on protesters. I am very familiar with the capabilities of body-worn cameras, and, as explained further below, I believe that if warnings were given when the DPD says they were given, the microphones on the cameras would have picked it up. That no warnings are audible reveals that no warnings were given or that only inaudible warnings were given. My review of the declarations submitted by Plaintiffs and other protesters shows that they consistently stated that orders, warnings, and announcements were not given. There was also little documentation of dispersal orders given prior to use of less-lethal

6

weapons.[1] The failure to give audible dispersal orders, warnings, and/or announcements prior to the use of less-lethal weapons on protesters is contrary to generally accepted police practices, standards, and training. The DPD's policy and practice caused in significant part the violation of the constitutional rights of the plaintiffs. It is also contrary to the DPD Crowd Management Manual. Protesters must be provided an opportunity to comply with police orders or police direction *before* force is used on them. This is especially true for the use of chemical munitions such as tear gas, which affects peaceful and non-peaceful protesters alike. A few specific examples are discussed below:

20.     **May 28, 2020, 8:30 p.m., Colfax and Washington:** At approximately 8:30 p.m. on May 28, 2020, a group of protesters marched toward and gathered at the District 6 police station at Colfax and Washington. (DEN 3850.) By 8:29 p.m., the bulk of the crowd was on the south side of the Colfax and Washington intersection. The crowd appears to be impeding traffic flow, but otherwise appears mostly peaceful.



---

[1] The DPD produced a document referred to as the Chemical Agent Timeline (DEN 2763-76, 5735-53, 5646-64, 6042-60), but it does not appear to be a complete list of all uses of chemical agents or other less-lethal weapons during the GFP, and it does not appear that dispersal orders were given even for the events listed on the timeline.



AirOne video May 28 (DEN 3840) at 8:29 p.m. MT (annotated)



Colfax & Washington HALO 05.28.2020 (DEN 3850) at 8:29 p.m. MT (annotated)

21.     At about this time, Commander Phelan (radio call sign "Adam 9") explained to his team that he wants to use "less-lethal PepperBall" or "launch some gas" to move the protesters away from the intersection. (DPD Tac 6 Dispatch Audio Files DEN 5143 at 2020-05-28_20.28.18_Ch33, 2020-05-28_20.28.49_Ch33; AirOne video May 28 (DEN 3840) at 8:28:18

p.m. and 8:28:52 p.m. MT). There is no discussion on the radio of a plan for providing warnings to the crowd before deployment of gas. I have seen no other evidence of any announcements or dispersal orders given before the deployment of less-lethal munitions. And, an unlawful assembly was not declared before protesters were dispersed through use of force. (Canino Deposition, pp. 37-38.) Officers deployed gas and PepperBalls at protesters.

22.     At 8:33 p.m., DPD formed a skirmish line just north of the intersection and began deploying large amounts of PepperBall into the intersection, and they advanced the skirmish line south to the intersection. At this time on the radio, you can hear Commander Phelan tell his team that he wants to move the protesters southbound on Washington and "just disrupt them there." (DPD Tac 6 Dispatch Audio Files DEN 5143 at 2020-05-28_20.34.12_Ch33; AirOne video May 28 (DEN 3840) at 8:34:18 p.m. MT)



Colfax & Washington HALO 05.28.2020 (DEN 3850) at 8:33:48 p.m. MT (annotated)



Colfax & Washington HALO 05.28.2020 (DEN 3850) at 8:34:34 p.m. MT (annotated)

23.      At about 8:36 p.m., DPD officers on the ground advanced a skirmish line south through the intersection, deploying PepperBall along the way, as seen in Colfax & Washington HALO 05.28.2020 (DEN 3850). Most of the protesters retreated further south. Officers reported over the radio that they were getting rocks thrown at them. DPD Tac 6 Dispatch Audio Files DEN 5143 at 2020-05-28_20.36.34_Ch33 AirOne video May 28 (DEN 3840). At 8:36:37 p.m. Commander Phelan directed his personnel to deploy gas and instructed them to don their gas masks. AirOne video May 28 (DEN 3840) at 8:36:44-8:38:13 p.m. MT.



Colfax & Washington HALO 05.28.2020 (DEN 3850) at 8:35:18 p.m. MT (annotated)



Colfax & Washington HALO 05.28.2020 (DEN 3850) at 8:36:06 p.m. MT (annotated)

24.     At 8:38 p.m., officers began deploying canisters of smoke and gas into the intersection. Colfax & Washington HALO 05.28.2020 (DEN 3850) at 8:38:52 p.m. There is no evidence that any warnings or announcements were given prior to the deployment of gas. For example, no warnings are audible in the body-worn camera videos from officers at this time and location. (E.g., DEN 4045.)

11



Colfax & Washington HALO 05.28.2020 (DEN 3850) at 8:38:52 p.m. MT (annotated)





DEN 4045 at 8:39:09 p.m. MT

25.     In my opinion, the DPD's use of less-lethal weapons at this location and time was contrary to generally accepted police practices, standards, and training because there were no warnings given, no attempt to isolate non-peaceful from peaceful protesters, and there was an excessive amount of gas used. Officers also appeared to deploy gas into an active traffic intersection, an extremely dangerous tactic.

26.     Commander Phelan testified at his deposition that DPD's approach is to be "low profile, low visibility," to avoid "confrontation," and to "let protestors take the street." (Phelan Deposition, p. 51.) However, his actions were inconsistent with this. It is significant to me that Commander Phelan stated, over the radio, that he wanted to utilize tear gas merely for the purpose of moving protesters out of the intersection. In my experience, that is not a generally accepted use of tear gas.

27.     **May 28, 2020, 9:10 p.m., 14th and Sherman:** In the rare instance in which dispersal orders were apparently given, the evidence shows that they were inaudible to most or all protesters in the area. (*E.g.,* Beall Deposition, p. 54; DEN 4021 and other DPD BWC from 5/28 at 14th & Sherman such as DEN 4023; DEN 4025; DEN 4027; DEN 4030; Taylor Declaration, ¶ 6; Sanchez Declaration, ¶ 16.)

28.     At approximately 8:26 p.m., DPD officers arrived at the intersection of 14th and Sherman. They formed a north-south line facing east down 14th Avenue. The officers were led by Lt. Williams and Lt. Pine. 14th and Sherman is on the south side of the State Capitol.

13





CSP video 05282020 v.63 at 8:27:51 p.m. MT (annotated)

29.    By about 8:35 p.m., a crowd of protesters formed facing the officers. I did not see evidence in the video that anyone was throwing objects at the officers at that time.



CSP video 05282020 v.63 at 8:36:17 p.m. MT (annotated)

30.     On the radio at around 8:48 p.m., Commander Phelan communicated with "Metro 2" (Lt. Pine), who was at 14th and Sherman. Phelan asked if the officers at that location are OK and if they need to "deploy." (AirOne video 5/28 (DEN 3840) at 8:47:57 p.m. MT) Lt. Pine responds, saying, no, they are ok, and that they are getting their gas masks on before they make that call. (AirOne video, 5/28.)



AirOne video 5/28 (DEN 3840) at 8:48:02 p.m. MT (annotated)

31.     On the radio at 8:59 p.m., Lt. Pine said that they are making "announcements" and that they are going to move protesters out of the street. Commander Phelan responded, "all right." (DPD Tac 6 Dispatch Audio Files DEN 5143 at 2020-05-28_20.58.54_Ch33, 2020-05-28_20.59.02_Ch33; AirOne video 5/28 (DEN 3840) at 8:58:58 p.m.-8:59:04 p.m. MT.)

32.     The video produced in this case for this time and location, including the body-worn camera from DPD officers at the scene at the time shows that, to the extent any announcements were made, they were barely audible, if at all, to the officers standing on the line, and likely inaudible to everyone else standing at the intersection. (DEN 4021; DEN 15718.) In at least one BWC video, a protester asks Sgt. Beall what is being said on the PA. (DEN 4021.) Sgt. Beall tells that protester that the officers are about to deploy gas. (Beall Deposition, pp. 54-59.) However, Sgt. Beall does not take this information—that protesters apparently cannot hear the announcement—to any supervisor or anyone in the chain of command to alert them to the problem so that it can be fixed. Sgt. Beall could not provide any explanation for why he did not do anything to resolve this problem. (Beall Deposition, p. 59.) Likewise, Lt. Williams, who was the one making the announcements during this incident, did not do anything to ensure that the announcements could be heard. (Williams Deposition, pp. 107-09.)



CSP video 05282020 v.63 at 8:58:24 p.m. MT

33.     On the radio at 9:02 p.m., Lt. Pine reported that they are giving a second set of announcements and that there is no need for a medic. DPD Tac 6 Dispatch Audio Files (DEN 5143 at 2020-05-28_21.02.22_Ch33; AirOne video May 28 (DEN 3840) at 9:02:13-9:02:42. MT.)

34.     By around 9:04 p.m., the crowd of protesters had increased to about 200-300. I would consider this to be a small group. Video evidence does not show any protesters acting aggressively towards the officers. (*E.g.*, CSP video, 052820 v63.ave; DEN 4023; DEN 4025; DEN 4027; DEN 4030.)



CSP 05282020 v.63 at 9:04:34 p.m. MT

     35.    At 9:07 p.m., what appears to be a water bottle is thrown from the crowd at the officers. (DEN 4035 at 9:07:57 p.m. MT; DEN 4038 at 9:07:57 p.m. MT; CSP video 05282020 v.63 at 9:07:17 p.m. MT.)



DEN 4035 at 9:07:57 p.m. MT

36.    At 9:10:43 p.m., Commander Phelan told the officers at 14th and Sherman to
deploy gas on the protesters.  On the radio, Commander Phelan told the team at 14th and
Sherman, "You're taking rocks and bottles, let's deploy some chemical agent at them please.
Dump some gas on 'em." (AirOne video 5/28 (DEN 3840) at 9:10:33-9:10:43 p.m. MT.)
Multiple videos show DPD deploying canisters of gas and PepperBalls on the protesters. (CSP
video 05282020 v63 at 9:10:19 p.m. MT; CSP video 05282020 v.29; 9News Video 5-28-2020 1;
DEN 4029; DEN 4030.)



CSP video 050282020 v63 at 9:10:19 p.m. MT

37.     According to Lt. Williams, he and Lt. Pine made the decision to declare an unlawful assembly. (Williams Deposition, pp. 99-100.) They decided to declare an unlawful assembly because individuals in the crowd were throwing objects. However, this testimony does not square with what is in the radio communications and video evidence—which indicate that a decision was made to disperse the crowd before any objects were thrown (as noted above, the first object that can be seen being thrown appears to be a water bottle at 9:07 p.m., a few minutes after announcements were purportedly provided). Also, according to Lt. Williams's report, the dispersal order he read using the PA system on a Metro RDV was that the protesters were "in violation of obstructing the roadway and needed to move." (DEN 3019, Lt. Williams Statement.) It appears from the video evidence that the vast majority of the protesters were peaceful.

38.     As noted above, the BWC video indicates that the protesters were chanting and noisy and that it was difficult to hear the announcements. (DEN 4021.) Lt. Williams did nothing to ensure that the protesters could actually hear the announcements, and according to declarations from protesters who were present, they did not hear any announcements.

39.     These actions were contrary to generally accepted police practices, standards, and training. The IACP provides, "A warning should be issued loudly and often enough to be heard by the entire crowd … To ensure the warnings have been heard throughout the crowd, it is recommended that at least two officers go to the rear of the crowd to verify the warnings are audible." (*Crowd Management: Concepts & Issues Paper*, Fitouri 18374.)

21

40.     Significantly, when asked, Lt. Williams testified that he could not think of anything that he could have done to ensure that the announcements were heard by everyone in the crowd. (Williams Deposition, pp. 108-09.) He stated that it would not have been wise to send an officer to the back of the crowd to see if the announcements could be heard from there. (Williams Deposition, p. 109.)

41.     All of this is contrary not only to DPD's own written policies, but also to generally accepted practices, standards, and training. The crowd at the intersection of 14th & Sherman was small. During the 1999 WTO protests in Seattle, my Incident Commander in consultation with his Field Commander made a decision to declare an unlawful assembly at a completely clogged intersection. The Field Commander used a bullhorn to make the announcement multiple times during a thirty-minute period. I personally walked to the back of the crowd to see if I could hear the announcement— listening for both clarity and volume—in order to ensure that we complied with policy and with the law. I was not wearing a helmet, face shield or other riot gear. The crowd's more or less nonstop chanting was quite loud yet the announcement was both clear and audible from the farthest edge of the crowd.

42.     In my opinion, the DPD's use of less-lethal weapons at this location and time was contrary to generally accepted police practices, standards, and training because there were no audible warnings given and there was no attempt to isolate non-peaceful from peaceful protesters. Further, the IACP *Concepts and Issues Paper on Crowd Management* provides that, "The crowd should be warned prior to CS deployment and provided with avenues of egress." (Fitouri 18374.)

43.     **May 28, 2020, 9:30-10:00 p.m., Lincoln and Colfax:** On May 28, 2020, between approximately 9:30 and 10:00 p.m., a crowd of protesters had gathered in the area of the intersection of Lincoln and Colfax on the west side of the Capitol. DPD officers had formed an east-west line facing north on Lincoln. HALO Video 1450 Lincoln (DEN 3846).





HALO Video 1450 Lincoln (DEN 3846) at 9:46:01 p.m. (annotated)

23

44.     The video evidence does not show any objects being thrown at the officers. The crowd appears generally peaceful. (DEN 4089; DEN 4090; DEN 4092; DEN 4091.) There is live traffic on Colfax behind the protesters.

45.     On the radio, at around 9:47 p.m., Commander Phelan can be heard on the radio instructing officers "As soon as you get there, launch" and "Actually, throw a smoke first then some chemical right after." (DEN 4092 (radio chatter audible in the BWC); DPD Tac 6 Dispatch Audio Files DEN 5143 at 2020-05-28_21.47.14_Ch33; 2020-05-28_21.47.20_Ch33.) At 9:48 p.m., an officer responds on the radio saying, "We are code six with 'em and we're putting some gas in the crowd." (DPD Tac 6 Dispatch Audio Files DEN 5143 at 2020-05-28_21.48.13_Ch33.) At 9:48 p.m., several DPD officers in green fatigues exit a vehicle behind the line of DPD officers and deploy 7-8 canisters of what appears to be tear gas into the crowd of protesters, causing them to retreat north into the live traffic on Colfax.



HALO Video 1450 Lincoln (DEN 3846) at 9:48:19 p.m. MT (annotated)

46.     In my opinion, the DPD's use of less-lethal weapons at this location and time was contrary to generally accepted police practices, standards, and training because there were no audible warnings given and no attempt to isolate non-peaceful from peaceful protesters. (DEN 4089; DEN 4090; DEN 4092; DEN 4091.) For example, the IACP *Concepts and Issues Paper on Crowd Management* provides, "The crowd should be warned prior to CS deployment and provided with avenues of egress." (Fitouri 18374.) It was also an egregious disregard for the safety of the protesters to push them into live traffic on Colfax using tear gas. (CSP video, 05282020 v88 at 9:47:46 p.m. MT.)



CSP video 05282020 v88 at 9:47:46 p.m. MT

47.   **May 29, 2020, 9:19 p.m., Lincoln and 13th:**  On May 29, 2020, at 9:19 p.m., DPD BWC shows officers casually throwing a tear gas canister at a motorist and yelling "woohoo" afterward.



DEN004220 at 9:19:43 p.m.

25

48.     **May 30, 2020, 5:30-8:00 p.m., Lincoln and Colfax:** On May 30, 2020, between approximately 5:30-6:00 p.m., there was a large number of protesters at Civic Center station, at the intersection of Broadway and Colfax. (*E.g.*, 9News video, 5-30-2020 7 at 40:58; AirOne video at 5:46 p.m., DEN 3842.)



AirOne video 5/30 (DEN 3842) at 5:38:20 p.m. MT

49.     At about 5:43 p.m., a BWC shows that DPD attempted to make announcements. (DEN 5008.) In Officer Carmody's BWC (DEN 5008) at 5:44:46 p.m. MT, an officer tells Officer Carmody that "announcements" will be made and then they were going to throw gas. Moments after that, I could vaguely hear an announcement "get out of the street," and "go back to the park," "or you will be arrested," but the scene is very loud with the protesters chanting, and I see no evidence that the officers made any attempt to make sure the protesters could hear the announcements.

50.     At approximately 5:45-5:47 p.m., protesters were pushed south of the intersection by DPD officers using less-lethal and chemical munitions. (*E.g.*, DEN 5008; DEN 4995; 9News video, 5-30-2020 7 at 1:00:48; Williams Deposition, p. 47.) It is my opinion that this use of force was completely inappropriate and contrary to generally accepted police practices. It is fundamental that if officers are going to use force to disperse protesters, they need to provide warning of such. They did not. Not only were the announcements apparently inaudible to the protesters, but protesters were not warned that chemical agents would be used. Moreover, and even more egregious, DPD was pushing protesters into a busy street (Colfax) without doing anything to ensure the safety of the protesters (or the drivers). And, there did not appear to be adequate reason in the first place for dispersing the protesters. For instance, the video does not

show anyone throwing anything at the officers before less-lethal munitions were used on the protesters. And, protesters have a First Amendment right to demonstrate on the streets, sidewalks, and public parks.





AirOne video 5/30 (DEN 3842) at 5:47:29 p.m. MT (annotated)



DEN 5008 at 5:46:54 p.m. MT (annotated)

51.     According to Lt. Williams, the objective at that time was to prevent protesters from accessing a rock pile in the parking lot bordering Broadway and Colfax. (Williams

Deposition, p. 45.) Lt. Williams ordered officers to form a skirmish line across Colfax, stretching from Lincoln to Broadway. He received this direction from Commander Phelan. (Williams Deposition, pp. 50-51.)



AirOne video 5/30 (DEN 3842) at 6:02:59 p.m. MT (annotated)

52.     From about 6:00 to 8:00 p.m., hundreds of protesters gathered in the park across from the Capitol. Many were crowded in the area of the intersection of Lincoln and Colfax. (9 News video, 5-30-2020 7 at 1:01:38-2:14:10 min.) DPD officers (primarily from the gang unit) and Aurora police officers were in the skirmish line at the intersection of Lincoln and Colfax. (Sampson Deposition, pp. 82-85; Cunningham Deposition, pp. 83-86.) DPD Metro/SWAT officers were also present. (*See* DPD and APD BWC video, 5/30.) BWC and Colorado State Patrol video shows that during this time period, protesters stood facing the line of officers, chanting, protesting, and holding signs. Some protesters knelt or stood with their hands up. There was an occasional water bottle thrown by someone in the crowd towards the officers. (DEN 4988 at 6:56:19 p.m. MT.) Although there were some references in some of the officers' depositions to Molotov cocktails, I did not see any video evidence of such items being thrown during this time period and at this location.



9 News video, 5-30-2020 7 (annotated)



CSP video 05302020 v217 at 6:54:25 p.m. MT

53.    Throughout this time period, BWC and CSP video shows officers deploying PepperBall, tear gas, pepper spray, and flash bangs at protesters. On a few occasions, the use of force appeared to be in response to a water bottle or other items thrown by someone in the crowd. On other occasions, there was no apparent reason for the use of force. Occasionally, protesters threw items in response to officers using force. Generally, the use of force by law enforcement personnel appeared to be indiscriminate. (*E.g.*, COABLM 238; COABLM 294; COABLM 297; COABLM 317; COABLM 330; DEN 4976; DEN 4988; DEN 4993; DEN 5017; CSP video 05302020 v88.ave; CSP video 05302020 v211.ave; CSP video 05302020 v217.ave.)



DEN 4988 at 6:56 p.m. MT

54.    As discussed below, chemical munitions are, by their very nature, indiscriminate weapons. When officers deployed chemical munitions, protesters scattered but then regrouped. In my experience this phenomenon is predictable to a high degree in protest behavior. The skirmish line stayed where it was, on Colfax, north of Lincoln.

55.    When asked about what the police objective was during this two-hour time period before curfew, Lt. Williams could not say, other than "Under directions of the command post, that's what we were doing." (Williams Deposition, p. 65.) No unlawful assembly or riot was declared. (Williams Deposition, pp. 57, 65-66.) Lt. Williams agreed that there were "many, many people that were present, that were not engaged in assaultive behavior." (Williams Deposition, p. 67.) Yet, peaceful individuals were affected by the use of chemical munitions. The police line did not move forward to disperse the crowd until after curfew. There were announcements about curfew, which began at about 7:45 p.m. However, I did not see any video evidence of any other

31

announcements, dispersal orders, or warnings about the use of force at the intersection of Lincoln and Colfax during this time period.

56.     In my opinion, the DPD's use of less-lethal weapons at this location and time was inconsistent with generally accepted police practices, standards, and training because there were no audible warnings given and no attempt to isolate non-peaceful from peaceful protesters. The failure of command to provide audible and adequate warnings, dispersal orders, or announcements prior to the use of less-lethal weapons on protesters was a failure of supervision and leadership. There was also no strategy for the deployment of tear gas, discussed in further detail below.

## 2.   Indiscriminate and inappropriate use of chemical munitions such as tear gas

57.     Chemical munitions such as tear gas are indiscriminate weapons which affect peaceful and non-peaceful protesters alike. This—in addition to the fact that tear gas is a serious level of force—is one of the reasons that its use must be authorized by command staff (and during the GFP, it was frequently authorized by Commander Phelan himself).

58.     It is my opinion that in each of the specific incidents discussed above, and the one described below (May 31 kettling incident at the Basilica), DPD indiscriminately and inappropriately used chemical munitions such as tear gas. There was no attempt to isolate non-peaceful from peaceful protesters. Tear gas was also frequently thrown into the middle of a crowd, which made it difficult for protesters to determine where to go, especially if they were faced with a line of officers on one side and tear gas on the other side. The appropriate use of tear gas is to disperse a crowd in a specific direction. DPD's use of tear gas was contrary to generally accepted police practices, standards, and training. The DPD's failure to provide adequate training, and its widespread custom and practice of indiscriminate and inappropriate use of chemical munitions, caused in significant part the violation of the constitutional rights of the plaintiffs.

59.     DPD's use of tear gas was also not consistent with the DPD Crowd Management Manual. The DPD Crowd Management Manual states:

> The policy of the Denver Police Department is to appropriately direct and control public gatherings so as to protect life and property, maintain public peace and order, ensure compliance with the law and respect all constitutional rights including those of free speech and assembly. *Efforts will be made to isolate and arrest violators from a crowd before declaring an assembly as unlawful.* (Emphasis added.) (DPD Crowd Management Manual, p. 4, DEN 71.)

The Manual also states: "If identifiable participants engage in disorderly conduct or violence and if circumstances allow, the Denver Police Department must respond by dispersing, controlling, or arresting the specific persons engaging in the conduct; *not* by issuing a general order to disperse." (Emphasis added.) (DPD Crowd Management Manual, p. 8, DEN 75.)

60.     The Manual also provides that general dispersal orders will not be given unless a "'significant number or percentage' of participants fail to adhere to time, place and manner restrictions *and* voluntary compliance, targeted citation and/or targeted arrest actions have not resulted or are not 'reasonably likely' to result in 'substantial compliance,' or a "'significant number or percentage of participants are engaging in, or are about to engage in, tumultuous and violent conduct which creates a grave danger of damage or injury to property or person…." (Emphasis added.) (DPD Crowd Management Manual, p. 9, DEN 76.)

61.     The Manual emphasizes the importance of protecting the rights of individuals peacefully exercising their rights:

When deciding to address law violations during crowd control situations, officers must consider the totality of the circumstances to include factors such as:

- The nature of the violation.
- The urgency of the crime (property crime or a crime against a person).
- The risk to officers and the public.
- The extent of property damaged or endangered.
- The importance of removing violators who may be impacting the rights of those involved in a lawful assembly and expressive activity in order to maintain control of the crowd and provide free expression opportunities to non-violators. (DPD Crowd Management Manual, p. 11, DEN 78.)

Thus, the DPD recognizes that it is important to protect the free speech rights of peaceful individuals or non-violators by attempting to remove violators or aggressors, *not* by issuing general orders to disperse or using chemical munitions to disperse everyone.

62.     Despite this knowledge and recognition, command-level DPD officers could not identify any specific instance during the GFP in which actions were taken to isolate aggressors within a crowd. Instead, DPD routinely dispersed protesters through the use of chemical munitions, including deployment of tear gas canisters and area saturation with PepperBalls, regardless of whether the protesters were largely peaceful. This occurred on numerous occasions, including at 14th & Sherman on May 28, at Washington and Colfax on May 28, at 16th Street and Welton on May 30, and at Lincoln and Colfax on May 30.

63.     It is fundamental that officers may not use force against individuals (including protesters) unless there is an objectively reasonable basis for the use of force against that particular individual. All persons are not subject to indiscriminate police force by simply being present at the scene, particularly at a scene where First Amendment rights are being exercised. For example, the IACP *Concepts and Issues Paper on Crowd Management* provides, "The fact that some individuals in a crowd have engaged in unlawful conduct does not normally provide blanket grounds for use-of-force countermeasures, crowd dispersal, or declaration of an unlawful assembly." (Fitouri 18372.)

64.     Lt. Williams testified that while there were some occasions on which officers targeted aggressive individuals within a crowd with 40 mm launchers or PepperBalls, there was no instance in which officers entered a crowd to attempt to physically isolate or arrest an individual engaged in assaultive behavior. (Williams Deposition, pp. 63-64.) I have not seen any evidence of any officers attempting to isolate violators within a crowd in order to protect the rights of free expression of peaceful protesters in the crowd. Instead, command staff did what was expedient, which was to use chemical munitions to disperse entire crowds, regardless of whether the crowd was mostly peaceful with only a few aggressors. Such use of indiscriminate force is contrary to generally accepted and proper police training and practices.

65.     There were several occasions, such as on May 28, when Commander Phelan himself authorized the use of tear gas to disperse crowds, without any assessment of whether the crowd was mostly peaceful with a few aggressors and without any attempt to isolate the aggressors. As Lt. Canino admitted when asked about Colfax and Washington on May 28, the crowd of protesters was not declared an unlawful assembly because "[s]ome of the people that were there were not throwing rocks, a good majority of them, actually were not throwing rocks." (Canino Deposition, p. 38.) Even though the majority of the crowd was peaceful and no unlawful assembly was declared, command staff nevertheless authorized the use of tear gas on the entire crowd. The same occurred at the intersection of Lincoln and Colfax on May 30 between 6:00-8:00 p.m. No unlawful assembly was declared, and yet, officers repeatedly used chemical munitions to disperse the protesters, even though the majority of them were peaceful. (Williams Deposition, pp. 65-70.)

66.     Lt. Canino, Lt. Williams, and other DPD officers uniformly testified that their actions during the GFP were consistent with DPD policy, training, and instructions from the Command Post. None of the DPD leaders or officers observed any use of force by officers that was inappropriate or inconsistent with department policy or training, and none of them took any actions that they believed were inappropriate or inconsistent with department policy or training.

67.     There is a clear discrepancy between the *written* policies of the DPD (including provisions of the Crowd Management Manual) and the *actual* policies of the DPD as understood and practiced by the officers (including command-level officers). The actual policies of the DPD in practice are what is seen on the BWC and other video from the GFP, as well as what the numerous DPD officers—from command staff to officers—testified to at their depositions. That is, the unwritten policy or practice of the DPD was to use force (such as tear gas) indiscriminately on crowds of protesters without regard to the proportion of individuals in the crowd who were peaceful versus non-peaceful, and without regard to whether the First Amendment rights of peaceful protesters were affected.

68.     DPD officers uniformly testified that they used less-lethal weapons to disperse crowds whenever objects were thrown at them. Rocks and water bottles are annoying and can be dangerous. But they are objects that can be dealt with, especially when officers are wearing helmets, face shields, and other protective gear. In order to protect the constitutional rights of the

34

majority of protesters, DPD should have made attempts to isolate the individuals throwing objects from the crowd. Lt. Williams testified that it was too dangerous to send officers, though teamed up and protected from head to foot by "hard gear," into a crowd to isolate and apprehend aggressors.

69.     Not only was there a general failure to give dispersal orders or warnings before the use of less-lethal weapons on protesters during the GFP, but there was a failure to ensure that dispersal of crowds using less-lethal weapons was in compliance with the Crowd Management Manual.

70.     A written policy is only effective if it is followed. There is little to no evidence that the written crowd management policies of the DPD were consistently adhered to—by Commander Phelan, and his lieutenants, sergeants, and officers throughout the GFP.

### 3.     Indiscriminate and inappropriate use of PepperBalls and inadequate training

71.     According to the DPD Crowd Management Manual, PepperBall use is allowed only against targeted individuals whose conduct rises to the level of "Defensive Resistance." (DPD Crowd Management Manual, p. 19, DEN 86.) "Defensive resistance" is defined in the DPD Operations Manual as "Physical actions that attempt to prevent an officer's control, including flight or attempt to flee but do not involve attempts to harm the officer …." (DPD Operations Manual, § 105.01(3)(d).) According to Commander Phelan, Lt. Williams, and other DPD officers, "defensive resistance" included failure to obey orders to disperse. (Williams Deposition, pp. 122-23; Phelan Deposition, p. 78.)

72.     The actual use of PepperBall during the GFP was in stark contrast to DPD policy. The evidence (including video footage) shows a practice of deploying DPD officers deploying PepperBall guns on protesters even though they were not engaged in "physical actions that attempt to prevent an officer's control." The video also shows many officers deploying PepperBalls in an indiscriminate fashion without regard to whether they were aiming at a person or at the ground or an object near a person. A few examples include:

- A BWC video from May 28, 2020, at 8:30 p.m. at Colfax and Washington shows officers shooting PepperBalls at individuals who did not appear to be engaged in any "physical action" that "attempt[ed] to prevent an officer's control." (DPD BWC videos, including DEN 4043; DEN 4044; DEN 4050.)

- On May 29, 2020, in the vicinity of the intersection of 14th and Sherman at approximately 9:04 p.m., Plaintiff Elisabeth Epps was shot with PepperBalls as she crossed 14th Ave. (BLM 1019; DEN 4180.) According to Officer Christian, Epps was peaceful, not making any disturbance, and not holding a weapon. (Christian Deposition, p. 72.) According to Christian, Epps was not taking any "physical action" in which she "attempted to prevent an officer's control."

35

(Christian Deposition, pp. 71-72.) The video of this incident does not show any "physical action" that Epps engaged in that "attempts to prevent an officer's control." Nor are any audible warnings or dispersal orders directed at her prior to the officers' deployment of PepperBall. At his deposition, Christian admitted that, when Epps had already crossed the middle of the intersection and was "less than 10 feet" from the sidewalk on the Capitol side of the street, he raised his PepperBall gun at her, and shot her without any warning or order to disperse. (Christian Deposition, pp. 71, 73.) Christian's justification was "because she was standing in the roadway in violation of the laws" and he wanted to "get her to move from the middle of the street." (Christian Deposition, pp. 73, 78.) Another officer saw Christian shoot at her and said "Sarge said don't hit her." (Christian Deposition, p. 72.) Against DPD policy, Christian did not include his use of force against Epps in his Officer Statement for that day. (Christian Deposition, p. 85.) Despite other officers (including, apparently, a sergeant) knowing of Christian's unjustified use of force on Plaintiff Epps, Christian was never disciplined. (Christian Deposition, pp. 85-86.) Nor was he disciplined for omitting the use of force from his Officer Statement. (Christian Deposition, p. 85.)





DEN 4180 at 9:04:43 p.m. MT (annotated)



BLM 1019 (video taken by Plaintiff Epps at this time)

- On May 29, 2020, on Lincoln street between 13th and 14th, between
  approximately 9:10 p.m. and 9:45 p.m., Plaintiff Elisabeth Epps was shot with
  PepperBalls causing damage to her cell phone. The BWC of this incident (DEN
  4164) shows several officers deploying their PepperBall guns in an indiscriminate
  fashion as they walked south down Lincoln Street. Other video produced in this
  case, including video produced by the Colorado State Patrol also shows this
  incident from different angles (BLM 1019 (video taken by Plaintiff Epps at this

37

time); CSP video 05292020 v138, 09:15:00-09:18:00; CSP video 05292020 v138, 09:28:04-09:30:30; CSP video 05292020 v225, 09:15:30-09:17:32.)





DEN 4164 at 9:16 p.m. MT (annotated)



BLM 1019 (video taken by Plaintiff Epps at this time)

- On May 30, 2020, at approximately 5:50 p.m. in the vicinity of the intersection at Lincoln and Colfax, the BWC produced as DEN 5055 shows an individual asking a group of officers, "do you guys enjoy being tyrants?" The officer tells him to "get back" and fires PepperBalls at him. The individual was almost run over twice by cars as he was walking away and being shot in the back with PepperBalls. This same incident can be seen in the BWC video produced as DEN 5008.





DEN 5008 at 5:50:13 p.m. MT

40



DEN 5008 at 5:50:14 p.m. MT



DEN 5008 at 5:50:15 p.m. MT



DEN 5008 at 5:50:17 p.m. MT

- On May 30, 2020, at 7:09 p.m., at the intersection of Lincoln and Colfax, Plaintiff Youssef Amghar was shot with PepperBalls while standing on a sidewalk with their hands up. (Amghar Declaration; DEN 5017; DEN 5047.) Video does not show Amghar engage in any "physical action" that "attempts to prevent an officer's control." Nor are any warnings or dispersal orders heard on the videos. There does not appear to be any reason that warranted shooting Plaintiff Amghar with PepperBalls at this time and location.





- On May 30, 3030 at 7:17 p.m., at the intersection of Lincoln and Colfax, Plaintiff Epps was struck in the face with a PepperBall while filming with her cell phone. BLM_00001021 (at about 52:50-53:27). A DPD Officer Valentine was firing several rounds from his PepperBall gun in Plaintiff Epps' direction at the time that Plaintiff Epps was struck in the face, as Plaintiff Epps was standing behind a different individual that threw an object in the direction of Officer Valentine. (DEN 5028; Valentine Deposition, pp. 84-86, 92, 100-101.)





DEN 5028 at 7:17:00 p.m.



BLM_00001021 (Video taken by Plaintiff Epps) (53:58)

- On May 30, 2020, between 6:00-8:00 p.m., officers in the skirmish line at the intersection of Lincoln and Colfax repeatedly shot PepperBalls at protesters who did not appear to be engaged in any "physical action" that "attempt[ed] to prevent an officer's control." (See BWC videos from DPD and APD officers.)

45

- According to the declarations of several plaintiffs and other witnesses, there were numerous occasions on which police shot PepperBalls at protesters without warning and not in response to any "physical action" by protesters that "attempt[ed] to prevent an officer's control." (Sannier Declaration, ¶¶ 8, 10, 13; Duran Declaration, ¶¶ 6-10, 14-16; Fitouri Declaration, ¶¶ 5, 7-11; Parkins Declaration, ¶¶ 5-12; Taylor Declaration, ¶¶ 9-13; Amghar Declaration; Deras Declaration, ¶¶ 5-6; Blades Declaration, ¶¶ 11, 17; Helmick Declaration, ¶ 18; Sanchez Declaration, ¶¶ 31-32, 35, 39-40; Stebleton Declaration, ¶¶ 6, 11, 16; Kelly Declaration, ¶¶ 4, 7, 19, 22.)

- In some instances, officers shot individuals who were dispersing. (*E.g.*, DEN 5109 at 9:44:57 p.m. MT; Sanchez Declaration, ¶ 31; Helmick Declaration, ¶ 18.)

- Officers shot credentialed members of the press. (Duran Declaration, ¶ 7.)

73. As discussed above, DPD witnesses, including command-level officers, uniformly testified that their actions and the actions of other officers during the GFP were consistent with DPD policy, training, and instructions from the Command Post. In addition, the DPD Crowd Management Manual provides that, during crowd control situations, "[t]he Pepper Ball projectile will not be deployed against a <u>specific individual</u> in a crowd without the approval of the Division or Unit supervisor. Additionally, the Pepper Ball system will not be used against a group or crowd without prior authorization from the Incident Commander." (DPD Crowd Management Manual, p. 19, DEN 86.)

74. Thus, I conclude that (1) use of PepperBalls as a crowd control or crowd dispersal measure was authorized by the Incident Commander; (2) use of PepperBalls on specific individuals was approved by DPD supervisors; and (3) DPD policy, training, and instructions from the Command Post (i.e., the Incident Commander) resulted in the indiscriminate use of PepperBalls during the GFP, which affected the rights of peaceful and non-peaceful protesters alike. Furthermore, in my opinion, the video and other evidence show that DPD officers were not appropriately or adequately trained in the use of PepperBalls. For instance, appropriately or adequately trained officers acting in a reasonable manner would not have deployed their PepperBall guns as described in the above-listed examples. The widespread nature of these examples—and the lack of discipline of DPD officers who engaged in this conduct—shows that the actual practice of DPD officers is quite different than what the DPD's policy is in writing (which is that PepperBall will be used in response to a "physical action" by a protester that "attempts to prevent an officer's control.").

## 4. Dangerous Kettling Incident on May 31, 2020

75. On May 31, 2020, between approximately 9:36-9:42 p.m., hundreds of protesters gathered in front of Cathedral Basilica of the Immaculate Conception, on Colfax between Logan and Pennsylvania. (DEN 3874 - HALO; DEN 3873 - HALO; Fitouri 228 at 25:00-28:24 min.)

The video shot by Plaintiff Jonathen De La Vaca Duran (Fitouri 228) shows that he and protesters were pushed west on Colfax by officers using less-lethal weapons. BWC produced by APD shows that Aurora officers were originally at the District 6 station at Colfax and Washington. On the radio (which can be heard on the BWC of APD Officer Alcorta, COABLM 345), Commander Phelan communicates with Captain Redfearn and Lt. Williams. Lt. Williams and his teams (Sgts. Beall and Abeyta and their officers) were on Colfax, coming in from the west. (COABLM 345; Redfearn Deposition, pp. 34, 98-110; Phelan Deposition, p. 75) Commander Phelan instructs Aurora to push from the east and the team headed by Lt. Williams to push from the west. At 9:39 p.m., Lt. Williams (radio call sign 100) says that they are at Colfax and Grant, and "we're going to be pushing into each other." At 9:40 p.m., Commander Phelan tells Lt. Williams, "we'll push 'em there, we will get 'em and make some arrests." (COABLM 345.)



76.     The HALO video (DEN 3874) and video shot by Plaintiff Duran (Fitouri 228) shows that protesters were pushed west on Colfax by Aurora officers (who were also with Jefferson County SWAT officers). Then, another large group of protesters marching east on Colfax end up in front of the Basilica on Colfax between Logan and Pennsylvania. (Fitouri 228

at 25:00-28:24 min.) Aurora BWC and the HALO (DEN 3874) shows that APD officers stopped at Pennsylvania. APD officers appear to be deploying less-lethal weapons, including large amounts of tear gas, into the crowd of protesters in front of the Basilica. (DEN 3874 at 9:34 p.m. MT; COABLM 371; COABLM 375; COABLM 398.) At the same time, Lt. Williams and his team are moving in from the east on Colfax. Clouds of gas are visible at the intersection of Logan and Colfax in the HALO video from that intersection (DEN 3873). DPD officers move into the middle of the block. Large numbers of protesters are hemmed in by the metal fence around the Basilica on the north, large buildings on the south, and officers firing tear gas from the east and west. Many protesters appear able to escape down the alley to the south, between the buildings, or around the corner, north, on Pennsylvania and Logan. (DEN 3873; COABLM 398; Fitouri 228 at 28:00-28:24 min.)

77.     The practice of encircling or surrounding a group of protesters in order to arrest them (or use force on them) is often referred to as "kettling." The DPD Crowd Management Manual does not prohibit kettling. In fact, it states:

A police line will not be used to encircle or "substantially encircle" any part of an assembly *unless the following three circumstances exist*:

1.  To provide safety for the demonstrators or when there is probable cause to believe that a significant number or percentage of the persons to be encircled have committed unlawful acts (other than failure to have a permit); and
2.  The police have the ability to identify those individual violators; and
3.  The police have decided to arrest the violators. (DPD Crowd Management Manual, p. 9, DEN 76) (Emphasis added).

Thus, the written policy of the DPD *expressly permits the encircling of protesters* under the circumstances listed above. In this case, Commander Phelan had decided to "arrest the violators" (presumably for violation of the emergency curfew). He expressly directed the two teams of officers, headed by Lt. Williams and Capt. Redfearn, to push toward each other so that the protesters could be arrested in one location. And when asked about whether the use of force as depicted in the HALO camera at Logan and Colfax (DEN 3873), was consistent with DPD policy, although Commander Phelan initially said that he did not have enough information, he then answered, "I'm sure it was." (Phelan Deposition, p. 76.)

78.     It is my opinion that DPD policy and the actions of the DPD during this kettling incident were contrary to generally accepted police practices and standards. Kettling, also described as "encirclement," "corralling," or "containment," is a dangerous practice that indiscriminately subjects everyone to the same, often violent, treatment regardless of individual conduct. The DPD's policy and practice caused in significant part the violations of the constitutional rights of the plaintiffs.

79.     Assuming that the emergency curfew could be validly enforced (and validly enforced only against protesters), that was not a reason to kettle protesters in order to arrest them for violation of the curfew, or to use less-lethal weapons on them in an enclosed space for violation of the curfew.[2]

80.     A law enforcement agency may use only that amount force necessary to accomplish a legal purpose. As documented throughout the materials I reviewed, there is evidence that DPD personnel are well aware of this policy. They are also aware that DPD requires specific dispersal orders and up to three warnings, where possible, in order to give protesters the opportunity to disperse. This did not appear to happen in front of the Basilica before protesters were hit with heavy clouds of tear gas. Aurora Sergeant Brukbacher can be heard saying on his BWC at 9:43:17 p.m. MT (after the use of force had already begun), "everybody hold your fire for a minute, they're going to give dispersal orders." (COABLM 371.) Yet, no such orders can be heard on the video. (COABLM 371.) And, according to the declarations of Plaintiffs and other protesters who were present during this incident, because no dispersal orders were heard, the protesters felt trapped and scared. (Sannier Declaration, ¶¶ 15-27; Fitouri Declaration, ¶¶ 21-36; Parkins Declaration, ¶¶ 21-36; Duran Declaration, ¶¶ 27-35; Cousik Declaration, ¶¶ 14-30; Smedberg Declaration, ¶¶ 7-23; Zinman Declaration, ¶¶ 26-43.) These protesters were able to run away from the tear gas, but only after having to choose between running toward officers firing less-lethal weapons, climb a metal fence, or run down a narrow alleyway with hundreds of other protesters.

**5.      Inappropriate use of 40mm launchers and other projectiles and inadequate training**

81.     An appropriately-trained police officer acting in a reasonable manner would not indiscriminately fire a potentially lethal projectile into a crowd, or toward persons who are not engaged in conduct that could be construed as posing a danger to the officer, others, or themselves. During the GFP, there were many press reports of individuals who were seriously injured by inappropriate use of 40mm launchers and other projectiles. Even innocuous-sounding "foam batons" fired from a 40mm launcher can cause loss of vision, broken bones, brain damage, even death. The DPD's inadequate training and widespread practice of inappropriate use of 40mm launchers caused in significant part the violation of the constitutional rights of the plaintiffs.

82.     **May 31, 2020 shooting of Plaintiff Jonathen Duran:** According to Plaintiff Duran's declaration, he was documenting the GFP as a credentialed member of the press on the evening of May 31, 2020. He alleges that he was wearing a white helmet with "MEDIA" visibly written on it on all sides. (Duran Declaration, ¶ 19.) While he was standing at the intersection of

---

[2] It is important to note that there were certain exceptions to the curfew, such as for "credentialed members of the news media." (Emergency Curfew Order, DEN011302-11303.) According to his declaration, Plaintiff Duran was a credentialed member of the news media; if that is true, there would have been no basis to enforce the curfew (or use force) against him whatsoever.

Colfax and Pearl Street, at approximately 9:30 p.m., he was shot in the groin with a foam baton. (Duran Declaration, ¶ 24.) This appears to be corroborated by his video. (Fitouri 228 at 21:24 (moment of shooting), 22:43 (projectile shown to the camera).) Although there appear to have been individuals in the street around him moving a dumpster and some fencing just before he was shot, that would not have justified the shooting of Plaintiff Duran.

83.     According to the DPD Crowd Management Manual, "The 40mm launcher will not be used against a specific individual in a crowd without the approval of the Division or Unit supervisor. Additionally, the 40mm system will not be used against a group or crowd without prior authorization from the Incident Commander." (DPD Crowd Management Manual, p. 20, DEN 87.) Assuming this provision was followed during the GFP, each use of the 40mm launcher on Plaintiff Duran was approved by a DPD supervisor or the Incident Commander. Certainly Chief Pazen believes the policy was followed, as he explained in an interview with Channel 9 News. In fact, the chief reported that every unit from an outside law enforcement agency which provided mutual aid to DPD was accompanied by a DPD supervisor, and each was provided the rules of engagement. (Pazen Deposition, pp. 29-30; 9News video, 6-1-2020 4.)

84.     The Manual further provides that use of the 40mm launcher in crowd control situations may be appropriate under the following circumstances:

- Against violent individuals within a crowd.
- Against subjects who are actively throwing objects at police officers.
- Against subjects who are at risk of causing imminent bodily injury to other persons.
- To mark individuals for future identification and arrest for illegal acts that include active aggression.
- To provide cover while Arrest Teams penetrate a crowd, or against individuals who attack the Arrest Team or who violently interfere with the movement of the team or arrest process. (DPD Crowd Management Manual, p. 20, DEN 87.)

85.     None of these circumstances appear to have been satisfied during the incident in which Plaintiff Duran was shot in the groin. (Fitouri 228 at 21:24.) According to the testimony of numerous DPD officers, 40mm launchers may only be used against individuals engaging in "active aggression." According to the DPD Operations Manual, that means "An overt act or threat of an assault, coupled with the present ability to carry out the action, which reasonably indicates that an assault or injury to a person is likely." (DPD Operations Manual, § 105.01(3)(e).) The Manual also provides that officers cannot intentionally target an individual's groin.

86.     It is my opinion that the shooting of Plaintiff Duran with a foam baton to the groin was contrary to generally accepted police practices, standards, and training. It was also inconsistent with the DPD Crowd Management Manual. The video (Fitouri 228) shows that

Plaintiff Duran was not violent, throwing anything, at risk of causing imminent bodily injury to other persons, or attacking an arrest teams or subject to arrest.

87.     Plaintiff Duran submitted a complaint to Internal Affairs. No one was disciplined as a result. In the "decline" letter sent to Duran by Commander Magen Dodge of the Internal Affairs Bureau, she appears to cast doubt on the veracity of his allegation (despite his production of video evidence), by pointing to the fact that he could not identify the officers (who were wearing riot gear) and stating that his video showed that he was walking backwards when struck and that he was able to walk without assistance after being struck. (DEN 8076.) This letter (and the other "decline" letters, discussed in more detail below) do not show any serious attempt by the DPD to investigate citizen complaints of use of force during the GFP.

88.     **May 31, 2020 shooting of Plaintiff Joe Deras:** According to Plaintiff Deras's declaration, he was marching with other protesters near the intersection of Colfax and Washington at approximately 8:30 p.m. on May 31, 2020, when he was struck with what he believed were three tear gas canisters. (Deras Declaration, ¶¶ 10-17.) The HALO camera video from this intersection at this time (DEN 3871) shows protesters marching east on Colfax. The camera is facing west and the intersection cannot be seen in the minutes before 8:30 p.m. At about 8:29 p.m., protesters can be seen stopping and backing up, away from the intersection. The camera shifts direction and faces north, in the intersection. A line of police officers can be seen behind large clouds of gas, standing just north of Colfax on Washington. (DEN 3871 at 8:29-8:30 p.m. MT.) It appears from the HALO camera footage that Plaintiff Deras (wearing a white helmet), may have run into the middle of the intersection to kick an object. (DEN 3871 at 8:30:43 p.m. MT.) He was a good distance away from the officers in the skirmish line. Even if Deras was kicking an object in the intersection, it would have been contrary to generally accepted police practices for officers to shoot him three times with projectiles, hitting him in the head, back and hand. Also, according to Deras, the force used was without warning. (Deras Declaration.)





DEN 3871 at 8:30:37 p.m.

89.   **May 31, 2020 shooting of Plaintiff Zach Packard:**  At approximately 9:12 p.m. in the vicinity of the intersection of Colfax and Washington, Plaintiff Zach Packard was shot in the head with a projectile by an officer shortly after he kicked a gas or smoke canister off the curb on the south side of Colfax. The incident is depicted in photographs produced at BLM_00000040-42. There are numerous BWC videos produced by DPD and the APD that show officers firing smoke or gas canisters, as well as less-lethal munitions rounds from shotguns, into the intersection of Colfax & Washington at this time. (COABLM 508; COABLM 450; DEN 5087; DEN 5110; DEN 5114.) The BWC produced at COABLM 508 shows that at approximately 9:12, the officers were told something to the effect that if individuals kicked the

tear gas canisters, "go ahead and hit 'em." or "go ahead and see if you can hit 'em." (COABLM 508.) This use of force was contrary to generally accepted police practices.

With respect to both Plaintiff Deras and Plaintiff Packard, it was not appropriate to directly fire a projectile—whether it be a bean bag or sock round, a foam baton, or a tear gas canister—at their heads or bodies. As noted, such use of force is potentially lethal or can cause serious bodily injury, and is only warranted when officers are confronted with force from an aggressive or violent individual posing a threat that is potentially lethal or can cause serious bodily injury to the officer or others. Even if they were kicking tear gas canisters, neither Deras nor Packard appeared to be posing such a threat.





BLM_00001771 (left), BLM_0000042 (right)



BLM_00001769

### 6.  Inappropriate use of pepper spray and inadequate training

90.     Under the DPD Crowd Management Manual, pepper spray is considered a chemical munition. (DPD Crowd Management Manual, p. 22, DEN 89.) The Manual states, "The use of a chemical agent for crowd control or riot control must be authorized by the Division or Unit Supervisor, except in the event of an emergency…." (DPD Crowd Management Manual, p. 23, DEN 90.) The Manual further states that chemical agent use may be appropriate in the following circumstances:

- To prevent an injury to an officer or a third person.
- To subdue a person who is threatening or attempting physical harm to himself or another.
- Against subjects resisting arrest.
- To quell rioting.
- Against subjects interfering with an arrest.
- Any situation with the officer can clearly articulate the need for deployment.

91.     There are numerous examples of DPD's inappropriate use of pepper spray during the GFP. The widespread nature of these examples—and the lack of discipline of DPD officers who engaged in this conduct—shows that the actual practice of DPD officers is quite different than what the DPD's policy is in writing. It also shows that DPD officers were inappropriately and inadequately trained in the use of pepper spray. For example:

92.     On May 28, 2020, at approximately 9:35 p.m. in the vicinity of the intersection of 14th and Lincoln, the BWC produced at DEN 4021 shows an officer deploying pepper spray on individuals who were simply standing in the intersection when the officers decided it was time

for them to move. These individuals posed no threat to the officers and they were given no warnings prior to being pepper sprayed. (DEN 4021.)



DEN 4021 at 9:35:33 p.m.

93.    On May 29, 2020, at approximately 9:56 p.m. on the Capitol lawn just east of Lincoln Street, an officer deployed pepper spray on an individual pushing him into live traffic on Lincoln Street. (DEN 4228.) The officer provided no warning that he was going to deploy pepper spray on the individual.



DEN4228 at 9:56:34 p.m.

94.     On May 30, 2020, at approximately 5:46 p.m. in the vicinity of the intersection of Colfax and Lincoln, as the officers started to move protesters south of Colfax, the BWC produced at DEN 5008 shows police officers deploying pepper spray on an individual even though he was not acting aggressively. (DEN 5008.)



DEN 5008 at 5:46:54 p.m. MT (annotated)

95.     On May 30, 2020, at approximately 6:54 p.m. at the intersection of Colfax and Lincoln, BWC produced at DEN 4988 shows an officer deploying pepper spray on an individual without warning. The individual was slowly approaching the officers asking, "which one of y'all shot me?" The officer told this individual to back up, and when he did not immediately comply, the officer deployed a significant amount of pepper spray directly into his face without warning. (DEN 4988.) There was no attempt to de-escalate. This incident is also visible in the videos produced at DEN 4976; CSP video 05302020 v217 at 06:54 p.m. MT; Channel 9 News video 5-30-2020 7 at 02:05:30-02:06:02 min.



DEN 4988 at 6:54:31 p.m.

96.    On May 30, 2020, at approximately 6:56 p.m., while a group of people were tending to the man who had just been pepper sprayed at the intersection of Colfax and Lincoln in the incident described in the preceding photograph, an individual standing on the corner threw a water bottle at the group of officers standing there. In response, the officers showered everyone on the corner in pepper spray, PepperBall, and various other less-lethal munitions.



57

DEN 4988 at 6:56:22 p.m. MT (annotated)



DEN 4988 at 6:56:25 p.m. MT

97.     On May 30, 2020, at approximately 7:34 p.m. in the vicinity of the intersection of Colfax and Broadway, Plaintiff Stanford Smith was pepper sprayed in the face while he was walking peacefully in front of a line of officers with his hands raised in the air. The BWC produced at DEN 5044 shows this incident, as does the video produced by the Colorado State Patrol at 05302020 v88 at 07:32:30-07:34:16 p.m. MT.



DEN5044 at 7:34:14 p.m. (annotated)

98.     On May 30, 2020, at approximately 8:20 p.m. in the vicinity of 14th and
Broadway, police officers were marching in a line and moving protesters as they moved, and
deploying pepper spray on individuals without warning when they were not moving fast enough.
The BWC produced at DEN 5034, for example, shows an officer telling a woman to "move out,"
and "you're making no point, just go," "just keep going," and "it's not worth it." When the
woman did not back up fast enough, an officer pepper sprayed her without warning. (DEN
5034.)



DEN5034 at 8:20:38 p.m.

99.     There is no evidence that any of the officers involved in these incidents were disciplined, or that these incidents were even investigated. The DPD's policy and widespread practice caused in significant part the violation of the constitutional rights of plaintiffs.

**7.     Inappropriate use of flash bangs and failure to train**

100.     According to Plaintiffs Fitouri, Parkins, Deras, and Sannier, flash bangs—also known as noise-flash diversionary devices (NFDD)—were used by DPD on numerous occasions, including on May 29, 2020 at the intersection of Colfax and Broadway, on May 30, 2020 at the intersection of Lincoln and Colfax, and on May 31, 2020 at the intersection of Colfax and Washington. (Fitouri, Parkins, Deras, and Sannier Declarations.) Plaintiff Fitouri states that, at the intersection of Colfax and Lincoln on May 30, 2020, police threw a flash bang which landed at her foot and exploded, causing minor burns and her foot to go numb. (Fitouri Declaration, ¶ 12.) Plaintiff Deras states that a flash bang exploded near his face, injuring his eardrum and causing him sharp pain in his ear for several days afterwards. (Deras Declaration, ¶ 6.) Plaintiff Sannier states that a flashbang went off near her head, causing disorientation and ringing in her ears. (Sannier Declaration, ¶ 14.)

101.     Aurora officers did not have flash bangs or PepperBall guns. (Shaker Deposition, pp. 19-20.) However, DPD Metro/SWAT had flash bangs. (Bolton Deposition, p. 39.)

102.     Assuming that a jury credits Plaintiffs' testimony, the DPD's use of flash bangs under the described circumstances was contrary to generally accepted police practices, standards, and training. Notably, the DPD Crowd Management Manual does not contain any discussion of

use of flash bangs. There is no policy on NFDDs or their use. These devices are hand-thrown explosive devices that emit a bright flash and loud noise. They are designed to disorient and can cause temporary blindness and deafness. (OIM Report, p. 15.) They can cause serious injuries, including fires and severe burns. They are "'not intended for the direct application of force against a person and should not be thrown directly at a person.'" (OIM Report, p. 15.) Only officers who are specially trained in their use should use them. In 2014, a police flash bang, common on virtually all early morning drug raids, landed in the crib of a baby in Georgia. Injuries to the child were devastating (Salon, June 24, 2014). Use of these devices has also become increasingly common during street protests (Seattle Times, June 2020), resulting in several people being wounded and maimed, including a Seattle police officer.

103.   However, there is no evidence that DPD officers were provided any training whatsoever on the use of flash bangs. None of the training materials produced by the City in this case contained any discussion of flash bangs. And, as the OIM noted, "Neither the DPD Use of Force Policy nor its Crowd Management Manual include any discussion of the appropriate use of NFDDs." (OIM Report, pp. 15-16; DPD Crowd Management Manual; DPD Operations Manual, § 105.00.)

104.   It is my opinion that the DPD's failure to create any policy on the use of NFDDs or provide any training to its officers on their proper use is contrary to generally accepted police practices and standards. DPD failed to provide any policy or training whatsoever, even though Metro/SWAT officers were armed with them and apparently used them. Given how dangerous NFDDs can be, the need for training and policy is obvious. No police department should give its officers dangerous weapons and allow them to use them without any policy governing their use or any training in their application and use. The DPD's failure to create any policy or provide any training on use of flash bangs caused in significant part the violation of the constitutional rights of the plaintiffs.

105.   The BWC produced at DEN 4086 shows that on May 28, 2020, at approximately 9:50 p.m., officers threw a flash bang grenade at protesters standing at the intersection of Lincoln and Colfax. (DEN 4086.) This incident can also be seen in the BWC produced at DEN 4089. (DEN 4089.)



DEN 4086 at 9:49:48 p.m. MT

106.    The BWC produced at DEN 5095 shows that on May 31, 2020, at approximately 9:18 p.m. in the vicinity of the intersection at Colfax and Emerson, officers deployed multiple flash bang grenades (at least two) on a group of protesters without warning. (DEN 5095.) This incident can also be seen in the videos produced at DEN 5113, Fitouri 228, and DEN 3878 (HALO), and the 9News Video 5-31-20 4.



DEN 5095 at 9:18:20 p.m. MT (first flash bang)



DEN 3878 at 9:18:21 p.m. MT (first flash bang)



DEN 3878 at 9:18:36 p.m. MT (second flash bang)



Fitouri 228 (first flash bang)



9News Video 5-31-20 4 (first flash bang)



9News Video 5-31-20 4 (second flash bang)

107.    The BWC produced at DEN 5110 shows that on May 31, 2020, at approximately 9:10 p.m. in the vicinity of Colfax and Washington, and officer threw a flash bang grenade

without providing any warning. (DEN 5110.)  The DPD officers on the line in front of this officer turn around and yell "woohoo" after he threw the grenade.



DEN 5110 at 9:09:33 p.m. MT



DEN 5110 at 9:09:35 p.m. MT



DEN 5110 at 9:09:44 p.m. MT

**Additional Opinions on DPD's Policies, Practices, and Customs**

**1.    DPD policy did not require timely use of force reports and the effect on officer accountability**

108.    As the OIM recognized in its report on the GFP:

National standards emphasize the importance of documenting uses of force during large protests to enhance accountability. … The IACP recommends that all uses of force during crowd control be reported consistent with agencies' normal force reporting policies. All use of force reports should be as comprehensive as practicable and provide the degree of specificity necessary to fully document and evaluate the force. Incomplete, vague, or boilerplate language in use of force reports could allow violations to go unchecked and cripple investigations, so this type of language should not be permitted. (OIM Report, p. 23; IACP *Crowd Management Model Policy*, § IV.E.3.j, Apr. 2019; IACP *Reporting of Use of Force Concepts and Issues Paper*, p. 4, Mar. 2017.)

109.    I completely agree. Timely and complete use-of-force reporting is essential for officer accountability and transparency, as well as organizational credibility. The IACP provides, "Use-of-force reporting requirements apply equally to policing demonstrations and civil disturbances. It is very important for law enforcement agencies to document and investigate uses of force during these events, not only for managerial and accountability reasons, but also to respond effectively to potential complaints alleging excessive force following an event." (*Crowd Management: Concepts & Issues Paper*, Fitouri 18375.)

67

110.    The DPD itself recognizes this, given that the Operations Manual sets forth detailed use-of-force reporting requirements, as well as a process for supervisors to review uses of force to determine whether additional investigation is necessary. (See DPD Operations Manual, §§ 105.03(1)(a)(2), 105.03(2), 105.03(3).) This section of the DPD Operations Manual requires Use of Force Reports if an officer applies force through the use of several types of weapons, regardless of whether an arrest is made, the individual dies, is injured, or complains of an injury: 40 mm launcher; any tool, object, or device used as an impact weapon; chemical agents and munitions; PepperBall system). Even accidental discharges of PepperBall, chemical agent or munition, or 40 mm launcher must be reported, and officers are required to "immediately report" these uses of force on a Use of Force Report. DPD Operations Manual, § 105.03(1)(a). As the OIM described it, "During day-to-day policework, uses of force are reviewed by a supervisor in the officer's chain of command." (OIM Report, p. 24.)

111.    Despite the DPD's recognition of the importance of detailed and timely use-of-force reporting, the DPD had a different policy when it came to uses of force during protests. As the OIM observed, "the DPD Crowd Management Manual is silent on use of force reporting requirements specific to crowd control situations." (OIM Report, p. 24.) And as Lt. Williams, Lt. Porter, and other DPD witnesses testified at their depositions, DPD policy and practice is that use-of-force reporting is *not* required for uses of force at protests or demonstrations, including the GFP (unless an arrest is made and force was used during an arrest). (Williams Deposition, pp. 15, 18-20; Porter Deposition, pp. 43-44.) DPD policy for protests is that officers who use force are supposed to inform their supervisors, who in turn, provide that information to the Command Post so that a single "after action" report can be completed regarding all uses of force during the protests. (Williams Deposition, pp. 15, 19; Porter Deposition, p. 44-45.)

112.    However, the After Action reports for the GFP are woefully inadequate and vague. They do not include all of the uses of force by officers during the GFP, and they explicitly state that they are not even attempting to do so. For instance, the After Action reports written by Captain Sylvia Sich state: "This After Action Report addresses the use of chemical agents during this event … This is an attempt to capture when and where chemical agents may have been used and is not at all inclusive. … In order to get a broader picture of the use of chemical agents; officer statements, After Action Report and *Use of Force Reports* must be reviewed." (DPD After Action Reports, DEN 1938, 1941, 1943, 1945.) (Emphasis added.)

113.    The adverse effect of the DPD's policy and practice of not requiring timely and detailed use of force reports for protests on officer accountability cannot be understated. During the protests, officers believed that they would not be required to document their use of force on protesters, whether that use of force was use of PepperBalls, tear gas, 40 mm launchers, or any other kind of less-lethal weapon. (See, for example, Williams Deposition, p. 15.) This fact, combined with the fact that officers were not required to follow the written BWC policy in recording their uses of force on protesters, meant that officers could escape accountability for uses of force during the GFP.

114.    It is my opinion that without contemporaneous or timely and detailed documentation of their uses of force on protesters, and without complete BWC video of their actions during the protests, officers could (and apparently did) use inappropriate force on protesters with impunity. A requirement that uses of force be reported in a timely and detailed manner means that officers know that they have to account for their uses of force on civilians. Conversely, removing that requirement means that officers know that they will not have to account for their uses of force. DPD's policy and practice caused in significant part the violation of the constitutional rights of the plaintiffs.

115.    On June 4, 2020, the first lawsuit was filed against the City and County of Denver seeking injunctive relief against the DPD's use of force on protesters. On June 5, 2020, the federal court issued a temporary restraining order in that case (*Abay, et al. v. City of Denver*). (See Temporary Restraining Order issued in *Abay*.) The next day, June 6, 2020, Lt. Robert Wyckoff wrote in an email "Chief Archer and Chief Thomas have tasked Paul Berdahl and I with gathering loads of data for an overall AAR/UOF report." (DEN 11383.) Lt. Wyckoff's email details the information that Deputy Chief Archer and Division Chief Thomas wanted in the officer statements/use of force reports for the GFP. On June 9, 2020, Lt. Berdahl, an aide to Division Chief of Patrol Ron Thomas, wrote an email to all District Commanders and Administrative Lieutenants forwarding the email from Lt. Wyckoff. The email requests all District Commanders and Administrative Lieutenants to have their officers, sergeants, and lieutenants complete Use of Force Reports for each date from May 28 to May 31, and it requires them to "cover each and every Less Lethal deployment that occurred" during an officer's shift. (DEN 11383.)

116.    Significantly, Lt. Berdahl's email states: "It will be critical for all completing statements to review our Use of Force policy and training materials for Less Lethal deployments. I want to ensure that the officers are using correct terms to avoid inconsistency and problematic language." (DEN 11383.) This email is forwarded amongst other supervisors, culminating in an email from District 6 Commander Aaron Sanchez, who says that this documentation "is of utmost importance to protect you and your troops." (DEN 11380.)

117.    As OIM put it:

In response to a lawsuit that was filed on June 4, DPD personnel attempted to review when and where DPD officers had deployed chemical munitions against protesters. This proved problematic because Use of Force Reports had not been routinely prepared. Starting on June 6, command staff asked officers to go back and document their uses of force from the beginning of the GFP. Many officers attempted to comply by providing a description of the force they used in an Officer Statement … rather than completing the standard Use of Force Report. Many of these … Statements were prepared 12 or more days after the use of force incidents they documented. (OIM Report, p. 24.)

The OIM observed that the Officer Statements were problematic because they contained only vague and short descriptions of the circumstances of use of force; some officers repeated their narrative for each day; and some officers could not adequately document what they did because they were completing the statements too long after the incidents at issue. Thus, "[t]hese issues seriously limited the utility of these statements in evaluating individual uses of force to determine whether or not they were compliant with DPD policy." (OIM Report, p. 24.) I agree. The Officer Statements are, by and large, vague and provide little detail about where officers were on specific days, what kind of force they used, and on whom. In that sense they were essentially worthless—busy work that more likely than not engendered cynicism among the officers about a critically important police function.

118.    In addition, the emails of Berdahl and other command-level staff discussed above are very troubling. What they show is that, after the *Abay* lawsuit was filed, the DPD—at the highest levels—failed to show interest in whether officers actually violated policy, or behaved accountably. What the DPD wanted was for their officers to review DPD policy and training materials before writing their reports so that they could "us[e] correct terms to avoid inconsistency" with policy "and problematic language." (DEN 11383.) DPD officers, including Commander Phelan, agreed that this was the message from command-level staff. (Phelan Deposition, pp. 103-04.)

119.    In other words, DPD brass, at least as translated by Lt. Berdahl in his June 9 email, was putting words into the mouths of the officers and telling them what to write. Commander Sanchez's email—that writing officer statements so that they are consistent with DPD policy "is of utmost importance to protect you and your troops" meant to protect the officers against lawsuits or accusations. (Phelan Deposition, p. 106.) In my opinion, given my experience in police management and as a former chief of police, these emails show that DPD was interested in protecting itself and its officers, not in finding out the truth. DPD was "circling the wagons."

120.    The effect of these command-level instructions to officers is evident in the Officer Statements themselves, a few examples of which follow:

- "Myself and my team have been properly trained on the deployment and use of less lethal systems. At no point during the 8 days of protest assignment did I observe any team member deploy less lethal out of policy or during any peaceful protest. … my team showed great professionalism and restraint …." (DEN 2797, 2799, Sgt. Beall Statement.)

- "Throughout this Protest event, I did not witness any officer act in an inappropriate way, and observed my fellow team member act with great professionalism and restraint when confronted with verbal and physical abuse by violent protestors." (DEN 2940, Ofc. McDermott Statement.) (Notably, this is the same Officer McDermott whose BWC

captures an officer yelling "Motherfucker! That's what you get. Fuck you!" at a protester who was shot in the face with a 40 mm launcher. DEN 4136 at 7:23 p.m. MT)

- "During this event I authorized the use of Pepper Ball, 40 mm launchers and chemical munitions. Each authorization I made was done in accordance with Department policy. Furthermore, all force that I observed officers use was reasonable and appropriate and consistent with Department policy." (DEN 3018, Lt. Williams Statement.)

- "I at no time observed any Impact officer utilize less lethal implements in an improper manner or against policy." (DEN 2781, Sgt. Abeyta Statement.)

- "We were briefed by Lieutenant Williams that less lethal munitions and other force situations is authorized as long as used within policy. I did not observe any of my 180 team utilize any unauthorized force with less lethal munitions or otherwise. … During all of these incidents that I am able to recall, I did not observe any unauthorized use of force by any Denver police officer." (DEN 2782, Sgt. Abeyta Statement.)

- "All deployment of Pepper Ball was reasonable, appropriate and consistent with Department policy. I did not personally observe any force used by officers or directed by myself that was inappropriate in response to crowd member actions." (DEN 2840, Lt. Cervera Statement.)

- "As Sergeant of the RDV, specific instructions were given to officer that they had authority to protect themselves and if they observed an assailant throwing rocks, bottles or other objects towards the RDV … they were authorized toe deploy LL; consistent with the Operations Manual that authorizes the use of these LL devices with Active Aggression." (DEN 3354, Sgt. Hyatt Statement.)

- "Each team member was instructed to use less lethal PepperBall and/or chemical weapons only if we were to come under attack and only at the order of a sergeant or above." (DEN 3374, Lucero Statement.)

- "Consistent with the Denver Police Department use of Force manual and Denver Police Department Crowd Management Manual,
      -To support the skirmish line.
      -Against subjects within a crowd who are actively throwing objects at police Officers,

  I began to deploy and target subjects with pepper ball who were throwing objects." (DEN 2913, Ofc. Leon Statement.)

- Some officers included very detailed information verbatim from the DPD Crowd Management Manual. (*See* DEN 3438-39, Sgt. Simmons Statement.)

121.   Clearly, the District Commanders and Administrative Lieutenants to whom Lt. Berdahl directed his email communicated this information down through the ranks. The result was Officer Statements generated weeks after the GFP that were essentially a cover-up, not a serious attempt to document uses of force on civilians and hold officers and their superiors accountable for improper or excessive uses of force.

## 2.   DPD policy gap in BWC activation during crowd control situations, failure to train, and effect on officer accountability

122.   According to the OIM, "Best practices emphasize the important role of BWCs during police crowd control and recommend that all uniformed officers use BWCs during such operations." (OIM Report, p. 20 (citing Police Foundation, *Managing Large-Scale Security Events: A Planning Primer for Local Law Enforcement Agencies*, pp. 30, 39 (Apr. 2018).) However, "[g]aps in the DPD's policies and practices … resulted in a substantial number of DPD officers recording no BWC footage during their assignments at the GFP." (OIM Report, p. 20.) Moreover, "[u]tilization of BWCs improves transparency and accountability by providing video evidence that allows police agencies to exonerate officers who are falsely accused or to identify officers engaging in misconduct and take corrective action when force is used inappropriately." (OIM Report, p. 21 (citing PERF, *Implementing a Body-Worn Camera Program: Recommendations and Lessons Learned*, US Department of Justice Office of Community Oriented Policing Services, pp. 5-7 (2014); Mitchell Deposition, p. 70.) I completely agree. In addition, officers know that the purpose of BWC is to provide objective evidence of officer-citizen interactions. It is as much for the officer's protection as for the citizen's protection.

123.   DPD has had BWC since 2015. The Operations Manual states that the BWC is "an 'on-the-body' audio and video recording system assigned to an officer as an additional means of documenting specific incidents in the field." (DPD Operations Manual, § 119.04.) The Operations Manual contains a policy regarding when BWCs must be activated and how officers are required to use them. (DPD Operations Manual, § 119.04.) In relevant part, BWC is required to be activated "prior to any officer initiated contacts involving actual or potential violations of the law including: … Pedestrian, citizen, and/or vehicle contacts … Any encounter that becomes adversarial… All arrests and/or citations…" and "Any situation that the officer believes the use of the BWC would be appropriate or would provide valuable documentation if not already activated per policy." (DPD Operations Manual, § 119.04(3)(a)(1)(b), (g), (k), (m).)

124.   There is no written policy that specifically governs the use of BWC during protests. However, it would seem that, under the existing policy, BWC activation should have been required under any of the subsections referenced above. Indeed, DPD officers generally agreed that their BWC should have been activated during use of force events on protesters during the GFP.

125.     According to OIM, there was a footage gap in BWC for the GFP. (OIM Report, p. 22.) My review of the video evidence and deposition testimony also reveals a troubling gap. For instance, Officer Bolton could not explain why there were gaps in his BWC video. On May 30, 2020, he turned off his BWC when he and his fellow officers were about to use force on protesters in order to push them south of Colfax at approximately 5:45-5:46 p.m. (Bolton Deposition, pp. 80-87; DEN 4996; DEN 4995.) There was a gap in his footage from 5:36 p.m. and 5:47 p.m., and when the footage begins in the second video (DEN 4995; Bolton Deposition, p. 89), it is apparent that officers have already pushed the protesters south of Colfax, away from the bus station, using tear gas and other less-lethal weapons. (DEN 4995.)

126.     Similarly, there is a very troubling gap in BWC footage for the Basilica kettling incident which occurred on May 31, 2020 at approximately 9:36-9:42 p.m. Sgt. Beall and his team members were present for this incident. They were with Lt. Williams, pushing protesters east on Colfax from the west. (Beall Deposition, p. 97.) However, there is no footage from Beall or any member of his team during the kettling incident. Instead, Beall's BWC footage for May 31 begins at 9:50 p.m. MT, minutes *after* the extensive police use of force on protesters depicted in the HALO camera footage (DEN 3873; DEN 3874). Beall was present for this incident. But he could not explain why he did not turn on his camera until after the use of force on protesters. (Beall Deposition, pp. 95-101.) Although a few other members of this team recorded BWC, all of it begins *after* the kettling incident. (DEN 5104, Connors BWC; DEN 5109, Hoffecker BWC.) It only takes a second or less to press the button to turn on a BWC. Kettling is, at a minimum, a controversial tactic. For the uninitiated, particularly, it is a form of police force that can be extremely disconcerting, terrifying, and dangerous. As with all provisions of DPD's crowd control policy, compliance with its own BWC policy in this instance should have been autonomic and consistent.

127.     OIM believed that there "may be several reasons" for the footage gaps, including "there was no specific guidance about BWC usage during crowd control situations in DPD policy and no discussion of BWC activation in the Crowd Management Manual. This may have created confusion for officers about whether to activate their BWCs during the chaos of the protests and, if so, when." (OIM Report, p. 23.) I agree, to a point. But I do believe if DPD had developed a clear, supervised policy direction on BWCs—a default position, as it were—any confusion would more likely than not have been resolved in favor of compliance.

128.     It is my opinion that the DPD's failure to provide specific guidance about BWC usage during crowd control situations in DPD policy and failure to discuss BWC activation in the Crowd Management Manual was contrary to generally accepted police practices and standards. Even command-level officers demonstrated confusion. For example, the two Metro/SWAT lieutenants had different understandings of when BWC activation was required for their teams. Lt. Canino testified that he understood that his officers should have worn their BWCs and had them turned on. (Canino Deposition, p. 58.) Lt. Pine, however, testified that he believed the protests were a "tactical operation," and that his officers did not need to wear and activate their BWCs. (Pine Deposition, pp. 44-45.) Lt. Williams also testified that BWC

activation was not required in crowd control situations. (Williams Deposition, pp. 90-91.) The DPD's policy failures caused in significant part the violation of the constitutional rights of the plaintiffs.

129.    It is indefensible that, five years after body-worn cameras were introduced, there is still confusion about when their activation is required and that there is no policy, guidance or training on the activation of BWC during crowd control situations or protests. BWCs should be activated when an officer is involved in any kind of action with a civilian—especially a use of force.

130.    Chief Pazen's claim that the footage gap was due to officers being unable to attach the BWC to their uniforms is not supported by the evidence. (See Bolton Deposition, pp. 16, 53, 81-98, 101; Beall Deposition, pp. 46-49, 51-53, 74-77, 88-10, 114-120.) And even if that were true, the DPD could and should have resolved any such issues years ago—they have had years to work with the technology and resolve any issues concerning attachment to uniforms, regardless of which uniform is worn on a given occasion.

131.    Given that there is no policy governing BWC activation during protest events, it is no surprise that DPD provides no training to its officers on protest-related BWC use and activation. These failures had an adverse impact on officer accountability. Without BWC, officers could not recall what they did at specific times and locations. (E.g., Beall Deposition, pp. 105, 114, 117-18; Williams Deposition, p. 88.)

* * *

132.    Significantly, in this litigation, the City has been unable to identify officers who are alleged to have used excessive force on Plaintiffs. (City's Supplemental Response to Fitouri Plaintiffs' Interrogatories.) This is a result of a combination of DPD policy and training failures: (1) the failure to have officer rosters (OIM Report, pp. 19-20); (2) DPD policy of not requiring timely use of force reports for protests; (3) the DPD policy gap and failure to train on BWC activation during protests; and (4) failure to have a scribe in the Command Post who documented what teams of officers were sent to what locations and what force was used during different events.

133.    It is my opinion that the City's policy and training failures demonstrate willful ignorance. If the City had an interest in actually holding officers accountable for their uses of force during the protests, they would have kept officer rosters, required timely use of force reports, required BWC activation during the protests, and trained on these policies and procedures. None of these issues is new. As several personnel testified, the City of Denver has been host to numerous protests over the years, especially in District 6.

### 3.        Failure to discipline

134.    Of the hundreds of DPD officers who policed the GFP and the numerous citizen complaints about officer use of force, only three officers have been disciplined for their actions during the GFP (Officers Streeter, Archuleta, and McClay). (Streeter and Archuleta IA files, DEN 12010-12073; Pazen Deposition, pp. 13-14.)

135.    Many citizens filed complaints about officers' conduct during the GFP. Most were complaints about uses of force. I reviewed the "decline" letters, and they indicate that the City did not appear to take the complaints seriously. The tone of the letters (see letter to Plaintiff Duran, discussed above) was largely to cast doubt on the veracity of the allegations made by the complainant. The City also suffered from a problem of its own making, namely, as cited previously, the difficulty in identifying officers alleged to have committed misconduct.

136.    In addition, a review of citizen complaint data from prior protests reveals that no DPD officer has been disciplined for any allegations of use of excessive force at those protests.[3] This, combined with the widespread inappropriate uses of force at the GFP—including those authorized by command staff—show that the City has a custom and practice of failing to discipline officers who use excessive force against protesters. This contributed to the violation of the constitutional rights of the plaintiffs. Based on the DPD's practices, DPD officers had little or no reason to believe that they would be disciplined for excessive force against, or for violation of the First Amendment rights of, protesters at the GFP.

137.    Moreover, it has taken an exceptionally long time for the DPD to investigate complaints of alleged police misconduct during the GFP. Long delays in internal investigations affect the quality of those investigations and undermine organizational credibility; witnesses disappear, or their memories fade; complainants and officers alike are kept in limbo; officers guilty of misconduct, or worse, are (too often) kept on the job, their conduct ultimately excused; the "code of silence" is strengthened; public and internal cynicism flourishes. At his deposition, Chief Pazen testified that there are currently 20-30 open investigations of citizen complaints stemming from the GFP. (Pazen Deposition, pp. 13-14.) I believe, based on my experience, it is more likely than not that this extraordinary delay is attributable to: inadequate staffing and/or supervision of Internal Affairs and/or inadequate management controls and/or a low priority assigned by the City and DPD to the essential function of accurate, thorough, and timely internal investigations of citizen complaints. In my professional experience, these internal investigations should have been completed long ago. In both San Diego and Seattle, from receipt of a complaint, Internal Affairs investigators have 180 days to complete the investigation. If that benchmark cannot be met (exceptions are granted, but only if justified for cause), it would point

---

[3] Excerpts from past complaint protest files, P2015-0288, P2015-0318, P2015-0339, P2015-0408, P2015-0361 (DEN 12174-79, 12447-51, 12681-86, 12699-706, 12771-73, 12811-14, 12831, 12854, 12867-72, 12855-59.)

to one or more of these systemic failures. In any case, DPD's handling of these complaints is contrary to generally accepted police practices and standards.

**4.      DPD was responsible for excessive use of force by mutual aid agencies; failure to train**

138.    DPD requested the assistance of numerous outside law enforcement agencies during the GFP, understandable given the size and scope of the national protest. Inexplicable, however, was DPD's policy to allow outside agencies to follow their own use of force policies during the protests. (Phelan Deposition, pp. 94-95; Pazen Deposition, pp. 32-33, 38.) However, according to Chief Pazen, there was a DPD supervisor embedded with every unit from an outside agency, and there were "rules of engagement" provided by DPD to the outside agencies. (Pazen Deposition, pp. 29-30, 34.) These two positions appear to be contradictory, and throughout the record, there is evidence of the confusion caused by the contradiction.

As police chief during the World Trade Organization protests in Seattle, my staff and I reached out to all our "mutual aid" partners. Our message was clear: when you are on our streets, you are under the command of the Seattle Police Department (SPD). We received signed agreements from each agency and the pact worked flawlessly through an otherwise fraught week during the "Battle in Seattle." Notably, the agreement was tested twice, with acts of misconduct committed by officers from outside agencies. In the first, an officer shot a beanbag round into a retreating, nonviolent protester then kicked him in the groin. In the second, a deputy ordered two young women to roll down the window of the car in which they were seated as they filmed some of the action. When the driver complied, the deputy filled the vehicle with pepper spray. Both officers were immediately removed from the streets and sent home. One lost his SWAT job and was suspended from his department, the other was fired. In sum, simply because mutual aid personnel work for other agencies does not mean they get a "free pass." As the requesting agency, DPD was ultimately responsible for the actions of officers from other agencies who were in the City of Denver to help police its streets. The Incident Command System must memorialize this reality, and all member agencies must be thoroughly familiar with operational provisions of the agreement.

139.    Video and reports of members of the outside agencies confirm that they were aware of their status in the city. A few examples include:

- COABLM 231 at 19:19:49: APD Sgt. Brukbacher takes direction from Lt. Williams

- COABLM 330 at 19:07:39: DPD Metro/SWAT Corporal hands APD Ofc. Spano a tear gas canister and tells him to throw it

- COABLM 317 at 18:01:20: APD Sgt. McClelland and Sgt. Brukbacher discuss what the objective or plan is, and Brukbacher says, "It's Denver's call."

- JSCO 14: A Jefferson County SWAT officer wrote in his report, "A Denver Police Lieutenant requested handheld gas to be deployed to disperse the crowd."

- JSCO 16: A DPD liaison directed Jefferson County SWAT where to go

- JCSO After Action Review at p. 4: Capt. Williams verified that Jefferson County use of force policies were "in line" with DPD's use of force policy

- Fitouri 12550-52: Adams County after action memo from Commander Robert Nanney stated that they were assigned DPD liaisons "to give us direction on deployment and maintaining the integrity of the DPD Use of Force directives. It was clarified that they would be directing the response of our team on site for any incident we responded to." (Fitouri 12550.)

140.     It is my opinion, based on my experience, especially as a former chief of police, that a law enforcement agency cannot request aid from outside agencies, invite them into one's jurisdiction to police one's citizens, and then not be held responsible for the outside agencies' uses of force on one's own citizens. DPD was responsible, not merely because it requested the assistance of outside agencies, but also because it (1) made the decision to allow outside agencies to use their own use of force policies, which was, in itself, a policy decision; (2) embedded a DPD supervisor with every unit; and (3) provided rules of engagement for the outside agencies to follow.

141.     DPD also failed to conduct joint training exercises with their mutual aid partners. I saw no evidence of any such training exercises in the months and several years leading up to the GFP. Such training is essential, and recommended by ICS experts (IACP, *Crowd Management: Concepts & Issues Paper*, Fitouri 18375: "Training considerations should include the following … Joint training exercises with other agencies that will likely work together during major events…."). In Seattle, we conducted joint training, including simulations and table-top exercises, with our mutual aid partners, and this training was invaluable. Of course, we had 11 months to plan for WTO. Still, given intense and growing "anti-police" sentiment throughout the country, and periodic large-scale protests (post-Ferguson, especially), the failure of DPD to conduct joint training exercises with mutual aid partners was contrary to generally accepted policies and practices. It also caused in significant part the violation of the constitutional rights of the plaintiffs.

142.     According to the OIM, officers they interviewed "often brought up their desire to receive additional crowd control and field force operations training. … training records produced by the DPD's Training Academy … revealed that there has been a decline in the volume and frequency of crowd control and field force training in recent years." (OIM Report, p. 51.) The training provided to DPD officers was inadequate, including for the reasons discussed above.

5.      **Leadership approval of officers' use of force**

143. In my experience, law enforcement officers are keenly interested in what their leaders tell them—whether they agree or disagree with what they hear. During the GFP the most prominent, conspicuous leaders of the DPD were the police chief and the mayor. They set the tone.

144. On May 29, 2020, the second day of the protests, Mayor Hancock and Chief Pazen gave a press conference in the early afternoon. They were asked questions about the DPD's use of force on protesters the day before. Chief Pazen commended members of the DPD, saying they demonstrated "extreme restraint" and performed in an "exemplary manner." (9News video, 5-30-2020 12 at 12:20 min.) When a reporter asked whether officers followed the use of force policy regarding use of tear gas and PepperBalls, Pazen replied that they did, and that officers were under attack. (9News video, 5-30-2020 12 at 19:10-21:11 min.) When asked by a reporter if he was satisfied with how the officers handled the protests the day before and how he would suggest that they handle it today, the Mayor replied that he had watched the "video feed" of the protests, saw how the officers responded, and thought that they showed "tremendous restraint and discipline." (9News video, 5-30-2020 12 at 37:15-37:52 min.)

145.    In my experience, officers follow the lead of the Chief of Police. If the Chief says that officers are doing a great job, the officers will keep doing what they have been doing. The effect of the Mayor and Chief's comments at the May 29, 2020 press conference would have been exactly that. Officers were praised for their performance on May 28—which, as discussed above, included indiscriminate and inappropriate use of chemical munitions on protesters. They were expressly told by the Mayor to keep doing what they were doing. This caused in significant part the violation of the constitutional rights of the plaintiffs.

6.      **Failure to prepare for GFP**

146.    Several DPD officers testified at their depositions that they had never seen protests in Denver as disruptive or violent as the GFP. The implication is that the DPD was unprepared for protests of this scale, and nature. It is my opinion that this represents a failure of imagination and of preparation. Mr. Floyd's death was only one in a long line of recent, highly publicized deaths of Black people at the hands of (mostly) white police officers. The DPD should have been much better prepared for a protest like the GFP—a protest directed not at pro- or anti-immigration forces, Covid-19 policies, labor issues, or political campaigns but at police conduct itself. The less often protests of this nature and scale happen, the greater the consequences of failure to plan, and of omissions and miscalculations in the plan. It is inherent in the mission of emergency services, police work in this instance, to be adequately prepared for big, infrequent events. It is my opinion that the city and its police department should not have been surprised by the scope and nature of GFP, that it should have been prepared for what it faced. The failure to adequately prepare caused in significant part the violation of the constitutional rights of the plaintiffs.

78

147.     Having adequate policies and training in crowd control and crowd management is fundamental to the work of police departments. Even if protests as large as the GFP are not an everyday occurrence, they are not rare—in Denver, or any other major city. It is foreseeable that, without adequate policies and training in the use of less-lethal weapons and field force tactics, officers will more likely than not continue to violate the constitutional rights of citizens—even as they undermine their own mission to protect life and property.

**7.     Inappropriate delegation of weapon assignment to officer discretion; failure of supervision**

148.     During the GFP, officers were allowed to choose which weapons (such as PepperBall or 40mm launcher) they wanted to use. Officer Bolton testified that officers were initially assigned a specific weapon, but that they could change out as they wished throughout the day. (Bolton Deposition, p. 40.) In my opinion, this was an inappropriate delegation of weapon assignment to officers. Supervisors should have been assigning the specific less-lethal weapons to officers, based on their determination of need and whether specific officers were more competent with specific weapons. This DPD practice of allowing officers to choose their own weapons indicates that supervisors were not appropriately supervising their officers and making decisions based on needs of the protest, as determined by the Incident Commander and command-level supervisors.

* * *

149.     It is my opinion that the duty and responsibility of police officers is to protect the rights and safety of its citizens, including business owners, shoppers, residents, visitors, and protesters. Police officers should serve as a model of lawful and constitutional behavior; not the opposite. Unfortunately, the material I have reviewed in this case offers strong evidence that the DPD did not live up to its obligations to protect the constitutional rights of its citizens, or even to follow the most basic and generally accepted police policies, practices, standards, and training. As discussed in more detail above, the DPD's policies, practices, and training failures caused in significant part the violation of the constitutional rights of the plaintiffs and protesters at the GFP.

150.     My rate of compensation for review is $450/hour. I am aware that discovery is ongoing in this case. My opinions may be added to, or amended, upon review of any additional information that becomes available.

Respectfully submitted,

Norman Stamper

Dated: July 29, 2021

80