**CONTAINS REFERENCE TO MATERIALS DESIGNATED AS CONFIDENTIAL**

IN THE UNITED STATES DISTRICT COURT
OF THE DISTRICT COURT OF COLORADO

Civil Action Nos. 1:20-cv-01878-RBJ & 1:20-cv-01922-RBJ-MEH (consolidated)

ELISABETH EPPS, *et al.*

Plaintiffs,

v.

CITY AND COUNTY OF DENVER, *et al.*,

Defendants

## REBUTTAL EXPERT REPORT OF NORMAN STAMPER

1.       A list of additional materials that I was provided for review is attached as Exhibit 1.  The information contained in the additional materials further support the opinions I provided in my original report, and, in some instances (as discussed below), the new information provides additional support for my opinion that the policies, procedures, and customs of the City and County of Denver were inconsistent with generally accepted police practices, and that they were the cause of the constitutional violations alleged by Plaintiffs.

### City and County of Denver's Policies and Procedures Were Inadequate and Inconsistent with Generally Accepted Police Practices and Standards

2.       Commander Michael O'Donnell provided testimony on behalf of Denver regarding any systemic or programmatic efforts by the City of Denver to prevent and identify officer misconduct during the George Floyd Protests (GFP). Of particular concern were officers' suppression of the First Amendment rights of protestors, and their use of excessive force on protestors, as well as Denver's written and unwritten policies and practices, in effect from May 2015 through June 2020 relating to crowd management, crowd control, and field force tactics, including the management of protests. (O'Donnell Deposition, pp. 9, 11-12.)

3.       Denver has no apparent systemic or programmatic efforts to prevent or identify officer misconduct, other than the training that it provides. (O'Donnell Deposition, pp. 15-16.) Commander O'Donnell referenced discipline, but he agreed that discipline is something that occurs after a complaint is made and investigated. (O'Donnell Deposition, p. 13.) He also agreed that discipline is only a preventative measure to the extent that holding an officer to account may serve to prevent future misconduct from that officer, and to set an example for other officers. (O'Donnell Deposition, p. 14.)

1

Exhibit 7

CONTAINS REFERENCE TO MATERIALS DESIGNATED AS CONFIDENTIAL

5.      If a DPD officer uses force outside of policy he or she would, in theory, be disciplined. If a DPD officer does not use force outside of policy, there would be no discipline. (O'Donnell Deposition, p. 15.) Thus, the fact that DPD has not disciplined any of the officers accused of misconduct alleged by Plaintiffs in this case means that none of their actions were deemed outside of DPD policy.

6.      Commander O'Donnell confirmed that Denver's only policies regarding crowd control, crowd management, field force tactics, and management of protests are the DPD Crowd Management Manual and the use of force policy in the DPD Operations manual. (O'Donnell Deposition, p. 16.)

7.      Commander O'Donnell explained several aspects of Denver's policies regarding crowd management and use of less-lethal weapons during the protests, including:

     a.      The Incident Commander has the authority and the responsibility to issue a general dispersal order to a crowd of protestors yet supervisors on the scene—and even the highest-ranking officer at the scene—also have the authority to issue a general dispersal order. (O'Donnell Deposition, pp. 17-19.)

     b.      The DPD Crowd Management Manual states:

       A general dispersal order will only be given under the following circumstances:

          1.      A "significant number or percentage" of participants fail to adhere to time, place and manner restrictions **and** voluntary compliance, targeted citation and/or targeted arrest actions have not resulted in or are not "reasonably likely" to result in "substantial compliance"; or

          2.      A "significant number or percentage" of participants are engaging in, or are about to engage in, tumultuous and violent conduct which creates grave danger of damage or injury to property or person or substantially obstructs the performance of any governmental function.

       (DPD Crowd Management Manual, p. 9.) Denver's policy is that this is "flexible" and "just a guide." (O'Donnell Deposition, pp. 19-20.) Denver's policy is that it is up to the officers at the scene to evaluate the situation and determine if they can give a general dispersal order, and the policy leaves it to the officer's discretion to decide when a general dispersal order can be given. (O'Donnell Deposition, p. 20.) Furthermore, the policy does not provide any specific guidance on what "significant number or

CONTAINS REFERENCE TO MATERIALS DESIGNATED AS CONFIDENTIAL

percentage" means. (O'Donnell Deposition, pp. 21-23.) Denver's policy is that it is up to the discretion of the officers or supervisors to make a determination as to when this "requirement" of the DPD Crowd Management Manual is satisfied before a general dispersal order is given. (O'Donnell Deposition, p. 23.)

c.     The DPD Crowd Management Manual states that PepperBalls may be used in crowd control situations under five specific circumstances, and that they "will not" be deployed "without the approval of the Division or Unit supervisor." In addition, it states that the "Pepper Ball system will not be used against a group or crowd without prior authorization from the Incident Commander. (DPD Crowd Management Manual, pp. 19; O'Donnell Deposition, p. 39.) However, as Commander O'Donnell testified on behalf of Denver, Denver's policy is that what is written in the Crowd Management Manual is merely "a guide," and that use of PepperBall does not always require prior authorization from a supervisor. (O'Donnell Deposition, p. 24-26.) As Commander O'Donnell explained on behalf of Denver, Denver's policy is that officers have discretion to decide when they need to get authorization from a supervisor or not (O'Donnell Deposition, p. 26.), so long as the officer can articulate a reason. (O'Donnell Deposition, p. 40.) Denver's policy on PepperBall use also does not require officers to give warning prior to deploying PepperBall. (O'Donnell Deposition, pp. 27-28.)

d.     For example, Denver's policy authorizes the use of PepperBall on a crowd in the form of "area denial" if there is a large group of peaceful protestors and a small number of individuals who are throwing water bottles at the officers. (O'Donnell Deposition, pp. 29-30, discussing example with 100 peaceful protestors and 3 individuals throwing water bottles.)

e.     The DPD Crowd Management Manual provides five specific circumstances under which the 40mm launcher may be used. (DPD Crowd Management Manual, p. 20.) However, Denver policy concerning the circumstances under which the 40mm launcher can be used against a person has exceptions. If an officer can provide an "articulation," of his or her reasons for using the 40mm launcher, even if it is outside of what is written in the Manual, it can be within policy. (O'Donnell Deposition, pp. 49-50.) Denver's policy is that officers can use the 40mm launcher in any situation where the officer can clearly articulate the need for deployment. (O'Donnell Deposition, p. 56.)

f.     The DPD Crowd Management Manual provides a list of circumstances under which chemical agents may be used. (DPD Crowd Management

CONTAINS REFERENCE TO MATERIALS DESIGNATED AS CONFIDENTIAL

Manual, p. 23.) Denver policy is that officers can use chemical agents (such as OC spray) in any situation where the officer can clearly articulate the need for deployment. (O'Donnell Deposition, p. 55.) If the use of bean-bag shotguns and other less-lethal weapons by mutual aid agencies was approved by Chief Pazen or the Incident Commander, then their use at the GFP was within policy. (O'Donnell Deposition, pp. 60-61.)

g.  Commander O'Donnell also explained that, as a lieutenant in the gang unit during the GFP, he did not see any officers under his purview act in a manner contrary to Denver policy. All of the officers acted within policy. (O'Donnell Deposition, p. 38.) Given that Commander O'Donnell is one of Denver's witnesses testifying in an official, representative capacity on behalf of Denver about what Denver's policies were, this is significant evidence that the actions of the gang unit officers were consistent with and fell within Denver's policies, procedures, and customs.

h.  If officers have provided a written officer statement of why and when they used less-lethal weapons during the GFP, and the officers have not been disciplined or held to account for their actions in any way, this means that their use of force was deemed by Denver to be appropriate and consistent with policy. (O'Donnell Deposition, p. 41.)

8.  From Commander O'Donnell's testimony on behalf of Denver, I conclude the following:

a.  The DPD Crowd Management Manual is merely a "guide" that does not set any firm limits on officer discretion in their use of less-lethal weapons in a crowd control or crowd management situation. The written policy is merely paper and inconsistent with the *actual* policy of the DPD, as I opined in my original report. (7/29/21 Report, Paragraph 67.)

b.  Denver policy gives officers nearly unlimited discretion to use their less-lethal weapons as they see fit.

c.  Given that ***none*** of the officers involved in the incidents of use of force alleged by Plaintiffs were disciplined, Denver has sanctioned the use of force alleged by Plaintiffs and deemed it appropriate pursuant to policy.

d.  For instance, Denver policy may allow an officer to fire a "less-lethal" weapon at a person who is standing still with their hands up, even if no orders to move back have been given. (O'Donnell Deposition, p. 43.) This is exactly what happened to Plaintiff Stanford Smith when he was sprayed in the face with OC without any warning or orders, and while he was protesting peacefully. (See Smith Deposition, pp. 105-106.) This is also

4

CONTAINS REFERENCE TO MATERIALS DESIGNATED AS CONFIDENTIAL

what happened to Plaintiff Youssef Amghar, when he was standing on the sidewalk at the corner of Lincoln and Colfax on May 30, 2020 at 7:09 p.m. and shot multiple times with PepperBalls. This use of force was authorized and caused by Denver's policies, procedures, and customs. (See also Eberharter Deposition, pp. 108-09.)

e.     Given that no officers were disciplined for inadequate "articulation" of their use of force on civilians during the GFP, Denver has sanctioned the use of force and deemed it as appropriate pursuant to policy. I have been provided no evidence that any officer was disciplined for inadequate articulation of use of force in their officer statements relating to the GFP. Nor have any officers been disciplined for failing to write officer statements (or use of force reports) for specific days that they were on duty during the GFP. Denver has sanctioned this conduct.

f.     In my original report, I opined, "[t]he actual use of PepperBall during the GFP was in stark contrast to DPD policy." (7/29/21 Report, Paragraph 72.) In light of Commander O'Donnell's testimony on behalf of Denver, the actual use of PepperBall during the GFP was entirely *consistent with DPD policy*, because DPD policy provided officers nearly unfettered discretion to deploy PepperBall (and other less-lethal weapons) as they saw fit.

g.     In my original report, I opined that the shooting of Plaintiff Jonathen Duran with a foam baton to the groin (on May 31, 2020 at approximately 9:30 p.m. at Colfax and Pearl) was "inconsistent with the DPD Crowd Management Manual," because the Manual lists specific circumstances under which a 40mm launch may be used. (7/29/21 Report, Paragraph 86.) In light of Commander O'Donnell's testimony on behalf of Denver, this shooting was consistent with DPD policy, because DPD policy provides that officers may use the 40mm even in situations not listed in the Manual. And, as I previously opined, the fact that Duran's complaint to Internal Affairs was "declined" for investigation shows that Denver did not find that the officer's conduct was inconsistent with its policies or subject to discipline.

h.     Likewise, Commander O'Donnell's testimony further supports my opinion that the less-lethal shooting of Plaintiffs Joe Deras and Zach Packard on May 31, 2020, was consistent with Denver policies, procedures, and customs.

9.     Technician Ryan Grothe oversees the DPD's less-lethal weapons program and training. He provided testimony on behalf of Denver. He explained:

**CONTAINS REFERENCE TO MATERIALS DESIGNATED AS CONFIDENTIAL**

a.     The written policies of Denver on the use of less-lethal weapons and nonlethal force are contained in the Operations Manual and the DPD Crowd Management Manual. (Grothe Deposition, 46.) There are no other policies.

b.     The only courses provided to DPD officers on 40mm use, PepperBall use, and OC spray use are reflected in the PowerPoint presentations of those courses. (Grothe Deposition, p. 16.)

c.     Denver does not provide any training on the use of Noise Flash Diversionary Devices (NFDDs also known as flashbangs) or Stinger grenades. (Grothe Deposition, pp. 17-20.) Technician Grothe testified that NFDDs and Stinger grenades are used by Metro/SWAT officers, but he could not describe what training they had in their use, if any. (Grothe Deposition, pp. 17-20.) Metro/SWAT Corporal Richard Eberharter testified at his deposition that he did not receive any training on how to use flashbangs or Stinger grenades in a crowd control or protest situation. (Eberharter Deposition, pp. 116-17, 141-42.)[1]

d.     Denver's policies do not reference NFDDs or Stinger grenades. (Grothe Deposition, pp. 20-21, 47.)

e.     At the time of the GFP, Denver policy was that physical actions by members of a crowd that has been declared an unlawful assembly or any disruption to pedestrian or traffic flow was considered "defensive resistance" within the meaning of Denver's written policies on use of force. (Grothe Deposition, pp. 28, 76-77.) Thus, Denver policy authorized the use of less-lethal weapons (such as PepperBall) on anyone disrupting traffic.

f.     Although CS gas deployment must normally be authorized by the Incident Commander, officers are trained that they have the discretion to decide if an emergency circumstance exists that warrants deployment of CS gas without Incident Commander approval. (Grothe Deposition, p. 36.) Thus, whether deployment of CS gas at the GFP was authorized by the Incident Commander or deployed because an individual officer, in his or her

---

[1]     In paragraphs 105-107 of my original report, I observed that certain body-worn camera and other videos produced in this case showed officers deploying flash bang grenades during the protests. On further reflection, I acknowledge the possibility that these incidents do not depict flash bang grenades even though they appear to explode in a manner consistent with flash bang grenades (i.e., with a bright light and loud blast).  (See Martinez Deposition, p. 55.) They may, however, be stinger grenades or another type of device that provides a similar effect.

CONTAINS REFERENCE TO MATERIALS DESIGNATED AS CONFIDENTIAL

discretion, decided that a situation was an "emergency," the CS gas deployment was consistent with and authorized by Denver policy.

g.      Likewise, officers are instructed to use their discretion in deciding whether they need to get authorization from a supervisor to deploy PepperBall or whether a given situation qualifies an "emergency" that does not require supervisor authorization. (Grothe Deposition, p. 40, 58.)

h.      Denver does not provide any specific training to officers on how to use their PepperBall guns when there is a single person in a crowd throwing water bottles. (Grothe Deposition, p. 38.)

i.      Grothe, testifying on behalf of Denver, could not provide any description of what training was provided to officers on the use of OC spray, other than what is in the PowerPoint course on OC spray. (Grothe Deposition, pp. 59-62.) Denver is also not aware of any training on the use of the Triple Chaser other than what is in the PowerPoint slide (DEN 334). (Grothe Deposition, pp. 67-68.)

j.      Grothe was not aware of any discipline of DPD officers from misuse of less-lethal weapons at the GFP. (Grothe Deposition, pp. 75-76.)

10.     From Technician Grothe's testimony on behalf of Denver, I conclude:

a.      Denver policy and training on use of NFDDs and Stinger grenades was at the time of the GFP non-existent. (This was also corroborated by Corporal Eberharter's testimony.) As I opined previously, this complete failure to establish policies and to train in the use of these dangerous weapons is contrary to generally accepted police practices. (7/29/21 Report, Paragraph 104.)

b.      Denver policy and training grants officers nearly unlimited discretion to use their less-lethal weapons as they see fit, and to declare "emergencies" that allow them to use their weapons without supervisor authorization.

c.      Denver policy, training, and accepted practice authorized the use of PepperBall against Plaintiffs in the ways they described in their complaints, depositions, and declarations. This included the PepperBall shooting of Elisabeth Epps by Officer Christian on May 29, 2020 in the vicinity of the intersection of 14th and Sherman at approximately 9:04 p.m. Officer Christian's justification for shooting Epps was that she was "standing in the roadway in violation of the laws." According to Grothe's testimony on behalf of Denver, this was an authorized use of PepperBall, in accordance with Denver policy and training.

7

CONTAINS REFERENCE TO MATERIALS DESIGNATED AS CONFIDENTIAL

    d.      Denver provided little training to its officers on the use of OC spray. As reflected in the PowerPoint produced by Denver, this course is woefully inadequate.

    e.      Denver's policy and training failures caused the alleged uses of force on Plaintiffs.

11.    Sergeant Eric Knutson testified on behalf of Denver regarding training on crowd control, crowd management, field force tactics, management of protests, documentation of uses of force, and the proper utilization of Body Worn Cameras (BWC). (Knutson Deposition, p. 11.) He testified:

    a.      The only training Denver provides to its officers on the proper use of BWC is the information in the Operations Manual and information on how to operate the camera. (Knutson Deposition, pp. 22-28, 69-70.) Sgt. Knutson testified that there is a PowerPoint presentation on this topic, but this was not in any of the materials produced by Denver.

    b.      There is no specific training provided to officers on when they are required to turn on their BWC at protests. (Knutson Deposition, p. 70.)

    c.      Denver's policy and training is that Metro/SWAT officers are not required to turn on their BWC when they are utilizing specific tactics and devices, such as flashbangs or Stinger grenades. (Knutson Deposition, pp. 71, 77.) Furthermore, Corporal Eberharter testified that because every Metro/SWAT deployment is necessarily "tactical" in nature, Metro/SWAT is never required to use or turn on their BWC, even when they use any kind of less-lethal weapon or make an arrest. (Eberharter Deposition, pp. 56-62, 76-79.)

    d.      Denver does not provide any training to its officers or supervisors that a warning or dispersal order must be given to a crowd before CS gas is used, even though CS munitions are indiscriminate in their effects. (Knutson Deposition, pp. 48-51.)

    e.      Denver does not provide any training to its officers or supervisors on the contents of the DPD Crowd Management Manual. (Knutson Deposition, pp. 51, 53.) Denver simply provides a copy of the manual to its officers. The Crowd Management Manual is not discussed during the training of either recruits or department leaders. (Knutson Deposition, p. 52.)

    f.      The DPD Operations Manual has a general section on use of force reporting but says nothing specific about how to report use of force in a

protest, crowd control or crowd management situation. (Knutson Deposition, p. 62.)

g.    Denver trains its officers that, in a protest situation, they have to remember each less-lethal round they fire and report it up the chain of command so that it may be documented on a blanket report per squad or in a single after-action report. Officers are not trained that when they use their 40mm launcher or PepperBall gun they are required to write their own use of force statement. (Knutson Deposition, p. 65-67.)

12.    From Sgt. Knutson's testimony on behalf of Denver, I conclude:

a.    Denver failed to train its officers in the proper use of BWC and had inadequate policies on the proper use of BWC. (See 7/29/21 Report, Paragraphs 122-131.) This failure to train described by Sgt. Knutson was corroborated by Metro/SWAT Corporal Eberharter, who testified that DPD policy did not require him to activate his BWC at all, during any deployment, because every Metro/SWAT deployment is necessarily "tactical" in nature. (The written policy on BWC in the Operations Manual states that Metro/SWAT officers must activate BWC only when performing patrol functions and not tactical functions.)

b.    Denver's policy that Metro/SWAT officers' use of specialized weapons, including NFDDs and Stinger grenades, was tactical in nature and did not require BWC use, is contrary to generally accepted police practices. This policy clearly contributed to the inappropriate and unreasonable use of force by Metro/SWAT officers during the GFP, including on Plaintiffs. And, it had an adverse effect on officer accountability.

c.    As I opined previously, DPD policy that did not require timely submission of force reports had an adverse effect on officer accountability. (See 7/29/21 Report, Paragraphs 108-121.) Sgt. Knutson's testimony on behalf of Denver merely strengthens this opinion.

d.    Not only did DPD exhibit a widespread practice and custom of failing to give dispersal or audible dispersal orders prior to the use of force (see 7/29/21 Report, Paragraph 19), this was apparently how DPD officers were trained as well, as confirmed by Sgt. Knutson. This failure to train contributed to the uses of force and alleged constitutional violations experienced by Plaintiffs.

13.    Commander Hans Levens testified on behalf of Denver on Denver's discipline of its officers, IA investigations arising from the GFP, and whether certain incidents of use of force alleged by Plaintiffs were consistent with DPD policy, procedures, or customs. In addition, I

CONTAINS REFERENCE TO MATERIALS DESIGNATED AS CONFIDENTIAL

reviewed documents from IA investigation files that were opened and closed relating to the GFP. This information reveals:

a.  IA investigations can be initiated in several ways. (Levens Deposition, pp. 16-21.) There is no apparent consistency in the manner in which certain citizen complaints are referred for investigation. For example, some state law notices of tort claims are referred by the City Attorney's Office to DPD's Internal Affairs Bureau (IAB) for investigation, but others are not. (Levens Deposition, pp. 18-21, 25.) IAB Commander Dodge decides what to investigate, and nothing circumscribes her discretion in this area. (Levens Deposition, p. 30.)

b.  There is no policy that describes how IAB investigators go about investigating citizen complaints. (Levens Deposition, p. 31.)

c.  There were 123 complaints filed by citizens or initiated internally that alleged officer misconduct at the GFP. (Levens Deposition, p. 34.)

d.  As of November 4, 2021 (the day before Levens's deposition), there were 12 cases still open. (Levens Deposition, pp. 34-35.)

e.  Levens could not say how long those have been pending but his best estimate was that, on average, complaints from the GFP took 7 months to complete. (Levens Deposition, pp. 35-36.)

f.  Of all the complaints from the GFP, two officers (Streeter and Archuleta) were disciplined for inappropriate use of force, one sergeant (O'Neill) was disciplined for failure to activate his BWC, and one probationary officer (McClay) was fired. (Levens Deposition, pp. 39-47.)

g.  Although a single officer (Sgt. Ed O'Neill) was, according to Levens, disciplined for failure to activate his BWC, there were other instances of inexplicable or apparent failure to activate BWCs during the GFP that were not investigated. (See 7/29/21 Report, Paragraphs 125-131.)

h.  For instance, one complainant, Huitziloxochitl Jaramillo (IAB case number P2020-0174), alleged that during the course of her arrest for violating the emergency curfew, the arresting officer tackled her to the ground, fracturing her wrist. She was also called "a piece of sh*t" several times. (DEN031610.) The IAB identified the arresting officer as Officer Adam Bolton. When asked during his interview whether he activated his BWC for the incident, Bolton stated, "I thought I did activate my BWC but could not find the BWC video after the notice of complaint." (DEN031642.) When asked if he used force on the complainant, he said,

10

CONTAINS REFERENCE TO MATERIALS DESIGNATED AS CONFIDENTIAL

"I don't recall…." (DEN031642.) When Officer Bolton's sergeant, Sgt. Vince Lombardi, was interviewed, he stated, "I did not witness the arrest" but "Officer Bolton was extremely professional." (DEN031647.) IAB credited Bolton and Lombardi's statements, even though it is incredible for Sgt. Lombardi to say both that he did not witness the arrest *and* that Officer Bolton was "extremely professional" during that arrest. Even Commander Levens agreed that he "has questions" about how Sgt. Lombardi could say both. (Levens Deposition, pp. 50-51.) The letter written by Lt. Addison on behalf of the IAB declining Ms. Jaramillo's complaint for further review credited the statements of Officer Bolton and Sgt. Lombardi. (DEN031598.) It concluded, "there is no evidence found to support your allegations against the officer. Further, there is no reason to suspect that the officer violated any department policy or acted in such a manner that would be considered inconsistent with their training." (DEN031598.) Officer Bolton was not disciplined either for the alleged use of force or his failure to activate his BWC. (Levens Deposition, p. 52.)

i.   Levens agreed that, if Officer Bolton's BWC had been activated during the arrest, then there would be some evidence either corroborating or disproving or discrediting Ms. Jaramillo's allegations. (Levens Deposition, p. 54.)

j.   Officer Bolton did not complete a use of force report for his arrest of Ms. Jaramillo. This was within Denver policy because that policy requires the completion of a use of force report only if an officer uses force. And because Bolton said he did not use force, he did not have to complete a report, pursuant to policy. (Levens Deposition, pp. 57-58.) Levens testified that if an officer *believed* he had not used force to effectuate an arrest, then Denver policy did not require him to complete a use of force statement. (Levens Deposition, p. 58.) Bolton did not violate the use of force reporting policy, the BWC policy, or any other policy of Denver. (Levens Deposition, pp. 58-59.)

k.   Numerous "decline" letters were written to citizens who complained about officers' use of force and misconduct arising from the GFP. (See IA files.) Levens agreed that many of these letters were issued on the basis that no officer could be identified. Because no officer could be identified, no specific disciplinary action against any particular officer could be pursued. (Levens Deposition, p. 54.) Levens also agreed that two of the major methods for identifying officers is through a use of force report (or any other statement that documents exactly what they did) or, if they had their BWC activated, video evidence of what they did. (Levens Deposition, pp. 54-55.)

CONTAINS REFERENCE TO MATERIALS DESIGNATED AS CONFIDENTIAL

l.     Levens testified that, pursuant to Denver policy, individual officers working the protests were not required to complete individual use of force reports for their use of force, including the deployment of any chemical munitions or less-lethal weapons. (Levens Deposition, p. 60.)

m.    Denver had no policies regarding use of NFDDs or Stinger grenades or reporting or documenting the use of NFDDs or Stinger grenades. (Levens Deposition, pp. 61-62.) Nor is there a policy, other than that contained in the department's general use of force policy, on how to document the use of 40 mm during the protests. (Levens Deposition, pp. 63-64.)

n.    No one has been disciplined for the failure to appropriately document their use of force during the protests. (Levens Deposition, pp. 63-64.)

o.    Denver reviewed the incident of Officer Bishop pepper spraying an individual in the face at the intersection of Lincoln and Colfax on May 30, 2020 and concluded that Bishop's actions were within policy and training. Bishop was "exonerated." (Levens Deposition, pp. 67.) My opinion of this incident is that the use of pepper spray was inconsistent with generally accepted police practices (see 7/29/21 Report, Paragraph 95.) Further, DPD made no attempt to deescalate the situation.

p.    Many of the letters issued by the IAB in the IA files concluded that the actions of DPD officers during the GFP were consistent with the department's training and use of force policy. (See IA files.) The IAB reached these conclusions by viewing HALO and/or BWC video. There were no interviews conducted for many of the IA files. Nor, apparently, did investigators visit the various locations for witness canvassing or potential evidence gathering.

q.    For instance, IAB case number SVC2020-0030 contains a collection of numerous citizen complaints. Most of them appear to concern DPD's use of force on protestors on May 30, 2020 at Lincoln and Colfax, between approximately 5:00-8:00 p.m. (See complaints in IA file SVC2020-0030.) The letters written by IAB to the complainants contain materially similar language, and all or nearly all of them conclude that, based upon IAB's review of HALO and BWC footage, "…these evidentiary facts, the deployment of crowd control munitions, including chemical munitions, were consistent with the Denver Police Department's training and use of force policy." (DEN031834-38, DEN031840-41, DEN031843-45, DEN031847, DEN031849, DEN031851-54, DEN031857-58, DEN031860-61, DEN031863, DEN031865, DEN031867, DEN031870-71, DEN031873-76, DEN031878-79.)

CONTAINS REFERENCE TO MATERIALS DESIGNATED AS CONFIDENTIAL

r.      Despite the fact that IAB routinely reached conclusions that DPD's use of force was consistent with Denver policy and training on the basis of video, Denver refused to provide any such conclusions when asked about the use of force incidents alleged by Plaintiffs in Topic 8 of Plaintiffs' Rule 30(b)(6) deposition notice. (See 8/20/21 Letter from Arnold & Porter.) Denver's position is that it cannot reach any conclusions about whether or not any of these incidents were within or outside of Denver policy. (Levens Deposition, pp. 81-82, 91-94, 99-102, 108-09.)

s.      Notably, when reviewing video concerning the Basilica kettling incident which occurred on May 31, 2020, Commander Levens did not see anything that caused him concern (relating to officer conduct) except for one video where an officer shot with PepperBall a bicyclist as he was fleeing. (Levens Deposition, pp. 95-99.)

14.     From the IA investigation files and Commander Levens's testimony, I conclude the following:

a.      In my professional opinion, the fact that Denver has disciplined only two officers for use of force, one officer for failure to activate BWC, and no officers for failure to report or document their use of force is, frankly, extremely disturbing. The videos and testimony I reviewed show that DPD and its mutual-aid officers regularly used inappropriate and unreasonable force during the GFP.

b.      Denver's failure to discipline officers—including any officers for any of the incidents involving Plaintiffs—amounts to an approval of the officers' conduct.

c.      Denver, per its witness Commander Levens, did not see anything wrong with what occurred during the Basilica kettling incident other than a specific interaction between one police officer and a bicyclist. As I have opined, the officers' actions during that incident were entirely inconsistent with generally accepted police practices. (See 7/29/21 Report, Paragraphs 75-80.) The fact that no officer (or supervisor) was disciplined for that incident alone indicates that Denver approved of its officers' conduct.

d.      Denver's failure to have any policy on the use of force reporting for Stinger grenades or NFDDs is inconsistent with generally accepted police practices.

e.      The fact that Denver did not require its officers to complete timely use of force reports and did not discipline any officer for failure to complete timely use of force reports allowed officers to escape accountability.

CONTAINS REFERENCE TO MATERIALS DESIGNATED AS CONFIDENTIAL

    f.      The fact that Denver did not require its Metro/SWAT officers to wear or activate their BWCs during the protests and did not discipline any of them for failure to do so allowed officers to escape accountability.

    g.      The length of time that DPD took to investigate citizen complaints arising from the GFP (on average, seven months) was far too long. DPD's handling of these complaints is contrary to generally accepted police practices and standards.

15.    Division Chief Thomas testified on behalf of Denver on the City's knowledge and internal discussions regarding officers' conduct, including use of force, suppression of First Amendment rights of protestors, documentation of or failure to document uses of force, and use of or failure to use BWC.

    a.      According to Division Chief Thomas, the first recorded message going out to all the district commanders and administrative lieutenants telling them that officers were required to complete use of force statements was on June 9, 2020. This was over a week after the protests began, even though problems with this came to Denver's attention within the first couple of days. (Thomas Deposition, pp. 16-22.)

    b.      According to Division Chief Thomas, there was also discussion during operational briefings that officers needed to have their BWC engaged. (Thomas Deposition, p. 24.) However, Thomas does not recall specifically discussing Metro/SWAT officers. (Thomas Deposition, p. 25.)

    c.      Denver received complaints that officers were allegedly suppressing First Amendment rights of protestors within the first couple days of the protests. (Thomas Deposition, pp. 30-31.)

    d.      However, Thomas agreed that the message communicated to the public and the officers by the Chief of Police and the Mayor at their press conference on the afternoon of May 29, 2020 was that the officers were acting with extreme restraint. Indeed, along with the Mayor and the Chief, Thomas believed that officers were in fact acting with extreme restraint. (Thomas Deposition, p. 34-35.)

    e.      Denver never communicated to its officers that they were using inappropriate or too much force, because it did not believe its officers were, in fact, engaging in such misconduct, despite the evidence, including complaints. (Thomas Deposition, pp. 32-33.)

CONTAINS REFERENCE TO MATERIALS DESIGNATED AS CONFIDENTIAL

16.     Division Chief Thomas's testimony only reaffirmed my opinion that DPD leadership and policymakers (such as the Mayor and the Chief) approved of officers' use of force. (See 7/29/21 Report, Paragraphs 143-145.)

\* \* \*

Below, I provide my analysis and opinion of specific incidents involving Plaintiffs:

### DPD's widespread practice and custom of failing to give dispersal orders or audible dispersal orders prior to use of force

17.     Plaintiffs' deposition testimony further supports my opinion that the DPD exhibited a widespread practice and custom of failing to give dispersal orders or audible dispersal orders prior to use of force. (See 7/29/21 Report.) Plaintiffs uniformly testified that, across several different dates, times, and locations in the first week of the George Floyd Protest (GFP), the DPD did not give any dispersal orders—or any audible ones—prior to use of tear gas or less-lethal weapons. (See Plaintiffs' Depositions.) Some specific incidents are discussed below:

18.     **May 30, 2020, 7:34 p.m., Colfax and Broadway:** At approximately 7:34 p.m. on May 30, 2020, Plaintiff Stanford Smith was pepper sprayed in the face while walking peacefully in front of a line of officers with his hands raised in the air. The BWC produced at DEN 5044 shows this incident. As disclosed and explained in my initial report, I am very familiar with the capabilities of BWCs and I believe that if amplified warnings were given by officers in or around the vicinity of the incident, the microphones on the BWCs would have picked those up. The BWC produced at DEN 5044 shows the pepper spraying of Smith, and clearly captured surrounding noises as well as the response of other peaceful protestors to the pepper spraying of Smith.  Other videos produced at 211202 COAEPP 72, BWC from Brukbacher, and DEN5002 are taken at or near the location where the pepper spray is deployed. In each of these videos, no warning is provided by any of the officers in the line that Smith was walking in front of prior to his being pepper sprayed in the face. The deposition of Smith, which was taken after my initial report, does not disclose or divulge any additional information that would alter this opinion.

### Indiscriminate and inappropriate use of chemical munitions such as tear gas

19.     Plaintiffs' deposition testimony further supports my opinion that the DPD exhibited a widespread practice and custom of indiscriminate and inappropriate use of chemical munitions. (See 7/29/21 Report.) Plaintiffs uniformly testified that, across several different dates, times, and locations in the first week of the George Floyd Protest (GFP), officers used chemical munitions indiscriminately, on peaceful and non-peaceful protestors alike.

20.     **May 30, 2020, 9:00 p.m., 1424 N. Pennsylvania St.:** At approximately 9:00 p.m., on May 30, 2020, Plaintiffs Amanda Blasingame and Maya Rothlein were on or near the front steps of their apartment building located at 1424 N. Pennsylvania St. between East Colfax

CONTAINS REFERENCE TO MATERIALS DESIGNATED AS CONFIDENTIAL

Avenue and 14th Avenue with four other individuals when a line of law enforcement vehicles driving north on Pennsylvania Street stopped in the middle of the street in front of their apartment in response to the verbal protesting by Blasingame and Rothlein and the others in their company. Based on the deposition testimony of both Blasingame and Rothlein, they were on their own property behind a fence which separated the apartment building—as well as the immediately adjacent outdoor area at the entry way of the building—from the public sidewalk and street. (Blasingame Deposition, p. 123; Rothlein Deposition p. 51.) A photo of the residence can be found at BLM_00000010, which is copied here:



BLM_00000010

20.    A law enforcement officer exited one of the vehicles, approached the fence of the apartment building and, using expletives, ordered Blasingame and Rothlein and the other individuals to go into their apartment building. (Blasingame Deposition, p. 123; Rothlein Deposition pp. 51-52.) The officer did not provide any basis or rationale for why he was permitted to instruct Blasingame and Rothlein on how to act on their own property. When Blasingame and Rothlein did not comply with his instruction, the officer verbally threatened to pepper spray the Plaintiffs on their own property. (Rothlein Deposition p. 52.) Despite being informed by Blasingame that she, Rothlein, and the others were on their own private property, the officer continued to threaten the Plaintiffs for a significant period of time before eventually returning to his vehicle. (Blasingame Deposition, p. 124; Rothlein Deposition pp. 52-53.) The image below is a screenshot from a video produced at BLM_00000071 (Timestamp 00:08) which, while blurry, shows the officer walking away from the apartment building.

**CONTAINS REFERENCE TO MATERIALS DESIGNATED AS CONFIDENTIAL**



BLM_00000071 (Timestamp 00:08)

21.     The images below are screenshots from BLM_00000071 (Timestamp 00:17 and 00:24) which show the white police vehicle the officer entered after the encounter.

**CONTAINS REFERENCE TO MATERIALS DESIGNATED AS CONFIDENTIAL**



BLM_00000071 (Timestamp 00:17)

CONTAINS REFERENCE TO MATERIALS DESIGNATED AS CONFIDENTIAL



BLM_00000071 (Timestamp 00:24)

22.      While tear gas was not deployed on this occasion, the threatening officer's actions
were representative of Denver's systemic, indiscriminate, and impermissible use of chemical
munitions. The officer's repeated threats to use pepper spray—without any explanation as to why
Plaintiffs Blasingame and Rothlein were required to comply with his direction—were completely
unjustified as well as provocative. The Plaintiffs were on their own private property. They had
not committed any crime or engaged in any behavior that could be construed as criminal. The
officer's conduct was unacceptable. In my professional opinion, this conduct was the opposite of
how reasonable police officers would have comported themselves. I have not seen any materials
produced by the Defendants that justify the actions taken by this officer.

### Indiscriminate and inappropriate use of PepperBalls and inadequate training

23.      Plaintiffs' deposition testimony further supports my opinion that the DPD
exhibited a widespread practice and custom of indiscriminate and inappropriate use of
PepperBalls. (See 7/29/21 Report.) Plaintiffs uniformly testified that, across several different
dates, times, and locations in the first week of the George Floyd Protest (GFP), officers used

CONTAINS REFERENCE TO MATERIALS DESIGNATED AS CONFIDENTIAL

PepperBalls inappropriately. In one such example, Plaintiff Youssef Amghar describes in deposition testimony an incident of May 30, 2020 at Lincoln and Colfax. Amghar was shot with PepperBalls by police multiple times and without warning. Similarly, Plaintiff Claire Sannier describes in deposition testimony being shot while filming the police on the evening of May 29, 2020—for filming the police. Plaintiff Kelsey Taylor was also shot with PepperBall for no discernable reason. So was Plaintiff Johnathen Duran. (See Amghar Deposition; Sannier Deposition; Taylor Deposition; Duran Deposition.) The Defendants have not provided any evidence that justifies this officer conduct.

24.     **May 30, 2020, approximately 12:00 a.m., near the intersection of W 14th Ave. on N. Broadway.**  On May 30, 2020 at approximately 12:00 a.m., near the intersection of W 14th Ave. on N. Broadway (Lyman Deposition, p. 78), Plaintiff Hollis Lyman was shot with a PepperBall. Lyman was with a group of approximately one hundred demonstrators who were protesting through verbal chants. (Lyman Deposition, p. 76.) Lyman was approximately 10 to 15 feet in front of many of the other protestors and was standing with a sign that said on one side "Black Lives Matter." The other side of the sign listed the names of all people of color who had been killed by the DPD. (Lyman Deposition, pp. 65, 69.) Without warning, justification, or provocation, an officer in a line of law enforcement officials standing ten to twenty feet away fired a PepperBall bullet at her. (Lyman Deposition, pp. 69, 76.) To protect herself, Lyman used her sign as a shield. The PepperBall penetrated the sign, went all the way through it, and struck her in the forearm. (Lyman Deposition, pp. 70, 77.)

25.     Based on the evidence available to me, this was an impermissible use of PepperBall for two fundamental reasons. First, there was no warning provided to Lyman prior to her being shot. Second, based on the location of the injury as disclosed by Lyman, the officer either aimed for her face or upper torso, which is inconsistent with proper practice and use of PepperBall launchers. Consistent with the findings in my initial report, it is not appropriate to directly fire a projectile—whether a bean bag or sock round, a foam baton, a tear gas canister, or a PepperBall—at a person's head or upper body (which can easily strike the head). As noted in the initial report, such use of force is potentially lethal. It can also cause serious bodily injury, and is warranted only when officers are confronted with force from an aggressive or violent individual posing a threat that is potentially lethal or can cause serious bodily injury to the officer or others. The Defendants have not provided any evidence to suggest that Lyman was such a threat. Therefore, based on evidence available to me, my conclusion is the officer who fired the PepperBall did so impermissibly. Moreover, since there is no evidence of any effort to identify and/or reprimand this specific officer, it supports my view that such practice was acceptable and consistent with the policy of Denver and its allied law enforcement agencies at the time of the GFP.

26.     **May 30, 2020, 9:30 p.m., Logan Street between E Colfax Ave and 13th Ave:** At the above time and location somewhere between E Colfax Avenue and Governors Park, (Packard Deposition, pp. 21, 23), Plaintiff Zach Packard observed officers rush a group of

CONTAINS REFERENCE TO MATERIALS DESIGNATED AS CONFIDENTIAL

protestors and begin firing PepperBalls at a woman who was running from the officers. (Packard Deposition, p. 25.) Packard witnessed the officers as they continued to fire PepperBalls at the woman even after she stumbled to the ground. (Packard Deposition, p. 25.) In response, Packard yelled for the officers to stop shooting the woman, which then prompted one of the officers without warning to turn towards Packard and begin firing on him. (Packard Deposition, p. 33.) Packard shielded his face using his skateboard, which was hit by a PepperBall. (Packard Deposition, p. 33.) As discussed in my initial report and above, it is not appropriate to directly fire a "less-lethal" projectile at a person's head. Such use of force is potentially lethal. It can also cause serious bodily injury, and is warranted only when officers are confronted with force from an aggressive or violent individual posing a threat that is potentially lethal or can cause serious bodily injury to the officer or others. No evidence has been produced by the Defendants to even suggest that Mr. Packard was such a threat. Moreover, since there is no evidence of any action being taken to identify and/or reprimand this specific officer, it supports my view that such practice was acceptable and consistent with the policies of Denver and Aurora—its mutual-aid agency providing assistance at that date and location.

27.    **May 30, 2020, 10:07 p.m., 1424 N. Pennsylvania St.:**  Plaintiffs Amanda Blasingame and Maya Rothlein were in the vicinity of the front steps of their apartment building at the above time and location when officers hanging off a law enforcement vehicle driving south on Pennsylvania Street, (Rothlein Deposition, p. 54), began firing PepperBalls at them and other individuals in their company. (Blasingame Deposition, p. 132; Rothlein Deposition, p. 54.) I will refer to this event as the PepperBall Drive-By.

28.    As discussed earlier in this report, at approximately 9:00 p.m., just a little over an hour before the PepperBall Drive-By, Blasingame and Rothlein had been confronted by a law enforcement officer and ordered to go into their apartment. (Blasingame Deposition, p. 123; Rothlein Deposition pp. 51-52.) When Blasingame and Rothlein did not comply with his instruction, the officer verbally threatened to pepper spray them on their own property. (Rothlein Deposition p. 52.) He continued to threaten the Plaintiffs before eventually returning to his vehicle.

29.    An hour and seven minutes later, the PepperBall Drive-By took place. As with the earlier incident, Blasingame and Rothlein were verbally protesting law enforcement in the City of Denver. (Blasingame Deposition, p. 131.) Plaintiffs were doing so from their own private property. No objects were thrown at the law enforcement officers. Without notice, and without advance warning of any kind the officers began deploying PepperBalls. (Blasingame Deposition, pp. 132-133.) The PepperBalls hit one of the neighbors of Blasingame and Rothlein, and additional PepperBalls were fired into the Plaintiffs' apartment complex. (Rothlein Deposition, pp. 54-55.) The images below produced at BLM_00000007, BLM_00000012, and BLM_00000014 show some of the damage caused by the PepperBalls to the Plaintiffs' apartment building.

**CONTAINS REFERENCE TO MATERIALS DESIGNATED AS CONFIDENTIAL**



BLM_00000007

**CONTAINS REFERENCE TO MATERIALS DESIGNATED AS CONFIDENTIAL**



BLM_00000012

CONTAINS REFERENCE TO MATERIALS DESIGNATED AS CONFIDENTIAL



BLM_00000014

30.     The image produced at BLM_00000013 shows some of the PepperBall casings recovered from in front of Plaintiffs' residence. The image produced at BLM_00000010 shows the front of the Plaintiffs' apartment building and where the Plaintiffs were situated while protesting at the time the police officers fired the PepperBalls.



BLM_00000013

CONTAINS REFERENCE TO MATERIALS DESIGNATED AS CONFIDENTIAL



BLM_00000010

31.    I have not seen any materials produced by the Defendants that support any justification whatsoever for this indiscriminate and impermissible use of PepperBalls against Plaintiffs Blasingame and Rothlein. There are many concerning elements surrounding this incident that confirm that the Defendants' policy on deployment of PepperBalls is fundamentally flawed. First, there is no justification for the officers' deployment of these dangerous munitions into a private residence; Blasingame and Rothlein and the other individuals had not committed any crimes and were simply exercising their constitutional rights. Second, the officers' failure to provide notice prior to deploying PepperBalls did not afford Blasingame and Rothlein even an opportunity to (a) remedy whatever alleged impermissible behavior they had engaged in, and (b) protect themselves against (unwarranted) physical harm. To date, I have seen nothing produced by the Defendants that shows any impermissible, violent, or otherwise criminal behavior on the part of Blasingame and Rothlein or others in their company that would trigger or justify such a response by law enforcement. Third, there is no BWC footage from any of the officers that can help explain the officers' actions, much less hold them accountable.

32.    Not surprisingly, while there is no conceivable justification or evidence to account for this use of force, there is a plausible and ugly explanation for it. Given the time—roughly an hour and seven minutes—between the initial threats to Blasingame and Rothlein at their home at

CONTAINS REFERENCE TO MATERIALS DESIGNATED AS CONFIDENTIAL

1424 N. Pennsylvania St and this attack, it is my professional judgment that more likely than not, this action by law enforcement was a targeted and deliberate act of revenge. This opinion is buttressed by the fact that the predominant area of protest activity on May 30, 2020 was at least six blocks (almost half a mile) away at the Colorado State Capitol, far from the Blasingame-Rothlein residence. This circumstantial evidence of retaliation against Blasingame and Rothlein for engaging in constitutionally protected free speech, from the safety of their own private residence, is particularly disturbing. The actions of these officers were utterly unwarranted, a blatant abuse of their authority.

33.     Moreover, it is my understanding that there were at least two detailed requests submitted to Denver's IAB for an investigation of two incidents that are consistent with Plaintiffs' description of the Pepperball Drive-By. Specifically, in IA file P2020-0150, the complaint (DEN5194), provides on page 2 the following summary of a similar incident:

> While sitting in the fenced in yard of a private residence, one of your cars drove by and shot pepper rounds at us. We rushed inside but didn't manage to get the door closed. Your officers continued to fire pepper rounds into the house causing several people to have breathing difficulties. Your officers then proceeded to set off a flash grenade in the yard. Your officers also fired pepper rounds into a car of people that were trying to leave the chaotic area. When they left the car because they couldn't breath[e], your officers continued to shoot at them with pepper rounds.

On page 1, the location of the incident is identified as "Denver around 14th & Pennsylvania," which is in the same area as Plaintiffs Blasingame and Rothlein's residence at the time of the PepperBall Drive-By.

The decline letter (DEN5192) in this file states that "[d]ue to the inability to identify officers, no further disciplinary review of this matter is possible."

34.     In IA file P2020-0176, the complaint (DEN5712) describes another incident consistent with the PepperBall Drive-By described by Plaintiffs Rothlein and Blasingame:

> On the date and time mentioned I was out front of my building due to the fact that we are not allowed to smoke cigarettes in our apartment or on our patios we must exit the building to have our cigarettes. While smoking my cigarette and talking to my mother who lives in St.Louis on the phone. A SWAT vehicle proceeded from 12th Street and Broadway towards my apartment there was no one on this street north or south of me in my vision of at least two blocks. While speaking to my mother as well please proceeded down Broadway in my direction to officers fired shots from the vehicle as they were driving one shot hit me in my side and the other shot Bounce Off the Wall next to me. There was no warning prior to them firing up on me. Due to the impact of the rubber bullet that was fired directly at me not aimed at the ground but directly at my back sustained a rather large bruise well over 12 and 1/2 in in diameter three weeks later I still have large knots under my skin and severe pain. I did not seek medical attention at that time and I did not report that incident previous to this due to the fact that my age being fired upon by

CONTAINS REFERENCE TO MATERIALS DESIGNATED AS CONFIDENTIAL

police officers I was in fear for myself and I can't afford to go to the hospital and risk getting more sick due to the pandemic if the pain persist I will have it checked out. I will include a photo of the impact point and I do have the rubber bullet that struck that morning my possession[.]

According to the complaint, this incident occurred on June 1, 2020 in front of the complainant's apartment near 12th and Broadway, a few blocks away from where Plaintiffs Blasingame and Rothlein were subjected to a similar attack.

The decline letter (DEN5710) states: "we are unable to identify any officers involved or determine where the incident occurred."

35.     Finally, the BWC produced at DEN5041 shows live footage of the same type of behavior as described in connection with the PepperBall Drive-By. BWC from Officer Parton shows him hanging from the side of a vehicle, firing PepperBalls toward residences without issuing any warning or providing any explanation at all for his actions. A blurred yet confirming screenshot of this is copied below, at timestamp 00:43 of DEN5041.



DEN5041

33.     It should be noted that this BWC footage was taken at approximately 9:11 p.m., on May 30, 2020. It ends with the vehicle that Officer Parton was hanging from driving by the residence of Blasingame and Rothlein where the two citizens can be heard verbally protesting police actions from their front yard. The evidence of Officer Parton firing PepperBalls in this police drive-by, raises several flags that should have prompted a thorough and complete investigation into what occurred at the residence of Blasingame and Rothlein. This is also true of the other requests for IA investigations described above. The fact that there was no investigation

CONTAINS REFERENCE TO MATERIALS DESIGNATED AS CONFIDENTIAL

and that no officer was ever disciplined indicates, in my experience, that Denver approved of its officers' conduct against Blasingame and Rothlein, and others.

34.   Notwithstanding the multiple records and reports of this same type of incident, it is my understanding that—to date—there has not been a completed investigation into the identification and/or behavior of these law enforcement officials. I am also unaware of any pending investigation directly related to the PepperBall Drive-By or the behavior and actions of Officer Parton. In my opinion, this evidences a very serious lack of accountability on the part of the Defendants. It also informs my broader view that this type of police behavior by these law enforcement officials was deemed acceptable in Denver during the GFP.

* * *

35.   In sum, the additional materials I have reviewed further support my professional opinion that the DPD's indiscriminate and inappropriate use of less-lethal weapons; its inappropriate tactics; its failure to set and enforce sound policies with regard to Body Worn Cameras; and its lack of individual officers' reporting of their use of force caused in significant part the violation of the constitutional rights of the plaintiffs during the GFP in Denver.

Respectfully submitted,

Norman Stamper

Dated: December 22, 2021

28