

LOUISVILLE   LEXINGTON   LONDON   FLORENCE   CINCINNATI   INDIANAPOLIS   ORLANDO   JACKSONVILLE   TAMPA

# KENTUCKIANA
## COURT REPORTERS

## CIVIL ACTION NO. 1:20-CV-01878-RBJ

## ELISABETH EPPS, ET AL.

### V.

## CITY AND COUNTY OF DENVER, ET AL.

## DEPONENT:

## COMMANDER MICHAEL O'DONNELL

## DATE:

## October 15, 2021



a courtroom
**powerhouse**

✉ schedule@kentuckianareporters.com

☎ 877.808.5856 | 502.589.2273

## www.kentuckianareporters.com

Exhibit 8

The Deposition of COMMANDER MICHAEL O'DONNELL, taken on October 15, 2021

15

```
 1            Speaking in his individual capacity.
 2       Q    You can answer.
 3       A    I find a challenge with the way your question
 4  is phrased.  If an officer used force outside policy,
 5  there would be discipline.  If they didn't, there would
 6  be no discipline, so there's -- I don't understand how
 7  you're wording that question?
 8       Q    Okay.  So if an officer acts outside of
 9  policy, they're disciplined and if they're not
10  disciplined, that shows that they were acting within
11  policy, correct?
12            MS. HOFFMAN:  Objection.  Outside the scope.
13            Speaking in his individual capacity.
14       Q    You can speak in your individual capacity on
15  this question.
16       A    That's correct.
17       Q    Okay.  And you have an understanding of that
18  since -- how -- you've been with the department for how
19  many years?
20       A    Almost 30 years.
21       Q    Okay.  And you're a commander, correct?
22       A    That's correct.
23       Q    Okay.  Other than training and discipline, are
24  there any other systematic or programmatic efforts by
25  the City of Denver, to identify or prevent any of the
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  following types of misconduct during the protests as

2  described in topics 1A and 1B?

3      A     Those are the biggest and most continual

4  programs we have.

5      Q     Are there any others?

6      A     No.

7      Q     Let's talk about topic 4 -- or topic 3, sorry.

8  You've been designated to talk about topic 3 and so

9  topic 3 says, "The city's written and unwritten policies

10  and practices in effect from May 2015 through June 2020

11  relating to A, crowd management, crowd control, and

12  field force tactics including the management of

13  protests."  So other than the use of force policy in the

14  operations manual and the DPD crowd management manual,

15  are there any other written policies of the city

16  relating to topic 3A?

17      A     I am unaware of any other policies that relate

18  specifically to this.

19      Q     Okay.  I'm showing you the DPD crowd

20  management manual, the version that was in effect in

21  February of 2019.  I'm showing you the first page here.

22          It says DEN001755.  Let's -- did you review

23  this document in preparation for today's deposition?

24      A     Yes.  I did.

25      Q     Okay.  So let's talk about page 9, which is

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of COMMANDER MICHAEL O'DONNELL, taken on October 15, 2021

17

1    DEN1763.  Do you see this paragraph here that's been

2    highlighted about when a general dispersal order would

3    be given?

4         A    Yes, I do.

5         Q    Okay.  How -- who -- who -- who's -- who has

6    the authority to give a general dispersal order?

7         A    It is situation specific.  In some instances,

8    it is the incident commander.  In some instances, it can

9    be the lieutenant supervisor, or whoever is at the scene

10   depending on circumstances.

11        Q    Okay.  And then how -- depending on what

12   circumstances?

13        A    The actions of the crowd is the biggest

14   factor.  If you have a violent crowd of three or more,

15   that is considered riotous conditions, and the policy

16   allows for a lot of flexibility in its preamble.  The

17   officers can make that determination.  In some cases,

18   even if it's a peaceful crowd, if it's a certain

19   severity of incidents, severity of -- of conditions that

20   are met, the officers would have to be able to explain

21   those, and why they would be giving an order to

22   disperse.

23        Q    Okay.  So you said the people with authority

24   to give a general dispersal order, would be the incident

25   commander or who exactly on the scene?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of COMMANDER MICHAEL O'DONNELL, taken on October 15, 2021

18

```
 1        A    As I mentioned, the policy has flexibility in
 2   it.  So in most cases where a large event is going to
 3   be, the incident commander.  There are certain
 4   permissions in there that allow a lieutenant, a captain,
 5   another commander that's on scene, even a supervisor,
 6   depending upon the circumstances.
 7        Q    But it has to be some kind of supervisor,
 8   correct?
 9        A    Yes.
10        Q    And why is that?  Why does a supervisor --
11        A    They're the --
12        Q    -- have to make a general dispersal order and
13   not just some officer on the scene?
14        A    So let -- let me clarify.  It -- it even has a
15   portion in there about the officer that is in charge.
16   So we could have a scenario where you have 15 to 20
17   individuals that are protesting and you would only have
18   an officer or a couple of officers monitoring them.
19             Typically, the senior officer meaning
20   seniority would be in charge of monitoring that.  Now,
21   if certain conditions were to come about and they were
22   to deem that an unlawful assembly, they would have to be
23   able to articulate it.  But -- so that -- just to
24   clarify on the officer piece, it is always, we want one
25   person that can make the determination and articulate
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

 1   the need for an unlawful assembly order.

 2        Q    Where is that in the policy?  That a senior

 3   officer on the scene could give a general dispersal

 4   order under certain circumstances?

 5        A    Give me one second.  Sorry.  It's taking a few

 6   minutes to find it, but it's in the matrix formula,

 7   towards the end of the policy.

 8        Q    The crowd management matrix?

 9        A    Yes.

10        Q    Where it says, "Division or unit supervisor"?

11        A    Yeah.

12        Q    Okay.  So let me -- let me ask you another

13   question.  Why don't you -- okay.  So the crowd

14   management manual does not necessarily -- or the

15   Denver -- policy of the Denver Police Department does

16   not necessarily require that an incident commander give

17   a general dispersal order.  It could be a lieutenant, a

18   captain, a supervisor, or just the highest ranking

19   officer on the scene.  Is that what you're saying?

20        A    That's correct.

21        Q    Okay.  And then what does the policy provide

22   for as to when the authority to give a general dispersal

23   order can be given by somebody who is not the incident

24   commander and not even a command level officer?

25        A    As I mentioned, there is flexibility in this

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   policy and the -- in its preamble talks about it's a

2   guide.  So each situation is different based on the

3   crowd behavior, crowd size, traffic conditions, a

4   variety of scenarios.  So it's really up to the officers

5   -- supervisors, sergeants to evaluate, seek information

6   from their higher superiors time permitting but each of

7   these situations is unique and a variety of conditions

8   can occur.

9       Q    Okay.  So the policy is just a guide because

10  it all depends on the circumstances; is that right?

11      A    That's correct.

12      Q    And it's really up to the officers to evaluate

13  to determine when and if they can give a general

14  dispersal order, right?

15      A    That's correct.

16      Q    So the policy leaves it to the officer's

17  discretion to decide when a general dispersal order can

18  be given?

19      A    In most instances, it has to be higher

20  authority officers, command level, that kind of thing,

21  but it does carve out that flexibility and option for

22  that kind of situation.

23      Q    And officers -- under the policy of the DPD,

24  officers are simply given discretion in determining --

25           MS. HOFFMAN:  Objection.  Form.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

 1      Q    -- when somebody -- when somebody other than
 2    an incident commander or command level officer can give
 3    a general dispersal order?
 4           MS. HOFFMAN:  Same objection.  You can answer.
 5      A    During rapidly evolving events, yes, there is
 6    that carve out.
 7    BY MS. WANG:
 8      Q    Okay.  So taking another look at page 9 of the
 9    crowd management manual it says, "A general dispersal
10    order will only be given under the following
11    circumstances," and it describes a significant number of
12    percentage of participants who basically are engaging in
13    violent conduct or failed to adhere to orders that have
14    been given, right?
15      A    Correct.
16      Q    Okay.  So what is -- what is significant --
17    there's no numerical, you know, it doesn't say like 60
18    percent, it doesn't give a specific percentage or
19    number, right?
20      A    That's correct.
21      Q    So what's the policy of the city as to what a
22    significant number of percentage means?
23      A    Again, this is situation specific.  It depends
24    on a crowd.  We've had numerous crowd events where a
25    significant number of people are attending but there's

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of COMMANDER MICHAEL O'DONNELL, taken on October 15, 2021

22

```
 1   not issues.  So it depends on the conditions that are
 2   existing at that time.  If you have a crowd of
 3   100 people and 20 of them are engaged in violent
 4   activity, that's a significant number.  So that's why
 5   you can't put a number associated to this because you --
 6   each situation is different.  When you look at the
 7   All-Stars, for instance, that came to Denver, that was a
 8   very celebratory crowd, we had no issues but you had a
 9   significant number of people in downtown Denver at
10   different locations.  But you didn't have any kind of
11   violence.  Therefore, there was no unlawful assembly
12   order given.  Protests that occur just about every week
13   for (Inaudible) or -- or whatever, they come down, they
14   are in compliance, there is not an unlawful assembly
15   order given because they are compliant, they're just
16   expressing their first amendment rights.  So you have to
17   have some sort of interpretation of the numbers and what
18   kind of actions they're committing to have this be in
19   effect.
20       Q    Okay.  So 20 out of 100 engaged in violent
21   conduct would be significant.  That would qualify under
22   subsection 2, right?
23            MS. HOFFMAN:  Objection.  Form.
24       A    It could.
25            MS. HOFFMAN:  You can answer.
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

 1       A     I was illustrating that as an example.  It

 2    could.  It depends on other conditions too.  Do you have

 3    enough officers to address the 20 that are problematic?

 4             Do you need additional resources?  So it's --

 5    it's a variable that has to continually be evolved

 6    because it's an unfolding event.

 7       Q     And it's up to the discretion of the officers

 8    or the supervisors to make that determination, whether

 9    or not a significant number of participants would

10    trigger this general dispersal order, right?

11       A     Yes.  That's correct.

12       Q     Let's take a look at page Denver 1773 of the

13    crowd management manual describing the PepperBall

14    system.  So in summary, the PepperBall may be used

15    against individuals who are engaged in defensive

16    resistance, right?

17       A     I'm sorry.  Can you repeat that?  Your voice

18    cut out for a second.

19       Q     DPD policy is that PepperBalls can be used on

20    people who are engaged in defensive resistance; is that

21    right?

22       A     Yes.  At that time, that is correct.  Yes.

23       Q     Okay.  And the policy provides that the,

24    "PepperBall projectile will not be deployed against a

25    specific individual in a crowd, without the approval of

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of COMMANDER MICHAEL O'DONNELL, taken on October 15, 2021

24

1  division or unit supervisor"; do you see that?

2      A    Yes.  I do.

3      Q    That's the policy of the city, correct?

4      A    That's correct.

5      Q    Additionally, "The PepperBall system will not

6  be used against a group or crowd without prior

7  authorization from the incident commander," that's also

8  the policy of the city at the time, right?

9      A    That's correct.

10     Q    Okay.  How is that prior -- how does the prior

11 -- how is the prior authorization obtained?

12     A    That is typically with radio communication,

13 additional video sources from cameras that are in the

14 area, perhaps in some instances surveillance from our

15 police helicopter, giving updates, evaluating with the

16 incident commander.  Now, I would also say that is the

17 policy but in the crowd control matrix, there's also

18 instances where there is permissions to supervisors to

19 direct PepperBall when certain conditions are met.

20 Again, it's a variable, so there is no -- it's only in

21 this instance, there is, again, this is a guide.  This

22 is our general policy, so we try to strive to.  But

23 understanding the human element that's involved, you

24 cannot outline every condition that may or may not

25 occur.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1      Q     Well, I mean, you -- so I mean, is it the rule
2    -- let me -- let me just stick with the first sentence
3    here.  It says, "The PepperBall projectile will not be
4    deployed against a specific individual in a crowd,
5    without the approval of the division or unit
6    supervisor."
7            Are you saying that's the general rule but
8    there's all sorts of exceptions or that's the rule?
9      A     There is -- there is flexibility in this.  I
10   realize what this is saying and -- and the officers do
11   too.  But in a situation where you've got a violent
12   crowd that is doing something against the officers, and
13   they're trying to get separation, and there may not be
14   time to get that approval, there is a carve out for
15   that.
16     Q     Okay.  Where does it say that?  It doesn't say
17   that on this page?
18     A     No.  It's down further in the crowd control
19   matrix portion.
20     Q     Okay.  All right.  It's in the crowd control
21   matrix?  Okay.  So --
22     A     That -- that's correct.
23     Q     -- it the not the rule that -- the policy of
24   the city is not that the PepperBall projectile can only
25   be deployed against a specific individual with the

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  approval of a -- of a division or unit supervisor,

2  right?  Because it depends on the circumstances and

3  there could be exceptions, right?

4        MS. HOFFMAN:  Objection.  Form.  You can

5    answer.

6    A    Yes.  that's correct.

7    Q    Okay.  And those exceptions -- the policy of

8  the city is that officers are provided discretion to

9  decide when an exception applies, right?

10   A    The term discretion is true, however, the

11 officers need to be able to clearly articulate the need

12 for such things, otherwise they face discipline.

13   Q    Okay.  And so when -- when would it be

14 justified to deploy -- pursuant to policy, when would it

15 be justified to deploy a PepperBall against a specific

16 individual, without the approval of a division or unit

17 supervisor?

18   A    So your question calls for speculation.  I --

19        I would say, again, it's -- it's situation

20 specific.

21        The officers have to clearly articulate that.

22 If there is a group, violent individuals that keep

23 encroaching on the officers or endangering their

24 particular officer safety and they are giving orders to

25 back up, back up, back up?  They may not have the

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  opportunity to put some less lethal munitions into the

2  ground to get separation, they may -- based on the

3  officers' articulation or supervisor, whatever the case

4  may be, have that carve out to say that person can be

5  PepperBall-ed.

6       Q    Okay.

7       A    -- but, again, that has to be met by the

8  supervisor, officer, whoever was deploying that less

9  lethal system to be able to articulate it.

10      Q    Okay.  In the example that you just gave --

11 you gave an example of a group of people who are engaged

12 in violence, who are encroaching on an officer and an

13 officer is giving warning, telling them to back up and

14 then they don't comply, right?

15      A    That's correct.

16      Q    All right.  Let's say that you have the same

17 situation, but the officer has not given any warning.

18           Does the policy allow for officers to deploy

19 PepperBall in that situation?

20           MS. HOFFMAN:  Objection.  Form.  You can

21   answer.

22      A    Yes.  It does.  It is preferred that the

23 officers give warnings.  However, there is also the

24 understanding within the policy that time may not be an

25 option -- may not be an option.



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    Q   Okay.  So DPD policy does not require a

2   warning prior to the deployment of PepperBall and

3   specific individuals, when an individual officer

4   determines that it's necessary, right?

5        MS. HOFFMAN:  Objection.  Form.  You can

6    answer.

7    A   Yes.  That's correct.

8    Q   Okay.  Now, let's say that instead of a group

9   of violent individuals, you've got a group of 100 people

10  and there's maybe three people in the crowd who are

11  throwing water bottles at the police officers, okay?

12       Does DPD policy allow for the deployment of

13  PepperBalls against the crowd as a group in a -- in the

14  form of area denial?

15       MS. HOFFMAN:  Objection.  Form.  You can

16    answer.

17    A   Generally in water bottles, if they are not

18  frozen, we would just try to have separation, further

19  distance so that it would limit the ability for those

20  individuals to throw the water bottles.  Whether or not

21  they're frozen is a little bit different scenario.  The

22  officers would by policy, try and focus the aim point at

23  those individuals committing that action, not against

24  the general group.

25    Q   Right.  So if you had a group of 100 people

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of COMMANDER MICHAEL O'DONNELL, taken on October 15, 2021

29

1    and there are three people who are throwing -- so let me

2    make sure I understand.  If you had a group of 100

3    protestors and there were three identifiable specific

4    individuals in the crowd who were throwing nonfrozen

5    water bottles, you're saying that's really not a

6    circumstance in which a PepperBall would be warranted at

7    all, because they're not frozen?

8              MS. HOFFMAN:  Objection.  Form.  You can

9         answer.

10        A    No.  For clarification, that would be, again,

11   the articulation of the officers would have to explain

12   the need to use less lethal munitions in the form of

13   PepperBall.  One option may, depending upon the

14   circumstances, be using it for area denial to get

15   further separation.  In that scenario you described, my

16   feeling would be the officers would focus on the

17   activity of the individuals throwing the water bottles,

18   not the larger crowd.

19        Q    Okay.  But would it be within policy or

20   outside of policy for -- in -- in a situation where you

21   have 100 individuals who are peaceful and there's three

22   people in the crowd who are throwing water bottles at

23   the officers for the -- would it be within policy or

24   not, for the officers to use PepperBall in the form of

25   area denial in that situation?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1            MS. HOFFMAN:  Objection.  Form.  You can

2      answer.

3      A     I would say with proper articulation, it is

4  with -- within policy.

5      Q     Okay.  So even though that 97 people in the

6  crowd are being peaceful and there's three people in the

7  crowd, out of 100 who are not peaceful and who are

8  throwing the objects, it would still be within DPD

9  policy for the officers to use PepperBall on the crowd

10  in the form of area denial, right?

11            MS. HOFFMAN:  Objection.  Form.  You can

12      answer.

13      A     The challenge that you're saying, using it on

14  the crowd, you're not using -- if you're using area of

15  denial, you're not using it on the crowd, it's going

16  into the ground.  It's a -- it's a signal, a visible

17  deterrence to push back.  So, yes, the officers are in

18  policy to do that.

19      Q     Okay.  And then but officers --

20      A     Again, with proper articulation.

21      Q     Well, what -- what would be the articulation

22  that an officer could give there, that would -- that you

23  as a supervisor would say, okay, that's within policy?

24      A     This is, again, a situation of theoretical

25  questioning, but I -- I -- again, it has to come back

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of COMMANDER MICHAEL O'DONNELL, taken on October 15, 2021

38

1  officer that was inconsistent with DPD policy?

2          MS. HOFFMAN:  Objection.  Outside the scope.

3          Speaking in his individual capacity.

4     A    I can only comment to the officers that were

5  under my purview at the time, which was the SORT team,

6  the gang unit.  I did not see any actions that I

7  believed were outside of policy.

8     Q    Right.  And you are the witness who has been

9  designated by the City of Denver to provide binding

10 testimony on what the city's policy is, correct?  With

11 respect to crowd management and management of protests?

12    A    Yes.  That's correct.  However, internal

13 affairs is the one that goes through and determines if

14 things are in policy or out of policy and disciplined,

15 recognized, or -- or awarded.  That's not my purview.

16    Q    Okay.

17    A    I can testify to the crowd management control

18 -- control -- management policy and -- and questions to

19 that, but I -- I can't comment to the officers that have

20 been disciplined or not disciplined.

21    Q    Well, let me ask you this, given your

22 designation as the witness who is going to testify about

23 what DPD's policy is about management of protests and

24 crowd management in general -- well, actually, strike

25 that.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of COMMANDER MICHAEL O'DONNELL, taken on October 15, 2021

40

1    Q    Okay.  So it is not -- the policy of the DPD

2   is that PepperBall -- use of PepperBall in crowd control

3   situations can be used in one of these five

4   circumstances enumerated here on this page, or as long

5   as the officer can justify it, right?

6    A    Yes.  That's correct.

7    Q    Okay.  And there's no enumeration in this

8   manual or anywhere else of what other possible things

9   could justify the use of PepperBall, right?

10    A    That's correct.

11    Q    It's up to the officer's discretion depending

12   on the circumstances, right?

13    A    Discretion and articulation.

14    Q    Okay.  And that's DPD policy, correct?

15    A    That's correct.

16    Q    Okay.  And so when you say, "It's up to the

17   officer's articulation," I mean, as -- does it -- do you

18   mean the officer just has to give you a reason and

19   you'll accept it or the officer has to give you a

20   reason, and then you have to determine as a supervisor

21   whether or not that's consistent with policy?

22        MS. HOFFMAN:  Objection.  Form.  You can

23    answer.

24    A    To answer your question, it -- it's a

25   combination.  So the officer has to have a clear and

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of COMMANDER MICHAEL O'DONNELL, taken on October 15, 2021

41

```
1   definitive reason for -- or a rationale for deploying
2   less lethal outside of these parameters.  It is reviewed
3   by the officer's supervisor and use of force report.  It
4   then goes to internal affairs for additional review and
5   if there's -- if it's found to be outside of policy,
6   then the complaint is initiated.  The officer is
7   ultimately subject to discipline.
8       Q    Okay.  And if officers were not -- gave their
9   -- gave their statements of why, and when they used less
10  lethal weapons during the protest, and those were
11  written down in officer statements, and the city has not
12  -- they have not been disciplined in any way or held to
13  account for it not anyway, then that means that their
14  use of force was appropriate pursuant to policy,
15  correct?
16          MS. HOFFMAN:  Objection.  Form.  You can
17      answer.
18      A    Yes.  That's correct.
19      Q    What is to, "Support the skirmish line," mean?
20      A    The skirmish line is essentially a resource
21  application of officers lined up.  In some cases you may
22  move forward to move a crowd to particular a direction.
23          You may just put a skirmish line up to protect
24  critical infrastructure.  PepperBall is brought up to
25  support that, so if folks keep coming up to the -- to
```



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of COMMANDER MICHAEL O'DONNELL, taken on October 15, 2021

43

```
 1  sure that that time would be available for the officers
 2  to do that.  It depends on each -- each one is situation
 3  specific.
 4      Q   Okay.  So it could be within DPD policy -- it
 5  could be consistent with DPD policy for an officer to
 6  shoot a person who's standing still with their hands up,
 7  even if no orders to move back have been given, if there
 8  wasn't enough time to give an order?
 9          MS. HOFFMAN:  Objection.  Form.  You can
10      answer.
11      A   Again, there has to be proper rationale and
12  articulation as to why that occurred but it is possible
13  to be within policy.
14      Q   Well, what -- I mean -- what -- given the
15  example I gave you, what possible rationale could an
16  officer give, that would make it within policy?
17          MS. HOFFMAN:  Objection.  Form.  You can
18      answer.
19      A   Given the scenario you presented, there's not
20  enough variables and information to say it is or is out
21  of policy.
22      Q   I'm showing you Denver 1774, section on 40-
23  millimeter launchers.  The 40-millimeter launchers can
24  only be used on individuals who are engaged in active
25  aggression, correct?
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of COMMANDER MICHAEL O'DONNELL, taken on October 15, 2021

49

1  example would be, if an officer has the person focused

2  and lets the less lethal round go, and that individual

3  moves, that's not intentional, that's unintentional.

4  But they made every good faith effort to target one of

5  the approved areas.

6      Q    Okay.  But -- sorry.

7          MS. WANG:  Can we go off the record for a

8      moment?

9          MS. HOFFMAN:  A five-minute break would

10     actually be great.

11         MS. WANG:  Okay.

12         VIDEOGRAPHER:  We'll go off the record at

13     10:41 a.m.

14             (OFF THE RECORD)

15         VIDEOGRAPHER:  Okay.  We are back on the record

16     at 10:49 a.m.

17 BY MS. WANG:

18     Q    Okay.  I'm putting back up on the screen

19 Denver 1774 and 1775 which describes the circumstances

20 under which a 40-millimeter launcher may be used in

21 crowd situations -- crowd control situations.  Is it --

22 it is -- it is the case that if a person is not engaged

23 in one of these activities -- is not committing one of

24 the acts enumerated here, then using 40-millimeter

25 launcher against them is -- would be outside of DPD

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of COMMANDER MICHAEL O'DONNELL, taken on October 15, 2021

50

 1    policy?

 2         A    Typically, yes.  Again, I would have to go

 3    back to if an officer can have a reasonable and rational

 4    articulation as to why it was used outside these

 5    parameters, it may fall within policy.  But this is the

 6    general guideline of when you can use a 40-millimeter in

 7    crowd control situations.

 8         Q    Okay.  So there are exceptions to this rule as

 9    well?

10         A    Yes.  That's correct.

11         Q    Can you give me an example of an exception?

12              MS. HOFFMAN:  Objection.  Form.  You can

13         answer.

14         A    Off the top of my head, I know it's kind of

15    addressed there if an officer was actively throwing

16    objects -- one of the instances that comes to mind is

17    during the events, that officers were subject to a

18    Molotov cocktail, so that would be another one.  It's

19    not specifically said Molotov cocktail, but something

20    like that.  It would be addressed and be within policy.

21         Q    Well, yes, I mean if -- so you're saying --

22    okay.  So this says, "Against subjects who are actively

23    throwing objects at police officers."  So you're just

24    saying if somebody threw a Molotov cocktail at a police

25    officer, the officer could use a 40-millimeter launcher

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    circumstances, under which chemical agent used in crowd

2    control situations is appropriate per DPD policy?

3         A     This would be another situation that's, you

4    know, even though they're not enumerated, there's also

5    flexibility and it is a guide.  To our earlier

6    discussions regarding a crowd moving back, you may have

7    to move them with some sort of less lethal munitions,

8    including chemical agent.

9         Q     Okay.  So this one, unlike the other ones

10   says, "Any situation where the officer can clearly

11   articulate the need for a deployment."  Do you see that?

12        A     I do.

13        Q     Okay.  Based on what you've testified about

14   use of 40-millimeter launchers and PepperBalls, does

15   this apply -- this is -- this is what you're talking

16   about?

17        A     I'm sorry.  I'm not quite clear on the

18   question.

19        Q     Okay.

20        A     Could you repeat that?

21        Q     So the other ones, the written policy doesn't

22   list this bullet point here for 40-millimeter launcher

23   use and PepperBall use, okay.

24        A     Yes.

25        Q     It only lists it here for chemical agent use

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  that, "An officer can use chemical agents in any

2  situation where an officer can clearly articulate the

3  need for deployment."  But based on what you've

4  testified to as the city's witness, off -- DPD policy is

5  that officers can use 40-millimeter launchers in any

6  situation where the officer can clearly articulate the

7  need for deployment, correct?

8      A    If you look in the matrix, it -- it references

9  that, so, yes, it is, again, within a carve out.

10     Q    Okay.  And DPD policy is that officers may use

11 the PepperBall launcher in any situation where the

12 officer can clearly articulate the need for deployment,

13 correct?

14     A    Yes.  Typically rising to the level of

15 defensive resistance.

16         MS. WANG:  Okay.  I have no further questions

17    at this time.  If we go off the record for a moment,

18    Mr. -- I don't -- where is Mr. Reidy, did he drop

19    off?

20         VIDEOGRAPHER:  I thought I heard someone drop

21    off like a minute ago, so it could have been him.

22    Here, I'll go off the record real quick.

23         MS. WANG:  Let's go off the record.

24         VIDEOGRAPHER:  Okay.  We'll go off the record

25    at 10:58 a.m.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   management manual and we identified -- we looked at a

2   part that talks about how officers cannot use bean bag

3   shotguns without approval of the incident commander.

4           Do you remember looking at that?

5       A    Yes, sir.  I do.

6       Q    Was that the policy of the Denver Police

7   Department at the time of the George Floyd protests?

8       A    It was.  And to clarify, I did not know the

9   chief and Commander Phelan had talked to those other

10  agencies about that.  To my knowledge, none of those

11  were deployed.  We don't have those in department

12  inventory.

13      Q    As the city's representative regarding the

14  city's crowd management policy, is it your understanding

15  that if officers from an outside agency, such as the

16  Aurora Police Department, used bean bag shotgun rounds

17  while policing the protests, it would have been with the

18  approval of DPD's incident commander?

19          MS. HOFFMAN:  Objection to form.  You can

20      answer.

21      A    Based on what we have discovered in today's

22  deposition, I didn't know the chief had authorized that.

23          So if that were to have occurred, then that

24  would have been within policy.  The chief can make

25  exceptions to those things.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    Q    So as the city's representative regarding the

2  city's crowd management policy, are you able to testify

3  today that the incident commander authorized the use of

4  bean bag shotgun rounds by outside agencies such as the

5  Aurora Police Department?

6         MS. HOFFMAN:  Objection.  Outside the scope.

7         Speaking in his individual capacity.

8    A    Again, I would say, based on today's

9  information in the deposition, it sounds like Chief

10  Pazen and Commander Phelan authorized that.  Therefore

11  it would be withing policy if it was approved by the

12  incident commander per our operations -- per our policy.

13    Q    Okay.  So if indeed police officers from the

14  City of Aurora policing the George Floyd protests

15  deployed bean bag or sock rounds from less lethal

16  shotguns, it would have been at the -- with the

17  authorization of either Incident Commander Phelan or

18  police Chief Paul Pazen, right?

19         MS. HOFFMAN:  Objection.  Outside the scope of

20      this individual's testimony.  Speaking in his

21      individual capacity.

22    A    Sir, to answer your question, I -- given

23  today's testimony, I conclude that Chief Pazen and

24  Commander Phelan authorized that.

25         MR. REIDY:  All right.  I have no further

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com