

LOUISVILLE  LEXINGTON  LONDON  FLORENCE  CINCINNATI  INDIANAPOLIS  ORLANDO  JACKSONVILLE  TAMPA

# KENTUCKIANA
## COURT REPORTERS

**CIVIL ACTION NO. 1:20-CV-01878-RBJ**

**(CONSOLIDATED WITH 1:20-CV-01922-RBJ-MEH)**

**BLACK LIVES MATTER 5280, ET AL.**

V.

**CITY AND COUNTY OF DENVER, ET AL.**

**DEPONENT:**

**CHIEF OF POLICE PAUL PAZEN**

**DATE:**

**June 17, 2021**



✉ schedule@kentuckianareporters.com

☎ 877.808.5856  |  502.589.2273

**www.kentuckianareporters.com**

Exhibit 9

The Deposition of CHIEF OF POLICE PAUL PAZEN, taken on June 17, 2021

16

1      A.    -- if you understand me.

2      Q.    Sure.  And so what was your role in the

3  command post relative to Commander Phelan?

4      A.    So are you familiar with the incident command

5  system, ICS?

6      Q.    Yes.

7      A.    Okay.  So Commander Phelan is the incident

8  commander managing the overall situation or event, and I

9  was in the command post monitoring.

10      Q.    Okay.  So as the incident commander, what were

11  his responsibilities?

12      A.    The responsibilities to manage a very

13  difficult situation to the best of their ability.

14      Q.    He was in charge of managing the police

15  response, generally speaking?  He was -- Phelan was in

16  charge as incident commander of managing how the police

17  was going to respond to the protests, right?

18      A.    I mean, that's kind of a broad statement, but

19  overall, yes.  The incident commander is responsible for

20  managing the situation, having input of information, and

21  then working to try to resolve whatever issues come up.

22      Q.    Right.  And so one of the things that Phelan

23  did as incident commander is that he would receive

24  different information from different forces, whether

25  it's looking and talking to the Air One helicopter, you

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    know, to see what they could see, being on the radio,

2    talking to his different lieutenants who were actually

3    out in the field at different locations, getting

4    information from them, and then deciding how he was

5    going to -- you know, which areas needed deployment of

6    certain teams of officers.  Would you agree with that?

7        A.    I would agree with that.

8        Q.    Okay.  And did he have to ask your permission

9    or authorization for specific, you know, strategic

10   decisions that he was making during the protests?

11       A.    No.  That's not how the ICS system or

12   structure works.

13       Q.    Okay.  And so what was your role in relation

14   to -- I mean, I get you were sort of just monitoring the

15   situation, right?  Is that right?

16       A.    That's fair.

17            MS. BIRKHOLZ:  Object to form.

18       Q.    Okay.  So I just want to try to get an

19   understanding of what your role was relative to -- to

20   Commander Phelan?

21       A.    To monitor the situation and provide support,

22   if necessary.

23       Q.    Okay.  And so Commander Phelan was delegated

24   the authority to make the decisions that he needed to

25   make in order to decide what the police response to the

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of CHIEF OF POLICE PAUL PAZEN, taken on June 17, 2021

18

1   protests would be, right?

2           MS. BIRKHOLZ:  Objection to form.

3       A.   Yes.

4           MS. BIRKHOLZ:  Go ahead.

5       A.   I'm sorry.  I was just going to state that

6   that's how the ICS system works.

7       Q.   Okay.  All right.  And so what information

8   were you looking at when you were in the command post

9   when -- you know, when we talk about you monitoring the

10  situation during the times that you were in the command

11  post, what kinds of information were you receiving?

12      A.   You know, again, various inputs.  Our -- our

13  role was to try to mitigate this, getting an

14  understanding of what's taking place, and then we

15  utilized information, public information in order to

16  attempt to mitigate the situation.  We held press

17  briefings, press conferences, asking people not to

18  engage in any level of violence, to -- that we support

19  peaceful protests, that damage, destruction, and

20  violence is not acceptable in peaceful protests, and

21  trying to get that message out to help reduce the

22  negative impacts that we were seeing with the damage

23  that was taking place, the injuries that we were seeing,

24  the fires that were being set, the weapons that were

25  being brought downtown during primarily the first five

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

 1   letting people know that we respect people's First

 2   Amendment rights, but to do it in way that it's not

 3   causing harm and not violating the law.

 4       Q.    There were hundreds of the protesters who were

 5   out in the evening hours who were not violent, correct?

 6       A.    There was a mix of non-violent protesters, and

 7   we -- as I stated earlier, we had our hands full with

 8   individuals that were engaging in violent riotous,

 9   destructive behavior in our city, evident by the $4

10   million in damage, evident by the 81 officers who were

11   injured during this timeframe, as well as evident with

12   the deadly weapons and other instruments that were

13   recovered during these protests.

14       Q.    What video were you looking at when you were

15   in the command post?

16       A.    Primarily, it was the HALO video.

17       Q.    Have you ever reviewed any video of specific

18   teargassing events on the first day of the protests, May

19   28th?

20       A.    Not that I recall.

21       Q.    Is it your view that the actions taken by

22   Denver police officers during the protests last summer

23   were consistent with DPD policy?

24           MS. BIRKHOLZ:  Objection.  Form.  Foundation.

25       And also he's testifying he's in individual

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1     capacity, not on behalf of the city as 30(b)(6)

2     witness, so placing that out there.

3          You can answer.

4     A.   So I wouldn't be able to answer that question

5  from what I saw on the HALO videos.  If an officer

6  violated policy, then we would have taken that officer

7  offline and reviewed the situation to ensure or hold

8  that person accountable, but I did not witness

9  violations of policy or I would have taken action.

10 BY MS. WANG:

11    Q.   And so let me ask you this:  How -- I get that

12 you were in and out of the command post, but let's say

13 during the four days of the protests, how much time were

14 you spending in the command post as opposed to being

15 somewhere else?

16    A.   Primarily, it was in the command post, hours

17 in the command post.  These events started during the

18 day and lasted well into the early morning hours, 3:00,

19 4:00 in the morning, so I don't know what that is,

20 16-hour days, 14-hour days, somewhere in that range.

21    Q.   Sure.  And during that time, you were in

22 regular -- you know, you were with Commander Phelan

23 during that time, right?

24    A.   In proximity.  It's a very large room, so...

25    Q.   Sure.  But you were monitoring what he was

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    doing, right?

2         A.   I was monitoring the situation.  I'm not

3    looking over the IC's shoulder.

4         Q.   Sure.  You didn't have any disagreement with

5    any actions that he decided to take during the time that

6    you were in the command post with him, right?

7         A.   I did not.

8         Q.   You -- did you think that Commander Phelan did

9    a good job?

10        A.   Yes, I did.

11        Q.   And you thought that the officers, Denver

12   police officers, acted with great restraint during the

13   protests, right?

14        A.   Again, it's a little -- I would say that, you

15   know, my understanding, from what I saw and witnessed,

16   we still have 20 to 30 cases that need to be

17   adjudicated, but, overall, I saw a lot of restraint when

18   officers -- one of them being injured, several of these

19   were significant injuries, injuries that I went every

20   single night to Denver Health Medical Center and had

21   five, six, seven officers in various emergency rooms

22   being treated for injury.  So, you know, in general

23   terms, I would say, yes, we still have cases to

24   adjudicate through a very comprehensive disciplinary

25   process.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    Q.   Were the actions that Commander Phelan took

2  during the protests during the time that you were in the

3  command post with him, were they consistent with DPD

4  policy?

5    A.   Yes.

6    Q.   You didn't see him do or authorize any actions

7  that you disagreed with?

8    A.   I thought I answered that question already,

9  but I'll say I did not see actions or decisions that I

10  disagreed with.

11    Q.   Okay.  And as chief of police, you are very

12  familiar with the policies of the Denver Police

13  Department, correct?

14    A.   I helped set the policy for the police

15  department.

16    Q.   So you have the foundation to talk about what

17  is consistent with DPD policy and what is not consistent

18  with DPD policy, right?

19    A.   Yes.

20    Q.   Okay.  You gave a press conference on May 29th

21  of 2020.

22         Do you recall that press conference?

23    A.   In general terms, yes, I do remember the press

24  conference.  You know, I think it was a fairly lengthy

25  conference, so -- press conference, so, yes, I do

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

24

1   remember the press conference itself.

2       Q.   Okay.  During that press conference, you

3   commended the members of the Denver Police Department

4   and said that they demonstrated extreme restraint.  Do

5   you recall that?

6       A.   I don't remember those exact words, but

7   similar to what I've answered previously that I do

8   believe what our officers faced being bombarded with

9   projectiles, having folks that are showing up armed with

10  dangerous weapons, that they showed a lot of restraint.

11      Q.   Why did you make those comments?

12      A.   It's what I believed.

13      Q.   And you believed that based on your having,

14  you know, been monitoring the situation in the command

15  post the day before, right?

16      A.   Yes.

17      Q.   Okay.  So you were familiar with what the

18  actions were of the Denver Police Department relative to

19  the protesters, right?

20      A.   Again, I'm just going to put a little

21  qualification in there.  Yes, in general terms, we were

22  able to monitor some of the activity and some of the

23  activity where -- some of the -- for instance, damage

24  and destruction that took place.  We don't have HALO

25  cameras or access to what folks are doing, so in general

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  terms, the answer would be yes.

2      Q.    You approved of the actions that you saw of

3  the Denver Police Department?

4      A.    Well, it's not my position to approve or

5  disapprove.

6          If there were actions were the inconsistent or

7  actions that violated policy that I saw, then I would

8  and have stepped in, in situations any time that I

9  observe policies -- policy violations.

10      Q.    But at least as of the press conference that

11  you gave on the May 29, 2020, you were not aware of any

12  violations of policy, right?

13      A.    That is correct.

14      Q.    Okay.  And so at least up to that point when

15  you gave that press conference and characterized the DPD

16  actions as -- the actions of Denver police officers as

17  demonstrating extreme restraint, that's what you

18  believed, based on all of the information that you

19  gathered the day before about the protests, right?

20      A.    I think you asked that the same question.  I

21  said that is exactly what I believed at that time,

22  correct.

23      Q.    And you haven't seen anything that causes you

24  to disagree with that, right?

25      A.    As I stated, there are two officers that have

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

 1      Q.   He asked you about the role of outside
 2  agencies in assisting the policing of protests.  Do you
 3  recall that?
 4      A.   I don't remember that specific question at
 5  all.
 6      Q.   Okay.  Let me pull something up.  Just a
 7  moment.
 8           Okay.  Can you see my screen?
 9      A.   I can.
10      Q.   Oops.
11      A.   Oh.
12      Q.   Sorry.  I'm going to try that again.  Okay.
13  All right.  Can you see it now?
14      A.   Yes, I can.
15      Q.   All right.  This is a 9News clip that was
16  produced by plaintiffs in this case that's file name
17  6-1-2024.  I'm going to play it starting at three
18  minutes into the video, and then I'll ask you a
19  question.  All right?
20      A.   Okay.
21           (VIDEO PLAYS)
22         MS. BIRKHOLZ:  Liz, you haven't shared the
23      audio.
24         MS. WANG:  All right.  Let's try that again.
25           (VIDEO PLAYS)

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   BY MS. WANG:
 2       Q.   All right.  I stopped -- we played about three
 3   minutes to four minutes of the video.  Did you hear
 4   that?
 5       A.   I did.
 6       Q.   Okay.  And that was true what you said to
 7   Mr. Clark, correct?
 8       A.   Just to point of clarification, that's not
 9   Kyle Clark.
10       Q.   Who is that?
11       A.   That would be Steve Staeger.
12       Q.   Okay.  All right.  It was true what you said
13   to that reporter, correct?
14       A.   Well, tell me -- tell me what specific -- I
15   guess, you kind of started with the question, so what's
16   the question?  You played a clip and you're saying what
17   I said to the reporter -- or that's a -- a true
18   interview?  I guess, help me understand what the
19   question is, I guess.
20       Q.   The question is:  Your response to the
21   reporter about the role of mutual aid agencies during
22   the protests, your response was truthful, correct?
23       A.   And I'm not trying to split hairs with you by
24   any means, but there was some things that you said
25   before you even played the clip, right?  You were saying
```



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    that something to the effect of officers being governed

2    by Denver Police Department's use of force.   Do you

3    remember, kind of, how you were going down that, and

4    then you played the video, so that's why I want to be

5    clear --

6        Q.    Mr. --

7        A.    -- specific as to what the question is.

8        Q.    **Just let me break it down --**

9        A.    Okay.

10       Q.    **-- all right?**

11       A.    Thank you.

12       Q.    **Just answer the question I'm asking you now.**

13       A.    Okay.

14       Q.    **The reporter asked you about what was the role**

15   **of the mutual aid agencies who came into the Denver,**

16   **right?**

17       A.    Right.

18       Q.    **Paraphrasing.   But that's basically what he**

19   **asked you, right?**

20       A.    Okay.

21       Q.    **Okay.   And then you said two things, and tell**

22   **me if I'm getting any of this wrong.   You said that,**

23   **first, we have a DPD supervisor embedded with every unit**

24   **from --**

25       A.    Right.



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

 1        Q.    -- the agency, right?  Is that true?

 2        A.    That is true.

 3        Q.    And you said that the supervisors are there to

 4   facilitate communication and make sure that everyone is

 5   on the same page, right?

 6        A.    Yes.

 7        Q.    And that was true, right?

 8        A.    Yes.

 9        Q.    Okay.  So let's talk about that for a moment.

10   What - - what is it -- what did you mean by making sure

11   that, you know, having -- strike that.

12              Having the DPD supervisor in with each unit

13   from an outside agency, how did that ensure that

14   everybody was on the same page?

15        A.    I think I even said it in the interview, we're

16   not just asking for people to show up at this and go do

17   their thing.

18              So this is a safe, coordinated approach to

19   deal with some of the same things that I said there, the

20   magnitude of the situation, the level of violence that

21   we were seeing, as well as weapons, it is very difficult

22   to manage a situation where people are armed with guns,

23   where people are armed with baseball bats, where people

24   are armed with blunt objects or throwing things at

25   officers.  It takes a very coordinated approach in order

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of CHIEF OF POLICE PAUL PAZEN, taken on June 17, 2021

31

1    to arrest an individual safely who is in possession --

2    illegal possession of a weapon, and so that's what we're

3    talking about that this is coordinated as best that we

4    can in order to manage an extremely difficult situation.

5        Q.   Right.  And so it was coordinated in that

6    Denver was inviting in or asking for assistance from

7    outside agencies, and they provided that assistance,

8    right?

9        A.   Correct.

10       Q.   Okay.  And, ultimately, all of the outside

11   agencies who were assisting Denver in policing the

12   protests were, you know, reporting to the incident

13   commander and following the incident command system,

14   right?

15           MS. BIRKHOLZ:  Objection.  Form.  Foundation.

16           You can answer.

17       A.   And I apologize.  My air conditioner kind of

18   like -- I don't know if you heard that same sound, like,

19   shh.

20           So, Liz, I couldn't hear, like, the last two

21   words you said.

22           And, Hollie, I didn't hear exactly what you

23   said, as well.

24       Q.   Sure.  So -- I mean, the outside agencies who

25   came in to assist Denver with the protests were

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  policies and their training.

2     Q.   Right.  You did not request or ask other

3  agencies to follow DPD policy during the protests,

4  right?

5          MS. BIRKHOLZ:  Objection.  Form.  Foundation.

6          You can answer.

7     A.   The specific question of follow -- "Could you

8  please follow our policy" was not asked, if that's what

9  your question is.

10    Q.   Right.  Because your working assumption is

11 that they're going to follow their own policies, just

12 like you do when you are asked to assist another agency,

13 right?

14         MS. BIRKHOLZ:  Objection to form.

15    A.   Yeah, I don't -- I don't love the word

16 "assumption."

17         Expectation.

18    Q.   I'm not -- expectation --

19    A.   Yeah.

20    Q.   -- the expectation?

21    A.   The expectation, as I indicated earlier, if an

22 outside agency requests our help, the expectation is our

23 officers follow our policy and our training, and if that

24 situation is reversed, the expectation is the same.

25    Q.   Why is it important to have body-worn cameras?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of CHIEF OF POLICE PAUL PAZEN, taken on June 17, 2021

40

 1          MS. BIRKHOLZ:  Objection.  Form.  Foundation.

 2          You can answer, go ahead.

 3     A.   So we, as a police department, have adopted a

 4  body-worn camera policy, body-worn camera program, in

 5  order to document interactions that our officers have in

 6  police situations.  I think we need to be pretty clear

 7  on this, right?

 8          We may walk down the street and just hello to

 9  folks, that's not necessarily a police interaction.  So

10  there's a policy that governs what types of situations

11  would be required or captured on the body-worn camera.

12     **Q.   Right.  And you would agree that it's**

13  **important to have body-worn camera to capture any**

14  **potentially contentious interactions between the police**

15  **and civilians, right?**

16          MS. BIRKHOLZ:  Objection.  Form and foundation.

17          You can answer.

18     A.   And I'm just going to put a qualifier on

19  there, in general, that body-worn cameras have continued

20  to prove or support in many instances officers doing the

21  right thing, as well as instances where our officers

22  fell short or violated policy.

23     **Q.   Right.  So they can help provide objective**

24  **evidence of what occurred during a particular action,**

25  **and that might show that the officer that was in right,**

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

 1  or it might show that he wasn't, right?

 2      A.   Correct.

 3      Q.   Okay.  And so one of the reasons that you want

 4  to make sure that officers have a body-worn camera and

 5  have it on during interactions with citizens is to

 6  provide for officer accountability?  That's one reason,

 7  right?

 8      A.   Yes.  And, again, I'm not trying to split

 9  hairs with you on this.  In those police-related

10  matters, as I indicated earlier, if an officer is

11  directing traffic, for example, we don't need hours and

12  hours of an officer blocking an interaction, so --

13      Q.   Right.

14      A.   -- there's a policy that governs this.  We

15  don't want officers, you know, walking through a

16  hospital, you know, with their body-worn camera

17  capturing protected information, so what I'm saying is

18  in general terms, yes, but there are some qualifiers

19  that need to be discussed.  It's not just put a

20  body-worn camera, here's your ten-hour shift, and the

21  camera is running for ten hours.  That's not the case.

22      Q.   Right.

23      A.   Okay.

24      Q.   During the protests, officers used less lethal

25  force, right?  Or less lethal weapons, rather?



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of CHIEF OF POLICE PAUL PAZEN, taken on June 17, 2021

62

```
 1        Q.   Why is it important for officers to fill out
 2   timely use of force statements?
 3        A.   So under normal circumstances, we complete a
 4   use of force report following the incident itself.  The
 5   officers, as well as the supervisor would return to the
 6   station and complete the paperwork to document the use
 7   of force.
 8        Q.   Is one reason why we have -- you would agree
 9   that it's important to have timely use of force
10   statements, right?  The officer -- if they used force on
11   a civilian, they should fill out a use of force
12   statement as, you know, in a timely manner?
13             MS. BIRKHOLZ:  Objection.  Form.  Foundation.
14             You can answer.
15        A.   Thank you.  Well, I think it's also important
16   to know the totality of the circumstances, and officers
17   were involved in a very dangerous situation that
18   occurred over multiple hours and multiple days.  So in
19   general terms, given the practicality as what we do in
20   normal situations on a day-to-day basis, then we have a
21   process by which officers, supervisors document use of
22   force.  When you're engaged in 14 to 16-hour days over
23   multiple days, that becomes challenging.
24        Q.   I get that.  But what I'm saying is one reason
25   that use of force statements, timely use of force
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of CHIEF OF POLICE PAUL PAZEN, taken on June 17, 2021

63

```
 1   statements, is important is for officer accountably,
 2   correct?
 3              MS. BIRKHOLZ:  Objection.
 4        A.   One reason that use of -- I'm sorry, Hollie.
 5              MS. BIRKHOLZ:  Just objection.  Foundation.
 6              You can answer.  Thank you.
 7        A.   I'm saying that in an ideal situation, that a
 8   timely statement can assist in the documentation.
 9        Q.   Chief, you would agree that you have the
10   foundation to answer questions about why timely use of
11   force statements are important, right?
12        A.   Yes.
13        Q.   You also have the foundation to answer why the
14   DPD has a requirement of body-worn cameras, right?
15        A.   Yes.  We have a policy on body-worn cameras,
16   and we have a policy on documenting use of force.
17        Q.   Right.  And you approved of those policies,
18   right?
19        A.   In general terms, yes.
20        Q.   Okay.  I mean, is there somebody more
21   qualified than you to talk about what DPD's policy is?
22              MS. BIRKHOLZ:  Objection.  Form.
23        A.   In some circumstances, yes, there would be.
24        Q.   You -- you would agree that you are qualified
25   to talk about what DPD's policy is, right?
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1      A.   In general terms, yes.  I think I answered

2   this already, right?  In general terms, I agree.  But in

3   some circumstances, an individual has actually written

4   the policy or has more intimidate knowledge about the

5   policy itself.

6      Q.   If officers don't complete -- are you aware of

7   the critiques of the OIM report about the officer use of

8   force statements that were completed many days after the

9   protests?

10      A.   Yes.  In general terms, I'm aware of the

11   office of independent monitor report.

12      Q.   All right.  And in that report, one of the

13   things that was said is that these officers' statements

14   were not completed until, in some instances, two or

15   three weeks after the events that are being described in

16   the reports, right?

17      A.   I don't remember the specific language, but in

18   general terms, something to that effect.

19      Q.   Okay.  And by that time, many officers did not

20   specifically -- could not recall where they were or what

21   they were doing on specific days, right?  Because some

22   time had passed?

23           MS. BIRKHOLZ:  Objection.  Foundation.

24           You can answer.

25      A.   In general terms, yes.  This was a very

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    was, you know, after about -- or, you know, after the

2    first five days or so where we worked out a way to get

3    use of force incidents documented by the on-scene

4    supervisor and the involved officers, but that was post

5    just because of the magnitude and the level of violence

6    and destruction that we were seeing during those initial

7    responses.

8        Q.    Would you agree that officers' statements that

9    are -- use of force statements which are vague and don't

10   -- let me put it this way.  Okay.

11           One of the things that's been difficult in

12   this case is identifying what officers did what to our

13   clients, okay?

14           Our clients allege that they had excessive

15   force used on them during the protests, okay?  You can

16   agree or disagree with that.  But one of the things that

17   all parties in this case have been trying to do is to

18   identify who did it, okay?  One way to do that is to try

19   to find body-worn camera that corresponds with the

20   particular location and time or date that our clients

21   were, right?  You would agree with that, right?

22       A.    That one way to identify involved officers

23   would be to review body cam?  Is that the statement that

24   I'm agreeing to?

25       Q.    Right.  Right.



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

 1          A.    Yes.

 2          Q.    Okay.  Another way would be to look at the

 3    officers' statements or the use of force statements to

 4    see, you know, is there an officer that wrote something

 5    about being at this particular location at this

 6    particular time, right?

 7          A.    Another way would be to review any

 8    documentation that would indicate officer placement

 9    during their deployment.

10          Q.    Right.  Are there any other ways that you can

11    think of to find out what officer did what?  You know,

12    let's say there's an allegation of use of force by one

13    of my clients, and we're having trouble identifying the

14    officers.  There's body-worn camera we can look at.

15    There's officer statements that we can look at.  Is

16    there anything else that you can think of?

17          A.    Yes, there is.

18          Q.    What else?

19          A.    The cell phone footage that individuals have

20    shared in social media.

21          Q.    Sure.  Okay.  So if some protester nearby or

22    if my client, one of the plaintiffs, took a cell phone

23    video and you could actually maybe see the name badge or

24    do something to identify the officer, right?

25          A.    Potentially, yes.  Video evidence, whether

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1            MS. BIRKHOLZ:  Objection.  Form.  Foundation.

2            You can answer.

3       A.   And my answer is going to be that an officer

4  using a 40-milliliter system should do that in

5  accordance with policy and training.  Period.

6       **Q.   Is it your view that DPD policy and training**

7  **would permit shooting a peaceful protester with a**

8  **40-milliliter round in the eye?**

9            MS. BIRKHOLZ:  Objection.  Form.  Foundation.

10           You can answer.

11      A.   So, Michael, you know, we're kind of splitting

12 hairs here as well, but I'm just going -- to without

13 trying to explain it I'm going to restate what I said

14 previously that officers that are trained in less lethal

15 systems are trained in accordance with our policy, and,

16 you know, circumstances that surround the situation that

17 they're in.

18      **Q.   Okay.  Let me rephrase that.**

19      A.   Okay.

20      **Q.   Are you suggesting that if you heard of a --**

21 **if you were watching a HALO cam video and you saw a**

22 **peaceful protester standing there, holding a sign, not**

23 **doing anything violent, not doing any harm, be shot in**

24 **the eye with a 40-milliliter, that you could watch that**

25 **video and not know whether or not DPD policy had been**

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

93

1    violated?

2            MS. BIRKHOLZ:  Objection.  Form.  Foundation.

3        A.   Again, not seeing all pieces of evidence, not

4    being there, I would not know if policy was violated or

5    not.  That's why we have such a comprehensive process,

6    which also has civilian oversight with the office of the

7    independent monitor, and every single case also goes

8    through the Denver district attorney's office for

9    review, as well, so we have a very comprehensive process

10   to identify and gather all pieces of evidence, and our

11   conversation earlier this morning that one video from

12   one angle, whether that be a body cam, HALO, a cell

13   phone video, or a news media camera footage of the

14   situation doesn't necessarily tell the whole story.

15   It's important that we look at all pieces of evidence

16   that we can gather to identify what occurred and what

17   didn't occur.

18       **Q.   So what are the circumstances in which a**

19   **peaceful protester could be shot in the eye with a**

20   **40-milliliter round that would be within DPD policy?**

21           MS. BIRKHOLZ:  Objections.  Form.  Foundation.

22       A.   And I just can't go there with you.  I don't

23   know of a peaceful protester being shot in the eye.

24       **Q.   I'm asking a hypothetical.**

25       A.   Yeah, I don't do hypotheticals.  I'm sorry.  I

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  don't know of a situation where a peaceful protester was

2  shot in the eye.  We will review the 20 to 30 additional

3  cases, and in that deliberative process, make a

4  determination based on available evidence.

5      Q.   So you're unwilling to say that DPD policy

6  prohibits shooting a peaceful protester with a

7  40-milliliter round in the eye?

8          MS. BIRKHOLZ:  Objection.  Form.  Foundation.

9      A.   I'm going to refer to the answer I just gave

10  you, because it's the same question.

11      Q.   Okay.  Does the DPD keep officer -- withdrawn.

12          Does the DPD keep rosters of officers who are

13  working at any given time?

14      A.   Yes.  We do have rosters that keep track of

15  officers that are working in the department.

16      Q.   And what is the purpose of keeping these

17  rosters?

18      A.   The rosters are time and attendance.

19      Q.   Do they -- do they provide any additional

20  purpose?

21      A.   I think it's covered under time and

22  attendance, who's there and how much time did they work.

23      Q.   Okay.  During -- during a protest, would the

24  command staff make informed decisions about how many

25  officers are working in a specific area?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  know, a procedures change, and so we would need to be

2  specific on which policy or which manual on what

3  particular date.

4      Q.   Chief, you know, I asked you a very simple

5  question:

6           Does the DPD have a crowd control manual?

7  What's the answer to that question?

8      A.   The answer is, yes.  But I will include that

9  context, because context matters.  We've had a crowd

10  control manual in effect for many, many years, and

11  there's been revisions.  So you can't utilize, you know,

12  something that, you know, is no longer part of the

13  current crowd control manual.  So I get what you're

14  saying, but it is important that I put that context in

15  this particular answer.

16      Q.   Do you think that that is a question that

17  can't be answered with a "yes" or a "no"?

18      A.   As I stated at least twice, maybe I'll say it

19  a third time.  That it's important to have the context.

20  That is this is a manual that gets revisions updated.

21      Q.   Do you expect your officers to have to deal

22  with protest situations?

23      A.   Do I expect our officers to have to address

24  protest situations?

25      Q.   Yeah, that's my question.  Do you -- do you

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of CHIEF OF POLICE PAUL PAZEN, taken on June 17, 2021

122

1  expect that your officers will have to deal with crowd

2  control or protest situations in their line of work?

3       A.   Based on situations, there are times when

4  officers will have to manage protest situations.

5       Q.   Okay.  Because crowd control and protest

6  situations are a normally recurring situation that

7  police officers have to face, you know, as part of their

8  daily jobs; is that right?

9            MS. BIRKHOLZ:  Objection.  Foundation.

10            You can answer.  Go ahead.

11       A.   And I would not -- I would not agree with you

12  on your statement.  You said this is normal.  There's

13  not a protest that I'm aware of happening today.

14       Q.   But it's a situation that you could expect

15  officers to have to encounter, and that's why there is a

16  crowd control manual, correct?

17       A.   There are situations that arise that would

18  require officers to manage situations involving large

19  crowds.

20       Q.   Okay.  And as part of that crowd management

21  that's -- officers would, you know, could expect to

22  encounter during their work as a police officer, that

23  includes having to deploy less lethal munitions like 40

24  milliliters and pepper balls, correct?

25       A.   It is a tool that potentially could be

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of CHIEF OF POLICE PAUL PAZEN, taken on June 17, 2021

123

 1  required in certain situations, but -- and I'll just

 2  leave it there.

 3       Q.   Okay.  Do you provide training on those two

 4  tools, because you would expect officers to have to

 5  encounter -- to use those tools during crowd control

 6  situations?

 7       A.   Those tools are utilized even in situations

 8  that have nothing to do with crowds, so, yes, that is a

 9  tool that officers are trained on.

10       Q.   Okay.  And it's something that could be

11  expected that an officer might have to use force against

12  a protester in a crowd control situation; is that right?

13       A.   I can't agree with the way that you're

14  phrasing this statement.

15       Q.   Okay.  What's wrong with my phrasing?

16       A.   Well, you're not giving context.  You're kind

17  of giving this generic protesting type of situation.  Is

18  the protester -- is this individual engaged in a law

19  violation?  Is this person harming another member of the

20  community?  Is this person harming a police officer?  So

21  a broad statement like that is just something I can't

22  agree to.  You would have to give context to the

23  situation.

24       Q.   You can't answer the question whether it's

25  something that you would expect as the chief of police

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

124

```
 1   for the Denver Police Department that an officer might

 2   have to use force against a protester in a crowd control

 3   situation?

 4        A.   You would have to provide context as to what

 5   that protester is doing.

 6        Q.   So it's true that you can't answer that

 7   question, right?

 8        A.   You would have to give context as to what that

 9   protester is doing.

10        Q.   So you are refusing to answer that question;

11   is that right?

12        A.   I'm not refusing to answer anything.  I'm

13   telling you that based on the broad way that you are

14   asking the question that I need some context here.  It

15   appears you are refusing to explain what this protester

16   is -- this hypothetical situation, what this protester

17   is doing.

18        Q.   I'm saying in situation, any hypothetical

19   situation, would you expect that an officer would have

20   to use force against a protester in a crowd control

21   situation in any hypothetical that you could think of?

22        A.   Now, you've broadened -- even broadened the

23   term. You made it more broad.  I mean, the way I'm

24   interpreting and maybe I'm not interpreting the words

25   that you are saying the right way, but what I am hearing
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  is that -- that we would expect an officer to use of

2  force.  I'm not understanding what is that you're

3  saying.  I'm asking for clarification, and I'm asking

4  for context, and it -- now you've even broadened even

5  more.  It would depend on the individual actions that

6  are taking place, and you're not -- you're not giving

7  any specifics as to what that protester is doing.

8      **Q.  Okay.  Let's say that there is someone who is**

9  **throwing bottles at the police from the crowd.  Would**

10 **you expect that the officer might have to use force**

11 **against that person?**

12     A.  Thank you for the clarification.  If an

13 individual is involved in violent behavior, law

14 violation, which throwing missiles or projectiles is a

15 violation of the revised municipal code, then, yes, an

16 officer would respond to that situation. Is force

17 necessary or not necessary?  Then, again, you would need

18 to take a look at each one of these individual actions,

19 based on the type of action of that person that is

20 involved in it that situation.

21     **Q.  Okay.  Do you train your officers about when**

22 **to use force in a crowd control situation?**

23     A.  The folks responsible for training, whether

24 that be a supervisor provide that training for our

25 officers.

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of CHIEF OF POLICE PAUL PAZEN, taken on June 17, 2021

129

```
 1        A.    Potentially.
 2        Q.    Is it considered deadly force?  Is that how
 3   you train -- sorry.  Scratch that.
 4              Are DPD officers trained that shooting someone
 5   in the head with a 40-milliliter round is deadly force?
 6        A.    I don't know.  I'm not trained in the
 7   40-milliliter itself.  That was a tool that came about
 8   after I already, you know, left the patrol division, so
 9   I don't know specifically what that training is.
10        Q.    Fair enough.  Fair enough.  But you are -- you
11   know, as you talked about earlier in this deposition,
12   you know, very familiar with DPD policy, right?
13        A.    I'm generally familiar with DPD policy.
14        Q.    Okay.  So is shooting someone in the head with
15   the 40-milliliter round considered deadly force under
16   DPD policy?
17              MS. BIRKHOLZ:  Objection.  Foundation.
18              You can answer.
19        A.    I guess I'm just going to refer to my
20   statement there earlier.  I have not been trained in the
21   40.  I don't have knowledge of that specific aspect of
22   the training that you described.
23        Q.    Should an officer ever shoot a peaceful
24   protester who has displayed no aggression whatever in
25   the head with a 40-milliliter round?
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1       MS. BIRKHOLZ: Objection. Form. Foundation.

2       You can answer.

3     A.   I don't know of what situation you're

4   describing, nor was I present for any situation that

5   you're describing, so I wouldn't be able to answer your

6   question.

7     Q.   Well, my situation is what I just described.

8   I said hypothetically you are on the street. There's a

9   protest.

10       There's a person in the crowd who has

11   displayed no active aggression, no active property

12   damage. He's just standing there protesting. Would

13   there be any circumstances where it be appropriate to

14   shoot that person in the head with a 40-milliliter

15   round?

16       MS. BIRKHOLZ: Objection. Form. Foundation.

17       You can answer.

18     A.   And, Andy, I'm not at this location. I wasn't

19   -- I didn't witness anything like that you're

20   describing. I don't know the totality of the

21   circumstance. I don't know what else is going on, so I

22   could not answer that. I think that as described

23   earlier, that we would need to gather all relevant video

24   and evidence possible to see what has occurred, and

25   that's why we have such a comprehensive process to

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  include some civilian monitoring of the situation, as

2  well as an outside elected official at Denver district

3  attorney's office to see if there are any law

4  violations, and, you know, the independence of the OIM

5  in order to help analyze these types of situations.  So

6  in a deposition talking about a hypothetical of

7  something that I am unaware of, I can't give you an

8  answer, because I wasn't there, and I don't know what

9  situation you are talking about.

10      Q.   I just described the situation for you.  So

11  you are telling me that the chief of police of the

12  Denver Police Department, the largest police department

13  in the state of Colorado, can't answer the question of

14  whether it's appropriate to shoot someone in the head

15  with a 40-milliliter round who is peacefully protesting

16  and has displayed no active aggression, no indication of

17  property damage, and is just standing on the sidewalk

18  protesting.  Is that your answer?

19          MS. BIRKHOLZ:  Objection.  Form.  Foundation.

20          You can answer.

21      A.   The totality of the circumstances.  I mean,

22  you're -- this is three four sentences of hypothetical

23  that you're giving, and then you are expecting an answer

24  to say that whether or not this is appropriate or not,

25  whether or not this is policy violation or not.  What I

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of CHIEF OF POLICE PAUL PAZEN, taken on June 17, 2021
132

1  can point to or talk about is the very comprehensive

2  process that involves outside review of the Denver

3  district attorney's office, as well as civilian

4  oversight in the form of the OIM to review each

5  situation.  So I cannot give you an answer to a

6  hypothetical situation that doesn't give the full, you

7  know, view of what occurred, so...

8      Q.  So fair to say if the chief of police can't

9  answer that question, probably most Denver police

10  officers don't know the answer to that question either?

11      MS. BIRKHOLZ:  Objection.  Foundation.

12      A.  I would say that we don't deal in

13  hypotheticals.  I would say that, you know -- the same

14  thing that I have repeated at least three times now that

15  the use of force is, you know, part of a totality of the

16  circumstance.

17      Q.  Well, you're in a deposition right now.  You

18  do understand that you are under oath, right?

19      A.  Yes, I am very aware.

20      Q.  You understand that, you know, these questions

21  could one day be played in front of a jury?

22      A.  Yes, I'm aware.

23      Q.  Do you know that, you know, the Denver Police

24  Department is being sued for potentially using excessive

25  force against protesters including the use of

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

 1   40-milliliter rounds?

 2            You know that, too, right?

 3       A.   My understanding is that's the purpose of this

 4   deposition.

 5       Q.   **And as part of the deposition, you have to**

 6   **answer the questions that I ask you hypothetical or not.**

 7   **Do you understand that?**

 8       A.   If I can answer the question, I will answer

 9   the question, but you've given me a hypothetical

10   question and then without this being based in a specific

11   situation, particularly a specific situation that I'm

12   not even physically there, yeah, I can't answer that

13   question.

14       Q.   **You can't give me a "yes" or "no," whether**

15   **shooting a peaceful protester in the head with a**

16   **40-milliliter round who is standing on a sidewalk, not**

17   **displaying any active aggression or any sense of the**

18   **property damage or anything at all or committing any**

19   **crime whatsoever is consistent, you know, is appropriate**

20   **under the circumstances?  You can't answer that**

21   **question; is that right?**

22            MS. BIRKHOLZ:  Objection.  Form.  Foundation.

23       A.   I was not at -- I was not physically located

24   at your hypothetical situation.  I cannot give an

25   answer.  I don't know.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

 1          this incident are currently under a pending IA

 2          investigation, which is in the process of the

 3          investigation, and so it is whether or not this is a

 4          policy issue of violation of policy or whether it's

 5          justified is going to be determined through that

 6          process, and we are instructing the Chief not to

 7          answer under the deliberative process privilege,

 8          because he is part of that process and decision

 9          making.  So all right.

10  BY MR. MCNULTY:

11          Q.    All right.  Chief, I'm going to share my

12  screen again and bring this video back up.  Ms. Birkholz

13  might have an objection to this question, too.  We'll

14  see.  All right.  I want you to listen closely to what

15  is said in this video, okay?  And then I'll ask you

16  questions about it, okay?

17          A.    Okay.

18                (VIDEO PLAYS)

19  BY MR. MCNULTY:

20          Q.    Chief, did you hear an officer say, "Mother

21  fucker, that's what you get.  Fuck you." in that video?

22          A.    Could you play it again?

23          Q.    Sure.  If it's helpful, before he says that,

24  he says, "Now what," in the video.

25          A.    Okay.

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1                (VIDEO PLAYS)

 2   BY MR. MCNULTY:

 3        Q.   Did you hear an officer say, "Mother fucker,

 4   that's what you get.  Fuck you," in that video?

 5             MS. BIRKHOLZ:  Objection.  Foundation.

 6        A.   I don't know who said what, so I couldn't

 7   agree with you whether or not that came from an officer

 8   or not.

 9        Q.   Okay.  You heard -- you heard that phrase

10   uttered in the video, correct?

11        A.   In a general sense, as you described, I heard

12   somebody, yeah, say kind of the general terms that you

13   just used.  I don't know who that is.

14        Q.   I'm going to submit to you that Sergeant

15   Daniel Abeyta admitted to saying that in his deposition.

16   And would you -- do you think that's an appropriate

17   thing to yell in that circumstance?

18             MS. BIRKHOLZ:  Objection.  Foundation.

19        A.   I wasn't at the sergeant's deposition, so I

20   can't speak on something that I don't know of.

21        Q.   Okay.  Assume that an officer said that in

22   that circumstance.  Do you think that would be an

23   appropriate thing for an officer to say in -- under

24   those -- that situation?

25        A.   So, Andy, I'm sorry.  I just can't go down the
```



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  hypothetical rabbit hole with you.  I don't know what

2  context that was said.  If you are saying this occurred,

3  I wasn't there.

4           I don't know.  I don't know who it's said to.

5  I don't know who it's said about.  This is the first

6  time I'm seeing this video -- or, I mean, I guess, you

7  played it for me a couple of times at this deposition.

8  So I can't give you an answer to something I wasn't at

9  the deposition.  I wasn't at this location that you have

10 to review of the totality of the circumstance that you

11 have a disciplinary process that works hard to gather

12 all of the relevant information that there's a

13 significant process to analyze what was occurred and

14 you're kind of asking me to do something that is part of

15 a very large, very comprehensive even, you know, a

16 process by which the community helped to design, you're

17 kind of, like, circumventing that whole thing by saying,

18 you know, make a determination without context, without

19 analysis, relying on one body cam, without any other

20 witness interviews or all relevant information, and --

21 as Hollie indicated on, you know, a case that apparently

22 is in internal affairs.  So how can we make

23 determination when there's a very comprehensive review

24 to include the office of independent monitor, a member

25 of EDOS, a member of the city attorney's office that

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

The Deposition of CHIEF OF POLICE PAUL PAZEN, taken on June 17, 2021

149

1   discusses and analyses each of these situations. So

2   I guess what I'm saying is that it's premature for any

3   of this, you know, to try to answer the questions as you

4   present them.

5       Q.   Do you think of any circumstance where it

6   would be appropriate for an officer to yell, "Mother

7   fucker, that's what you get.  Fuck you"?

8       A.   This is kind of like the start of our

9   conversation, depending on the circumstances.  I don't

10  know.

11      Q.   Can you give me one circumstance?  Just name

12  one, if you think that there is one.

13      A.   Totality of the circumstances, I can't give

14  you an answer.  I wasn't there.  I don't know what --

15      Q.   I'm not asking the specific circumstance.  I'm

16  saying give me any -- any hypothetical you could ever

17  think of where it's appropriate for one of your

18  officers, the officers that you trained and you're

19  responsible for, as the chief of police for city of the

20  Denver, to yell, "Mother fucker, that's what you get.

21  Fuck you," while he's on the job?

22          MS. BIRKHOLZ:  Objection.  Form.  Foundation.

23          You can answer.

24      A.   I cannot give you an answer to -- to that

25  question.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

 1   Q. So you can't think of a circumstance where

 2 that would be appropriate; is that right?

 3   A. I can't give you a hypothetical situation to

 4 answer that question.

 5   Q. That's because there is no hypothetical

 6 situation that exists where that would be appropriate,

 7 right?

 8     MS. BIRKHOLZ:  Objection.  Form.

 9     You can answer.

10   A. I'm not going to agree with you on that.

11   Q. So you think that it would be appropriate in

12 some circumstances for an officer to yell, "Mother

13 fucker, that's what you get.  Fuck you," while in the

14 performance of his duties.  Is that what you are saying?

15   A. Context matters, and I don't know who this is

16 directed to.  I'll rely on what you state as far as who

17 said it, but I don't -- I cannot give you a definitive

18 answer, particularly, around discipline based on a

19 hypothetical situation or based on a situation where I

20 physically wasn't there or a situation that has not come

21 through the IA process that involves conduct review, the

22 deliberative process, the analysis of all available

23 evidence to say whether or not a policy violation

24 occurred or not, including in the hypothetical realm

25 that you're describing.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1    Q.   Okay.  So you think that there could be a

2    situation where one of your officers, who you've

3    trained, who you supervised, who you have selected to be

4    on your force could yell, "Mother fucker, that's what

5    you get.  Fuck you," during the performance of his or

6    her duties, and that would be acceptable to you; is that

7    correct?

8           MS. BIRKHOLZ:  Objection.  Form.  Foundation.

9           You can answer.

10   A.   I'm not going to agree with the framing that

11   you stated there.

12   Q.   I want a "yes" or "no."  I want "yes" or "no."

13   Is it ever appropriate for an officer who works for your

14   department that you're -- you purport to highest the

15   standards of excellence for temperament and everything

16   else for your officers to yell, "Mother fucker, that's

17   what you get.  Fuck you," during the performance of

18   their duties?  Is it acceptable ever, yes or no?

19           MS. BIRKHOLZ:  Objection.  Form.  Foundation.

20   A.   Andy, we have a disciplinary process for a

21   reason.

22           It's a comprehensive disciplinary process.  It

23   involves citizen oversight.  It involves analysis.  It

24   involves EDOS, and the city attorney's office.  It would

25   not appropriate for me to comment on a hypothetical

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of CHIEF OF POLICE PAUL PAZEN, taken on June 17, 2021

152

1  situation.  All disciplinary cases go through this very

2  comprehensive process.  They are adjudicated.

3          There are disciplinary letters that are shared

4  with the public, and because I have not seen this case

5  as described in today's deposition, apparently, this is

6  at internal affairs.  When this comes through the

7  conduct review as described, the deliberative process

8  involving analysis and input from civilian oversight,

9  attorney's office, and EDOS, then we can make an

10  informed decision, but as I have indicated multiple

11  times today, one camera angle is not, you know,

12  reflective of the overall situational awareness.  That

13  it's multiple pieces of evidence that is analyzed in all

14  disciplinary cases to see if there are policy violations

15  and analyze what rule or regulation, what policy

16  potentially was violated, and then to impose discipline

17  in accordance with the disciplinary handbook that the

18  community themselves also had input into creating.

19      Q.   Okay.  Will you agree with me, just the basic

20  premise, that when we watch in the video is the man in

21  gas mask gets shot in the face with a 40-milliliter

22  round, and then someone yells, "Mother fucker, that's

23  what you get.  Fuck you."  Do you agree with that?

24          MS. BIRKHOLZ:  Objection.  Foundation.

25          You can answer.

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of CHIEF OF POLICE PAUL PAZEN, taken on June 17, 2021

153

1      A.   I heard terms as you described.

2      Q.   Okay.  And even under that situation, you

3  can't tell me whether that use of the phrase, "Mother

4  fucker, that's what you get.  Fuck you," is appropriate,

5  correct?

6      A.   Andy, this is, like, the third, if not fourth

7  time you're asking me the exact same question.  I've

8  answered it three or four times, so I'll refer to my

9  previous answers.

10     Q.   All right.  And if I ask the question in front

11 of jury, you'll give the exact same answer.  Is that

12 your testimony today?

13     A.   Yes.

14     Q.   All right.  You would agree with me that,

15 based on the video we saw, there was no warning given to

16 the individual in the mask before he was shot with the

17 40-milliliter round?

18         MS. BIRKHOLZ:  Objection.  Foundation.

19         You can answer.

20     A.   As previously stated, I believe at least two

21 times, that's not a requirement for an officer to defend

22 themselves. I don't know the totality of the

23 circumstances as I was not present.  This is one video.

24 I was not physically there.  We would need to review all

25 pieces of evidence regarding this incident before we

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com