

LOUISVILLE   LEXINGTON   LONDON   FLORENCE   CINCINNATI   INDIANAPOLIS   ORLANDO   JACKSONVILLE   TAMPA

# KENTUCKIANA
## COURT REPORTERS

**CIVIL ACTION NO. 1:20-cv-01878-RBJ**

**(CONSOLIDATED WITH 1:20-cv-01922-RBJ-MEH)**

**BLACK LIVES MATTER 5280, ET AL.**

vs

**CITY AND COUNTY OF DENVER, ET AL.**

**DEPONENT:**

**LIEUTENANT VINCE PORTER**

**DATE:**

**June 22, 2021**



a courtroom
**powerhouse**

✉ schedule@kentuckianareporters.com

☎ 877.808.5856 | 502.589.2273

**www.kentuckianareporters.com**

Exhibit 17

1  was for officer safety, I could give the order or

2  Lieutenant Chavez could give the order to disperse those

3  or an officer could disperse those if they felt it was

4  for officer safety.

5      Q.   So you referenced OC or blast balls.  What do

6  you mean by "OC"?

7      A.   It's either smoke.  We could throw smoke.  We

8  could throw CS gas in the cannister or a blast ball that

9  disperses gas and has a loud bang to it.

10     Q.   Okay.  So when I think of OC, I normally just

11 think of the cannisters that you hold in your and you

12 hand spray somebody with, but you are referring to

13 something broader than that; is that fair?

14     A.   There's different -- there's the small

15 canisters.

16          There's the larger cannister, and there's the

17 type that we can throw into a -- into an area.

18     Q.   So your understanding of the guidelines for

19 use of OC on protesters was that if it's for crowd

20 dispersal, it would have to come -- the order -- the

21 authorization to use it would have to come from the

22 command post?

23     A.   If it's something that we're going to throw

24 for crowd dispersal, yes, it generally comes from the

25 command post.



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1      Q.    Why is that?  Do you know?

2      A.    That's what our policy and guidelines state

3  that the incident commander will make the decision.

4      Q.    Do you have an understanding of why that was

5  the policy?

6      A.    Because they want to make sure that we've

7  taken other -- every other measure we can before we

8  start dispersing that.

9      Q.    But why?

10          MS. JORDAN:  Object to form and foundation.

11          Lieutenant Porter, I may object throughout

12      this.  You can just ignore and those answer unless

13      I tell you not to, so go ahead and answer.

14          THE WITNESS:  I was waiting for her to come

15      back on the screen.

16      A.    Because we want to make sure that something's

17  not getting thrown that we as command officers don't

18  approve of.

19  BY MS. WANG:

20      Q.    Okay.  Why is it important to -- you had

21  earlier said that if OC or -- is used for crowd

22  dispersal, it needs to come from the command post

23  because we need to make sure that we've taken all --

24      A.    We don't deploy CS gas or blast balls or

25  anything we throw.  We don't like to deploy that unless

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of LIEUTENANT VINCE PORTER, taken on June 22, 2021

32

1    it's a last resort.

2            So we want to take every other measure we can

3    before we can deploy those.

4        Q.   Okay.  So I'm -- thank you for that.  And so

5    I'm trying to understand, why is it that that is a last

6    resort measure?

7        A.   Because it has -- we have the ability -- it

8    goes into a crowd, and it can affect multiple people

9    around the crowd --

10       Q.   Right.

11       A.   -- So we want to make sure we're dealing with

12   a hostile that is doing stuff against us before we throw

13   that into the crowd.

14       Q.   Okay.  Thank you.  So how do you determine --

15   and so how do you -- I mean, it's fair to say that the

16   --

17           Commander Phelan was in the command post.  He

18   wasn't out in the field, but you were reporting -- you

19   and other lieutenants may have reporting information to

20   him about what was going on, on the ground; right?

21       A.   Yes.

22       Q.   Okay.  And so how would you -- ow -- how would

23   you communicate with Commander Phelan about, you know,

24   what the circumstances were, so that you could make a

25   determination with whether to authorize the use of CS

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  gas?

2       A.   Just you would report to him that objects were

3  being thrown, what type of objects, if officers were

4  being injured, if stuff was being -- property was being

5  destroyed, what you were seeing with the crowd, if they

6  had weapons, if they had different types of ammunitions

7  to throw at us, and stuff like that.

8       **Q.   Okay.  And so it's fair to say that during the**

9  **protests, there were frequently large crowds of people,**

10 **some of who may have been peaceful, but other people in**

11 **the crowd may have been actively aggressive throwing**

12 **objects at officers; right?**

13      A.   Yeah.  There were times that there was

14 peaceful, and there were times that there wasn't.

15      **Q.   So how did you determine whether or not a**

16 **crowd was hostile enough to warrant requesting**

17 **authorization for use of CS gas?**

18      A.   By the amount of projectiles we were taking,

19 the officers being injured, the property being

20 destroyed, the number of people that were engaged in

21 such actions as throwing stuff or forming defense lines

22 or whatever else they were doing.

23      **Q.   And so is there -- was there a way you could**

24 **quantify -- let's say you had a crowd of 500 people who**

25 **were in Veterans Park at 8:30 p.m. on May 29th, and, you**

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
1    know, how many people would have to be throwing things
2    from that crowd in order to determine, "Okay.  It's
3    hostile, and we need to request authorization for the CS
4    gas"?
5         A.   There's no set number.
6         Q.   Okay.  And so how would you -- how would you
7    evaluate that?
8         A.   Based upon the safety of the officers that
9    were on scene and the objects, the types of objects, the
10   stuff that was being thrown and what was going on.
11        Q.   Right.  And so how would your determination
12   vary depending on the type of objects that were being
13   thrown?
14        A.   Obviously, some objects -- an empty water
15   bottle is not going to cause any injuries, but a large
16   rock thrown with a lacrosse stick can cause serious
17   injury or death.
18        Q.   Sure.  What about full plastic water bottles?
19        A.   If they're frozen, then they can cause
20   injuries.
21        Q.   Okay.  What if it's just not frozen water?
22        A.   It's not a huge concern.
23        Q.   Okay.  So the throwing of plastic water
24   bottles, assuming they're not frozen, would not cause
25   you to call a crowd hostile and request authorization of
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   CS gas; right?

2       A.    (No verbal response.)

3       Q.    Is that a "yes"?

4       A.    Yes, ma'am.

5       Q.    All right.  Did you make any efforts to try to

6   isolate people in -- and let's just focus on May 29th

7   for a moment and from during the time period from 8:00

8   to 9:00 p.m. when you were at that Colfax and Broadway

9   area.  Did you make any attempt -- you or any of your

10  other officers make any attempt to try to isolate people

11  in the crowd across the street who were throwing

12  objects?

13      A.    Isolate as in -- I'm not quite clear what you

14  mean by "isolate."

15      Q.    Right.  Just try to figure out who in the

16  crowd is causing these problems, is throwing things, and

17  try to go in and arrest them or separate them so that

18  anybody else who may be there peacefully exercising

19  their rights could continue, but try to get the

20  aggressive people or the people throwing rocks out of

21  there?

22      A.    We did not try to make an arrest at that time.

23      Q.    Okay.  Did you make any attempts to try to

24  isolate the problematic or troublemakers in the crowd?

25      A.    Yes.  We would target them with the



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

43

```
 1    time --

 2         A.    Sorry.

 3         Q.    Go ahead.

 4         A.    I did not think we were going to have to, no.

 5         Q.    Okay.  And why not?

 6         A.    I've been involved in several large-scale

 7    protests, and I've never had to complete a use of force

 8    in them before.

 9         Q.    Okay.  And why -- why is that?

10         A.    Generally, we report the actions we've taken,

11    and then the command post -- somebody in the command

12    post will complete one report for everybody is how it

13    used to be.

14         Q.    All right.  And is that understanding -- is

15    that written down somewhere in a policy?

16         A.    I've never seen it -- I've never read it in a

17    policy, no.

18         Q.    Right.  So how did you come to have that

19    understanding?

20         A.    From previous riots or protests that I've been

21    involved with.

22         Q.    Okay.  And how many previous protests or

23    demonstrations have you been involved in?

24         A.    Hundreds.

25         Q.    Okay.  And for each of those during your
```



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of LIEUTENANT VINCE PORTER, taken on June 22, 2021

44

1    career, it has always been your understanding that

2    officers would not be required to complete use of force

3    statements during -- you know, relating to the protests;

4    right?

5        A.   We would complete a use of force statement if

6    you made an arrest, if the subject was taken into

7    custody.  If there was no arrest made, then it would

8    just be reported -- at general after action after it was

9    all over with.

10       Q.   Okay.  And then the general after-action

11   report is the thing that you were talking about before

12   where some -- somebody would write up an after-action

13   report documenting what happened during the protests

14   that would be one report for everybody?

15       A.   Yes.

16       Q.   Okay.  Now, so your understanding of what the

17   policy was with respect to use of -- the completion of

18   use of force statements in relation to protests, was

19   that, to your knowledge, shared by other lieutenants?

20       A.   I cannot comment for them, but I believe so.

21       Q.   Okay.  And so this -- the practice of the

22   Denver Police Department was not to require any use of

23   force statements by officers in relation to protests

24   unless there were arrests made?

25       A.   Yes.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of LIEUTENANT VINCE PORTER, taken on June 22, 2021

45

```
 1              MS. JORDAN:  Form and foundation.
 2         Q.    Okay.  And that was the practice of the Denver
 3    Police Department during all of the previous hundreds of
 4    protests that you have been involved in; right?
 5              MS. JORDAN:  Form and foundation.
 6         A.    Yes.
 7         Q.    And you assume that that applied here, too;
 8    right?
 9         A.    Yes, I did.
10         Q.    Okay.  And so even if an officer used a less
11    lethal weapon, such as tear gas or smoke or pepper balls
12    during a protests, that was not something that you
13    needed to document in a use of force statement; right?
14         A.    It was something you needed to report to the
15    command post, and then they would complete the
16    documentation for it.
17         Q.    Got it.  And how would officers go about
18    reporting that to the command post?
19         A.    You could either say it on the radio or talk
20    to the incident commander afterwards.
21         Q.    So I'm trying to understand how practically
22    that would happen, because it seems like -- so just
23    describe for me, you know, if an officer -- before these
24    protests, your understanding was during a protest, if a
25    specific officer used a less lethal weapon like a pepper
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1    ball on a protester, he needed to report that to the

2    incident commander either on the radio or afterwards?

3        A.    An individual officer would most likely report

4    it to me, and then I would report it on the radio, or I

5    would report it afterwards.

6        Q.    Okay.  So somebody -- if it was reported on

7    the radio, somebody was keeping track of that?

8        A.    I would assume so.

9        Q.    Okay.  And so if an officer reported it to you

10   -- and I'm talking about before these protests.  I'm

11   talking about your general practice in prior protests.

12   Okay?  So if an officer reported it to you, how would

13   you keep track of it while everything is going on?

14       A.    Just by memory.

15       Q.    Okay.  And so an officer would report it to

16   you orally, like either during the protests, or would

17   they do it in writing afterwards?

18       A.    No.

19           MS. JORDAN:   Form.

20       Q.    Okay.  It would just be something they would

21   just say, "Hey, Lieutenant, I used a pepper ball on this

22   protester, because he was, you know, throwing something

23   at me," or whatever it might be?

24       A.    Yes.

25       Q.    Okay.  And then you would make it a note of



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of LIEUTENANT VINCE PORTER, taken on June 22, 2021

47

1   that and make sure to report it to the command post

2   later?

3        A.   Yes.  We would usually debrief at the end of

4   -- at the end of it, and then I would always ask the

5   question, "Did anybody deploy any munitions?"  And they

6   would go around and ask the officers if they deployed

7   and where they deployed at.

8        Q.   Okay.  So you would have a meeting with your

9   team afterwards?

10       A.   Yes.

11       Q.   Would that normally happen at the end of your

12   shift?

13       A.   Yes.

14       Q.   Do you know why that was the practice of the

15   Denver Police Department?

16            MS. JORDAN:  Form.  Foundation.

17       Q.   You can go ahead.

18       A.   I do not.

19       Q.   Okay.  So going into these protests, the

20   protests that occurred last summer in Denver in May and

21   June, your understanding was that the same practice that

22   had -- that you had followed in other protests was going

23   to apply here, as well?

24       A.   Yes.

25       Q.   Okay.  And so when did you come to understand



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of LIEUTENANT VINCE PORTER, taken on June 22, 2021

49

1      A.   I believe it was an e-mail.  I can't be sure.

2      Q.   I mean, do you remember being told orally,

3  like in person by anybody, that this was the policy was

4  going to be for these protests?

5           MS. JORDAN:  Form.

6      A.   I was -- I remember having a conversation with

7  Lieutenant Berdahl who informed me they were talking

8  about it, but I did not -- I don't recall getting a

9  direct order orally.

10     Q.   Okay.  You're speaking of Lieutenant Paul

11 Berdahl?

12     A.   Yes.

13     Q.   Who's he?

14     A.   He was the aid for the division chief of

15 patrol, Chief Thomas.

16     Q.   Ron Thomas?

17     A.   Yes.

18     Q.   Okay.  And so what is, Lieutenant, what is

19 your understanding of Lieutenant Berdahl's role as an

20 aid to the division chief of parole -- patrol?

21     A.   He just does whatever the division chief needs

22 him to do.  So a lot of times, he will send out e-mails

23 giving us direction on what we need to do, per the

24 division chief.

25     Q.   So it's your understanding that when he sends

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    Q.    But before that, you had some informal

2    conversation with Lieutenant Berdahl that you learned

3    they were talking about it?

4    A.    Yes.

5    Q.    And who's they?

6    A.    That would be the chiefs -- all of the

7    different chiefs, the people much higher up than me.

8    Q.    And so what was the substance of this

9    conversation that you had with Lieutenant Berdahl?

10    A.    There was no really no substance.  Lieutenant

11    Berdahl just said that "Hey, just so you know, they're

12    talking about having you write statements for those

13    first four days."

14    Q.    Okay.  And did he say anything to you about

15    why it concerned only the first four days?

16    A.    No.

17    Q.    Did you say anything to him, like ask any

18    questions about it?

19    A.    I believe I said, "Why?  We've never done that

20    before."  And he said, "I don't know."

21    Q.    Where were you when you had this conversation

22    with him?

23    A.    Up in the kitchen of the command post.

24    Q.    Okay.  Was this issue regarding the officer

25    statements, the completion of the officer statements was



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of LIEUTENANT VINCE PORTER, taken on June 22, 2021

52

```
 1    it brought at any sort of briefing?

 2         A.   I don't recall it being brought up at a

 3    briefing.

 4         Q.   Okay.  Do you recall when you had this

 5    conversation with Lieutenant Berdahl before you actually

 6    learned that, yes, in fact, you and your officers would

 7    have to complete statements?

 8         A.   I don't know.  It was shortly thereafter that

 9    I learned that we would have to complete statements.

10         Q.   Sure.  What's your best estimate in terms of

11    number of days?

12         A.   A couple of days, maybe.  I don't know.

13         Q.   Okay.  I'm going to show you a document.  So

14    I'm pulling Denver11380 to 11384.  It's an e-mail chain,

15    so I'm going to start at the bottom because that's the

16    beginning of the chain.

17         A.   Okay.

18         Q.   All right.  So here we've got -- can you see

19    this on my screen?

20         A.   I can.

21         Q.   Okay.  So we have an e-mail here from the

22    Robert Wyckoff dated Saturday, June 6, 2020, to

23    Lieutenant Canino and Lieutenant Thomas Pine, and

24    there's a CC to Lieutenant Berdahl.

25              And in this e-mail, Lieutenant Wyckoff says to
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of LIEUTENANT VINCE PORTER, taken on June 22, 2021

53

1    Lieutenants Canino and Pine that -- he says, "Chief

2    Archer and Chief Thomas have tasked Paul Berdahl and I

3    with gathering loads of data for an overall AAR/UOF

4    report.  We know how busy your teams have been and the

5    troops are spent.  Please, at your earliest convenience,

6    assist with the following," And then he has a number of

7    things that he wants them to -- information that he

8    wants them to give him.  Did you ever receive an e-mail

9    like this?

10       A.   I don't remember, but if I'm on here, this

11   chain, then

12   I did.

13       Q.   Okay.  So a little further up, there's an

14   e-mail here.

15            I'll try to -- so I'm showing you pages

16   Denver01132 to 33.  Here there is an e-mail to the

17   Lieutenant Berdahl dated June 9, 2020.

18            It's to a number of people including yourself.

19   Do you see your e-mail here?

20       A.   I do.

21       Q.   Okay.  And then it's addressed, "District

22   commanders and admin lieutenants."  And it says, "Please

23   see e-mail from Lieutenant Wyckoff below, which explains

24   the items required to complete a use of force report for

25   each day from Thursday, May 28th, to Sunday May 31st" --

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of LIEUTENANT VINCE PORTER, taken on June 22, 2021

54

1        A.    Okay.

2        Q.    -- May 31.  Just take a moment to review this

3    and let me know if you have seen this before.

4        A.    Yes.

5        Q.    Okay.  I'm sorry.  I'm trying to make it

6    bigger, so you can read it.  So you have seen this

7    before?

8        A.    Yes.

9        Q.    All right.  Is this the e-mail that you

10   received regarding, you know, the requirement that all

11   officers complete use of force reports?

12           MS. JORDAN:  Object to form.

13       A.    I'm not reading in here where it's requiring

14   the officers to recruit -- to -- for the complete use of

15   force reports.  It looks like it's reading that they

16   needed statements to complete a use of force report.

17       Q.    Okay.  So this first sentence -- so, first of

18   all, let me maybe back up for a second.

19           So it's addressed to -- it says district

20   commanders and admin lieutenants, and it's got all these

21   people that it's addressed to with bunch of CCs; right?

22       A.    Yes.

23       Q.    Okay.  So just tell me briefly who are these

24   people that it's addressed to?

25       A.    Each district commander and each district

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    admin lieutenant.

2        Q.    Okay.  So this covers -- okay.  So the people

3    on the two who are recipients listed in the "to" line,

4    this -- this covers, like, all of the districts?

5        A.    That is the 6th District commanders, yes.

6        Q.    Got it.  And so James Williams is the admin

7    lieutenant for District 1 then?

8        A.    He was then, yes.

9        Q.    He was then.  Okay.  And Mike Cody, what

10   district was he?

11       A.    I believe he was District 6 at the time.

12       Q.    Okay.  And lieutenant -- Commander Sanchez, he

13   was --

14       A.    District 6 commander.

15       Q.    Okay.  And Kathleen Bancroft, she was District

16   2?

17       A.    Yes.

18       Q.    Okay.  Was she your commander?

19       A.    Yes.

20       Q.    All right.  Now, this e-mails -- the first

21   sentence says, "Please see the e-mail from Lieutenant

22   Wyckoff below, which complains the items required to

23   complete a use of force report for each date from

24   Thursday, May 28th, to Sunday, May 31st."

25       A.    Yes.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of LIEUTENANT VINCE PORTER, taken on June 22, 2021

56

1    Q.    "These statements are to cover each and every

2  less lethal deployment that occurred during officer,

3  sergeant, or lieutenant's shift."

4    A.    Yes.

5    Q.    So is this the e-mail -- my question to you

6  is, what is your understanding of what Lieutenant

7  Berdahl was asking you-all to do in this e-mail?

8    A.    Complete statements talking about our action

9  and deployment of less lethal, so he could complete a

10  use of force for that each day.

11    Q.    Okay.  So did you review the officer

12  statements that were completed by members of your team?

13    A.    I did not review each and every one of them,

14  no.

15    Q.    Okay.  But you've seen them, at least some of

16  them?

17    A.    I've seen them.  I haven't reviewed them.

18    Q.    Okay.  So my question is, are those -- well,

19  let me ask it this way, what did you tell your team to

20  do after you got this e-mail from Lieutenant Berdahl?

21    A.    To complete a statement for him.

22    Q.    Okay.  And then what did you do with those

23  statements?

24    A.    Turned them in to Lieutenant Berdahl.

25    Q.    Got it.  And so Lieutenant Berdahl is

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of LIEUTENANT VINCE PORTER, taken on June 22, 2021

60

```
 1    sending this e-mail to are people in his district?

 2           MS. JORDAN:  Form and foundation.

 3       A.   Some are.  I don't know who all is assigned to

 4    his district at that time.

 5       Q.   Sure.  Commander Sanchez says, "This is of

 6    upmost important to protect you and your troops.  Thank

 7    you."  Do you see that?

 8       A.   Yes.

 9       Q.   Do you know what he's referring to?

10           MS. JORDAN:  Form and foundation.

11       A.   I don't know what Commander Sanchez was

12    referring to, I'm assuming writing the statements from

13    reading this.

14       Q.   Did you ever receive any e-mail from

15    Commander Bancroft commenting on requirement --

16    commenting on Lieutenant Berdahl's e-mail about the

17    completion of use of force statements?

18       A.   I don't recall.  I could have.  I don't know.

19       Q.   Okay.  So the e-mail that we were just looking

20    at from Lieutenant Berdahl was dated June 9, 2020.  Do

21    you know when you would have communicated the

22    information in that e-mail to your team?

23       A.   It would have been the same day.

24       Q.   Okay.  So is it fair to say that during the --

25    during the first week or so of the protests, you and
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of LIEUTENANT VINCE PORTER, taken on June 22, 2021

1  your team were operating under the assumption that

2  nobody would have to complete a use of force statement?

3      A.   Unless we made an arrest on an individual and

4  used force on that arrest.

5      Q.   Sure.  Okay.  Did you have any conversation

6  with the members of your team about this new requirement

7  that you were going to have to complete use of force

8  statements other than, you know -- did any of your team

9  members comment on it to you?

10          MS. JORDAN:  Form.

11     A.   I don't recall the conversations from a year

12  ago.

13     Q.   Why is it that DPD has a policy with respect

14  to completion of use of force statements at all?

15          MS. JORDAN:  Form and foundation.

16     A.   To document any actions that we take the

17  results in force used to arrest an individual.

18     Q.   And use of force statements are required even

19  if you don't arrest somebody; right?

20     A.   Yes.

21     Q.   And why is that?

22     A.   To document if we deployed any type of pepper

23  spray or any type of munitions.

24     Q.   Is it important to complete timely use of

25  force statements?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of LIEUTENANT VINCE PORTER, taken on June 22, 2021

62

1      A.   Yes.

2      Q.   Why?

3      A.   So that the department knows what actions we

4  took in case there's a complaint later or something

5  happens, they know what actions we took.

6      Q.   Sure.  And so it could be important to -- in

7  case somebody complains about your conduct later; right?

8      A.   Yes.

9      Q.   We would have a timely version of what the

10  officer says happened; right?

11      A.   Yes.

12      Q.   And it could also be important if an officer

13  used inappropriate or excessive force for officer

14  accountability; right?

15      A.   Yes.

16      Q.   Okay.  If officers don't complete timely use

17  of force statements, then would you agree it makes it

18  more difficult to determine what actually happened

19  later?

20          MS. JORDAN:  Form.

21      A.   No.  I mean, I guess you would have to

22  rephrase that question.  I'm not quite sure what you're

23  getting at.

24      Q.   Sure.  So would you agree that the officer

25  statements that members of your -- you and your members

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  of your team completed relating to the protests were

2  completed, you know, 12 or more days after the events

3  that are being described in the reports; right?

4      A.  Yes.

5          MS. JORDAN:  Form and foundation.

6      Q.  By that time, you had been out many days

7  policing protests on many days; right?

8      A.  Yes.

9      Q.  You had worked long shifts; right?

10     A.  Yes.

11     Q.  Worked in many different interactions with

12  protests; right?

13     A.  Yes.

14     Q.  And it was more difficult to recall what

15  happened on particular days or during particular

16  occasions, because you were writing these reports long

17  after the events; right?

18         MS. JORDAN:  Form.

19     A.  Yes.  That's fair.

20     Q.  So one reason that it's important to complete

21  timely use of force statements is to make sure that

22  things are accurately documented at that time close in

23  time so you could have your best memory of what happened

24  in a written format; right?

25         MS. JORDAN:  Form.



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    A.   Yes.  Generally we would like to complete

2    statements the same day.

3        Q.   If there is no body-worn camera of officer

4    interactions with protesters and use of force statements

5    that are completed many days after the incident, which

6    are vague because the officer can no longer really

7    remember what exactly happened on a particular day, does

8    that cause problems for figuring out the truth of what

9    may have happened between a particular officer and

10   protesters during a given day?

11            MS. JORDAN:  Form and foundation.

12       A.   I don't believe so, no.

13       Q.   Why not?

14       A.   Because the officers are going to tell the

15   truth as to what actions they took.

16       Q.   Do your officers recall what specific

17   protesters they used force on without looking back at

18   their -- either body-worn cameras or use of force

19   statements?

20            MS. JORDAN:  Form and foundation.

21       A.   I don't know.  I can't comment for my

22   officers.

23       Q.   The members of your team did use force on

24   protesters on different occasions during the protests;

25   correct?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   without asking the officers who were there what's

 2   actually happening?

 3             MS. JORDAN:  Form and foundation.

 4        A.   Based upon the radio transmission I got and

 5   based upon what I seen when I got there with the

 6   officers surrounded, yes.

 7        Q.   Were any of the actions of yourself or your

 8   team during the protests inconsistent with DPD policy?

 9             MS. JORDAN:  Form.

10        A.   Not that I observed.

11        Q.   All of the actions that you observed of any

12   DPD officers during the protests last summer were

13   consistent with DPD policy and practice; correct?

14             MS. JORDAN:  Form.

15        A.   I don't recall seeing anybody violate policy

16   during that time.

17        Q.   Right.  You didn't see any officers do

18   anything during the protests with respect to the

19   protesters that you thought should have been a subject

20   of discipline or anything of that nature; correct?

21             MS. JORDAN:  Form and foundation.

22        A.   I don't recall seeing anything.

23        Q.   If you had seen any of your officers take any

24   actions that you thought was inconsistent with policy or

25   that was an inappropriate use of force, you would have
```



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of LIEUTENANT VINCE PORTER, taken on June 22, 2021

83

```
 1   reported them; right?

 2        A.   Yes.

 3        Q.   You did not do so; right?

 4        A.   No.

 5        Q.   Which means that you approved of all of the

 6   actions that you observed of your officers and other

 7   officers that you were with during the protests; right?

 8             MS. JORDAN:  Form.

 9        A.   I approved the actions of my officers, and I

10   did not see any officers -- I don't recall seeing any

11   officers violating any policy.

12        Q.   Okay.  Did you and your officers patrol in the

13   Capitol Hill neighborhood later in the evening on May 30

14   between Lincoln and Pearl and 12th and 14th Streets?

15        A.   Yes.

16        Q.   Right.  What do you recall about what was

17   going on at that location at that time?

18        A.   There was a lot of property destruction going

19   on, fires being set, barricades being put up in the

20   streets, rioters throwing rocks and bottles and other

21   projectiles at the officers.

22        Q.   Did your officers -- did you see any of your

23   officers chase protesters into alleys?

24        A.   That night I cannot recall seeing any officers

25   chase people into alleys.
```



**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

The Deposition of LIEUTENANT VINCE PORTER, taken on June 22, 2021

91

```
 1   division chief about how to enforce the curfew?
 2       A.   I did not.
 3       Q.   I'm showing you your text messages.  This is
 4   documents Bates stamped 013035 through 037, and
 5   Denver013053 through 13054.  Okay.  So have you ever
 6   seen these before?
 7       A.   They're text messages.
 8       Q.   All right.  So this message on page
 9   Denver013035, this second message on this page is from
10   Kathy Bancroft; correct?
11       A.   Okay.
12       Q.   And that's your commander?
13       A.   Yes.
14       Q.   Okay.  And it's to you; right?
15       A.   Yes.
16       Q.   Do you know why this says your e-mail as
17   opposed to --
18            I mean, it's a text message you received on
19   your work phone; right?
20       A.   It could have been an e-mail I received on my
21   work phone.
22       Q.   Do you get text messages that are sent to your
23   e-mail address?
24       A.   Text messages are sent to my e-mail address?
25   Not usually.  Not usually, no.
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    Q.   Okay.  So this message here from Kathy
2    Bancroft says, "From DC Thomas."  That refers to
3    division chief Ron Thomas; correct?
4    A.   Yes.
5    Q.   And he's division chief of patrol; right?
6    A.   Yes.
7    Q.   So he is a division chief over all of the
8    districts; right?
9    A.   Yes.
10   Q.   Okay.  So what he says about enforcement of
11   the curfew applies to all of the districts; right?
12   A.   Yes.
13   Q.   Okay.  This message that's being communicated
14   to you from Commander Bancroft per DC Thomas says, "All,
15   couple of things.
16        One, we are working with the city attorney to
17   extend the curfew order later into the week.  Make sure
18   your troops understand this charge is only to be the
19   used in relation to protest activity, either downtown or
20   elsewhere in the city."  Do you see that?
21   A.   Yes.
22   Q.   This was a message that was communicated to
23   you from your commander per DC Chief Thomas; correct?
24   A.   Yes.
25   Q.   Okay.  And this was an accurate description of



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of LIEUTENANT VINCE PORTER, taken on June 22, 2021

93

 1   how you and your team members were instructed to enforce

 2   the curfew; correct?

 3       A.   Yes.

 4       Q.   Okay.  What -- do you know, by the way, these

 5   other people; Andy Cleary, Kim Lovato, who are they?

 6       A.   Other lieutenants in District 2.

 7       Q.   Okay.  Were they other lieutenants who were

 8   out in the field?

 9       A.   Some were in the state -- at times, they were

10   at the station in the district, and at times, they were

11   downtown.  Some of them were.  I don't know exactly

12   where they were.

13       Q.   And Division Chief Thomas was on the text

14   message chain, as well; right?

15       A.   Yes.

16       Q.   Okay.

17       A.   It looks like an e-mail more than a text

18   message, but I can't tell from this.

19       Q.   Sure.  Okay.  So let's go down.  You replied

20   here on page Denver013037 from Vince Porter to Ron

21   Thomas, Sandy Cleary, Kim Lovato, Kathy Bancroft.  You

22   say, "Okay"; right?

23       A.   Yes.

24       Q.   So it's your acknowledgement that you received

25   this message; right?



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of LIEUTENANT VINCE PORTER, taken on June 22, 2021
94

```
 1       A.   Yes.

 2       Q.   And that you were going to follow it; right?

 3       A.   Yes.

 4       Q.   Now, at Denver013053, this is a message that

 5  was read at 6-2-2020; right?

 6       A.   Yes.

 7       Q.   And, again, it's a message from Kathy Bancroft

 8  to you, Ron Thomas, Andy Cleary, and Kim Lovato;

 9  correct?

10       A.   Yes.

11       Q.   It says, "From DC Thomas."  So it's a message

12  directly from the Division Chief Ron Thomas?

13       A.   Yes.

14       Q.   It says, "All, just to reiterate, the city

15  curfew in effect this week begins at 2100.  As has

16  occurred previously, everyone will receive an emergency

17  announcement on their cellphone at 2045 as a

18  notification.  Please advise all your officers that this

19  curfew ordinance is to be used only for the enforcing

20  protest-related behavior, regardless of location in the

21  city.  Do not let officers cite for curfew just for

22  being out after 2100.  Unless they are actively engaged

23  in protest activity, some other charge of justification

24  must be used.

25            Thanks."  Do you see that?
```



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

The Deposition of LIEUTENANT VINCE PORTER, taken on June 22, 2021

95

```
 1        A.    Yes.
 2        Q.    Okay.  That was consistent with your
 3   understanding of how to enforce the curfew during the
 4   protests; right?
 5        A.    Yes.
 6        Q.    And that was an order you were being given by
 7   the division chief; right?
 8        A.    It was a reminder from the division chief, is
 9   how I took it.
10        Q.    Sure.  It was a reminder, because he had said
11   it before; right?
12        A.    Uh-huh.
13        Q.    Is that a "yes"?
14        A.    Yes.  Well, he had said it in the previous
15   text message or, you know, whatever this is.
16        Q.    Okay.  Sure.  So is it your understanding that
17   per Division Chief Thomas, the curfew was to be enforced
18   only against protesters?
19        A.    Yes.
20        Q.    All right.  And that was consistent for every
21   day that the curfew was in place; correct?
22        A.    Yes.
23        Q.    Did you ever get an explanation of why?
24        A.    Because they didn't want us enforcing it
25   throughout the city for people just being out past 9:00
```



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1  that were engaged in protest activities.  I didn't get

2  the explanation.  That's just what I assumed from the --

3      Q.   Sure.  You were just following orders; right?

4      A.   Yes.

5      Q.   Okay.  And did you ever have any conversation

6  with your commander about this?

7      A.   I don't recall.  I don't know.

8      Q.   Did you ever remember -- recall receiving any

9  sort of communication from Division Chief Thomas himself

10 about this?

11     A.   I don't recall having a conversation with

12 Division Chief Thomas.

13     Q.   Okay.  Is it your understanding that this was

14 the policy throughout the city?  Not just applied to you

15 and your Division 2 -- or District 2 rather, but that it

16 was the same for all of the districts?

17     A.   Yes.

18          MS. JORDAN:  Form and foundation.

19     Q.   Okay.  And is it your understanding that other

20 lieutenants and teams who were out there were enforcing

21 the orders of Division Chief Thomas as to how to enforce

22 the curfew?

23          MS. JORDAN:  Form.

24     A.   I don't remember that.

25     Q.   You followed the order that was given to you

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of LIEUTENANT VINCE PORTER, taken on June 22, 2021

97

```
 1    by Division Chief Thomas communicated to you from your
 2    commander; correct?
 3         A.    Yes.
 4         Q.    Okay.  Did you ever come to any understanding
 5    that this only applied to your district and not to other
 6    districts?
 7         A.    No.
 8         Q.    That wouldn't make any sense; right?
 9         A.    No.
10         Q.    Okay.  The policy of the city is you
11    understood it at the time of the protests is that the
12    curfew would only be enforced against protesters; right?
13         A.    Yes.
14              MS. WANG:  Okay.  Let's take a five-minute
15         break.
16              THE VIDEOGRAPHER:  We're off the record at
17         11:02.
18                    (OFF THE RECORD)
19              THE VIDEOGRAPHER:  We're on the record at
20         11:09.
21    BY MS. WANG:
22         Q.    With respect to the deployment of tear gas on
23    protesters at Colfax and Clarkson on May 31, 2020,
24    between 8:30 and 9:00 p.m., was that authorized by the
25    command post?
```



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com