LOUISVILLE   LEXINGTON   LONDON   FLORENCE   CINCINNATI   INDIANAPOLIS   ORLANDO   JACKSONVILLE   TAMPA



# KENTUCKIANA
## — COURT REPORTERS —

**CIVIL ACTION NO. 1:20-cv-01878-RBJ**

**BLACK LIVES MATTER 5280, ET AL.**

**V.**

**CITY AND COUNTY OF DENVER, ET AL.**

**DEPONENT:**

**LIEUTENANT JAMES D. WILLIAMS**

**DATE:**

**June 24, 2021**


a courtroom
**powerhouse**

✉ schedule@kentuckianareporters.com

☎ 877.808.5856 | 502.589.2273

**www.kentuckianareporters.com**

Exhibit 20

The Deposition of LIEUTENANT JAMES D. WILLIAMS, taken on June 24, 2021

15

1    Q.   Okay.  And so my questions -- unless I

2    indicate otherwise, my questions will focus on the first

3    six days of the protests, okay?

4    A.   Okay.

5    Q.   During that time, did you have an

6    understanding of whether or not you would be required to

7    complete an officer statement, regarding use of force

8    during the protests?

9    A.   So, as to completing a statement for each

10   individual night, no.  There's an after action report

11   that is completed at the command post.  That was pretty

12   much procedure, at that time.  So if there are

13   individual incidents in -- in which I play a role in an

14   arrest or there's anything, yes, I would complete a

15   statement specific to that incident.  But as far as an

16   overall statement that covered our actions throughout

17   the course of -- of that date, any particular date, in

18   those six days, no.

19   Q.   Okay.  And how many protests have you been

20   involved in policing, prior to this one?

21   A.   I could not give you an exact number, but it

22   would be more than a dozen.  You look at protests,

23   protest events, it would either -- there are some that -

24   - there are -- most -- the vast majority of them don't

25   involve civil unrest.  So, yeah, it could be north of --

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

 1   one assignment in the identification bureau as a -- as a

 2   sergeant.

 3       Q.   Okay.  And for how many years were you a

 4   sergeant?

 5       A.   I was a sergeant from 2003 until 2007.

 6       Q.   Okay.  And before that, were you -- what was

 7   your position?

 8       A.   Immediately prior to that, I was a corporal in

 9   district four.

10       Q.   So during the first six days of the protests,

11   it was your understanding that there would be an after

12   action report completed concerning any uses of force on

13   protesters, but that you and members of your team would

14   not have to complete individual use-of-force reports; is

15   that right?

16       A.   That would be basically correct, the exception

17   of that being as if we had an individual use of force in

18   which an arrest was made, and then that report would be

19   required.

20       Q.   Sure.  And is that consistent with how you had

21   handled use-of-force reports for other protests in the

22   past?

23       A.   Yes, in -- in large-scale events like that,

24   civil unrest, that is consistent.

25       Q.   Okay.  And was that your understanding of the

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  policy of the Denver Police Department with respect to

2  the completion of use-of-force reports for protests?

3      A.   That was my understanding, yes.

4      Q.   Okay.  How did you come to that understanding?

5      A.   Based on experience and the way that we've

6  done things in the past.  When we have deployments to

7  civil unrest, that -- that's the way that we've done it

8  in the past.

9      Q.   Sure.  And do you know what the rationale or

10  reason is for doing it that way?

11      A.   I think when you have -- I can't state the

12  city's rationale on that.  It's my understanding, that

13  it -- rather than have multiple reports and doing that

14  when you have an action of entire teams, an entire unit,

15  that's basically summarized and put together at -- at

16  the command post level as an overall report, rather than

17  getting several different reports from people involved

18  in the same activity.

19      Q.   So if during the -- during the protests, if

20  one of the officers on your team had to use pepper

21  balls, let's say had to -- had to use his pepper ball

22  gun on a protester, then how would that information get

23  communicated up the chain of command to the command

24  post, so that it could be incorporated into an after

25  action report?



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of LIEUTENANT JAMES D. WILLIAMS, taken on June 24, 2021

20

1      A.   So via radio communication.  We communicate in

2   different ways.  For direct communication one to one, to

3   explain, yeah, this is what we did at this location, and

4   whatnot.  There's also a -- downtown, as -- as you know,

5   is -- is very well covered by camera footage, so they

6   can -- they can see the deployments we're doing.  But,

7   yes, we -- and so, yeah.  So -- so there's different

8   ways it's communicated, is -- is what I'm saying.

9      Q.   Okay.  So it would be fair to say that the

10   understanding of the officers on your team during the

11   first six days of the protests, was that they would not

12   have to complete individual use-of-force reports for any

13   use of less lethal weapons on protesters, right?

14           MR. HUSS:  Objection.  Foundation.  You can

15      answer.

16      A.   No, because your statement is too broad there.

17   Again, we go back to if there's an individual in which

18   we're involved in a use-of-force and we take that person

19   into custody, that -- that --

20   BY MS. WANG:

21      Q.   Right.  Okay.  I keep forgetting that

22   exception.  But with that exception, is that -- is what

23   I said otherwise, correct?

24      A.   Yes.  No individual statements for our overall

25   actions each -- each night were required.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        A.   So a bit of a correction there.  It was more

 2   than a couple of weeks.  It was several weeks.

 3        Q.   Several weeks.  Okay.

 4        A.   And use-of-force reports themselves weren't

 5   required.  What was required was individual statements

 6   from everybody that was involved.  And beyond the

 7   discussions that I stated earlier, no.  There were

 8   concerns that were communicated as to it being a -- the

 9   lapse of time from there, as to how accurate and

10   detailed the statements could be.

11             And it's -- you know, and it's like, just put

12   down your -- and the answer to that was, just your best

13   recollection of the events.  Each individual officer,

14   supervisor, command officer involved, your best

15   recollection of the events as -- as you -- you know,

16   putting that together as -- as -- as well as you could.

17             So it's -- there's no way for -- for a

18   multi-day deployment.  We're going to remember every

19   minute of the event.

20        Q.   Right.  Have you ever reviewed any of the

21   officers' statements completed by the members of your

22   team?

23        A.   Yes, I reviewed statements prior to them being

24   submitted, just for completeness, accuracy.

25        Q.   Okay.  Did you provide a copy of the use-of-
```



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1   can't speak to -- to what his intent is.  But

2   generically, I would look at that and say that this is

3   important to get this -- to -- to get this in, and --

4   and to make sure that we're getting as much as we can on

5   paper.  So I -- I -- it just needs to be done is -- is

6   how I would interpret that.  You would have to ask him

7   as to -- to the intent.  I can't speak to his intent.

8       Q.   If officers document their uses of force -- if

9   officers documented their uses of force during the

10   protests so that it was consistent with DPD policy and

11   training, that would protect them from lawsuits, right?

12             MR. HUSS:  Objection.  Form and foundation.

13       A.   I would -- I would say it's -- it would be a

14   good practice to document those things, and certainly

15   would be helpful.  But I -- we don't document with just

16   lawsuits in mind.  I don't anyway.  Personally, I don't

17   document things just on that basis alone, no.

18       Q.   Okay.  In your officer statement, you stated

19   that, in -- on the first page, in the first paragraph,

20   "During this event, I authorized the use of pepper ball

21   40 mm launchers, and chemical munitions.  Each

22   authorization I made was done in accordance with

23   department policy.  Furthermore, all force that I

24   observed officers use was reasonable and appropriate and

25   consistent with department policy."  Do you recall

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  and documented and investigated.

2      Q.    Okay.  So if you saw any of your officers use

3  force that was outside of policy or inconsistent with

4  DPD policy, then you would have been required to report

5  that yourself?

6      A.    That is correct.

7      Q.    Okay.  And you didn't make any such reports,

8  right?

9      A.    I made no such reports, and I observed no

10  actions that were outside of policy.

11     Q.    Okay.  Chemical munitions -- during the

12  protests, the use of chemical munitions had to be

13  authorized by the command post, right?

14     A.    There is -- the -- generally, the order to

15  deploy certain types of chemical munitions comes from

16  the command post.  But there is discretion. based on

17  exigency that commander officers on the ground can make

18  that decision, as well as supervisors.

19     Q.    Okay.  So generally -- and I'm just trying to

20  make sure I understand.  Generally speaking, the command

21  post had to authorize the use of chemical munitions,

22  unless there was exigent circumstances, in which case a

23  command officer on the ground, could authorize the use

24  of chemical munitions?

25          MR. HUSS:  Objection.  Form and foundation.



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    Lieutenant Canino.  I may very well have, but I cannot

2    recall.

3        Q.   Did you see Lieutenant Pine there?

4        A.   Again, I don't recall speaking directly with

5    anyone from -- from Metro SWAT on that date, Denver

6    Metro SWAT.

7        Q.   Okay.  Do you recall what gang -- what gang

8    unit supervisors were present, at the intersection of

9    Lincoln and Colfax?

10       A.   Yes.  I remember both Lieutenant O'Donnell at

11   the time, and Lieutenant Carrol there, as well.

12       Q.   Okay.  Both of them were there?

13       A.   As far as I can recall, I believe they were

14   both there, yes.

15       Q.   Okay.  Now, do you recall there being CS

16   canisters deployed on numerous occasions, between 6:00

17   and 8:00 p.m. at the intersection of Lincoln and Colfax?

18       A.   Yes, I do recall CS being deployed there.

19       Q.   Okay.  And who authorized that?

20       A.   That was -- I did not call for that

21   deployment.  I was not directly in charge of those

22   teams.  I -- so I couldn't tell you who authorized that.

23       Q.   Did one of the Metro SWAT lieutenants

24   authorize that?

25       A.   Again, I don't know who made that

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of LIEUTENANT JAMES D. WILLIAMS, taken on June 24, 2021

61

1    there were -- there were things thrown by people who

2    were in that crowd at the intersection of Lincoln and

3    Colfax, right?

4        A.   Yeah, thrown directly at the officers.

5        Q.   Right.  And then in response, officers

6    deployed tear gas -- CS canisters at the protesters,

7    right?

8        A.   That would be correct.  There was -- that was

9    part of the response to -- to the -- the assaultive

10   behavior that -- that those officers that were assigned

11   there took, yes.

12       Q.   Okay.  You would agree that CS gas is a

13   indiscriminate weapon, right?

14            MR. HUSS:  Objection.  Form, foundation.

15       A.   It is, by its very nature, indiscriminate,

16   yes.  It affects anybody that's around it, to include

17   us.

18       Q.   Right.  So -- well, so there were probably

19   hundreds.  I mean, what's your estimate of how many

20   protesters were at the intersection of Lincoln and

21   Colfax, between 6:00 and 8:00 p.m.?

22       A.   I would say that number ebbed and flowed, but

23   at points in times, it was in the hundreds.  It seemed

24   the larger the crowd that -- that -- that would gather

25   there, the -- were the times for violence when things

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of LIEUTENANT JAMES D. WILLIAMS, taken on June 24, 2021

64

1  team into that position, where we go in there and they

2  could possibly get surrounded very quickly, it's -- it's

3  just a difficult thing to do.

4           As far as to the second part of that,

5  targeting individuals, yes, we would target individuals

6  that were engaged in -- in assaultive behavior, be it

7  throwing rocks, fireworks, or whatever.  And those were,

8  at least certain times, successful because it stopped

9  that assaultive behavior at that point in time.

10      **Q.   When officers deployed tear gas, CS canisters,**

11  **at Lincoln and Colfax, it would cause the entire crowd**

12  **to disperse, right?**

13           MR. HUSS:  Objection.  Foundation.

14      A.   It typically has that effect.  As to where it

15  will for the amount of time that that gas is dispersed

16  into that area, it -- it -- and that's what it's

17  designed to do.  It's a dispersal technique.  It -- it -

18  - and it -- it's effective in -- in doing that.  So,

19  yes, when the gas was deployed, typically the crowd

20  would -- would disperse very well.

21      **Q.   Okay.  And because gas is an indiscriminate**

22  **weapon, it would cause people who are protesting**

23  **peacefully, to disperse as well?**

24      A.   Gas will affect anybody that is in that area.

25           So if the decision is made to disperse the



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

The Deposition of LIEUTENANT JAMES D. WILLIAMS, taken on June 24, 2021

65

1   crowd due to overall violent activity within that crowd,

2   yes, it will affect everybody that's in that area.

3       Q.   And did you ever declare an unlawful assembly

4   between 6:00 and 8:00 p.m. at Lincoln and Colfax?

5       A.   I did not.

6       Q.   Did you ever declare that there was a riot?

7       A.   I -- declaring that there's a riot?  If you're

8   asking me as -- as to whether it met the grounds for a

9   riot, yes.  My definition of that activity would have

10  been a riot.

11      Q.   Okay.  So why didn't you disperse everybody,

12  and push the line forward, and tell them all to leave,

13  even before curfew?

14      A.   Under directions of the command post, that's

15  what we were doing.

16      Q.   Okay.

17      A.   It would -- it was -- our objective at that

18  time was to protect that crew, also.  Within -- it's --

19  we don't have an infinite number of resources.  If we

20  push that crowd forward, they're going to disperse, and

21  then we have to leave that area that's behind us.

22           We also had our vehicles, a number of

23  vehicles, staged behind us that we would then be leaving

24  there, too.  And based on activities on the -- on

25  previous -- based on activities the previous day, we had

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of LIEUTENANT JAMES D. WILLIAMS, taken on June 24, 2021
66

1  numerous police cars that were left unattended for

2  moments and suffered significant amounts of damage.

3  So --

4      Q.   All right.  So --

5      A.   So there's a -- there's a number of reasons.

6  A lot of this is based on resources and -- and -- and --

7  and -- but ultimately, I took all of my directions from

8  the command post.

9      Q.   Okay.  So the command post never declared an

10 unlawful assembly, right?

11     A.   I didn't receive any direction from the

12 command post to declare an unlawful assembly in an

13 attempt to get people to disperse completely out of that

14 area during that timeframe, no.

15     Q.   The command post never declared that there

16 were riotous conditions, right?

17     A.   I'm observing what I'm observing on the

18 ground.  The -- the command post sees what there -- we

19 would communicate back and forth.  We're -- there are --

20 there's a description of activities going back and

21 forth.  And, I mean, from the point of declaring to the

22 crowd that there's a riot and they need to leave, I -- I

23 don't remember any of those announcements being made.  I

24 can --

25     Q.   Right.  So my point is that you had hundreds



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of LIEUTENANT JAMES D. WILLIAMS, taken on June 24, 2021

67

1    of protesters at certain points in time between the 6:00

2    and 8:00 p.m. timeframe at Lincoln and Colfax, and there

3    may have been some people who were throwing items from

4    the crowd, right?

5        A.    Correct.  There -- there were --

6        Q.    **There were many people who were present who**

7    **were peacefully protesting, right?**

8              MR. HUSS:  Objection.  Form.

9        A.    There were many, many people that were

10   present, that were not engaged in assaultive behavior.

11   I would agree with that.

12       Q.    **Okay.  Did you think that they were there, but**

13   **they were not actually protesting?**

14       A.    If you're asking my personal opinion, I

15   honestly believe that -- that a lot of this was -- was a

16   mob mentality.  People seemed to be having fun there.

17   So they were more in a celebratory fashion.  There were

18   a good number of people that were engaged in -- in -- in

19   -- they were there because -- this is strictly my

20   opinion based upon my observations, but, yes, you had

21   some people that -- that were there holding signs and

22   protesting, but you had a fair number of people in there

23   that were -- looked like they were just having fun.

24       Q.    **Okay.  So you said earlier that you personally**

25   **Believe, that there was a riot there between 6:00 and**

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of LIEUTENANT JAMES D. WILLIAMS, taken on June 24, 2021

68

1   8:00 p.m., right?

2       A.   I would define that as a riot.

3       Q.   Okay.  And so -- but you didn't take any

4   action, and the command post didn't take any action, to

5   disperse that riot, right?  Before curfew?

6           MR. HUSS:  Objection.  Form.

7       A.   I answered that before, for -- based on

8   numerous reasons, we didn't -- no.

9       Q.   I mean, you did -- you did not, right?  You

10  did not take any action to disperse the crowd before

11  curfew, right?

12      A.   Well --

13          MR. HUSS:  Objection.  Form.

14      A.   There was action taken.  Those officers that

15  deployed CS, did disperse that crowd on a number of

16  cases.  If you're talking about removing that crowd from

17  that area and -- and pushing them out, no, we did not at

18  that time take that.  That action was taken later in the

19  evening.

20      Q.   Okay.  And so my point is, when -- do you

21  recall there being circumstances at Lincoln and Colfax,

22  between 6:00 and 8:00 p.m., when officers would deploy

23  CS canisters.  People would run away, and then they

24  would regather exactly where they were.  And then a few

25  minutes later, maybe somebody threw something from -- a

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of LIEUTENANT JAMES D. WILLIAMS, taken on June 24, 2021

1   water bottle from the crowd.  Officers would deploy gas

2   again, and this situation would just repeat over and

3   over again for the time period up until curfew?  Does

4   that seem accurate to you?

5          A.   There were several deployments, and --

6               MR. HUSS:  Objection.  Form.

7          A.   Okay.  There were several deployments of -- of

8   CS and other chemical munitions, that did disperse that

9   crowd.  I mean, we've covered this before, but -- and

10  then the crowd did reform, and it was engaged again.

11              And, yes, there were a number of things.  And

12  water bottles, as well as mortar fireworks, rocks, and

13  several other projectiles, unknown liquids, and whatnot,

14  that were thrown on officers during that timeframe, yes.

15         Q.   Okay.  So my question is this:  If the crowd

16  was so bad, if it was a riot -- a riot, if the crowd was

17  so violent and riotous that you had to deploy CS gas,

18  why didn't you just push them out of there, instead of

19  repeatedly tear gassing them?

20         A.   I spoke to --

21              MR. HUSS:  Objection.  Form and foundation.

22         A.   Okay.  I spoke to that earlier.  Our point in

23  that time was to hold that position.  It was not to

24  remove that crowd from that overall area.  And there are

25  a number of reasons as -- as to why that decision was

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  made.  But ultimately, I followed direction of the

2  command post, and we held that area for the time that we

3  held it.

4      **Q.   But you did manage to -- I mean, did you get**

5  **more officers assigned to this location when you -- when**

6  **you did push people out of there at curfew?**

7      A.   So there was a point in time -- and I couldn't

8  tell you as to the exact number of officers we

9  ultimately got there.  I did not do a head count.  There

10  was a point in time, to where I received direction from

11  the command post that we were going to make that

12  movement and clear the park, and that area, and enforce

13  the mayor's emergency curfew order.

14          And we organized resources to do that, to

15  include securing the vehicles to make sure we didn't

16  leave the vehicles behind.  But that was at a point in

17  time where the -- the work crew there no longer needed

18  protection.  They had wrapped up their activities

19  between Colfax and Broadway -- I mean between Lincoln

20  and Broadway on Colfax.

21          And -- and so, yes, there was a point in time

22  we -- we -- we consolidated the resources we had and

23  added whatever additional units that we could add and

24  did make that -- did make that push to the park.

25      **Q.   If there were people throwing items from the**

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        A.    That would be correct.

 2        Q.    And what -- who was in charge of 130 and 140?

 3        A.    There were different sergeants on different

 4   dates in charge of those teams.  On Sunday, I can't

 5   recall exactly, but there was a total of three or four

 6   sergeants that -- that cycled in and out of those

 7   positions throughout those six days.

 8        Q.    Okay.  And let me -- I'm going to play you

 9   some radio -- you're -- you are 100 on the radio, right?

10        A.    That would be correct.

11        Q.    And Commander Phelan was Adam Nine, or A-Nine

12   right?

13        A.    That is correct.

14        Q.    Okay.  So I'm going to play you some radio

15   communications from Sunday, May 31st, and it's going to

16   be a few minutes of it.  But just pay attention, and

17   then I'll ask you some questions, okay?

18        A.    Okay.

19        Q.    So this is starting at radio communications

20   for 5-31-2020 starting at 213748, which is, I believe,

21   9:38 p.m., on Sunday May 31st.

22                    (AUDIO PLAYS)

23        Q.    Okay.  I'm going to pause it there.  That's at

24   31 -- or 213949.  So you're on the radio communicating

25   with Commander Phelan, correct?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of LIEUTENANT JAMES D. WILLIAMS, taken on June 24, 2021

78

1        A.   Correct.

2        Q.   And you and your teams -- at the point where

3   we stopped this communication, you and your teams were

4   at Colfax and Grant, right?

5        A.   Yes.  That's the location I heard, yeah.

6        Q.   Okay.  And Commander Phelan was asking you to

7   push east, while an Aurora team was coming from the

8   west, right?

9        A.   There was a team coming from the west.  But --

10  but, correct, I was aware there was a team to the west

11  of us.

12       Q.   Okay.  And you say to Commander Phelan,

13  "You're at Colfax and Grant, but we're going to be

14  pushing into each other," right?

15       A.   Correct.

16       Q.   And why did you say that?

17       A.   Situational awareness on the ground to make

18  sure those other teams knew where we were at and that

19  they were -- you know, they -- they have a crowd in

20  front of them that -- that they're engaging in and --

21  and taking -- and dealing with.  So they need to know

22  that we're going to be directly behind that crowd, that

23  we're coming to that same location -- I mean, we're

24  going to be coming towards them, so...

25            The proper thing is to make them aware that --

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   that -- that we're coming directly at them, as opposed

2   to -- to coming from another direction, in which we're

3   not in their -- in -- in their area of -- if -- if

4   they're deploying whatever -- you know, primarily for

5   our safety.  So if they're deploying anything directly

6   towards that crowd, that -- that they realize that we're

7   coming up that direction, as well.

8        Q.   Okay.  And what was your goal at that time?

9        A.   Per the direction of the command post, we were

10  there, and we were to -- to start making some arrests.

11  That was the goal.

12       Q.   And so when you say that you were pushing --

13  you were going to be pushing east, what did that mean?

14       A.   That's just terminology I'm throwing out

15  there.  We're moving east.  So basically, we are moving

16  east towards that location.

17       Q.   And the teams who are with you were -- you

18  were with Sergeant Abeyta and Sergeant Rick Beall's team

19  at that time?

20       A.   I believe that's correct, yes.

21       Q.   And as you were pushing east, did you

22  authorize the deployment of any CS canisters?

23       A.   I don't recall deploying CS or authorizing CS

24  at that location.  I can recall taking a brick to our

25  windshield and a number of other things.  I can recall

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  us deploying pepper ball and -- and, I believe, OC at

2  that location, but I can't speak as to whether or not I

3  authorized -- I don't recall deploying CS there, no.

4       Q.    When you say, "OC," in what format was that

5  deployed?

6       A.    It would have been foggers.

7       Q.    Okay.  And do you recall pushing with your

8  teams east, until you got to the basilica at Colfax and

9  Logan?

10      A.    I remember pushing -- I remember driving with

11 our teams up there and moving east.  We took a number of

12 projectiles to include a large brick, to where we

13 immediately jumped out and started addressing the crowd

14 that was right there.  We were not able to apprehend

15 that individual.  We did pursue him for a short distance

16 but had to pull my guys back for -- because they were

17 getting too far away from the other officers.

18      Q.    Okay.  Are you talking about at the location

19 of Colfax and Logan at 9:30 p.m.?

20      A.    Yeah, it was in that general area.  I can't

21 remember if we stopped short at Logan, or whatever.  So

22 I believe that's -- I think that's that same timeframe

23 in my statement.  This is what I'm recalling for that --

24 for that particular -- I think that's where we're at on

25 the 31st.  It's in -- it's in my statement there,



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   though.
 2       Q.   Okay.  So you and your team were in your
 3   vehicles, but you stopped your vehicles and got out,
 4   short of Colfax and Logan?
 5       A.   I can't recall exactly where we stopped, but
 6   we did get out in that area and -- and, yes, to -- to --
 7   to deal with the crowd, yeah, we can't stay on the
 8   vehicles.  So we stopped the vehicle and -- to take
 9   whatever actions we were going to take, we get off -- we
10   get out of the vehicle, or off the vehicle.
11       Q.   And what less lethal weapons did you or your
12   team of officers deploy at that location, at that time?
13       A.   Again, I can say with certainty that -- that
14   pepper ball and -- and I am almost absolutely certain OC
15   was deployed in fogger form.  Beyond that, I can't -- I
16   can't recall if -- if we deployed any gas munitions at
17   that location.  It's possible.
18       Q.   Okay.  I'm going to play this for a little bit
19   more, the radio communications.  We're starting, again,
20   at 213949
21                    (AUDIO PLAYS)
22       Q.   Okay.  So that -- this section ended with
23   Commander Phelan saying, basically, "We'll push them
24   there, and we'll make some arrests," right?
25       A.   Yeah.  I'm not so sure if I -- if -- it's a
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of LIEUTENANT JAMES D. WILLIAMS, taken on June 24, 2021

82

1   chaotic event.  I'm not so sure I heard that radio

2   transmission at the time, but I do recall and remember,

3   once you played that audio, that we were directed to

4   make arrests at that location, yes.

5       Q.   Did you have any concerns -- other than what

6   you've identified, did you have any concerns about the

7   fact that you and this other team of officers were

8   pushing a crowd, you know, one from one direction and

9   one team from the other direction?

10      A.   Other than the concerns I -- I mentioned

11  earlier, with us being aware of each other's locations,

12  no.  I mean, the -- the -- it's just as long as we're

13  aware of where each team is at.

14      Q.   Okay.  So your concern at that time was that

15  you wanted to make sure that the other team of officers

16  knew that you were on the other side of -- you and your

17  team were on the other side of the crowd, right?

18      A.   That's correct.

19      Q.   You didn't have any particular concern about

20  the people in the crowd?

21           MR. HUSS:  Objection.  Form.

22      A.   I'm not sure to -- to -- what are you -- what

23  are you speaking to as to what concern that I had with

24  them?  I mean --

25      Q.   Well, did you have any concern that there was

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    a crowd of people who were being pushed from one

2    direction, and tear gassed by one set of officers coming

3    from the east, and being pushed by officers coming from

4    the other side?

5           MR. HUSS:  Objection.  Form.

6    A.    So I think I can answer that by saying, our

7    goal at that point in time was to make arrests.  The

8    curfew order was in place.  So obviously we're going to

9    try to target the individuals engaged in violent

10   activity first.  But our goal was to make arrests, and

11   that whole crowd at that point in time, the target was

12   to make as many arrests as we can in the hopes to -- to

13   get those crowd numbers reduced and get other people to

14   leave the area.

15          We had a number of things going up.  There was

16   extensive property damage up and down Colfax.  So a

17   number of ongoing events.  We had dumpsters set on fire.

18   We had -- earlier in the evening, there was -- there was

19   -- I mean, some of these dumpsters that were set on fire

20   were close to -- to occupied buildings and apartments --

21   Q.    I'm sorry.  Did you answer, like -- my

22   question was: Did you have any concerns about the safety

23   of the members of the crowd, who were being pushed from

24   one direction and tear gassed from one direction by one

25   set of officers, and being pushed from the other side by

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of LIEUTENANT JAMES D. WILLIAMS, taken on June 24, 2021

84

1    another set of officers?  Did you have any concern for

2    the --

3              MR. HUSS:  Objection.  Form.

4         Q.    -- safety of the protesters in the crowd?

5              MR. HUSS:  Objection.  Form.

6         A.    Our concern for safety extends to everyone.

7    As to -- far as for us and our ultimate goal of making

8    arrests at that location, I don't know that it is any

9    less safe, to allow this crowd to continue -- for

10   everyone involved, to allow the crowd to -- to continue,

11   I mean, just to continue to follow it.

12             So -- so, I mean, there's always a safety

13   concern with anything we do, and we make the decision

14   based upon what we feel is the best tactic to try to

15   restore order and stop a -- a lot of the illegal

16   activity that was occurring.  So the -- that's the best

17   I can answer the question.

18        Q.    Were the actions that you took between 9:36

19   and 9:45 p.m. at the intersection of Colfax and Logan,

20   they were authorized by Commander Phelan, correct?

21        A.    Correct.

22        Q.    Okay.  And they were consistent with DPD

23   policy, right?

24        A.    As I understand it, correct.

25        Q.    All right.  Based on your 29 years of

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of LIEUTENANT JAMES D. WILLIAMS, taken on June 24, 2021

85

1    experience with the department, you saw nothing that you

2    or your team did at that location at that time that was

3    inconsistent with DPD policy, right?

4        A.    Correct.

5        Q.    Okay.  And there was nothing that the Aurora

6    team, pushing from the other side of Colfax, nothing

7    they did was inconsistent with DPD policy, right?

8        A.    I was --

9            MR. HUSS:  Objection.  Foundation.

10       A.    I was focused on my officers and my team's

11   response, but I saw nothing from the Aurora side --

12   observed nothing from the Aurora side, that I -- I

13   considered to be improper or that would be out of line,

14   with our policies and procedures.

15       Q.    Okay.  Let me play -- I have up on the screen

16   a Denver HALO camera footage from May 31, 2020,

17   beginning at 9:37:06 p.m.  We'll play it for a few

18   minutes, and then I'll ask you some questions.  So this

19   -- to orient you, this camera is facing Colfax at Logan.

20   The basilica is up here on the right side of the screen,

21   okay?

22            (VIDEO PLAYS)

23       Q.    All right.  I'm going to pause it at

24   9:38:54 p.m.  Do you see up here in the distance, gas?

25       A.    Yes.  I would say that -- again, on video, I

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of LIEUTENANT JAMES D. WILLIAMS, taken on June 24, 2021

86

1   can't tell whether it's smoke or CS, but I do see that.

2        Q.   Okay.  I'm going to continue playing it.

3                   (VIDEO PLAYS)

4        Q.   Okay.  I'm going to pause it at 9:41:27.  So

5   did you see there were some people who were beginning to

6   run around the corner, away from the gas that's over in

7   the distance, right?

8        A.   I see the people running.  I also saw earlier

9   in the video where the gas was -- was deployed,

10  dissipated, and then a large crowd amassed, and moved

11  directly towards those officers.  But, yes, I do see --

12  I do see on that second deployment, that the crowd is

13  starting to run and move different directions north and

14  south, primarily.

15       Q.   And then from this side of the street, which

16  is Logan, there's clouds of gas here, right?

17       A.   Yeah.  Those smaller munitions, I -- I have no

18  clue as to what those are because those things are

19  exploding in the air.  I have no clue as to whether it

20  was something the protesters were throwing, or officers

21  were throwing.  There was -- there was certainly nothing

22  that would do that that -- that I had access to, during

23  this entire timeframe.  So I -- I have no clue as to --

24  to what those are.

25       Q.   All right.  We're going to continue playing

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

 1   it.

 2                    (VIDEO PLAYS)

 3       Q.   So I'm stopping it at 9:42 p.m.  Do you see

 4   this -- this canister that's smoking right here in the

 5   front?

 6       A.   Yeah.  And you would have to play the video

 7   again.  I think it came from the left side of the screen

 8   right there (indicating).  So I wasn't noticing any

 9   police units up there.  So I am kind of confused as to

10   where that came from.

11                    (VIDEO PLAYS)

12       Q.   Well, we can't see behind the --

13       A.   I can see it land.  I can see it land.  And I

14   can see the officers in the background.  It -- it

15   appears to be consistent with -- with -- with police

16   chemical munitions that we have, yes.

17       Q.   Okay.  So do you think that canister that was

18   right here in between these yellow lines came from the

19   officers in the distance?

20       A.   It's possible.  It's kind of hard to tell.  I

21   can see it land, but it is -- it is possible, that it

22   did come from that direction.  I am not certain.

23       Q.   Okay.  I'm going to pause it at 9:44.  So

24   there are some DPD officers that have come in from the

25   west who are walking forward into the screen, right?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of LIEUTENANT JAMES D. WILLIAMS, taken on June 24, 2021

88

1      A.    Uh-huh.

2      Q.    **And those were your officers in your team,**

3  **right?**

4      A.    I can't say specifically looking at that

5  whether that's our guys at that point in time.  But,

6  yes, we were deployed in that area, and we were -- we

7  are on the ground.

8      Q.    **Okay.  So if we have a body-worn camera from**

9  **Sergeant Beall that shows that he was at the**

10 **intersection of Logan and Colfax at 9:50 p.m., you have**

11 **no reason to doubt that this was your team, right?**

12     A.    It's --

13          MR. HUSS:  Objection.  Foundation.

14     A.    Okay.  It's very possible that that is my

15 team.  And -- and, like I said, we did pursue an

16 individual that threw a rock into our windshield up that

17 alley.  That very well could be that incident.  I just

18 hesitate to say because we were deployed so many times

19 that -- definitively that -- that was us at this point

20 in time.  I'm just -- with more information, I might

21 come to that conclusion, but, yes, it very well could be

22 our team.

23     Q.    **Can you think of any reason -- did anybody on**

24 **your team ever alert you to any problems with activating**

25 **their body-worn camera?**

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of LIEUTENANT JAMES D. WILLIAMS, taken on June 24, 2021

90

1  they did have problems with attaching their body-worn

2  cameras?

3       A.    That would be correct.  Once we were required

4  to have them, once the court -- the order from the court

5  came down, then we had to figure out how to affix them

6  to (Inaudible).

7       Q.    Okay.  So up until that time, your

8  understanding of DPD policy was that there was no

9  requirement to have their -- for your officers to have

10 their body-worn cameras on during interactions with

11 protesters?

12      A.    Up until that point, it was my understanding

13 of policy that in -- in a crowd control situation like

14 that, that they were not required.  That would be

15 correct.

16      Q.    Okay.  And that's consistent with your

17 understanding of DPD policy, with respect to prior

18 protests, as well?

19      A.    Body-worn cameras are relatively new.  I can't

20 even remember the time that they were, but they're

21 relatively new to the department.  I would say -- I

22 cannot recall -- I can't recall much about body-worn

23 cameras in any recent protests, since the cameras have

24 come out.  But it's my understanding overall, yes, that

25 would be consistent that -- that when responding to --

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  and as -- you know, when responding in -- in a large

2  team or a crowd control environment, body-worn cameras

3  were not required for each individual officer.

4      Q.   Okay.  And that's true even if officers are

5  using less lethal weapons on protesters, right?

6      A.   It's -- regardless, it's -- it's when -- when

7  they're responding to that environment at the time.  And

8  this has -- that has since changed.  But -- but at that

9  time, during that time period that went from May 28th

10  and the several days following, my understanding of the

11  policy is that the cameras were not required by each

12  individual officer.

13      Q.   Okay.  And so just to confirm, if that was

14  true even if officers had to use less lethal weapons on

15  protesters.  They were just not required at all, to have

16  body-worn cameras on during the protests, right?

17      A.   If it -- it wasn't required of them as -- as

18  the nature of that assignment, then it wouldn't be

19  required of them for any actions that they took during

20  that -- that assignment, so...

21      Q.   Okay.  And that was the understanding of your

22  officers during the time of the protests, right?

23      A.   It was my --

24           MR. HUSS:  Objection.  Foundation.

25      A.   It was my -- that was my understanding.



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of LIEUTENANT JAMES D. WILLIAMS, taken on June 24, 2021

128

```
 1    Ms. Wang might have a few more.

 2              THE WITNESS:  Okay.  Thank you.

 3                    REDIRECT EXAMINATION

 4    BY MS. WANG:

 5         Q.   Hi.  I just have a few follow-up questions,

 6    which I forgot to ask earlier.

 7              So did you or your -- any members of your team

 8    arrest anybody, pursuant to the emergency curfew?

 9         A.   Yes.

10         Q.   Okay.  What were you told about how the curfew

11    was to be enforced?

12         A.   I mean, generically, the curfew order was

13    there, and we were to make arrests of those individuals

14    that were failing to leave the area.  So, I mean, that

15    was -- that was, in essence, that -- the mayor's curfew

16    order was there.  And the purpose of that was to -- to

17    stop the -- the -- the activity, the criminal activity,

18    that had been occurring throughout that area.

19              I mean, we had tons and tons of property

20    damage, broken windows, fires, all kinds of stuff.  But

21    -- but the essence of that was to -- to quell that

22    behavior and -- and to remove people -- and to remove

23    people from the street that -- that -- that were engaged

24    in that overall behavior, or that were part of that

25    overall crowd, regardless of whether or not they were
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   directly involved in those other criminal acts.

 2        Q.   Was it your assumption that people who were

 3   protesting were the ones committing -- or sorry.  Strike

 4   that.  Was it your assumption that the people who were

 5   engaging in property destruction and violence were

 6   protesters?

 7        A.   Some of the people that were engaged in

 8   protesting were also engaged in criminal acts, yes.  Not

 9   all, but some, yes.

10        Q.   All right.  So there were people protesting,

11   who were not engaged in any criminal acts, right?

12        A.   Well, and let me clarify that.  And -- and

13   there were people protesting that -- that -- and I don't

14   know.  I -- I haven't -- I can't follow one individual

15   around through the duration of this event and see what

16   all their activities were.  But there were people that I

17   -- that I saw.

18             You know, they may have yelled, they may have

19   done other things, they may have held signs, but they

20   did not engage in any act of violence or any other

21   property destruction, from -- from my viewpoint, in the

22   time period that I saw them.  So, yeah, it would be

23   incorrect to say the entire crowd was engaged in -- in -

24   - in -- throughout this thing was engaged in -- in

25   property destruction and violence.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of LIEUTENANT JAMES D. WILLIAMS, taken on June 24, 2021

130

1    Q.   Were all of the people who were engaged in

2    property destruction and violence protesters?

3    A.   This is going to go down to my opinion,

4    because I have no way of knowing, direct knowledge,

5    their reasons for being down there.  But I would say the

6    -- the nature of these things, as I understand them, and

7    things that I've read over the years and whatnot, is,

8    no.  Some folks are down there more as opportunists, and

9    some of them enjoy -- I mean, they're down there to have

10   their version of fun.  So I -- I would say you -- that -

11   - that element would exist amongst this crowd, as well.

12   Q.   If you had received any directions from

13   Division Chief Thomas about how the curfew was to be

14   enforced, you would have followed them, right?

15   A.   I don't recall any directions, directly from

16   Chief Thomas.  There may have been, but I do follow

17   directions that are given to -- that -- that come from

18   my superiors.

19   Q.   Right.  And Division Chief Thomas, his

20   position was division chief of patrol, right?

21   A.   That is correct.

22   Q.   And so what was his job?

23   A.   He is the division chief of patrol.  He's in

24   charge of all patrol functions.  That includes patrol

25   officers, detectives that are attached -- investigative

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of LIEUTENANT JAMES D. WILLIAMS, taken on June 24, 2021

134

1  curfew charge is only to be used in relation to protest

2  activity,  either downtown or within -- elsewhere in the

3  city, right?

4      A.   Correct.

5      Q.   Okay.  And I'm showing you a document Bates

6  stamped Denver 13053.  Could you read this text message?

7  And let me know when you're finished.

8      A.   Okay.

9      Q.   All right.  So here, Commander Bancroft is

10 reiterating a message from Division Chief Thomas that,

11 "The emergency curfew is to be used only for enforcing

12 protest-related behavior regardless of location in the

13 city," right?

14     A.   Yes.

15     Q.   Okay.  And she emphasizes, "Do not let

16 officers cite for curfew, just for being out after 2100.

17 Unless they are actively engaged in protest activity,

18 some other charge of justification must be used."  Do

19 you see that?

20     A.   I do.

21     Q.   Okay.  Did you ever receive any instructions

22 from your commander or communicated down to you from

23 Division Chief Thomas, that was inconsistent with this

24 message?

25     A.   No.



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of LIEUTENANT JAMES D. WILLIAMS, taken on June 24, 2021
135

1          MR. HUSS:  Objection.  Foundation.  You can

2    answer.

3     A.    No, I don't recall anything that would -- I

4    would consider inconsistent with that message.

5     Q.    Okay.  Did you ever receive a message like

6    that?

7     A.    I can't recall whether I did or not.

8     Q.    Did you have any conversations with your

9    commander about how to enforce the emergency curfew?

10    A.    I don't recall.

11    Q.    Did you ever have any conversations or receive

12    any direction from Commander Phelan, about how to

13    enforce the emergency curfew?

14    A.    As to -- as to when to enforce it, yes.  I

15    mean, yeah, we were directed to go out and target

16    individuals that -- that -- that weren't complying with

17    the curfew or with the emergency curfew order and -- and

18    to enforce it.  So -- so, yes, I did receive direction

19    to enforce it.

20    Q.    Right.  So the directions that you received

21    regarding enforcement of the emergency curfew was to

22    enforce it against protesters who were violating the

23    curfew, correct?

24          MR. HUSS:  Objection.  Foundation, form.

25    A.    So, yeah.  I mean, the simple answer is, yes,

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of LIEUTENANT JAMES D. WILLIAMS, taken on June 24, 2021

136

```
 1   that was the purpose of the emergency curfew order to
 2   begin with.  The mayor's order to begin with.  So we
 3   went out and -- and did just that.
 4        Q.   Okay.  I'm going to pull up a video.  Just
 5   give me a moment.  I'm showing you Denver 5017, which is
 6   a body-worn camera from Officer Tanna Cunningham
 7   (phonetic).  It's going to -- I'm going to play it
 8   starting at 1:07:41 a.m. Greenwich Mean Time, which is
 9   7:07 p.m.  Do you see this figure here, this person in
10   the shorts and with his -- with their hands up?
11        A.   I do.  I do.
12        Q.   Okay.  I want you to -- I'm sorry?
13        A.   Where your cursor is at, I -- I do, yes.
14        Q.   Yes.  Okay.  I want you to just keep your eyes
15   on that individual, and then I'll ask you a question
16   about him after.
17                      (VIDEO PLAYS)
18        Q.   Let me pause it for a moment.  At 1:08:33, did
19   you see this canister of gas thrown into the street?
20        A.   I do.
21        Q.   Okay.  What was the -- can you tell what the
22   justification was for that?
23        A.   No.  I mean, you had me focused on the other
24   guy there, and -- and not the crowd's movements on the
25   other side.  But there was a good chunk of that video
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com