*AB Litigation Services*

*** CONFIDENTIAL ***

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Case No. 20-cv-01878-RBJ (consolidated with
20-CV-01922-RBJ-MEH)

---

ZOOM DEPOSITION OF ELISABETH EPPS
September 16, 2021

---

ELISABETH EPPS, et al.,

Plaintiffs,

vs.

CITY AND COUNTY OF DENVER, et al.,

Defendants.

---

APPEARANCES:

ARNOLD & PORTER KAYE SCHOLER, LLP
     By Patrick C. Reidy, Esq.
     70 West Madison Street
     Suite 4200
     Chicago, Illinois 60602
     312.583.2424
     patrick.reidy@arnoldporter.com
     Appearing on behalf of Plaintiffs
               and

ARNOLD & PORTER KAYE SCHOLER, LLP
     By Timothy R. Macdonald, Esq.
     1144 Fifteenth Street
     Suite 3100
     Denver, Colorado 80202
     303.863.2334
     timothy.macdonald@arnoldporter.com
     Appearing for Plaintiffs

Exhibit 38

1        Q       Fair enough.   Okay.   One of the things I

2    understand occurred was that you had physical

3    injuries related to exposure to gas or chemical

4    munitions; is that correct?

5        A       Yes.

6        Q       Okay.   And when we go over the events of

7    each of the days of the protest that form the basis

8    of your claims, we'll talk about it with more

9    specificity.   But what I wanted to initially talk

10   about is what your -- what that experience was like,

11   what was the nature of the injuries that happened

12   related to your exposure to gas or chemical

13   munitions.   Okay?

14       A       Okay.

15       Q       All right.   During the time that you were

16   at these protests in May and June of 2020, how many

17   times were you exposed to a gas or chemical munition

18   that you recollect?

19       A       Every day.

20       Q       Okay.   Including in June?

21       A       On May 28th, 29th, 30th.   I realized when

22   we answered earlier, I said June 1st, but I'm not

23   sure.   There are 31 days in May.   I would have to

24   have something -- the days in June are less distinct

25   to me.

1    three that stand out.

2        Q     Okay.  Understood.  It was -- is it fair

3    to characterize it as a broad community protest about

4    a variety of different issues?

5        A     It would not be fair for me to

6    characterize it as such.

7        Q     Okay.  What were you there to protest

8    specifically?

9        A     I was there in much more of an observatory

10   context at that point.

11       Q     Okay.  I understand.  All right.  So when

12   you had exposure to gas or chemical munitions or

13   chemical agents during the protests in May and June

14   of 2020, how long did the direct impact from your

15   exposure last?

16       A     How long did the impacts of the chemical

17   gaseous --

18       Q     Right.

19       A     -- last?  The thing that lasted the

20   longest of physical manifestations was definitely

21   related to my eyes.  Those impacts, particularly on

22   contacts and issues related to eyes, lasted through

23   the summer.

24       Q     Okay.  So when you say "issues related to

25   eyes," was your vision impacted?

1      A      Yes.

2      Q      How was your vision impacted?

3      A      The most -- the most direct impact was

4   that I could not get my contacts out, my contact

5   lenses.  And it was extremely painful to manipulate

6   them, to attempt to clean them.  They were supposed

7   to be worn for shorter periods.  Lots of issues

8   surrounding them and accompanying pain that was not

9   existent in my life before May 28th of 2020.

10      Q      I understand.  Do you wear contacts daily?

11      A      Or glasses.  But yes.

12      Q      Okay.  Do you wear extended-wear contacts,

13   or do you take them out every evening before you go

14   to bed?

15      A      I don't know how to answer the first part

16   of the question, but I take them out every night.

17      Q      So you wear contacts -- you put them in in

18   the morning, and you take them out at night on the

19   days that you wear contacts, generally?

20      A      Yes.

21      Q      When I say "extended wear," there's some

22   people that wear contacts for a month or several

23   months and sleep in their contacts.  And I was just

24   trying to understand if you fell under that category.

25           Do you?

*AB Litigation Services*

```
 1        Q      Okay.  Fair enough.  I assume that you
 2   have a driver's license?
 3        A      I do.
 4        Q      Do you drive a car occasionally or
 5   regularly?
 6        A      I do.
 7        Q      Have you had any impact on your ability to
 8   safely operate a motor vehicle as a result of
 9   anything that happened with your eyes and your
10   contact lenses?
11        A      Yes.
12        Q      Okay.  What?  How so?
13        A      Well, again, at the end of May, the
14   beginning of June, my -- the issues with my eyes were
15   acute enough that I didn't feel comfortable driving
16   regularly.  I would take Lyfts or Ubers much more
17   often specifically because of that.
18        Q      Okay.  Is it fair to say that today these
19   issues that you experienced with your eyes have
20   resolved, or would you disagree with that?
21        A      My vision may be worse, but I certainly
22   am, with contact or glasses, okay to drive now.
23        Q      Okay.  And when did that first become
24   true?  You know, how long after the protests did you
25   feel that the issue was sufficiently resolved that
```

*AB Litigation Services*

1  had a direct exposure and you're experiencing a

2  direct exposure to the chemical agent?

3      A     You know, when Denver Police was gassing

4  me or was gassing us, whatever the substance was,

5  there were not consistent breaks between this.  It's

6  not like I was given an opportunity to recover and

7  then the police gassed us again and then I recovered

8  and the police gassed us again.

9            And so in that way, you can say certainly

10  every day of those first few days, it's difficult.

11  They didn't give us time to recover before they

12  gassed us again.

13      Q     Got it.  So what you're saying, it felt

14  like more a continuous event than a series of

15  discrete events?

16      A     No, that's not what I'm saying.

17      Q     Okay.  Was it a series of discrete events?

18      A     No.  If those are the two binary options,

19  it's something in between the two.  It was both.

20      Q     Okay.

21      A     There were certainly discrete deployments.

22  But I was not able to, either contemporaneously or

23  after the fact, always assess, okay, I was gassed,

24  now I'm better, I was gassed again.  So not discrete.

25  Closer to continuous than discrete, but on a

*AB Litigation Services*

1    had hand sanitizer, pre wet wipes like -- maybe not

2    alcohol wipes but something of that sort, cleansing

3    hand wipes, wet wipes, like a bigger type cleaning

4    wipe that you use for a baby or something like that,

5    lotion -- small but lotion, some sort of latex or

6    latex-alternative gloves, maybe milk sometimes.  But

7    those would be the things.

8         Q    Okay.  Fair enough.  I appreciate that

9    description.  Okay.

10        A    And my phone.

11        Q    Right.  What kind of phone did you have in

12   May and June of 2020 before it was damaged?

13        A    It wasn't damaged.  They destroyed it.

14        Q    Okay.

15        A    It was an iPhone before and an iPhone

16   after.

17        Q    That's probably true.  Just the question

18   whether it was working or not.  Okay.

19             What model iPhone was it?

20        A    I don't remember.

21        Q    Do you remember the day that it was

22   destroyed?

23        A    Yes.

24        Q    Which day was that or which date?

25        A    Denver Police shot my phone on the night

1   of -- the Friday night.  So the Friday night in that

2   sequence.

3         Q     So that would be May 29th, right?

4         A     Yes.

5         Q     Okay.  All right.  Do you have an

6   understanding of what your phone was shot with or

7   what hit your phone?

8         A     I don't know how to tell you.

9         Q     All right.  It wasn't a bullet from a

10  firearm, was it?

11              MR. MACDONALD:  I'm going to object to the

12  form of the question.

13              MR. RINGEL:  And what's the evidentiary

14  rule that that question violates, Tim?

15              MR. MACDONALD:  What do you mean what

16  evidentiary rule does it violate?  You don't have

17  to --

18              MR. RINGEL:  I need the -- I don't

19  understand the form objection.  I want to see if I

20  can correct the question.  What evidentiary rule does

21  it violate?

22              MR. MACDONALD:  So it's not that your

23  question violates the rule, Mr. Ringel.  It's that

24  your question doesn't provide a definition of

25  "firearm."

1              MR. RINGEL:  So what is the rule of

2    evidence that I violated by asking the question?

3              MR. MACDONALD:  I didn't say you violated

4    a rule by asking a question.  Your question is vague,

5    and I'm entitled to assert a form objection to your

6    question.

7              MR. RINGEL:  I understand that.  But I'm

8    trying to correct my question.  So if you --

9              MR. MACDONALD:  I just described it.

10             MR. RINGEL:  -- were in court, you would

11   say "Objection, vague."  Is that what I'm

12   understanding?

13             MR. MACDONALD:  Among other things, that

14   is one thing I would say.  You asked her if it -- if

15   it came from a firearm.  Are you, Mr. Ringel,

16   describing rubber bullets as something -- something

17   shot from a rubber bullet as a firearm?  A

18   40-millimeter launcher, is that a firearm?  I don't

19   know.

20             MR. RINGEL:  I understand.  But you

21   understand that when you object in court to a

22   question, you have to object on the basis of it being

23   inconsistent with some provision of the Federal Rules

24   of Evidence, correct?

25             MR. MACDONALD:  Your question is vague.

*AB Litigation Services*

1    If you want to restate it or if you want to just

2    leave it, that's fine.

3                MR. RINGEL:  Okay.  I understand.  All

4    right.  Let me try again.

5        Q      (BY MR. RINGEL)  You don't have any idea,

6    sitting here today, what caused your -- well, let me

7    rephrase the question in a different way.

8                On May 29th, 2020, what did you observe

9    caused your phone to be destroyed?

10       A      Denver police officers shooting at me.

11       Q      What was shot?

12       A      I don't know.

13       Q      Okay.  Who shot whatever was shot?

14       A      One or more of the armed state gunmen.  I

15   don't know which one.

16       Q      What makes you conclude that they were

17   representatives of the Denver Police Department?

18       A      It's a -- I didn't get a lot of time

19   between the moment that my phone was shot and looking

20   at the particular group of officers who were closest,

21   closing in, but I recognized them to be -- I

22   recognized some of them to be wearing uniforms and --

23   that I associated with Denver Police.

24       Q      How far away were they from you when you

25   had this recognition that you just described?

*AB Litigation Services*

1    time.

2         Q     Okay.  All right.  I have seen a variety

3    of pictures that show bruises on various parts of

4    your body.  You suffered bruises as part of the

5    protests, I'm understanding; is that true?

6         A     It is.

7         Q     Do you have an understanding of what

8    caused those bruises?

9         A     Some.

10        Q     Okay.  So tell me what your understanding

11   is about what caused those bruises.

12        A     Denver Police -- or police, certainly

13   including Denver Police, firing things at me.

14        Q     Do you have any understanding of what was

15   fired at you?

16        A     Some.

17        Q     What is your understanding of either what

18   was fired at you or what hit you?

19        A     Some of the things felt very solid, solid

20   and acutely firm.  Some of the things felt like they

21   kind of exploded into like shards or pebbles and had

22   left a gray dust, which was different than the solid

23   things that didn't leave a dust.  Some of the things

24   felt more wet, mushy.

25        Q     Okay.  Do you have an estimate of the

1    number of times that you -- your body was hit with

2    one of these different projectiles that you've just

3    described to me?

4       A    It's hard, particularly because there were

5    times where the barrage was so not discrete, was so

6    consistent.  And it was again and again and again in

7    the same part of my body, so that even when I

8    undressed and tried to assess, I couldn't count

9    distinct bruises.  So, many.

10      Q    I understand.  Okay.  Do you think you

11   were hit with projectiles more than 50 times?

12      A    No.

13      Q    Okay.  So less than 50 times.  Do you have

14   any way to estimate?  I mean, are we talking 25 to

15   50?  Is that an appropriate range for us to be

16   talking about?

17      A    "Appropriate" is an interesting word

18   choice.  But it certainly wasn't single digits.

19      Q    Okay.  I'm not trying to characterize the

20   nature of the projectiles hitting you in my question.

21   I just want to get a word that we can agree on as to

22   what the range is.

23           So is it a correct range, an accurate

24   range to say somewhere between 25 and 50 projectiles

25   hit you, causing the bruises that we see in the

*AB Litigation Services*

1   photographs during the time that you were at the

2   protests in May and June of 2020?

3       A     I don't know that that's accurate.  But if

4   it's inaccurate, it's not terribly far off.

5       Q     Okay.  Fair enough.  Did anything cause a

6   bruise to your body other than you being hit by a

7   projectile?

8       A     When do you mean?

9       Q     Related to the protests.  So you have

10  pictures of yourself that have been produced in this

11  lawsuit.  I have seen them.  There are a lot of

12  bruises.  My question is, are all of those bruises,

13  from your understanding, caused by you being hit by a

14  projectile, or is there any other additional or

15  different thing that caused you to have a bruise?

16      A     All of the -- all of the bruises that are

17  in those pictures are from police shooting me with

18  things.

19      Q     Okay.  Did any police officer at any time

20  go hands-on to you during the time that you were at

21  the protests?

22      A     Yes.

23      Q     When?

24      A     On -- in the evening or the night of May

25  29th.

1          Q        Okay.

2          A        After -- there was an officer who shot me

3     with something one place.  Then there was later

4     experience where multiple officers were shooting and

5     hit me many times after that.  I was on a sidewalk,

6     and an officer put his hands on both me and my bag.

7          Q        Okay.  Do you know who that officer was?

8          A        Not by name, no.

9          Q        Okay.  Were you injured by the officer

10    going hands-on?

11         A        No.

12         Q        Were you injured by any other -- by any of

13    the officers other than through the exposure,

14    deployment of gas and chemical agents and these

15    projectiles that we've talked about?  Did you get

16    injured in any other way, any other mechanism cause

17    an injury to you physically?

18         A        Other than the officers releasing gas and

19    the officers firing things, no, not that I can think

20    of.

21         Q        Understood.  You know, I -- nobody grabbed

22    you and threw you to the ground, for instance?

23         A        Nobody grabbed me and threw me to the

24    ground.

25         Q        No police officer struck you with a baton?

1        A       That's right.

2        Q       No police officer punched you or kicked

3    you?

4        A       That's also right.

5        Q       You weren't -- no police officer deployed

6    a Taser on you?

7        A       Deployed a what?

8        Q       A Taser.

9        A       No.

10       Q       And no police officer used a firearm that

11   could kill you on you, correct?

12       A       Well, that's not correct.

13       Q       Okay.  Were you handcuffed at any time

14   during the protests?

15       A       No.

16       Q       Were you arrested at any time during the

17   protests?

18       A       No.

19       Q       My understanding is the cell phone and the

20   cost to retrieve your data, your damages related to

21   that are $700; is that correct?

22       A       Whatever I submitted through my counsel is

23   correct.

24       Q       Okay.  Fair enough.  Did you receive any

25   medical attention for any of the bruising that you

1    experienced?

2         A    Yes.

3         Q    Where did you -- what medical attention

4    did you receive for the bruising?

5         A    I mean, I didn't go to a paid health

6    facility, but community and neighbors tended to me.

7         Q    What did you do to --

8              THE DEPONENT:  I need to plug this in.

9              MR. RINGEL:  Oh, sure.  I'm sorry.  Go

10   ahead.

11             THE DEPONENT:  One second.  Sorry.  Pardon

12   me.

13             MR. RINGEL:  No problem.

14        Q    (BY MR. RINGEL)  When you say you got

15   medical care from community and neighbors, what kind

16   of medical care did you get for the bruises?

17             THE DEPONENT:  I need just one second.

18             MR. RINGEL:  Why don't we take a break for

19   five minutes.  We're about at a time where that makes

20   sense.  And then you can deal with that and we can

21   all have a little bit of a break.  Does that work for

22   everybody?

23             THE REPORTER:  Yes.

24             (Recess from 2:18 p.m. to 2:25 p.m.)

25        Q    (BY MR. RINGEL)  When we broke, we were

1    talking about medical care that you received from

2    sort of neighbors in the community.  Can you describe

3    what that -- for the bruises that you experienced.

4              Can you describe what that -- the nature

5    of that medical care was?

6        A    Yes.  I -- actually I lost track of the

7    question, but I was referring to neighbors in terms

8    of both assisting with dealing with the chemical

9    things and the bruises.

10       Q    That's fine.  So let's generally talk

11   about it.  What kind of medical care or assistance

12   did you get from neighbors related to both the

13   exposure to chemical agents and the bruises, as sort

14   of a general matter?

15       A    On the first couple of nights, there were

16   multiple times where a neighbor, a stranger, when I

17   was struggling to breathe, pulled me in, wet my eyes,

18   covered my eyes.  Primarily acute things related to

19   being able to breathe, helped me dig out inhalers on

20   one of the nights, things like that.

21       Q    Do you -- at the time did you live in a

22   place where there were neighbor -- was it a

23   multifamily-living arrangement, a multiperson living

24   arrangement, like an apartment or a condominium or a

25   townhouse or something like that, where neighbors

1  2020, at that time, were you using iCloud backup or

2  some other backup mechanism to retain your data?

3      A    Not on purpose.

4      Q    Okay.  Were you able to retain some of

5  what was on your phone through that kind of

6  mechanism?

7      A    When I got a new phone, some things -- and

8  it was so random and spotty, what things.  Like some

9  things were there.  So I concede my lack of knowledge

10 about the tech, but I didn't put it there.

11          So maybe I guess is the answer.  Some

12 things were there.  The new phone was not completely

13 blank, but it was certainly not -- didn't have, you

14 know, correspondence and photos and calendar entries.

15     Q    Understood.  So what types of things were

16 on the new phone that sort of, for lack of a better

17 word, migrated from the old phone?

18     A    You said what types of things?

19     Q    Yeah.  What are we talking about?  Apps?

20 Text messages?  I don't know, things you saved on

21 your phone?  I don't know, whatever.  Contacts?

22     A    It's an interesting question just because

23 it was spotty.  I remember noticing that I had some

24 texts from 2011, from first move -- but -- with

25 people who I had been in communication with but not

1    were you doing specifically?

2         A     What I was doing specifically was

3    documenting, being present, being a witness, very

4    much wanting to be in fellowship and in community and

5    share grief and energy.  So fellowshipping.

6         Q     Okay.  Were you -- I mean, I understand

7    you were at the location of the protests, but were

8    you doing anything that would be -- that you consider

9    protest activity other than physically being there?

10        A     Could you -- I'm just not sure what you're

11   asking.

12        Q     Sure.  I mean holding a sign, chanting --

13        A     I --

14        Q     -- singing.  I mean, one can think of all

15   sorts of different things that might be considered

16   protest activity.  And that's why I tried to ask the

17   question broadly so that you could tell me what you

18   were doing that might be considered protest activity.

19        A     I was not holding a sign.  I certainly

20   intermittently participated in chants.  I spend a

21   good bit of my life at the capitol, but there was no

22   reason to be there at that time on that night but for

23   protest, that -- holding space is what we call it.

24   But yes.  So yes to chanting.  No to signs.

25        Q     Okay.  Were you livestreaming the event on

1    that evening?

2          A      I was streaming -- or I did stream, yes.

3          Q      Okay.  When you are at a protest -- well,

4    let me just ask it more specifically.  On May 28th,

5    2020, do you have -- did you turn on your livestream

6    and then just start livestreaming and sort of

7    videoing what's happening around you and talking

8    about it, or did you do something else?

9          A      That is a not inaccurate description:

10   Streaming, talking to folks, narrating.

11         Q      I mean, I get the sense that your role, as

12   you saw it, was to sort of be a witness of the event

13   and to describe for people that are watching the

14   stream what the experience is like and what's going

15   on and what's happening to the people at the event;

16   is that correct?

17         A      That's certainly part of it.

18         Q      Okay.  And then another part of it is for

19   you to be there so that you can act in fellowship

20   with the other protestors?

21         A      That's certainly part of it too.

22         Q      Okay.  What else is part of it?  What am I

23   missing?

24         A      I do understand the desire, for lack of a

25   better word, to sort of categorize, but it's just --

1   it's a much more organic, lived experience than that.

2   It was not nearly as intentional as now I am

3   documenting, now I am in fellowship with protestors.

4   It was this thing has happened again.

5           So what you're missing is something that

6   even I -- is difficult to articulate.  It's just much

7   more organic.  I wasn't terribly aware of which way

8   I'm orienting, necessarily, my camera, or . . .

9       Q    I understand.  It sounds like what I'm

10  missing is since you're trained as a lawyer, you

11  understand lawyers tend to try to categorize and

12  intellectualize things.  What I'm missing is maybe

13  the feeling of the need to be at that location at

14  that moment of time because of what happened in

15  Minneapolis.

16      A    Well, that's distinct from the streaming.

17  I thought you were asking about what you were missing

18  about why I was streaming.  But that's not

19  inaccurate, what you just said.  That was a part of

20  it too.

21      Q    Okay.  No, I was trying to get a sense of

22  why you were at the protest generally, not just the

23  streaming.  But I get it.  That makes sense.  All

24  right.

25          So when you say in the next sentence,

*AB Litigation Services*

1   There were about 100 to 200 protestors in the area

2   with little activity occurring, when you say "the

3   area," what geographic area are you talking about?

4       A    I'm describing my vantage, looking out

5   from -- what I'm calling a landing is where the

6   materials change, from whatever the black material is

7   to the -- a tanner sort of material.  That's what I'm

8   calling the landing.

9            And so what I'm describing in that

10  sentence is, from my vantage, looking out, seeing a

11  hundred or maybe a couple hundred people, little

12  activity, meaning the formal shared rituals of

13  protest that you named like singing or chanting.  It

14  was very organic and raw and not -- not, amongst the

15  protestors, tense or -- yeah.  That's what I mean by

16  little activity.

17      Q    Okay.  That makes sense.  Now, the next

18  sentence talks about police officers deploying

19  teargas.  Where were the police officers in

20  relationship to where you were who deployed teargas,

21  if you know?

22      A    Well, that's part of what was so

23  terrifying, is they certainly weren't close enough

24  that I could see an officer with something that I

25  would perceive to be about to be teargas.  And yet

*AB Litigation Services*

1   very aware of police officers being around, but

2   not -- they weren't one, two, three level of sort of

3   the people around me.

4        Q     How far away from you were police

5   generally when you first understood that teargas had

6   been deployed?

7        A     How far were they when I first understood

8   that it had been deployed.

9        Q     Or immediately before or anything to --

10  I'm just trying to -- I mean, I want to get a

11  sense -- you were there.  I wasn't.  So at the

12  moment, you know, in any way that you can describe

13  it, how far away were the police from you at this

14  point in time that you're describing in Event 1?

15       A     I would really need to see to be able to

16  try to estimate a distance.  The best way I could

17  describe how far away they were is -- I was genuinely

18  surprised.  I didn't see -- they weren't close

19  enough -- they weren't giving a warning, you know,

20  physically or audibly.

21             I don't know how to tell you just how far

22  they were.  Close enough to hurt us, not close enough

23  to be -- to warn us.

24       Q     Okay.

25       A     To warn me.

*AB Litigation Services*

1  Q  And distance is hard.  I understand that.

2 So let's talk about it in geographic terms.  Were the

3 police somewhere geographically that you can help me

4 describe?  You described yourself being on this

5 landing, and I understand where that is.

6    Were the police on the capitol grounds?

7 Were the police between the sidewalk and 14th Street?

8 Were the police on 14th Street?  Were the police

9 across on the other side of 14th Street?  Where were

10 the police, from a geographic perspective?

11  A  There were certainly police on the capitol

12 grounds.  I don't know where the police officers who

13 unleashed that round of gas were.  It was, by design,

14 disorienting.  But I don't know beyond capitol

15 grounds.

16  Q  Fair enough.  Did you observe the manner

17 in which the teargas was deployed?

18  A  What do you mean by "the manner"?

19  Q  So you understand that there are different

20 ways that teargas can be deployed, right?

21  A  I don't know what you mean.  Like it

22 wasn't from above, like sprayed on us from a

23 helicopter or something like that.  It wasn't that

24 way.  It was certainly ground level, if that's what

25 you mean.

*AB Litigation Services*

1     Q     Fair enough.  So one way that teargas can

2  be deployed is a canister of teargas is thrown and

3  then it releases the teargas.  Is that what occurred?

4  Is that something that you observed in Event

5  Number 1?

6     A     Even as we're using this term "teargas," I

7  don't know what the gas was or the specific way that

8  it was deployed.  It was that alarming.  There was no

9  assessment of, Here's incoming this thing.

10     Q     I get it.  Understood.  Do you have any

11  way to estimate the volume of the teargas in terms

12  of, you know, its density or extent or how many

13  people were affected by it?  Anything along those

14  lines?

15     A     Estimating density, no.  Estimating number

16  of people, it had to be a hundred percent of us in

17  the area, because I was -- everyone.  I would imagine

18  everyone was affected by it.

19          So the -- how to estimate or measure, I

20  really can only sort of reflect upon the experience

21  as opposed to, for example, the next night.

22     Q     Okay.  So when you're reflecting about it

23  as opposed to the next night, tell me what you mean.

24     A     Whatever the police unleashed on us, you

25  know, without warning, without -- without warning on

1    that broke that mask was from Denver Police?

2         A    How do I know?

3         Q    Yeah how do you know?  You've reached that

4    conclusion.  What is the basis of that conclusion?

5         A    It's -- I base that conclusion on

6    materials provided by the city.

7         Q    Okay.  What materials specifically?

8         A    That I'm aware of the name of a person

9    who -- you know, you're right.  You said draw

10   conclusion.  I think that person was with Denver

11   Police.

12        Q    Okay.  What is the name of the person that

13   you've concluded fired the projectile at you that

14   broke the mask that Ms. Frickle gave you that you

15   wore on May 30th?

16        A    I believe the name of the person who shot

17   me in my face and broke the mask, that their last

18   name is Valentine.

19        Q    Okay.  All right.  I understand.  Okay.

20   Why don't you read Event 2 to yourself, and then I

21   want to ask you about that.

22        A    Okay.

23        Q    Okay.  So the location of this is on the

24   west side of the capitol, which is distinct from

25   where you were at Event Number 1, right?

*AB Litigation Services*

1    impacted by the projectile, right?

2        A    I'm not -- yes.  I'm not exactly sure

3    where I was in crossing.  But that's fair.  That's

4    close.

5        Q    All right.  Describe for me what your

6    experience was at that -- with respect to Event

7    Number 3.

8        A    I -- my experience.  I had recently -- I

9    had just recently got downtown.  And behind and to my

10   sort of left were a bigger number, more protestors.

11   And ahead of me on a hill, slight hill of the side of

12   the capitol were some police officers.

13           And my experience in that moment, that was

14   a moment of documenting, of -- it felt kind of

15   surreal to see them.  So I'm just appreciating what

16   I'm watching.  I'm filming.  I was walking relatively

17   slowly as opposed to my usual gait.  I don't think I

18   was talking much.  And one of the officers went to a

19   knee and shot at me with something.

20       Q    Do you think that the officers generally

21   could tell that you were filming?

22           MR. MACDONALD:  Object to the form.

23       A    I would have no way to know if those

24   officers knew that I was filming.  I can't imagine

25   that they couldn't see that I was walking with a

*AB Litigation Services*

1   14th were you up the block of Lincoln?  In feet or

2   yards or part of the block, in any way that you can

3   describe it.

4        A      It would have been approximately the first

5   half of the block.

6        Q      Okay.  Are you in the street, or are you

7   on one of the sides of Lincoln?

8        A      When the police shot my phone, I was in

9   the street.

10       Q      Okay.  Were you by yourself or were there

11  others around you?

12       A      There were others around me.

13       Q      Do you have any sense of how many people

14  were around you?

15       A      Yes.

16       Q      How many people were around you?

17       A      One, in my very immediate vicinity.

18       Q      Okay.  Was that Mr. Colter?

19       A      Yes.

20       Q      Okay.  Was there anybody else around you

21  and Mr. Colter and sort of a crowd?

22       A      Not within a couple of arms' lengths.  But

23  at maybe two to three arms' lengths, then there were

24  a few people.  And then at a further distance, there

25  were many more people.

1     Q     Okay.

2     A     So I was set apart but not alone.

3     Q     Do you have a sense of where the shot came

4  from that hit your cell phone?

5     A     Yes.

6     Q     Where did it come from?

7     A     From a police officer.

8     Q     I understand.  But what was the location

9  of that police officer?

10    A     On Lincoln, more -- is this oriented where

11 north is up on the screen?  So on Lincoln but more

12 north.

13    Q     So why don't we say on Lincoln towards

14 14th?  Was he -- was the police officer that you

15 believe shot you -- shot and hit your cell phone

16 closer to 14th on Lincoln from where you were?

17    A     I mean, I don't believe it.  He shot it.

18          But yes.

19    Q     Was he on the same side of 14th as you

20 were, or was he on the other side of 14th?

21    A     I should -- if I said "he," then I should

22 have been more careful because I don't know that,

23 but --

24    Q     Fair enough.  The police officer.  Let's

25 do that.  Does that make sense?  The officer?