# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

Civil Action No. 20-cv-1878-RBJ

ELISABETH EPPS, *et al.,*

Plaintiffs,

v.

CITY AND COUNTY OF DENVER, *et al.,*

Defendants.

## DECLARATION OF EDWARD MAGUIRE

Pursuant to 28 U.S.C. § 1746, I, Edward Maguire, declare as follows:

1. I am over 18 years old and competent to make this declaration.

2. My expert reports in the above-captioned case are attached hereto.

3. The contents of my reports are true and accurate to the best of my knowledge, and the opinions offered therein are each to a reasonable degree of professional certainty. If called to testify, I would testify consistently with the opinions offered in my reports.

I declare under penalty of perjury that the foregoing is true and correct.

February 10, 2022  
Date

_____  
Edward Maguire

Exhibit 51

IN THE UNITED STATES DISTRICT COURT
OF THE DISTRICT COURT OF COLORADO

Civil Action Nos. 1:20-cv-01878-RBJ & 1:20-cv-01922-RBJ-MEH (consolidated)

ELISABETH EPPS, *et al.*

Plaintiffs,
v.
CITY AND COUNTY OF DENVER, *et al.*,

Defendants

---

# EXPERT REPORT OF DR. EDWARD R. MAGUIRE

## Experience and Qualifications

1. I am a Professor of Criminology and Criminal Justice at Arizona State University, where I also serve as director of the Public Safety Innovation Lab. I earned a Ph.D. in criminal justice from the State University of New York at Albany in 1997. I have been involved in studying, teaching, training, providing technical assistance for, and collaborating with police for more than 25 years. My work focuses primarily on policing and violence. One of the areas I specialize in is the study of policing crowds, including protests.

2. I have authored or edited seven books or monographs, and published more than 100 scientific journal articles and book chapters on a variety of criminal justice issues. Most of that work focuses on policing and violence, with much of my recent work focusing specifically on policing crowd events and protests.

3. In January 2020, I published a guidebook for police entitled *Policing Protests: Lessons from the Occupy Movement, Ferguson, and Beyond.*[1] The guidebook presents a summary of scientific evidence from criminology and social psychology on crowds and the police response to crowd events. It also provides an analysis of the police response to Occupy Wall Street and other protests by law enforcement agencies in the United States and abroad. Finally, the guidebook provides a detailed framework for handling police protests in a manner that seeks to prevent conflict and violence and minimize harm to protesters, police, and bystanders. The research featured in the guidebook was funded by the Office of Community Oriented Policing Services, a component of the United States Department of Justice.

---

[1] Maguire, E.R., & Oakley, M. (2020). *Policing Protests: Lessons from the Occupy Movement, Ferguson, and Beyond*. New York: Harry Frank Guggenheim Foundation. https://www.hfg.org/s/Policing-Protests.pdf

4. I also serve as Chair of the Police Executive Research Forum's ("PERF") Research Advisory Board (the "Board"), which is composed of a group of researchers, and law enforcement practitioners who advise PERF's efforts to advance police research and innovation. The Board assists PERF's staff in identifying potential research topics; coordinating research efforts with other organizations; assisting with human subjects review; and disseminating findings to the academic and policing professions. As part of my duties as Chair of the Board, I engage in communications with law enforcement leaders throughout the country in identifying and helping to implement evidence-based practices associated with leadership and management, community policing, patrol and criminal investigation practices, and crowd management.

5. In addition, I serve as the senior researcher for law enforcement for CrimeSolutions.gov, an effort coordinated by the National Institute of Justice, a component of the U.S. Department of Justice. The purpose of the website is to provide policymakers and practitioners with an easy-to-follow resource for understanding scientific evidence associated with improving criminal justice practices and reducing crime and violence. My role is to coordinate all reviews of research associated with law enforcement and policing for this U.S. government website.

6. Much of my research and consulting in recent years has focused on crowd management and the police response to protests. I am currently working with the Columbus Police (OH) and the Phoenix Police (AZ) assessing their responses to the protests following the death of George Floyd and providing recommendations for reform. I am performing similar services for the Seattle Office of the Inspector General regarding the Seattle Police Department's response to protests. I was also commissioned by the Inter-American Development Bank to write a guide for police in Latin America and the Caribbean on appropriate police responses to protests. I have also been invited to speak or provide training on policing crowd events for police in four countries (Australia, Honduras, the U.K., and the U.S.).

7. My experience, training, and background is more fully described in my C.V., attached as Exhibit A. A list of materials I was provided for review is attached as Exhibit B. I have not testified at trial or deposition in the last four years.

8. My opinions are based upon the totality of my specialized knowledge, experience, and my expertise in the field of criminology generally, and policing and violence more specifically. My expertise has been developed during my decades of research of and engagement with law enforcement and my continued experience as a professor, researcher, author, and consultant to governments and law enforcement agencies. Moreover, my expertise is based on an intimate familiarity with standards of training and police practices that have been examined and/or adjudicated in case law; departmental policies and procedures; applicable federal, state and local police training programs; model policies; and training and research from scholars and police professional organizations.

**Relevant Background Facts**

9. On May 25, 2020, Minneapolis police officers arrested George Floyd after receiving a complaint that he had used counterfeit money. Officer Derek Chauvin knelt on Mr. Floyd's neck until he stopped breathing and died. Beginning on May 28, 2020, protests over the death of Mr. Floyd began in Denver. During the first day of the protests, the Denver Police Department ("DPD") was solely responsible for monitoring and managing the protests. In the days that followed, outside law enforcement agencies were brought in at the request of DPD to assist in crowd management and control.

10. The purpose of this report is to examine and assess the crowd management and crowd control policies, training, strategies, and tactics of the Denver Police Department ("DPD") at the time of the George Floyd protests (referred to herein as "GFP") as compared to nationally accepted police standards and practices at the time of the GFP. For purposes of this report, my analysis will focus on DPD policies, training, strategies and tactics that were in place at the time of the GFP, or that occurred during the GFP, defined here as the first six days of protests that occurred from May 28, 2020 through June 2, 2020.

**DPD Policies, Training, Strategies, and Tactics**

**A. Insufficient and Outdated Training in Crowd Management and Control**

11. Below is a table listing the training materials produced by the City of Denver in this case, which lists the title of the document, the date of creation/publication (where available), and the purpose of the document. This table is not intended to analyze the documents, but to set forth the scope of documents that helped inform the analysis to be undertaken in this section of the report.

| Title and Bates Number | Date | Purpose |
|---|---|---|
| Denver Police Department Crowd Management Manual - DEN000068 | February 13, 2019 | The manual serves as a guide for crowd management and control operations. |
| Crowd Management and Control for Supervisors Part 1 and Part 2 - DEN000235 | May 14, 2008 | This presentation covers protestor tactics and police preparation for civil disturbance. |
| Chemical Agents: O.C. Pepperspray - DEN000317 | September 2008 | A presentation detailing what are chemical agents and when can they be used in the field. |

3

| | | |
|---|---|---|
| 40mm Operator Course - DEN000336 | November 2019[2] | Course that must be completed and refreshed by Denver Police Department officers who become certified to utilize 40mm systems. |
| 40mm Operator Course Outline - DEN000414 | November 2019[3] | Outline for the instructor presenting the 40mm Operator course training. |
| 40mm Operator Course - Safety Brief for Practical Qualification | | Outline detailing safety instructions for the practical exercise required to complete certification for the 40mm Operator course training. |
| 40mm Operator Course - Written Exam - DEN000418 | November 2019[4] | Written examination required to complete certification for the 40mm Operator course training. |
| 40mm Operator Course - Written Exam Answers - DEN000422 | November 2019[5] | Answers to written examination required to complete certification for the 40mm Operator course training. |
| 40MM DIRECT IMPACT® ROUND OC, CS, INERT & MARKING - DEN000426 | September 2018 | Product and projectile specifications for 40mm Direct Impact rounds. |
| 40MM eXact iMpact™ SPONGE ROUND - DEN000427 | September 2018 | Product and projectile specifications for 40mm eXact iMpact sponge rounds. |
| 40MM 250-SHOT TRAINING KIT - DEN000428 | September 2018 | Document summarizing the materials and devices included in the 40mm 250-Shot system kit. |

---

[2] This document is labeled as "Version 11.19", and adopts some of the structure set forth in the Crowd Management Manual.  Accordingly, I have dated this as November 2019.

[3] This document is labeled as "Version 11.19", and adopts some of the structure set forth in the Crowd Management Manual.  Accordingly, I have dated this as November 2019.

[4] This document is labeled as "Version 11.19", and adopts some of the structure set forth in the Crowd Management Manual.  Accordingly, I have dated this as November 2019.

[5] This document is labeled as "Version 11.19", and adopts some of the structure set forth in the Crowd Management Manual.  Accordingly, I have dated this as November 2019.

| Document | Date | Description |
|---|---|---|
| 40MM MULTI SHOT, PUMP ADVANCE LAUNCHER, 5" CYLINDER - PENN ARMS Product Specification Chart - DEN000429 | | Document describing the product specifications of the Penn Arms' 40mm Multi Shot, Pump Advance Launcher. |
| 40MM SINGLE SHOT LAUNCHER COMPACT - PENN ARMS Product Specification Chart - DEN000430 | | Document describing the product specifications of the Penn Arms' 40mm Single Shot Launcher Compact. |
| 8 Hour Schedule (Redacted) - DEN000432 | Post-March 2019[6] | Schedule detailing a training seminar related to field management and field force deployment. |
| Crowd Control Leadership Training (Redacted) - DEN000433 | | Presentation related to crowd control tactics, commands, and equipment. |
| Practice Handout (Redacted) - DEN000580 | | Handout which instructs training exercises. |
| DPD Crowd Control - Online Refresher Training (Redacted) - DEN000583 | | |
| Pepperball Operator Course - DEN000584 | | Presentation detailing the use and policies surrounding pepperball systems. |
| PepperBall Operator Practical Qualification - DEN000672 | | Safety brief detailing process for practical qualification for Pepperball Operator course. |
| PepperBall Operator Written Exam - DEN000675 | | Written exam for Pepperball Operator course. |
| PepperBall Operator Written Exam - Answer Key - DEN000678 | | Answer key to written exam for Pepperball Operator course. |
| Full Tactical Carbine Pepperball System User Manual - DEN000682 | | User manual for the Full Tactical Carbine pepperball system. |
| PepperBall FTC Specification Sheet - DEN000691 | | Specification chart for PepperBall Full Tactical Carbine system. |
| PepperBall Accessories (13 CU. IN. HPA) Specification Sheet - DEN000692 | | Specification chart for pressure gauge and gas |

---

[6] I will note that the document references the Hong Kong protestor tactics. Assuming this is in reference to the Hong Kong anti-extradition bill protests, then this training schedule would date to a point in time after March 2019.

| | | |
|---|---|---|
| | | cannister device accessaory for PepperBall system. |
| PepperBall Accessories (Scuba Tank) Specification Sheet - DEN000693 | | Specification chart for scuba tank accessory for PepperBall system. |
| PepperBall Projectile Round Live-X Specification Sheet - DEN000694 | | Specification chart for Live-X ammunition for PepperBall system. |
| PepperBall Projectile Round Inert Specification Sheet - DEN000695 | | Specification chart for Inert ammunition for PepperBall system. |
| DEN000696 | | |
| Crowd Control Recruit Training (Speaker Notes) - DEN000696 (Redacted) | | Presenter annotated version of presentation covering crowd control tactics and protocols. |
| Crowd Control Recruit Training - DEN000823 (Redacted) | | Presentation covering crowd control tactics and protocols. |
| Denver Police Department Training Bulletin - June 6, 2019 (Updated June 10, 2019) - DEN001909 | June 10, 2019 | Training bulletin published on June 10, 2019 under the name of Chief Paul M. Pazen regarding First Amendment and Free Speech protections. |
| Denver Police Department Training Bulletin - August 16, 2018 - DEN001912 | August 16, 2018 | Training bulletin published on August 16, 2018 under the name of Chief Paul M. Pazen regarding First Amendment considerations. |

12. As evidenced by the above table, certain of the key training materials that were produced by the City of Denver as the controlling documents to guide the DPD response to the GFP are dated, with some not having been updated since 2008. Significant advances in our understanding of policing protests and crowd psychology have occurred in recent years. The use of dated training materials, as I will illustrate below, results in the use of outdated and inappropriate strategies and tactics for policing protests. Moreover, even when the training materials have been updated more recently, many of them contain content that is outdated and inconsistent with nationally accepted standards and practices. More alarmingly, as I will show below, they are also inconsistent with the DPD's own policies. These training materials need to be updated and aligned with nationally accepted standards and DPD policies.

13. The two principal documents outlining DPD policies relevant to this case are the *Operations Manual* (DEN000950-001754) and the *Crowd Management Manual* (DEN001755-1798). The *Operations Manual* is more than 800 pages long and covers policies and procedures governing a

wide array of DPD operations. For instance, it includes general policies and procedures associated with using force, making arrests, managing traffic, investigating crimes, and many other topics. The *Crowd Management Manual* is 44 pages long and focuses specifically on policies associated with handling crowd events, including protests.[7]

14. The DPD's *Crowd Management Manual* divides the police response to crowds into two categories: crowd management, and crowd control. The DPD's *Crowd Management Manual* defines crowd <u>management</u> as "Techniques used to address lawful public assemblies before they begin and during the event for the purpose of guaranteeing a safe and lawful assembly. This can be accomplished in part through coordination with event planners and group leaders, permit monitoring, past event critiques and future planning" (p. 5).

15. The *Crowd Management Manual* defines crowd <u>control</u> as "Techniques used to protect lawful public assemblies and free speech activities and prevent unlawful conduct. The techniques could include a display of formidable numbers of police officers, crowd containment tactics, crowd dispersal tactics, and individual or group arrest procedures" (p. 6). The *Crowd Management Manual* notes, "When possible, crowd management tactics will be used prior to implementing crowd control tactics. Crowd control tactics are generally intended for use when efforts to manage a crowd or event have been unsuccessful or simply require a greater level of intervention. Some situations, both planned and spontaneous, may require a combination of management and control" (p. 4). Although I do not use the crowd management/crowd control dichotomy in my guidebook on policing protests, the framework that I recommend based on the research evidence is consistent with the idea that some crowd events require the simultaneous use of crowd management and crowd control approaches.

16. Consistent with best practices in policing, the DPD *Crowd Management Manual* states that "the overriding goal of police actions at the onset of civil disturbance problems is the de-escalation of violence" (p. 8). A key element of de-escalation is communication and dialogue between police and crowd members. The *Crowd Management Manual* emphasizes this point, noting, "The preferred use of uniformed and non-uniformed police officers is to communicate as much as possible to demonstrators and their leaders that police officers are present in order to facilitate the peaceful and lawful expression of First Amendment rights." In my opinion, the *Crowd Management Manual* does a good job of setting the tone for an appropriate police response to crowd events, one that relies heavily on "communication, mediation, and negotiation" (p. 11).

17. Unfortunately, the aspirational language used in the *Crowd Management Manual* to emphasize the importance of de-escalation and communication strategies for avoiding conflict and violence does not match the content of the training materials I reviewed. Those training materials focus primarily on crowd control rather than crowd management. They focus very little

---

[7] The copy of the DPD *Crowd Management Manual* provided by the city contained redacted text. As a result, I was unable to review the full document. Portions of the text on pp. 9-11 and pp. 25-26 were redacted. In addition, the full text of pp. 27-41 was redacted.

on de-escalation, communication, mediation, or negotiation. Therefore, they set the tone for officers to respond to crowd events in a manner that, consistent with their training, focuses primarily on crowd control. Below I will outline some examples in which the training provided to DPD officers on crowd management and control is deficient relative to nationally acceptable police standards and practices.

18. Current best practices in crowd management and control are based heavily on research evidence from psychology, particularly research on crowd psychology and behavior. Understanding how crowds think and behave is useful for managing them and avoiding unintended consequences, including conflict and violence. The guidebook that I authored on policing protests notes that some protest policing practices "are consistent with current perspectives from crowd psychology while others are more consistent with older perspectives in crowd psychology that have since been discredited."[8] Basing police practices on an inaccurate or outdated understanding of crowd psychology "is a recipe for conflict and can endanger both crowds and the police."[9]

19. Research evidence from crowd psychology is useful for understanding how conflict evolves between police and crowds. When police choose to engage primarily in crowd control strategies, particularly the use of indiscriminate force -- rather than focusing on crowd management approaches like de-escalation, communication, mediation, and negotiation -- they tend to escalate conflict and increase the likelihood that crowds will react in a rebellious manner. This is especially true if police use force against an entire crowd in response to the misbehavior of a subset of its members. Under such circumstances, "the entire crowd will unite around a sense of opposition to the police."[10]

20. This research evidence has direct implications for policing protests. Consider the following quote from Her Majesty's Chief Inspector of the Constabulary in England and Wales: "Indiscriminate use of force by the police can create a sense of unity in the crowd through a common perception of the illegitimacy of police action and corresponding opposition in response. Perceptions of police legitimacy are critical because they affect the crowd's internal dynamics, facilitating or undermining the ability of those seeking conflict to exert social influence over others in the crowd. Consequently, there is an increase in the numbers within the crowd who perceive conflict against the police as acceptable or legitimate behaviour, thereby empowering those prepared to engage in physical confrontation with the police. In this way, the

---

[8] Maguire & Oakley (2020, p. 46).

[9] Maguire & Oakley (2020, pp. 46-47).

[10] Maguire & Oakley (2020, p. 50).

8

crowd is drawn into conflict even though the vast majority had no prior intention of engaging in disorder" (p. 86).[11]

21. These issues are especially salient when the protests are about the police. In this case, the protests were focused primarily on the death of George Floyd specifically and the police use of excessive force against minorities more generally. As noted in my guidebook on policing protests, when police are the object of protests, thoughtful crowd management strategies are especially important because "efforts to block protests will inevitably strengthen the perception that police are unjust and illegitimate."[12] In such circumstances, the use of de-escalation, communication, mediation, and negotiation – as outlined in the DPD's *Crowd Management Manual* – is especially important for calming tensions, reducing conflict and violence, and minimizing harm to police officers and the public.

22. The DPD's "Crowd Control Recruit Training" course (DEN 696-822) focuses primarily on crowd control rather than crowd management. Most of the material in this course focuses on field force tactics such as formations, arrests, and the use of force. Crowd psychology is covered briefly but the coverage of this topic is dated, incomplete, and inaccurate. For instance, page 5 lists contagion as a source of escalation in crowds, but research has discredited this idea long ago.[13] Page 6 focuses on intelligence and planning, but misses the importance of identifying potential allies who can partner with the police to help de-escalate tensions from inside the crowd. Page 19 covers different types of protesters. The typology it presents is inconsistent with research evidence on the composition of protest crowds. Finally, crowd management principles are covered on just *one* page in this 127-page document. The imbalance in coverage of crowd management and crowd control in this course sends the unfortunate and inappropriate message that crowd control is the dominant tool police should use in responding to protests.

23. The DPD's "Crowd Management and Control for Supervisors" (DEN 235-316) course has not been updated since 2008. The training is outdated, poorly organized, inconsistent with the DPD's *Crowd Management Manual*, and does not reflect current nationally accepted protest policing standards and practices. It covers very little of the crowd management strategies described in the *Crowd Management Manual* and focuses primarily on crowd control tactics such as platoon movements, formations, arrest teams, and use of force. It provides no real coverage of crowd psychology and the factors that tend to escalate conflict and violence during crowd events. Based on the course content, a supervisor taking this course would naturally conclude that crowd control tactics -- including the use of force and less lethal weapons – are

---

[11] Her Majesty's Chief Inspector of the Constabulary (2009). *Adapting to Protest: Nurturing the British Model of Policing*. https://www.justiceinspectorates.gov.uk/hmicfrs/media/adapting-to-protest-nurturing-the-british-model-of-policing-20091125.pdf

[12] Maguire & Oakley (2020, p. 62).

[13] Reicher, S., Stott, C., Cronin, P., & Adang, O. (2004). An integrated approach to crowd psychology and public order policing. Policing: An International Journal of Police Strategies and Management, 27(4), 558-572.

9

much more important than the crowd management strategies contained in the *Crowd Management Manual* when handling crowd events, including protests.

24. The DPD's "Crowd Control Leadership Training" (DEN 433-579) course contains some of the same material covered in the previous two paragraphs. Like the other courses, it is outdated, poorly organized, inconsistent with the DPD's *Crowd Management Manual*, and does not reflect current nationally accepted protest policing standards and practices. Its coverage of "types of protesters" is misleading and inconsistent with what we know from crowd psychology. Its coverage of intelligence and planning is incomplete and does not account for the importance of identifying potential allies who can help de-escalate tensions from within the crowd. It focuses primarily on crowd control tactics such as movements, formations, arrest teams, and use of force. Once again, based on the course content, a participant taking this course would naturally conclude that crowd control tactics -- including the use of force and less lethal weapons – are much more important than the crowd management strategies contained in the *Crowd Management Manual* when handling crowd events, including protests.

25. In addition to providing outdated and insufficient training on crowd <u>management</u>, the DPD also provided officers with insufficient training on crowd <u>control</u>. For instance, the Office of the Independent Monitor's (OIM) report (DEN 3925-4018) on the police response to the GFP listed several training deficiencies. One such deficiency concerned the lack of training and policy in the DPD on the use of flash-bang grenades (also known as distraction grenades or stun grenades). These devices emit an intense flash of light and a loud explosion sound to distract and disorient people temporarily. Flash bang grenades can result in several health risks to crowd members, bystanders, and police officers, including burns and other injuries related to the explosion, eye injuries associated with the intense flash of light, and ear-related injuries (including irreversible hearing loss) associated with the loud noise.[14] In addition to the health risks associated with these devices, there is some evidence to suggest that they may escalate conflict and violence with crowds rather than achieving their intended objective of dispersing crowds.[15] Because of these various issues, police must use great caution in deploying flash-bang devices and must train their officers on the safe and proper use of these devices.

26. The OIM report (DEN 3925-4018) also concluded that during the GFP, some DPD officers used less-lethal weapons (Pepperball and 40mm launchers) that they were not trained or certified

---

[14] Cazares, S.M., Hirsch, L.R., & King, A.L. (2015). *Significance of Tympanic Membrane Rupture Potentially Caused by Flashbang Grenades*. Alexandria, VA: Institute for Defense Analyses; Hoskin, A.K., Atlas, M.D., & Mackey, D.A. (2015). The Sydney siege: Courage, compassion, and connectedness. *Medical Journal of Australia*, 202(7), 360; Wang, H., Burgei, W., & Zhou, H. (2018). Risk of hearing loss injury caused by multiple flash bangs on a crowd. *American Journal of Operations Research*, 8, 239-265.

[15] Haar, R.J., & Iacopino, V. (2016). *Lethal in Disguise: The Health Consequences of Crowd-Control Weapons*. Physicians for Human Rights. https://phr.org/resources/lethal-in-disguise/

to use (p. 29). Proper training is essential to reduce the risk of injury or death among people struck by the kinetic impact projectiles fired by these weapons.[16]

27. Third, the OIM report notes that the DPD provides no training on certain "high-risk explosive devices" such as rubber-ball grenades. These are dangerous devices because when they explode, the rubber balls or pellets spray indiscriminately striking anyone located nearby. They cannot be carefully aimed, and for that reason, they should only be used under very restrictive conditions. Proper training on their use is essential to minimize the risk of injury or death.

28. Finally, the OIM review found that "there has been a decline in the volume and frequency of crowd control and field force training in recent years" (p. 51). The report concluded that the DPD "needs to substantially increase its investments in crowd control and field force training to properly prepare officers for the possibility of other mass protest events in the future." I agree with this assessment.

29. To summarize, at the time of the GFP, the DPD used deficient training for crowd control and crowd management. That training was inconsistent with the DPD's own *Crowd Management Manual*. It devoted insufficient attention to crowd management strategies, including de-escalation, communication, mediation, and negotiation. It provided almost no coverage of crowd psychology and behavior, and what coverage it did provide was dated and inaccurate. Finally, as noted in the OIM report, the crowd control training provided by the DPD was insufficient in content, volume, and frequency and therefore did not adequately prepare officers for the challenges they faced during the GFP. The foreseeable consequence of DPD's failure to provide adequate training to its officers was officers' use of inappropriate tactics on, and violation of the constitutional rights of, the Plaintiffs and other protestors.

**B. Insufficient Reliance on Crowd Management Strategies**

30. Consistent with my findings regarding the DPD's training on crowd management and control, the DPD's response to the GFP involved an insufficient reliance on crowd <u>management</u> strategies. Instead, the evidence reveals that the DPD relied primarily on crowd <u>control</u> tactics, particularly the use of skirmish lines, less lethal weapons, and arrests. This heavy reliance on crowd control and insufficient use of crowd management is inconsistent with nationally accepted police standards and practices, and the DPD's own *Crowd Management Manual*.

31. The materials I reviewed provide no evidence that the DPD relied on dialogue-based de-escalation strategies to reduce tension and prevent conflict and violence with crowds during the GFP. Instead, the DPD relied on militaristic crowd control tactics. The *Crowd Management Manual* states, "The policy of the Denver Police Department is not to choose a standard police

---

[16] Haar, R.J., Iacopini, V., Ranadive, N., Dandu, M., & Weiser, S.D. (2017a). Death, injury and disability from kinetic impact projectiles in crowd-control settings: A systematic review. *BMJ Open*, doi:10.1136/bmjopen-2017-018154

11

reaction (such as skirmish lines and the use of chemical agents) in a robotic response to problematic crowds. Techniques such as communication, mediation, and negotiation… are preferred in an attempt to prevent the escalation of violence" (p. 11). The wisdom of this approach, as the stated policy of the DPD, is backed up by a substantial body of research evidence from the study of protests and other crowd events. This research has taken place in a variety of settings around the world and has accumulated over nearly four decades.[17]

32. Unfortunately, the DPD did not follow its own crowd management policy during its handling of the GFP. My extensive review of video footage from the GFP revealed that DPD officers and their partners from other law enforcement agencies relied heavily on skirmish lines, kinetic impact munitions (such as pepperballs and 40mm foam baton rounds), and chemical agents (such as CS gas and OC spray) to control crowds. The After-Action reports completed by DPD Lieutenants Wyckoff and Wheaton from May 28, 2020 to June 2, 2020 do not list any attempts to communicate with the crowd or engage in verbal de-escalation, communication, mediation, or negotiation for the first four days of the protests. (DEN 1916-1936) On the fifth day, Chief Pazen marched with the crowd (DPD After-Action Report for June 1, 2020, DEN 1930-1933). On the sixth day, Murphy Robinson, Executive Director of the Department of Public Safety, marched with the crowd (DPD After-Action Report for June 2, 2020, DEN 1934-1936). The decision of these leaders to march with the crowd was a good one. Unfortunately, these efforts did not occur until the conflict and violence had already been escalating for four days. The daily Operations Plans issued by Commander Phelan do not provide any evidence of officers engaging in dialogue or de-escalation with protesters. The Operations Plans list assignments for various functions, but there is no evidence of any personnel being assigned to roles focusing specifically on dialogue or de-escalation. The standard approach in policing, even for spontaneous protests, is to communicate with protest organizers or participants before, during, and after protests. A continuous line of communication between police and protesters reduces tension and prevents conflict and violence from escalating. I do not see any evidence that this type of communication occurred between police and protesters in Denver during the GFP.

33. The use of dialogue-based crowd management strategies is especially important when protests are focused on the police. As noted in my guidebook for policing protests, "In the aftermath of a controversial arrest or use-of-force incident, people are angry, emotions run high, and event participants may be less willing to communicate or cooperate with police in a calm and productive manner. The ratio of moderates to radicals may be smaller than usual relative to other types of protests. Police may naturally feel frustrated and defensive and less willing to negotiate or facilitate under these conditions. While this is certainly understandable at a human level, at a professional level these are exactly the moments when communication and facilitation become most important. People who are protesting police misconduct expect the police to treat them poorly. They may even attempt to goad the police into treating them poorly to capture it on video, provide grounds for a complaint or a lawsuit, or otherwise prove a point. Changing the

---

[17] Reicher, S.D. (1984). The St. Pauls' riot: An explanation of the limits of crowd action in terms of a social identity model. *European Journal of Social Psychology*, 14(1), 1-21. https://doi.org/10.1002/ejsp.2420140102

interpersonal dynamic at moments like this can have powerful effects on the tone of these events and prevent them from escalating into conflict or violence. Communicating in a patient, thoughtful, and professional manner when people are angry or frustrated with you and the institution you represent can sometimes help calm people down."[18] Because the protests were about the police, the DPD's decision to rely so heavily on crowd control tactics, in lieu of the types of crowd management strategies outlined in its own *Crowd Management Manual*, very likely inflamed tensions and promoted unnecessary tension and conflict between police and protesters.

34. Aside from dialogue and de-escalation, another crucial element of crowd management is providing verbal warnings or dispersal orders prior to using force against a crowd. My review of video footage from the GFP revealed numerous instances of police using force against crowds without any warning ahead of time or without an order to disperse. Numerous officers justified this approach during their depositions, citing exigent circumstances because people in the crowd were throwing objects at them (for example, see Lt. Canino's deposition, pp. 33-38, p. 46, and p. 63).

35. In his deposition, Commander Phelan stated that there are times when giving an announcement "wouldn't be prudent." I do not understand or agree with this sentiment. It is especially concerning coming from the person who served as incident commander during the GFP and who set the tone for the DPD response to the protests. There may be moments when exigent circumstances (in the form of serious threats to officer safety) do not allow police officers to issue a warning or dispersal order first and then wait before using force. However, even in circumstances where police officers are encountering active aggression from people in the crowd, there should still be a person designated to make announcements to the crowd while other officers handle the aggressors. Aurora Commander Redfearn stated in his deposition that it is customary to issue warnings prior to deploying tear gas unless there are immediate life safety issues. I agree. My review of the video evidence and depositions revealed a widespread custom or practice of firing chemical agents and kinetic impact munitions at crowds in the absence of warnings or orders to disperse. The research evidence shows that decisions like this tend to escalate conflict and violence between police and crowds. This is why British police rely on a "no surprises" approach, letting protesters know ahead of time about likely police actions so they can make informed choices about whether to alter their behavior or exit the area.[19] In those moments when exigent circumstances do not allow police to issue warnings or announcements prior to using reasonable force, they can simply issue those warnings or announcements as soon as practicably possible. The idea that once a crowd is aggressive, police no longer need to communicate with or issue announcements to the crowd is professionally irresponsible and dangerous.

---

[18] Maguire & Oakley (2000, p. 69).

[19] Her Majesty's Chief Inspector of the Constabulary (2009, p. 164).

36. In addition to the need to issue verbal warnings or dispersal orders before using force against a crowd, police also have an obligation to ensure that these warnings are loud enough for the crowd to hear them. Crowd events tend to be loud, and the amplification devices used by police are sometimes not loud enough to enable the full crowd to hear police announcements. The materials I reviewed suggest that when warnings were issued, they were often made without amplification or were amplified using a public address system in a police vehicle. The video footage reveals that some of these announcements were not loud enough to reach the full crowd. Moreover, evidence from the depositions reveals that DPD officers were not particularly sensitive to this issue. For instance, in their depositions, both Lt. Pine and Lt. Williams stated that they did not do anything to ensure that the crowd could hear the announcements by police. When asked why he didn't do anything, Lt. Pine said it was because he was busy. When asked the same question, Lt. Williams stated, "I don't really know what we could have done to… verify it" (p. 107). Evidence of protesters not being able to hear announcements made by police is also present in the depositions of Sergeant Beall (pp. 57-58) and Mr. Mitchell (pp. 72-75). I conclude from the available evidence that the DPD did not take seriously the question of whether the crowd could hear their warnings or orders to disperse. As a result, some protesters were "subjected to less lethal munitions before hearing any warning or order" (OIM report, p. 26).

37. To summarize, at the time of the GFP, the DPD did not rely sufficiently on crowd management strategies to reduce tensions and prevent conflict and violence. Instead, the DPD appears to have defaulted to the use of crowd control tactics, including the use of skirmish lines, less-lethal weapons, and arrests in an effort to control the crowds. Moreover, the DPD did not follow nationally accepted standards or its own policies regarding warnings and dispersal orders before launching chemical agents or less-lethal munitions at crowds. These approaches are deficient in relation to nationally accepted standards and practices in policing, and they are inconsistent with the DPD's *Crowd Management Manual*. Unfortunately, these approaches are consistent with the training reviewed in the previous section, which focused heavily on crowd control and did not train officers sufficiently on either crowd management or crowd control. The crowd control approach used by the DPD at the GFP very likely had the effect of inflaming tensions between protesters and police rather than de-escalating tensions and preventing conflict and violence.

### C. Use of Inappropriate Crowd Control Tactics

38. In addition to not relying sufficiently on crowd management strategies during the GFP, the DPD also relied on a variety of inappropriate crowd control tactics. For instance, although Commander Phelan noted that in his deposition (p. 31) that his principal concern was the safety of the protesters, I could find little evidence substantiating this claim. The DPD engaged in a custom or practice of using aggressive crowd control tactics during the GFP that unnecessarily endangered peaceful protesters and others who were not committing crimes. Moreover, these tactics very likely had the effect of inflaming tensions and escalating conflict and violence between police and protesters.

39. Video evidence reveals numerous instances of police using chemical agents and less lethal munitions against peaceful members of the crowd during the GFP. In multiple depositions, DPD officers defended this practice based on officer safety concerns because they were being struck by harmful objects such as rocks and bottles. Officers have the right to defend themselves against assault by crowd members, but the appropriate response is not to punish or harm members of the whole crowd based on the violent or destructive behavior of a subset of its members, particularly in the absence of a warning or a dispersal order. The appropriate response is to target the people engaging in violent or destructive behavior. My guidebook on policing protests refers to this as a "differentiated" strategy. It is meant to accomplish three key objectives: protecting the First Amendment rights of people who are behaving peacefully, ensuring that peaceful protesters are not injured or killed, and preventing the unnecessary escalation that results when police take enforcement action "against the whole crowd in response to the misbehavior of a subset of its participants."[20]

40. If crowd management efforts have failed (or if they have not been attempted) and crowd members are throwing objects at officers, the police have several reasonable alternatives they can employ. They can arrest the offenders, they can use targeted forms of force against the offenders, or they can issue an order instructing the crowd to disperse. Several officers state under deposition that they could not enter the crowd to make arrests because it was unsafe to do so. The less lethal systems available to DPD officers during the GFP included two targeted forms of force that can be used during crowd events: pepperballs and 40mm foam baton rounds. The video evidence and depositions both reveal numerous instances of officers targeting individuals using these systems. This approach is appropriate, as long as officers strike authorized parts of the body and do not strike people who are not engaged in violent or destructive behavior. This standard is consistent with language from the DPD *Crowd Management Manual,* which states that pepperball and 40mm operators "are responsible for every round they fire" and they must ensure that "innocent persons are not struck unintentionally" (pp. 19-21). (There was, however, also video evidence of numerous instances of officers targeting individuals with these systems who did *not* appear to have engaged in any violent or destructive behavior.) Furthermore, several officers stated under deposition that aggressive protesters were purposely hiding behind peaceful protesters who were located on the front lines of the protests (for example, see deposition of former DPD officer Keith Valentine Jr.). This made it difficult for them to target the aggressive protesters with less lethal projectiles.

41. When being assaulted by protesters throwing objects at them, if officers were unable to arrest or use targeted force against the offenders, the remaining option was to issue a dispersal order, provide clear instructions about what route people should take when exiting the area, and give the crowd sufficient time to follow police orders to disperse. That approach is consistent with nationally accepted police standards for dispersing a crowd peacefully when officers are under assault and do not have other options available for stopping the assault. Once people have been ordered to disperse, police confirm that the order is sufficiently loud for the whole crowd to hear

---

[20] Maguire & Oakley (2020, p. 76-81).

15

it, and the crowd members have been given sufficient time to follow the order, police then have a reasonable justification for using more indiscriminate forms of force against the entire crowd. At that point, consistent with the British "no surprises" approach, crowd participants have been given the information they need to make an informed decision about whether to comply with police orders. My review of the video evidence in this case, as well as the depositions, indicates the officers did not follow this approach to dispersing crowds. Instead, police routinely used chemical agents to disperse crowds without sufficiently audible warnings or orders to disperse, and without providing protesters information about where the police wanted them to go.

42. Furthermore, video evidence reveals numerous instances of police striking people in the head or other vulnerable areas with projectiles during the GFP. For example, a protester behaving peacefully was shot in the face with a 40mm round (see video DEN4136 and Sgt. Abeyta's deposition, pp. 101-122), another was hit in the head with a tear gas canister (see declarations of plaintiffs Deras, Fitouri, and Parkins), and another was struck in the groin by a 40mm round (see video Fitouri 228). The DPD *Crowd Management Manual* states that police should not deploy pepperball or 40mm rounds to the head, eyes, throat, neck, or genitalia, or other vulnerable areas unless deadly force is warranted (pp. 19-21). This policy is consistent with medical research evidence showing that kinetic impact projectiles can cause death or serious injury when they strike vulnerable areas.[21] I saw no evidence that the officers who fired these rounds were disciplined for violating departmental policy and placing protesters at risk for serious injury or death.

43. Video evidence also reveals numerous instances of police pushing crowds into active intersections or firing chemical agents or impact munitions into intersections (for example, see videos DEN 3850 and DEN 4045). Police officers are obligated to look out for the safety of the crowds they are seeking to move or disperse as well as the safety of other people who happen to be in the area. These ill-advised practices endanger drivers passing through the intersections as well as protesters. I saw no evidence that officers who were responsible for pushing people into active intersections or firing less lethal weapons into intersections were disciplined for violating departmental policy and placing protesters and others at risk for serious injury or death.

44. DPD and other police agencies present at the GFP in Denver relied on indiscriminate impact munitions during the GFP, including Rubber Ball Grenades (see Mitchell deposition, pp. 83-84) and Sting Ball Grenades (see Commander Redfearn deposition). These grenades are thrown by hand and they project rubber balls or pellets for approximately a 50-foot radius. Because the projectiles cannot be aimed, they place crowd members at risk for serious injury or death, with a particularly high risk of eye injuries. I saw no evidence of DPD officers being trained in the use

---

[21] Haar, et al. (2017a); Hiss, J., Hellman, F.N., & Kahana, T. (1997). Rubber and plastic ammunition lethal injuries: The Israeli experience. *Medicine, Science, and the Law*, 37(2), 139-144; Mahajna, A., Aboud, N., Harbaji, I., Agbaria, A., Lankovsky, Z., Michaelson, M., Fisher, D., & Krausz, M.M. (2002). Blunt and penetrating injuries caused by rubber bullets during the Israeli-Arab conflict in October, 2000: A retrospective study. *Lancet,* 359(9320), 1795-1800; Rodríguez, Á., Peña, S., Cavieres, I., Vergara, M.J., Pérez, M., Campos, M., Peredo, D., Jorquera, R., Palma, R. Cortés, D., López, S., & Morales, S. (2020). Ocular trauma by kinetic impact projectiles during civil unrest in Chile. *Eye*. https://doi.org/10.1038/s41433-020-01146-w

of these impact munitions. The OIM report quotes the manufacturer of one of these devices: "rubber-ball grenades can result in serious bodily injury and should only be deployed by officers who have received specialized training" (OIM report, p. 34) Moreover, due to the risk of injury, the manufacturer recommends that these grenades be used as a last resort when chemical agents and other types of impact munitions have failed to achieve their objective. Because these devices cannot be carefully aimed, and because they spread their payload indiscriminately, they run the risk of injuring and endangering not only people who are engaging in violent or destructive behavior, but also people who are behaving peacefully and lawfully. I agree with the OIM's conclusion, which states that if these devices are to be used for crowd control, "it is incumbent on the DPD to regulate their use with clear and explicit policy, which it did not do before the GFP" (OIM report, p. 35).

45. In one egregious incident that occurred on May 31, police trapped protesters between two lines of officers and fired chemical agents and impact munitions at them from both sides (see depositions of Sergeant Abeyta, Sergeant Beall, and Commander Redfearn). Chief Stamper discussed this incident in detail in his expert report, so I will not restate the details here. I concur with his assessment that this use of kettling or encirclement tactics was "contrary to generally accepted police practices and standards" and violated the constitutional rights of the plaintiffs and other protesters.

**D. Insufficient Internal Controls for Addressing Officer Misconduct**

46. As pointed out by Chief Stamper in his expert report, the DPD appears to have "circled the wagons" and sought to shield its officers from discipline for misconduct that occurred during the GFP. I reach this conclusion for several interconnected reasons. First, my review of the video footage from the GFP identified numerous inappropriate uses of force against peaceful protesters who were not given any warning or order to disperse. Moreover, I did not find any evidence that the officers involved in these inappropriate uses of force were ever disciplined.

47. Second, as noted earlier, several protesters were struck with impact munitions in vulnerable parts of the body where the projectile could have caused serious injury or death. Once again, I did not find any evidence that the officers involved in these inappropriate uses of force and violations of DPD policy were ever disciplined.

48. Third, the video footage in this case revealed numerous instances of officers not behaving with an appropriate professional demeanor. For instance, one officer called a protester a "fucking faggot" [see DEN 4995]. Another celebrated a peaceful protester being shot in the face with a 40mm round by yelling, "Motherfucker! That's what you get! Fuck you!" (DEN 4136 @ 7:23 p.m.). Another said, "that was fun" after throwing tear gas at protesters (COABLM @ 20:47:22). These utterances are contrary to professional standards in policing and the DPD's own *Crowd Management Manual*, which states, "police personnel must maintain a professional demeanor, despite unlawful or anti-social behavior on the part of crowd members" (p. 8). When officers

behave in this manner, they diminish the perceived legitimacy of the police and promote conflict rather than de-escalating it.

49. Fourth, some officers seem to have tried to escape accountability for their actions during the GFP. As highlighted in the OIM report, officers were often observed not displaying their badge numbers or other identifying information, thereby making it difficult to identify them in case of allegations of misconduct. Hiding badge numbers and names is a well-known strategy used by police officers during civil disturbances to promote anonymity and avoid accountability. This is contrary to nationally accepted policing practices and standards promoted by police professional bodies such as the International Association of Chiefs of Police[22] and the Police Executive Research Forum.[23] Moreover, officers were often either not wearing their body-worn camera or had their camera deactivated (see OIM report, p. 20). Evidence from video footage and depositions revealed several incidents in which officers seemed to deactivate their body-worn cameras immediately prior to using force against protesters, contrary to nationally accepted policing practices and standards. The net effect of officers concealing their identity and not activating their body cameras was to escape accountability for their actions during the GFP.

50. Fifth, as articulated in detail in Chief Stamper's expert report, the DPD has not provided adequate or timely investigation of complaints against officers. Investigations into many of the complaints have still not been completed more than a year after the GFP, and the DPD appears to have issued "decline letters" in an overly casual manner, even in instances where the evidence appears to support the allegations. I agree with Chief Stamper's conclusion that the handling of these cases by Internal Affairs does not "show any serious attempt by the DPD to investigate citizen complaints of use of force during the DPD" (Stamper report, p. 51).

51. In summary, the DPD does not appear to have taken concerns about officer misconduct during the police response to the GFP seriously. Officers were allowed to violate policy, adopt an unprofessional demeanor, conceal their identity, and not use their body cameras without consequence. Moreover, the DPD's investigation of citizen complaints illustrates that the department is not serious about holding officers accountable for misconduct during the GFP, and demonstrates a failure to discipline officers appropriately.

* * *

52. Police officers in the United States have an obligation to facilitate peaceful First Amendment expression and public safety during protests. They also have an obligation to behave in a lawful and transparent manner that embraces accountability and builds trust with the community. The materials I reviewed in this case reveal that the Denver Police Department did not live up to these obligations during the GFP. Instead, they behaved in a manner that likely escalated

---

[22] International Association of Chiefs of Police (2019). *Crowd Management Model Policy*. IACP Law Enforcement Policy Center.

[23] Police Executive Research Forum (2015). *Lessons Learned from the 2015 Civil Unrest in Baltimore* (p. 57).

tensions and conflict with protesters rather than relying on the types of dialogue and de-escalation strategies described in the DPD's *Crowd Management Manual*. Moreover, a review of the DPD's training curricula reveals that, in choosing to engage primarily in crowd control rather than crowd management, officers were doing what they were trained to do.

53. The training materials were inaccurate, out of date, and deficient in comparison to national standards for policing protests. Moreover, the DPD had not established credible structures and procedures for enacting the policies outlined in the *Crowd Management Manual*. As a result, during the GFP, DPD officers relied on inappropriate strategies and tactics that were more likely to inflame tensions than to relieve them. The DPD's policies, training, strategies, and tactics led to violations of the constitutional rights of the plaintiffs and other protesters during the GFP.

54. My rate of compensation for review is $250 per hour. I am aware that discovery is ongoing in this case. My opinions may be added to, or amended, upon review of any additional information that becomes available.


Respectfully submitted,

Edward R. Maguire, Ph.D.
Dated: August 2, 2021