IN THE UNITED STATES DISTRICT COURT
OF THE DISTRICT COURT OF COLORADO

Civil Action Nos. 1:20-cv-01878-RBJ & 1:20-cv-01922-RBJ-MEH (consolidated)

ELISABETH EPPS, *et al.*

Plaintiffs,

v.

CITY AND COUNTY OF DENVER, *et al.*,

Defendants

## **REBUTTAL EXPERT REPORT OF DR. EDWARD R. MAGUIRE**

1. Exhibit 1 contains a list of additional materials that I was provided for review. The information contained in the additional materials further supports the opinions I provided in my original report.

2. The information contained in the additional materials provides further support for the opinions I presented in my original report. The new information bolsters my earlier conclusion that the Denver Police Department (DPD) behaved in a manner that likely escalated tensions and conflict with protesters. This behavior resulted from insufficient policies, training, strategies, and tactics that were inconsistent with generally accepted police practices, and that were the cause of the constitutional violations alleged by Plaintiffs.

### DPD Policies, Training, Strategies, and Tactics

**A. Insufficient and Outdated Training in Crowd Management and Control**

3. DPD provided one additional document containing training materials for several courses related to less-lethal munitions. Two of the courses contained in this 239-page document are a *PepperBall Instructor Course* and *PepperBall Operator Course*. These two courses appear to be copyrighted training materials developed by PepperBall. Both courses focus primarily on technical issues such as *how* to use the weapons, with little coverage of *when* it is appropriate to use them. Both courses make irresponsible and inaccurate claims about the physiological and psychological effects of these weapons.

4. In terms of physiological effects, both courses claim that the PepperBall is "nonlethal." All kinetic impact munitions are potentially lethal depending on a variety of factors such as their

1

Exhibit 52

composition, their velocity at impact, and where they strike the body.[1] For that reason, no kinetic impact munition should be referred to as nonlethal. The appropriate terminology is "less-lethal." This is important, because any training that describes these munitions as non-lethal suggests to course participants that these munitions are less dangerous than they really are.

5. Consistent with this perspective, DPD Less Lethal Coordinator Ryan Grothe, one of the City's Rule 30(b)6) experts, testified, "we don't call it nonlethal force. It's less-lethal force" (see Grothe deposition, p. 69). Grothe explained that the less-lethal weapons options used by the DPD are designed to reduce the possibility of a lethal outcome, "but there is a possibility of serious bodily injury or death when you use those" (Grothe deposition, p. 70).

6. Both courses also state that the PepperBall system has resulted in "no deaths or serious injuries." This is professionally irresponsible. Kinetic impact munitions often result in serious injuries,[2] especially eye injuries.[3] As noted by one set of physicians studying the effects of less-lethal weapons on ophthalmic injuries, "the eye is at particular risk of injury due to its delicate organ structure and the ability of the projectile to bypass the protection afforded by the bony orbit."

7. During the George Floyd protests (GFP) in 2020, media reports featured several people in the United States who claimed to have sustained eye injuries from being struck by PepperBalls. For instance, one protester in Denver had to have his eyeball removed after being struck by a PepperBall.[4] Eye injuries due to PepperBalls were also reported by people attending protests in Omaha,[5] Portland,[6] and Washington, DC.[7] So far, the medical literature has documented two cases of serious eye injuries resulting from PepperBall strikes during protests.[8] The number of

---

[1] Haar, R. J., Iacopino, V., Ranadive, N., Dandu, M., & Weiser, S. D. (2017). Death, injury and disability from kinetic impact projectiles in crowd-control settings: a systematic review. *BMJ open*, *7*(12), e018154.

[2] Haar, et al. (2017), note 1.

[3] Ifantides, C., Deitz, G. A., Christopher, K. L., Slingsby, T. J., & Subramanian, P. S. (2020). Less-lethal weapons resulting in ophthalmic injuries: A review and recent example of eye trauma. *Ophthalmology and Therapy*, *9*(3), 1-7; Rodríguez, Á., Peña, S., Cavieres, I., Vergara, M. J., Pérez, M., Campos, M., ... & Morales, S. (2021). Ocular trauma by kinetic impact projectiles during civil unrest in Chile. *Eye*, *35*(6), 1666-1672.

[4] https://kdvr.com/news/local/dpd-internal-affairs-man-who-lost-eye-during-protests-was-struck-by-pepperball

[5] https://www.ketv.com/article/bystander-legally-blind-from-pepperball-during-omaha-protests-files-claim-against-sarpy-county/34340372

[6] https://www.cnn.com/2020/07/30/us/journalist-portland-protest-federal-agents-trnd/index.html

[7] https://patch.com/district-columbia/washingtondc/dc-protester-continues-recovery-after-being-shot-pepper-bullet

[8] Chacko, J., Fong, J., & Davis, R. (2021). Pepper-Ball-related ocular injury. *Clinical and Experimental Ocular Trauma and Infection*, *3*(1), 12-15; Ifantides, et al. (2020), note 3.

injuries is likely much higher, but it is difficult to document accurately because many people who are not knowledgeable about less lethal projectiles refer to all of them using the generic term "rubber bullets." This likely obscures the true number of PepperBall injuries.

8. Both courses also demonstrate a profound lack of understanding of crowd psychology and its implications for the use of these weapons. For instance, when listing the psychological effects of being struck by a PepperBall, the training materials mention responses such as panic, fear, anxiety, nervousness and irrational decision-making. But they do not list anger and frustration, which are the psychological reactions that are most frequently documented in the crowd psychology literature in settings where police are perceived by crowd members as using force unfairly or indiscriminately. This is a crucial omission because it demonstrates a fundamental misunderstanding of basic crowd psychology principles. Understanding these principles is vital for developing crowd management and control strategies that minimize conflict and violence.

9. Research evidence from crowd psychology shows that when police rely on the indiscriminate use of force from the outset – rather than softer crowd management approaches like communication, de-escalation, mediation, and negotiation – their actions tend to escalate conflict and increase the likelihood that crowds will rebel. When people in a crowd perceive that force is being used against them or their peers unfairly, "the entire crowd will unite around a sense of opposition to the police."[9] Moreover, in such circumstances, protesters may begin to feel morally justified in resisting or behaving violently toward the police.[10]

10. The newly available training materials include documents from the *Denver Police Department Less Lethal Operator Course*. This course also demonstrates an inaccurate understanding of crowd psychology. On pages 183 and 231, it states that "less lethal force takes away their will to fight." This may be true for some people, but for others it will likely have the opposite effect. If people believe the force was used unfairly, they will often rebel. Moreover, if others in the crowd believe the force was inappropriate, they may begin to unite in opposition to the police. As noted in my original report, this is especially true when police are the object of the protest.

11. This same course demonstrates a further misunderstanding of crowd psychology on pages 184 and 232 where it lists three reasons why less lethal weapons may fail to gain the crowd's compliance: suspect intoxication, suspect focus/mental illness, and limitations of the system. Again, it misses perhaps the most important reason why less lethal weapons may fail. If people believe the weapons were used inappropriately or illegitimately, they will rebel rather than complying. These are basic principles from crowd psychology that should serve as the foundation for developing effective, evidence-based crowd management and control strategies.

---

[9] Maguire, E.R., & Oakley, M. (2020). *Policing protests: Lessons from the Occupy movement, Ferguson, and beyond*. New York: Harry Frank Guggenheim Foundation (p. 50). https://www.hfg.org/s/Policing-Protests.pdf.

[10] Maguire, E. R., Barak, M., Cross, K., & Lugo, K. (2018). Attitudes among Occupy DC participants about the use of violence against police. *Policing and Society*, *28*(5), 526-540.

**B. Insufficient Reliance on Crowd Management Strategies**

12. Consistent with the findings and opinions from my earlier report, the additional information I reviewed provides further evidence that the DPD's response to protests involves an insufficient reliance on *crowd management* strategies. Instead, the evidence shows that the DPD relies primarily on *crowd control* tactics. This heavy reliance on crowd control and insufficient use of crowd management is inconsistent with nationally accepted police standards and practices, and the DPD's own Crowd Management Manual.

13, For example, Sgt. Eric Knutson testified during deposition that the contents of the Crowd Management Manual are not discussed during DPD's crowd management training for recruits, supervisors, or leaders. The Crowd Management Manual is distributed to the officers and they are required to indicate that they received it. However. Sgt. Knutson confirmed that there is no specific training provided to officers or supervisors on the Crowd Management Manual (Knutson deposition, pp. 50-56). By not providing training on the Crowd Management Manual's contents, the DPD rendered this document as more aspirational than operational. It is incumbent upon police organizations to train their officers how to perform the functions they are expected to perform. Not providing such training is, quite simply, a failure to train.

14. As noted in my earlier report, a crucial element of crowd management is providing verbal warnings or dispersal orders prior to using force against a crowd. My earlier review of video footage from the GFP revealed numerous instances of police using force against crowds without issuing an advance warning or an order to disperse. Newly available depositions seek to justify this approach based on exigent circumstances because there was not sufficient time to issue warnings or dispersal orders. For instance, Commander Michael O'Donnell testified in his deposition that the policy contained in the Crowd Management Manual "allows for a lot of flexibility" and that officers are given discretion to decide whether a dispersal order is warranted given the dynamics of each situation (O'Donnell deposition, pp. 17-23). <u>Allowing this level of flexibility in a policy is tantamount to having no policy.</u>

15. Anytime a police agency establishes a formal written policy, it must decide how much flexibility to incorporate into the policy so that it is able to account for unforeseen circumstances. If a policy incorporates too little flexibility, it may paint officers into a corner when they encounter circumstances that the policy did not account for. If a policy incorporates too much flexibility, it is not an effective tool for regulating behavior. Commander O'Donnell's deposition testimony makes it clear that the DPD's Crowd Management Manual is overly flexible and allows officers too much discretion about when to provide warnings or dispersal orders when policing crowd events. As a result, there does not appear to be a clear or firm policy about when force can be used to disperse a crowd. This concern is exacerbated by the fact that the DPD does not provide clear training on the factors that must be assessed when deciding whether to declare an unlawful assembly (Knutson deposition, pp. 40-51).

16. Consistent with the conclusions I reached in my earlier report, the DPD did not rely sufficiently on crowd management strategies during the GFP to reduce tensions and prevent conflict. Part of the reason for this is that the DPD provided the officers or their supervisors with no training on how to enact the practices described in the Crowd Management Manual. Instead, the DPD relied primarily on the use of crowd control tactics. The DPD also did not follow nationally accepted standards or its own policies regarding warnings and dispersal orders before using less lethal force against crowds. The crowd control approach used by the DPD during the GFP very likely had the effect of inflaming tensions between protesters and police rather than de-escalating tensions and preventing conflict and violence.

**C. Use of Inappropriate Crowd Control Tactics**

17. My previous report concluded that in addition to not relying sufficiently on crowd management strategies during the GFP, the DPD also relied on a variety of inappropriate crowd control tactics. Newly available evidence supports that conclusion.

18. Corporal Richard Eberharter testified at deposition that Metro SWAT deployed Flash-Bang grenades and Sting-Ball grenades[11] during the protests although they had not been provided with any training on the proper use of these devices in protests or other types of crowd events (Eberharter deposition, pp. 101, 116-117). Moreover, both Corporal Eberharter and Mr. Ryan Grothe testified that neither device is mentioned in the DPD's Crowd Management Manual (Eberharter deposition, pp. 140-141; Grothe deposition, pp. 17-21, 47).

19. One theme that emerged several times from the newly available depositions was the idea of police using crowd control formations and less lethal weapons as a form of communication with crowds. It is well known that communication has both verbal and nonverbal components, so it is possible to communicate nonverbally in both interpersonal and intergroup settings.[12] However, I have serious reservations about the disjuncture between the nonverbal messages the DPD thinks it is sending and how those messages are likely received by protesters.

20. Below are four instances in which DPD officers discussed the use of formations or less-lethal weapons as forms of communication with protesters.

    a. When asked if an individual who had been shot by a less lethal munition had been given orders to move back, Corporal Richard Eberharter responded, "well, with the

---

[11] https://www.combinedsystems.com/cts-flash-bangs-sting-ball-grenades

[12] Interpersonal communication takes place between individuals. Intergroup communication takes place between representatives of different groups. There is a large body of research on intergroup communication. Some of that research focuses on the intergroup dynamics between police and members of the public. For more information about the application of intergroup communication to the police, see: Giles, H., Maguire, E. R., & Hill, S., Eds. (2021). *The Rowman and Littlefield handbook of policing, communication, and society*. Rowman & Littlefield.

> deployment of all the CS gas, I would assume he would have understood that" (Eberharter deposition, p. 111).

b. Sergeant Eric Knutson testified that with "with the PepperBall, we can actually lay a line to let the crowd know area denial… But area denial, letting a crowd know, just don't go past here" (Knutson deposition, pp. 47-48).

c. Sergeant Eric Knutson testified that "we also include in the training that it may be appropriate for officers to line up and show force in order to let the crowd know, this is your time to leave and to get that point across as well" (Knutson deposition, p. 50).

d. Commander Michael O'Donnell testified that when using the PepperBall in area denial mode [in which the officer fires the projectile into the ground] "it's a signal, a visible deterrence to push back."

21. Throughout this case, I have observed a tendency among the DPD and its partners not to issue warnings or dispersal orders before using force against crowd members. In my previous report, I noted that DPD officers frequently justify this approach based on exigent circumstances such as protesters throwing objects at police officers. My previous report concluded that within the DPD, there was a "widespread custom or practice of firing chemical agents and kinetic impact munitions at crowds in the absence of warnings or orders to disperse."

22. Some of the newly available depositions confirm that the DPD often doesn't see the need for, or the opportunity to, issue verbal warnings or dispersal orders before using force against crowd members. At the same time, I see a tendency among DPD officials to view formations and less lethal weapons as nonverbal forms of communication with protesters. There are two major problems with this approach.

23. First, conventional best practice is for police to communicate with crowd members before, during, and after crowd events. This verbal communication is intended to help build trust, avoid misunderstandings, and de-escalate tensions. Verbal communication is one of the principal tools for avoiding conflict and violence during protests and other crowd events.[13] The most innovative and evidence-based approaches to policing protests and other types of crowd events rely heavily on dialogue between police and protesters.[14] Choosing not to communicate verbally with crowd members is a recipe for misunderstandings and conflict.

24. Second, there is usually a large gap between the nonverbal messages police think they are sending at protests and the way crowd members perceive those messages. For instance, police often don riot gear to protect themselves and remain safe, but protesters usually perceive officers

---

[13] Maguire and Oakley (2020), note 9.

[14] Stott, C., Scothern, M., & Gorringe, H. (2013). Advances in liaison based public order policing in England: human rights and negotiating the management of protest? *Policing: A Journal of Policy and Practice*, 7(2), 212-226.

putting on riot gear as an act of escalation.[15] Similarly, in the examples given above, police are seeking to communicate to protesters that they should step back or leave the area altogether. However, based on my experience interviewing and surveying protesters, I believe these nonverbal cues send a very different message to protesters. The use of formations, PepperBalls, and CS gas most likely communicates to protesters that police are escalating and looking for a fight. The principal mode of communication when policing protests should be verbal. Nonverbal communication can certainly play a role, but police need to think very carefully about the message they are trying to send and how it is being received by others who have a different worldview than theirs. Less lethal weapons should not be treated as a substitute for genuine dialogue.

**D. Insufficient Internal Controls for Addressing Officer Misconduct**

25. In my previous report, I concluded that the DPD "appears to have 'circled the wagons' and sought to shield its officers from discipline for misconduct that occurred during the GFP." The newly available information I examined further bolsters that conclusion.

26. In my previous report, I concluded that some officers sought to avoid accountability for their actions during the GFP by either not wearing or not activating their body-worn camera (BWC). My previous report noted that there were several incidents in which officers seemed to deactivate their BWCs immediately prior to using force against protesters, contrary to nationally accepted policing practices and standards. The net effect of officers not wearing or activating their BWCs (and in some cases concealing their identities as well) was to avoid accountability for their actions during the GFP. Some of the information that became available since my previous report provides additional support for this conclusion.

27. For instance, Corporal Richard Eberharter testified at deposition that he and his fellow Metro/SWAT officers did not wear BWCs during the protests for officer safety reasons (Eberharter deposition, pp. 53-54). This is not a credible argument and it is inconsistent with national standards for police transparency and accountability. There are certain functions in policing, such as undercover work, that raise genuine officer safety issues associated with wearing body-worn cameras, but responding to protests is not one of them. There are some occasions on which a SWAT team will have a credible interest in keeping its tactics private to preserve officer safety, but the most appropriate way of addressing that issue is to tag BWC videos with sensitive content to prevent them from being released.

28. Corporal Eberharter further noted that Metro/SWAT team members are not required to wear BWCs during tactical operations, but that they are required to wear them when engaging in patrol-related functions. He testified that the decision to treat the protests as a tactical situation (rather than a patrol function) was made by somebody other than him. When asked about how

---

[15] Maguire and Oakley (2020), note 9.

the decision was made to treat their response to the protests as a tactical deployment, he responded: "that's what we are, tactical officers… if we're deployed, we deploy tactically" (Eberharter deposition, pp. 56-57). This is a circular argument that lacks credibility. It suggests that Metro/SWAT officers never need to wear body cameras because they are always engaged in tactical operations. The fact that the entire team deployed without BWCs represents a serious management failure that appears engineered to ensure that officers would not be held accountable for their actions.

29. The International Association of Chiefs of Police (IACP) *Model Policy on Body-Worn Cameras* states that "officers shall activate the BWC to record all contacts with citizens in the performance of official duties."[16] All members of Metro/SWAT should have worn their BWCs throughout the protests, and should have had them activated during any contacts with members of the public, especially contacts that involved arrest and/or the use of force.

30. Sergeant Eric Knutson testified at deposition that when the DPD first obtained BWCs, the Department provided training on the technical aspects of how to use the cameras. However, there is not currently any training provided to officers on the BWC policy including issues like when officers are required to activate the camera. Furthermore, he noted that there is no specific policy or training on when officers are supposed to activate their cameras during protests. In general, officers are supposed to activate their cameras "anytime they're taking enforcement activity" (Knutson deposition, p. 70).

31. With regard to protests, Sgt. Knutson testified that if officers are standing in a skirmish line and nothing is happening, they do not need to activate their BWCs. However, if they are dealing with a violent crowd or people are approaching the line, officers would be required to activate their BWCs. Sgt. Knutson trains officers that when they are taking enforcement actions or using force against civilians, they should have their body-worn camera on (Knutson deposition, pp. 69-78).

32. Sgt. Knutson's testimony about when BWCs should be worn and activated is consistent with nationally accepted police standards and practices and with the IACP's Model Policy on Body-Worn Cameras. However, many DPD officers did not follow this protocol during the GFP. Moreover, the DPD did not discipline the officers who violated this protocol, thereby sending a clear message to officers that they can disregard it with impunity. The DPD's failure to enforce its own BWC policy represents a serious management failure that once again appears engineered to help officers avoid accountability for their actions during the protests.

33. Another mechanism that police agencies rely on to improve accountability and control misconduct is to establish standardized reporting procedures for documenting discretionary decisions like arrests and/or use of force. For example, ensuring that officers file timely,

---

[16] https://www.theiacp.org/sites/default/files/all/b/BodyWornCamerasPolicy.pdf

accurate, and sufficiently detailed use of force reports is an important way for police leaders to track the use of force by officers and to hold officers accountable for their actions.

34. Unfortunately, the DPD's use of force reporting procedures during the GFP were confusing and chaotic. By not creating and communicating clear reporting procedures for officers to follow during the protests, the DPD defeated its own ability to hold officers accountable for their actions. Without proper use of force reports, the Department lacked sufficient information to conduct thorough, professional internal affairs investigations into allegations of excessive force by officers. The absence of use of force reports and witness statements, coupled with the lack of BWC footage, served to obscure officer actions during the protests and impede any reasonable attempt to review use of force incidents.

35. For example, Corporal Richard Eberharter from Metro/SWAT testified at deposition that officers were not required to fill out use of force reports because they didn't have time due to "everything that was going on." He used the PepperBall gun during the first five days of the protests and did not document any instances of its use in any officer statement unless he took the person into custody. He testified that when he struck people in the lower legs with a PepperBall, or when he used the PepperBall for area denial [in which the officer aims the projectile at the ground in front of people], he was not required to file a report documenting the use of force. (Eberharter deposition, pp. 49-50).

36. Contrast Corporal Eberharter's testimony with that of Commander Michael O'Donnell, who testified at deposition that officers completed all necessary reports following the use of force during George Floyd protests. He noted that when officers use less lethal force, they fill out "a use of force report, which also acts as his statement or her statement." Commander O'Donnell served as lieutenant in the gang unit during the protests. He testified that each of his officers completed use of force statements for each use of force during the protests, and that he then reviewed those statements (O'Donnell deposition, pp. 34-36). He later testified that an officer who deployed less lethal force would be required to complete a use of force report, and that "any additional officers that were in close proximity would provide witness statements." He then noted it "would be a policy violation if the officer deployed less lethal and did not complete those reports." If an officer did not prepare a statement, "the officer would face discipline… he is required by policy and procedures to report that and articulate the need and rationale for utilizing less lethal. So the officer would be subject to discipline" (O'Donnell deposition, pp. 58-59).

37. Sergeant Eric Knutson testified at deposition that officers are typically required to fill out a use of force report when they use force, but in a crowd control scenario, the report may be a "blanket" report that is filled out at the squad level. He acknowledged that these atypical use-of-force reporting procedures are not discussed in the crowd management training that the DPD provides for recruits and for leadership. Sgt. Knutson testified that officers have to remember and report every round that they fire from the PepperBall gun. This requirement applies to both individual and blanket use-of-force reports (Knutson deposition, p 68). Every officer who used or witnessed force is required to complete a statement about what their actions were and what

they saw, then these individual statements are used as a basis for completing a squad-level blanket report (Knutson deposition, p. 81).

38. In his deposition, Commander Hans Levens quoted the DPD Operations Manual (section 105, subsection 9) about use of force reporting requirements. "With authorization of the chief of police or designee, the multiple use of chemical munitions in response to defensive resistance during large scale events may be documented with a single use-of-force report." One of the issues in this case is that officers delayed filing individual use of force statements because they believed there would be one overarching report written. However, this was a misunderstanding because, according to the policy quoted by Commander Levens, the only use of force that results in a blanket report being written is the use of chemical munitions. All other types of force require the standard individual-level police use-of-force reports. The blanket reporting policy does not cover 40mm munitions, noise-flash diversionary devices (Flash-Bangs), or Stinger grenades. He testified that nobody was disciplined for the failure to document their use of 40mm launchers or any other use of force during the protests (Levens deposition, pp. 60-62).

39. The IACP *Model Policy on Reporting Use of Force* states that "the authority to use force carries with it the need for accountability in order to safeguard the rights of the public and to preserve the integrity of the law enforcement agency and the jurisdiction that provides this authority."[17] Timely and accurate use-of-force statements are crucial for transparency, accountability, and legitimacy.

40. The *IACP Model Policy on Crowd Management* states that "Use-of-force reporting requirements apply equally to policing demonstrations and civil disturbances. It is very important for law enforcement agencies to document and investigate uses of force during these events, not only for managerial and accountability reasons, but also to respond effectively to potential complaints alleging excessive force following an event."[18]

41. Commander Michael O'Donnell testified at deposition that disciplinary action can be preventative because "if an officer violates a particular policy and they're disciplined for it, other officers are going to learn from that as well." (O'Donnell deposition, p. 14). This same logic can be applied in reverse. If officers violate policy and they're not disciplined for it, they will learn that they can sidestep accountability measures and can get away with violating policy.

42. Commander Hans Levens testified that DPD's internal affairs division has received a total of 123 complaints associated with the police response to the GFP (Levens deposition, p. 34). Most of these resulted in "decline letters" because the officers could not be identified. Part of the reason that officers could not be identified during these investigations was that many of them had not activated their BWCs and/or had not filed use of force reports.

---

[17] https://www.theiacp.org/sites/default/files/2020-06/Reporting%20UoF%20June%202020.pdf

[18] https://www.theiacp.org/sites/default/files/2020-08/Crowd%20Management%20FULL%20-%2008062020.pdf

* * *

43. In sum, the additional materials I reviewed in this case lend further support to my earlier conclusion that during the George Floyd protests (GFP), the DPD behaved in a manner that likely escalated tensions and conflict with protesters. The DPD's policies, training, strategies, and tactics led to violations of the constitutional rights of the plaintiffs and other protesters during the GFP.

Respectfully submitted,

Edward R. Maguire, Ph.D.
Dated: December 22, 2021