LOUISVILLE   LEXINGTON   LONDON   FLORENCE   CINCINNATI   INDIANAPOLIS   ORLANDO   JACKSONVILLE   TAMPA



# KENTUCKIANA
## COURT REPORTERS

## CIVIL ACTION NO. 1:20-CV-01878-RBJ

## ELISABETH EPPS, ET AL.

### V.

## CITY AND COUNTY OF DENVER, ET AL.

## DEPONENT:

## COMMANDER HANS LEVENS, 30(B)(6)

## DATE:

## November 05, 2021



a courtroom
**powerhouse**

✉ schedule@kentuckianareporters.com

☎ 877.808.5856 | 502.589.2273

www.kentuckianareporters.com

Exhibit 53

The Deposition of COMMANDER HANS LEVENS, 30(B)(6), taken on November 05, 2021

34

1    whether or not they need to generate or open a complaint

2    based on anything and everything that can be posted on

3    social media.

4        Q.   Is there -- are there any other ways in which

5    investigations into potential officer misconduct are

6    initiated?

7        A.   I'm sorry.  That are initiated?

8        Q.   We were talking about all the different ways

9    in which investigations into officer conduct may be

10   initiated.  Have we covered all of them?  Are there any

11   others?

12       A.   Not that I can think of, ma'am.

13       Q.   Okay.  How many complaints were filed by

14   citizens concerning potential officer misconduct at the

15   George Floyd protests?

16       A.   So we had 123 total complaints.  It was my

17   understanding we had 85 citizen complaints and

18   29 internal complaints that were generated internally by

19   the Denver Police Department and nine service

20   complaints.

21       Q.   Are the investigations into all of those

22   completed?

23       A.   No, ma'am.

24       Q.   How many are remaining?

25       A.   As of yesterday, because I -- I had followed

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of COMMANDER HANS LEVENS, 30(B)(6), taken on November 05, 2021

39

1  this case.

2      Q.   The one involving 70 officers, do you know

3  which day of protests that involved?

4      A.   I do not have that date, but I can get that

5  for you, if you would like.

6      Q.   Why are those investigations still open?

7      A.   These are complex investigations.  They take a

8  lot of time to review.  You know, typically we, you

9  know, know who the officers are on normal complaints.

10          They're not dressed in riot gear.  So in

11 trying to identify potential subject officers in these

12 cases, trying to identify witness officers, is very

13 difficult when they're in riot gear. Trying to going

14 through hours upon hours upon hours of video to identify

15 other potential witness officers to the alleged

16 misconduct is very time consuming.  Also during the

17 George Floyd protests our Internal Affairs

18 Bureau was not fully staffed and had some staffing

19 challenges at the time.  And due to the magnitude and

20 the number of cases, it just -- that's why it takes so

21 long.

22      Q.   Of the cases that have been closed, how many

23 resulted in discipline?

24      A.   So there are three cases that are closed that

25 resulted in discipline.  There is a fourth case.  This



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    was the social media post.  This officer was fired

2    before the investigation was complete because he was

3    still a probationary officer.  So --

4        Q.    Are you talking about -- sorry.  Go ahead.

5        A.    Yeah, I -- go ahead, ma'am.

6        Q.    That's Tommy McClay, right?

7        A.    Yes, ma'am.

8        Q.    Okay.  So that's the fourth one?

9        A.    Yes, ma'am.

10       Q.    The other -- there's two that I know of that

11   resulted in discipline,  Streeter and Archuleta --

12       A.    Correct.

13       Q.    -- right?

14       A.    Correct.

15       Q.    What's the third one?

16       A.    There is also a violation that was -- came in

17   as a citizen complaint.  It -- the original allegation

18   was an inappropriate force.  A review of that case in --

19   it was investigated by Internal Affairs.  The

20   inappropriate force was declined, but in reviewing this

21   case, Internal Affairs Bureau investigators identified

22   an additional specification that needed to be added to

23   this case, and this was a failure on the officer -- or

24   an officer to activate his body-worn camera.

25       Q.    Do you know what case number that one was?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of COMMANDER HANS LEVENS, 30(B)(6), taken on November 05, 2021
41

```
 1        A.   If I can refer to my notes real quick, I could
 2   tell you, if that's okay?
 3             MS. WANG:  Yeah.  Let's go off the record for a
 4        second.  Why don't you look at your notes?  I'm
 5        going to just get some water.
 6             VIDEOGRAPHER:  Okay.  We are off the record.
 7             The time is 10:51.
 8               (OFF THE RECORD)
 9             VIDEOGRAPHER:  We are back on the record for
10        the 30(b)(6) deposition of Officer Hans Levens being
11        conducted by videoconference.  My name is Laurin
12        Harrill, the videographer, and Sandra Ventura is the
13        court reporter.  Today is November 5, 2021.  The time
14        is 10:55 a.m. Mr. Reidy, if you could please state
15        your appearance for the record?  Patrick Reidy, if
16        you can hear me, would you please state your
17        appearance for the record?
18             MR. ARO:  I know Mr. -- Mr. Reidy is multi-
19        tasking this morning.  He may be away right now.
20             He is one of my colleagues at Arnold & Porter
21        and is also counsel for the Epps plaintiff.
22             VIDEOGRAPHER:  Okay.  Thank you.  And you may
23        begin with your questioning again.  Thank you.
24   BY MS. WANG:
25        Q.   What case number was that?
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1      A.    Ma'am, it was P2020-0141.

2      Q.    And which -- what was the discipline that was

3  imposed for failure to activate the BWC?

4      A.    So, real quick, if you don't mind me inter --

5  so I'm just looking at the decline letter was sent to

6  the complainant list shows that case number I provided.

7  I have a handwritten note that actually shows

8  P2020-0139.  So if we take a break, I can confirm that

9  through our IA Pro System for you.  But reference to

10  this particular complaint, so the ultimate outcome -- so

11  what happened was, the -- like I said earlier, the

12  allegation was inappropriate force.  That was declined

13  at Internal Affairs Bureau after being reviewed by the

14  Office of the Independent Monitor. But Internal Affairs

15  Bureau investigators identified this body-worn camera

16  violation.  That case was then sent to our Conduct

17  Review Office for review. In reviewing this case, to

18  give you some background on what occurred, on May 30th,

19  during the George Floyd protests, a team of officers was

20  instructed to contact some individuals in violation of

21  curfew.  Upon contact, the complainant in this case fled

22  on foot.  She had tripped and fallen down.  She was

23  taken into custody. She alleged that her shirt, in the

24  course of this incident, had -- had rose up exposing her

25  breasts.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of COMMANDER HANS LEVENS, 30(B)(6), taken on November 05, 2021

43

```
 1        Q.   I'm sorry.  Hold on a second.  This is the one

 2   involving Brukbacher, correct?

 3        A.   Should be Ms. Havens.  It's...

 4        Q.   Okay.  Got it.  Okay.

 5        A.   Okay.

 6        Q.   Now, is this documented in the file, because I

 7   don't recall seeing that?

 8        A.   This is -- I don't remember seeing it in this

 9   file.  This is something that I informed the City

10   Attorney of.

11        Q.   Oh, okay.  So this is not in the documents

12   that we received?

13        A.   I don't know if you had received that from the

14   City Attorney's Office or not.

15        Q.   Okay.  What I'm asking is, you're -- you're --

16   what you're saying -- now, you had mentioned another

17   case. This is P2020-0141; is that right?

18        A.   Yes.  That's what I have on -- with the

19   decline letter in front of me, and I can pull up our

20   system to see if that's the correct case number.  But in

21   a handwritten note, I have it as 0139, but I would have

22   to confirm it through IA Pro since I have two different

23   numbers here in front of me.

24             MS. WANG:  Okay.  Why don't we go off the

25        record and you can tell me what's the correct case
```



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of COMMANDER HANS LEVENS, 30(B)(6), taken on November 05, 2021

44

1    number?

2           THE WITNESS:  Okay.

3           VIDEOGRAPHER:  Okay.  We are off the record.

4           The time is 10:59 a.m.

5             (OFF THE RECORD)

6           VIDEOGRAPHER:  We are back on the record for

7    30(b)(6) deposition of Officer Hans Levens being

8    conducted by videoconference.  My name is Laurin

9    Harrill, the videographer, and Sandra Ventura, the

10   court reporter.  Today is November 5, 2021.  The

11   time is 11:00 a.m.

12          THE WITNESS:  Okay.  Thank you.  Just to

13   confirm, that case number for that body-worn camera

14   violation was P2020-0139.

15   BY MS. WANG:

16       Q.   Not 0141?

17       A.   No.  I had obtained that number from the

18   decline letter, so it looks like that was a

19   typographical error from the Internal Affairs Bureau.

20       Q.   Okay.  So there was a decline letter that said

21   what?

22       A.   So essentially, this complainant's allegation

23   of inappropriate force was not substantiated due to the

24   fact that she had fell down on her own.  And when her

25   shirt had rosen [sic] up exposing her breasts, according

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of COMMANDER HANS LEVENS, 30(B)(6), taken on November 05, 2021

45

1 to her complaint, she had pleaded to have it pulled

2 down. Body-worn camera video indicated that a female

3 officer assisted her with that as soon as she requested.

4 So there was no evidence to substantiate an

5 inappropriate force specification, but we did observe

6 that there was a body-worn camera violation.

7      Q.   Who violated the body-worn camera policy?

8      A.   Sergeant Mike O'Neill.

9      Q.   Okay.  And so, is the case number -- and when

10 that -- who determined that there was a violation of the

11 body-worn camera policy?

12      A.   So in review -- when our investigators in the

13 Internal Affairs Bureau conduct the investigation, they

14 made that determination that based on our body-worn

15 camera policy, which states that the body-worn camera is

16 required to be activated upon all arrests, they then

17 added that specification for Sergeant O'Neill because we

18 did not have body-worn camera video from Sergeant

19 O'Neill related to this arrest.

20      Q.   Okay.  And so, that was -- that is in the case

21 number 0139?

22      A.   Yes, ma'am.

23      Q.   And you don't know one way or the other

24 whether that was produced to us?

25      A.   No, ma'am.



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of COMMANDER HANS LEVENS, 30(B)(6), taken on November 05, 2021

46

```
 1        Q.   Would it have stayed within the same case file
 2   -- because I do recall the one that you're talking about
 3   with the -- the woman alleging that her -- her shirt had
 4   been pulled up.  I do recall that one, but I don't
 5   recall seeing anything in there about discipline being
 6   imposed for body-worn camera violation.  So what I'm
 7   trying to get at is: Was there a separate case number
 8   opened for --
 9        A.   No, ma'am.
10        Q.   Okay.
11        A.   It's all contained in that same case.
12        Q.   Okay.  What was the discipline that was
13   imposed on Sergeant Mike O'Neill?
14        A.   So our body-worn camera policy is handled
15   through schedule discipline.  So a violation of
16   body-worn camera policy, the first violation in
17   12 months is an oral reprimand.  And if -- this was his
18   first violation in 12 months, so he received an oral
19   reprimand for that violation.
20        Q.   Okay.  Is that the only -- now, you have been
21   designated to talk about topic 3D, which concerns the
22   body-worn camera policy as well.  So is that the only
23   incident of discipline that was imposed relating to the
24   George Floyd protests for failure to comply with the
25   body-worn camera policy?
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        A.   Yes, ma'am.

 2        Q.   Okay.  So let's just -- since we're talking

 3   about body-worn camera policy, why don't we take a look

 4   at -- there was a complaint from a woman named

 5   Jaramillo, and I cannot for the life of me, pronounce

 6   her last name, but it begins with an H.  And it was a

 7   complaint against Officer Bolton. It's P2020-0174. Were

 8   you given that one to review?

 9        A.   I'm sorry, ma'am.

10        Q.   Were you given 0174 to review?

11        A.   I'm looking right now in my folders there,

12   ma'am. I can't find it within my folder here.  Could you

13   show it to me?

14        Q.   Okay.  Sure.  So I'm showing you the decline

15   number in the IAB case number P2020-0174.  Do you see

16   this one?

17        A.   Yes, ma'am.

18        Q.   Okay.  So in this one, Ms. -- her name is

19   Lala.  Okay.  I'm just going to call her Lala because I

20   can't for the life of me pronounce her last name.  Lala

21   complained that when she was arrested for being out

22   after curfew, she was tackled to the ground resulting in

23   a fractured wrist and that the officer, Officer Adam

24   Bolton, put his knee in her back, called her a piece of

25   shit.  Do you see this?
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1  called her a piece of shit, right?

2      A.   Correct.

3      Q.   Okay.  And when the officer's sergeant was

4  interviewed, Sergeant Lombardi, Lombardi said, "I did

5  not witness the arrest."  Do you see this right here?

6      A.   Yes.

7      Q.   Okay.  That's at page DN_031647.  But then he

8  also says, when he's asked, "Did you hear Office Bolton

9  or any officers call the complainant a piece of shit or

10  use any other profanity during the incident?  If yes,

11  please explain."  Answer: "No, Officer Bolton was

12  extremely professional."  Do you see that?

13      A.   Yes, ma'am.

14      Q.   Okay.  So then, in summary, the sergeant

15  didn't see the arrest, but he says that the officer was

16  extremely professional, right?

17          MS. HOFFMAN:  Objection.  Form.  You can

18      answer.

19      A.   Yes, ma'am.

20      Q.   Does that seem consistent to you that if he

21  didn't witness the arrest, he could have anything to say

22  about the officer's conduct?

23          MS. HOFFMAN:  Objection.  Form.  You can

24      answer.

25      A.   It causes me -- you know, I have questions

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   regarding the statements.

2        Q.    Okay.  But this is what was found, the decline

3   letter found that the sergeant backed up the officer,

4   right?  I'm showing you the decline letter again 31598.

5   Right.  It says right here, "The officer denies using

6   any inappropriate language during your arrest. This was

7   corroborated by the officer's supervisor who was present

8   on scene and described the officer's behavior as

9   'extremely professional,'" right?

10       A.    Yes, ma'am.

11       Q.    So -- and this is signed by Lieutenant Steve

12  Addison of the Internal Affairs Bureau, right?

13       A.    Yes, ma'am.

14       Q.    So the City, the DPD found that what the

15  sergeant said was truthful?

16       A.    Yes, ma'am.

17       Q.    Backing up his officer even though he admitted

18  that he did not witness the arrest, right?

19       A.    According to his statement, yes.

20       Q.    Right.  So based on the officer's statement,

21  which Lieutenant Addison accepted as true and the

22  supervisor's statement, which Lieutenant Addison

23  accepted as true, and the failure of Officer Bolton to

24  have any body-worn camera, the DPD found that there was

25  no evidence to support to complainant's allegations,

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of COMMANDER HANS LEVENS, 30(B)(6), taken on November 05, 2021

52

```
1   right?
2           MS. HOFFMAN:  Objection.  Form.  You can
3       answer.
4       A.   Yes.
5       Q.   Okay.  Now, if the DPD -- Officer Bolton has
6   not been disciplined for his failure to activate
7   body-worn camera during the course of an arrest -- of
8   this particular arrest, right?
9       A.   No, ma'am.
10      Q.   Okay.  And in fact, the decline letter says,
11  expressly, there is no reason to suspect that the
12  officer violated any department policy or acted in such
13  a manner that would be considered inconsistent with
14  their training, right?
15      A.   Yes, ma'am.
16      Q.   Okay.  So Officer Bolton didn't violate any
17  use of force policy and he didn't violate any
18  BWC policy, because if he had, he would have been
19  investigated and disciplined for it, right?
20      A.   In -- in reviewing that statement, he
21  indicated he thought he had activated it.  So, you know,
22  for that -- his intent was he believed he had activated
23  it, but could not find the recording.
24      Q.   That was deemed to be truthful by Internal
25  Affairs, right?
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

53

```
 1        A.   Yes, ma'am.

 2        Q.   Okay.  So there's no particular -- nobody else

 3   has been disciplined, other than the one that you

 4   mentioned, for failure to activate BWC during the

 5   protests, right?

 6        A.   Correct.

 7        Q.   Are you aware that in this case, there was a

 8   kettling incident on Sunday the 31st for which there

 9   were numerous DPD officers, including two sergeants and

10   a lieutenant present?

11             MS. HOFFMAN:  Objection.  Form.  Foundation.

12        A.   I'm not aware of that, no.

13        Q.   Okay.  Is there any sort of systematic way in

14   which the DPD determines, in the course of its

15   investigations, whether officers should be disciplined

16   for violation of BWC policy?

17        A.   Yes.  So Internal Affairs, if -- when they

18   receive the initial complaint, if they deem that there

19   is a potential policy [sic] of the body-worn camera

20   policy, they will add that to the case.  There are

21   instances, if the complaint goes to the Conduct Review

22   Office for analysis, that, you know, my office and

23   myself, I review that specification.  I also review the

24   case, if it's not declined, obviously, and if there is a

25   BWC violation, I will add that specification to the case
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of COMMANDER HANS LEVENS, 30(B)(6), taken on November 05, 2021

54

1   in the Conduct Review Office.

2       Q.   If there had been body-worn camera -- if

3   Officer Bolton's body-worn camera had been activated,

4   there would be some evidence either corroborating or

5   disproving the complainant's allegation, right?

6           MS. HOFFMAN:  Objection.  Form.  You can

7       answer.

8       A.   Yes.  I can't tell you what it would have

9   captured, but had it been activated, it may have

10  assisted in investigating that complaint.

11      Q.   Based on your review of the IA investigations

12  into the complaints arising from the George Floyd

13  protests, it's fair to say that many decline letters

14  were issued on the basis that no officer could be

15  identified, right?

16      A.   Yes, ma'am.

17      Q.   Okay.  And because no officer could be

18  identified, no specific disciplinary action against any

19  particular officer could be pursued, right?

20      A.   Yes, ma'am.

21      Q.   And the ways in which an officer may be

22  identified are through their officer statements that

23  they fill out, documenting their use of force and their

24  body-worn cameras, right?

25      A.   Or other video evidence that would assist in

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of COMMANDER HANS LEVENS, 30(B)(6), taken on November 05, 2021

55

 1   identifying the officer.

 2        Q.   So if you can find something on social media

 3   or if a third-party or the complainant might have some

 4   video, right?

 5        A.   Yes, ma'am.

 6        Q.   Okay.  But two of the -- you would agree that

 7   two of the major methods for identifying officers in the

 8   context of -- in this context, would be if they wrote a

 9   use-of-force statement documenting exactly what they did

10   or if they had their body-worn camera on showing what

11   they did?

12        A.   Yes, ma'am.

13        Q.   Okay.  And if those -- if officers did not

14   have their body-worn cameras on when they were supposed

15   to, and if they did not fill out use-of-force reports in

16   a timely fashion to document all their uses of forces

17   during the protests, then it would make it very

18   difficult to identify anybody for discipline, right?

19             MS. HOFFMAN:  Objection.  Form.  You can

20        answer.

21        A.   So can you identify "timely"?

22        Q.   Well, you're familiar with the fact that many

23   of the use-of-force reports, or rather -- not

24   use-of-force reports, the officer statements that were

25   filled out after the George Floyd protests were



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  completed weeks afterwards, right?

2     A.   Yes, ma'am.

3     Q.   Okay.  And, in fact, that was what officers

4  believed they were supposed to do, right?

5          MS. HOFFMAN:  Objection.  Form.  Foundation.

6          Outside the scope of this individual's

7       testimony.  So speaking in his individual capacity.

8  BY MS. WANG:

9     Q.   Well, actually, you're designated on topic 3C,

10  which concerns use-of-force policy -- use-of-force

11  reporting policy.  So you are designated to talk about

12  this topic, right, Commander?

13     A.   Yes, ma'am.

14          MS. HOFFMAN:  The question was about individual

15       officers' understanding of when and what they had to

16       report relating to the protests.  That's outside the

17       scope of topic 3.

18  BY MS. WANG:

19     Q.   Okay.  I'm showing you Denver 31642, which is

20  again, Officer Bolton's statement when he was

21  interviewed about this particular complaint about

22  pushing down a protestor, breaking her wrist, and

23  calling her a piece of shit.  Right here it says, "For

24  the George Floyd protests, we were told that all uses of

25  force be documented under a large 'use of force' and

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of COMMANDER HANS LEVENS, 30(B)(6), taken on November 05, 2021

57

1  that after an after-action would be completed.  There

2  was nothing from this arrest that stood out in my mind."

3  Do you see that?

4      A.   Yes, ma'am.

5      Q.   Okay.  So at least what Officer Bolton said,

6  when he was interviewed by IA, he didn't complete a use-

7  of-force report for his interaction with this particular

8  woman because he believed that a general one would be

9  completed afterwards?

10         MS. HOFFMAN:  Objection.  Outside the scope of

11      his testimony.  Speaking in his individual capacity.

12      A.   So in reviewing this -- documents in front of

13  me, typically, as outlined in our operations manual,

14  when an officer uses force and usually -- if an officer

15  is using force, there are some criminal charges that are

16  associated, an individual use-of-force report would be

17  completed for each incident.  Because this was tied to

18  arrest, typically this would be a standalone

19  use-of-force report if force was used in affecting the

20  arrest. Now, I know that there were some communication

21  concerns during the protests.  There is a section in the

22  Denver operations manual that says that the chief of

23  police or his designee can in a spontaneous event, such

24  as this, can -- when force is used related to defensive

25  resistance can complete one overall use-of-force report

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  documenting the force used.  But typically when an

2  arrest is made, and if there is force used, the

3  standalone use-of-force report would be completed.

4      Q.   Okay.  So let's break that down.  With respect

5  to Officer Bolton, if he -- you're saying the policy is,

6  Denver's policy is, that if you use force during the

7  course of an arrest, you're supposed to complete your

8  own use-of-force statement, right?

9      A.   Yes, ma'am.

10     Q.   Okay.  And because Officer Bolton is saying,

11 "I did not use force during this arrest," he was

12 complying with DPD policy on the use-of-force reporting,

13 right?

14     A.   If he believed there was no force used in

15 affecting in this arrest, then there would be no

16 use-of-force report to complete and a statement

17 associated.

18     Q.   So Officer Bolton did not violate with respect

19 to this particular complaint, as found by DPD,

20 Officer Bolton did not violate the use-of-force

21 reporting policy, right?

22     A.   Now, her complaint was that he used force.

23     Q.   Well, I get that.  But you -- you're telling

24 me that there have been instances where some other

25 different violation has been identified by IA and then

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

 1    they act on it, right, like that one that you mentioned,

 2    case number 0139?

 3         A.    The body-worn camera?  Yes, ma'am.

 4         Q.    Right.  And this one was also investigated by

 5    IA, and they didn't see anything that Officer Bolton had

 6    done that violated either the BWC policy or the

 7    use-of-force reporting policy, right?

 8         A.    Yes, ma'am.

 9         Q.    So even though this particular complainant's

10    complaint is about use of inappropriate force -- and

11    DPD didn't find that he had violated that policy either,

12    right?

13         A.    Yes, ma'am.

14         Q.    Okay.  They didn't see anything that he had

15    done that violated any other policy, right?

16         A.    Correct.

17         Q.    Okay.  So going back to what you were saying

18    on topic 3C, the use-of-force reporting policy for the

19    DPD with respect to protests is that if there is force

20    used during the course of a protest, that's going to be

21    documented in a single after-action report afterwards?

22         A.    Yeah.  I can -- I have -- I can refer you to

23    that section, if you'd like.  I have that available,

24    readily available.

25         Q.    Okay.  What is it?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of COMMANDER HANS LEVENS, 30(B)(6), taken on November 05, 2021

60

```
 1        A.   So in the operations manual section -- so your

 2   Bates number is DEN_001134.  It's under

 3   105.00 force-related policies.  105.03 reporting would

 4   be subsection 2, supervisory investigation, and

 5   subsection 9 that reads, "With authorization of the

 6   chief of police or designee, the multiple use of

 7   chemical munitions in response to defensive resistance

 8   during large scale events may be documented with a

 9   single use-of-force report."

10        Q.   Okay.  So that is DPD policy, yes, and it is

11   in writing, correct?

12        A.   Yes, ma'am.

13        Q.   Okay.  So individual officers who were

14   attending the protests, standing in skirmish lines and

15   are policing the protests, understood that they did not

16   have to complete individual use-of-force statements for

17   any use of force in response to defensive resistance,

18   right?

19             MS. HOFFMAN:  Objection to form.

20        A.   Related to the use of chemical munitions as

21   outlined in the policy.

22        Q.   Okay.  And chemical munitions may include

23   what?

24        A.   Chemical munitions could be OC spray, OC --

25   individual pepper spray, PepperBall.
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1      Q.   But it doesn't include 40-millimeter

2   launchers?

3      A.   No, direct -- not direct impact 40-millimeter

4   rounds.

5      Q.   What about flash bangs?

6      A.   Flash bangs is noise flash diversionary

7   device.  That is not a chemical munition.

8      Q.   Okay.  So if an officer uses flash bangs

9   during the protests, they are required by DPD policy to

10   complete a -- their own individual use-of-force report?

11      A.   That -- our use-of-force policy talks about

12   force used related to individuals.  There was nothing in

13   our policy at the time related to NFDDs.

14      Q.   Okay.  So if there is nothing govern -- there

15   was nothing in writing whatsoever dealing with NFDDs,

16   whatsoever, right?

17      A.   Not in our use-of-force section.

18         MS. HOFFMAN:  Object to the form.

19      Q.   Okay.  And there's -- and not in the

20   use-of-force section and not in the use-of-force

21   reporting section either, right?

22      A.   No.  No, ma'am.

23      Q.   I'm correct, right?  There was a double

24   negative there.

25         It is correct to say that there were no

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

 1   policies whatsoever governing the use of NFDDs whether

 2   in the context of using the force or documenting it,

 3   right?

 4        A.   Correct.

 5            MS. HOFFMAN:  Outside of -- outside of this

 6        witness' designation speaking in his individual

 7        capacity.

 8        A.   Yes.  It's my understanding and knowledge of

 9   the use-of-force policy in 105, there's nothing specific

10   to NFDDs.

11   BY MS. WANG:

12        Q.   Okay.  So with respect to topic 3C on which

13   you have been designated about use-of-force reporting,

14   DPD had no policy with respect to how officers should

15   report their use of NFDDs?

16        A.   Correct.

17        Q.   Okay.  And there was no policy that the DPD

18   had at the time of the protests with respect to how

19   officers should use Stinger Grenades, right?

20            MS. HOFFMAN:  Objection.  Outside the scope of

21        this individual's designation.  Speaking in his

22        individual capacity.

23   BY MS. WANG:

24        Q.   No.  This relates to topic 3C.  You may answer

25   the question.



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1          MS. HOFFMAN:  But how to use, not how to

2      document.  If you want to rephrase, then -- then we

3      can address, but right now the question, as phrased,

4      is outside his designation.

5  BY MS. WANG:

6      Q.   The DPD policy -- there was no DPD policy at

7  that time of the protests on how to document the use of

8  Stinger Grenades, right?

9      A.   To my understanding, no, ma'am.

10     Q.   Okay.  What was the DPD policy at the time of

11 the protests on how to document the use of

12 40-millimeters?

13     A.   So the -- there's nothing -- in the

14 use-of-force policy, just as is with any force, when you

15 use force with the 40-millimeter in response to active

16 aggression, an individual use-of-force report would be

17 completed for that individual upon which that force was

18 used.

19     Q.   Nobody has been disciplined for the failure to

20 document use of 40-millimeters during the protests,

21 right?

22     A.   Correct.

23     Q.   Has anybody been disciplined at all from

24 failure to appropriately document their use of force

25 during the protests?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1      A.    No, ma'am.  So if the specification for that

2  violation would be failure to make or complete official

3  reports, that's a rule and regulation of the sustained

4  cases.  That has not been a specification that has been

5  sustained.

6           MS. HOFFMAN:  Can we take a five-minute break?

7           VIDEOGRAPHER:  We are off the record.  The time

8      is 11:25.

9             (OFF THE RECORD)

10          VIDEOGRAPHER:  We are back on the record for

11     the 30(b)(6) deposition of Officer Hans Levens being

12     conducted by videoconference.  My name is Laurin

13     Harrill, the videographer, and Sandra Ventura is the

14     court reporter.  Today is November 5, 2021.  The

15     current time is 11:33 a.m.

16  BY MS. WANG:

17     Q.    Commander Levens, I'm showing you on the

18  screen DEN_031838.  It's a decline from the case

19  number SVC2020-0030.  Do you see it?

20     A.    Yes, ma'am.

21     Q.    So this decline letter signed by the commander

22  of Internal Affairs Bureau says that, "During the course

23  of this investigation high-activity location observation

24  Halo cameras were reviewed along officer's body-worn

25  camera at BWC footage."  Do you see that?

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    A.   So in reviewing the -- both the body-worn

2    camera video from Officer Christian as well as the video

3    that Ms. Epps was taking, I did see Officer Christian

4    kneel down on one knee.  I could not see where this

5    PepperBall round landed.  In fact, I couldn't tell

6    exactly where Ms. Epps was at the time, whether she was

7    on the roadway or on the sidewalk.  But in reviewing the

8    videos, I could see that Officer Christian did fire one

9    PepperBall round, what appeared to be in the direction

10   of Ms. Epps.

11   **Q.   As a representative of City and County of**

12   **Denver, was Officer Christian's conduct during the event**

13   **that we're talking about with Ms. Epps consistent with**

14   **DPD policies, practices, and customs?**

15        MS. HOFFMAN:  Objection.  Form.  You can

16        answer.

17   A.   So in just reviewing those videos alone, I

18   could not make a determination whether this was in or

19   out of policy.  In the videos that were -- were

20   supplied, I could see that when Ms. Epps was crossing

21   the roadway, there appeared to be a couple individuals

22   on the south curb line prior to.  I could not observe

23   exactly where Ms. Epps was, whether she was on the

24   roadway or on the sidewalk at the time the PepperBall

25   round was fired. None of the video evidence shows her

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  being struck with the PepperBall.  She did indicate in

2  her video that I believe it was that "he had shot me in

3  the calf," but there was no, you know, reaction that I

4  observed in her voice as if she had been hit, which, you

5  know, I would expect someone to say, ow, or something to

6  that affect.  But I -- you know, to actually look at an

7  incident where an officer is using force, I would need

8  to look at all the available evidence to include Officer

9  Christian's body-worn camera, any other body-worn

10  cameras that may have captured this incident, as well as

11  Ms. Epps' video from this case, any potential Halo video

12  that we could obtain.  As well as, give Officer Christian

13  an opportunity to, you know, explain why he deployed his

14  PepperBall and reasoning to determine whether or not

15  this was in or out of policy.  I would also need to

16  identify witness officers that witnessed this PepperBall

17  deployment to obtain statements from them before I could

18  conduct a thorough review to determine whether or not

19  this PepperBall deployment was in or out of policy.

20       Q.   **So is the answer to my question: The City is**

21  **not taking a position on whether Officer Christian's**

22  **conduct was within or outside of DPD's policies,**

23  **practice and customs?**

24       A.   So I cannot make a determination whether it

25  was in or out of policy, based on the information



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of COMMANDER HANS LEVENS, 30(B)(6), taken on November 05, 2021

83

```
 1   available.
 2       Q.   Okay.  Well, you had more information
 3   available to you, right?  Like, I don't know,
 4   Officer Christian's deposition, right?  You could have
 5   read that.
 6           MS. HOFFMAN:  Objection.  Form.  Outside the
 7       scope of the designation.  Speaking in his
 8       individual capacity.
 9           MR. ARO:  Absolutely not.  His job and your job
10       was to prepare him to address these issues, and this
11       is incident one or example one of your failure to do
12       so. So this relates directly to the topics that
13       we're here to talk about.  So let me ask the
14       question again.
15   BY MR. ARO:
16       Q.   Officer Levens, you had available to you the
17   deposition in which Officer Christian explained what he
18   did in deploying PepperBall on Elisabeth Epps.  You
19   didn't read it, did you?
20           MS. HOFFMAN:  Objection -- same objection.  The
21       topic was to look at video.  So, again, he's
22       speaking in his individual capacity.
23           MR. ARO:  No.
24   BY MR. ARO:
25       Q.   But go ahead and answer.
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of COMMANDER HANS LEVENS, 30(B)(6), taken on November 05, 2021

84

1          MR. ARO:  And if this becomes an issue later,

2      we can fight that out with the judge.

3      A.   So what I had available for this topic was the

4  video of this incident.  That is what I reviewed.

5      **Q.   Do you know how to reach Officer Christian if**

6  **you want to talk to him about what he did?**

7      A.   Yes.

8          MS. HOFFMAN:  Same objection.  Individual

9      capacity.

10         MR. ARO:  I'm going say the same thing one more

11     time.  If you want to fight about whether it's

12     within the scope of the designation, that's fine.

13     We'll do it with the judge.  I've got limited time,

14     and I'd appreciate it if you'd let me ask the

15     questions.  You can have a standing objection to it

16     being outside the scope, and we'll just argue about

17     it later.

18         MS. HOFFMAN:  Understood.

19  BY MR. ARO:

20     **Q.   Do you know how to reach out Officer -- oh,**

21  **you answered it.  So, yes, you know how to reach out to**

22  **Officer Christian if you want to ask him about what he**

23  **did, right?**

24     A.   Yes, sir.

25     **Q.   And you could have figured out pretty easily**

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   who the other officers who were assigned to that

2   location at that time were, including the sergeant who

3   was present?

4         MS. HOFFMAN:  Same objection.

5   A.   So for this topic, I was reviewing videos.  My

6   concern about essentially conducting my own additional

7   investigation for this would be to jeopardize a

8   potential complaint that we'd have to generate and

9   related -- related to Officer Christian's misconduct.

10  Q.   So my question was a little bit different,

11  Officer.  I'm sorry.  I do have limited time, and I'm

12  trying to get through my questions.

13        My question was: You had the opportunity and

14  the wherewithal to identify the other officers,

15  including a sergeant, who were present at that time that

16  Officer Christian deployed PepperBall at Ms. Epps,

17  correct?

18        MS. HOFFMAN:  Same objection.  He was also

19     attempting to answer this question.  He may not be

20     able to do it in a yes or no, but he was answering

21     the question.

22        MR. ARO:  No, he actually wasn't.  He told me

23     why he chose not to reach out to these folks.  My

24     question was, he had the wherewithal to reach out

25     had he chosen to do so.  Different questions.  Let

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        me ask my questions so that we can get through this

 2        within the time allotted.

 3   BY MR. ARO:

 4        Q.   Let me ask the question again, Officer --

 5   excuse me, Commander. You had the wherewithal, had you

 6   chosen to do so, to identify the other officers,

 7   including a sergeant who were there present with Officer

 8   Christian when he shot Elisabeth Epps, correct?

 9             MS. HOFFMAN:  Outside scope.

10        A.   Yes.  I -- I could have attempted to reach out

11   and identify additional officers.

12        Q.   And you didn't do that, right?

13             MS. HOFFMAN:  Outside scope.

14        A.   Correct.

15        Q.   When you watched the video, you had the

16   wherewithal and the ability, if you chose to do so, to

17   initiate an Internal Affairs investigation of the

18   circumstance that would allow DPD to take its own look

19   about what Officer Christian did, correct?

20        A.   Yes, sir.

21        Q.   Did you do so?

22        A.   No, sir.

23        Q.   Why not?

24        A.    In this video -- I was reviewing the video in

25   preparation for this topic.  There was -- with not
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  having all available evidence, there was nothing that

2  stood out to me on its face, as did a couple of other

3  incidents that I did report to Internal Affairs,

4  regarding this PepperBall deployment, but under my

5  topic, I was reviewing what was provided to me.

6      **Q.   So did anybody tell you that Officer**

7  **Christian's explanation for why he shot Elisabeth Epps**

8  **that she was creating a traffic hazard?**

9          MS. HOFFMAN:  Outside scope.

10     A.   No, sir.

11     **Q.   Would that information inform your judgment**

12  **about whether his conduct was within or outside of DPD**

13  **policy?**

14     A.   So I would have to get more than just a

15  traffic hazard.  I feel it's my obligation to talk to

16  the officer, and, you know, get all the information

17  available, you know, including allowing him to review

18  his body-worn camera video which is customary in

19  Internal Affairs cases to explain his actions to make a

20  determination whether it's in or out of policy.

21     **Q.   Is it within or out of DPD policy to shoot**

22  **jaywalkers with PepperBall, simply because they are**

23  **jaywalking?**

24     A.   So --

25          MS. HOFFMAN:  Object to form.  You can answer.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    A.    So DPD policy requires that the individual

2    exhibits defensive resistance in order to deploy

3    PepperBall.  At the time, the resistance and response

4    chart and operations manual also talked about crowd

5    control and deploying physical resistance also include

6    physical actions by individuals to disrupt a pedestrian

7    or traffic flow.

8    **Q.    So is it your testimony that it is within**

9    **policy to shoot a jaywalker with PepperBall?**

10   MS. HOFFMAN:  Objection.  Form.  You can

11   answer.

12   A.    I can't make that determination whether it's

13   in or out of policy without all the available evidence

14   related to this case.

15   **Q.    Did you hear Officer Christian issue a warning**

16   **before deploying PepperBall in the direction of**

17   **Ms. Epps?**

18   A.    In reviewing the video, I did not hear a

19   warning given.

20   **Q.    The incident that we're talking about here**

21   **happened more than 18 months ago, right?**

22   A.    Yes, sir.

23   **Q.    And it was featured -- has been featured in**

24   **this federal lawsuit claiming that the conduct in**

25   **question, including Officer Christian's conduct, is**



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  illegal, right?

2      A.   I would have to refer to the lawsuit, the

3  exact language.

4      Q.   Okay.

5      A.   But I'm saying that it was a violation of her

6  rights.

7      Q.   Okay.  Assume for purposes of this question

8  that the lawsuit in this case alleges that Officer

9  Christian's conduct was a violation of law.  DPD has had

10 18 months to do an IAD investigation of that accusation,

11 right?

12     A.   Elisabeth Epps did not file any complaints

13 with the Internal Affairs Bureau.

14     Q.   She sued you -- or the DPD in federal court

15 accusing the DPD of illegal conduct, including Officer

16 Christian's conduct, and DPD has had a year and a half

17 since that happened to open an IAD investigation, true?

18         MS. HOFFMAN:  Objection.  Form.  You can

19     answer.

20     A.   Again, it's not policy that based on lawsuits

21 that the Department automatically open Internal Affairs

22 cases.

23     Q.   Okay.  And it -- in fact, in the case of

24 Ms. Epps being shot, DPD has not done so, correct?

25     A.   Correct.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of COMMANDER HANS LEVENS, 30(B)(6), taken on November 05, 2021

90

1       Q.    When's that investigation going to start after
2    this deposition?
3       A.    You know, Ms. Epps could -- anyone can -- she
4    can file a complaint with our Internal Affairs Bureau
5    and then that process could be initiated.
6       Q.    So how about if we do this?  I'm telling you,
7    as an officer assigned to the IAD that Officer Christian
8    testified that he shot Elisabeth Epps for jaywalking.
9    You've seen both body-worn cameras.  You know who the
10   sergeant is at the site.  You know or can figure out who
11   the other officers were at the site.  How long from now
12   are you going to initiate an Internal Affairs
13   investigation of the information that I'm providing you
14   on videotape in this circumstance?
15          MS. HOFFMAN:  Objection.  Form.  You can
16      answer.
17      A.    I'm happy to notify Internal Affairs --
18      Q.    You are Internal Affairs, aren't you?
19      A.    I'm Conduct Review.
20      Q.    Which is part of Internal Affairs, right?
21      A.    It's part of some disciplinary process, but
22   it's not Internal Affairs.  But, yes, it's part of the
23   disciplinary process from Internal Affairs.
24      Q.    Okay.  Well, we'll look forward to the
25   information that we later get about the investigation

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of COMMANDER HANS LEVENS, 30(B)(6), taken on November 05, 2021

91

1   that started with today's deposition. Has anybody been

2   disciplined in relation to topic 8, incident A, Officer

3   Christian shooting Elisabeth Epps?

4        A.   No, sir.

5        Q.   All right.  Topic 8, incident B also involves

6   Ms. Epps.  It's an incident that occurred on May 29.

7             And, in general, the video of that that you've

8   seen is the video that's identified in the August 20

9   letter; is that true?

10       A.   Yes, sir.

11       Q.   Other than what you saw in the video that's

12  identified in the August 20 letter, do you have any

13  information about topic 8, subpart B?

14       A.   No, just my observations.

15       Q.   And is the conduct of the DPD officers who

16  were at the scene of topic 8, subpart B consistent with

17  City -- DPD policies, practices, and customs?

18            MS. HOFFMAN:  Objection to form.  You can

19       answer.

20       A.   Again, like my last answer, in reviewing the

21  available videos for that, you know, I had my own

22  personal observations, but we would have to identify all

23  the officers, you know, that were involved in that

24  incident and obtain statements as to why force was used

25  before I could make a proper determination of whether

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of COMMANDER HANS LEVENS, 30(B)(6), taken on November 05, 2021

92

 1   this incident was in or out of policy.

 2        Q.    So your testimony on behalf of the City is

 3   that the City cannot take a position at this time about

 4   whether what happened in topic 8, subpart B is within or

 5   outside of DPD policy, practice, and customs; is that

 6   correct?

 7        A.    Correct.

 8        Q.    And are you going to tell me the same thing

 9   with respect to each of the other topics -- in topic A?

10        A.    So, yes, it's my -- I cannot do a proper

11   review or analyze an incident to determine whether

12   anything is in or out of policy without collecting all

13   available information associated with that incident,

14   like I described, the involved officers, witness

15   officers, all the available video evidence and then

16   obtaining written statements or video statements from

17   the officers providing explanations as to why they took

18   the actions they took.

19        Q.    So -- and what you just said is true with

20   respect to issue -- topic 8C, which is another incident

21   involving Ms. Epps.  And it's your position -- or the

22   City's position that it is not possible for you, as we

23   sit here today, to tell us, under oath whether the

24   conduct of the officers identified in topic 8C is inside

25   or outside of DPD policy -- DPD policy, practice, and

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   custom; is that right?

 2           MS. HOFFMAN:  Objection.  Form.  You can

 3       answer.

 4       A.   Yes.  That's correct.

 5       Q.   And is it your testimony that for the same

 6   reason, you are not able to tell us today whether topic

 7   8D -- the conduct described in topic 8D was within or

 8   outside of DPD policy, practice, custom, correct?

 9           MS. HOFFMAN:  Objection.  Form.  You can

10       answer.

11       A.   I would have to look back at the video on D.

12   I don't remember, unless I could refer to some notes,

13   what topic the case was associated that I had sent to

14   Internal Affairs regarding the investigations that I

15   requested to be open.  I know one of them was under

16   topic 8E.  I believe the other one may have been under

17   D, but I'd have to see a quick snippet of the video to

18   confirm that.

19       Q.   Just so I understand what you're saying, in

20   preparing for today's deposition, you saw some things

21   that caused you to reach out to Internal Affairs for

22   Internal Affairs to take a closer look at some of these

23   incidents; is that true?

24       A.   Yes, sir.

25       Q.   Okay.  And you say that you know that
```



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

 1   topic 8E is one of those topics?

 2       A.   Yes, sir.

 3       Q.   And generally, what topic 8E involves is

 4   groups of officers on Colfax Avenue walking towards the

 5   capitol from the east and towards the east from the

 6   capitol and a group of protestors between those two

 7   group of officers and a confrontation that happened in

 8   front of the Basilica of the Immaculate Conception,

 9   right?

10       A.   Yes.

11       Q.   Have you heard that incident ever referred to

12   as a kettling incident?

13       A.   No, sir.

14       Q.   Are you familiar with the phrase kettling as

15   it relates to police practices?

16       A.   No, sir.

17       Q.   Are you familiar with the idea that it can be

18   problematic in certain circumstance for multiple groups

19   of police officers to kind of corral a group of people

20   into a confined space and then deploy less-lethal

21   munitions at those people?

22            MS. HOFFMAN:  Objection.  Form.  You can

23       answer.

24       A.   Yes, sir, without a proper route to disperse.

25       Q.   Sure.  I'm not asking you for an opinion in



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   this circumstance.  I'm just saying that that is a

 2   practice that you're aware can be problematic in certain

 3   circumstances, correct?

 4       A.   Yes, sir.

 5       Q.   And so, you watched the video in topic 8E, and

 6   based on your own review, you were concerned about

 7   something you saw that caused -- and that concern caused

 8   you to make a referral to the Internal Affairs

 9   Department; is that fair?

10       A.   Yes, sir.

11       Q.   What was that it you saw that caused you to

12   make the referral to Internal Affairs?

13       A.   So there was a body-worn camera video

14   incident.  I believe it was Officer Hoffecker, that he

15   had advised a bicyclist that was pushing a bicycle that

16   he needed to leave.  He had told him he had five seconds

17   to leave.  The officer approached this individual after

18   he refused, and he -- he's in real close proximity to

19   this individual, so I can't see exactly what's

20   happening. But this individual said, "Fuck you.  Point

21   your gun at me."  And then there was some type of

22   scuffle or movement of the body-worn camera video.  I

23   can't see what's happening.  But he starts to flee away

24   from the officer, eastbound on the sidewalk on Colfax

25   pushing his bicycle, and the officer deployed
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    PepperBall.

2         Q.    And shot him in the back?

3         A.    Yes, sir.

4         Q.    Okay.  As part of your review of the various

5    video images of this incident in front of the basilica,

6    did you become aware that most of the officers who were

7    walking on Colfax towards the east, towards the

8    basilica, were not -- had not activated their body-worn

9    cameras?  Is that a fact that you know about?

10        A.    No, sir.

11        Q.    If it is true that a number of the officers

12   who were moving eastward on Colfax towards the basilica

13   did not activate their body-worn cameras, would that be

14   a fact that would concern you?

15        A.    At this point, at the time of this incident --

16   our body-worn camera policy has a section about required

17   activation.  There was nothing in our body-worn camera

18   policy at the time related to spontaneous events, crowd

19   control incidents.  That has since been -- there has

20   since been a change to our operations manual regarding

21   required activation. The -- under the body-worn camera

22   policy requiring activation, the -- there -- probably

23   closest is that the contact becomes adversarial would

24   require an officer to activate their body-worn camera

25   video or there's also a caveat that any time the officer

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

The Deposition of COMMANDER HANS LEVENS, 30(B)(6), taken on November 05, 2021

97

 1    feels it would be beneficial.  But there's nothing about

 2    an officer being ordered as part of a field force to

 3    walk eastbound on Colfax that would require him or her

 4    to activate their body-worn camera video.

 5         Q.   If the officers were in effect kind of herding

 6    people away from the capitol down Colfax and trying to

 7    get them to disperse away from the capitol, would that

 8    be a circumstance that might trigger, even under the

 9    prior body-worn camera policy, a requirement that those

10    cameras be activated?

11         A.   So you used the word herding.  When we have to

12    look at a case to sustain, we have to go through the ops

13    manual section of what's required.  There's nothing

14    about herding individuals.  It's about contacting and

15    arresting individuals.  It's about an adversarial

16    contact or the blanket, you know, any time an officer

17    feels it would be beneficial.  You know -- you know,

18    it's a -- you know, in my personal opinion, there's

19    always a benefit to activating body-worn camera for both

20    the officer and the public.

21         Q.   Because one of the whole points of the cameras

22    is take the he-said, she-said out of situations and give

23    everybody a video of what actually happened, right?

24         A.   Correct.

25         Q.   Including a sound recording, which is not

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  available from Halo cams and many other kinds of cameras

2  that might be available to the officers?

3      A.   Correct.

4      Q.   All right.

5          MS. HOFFMAN:  I'm just going to have to stop.

6  Can we go off record for a minute?

7          MR. ARO:  Sure.

8          VIDEOGRAPHER:  Okay.  We are off the record.

9          The time is 12:16.

10            (OFF THE RECORD)

11         VIDEOGRAPHER:  We are back on the record for

12  the 30(b)(6) deposition of Commander Hans Levens

13  being conducted by videoconference.  My name is

14  Laurin Harrill, the videographer, and Sandra Ventura

15  is the court reporter.  Today is November 5, 2021.

16  The time is 12:17.

17 BY MR. ARO:

18     Q.   All right.  So you said that the -- that you

19 referred topic 8E to Internal Affairs because of a

20 concern about an officer deploying PepperBall at a -- at

21 a guy walking a bicycle when the guy was walking away

22 from the officer; is that fair?

23     A.   Yes, sir.

24     Q.   Was there anything else that you saw in the

25 video that related to topic 8E that -- that you included

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

 1  in your referral to Internal Affairs or that caused you

 2  any pause as a professional who understands what is and

 3  what is not misconduct by a police officer?

 4      A.   Yes, sir.  The only thing that jumped out to

 5  me to cause me to pause was this deployment of the

 6  PepperBall on this individual that I described.

 7      Q.   Okay.  So as far as you could tell, based on

 8  the other views that you were provided to look at, you

 9  didn't see anything that jumped out at you as a

10  potential problem; is that fair?

11      A.   Yes, sir.

12      Q.   Okay.  Topic 8F involved a group of protestors

13  at Colfax and Lincoln near Civic Park.  Several

14  SWAT officers deployed canisters of gas.  Is it your

15  testimony on behalf of the City here today that you lack

16  the information at this moment to take a position on

17  whether the conduct depicted in those videos was or was

18  not within DPD policy, practice, and custom?

19      A.   Yes.  I cannot make that determination today.

20      Q.   And with respect to 8G, in which the plaintiff

21  Zach Packard, was shot in the head with a bean bag round

22  on May 31st, it's your testimony that the extensive

23  video that was provided for your review does not allow

24  you on behalf of the City to take a position about

25  whether what happened there was within or outside of

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   policy?

 2         MS. HOFFMAN:  Objection to form.  You can

 3      answer.

 4      A.    That is correct, sir.

 5      Q.    With respect to topic 8H, which is the last

 6   one listed here, is it also your position that you do

 7   not -- or were not provided with sufficient information

 8   to take a position on behalf of the City about whether

 9   the officer's conduct in that incident was inside or

10   outside of DPD policy, practice and custom?

11         MS. HOFFMAN:  Form.  You can answer.

12      A.    Sir, if available, can you show me the end of

13   that video, after 20 minutes?  I had some issues with my

14   player in reviewing that one.

15      Q.    So I can do that.  I'm afraid it's probably

16   going to consume the rest of the time that I have.  So

17   it's your testimony that the video that was provided to

18   you -- you had an issue with the player or the video or

19   something and you weren't able to view the entire video?

20      A.    Yes, sir.  At about 20 minutes into the video,

21   it kept glitching out.  I tried to download it multiple

22   ways and could not get it to play correctly.

23      Q.    All right.  Did you let anybody know that that

24   was the case before today?

25      A.    Yes.  I let my City Attorney's Office know.
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of COMMANDER HANS LEVENS, 30(B)(6), taken on November 05, 2021

101

1   Q.   And at -- for some reason, that problem was
2   not corrected before today; is that fair?
3   A.   Yes, sir.
4   Q.   All right.  So are you aware that that
5   incident was the subject of one of the Internal Affairs
6   cases that you said you reviewed a file concerning when
7   you first were speaking with Ms. Wang?
8   A.   The incident date I -- I didn't recognize the
9   video that I did watch being associated with any
10  Internal Affairs case that I reviewed.
11  Q.   So the Internal Affairs case number that
12  pertains to this incident is IAB case number P2020-0158.
13      Is it easy for you to retrieve that file
14  quickly?
15  A.   Yeah.  I just have to log into my computer
16  system.  If I can find it.  One second, sir.
17  Q.   And if I need to give that to you, again, I
18  would be pleased to.
19  A.   One second, sir.
20      I'm sorry.  Could you read the P case number
21  to me again, please?
22  Q.   Sure.  2020-0158.
23  A.   158?
24  Q.   That's right.
25  A.   Okay.  So, sir, looking at the case, this does

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   not look familiar as something that I reviewed out of

2   the conduct review office.  It appears that this was

3   sent as a decline from Internal Affairs.

4       Q.   So you referred to this as one of the files

5   that you were provided to prepare for this deposition.

6   Do you recall that?

7       A.   Yeah, not exact number.  I would have to look

8   in my file here.

9       Q.   Do you have any idea why this file was

10  provided to you as part of your preparation for the

11  deposition?

12      A.   Just another force-related complaint that was

13  declined by Internal Affairs.

14      Q.   And you did not associate this case number

15  P2020-0158 involving Jonathan Duran with the incident

16  that is identified in section 8H or topic 8H even though

17  Jonathan Duran's name also appears in that letter; is

18  that fair?

19      A.   Yes, sir.

20      Q.   Okay.  This IAD report, the December 9 decline

21  letter, do you have access to that?

22      A.   Yes, sir.  One second.  Okay.  I have it up.

23  It should be dated December 9, 2020?

24      Q.   That's right. Am I correct in understanding

25  that you before today have no independent knowledge of

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of COMMANDER HANS LEVENS, 30(B)(6), taken on November 05, 2021

103

1    what happened to Mr. Duran other than what you happen to

2    see in the videos in section 8H or in the December 9

3    letter?

4         A.   Correct.

5         Q.   So you weren't involved in the investigation

6    or talked to anybody about what happened, correct?

7         A.   Correct.

8         Q.   Are you familiar with the idea that this

9    particular complaint was declined, in other words, there

10   was no prosecution initiated by the Denver District

11   Attorney's Office based on a review of video only

12   without any additional information?

13        A.   I would have to re-review this case.  Reading

14   so many cases, they all kind of sound the same, but I

15   have to review the case.

16        Q.   You've seen a lot of letters that -- like this

17   December 9 letter to Mr. Duran that conclude an

18   IAD investigation, right?

19        A.   Yes, sir.

20        Q.   Do you think you've seen hundreds of them or

21   thousands maybe?

22        A.   I wouldn't say thousands, just based on what

23   was supplied to me for this deposition today.

24        Q.   But you've seen hundreds over the course of

25   your career of letters like the December 9 letter to

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   Jonathan Duran that concludes the IAD investigation of

2   his complaint; is that fair?

3        A.   I would not say I've seen hundreds.  I've been

4   in my position for about two and a half years.  And if a

5   case is declined out of Internal Affairs, I don't see

6   it.  I only see it if maybe one portion of the

7   allegation is declined, and it would still come to the

8   Conduct Review Office.  Then that point in time, I would

9   -- I would read that decline letter but I would be

10  analyzing just the other specification that was not

11  declined.

12       Q.   Are you familiar with the fact that DPD IAD

13  investigations are often concluded and closed based on

14  nothing more than a review of video?

15            MS. HOFFMAN:  Objection.  Form.  You can

16       answer.

17       A.   I do know that there are a large number of the

18  citizen complaints that are declined based on video, a

19  majority of those being based on body-worn camera video.

20       Q.   Why is it that video review is good enough to

21  conclude an IAD investigation by DPD, but it's not good

22  enough for you as a representative of the City and

23  County of Denver to tell me whether the conduct

24  described in topic 8 was within or outside of DPD

25  policy?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

The Deposition of COMMANDER HANS LEVENS, 30(B)(6), taken on November 05, 2021

105

1          MS. HOFFMAN:  Objection.  Form.  You can

2     answer.

3          A.   So every case has different circumstances.  In

4     a case that Internal Affairs declines to do solely based

5     on body-worn camera footage, the alleged misconduct

6     would had to have been accurately captured leading up to

7     the incident, during the contact with the citizen, all

8     the way through the duration.  So there's no doubt that

9     there's any additional evidence left out based on the

10     allegation that's made by the complainant and that the

11     video is clear that there's no misconduct related to

12     that complaint.

13          MR. ARO:  Okay.  I don't have any further

14     questions, and I'm just going to invite if there's

15     one more question that you have, Liz, I -- to clean

16     anything up, I'm going to invite you to ask that,

17     but I don't have anything further.

18                    REDIRECT EXAMINATION

19     BY MS. WANG:

20          Q.   Yeah.  I'm going to show you this video

21     relating to Jonathan Duran because you were not prepared

22     to -- because you did not watch it in -- the relevant

23     portions beforehand, so I'm entitled to ask this

24     question.  I'm going to show you the video.

25          A.   Okay.



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1        Q.    Do you see my screen?

2        A.    Yes, ma'am.

3        Q.    Okay.  So what Mr. -- just to give you the

4    context, what Mr. Duran alleges is that as a journalist,

5    he was reporting the protest and then at the

6    intersection of Colfax and Pearl on May 31st at

7    9:34 p.m., he was shot in the groin with a rubber

8    bullet, okay?  So this is the video that's referenced in

9    topic 8H starting at 22:07 minutes.  I'm sorry.  Can you

10   hear the -- can you hear the sound?

11       A.    No.  There's no audio, ma'am.

12       Q.    Wait.  Sorry.  I have to rewind it.  Okay.

13             I'm going start at 21:02.

14       A.    Yes, ma'am.

15             (VIDEO PLAYED)

16       Q.    Okay.  Let's pause at 21:29.

17       A.    Yes, ma'am.

18       Q.    Was that use of force consistent with DPD

19   policy and training?

20             MS. HOFFMAN:  Objection.  Form.  You can

21     answer.

22       A.    So in the video that I just watched, I can't -

23   - all I hear is the audio piece of Mr. Duran saying he

24   got hit in the genitals.  I cannot see -- there's no

25   additional evidence that -- what he was hit with, so



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   there -- there would need to be further investigation to

2   look at that to try to determine, you know, what he was

3   struck with.

4        Q.   Okay.  Let me play it at 21:57.

5        MS. HOFFMAN:  Can we go off record for a

6   minute?

7        VIDEOGRAPHER:  Are all parties in agreement to

8   go off the record?

9          (VIDEO PLAYED)

10       MS. WANG:  Let's pause it at 22:13.  That's

11   what he was shot with.

12       MS. HOFFMAN:  Sorry.  I -- I asked to go off

13   the record.  Are we -- are we on the record or off

14   the record?

15       VIDEOGRAPHER:  Are all parties in agreement to

16   go off the record?

17       MS. WANG:  No, we are not. You are going to

18   answer this question because you didn't prepare him

19   by giving him the video to watch.

20       MS. HOFFMAN:  Liz -- Liz, I'm going to give you

21   one more minute and then I'm going to shut down this

22   depo.  I've already given you the courtesy of an

23   additional ten minutes.

24       MS. WANG:  If you want to go to the Court and

25   explain to them how it is that when he asked you for

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        a functioning video with respect to topic 8H, you
 2        didn't give it to him, and then I have to use my
 3        time to show it to him during this deposition, you
 4        can do that or you can just have him answer this
 5        question right now.
 6             MS. HOFFMAN:  Okay.  I let you play the video
 7        for him, and I'm letting you ask a few follow-up
 8        questions.  I said you could have another minute.
 9   BY MS. WANG:
10        Q.    Commander Levens --
11        A.    Yes, ma'am.
12        Q.    -- do you -- do you see on the screen, the
13   rubber bullet displayed at 22:13?
14        A.    Yes, ma'am.
15        Q.    Okay.  That's what Mr. Duran was shot with.
16   Was this police action consistent with DPD policy and
17   training or not?
18        A.    I can --
19             MS. HOFFMAN:  Objection.  Form.  You can
20        answer.
21        A.    I cannot determine that he was shot with that
22   because none of the video evidence shows that projectile
23   hitting him during these riots and protests that
24   occurred over several days.  There were lots of
25   40-millimeter rounds and munitions that were deployed.
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   I don't know if that is, in fact, the -- the round that

2   struck Mr. Duran.

3       **Q.   Okay.   The City's position is that it cannot**

4   **say whether any of the actions described in topics 8A**

5   **through H were consistent with DPD policy or not,**

6   **correct?**

7           MS. HOFFMAN:   Objection.   Form.   You can

8       answer.

9       A.   Correct.

10          MS. WANG:   I have no further questions.

11          MR. ARO:   Thank you, Commander.   Have a good

12      afternoon.

13          THE WITNESS:   Thank you, sir.

14          VIDEOGRAPHER:   Okay.   This concludes the

15      deposition of Commander Hans Levens.   The time is

16      12:32, and we are off the record.

17              (DEPOSITION CONCLUDED AT 12:32 P.M.)

18

19

20

21

22

23

24

25

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com