

# 2014 Annual Report

Nicholas E. Mitchell
Independent Monitor

Exhibit 58

## The Pilot Project did not Require Officers Working Off-Duty or Supervisors to use BWCs, Leaving Many Uses of Force Unrecorded

### a. Officers Working Off-Duty

DPD officers routinely work secondary employment ("off-duty") police jobs, providing security services for private or public entities, including bars, nightclubs, and sports stadiums. Of the 588 off-duty employment contracts approved by the DPD in 2012, 170 (29%) included establishments that sold alcohol or planned to provide alcohol.[19] Off-duty work at bars and other locations where alcohol is served can be particularly volatile. [20]

While working off-duty in their official capacity, DPD officers retain their police authority to enforce the law, and are required to comply with DPD policy and procedure, including policy on the use of physical force.[21] The City of Denver is also potentially liable for any harm that results from police actions during off-duty assignments.[22] Even if the City is not ultimately found liable in such lawsuits, the City may still have to pay the costs of defending them. Similarly, the City may be liable for injuries incurred by officers working off-duty when they are engaging in "official police action" during those jobs.[23]

During the pilot project, DPD officers working off-duty were instructed not to use their BWCs during those jobs. Not surprisingly, in 22 of the 80 (28%) use of force incidents, BWC footage was not available from certain officers because they were working off-duty.[24] A number of these incidents involved uses of force where BWC recordings could have been very helpful. For example:

- On July 4, 2014, an officer normally assigned to District 5 was working off-duty on the 16th Street mall when he observed a large fight and attempted to intervene. One combatant continued to fight, despite the officer grabbing him by his arm and commanding him to sit down. The suspect resisted by pushing back against the officer, who then struck the suspect's leg with his baton. The officer was not equipped with a BWC, and none of the responding, on-duty officers activated their BWCs. The investigating supervisor was able to obtain HALO footage of the incident, but concluded that it was dark, grainy, and taken from fairly far away, making it impossible to determine individual actions.

■ On July 26, 2014, an officer regularly assigned to District 2 was working off-duty at a bar downtown when he was contacted by security regarding a heavily intoxicated patron who refused to leave. During the encounter, the patron's brother reportedly became aggressive and was pushed onto a set of stairs by the officer. The officer was not wearing a BWC, but video of the event (without audio) was captured by a HALO camera. The citizen who was pushed to the ground subsequently filed a complaint against the officer, alleging that inappropriate force had been used against him. That complaint was investigated and is currently under review.

■ On October 18, 2014, off-duty officers were working an event called "The Zombie Crawl" on the 16th Street mall when one officer observed two males fighting. As the officer tried to separate the individuals, a mass of people gathered to watch the fight. When the two men did not stop fighting, the officer deployed his OC spray. Bystanders, including two children, were allegedly affected by the OC spray, and some members of the crowd grew hostile. The officer was off-duty and not wearing a BWC. Although the incident was captured by other surveillance cameras, they were distant, had no audio, and only captured the initial deployment of OC spray, and other officers responding to the scene activated their BWCs but did not capture the use of force. The father filed a complaint alleging that inappropriate force was used towards both him and his children, and due to inconclusive evidence, the force allegation was not sustained.

  *b. Sergeants and Other Supervisors*

Sergeants and other supervisors were also involved in a number of uses of force during the pilot project, taking part in 19 of the 80 District 6 use of force incidents. In 13 of those incidents, the sergeants were working alongside patrol officers; in five incidents, the sergeants were working alone and off-duty; and in one, the sergeant was alone and on-duty. Because sergeants and other supervisors were not equipped with BWCs during the pilot project, footage was not available of some of these incidents. For example:

■ On September 7, 2014, District 6 officers, including one sergeant, responded to a report of an individual running through an alley and screaming. The individual climbed a fire escape of a condominium building, grabbed a rock and threw it through the window of a unit and then went inside and hid in an upstairs loft. The officers entered the unit, and a sergeant attempted to communicate with the

suspect from a spiral staircase leading to the loft.  A few minutes later, the man came towards the sergeant holding a chair, and the sergeant deployed his Taser. Other officers were ultimately able to take the man into custody.  Of the four officers other than the sergeant who were identified in the use of force report, one captured footage of the incident on his BWC, one captured only the first 13 minutes (up until the physical confrontation) due to an apparent equipment issue, one stated that his BWC was not functioning due to a faulty cord, and one was a recruit and therefore not issued a BWC.  The sergeant who deployed his Taser was also not issued a BWC.

■ On October 28, 2014, a District 6 sergeant observed a suspect tagging a traffic signal controller box with a marker and approached him, grabbing the suspect's arm.  After a foot chase, the suspect stopped and turned toward the sergeant, taking a fighting stance and balling his fists.  The sergeant reportedly deployed "mace" and the suspect began throwing punches at the sergeant.  To gain control, the sergeant struck the suspect five to seven times in the head with a closed fist. The sergeant was not equipped with a BWC, and a HALO camera captured only the first part of the chase, and not the physical altercation between the sergeant and the suspect.

The DPD has stated that while it is considering requiring officers working off-duty to utilize BWCs, it is concerned about equipment and storage costs, which may be prohibitive.[25] While considering costs is certainly important, we encourage the DPD to also consider the fiscal benefits that might accrue if supervisors and officers working off-duty are equipped with BWCs.  This could include costs associated with litigation and Internal Affairs investigations, both of which may be made more efficient, or avoided altogether, with footage supplied by BWCs.[26] In addition, the OIM believes that officers in specialized units such as SWAT and Gang, which are also sometimes involved in serious uses of force, should also be equipped with BWCs.  In fact, of the ten DPD officers who were involved in officer-involved shootings in 2014, 60% were assigned to specialized units, with four in the Gang Unit, and two in Metro/SWAT. (See Chapter 5 for more information.)We believe that this fact alone provides strong incentive for equipping officers working in those units with BWCs.  While the DPD has indicated that it plans to deploy BWCs to the Gang and Traffic Units, it does not plan to deploy them to Metro/ SWAT.  We believe that it should do so.

***Recommendation 3: The OIM recommends that the DPD deploy BWCs to all uniformed officers who interact with the public in a law enforcement capacity, regardless of rank or whether they are working on- or off-duty, and that the DPD also equip officers working in certain specialized units with BWCs, including the Gang, Traffic and Metro/SWAT Units.***

**Chapter 2** :: Body Worn Cameras

## Permitting Officers to Stop Recording Prior to the Conclusion of Citizen Encounters may Result in Important Parts of Interactions Going Unrecorded

Under the BWC Policy, once a BWC was activated, an officer was required to continue recording until the encounter concluded or appeared to be "stabilized," which was defined as when the initial response or exchange of communication had transitioned to a "controlled and orderly investigation."[27] Yet, law enforcement encounters with the public are sometimes volatile, and a situation that appears to be stable can deteriorate rapidly. One incident from the pilot project provides a useful example:

- On November 12, 2014, District 6 officers responded to a home on a report of a suicidal female. Paramedics took the woman into the ambulance without incident, and she then became irate and combative, prompting the paramedics to request assistance. While attempting to control her legs to keep her from injuring herself or kicking paramedics, an officer accidentally struck her in the mouth with his arm, causing a small laceration on her lip. The officer had captured the earlier part of the encounter on his BWC, and then turned it off because the woman appeared to have become compliant. The accidental use of force was thus not captured on the BWC.

*Recommendation 4: The OIM recommends that the DPD consider revising its policy to require officers to keep their BWCs activated until the actual conclusion of citizen encounters that must be recorded, regardless of whether or not officers perceive the situation to have "stabilized."*

## DPD Officers Were not Required to Inform Citizens That They Were Recording, Which may Have Reduced the Impact of BWCs on Citizen and Officer Behavior

We believe that the DPD's BWC Policy should be amended to require officers to notify citizens that they are being recorded, when possible, for several reasons. First, notable authorities have recommended as much. For example, in its model policy on BWCs, the International Association of Chiefs of Police ("IACP") recommended that "whenever possible, officers should inform individuals that they are being recorded."[28] The IACP further noted that the reasons to provide such notifications are particularly strong when the recordings are being made inside places in which there is a reasonable expectation of privacy, such as private homes.

In addition, the Rialto (California) Police Department is often at the center of discussions about BWCs. This is not surprising; after the introduction of BWCs, the Rialto PD experienced marked declines in both uses of force by officers and citizen complaints against officers. Notably, Rialto saw remarkable reductions in use of force department-wide, although only some officers were assigned to wear BWCs during the study period. Specifically, the Rialto PD reported a 58% decline in uses of force department-wide, and an 88% decline in citizen complaints department-wide, when comparing the study period to the previous year. These declines are particularly significant given that officers were instructed to use BWCs in a nearly equal number of shifts as they were instructed not to use them.[29]

To examine whether the DPD began to see similar reductions in complaints and uses of force during the pilot project, the OIM analyzed trends in the number of complaints and uses of force prior to and after the introduction of BWCs. To control for seasonal patterns in arrest and complaint data (which tend to peak and fall during certain months of the year), the OIM compared the months during which the pilot project occurred in 2014 (July through December) to the same months in 2013.[30] As reflected below, during the pilot project, the DPD did not experience the kind of declines in uses of force or citizen complaints that were seen in Rialto. Specifically, during the pilot project:

- Reported use of force incidents in District 6 increased by 11% (from 87 to 97), while they decreased by 7% in all other districts and units (from 271 to 253);[31]

- The total number of complaints against District 6 officers increased by 8% (from 60 to 65), compared to an increase of 6% in all other districts and units (from 240 to 255); and

- The total number of complaints against District 6 officers that included one or more allegations of inappropriate force increased from 9 to 19 (by 111%), while the total number in all other districts and units increased from 25 to 49 (by 96%).[32&33]

We note that this analysis is descriptive and just a first step towards examining possible changes in complaint and use of force patterns that may be attributable to BWCs. Importantly, this analysis does not test whether the BWCs were responsible for any of these changes; a question that the evaluation study to be conducted by the outside researcher may address in greater depth.

Yet, we believe that a key policy difference between Rialto and Denver during their respective BWC pilot projects may be a factor in their different complaint and use of force trends. In its Body Worn Video Policy, the Rialto PD encouraged officers to advise citizens that they were being recorded "if the advisement may gain compliance, assist in the investigation, and does not interfere with the investigation or officer safety."[34] While there are many questions about the potential cause(s) of the steep declines in complaints and uses of force in Rialto, some have argued that this notification requirement may have contributed to a "self-awareness effect," causing police to regulate their own behavior, and encouraging citizens to exhibit cooler demeanors or more law abiding conduct.[35] Researchers have also suggested that notifying citizens that they are being recorded may have positive effects on both officer and citizen behavior.[36]

DPD policy during the pilot project did not require officers to notify citizens that they were being recorded. While this was not necessarily responsible for the lack of reduction in complaints and uses of force in District 6, it may have been a factor, and we believe that the BWC policy should require such notification when practicable in the future. The Executive Director of Safety informed the OIM on March 5, 2015, that Chief White is considering a proposed revision of the policy that would require officers to notify citizens that they are being recorded, whenever possible. We commend Chief White for considering this change, and look forward to seeing the final policy.

*Recommendation 5: The OIM recommends that the DPD revise its current policy to require officers to notify citizens that encounters are being recorded by BWCs, when possible.*

## Supervisors' Use of Force Cover Reports Sometimes Lacked Sufficient Detail to Properly Assess Uses of Force

Supervisors investigating uses of force during the pilot project concluded that 100% of these uses of force were appropriate and within policy. In six of the 80 incidents, debriefs were recommended following the incidents, while six incidents resulted in later Internal Affairs complaints (five initiated by citizens alleging that inappropriate force was used, and one internal complaint related to transporting prisoners). Of those six complaints, one was partially sustained, two were declined, one was handled informally, one was an administrative review with no policy violation, and one is still under review.

Supervisor cover reports (in which supervisors document their use of force investigations and the use/non-use of BWCs) are important since they provide an account of all uses of force to IAB and command staff from the primary investigator. They can also provide useful feedback that will help officers learn from tactical decisions made during use of force incidents. In addition, if citizens ultimately file complaints, supervisor cover reports may also provide helpful information for IAB investigators.

Relying solely on supervisor cover reports, the OIM was unable to determine whether all 80 incidents in District 6 were sufficiently investigated by responding supervisors, a question that goes beyond the scope of this report. However, the OIM does have concerns over the quality and thoroughness of the documentation of BWC usage included in some reports, which was inconsistent and, at times, completely absent. While the majority of supervisors did refer to the presence or absence of BWC footage in their reports, it was sometimes minimal and confusing, failing to delve into the reasons why BWCs were not activated or including conclusory officer assertions about the reasons BWCs were not activated without noting whether or not the supervisor agreed with the assessment or providing reasons why.

Supervisors sometimes used language that made it impossible to know why BWC footage was not available, with one report simply noting that the "camera did not activate," and typically did not mention whether or not all other officers on scene had activated their BWCs as required by policy, instead focusing only on the primary officer. This is problematic because DPD policy requires all officers to activate their BWCs. In addition, we have observed that officers who are not directly involved in a use of force sometimes have the best vantage point and provide the most useful footage for investigations.

In contrast, some supervisors were very thorough in their reports, including the pertinent details related to BWC activation. We believe that additional training for supervisors and a clearer policy on what is expected in supervisor cover reports could help to ensure that all supervisors are diligent in documenting the reasons for the use or non-use of BWCs.

*Recommendation 6: The OIM Recommends that the DPD require supervisors to provide thorough documentation of the reasons for the use or non-use of BWCs in supervisor cover reports, and provide additional training and ongoing feedback to supervisors on how BWC use or non-use should be documented in those reports.*

## Officers Have not Been Informed of the Possible Disciplinary Consequences of Non-Compliance With the BWC Policy

According to the BWC Procedure distributed to officers during the pilot project, officers could be disciplined for non-compliance, but did not state what that discipline could or would be.[37] As the DPD's Disciplinary Handbook makes clear, fairness in discipline is based, in part, on providing notice to officers and the public of the consequences of violating particular rules.[38] The OIM recommends that the DPD clearly articulate to officers and the public the possible disciplinary consequences of failing to adhere to the BWC Policy, including the penalties for unauthorized recording, failing to record when required to do so, unauthorized viewing of video, or attempting to tamper with or alter body worn video or the BWCs themselves.

The Executive Director of Safety informed the OIM on March 5, 2015, that the DPD has begun developing a policy concerning disciplinary penalties for failing to comply with the BWC Policy. We look forward to working with Director O'Malley and Chief White to ensure that violations of the BWC Policy are appropriately categorized under the disciplinary matrix.

*Recommendation 7: The OIM recommends that the DPD provide notice of the possible disciplinary penalties for failing to adhere to the Body Worn Camera Policy in its policies and in the DPD Disciplinary Handbook.*

## BWCs Raise Unprecedented Privacy Issues That Should be Addressed in Greater Depth

BWCs and other surveillance technologies present a host of new challenges to law enforcement agencies as they balance the need to protect public safety with citizens' and officers' right to privacy. For example, when discharging their duties, officers must often enter private homes, businesses, hospitals, doctors' offices, houses of worship, and other places in which members of the public may have an expectation of privacy. The community has confidence that under most circumstances, citizen conduct in these locations will not be recorded and subjected to possible later review by law enforcement authorities. The BWC Policy limited recording in certain private places, but there were gaps in these limitations. For example, while the BWC Policy generally prohibited recording inside patient health care areas, it also specifically allowed officers to record in those areas for "official purposes."[39] Similarly, the BWC Policy generally prohibited recording in restrooms or locker rooms, yet allowed such recording for the "purpose of official law enforcement activity such as a call for service." In these situations, officers were advised to use caution to record only those individuals involved in an investigation.[40]

These provisions are potentially confusing and do not provide clear guidance to officers. There are certainly situations in which officers may be on official calls for service in restrooms, locker rooms or patient care areas, but should not record in order to protect the privacy of bystanders, and officers may find it difficult to limit their recordings to only the particular people involved in investigations. We believe that the DPD should provide guidance that is more specific on when recording in private places such as homes, restrooms, locker rooms, houses of worship, certain businesses, and patient care areas is authorized, and when it is unauthorized.

The BWC Policy also advised officers conducting strip searches to use their BWCs to record a 360-degree view of the area in which the search was to be conducted, and then point the BWC away to allow the officer to capture audio, but not video, of the strip search.[41] During the OIM's regular work monitoring cases, we have observed that it can sometimes be difficult for officers to aim their BWCs with precision, and to control the position of the BWCs throughout interactions. Thus, we have concerns about officers using BWCs during strip searches, and encourage the DPD to consider whether there might be a way of capturing audio of strip searches that does not put citizens' privacy at risk.

Similarly, if officers are required to record most law enforcement interactions with the public in the future deployment of BWCs department-wide, stored BWC footage may become an archive of interactions with citizens who are neither

suspects in nor have been accused of crimes. While not contemplated at present, this vast footage archive could raise risks of becoming a tool for the investigation of community members unrelated to the evaluation of complaints, uses of force, or critical incidents. In the interest of privacy, the DPD's BWC Policy should establish a video retention protocol that allows for the long-term storage of only those videos needed for criminal and/or administrative investigations, while requiring that all other videos of citizen contacts be deleted within a short time period. Apparent conflicts in two policy documents that were in effect during the pilot project make unclear what the retention period for BWC footage that has no evidentiary purpose will be going forward.[42] The Executive Director of Safety informed the OIM on March 5, 2015, that the DPD has committed to storing footage with no evidentiary value for 30 days, and we look forward to seeing the final retention policy.

*Recommendation 8: To address the unprecedented privacy issues presented by BWCs, the OIM recommends that the DPD provide clear and specific guidance on when recording in private places such as homes, restrooms, locker rooms, houses of worship, certain businesses, and patient care areas is authorized, and when it is unauthorized. The OIM also recommends that the DPD consider the use of alternative methods for documenting strip searches, including possibly audio-only devices. The OIM also recommends that the DPD provide clear retention guidelines for BWC footage that do not allow for the storage of footage with no evidentiary value for investigations for an unreasonable period of time.*

## Officers and Community Members can Provide Valuable Input Into the BWC Policy and Should be Given Formal Opportunities to do so

Many police departments have found that soliciting the direct input of officers while implementing a BWC program is a good way to garner officer buy-in and encourage them to see BWCs as a useful tool.[43] By piloting BWCs with District 6 patrol officers, the DPD has created a team of officers who are uniquely qualified to speak about the benefits and challenges of using BWCs. We believe that it is critical that the DPD tap into these in-house experts in order to anticipate and find solutions to challenges that will be faced by officers in other districts as BWCs are deployed department-wide. In addition, some District 6 officers may be particularly well-suited to serve as champions for BWCs by sharing their initial concerns, their experiences using BWCs, challenges they've overcome, and any successes (such as exonerated complaints and better relationships with citizens) that have resulted from their use of BWCs, with officers in other districts.

Similarly, because the introduction of BWCs will impact the community, we strongly encourage the DPD to engage in robust public consultation with the Denver community regarding its BWC Policy. Community members and leaders have often played an important role in developing public policy in Denver, and we suggest that the DPD create opportunities for public feedback that could include soliciting public comment and creating community forums or discussions regarding BWCs, then incorporate this feedback into further revisions of the BWC Policy.[44]

*Recommendation 9: The OIM recommends that the DPD solicit officer and community input on the BWC Policy and use that input in revising the BWC Policy that will be in effect once BWCs are deployed department-wide.*

# Summary of OIM Recommendations Regarding Body Worn Cameras in the DPD

■ **Recommendation 1:** The OIM recommends that the DPD provide additional training on the importance of activating BWCs prior to initiating citizen contacts, rather than after-the-fact, when situations may escalate or deteriorate too quickly to permit BWC activation.

■ **Recommendation 2:** The OIM recommends that the DPD evaluate possible equipment issues that arose during the pilot project before selecting a BWC vendor and model for department-wide deployment, and provide additional training to officers in an attempt to avoid future technical or user error.

■ **Recommendation 3:** The OIM recommends that the DPD deploy BWCs to all uniformed officers who interact with the public in a law enforcement capacity, regardless of rank, and whether they're working on- or off-duty, and also equip officers working in certain specialized units with BWCs, including the Gang, Traffic and Metro/SWAT units.

■ **Recommendation 4:** The OIM recommends that the DPD consider revising its policy to require officers to keep their BWCs activated until the actual conclusion of citizen encounters that must be recorded, regardless of whether or not officers perceive the situation to have "stabilized."

■ **Recommendation 5:** The OIM recommends that the DPD revise its current policy to require officers to notify citizens that encounters are being recorded by BWCs, when possible.

■ **Recommendation 6:** The OIM Recommends that the DPD require supervisors to provide thorough documentation of the reasons for use or non-use of BWCs in supervisor cover reports, and provide additional training and ongoing feedback to supervisors on how BWC use or non-use should be documented in those reports.

■ Recommendation 7: The OIM recommends that the DPD provide notice of the possible disciplinary penalties for failing to adhere to the Body Worn Camera Policy in its policies and in the DPD Disciplinary Handbook.

■ Recommendation 8: To address the unprecedented privacy issues presented by the BWCs, the OIM recommends that the DPD provide clear and specific guidance on when recording in private places such as homes, restrooms, locker rooms, houses of worship, certain businesses, and patient care areas is authorized, and when it is unauthorized. The OIM also recommends that the DPD consider the use of alternative methods for documenting strip searches, including possibly audio-only devices. The OIM also recommends that the DPD provide clear retention guidelines for BWC footage that do not allow for the storage of footage with no evidentiary value for investigations for an unreasonable period of time.

■ Recommendation 9: The OIM recommends that the DPD solicit officer and community input on the BWC Policy and use that input in revising the BWC Policy that will be in effect once BWCs are deployed department-wide.

# The Denver Police Department's Body Worn Camera Pilot Project:
# A Focus on Policy and Lessons Learned

March 2015 | Policy Highlight

## BACKGROUND

The Office of the Independent Monitor ("OIM") is charged with monitoring the disciplinary systems in the Denver Police and Denver Sheriff Departments ("DPD" and "DSD" respectively), making policy recommendations to those departments, and conducting outreach to communities throughout Denver. By ordinance, the OIM reports annually about its work, as well as information about complaints, investigations, and discipline of sworn police and sheriff personnel during the previous year. A key component of the OIM's oversight is proactively identifying policy and training issues, conducting analysis, and recommending solutions. This policy highlight presents a brief summary of the OIM's analysis of the DPD's Body Worn Camera ("BWC") Pilot Project, which is covered in greater depth in the OIM's 2014 annual report.

Both locally and nationally, in the wake of several incidents involving the use of deadly force against unarmed black and/or Latino community members, citizens have voiced the need for greater police accountability and better mechanisms for transparency in law enforcement. The citizens of Denver have been active participants in these conversations, and BWCs represent one important step taken by the DPD to address the concerns of communities across Denver.

Many have suggested that BWCs may be one solution to a perceived lack of police accountability. BWCs, small, digital cameras that can record officers' interactions with the public, may improve relationships between citizens and police, and may even contribute to reductions in use of force and citizen complaints against the police. For this reason and others, the OIM commends Police Chief Robert White's decision to begin using them on a small scale in 2014, as well as his commitment to deploy them more extensively in 2015.

The DPD launched the BWC pilot project in June 2014, outfitting 102 patrol officers in District 6 (most of downtown Denver) with BWCs to test their use on a small scale over the course of approximately six months.

The OIM conducted an assessment of the use of BWCs by District 6 patrol officers during the pilot project, specifically by reviewing documents created by police supervisors who investigated uses of force. This included all 80 uses of force that either occurred in District 6 or involved District 6 officers during the pilot period. We sought to understand how frequently BWCs recorded uses of force, as well as some of the challenges experienced by officers during the pilot project. While the initial findings were encouraging, we noted several opportunities for improvements, both in policy and in practice, and offer nine recommendations for the DPD to consider as they implement the BWC program on a larger scale.

## KEY FINDINGS FROM THE OIM'S ANALYSIS

- BWCs did not record a majority of the uses of force that occurred during the pilot project in District 6. 21 of 80 uses of force (26%) were recorded by BWCs, according to supervisors' reports.
- Many (44%) were excluded due to the structure of the pilot project, which did not require supervisors or officers working off-duty to wear BWCs. Almost half of the remaining 45 incidents were recorded.



Unknown if Recorded 5 (6%)

UOF Not Recorded Due to Structure of Pilot Project (Off-Duty or Supervisors) 35 (44%)

BWC Recorded UOF 21 (26%)

BWC did not Record for Other Reasons 19 (24%)

n=80

**DENVER**
OFFICE OF THE INDEPENDENT MONITOR

- Almost half of the remaining 45 incidents were recorded. In 24% of incidents (11 of 45), officers reported that they did not have time to activate their BWCs safely because the encounters escalated or deteriorated rapidly. An additional 11% were not recorded due to user- and/or equipment errors.

- BWCs raise important privacy issues, such as whether and how to record in hospitals and other areas where privacy is expected, and how long to store footage with no evidentiary value.

- Officers and community members can make valuable contributions to the development of the DPD's BWC policy going forward.



n=45

■ Recorded
■ Not Recorded

## RECOMMENDATIONS

With the OIM's findings and lessons from the pilot project in hand, the DPD is engaged in the process of developing its final BWC policy. The OIM looks forward to continuing to work with the DPD as it begins deploying BWCs to officers working throughout Denver. We offer nine actionable recommendations for improvements in policy and practice:

1. Provide additional training on the importance of activating BWCs prior to the initiation of citizen contacts rather than after-the-fact, when situations may escalate or deteriorate too quickly to permit BWC activation.

2. Evaluate possible equipment issues that arose during the pilot project before selecting a vendor for department-wide deployment, and provide additional training to officers in an attempt to avoid future technical or user errors.

3. Assign BWCs to all uniformed officers who interact with the public, regardless of rank, and whether they are working on- or off- duty, including officers in specialized units such as Metro/ SWAT.

4. Require officers to keep BWCs activated until the actual conclusion of encounters, regardless of whether or not the officer perceives the situation to have "stabilized."

5. Require officers to notify citizens that encounters are being recorded by BWCs, whenever possible.

6. Require supervisors to provide thorough documentation of the reason for the use/non-use of BWCs.

7. Provide officers with notice of possible disciplinary penalties for failing to adhere to the BWC policy.

8. Provide clear and specific guidance on when recording in private places (homes, restrooms, locker rooms, places of worship, certain businesses, and patient care areas) is authorized and when it is not. Provide clear retention guidelines for BWC footage that do not allow for the storage of footage with no evidentiary value for an unreasonable period of time.

9. Solicit officer and community input on the BWC policy and use that input to inform of the policy that will be in effect once the BWCs are deployed department-wide.

The findings presented here are discussed in greater depth in the OIM's 2014 Annual Report. Access our annual report here: http://www.denvergov.org/oim/OfficeoftheIndependentMonitor/Reports/tabid/433998/Default.aspx

Nicholas E Mitchell
Independent Monitor
Wellington Webb Municipal Office Building
201 W. Colfax, Dept. 1201
Denver, Co 80202
Phone: (720) 913-3306
Fax: (720) 913-3305

http://www.denvergov.org/oim

https://www.facebook.com/DenverOIM



**DENVER**
**OFFICE OF THE INDEPENDENT MONITOR**



# DENVER
## OFFICE OF THE INDEPENDENT MONITOR

# 2017 Semiannual Report

Nicholas E. Mitchell

Independent Monitor

**Chapter 3** :: Critical Incidents

recommendations to the Board, which determined the shooting to be in-policy. The OIM had significant concerns about the tactics used during the incident, including the decision to apprehend the suspect in a very crowded area downtown during the lunch hour, and the officer's position in front of the car during the incident. The OIM also had concerns about the DPD policy, at the time, of not equipping Metro/SWAT officers with body worn cameras.[56] That decision is inconsistent with the OIM's previous recommendation that officers in specialized units, including Metro/SWAT, be equipped with body worn cameras due to the relatively high likelihood, compared to patrol officers, of their involvement in officer-involved shootings.[57] The Use of Force Review Board ultimately referred the case to the Tactics Review Board. Notwithstanding its concerns, the OIM did not consider the Use of Force Review Board's decision that the shooting was in-policy unreasonable.

■ On July 10, 2016, two males got into a verbal altercation outside of a residential building in downtown Denver. The altercation turned into a physical fight. A nearby civilian security guard attempted to break up the fight by deploying pepper spray, but was unsuccessful. While the security guard attempted to interrupt the fight, one of the involved males ran down the street, where he stopped at a vehicle and opened the trunk. Moments later, he returned toward the fight holding a handgun. The security guard caught the attention of a detective working off-duty at a nearby bar. The detective then saw one of the men raise a handgun and start firing it in the direction of the crowd. The detective yelled at the gunman to get on the ground, but the gunman continued to fire. Both the detective and the security guard, who was also armed, fired at the gunman. Both the gunman and his brother, who was involved in the physical fight and standing near the gunman at the time of the shooting, were shot and wounded.

The Denver District Attorney reviewed the incident and declined to file charges against the officer and the security guard involved in the shooting. The District Attorney prepared a detailed letter reviewing the shooting, which can be found here.[58] The DPD's Use of Force Review Board met on April 26, 2017, and the OIM provided advice and recommendations to the Board, which determined the shooting to be in-policy. The OIM concurred.

■ On August 16, 2016, a sergeant radioed for police assistance after he spotted a car known to have been stolen in an armed car-jacking two days prior. The sergeant followed the car for a short distance, but, due to traffic, was unable to keep up. A corporal responding to the call spotted the car in a parking lot, backed up to a chain-link fence. The corporal positioned his police SUV to face the car, got out with his

weapon drawn, and yelled for the car's occupants to show their hands. Two backseat passengers and the driver, who was armed with a handgun, got out of the car and began running. The officer chased the driver toward the chain-link fence. The two passengers attempted to escape by going over the chain-link fence. The corporal was concerned that the armed driver would attempt to escape and would be an imminent threat to himself and others if he got over the fence. The corporal fired his gun multiple times at the driver, striking him in the ankle area. The driver, who was a juvenile, survived his injury.

The Denver District Attorney reviewed the incident and declined to file charges against the involved officer. The District Attorney prepared a detailed letter reviewing the shooting, which can be found here.[59] The DPD's Use of Force Review Board met on September 6, 2017, and the OIM provided advice and recommendations to the Board, which determined the shooting to be in-policy. The OIM had concerns about the tactics used during the incident, but deferred to the in-policy decision. The Use of Force Review Board referred the case to the Tactics Review Board.

■ On August 27, 2016 two officers responded to a 911 call that a man had been stabbed at his home by a suspect who was wanted by police. When the officers arrived at the home, the suspect came out of the house, saw the officers, and ran back inside to a bedroom on the second floor. The officers entered the home, and an officer ("Officer A") drew his handgun and a second officer ("Officer B") drew his Taser. At the closed door of the second story bedroom, the officers heard a woman who was crying say, "[D]on't do this," and then scream. Fearing that the woman was being attacked, the officers opened the door and observed the suspect, who was in the room with two other people, holding a large knife that he began swinging at the officers. Officer A pointed his gun at the suspect and shouted commands for the man to put down the knife. The suspect refused to comply and instead said that he was, "not going back." The suspect began throwing items in the room at the officers while the officers continued to tell the suspect to put the knife down. At one point, the suspect charged at the officers with the knife and Officer B deployed his Taser, stopping the suspect momentarily. However, the suspect was able to remove the Taser probes. The officers retreated down a hallway when the suspect, still armed with the knife, came out of the bedroom and advanced on the officers shouting, "Just kill me, shoot me!" Officer A again told the suspect to put the knife down. When he did not, Officer A fired his weapon several times, striking and killing the suspect.

**Chapter 3** :: Critical Incidents

The Denver District Attorney reviewed the incident and declined to file charges against the officer. The District Attorney prepared a detailed letter reviewing the shooting, which can be found here.[60] The DPD's Use of Force Review Board met on April 26, 2017, and the OIM provided advice and recommendations to the Board, which determined the shooting to be in-policy. The OIM concurred.

■ On September 5, 2016, detectives received information about a suspect who was wanted for several bank robberies. Officers located the suspect and attempted to contact him, but he fled on foot. A detective stopped and began to exit his police vehicle as the suspect pulled out a gun and shot at least one time. Another detective observed the suspect's actions, and fired four rounds at him. The suspect was not hit, but he fell to the ground. The detective ran toward the suspect and saw the gun was still in his hand and was pointed in his direction. He fired a fifth shot at the suspect, which also missed. The suspect tossed the gun aside and was taken into custody. No one was hit by any gunfire.

The DPD's Use of Force Review Board met on April 26, 2017, and the OIM provided advice and recommendations to the Board, which determined the shooting to be in-policy. The OIM deferred to the Use of Force Review Board's decision.

## DPD Accidental Shootings Closed (January 1–June 30, 2017)

■ On July 28, 2016, an officer responded to provide cover for other officers who had stopped a suspected stolen vehicle. As the officer was getting out of his car and drawing his gun, he allegedly accidentally discharged his weapon when his hand inadvertently struck the car frame, causing him to pull the trigger. No one was injured in the shooting. The Denver District Attorney reviewed the incident and declined to file charges against the officer. The officer was suspended for four days for carelessly handling his firearm.

# Critical Incidents: Denver Sheriff Department

## In-Custody Death Investigation and Review Protocol

Similar to situations involving the DPD, in all DSD critical incidents, the DPD's Major Crimes Unit responds to the scene to begin an investigation to determine whether any person should be held criminally liable. If the incident warrants it, the OIM also responds to the scene of the incident for a walk-through and debriefing from command staff. Major Crimes detectives interview all witnesses and every involved deputy, and obtain video and documentary evidence. The OIM monitors interviews conducted by the Major Crimes Unit and may suggest additional questions at the conclusion of each interview. After the criminal investigation is complete, the administrative review process begins.

## Administrative Review of Critical Incidents Involving DSD Deputies

Once the District Attorney's Office has made a decision regarding the filing of criminal charges against anyone involved in the incident, the Major Crime Unit's reports are submitted to DSD IAB to commence the administrative review. The OIM confers with IAB to determine whether further investigation is necessary to assess whether there have been violations of Department policy. If, after reviewing the investigation, the Conduct Review Office ("CRO") finds that the involved deputy's actions were in compliance with DSD policy ("in-policy"), the case is forwarded to the Sheriff. If the Sheriff agrees there were no policy violations, the case may be closed. The OIM reviews the CRO's findings and makes recommendations to the Sheriff and the EDOS.

If the CRO finds that the involved deputy's actions violated any Department policy ("out-of-policy"), the case is referred to the Sheriff for a "Contemplation of Discipline Hearing." The OIM observes the hearing and participates in deliberations of the Command Staff. At that hearing, the involved deputy is given the opportunity to present his or her side of the story, including mitigating evidence, if any. After hearing from the involved deputy, the OIM makes disciplinary recommendations to the Sheriff. Both the Sheriff's recommendations and that of the OIM are forwarded to the EDOS for consideration. The EDOS determines whether the deputy's actions were in-policy or out-of-policy and the appropriate level of discipline, if any.

**Chapter 3** :: Critical Incidents

## DSD In-Custody Deaths (January 1–June 30, 2017)

■ On July 10, 2017, a fight occurred between two inmates at the DDC. Deputies responded, and one of the inmates died immediately after the fight. There is no indication that a weapon was used, and the Denver District Attorney declined to file charges against the surviving inmate. The case is currently under administrative review.

## DSD Critical Incidents Closed (January 1–June 30, 2017)[61]

■ On November 11, 2015, an inmate at the DDC was exhibiting erratic and aggressive behavior. Deputies used force to control the inmate, which resulted in a medical emergency and the inmate's eventual death nine days later. On January 21, 2016, the Denver District Attorney announced his decision to decline to file charges against the involved deputies.

On April 19, 2017, the EDOS announced that two deputies and a captain would be suspended for their roles in the incident (for 16, 10, and 10 days, respectively). After that announcement, the OIM publicly disagreed with and expressed concern about the disciplinary decisions by the EDOS for several reasons, including our view that the discipline was not commensurate with the seriousness of the misconduct. Please see pages 22-24 of this report for a more detailed discussion of this incident.

## DSD Accidental Shootings Closed (January 1–June 30, 2017)

■ On August 18, 2016, a sergeant was at a clearing barrel after qualification testing at the firing range and had an accidental discharge while clearing his weapon. No one was injured. The sergeant was suspended for two days for carelessly handling his firearm.

# Endnotes

[1] Denver Council Bill 17-0940 (2017).

[2] *See, e.g.*, Graham C. Ousey and Charis E. Kubrin, *Exploring the Connection Between Immigration and Violent Crime Rates in U.S. Cities, 1980-2000,* SOCIAL PROBLEMS 56 (3), 447-473; *See also* Lesley Williams Reid, Harald E. Weiss, Robert M. Adelman, and Charles Jaret, *The Immigration-Crime Relationship: Evidence Across US Metropolitan Areas,* SOCIAL SCIENCE RESEARCH 34 (4), 757-780.

[3] INTERNATIONAL ASSOCIATION OF CHIEFS OF POLICE, ENFORCING IMMIGRATION LAW: THE ROLE OF STATE, TRIBAL, AND LOCAL LAW ENFORCEMENT 5; MAJOR CITY CHIEFS ASSOCIATION IMMIGRATION POSITION 1 (OCT. 2011).

[4] INTERNATIONAL ASSOCIATION OF CHIEFS OF POLICE, ENFORCING IMMIGRATION LAW: THE ROLE OF STATE, TRIBAL, AND LOCAL LAW ENFORCEMENT 5.

[5] Compared to 2016.

[6] Denver Council Bill 17-0940 (2017), citing Fivethirtyeight.com analysis of DPD data.

[7] DPD policy prior to the adoption of the Act stated that "Denver Police officers shall not initiate police actions with the primary objective of discovering the immigration status of a person" and that "Generally, officers will not detain, arrest, or take enforcement action against a person solely because he/she is suspected of being an undocumented immigrant." *See* DPD Operations Manual Section ("OMS") 104.52 (3)(a-b).

[8] Denver Announces New Public Safety Enforcement Priorities Ordinance, City and County of Denver Office of Sustainability, https://www.denvergov.org/content/denvergov/en/office-of-sustainability/news-events/2017/denver-announces-new-public-safety-enforcement-priorities-ordina.html.

[9] The data reported in this chapter were extracted from the Denver Police Department's Internal Affairs records management database ("IAPro"). The OIM is not an IAPro administrator and has limited control over data entry into the database. The OIM does not conduct governmentally-approved audits of the database for accuracy. As a result, the OIM is unable to certify the accuracy of the DPD's Internal Affairs data. Finally, because the OIM is not the final arbiter of what allegations to record in IAPro and against which officers, the OIM cannot certify that the data presented (with respect to specific complaint allegations) are what they would be if the OIM were making these decisions. Since the data were drawn from dynamic, live databases, the recorded complaint, allegation, and outcome numbers will fluctuate over time and are subject to revision. The figures reported in this chapter do not include complaints against DPD civilian employees, or complaints that were not linked to a subject officer in IAPro. Unless otherwise noted, the data included in this chapter were last retrieved from IAPro on August 4, 2017.

[10] Because of changes in coding and/or analysis of complaints, allegations, findings, and discipline, there may be slight discrepancies between historical data presented in this report and data presented in previous OIM reports.

**Endnotes**

[11] Scheduled discipline violations include Failure to Appear in Court, Failure to Shoot for Efficiency, Photo Radar, Safety Restraining Devices, Required Minimum Annual Continuing Education, CEP Cancellation/CEP Failure to Attend, Preventable Accidents, and Punctuality. *See* DENVER POLICE DEPARTMENT DISCIPLINE HANDBOOK: CONDUCT PRINCIPLES AND DISCIPLINARY GUIDELINES, 12.4.

[12] *See* DPD OMS 119.04(12) (The policy provides scheduled discipline for the first three violations, in a 12-month period, of the body worn camera recording requirements. The first violation requires a review of the BWC policy, an oral reprimand, and a journal entry, the second violation a written reprimand, and the third violation one fined day.).

[13] Many reports related to police oversight and IAB processes refer to complainant allegations. In this chapter, "allegations" refer to assertions, in a complainant's own words, of particular kinds of purported misconduct by an officer. The DPD does not systematically track the detailed allegations made by complainants in its Internal Affairs database. Instead, it tracks "specifications" that are based upon the departmental rules and disciplinary policies implicated by a complaint. Thus, a specification captures the rule under which an officer might be punished, rather than the precise allegations communicated in the complaint. At the time the OIM extracted the data for this report, 39 specifications associated with complaints recorded in the first half of 2017 were unassigned. Data on specifications were extracted from IAPro on September 28, 2017.

[14] DENVER POLICE DEPARTMENT DISCIPLINE HANDBOOK: CONDUCT PRINCIPLES AND DISCIPLINARY GUIDELINES, Appendix G, at 9 (RR-127).

[15] DENVER POLICE DEPARTMENT DISCIPLINE HANDBOOK: CONDUCT PRINCIPLES AND DISCIPLINARY GUIDELINES, Appendix G, at 6 (RR-102.1).

[16] *See* DPD OMS 119.04(3).

[17] OFFICE OF THE INDEPENDENT MONITOR, 2014 ANNUAL REPORT 7-36.

[18] DENVER OFFICE OF THE AUDITOR, AUDIT OF POLICE OPERATIONS – DISTRICT PATROL, 36 (Jan. 2016).

[19] E-mail from Chief Robert White to Independent Monitor Nicholas E. Mitchell (Sept. 27, 2017) (on file with author).

[20] Complaints with significant discipline closed in the first half of 2017 may not be included in this section if they were summarized in the OIM's 2016 Annual Report.

[21] Summary data on appeals filed by DPD officers or by the Office of the Executive Director of Safety regarding DPD officers were provided to the OIM by the Civil Service Commission on July 21, 2017.

[22] DPD OMS 503.02(5).

[23] *See, e.g.,* GEORGE FACHNER AND STEVEN CARTER, AN ASSESSMENT OF DEADLY FORCE IN THE PHILADELPHIA POLICE DEPARTMENT 117 (Office of Community Oriented Policing Services 2015) (recommending that the "department should develop a commendation that recognizes when an officer uses exceptional tactical or verbal skills to avoid a deadly force situation"); Errin Haines Whack, *Police Departments Begin to Reward Restrain Tactics*, ASSOCIATED PRESS

**Endnotes**

(May 31, 2016) (citing the directors of the Center for Police Equity and U.S. Department of Justice's Community Oriented Policing Services as recommending the use of such awards).

[24] Unless otherwise noted, the data for this chapter were obtained from the Denver Sheriff Department's Internal Affairs records management database ("IAPro"). The OIM is not an IAPro administrator and has no control over data entry into the database. The OIM does not conduct governmentally approved audits of the database for accuracy. As a result, the OIM is unable to certify the complete accuracy of the DSD's internal affairs data. Finally, because the OIM is not the final arbiter of what allegations to record in IAPro and against which officers, the OIM cannot certify that the data presented (with respect to specific complaint allegations) is what it would be if the OIM were making these decisions. Since the data were drawn from dynamic, live databases, the recorded complaint, allegation, and outcome numbers will fluctuate over time and are subject to revision. The figures reported in this chapter include only complaints against sworn DSD deputies. The data included in this chapter were last retrieved from IAPro on August 4, 2017.

[25] Because of changes in coding and/or analysis of complaints, allegations, findings, and discipline, there may be slight discrepancies between historical data presented in this report and data presented in previous OIM reports.

[26] Sworn DSD staff, including supervisors, are collectively referred to as "deputies" throughout this report, unless otherwise noted.

[27] Many reports related to police oversight and IAB processes refer to complainant allegations. In this chapter, "allegations" refer to assertions, in a complainant's own words, of particular kinds of purported misconduct by an officer. The DSD does not systematically track the detailed allegations made by complainants in its Internal Affairs database. Instead, it tracks "specifications" that are based upon the departmental rules and disciplinary policies implicated by a complaint. Thus, a specification captures the rule under which an officer might be punished, rather than the precise allegations communicated in the complaint.

[28] DENVER SHERIFF DEPARTMENT DISCIPLINE HANDBOOK: CONDUCT PRINCIPLES AND DISCIPLINARY GUIDELINES Appendix F, at 8 (RR 100.10.2). The OIM does not generally review these complaints unless aggravated.

[29] DENVER SHERIFF DEPARTMENT DISCIPLINE HANDBOOK: CONDUCT PRINCIPLES AND DISCIPLINARY GUIDELINES Appendix F, at 8 (RR 100.10.2).

[30] CITY AND COUNTY OF DENVER, REQUEST FOR PROPOSAL NUMBER 28275 DENVER SHERIFF DEPARTMENT VIDEO VISITATION REPLACEMENT (2015).

[31] Telephone conversation between Independent Monitor Nicholas E. Mitchell and City and County of Denver Technology Services Project Manager Berkley Swarzentruber (Oct. 10, 2017) (record on file with author).

[32] DENVER SHERIFF DEPARTMENT ORDER 4520.1M; *see also* DDC and County Jail Visit Schedules, "ALL VISITS ARE VIDEO VISITS ONLY (no contact visits)," available at: https://www.denvergov.org/content/dam/denvergov/Portals/776/documents/InmateServices/Visit ScheduleDDC.pdf.

[33] AMERICAN BAR ASSOCIATION, ABA CRIMINAL JUSTICE STANDARDS ON THE TREATMENT OF PRISONERS 175 (2010).

**Endnotes**

[34] Arif Khan, Robyn M. Leventhal, Shirin Khan, and Walter A. Brown, *Suicide Risk in Patients with Anxiety Disorders: A Meta-analysis of the FDA Database,* 68 JOURNAL OF AFFECTIVE DISORDERS 189 (2002).

[35] Kristie R. Blevins, Shelley Johnson Listwan, Francis T. Cullen, and Cheryl Lero Jonson, *A General Strain Theory of Prison Violence and Misconduct: An Integrated Model of Inmate Behavior,* 26 JOURNAL OF CONTEMPORARY CRIMINAL JUSTICE 154 (2010).

[36] Grant Duwe and Valerie Clark, *Blessed Be the Social Tie That Binds: The Effects of Prison Visitation on Offender Recidivism,* 24 CRIMINAL JUSTICE POLICY REVIEW (2013).

[37] William D. Bales and Daniel Mears, *Inmate Social Ties and Transition to Society: Does Visitation Reduce Recidivism?* 45 JOURNAL OF RESEARCH IN CRIME AND DELINQUENCY (2008).

[38] Daniel P. Mears, Joshua C. Cochran, Sonja E. Siennick, and William D. Bales, *Prison Visitation and Recidivism,* 29 JUSTICE QUARTERLY 888 (2012).

[39] DENVER SHERIFF DEPARTMENT 2012 ANNUAL REPORT 17 (defining recidivism as "an offender's return to incarceration in Denver's city or county jail for a new offense within a year of release").

[40] Mindy Fetterman, *Face-to-Face Family Visits Return to Some Jails, Pew Charitable Trusts* (Feb. 2017) (available at: http://www.pewtrusts.org/en/research-and-analysis/blogs/stateline/2017/02/15/face-to-face-family-visits-return-to-some-jails) (noting that counties in Texas, Mississippi and the District of Columbia are reinstating jail contact visits).

[41] H.B. 549, 84th Legislature (Tex. 2015) (requiring the Texas Commission on Jail Standards to establish minimum standards that provide inmates with a minimum of two in-person contact visits per week).

[42] Complaints with significant discipline closed in the first half of 2017 may not be included in this section if they were summarized in the OIM's 2016 Annual Report.

[43] In this section, "deputy" refers only to those personnel with the title "deputy" at the time of the incident. Sworn staff with other titles, such as "captain" or "sergeant," are noted throughout the summaries.

[44] Though the settlement agreement was signed in August 2016, this incident is included in this report rather than a previous report because it was not marked as completed in IAPro until February 16, 2017.

[45] Decision Statement from Denver District Attorney Mitchell R. Morrissey (January 21, 2016), http://www.denverda.org/News_Release/Releases/2016%20Release/MarshallDecisionStatement.pdf (regarding the investigation of the in-custody death of Mr. Michael Marshall).

[46] Summary data on appeals filed by DSD deputies or by the Office of the EDOS regarding DSD deputies were provided to the OIM by the Career Service Hearing Office on August 17, 2017.

[47] The Colorado Court of Appeals remanded the case to the Denver District Court to further remand back to the Career Service Board to determine the appropriateness of the EDOS's original discipline decision. The Career Service Board then remanded the case to the Hearing Officer to make that determination.

**Endnotes**

[48] Data on DSD commendations were provided by the DSD Data Science Unit and may include commendations awarded to non-sworn personnel.

[49] When community members die in the custody of the DPD or DSD of natural causes, the OIM has not historically reported on those deaths.

[50] While the Denver District Attorney's Office investigates all officer-involved shootings, it only releases decision letters on its website for members of the public when an officer shoots and wounds or kills a person. *See* BETH MCCANN, DENVER DISTRICT ATTORNEY, OFFICER-INVOLVED SHOOTING PROTOCOL (2017) at 1. The District Attorney did not issue a public letter on the investigation of the shooting, likely because the suspect was not killed or wounded.

[51] Decision Letter from Denver District Attorney Beth McCann to Denver Police Chief Robert White (Sept. 29, 2017), http://www.denverda.org/News_Release/Decision_Letters/Decision%20Letter%20re%20Officer-Involved%20Shooting--May%2020,%202017.pdf regarding the investigation of the shooting of Mr. Brendan Gerwing).

[52] Critical incidents closed in the first half of 2017 may not be included in this section if they were summarized in the OIM's 2016 Annual Report.

[53] Decision Letter from Denver District Attorney Mitchell R. Morrissey to Denver Police Chief Robert White (May 5, 2016), http://www.denverda.org/News_Release/Decision_Letters/2015letterBradleyTitus.pdf (regarding the investigation of the shooting death of Mr. Phillip Munoz).

[54] This incident is included in this report because the DPD's administrative review of the shooting was completed on January 19, 2017

[55] Decision Letter from Denver District Attorney Mitchell R. Morrissey to Denver Police Chief Robert White (Aug. 11, 2016), http://www.denverda.org/News_Release/Decision_Letters/Decision%20letter%20April%2012%202016%20--%20DPD%20Technician%20Jeffrey%20Motz%20.pdf (regarding the investigation of the shooting death of Mr. Dion Damon).

[56] Four months later, in June 2017, the DPD revised its Body Worn Camera Policy to require Metro/SWAT officers to activate their body worn cameras according to policy only when performing the duties of a patrol officer. The revised policy does not require Metro/SWAT officers to activate body worn cameras while executing planned tactical operations, unless ordered to do so by a commander or above. *See* OMS 119 (3)(b)(10).

[57] OFFICE OF THE INDEPENDENT MONITOR, 2014 ANNUAL REPORT 25.

[58] Decision Letter from Denver District Attorney Mitchell R. Morrissey to Denver Police Chief Robert White (Sept. 19, 2016), http://www.denverda.org/News_Release/Decision_Letters/2016-14th%208&%20Curtis.pdf (regarding the investigation of the shooting and wounding of Mr. Kevin Lee Jones and Robert Jones).

[59] Decision Letter from Denver District Attorney Mitchell R. Morrissey to Denver Police Chief Robert White (Nov. 22, 2016), http://www.denverda.org/News_Release/Decision_Letters/2016letterHeinis.pdf (regarding the investigation of the shooting and wounding of Mr. LAJ, a juvenile).