UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

| | |
|---|---|
| Elisabeth Epps, *et al.*,<br><br>   v.<br><br>City and County of Denver, *et al.* | Civ. Nos. 1:20-cv-1878-RBJ (consol.) |

**OPPOSITION TO JEFFCO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Defendants' motion ignores disputed material facts, fails to view facts in Deras's favor, and misconstrues the law.[1] Deras raises a genuine dispute as to whether Defendants directly participated in shooting him, used excessive force against him, and whether their use of force was motivated by his anti-police message. Moreover, Defendants are not entitled to qualified immunity because their conduct violated Plaintiff's clearly established constitutional rights.

**Response to Defendants Dreith and Hamilton's Statement of Material Facts ("RSF")**

Admit the following: 1, 6, 8, 15, 17, 18, 34, 36. Otherwise, state as follows:

2.  Admit that the protests were large-scale numbering in the thousands; admit that many of the protestors were peaceful; deny the rest. The protests were overwhelmingly peaceful. Dkts. 91-3–91-9, 91-100–91-108, 91-110, 91-115; Ex. 1 (Parkins Dep.) at 161-62.

3.  Object that events on May 29 are immaterial to Deras's claims against Defendants on May 31. Without waiving objection, deny; unsupported by citations. Defendants did not have any Molotov cocktails thrown at them. The cited report merely states that Donohue said he saw a Molotov cocktail on t.v. Dkt. 253-3 at 5.[2] Deny that it was protestors who started fires, or that fireworks and Molotov cocktails were thrown at law enforcement; admit that occasional water

---

[1] Defendants filed an 18-page brief (20 pages including the signature and certificate of service), despite the Court's order clearly limiting briefing to 15 pages.
[2] Defendants' brief appears at times to cite to the original page numbers of the documents, and not the stamped Exhibit page numbers. *See e.g.*, Dkts. 253-1; 253-3. Plaintiff will cite to the stamped exhibit numbers for consistency.

1

bottles were thrown at the direction of law enforcement; deny that Plaintiffs were involved in any violence. Ex. 1 at 89-90,158-60; Ex. 2 (Fitouri Dep.) at 124-26; Ex. 3 (Sannier Dep.) at 165-67.

4. Object as immaterial. Without waiving objection, admit that JCRS officers were briefed prior to their shift; deny that there was "increasing violence of the protestors," or that protestors had used the weapons listed; unsupported by citation. Dkt. 253-1 at 13 (reciting vague second-hand accounts). The protests were overwhelmingly peaceful, and Plaintiffs only saw occasional water bottle was thrown at the direction of law enforcement. Ex. 1 at 89-90,158-60, 161-62; Ex. 2 at 124-26; Ex. 3 at 165-67. Admit there was some property damage, committed by other people.

5. Admit JCRS officers were called to protect District 6 on May 31. Object to second sentence as immaterial, because what happened on May 30 is irrelevant, especially when JCRS officers were not present in Denver on May 30. Without waiving objection, deny that the day before District 6 had been "surrounded and vandalized;" protestors chanted peacefully near District 6 and police used indiscriminate violence on protestors whether anything was thrown or not, even on protestors kneeling and chanting. Ex. 4 (DEN 4234, Connors BWC) at 19:00-21:00; Dkt. 91-108 ¶¶ 15-29.

7. Admit JCRS officers formed a line; deny that line was approximately 20-30 feet back from the crosswalk; deny the skirmish line was formed to "prevent *further* damage" to District 6; unsupported by citation. Dkt. 253-4 at 3 ("This was to prevent damage to the Denver Police District 6 Station."); Dkt. 253-1 at 16 (the skirmish line was 27 meters (88 feet) from protestors).

9. Admit protestors were marching east on Colfax. Deny the rest. The crowd was not "highly agitated" until JCRS officers started gassing and shooting them. Deny thousands of protestors congregated near the skirmish line; they had been marching and chanting peacefully until stopped by officers. The officers allowed half the group to march past the precinct without incident, and then without warning, officers gassed, threw flashbang grenades at, and shot PepperBalls at the

2

protestors. The protestors were forced to stop marching because of the officers' actions. Ex. 1 at 129-33; Ex. 2 at 113-17; Ex. 5 (Deras Aug. 2021 Dep.) at 145-48; Ex. 6 (Deras Nov. 2021 Dep.) at 23-25, 57-59; Dkts. 91-4, 91-5, 91-9, 91-103; Dkt. 253-8 (DEN3871) at 8:26-8:29; Ex. 10 (screen shot of HALO video depicting Plaintiffs Deras, Parkins, and Fitouri at 8:28 p.m.).

10. Object as immaterial; Deras had nothing to do with this incident, which occurred an entire half hour earlier. Dkt. 253-3 at 6; Ex. 5 at 140-146. Without waiving objection, admit.

11. Object as immaterial; Deras had nothing to do with this incident, which occurred an entire half hour earlier. Without waiving objection, admit the information was in Dreith's report.

12. Deny. *See* RSF ¶ 9.

13. Object as immaterial; Deras had nothing to do with this. Without waiving objection, deny; unsupported by citation. Dkt. 253-1 at 23-25 (no indication that officer injuries occurred at the date, time, and location of Plaintiff's incident). Admit Dreith reported he was struck by a rock and two unidentified objects, none of which left marks on his body. Dkt. 253-4 at 4.

14. Deny; unsupported by citations. The HALO video shows that protestors were peacefully marching when they were suddenly attacked by officers with gas and explosives, as Plaintiffs have testified. Dkt. 253-8 at 8:26-8:29; RSF ¶ 9. JCRS officers used force without warning and without orders to disperse. Dkt. 91-9 at 3-4. Only *after* JCRS officers attacked did a few people in the crowd of thousands throw or attempt to throw objects at the officers. Dkt. 253-8 at 8:28-8:31.

16. Deny. Of the JCRS officers, only Hamilton and Dreith shot people who were *kicking* objects. Dkt. 253-4 at 4 (Dreith stated he "saw people repeatedly kicking and throwing gas canisters back at our team" so "I fired approximately 15 bean bag rounds"); 25 (Hamilton stated "crowd participants would attempt to throw or kick gas canisters back at us" so "I began engaging these individuals with my less lethal shot gun"). Others stated that they aimed at/shot people who

3

were *throwing* objects. Dkt. 253-4 at 8 (Stegink); 12 (Pitton); 14-16 (Spery was the paramedic, did not use less lethal, but observed it being used on those who threw gas canisters); 21 (Bybee); 34 (Brown). While Deputy Colley stated "we engaged the specific individuals" who threw or kicked gas canisters, he was a rear guard and stationed with the vehicle until after officers from Aurora (APD) arrived at that intersection to assist. Dkt. 254-4 at 29. APD was not present at 8:30 p.m. and did not arrive until approximately 8:39 p.m. Ex. 11 (Serrant Dep.) at 90-94. This means that Colley was not shooting the individuals at the intersection at 8:30 p.m., including Deras. As for his own actions, Colley stated "I fired several 40mm foam baton rounds at specific individuals who were *throwing* projectiles[.]" Dkt. 254-4 at 29 (emphasis added). None of officers from Arvada or Golden targeted people who kicked tear gas canisters or described taking actions that could have caused Deras's injuries.[3] Dkt. 253-3 at 7 (Donahue stated he deployed 3 bean bag rounds on a male who was throwing rocks at officers, and he used 5 rounds of sting balls "as a means to disperse the crowd" and "aimed low in an effort to strike the legs of the protesters."); 10-11 (Moody was the driver and was 200 ft. away from main line); 14 (Williams did not have a projectile weapon); 19 (Novak not present); 22 (Beale shot people throwing or attempting to throw objects); Dkt. 253-11 at 5 (Griffin did not engage); 8 (Moretti shot people throwing objects); 12 (Vinnola same); 17 (Vogel same); 21 (DiDomenico stated he observed individuals throwing and kicking objects, but he "targeted specifically individuals who were involved in a current act of aggression, was in the act of throwing or picking up an object to throw."); 26-27 (Clark was behind skirmish line; did not engage); 31, 36 (Neidig and Baros engaged in using less lethal only after Aurora arrived).

---

[3] Defendants' citations to the Arvada Police Department reports are incorrect. For example, there is no page 83. Plaintiff thus also denies on the basis that it is unsupported by citations.

19. Admit Dreith stated he attempted to give verbal commands; deny that warnings or orders to disperse were given prior to officers' indiscriminate use of force. *See* RSF ¶ 9.

20. Deny that Dreith aimed only at the green zone of an individual. Ex. 8 (Dreith Dep.) at 23-24, 65-66 (describing the different zones); Ex. 5 at 147-48 (Deras was hit on the top of his hard hat, on his right palm, and on his left lower back). Admit the rest.

21. Deny Hamilton engaged only individuals who were "actively aggressing towards officers." Kicking a tear gas canister away from unarmed protestors without gas masks is not an act of aggression. Ex. 5 at 147; Ex. 6 at 32; Ex. 12 (Stegink Dep.) at 87; *see* Ex. 1 at 162. Admit the rest.

22. Object as immaterial. This assertion of fact is speculation and a red herring. The fact that there were other projectile weapons used by the JCRS officers besides bean bag shotguns[4] does not mean Deras was not hit with a bean bag, especially when the video shows that a white object that officers admitted could be a "bean bag" flopped to the ground after hitting Deras. Dkt. 253-8 at 8:30:39; Ex. 8 at 66-67. Moreover, the after-action report was written after the events of the protests. JCRS officer reports were written as late as two weeks after May 31, 2020. *See e.g.*, Dkts. 253-4 at 24, 32; 253-11 at 2; 253-3 at 13. Officers self-reported the impact munitions they used many days after the fact. Dkt. 253-1 at 28. Thus, there is no reason to believe this delayed self-report of the exact number of munitions fired is accurate, especially given the officers' difficulty recalling the events. Ex. 9 (Hamilton Dep.) at 17, 29, 32; Ex. 8 at 58, 108. Moreover, the estimate of the numbers of less-lethal projectiles deployed does not distinguish between the officers, days, or locations of incidents. Deras appears to be the *only* person in the intersection at 8:30 p.m. who kicked a canister. Dkt. 253-8 at 8:30:36-40. He was one of only four protestors who kicked canisters. *Id.* at 8:30-8:32. Only Defendants shot at anyone kicking an object. RSF ¶ 16.

---

[4] "Bean bag" is a misleading colloquial term. These less-lethal shotguns shoot bags filled with lead pellets. Ex. 12 at 24; Ex. 9 at 38; Ex. 13 (OIM Report) at 2 (these bags are filled with #9 lead shot and can cause fatal or serious injury).

5

23. Admit that the officers could clearly see their target. Deny the rest. *See* RSF ¶¶ 16, 20, 21.

24. Admit JCRS officers were equipped with less-lethal weapons. Deny the rest. Only Defendants specifically used less lethal on individuals kicking canisters. *See* RSF ¶ 16.

25. Deny; unsupported by citation. The video does not show "at least 37 additional instances of individuals throwing items or kicking gas canisters." Dkt. 253-8 at 8:29:02-8:33:00. From 8:33:00-8:34:09, the camera has shifted and no longer depicts the intersection. Nor does the video show any "fireworks launched." Two traffic cones were thrown from the side to the middle of the intersection where the canisters were, and not at the direction of the officers. *Id.* at 8:29:40-8:29:50; *see also* RSF ¶¶ 2-4; Ex. 5 at 96-98.

26. Admit that the video shows instances where individuals kick gas canisters; but deny there are "at least six instances"; unsupported by citations. *See* PSF ¶ 7.

27. Deny that Deras kicked a canister towards the officers; he kicked it away from unarmed protestors. Ex. 5 at 147; Ex. 6 at 32. Admit the rest.

28. Admit that Deras was present when the officers gassed peaceful marchers without justification or warning, and he kicked a canister away from the protestors. Deny the rest. The canister moved only a few feet, never left the intersection, and came nowhere near Defendants. Ex. 6 at 32-36; Ex. 9 at 30-32, 36-37; Ex. 8 at 62; *see* RSF ¶ 9.

29. Object that Dreith's post hoc interpretation of a video interaction he does not recall is immaterial. Ex. 8 at 56, 58. Without waiving objection, deny. Dreith admitted "it's hard to say" whether he would have found Deras to be a threat to him. Dreith stated it was unclear whether the use of projectiles against Deras was justified. Dreith testified that a person "would have to be trying to hurt someone or actively resisting arrest" to warrant such use of force. Ex. 8 at 24, 62-64.

30. Object as immaterial. Hamilton's post hoc interpretation of a video interaction he does not recall is immaterial. Ex. 9 at 29, 34. Without waiving objection, deny. Hamilton stated that the kicked canister did not get past the crosswalk, the canister came nowhere near him, and that he has no recollection of whether Deras posed a threat to him at that time. Ex. 9 at 30-32, 34.

31. Admit, but stating further, Deras had assumed the first hit was a gas canister because that is what he had seen in the area. Ex. 6 at 36. The projectiles that hit Deras came from a gun because "I don't think anyone can throw as fast as the rounds hit." Ex. 5 at 153-54. The first projectile hit the top of his head so hard that his helmet fell off and he had to catch it. Ex. 6 at 16-17, 33-39.

32. Admit Deras was hit by a projectile on the inside of his hand and he did not see this projectile. Deny remainder of paragraph; unsupported by citations. The injury to Deras's palm looked like "a first degree burn," so he assumed it was a canister. Ex. 5 at 147-148; Ex. 14 (photos of hand). The impact felt like a baseball bat hit the inside of his hand; this caused excruciating pain, swelling, and bruising. Ex. 6 at 37-39. It felt like bone had been broken or crushed. *Id.* at 41.

33. Admit in part, deny in part. Deras was hit by a third projectile on his lower left backside. Ex. 6 at 16-17, 39-42; Ex. 5 at 145-48; Ex. 15 (photos of backside).

35. Object as immaterial because a body's response to blunt force or traumatic injury can feel "hot." Ex. 14; s*ee* https://www.ncbi.nlm.nih.gov/books/NBK556083/ (heat is a symptom of acute inflammation, which occurs immediately after injury and lasts several days).[5] Without waiving objection, admit.

## **Plaintiff's Additional Statement of Material Facts ("PSF")**

**Hamilton and Dreith Shot Plaintiff Deras While He Was Peacefully Exercising His Rights**

---

[5] *Widjaja v. Nicholson*, 2006 WL 2871634, at *8 (D. Colo. Oct. 4, 2006) (court may take judicial notice of well-known medical facts).

1. On May 31, 2020, at about 8:30 p.m., Deras was peacefully marching east on Colfax with Plaintiffs Fitouri, Parkins, and other protestors. Dkts. 91-4, 91-5, 91-9, 91-103; Ex. 6 at 23-25.

2. Deras had noticed that officers lost patience and used more force later in the day. Deras joined the protests that evening because he believed there was safety in numbers and that it was his responsibility to continue expressing the message in support of Black lives. Ex. 6 at 19-20.

3. JCRS officers near District 6 station intentionally allowed half the group to pass by, and then began tear gassing, throwing flashbangs at, and shooting projectiles at people in the middle of the march. Dkt. 91-9 at 3-7; Ex. 6 at 23-25, 58-59; Ex. 1 at 129-33; Ex. 2 at 114-17.

4. JCRS officers wanted to target and hit protestors. Ex. 6 at 58-59.

5. There were kids in the crowd; others did not have protective gear on (masks or goggles). Concerned about the safety of his fellow protestors, Deras kicked a canister away from the crowd in the only direction where there were not protestors present. Ex. 6 at 34-36; Ex. 5 at 145-48. He did not kick it at and had no intention to kick it at the officers. Ex. 5 at 147; Ex. 6 at 32.

6. Deras was wearing a white hard hat and orange goggles for protection because, on May 29, he saw a woman get shot in the face with a 40 mm by an officer and was about to lose her eye. Ex. 5 at 143-44. He was away from the others when he kicked the canister and visibly in the middle of the intersection. Dkt. 253-8 at 8:30:38. He was also one of only four protestors who kicked, rather than threw, a canister. *Id.* at 8:29:02-8:32:59.

7. The HALO video shows: from 8:29:02 to 8:32:59 (before the camera turns away from the intersection), Deras recorded thirteen instances of people throwing or kicking canisters. Of them, only <u>four</u> people, including Deras, kick canisters. Two other instances are out of frame, so it is unclear from the video alone if the canister was thrown or kicked. However, in one of those instances, the canister is clearly airborne, showing it was thrown as well. Dkt. 253-8 at 8:29:02;

8:29:55; 8:30:06; 8:30:13; 8:30:16; 8:30:18; 8:30:38; 8:30:44; 8:30:49; 8:30:54; 8:31:11; 8:31:31; 8:32:59. Only Deras kicked a canister at 8:30 p.m. (the rest occurred 8:31:11 and after).

8. Deras did not throw or attempt to throw anything. He did not commit any act of violence against anyone. And he did not destroy any property. Dkt. 91-9; Ex. 5 at 184-85.

9. Dreith fired approximately 15 bean bag rounds within a five-minute period at people who were throwing and kicking canisters. Dkt. 253-4 at 4; Ex. 8 at 37-38. Hamilton recalls "engaging and impacting" three or four protestors who were attempting to throw or kick canisters within "several long minutes." Dkt. 253-4 at 25; Ex. 9 at 34-36.

10. No other officers on the line utilized their less-lethal weapons at around 8:30 p.m. against individuals kicking tear gas canisters. *See* RSF ¶ 16. Hamilton and Dreith could clearly see the individuals they targeted. Ex. 8 at 64-65 ("I could see my target."); Dkts. 253-9–10.

11. As Deras moved the canister away from the crowd, he was hit three times with projectiles from the police line. Ex. 5 at 153-54; Ex. 6 at 33, 36-42. Deras was away from the canister and had begun to turn away when he was shot with the latter two projectiles. Ex. 6 at 37-42.

12. Deras was not threatening the officers, committing any crime, or disobeying any commands. No commands were given prior to the uses of force. Dkt. 91-9; Ex. 5 at 184-87.

13. Hamilton and Dreith were trained that they could only use less-lethal weapons targeting the head or neck when deadly force is justified. Ex. 9 at 38-39; Ex. 8 at 104-05.

14. Dreith conceded that Deras did not engage in any behavior warranting the use of deadly force, and that he would not be allowed to target Deras's head Ex. 8 at 66, 105-06.

15. Hamilton and Dreith do not deny shooting Deras. They merely cannot recall one way or the other whether they shot Deras. Ex. 8 at 56, 58; Ex. 9 at 29, 34.

16. Deras had to immediately leave the protests and went to the emergency room at St. Joseph Hospital. Dkt. 91-9; Ex. 5 at 148-49; 156-57; Ex. 6 at 44-45. Deras got an x-ray of his hand. Due to the swelling, the x-ray was inconclusive, but Deras had to wear a brace for several weeks. Deras also saw an orthopedic specialist. Ex. 5 at 156-62; Ex. 16 (Deras medical records).

17. Deras suffered serious injuries from Hamilton and Dreith's use of force. For weeks, he struggled with tasks such as writing, typing, and cooking. He could not move his palm or thumb. Deras had pain in his back from where he was hit, which left a large bruise and made it hard to sleep, stand, or sit for very long. Deras suffered extreme emotional distress, including increased distrust of police, nightmares, and fear and anxiety. Dkt. 91-9; Ex. 5 at 156-74; Ex. 6 at 47-56.

18. Former Seattle police chief Norman Stamper examined the incident and found that "[e]ven if Deras was kicking an object in the intersection, it would have been contrary to generally accepted police practices for officers to shoot him three times with projectiles, hitting him in the head, back, and hand." It was not appropriate to fire a projectile at Deras's head or body given that this type of force can cause death or serious bodily injury. Ex. 17 (Stamper Report) at 51-53.

**Dreith And Hamilton Were Motivated to Use Force Because of the Anti-Police Message**

19. Both Dreith and Hamilton were impacted by the anti-police message of the protestors. Dreith reported that "[t]here was a great deal of noise from people chanting and yelling and screaming profanities." Dkt. 253-4 at 4. Hamilton stated: "During this time, several citizens in protest shouted obscenities at me, and gestured with middle fingers yelling, 'Fuck you.' Several unidentified individuals stood near us and used disparaging language and taunting in an effort to incite or provoke a violent response from me" *Id.* at 24.

20. Dreith was excited to use force against protestors who were speaking out against police brutality and in support of Black lives. In response to a text message from a JCRS team member

10

who messaged "Guess we get to thump some more rioters tonight. I'm playing this time," Defendant Dreith replied, "Yay!!!!!!!!!" Ex. 18 (Dreith text messages); Ex. 8 at 94-96.

21. Hamilton posted in a group text chain with other JCRS officers an image of Brad Pitt from the war movie, *Fury*,[6] that stated "BEST JOB I EVER HAD" in large white letters. Ex. 19 at 1 (Hamilton text messages) JCSO 112; Ex. 9 at 50-53. And in response to a photo of Hamilton and his co-deputies that Deputy Colley edited by imposing an American flag over it, Defendant Hamilton texted, "SO…SIIIIIIIICK!!!". Ex. 19 at 2; Ex. 9 at 53-54.

## ARGUMENT

At summary judgment, the Court must view the facts and all reasonable inferences in Plaintiff's favor. *Bark v. Chacon*, 2012 WL 1080547, at *4 (D. Colo. Mar. 30, 2012) (Jackson, J.). Defendants ignore the facts and misconstrue the law. They are not entitled to qualified immunity.

**I. Defendants Hamilton and Dreith Are Not Entitled to Qualified Immunity.**

    **A. Defendants Violated Plaintiff's Right to Be Free from Excessive Force.**

        *1. Whether Hamilton and Dreith Shot Plaintiff Is Genuinely Disputed.*

Defendants ignore the following evidence creating a dispute of fact: (1) they were the only officers who could have shot Deras; (2) Dreith fired approximately 15 bean bag rounds within a five-minute period; (3) Hamilton recalls "engaging and impacting" three or four protestors who were attempting to throw or kick canisters within "several minutes;" (4) Deras was hit not just once, but three times by projectiles from the police line; and (5) and neither Hamilton nor Dreith *deny* shooting Deras. RSF ¶ 16; PSF ¶¶ 6, 7, 9,10-11, 19. Deras was also isolated from the crowd, was one of only four people who kicked (rather than threw) a canister, and was a visible target (middle of the intersection, wearing a white hard hat and orange goggles). PSF ¶ 6.

---

[6] *See* https://www.nytimes.com/2014/10/17/movies/movie-review-fury-has-brad-pitt-killing-nazis-again.html.

This evidence, viewed together, raises a genuine dispute as to whether Hamilton and Dreith physically shot Plaintiff with their weapons. Courts have relied on similar circumstantial evidence to deny summary judgment based on personal participation. *See Lynch v. Barrett*, 2010 WL 3938359, at *5 (D. Colo. Oct. 5, 2010) (denying summary judgment where plaintiff presented circumstantial evidence that one or two of the four defendant officers cuffed him and hit him); *Davis v. Hill*, 173 F. Supp. 2d 1136, 1144 (D. Kan. 2001) (denying summary judgment against four officers where the plaintiff alleges two officers beat him but sued seven officers, because those four officers were present by plaintiffs' cell at the time of the alleged beating).[7] Here, a reasonable jury could infer that Defendants specified that they targeted people kicking canisters because when they wrote their reports, they remembered Deras since he was wearing noticeable gear and was isolated from the crowd, and therefore Defendants remembered shooting at him.

Further, as described below, since each of the three uses of force was unreasonable, Deras need not link a specific hit to a specific Defendant (Hamilton or Dreith). At this stage, Deras need only present sufficient evidence for a reasonable jury to find that Hamilton, Dreith, or both, violated his constitutional rights. *Cf. Mwangi v. Norman*, 2016 WL 7223270, at *9 (D. Colo. Dec. 13, 2016) ("[I]n certain circumstances where a plaintiff alleges that the individual defendants all participated in a single incident and acted in concert together, it would be inequitable to require a plaintiff to articulate which specific defendant committed which specific act during the incident in question.") (citing *Bark*, 2012 WL 1080547, at *5). Any concerns about holding Defendants liable for the same injury can be assuaged by giving an instruction "that would allow the jury to consider the

---

[7] *See also Darden v. City of Berkeley*, 12 F.3d 1105 (9th Cir. 1993) ("Where the facts surrounding the alleged beating are disputed and the plaintiff cannot identify any specific officer who beat him, the very presence of a particular officer at the scene may constitute sufficient evidence to infer that the officer participated in the beating."); *Lolli v. Cnty. of Orange*, 351 F.3d 410, 417 (9th Cir. 2003) (plaintiff could not identify which officer used force but presented evidence from which a jury could infer that the officers who had physical contact with her participated in beating).

interplay of two or more officers in a deprivation of constitutional rights." *Jones v. Williams*, 297 F.3d 930, 937 (9th Cir. 2002).

### 2. A Reasonable Jury Could Conclude That Defendants Used Excessive Force.

Whether an officer's actions are objectively reasonable is made by evaluating, among other things: the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight to determine. *Casey v. City of Fed. Heights*, 509 F.3d 1278, 1281 (10th Cir. 2007).

Deras was first hit in the forehead region on his hard hat. RSF ¶ 34; PSF ¶ 12. It is undisputed that Defendants can use less-lethal weapons aimed at a person's neck or head only when the person poses a significant threat of death or serious physical injury to the officer or others. PSF ¶ 17; *Tennessee v. Garner*, 471 U.S. 1, 11 (1985). It is undisputed that Defendants clearly saw their targets and every shot was intentional. PSF ¶ 10; RSF ¶ 23. Dreith concedes that Deras did not engage in behavior warranting the use of deadly force. PSF ¶ 18. And the canister Deras kicked rolled only a few feet towards the officers. RSF ¶ 24. Viewing the evidence in the light most favorable to Plaintiff, a reasonable jury could find that Defendants used excessive force when they intentionally shot Deras in the head because he posed little to no threat of injury to the officers or others. There is also a genuine dispute as to whether the second and third shots were objectively reasonable. Deras had already started turning away when he was hit and thus no longer posed any threat whatsoever. *See McCoy v. Meyers*, 887 F.3d 1034, 1052 (10th Cir. 2018) (clearly established that "the use of force on effectively subdued individuals violates the Fourth Amendment").

### 3. The Law Was Clearly Established.

Defendants' argument that the law was not clearly established based on the particular circumstances in this case fails to view the facts in Mr. Deras's favor by suggesting that it is an

13

undisputed fact that Plaintiff was "displaying aggressive behavior towards the officers." Dkt. 25 at 17. That is not the case. PSF ¶¶ 1, 3, 5, 7-8, 12-19, 23; RSF ¶¶ 9, 14, 21, 27, 28.

In May 2020, it was clearly established that firing less-lethal munitions at a peaceful protestor under similar circumstances is unlawful. *See Fogarty v. Gallegos*, 523 F.3d 1147 (10th Cir. 2008). The court's reasoning in *Fogarty* applies squarely to acts in question here. Further, it has long been established that an officer cannot continue to use force on an effectively subdued individual. *McCoy,* 887 F.3d at 1052-53; *Reavis Estate of Coale v. Frost*, 967 F.3d 978, 993 (10th Cir. 2020). And it would have been clear to any reasonable police officer that they could not use deadly force on a person kicking a tear gas canister. *Weigel v. Broad*, 544 F.3d 1143, 1154 (10th Cir. 2008).

In sum, Deras presents sufficient evidence for a reasonable jury to find that Defendants intentionally targeted and shot him in a manner that was objectively unreasonable, which violated his Fourth Amendment rights. Defendants are not entitled to qualified immunity on this claim.

### B. A Jury Must Decide the First Amendment Claim.

Plaintiff's First Amendment claim requires proof of three elements. *Worrell v. Henry*, 219 F.3d 1197, 1212 (10th Cir. 2000). Defendants challenge only the third, whether Plaintiff's participation in protected activity was a substantial or motivating factor in Defendants' actions. This is highly factual and should be left for trial. *Index Newspapers LLC v. USMS*, 977 F.3d 817, 827 (9th Cir. 2020). Because there is evidence that Hamilton and Dreith were motivated to shoot Mr. Deras due to his "anti-police" message, this factual dispute precludes summary judgment. PSF ¶¶ 24-26. Here, Deras presents sufficient evidence for a reasonable jury to conclude that Defendants would not have used force on Deras were it not for the fact that his protected activity expressed a negative sentiment towards the police. Dreith was excited to "thump some more rioters." PSF ¶ 25. Hamilton viewed the protests as a war between police officers (good) and protestors (evil), akin to

14

the Allies versus the Nazis in the movie *Fury*. PSOF ¶ 26. These views, apparent from text messages sent by them, raise a genuine dispute as to whether Plaintiff's protest activity was a substantial or motivating factor in Defendants' decision to shoot him, especially since they used deadly force, and no deadly force was warranted. There is sufficient evidence for a reasonable jury to infer that Defendants targeted protestors like Plaintiff, took joy in "thumping" protestors, and viewed the protestors as enemies needing to be vanquished.

Moreover, a reasonable jury could infer that Deras did not appear to be doing anything violent and did not pose a threat of any kind when Defendants shot him. This raises a genuine dispute whether Defendants used force for ulterior purposes. *See Anti Police-Terror Project v. City of Oakland*, 477 F. Supp. 3d 1066, 1088 (N.D. Cal. 2020); *Don't Shoot Portland v. City of Portland*, 465 F. Supp. 3d 1150, 1155-56 (D. Or. 2020).

The evidence also shows that Defendants found it relevant to note the anti-police messages and chants in their after-action reports. PSF ¶ 24. This provides yet another inference that they were motivated by Deras's form of protected activity. *Ballentine v. LVMPD*, 2020 WL 4925694, at *1114-17 (D. Nev. Aug. 20, 2020) (a reasonable jury could conclude that the "anti-police content of the chalkings was a substantial or motivating factor" for the arrests where officer's declaration referred to the content of the messages, including "fuck pigs" and "fuck the cops").

|  |  |
|---|---|
|  | Respectfully submitted, |
|  | /s/ Makeba Rutahindurwa |
| Elizabeth Wang | Makeba Rutahindurwa |
| LOEVY & LOEVY | LOEVY & LOEVY |
| 2060 Broadway, Ste. 460 | 311 N. Aberdeen St., Ste. 460 |
| Boulder, CO 80305 | Chicago, IL 60607 |
| O: 720.328.5642 | O: 312.243.5900 |
| *Counsel for Plaintiff Deras* |  |

**CERTIFICATE OF SERVICE**

I hereby certify that on February 11, 2022, I served via CM/ECF the foregoing **Opp'n to JeffCo Defendants' Motion for Summary Judgment** on all counsel of record. /s/ Makeba Rutahindurwa

15