**IN THE UNITED STATES DISTRICT COURT**
**OF THE DISTRICT COURT OF COLORADO**

ELISABETH EPPS, *et al.*,
　　　　　Plaintiffs,

　　　v.

CITY AND COUNTY OF DENVER, *et al*.,
　　　　　Defendants.

Civil Action Nos. 1:20-cv-01878-RBJ &
1:20-cv-01922-RBJ-MEH

---

**PLAINTIFFS' JOINT RESPONSE TO DENVER DEFENDANTS' TRIAL BRIEF**

---

**I.　& II.　DENVER POLICE DEPARTMENT POLICIES AND TRAINING
　　　STANDARDS, ARE RELEVANT AND ADMISSIBLE**

Sections I and II of Denver Defendants' Trial Brief relate to the admissibility of evidence

of violations of the Denver Police Department (DPD) policies and training standards. Defendants

argue that mention of any violation of the DPD policies and training standards is inadmissible

under *Tanberg v. Sholtis*, 401 F.3d 1151, 1161–67 (10th Cir. 2005). Defendants are incorrect. As

explained below, this evidence is relevant and admissible, and Plaintiffs' proposed use of the

evidence is entirely consistent with the opinion in *Tanberg*.

Evidence of DPD's policies and training standards is relevant and admissible to

Plaintiffs' claims against the City of Denver under *Monell v. Dep't of Soc. Serv. of City of New*

*York*, 436 U.S. 658 (1978). Defendants do not contend otherwise in their trial brief and would

have no basis to argue for its exclusion at trial.Defendants conceded as much at the Trial

Preparation Conference on February 4, 2022. Similarly, violations of DPD's written policies and

the enforcement or lack of enforcement of those policies in the form of disciplinary action by the

City, are relevant to demonstrate the patterns and practices of the City with respect to its policies.

For example, the testimony of Denver's 30(b)(6) witnesses establishes that many of DPD's

policies relating to crowd control and use of force, including use of less lethal munitions, body worn cameras, and tear gas, are merely a "guide" and that the officers are authorized—per policy—to use less-lethal weapons in their discretion if they believe it is warranted by the circumstances. Dkt. 286-8 (O'Donnell 10/15/21 Dep.) at 19-20, 40.  The 30(b)(6) testimony further establishes that if there is no discipline taken against an officer who, consistent with policy, uses his discretion in the use of his less-lethal weapons, then Denver has determined that the officer's actions complied with DPD policy. *Id.* at 15. Thus, both the policies and violations of those policies are relevant evidence against the City of Denver.

Although Denver cannot dispute the relevance and admissibility of this evidence, which goes to the heart of Plaintiffs' *Monell* claims, it argues that the evidence cannot be admitted for the purpose of establishing a constitutional violation. But Plaintiffs are not seeking to admit this evidence for that purpose. In fact, the evidence establishes that many of the unreasonable and excessive uses of force by individual officers, including the only remaining individual Defendants, Officers Christian and Valentine, were *within* DPD policy. *See, e.g.*, Dkt. 286 at 8-9, ¶¶ 13-15, 17-20].

One example of an appropriate use of the evidence relating to DPD policy and the conduct of Officers Christian and Valentine is the body-worn camera policy. Officer Valentine turned off his body-worn camera before firing pepperballs at protesters—one of which hit plaintiff Elizabeth Epps in the face. *See* Ex. 1 (Valentine Dep.) at 102. The Office of the Independent Monitor (OIM) found that "[b]est practices emphasize the important role of BWCs [body-worn cameras] during police crowd control and *recommend* that all uniformed officers use BWCs during such operations."  Ex. 2 (OIM Report) at 20 (emphasis added). The OIM observed

that there was a notable gap in DPD policies on use of BWCs during protests. The fact that the Officers' BWCs were turned off prior to the excessive force used against the Plaintiffs is not a violation of DPD policy because the policy did not require the use of BWCs during protests. In this instance, Plaintiffs will not argue that the Officers violated this specific policy, but that the policy itself, as well as Officers Valentine and Christian's actions in relation to their BWCs, are relevant both to the claims against the City and also to the state of mind and intent of the Officers, which is an element of the claims against them.

Both cases that Defendants rely on—*Tanberg* and *Whren v. United States,* 517 U.S. 806 (1996)—are inapplicable here. In *Whren*, the court held that police policies cannot be used as a standard for evaluating the constitutionality of police officer's actions. 517 U.S. at 516–17. The Tenth Circuit extended *Whren* to § 1983 lawsuits in *Tanberg*. 401 F.3d at 1167. In *Tanberg*, the Tenth Circuit held that it was not an abuse of discretion to exclude evidence of a police department's standard operating procedures. *Id.* The court said "[t]hat an arrest [that] violated policy department procedures does not make it more or less likely that the arrest implicates the Fourth Amendment, and evidence of the violation is therefore irrelevant." *Id.* at 1163–64. *Tanberg* is thus inapplicable here because Plaintiffs are not introducing a policy violation by Christian or Valentine as evidence of a constitutional violation.

The relevant policies and training standards may come up in multiple ways during the trial and this Court should determine whether the Plaintiffs' use of those policies and any violations or non-compliance with DPD policies or best practices is appropriate and complies with *Tanberg* under the context in which they are offered. Denver's request for a blanket pre-trial ruling as to the admissibility of this evidence, all of which is concededly relevant in the first

instance to the *Monell* claim against the City of Denver, is premature, and any challenges to how Plaintiffs are using or making arguments relating to this relevant, admissible evidence should be resolved at trial.

### III. & IV. DENVER'S POLICY OF NOT REQUIRING USE OF FORCE REPORTS FOR USES OF FORCE DURING PROTESTS OR BWC ACTIVATION DURING PROTESTS IS RELEVANT AND ADMISSIBLE.

Defendants' argument that the Constitution does not require timely use of force reports or BWC activation, Dkt. 267 (Defs.' Trial Br.) at 4-5, misunderstands the evidence, Plaintiffs' position, and the law. What the evidence at trial will show is that, as a matter of policy, Denver did not require its officers to document their uses of force during protests, and it did not require officers to activate their BWC during protests. *See* Dkt. 286 at 8-10, ¶¶ 17-23. This is undisputed; it was testified to by Denver's 30(b)(6) witnesses and numerous command-level DPD witnesses. Plaintiff's expert, former Seattle chief of police Norman Stamper, will testify that failing to require officers to account for their uses of force on protestors meant that "officers could (and apparently did) use inappropriate force on protestors with impunity." *Id.* at 9, ¶ 20 (citing Dkt. 286-6 (Stamper Report) ¶ 114). Thus, Plaintiffs are not arguing that the Constitution required the officers to write use of force reports. They are arguing that Denver's policy of not requiring timely, individual use of force reports for uses of force during protests contributed to officers using excessive force with impunity, because they knew they would not have to account for their uses of force. The issue is not whether a particular officer's failure to complete a particular report after the fact *caused* the particular injury that went unreported. The point is that Denver has a policy or custom of *not requiring* such reports or activation of BWC—a policy or practice that officers understood *before and during the protests.* That policy or custom

4

minimized the likelihood that officers would be held accountable for their use of force (excessive or otherwise), which in turn led to unlawful excessive force and Plaintiffs' injuries. Dkt. 286 at 18-19. The cases cited by Denver do not address Plaintiffs' evidence or how they intend to use that evidence.

## V.   DEFENDANTS' REQUEST REGARDING PUNITIVE DAMAGES IS PREMATURE

Defendants' requests regarding the admission of punitive damages related evidence is unsupported by its cited caselaw. Further, the request is premature.

Defendants appear to be arguing that there should be no mention of punitive damages during the trial until and unless the Court makes a threshold legal determination whether Plaintiffs proffered sufficient facts to support an award of punitive damages against each individual Denver Defendant. Dkt. 267 at 6. Notably, none of the cases Defendants cite supports this proposition, as they relate solely to the issue of what evidence is required before the issue of punitive damages can go to the jury, and they say nothing about the conduct of the trial itself. *See e.g.*, *Searles v. Van Bebber*, 251 F.3d 869, 879 (10th Cir. 2001) (concluding that "a reasonable jury could find from [the] evidence that defendant's actions were in reckless disregard of plaintiff's rights" but the "punitive damages must be set aside because of error in the instruction"); *McGhee v. Biamont*, 348 F. App'x 418, at *1 (10th Cir. 2009) (upholding trial court's decision that plaintiff was not entitled to punitive damages as there was no showing of reckless disregard of plaintiff's due process rights). To the contrary, those cases discuss the sufficiency, or lack thereof, of evidence submitted during trial to support Plaintiff's request for punitive damages and whether the ultimate award was appropriate.

This Court possesses broad discretion in assessing what evidence to admit during trial. *Valdez v. Motyka*, 2021 WL 1123576, at *1 (D. Colo. Mar. 24, 2021) ("The admission or exclusion of evidence lies within the sound discretion of the trial court ….") (citing *Robinson v. Mo. Pac.*, 16 F.3d 1083, 1086 (10th Cir. 1982)); *Rothman v. Torian Plum Condo. Owners' Ass'n, Inc.*, 986 F.2d 1429, *4 (10th Cir. 1992) ("A trial court has broad discretion to determine whether evidence is relevant, and its decision will not be reversed on appeal absent a showing of clear abuse of that discretion."). Further, Rule 403 affords this Court the authority to exclude any evidence from the trial if the evidence's probative value is substantially outweighed by its prejudicial value. Defendants argue that "statements or requests" by Plaintiffs concerning the issue of punitive damages would be unduly prejudicial but fail to explain how such statements would be prejudicial. *See* Dkt. 267at 6. Further, the mere mention of punitive damages is unlikely to sway a jury to find in favor of Plaintiffs.

Finally, Defendants' request is premature. Like *Valdez*, Defendants are seeking a pretrial ruling on what Plaintiffs may state or present regarding punitive damages. 2021 WL 1123576, at *7. Such a ruling is unnecessary as Plaintiffs' ability to present a roadmap of its case in the manner it sees fit "outweighs any potential prejudice from allowing Plaintiff[s] to reference punitive damages prior to [their] closing argument." *Id.* Further, if the Court finds at the conclusion of trial that there is insufficient evidence to support a claim for punitive damages it may decline to instruct the jury regarding punitive damages. *Id.*

## VI. THE OIM REPORT AND THE TESTIMONY FROM FORMER MONITOR MITCHELL ARE BOTH ADMISSIBLE

The OIM Report and related testimony from former Monitor Nicholas E. Mitchell are relevant and admissible under Federal Rules of Evidence 401 and 402. Denver incorrectly asserts

that this evidence should be excluded under Rules 407 and 403, but these arguments fail and have been rejected by this Court in similar circumstances.

Rule 407 limits the introduction of subsequent remedial measures into evidence. *See* Fed. R. Evid. 407. "[P]ost-event investigative tests and reports are not excluded by Rule 407" as the Rule's policy considerations "are not as vigorously implicated where investigative tests and reports are concerned." *Rocky Mountain Helicopters, Inc. v. Bell Helicopters Textron, a Div. of Textron, Inc.*, 805 F.2d 907, 918 (10th Cir. 1986); *see Ortega v. City & Cty. of Denver*, 944 F. Supp. 2d 1033, 1039 (D. Colo. 2013) (using, among other things, deposition testimony from former independent monitor to hold that plaintiffs' excessive force-related *Monell* claim survived summary judgment).

Post-incident investigations into police conduct are "relevant to the jury's fact-finding mission like any investigation of an accident after the fact" to the extent they result "in findings as to the facts of what occurred." *Davies v. City of Lakewood*, 2016 WL 614434, *18 (D. Colo. Feb. 16, 2016). To the extent they show what a Police "Department's policies, customs or practices were at the time of the incident, they potentially would be relevant and admissible on the 'Monell' issue." *Id.* In *Davies*, this Court found that the IRB report in that case would only be inadmissible as a subsequent remedial measure if two conditions were met, neither of which applies to the OIM report here. First, if the "investigation was conducted *solely* to identify remedial measures that the [Police Department] should take to ensure that a similar tragedy would not happen again . . ." *and* second, "if convening the IRB was done voluntarily by the Department in order to obtain recommendations for improvements to its procedures." *Id.* (emphasis added).

The OIM Report and Mitchell's testimony about his findings are relevant as a post-incident investigation that resulted in findings as to the facts of what occurred. *E.g.*, Ex. 2 at 2–8 (summarizing George Floyd Protest events), 11–19 (detailing findings regarding use of force during these protests); *see e.g.*, Ex. 3 at DEN005192–93 (Internal Affairs Bureau Letter) (declining to pursue disciplinary review of a citizen complaint because DPD was unable to identify the individual officers in question, while forwarding complaint to OIM to be incorporated into their "general review of allegations of misconduct associated with the protests and the tactics police officers used."). They are relevant and admissible on the *Monell* issue because they show DPD's policies, customs, or practices at the time of the protests. *See, e.g.*, Ex. 2 at 13 (summarizing DPD pepperball launcher policy as laid out in DPD Operations Manual); Ex. 2 (Mitchell Letter, OIM Report) ("This report summarizes the results of the OIM's independent investigation and review during the past six months. It addresses . . . [DPD's] policies and practices concerning less-lethal equipment and munitions").

Moreover, because they are not equivalent to subsequent remedial measures under *Davies*, they are not inadmissible under Rule 407. The OIM Report investigation was not conducted solely to identify remedial measures DPD should take to prevent a similar tragedy; it was also undertaken to achieve accountability and understanding. *See* Ex. 2 (OIM Report, App'x B) (Letter from Councilwoman CdeBaca) (requesting "thorough investigation and public accounting of the impacts of [law enforcement] policies" by OIM). The investigation was also not done voluntarily by DPD; it was requested by City Council. *E.g.*, Ex. 2 (OIM Report, App'x A) (Letter from City Council to OIM requesting "analysis and review" of DPD actions).

Finally, the OIM report is not inadmissible under Rule 403. Contrary to Denver's argument, it does not use a standard that could confuse a jury. The OIM report included an extensive factual investigation into the actions of police officers during the protests, and how those actions relate to DPD policies and training. *See* Ex. 4 (Mitchell Dep.) at 62 ("[OIM] set out to understand the way in which the [DPD] organized its response to the protests and the policy framework that the department was operating within and identify weaknesses or deficiencies that may have contributed to some of the problems and challenges that we observed during the protests."). The OIM Report investigation occurred alongside Internal Affairs investigations; it did not itself involve the disciplining of officers. *See id.* And unlike the "unusual circumstances" of *Stump v. Gates*, where a trial jury was given a grand jury report that found that police officers committed crimes including evidence tampering and accessory to homicide, 211 F.3d 527, 538 (10th Cir. 2000), the OIM Report investigations are plainly dissimilar from jury deliberations and findings, *see* Ex. 2 at 9 (describing Report compilation as including "read[ing] and analyz[ing] a large quantity of academic research and best practice literature"); Ex. 4 at 147 ("to the extent there were constitutional violations alleged in this lawsuit … [t]hose are not the questions that we were attempting to analyze or resolve in that report.").

Because the OIM Report and Mitchell testimony are neither equivalent to subsequent remedial measures nor unduly prejudicial, they should not be excluded.

## VII. DETERMINATION OF WHO IS A FINAL POLICYMAKER IS A QUESTION OF LAW FOR THE COURT AND UNDISPUTED IN THIS CASE

Plaintiffs agree that the determination of who is a final policymaker with respect to the DPD's response to the George Floyd Protests is a question of law for the Court. The City does

not and cannot dispute that Mayor Hancock, Chief Pazen, and Incident Commander Phelan were final policymakers with respect to the DPD's response to the protests.

## VIII. DENVER DEFENDANTS' ASSERTION THAT THERE WILL BE INSUFFICIENT EVIDENCE OF RATIFICATION AT TRIAL IS PREMATURE

As Plaintiffs detailed in their Response to Denver Defendants' motion for summary judgment, there is more than enough evidence for Plaintiffs to present their *Monell* claim against Denver to the jury, including on their ratification theory. *See* Dkt. 286 at 15-20. Thus, there is no basis for Denver to bar Plaintiffs from presenting the evidence on this theory at trial. Plaintiffs' evidence will show not only that Denver declined to discipline any of the officers who used allegedly excessive force against Plaintiffs, but that Denver found that numerous uses of force during incidents at which Plaintiffs were present were within DPD policy and training. Moreover, the Mayor and Chief Pazen expressly praised the conduct of DPD officers on May 29, 2020, after witnessing their uses of force on the first day of protest, May 28, 2020. *See, e.g.*, Dkt. 286 at 11-12, ¶¶ 29-33. The Mayor and Chief Pazen expressly praised the officers' actions and the basis for their actions. On June 6, 2020, the Executive Director of the Department of Public Safety praised the officers' conduct during the protests in a DPD-wide email. *Id.* at 12, ¶ 33. Judge Martinez's decision in *Valdez v. Macdonald*, 2019 WL 1651857, at *4-5 (D. Colo. April 17, 2019) (denying summary judgment on ratification theory where Manager of Safety approved acts of the involved officer), is directly on point. Furthermore, there were at least two major uses of force on May 28, 2020—one was the teargassing of peaceful protestors at Colfax and Washington at 8:30 p.m. and one was the teargassing of peaceful protestors at 14th & Sherman at 9:10 p.m. Both of these uses of force were directly authorized by Commander Phelan (who is himself a final policymaker for purposes of the protest). The cases cited by Denver on page 11 of

its Trial Brief are inapposite; they involved conclusory allegations in complaints that did not

identify the final policymaker(s) and that were dismissed at the motion to dismiss stage.

### IX. **THE COURT'S TEMPORARY RESTRAINING ORDER IN *ABAY* IS RELEVANT AND ADMISSIBLE**

As explained in Plaintiffs' Opposition to the Denver Defendants' Motion for Summary

Judgment, DPD did not require its officers to complete use-of-force statements until the day after

this Court issued its Temporary Restraining Order (TRO) in *Abay*. Dkt. 286 at 9, ¶ 21. This is

relevant because, as Stamper explains, the DPD only required officers to write up use-of-force

statements in response to the *Abay* lawsuit and TRO. DPD leadership sought to ensure that the

after-the-fact reports avoided inconsistencies and problematic language and wanted the reports

prepared in order to protect officers from lawsuits. *Id.* The goal was to cover up any problematic

uses of force rather than protect the constitutional rights of Denver's citizens. *Id.* This is

important evidence on Plaintiffs' *Monell* claim because DPD's policy of not requiring use of

force statements for uses of force during protests resulted in the complete lack of officer

accountability and caused officers to act with impunity. Given this evidence, there may be a need

to reference the fact that there was a separate lawsuit filed concerning use of force at the protests,

and that a court issued a TRO in that lawsuit. Any theoretical prejudice to Denver may be

avoided by not referencing the fact that it was *this Court* which entered the TRO.

### X. **DENVER DEFENDANTS' DEMAND THAT THIS COURT POLICE CUMULATIVE EVIDENCE ISSUES IS PREMATURE**

Denver Defendants demand that the court rule on allegedly cumulative evidence is

premature, particularly as the parties to this case remain engaged in the process of exchanging

pared down witness and exhibit lists. (It should also be noted that the Denver Defendants' exhibit

list contains every single document and video disclosed during discovery in this case. Both sides

are in the process of paring down their lists.) It would be premature for the court to rule on

whether or not Plaintiffs' evidence is cumulative at this stage. This issue may be addressed, if

necessary, at trial.

Dated: February 14, 2022                     Respectfully submitted,

By: /s/ Elizabeth Wang                       By: /s/ Timothy R. Macdonald
    Elizabeth Wang                               Timothy R. Macdonald
    LOEVY & LOEVY                                ARNOLD & PORTER KAYE SCHOLER LLP
    2060 Broadway, Suite 460                     1144 Fifteenth Street, Suite 3100
    Boulder, CO 80302                            Denver, Colorado 80202
    Telephone: (720) 328-5642                    Telephone: (303) 863-1000
    elizabethw@loevy.com                         Timothy.Macdonald@arnoldporter.com

## CERTIFICATE OF SERVICE

I hereby certify that on February 14, 2022, I served via CM/ECF the foregoing **Response to Denver Defendants' Trial Brief** on all counsel of record. /s/ Elizabeth Wang