

# The Police Response to the 2020 George Floyd Protests in Denver, an Independent Review

Nicholas E. Mitchell

Independent Monitor

DEN003925

Exhibit 2

DEN003926

# The Office of the Independent Monitor

The Office of the Independent Monitor ("OIM") is charged with working to ensure accountability, effectiveness, and transparency in the Denver Police and Sheriff disciplinary processes.   The OIM is responsible for:

- Ensuring that the complaint and commendation processes are accessible to all community members;

- Monitoring investigations into community complaints, internal complaints, and critical incidents involving sworn personnel;

- Making recommendations on findings and discipline;

- Publicly reporting information regarding patterns of complaints, findings, and discipline;

- Making recommendations for improving Police and Sheriff policy, practices, and training;

- Conducting outreach to the Denver community and stakeholders in the disciplinary process; and

- Promoting alternative and innovative means for resolving complaints, such as mediation.



DEN003927

# OIM Staff:

Policy

Matthew Buttice, Policy and Operations Director

Alyssa Perez Morrison, Senior Policy Analyst

James Davis, Senior Policy Analyst

Monitors

Gregg Crittenden, Senior Deputy Monitor

Nate Fehrmann, Deputy Monitor

Kevin Strom, Deputy Monitor

Suzanne Iantorno, Deputy Monitor

Kerri Wyman, Deputy Monitor

Stephanie Howard, Deputy Monitor

Community Outreach/Administration

Nicole Taylor, Community Relations Director

Teniqua Pope, Operations Coordinator

Gianina Horton, Youth Outreach Project Manager

Asiya Mustefa, Youth Outreach Project Coordinator

DEN003928

# Contents

*Introduction and Factual Summary*                                          *1*

   Factual Summary  . . . . . . . . . . . . . . . . . . . . . . . 2

   The First Five Days of the GFP in Denver . . . . . . . . . . . . . 2

   Size and Scale of the GFP  . . . . . . . . . . . . . . . . . . . 6

   Officer and Community Member Injuries  . . . . . . . . . . . . . 7

   Other Impacts . . . . . . . . . . . . . . . . . . . . . . . . 8

*Methodology*                                                               *9*

*Use of Force*                                                             *11*

   Policing Protests and Protesting Police  . . . . . . . . . . . . .11

   OIM Information Requests and Documentation Gaps . . . . . . . .12

   Less-Lethal Equipment and Munitions Used During the GFP  . . . .12

   Internal Controls on the Use of Force by DPD Officers . . . . . . .16

      Less-Lethal Munitions  . . . . . . . . . . . . . . . . . . .16

      Officer Rosters . . . . . . . . . . . . . . . . . . . . . . .19

      Body Worn Cameras  . . . . . . . . . . . . . . . . . . . .20

      Delayed/Vague Officer Statements about Uses of Force . . . . .23

      Inconsistent Documentation of Crowd Dispersal Orders  . . . . .24

      Crowd Dispersal Without Dispersal Orders  . . . . . . . . . .26

      Visibility of Officer Identification on Riot Gear . . . . . . . . .27

      Use of Pepperball and 40mm Launchers by Uncertified Officers . .28

      Conclusions and Recommendations . . . . . . . . . . . . . .29

   Substantive Use of Force Issues and DPD Policy  . . . . . . . . .31

      Uses of Force Referred for Review and Possible Investigation . . .32

      Policy Deficiencies for Less-Lethal Equipment and Munitions . . .32

         No Guidance for High-Risk Explosive Devices . . . . . . . .33

         Inappropriate Standard for Direct-Fired Pepperball . . . . . .36

      Conclusions and Recommendations  . . . . . . . . . . . . .37

DEN003929

*Mutual Aid*                                                                     *39*

    The DPD was Unable to Produce Relevant Mutual Aid Agreements   . 40

    Responding Mutual Aid Partners and the Aid They Provided   . . . . 42

    Inconsistent Policies, Equipment, and Munitions   . . . . . . . . . 43

        Use of Force Standards and Limitations . . . . . . . . . . . . 44

        Less-Lethal Equipment and Munitions   . . . . . . . . . . . . 45

    Conclusions and Recommendations   . . . . . . . . . . . . . . . 47

*Additional Issues Referred for DPD Review*                                      *49*

    The Role of the Operations Chief During Mass Protests . . . . . . 49

    Overcrowded Radio Channel and "Bonking" During the GFP. . . . 50

    Demand for Additional Crowd Control Training   . . . . . . . . . 51

    Recommendation   . . . . . . . . . . . . . . . . . . . . . . 52

*OIM Recommendations*                                                           *53*

**Office of the Independent Monitor**



101 W. Colfax Avenue. Ste. 100
Denver, CO 80202
p: 720.913.3306
f: 720.913.3305
www.denvergov.org/oim

Dear Mayor Hancock, Denver City Council members, Executive Director Robinson, Chief Pazen, and Denver Citizen Oversight Board members:

I provide the enclosed report in response to a unanimous request from the Denver City Council. The Council asked Denver's Office of the Independent Monitor ("OIM") to conduct an investigation into the Denver Police Department's ("DPD") responses to the demonstrations that began in Denver on May 28, 2020 ("George Floyd Protests" or "GFP"), following the murder of George Floyd by Minneapolis police officers. We were asked to evaluate, among other things, the DPD's approaches to crowd control, including officer uses of force during the GFP.

This report summarizes the results of the OIM's independent investigation and review during the past six months. It addresses the unprecedented size and scale of the demonstrations, which resulted in serious injuries to many officers and community members, as well as deficiencies in the DPD's internal controls on officer use of force, its policies and practices concerning less-lethal equipment and munitions, and the mutual aid framework under which neighboring law enforcement agencies provided assistance in Denver. The report also makes 16 actionable recommendations to the DPD that are intended to help to keep officers and community members safer in the event of future, similar protests in Denver.

I want to recognize Executive Director of Safety Murphy Robinson and Chief of Police Paul Pazen for immediately expressing their complete support for this review. Welcoming this level of scrutiny is not easy, and it demonstrates their strong commitment to public safety and building community trust. DPD officers and command staff demonstrated a similar commitment by responding thoroughly to our extensive document requests, and volunteering to participate in interviews. Community members also provided substantial information and assistance. I am thankful for the high level of collaboration and transparency that we experienced as we conducted this review.

I also want to thank the OIM team for their tireless work during this project. The staff worked exceptionally hard, routinely giving up nights and weekends, to accomplish this review so quickly. I am so grateful for their commitment to collaborative public safety, and to the people of the City and County of Denver.

Sincerely,

Nicholas E. Mitchell
Independent Monitor
Denver, Colorado

FOR CITY SERVICES **VISIT** | **CALL**
DenverGov.org | 311

DEN003931

DEN003932

# Introduction and Factual Summary

This report is presented in five sections. In the *Introduction and Factual Summary*, we provide a brief overview of key facts from the first five days of the demonstrations that were prompted by the murder of George Floyd ("George Floyd Protests" or "GFP") that give context for our analysis in the rest of the report. *Methodology* summarizes the methods we used to perform this review and the sources of information that we relied upon.

*Use of Force* details the various types of munitions used by the Denver Police Department ("DPD") during the GFP, including gas grenades, chemical and impact projectiles, and explosive devices. With an eye on national standards, we also explore the internal systems, sometimes known as "internal controls," that are often used to help manage police use of force during large-scale protests. This includes the systematic use of body worn cameras ("BWC"), accurate tracking of less-lethal munitions, prompt documentation of all uses of force, and restricting high-risk, less-lethal equipment to officers who have been certified to use them properly. During our review, we discovered significant gaps in the DPD's use of each of these internal controls during the GFP. We also discuss areas of DPD policy, such as the lack of guidance on high-risk explosive devices during crowd control events, that we believe can be improved.

*Mutual Aid* details the many law enforcement agencies that provided aid in Denver during the GFP and explores the framework under which they operated, which was deficient in important ways. Most notably, it permitted each agency to follow its own guidelines about when force could be used, rather than the DPD's standards, and use less-lethal tools that were not permitted under DPD policy. Finally, in *Additional Issues Referred for DPD Review*, we refer certain issues to the DPD for its own consideration. This includes concerns expressed to us by some DPD supervisors and officers: 1) that they received insufficient tactical and strategic direction in the field, 2) that the single radio channel used for all police radio transmissions during the GFP was overcrowded and often inaccessible, and 3) that the DPD has not made enough recent investments in crowd control and field force operations training to properly prepare officers for an event like the GFP. Each section proposes changes to DPD policies and practices that are intended to remedy the identified issues and help keep both DPD officers and community members safer in the event of future, similar protests.

DEN003933

## Factual Summary

On May 25, 2020, four officers from the Minneapolis Police Department arrested George Floyd, a Black man, after receiving a complaint that he had used a counterfeit twenty-dollar bill. Mr. Floyd was pinned down by three officers, and seventeen minutes after the first police car arrived on scene, Mr. Floyd lay unconscious in the street with no pulse. The next day, the Minneapolis Police Department fired all four officers, and shortly thereafter, all were criminally charged.

In the preceding months, the deaths of several other Black individuals at the hands of law enforcement had garnered national attention, including the death of Breonna Taylor, who was shot and killed in her bed in Louisville, Kentucky on March 13, during the execution of a no-knock search warrant. Over the last decade, protests concerning policing and allegations of systemic racism in the criminal justice system have become more frequent. The increasing prevalence of BWC and bystander cell phone footage has prompted greater awareness for many communities about the deaths of Black, Indigenous, and other people of color during police interactions. In the days after Mr. Floyd's death, protests erupted throughout the United States, starting in Minnesota on May 26 and spreading to dozens of other cities in the succeeding days, including Denver.

Beginning on May 28, Denver experienced several weeks of sustained protests that ended in mid-June. The first five protest days were characterized by peaceful demonstrations, as well as property destruction, fires, and violence that resulted in significant injuries to both officers and community members.

## The First Five Days of the GFP in Denver

On the first day of the GFP, May 28, crowds began to form at approximately 5 p.m., and word quickly spread that a significant protest was growing near the Colorado State Capitol Building. Although the protest largely developed organically, numerous people organized and social media posts drew many people downtown. DPD officers were caught off guard by how quickly the protests swelled and the anger of some in the crowd. The DPD immediately opened a Command Post, and an Incident Commander was appointed to assume primary command responsibility. On that first day and throughout the protests, the Incident Commander monitored a flow of video footage from hundreds of High Activity Location Observation ("HALO") cameras spread throughout downtown to assess conditions and to direct police resources to areas of need.

DEN003934

To facilitate the management of the police response, the DPD divided the protest area into three primary sections: the 16th Street Mall, the Broadway/Lincoln corridor, and Civic Center Park.



DEN003935

Officers were deployed within those sections, and the Incident Commander assigned a lieutenant to command the officers in each. Specialized teams, such as Metro/SWAT and the Gang Unit used tactical vehicles, such as Rapid Deployment Vehicles ("RDVs"), to respond to hot spots throughout downtown. The DPD initially assigned several police radio channels to the GFP in order to separately communicate with the officers in each section. This soon proved unworkable, however, prompting the DPD to consolidate communication with all officers onto a single police radio channel.

On the first day, protestors divided into two primary groups: one initially stayed near the State Capitol and then moved east toward the District 6 Police Station, and another went west and entered I-25. Officers were directed to parallel each group and respond, as needed. At approximately 5:30 p.m., there were gunshots near the Colorado State Capitol Building. As night approached, the DPD determined that it would need additional officers and placed a city-wide call for assistance. As discussed later in this report, DPD records are inconclusive about the number of DPD officers who policed the GFP during its first four days. However, the DPD has estimated that 150–200 officers were working the protest on the first day.

As night fell, confrontations erupted, some violent, with officers deploying less-lethal munitions and some individuals throwing projectiles at officers, damaging buildings, and stealing property. At approximately 10:30 p.m., DPD teams began reporting that they had depleted their supplies of certain less-lethal munitions, and DPD command staff began requesting munitions resupplies from neighboring jurisdictions. The DPD arrested a total of 28 people on May 28, and multiple officers and civilians were injured, some seriously.[1]

By May 29, the second protest day, there were additional clashes, and DPD's command staff began requesting that neighboring law enforcement agencies ("Mutual Aid Partners") send officers to support the DPD. At least one agency responded to Denver that night with officers. But even with that assistance, the number of officers on the street remained relatively low, with only 100–150 officers working the protests on the second day. Violence again erupted, with individuals throwing projectiles, damaging buildings, and officers deploying less-lethal munitions. The downtown was described by some as being like a "warzone." The DPD and its Mutual Aid Partners arrested an additional 21 people, and more officers and civilians were injured.

On May 30, Denver Mayor Michael B. Hancock announced a citywide curfew that went into effect between 8 p.m. and 5 a.m. and was to last until June 1. To address

DEN003936

compounding munitions shortages, the Colorado State Patrol flew its plane to Wyoming to purchase less-lethal munitions directly from a manufacturer, including some munitions that had been ordered by the DPD. By this point, a large number of officers from over five neighboring law enforcement agencies were providing assistance to the DPD. Approximately 450–500 DPD and Mutual Aid Partner officers were then working the GFP, a substantial increase from the previous two days. Again, as day turned to night, there was violence in the streets that resulted in injuries to both civilians and officers. An additional 64 arrests were made, the vast majority for violating the curfew.

On May 31, 450–500 officers were deployed to work the GFP, which included officers from both the DPD and its Mutual Aid Partners. At night, the demonstrations moved eastbound on Colfax Avenue and protesters approached the District 6 Police Station. The DPD command staff had seen reports that protesters in other cities had taken over or started fires in police buildings, and they were prepared to defend District 6 if it became necessary. There were clashes at the District 6 Police Station, but protesters were eventually turned away. The DPD and its Mutual Aid Partners made 102 protest-related arrests, and many civilians and officers reported injuries.

By many accounts, June 1, the fifth day of protests, had a different character than the previous days. Chief Paul Pazen marched with protesters during the day, clearly voicing his desire to work together towards making positive change in Denver. Mayor Hancock extended the curfew to June 4 and pushed the curfew time to 9 p.m. At night, there was limited activity in Civic Center Park. Protesters held a moment of silence for George Floyd outside the Colorado State Capitol Building. Even though 500–550 DPD and Mutual Aid Partner officers were assigned to the protests and made 124 arrests, many felt that the chaos and violence of the first four days had begun to pass.

After the fifth day, conditions became much calmer on the street. The GFP continued for several more weeks but there was limited violence and far less property damage. In these subsequent weeks, the DPD made a total of 111 arrests, a fraction of the number from the first five days.

DEN003937

## Size and Scale of the GFP

In Denver's history, protests have often been uni-directional, and included coordinated marches that culminated with rallies and speeches at the Colorado State Capitol Building, Civic Center Park, and other government facilities. For example, in 2012, an Occupy Denver protest started at Civic Center Park, made a loop through Capitol Hill, marched down the 16th Street Mall, and then returned to the Colorado State Capitol Building.[2] That march was so coordinated that when the people leading it made a wrong turn, organizers quickly got them back on track because they were behind schedule.[3] Similarly, after the 2016 officer-involved shooting of Philando Castille in Minnesota, hundreds of people marched along the 16th Street Mall in Denver and ended at the Capitol.[4] During that protest, police escorted the protesters and blocked traffic on their behalf.[5]

In contrast, the GFP was multi-directional and developed quickly, without an obvious schedule for the first five days. Groups often split from each other and moved in different directions without easily discernable intended destinations. The DPD redirected protesters several times when officers believed that they were attempting to storm the District 6 Police Station or to enter the highway to stop interstate traffic. Often, many protesters remained on the streets long after midnight. By the third day of the protests, Saturday, May 30, an estimated ten thousand people or more were expected to fill the streets of Denver.[6]

The arrest data demonstrates the geographic dispersion of the GFP. The DPD recorded protest-related arrests as far south as 10th Avenue and Acoma Street, as far northwest as 16th Street and Wazee Street along the 16th Street Mall, and as far east as Colfax Avenue and Downing Street, beyond where clashes took place near the District 6 Police Station at Colfax Avenue and Washington Street. The total area where protest-related arrests were made stretched more than a mile from north to south and east to west.

Due to the unexpected nature of the protests, the DPD was caught with limited personnel, especially for the first two days, which were staffed by an estimated 150–200 and 100–150 DPD officers, respectively. While many officers were assigned to fixed locations, such as skirmish lines near sensitive locations, mobile response teams on RDVs were also deployed to quickly traverse the downtown to address emergencies. Yet, these teams often struggled to cross streets, parks, and other areas blocked by protesters or traffic, causing delayed response times. After a few days, the DPD adjusted by assigning mobile response teams to distinct parts of the

DEN003938

downtown area with particular consideration for major thoroughfares that could be blocked, which sped up response times significantly.

Other units were assigned to shadow splintered protest groups to report about their plans or direction of travel. All of these resources, officers, and methods of responding to the GFP notwithstanding, every command officer we spoke to during this review said that the protests were extremely difficult to manage, with many calling them the most challenging situation they have faced in decades on the DPD.

## Officer and Community Member Injuries

The first five days of the GFP led to injuries for both officers and community members, as the generally peaceful demonstrations during the day turned into violent clashes at night. The DPD reported 81 officer injuries, with 11 officers placed on limited duty, and 4 needing to take time off work. According to the DPD, the vast majority were caused by individuals throwing objects, such as rocks, fireworks, and other projectiles at officers. We are aware of no other event in Denver's recent history that resulted in this number of injuries to DPD officers.

Many community members were also hurt, though the precise number is impossible to determine as many of those injuries went unreported.[7] Data from the Denver Health Paramedic Division ("DHPD") are an imperfect measure as they necessarily undercount the number of community member injuries. Yet, the data may include many of the most serious injuries. From May 28 to June 7, DHPD responded to 125 calls for service in the protest area for individuals not identified as law enforcement personnel, 74 of which resulted in hospital transports. They included impact projectile injuries and breathing problems associated with chemical munitions. Some of the patients were clearly injured while protesting or were bystanders to the protests. For many of the calls for service, however, the information available from DHPD was insufficient for us to make a determination about the cause or severity of the injuries.

As of the date of this report, three lawsuits have been filed against the DPD and the City and County of Denver alleging serious injuries as a result of enforcement actions during the GFP, and more than 50 additional notices of claim have been served. Many of those notices involve alleged serious bodily injury to protesters, including grievous eye injuries and ligament damage resulting from less-lethal projectile strikes. One of the lawsuits sought and obtained a temporary restraining order prohibiting DPD officers from using chemical munitions unless authorized

DEN003939

by a supervisor, among other matters. More than 100 complaints were filed alleging DPD misconduct during the GFP, and approximately 50 of these investigations remain open to this day.

## Other Impacts

Significant property damage occurred downtown during the GFP, including vandalism of public and private property. The Denver Fire Department responded to more than 200 calls related to fires during the GFP. Private businesses reported approximately $2 million in damage and the damage to city property was estimated at just over $1 million.[8] The destruction to the Colorado State Capitol Building, which included broken windows, doors, gates, and security cameras, was estimated at $1.1 million.[9] The DPD also reported over $76,000 in property damage, almost all to police vehicles.

More than 400 people were arrested during the GFP. Many of those arrests were for curfew violations, which were ultimately dropped by prosecutors. Some arrests for other charges, such as trespassing, theft, burglary, and assault on a peace officer, for example, are still pending in court. Nearly 50 arrests included weapons-related charges, and 33 firearms were seized.

Some DPD officers who we spoke with described physical or emotional after-effects from policing the GFP that linger to this day. Similarly, some community members have described anger, trauma, and a loss of confidence in the police based on their experiences. The damage to trust between officers and the community that resulted from the GFP is impossible to quantify.

DEN003940

# Methodology

Between June and November 2020, the Office of the Independent Monitor ("OIM") gathered and reviewed information from many sources to prepare this report. The OIM analyzed the DPD's Crowd Management Manual and sections of its Operations Manual that address the use of force, emergency procedures, BWC requirements, and uniforms and equipment. To understand the specific application of these policies and procedures during the first five days of the GFP, the OIM requested and reviewed documentation for those days, including operational plans, after-action reports, officer rosters, less-lethal munition inventories, officer use of force statements, computer-aided dispatch data, injury reports, and arrest records.

Information from other City and County of Denver ("CCD") departments and the DPD's Mutual Aid Partners was also important. The OIM analyzed data regarding Denver Fire Department and Denver Health calls for service, as well as Emergency Operations Center situation reports from the Denver Office of Emergency Operations. The DPD produced documentation from some of its Mutual Aid Partners, including memoranda of understanding ("MOU") and reports that documented their specific actions during the GFP, including their use of force.

Video and audio recordings played an important role in the OIM's review. The DPD produced over 200 hours of BWC video and 25 hours of footage recorded by the DPD's helicopter ("Air One") during the first five days of the GFP. The OIM analyzed all of this video footage, often multiple times. The DPD also gave the OIM temporary access to its HALO video system. With over 250 HALO cameras recording continuously, the OIM had access to more than 15,000 hours of potentially relevant video from the first five days. To make this review more manageable, OIM staff focused on particular locations and times that had the most significant protester and officer activity. The OIM obtained audio files for all police radio communications during the GFP and focused its radio review on the days and times with particularly high broadcast volume.

The OIM conducted dozens of interviews with DPD officers and command staff, community members, and personnel from other CCD agencies. This included interviews with Chief Paul Pazen, Deputy Chief Barb Archer, Division Chief Ron Thomas, the DPD Incident Commander, others in the DPD Command Post, lieutenants who managed the DPD's downtown response, sergeants who led mobile response teams, and officers who worked on those teams and on static

DEN003941

skirmish lines.  The OIM also interviewed personnel from the CCD's Office of Emergency Management and Technology Services.

As part of its review, the OIM read and analyzed a large quantity of academic research and best practice literature about law enforcement crowd control and the use of less-lethal munitions.  This included research into the history of protest policing practices, evaluations of certain types of less-lethal munitions, and different tactical approaches to protests concerning police conduct.  The best practices literature came, in part, from the United States Department of Justice Office of Community Oriented Policing Services ("COPS Office") and recognized law enforcement leaders, such as the International Association of Chiefs of Police ("IACP") and the Police Executive Research Forum ("PERF").  The OIM used these resources to establish a baseline of best practices to assess the DPD's responses to the GFP and to generate the recommendations in this report.

DEN003942

## Use of Force

The force used by officers during the GFP was the largest source of public controversy. Some community members shared their belief that much of the force was excessive or unnecessary. Others disagreed. To address these concerns and to enhance transparency, much of the OIM's review focused on the DPD's use of force policies, equipment, and practices.

## Policing Protests and Protesting Police

Policing large protests requires police departments to balance the legal commands of the First Amendment to respect the rights of protestors to assemble and be heard, with the need to maintain public order, defend property, and protect people from injury, if possible. The DPD has had successes in this arena, and during our review, frequently pointed to its accomplishments managing the many protests that occurred during the Democratic National Convention in Denver in 2008 as evidence.

While the DPD rightly points to its achievements of the past, many of those protests were different from the GFP in a fundamental way: they were not *about the criminal justice system or the police*. The challenges presented by policing mass protests are magnified exponentially when the demonstrations concern police conduct itself. Police must still balance First Amendment guarantees with the need to protect life and property, but they must do so under sustained criticism from protest participants. Recent research has demonstrated that, in general, police tend to respond to demonstrations about police brutality more aggressively than they do to protests with other messages, making arrests and using force at greater rates.[10]

Some of that response may be difficult to avoid. When a protest is about the police, officers may be insulted, threatened, or even targeted with thrown projectiles or other improvised weapons, as happened during the GFP. This behavior will naturally provoke a more forceful response from the police. Yet, protests about police conduct also pose a risk that officers will seek to punish protestors for speech that officers find offensive or objectionable.[11] Given that risk, we believe that police departments must implement tighter internal controls on the use of force during protests that are about police conduct. As set forth below, we do not believe that the DPD sufficiently met that challenge during the GFP.

DEN003943

## OIM Information Requests and Documentation Gaps

The OIM began its use of force review by promptly requesting documents and information from the DPD.  This included the most recent versions of the DPD's Use of Force Policy and Crowd Management Manual.  Specific to the first five days of the GFP, we requested operational plans and after-action reports; inventories of all equipment, munitions, and weapons deployed; rosters of assigned officers; documentation of all dispersal orders and uses of force, including use of force reports and officer statements; and all BWC, Air One helicopter, and HALO camera video footage.[12]

The DPD provided much of the requested information, but early on, it became clear that there were significant gaps in the documentation that was available.  The DPD's after-action reports included some general information about when force was used, but they were often vague rather than specific, and they documented only a relatively small number of incidents.  The DPD produced a pre-protest inventory of its less-lethal munitions but could not provide complete counts of the actual number of munitions deployed during the GFP.[13]  Similarly, the DPD provided an officer roster for June 1, but admitted that similar rosters had not been created for the first four protest days.[14]  The DPD produced Use of Force Statements written by officers that contained certain information about individual uses of force.  But many of them were created almost two weeks after the incidents they documented, and they were often vague, which severely limited their evidentiary value.  The DPD also produced a certain amount of BWC, Air One helicopter, and HALO footage but was unable to produce BWC video for many of the officers who policed the GFP.  Notwithstanding these limitations, the OIM analyzed the documentation produced, and this section describes our resulting findings and recommendations.

## Less-Lethal Equipment and Munitions Used During the GFP

The DPD used a variety of types of less-lethal equipment and munitions during the GFP.  Many officers carried pepperball or 40mm launchers.  Others served as grenadiers with throwable chemical munitions.  Below, we detail the primary types of less-lethal equipment and munitions used by the DPD during the GFP, as well as certain key policies that governed their use.

DEN003944

## Pepperball Launchers



Pepperball launchers are air-powered devices that deploy plastic sphere rounds containing either inert powder or pelargonic acid vanillylamide ("PAVA") powder.[15] They fire the PAVA rounds at a velocity of 280–320 feet per second and the inert rounds at 280–350 feet per second.[16] PAVA powder is a chemical agent that can cause impaired breathing, skin inflammation, tightness and pain in the chest, involuntary eye closure, profuse tearing, secretion of excessive mucous, involuntary extension of ones hands to the face, and anaphylactic shock.[17] The manufacturer of the equipment used by the DPD, United Tactical Systems, cautions that pepperball launcher operators should "[n]ever aim or shoot at the head, face, eyes, ears, throat or spine. Impact in these areas could result in unintended severe or permanent injury or death."[18]

Pepperball launchers have two primary methods of use:

- Area Saturation – Shot at the ground or other hard objects near subjects, causing the rounds to release a cloud that exposes subjects to PAVA powder. Used in this manner, pepperball launchers have an effective range of 0–150 feet.[19]

- Direct Fire – Shot directly at subjects, exposing them to the pain caused by the round's impact and the effects of the chemical exposure. Impact can cause bruises, welts, and bleeding.[20] Used in this manner, pepperball launchers have an effective range of 0–60 feet.[21] 

The DPD Use of Force Policy does not distinguish between the area saturation and direct fire methods of use. It authorizes officers to use pepperball launchers in response to defensive resistance, which in crowd control situations it defines as "physical actions by members of a crowd that constitute an unlawful assembly and/or disruption to pedestrian or vehicle traffic."[22]

DEN003945

## 40mm Launchers



Single- or multi-round 40mm launchers fire 40mm rounds using a smokeless propellant.[23] The rounds consist of a plastic body and a foam nose, and travel at a velocity of 295–325 feet per second.[24] Some 40mm rounds also contain inert, marking, or oleoresin capsicum ("OC") powder.[25] 40mm launchers are meant to be fired directly at individuals. They have a minimum safe range of 5 feet and a maximum effective distance of 120 feet.[26] Impact can cause bruising, swelling, lacerations, critical eye injuries, and skull fractures.[27] The manufacturer warns that 40mm launchers are "to be used only by trained law enforcement, corrections, and military personnel" and "[i]f used incorrectly, [40mm launchers] may cause serious injury or death."[28]



The DPD Use of Force Policy authorizes officers to use 40mm launchers in response to active aggression, which it defines as an "overt act or threat of an assault, coupled with the present ability to carry out the action, which reasonably indicates that an assault or injury to a person is likely."[29]

## OC Foggers

OC foggers are hand-held canisters that, when activated, emit OC aerosol, which is commonly referred to as "pepper spray."[30] OC aerosol can cause a burning sensation of the skin and eyes, and inflammation of the mucous membranes in the breathing passages, temporarily restricting breathing to short, shallow breaths.[31] OC foggers have a minimum recommended distance of 6 feet and an effective range of 18–20 feet.[32] The DPD Use of Force Policy authorizes officers to use OC foggers in response to defensive resistance.[33]

DEN003946

## Gas and Smoke Grenades



Gas and smoke grenades are hand-thrown canisters containing pellets that emit either chlorobenzylidene malononitrile ("CS") gas or inert smoke.[34]  CS gas, commonly referred to as "tear gas," can cause irritation, burning sensations, blisters, coughing, shortness of breath, and chest tightness.[35]  Gas and smoke grenades are "to be used only by authorized and trained law enforcement, corrections, or military personnel" and "should not be deployed onto rooftops, in crawl spaces, or indoors due to [their] fire-producing capability."[36]  The manufacturer cautions that gas and smoke grenades "may cause serious injury or death."[37]  The DPD Use of Force Policy authorizes officers to use gas and smoke grenades in response to defensive resistance.[38]

## Rubber-Ball Grenades



Rubber-ball grenades (also known as "Sting-Ball" or "Stinger" grenades) are hand-thrown explosive devices that emit a bright flash and a 175 decibel noise, and project up to 180 rubber-balls in 360 degrees with up to a 50-foot radius.[39]  The light and sound can disorient individuals and the rubber pellets cause physical pain.[40]  Rubber-ball grenades can also contain OC powder that disperses into a cloud that causes irritation.[41]  Neither the DPD Use of Force Policy nor its Crowd Management Manual include any discussion about the appropriate use of rubber-ball grenades.[42]

## Noise Flash Diversionary Devices

Noise flash diversionary devices ("NFDD"), commonly known as "flash bangs," are hand-thrown explosive devices that emit a bright flash and a loud noise.[43]  The light and sound are designed to disorient and can cause temporary blindness and deafness.[44]

NFDDs can cause serious injuries to the officers and the community members in the vicinity of their use.[45]  The heat they release (up to 4,900 degrees Fahrenheit) can cause fires and severe burns.[46]  As such, NFDDs are "not intended for the direct application of force against a person and should not be thrown directly at a person."[47]  Because of the potential hazards, NFDDs should only be deployed by officers who have received specialized training in their use.[48]  Neither the DPD Use

DEN003947

of Force Policy nor its Crowd Management Manual include any discussion of the appropriate use of NFDDs.[49]

# Internal Controls on the Use of Force by DPD Officers

Mass-protest events are inherently chaotic, and supervisors are often stretched too thin to closely supervise the force being used by individual officers. To address this, police departments have developed a variety of internal controls to help regulate the way that force is used. This includes tracking the distribution and deployment of less-lethal munitions, creating officer rosters to track assigned personnel, and requiring officers to activate BWCs to record uses of force. It also includes the prompt preparation of use of force reports, issuing and recording orders for crowd dispersal, and ensuring that only certified officers may deploy certain less-lethal munitions, such as pepperball and 40mm launchers. There were significant gaps in the DPD's use of each of these internal controls during the GFP.

## Less-Lethal Munitions

The DPD ordered an extremely large quantity of multiple types of less-lethal munitions during the GFP's first five days. Given the chaos and violence on the street during that period, this may be unsurprising. Yet, the DPD did not effectively track this inventory during the protests.

### Pre-Protest Inventory and Purchases During the GFP

At the start of the GFP, the DPD had more than 30,000 PAVA and inert pepperball rounds, 600 40mm rounds, 200 gas and smoke grenades, and 150 OC foggers in its existing inventory.[50] On May 28, a large number of officers deployed with less-lethal equipment, and hours after the protests had begun, DPD officers began reporting that they had exhausted their supplies of less-lethal munitions. For example, as early as 10:30 p.m., the Gang Unit and Metro/SWAT reported that they had depleted their supply of pepperball rounds and throwable munitions. This prompted CCD personnel to begin reaching out to the Aurora Police Department and Englewood Police Department to ask for resupply.

On the second day of the GFP, the DPD began purchasing additional munitions directly from its vendors while continuing to request resupply from neighboring jurisdictions. Specifically, between May 29 and June 1, the DPD ordered an additional 66,000 PAVA pepperball rounds, which was more than three times the

DEN003948

amount that it had in inventory at the start of the protests. It also ordered 7,875 inert pepperball rounds.



*Figure 1: Pre-Protest Inventory of PAVA and Inert Pepperball, and Orders During the GFP*

During that same time period, the DPD ordered an additional 670 40mm rounds, 300 rubber-ball grenades, 250 gas grenades, 250 smoke grenades, and 200 OC foggers.



*Figure 2: Pre-protest Inventory of Other Less–Lethal Munitions, and Orders During the GFP*

DEN003949

The total cost of the less-lethal munitions ordered by the DPD during the first five days was $202,341.50.  A specific breakdown appears below:

*Table 1:  DPD Less-Lethal Munitions Orders, First Five Days of the GFP*

| Date | Munition Type | Quantity | Cost Per Unit | Total Cost |
|---|---|---|---|---|
| 5/29/2020 | LiveX PepperBall 375 Count Containers | 40 Containers of 375 PAVA Rounds | $845.00 | $33,800.00 |
| | 40mm Exact Impact Sponge Rounds | 70 40mm Rounds | $19.75 | $1,382.50 |
| | SpedeHeat CS Grenade | 200 Gas Grenades | $30.55 | $6,110.00 |
| | MK9 OC Fogger | 100 OC Foggers | $36.72 | $3,672.00 |
| 5/31/2020 | LiveX PepperBall 375 Count Containers | 134 Containers of 375 PAVA Rounds | $840.00 | $112,560.00 |
| | Inert PepperBall 375 Count Containers | 20 Containers of 375 Inert Rounds | $235.00 | $4,700.00 |
| | 40mm Exact Impact Sponge Rounds | 600 40mm Rounds | $19.45 | $11,670.00 |
| | Stinger Rubber-Ball OC Grenade | 300 Rubber-Ball Grenades | $45.35 | $13,605.00 |
| | Triple Chaser CS Grenade | 50 Gas Grenades | $40.50 | $2,025.00 |
| | SAF Smoke Grenade | 250 Smoke Grenades | $28.50 | $7,125.00 |
| 6/1/2020 | LiveX PepperBall 375 Count Containers | 2 Containers of 375 PAVA Rounds | $875.00 | $1,750.00 |
| | Inert PepperBall 375 Count Containers | 1 Container of 375 Inert Rounds | $270.00 | $270.00 |
| | MK9 OC Fogger | 100 OC Foggers | $36.72 | $3,672.00 |
| Total | | | | $202,341.50 |

Some of these munitions were picked up immediately and available to officers during the first five days of the GFP.  This included a May 29 order of gas grenades and 40mm rounds that the Colorado State Patrol flew its plane to Wyoming to pick up for the DPD.[51]  In interviews, DPD personnel also described receiving unknown amounts of less-lethal munitions from Mutual Aid Partners.

DEN003950

## Incomplete Tracking of Less-Lethal Munitions

The DPD did not effectively track its less-lethal munitions during the GFP. As munitions were exhausted and new supplies were obtained, they were generally distributed at each day's briefing to supervisors, who would then dispense them to the officers under their command. Yet, the DPD maintained no log of these munitions distributions, nor an accounting of the rate at which teams were expending them.

Effective tracking of less-lethal munitions is critical in protest management, as it helps to determine when new supplies must be ordered. It also enhances accountability, as tracking logs can be used to identify whether particular teams or squads are running through munitions at disproportionate rates, which can prompt supervisory investigation, review, or intervention.

Best practices state that police agencies should "develop a tracking system for all equipment as it is procured, assigned to officers, used in the field, and collected during demobilization."[52] Some police departments require a particular unit to maintain a less-lethal munitions inventory log during crowd control events to track which munitions are checked out, how many are used, and by whom.[53] This kind of tracking allows "the department to maintain accountability of where equipment is, who is using it, and how it should be allocated."[54] These logs can later be cross referenced with use of force reports to help ensure that officers are using less-lethal force consistent with policy, and to spot trends in the use of force that may require modifications to agency policy or training. The DPD has general procedures for inventory tracking but none specific to tracking less-lethal munitions during crowd control situations.[55]

Given the lack of tracking, the DPD is generally unable to account for the number of munitions deployed by individual teams or squads.[56] Nor is it able to account for the total amount of each type of munition deployed during the GFP.

## Officer Rosters

The staffing of the protests was also not effectively tracked during the GFP's first five days. Officer rosters are comprehensive lists of all officers who are assigned to work a particular detail or deployment. They generally list all assigned officers, the supervisors each reports to, and may also include information about each officer's particular skills and certifications, such as specialized trainings or less-lethal equipment certifications. Rosters help command staff make informed decisions

DEN003951

about the number of officers that must be assigned to effectively manage a large protest. National standards recommend that law enforcement agencies create rosters for crowd control events, and doing so is a common practice for many agencies.[57]

DPD policies are somewhat vague about officer rosters during large-scale protests. While the DPD Operations Manual suggests that they should be created, the DPD Crowd Management Manual is silent on the subject.[58] Despite this, the DPD has historically created officer rosters for large crowd control events.

During the first five days of the GFP, the DPD created only a single officer roster, for June 1, which was the fifth protest day. It lists each assigned officer with their rank and badge number, as well as information about certain certifications they held. It also shows a total count of all DPD officers assigned to the GFP on that day. However, rosters were not prepared for the first four days. On May 28, the DPD was caught by surprise by the size and scale of the protests and put out a citywide call for help, prompting many officers to respond. In the chaos that followed, it would have been extremely difficult to create a roster. Yet, we believe that rosters could have been created for the three days that followed, and they would have provided basic information for use in managing the protest response.

On several occasions during this review, we asked the DPD, or members of its command staff, for the number of officers who were assigned to work the GFP during its first four days. We got varying answers to that question, and none were authoritative. The DPD's after-action reports document a total number of officers who worked in Denver for each day, but they include *both* DPD officers and officers from other law enforcement agencies. They do not clarify how many DPD officers were assigned to the GFP each day. The DPD also provided an estimated number of DPD officers who worked each day, but a large number of officers who recorded BWC footage were not included in these counts, so they are also not reliable.[59] Rosters would have definitely shown this basic piece of information, which the DPD has otherwise been unable to definitively provide.

## Body Worn Cameras

Best practices emphasize the important role of BWCs during police crowd control and recommend that all uniformed officers use BWCs during such operations.[60] Gaps in the DPD's policies and practices, however, resulted in a substantial number of DPD officers recording no BWC footage during their assignments at the GFP.

DEN003952

BWCs "provide an opportunity to record verbal and physical exchanges between demonstrators and the police – protecting all parties from false accusations."[61] "By documenting verbal and physical exchanges, as well as other evidence, BWC footage may assist with the prosecution of criminal cases or in the review of complaints against officers by community members."[62] Utilization of BWCs improves transparency and accountability by providing video evidence that allows police agencies to exonerate officers who are falsely accused or to identify officers engaging in misconduct and take corrective action when force is used inappropriately.[63]

The DPD has utilized BWCs since 2015 and has adopted policies regarding which officers are required to use them, when they must be activated, and how officers are to upload the footage to the cloud.[64] BWCs must be worn by "[a]ll officers (sergeants and below in uniformed on-duty line assignments)."[65] This includes "sergeants, corporals, technicians, and patrol officers assigned to all six (6) police districts, Metro/SWAT, the Gang Unit, the Traffic Operations Section, and the Airport Police Bureau."[66, 67] Officers are required to activate their BWCs during "any encounter that becomes adversarial" and in "any situation that the officer believes the use of the BWC would be appropriate or would provide valuable documentation if not already activated per policy."[68] Immediately following an on-duty assignment, officers are required to upload BWC data by placing the BWC into a docking station.[69] BWC video footage is then retained in the Evidence.com database for storage.[70] DPD policy provides no specific guidance on BWC usage during crowd control operations.[71]

On June 12 the OIM requested access to Evidence.com.[72] Instead of providing direct access, on June 18 the DPD began sending the OIM links to download specific video files identified by the DPD as related to the GFP.[73] The DPD shared additional links on June 26 and again on July 16.[74] At that time, the DPD indicated that it had used "all plausible searching options to ensure we are doing the absolute best we can to provide you with every piece of evidence possible."[75] On August 22, the OIM gave the DPD a list of officers who appeared to have worked the GFP but for whom we had received no BWC footage.[76] The OIM asked the DPD to search Evidence.com and confirm that there were no video files for these officers from the first five days of the GFP. On September 3, the DPD provided a final set of download links for additional BWC video that was identified in response to the OIM's August 22 request.[77] In total, the DPD produced 1,218 BWC video files recorded during the first five days of the GFP.[78] These files included BWC recordings made by 226 officers, totaling 226 hours and 23 minutes of footage.

DEN003953

## The "Footage Gap"

The OIM analyzed this footage to identify patterns in how force was used and to determine the rate at which officers activated their BWCs. Ideally, we would have compared officer rosters from each of the first five days with the names of officers who recorded BWC footage. As already discussed, however, rosters were not prepared for May 28 through May 31.[79] As such, the OIM focused on June 1, the only day for which a roster was created. On June 1, approximately 150–200 DPD officers were assigned to the GFP, but the DPD produced BWC video from only 38 DPD officers.

*Figure 3:  Number of DPD Officers Assigned to the GFP and the Number with BWC Video, June 1*



Thus, there were at least 112 DPD officers who worked the GFP on June 1 for whom no footage could be produced. This is despite the fact DPD officers made 124 arrests on June 1, including arrests for curfew violations, carrying a concealed weapon, burglary, and felony menacing, among other charges. The DPD's BWC policy notes that a core purpose of BWCs is "to capture crimes in-progress."[80] That same policy requires that "all arrests and/or citations" must be recorded on BWC.[81] We are aware of no reason why more of these 124 arrests were not recorded, as policy required.

A similar comparison is difficult for the first four days of the GFP. DPD estimated the number of its officers who worked at the protests on those days but, as described above, we believe that this method undercounts the number of officers who were present. But even using these numbers, a large number of officers had no footage

DEN003954

recorded.  For example, the DPD estimates that 150–200 DPD officers worked on May 30, the third day of the GFP, yet it produced BWC video for just 75 DPD officers.  This leaves at least 75 officers for whom the DPD could produce no BWC video.

There may be several reasons for these footage gaps.  As discussed above, there was no specific guidance about BWC usage during crowd control situations in DPD policy and no discussion of BWC activation in the Crowd Management Manual.  This may have created confusion for officers about whether to activate their BWCs during the chaos of the protests and, if so, when.  Additionally, during interviews, the OIM learned that some officers were unable to attach their BWCs to their protective gear (which is often referred to as "turtle suits" or "riot gear").  While the DPD subsequently acquired new equipment to better affix the BWCs, this prevented an unknown number of officers from attaching their cameras during the GFP.  In addition, some officers may have failed to activate their cameras for other, unknown reasons.

Part of the gap can be explained by the fact that the DPD BWC Policy did not require all detectives, lieutenants, captains, commanders or chiefs to use BWCs.[82] Personnel who hold these ranks were thus generally without BWCs during the GFP.[83]  The extent of this issue is difficult to determine for the first four days of the protests, but the June 1 roster provides some information.  It indicates that approximately 28% of those assigned to the GFP on that day were commanders, captains, lieutenants, and detectives.

## Delayed/Vague Officer Statements About Uses of Force

National standards emphasize the importance of documenting uses of force during large protests to enhance accountability.  The DPD did require officers to prepare use of force reports for the GFP, but they were significantly delayed and often very vague, which limited their evidentiary value.

The IACP recommends that all uses of force during crowd control be reported consistent with agencies' normal force reporting policies.[84]  All use of force reports should be as comprehensive as practicable and provide the degree of specificity necessary to fully document and evaluate the force.[85]  Incomplete, vague, or boilerplate language in use of force reports could allow violations to go unchecked and cripples investigations, so this type of language should not be permitted.[86]

The DPD Operations Manual requires that all uses of force must be documented in a Use of Force Report.[87, 88]  The report must include, among other things, a

DEN003955

description of the incident and a detailed recounting of the officer's actions and observations.[89]   During day-to-day policework, uses of force are reviewed by a supervisor in the officer's chain of command.[90]  The supervisor will gather evidence from the field, such as video footage and statements from all witnesses, in order to determine whether or not additional investigation by the DPD Internal Affairs Bureau ("IAB") is required.[91]

The DPD Crowd Management Manual is silent on use of force reporting requirements specific to crowd control situations.[92]  In response to a lawsuit that was filed on June 4, DPD personnel attempted to review when and where DPD officers had deployed chemical munitions against protesters.  This proved problematic because Use of Force Reports had not been routinely prepared. Starting on June 6, command staff asked officers to go back and document their uses of force from the beginning of the GFP.  Many officers attempted to comply by providing a description of the force they used in an Officer Statement (hereafter "Use of Force Statement") rather than completing the standard Use of Force Report.  Many of these Use of Force Statements were prepared 12 or more days after the use of force incidents that they documented.  In response to OIM document requests, the DPD produced more than 400 Use of Force Statements from officers assigned to the Citywide Impact Team, Districts 1 through 6, the Gang Unit, Metro/SWAT, and Traffic Operations.

The lack of timely reporting about use of force significantly complicated our attempts to evaluate how, when, and where force was used during the GFP. Further, during our analysis of the Use of Force Statements produced by the DPD, we identified three common issues: 1) many included short and vague descriptions of the circumstances surrounding uses of force and few included the amount of detail required by policy; 2) some officers repeated narratives verbatim for each day they worked, changing only the date; and 3) some officers reported feeling uncomfortable detailing events that were so far in the past given the chaos of the GFP.  These issues seriously limited the utility of these statements in evaluating individual uses of force to determine whether or not they were compliant with DPD policy.

## Inconsistent Documentation of Crowd Dispersal Orders

Another issue was the DPD's compliance with its policies on crowd dispersal orders.  Under existing law, police may not seek to disperse protests "because they simply fear possible disorder."[93]  In certain circumstances, however, when disorder or violence are pervasive in a crowd, the police may seek to forcibly disperse it.

DEN003956

Dispersal orders, which warn that force and arrest are likely if people do not disperse, may help to limit the number of people who are exposed to less-lethal munitions. Recording and documenting these orders helps to ensure that they are being regularly given. Although DPD policy requires the DPD to record dispersal orders and document them in writing, DPD's compliance with this requirement during the first five days of the GFP was inconsistent at best.

Under national standards, dialogue and other non-force alternatives should be considered before ordering a crowd's forced dispersal.[94] If containment and dialogue are ineffective, warnings should be given before less-lethal munitions are used, if time and circumstances permit.[95] The warnings should consist of an announcement citing the offenses or violations being committed, an order to disperse, and designated dispersal routes.[96] Clear orders may be effective at thinning a crowd before its members are subjected to less-lethal munitions. To allow for compliance, multiple warnings should be issued at reasonable time intervals before deploying less-lethal munitions.[97]

The guidance provided by the DPD Crowd Management Manual is largely consistent with these national standards. It provides that the decision to declare an unlawful assembly will be made by the Incident Commander.[98] Unless there is an imminent threat of "personal injury or significant damage to property," dispersal orders should be given and "repeated at least three times, and if possible, from a variety of locations."[99] The orders must include dispersal route information and warnings that the refusal to comply shall subject participants to force and arrest.[100] Only when voluntary compliance has not been obtained, may dispersal tactics, such as the use of chemical agents and other less-lethal munitions, be used.[101]

Specific guidance about documenting dispersal orders can be found in the DPD Crowd Management Manual and operational plans from the GFP. The DPD Crowd Management Manual states that dispersal orders "should be videotaped or tape-recorded if possible" and if time and circumstances permit, "an officer should be posted on the far side of the crowd to tape record the order."[102] Operational plans from the GFP echo this guidance, noting that the "command officer that gives the dispersal order is required to write a statement" and that all warnings will be videotaped.[103]

Records indicate that the DPD did not routinely document dispersal orders during the first five days of the GFP, as both policy and the operations plans required. The OIM requested written documentation of all dispersal orders and was told by DPD personnel that "[w]e can not locate any written statements that contain this information."[104] The DPD's after-action reports from the first two days of the GFP

DEN003957

do not include any information related to dispersal orders.  Beginning on May 30, the day that the curfew was implemented, the after-action reports document announcements that were made before the curfew went into effect, but no general dispersal orders.

The DPD also did not consistently audio or video record dispersal orders.  Rather than use videographers to record them, as was the DPD's practice during previous mass protests, the DPD largely depended on BWCs.  Yet lieutenants were generally responsible for issuing dispersal orders, and prior to the temporary restraining order issued on June 5, lieutenants were not generally equipped with BWCs.[105]  As a result, dispersal orders issued by lieutenants were generally recorded only if they were captured on another officer's BWC by chance.

## Crowd Dispersal Without Dispersal Orders

Our video review showed that the DPD also did not consistently issue dispersal orders before using force to disperse crowds.  Community members who we spoke with during this review reported that they heard only sporadic dispersal orders.  More often, they reported being subjected to less-lethal munitions before hearing any warning or order.  In contrast, DPD officers indicated they did issue dispersal orders prior to deploying less-lethal munitions to disperse crowds, except in exigent circumstances.  Officers described being struck by rocks and other projectiles thrown by protesters, and some stated that BWC footage often failed to fully capture the assaultive behavior of certain members of the crowd.

The video footage that we reviewed from the first five days of the GFP did demonstrate that officers were sometimes targeted with thrown projectiles, including rocks and other dangerous weapons.  Yet, it also revealed that the DPD did not routinely comply with its policies on issuing orders to disperse.  We reviewed hundreds of hours of video footage and observed dozens of situations in which the DPD used less-lethal munitions to disperse crowds.  We heard orders to disperse in only a minority of those situations.  In most, the available video did not show any exigency that required the application of less-lethal munitions without orders to disperse.

Even when DPD did issue dispersal orders, the orders that we heard sometimes did not comply with DPD policy.  They sometimes lacked information about dispersal routes and did not warn protesters that by remaining, they would be subjected to force and arrest.  Often, we did not see officers allowing enough time and space for protesters to comply even if they wanted to.  This created the risk that some

DEN003958

protesters who might have voluntarily complied were unnecessarily exposed to less-lethal munitions alongside those engaging in unlawful and dangerous behavior.

## Visibility of Officer Identification on Riot Gear

Even in the midst of chaotic crowd control situations, the "public has a right to expect accountability during an encounter with law enforcement, and accountability includes having a means for citizens to identify officers."[106]   Recent IAB investigations, as well as our analysis of video during this review, demonstrate that officer identification was also a problem during the GFP.

Best practices recommend that "[o]fficers assigned to duties at demonstrations and disturbances should wear their badges, nameplates, or other personal identification on the outside of their uniforms or on their helmets at all times."[107]   The IACP Crowd Management Model Policy requires that "[u]niformed personnel shall wear their badges and nameplates or other identification in a visible location on their person at all times."[108]   The PERF recommends annual training that addresses, among other things, "rules regarding maintaining visibility of officers' badge numbers when donning civil disturbance equipment and other means of identification."[109]

The DPD Operations Manual, Crowd Management Manual, and training documents offer varying guidance about how officer badges and badge numbers are to be displayed.   The Uniforms and Equipment Policy states that a "badge will be worn on the uniform shirt attached to the badge holder or on the outermost garment to be clearly visible at all times" and that the "badge will designate the appointed position or civil service rank and the officer's serial number."[110]   When listing the typical equipment to be worn in crowd control situations, the DPD Crowd Management Manual describes protective gear for the chest that is "marked with agency & badge number designations."[111]   Presentation slides from a DPD crowd control refresher training do not address requirements to wear identifying information when discussing identification issues during crowd control situations.[112]

Recent investigations into misconduct complaints demonstrate the importance of this guidance.   As previously discussed, the DPD opened more than 100 investigations into complaints alleging misconduct by DPD officers during the GFP.   Although many of those investigations were not completed at the time of this report, of the 56 complaints closed, 20 were declined for further investigation and review due, in part, to an inability to identify the subject officer.   That is, the

DEN003959

complainant did not provide the officer's identifying information in the complaint, and the investigation did not reveal it either. These declined complaints contained potentially serious allegations, such as officers firing pepperball rounds into a car of people trying to leave the GFP or unnecessarily throwing an NFDD into the yard of a private residence. It would be far better to resolve such complaints on the merits of the available evidence rather than declining them because the involved officers could not be identified.

BWC footage reviewed by the OIM also suggested that difficulties in identifying officers might have unnecessarily escalated certain interactions during the GFP. The OIM viewed footage in which officers lacked easily visible identifying information, community members asked for it, and the officers provided it without issue. In others, the lack of visible identifying information appeared to escalate already contentious situations as people confronted officers for not wearing badges or having visible badge numbers.

## Use of Pepperball and 40mm Launchers by Uncertified Officers

We also evaluated the DPD's compliance with its policies that limit the use of certain less-lethal equipment to officers who were certified to deploy them. Less-lethal tools can be effective when they are used in appropriate circumstances and in accordance with policy. When used improperly, however, they can also be quite dangerous. For example, these systems each have an effective range in which they can target with reasonable precision, and beyond which the risk of striking an unintended target increases. In addition, there are certain vulnerable body parts that must not be targeted.

Police departments generally manage these risks by ensuring that only officers who are certified and trained may deploy these weapons. For example, the IACP's Model Crowd Management Policy requires that "[i]n all cases, weapons should be carried and deployed only by trained and authorized officers," including impact projectiles and chemical munitions.[113] Manufacturers agree. In its pepperball launcher user manual, United Tactical Systems states that an officer must be "fully trained" on pepperball launchers before being allowed to use them.[114] The manufacturers of 40mm launchers share similar requirements.[115]

Consistent with these standards, the DPD's Use of Force Policy states that "[o]nly authorized users will display, carry, or deploy a PepperBall® system or 40 mm launcher." To become an authorized or certified user, officers "must successfully

DEN003960

complete designated instruction and periodic qualification conducted by authorized less-lethal instructors."[116]   Training documents indicate that the instruction for pepperball and 40mm launchers are each four hours long.[117]  To attain certification, officers must pass both a written exam and practical qualification.[118]  They can only seek certification with approval from their commanding officer and division chief.[119]

The OIM requested a list of all DPD officers who were authorized to use pepperball and 40mm launchers before the GFP.  In response, the DPD produced a Master list of all officers who had attained these certifications ("Certified Officer List").   The Certified Officer List included over 500 DPD officers with assignments in all patrol districts and several specialized units.  Many officers had achieved certifications in both pepperball and 40mm, though some were only certified on one of the launchers.

The OIM analyzed the Use of Force Statements produced by the DPD and found that there were five officers who stated that they were given "training" on the pepperball or 40mm when they arrived to the GFP.  For example, one officer indicated that on May 30, "upon arrival to the meeting point near the Capitol Building, I was given training for the Pepper Ball launcher due to the emergency situation, and as we did not have enough Officers who had the certification."  Other officers also stated that they were given "emergency field training" when they began working at the GFP.  All of these officers deployed pepperballs or 40mm rounds during the GFP, and none was on the Certified Officer List.  The OIM also identified other instances in which officers stated that they had used pepperball or 40mm during the first five days of the GFP, but they did not appear on the Certified Officer List.

## Conclusions and Recommendations Regarding Internal Controls on the Use of Force

A key goal of our review was to perform, among other things, "an in-depth analysis" of the DPD's use of force at the GFP.[120]  To achieve that, we sought to analyze DPD records to determine what force was used at the GFP, when, by whom, and for what purpose.  Much of the necessary information for that analysis was simply not collected by the DPD.  The untracked munitions, the lack of officer rosters, the BWC footage gaps, the untimely and often vague Use of Force Statements, and the gaps in recording dispersal orders were an obstacle to our full after-the-fact analysis of the DPD's uses of force during the protests.

DEN003961

Yet, their absence points to an even bigger problem. We believe that a number of the internal controls on use of force discussed above could have played a role in command review of force *while* events were unfolding. That is, command personnel could have reviewed tracking logs to determine whether certain teams or officers were exhausting supplies of munitions at disproportionate rates, they could have reviewed contemporaneous Use of Force Statements to determine whether force was being used in conformity with policy, and they could have analyzed Evidence.com to ascertain whether or not officers were activating their BWCs. We recognize that the GFP was extremely chaotic, and command personnel had their hands full—and then some. Even taking this into account, we view the deficient internal controls as a missed opportunity for greater managerial oversight of use of force during the GFP, which we strongly encourage the DPD to learn from for future protest events. Therefore:

1) *The OIM recommends that the DPD amend its Operations and Crowd Management Manuals to require the creation of a log or tracking system for the distribution and deployment of all less-lethal munitions during crowd control events.*

2) *The OIM recommends that the DPD amend its Crowd Management Manual to require the creation of rosters of all officers who are assigned to crowd control events, and that the DPD ensure that such rosters are created in the future.*

3) *The OIM recommends that the DPD amend its Operations and Crowd Management Manuals to require that all sworn personnel working in the field during protest operations be required to wear BWCs, regardless of rank. Further, the OIM recommends that protest operations plans assign a supervisor to conduct regular spot check comparisons between rosters and the BWC database to identify any gaps in officer recording that must be addressed.*

4) *The OIM recommends that the DPD amend its Operations and Crowd Management Manuals to detail the specific requirements for use of force reporting and review during crowd control operations. The OIM also recommends that the DPD ensure that Use of Force Reports are promptly created by officers and reviewed by supervisors and IAB during future crowd control events to identify possible divergences from the Use of Force Policy.*

5) *The OIM recommends that during future protest events, the DPD ensure that its supervisors routinely issue multiple dispersal orders before using force to disperse crowds, when time and circumstances permit.*

DEN003962

6) *The OIM recommends that the DPD ensure that crowd dispersal orders are consistently audio or video recorded and documented in writing during future crowd control events.*

7) *The OIM recommends that the DPD ensure that all officers have their badges and badge numbers prominently displayed and easily visible on the exterior of their uniforms or protective gear at all times during future crowd control events. The OIM also recommends that supervisors should be required to verify compliance for each member of the teams under their command.*

8) *The OIM recommends that the DPD ensure that only officers who have been trained and certified on the use of pepperball and 40mm launchers be permitted to use them during future crowd control events. The OIM also recommends that the DPD amend its Crowd Management Manual to specify that only authorized officers will be allowed to use pepperball and 40mm launchers during crowd control operations.*

9) *To enhance transparency, the OIM recommends that the DPD evaluate how to most effectively operationalize each of the internal controls on the use of force discussed in this report, and report back to the public with an explanation of how they will be employed during future protests.*

## Substantive Use of Force Issues and DPD Policy

In additional to the internal controls, we also sought to evaluate the DPD's uses of force themselves, as well as the relevant policies and procedures under which force was used. During our review, some community members expressed the belief that the DPD relied too heavily on less-lethal equipment and munitions or used tactics that exacerbated conflicts and led to more uses of force than would have otherwise been necessary. Others pointed to the large number of DPD officer injuries, the significant property damage in Denver, and the prolonged and dangerous protests in other cities as evidence that the force used by the DPD was largely necessary. Given the documentary gaps discussed above, it was impossible for the OIM to evaluate these competing claims or to resolve them with this report. Yet, through our review of hundreds of hours of video footage, all available documents, and interviews with police officers and community members, we identified a number of issues regarding specific uses of force and DPD's Use of Force Policy that we discuss below.

DEN003963

## Uses of Force Referred for Review and Possible Investigation

There were legitimate uses of chemical and impact munitions during the GFP. This included the targeting of specific individuals who were throwing rocks or other dangerous weapons at police officers or others. The DPD reported 81 officer injuries during the GFP, some serious, which speaks to the violent behavior of certain individuals within GFP crowds. Yet, during our review, we also saw examples of DPD officers deploying less-lethal munitions in ways that were extremely troubling. We observed DPD officers:

- Deploying OC spray or pepperball rounds at persons who were verbally objecting to police behavior and not engaged in apparent physical resistance.

- Deploying pepperball rounds and other projectiles that nearly or directly impacted prohibited areas of the body, including the head, face, and groin area.

- Continuing to deploy chemical, gas, impact, or explosive munitions after their use had already caused people to disperse and leave an area.

- Throwing explosive devices at or extremely close to individuals, sometimes resulting in people being knocked to the ground with apparent injuries.

- Deploying OC spray at drivers or throwable munitions into lanes of traffic in ways that may have interfered with the ability of drivers to safely operate motor vehicles.

As discussed above, over 100 investigations were opened by the DPD's IAB into complaints filed with the OIM, DPD, City Council, and Executive Director of Safety. Many of those investigations remain open to this day. As a result of this review, we also referred 24 additional BWC videos to the DPD for review and investigation.[121] Some of these videos are different angles on the same incidents. Given that investigations may be opened into some of these videos, we will not comment on their particulars in this report more than what we have said above. We will, however, update the public on these videos and the results of any investigations in future OIM reports.

## Policy Deficiencies for Less-Lethal Equipment and Munitions

Best practices recommend establishing clear guidelines on the use of less-lethal equipment and munitions. For example, the IACP Crowd Management Model Policy proposes clear limitations on the use of certain less-lethal munitions at mass

DEN003964

protest events.[122]  While the DPD incorporates some of this guidance in its policies on certain less-lethal equipment and munitions, the OIM identified several areas of concern.

## No Guidance for High-Risk Explosive Devices

DPD policy provides no guidance for the appropriate use of rubber-ball grenades and NFDDs, which are both high-risk explosive devices.  The Use of Force Policy and Crowd Management Manual are silent on the topic, and nothing in the training documents the OIM reviewed indicates that the DPD has articulated a clear standard for the use of these devices or permits only specialized officers in tactical units to deploy them.[123]

### Rubber-Ball Grenades

DPD officers used rubber-ball grenades during the first five days of the GFP though, as described above, the specific number used is unknown.  Rubber-ball grenades are hand-thrown explosive devices that, when detonated, explode 8 grams of flash powder to propel up to 180 rubber-balls in 360 degrees as far as 50 feet.[124] They also emit a bright flash and an approximately 175-decibel noise.[125]  When exploding outwards, the rubber balls cause physical pain and sometimes serious injury, and the light and sound from the blast can be extremely disorienting.[126]  The DPD's vendor, Defense Technology, describes their tactical use as follows:

> Applications in tactical deployment situations include high-risk warrant service, hostage rescue, and the arrest of potentially violent subjects.  The purpose of the [rubber-ball grenade] is to minimize the risks to all parties through pain compliance, temporary distraction or disorientation of potentially violent or dangerous subjects.[127]

In interviews, DPD personnel described the utility of rubber-ball grenades in risky tactical situations, such as incapacitating potentially armed barricaded subjects.  Within the DPD, such uses would generally be handled by officers in specialized, tactical units.[128]

DEN003965

Because the rubber balls explode outward in 360 degrees, the United States Department of Justice COPS Office explains that rubber-ball grenades "cannot be targeted at a single individual."[129]  In an evaluation of rubber-ball grenades, researchers found that they bounce unpredictably in a "similar fashion to a child's 'crazy ball'" and that not only do the rubber balls become projectiles but "the entire body of the grenade has the possibility of becoming shrapnel."[130]  Through repeated testing, they determined that upon detonation, the grenade body sometimes disintegrates, "creating a shower of shrapnel."[131]  Researchers specifically found that:



Figure from "An Exploratory Study of Stingball Grenades" by Charlie Melosh, et al. demonstrating the 360-degree projection of rubber balls.

> [U]nlike other less lethal weapons that target "safe" zones of the body, the trajectory of the [rubber-ball grenade] fragments cannot be controlled by the user and could potentially strike unintended portions of the target's body.  This creates a concern for eye safety and soft tissue damage, and the potential that the projectiles may become lethal.[132]

Perhaps unsurprisingly, the manufacturer warns that rubber-ball grenades can result in serious bodily injury and should only be deployed by officers who have received specialized training.[133]  The manufacturer recommends that in crowd management situations, rubber-ball grenades should be "generally reserved as a last selection when chemical agents and less-lethal impact munitions have not resolved the disorder or routed the crowd."[134]

As discussed above, the DPD did not routinely track its less-lethal munition inventory during the GFP.  However, purchase invoices show that the DPD ordered 300 new rubber-ball grenades on May 31, the fourth protest day.  Further, DPD officers can be seen using rubber-ball grenades in certain BWC videos reviewed by the OIM.  Several officers also described deploying rubber-ball grenades in their Use of Force Statements, and not all were assigned to highly-trained tactical units with specialized training.[135]

Fundamentally, we believe that rubber-ball grenades, which risk striking peaceful and aggressive individuals alike, are inappropriate for crowd control under all but the most extreme circumstances.  We believe that these devices are best used only

DEN003966

for high-risk tactical applications. If they are to be used during crowd control, it is incumbent on the DPD to regulate their use with clear and explicit policy, which it did not do before the GFP.

### Noise Flash Diversionary Devices

As discussed above, NFDDs, commonly known as "flash bangs," are hand-thrown explosive devices that emit a bright flash and a loud noise.[136] The light and sound are designed to distract and disorient, and may cause temporary blindness and deafness.[137] When facing armed, barricaded suspects in felony crimes, NFDDs "can enable officers to make a dynamic entry into a home or business in a manner that can put the suspects off guard or give them something to have to deal with that can divert them from directly confronting officers."[138] Within the DPD, NFDDs would typically be handled in such circumstances by officers in specialized, tactical units.[139]

NFDDs can cause serious injuries to the officers and community members in the vicinity of their use.[140] The heat they release (up to 4,900 degrees Fahrenheit) can cause fires and severely burn those who come in contact.[141] As such, NFDDs are "not intended for the direct application of force against a person and should not be thrown directly at a person."[142] Because of the risks they pose, NFDDs should only be deployed by officers who have received specialized training in their use.[143]

While the pre-protest inventory documents and purchase orders that were produced to us did not include any information about NFDDs, DPD officers used them during the first five days of the GFP. In interviews, DPD personnel stated that NFDDs were used, in part, when officers ran out of other munitions. The Metro/SWAT Unit indicated that its officers deployed seven NFDDs. Written officer statements described several uses of NFDDs to disperse groups.

During our review of BWC video from the GFP, we identified a number of instances in which explosive devices that we believe to be NFDDs were used by DPD officers in ways that we found extremely concerning. We have referred these to the DPD for review and investigation. More broadly, we found the lack of specific policy guidance about the appropriate use of NFDDs—and limitations on their use during crowd control—also concerning.

DEN003967

## Inappropriate Standard for Direct-Fired Pepperball

Police departments generally use impact and chemical munitions during crowd control operations for distinct purposes.  Police can use impact projectiles to strike specific individuals in a crowd who are attacking officers or other community members or are causing serious property damage.[144]  These are deployments against specific persons, rather than entire crowds.  In contrast, police may use chemical munitions, in several forms, to disperse crowds and force people to clear a particular area.[145]  We believe that the DPD's policies for the use of pepperball do not appropriately distinguish between these kinds of uses.

Chemical munitions and impact projectiles present different kinds of risks.  Chemical munitions are largely irritants.  They make people uncomfortable; they cause temporary pain and distress, but with time, distance, and appropriate treatment, people generally recover, and there is little risk of long-term injury.[146]  Impact projectiles, on the other hand, can bruise and sometimes cause long-term damage.  When they strike sensitive areas like the face, eyes, small bones, and even certain areas of the body where internal organs are unprotected, they can break bones, cause disfiguring injury, and even result in death.[147]  National standards recognize the varying risks posed by chemical and impact munitions and suggest tighter restrictions for direct-fired impact projectiles. For example, the IACP notes that direct-fired impact munitions should only be used "against specific individuals who are engaged in conduct that poses an immediate threat of death or serious injury or significant levels of property damage.  A verbal warning should be given prior to the use of impact munitions when reasonably possible."[148]

Pepperball is a hybrid of a chemical munition and an impact projectile.  It can be used in two ways: area saturation and direct fire.  When used for area saturation, pepperballs are shot at the ground or other hard surfaces, causing the rounds to release a cloud of the chemical agent near a person or persons.  When direct fired, the rounds are shot directly at subjects, exposing them to both the pain of impact and the effects of chemical exposure.  During area saturation, pepperball functions as a chemical munition; when direct fired, it is both a chemical munition and an impact projectile.  During our review of hundreds of hours of BWC video from the GFP, we identified many examples of pepperball being used in both ways by DPD officers.  Often, the pepperball was fired at the ground or against hard objects near protesters to release the chemical irritant and move protesters from one location to another.  We also often saw it used to target specific individuals by striking them directly.

DEN003968

Notwithstanding pepperball's hybridity, the DPD has a single standard for its use: defensive resistance.[149]  The DPD Use of Force Policy defines defensive resistance in crowd control situations as "physical actions by members of a crowd that constitute an unlawful assembly and/or disruption to pedestrian or vehicle traffic."[150, 151]   This means that an officer may strike a person directly with pepperball in response to nothing more than disrupting traffic.  We believe that this standard is too low for direct-fired pepperball use.  We believe that striking someone directly with an impact projectile that could cause them serious harm during crowd control should be reserved for situations in which individuals are engaging in no less than active aggression, defined as "an overt act or threat of an assault, coupled with the present ability to carry out the action, which reasonably indicates that an assault or injury to a person is likely."[152]

## Conclusions and Recommendations Regarding Substantive Use of Force Issues and DPD Policy

Given the documentary gaps discussed above, it was not possible for us to conclusively resolve the competing claims about the DPD's use of force during the GFP.  However, our review did reveal a number of issues regarding specific uses of force and the DPD's use of force policies and practices.  Therefore:

10) *The OIM recommends that the DPD disallow the use of rubber-ball grenades during crowd control operations.  The OIM further recommends that the DPD articulate clear and specific standards for when rubber-ball grenades may be used, by whom, and when their use is prohibited in its Operations Manual.*

11) *The OIM recommends that the DPD articulate clear and specific standards for when NFDDs may be used, by whom, and when they are prohibited in its Operations Manual.*

12) *The OIM recommends that the DPD revise its standards for pepperball use during crowd control situations to limit direct-fired applications to only circumstances in which a person is displaying active aggression or aggravated active aggression.*

DEN003969

DEN003970

## Mutual Aid

Mutual aid was a critical component of the DPD's approach to the GFP. Responding to large-scale emergencies sometimes requires more officers than a law enforcement agency can easily muster from its own ranks.[153]   Colorado law recognizes that under such circumstances, jurisdictions should help one another, to the extent possible, by sharing personnel, equipment, and other resources until the emergency has ended.[154]   These arrangements, known as "mutual aid" arrangements, are a feature of many neighboring jurisdictions, and requests for mutual aid are common in response to mass protests.[155]

On May 28, the first night of the GFP, the DPD began reaching out to neighboring law enforcement agencies for support.  At least two outside agencies responded that night to provide less-lethal munitions resupply.  By the third night, many outside agencies were providing assistance in Denver.  Throughout the GFP, 18 different Mutual Aid Partners were involved in policing protests in Denver.  The Denver Sheriff Department also assisted.  Most agencies sent "tactical teams" commonly known as "SWAT teams," which were used for mobile response throughout the downtown area.

While mutual aid provides many obvious benefits to a host jurisdiction, it also presents serious risks. Officers from partner agencies may be trained differently than officers from the host city, and they may have different expectations about when force can be used—and when it may not be.[156]   They may also be equipped with less-lethal tools that are not approved for use in the host city.[157]   Partner agencies may also have radio systems that are not compatible with their host, and they operate under their own unique command structures.[158]   Inviting their aid thus also necessarily invites risks of confusion and increased chaos during an already tense, unfolding emergency.

To minimize these dangers, best practices call for neighboring jurisdictions to have comprehensive agreements that establish the ground rules for mutual aid.[159]   These agreements should define who can request assistance under what circumstances, and specify the forms of aid to be provided and a centralized command structure for all responding agencies.[160]   During our review, we requested that the DPD produce copies of all of its mutual aid agreements with any of the regional law enforcement agencies that provided assistance during the GFP.[161]   We also requested documentation of the support that each provided, including the vehicles, equipment, munitions, and weapons used, as well as rosters of all officers they deployed.  The DPD produced the documents in its possession, which included

DEN003971

some but not all of the requested information.[162]   From our review of these materials, we identified serious gaps in the mutual aid framework used by the DPD, which we discuss in detail below.

## The DPD was Unable to Produce Relevant Mutual Aid Agreements

The development of written agreements between neighboring law enforcement jurisdictions is a crucial step in preparing for possible large-scale protests.[163]   The IACP and the PERF, which establish best practices, recommend that nearly all law enforcement agencies enter into formal mutual aid agreements with their neighboring jurisdictions.[164]   Law enforcement agencies "should be party to established multijurisdictional agreements or mutual aid plans,"[165] which should be developed well in advance of any mutual aid deployment.[166]   These agreements should be specific about the ways that agencies will work together.[167]   They should address "how officers from neighboring jurisdictions will deploy, how they will be used, what rules of engagement will be followed, and what guiding philosophy will inform their joint response to a mass demonstration. This ensures that all agencies are working together toward the same mission."[168]

The IACP articulates recommendations for mutual aid agreements.[169]   This includes specifying the type of assistance to be provided to the host agency, which will vary depending upon the needs and capabilities of each department.[170]   "Command and control issues must be addressed in the mutual aid agreement. The mutual assistance agreement must be clear about who shall be in charge at the scene of any emergency and in other operations related to the emergency."[171]

Mutual aid agreements are sometimes entered into for a specific purpose for a limited period of time, such as to address particular crime problems occurring across multiple jurisdictions or to create emergency response teams with special equipment that no one agency could independently maintain.[172]   These agreements typically take the form of MOUs between agencies.[173]   A MOU is a written agreement that establishes the terms on which two agencies will help each other for a specific, designated reason.[174]

On June 26, in response to the OIM's document requests for "any written agreements or memoranda of understanding between the DPD and its [Mutual Aid Partners] to provide crowd control assistance to the DPD," the DPD produced eight agreements or MOUs.[175]   All were irrelevant to the mutual aid provided during the GFP.  Six were irrelevant because the agencies did not respond to the

DEN003972

GFP and they covered matters other than crowd control mutual aid.  Two were with agencies that did respond, the Adams County Sheriff's Office and the Aurora Police Department, but the MOUs had nothing to do with crowd control.[176]  None of the agreements produced by the DPD addressed the mutual aid provided during the GFP or contained the parameters on which such aid would be provided.  Table 2 presents the agreements produced by the DPD, whether or not each agency responded to the GFP, and the general subject matter of each agreement.

*Table 2: Agreements Produced by the DPD*

| Agreement Produced by the DPD | Did Agency Respond to the GFP? | Subject Matter of the Agreement |
|---|---|---|
| Adams County Sheriff's Office, dated January 30, 2018 | Yes | Officers and equipment to be provided by the DPD on Feb. 2, 2018 for mutual aid to Adams County |
| Aurora Police Department, dated April 28, 2011[177] | Yes | Use of the DPD Training Facility |
| Auraria Campus Police Department, dated July 11, 2014 | No | Ordinance enforcement |
| University of Colorado Denver Police Department, dated October 24, 2011[178] | No | Use of the DPD Training Facility |
| University of Denver Campus Safety Department, dated November 8, 2019 | No | Assistance from DPD for certain types of investigations and arrests |
| U.S. Federal Bureau of Prisons, Englewood, dated November 7, 2016 | No | Assistance during a natural disaster or law enforcement emergency |
| U.S. Drug Enforcement Agency, dated August 20, 2019 | No | Taskforce agreements |
| U.S. Department of Veterans Affairs Police, dated April 8, 2019 | No | Jurisdictional investigation agreement |

The DPD also produced emails sent by DPD's Deputy Chief and a division chief on May 29, May 31, and June 2 requesting assistance from various agencies.  These one-sentence e-mails contained the request for mutual aid, the desired date of assistance, and the reason for the request.  They did not enumerate the terms of the

DEN003973

mutual aid to be provided.  DPD personnel informed us that they also made verbal requests for assistance, by telephone, to several of the agencies that responded.

It would have been impractical for the DPD to negotiate the terms of the mutual aid to be provided once the GFP were already underway, as command personnel were then absorbed by the unfolding emergency.  For this reason, best practices recommend that these agreements be negotiated in advance, which was not done before the GFP.[179]

## Responding Mutual Aid Partners and The Types of Aid They Provided

Notwithstanding the absence of relevant mutual aid agreements, 18 Mutual Aid Partners did provide the DPD with support during the GFP.[180]  Table 3 presents a list of these agencies.

*Table 3: Law Enforcement Agencies/Multijurisdictional Teams that Provided Aid to the DPD During the GFP[181]*

| Agency/Multijurisdictional Team |
| --- |
| 1. Adams County Sheriff's Office |
| 2. Arapahoe County Sheriff's Office |
| 3. Arvada Police Department |
| 4. Aurora Police Department |
| 5. Brighton Police Department |
| 6. Broomfield Police Department |
| 7. Colorado Rangers Law Enforcement Shared Reserve |
| 8. Colorado State Patrol |
| 9. Commerce City Police Department |
| 10. Douglas County Sheriff's Office |
| 11. Golden Police Department |
| 12. Jefferson County Regional SWAT Team |
| 13. Lakewood Police Department |
| 14. Regional Transportation District Transit Police Division |
| 15. Thornton Police Department |
| 16. U.S. Federal Bureau of Investigation |
| 17. Westminster Police Department |
| 18. Wheat Ridge Police Department |

DEN003974

As noted above, the DPD produced the documents in its possession, which included some, but not all, of the requested information about mutual aid during the GFP. This included nine after-action reports generated by Mutual Aid Partners.[182] Some were relatively specific, while others were extremely vague.[183] Based on our analysis of the records produced by the DPD, the Mutual Aid Partners had varying levels of involvement in the GFP, with some playing a very active role in enforcement efforts. These agencies were directed to emergent incidents throughout the downtown area. They were responsible for blocking protester access to the interstate, providing security for the Denver Fire Department, and preventing property damage, among other tasks. Some agencies reported that they made arrests on their own, while others merely assisted the DPD with its arrests.

They also used force of varying kinds during the GFP. While many of the encounters were peaceful, some agencies reported that protesters threw objects at officers, prompting the deployment of gas canisters and less-lethal rounds. A number of agencies stated that their officers used less-lethal munitions of various kinds. One reported having used 83 40mm rounds, 77 gas grenades, 73 rubber-ball rounds, 66 bean-bag rounds, and 5 NFDDs. Some agencies reported using force frequently in order to move protesters or get them to disperse, which we saw during our video review. Additionally, several Denver community members filed complaints of excessive force against officers who they presumed were with the DPD. Internal investigation revealed that they were, in fact, officers from other agencies, and the complaints were referred to those agencies for review and potential investigation.

## Inconsistent Policies, Equipment, and Munitions Among the DPD and its Mutual Aid Partners

According to the DPD, officers who provided mutual aid during the GFP were required to follow the policies of their own agencies and not the DPD's use of force policy. We heard this in almost every interview of DPD command staff. Yet, best practices disfavor this approach. Instead, mutual aid arrangements should "make clear which agency is in charge and whose rules (particularly regarding use of force) and command will be followed."[184] The agreements must ensure that "policies and terminology on use of force and civil disobedience are consistent across agencies to prevent misunderstandings and loss of control during mass demonstrations."[185] Stated explicitly, officers who are providing mutual aid "must understand that they are under the command of the requesting agency and are required to follow its

DEN003975

policies and direction."[186]  To make certain that its policies are followed, the host agency should "use its own officers in the locations that are considered more likely to experience violence or other incidents that may require officers to use force."[187]

## Use of Force Standards and Limitations

To assess the potential impacts of the DPD's approach to this issue, the OIM requested that the DPD provide the use of force policies for all GFP Mutual Aid Partners.  As described above, the DPD produced after-action reports and rosters but no use of force policies.  The OIM obtained publicly available use of force policies for some of these agencies and compared them to the DPD Use of Force Policy.  There were several key differences.

First, several agencies had enacted a less restrictive use of force standard than appeared in DPD policy.  At the time of the GFP, the DPD Use of Force Policy stated that "officers must use only the amount of force reasonable and necessary under the totality of the circumstances to safely accomplish a lawful purpose."[188]  This was more restrictive than the standard then-required under Colorado law.[189]  The Mutual Aid Partners had varying standards for when force could be used, including "reasonable and necessary," while others included the less restrictive standard "reasonable" or "reasonable and appropriate."   While these differences might appear purely technical, they may have impacted the kinds of force used by officers and in what amounts.

Second, not all of the Mutual Aid Partner policies explicitly stated the resistance thresholds at which certain less-lethal equipment and munitions could be used.  Best practices provide guidance about when certain less-lethal equipment and munitions may be used, some of which have been adopted in DPD policy.[190]  For example, 40mm launchers can only be used when facing an "overt act or threat of an assault, coupled with the present ability to carry out the action, which reasonably indicates that an assault or injury to a person is likely."[191]  While some of the Mutual Aid Partners' policies provided similar guidance, not all did.  To be clear, less-lethal equipment and munitions can cause serious bodily injury and death.  Without specific direction about the resistance thresholds at which they can be used, individual officers could be forced to make those determinations on their own in the middle of chaotic and stressful crowd-control situations.

Third, while the DPD Use of Force Policy required its officers to intervene to prevent other officers from using inappropriate force, not all of the Mutual Aid Partners' policies included a similar requirement.[192]   The duty to intervene is

DEN003976

established in best practices, with IACP's Model Use of Force Policy stating that an "officer has a duty to intervene to prevent or stop the use of excessive force by another officer when it is safe and reasonable to do so."[193]  Consistent with this, the DPD Use of Force Policy required that, "[w]hen reasonably possible, considering the totality of the circumstances, officers will act to intervene whenever they witness inappropriate force and/or mistreatment of arrestees, suspects, or other persons."[194] Some of the use of force policies that were in effect mirrored this requirement, but not all.[195]

During interviews, DPD command staff stated that it would have been unreasonable to require officers from Mutual Aid Partners to adhere to the DPD's use of force standards while they were providing assistance in Denver given that they had been trained under different policies.  While we understand this concern, it is for this very reason that best practice guides recommend that mutual aid partners conduct "joint periodic training . . . to ensure collective understanding of policies, procedures, and rules that must be followed by all officers during crowd management and control operations."[196]  DPD command also pointed to the fact that a DPD sergeant was assigned as a liaison to each partner agency to help mitigate the effects of differences among agencies.  Further, the DPD provided briefings to partner agencies and included some partner agency commanders in the Command Post.  While these were useful practices, we do not believe that they were sufficient.  We are persuaded by the best practices that indicate having a uniform set of standards for the use of force during mutual aid deployments is both preferable and achievable with sufficient preparation.

## Less-Lethal Equipment and Munitions

Best practices also state that Mutual Aid Partners should only utilize tools and munitions that are authorized by the host agency.[197]  Inconsistent weapons and munitions can create confusion among officers that may undermine the host agency's goals.[198]  To ensure consistency, the host agency should inspect the weapons and munitions brought by Mutual Aid Partners before they are deployed.[199]  Based on the documentation reviewed by the OIM, certain Mutual Aid Partners used equipment and munitions during the GFP that were not approved for use by the DPD.

DEN003977

## Rubber-Ball Rounds

There are several types of impact projectiles, including foam and sponge rounds, and rubber-ball rounds that contain rubber balls similar to those used in rubber-ball grenades. The specifics vary by manufacturer, but rubber-ball rounds often contain approximately 180 rubber balls that travel at a velocity of 280–330 feet per second.[200]  One manufacturer warns that rubber-ball rounds can cause "serious bodily injury or death."[201]  It also cautions that rubber-ball rounds can create a specific risk of eye injury.[202] 

None of the documentation reviewed by the OIM suggests that the DPD used rubber-ball rounds during the GFP. The DPD Use of Force Policy and Crowd Management Manual do not discuss their use, and the inventory documents do not indicate that the DPD had any in inventory prior to the GFP. In fact, in a motion to modify a temporary restraining order related to the DPD's response to the GFP, the City and County of Denver stated that it did not use rubber impact projectiles.[203]

Documentation provided by the DPD from its Mutual Aid Partners, however, showed that at least one Mutual Aid Partner deployed rubber-ball rounds during the GFP. The agency described the rounds as rubber pellets "designed to cause pain but not serious injury" and indicated that its officers deployed at least 73 of the rounds.[204]

## Less-Lethal Shotguns

During the GFP, the DPD deployed impact projectiles from pepperball and 40mm launchers. Some law enforcement agencies, on the other hand, used less-lethal shotguns  to deploy impact projectiles. Less-lethal shotguns are typically traditional 12-gauge pump action shotguns that are converted into less-lethal devices, often by fitting them with orange stocks and forends, and placing "less lethal" labels on the stock.[205] Less-lethal shotguns are still able to fire lethal rounds, but officers only load them with less-lethal munitions. Their range and accuracy vary by the type of less-lethal shotgun and munition used, but 40mm launchers and the associated munitions are generally more accurate and have a longer effective range.[206] Munitions manufacturers warn that less-lethal shotguns can cause serious bodily injury and

DEN003978

death, and because they can still fire standard ammunition, there is a risk that officers mistakenly load them with lethal rounds.[207]

Based on the documentation reviewed by the OIM, the DPD did not deploy less-lethal shotguns during the GFP. The DPD Use of Force Policy does not reference their use, and none of the inventory documents suggest that the DPD had less-lethal shotgun munitions in inventory prior to the GFP. In response to a request for information about DPD use of less-lethal shotguns, the DPD indicated that it does not use less-lethal shotguns. Despite this, several Mutual Aid Partners reported using less-lethal shotguns during the first five days of the GFP, and officers from these agencies deployed more than 150 less-lethal shotgun rounds.

## Beanbag Rounds

In addition to foam and rubber-ball projectiles, 40mm launchers and less-lethal shotguns can also fire beanbag rounds. The velocity and range depend on the manufacturer and deployment device, but the "beanbags" are generally filled with #9 lead shot. One manufacturer warns that "[s]hots to the head, neck, thorax, heart, or spine can result in fatal or serious injury."[208] Research partly funded by the Department of Justice describes several instances in which beanbag rounds have been fatal.[209]



Documents produced by the DPD do not indicate that any DPD officers used beanbag rounds during the GFP. As with less-lethal shotguns, the DPD Use of Force Policy does not mention the munition, and the pre-GFP inventory documents do not include any beanbag rounds. Although DPD officers did not deploy beanbag rounds, several Mutual Aid Partners reported using them. Officers from these agencies deployed more than 200 beanbag rounds during the GFP.

## Conclusions and Recommendations Regarding Mutual Aid

The DPD understandably reached out to neighboring jurisdictions for mutual aid during the GFP, and DPD command staff have persuasively explained the value of that aid. Yet, we believe that the framework under which it was provided was deficient in several important ways. Therefore:

*13) The OIM recommends that the DPD develop mutual aid agreements with neighboring jurisdictions that address potential crowd control assistance. These*

DEN003979

*agreements should adhere to best practices, including but not limited to specifying the circumstances under which assistance may be requested and provided, acceptable request methods, forms of assistance to be provided, and an agreed upon command and control structure.*[210]

14) *The OIM recommends that during future mutual aid deployments in Denver, the DPD require its Mutual Aid Partners to adhere to the DPD's Use of Force Policy, and to utilize only types of weapons and munitions approved for use by the DPD.*

15) *The OIM recommends that the DPD seek to participate in periodic joint trainings and exercises with its potential Mutual Aid Partners to ensure a unified and consistent response during future mutual aid deployments in Denver.*

DEN003980

## Additional Issues Referred for DPD Review

We have thus far provided analysis and specific recommendations that are intended to help the DPD learn from the GFP in order to improve its responses to future protests. During our review, we also became aware of certain issues that we now refer to the DPD for its own consideration. This includes concerns expressed to us by various DPD supervisors and officers that:

- They received little guidance from an on-the-ground field commander during the GFP, in contrast to previous protests when they received significant strategic and tactical direction from a clearly-identified Operations Chief;

- The single radio channel used for all police radio transmissions during the GFP was overcrowded and often inaccessible for communication with the Command Post, which raised concerns about officer and community safety; and

- They believe that the DPD has not made enough recent investments in crowd control and field force operations training to properly prepare officers for an event like the GFP, and they would like that to change.

## The Role of the Operations Chief During Mass Protests

The Incident Command System ("ICS") is a standardized approach to the command and control of an emergency response that provides a common hierarchy for first responders, including police.[211] Best practice guides recommend that police departments adopt ICS during mass protests and civil disturbances.[212] One function of ICS includes appointing an Incident Commander to become responsible for the overall management of mass protests.[213] The Incident Commander also establishes the Command Post and determines the priorities and objectives of the police response.[214]

Another key role in ICS is that of the Chief of the Operations Section, or the "Operations Chief."[215] The Operations Chief develops and executes the tactics necessary to achieve the objectives established by the Incident Commander.[216] That is, the Operations Chief is the on-the-ground commander with primary responsibility for the tactics employed in the field.[217] The Incident Commander, who is based in the Command Post, and the Operations Chief, who largely works in the field, should be in frequent communication and work in tandem throughout a mass protest.[218]

DEN003981

The DPD has traditionally used ICS in managing its responses to mass protests and did so during the GFP.[219]  Yet, our interviews with DPD supervisors in both the field and the Command Post caused us concern.  There was nearly universal praise from DPD personnel for the Incident Commander responsible for the GFP. Yet, supervisors of multiple ranks told us that they often received insufficient direction in the field and sometimes did not even know who the appointed Operations Chief was on particular days.  They sometimes reported a lack of clarity about their strategic objectives, which led to confusion about when to advance on, retreat from, or hold specific pieces of ground downtown.  This concern was so strongly voiced by DPD personnel that we believe it merits specific scrutiny by the DPD to ensure that it is addressed before future protests.

## Overcrowded Radio Channel and "Bonking" During the GFP

In our interviews with officers and supervisors, a frequent complaint was that excessive traffic on the single radio channel used during the GFP hampered the free flow of information between the Command Post and the field.  There are many reasons why supervisors would need to communicate with the Command Post, including requesting additional officers, sharing information about individual or crowd behavior, and seeking direction about whether or not to use force in response, among others.  DPD personnel told us that during the times of highest activity, the radio channel became exceedingly crowded, leaving them unable to broadcast. Officers described a phenomenon called "bonking," when they would key up their radios to broadcast but would instead get a "bonk" tone indicating that another officer was already occupying the channel.  Many supervisors described their frustration with repeatedly "bonking," sometimes in the middle of heated clashes, leaving them unable to communicate with the Command Post.  Sometimes, they said, they just gave up trying, or they switched to cell phones, which were difficult to use given that officers were wearing gas masks.

The DPD began using a Motorola P25 encrypted radio system in March 2019.  It is a trunked two-way radio system designed for public safety, and indeed, it is used by all of Denver's public safety agencies.[220]  The system allows for the creation of groups of users, called "talkgroups," and all members of a talkgroup share a single radio channel.[221]  Early in the GFP, the DPD created multiple talkgroups for officers assigned to different parts of the downtown area.  However, the Command Post became concerned that when it needed to broadcast information to all officers, having multiple talkgroups made that less efficient.  All officers were thus consolidated into one talkgroup on a single radio channel for the remainder of the GFP.

DEN003982

We believe that the DPD should closely analyze the many complaints of supervisors and officers about the overcrowded single radio channel used during the GFP in order to determine whether a different talkgroup or radio structure would better facilitate communication during future large-scale deployments.

## Demand for Additional Crowd Control Training

Best practices emphasize the importance of crowd control and field force operations training to prepare officers to effectively respond to mass demonstrations.[222]  Such training helps officers coordinate their movements along skirmish lines, maintain officer and community safety, de-escalate potential confrontations, and only judiciously use less-lethal munitions in crowd control situations, if necessary.[223]  Officers should receive this training as recruits and in regular refresher courses throughout their careers.[224]  Team leaders, supervisors, and commanders should also receive initial and refresher training to ensure that they can lead the officers under their command in effective and Constitutional policing during mass protests.[225]

During interviews, DPD personnel often brought up their desire to receive additional crowd control and field force operations training.  They spoke very positively about the extensive training they received in preparation for the 2008 Democratic National Convention, which included multi-day Federal Emergency Management Agency field force training, and subsequent refreshers.  Some also expressed a perception that there has been less attention to crowd control training in recent years and noted that the time for such training often conflicts with the demands of normal patrol duties.  During our review, we examined training records produced by the DPD's Training Academy, which revealed that there has been a decline in the volume and frequency of crowd control and field force training in recent years.

We understand that freeing officers for multi-day crowd control training may be difficult given their other patrol responsibilities.  Doing so is critical, however, because crowd control skills are perishable, officers are not normally required to use them during patrol, and the consequences of being caught unprepared can be severe.[226]  We believe that the DPD could benefit from an internal training review among command staff, training personnel, patrol supervisors, and officers to ensure that the content and frequency of the DPD's crowd control training strikes the right balance and properly prepares officers for future crowd control events.

DEN003983

## Recommendation Regarding Additional Issues Referred for DPD Review

16) *The OIM recommends that the DPD convene internal stakeholders to evaluate possible operational issues that arose during the GFP, including but not limited to concerns raised by some supervisors and officers: 1) that they received little guidance from an on-the-ground field commander or Operations Chief conveying clear tactical and strategic objectives; 2) that the single radio channel used by all officers was often overcrowded and inaccessible for communication with the Command Post; and 3) that the DPD needs to substantially increase its investments in crowd control and field force training to properly prepare officers for the possibility of other mass protest events in the future.*

## Conclusion

The protests that began on May 28, 2020 were unlike any others in Denver's history, given their size and scale, as well as the injuries and damage that resulted from them. As we issue this report and make these recommendations, we also note that Denver is very fortunate to have a public safety team, led by Chief Paul Pazen and Executive Director of Safety Murphy Robinson, who are committed to reform and building community trust. Director Robinson and Chief Pazen have indicated that they have begun making changes in response to the GFP. We have full confidence in their commitment to learning from these events and making the changes necessary to prevent similar outcomes in the future.

DEN003984

## The Police Response to the 2020 George Floyd Protests in Denver, An Independent Review, OIM Recommendations:

### Recommendations Regarding Internal Controls on the Use of Force

1) *The OIM recommends that the DPD amend its Operations and Crowd Management Manuals to require the creation of a log or tracking system for the distribution and deployment of all less-lethal munitions during crowd control events.*

2) *The OIM recommends that the DPD amend its Crowd Management Manual to require the creation of rosters of all officers who are assigned to crowd control events, and that the DPD ensure that such rosters are created in the future.*

3) *The OIM recommends that the DPD amend its Operations and Crowd Management Manuals to require that all sworn personnel working in the field during protest operations be required to wear BWCs, regardless of rank. Further, the OIM recommends that protest operations plans assign a supervisor to conduct regular spot check comparisons between rosters and the BWC database to identify any gaps in officer recording that must be addressed.*

4) *The OIM recommends that the DPD amend its Operations and Crowd Management Manuals to detail the specific requirements for use of force reporting and review during crowd control operations. The OIM also recommends that the DPD ensure that Use of Force Reports are promptly created by officers and reviewed by supervisors and IAB during future crowd control events to identify possible divergences from the Use of Force Policy.*

5) *The OIM recommends that during future protest events, the DPD ensure that its supervisors routinely issue multiple dispersal orders before using force to disperse crowds, when time and circumstances permit.*

6) *The OIM recommends that the DPD ensure that crowd dispersal orders are consistently audio or video recorded and documented in writing during future crowd control events.*

7) *The OIM recommends that the DPD ensure that all officers have their badges and badge numbers prominently displayed and easily visible on the exterior of their uniforms or protective gear at all times during future crowd control events. The OIM also recommends that supervisors should be required to verify compliance for each member of the teams under their command.*

DEN003985

8) *The OIM recommends that the DPD ensure that only officers who have been trained and certified on the use of pepperball and 40mm launchers be permitted to use them during future crowd control events.  The OIM also recommends that the DPD amend its Crowd Management Manual to specify that only authorized officers will be allowed to use pepperball and 40mm launchers during crowd control operations.*

9) *To enhance transparency, the OIM recommends that the DPD evaluate how to most effectively operationalize each of the internal controls on the use of force discussed in this report, and report back to the public with an explanation of how they will be employed during future protests.*

## Recommendations Regarding Substantive Use of Force Issues and DPD Policy

10) *The OIM recommends that the DPD disallow the use of rubber-ball grenades during crowd control operations.  The OIM further recommends that the DPD articulate clear and specific standards for when rubber-ball grenades may be used, by whom, and when their use is prohibited in its Operations Manual.*

11) *The OIM recommends that the DPD articulate clear and specific standards for when NFDDs may be used, by whom, and when they are prohibited in its Operations Manual.*

12) *The OIM recommends that the DPD revise its standards for pepperball use during crowd control situations to limit direct-fired applications to only circumstances in which a person is displaying active aggression or aggravated active aggression.*

## Recommendations Regarding Mutual Aid

13) *The OIM recommends that the DPD develop mutual aid agreements with neighboring jurisdictions that address potential crowd control assistance.  These agreements should adhere to best practices, including but not limited to specifying the circumstances under which assistance may be requested and provided, acceptable request methods, forms of assistance to be provided, and an agreed upon command and control structure.*[227]

14) *The OIM recommends that during future mutual aid deployments in Denver, the DPD require its Mutual Aid Partners to adhere to the DPD's Use of Force Policy, and to utilize only types of weapons and munitions approved for use by the DPD.*

DEN003986

15) *The OIM recommends that the DPD seek to participate in periodic joint trainings and exercises with its potential Mutual Aid Partners to ensure a unified and consistent response during future mutual aid deployments in Denver.*

## Recommendations Regarding Additional Issues Referred for DPD Review

16) *The OIM recommends that the DPD convene internal stakeholders to evaluate possible operational issues that arose during the GFP, including but not limited to concerns raised by some supervisors and officers: 1) that they received little guidance from an on-the-ground field commander or Operations Chief conveying clear tactical and strategic objectives; 2) that the single radio channel used by all officers was often overcrowded and inaccessible for communication with the Command Post; and 3) that the DPD needs to substantially increase its investments in crowd control and field force training to properly prepare officers for the possibility of other mass protest events in the future.*

DEN003987

DEN003988

# Endnotes

[1] Officers continued policing the protest after midnight on each of the first five days of the GFP, and the DPD Command Post did not generally close until after 1:30 a.m. the next morning. When arrests were made between midnight and 5:00 a.m., we counted the arrest as relating to the prior day's protest. For example, an arrest at 2:30 a.m. on May 29, 2020, would be treated as an arrest on the first day of the protest, May 28, 2020.

[2] Kristen Leigh Painter, *Occupy Denver Joins Occupy Wall Street in May Day Protests*, The Denver Post (May 1, 2012).

[3] Kristen Leigh Painter, *Occupy Denver Joins Occupy Wall Street in May Day Protests*, The Denver Post (May 1, 2012).

[4] Colleen O'Connor, *Denver Protests Peaceful Thursday Night*, The Denver Post (July 7, 2016).

[5] Colleen O'Connor, *Denver Protests Peaceful Thursday Night*, The Denver Post (July 7, 2016).

[6] Sam Tabachnik, *10,000 Expected at Denver Protests for George Floyd on Saturday*, Greeley Tribune (May 30, 2020).

[7] *See, e.g.*, Elise Schmelzer, *Denver Protest Bystander Blind in One Eye After Being Hit by Police With "Less Lethal" Projectile*, The Denver Post (June 9, 2020); Lori Jane Gliha, *Police Projectile Fractures Denver Protester's Face; She Says It Was Unprovoked*, FOX31 Denver (June 3, 2020); Noelle Phillips, *College Student Hit in Face by 40mm Round During Police Protests Sues Denver*, The Denver Post (Oct. 22, 2020).

[8] Conrad Swanson, *Denver's George Floyd Protests Cost at Least $5.5 Million in Damage, Overtime*, The Denver Post (June 26, 2020).

[9] Russell Haythorn, *State Capitol Damage Estimated at $1.1m as Crews Clean Graffiti, Replace Windows After Summer Chaos*, Denver 7 (Oct. 22, 2020).

[10] Heidi Reynolds-Stenson, *Protesting the Police: Anti-Police Brutality Claims as a Predictor of Police Repression of Protest*, Social Movement Studies (2018).

[11] Heidi Reynolds-Stenson, *Protesting the Police: Anti-Police Brutality Claims as a Predictor of Police Repression of Protest*, Social Movement Studies (2018).

[12] Letter from Independent Monitor Nicholas E. Mitchell to Denver Police Department Chief Paul Pazen (June 12, 2020) (attached as Appendix D).

[13] E-mail from Commander Jeffrey Martinez to Independent Monitor Nicholas E. Mitchell (July 16, 2020) (on file with author) (sharing information from the DPD Less-Lethal Coordinator that he did "not have the number of munitions deployed" and that the pre-protest inventory was insufficient to determine the number deployed because the DPD "utilized similar munitions donated from outside agencies").

[14] E-mail from DPD Commander Jeffrey Martinez to Independent Monitor Nicholas E. Mitchell (July 16, 2020) (on file with author) (stating that "[r]osters for 5/28, 529 [*sic*], and 5/30 do not exist"); e-mail from DPD Commander Jeffrey Martinez to Independent Monitor Nicholas E. Mitchell (Sept. 14, 2020) (on file with author) (forwarding an e-mail from DPD Lieutenant Julie Wheaton stating that "[t]here is no roster for 05/31").

DEN003989

[15] United Tactical Systems, Full Tactical Carbine FTC User Manual (2017); United Tactical Systems, LIVE-X Round Specification Sheet (2018); United Tactical Systems, Inert Round Specification Sheet (2019).

[16] United Tactical Systems, LIVE-X Round Specification Sheet (2018); United Tactical Systems, Inert Round Specification Sheet (2019).

[17] DPD, PepperBall Operator Certification Instructor Slides, at 59 (version 6.20).

[18] United Tactical Systems, Full Tactical Carbine FTC User Manual, at 4 (2017).

[19] DPD, PepperBall Operator Certification Instructor Slides, at 34 (version 6.20).

[20] DPD, PepperBall Operator Certification Instructor Slides, at 61 (version 6.20).

[21] DPD, PepperBall Operator Certification Instructor Slides, at 34 (version 6.20).

[22] DPD, Operations Manual §§ 105.01(14), 105.02(4)(f)(1) (revised Jan. 27, 2019).

[23] Combined Systems, 40mm Single Shot Launcher Compact Specification Sheet (revised Apr. 2018); Combined Systems, 40mm Multi Shot, Pump Advance Launcher, 5" Cylinder Specification Sheet (revised Apr. 2018); Defense Technology, 40mm Direct Impact Round OC, CS, Inert, and Marking Specification Sheet (revised June 2020).

[24] Defense Technology, 40mm Direct Impact Round OC, CS, Inert, and Marking Specification Sheet (revised June 2020); Defense Technology, 40mm eXact iMpact Sponge Round Specification Sheet (revised Aug. 2020).

[25] Defense Technology, 40mm Direct Impact Round OC, CS, Inert, and Marking Specification Sheet (revised June 2020).

[26] DPD, 40mm Operator Certification Instructor Slides, at 36 (version 6.20).

[27] DPD, 40mm Operator Certification Instructor Slides, at 55-58 (version 6.20).

[28] Combined Systems, 40mm Single Shot Launcher Compact Specification Sheet (revised Apr. 2018); Combined Systems, 40mm Multi Shot, Pump Advance Launcher, 5" Cylinder Specification Sheet (revised Apr. 2018).

[29] DPD, Operations Manual §§ 105.01(3)(e), 105.02(4)(d)(1) (revised Jan. 27, 2019).

[30] Defense Technology, MK-9 Aerosol Projector (revised June 2020).

[31] National Institute of Justice, *Oleoresin Capsicum: Pepper Spray as a Force Alternative*, at 1 (Mar. 1994).

[32] Defense Technology, MK-9 Aerosol Projector (revised June 2020).

[33] DPD, Operations Manual § 105.02(3)(b)(1) (revised Jan. 27, 2019).

[34] *See, e.g.*, Defense Technology, Triple-Chaser Grenade Continuous Discharge OC, CN, CS and SAF-Smoke Specification Sheet (revised June 2020); Defense Technology, Spede Heat Grenade Continuous Discharge OC, CN, and CS Specification Sheet (revised June 2020); Defense Technology, SAF-Smoke Grenade Training and Operational Specification Sheet (revised June 2020).

[35] Defense Technology, Spede-Heat Continuous Discharge Chemical Grenade, CS, available at https://www.defense-technology.com/product/spede-heat-continuous-discharge-chemical-grenade-cs/.

DEN003990

[36] Defense Technology, Spede Heat Grenade Continuous Discharge OC, CN, and CS Specification Sheet (revised June 2020).

[37] Defense Technology, Spede Heat Grenade Continuous Discharge OC, CN, and CS Specification Sheet (revised June 2020).

[38] DPD, Operations Manual § 105.02(3)(b)(1) (revised Jan. 27, 2019).

[39] Defense Technology, Stinger Grenade w/ Safety Clip Rubber Pellet RP, RP/CS, and RP/OC Specification Sheet (revised June 2020).

[40] Defense Technology, Stinger Grenade w/ Safety Clip Rubber Pellet RP, RP/CS, and RP/OC Specification Sheet (revised June 2020).

[41] Defense Technology, Stinger Grenade w/ Safety Clip Rubber Pellet RP, RP/CS, and RP/OC Specification Sheet (revised June 2020).

[42] DPD, Operations Manual § 105.02 (revised Jan. 27, 2019); DPD, Crowd Management Manual (revised Feb. 13, 2019).

[43] Combined Systems, Flash-Bang, Mini-Bang Steel Body Single Use Specification Sheet (revised Mar. 2019).

[44] Poornima Madhavan and Christian Dobbins, *Path Analysis of Human Effects of Flashbang Grenades*, Institute for Defense Analyses, at 1, 9, 19 (2018).

[45] Americans for Effective Law Enforcement Monthly Law Journal, *Civil Liability for Use of Distraction Devices Part 2*, at 104 (Feb. 2015).

[46] Americans for Effective Law Enforcement Monthly Law Journal, *Civil Liability for Use of Distraction Devices Part 2*, at 102 (Feb. 2015).

[47] Americans for Effective Law Enforcement Monthly Law Journal, *Civil Liability for Use of Distraction Devices Part 2*, at 105 (Feb. 2015).

[48] Combined Systems, Flash-Bang, Mini-Bang Steel Body Single Use Specification Sheet (revised Mar. 2019).

[49] DPD, Operations Manual § 105.02 (revised Jan. 27, 2019); DPD, Crowd Management Manual (revised Feb. 13, 2019).

[50] The DPD provided district inventory spreadsheets from May 2020 and a separate count of less-lethal munitions stored in the DPD Police Administration Building armory conducted by the Denver Department of Public Health and Environment.  The counts presented in this report are based on the May 2020 district inventory spreadsheets.

[51] Invoices provided by the DPD indicate that the specific order was for 70 40mm rounds and 200 gas grenades.

[52] Police Foundation, *Managing Large-Scale Security Events: A Planning Primer for Local Law Enforcement Agencies*, at 30 (2018).

[53] *See, e.g.*, Oakland Police Department, Crowd Control and Crowd Management Manual, at 17 (revised Oct. 2013).

[54] Police Foundation, *Managing Large-Scale Security Events: A Planning Primer for Local Law Enforcement Agencies*, at 30 (2018).

DEN003991

55 The DPD Inventory and Transfer of Department Property and Equipment Policy requires individual bureaus, divisions, districts, sections, and units to maintain an inventory of, among other items, all less-lethal equipment and munitions.  Each division and district commander appoints an Inventory Control Officer that manages the day-to-day inventory tracking and coordinates with the Inventory Control Unit, which maintains overall DPD inventory records and conducts annual physical audits.  DPD, Operations Manual § 504.03 (revised Feb. 16, 2018).

56 E-mail from Commander Jeffrey Martinez to Independent Monitor Nicholas E. Mitchell (July 16, 2020) (on file with author) (sharing information from the DPD Less-Lethal Coordinator that he did "not have the number of munitions deployed" and that the pre-protest inventory was insufficient to determine the number deployed because the DPD "utilized similar munitions donated from outside agencies").

57 IACP Law Enforcement Policy Center, *Incident Command System Model Policy*, at 3 (2009) (recommending the creation of a "master record of all personnel and components involved in the response to a critical incident," including, among other items, personnel rosters).

58 DPD, Operations Manual § 108.01(4)(c) (revised Jan. 2006) (requiring the appointed commander of "any emergency situation requiring the employment of a large number of officers" to, among other things, "maintaining duty assignment records for all personnel committed to the emergency").

59 E-mail from Independent Monitor Nicholas E. Mitchell to DPD Lieutenant Robert Wykoff (Nov. 11, 2020) (on file with author).

60 *See, e.g.*, Police Foundation, *Managing Large-Scale Security Events: A Planning Primer for Local Law Enforcement Agencies*, at 30, 39 (Apr. 2018).

61 Police Foundation, *Advancing Charlotte: A Police Foundation Assessment of the Charlotte-Mecklenburg Police Department Response to the September 2016 Demonstrations*, at 48 (Feb. 2018).

62 Police Foundation, *Advancing Charlotte: A Police Foundation Assessment of the Charlotte-Mecklenburg Police Department Response to the September 2016 Demonstrations*, at 48 (Feb. 2018).

63 Police Executive Research Forum, *Implementing a Body-Worn Camera Program: Recommendations and Lessons Learned*, US Department of Justice Office of Community Oriented Policing Services, at 5-7 (2014).

64 Noelle Phillips, *Body Cameras for Denver Police to Cost $6.1 Million Over Five Years*, The Denver Post (July 7, 2015); DPD, Operations Manual § 119.04 (revised Apr. 8, 2020).

65 DPD, Operations Manual § 119.04(3) (revised Apr. 8, 2020).

66 The Gang Unit is also referred to as the Special Operations Response Team.  DPD, Operations Manual § 2.103 (revised Sept. 1, 2020).

67 DPD, Operations Manual § 119.04(3) (revised Apr. 8, 2020).

68 DPD Operations Manual §§ 119.04(3)(g), 119.04(3)(m) (revised Apr. 8, 2020).

69 DPD, Operations Manual § 119.04(4)(g) (revised Apr. 8, 2020).

70 DPD, Operations Manual § 119.04(4)(a) (revised Apr. 8, 2020).

71 *See* DPD, Operations Manual § 108.08 (revised Jan. 2006); DPD, Operations Manual § 119.04 (revised Apr. 8, 2020); DPD, Crowd Management Manual (Feb. 13, 2019).

DEN003992

[72] Letter from Independent Monitor Nicholas E. Mitchell to Denver Police Department Chief Paul Pazen (June 12, 2020) (attached as Appendix D).

[73] E-mail from Evidence.com to Independent Monitor Nicholas E. Mitchell (June 18, 2020) (on file with author).

[74] E-mail from Evidence.com to Independent Monitor Nicholas E. Mitchell (June 26, 2020) (on file with author); e-mail from Evidence.com to Independent Monitor Nicholas E. Mitchell (July 16, 2020) (on file with author).

[75] E-mail from DPD Commander Jeffrey Martinez to Independent Monitor Nicholas E. Mitchell (July 15, 2020) (on file with author).

[76] The OIM built this list using the names of officers found on the June 1, 2020 roster and daily detail report, and officer written statements and arrest records from the first five days of the GFP. E-mail from Independent Monitor Nicholas E. Mitchell to DPD Sergeant Mark Beveridge (Aug. 22, 2020) (on file with author).

[77] E-mail from Evidence.com to Independent Monitor Nicholas E. Mitchell (Sept. 3, 2020) (on file with author).

[78] The Evidence.com links also included image files and videos from the DPD Air One helicopter.

[79] E-mail from DPD Commander Jeffrey Martinez to Independent Monitor Nicholas E. Mitchell (July 16, 2020) (on file with author) (stating that "[r]osters for 5/28, 529 [*sic*], and 5/30 do not exist"); e-mail from DPD Commander Jeffrey Martinez to Independent Monitor Nicholas E. Mitchell (Sept. 14, 2020) (on file with author) (forwarding an e-mail from DPD Lieutenant Julie Wheaton stating that "[t]here is no roster for 05/31").

[80] DPD, Operations Manual § 119.04(4)(1)(a) (revised Apr. 8, 2020).

[81] DPD, Operations Manual § 119.04(3)(a)(1) (revised Apr. 8, 2020).

[82] The DPD requires that sergeants and below in uniformed on-duty line assignments must utilize the BWC system when on duty. When volunteering in uniform or working off-duty secondary employment jobs, the DPD generally requires that officers below the rank of commander use BWC systems. DPD, Operations Manual § 119.04(3) (revised Apr. 8, 2020).

[83]A lawsuit filed on June 4, 2020 resulted in the issuance of a temporary restraining order on the ninth night of protests, June 5, 2020, which was then modified by the court on June 6, 2020, requiring all officers working the demonstrations to activate BWC during, "any and all acts of confrontation between police officers and others." *Abay v. City and County of Denver Order on the Motion to Amend*, 20-CV-01616 (D. Colo., June 6, 2020).

[84] IACP Law Enforcement Policy Center, *Crowd Management Model Policy* § (IV)(E)(3)(j) (Apr. 2019).

[85] IACP Law Enforcement Policy Center, *Reporting of Use of Force Concepts and Issues Paper*, at 4 (Mar. 2017).

[86] Leadership Conference Education Fund, *New Era of Public Safety: A Guide to Fair, Safe, and Effective Community Policing*, at 146 (2019).

[87] DPD, Operations Manual § 105.03(1)(a) (revised Jan. 27, 2019).

DEN003993

[88] With authorization of the Chief of Police or designee, multiple uses of chemical munitions during large-scale events may be documented with a single use of force report.  DPD, Operations Manual § 105.03(2)(a)(9) (revised Jan. 27, 2019).

[89] DPD, Operations Manual §§ 105.03(2)(b-c), 105.03(3) (revised Jan. 27, 2019).

[90] DPD, Operations Manual § 105.03(2) (revised Jan. 27, 2019).

[91] DPD, Operations Manual §§ 105.03(2), 105.03(6) (revised Jan. 27, 2019).

[92] DPD, Crowd Management Manual (revised Feb. 13, 2019).

[93] *Jones v. Parmley*, 465 F.3d 46, 56 (2d Cir. 2006) (citing *Cox v. Louisiana*, 379 U.S. 536, 550 (1965) (noting that "constitutional rights may not be denied simply because of hostility to their assertion or exercise" (quoting *Watson v. City of Memphis*, 373 U.S. 526, 535 (1963) (internal quotation marks omitted); *Edwards v. South Carolina*, 372 U.S. 229, 237 (1963) (political speech is protected even though it invites dispute and may stir people to anger)).

[94] IACP Law Enforcement Policy Center, *Crowd Management Model Policy* § (IV)(F)(1) (Apr. 2019).

[95] IACP Law Enforcement Policy Center, *Crowd Management Model Policy* § (IV)(F)(3) (Apr. 2019).

[96] IACP Law Enforcement Policy Center, *Crowd Management Model Policy* § (IV)(F)(3)(a) (Apr. 2019).

[97] IACP Law Enforcement Policy Center, *Crowd Management Model Policy* § (IV)(F)(3)(b) (Apr. 2019).

[98] DPD, Crowd Management Manual, at 12 (revised Feb. 13, 2019).

[99] DPD, Crowd Management Manual, at 13 (revised Feb. 13, 2019).

[100] DPD, Crowd Management Manual, at 13-14 (revised Feb. 13, 2019).

[101] DPD Crowd Management Manual, at 14 (revised Feb. 13, 2019).

[102] DPD, Crowd Management Manual, at 14 (revised Feb. 13, 2019).

[103] DPD, Operations Plan for the Justice for George Floyd Protest and Rally, at 10 (May 28, 2020); DPD, Operations Plan for the Justice for George Floyd Protest and Rally, at 10 (May 29, 2020).

[104] E-mail from DPD Commander Jeffrey Martinez to Independent Monitor Nicholas E. Mitchell (Aug. 21, 2020) (on file with author).

[105] The DPD requires that sergeants and below in uniformed on-duty line assignments must use the BWC system when on duty. DPD, Operations Manual § 119.04(3) (revised Apr. 8, 2020).

[106] Institute for Intergovernmental Research, *After–Action Assessment of the Police Response to the August 2014 Demonstrations in Ferguson, Missouri*, US Department of Justice Office of Community Oriented Policing Services, at 78 (2015).

[107] IACP Law Enforcement Policy Center, *Crowd Management Concepts and Issues Paper*, at 5 (Apr. 2019).

[108] IACP Law Enforcement Policy Center, *Crowd Management Model Policy* § (IV)(C)(2) (Apr. 2019).

DEN003994

[109] Police Executive Research Forum, *Lessons Learned from the 2015 Civil Unrest in Baltimore*, at 57 (Sept. 2015).

[110] DPD, Operations Manual § 111.01(3)(a) (revised Oct. 4, 2019).

[111] DPD, Crowd Management Manual, at 30 (revised Feb. 13, 2019).

[112] DPD, Crowd Control Refresher Training Presentation Slides, at 47.

[113] IACP Law Enforcement Policy Center, *Crowd Management Model Policy* § (IV)(E)(3) (Apr. 2019).

[114] United Tactical Systems, Full Tactical Carbine FTC User Manual, at 4, 12 (2017).

[115] Combined Systems, 40mm Single Shot Launcher Compact Specification Sheet (2018); Combined Systems, 40mm Multi Shot, Pump Advance Launcher, 5" Cylinder Specification Sheet (2018); Defense Technology, 40mm Direct Impact Round OC, CS, Inert, and Marking Specification Sheet (2018).

[116] DPD, Operations Manual § 105.02(5)(a) (revised Jan. 27, 2019).

[117] DPD, Operations Manual § 105.02(5)(a) (revised Jan. 27, 2019).

[118] DPD, Operations Manual § 105.02(5)(a) (revised Jan. 27, 2019).

[119] DPD, Operations Manual § 105.02(5)(a) (revised Jan. 27, 2019).

[120] Letter from Denver City Councilmembers to Independent Monitor Nicholas E. Mitchel, Executive Director of Public Safety Murphy Robinson, and Chief of Police Paul Pazen (June 5, 2020) (attached as Appendix D).

[121] Letter from Nicholas E. Mitchell to Denver Police Chief Paul Pazen (Nov. 20, 2020) (on file with author).

[122] IACP Law Enforcement Policy Center, *Crowd Management Model Policy* § (IV)(E) (Apr. 2019).

[123] DPD, Operations Manual § 105.02 (revised Jan. 27, 2019); DPD, Crowd Management Manual (revised Feb. 13, 2019).

[124] Defense Technology, Stinger Grenade w/ Safety Clip Rubber Pellet RP, RP/CS, and RP/OC Specification Sheet (revised June 2020).

[125] Defense Technology, Stinger Grenade w/ Safety Clip Rubber Pellet RP, RP/CS, and RP/OC Specification Sheet (revised June 2020).

[126] Defense Technology, Stinger Grenade w/ Safety Clip Rubber Pellet RP, RP/CS, and RP/OC Specification Sheet (revised June 2020).

[127] Defense Technology, Stinger Grenade w/ Safety Clip Rubber Pellet RP, RP/CS, and RP/OC Specification Sheet (revised June 2020).

[128] DPD, Operations Manual § 115.01(4) (revised Oct. 4, 2019).

[129] Institute for Intergovernmental Research, *After-Action Assessment of the Police Response to the August 2014 Demonstrations in Ferguson, Missouri*, US Department of Justice Office of Community Oriented Policing Services, at 46 (2015).

[130] Charlie Mesloh, Jo Ann Webalis, Lindsey Medley, and Ross Wolf, *An Exploratory Study of Stinghall Grenades*, at 15, 17 (2011).

DEN003995

[131] Charlie Mesloh, Jo Ann Webalis, Lindsey Medley, and Ross Wolf, *An Exploratory Study of Stingball Grenades*, at 18 (2011).

[132] Charlie Mesloh, Jo Ann Webalis, Lindsey Medley, and Ross Wolf, *An Exploratory Study of Stingball Grenades*, at 8-9 (2011).

[133] Defense Technology, Stinger Grenade w/ Safety Clip Rubber Pellet RP, RP/CS, and RP/OC Specification Sheet (revised June 2020).

[134] Defense Technology, Stinger Grenade w/ Safety Clip Rubber Pellet RP, RP/CS, and RP/OC Specification Sheet (revised June 2020).

[135] For example, one officer was a sergeant assigned to the Citywide Impact Team.  Another was a lieutenant assigned to District 2.

[136] *See, e.g.,* Defense Technology, Tactical Diversionary Devise 6.5-Gram, Non-Reloadable and Non-Reloadable with Safety Clip Specification Sheet (revised June 2020); Defense Technology, Low Roll Distraction Devise 12-Gram, Non-Reloadable (revised June 2020).

[137] Poornima Madhavan and Christian Dobbins, *Path Analysis of Human Effects of Flashbang Grenades*, Institute for Defense Analyses, at 1, 9, 19 (2018).

[138] Americans for Effective Law Enforcement Monthly Law Journal, *Civil Liability for Use of Distraction Devices Part 1*, at 101 (Feb. 2015).

[139] DPD, Operations Manual § 115.01(4) (revised Oct. 4, 2019).

[140] Americans for Effective Law Enforcement Monthly Law Journal, *Civil Liability for Use of Distraction Devices Part 2*, at 104 (Feb. 2015).

[141] Americans for Effective Law Enforcement Monthly Law Journal, *Civil Liability for Use of Distraction Devices Part 2*, at 102 (Feb. 2015).

[142] Americans for Effective Law Enforcement Monthly Law Journal, *Civil Liability for Use of Distraction Devices Part 2*, at 105 (Feb. 2015).

[143] Combined Systems, Flash-Bang, Mini-Bang Steel Body Single Use Specification Sheet (revised Mar. 2019).

[144] Impact projectiles can also be used to mark individuals for future identification and arrest, and to provide cover for officers making arrests.  DPD, Crowd Management Manual, at 20 (revised Feb. 13, 2019).

[145] DPD, Crowd Management Manual, at 22-23 (revised Feb. 13, 2019).

[146] *See, e.g.,* DPD, PepperBall Operator Certification Instructor Slides, at 59 (version 6.20).

[147] *See, e.g.,* DPD, 40mm Operator Certification Instructor Slides, at 55 (version 6.20).

[148] IACP Law Enforcement Policy Center, *Crowd Management Concepts and Issues Paper*, at 7 (Apr. 2019).

[149] The Worcester Police Department Pepperball Policy is an example of policy that sets two standards.  It describes the two distinct ways Pepperball can be used and dictates different standards that must be met for each use.  In order to use Pepperball as direct fire, the target must be exhibiting "assaultive" behavior.  This standard is similar to active aggression. Worcester Police Department, Policy and Procedure NO.400.4 (issued Apr. 13, 2007).

DEN003996

[150] DPD, Operations Manual § 105.01(14) (revised Jan. 27, 2019).

[151] The DPD uses two definitions of defensive resistance. In general, the DPD Use of Force Policy defines defensive resistance as "[p]hysical actions that attempt to prevent an officer's control, including flight or attempt to flee but do not involve attempts to harm the officer (includes 'turtling,' which involves a pronated individual pulling his or her arms and/or legs to their chest to prevent access and control by an officer)." In a crowd control situation, defensive resistance is "[p]hysical actions by members of a crowd that constitute an unlawful assembly and/or disruption to pedestrian vehicle traffic." The DPD Crowd Management Manual uses the general definition for defensive resistance, rather than the one specific to crowd control situations. We recommend that the DPD update the Crowd Management Manual to include the definition specific to crowd control situations. DPD, Operations Manual §§ 105.01(3)(d), 105.01(14) (revised Jan. 27, 2019); DPD, Crowd Management Manual, at 24 (revised Feb. 13, 2019).

[152] DPD, Operations Manual § 105.01(3)(e) (revised Jan. 27, 2019).

[153] Police Executive Research Forum, *The Police Response to Mass Demonstrations: Promising Practices and Lessons Learned*, at 39 (2018).

[154] See Colorado Revised Statutes ("CRS") § 24-33.5-713 (2018).

[155] Police Executive Research Forum, *The Police Response to Mass Demonstrations: Promising Practices and Lessons Learned*, at 39 (2018).

[156] Police Executive Research Forum, *The Police Response to Mass Demonstrations: Promising Practices and Lessons Learned*, at 44 (2018).

[157] Police Executive Research Forum, *The Police Response to Mass Demonstrations: Promising Practices and Lessons Learned*, at 45 (2018).

[158] Institute for Intergovernmental Research, *After-Action Assessment of the Police Response to the August 2014 Demonstrations in Ferguson, Missouri*, US Department of Justice Office of Community Oriented Policing Services, at 89 (2015).

[159] *See, e.g.*, Police Executive Research Forum, *The Police Response to Mass Demonstrations: Promising Practices and Lessons Learned*, at 46 (2018); IACP Law Enforcement Policy Center, *Mutual Aid Concepts and Issues Paper*, at 10-16 (revised May 2007).

[160] IACP Law Enforcement Policy Center, *Mutual Aid Concepts and Issues Paper*, at 10-15 (revised May 2007).

[161] Letter from Independent Monitor Nicholas E. Mitchell to Denver Police Department Chief Paul Pazen (June 12, 2020) (attached as Appendix D).

[162] E-mail from Commander Jeffrey Martinez to Independent Monitor Nicholas E. Mitchell (July 16, 2020) (on file with author).

[163] *See, e.g.*, Police Executive Research Forum, *The Police Response to Mass Demonstrations: Promising Practices and Lessons Learned*, at 39 (2018); IACP Law Enforcement Policy Center, *Mutual Aid Concepts and Issues Paper*, at 10 (revised May 2007).

[164] IACP Law Enforcement Policy Center, *Crowd Management Concepts and Issues Paper*, at 3 (Apr. 2019); Police Executive Research Forum, *The Police Response to Mass Demonstrations: Promising Practices and Lessons Learned*, at 40 (2018).

DEN003997

[165] IACP Law Enforcement Policy Center, *Crowd Management Concepts and Issues Paper*, at 3 (Apr. 2019).

[166] Police Executive Research Forum, *The Police Response to Mass Demonstrations: Promising Practices and Lessons Learned*, at 39 (2018).

[167] Police Executive Research Forum, *The Police Response to Mass Demonstrations: Promising Practices and Lessons Learned*, at 40 (2018); IACP Law Enforcement Policy Center, *Mutual Aid Concepts and Issues Paper*, at 10 (revised May 2007).

[168] Police Executive Research Forum, *The Police Response to Mass Demonstrations: Promising Practices and Lessons Learned*, at 46 (2018).

[169] IACP Law Enforcement Policy Center, *Mutual Aid Concepts and Issues Paper*, at 10-16 (revised May 2007).

[170] IACP Law Enforcement Policy Center, *Mutual Aid Concepts and Issues Paper*, at 11 (revised May 2007).

[171] IACP Law Enforcement Policy Center, *Mutual Aid Concepts and Issues Paper*, at 12 (revised May 2007).

[172] IACP Law Enforcement Policy Center, *Mutual Aid Concepts and Issues Paper*, at 1 (revised May 2007).

[173] United States Department of Justice, Bureau of Justice Assistance, *Mutual Aid: Multijurisdictional Partnerships for Meeting Regional Threats*, at 1 (2005).

[174] United States Department of Justice, Bureau of Justice Assistance, *Mutual Aid: Multijurisdictional Partnerships for Meeting Regional Threats*, at 11 (2005); IACP Law Enforcement Policy Center, *Mutual Aid Concepts and Issues Paper*, at 23 (revised May 2007); Police Executive Research Forum, *The Police Response to Mass Demonstrations: Promising Practices and Lessons Learned*, at 39 (2018).

[175] Letter from Independent Monitor Nicholas E. Mitchell to Denver Police Department Chief Paul Pazen (June 12, 2020) (attached as Appendix D); e-mail from DPD Commander Jeffrey Martinez to Independent Monitor Nicholas E. Mitchell (June 26, 2020) (on file with author).

[176] The MOU with Aurora Police Department included the requirements for that agency's use of the DPD training facility and contains no information on crowd management mutual aid.   The DPD also provided an MOU with the Adams County Sheriff's Office, detailing a January 30, 2018 request from Adams County.  The agreement includes a formal request for officers and equipment: "Pursuant to CRS section 29-5-103, I am formally requesting officers and equipment from your department to be temporarily assigned to the Adams County Sheriff's Office Patrol and/or Jail divisions for general law enforcement activities on Friday, February 2, 2018, from 0700 hours until 1900 hours."

[177] The Aurora Police Department signed the agreement on February 2, 2011.

[178] The University of Colorado, Denver Police Department signed the agreement on August 10, 2011.

[179] Police Executive Research Forum, *The Police Response to Mass Demonstrations: Promising Practices and Lessons Learned*, at 39 (2018).

[180] The DPD provided a Mutual Aid Partner roster specific to May 29, 2020 and a general list of all the Mutual Aid Partners that provided support during the GFP.  We report the 18 agencies that

DEN003998

were included in the general list of Mutual Aid Partners, but note that there were several agencies that appeared on the May 29, 2020 Mutual Aid Partner roster that did not appear in the general list provided by the DPD.

[181] The Denver Sheriff Department also provided assistance during the GFP, which primarily took the form of providing secure transport vans and assisting the DPD with security. The Governor approved deployment of the Colorado National Guard, which deployed to protect key municipal buildings in Denver.

[182] Some agencies provided mutual aid support as a multijurisdictional team. In these cases, the documents provided by the DPD addressed the team's combined aid in a single after-action report.

[183] For example, certain reports contained a relatively comprehensive description of actions taken by the Mutual Aid Partners and encounters with protesters, officer statements, and munitions used, while others contained only a roster of officers or a high-level summary of events.

[184] Police Executive Research Forum, *The Police Response to Mass Demonstrations: Promising Practices and Lessons Learned*, at 46 (2018).

[185] Police Executive Research Forum, *The Police Response to Mass Demonstrations: Promising Practices and Lessons Learned*, at 43, 47 (2018).

[186] IACP Law Enforcement Policy Center, *Crowd Management Concepts and Issues Paper*, at 3 (Apr. 2019).

[187] Police Executive Research Forum, *The Police Response to Mass Demonstrations: Promising Practices and Lessons Learned*, at 48 (2018).

[188] DPD, Operations Manual § 105.01(1) (revised Jan. 27, 2019).

[189] At the time of the GFP, Colorado Revised Statutes stated that "a peace office is justified in using reasonable and appropriate physical force upon another person when and to the extent that he reasonably believes it necessary." CRS § 18-1-707 (2019).

[190] IACP Law Enforcement Policy Center, *Crowd Management Model Policy* § (IV)(E) (Apr. 2019).

[191] DPD, Operations Manual §§ 105.01(3)(e), 105.02(4)(d) (revised Jan. 27, 2019).

[192] The duty to intervene is now required by Colorado Revised Statutes. CRS § 18-8-802 (2020).

[193] IACP Law Enforcement Policy Center, *National Consensus Policy and Discussion Paper on Use of Force*, at 3 (revised July 2020).

[194] DPD, Operations Manual § 105.01(4)(c)(3) (revised Jan. 27, 2019).

[195] Ryan Osborne, *Aurora police issues five changes to department policy, including ban on carotid hold*, The Denver Channel (June 9, 2020).

[196] IACP Law Enforcement Policy Center, *Crowd Management Concepts and Issues Paper*, at 3 (Apr. 2019).

[197] Police Executive Research Forum, *The Police Response to Mass Demonstrations: Promising Practices and Lessons Learned*, at 48 (2018).

[198] Police Executive Research Forum, *The Police Response to Mass Demonstrations: Promising Practices and Lessons Learned*, at 43-44 (2018).

[199] Police Executive Research Forum, *The Police Response to Mass Demonstrations: Promising Practices and Lessons Learned*, at 48 (2018).

DEN003999

[200] Combined Systems, Model 3553 37mm 31 caliber Sting Ball Specification Sheet (revised Sept. 2018).

[201] Combined Systems, Model 3553 37mm 31 caliber Sting Ball Specification Sheet (revised Sept. 2018).

[202] Combined Systems, Model 3553 37mm 31 caliber Sting Ball Specification Sheet (revised Sept. 2018).

[203] Civil Action No. 20-cv-1616-RBJ, City and County of Denver's Emergency Motion for Modification of Temporary Restraining Order, at 3 (2020) ("Denver also wants to correct the record where the Court states in its Order that the Denver Police Department has used rubber bullets during operations related to the protests. Denver does not use such munitions.").

[204] Jefferson County Regional SWAT Team, After Action Review: Mutual Aid - Denver Police Department "March in Honor of George Floyd Protest," at 25.

[205] Michele Coppola, *Using Shotguns as Less-Lethal Weapons*, TechBeat, United States National Institute of Justice (2018).

[206] Mike Wood, *Why LE should keep the lethal shotgun*, Police1 (Dec. 21, 2018).

[207] Jennifer Edwards Baker, *Cincinnati Police Sergeant Accidentally Grabs Wrong Ammo, Fires Shotgun Round at – but Does Not Hit - Armed Suicidal Man, Chief Says*, Fox19, (June 28, 2020); Maxine Bernstein, *Months After Portland Cop Mistakenly Shoots a Man With Live Rounds Loaded Into a Beanbag Shotgun, Bureau Has Yet To Make Changes*, The Oregonian, (Jan. 10, 2019); Michele Coppola, *Using Shotguns as Less-Lethal Weapons*, TechBeat, United States National Institute of Justice (2018).

[208] Combined Systems, 12GA Super-Sock Bean Bag Specification Sheet, (2018).

[209] Ken Hubbs, David Klinger, *Impact Munitions Data Base of Use and Effects*, 19-20 (Feb. 2004).

[210] IACP Law Enforcement Policy Center, *Mutual Aid Concepts and Issues Paper*, at 10-12 (May 2007).

[211] Federal Emergency Management Agency, *National Incident Management System Third Edition*, at 24 (Oct. 2017).

[212] *See, e.g.,* Police Executive Research Forum, *The Police Response to Mass Demonstrations: Promising Practices and Lessons Learned*, at 49-53 (2018); IACP Law Enforcement Policy Center, *Crowd Management Model Policy* § (IV)(B)(2) (Apr. 2019).

[213] IACP Law Enforcement Policy Center, *Crowd Management Model Policy* § (IV)(B)(3)(a), at 2 (Apr. 2019).

[214] Federal Emergency Management Agency, *National Incident Management System Third Edition*, at 25 (Oct. 2017).

[215] IACP Law Enforcement Policy Center, *Incident Command System Model Policy*, at 3 (2009).

[216] Federal Emergency Management Agency, *National Incident Management System Third Edition*, at 28 (Oct. 2017).

[217] IACP Law Enforcement Policy Center, *Incident Command System Model Policy*, at 3 (2009).

[218] IACP Law Enforcement Policy Center, *Incident Command System Model Policy*, at 3 (2009).

DEN004000

[219] DPD, OMS 108.08, Crowd Management Policy §§ (5)(b-e) (revised Jan. 2006); DPD, Crowd Management and Control Manual, at 12 (effective Feb. 13, 2019).

[220] City and County of Denver, P25 Public Safety Radio System Replacement Project, Lease Purchase and Hardware Agreement, Proposed System Technology § 2.1.1.1.1 (June 1, 2017).

[221] City and County of Denver, P25 Public Safety Radio System Replacement Project, Lease Purchase and Hardware Agreement, Proposed System Technology 2.1.1.8.3 (June 1, 2017).

[222] IACP Law Enforcement Policy Center, *Crowd Management Concepts and Issues Paper*, at 9 (Apr. 2019*);* Police Executive Research Forum, *The Police Response to Mass Demonstrations: Promising Practices and Lessons Learned,* at 30 (2018).

[223] Police Executive Research Forum, *The Police Response to Mass Demonstrations: Promising Practices and Lessons Learned*, at 37 (2018); Police Foundation, *Managing Large-Scale Security Events: A Planning Primer for Local Law Enforcement Agencies*, at 8, 25, 47 (Apr. 2018).

[224] Police Executive Research Forum, *The Police Response to Mass Demonstrations: Promising Practices and Lessons Learned*, at 37-38 (2018).

[225] Police Executive Research Forum, *The Police Response to Mass Demonstrations: Promising Practices and Lessons Learned*, at 37-38 (2018); IACP Law Enforcement Policy Center, *Crowd Management Concepts and Issues Paper*, at 9 (Apr. 2019).

[226] Police Executive Research Forum, *The Police Response to Mass Demonstrations: Promising Practices and Lessons Learned*, at 31-32 (2018).

[227] IACP Law Enforcement Policy Center, *Mutual Aid Concepts and Issues Paper*, at 10-12 (revised May 2007).

DEN004001

DEN004002

**Appendix A**

**Letter from Denver City Council**

DEN004003



City and County of Denver
CITY COUNCIL

June 5, 2020


Independent Monitor, Nick Mitchell

Executive Director of Public Safety, Murphy Robinson

Chief of Police, Paul Pazen


Gentlemen,

During the last days of May and first week of June, prompted by the murder of George Floyd in Minneapolis, numerous large public gatherings took place in downtown Denver including the state Capitol grounds, Civic Center and the area surrounding the City and County Building. In the course of these events crowd activity spilled over into other parts of Downtown, the Colfax Avenue corridor and surrounding neighborhoods.

The Denver Police Department was tasked with providing crowd control and public safety for these events, partnering with a number of other law enforcement agencies to assist in carrying out these duties.

Numerous news accounts and public complaints have surfaced alleging excessive use of force by Denver Police Department personnel.

Mr. Mitchell, in line with your charge to provide oversight of Denver's public safety agencies, we request that you undertake an in-depth analysis and review of Denver Police Department's exercise of their duties at the above-mentioned demonstrations. Please focus, among other things, on DPD's Use of Force policy and other relevant policies and procedures; the use of various forms of "riot" gear and equipment, chemical agents, rubber bullets and other crowd control measures; and DPD's handling of community complaints made regarding officer conduct at the demonstrations.



Mr. Robinson and Chief Pazen, we ask for your cooperation in making all relevant personnel and documents available to assist Mr. Mitchell and his staff in fulfilling the above request.

Respectfully,

Paul Kashmann - Denver City Council, District 6
Chairman, Safety Committee

Jamie Torres – Denver City Council, District 3
Co-Chair, Safety Committee

Kevin Flynn – Denver City Council, District 2
Member, Safety Committee

Robin Kniech – Denver City Council, At-Large
Member, Safety Committee

Amanda Sandoval – Denver City Council, District 1
Member, Safety Committee

DEN004005



Amanda Sawyer – Denver City Council, District 5
Member, Safety Committee

Jolon Clark – Denver City Council, District 7
Council President

Stacie Gilmore – Denver City Council, District 11
Council President Pro-Tem

Kendra Black – Denver City Council, District 4

Candi CdeBaca – Denver City Council, District 9

Chris Herndon – Denver City Council, District 8

Chris Hinds – Denver City Council, District 10

Deborah Ortega – Denver City Council, At-Large

DEN004006

**Appendix B**

**Letter from Councilwoman CdeBaca**

DEN004007



*Candi CdeBaca*
COUNCILWOMAN DISTRICT 9

*City and County of Denver*
CITY COUNCIL
City and County Building
1437 Bannock Street, Room 451
Denver, CO 80202
p: 720.337.7709
District9@denvergov.org

June 2, 20202

Nicholas Mitchell, Independent Monitor         Murphy Robinson, Director of Safety
Office of the Independent Monitor               Department of Public Safety
101 W. Colfax Ave., Suite 100                   331 Cherokee Street, Room 302
Denver, C0 80202                                Denver, CO 80204

Dear Mr. Mitchell and Director Robinson:

We, the undersigned, call on the Office of the Independent Monitor and Department of Public
Safety to investigate accounts from bystanders, protesters and journalists who were injured by
Denver police officers during the protests that have taken and are taking place in Denver in
response to the killing of George Floyd in Minneapolis.

We are also formally requesting that Safety Director Murphy Robinson provide a public report
examining the militarized police presence, where numerous law enforcement agencies from
surrounding counties, as well as the National Guard, were called in.

In his press briefings, DPD Chief Paul Pazen supported the deployment of "less-lethal" weapons
such as tear gas, pepperballs, and incendiary devices, but he has failed to address the harm caused
to civilians by these methods, nor has he provided to the public their number of injuries.

Protests against police abuse should not result in more police abuse. It appears that once the
decision was made to shut down the protests, everyone present was targeted with the same level of
violence, resulting in injuries, some requiring emergency care. At the very least, the excessive
police response has caused trauma to an already traumatized and grieving community.
Specifically, we are calling for an investigation into the following activities:

- How, when and where pepper spray, rubber bullets, tear gas, and a logging process
  to track frequency of use by which officers; the environmental impact, including
  issues raised in this Harvard study, and how bystanders, including those living in
  the area, were impacted.

- The use of military vehicles, including which partner agencies brought them, and
  for what specific purposes.

- An explanation about why journalists were targeted, even though they were clearly
  identified as members of the press.

- The number of reported civilian injuries, including the type of injuries, the manner
  caused, and location where these injuries occurred.

DEN004008



*Candi CdeBaca*
COUNCILWOMAN DISTRICT 9

*City and County of Denver*
CITY COUNCIL
City and County Building
1437 Bannock Street, Room 451
Denver, CO 80202
p: 720.337.7709
District9@denvergov.org

- Alternative methods that should have been provided for free speech expression when the curfew was imposed.

Our message to the City's administration is clear: If you really wish to honor George Floyd's memory, then STOP POLICE BRUTALITY by beginning with your own police force. A thorough investigation and public accounting of the impacts of these policies are essential to restoring the public's trust and protecting our communities from police violence going forward.

Signed,

Councilwoman Candi CdeBaca
Denver City Council, District 9

9to5 Colorado
Abolish ICE Denver
ACLU of Colorado
Colorado Latino Forum
Denver Democratic Socialists of America
Denver Area Labor Federation
Denver Justice Project
FreeMusicForFreePeople
Greater Kingdom Fellowship International, Inc.
Harm Reduction Action Center
Hope Tank
Indivisible CO-5
Indivisible Denver CD1
kindColorado
New Nation Church
Our Voice Our Schools
R.K.L. Lending and Financial Services
Regan Byrd Consulting
Seasoned With Grace
The AMP-athy Project
The Indigenous Agency
The Kaleidoscope Project
The Weekly Issue El Semanario
titwrench Collective
Unite North Metro Denver
Warm Cookies of the Revolution
Women's Lobby of Colorado

Write Now Communications Inc.
Yellow Scene Magazine
Alison Coombs
Juan Marcano
Jessica Abell
Amalthea Aelwyn
Fran Aguirre
Ahmed Almutawa
Katura Alwyn
Leah Anthony
Lauren Arnke
Kristin Axley
Kristen Baird
Hayley Banyai-Becker
Gabe Barnard
Victoria Barriga
Elise Beall
Terin Blake
Diego Bleifuss Prados
Roshan  Bliss
Margaret Bobb
Daniel Bonucci
April Bowen
Allison Brown
Nicholas Bunce

Deborah V. Burgess
Liam Buschel
Regan Byrd
Rosario C. de Baca
John Cameron
Pamela P. Carter
Germany
Janet Caspers
Zachary Cheikho
Helenna Chun
Sandra Claus
Eve Cohen
Ronald Cole
Rhonda Coleman
Benjamin Combs
Kim Conrad
Anna Crawford
Lisa Culpepper
Marc Davis
Chris Davis
Robert Davis
Teresa Dickinson
Chris Diehn
Joshua Downey
Johnathen Duran
Daniel Ebeling
Benjamin Efram
Lisa Escarcega
Rafael Espinoza
Shawn Fausett

DEN004009



*Candi CdeBaca*
COUNCILWOMAN DISTRICT 9

*City and County of Denver*
CITY COUNCIL
City and County Building
1437 Bannock Street, Room 451
Denver, CO 80202
p: 720.337.7709
District9@denvergov.org

| | | |
|---|---|---|
| Sue Felton | Autumn Mechtly | John Ronquillo |
| Lisa Marie Fertman | Angelo Mendez | Andy Sannier |
| Bishop Foreman | Stephen Meswarb | Christopher Savin |
| Chris Fresquez | Stephani Meyers | Sheryl Schmatjen |
| Daniel Fritz | Dana Miller | Amy Schneider |
| Bobbette Furer | Matt Miller | Meg Schomp |
| Xochitl Gaytan | Rachel Monserrate | Jacque Scott |
| Maria Gaytan | Veronica Montoya | Kristen Seidel |
| Helen Giron | Cory Montreuil | Sara Sheiner |
| Tanya Given | Jay Morse | Jeri Shepherd |
| Lindsey Glover | Kimberly Morse | Kim Shively |
| Raffi Greenberg | Tanya Mote | Jacqui Shumway |
| Daniel Grosso | Kevin Mullan | Sarah Slater |
| Cesiah Guadarrama Trejo | Jennifer Nahulu | Oak Slater |
| Brittany Hagood | Dr. Eric D. Nelson | Sheila Smith |
| Maria Heymans | Lindsay Nerad | Molly Snook |
| Janessa Ho | Scott Niblack | Aletha Spang |
| Melanie Horton | Lucia Nisly | Scott Stelzriede |
| Troy Hubbell | Dana Nobles | Dwayne Taylor |
| Christina Ibanez | Marlon  Nunez | John Tellis |
| Ryan Ingram | Naomi Ochoa | Gabriel  Thorn |
| Sam Jarris | Confidence Omenai | James Thornton |
| Samantha Jimenez | Michaela Owens | Diane Tipton |
| Cayenna Johnson | Eric Parker | Timothy Tyler |
| Jayne Johnson | Oneda Patterson | Chinelo Tyler |
| Cassandra Johnson | Olivia Perez | Ashish Vaidya |
| Melissa Jones | Kelly Perez | Troy Valentine |
| Loni Jones | Michaela Perez | Tyler Van Kirk |
| Deana Kamm | Dylan Perito | Tania Van Pelt |
| Maggie Kantor | Meredith Phillips | Jeremy VanHooser |
| Kate Kelly | Rocky Piro | Greg Verzosa |
| Patrick Kelsall | Maximilian Popiel | Bridget Walsh |
| Yoal Kidane Ghebremeskel | Arthur Porter | Morghan Weber |
| Jonathan Lamar | Jennifer Portillo | Mitchell Weldon |
| Patty Lampman | Aaron Pott | Morgan Whatley |
| Athena   Landy | Vanessa Quintana | David Whitmore |
| Bradley Laurvick | Elina Rodriguez | Tiana Yepes |
| Eliav Levy | Lisa Raville | Kristi Zaragoza |
| Peter Loewi | Hamilton Reed Zemek | |
| Gregory Lohrke | Jody Rein | |
| Mona Magno | Alyssa Rich | |
| Michael Mansuy | Laura Richards | |
| Carol March | Erika Righter | |
| Taryn Martin | Diana Rivero | |
| Mike McDaniel | Rebecca Robidoux | |
| Colin McIntosh | Dave Robinson | |

DEN004010

**Appendix C**

**Letter from the Office of the Independent
Monitor to City Council**

DEN004011



Office of the Independent Monitor

101 W. Colfax Avenue. Ste. 100
Denver, CO 80202
p: 720.913.3306
f: 720.913.3305
www.denvergov.org/oim

June 11, 2020

**Re: OIM Investigation into DPD Approach to George Floyd Demonstrations**

Dear Councilmembers:

I write in response to your letters dated June 2 and 5, 2020, requesting that the Denver Office of the Independent Monitor ("OIM") conduct an investigation that examines the Denver Police Department's ("DPD") approach to the demonstrations held in response to the recent murder of George Floyd in Minneapolis, Minn.  You have asked that we evaluate, among other things, the DPD's use of physical force, chemical agents, riot gear, and surplus military equipment, as well as its handling of community complaints regarding alleged officer misconduct during the demonstrations.

We accept.

As you know, the OIM provides oversight of the DPD through the review of internal investigations, disciplinary proceedings, and policies and practices in that agency.  Given the length of the demonstrations in our city, conducting this investigation will require us to review hundreds (if not thousands) of hours of HALO and body-worn-camera footage, radio transmissions, and community generated video, digest a large volume of documentary evidence, and interview command staff, line officers, and community members.  While I expect the investigation to be time and labor intensive, I assure you that our small staff will move expeditiously, and we have already drafted our first request for documents and information, which we will issue to the DPD shortly.

Thank you for your trust in us to do this essential work.  I am gratified by the pledge of complete cooperation from Executive Director Robinson and Chief Pazen, and I look forward to collaborating with them and their teams as we conduct this review.  I will keep you apprised of our progress in the weeks and months ahead.

Respectfully,

Nicholas E. Mitchell
Independent Monitor

cc:   Alan Salazar, Chief of Staff
      Murphy Robinson, Executive Director of Public Safety
      Paul Pazen, Chief of Police
      Citizen Oversight Board Members

DEN004012

**Appendix D**

**Letter from the Office of the Independent Monitor
to the Denver Police Department**

Office of the Independent Monitor



101 W. Colfax Avenue. Ste. 100
Denver, CO 80202
p: 720.913.3306
f: 720.913.3305
www.denvergov.org/oim

Murphy F. Robinson, Executive Director
Department of Safety
1331 Cherokee Street
Denver, CO 80202

Paul M. Pazen, Chief of Police
Denver Police Department
1331 Cherokee Street
Denver, CO 80202

June 12, 2020

**Re: OIM Review of DPD Approach to George Floyd Demonstrations**

Dear Director Robinson and Chief Pazen:

I write in response to your letter dated June 5, 2020, supporting the Denver City Council's request that the Denver Office of the Independent Monitor conduct a review that examines the Denver Police Department's ("DPD") approach to the demonstrations held in response to the recent murder of George Floyd in Minneapolis, Minn.  I look forward to collaborating with you and your teams on this important project.

To further our review, I respectfully request access to records and information from within the DPD.  I have attached to this letter Appendix A, "**First Request for Documents and Information in the OIM's George Floyd Protest Investigation.**"  I would appreciate your assistance in providing this material as expeditiously as possible, on a rolling basis, so that we may begin our work.  Please let me know if you have any concerns and, again, my thanks for your collaboration and assistance.

Respectfully,

Nicholas E. Mitchell
Independent Monitor

cc:     Alan Salazar, Chief of Staff
        Citizen Oversight Board Members

DEN004014

**Appendix A:**
**First Request for Documents and Information in the OIM's George Floyd Protest Investigation**

1. All versions of DPD's Crowd Management Manual in effect from 2010-present.
2. An inventory of all surplus military equipment, whether acquired through the Federal 1033 Program or other means, in the possession of the DPD, and any associated acquisition records.
3. Access to all video footage from the protests, including but not limited to:
   a. Access to Evidence.com to review body-worn-camera ("BWC") video.
   b. All helicopter, HALO camera, and Rapid Deployable Camera footage from the area of the protests.[1]
   c. Video or audio recordings of each order to disperse the crowd given during the protests, per the Crowd Management Manual.[2]
4. All documentation of police radio communication for each protest day, including but not limited to:
   a. A list of all radio channels used by DPD officers and officers from regional and federal law enforcement agencies that provided assistance to the DPD (hereafter, "Law Enforcement Partners").
   b. CAD transmissions and reports.
   c. Complete audio recordings of each channel used.
   d. A dataset of all calls for service related to the protests, including the call type, location, involved officers, and eventual call disposition.
5. All documentation that reflects the DPD's planning and after-action reporting for each protest day, including but not limited to:
   a. Operational Plans and any associated documentation.[3]
   b. All staffing rosters and assignment records for all officers deployed to the protests.
   c. Traffic Management Plans and any associated documentation.[4]
   d. Inventory of all vehicles, equipment, munitions, or weapons deployed.
   e. All after-action or similar reports.
6. Documentation of/from all Law Enforcement Partners that supported the DPD's crowd control efforts, including but not limited to:
   a. A list of all Law Enforcement Partners that supported the DPD during the protests.
   b. Documentation of the support that each Law Enforcement Partner provided, including a list of vehicles, equipment, munitions, and weapons each agency used (e.g., drones, flash bang and sting ball grenades, Tasers, and PepperBall Systems, etc.).
   c. Rosters of all officers deployed from each Law Enforcement Partner with an identification of which officers were equipped with BWCs.
   d. Any written agreements or memoranda of understanding between the DPD and its Law Enforcement Partners to provide crowd control assistance to the DPD.
   e. Documentation of any payments or agreements to make payments to Law Enforcement Partners for their involvement in the DPD's crowd control efforts.

---

[1] DPD Operations Manual Section 119.01 (effective June 6, 2020).
[2] DPD Crowd Management Manual, at 13-14 (effective Feb. 13, 2019).
[3] DPD Crowd Management Manual, at 5-6 (effective Feb. 13, 2019).
[4] DPD Crowd Management Manual, at 5-6 (effective Feb. 13, 2019).

DEN004015

    f.   Use of force policies for all Law Enforcement Partners.

7.  Documentation of all uses of force and injuries during the protests, including but not limited to:

    a.   All use of force reports.

    b.   Any reports of injury to DPD officers.

    c.   Any reports of injury to community members.

8.  All documentation of permits submitted, if any, for the George Floyd protest activity.

9.  All documentation associated with arrests made and citations issued as a result of the protests, including but not limited to:

    a.   All arrest reports and citations.

    b.   Datasets aggregating citation and arrest data.

DEN004016

DEN004017



Office of the Independent Monitor
101 W. Colfax Ave., Suite 100
Denver, CO 80202
720 913 3306
www.denvergov.org/OIM | oim@denvergov.org

DEN004018