1              IN THE UNITED STATES DISTRICT COURT

2                 FOR THE DISTRICT OF COLORADO

3
     Civil Action No. 20-CV-01878-RBJ
4

5     ELISABETH EPPS, et al.,

6            Plaintiffs,

7            vs.

8     CITY AND COUNTY OF DENVER, et al.,

9            Defendants.

10   ---------------------------------------------------------

11                      REPORTER'S TRANSCRIPT
                       Trial Preparation Conference
12
     ---------------------------------------------------------
13           Proceedings before the HONORABLE R. BROOKE JACKSON,
     Judge, United States District Court for the District of
14   Colorado, commencing on the 23rd day of February, 2022, in
     Courtroom A902, United States Courthouse, Denver, Colorado.
15
                            APPEARANCES
16   For the Plaintiffs:
     TIMOTHY R. MACDONALD and ROBERT REEVES ANDERSON and MATTHEW J.
17   DOUGLAS, Arnold & Porter Kaye Scholer, LLP, 1144 Fifteenth
     St., Ste. 3100, Denver, CO 80202
18
     ELIZABETH C. WANG, Loevy & Loevy, 2060 Broadway St., Ste. 460,
19   Boulder, CO 80302

20   For the Defendants:
     ANDREW D. RINGEL and KATHERINE HOFFMAN and ROBERT A. WEINER,
21   Hall & Evans, LLC, 1001 Seventeenth St., Ste. 300, Denver, CO
     80202
22
     LINDSAY M. JORDAN and HOLLIE R. BIRKHOLZ, Denver City and
23   County Attorney's Office, 201 West Colfax Ave., Denver, CO
     80202
24

25      Sarah K. Mitchell, RPR, CRR, 901 19th Street, Room A252,
                   Denver, CO 80294, 303-335-2108
           Proceedings reported by mechanical stenography;
                 transcription produced via computer.

1              *        *        *        *        *

2        (The proceedings commenced at 9:02 a.m.)

3              THE COURT:  Good morning.  This is 20CV1878, I'll

4   call it Epps, et al., versus City and County of Denver, et

5   al., set for the second session of a trial preparation

6   conference.  Let's have your appearances, starting with the

7   Epps plaintiffs.

8              MR. MACDONALD:  Good morning, Your Honor.  Tim

9   Macdonald on behalf of the Epps plaintiffs.  With me is Reeves

10  Anderson and Matt Douglas.

11             THE COURT:  And the other Fitouri plaintiffs?

12             MS. WANG:  Elizabeth Wang for the Fitouri plaintiffs.

13             THE COURT:  And for the Denver defendants?

14             MR. RINGEL:  Good morning, Your Honor.  Andrew Ringel

15  for the Denver defendants.  With me at counsel table are

16  Robert Weiner and Katherine Hoffman from my firm, and Hollie

17  Birkholz and Lindsay Jordan from the city attorney's office.

18             THE COURT:  Thank you.  I haven't seen you for a

19  while, Mr. Weiner.

20             MR. WEINER:  It's been a while, Your Honor.

21  Pleasure.

22             THE COURT:  Usually you sit on that side.

23             MR. WEINER:  Don't let anybody know that.

24             THE COURT:  All right.  So we've had a few

25  developments since the last session.  First, there have been

20-CV-01878-RBJ     Trial Prep. Conference     02/23/2022   3

1   one or two settlements, I think, since last time, right?

2   Second, just yesterday we issued our order on the Jeffco

3   defendants and dismissed them.  Maybe the Aurora defendants

4   are remembering now my admonition that they shouldn't make

5   such a hasty decision to bifurcate, but they did, and Jeffco

6   did not.

7           Third, although we haven't issued the decision yet

8   because it isn't quite finished, we've indicated to the

9   parties that we likely will be denying the Denver defendants'

10  motion for summary judgment as to the City and County of

11  Denver and as to one of the individuals, Officer or Deputy

12  Christian, but granting with respect to the other individual.

13  There were only two individual defendants left because the

14  plaintiffs had dropped all but two.  Not sure why Ms. Epps was

15  so insistent on keeping those two officers in the case.

16  Nevertheless, one of them is going to be gone, one of them is

17  going to stay.

18          Another development is that I received and have gone

19  over your updated jury instructions and sent that out to you

20  last night, at least I think I did.  I did that myself instead

21  of relying on more competent people to distribute that.  I was

22  a little bit disappointed and maybe not surprised that you

23  still hadn't reached agreement on most of the substantive

24  instructions.  We can talk about those.  And, finally, I have

25  been trying to make my way through your avalanche of in limine

1   and other non-dispositive motions.  I didn't quite make it all

2   the way through, but I will give you my tentative rulings on

3   at least those that I've gone through.  I've prepared a

4   written order, but it's not complete.  But in terms of the

5   ones that I have been able to get through so far, this is how

6   I see them.

7         ECF No. 169, Denver's motion to preclude the

8   Independent Monitor Nicholas E. Mitchell as a witness for

9   plaintiffs and Office of Independent Monitor interview memos

10  as evidence.  That motion is based on Denver's suspicion, I

11  think speculation, that there was improper ex parte contact

12  between plaintiffs' counsel and Mr. Mitchell, and that

13  regardless of whether the contact was improper, in general

14  there were improper communications concerning matters subject

15  either to the attorney-client privilege or the deliberative

16  process privilege or, although this wasn't articulated as

17  such, the law enforcement privilege.  And reading from my

18  draft order, the Court finds no evidence that counsel

19  discussed with Mr. Mitchell the substance of any privileged

20  communications -- let me read the whole paragraph to you and

21  start over.

22         Having read the motion and response and reply, the

23  Court finds no evidence that plaintiffs' counsel engaged in

24  improper communications with Mr. Mitchell.  Specifically, the

25  Court finds no evidence that counsel had any ex parte

20-CV-01878-RBJ      Trial Prep. Conference      02/23/2022    5

1   communications with Mr. Mitchell while he was known to be

2   represented by counsel, or even that he was, in fact,

3   represented by counsel when the communications took place.

4          The Court finds no evidence that counsel discussed

5   with Mr. Mitchell the substance of any privileged

6   communications, i.e., communications subject to an

7   attorney-client privilege or the deliberative process

8   privilege or the law enforcement privilege.

9          The Court finds no evidence that counsel discussed

10  with Mr. Mitchell the substance of any portion of his office's

11  interview memos that had been designated as privileged by the

12  defendant and redacted from the memos as produced to

13  plaintiffs in discovery.  The motion is based upon unwarranted

14  speculation and is denied.  So that is my ruling on 169.

15         Next, 244, plaintiffs' motion to limit the expert

16  opinion of Mr. Steve Ijames.  I don't know if I'm pronouncing

17  it correctly.

18         MR. RINGEL:  It's Ijames, Your Honor.

19         THE COURT:  Ijames.

20         MR. RINGEL:  Like the dog food, Your Honor.

21         THE COURT:  But spelled I-j-a-m-e-s.

22         MR. RINGEL:  It is.  But he -- he has the J as

23  silent, so it's Steve Ijames.

24         THE COURT:  All right.  Thank you.  What I have

25  determined is that that isn't your typical *Daubert* motion as

20-CV-01878-RBJ     Trial Prep. Conference     02/23/2022    6

 1   such.  There's no concern about his credentials or that he

 2   used an unreliable methodology.  The whole point of the motion

 3   is that plaintiffs claim his opinions are based on assumptions

 4   that will have no support in the record, whether from

 5   plaintiffs or defendants' witnesses.  The defendant cites

 6   cases saying, well, experts are allowed to make assumptions

 7   and base their opinions on assumptions, and those assumptions

 8   are to be challenged by cross-examination.

 9        Okay.  The way I see it is that if, in fact, there's

10   no support from the plaintiff witnesses or from other

11   defendant witnesses for the assumptions, then Mr. Ijames would

12   be a jolly bad witness for the defendant, but I'm not going to

13   preclude his testimony in limine.  It is a paradigm example of

14   a situation that Courts, at least this Court, prefers to deal

15   with in the context of the evidence at trial.  We'll see if he

16   gets -- well, first of all, we'll see if any of these

17   assumptions might be borne out by any evidence.  We'll see if

18   he gets called as a witness, and if I'm still okay with his

19   testimony, then he will be subject to very rigorous

20   cross-examination.  We'll deal with that at trial.  So that

21   one is denied.

22        Next, Number 245 to limit the expert opinions of

23   Sergeant Josh Garcia.  I really couldn't tell whether that's

24   now moot.  In part I couldn't tell because of the motion

25   itself.  It seems to concern the Jeffco deputies.  But in

1  places it talks about Deputies Dreith and Hamilton, and in at

2  least one other place it talks about Deputies Hamilton and

3  Stegink.  That might have been a typo.  In any event, since

4  the Jeffco deputies have been dismissed, I don't know if that

5  testimony is even relevant at all.  Is it?

6          MR. RINGEL:  Your Honor, I don't know if the Court

7  has had a chance to read the second trial brief that we filed,

8  but the issue presented in that is the plaintiffs appear to

9  intend to present evidence related to the events involving the

10  Jeffco deputies and the Aurora officers, and argue that

11  because Denver requested them for mutual aid, Denver can be

12  held liable under a Monell theory for their actions.

13          THE COURT:  Yes.

14          MR. RINGEL:  If that's the intent, then it may be

15  that we need to present that evidence, including potentially

16  the evidence from Sergeant Garcia.

17          THE COURT:  Well, I anticipated that.  I haven't read

18  your trial brief, but I assumed that that might be the issue,

19  because the theory would be the municipality for Monell

20  purposes is Denver since Denver brought them in as part of the

21  overall force.  Is that plaintiffs' position?

22          MR. MACDONALD:  Yes, Your Honor.  That's right.  It's

23  consistent with the testimony of Commander Phelan in the *Abay*

24  case in which he testified that Denver was, I think the words

25  he used, responsible for the actions of the mutual aid

20-CV-01878-RBJ   Trial Prep. Conference   02/23/2022   8

1   partners.  He also described them as -- the mutual aid

2   partners as being the agents.  Monell itself talks about

3   liability for agents.  There are a raft of cases around the

4   country --

5            THE COURT:  That's okay.  You don't have to make a

6   speech now.

7            MR. MACDONALD:  Yes, Your Honor.

8            THE COURT:  I agree with you then, Mr. Ringel.

9            MR. RINGEL:  Okay.

10           THE COURT:  The testimony might well be relevant to

11   that, and for the same reasons I'm not going to rule in limine

12   to deny his potential testimony as to Ijames, I will do the

13   same with respect to Garcia.  That one is denied.

14           Next, plaintiffs' four, they say, motions in limine.

15   These are all largely motions in limine, but they want to call

16   four of them, and then add another one later apparently,

17   motions in limine.  So I'll call them subparts A, B, C and D.

18   Subpart A, concerning the plaintiffs' criminal history and the

19   one fellow Amghar's military discharge.  That's moot because

20   the defendant said we're not going to put it in unless the

21   plaintiffs open the door.  On any ruling of exclusion if the

22   other side opens the door, that's a different ball game.  I

23   think the plaintiffs will be careful not to do that, and

24   therefore it's moot.

25           Number two, appeals to the -- or appeals to the

Sarah K. Mitchell, RPR, CRR

1    jury's financial interest as taxpayers.  I kind of get a kick

2    out of some of these things.  The defendants say they won't

3    introduce this evidence unless the plaintiffs open the door.

4    Now, I'm not quite sure how the plaintiffs are going to open

5    the door to an appeal to taxpayers' interest or jurors'

6    interest as taxpayers, but the basic idea here is that the

7    plaintiffs want to make sure that the defendants don't get up

8    and say, Hey, some of you are taxpayers, and some of you live

9    in Denver, and, by gosh, if you award money against Denver,

10   you're going to pay for it, so don't do it.  And Denver

11   predictably said, Not to worry, we're not going to do that.

12   We've got better defenses than that.  So that's moot.

13         Third, evidence as to the defendants' financial

14   status.  I will grant that in part and deny that in part.  It

15   seems to me that I have to grant it with respect to the

16   financial status of Jefferson County and the Aurora

17   defendants.  That's not going to be relevant to anything.  But

18   as to the remaining Denver defendants, it seems to me that

19   they put their financial status at issue potentially by

20   seeking punitive damages, and therefore that part of the

21   motion is denied.

22         Part D, to bar testimony from newly disclosed

23   witnesses Martinez, Hohnholz, Moyski, Lee, and Whitfield.

24   There are two parts to this.  First, that they weren't timely

25   disclosed, although I think we took care of that because we

20-CV-01878-RBJ     Trial Prep. Conference     02/23/2022    10

1    said you can take depositions of them if you wish.  But,

2    second, that the testimony concerning property destruction,

3    injuries to officers, violent behavior, threatening behavior,

4    all those things is irrelevant because the plaintiffs were the

5    good guys who were just there to protest and didn't do any of

6    those bad things.  I don't agree.  That may be true as to the

7    plaintiffs.  That, I think, remains to be seen.

8           But the context in which the Denver officers and the

9    officers that they brought in to help them had to deal with

10   the protests is absolutely relevant to explain their tactics,

11   to explain their strategies.  We saw that in the OIM memos.

12   We all know that to be the case.  Not all the protesters were

13   the good guys like the plaintiffs say they were, and the

14   officers had very difficult situations to deal with as a

15   general matter.  That was the environment.  That was the

16   context in which all this happened, and so I don't find it to

17   be irrelevant, and that is denied.

18          Next as to 252, motion to bar testimony from Marc

19   Sears and Jason Petrucelli, these are the Aurora defendants'

20   non-retained experts.  Is that relevant to anything?

21          MR. RINGEL:  Only potentially for the same reason.

22   If we're going to litigate the issues with the Aurora

23   defendants in this proceeding in the absence of the Aurora

24   defendants, we should be able to potentially call those folks

25   as experts.

                        Sarah K. Mitchell, RPR, CRR

1          THE COURT:  Okay.  Well, potentially.  Are you going

2    to call them or not?

3          MR. RINGEL:  Is the Court going to allow the

4    plaintiffs to litigate the Aurora claims in this case?  If

5    that's the case, then we haven't made a decision yet, and I

6    can notify the Court, but I think given the bifurcation and

7    the separate issues, the fundamental issue is Aurora's

8    attorneys are going to have to be involved to prepare their

9    witnesses.  If their officers are going to testify on the

10   stand in a week and a half, it presents the same issue that

11   led this Court, reluctantly I understand, to grant the

12   bifurcation.

13         THE COURT:  Well, I don't know.  I mean, you guys

14   seem to want to make this as big and complicated as you can.

15   I think as an advocate you're making a huge mistake, but are

16   you going to try the Aurora case now and claim that Denver's

17   responsible for it?

18         MR. MACDONALD:  With respect to the incidents of --

19   right now we think there's one plaintiff who was shot,

20   Mr. Packard, by an Aurora defendant.  We think Denver is

21   responsible for that on a Monell basis, and so we do plan to

22   try Mr. Packard's injuries that he suffered during the

23   protests, Your Honor.

24         THE COURT:  Well, then I'm going to deny the motion

25   to exclude the testimony of these guys.

Sarah K. Mitchell, RPR, CRR

20-CV-01878-RBJ    Trial Prep. Conference    02/23/2022    12

1          MS. WANG:  Judge, may I just raise one issue relating

2     to this?

3          THE COURT:  Pardon me?

4          MS. WANG:  May I raise one issue relating to this?

5          THE COURT:  Yes.

6          MS. WANG:  So I just want to be clear that the

7     testimony -- or the disclosure from the Aurora defendants

8     regarding Sears and Petrucelli were really geared towards the

9     Aurora Monell claim.  We are not trying a Monell claim against

10    Aurora in this trial.  Furthermore, Denver already retained an

11    expert, Steve Ijames, to talk about all the incidents where

12    other mutual aid agencies were involved, such as Zach Packard,

13    Joe Deras, and Stanford Smith.  So, I mean, I get we don't

14    have to force them to choose what expert they're going to

15    call, but there should not be -- I'm just flagging the issue

16    -- there should not be cumulative testimony from five

17    different experts on the defense side as to the same thing

18    when they've already got one, Steve Ijames.

19         THE COURT:  There shouldn't be cumulative testimony

20    from any witness, expert or not.  But Mr. Macdonald has grand

21    visions of trying to keep Aurora indirectly in this case even

22    though I bifurcated it, and he could live to regret that.

23    What if the jury does what I think is very possible and find

24    for the defendants in this case?  I don't know where that

25    leaves you with respect to Aurora and Jeffco.  Jeffco you've

Sarah K. Mitchell, RPR, CRR

20-CV-01878-RBJ     Trial Prep. Conference      02/23/2022   13

1   already dismissed.  Aurora was bifurcated.  But you're

2   potentially affecting that claim.  I'm going to have to look

3   at what those experts are purported to say.  I thought that I

4   was going to grant that motion just because Aurora was out,

5   but since Mr. Macdonald is unwilling to agree to that, my

6   inclination is to deny the motion.  I'll take another look at

7   it, though.  And that's as far as I got.

8          So those are the only rulings I can give you, but

9   I'll have the rest done as soon as I can.  Welcome back to

10  Colorado.  I thank you for all of your many motions.  Makes me

11  feel right at home again.

12         Now, what do you want to talk about today?

13  Plaintiffs?  My usual list is exhibits -- or witnesses,

14  exhibits, in limine, jury instructions, and trial.  I told you

15  that last time.

16         MR. MACDONALD:  I think, Your Honor, we're prepared

17  to talk about the jury instructions.  We did receive your

18  comments last night, if you'd like us to talk about that.

19  Otherwise, obviously we put in our comments and explanations,

20  and my colleague Mr. Anderson will be prepared to talk about

21  the jury instructions.

22         THE COURT:  We can talk about the jury instructions,

23  sure.  What else do you want to talk about?

24         MR. MACDONALD:  We'd like to talk about deposition

25  designations.  We have sent the defendants Rule 30(b)(6)

20-CV-01878-RBJ     Trial Prep. Conference     02/23/2022     14

1    designations of witnesses who were deposed as 30(b)(6)

2    witnesses.  We're trying to figure out ways to streamline the

3    trial.  Our position and I think the rules provide that those

4    can be used for any purpose under Rule 32(a)(3) and Federal

5    Rule of Evidence 801(d)(2)(D).  They're non-hearsay.  The

6    defendants have taken the position that we shouldn't be able

7    to use the 30(b)(6) designations, so we'd like to address that

8    issue, Your Honor.

9         THE COURT:  Okay.  What else?

10         MR. MACDONALD:  There's one plaintiff in the case,

11   Your Honor, that we no longer represent that we represented at

12   the outset of the case, Cidney Fisk.

13         THE COURT:  Who?

14         MR. MACDONALD:  Cidney Fisk, F-i-s-k.  Early on in

15   the case we filed a motion to withdraw, so we do not represent

16   her.  Ms. Wang does not represent her.  She has not -- she's

17   still in the case.  We have not had communication with her,

18   which is one of the reasons why we moved to withdraw.  So

19   that's -- I don't know what the Denver defendants' view is,

20   whether she ought to be bifurcated or something else, but I

21   just wanted to alert the Court she's still sort of hanging out

22   there in this case.

23         MR. RINGEL:  She also obviously hasn't been

24   participating in these proceedings and did not respond to the

25   motion for summary judgment.

1       THE COURT:  Well, what do you want me to do about

2   her?

3       MR. RINGEL:  I would say the Court should issue an

4   order to show cause for failure to prosecute.

5       THE COURT:  Okay.

6       MR. RINGEL:  I mean, the Court -- as the Court knows,

7   for summary judgment the Court has an independent obligation

8   to assess summary judgment for Ms. Fisk and its propriety

9   regardless of whether she files a response.  So the Court

10  could address it in that order, but short of that, I think a

11  failure-to-prosecute show cause makes sense.

12      THE COURT:  Does anybody have current contact

13  information for her?

14      MR. MACDONALD:  I can check with our team.  We have

15  had trouble communicating with her in the past, Your Honor.

16      THE COURT:  Well, if we don't have an ability to

17  contact her, how are we going to serve an order to show cause?

18      MR. RINGEL:  She has two addresses, and we've

19  provided them in all of the stuff that we've been filing with

20  the Court.  So to the extent that that's on the court docket,

21  that would work.  But, like, the summary judgment I'm pretty

22  sure was mailed to her at both of her addresses.  One is in

23  Denver, and the other is in Delta.

24      THE COURT:  Well, I'm definitely not going to hold up

25  on the motion for summary judgment because of her.

Sarah K. Mitchell, RPR, CRR

1           MR. RINGEL:  I understand, Your Honor, and that's why

2    I suggested the failure to prosecute as an alternative.

3           THE COURT:  Okay.  What else?

4           MR. MACDONALD:  We're working on the jury

5    questionnaire, Your Honor.  We're a little bit farther behind

6    on that than we'd like to be, but we plan to work with the

7    Denver defendants.  We both -- they've indicated they also

8    agree that would be a wise idea, so we will plan to work with

9    them and hopefully get you something.  When would you like

10   that?

11          THE COURT:  So I told you I think that I'm okay with

12   a jury questionnaire, but it has to be relatively short, and

13   it can't ask jurors questions that I wouldn't let you ask

14   during voir dire, such as precisely where they work, such as

15   their religion or their politics, private things like that.

16   The other thing is once you've had the opportunity to view the

17   jury questionnaire, I will not expect that you will be asking

18   the same questions during your oral voir dire.  That would be

19   cumulative.  You don't like cumulative.  Ms. Wang just told me

20   that.  You can ask follow-up questions.  Mr. Jones, on your

21   questionnaire you said X, Y, Z.  I'd like to ask you a

22   question about -- a further question about that.  Yes, that's

23   the whole point.  But you can't ask the question again.

24   Understood?

25          MR. MACDONALD:  Yes, Your Honor.

                    Sarah K. Mitchell, RPR, CRR

20-CV-01878-RBJ     Trial Prep. Conference     02/23/2022     17

1           THE COURT:  What else, Mr. Macdonald?

2           MR. MACDONALD:  You had indicated at our last

3    pretrial that you would be amenable to brief non-argumentive

4    statements.

5           THE COURT:  Yes, I said that.

6           MR. MACDONALD:  And do you have a set number you

7    would like us to establish now today?  Four of them, five of

8    them, or some other amount?

9           THE COURT:  I don't particularly care too much.

10   What's your number?

11          MR. MACDONALD:  We were thinking in that range, four

12   or five, Your Honor.

13          THE COURT:  And what is the -- well, do you agree

14   with that, Ms. Wang?

15          MS. WANG:  Sure, Your Honor.

16          THE COURT:  What are the defendants' views?

17          MR. RINGEL:  That's fine, Your Honor.

18          THE COURT:  Why don't we say four, no more than two

19   minutes.  Is that acceptable?

20          MR. MACDONALD:  Yes, Your Honor.

21          MR. RINGEL:  Yes, Your Honor.

22          THE COURT:  Anything else, Mr. Macdonald?

23          MR. MACDONALD:  We had one other issue relating to

24   deposition designations we'd like to discuss with you, and

25   that's whether or not command level officers satisfy the rule

Sarah K. Mitchell, RPR, CRR

20-CV-01878-RBJ     Trial Prep. Conference     02/23/2022   18

1    under 32(a)(3) as managing agents of the city of Denver.  And

2    I think that covers it.  Exhibits, if I didn't say that, as a

3    final topic.

4         THE COURT:  Now, I assume you've tried a case at

5    least once in your past.

6         MR. MACDONALD:  Yes, Your Honor.

7         THE COURT:  I've tried quite a few, and I've presided

8    over many, many hundreds.  Depositions can be really deadly.

9    You're way better off with live testimony just in terms of

10   communication to people.  The other thing about depositions is

11   if you are disputing which parts can be read or shown, I have

12   to make rulings on that.  I don't have unlimited time.  I

13   can't even begin to tell you how busy my chambers is at the

14   moment.  It's overwhelming.  I just came back from a vacation.

15   I'll call it a vacation.  I worked every single day but one.

16   So if you want to flood the Court with depositions and

17   deposition testimony to read, you're just going to have to

18   take what you get when you get it.

19        But the way I need to receive it, it can be hard copy

20   or it can be electronic.  I don't care really too much about

21   that.  But it's got to be highlighted so I know what

22   deposition testimony is desired, what part is objected to by

23   the plaintiff, if any, and what the objections are.  What part

24   is objected to by the defendant, and what the objections are

25   in a very brief shorthand way so that I can quickly look at

20-CV-01878-RBJ    Trial Prep. Conference    02/23/2022    19

1    just that testimony and give you a grant or deny.  That's all

2    I have time to do.  Or overruled or sustained.  That's all I'm

3    going to have time to do.  So I would urge that you try to

4    keep it as limited as you can and submit them in the

5    chronological order in which you expect to call the witnesses,

6    because I may be doing some of that at night, not that I want

7    to do anything on this case at night, because I may not be

8    able to get it all done before the trial.  Trial is coming up

9    in, what, two weeks?  I mean, we're right there, folks.  Now,

10   the issue you raised is a different issue.  I'm just talking

11   about the logistical issue.  But you raised the can we issue,

12   and we can talk about that.  That's your last item.

13           What about you, Mr. Ringel, or your --

14           MS. WANG:  Judge.

15           MR. RINGEL:  I'm sorry.

16           THE COURT:  Go ahead.  Which issues do you want to

17   raise today?

18           MS. WANG:  Judge, this is -- I just have one question

19   about exhibits.

20           THE COURT:  Okay.

21           MS. WANG:  In terms of submitting them to your

22   chambers, so a copy for -- there's going to be exhibits

23   obviously that are --

24           THE COURT:  I can't really hear you very well.

25           MS. WANG:  There are going to be exhibits that are

20-CV-01878-RBJ    Trial Prep. Conference    02/23/2022    20

1    videos, so what is the procedure you would like us to follow

2    in terms of submitting a copy of the marked exhibits to you,

3    like on an external hard drive as well as a copy that's the

4    official copy --

5            THE COURT:  You mean exhibits that are being

6    discussed in the deposition testimony?

7            MS. WANG:  No just exhibits, trial exhibits.

8            THE COURT:  Why do you have to submit any of them to

9    me?

10           MS. WANG:  Well, I've had judges ask for a copy of

11   the exhibits.

12           THE COURT:  Oh, I don't want that.

13           MS. WANG:  Okay.  Okay.  That's fine.

14           THE COURT:  No, I don't want that.  If I didn't say

15   so last time, let me say so now.  We only need one set of hard

16   copies of exhibits, and that's for the witness stand just in

17   case there's a witness who can't handle reading the document

18   on the screen, and more importantly so that there's a hard

19   copy set to go to the jury for their deliberations.

20           Mask up, Mr. Weiner.  You'll find that I'm a ninny on

21   that.

22           That's all.  I don't need a set.  I'll just look at

23   them when the jurors looks at them.  If I need to look at a

24   hard copy, then I'll look at the set on the witness stand.

25           MR. RINGEL:  Related to that, how should we provide

Sarah K. Mitchell, RPR, CRR

20-CV-01878-RBJ    Trial Prep. Conference    02/23/2022    21

1    the original exhibits for video and audio?  Is there a format?

2    Is there -- I mean, what technology does the Court have and

3    how does the Court want to handle that?  Because there's a lot

4    of video, and there's a lot of different types of video, and

5    we're -- both sides are going to be admitting video, and so

6    how would the jury, if they wanted to view a video during

7    their deliberations, handle that, and what can we do to help

8    facilitate that?

9            THE COURTROOM DEPUTY:  Back in the jury room they

10   have a video presentation monitor, and we can do --

11           THE COURT:  I can't hear you, Julie.

12           THE COURTROOM DEPUTY:  Where's your hearing aid, Your

13   Honor?  Back in the jury room there's a video presentation

14   monitor, and it has CD capability, DVD, or a USB drive.  So

15   however you would like to put it in the exhibit binder, the

16   jury --

17           MR. RINGEL:  If we put it on a USB drive or drives,

18   that would work?

19           THE COURTROOM DEPUTY:  Right.  As long as it's

20   labeled with each individual number.

21           MR. RINGEL:  Right.  Understood.  Okay.  Like, if we

22   could technologically talk to -- if we had a hard drive that

23   we could use through the USB port, would that potentially

24   work, or is that not something --

25           THE COURTROOM DEPUTY:  I haven't ever tried it, but

Sarah K. Mitchell, RPR, CRR

20-CV-01878-RBJ     Trial Prep. Conference     02/23/2022     22

1   it could potentially work.

2           MR. RINGEL:  I mean, we may have 100 thumb drives

3   otherwise, and that seems fairly cumbersome to me.

4           THE COURTROOM DEPUTY:  It does.

5           MR. RINGEL:  We'll work it out with counsel and with

6   Julie.

7           THE COURT:  Good thinking.  Because I can't help you

8   with that.

9           MR. RINGEL:  Neither can I, Your Honor.

10          THE COURT:  Okay.  Well, I was kind of impressed the

11  way you were talking.  You sounded like you were pretty savvy

12  about this stuff.  Maybe you're just being --

13          MR. RINGEL:  I'm an advocate, Your Honor.

14          THE COURT:  All right.  Any other issues you want to

15  raise?

16          MR. RINGEL:  Two that were in the original trial

17  brief, the *Tanberg* issue, and then the issues related to the

18  OIM report and Mr. Mitchell's testimony on the 407 and 403

19  grounds.  And then the issue of the number of witnesses, Your

20  Honor.

21          THE COURT:  So I've got a total of nine things on my

22  list, two of which we've already crossed off.  Anything else?

23  Let's skip the jury instructions.  That's time consuming.

24  Let's deal with some of the other things.  30(b)(6)

25  depositions.  A deposition of a party can be used for any

20-CV-01878-RBJ    Trial Prep. Conference    02/23/2022    23

1    purpose.  Why would that not include a 30(b)(6) deposition?

2          MR. RINGEL:  Your Honor, let me find my notes.  I

3    agree that a 30(b)(6) can be used, but in the cases that I was

4    reading, there's a split of authority, and some of the

5    authority suggests that the Court has discretion about the

6    order and presentation at trial, which I think is true.  And

7    the concern that we have is only what -- if we do deposition,

8    what will happen is there will be a deposition either read or

9    played with designations from both sides subject to

10   objections, and then in all likelihood in the defense case the

11   same witness who had a deposition will be presented in the

12   defense case and then cross-examined, and that just seems to

13   be wholly inefficient, Your Honor.

14         THE COURT:  I thought your issue was whether or not

15   you could use 30(b)(6) depositions.  He's just told us he

16   doesn't object to that as a general matter.

17         MR. MACDONALD:  That's great, Your Honor.  If he

18   doesn't object, then we'll make our decisions about whether we

19   want to play a 30(b)(6) deposition in our case in chief or

20   not, Your Honor.

21         THE COURT:  Well, why would you use a 30(b)(6)

22   deposition other than for impeachment purposes possibly?

23         MR. MACDONALD:  So here's one example, Your Honor.

24   The 30(b)(6) -- some of the 30(b)(6) testimony is on

25   relatively technical issues to satisfy our Monell elements

1   about training or policies, customs or practices.  So from a

2   strategic standpoint we think it might be in our clients'

3   interest to play a small segment of 30(b)(6) deposition, and

4   then they can play what they would like from that deposition.

5   And if they choose to call that witness live in their case,

6   they can have that witness testify about whatever they want,

7   but we ought not be pushed to the point where they can -- if

8   we're forced to call that witness live in our case, Your Honor

9   indicated you'll let them go beyond the scope, and they could

10  have the witness up there testifying about a lot of things

11  that are unrelated to the reason we want the witness on the

12  stand.  So that may be a reason we want to play a narrow

13  designation from the 30(b)(6) deposition rather than call a

14  person live and let them testify about anything that the

15  Denver defendants would want them to testify about.

16          THE COURT:  Can you give me an example?

17          MR. MACDONALD:  Yes, Your Honor.  The use of force

18  reporting that was under -- the testimony from the 30(b)(6)

19  witnesses was that they were not required to fill them out,

20  and it's a fairly narrow discrete issue, and they were only

21  required to fill them out 10 or 12 days after the use of

22  force.  That's one example.

23          THE COURT:  Why wouldn't that be a stipulated fact,

24  if it's a fact?

25          MR. MACDONALD:  We have asked them to stipulate to

20-CV-01878-RBJ     Trial Prep. Conference     02/23/2022    25

1    that fact.  They have declined to that fact, Your Honor --

2    they've declined to stipulate, at least as of yesterday.  We

3    received -- we proposed that as a stipulation last week.  We

4    received the response yesterday that they were not prepared to

5    stipulate to that fact.

6         MR. RINGEL:  I didn't work on that issue.  We'll

7    stipulate to reasonable facts, but my recollection of the

8    stipulated facts was they were argumentative, and they weren't

9    really facts.  And the issue with respect to the reports goes

10   back to the issue involving this Court's order in the *Abay*

11   case, because their argument is the reports were written after

12   this Court's order in *Abay*, and that's -- so -- and my -- I

13   don't know -- I don't remember whether or not the fact that

14   Mr. Macdonald is referencing referenced *Abay* or not.

15        THE COURT:  Well, setting aside the argumentative

16   wording that apparently one of your colleagues found

17   unacceptable, this example should be factual.  They either

18   were required or were not required to write use of force

19   reports.

20        MR. RINGEL:  So it's --

21        THE COURT:  They either were then asked to do it or

22   they were not then asked to do it at a later time.  All of

23   that is just factual.

24        MR. RINGEL:  It is and it isn't, Your Honor, because

25   it's all about the context, and there are certain instances

20-CV-01878-RBJ    Trial Prep. Conference    02/23/2022   26

1    that there was no question that people had to write reports,

2    and they were supposed to write reports with respect to things

3    that occurred, and some of them didn't.  But that -- that's a

4    different issue than the notion that there were no reports

5    that were supposed to be written, and that's what they're

6    trying to assert.

7          So the problem with the stipulation, as the Court

8    knows, is it's hard to establish the context around the

9    stipulation, and you run into the notion of cumulative

10   evidence.  If we agree to a stipulation that is partially

11   true, then the Court would say, well, why are you presenting

12   evidence related to that stipulation?  We need to provide the

13   context for those kind of things, and that's the whole point

14   about this case as a whole.  The context is critical for the

15   jury to understand everything that was happening.

16         THE COURT:  Well, I agree with that, and generally I

17   said so before with respect to, you know, the out-of-control

18   protesters and the violence and injuries to cops and that kind

19   of stuff.  I agree with you.  But the context that we're

20   considering right now is your objection to their using

21   deposition excerpts because you think it would be cumulative.

22         MR. RINGEL:  No.  My objection is about efficiency,

23   and I understand that the plaintiffs want to control their

24   case, and they want to use depositions so that we don't

25   essentially start putting on our case during the -- during

20-CV-01878-RBJ     Trial Prep. Conference     02/23/2022    27

1   their case, and I think that the Court has discretion under

2   the rule.  I agree that it's something that can be done, and I

3   understand with a 30(b)(6) -- I think the other depositions

4   are clearly different.  But I think with the 30(b)(6), it is a

5   deposition of Denver, Denver is a party, the Court can allow

6   it.  I was just pointing out the inefficiency of it.  I don't

7   know whether it will be cumulative or not.  It depends on what

8   is raised.  But what I would worry about is the cumulative

9   nature of the cross-examination, because -- but until the

10  Court hears evidence, neither of us can know what it's going

11  to be.

12         THE COURT:  That's true.  I will not preclude you

13  from using excerpts in the limited manner that you stated

14  you're going to use them to fill in blanks that you think need

15  to be filled in to make your Monell claim.  But by the same

16  token, then I will expect that you do what you said you would

17  do, and that is you limit the use of the 30(b)(6) depositions

18  just to those blanks you need to fill in.  I'll take you at

19  your word.

20         Now, the other related issue that you raised was at

21  what level of status or office can a deposition of an

22  individual employee be said to be a deposition of a party and

23  therefore use them.  I think that's what you were raising.

24  That's to command officers.

25         MR. MACDONALD:  Yes, that's right, Your Honor.  The

20-CV-01878-RBJ    Trial Prep. Conference    02/23/2022    28

1    question is what level of officer satisfies the standard under

2    32(a)(3) as a managing agent.

3              THE COURT:  Well, what do you think?

4              MR. MACDONALD:  We think it is lieutenants and above,

5    Your Honor, satisfies the standard.  I'm not sure --

6              THE COURT:  What do they think?

7              MR. MACDONALD:  They disagree.  They don't think any

8    of them, I think including all the way up to Commander Phelan

9    and Chief Pazen -- I think their position is none of them

10   satisfy the standard, Your Honor.

11             THE COURT:  Well, you probably would agree that the

12   chief of police would satisfy the standard.  Not even that?

13             MR. RINGEL:  No.  There is no authority on the issue

14   of applying the 32(a)(3) standard in a government context.

15   The case -- I was able to find one case.

16             THE COURT:  What does the standard say?  Let's start

17   with that.

18             MR. RINGEL:  It says an adverse party may use for any

19   purpose the deposition of a party or anyone who when deposed

20   was the party's officer, director, managing agent, or

21   designee.  So it's written in the form of a corporation, Your

22   Honor.  It's not written in the form of a government.

23   Commander Phelan was retired at the time of his deposition, so

24   he cannot fall within that definition.

25             THE COURT:  He cannot what?

                    Sarah K. Mitchell, RPR, CRR

1    MR. RINGEL:  He cannot fall within that definition,

2  because it says at the time the deposition was taken.  The

3  only case that I was able to discover is a case out of the

4  Eastern District of Tennessee, and I can provide the Court the

5  cite.  It's not particularly helpful, but it concludes that

6  neither the chief nor a detective were within 32(a)(3), that

7  they hadn't made a sufficient showing in that case.  I

8  provided that cite to Mr. Macdonald in an e-mail.  I invited

9  him to provide me any contrary authority that they had

10  located.  I have not received any contrary authority.

11    Lieutenants clearly are not managing agents, Your

12  Honor.  There's a huge debate, as the Court probably is aware,

13  of whether lieutenants are a supervisor for purposes of the

14  Fair Labor Standards Act, and there's cases out there that say

15  they're not.  So the notion that they're a managing agent when

16  they're not even an exempt employee doesn't make any sense.  I

17  think the best argument they have is the chief, but, again,

18  the chief lives in Denver and can be available, and it doesn't

19  make sense to present a deposition and then have him testify

20  again.

21    THE COURT:  Isn't that always true of depositions of

22  parties?  Parties are presumably always available, but the

23  rule says the deposition of a party may be used.

24    MR. RINGEL:  That's true.  The distinction here, Your

25  Honor, is the chief is not a party.  So the question is does

20-CV-01878-RBJ     Trial Prep. Conference     02/23/2022     30

1    the Court -- and it's essentially a structural issue for the

2    City and County of Denver and who can bind the City and County

3    of Denver, and it's a lot more complicated than it is with a

4    corporation because of the different branches of the

5    Government and the structure and who has the authority to do

6    what.  And so it's much more complicated, and the Court would

7    have to make findings that the people that are at issue are

8    the chief, a division chief, and five lieutenants.

9              THE COURT:  And what?

10             MR. RINGEL:  Lieutenants.

11             THE COURT:  Is lieutenant above commander?

12             MR. RINGEL:  No.  Commander is above lieutenant.  So

13   lieutenants that were on the ground out in the field, that's

14   who we're talking about here.  Commander Phelan was their

15   supervisor, and then it goes up through the chain of

16   authority.  There's -- there are division chiefs.  There's a

17   deputy chief, and then there's a chief of police.  Then

18   there's the director of safety who manages all the safety

19   departments, and then there's the mayor and the city council.

20             So the question is can you go and pick out one of

21   those people and say this is in 32(a)(3) when it's not -- it's

22   as clear as mud, Your Honor.  And given that the people are

23   available to testify, why are we elevating strategy over the

24   purpose of getting at what the jury should hear?  I mean,

25   Learned Hand a hundred years ago said there's a strong

20-CV-01878-RBJ    Trial Prep. Conference    02/23/2022    31

1    preference to live testimony, and there's no reason not to

2    have live testimony of these witnesses.  It's one thing on the

3    30(b)(6).

4         THE COURT:  Learned Jackson said that probably

5    30 minutes ago.

6         MR. RINGEL:  Your Honor, I would like to quote you to

7    you, but I don't think that's appropriate.

8         THE COURT:  So what authority -- first of all, what

9    authority do you have that any of these people can speak for

10   the City and County of Denver?

11        MR. MACDONALD:  So, Your Honor, in the Tenth Circuit

12   law in this district there's a four-part test as to whether or

13   not a person satisfies the managing agent, and it's a question

14   of the agent's interests are identified with those of the

15   principal, the extent of the agent's function, the extent of

16   the agent's power to exercise judgment and discretion, and

17   whether anyone was -- possessed a higher authority than the

18   deponent in charge of the particular matter.  So it is a fact

19   intensive test.  We acknowledge that.  There are cases from

20   around the country --

21        THE COURT:  Now answer my question, which that

22   didn't.  What authority do you have in the context of a police

23   department that any of these levels of police department can

24   speak for the city?  He's got the one Tennessee case.  What

25   have you got?

20-CV-01878-RBJ    Trial Prep. Conference    02/23/2022    32

1    MR. MACDONALD:  We do not have a case from this

2    district, Your Honor, that says that a lieutenant or a

3    commander satisfies the managing agent test.

4    THE COURT:  How about from some other district?

5    MR. MACDONALD:  There are cases from around the

6    country that have analogous situations that high-level

7    government officials exercising discretion out in the field

8    satisfy the standard.  We'd be happy to provide those for Your

9    Honor.

10    THE COURT:  Well, Mr. Ringel said he gave you the one

11    case he found, and he never heard back from you.

12    MR. MACDONALD:  It's true.  It was either yesterday

13    or the day before, Your Honor, and we haven't had an

14    opportunity to exchange on that.  We had sent them our request

15    last week.  We've obviously had a lot of things on our plate.

16    We hear Your Honor with respect to your preference and most

17    judges' preference for live testimony.  I don't think we're

18    going to do much with respect to the command officers with --

19    on designations, and I'm happy to convene with our team to

20    decide whether we want to do any of those and simply stick

21    with the 30(b)(6) depositions.  That may well be the decision

22    we make.

23    THE COURT:  Well, why can't you make the decision

24    right now?

25    MR. MACDONALD:  Because I don't have my colleagues to

Sarah K. Mitchell, RPR, CRR

20-CV-01878-RBJ    Trial Prep. Conference    02/23/2022    33

1   discuss, and I'm not the sole decision --

2         THE COURT:  Where are they?  Where are your

3   colleagues?  I thought they were sitting here.

4         MR. MACDONALD:  Well, yes, Your Honor.  Some of them

5   are, and some of them are not.

6         THE COURT:  So you need to talk with your colleagues,

7   some of whom are here and some of whom are not, about whether

8   you even want to use any of these depositions of these

9   lieutenants, commanders, division chiefs or chief of police,

10  and you may not want to use any of them, because they're all

11  available, and they will be called as witnesses.

12        MR. MACDONALD:  That's right, Your Honor.  We have to

13  balance the desire of streamlining our case and Mr. Ringel's

14  -- which he expressed today and has expressed before, if we

15  call one of their witnesses in our case, he's going to provide

16  all the context.  So we might have a very short exam of a

17  witness on a similar point that I raised earlier; for example,

18  the use of the body-worn cameras and the policy that we

19  believe -- they had a policy of not requiring officers to turn

20  them on and not training them on when they should, and we may

21  want to have a command officer testify on a very narrow issue,

22  and Mr. Ringel and his clients will want to provide the full

23  context of everything that happened at the protests, and

24  that's the decision we have to make, Your Honor.

25        THE COURT:  I don't have to decide this until you

1    tell me that you do want to use some of these depositions.

2             MR. MACDONALD:  That's right, Your Honor.

3             THE COURT:  But if you do want to use them, and if

4    Mr. Ringel objects, then I want to see your authority that

5    says they can speak for the city, because I'm inclined to

6    doubt it.

7             MR. MACDONALD:  Understood, Your Honor.

8             THE COURT:  I don't see how some lieutenant or some

9    commander can speak for the City and County of Denver.

10             MR. MACDONALD:  Understood, Your Honor.

11             THE COURT:  All right.  Well, you get together with

12    your colleagues, and then get together with Mr. Ringel, and

13    then present to me an issue if there really is an issue.

14             Mr. Ringel, I think this is all the issues except

15    jury instructions that the plaintiff raised.  Mr. Ringel

16    raised the *Tanberg* issue.  What's the issue?

17             MR. RINGEL:  So the issue with *Tanberg* still exists,

18    Your Honor.  The plaintiffs filed a response to the trial

19    brief that outlined their position that the policies should

20    come into evidence.  And if this were just a Monell case, I

21    think they have a point, but it's not just a Monell case.  We

22    still have the claims against Officer Christian, and as a

23    result, *Tanberg* is pretty clear authority, and I don't think

24    there's any way for them to proceed with a claim on an

25    individual defendant and a claim against a municipality and

1   have the notion that Officer Christian violated policy be

2   presented to the jury.  I think that's incredibly prejudicial

3   to Officer Christian and against Judge McConnell's decision in

4   *Tanberg* that this Court followed in *Davies*, and I think that's

5   very clear.  So it seems to me that the plaintiffs need to

6   make a choice, either they give up the claim against

7   Mr. Christian and they proceed to present this as a policy

8   matter and then join it that way --

9           THE COURT:  What's the policy matter?

10          MR. RINGEL:  They are saying that there are policies

11  of the City and County of Denver that were not followed by

12  Officer Christian that caused the violation in this instance

13  of Ms. Epps' constitutional rights.  That's the issue here.

14          THE COURT:  What policy?

15          MR. RINGEL:  The policies that they've identified are

16  the policy of his failure to use his body-worn camera and

17  failure to write a report.  That's what we're talking about

18  here.  And so it doesn't make sense to me, given *Tanberg*, for

19  Officer Christian to be on the stand and for them to say,

20  Isn't it true, Officer Christian, you didn't write a report

21  about this incident?  That's what we're talking about, Your

22  Honor.

23          THE COURT:  I didn't realize that there was that kind

24  of a dispute concerning Christian.

25          MR. MACDONALD:  There's not, Your Honor.  He actually

20-CV-01878-RBJ     Trial Prep. Conference     02/23/2022     36

 1   did use his body-worn camera.  That's the footage we have.

 2           MR. RINGEL:  But you were going to argue --

 3           THE COURT:  Mr. Christian -- is it disputed that he

 4   shot Epps with a pepper ball?

 5           MR. MACDONALD:  No, Your Honor.

 6           THE COURT:  Is it?

 7           MR. RINGEL:  Yes.

 8           THE COURT:  Oh.

 9           MR. RINGEL:  He shot at her.  He didn't hit her.

10           THE COURT:  Says who?

11           MR. RINGEL:  Says the body-worn camera.

12           THE COURT:  So somebody else hit her?

13           MR. RINGEL:  No, she wasn't hit.  That's the

14   defendants' defense.

15           THE COURT:  That day or any day?

16           MR. RINGEL:  That incident she was not hit by a

17   pepper ball by Officer Christian.  That's what the defense is

18   on that particular issue.

19           THE COURT:  So Epps is the individual who claims to

20   be some form of journalist, and she claims that she was just

21   out there not even protesting but taking pictures, taking a

22   video.  And she got clobbered on day one, and then she came

23   back for more the second day and got hit again, so there are

24   two days' worth of hits, right?

25           MR. MACDONALD:  Three, Your Honor.

                        Sarah K. Mitchell, RPR, CRR

20-CV-01878-RBJ    Trial Prep. Conference    02/23/2022    37

1           THE COURT:  Three days' worth?

2           MR. MACDONALD:  Well, shot on three -- I think three

3    times on two days, to be --

4           THE COURT:  Three times on two days, day one and day

5    two.

6           MR. RINGEL:  And only one of those involves Officer

7    Christian.

8           THE COURT:  And that's the first one.

9           MR. RINGEL:  I think that's correct.

10           THE COURT:  Is that what you think too?

11           MR. MACDONALD:  Yeah, I can't remember if it's the

12    first or second, Your Honor, but it's on the first day, Your

13    Honor.

14           THE COURT:  So she claims she got hit three times,

15    and once it was by Christian.

16           MR. MACDONALD:  That's right, Your Honor.

17           THE COURT:  And the time that she attributes to

18    Christian, where did she say she got hit by his pepper ball?

19           MR. MACDONALD:  In the leg, Your Honor.

20           THE COURT:  In the leg.

21           MR. MACDONALD:  Yes.

22           THE COURT:  And what injury did she sustain from his

23    pepper ball?

24           MR. MACDONALD:  She has a -- and including in our

25    materials we've put in the complaint, I think, and also in

Sarah K. Mitchell, RPR, CRR

1    discovery, she has a wound on her leg from being shot by

2    Officer Christian.

3              THE COURT:  What kind of a wound?

4              MR. MACDONALD:  Getting hit with a pepper ball

5    produces a large welt and bruise, Your Honor.

6              THE COURT:  I get hit with racquetballs when I play.

7    Believe you me that leaves a nice big round welt and bruise,

8    and I go home, and, once again, my wife says, You are 74 years

9    old.  You stop playing racquetball.  But it goes away.  Did

10   hers go away?  Are we talking about a bruise that was there

11   for a week and went away?

12             MR. MACDONALD:  I assume, Your Honor, at some point

13   the bruise went away, and that would be true with all the

14   people that were shot with pepper balls, Your Honor.

15             THE COURT:  Well, not necessarily.  There were people

16   that had serious eye injuries and things like that.

17             MR. MACDONALD:  That's true.  I stand corrected.

18             MR. RINGEL:  Those aren't the plaintiffs, Your Honor.

19             THE COURT:  Pardon me?

20             MR. RINGEL:  Most of the plaintiffs don't have

21   injuries to their eyes or anything like that.  We're talking

22   about in this case contusions and exposure to chemical agents,

23   except for Mr. Packard.

24             THE COURT:  Except who?

25             MR. RINGEL:  Mr. Packard, Your Honor.

20-CV-01878-RBJ    Trial Prep. Conference    02/23/2022    39

1      THE COURT:  Okay.  So Epps got shot in the leg one of

2   the times.  Where did she get shot the other times?

3      MR. MACDONALD:  She got shot in the face, Your Honor,

4   by Officer Valentine.  She got shot about five or six times in

5   the back, Your Honor.

6      THE COURT:  So it sounds like the shot that she

7   attributes to Christian was relatively lesser -- I mean, it's

8   less to get hit in the leg with a pepper ball than to get hit

9   in the face, right?  Usually.

10      MR. MACDONALD:  Certainly different, Your Honor.

11   Ms. Epps was walking across the street on her own filming, and

12   Officer Christian took a knee while standing on the State

13   Capitol grounds and without a warning shot her.

14      THE COURT:  In the leg.

15      MR. MACDONALD:  Yes, Your Honor.

16      THE COURT:  And he denies it?

17      MR. RINGEL:  He denies that anything hit her.

18      THE COURT:  And the body-worn camera that he did have

19   on, what did it show?

20      MR. RINGEL:  The body-worn camera, in our view and in

21   the view of our expert, shows that she wasn't hit with any

22   projectile fired by Officer Christian.

23      THE COURT:  And you interpret it differently?

24      MR. MACDONALD:  That's right, Your Honor.  And to be

25   more precise, Officer Christian did not deny hitting her.  He

Sarah K. Mitchell, RPR, CRR

20-CV-01878-RBJ    Trial Prep. Conference    02/23/2022    40

1    said he didn't know at his deposition.

2         THE COURT:  So if Mr. Ringel is right about the

3    *Tanberg* issue, it's okay to put the policies in on your Monell

4    claim but not on the individuals' claim, and because you're

5    going on behalf of Epps because she allegedly got hit in the

6    leg, if Mr. Ringel is correct, you're going to lose it as to

7    all defendants because of the one defendant.

8         MR. MACDONALD:  No.  I don't think his reading both

9    of the facts are right.  He said we were going to argue that

10   Officer Christian violated policy because he didn't turn on

11   his body-worn camera.  We're not going to argue that.  That's

12   not part of our case.  That's not what happened.

13        THE COURT:  Are you going to argue he didn't follow

14   any procedure or are you going to argue he shouldn't have shot

15   somebody who was a peaceful journalist?

16        MR. MACDONALD:  That is certainly what we're going to

17   say, Your Honor.  He acknowledges it was a use of force by

18   shooting at her.  He has no explanation for why he shot at

19   her, and there was no legitimate explanation for why he shot

20   at her.  An officer ran up to him after he shot Ms. Epps and

21   said, Sarge said don't shoot her.  So we're not going -- we

22   don't think there's a *Tanberg* issue here at all.

23        THE COURT:  You're not going to issue -- you're not

24   going to try to put in any policy that he violated?

25        MR. MACDONALD:  That's right, Your Honor.

Sarah K. Mitchell, RPR, CRR

20-CV-01878-RBJ    Trial Prep. Conference    02/23/2022    41

1          THE COURT:  Not the body-worn camera, not the didn't

2    write a report, none of that?

3          MR. MACDONALD:  The policy is --

4          THE COURT:  You're just going to put in the physical

5    evidence of what happened.

6          MR. MACDONALD:  The policy is he wasn't required to

7    write a report, Your Honor.  So we're not going to argue that

8    he violated any policy, so there is no *Tanberg* issue.

9          MR. RINGEL:  If they will commit to not question

10   Officer Christian about the report and not have any issue --

11   argument about Officer Christian in the report, then it's a

12   different discussion.  But their position that there was this

13   policy is not correct, and we have contrary evidence, and

14   there is the possibility that if they present all this policy

15   stuff, it has the spillover effect on Officer Christian, which

16   *Tanberg* is designed to prevent, which is not fair to Officer

17   Christian.  It seems to me they can't have it both ways, Your

18   Honor.  They either drop Officer Christian --

19          THE COURT:  I think he said he isn't going to do

20   that.  I think he said he isn't going to suggest, imply, argue

21   that Christian violated any policy at all.

22          MR. RINGEL:  Here's the problem, Your Honor.  They're

23   going to argue about policy violations generally in the trial.

24          THE COURT:  That's their case basically.

25          MR. RINGEL:  In part that's their case.  And so how

Sarah K. Mitchell, RPR, CRR

1   does the jury not understand if they don't see a report from

2   Officer Christian that maybe he didn't write a report and

3   maybe he violated the policy, and then you get the *Tanberg*

4   issue through the backdoor.  It's not good enough for them to

5   just say, okay, we're going to make this general argument,

6   we're going to present all this evidence, we're going to

7   hammer the fact that both the policies were bad and all these

8   people violated the policies, and then we're just going to

9   leave Officer Christian out to dry.  That's not fair.  That's

10  not what *Tanberg* says.

11         THE COURT:  Mr. Macdonald said that there wasn't a

12  policy requiring the writing of a report, and therefore by not

13  writing a report, Christian didn't violate any policy.

14         MR. RINGEL:  Okay.  It's complicated, Your Honor,

15  because there's a dispute about whether that policy as

16  asserted by the plaintiffs exists.  We disagree.  We think in

17  some circumstances there didn't need to be an individual

18  report, but in other circumstances there did under existing

19  Denver Police Department policy regarding uses of force.

20         THE COURT:  Okay.  So what was the applicable policy

21  for Christian at the time?

22         MR. RINGEL:  A strike with a pepper ball if it

23  injured someone probably needed to have an individual report.

24         THE COURT:  Needs to have a --

25         MR. RINGEL:  An individual use of report if someone

20-CV-01878-RBJ     Trial Prep. Conference     02/23/2022    43

1  was injured.  There's a debate in this case because we don't

2  believe the pepper ball actually struck Ms. Epps on this

3  particular instance.  But the command level staff, which

4  doesn't include lieutenants, will testify that they understood

5  that for a specific discrete use of force, particularly one

6  that injured someone, they needed to do a report.

7      THE COURT:  Okay.  So that's going to be in evidence.

8  You're going to put it in evidence.

9      MR. RINGEL:  Right.  And that's the problem with

10  *Tanberg*.  Because you have this individual defendant, and

11  *Tanberg* is crystal clear, and it says you can't -- you can't

12  be putting -- you can't be doing this policy issue.  I don't

13  think it's good enough for them to just commit and say we're

14  not going to do this with this officer when it's in the

15  context of all this other evidence.  I don't see how that's

16  not prejudicial to Officer Christian.

17      MR. MACDONALD:  Your Honor, it sounds to me like

18  Mr. Ringel is going to argue that Officer Christian violated a

19  policy.  I mean, *Tanberg* is not crystal clear on the issue he

20  described.  We are not going to argue that Officer Christian

21  violated a policy, and if they want to argue that he did,

22  *Tanberg* doesn't address that.

23      THE COURT:  They're not going to argue that he

24  violated anything.  They're going to say if you shoot a pepper

25  ball and injure somebody, you're supposed to write a report,

20-CV-01878-RBJ    Trial Prep. Conference    02/23/2022   44

1    but we deny that she shot a pepper ball and injured Ms. Epps,

2    and therefore he had no obligation to write a report.  You

3    don't write a report about something that didn't happen.

4    That's what they're going to say, right?

5              MR. MACDONALD:  Perhaps, Your Honor.

6              THE COURT:  That's what he just said.

7              MR. RINGEL:  But aren't they also going to argue that

8    he violated the use of force policy?

9              MS. WANG:  Judge --

10             THE COURT:  Well, okay, Ms. Wang.  Epps isn't even

11   your client.

12             MS. WANG:  That's true, but I'm very familiar with

13   what all the 30(b)(6) witnesses for the defendants testified

14   to, and it is simply not true what Mr. Ringel is saying about

15   what those witnesses said.  The policy, as testified to by the

16   Rule 30(b)(6) witnesses and a whole slew of lieutenants, is

17   that during a protest officers did not need to document their

18   uses of force with any weapon, 40 millimeter, tear gas, pepper

19   ball, what have you, against the protester at all.

20             THE COURT:  Even if they injured somebody.

21             MS. WANG:  Even if they injured somebody.  What they

22   did was orally tell their lieutenant, Hey, Lieutenant, I shot

23   somebody, and then at the end of the day, or whenever it was

24   -- it's unclear -- that part is unclear -- the lieutenants

25   report that to the command post, and there was supposed to be

20-CV-01878-RBJ     Trial Prep. Conference     02/23/2022     45

1   a single after-action report written at the end of the

2   protests.  So each officer -- it's crystal clear -- each

3   officer did not need to and were not required by policy or

4   practice, decades of policy and practice, to document their

5   uses of force regardless of injury in a report.  That's what

6   the testimony is.

7          THE COURT:  Mr. Ringel, where do you get the argument

8   that if they injured somebody they have to write a report

9   under the policies at that time?

10          MR. RINGEL:  Okay.  So there are two different kinds

11   of reports that we're talking about here.  There's a general

12   use of force report that goes to the general use of less

13   lethal munitions in the broader context, but there's also an

14   individual use of force report, and my understanding is that

15   30(b)(6) witness Mr. Knudsen articulated that it needed to be

16   in one of those two things.  Either conveying to get into the

17   general use of force report or an individual use of force

18   report.

19          THE COURT:  And are you saying he didn't say that?

20          MS. WANG:  That's right, Your Honor.  And I might add

21   that the entire theory of plaintiffs' case, as I think should

22   be clear from both the complaint and the response to summary

23   judgment, is that the officers in this case, Christian,

24   Valentine, any of the officers up to the lieutenants, the

25   commander, all acted consistent with Denver Police training,

Sarah K. Mitchell, RPR, CRR

20-CV-01878-RBJ    Trial Prep. Conference    02/23/2022    46

1    policy, and practice, and it was the training, policies, and

2    practice that were deficient.  That's the Monell claim.  That

3    is our case.

4              THE COURT:  And that applies to Christian too?

5              MR. MACDONALD:  That's right, Your Honor.  And it may

6    be --

7              THE COURT:  What Christian did was consistent with

8    training, custom, and practice and policy and --

9              MR. MACDONALD:  That's right, Your Honor.  And we may

10   be able to solve the *Tanberg* issue if --

11             THE COURT:  I don't think there is a *Tanberg* issue.

12             MR. MACDONALD:  I agree.  I agree with that, Your

13   Honor.  I agree with that.  We do not think there's a *Tanberg*

14   issue.  But if Your Honor wanted to consider -- and I don't

15   think we need to decide this now -- a limiting instruction

16   along the following lines, because we think this would

17   completely take care of even any theoretical arguable *Tanberg*

18   issue, which is to find Officer Christian liable you must find

19   that he violated a constitutional right of Ms. Epps.  It is

20   not enough for Ms. Epps to prove that he violated a policy,

21   regulation, rule, training or practice to succeed on our

22   claims against Mr. Christian.  *Tanberg* didn't say --

23             THE COURT:  That's misleading, because you say he

24   didn't violate any.

25             MR. MACDONALD:  That's right, Your Honor.  We're fine

20-CV-01878-RBJ    Trial Prep. Conference    02/23/2022    47

1    with no limiting instruction, which is why we did not propose

2    --

3            THE COURT:  I wouldn't give that limiting

4    instruction, because that's -- that implies that he did

5    violate some policy, and he didn't.

6            MR. MACDONALD:  That's certainly our view, Your

7    Honor.

8            THE COURT:  I don't see the problem, Mr. Ringel.

9    With the exception of Ms. Epps who, for whatever reason, is

10   still in this case because of allegedly a pepper ball hitting

11   her in the leg and causing a bruise, and why she's still in

12   the case, I guess I don't know and maybe will never know, on

13   an individual claim, but their position is going to be

14   Christian didn't violate any policy at all.  None of these

15   people did.  Now, you're not going to put in evidence that he

16   did violate the policy.

17           MR. RINGEL:  No, we're not, Your Honor.

18           THE COURT:  And they're going to claim that neither

19   he nor anyone else violated any policy, and they're going to

20   say our complaint with Christian is not that he violated a

21   policy, which he didn't, but that it was an excessive use of

22   force for him to shoot Ms. Epps in the leg when all she was

23   doing was walking across the street with a video camera.  So I

24   don't see the *Tanberg* issue.

25           MR. RINGEL:  I understand, Your Honor.  I think it's

Sarah K. Mitchell, RPR, CRR

1   appropriate to wait and see until the evidence comes in --

2          THE COURT:  Well, I agree with that.  I mean, as I

3   said -- well, I said it in my written thing, which you haven't

4   seen yet, but any ruling in limine is subject to change in the

5   context of evidence at trial.  All an in limine ruling is is

6   to give you some idea of the Court's thinking outside the

7   context of trial, and that would apply to your *Tanberg* issue.

8   Okay.  The Office of the Independent Monitor issue, what's

9   that?  I kind of already --

10          MR. RINGEL:  So it's a different issue than what the

11   Court ruled on related to the communications with opposing

12   counsel.  The issue is framed by this Court's decision in

13   *Davies*, and it's addressed in the trial brief and then in the

14   response to the trial brief.  But in short, the issue is in

15   our mind the Office of Independent Monitor report was a report

16   that was designed to make policy recommendations to the Denver

17   Police Department.

18          It was not a report that was -- its principal

19   function was to find out what occurred, and it's -- I would

20   invite the Court to look at the report which was attached as

21   an exhibit to the trial brief, and there's a small fact

22   section of several pages which is what the plaintiffs rely on

23   to suggest it's a factual report, and then at the end there's

24   a bunch of recommendations, and if that report comes in, or if

25   testimony comes in related to that report from Mr. Mitchell,

20-CV-01878-RBJ    Trial Prep. Conference    02/23/2022    49

1    the problem with that is a Rule 407 problem, because what this

2    is about is what should the Denver Police Department do in the

3    future to change the dynamic of how it responds to protests

4    like this one.  That's -- if you look at the report as a

5    whole, that's what it's designed to do.  That's the purpose of

6    the report.

7         THE COURT:  You're assuming they're going to offer

8    the report in evidence.

9         MR. RINGEL:  It's on their list, and Mr. Mitchell is

10   a will-call witness, Your Honor.

11        THE COURT:  Typically an expert report, and this is

12   analogous, wouldn't be admitted.

13        MR. RINGEL:  I don't think it should come in at all,

14   but they put it on their witness list, and so we need to raise

15   the issue so the Court understands what our perspective is,

16   because --

17        THE COURT:  What I think they want, and what seems to

18   me they're entitled to have, is his testimony about facts that

19   he learned through his investigation.  In other words, what he

20   put in his memos.  If it had to do with a recommendation or

21   something policy based, I tried as best I could to protect

22   your privilege objections to that stuff.

23        MR. RINGEL:  And I understand that.

24        THE COURT:  The issue is that these officers were

25   describing things that already had happened as facts, and he

20-CV-01878-RBJ     Trial Prep. Conference     02/23/2022    50

1    was making a record of what they were telling him.  Why can't

2    they put that in evidence?

3            MR. RINGEL:  So I think the Court is misunderstanding

4    what we're arguing about.  I'm not talking about the memos,

5    the OIM memos.  I'm not talking about those.  The Office of

6    Independent Monitor wrote about a 70- or 80-page report that

7    --

8            THE COURT:  Right.  I read about it in the paper.

9            MR. RINGEL:  Correct.  That's the report that has all

10   the recommendations in it.  That's the report and any

11   testimony related to those kind of recommendations, those kind

12   of policy decisions that presents the 407 issue.

13           THE COURT:  I think it probably does too.  I haven't

14   heard the plaintiffs say they're going to try to put that

15   report or those portions of the report in evidence.  I doubt

16   that I would allow that.

17           MR. DOUGLAS:  Good morning, Your Honor.  Matt Douglas

18   on behalf of the Epps plaintiffs, and I can respond to that.

19   I believe the OIM report here is directly analogous to the IRD

20   report that this Court did allow in the *Davies* case with the

21   exception specifically of the portions of the report that had

22   forward-looking recommendations.  And if you look at the

23   report itself, it is largely --

24           THE COURT:  Mr. Douglas, are you thinking that the

25   recommendations for future corrections and different policies

20-CV-01878-RBJ     Trial Prep. Conference     02/23/2022     51

1   and procedures gets into evidence?

2           MR. DOUGLAS:  No, Your Honor.

3           THE COURT:  Well, then what are you arguing about?

4           MR. DOUGLAS:  Because if you look at the first

5   48 pages of the OIM memo, it's introduction and factual

6   summary, which is key facts from the first five days of the

7   demonstrations, the use of force.  Details the various types

8   of munitions and their policies.  Mutual aid, details the law

9   enforcement that provided aid and explores the framework under

10  which they operate.  In those first 48 pages, there are three

11  pages, if you combine them together, of very discrete

12  forward-looking recommendations that could easily be redacted

13  out.  All the rest of the first 48 pages are factual findings

14  about what happened and what the policies were --

15          THE COURT:  Why don't you just get that information

16  from your witness that you want to call, which is

17  Mr. Mitchell?

18          MR. DOUGLAS:  Well, we certainly will have

19  Mr. Mitchell speak to that, but the 48 pages that he wrote of

20  his factual findings are relevant and admissible directly

21  under this Court's ruling in *Davies*.  The only thing that was

22  excluded in *Davies* --

23          THE COURT:  I'm sorry.  I'm not so sure.

24          MR. DOUGLAS:  -- was the forward-looking

25  recommendations.

                    Sarah K. Mitchell, RPR, CRR

20-CV-01878-RBJ    Trial Prep. Conference    02/23/2022    52

1          THE COURT:  *Davies* never went to trial.

2          MR. DOUGLAS:  I'm sorry?

3          THE COURT:  *Davies,* that case never went to trial.  I

4    didn't make any final decision as to what was going to be

5    admitted in that case.  That case got settled.

6          MR. DOUGLAS:  I did not know that, Your Honor.  I was

7    taking guidance from Your Honor's ruling in that case.

8          THE COURT:  We're talking about the shooting in

9    Lakewood case.  That case was settled way before it went to

10   trial.

11         MR. RINGEL:  Yeah, what happened in that case is the

12   Court issued some rulings on summary judgment and on in limine

13   issues.  Then there was an interlocutory appeal, and then the

14   Circuit mediation office settled the case.

15         MR. DOUGLAS:  I understand, Your Honor, but the

16   guidance in *Davies* was the report -- the IRD report would be

17   out entirely if it was solely about -- for the purpose of

18   identifying remedial measures, and you said specifically that

19   the factual findings of the investigation were relevant and

20   admissible, and that's all we're suggesting here.  And I think

21   the report itself is very --

22         THE COURT:  Well, but wait a minute.  You're going to

23   have Mitchell as a witness, yes?

24         MR. DOUGLAS:  Yes.

25         THE COURT:  And you've got all these memos.  They're

20-CV-01878-RBJ      Trial Prep. Conference      02/23/2022    53

 1    not objecting to those.

 2              MR. DOUGLAS:  Right.

 3              THE COURT:  And there's quite a bit of stuff in those

 4    memos that helps you, right?

 5              MR. DOUGLAS:  Agreed, Your Honor, yes.

 6              THE COURT:  But you're greedy.  Not only do you want

 7    Mitchell to be able to talk and to talk about all the things

 8    that are in those memos, which are the grist for the mill what

 9    became his report, you want the report too.  Why?

10              MR. DOUGLAS:  Because, Your Honor, he --

11              THE COURT:  Why wouldn't that be cumulative?  Why

12    wouldn't it be hearsay?

13              MR. DOUGLAS:  Because his report synthesizes not just

14    the interviews, but documents produced by Denver and Aurora to

15    the OIM, the Office of Independent Monitor, that they

16    reviewed, analyzed, the policy documents they looked through.

17    They synthesize it all in factual findings.  Those are

18    relevant.  They're admissible.  They're very important

19    evidence in the case.

20              THE COURT:  That sounds a lot like ipse dixit.

21    They're admissible because they're admissible.  Take the

22    analogy that I just talked about.  An expert witness writes a

23    report.  That happens in every case.  The rules require the

24    expert to write a report for a retained expert, right?

25              MR. DOUGLAS:  Right.

                         Sarah K. Mitchell, RPR, CRR

20-CV-01878-RBJ     Trial Prep. Conference     02/23/2022    54

1           THE COURT:  Right.  They write these reports.  How

2    often have you ever seen a report itself admitted?  Never.

3    Almost never.  Because the report itself is generally

4    considered to be hearsay.  But the author of the report

5    testifies and sings like a songbird and says all and gives all

6    his opinions and what they're based on.  Everything that's in

7    the report basically comes in to evidence before the jury as

8    testimony and gets cross-examined.  The report itself doesn't

9    come in.  Now, why is this report any different than that?

10          MR. DOUGLAS:  Mr. Mitchell is not an expert in this

11   case, and he wrote a report of his factual findings based on

12   his review of the documents produced by Denver in the

13   interviews, and to be able to talk to him at trial about what

14   his findings were and how he wrote --

15          THE COURT:  Didn't say you couldn't do that.  Didn't

16   say you couldn't talk to him about what his findings were.

17   We're talking about the physical document, the report.  That's

18   what Mr. Ringel is objecting to.  The report, not the

19   opinions, not the findings, not the memos.  Just the physical

20   report.  Now, what's your evidence that the physical report

21   itself gets admitted so that the jury can, in its leisure,

22   read through the report in addition to hearing the testimony?

23          MR. DOUGLAS:  Your Honor, there are findings by

24   Mr. Mitchell that are factual findings in his report that are

25   not specifically in the memos, and, like I said, in the

20-CV-01878-RBJ     Trial Prep. Conference     02/23/2022   55

1    48 pages there's a handful of forward-looking recommendations

2    and opinions that can be redacted out, and the jury can

3    explore the details --

4         THE COURT:  Now you're just repeating what you said

5    already.  Can anybody help Mr. Douglas here and answer my

6    question, which is why do you need the actual report in

7    evidence and what authority do you have that it's admissible

8    when you have open authority to question Mr. Mitchell about

9    his findings, about the memos, all that?  What evidence do you

10   have and why do you even need the report on top of that?

11        MR. MACDONALD:  So I think two reasons.

12        THE COURT:  What authority do you have that the

13   report itself is admissible?

14        MR. MACDONALD:  I think it is both a business record,

15   Your Honor, under the hearsay exceptions, and a public record.

16   Both of those I think the report satisfies.  And we think --

17        THE COURT:  Why isn't it cumulative?

18        MR. MACDONALD:  Well, why is the report not

19   cumulative?

20        THE COURT:  Sure.  If you're allowed to ask him

21   questions about his findings and his conclusions, why isn't

22   the report just cumulative?

23        MR. MACDONALD:  Two reasons, Your Honor.  One is the

24   city has told us now I think as of yesterday that they are

25   going to represent Mr. Mitchell.  If Mr. Mitchell has not

20-CV-01878-RBJ     Trial Prep. Conference      02/23/2022    56

1    looked at his report in 18 months since he did it, my guess is

2    -- he's been working for the City of Los Angeles as an

3    independent monitor.  It would not surprise me at all, Your

4    Honor, if Mr. Mitchell remembers very, very little about what

5    he wrote 18 months ago, and for efficiency sake --

6          THE COURT:  That's what the rule about refreshing

7    recollection is for.

8          MR. MACDONALD:  I was thinking about that, Your

9    Honor.  It just could be a very cumbersome exam if we have to

10   ask a question, I don't remember, take a look at this, read a

11   page and a half, or read this paragraph, do it again, do it

12   again, do it again, and so I think --

13         THE COURT:  I don't know if it's cumbersome or not.

14   I don't know if his memory is bad or not.  My guess is the

15   opposite of yours.  My guess is that his memory about this

16   incident is something that he won't forget.  But if he does

17   forget, you can refresh his memory with his report.  You can

18   always do that.

19         MR. MACDONALD:  Understood, Your Honor.

20         THE COURT:  That doesn't mean the report comes into

21   evidence.  Show me your authority that says the report comes

22   into evidence, and tell me why it's any different than what we

23   all have experienced with expert reports.

24         MR. MACDONALD:  Expert reports are not a recording of

25   a regularly conducted activity.  That's why they don't come

                    Sarah K. Mitchell, RPR, CRR

20-CV-01878-RBJ    Trial Prep. Conference    02/23/2022    57

1    in.  His was.  That's why his is a business record and why an

2    expert report is not.

3            THE COURT:  Show me an authority.

4            MR. MACDONALD:  And I don't have that authority at

5    hand, Your Honor.  We will --

6            THE COURT:  Show me an authority that a report

7    doesn't come into evidence.  And Mr. Ringel is making notes.

8    He doesn't have that authority either.  So we'll have to deal

9    with that when the times comes.  I'm skeptical that the report

10   itself comes into evidence.  To me, if nothing else, it's

11   cumulative.  Now, the last issue was number of witnesses, and

12   then I'm going to take a break before we talk about jury

13   instructions.  What's the problem with number of witnesses?

14           MR. WEINER:  Your Honor, as the Court duly noted,

15   we're less than two weeks from trial.

16           THE COURT:  This is Mr. Weiner, I know, but Sarah may

17   not.

18           MR. WEINER:  Robert Weiner appearing on behalf of the

19   defendants, Your Honor.  There's some 70 witnesses still on

20   the plaintiffs' may-call or will-call list, and it's difficult

21   for us to prepare -- and I know we've been talking about some

22   of these issues with depositions and use of depositions.  But

23   less than two weeks out, and this good-faith list is 70

24   witnesses.  The case is set for trial I think for 12 to

25   15 days.  It's been set for a year and a half.  Quite frankly,

20-CV-01878-RBJ    Trial Prep. Conference    02/23/2022   58

1    I don't see how in the world we can get through -- that's just

2    on their case -- 70 witnesses in that length of time.

3         THE COURT:  Well, I'll help you out with that.  I'm

4    starting a criminal three-week antitrust trial on March 28th.

5    We're going to be done by March 28th, or we're going to

6    mistry.

7         MR. RINGEL:  We're asking for a better good-faith

8    list than this 70, because we need --

9         THE COURT:  70 is ridiculous.  How many witnesses are

10   you actually going to call?

11        MS. WANG:  Judge, we had a conference with them

12   yesterday where we thought that we had reached some sort of

13   agreement that we were going to, you know, talk about the

14   witnesses after issues concerning deposition designations and

15   so forth were --

16        THE COURT:  I can't hear you.  I'm going to have to

17   ask you to go to the lectern and speak.  You've got a very

18   quiet voice.

19        MS. WANG:  I don't usually get that.  Judge, we gave

20   them a will-call list of 20 people, and those are expected

21   people, the plaintiffs, at the time of yesterday anyway, the

22   two remaining individual defendants, but, you know, that's

23   sort of a moving target given Your Honor's ruling on summary

24   judgment on one of the Denver officers.  We also told them

25   yesterday that we would call anybody that's on their will-call

20-CV-01878-RBJ    Trial Prep. Conference    02/23/2022    59

1   list, so that's an additional five or six people off of our

2   may-call list onto the will-call list.  They seemed completely

3   satisfied with that.  We gave them a list that has -- so, you

4   know, we have probably 25 will-calls, depending -- you know,

5   again, that number changes depending on what's on their

6   will-call list, because I will call whoever they put on their

7   will-call list.

8           THE COURT:  Why would you do that?

9           MS. WANG:  I'm sorry?

10          THE COURT:  Why would you call anybody they put on

11  their will-call list?

12          MS. WANG:  The will-calls that we intend to call are

13  lieutenants and so forth, and so they're people who have

14  knowledge of the facts on the ground at the time.  There are

15  some people on their will-call list who we may not call.  For

16  instance, they've got a couple people they've designated

17  recently to talk about officer injuries and property damage.

18  We're not probably going to call them.  They're going to call

19  them.  But this list is a list of people that we believe we

20  will finish in the time that we have allotted.  So I'm not

21  sure what the confusion is about, because we had a conference

22  yesterday where we thought we had reached some sort of

23  compromise about the witnesses.

24          THE COURT:  Maybe Mr. Weiner wasn't there.

25          MS. WANG:  He wasn't.

                    Sarah K. Mitchell, RPR, CRR

20-CV-01878-RBJ     Trial Prep. Conference     02/23/2022    60

1          MS. JORDAN:  He wasn't, Your Honor.  Lindsay Jordan

2    for the City and County of Denver.  I can speak to it because

3    I was on that conference, and hopefully you can hear me.

4    Ms. Wang is correct.  We did have a conference working on

5    narrowing it down knowing that some rulings you had today

6    would probably determine on where witnesses would fall on the

7    may-call or will-call lists.  We were also told, though, that

8    if we -- if the designations weren't -- if we continued to

9    object to the designations, that the trial would then turn

10   into a seven or eight-week affair, and so I just wanted to

11   bring that to the Court's attention as well, because we are

12   working in good faith to try to limit this, but it just

13   appears that we still -- and it's even fair to say that we

14   don't know exactly who we'll be calling on our may-call list

15   as well because we still don't quite know the scope of where

16   everything is going to go.

17          THE COURT:  What you're basically telling me is you

18   folks aren't prepared for trial.  You don't know who you're

19   going to call, and you're not willing to exercise your

20   judgment to tell the other side exactly who you're going to

21   call.  That's what you're telling me.  You've got 20 people --

22   that's your list -- that's who you're going to call, plus

23   somebody on their will-call list.  That's it.  How many people

24   do you have on your will-call list?  Maybe none because

25   they'll be called by the plaintiff.

                          Sarah K. Mitchell, RPR, CRR

20-CV-01878-RBJ   Trial Prep. Conference   02/23/2022   61

1         MS. JORDAN:  In addition to what will be called by

2    them, I think just a few more.  I don't know how many we have

3    on our will-call list.  I think it's like 11.

4         THE COURT:  But they're going to call -- let's talk

5    about the 11.  We'll find out which ones they're going to

6    call.  Name them off one by one.

7         MS. JORDAN:  Off the top of my head -- I don't have

8    it in front of me -- Division Chief Thomas.

9         THE COURT:  Stop.  You're going to call Thomas?

10        MS. WANG:  Yes, Your Honor.

11        THE COURT:  That's in addition to your 20.  How many

12   plaintiffs do you have, by the way?

13        MS. WANG:  We have 12 total.

14        THE COURT:  Each of them is going to testify?

15        MS. WANG:  Correct.

16        THE COURT:  But hopefully pretty briefly.  They don't

17   have anything to say about your main issue, which is the

18   policies of Denver.

19        MS. WANG:  That's correct.  And some of them will be

20   a little bit longer than others, but --

21        THE COURT:  All they can say is, what, my name is

22   Jones.  I went out to protest because it was important to me

23   to protest what was going on.  I was out there.  I didn't kick

24   any cans or throw any rocks or burn down any buildings, and I

25   got hit with a paint ball, and this is what my injury is.

Sarah K. Mitchell, RPR, CRR

20-CV-01878-RBJ     Trial Prep. Conference      02/23/2022    62

1    What else are they going to say?

2            MS. WANG:  We don't disagree, Your Honor.

3            THE COURT:  So there are 12 of those.  Let's go

4    through your other eight.  Who are the other eight?

5            MS. WANG:  12 plaintiffs.  There's two experts for

6    the plaintiff, Edward McGuire and Norman Stamper.

7            THE COURT:  Two experts.  All right?

8            MS. WANG:  There's Nicholas Mitchell.

9            THE COURT:  What are the names of the experts?

10           MS. WANG:  Edward McGuire and Norman Stamper.

11           THE COURT:  Stamper?

12           MS. WANG:  Yes.

13           THE COURT:  Okay.  Then, of course, there's Mitchell.

14           MS. WANG:  Actually, and we can take a couple --

15   since the judge ruled -- since Your Honor ruled on the Jeffco

16   defendants, we actually probably are not going to call them,

17   so those were on our will-call, but I think they're now just

18   on may-call.

19           THE COURT:  I want your will-calls.  Your may-calls,

20   as far as I'm concerned, aren't going to be called.

21           MS. WANG:  Okay.  So Patrick Phelan.

22           THE COURT:  Makes sense.

23           MS. WANG:  And their will-call list, which as of

24   yesterday --

25           THE COURT:  Now, just -- don't get into theirs yet.

20-CV-01878-RBJ   Trial Prep. Conference   02/23/2022   63

 1   Just tell me yours.  We'll get to theirs.

 2        MS. WANG:  Then as far as Christian and Valentine,

 3   both of them.

 4        THE COURT:  Christian and Valentine?

 5        MS. WANG:  Yes, Judge.

 6        THE COURT:  Okay.  12 plus two experts, 14.  Mitchell

 7   is 15.  Phelan, Christian, and Valentine, now we're up to 18.

 8   Is that it?

 9        MS. WANG:  Then there's the people on their list we

10   would put on our will-call as well.

11        THE COURT:  Let's go to their list.

12        MS. JORDAN:  And I was incorrect, Your Honor.  We

13   have 13 on our will-call list.  I found my exhibit (sic) list.

14        THE COURT:  So you're a bigger offender than they are

15   practically.  Who's your will-call?  You're going to call

16   these people if they don't.

17        MS. JORDAN:  Well, Phelan was one that they just

18   said, Commander Phelan.

19        THE COURT:  So we can strike him off because they're

20   going to call him.

21        MS. JORDAN:  Because they're going to call him.

22   Division Chief Ron Thomas.

23        THE COURT:  Thomas.  Okay.

24        MS. JORDAN:  Commander Michael O'Donnell.

25        THE COURT:  Okay.

                    Sarah K. Mitchell, RPR, CRR

20-CV-01878-RBJ    Trial Prep. Conference    02/23/2022    64

1          MS. JORDAN:  Sergeant Knutson.

2          THE COURT:  Sergeant?

3          MS. JORDAN:  Knutson, K-n-u-s-t-o-n (sic).

4          THE COURT:  Okay.

5          MS. JORDAN:  Technician Grothe, G-r-o-t-h-e.

6          THE COURT:  Okay.

7          MS. JORDAN:  We had Valentine and Christian, but they

8    said them, so I'm skipping over.  Lieutenant Pine, P-i-n-e.

9          THE COURT:  Okay.

10          MS. JORDAN:  Lieutenant Porter, Lieutenant Canino,

11   C-a-n-i-n-o.

12          THE COURT:  All right.

13          MS. JORDAN:  Sergeant Parsons, Matt Woods.

14          THE COURT:  Is he a cop?

15          MS. JORDAN:  He is a city employee.  He doesn't have

16   a title.

17          THE COURT:  He's a what employee?

18          MS. JORDAN:  He's a city employee.  He might have a

19   title.  I don't know it.  I know him as Mr. Matt Woods.

20          THE COURT:  Okay.

21          MS. JORDAN:  And then we have Officer Cunningham.

22          THE COURT:  Cunningham.

23          MS. JORDAN:  And the one caveat I would tell this

24   Court is that, as Mr. Ringel mentioned earlier, if they're

25   going to bring their claims against the Aurora officers or the

20-CV-01878-RBJ    Trial Prep. Conference    02/23/2022   65

1   incident that had the Jeffco officer, that -- as Mr. Ringel

2   presented to the Court, we may need to call someone from

3   Jeffco or someone from Aurora.  So those are not on our

4   will-call list right now, but as that gets figured out, we can

5   figure out who that is and tell them.

6          THE COURT:  All right.

7          MS. WANG:  And, Judge, we have a few more.  I'm

8   sorry.  I just conferred with my co-counsel here.

9          THE COURT:  You know that at some point the jury will

10  get very tired of having more witnesses.

11         MS. WANG:  Yes.

12         THE COURT:  It's going to happen earlier than you

13  think.  Who are your few more?

14         MS. WANG:  Silvia Sich.

15         THE COURT:  Who?

16         MS. WANG:  Silvia Sich, S-i-c-h.  Commander Sanchez,

17  Lieutenant Chavez, and Lieutenant Williams.

18         THE COURT:  Plaintiff has 22.

19         MS. JORDAN:  I just want a clarification on

20  Lieutenant Williams.  Is that Denver Police Department J.D.

21  Williams?

22         MS. WANG:  Yes.  J.D. Williams.

23         MS. JORDAN:  I just knew that there was a Jeffco

24  Williams, so I wanted to make sure.

25         THE COURT:  And so on the plaintiffs' list is 22, and

Sarah K. Mitchell, RPR, CRR

20-CV-01878-RBJ    Trial Prep. Conference    02/23/2022    66

1    on the defendants' list is 12, and that includes a Jeffco

2    person and Aurora person.  So if you call all these people,

3    which seems like a lot of witnesses to me, you're still only

4    up to 34 between.  That's manageable.  It's too many, but it's

5    manageable.

6         MS. WANG:  Judge, you know, with respect to the

7    Rule 30(b)(6) witnesses, we are interested in trying to make

8    an attempt -- another attempt -- a second attempt to reach

9    some sort of stipulations regarding that testimony, because

10   five of the witnesses on the list -- Knutson, Grothe, Thomas,

11   O'Donnell, although some of these people are mixed fact and

12   Rule 30(b)(6) -- but the point is there are a number of

13   witnesses who perhaps we can reach some sort of agreement as

14   to stipulations.  Maybe we can't.  But if we can do that, then

15   that would reduce the number of witnesses.

16        THE COURT:  Okay.  But even so, you've got 34 now.

17        Mr. Weiner.

18        MR. WEINER:  We're at 34.  I'd like to cut it down to

19   33, because Ms. Sich, my understanding, was not previously

20   disclosed, and I'm not sure how she ends up on the list then.

21        MS. WANG:  Well, Judge, Silvia Sich is one of the

22   authors of the -- not authors -- is one of the persons who was

23   interviewed by the OIM in the OIM interview memos, and as you

24   know, we did not receive the unredacted memos until Your Honor

25   ruled on it in January, and so we had no idea of knowing what

20-CV-01878-RBJ     Trial Prep. Conference     02/23/2022     67

1   was under those redactions and that they would be highly

2   relevant to our Monell claims until we saw the unredacted

3   memos.  Of course, the defendants knew about her all along

4   because she is a DPD captain, and the attorneys for the other

5   side knew about her all along because they were sitting there

6   redacting this stuff back in the fall of last year.  And so

7   she's not a surprise, and the relevance of her testimony is

8   important to our Monell claim, and it's not something we would

9   have known until we saw the less redacted memos.

10        THE COURT:  You had a redacted memo of her interview

11   before.  At some point you got that, right?

12        MS. WANG:  We got two versions.  The first version we

13   got sometime in -- I want to say August or so of last year was

14   highly, highly redacted.  The second version of her memo we

15   got on October 1st, which was three days before the close of

16   fact discovery.  But even that contained serious redactions of

17   major paragraphs of her memo which contained information about

18   what was going on in the command post and the training and

19   leadership failures, which we really did not see until we saw

20   the less redacted memos.  And, you know, the Rule 37 issue is

21   whether or not they --

22        THE COURT:  Why didn't you disclose her then?

23        MS. WANG:  We did disclose her on the trial witness

24   list we gave to them weeks ago after we got the Court's order

25   on the in-camera review of the OIM memos.

Sarah K. Mitchell, RPR, CRR

20-CV-01878-RBJ     Trial Prep. Conference     02/23/2022     68

1          THE COURT:  Then what are we talking about,

2    Mr. Weiner?  She says they did disclose her on the list.

3          MS. JORDAN:  Your Honor, I guess it's more of a topic

4    of it wasn't disclosed in discovery like in a 26(a) not on the

5    list.

6          THE COURT:  Well, you brought that on yourselves by

7    redacting things that the Court found you probably shouldn't

8    have redacted.  So there are 34.  Now, what's the problem with

9    the number of witnesses?  It's too many from an advocacy point

10   of view, in my opinion.

11         MR. RINGEL:  There isn't -- the problem was that

12   there were 50 may-calls, and if the Court has now solved that,

13   and we're not going to have any of the may-calls, and we don't

14   have to prepare for any of the witnesses other than the ones

15   that we've now listed in court, that's fine, Your Honor.

16         THE COURT:  That's basically what I'm saying.  It's

17   time for you guys to know who you're going to call.  To list a

18   whole long list of may-calls is like listing 500 documents and

19   saying we're going to decide at trial which 10 we're going to

20   put in.  No, you don't.  We're past that point.  If someone

21   isn't on this list of 34, there would have to be a very, very

22   good reason why something happened during trial that makes

23   that person important.

24         All right.  Let's take our break now for at least 10

25   minutes, say until 11 o'clock, and then we can come back and

20-CV-01878-RBJ    Trial Prep. Conference    02/23/2022    69

1    talk about jury instructions.

2            THE COURTROOM DEPUTY:  All rise.  Court is in recess.

3        (Break was taken from 10:49 a.m. to 11:05 a.m.)

4            THE COURT:  So during the break I took a peek at the

5    online Denver Post and saw that you folks settled two more of

6    these cases, right?

7            MS. JORDAN:  Well, one was with this group of

8    plaintiffs, Your Honor.  One was with a plaintiff outside of

9    this case.

10           THE COURT:  I see.  Is that going to be happening

11   over the next two weeks until we get down to none?

12           MR. RINGEL:  No.  The only other settlement that's

13   going to be considered by counsel is the one involving

14   Mr. Duran.

15           THE COURT:  Mr. who?

16           MR. RINGEL:  Duran, D-u-r-a-n.  And that's -- that's

17   likely to go through, and he's out of the jury instructions

18   and things like that.

19           THE COURT:  All right.  So let's take a look --

20           MR. MACDONALD:  Your Honor, before we turn to jury

21   instructions, can I address one issue?  When we went back and

22   looked at our witnesses, we have three that we would like to

23   remove from the may-call to the will-call, and that's Hans

24   Levens.  He was one of the 30(b)(6) witnesses that we've

25   already designated.

                        Sarah K. Mitchell, RPR, CRR

20-CV-01878-RBJ    Trial Prep. Conference    02/23/2022    70

1             THE COURT:  Who?

2             MR. MACDONALD:  Hans Levens, L-e-v-e-n-s.  John

3    Coppedge.  He's also a Denver officer.  And Lieutenant Kevin

4    Carroll.

5             THE COURT:  Kevin whom?

6             MR. MACDONALD:  Carroll, C-a-r-r-o-l-l, Your Honor.

7             THE COURT:  So every time I think we've got you

8    pinned down, then you come up with more.  You're going to

9    actually call now 37 witnesses.

10            MR. MACDONALD:  I don't think we will call 37

11   witnesses in our case, Your Honor.  Obviously we have the --

12            THE COURT:  Well, you've got now 25 will-calls.

13   You're going to call them.  Don't tell me they're will-calls

14   and then not call them.

15            MR. MACDONALD:  I believe so, Your Honor.  We

16   obviously have the deposition designations of the 30(b)(6)s,

17   so that would -- if we do that, that takes five off.  Five of

18   those people we have identified are people we have sent them

19   designations.  So that's -- we will do our best to slim that

20   down where we can, Your Honor.

21            THE COURT:  Whether it's deposition designations or

22   not, you're going to call 25 witnesses.

23            MR. MACDONALD:  Yes, Your Honor.  That's what we

24   believe is necessary.

25            THE COURT:  And they're counting on you.  They're

20-CV-01878-RBJ     Trial Prep. Conference     02/23/2022     71

1    going to take their time to prepare for that as if you're

2    actually going to call those people.  So you're telling me you

3    are.  Not 24, not 26, but 25.

4              MR. MACDONALD:  Yes, Your Honor.

5              THE COURT:  And you're telling me you've got 12

6    others.

7              MR. RINGEL:  One other is a may-call because we don't

8    know yet, but I just wanted to raise it for the Court.  That's

9    our expert Mr. Ijames.  I don't know whether we're going to

10   call him or not.

11             THE COURT:  Mr. Ijames.

12             MR. RINGEL:  Yes.  Mr. Steve Ijames.  I don't know

13   whether we're going to call him or not.  It depends on how the

14   evidence comes in, Your Honor.

15             THE COURT:  Well, we're getting down to the

16   will-calls.  So yours is 13 now.  38 witnesses.

17             All right.  Now, jury instructions.

18             MR. ANDERSON:  Thank you, Your Honor.  This is Reeves

19   Anderson for the Epps plaintiffs.  I just didn't want to have

20   my back to Your Honor and still be able to speak into the

21   microphone.  Is that okay?  Thank you.  Thank you for taking

22   the time to go so quickly through the proposed jury

23   instructions.  As you saw, the plaintiffs provided comments

24   and objections to streamline that process, but I wanted to

25   take the opportunity to respond to some of Your Honor's

20-CV-01878-RBJ    Trial Prep. Conference    02/23/2022    72

 1   specific questions or comments on instructions, particularly

 2   where there are remaining legal disputes between the parties,

 3   and if we could get either rulings or advice from Your Honor

 4   on that, I think we can get very close to a final set today,

 5   if not final.

 6          So beginning, Your Honor, with the first instruction,

 7   we will obviously need to make some minor conforming edits.

 8   There are two defendants still listed here.  We would remove

 9   the Jefferson County paragraph --

10          THE COURT:  You don't have to talk about Instruction

11   No. 1.  I trust you guys to be able to take care of that.

12   Let's talk about the ones that are disputed.

13          MR. ANDERSON:  Thank you, Your Honor.  You had a

14   question on Instruction No. 9.

15          THE COURT:  Well, actually I do have a question on

16   number one, and that is why do we have the curfew stuff in

17   there?

18          MS. HOFFMAN:  Good morning, Your Honor.  Kate Hoffman

19   for the Denver defendants.  We have seen your note, and we'll

20   omit that language in the revised instructions.

21          THE COURT:  All right.  So let's move forward then to

22   where, what page?

23          MR. ANDERSON:  Instruction No. 9, Your Honor, was

24   your next comment.

25          THE COURT:  What page?

                      Sarah K. Mitchell, RPR, CRR

1          MR. ANDERSON:  It was on page 12.  You asked about

2    the omission for the burden of proof for affirmative defenses.

3    We discussed this with the defendants, and they do not contend

4    that mitigation is an absolute defense, and therefore we

5    thought it would be best for the jury to only hear about the

6    burden for the defense after the end of the liability

7    instructions if Your Honor chooses to give a mitigation

8    instruction at all.

9          THE COURT:  Well, what's the deal on mitigation,

10   Ms. Hoffman?

11         MS. HOFFMAN:  Mr. Reeves is correct.  We did agree

12   that failure to mitigate wouldn't be an absolute defense.

13   That it would just be with respect to any damages calculation.

14   Jumping ahead, we do believe that a failure to mitigate

15   instruction is appropriate here.  It's our understanding that

16   the majority of plaintiffs either didn't -- failed to mitigate

17   their damages, notwithstanding injuries, either by failing to

18   seek medical care or failing to seek psychological treatment

19   when they testified to symptoms of having some forms of

20   emotional distress.

21         So we do think it's appropriate.  We did note your

22   comment.  I can think of one particular example as I stand

23   here today.  Elizabeth Epps I believe suffered damages to her

24   eyes, indicated that her contacts were like stuck to her eyes

25   for a period of time, and yet never sought any medical

20-CV-01878-RBJ    Trial Prep. Conference    02/23/2022    74

1   treatment for that.  So that's just one example for the Court.

2   But we did note that you'd like us to incorporate the specific

3   names of plaintiffs into that instruction.  We think that that

4   makes sense, and we can do that.

5           THE COURT:  Okay.  So let me understand.  You're the

6   instruction person.

7           MS. HOFFMAN:  Yes.

8           THE COURT:  But Ringel or somebody is going to be the

9   closing argument person, right?

10          MS. JORDAN:  That would be me, Your Honor.

11          THE COURT:  That's you.  So you're the one that's

12  getting the gift of getting up in front of the jury and saying

13  to these people, Don't give them the money they want because

14  they didn't go to the doctor.  Bad on them.  You want to do

15  that?

16          MS. JORDAN:  Your Honor, it depends on how the

17  evidence comes in.  If it seemed that it would be appropriate,

18  that if there's going to be someone testifying, and I don't

19  have a specific example off the top of my head, but someone

20  that's going to testify that I'm now almost two years out, and

21  I'm still having nightmares, I'm still unable -- I have panic

22  attacks, or something to that extent, and they never sought

23  any -- anything more than garden-variety emotional distress,

24  and they didn't seek any sort of counseling or anything to

25  help mitigate that, then, yes, that would be an argument I

1    would like to make.

2         THE COURT:  Okay.  Well, then it seems to me that

3    regardless of how you label the mitigation defense, it's an

4    affirmative defense the defendant has the burden to prove.

5    Why wouldn't you want that here?

6         MR. ANDERSON:  We're fine to include it, Your Honor.

7    We just don't want the jury to be confused that it's a defense

8    to liability, which it is not.

9         THE COURT:  The jury isn't going to be confused by

10   anything.  This jury is going to be smarter than anybody else

11   in the room, including me.  They aren't going to get confused.

12   Collectively they're going to be super smart.

13        MR. ANDERSON:  Your Honor, we understand, and the

14   instruction that both sides have proposed on failure to

15   mitigate does, in fact, allocate the burden, as it should, to

16   the defense, and so we think that is the only place where that

17   arises, and so rather than include it 20 pages earlier, we

18   wanted to introduce the concept of their burden in the only

19   place that it arises in this case.

20        THE COURT:  Well, the Court wants you to introduce it

21   right here, so please put in there with respect to the

22   defendants' failure to mitigate damages defense, the defendant

23   has the burden of proving the defense by a preponderance of

24   the evidence.

25        MR. ANDERSON:  We will add that, Your Honor.

                    Sarah K. Mitchell, RPR, CRR

20-CV-01878-RBJ    Trial Prep. Conference    02/23/2022    76

1              MS. HOFFMAN:  Judge, I believe that that language is

2      previously in there, and I think plaintiffs' only issue was

3      the location with it being given in this particular early

4      instruction, so I think we should be able to reinsert the

5      language that was previously there.

6              THE COURT:  Okay.

7              MR. ANDERSON:  The next two instructions, Numbers 10

8      and 11 on pages 13 and 14, I think given Your Honor's recent

9      rulings, this can particularly be streamlined.  As it stands

10     right now, there are only two individual defendants named.

11     You indicated there may only be one after your final summary

12     judgment ruling.  If that is the case, there's no need to

13     frame this in the abstract.  We can talk about the specific

14     plaintiff, the specific defendant, and the specific conduct.

15     And so I think we can streamline this instruction and tailor

16     it to the specific conduct, because that does not apply to the

17     general First Amendment and excessive force claims.  This is

18     just individual liability instructions.

19             THE COURT:  So let me ask you folks.  You've told me

20     that the one individual is Epps, and the one claim she's got

21     is that she got struck by a pepper ball from Christian -- or

22     the one -- the one individual plaintiff that has an individual

23     claim left is Epps, and the individual defendant is Christian,

24     and the claim is that Christian hit her in the leg with a

25     pepper ball, and she was bruised.  Why aren't you folks

20-CV-01878-RBJ    Trial Prep. Conference    02/23/2022    77

1   getting that taken care of and getting her out of this case on

2   the individual basis so that we just have a Monell case?

3   Epps' damages from being hit by a paint ball in the leg,

4   especially if she got hit two or three more times later, have

5   got to be minor.  What's the deal here?

6          MR. ANDERSON:  Your Honor, we received your

7   indicative ruling last night.  We haven't had a chance to

8   discuss how that frames the individual plaintiff's case.

9   Prior to your summary judgment ruling yesterday, there were

10  four individual defendants named, as well as two plaintiffs.

11  Ms. Epps' second individual defendant claim was that she was

12  shot in the face.  And so as the case stands now through the

13  briefing, if Your Honor is intending to grant summary judgment

14  for Officer Valentine, then there's just the one individual

15  plaintiff, one individual claim, and we think that can be

16  streamlined and be made very efficient in these instructions.

17         THE COURT:  Well, you streamlined them in the

18  extreme.  You dropped them all.  You decided for whatever

19  reasons that all these individual defendants, you weren't

20  going to pursue them except this one.  Now -- and this one has

21  got a comparatively minor injury, and whether she even got

22  struck by Christian's pepper ball is disputed.  So what do we

23  have here?  Is Ms. Epps particularly stubborn, or is the

24  defendant unwilling to even contemplate some sort of a

25  resolution of her claim, or what's going on?

                    Sarah K. Mitchell, RPR, CRR

1        MR. MACDONALD:  I think the latter, Your Honor.  The

2    defendants have not proposed anything with respect to that.

3    The other defendants, the individual defendants that were

4    settled out, none of those were people -- trigger people, for

5    lack of a better word.  They were supervisory defendants.  The

6    other officers were claims that Ms. Wang had brought against

7    supervisory defendants, individuals.

8        THE COURT:  Right.

9        MR. MACDONALD:  And those were the ones that were

10    settled out, Your Honor.

11        THE COURT:  Well, just think about the practical

12    issue here.  I mean, throughout the whole trial you're going

13    to have to say the defendants Denver and Christian.  You're

14    going to have to have separate instructions for Christian.  I

15    just read about these two settlements in the paper.  You're

16    talking there, I assume, about people that were fairly badly

17    injured.  You're talking about six-figure settlements

18    according to the paper.  This isn't a six-figure settlement,

19    folks.  This isn't a five-figure settlement, I don't think

20    either.  This is somebody who got hit with a pepper ball in

21    the leg like I get hit on the back with a racquetball.

22        MR. RINGEL:  Your Honor, I think to be fair to

23    counsel, Ms. Epps has other incidents that she's pursuing in

24    this case that are not related to Officer Christian or any

25    individual defendant.  So it's more complicated than to just

20-CV-01878-RBJ    Trial Prep. Conference    02/23/2022    79

 1   settle this one incident.  She -- there's allegations of five

 2   or six different events related to Ms. Epps.

 3           THE COURT:  But that's against Denver.  Denver's

 4   already in it.

 5           MR. RINGEL:  That's correct, Your Honor.  That's

 6   correct.

 7           THE COURT:  Those aren't going away.  Denver is in

 8   the case.

 9           MR. RINGEL:  We have not had any discussions on the

10   issue of settlement of just this one narrow issue involving

11   Officer Christian.  No side talked about that.  The settlement

12   discussions were broader than that, just so that the Court

13   understands.

14           THE COURT:  Understood.  All right.

15           MR. ANDERSON:  Thank you, Your Honor.  The next

16   substantive comment related to Instruction 12 on the First

17   Amendment.  That's on page 16.  We agree with Your Honor's

18   striking of the word solely --

19           THE COURT:  Well, wait a minute.  There was one on

20   page 14.  Oh, that's a comment on --

21           MS. HOFFMAN:  I think there's a comment regarding

22   Instruction Number 11, and that's directed toward the

23   defendants.  And it appears to be the Court -- the Court

24   asking a question with respect to the second sentence in

25   paragraph number two, which is italicized and bracketed and

20-CV-01878-RBJ    Trial Prep. Conference    02/23/2022    80

1    reads, An individual defendant can only be held liable for his

2    or her own actions or omissions.  I believe the Court was

3    inquiring whether or not we can let this go in light of the

4    Court's rulings on the MSJ, and we'd be willing to let this go

5    at this time.

6         THE COURT:  All right.  So that takes us over to

7    page 16, as you said.

8         MR. ANDERSON:  Yes, Your Honor.  There's a question

9    about whether the standard is substantial or motivating factor

10   or substantially motivating factor.  All of the standard jury

11   instructions, including the Ninth Circuit, use the phrase

12   substantial or motivating factor.  The genesis of that test

13   comes from a 1977 Supreme Court case called *Mt. Healthy*.  It

14   originally arrives in the context of government employee

15   retaliation cases.  The Supreme Court eventually adopted that

16   phrase substantial or motivating factor in the *Nieves* case as

17   applied to this context in -- I believe in 2019.  It's cited

18   in the comments to our instructions here.  We believe that the

19   appropriate language and the test that has been used in a

20   number of different contexts is the substantial or motivating

21   factor.

22        THE COURT:  What does it mean?

23        MR. ANDERSON:  We understand your Court's question

24   that substantial or motivating may be getting at very similar

25   activity, particularly when there's a mixed motive.  If the

1    defense is one of the reasons I took this retaliatory action

2    was impermissible and another reason may have been

3    permissible, that is sufficient.  The reason we take issue

4    with the phrase substantially motivated is that it creates a

5    higher burden.  You have to be particularly motivated under

6    the phrase that the defendants have proposed.  That is not --

7    that is not what Your Honor instructed in a previous case.

8    It's not what the Third Circuit pattern instructions require.

9    It's not what the Ninth Circuit pattern instructions require,

10   and it's not what the Eleventh Circuit pattern instructions

11   require.

12          THE COURT:  Well, I care about the Tenth Circuit.

13          MR. ANDERSON:  The Tenth Circuit doesn't have pattern

14   instructions, and the *Nieves* case would control any prior

15   Tenth Circuit case to the contrary.  And the *Nieves* case,

16   *Nieves vs. Bartlett*, that's a 2019 Supreme Court case, to

17   prove retaliatory arrest, quote, the plaintiff must show that

18   the retaliation was a substantial or motivating factor behind

19   the arrest.

20          THE COURT:  So you're saying that what the Tenth

21   Circuit did in *Worrell* was either wrong at the time or at

22   least is no longer good law.

23          MR. ANDERSON:  The *Worrell* case from 2000 actually

24   cites both standards, Your Honor.  On page 1206 it says the

25   employee must show that the speech was, quote, a substantial

1  or motivating factor.  Later in the case they use the phrase

2  substantially motivating.  At best that's a wash, and to the

3  extent there is any confusion, the Supreme Court cleared it up

4  in 2019.

5        THE COURT:  Okay.  All right.  Ms. Hoffman, he's made

6  a pretty powerful argument there.

7        MS. HOFFMAN:  It's the defendants' position -- I'm

8  not sure why we're talking about other circuits when *Worrell*

9  *v. Henry* is the leading Tenth Circuit case here.  It's very

10  clear why the Tenth Circuit in *Worrell v. Henry* both used

11  substantial or motivating and later on in the case

12  substantially motivating, and that's because in the first

13  instance the Court was evaluating a First Amendment

14  retaliation claim in the employment context, which has a

15  different standard, and later on the Court decided that not to

16  -- not to use substantial or motivating and instead follow the

17  Eighth Circuit and use a different standard in the

18  nonemployment context, which is obviously what we have here.

19        THE COURT:  Did the Court say that?

20        MS. HOFFMAN:  Yes.

21        THE COURT:  That we've decided that in a

22  nonemployment context instead of using substantial or

23  motivating we're going to say substantially motivating?

24        MS. HOFFMAN:  I believe -- I mean, they didn't say it

25  in the exact words that I chose, but they follow the Eighth

1   Circuit and indicate that in a nonemployment context that

2   they're making a decision to not follow *Pickering*, and instead

3   they announce that the language to be applied in the

4   nonemployment context is that the defendants' adverse action

5   was substantially motivated as a response to the plaintiff's

6   exercise of constitutionally protected conduct.  It's also our

7   position that the Supreme Court cited -- case cited by

8   plaintiffs' *Nieves v. Bartlett* is not applicable.  That deals

9   with retaliatory arrest.  The case is focused on probable

10  cause.  None of that is applicable here.  We're not dealing

11  with any arrests.

12         MR. ANDERSON:  Excuse me, Your Honor, it may be more

13  applicable.  We're not talking about employment.  *Worrell* is

14  an employment case.  An arrest case is much more analogous to

15  the circumstances we have here, which is a private citizen

16  interacting with a police officer, and the question is whether

17  the retaliatory conduct, whether it was arrest or being shot

18  with a weapon, is a substantial or motivating factor in that

19  retaliatory action.

20         THE COURT:  Why doesn't your argument support what

21  she just said?  She just said substantial or motivating is in

22  the employment context, and otherwise it's substantially

23  motivating, and you just said the same thing.

24         MR. ANDERSON:  Your Honor, I think that's backwards.

25  The substantial or motivating is not in the employment

1    context.  *Nieves* is an arrest case involving retaliatory

2    conduct by the police.  That test from the Supreme Court in

3    2019 sets forth the disjunctive test that every pattern

4    instruction uses in this context.

5          THE COURT:  Maybe I misunderstood Ms. Hoffman.

6          MS. HOFFMAN:  No, you didn't.  You got it right.  I

7    think if the Court takes a brief look at *Worrell v. Henry*, it

8    will be very clear that substantially misleading -- or

9    substantially motivated is the standard in the nonemployment

10    context, and I can get you a page cite for that too.

11          THE COURT:  Well, it's probably the one I gave you,

12    1212.  All right, legal beagles, what's the answer?

13          THE LAW CLERK:  Unfortunately, our computer is not

14    functioning at this time, so we've been unable to follow

15    along.

16          MS. HOFFMAN:  The page cite is 1212.

17          THE COURT:  What's your response to that?  She says

18    the Tenth Circuit in *Worrell* said in the nonemployment context

19    the standard is substantially motivated.

20          MR. ANDERSON:  Again, I would say that *Worrell* was an

21    employment case, so it's not talking about the nonemployment

22    context.  And to the extent there's any ambiguity in the Tenth

23    Circuit's decision from 2000, it is superseded by the U.S.

24    Supreme Court's pronouncement in 2019, outside of the

25    employment context of the disjunctive test, substantial or

20-CV-01878-RBJ      Trial Prep. Conference      02/23/2022      85

1    motivating factor.  So to the extent --

2         THE COURT:  Do you have a case in the application of

3    excessive force context?

4         MR. ANDERSON:  Yes.  In fact, all of the pattern

5    instructions -- we can look for particular cases on this, but

6    many of the -- many of the cases, because of the origin of

7    this test, arise in the employment context.  So we looked

8    specifically for a case that was not in the employment context

9    to resolve any ambiguity, and we found one in the Supreme

10   Court's decision from 2019.  And that is consistent again with

11   the instructions that are given across the country.  The Tenth

12   Circuit, unfortunately, does not have pattern instructions, so

13   as we have done throughout these instructions, we have looked

14   to the guidance of the uniform authority from other

15   jurisdictions.

16        MS. HOFFMAN:  And I'll just say one other point, and

17   I think it's going to be most clear to the judge if you take a

18   look at *Worrell v. Henry* at 1212, but in that case they

19   evaluated defendants -- they evaluated First Amendment

20   retaliation claims both with respect to employer defendants,

21   as well as non-employer defendants.  And I think it will be

22   abundantly clear to the Court that in evaluating the First

23   Amendment retaliation claims with respect to non-employer

24   defendants, that's when you're going to see the substantially

25   -- I keep forgetting -- substantially motivating language.

Sarah K. Mitchell, RPR, CRR

20-CV-01878-RBJ   Trial Prep. Conference   02/23/2022   86

1          THE COURT:  Okay.  So you two can't get any cases on

2    your computer?

3          THE LAW CLERK:  That's correct.  I'll be happy to pop

4    into the back and have a look around, if you'd like.

5          THE COURT:  Yeah, I would like.

6          THE LAW CLERK:  Okay.

7          MR. ANDERSON:  Your Honor --

8          THE COURT:  So this is a terrific example of

9    something I've said to many, many parties.  In my opinion the

10   difference between substantial or motivating and substantially

11   motivating does not make any difference at all to the outcome

12   of this case.  None, in my opinion.  Where it could make a

13   difference is on appeal.  And so if you folks have any concern

14   about appeal, for example, if you lose, and there's a good

15   chance that you will, there's a good chance that you won't,

16   but you've got to realistically understand there are a lot of

17   people in this world that are going to be sympathetic to the

18   situation these officers were in.

19          They were facing unruly crowds of people, including

20   people who, whether they call themselves protesters or not,

21   were throwing objects, kicking cans, burning, breaking

22   windows, looting probably.  If you paid any attention at all

23   to the aftermath of *Abay*, you would know that public opinion

24   was divided.  Public opinion was not well educated, but the

25   people who express their opinions often are not that educated.

20-CV-01878-RBJ     Trial Prep. Conference     02/23/2022     87

1    Public opinion was divided about whether the cops should be

2    able to be villains or heroes, and the jury can go either way

3    in this case.  So you get your $10 million verdict, and you

4    lose your verdict over substantial or motivating.

5            How are you going to feel then, Mr. Anderson?

6            MR. ANDERSON:  Your Honor, like you, we only want to

7    try this case once, which is why we are trying to insist on

8    following what is the binding authority on this Court.  I

9    would much rather have a defensible verdict than a really good

10   appellate issue down the road.

11           THE COURT:  And hopefully that would be true of

12   Ms. Hoffman too.

13           MS. HOFFMAN:  That's correct.

14           MR. ANDERSON:  And, Your Honor, we've never seen an

15   instruction, including your instruction that you quoted in the

16   *Abay* case, that uses the phrase substantially motivated.

17           THE COURT:  I didn't have any instruction in the *Abay*

18   case, because it wasn't a jury case.

19           MR. ANDERSON:  I'm sorry.  Your comments in the *Abay*

20   case that it is motivating, not substantially motivating.  We

21   just think this is an important question --

22           THE COURT:  *Abay*, that decision was written between

23   6 o'clock and 8:30 on a Friday night.  It's an extraordinary

24   work given the unbelievable timeframe, and I and two law

25   clerks put our efforts together and were able to churn that

20-CV-01878-RBJ     Trial Prep. Conference     02/23/2022     88

1   out.  But I wasn't thinking about the subtle difference

2   between motivating, substantially motivating, and substantial

3   or motivating.  I was trying to get a decision on a TRO out

4   under very extreme circumstances.

5          MR. ANDERSON:  Point well taken, Your Honor.

6          THE COURT:  So I wouldn't rely too much on specific

7   wording in *Abay*.

8          MR. ANDERSON:  Understood, Your Honor.  We'll put our

9   eggs in the Supreme Court basket on its articulation of the

10  test.  I do think while your law clerk is looking for some

11  resolution in the case law to this it does play into your

12  comments on the following page.

13         THE COURT:  Yeah, I know.

14         MR. ANDERSON:  Which goes slightly beyond the

15  question of substantially motivating.

16         THE COURT:  It concerns intent.

17         MR. ANDERSON:  Correct, Your Honor.  And we don't

18  disagree that intent is an element, but it's already

19  instructed in the substantially motivating or substantial or

20  motivating factor.

21         THE COURT:  No, it isn't.  It doesn't use the word

22  intent.  You have to infer it from that.

23         MR. ANDERSON:  Correct, Your Honor.  And when --

24  there's another pattern instruction that gets to this point

25  which addresses our objection, which is that it may cause the

1  jury to expect some admission of guilt on the stand.  That it

2  needs to have some kind of guilty mind revelation.  In

3  determining whether there was a motivating factor in the

4  defendant's decision -- and I'm reading from a pattern

5  instruction from another jurisdiction -- you may consider any

6  statements made or act done or admitted by the defendant and

7  all other facts and circumstances in evidence indicating a

8  state of mind.  An improper motive, if it exists, is seldom

9  directly admitted, and may or may not be inferred from the

10  existence of other facts.  If we are going to talk about

11  intent or subjective desire in an instruction, we would want

12  the jury to understand that it is seldom admitted on the stand

13  and may be inferred from other objective evidence.

14          THE COURT:  Mr. Anderson, I've given an instruction

15  like that probably, I don't know, several dozen times.  It's

16  obvious.  But many times, maybe hundreds of times I've

17  instructed juries that it's rare that you find direct evidence

18  of intent, so you have to infer -- may infer intent from other

19  evidence.

20          MR. ANDERSON:  If Your Honor is amenable to it, we'd

21  be happy to propose it.  If we're going to have an instruction

22  like that, we'd want to have a balanced one, which is all I'm

23  proposing, Your Honor.

24          THE COURT:  Well, subject to what Gavri might come up

25  with, it's decision time, and I'm going to go with substantial

20-CV-01878-RBJ     Trial Prep. Conference     02/23/2022     90

1     or motivating.  That appears to be more likely to be the

2     consensus view, even though to me, if I'm writing on a clean

3     slate, substantially motivating makes more sense to me.  So

4     we're going to leave it with substantial or motivating unless

5     Gavri comes up with something that convinces me otherwise.  So

6     you'll make those changes accordingly on page 16, and then we

7     get to 17.

8          MS. HOFFMAN:  Would you like to hear from defendants

9     regarding the first paragraph on 17 as previously addressed by

10    plaintiffs' counsel?

11         THE COURT:  Yeah, why I haven't heard from defendants

12    all along?  All I heard were the comments from the plaintiffs.

13         MS. HOFFMAN:  Sure.  That is something that we wanted

14    to bring up.  We weren't aware that the plaintiffs were

15    submitting issues and objections with these particular

16    proposed jury instructions.  We did meet and confer early

17    Monday morning.  We were able to reach some agreements.  We

18    were not able to reach agreements on other matters.  We did

19    review what we believed to be the final set of instructions on

20    Monday late afternoon.  They did not include the issues and

21    objections.  So we approved sending that to chambers, and then

22    later it came to our attention that the issues and objections

23    were added.

24         THE COURT:  They pulled a fast one on you.

25         MS. HOFFMAN:  So if we had known that, we would have

20-CV-01878-RBJ     Trial Prep. Conference     02/23/2022    91

1    obviously provided our own issues and objections, because

2    obviously what you're left now with is a one-sided

3    presentation, which is probably not that helpful to Your

4    Honor.  So I'm here to do my best to answer all questions that

5    you have, but just wanted you to have a little context there.

6    And with that said, I'm happy to jump into the first paragraph

7    on 17.

8         Let's see, with respect to intent, there's two

9    particular reasons that we're pushing for this paragraph on

10   the top of 17.  First, we really tried to take to heart Your

11   Honor's comments when you reviewed our previously submitted

12   set of instructions reminding us that we're not teaching a

13   constitutional law class, and we need to be speaking to the

14   jurors in regular people speak.  We think a juror is much more

15   likely to understand that intent is involved in this

16   particular claim than they are to infer intent is implied from

17   substantial or motivating.  We believe that now the intent --

18   or now this language is more important than ever given Your

19   Honor's ruling that you just made that you're going to use

20   substantial or motivating, because intent can't be inferred

21   from substantial.

22        THE COURT:  Okay.  I agree.  Well, up until the last

23   part of your last sentence I agree.  If something was a

24   substantial factor -- because look back at the language --

25   plaintiffs' participation in the protected activity was a

1    substantial factor, was a motivating factor.  Whether it's a

2    substantial factor or motivating factor, it had to be a factor

3    that motivated the officer's decision.  In other words, intent

4    is implied, right?  Mr. Anderson?

5          MR. ANDERSON:  Yes, Your Honor.  It was the factor

6    that went into the decision.  And we don't -- we think that is

7    clear enough, but in the interest of moving things along, our

8    concern here is the one that was previously articulated, which

9    is to make sure that the jury understands that when they are

10   searching for intent, they don't need to -- we're not waiting

11   for an aha moment, Your Honor.

12         THE COURT:  So what we need to say where this

13   language is on page 17 is something like this.  I'm not trying

14   to just out loud dictate language here.  In determining

15   whether the plaintiffs' participation in protected activity

16   was a substantial or motivating factor in the officer's

17   decision, you will consider the officer's intent.  There is

18   rarely in any case direct evidence of what an individual

19   intended or didn't intend to do.  Instead, typically intent is

20   inferred from other evidence, something like that, right?

21         MR. ANDERSON:  Yes, Your Honor.

22         THE COURT:  Again, I'm not trying to dictate exact

23   language.  I'd almost have to write it out and see how it read

24   to me, but that's what we're talking about.

25         MR. ANDERSON:  With that instruction I'm confident

1    that we can work something out.  We've worked well with

2    defendants.  Once we understand Your Honor's direction, the

3    wordsmithing I'm comfortable we can work out, Your Honor.

4          MS. HOFFMAN:  Agreed.  There is one other point of

5    contention in this particular instruction that I think we may

6    have skipped over, which is with respect to paragraph 1 on

7    page 16.  And it's the defendants' request to incorporate the

8    word solely, and I'd just like to give you a little bit more

9    context as to why we're requesting that word.

10          It is our understanding that certain protesters and

11    even certain plaintiffs in this case, including plaintiff

12    Deras, engaged in peaceful, which would then be protected,

13    conduct at certain points in time during the protests, but at

14    another point in time he kicked a canister.  So that's why

15    we're including the word solely, just because we think that

16    the facts are a little bit more nuanced, and to cover the fact

17    that protesters were sometimes engaging peacefully, and that

18    would be protected, but other times were throwing projectiles,

19    and that would not be protected.

20          MR. ANDERSON:  Your Honor, this is an issue about

21    factor number three, not factor number one.  What we're trying

22    to do is inform the jury on what should be an uncontested

23    question what is protected First Amendment activity.  If the

24    defendants want to argue that something else motivated the

25    officer to take the action, then they're free to do so.  They

20-CV-01878-RBJ    Trial Prep. Conference    02/23/2022    94

1    can say it was not peaceful protesting.  It was kicking a

2    canister.  It was throwing a rock.  So the argument here meets

3    the jury in factor number three, not a limitation that could

4    cause confusion about what constitutes personally protected

5    activity.

6         THE COURT:  I agree with you, Mr. Anderson.

7    Paragraph number one is fine as is.

8         MR. ANDERSON:  Your Honor's next question was on the

9    Fourth Amendment instruction on page 18.  You --

10        THE COURT:  That gets into the whole Fourth versus

11   Fourteenth Amendment business.

12        MR. ANDERSON:  There's one issue before the

13   Fourteenth Amendment that is raised in the context of this

14   particular instruction, and it's the alternative way to

15   constitute a seizure, and I want to make it very concrete in

16   the context of this case why that instruction may be

17   necessary.  But before I do so, we don't think there needs to

18   be any instruction on seizure whatsoever for the reasons that

19   we've articulated and that you actually point out in here.  If

20   it is uncontested that the acts of the defendants all

21   constituted seizure, then we have a Fourth Amendment claim,

22   and we just look at the excessive use of force.  However, we

23   understand the defendants intend to contest at least some

24   aspect of seizure, most likely the question of intentionality.

25        If that's true, there are two ways to form a seizure

Sarah K. Mitchell, RPR, CRR

1   under the Supreme Court precedent.  One is the application of

2   physical force, actually hitting someone.  The other is a show

3   of authority that to which the plaintiff in that case submits.

4   A skirmish line is a seizure.  It's well-established in the

5   case law.  Yelling, Freeze, and pointing a gun at someone is a

6   seizure.  Well-established in the case law.  None of those

7   involve the intention -- the intentional application of

8   physical force.

9        Here's where it applies potentially in our case.  We

10  have two plaintiffs, Maya Rothlein and Amanda Blasingame, who

11  were sitting on their porch, and an officer drove by and had a

12  drive-by shooting.  Neither of them were hit with pepper

13  balls.  There's no question that is a show of authority.  It

14  restrained their movement.  They went from where they were,

15  fled inside, that constitutes a seizure.  Once that threshold

16  is crossed, you then ask a second question.  Was the use of

17  force excessive, not the application of physical force.

18       If you're under arrest, and an officer starts

19  shooting bullets beside your head, that is an excessive use of

20  force even if you're not hit, and I think that's an important

21  analytical point to make sure this instruction is complete

22  that we have both forms of seizure, and then once that

23  threshold is crossed, that element is met, then you look at

24  whether the use of force, whether physical or not, was

25  excessive under the circumstances.

                    Sarah K. Mitchell, RPR, CRR

20-CV-01878-RBJ   Trial Prep. Conference   02/23/2022   96

1           THE COURT:  Well, I think you guys are going to give

2    me a seizure.

3           MR. ANDERSON:  What we don't want to have --

4           THE COURT:  You have two plaintiffs who are sitting

5    on their porch, and they scurried inside when the officers

6    were allegedly shooting paint balls at them or something.

7           MR. ANDERSON:  Your Honor, it was a chemical agent of

8    pepper spray.  I don't think any of us want to sit on our

9    porch and be shot at by the police.

10          THE COURT:  No, we don't.  On the other hand, I hope

11   you're not on a contingency fee as to their damages.

12          MR. ANDERSON:  Your Honor, we're here as pro bono

13   counsel.

14          THE COURT:  I'm making a point.

15          MR. ANDERSON:  I understand.  And we think that the

16   point is an important one to make, and that is that when

17   police show -- and this wasn't the only isolated occasion that

18   that happened when you have a record of several drive-by

19   shootings in Denver to quell a protest.  That constitutes a

20   seizure under the law.

21          THE COURT:  Okay.  So you want this language in

22   paragraph 1.  Why do you care, folks on the defendants' side?

23   Why do you care?

24          MS. HOFFMAN:  We don't think there's any factual

25   support for it.  It's our understanding that all of the

                    Sarah K. Mitchell, RPR, CRR

20-CV-01878-RBJ     Trial Prep. Conference     02/23/2022     97

1    plaintiffs' claims relate to (1)(a), which are applications of

2    physical force, whether that be 40 millimeters or pepper balls

3    or the discharge of tear gas.

4         THE COURT:  Well, he's telling us that there are

5    these two poor people sitting on the porch minding their own

6    business enjoying a warm evening in early June when all of a

7    sudden vigilante officers drive by and just for the fun of it

8    are shooting pepper balls at them, which is kind of

9    implausible, but they say that happened.  And their movement

10   was restricted because they might have wanted to get off the

11   porch and go protest, but instead they scurried into the house

12   and locked the doors.

13        MS. HOFFMAN:  I'm still not sure --

14        THE COURT:  Now, that's a little farfetched, but

15   that's what he says.

16        MS. HOFFMAN:  I'm not sure that that would fall under

17   the show of authority.  I still think that that would fall

18   under (1)(a) application of physical force under *City of*

19   *Canton* where in that case there was a discharge of a weapon

20   that didn't necessarily strike the plaintiff in that case, but

21   --

22        THE COURT:  I'll tell you what.  Like I said, it's

23   decision time.  I'll let the plaintiffs have it even though I

24   think for advocacy reasons it's a bad idea for the plaintiffs,

25   not for you.  It just detracts.  The best cases usually are

20-CV-01878-RBJ     Trial Prep. Conference     02/23/2022     98

1    the ones where the claims are narrowed, they're easy to

2    articulate, they're straightforward.  My guys were the victims

3    of physical force.  But they want to put these other two

4    people in there and argue that their freedom of movement was

5    restricted.  I think they're just diluting their case by doing

6    that.

7        MR. ANDERSON:  And, Your Honor, to be clear, what we

8    don't want to have happen are donut holes where people fall

9    through the cracks.  What we heard over and over --

10        THE COURT:  I just ruled in your favor.  A lot of

11   times when that happens the smart thing to do is to just sit

12   down.

13        MR. ANDERSON:  Understood, Your Honor.  That does

14   bring us to the Fourteenth Amendment claim.  This is related

15   to the point we were just making, and that was the transition

16   I was going to make.  We believe we have an excessive force

17   claim.  The law is clear that that can arise under two

18   different standards depending on whether there was a seizure

19   or not.  I just heard an impassioned speech by defense counsel

20   about why all of our plaintiffs were seized.  That would be

21   great if they would admit that.  If they would say that the

22   plaintiffs were seized in this case, we wouldn't need two

23   alternative instructions, which I appreciate --

24        THE COURT:  They don't have to admit that the

25   plaintiffs were seized because they'd be admitting your case.

Sarah K. Mitchell, RPR, CRR

20-CV-01878-RBJ     Trial Prep. Conference     02/23/2022     99

1    What they have to -- what you should be asking them to do is

2    to admit or to stipulate that they're not going to argue that

3    there wasn't a seizure because people weren't physically

4    handcuffed.

5           MR. ANDERSON:  And if they argue that there was not a

6    seizure for an additional reason, and I understood from our

7    discussions during our meet-and-confer that there was a

8    question about intentionality, all that does -- it doesn't

9    resolve the case.  It doesn't win it for them.  It just pushes

10   us to a different amendment, which is why we have the second

11   instruction in here to make sure that the case is covered

12   under one or the other.  And so your point is well taken, Your

13   Honor, about dilution.  We want to make this very clear.  The

14   only reason that we've maintained these two alternative

15   theories is so that everyone has an opportunity to recover,

16   because it's clear that they fall under either one or the

17   other.

18           THE COURT:  Where this often arises, such as in the

19   *Booker* case, is in the context of some form of detention, and

20   the courts, including the Tenth Circuit, have said we have to

21   look at where in the chronology of one's detention the

22   plaintiff falls, and depending on where that occurs, it might

23   be the Fourth Amendment, it could be the Fourteenth, or it

24   could even be the Eighth, but this is not that context.  This

25   is not a detention context.

                          Sarah K. Mitchell, RPR, CRR

1       So what you're saying is the law is that if you're

2  talking about any type of seizure of a person, you're talking

3  about the Fourth Amendment, and Fourth Amendment seizure law

4  has provided the law for excessive force cases.  But you're

5  worried that the plaintiffs' -- that the defendants are going

6  to say, well, ladies and gentlemen, nobody got seized here,

7  and so you're wanting to plead the Fourteenth Amendment as

8  sort of a just-in-case.  Now, what's the deal on the

9  defendants' side here?

10      MR. RINGEL:  We believe that there -- if there is any

11 constitutional violation for the use of force including the

12 use of chemical agents, it is a Fourth Amendment violation.

13 Period.  Full stop.  That's what we argued in our summary

14 judgment motion.  We do not believe the Fourteenth Amendment

15 applies.  The problem is we're not going to concede that it is

16 a Fourth Amendment violation.

17      THE COURT:  Of course not.

18      MR. RINGEL:  But if there's a violation, it's the

19 Fourth Amendment.  It's not the Fourteenth Amendment.

20      THE COURT:  And that's all you need.

21      MR. ANDERSON:  Seizure is not a violation.  A seizure

22 just means that you're in the Fourth Amendment.  If he admits

23 to a seizure, he has not given away his case.

24      THE COURT:  He's not going to admit to a seizure.

25 What he has just told you -- whatever violation occurred would

20-CV-01878-RBJ   Trial Prep. Conference   02/23/2022   101

1   have violated the Fourth Amendment.  He's not going to argue

2   that there wasn't a seizure so that the Fourth Amendment

3   doesn't apply.  He's going to argue that there was no

4   excessive force applied to these people.

5          MR. ANDERSON:  If that statement can be made on the

6   record, I think we've made a lot of progress.  Yesterday I was

7   informed --

8          THE COURT:  He just said that.  Say it again,

9   Mr. Ringel.  Mr. Anderson --

10          MR. RINGEL:  There is no Fourteenth Amendment claim

11   here.  If there is a constitutional violation, it's a

12   violation of the Fourth Amendment.  Full stop.

13          THE COURT:  If there was --

14          MR. RINGEL:  If there is any --

15          THE COURT:  -- a violation, it was excessive force.

16          MR. RINGEL:  Under the Fourth Amendment.

17          THE COURT:  Under the Fourth Amendment.

18          MR. RINGEL:  That's the appropriate analysis.

19          THE COURT:  And you are not going to argue, imply,

20   suggest, try to convince the jury that because there is no,

21   quote, physical handcuffing or arresting or that kind of an

22   event, there was no seizure.

23          MR. RINGEL:  That would be an argument I would make

24   to a Court.  I would never stand up in front of a jury and say

25   this was wrong, but it doesn't fit the definition of seizure.

20-CV-01878-RBJ    Trial Prep. Conference    02/23/2022    102

 1    The argument in front of the jury is nothing wrong happened

 2    here.  That's the basis of the defendants' defense.

 3           THE COURT:  But if it did happen, it was a Fourth

 4    Amendment violation.

 5           MR. RINGEL:  Yeah.  We agree that if there was a

 6    violation of anybody's constitutional rights, it fits in the

 7    Fourth Amendment box.  I don't know how to be any more clear.

 8           THE COURT:  Mr. Anderson, what more can you ask for?

 9           MR. ANDERSON:  The word "if" he repeats at the

10    beginning of every single sentence he just said.  If that's

11    true, let's get rid of -- on Instruction 13, let's get rid of

12    element one.  What we need him to say is that there was an

13    intentional application of physical force.  That element is

14    then admitted, and we are in the Fourth Amendment, and we're

15    going to talk about excessive use of force.

16           THE COURT:  He doesn't have to admit there was an

17    intentional application of physical force.  For example in the

18    Epps case, his position there was no force applied to her.

19    The officer didn't shoot her.  You're wrong about that.

20    That's his position.  But he's not saying if Officer Christian

21    did, in fact, shoot a pepper ball and hit Epps, it's not a

22    Fourth Amendment violation, because it wasn't a seizure.  He's

23    just saying it didn't happen.  He doesn't have to stipulate to

24    your case.

25           MR. ANDERSON:  Understood, Your Honor.  But I just

                        Sarah K. Mitchell, RPR, CRR

20-CV-01878-RBJ    Trial Prep. Conference    02/23/2022    103

1   want to make it clear that this is why the alternatives are

2   important.  If she was not physically hit, if that's the

3   theory they want to take to the jury, then it's a show of

4   authority that she was trying to cross the street, she was

5   shot at, they say she wasn't hit, we say she was, she then

6   went somewhere else because --

7          THE COURT:  It's decision time.  You're not hearing

8   what Mr. Ringel is saying.  You're not hearing what I'm

9   saying.  The Fourth Amendment is out.  Take it out.

10          MR. ANDERSON:  Do you mean the Fourteenth Amendment,

11   Your Honor?

12          THE COURT:  I meant the Fourteenth.  Fourteenth

13   Amendment.  I misspoke.  Take it out.  You're not making any

14   sense to me at all.  So that takes care of Instruction 14

15   right there, yes?  Now, what's next?

16          MR. ANDERSON:  Next is Instruction 15.  Your Honor

17   suggested that we create a framework so the jury can

18   understand the different theories of Monell liability.  That

19   is what we have tried to do here writing by committee, of

20   course.

21          THE COURT:  Well, different theories of Monell

22   liability, but more than that, different theories of

23   causation.

24          MR. ANDERSON:  Correct, Your Honor.  I want to

25   address causation directly.  The paragraph that defendants

Sarah K. Mitchell, RPR, CRR

1   propose includes a proximate causation instruction.  The

2   phrase proximate causation does not appear anywhere else in

3   these instructions.  It's also not the standard for all of the

4   Monell liability theories.

5          THE COURT:  Which are your Monell liability theories?

6          MR. ANDERSON:  The first one is a policy, practice,

7   or custom.  The causation standard is moving --

8          THE COURT:  They're all policy, practice, or custom,

9   every one.  That's what Monell is.

10          MR. ANDERSON:  So when there's an official policy for

11   a widespread practice or custom, so an affirmative -- so as

12   opposed to the failure to train, which is passive, and as

13   opposed to ratification, which comes after the fact, all three

14   of those have different causation standards.  For the policy,

15   practice, or custom, the affirmative policies or practices of

16   the city, we all agree that it's the moving force standard,

17   that the policy is the moving force behind the violation.  For

18   failure to train, it's whether it played a substantial part.

19   Let's make things easy.  We can also call that a moving force.

20          Ratification is different.  Ratification doesn't have

21   a causation standard because it comes after the fact.  So on

22   the instruction that's stipulated in here, proximate cause

23   wouldn't have any valence to play.  We also think that the

24   directness of -- the case law hasn't used proximate cause as

25   the standard here.  They talk about that it caused it such

20-CV-01878-RBJ    Trial Prep. Conference    02/23/2022    105

 1   that it was the moving force for the violation, and so --

 2          THE COURT:  What happened to substantial or

 3   motivating?

 4          MR. ANDERSON:  That was from the First Amendment.

 5   That is a question, not of Monell liability, but of intent.

 6   It's not a causation standard.  It's a question, as we've

 7   discussed with Your Honor, whether it was the substantial or

 8   motivating factor for an officer retaliating because of

 9   protected activity.

10          THE COURT:  Of course it's causation.  That's exactly

11   what it is.

12          MR. ANDERSON:  And so that's a specific thing for the

13   First Amendment.  It's not an overall instruction for Monell

14   liability at large.

15          THE COURT:  So what you're going to do is tell the

16   jury, okay, we have a First Amendment claim, and we have a

17   Fourth Amendment claim.  The First Amendment claim has to do

18   with the interference of their right to speech and protest --

19   speak and protest.  The Fourth Amendment claim has to do with

20   excessive force being applied to them.  The standards of proof

21   of causation are different in the law as to those claims.  In

22   the First Amendment context, as we instructed in instruction

23   number whatever it was, you have to show that -- whatever the

24   words were -- the participation was a substantial or

25   motivating factor.

                        Sarah K. Mitchell, RPR, CRR

20-CV-01878-RBJ    Trial Prep. Conference    02/23/2022    106

1           When we get into the excessive force context, we're

2    talking about different ways in which the city is liable for

3    the officers' application of excessive force.  One way is that

4    the city had a policy, practice, or custom that the officers

5    followed, and that the result was the application of the

6    excessive force.  There we have to show that the policy,

7    practice, or custom was the motivating factor.

8           MR. ANDERSON:  The moving force, Your Honor, correct.

9           THE COURT:  The moving force.  Another way is if

10   there was an absence or lack of training given to these

11   officers, and it was that lack of training that ultimately

12   resulted in the application of the excessive force, there the

13   standard of causation is whatever it is, and then there's this

14   ratification after the fact, which doesn't have a causation

15   element because it happened after the event was over.

16          MR. ANDERSON:  That's correct, Your Honor.

17          THE COURT:  You're going to give an instruction like

18   that so they understand why there's these different causation

19   theories.

20          MR. ANDERSON:  And I think Your Honor's suggestion

21   that we tell the jury that we -- that you will instruct them

22   separately on each of these theories against the City of

23   Denver which have different requirements or elements, and that

24   they have to find those elements on one of the alternative

25   theories to find for us.  So I think we completely agree, Your

20-CV-01878-RBJ    Trial Prep. Conference    02/23/2022    107

1   Honor, and think that's a right approach rather than trying to

2   craft a one-size-fits-all instruction which does not fit all.

3            THE COURT:  Okay.  Does the defendant disagree with

4   that?

5            MS. HOFFMAN:  We do disagree in that we take the

6   position that proximate cause is the standard of causation for

7   all the Monell theories being asserted here.  It's -- this

8   used to be a standalone instruction in our previously

9   submitted instructions, but in response to both I think the

10  Court's questions and previous comments, as well as conferral

11  with counsel, we thought that it made sense to essentially cut

12  and put that language into this instruction since it's the

13  standard for all of the Monell claims, and we think that

14  proximate cause comes from Monell itself.

15           So since it's nowhere else, and we can think of

16  nowhere else to put it, we think it makes sense where it is.

17  If it's just a matter of where we can put it to make it less

18  confusing to the jury, if the Court believes that it's

19  confusing, we're happy to work with the Court and plaintiffs'

20  counsel to do that, but we do think it's a necessary

21  instruction since it is the standard, and it's nowhere else.

22           THE COURT:  Well, you say it is, and he says it

23  isn't.  He says the case law has evolved so that there are

24  different standards depending on what type of Monell claim

25  you're making, and you're saying that's not true.

                    Sarah K. Mitchell, RPR, CRR

20-CV-01878-RBJ     Trial Prep. Conference     02/23/2022     108

1          MS. HOFFMAN:  And I think we agree that there's also

2     different standards because those -- that language is

3     incorporated into other instructions, and I think that we've

4     largely agreed to that language as well, but I don't think

5     that that eliminates proximate cause causation.

6          THE COURT:  Maybe all of this is under the umbrella

7     of proximate cause, and it's just phrased differently.  There

8     has to be causation.

9          MS. HOFFMAN:  Correct.

10          THE COURT:  The alleged wrong had to cause the

11     damages.  If the alleged wrong didn't cause damages, the

12     plaintiff loses.  There has to be causation.

13          MR. RINGEL:  So --

14          THE COURT:  Now, if you call it proximate causation,

15     that doesn't mean anything to a jury.  It's just a label.  You

16     can say in your explanatory instruction -- probably should do

17     this -- for the plaintiff to recover, we have to show that

18     there was a wrong and that the wrong resulted in damage to the

19     plaintiff -- to the plaintiff.  There was a wrong.  We claim

20     it was a constitutional violation, and there was damage to the

21     plaintiff.  We claim it was physical injuries and emotional

22     injuries, and what that means is we have to show that the

23     wrong proximately caused the damage, but depending upon which

24     claim it is, the First Amendment or the Fourth Amendment, and

25     which type of wrongful conduct by the city we're talking about

20-CV-01878-RBJ   Trial Prep. Conference   02/23/2022   109

1    within the Fourth Amendment, the way proximate cause is

2    phrased in the law is a little different from claim to claim,

3    and so as we get to each of these claims, we'll tell you how

4    the proximate cause is phrased as to that claim.  Why can't

5    you just do that?

6         MR. ANDERSON:  I'm very happy to road map, and we

7    think that that would be helpful to the jury.  We think

8    introducing a phrase like proximate cause that doesn't appear

9    later rather than just saying that it must cause the injury --

10   in the ratification context, it's a little bit trickier

11   because the ratification didn't cause something that happened

12   before, so rather than instruct them twice --

13        THE COURT:  I don't care much about the word

14   proximate.  I've never understand what's that about anyway.

15        MR. RINGEL:  We don't either, Your Honor.  We just

16   want some clear causation as the Court has explained.

17        THE COURT:  So why not have an instruction like I was

18   just saying.  For the plaintiff to win this case -- you know,

19   before you even get into the individual claims, you can say

20   for the plaintiff to win this case, they have to basically

21   show two things.  Number one, that a legal wrong occurred;

22   number two, that that wrong caused damage to the plaintiff.

23   Now, as we get into the individual claims, we have a First

24   Amendment claim.  You'll hear about that.  We have a Fourth

25   Amendment claim.  You're going to hear about that.  The First

20-CV-01878-RBJ    Trial Prep. Conference    02/23/2022    110

1    Amendment claim has to do with the people's right to protest

2    and speak and assemble.  The Fourth Amendment claim has to do

3    with people's right not to be victimized by the excessive

4    application of force by police officers.  You're going to --

5    we're going to get to those instructions too.

6           But underlying all of this is there has to be a

7    wrong, and there has to be causation that it caused damages of

8    some kind to the plaintiff.  Now, when we get to the

9    individual -- and then you get to the individual claims, and

10   you say when we get to the individual claims we'll explain

11   what causation means in the context of each of those claims,

12   and you've got it.  And then as to each claim you can use

13   whatever the cases used as the standard for that type of

14   claim, right?

15          MR. ANDERSON:  Very good, Your Honor.  In fact,

16   that's what we have done.

17          THE COURT:  Mr. Anderson, you agree.

18          Ms. Hoffman, do you agree?

19          MS. HOFFMAN:  That makes sense.

20          THE COURT:  Okay.  It's after noon, so let's try to

21   finish up here.  What's next?

22          MR. ANDERSON:  On page 25 the defendants have

23   proposed an instruction about deliberate indifference on the

24   policy, custom, or practice.  As we have briefed for summary

25   judgement and explained in our objections here, the deliberate

20-CV-01878-RBJ   Trial Prep. Conference   02/23/2022   111

1    indifference element only applies to a failure-to-train

2    theory.  And, in fact --

3            THE COURT:  Do you dispute that?

4            MS. HOFFMAN:  We do.  We believe deliberate

5    indifference is a state of mind for all Monell claims.  We

6    believe that that's supported by *Schneider vs. City of Grand*

7    *Junction Police Department*.  We have that cite available for

8    you.  We also believe that that is supported by Your Honor's

9    previous decision in *Davies vs. City of Lakewood* in which you

10   rely on *Schneider vs. Grand Junction*.  Both of those cases

11   involved more than --

12           THE COURT:  Was *Schneider* a Tenth Circuit case?

13           MS. HOFFMAN:  Sorry, Your Honor?

14           THE COURT:  Was it a Tenth Circuit case, *Schneider*?

15           MR. RINGEL:  *Schneider* is a Tenth Circuit case, Your

16   Honor.

17           THE COURT:  And does it say that deliberate

18   indifference is a part of any Monell claim?

19           MS. HOFFMAN:  So I'll provide you some relevant

20   language from that case.  A plaintiff seeking to establish

21   municipal liability on the theory that a facially lawful

22   municipal action has led an employee to violate a plaintiff's

23   rights must demonstrate that the municipal action was taken

24   with deliberate indifference as to its known or obvious

25   consequences.  In that case the Court considered in addition

1   to a failure to train a hiring claim, as well as a failing to

2   discipline claim, all of which the Tenth Circuit evaluated

3   using the deliberate indifference state of mind requirement.

4           THE COURT:  Is that true, Mr. Anderson?

5           MR. ANDERSON:  The quote that she just read then

6   quotes to two Supreme Court cases, *Brown* and *City of Canton*.

7   *City of Canton* was a failure-to-train case.  So *Schneider* was

8   taking that comment out of the context of failure to train.

9   *Brown* was a failure to, I believe, screen for hiring, also a

10  failure case.  Later on in *Schneider* the Tenth Circuit, after

11  the language that Ms. Hoffman just read, said that a

12  challenged practice may be deemed an official policy or custom

13  for 1983 municipal liability purposes -- I'm reading -- the

14  pin cite is page 770 -- if it is for a formally promulgated

15  policy, a well-settled custom or practice, a final decision by

16  a municipal policymaker, or deliberatively indifferent

17  training or supervision.

18          It then applies the deliberately indifferent only to

19  the fourth theory, and, in fact, the -- it was most directly

20  stated by Judge Martinez in the *Trujillo vs. City and County*

21  *of Denver* case.  The distinction is potentially significant

22  because a failure-to-train theory requires proof of deliberate

23  indifference, whereas a policy custom theory does not, and

24  then canvasses all of the cases, including the cases that the

25  parties are talking about.  It's an important point, Your

20-CV-01878-RBJ     Trial Prep. Conference     02/23/2022     113

1   Honor.

2           MS. HOFFMAN:  I don't really have anything to add

3   other than we don't disagree that deliberate indifference is

4   the standard for failure to train.  We just think it goes

5   beyond that, and we think that's supported by the Tenth

6   Circuit's decision in *Schneider v. City of Grand Junction* in

7   which the Court clearly applied that state of mind requirement

8   to more than just failure to train.

9           THE COURT:  I'll go with the deliberate indifference

10  applicable to the training as indicated by Judge Martinez.

11  What's next?

12          MR. ANDERSON:  Thank you, Your Honor.  Now we're to

13  the failure-to-train instruction on page 27.

14          THE COURT:  Yes.

15          MR. ANDERSON:  We take Your Honor's comment to heart.

16  We think that most of the instruction that the defendants give

17  aligns with ours.  The rubber hits the road on deliberate

18  indifference in two places -- three, actually.  The first is

19  the one that Your Honor noted on page 29 -- excuse me -- on

20  the bottom of page 30, to strike the last sentence on page 30,

21  that you need not show a pattern or practice of constitutional

22  violations.  That's not the law, so we think that can't be

23  instructed.

24          So our deliberate -- we would like to replace the

25  defendants' deliberate indifference paragraph with ours.  What

20-CV-01878-RBJ    Trial Prep. Conference    02/23/2022    114

1  our deliberate indifference paragraph accomplishes is the

2  first sentence sets out the legal standard of deliberate

3  indifference.  The next two sentences set out specific

4  examples where deliberate indifference can be found directly

5  from the case law.  The last sentence is particularly

6  important.  A deliberate indifference can occur when a city

7  fails to train its employees to handle recurring situations

8  presenting an obvious potential for such a violation.  That's

9  directly from *Lance vs. Morris* from the Tenth Circuit in 2021.

10        We think that that's also necessary.  So if we could

11  replace defendants' paragraph on deliberate indifference with

12  ours, and then strike the final paragraph of defendants'

13  proposed instruction because it is an incorrect statement, it

14  says that if you do not find on this theory of Monell

15  liability, you must find for the defendant, that's not true.

16  These are alternative theories.

17        THE COURT:  All right.  Ms. Hoffman.

18        MS. HOFFMAN:  If I could just have one further second

19  just to actually evaluate what plaintiffs' counsel is

20  suggesting.

21     (Pause in the proceedings.)

22        THE COURT:  I think if I were the defendant I would

23  like the plaintiffs' version better.

24        MR. RINGEL:  In some ways it's six of one, half a

25  dozen the other.  I think, Your Honor, that the language on

Sarah K. Mitchell, RPR, CRR

1   page 29 in the middle of the paragraph it begins, To

2   demonstrate the deficiency in training directly caused or is

3   the moving force behind plaintiffs' injuries is a useful

4   sentence to include, because I think Mr. Anderson agrees that

5   this is a moving force standard.  But other than that, I'm

6   okay with that.

7          MR. ANDERSON:  The reason we don't think -- it's

8   placed in the middle of the deliberate indifference paragraph,

9   which is the third element.  So to insert a causation

10  sentence, which is the second element, to embed that in the

11  deliberate indifference paragraph we think is, again,

12  confusing.  We've set forth the causation standard in element

13  two, and now we're going to have one paragraph that describes

14  what constitutes deliberate indifference.

15         MR. RINGEL:  That's fair.  But then why don't we put

16  that sentence in paragraph number two or paragraph number

17  three?  Because it's very clear -- the instruction as proposed

18  by the plaintiffs doesn't have the concept of moving force,

19  and Mr. Anderson has agreed that's the standard for causation,

20  and if that's the case, it seems to me it needs to be put in

21  the instruction somewhere.

22         THE COURT:  It's true, Mr. Anderson.  You did say

23  that.

24         MR. ANDERSON:  If we're going to elaborate on this,

25  we should make sure we quote it correctly then.  The placement

20-CV-01878-RBJ     Trial Prep. Conference     02/23/2022     116

1   of the word so, as in so closely related, the so is actually

2   supposed to go elsewhere in the sentence.  They're adding

3   emphasis to the closely related that doesn't appear in the

4   case law.  And that's from the *Carr vs. Castle* case that they

5   originally cited.  So we think that moving force doesn't

6   require elaboration, but if it does, we then put that where

7   moving force appears.  We should make sure that the Tenth

8   Circuit is quoted correctly, but the deliberate indifference

9   instruction doesn't need to be diluted.

10          THE COURT:  Well, here's where the old phrase he

11  argues too much -- is that what Shakespeare said?

12          MR. ANDERSON:  He doth protest too much, perhaps.

13          THE COURT:  Since you two can't agree, and you're

14  going back and forth, I'm going to use the defendants'

15  paragraph absent the last sentence.  In fact, I'll use the

16  defendants' instruction absent the last sentence.

17          MR. ANDERSON:  Could we propose to add the final

18  sentence, Deliberate indifference can occur when a city fails

19  to train its employees to handle recurring situations

20  presenting an obvious potential for such a violation.  That's

21  a quotation from the Tenth Circuit's decision in *Lance*, and

22  that's what we think the circumstance is here.

23          THE COURT:  Mr. Ringel, can you live with that?

24          MR. RINGEL:  Sure.

25          THE COURT:  Okay.  Done.  Now we move to Number 32.

Sarah K. Mitchell, RPR, CRR

20-CV-01878-RBJ    Trial Prep. Conference    02/23/2022    117

1          MR. ANDERSON:  Perhaps this has become overcome by

2     other events from the *Tanberg* discussion this morning, Your

3     Honor, and perhaps this instruction is no longer necessary.

4          MS. HOFFMAN:  I do believe this instruction is

5     necessary.

6          THE COURT:  Okay.  You can have it.

7          MS. HOFFMAN:  I think -- oh, great.  I'll end there.

8          THE COURT:  You can have it.

9          MS. HOFFMAN:  Thank you.

10          MR. ANDERSON:  Your Honor, this relates to the

11     individual defendants.  We think putting it here after all the

12     Monell discussion will create a problem.  So if we're going to

13     include an instruction, we should do it in the instruction

14     that's specifically about Officer Christian, and we can say

15     the substance of this instruction that defined that Officer

16     Christian violated a policy is not to establish that he

17     committed a constitutional violation.  We have to prove a

18     constitutional violation.  So we would -- this is only about

19     the individual defendants.  It doesn't make sense here, and so

20     if it's going to be included, we would move it to the

21     individual defendant instruction and tailor it for that

22     context, not generally.

23          THE COURT:  Well, he's right, isn't he, about that?

24          MR. RINGEL:  He's right in part.  It does -- it most

25     specifically deals with the individual defendant, but it is

20-CV-01878-RBJ   Trial Prep. Conference   02/23/2022   118

1   also true that for a Monell claim you have to have an

2   underlying constitutional violation, and so the violation of a

3   policy to prove an underlying violation by someone who is an

4   officer but not an individual defendant would be an incorrect

5   way to get Monell liability too.

6          THE COURT:  Where's the Monell instruction again?

7   The one on --

8          MR. ANDERSON:  The Monell instruction -- the

9   introductory instruction is on page 22.  And so we would

10  propose to include this before.  As Mr. Ringel said earlier,

11  if this were just a Monell case, this issue wouldn't be

12  relevant at all.  He can't have his cake and eat it too.

13         MR. RINGEL:  Mr. Anderson -- may I respond, Your

14  Honor?

15         THE COURT:  Yeah, just a second.  He says if it were

16  just a Monell claim this wouldn't be relevant at all.

17         MR. RINGEL:  It's a different issue, Your Honor.

18         THE COURT:  The Monell claim -- this is where it

19  could be confusing.  The Monell claim, one of them, is there

20  was a violation of a policy, practice, or custom.  That's what

21  makes the city liable for the constitutional violation by the

22  individual officer, right?

23         MR. RINGEL:  That's right.  But the issue to me, Your

24  Honor, is as follows.  *Tanberg* and the conversation we were

25  having this morning is about evidence.  Can there be evidence

20-CV-01878-RBJ    Trial Prep. Conference    02/23/2022    119

1  presented related to a violation of policy.  That's not

2  admissible in an individual defendant context.  *Tanberg* says

3  that.  But there's another part of *Tanberg*, which is the

4  general concept.  If you violate a policy, if you violate

5  state law, if you violate an agency rule or regulation, if you

6  violate a training standard, none of that establishes a

7  constitutional violation either.

8          THE COURT:  We're still talking about defendant

9  Christian.

10          MR. RINGEL:  We're also talking about all the other

11  officers who are going to be the predicate actors for the

12  Monell claim.

13          THE COURT:  I get it.  So back on page 22, this

14  introduction to claims against Denver, second paragraph, the

15  plaintiffs claim that the city of Denver is liable for

16  violating their constitutional rights in three separate ways.

17          MR. ANDERSON:  Perhaps I can clarify, Your Honor.

18  What makes the city liable is not when an officer violates a

19  policy.  What makes the city liable is when the city has a

20  policy that then causes the constitutional violation.

21          THE COURT:  I understand that.  So this -- what you

22  need to do is to make this clearer.  You need to explain in

23  this instruction that --

24          MR. RINGEL:  This instruction, if it referred

25  specifically to Denver Police Department policies or training

1    or things like that, I think that would provide the clarity

2    that the Court's looking for.

3           THE COURT:  Yeah.  So, again, this weird situation

4    with Ms. Epps' claim against Officer Christian is I think

5    causing more trouble for the plaintiffs collectively than it's

6    worth.  You know, in this *Tanberg* context I raised back in the

7    other trial preparation conference the question whether

8    Mr. Ringel possibly was in a conflict situation.  I think I

9    could raise the same question here as to plaintiffs' counsel.

10   But assuming that they're going forward with this individual

11   claim, somehow this instruction needs to say to the jury, all

12   right, we've got this one claim against Officer Christian, and

13   the claim is that he violated Ms. Epps' constitutional right

14   by applying excessive force when he shot her with a pepper

15   ball.

16          Now, in addition to that claim and wholly apart from

17   that claim you've got claims against the city, and the basic

18   idea there is that the city can be held responsible for the

19   constitutional violations of its police force, individual

20   officers, including Christian and others, only under certain

21   circumstances.  The city isn't just automatically liable

22   because they were employed.  They can be liable for the

23   constitutional violations of the individual officers in

24   certain ways that we're going to explain to you, but we need

25   to make one point clear.

                    Sarah K. Mitchell, RPR, CRR

 1          When deciding whether the individual officers

 2    violated the Constitution, the fact that they did or did not

 3    violate policies of the Denver Police Department is not

 4    determinative of that issue.  But when deciding whether the

 5    city is responsible for their constitutional violations, if

 6    proven, whether the city had a policy, practice, or custom

 7    that, in effect -- that caused the officer to commit the

 8    constitutional violation, that is an issue.  Somehow you've

 9    got to explain it that way.  And if you do, that takes care of

10    this separate issue we're talking about, this separate

11    instruction, right?  So let's do that.  You draft it.  I'm not

12    going to draft it for you.

13          MR. ANDERSON:  Thank you, Your Honor.

14          THE COURT:  Now, what's left?

15          MS. WANG:  Judge, I can speak to the next one, Judge.

16          THE COURT:  Speak into the microphone, please.

17          MS. WANG:  I can speak to the next one, Judge.

18          THE COURT:  What's the next one?

19          MS. WANG:  On page 34 is the defendants' proposed

20    instruction regarding attorneys' fees and costs, and our

21    objection to this instruction is that it will cause the jury

22    to speculate and ask themselves about attorneys' fees and

23    costs when that is not a proper part of -- it's not going to

24    be in evidence.  It's not something that's going to be

25    discussed at all.  They're already instructed under the

1   compensatory damages instruction as to what they can consider.

2   There's a lot of things that the jury should not consider, and

3   attorneys' fees and court costs is one of them, but so is, for

4   instance, the budget of the City of Denver.

5          So it will inject -- it's kind of like talking about

6   the elephant in the room, and it will inject an issue that

7   nobody -- the jury is unlikely to have thought about or be

8   thinking about at all until you bring it up, and it's not

9   something they should be considering at all.  So it could

10  cause the jury to think about that issue and speculate on

11  something that is just not going to be in evidence at all.

12         THE COURT:  Okay.  Defendant, what's your response?

13         MR. RINGEL:  The response is, number one, it's a

14  correct statement of the law; and, number two, we live in a

15  country where everybody understands the notion of a

16  contingency fee, and the reason that I propose this

17  instruction in every fee-shifting case that I litigate in this

18  court or other every other court is because I think the

19  potential exists of the verdict being higher than the jurors

20  think it should be to account for paying the lawyers .  That's

21  the only reason.  I think that's the background that we live

22  in, and I think because it's a correct statement of the law it

23  should be instructed.

24         THE COURT:  In other words, the jury wants to award

25  damages of a million, but then somebody says, well, wait a

20-CV-01878-RBJ   Trial Prep. Conference   02/23/2022   123

1   minute, those greedy lawyers are going take a third.

2          MR. RINGEL:  They don't know that it's really -- I'm

3   not speaking of these lawyers.  It might be 40 percent.  It

4   might be 45 percent.

5          THE COURT:  Whatever.  They're going to take their

6   fee, a third or 40 percent, so let's just award a million,

7   three or a million, four.  Their math won't be right, but

8   they're thinking that way.

9          MR. RINGEL:  That's the concern, and that's why I --

10          THE COURT:  And so they get the million, four, or the

11   jury wanted them to get a million and the attorneys get the

12   other, and then the attorneys come in and say, well, wait a

13   minute, we get our 40 percent on top of that.  I hear you.

14   I'll give it.  Next.

15          MS. WANG:  Judge, can I raise one more issue relating

16   to that?  If Your Honor is giving this instruction -- and we

17   put this on page 34 of our -- of the instructions that we sent

18   you, then we propose the following instruction.  If you find

19   for any of the plaintiffs against any of the defendants, you

20   must not take into account any consideration of the city of

21   Denver's budget for 2022, which is $1.49 billion, in deciding

22   the amount of damages.  It's a correct statement of the law.

23   It's something the jury might be thinking about.

24          THE COURT:  You want to withdraw your punitive

25   damages claims then?

                    Sarah K. Mitchell, RPR, CRR

20-CV-01878-RBJ     Trial Prep. Conference     02/23/2022     124

 1          MS. WANG:  I don't have one because my clients --

 2          THE COURT:  Well, your colleague sitting at the table

 3   with you does, and if he's going to be arguing for punitive

 4   damages, then the city's budget is potentially relevant.  So

 5   which way do you want it?

 6          MS. WANG:  I'm not sure I follow, Your Honor.  The

 7   city --

 8          THE COURT:  The jury in deciding punitive damages

 9   typically can consider the ability of the defendant

10   financially to pay.  If it's General Motors, it takes more

11   money to punish them than if it's Deputy Christian, right?

12          MS. WANG:  Right.  But it's my understanding that we

13   can't get punitive damages against the city itself, only

14   against the officer.

15          THE COURT:  That's right.  So you can only get --

16   this is all about Christian?

17          MS. WANG:  No.  What I'm saying, Judge, is if the

18   reason that you're giving the instruction that the jury should

19   not consider attorneys' fees and court costs is because that

20   is a correct statement of law and it's something the jurors

21   might be thinking about, then I'm proposing an instruction

22   that tells the jury not to consider the city of Denver's

23   budget because that is also a correct statement of law and

24   that is something that the jury might be thinking about.

25          THE COURT:  Is the city of Denver's budget even going

20-CV-01878-RBJ    Trial Prep. Conference    02/23/2022    125

1    to be in evidence?

2         MS. WANG:  Right.  But it's not, and neither are the

3    attorneys' fees and court costs.

4         THE COURT:  I guess I'm not understanding what your

5    concern is.

6         MS. WANG:  My concern -- my concern --

7         THE COURT:  You're thinking that the jury is going to

8    think kind of like insurance.  The city has more money than

9    God, therefore we can jack up the damages.

10        MS. WANG:  It might be a concern, as much as the

11   contingency fee might come up in the jury deliberations.

12        THE COURT:  It's not my concern, but I do think it's

13   realistic they could worry about attorneys' fees, so I'll give

14   the one that Mr. Ringel proposed.  Now, punitive damages,

15   stipulated.  That's the next one.  I say so this is Epps'

16   claim against Christian.  Are you really seeking punitive

17   damages against Detective -- or Deputy Christian?

18        MR. MACDONALD:  At this time, yes, Your Honor.

19   Obviously if the evidence supports that, we would.

20        THE COURT:  Okay.  So you've got to tailor this

21   instruction then so that it's clear that the plaintiffs are

22   seeking punitive damages, but only against Deputy Christian.

23   Wow.  All right.  Do you disagree with that, defendant?

24        MS. HOFFMAN:  No.

25        THE COURT:  And where are we?  Is that the last one?

Sarah K. Mitchell, RPR, CRR

20-CV-01878-RBJ    Trial Prep. Conference    02/23/2022    126

1    Where's the mitigation stuff?

2         MR. RINGEL:  The only other one is we need to revise

3    the mitigation to provide specific plaintiffs, and we will do

4    that, and we'll confer, and we will resubmit that to the

5    Court.

6         THE COURT:  Okay.  So come up with a new set.  Who's

7    the instruction guru?  It's either Anderson or Hoffman.

8         MR. ANDERSON:  We'll work together, Your Honor.

9         THE COURT:  See if you can come up with a new set.

10   If you get a final set together, I'll even instruct before

11   openings.

12        MR. ANDERSON:  We would appreciate that, Your Honor.

13        THE COURT:  It's 12:35.  Is there anything else that

14   you need to talk about today?

15        MR. MACDONALD:  I don't think so, Your Honor.  The

16   only other question would be what time you'd like us here on

17   Monday.  What's your practice?

18        THE COURT:  On Monday, the 7th?

19        MR. MACDONALD:  Yes, Your Honor.

20        THE COURT:  Well, we start at 9 o'clock, so probably

21   would be a good idea to come earlier than that and set up.

22        MR. MACDONALD:  Sounds great.  And we'll work with

23   Julie.  I understand we can come and take a look at the

24   electronics and make sure --

25        THE COURT:  You should do that.  You can take a look

Sarah K. Mitchell, RPR, CRR

20-CV-01878-RBJ    Trial Prep. Conference    02/23/2022    127

1    at the courtroom, do whatever you want.

2              MR. MACDONALD:  Thank you.

3              THE COURT:  And I think we agreed that we were going

4    to have eight jurors on this one instead of seven, which means

5    that our -- instead of 13, it will be 15.

6              MR. RINGEL:  I think 14, because three peremptories

7    per side, Your Honor.

8              THE COURT:  Right.  You're right.

9              MS. JORDAN:  Your Honor, there was one other thing

10   from the defendants.  We were conferring about exhibits and

11   labeling them.  It was pointed out that the practice standards

12   like the defendants to use letters, but there's more than --

13             THE COURT:  I don't care.

14             MS. JORDAN:  So if we can work on something together,

15   that's fine.

16             THE COURT:  I don't care.  What I care about is that

17   you stipulate to exhibits to the maximum extent you can.

18             MS. JORDAN:  Thank you.

19             THE COURT:  Thank you, folks.  Good day.

20             THE COURTROOM DEPUTY:  All rise.  Court is in recess.

21        (The proceedings were concluded at 12:37 p.m.)

22

23

24

25

                    Sarah K. Mitchell, RPR, CRR

1                    REPORTER'S CERTIFICATE

2

3          I, SARAH K. MITCHELL, Official Court Reporter for the

4   United States District Court for the District of Colorado, a

5   Registered Professional Reporter and Certified Realtime

6   Reporter, do hereby certify that I reported by machine

7   shorthand the proceedings contained herein at the time and

8   place aforementioned and that the foregoing pages constitute a

9   full, true and correct transcript.

10          Dated this 28th day of February, 2022.

11

12

13

14             /s/ Sarah K. Mitchell

15               SARAH K. MITCHELL
                Official Court Reporter
16         Registered Professional Reporter
             Certified Realtime Reporter
17

18

19

20

21

22

23

24

25

                    Sarah K. Mitchell, RPR, CRR