IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Senior Judge R. Brooke Jackson

Civil Action No. 1:20-cv-01878-RBJ *consolidated with 1:20-cv-01922-RBJ*

ELISABETH EPPS, et al.,

  Plaintiffs,

v.

CITY AND COUNTY OF DENVER, et. al.,

  Defendants.

---

ORDER ON DENVER DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

---

This matter is before the Court on a motion for summary judgment filed by defendants City and County of Denver, Officer Jonathan Christian, and Officer Keith Valentine (Denver defendants). For the below reasons, that motion (ECF No. 271) is GRANTED IN PART and DENIED IN PART.

## I.  STANDARD OF REVIEW

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it is essential to the proper disposition of the claim under the relevant substantive law. *Wright v. Abbott Labs.*, Inc., 259 F.3d 1226, 1231–32 (10th Cir. 2001). A dispute is "genuine" if the evidence is such that it might lead a reasonable jury to return a verdict for the nonmoving party. *Allen v. Muskogee, Okl.*, 119 F.3d 837, 839 (10th Cir. 1997). When reviewing a motion for summary judgment, a court must view the evidence in the light most favorable to the non-moving party. *Id.* However, conclusory statements based merely

1

on conjecture, speculation, or subjective belief do not constitute competent summary judgment evidence. *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004).

The moving party bears the initial burden of demonstrating the absence of a genuine dispute of material fact and entitlement to judgment as a matter of law. *Id.* In attempting to meet this standard, a movant who does not bear the ultimate burden of persuasion at trial does not need to disprove the other party's claim; rather, the movant need simply point out a lack of evidence for the other party on an essential element of that party's claim. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).

Once the movant has met its initial burden, the burden then shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). The nonmoving party may not simply rest upon its pleadings to satisfy its burden. *Id.* Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant." *Adler*, 144 F.3d at 671. Stated differently, the party must provide "significantly probative evidence" that would support a verdict in her favor. *Jaramillo v. Adams Cnty. Sch. Dist. 14*, 680 F.3d 1267, 1269 (10th Cir. 2012). "[T]he facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Id.*

## II.  BACKGROUND

This case is a consolidation of claims arising from police-protestor interactions during demonstrations following George Floyd's murder. The instant motion seeks summary judgement on all claims against the Denver defendants. The relevant claims fall into three categories. First are class action claims against the City and County of Denver. These claims

arise from an Emergency Curfew (curfew) imposed by the Mayor of Denver on May 30, 2020 after three days of protests. *See* ECF No. 271 at ¶¶15–20. The curfew, which was eventually extended through June 5, prohibited all persons from "using, standing, sitting, traveling or being present on any public street or in any public place," with a few limited exceptions,[1] from 8:00 p.m. until 5:00 a.m.[2] Plaintiffs, who were arrested and detained pursuant to the curfew but not charged with any other violations, brought a putative class action alleging that the curfew and its enforcement violated their First, Fourth, and Fourteenth Amendment rights. *See* ECF No. 219. The Court certified a class consisting of "[p]rotesters who (1) between May 30 and June 5, 2020; (2) were arrested for violation of D.R.M.C. 1-13 (emergency curfew) or D.R.M.C. 38-31(c) (failure to obey lawful order); (3) were not charged with any other violations; and (4) whose charges were dismissed." ECF No. 127.

The second category of claims seeks damages from the City and County of Denver for alleged policies that caused violations of plaintiffs' First, Fourth, and Fourteenth Amendment rights. These municipal liability claims—also called *Monell* claims after *Monell v. Department of Soc. Servs.*, 436 U.S. 658 (1978)—allege a slew of rights-violative policies and practices.[3]

---

[1] The curfew carved out exceptions for emergency personnel, individuals traveling directly to or from work or the airport, seeking exempt care, fleeing dangerous circumstances, or experiencing homelessness, and individuals granted special permission by the city council. ECF No. 255-13 at ¶2. It contained no exceptions for First Amendment activity. *See id.*

[2] From June 1–5, the curfew began at 9:00 p.m. ECF No. 255-14.

[3] The alleged policies and practices include, but are not limited to:

> [F]ailure to give audible dispersal orders before the use of force; indiscriminate and inappropriate use of chemical munitions such as tear gas; indiscriminate and inappropriate use of PepperBalls, including as a crowd control/dispersal measure or on anyone disrupting traffic and without warning, and inadequate training thereon; dangerous "kettling" tactics; inappropriate use of 40mm launchers and other projectiles, including authorized use based on any "articulatable" need, and inadequate training thereon; inappropriate use of pepper spray and inadequate training thereon; inappropriate use of flashbangs and Stinger grenades and failure to train thereon; failure to require officers to complete timely use-of-force reports,

3

Evidence for these policies and practices includes observations of their use during the protests and statements by Denver Police Department (DPD) personnel that all police actions taken during the protests were consistent with departmental policies. *See* ECF No. 286-7 at ¶13q.

The final category of claims alleges that two individual DPD officers, Jonathan Christian and Keith Valentine, violated plaintiff Elizabeth Epps's First, Fourth, and Fourteenth Amendment rights when they hit her with pepperballs. Ms. Epps alleges that Officer Christian shot her with pepperballs "without any warning or justification while she was documenting the protests and isolated on a public street." ECF No. 286 at p. 24. She alleges that Officer Valentine struck her with a pepperball when he improperly fired into a crowd. *Id.* Defendants argue that qualified immunity bars these claims. ECF No. 271 at pp. 23–25.

### III.    CLASS PLAINTIFFS

The class plaintiffs allege that defendants violated their First, Fourth, and Fourteenth Amendment rights by arresting and/or detaining them pursuant to the curfew. They argue that the curfew and its enforcement illegally infringed upon their right to freedom of expression, that their arrests for violating the curfew were unconstitutional seizures, and that defendants' allegedly selective enforcement of the curfew constituted an improper classification in violation of the Fourteenth Amendment Equal Protection Clause. Defendants respond that undisputed evidence shows that the curfew withstands constitutional scrutiny and, in any case, plaintiffs are not entitled to relief because arrests were made with probable cause.

---

which negatively impacted officer accountability; inadequate BWC activation during crowd-control situations and failure to train thereon; failure to discipline officers for the excessive use of force; and dictating the rules of engagement for mutual assistance agencies from outside jurisdictions while simultaneously allowing agencies to follow their own policies.

ECF No. 286 at pp. 16–17 (internal citations omitted).

4

### A. Defining the Curfew

The parties' dispute the curfew's content and Denver's policies surrounding curfew enforcement. Because the curfew's restrictions determine the proper level of constitutional scrutiny to apply, this section reviews the record to define the curfew. I keep in mind that I must view the evidence in the light most favorable to the plaintiffs but need not accept conclusory or unsupported allegations. *See Allen*, 119 F.3d at 839; *Bones*, 366 F.3d at 875.

I start with the curfew's text. It prohibited "all persons" from "being present on any public street or in any public place," defined as any place accessible to the general public. ECF Nos. 255-13; 255-14. The curfew carved out exceptions for emergency personnel, travel to and from work, individuals experiencing homelessness, and others, but it did not include an exception for First Amendment activity. The curfew order noted that, after Mr. Floyd's murder, "a civil disturbance ha[d] occurred within the downtown and surrounding areas of the City and County of Denver" resulting in "significant and extensive damage to people and/or property," and that the risk of continuing injury and/or damage remained. *Id.*

Defendants describe a version of the curfew I will call the "neutral curfew." Defendants emphasize that the curfew's language did not limit its applicability to demonstrators or protestors. They claim that the curfew's content-neutral text starts and ends the inquiry into its content—it applied to all citizens regardless of their speech or actions. Defendants further argue that the city's curfew enforcement policies did not draw distinctions based on speech. They highlight one instance supposedly confirming the curfew's neutral application: three non-protestors were arrested in Cherry Creek after fleeing from officers. ECF No. 271 at p. 13. If the majority of individuals cited for curfew violating were protestors, argue defendants, that was only because protestors constituted a disproportionate share of curfew violators.

Plaintiffs describe a different curfew and different enforcement policies. I will call plaintiff's version the "protest-targeted curfew." According to plaintiffs, despite the curfew's neutral language, Denver's actual curfew was a targeted order prohibiting protestors—and only protestors—from accessing public places after dark. They support this allegation with text messages, emails, and testimony that they claim show that the curfew was understood not as a curfew but as a ban on protesting. *See* ECF Nos. 286-19; 286-20; 286-21. The most notable texts convey a message from Division Chief Thomas: the curfew "is only to be used in relation to protest activity," and officers may "not [] cite for curfew just for being out after 2100." Instead, an individual must be engaged in "protest-related behavior" to be cited for a curfew violation. ECF No. 286-20 at pp.1, 4. Plaintiffs say that a reasonable jury could conclude that the text messages reflect a citywide policy because, although Division Chief Thomas is not a final policymaker, his texts summarized directives from the Chief of Police and other final policymakers. The one instance of curfew enforcement against non-protestors, claim plaintiffs, could reasonably be interpreted as an outlier when compared with over 300 instances of curfew enforcement against protestors. Plaintiffs argue in the alternative that even if the evidence does not show that the curfew's content discriminated based on speech, it nonetheless shows that DPD had adopted a speech-based selective enforcement policy.

I conclude that both versions of the curfew are supported by the record. A reasonable jury could accept defendants' claim that the policy was a "neutral curfew," but it could also accept plaintiffs' "protest-targeted curfew" description or plaintiffs' claims of selective enforcement. Internal DPD communications, which a jury might find persuasive, support plaintiffs' story. Because I must construe all evidence in the light most favorable to plaintiffs at this stage, I will analyze whether the protest-targeted curfew passes constitutional scrutiny.

B. **First Amendment Claims**

This Court applies a three-step inquiry to decide whether the government violated a plaintiff's First Amendment rights. *Verlo v. Martinez*, 820 F.3d 1113, 1128 (10th Cir. 2016). Plaintiff must first establish that his activities were protected by the First Amendment. *Id.* If they were, the Court must "identify whether the challenged restrictions impact a public or nonpublic forum, because that determination dictates the extent to which the government can restrict First Amendment activities within the forum." *Id.* Finally, the Court determines whether a policy is content-based or content-neutral and then applies the requisite standard of review to the government's proffered justification for prohibiting plaintiff's speech. *Id.*

The parties agree that plaintiffs engaged in protected First Amendment activity and that the curfew, by closing all public places, impacted traditional public fora. The appropriate standard of review depends on whether the curfew was content-based or content-neutral. Content-based speech restrictions "must satisfy strict scrutiny," meaning they must be "narrowly tailored to serve a compelling government interest." *Id.* at 1134 (quoting *Pleasant Grove City v. Summum*, 555 U.S. 460, 469 (2009)). Narrow tailoring in the strict-scrutiny context requires that a policy be "the least restrictive means" of achieving the government's interest. *Id.* Content-neutral restrictions undergo less rigorous scrutiny. They are permissible if they "(a) serve a significant government interest; (b) are narrowly tailored to advance that interest; and (c) leave open ample alternative channels of communication." *Id.*

The protest-targeted curfew, which a reasonable jury could find was Denver's actual policy, would have been content-based because it applied only to those participating in what the DPD referred to as the George Floyd protests. *See Golan v. Gonzales*, 501 F.3d 1179, 1196 (10th Cir. 2007) ("Content-based restrictions on speech are those which suppress, disadvantage, or impose differential burdens upon speech because of its content." (internal quotations

7

omitted)). Such a law is "presumptively unconstitutional." *Nat'l Inst. of Family & Life Advocs. v. Becerra*, 138 S. Ct. 2361, 2371 (2018). I find that the protest-targeted curfew does not satisfy strict scrutiny because, although the government had a compelling interest in preventing "violent, destructive, and riotous behavior jeopardizing public and officer safety and significant property damage," ECF No. 271 at p. 9, the protest-targeted curfew was not "narrowly tailored." For content-based restrictions, a policy is narrowly tailored "only if it is the least restrictive means of achieving the government's compelling objective." *Verlo*, 820 F.3d at 1134. A court must analyze whether the government could have achieved the same compelling interest in a way that imposed a less onerous burden on speech. *Golan*, 501 F.3d at 1196.

     I cannot conclude that the protest-targeted curfew was the least restrictive means of achieving the government's interest. First, the government has not argued that its curfew was the least restrictive means—it argued only that the curfew survived First Amendment scrutiny if construed as a content-neutral restriction. *See* ECF No. 271 at pp. 9–10. Moreover, it is plausible that the government could have achieved its aims while imposing a less onerous burden on speech. The government identified disturbances "occurring Downtown" that "involved substantial destruction of property and endangered public safety." *Id.* at p. 10. A geographically limited curfew, for example, might have fulfilled the governmental objective. Had the government chosen to clear 16th Street Mall, other business districts, and pedestrian-trafficked areas after dark but permitted peaceful protests to continue somewhere like City Park the "Downtown" disturbances would have ceased, property damage might have been eliminated or substantially reduced, public safety might have been preserved, and the foundational right to freedom of expression might have been maintained. The protest-targeted curfew therefore does not survive First Amendment scrutiny.

The neutral curfew, however, would survive First Amendment scrutiny. It would have been content-neutral and thus permissible even if it were not the *least* restrictive or intrusive means of advancing the government's interest. *Brewer v. City of Albuquerque*, 18 F.4th 1205, 1224 (10th Cir. 2021). The neutral curfew would have been narrowly tailored in the sense required for content-neutral restrictions and would have left open ample alternative channels for communications by allowing daytime protests. As a result, to succeed on their First Amendment claim at trial, plaintiffs must prove that Denver's policy was a curfew for protestors but not for anyone else, the order's text notwithstanding. I find that plaintiffs have presented sufficient evidence to potentially carry this burden at trial, and there therefore exists a genuine dispute of material fact about the content of Denver's curfew policy.

## C. Fourteenth Amendment

Plaintiffs claim that Denver's curfew enforcement policies violated their rights under the Fourteenth Amendment Equal Protection clause. For this claim, plaintiffs argue that even if the curfew was content-neutral, Denver adopted a policy of discriminatory enforcement that targeted protestors because of their speech. *See* ECF No. 286 at pp. 20–21 (citing internal DPD text messages instructing officers to enforce the curfew only "in retaliation for protest activity"). Defendants dispute the existence of such a selective enforcement policy. They argue that not all protestors were arrested, and there was at least one instance in which a non-protestor was arrested. ECF No. 271 at p. 13. I found above that a reasonable jury could conclude that Denver had adopted a speech-based discriminatory enforcement policy. The only remaining question is whether this factual dispute is material. In other words, would the discriminatory enforcement policy described by plaintiffs affect their right to relief under the Fourteenth Amendment?

Defendants represent that an Equal Protection Clause selective enforcement claim "requires establishing: (1) different treatment from others similarly situated; and (2) the differing

9

treatment was based on clearly impermissible or invidious grounds 'such as race, religion, or the desire to prevent the exercise of constitutional rights.'" ECF No. 271 at p. 12 (quoting *United States v. Salazar*, 720 F.2d 1482, 1487 (10th Cir. 1983)).

The discriminatory enforcement policy described by plaintiffs would suffice for Fourteenth Amendment liability under defendants' standard. Plaintiffs contend that protestors—who were arrested—were treated differently under Denver's enforcement policy than non-protestors. They further contend that the differing treatment was due to exercise of a constitutional right to free expression—as DPD text messages put it, whether an individual was "actively engaged in protest activity." ECF No. 286-20. The enforcement policy described by plaintiffs would violate the Equal Protection Clause. If, however, defendants are correct that Denver's policy did not enforce the curfew only against protestors, then the curfew would not have given rise to a claim under the Equal Protection Clause because there would be no speech-based disparate enforcement. The question of whether Denver adopted a protest-targeted enforcement policy is thus a genuine dispute of material fact.

### D. Fourth Amendment

Defendants argue that, even if the curfew was unconstitutional, arrests for violating the curfew could not have violated plaintiffs' Fourth Amendment right against unreasonable search and seizure because the arrests were supported by probable cause. ECF No. 271 at p. 14. I agree. Many courts have found that officers should be excused from liability under a statute they reasonably believed to be valid at the time of arrest. *See, e.g.*, *Pierson v. Ray*, 386 U.S. 547, 555 (1967); *Roska v. Peterson*, 328 F.3d 1230, 1251 n. 29 (10th Cir. 2003); *Grossman v. City of Portland*, 33 F.3d 1200, 1209 (9th Cir. 1994); *Peterson Novelties, Inc. v. City of Berkley*, 672 N.W.2d 351, 363 (Mich. 2003). Although these sources deal with officer liability, I find the underlying principle persuasive. Because plaintiffs did not respond to this argument or provide

alternative authority, I find no genuine dispute of material fact and dismiss the Fourth Amendment class action claims.

## IV.   *MONELL* CLAIMS

Plaintiffs' municipal liability claims against the City and County of Denver require (1) a city policy or custom; and (2) a causal link "between the policy or custom and the injury alleged." *Waller v. Denver*, 932 F.3d 1277, 1283–84 (10th Cir. 2019). "A municipal policy or custom may take the form of (1) 'a formal regulation or policy statement'; (2) an informal custom 'amoun[ting] to a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law'; (3) 'the decisions of employees with final policymaking authority'; (4) 'the ratification by such final policymakers of the decisions—and the basis for them—of subordinates to whom authority was delegated . . .'; or (5) the 'failure to adequately train or supervise employees, so long as that failure results from deliberate indifference[4] to the injuries that may be caused.'" *Bryson v. City of Oklahoma City*, 627 F.3d 784, 788 (2010) (quoting *Brammer-Hoelter v. Twin Peaks Charter Acad.*, 602 F.3d 1175, 1189–90 (10th Cir. 2010)) (citations omitted).

### A. Fourth Amendment Claims

Plaintiffs claim that Denver's policies deprived them of their Fourth Amendment right to freedom from unreasonable seizures. Claims that police used excessive force during a seizure are analyzed under the Fourth Amendment's reasonableness standard.[5] *Graham v. Connor*, 490

---

[4] Deliberate indifference is required only for municipal liability based upon a failure to adequately train or supervise. *See City of Canton v. Harris*, 489 U.S. 378, 387 (1989). Other claims require only the existence of a policy and causation. *Waller*, 932 F.3d at 1283–84.

[5] Plaintiffs must show both that a "seizure" occurred and that the seizure was "unreasonable." *Brower v. County of Inyo*, 489 U.S. 593, 599 (1989).

U.S. 386, 395 (1989). Defendants do not dispute that plaintiffs have sufficient evidence to sustain a Fourth Amendment claim; defendants argue only that the two *Monell* factors—policy and causation—are not met.

I find there is sufficient evidence for a jury to find in plaintiffs' favor on the Fourth Amendment *Monell* claim. To prove the existence of a policy, plaintiffs present expert witness reports identifying numerous DPD policies and customs. ECF Nos. 286-6 at ¶¶6–142, 286-7; *see also supra*, p. 3 n.3. A jury could believe plaintiffs' experts. Defendants' litigation posture establishes the second *Monell* element, causation, for purposes of the summary judgment motion. Defendants do not dispute that plaintiffs have sufficiently alleged a Fourth Amendment injury at the hands of individual officers, nor do they dispute plaintiffs' contention that all individual officers were following DPD policies to a "T." If officer compliance with DPD policies led to violations of Fourth Amendment rights, then a reasonable jury could find a causal connection between the policies and the violations.

Defendants contest only the possibility of drawing a causal connection between three specific policies and plaintiffs' injuries. They argue that Denver's allegedly failing to discipline officers for uses of force, permitting officers to deactivate body worn cameras, and not requiring officers to complete use of force reports cannot have caused plaintiffs' injuries because those actions and inactions happened after injuries had already occurred. ECF No. 271 at pp. 22–23. Defendants misunderstand the application of plaintiffs' evidence. Plaintiffs argue that Denver's failure to require use of force reports and body worn camera activation, a preexisting policy understood by officers before the protests, notified officers that they likely would not be held accountable for excessive uses of force and thus caused them to use excessive force. Plaintiffs have presented sufficient evidence to support this causal claim. *See* ECF No.286 at p. 8.

Defendants are correct that Denver's alleged failure to discipline officers cannot be said to have caused an injury, but plaintiffs do not seek to introduce evidence of the policy for this purpose. Plaintiffs present evidence of failure to discipline as proof that specific policies existed—at least one DPD officer testified that "if [a DPD officer] is not disciplined, that shows that they were acting within policy." ECF No. 286-8 at p. 2.

### B. First Amendment Claims

Plaintiffs' First Amendment retaliation claim requires proof of three elements: (1) constitutionally protected activity; (2) government conduct that chills the protected activity; and (3) motive. *Worrell v. Henry*, 219 F.3d 1197, 1206 (10th Cir. 2000). Defendants contest only the third element—they argue that plaintiffs cannot raise a genuine dispute of material fact on the question of whether defendants' activities were "substantially motivated as a response to the plaintiff's exercise of constitutionally protected conduct." *Id.* I disagree. Plaintiffs argue that "[a] factual dispute exists as to whether officers' actions were motivated, at least in part, by [p]laintiffs' protected activity." ECF No. 286 at p. 13. Plaintiffs present evidence that they did not engage in destructive activity, and that many officers used force in situations that support an inference of retaliatory motive, such as tear gassing kneeling protestors chanting "Hands Up Don't Shoot" or shooting a plaintiff through her "Black Lives Matter" sign. *Id.* Denver's allegedly permissive policies regarding officers' use of less-lethal munitions could have caused retaliatory uses of force. Defendants' contention that officer actions were motivated by a legitimate need to respond to violent protestors may be true, but that is for a jury to decide. Plaintiffs' First Amendment *Monell* claim survives summary judgment.

### C. Fourteenth Amendment Claims

Although plaintiffs are permitted to bring excessive force claims under the Fourteenth Amendment Due Process clause for uses of force that do not fall under the Fourth Amendment's

13

"searches and seizures" requirement, *Roska v. Peterson*, 328 F.3d 1230, 1243 (10th Cir. 2003), plaintiffs' Fourteenth Amendment claims are no longer at issue. Based on statements by counsel during the trial preparation conference held on February 23, 2022, this Court understands that plaintiffs pursued their Fourteenth Amendment claims only in case defendants argued that Denver's actions were not withing the Fourth Amendment's ambit because, regardless of the actions' unreasonableness, plaintiffs were not seized. *See Brower*, 489 U.S. at 599 (stating that Fourth Amendment claim requires plaintiffs must show both that a "seizure" occurred, and that the seizure was "unreasonable"). Defendants represented that they would make no such argument—if the evidence shows that Denver and its employees' actions constituted unreasonable and/or excessive force, defendants will not seek to evade liability because the unreasonable and/or excessive force was not applied during the course of a seizure. The Fourteenth Amendment claims are therefore moot.

## V.   INDIVIDUAL DEFENDANTS

Plaintiff Elizabeth Epps brings Fourth, Fourteenth,[6] and First Amendment claims against Officers Jonathan Christian and Keith Valentine in their individual capacities. Ms. Epps claims that Officer Christian shot her with a pepperball while she was livestreaming video of the police. ECF No. 286-35 at p.35. According to Ms. Epps, Officer Christian shot her without warning or justification. *See* ECF No. 178 at ¶ 95. Ms. Epps claims that Officer Valentine shot her in the face with a pepperball the next day while she peacefully protested. ECF No. 286-35 at p. 34. Ms. Epps alleges that Officer Valentine fired in retaliation when a different protestor threw a water bottle, but he did not give any warnings and took no precautions to ensure that he would

---

[6] Like plaintiffs' Fourteenth Amendment *Monell* claims, Ms. Epps's Fourteenth Amendment claims against the individual officers are no longer contested for the purposes of trial. *See supra* pp. 7–8.

not injure innocent bystanders—Ms. Epps claims that Officer Valentine fired several rounds at face-level.  *See* ECF No. 178 at ¶ 97.

Defendants respond that Officers Christian and Valentine are entitled to qualified immunity.  ECF No. 271 at pp. 23–25.  "Qualified immunity balances two important interests— the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably."  *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).  To avoid application of qualified immunity, a plaintiff must prove that (1) defendant violated a constitutional right, and (2) the constitutional right was clearly established at the time it was allegedly violated.  *Id.* at 232.  In arguing that the individual defendants are entitled to qualified immunity, defendants argue that no binding precedent "clearly established" that defendant officers' alleged conduct was unlawful.  ECF No. 721 at pp. 23–24.  Defendants emphasize the "essence" of qualified immunity's second prong: to ensure that "every reasonable official" has received "fair warning" before being held liable.  *See id.* (quoting *Tolan v. Cotton*, 572 U.S. 650, 56 (2014)).

### A. Officer Christian

I find that Officer Christian is not entitled to qualified immunity.  Ms. Epps stated at her deposition that she was walking slowly and filming the protests when a police officer, who she identifies as Officer Christian, shot her with a less-lethal munition.  ECF No. 286-35 at p. 27. Her cellphone video provides no reason to doubt her testimony—it shows her isolated and inoffensively crossing a street when an officer kneels and aims what appears to be a pepperball gun at her.  ECF No. 286-36 at 2:50–3:10. She then states, "he just shot me," and zooms in on the kneeling officer.  *Id.*

The law was clearly established that an officer cannot shoot a protestor with pepperballs when that protestor is committing no crime more serious than a misdemeanor, not threatening

15

anyone, and not attempting to flee. In *Buck v. City of Albuquerque*, 549 F.3d 1269 (10th Cir. 2008), the Tenth Circuit "ha[d] little difficulty in holding that the law was clearly established at the time of the alleged infraction" with regard to a plaintiff shot with pepperballs when she "posed no threat and did not attempt to flee." *Id.* at 1291. The Tenth Circuit reached the same conclusion in *Fogarty v. Gallegos*, 523 F.3d 1147 (10th Cir. 2008), where it held that because it was clearly established that "force is least justified against nonviolent misdemeanants who do not flee or actively resist arrest," a reasonable officer would have been on notice that deploying less-lethal munitions against such an individual violated the law. *Id.* at 1161. Ms. Epps's allegation is that she posed no threat and was not attempting to flee, but she was shot by a pepperball nonetheless. It was clearly established that such a use of force is illegal, and qualified immunity is thus denied.

Regarding Ms. Epps's First Amendment retaliation claim, "[i]t has long been clearly established that the First Amendment bars retaliation for protected speech and association." *Buck*, 549 F.3d at 1292 (quoting *Mimics, Inc. v. Vill. of Angel Fire*, 394 F.3d 836, 848 (10th Cir. 2005) (alteration in original). Because Ms. Epps alleges she was doing nothing but filming the events and, through her presence, protesting police violence, I find a genuine dispute of material fact over whether Officer Christian shot Ms. Epps in retaliation for protected speech and association.

### B. Officer Valentine

I cannot find that Officer Valentine's actions violated clearly established law. Officer Valentine allegedly saw a protestor throw an object at the police, fired at the protestor, missed, and hit Ms. Epps, who was standing 10-15 feet behind the thrower. *See* ECF No 286-6 at p.45. Ms. Epps protests that Officer Valentine unnecessarily deployed pepperballs, did not warn protestors before firing, and aimed too high. ECF No. 178 at ¶ 97. The cases cited above

establish that pepperballs are inappropriate against non-threatening individuals. I do not find them applicable here where an individual threw objects at the police. And plaintiffs have provided no authority clearly establishing that it violates the constitution for an officer to fail to give warning to those standing behind an aggressive individual before firing at that individual, or that an officer violates the constitutional rights of those standing behind a threatening individual by aiming too high and being a poor shot. Officer Valentine is thus entitled to qualified immunity.

## VI.   ORDER

For the above reasons, Denver's motion for summary judgment (ECF No. 271) is GRANTED as to Officer Valentine, GRANTED as to the Fourth Amendment class action claims, and DENIED as to all other claims and defendants.

DATED this 1st day of March, 2022.

BY THE COURT:

_____
R. Brooke Jackson
Senior United States District Judge