1               IN THE UNITED STATES DISTRICT COURT

2                    FOR THE DISTRICT OF COLORADO

3      Civil Action No. 20-cv-1878-RBJ

4      ELISABETH EPPS AND SARA FITOURI, ET AL.,

5           Plaintiffs,

6           vs.                        ***EXCERPT***

7      CITY AND COUNTY OF DENVER, ET AL.,

8           Defendants.

9      ----------------------------------------------------------------

10                       REPORTER'S TRANSCRIPT

11                        Rule 50 Motion

12     ----------------------------------------------------------------

13          Proceedings before the HONORABLE R. BROOKE JACKSON,
       Judge, United States District Court for the District of
14     Colorado, commencing on the 21st day of March, 2022, in
       Courtroom A902, United States Courthouse, Denver, Colorado.
15

16                          APPEARANCES
       For the Plaintiffs:
17     TIMOTHY R. MACDONALD, MATTHEW J. DOUGLAS, and DIANA K. STERK,
       Arnold & Porter Kaye Scholer LLP, 1144 Fifteenth Street, Suite
18     3100, Denver, CO 80202

19     ELIZABETH C. WANG and MAKEBA RUTAHINDURWA, Loevy & Loevy, 2060
       Broadway Street, Suite 460, Boulder, CO 80302
20

21     For the Defendants:
       ANDREW D. RINGEL, KATHERINE HOFFMAN, and ROBERT A. WEINER, Hall
22     & Evans LLC, 1001 Seventeenth Street, Suite 300, Denver, CO
       80202
23
       HOLLIE R. BIRKHOLZ and LINDSAY M. JORDAN, Denver City Attorney's
24     Office, 201 West Colfax Avenue, Denver, CO 80202

25     Reported By KEVIN P. CARLIN, RMR, CRR, 901 19th Street, Room
       A259, Denver, CO 80294, (303)335-2358

20-cv-1878-RBJ     Rule 50 Motion     03-21-2022

1                    P R O C E E D I N G S

2        (The following transcript is an excerpt of the proceedings.

3   The complete proceedings are contained in a separate

4   transcript.)

5        (Proceedings commenced at 9:46 a.m.)

6            THE COURT:  The jury has been excused.  Mr. Ringel, do

7   you wish to make a motion?

8            MR. RINGEL:  I do, Your Honor.  Thank you.  At this

9   time, on behalf of the defendants the City and County of Denver

10  and Jonathan Christian, I move for judgment as a matter of law

11  on the following issues pursuant to Federal Rules of Procedure

12  50.  Initially, I incorporate all of the arguments and

13  authorities made in the Denver defendants' motion for summary

14  judgment and the applicable arguments in the trial brief and the

15  second trial brief.

16            The first issue I would like to raise, Your Honor, is

17  related to the claims involving plaintiff Cidney Fisk.  As the

18  Court knows, Ms. Fisk was previously represented by counsel for

19  the Epps plaintiffs.  She became pro se.  She has not appeared

20  in this matter in quite some time.  She has failed to appear at

21  trial, and offered no evidence to support her claims.  Because

22  no evidence has presented, it is our view that the defendants

23  are entitled to judgment as a matter of law related to Ms. Fisk.

24            THE COURT:  Is there any objection to that from

25  anybody?

Kevin P. Carlin, RMR, CRR

20-cv-1878-RBJ     Rule 50 Motion     03-21-2022

1          MS. STERK:  We have no position on that, Your Honor.

2          THE COURT:  Winner, winner, chicken dinner.

3          MR. RINGEL:  I thought I would start with the easy

4  one, Your Honor.

5          THE COURT:  All right.  Your claim by Ms. Fisk is

6  dismissed for failure to prosecute.

7          MR. RINGEL:  All right.  Moving on, Your Honor.

8          THE COURT:  It has to be without prejudice.  Any

9  failure to prosecute is without prejudice, but --

10         MR. RINGEL:  Well, but shouldn't it be a dismissal

11 under Rule 50 for failure to present evidence?

12         THE COURT:  Good question.  You're probably right.

13         MR. RINGEL:  And that would be with prejudice under

14 Rule 50.

15         THE COURT:  You're right.  I agree.

16         MR. RINGEL:  Okay.  Moving on, I want to address the

17 claims of plaintiff Elisabeth Epps against Jonathan Christian.

18 The first of those claims is a First amendment retaliation

19 claim.  It is our position that Ms. Epps can't meet the

20 subjective intent requirement for a claim under *Worrell versus*

21 *Henry* for the causation claim aspect of the claim based on the

22 Tenth Circuit's decision that it has to be but for.

23         So, the issue here is whether Mr. Christian's firing of

24 a single PepperBall in the direction of Ms. Epps was

25 substantially motivated in our version of *Worrell*, or

20-cv-1878-RBJ     Rule 50 Motion     03-21-2022

1   substantial or motivated in the version from the plaintiffs for

2   her exercise of protected activity under the First amendment.

3          It is our view that there is not sufficient evidence in

4   the record of that subjective motivation by Mr. Christian.

5   There is not evidence that he specifically fired the PepperBall

6   because of any First amendment activity that Ms. Epps was

7   engaged in at that moment.  He said that he didn't know that she

8   was filming anything, and that he fired the PepperBall for the

9   purpose of being -- because she was in the street and to get her

10  out of the street.

11         And one can argue about the legitimacy of that, and we

12  will in a minute with respect to the Fourth amendment claim, but

13  I don't think it fits a First amendment theory or there's

14  sufficient evidence on that issue.

15         With respect to the Fourth amendment claim against

16  Mr. Christian, it is our view that on the -- under the totality

17  of circumstances it was objectively reasonable for him to have

18  deployed the single PepperBall in an area saturation method to

19  encourage Ms. Epps to get out of 14th Avenue where she was

20  obstructing traffic.  We think that it's simply not a Fourth

21  amendment violation.

22         In addition, Your Honor, we would renew the

23  articulation of qualified immunity.  I understand the Court has

24  ruled against us with respect to the clearly established prong

25  of the qualified immunity analysis, but we would just renew that

20-cv-1878-RBJ      Rule 50 Motion      03-21-2022

1    argument to preserve that issue for purposes of the record.

2          And then the last issue with respect to Mr. Christian

3    is Ms. Epps has asserted a claim for punitive damages against

4    Mr. Christian, and on these facts, it is our position that under

5    the *Smith versus Wade* standard from the Supreme Court in 1983,

6    that there isn't sufficient evidence that a reasonable jury

7    could find that Mr. Christian's actions meet the extremely high

8    threshold for punitive damages under federal law.

9          There isn't any evidence that he acted with an evil

10   motive, and there isn't any evidence that he acted in reckless

11   disregard for Ms. Epps' federally protected rights.  What we

12   have here is one single shot of a PepperBall.  If it was a full

13   cartridge of PepperBalls, maybe it could support punitive

14   damages, but in this instance, it is our position that no

15   reasonable jury could conclude that punitive damages are

16   appropriate, and it doesn't meet the threshold for punitive

17   damages as a matter of law.

18          Do you want me to go on to the municipal liability

19   issues?

20          THE COURT:  Yes.

21          MR. RINGEL:  Thank you, Your Honor.  Also, I am going

22   to move for judgment as a matter of law on the issue of

23   municipal liability with respect to Denver.  And as the Court

24   understands and has been briefed, there are essentially five

25   different ways that a plaintiff can establish municipal

20-cv-1878-RBJ      Rule 50 Motion      03-21-2022

1   liability against Denver.

2          And what I think the Court needs to appreciate and

3   understand here is under all of those ways, there still needs to

4   be a direct causal link between whatever mechanism is going to

5   impose liability against Denver and the actions related to each

6   of the individual plaintiffs and all of the events involving

7   each of the plaintiffs.

8          The municipal liability theories here are pled in what

9   I would characterize as a throwing spaghetti against the wall

10  fashion.  And I don't mean to be pejorative, but I think it's

11  very important for the Court to analyze from a causation

12  perspective, what are the specific municipal liability theories,

13  and how do they translate into an argument for causation related

14  to all of the specific events involving each of the 12

15  plaintiffs that we're talking about here?

16         So, let me talk about some of those theories so that

17  the Court understands my perspective.  The first way that you

18  can get municipal liability is a formal regulation or policy

19  statement.  The only evidence that I heard related to any formal

20  regulation or policy statement presented by the plaintiffs is

21  the references to the crowd management manual, and it allowing

22  encircling crowds under some specific incidents and some

23  specific circumstances.

24         But my understanding of the theory here is that it is

25  not that the -- that policy in itself is unconstitutional, but

20-cv-1878-RBJ      Rule 50 Motion      03-21-2022

 1   that that policy allowed the application of the so-called

 2   kettling that happened on Colfax between Pennsylvania and

 3   William.

 4        And so I don't think the formal regulation or policy

 5   statement part of municipal liability applies.  I think what

 6   this essentially is is an application of the policy in this

 7   particular instance, because the way that I understand the

 8   formal regulation and policy statement analysis to generally

 9   apply would be like in the -- I think it's the *City of Los*

10   *Angeles versus Lyons* where there was a choke-hold policy at

11   issue, and that the policy on its face was challenged as

12   unconstitutional.  And I don't think that's what is being

13   asserted here, at least as I understand it.

14        With respect to the second way that this can be -- that

15   a policy can be formed is an informal custom amounting to a

16   widespread practice.  And I think it's important for the Court

17   to focus on what the Tenth Circuit has talked about, using

18   Supreme Court language about what that means.

19        A custom has to be persistent and widespread.  And

20   specifically, I would direct the Court to the *Carney versus City*

21   *and County of Denver* decision, which is 534 F.3d 1269, with a

22   pinpoint cite of 1274, Tenth Circuit decision of 2008.

23        And that decision says in pertinent part, a custom has

24   come to mean an act that, although not formally approved by an

25   appropriate decision maker, has such widespread practice as to

20-cv-1878-RBJ      Rule 50 Motion      03-21-2022

1  have the force of law.  In order to establish a custom, the

2  actions of the municipal employees must be continuing,

3  persistent, and widespread.

4         The failure of the proof in this case, in my judgment,

5  is on the continuing, persistent, and widespread part of the

6  informal custom analysis.  And the basis of that argument, Your

7  Honor, is there is no evidence that has been presented related

8  to anything other than the response to the George Floyd protests

9  themselves.  There is no evidence that anything has been

10  continuing beyond the first five or six days of the response to

11  the George Floyd protest.

12         I am not aware of any decision from the Supreme Court

13  of the United States or the Tenth Circuit that has applied the

14  consistent -- the continuing, persistent, and widespread

15  language to something that is essentially a single incident,

16  albeit a single incident over a multiple-day period of time.

17         And in the absence of that, I don't think the evidence

18  is sufficient.  The whole point of the continuing, persistent,

19  and widespread language from the Supreme Court case law is to

20  avoid collapsing municipal liability in a 1983 case, and a

21  respondeat superior liability in a negligence case.  And in the

22  absence of issues in the past that have any knowledge of the

23  folks of the City and County of Denver that they were issues,

24  and it isn't something that is in my judgment sufficient.

25         The next way that somebody can establish a custom,

20-cv-1878-RBJ      Rule 50 Motion      03-21-2022

1   policy, or practice is a decision of someone with final

2   policymaking authority.  And this is, I think, the part of the

3   analysis that is going to require care for the Court, because

4   it's both legally and factually -- the causation issue is

5   legally important, but also factually important.

6          It is my understanding that the final policymaker that

7   the plaintiffs point to is Commander Phelan.  And I understand

8   the possibility that he can be considered a final policymaker

9   for purposes of his role as an incident commander in responding

10  to the protests.

11         And even if one accepts the proposition that Commander

12  Phelan is a final policymaker, there still has to be the moving

13  force causation that's required from the municipal liability

14  perspective between an actual decision of Commander Phelan and

15  an event involving the plaintiffs.

16         THE COURT:  I thought there was a stipulation that he

17  was one of the three final policymakers.

18         MR. RINGEL:  That's part of the jury instructions.

19  That was -- and I agree that that could be instructed by the

20  jury -- to the jury, but my point, Your Honor, is if he's a

21  final policymaker for this purpose, there still has to be a

22  causal connection between a decision of his and a violation of

23  the plaintiffs' constitutional rights.

24         We have heard a lot of evidence with respect to what

25  Commander Phelan did or didn't do, and if you -- the incidents

20-cv-1878-RBJ      Rule 50 Motion      03-21-2022

1    that there appears to be evidence -- or at least some evidence

2    that he was directly involved, are the so-called kettling

3    incident and the deployment of gas at 14th and Sherman.

4            But as an example, there is no evidence that directly

5    links Commander Phelan to Officer Christian's decision to fire

6    the pepper involving Ms. Epps, the pepper spray related to

7    Dr. Smith, the deployment of a bean bag shotgun related to

8    Zachary Packard, the deployment related to Joe Deras.  And we

9    can go on and on and on about some of these individual events,

10   and in the absence of a causal connection between a decision of

11   Commander Phelan and those particular actions, again, it

12   collapses into respondeat superior liability, and that's not

13   appropriate under these circumstances.

14           Another way that one can have a custom, policy, or

15   practice and liability against the City and County of Denver is

16   ratification by final policymakers of the decisions of

17   subordinates.  And the leading case that I found related to this

18   issue is *Jackson versus the City and County of Denver*.  That can

19   be found by the Court at 2022 U.S. App Lexis 1134.  It's a Tenth

20   Circuit decision from January 13th of this year.  And it

21   explained the ratification theory at pinpoint cite of star 11.

22           Moreover, a municipality will not be found liable under

23   a ratification theory unless the final decision maker ratifies

24   employees' specific unconstitutional actions as well as the

25   basis for those actions.  That is if the authorized policymakers

20-cv-1878-RBJ      Rule 50 Motion      03-21-2022

 1   approve a subordinate's decision and the basis for it, their

 2   ratification would be chargeable to the municipality because

 3   their decision is final.

 4          Let's look at the bases of ratification as I understand

 5   it from the evidence.  First, as we argued in the trial brief,

 6   failure to discipline an officer does not as a general matter

 7   create a ratification theory.  And there are a variety of cases

 8   for that, and one that cites others is the *Sexton versus City of*

 9   *Colorado Springs* case, 530 F. Supp. 3d 1044, pinpoint cite 1071

10   to 72.  It's a District of Colorado decision, and I believe it's

11   2021, if my notes are correct.

12          But even factually here, to get a ratification theory,

13   it would have to be an affirmative decision by a final

14   policymaker.  In this instance, that would have to be the

15   executive director of the Department of Public Safety.  So, what

16   would have to happen is there would have to be discipline that

17   goes all the way up to the executive director of the Department

18   of Public Safety, and that in this case, his name is Murphy

19   Robinson at the time, and he would have had to have made an

20   affirmative decision that the particular conduct involving the

21   plaintiff wasn't a violation of policy, and then you could

22   theoretically have a ratification theory.  Otherwise, it just

23   doesn't add up, and it's not an appropriate theory.

24          The other way that they're trying to argue that there's

25   ratification is the information that was presented related to

20-cv-1878-RBJ       Rule 50 Motion       03-21-2022

1    the press conference that we saw on video involving the chief of

2    police and Mayor Hancock, and the date of that press conference

3    is the second day, May 29th of 2020.  And there are general

4    statements made by the mayor and the chief related to the

5    officers using restraint, and specifically with respect to the

6    mayor, him saying he saw a video, and he didn't see any

7    violation of anybody's rights.

8         Fundamentally, the problem with that is that doesn't

9    provide any specific information from -- to a final policymaker

10   related to the specific events that are at issue.  A general

11   statement like that isn't enough to create ratification, because

12   under the *Jackson* decision, there has to be more information and

13   more knowledge of the specificity of what's going on.

14        The last way that one can get a municipal liability is

15   a failure to train theory.  And it is the defendants' position

16   that the deliberate indifference standard applies across the

17   board in municipal liability claims.  I understand the Court has

18   rejected that, but even the plaintiffs agree that deliberate

19   indifference is required for purposes of the failure to train

20   theory.

21        The barrier with respect to the failure to train theory

22   is what I've been harping on with respect to the plaintiffs'

23   experts and Mr. Mitchell, which is the lack of any evidence of

24   this being a problem and an issue prior to the protests

25   themselves.  So, deliberate indifference requires notice and

20-cv-1878-RBJ      Rule 50 Motion      03-21-2022

1   knowledge of deficiencies with respect to a policy or training,

2   and there is no -- there is nothing there that exists.

3            THE COURT:  Who was the insider who told the

4   independent monitor that under the current regime, training was

5   not emphasized and better training could have prevented this?

6            MR. RINGEL:  That's Lieutenant Coppedge, and the issue

7   is that there is no evidence that Lieutenant Coppedge had

8   that -- had any such conversation with anyone in leadership

9   prior to the protests.  And his statement to the monitor doesn't

10  establish deliberate indifference by the chief or the

11  department -- the executive director of the Department of Safety

12  or anyone who is in a position to do something about that.

13           I understand the evidence related to that OIM memo, but

14  I don't think that creates deliberate indifference, because no

15  knowledge of that has been presented prior to the protests.  And

16  in the absence of that, even if that was Lieutenant Coppedge's

17  opinion, if he doesn't announce it to anyone, it can't establish

18  deliberate indifference, and there is no evidence of that such

19  announcement.

20           The last issue that I wanted to highlight for the Court

21  is the importance of causation.  And I talked about that a

22  little bit, but I would encourage the Court to look at the *Board

23  of County Commissioners of Bryan County Oklahoma versus Brown*

24  decision, 520 U.S. 397, 1997.  And that talks about how there is

25  a rigorous causation requirement for municipal liability claims.

Kevin P. Carlin, RMR, CRR

20-cv-1878-RBJ      Rule 50 Motion      03-21-2022

1    And essentially what that means, at least from my

2  perspective, is there has to be evidence established and a

3  causal connection, a direct causal link between the violation of

4  a particular plaintiff's constitutional rights on the one hand

5  and the municipal liability theory on the other hand.  And I

6  think that's mostly where the -- where things break down.

7    The last thing I wanted to raise with the Court related

8  to municipal liability is the issue of the mutual aid partners.

9  And it is undisputed, based on the testimony that was presented

10  in the plaintiffs' case that Mr. Packard was injured based on

11  the actions of the City of Aurora, and Mr. Deras was injured

12  based on the actions of the Jefferson County Regional SWAT.  And

13  as the Court knows, Mr. Packard has a pending claim against the

14  City of Aurora and people from there, and Mr. Deras had a claim

15  with respect to two people from Jefferson County.

16    The question before the Court is can Denver be held

17  liable with respect to those events under a municipal liability

18  theory?  And I think that it's my position that there is no

19  theory that allows that to exist.  There is no Supreme Court,

20  Tenth Circuit, or decision from this Court that recognizes that

21  one municipality can be held liable for the actions of officers

22  from another municipality.

23    And I just got a note that with respect to Stanford

24  Smith, that the action related to him -- related to Dr. Smith

25  was the City of Aurora as well.

20-cv-1878-RBJ     Rule 50 Motion     03-21-2022

1          Even if one accepts as a proposition that Denver could

2     be held liable for the actions of the officers from these other

3     municipalities -- so, even if I accept that arguendo, there has

4     to be a municipal liability-based link between it.  It can't

5     just be we invite you to our protest -- to respond to the

6     protests, you violate someone's constitutional rights, we buy

7     the violation of the constitutional rights.

8          It has to be considered and examined in the context of

9     municipal liability principles that exist, because otherwise, it

10     makes it a negligence case.  And there hasn't been any evidence

11     that those three events are directly linked to any of the

12     theories related to municipal liability.  The criticisms related

13     to the mutual aid partners have to do with Denver not training

14     with them, not requiring them to use their own -- use Denver's

15     use of force policies, allowing them to use their own munitions,

16     and all of those things, and all -- you know, those criticisms

17     are either fair or not fair in the Court's mind, but there isn't

18     a causal connection between those criticisms and what

19     specifically happened with respect to those three plaintiffs.

20     And as a result, I don't think that that fits.

21          The last thing I just wanted to raise sort of from a

22     housekeeping perspective is a few specific issues related to

23     individual plaintiffs.  When Mr. Deras testified, he talked

24     about getting medical care for his injuries, but he didn't

25     present any evidence related to the amount of damages for

20-cv-1878-RBJ     Rule 50 Motion     03-21-2022

1    medical care.  And as a result, he shouldn't be able to recover

2    for any of the medical care that he claimed that he received.

3           With respect to Amanda Blasingame, she talked about

4    having one event -- one session with the therapist related to

5    the events with respect to the protests, but again, she didn't

6    present any evidence related to the cost of that therapy, and

7    she shouldn't be allowed to recover for that.

8           With respect to Claire Sannier, she testified related

9    to having some therapy, but that that was free.  And then she

10   testified to having EDMR therapy, but again, didn't present any

11   evidence related to the cost of the EDMR therapy.

12          And then finally, plaintiff Ashlee Wedgeworth

13   specifically testified about two incidents of exposure to

14   chemicals, but then generally said she was exposed on other

15   nights, but just talked about it generally.  And I don't think

16   that's enough to meet her burden to provide specific evidence to

17   recover for anything other than those two incidents.

18          Unless the Court has questions, that's my presentation

19   related to Rule 50, Your Honor.

20          THE COURT:  Thank you.

21          MS. STERK:  Good morning, Your Honor.  I'm going to

22   talk about the argument on Officer Christian, and Ms. Wang is

23   going to talk about the remainder.  So, I heard a couple

24   arguments on Officer Christian, and the first was that there's

25   no evidence of his subjective intent.

20-cv-1878-RBJ      Rule 50 Motion     03-21-2022

1      I think here, there is plenty.  We've seen plenty of

2   evidence of his intent.  As the Court well knows, intent can

3   be --

4           THE COURT:  I understand all that.

5           MS. STERK:  Okay.  So, I guess before I start as well,

6   we want to make sure that we incorporate our responses to the

7   MSJ and our responses to the trial brief.

8           THE COURT:  What's your evidence of punitive damages?

9           MS. STERK:  Yeah.  Your Honor, I think there's a few

10  things that we've seen through the evidence against Officer

11  Christian to support punitive damages.  One is that he was not

12  just -- he was -- certainly had a pattern of aiming at people

13  with phones.  We saw the comment that he had to one of his

14  fellow officers, agreeing that -- or at least seeming to agree

15  that he likes shooting people.  And I think that that alone is

16  enough for the jury to determine that he was acting with evil

17  intent, and not just shooting to get her out of the street.

18          Again, he was shooting at multiple people with phones.

19  We've seen a lot of aggression from him in the videos, and there

20  is certainly evidence that has been presented to show that he

21  was not simply acting to get her out of the street, but was

22  acting because he wanted to be shooting at protesters for their

23  message.

24          He also understood and has testified that he understood

25  that what he did was a use of force, and that even if it wasn't

20-cv-1878-RBJ      Rule 50 Motion      03-21-2022

1  going to hit her, it was going to get the PepperBall residue on

2  her and cause her to not be able to, you know, breathe as well,

3  and cause all the effects that that causes.

4         THE COURT:  And how are you going to argue that his

5  shot caused her bruise?

6         MS. STERK:  Well, Ms. Epps testified as to that.

7         THE COURT:  Yes, she did.

8         MS. STERK:  Excuse me?

9         THE COURT:  I said yes, she did.

10         MS. STERK:  Yes, she did.

11         THE COURT:  And that's all you've got, isn't it?

12         MS. STERK:  Well, Ms. Epps testified to that, and we

13  believe, Your Honor, that the video shows that the shot was

14  landing right where her calf was, and that's going to be a jury

15  decision.

16         THE COURT:  No, it doesn't.  It shows that the shot

17  hit to her right, and she's claiming the injury to her left

18  calf, the inside of her left calf.  Of course, your partner,

19  Mr. Macdonald, tried to demonstrate how she was walking.  That's

20  pure speculation as to how that happened; right?

21         MS. STERK:  It actually isn't pure speculation, Your

22  Honor.  Ms. Epps testified that she was hit.  She was saying

23  that she was hit in the video she was taking at the time as

24  well.  She had a bruise on her leg, and the video shows that her

25  left leg was in the back, right where the PepperBall was

20-cv-1878-RBJ      Rule 50 Motion     03-21-2022

1   landing.  And further, Your Honor, in some ways it doesn't

2   matter whether it hit her or not, because it did affect her.

3          THE COURT:  It matters a lot if it affects the

4   credibility of your case.  I am going to deny the motion on

5   Epps, and in doing so, I am giving them a gift.  I think you're

6   making an advocacy mistake.  I have told you that before.  I

7   tell you that again now, but if you're willing to have the

8   credibility of your whole case affected by that argument on

9   Epps, I can't help you.

10          MS. STERK:  I understand, Your Honor.

11          THE COURT:  All right.  Let's hear the response on all

12   the rest of it, briefly.

13          MS. WANG:  Judge, we -- as with the other attorneys,

14   we incorporate our responses to the motion for summary judgment,

15   but I will specifically address some of the things that

16   Mr. Ringel asked, unless you have some specific questions you

17   would like me to target my argument to.

18          THE COURT:  No.  It is totally not helpful to the

19   Court for any of the three of you to incorporate all your prior

20   briefs and motions.

21          MS. WANG:  Okay.  Great.  So, with respect to

22   municipal liability, so we've heard a lot from Mr. Ringel in his

23   questioning of the experts and other witnesses about, you know,

24   whether or not Denver's official policies on BWC, meaning not

25   requiring officers to turn on or activate their body-worn

20-cv-1878-RBJ     Rule 50 Motion     03-21-2022

1   cameras during protests and not requiring officers to complete

2   use of force statements during the protests was causally

3   connected to the harms in this case.

4        Those were official policies of the City of Denver,

5   which appears to have been conceded by Denver.  If it is an

6   official policy of the City of Denver, then the only question is

7   whether it caused the constitutional violations.  And you heard

8   testimony, the jury has heard testimony from the experts as well

9   as from some of the DPD's own witnesses, including Commander

10  Levens that if the City had had policies in place requiring the

11  activation of BWC and requiring timely and accurate use of force

12  statements at the time, that they would have allowed officers to

13  be held accountable for their actions.

14       And the causation is that officers understood and knew

15  at the time that they were using force against the plaintiffs

16  and other protesters during the protests in May and June of 2020

17  that they would not be held accountable, because they did not

18  have to document what they did, and there would not be any

19  objective evidence of what they did.  Those are the official

20  policies of the City of Denver, and they're causally connected

21  to the harms caused to our clients.

22       Additionally, there were official policies as testified

23  to by Commander O'Donnell in his video deposition that we played

24  for the jury, particularly with respect to the crowd management

25  manual.  What he said about the crowd management manual is that

20-cv-1878-RBJ     Rule 50 Motion     03-21-2022

1  with respect to all of the weapons that were used, the chemical

2  munitions, the 40-millimeters, the PepperBalls, officers had an

3  extreme amount of discretion to use those weapons as they saw

4  fit, and that official policy of the City of Denver was what

5  caused the officers in this case to use their weapons against

6  our clients in situations when they should not have been using

7  them at all.  So, that is another policy of the City of Denver

8  that caused the constitutional violations in this case.

9       In addition, there were acts that Judge -- that, you

10  know, Mr. Ringel talked about how, you know, with respect to

11  practice -- widespread practice or custom, he talked about

12  whether there was any evidence of prior incidents or notice

13  given to the City.  Now, of course, with respect to the official

14  policy claim, there does not need to be a prior series of events

15  that put them on notice.  The question is simply -- and this is

16  in the jury instructions that Your Honor has already approved.

17  The question with respect to official policy is simply whether

18  or not there was an official policy that caused the violations.

19       With respect to custom or practice, there is

20  testimony -- Mr. Mitchell testified that there were failures

21  relating to the DPD's use of PepperBalls and chemical munitions

22  against protesters in Occupy in 2012.  There were failures about

23  use of force reporting and BWC policy known as far back as 2014.

24  There were failures relating to use of force reporting and

25  policies as far back as 2017.  So, all of these things were in

20-cv-1878-RBJ      Rule 50 Motion      03-21-2022

1  addition on top of what I've already stated, known to the DPD at

2  the time, and they never addressed it.

3        And as Your Honor pointed out, there was testimony or

4  evidence in the form of the OIM memos that people within the

5  DPD, Lieutenant Coppedge, as well as Captain Sich talked about

6  how there were failures in training, and there was a deemphasis

7  in training under the current chief of police.

8        Now, with respect to the failure to train, there's been

9  an extensive evidence about the failure of the DPD to train.

10 There's been testimony from DPD witnesses as well as the experts

11 regarding the fact that they haven't had crowd control training

12 or field force training for years, that the amount of training

13 that they received was inadequate and insufficient.

14       And let me emphasize, it is absolutely the law that to

15 prove a failure to train claim, all you have -- you do not have

16 to show a pattern of prior incidents.  You have to show that

17 there is a -- a failure to train in an area where there is an

18 obvious -- and let me read from the jury instruction that Your

19 Honor has approved.  When the City has failed to train its

20 employees to handle recurring situations presenting an obvious

21 potential to result in a constitutional violation.

22       I don't think it's even disputed in this case that the

23 kinds of failures to train on the use of potentially deadly

24 weapons during a protest is the kind of thing that you should

25 train officers to do, and it was not done in this case.  And so

20-cv-1878-RBJ      Rule 50 Motion      03-21-2022

1   we have sufficient evidence, you know, when Your Honor construes

2   the evidence in the light most favorable to the plaintiffs to go

3   forward on that theory.

4         With respect to the act of a final policymaker, the

5   final policymakers in this case, and the one in particular that

6   is discussed in the jury instructions is Commander Phelan.

7   There is a connection between Commander Phelan's actions and the

8   plaintiffs.  One example, but not the only example, is the

9   kettling incident that occurred on May 31st, 2020, in front of

10  the Basilica.

11        There really is not even a dispute, and Commander

12  Phelan agreed that he ordered the two teams of officers to

13  squish the protesters on that block, and that he wanted them to

14  do it.  Not only was this an act of him, a final policymaker,

15  but it was also authorized expressly in the crowd management

16  manual itself.  So, there's two ways to municipal liability on

17  that particular incident.

18        In addition, Commander Phelan ordered and authorized

19  the gassing of protesters on numerous incidents, not just 14th

20  and Sherman on May 28th or Lincoln and Colfax on May 28th, but

21  on virtually every other time when there was a gassing of

22  protesters, there has been testimony -- there was testimony and

23  evidence that those things were authorized by the commander

24  himself.

25        And so given those things, we have the ability to --

20-cv-1878-RBJ      Rule 50 Motion      03-21-2022

1   the jury has -- we -- the Rule 50 motion should be denied on

2   that prong as well.

3            With respect to the ratification claim, there is

4   sufficient evidence to proceed on -- to deny the Rule 50 motion

5   with respect to ratification.

6            THE COURT:  I agree.

7            MS. WANG:  Okay.  Is there -- I mean, I want to

8   address Your Honor's specific questions, and I don't want to

9   just go on.  So, if there's something that you would like --

10            THE COURT:  What about Mr. Ringel's last point that

11   Deras, Blasingame, Sannier, and Wedgeworth didn't show any proof

12   of medical expenses?

13            MS. WANG:  Well, with respect -- I mean, with respect

14   to the amount of money for medical expenses, there were certain

15   plaintiffs, I believe Packard was the one who did provide

16   evidence of that.  And to the extent the others didn't --

17            THE COURT:  That wasn't my question.

18            MS. WANG:  Right.

19            THE COURT:  My question was do you dispute what he

20   says about Deras, Blasingame, Sannier, and Wedgeworth?

21            MS. WANG:  I don't dispute that there was -- I'm

22   sorry.  With respect to the medical expenses of Deras,

23   Blasingame, and Sannier, I agree there was not a specific dollar

24   amount presented as to the medical expenses.  With respect to

25   Wedgeworth --

20-cv-1878-RBJ      Rule 50 Motion      03-21-2022

1        MS. STERK:  Sorry.  I will address the questions as to

2    Wedgeworth.  I think that Mr. Ringel actually had said that the

3    problem with her is that she talked specifically and in detail

4    about two events, and there were other nights where she said she

5    was gassed but didn't go into huge detail.  And, you know, we

6    had done that in part, Your Honor, to move things along.  She

7    did testify that on the other nights she had similar experiences

8    to what she did testify about.

9        THE COURT:  That wasn't his point.  His point was very

10   simple and straightforward.  There was no evidence that she

11   incurred any economic damages in the form of medical expenses.

12       MS. STERK:  If that was the issue, that's true.  And I

13   don't think she testified about medical damages.  I don't think

14   that was the issue, but it is correct, Your Honor, that she did

15   not testify about medical expenses.

16       THE COURT:  All right.

17       MS. WANG:  Are there other specific questions that

18   Your Honor would like me to address?

19       THE COURT:  No.

20       MS. WANG:  Okay.  No?  All right.

21       THE COURT:  So, before getting into the details, I

22   will say this from the standpoint of the Court having witnessed

23   all of the evidence so far:  It is indisputable in my mind that

24   the plaintiffs have presented evidence that there were

25   widespread excessive applications of force to protesters.

20-cv-1878-RBJ      Rule 50 Motion      03-21-2022

1      To be totally fair, I think it's also indisputable that

2  the Denver Police Department faced a Herculean task in this

3  case.  How you could cope with that number of protesters, that

4  degree of violence, property destruction, looting, breaking of

5  windows, throwing of rocks and water bottles and other things is

6  almost beyond my understanding.

7      There absolutely is evidence of fault on both sides,

8  the protesters' side and the police department's side.  But the

9  plaintiffs refuse to acknowledge any good things that the police

10  did.  The police refuse to acknowledge that they did anything

11  wrong.  The two sides are blinded by their biases, and that's, I

12  think, why we are having this trial.  I've said that before, and

13  I now say it again.

14      With respect to the motion, the Court is required to

15  construe all the evidence in favor of the plaintiff for purposes

16  of a Rule 50 motion.  And as part of that, to draw inferences

17  that rationally can be drawn in favor of the plaintiff, and then

18  take the case away from the jury only if no rational jury could

19  find in favor of any of the plaintiffs.

20      The motion will be denied.  I can't think of a case

21  that I've had or that I'm even aware of in this court that more

22  deserves the pulse of the people, the pulse of the community as

23  reflected in the eight jurors that have heard the case.

24      In terms of details, however, with respect to the claim

25  which is the main claim here, that the harms sustained by the

20-cv-1878-RBJ     Rule 50 Motion     03-21-2022

1    plaintiff, which were the plaintiffs' exposure to PepperBalls in

2    several cases, exposure to tear gas in all cases, exposure to

3    emotional as well as physical harm, were caused by policies,

4    practices, and/or customs of the City and County of Denver, I

5    find that there is evidence construed in favor of the plaintiff

6    that could support a *Monell* decision in their favor.  Not of

7    course that that necessarily will be or even should be the

8    jury's decision, but it rationally could be, first of all.

9         We have the testimony of Commander Phelan, who is in my

10   view a final policy authority.  I think that was stipulated, but

11   even if it wasn't, he was the incident commander in charge of

12   the entire response to the protests.  That certainly makes him a

13   final policymaker.  And his testimony was -- and there were

14   others who were similar -- was that all actions of all of the

15   officers who were involved in the response to the protests were

16   consistent with the City and County of Denver's policies.  That

17   in and of itself is sufficient in my view to send this case to

18   the jury.

19        It was notable to me that even the incident where the

20   officer reached into a car and shot a PepperBall and/or gas

21   through the window, into the car which was then moving into

22   traffic, even that, although he said he didn't like the look,

23   was consistent with policy.  That is sufficient to send the case

24   to the jury.

25        But there's more.  There is testimony from the experts,

20-cv-1878-RBJ       Rule 50 Motion      03-21-2022

1   the police chief retired from Seattle and Professor Maguire,

2   that the training was substandard, and the result was the

3   violations that we all saw in video after video.  Violations of

4   people's rights to speech and to assembly and to be free from

5   excessive applications of force.

6          There were criticisms by the experts of the body-worn

7   camera policies as it existed and as it was implemented,

8   criticisms of the use of nonlethal projectiles, the fact that it

9   was discretionary with the officers, all of that expert

10  testimony supported this Court's finding that a prima facie case

11  has been presented.

12         There was the Coppedge memo, which I thought was

13  particularly poignant in that he basically said -- and this is

14  an officer now, not a patrol officer, but a management level

15  officer of the Denver Police Department -- that frankly, said he

16  to the Office of Independent Monitor, under the present chief of

17  police, training has not been considered to be all that

18  important.  It's a big change from how it used to be.  Better

19  training could have prevented a lot of what happened.

20         In addition to all of that, I think there is support

21  for a ratification theory.  Again, Phelan's statement to

22  everything that happened was consistent with Denver policy is a

23  form of ratification.  The fact that there was almost no

24  discipline imposed even though it is evident to the Court that

25  there was evidence of widespread violations, inappropriate

20-cv-1878-RBJ      Rule 50 Motion      03-21-2022

1  applications of force, inappropriate response to peaceful

2  protesters, but no discipline, virtually was imposed, by itself

3  distinguishes this case in terms of ratification based on lack

4  of discipline from the *Jackson* case and the other cases which

5  had to do with individual officer actions as opposed to this

6  massive response that occurred in this case.

7          We also have, of course, the televised press conference

8  featuring the chief of police and the mayor, both of whom

9  assured the people of Denver that the police department had

10  responded with great restraint to the protests.  Not so.  There

11  was not great restraint, at least I would say there is certainly

12  evidence that suggests there was not great restraint.

13          As for the sister agencies, I think that's a closer

14  call, but the evidence is, from Phelan, that they were under his

15  direction -- under his direction, and as an example of that,

16  when he discovered that one of the agencies, I think it was

17  Jefferson County, was using shotguns, a particular method that

18  he did not approve of, he told them to stop, and they stopped.

19  That to me showed that they were acting under his direction.

20          Indeed, I think the video showed Aurora, Jeff. Co., and

21  other agency officers intermingled with Denver officers to the

22  point that they were all, as Phelan said, acting in effect under

23  the policies, procedures, and practices of the City and County

24  of Denver through the police department.

25          So, that takes me to the final issue, which is the one

20-cv-1878-RBJ      Rule 50 Motion      03-21-2022

1   that is like the tail wagging the dog, and that is the claim

2   against Officer Christian.  I have been fairly vocal in saying

3   what I thought of that claim.  I don't know what a jury will do

4   with the claim.  I have a pretty good suspicion as to what they

5   will do with the claim.

6          What the evidence is is that Ms. Epps, minding her own

7   business, walking across 14th Street, filming, doing nothing

8   offensive other than the fact that she was jaywalking, saw

9   Christian take a knee, aim his PepperBall rifle right at her,

10  and fire a PepperBall.

11         Now, she claims that it hit her and caused a bruise on

12  her inner left calf.  And I guess you could infer that when she

13  saw him fire, she heard or felt a sting on her calf, and later

14  found a bruise there.

15         However, the objective evidence from the video, which

16  in all other circumstances the plaintiffs have endorsed, shows

17  that the PepperBall did not, as I see it, hit her, but as

18  Christian testified, missed her, hit on the street to her right.

19  There was some flutter about which way the wind was blowing.

20  Nothing came of that.

21         If it hit on the road to her right as the video seems

22  to show, then it is difficult, if not almost impossible to

23  understand how that same PepperBall would have caused a bruise

24  to Ms. Epps' inner left calf.  And I have cautioned the

25  plaintiff, of course they don't listen, that their effort to

20-cv-1878-RBJ      Rule 50 Motion      03-21-2022

1   contort the evidence to support this claim against Christian

2   could easily backfire in terms of the credibility of their case,

3   I believe.

4        But there is evidence, which if believed, from Ms. Epps

5   could show that that PepperBall caused her a bruise.  If you

6   think that the bruise is a major damage, then I guess it's worth

7   to be in federal court suing about it.

8        In terms of his intent and the punitive damages, intent

9   has to be inferred.  It's rare in our life that somebody just

10  comes out and says, I intended to shoot her in the leg or I

11  intended to hit her with the PepperBall.  His testimony was to

12  the contrary, but one could infer, since he's a police officer,

13  after all, he took a kneeling position, lined up his sights at

14  her, and fired, that he intended to hit her, or at least scare

15  the bejeebies out of her.  And I can't say that that couldn't

16  support a finding of reckless disregard of Ms. Epps' rights.

17       So, I think to the plaintiffs' detriment, I deny the

18  motion to dismiss the claim by Ms. Epps against Christian, as

19  well as the main claim against the City and County of Denver.

20       I do want to say that with respect to causation, no,

21  you can't link something that Phelan specifically did to any

22  exposure of one particular plaintiff.  That would be impossible.

23  But what the evidence does show is that the overreaction of the

24  cops, the excessive application of PepperBalls and tear gas and

25  sometimes some of the other projectiles, if you infer in favor

20-cv-1878-RBJ      Rule 50 Motion      03-21-2022

1    of the plaintiff, you construe in favor of the plaintiff, which

2    I have to do, was what led to the exposure of the plaintiffs to

3    PepperBalls and tear gas, notwithstanding their peaceful

4    protesting.  And that to me establishes causal link.  That means

5    that the case has to go to the jury.

6            So, with respect to the claims of Fisk, which have been

7    dismissed with prejudice, and the Court's agreement with

8    Mr. Ringel that there is no evidence to support any award of

9    economic damages in the form of medical expenses or otherwise,

10   at least as to Deras, Blasingame, Sannier, and Wedgeworth, and

11   any such economic damages claims by them are now dismissed.

12   With those exceptions, the Court denies the motion, and we will

13   proceed to the defendants' case after taking a short break so we

14   can all refresh and regroup.

15           (End of excerpted proceedings.)

16

17

18

19

20

21

22

23

24

25

1                           REPORTER'S CERTIFICATE

2

3

4          I, KEVIN P. CARLIN, Official Court Reporter for the

5   United States District Court for the District of Colorado, a

6   Registered Merit Reporter and Certified Realtime Reporter, do

7   hereby certify that I reported by machine shorthand the

8   proceedings contained herein at the time and place

9   aforementioned and that the foregoing pages constitute a full,

10  true, and correct transcript.

11          Dated this 28th day of March, 2022.

12

13

14

15

16          _____
            Kevin P. Carlin, RMR, CRR
17          Official Court Reporter

18

19

20

21

22

23

24

25