```
1                IN THE UNITED STATES DISTRICT COURT

2                    FOR THE DISTRICT OF COLORADO

3    Civil Action No. 20-cv-1878-RBJ

4    ELISABETH EPPS AND SARA FITOURI, ET AL.,

5         Plaintiffs,

6         vs.

7    CITY AND COUNTY OF DENVER, ET AL.,

8         Defendants.

9    ----------------------------------------------------------------

10                      REPORTER'S TRANSCRIPT

11                      Jury Trial, Vol. 6

12   ----------------------------------------------------------------

13        Proceedings before the HONORABLE R. BROOKE JACKSON,
     Judge, United States District Court for the District of
14   Colorado, commencing on the 14th day of March, 2022, in
     Courtroom A902, United States Courthouse, Denver, Colorado.
15

16                         APPEARANCES
     For the Plaintiffs:
17   TIMOTHY R. MACDONALD, MATTHEW J. DOUGLAS, and MINDY A. GORIN,
     Arnold & Porter Kaye Scholer LLP, 1144 Fifteenth Street, Suite
18   3100, Denver, CO 80202

19   ELIZABETH C. WANG and MAKEBA RUTAHINDURWA, Loevy & Loevy, 2060
     Broadway Street, Suite 460, Boulder, CO 80302
20

21   For the Defendants:
     ANDREW D. RINGEL, KATHERINE HOFFMAN, and ROBERT A. WEINER, Hall
22   & Evans LLC, 1001 Seventeenth Street, Suite 300, Denver, CO
     80202
23
     HOLLIE R. BIRKHOLZ and LINDSAY M. JORDAN, Denver City Attorney's
24   Office, 201 West Colfax Avenue, Denver, CO 80202

25   Reported By KEVIN P. CARLIN, RMR, CRR, 901 19th Street, Room
     A259, Denver, CO 80294, (303)335-2358
```

Proceedings reported by mechanical stenography; transcription
produced via computer.

20-cv-1878-RBJ    Jury Trial    03-14-2022

1                          I N D E X

2   PLAINTIFFS' WITNESSES                              PAGE

3   JOE DERAS
        Direct Examination By Ms. Rutahindurwa . . . . . . .990
4       Cross Examination By Ms. Jordan  . . . . . . . . . 1014
        Redirect Examination By Ms. Rutahindurwa . . . . . 1032
5
    KEITH VALENTINE
6       Direct Examination By Mr. Douglas  . . . . . . . . 1033
        Cross Examination By Mr. Weiner  . . . . . . . . . 1115
7       Redirect Examination By Mr. Douglas  . . . . . . . 1160
        Redirect Examination By Mr. Douglas  . . . . . . . 1177
8

9   PLAINTIFFS' EXHIBITS:

10
                            Identified               Received
11

12      5                     1162                     1162
        513                   1072                     1073
13      542                   1101                     1101
        585                   1055                     1055
14      624                   1155                     1155
        687                   1091                     1091
15      691                   1087                     1087
        878                   1011                     1011
16      881                   1011                     1011
        882                   1011                     1011
17      1005c                  998                      998
        1111                  1049                     1050
18      1121                  1155                     1155
        1134                  1065                     1066
19      1224                  1021                     1021

20

21  DEFENDANTS' EXHIBITS:

22
                            Identified               Received

23      3054                   994                      994

24

25  Reporter's Certificate  . . . . . . . . . . . . . . . 1180

Kevin P. Carlin, RMR, CRR

20-cv-1878-RBJ    Jury Trial    03-14-2022

1                    P R O C E E D I N G S

2        (Proceedings commenced at 9:04 a.m.)

3        (Jury in at 9:04 a.m.)

4            THE COURT:  Good morning, ladies and gentlemen.  How

5    are Colorado's finest this morning?  Doing well?  Excellent.

6    Just get going?  Now, before the trial started, I did something

7    a little bit unusual, and that is I granted both sides the

8    opportunity to make some -- to have counsel make some very short

9    speeches, statements at periodic times during the trial.  And

10   they choose when they want to do this.  I gave them a limited

11   number and a limited amount of time, and I understand that

12   plaintiff counsel wanted to use one of their opportunities now

13   this morning.  So, go right ahead, somebody.

14           MR. MACDONALD:  Thank you, Your Honor.

15           THE COURT:  Remember, when the lawyers are talking,

16   that's not evidence, but it hopefully is helpful to you.

17           MR. MACDONALD:  Ladies and gentlemen of the jury,

18   again, I haven't talked to you for a little while.  My name is

19   Timothy Macdonald, and today we're shifting a little bit in our

20   case.  You heard from a number of our plaintiffs.  You heard

21   from our expert witness, Chief Norm Stamper, and a couple of the

22   Denver command officers, Commander Sanchez and Commander Levens.

23           Today you're going to hear from one plaintiff, Joe

24   Deras, and you're going to hear from, I think, depending on how

25   efficient all of us are, three officers.  And so you will hear

20-cv-1878-RBJ     Jury Trial     03-14-2022

1    from Officer Keith Valentine.  We think he's representative --

2    his actions during the protest we think are representative of

3    the actions of lots of officers during the protest.

4            Then you're going to hear from Commander Patrick

5    Phelan.  You heard in the testimony earlier Commander Phelan was

6    the incident commander over sitting on top of all of the

7    protests in the command post, and you're going to hear about

8    some of the actions that he directed and some of the things that

9    he instructed the officers to do.

10           Then, depending on where we are in the day, you might

11   get to finish the day with a video.  Apologies in advance.

12   Watching -- and it's a videotaped deposition.  So, during the

13   case, we took depositions of officers, which are sworn

14   statements in front of a court reporter.  We videotaped those.

15   Then both sides get to select certain amount of testimony to

16   play.  So, we select some, the City of Denver selects some, and

17   that is going to be from Commander Michael O'Donnell.

18           And he was designated by the City as a witness to

19   testify about the City's training on First amendment and

20   excessive force, as well as their policies on crowd control,

21   crowd management.  And so that hopefully would be a video of, I

22   think it's cut at a little less than an hour.  I suspect that's

23   what we will get through today.

24           Tomorrow we will have a few more of the plaintiffs, and

25   probably at least one or two more officers.  So, that's what

20-cv-1878-RBJ   JOE DERAS - Direct   03-14-2022

1   we're planning to do with the next couple days.

2         THE COURT:  All right.  Thank you.  Next witness,

3   please.

4         MS. RUTAHINDURWA:  Thank you, Your Honor.  Plaintiffs

5   call Joe Deras.

6         THE COURT:  Good morning.

7      (The Witness is Sworn)

8         THE COURT:  Have a seat.

9                      **DIRECT EXAMINATION**

10  BY MS. RUTAHINDURWA

11  Q    Good morning.

12  A    Good morning.

13  Q    Can you please state your name, and spell your last name

14  for the record.

15  A    My name is Joe Deras, D-E-R-A-S.

16  Q    Have you ever been to a protest?

17  A    I have.

18  Q    And were you at the protest in Denver in end of May and

19  June of 2020?

20  A    I was.

21  Q    How many days did you attend the protest?

22  A    I attended four days, starting on Thursday, going through

23  Sunday.

24  Q    Of those days, which day stands out the most to you?

25  A    Saturday must be the day that stands out the most to me.

20-cv-1878-RBJ   JOE DERAS - Direct   03-14-2022

1   Q    And that would be Saturday, the third day, May 30th?

2   A    That's right.

3   Q    Why is that?

4   A    Saturday was the day that we -- I experienced tear gas for

5   the first time, and it was the first day where I saw people

6   almost get trampled, and was trapped in alleyways.  It was a

7   very traumatic experience.

8   Q    Before we get into that day, let's tell the jury a little

9   bit about yourself.  Where are you from?

10  A    I grew up in Aurora, Colorado, and went to school there.

11  Q    And do you have any siblings?

12  A    I do.  I have two siblings.  I have a younger brother and

13  an older brother who is a physician.

14  Q    What about your younger brother?  What does he do?

15  A    He does construction.

16  Q    Are you close to your siblings?

17  A    I am.  I grew up closest to my older brother.  When he went

18  to school, to medical school, I was thinking of following in his

19  footsteps, but I wasn't as academically skilled.  So, I went to

20  school for nutrition and science.

21  Q    And where did you go to school?

22  A    I went to school downtown at the Metro State University.

23  Q    Do you utilize your degree in the work that you do?

24  A    Not particularly.  While I was in school, I met a lot of

25  people and got involved with some organizations that kind of

Kevin P. Carlin, RMR, CRR

20-cv-1878-RBJ    JOE DERAS - Direct    03-14-2022

1   introduced me into the world of racial justice and police

2   accountability and just justice in general.

3   Q    Can you tell me a bit about the racial justice and social

4   accountability you witnessed during law school -- or during

5   college.

6   A    Yeah.  When I was, I believe like a sophomore, it was the

7   year that Trayvon Martin was killed in Florida.  He was a young

8   man who had gone to the grocery store, and when returning home,

9   someone had stopped him and asked him what he was doing and why

10   he was going in the neighborhood, and ultimately killed him.

11        It was a very impactful moment for me.  It was the

12   moment that I started to pull together different experiences

13   from my life growing up and relating to these kinds of issues.

14   And so it was really important for me at that time to protest,

15   to demonstrate, and to speak out against the policing system.

16   Q    And have you been doing that since graduating from college?

17   A    I have.

18   Q    Can you give a few examples of the work that you've been

19   doing.

20   A    Yeah.  I think early on, the most impactful work I did was

21   with an organization called the Colorado Progressive Coalition.

22   They did a lot of different work including economic justice, but

23   they had a racial justice program that I interned with, and we

24   would go to northeast Park Hill, which is the historically Black

25   neighborhood here in Denver, and we would knock on doors.  We

Kevin P. Carlin, RMR, CRR

20-cv-1878-RBJ    JOE DERAS - Direct    03-14-2022

 1   would ask residents if they had ever had experiences with the

 2   police, and if they did, what they were.

 3          And overwhelmingly, it was one of the experiences that

 4   everyone had a story.  Everyone took the time to talk to us.

 5   And, you know, after the conversation, after building that

 6   relationship, we asked if they wanted to submit a complaint to

 7   the Office of Independent Monitor.  And if they did, we would

 8   help them through the process.

 9          We would also invite them to know-your-rights teach-ins

10   so that they would be able to defend themselves in situations

11   where they were unsure of what to do.

12   Q    And while you were canvassing the Park Hill neighborhood,

13   did you observe anything in particular?

14   A    Yeah.  It was one of those experiences that was very

15   shocking when you see it with your own eyes.  Holly and 35th

16   Street is really close by a precinct, and so there's lots of

17   police officers in the neighborhood.  And as I was knocking on

18   one of the doors, I saw a police officer park their car on the

19   side of the street and wait for cars to pass, and waited for a

20   car full of people of color to stop at the stop sign on the very

21   next street, and then immediately pulled them over.

22          To me, it seemed like there was no reason to have

23   stopped them.  They pulled the people out of the car, and they

24   ripped it apart.  There was just like things from their car out

25   in the street while they were all sitting on the sidewalk.  And

20-cv-1878-RBJ    JOE DERAS - Direct    03-14-2022

1   it seemed to me like a very degrading experience.  And when I

2   talked to them after the police had left, they told me that they

3   had been stopped because the windows had been too tinted, or

4   were too high of a degree.

5   Q    So, did your observations shape your understanding of

6   policing in Colorado?

7   A    Yes.

8   Q    And how did it do that?

9   A    I think I saw with my eyes how often we would submit these

10  complaints to the Office of Independent Monitor, and oftentimes

11  nothing would happen.  It would just get dismissed or not enough

12  information, or there was always an excuse to not hold police

13  officers accountable for the things that they did, for the

14  mistakes that they made.

15  Q    And so going back to the protests, you attended that first

16  day on Thursday, and you were one of the protesters with Sara

17  Fitouri on the Highland Bridge?

18  A    Yes, I was.

19  Q    Did you take any videos from that day?

20  A    I did take some videos that day.

21        MS. RUTAHINDURWA:  I'm showing you Defendant's

22  Exhibit 3054.  It's been stipulated to by the parties.  We move

23  to admit at this time.

24        THE COURT:  All right.  Admitted.

25  Q.    (By Ms. Rutahindurwa) Let's play the video, and I'm going

20-cv-1878-RBJ    JOE DERAS - Direct    03-14-2022

1    to ask you a couple questions.

2         (A video was played.)

3    Q    Do you recognize this video?

4    A    I do.  I took that video.

5    Q    Why did you take this video?

6    A    Because I felt like after such a traumatic and sad moment

7    where we all found out about George Floyd's murder, that at the

8    very least, there was people having to stop and listen to the

9    fact that we were not okay with the policing system and how

10   accountability worked.  To me, it was a moment of education.

11   Q    Did you yourself get onto I-25?

12   A    I did not.

13   Q    So, when you state in this video, we found a way in to

14   I-25, what do you mean by that?

15   A    I mean those of us who were outraged by the murder of

16   George Floyd were finally able to -- or were for the first time

17   able to talk about our disagreement with how the police system

18   works in this country.  And so that's why there's a way there.

19   Q    And why are you supportive of protesters expressing their

20   message onto a highway?

21   A    I think it's a longstanding American tradition, civil

22   disobedience, even before civil rights, going back to the Boston

23   Tea Party, where Americans did something very illegal and threw

24   property off of a boat in protest of high taxes.  It's something

25   that we all learn in school, and I think it's the most American

Kevin P. Carlin, RMR, CRR

20-cv-1878-RBJ    JOE DERAS - Direct    03-14-2022

1   thing we can do.

2   Q    We can take the exhibit down.  Thank you.  I'm now going to

3   show you a screenshot from Exhibit 934, which has already been

4   admitted into evidence.  Can you circle yourself where you are

5   in this photo.

6   A    This is me.

7   Q    And you were close to that PepperBall that we see, this

8   white puff of smoke?  You were close to that PepperBall?

9   A    I was.

10  Q    Approximately how many PepperBalls did you feel exposed to

11  when you were on that bridge?

12  A    It's hard to tell.  There was lots of impact sounds.  So,

13  I'm not sure where they were hitting, but I was taking a video

14  during this picture, and you can see me -- like, as soon as the

15  cloud of PepperBall is spread, you can hear me cough and start

16  to feel the effects.

17  Q    And what did it feel like to be exposed to these chemicals?

18  A    It was the first time that I had ever experienced anything

19  like it.  It's really jarring.  There's water -- like, water

20  that comes out of your eyes, and it blurs your vision.  It

21  disorients you.  And my nostrils and my sinuses were just

22  burning and dry.  It was hard to breathe.

23  Q    You left the protest after the incident on Highland Bridge?

24  A    I -- yeah.  I was on the other side of the Highland Bridge

25  for like 30 minutes, and then I walked back to the capitol.

20-cv-1878-RBJ    JOE DERAS - Direct    03-14-2022

1   Q     How did you feel generally about your experience on day

2   one?

3   A     I think I was very surprised.  I wasn't -- you know, this

4   is a spontaneous demonstration, and I had been to many

5   spontaneous demonstrations in the last decade, and nothing like

6   this had happened before.  And so to see police officers just be

7   so aggressive without any cause, it was a little bit concerning.

8   Q     And just to orient you to the next day that we're going to

9   talk about, you attended the protest on May 29th, but you did

10  not encounter police; is that correct?

11  A     That's correct.

12  Q     So, let's talk about that Saturday, May 30th, which you've

13  already testified was the most memorable day for you.  We can

14  take the exhibit down.

15         Why did you return to the protest after what you had

16  experienced on that bridge?

17  A     You know, I suffer from depression.  I suffer from anxiety.

18  And the environment that the police have created definitely

19  supercharged those feelings, but my resolve and commitment to

20  justice was much greater than my fear of coming back.  And so I

21  came back every day.

22  Q     Almost every plaintiff so far has spoken in detail about

23  their experience at the intersection of Lincoln and Colfax.

24  Were you at that intersection?

25  A     I was.

20-cv-1878-RBJ   JOE DERAS - Direct   03-14-2022

1   Q    Can you describe what happened to you at that location.

2   A    Yeah.  So, that was the first time -- that was like the

3   first thing that happened that day.  When I arrived at the

4   capitol, there was -- I was on the south side of the West Steps,

5   and I could see police officers throwing tear gas and

6   PepperBalls into the crowds of people.  And momentarily would

7   stop, and then start up again.

8        And so it's one of those situations -- I was on the

9   sidewalk on the -- closest to Lincoln on Broadway -- or on,

10  sorry, on Lincoln.  And I remember getting PepperBalled in my

11  right -- in my right arm, my forearm.  And also experiencing a

12  flash-bang grenade going off on -- exposed my eardrum and caused

13  some ringing and loss of hearing.

14  Q    And how long did the impacts from that flash-bang last?

15  A    Like an hour or two.

16        MS. RUTAHINDURWA:  I'm going to show you

17  Exhibit 1005c.  This exhibit has been stipulated as authentic,

18  and we move to admit at this time.

19        MS. JORDAN:  No objection, Your Honor.

20        THE COURT:  It's admitted.

21  Q.   (By Ms. Rutahindurwa) Do you recognize this image?

22  A    I do.  It's a picture or video I took.

23  Q    And this shows where you were at one point in time at

24  Lincoln and Colfax?

25  A    Yeah.  It was in, like I said, a chaotic situation.  And so

Kevin P. Carlin, RMR, CRR

20-cv-1878-RBJ    JOE DERAS - Direct    03-14-2022

1  people are running to and from the grass on the West Steps, and

2  we had been moving back and forth on Lincoln as well.

3  Q    And can you orient to the jury people that we've discussed

4  before in prior testimony?

5  A    Yeah.  So, we've talked about this man in the brown shirt

6  before.  And this man has been in videos that we've seen on this

7  intersection as well.

8  Q    So, you were in the thick of all of the experiences at

9  Lincoln and Colfax?

10  A    Yes.

11        MS. RUTAHINDURWA:  We can take this exhibit down.

12  Thank you.  I'm going to show you Exhibit 1004A.  The City has

13  stipulated to this as authentic as well, and I move to admit at

14  this time.

15        MS. JORDAN:  No objection.

16        THE COURT:  Admitted.

17  Q.    (By Ms. Rutahindurwa) Do you recognize this video?

18  A    I do.

19  Q    What is it?

20  A    It's one of the videos that I took early on in the evening

21  while I was moving back onto the grass.

22  Q    We're going to play the video, and I'm going to ask you a

23  couple questions.

24      (A video was played.)

25  Q    Can you tell us a bit about what we're witnessing here.

20-cv-1878-RBJ   JOE DERAS - Direct   03-14-2022

1    A    Yeah.  You see the line of Lincoln and Colfax that we've

2    seen for various days, had deployed tear gas and was moving in

3    and shooting people on the street.  So, people had moved up onto

4    the grass, but before that, there was a line of other police

5    that had moved up onto 14th and Lincoln.

6    Q    So, the protesters were wedged between two lines of

7    officers?

8    A    Yeah.

9    Q    We can take this video down.  You mentioned you were hit

10   with PepperBalls at this location.  There were also lots of tear

11   gassings.  Were you impacted by that?

12   A    I was.

13   Q    Can you describe what it felt like to be impacted by tear

14   gas.

15   A    So, you know, this was the first time that I have ever

16   experienced any kind of chemical weapon, and I was really

17   shocked, because it was really fast.  I was on the grass on the

18   West Steps when I saw a tear gas canister roll up on the grass

19   from the Colfax and Lincoln intersection.  Cops were shooting

20   them into the crowd and onto the grass.  And, you know, the tear

21   gas couldn't have been more than 15, 20 feet away.  And as soon

22   as it hit the ground, the air around had filled with the

23   chemical.  Even though like you couldn't see the white cloud,

24   you could feel it.  It was palpable in the air.

25              And I immediately lost my vision and had trouble --

20-cv-1878-RBJ    JOE DERAS - Direct    03-14-2022

1   having trouble breathing.  It felt like I was drowning.  My

2   lungs, every time I took a breath, didn't feel like I was

3   getting any air.  And I was dry heaving, and at one point I went

4   back to the south side of the capitol, and I fell over, or

5   started to fall over when someone caught me and pulled me to the

6   south side of the capitol and poured water in my face and Milk

7   of Magnesia.  And if it wasn't for that person, I probably would

8   have passed out next to the capitol steps.

9   Q    Did the police ever come to your aid?

10  A    They did not.

11  Q    So, that person was another protester?

12  A    That was another protester.

13  Q    During your time at Lincoln and Colfax on May 30th, did you

14  hear any orders to disperse?

15  A    I did not.

16  Q    Did you throw anything?

17  A    I did not.

18  Q    Did you destroy any property?

19  A    Absolutely not.

20  Q    Did you engage in any violence?

21  A    No.

22  Q    During any time during the protest, did you do any of the

23  above?

24  A    No.

25  Q    Were you aware there was a curfew in place on May 30th?

Kevin P. Carlin, RMR, CRR

20-cv-1878-RBJ   JOE DERAS - Direct   03-14-2022

1   A    I was.

2   Q    Did you comply with the curfew?

3   A    I didn't.  I believed that it was another tactic in the

4   toolbox of the City to stop us from saying our protest and

5   taking our message to the streets.

6   Q    What were you hoping would be the City's response to the

7   protest?

8   A    I was hoping they would do many things.  For one, I was

9   hoping that they would call for the arrest of the four officers

10  in the George Floyd protest.  I was hoping that they would

11  demilitarize the police, which has been happening for the last

12  20 years in this country.  Police departments get a large

13  percentage of their munitions and, you know, the big cars that

14  we've seen on the videos that look like tanks, they're actually

15  decommissioned army weapons and tools.  And police departments

16  are using them on civilians.  And so I wished that they would

17  roll back that trend.

18        I also hoped that they would fire and prosecute

19  officers who have been found to have assaulted community

20  officers -- or community members.  I remember specifically Randy

21  Murr and Devin Sparks, officers of the Denver Police Department

22  who assaulted people ten years ago, more than ten years ago now.

23  And they were reinstated in 2020, in April of 2020, just one

24  month after -- or before the George Floyd protests, with half a

25  million dollars in back pay, and I thought that was wrong.

Kevin P. Carlin, RMR, CRR

20-cv-1878-RBJ    JOE DERAS - Direct    03-14-2022

1   Q     You heard Ms. Fitouri speak about her experiences this

2   evening when she was chased through the alleyways.  Were you

3   present for that?

4   A     I was present for that.

5   Q     Can you tell us about that experience from your

6   perspective.

7   A     It was one of the scariest parts of the night.  It really

8   felt like there was no way to keep yourself safe.  We were

9   marching through the streets on either side of 14th and Colfax

10  going east, and it didn't seem like anything that we would be --

11  that we would do.  Like, how does it keep safe?  Because the

12  officers would come up behind us and start shooting, throwing

13  tear gas, flash-bang grenades.

14        I remember specifically there was one alleyway at the

15  end of the night before we called it a night and went home,

16  where police officers actually threw large amounts of tear gas

17  into an alleyway that we had entered, and as we were trying to

18  exit that alleyway, another car of police came and blocked the

19  other entrance and started shooting into it as well.

20        I saw a woman fall and almost get trampled.  I thought

21  she might be seriously injured.  But there was enough protesters

22  that they made a barrier around her until she was able to get

23  back up.  But it left a lasting imprint in my mind.  The

24  screams, I can still like hear them sometimes in like during

25  this trial, and when I've seen these videos, I have gone home

Kevin P. Carlin, RMR, CRR

20-cv-1878-RBJ   JOE DERAS - Direct   03-14-2022

1   and in my dreams, they have come back up.  And it's been very

2   traumatic to see those things again.

3   Q    You were also about to get into your car when the police

4   were shooting protesters through the CEA parking lot?

5   A    I was.

6   Q    Do you have anything to add about that experience?

7   A    I think I'd just like to emphasize that the crowd that the

8   police shot without any warning were mainly young people, like

9   students.  I remember feeling outraged that the Denver Police

10  would make the city's youth feel so unsafe.  That's the Colorado

11  Education Association building, a building where they should

12  feel safe, and the police officers had made everyone unsafe

13  there that day.

14  Q    After you left the protest, where did you go?

15  A    After we left the protest that day, we -- you know, we were

16  all kind of still kind of in shock from the last three days.  We

17  had lots of injuries, and had not really had the time to like

18  think about our emotions or wellbeing.  And so a group of us

19  decided to go back to Sara Fitouri's house and discuss what had

20  happened the last few days and try to figure our experience, or

21  process our experiences with each other.

22  Q    Who went back to Ms. Fitouri's house?

23  A    Jackie Parkins was there.  Youssef Amghar was there, and I

24  believe Emma Bilson was there.

25  Q    I'm showing you Exhibit 994.  It's already been admitted

20-cv-1878-RBJ    JOE DERAS - Direct    03-14-2022

1   into evidence.  This is your friend Youssef?

2   A    This is my friend Youssef.

3   Q    Can you tell me your impression after speaking to Youssef

4   and learning about their injuries.

5   A    You know, I spent the night with Youssef running through

6   the alleys and trying to be safe, and I was really, really

7   grateful that they were with us, because they're a former

8   Marine, and they tried their best to get us home safe.

9         And I remember just being horrified when You took off

10  his shirt at Sara's house.  I already had seen his nose and his

11  mouth, and when they took their shirt off, I saw the welts, and

12  it just really broke me.

13  Q    But you returned the next day?

14  A    I did.

15  Q    Did you do anything differently to prepare for the

16  protests?

17  A    I did.  I -- you know, I saw how the video that we saw

18  earlier in testimony, where a protester was standing at the

19  intersection of Lincoln and Colfax, and they were hit by a

20  projectile and immediately fell on the ground.  I saw that in

21  real life.  And I knew that was going to be a risk going

22  forward, so I brought a hardhat from my time with the painter's

23  union, which I worked at for six years.  And I brought some

24  bandannas with apple cider vinegar.  I had some squirt bottles

25  with water and Milk of Magnesia to protect against tear gas.

20-cv-1878-RBJ    JOE DERAS - Direct    03-14-2022

1   And I had some earplugs to protect against flash-bang grenades.

2   Q    Approximately how big was the crowd that met up right

3   before curfew?

4   A    It was a big crowd.  I've been to a lot of demonstrations.

5   I try and every time guess the size of the crowd, and this time

6   it was really hard, because there was just so many people, I

7   hadn't really been able to gauge that big.  It must have been in

8   the thousands.

9   Q    Can you describe the general atmosphere in the crowd?

10  A    I think a lot of people had been mourning the last three

11  days.  I think Sunday was no different.  There was a lot of

12  families who had come out.  I think a lot of young people, a lot

13  of children in strollers, actually.  And there was like people

14  in sandals, which I remember made me very anxious, because if

15  the police had decided to deploy tear gas or any kind of

16  chemical weapons, then they wouldn't be able to run away as

17  fast, and maybe trip.  And I remember feeling very, very nervous

18  about those folks in the crowd.

19  Q    And how long were you able to march peacefully?

20  A    I think it was about 30 minutes.  You know, for the first

21  30 minutes, it seemed like we might be able to march without

22  police violence, but it didn't really end up that way.

23  Q    Can you tell us what happened at around 8:30 p.m.

24  A    Yeah.  About 8:30 p.m., about half of the march had already

25  passed Washington and Colfax, and we -- me and myself, Sara

1  Fitouri, Jackie Parkins, and Richael were walking down east, and

2  right before we got to the intersection on Washington and

3  Colfax, there was several flash-bang -- or there was a

4  flash-bang grenade that went off that we saw in the distance

5  about maybe five or ten feet away, and then several tear gas

6  canisters that were thrown into the intersection.

7  Q    I'm showing you a screenshot from Exhibit 544, which the

8  jury has already seen before.  Can you point yourself out to

9  the -- let's go to page eight.

10  A    Yeah.  This is me.

11  Q    And then the next page?  Do you see yourself on the screen?

12  A    Here.  This is me.

13  Q    So, you were right near the intersection of Colfax and

14  Washington when officers first deployed tear gas?

15  A    I was.

16  Q    And we can take the exhibit down.  And now play the video

17  from Exhibit 544.  We're going to play the video, and I'm going

18  to ask you some questions.

19       (A video was played.)

20  Q    Do you see yourself in this clip?

21  A    I did.

22  Q    What were you doing?

23  A    I saw the tear gas canister come into the intersection.

24  You know, when the tear gas was thrown, people ran in this

25  direction, and they ran into this direction, and they ran this

1   direction.  So, every direction where the line of police were

2   not.

3           And I had experienced that tear gas the day before, and

4   had seen my friend Youssef be hurt really badly by these things,

5   and I didn't want anyone else to have to go through that, and so

6   I made it a point that if I was in a position to help people not

7   breathe in this poison gas, that I would do it.  And so I kicked

8   the tear gas canister away from protesters.  And it didn't

9   really go very far, but I hoped that it at least kept some

10  people from breathing in the poison.

11  Q    Can you circle yourself where you're seen in this clip.

12  And you mentioned you were trying to get the tear gas canisters

13  away from the protesters.  What made you decide to kick that

14  tear gas canister at that moment?

15  A    It was a tear gas canister that was close to me.  And like

16  I said, I didn't want anyone else to experience the same effects

17  that I had.  And I was wearing a bandanna with apple cider

18  vinegar, and it was cutting the tear gas, so I felt good enough

19  to get closer.  And I was also wearing goggles that day, and so

20  I felt sufficiently able to get close enough to move it away

21  from people.

22  Q    What happened after you kicked the tear gas canister away

23  from the protesters?

24  A    Yeah.  Almost immediately, as I touched the tear gas

25  canister, I felt a loud and very disturbing sound on the top of

 1   my head that actually pulled my helmet off, and I had to catch

 2   it with my hand, pull it back on.  And as I was bringing my hand

 3   down and turning, my hand was struck by a projectile as well.

 4   And as I was, again, in the same motion turning, I was also hit

 5   in the back.

 6   Q    Do you know what you were hit with?

 7   A    At first I believed they were tear gas canisters, because

 8   that's what they were throwing -- the police officers were

 9   throwing into the intersection.  And it was definitely not a

10   PepperBall, because I had experienced those before, the days

11   preceding.  It definitely felt like it was a much larger

12   munition, like a shotgun round or some other larger projectile.

13   Q    How did it feel being shot in the head?

14   A    It was all very, very fast and chaotic.  I really couldn't

15   process any of the things that were happening in the moment.  I

16   was just moving and reacting to the impacts.  And as soon as I

17   felt them, I knew it was unsafe.  And so I tried to, like, move

18   into safety, and then I was shot again as I was leaving.

19   Q    And you had a helmet on?

20   A    I did.

21   Q    Do you know what would have happened if you did not have

22   the helmet on?

23   A    I don't think it really, like, set in until I heard my

24   co-plaintiff Zach's testimony and saw the extent of his -- of

25   his injuries, his broken skull, fractured skull, and

20-cv-1878-RBJ    JOE DERAS - Direct    03-14-2022

1   hemorrhaging.  The impact was straight on my forehead.  I think

2   that I would have been seriously injured, if not died that day.

3   Q    Did you have to leave the protest after the officer shot

4   you?

5   A    I did.

6   Q    Where did you go?

7   A    I first tried to get help from street medics that were

8   around.  I know that there was lots of off-duty medical

9   employees at the protest, and thank God for them, because they

10  were able to give me a splint to not further damage my hand.

11  They believed that my hand had been broken, and so they sent me

12  to the emergency room.  My friend Richael drove me there.

13  Q    We can take this exhibit down now.  Thank you.  And what

14  happened when you were at the emergency room?

15  A    At the emergency room, I -- Richael was not allowed to come

16  in.  This was at the beginning of the COVID pandemic, and/or we

17  didn't really know what the virus was or how it affected people.

18  And it was a very scary situation to be in a hospital with

19  possibly infected people that might cause me even more injury

20  and serious illness.  But once I was there, I was able to get an

21  x-ray, and they were able to -- they weren't able to really see

22  my bones clearly because of the swelling, and so they referred

23  me to an orthopedic specialist.

24  Q    Did you see that specialist?

25  A    I did.

20-cv-1878-RBJ   JOE DERAS - Direct   03-14-2022

1   Q    And what did the specialist say?

2   A    I saw them a few days after, I believe, or a little bit

3   after that.  And the specialist also could not see whether there

4   was microfractures or not.  And he recommended that I get an MRI

5   after a same period of time if I was still feeling the effects.

6   Q    Did you have to wear a brace?

7   A    I did.

8   Q    How long did you wear that brace for?

9   A    I believe it was somewhere around two to three months.

10        MS. RUTAHINDURWA:  At this time, I move to admit

11   photos of Mr. Deras' injuries identified as Exhibits 878, 881,

12   and 882.  They've been stipulated as authentic.

13        MS. JORDAN:  No objection.

14        THE COURT:  Okay.  Admitted.

15   Q.   (By Ms. Rutahindurwa) Did you take this photo?

16   A    I did.

17   Q    When did you take it?

18   A    I took this photo in the emergency room.

19   Q    And did you take a photo of your hand later?

20   A    I did.

21   Q    I'm showing you page two.  Is this a photo that you took

22   several days later?

23   A    It was.

24   Q    And then let's scroll down to the last photo.  This is the

25   brace that you were required to wear?

20-cv-1878-RBJ    JOE DERAS - Direct    03-14-2022

1    A     That was the brace, yes.

2    Q     And speaking more about only your hand injury, were you

3    able to go about your daily life afterwards?

4    A     I wasn't.  You know, I work for the Education Association.

5    A lot of my job requires me to be on the computer, and I wasn't

6    able to type for that amount of time.  The flexibility in my

7    fingers wasn't enough, and it hurt any time I moved it.  And so

8    it was really hard to just do my job with one hand.  I couldn't

9    cook for myself.  I needed help from friends.  I even had a

10   friend take me to the grocery store.  It was a really tough time

11   to like do anything for myself.

12   Q     And you mentioned you were also hit in the back?

13   A     I was.

14   Q     Can you tell us about that injury.

15   A     Yeah.  It was as I was turning away from the tear gas, I

16   was struck in my lower back.  And at the time, it really didn't

17   register.  And over the course of that night, it started to

18   throb and to like start to feel the pain come through.  By that

19   night, I was unable to even sleep on my back.  And for the

20   proceeding days, I couldn't sit for very long.  I couldn't walk

21   for very long, because it would start to feel like shooting

22   pains coming through.  There was just no -- no safe haven from

23   the pain.

24   Q     I'm showing you Exhibit 882.  When did you take this photo?

25   A     I believe that photo --

Kevin P. Carlin, RMR, CRR

20-cv-1878-RBJ    JOE DERAS - Direct    03-14-2022

1   Q    The first page.

2   A    That photo was taken pretty recently after the injury.

3   Like, within the same, like night or two.

4   Q    And then page two.  Do you remember when you took this

5   photo?

6   A    I believe that was a week later.

7   Q    How did you feel at the time that you took this photo?

8   A    It was just a very hard time.  I think it was, you know,

9   trying to process the days of the protest, but also deal with my

10  own pain and my inability to return to the protest because of my

11  injuries.  It felt hopeless, and it was not a very good time

12  during my life.

13  Q    Is the pain that you felt comparable to anything you've

14  experienced before?

15  A    I've never broken a bone.  Like, this was the most pain

16  I've ever felt in my life.

17  Q    We can take this exhibit down now.  Thank you.  You've

18  talked a little bit about the recovery process.  Can you tell us

19  how this experience impacted your life otherwise?

20  A    Yeah.  And I think it's been, you know, being a critic of

21  the policing system in this country, like, I think I've had some

22  experiences and seen other people's experiences, but nothing to

23  this level.  It was very hard to understand that police would

24  just start shooting at us in the middle of alleyways and hunting

25  us down through the city like animals, and that I would be shot

20-cv-1878-RBJ   JOE DERAS - Cross   03-14-2022

1   in the middle of the head by police officers that we've seen on

2   other videos who have no clue how to handle these weapons.

3          It took 40 seconds for this officer to pull the pin in

4   the video we saw and throw the flash-bang.  And to think that

5   that -- those same officers who didn't know how to handle these

6   weapons were aiming at my head and could have seriously injured

7   or killed me that night, and I would just be laying in the

8   middle of the street dying like a dog was one of the most hard

9   real observations that I've had to make, and it's not been an

10  easy, easy road to recovery.

11  Q    Mr. Deras, why did you file this lawsuit?

12  A    I filed this lawsuit because I've seen often how the

13  police -- the police in Denver have been unaccountable for the

14  mistakes they've made.  This lawsuit is a continuation of my

15  protest.

16          MS. RUTAHINDURWA:  No further questions.

17          THE COURT:  Cross examination?

18                        **CROSS EXAMINATION**

19  BY MS. JORDAN

20  Q    Good morning, Mr. Deras.

21  A    Good morning.

22  Q    Just a few follow-up questions for you.  You were asked

23  questions about the video with the text overlay that you took

24  when you were at the pedestrian bridge, and I believe your

25  testimony, and correct me if I'm wrong, was that you did support

20-cv-1878-RBJ     JOE DERAS - Cross     03-14-2022

1   those individuals that got onto the highway; correct?

2   A    I said that I was glad that there was people hearing the

3   message.

4   Q    Okay.  Did you support those actions of them getting on the

5   highway?

6   A    I don't think they did anything wrong.

7   Q    Okay.  Is there a reason why you didn't get on the highway?

8   A    I was with my friends, Sara and Jackie, and we were staying

9   together.

10  Q    And you had testified that prior to May 28th, 2020, I

11  believe it was after Trayvon Martin's death, that's when you

12  started to get into demonstrating against the police; is that

13  correct?

14  A    That's when I first started to be involved in racial, like,

15  justice and issues of justice, yes.

16  Q    Okay.  Thank you.  And prior to then May 28th of 2020, had

17  you ever attended any sort of protest or demonstration in Denver

18  that the protest was targeted towards the police?

19  A    I believe so.  I can't recall any specific one, but I mean,

20  I was involved with the Colorado Progressive Coalition.  They

21  put on a lot of different demonstrations, including one for the

22  death of Trayvon Martin.  And I believe we also did a lot of

23  work with Alex Landau, who was a community member, who was

24  brutally beaten in 2008 by the Denver Police for making an

25  illegal left turn.  And so we did a lot of work with Alex Landau

20-cv-1878-RBJ     JOE DERAS - Cross     03-14-2022

1  in getting justice and reform through the legal system.

2  Q    And did that -- at those prior demonstrations, did you have

3  any encounters with the police like you did in May of 2020?

4  A    No.

5  Q    And moving forward to May 30th, I just wanted to touch base

6  really quick, you said that when you -- I believe it was like

7  kind of at the corner of Colfax and Lincoln, a flash-bang was

8  deployed; correct?

9  A    Yes.

10  Q    And I believe you said that it affected your hearing?

11  A    It did.

12  Q    Okay.  Just tell me, what do you mean by it affected your

13  hearing?

14  A    Well, I think in the very immediate sense, like, I couldn't

15  hear from my ear.  There was ringing.  There was sharp pains.

16  And I think like after an hour or two, like, it settled down a

17  little bit, but then for the proceeding weeks, any time I would,

18  you know, like extend my jaw or there was like a change in

19  elevation, the eardrum would just start to like really feel like

20  there was like something wrong.

21  Q    Okay.  After that hour or so, did the hearing come back and

22  the ringing stop?

23  A    The ringing stopped after that, yeah.

24  Q    Okay.  And when you went to the emergency room the

25  following day for the injuries you received at Colfax and

20-cv-1878-RBJ   JOE DERAS - Cross   03-14-2022

1   Washington, did you tell any of the doctors about the ear injury

2   that you had?

3   A   Yeah.  They took a look, but they didn't see anything in

4   the superficial, like, view that they did.  And they told me

5   that if I was still feeling bad about it that I could come back.

6   Q   And did you?

7   A   No.  After a couple days, or a few days, it started to calm

8   down.

9   Q   And you were testifying earlier about how you had hoped

10  that the Denver Police Department would demilitarize the police,

11  and I believe you testified that DPD gets some of its inventory

12  from the military.  How do you know that?

13  A   It's just a common knowledge that the United States

14  military has a surplus, like, program where anything that's

15  decommissioned from the Iraq and the Afghanistan war is directed

16  towards -- or police departments have the ability to source that

17  surplus equipment, and it often ends up in the hands of our

18  civilian police.

19  Q   So, you don't have any actual knowledge that DPD gets any

20  of its inventory from the military?

21  A   I mean, not specifically, but I don't think the big, you

22  know, SUV tank-looking things that we saw were civilian, like --

23  or require the police to have them to react to civilian

24  protests.

25  Q   That's just your belief.  You don't have actual knowledge

20-cv-1878-RBJ     JOE DERAS - Cross     03-14-2022

1   of where they get their equipment?

2   A    No, I don't.

3   Q    And are you aware that you can purchase PepperBalls or

4   PepperBall guns on Amazon?

5   A    I was not aware of that.

6   Q    Now, going forward to May 30th, you gave a little testimony

7   about when you and Ms. Fitouri and Ms. Parkins and Youssef

8   Amghar were at the park, is it Colorado Education Association?

9   A    That's correct.

10           MS. JORDAN:  I always mess up the E and the A, so

11   thank you for that.  Let's go and look at Exhibit 989, and I

12   believe this is stipulated to.  It's the CA camera footage.

13           MS. RUTAHINDURWA:  No objection.

14           THE COURT:  989?

15           MS. JORDAN:  We're having technical difficulties, so

16   we will not be going to 989.  Are we getting it?

17           THE COURT:  989 has multiple subparts.

18           MS. JORDAN:  It's G, Your Honor, and it will not open

19   for us.

20           THE COURT:  989g.  Okay.  Admitted.

21           MS. JORDAN:  It's fine.  I can just ask you a couple

22   questions about it.

23   Q.    (By Ms. Jordan) And so you were in the parking lot.  I

24   believe you said that you were all getting ready to depart from

25   protesting, and that is when officers were -- were they on

                    20-cv-1878-RBJ    JOE DERAS - Cross    03-14-2022

1   Colfax?

2   A    They were driving west on Colfax.

3   Q    Okay.  And they deployed PepperBall at, I believe you said

4   a group of kids on Colfax; correct?

5   A    Yeah.  We -- you know, when we got back to the parking lot,

6   we stopped and were talking to a vehicle that was parking in the

7   parking lot.  There was actually two seventeen-year-old women

8   from -- girls from the Cherry Creek High School, and so we knew

9   that there was lots of teenagers.  And when the crowd started to

10  move past the Colorado Education Association, a lot of them,

11  when they started to get shot, ran through the Colorado

12  Education parking lot, and so we were able to see a lot of

13  really young faces.

14  Q    Were you and your group ever -- strike that.  Let me start

15  that all over.  Did the Denver -- strike that.  Did the officers

16  that you saw deploy the PepperBalls ever deploy PepperBalls in

17  the direction that you and your group were?

18  A    Yes.

19  Q    And how do you know that?

20  A    Because they were aiming their guns and shooting at us.  We

21  heard them.

22  Q    And were you hit by any PepperBalls during that situation?

23  A    No.  As soon as the police officers started shooting, we

24  heard that recognizable pop that we hear in the videos, and we

25  ran behind our cars to take cover.

                    Kevin P. Carlin, RMR, CRR

20-cv-1878-RBJ    JOE DERAS - Cross    03-14-2022

1    Q     And how long did you hear the popping?

2    A     It's hard to tell.  It was a really fast-moving situation.

3    I think we were all really scared.  We weren't really looking at

4    the clock.

5              FEMALE SPEAKER:  Again, my apologies, Your Honor.

6              MS. JORDAN:  The what?

7              FEMALE SPEAKER:  The plaintiffs have 989g for us.

8              THE COURTROOM DEPUTY:  I need to know.  I'm sorry.

9    Where?

10             MR. MACDONALD:  The plaintiffs' table, yes.

11             MS. JORDAN:  Oh.  Where it's coming.  I thought you

12   meant the label.  Is it?  I don't know.  You know, it's fine.

13   I'm going to move on.  Thank you, though.  Now going back to the

14   defendant's table, Julie.  Thank you.

15   Q.    (By Ms. Jordan) Moving forward to May 31st, I want to

16   talk about when -- after -- I believe it was like after

17   8 o'clock, you said a large group of people got together, and

18   they started marching.  Did I get that right?

19   A     Yes.

20   Q     And I believe you testified that there was like -- this was

21   the largest group you had ever been in before; is that correct?

22   Or something like that?

23   A     During the -- during the four days, this was the largest

24   group that I had seen.

25   Q     And did the marching start at the capitol?

20-cv-1878-RBJ    JOE DERAS - Cross    03-14-2022

1   A    Yes.

2   Q    Okay.  And then you headed in which direction?

3   A    East of Colfax.

4   Q    On Colfax.  And was there an intended location you were

5   marching to, or was it just a general march?

6   A    No.  I think like a lot of the marches during those days

7   were very spontaneous.  I think a lot of people just wanted to

8   be in the vicinity where people could hear the message, and I

9   think for that night, it was the same.  We were just marching

10  down Colfax until we were able to tell everyone that we could.

11  Q    And let's look at Exhibit 1224, which is already admitted.

12  And just to orient the jury, do you see at the top of the screen

13  where it says East Colfax Avenue?

14  A    Yes.

15  Q    And so you would have been marching east, which means you

16  would have crossed over Logan, then Pennsylvania, then Pearl

17  Street?

18           THE COURTROOM DEPUTY:  I'm sorry.  I don't have 1224

19  as admitted.  I have 1225.

20           MS. JORDAN:  How about 1224?  Can I get that admitted?

21           MS. RUTAHINDURWA:  No objection.

22           THE COURTROOM DEPUTY:  Sorry to interrupt.

23           MS. JORDAN:  No worries.

24           THE COURT:  It's admitted.  1224.

25           MS. JORDAN:  If I'm orienting the jury, I would like

20-cv-1878-RBJ    JOE DERAS - Cross    03-14-2022

1  them to see it.

2  Q.    (By Ms. Jordan) So, again, for the jury, we have Colfax

3  at the top, and that's the avenue that the march went down;

4  correct?

5  A    Correct.

6  Q    And so as you're traveling towards the east, you cross over

7  Logan.  You cross over Pennsylvania.  You cross over Pearl

8  Street; correct?

9  A    Yes.

10 Q    Okay.  And then the incident which you were struck with

11 projectiles was at Washington and Colfax; correct?

12 A    Correct.

13       MS. JORDAN:  Okay.  And you can take that down.  I'd

14 like to admit Exhibit 548, which I believe is stipulated to.

15       MS. RUTAHINDURWA:  No objection.

16       MS. JORDAN:  And I will have it move to the timestamp

17 of 8:27:17.

18       THE COURT:  Admitted.

19 Q.    (By Ms. Jordan) And do you see yourself in this -- the

20 beginning of this screen -- on the video?

21 A    I do.

22 Q    And can you circle yourself for us, please.

23 A    This is me right here.

24 Q    Okay.  And then -- and it says up here at the top that it's

25 8:27:16 p.m.; correct?

20-cv-1878-RBJ    JOE DERAS - Cross    03-14-2022

1   A    Yes.

2   Q    And then you would have continued marching -- we can take

3   this down for now.  You continue marching forward, and by

4   forward I mean east towards Colfax and Washington.  And as we

5   saw on that video, there's a lot of people behind you.  And were

6   there a lot of like similar that was in front of you as well?

7   A    Yeah.  There was a really large crowd in front of us.

8   Q    Okay.  And as you approached Colfax and Washington, did

9   part of the crowd continue marching, or did everybody stop at

10  the intersection?

11  A    No.  So, when the tear gas -- when the first flash-bang was

12  thrown into the intersection, people who were there either ran

13  into east or west on Colfax, or went south on Washington.  Very

14  immediately, the crowd dispersed in those directions.

15  Q    Okay.  And how far from the intersection were you when that

16  deployment happened?

17  A    If you pull up the video, it's right next to like the

18  columns.

19  Q    Sorry.  I interrupted you, and the court reporter is going

20  to get mad at me.  So, let's pull up Exhibit 4 -- no.  544, and

21  then I gotta do this little thing to clean it off.  I don't

22  know.  It went away.  So, do you see yourself in this -- in

23  what's pulled up at the moment, it's --

24  A    I think this is me.

25  Q    Yeah.  Oh, good.  Because that's who I thought was you.

20-cv-1878-RBJ    JOE DERAS - Cross    03-14-2022

1   I'm glad we're on the same page.  Okay.  And so let's -- that is

2   at 8:28:29.  Let's play the video for a little bit.

3        (A video was played.)

4   Q    Okay.  So, stop it.  Okay.  And I think if we -- if I'm

5   following the white hat correctly -- can you expand that so it's

6   not cutting off?  I believe that -- is that you?

7   A    No.

8   Q    It's not?

9   A    This is me.

10  Q    Oh.  Thank you.  Thank you.  Okay.  So, that's you.  And I

11  believe we just saw what was that -- a loud -- or a large flash.

12  Is that the deployment you were talking about?

13  A    I believe so.

14  Q    Okay.  Let's keep playing it.  And I need the whole screen

15  to show.  We need to be at 8:29:16.  Play it.

16       (A video was played.)

17  Q    Stop.  Did you see that -- when you were at the

18  intersection, did you see that gentleman with the white shirt

19  and the red sleeves throw an object at the officers?

20  A    Not when I was at the intersection.

21  Q    But you see that now?

22  A    I see that now.

23  Q    Okay.  Let's play it a little bit farther.

24       (A video was played.)

25  Q    Did you see that firework that was shot towards the

20-cv-1878-RBJ   JOE DERAS - Cross   03-14-2022

1   officers?

2   A    No.  Could you play that again?

3   Q    Yeah.  Let's watch that again.

4        (A video was played.)

5   Q    Okay.  Did you see the firework that time?

6   A    This thing?

7   Q    No.  Can you back it up, please.

8        (A video was played.)

9   Q    Right here.  Did you see that firework?

10  A    I'm not sure what that is.

11  Q    All right.  Well, we can back it up again and we can watch

12  that the path comes from the crowd.  All right.  Play it again.

13       (A video was played.)

14  Q    Do you see that coming from --

15  A    Yes.

16  Q    You don't know what that is, but is it fair to say that it

17  did come from the crowd and not from the police line?

18  A    It does appear to look that it's coming from the crowd.

19  Q    Okay.  And we're going to let it keep playing.  Clean that

20  off.

21       (A video was played.)

22  Q    And then we see a deployment from the officers.  And it

23  appears that the crowd throws it back at the officers; is that

24  correct?

25  A    Yeah.  Looks that way.

Kevin P. Carlin, RMR, CRR

20-cv-1878-RBJ   JOE DERAS - Cross   03-14-2022

1   Q     Okay.  And then keep letting it play.

2         (A video was played.)

3   Q     And then pause it right -- oh.  I need the full screen.  Do

4   you see right here that this person has a racket in his hand?

5   A     It does look like he has something in his hand.

6   Q     Keep letting it play.

7         (A video was played.)

8   Q     And then stop right there.  Is that you that just kicked

9   the canister?

10  A     That was me.

11  Q     Go back.  Okay.  Play it.

12        (A video was played.)

13  Q     Stop.  That's not you right there?

14  A     Yeah.  That's me.

15  Q     That's you?  Okay.  And so you kicked a canister that

16  landed in the middle of the intersection.  That's correct?

17  A     Yes.

18  Q     And this is at 29:16 according to this little -- or up

19  here.  Sorry.  Let's clean that off.  Up here at 8:30:17, that's

20  when you kick your first canister; correct?

21  A     Yes.

22  Q     And are you -- you're aware that the officers over here are

23  from Jefferson County Regional SWAT Team; right?

24  A     Not at the time.  I just knew there were police officers.

25  I don't know who they were.

20-cv-1878-RBJ   JOE DERAS - Cross   03-14-2022

1   Q    Okay.  But now you know that's regional SWAT; correct?

2   A    I think through -- yeah.  Through the lawsuit, we've

3   learned that they were Jefferson County officers there.  I think

4   there was a problem identifying the specific officers, because

5   they weren't wearing body-worn cameras.  I think there was also

6   some issues because there was several different, you know, like

7   sheriffs and police and a SWAT team that were part of this

8   group.  And so they weren't really able to know who it was.

9   Q    No.  That's fair.  All right.  Let's play it a little bit

10  farther.

11       (A video was played.)

12  Q    All right.  Stop.  And that was -- this is the kicking of

13  the second canister that you were shown by counsel; correct?

14  A    Correct.

15  Q    Okay.  And you ran out into the intersection to kick that

16  one away; correct?

17  A    Yeah.  I was just off of screen.  So, you could see -- if

18  the screen would have shown this, I was right behind on the

19  eastbound lane.

20  Q    Oh.  Okay.  And then after you were -- this is when you

21  were struck by the projectiles.  Where did you go after that?

22  You can take it down.

23  A    I believe I went south of Washington, and into the Good

24  Times parking lot that's nearby.

25  Q    And you would agree with me that based on the size of the

20-cv-1878-RBJ    JOE DERAS - Cross    03-14-2022

1   crowd, you -- you can't tell what was going on in front of you

2   or behind you; is that correct?

3   A    I could see the police officers in front of me, and I knew

4   that there was people behind me.

5   Q    And you don't know what the people behind you in the crowd

6   were doing, do you?

7   A    No.  I think it's impossible to know it, especially in a

8   crowded chaotic situation to see everything.

9   Q    Okay.  Let's pull back up Exhibit 548 at 8:31:58.  And so

10  this is -- stop.  Can you back it up, please.

11       (A video was played.)

12  Q    This is at -- this is from the intersection of Colfax and

13  Pearl, which would have been behind you or west of where you

14  were located; correct?

15  A    This is on the west side of --

16  Q    This is on Colfax and Pearl.  So, as we went through that

17  map, we saw that you cross over Pearl before you get to

18  Washington?

19  A    Yeah.  That would be west of where I was.

20  Q    So, closer to the mountains.  I'm from here.  So, closer to

21  the mountains?

22  A    Yes.

23  Q    And I'm going to draw your attention to this gentleman who

24  I just circled who has his arm stuck out, and we're going to

25  watch this for a couple seconds.  Please play.

20-cv-1878-RBJ    JOE DERAS - Cross    03-14-2022

1        (A video was played.)

2   Q    All right.  And stop there.  And this is 30 seconds after

3   you were hit, and so it's fair to say that it's chaotic, but did

4   you just see that gentleman shooting fireworks in the direction

5   of the officers?

6   A    I did.

7   Q    And you would agree with me that that causes a grave safety

8   concern; correct?

9   A    Yeah.  I don't think that's a smart idea to point fireworks

10  or any kind of weapon and shoot them at people.

11  Q    And did you actually see that person that was in the median

12  area was actually hit by one of those fireworks?

13  A    I didn't.

14  Q    Okay.  You can take that down.  And going back to you were

15  struck in the hand, and I know you said you went to the

16  emergency room, and then you went to a specialist.  Did you go

17  back to the specialist after that first visit?

18  A    I did not.

19  Q    Okay.  And then how long did you wear your brace?

20  A    I think it was like a couple months.

21  Q    Okay.  Did you need any sort of physical therapy or

22  anything to help rebuild the muscles after not using your arm

23  for a couple months?

24  A    No, I didn't.

25  Q    Okay.  And then you said it was difficult to do your job

Kevin P. Carlin, RMR, CRR

1   because obviously you can't really type with a hand when it's in

2   a brace, but did you have to miss any time from work?

3   A    I didn't miss any time from work.  My work was very

4   supportive through me the whole time, and I was lucky enough to

5   be working from home, so it wasn't too much of an imposition.

6   So, I'm really grateful for the Education Association.

7   Q    Yeah.  That is great.  So, you're not claiming any lost

8   wages?

9   A    No.

10   Q    And then just really quick, I know that this has been very

11   emotionally hard on you.  You had mentioned that prior, you

12   had -- you had dealt with anxiety, and did you say depression as

13   well?  Okay.  And had you ever seen a mental health professional

14   prior to the George Floyd protest?  And I don't want to know

15   about what for, just if you ever had.

16   A    I believe the first time I saw a mental health professional

17   was, if I can remember correctly, after -- in the fall of 2020.

18   Q    Okay.  So, and you had never seen one before?

19   A    No.

20   Q    And how long did you see that mental health professional?

21   A    I am still a patient.

22   Q    Okay.  Okay.  And you felt -- you stated that you felt

23   hopeless, you know, after your injury.  Has that -- as you see a

24   mental health professional, has that -- has it -- this is not

25   very eloquent.  Gotten better?  Sorry.  I can't think of the

20-cv-1878-RBJ    JOE DERAS - Cross    03-14-2022

1   words.

2   A    You know, I think it's a long road with mental health.  I

3   think that this trial has done a lot to help the healing

4   process, and I hope that at the end of this trial, we're able to

5   hold the police departments accountable for their failures, then

6   I think that would help a lot.

7   Q    And how often do you see your mental health professional?

8   A    I see them once a month, about.

9   Q    I'm sorry.  Did you say once a month?

10  A    Yeah.  About.

11  Q    I thought you said month-to-month, and I was like, like a

12  lease?  So, once a month, and you started seeing them in the

13  fall of 2020?

14  A    I believe that's when I first started seeing them.

15  Q    And just on average, about once a month since you started

16  seeing them?

17  A    Yeah.

18  Q    And is this any sort of specialized treatment, or is it

19  just talk therapy?

20  A    It's -- yeah.  Psychiatry.

21  Q    And when I say just talk therapy, I don't mean to diminish

22  talk therapy, but I wasn't sure if you were doing -- we had

23  testimony that someone else had done some EMDR.

24  A    I have not done that.

25          MS. JORDAN:  Okay.  Those are all the questions I

                    Kevin P. Carlin, RMR, CRR

20-cv-1878-RBJ    JOE DERAS - Redirect    03-14-2022

1   have.  Thank you.

2          THE COURT:  Redirect?

3                **REDIRECT EXAMINATION**

4   BY MS. RUTAHINDURWA

5   Q    I just have two questions.  Ms. Jordan showed you a video

6   of someone shooting a firework into the crowd after you were

7   shot in the head.  Did you see anyone shooting anything before

8   you were shot by police officers?

9   A    I did not.

10  Q    And is it your understanding that the Denver Police were

11  responsible for all the outside law enforcement agencies who

12  they asked to come into Denver to assist?

13         MS. JORDAN:  Objection.  Speculation.

14         THE COURT:  Sustained.

15         MS. RUTAHINDURWA:  No further questions.  Thank you.

16         THE WITNESS:  Thank you.

17         THE COURT:  Questions from the jurors?  I don't see

18  any.  All right.  Thank you, sir.

19         THE WITNESS:  Thank you.

20         THE COURT:  Should we start up another witness?

21         MR. DOUGLAS:  Yes, Your Honor.  The plaintiffs call

22  Keith Valentine.

23         MR. RINGEL:  Your Honor, apparently Mr. Valentine is

24  putting money in a meter.  So, maybe we can take five minutes

25  for him to get back, unless the Court wants to just break.

20-cv-1878-RBJ   KEITH VALENTINE – Direct   03-14-2022

1          THE COURT:  No.  We can take our morning break now.

2      (Jury out at 10:17 a.m.)

3          THE COURT:  Okay.

4      (Recess at 10:18 a.m., until 10:35 a.m.)

5      (Jury in at 10:35 a.m.)

6          THE COURT:  Onward.

7          MR. DOUGLAS:  May I proceed, Your Honor?

8          THE COURT:  Yes.

9          MR. DOUGLAS:  All right.  Take two.  The plaintiffs

10     call Keith Valentine to the stand.

11         (The Witness is Sworn)

12         THE COURT:  Thank you.

13                     **DIRECT EXAMINATION**

14     BY MR. DOUGLAS

15     Q    Good morning, Mr. Valentine.

16     A    Good morning.

17     Q    My name is Matthew Douglas, and I'm going to ask you some

18     questions today on behalf of the plaintiffs in this case.  Could

19     you please state your full name for the record.

20     A    Keith Valentine.

21     Q    And you were an officer with the Denver Police Department

22     who worked during the time of the George Floyd protests;

23     correct?

24     A    Yes, sir.

25     Q    And you began working as an officer in the Denver Police

20-cv-1878-RBJ   KEITH VALENTINE - Direct   03-14-2022

1  Department -- and by the way, can I shorthand that sometimes as

2  DPD?  We're on the same page if I say DPD?

3  A     Sure.

4  Q     Great.  Thank you.  You began working as an officer at the

5  DPD in December of 2015; is that correct?

6  A     Yes, sir.

7  Q     And you left for the private sector in April of last year,

8  2021; correct?

9  A     Yes, sir.

10  Q     And you currently work for Axon?

11  A     That's correct.

12  Q     Okay.  The jury has seen a lot of body-worn camera videos.

13  The word "Axon" appears in the top left of all of those.  Is

14  that the same company?

15  A     Yes, sir.

16  Q     Okay.  Because Axon is the company that manufactures and

17  sells the body-worn cameras that are used by DPD; correct?

18  A     Yes, sir.

19  Q     Now, your leaving the DPD and going to Axon, that did not

20  have anything to do with the events of the George Floyd protest;

21  correct?

22  A     One hundred percent unrelated.

23  Q     Okay.  And at the time of the protests, you were an officer

24  in what was called at the time the gang unit; correct?

25  A     That's correct.

20-cv-1878-RBJ   KEITH VALENTINE - Direct   03-14-2022

1   Q    Okay.  It's currently called the Special Operations

2   Response Team, or SORT team.  Are you aware of that?

3   A    I am aware of that.

4   Q    Can you explain to the jury what is the gang unit?

5   A    What is the gang unit?

6   Q    Yeah.

7   A    Sure.  SORT, Special Operations Response Team?

8   Q    Yes.

9   A    It's a proactive team of police officers that patrol

10  different parts of the city, making proactive contacts, stops,

11  things of that nature.

12  Q    Okay.  And you were personally with the gang unit deployed

13  during DPD's response to the George Floyd protests on multiple

14  days; correct?

15  A    That's correct.

16  Q    Okay.  And on day one of the protest, you were injured by a

17  rock thrown at you that hit you in the back; correct?

18  A    Many times.

19  Q    Okay.  Throughout the course of the protest, you were hit

20  with a number of projectiles; correct?

21  A    That is correct.

22  Q    Okay.  And that's very unfortunate, and I'm sure that made

23  your job even more difficult, didn't it?

24  A    Yes.

25  Q    Now, I want to focus on the timing of the protest and

20-cv-1878-RBJ   KEITH VALENTINE - Direct   03-14-2022

1  understand what days you worked.  I am confident, because we

2  have some statements from you, that you worked the first four

3  days of the protest, May 28th through May 31st; is that correct?

4  A    That's correct.

5  Q    Okay.  After that, did you work additional days of the

6  protest?

7  A    Yes, I did.

8  Q    Okay.  Which additional days do you recall working?

9  A    I don't recall.  A lot.

10 Q    You recall it was all the days?  Did you get a day off

11 during that time?

12 A    I mean, what days specifically are you referring to?

13 Q    June 1st, 2nd, 3rd.

14 A    Yes.

15 Q    You worked all three?

16 A    Yes.

17 Q    Okay.  And in your mind, during that work, all of those

18 days when you worked the protest, you only deployed less-lethal

19 weapons on people engaged in riotous activity; correct?

20 A    Where are you getting that?  I don't understand the

21 question.

22 Q    Okay.  During your work at the protest, it's your view that

23 when you -- well, let me just back up.  You did deploy

24 less-lethal weapons on various days during the protests;

25 correct?

20-cv-1878-RBJ   KEITH VALENTINE - Direct   03-14-2022

1  A     Yes.

2  Q     And your deployment of those less-lethal weapons was on

3  people engaged in riotous activity and not against peaceful

4  protesters; correct?

5  A     I did not deploy less-lethal on anybody engaged in peaceful

6  protest.

7  Q     Okay.  And when you discharged your less-lethal weapons on

8  those various occasions, you were acting in a manner consistent

9  with your training at DPD; correct?

10 A     Yes, sir.

11 Q     And you were acting in a manner consistent with DPD policy;

12 correct?

13 A     Yes, sir.

14 Q     And you were acting in a way consistent with the practice

15 and custom of DPD at that time; correct?

16 A     In accordance with the policy, yes.

17 Q     And you saw other officers deploy less-lethal weapons

18 during the protests; correct?

19 A     Yes, sir.

20 Q     And at all times, those officers that you saw were acting

21 in a manner consistent with the training at DPD; correct?

22 A     I can only speak to the fact that I saw other officers

23 deploying less-lethal.  I can't and won't speak to their

24 justification for doing so, as I am not that officer.

25 Q     Okay.  I am just asking if anything you saw struck you as

20-cv-1878-RBJ    KEITH VALENTINE - Direct    03-14-2022

1   something inconsistent with the training you had received at

2   DPD.

3   A    Nothing that I saw concerned me.  I can't speak to any

4   other officer's justification for doing so.

5   Q    Sure.  I'm not asking about what their justification may

6   have been.  I'm just asking what you observed and whether it

7   struck you.  And you answered the question, and I appreciate

8   that.  And these other officers deploying less-lethal weapons

9   that you observed personally, was all of that consistent with

10  your understanding of DPD policy?

11  A    I saw nothing that alarmed me or concerned me or that I

12  felt was outside of policy.

13  Q    And you didn't raise with any other officer at any time or

14  any supervisors any concerns over any deployment of less-lethal

15  weapons during the protest; correct?

16  A    No, sir.

17  Q    Sorry.  I asked if that was correct, and I think you said

18  no?

19  A    Oh.  I'm sorry.  I thought you said did I raise any

20  concerns with the supervisors.

21  Q    And the answer is?

22  A    The answer is no, I did not, because I didn't have any

23  concerns.

24  Q    Thank you.  I want to start by asking you about May 30th.

25  And that's day three of the protest; correct?

20-cv-1878-RBJ    KEITH VALENTINE - Direct    03-14-2022

1   A    Yes.  If you're considering the start May 28th.

2   Q    Yes.

3   A    Sure.

4   Q    Okay.  All right.  If we could pull up for the witness

5   Exhibit 669, please.  And I'm going to represent to you based on

6   the filing that this is the body-worn camera of Officer

7   Hastings.  Was Officer Hastings another member of the gang unit?

8   A    Yes.

9   Q    Okay.  And you can see the timestamp, and it's in Greenwich

10  Mean Time, so when translated, this is May 30th at 7:16 p.m.;

11  correct?

12  A    I -- if I'm to assume that you're correct, yes.  I can't

13  speak to the translation of the timestamp on the body cam.

14  Q    It messes me up every time, but I have it written down

15  here.

16  A    Then I will take your word for it.

17  Q    Okay.  And you were present at this scene; correct?

18  A    Yes, I was.

19         MR. DOUGLAS:  Okay.  I would offer Exhibit 669 into

20  evidence.

21         MR. WEINER:  I think it already is, but I think he

22  said May 30th.  Gotcha.  So, then we go back.

23         MR. DOUGLAS:  It's confusing.

24         THE COURT:  669 is already admitted.

25         MR. DOUGLAS:  Thank you, Your Honor.  I was mistaken

20-cv-1878-RBJ    KEITH VALENTINE - Direct    03-14-2022

1    on that.

2                THE COURT:  It's not just me.  It's blurry; right?

3                MR. DOUGLAS:  That's correct.

4                THE COURT:  Glad to hear that.

5                MR. DOUGLAS:  So, Julie, the jury can see this at this

6    time too?  Thank you.  All right.  Let's play -- this one we're

7    just going to watch.  So, let's play this video, please.

8        (A video was played.)

9    Q.    (By Mr. Douglas) Okay.  And what we're looking at in the

10   picture on the left, that's you; right?

11   A    I can't -- I don't know.

12   Q    Okay.  Well, the person on the video, did you hear him say,

13   Keith?

14   A    I did hear that.

15   Q    Okay.  And you would be Keith; right?

16   A    I am Keith, yes.  Yes.

17   Q    All right.  So, you think that's you standing there?

18   A    Yes.

19   Q    Okay.

20   A    One could assume.

21   Q    All right.  And so did you see someone throw a water bottle

22   at the line of police in the early portion of this video?

23   A    I saw several things coming at us throughout the course of

24   the video.

25   Q    Okay.  Well, then let's back up to the beginning.  And it's

20-cv-1878-RBJ   KEITH VALENTINE - Direct   03-14-2022

1  going to be someone -- they're going to be right in this area.

2  And it's a guy holding a skateboard.  Let's keep an eye out for

3  him.  He's not there yet.  Let's play and then stop it after we

4  see the water bottle, please.

5      (A video was played.)

6  Q    Okay.  Did you see the protester with the skateboard throw

7  the water bottle in the direction of the police line?

8  A    Yes, sir.  I did see an individual in the center of the

9  screen throw something at us.

10 Q    Okay.  And then that's you to the left firing at that

11 protester; correct?  PepperBalls?

12 A    Yes.

13 Q    And you rapid fired a number of PepperBalls.  Did you see

14 how many you shot?

15 A    I saw a succession of PepperBalls being fired.

16 Q    And you heard a number of officers firing PepperBalls

17 around that time; right?  Not just you?

18 A    Yes.

19 Q    And you and those other officers continued firing

20 PepperBalls in that direction even after the person with the

21 skateboard ran away and disappeared; correct?

22 A    I can't speak to the direction.  And from this video of

23 what other officers were firing at, I was firing in that

24 direction, yes.

25 Q    Okay.  You were trying to hit that guy who threw the water

20-cv-1878-RBJ   KEITH VALENTINE - Direct   03-14-2022

 1  bottle; right?

 2  A    Yes.

 3  Q    Okay.  And that was true even though there were a number of

 4  people there in the immediate area; right?

 5  A    There was a number of people in the immediate area throwing

 6  stuff from behind that guy from all around that person.  So,

 7  yes.

 8  Q    Okay.  Did you see any of the people directly to the left

 9  or the right or behind that person throwing anything in this

10  video?

11  A    I recall that moment, and I do recall several people in

12  that area throwing stuff at us, which you have to understand is,

13  this body cam is -- it is literally just this angle.  It doesn't

14  show anything that was going on beyond its scope from left,

15  right, side to side, or behind us.

16  Q    Right.  I'm talking about all those people you can see

17  right here.

18  A    Yeah.

19  Q    Did you see any of those people in this video throw

20  anything other than the guy with the water bottle?

21  A    This video doesn't accurately show what was going on behind

22  that.  So, I stand by the fact that yes, I saw people within

23  that immediate area throwing stuff from behind the trees, from

24  behind the stairwell, from up on the hill.  It wasn't just that

25  person at the sidewalk that threw stuff at us.  And so to speak

20-cv-1878-RBJ    KEITH VALENTINE – Direct    03-14-2022

1   to the fact that this video was picking up every single minute

2   detail that's going on in the area I think would be inaccurate

3   and unfair.

4   Q    Did you see any projectiles coming at the police from this

5   area other than the water bottle when we just watched that video

6   twice?

7   A    So, again, there's people in the back that this video

8   doesn't pick up that to say that just because the video doesn't

9   pick it up that it wasn't there is inaccurate and unfair.

10  There's several people up on this hill that are hiding stuff

11  behind trees, that are hiding stuff in backpacks, and they're

12  using it to go back and pick it up and throw it at us.  So, yes,

13  it wasn't just the individual that was standing on the sidewalk

14  I fired PepperBalls at.

15  Q    But I'm still not sure I got an answer.  Does the video

16  show any projectiles from this area other than the water bottle

17  thrown at the police?

18  A    I think the entirety of the video shows several things

19  being thrown at us, and to say that just because the video

20  doesn't pick it up it didn't happen is inaccurate.  If you're

21  talking about this particular moment in time, sure.  The video

22  doesn't show what happened at that moment in time completely

23  accurately is the best I can speak to that.

24  Q    All right.  Thank you.  And was it Denver's policy at the

25  time and consistent with your training that you were to shoot at

Kevin P. Carlin, RMR, CRR

20-cv-1878-RBJ   KEITH VALENTINE - Direct   03-14-2022

1   people who threw water bottles at the line of officers?

2   A    So, if by saying water bottle you're insinuating that water

3   is harmless, I would actually have to say that these water

4   bottles oftentimes were filled with more than just water,

5   ranging the gamut of feces to urine to being frozen, which I

6   would argue if you're throwing a frozen water bottle at someone,

7   it's to cause harm.  So, if someone is going to throw a frozen

8   water bottle at me, any of the people, or officers standing

9   around me, or, for that matter, with complete disregard of the

10  people that are in front of them, then yes, I am going to fire a

11  PepperBall at that person.

12  Q    And that's consistent with DPD policy, that if someone

13  throws a plastic water bottle, whatever it contains, at the line

14  of officers, you shoot PepperBalls?

15  A    It being a plastic water bottle seems as if it's trying to

16  be minimized, and I don't think that's accurate or fair.

17  Plastic water bottle is certainly to the best of my recollection

18  not spelled out in policy.  However, it is aggressive, and if

19  someone is going to throw something at me, anybody around me, or

20  other protesters that were actually trying to exercise their

21  First amendment right, then yes, I'm going to fire at them.  And

22  I believe that's reasonable and in accordance with policy, yes.

23  Q    Okay.  Thank you.  And there was a large line of officers

24  standing right there with you, right, at this time?

25  A    Yes, sir.

Kevin P. Carlin, RMR, CRR

20-cv-1878-RBJ    KEITH VALENTINE – Direct    03-14-2022

1   Q    Okay.  And was there an arrest team that could have gone

2   after the person who is -- who threw that water bottle at the

3   line of police officers?

4   A    At that moment in time, I would say no.  It was

5   unreasonable to do so in that moment.

6   Q    It would have been unreasonable to have an arrest team go

7   after that person?

8   A    Yeah.  If you take in the totality of the circumstances,

9   and just safety in general, I mean, sure, there's a large line

10  of officers, but at a minimum, I would say there's at least

11  double if not triple the amount of people there.  So, to run

12  into a crowd of -- a hostile crowd at that, of people throwing

13  who knows what at us, to run into that situation would be

14  unreasonable and not safe in that moment.

15  Q    Okay.  So, and the person was throwing the water bottle

16  from about right here; right?

17  A    As he was retreating back into the crowd?

18  Q    No.  We saw him.  He threw the water bottle standing about

19  right here?

20  A    He threw the water bottle and then ran back into the crowd.

21  Q    Right.

22  A    Yes.

23  Q    And how far, approximately, was he from this line of

24  officers when he threw that water bottle?

25  A    I have no idea.  I couldn't estimate based on this video.

20-cv-1878-RBJ     KEITH VALENTINE - Direct    03-14-2022

1   Q    Okay.  And it would have been too dangerous for an arrest

2   team of officers to go after that person?  That's your

3   testimony?

4   A    Absolutely.  If you consider the totality of the

5   circumstances, he didn't throw the water bottle and stand there

6   and say, come arrest me.  He retreated back into the crowd.  I

7   mean, that could be used in a number of different ways.  We run

8   into that crowd and get surrounded, that's a bad situation for

9   everybody.  So, to insinuate that just because he threw the

10  water bottle from, what?  10, 15 feet away, maybe?  As he's

11  retreating back into the crowd to insinuate that we could have

12  just grabbed that person and he would have stood there and

13  compliantly gone into custody I think is unfair and inaccurate.

14  Q    Okay.  I want to just back up and do one -- ask you one

15  more thing about this.  You saw yourself kick the tear gas

16  canister back towards the crowd near the end of that video?  Do

17  you recall that?

18  A    Yes, I do.

19  Q    And at that point, the person who threw the water bottle,

20  he's run back into the crowd, and you then fire a number of

21  shots really right down the street that we're looking.  Do you

22  recall seeing that?

23  A    Not particularly, no.

24  Q    Okay.  Let's watch that again.  Can we watch that part of

25  it?

20-cv-1878-RBJ   KEITH VALENTINE - Direct   03-14-2022

1   A     Sure.

2         (A video was played.)

3   Q     Okay.  I count 14 shots in that general direction of the

4   crowd down that street after the protester is off -- who threw

5   the water bottle is off the screen.  Is that what you counted?

6   A     I didn't count.  I'd be more than happy to if you'd like me

7   to.

8   Q     No.  We'll just go with it.  Let's play a little bit more.

9   I just want to see how this scene ends up, please.

10        (A video was played.)

11  Q     All right.  That's fine.  So, this is the scene that's too

12  dangerous for officers to go in and find the person with the

13  water bottle?  That's correct?

14  A     That is incorrect.

15  Q     Okay.

16  A     This scene is the aftermath after trying to disperse what

17  of the crowd we could.  To insinuate that because there's nobody

18  within the immediate direction after we deployed less-lethal to

19  push the crowd back I think is unfair.  This scene, you have to

20  understand is completely volatile.  We're taking rocks and

21  bottles and canned goods, which I can't imagine anybody in this

22  room -- any room would want to get hit in the face or any part

23  of the body with canned goods that are full, or not full, for

24  that matter.

25            There's backpacks.  There's boxes.  There's bags full

20-cv-1878-RBJ    KEITH VALENTINE - Direct    03-14-2022

1   of debris that were being used to throw at us from all angles.

2   This video is a body cam video that's attached to my chest, and

3   wherever it's looking is the only angle that it's looking at.

4   So, you have to understand that this is that angle.  It's not

5   what's going on to the left.  It's not what's going on to the

6   right of me.  It's not picking up beyond what it can pick up

7   accurately.

8           There's a crowd of people back there that are blending

9   in with people that don't have anything to throw, sure, but to

10  insinuate that this snippet of my video, this moment in time is

11  the crowd that was too dangerous to go into I think is pretty

12  misleading, being what we were up against for several days, and

13  particularly in this moment.

14  Q    Okay.  Well, the good news is the City can show you

15  whatever videos of the scene they want, but in the video we saw,

16  we saw one water bottle coming at the police; correct?

17  A    You saw one -- no.  In the moment in time, in the person

18  that you're referring to, you saw him throw something at us.

19  However, if you replay the video, you will see several things

20  coming our way.

21  Q    Yeah.  There were some tear gas canisters that the line of

22  officers had thrown that came back at the officers; right?

23  A    Yeah.  They came back at us.  And there was other things,

24  several other things that were thrown at us as well, not to --

25  not just the stuff that we used.

20-cv-1878-RBJ   KEITH VALENTINE - Direct   03-14-2022

1  Q    All right.  Well, we all saw the video, so -- several

2  times.  I don't want to watch it again, but do you recall at

3  your deposition seeing a video, a cell phone video taken by

4  someone who was standing behind the person with the skateboard

5  who threw the water bottle who you fired at?  Do you recall

6  that?

7  A    Yes.

8  Q    Okay.  And do you recall that that's one of the plaintiffs

9  in this case, Elisabeth Epps?

10  A    I don't recall that.

11  Q    Do you recall confirming that the injury that she videoed

12  on her face was consistent with being hit by a PepperBall?

13  A    Not particularly, no.

14            MR. DOUGLAS:  Okay.  Let's just show that briefly,

15  then.  It's Exhibit 111, but it's your deposition, page 99, line

16  24.  Your Honor, may I show that on the screen?

17            THE COURT:  Yes.  Assuming that it's already been

18  admitted.

19            MR. DOUGLAS:  Well, it's his deposition.  I can offer

20  it.  I wasn't going to offer the whole thing.

21            THE COURT:  I thought you said 111.

22            MR. DOUGLAS:  1111.

23            THE COURT:  1111 is his deposition, and you want to

24  show a piece from that?

25            MR. DOUGLAS:  Yeah.

20-cv-1878-RBJ   KEITH VALENTINE - Direct   03-14-2022

1           THE COURT:  Any objection?

2           MR. WEINER:  No objection, Your Honor.

3           THE COURT:  All right.  Admitted.

4    Q.    (By Mr. Douglas) So, Mr. Valentine, we were just talking

5    about your deposition.  You were under oath when you gave that

6    testimony; correct?

7    A    Yes.

8    Q    Okay.  And after confirming that -- or after seeing the

9    video of Elisabeth Epps, she shows her face, and you were asked,

10   do you see that this person has white residue on her cheek?

11          Answer, yes.

12          Is that consistent with your understanding of, you

13   know, what the residue would look like if somebody had gotten

14   hit in the face with a PepperBall?

15          I mean, yeah.  It would leave a white mark.

16          Do you recall that testimony?

17   A    Yes.

18   Q    Okay.  All right.  We can put that down.  Now, you did not

19   have your body-worn camera on during the time of what we just

20   saw; correct?

21   A    I don't recall.

22   Q    You don't recall.  Do you recall being asked at your

23   deposition to confirm your body-worn camera, which was turned

24   off by you approximately two minutes before this time, around

25   7:15 p.m.?

Kevin P. Carlin, RMR, CRR

20-cv-1878-RBJ   KEITH VALENTINE - Direct   03-14-2022

1   A    I recall discussing that during the deposition, yes.

2   Q    Okay.  And you understood at the time of the protest that

3   DPD policy did not require you to have your body-worn camera

4   activated when you were discharging less-lethal weapons during

5   the protest; correct?

6   A    I'm sorry.  Can you rephrase that question?

7   Q    Sure.  Was it your understanding during the protest that

8   you were not required to have your body-worn camera activated

9   during moments where you were discharging less-lethal weapons?

10  A    No.  That's not my understanding.

11  Q    Oh.  So, you should have had your body-worn camera turned

12  on on the video we just saw?

13  A    If reasonable, yes.

14  Q    Okay.  So, if reasonable.  And who would determine if it's

15  reasonable or not?

16  A    Myself.

17  Q    You would?

18  A    The circumstances.  The totality of the circumstances.

19  Q    Okay.  So, if you believed that it was not reasonable to

20  have your body-worn camera on at a time when you were

21  discharging less-lethal weapons, you were not required to turn

22  it on; right?

23  A    If implying that because it was off, I determined that it

24  was unreasonable, I think is not accurate.  We were under

25  situations where we had to manage our body-worn cameras.  What's

20-cv-1878-RBJ    KEITH VALENTINE - Direct    03-14-2022

1   considered normal use for a body-worn camera is certainly not

2   letting it run for 15, 16 hours a day.  The technology just

3   isn't available to have that happen.  So, we had to make

4   decisions as individuals on the fly to activate and deactivate

5   our body cams in an effort to make them last throughout the day,

6   understanding that we were out there 16, 17 hours a day,

7   sometimes, taking it back, allowing it to charge for a few

8   hours, and then being back for 17 hours a day, very likely on

9   not a full charge at this time because of all the uploads and

10  downloads going on, body cam just didn't charge fully.  So, when

11  it comes to management of battery life, just like anything else

12  utilizing a battery, we had to do the best that we could.

13  Q    Okay.  But was there any particular reason you recall why

14  you would not have had your body-worn camera on at the moment

15  you were firing PepperBalls at the guy with the skateboard that

16  hit Ms. Epps in the face?

17  A    I'm not understanding that question.

18  Q    Was there a reason why you didn't have it on?

19  A    At the moment, no.  I don't recall.  I mean, whatever the

20  situation would have dictated me turning it off, I don't recall

21  exactly what that was.

22  Q    But the officer to the right of you did have his on,

23  because that's what we just watched; right?

24  A    Yes.

25  Q    Okay.  And are you aware that the City has produced a total

20-cv-1878-RBJ   KEITH VALENTINE - Direct   03-14-2022

1   of two hours and 52 minutes of your body-worn camera footage

2   from your entire work on the protest in this case?  Are you

3   aware of that?

4   A    No.  I was not aware of that.

5   Q    Okay.  And you said you worked at least the first six days

6   of the protest, it sounds like; correct?

7   A    To the best that I can recall, yes.

8   Q    And I think you just said that was something like 16 hours

9   a day?

10  A    Yes.

11  Q    Okay.  And you did work the protest on May 31st,

12  specifically the fourth day; correct?

13  A    Yes.

14  Q    Okay.  And you would have had your body-worn camera turned

15  on that day; right?

16  A    Turned on?

17  Q    At some point during that day?

18  A    I don't recall.

19  Q    Okay.  Do you have any explanation for why -- well, strike

20  that.  Do you know of any reason why your body-worn camera

21  footage, if you had your camera turned on for more than two

22  hours and 52 minutes of your work on the protest, why that

23  wouldn't have been captured and available to the defendants to

24  produce in this case?

25  A    At what particular moment?  I don't understand the

20-cv-1878-RBJ    KEITH VALENTINE - Direct    03-14-2022

1    question.

2    Q    Well, do you have -- do you have any reason to you why

3    whatever body-worn camera footage existed when you turned your

4    camera on, why that would not be available to the department to

5    give to us in this case?

6    A    I wouldn't be aware of any reason why whatever footage I

7    have wouldn't be made available.

8    Q    Okay.  And I want to go now -- well, actually, let me ask

9    you, before we do that, during the days you were working the

10   protest, it was your understanding that you would not be

11   required to complete individual use of force reports for your

12   discharges of less-lethal weapons during the protest; correct?

13   A    Daily?  I don't recall exactly what my understanding was at

14   the time.  I believe generally speaking, what I understood was

15   that we were going to complete statements at the conclusion of

16   it, as far as from a supervisory level would be provided

17   whatever use of force -- type of use of force was used.

18   Q    Okay.  Was this the first protest you ever worked?

19   A    In that capacity?  Yes.

20   Q    Okay.  Well, you certainly didn't fill out use of force

21   reports during the time of the protest; right?

22   A    I filled out use of force statements.  I don't recall the

23   exact day, but several days after, yeah.

24   Q    Sorry.  Didn't mean to interrupt you.  We will look at the

25   dates.  But isn't it true that it was only sometime after the

20-cv-1878-RBJ   KEITH VALENTINE - Direct   03-14-2022

1    protest that you were asked to prepare those individual use of

2    force statements that you did eventually prepare?

3    A    Yes.

4    Q    So, during the time you were working the protest, not only

5    did you -- did you not fill those out on a daily basis, but you

6    didn't have an understanding that you would need to fill them

7    out at some point, did you?

8    A    I don't recall exactly what I was under the impression of

9    at the time.

10          MR. DOUGLAS:  Okay.  Okay.  Let's go back in time to

11   day one of the protest.  And if we can mark Exhibit 585, please.

12   Okay.

13          THE COURT:  585?

14          MR. DOUGLAS:  585, yes.

15          THE COURT:  Any objection?

16          MR. WEINER:  No objection.

17          THE COURT:  Admitted.

18   Q.    (By Mr. Douglas) All right.  We can put that up on the

19   screen.  Mr. Valentine, this is your body-worn camera from --

20   and I'm going to do the translation again.  It's Greenwich Mean

21   Time, which is six hours ahead of Denver.  Subtract six, that

22   takes us to May 28th at 9:08 p.m.; is that correct?

23   A    Again, I'm going to trust your math on this one.

24   Q    All right.  Let's take a look at just the beginning of this

25   clip for a little bit so we can see what's going on, please.

20-cv-1878-RBJ    KEITH VALENTINE - Direct    03-14-2022

1    (A video was played.)

2   Q    So, I want to just set the scene here.  You are in a line

3   of officers marching west on Colfax, and I will represent to you

4   the light in the distance is Grant.  We're going to get there,

5   but does that appear to be the scene?

6   A    Yes, sir.

7   Q    Okay.  It's day one of the protest.  There's no curfew;

8   correct?

9   A    Yeah.  I believe that's correct.

10  Q    Okay.

11  A    I don't recall exactly when curfew went into effect.

12  Q    Do you recall that the first time the curfew was day three

13  of the protest?  Does that sound right?

14  A    I don't recall that specifically.

15  Q    Okay.  All right.  So, and you are at this point marching

16  down Colfax, pushing back a handful -- there was one or two

17  other people that went off the screen here -- of protesters who

18  are walking backwards; correct?

19  A    Correct.

20  Q    Okay.  Let's just skip ahead.  It gets a little boring.

21  Okay.  Can I -- so, you're -- I think you can see that that's

22  Grant.  Do you see that?

23  A    Yes, sir.

24  Q    Colfax and Grant.  And I want you to focus towards the end

25  of the video on this guy.  Because he's going to come into play

20-cv-1878-RBJ    KEITH VALENTINE - Direct    03-14-2022

1   at the end, and we will get there, but I just want to flag him

2   for now.

3   A    Okay.

4   Q    Let's go forward a little bit.  Okay.  Let's go back.

5   Okay.  Right here.  So, this is the line of officers across

6   Colfax that you were a part of that night.  Do you see that?

7   A    Yes, sir.

8   Q    Okay.  And you see right here on this officer, those are

9   the chevrons of a sergeant; correct?

10  A    Yes.  I'm having a hard time seeing if it's two or three,

11  but it looks like three, yes.

12  Q    I think it's three.

13  A    Then yes.  It would be indicative of a sergeant.

14  Q    But whoever it is, that was the supervisor of this

15  particular line; correct?

16  A    Yes.

17  Q    Okay.  All right.  Let's go forward.

18       (A video was played.)

19  Q    Let's stop real quick.  Do you see the protesters are

20  now -- they're protesting here across Colfax right under that

21  stoplight on Grant?  Do you see that?

22  A    Yes, sir.

23  Q    Okay.  We're going to see them go -- move to the left, and

24  your line is going to follow them this way down Grant, and then

25  we're going to watch and see what happens.  So, let's get to the

20-cv-1878-RBJ   KEITH VALENTINE – Direct   03-14-2022

1   point where they're moving left.

2        (A video was played.)

3            MR. DOUGLAS:  You can zip ahead to where they're

4   walking to the left.  Trying to speed things up, Your Honor.

5            THE COURT:  Thank you.

6            MR. DOUGLAS:  It's not a very exciting protest at this

7   point.  All right.  That's fine.  Let's play from here.

8        (A video was played.)

9   Q.   (By Mr. Douglas) Let's stop there.  Stop there.  Did we

10  just see -- was this just a PepperBall fired at this person's

11  feet right here?  Did you see that?  We can go back if you

12  didn't.

13  A    Oh.  I thought you were going back.

14  Q    No.  I'm happy -- let's just go back, just to make sure

15  we're all seeing it.  I forgot about that.

16       (A video was played.)

17  Q    Okay.  Did you hear a click of a PepperBall gun and the

18  puff of smoke at this guy's feet?  Did you see that?

19  A    Yes, sir.

20  Q    So, that was a PepperBall being shot at this person

21  standing just off the street; right?

22  A    It appears to be so, yes.

23  Q    Okay.  Any idea why that PepperBall was shot at that person

24  at that time?

25  A    I would have no idea.

Kevin P. Carlin, RMR, CRR

20-cv-1878-RBJ   KEITH VALENTINE - Direct   03-14-2022

1   Q    Okay.  Let's keep going.

2        (A video was played.)

3   A    Can we pause just for one second?  I want to clarify, I

4   would have no idea because I'm not that officer.  And so to

5   speak to the justification that that officer had to use

6   less-lethal, I mean, I don't know.  So, I can't speak to another

7   officer's state of mind.  Can't speak to what they saw.  So, I'm

8   saying I have no idea doesn't insinuate that there wasn't a

9   justification for the deployment of that less-lethal.

10  Q    Understood.  And I want to be clear.  You were there.  And

11  so I'm only asking you what you recall seeing or what you can

12  see on this video, whether you can think of any reason or

13  whether you know of any reason why that PepperBall would have

14  been shot at that protester.

15  A    I personally am unaware of the reason.

16  Q    Okay.  Did you hear any warning given to that protester

17  before that was shot?

18  A    I did not.

19  Q    Okay.  Let's keep watching.

20       (A video was played.)

21  Q    Let's stop.  Let's stop.  So, was that you, your voice we

22  were hearing on the video?

23  A    Yes.

24  Q    Okay.  And first you told them to go home, I think?

25  A    Move back.

Kevin P. Carlin, RMR, CRR

20-cv-1878-RBJ    KEITH VALENTINE – Direct    03-14-2022

1   Q    Okay.  Well, at the end.  Okay.  We will go with move back.

2   And you also said take the sidewalk; right?

3   A    Yes.

4   Q    Did you hear that?  All right.  And then you proceeded to

5   walk to someone who was on the sidewalk and push them with your

6   baton into the street?  Did you see that?

7   A    I didn't -- I don't recall if that person was on the

8   sidewalk.  I do recall obviously saying take the sidewalk,

9   meaning like, we needed to take the entire street, and the goal

10  was to push people off of that street.

11  Q    Okay.  Everything we've seen in this walk up and left was

12  peaceful; right?

13  A    Yes.

14  Q    Yeah.  You didn't see anyone throwing anything, anything

15  like that; right?

16  A    No.  But you have to understand this is, again, a few

17  seconds from my video as we were pushing westbound on Colfax,

18  there was people jumping out from alleys, from behind dumpsters.

19  There was people running across the street, in cars throwing

20  things at us that were actually traveling.  There's a portion of

21  this video that you skipped that there's people traveling

22  southbound on Grant that were throwing stuff from cars.

23      So, to say that this five, six, seven people were

24  peaceful at this moment in time, yeah.  This particular video

25  does not show any of that.  However, the parts that were

20-cv-1878-RBJ    KEITH VALENTINE - Direct    03-14-2022

1    skipped, there's people jumping out of alleys.  There's people

2    throwing stuff from backpacks.  So, to skip pieces and moments

3    of this video doesn't create an accurate picture of exactly what

4    was going on.

5    Q    Okay.  So, you're saying earlier in the march before you

6    got to this place, which was quite peaceful, other people, not

7    these people standing there, were throwing things from alleys at

8    your line of officers?

9    A    No.  What I'm saying is I can't speak to at this moment if

10   it was those people or not.  What I'm saying is as we were

11   moving westbound on Colfax, there was people -- before we make

12   the southbound turn onto Grant, there's people that -- that

13   alley is a north-south alley between Grant and Logan.  It runs

14   north and south, crossing Colfax, up to 14th.  People were using

15   that alley to flank us on the sides to throw stuff at us from

16   the alley.  They were circling back around the building to come

17   back and throw stuff at us from the front.  So, the few seconds

18   of this 44-minute video that we watched doesn't create an

19   accurate picture of actually what was going on.

20   Q    Okay.  Well, I'd like to see some of the other video that

21   shows those people doing anything.  You're talking about people

22   earlier in time at a different location that did something;

23   right?

24   A    I don't agree with that, no.  I'm talking about the

25   totality of the circumstances, people were -- these people, this

20-cv-1878-RBJ   KEITH VALENTINE - Direct   03-14-2022

1   group, a group of people in this immediate area as we're

2   skipping through this video -- I mean, we can watch the entire

3   thing if you'd like.  However, as we're skipping through this

4   video, there's people coming in and out of the alley, hiding

5   from behind dumpsters, hiding from building -- hiding behind the

6   building, circling back, flanking us from all sides, throwing

7   stuff at us every opportunity that this group had.

8         So, to say that the six people that are in this video,

9   however many it is, were peaceful, they're -- it's hard to tell,

10  as far as the totality of what was actually taking place.

11  Watching six seconds, five seconds at a time, doesn't create

12  that full colorful picture of what was actually taking place.

13  Q   Okay.  I want to -- I'm going to just come back to what

14  we're seeing in these particular people.  So, did you see -- you

15  say take the sidewalk, and the person is filming it.  Did you

16  see he was filming you with a cell phone?

17  A   I didn't see that.

18  Q   Okay.  Let's just back it up to that point, because I want

19  to just make sure we see this.  Let's just start from right

20  here.  And I'm -- at this point, I don't need to ask you any

21  more questions about that, so let's just see what happens there,

22  and then we're going to play this to the end, and I'm going to

23  ask you some questions.

24        (A video was played.)

25  Q   All right.  So, first of all, when someone insults you like

Kevin P. Carlin, RMR, CRR

20-cv-1878-RBJ   KEITH VALENTINE - Direct   03-14-2022

1   that, that has to be difficult to hear; correct?

2   A    Insults me like telling me I can't read and calling me a

3   bastard and a piece of fucking shit?

4   Q    Yes.

5   A    I take it with a grain of salt, to be honest with you.

6   Q    Okay.  Well, that's big of you, but we can agree that the

7   use of insulting words like that is not a justification to shoot

8   someone with PepperBalls; right?

9   A    I would agree with that.

10  Q    Okay.  And you heard in the video that you and other

11  officers started yelling at the guy back up, back up, back up or

12  you're going to get a PepperBall.  Did you hear that?

13  A    Yes.

14  Q    Okay.  And he in fact continued backing up the entire time,

15  didn't he?

16  A    He's walking backwards for some of it.  At different paces,

17  yes.

18  Q    Okay.  Did you see him stop?

19  A    I think at the beginning, he stopped like right -- he got

20  closer to us.

21  Q    Okay.  After you're yelling back up or you're going to get

22  a PepperBall, he never stopped, did he?

23  A    No.

24  Q    And in fact, he had been backing up at your request for

25  several blocks; right?

20-cv-1878-RBJ    KEITH VALENTINE - Direct    03-14-2022

1  A    Yes.

2  Q    Because we saw him earlier.  Remember --

3  A    Correct.  We saw him at Colfax and Grant.  Yes, sir.

4  Q    Okay.  And yet he got shot with PepperBalls anyway.  You

5  saw that?

6  A    I did see that.

7  Q    Okay.  What justification did you see for that protester

8  being shot?

9  A    I can't speak to why someone else fired a PepperBall.

10  Q    Okay.  You didn't see -- you don't recall from being there

11  or seeing anything on the video that you would consider adequate

12  justification for that PepperBall?

13  A    Again, that's an individual justification, and that officer

14  could have saw something totally different than I did from a

15  different perspective or vantage point.

16  Q    Okay.  Is shooting PepperBalls at the protester who is

17  backing away consistent with DPD training and policy?

18  A    A protester who is backing away?  Specifically, no.  I

19  would say that's inconsistent, but I don't feel like this video

20  shows the totality of the circumstances, nor does it -- is this

21  video from the perspective of the officer that did fire the

22  PepperBall.

23  Q    The totality of the circumstances around you would justify

24  the shooting of the guy we saw right in front of you?

25  A    Again, I did not deploy that PepperBall, and I can't speak

20-cv-1878-RBJ    KEITH VALENTINE - Direct    03-14-2022

1  to that justification.

2  Q    Did you say anything to the officer, like, hey, that

3  maybe -- the officer who did deploy the PepperBall, like maybe

4  you shouldn't have shot that guy?

5  A    No.  I trust that officer had that justification.  I can't

6  speak to that.

7  Q    Okay.  You were standing right there; right?

8  A    I don't know how far away I was.  I mean, relatively

9  speaking, I was right there, yes.

10  Q    Did the supervisor with the chevrons that we saw or anyone

11  else on the line to your knowledge say anything to that officer

12  like, hey, that wasn't okay?

13  A    I would have no idea as to what conversations took place

14  after the fact.

15  Q    But on the scene, you didn't -- you don't recall hearing

16  anyone say anything to that officer about that?

17  A    I don't feel like I would be necessarily privy to that.

18  Q    Okay.  You're aware that the internal affairs bureau did in

19  fact investigate this incident?

20  A    No.  I'm not aware of that.

21  Q    You're not.  You were interviewed by internal affairs about

22  this.  Do you recall that?

23  A    No.  Honestly, I don't.

24         MR. DOUGLAS:  Okay.  Well, then let's go to

25  Exhibit 1134, which is not yet admitted.  It's the internal

20-cv-1878-RBJ    KEITH VALENTINE - Direct    03-14-2022

1    affairs file regarding this incident.  I would offer that into

2    evidence.

3            THE COURT:  1174?

4            MR. DOUGLAS:  Yes.  I'm sorry.  1134.

5            THE COURT:  All right.  Admitted.

6            MR. WEINER:  Judge, I would like to pose an objection

7    that it is hearsay, if we're introducing the entire report.  I

8    think if he wants to impeach him reference his statement, he can

9    bring it to his attention.  That's my standing objection.

10           THE COURT:  Sorry.  I didn't hear your objection

11   before.

12           MR. WEINER:  Sorry, Your Honor.

13           THE COURT:  Hearsay?

14           MR. WEINER:  Yes, Your Honor.

15           THE COURT:  What is 1134?

16           MR. DOUGLAS:  It's an internal affairs report

17   involving this incident we just watched on video.

18           THE COURT:  Overruled.

19   Q.   (By Mr. Douglas) All right.  If we can go -- first of

20   all, just look at the first page.

21   A    This is not me.  This is Officer Clyde Carmody.

22   Q    Oh.  Page four.  All right.  Okay.  So, on page four, this

23   is a statement by you, Keith Valentine; correct?

24   A    Yes, sir.

25   Q    Okay.  And it says with -- the following questions are in

20-cv-1878-RBJ   KEITH VALENTINE - Direct   03-14-2022

1   regards to the video of your body-worn camera on the date of

2   5/28/20 reported at 8:28 p.m., and lasts 50 minutes.  In

3   particular the incident that takes place 37 minutes, 35 seconds

4   into the video.  Do you see that?

5   A     Yes, I do.

6   Q     That's the video we just watched.  A portion of it; right?

7   A     Yes.

8   Q     Okay.  And it says -- let's go to the bottom.  It says, did

9   you deploy a PepperBall?

10          I did not.

11          And then it asks if you recall -- well, actually,

12   above, do you recall who was at the skirmish line with you?

13          You say, I don't recall.

14          Do you see that?

15   A     Yes.

16   Q     Okay.  And then I just want to go to page 51 of this

17   exhibit, which is the final -- the conclusion of this

18   investigation.  At the bottom, Sergeant Castillo, who is the

19   investigator on this one, was not able to identify the officer

20   who deployed the PepperBall launcher at the unknown protester.

21   Sergeant Castillo submitted a case summary for review by IA

22   command staff.  It looks like he did that on February 12th of

23   last year.  Do you see that?

24   A     Yes, sir.

25   Q     So, in the end, DPD and internal affairs was unable to

20-cv-1878-RBJ    KEITH VALENTINE – Direct    03-14-2022

1   determine who shot that guy; right?

2          MR. WEINER:  I'm going to object, Your Honor.  It's

3   not in evidence that he shot him.  He shot the ground.  And so

4   he's misstating facts.

5          THE COURT:  Sustained.

6   Q.    (By Mr. Douglas) Okay.  Let's move on.  I want to go to

7   the next day, May 29th.  It's day two of the protest; correct?

8   To your recollection?

9   A    Yes, sir.

10  Q    Okay.  Let's go to Exhibit 1120, and this is already

11  admitted.  So, again, setting the scene, this is your body-worn

12  camera, and with the time translation, it is May 29th, because

13  we're back before midnight with the six hours.  8:33 p.m.;

14  correct?

15  A    I think we know the answer to that, but I'm going to go

16  ahead and trust your math on that one.

17  Q    All right.  And we're looking south across Colfax; right?

18  A    Yes.

19  Q    Okay.  So, you're on the north side of Colfax.  State

20  capitol is to the left there, and straight ahead of you is the

21  Colorado Supreme Court; correct?

22  A    Yes, sir.

23  Q    Thank you.  And that's six lanes of traffic?  Do you see

24  that?

25  A    Yes, I do.

Kevin P. Carlin, RMR, CRR

20-cv-1878-RBJ    KEITH VALENTINE – Direct    03-14-2022

1    Q    Okay.  And you and your -- you and the gang unit were set

2    up in a parking lot right there at that time?  Do you recall

3    that?

4    A    Yes, sir.

5    Q    Okay.  Let's watch starting eight minutes, 30 -- no.  About

6    eight minutes in.  Let's watch a portion of this.

7         (A video was played.)

8    Q    Let's stop.  So, again, we have a sergeant, three chevrons

9    on the arm; correct?

10   A    Yes, sir.

11   Q    Okay.  Let's see what he does.  Let's play.

12        (A video was played.)

13   Q    That's fine.  Do you recall who that sergeant is?

14   A    I do not.

15   Q    Okay.  And he threw a grenade across the street at some

16   protesters; correct?

17   A    Yes.

18   Q    Do you know what kind of grenade that was?

19   A    I do not.

20   Q    Okay.  All right.  Let's go ahead into the video a little

21   bit, a few minutes.  Right here.  Okay.  Let's watch this one,

22   please, and then I will ask you some questions about it.

23        (A video was played.)

24   Q    All right.  So, in that video, that's you throwing that

25   second grenade, and who we hear talking?

20-cv-1878-RBJ    KEITH VALENTINE – Direct    03-14-2022

1   A     Yes, sir.

2   Q     Okay.  And there were three grenades.  There was one that

3   went before you.  Then you threw yours, and then there was a

4   third grenade.  You saw that?

5   A     Yes.

6   Q     Was that the first time you had used a grenade in the

7   field?

8   A     I don't know.  I don't recall.

9   Q     All right.  Do you recall what type, or can you tell from

10  the video what type of grenade that is?

11  A     No, sir.  I cannot.

12  Q     Was there a certification for grenades when you were an

13  officer at DPD?

14  A     I don't know if there was a certification, but there would

15  have been training on it.

16  Q     Okay.  So, you would have had training on grenades before?

17  A     I had not.

18  Q     You had not?

19  A     No.

20  Q     Okay.  And was it consistent with your training, grenade or

21  otherwise, to throw a less-lethal device like a grenade over six

22  lanes of traffic?  Was it consistent with your training?

23  A     I hadn't received -- if you're referring to the training,

24  like grenade specific, I hadn't received that training.  If

25  you're implying that the six lanes of traffic -- traffic at

20-cv-1878-RBJ   KEITH VALENTINE - Direct   03-14-2022

1   times would prohibit us from using less-lethal, I think that

2   that's inaccurate.

3   Q    Okay.  And your throwing that grenade that we just saw was

4   consistent with DPD policy, practice, and custom at the time?

5   A    I don't understand the question.  I hadn't received the

6   training on grenade -- on the use of grenades.

7   Q    Okay.  Well, I've moved off of training.  Let me just ask,

8   was what we saw you do in that video consistent with your

9   understanding of DPD policy at the time?

10  A    What particular policy are you referring to?

11  Q    All policies.  All policies that you were aware of at the

12  time.

13  A    If you're referring to use of force policy and trying to

14  disperse this crowd, then yes.  It was consistent.

15  Q    Okay.  And you saw the grenade hit the car after you threw

16  it.  Did you see that?

17  A    I'm sorry?

18  Q    Did you see the grenade hit the car after you threw it?

19  A    No.  I didn't see it hit the car, because it did not hit

20  the car.

21  Q    Oh.  Okay.  Let's take another look.  Let's watch that one

22  again, and maybe, Dan, Mr. Bupp, if you could slow that down so

23  we can make sure we get a good look at where that grenade hits,

24  I would appreciate it.

25       (A video was played.)

20-cv-1878-RBJ    KEITH VALENTINE - Direct    03-14-2022

1   A    I recall that.  And I can confidently say that did not hit

2   the car.

3   Q    It did not hit the car?

4   A    It did not hit the car.  I recall.

5   Q    Did you hear what you said right after the grenade landed?

6   A    Yes.

7   Q    What did you say?

8   A    I said, ah, fuck.

9   Q    Did you say that because you were worried about getting in

10  trouble for landing a grenade -- either hitting, or I guess

11  close to a moving vehicle in traffic?

12  A    No.  Because I had almost slipped and fallen -- and fell.

13  Q    You slipped -- okay.  And you did not get into any trouble

14  for throwing that grenade that day; right?

15  A    No.

16  Q    And you were never contacted by internal affairs or anyone

17  else about throwing that grenade, were you?

18  A    No.

19  Q    Okay.  Who was that person who was instructing you on how

20  to throw that grenade?  Do you know who that was?

21  A    I have no idea.

22  Q    Was that your supervisor?

23  A    I didn't see if it was the same guy that had the chevrons,

24  so I don't know.

25          MR. DOUGLAS:  Okay.  All right.  We talked about use

Kevin P. Carlin, RMR, CRR

20-cv-1878-RBJ    KEITH VALENTINE - Direct    03-14-2022

1  of force reports.  I want to go to Exhibit 513, which are the

2  officer's statements of Officer Valentine at the time.  And I

3  would offer that into evidence, please.

4           MR. WEINER:  Objection.  Hearsay.

5           THE COURT:  All right.  I would have to look at it,

6  then.  It's a declaration of this witness?

7           MR. DOUGLAS:  Yes.

8           THE COURT:  Overruled.  Admitted.

9           MR. DOUGLAS:  Thank you, Your Honor.

10 Q.    (By Mr. Douglas) So, this is page one, and let's flip

11 through, because it's -- I'm not sure how many pages.  Five or

12 six pages.  So, we will take a quick look, see what this is.

13 All right.  And so those are the use of force statements that

14 you prepared after -- sometime after the protest ended regarding

15 your first four days of work at the protest; correct?

16 A    Yeah.  I don't know if -- I didn't see if it was all of

17 them, but yes.

18 Q    Okay.  And let's go back to page one.  So, we've got

19 statement for May 28th, and you signed that at the bottom on

20 June 9th, 2020, at 11:47 p.m., three minutes to midnight;

21 correct?

22 A    Thirteen minutes to midnight, but yes.

23 Q    Sorry.  Thirteen minutes to midnight?

24 A    I'm not trying to be difficult.  I just want to be clear.

25 Yes.

20-cv-1878-RBJ   KEITH VALENTINE - Direct   03-14-2022

1  Q   No.  Thank you.  I misspoke.  Let's go to the next page.

2  That's a continuation of the first one.  Let's go to the third

3  page.  So, this is your statement for May 31st of 2020 that you

4  also signed at -- well, looks like June 9th, same date, at 2300

5  hours, 11 o'clock; correct?

6  A   Yes, sir.

7  Q   Okay.  And just -- I want to pause on that one for a

8  minute.  At the very top, it says BWC active in your -- sorry.

9  Not very top of the page.  Very top of the actual statement.

10  The first thing you write is BWC active.  That is -- sorry.  Go

11  ahead.

12  A   No.  I'm just agreeing with you.  That's what it says.

13  Q   That means for some portion of that day you had your

14  body-worn camera activated; right?

15  A   Correct.

16  Q   And so you don't know why we would have no body-worn camera

17  from you from that day at all produced in this case, would you?

18  A   No.

19  Q   Okay.  All right.  Let's go to the next page.  This is for

20  May 29th, and this one doesn't have a date, but it says

21  11:47 p.m.  So, likely the same time you did the -- that first

22  one?

23  A   Yes.

24  Q   Okay.  All right.  And then is there one more?  Yeah.  One

25  more.  May 30th, also 11:47 p.m.  Do you see that?  And that one

20-cv-1878-RBJ    KEITH VALENTINE - Direct    03-14-2022

1   also says June 9th?

2   A    Yes, sir.

3   Q    Okay.  So, you created all of these at the same time, about

4   ten days after the protest started; correct?

5   A    The time I noted is the time that I signed them on that

6   day.  But yes.  I created them on the same day.

7   Q    Okay.  So, let's go to your May 29th statement, which is at

8   pages four and five of this exhibit.  If we could put both of

9   those up.  And we have this in hard copy.  If it's easier to

10  have that in front of you, I can give you a hard copy of this

11  one.

12  A    That would be great.

13       MR. DOUGLAS:  Okay.  Let's do that.  Your Honor, may I

14  approach the witness?

15       THE COURT:  Sure.

16       MR. DOUGLAS:  Thank you.  Thank you, Julie.

17  Q.   (By Mr. Douglas) Okay.  So, you have in front of you

18  Exhibit 513.  If you look at the fourth and fifth pages -- and I

19  just want to ask you, is there any mention in your description

20  of -- well, actually, let me back up.  Was it your understanding

21  when you completed these use of force reports after the protests

22  were over that you were to include each and every instance of

23  deployment of less-lethal munitions that you made during that

24  time?

25  A    I'm sorry.  What's the question?

20-cv-1878-RBJ    KEITH VALENTINE - Direct    03-14-2022

1   Q    Was it your understanding when you filled out these reports

2   a couple of weeks after the protest that you were supposed to

3   include every single instance of deployment of less-lethal by

4   you on the days that you were filling out forms for?

5   A    It was my understanding that writing the statement as

6   accurately as possible, recounting what we could in terms of --

7   or in reference to the general use of force that was used.

8   Q    Okay.  And you were supposed to review your body-worn

9   camera before doing that?

10  A    I don't specifically recall what was asked.

11  Q    You don't recall.  Okay.  But to the best of your

12  recollection, you were to include every instance of use of

13  less-lethal force; correct?

14  A    Yes.

15  Q    All right.  So, now take a look with that in mind at this,

16  you know, page and a half, page and a third officer statement by

17  you from May 29th.  First of all, that's the date of the video

18  that we just watched where you threw the grenade?

19  A    Okay.

20  Q    Do you agree with that?

21  A    Yes.

22  Q    Okay.  And do you see anything in your statement mentioning

23  your deployment of a grenade south across Colfax on that date?

24  A    No, sir.

25  Q    I'm sorry?

20-cv-1878-RBJ   KEITH VALENTINE - Direct   03-14-2022

 1  A    No.  I don't see it in my statement.

 2  Q    There's no mention of a grenade anywhere in there; right?

 3  A    No.

 4  Q    Sorry.  It's correct that there is not?

 5  A    It is correct that there is not.

 6  Q    That was my fault.  It was a bad question.  Okay.  Let's go

 7  to another exhibit that is 20 minutes later that same day,

 8  May 29th.  This is Exhibit 623.  It's also already in evidence,

 9  Your Honor.  Okay.

10         Mr. Valentine, this is your body-worn camera again, and

11  you're standing at the top of the hill there.  You're facing

12  west.  The capitol is behind you, and that's Lincoln Street in

13  front of you.  Does that appear to be what we're looking at?

14  A    Yes, sir.

15  Q    Okay.  And time translation, May 29th, because we're back

16  before midnight, 9:56 p.m., assuming my math is correct?

17  A    Yes.

18  Q    Okay.  All right.  Let's watch this video, please.

19         (A video was played.)

20  Q    Can you stop that.  Okay.  Was that you saying, move up,

21  move up?

22  A    Yes.

23  Q    Okay.  And you're saying that -- you're here with a line of

24  officers; correct?

25  A    Yes.

Kevin P. Carlin, RMR, CRR

20-cv-1878-RBJ   KEITH VALENTINE - Direct   03-14-2022

1   Q    Okay.  And you're saying to the people in the line, move

2   up, as in move forward; right?

3   A    Yes, sir.

4   Q    Okay.  All right.  Let's keep playing.

5        (A video was played.)

6   Q    Okay.  So, you yelled, get out of here, to that protester

7   as you were coming down the hill; right?

8   A    Yes.

9   Q    And then pretty much immediately thereafter you sprayed him

10  with -- that was OC spray?

11  A    Yes.

12  Q    He had his hands up?

13  A    Yes.

14  Q    Did you give him a warning that you were going to use your

15  OC spray on him?

16  A    I don't recall what exactly took place before this video.

17  Again, we're watching, you know, a few seconds of a moment in

18  time.  We had been on that hill for a while, pushing people off

19  of the hill that were attempting to break into the capitol, so I

20  don't recall if this -- I don't recall this exact moment.

21  Q    Okay.  Well, I'm focused on this guy.  Do you recall this

22  guy, or did you see it on video, getting a warning about OC

23  spray?

24  A    I don't recall what took place before this video.  I know

25  we had given several people warnings to move off of the capitol.

Kevin P. Carlin, RMR, CRR

20-cv-1878-RBJ    KEITH VALENTINE - Direct    03-14-2022

1   I don't know if he was specifically one of them.

2   Q    Okay.  And after you told him, get out of here, did you

3   give him a chance to get out of there before you sprayed him?

4   A    Everybody had ample opportunity to get off of the hill of

5   the capitol.

6   Q    Could we watch that again, please.  I want to see if you

7   can estimate the amount of time after your words, get out of

8   here, and your spray to his face.  Let's see if we can do that.

9        (A video was played.)

10  Q    You can stop it.  How much time was there between the time

11  you told him to get out of there and you sprayed him?

12  A    Between the time I told him to get out of there and sprayed

13  was about five seconds.

14  Q    Five?

15  A    Sorry?  Did I count wrong?

16  Q    Sorry.  No.  No.

17  A    That doesn't show the number of times that he was told to

18  leave before that.  That doesn't show anything but the -- that

19  snippet in time.

20  Q    All right.  So, you think it was five seconds between get

21  out of here and the spray?  That's what you saw?

22  A    Three to five seconds.  About that.  Yeah.

23  Q    Let's watch it one more time.

24       (A video was played.)

25  Q    Still think it's three to five seconds?

20-cv-1878-RBJ    KEITH VALENTINE - Direct    03-14-2022

1  A    Four seconds.  Unless I'm counting wrong.  Yeah.  It was

2  about that.  Three to five seconds.

3  Q    All right.  Was that guy filming, could you see?

4  A    It appears he's using his phone to film, yes.

5  Q    Okay.  And other than that, he's just walking -- he's

6  walking left to right down that sidewalk; right?

7  A    Yeah.

8  Q    He's not coming up towards the capitol behind you, is he?

9  A    Not in that moment, no.

10  Q    He's not doing anything whatsoever that was a threat to you

11  and your officers at that time, was he?

12  A    I believe this is after curfew, and we were clearing the

13  capitol grounds.  So, it was an attempt to disperse the crowd

14  that if you watch the entirety of the video, was launching stuff

15  at us from the middle of the street, across the street.  They

16  would run across the street to that opposite sidewalk, launch

17  something up the hill, and then run back.  So, that's what was

18  happening at that time.

19  Q    Do you see that guy launching anything?

20  A    Not in this moment, no.

21  Q    Okay.  And I think the -- the question was in this moment,

22  when you sprayed him, was he a threat to you and your officers?

23  Can you answer that one?

24  A    In this moment, we were attempting to clear the hill and

25  disperse the crowd.

20-cv-1878-RBJ   KEITH VALENTINE - Direct   03-14-2022

1   Q    Okay.

2   A    And those directions were not being followed, so we were

3   attempting to disperse the crowd using OC spray and PepperBalls

4   or whatever.

5   Q    And we established this is May 29th; correct?

6   A    If your math is correct, yes.

7   Q    Okay.  And it's day two of the protest; correct?

8   A    Yes, sir.

9   Q    So, there actually was no curfew in effect at this time,

10  was there?

11  A    No.  I don't agree -- I don't recall exactly when the

12  curfew went into place.

13  Q    If the evidence in this case establishes that the curfew

14  went into effect on day three, then there would not have been a

15  curfew in effect at that time, so that wouldn't have been a

16  reason either?

17  A    Sure.  That is correct.  However, breaking into the

18  capitol, destroying the capitol grounds at the time was a cause

19  to do so.  That fact still stands, yes.

20  Q    Did you see that guy try to break into the capitol?

21  A    In this 20-second clip of a video?  No.

22  Q    And you were -- again, we established, there was a group of

23  officers; correct?

24  A    Yeah.  I think that, you know, what's important -- really

25  important and critical to understand is showing 10-, 15-,

20-cv-1878-RBJ    KEITH VALENTINE - Direct    03-14-2022

1  20-second snippets of a body cam video very easily lends itself

2  to take things out of context.  So, to take a moment in time and

3  insinuate that because of that moment in time, there was no

4  active threat or whatever you would perceive as a threat,

5  creates a pretty inaccurate picture of what the totality of the

6  circumstances were lending itself to at the time.

7  Q    Could you have arrested him, the guy that you sprayed,

8  instead of spraying him?  He's by himself; right?

9  A    I don't recall the exact circumstances.  I don't know.

10 Q    Okay.  And after you sprayed him -- and spraying -- getting

11 sprayed with OC spray in the face is disorienting, isn't it?

12 A    It can be for some, yes.

13 Q    And what he did is he wandered out into live traffic on

14 Lincoln after you sprayed him; right?

15 A    He ran back to the group of -- across the street, yes.

16 Q    Across live traffic on Lincoln; right?

17 A    I wouldn't necessarily call it live, being that the entire

18 group of people there had the traffic jammed up.  So, if you

19 watch the video, I would say that although traffic moves at

20 times, certainly not normal flowing traffic for that block,

21 being that nobody could go anywhere.  So, those cars are fairly

22 stationary, and a lot of the cars that you hear honking are

23 actually there with the crowd that's across the street.  So, I

24 couldn't necessarily call it live traffic.

25 Q    And there were -- were there supervising officers in that

20-cv-1878-RBJ    KEITH VALENTINE – Direct    03-14-2022

1   line with you at that time?

2   A    I believe so.

3   Q    Okay.  Did any of the supervising officers or any of the

4   other officers say anything to you like, hey, maybe you

5   shouldn't have sprayed that guy?

6   A    No.

7   Q    And the spraying that protester at that time that we just

8   saw, was that consistent with your training at DPD?

9   A    I don't recall the exact circumstances of what exactly is

10  going on.  So, I can't -- I don't recall everything that

11  happened in this moment.

12  Q    Okay.  But you're the one that sprayed this guy?

13  A    Yeah.  I understand that.

14  Q    And was your spraying of that guy consistent with your DPD

15  training?

16  A    Again, I don't recall the exact moment in time when this

17  is -- this is five seconds of a video; right?  So, when you go

18  back to this exact moment and that exact night and you, like, I

19  think maybe this is even one of them, you can hear metal ball

20  bearings and rocks dinging off the poles and the building next

21  to us.

22          So, I don't recall the exact moment in time of the --

23  whatever the timeframe is you want to call it, five seconds, six

24  seconds.  I don't recall everything that was happening in that

25  moment.  I would say that my actions were consistent with the

Kevin P. Carlin, RMR, CRR

20-cv-1878-RBJ   KEITH VALENTINE - Direct   03-14-2022

1   policy at the time, being that we were trying to disperse the

2   crowd, yes.

3   Q    Would you agree that every use of force against a person

4   has to be justified by the specific situation surrounding that

5   person and that use of force; correct?

6   A    With considerations to the totality of the circumstances,

7   yes.

8   Q    All right.  I want to go back to Exhibit 513, very briefly,

9   and this is the one you have in front of you, Mr. Valentine.

10  It's in evidence.  We can put it up.  Those same two pages,

11  pages four and five, this is what we just looked at, May 29th,

12  your use of force report.  Is there anything in your use of

13  force report about spraying any person at the bottom of that

14  hill on Lincoln with OC spray?

15  A    Yes, there is.

16  Q    All right.  What -- can you point me to that, please?

17  A    It says the crowd at large began to throw several

18  projectiles at officers to include but not limited to cans,

19  landscaping river rocks, locks, bottles filled with unknown

20  liquids.  I deployed gas and an OC fogger.

21  Q    Okay.  Let's -- yeah.  Let's highlight that, please.  Let's

22  just go through that whole thing.  Thank you for pointing me to

23  that.  Okay.  So, first of all, you're talking about a crowd at

24  large.  Do we see a crowd in that video?

25  A    Yes.

20-cv-1878-RBJ   KEITH VALENTINE - Direct   03-14-2022

1   Q    We did?  The crowd was across Lincoln; right?

2   A    Yes.

3   Q    So, the crowd at large began to throw several projectiles

4   at officers to include, and you just went through that.  Did you

5   see that guy who you sprayed doing any of that?

6   A    In that few seconds of my body cam, no, not at that time.

7   Q    And you say I deployed gas and OC fogger, and it says I was

8   unable to make any arrest due to the active aggressors

9   retreating into the crowd and fleeing apprehension.  Do you see

10  that?

11  A    Yes.

12  Q    But this guy wasn't fleeing into the crowd, so you could

13  have arrested him; right?

14  A    He walked back westbound toward the crowd.

15  Q    After you sprayed him?

16  A    Correct.

17  Q    Before you sprayed him, you could have arrested him, and it

18  wasn't -- the reason you couldn't arrest him wasn't because he

19  was retreating into the crowd and fleeing apprehension, was it?

20  A    He ran back toward the crowd.  I was not going to run

21  across the street to get him.

22  Q    After you sprayed him?

23  A    Correct.

24  Q    So, you made a choice to spray him instead of arrest him?

25  A    I made a choice to disperse him from the area that we were

Kevin P. Carlin, RMR, CRR

20-cv-1878-RBJ   KEITH VALENTINE - Direct   03-14-2022

1    moving people from.  To run across the street and grab this guy

2    when who knows what else is across the street, judging by what

3    they were throwing at us, padlocks, metal ball bearings, I'm not

4    going to run across the street, grab this guy, who is presumably

5    not just going to be like, oh, you got me, and go into custody.

6    So, at that moment in time, I did feel like it was unreasonable

7    and unsafe for me to grab that individual while he was going

8    back across the street, yes.

9    Q    Okay.  But he was only going back across the street because

10   you sprayed him in the face.  You could have grabbed him before

11   you sprayed him; right?

12   A    I disagree with that.

13   Q    Okay.

14   A    He was -- he was going back across the street because

15   that's where the rest of his group was.

16   Q    He was actually walking left to right, wasn't he, along the

17   sidewalk?

18   A    Yes.

19   Q    Do you want to see it again?

20   A    He was standing on the sidewalk, yes.

21   Q    Okay.  And then the next sentence, I used the fogger in the

22   general direction of several parties I identified as throwing

23   projectiles, and those that were refusing to leave the park.  Do

24   you see that?

25   A    Yes.

Kevin P. Carlin, RMR, CRR

20-cv-1878-RBJ    KEITH VALENTINE - Direct    03-14-2022

1    Q     Well, and this guy, we didn't see him throw any

2    projectiles, did we?

3    A     Not in that moment, no.

4    Q     And he wasn't even in the park.  He was on the sidewalk

5    just walking north; right?

6    A     The park referring to clearing the capitol grounds, the

7    park areas that's in front of there.

8    Q     Okay.  And when you soaked him from head to toe with that,

9    you would describe that as using your fogger in the general

10   direction of him?

11   A     Yes.

12   Q     That's accurate?

13   A     That's accurate.

14           MR. DOUGLAS:  Okay.  All right.  I want to go to

15   Exhibit 691, which is also your body-worn camera, this time from

16   the next day, May 30th.  And that is not yet in evidence, so I

17   would offer it at this time.

18           MR. WEINER:  Stipulate.

19           THE COURT:  Okay?

20           MR. WEINER:  Sorry, Your Honor.  I said we stipulate

21   to it.  It's fine.

22           THE COURT:  It's admitted.

23           MR. DOUGLAS:  Thank you, Your Honor.

24   Q.    (By Mr. Douglas) So, we're looking at your body-worn

25   camera, and you're in front of the Colorado Supreme Court here?

20-cv-1878-RBJ   KEITH VALENTINE - Direct   03-14-2022

1   A    Yes, sir.

2   Q    Okay.  And time translation gets us to the day before.  You

3   subtract six hours, so it's May 30th, and I have it as

4   8:19 p.m., assuming my math is correct.  Do you agree with that?

5   A    Yes, sir.

6   Q    Okay.  Let's play the first few seconds of this, please.

7        (A video was played.)

8   Q    Okay.  I want you -- well, there's something that's going

9   to happen on the left we're about to see, but then I also want

10  you to focus on this person right here.  Do you see that's a

11  woman with sunglasses holding a sign?

12  A    Yes, sir.

13  Q    And do you see her sign says -- can you read it from here?

14  I can't breathe?  Do you see that?

15  A    Yeah.  I think -- I mean, the red -- is it red?  Looks like

16  "can't."

17  Q    Okay.

18  A    Can't assume what that sign says.  I don't know.

19  Q    That's not critical.  Let's keep playing, please.

20       (A video was played.)

21  Q    Okay.  Did you see at the beginning of that clip, the

22  person at the far left over here, they're not there anymore, but

23  on this side of the screen gets sprayed in the face with pepper

24  spray?

25  A    I saw OC be deployed toward the corner of my body cam, yes.

20-cv-1878-RBJ    KEITH VALENTINE - Direct    03-14-2022

1   Q    And you saw that, that hit a woman in the face?

2   A    I didn't immediately see it on the video, no.  But I did

3   see it being deployed.

4   Q    Okay.  Did you see her fall to the ground after that was

5   deployed?

6   A    Yeah.  I did see that.  I didn't know if that was the same

7   person, but yes.

8   Q    Okay.  Now, that woman who was sprayed, I understand you

9   didn't spray her, but she wasn't acting in a way that was

10  threatening to you or any of the other officers in that area,

11  was she?

12  A    I don't know.  I don't recall.

13  Q    You don't see on the video her doing anything threatening,

14  do you?

15  A    I don't see what's in her hands.  I didn't see what

16  happened before.  I have no idea as far as the justification

17  goes for that isolated situation.

18  Q    Okay.  And you said you saw her fall to the ground.  Did

19  you see you or any other officer offer her assistance after she

20  went to the ground?

21  A    I saw her fall to the ground in my video.  I don't recall

22  that moment, but no.

23  Q    Okay.  In fact, you see you aiming your PepperBall gun at

24  her while she's on the ground, don't you?

25  A    I aimed my PepperBall in the general direction of the

20-cv-1878-RBJ   KEITH VALENTINE - Direct   03-14-2022

1   people that were running toward the line.

2   Q    Okay.  And you actually shot one of them, a woman who said,

3   tough guy with a spray can.  Did you see that?

4   A    Yes.

5   Q    Okay.  And that was the woman holding that "I can't

6   breathe" sign that you shot with a PepperBall; right?

7   A    Yes.

8   Q    You shot her as she was backing up onto the sidewalk?

9   A    Yes.

10  Q    Okay.  And that was consistent with your DPD training?

11  A    We're trying to move the crowd and disperse the crowd.  So,

12  several rounds were used at the ground or approved areas.  So,

13  yes.  It's consistent with policy in this moment in time where

14  we're trying to clear the area and move that crowd out of that

15  specific area, yes.

16  Q    Even though she's backing up?

17  A    Yes.

18  Q    Okay.  All right.  Let's go to use of force report,

19  Exhibit 513, pages six and seven.  This is May 30th.  That's the

20  date of the video we just reviewed?

21  A    Yes.

22  Q    Okay.  I want to ask if this, it looks like a page and a

23  half report, has any mention of your shooting that woman with

24  the sign who was backing up with your PepperBall gun.

25  A    On page two, it says, I was using the PepperBall to target

Kevin P. Carlin, RMR, CRR

20-cv-1878-RBJ    KEITH VALENTINE - Direct    03-14-2022

1  department-approved areas on the ground and attempt to disperse

2  the crowd.

3  Q    Okay.  And hers certainly wasn't to the ground; right?  It

4  was at her?

5  A    Yeah.  It was at the leg.

6        MR. DOUGLAS:  Okay.  Thank you.  Okay.  I want to move

7  to the last incidents I'm going to ask you about.  This is

8  Exhibit 687.  It's another body-worn camera from Officer

9  Valentine.  I would offer it into evidence at this time, Your

10 Honor.

11       MR. WEINER:  No objection.

12       THE COURT:  Admitted.

13 Q.    (By Mr. Douglas) Okay.  Mr. Valentine, we are looking

14 here at your body-worn camera.  You're very close to where you

15 were in that grenade video.  Do you see that Colorado Supreme

16 Court to the south?  Do you see that?

17 A    I see the building, yes.

18 Q    Right.  And you're on the north side of Colfax facing

19 south.  The state capitol is off the camera just to the left;

20 correct?

21 A    That is correct.

22 Q    Okay.  And the time is May 30th, 5:55 p.m., if my math is

23 correct?

24 A    Yes.

25 Q    Okay.

20-cv-1878-RBJ   KEITH VALENTINE - Direct   03-14-2022

1   A    Yes.

2   Q    All right.  So, it's the middle of the day, or at least

3   well before dark; correct?

4   A    That's correct.

5   Q    Okay.  Let's watch the beginning of this video, please,

6   Mr. Bupp.

7        (A video was played.)

8   Q    Okay.  Was that you we heard say, crowd is closing in?

9   A    Yes.

10  Q    Okay.  And are you referring to this crowd?

11  A    I don't recall exactly what I was referring to at the time.

12  Q    Okay.

13  A    You can see people everywhere.  I believe right before

14  this, that crowd was in the park.  So, the statement of fact

15  that they are closer than they were -- than they were when they

16  were previously in the park, yes.

17  Q    Okay.  Well, in that portion of the video, and we will

18  watch more of it, did you see -- did you see that crowd moving

19  forward at all when you said, crowd closing in?

20  A    In this few seconds?  No.  That does not depict what took

21  place before, or after, for that matter, I'm assuming.

22  Q    I'm talking about the time when you said that.  Crowd is

23  closing in.  We didn't see the crowd moving at all, did we?

24  A    No.

25  Q    Okay.  Did you see anything other than peaceful behavior

Kevin P. Carlin, RMR, CRR

20-cv-1878-RBJ    KEITH VALENTINE - Direct    03-14-2022

1  from that crowd?

2  A    In this few seconds video which doesn't accurately depict

3  everything that was going on, no.  The crowd that you have

4  circled is stationary at the time.  Now, obviously, there's

5  people breaking off of that crowd and coming closer or walking

6  in front of us or biking or whatever, but the people that you

7  have circled are at the moment stationary, yes.

8  Q    Okay.  And we're going to watch more of this video, and if

9  you see something flying at the officers or anything not

10  peaceful, please speak up.  I want to see it.

11 A    Sure.

12 Q    So, let's clear that, and let's watch this some more,

13 please.

14      (A video was played.)

15 Q    Can you stop it.  Okay.  First of all, we were watching

16 that crowd.  Still pretty peaceful; right?  Or completely

17 peaceful; right?  From what we can see?

18 A    In the -- yeah.  There's nothing -- yes.

19 Q    Okay.  And at that point you pull out a grenade.  We just

20 saw that; right?

21 A    Correct.

22 Q    Okay.  And can we back this up just so you see this guy on

23 the scooter.  Did you see him riding in circles before that?

24 A    I wasn't particularly -- yeah.

25 Q    Let's just watch -- yeah.  Please start that, and then stop

20-cv-1878-RBJ   KEITH VALENTINE - Direct   03-14-2022

 1   when that gun comes up, please.

 2        (A video was played.)

 3   Q    Okay.  So, you saw that scooter guy riding around in

 4   circles over there; right?

 5   A    Yes, sir.

 6   Q    Okay.  Now, he wasn't a threat to the crowd, was he?

 7   A    I'm sorry?  He wasn't a threat to the crowd?

 8   Q    I mean -- I'm sorry.  Thank you for correcting me.  He

 9   wasn't a threat to the officers at that time, was he?

10   A    In this few seconds, I don't see a threat particularly, no.

11   Q    Okay.  So, then why is the person to your right aiming a

12   PepperBall gun at him?

13   A    I don't know.

14   Q    Okay.  Now, let's keep going a few seconds.  I think he

15   tracks the guy with the PepperBall, and then there's a guy on a

16   bike that shows up.  Let's take a look at him.  A few more

17   seconds, please.

18        (A video was played.)

19   Q    Okay.  So, you see the guy with the bike, and he's now the

20   subject of this person to your right with the PepperBall gun;

21   right?

22   A    Yes.

23   Q    And the person --

24   A    I mean, I don't know if he's the subject of the person with

25   the PepperBall gun, but I do see him.

                    Kevin P. Carlin, RMR, CRR

20-cv-1878-RBJ    KEITH VALENTINE - Direct    03-14-2022

1  Q    Okay.  And he's riding from left to right.  He's got one

2  hand up sort of waving at the line of officers; right?

3  A    Correct.

4  Q    Did you consider that guy on the bike a threat at that

5  time?

6  A    I don't know anything that that guy on the bike was doing

7  prior to coming into the screen.  So, I don't know.  I may not

8  have been focused on him at the time.  That doesn't mean anybody

9  to my right or left was not.

10 Q    Okay.  Did you receive as part of your training something

11 about the concept that you were never to aim a weapon at someone

12 unless you intend to use it?

13 A    Yes.

14 Q    Okay.  All right.  Let's keep playing the video.  And we're

15 going to --

16         THE COURT:  How much more do you have here?

17         MR. DOUGLAS:  I'm close, Your Honor.  To get through

18 this, I would say maybe ten more minutes.

19         THE COURT:  Well, it's already five after 12:00.

20         MR. DOUGLAS:  I defer to you, Your Honor.  I'm happy

21 to stop or --

22         THE COURT:  Ten minutes?  We'll have you out by 12:15.

23         MR. DOUGLAS:  All right.  Let's keep playing this

24 video to the end, please.

25         (A video was played.)

                    Kevin P. Carlin, RMR, CRR

20-cv-1878-RBJ    KEITH VALENTINE - Direct    03-14-2022

1   Q.    (By Mr. Douglas) All right.  I'm going to ask you some

2   questions about this video.  Did you hear at the end there the

3   woman saying, why are you doing this?  We've done nothing wrong.

4   We're peaceful people.  Did you hear that?

5   A    Yes.

6   Q    Okay.  And before the officers advance, we were watching

7   that, did you see the crowd throw anything, do anything other

8   than protest peacefully?

9   A    I saw something take place off to the left side of my body

10  cam.  I don't know exactly what that was.

11  Q    Okay.  A different crowd.  Not the crowd we were looking

12  at; right?

13  A    I wouldn't necessarily agree with that, no.

14  Q    Okay.  And then you saw your line of officers begin

15  advancing towards the crowd, and they start deploying tear gas

16  and PepperBalls; correct?

17  A    Correct.

18  Q    Did you consider those protesters a threat to your line of

19  officers at that time?

20  A    I don't recall exactly what the orders were or the

21  direction was given at that time.  So, there's -- there's a lot

22  of information going on behind the scenes, and a lot of

23  decisions being made that I don't have access to.  So, I mean, I

24  don't recall exactly what the orders were or what the

25  information was.  People a lot more important than me, a lot

20-cv-1878-RBJ   KEITH VALENTINE – Direct   03-14-2022

1  smarter than me as far as making those decisions and how to move

2  forward that are making those decisions, so I don't know.

3  Q    They're the ones that made the decision to use weapons

4  against that crowd, not you; correct?

5  A    I don't recall exactly what the orders were.

6  Q    And that crowd, did you give a dispersal order to that

7  crowd before deploying those less-lethal weapons on them?

8  A    Me specifically, no.

9  Q    Do you know if anyone did?  Did you hear anything?

10  A    I recall several people yelling.  I believe there was

11  bullhorns and things like that, but I don't recall specifically

12  who was giving orders at the time, no.

13  Q    Did you hear the bullhorns on that video?

14  A    Not in this moment, no.

15  Q    Okay.  Did you hear any warning that you were about to

16  deploy chemical weapons on that crowd?

17  A    Not on this video, no.

18  Q    Okay.  And if you just wanted to move the crowd, isn't

19  there a technique where the officers stand in a tight line with

20  their batons, and you get up to the crowd and you try to just

21  like push them where you want them to go?  Have you learned that

22  technique?

23  A    There is a technique like that, yes, when it comes to crowd

24  management and kind of controlling or moving a crowd.  However,

25  in this situation, it was not a reasonable action to take.

20-cv-1878-RBJ    KEITH VALENTINE - Direct    03-14-2022

1    Q    Because the crowd was being violent?

2    A    Yeah.  Absolutely.

3    Q    Oh.

4    A    Yeah.  To insinuate that because that group of people

5    standing in the middle of the street at that moment in time

6    wasn't throwing anything again is inaccurate, and my body cam

7    doesn't show exactly what was taking place.  What actually was

8    taking place in this moment that doesn't come through completely

9    on the camera is the fact that people behind this crowd, behind

10   the crowd that was in the street were running up, throwing

11   everything out of it.

12            If you watch the rest of this video, I actually believe

13   this is the one where I say, watch that trash can, which is down

14   on the corner of Colfax and Broadway, because there was people

15   taking stuff out of the trash can, running back behind the crowd

16   that was in the street, to throw it at us.  There is -- as you

17   can see, that backpack there is extremely heavy, and they keep

18   passing it back and forth, which was a common tactic, if you

19   will, amongst folks in the crowd or bad actors in the crowd

20   where they were passing around backpacks, pulling stuff out of

21   it, and then throwing it at us.

22            MR. DOUGLAS:  Your Honor, I apologize.  But I'm

23   getting some very long answers here, so I'm not sure I can wrap

24   it up in the ten minutes I said.  Maybe we should take a lunch

25   break now.

20-cv-1878-RBJ    KEITH VALENTINE - Direct    03-14-2022

1          THE COURT:  Okay.  We will stop here.  How about 1:30,

2   folks?

3          (Jury out at 12:11 p.m.)

4          THE COURT:  Okay.  1:30.

5       (Recess at 12:12 p.m., until 1:35 p.m.)

6       (Jury in at 1:35 p.m.)

7          THE COURT:  Okay.

8          MR. DOUGLAS:  Thank you, Your Honor.

9   Q.    (By Mr. Douglas) Mr. Valentine, when we broke for lunch,

10  we were looking at Exhibit 687, and I want to come back to where

11  we were.  I think we have a screenshot, if we can put that up,

12  from this same video.  Yeah.  This one.  This is the same scene

13  we were just looking at, but this is before you threw the

14  grenade; is that correct?

15  A    Yes, sir.  That's correct.

16  Q    Okay.  And here, we can see clearly the grenade that you

17  were holding for several minutes before you threw it.  And you

18  see it says OC Blast on it; correct?

19  A    Yes, sir.  I do see that.

20  Q    All right.  And is this the same kind of grenade that we

21  saw you throw the day before, May 29?

22  A    I don't know the answer to that.

23  Q    Okay.  And so you said that May 29th, that was your first

24  time throwing a grenade in the field.  Was this your second

25  time?

20-cv-1878-RBJ   KEITH VALENTINE - Direct   03-14-2022

1   A   I believe I said I don't know if that was the first time,

2   and I don't know what time this would have been.

3   Q   Okay.  So, we just saw you throw it.  We're going to talk

4   about that, but after this grenade, did you throw more grenades

5   during the remainder of the time that you worked on the protest?

6   A   I don't recall.

7   Q   Okay.  Are you familiar with what an OC Blast grenade is?

8   A   The grenade with OC in it.

9   Q   It is in fact a grenade with OC in it.  Do you understand

10  it also to have 200 rubber balls that fly in all directions when

11  it explodes?

12  A   I don't recall that.  I don't think that is necessarily

13  correct.

14  Q   Okay.  But you know it's intended to explode and affect

15  people at least with a loud sound; correct?

16  A   Yes, sir.  That's correct.

17  Q   Large flash of light; correct?

18  A   Yes.

19  Q   And then OC, which is the chemical that's also in the

20  fogger cans; correct?

21  A   Correct.  I do believe that the OC grenade is different

22  than something that actually shoots out a projectile, just to

23  make that distinction.

24  Q   Okay.  And we watched when you threw it at the crowd at

25  some point.  Did you give a warning before throwing that grenade

Kevin P. Carlin, RMR, CRR

20-cv-1878-RBJ    KEITH VALENTINE - Direct    03-14-2022

1   at those people?

2   A    I don't believe so.  I don't recall exactly from the video.

3   Q    And did you see that with the time you threw the grenade,

4   it was after the crowd in that street had already dispersed?

5   A    I don't recall -- the crowd in the street?

6   Q    Yeah.  The crowd in the street that we've been looking at?

7   A    Sure.  The crowd in the street had dispersed to the park

8   where I threw the grenade.

9   Q    So, at the time you threw the grenade, that crowd that had

10  been in that street was actually fleeing into the park; correct?

11  A    I mean, I'm going to disagree with the semantics of

12  "fleeing."  Repositioning, perhaps, but fleeing, I don't think

13  that's necessarily correct, no.

14        MR. DOUGLAS:  Okay.  Let's see if we can get a better

15  look at it.  If we go to Exhibit 542, this is HALO cam from the

16  same time at the corner of Colfax and Lincoln, and I would offer

17  that into evidence at this point.

18        MR. WEINER:  No objection.

19        THE COURT:  It's admitted.

20  Q.    (By Mr. Douglas) All right.  So, Mr. Valentine, we are

21  looking north in this HALO cam; correct?

22  A    No.  We're looking east.  Right?

23  Q    I'm sorry?

24  A    I believe this camera's position --

25    (Simultaneous discussion interrupted by the court reporter.)

20-cv-1878-RBJ   KEITH VALENTINE - Direct   03-14-2022

1    A    This is my perspective.

2    Q    No.  You're right.  Thank you for correcting me.  This

3    camera is facing east on Colfax, looking towards Lincoln;

4    correct?

5    A    Yes, sir.

6    Q    Okay.  And this group of officers, this is not your line;

7    correct?

8    A    I don't believe so, no.

9    Q    Right.  When we were watching you, you were down this way

10   at this point off camera; correct?

11   A    More mid block.  Yes, sir.

12   Q    Right.  Mid block, off camera.  You understand that the

13   HALO cameras can be moved and zoomed and that kind of thing?

14   A    I do understand that, yes.

15   Q    Okay.  So, let's watch.  And by the way, this is 5:57 p.m.,

16   and it says up there it's Colfax and Broadway is where the

17   camera itself is.  That's the same time period we were just

18   looking at on your body-worn camera?

19   A    Yes, sir.

20   Q    Okay.  Let's play this, please.

21        (A video was played.)

22   Q    Okay.  I'm sorry.  Stop.  All right.  That was too fast.

23   So, unfortunately, the camera zipped around pretty fast, but

24   let's go back and see if we can see -- let's go a little bit

25   more and then pause it right -- right after the camera zips.

20-cv-1878-RBJ    KEITH VALENTINE - Direct    03-14-2022

1      (A video was played.)

2    Q    Right there.  Okay.  Is this you sort of winding up to

3    throw that grenade?

4    A    I have no idea.  I don't think so.  I think I'm further

5    west, but I wouldn't want to say that that's me beyond any sort

6    of shadow of a doubt.

7    Q    Okay.  Let's back it up, and then we will just watch what

8    happens.

9      (A video was played.)

10   A    In fact, no.  That's definitely not me.  That grenade is --

11   or whatever it is, projectile it is, is already emitting smoke.

12   If you recall on the video before it's paused, before I throw

13   the one that I had, it was not smoking.  So, I'm pretty

14   confident in saying that that's not me.

15   Q    You are correct.  I jumped the gun and thought someone

16   throwing something was you, and it was not.  Let's keep playing,

17   please.

18     (A video was played.)

19   Q    Okay.  Stop it.  Okay.  Is this you in the process of

20   winding up to throw that grenade?

21   A    Again, that's hard to tell.  It's possible.

22   Q    Okay.  And then I'm going to ask you to focus over here by

23   these tents.

24   A    Okay.

25   Q    After you throw it, and the camera is going to zip again,

Kevin P. Carlin, RMR, CRR

20-cv-1878-RBJ    KEITH VALENTINE - Direct    03-14-2022

1   and so it's a little bit -- we'll watch again if we need to, but

2   focus over there on where it lands.  And let's play that,

3   please.

4        (A video was played.)

5   Q    Okay.  You can stop it.  So, based on your body-worn

6   camera, does that appear to be where the grenade you threw

7   landed?

8   A    Yes, sir.

9   Q    Okay.  So, you think that was you throwing that grenade?

10  A    Yes, sir.

11  Q    Okay.  And you could see over here that the grenade landed

12  to the right -- to the right of some people who were already

13  before it landed running into the park; correct?

14  A    Yeah.  What you're not seeing is what was behind those

15  folks and what they were doing prior to running back into the

16  park for whatever the reason was.  So, yes.  In this still

17  capture, freeze-frame moment from HALO pieced together with my

18  body cam, you do not see what took place before or after this

19  particular moment.

20  Q    Okay.  But as to the people who were running away and whose

21  right the grenade landed next to and then exploded, what did

22  they do to justify that use of force against them?

23  A    I don't recall this exact moment.  I mean, we are

24  discussing something two years ago, so I don't particularly

25  remember this exact moment in time.

20-cv-1878-RBJ    KEITH VALENTINE – Direct    03-14-2022

1    Q    All right.  And there were other officers, it looks like a

2    good number of officers on the line with you; correct?

3    A    That's correct.  Yes.

4    Q    There would have been at least one sergeant there at the

5    time?

6    A    I would assume.  That's safe to assume.

7    Q    Do you remember who the sergeant was at that time?

8    A    No, I do not.

9    Q    Okay.  And in your whole gang unit, there were four

10   sergeants; correct?

11   A    Total?

12   Q    Yeah.

13   A    Yeah.  That doesn't necessarily mean they were all there at

14   that time.

15   Q    Okay.  Understood.  But there were four, and you can't

16   remember which one was there at that time; correct?

17   A    Correct.

18   Q    Okay.  Did any -- did the sergeant, the gang unit sergeant

19   or anyone else on that line say anything to you, like, hey,

20   maybe once the crowd is gone, don't throw the grenade?

21   A    The crowd was not gone, but no.  They didn't particularly

22   specifically say that.

23   Q    Okay.  Or don't throw a grenade at people who are running

24   away?  Anyone say that to you?

25   A    That would imply that I threw a grenade at someone who was

20-cv-1878-RBJ    KEITH VALENTINE - Direct    03-14-2022

1    running away, and I'm going to argue that fact all the time,

2    because I did not.

3    Q    Well, it certainly landed next to people who were running

4    away; right?

5    A    It landed next to people that were possibly moving away

6    because of the grenade, sure, which I would argue is the desired

7    effect, or intended outcome.  But to imply that someone is

8    running from me and I threw it at them as they were running

9    away, I think is incorrect.

10   Q    Okay.  So, you didn't see them already running away before

11   the grenade landed?

12   A    I can't speak to what I saw two years ago.  What I'm

13   telling you is I would never intentionally throw a grenade at

14   somebody that is fleeing, per se.  These cameras, sure, they're

15   a perspective, and they're a lens into -- they're one piece of a

16   puzzle that -- of everything that was going on.  It is certainly

17   not the totality of the circumstances.

18           In fact, like, one of the reasons that we're standing

19   in the middle of the street is because if you looked behind us

20   where that pile of dirt is, that pile of dirt is covered -- or

21   the pile of dirt is covering a massive amount of landscaping

22   rocks that were being used to throw at us, which they were

23   storing in those trash cans and these tents to conceal those

24   types of items.

25           So, the reason we're standing in the street -- and you

20-cv-1878-RBJ   KEITH VALENTINE - Direct   03-14-2022

1   see people strung about here that would run back into the crowd,

2   or getting to this pile is exactly that.  So, to speak to that

3   exact moment as to why I threw the grenade, I couldn't speak to

4   that now.  However, I am going to disagree with the fact that I

5   threw it at somebody that was fleeing.

6   Q    Okay.  And just to clarify that last point, when we were

7   looking at your body-worn camera before the crowd was dispersed,

8   there was a huge line of officers along this whole sidewalk;

9   right?  Or maybe it was here, but that's where you were; right?

10  A    Prior to moving into the street?

11  Q    Yes.

12  A    Correct.

13  Q    Okay.  And this is the pile of rocks behind you you were

14  just describing; right?

15  A    That is correct.

16  Q    Okay.  And in that video, do we see any of the protesters

17  that were really here-ish at the time making any effort to get

18  through the line of officers to get to the pile of rocks?  Do

19  you see that?

20  A    Again, a singular body camera HALO snippet is not

21  necessarily going to show the totality of the circumstances.

22  Q    And I want to back up just two seconds, and we're going to

23  focus on the point of impact.  And I just want to see if we can

24  tell whether those people are running -- already running away

25  before the grenade explodes.  Let's take a look.

Kevin P. Carlin, RMR, CRR

20-cv-1878-RBJ    KEITH VALENTINE - Direct    03-14-2022

1      (A video was played.)

2  Q    All right.  Did you see that?  Did you see the people in

3  the vicinity of the grenade were already running when the

4  grenade landed?

5  A    Yeah.  And I stand by the fact once I made the decision to

6  disperse the crowd using that means, like, you can't stop it

7  midair.  That's impossible.  And the desired outcome was to push

8  the crowd back, and just because those folks had decided to run

9  in the moment that the tool was already in the air, I mean,

10  that's -- they weren't -- I wasn't throwing it at a fleeing

11  person at the time.  Midair, I mean, that decision has been

12  made, and I stick by that decision.  But there's no bringing

13  that back.

14  Q    Okay.  And your throwing that grenade under the conditions

15  that we saw is consistent with your training at DPD?

16  A    Yes.

17  Q    Okay.  And consistent with DPD policy?

18  A    Yes.  I believe so.

19  Q    Okay.  I want to go to the very -- I want to go back to

20  that 637, Exhibit 637 that we were looking at.  Actually, no.

21  Before we do that, I apologize.  513, your use of force report

22  which you have in front of you, let's take a look at pages six

23  and seven of that report that you wrote for this day.  You can

24  see here that this is May 30th, 2020, the day we just looked at?

25  A    Yes, sir.

20-cv-1878-RBJ    KEITH VALENTINE - Direct    03-14-2022

1   Q    Can you just tell me, is there anything in this use of

2   force report that you wrote for that day that mentions you

3   throwing a grenade?

4   A    No, sir.

5   Q    Okay.  And now let's go back to Exhibit 687.  We're close.

6   I promise.  And we're going to go to -- this is two and a half

7   minutes after we saw you throw the grenade.  And let's play this

8   here, please.

9        (A video was played.)

10  Q    Okay.  So, let's talk about what we just saw.  You saw a

11  protester in a white shirt in this area run up and throw a water

12  bottle in the direction of the line of officers; correct?

13  A    That's correct.

14  Q    Okay.  And then you saw a number of officers -- you called

15  out, bottle, white shirt, white shirt.  That was you; correct?

16  A    Yes, sir.

17  Q    And you were instructing the other people on the line to

18  try to shoot that person with PepperBalls?

19  A    I was instructing the people on the line that a bottle was

20  being thrown at us.

21  Q    And you saw a number of people in fact discharge -- or you

22  heard and then saw people discharge PepperBalls in that person's

23  direction; correct?

24  A    Yes, sir.

25  Q    Did you see anyone else get hit who was not throwing a

20-cv-1878-RBJ   KEITH VALENTINE - Direct   03-14-2022

1   bottle?

2   A    I don't recall.

3   Q    You don't recall?

4   A    I was focused on the person throwing something at us.

5   Q    Then I would like to show that quickly again.  Can we go --

6        (A video was played.)

7   Q    This guy -- yeah.  There we go.

8   A    I wasn't -- okay.

9   Q    Okay.  So, you see that guy in the black shirt.  He's hit

10  with several PepperBalls; correct?

11  A    Yes.

12  Q    Okay.  In his back as he's walking away; correct?

13  A    I don't know if he's walking away.  This is frozen, but

14  yes.  He's hit with PepperBalls, it looks like.

15  Q    Okay.  And he didn't throw a water bottle that you saw, did

16  he?

17  A    Not that I saw, no.

18  Q    Okay.  All right.  Let's move to -- we're going to -- why

19  don't we watch this guy.

20       (A video was played.)

21  Q    Okay.  Do you see this guy in the blue tank top?  He's also

22  hit with PepperBalls; correct?

23  A    Yes, sir.

24  Q    Okay.  Does he appear to have a phone in his hand?

25  A    I'm not going to speculate as to what that is.  I don't

20-cv-1878-RBJ   KEITH VALENTINE - Direct   03-14-2022

1  know.

2  Q    Okay.  So, the one protester -- there's not really a crowd

3  in that part of the park, is there?

4  A    I mean, I guess that would be relative.  I mean, if you're

5  talking specifically around the guy in the blue T-shirt, you'd

6  have to define what around that area in the park means, but

7  there's -- he's certainly with -- there's other people in the

8  park.

9  Q    Right.  But in this area of the park where the guy walked

10 up and threw a water bottle, you've got the guy in the white

11 shirt, this guy, and this guy; right?

12 A    At this moment, yes.

13 Q    Right.  And all three of them were struck by PepperBalls,

14 even though only the person in the white shirt threw the water

15 bottle; correct?

16 A    They were struck with PepperBalls, yes.  I can't speak

17 to -- as to why.

18 Q    Okay.  And that deployment of PepperBalls that you -- you

19 were there for, was consistent with DPD training?

20 A    PepperBalls are in part a crowd dispersal tool.  So, when

21 you're trying to disperse a crowd, I mean, you're talking about,

22 again, a singular moment in time as opposed to like everything

23 that was happening before this.  So, when it comes to dispersing

24 a crowd using a PepperBall gun, yeah, that's consistent at the

25 time -- with policy at the time.

20-cv-1878-RBJ   KEITH VALENTINE - Direct   03-14-2022

1   Q    And was there ever any discipline against you or any

2   officers that we've seen deployed relating to any of the videos

3   we have watched here today, to your knowledge?

4   A    To my knowledge, I'm not going to speak to anybody -- any

5   other officers' disciplinary record is -- personally don't know.

6   For me, I did not receive any sort of disciplinary action, no.

7        (A video was played.)

8   Q    Stop right here.  Okay.  So, this is the same area where we

9   see the guy with the blue tank top right here again.  Do you see

10  this person walking from right to left over the -- on the

11  sidewalk, holding one hand up and carrying a sign?  Do you see

12  him?

13  A    Yeah.  Do we know if this is before or after the video that

14  you just showed me?  You keep jumping back and forth.

15  Q    This is immediately before.  So, if we kept playing it, you

16  would see the guy throw the water bottle almost immediately

17  after what happens to this guy that we're about to see.

18  A    Okay.

19  Q    Okay.  So, let's play and see what happens.

20       (A video was played.)

21  Q    Okay.  Can you keep playing that, or -- okay.  Well, let me

22  ask you before -- we will come back to that in a second.  You

23  saw that guy who was walking past with the sign get sprayed in

24  the face by an officer; correct?

25  A    Yes.

20-cv-1878-RBJ   KEITH VALENTINE – Direct   03-14-2022

1  Q    Okay.  And did you see anything threatening by that

2  gentleman walking by?

3  A    No.

4  Q    Are you aware that one of the plaintiffs in this case,

5  Stanford Smith, was sprayed in the face while walking up and

6  down a police line on this same block an hour and a half later,

7  a little bit down the block?

8  A    No.

9  Q    Okay.  Can we keep --

10      (A video was played.)

11 Q    So, let's back up, because I want to make sure -- there it

12 is.  Okay.  We're going to watch the --

13      (A video was played.)

14 Q    Okay.  We can stop it there.  So, you saw that it was the

15 guy was sprayed in the face, and then the guy threw the water

16 bottle, and then there's the PepperBalls?

17 A    Yes, sir.

18 Q    That's the sequence.  Did you see what the -- that

19 protester who walked by and got sprayed in the face had on his

20 sign?

21 A    Something about arrests, convictions, stay fighting,

22 something to that effect.

23 Q    Okay.  Well, can we just go back.  I want to just see what

24 that said.  This is it, Your Honor.  I promise.  Well, you know

25 what?  We don't need to.  That's fine.  You can leave it here.

20-cv-1878-RBJ    KEITH VALENTINE - Direct    03-14-2022

1  Okay.

2          Mr. Valentine, before you filled out your use of force

3  statements, were you told to review DPD policy like the crowd

4  control manual?

5  A    Again, I don't recall exactly what we were told before

6  filling out statements.

7  Q    Okay.  All right.  So, last series of questions.  Right

8  here, what we're looking at, this park where we saw you throw

9  the grenade, see the guy get sprayed, we see the PepperBalls.

10  Do you know the name of that park?

11  A    Was that Veterans Park?

12  Q    So, it was changed to Veterans Park in the summer of last

13  year.  And since 1912, it was known as Liberty Park.  Were you

14  aware of that?

15  A    No.

16  Q    Okay.  And are you aware that the architects of Liberty

17  Park, when it was created, placed it next to the state capitol

18  to be a place for people to gather and have their voices heard?

19  A    I would imagine that's anywhere in the city, yes, people

20  can gather.

21          MR. DOUGLAS:  No further questions at this time.

22          THE COURT:  Cross examination?

23          MR. WEINER:  Thank you, Your Honor.

24

25

20-cv-1878-RBJ   KEITH VALENTINE – Cross   03-14-2022

1                              **CROSS EXAMINATION**

2    BY MR. WEINER

3    Q     Mr. Valentine, thank you.  I want to begin by kind of going

4    back and getting a more complete and total picture with respect

5    to the entirety of the events that you just testified to on

6    direct.  Okay?

7    A     Yes, sir.

8    Q     And where I actually want to start with was you were asked

9    some questions in terms of when you started with the Denver

10   Police Department.  I believe your testimony was somewhere in

11   June of 2016?

12   A     Started with Denver Police Department?

13   Q     Yes.

14   A     I started in the academy in December of '15.  Graduated the

15   academy in June of '16.

16   Q     And can you tell me -- or tell the jury a little bit about

17   what is involved with the academy.  Like, what kind of training?

18   How long is the training program?

19   A     It's that entire six months, give or take.  Basic law,

20   defensive tactics, physical exercises.  I mean, just lots of

21   learning throughout.

22   Q     Okay.  And do you know when you actually graduated, then?

23   Would it have been June?

24   A     It would have been June.

25   Q     Okay.  And are you from Denver, or where were you born and

20-cv-1878-RBJ   KEITH VALENTINE – Cross   03-14-2022

1  raised?

2  A    Born and raised in Denver.

3  Q    And why did you decide to become a police officer?

4  A    I decided to become a police officer -- I was raised with a

5  sense of service instilled in my family from military

6  backgrounds, and I grew up born and raised in Denver, and some

7  lower socioeconomic family, and always interacted and had some

8  positive experiences with the police department.  And I just

9  wanted to be a representation and an extension of the

10  communities that I grew up in, and just kind of be that familiar

11  face that I didn't necessarily grow up with.

12  Q    And as you sit here, do you think you achieved that goal?

13  A    I do.

14  Q    Okay.  Now, turning your attention to May 28th of 2020, you

15  were -- you testified on direct examination, I believe, that you

16  were part of the gang unit; is that correct?

17  A    Yes, sir.

18  Q    And now it's been referred to as the SORT team.  Can you

19  kind of walk us through after June of 2016, you become a police

20  officer with the City of Denver.  Can you talk just a little bit

21  about your progression, and how you got to the gang unit such as

22  you were on May 28th of 2020.

23  A    Post-academy, you go through like a training --

24  several-month field training, it's called, on the street with a

25  supervisor, training officer every day.  I started in District

1   2, which is Park Hill area, for context, down south towards like

2   Crestmoor and things like that.  Started in District 2.  Went

3   through several phases of field training.  Passed all of that,

4   and remained in District 2, and then put in for the gang unit

5   when it opened up around the time that I went.

6   Q    Why did you put in for the gang unit?

7   A    Several reasons, but for me personally, it was more kind of

8   working in the areas that I grew up in was important to me,

9   being that familiar face.  But also, I mean, the proactive side

10  of policing was very interesting to me, being able to go out and

11  just, you know, create your own body of work, if you will, and

12  just being a part of that.  The big difference there is

13  generally speaking, if you're on patrol within a district,

14  you're tied to calls for service, and I just wanted to get

15  experience doing something different.

16  Q    Okay.  And as part of the gang unit, is that, you know,

17  violence prevention and getting into the community and trying to

18  get young citizens away from gangs and away from violence?

19  A    Yeah.  There's certainly an outreach portion of it, which I

20  personally took very seriously.  But it is gang prevention.

21  This is response to gang-related activity.  Shootings,

22  stabbings, you know, some of the higher-risk individuals that

23  are committing crimes.  Oftentimes when a shooting or something

24  like that would happen, we were tasked with, you know,

25  attempting to find that person, whether it be through, you know,

20-cv-1878-RBJ    KEITH VALENTINE - Cross    03-14-2022

1   social media or you -- just people that you've made contacts

2   with in the streets, things like that.

3   Q    And was part of that crime prevention -- gang violence

4   prevention involve some outreach into the community and some of

5   the specific individuals who may get sucked into that gang life,

6   that life of violence?

7   A    Yeah.  I mean, I had the opportunity -- on our day shift

8   team, there's a little bit more ability to work in an outreach

9   capacity, simply because it's regular hours for people instead

10  of coming in at the close of the business day.  But we would do

11  things like the guy that worked on outreach, we would take like

12  Christmas presents to high-risk families, or someone that had

13  been identified, whether it be through school, like DPS system

14  or whatever outreach functions or arms that are out there.  Took

15  Christmas presents on several different occasions.

16        Did a lot of different follow-up on like post-incident,

17  go and follow up with these families, have conversations, and

18  see what resources the gang unit would have to assist that

19  individual or individuals in getting off of -- or getting out of

20  the gang life, if you will.

21  Q    Okay.  So, when you went in to work on May 28th of 2020,

22  what -- if you can just explain to the jury what your normal set

23  time of work was.  In other words, did you come in at 8:00, or

24  did you come in later in the day because of the specific

25  assignment?

 1   A     My specific assignment at the time was working Wednesday

 2   through Saturday, 5:00 p.m. to 3:00 a.m.

 3   Q     And why was the gang unit that you were assigned to at the

 4   time -- why did you have those hours?

 5   A     Those hours covered as best as we could with the resources

 6   that we had, generally speaking, when some of the highest-risk

 7   activity would take place.  Shootings, different things like

 8   that, you know, there's a day shift team and a night shift team,

 9   and that was just night shift hours.  If you look at crime

10   statistics and happenings or what happens within the city,

11   there's peaks and valleys, and our shift was designed to kind of

12   cover as many peaks as possible.

13   Q     So, going back to this May 28th, 2020, date, you know, the

14   first date that you've talked about, and I think we saw one

15   video, at least some snippets of that, when you went in that

16   day, did you know anything about protests or potential protests?

17   A     No, sir.  I had no idea anything was going on at the start

18   of my shift.

19   Q     Okay.  And did that change at some point during, you know,

20   when you got to work?

21   A     Yes, sir.

22   Q     And what was the first thing you found out, or how did you

23   hear about any potential violence in the city?

24   A     The first -- the first thing I found out was my mom texted

25   me, saying that there was protests downtown.  She didn't tell me

20-cv-1878-RBJ   KEITH VALENTINE - Cross   03-14-2022

1   what they were about.  She said there's protests downtown, and

2   the news is reporting that there were shots fired.

3   Q    And what did you do at that point?  Let me back up a little

4   bit.  Were you actually at work when you got this text from your

5   mother?

6   A    Yes, sir.

7   Q    Okay.  And what were you planning on doing that day in

8   terms of your work and the gang unit?

9   A    At the time, it was a normal day.  I didn't, at the time,

10  have any thoughts that we would be going downtown or in that

11  area for protest-related activities.

12  Q    And so after you got your text from your mom, there's

13  violence, there's gunfire, did your normal plans for work

14  change?

15  A    Yeah.  We were in the roll call -- or what's called the

16  roll call room where everyone comes for like preshift briefing,

17  if you will.  And there was a sergeant that came in and said

18  something to the effect of we've been put on standby.  There's

19  protests going on downtown, and we may have to respond.

20  Q    And you said one of the sergeants.  Do you remember which

21  sergeant it was specifically?

22  A    I can't speak with any certainty, but I believe it was

23  Sergeant Lombardi.

24  Q    Okay.  And how many sergeants were there?

25  A    I mean, that would depend on the day, but two, I think.

20-cv-1878-RBJ   KEITH VALENTINE - Cross   03-14-2022

1    Q    So, at the point you're put on standby, are you in your --

2    I don't know if it's best described as an office, or where you

3    were located, but after the roll call, you're put on standby,

4    then what happens?

5    A    I don't remember the exact sequence of events.  I just

6    remember things moved pretty rapidly to where we went from being

7    placed on standby just in case we were needed to we need to

8    leave now.  Between that time, we made a few preparations, like

9    making sure the trucks that we were using were functional and

10   operable, you know, batteries charged and things like that, and

11   that we had -- we would have as much supplies or resources as

12   possible.

13   Q    Okay.  And so at the point you're getting ready, you've

14   been advised, hey, we're on standby, were you given any

15   specifics at that stage as to what exactly your responsibility

16   and that of your unit was going to be reference this -- the

17   violence at the capitol, the gunfire, et cetera?

18   A    At that moment, not that I specifically recall.

19   Q    Okay.  And then did you get a specific -- when I say you, I

20   mean generally, generally your team, did you get a specific call

21   for assistance for fellow officers?

22   A    Yes.

23   Q    Can you explain to the jury a little bit how that happened,

24   what happened?

25   A    Yeah.  So, what I recall specifically was, again, we went

20-cv-1878-RBJ    KEITH VALENTINE - Cross    03-14-2022

1   from kind of standby, making light preparations to go downtown

2   to like, we need to go now.  And the reason that I specifically

3   remember was there was an officer calling for help.  They had

4   been surrounded by several hundred people within their patrol

5   car that were rocking it, throwing things at it, trying to get

6   that officer out.  And I think there was two officers in the

7   car, and they were unable to get out of that car.  So, we were

8   mobilized to respond to that area to try and essentially save

9   that officer from the crowd of people that felt it necessary to

10  try to tip over their car.

11  Q    So, we actually have two officers who are trapped in a car

12  and can't get out, and that's what you're responding to?

13  A    Yes, sir.

14  Q    And as part of your equipment when you get ready and head

15  to save these two officers, we've heard a lot of discussion

16  about body-worn cameras?

17  A    Yes, sir.

18  Q    Okay.  And were you assigned a body-worn camera?

19  A    Yes, sir.

20  Q    And you talked a little bit about it during your direct

21  examination, but how long did those batteries last on those

22  things?

23  A    I mean, just like anything else, your phone or whatever

24  operates on a battery can vary because of all kinds of different

25  factors.  Normal use, obviously, would cover an entire shift,

20-cv-1878-RBJ   KEITH VALENTINE - Cross   03-14-2022

1    but normal use is considered normal day-to-day operations;

2    right?  I mean, a few contacts, traffic stops, or calls or

3    whatever that looks like.  Normal -- the normal use is not

4    covered by the scope of what was to come.

5    Q    Okay.  And for example, working in the gang unit, and you

6    would oftentimes go into the community and maybe speak with some

7    gang members who may be providing you with information.  For

8    example, would you have the body-worn camera on then?

9    A    Generally speaking, yes.  But certainly not all the time.

10   I mean, it's situationally dependent.  Body-worn cameras, to my

11   understanding, were designed to capture like crimes in progress.

12   Certainly obviously -- sorry.  Interactions between, you know,

13   officers in the community, but the caveat is, you know, is it

14   confrontational?  Is it adversarial?  Is there any need to, you

15   know, if we're saying how's it going, there's no need to have a

16   body cam on.  If it was a situation of potential value or, you

17   know, descriptions or what happened in a certain event, then,

18   you know, we would always make the attempt, at least to have the

19   camera on.

20   Q    Okay.  And you were asked some questions on direct

21   examination about you provided X amount of hours of video, but

22   you were here this whole period of time.  Were you familiar

23   with -- or are you familiar with the limits -- discovery limits

24   in this litigation put on what you have to provide and the

25   timeframes and specific instances?

20-cv-1878-RBJ    KEITH VALENTINE - Cross    03-14-2022

1          MR. DOUGLAS:  Objection.  Form, foundation,

2   speculation.

3          THE COURT:  Overruled.

4          THE WITNESS:  I am not familiar with that, no.

5   Q.    (By Mr. Weiner) So, you don't know whether there was

6   specific things requested to provide your body-worn cameras for,

7   not everything, necessarily; correct?

8          MR. DOUGLAS:  Same objection.

9          THE COURT:  He said he wasn't familiar with it.

10  Q.    (By Mr. Weiner) Now, Mr. Valentine, going back to this

11  call for service to save these two officers that were stuck in

12  their car, can you describe for the jury what takes place in

13  terms of what you were personally observing and what you did

14  with respect to saving these two officers.

15  A     Yeah.  I mean, it was -- when we got down there, it was

16  complete chaos.  There was people everywhere screaming, yelling,

17  throwing things at of us -- or at us.  RDV is a term that maybe

18  comes up.  It stands for rapid deployment vehicle, essentially

19  is like an F-350, Ford F-350 truck for context.  And so

20  responding down to the scene, we were essentially hanging on to

21  the side of the truck, I guess to get through this crowd to get

22  to the car of officers that were trapped.

23  Q     And you just testified that you started having stuff thrown

24  at you?

25  A     Mm-hmm.

20-cv-1878-RBJ    KEITH VALENTINE - Cross    03-14-2022

1    Q    Had you or any other officer done anything other than to

2    try to rescue these two police officers stuck in their car when

3    you started taking -- and being assaulted?

4    A    No.  Quite literally, the only thing we did was try to get

5    to the officers that were trapped in the car.

6    Q    And what type of things were being thrown at you?

7    A    You name it.  I mean, rocks, water bottles, street debris.

8    You know, this term "plastic water bottle" gets thrown around a

9    lot, but I think what gets missed is a lot of those water

10   bottles weren't just filled with water.  They were filled with

11   urine, feces.  One instance we had a Molotov cocktail thrown at

12   us that exploded at our feet and melted some of our boots,

13   obviously because of the fire.

14        So, while on the side of the truck, I mean, you know,

15   padlocks, metal ball bearings, without any sort of instigation.

16   I mean, we drove down there on this call to try to get these

17   officers that were trapped in their car out of their car, and we

18   started taking stuff thrown at us immediately.

19   Q    And at that point, were you hit?

20   A    I don't recall specifically if I was hit at that moment,

21   no.

22   Q    Do you know if any other officers were hit when you were

23   trying to rescue those two officers stuck in a car?

24   A    Oh, yeah.  Yes.

25   Q    And eventually, I would assume you get there, you park.

20-cv-1878-RBJ   KEITH VALENTINE – Cross   03-14-2022

1   What do you do -- what does your team do to try to extricate

2   these two officers?

3   A     To the best of my recollection, I mean, there was a kind of

4   on-the-fly plan to put in -- or put in place to try to get to

5   these guys.  And it was essentially just try to get the crowd

6   out of the way as best as we could to get to the car to get --

7   to give them the ability or the space to get out.

8            In that moment, you know, when we drove kind of up to

9   the crowd, we were immediately surrounded on all sides, and so

10  we were doing the best we could to kind of watch each other's

11  back and watch our, you know, people around us, things like

12  that.  And I remember getting to the officers, and just kind of

13  wondering, like, what was going on.  And then I hear this

14  massive explosion behind me.  I'm sorry.

15  Q     Take your time.  Do you need a break?

16  A     No.  I heard this explosion.  The only thing I could think

17  was I was going to look next to me and somebody was going to be

18  pretty badly hurt.  For context, that explosion did not come

19  from us.  The crowd had pushed in and encircled us and threw

20  some sort of improvised firework to the back of our truck,

21  exploding the tire underneath the fuel tank, which for context,

22  if you think about it, an explosion going off under a fuel tank,

23  I think not just the officers, but the people that were actually

24  interested in expressing their frustrations with the system or

25  whatever the circumstances were, you know, the officers were not

20-cv-1878-RBJ    KEITH VALENTINE – Cross    03-14-2022

1    the only ones that were in danger at that moment.

2          And the explosion itself was so rattling and

3    disorienting that, you know, the first thing I did was ask the

4    people next to me, you know, if they were okay.  Because I was

5    certain -- I mean, I don't know what it was.  And then I

6    remember getting back to the truck, and the entire rear wheel

7    was blown off.

8    Q   And were you able to check on your fellow officers to see

9    if everybody was okay?

10   A   Yeah.

11   Q   Did you check on other -- well, not other, but did you

12   check on citizens, protesters, who legitimately were there

13   trying to voice their displeasure?

14   A   Things were so chaotic and adversarial that I didn't have

15   the opportunity to ask individuals if they were okay.  But I

16   did, you know -- I distinctly remember scanning the crowd,

17   because in my mind at the time, I was pretty convinced that

18   there's no way that an explosion of that magnitude could go off

19   and not have somebody extremely injured.

20   Q   Okay.  And you mentioned it was adversarial.

21   A   Yeah.

22   Q   Specifically what do you mean by that?  Other than this

23   explosion and the rocks being hit, were there other things that

24   you were personally observing or hearing?

25   A   Yes.

Kevin P. Carlin, RMR, CRR

20-cv-1878-RBJ   KEITH VALENTINE - Cross   03-14-2022

1    Q    Can you tell us what that was.

2    A    I mean, generally speaking, it was very clear that we were

3    the targets of the anger.  You know, I don't know if I can cuss,

4    but I mean, it was just -- it was a lot.  It was fucking pigs,

5    you know, die, kill yourself, you know, no pig deserves to --

6    Q    And during the course -- and I'm going to expand this

7    question to beyond just -- I know we've been talking about

8    May 28th, but beyond that, were you subjected to specific

9    insults because of your race?

10   A    Yeah.  I was called an Uncle Tom.  You name it.  I mean,

11   there was this underlying perception that because I was Black, I

12   was on the wrong side.  I took the opportunity to try and have

13   those conversations when time allowed for it, but it was

14   certainly not as much as would have been desired.

15   Q    So, when you said you took opportunities to have those

16   conversations, would that have been with people who were

17   protesters?

18   A    Yes.

19   Q    And what were those conversations?

20   A    I mean, they ranged.  You know, I remember one

21   specifically, there was an African American guy, a Black guy

22   that was yelling at me that, you know, I'm an Uncle Tom, I'm on

23   the wrong side, I'm fighting for the wrong people, the wrong

24   cause.  And at that moment, I mean, the time -- that timeframe

25   allowed for me to have a conversation as best as possible with

20-cv-1878-RBJ   KEITH VALENTINE - Cross   03-14-2022

 1  that guy, just explaining from my perspective in that moment,
 2  there wasn't necessarily sides, and me standing here doing my
 3  job to the best of my abilities wasn't indicative of sides or
 4  anything like that.
 5          And that I, you know, he's yelling for change and
 6  things like that, and I told him, I mean, there's a lot of
 7  things within society that need to change.  I don't -- I would
 8  never disagree with that at all.  The way that you go about it,
 9  I think, is pretty important, though.
10  Q    Okay.  And what do you mean by that, the way you go about
11  it is pretty important?
12  A    Well, I mean, when, you know -- and this wasn't my
13  perspective, but when you break things down to one side versus
14  the other, then I think it begs the conversation of saying,
15  okay, well, if you're on one side and I'm on the other side,
16  what action are you taking for change and improvement?  And in
17  that moment, it was just kind of an agree to disagree of where
18  it's like, hey, I'm going to be out here, you know, voicing my
19  opinion, and whatever is going on in the crowd, and, you know,
20  I'm on this side.
21          And so it was -- that's the gist of the conversation, I
22  guess.  I mean, ultimately, that conversation ended with agree
23  to disagree, and we're going to approach change and progress
24  from different sides, I guess.
25  Q    And you had mentioned a few minutes ago, when you were

20-cv-1878-RBJ   KEITH VALENTINE - Cross   03-14-2022

1    talking to this other gentleman, and you mentioned that you were

2    just trying to do your job.  And just overall, in terms of your

3    involvement, we've seen snippets of videotapes, et cetera.  What

4    was your job?  What did you see your job and that of the Denver

5    Police Department during this -- these riots?

6    A    I think given the general circumstances, my job at the time

7    was to do my best with the circumstances, to protect the public.

8    And the property, you know, the county building -- or the

9    capitol, just businesses.  I mean, I think something that often

10   gets overlooked is the fact that, you know, businesses up and

11   down Colfax or wherever else in the area were completely

12   destroyed.

13          And I understand that we're talking semantics for some,

14   but I don't think -- what I think gets lost in the battle over

15   semantics is the fact that there's people down there that work

16   incredibly hard to run those businesses.  And whether they agree

17   with the different sides or not, the point is -- the essence of

18   it is at the end of the day they did nothing to have their

19   business destroyed.

20          And so, you know, in my mind it was to protect the

21   people that were actually there peacefully protesting, and I

22   think there's an important distinction that needs to be made

23   between those that were peacefully protesting, regardless of the

24   message, and those that were there as bad actors.  And so my job

25   was to protect my team and myself from the bad actors and the

20-cv-1878-RBJ   KEITH VALENTINE - Cross   03-14-2022

1   people that, you know, were also in the crowd that were not bad

2   actors.

3   Q    And to that point, there were clearly people in the crowd,

4   clearly people out there who were not bad actors, who were not

5   doing anything wrong other than trying to have their voice be

6   heard to correct the wrong that they perceived; is that fair?

7   A    Absolutely.

8   Q    Okay.  Now to bad actors.  At some point -- and it sounds

9   like with this explosion, they took over that voice; is that

10  fair?

11  A    Without a doubt.

12  Q    Let's get back to that time, that explosion that happened

13  on May 28th.  After that explosion, you looked around.  You

14  checked on your fellow -- you know, your fellow teammates.

15  You've looked at the crowd.  What do you do then?

16  A    It's kind of a blur at that moment.  I believe we were

17  obviously able to get those officers out of their car and to

18  safety.  And then we backed out of the crowd as best we could,

19  keeping people back from the truck that kept trying to get to

20  the truck.  But the truck itself was completely disabled.  And

21  so we had to limp -- limp back, I guess, if you will, back to

22  our offices to get a different truck.

23  Q    Basically, you headed back with three wheels?

24  A    We hopped on the side and drove the three miles on three

25  wheels, yes.

1    Q    Okay.  And, you know, while we're talking about it, you

2    mentioned that you -- people would get away from the truck and

3    then come back to the truck.  And kind of a back and forth.  Was

4    that a consistent pattern throughout what we've seen, again,

5    those videos that you testified on direct?  I mean, we've looked

6    at sometimes when you're on the sidewalk, you push to the park,

7    and then you come back.

8         So, can you describe that for the jury a little bit?

9    Because this sounds like this is the first time that this

10   happens.  I mean, you're just out there, haven't done anything.

11   You take rocks, explosion happens, and can you explain a little

12   bit of that seesaw that you observed.

13   A    In that particular moment?

14   Q    In that particular moment, but then also generally speaking

15   throughout the days that you've testified to.

16   A    Yeah.  I mean, in that particular moment, you know, we were

17   surrounded.  I mean, there was -- you know, essentially what we

18   had to do was after we got the officers out of their car, was

19   kind of encircle our truck, who someone was still driving, and

20   literally just push people back as we inched forward, to try and

21   get the truck out.  And obviously, you know, by nature, whether

22   people are fleeing or not, if you get pushed back, and then

23   you -- you -- they were coming back; right?

24        It wasn't like, get out of here, move, move back,

25   whatever, and it was just like, okay, my bad, I understand that

20-cv-1878-RBJ   KEITH VALENTINE - Cross   03-14-2022

1    I just blew up your truck and tried to blow up your teammates or

2    whatever.  It was literally, you get pushed back and come back.

3    So, quite literally, our backs were against the wall -- or the

4    truck in that moment.  And we had nowhere to go but to literally

5    inch forward until we finally got to the intersection where the

6    crowd kind of broke.

7            But as far as patterns go, it was very often seen from

8    our perspective that, you know, people would run from, you know,

9    middle of the crowd or the back of the crowd to the front,

10   throwing something at us, and then run back into the crowd.  Or

11   we would clear an area, step a few feet back, and then I guess

12   that was carte blanche to come back to where we had just

13   cleared.

14           And so we would clear an area, pull back, and the crowd

15   would come right back up, or, you know, we would create a line

16   and try to create a boundary or, you know, disperse people, and

17   it was just kind of this yin-yang, yo-yo, generally speaking,

18   all the time.  You take -- you take ground, and you give it up,

19   or so on and so forth.

20   Q    Okay.  And back to the time when you're limping out of

21   that -- you've rescued those two officers, do you have to -- or

22   your other teammates have to deploy less-lethal munitions to get

23   out of there?

24   A    I don't specifically recall.  I do believe there was

25   PepperBall used in that situation.  I don't remember the exact

20-cv-1878-RBJ   KEITH VALENTINE - Cross   03-14-2022

1   circumstance, to be honest.

2   Q    Okay.  Now, after you've -- it sounds like you take the

3   truck back, the F-350.  You take it back, you get it repaired.

4   Then where do you go next?

5   A    Back downtown.

6   Q    Okay.  And do you know specifically where you went back

7   downtown?

8   A    I believe we went to District 6.  My memory is kind of

9   fuzzy on that, but I believe it was to District 6, kind of

10  staged in the 1600 block of Pennsylvania, maybe.

11  Q    Okay.  And do you recall why you were requested and your

12  team requested to go to District 6?

13  A    Yeah.  I believe at the time that was kind of where the

14  concentration -- or at least where we were focused.  I mean, I

15  don't know what information was had above me, but there was a

16  concentration of people that were there that were destroying

17  businesses, throwing rocks through windows, and there was a

18  belief that they were moving toward District 6 to try and take

19  over the police station there.

20  Q    Okay.  And is this area that you're talking about that you

21  deployed to -- and would that be with the rapid deployment

22  vehicle?  Did you get that fixed, and is that the vehicle you

23  went back out there with?

24  A    No.  We didn't get it fixed that day.  There was a

25  different -- a secondary vehicle available.

20-cv-1878-RBJ   KEITH VALENTINE - Cross   03-14-2022

1   Q     Okay.  So, you actually had to get another vehicle to get

2   out to the District 6 location?

3   A     Yes, sir.

4   Q     Okay.  And are there residents around there as well as

5   businesses?

6   A     Yeah.  I mean, if you're familiar with the area, there's

7   residences.  There's businesses of all sorts.  You know, lots of

8   homeless camps, things like that.

9   Q     Okay.  And were you getting reports and Denver Police

10  Department getting reports of incidences with homes' windows

11  being broke out and damage to, you know, single-family

12  residences?

13  A     Yeah.  What I recall is there was information that, you

14  know, there was people running in and out of apartment buildings

15  that were unsecured.  Rocks being thrown through windows.  I

16  think at the time -- I think it was the first night, not totally

17  sure, but there's a school right there that, you know, was

18  surrounded, and people were running in and out of and running

19  all around the streets.  So, yeah.  Everything is down there.

20  Q     So, you get to the area around District 6, and I believe

21  you -- Plaintiffs' Exhibit 585, you were asked some questions

22  about the latter part of that video, but as I recall it, the

23  video is approximately 50 minutes long; is that correct?

24  A     Five, zero?

25  Q     Five, zero?

20-cv-1878-RBJ    KEITH VALENTINE - Cross    03-14-2022

1    A    Yeah.  I believe it's about that long, yes.

2    Q    Okay.  And at this point, I would like to begin by

3    publishing Plaintiffs' Exhibit 585, the beginning part of it.

4    Thank you.

5        (A video was played.)

6    Q    And again, I'm going to speak now, since this is your

7    body-worn camera, and as we all know by now, and are experts in,

8    there's a 30-second buffering before the voice begins.

9        (A video was played.)

10   Q    And as we're watching this, are those members of your team

11   with those helmets that we see on the left of your camera?

12   A    Yes.

13   Q    We should have volume by now, but maybe not.  There we go.

14       (A video was played.)

15   Q    Okay.  I'm going to stop there, please.  If you can

16   fast-forward it, then, to a minute, four, please.  And when

17   that's being done, Mr. Valentine, the -- you talked some about

18   the body-worn camera.  And when you were testifying about the

19   incident with the truck being -- tire being blown up, you say

20   you're looking around.  Can you explain as a police officer,

21   you've got the body-worn camera.  Can you tell us where that's

22   affixed to your body.

23   A    Chest.

24   Q    Okay.

25   A    Chest region.

20-cv-1878-RBJ   KEITH VALENTINE - Cross   03-14-2022

1   Q     Now, are you looking around, scanning and looking for

2   different things, maybe people, items?  Can you explain that a

3   little bit to the jury what you, as a trained police officer,

4   are looking for.

5   A     Yeah.  I mean, the body-worn camera is a perspective on

6   your chest; right?  It's seeing what's directly in front of you

7   and has the ability to pick up some things, you know, behind it,

8   but it's also limited.  It's another tool.  So, I think for --

9   as a police officer, you're looking all around.  You're scanning

10  the environment, behind people, around people, behind trees,

11  behind buildings.

12        You know, the thing is the body-worn camera picks up

13  what's directly in front of you, but I think obviously it goes

14  without being said, it doesn't pick up what's off camera, and

15  really, at the end of the day, you're the only person that has

16  the perspective or the vantage point of what's off camera.

17  Q     Okay.  And so as we get into this video a little bit more,

18  you were asked a number of questions on direct examination, and

19  were making the point of, hey, there's a lot of other stuff

20  going around.  You can't take this snippet.  Can you explain

21  that a little bit more so we have some context when we watch

22  this video.

23  A     Yeah.  I mean, life happens in 360; right?  So, there's

24  things going on behind you, around you, you know, directly in

25  front of you.  That's, you know, just out of the capabilities of

20-cv-1878-RBJ   KEITH VALENTINE - Cross   03-14-2022

1   the body cam.  And so there's things that you can see, I think,

2   reasonably, it's like if you think about taking your iPhone and

3   taking a picture, you know, there's only certain things that

4   that phone picks up.  And you can zoom in, which the body-worn

5   camera doesn't have the ability to do.  But my point is that

6   picture is only what can be captured or that the phone itself

7   has the capability to do.  And the body-worn camera is the same

8   thing.

9           So, it's a matter of just kind of taking in

10  consideration of everything around you, just kind of this

11  hypervigilance of the body-worn camera, generally speaking, if

12  it's pointed this way doesn't have the ability to see on top of

13  buildings or behind trees.  And there's just things that the

14  human eye can pick up that the body-worn camera can't.

15  Q    And for the record, we're going to start the video back up.

16  It's 3:59, and it's three minutes and 59 seconds into this

17  video.  Play it, please.  Thank you.

18          (A video was played.)

19  Q    What street are you on here?  Where are you walking

20  towards?

21  A    To your left.  The building that you see there is part of

22  District 6, or that parking lot is part of District 6.  I

23  believe it's Pennsylvania.

24  Q    If we could now fast-forward up to minute, ten, please.

25          (A video was played.)

20-cv-1878-RBJ   KEITH VALENTINE - Cross   03-14-2022

1   Q     Back up to eight.  Eight minutes, please.  Thank you.

2         (A video was played.)

3   Q     Mr. Valentine, you had mentioned something about in that

4   video that sounded like, was it your voice?

5   A     Yes.

6   Q     Okay.  Were you guys -- when I say you guys, your team,

7   were you being surrounded and having people come up from behind

8   you?

9   A     Everywhere.  I mean, from every possible angle that if you

10  stood in the middle of the street, there was people coming from

11  every angle possible.

12  Q     How about through alleys?

13  A     Alleyways, passing vehicles, people were throwing stuff at

14  us from moving cars.  You saw I deployed the PepperBall there.

15  Contextually, if you think there's a parking lot, and that

16  raised brick wall, I think there is a dumpster behind it.

17  People were standing on top of that dumpster, and then

18  subsequently climbing on top of that wall and throwing stuff at

19  us from that angle, which is why I shot for the wall.

20  Q     And so that's what I want to talk a little bit about.

21  Because you couldn't see -- we see you utilize your PepperBall

22  gun?

23  A     Right.

24  Q     Okay.  But we don't see what happened before you shot your

25  PepperBall gun.  So, can you tell this jury what you saw that

Kevin P. Carlin, RMR, CRR

20-cv-1878-RBJ   KEITH VALENTINE - Cross   03-14-2022

1   the body camera doesn't pick up, why you deployed your

2   PepperBall.

3   A     Like I said, in that particular moment, it's hard to see in

4   the video when you get -- when you get a clear picture, but

5   we're facing southbound, standing on -- in the intersection of

6   Colfax and Pennsylvania, I think, at this point.  And the things

7   that you're not seeing is there's people standing on top of the

8   businesses.  There's people standing on top of trash cans,

9   running in and out of alleys.

10        That park right there kind of wraps around going like

11   north and south, wraps around east and west, and then comes back

12   out on the other side.  People were using this building as cover

13   to kind of pop back in and out, throwing different things at us.

14   You hear that big ding, and I follow up by saying, oh, shit.

15   It's, I mean, literally, softball-sized rocks are being launched

16   at us from the top of Cheba Hut, from behind, I think it's Slice

17   Works or that pizza restaurant right there.  Something to that

18   effect.

19        So, yeah.  The things that you're not -- a body-worn

20   camera is a valuable tool, but the mistake of thinking that it

21   captures everything is certainly critically important to not

22   make.

23   Q   And at the time that you and your fellow officers are

24   taking these rocks and being assaulted, had you guys done

25   anything other than form a line to protect District 6?

20-cv-1878-RBJ   KEITH VALENTINE – Cross   03-14-2022

1   A     No.  At the time, I mean, I specifically remember being

2   concerned about the fact that, you know, my assumption was there

3   was a lot of vehicular traffic that was kind of trapped in this

4   intersection, and, you know, certainly there were some people --

5   or obviously throwing stuff out of -- throwing stuff at us from

6   traffic, from their cars, but my assumption was not everybody

7   that's trapped in this line of traffic is down here to either

8   protest or cause damage.  And so, you know, there was just a lot

9   of -- there's a lot of things that the body cam can't see that

10  was not captured, or that isn't readily evident on here.

11  Q     And as we watched these videos, do you hear dings?  And you

12  mentioned a ding.  And I think you said, oh, shit.  Are there

13  other dings that aren't rocks?  And can you explain to the jury

14  what's being thrown at you guys.

15  A     There was multiple dings that were not rocks.  Metal ball

16  bearings, like screws and nuts and bolts and things like that.

17  Padlocks, like the Master Lock, that style padlocks were being

18  launched at us from all different angles.  There was, you know,

19  dumpsters being set on fire and pushed into the street.  There

20  was debris being removed from those dumpsters and thrown at us.

21  I mean, you know, back to the water bottles that weren't always

22  liquid, certainly were coming at us in their frozen state.

23        So, I mean, when you hear a ding, it's -- if you're

24  hearing a ding like that on a pole, it's something that's going

25  to cause damage to the human body.

1   Q    And it's also not something that officers are doing?

2   A    Officers don't carry padlocks, nor do they throw them at

3   people.

4   Q    Okay.  If you could continue to play, please.

5        (A video was played.)

6   Q    Can we pause that, please.  And Mr. Valentine, did you hear

7   it sounded like over the radio that they're doing serious

8   damage, PepperBalls aren't doing the trick?

9   A    Yes.

10  Q    What does that mean?

11  A    It was -- it was chaos.  I mean, I don't know if the term

12  "The Purge" makes sense, but it was almost just this like

13  massive influx of people.  I mean, I've never -- this scene was

14  something that I never even like fathomed as a possibility.

15  Damage just as far as property damage, businesses, you know,

16  broken windows.  I mean, I don't -- I don't even know if I can

17  summarize.  Like, I mean, streetlights and traffic lights, and

18  damage to us.

19       I mean, I think it goes without being said, you catch a

20  padlock to any part of your body, at a minimum, you're going to

21  feel pain.  You're going to know you got hit.  Even with the

22  gear that we had on, at one point in time, I think it's later in

23  this video, I get hit by a landscaping river rock in the back of

24  my neck, and then right after that, to the -- to my ballistic

25  helmet.  The helmet is ballistic, and this rock was thrown with

20-cv-1878-RBJ   KEITH VALENTINE - Cross   03-14-2022

 1  such force that it dented my ballistic helmet.  So, damage,

 2  people, property, and not just to officers.

 3          I mean, one can assume when you're throwing rocks from

 4  the middle of a crowd using peaceful people as your shield, you

 5  know, the people that are in front of you are also going to get

 6  hurt by the rocks, the bottles, the frozen stuff that you're

 7  launching at officers.

 8  Q    Could you continue to play, please.

 9      (A video was played.)

10  Q    Stop right there.  Real quickly, Mr. Valentine, there was

11  an individual standing on the corner in a white shirt.  Do you

12  recall seeing him?

13  A    I didn't.  I don't recall specifically seeing that, but --

14  Q    Okay.  There was an individual in a white shirt standing on

15  the street corner, and I think you were deploying PepperBall

16  down the street.  How come you didn't shoot that guy?

17  A    So, in this moment, like, again, what the body cam is not

18  catching is my body cam is, I mean, without any intent, like,

19  it's only able to face this way.  And your head is on a swivel

20  at all times, especially in an environment like this.

21          And the reason I shot past that guy was because he

22  didn't -- my assumption is he didn't pose any threat at this

23  time.  What's going on at the end of this building, again, the

24  reason we were surrounded -- I mean, logistically, it's an awful

25  situation to be in.  And so what's going on at the end of that

1    building is that building wraps around and comes back out behind

2    us.

3            So, if you go west on Colfax and then make a northbound

4    turn through that parking lot and then wrap around, we were --

5    people were kind of bouncing back and forth between the front of

6    that building and the back of that building.  So, you would -- I

7    would deploy a PepperBall at the end of this building, and they

8    would run back around and just throw stuff at us from behind.

9    So, my assumption is that guy was just standing there.

10   Q    So, there was no need to disperse him, because he wasn't

11   part of those people?

12   A    At that moment, no.

13   Q    Okay.  Can you continue to play, please.

14        (A video was played.)

15   Q    Mr. Valentine, how come you're not counting every single

16   PepperBall that's being put in your gun?

17   A    Impossible in this moment.  I mean, if you saw my body just

18   shaking, you kind of yell out, that's when I got hit by a rock

19   in the back of the neck.  You know, causing disorientation,

20   causing numbness.  So, to sit there and count the number of

21   PepperBalls that you're putting in a hopper in a moment where

22   you're completely flanked from all sides, I mean, this is a

23   contingent of -- I don't even know, 20, 30, 40 officers, and

24   there's triple, quadruple that -- the number of people opposite

25   of us.

20-cv-1878-RBJ   KEITH VALENTINE – Cross   03-14-2022

1    And so at that moment, it was just like, I had, you

2    know -- I'm assuming I had no more PepperBall, and so it was

3    just you're doing the best you can at that moment.  There's

4    human limitations involved in everything, and at that moment,

5    with my teammates and the people I work with, in that moment, it

6    just wasn't possible.

7    Q    Continue to play, please.

8         (A video was played.)

9    Q    Pause, please.  Why did you say, hit her with the 40?  What

10   was going on?  Was that part of the flanking?

11   A    Yeah.  So, if you can see the corner of that building, this

12   building is kind of in the center of -- or not in the center,

13   but at the corner of a parking lot.  And so the parking lot

14   wraps around the building.  And so what was happening was they

15   would throw stuff from the -- what is it -- in the southeast

16   corner, and then they would wrap around and throw stuff at us

17   from the northeast corner.  And so if you saw that person kind

18   of ducking behind that dumpster, that was part of the flanking.

19   Q    And so that was a specific threat that officers were taking

20   incoming missiles or whatever, that you were trying to address

21   when you advised that other officer to hit her with a 40?

22   A    Yes, sir.

23   Q    And to a point, and I know this happens on some of the

24   later videos, but is it fair to say that there's kind of people

25   coming in and out, law enforcement, and sometimes you may not

20-cv-1878-RBJ   KEITH VALENTINE - Cross   03-14-2022

1   know who is next to you?  It may be somebody on another team, or

2   in fact it may be somebody from another department?  Is that

3   fair?

4   A    Yes, sir.

5   Q    Can you play it.

6        (A video was played.)

7   Q    And we're going to fast-forward it.  We're at minute 14:29,

8   I believe.  If we could fast-forward it to minute 24, please.

9   Again, this is a 50-minute-long video.  And before you begin to

10  play, Mr. Valentine, after you're at this street corner here by

11  District 6, and you've explained it, do you guys eventually then

12  move that location?  I know you were shown some videos on direct

13  examination, that guy with the sign that you helped him flip it

14  around.  Do you remember why you moved left -- left this

15  specific location that you were at?

16  A    I don't recall.  I mean, ultimately, you know, whatever

17  orders were passed down from my teammates or supervisors, then,

18  you know, that's -- that was my marching orders.

19  Q    I'm sorry.  I cut you off.

20  A    I'm just saying, that was -- I don't know specifically why.

21  Q    Okay.  If you could hit play, please.  We're at minute

22  23:58 for the record.

23       (A video was played.)

24  Q    Pause, please.  And it appears that you're shooting to your

25  left.  What's going on?  What specific threat are you addressing

20-cv-1878-RBJ    KEITH VALENTINE - Cross    03-14-2022

1   at that point?

2   A    So, there's that Office Depot right there.  I don't know if

3   you saw that kind of white picket fence.  There was people kind

4   of running between the Office Depot, and there was a guy that

5   kind of flashed across that parking lot and was throwing stuff

6   at us, so I addressed that individual.

7   Q    You addressed that specific threat at that point?

8   A    Yes, sir.

9   Q    Okay.  And I'm going to ask just a general question so we

10  don't have to go through each and every incident that you were

11  involved with, but can you tell us were there warnings given,

12  orders given to individuals that were a threat or groups of

13  people that were a threat?  In other words, to disperse or move

14  back or anything to that effect?

15  A    Generally speaking, I mean, yeah.  There was times that we

16  were able to give -- to give orders to clear the area or move

17  back, but I think, you know, one thing that you have to consider

18  is that that also comes with a -- a level of reasonableness, if

19  you will.  And it wasn't always -- we weren't always able to

20  reason -- within reason to yell, move back.  I mean, we're

21  taking rocks.  We're taking bottles.  Again, you saw me get hit

22  in the hand so hard, I had a golf-ball-sized welt on the top of

23  my hand.

24        And so in the moment, if you're talking about exigency

25  of circumstances and you're talking about the totality of the

20-cv-1878-RBJ   KEITH VALENTINE - Cross   03-14-2022

1   pictures, it's not always possible to tell someone to move.  I

2   mean, if I see a threat, and I don't have time to tell someone

3   to move out of the way or to give an order, but I perceive an

4   imminent threat to the person next to me or the people around

5   them, then I am going to take action.  I mean, out of duty and

6   obligation, ultimately, but, you know, I'm not going to waste

7   time always, always within reason, giving an order to do

8   something when it's not reasonable.

9        THE COURT:  All right.  It's 3 o'clock.  We need to

10  take a break here.  We've been going for an hour and a half

11  straight.  Ten minutes, folks, roughly.

12       (Jury out at 2:59 p.m.)

13       (Recess at 2:59 p.m., until 3:14 p.m.)

14       (Jury in at 3:14 p.m.)

15       THE COURT:  Okay.

16  Q.   (By Mr. Weiner) Mr. Valentine, I think when we left off,

17  we took the break, we were still on May 28th, and I promise you

18  I will be speeding things up here for you and for the jury.  My

19  understanding is after the video that you were shown on direct

20  examination, which was Plaintiffs' Exhibit 585, where you were

21  walking down the street and the individuals were -- the guy with

22  the sign upside down, soon after that, the video stops.  You

23  turned it off because there's no more contact that night; is

24  that correct?

25  A    I don't know about that night, but at that moment, yeah.

Kevin P. Carlin, RMR, CRR

                    20-cv-1878-RBJ    KEITH VALENTINE - Cross    03-14-2022

 1   The video ends pretty quickly after that.

 2   Q     So, jumping then, fast-forwarding to the next day on

 3   May 29th, were you also deployed to provide security and

 4   assistance with regard to the riots?

 5   A     Yes.

 6   Q     And do you recall initially where you were deployed?

 7   A     The next day?  It doesn't immediately come to mind, no.

 8   Q     Okay.  Well, let's start -- maybe the easiest way is

 9   Plaintiffs' Exhibit 623, which was played during your direct

10   examination.  If we could play that, publish that for you.

11         (A video was played.)

12   Q     And again, we've got that 30-second buffering.

13         (A video was played.)

14   Q     Can you pause, please.  Can you tell the jury what is

15   actually going on in this -- again, I believe it's 623,

16   Plaintiffs' Exhibit 623.  What is going on?  You're saying hold,

17   and move up.  What's transpiring that you can't see on that

18   body-worn camera?

19   A     Orders are coming from somewhere, and I was just trying to

20   communicate as best we can just up and down the line.

21   Q     And at this point, are you trying to -- were you called in

22   by the state patrol to assist in protecting the capitol?

23   A     Yeah.  The capitol had been overran.

24   Q     Okay.  Was there -- we talked a little bit before on

25   examination we were asking some questions, kind of, and you

                        Kevin P. Carlin, RMR, CRR

20-cv-1878-RBJ    KEITH VALENTINE – Cross    03-14-2022

1   referred to it as a yo-yo, which is probably a better term than

2   what I was using.  Was that a concern in terms of people, large

3   groups then proceeding back to where you were holding, and then

4   those individuals who would come running up and start attacking

5   you all?

6   A    Yeah.  I mean, it was a concern at this moment for sure.  I

7   mean, you know, the capitol was kind of in the center of the

8   grounds; right?  So, there's people kind of coming from all over

9   the place.  They would retreat back across the street, run

10  southbound, and then come back up a different part of the hill.

11       One thing that you're seeing in this video is if you

12  keep seeing that bright flash of light, one thing that was

13  commonly used especially at night was really bright flashlights

14  to try and blind our view of what was going on.  You know, if

15  there's a light coming from this way, same context as like

16  someone driving with their brights on.  You can't really see

17  past that.  And then that's what that bright flash is, is going

18  back.

19       And so part of the concern was we're being blinded by

20  this light, someone retreats back, and a group comes forward, or

21  we can't see what's being thrown from that general direction.

22  And so, you know, tactical considerations like that were of

23  constant concern.

24  Q    Okay.  And during the entire period of time, again, in

25  order so we get the whole picture, were you as an officer and

20-cv-1878-RBJ   KEITH VALENTINE – Cross   03-14-2022

1   your team receiving information, what we call BOLOs, be on the

2   lookout for specific things such as potential weapons,

3   explosives, or anything?

4   A    Yeah.  We'd get occasional information from, you know,

5   intel or wherever, you know, passed down from supervisors and

6   things like that that there was people, you know, with guns,

7   people with knives, or certain, you know, throwing objects.  One

8   of the things that was being used was laser pointers to blind

9   us.  Like, not temporarily.  Permanently damage your eye so you

10   can never see again.  So, that's the type of intel that was

11   being received, like hey, be on the lookout for this group or

12   this person.

13        There's believed, you know, confirmation believed that

14   you don't have all the information, that this group has guns,

15   has knives, has batons.  One thing that was quite frequently

16   used every day was lacrosse sticks.  I don't know if you're

17   familiar with lacrosse sticks, but certain individuals would

18   drop whatever item of the moment of choice was desired to use to

19   be launched at us, and use a lacrosse stick to launch it at us,

20   which is certainly more powerful than the human arm.  So,

21   considerations like that, and information like that was quite

22   frequently passed down.

23   Q    And did you ever, like we're looking at here, in

24   Plaintiffs' Exhibit 623, if you see someone throwing, and you

25   were asked some questions on direct examination about some, you

1  know, the guy in the white shirt in that one video.  Guy in the

2  white shirt that throws something at you.  Why don't you just go

3  into the crowd and arrest him and take him away?

4  A    Generally speaking, I mean, I think it's safe to assume

5  that any number of us walk into that crowd, that situation is

6  going to be a whole lot worse than you see right here from a lot

7  of perspectives.  I mean, you know, we were on an F-350 truck

8  that was surrounded and blown up.  Walking into a crowd that is

9  agitated, throwing stuff, you know, whatever the nature of that

10  is, it's only going to agitate it further.

11        And it's a risk for injury.  You can't see.  I mean,

12  you see these flashlights, and there's kind of this sensory

13  overload.  You walk in that crowd, I mean, my personal belief is

14  there's a good chance you may not be walking out of that crowd.

15  So, that's why.

16  Q    And at some point in time, were there protesters or people

17  in the crowd who were injured, either as a result of actions by

18  law enforcement to disperse or address clear and present danger,

19  or by protesters on protesters that you and other officers

20  became aware of?

21  A    Yes.

22  Q    Okay.  Can you give us an example of something such as

23  that.

24  A    I don't recall which day.  I mean, I know there was an

25  individual who was injured.  I think he was unconscious at the

20-cv-1878-RBJ    KEITH VALENTINE - Cross    03-14-2022

 1   moment, and I know we tried two or three of us, myself included,

 2   tried to move forward to this person, because he was on the

 3   ground, and he was pulled back into the crowd.  And, I mean, at

 4   that point, it's this -- this risk-benefit analysis of like, if

 5   I go and get this person, you know, am I doing more harm than

 6   good to myself or the people around me?  Is it going to agitate

 7   even further?  You know, is it a tactic to like is this person

 8   pretending to be down?

 9          We go render aid, and the next thing you know we're

10   surrounded again taking rocks, bottles, nails, ball bearings,

11   padlocks, urine, feces.  I mean, you know, I think the average

12   person doesn't particularly enjoy being covered in human feces.

13   So, you have to weigh -- you have to weigh the circumstances of

14   what's going on and just do the best you can with the

15   information that you have.  So, that one particular situation

16   comes into mind.  That particular situation, they drug this

17   individual, I don't know who he was, into the crowd, and we

18   ultimately did end up having to form a team of people to -- they

19   left him there -- to push people out, go render aid, and get

20   that person out of there.  So, there were situations like that.

21   Q    Was that individual that you were referencing or referring

22   to, did that individual happen to have a traffic cone with him

23   before he got hit and got knocked out?

24   A    Yes.

25   Q    Okay.  And so when he's dragged into the crowd, you guys

20-cv-1878-RBJ    KEITH VALENTINE - Cross    03-14-2022

1  actually tried to rescue him but were thwarted from that because

2  of the crowd?

3            MR. DOUGLAS:  Objection.  Leading.

4            THE COURT:  Sustained.

5            THE WITNESS:  There was --

6            THE COURT:  Sustained.

7            THE WITNESS:  Sorry.

8  Q.    (By Mr. Weiner) So, the rest of the story with the

9  individual who had the cone, were you eventually able to get him

10 medical treatment?

11           MR. DOUGLAS:  Same objection, Your Honor.

12           THE COURT:  Overruled.

13           THE WITNESS:  Yes.  So, in the moment I'm particularly

14 referring to, when he was on the ground, I don't even remember

15 who it was.  It was myself and I think two others said that guy

16 is hurt, or appears to be hurt.  We started to move toward him,

17 and then somebody grabbed him, like fireman's carry under the

18 arms, and just dragged him back into the crowd.  And I don't

19 remember the information particularly that came down, but we did

20 end up forming a group that was kind of pushing people back on

21 every side to get to this guy, get him aid, get him out of

22 there, and I think he was ultimately transported by ambulance.

23 I'm not exactly sure.

24 Q.    (By Mr. Weiner) Okay.  So, it wasn't a situation where

25 you just left somebody who was injured there?

20-cv-1878-RBJ   KEITH VALENTINE - Cross   03-14-2022

1  A    No.  No.  That -- leaving somebody that's visibly hurt is

2  not within the realm of the duty of a police officer, nor the

3  obligation.  So, leaving someone that's hurt intentionally

4  without considering the totality of the situation that you're

5  in, you know, certainly willing to risk my own safety to save

6  someone, but you have to consider everyone else around you.  You

7  have to consider your team and what the likelihood of that

8  situation specifically on these days is becoming more agitated

9  and volatile.

10        MR. WEINER:  And again, back to the date of May 29th

11  of 2020, my understanding is you had four body-worn camera

12  videos that you provided, and I believe two of them have been

13  introduced, 623 and 1120.  At this time, I would move to admit

14  624 and 1121.  Those are Plaintiffs' Exhibits 624 and 1121.  I

15  believe they were stipulated as authentic.

16        THE COURT:  Well, if they're stipulated, then they're

17  admitted.

18        MR. WEINER:  I am not going to publish those, but I

19  just wanted those introduced.

20        THE COURT:  Well, if you're not going to use them, why

21  did you want them in the evidence?

22        MR. WEINER:  I am trying to save a little time, Judge.

23  We may use those in closing.  So, there's some pieces of that.

24  I'm just moving on.

25        THE COURT:  Well, don't do that again.  I don't want

20-cv-1878-RBJ    KEITH VALENTINE – Cross    03-14-2022

1    you to put just random stuff in the record that you're not going

2    to use.

3            MR. WEINER:  I'm going to move on now to the date of

4    5/30.  You were asked some questions about Exhibit 687.  And if

5    we could pull up 687, please.  We're publishing now 687.

6        (A video was played.)

7    Q.    (By Mr. Weiner) You can pause there.  Mr. Valentine,

8    there was another officer who was next to you, and you were

9    asked some questions -- the reason this is pulled up, you were

10   asked some questions about another officer who was next to you

11   when you had used that OC device.  Do you remember those

12   questions?

13   A    Yeah.  Generally speaking, yes.

14   Q    And the officer had kind of a lapel or something on his

15   collar.  Do you know whether that officer was state patrol,

16   Aurora, or what department he was with?

17   A    No.  I mean, I would have to rewatch the video to see if I

18   can get a good look, but I mean, it doesn't come to top of mind

19   as to where that officer was from.

20   Q    Okay.  And I apologize to do this to you and to the jury,

21   but I'm going to jump back to the date before on May 29th of

22   2020, and Exhibit 1120.  If you could fast-forward and begin at

23   approximately seven minutes, please, on Plaintiffs'

24   Exhibit 1120.

25       (A video was played.)

20-cv-1878-RBJ   KEITH VALENTINE - Cross   03-14-2022

1   Q    Can we pause it there, please.  Mr. Valentine, it appears

2   you had mentioned about something being done with a sign, and

3   then we have some, what appears some OC or some smoke being

4   deployed.  What was being done with that sign?

5   A    That orange street sign was being taken apart.  Those

6   poles, the stands that it sits on were being used as objects to

7   throw and smash.  And so ultimately, what I was trying to relay

8   is -- I mean, there was street signs and fences and everything

9   in the area that was being taken apart to, you know, to cause

10  damage, and that's what my concern was.

11  Q    And so was that something that you could readily see on the

12  body-worn camera as you were looking at it?

13  A    No.

14  Q    If you could fast-forward to ten minutes and 35 seconds.

15       (A video was played.)

16  Q    You can pause there.  So, it appears, Mr. Valentine, you're

17  kind of moving around.  What are you scanning?  What are you

18  assessing?

19  A    So, the problem that we had at this particular moment that

20  is not -- that is just off camera is, I don't know the name of

21  the building that's immediately to my left, but there's those

22  tall kind of marble-looking pillars.  So, we were -- like,

23  people would run from this crowd across the street and then

24  flank us on that side.  They would come up from the top of those

25  concrete pillars, throw something at us, and then run back to

20-cv-1878-RBJ   KEITH VALENTINE - Cross   03-14-2022

1   their group there.

2        The reason I keep moving is because my concern is

3   obviously there's a lot going on at times in front of us, but

4   immediately to our left as well, we kept getting flanked from

5   the left from people that would pop up above that concrete wall

6   pillar.  And so that's why I kept scanning kind of the area.

7   Q    I know I've been jumping around, but this is the video that

8   you were shown on direct examination where you threw the OC

9   thing across the street.  Okay?  How are those people across the

10   street a threat to you or other officers?

11   A    Well, you heard me yell another -- I said, ah, fuck.  And

12   that's because apparently my upper body during these few days

13   was a rock magnet or other projectile magnet.  So, in that

14   moment, the threat was that there was lacrosse sticks and things

15   being thrown from across the street that kept hitting officers,

16   that were actually hitting cars in the middle of the street that

17   were just passing by.

18        And so that -- the threat was if you have these people

19   in front of you that are able to flank you from the left and

20   throw stuff at you from the left, from the front, you know, that

21   was the immediate concern at the time.  So, I mean, this is just

22   ultimately a bigger picture of what was taking place.  I don't

23   even know -- I think this is -- I don't know if this is before

24   or after I threw the grenade, but there's a lot going on to

25   where you hear me get hit, you hear another ding or a clank on

1  the metal there in front of me of stuff that was hitting the

2  streets and the sidewalks in front of us, hitting our cars

3  behind us, hitting me in the face and upper body.  So, there was

4  a lot going on more than just five seconds of a video can depict

5  a little bit more accurately.

6  Q    If we can fast-forward to 20:30.  Twenty minutes and 30

7  seconds, please.

8       (A video was played.)

9  Q    I think we may have gone past it, the point where -- what I

10  was trying to show, were there times where people were, for

11  example, in the trees?

12  A    The trees across the street?

13  Q    Yes.

14  A    Yes.

15  Q    And were they doing anything from the trees?

16  A    There was stuff, items, debris, box -- I mean, again,

17  bottles, rocks, you name it, they were just kind of being

18  stashed behind these trees, and these folks would kind of move

19  back and forth.  The trees were certainly a focus, and then they

20  would -- at this time of night, they were pretty successful and

21  able to kind of conceal themselves in those trees.  That's the

22  concern with the trees.

23  Q    And you had mentioned that you were kind of a magnet for

24  rocks and stuff, in kind of your torso.  Did you also get hit in

25  other places?

20-cv-1878-RBJ   KEITH VALENTINE - Redirect   03-14-2022

1   A    Yeah.  I mean, foot, hand, head, back of the neck, took

2   a -- a can of canned goods to the old groin.  I mean, it was --

3   it was nonstop.  Metal ball bearings bouncing off, you know,

4   stuff I was holding, my hands, my facemask, my helmet.  You

5   know, it was endless.

6   Q    At any point did a Mr. Stamper ever interview you and ask

7   you with regards to your use of force and what you were thinking

8   and seeing during the course of your actions for these several

9   days of protests, riots?

10   A    Who?  I have never heard that name, so no.

11          MR. WEINER:  I have no further questions.

12          THE COURT:  Redirect?

13          MR. DOUGLAS:  Thank you, Your Honor.

14                    **REDIRECT EXAMINATION**

15   BY MR. DOUGLAS

16   Q    All right.  Mr. Valentine, I want to start -- oh.  Start

17   where you started your testimony, on the first day, when you

18   first got the call and had your first involvement with the

19   protest.  So, you said you showed up at work, and you got a call

20   that some officers needed help because they were trapped --

21   their vehicle was surrounded by protesters.  Do you remember

22   talking about that?

23   A    Yes.

24   Q    And do you recall -- well, and that was where you said

25   there was a massive explosion that you think -- that was a --

20-cv-1878-RBJ    KEITH VALENTINE - Redirect    03-14-2022

1  some sort of homemade firework that made the tire go flat;

2  correct?

3  A    Did a little more than make the tire go flat, but

4  ultimately, we're getting to the same point here, yeah.

5  Q    I just want to make sure we're on the same page with the

6  event we're talking about.

7  A    Yeah.

8  Q    Do you recall that that was at 14th and Lincoln, in that

9  vicinity?

10  A    Yes.

11  Q    Okay.  And it was about -- would have been a couple of

12  hours after you started your shift that day?

13  A    I don't know the exact timeframe.  My guess is, I mean, by

14  the time that we were able to get out and actually deployed, a

15  couple-hour timeframe would be fairly accurate.

16  Q    Okay.  And the vehicle was an RDV, one of those white

17  trucks with the handles on it that you hold on to?

18  A    Yes, sir.

19  Q    Did you -- when you heard that explosion or after that, did

20  you or anyone else to your knowledge call on the radio -- you

21  guys had radio communication going constantly -- for help after

22  that explosion under that car?

23  A    I'm sorry?

24  Q    Did any -- did you or anyone else to your knowledge call

25  for help on the radio after that massive explosion you

20-cv-1878-RBJ   KEITH VALENTINE - Redirect   03-14-2022

1   described?

2   A    I'm unaware.  I don't know.

3           MR. DOUGLAS:  Okay.  Okay.  So, I want to put up

4   Exhibit 5, please.  And this -- I believe this is not in

5   evidence yet.  And if not, I would offer it.  It's HALO cam from

6   14th and Lincoln around 7:00 p.m. on May 28th.  I would offer

7   that.

8           MR. WEINER:  No objection.

9           THE COURT:  Admitted.

10  Q.   (By Mr. Douglas) All right.  Mr. Valentine, is this the

11  incident that you were describing at the beginning of your

12  testimony where this -- this vehicle is surrounded by protesters

13  at 14th and Lincoln?

14  A    Possibly.  I haven't seen this video, so I don't know.

15  Q    Okay.  But this is -- if you look at the timestamp, it's

16  May 28th, 7:13 p.m., a couple hours after you started your shift

17  that day; right?

18  A    That's correct.

19  Q    And you said it was a white RDV vehicle.  That's what this

20  is; right?

21  A    That's also correct.

22  Q    And you said it was surrounded by protesters; right?

23  A    Correct.

24  Q    So, does this appear to be that scene?

25  A    Yes.

Kevin P. Carlin, RMR, CRR

```
           20-cv-1878-RBJ    KEITH VALENTINE - Redirect    03-14-2022
```

1   Q    Okay.  I want to go to -- actually, this is -- yeah.  7:13.

2   Let's play it from here, please.

3        (A video was played.)

4   Q    All right.  You can stop that.  Did you see what happened

5   there?

6   A    Mm-hmm.

7   Q    Did you see the tire go flat?

8   A    Yes.

9   Q    Okay.  Did you see any explosion around that time?

10  A    No.

11  Q    Okay.  Is it possible -- is it possible that someone did

12  something to the tire to make it go flat that wasn't an

13  explosion?

14  A    Sure.  Anything is possible.  Explode it.  I don't know.

15  Q    Okay.  Let's go to Exhibit 513, which is your officer

16  statement.  And let's put up page one of that.

17  A    Okay.

18  Q    All right.  Let's pull up that first paragraph.  It says on

19  May 28th, 2020, so that's your report from this very day; right?

20  A    Yes.

21  Q    Okay.  At approximately 1900 hours, that's 7 o'clock;

22  right?

23  A    Yup.

24  Q    While working TAC49 in full Denver Police uniform, we

25  responded to East 14th Avenue and North Lincoln Street via our

                        Kevin P. Carlin, RMR, CRR

20-cv-1878-RBJ    KEITH VALENTINE - Redirect    03-14-2022

1    Denver Police rapid deployment vehicle, RDV, on an officer

2    calling for help.  I had subsequently learned that district

3    three of officers needed help due to being trapped in a large

4    hostile crowd at the listed location.  Do you see that?

5    A    Yes.

6    Q    So, this is the -- this is the event you described and what

7    we just saw on the video; right?

8    A    Yes.

9    Q    Okay.  It says the crowd surrounded the officers' vehicle,

10   would not let the vehicle out.  A little bit further down, let's

11   go to the next part.  I observed multiple people pushing and

12   attempting to cross the skirmish line.  Sorry.  I'm going too

13   fast.  Okay.  Let's go to the last -- let's -- last four lines.

14   It starts, while this is happening.  While this was happening, I

15   observed an unknown subject approach the rear driver side tire

16   and use an unknown object to pop the tire of the RDV.  Do you

17   see that?

18   A    Yes.

19   Q    Does it say anything about an explosion in this report?

20   A    No.

21   Q    Does this refresh your recollection that actually someone

22   came up and popped the tire and it wasn't an explosion?

23   A    No.  Because I think what we're skipping over here is my

24   perception at the time.  And when you consider the explosion,

25   like sound that took place, I think it's still absolutely

20-cv-1878-RBJ   KEITH VALENTINE - Redirect   03-14-2022

1   accurate, my statement matches with my version of events.

2   Q    Okay.  So, the explosion you heard was the tire popping,

3   not --

4   A    I don't know that to be fact.  What I'm saying -- what I

5   said was I felt like it was an explosion that caused the tire --

6   or an explosion that caused the tire to pop, explode, whatever.

7   So, I mean, we're talking about the same thing.

8   Q    But you didn't put anywhere in this statement that there

9   was a massive explosion caused by a makeshift firework, which is

10  what you testified here today; right?

11  A    No.  Yes.  That's right.

12  Q    In fact, your testimony was that the truck was surrounded

13  and blown up.  You said that; right?

14  A    Yes.

15  Q    Okay.  And that wasn't true, was it?

16  A    It is true.

17  Q    This truck that we just saw on the video was blown up?

18  A    I mean, if we're going to go back and forth about

19  semantics, sure, the truck was not blown to pieces.  However, my

20  perception at the time was that the rear of the truck was

21  exploded, yes.

22  Q    Right.  And your perception two years ago -- almost two

23  years ago when you wrote this report was that someone approached

24  the rear driver side and popped -- and used some object to pop

25  the tire; right?  That's what you wrote?

20-cv-1878-RBJ   KEITH VALENTINE - Redirect   03-14-2022

1   A   Correct.  Yeah.  For -- yes.

2   Q   You can put that down.  Oh.  I'm sorry.  I forgot.  Let's

3   keep that up.  It says shortly after the tire was popped, the

4   police officers who called for help were able to safely leave

5   the area.  At this point, we got back on the RDVs and returned

6   to the station to fix our flat tire and redeployed on our second

7   RDV.  Do you see that?

8   A   Yes.

9   Q   Okay.  So, you were able to drive back after the tire was

10  popped and get a new vehicle; right?

11  A   Yeah.  It's not ultimately clear here, but it was on a

12  completely different truck.

13  Q   Okay.  All right.  Let's put that down.  Mr. Weiner asked

14  you about a video that was 50-some-odd minutes from your

15  body-worn camera that started with you guys walking up

16  Washington, and then he showed you a large period of time when

17  you were at Washington and Colfax by the District 6 station.  Do

18  you recall that?

19  A   Yes.

20  Q   Okay.  And during that time, you took some rocks, the one

21  that hit your spine.  People were throwing things.  There were

22  PepperBalls.  We saw all that.  Do you remember that?

23  A   Yes.

24  Q   Okay.  And after that time, your line -- well, actually,

25  let me orient us.  Can we pull up Exhibit 1241, please.  Okay.

20-cv-1878-RBJ   KEITH VALENTINE - Redirect   03-14-2022

 1   So, you were shown -- let me just circle this.  So, that's

 2   Colfax and Washington; correct?

 3   A    Yes.

 4   Q    Okay.  So, that's where your -- you and the other officers

 5   were when you were taking those rocks, shooting the PepperBalls,

 6   that kind of thing.  Do you recall that?

 7   A    Yes.

 8   Q    Okay.  And after that time, your line moved this way;

 9   correct?

10   A    That's correct.

11   Q    Okay.  And that's the video I was showing you; right?  It

12   was after that time when you were marching down -- marching west

13   on Colfax and were pushing some protesters back.  Do you recall

14   that?

15   A    Yes.

16   Q    Okay.  And you marched down Colfax all the way to Grant.

17   That's that light where we saw those protesters protesting;

18   right?

19   A    Yes, sir.

20   Q    Okay.  And then you turned left to follow those protesters.

21   And this is the corner, actually, right here, where those three

22   people were standing, two of them in the street, one on the

23   sidewalk, and you yelled, take the sidewalk.  Do you recall

24   that?

25   A    Yes.

20-cv-1878-RBJ    KEITH VALENTINE - Redirect    03-14-2022

1   Q    And that's where you pushed the guy with the camera off the

2   sidewalk, into the street, who was just standing there.  Do you

3   remember seeing that?

4   A    I remember moving someone back that -- yes.

5   Q    Okay.  And it's right here where that guy who was holding

6   the sign got shot with PepperBalls while he was walking

7   backwards after being asked to walk backwards.  Do you remember

8   that one?

9   A    I do recall someone being -- where a PepperBall was

10  deployed, yes.

11  Q    Okay.  Well, did anything that happened here justify

12  pushing that guy off the sidewalk or shooting PepperBalls at

13  people over here?

14  A    Yeah.  I think what we're skipping over is everything that

15  happened in between those two points.  So, again, you can see

16  clearly marked on this map, if you'd like to circle them,

17  obviously you can, but people coming in and out of alleyways,

18  people throwing stuff from tops of buildings, from windows and

19  things like that.

20         So, sure, they're independent in that nature.  However,

21  when you skip over -- when you just go from point A to point D,

22  I mean, there's a lot that happens in between that moment.  And

23  certainly not saying that something happens here justifies this,

24  but when we're pushing people off the sidewalk and giving orders

25  to move, and we're trying to take the sidewalk and clear the

Kevin P. Carlin, RMR, CRR

20-cv-1878-RBJ   KEITH VALENTINE - Redirect   03-14-2022

1    area, it was still absolutely independently justifiable at that

2    moment, yes.

3    Q    Okay.  Well, I didn't see -- I only saw video of you --

4    video shown by Mr. Weiner of what happened here.  So, I was

5    asking if anything we saw in that video here justifies what

6    happened over here, and it doesn't; right?

7    A    What are you specifically referring to?

8    Q    The taking of the rocks that we saw on that video.

9    A    No.  But at Grant -- are you talking about the deployment

10   of PepperBall?  Are you talking about moving someone off the

11   sidewalk?  Like, I can't say.

12   Q    Okay.  How about the deployment of PepperBall against the

13   guy with the sign?  Anything over there justify that?

14   A    As I said before, I can't speak to why an individual

15   officer that was not myself deployed a PepperBall, and I'm not

16   going to speculate on that.

17   Q    Okay.  And you -- do you have any information that any of

18   the 12 plaintiffs in this case were involved in the surrounding

19   of that vehicle, the popping of the tire, rocks and bottles

20   thrown over here, anything like that?

21   A    Do I have information to that effect?

22   Q    Yes.

23   A    I don't have any information.

24   Q    Okay.  And do you have any information that any of the

25   people who we saw you deploy less-lethal weapons against in the

Kevin P. Carlin, RMR, CRR

20-cv-1878-RBJ    KEITH VALENTINE - Redirect    03-14-2022

1  videos we watched were involved in that incident with the RDV or

2  any of the rocks and things that were thrown at Colfax and

3  Washington?

4  A    No.  But I also -- I don't know who was individually

5  involved in this.  So, I couldn't speak to that.

6  Q    Okay.  I'm talking about the people we watched on the

7  video.  Any of those people who you used force against, were

8  they involved with that RDV incident or the throwing of rocks or

9  anything else at Colfax and Washington?

10 A    I am unaware.  I don't know.

11 Q    Okay.  And you agree that the use of less-lethal force

12 against a person has to be justified by the specific

13 circumstances surrounding that individual; correct?

14 A    Specifically regarding the totality of the circumstances,

15 yes.

16 Q    Okay.  And the totality of the circumstances doesn't

17 involve other things that other people did at different

18 locations or different days; right?

19 A    When you're trying to disperse a crowd, I mean, it's the

20 totality of the circumstances.

21 Q    Okay.  So, it could involve things that people did on

22 different days other than the day you deployed less-lethal?

23 A    No.  We're not talking about different days.  Ultimately

24 what I'm saying is you're trying to disperse a crowd, and yes,

25 you have to have justification for each individual use of force.

20-cv-1878-RBJ   KEITH VALENTINE - Redirect   03-14-2022

1   However, I mean, that's not taking into account for the totality

2   of everything that was going on.

3   Q    The totality of the circumstances surrounding that specific

4   person who you used force to; right?

5   A    Which specific person?

6   Q    Any.  In the abstract.  You said it has to be the totality

7   of the circumstances.  It's the totality of the circumstances

8   relating to the individual who you used force against; correct?

9   A    Yes.

10          MR. DOUGLAS:  Okay.  I have nothing further, Your

11   Honor.

12          THE COURT:  Any questions for this witness from the

13   jury?  All right.

14       (Proceedings held at the bench:)

15          THE COURT:  All right.  This is number 13.  Fourteen.

16          MR. DOUGLAS:  No objection, Your Honor.

17          MR. WEINER:  No objection.

18          THE COURT:  Fifteen.

19          MR. DOUGLAS:  No objection.

20          MR. WEINER:  No objection.

21          THE COURT:  Number 16.

22          MR. DOUGLAS:  No objection.

23          MR. WEINER:  No objection.

24          THE COURT:  Seventeen.

25          MR. DOUGLAS:  I'm not sure I understand it, but I'm

Kevin P. Carlin, RMR, CRR

20-cv-1878-RBJ   KEITH VALENTINE - Redirect   03-14-2022

1   fine with it.

2                MR. WEINER:  I'm fine with it too.

3                THE COURT:  Eighteen.

4                MR. DOUGLAS:  No objection.

5                MR. WEINER:  No objection.

6                THE COURT:  Nineteen.

7                MR. DOUGLAS:  No objection.

8                MR. WEINER:  No objection.

9                THE COURT:  And 20.

10                MR. DOUGLAS:  No objection.

11                MR. WEINER:  No objection.

12                THE COURT:  All right.  That was easy.

13          (Proceedings held in open court:)

14                THE COURT:  All right.  Mr. Valentine, we have quite a

15   number of questions for you from the jury.  Question, in your

16   six months of training, how many hours of policing protesters

17   did you receive?

18                THE WITNESS:  I have no idea.  I know there was a

19   training record that documents that, but I don't personally

20   recall.

21                THE COURT:  Did it come up at all?

22                THE WITNESS:  Did what -- did --

23                THE COURT:  Dealing with protesters?  Did that come up

24   during the academy?

25                THE WITNESS:  Yes.

Kevin P. Carlin, RMR, CRR

20-cv-1878-RBJ   KEITH VALENTINE - Redirect   03-14-2022

1        THE COURT:  You don't remember how much of the time

2   was devoted to that subject?

3        THE WITNESS:  I mean, dealing with protesters

4   specifically?  I mean, it was more general like crowd

5   management, you know, commands, things of that nature.  But I

6   don't know the number of hours specifically dedicated to that.

7        THE COURT:  Do you feel that whatever the number of

8   hours was, or minutes was, that it was enough time?

9        THE WITNESS:  I feel that it was enough time given

10   protests of the past.  I personally feel like these events were

11   honestly outside of the scope, I mean, that -- I mean, there's

12   only so much preparation you can do, and, you know, I felt

13   personally prepared enough to go on the street and deal with the

14   events in front of us.

15        THE COURT:  All right.  Question, how often did you

16   receive orders from the supervisor on hand during the time you

17   were dealing with the protests?

18        THE WITNESS:  Orders from like a specific supervisor?

19   I mean, there was a number of supervisors or people within

20   command, and everybody was doing the best that they can -- that

21   they could.  I mean, if you think about, you know, there's

22   certainly less supervisors on any given day than there is patrol

23   officers, and when you're thrown into a situation like that,

24   your span of control rapidly increases.  And so I think the

25   supervisors that we had relayed information as best as they

20-cv-1878-RBJ   KEITH VALENTINE - Redirect   03-14-2022

1    could to everybody on the line.

2            THE COURT:  Can you give us any kind of a feeling for

3    how often you would have contact with supervisors who would give

4    orders as to what to do?

5            THE WITNESS:  I mean, I had regular contact with

6    supervisors.  I mean, when there was moments of down time, you

7    know, feedback, discussions with supervisors, things like that.

8    As far as on the line specifically, there's so much going on,

9    and we're talking about two years ago, that I couldn't really

10   specifically, with any level of confidence speak to how often I

11   got orders directly from a supervisor.

12           THE COURT:  All right.  Next question, referring to I

13   believe it's Exhibit 687, one of the videos, do you know if the

14   tents on the sidewalk are the protesters', or are they homeless

15   people tents?

16           THE WITNESS:  I don't know.  Specifically -- I mean,

17   to the best of my recollection, they were homeless tents.  We

18   did have intel at times that those tents were also being used to

19   house or store items to throw at us.

20           THE COURT:  And this reference to the same video,

21   where were you pushing the crowd back to when you were pushing

22   the crowd back in Exhibit 687?

23           THE WITNESS:  I don't specifically recall.  Which

24   video?  Is it the one where we're standing on the north side of

25   Colfax?  Is that the one we're referring as to?

20-cv-1878-RBJ   KEITH VALENTINE - Redirect   03-14-2022

 1           MR. DOUGLAS:  Yes.  In front of the bus station with

 2      the rocks.

 3           THE WITNESS:  Yeah.  I believe at the moment we were

 4      trying to clear that park, which is where a lot of the stuff was

 5      coming from.  And get them out of that area through the park and

 6      clear that immediate, kind of, I guess, where the concentration

 7      of activity was going on.

 8           THE COURT:  Question, do you mean that you were at the

 9      District 6 station at Washington and Colfax?  The District 6

10      station was on the outside of the wall to the left of you?

11           THE WITNESS:  Yes.  That first night, I think I

12      misspoke at one point and said we were on Pennsylvania.

13      District 6 is at Colfax and Washington.  If you're referring to

14      the moment in time where you see the building just kind of out

15      of the corner of my body cam, there's a building that's attached

16      to the District 6 station.  I don't think it's in use.  I don't

17      know the logistics of that building.  I don't think there's even

18      any access from District 6 into that building, but my point was

19      District 6 is in that parking lot, and there's kind of a shared

20      common parking lot between District 6 and the building that's

21      attached to it.

22           THE COURT:  In regards to the BWC footage where

23      someone instructed you for the first time how to use the

24      grenade, did you feel safe and prepared to use it?

25           THE WITNESS:  Yes.

                    Kevin P. Carlin, RMR, CRR

20-cv-1878-RBJ   KEITH VALENTINE - Redirect   03-14-2022

1        THE COURT:  During the George Floyd protest, when were

2   officers allowed to use less-lethal weapons, or was it just up

3   to the officer to determine?

4        THE WITNESS:  I mean, those -- we have orders from

5   supervisors.  We have direct, you know, discretion, if you will,

6   to use less-lethal within policy to where we saw fit.  We didn't

7   necessarily receive orders every time we deployed PepperBall or

8   whatever -- whoever was using to deploy that time.

9        THE COURT:  Was there a policy on when to use

10  less-lethal?

11       THE WITNESS:  Yes.  And the policy dictated the use of

12  that.

13       THE COURT:  And what was the policy?

14       THE WITNESS:  I don't recall the policy at this point.

15  I would have to read back through it.

16       THE COURT:  Question, are you aware that you were

17  shooting the -- you were shooting the district behind -- you

18  were shooting the district station wall?  Are you aware that you

19  were shooting the District 6 station wall?

20       THE WITNESS:  I feel like there was probably some

21  confusion regarding whatever video referring to, as I don't

22  particularly ever recall specifically shooting the District 6

23  station wall.

24       THE COURT:  All right.  Okay.  Any other questions

25  from the jurors?  Any follow-up questions, ladies and gentlemen,

Kevin P. Carlin, RMR, CRR

20-cv-1878-RBJ   KEITH VALENTINE - Redirect   03-14-2022

1   that you didn't get a satisfactory answer?  No.  Follow-up from

2   counsel?

3          MR. DOUGLAS:  Yes.  Very briefly, Your Honor.

4                  **REDIRECT EXAMINATION**

5   BY MR. DOUGLAS

6   Q   Mr. Valentine, you testified that there was some sort of

7   intel that the tents that we saw on that video on that park were

8   being used to store items that could be thrown at officers.  Do

9   you recall that testimony?

10  A   I recall hearing that at some point, yes.

11  Q   We've seen those tents all through the protests and the

12  videos.  Why weren't those removed if you have that intel?

13  A   I can't speak to that.  I wasn't on the -- I can't speak to

14  that decision-making process.

15         MR. DOUGLAS:  Okay.  Thank you.  Nothing further.

16         THE COURT:  Mr. Weiner, follow-up to the jurors'

17  questions?

18         MR. WEINER:  No, Your Honor.  Thank you.

19         THE COURT:  All right.  Thank you, sir.  You are

20  excused, free to go.  We can at least start somebody else, I

21  guess.

22         MR. MACDONALD:  Yes, Your Honor.  We would like to

23  do -- subject to Your Honor's wishes, we have a video deposition

24  of Commander O'Donnell that we would like to start.  I believe

25  the full cut is approximately 47 minutes.  So, we could start it

20-cv-1878-RBJ   KEITH VALENTINE – Redirect   03-14-2022

1   now and stop whenever you or the jury would like.

2           THE COURT:  Okay.  Well, we will watch a little bit of

3   it, and then stop.

4           MR. MACDONALD:  We call by deposition designation,

5   Your Honor, Commander O'Donnell.  As I said this morning, this

6   includes cuts that we chose and also cuts from the City.

7           THE COURT:  Right.  Both sides want certain parts, but

8   it's all going to be played at one time.

9           MR. MACDONALD:  Thank you, Your Honor.

10      (A video was played.)

11          THE COURT:  Wait a minute.

12          MR. MACDONALD:  I think that's a little bit sped up.

13          THE COURT:  That's the same guy that's sitting over

14   here.

15          THE WITNESS:  Yes, Your Honor.

16          THE COURT:  Why do you want to use the deposition

17   instead of him?

18          MR. MACDONALD:  This is an issue we discussed

19   pretrial, Your Honor.  We wanted to get the testimony in via the

20   deposition designation.

21          THE COURT:  Yeah.  Why?  We've got the live witness

22   here.

23          MR. MACDONALD:  Understood, Your Honor.  Because we

24   had a narrow set of questions.  I believe the City is going to

25   have a much more extensive exam of Mr. O'Donnell, which they can

20-cv-1878-RBJ   KEITH VALENTINE - Redirect   03-14-2022

1    put on in their case.  So, he was designated as both a -- as a

2    30(b)(6) witness, and that's what we wanted to put on.

3                    THE COURT:  Okay.  You got some answers you like, in

4    other words, is the answer to my question?

5                    MR. MACDONALD:  Yes, Your Honor.

6         (A video was played.)

7                    THE COURT:  All right.  Let's stop there, please.

8    Thank you, ladies and gentlemen.  It's been a long day.  I'm

9    sure you're eager to keep going, but I am going to call a halt

10   to it right now.  See you in the morning, 9 o'clock.

11        (Jury out at 4:30 p.m.)

12                   THE COURT:  All right.  The jury has been excused.

13   Either side have anything to say for the record before we

14   recess?

15                   MR. MACDONALD:  Not for us, Your Honor.

16                   MR. RINGEL:  Not from the defendants.  Thank you, Your

17   Honor.

18                   THE COURT:  All right.  We'll see you in the morning.

19        (Proceedings concluded at 4:31 p.m.)

20

21

22

23

24

25

1                        REPORTER'S CERTIFICATE

2

3

4          I, KEVIN P. CARLIN, Official Court Reporter for the

5    United States District Court for the District of Colorado, a

6    Registered Merit Reporter and Certified Realtime Reporter, do

7    hereby certify that I reported by machine shorthand the

8    proceedings contained herein at the time and place

9    aforementioned and that the foregoing pages constitute a full,

10   true, and correct transcript.

11          Dated this 6th day of April, 2022.

12

13

14

15

16          _____
            Kevin P. Carlin, RMR, CRR
17          Official Court Reporter

18

19

20

21

22

23

24

25