1                    IN THE UNITED STATES DISTRICT COURT

2                       FOR THE DISTRICT OF COLORADO

3    Civil Action No. 20-cv-1878-RBJ

4    ELISABETH EPPS AND SARA FITOURI, ET AL.,

5         Plaintiffs,

6         vs.

7    CITY AND COUNTY OF DENVER, ET AL.,

8         Defendants.

9    ----------------------------------------------------------------

10                       REPORTER'S TRANSCRIPT

11                       Jury Trial, Vol. 7

12   ----------------------------------------------------------------

13         Proceedings before the HONORABLE R. BROOKE JACKSON,
     Judge, United States District Court for the District of
14   Colorado, commencing on the 15th day of March, 2022, in
     Courtroom A902, United States Courthouse, Denver, Colorado.

15

16                            APPEARANCES
     For the Plaintiffs:
17   TIMOTHY R. MACDONALD, MATTHEW J. DOUGLAS, MINDY A. GORIN, and
     ANDREAS E. MOFFETT, Arnold & Porter Kaye Scholer LLP, 1144
18   Fifteenth Street, Suite 3100, Denver, CO 80202

19   ELIZABETH C. WANG and MAKEBA RUTAHINDURWA, Loevy & Loevy, 2060
     Broadway Street, Suite 460, Boulder, CO 80302

20

21   For the Defendants:
     ANDREW D. RINGEL, KATHERINE HOFFMAN, and ROBERT A. WEINER, Hall
22   & Evans LLC, 1001 Seventeenth Street, Suite 300, Denver, CO
     80202

23
     HOLLIE R. BIRKHOLZ and LINDSAY M. JORDAN, Denver City Attorney's
24   Office, 201 West Colfax Avenue, Denver, CO 80202

25   Reported By KEVIN P. CARLIN, RMR, CRR, 901 19th Street, Room
     A259, Denver, CO 80294, (303)335-2358

        Proceedings reported by mechanical stenography; transcription
                        produced via computer.

20-cv-1878-RBJ     Jury Trial     03-15-2022

1                    I N D E X

2    PLAINTIFFS' WITNESSES                              PAGE

3    PATRICK PHELAN

Direct Examination By Ms. Wang . . . . . . . . . . 1185
Cross Examination By Ms. Birkholz  . . . . . . . . 1284
Redirect Examination By Ms. Wang . . . . . . . . . 1392

6    PLAINTIFFS' EXHIBITS:

| | Identified | Received |
|---|---|---|
| 39 | 1227 | 1227 |
| 448 | 1317 | 1317 |
| 449 | 1317 | 1317 |
| 450 | 1317 | 1317 |
| 451 | 1317 | 1317 |
| 452 | 1184 | 1184 |
| 453 | 1369 | 1369 |
| 454 | 1369 | 1369 |
| 467 | 1313 | 1313 |
| 470 | 1342 | 1343 |
| 473 | 1294 | 1295 |
| 474 | 1294 | 1295 |
| 475 | 1294 | 1295 |
| 476 | 1294 | 1295 |
| 477 | 1294 | 1295 |
| 525 | 1326 | 1326 |
| 527 | 1365 | 1365 |
| 528 | 1380 | 1380 |
| 570 | 1238 | 1239 |
| 709 | 1398 | 1398 |
| 720 | 1320 | 1320 |
| 723 | 1248 | 1248 |
| 753 | 1231 | 1231 |
| 788 | 1245 | 1245 |
| 1114 | 1235 | |

20-cv-1878-RBJ   Jury Trial   03-15-2022

1  DEFENDANTS' EXHIBITS:

2                          Identified              Received

3      3012              1353                    1353
       3021              1339                    1339
4      3106              1368                    1368
       3107              1338                    1338
5      3108              1335                    1335
       3124              1308                    1309
6      3149              1309                    1309
       3150              1364                    1364

7

8  Reporter's Certificate  . . . . . . . . . . . . . . . 1402

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

20-cv-1878-RBJ    Jury Trial    03-15-2022

1    P R O C E E D I N G S

2        (Proceedings commenced at 9:02 a.m.)

3        (Jury in at 9:02 a.m.)

4        THE COURT:  Good morning, ladies and gentlemen.  How

5    are y'all this morning?

6        JUROR:  Much better.

7        THE COURT:  Much better.  Excellent.  So, are we going

8    to start out with more of this deposition?

9        MR. MACDONALD:  Yes, Your Honor.

10       THE COURT:  Do you want to take a vote on whether we

11   do that?

12       MR. MACDONALD:  Sorry we didn't bring popcorn, Your

13   Honor.  Spice it up.

14       (A video was played.)

15       MR. MACDONALD:  That's all, Your Honor.  We would like

16   to move admission of that crowd management manual that Commander

17   O'Donnell was shown during his deposition as Exhibit 452.

18       MR. RINGEL:  That's a stipulated exhibit.  No

19   objection.

20       THE COURT:  All right.  It's admitted.  Okay.  Who is

21   your next witness?

22       MS. WANG:  We call Commander Phelan.

23       THE COURT:  Good morning.

24       THE WITNESS:  Good morning, Judge.

25       (The Witness is Sworn)

Kevin P. Carlin, RMR, CRR

20-cv-1878-RBJ   PATRICK PHELAN - Direct   03-15-2022

 1    THE COURT:  Over there, please.

 2                    **DIRECT EXAMINATION**

 3  BY MS. WANG

 4  Q    Good morning.

 5  A    Good morning.

 6  Q    Could you please state your name, and spell it for the

 7  record.

 8  A    Patrick Phelan, P-H-E-L-A-N.

 9  Q    Okay.  You are currently retired; correct?

10  A    Trying to be.

11  Q    Okay.  And when did you retire from the Denver Police

12  Department?

13  A    September of 2020.

14  Q    Okay.  And how long had you worked for the Denver Police

15  Department?

16  A    Forty years.

17  Q    And before you retired in September of 2020, what was your

18  position with the DPD?

19  A    I was commander of the special operation division.

20  Q    How long had you had that position?

21  A    Approximately eight years.

22  Q    Okay.  Can you tell us a little bit about what you did as

23  commander of the special operations division.

24  A    Well, the special operations division is -- is actually

25  responsible for all spontaneous and planned events, special

20-cv-1878-RBJ   PATRICK PHELAN - Direct   03-15-2022

1   events in the City and County of Denver.  It's also responsible

2   for all tactical operations, barricade hostage operations,

3   fugitive operations.  Also, the bomb squad is assigned to

4   special operations division, bomb technicians are, and so are

5   bomb K-9s.  In addition, there's a traffic operations division

6   and also traffic investigation.  There's also the helicopter

7   division is assigned to that division along with unfortunately

8   photo enforcement, I think we're all familiar with.

9   Q    Photo enforcement?

10  A    Photo traffic enforcement.  Photo cameras and speed cameras

11  throughout the city.

12  Q    You were the incident commander for the George Floyd

13  protest that took place in Denver from May to June 2020;

14  correct?

15  A    Yes, ma'am.

16  Q    And as the incident commander, you were in charge of the

17  police response to the protest; right?

18  A    Correct.

19  Q    You had the responsibility to make final decisions

20  regarding management of the protests and how the police would

21  respond to it; right?

22  A    I'm sorry.  I missed that first part.  I'm sorry.

23  Q    You had the responsibility to make final decisions about

24  how the police would respond to the protests; right?

25  A    Yes, ma'am.

20-cv-1878-RBJ   PATRICK PHELAN - Direct   03-15-2022

1   Q    And as the incident commander, one of your jobs was to

2   coordinate teams of officers in the field and decide on where

3   they needed to go; right?

4   A    Correct.

5   Q    And you did that over the radio; right?

6   A    I did it several different ways.  Radio, phone, text,

7   through different divisions.

8   Q    Okay.  Your job -- tell us -- so, the incident -- as an

9   incident commander, that's part of something called the incident

10  command system; right?

11  A    It's part of NIMS, National Incident Management Structure.

12  And ICS is part of that, yes, ma'am.

13  Q    Okay.  So, tell me what the incident -- what ICS is.

14  A    ICS is a -- actually kind of a guide or roadmap to the

15  formation of our command structure.  So, for instance, I would

16  be at the top of that command structure.  Below me would be area

17  commanders.  Below them would be unit supervisors.  Below them,

18  officers.  Also, coming off my command structure probably would

19  be the bomb squad and FIT teams, whatever else is -- it's a

20  structure that's used nationwide.  Just to kind of make it

21  simple to look at a form, it's kind of like a chart.  It is

22  actually a chart.  You look at a chart and decide who is in

23  charge and who is responsible and what they're responsible for.

24  Q    And you were at the top of that chain of command; right?

25  A    Yes, ma'am.

20-cv-1878-RBJ     PATRICK PHELAN - Direct     03-15-2022

1   Q    And that included the outside agencies that came in at the

2   invitation of Denver to provide assistance during the protest;

3   right?

4   A    Yes, ma'am.

5   Q    You would agree that leadership during a major protest

6   event is very important; right?

7   A    Command and control.  Yes, ma'am.

8   Q    And that field -- you would also agree that field force

9   training involves perishable skills?

10  A    All skills are perishable, yes.

11  Q    Right.  And if officers are not provided training in field

12  force tactics and crowd management, those skills may go away.

13  They're perishable; right?

14  A    They could be, yes.

15  Q    Okay.  And you would agree, certainly, that supervision,

16  leadership, and training are all very important in a police

17  department?

18  A    Yes, ma'am.

19  Q    And that bad policing can be blamed on failures in

20  supervision, leadership, and training; right?

21  A    I'm sorry.  Can you repeat that?

22  Q    Would you agree with the proposition that bad policing can

23  be blamed on failures in supervision, leadership, and training?

24  A    There's probably several different reasons that there's

25  failures.

20-cv-1878-RBJ    PATRICK PHELAN - Direct    03-15-2022

1   Q    Okay.  But is failures in leadership, supervision, and

2   training one of those?

3   A    Could be.

4   Q    Okay.  Now, as commander of the special operations section,

5   you had overseen many protests during your 40-year career at the

6   DPD; right?

7   A    Correct.

8   Q    And you know that you don't necessarily need a permit to

9   protest; right?

10  A    Not in Denver, you don't.

11  Q    Okay.  Spontaneous protests in response to current events

12  are generally allowed; right?

13  A    You know, we kind of welcome them in Denver.  It's kind of

14  known for that here in the city.  We have a lot of spontaneous

15  events.  Although you're required to get permits, we don't

16  require that, because we understand people have First amendment

17  issues, protest, the right to assembly.  It happens all the

18  time, weekly, in Denver.

19  Q    Spontaneous protests that don't have permits were allowed

20  before the George Floyd protests, and they have been allowed

21  afterwards?

22  A    And they will continue to be allowed.

23  Q    Okay.  And protesters are allowed to march in the street;

24  right?

25  A    Well, no.  Nobody is allowed to be in the street.

20-cv-1878-RBJ    PATRICK PHELAN - Direct    03-15-2022

1    Q    You have allowed spontaneous protests --

2      (Simultaneous discussion interrupted by the court reporter.)

3    Q    You have allowed -- as the commander of the special

4    operations section, when you have overseen protests, you have

5    allowed spontaneous protests in the street?

6    A    We try to facilitate that, yes.  If it makes the event

7    easier, we will do that for them.  We try to facilitate their

8    protest.

9    Q    You don't just gas people for marching in the street;

10   right?

11   A    No.

12   Q    Okay.  People are allowed to say F you to police officers;

13   right?

14   A    All the time.

15   Q    And that's constitutionally protected; right?

16   A    Yes.

17   Q    Giving the middle finger to police officers is also

18   constitutionally protected; right?

19   A    Unfortunately, in this day and age, yes.

20   Q    Chanting, kneeling, standing in the air, standing with a

21   sign in the street, those are all protected activities; right?

22   A    Yes.  If they're allowed in the street.

23   Q    And as commander of the special operations section, you

24   have routinely allowed such protests in the street?

25   A    Absolutely.  We don't want to have any confrontation -- I'm

20-cv-1878-RBJ   PATRICK PHELAN - Direct   03-15-2022

1    sorry.

2    Q    I was just going to say the court reporter is going to get

3    mad at us if we talk over each other.

4    A    He's looking at me.  Okay.  I understand.

5    Q    Are you finished?

6    A    Where did I leave off, sir?

7    Q    I was just asking you, you know, if it is true that

8    spontaneous protests in the street are allowed?

9    A    Yes.

10   Q    Okay.  And you would also agree, having been a police

11   officer for 40 years, that each use of force against a specific

12   individual has to be justified with reference to what that

13   individual is doing; right?

14   A    Correct.

15   Q    Okay.  Now, mutual aid agencies did not assist Denver on

16   day one of the protest; right?

17   A    That's correct.

18   Q    They came in a day or two after; right?

19   A    I believe the first time I had outside agencies was the

20   second day, ma'am.

21   Q    All right.  The second day.  Now, each mutual aid agency

22   unit that came to assist in Denver was assigned a DPD sergeant;

23   right?

24   A    Correct.  We just try to facilitate, make sure we had good

25   communication.

20-cv-1878-RBJ    PATRICK PHELAN - Direct    03-15-2022

1    Q    Okay.  And all of these agencies operated under your

2    command as the incident commander; right?

3    A    My direction.

4    Q    And officers from mutual aid agencies were in fact working

5    as agents for the DPD during the protest; right?

6              MS. BIRKHOLZ:  Objection.  Speculation.

7              THE COURT:  Overruled.

8              THE WITNESS:  We coordinated their movements.  Each

9    outside jurisdiction brought their own command structure with

10   them.  There was a commander, usually other lieutenants or

11   sergeants with them, plus their officers.  So, they brought

12   their own command contingency with them, excuse me, to the

13   event.

14   Q.   (By Ms. Wang) Let me ask it this way:  Commander Phelan,

15   does the City of Denver take responsibility for the actions of

16   other jurisdictions at the downtown Denver demonstrations in

17   2020?

18             MS. BIRKHOLZ:  Objection.  Speculation and calls for

19   analysis of the jury.

20             THE COURT:  Overruled.

21             THE WITNESS:  Could you repeat the question?  I'm

22   sorry.

23   Q.   (By Ms. Wang) Does the City of Denver take responsibility

24   for the actions of other jurisdictions at the Denver

25   demonstrations in 2020?

20-cv-1878-RBJ    PATRICK PHELAN - Direct    03-15-2022

1   A    They're under our direction.  They're under my direction

2   while they're there.

3   Q    So, the answer is yes?

4   A    The answer is they're under my direction.  That's what I

5   can tell you.

6   Q    Okay.  Did you give testimony at a preliminary injunction

7   hearing in 2020 under oath?

8   A    Yes.

9   Q    And were you asked this question, and did you give this

10  answer:  Question, Commander Phelan, does the City of Denver

11  take responsibility for the actions of other jurisdictions at

12  the downtown Denver demonstrations?

13        Answer, yes, they're working as an agent for the Denver

14  Police Department.  We ask them for help, and they come to help

15  us.  They're acting as an agent for us.

16        Were you asked that question, and did you give that

17  answer?

18  A    Yes.

19  Q    Okay.  So, if counsel for the City has suggested during

20  this trial that Denver is not responsible for the actions of

21  outside agencies such as the Aurora Police Department or

22  Jefferson County SWAT team, that's just not true; right?

23  A    Yeah.  I don't think we're responsible for actions taken by

24  their officers.  If that --

25  Q    Okay.  Now, DPD policy was to allow mutual aid agencies to

20-cv-1878-RBJ    PATRICK PHELAN - Direct    03-15-2022

1   use their own policies; correct?

2   A    Yes, ma'am.

3   Q    And you did not look at what Aurora Police Department

4   policies were on use of force before you allowed them to follow

5   their own policies; right?

6   A    Correct.

7   Q    You did not look at what Jefferson County Regional SWAT

8   Team's policies were on use of force before you allowed them to

9   follow them for the protest; right?

10  A    Right.  Every agency has their own policy and procedures as

11  far as use of force or --

12  Q    And DPD policy was to allow those agencies to use their own

13  policies; right?

14  A    Yes, ma'am.

15  Q    And to use their own weapons; right?

16  A    Their use -- as far as, yes, whatever they're trained on.

17  Whatever they're trained on, of course we let them do that.

18  Q    And you as the incident commander making final decisions

19  for the police response to the protests also allowed outside

20  agencies such as Aurora and Jefferson County to use their own

21  weapons during the protest; right?

22  A    Yes, ma'am.

23  Q    That included 12 gauge shotguns that shot lead pellets;

24  right?

25  A    I think some outside agencies might use that less-lethal

20-cv-1878-RBJ   PATRICK PHELAN - Direct   03-15-2022

1   form of shotgun.  Once we realized that that was being used,

2   that was after the judge's injunction, possibly, we ended that.

3   We want them to use the same, if they have the same less-lethal

4   munitions that we use.

5   Q    So, the judge's injunction didn't occur until June 5th;

6   right?

7   A    Right.

8   Q    So, during the first week or so of the protest, Denver

9   policy was to allow Aurora and Jefferson County to use the 12

10  gauge shotguns that shot bean bags full of lead pellets?

11  A    They were allowed to use their less-lethal options,

12  whatever those were, ma'am.

13  Q    And those were in fact so dangerous that Denver doesn't

14  even allow the use of those weapons on their own; right?

15  A    Less-lethal shotgun rounds are approved in several

16  jurisdictions.  We don't use them in Denver, no, ma'am.

17  Q    And there's no reference to those weapons in the DPD crowd

18  management manual; right?

19  A    Correct.

20  Q    There's no reference to those 12 gauge shotguns in the DPD

21  operations manual either; right?

22  A    No, ma'am.

23  Q    There is -- that's right; right?

24  A    Correct.  I'm sorry.

25  Q    Sorry.  I shouldn't phrase questions like that.  And

Kevin P. Carlin, RMR, CRR

20-cv-1878-RBJ   PATRICK PHELAN - Direct   03-15-2022

1  there's no written policy of the DPD that references 12 gauge

2  shotguns at all; right?

3  A    Correct.

4  Q    There is no written policy of the City of Denver that

5  references Stinger grenades; is that right?

6  A    Correct.

7  Q    There is no written policy of the City of Denver that

8  references noise flash diversionary devices or any other kind of

9  explosive devices; right?

10  A    Noise flash devices are referenced.  They're a tool used by

11  the tactical team.

12  Q    That's in the crowd management manual?

13  A    It's not in the crowd management manual.  I misunderstood

14  you.  I thought you said anywhere in the DPD policies or

15  procedures.

16  Q    Okay.  I guess let me be specific.  The manual -- the

17  written policy of the DPD that governs crowd management and

18  protests is the crowd management manual; right?

19  A    Yes, ma'am.

20  Q    Okay.  And that manual references 40-millimeter launchers;

21  right?

22  A    Mm-hmm.

23  Q    Is that a yes?

24  A    Yes.

25  Q    Chemical munitions; right?

20-cv-1878-RBJ    PATRICK PHELAN - Direct    03-15-2022

1   A    Yes, ma'am.

2   Q    PepperBalls; right?

3   A    Yes.

4   Q    And it references OC spray; right?

5   A    Correct.

6   Q    It does not reference flash-bang grenades, also known as

7   noise flash diversionary devices; right?

8   A    Correct.

9   Q    It does not reference OC blast grenades; right?

10  A    Correct.

11  Q    Doesn't reference Stinger grenades; right?

12  A    I'm sorry?

13  Q    The manual does not reference Stinger grenades; right?

14  A    Correct.

15  Q    And it doesn't reference rubber ball blast grenades; right?

16  A    Correct.

17  Q    Okay.  But those are all items that were used by DPD and

18  the outside agencies during the protest; right?

19  A    Correct.  Some were, yes.

20  Q    Okay.  Now, you would agree that you cannot shoot somebody

21  in the head with a 40-millimeter launcher or a 12 gauge shotgun

22  unless deadly force is required?

23  A    Not intentionally.

24  Q    Okay.  So, you can -- does DPD policy allow the accidental

25  shooting of somebody with a 40-millimeter launcher or 12 gauge

20-cv-1878-RBJ   PATRICK PHELAN - Direct   03-15-2022

1   shotgun in the head?

2   A    They wouldn't allow it.  What I'm saying, somebody could be

3   hit unintentionally.  It's a -- it's a dynamic application of a

4   trained technique when you're firing a less-lethal projectile.

5   Q    Right.  So, you would want to be especially careful to

6   intentionally aim at the right body parts if you were using a

7   weapon as dangerous as a 40-millimeter launcher or a 12 gauge

8   shotgun; right?

9   A    There's specific areas you would try to aim for and try to

10  hit.  Unfortunately, like I said, it's a dynamic application.

11  So, that means -- it's not like we're having officers stand on

12  the skirmish line, and there's target static.  That's not

13  happening.  If an officer is trying to deploy a less-lethal

14  munition at someone and they move or they're throwing something

15  and they move, it's a dynamic -- what I'm saying is we're trying

16  to aim at a location, and they're trying to fire the best they

17  can at that location.  It's a restricted location, area that you

18  want to hit.  It's a possibility that unintentionally, it could

19  ricochet or it could actually strike someone.

20  Q    That's fine.  But let's think -- let's stick to the

21  question that I asked, which is it is -- you would agree that

22  you cannot intentionally shoot a person --

23  A    You don't want to --

24  Q    -- in the head -- just let me finish my question.

25  A    I'm sorry, ma'am.

20-cv-1878-RBJ    PATRICK PHELAN - Direct    03-15-2022

1    Q    You would agree that an officer cannot intentionally shoot

2    somebody in the head with a 40-millimeter launcher or a 12 gauge

3    shotgun?

4    A    Yes.

5    Q    Right.  Unless deadly force is required; right?

6    A    Correct.

7    Q    Okay.  And you've talked a little bit about how something

8    might be intentional, but DPD -- does DPD train its officers how

9    to use the 40-millimeter launcher when you've got people moving

10   and maybe throwing things and there's tear gas all around?

11   A    Yeah.  They're trained in that -- they are trained in that

12   weapon system, yes.

13   Q    Right.  So, if you're going to use a 40-millimeter launcher

14   during a protest situation, it might be a little bit chaotic;

15   right?  There might be tear gas in the air; right?

16   A    Yes.

17   Q    And it might be a little bit difficult to see?

18   A    It's a dynamic application.

19   Q    Okay.  And does DPD train its officers on how to use those

20   weapons in those situations?

21        MS. BIRKHOLZ:  Objection.  Asked and answered.

22        THE COURT:  Overruled.

23        THE WITNESS:  They're trained on the weapon system.

24   Q.    (By Ms. Wang) So, you would hope that determined officers

25   don't accidentally -- I'm sorry.  You gotta let me finish.

20-cv-1878-RBJ    PATRICK PHELAN - Direct    03-15-2022

1    A    I apologize again, Counselor.  I'm sorry.

2    Q    You are confident that DPD trains its officers on how not

3    to accidentally shoot somebody in the head with deadly force;

4    right?

5    A    Officers are trained what areas they should hit using that

6    weapon system.

7    Q    You had supervisor briefings during the protests; right?

8    A    Yes, ma'am.

9    Q    And at those supervisor briefings, tell me who was

10   generally present.

11   A    Well, it all depends on what the protest is, what the size

12   of the protest is, what the event is.  There's several different

13   factors.  Usually in the command post who is there is myself,

14   obviously with a lieutenant as an aide.  We have HALO operators

15   that are also inside the command post.  They operate the HALO

16   cameras throughout the city.  We also -- depending on the size

17   of event, we will have RTD security there.  We have Denver Fire

18   in there, Denver paramedics.  Whatever agency might have some --

19   if there's a need for somebody to be there, we try to have them

20   inside that command post based on an event.

21   Q    And what level supervisors from the DPD did you have

22   present at these briefings?

23   A    When we have a briefing -- I think I misunderstood.  So, at

24   the briefings, what we have is supervisors that are going to be

25   at that event.  So, lieutenants, sergeants, some corporals, and

20-cv-1878-RBJ    PATRICK PHELAN - Direct    03-15-2022

1   some officers also.

2   Q    Okay.  And at these briefings, you authorized the use of CS

3   gas and other chemical agents; correct?

4   A    Correct.

5   Q    You told the DPD and other supervisors that CS canisters

6   could only be used when ordered by a command officer; right?

7   A    Unless there's exigent circumstances.

8   Q    Okay.  And you authorized all of that?

9   A    Yes.  I authorized that, yes.  Part of rules of engagement.

10  Q    Okay.  CS gas has to be authorized by a command officer

11  because why?

12  A    Well, CS -- it has to be authorized by a command officer

13  because they usually see the entire picture.  They're getting

14  information or they observe the bigger picture, what the

15  situation is.  Maybe someone on -- an officer on the line might

16  not be able to see that.

17  Q    Okay.  And you would agree that CS gas is a serious use of

18  force; right?

19  A    CS gas is a form of use of force, yes.

20  Q    Okay.  And CS gas is an indiscriminate weapon in that it

21  disperses everybody in the vicinity whether they're peaceful or

22  not; right?

23  A    It's indiscriminate, yes.

24  Q    Okay.  And so CS gas should only be used to disperse an

25  entire crowd of protesters if an unlawful assembly has been

20-cv-1878-RBJ   PATRICK PHELAN - Direct   03-15-2022

1  declared?

2  A    Or if there's -- if there's unlawful assembly or officers

3  are under attack.  If there's exigent circumstances to deploy

4  chemical agent, that should be deployed.

5  Q    Okay.  And so DPD policy was that you could use CS gas -- a

6  command officer could authorize the use of CS gas if an unlawful

7  assembly has been declared or if officers are under attack; is

8  that right?

9  A    Correct.  Each situation is different.  What circumstance

10  has the supervisor, the command officer encountered, it's their

11  decision on what use of force applications need to be applied.

12  Q    So, when the DPD -- and it just -- and circumstances may be

13  different from time to time; right?

14  A    Absolutely.

15  Q    And so the command officer on the scene just has to make

16  that decision at the time; right?

17  A    Yes.  He has that information.

18  Q    And they have to use their discretion to decide if CS gas

19  is warranted; right?

20  A    Right.  Depending on the situation.  Absolutely.

21  Q    So, when the DPD crowd management manual says that you

22  cannot use CS gas to disperse people unless a significant number

23  or percentage of people are engaged in violent or aggressive

24  actions, that's just not true; right?

25  A    The manual says that it has to be approved by the incident

20-cv-1878-RBJ    PATRICK PHELAN - Direct    03-15-2022

1   commander or command officer.  So, I approved that.

2   Q    Okay.  So, you approved -- well, let me try to sort this

3   out, because according to what's written in the crowd management

4   manual, it says that you cannot use CS gas unless an unlawful

5   assembly has been declared; right?

6   A    That's one reason, yes.

7   Q    Well, does it say anything in the manual about officers on

8   the ground just using their discretion to decide when to

9   disperse an entire assembly?

10  A    No, it doesn't, but it's a guide.  Matter of fact, the

11  second page, if you look at the second page of the manual,

12  different situations, different responses, and it's a fluid --

13  it's a dynamic situation.  So, we can make changes.  Whatever

14  is -- if that incident commander at the scene is confronted with

15  a situation, we trust him to make those decisions.  He's not

16  going to let his officers take a barrage of water bottles,

17  slingshots, ball bearings, frozen water bottles, urine,

18  whatever.  That's not a command officer should be doing that.

19  It's not leadership to be doing that, let that happen.  People

20  are going to get hurt.

21  Q    Okay.  I'm just trying to confirm that what's written in

22  the policy is not the practice of the DPD policy?

23  A    It is the practice.  It's a guide, yes.

24  Q    So, it's just a guide.  So, when it says a significant

25  number of percentage, that can change depending on what the

20-cv-1878-RBJ    PATRICK PHELAN - Direct    03-15-2022

1    officer sees on the scene?

2    A    Depending on what's happening on the scene at that point in

3    time.

4    Q    And you authorized your command officers on the ground to

5    use their discretion to decide when to disperse entire

6    assemblies; right?

7    A    They're allowed to do that, and they could even -- yes.

8    Q    Okay.  And so if there is a small number of people in a

9    crowd of hundreds who are throwing rocks or water bottles at

10   officers, the command officer on the scene, according to DPD

11   policy, can simply make the decision at the time that they can

12   disperse the entire crowd; right?

13   A    They can.

14   Q    It doesn't matter how many peaceful protesters there are in

15   that crowd if the command officer feels that this rock, this

16   water bottle, it's too much, they can just use their discretion

17   to make that decision at the time; right?

18   A    It's based on several different factors.  How close is the

19   people that are attacking them?  What are they attacking them

20   with?  We had, I think 80 officers were injured during this, and

21   protesters --

22   Q    Do you know how many --

23   A    Protesters were injured also in this.  And so we try to

24   avoid that.  We were trying to avoid any type of confrontation.

25   Q    Do you know how -- you have at your fingertips how many

Kevin P. Carlin, RMR, CRR

20-cv-1878-RBJ    PATRICK PHELAN - Direct    03-15-2022

1   officers were injured.  Do you know how many protesters were

2   injured during the protests?

3   A    No, I don't.

4   Q    Did you ever look that up?

5   A    No.

6   Q    Did the City ever compile that information?

7   A    I was retired.  They possibly did, ma'am, yes.

8   Q    Okay.  But you didn't look that up to prepare for your

9   testimony today; right?

10  A    No.

11  Q    Okay.  Would you agree that during the protests, weapons

12  such as CS gas, PepperBalls, and flash-bang grenades were used

13  to move protesters?

14  A    Yes.

15  Q    So, and that was something that you ordered; right?

16  A    Or was ordered by the area commander there at the scene.

17  Q    Based on instructions that you had given them prior?

18  A    They were -- under rules of engagement, they were allowed

19  to use chemical agent, yes.  And less-lethal.

20  Q    So, instead of moving protesters by having police officers

21  line up in a skirmish line and use their batons to walk forward

22  in a line, the DPD used chemical weapons; right?

23  A    They -- yes.  They could use chemical weapons.  We didn't

24  want to go back to 1968 Chicago where we're using batons on

25  individuals.

20-cv-1878-RBJ   PATRICK PHELAN - Direct   03-15-2022

1  Q    I'm not suggesting that --

2  A    I thought you were trying to say you wanted us to do that.

3  Q    Sorry.  The court reporter is going to get real mad at us

4  if we don't stop talking over each other.

5  A    I'm sorry.

6  Q    So, sometimes I take a moment to get my question out, but

7  I'm not suggesting that police officers should have been hitting

8  people over the head with batons.

9  A    I'm sorry.  You said batons, use batons?

10  Q    Are you familiar with a tactic, field force tactic where

11  officers line up in a skirmish line, and they hold their batons

12  either, I don't know what it's called, court arms, maybe this

13  way, maybe sideways, and walk forward in a line to move

14  protesters using their bodies without using weapons?

15  A    I've heard of that.  Not a fan of that.

16  Q    You're not a fan of that?

17  A    Causes a confrontation.

18  Q    So, that's not a tactic that the DPD has trained its

19  officers on?

20  A    They're trained in that, yes.

21  Q    All right.  But that's not a tactic that you instructed

22  your officers to use during the protests; right?

23  A    They used skirmish lines, but they didn't use that tactic

24  as far as marching into the crowd with their batons.  Didn't

25  want them to do that.

20-cv-1878-RBJ    PATRICK PHELAN - Direct    03-15-2022

1    Q    And you're not familiar with that tactic being used in

2    prior protests?

3    A    We've used that in prior protests.

4    Q    You have used that in prior protests?

5    A    Could have been, yes.  I don't know.  I can't answer that.

6    Q    Okay.  You did not, as the incident commander, create any

7    arrest teams that could go into a crowd and arrest, you know,

8    and isolate specific people who are causing trouble; right?

9    A    No, we did not.  That's available.  Once again, that's

10   confrontation.  We're sending people into a crowd, and the

11   chance of officers getting hurt and the chance of protesters

12   getting hurt is just too great.

13   Q    So, you made the decision not to do that; right?

14   A    If that came up, if that was a decision I needed to make,

15   that was a decision I would have made.

16   Q    You would agree that protesters should be given a chance to

17   comply with a dispersal order before chemical weapons are used

18   on them; right?

19   A    If -- yeah -- time and circumstance allow.

20   Q    Okay.  And are there any factors that guide an officer's

21   discretion in determining whether time and circumstances allow a

22   dispersal order before chemical weapons are used?

23   A    We always want to issue an order, if we can, a dispersal

24   order.  It's the best way to do it.  We've done it a hundred

25   times.  We've done it in the past, and we do it every chance we

20-cv-1878-RBJ   PATRICK PHELAN - Direct   03-15-2022

1  need to or should do it.

2       Unfortunately, this was a unique situation.  These

3  officers, this is a -- in 40 years, I've never seen such

4  violence against police.  I never saw such angry people,

5  justified possibly.  So, they were attacking officers.  That was

6  their goal, confrontation.  So, you know, we cannot -- I would

7  not allow officers to stand static and be hit with rocks,

8  bricks, slingshots, objects thrown with lacrosse sticks.  I

9  wouldn't allow that to happen.

10  Q   So, but again, it's up to -- you decided to give your

11  officers discretion on when to give a dispersal order or not?

12  A   The supervisors.  They are told to give a dispersal order

13  every time, if time allows.  If time and circumstances allow,

14  absolutely.  That's what we want to do.

15  Q   So, any dispersal orders that were given during the protest

16  would have been documented; right?

17  A   They were given.  If they were given, they're usually

18  documented on a use of force report -- or, excuse me.  I think

19  they're usually documented by whoever gives that, and I think

20  they're attached to the -- they're usually attached to if

21  there's an arrest made, they're attached to that.  There would

22  be a statement by the supervisor, and then usually -- in regular

23  circumstances, these weren't regular circumstances, but --

24  Q   So, if there was a dispersal order given before chemical

25  weapons were used, it would be documented?

20-cv-1878-RBJ   PATRICK PHELAN - Direct   03-15-2022

1    A    Well, possibly.  This was a unique situation.  So, I'm

2    trying -- it's not like we just have one situation going.  We've

3    got numerous -- it was fractured.  These protesters were

4    everywhere.  And I shouldn't say -- there was a lot of lawful

5    protesting going on.  People were down there because they were

6    concerned, and they want to protest, and that's understandable.

7    We welcome that, but there was a lot more going on than just

8    that.  There was looting going on, breaking, damage, destruction

9    to property.  So, we were moving all over.  So, there's a lot of

10   time issues involved.

11   Q    Okay.  So, you wrote the operations plan; right?

12   A    Yes.

13   Q    And in the operations plan, you had some very specific

14   instructions about documenting dispersal orders; right?

15   A    There's a page in there that gives a guide to the --

16   actually, tells officers what to say, excuse me, command

17   officers or supervisors what to say.  It's a document.  They can

18   actually read it verbatim if they're giving dispersal orders,

19   yes.  We put that in there for them.  So, that's available,

20   because we want to use it.

21   Q    All I'm trying to understand is that -- let me ask it this

22   way:  In the operations manual, you said -- you instructed your

23   supervisors and officers that dispersal orders need to be

24   documented; right?

25   A    They need to be given.

20-cv-1878-RBJ    PATRICK PHELAN - Direct    03-15-2022

1    Q    Need to be given.  And three warnings will be given using

2    an amplified sound system.  All warnings and arrests will be

3    videotaped.  The command officer that gives the dispersal order

4    is required to write a statement.  The order to disperse will be

5    given by a lieutenant designated by the IC.  In the -- it says

6    that the dispersal order has to be documented; right?  It has to

7    be -- the command officer who gives it has to write a statement

8    about it; right?

9    A    Right.

10   Q    Okay.  So, you instructed your command officers to document

11   their dispersal orders?

12   A    I -- I gave direction to use dispersal orders, give

13   announcements whenever possible.

14   Q    Does that -- does it say that in the operations plan?  Do

15   you want to take a look at it?

16   A    No.  But like I said, page two, sometimes we have to make

17   adjustments to what's going on.  Once again, these officers are

18   being attacked.  It's a fluid, dynamic situation.  I wish they

19   wouldn't have been.  I wish that they were -- everybody was

20   peaceful and, you know, we didn't have to give any dispersal

21   orders, or if we did have to give dispersal orders, we weren't

22   under attack during those dispersal orders, and we give a way --

23   so, here's your dispersal order.

24       We read this dispersal order.  We'd say, okay, this is

25   the way to exit.  Please, if you don't want to be arrested or

20-cv-1878-RBJ   PATRICK PHELAN - Direct   03-15-2022

1  possibly deploy a chemical agent, please leave in this

2  direction.  Thank you.  And we give them some time to do that.

3  That's how it usually operates.  This was a totally different

4  situation, ma'am.

5  Q   So, you're saying that you -- well, let's put up

6  Exhibit 472, the operations plan for May 28th, which has already

7  been admitted.  All right.  So, we are looking at the operations

8  plan for May 28th, 2020; correct?

9  A   Yes, ma'am.  I will get my glasses out for a minute,

10  please.  Yes.  It's the --

11  Q   Can you see that?

12  A   I'm sorry.  Yes, ma'am.  It's the operation plan for

13  5/28/20.

14         MS. WANG:  And you're going to look at page 20.  Okay.

15  You know what?  We're going to go old school and do the Elmo.

16         THE COURTROOM DEPUTY:  It just takes a second.  The

17  auto focus just went off, if you want to press it again.

18         (Pause in the proceedings.)

19  Q.   (By Ms. Wang) All right.  Can you see that page,

20  Commander Phelan?

21  A   Yes, ma'am.

22  Q   So, you wrote this; right?

23  A   I'm sorry.  This is a page out of --

24  Q   It's a page out of the operations manual that you wrote?

25  A   Right.  That's included in the ops plan, yes.

Kevin P. Carlin, RMR, CRR

20-cv-1878-RBJ   PATRICK PHELAN - Direct   03-15-2022

1   Q    And it says the command officer that gives the dispersal

2   order is required to write a statement; right?

3   A    Correct.

4   Q    And it even says copies of that statement should be

5   attached to the city attorney's copy of the paperwork?

6   A    That's what I testified to, yes.  It should be.

7   Q    Okay.  So, you required the documentation of dispersal

8   orders; right?

9   A    It should have been a natural --

10  Q    I'm sorry?

11  A    In a natural progression of things, it should have been,

12  right.  But this was -- I'm sorry, but this was such a unique

13  situation I've never encountered in 40 years.  So, these

14  officers were moving constantly, and I'm sure they should have

15  done that.  If they didn't do that, that's our fault.  That's a

16  mistake.

17  Q    Did you change this instruction in your operations manual

18  for the subsequent days?  You had an operations manual for

19  subsequent days; right?

20  A    I had an ops plan.  Did you mean an ops plan?

21  Q    I'm sorry.  Operations plan.  Each day of the protest, you

22  had an operations plan; right?

23  A    Yes, ma'am.

24  Q    Is that right?

25  A    Correct.

20-cv-1878-RBJ    PATRICK PHELAN - Direct    03-15-2022

1  Q    So, you're saying that there were changing circumstances.

2  It was so difficult that you just gave up on this documentation

3  of the order to disperse; right?

4  A    No.  We didn't give up on anything.  It was just, time was

5  consistent.  We attached -- these officers were working 12, 14,

6  16 hours a day, and coming back.  Were these made?  Possibly

7  some were made.  I'm not sure.  I can't tell you if copies were

8  made, if their statements were made and these officers have

9  copies and they attached them to the city attorney's copy.  I

10  can't tell you what didn't happen.

11  Q    So, on subsequent days of the protest, when you wrote the

12  operations plan for those days, for day two, day three, so

13  forth, did it have this same paragraph about documentation of

14  order to disperse in the operations manual?

15  A    Yes, ma'am.  It did.  And it should have been done.  If

16  this was a gap that wasn't done, that's on us.

17  Q    Okay.  Have you seen any documentation of any orders to

18  disperse protesters before chemical weapons were used on them?

19  A    No.  I've heard it.  I've heard it over the radio.  They

20  were saying we're giving -- I would tell them, make sure you

21  give dispersal orders.  I heard them say, we're giving dispersal

22  orders.

23  Q    That happened on one day at 14th and Sherman; correct?

24  A    No.  It happened several times.  It happened every time at

25  the briefings, we said make sure you give dispersal orders.

20-cv-1878-RBJ    PATRICK PHELAN - Direct    03-15-2022

1   Q    Well, those are separate.  You're talking -- let's separate

2   things out.  First, you said you heard officers say over the

3   radio that they were giving dispersal orders prior to using CS

4   gas or other chemical weapons; right?

5   A    It was on the air.  We gave those instructions every day,

6   tried to make -- give dispersal orders prior to launching a

7   chemical agent.

8   Q    I want to try to get clarity on something, because first

9   I'm asking you right now about radio communications.  You're

10  saying that you heard on the radio channel command officers

11  saying we're giving orders to disperse before we gas people.

12  That's what you're saying?

13  A    Before they deployed a chemical agent, correct.

14  Q    How many times did you hear that?

15  A    It could have been on the phone, too.  We had trouble with

16  communication with radio, so there's several different pipelines

17  coming in to me.  It's not I'm sitting there with the radio all

18  the time.  There's two phone lines in there.  There's my cell

19  phone.  There's other assistants to me telling me, hey, they're

20  doing this here.  They're doing that there.  I got the fire

21  department.  Just a lot of information coming in, but not

22  everything is put on the radio.

23  Q    Well, you're -- let me try to understand.  I want to know

24  where we can find evidence of orders to disperse before the

25  gassing of protesters.  Okay?  So, let me just try to sort it

20-cv-1878-RBJ   PATRICK PHELAN - Direct   03-15-2022

1    out, what we've talked about already.

2    A    Right.

3    Q    According to your operations plan, it was supposed to be

4    documented in writing; right?

5    A    Mm-hmm.

6    Q    Is that a yes?

7    A    Yes, ma'am.

8    Q    Okay.  But you're saying it wasn't documented in writing

9    because there was such a difficult situation?

10   A    It wasn't always done, correct.  I'm saying it's a

11   difficult situation, it was just hectic, and there was -- it

12   probably wasn't done like it should have been done, and that's

13   our error.

14   Q    Are you going to produce a piece of paper that says here on

15   this day there was an order to disperse given before we gassed

16   the crowd?

17   A    Am I going to produce that?

18   Q    Yeah.

19   A    No, ma'am.

20   Q    Now, do you think the city attorney is going to show us

21   that?

22   A    I have no idea.

23   Q    Radio communications, that's a second thing you talked

24   about; right?

25   A    Right.

20-cv-1878-RBJ    PATRICK PHELAN - Direct    03-15-2022

1   Q    Okay.  So, you're saying you heard on the radio command

2   officers giving warnings or orders to disperse before gassing

3   people; right?

4   A    Right.

5   Q    Okay.  And you can't tell me how many times that happened;

6   right?

7   A    Correct.

8   Q    Are you going to -- and I said that there was one that I'm

9   aware of, which is that 14th and Sherman on day one; right?  Is

10  that right?

11  A    That's what you heard.

12  Q    Yeah.  That's what I'm aware of.  Are you aware of any

13  others?

14  A    Yes.  Possible, several others.  So, I was also -- here's

15  what happened.  We were having communication, we had a new radio

16  system, not to -- where it was bonky.  So, people could not talk

17  over each other.  So, if I was talking, somebody else would bonk

18  in or try to get communication that bonked in.  So, we relied

19  heavily on our cell phones, especially my communication with

20  field commanders.

21  Q    Okay.  Well, we were talking about radio.  Now you're

22  talking about cell phone.  So, let's just talk about them one by

23  one so we can get it all straight, because there's a lot going

24  on here.  So, radio communications.  Are you going to show me,

25  or is your -- are your attorneys going to show us some radio

20-cv-1878-RBJ   PATRICK PHELAN - Direct   03-15-2022

 1  communications of orders to disperse given other than at 14th

 2  and Sherman on May 28th?

 3  A    I don't know what the city attorneys are going to do.

 4  Q    So, now you're suggesting, well, maybe it wasn't on the

 5  radio.  It was on cell phone?

 6  A    I wasn't saying maybe.  I was saying there's a lot of

 7  communication going on via cell phone.

 8  Q    Okay.  You don't have a record of that, though; right?

 9  A    No.

10  Q    We can't play your cell phone calls with commanders where

11  they're telling you I'm giving warnings to people before we gas

12  them?

13  A    No.  You don't have my cell phone.

14  Q    Okay.  Is there any other evidence that you can point us to

15  of orders to disperse given to crowds before they were gassed?

16  A    Other than what I'm telling you, no.

17  Q    Now, orders to disperse, you would expect that they could

18  be heard -- now, let me ask it this way.  If you were going to

19  have your commanders give a crowd an order to disperse, you want

20  to make sure they can hear it; right?

21  A    Correct.

22  Q    Okay.  And the crowds were kind of loud; right?  There were

23  people chanting; right?

24  A    Yes.

25  Q    Sometimes there were people playing music; right?

20-cv-1878-RBJ   PATRICK PHELAN - Direct   03-15-2022

1   A     Mm-hmm.

2   Q     Is that right?

3   A     Yes.  I suppose they were playing music, whatever it is.

4   Q     Sure.  Okay.  Now, you would expect your commanders to give

5   an order to disperse if any were given on an announcement

6   system, a speakerphone or, you know, PA system?

7   A     PA system.

8   Q     Is that right?

9   A     Yes.

10  Q     Okay.  And the RDVs were equipped with PA systems; right?

11  A     All vehicles are -- all police vehicles are equipped with a

12  PA system.

13  Q     Okay.  And the -- would you expect that if announcements

14  were given, we would hear them on some officer's body-worn

15  camera?

16  A     Yes.

17  Q     Okay.  And certainly, before curfew on the days that the

18  curfew was in effect, there were announcements given about the

19  curfew; right?

20  A     Correct.

21  Q     Those were also given from RDVs; right?

22  A     They were given from RDVs, and they were also given through

23  our LRAD system.

24  Q     And that's like the really loud --

25  A     VOG.

Kevin P. Carlin, RMR, CRR

20-cv-1878-RBJ   PATRICK PHELAN - Direct   03-15-2022

1   Q    What's it called?

2   A    It's the term we use in like voice of God.  It's a term

3   used in the arenas and stadiums.  They call it VOG.  It's the

4   voice of God.

5   Q    And those are very loud; right?

6   A    Yes.

7   Q    All right.  So, you would expect that if we -- if we see a

8   video, a body-worn camera video where you can hear a curfew

9   announcement, you would -- given from an RDV, you would expect

10  that if there had been dispersal orders given prior to the use

11  of chemical weapons, you would hear that too?

12  A    You would hope so.  We -- the body-worn cameras were kind

13  of a disappointment, as far as what they captured.  They were

14  kind of new to the police department.  We were expecting more

15  than we probably got, which is probably our mistake too.

16  Q    Is there any documentation of any dispersal orders given

17  before crowds were gassed in the after-action reports?

18  A    I don't think so.  I don't know.  I would have to look at

19  the after-action report.  I don't recall.

20  Q    Now, you were using HALO video to observe the protests

21  while you were in the command post; right?

22  A    Yes, ma'am.

23  Q    And HALO video is -- it's, you know, throughout downtown

24  Denver, there are these security cameras affixed to light posts

25  or something else throughout downtown Denver?

20-cv-1878-RBJ    PATRICK PHELAN - Direct    03-15-2022

 1  A    Yeah.  Usually, right.  Light poles or traffic cams.

 2  Q    Okay.  And so in the command post, you had access to all

 3  the HALO video; right?

 4  A    Correct.

 5  Q    And that was often your primary information source; right?

 6  A    It was one of them, yes.

 7  Q    Okay.  And was Captain Sylvia Sich in the command post with

 8  you?

 9  A    Not every day, but yes, she was in the command post.

10  Q    Did you have any communications with her?

11  A    Yes.

12  Q    Now, another method of communicating that you had with your

13  officers was the radio; right?

14  A    Mm-hmm.

15  Q    You're going to have to say yes or no.

16  A    I'm sorry, ma'am.  Yes.

17  Q    And the radio that the officers used was called -- the

18  channel -- there was a specific channel called TAC6; right?

19  A    Correct.

20  Q    And that was the channel that all the teams of officers

21  were supposed to use to communicate with you in the command

22  post; right?

23  A    Correct.

24  Q    And so you had team -- when I say teams of officers, you

25  had, you know, let's say six to ten officers in a -- out in a

20-cv-1878-RBJ    PATRICK PHELAN - Direct    03-15-2022

1   unit, and then you would have some supervisors with them; right?

2   A    Yeah.  Depending on the plan.  We had a deployment plan.

3   So, we divided up -- we divided up the area into three different

4   area commands.  Those area commands was a command officer with

5   different units assigned to him.  So, yes.

6   Q    Right.  So, you might have the line off -- in any

7   particular team, you might have a line -- a bunch of line

8   officers just, you know, regular officers?

9   A    Officers.  Mm-hmm.

10  Q    And then you would have a sergeant or two, and perhaps a

11  lieutenant; right?

12  A    Could be.

13  Q    Okay.

14  A    It all depends on the situation, where they were.  I can't

15  give you it exactly.

16  Q    Sure.  But that was the general structure; right?

17  A    General, yes.

18  Q    And then you didn't have everybody on a team on the radio

19  communicating with you; right?  You had specific supervisors

20  communicating with you?

21  A    Correct.

22  Q    Okay.

23  A    We tried to limit the amount of radio traffic, because we

24  were having problems with the radio communication.  That's why

25  we had to use phones and texts and landlines.

20-cv-1878-RBJ   PATRICK PHELAN - Direct   03-15-2022

1   Q    Right.  And you had radio call signs; right?

2   A    Yes.

3   Q    And your call sign was A9, or Adam nine; right?

4   A    Yes.

5   Q    Okay.  Now, on the radio -- so, we were talking about how

6   officers were supposed to be using TAC6; right?

7   A    Yes.

8   Q    Okay.  Not primary six; right?

9   A    No.  For the operation run, TAC6.  There's other radios

10  there.  Traffic was on its own radio system.  So, we did have

11  different units there that were on different radio systems,

12  different radio channels, but the main operation was on TAC6.

13  Q    Right.  So, if there was the lieutenant, like Lieutenant

14  Ken Chavez who was giving his officers orders on primary six,

15  that was not a channel that he was supposed to be on; right?

16  A    He could use that.  If he just wants to have a

17  communication with his officers at that location, yes, he could

18  do that.

19  Q    Okay.  But those were not part of the official

20  communications for the protests; right?

21  A    Well, yes.  It can be.

22  Q    Were those -- go ahead.

23  A    Yes.  So, there's different units.  If he wants to

24  communicate, he's getting the information, say, from the command

25  post, he could communicate that information, or he has maybe

20-cv-1878-RBJ   PATRICK PHELAN - Direct   03-15-2022

1  information specific to his location, and he could use that

2  channel to talk to his officers.

3  Q    Were you privy to the communications on primary six?

4  A    No.  It could be.  It could be.  At certain times, I could

5  be, yes.

6  Q    Were you aware during the protests, specifically on

7  May 30th, that Lieutenant Chavez was giving his officers orders

8  to go shoot at people out in the streets?

9  A    No.

10 Q    Okay.  So, you did not hear those communications on primary

11 six?

12 A    No.  Primary six is used auxiliary.  It's an auxiliary

13 channel.  It could be primary six, primary one, primary two.

14 There's so many different communications channels that are used

15 by different units to communicate with each other, but the main

16 communication -- the main channel for the protest was TAC6, if

17 that makes sense.  There's numerous different radio channels,

18 different pipelines, different communications to get information

19 in and out of the command post and information to officers from

20 their supervisors.  So, there's a lot of communications going

21 on.

22 Q    Sure.  But you were listening to TAC6 during the protest?

23 A    I was listening to TAC6.  I think I was also listening to

24 TO1, which is traffic operations.

25 Q    Okay.  So, whatever Lieutenant Chavez was saying on primary

20-cv-1878-RBJ     PATRICK PHELAN - Direct     03-15-2022

1   six, you were not privy to?

2   A     No.  Unless you would happen to be listening to it, I guess

3   try to make it clear.  So, if I'm listening to it, and you can

4   scan radios.  It's kind of convoluted communication -- kind of

5   complicated, but I could set my radio to listen to more than one

6   channel, and so could everybody else in the city.  So, all

7   officers had the capability of listening to three or four

8   different channels by scanning them.  So, it's not always --

9   you're not -- you might be listening to TAC6, but you're

10  scanning primary six, or you're scanning whatever channel you

11  want to scan.  You're scanning TO channel for traffic

12  operations, so you hear a lot of communication going on.  So,

13  but to answer your question, I didn't hear Lieutenant Chavez's

14  comments.

15  Q     All right.  You thought that officers in the Denver Police

16  Department acted within policy and training during the protests;

17  right?

18  A     Yes.  I hope so.

19  Q     You were not aware of any use of force that was outside of

20  policy?

21  A     No.  I don't recall seeing anything that was outside of

22  policy.

23  Q     You did not see any use of force by any Denver officers

24  that were inconsistent with their training?

25  A     Well, you mean did I see during that -- during the

20-cv-1878-RBJ   PATRICK PHELAN - Direct   03-15-2022

1    operation?

2    Q    Sure.  Let's start with that.

3    A    No, I didn't.

4    Q    Okay.  You've never -- since then, you've not seen any

5    video or documentation relating to the protest that showed

6    officers using force on protesters in a manner inconsistent with

7    policy, training, or practice; right?

8    A    I have seen some videos where I might not agree with the

9    application, but it was still within policy.

10   Q    Okay.  So, you might not -- you've seen some videos where

11   you thought, well, I might not have done it like that if I were

12   in that situation, but that was still within policy?

13   A    Yes.

14   Q    Okay.  Did that include the shooting of a man who was in a

15   car with his pregnant girlfriend?

16   A    I did see that video.

17   Q    So, is that the -- and just to be --

18   A    I'm sorry.  I'm sorry to keep doing that.  I apologize,

19   Counselor.

20   Q    So, just to be clear, there was a video that you have seen

21   before of a man who was driving a car, and he gets out of the

22   car, and police officers shoot him with PepperBalls, and he

23   yells, and he says, I have my pregnant girlfriend in the car.

24   You saw that video; right?

25   A    I saw that video.

Kevin P. Carlin, RMR, CRR

20-cv-1878-RBJ   PATRICK PHELAN - Direct   03-15-2022

1   Q    Okay.  And when you saw that video, you thought, that might

2   not have been the best, but that was consistent with DPD policy

3   and training?

4   A    I saw that video, and it -- I didn't like the application.

5   It shocked me.  The visual, the optics on that were not good.  I

6   didn't like the application there.

7   Q    But it was in your view --

8   A    Depending --

9   Q    Based on your 40 years with the Denver Police Department,

10  you thought that was consistent with policy, practice, and

11  training; right?

12  A    It was consistent depending on what the situation was, what

13  were they asking him to do.  If he didn't comply, they could

14  authorize, or they could deploy a PepperBall.  I wouldn't have

15  done it.  I didn't like the way it looked.  I don't think it was

16  appropriate application, but it was still in policy, yes.

17  Q    Right.  And, you know, as somebody who has reached the

18  highest levels at the Denver Police Department, you did not

19  think, well, you know, if I had been a supervisor of that

20  officer, I would have disciplined him?

21  A    Well, I think it was within policy.  I didn't like it.

22  Q    Do you believe that the chief of police sets an example for

23  the officers within the department?

24  A    Yes.

25  Q    Okay.  And that line officers, as well as supervisor

20-cv-1878-RBJ   PATRICK PHELAN - Direct   03-15-2022

1   officers in the police department, look to the chief and even

2   the mayor for guidance on how they should conduct themselves?

3   A    Yes.  Their conduct.

4   Q    Are you aware that at about 11:00 a.m. on May 29th, 2020,

5   day two of the protest, Chief Pazen gave a press conference

6   during which he praised officers for showing, quote, great

7   restraint the day before?

8   A    Was I aware of the press conference?  No, I wasn't, but if

9   you say he had a press conference, I'm sure he did.

10  Q    Were you aware of those comments that were made by the

11  chief?

12  A    No.  But if he made those comments, I'm sure he did.

13  Q    You're aware that he made those comments that the officers

14  acted with great restraint?

15  A    I don't remember seeing -- it's been two years.  I don't

16  remember seeing a press conference, but it's possible.

17          MS. WANG:  Okay.  I'd like to show Exhibit 39.

18          MS. BIRKHOLZ:  Your Honor, we object on the basis of

19  hearsay.  It's an incomplete picture of what was happening, and

20  a lack of foundation.

21          THE COURT:  I don't even know what it is.

22          MS. WANG:  It's a clip of the press conference that

23  the chief gave, and the mayor gave, and the comments made at

24  that press conference.

25          THE COURT:  All right.  The objection is overruled.

20-cv-1878-RBJ    PATRICK PHELAN - Direct    03-15-2022

1    THE WITNESS:  That wasn't the chief, I don't think.

2    THE COURT:  That guy looked pretty startled.

3    MS. WANG:  All right.  So, it's been -- it's been

4  admitted?  All right.  Let's show Exhibit 39.

5    (A video was played.)

6    THE WITNESS:  Is there audio?

7    MS. WANG:  Sorry.  Just a moment.

8    THE COURT:  That's the best kind of press conference.

9    THE WITNESS:  That's the best way I like the chief.  I

10  can't hear him.

11    MS. WANG:  All right.  Let's do the back table.

12    (A video was played.)

13    MS. WANG:  Okay.  We're going to have to fix our

14  issues.  Okay.

15  Q.    (By Ms. Wang) Now, are you aware that the mayor at the

16  same press conference stated that protesters acted -- or that

17  police officers acted with tremendous restraint?

18  A    I didn't see the press conference, ma'am.  If you said he

19  said that, I'm sure he did.

20  Q    Do you agree with that?

21  A    Absolutely.  I never saw -- I've never seen more abuse

22  towards police officers in 40 years.  Not only the language,

23  which unfortunately this day and age, where officers are kind of

24  used to receiving that kind of abuse, verbal abuse, but between

25  the verbal abuse and the physical abuse, I've never seen it like

20-cv-1878-RBJ   PATRICK PHELAN - Direct   03-15-2022

1  that.

2  Q    And so if the -- you would agree that both the chief of

3  police and the mayor set an example for officers in the police

4  department; correct?

5  A    Yes.

6  Q    And that if they gave a press conference in which they

7  publicly praised officers and said that they acted with great

8  restraint and tremendous restraint on the first day of the

9  protest, then that set the tone for how officers should behave

10 on the subsequent days; right?

11         MS. BIRKHOLZ:  Objection.  Speculation.

12         THE COURT:  Overruled.

13         THE WITNESS:  I was going to say, that's a lot of

14 speculation for me to do, but I don't know if it set the tone.

15 I think they were thanking the officers for all the abuse they

16 take -- they were taking.

17 Q.    (By Ms. Wang) And if you were a police officer -- the

18 press conference was given at 11:00 a.m. on day two, so that's

19 before the protests that occurred in earnest on the second day;

20 right?

21 A    Yes.

22 Q    Okay.  And so if you were a police officer and you saw the

23 chief of police give a press conference where he said I'm proud

24 of you, you acted with great restraint, keep on doing what

25 you're doing, then you would just keep on doing what you're

20-cv-1878-RBJ   PATRICK PHELAN - Direct   03-15-2022

1   doing; right?

2   A     You know, I guess I would have to say, first of all, I

3   didn't see this press conference.  I doubt if officers who had

4   just worked, you know -- I don't know.  They're probably more

5   interested in looking at stuff on their phone, these young guys,

6   but I don't think probably 90 percent or 99 percent of officers

7   assigned probably saw this, ma'am, if it was 11 o'clock in the

8   morning.  They could have, but I have no idea.

9               MS. WANG:  Okay.  Murphy Robinson was the executive --

10  all right.  Let's display Exhibit 39.  This table right here.

11  It's not coming through the audio in the courtroom.

12              THE COURTROOM DEPUTY:  It's not our system.

13      (A video was played.)

14  Q.    (By Ms. Wang) Are you aware of what -- the mayor in that

15  clip said he was watching a video feed throughout the day.  Did

16  you hear that?

17  A     Yes, ma'am.

18  Q     Okay.  Do you know what video feed he was watching?

19  A     No, I don't.

20  Q     Was he in the command post?

21  A     He might have stopped by during the first five days.

22  That's a possibility.  I don't recall.  The video feed, he was

23  watching video feed on that day -- it wasn't in the command

24  post.  I'm sure the mayor's office has ways to do that.

25  Q     Okay.  Now, Murphy Robinson was the executive director of

20-cv-1878-RBJ   PATRICK PHELAN - Direct   03-15-2022

1    the Department of Public Safety in June 2020; right?

2    A    Yes, ma'am.

3    Q    And the chief of police reported to him in some ways;

4    right?

5    A    Yes.

6    Q    And on the day after the Court issued a temporary

7    restraining order against the DPD, you received an email from

8    Murphy Robinson about the actions of the DPD; correct?

9    A    I think so.  Yes.  I would have to see it.

10   Q    Okay.  Showing you Exhibit 753.  Scroll down.  Okay.  So,

11   right there, just this DPDbadged@Denvergov.org, that's to all

12   the people in the Denver Police Department; correct?

13   A    Yes.

14   Q    So, you received this email; right?

15   A    Yes.  It would go to my mailbox.

16        MS. WANG:  Can we move to admit Exhibit 753?

17        MS. BIRKHOLZ:  No objection.

18        THE COURT:  All right.  Admitted.

19   Q.   (By Ms. Wang) Now, this email from Murphy Robinson was

20   sent on Saturday, June 6th, 2020; right?

21   A    Yes.

22   Q    Early in the morning?

23   A    12:01 a.m.

24   Q    Okay.  And in this message, he tells the members of the --

25   and this is -- this email is to the entire police department;

20-cv-1878-RBJ   PATRICK PHELAN - Direct   03-15-2022

1  right?

2  A    All badged, yes.

3  Q    And what he's telling the entire police department is

4  tonight we received a temporary restraining order from a Federal

5  Court that imposes limitations on our ability to use certain

6  types of force during protest activities currently occurring in

7  the City and County of Denver.  It continues that they will

8  comply, but it says, however, you should know that the language

9  of the order is not reflective of the dedicated service that I

10 have witnessed from our officers when on the front line.  Do you

11 see that?

12 A    Yes, ma'am.

13 Q    So, that is what Murphy Robinson was telling DPD officers

14 about their actions during the protest; right?

15 A    Yes.

16 Q    Okay.  And you agreed with that; right?

17 A    I agreed that this is the email?

18 Q    You agreed with the sentiment?

19 A    Yeah.  It's -- well, I don't really know what his -- what

20 he's trying to say there.  He's thanking the officers for what

21 they do, but we also have a temporary restraining order that we

22 have to abide by.

23 Q    Well, the restraining order apparently had some -- did you

24 read the temporary restraining order?

25 A    Yes.  I was involved in that.  It's been a while, a couple

20-cv-1878-RBJ    PATRICK PHELAN - Direct    03-15-2022

1    years, but I did read it, I'm sure.

2    Q    And the temporary restraining order imposed some

3    limitations on the City's use of force during the protests;

4    right?

5    A    Correct.  Use of less-lethal munitions, I believe.

6    Q    And did you agree that the language of the order was not

7    reflective of the dedicated service from the officers during the

8    protests?

9    A    I think what he's trying to say is here is a restraining

10   order.  We will abide by this restraining order from a federal

11   judge, obviously, but it doesn't reflect -- it still doesn't

12   reflect the dedication of these officers doing their work in the

13   protest.  I imagine.  That's the way I read it.

14   Q    Have you ever seen any effort from the Denver Police

15   Department to say, hey, you know, some of the uses of force we

16   see -- we saw at these protests was not appropriate?

17   A    At this point in time?

18   Q    At any point in time.

19   A    Could you repeat the question?  You're not referring to

20   this document anymore?

21   Q    No.  I'm done with the document.

22   A    I'm sorry.  Okay.  Thank you.  I was watching it.

23   Q    I'm just asking you, have you ever seen any attempt by

24   anybody in the City or in the Denver Police Department to say,

25   hey, we are sorry for how the officers behaved during the

20-cv-1878-RBJ   PATRICK PHELAN - Direct   03-15-2022

1   protest?

2   A   No.

3   Q   You have seen nothing but praise for the way the police

4   officers behaved during the protest?

5   A   No.  I've seen a lot of complaints -- are you talking about

6   from who did I receive?  There's praise from a lot of people,

7   and there's disgruntled people too.  There's on both sides.

8   Q   I'm talking about from within the DPD.  Have you seen any

9   criticism or any reflection from members of the DPD or people at

10   the City about how the police officers behaved towards protests

11   during the protest?

12   A   Not the protesters -- I think, as all situations and all

13   protests we do, there's an after-action done.  And I think we

14   looked at things that had gaps and things that could be changed,

15   and those changes were made.

16           THE COURT:  Kevin, would you like a break?

17           THE COURT REPORTER:  Yes, please.

18           THE COURT:  Let's have a break here for ten minutes or

19   so.

20       (Jury out at 10:40 a.m.)

21       (Recess at 10:40 a.m., until 10:57 a.m.)

22       (Jury in at 10:57 a.m.)

23           THE COURT:  Onward.

24   Q.   (By Ms. Wang) Commander Phelan, I thought you had said

25   something earlier about body-worn cameras being new in 2020.

20-cv-1878-RBJ     PATRICK PHELAN - Direct     03-15-2022

1   Isn't it true that the DPD has had body-worn cameras since 2015?

2   A     No.  It was new as far as protests, this type of protest.

3   To use -- it's used to capture dispersal orders, or we try to

4   use that to capture some dispersal orders.  Instead of using

5   video cameras, we thought that might work, and it just didn't,

6   so I should say new to that.  It was the first time we did that.

7   Q     But as far as how to operate a body-worn camera, those

8   sorts of things, the DPD -- members of the DPD had been told

9   about how to do that since they got body-worn cameras in 2015;

10  right?

11  A     Absolutely.

12  Q     Okay.  Did you read the Office of Independent Monitor's

13  report, by the way?

14  A     Yes.  I looked at it.

15  Q     Did you disagree with anything in there?

16  A     No.  I can't remember what was in there, to be honest with

17  you.  It's been a while since I read it.

18  Q     When officers act as agents of the Denver Police

19  Department, the department is responsible for those officers;

20  correct?

21  A     Mm-hmm.

22  Q     Is that right?

23  A     Well, they're responsible to our direction.

24            MS. WANG:  Well, let me show you your hearing

25  testimony, Exhibit 1114, from the preliminary injunction

20-cv-1878-RBJ   PATRICK PHELAN - Direct   03-15-2022

1   hearing.  I'd like to move this into evidence.

2          MS. BIRKHOLZ:  Your Honor, this line of questioning

3   has been asked and answered.

4          MS. WANG:  I'd like to move the page into evidence.

5          MS. BIRKHOLZ:  It's for impeachment purposes, Your

6   Honor, and he's asked and answered this question.

7          THE COURT:  The objection is sustained.

8   Q.    (By Ms. Wang) You would agree that if outside agency

9   officers act as agents of the Denver Police Department, you are

10  responsible for them; right?

11  A    We work with them.  We work in cooperation with them for

12  the mission, for the protest.  Maybe I misunderstand your

13  question.

14  Q    So, do you agree or disagree that when somebody acts as an

15  agent for somebody else, the agent -- the principal, the DPD, is

16  responsible for the agent?

17  A    We're not responsible for the actions by individual

18  officers from that jurisdiction, I guess, is --

19  Q    Well, but you as the incident commander have ultimate

20  responsibility over everybody; right?

21  A    Right.  We're a collaboration.  I have command officers

22  from those outside jurisdictions sitting with me in the command

23  post.  So, if I have to give them direction, I will give them

24  direction to what we need to be done, and they deploy under that

25  direction.

Kevin P. Carlin, RMR, CRR

20-cv-1878-RBJ   PATRICK PHELAN - Direct   03-15-2022

1    Q    Right.

2    A    So, they're acting in cooperation with us.  You could call

3    it whatever you want to call it, I guess.

4    Q    I mean, when you invited -- when the DPD -- you as the

5    incident commander made the decision or were part of the

6    decision-making to bring in outside agencies; right?

7    A    Correct.

8    Q    Okay.  And you didn't say, hey, Aurora, just come in and,

9    you know, go use your weapons; right?  You gave them direction;

10   right?

11   A    Gave them directions.  Usually through their command

12   officer, yes.

13   Q    You directed their teams of officers on where to go and

14   what to do just as you did with every DPD team of officers;

15   right?

16   A    Correct.

17   Q    Okay.  And you even told them you can use your own weapons,

18   even ones that are more dangerous than the ones that we use?

19   A    I told them they could apply their policy procedures.  They

20   could use their less-lethal.

21   Q    That they could use their own policies, and they could use

22   their own weapons; right?

23   A    Correct.  That was their policy, and so they operate under

24   their policies and their procedures, correct.

25   Q    Okay.  So, let's talk about -- let's move on to 14th and

20-cv-1878-RBJ     PATRICK PHELAN - Direct     03-15-2022

1  Sherman on May 28th.  Are you familiar with the incident that

2  occurred at 14th and Sherman on May 28th?

3  A     I think I've seen it.

4  Q     Well --

5  A     I can't say I'm familiar with it, but if you show it to me,

6  I could become familiar with it.

7  Q     You directed officers on what to do during that incident;

8  right?

9  A     Yeah.  Over five, six days, or numerous, numerous, numerous

10  operations, numerous engagements.  So, yes, I remember if

11  there's something at 14th and Sherman, I'm sure I was.

12  Q     Can you identify -- no.  Let me ask you this:  At 14th and

13  Sherman, there was an announcement that was given to the crowd

14  that they are in violation of blocking the street, and therefore

15  they need to leave --

16  A     Okay.

17  Q     -- right?  Are you familiar with that?

18  A     It's been a couple years, but yes.  I'm familiar with

19  something happening at 14th and Sherman.  There's several

20  incidents throughout downtown Denver, through the capitol.

21            MS. WANG:  Well, let's show Exhibit 570.  The back

22  table.  Thank you.

23            THE COURTROOM DEPUTY:  It's not admitted.

24            MS. WANG:  Right.  I'm going to.

25            THE COURTROOM DEPUTY:  Thank you.

Kevin P. Carlin, RMR, CRR

20-cv-1878-RBJ   PATRICK PHELAN - Direct   03-15-2022

1      MS. WANG:  I move to admit Exhibit 570, body-worn

2   camera from Officer Hagan.

3      MS. BIRKHOLZ:  No objection.

4      THE COURT:  All right.  It's admitted.

5      MS. WANG:  Can we start at minute 38.

6   (A video was played.)

7   Q.   (By Ms. Wang) All right.  Let's -- let's watch

8   Exhibit 570, and I'm going to ask you to listen for an

9   announcement at about 46 seconds into this clip.  All right?

10  A    Yes.

11  Q    Let's go ahead.

12       (A video was played.)

13  Q    Okay.  Did you hear that announcement in the background

14  that said this is the Denver Police Department, all persons here

15  are in violation of blocking the street?

16  A    Yes.  I did hear that.

17  Q    Okay.  Now, it's otherwise kind of loud in this crowd;

18  right?

19  A    Yes.

20  Q    And you have to strain to hear it; right?

21  A    I heard it.

22  Q    Okay.  So, whoever is on the scene gives orders to this

23  crowd to disperse because they're blocking the street; right?

24  A    Mm-hmm.

25  Q    Is that --

20-cv-1878-RBJ   PATRICK PHELAN - Direct   03-15-2022

1   A    Yes.  I'm sorry.

2   Q    Was that done under your command?

3   A    To give orders there?

4   Q    Yes.

5   A    I don't know.  Could have been.  I doubt it.  I'm probably

6   getting information from whoever the command officer is at that

7   location.

8   Q    Well, I mean, it wasn't just some officer giving an

9   announcement telling everybody to disperse; right?  It was a

10  command officer?

11  A    I'm sure.  I can't tell from that who that was, though.

12  Q    I'm not asking for the identity of the person.  I'm just

13  saying line officers who were present at this scene are not in

14  the truck giving announcements without authorization from some

15  command officer; right?

16  A    It's probably a command officer, a lieutenant or -- that's

17  probably giving those orders through a PA system in an RDV or a

18  vehicle, yes.

19  Q    Right.  Can you think of any reason why these people needed

20  to disperse simply for blocking the street?

21  A    I'm not there right there on the scene, so I can't say what

22  the circumstances were.  They're blocking the street.  They want

23  to move -- if we have to get a crowd out or if they're blocking,

24  if they're stationary and not moving from that location, it's a

25  possibility for whatever reason, he needs to move them from the

20-cv-1878-RBJ   PATRICK PHELAN - Direct   03-15-2022

1  street.

2  Q    Do you recall any conversation that you had with the

3  commander or the command officer who was at this scene saying,

4  all right, they're blocking the street, tell them to leave, and

5  if they don't, we're going to gas them?

6  A    I don't recall.  Could have.  It's been a long time.

7  Q    Did you watch any videos regarding any of the --

8  A    I've never seen --

9  Q    The court reporter is going to kill us.

10       THE COURT:  You gotta resist that.

11       THE WITNESS:  He's going to kill me.

12  Q.    (By Ms. Wang) Did you watch any videos to prepare for

13  your testimony here today?

14  A    I've seen -- I've seen videos.  I haven't seen this video,

15  ma'am.

16  Q    Okay.  I'm just asking you what you recall about what

17  orders you gave to the command officers about why these people

18  needed to leave for simply blocking the street.

19  A    I don't know what the situation is.  If I gave orders,

20  there was a reason for them blocking the street.  They were

21  surrounded, or they were trapped -- could have been they were

22  surrounding the police officers in that location.  I don't know

23  what the situation was.

24  Q    You don't know.  These things that you just threw out

25  are -- you're speculating; right?

20-cv-1878-RBJ    PATRICK PHELAN - Direct    03-15-2022

1   A    From what I know right now, what you're showing me.

2   Q    Does this look peaceful to you?

3   A    There's people in the street, yeah.  It looks fine.

4   Q    You can't think of any reason as you're watching this that

5   these people needed to leave?

6   A    This is a view of somebody's body cam that's a static view

7   of one -- it's just a single shot.  It's one dimensional.

8   Q    Okay.  But based on what we have seen in this video so far,

9   you have not seen anything that would cause you as a command

10  officer to say, yeah, these people gotta go?

11  A    No.  I don't have all the circumstances, but from the view

12  I have from this body cam, no.

13  Q    Okay.  Let's continue playing Exhibit 570.

14       (A video was played.)

15  Q    Okay.  See this guy who has walked up?

16  A    With the balaclava on, covering his face?

17  Q    Yes.

18  A    Yes.

19  Q    Let's pay attention to what he says.  Go ahead.

20       (A video was played.)

21  Q    Pause for a moment, because we missed the first part of

22  what he said.

23       (A video was played.)

24  Q    He said, if we're not blocking the street, can we stay?

25  Right?

20-cv-1878-RBJ   PATRICK PHELAN - Direct   03-15-2022

1  A     Right.

2  Q     Okay.  Let's see what the officer's response is, if any.

3        (A video was played.)

4  Q     There was no response from the officers he was asking;

5  right?

6  A     I didn't hear a response, ma'am.

7  Q     Okay.  And then he shook his head and said, we follow the

8  law, and they tell us we're breaking it; right?

9  A     I'm sorry?

10 Q     He shook his head, and when he didn't get a response, he

11 said, we follow the law, and they tell us we're breaking it;

12 right?

13 A     It looks like he must have heard the announcements being

14 made, and then approached an officer.  Probably heard the

15 announcement being made to disperse, and that's when he went up

16 to the officer and asked him, I imagine.

17 Q     And can you think of any reason why that guy could not have

18 stayed on the sidewalk or the grass as he was?

19 A     I don't know what the situation was there at that

20 particular time.

21 Q     Right.

22 A     We've had hundreds upon hundreds of situations throughout

23 this protest, so I can't recall every one, and I wasn't at every

24 one, and that's why we had area command and supervisors at all

25 these different locations.

20-cv-1878-RBJ    PATRICK PHELAN - Direct    03-15-2022

1   Q    The point is the particular announcement given at that time

2   and location was you're in violation of blocking the street, and

3   you need to leave.  You need to disperse; right?

4   A    They gave that reason, yes.

5   Q    Okay.  And so a protester comes up to the officers and

6   says, all right, well, if I'm not blocking the street, can I

7   stay?  Right?  Is that right?

8   A    Correct.  That's what it sounded like, yes.

9   Q    Can you think of any reason why he could not stay if he was

10  not blocking the street?

11  A    I don't know the circumstances, what was going on there.

12  It's a whole -- the whole circumstances.  This is, I'm looking

13  at one camera with one individual.

14  Q    Would you have liked to see an officer respond to this

15  guy's question?

16  A    I think probably during this protest, officers probably

17  don't have a lot of conversation back and forth, because most of

18  the conversation was derogatory towards them.  Could he have

19  responded?  I suppose he could have.  He obviously chose not to.

20  Q    Well, he's trying to comply with the law; right?  And

21  whatever the officers are telling him, he's trying to comply;

22  right?

23  A    I don't know what he's trying to do.

24  Q    Okay.  Can you identify a single instance, the day and

25  location, when a dispersal order was given to the crowd other

20-cv-1878-RBJ    PATRICK PHELAN - Direct    03-15-2022

1    than at this location on May 28th at 14th and Sherman?

2    A    I don't know.  I can't say if others were given or not.

3    Q    Okay.  Now, you said your call sign was Adam nine or A9;

4    right?

5    A    Correct.

6    Q    And Lieutenant Williams was call sign 100; correct?

7    A    Could have been 100.  Could have been 1100.  I'm not sure

8    what his call sign is.

9    Q    Well, if I show you a list of call signs, would that

10   refresh your recollection?

11   A    It was a supervisor -- 100 or 1100 would be a supervisor

12   from District 1, yes.

13   Q    Can I have the Elmo.  I'm showing you Exhibit 788.

14   A    You want a response?  I'm sorry.

15           MS. WANG:  Is there an objection?

16           MS. BIRKHOLZ:  No objection if you're offering it.

17           THE COURT:  All right.  718 is admitted.

18           MS. WANG:  788.

19           THE COURT:  Oh.  788.  All right.  Admitted.

20   Q.    (By Ms. Wang) Commander Phelan, do you see the document

21   up on the screen?

22   A    Yes.  It looks like a roster of officers.

23   Q    All right.  And J. Williams, Lieutenant Williams is 100;

24   right?

25   A    Correct.

20-cv-1878-RBJ   PATRICK PHELAN - Direct   03-15-2022

1   Q    Okay.  Now, so when you talk on the radio with your

2   officers, they give their call sign; right?

3   A    Mm-hmm.  Yes.

4   Q    Okay.  Now, on the evening of May 31st, 2020, which is day

5   four of the protest, you were coordinating with your officers in

6   the same way you did during other days of the protest; right?

7   A    Yes.

8   Q    You were in the command post; right?

9   A    Yes.

10  Q    And you were looking at HALO video at the time; right?

11  A    Could be.

12  Q    Well, you were probably looking at the HALO video at that

13  time; right?  If you were coordinating the actions of your

14  officers?

15  A    Could be, yes.  There's several things going on.  Was HALO

16  available?  Was I looking at it?  Sure.

17  Q    And were there actual HALO camera operators in the command

18  post with you?

19  A    Yes.

20  Q    And there were two of them?

21  A    Usually two.  Yes, ma'am.

22  Q    So, then would you give them instruction on, you know, I

23  want to see this intersection or this location?  Can you zoom in

24  here?  Things like that?

25  A    Yes.

20-cv-1878-RBJ    PATRICK PHELAN - Direct    03-15-2022

1   Q    Okay.  So, those two HALO camera operators would pull up

2   whatever you needed to see to see what was going on; right?

3   A    Usually, yes.

4   Q    Okay.  And on May 31st, 2020, at 9:37 p.m., you were

5   coordinating teams of officers to make protests -- to make

6   arrests of protesters in front of the Basilica on Colfax between

7   Logan and Pennsylvania; right?

8   A    Okay.

9   Q    Is that right?

10  A    Yes.  Could be.  You're telling me what I was doing.  I

11  mean, I could have been doing that.

12  Q    Okay.

13  A    I'm just -- I'm sorry.  You're saying was I doing this?

14  Was I doing that?  Could be.  I don't have anything showing me

15  that or if I was there or if I wasn't there.

16  Q    Did you listen to any radio communications in preparation

17  for your testimony here today?

18  A    I heard some radio communication, yes.

19  Q    Did you listen to any radio communications from May 31st,

20  2020?

21  A    Ma'am, there was so much radio communication over five or

22  six days, you just have to point out, and I will listen to it

23  all you want.  Trying to pick out one or two radio transmissions

24  over five days, I'm just trying to get acclimated to where

25  you're at, trying to help you.

20-cv-1878-RBJ   PATRICK PHELAN - Direct   03-15-2022

1  Q     There was a team of Aurora officers under your command;

2  right?

3  A     There was Aurora officers there, yes.

4  Q     And there was a team of Denver officers under your command;

5  right?

6  A     Yes.

7  Q     And from 9:37 to 9:40 p.m. on May 31st you communicated

8  with an Aurora captain named Captain Stephen Redfearn as well as

9  DPD Lieutenant JD Williams; right?

10 A     Yes.

11 Q     And you communicated with them over the radio; right?

12 A     Yes.

13        MS. WANG:  Let's take a look at your -- or listen to

14 your radio communications, Exhibit 723.  Is there an objection?

15        MS. BIRKHOLZ:  No objection.

16        THE COURT:  All right.  That's admitted.

17        MS. WANG:  Can we play clip one.

18        (An audio recording was played.)

19 Q.    (By Ms. Wang) So, you're telling the Aurora officers in

20 that clip to hold off on moving forward; right?

21 A     Yes.  That was me.

22 Q     Okay.  And so at that time, there was a group of Aurora

23 officers at Colfax and Pearl.

24 A     Okay.

25 Q     Is that right?

20-cv-1878-RBJ   PATRICK PHELAN - Direct   03-15-2022

1   A   Yes.

2   Q   Okay.

3   A   You refreshed me when I heard that.  That's all I was

4   asking for.

5   Q   Sure.  So, let's play -- let's see what happens next.

6   We're going to play clip two.

7        (An audio recording was played.)

8   Q   All right.  So, here, Adam nine to 100.  That's you to

9   Lieutenant Williams; right?

10  A   Yes, ma'am.

11  Q   And then you also say Adam nine to 200.  That's Lieutenant

12  Porter; right?

13  A   Yes.

14  Q   Okay.  And then 100 responds and says, go ahead.  So, then

15  you give him an instruction; right?

16  A   Yes.

17  Q   And you ask him, do you have any mobile resources you can

18  send up on Colfax; right?

19  A   Yes, ma'am.

20  Q   And Lieutenant Williams, 100, says we can bring up a whole

21  team if you'd like; right?

22  A   Yes, ma'am.

23  Q   Okay.  Let's play clip three.

24       (An audio recording was played.)

25  Q   So, here, you were talking to Lieutenant Williams, and he

20-cv-1878-RBJ   PATRICK PHELAN - Direct   03-15-2022

1  tells you that they're at Colfax and Broadway; right?

2  A    Yes.

3  Q    And you want to make some arrests?

4  A    Correct.

5  Q    Okay.  And those arrests were for curfew violations,

6  because there was a curfew on this day; right?

7  A    Yes, ma'am.

8  Q    Okay.  And let's play clip four.

9       (An audio recording was played.)

10  Q    Okay.  So, you tell Lieutenant Williams, Aurora is pushing

11  towards you.  Let's go in and make some arrests; right?

12  A    Yes.

13  Q    Okay.  And so you've got Aurora at Colfax and Pearl; right?

14  Which is east of the Basilica; right?

15  A    Yes, ma'am.

16  Q    And then you've got Lieutenant Williams and his team west

17  of the Basilica on Colfax; right?

18  A    Yes.

19  Q    He said he was at Colfax and Broadway?

20  A    He's west, yes.

21  Q    The Basilica is between Logan and Pennsylvania on Colfax;

22  right?

23  A    Correct.

24  Q    Okay.  So, you're telling them, let's push together and

25  make some arrests?

Kevin P. Carlin, RMR, CRR

20-cv-1878-RBJ    PATRICK PHELAN - Direct    03-15-2022

1   A    Correct.

2   Q    Okay.  Let's play clip five.

3        (An audio recording was played.)

4   Q    Okay.  So, in this section of radio communications, you're

5   communicating with Aurora, Jeff. Co., and Lieutenant Williams;

6   right?

7   A    Correct.  I don't think I heard Jeff. Co. there, ma'am.

8   I'm sorry.

9   Q    Well, at the beginning, Jeff. Co. says we're going to go

10  ahead and grab our Bearcat from the 1600 block of Washington and

11  start moving westbound on Colfax.  Did you hear that?

12  A    I didn't hear that, but I believe you.

13  Q    Jeff. Co. was with Aurora; right?

14  A    Could have been at that point.  We moved different assets

15  to different locations.  They turned out to be not always with

16  the same contingency of people.

17  Q    Point is that you were telling these groups of officers,

18  teams of officers, Aurora and Jeff. Co. on one side and DPD on

19  the other side to push into each other on Colfax; right?

20  A    What was happening that I recall is we had a large group

21  going eastbound on Colfax towards District 6.  So, we've had

22  information about trying to firebomb District 6 or take over

23  District 6.  We had a very large group heading that direction.

24  Aurora had stopped and held a skirmish line, it sounds like at

25  Colfax and Pearl, and I couldn't hear exactly.  And we had other

20-cv-1878-RBJ    PATRICK PHELAN - Direct    03-15-2022

1   officers coming that direction to assist them.  Also, we wanted

2   to make arrests because of curfew violations, yes.

3   Q    So, you specifically remember that there -- you received

4   intelligence or some sort of information that there were

5   protesters marching east on Colfax to firebomb the station?

6   A    No.  We had that information for days.  That was one of the

7   first information that -- that's why we were concerned about

8   several locations throughout the city.  That's why we set up

9   fencing around District 6, and set up fencing --

10  Q    Are you going to show me some document that says we had

11  information that this group on May 31st at 9:36 p.m. marching

12  east towards the police station was going to firebomb the

13  station?

14  A    I think we had document -- I recall seeing documentation

15  about firebombing District 6.

16  Q    You can't tell me that that had anything to do with this

17  group?

18  A    Could have been any group.  That was information we had.  I

19  don't know who was going to perpetrate that, but we had that

20  information about District 6.

21  Q    You don't say anything about that on this radio

22  communication; right?

23  A    I didn't, no, but we set up a skirmish line to block people

24  from going to District 6.

25  Q    At this time, on the radio communications we just listened

20-cv-1878-RBJ   PATRICK PHELAN - Direct   03-15-2022

1  to, Aurora said we own Colfax from -- we own the street from

2  Clarkson to Pennsylvania.  They had already pushed people away

3  from District 6; right?

4  A    It's on the way up to District 6.  That's the route they go

5  up to District 6.  They leave the capitol, march up Colfax to

6  District 6.

7  Q    Okay.  But at the time you were telling arrests to be made

8  in front of the Basilica, there was nobody in front of District

9  6 or anywhere near it because Aurora and Jeff. Co. had already

10  pushed people west?

11  A    That was by design.  We didn't want them to go to District

12  6.  That's why there was a skirmish line there.

13  Q    Okay.  So, let's focus on the arrest that you ordered in

14  front of the Basilica on Colfax.  So, Lieutenant Williams comes

15  in at the end of the last clip we listened to and said we're at

16  Colfax and Grant now, but we're going to be pushing into each

17  other; right?

18  A    Mm-hmm.

19  Q    Is that a yes?

20  A    Yes.

21  Q    Okay.  And you were fine with that; right?

22  A    They were going to be at -- yes.  Fine.  I was fine.

23  Q    That's what you wanted; right?

24  A    No.  I wanted to make arrests.

25  Q    Okay.  Let's play clip six.

20-cv-1878-RBJ   PATRICK PHELAN - Direct   03-15-2022

1    (An audio recording was played.)

2  Q    You wanted to push them there and get them and make

3  arrests; right?

4  A    Yeah.  They were at a certain location.  We wanted to go up

5  to that location and make arrests.

6  Q    And you wanted the protesters surrounded from both sides;

7  right?

8  A    No.  We just wanted resources there to make arrests.

9  Q    This action that you ordered your teams of officers to take

10 was authorized not only by you, but also permitted in the crowd

11 management manual; right?

12 A    No.  It's not -- what tactic are you talking about that's

13 permitted?

14 Q    Well, the crowd management manual says that you were

15 allowed to encircle protesters for the purpose of arrests;

16 right?

17 A    It could be in there.

18 Q    It could be in there?

19 A    Yeah.  I believe, yes.  It is.

20 Q    All right.  Let's show Exhibit 452.  Page nine.  Okay.

21 Scroll down a little bit.  So, right here, this is the crowd

22 management manual.  It says a police line will not be used to

23 encircle or substantially encircle any part of an assembly

24 unless the following three circumstances exist.  And then it

25 gives three circumstances; right?

20-cv-1878-RBJ    PATRICK PHELAN - Direct    03-15-2022

1   A     Yes.

2   Q     Okay.  And so it says to provide for safety of the

3   demonstrators or when there is a probable cause to believe that

4   a significant number or percentage of the persons encircled

5   committed unlawful acts; right?

6   A     Mm-hmm.

7   Q     Is that right?

8   A     Yes.

9   Q     And you believe that you had the basis to arrest these

10  people because they were out after curfew; right?

11  A     Probable cause to arrest them, yes.

12  Q     Right.  And then the police have the ability to identify

13  those individuals as violators, and you had that ability,

14  because the people were out after curfew; right?

15  A     Right.  Yes.

16  Q     And you decided to arrest them; right?

17  A     We were making arrests, yes.

18  Q     Okay.  So, what you ordered in front of the Basilica on

19  May 31st, 2020, between 9:36 and 9:42 p.m. was not only

20  authorized by you, but allowed and authorized by the DPD crowd

21  management manual; right?

22  A     The purpose was -- and I never said let's surround them.

23  That wasn't the -- we were going up there to make arrests.  We

24  wouldn't want to have any type of giant confrontation.  We would

25  make arrest -- and the best way we made arrests was on the

20-cv-1878-RBJ   PATRICK PHELAN - Direct   03-15-2022

1  fringe.  We wouldn't send officers inside the big crowd like

2  this to try to arrest people.  So, we sent officers -- and

3  that's why I wanted everybody mobile, so if they encountered

4  anybody, they could make those arrests.  But we also lead a

5  scout car up to that location to be ready to accept arrests.

6  Q    During the time that you were in the command post telling

7  your officers or teams of officers to push into each other,

8  you're watching the HALO footage; right?

9  A    Yes.

10  Q    And on that HALO footage, you could see that Aurora

11  officers were pushing east with gas; right?

12  A    Yes.  I believe more officers had taken some sort of

13  explosives -- somebody threw explosives at them at that

14  location.

15  Q    Did we hear that on the radio communications we just

16  listened to?

17  A    No, I didn't.

18  Q    Is that something that they called you on the cell phone?

19  A    Could be we had information that there -- it could -- yes.

20  I don't recall where I got that information.  I testified before

21  I got information coming at me several different directions.

22  Q    So, I just want to be clear, because we were talking over

23  each other a little bit there.  This information about Aurora

24  taking explosives and therefore needing to use gas, that was not

25  on the radio; right?

20-cv-1878-RBJ   PATRICK PHELAN - Direct   03-15-2022

1   A    No.  It was on -- I think it was on video I saw.

2   Q    Okay.  All right.  So, you're not saying they called you on

3   the phone and told you that?

4   A    I don't recall where I got that information from, ma'am.

5   Q    All right.  Let's show Exhibit 547.  All right.  So, this

6   is the footage that you were -- this was previously admitted,

7   Exhibit 547.  This is footage that you were watching while you

8   were in the command post; right?

9   A    Yes.

10   Q    Okay.  And we can scroll through towards the end.  Maybe

11   play it from about there.  Keep going.

12       (A video was played.)

13   Q    So, at this time, there is Aurora officers pushing forward

14   with tear gas; right?

15   A    Yes.

16   Q    And that is something that you authorized; right?

17   A    Or the commander at that location did.

18   Q    Well, did you hear that on the radio?

19   A    I'm sorry?

20   Q    Did you hear that Aurora commander on the radio saying,

21   Commander Phelan, incident commander, we're going to use tear

22   gas because there are people throwing things at us?

23   A    Well, tear gas was deployed at that location.  I'm sure he

24   had a reason to deploy it.

25   Q    And you allowed that to happen?

20-cv-1878-RBJ   PATRICK PHELAN - Direct   03-15-2022

1   A   As I did in every briefing, if it was an engagement, they

2   are allowed to use a less-lethal and chemical agent when they

3   see fit.

4   Q   This action right here -- and we can pause it -- that we

5   see in Exhibit 547 was authorized by you and DPD practice,

6   policy, and training; right?

7   A   Yes.

8   Q   Okay.  Let's take a look at Exhibit 546.

9       (A video was played.)

10  Q   Now, this has also been previously admitted.  So, you're

11  also watching this HALO camera at Colfax and Logan at the time

12  of this incident; right?

13  A   Could be.

14  Q   Okay.  And you can go ahead and play and scroll through.

15  You can just scroll through.  So, at this time, you see

16  protesters filling this block; right?

17  A   I see a lot of protesters filling the block, yes.

18  Q   And you're watching all of this at the time it's happening;

19  right?

20  A   I believe so.

21  Q   Okay.  And you know that there's the Basilica on the left,

22  on the north side of the street; right?

23  A   Yes.

24  Q   And that there's a large fence that's six feet high with

25  metal spikey things on top; right?

20-cv-1878-RBJ   PATRICK PHELAN - Direct   03-15-2022

1   A    Yes.

2   Q    And you know that on the other side of this street, there

3   are buildings and just a small narrow alleyway; right?

4   A    Correct.

5   Q    And you know that on one side, on the east side, there's

6   Aurora officers tear gassing the crowd.  You can see that in the

7   distance here; right?

8   A    It looks like it's some sort of explosion there.  That's

9   not tear gas.

10  Q    You don't think that was a flash-bang that just exploded

11  back there?

12  A    Uh-uh.

13  Q    All right.

14  A    That's got color -- that has color to it.

15  Q    Did Aurora have any sort of explosives that you weren't

16  aware of?

17  A    I don't think anybody deployed any explosives.

18  Q    You don't think anybody deployed any explosives at this

19  intersection?

20  A    No.  It looked like -- I don't know what was deployed at

21  that intersection.  It looks like an explosion.  There's color.

22  Q    There's gas, though; right?

23  A    Yes.

24  Q    All right.  And so you knew these officers were here

25  deploying gas on the people in this block; right?

Kevin P. Carlin, RMR, CRR

20-cv-1878-RBJ   PATRICK PHELAN - Direct   03-15-2022

1   A     Yes.

2   Q     And you knew that you were sending a team of officers in

3   from this side, and we can't see them on camera yet; right?

4   A     Right.

5   Q     Okay.  And how did you -- did you expect that these

6   people -- you wanted to do this so that you could arrest these

7   people here for violating the curfew; right?

8   A     We were sending officers to that location to make arrests

9   if we could, yes.

10  Q     Okay.  Nothing that the officers did, either the -- strike

11  that.  Nothing that the officers did during this incident was

12  inconsistent with DPD policy, training, or practice; right?

13  A     No.

14  Q     Is that right?

15  A     Right.  It looks like they were attacked, or there's an

16  explosion up in front of Aurora.  Gas is deployed on the crowd.

17  Q     Are you saying that from watching this video, you think

18  they were attacked?

19  A     Yeah.  From -- we don't deploy anything that has color.  I

20  don't know.  It looks like there was an explosion there at that

21  location.  That's all I can testify to.

22  Q     Okay.  Did you hear any radio communication where the

23  Aurora officers were saying, we're being attacked, we need to

24  gas these people?

25  A     I don't recall.

Kevin P. Carlin, RMR, CRR

20-cv-1878-RBJ   PATRICK PHELAN - Direct   03-15-2022

1   Q    Okay.  You would expect that if that had happened, that

2   would be on the radio communications; right?

3   A    Could be, yes.

4   Q    And we certainly didn't hear that in the clip that we just

5   listened to; right?

6   A    Correct.

7   Q    Okay.  Have you ever heard anything like that on the radio?

8   A    I don't know if on the radio.  I did get information that

9   there was -- taking explosives or fireworks, I thought at that

10  location.

11  Q    You would agree that this -- these -- this is a stoplight,

12  these colors that are changing back there; right?

13  A    It was part of that, ma'am.  It was green, I saw.  If you

14  want to play it back.

15  Q    Okay.  Now, you can take that down.  You created the

16  operations -- sorry.  We already covered that.  So, part of an

17  operations plan is developing a plan for traffic so that

18  protesters are safe; right?

19  A    Yes.

20  Q    Okay.  And you want to make sure that people can safely and

21  peacefully exercise their rights and not get run over by cars?

22  A    It's difficult sometimes, but yes.

23  Q    Okay.  And part of your traffic plan is to make sure that

24  you block all the intersections so that people can pass through

25  without getting hit; right?

20-cv-1878-RBJ    PATRICK PHELAN - Direct    03-15-2022

1   A    We try to do that.  Unfortunately, the protesters, and this

2   is something we facilitate for them to make them safe, but

3   unfortunately, sometimes they walk counterflow in traffic.  They

4   usually disregard the traffic signals.  So, we have to scramble

5   as fast as we can to try to stop traffic for their safety, and

6   also for safety for vehicle -- people in their vehicles coming

7   into that area too.

8   Q    Well, there's plans that you can develop beforehand; right?

9   For shutting down traffic, because you know that protesters are

10  going to come to areas like public parks and the state capitol;

11  right?

12  A    Yeah.  It's fluid and dynamic.  We're based on how many

13  locations they're moving to and where they're moving from.  It's

14  not like there's a plan that we could say okay, plan A, because

15  they are at this location.  We can on certain occasions

16  anticipate where they want to go, and we try to get ahead of

17  that so that we do have a safe environment.

18         So, we know in most cases at the capitol, they will

19  step off onto Lincoln.  So, we try to preset people at Lincoln

20  and 14th or 13th, so as soon as they step off, we create a safe

21  zone for them to start walking, and they usually go up and down

22  the mall.  In this instance, they went everywhere all during the

23  day and evening.

24  Q    Sure.  And so perhaps on the first day -- well, let me ask

25  you this:  Before the protest began on the first day, had you

20-cv-1878-RBJ   PATRICK PHELAN - Direct   03-15-2022

1  developed any plan for shutting down traffic that you put into

2  an operations plan or anywhere else?

3  A    Yes.  The traffic operations is responsible for that.

4  Q    So, what lanes of traffic, and on what streets did you shut

5  down?

6  A    Well, we based it -- it's mobile.  It's fluid.  It's

7  dynamic, so wherever we need to.  We can't say, okay, shut that

8  down.  Well, that's great, but there's nobody there.  We have to

9  be fluid with that.  We have to make decisions based on the

10 behavior of the crowd and where they're marching.

11 Q    Okay.  After the first day -- so, you had indicated before

12 that perhaps you don't always know where the protest is going to

13 happen, just kind of depends on where people gather; right?

14 A    Mm-hmm.  Yes.

15 Q    And but after the first day, you certainly understood that

16 there were people gathering in and about the state capitol;

17 right?

18 A    Yes.

19 Q    So, that would include Lincoln; right?

20 A    Yes.

21 Q    That would include Colfax; right?

22 A    Yes.

23 Q    Colfax in the area of the state capitol is a very busy

24 road; right?

25 A    Absolutely.

20-cv-1878-RBJ   PATRICK PHELAN - Direct   03-15-2022

1   Q    And that might also include the south side of the capitol,

2   which is 14th; right?

3   A    It can, yes.

4   Q    Okay.  And so after the first day, you had a good

5   indication of where people were going to go and where you might

6   need to shut down traffic; right?

7   A    Like I said, it's a fluid movement.  Unfortunately, during

8   this protest, some of the traffic officers were assigned

9   intersections, and they were taking rocks and bottles.  So, we

10  had to abandon a couple locations, a couple static traffic

11  locations, because the officers couldn't remain at their post

12  there.

13  Q    On May 30th, at Lincoln and Colfax at 5:50 p.m., you

14  ordered officers to push protesters south of Colfax; right?

15  A    Yes.

16  Q    Did you order the officers to shut down Colfax before you

17  did that?

18  A    We would try to.

19  Q    Well, did you, or did you not?

20  A    I'm sure I did.

21  Q    Okay.  Let's show Exhibit 656.  Now, you can forward a

22  little bit.  This has already been admitted.  You can forward

23  towards the end.

24       (A video was played.)

25  Q    Let's pause here.  Go back a little bit so we can see the

20-cv-1878-RBJ   PATRICK PHELAN - Direct   03-15-2022

1   cars on Colfax.  So, there we go.  Now, this is -- you recognize

2   this to be the intersection of Lincoln and Colfax; right?

3   A    Yes.

4   Q    There's cars on Colfax still; right?

5   A    Trying to get to -- yes.

6   Q    And just so that we're on the same page, this date and time

7   is six hours ahead of what we actually -- what it actually was,

8   so this is actually 5:49 p.m. on May 30th; right?

9   A    Yes.

10  Q    Okay.  So, Colfax had not been shut down -- let me back up.

11  These officers are pushing protesters south of Colfax?

12  A    Yes.  It appears they are.

13  Q    With both gas and PepperBalls, which you ordered?

14  A    I can't tell if they're moving yet.  It looks like they're

15  stationary right now.

16  Q    Okay.  Well, the video is paused.

17  A    Okay.  That would make it look that way.

18  Q    But we would agree that Colfax does not appear to be shut

19  down; right?

20  A    There's traffic.  There's vehicle traffic on Colfax.

21  Q    All right.  So, let's move forward a little bit in this

22  video.  We will --

23       (A video was played.)

24  Q    Okay.  So, that guy nearly got run over by a car; is that

25  right?

20-cv-1878-RBJ     PATRICK PHELAN - Direct     03-15-2022

1   A     Yes.

2   Q     You had not developed any sort of traffic plan for this

3   push of protesters south of Colfax?

4   A     We did.  I recall this too.  We lost control of those

5   traffic situations based on what I told you.  I got a call from

6   command of traffic saying we had to abandon positions.

7   Q     Okay.  So, you're saying that at this particular location,

8   you had actually told officers to shut down Colfax before the

9   police officers pushed the crowd south of Colfax?

10  A     We routinely do that.  It's the first thing we try to do is

11  shut down traffic.

12  Q     I am asking about this particular instance.

13  A     I do recall in this particular instance receiving the --

14  because there's traffic.  I am seeing it.  I don't like that.

15  We don't want that situation where there's traffic.  I'm

16  concerned about the protesters.  I'm concerned about the people

17  driving to and from work with their kids, whatever.  They're in

18  the middle of that.  I am concerned about that.  If something

19  would happen -- and I recall being told, hey, we had to abandon

20  our positions.

21  Q     Who told you they had to abandon their positions so that

22  you couldn't shut down traffic?

23  A     Probably a command officer from traffic.

24  Q     A command officer from traffic?

25  A     They're on a separate radio channel, yes, or they're

20-cv-1878-RBJ    PATRICK PHELAN - Direct    03-15-2022

1  calling me on the phone.

2  Q    So, we don't have radio communications that would support

3  what you're saying.  Is that what you're saying?

4  A    I'm just telling you what the situation was.

5  Q    I'm just asking, are you going to play some radio

6  communication from a commander from traffic that's going to

7  corroborate what you're saying about telling people to shut down

8  traffic, but you couldn't do it because they were being

9  attacked?

10 A    I was told that.  And obviously, I wouldn't have allowed

11 that situation to happen the way that happened.  We do not want

12 traffic inside protesters.  Once -- we got several calls from

13 people who accidentally get in with the crowd, or the crowd

14 would be moving, and we didn't get ahead of it far enough, and

15 they would be pedestrian -- vehicle traffic would be there, and

16 we'd get calls from people saying the protesters thought it was

17 funny to walk on their cars, push them, and they're scared to

18 death.  We try to avoid having vehicles and protesters together

19 at the same time.  It just doesn't make sense.  That's not a

20 good application.

21 Q    I get that.  What I'm asking you is you're telling us today

22 that during this specific incident you actually did ask for

23 traffic on Colfax to be shut down, but it couldn't be done.  Is

24 that going to be corroborated by any piece of paper or any radio

25 communications or any evidence whatsoever?

20-cv-1878-RBJ   PATRICK PHELAN - Direct   03-15-2022

1    MS. BIRKHOLZ:  Objection.  Speculation.

2    THE COURT:  Yeah.  It's not for him to be the person

3    putting on evidence.  He's just a witness here.

4    Q.    (By Ms. Wang) On May 28th, day one of the protest, at

5    about 9:47 p.m., you ordered officers to push protesters north

6    on Lincoln; correct?

7    A    Yes.

8    Q    Okay.  And north of Lincoln -- and that was in front of the

9    state capitol; right?

10   A    1400 block, yes.

11   Q    I'm sorry.  What?

12   A    1400 block of Lincoln is in front of the state capitol.

13   Q    That's right.  So, if there are protesters who were in

14   front of the state capitol on Lincoln and you order officers to

15   push them north, that is towards Colfax; right?

16   A    Correct.

17   Q    Did you develop a traffic plan for that?

18   A    I'm sure we tried to close Lincoln and 14th.  Or maybe even

19   13th.

20   Q    Did you tell your officers to do that over the radio?

21   A    I'm communicating with -- traffic is on a different radio

22   channel.  So, they're trying to move around.  Like I said, it's

23   dynamic.  It's fluid.  They are moving forward.  They have all

24   their resources dedicated to the protest, trying to stop traffic

25   when we can.

Kevin P. Carlin, RMR, CRR

20-cv-1878-RBJ    PATRICK PHELAN - Direct    03-15-2022

1   Q    Do you specifically -- okay.  Let's play Exhibit 529.  All

2   right.  So, this is the incident that we've -- this has been

3   previously admitted, Exhibit 529.  So, this is a group of

4   protesters in front of the state capitol at 9:48 p.m. on

5   May 28th, day one of the protest.  Let's play the video.

6        (A video was played.)

7   Q    All right.  So, the traffic is going on Colfax; right?

8   A    I can't see.  It looks like there's some traffic there,

9   ma'am.

10  Q    Okay.  It does not -- I mean, there was cars here, and

11  there's cars here; right?

12  A    Yes.  It looks like to be cars, yes.

13  Q    Colfax was not shut down before you ordered these officers

14  to gas people and push them into Colfax; right?

15  A    It should have been shut down.  It might have been shut

16  down prior to them having to leave their posts.

17  Q    I'm sorry.  What was the last part?

18  A    It would have been shut down.  We would coordinate that to

19  shut down traffic prior to deploying a chemical agent.

20  Obviously something happened, and it wasn't shut there.  We

21  don't want that situation where there's vehicles there,

22  obviously.

23  Q    All right.  Let's show Exhibit 598.  Let's play this one.

24       (A video was played.)

25  Q    Pause it.  Now, that's you; right?  You said as soon as you

20-cv-1878-RBJ   PATRICK PHELAN - Direct   03-15-2022

1    get there, launch.  Throw smoke first, then chemical right

2    after?

3    A    Yes.

4    Q    You didn't say anything about shutting down traffic; right?

5    A    Well, I wouldn't be talking on that channel to say that.

6    Q    Okay.  So, you agree that traffic was not in fact shut

7    down.  You just don't know why?

8    A    I received information several times during these days

9    traffic had to leave their posts because they were being

10   assaulted by protesters or rioters.  Several times that

11   happened.

12   Q    Are the traffic police dressed differently than the other

13   officers were?

14   A    Yes.

15   Q    What do they wear?

16   A    They wear standard A uniform.  They got a badge, a blue

17   uniform.  They're in just cars, usually by themselves.

18   Q    And did they have yellow or orange vests that indicate that

19   they're traffic cops?

20   A    They can wear those too.

21   Q    Do you know if they were wearing those?

22   A    They're supposed to wear those.  If they're outside their

23   vehicle doing traffic, they're supposed to wear those, yes.

24   Q    Do you have a specific recollection that at this incident

25   at 9:47 p.m. on day one of the protest there were traffic cops

20-cv-1878-RBJ   PATRICK PHELAN - Direct   03-15-2022

1   that were assaulted by police officers, and that's why you

2   couldn't shut down Colfax?

3   A     Assaulted by protesters?

4   Q     I'm sorry.  Protesters.

5   A     The traffic operation is the integral part of these

6   protests.  So, they know their job and what their assignments

7   are supposed to be, and we give them direction to do that.  We

8   wouldn't want the situation where there's vehicles with

9   protesters with gas.  That's not acceptable to me.  We don't

10  want that situation.  Something happened to let those vehicles

11  through.  So, we stopped traffic.  If they know which way we're

12  going to go, they will attempt, try to stop traffic, and that's

13  their assignment to do that.

14  Q     Okay.  So, you have a recollection of talking on the radio

15  to traffic, a separate channel, and telling them to shut down

16  Colfax?

17  A     It could have been on a separate channel.  It could have

18  been my phone.  We did every -- you know, whatever we did.  I

19  might even have had a rep.  Could have been one of those days I

20  think we had a rep from traffic in the command post.

21  Q     Why couldn't these protesters be here at this time and

22  location?

23  A     I don't know what the situation was.

24  Q     Well, you --

25  A     I'm getting information from somebody what's happening.

20-cv-1878-RBJ   PATRICK PHELAN - Direct   03-15-2022

1  He's telling me -- whoever the command officer is, he's telling

2  me whatever, we're taking rocks and bottles.  I don't know what

3  the situation is.  We've got -- cars got in.  We got surrounded.

4  I don't know what the situation is.  All I know is I'm getting

5  information from someone.

6  Q    Well, actually, during this incident, there's nothing on

7  the radio about taking rocks and bottles.  Do you actually

8  remember getting information from somebody during this

9  particular incident that there were rocks and bottles?

10 A    Ma'am, I don't know what information I'm getting, is what

11 I'm saying.  It could be what -- I don't know what the situation

12 is.  I'm getting information from someone that the chemical

13 agent needs to be deployed.  I'm deploying some smoke first.  We

14 like to deploy smoke first for two reasons.  It shows us which

15 way the wind is blowing and which way that gas or smoke will go,

16 number one.  And why I like to do it, primarily is people think

17 it's chemical agent, and they will leave.

18 Q    So, my question to you is do you have a specific

19 recollection of why these protesters could not be protesting on

20 Lincoln on day one at 9:47?

21 A    No.  It looks like the crowd is pretty amped up, but no, I

22 don't.

23 Q    You think this crowd is amped up?

24 A    It looks like there's some yelling and screaming going on,

25 yeah.  It looks like they're amped up.

20-cv-1878-RBJ   PATRICK PHELAN - Direct   03-15-2022

1   Q    Is chanting -- is chanting unusual at a protest?

2   A    No.  This is -- this time of night, you know, and they're

3   down blocking a major thoroughfare, you know, we're concerned

4   about the crowd, obviously.

5   Q    Have you -- did you see anything in this video or the last

6   one of this incident indicating that this crowd was being

7   violent?

8   A    They're going somewhere, and they're directed somewhere.

9   But the last video, they're going up to District 6, which

10  concerns me.  And this video, and whatever information I'm

11  getting, obviously concerns me.

12  Q    But you don't recall what information --

13  A    I don't recall.  No, ma'am.

14  Q    Okay.  Now, let's show Exhibit 626.  All right.  So, this

15  has been previously admitted.  It's from day three, 4:02, at

16  Colfax and Washington.

17          THE COURT:  I don't have it as admitted.  Is it 626?

18          THE COURTROOM DEPUTY:  Yes, Your Honor.

19          THE COURT:  I missed it, then.

20          MS. WANG:  Let's play it.

21      (A video was played.)

22  Q.    (By Ms. Wang) Let's pause it.  What was the tactical

23  objective going on here?

24          MS. BIRKHOLZ:  Objection, Your Honor.  Speculation.

25          THE COURT:  Overruled.

20-cv-1878-RBJ    PATRICK PHELAN - Direct    03-15-2022

1   THE WITNESS:  I'm trying to get acclimated here.  This

2   camera is pointing, it looks like it's pointing north to south;

3   is that correct?

4   Q.    (By Ms. Wang) That's right.  And let me orient you.

5   That's a good point.

6   A    I have it.

7   Q    You've got it?

8   A    I have it now.  Thank you.

9   Q    All right.  So, the officer with this camera is looking

10  south, and he's standing on Washington facing Colfax.  There's

11  been tear gas that's been thrown, an explosive, and there's

12  PepperBalling.  Was there a tactical objective that was

13  happening that justified what the officers were doing here?

14           MS. BIRKHOLZ:  Objection, Your Honor.  Lacks

15  foundation.

16           THE COURT:  If you know.

17           THE WITNESS:  Your Honor, obviously this is right in

18  front, right across the street from District 6.  So, I couldn't

19  tell you what happened.  I know it's popular to throw

20  projectiles from around the corner, but no, I can't.  I can't

21  tell you.

22  Q.    (By Ms. Wang) Okay.  Showing you Exhibit 338.  Now, just

23  to orient you, this is a body-worn camera from an Aurora officer

24  previously admitted.  It's at May 30th at 7:06 p.m.  Go ahead

25  and play it.

Kevin P. Carlin, RMR, CRR

20-cv-1878-RBJ   PATRICK PHELAN - Direct   03-15-2022

1    (A video was played.)

2    Q    All right.  There were two gang unit officers that threw

3    explosives into the crowd; right?

4         MS. BIRKHOLZ:  Objection, Your Honor.  Speculation.

5    Lacks foundation with respect to this line of inquiry.

6         THE COURT:  Yeah.  Sustained.

7    Q.    (By Ms. Wang) What was the tactical objective here?

8         MS. BIRKHOLZ:  Same objections.

9         THE COURT:  Overruled.

10         THE WITNESS:  I believe -- looking at this, I think

11    the line officers were there to -- there was a large gathering

12    of stones and rocks that we were trying to remove.  So, I don't

13    know, without getting information of the circumstances, at that

14    time and that place, I don't know.  There was no explosive

15    thrown.  I don't know your reference to explosives.

16    Q.    (By Ms. Wang) Was it tear gas canisters?

17    A    Could have been.

18    Q    Okay.  So, the intersection of Lincoln and Colfax -- or,

19    sorry.  Strike that.  The pile of rocks you were talking about

20    is a pile of rocks that was at the RTD station at Colfax and

21    Broadway; right?

22    A    Right.  There were some rocks there.  We had them removed.

23    They were -- yes.

24    Q    Right.  And on May 30th, that's part of the reason that you

25    had officers push protesters south of Colfax; right?

20-cv-1878-RBJ   PATRICK PHELAN - Direct   03-15-2022

1    A    Yes.

2    Q    And then you had officers form a skirmish line going across

3    Colfax all the way from Lincoln to Broadway; right?

4    A    Yes.

5    Q    Okay.  And then for the ensuing two hours, the officers

6    under your command at this intersection repeatedly gassed and

7    threw explosives into the crowd; right?

8    A    I don't know.  We had --

9         MS. BIRKHOLZ:  Lacks foundation, speculation.

10        THE COURT:  Overruled.

11        THE WITNESS:  We had set up that perimeter, and we had

12   to stay there for a significant amount of time, because

13   unfortunately, it took that amount of time to remove the -- I

14   was going to say ammunition for the protesters, but those rocks.

15   And more importantly, we had public works employees, civilians,

16   removing that, and we didn't want them to be left unprotected.

17   Q.    (By Ms. Wang) Okay.  But having a skirmish line of

18   officers surround or protect a pile of rocks just in case

19   there's people who get a bad idea in terms of using the rocks to

20   throw them, that doesn't have anything to do with throwing

21   explosives into the crowd; right?

22   A    We were -- we were set there to remove the rocks, because

23   we had video of people loading rocks into their backpacks and

24   using them against the police.  So, we thought we needed to

25   remove that ammo, or remove their ability to take those rocks

20-cv-1878-RBJ   PATRICK PHELAN - Direct   03-15-2022

1  from that location, because they were getting rocks all the time

2  from there.

3  Q   Sure.  And protecting the rocks has nothing to do with

4  gassing the crowd at the intersection.  They're two separate

5  things; right?  You can protect the rocks without gassing the

6  crowd?

7  A   We weren't really protecting the rocks.  We were protecting

8  the public works employees that were trying to remove the rocks,

9  but I don't know what's going on here as far as what happens.

10  Are they taking some projectiles towards them?  I don't know why

11  they're deploying there without being there, without getting the

12  information.

13  Q   But the actions of officers at the intersection of Lincoln

14  and Colfax from 5:30 to 8:00 p.m. were all authorized by you;

15  correct?

16  A   We were holding that skirmish line, yes.

17  Q   And they were all consistent with DPD training, policy, and

18  practice; right?

19  A   To the best of my knowledge.  I don't know exactly what's

20  happening here.

21  Q   Now --

22  A   There's a command officer there.

23  Q   Okay.  Who you are in charge of.  You're in charge of

24  whatever command officers are there; right?

25  A   Yes.  I am in charge of -- yes.  Everyone.

20-cv-1878-RBJ    PATRICK PHELAN - Direct    03-15-2022

1  Q    You're in charge of everyone.

2  A    You can't -- my point being to that is there's so many

3  different things going on.  There's looting.  They're breaking

4  windows.  It's happening not just here, but all through the

5  downtown area.  So, I'm not focusing on one thing.  That's why

6  we have area command and supervisors at this location.  Yes,

7  it's under my purview as the incident commander, but I can't

8  physically be able to observe everyone.

9  Q    At this particular location at 7:07 p.m. on May 30th, was

10  there looting happening?

11  A    Could be.  Looting was happening -- looting and breaking

12  windows, we had I don't know how many millions of dollars of

13  damage.  I think you've probably seen that, but all through

14  downtown.  I know that the federal court -- not the federal

15  courthouse.  The state courthouse, the capitol, the city and

16  county building, the Webb building, the McNichols building, all

17  in this area, were constantly being damaged.

18          THE COURT:  Let's stop here.  It's noon.  1:15, folks?

19  All right.

20      (Jury out at 12:00 p.m.)

21          THE COURT:  Okay.  1:15.

22      (Recess at 12:00 p.m., until 1:15 p.m.)

23          THE COURT:  Somebody has an issue about something?

24          MR. RINGEL:  I have two evidentiary issues with

25  Mr. Christian, who is going to be the next witness, I

20-cv-1878-RBJ   PATRICK PHELAN - Direct   03-15-2022

1   understand.  I can raise them with the Court now or whenever the

2   Court would like.

3          THE COURT:  Well, what are they?

4          MR. RINGEL:  So, Mr. Christian, as the Court

5   understands is an individual defendant related to one incident

6   involving the deployment of PepperBall involving Ms. Epps.

7          THE COURT:  I understand it, and yet I don't

8   understand it.

9          MR. RINGEL:  So, the two issues, one is

10  Mr. Christian's employment with the Denver Police Department

11  employment was terminated for his refusal to get a COVID-19

12  vaccination, and I believe that those circumstances are entirely

13  irrelevant and prejudicial under 403, because it would inject

14  anyone's viewpoints on the jury about COVID vaccination, and I

15  don't think that has any place in this trial.

16         THE COURT:  And so you want it known that he was

17  terminated, but not the reason?

18         MR. RINGEL:  I don't want it known that he's

19  terminated.  If they want to elicit that he's no longer working

20  with the police department, that's fine.  But the fact of

21  termination and the reason for termination I don't think are

22  appropriate before the jury, because it has nothing to do with

23  his work performance and nothing to do with the protests.

24         THE COURT:  Does the plaintiff disagree?

25         MR. MACDONALD:  Your Honor, our concern is that if the

20-cv-1878-RBJ   PATRICK PHELAN - Direct   03-15-2022

1    jury is aware that he's no longer employed, which they will be,

2    that they will then begin to speculate about why he's no longer

3    employed, and then it might be -- it might have something to do

4    with what he did at the protest.  And so we don't know what

5    testimony they're going to elicit from Mr. Christian, but we

6    think it -- the fact that he was terminated, that it had nothing

7    to do with the protest, and that it pertains to his vaccine is

8    relevant given we don't know what he's going to testify and what

9    position they're going to take with respect to Mr. Christian.

10             THE COURT:  All right.  I agree with the defendant.

11   Don't do it.  What's the second one?

12             MR. RINGEL:  The second issue is another event

13   involving Mr. Christian that occurred on May 29th of 2020 at

14   17th and Broadway.  And it involves the deployment of pepper

15   spray.  And I think that's a 404(b) issue, because what

16   Mr. Christian is on trial for is the event involving Ms. Epps.

17             One can make an argument that pattern and practice

18   evidence can be presented as a general matter related to the

19   City, but there's no reason to present pattern and practice

20   evidence involving Mr. Christian as part of it.  The Court is

21   well aware that all sorts of pattern and practice evidence has

22   been applied.  There's no reason to be presenting that other

23   event other than propensity, and that's inappropriate under

24   404(b).

25             MR. MACDONALD:  We have a First amendment claim

20-cv-1878-RBJ   PATRICK PHELAN - Direct   03-15-2022

1  against Officer Christian.  Mr. Christian, his intent, in the
2  instructions that you have, we need to be able to show what
3  Mr. Christian did during a couple days of protests, Your Honor.
4  It's not extensive questioning, but we think that goes to
5  intent, plan, preparation.
6      THE COURT:  The only reason that we didn't dismiss
7  Christian was because of his shooting a PepperBall and making a
8  bruise on the leg of Ms. Epps.  That's it.  I agree with the
9  defendant.  Don't do it.  Now, let's get the jury.  I don't know
10  why you kept Christian in the case.  It makes no sense.  None.
11      (Jury in at 1:18 p.m.)
12      THE COURT:  Well, I'm hearing a lot of smiling,
13  laughter coming from back there.  So, I have decided to
14  commandeer you as a permanent jury.
15      JUROR:  You need to raise that $50.  Keep us on
16  retainer.
17      THE COURT:  All right.  We will keep going with
18  Officer Phelan.
19      MS. WANG:  Commander Phelan.
20      THE COURT:  Commander Phelan.  I'm sorry.
21  Q.   (By Ms. Wang) The DPD did not conduct any joint training
22  with the agencies that you invited to the protest; right?
23  A    We have joint training.  You're talking specifically for
24  crowd control?
25  Q    Right.

20-cv-1878-RBJ    PATRICK PHELAN - Direct    03-15-2022

1    A    No.  Not recently.  Not recently.

2    Q    And when you say not recently, what do you mean by that?

3    A    We did training for the Democratic National Convention.  We

4    did training for the presidential debates, joint training.  And

5    we were constantly doing joint training with other jurisdictions

6    as far as our bomb squad, as far as our K-9s.  So, there's

7    different units within the police department based on their

8    specialties that do train together.

9    Q    But in terms of managing a protester demonstration, you did

10   not have joint trainings?

11   A    Right.  Not since then.  We've had joint training, but

12   not --

13   Q    Not since 2008, the DNC; right?

14   A    Maybe the -- I take that -- that's fine, yes.

15         MS. WANG:  Okay.  I have no -- just one moment.  I

16   have no further questions at this time.

17         THE COURT:  Okay.  Cross examination?

18         MS. BIRKHOLZ:  Good afternoon.  Your Honor, may the

19   defendants take the opportunity to briefly address the jury?

20         THE COURT:  Yes.

21         MS. BIRKHOLZ:  All right.  Thank you.  Good afternoon,

22   jurors.  You know, as you proceeded through, we're still in

23   plaintiffs' case in chief right now.  Right?  And if you

24   remember from the beginning of this trial, after the plaintiffs

25   go, then the defendants will go.  So, the plaintiffs have called

Kevin P. Carlin, RMR, CRR

20-cv-1878-RBJ   PATRICK PHELAN - Direct   03-15-2022

1   as part of their case in chief Commander Phelan, and defendants

2   would have as well.  As you've heard already, he's a pretty

3   important guy.  He's the commander of this entire operation.

4   So, instead of bringing him back here next week, we're going to

5   talk to him about what we need to talk to him as well.

6          Now, you've heard from plaintiffs' expert already.

7   You've seen the videos, which I think you remember from the

8   opening, the defendants told you, you know, some of these videos

9   are going to be difficult to watch, and I think you've seen that

10  now.  And even Commander Phelan has been shown some of those

11  videos, but now Commander Phelan is going to start to explain

12  the totality of the circumstances that officers faced with their

13  boots on the ground and from the perspective of the commander in

14  chief or the commander of this particular operation.

15         So, through him, we're going to learn those

16  circumstances.  We're going to talk about the incident command

17  center, the preparations that DPD actually did take, go through

18  the days each day.  And I'm going to try to be brief, but it's

19  very important with Commander Phelan that you understand these

20  details.

21         So, we're going to learn why DPD responded to the

22  violence and destruction as it did, and we're also going to

23  explain to you through Commander Phelan why the police response

24  balanced the rights between the community and the protesters'

25  rights.

20-cv-1878-RBJ   PATRICK PHELAN - Cross   03-15-2022

1  So, it may feel a bit long.  I appreciate that you've

2  been paying attention keenly all through -- all through now, and

3  I'm sure you will continue to do so, so thank you.

4  **CROSS EXAMINATION**

5  BY MS. BIRKHOLZ

6  Q    Commander Phelan, good afternoon.

7  A    Good afternoon.

8  Q    How's retirement treating you?

9  A    It will get better, I think.

10 Q    Commander Phelan, why did you decide to become a police

11 officer?

12 A    Probably because my father was a police officer.  That's

13 probably the most honest person I have met, so I guess like a

14 lot of people, you follow in your parents' footsteps.

15 Additionally, my great uncle was shot and killed as a Denver

16 police officer.  So, that was kind of something we cherished.

17 Q    And you said that you were in the DPD for 40 years.  What

18 year did you join?

19 A    1980.

20 Q    Now, tell us briefly about your career with DPD.  Walk us

21 through.

22 A    Well, like everyone else, I started in the academy.  After

23 the academy, I was -- to be brief, I was assigned to the patrol

24 division.  After the patrol division, I was a detective.  I made

25 the rank of detective.  After rank of detective, I was promoted.

20-cv-1878-RBJ    PATRICK PHELAN - Cross    03-15-2022

1   I went to the Metro SWAT unit, which is our tactical unit in the

2   Denver Police Department.  From there, I was promoted to the

3   rank of sergeant.  And the rank of sergeant, I went to the

4   patrol division, back to the patrol division, which is common.

5          And then I went to the gang unit.  And then I was

6   transferred back to the Metro squad, our tactical unit from

7   there.  From sergeant of the tactical unit, I made lieutenant.

8   From lieutenant, I was transferred back out to patrol, which

9   always happens.  And I was recruited back to the Metro SWAT, the

10  tactical unit.  I became commander of the Metro SWAT unit after

11  that time.  And then in 20 -- to be brief, in 2012, I was

12  appointed commander of the special operations division.

13  Q    And you retired as commander of the special operations?

14  A    Yes, ma'am.

15  Q    Okay.  So, now you just talked about a lot of positions,

16  and I'd kind of like to draw this out with the jury, if I can

17  use the Elmo.  And we're going to do a little artistic

18  experiment, if you will.  All right.  So, after you graduate

19  from the academy, where are you at?

20  A    I'm at -- I was assigned to District 3.

21  Q    Well, and I'm speaking generally.  Just DPD in general,

22  let's talk about.

23  A    I was at the bottom.  I was at the bottom.  I was at the

24  bottom.

25  Q    And what are those people called?

20-cv-1878-RBJ   PATRICK PHELAN - Cross   03-15-2022

1   A      Patrol officers.

2   Q      Okay.  And I'm going to abbreviate.  Then after patrol

3   officer, where do you promote to?

4   A      Actually, I became a technician, or an -- what's called an

5   operator in the SWAT unit.

6   Q      Okay.  So, generally speaking --

7              THE COURT:  Just to be sure, you're not marking on

8   that thing with a permanent marker?

9              MS. BIRKHOLZ:  No, I am not, sir.  Thank you.  I am

10   not.

11   Q.     (By Ms. Birkholz) So, generally speaking, just through

12   DPD, as you promote up, what is the next level of promotion up

13   at DPD?

14   A      Up would be -- well, it could be detective or technician.

15   Q      Okay.  How about for regular, you know, district officers?

16   A      It would be sergeant.

17   Q      Okay.  Now, after sergeant -- and if you could, what --

18   what kind of identification does sergeant have?

19   A      Sergeant has chevrons.  It's called a chevron.  It's like

20   three stripes.  They're usually a little bit like a sky blue

21   color.  They're easy to identify.  Our uniform is obviously very

22   dark blue, but the chevrons are on each shoulder, and they're a

23   lighter shade of blue.  Easy to identify.

24   Q      Okay.  Great.  And then after sergeant, what do you promote

25   to next?

20-cv-1878-RBJ   PATRICK PHELAN - Cross   03-15-2022

1    A    Lieutenant.

2    Q    Okay.  And after -- well, strike that.  What kind of

3    identifying marker does a lieutenant have on their uniform?

4    A    Lieutenants wear the same Denver Police uniform.  It's

5    called a butter bar.  In other words, it's just a bar on each

6    side of their collar, one bar on each side of their collar.

7    Q    And after lieutenant, what comes next?

8    A    Well, it used to be captain.  There's no longer that rank,

9    but the rank of captain.

10   Q    And then what's after that?

11   A    After captain would be commander.

12   Q    Okay.  And after commander?

13   A    At the time it was deputy chief.

14   Q    And after that?

15   A    Chief.

16   Q    Okay.  So, as commander, you are this level in the DPD?

17   A    It looks like a birthday cake, yeah.  But that's where I'm

18   at.

19   Q    All right.  And now we were also talking about Murphy

20   Robinson.  So, where does Murphy Robinson fall on the top of

21   this birthday cake?

22   A    Murphy Robinson is the director of public safety.  So, his

23   authority is over the police department, the sheriff's

24   department, and the fire department.

25   Q    Okay.  So, does this look about right for what we're

20-cv-1878-RBJ   PATRICK PHELAN - Cross   03-15-2022

1   talking about?

2   A    It looks fine.

3   Q    Okay.  So, that's the commanding structure for the Denver

4   department of safety, including the police, sheriffs, and fire

5   department?

6   A    Correct.

7   Q    Okay.  Thank you for that.  Now, I'd like to move on and

8   talk to you about what year you were promoted to the position of

9   commander.

10  A    2012.

11  Q    Okay.  Now, you talked about the special operations

12  division.  That is something separate from kind of what we were

13  just talking about; right?

14  A    Right.

15  Q    Can you kind of explain what the special operations

16  division does.

17  A    The special operations division, there's several divisions

18  within the Denver Police Department.  The special -- the

19  district being one division, commanders, special operations

20  division is a response -- what was the question?  I'm sorry.

21  Q    Talking about the special operations division.

22  A    What the special operations division is, it's a division

23  within the Denver Police Department.  We're responsible for all

24  special events within the City of Denver, whether spontaneous or

25  planned events.  We also have -- under the realm of special

20-cv-1878-RBJ    PATRICK PHELAN - Cross    03-15-2022

1  operations, we also have the Metro SWAT bureau, which is our

2  tactical operations that are responsible for executing search

3  warrants and responsible for barricade hostage situations.

4       We also have the K-9s, the patrol K-9s in that unit.

5  We have the bomb technicians, bomb detectives that investigate

6  all calls of explosive devices or suspicious devices anywhere.

7  Attached to them is also the explosive K-9.  These are K-9s,

8  you've probably seen them, that are basically a -- they sniff --

9  they're trained to identify explosives.

10 Q    All right.  So, a group of specialized folks, essentially;

11 right?

12 A    It's all specialized, yes.

13 Q    All right.  So, you mentioned to Ms. Wang that you had a

14 lot of other protests that you've been involved in.  How many

15 other protests have you been involved in as the incident

16 commander with DPD in your long career?

17 A    Probably hundreds.

18 Q    Okay.  And of those, how many prior protests have you been

19 involved with where the message was directed against the police?

20 A    Probably -- I could say this.  As an example, if you recall

21 the Ferguson, Missouri, shooting, a police officer shot, there

22 were several demonstrations after that.  And so that was -- the

23 year of that shooting, we had probably 100 -- if I recall, it

24 was like 120 demonstrations, probably 110 were completely

25 antipolice with -- we had Black Lives Matter.  We had antifa.

20-cv-1878-RBJ    PATRICK PHELAN - Cross    03-15-2022

1  We had Occupy.  We had FTP, which is F you the police.  That's

2  their organization.  So, several -- about over 100 definitely

3  were antipolice.

4  Q    So, protester rallies with that particular message, that's

5  not new to you, is that?

6  A    No.

7  Q    All right.  Now, we kind of talked about planned or

8  spontaneous events when Ms. Wang was asking you questions.

9  What's the difference between a planned and spontaneous event?

10 A    Well, a planned event is something we have quite a bit of

11 advanced warning what's going on.  A lot of them are parades

12 where they get a permit.  A lot of them are whatever type of

13 special event.  You know, we go back and talk about the DNC.  We

14 could talk about the presidential debates.  Every time the

15 president -- presidents like to come to Denver.  Every time

16 there's a president or VIP of some sort, vice president present,

17 those are planned events.  We're able to schedule officers and

18 do an ops plan based on the information we have.

19       So, that's kind of a different, spontaneous event would

20 be something that, hey, we're just finding out about right now,

21 obviously spontaneous.  It's something we have no idea is

22 coming, and we're getting information, okay, this is coming.

23 Q    Now, regardless of whether something is planned or

24 spontaneous, what's the goal of the Denver Police Department

25 with their response?

20-cv-1878-RBJ    PATRICK PHELAN - Cross    03-15-2022

1  A    Well, as probably any agency, what we want -- our goal is

2  it's a successful event.  And that successful event could be if

3  they -- if they -- successful to whoever is protesting or parade

4  or whatever special event, run, race, and it's successful to us

5  because we're able to assist that, and there's no issues, and

6  everybody goes home happy and satisfied.

7  Q    And is that goal the same regardless of what message is

8  being expressed by the event?

9  A    Absolutely.

10  Q    Now, I want to talk about what happened in late May of 2020

11  in Denver.  When did you first become aware of the possibility

12  of protests in Denver?

13  A    That was after this -- after the killing, and I was -- it

14  was maybe a day or two after, probably the day before we had the

15  protests.  So, probably like the 27th.

16  Q    Okay.  And what did you learn about when the crowds would

17  begin converging on Denver?

18  A    We had information that it was probably going to be the

19  evening of the 28th.

20  Q    So, after you personally learned of the death of George

21  Floyd, did you follow what happened in other cities?

22  A    Well, actually, there really wasn't much happening in other

23  cities.  I followed the -- you know, there was a lot of

24  violence, obviously, in Minneapolis, but at that point in time,

25  there really wasn't anything going on anywhere else, that I knew

20-cv-1878-RBJ   PATRICK PHELAN - Cross   03-15-2022

1  about, that I could find.

2  Q    So, aside from Minneapolis, did you observe any protests

3  happening around the nation on May 27th?

4  A    Not that I recall.

5  Q    Based upon your recollection, was Denver one of the first

6  cities aside from Minneapolis where protests were occurring?

7  A    I guess it would be, yes.

8  Q    Now, when you learned of the protests beginning on

9  May 28th, what was your understanding as to the time the crowds

10  were going to start converging?

11  A    It was going to be afternoon.  I thought it was like

12  5:00 p.m., around that time.

13  Q    Do you happen to recall what day of the week May 28th was?

14  A    I believe that was like -- my gosh.  I think that was a

15  Wednesday or Thursday.  I'm sorry.

16  Q    Now, how were you made aware of the protests converging on

17  Denver?

18  A    How was I made aware?

19  Q    Yes.

20  A    You know, we monitor several ways that we're -- we receive

21  information about a protest or an event, or spontaneous.  So,

22  people actually call and tell us they're going to have an event.

23  If it's a spontaneous event, hey, we're planning on having this

24  event.  We just want to let you know.  We get information

25  through -- obviously we're always trying to glean social media,

20-cv-1878-RBJ    PATRICK PHELAN - Cross    03-15-2022

1  newspapers, regular media, through sometimes -- a lot of times

2  we will get information from the community will call, or we will

3  get community will call their commander of that district.  So,

4  there's different pipelines coming in.  Anywhere we can get

5  information, I guess, we get information.

6  Q     Okay.  And what does DPD do in response to learning of that

7  information?

8  A     Well, obviously we realize that we're going to have to

9  prepare for that event.  So, we do an -- depending on the size

10  of the event, the location, what the event is, we look at all

11  these events and say, okay, we need to do something with this,

12  or this is a very small event, and pass that off to the

13  district.

14  Q     Do you make any attempts to connect with the groups that

15  are --

16  A     Absolutely.  What really helps success is trying to make

17  communication with whoever is planning the event.  Whether it's

18  antipolice, whatever it is, a person of contact really helps,

19  and a lot of people like that because come to -- they've come to

20  realize we will assist them with their event.  So, sometimes

21  they might not agree, we don't agree on the messages, but we can

22  work together, and we try to do that.  If we can make any type

23  of communication, we do, whether it's -- we try to reach out.

24  If we have any information, if we have a name or address or

25  number, we will try to contact them if possible.

20-cv-1878-RBJ   PATRICK PHELAN - Cross   03-15-2022

1   Q    Okay.  And did DPD reach out to those groups here?

2   A    We routinely do this, yes.

3   Q    And what response did DPD receive?

4   A    None.

5   Q    What types of groups was it the DPD tried to reach out

6   to --

7   A    Any of the groups that we saw that were -- I think Black

8   Lives Matter was one.  I don't remember who else, if antifa was

9   involved, but F the Police was also involved, and there is --

10  there's a history of not cooperating with the police.

11  Q    Did any of those groups cooperate here?

12  A    No.

13  Q    Okay.  Now, what would DPD have done had those groups

14  cooperated?

15  A    Well, we like to get together and kind of tell them what we

16  will do for them.  We will tell them, hey, if you want to march,

17  let us know.  We will help you march.  Hopefully they will share

18  the route, and we want to go down to the Federal Reserve.  We

19  want to go down to the federal courthouse.  We want to go

20  wherever they want to go, and then we're going to stay there for

21  half hour or whatever and then return to the capitol.  So, it's

22  a coordination.  It's a plan that we do with them, and that's

23  what we try to accomplish.  And we tell them what we're going to

24  do for them.

25          MS. BIRKHOLZ:  Great.  So, now I want to shift gears

20-cv-1878-RBJ    PATRICK PHELAN - Cross    03-15-2022

1   to the preparation that DPD did after you learned about the

2   protest, and as we're gearing up to -- for them to begin.  Now,

3   we've already talked about the operations plan, and I would like

4   to move to admit -- I believe 472 has already been admitted, but

5   I would like to also at this time move to admit 473 through 477.

6           MS. WANG:  No objection.

7           MS. BIRKHOLZ:  All right.

8           THE COURT:  Just a minute.  I will do it if you slow

9   down a little bit.

10          MS. BIRKHOLZ:  I apologize.  I'm trying to move

11  through it, guys.  My bad.

12  Q.    (By Ms. Birkholz) All right.  Commander Phelan, what is

13  the purpose of an operations plan?

14  A    It gives direction to the officers and supervisors that are

15  assigned to that event.

16  Q    Okay.  Now, I'm showing you what's been marked as

17  Exhibit 472, or I'm about to show you that.  So, let's talk

18  about the operations plan as we're pulling this up.  When is an

19  operation plan typically created?

20  A    As soon as possible.  Actually, with a spontaneous event,

21  it's really not necessary, but I do not like to do anything

22  without an ops plan.  So, as soon as I can create one, we create

23  one.

24  Q    All right.  So, we're going to go to the next page.  All

25  right.  So, we see the operations plan here.  Let's go down just

20-cv-1878-RBJ   PATRICK PHELAN - Cross   03-15-2022

1   a little bit, and what is the purpose of this plan?

2   A    Well, obviously you can see what's listed there, to

3   determine who is the incident commander, operations chief,

4   command post, time, time of event, location of event, just

5   general information.  What radio channels we're going to use,

6   who is assigned, just general information there.

7   Q    Okay.  And this start time you have up here at the very top

8   of this screen, it says 1700.  Is that --

9   A    Correct.  So, 5 o'clock.  5 o'clock.

10  Q    And the end time that you have, what time is that?

11  A    1900.  Two hours later.

12  Q    Okay.  So, is it fair to say you didn't anticipate that

13  this protest would go all night?

14  A    Yes.

15  Q    Who receives a copy of this plan?

16  A    Everyone that's at the briefing, and then sent up the chain

17  of command.

18  Q    Okay.  Let's go to the next page.  Now, I'd like to briefly

19  discuss this event synopsis.  What's the purpose of including

20  event synopsis here?

21  A    To give the officers or supervisors obviously a synopsis of

22  what the issue is, what the demonstration is about.

23  Q    Okay.  And the controversial police incident reference

24  there is the death of George Floyd; is that correct?

25  A    Yes, ma'am.

20-cv-1878-RBJ   PATRICK PHELAN - Cross   03-15-2022

1    Q    Now, I'm going to draw your attention to the response plan,

2    which is in this section.  What's the purpose of the response

3    plan?

4    A    It tells you who is -- I will be the incident commander,

5    and I will be making assignments.  There is a responsibility of

6    what I'm going to be doing, what the response plan is to this

7    event.

8    Q    Okay.  Now, there's some information blacked out on here,

9    and briefing at, for instance, blacked out.  What type of

10   information is blacked out on this?

11   A    It's usually just operational information.  It could be

12   phone numbers, addresses, something that might affect the safety

13   of an officer.

14   Q    Okay.  So, why is it important for this not to be made

15   public?

16   A    It's security -- it's for what's called SecOps, which is

17   security of the operation plan.  We don't want this to fall into

18   the wrong hands.

19   Q    Okay.  Great.  And let's go to the next page.  And on that

20   page -- or actually, strike that.  Let's stay on this page.

21   With respect to the response plan, this -- these one through

22   three here, the overall mission is threefold.  What is that?

23   A    The overall mission.  And this is what we try to do,

24   protect life and safeguard property, number one.  Number two, to

25   provide the safety of protest participants, bystanders, and

20-cv-1878-RBJ    PATRICK PHELAN - Cross    03-15-2022

1    passersby, to take law enforcement action when it is appropriate

2    and in the public interest.

3    Q    Okay.  And why are those the overall mission?

4    A    Because that's what we're trying to do.  That is our

5    mission.  That's our responsibility as police officers.

6    Q    Okay.  Now, let's go to the next page.  So, at the -- let's

7    see.  We've got deployment plan here, kind of spanning the first

8    and second page.  Now, what is the purpose of the language in

9    bold?  The benefits of taking immediate action should be

10   evidence-based against the possibility of further inciting the

11   crowd and possibility of creating a more serious breach?

12   A    As I talked earlier, you know, what we want -- we don't

13   want any confrontation.  We want this event to go off without

14   any issues, without any confrontation between police and the

15   protesters.  And so we take -- you know, if there's somebody

16   doing something that they're putting graffiti on the 16th Street

17   Mall going down the street, that is something I don't want to

18   address if it will cause a confrontation.  It's just not worth

19   dealing with.  Let them do that.  That's fine.

20   Q    And then right here we're talking about equipment.  Why is

21   this considered mandatory equipment, everything that's listed

22   here?

23   A    It's a little bit different for this type of situation.

24   So, it's basically -- personal protection equipment is what it's

25   called right there.  So, just make sure you have your helmet,

20-cv-1878-RBJ    PATRICK PHELAN - Cross    03-15-2022

1   baton, gas mask, Turtle suit.

2   Q    And is this -- this gear, is this something you do when you

3   don't know what's going to be expected?

4   A    Right.  Right.  We don't list everything.  We don't say

5   don't forget your handcuffs and your -- you know, this is just

6   specific to protests.

7   Q    Great.  So, now we will turn to page five of this.  We will

8   scroll down.  Looking at page five, we obviously mentioned video

9   and HALO.  We've had a long discussion already about HALO, but

10  so you again had access to all the HALO at that time; correct?

11  A    Correct.  There's approximately cameras in the downtown --

12  downtown area, there's about -- there was.  It's two years ago,

13  but there was about 300, I think three to 350 HALO cameras in

14  the Denver area.  And then of course there's also traffic

15  cameras down there too.

16  Q    Now, video.  We've looked at a lot of body-worn camera

17  video.  Did you actually have access to body-worn camera in real

18  time as you were monitoring these protests?

19  A    No.  We have no access to that.

20  Q    Okay.  Did you ever look at any body-worn camera throughout

21  the first five days of the protest?

22  A    No, I did not.

23  Q    Okay.  Now, let's talk about this section on the Colorado

24  State Patrol.  This says the Colorado State Patrol is

25  responsible for monitoring the capitol grounds and Veterans

20-cv-1878-RBJ   PATRICK PHELAN - Cross   03-15-2022

1   Park.  CSP, is that the abbreviation for Colorado State Patrol?

2   A    Yes, ma'am.

3   Q    Okay.  Can be immediately contacted through their

4   operations center at, hmm, through whoever.  So, what law

5   enforcement agency is responsible for the Colorado State Capitol

6   grounds?

7   A    The Colorado State Patrol.

8   Q    Great.  So, let's go to the next page.  Now, if you can

9   draw the area of responsibility, we have this map here.  That is

10  in the operations plan.  What is the area of Veterans Park and

11  the Colorado State Patrol that you mentioned?

12  A    So, they're -- here is the capitol here, capitol grounds.

13  And as you cross Lincoln, you enter into Veterans Park.  So,

14  between 14th and Colfax, between Broadway and Lincoln, this is

15  Veterans Park.  This is capitol grounds, if that makes sense.

16  Q    That makes total sense.  Does Denver have any ability to

17  control what Colorado State Patrol troopers are doing with

18  respect to their policing of those areas?

19  A    No.  I mean, we could work with state patrol if they need

20  some assistance, but that's their responsibility.

21  Q    Does DPD have any oversight over Colorado State Patrol?

22  A    No.

23  Q    Do you know if Colorado State Patrol has their own

24  munitions?

25  A    Yes, they do.

20-cv-1878-RBJ   PATRICK PHELAN - Cross   03-15-2022

1    Q    Do they have PepperBall?

2    A    Yes, they do.

3    Q    Do they have gas?

4    A    I believe so.

5    Q    And if something is in their area of responsibility, do

6    they have the autonomy to deploy their own munitions?

7    A    Yes, of course.

8    Q    So, let's turn to page seven.  All right.  So, here we have

9    a graph, and we have reference to traffic management here.

10   What's the purpose of traffic management?

11   A    Well, as I talked before, traffic management is essential

12   on protests to make sure that we're able to assist the protest

13   group in their march.  So, we talked before, they're deployed at

14   intersections to stop cross traffic.  You will have protests go

15   down the 16th Street Mall.  You gotta remember at every

16   intersection there's traffic going back and forth across 16th or

17   wherever.  If they're going the wrong way on Speer, if they're

18   going the wrong way on Colfax, if they're in traffic, whatever

19   the situation is, traffic management of just the traffic bureau

20   is responsible for trying to stop traffic when they can.

21   Q    And you coordinated with these folks listed here with

22   respect to traffic management?

23   A    Yes.

24   Q    Okay.  Now, next we have rapid deployment.  We have talked

25   about that briefly, but again, rapid deployment is what?

20-cv-1878-RBJ   PATRICK PHELAN - Cross   03-15-2022

1   A     Rapid deployment is a little bit different than mobile

2   response.  Rapid deployment, those are -- tactical teams are

3   usually assigned rapid deployment.  Those are officers that have

4   experience with crowd control, and are -- they're our tactical

5   unit that is assigned to the special operations division.

6   Q     Okay.  Now, mobile response is the third category here.

7   What's that?

8   A     Mobile response is similar.  They're usually from the

9   district.  If I have to bring other additional officers in for

10   an event, I will put them on a mobile response team.  They will

11   be under the command of an area commander, and he will be able

12   to move -- I will be able to move them to an area we need

13   assistance, or he will be able to move them where they need

14   assistance.  So, they're mainly officers from the patrol

15   division.

16   Q     Okay.  So, now let's briefly turn to the next two pages

17   where it indicates we're looking at some legal guidelines here.

18   What's the purpose of these?  I'm not going to go over them, but

19   what's the purpose of --

20   A     Just for the better -- it's kind of a cheat sheet for

21   officers and supervisors, if they're looking for a specific

22   ordinance.  We kind of listed some ordinance that they might be

23   looking for.

24   Q     Great.  Now let's go to the next page.  And crowd control,

25   we have down here highlighted, this sentence, officers will make

1  every effort to differentiate between individual misbehavior and

2  actions of the crowd in general.  And to minimize the risk that

3  arrests may be directed at persons who are not in violation of

4  the law.  What does that mean?

5  A    Well, what we like to do is try to isolate someone that's

6  committing a crime, whether they're breaking windows or whatever

7  they're doing.  And if they're amongst a crowd, if they're in

8  the middle of a crowd, they're throwing something or they do

9  some damage, it's very common to kind of get in and out of the

10  crowd.  In this case there was a lot of this going on, but we

11  were trying to isolate that person.

12       What we do is we don't want to go and try to contact

13  him right in the middle of the event, because that's going to

14  start a confrontation.  So, we don't like to do that.  What we

15  will do is put a FIT team on him, which is a field investigation

16  team, to monitor that person if we can.  Sometimes it's

17  difficult, but we will monitor that person.  We know the

18  violation, and then we will make an arrest.  Could be an hour

19  later or two hours later once that person is isolated or away

20  from that protest, we could safely arrest him without a

21  confrontation.  That's our goal.

22  Q    Okay.  Now, let's move on to the next page.  We've already

23  talked about the order of dispersal with Ms. Wang.  Now, it

24  discusses an unlawful assembly down here.  What is an unlawful

25  assembly?

20-cv-1878-RBJ   PATRICK PHELAN - Cross   03-15-2022

1   A    Well, an unlawful assembly is when a crowd -- it could be

2   several things.  When someone is trying to -- is given

3   directions to leave an area, they occupy an area, whether it's a

4   street or building, in the interest of whatever the situation

5   is, they're given orders.  It's unlawful, or it could be a very

6   aggressive crowd, it could be a crowd that's, you know, throwing

7   things at the police.  It could be several things.  It could be

8   someone that's just kind of the -- it's kind of the -- what's

9   the word?  It's just what the crowd is -- it's the crowd

10  actions.  The crowd action, what they're doing.

11  Q    Maybe this.  Can you provide an example of what an unlawful

12  assembly might be in your history?

13  A    We've had a lot of them.  We had several unlawful

14  assemblies at -- during -- especially Broncos.  Avalanche, when

15  they win the Stanley Cup or they win a game, they will, you

16  know, celebrate downtown.  People come out of the bars.  They

17  will be downtown.  They refuse to leave.  So, we will -- you

18  know, they have to move, because there's traffic coming in and

19  out of there, so it will be an unlawful assembly there.

20       Another issue would be, they're celebrating, lighting

21  fires.  So, it could be the demeanor of the crowd.  Thank you.

22  And then one, I think the last one that wasn't -- it was a

23  protest.  We had an illegal assembly in front of Cherry Creek

24  Mall.  I don't know if you know where Cherry Creek Mall is, but

25  it was during Christmas, and they had a large group lock

20-cv-1878-RBJ   PATRICK PHELAN - Cross   03-15-2022

1    themselves to a device in the middle of First Avenue.  So, there

2    was no -- you couldn't travel up First Avenue.

3         So, we contacted them.  We -- like we do, we diverted

4    traffic around First Avenue, Speer, right during rush hour

5    during Christmas season, but that's what we do.  And we were

6    able to give them some time, give them announcements, talk to

7    them.  And eventually we did make some arrests, but we didn't

8    have to use any chemical agent.  So, that's kind of examples

9    of --

10   Q    Who determines whether an unlawful assembly should be

11   declared?

12   A    Whoever -- whoever is there, the person being there, the

13   command officer being there.

14   Q    And I see reference here to an amplified sound system.

15   What kind of amplified sound system is used?

16   A    Usually it's a PA system, either from a car -- command

17   officers do carry bullhorns.

18   Q    How do you know if the announcement is loud enough?

19   A    Well, if you're there, you can tell if it's loud enough.

20   You hope it's loud enough.  There's a lot of crowd noise, but

21   you make those announcements.  A lot of times we get in the back

22   of the crowd, the opposite side of -- depending on what the

23   situation is.  There's some safety issues, too, but if it's a

24   crowd, we try to get on the other side of the crowd, and then we

25   can hear that announcement being made.

20-cv-1878-RBJ   PATRICK PHELAN - Cross   03-15-2022

1   Q    Were you able to go in the back of the crowds during the

2   George Floyd protests?

3   A    No.

4   Q    Why not?

5   A    Well, it wasn't safe.  Confrontation.  It just wasn't worth

6   it.

7   Q    All right.  Now, as the commander, you don't need to give

8   permission to provide an order to disperse the crowd?

9   A    No.

10  Q    Okay.  All right.  Let's take this down.  Now, you've

11  indicated during your testimony so far that you've handled

12  previous spontaneous events in Denver.  What was your

13  expectation for this particular event being on a weekday and

14  starting at 5:00 p.m. of the day?

15  A    We have a lot of events.  And of course the capitol is a

16  favorite location that usually, you know, it's after work, so

17  they will try to get people down there after work, and they will

18  advertise that to come down for a couple hours.  They like to be

19  at the capitol.  Lincoln and Broadway run -- are one way each

20  way, so they like to be out there and waving and show their

21  signs.  It's a popular -- so, I expected it to be, you know, a

22  protest of what happened, and probably be short, hopefully,

23  short duration.

24  Q    All right.  In addition to the operations plan, did you do

25  anything else to prepare for these protests?

20-cv-1878-RBJ   PATRICK PHELAN - Cross   03-15-2022

1  A    Well, no.  That's the initial thing we do is the operations

2  plan, and then of course we try to communicate with, if we can

3  get in communication, then we also devise a traffic plan, or

4  they're part of that.

5  Q    Okay.  Now, let's shift to the command post.  If you could

6  paint a picture for what a command post for an operation like

7  this looks like.

8  A    We have a command post.  It's -- I'm trying to look here.

9  It's similar, if you're the jury looking this way, our command

10  post is up there seating like that.  There's kind of stadium

11  seating that comes down.  There's a desk that runs in front of

12  every chair.  There's phone jacks and computer hookups for every

13  station.  There's several stations, and there's a station for

14  the incident commander.  There's a station for the fire chief or

15  fire representative.  There's a station for EMS.  There's a

16  station for parks and rec.  There's a station for public works.

17      Particularly we had FBI.  We had FPS, which is Federal

18  Protective Services in there.  So, we have several seating

19  positions designated for different agencies.  So, what it

20  becomes, it becomes what we call a unified command.

21      So, and let me continue on.  I don't mean to get ahead

22  of myself, but you're there, as far as the -- you're the command

23  post.  You're on scene there, and on this wall up close, I will

24  have HALO operators.  In front of HALO operators -- and they're

25  busy with their computers.  We got 350 cameras, like I said, and

20-cv-1878-RBJ   PATRICK PHELAN - Cross   03-15-2022

1    also traffic cameras.  I think there's -- I don't want to

2    misquote.  I think there's about 2,000 traffic cameras in the

3    city of Denver.

4             So, and in front of the operators, there's three giant

5    screens.  There's one screen that almost goes from the top of

6    the -- top of the paneling down to the floor.  And there's two

7    other screens pretty close to that side, and on either side of

8    the main screen.  In addition, we have some monitors like you

9    see there, mobile monitors, that TV down there.  We have a

10   couple of those, too, that we could access that.  So, that's

11   basically -- is that what you're looking for?  That's basically

12   the command post.

13   Q    How many TV screens do you have in there?

14   A    About five.

15   Q    I don't know.  I picture it looking like NASA.

16   A    No.  It's -- it's in a very state-of-the-art building, and

17   it's -- it is.  It's a nice facility.

18   Q    So, you've told us about some other agencies or individuals

19   who were present in the command post.  How many other DPD

20   officers or personnel are present?

21   A    Probably other DPD officers, depending on the event,

22   depending on the size, depending on what's happening, anywhere

23   from, besides myself, two to maybe six or eight.

24             MS. BIRKHOLZ:  Now, you mentioned that you've got

25   these videos, and you can see the HALO cam.  I'd like to move to

20-cv-1878-RBJ    PATRICK PHELAN - Cross    03-15-2022

1  admit Exhibit 3124.

2          MS. WANG:  No objection.

3          THE COURT:  Admitted.

4  Q.    (By Ms. Birkholz) All right.  So, I'm showing you what is

5  a map of the HALO cameras located in Denver.  So, you told us

6  there are a whole bunch of cameras right across the city?   There

7  are -- tell me kind of why these are concentrated where they are

8  across the city.

9  A    Well, they're called HALO.  And some of them are actually

10 mobile, but it's high activity location observation.  So, we're

11 having a lot of activity, where there's criminal activity or

12 there's a lot of congregation of people, we might have some

13 issues, that's where we try to put these cameras.

14 Q    So, it looks like there's quite a few along the 16th Street

15 Mall here?

16 A    Yes.

17 Q    Quite a few around Colfax, quite a few around the capitol.

18 Why are these concentrated in these particular areas?

19 A    Because there's usually -- it's probably a higher crime

20 area, or higher incident of location of incidents in those

21 areas.

22          MS. BIRKHOLZ:  Okay.  Now I'd like to turn to

23 Exhibit 3149.  And move to admit it.

24          MS. WANG:  No objection.

25          THE COURT:  Admitted.

20-cv-1878-RBJ    PATRICK PHELAN - Cross    03-15-2022

1   Q.    (By Ms. Birkholz) All right.  So, I'm now showing you the

2   intersection of Logan and Colfax, which has been a topic of

3   discussion here during this trial.  Can you circle the HALO

4   camera at this location?

5   A    It's this one right here.

6   Q    Okay.  And what side of the intersection is that on?

7   A    That would be the northwest corner.

8   Q    Okay.  Now, I see some other cameras in this picture.

9   What -- can you circle what you see for other cameras?

10  A    Oh, there's traffic cameras here.  It looks like a traffic

11  camera here.

12  Q    Now, are these the types of cameras that you have available

13  to view while you were in the command post?

14  A    Yes.  You can view.

15  Q    Okay.  All right.  And while you're sitting in the command

16  post, you don't have a screen of all of the HALO cameras

17  available to you; right?

18  A    No.

19  Q    So, how does that work?

20  A    Well, they have -- sometimes they will put -- could be as

21  many as -- I think they can probably put, I want to say a little

22  older, but picture in picture.  So, we could have -- they might

23  have like several cameras up at a certain time.  The HALO system

24  runs 24/7, whether there's a protest or not.  That's always

25  ongoing, so they monitor numerous cameras at a time.

20-cv-1878-RBJ    PATRICK PHELAN - Cross    03-15-2022

1    Q    And so if you want to see something, you ask to see it?

2    A    I would have to ask to see something, yes.

3    Q    We talked about the other ways that you can communicate

4    while you're in the command post.  You've already mentioned

5    radio communications and various channels.  You've mentioned

6    cell phone.  Any other ways of communication?

7    A    Well, I'm getting, as I said previously, you know, we have

8    other agencies in there, and so whether it's fire or whether

9    it's an investigative support, whether it's DOTI, whether it's

10   RTD, whether it's the Auraria Police Department, whether it's

11   state patrols in there, I'm getting information from them, just

12   voice information like I'm talking to you.  This is what's going

13   on here.  We're getting a report of this through RTD.  We're

14   getting a report of this through Auraria.  The fire department

15   says we were driving through this area, they're trying to light

16   fires, or they threw rocks.  That's where we get information

17   from all sorts of pipelines coming.

18   Q    What's Air One?

19   A    Air One, yes.  We get information from Air One too.  It's

20   not -- it's not video information.  We cannot see what they see.

21   Q    But what is Air One?

22   A    It's a helicopter.  I'm sorry.

23   Q    No worries.  And was Air One operating during these

24   protests in May?

25   A    Yes.

20-cv-1878-RBJ   PATRICK PHELAN - Cross   03-15-2022

1 Q    Now, let's shift to start talking about the individual days

2 of the protest, starting with May 28th.  Did you work a regular

3 shift on May 28th?

4 A    Well, as a commander on the police department, I don't

5 think there's such a thing as a regular shift, but I usually

6 start about 8:30 or 9:00 in the morning.

7 Q    And at what point in the day did your duties shift from

8 normal commander-type duties to incident commander?

9 A    Well, actually, on the 28th, I mean, that's, you know, once

10 we had that information, I am -- all my efforts are going to

11 getting a plan ready for this activity.

12 Q    Did you gather a team to respond specifically to the

13 protests before they started?

14 A    Yes.  That's what we were doing with the ops plan.  We were

15 trying to get resources, yes.

16 Q    And did you actually provide a team of individuals that

17 were ready to respond?

18 A    Yeah.  We contacted -- we had -- I have personnel from the

19 special operations division.  We notify them, and they're going

20 to be responding.  I notify traffic.  They're going to be

21 responding for the briefing.  So, whoever I need to notify,

22 whoever I could get, they're notified, if I'm hearing you right.

23 Q    Now, were you able to have a briefing that day?

24 A    Yes.

25 Q    And who was present for that briefing on May 28th, 2020?

20-cv-1878-RBJ   PATRICK PHELAN - Cross   03-15-2022

1    A    I could probably tell by looking.  All the supervisors that

2    were involved in that deployment, or assignment to that

3    location, that protest, would be at the briefing.

4    Q    Did you discuss rules of engagement?

5    A    Yes.

6    Q    Did you discuss the deployment of munitions?

7    A    Yes.

8    Q    What did you say about the deployment munitions?

9    A    That less-lethal and chemical agent were allowed.

10            MS. BIRKHOLZ:  Now, I'd like to turn to Exhibit 467,

11   and move to admit that.

12            THE COURT:  Operations manual?

13            MS. WANG:  I don't object to certain sections, but I

14   do object to the 900-page operations manual.

15            MS. BIRKHOLZ:  We are only going to talk about the use

16   of force policy.  So, I will move to admit, Your Honor, only the

17   use of force policy at this particular moment.

18            MS. WANG:  No objection to that, Your Honor.

19            THE COURT:  Okay.

20   Q.    (By Ms. Birkholz) Commander Phelan, we're going to talk

21   about this operations manual with another person, but I just

22   wanted to briefly touch on it with respect to the use of

23   munitions.  But I wanted to ask you first, with respect to this

24   operations manual, how long do you understand the entire manual

25   to be?

20-cv-1878-RBJ    PATRICK PHELAN - Cross    03-15-2022

1   A    It's big.  It's big.  It's -- you know, it's huge.  So,

2   probably volumes.  If we -- it's gone electronic, digital now,

3   thank goodness, but at the point in time, probably two very

4   large -- trying to think of something to compare it with.  Two

5   very large -- it covers every aspect of the Denver Police

6   Department, basically.  So, it's huge.  I don't know how many

7   pages.

8   Q    That's fair.  You can say I don't know.  Based upon your

9   personal experience, did you have to learn and train -- learn

10  and train on this manual in the academy?

11  A    Yes.

12  Q    And does this manual get updated frequently?

13  A    Frequently.

14  Q    And when it gets updated, are you as an officer who already

15  has his, you know, badge and his rank, required to review and

16  sign off on updates?

17  A    Yeah.  They actually send that to you.  Everybody, you saw

18  the all badged earlier, they will send you all revisions to the

19  operations manual.  It's actually highlighted what the revisions

20  are in whatever section, and then you read those revisions, and

21  you would sign off on those.

22  Q    Okay.  Now, we're going to turn to the use of force

23  section, which is what we have admitted here, which is section

24  105.  What is the use of force section?

25  A    It's -- the use of force section is the section that

20-cv-1878-RBJ    PATRICK PHELAN - Cross    03-15-2022

1  dictates the use of force policy for the Denver Police

2  Department.

3  Q    Okay.  How many pages is this use of force policy,

4  approximately?

5  A    I think it says at the top.  It's double paged.  Probably,

6  I don't know, 30, 40 pages, I imagine.

7  Q    Now, I'd like to turn to the page marked Den 11546.  All

8  right.  So, now we're showing the jury a graphic.  What is this

9  graphic?

10 A    That's the use of force chart.

11 Q    What does that mean?

12 A    It's some guidance, and kind of a visual guidance for

13 officers, as far as when to use use of force, what can be

14 allowed as far as use of force.  You see the arrows there, type

15 of resistance, potential for injury, officer's response.

16 Q    Okay.  And on this graphic, can you circle where crowd

17 control lands.

18 A    Well, basically crowd control is defensive resistance.  So,

19 right here.  So, this whole thing would be, actually, could be

20 with crowd control.

21 Q    Okay.  So, on top, it says the type of resistance, or the

22 type of behavior that you're facing, and am I correct that on

23 the bottom it tells you what sort of officer response is okay?

24 A    Correct.

25 Q    Okay.  So, when you said during your briefing you're to

20-cv-1878-RBJ    PATRICK PHELAN - Cross    03-15-2022

1    abide by Denver's use of force policy, this is kind of a

2    synopsis of what you're referring to; is that correct?

3    A    Yeah.  It's a visual.  I think it probably makes it a

4    little bit easier, quicker.

5    Q    Right.  And with respect to crowd control, I'm going to

6    circle this down here.  For crowd control purposes, chemical

7    agent, and less-lethal munitions are permitted under Denver's

8    policy?

9    A    Yes.

10   Q    Okay.  Now, next I want to talk to you -- we can take this

11   down -- about something called a CAD.  What is a CAD?

12   A    A CAD is -- stands for computer aided dispatch.  All

13   officers are on the CAD.

14   Q    So, what kind of activity is reported on the CAD?

15   A    It's recorded by dispatch.  Anything that comes into it

16   there, any action by that officer is usually recorded on the

17   CAD.  So, everything that's happening, you could look at a CAD

18   throughout the city each -- and look what's happening throughout

19   the city of just based on reading the CAD, or the location.

20   Q    Okay.  How are those created?

21   A    They're created through dispatch.  So, dispatch is getting

22   that information, or they're listening for that information too.

23   So, they're receiving information via the radio traffic.

24   Q    Okay.  So, is this information recorded in real time as

25   it's occurring?

20-cv-1878-RBJ    PATRICK PHELAN - Cross    03-15-2022

1   A    Yes.

2   Q    Okay.

3   A    Close to real time, I think.

4   Q    And is there a CAD report for each day of the protest?

5   A    I'm sure there is a CAD report 24/7 every day there.

6        MS. BIRKHOLZ:  I'd like to move to admit the CADs for

7   the protests, Exhibits 448 through 451.

8        MS. WANG:  I object to the admission of all of these,

9   unless she has specific questions about specific entries.  I may

10  not object to that, but I do object to the admission of all of

11  them.

12       THE COURT:  What are you planning to do with them?

13       MS. BIRKHOLZ:  I will be pointing out specific

14  entries, but this shows the entire record of DPD's knowledge

15  during the protest, so it's highly relevant.

16       THE COURT:  All right.  The objection is overruled.

17  Those four documents are admitted.

18  Q.   (By Ms. Birkholz) All right.  Let's look to Exhibit 448.

19  Now, I'm going to turn to page five of this document.  And we

20  will kind of go down to the bottom of this particular page.  All

21  right.  And right down here, it references people expected.  How

22  many people did you expect for these protests?

23  A    It says 700 right here.

24  Q    Okay.  Now, going up a little bit on this page, and the

25  page before, there's a whole bunch of names.  Up.  All right.

20-cv-1878-RBJ   PATRICK PHELAN - Cross   03-15-2022

1   So, on this page and the page before, what are those names?

2   A    Those are Denver police officers.

3   Q    Okay.  Is that a list of some people that worked those

4   protests on day one?

5   A    Yes.  It looks like it is, yes.

6   Q    About how many officers are listed here?

7   A    Slow that down a little bit.  It looks like probably --

8   from looking here, it's hard to say.  Probably altogether, 100,

9   150, maybe.

10  Q    Okay.  So, assuming it's a hundred, you had --

11  A    About a hundred.

12  Q    You had one officer for every seven protesters that you

13  anticipated?

14  A    That makes sense in math.

15  Q    Okay.  So, let's go back down to the first entry of the

16  CAD.  And make it just a wee bit bigger, if you could.  All

17  right.  So, with respect to the plan, what does it say here?

18  A    It says 577 people are expected, 1520, TAC6, peaceful

19  protest, staying out of sight.  District impact teams and

20  traffic control.

21  Q    What do you mean, staying out of sight?

22  A    It's part of our rules of engagement.  You know, we learned

23  from the previous protests I talked about, as far as antipolice

24  protests, the best thing we can do is low profile, sort of stay

25  out of sight.  That's part of our --

20-cv-1878-RBJ   PATRICK PHELAN - Cross   03-15-2022

1   Q    Okay.  And as this protest began, where did protesters

2   first gather, based upon this record?

3   A    At the capitol.

4   Q    Okay.  150 on capitol steps right now.  What time was that?

5   A    That's 5:01.

6   Q    Did that group stay there?

7   A    No.  Eventually, that group left there.

8   Q    Where did they go?

9   A    Well, actually, they kind of split in two.  We had a group

10  that left there and kind of they went onto Colfax and came back,

11  if I recall.  And then another group started marching, and they

12  actually -- like we sometimes anticipate, they stepped off onto

13  Lincoln, Lincoln down -- counterflow, counter traffic, down to

14  16th Street Mall, I believe.

15  Q    Okay.

16  A    Then down the mall.

17  Q    As protesters were marching, what was the police response?

18  A    We will parallel it with some response teams, just in case

19  we do have some illegal activity that we do have to act upon,

20  and also we have traffic -- traffic operations is shutting down

21  traffic behind them, in front of them, and try to stop cross

22  traffic while they go down the mall, all the streets on the

23  mall, kind of leapfrogging, depending on how big the crowd is.

24  It's tough, but that's what we do.

25  Q    As the protesters are heading northwest, you're trying to

20-cv-1878-RBJ   PATRICK PHELAN - Cross   03-15-2022

1    shut down traffic for that?

2    A    We do.  It's safety.  We got people, unfortunately --

3    that's why we like to get information and, you know, cooperation

4    with these groups, because then we can make it easier.  But they

5    don't listen, or they won't stop at a red light, even though the

6    cross traffic is moving.  So, we have to get there and stop

7    traffic, or somebody is going to get hit.

8    Q    You mentioned the word "parallel," and I just want to ask

9    you, what does that mean in police lingo?

10   A    So, if we have an example, if you have 16th Street Mall,

11   there's two streets parallel, run parallel to it, 15th and 17th.

12   So, in the middle of 16th, parallel to the 16th Street Mall is

13   17th Avenue on one side, and 15th.  So, it goes 15th, 16th,

14   17th.  We're on the parallel streets next to the mall.  Not on

15   the mall.

16            MS. BIRKHOLZ:  Okay.  That makes sense.  Thank you.

17   So, I'd like to next move to admit some radio from this day,

18   which is Exhibit 720.

19            MS. WANG:  No objection.

20            MS. BIRKHOLZ:  All right.

21            THE COURT:  All right.  Admitted.  720.

22            MS. BIRKHOLZ:  Perfect.  Thank you.  We're going to

23   listen to three clips of radio from May 28th.

24       (An audio recording was played.)

25   Q.    (By Ms. Birkholz) Approximately what time was that?

20-cv-1878-RBJ   PATRICK PHELAN - Cross   03-15-2022

1   A    I'd have to look.  I don't see the --

2   Q    Yeah.  The -- can you pull that back up.  No worries.

3        (An audio recording was played.)

4   Q    Did you see the --

5   A    No, I didn't.

6   Q    Fair enough.

7   A    I can read the top of it, but --

8   Q    Let's pull --

9     (Simultaneous discussion interrupted by the court reporter.)

10  Q    My sincerest apologies.  Let's go back to Exhibit 448.  I

11  think that will help you out.

12  A    I saw the time there.

13  Q    Okay.

14  A    1737.

15  Q    Okay.  What time?

16  A    5:30, approximately.

17  Q    Thank you.  So, let's go back to the CAD, page six, around

18  this time.  And we're going to pull out a little certain section

19  here.  I'd like to draw your attention to 17:38:43.  All right.

20  So, troopers chasing westbound.  Okay.  We'll just zoom it, and

21  scroll down if we can.  So, we have a reference at 1738,

22  troopers chasing westbound.  Then if I can draw your attention

23  to going down further, 1741, response, state patrol at 18th and

24  Sherman.  If we can highlight that.  And then the one after it,

25  which reads shooter P-O-S-S at 18th Sherman.  And then the one

20-cv-1878-RBJ    PATRICK PHELAN - Cross    03-15-2022

1    under that says CSP, P-O-S-S, saying they have suspect.

2    A    Correct.

3    Q    And then finally, 17:43:48, shooter detained on Sherman and

4    18th.  So, when it references troopers, who are they?

5    A    Colorado State Patrol.

6    Q    And Colorado State Patrol, again, that's different than

7    DPD; right?

8    A    Right.

9    Q    Did Colorado State Patrol apprehend that subject?

10   A    It looks like they did, yes.

11   Q    Okay.  Now, based upon your understanding of these entries,

12   was that shooter a person from the crowd?

13   A    Yes.  As a matter of fact, we had several -- several

14   reports of shots fired throughout the protests.

15   Q    All right.  And CSP, Colorado State Patrol, they detained

16   this one?

17   A    Right.  Mm-hmm.

18   Q    We can take that down.  Now, you mentioned you had one

19   group marching down the 16th Street Mall.  What was the tactical

20   consideration of them marching down the 16th Street Mall?

21   A    Well, the tactical consideration we have when -- obviously

22   there's a lot of restaurants.  There's a lot of stores down

23   there.  So, we want to be in close enough proximity.  Like I

24   said, we're going down parallel roads, so some illegal activity,

25   they're breaking some windows, some stuff we will let fly,

20-cv-1878-RBJ   PATRICK PHELAN - Cross   03-15-2022

1   because we don't want confrontation, like we talked about.

2   Graffiti poles, some stuff like that, if we can identify a

3   suspect, we will try to follow them, but we're concerned about

4   more vandalism, a bigger vandalism than that, breaking windows.

5          We also were concerned that if they're going down the

6   mall, where are they going?  Part of our rules of engagement on

7   this issue is we don't want if -- it's a popular tactic, as

8   you've probably seen it on TV, they like to get on major

9   highways.  And so our concern is becoming any time they start

10  going down the mall, we're concerned they might try to get on

11  the highway, because that's where they have access to the

12  highway.

13  Q    Now, what are officers doing to try to prevent that from

14  happening?

15  A    Well, we put officers -- we try to position officers, stage

16  officers on that end of the mall if we can.

17  Q    Did that work?

18  A    No, it did not.  There's ten different ways to get on the

19  highway from lower downtown.

20  Q    I would like to now play a clip from Exhibit 720, which is

21  now in evidence from 1944.

22         (An audio recording was played.)

23  Q    Okay.  So, now the jury has already seen video from this

24  incident, and I'm not going to ask you about it, because we've

25  got another lieutenant who is going to talk about who was

20-cv-1878-RBJ    PATRICK PHELAN - Cross    03-15-2022

1  actually present for it, but what's the tactical concern about

2  people entering the highway?

3  A    I don't know if it's a tactical concern.  It's a common --

4  I mean, our concern is people are going to get killed.

5  That's -- people are going to get killed.  That's my concern.

6  We've got -- we're shutting down the highway.  We've got traffic

7  expecting to be driving down the highway, you know, at 80,

8  75 miles an hour, and then all of a sudden you have people in

9  front of you, pedestrians on the highway.  So, our concern is we

10 don't want them blocking the highway for their safety and for

11 everybody's -- the pedestrian and the motor vehicle.  We don't

12 want anybody to be injured.

13 Q    Now, in the video the jury has already seen, the protesters

14 took the highway while traffic was still going down the highway.

15 What's the speed limit in that location where they took the

16 highway?

17 A    Geez, I haven't taken it in a long time, but I think it's

18 probably about 65 or 70 miles an hour.

19 Q    What's your understanding of what was happening on the

20 highway with respect to protesters' behavior?

21 A    Well, they were attempting to stop traffic.

22 Q    Okay.  Well, with respect to the protesters -- and I will

23 put Exhibit 448 back up here, which is, again, the CAD that

24 we've seen, and I will turn to page eight.  All right.  So, we

25 have already highlighted some sections of this CAD report.  So,

20-cv-1878-RBJ   PATRICK PHELAN - Cross   03-15-2022

1   it looks like I see an entry, 1907, bottles being thrown.  Kind

2   of read through the highlighted entries for us to kind of give

3   us a picture of what was happening on the highway.

4   A    Which time?

5   Q    So, starting at 1907.  We've highlighted some activity.

6   A    Oh, yeah.  So, officers being injured, Metro guy just took

7   a bottle.  So, while we're trying to clear the highway, the

8   protesters and rioters, they have high ground on us.  They had

9   come down the embankment, and the highway is below the

10  embankment.  So, they came down the embankment, got on the

11  highway.  So, we had to, as fast as we could, deploy resources

12  to try to block I-25 both north and southbound, and also get

13  those people off the highway as soon as we could.

14          So, while we were trying to do that, they were taking

15  rocks and bottles, and they were throwing -- I like to say

16  projectiles.  Projectiles could be anything.  They were throwing

17  everything.  So, they were throwing projectiles at a Metro

18  officer who was injured.

19  Q    It looks like down here in the bottom, EMS needed,

20  emergency response unit.  Is this on I-25?  Yes.

21  A    Yeah.  It looks like even ahead of that, there's one at

22  1909.  It says EMS needed for officer at I-25 location.

23  Q    Okay.  So, is it fair to say that the officer was injured

24  so badly that he required an ambulance to respond?

25  A    Yeah.  He was -- if I recall, he was -- a good laceration.

20-cv-1878-RBJ    PATRICK PHELAN - Cross    03-15-2022

1   It hit him pretty good.

2   Q    Let's take this exhibit down, and tell me, where did

3   protesters go after leaving the highway?

4   A    After they got on the highway, they made their way back

5   towards the capitol.  But we're still stopping traffic for them

6   to make sure they didn't get hit.  So, no confrontation, stay

7   low profile, but they're going back to the capitol.

8            MS. BIRKHOLZ:  I'd like to admit Exhibit 525, which is

9   Air One video from the first day.

10           MS. WANG:  I may not have an objection to specific

11  time or times, but I do object to the entirety of the Air One

12  video.  So, if Ms. Birkholz wants to say a specific time or

13  section.

14           MS. BIRKHOLZ:  Sure.  So, at this point in time, we

15  will move to admit 7:46 to 8:11 on the first video.  And I've

16  got a --

17           THE COURT:  It's admitted.

18           MS. BIRKHOLZ:  -- of Air One, but we will address the

19  times each time.  So, I'm going to now show you Air One video.

20       (A video was played.)

21           MS. BIRKHOLZ:  And we're going to play the section

22  from 7:46 to 8:11.

23       (A video was played.)

24  Q.    (By Ms. Birkholz) All right.  So, as the protesters

25  headed back to the capitol area, we're seeing them blocking

20-cv-1878-RBJ   PATRICK PHELAN - Cross   03-15-2022

1  traffic.  Was -- what about this is a concern?

2  A    Well, it's a concern because they're blocking traffic.

3  They're in the intersection.  We have traffic coming their

4  direction as they came back.  They just stepped out into

5  traffic.

6  Q    And what response did DPD take with respect to these folks?

7  A    I'm sure that we tried to move them up into the park.  And

8  we blocked traffic.  We had to turn cars around and move them.

9          MS. BIRKHOLZ:  Now, I'd like to move to admit another

10  clip from the Air One video.  It is the second video, the first

11  ten seconds, again from the first night, Exhibit 525.

12          MS. WANG:  No objection to that specific time.

13          THE COURT:  It's admitted.

14      (A video was played.)

15  Q.    (By Ms. Birkholz) All right.  So, we saw a clip there.

16  What's happening here?

17  A    Well, it looks like protesters are going -- you kind of

18  shrunk here -- eastbound on Colfax towards District 6.

19  Q    And in what lane of traffic were they walking?

20  A    It looks like the -- what I call counterflow.  Traffic is

21  driving westbound.  They're in that -- they're actually over the

22  whole entire street.

23  Q    Is that a concern?

24  A    It's a concern for obvious reasons.  It's a safety concern

25  for both the protesters, and also it's a concern for people that

20-cv-1878-RBJ   PATRICK PHELAN - Cross   03-15-2022

1   are trapped in their vehicles inside the protest.  They're

2   scared to death.  And I don't know where they're going or where

3   they're coming from, but if they have their kids with them,

4   whatever, it's a terrible situation for them.

5           MS. BIRKHOLZ:  Okay.  Now, I'd like to move to watch

6   one more clip of the Air One video, Exhibit 525, video, the

7   first video from 51:30 to 52:22.  The time is -- I've got the

8   time on the screen, actually, but it's showing of the capitol

9   area.

10          MS. WANG:  No objection.

11          THE COURT:  Okay.

12          MS. BIRKHOLZ:  And so we're going to clip ahead here

13   to 51:30 to 52:22, and I'd like you to look in the left area of

14   the screen.  That's the wrong one.  The very first one we're

15   talking about.

16       (A video was played.)

17          MS. BIRKHOLZ:  All right.  51:30 on the clock.

18       (A video was played.)

19          MS. BIRKHOLZ:  I'm going to focus your attention down

20   here.

21       (A video was played.)

22   Q.    (By Ms. Birkholz) All right.  Do you recall this report?

23   A    Yes.

24   Q    What do you recall with respect to the destruction that the

25   protesters caused near the capitol on the first night?

20-cv-1878-RBJ   PATRICK PHELAN - Cross   03-15-2022

1    A    Well, they're spray painting.  They're breaking windows.

2    Obviously they're doing damage to vehicles.  It was actually --

3    even took out the lights on the property, but just damaging our

4    state capitol.

5    Q    I will now play Exhibit 720, some radio, which has been

6    admitted into evidence, from 20:23:23.

7         (An audio recording was played.)

8    Q    Do you happen to recall what response the Colorado State

9    Patrol took to the shots fired earlier in the night?

10   A    Well, they attempted to chase the suspect and apprehend

11   him.

12   Q    With respect to the building itself, the capitol itself, do

13   you remember what happened inside the capitol?

14   A    They tried to actually -- at a point in time, they tried to

15   force their way, similar to what you saw in the -- they tried to

16   force their way into the capitol.  They had to use PepperBall

17   there to keep that from happening.

18   Q    Now, on the night of May 28th, what actions did protesters

19   take with respect to police vehicles downtown?

20   A    We tried to keep -- any police vehicle that was down there

21   was damaged.  Any time they drove by in close proximity to

22   protesters, they were pelted with tons of damage.  If they were

23   left unattended or in a situation, windows were broken out.

24   Q    Now I'd like to play another clip of radio that's been

25   admitted into evidence from Exhibit 720 at 18:36:25.

20-cv-1878-RBJ   PATRICK PHELAN - Cross   03-15-2022

1     (An audio recording was played.)

2  Q     So, what response did you -- did you try to take to

3  avoid --

4  A     Well, honestly, what he said is -- we tried to -- try not

5  to have any confrontation.  So, any time I'd send units

6  somewhere to alleviate a crime or something in progress, we

7  tried to disengage from there, diffuse that and leave, but as

8  soon as we got to the location or as soon as we were on a

9  certain street with their protesters, they would converge on

10 that vehicle.  So, what we tried to do is like you heard them

11 say, we will try to monitor traffic, help as best we can, but

12 stay out, stay away from the protesters if possible.

13 Q     Now I'd like to play another radio clip from Exhibit 720,

14 which is timestamped 20:16:17.

15     (An audio recording was played.)

16 Q     Do you recall that?

17 A     I missed some of that.  I'm sorry.

18 Q     Okay.  Let's play it one more time.

19     (An audio recording was played.)

20 A     That's -- that happened frequently.  Unfortunately,

21 individuals, there's always a female, and they're getting --

22 they stop cars.  They knew there was no consequence, because

23 there's nobody around.  They would get on top of vehicles and

24 shake them and scare people.

25 Q     Let's play one more clip of video.  Let's go to the

Kevin P. Carlin, RMR, CRR

20-cv-1878-RBJ    PATRICK PHELAN - Cross    03-15-2022

1   timestamp 19:06:08 from Exhibit 720.

2        (An audio recording was played.)

3   Q     All right.

4   A     Same concern, obviously.  Safety of the protesters,

5   jeopardized -- people panic, trying to get out of the area.

6   Q     Do you recall other examples of situations between

7   community members and protesters that you heard over the radio?

8   A     Yes.  All the time.  I mean, we had, you know, calls in,

9   whether they were looting or breaking windows or, you know, out

10  breaking windows of cars on streets, you know, that belonged to

11  citizens.  Actually, there was a lot of community support for

12  what we were trying to do.

13  Q     Now, you mentioned shots fired previously.  How many

14  reports of shots fired did you get the first night,

15  approximately?

16  A     Best -- there were several.  I'd say, you know, four.  Four

17  or five, possibly.

18  Q     And would those be reflected in the CAD report?

19  A     It could be.

20  Q     Okay.  Any other types of weapons that you recall the

21  people in the crowd who are down to protest had?

22  A     I think we recovered 25 guns.  I think there was 50 to 60

23  weapons recovered.  That could have been -- there was hatchets,

24  machetes, slingshots.  And then on top of that there was

25  actually 25 guns recovered.

20-cv-1878-RBJ    PATRICK PHELAN - Cross    03-15-2022

1   Q    Was that over the course of the entire protest --

2   A    Yes --

3   Q    -- that you're referring to?

4   A    -- it was.

5   Q    Now, let's go back to District 6.  You mentioned that there

6   was a group marching towards District 6.  We have already talked

7   about the City's intel that stations were being burned down.

8   How did you receive that intel?

9   A    I don't recall how I received that intel, but I recall that

10  intel.

11  Q    Okay.  And DPD did indeed see action outside of its

12  District 6 station the first night; right?

13  A    Correct.

14  Q    Okay.  Now, we already saw some video of Officer Valentine,

15  the jury has, at District 6.  And I want to play some radio for

16  you, starting at 20:25:16 from Exhibit 720, which has already

17  been admitted into evidence.

18       (An audio recording was played.)

19  Q    And we will play the next clip, which is timestamped

20  20:37:43, also from Exhibit 720.

21       (An audio recording was played.)

22  Q    And then one more radio clip from the time 20:33:31.

23       (An audio recording was played.)

24  A    I didn't hear that.  I'm sorry.

25  Q    We can play it one more time.

20-cv-1878-RBJ   PATRICK PHELAN - Cross   03-15-2022

1    (An audio recording was played.)

2    A    Yes.

3    Q    Now, why was DPD's use of gas appropriate in that scenario?

4    A    We had to stop that behavior right away.  Obviously you're

5    hearing about large rocks.  You're hearing about mayhem.  You're

6    hearing about using slingshots, which actually would be -- all

7    that could be lethal.  So, we had to stop that activity.  So,

8    the fastest way to stop that activity is deploy a chemical

9    agent.

10   Q    Okay.  Now, was the use of gas at that intersection only to

11   move the crowd out of the intersection?

12   A    Oh, it's to stop the activity.  Stop them from throwing

13   those projectiles at the officers.

14   Q    Okay.  And we won't look at the continuum again, but where

15   does this fall on the continuum that we looked at, the graph in

16   the ops manual?

17   A    Actually, that would fall -- probably active aggression --

18   between defensive resistance and active aggression, in between

19   is intent to harm.  If there was intent to harm there, I would

20   say there was intent to harm.

21   Q    Would officers on that scene have been permitted to use

22   more than just gas?

23   A    Yes.  They could have used PepperBall, and actually they

24   could use any impact weapon there.

25   Q    Now, we also talked about on the first day a gas deployment

20-cv-1878-RBJ   PATRICK PHELAN - Cross   03-15-2022

1   at the intersection of 14th and Sherman.  And are you -- are you

2   aware who gave the dispersal order?

3   A     Once again, there's so many situations.  At 14th and

4   Sherman, I believe that was the same thing as earlier, was

5   Lieutenant Pine, I believe.

6   Q     Okay.  Would that be in the statements, most likely, from

7   the officers at that location?

8   A     Should be, yes.

9   Q     Now, would gas have been deployed for the throwing of just

10   one water bottle?

11   A     Well, I personally feel you should never throw anything at

12   a police officer or anybody else, but probably not.

13   Q     So, with respect to the deployment of gas at that location,

14   do you believe it was in response to multiple objects being

15   thrown at officers?

16   A     Absolutely.  That's a SWAT lieutenant there that's been

17   through several protests, and I'm sure he was taking a lot of

18   projectiles.

19   Q     All right.  And in the body-worn camera, do you recall the

20   body-worn camera that you saw at this location earlier?

21   A     I would have to probably look at it again.  The body-worn

22   camera -- oh.  Yes, I do.  Yes, I do.

23   Q     Do you remember just seeing at least something being thrown

24   at the line of officers in that body-worn camera footage?

25   A     I don't recall.  If it's the one with the one officer body

20-cv-1878-RBJ    PATRICK PHELAN - Cross    03-15-2022

1  cam, I'd have to look at it.

2  Q    It's not important.  We are going to ask the lieutenant who

3  had his boots on the ground about this later.  So, let's move

4  on.  Next I want to listen to radio again from Exhibit 720 at

5  22:02:37.

6        (An audio recording was played.)

7  A    I'm sorry.  I didn't hear that.

8  Q    You couldn't understand your mumbling?

9  A    That's me talking.  I have a tendency to mumble, so I

10  apologize for that.  Can you play it again?

11        (An audio recording was played.)

12  A    We're getting reports, and that report is probably coming

13  in from fire dispatch or fire officers that were there at the

14  command post saying, hey, we're getting fires here and

15  everywhere else.  Because they have communication -- the fire

16  chiefs that are there, assistant chiefs have communication with

17  their dispatch, and they're getting that information real time

18  from their dispatch and telling me what's going on.

19        MS. BIRKHOLZ:  Okay.  I'd like to now move to admit

20  Exhibit 3108, which is photographs.

21        MS. WANG:  No objection.

22        THE COURT:  Admitted.

23  Q.    (By Ms. Birkholz) All right.  So, we're now looking at

24  some photographs.  How frequently did you receive reports of

25  fires?

20-cv-1878-RBJ   PATRICK PHELAN - Cross   03-15-2022

1  A    Oh, it was constant.  Especially after dark.  Cover of

2  darkness is very popular to light fires.  I believe that --

3  like, can't remember, I think there was over -- the fire

4  department responded on over 200 fires.

5  Q    Now, we heard plaintiffs' expert Norman Stamper talk to us

6  earlier -- well, last week, gosh, how time flies -- and he said

7  that dumpster fires are no big deal.  What challenge did these

8  pose to you during these George Floyd protests?

9  A    Well, you might ask the fire -- you could ask the firemen

10  about that, what they think of dumpster fires, but obviously

11  they're a hazard to property and to people.  They could -- it

12  was real popular to bring these dumpsters out in the middle of

13  the street, light them on fire.  I think we started -- or almost

14  started a fire.  They lit the dumpster fire next to the

15  McNichols building, which is in Civic Center Park, and we had

16  several fire apparatuses have to respond to that to put that

17  out.

18       And the problem is any time firefighters respond to

19  these dumpster fires, whatever fires, they become victims.  I

20  don't know -- we don't even wear the same uniform, but they were

21  throwing projectiles at the fire department.  So, we had to

22  provide, we call it force protection.  We had to go with the

23  fire department and get them in so they could fight these fires,

24  put them out so there wasn't any property damage or nobody got

25  injured, and then come out with them.  So, it's just a

20-cv-1878-RBJ    PATRICK PHELAN - Cross    03-15-2022

1   constant -- it's a drain on personnel, too.  While they're

2   fighting these fires, the rest of the city is, you know, without

3   service that has to do with police and fire.

4   Q    So, were these the only fires going on in downtown Denver?

5   A    I don't know.  You'd have to -- but they -- my point is,

6   Denver Fire responds to all EMS situations, heart attacks, car

7   accidents, and so we have to get resources somewhere else to

8   cover the city.

9   Q    So, we can take these down, and we will move on.  We

10  briefly talked about DPD's involvement or lack of involvement

11  with Colorado State Patrol, and I want to just ask you

12  specifically before we move on, on May 28th, did Denver Police

13  Department send any officers inside of the capitol in the first

14  night for any reason that you know of?

15  A    No.

16  Q    Are you aware that CSP deployed smoke or gas on their own

17  capitol grounds on May 28th?

18  A    Yes, they did.

19  Q    Now, moving on to maybe damages and crime on the first

20  night, do you recall hearing reports of buildings being

21  destroyed by looters or rioters?

22  A    Well, yeah.  There's several, you know, sort of criminal

23  mischief.  They're breaking windows.  They're looting, maybe

24  down on the mall and around the mall.  And there were several

25  calls to what's called the Denver -- old Denver Post building

20-cv-1878-RBJ    PATRICK PHELAN - Cross    03-15-2022

1   right there.  So, they were -- there was destruction, criminal

2   mischief, glass breaking, things like that, all over, every

3   night.

4              MS. BIRKHOLZ:  Okay.  I'd like to move to admit

5   Exhibit 3107, additional photographs.

6              MS. WANG:  No objection.

7              THE COURT:  It's admitted.

8   Q.    (By Ms. Birkholz) All right.  So, we're going to look

9   through a couple of these photographs here.  That one had

10  turned.  And flip to the third page.  Where were these

11  businesses located?

12  A    It looks like they're down on the mall.  Target is for

13  sure.

14  Q    Were those businesses affected frequently?

15  A    Yes, they were.  Most of the businesses ended up trying to

16  close, and they boarded up all their windows, or on top of the

17  windows during this time, because they knew it was coming.

18  Q    Do you know how many private businesses downtown were

19  damaged by these protests?

20  A    Hundreds.

21  Q    How about other buildings?

22  A    Well, public -- public buildings, the city and county

23  building.  They broke windows out of the city and county

24  building.  They broke windows out of the State Supreme Court

25  building, which, beautiful building there.  They broke, you

20-cv-1878-RBJ   PATRICK PHELAN - Cross   03-15-2022

1   know, windows out of the state capitol.  The Webb building is a

2   City building.  They broke all the windows on that level there.

3   So, everywhere in close proximity downtown area was hit pretty

4   good.

5   Q    Now, speaking of crimes, were arrests made the first night?

6   A    Yes.

7   Q    About how many?

8   A    I'd have to look at it.  I think probably about 20, 25,

9   maybe.  I would have to look.

10  Q    Okay.  And for what reasons, if you recall?

11  A    Numerous reasons.  Criminal mischief, disobeying a lawful

12  police order, assault, weapons charges obviously were for the

13  weapons.

14          MS. BIRKHOLZ:  I'd like to move to admit Exhibit 3021.

15          MS. WANG:  I object to this, Your Honor.  It's

16  hearsay, and 402 and 403.

17          THE COURT:  Your response?

18          MS. BIRKHOLZ:  Yes, Your Honor.  It is some data

19  maintained by the City and County of Denver with respect to the

20  arrests that were made during the protests.

21          MS. WANG:  For crimes not committed by any of our

22  plaintiffs.

23          THE COURT:  The objection is overruled.  3021 is

24  admitted.  I don't think they're saying that your people

25  committed these crimes.

20-cv-1878-RBJ   PATRICK PHELAN - Cross   03-15-2022

1  Q.     (By Ms. Birkholz) All right.  So, we are looking at a

2  record of arrests made, and looking down here, gosh.  How many

3  on the first night?

4  A    I wish there was a numbering system here, but obviously --

5  oops.

6  Q    Above that line.

7  A    So, obviously, I'd have to count them for you.  You'd have

8  to scroll that down a little bit for me, too, because I don't

9  have the top anymore, but -- thank you.

10 Q    All right.  So, with respect to these arrests, is it fair

11 to say that DPD was able to make a number of arrests the first

12 night?

13 A    Yes.

14 Q    And is that true for the second, third, fourth, fifth

15 nights as well?

16 A    Absolutely.

17 Q    Now, you were also shown -- we can take this down -- a

18 video outside of the capitol on the first night of the protests,

19 and you made a comment about being concerned about the

20 protesters being kind of amped up.  Do you recall that comment

21 that you made?

22 A    Yes.

23 Q    Why did you say that?  Why were you concerned about the

24 protesters at that location?

25 A    Because that's the mentality of that crowd.  They were

20-cv-1878-RBJ    PATRICK PHELAN - Cross    03-15-2022

1   excited, almost like anticipation, they want something to

2   happen.

3   Q    Okay.  What was your, I guess, thought about the mentality

4   at that time and location?  If you had one.

5   A    The mentalities of the crowd?

6   Q    Yes.

7   A    I think they were there to, you know, riot.  I think they

8   were there to cause problems.  I think they were there to become

9   involved in that activity.  I mean, we had several people come,

10  it was like -- I don't know if you watched the news, but every

11  night after dark, people would come down.  It was like an

12  activity.  I'm not doing anything, so let's go down and see if

13  we can't get involved in throwing stuff at the cops, breaking

14  some windows, or whatever they want to do.  It was crazy.

15  Q    So, as darkness fell, did you see a shift in the activity?

16  A    Absolutely.

17  Q    How so?

18  A    Well, during the day, there was a lot -- we did this every

19  day during the protests.  We still -- there's people that came

20  down there to protest and march.  We facilitated the march.

21  Once again, during the day.  Then at night, they almost went in

22  to stay on the state capitol, and I called it like a camp.  It

23  seemed like they went into a camp, and were waiting.  And then

24  once it got a little bit darker a little bit later, they started

25  coming out of their camp.

20-cv-1878-RBJ   PATRICK PHELAN – Cross   03-15-2022

1   Q    All right.  Now, with respect to the end of the day, before

2   the command post closed at night, did you have anyone making any

3   reports of the activity during the day?

4   A    We have a lieutenant that sits there, and that's his job to

5   be the scribe and to write all activity down on the

6   after-action.

7   Q    Do you recall who your designated scribe was the first

8   night of the protest?

9   A    That would be Lieutenant Wyckoff.

10  Q    Why did you not have that job?

11  A    I had a lot of stuff going on.  I couldn't do that job.  I

12  don't have the capabilities to do what I was doing plus being

13  there trying to capture all that activity.  He has a hard time.

14  One person has a hard time capturing that.

15  Q    And is the scribe basically taking notes throughout the

16  day, or what do they do?

17  A    That's what -- the scribe is listening to radio traffic and

18  putting information that he can, that he hears or ascertains and

19  putting that on the after-action report chronologically.

20  Q    You mentioned after-action report.  Is that the document

21  that the scribe is creating?

22  A    Yes.

23         MS. BIRKHOLZ:  Okay.  I'd like to move to admit

24  Exhibit 470, which is the after-action reports for the entire

25  protest, unless we have already admitted that.

Kevin P. Carlin, RMR, CRR

20-cv-1878-RBJ    PATRICK PHELAN - Cross    03-15-2022

1    MS. WANG:  No objection.

2    THE COURT:  470 is admitted.

3  Q.    (By Ms. Birkholz) All right.  So, right now we are

4  looking at the after-action report for, it looks like the first

5  day of the protest; correct?

6  A    Correct.

7  Q    Okay.  So, if we can kind of just zoom out of this a little

8  bit.  What's the purpose of these?

9  A    To capture information on that event, and it's a document

10  that we can refer to if we have a repeat protest or just

11  information that's available to actually everybody.

12  Q    Okay.  And so these after-action reports, together with the

13  CADs that we've already looked at, which are Exhibits 448

14  through 451, would you -- would you say that these are the best

15  place to look for someone to get a comprehensive picture of what

16  was going on at these protests day to day at any given time?

17  A    Yes.

18  Q    Okay.  Now, I'd like to take a look at the next page.  We

19  have highlighted some things on this, which just recap the day.

20  All right.  We will move on and hopefully for the next day as we

21  can look at the highlighted version.  All right.

22    So, let's talk about the next day of the protest, which

23  was May 29th, 2020.  Looking back to Exhibit 473, which are the

24  operations plans, did you also prepare an operations plan for

25  May 29th?

20-cv-1878-RBJ   PATRICK PHELAN - Cross   03-15-2022

1   A     Yes.

2   Q     Okay.  Now, this plan, is it largely similar to the one

3   that you had prepared from the day before?

4   A     I believe so.

5   Q     Okay.  Did you change -- do you remember if you changed

6   certain details?

7   A     Obviously the time, and we're starting early.  They're

8   starting at 11:00.  We have information that they're starting

9   earlier.  We have operations chief listed there, but similar to

10  the day before.

11  Q     Okay.  All right.  And we can take this down.  What time

12  did you start on May 29th?

13  A     I started earlier than that, but it looked like 11 o'clock

14  in the morning.

15  Q     Okay.  And how did your day start?

16  A     My day started getting ready to do a briefing for the

17  resources that were coming down, the supervisors and officers

18  coming down.  Started with a briefing.

19  Q     Okay.  And every day of the protest, did you have a

20  briefing?

21  A     Every day of the protest we had a briefing.  There was

22  information coming in.  I would make notes on the ops plan and

23  things I wanted to remind like everybody does when we have a

24  briefing, and things I wanted to mention.  So, every day there's

25  a briefing.

20-cv-1878-RBJ   PATRICK PHELAN - Cross   03-15-2022

1   Q    And who was present?

2   A    All the supervisors that were assigned to that event, and

3   some sergeants.  Also, some corporals.  We actually didn't -- if

4   there was some officers down, we had officers come down too.

5   They weren't required to.

6   Q    Did you again discuss the rules of engagement?

7   A    Yes.

8   Q    And the permissible deployment of munitions?

9   A    Yes.

10  Q    Okay.  Now, you were asked by Ms. Wang with respect to

11  whether you observed anyone that used use of force outside of

12  policy.  Given your position in the command post and not having

13  access to any body-worn camera, as we've already discussed, is

14  that one explanation as to why you may not have seen wrongdoing?

15  A    If there's wrongdoing -- yes.  I can't -- I'm not out there

16  on the street.  There's no -- all I have is basically HALO, if

17  I'm watching that at a certain time.

18  Q    Okay.  Now, with respect to those in the command post for

19  the briefing, did you then have them disperse that information

20  that was shared?

21  A    Yes.  That's what the goal is.  That's what they're

22  instructed to do.  So, I would brief lieutenants and sergeants.

23  They would meet with their individual units, and they would

24  brief them on the operations plan.

25  Q    Okay.  What was the biggest change on day two of the

20-cv-1878-RBJ   PATRICK PHELAN - Cross   03-15-2022

1  protests?

2  A    Oh, probably, I think we had -- we reached out to Jefferson

3  County.  We had Jefferson County assist us on day two.

4  Q    Okay.  And this is what has been referred to as mutual aid;

5  is that correct?

6  A    Correct.

7  Q    Okay.  When did you guys decide that you needed assistance

8  in responding to these protests?

9  A    Actually, the day before we realized, you know, we needed

10  more officers.  That was our concern, if we had enough personnel

11  to safely handle the situation.

12  Q    And you mentioned Jefferson County.  Is that the only

13  mutual aid jurisdiction that you called in on the first day of

14  the protest?

15  A    Probably be the second day of the protest.

16  Q    Second.  Sorry.

17  A    Yeah.  On the second day of the protest, we had Jefferson

18  County come in.  They have kind of a multi-jurisdictional unit

19  that they send down there.

20  Q    Now, over the first five to six days of the protest, how

21  many additional mutual aid jurisdictions did you call in?

22  A    I believe we had a total of -- different agencies at

23  different times, probably 12 different agencies assisted us,

24  helped us with this.

25  Q    Now, we've already established that they brought their own

20-cv-1878-RBJ   PATRICK PHELAN - Cross   03-15-2022

1  munitions, and we've already established that they were

2  operating under their own policies; is that correct?

3  A    Correct.

4  Q    Okay.  But before I shift gears, actually, how many times

5  in your 40-year career with DPD have you had the need to call in

6  mutual aid for large-scale crowd control response situations

7  like this?

8  A    None.

9  Q    Well, you mentioned DNC before?

10  A    Well, you're talking about spontaneous?

11  Q    Sure.  Okay.  Let's talk about spontaneous events.

12  A    Yeah.  Spontaneous, no.  I can't remember having to do

13  that.  This was an event that was -- I've never seen before.  I

14  kind of relate it to once in a career, kind of like the

15  pandemic.  It comes around once, and hopefully we'll never have

16  to deal with this again, a situation like this.

17  Q    So, when you had occasion to call mutual aid in for the

18  DNC, for instance, how much advanced warning did you have about

19  that particular event?

20  A    Very little warning.

21  Q    DNC?

22  A    Oh.  I'm sorry.  I apologize.  DNC was actually a planned

23  event for two years.

24  Q    Okay.  So, you mentioned -- strike that.  What training

25  with those mutual aid partners did you do for the DNC?

20-cv-1878-RBJ   PATRICK PHELAN - Cross   03-15-2022

1  A    It was mainly -- several different aspects.  It was mainly

2  field force training with DNC, protest training.

3  Q    And why was that not done for the George Floyd protests?

4  A    Well, we didn't know we had a need for it.

5  Q    Did you have time for it?

6  A    No.  Absolutely not.

7  Q    All right.  Now, we discussed with Ms. Wang earlier the

8  concept of responsibility for the mutual aid jurisdictions.  And

9  you -- you've said that, you know, you have authority over these

10 people, and that their agents -- and I want to dive into that,

11 because you've also said that you don't believe that you have

12 control over the individuals' use of force.  So, can you explain

13 that for me.

14 A    Well, each different jurisdiction that came, I've explained

15 earlier, comes with their command structure.  So, there's a

16 commander, probably my same rank, with that jurisdiction there.

17 And they're sitting in the command post with me.  So, I will

18 give him instructions like, I'd like to -- can you send some

19 units to this location.  He gives them that direction, and so

20 they're responsible to him.

21         So, I can't really jump -- I'm not going to tell his

22 officers what policy and procedures to do.  He could do that,

23 but they respond to him.  That's who they're responding to.

24 Q    Okay.  Is Denver responsible for the decision-making that,

25 say, a mutual aid officer makes with respect to when to fire his

20-cv-1878-RBJ   PATRICK PHELAN - Cross   03-15-2022

1   munition?

2   A    No.

3   Q    Why is that?

4   A    Because we don't know their procedures and policies.  It's

5   their decision.  Every officer is responsible for everything

6   that he's responsible for.  If he makes a deployment with the

7   less-lethal, that's his responsibility.

8   Q    Why are these jurisdictions not acting under DPD's use of

9   force policy?

10  A    Because they're trained -- you know, just like they have

11  their academy, their training, their monthly training, their

12  weekly training, whatever they do, they are trained on

13  procedures and policies that they deal with every day.  It would

14  be ridiculous for us to say, today, that's all great, but here

15  is our policy, try to learn this in five minutes because this is

16  what you're going to have to do.  It just doesn't make sense.

17  Q    You were asked about the munitions that other jurisdictions

18  brought.  Were you aware when the mutual aid jurisdictions

19  started coming that they had less-lethal shotgun rounds?

20  A    No.  I did not know that.

21  Q    When did you learn about it?

22  A    I think a few days later.

23  Q    What did you do about it?

24  A    We stopped that.

25  Q    Okay.

20-cv-1878-RBJ   PATRICK PHELAN - Cross   03-15-2022

1   A    It's not a less-lethal that we use, and we'd rather not use

2   it in the city.

3   Q    Why did you stop it?

4   A    Because it's -- we don't use it.  So, we don't want that --

5   the potential probably for injury is probably greater with that

6   less-lethal than what we used.

7   Q    Okay.  Why didn't you realize before the first couple days

8   that they had these munitions?

9   A    Because they were allowed to use their less-lethal

10  munitions, what they were trained on.  So, didn't --

11  Q    So -- I'm sorry.  So, when the problem, or I guess the

12  issue came to your knowledge, you made a change?

13  A    Right.  I don't like that less-lethal application from the

14  shotgun.

15  Q    Okay.  Now, did DPD ever enter into any written agreements

16  with those mutual aid jurisdictions before the policing of those

17  protests?

18  A    Not that I know of.

19  Q    Did Denver make any agreement to pay them?

20  A    Not that I know of.

21  Q    Did Denver ever retroactively pay the other jurisdictions?

22  A    Not that I know of.

23  Q    Did Denver make any agreements to be held responsible for

24  their officers in this litigation?

25  A    Not that I know of.  It's above my pay grade.

20-cv-1878-RBJ   PATRICK PHELAN - Cross   03-15-2022

1   Q    So, as incident commander, did you ever have any occasion

2   to review any of the behavior that was brought to your attention

3   by any of the other mutual aid officers?

4   A    No.

5   Q    Why not?

6   A    It just wouldn't come up through me.  That's not part of my

7   chain of command.  It wouldn't be reviewed by me.

8   Q    All right.  So, I'd like to move away from that topic and

9   go to the highlighted after-action report, which is marked as

10  Exhibit 470, and day two.

11          THE COURT:  Let's do that after the break.

12          MS. BIRKHOLZ:  Great.  Thank you.

13          THE COURT:  We'll take about 13 minutes.

14      (Jury out at 3:02 p.m.)

15          THE COURT:  3:15.

16      (Recess at 3:02 p.m., until 3:14 p.m.)

17      (Jury in at 3:14 p.m.)

18  Q.    (By Ms. Birkholz) So, right before we took our break, we

19  were going to go to Exhibit 470, which is already admitted into

20  evidence.  And look to the page marked Den 1919.  All right.

21  And this -- Commander Phelan, is this an after-action report

22  from the second day of the protest?

23  A    Yes, it is.

24  Q    Okay.  I'd like to go to the second page, which has been

25  highlighted, and have you -- oh.  We're going to trade it out.

20-cv-1878-RBJ   PATRICK PHELAN - Cross   03-15-2022

1    And that is the wrong one.  Technical difficulty here.

2            MALE SPEAKER:  It was my fault.  My apologies.

3    Q.    (By Ms. Birkholz) No worries.  So, here we are on the

4    second page where it says on Friday, May 29th, so this is a --

5    we're looking at the right spot.  Give us a rundown of what was

6    happening via these highlights.

7    A    It looks like at 1625 hours, suspect observed handing out

8    golf balls to crowd, and miscellaneous projectiles.  Group could

9    use a -- group continues to grow, begins to march towards the

10   16th Street Mall.  Officers report bottles being tossed toward

11   them, unknown suspect.

12   Q    Okay.  Let's go down to 1855.

13   A    The crowd begins throwing rocks -- the crowd begins

14   throwing rocks and bottles -- excuse me.  Throwing rocks at

15   officers.

16   Q    Okay.  And then at 1955.  And what time is 1955 normal

17   time?

18   A    That is five until 8:00, or 7:55.

19   Q    Okay.  What's happening there?

20   A    Suspect threw fireworks, flash-bang at officers.

21   Q    How about 2005?

22   A    Reported bomb was at the steps of the state capitol.

23   Q    Okay.  Let's go to the second page.  Now, we're getting

24   into the evening hours here.  What's happening at 2020?

25   A    Colfax and Lincoln, northwest corner, suspect throwing

20-cv-1878-RBJ    PATRICK PHELAN - Cross    03-15-2022

1   rocks.

2   Q    Okay.  Let's go down to the next highlight.

3   A    Colfax and Broadway trash fire.  Trash can fire.  DFD

4   responding.

5   Q    Okay.  And the jury can keep reading.  It looks like we've

6   got, you know, more of the same, basically.  Party with a gun.

7   Dumpster fires.  Looting.  Store windows being broken.  Trash

8   vehicle burning.  Injured officer, rock to the neck.  Dumpster

9   fire.  Shooting.  Shooting.  Is that your recollection of as

10  things proceeded on the second day of the protest after

11  nighttime fell?

12  A    Yes.  That's how it is.  It was fluid.  It was dynamic.  It

13  was crazy.

14        MS. BIRKHOLZ:  Okay.  Let's go ahead and take this

15  down.  I would now like to turn -- move to admit Exhibit 3012.

16        THE COURT:  Photographs.  Any objection?

17        MS. WANG:  Objection.  Yes.  Relevance.  402, 403.

18        THE COURT:  Okay.  Overruled.  Admitted.

19  Q.    (By Ms. Birkholz) All right.  So, we're going to show you

20  some photographs here.  We're going to skip ahead to the second

21  page, and proceed through a few of these photographs.  What are

22  these photographs of?

23  A    Well, damage to -- one looks like a motorcycle.  The one

24  shows the size of the rock.  This is just damage -- these are

25  police vehicles here you're looking at.

20-cv-1878-RBJ   PATRICK PHELAN - Cross   03-15-2022

1   Q     Were police vehicles commonly the target of rioters,

2   looters, aggressors?

3   A     Yes.

4   Q     And are these pictures illustrative of the type of damage

5   that occurred to police vehicles?

6   A     Yes, they are.

7   Q     Do you know how many police cruisers were damaged during

8   the first five days of the protest?

9   A     You know, I don't.  Several.  Numerous.  I think it was in

10  the -- I don't want to comment.  I'm not sure of the number.

11  Q     Fair enough.  I would like to now go to page 63 of this

12  exhibit.  Okay.  What is shown here?

13  A     It's a Kevlar helmet, ballistic helmet.  It's cracked.

14  Q     Is that the type of helmet that officers were wearing?

15  A     Yes.

16  Q     Kevlar.  What's that?

17  A     It's a ballistic material that's made -- it's a weave,

18  actually, and it's designed, you see bulletproof vests, helmets

19  are made out of a material called Kevlar.  I think that's a name

20  used by the manufacturer.

21  Q     And it appears this particular helmet is actually cracked.

22  Have you ever seen these crack or break in duty before?

23  A     It would take, I've seen -- this would take a significant

24  amount of force to do what that did.

25  Q     Okay.

20-cv-1878-RBJ   PATRICK PHELAN - Cross   03-15-2022

1    A    Hard to say what hit that.

2    Q    Okay.  Did you hear reports of multiple helmets being

3    impacted like this during the protest?

4    A    Yes.  Constantly.

5    Q    All right.  How many hours did the protest go on for -- go

6    on for on May 29th?

7    A    I'd probably have to look at the after-action.  The time

8    would be on there.

9    Q    Okay.  We can pull that back up.  That's Exhibit 470, and

10   we can go to the bottom of the page.  All right.  So, let's go

11   down to the bottom of this.  Back up.  Sorry.  What time did the

12   protest continue to on the second day?

13   A    Looks like approximately 2:00 in the morning.

14   Q    Okay.  Do you know how many Denver officers worked that

15   day?

16   A    How many Denver -- I'm sorry?

17   Q    Do you know how many Denver officers worked that day of the

18   protest?

19   A    Probably -- was that the third day?

20   Q    Second day.

21   A    Second day, I think probably about 150.

22   Q    Do you know how many Jefferson County officers responded?

23   A    It would be on their detail.  I'm not sure.  Probably 20 or

24   30.

25   Q    Was that a sufficient amount of personnel to police these

20-cv-1878-RBJ   PATRICK PHELAN - Cross   03-15-2022

1    protests?

2    A    Not even close.

3    Q    So, how did you respond?

4    A    We reached -- I didn't reach out.  We had the deputy

5    chief -- I believe it was the deputy chief had been making calls

6    to outside jurisdictions to bring outside jurisdictions in.

7    Q    So, more manpower?

8    A    More personnel.

9    Q    With respect to Colorado State Patrol, just because I

10   haven't asked you about them yet, were they also present doing

11   their thing on the second day of the protest?

12   A    Yes, they were.  And they were increasing their capacity

13   with personnel also.

14   Q    Did they deploy PepperBall on this day, to your knowledge?

15   A    They have PepperBall.  Whether they deployed that day, I

16   don't know.  The second day?

17   Q    Yes.

18   A    Yeah.  The second day they did.

19   Q    They did?  Okay.  How about gas?  Do you know whether CSP

20   deployed gas on the second day of the protest?

21   A    I couldn't answer that specifically.  Probably, matter of

22   fact, I imagine they did.  I can't be specific on that, though.

23   Q    Fair enough.  Let's move on to the third day of the

24   protest, which was May 30th, 2020.  I'd like to pull up

25   Exhibit 474, which is the operations plan for 5/30.  So, once we

20-cv-1878-RBJ   PATRICK PHELAN - Cross   03-15-2022

1   get this up, I want to turn to page three, which will discuss

2   the deployment plan.

3           And, you know, we generally discuss the deployment

4   plan, the first one, and on page -- actually, let's go to page

5   four.  Let's skip ahead to page four, where it discusses the

6   areas of responsibility.  Now, this appears to me to be new from

7   the prior operations plan.  Is that consistent with your

8   recollection?

9   A    Yes, it is.

10  Q    Okay.  Why -- what is this section discussing?

11  A    These are deployments.  So, based on the previous two days,

12  based upon the additional resources I've had, I have -- I break

13  that downtown area into three areas of responsibility.  So, the

14  three different separate, almost like mini command posts.  So,

15  mini ICs, incident commander, so -- you can see there, there's

16  the responsibility -- excuse me.

17          There is a responsibility -- areas of responsibility.

18  Area one was Lieutenant JD Williams.  His responsibility was

19  Civic Center Park and Veterans Park, and it shows the resources

20  he has available to him there.  Area two would be 16th Street

21  Mall, 15th to 17th Street, Broadway to Union Station, and the

22  resources that he has underneath them just was coming his

23  direction.

24          Area three is Lieutenant Vince Porter, Broadway-Lincoln

25  corridor, 14th to 18th Avenue, and then of course I think the

Kevin P. Carlin, RMR, CRR

20-cv-1878-RBJ   PATRICK PHELAN - Cross   03-15-2022

1  rapid response team, which is Metro SWAT, and their two

2  lieutenants and the gang unit with their two lieutenants, and of

3  course traffic operations.

4       So, we've broken that big area down into three -- we

5  have so much activity, so many reports of criminal behavior that

6  we have to try to break that down to get better response.  And

7  these are all mobile response teams.  All these teams were

8  multiple RDVs, which is a rapid deployment vehicle, and they're

9  responsible for their area.

10       So, you usually stay in that area.  They can't be

11  moved, but they can move resources all over to have them as

12  rapid response to a problem that we can have.

13  Q    Okay.  Why is this included in this plan for the first time

14  this third day of the protest?

15  A    Because we have the resources.  Now I have additional

16  resources, and I'm planning with additional resources.  And

17  obviously we have outside jurisdictions too.  So, and then

18  obviously so supervisors know who they're assigned to.

19  Q    Okay.  So, I see the mutual aid jurisdictions listed here.

20  Were there any other jurisdictions aside from what's listed here

21  that came that day to assist?

22  A    This is the third day?  I believe -- there could have been

23  additional outside jurisdictions, but I think I would have to

24  look.  I think Jefferson County -- I don't see Jefferson County.

25  I think Jefferson County also responded that night with their

20-cv-1878-RBJ   PATRICK PHELAN - Cross   03-15-2022

1   regional response team.

2   Q     How about Brighton or Commerce City?

3   A     Brighton or Commerce City was involved.  Also Westminster,

4   also Arapahoe County, and also Douglas County.  So, on different

5   days, there was different resources, but on most days we tried

6   to get as many resources there as we could from outside

7   jurisdictions.  Sometimes they had responsibilities in their own

8   jurisdiction, so they would have to make amends.  They couldn't

9   come every night.

10  Q     How did you decide to allocate the mutual aid partners?

11  A     Well, where we needed them.  So, we would assign them to

12  different areas of responsibility, and they would be assigned

13  through their commander.  They were at the briefings -- most of

14  them were at the briefings.  We had secondary briefings for

15  outside jurisdictions.  If they couldn't be there for the

16  initial briefing, they came for a secondary briefing, which they

17  received.  And they were assigned through their commander to a

18  specific area of responsibility.

19  Q     So, I see that there is a, you know, lieutenant listed

20  under each of these categories.  And we've discussed through the

21  testimony of this trial that there was a lieutenant kind of

22  embedded with some of the mutual aid jurisdictions.  That's

23  consistent with your recollection; right?

24  A     Right.  And also, we also had -- because we did have

25  communication issues, each outside jurisdiction had -- on the

20-cv-1878-RBJ   PATRICK PHELAN - Cross   03-15-2022

1   street had a Denver Police sergeant with them to make sure

2   there's no -- for two reasons.  Actually, some communication

3   problems, but mainly to give them direction.  Obviously a lot of

4   these people have never been to Denver, a lot of these officers,

5   so here is how we get from point A to point B so they know where

6   they're going, so there's no confusion.

7   Q    So, the purpose of the person from DPD placed with the

8   mutual aid jurisdictions was to basically tell people where to

9   go and what direction you were giving from the command post?

10  A    Right.  That was the only individual, one sergeant for each

11  outside jurisdiction.

12  Q    Okay.  Did that person ever tell those mutual aid partners

13  when to deploy?

14  A    No.

15  Q    Okay.  Now let's turn to page five of this.  I see, going

16  down, there's a difference -- let's go down.  Wait.  No.  Sorry.

17  Up here.  DHMC.  What's that mean?

18  A    Denver Health Medical Center.

19  Q    Okay.  This appears to me to be a change from the first

20  one.  What is that?

21  A    So, paramedics, Denver Health, obviously does the paramedic

22  service for the City and County of Denver.  They're embedded

23  with us.  They actually are probably there day three.  It says

24  they're representatives in the command post.  We always have

25  radio communication, but now, based on the number of calls,

20-cv-1878-RBJ   PATRICK PHELAN - Cross   03-15-2022

1    they're having to come too.

2            And it's a coordination thing.  If you remember, you

3    have the fire department, you have light rail, you have RTD, and

4    you have Denver Health.  They have to get to locations for

5    service.  People are calling for an ambulance.  People are

6    calling for fire.  It's good if we have them in the command

7    post.  That way we can tell them, you can't go that way.

8    There's protesters there.  You cannot get through.  You're going

9    to have to divert to this location to get to the location you're

10   trying to get to, if that makes sense.

11   Q    Okay.  So, why did it become necessary on the third day to

12   have a rep available in the command post?

13   A    It's a big event.  We're getting more people, and it's more

14   convenient, because I can talk to them like I'm talking to you.

15   Q    Now let's turn to the sixth page of this document, the

16   operations plan from the third day.  And it says now, a category

17   for mass arrests.  What's that?

18   A    Mass arrests is a process we do.  It's mainly made up of

19   detectives.  So, if we make arrests, we're able to process those

20   arrests in a timely manner, especially if we make a large mass

21   arrest.  So, I think this was the night of -- could have been

22   the first night of the curfew.  So, we needed mass arrest people

23   in position.  So, if somebody is arrested, we notify Denver

24   Sheriff's Department, we're going to attempt to make some

25   arrests, could be a lot of arrests.  So, they're aware of that,

20-cv-1878-RBJ   PATRICK PHELAN - Cross   03-15-2022

1    of arrestees coming to their location, and so people don't have

2    to stay in custody as long, the process doesn't take as long.

3         These guys are trained to do the paperwork.  We hand it

4    off to them.  They're able to process those individuals that

5    were arrested for whatever -- in this case most of them were

6    probably curfew.  They process that right away, and get them --

7    get it going.  Those officers would have to return back into the

8    field.

9    Q    All right.  Let's take this down.  And now, did your day on

10   May 30th begin similarly to the days that we've already

11   discussed?

12   A    Yes.  I'm sure it began with a briefing.

13   Q    And you discussed the rules of engagement and the dispersal

14   of munitions?

15   A    Right.

16   Q    Okay.  So, let's go to the summary, the after-action report

17   for the days, the events of day three, which is Exhibit 470.

18   And we will turn to page 1927, which again, this copy is

19   highlighted to kind of highlight what was going on during the

20   day.  Okay.  So, we see the date here.  May 30th, 2020.  Looks

21   like injuries this day.  How many officers were injured?

22   A    Five injured officers.

23   Q    Okay.  Looks like we've got some more things here.

24   A    Right.

25   Q    But what I'm really interested in, let's go to the next

20-cv-1878-RBJ   PATRICK PHELAN - Cross   03-15-2022

1   page.  All right.  So, what time did it start that day?

2   A    10:30 in the morning.

3   Q    Okay.  And looks like you're proceeding through the daytime

4   hours pretty calmly.  Is that your recollection?

5   A    Yes.

6   Q    Okay.  What time did things start to differ?

7   A    Looks like -- I'm trying to look through there.  There's a

8   party stabbed at -- that looks like Colfax and Broadway.  That's

9   at 1925.  There's one at 14th and Lincoln.  Also report being --

10   taking rocks, being thrown at them at Colfax and Lincoln.

11   That's at 1930.  Are you trying to underline something?  Kind of

12   right in the middle of that.  1845.

13   Q    Okay.

14   A    We got report of a gunshot wound of a party to the head.

15   Q    Okay.  So, moving into 2030, which is 8:30; is that

16   correct?

17   A    Correct.  8:30.  We're getting dumpster fires, dumpster on

18   fire, breaking windows out with a baseball bat, 15th and

19   Cleveland, dumpster fire, officers taking rocks being thrown

20   with one officer struck, and in need of medical attention.

21   Reports of party breaking into police vehicle, 1600 block of

22   Lincoln.  On and on.  Reports of parties throwing rocks in 1200

23   block of Corona Street.  Reports of parties breaking into a

24   business in the 14 block of Logan.  Reports of parties throwing

25   rocks at officers at 14th and Pearl.  Reports of parties making

20-cv-1878-RBJ   PATRICK PHELAN - Cross   03-15-2022

1    Molotov cocktails behind the Argonaut Liquor, 760 East Colfax.

2    Report of officers struck by a rock in 1400 block of Grant

3    Street.  Keeps kind of going.

4    Q    So, it just keeps going.  Looks like there's a Molotov

5    cocktail, parties making Molotov cocktails.  So, again, was it

6    more of the same on this day at night?

7    A    As -- I think as the helicopter said, more mayhem, yes.

8    Continuing mayhem.

9    Q    Okay.  But during the day, it looks like there was no

10   activity --

11   A    During the day, there's protesters out there.  They marched

12   all over.  We facilitated, we provided traffic resources to make

13   that protest as safe as we can.  They marched all through 16th

14   Street Mall, downtown, around.  They did it every day.

15   Sometimes smaller groups, sometimes larger groups, but we kept

16   an eye on them.

17            MS. BIRKHOLZ:  I'd like to move to admit Exhibit 3150.

18   And that's photographs from Plaintiffs' Exhibit 910.

19            MS. WANG:  No objection.

20            THE COURT:  3150 is admitted.

21   Q.   (By Ms. Birkholz) All right.  We're going to pull up some

22   photographs here.  Sorry for the technical difficulty.  No

23   worries.  All right.  So, we're going to look at some

24   photographs here.  And we're just going to kind of scroll

25   through a few of them.  Is this consistent with your

20-cv-1878-RBJ   PATRICK PHELAN - Cross   03-15-2022

1 recollection of what activity looked like during the day?

2 A    Yeah.  Absolutely.  These marches all day, obviously going

3 the wrong way, but that's okay.  We're providing -- you know,

4 we're facilitating their march, peaceful marchers, First

5 amendment right.  They're assembling.  It's great.  It's

6 America.

7 Q    And were there several occasions like this during the

8 protest where people are allowed to express their message?

9 A    Absolutely.

10 Q    All right.  Let's take these photographs down.  Now, on

11 May 30th, Ms. Wang addressed with you a particular incident

12 surrounding an area where you mentioned that DOTI or public

13 works people were clearing out a rock bed.  Is that consistent

14 with your testimony that we discussed earlier?

15 A    Yes.

16        MS. BIRKHOLZ:  Okay.  So, now, I would like to -- have

17 we already admitted 527, Liz?  So, I would like to, if we have

18 not, move to admit Exhibit 527, which is Air One from May 30th,

19 into evidence.

20        MS. WANG:  I don't -- I may not object to specific

21 times, but I do object to the entire recording for the whole

22 day.

23        MS. BIRKHOLZ:  Sure.  So, we will be playing 1709 to

24 1809.

25        THE COURT:  All right.  I don't know about those, but

20-cv-1878-RBJ   PATRICK PHELAN - Cross   03-15-2022

1    it's admitted.

2            MS. BIRKHOLZ:  So, we're going to start playing at

3    about 36 minutes and 45 seconds.

4        (A video was played.)

5    Q.    (By Ms. Birkholz) All right.  So, let's stop right there.

6    Can you move it forward a bit more?  I think we're looking at

7    the wrong time.  So, we will just -- that's no problem.  Just

8    move it ahead a little bit, and we will see if we can find where

9    I'm talking about.  So, we've already discussed -- so, we've

10   already discussed what was kind of going on at this location --

11   okay.  Tell me -- if you would, tell us -- tell us, is -- so,

12   what do we see here?  Oh.  Apologies.  What did we see coming

13   through on that clip?

14   A    Well, it was -- it was equipment from like a bulldozer,

15   grader.  You could see in this photo here -- I don't know if you

16   guys can see this.  This is where all the rocks were.  This is

17   all large rocks here.  They're removing those rocks.  You're

18   seeing public works removing those rocks.

19   Q    So, let's skip ahead, maybe -- I don't know.  Is it okay,

20   Liz, do you mind if I -- let's skip ahead about five minutes or

21   so, and see if we can find -- I want to find the space where the

22   actual equipment is in the -- in the square so that we can see

23   what -- what officers are doing so that we can understand

24   your -- your plan at that point in time.

25       (A video was played.)

20-cv-1878-RBJ    PATRICK PHELAN - Cross    03-15-2022

1    Q    All right.  So, it looks like we're not finding it.  So, if

2    you would, where were officers positioned at this point in time

3    as the public works equipment was clearing out the rocks?

4    A    They had formed a perimeter around that area so that they

5    could work that area.

6    Q    What do you mean, perimeter?

7    A    They had skirmish lines around that area that we're trying

8    to recover the rocks from.

9    Q    So, did they make a complete square around the area?

10   A    Yes.  They're trying to -- they're trying to have a

11   perimeter on each side to protect those public work officers

12   that were doing that, removing those rocks.

13   Q    Okay.  How long did that take?

14   A    It took quite a while.

15   Q    Why was an unlawful assembly not declared in that area?

16   A    I'm sorry?

17   Q    Why was an unlawful assembly not declared in that area?

18   A    Because there was no issues to declare.

19   Q    Okay.  Now, yesterday there was some testimony through

20   Officer Valentine, which I will just bring to your attention,

21   regarding some tents located along Colfax.  And he suggested

22   that there were weapons stashed inside of homeless individuals'

23   tents.  Is that consistent with what you heard?

24            MS. WANG:  Objection.  Hearsay.

25            THE COURT:  Overruled.

20-cv-1878-RBJ   PATRICK PHELAN - Cross   03-15-2022

1    THE WITNESS:  Can I have the question again, please?

2    Q.    (By Ms. Birkholz) Sure.  Do you recall reports of items,

3    objects, like rocks being stored in homeless individuals' tents?

4    A    I don't recall that, no.

5    Q    Now, with respect to homeless individuals' property, what

6    is your understanding of DPD's policy with respect to removal of

7    homeless people's property?

8    A    I'm not an expert on that, but when we do remove property

9    from homeless, that is stored.  It's cataloged and stored.

10   Q    Is there a process for taking people's belongings from

11   them?

12   A    For the homeless?

13   Q    Yes.

14   A    I believe so.

15        MS. BIRKHOLZ:  I'd like to move on.  I'd like to move

16   to admit Exhibit 3106.

17        MS. WANG:  No objection.

18        THE COURT:  All right.

19   Q.    (By Ms. Birkholz) All right.  So, now showing you, soon,

20   hopefully, some photographs.  Commander Phelan, do you recall

21   situations where protesters blocked the roads?

22   A    Frequently.

23   Q    Okay.  And what we're seeing in these photographs, are

24   these examples of what protesters would do to block the roads?

25   A    Correct.

20-cv-1878-RBJ   PATRICK PHELAN - Cross   03-15-2022

1   Q     How frequently did this happen?

2   A     It happened frequently.

3   Q     Is it concerning --

4   A     A couple times a day.  If there was barricades anywhere

5   that they were using, say, for official barricades for

6   construction or whatever, they would always pull them away, drag

7   them into the street.  You see some fencing material, and

8   probably some legitimate barriers were probably somewhere else.

9   You see a road closed sign that's been painted over.  So, they

10  just bring whatever was available and block streets.

11  Q     What logistical concern did this present to officers?

12  A     I think we talked about this before, mainly emergency

13  equipment, whether it's fire, paramedics, EMS trying to get from

14  one location to another location.  They're responding in

15  emergency situations, and they're blocked.  So, they can't get

16  through.

17  Q     Okay.  Let's go ahead and take these down.  Commander

18  Phelan, what was the biggest change about the police response

19  day three?

20  A     The curfew violation.

21        MS. BIRKHOLZ:  Okay.  So, let's -- I'd like to move to

22  admit Exhibits 453 and 454.

23        MS. WANG:  No objection.

24        THE COURT:  All right.  Admitted.

25  Q.    (By Ms. Birkholz) All right.  So, we're going to show you

20-cv-1878-RBJ   PATRICK PHELAN - Cross   03-15-2022

1    first, just Exhibit 453.  What is this?

2    A    That's an order from the mayor, Michael Hancock, emergency

3    curfew order.

4    Q    Okay.  And so Mayor Hancock is the one that instituted this

5    curfew; is that correct?

6    A    Yes, ma'am.

7    Q    Okay.  When was this curfew in effect?

8    A    May 30th.

9    Q    Okay.  Was it also in effect subsequent days?

10   A    Yes.

11   Q    Okay.  How many days?

12   A    I think through the weekend, through the 31st.

13   Q    Okay.  What time did the curfew start?

14   A    8:00 p.m.

15   Q    Okay.  And what was your understanding as to its purpose?

16   A    The purpose is that we had people -- it was a riotous

17   situation.  We had to stop that, any way to stop the behavior

18   that was happening.  So, we were having criminal mischief.  We

19   were having officers attacked.  We had to stop that behavior,

20   and there was no need for -- the people that were down there

21   were causing that, so we wanted to make sure there was a curfew

22   so nobody was on the street after 8:00 p.m.  Because that's when

23   we were seeing the most violence, the most mischief, after

24   8:00 p.m.

25   Q    How was it made known to the public that the curfew was in

20-cv-1878-RBJ   PATRICK PHELAN - Cross   03-15-2022

1   effect?

2   A   Well, they put this up on all their media sources, radio

3   sources, whatever.  The PIO, the public information officer puts

4   that out.  So does the mayor's office.  So does the police

5   department.  So, several different media outlets, it's put out

6   onto.

7   Q   For those present out after curfew, what was done to let

8   them know that it was now after curfew?

9   A   Well, announcements were made via the LRAD, and both the

10  LRAD and all the vehicles were told to start making

11  announcements via their PA system in their vehicles.

12  Q   What's an LRAD?

13  A   It's an acoustic equipment, stands for long range audio

14  device.  And so what that means, we put it on top of the parking

15  garage at 14th and between Sherman and Lincoln.  And what it

16  does, it's -- has the capability, like I talked about earlier,

17  voice of God, you can hear it from about a mile.

18  Q   Is that equipment owned by DPD?

19  A   It's owned by office of emergency management, I believe.

20  Q   And I believe one of the plaintiffs, Mr. Packard said that

21  it was maybe a cannon.  Does it shoot anything?

22  A   The LRAD?

23  Q   Yeah.

24  A   No.  It looks like a giant speaker.

25  Q   Okay.  So, it just makes announcements?

20-cv-1878-RBJ   PATRICK PHELAN - Cross   03-15-2022

1   A    Yes.

2   Q    Okay.  Understand.  So, how did the protesters respond on

3   the first night of the curfew to the announcements that it was

4   curfew?

5   A    Not very well.  There didn't seem to be any movement or

6   anybody seemed to go home.

7   Q    What -- so, you mentioned that the curfew gave DPD the

8   authority to arrest; is that correct?

9   A    Correct.

10  Q    Okay.  Did DPD begin making arrests at 8 o'clock when the

11  curfew went into effect?

12  A    No.  We wanted to give them an opportunity to leave.

13  Q    How long did you wait to begin enforcing the curfew?

14  A    I think probably a half hour.

15  Q    Okay.  And what if people refused to leave after

16  instruction to do so?  What happened?

17  A    They were subject to arrest for curfew violation.

18  Q    Okay.  What type of -- on that continuum that we saw in the

19  operations manual, what sort of resistance is that classified

20  as?

21  A    That would be defensive resistance.

22  Q    Okay.  So, under those circumstances, what does policy

23  allow you to use?

24  A    Use less-lethal chemical agent.

25  Q    Okay.  Now, I want to shift gears.  We can take this down.

20-cv-1878-RBJ   PATRICK PHELAN - Cross   03-15-2022

1   One of the plaintiffs -- or two of the plaintiffs, Ms. Rothlein

2   and Ms. Blasingame have alleged an incident near their house.

3   And I want to look to the CAD in that location, which is

4   Exhibit 450, already admitted into evidence.

5         So, the night of May 30th, near -- on -- strike that.

6   Sorry.  The night of May 30th, at Pennsylvania and between

7   Colfax and 14th, we've heard some plaintiffs testify about an

8   event there.  And I want to draw your attention starting at 2236

9   through 2335.  Whoops.  I am already messing up here.

10  Apologies.  Okay.  22:36:28.  I'm just going to draw a box

11  around this real quick.  Apologies it's taking me so long.  I

12  don't think this is the right date.  Is it?  Oh, no.  It is.

13  I'm sorry.  Yes, please.  Sorry.  Apologies.  So, starting at

14  22:36:28 time, what does that CAD entry say?

15  A    2238?

16  Q    22:36:28.

17  A    470, 14th and Penn, rocks.

18  Q    The one under that, what does that say?

19  A    470 Adam, 14th and Penn, taking rocks.

20  Q    22:36:44?

21  A    470, group of 20, 25, standing there.

22  Q    23:02:06?

23  A    Below that?

24  Q    Yeah.

25  A    It says Lincoln 122, have SC5, take 14th and Logan.  Is

20-cv-1878-RBJ    PATRICK PHELAN - Cross    03-15-2022

1   that what you're talking about?

2   Q    No.  23:02:06.

3   A    Okay.  You have to go down to that.

4   Q    Okay.  Then let's go down to 23:35:39.

5   A    640 Adam, 14th and Penn, taking rocks.

6   Q    And then there's about four more entries which we will

7   highlight, but as we get down to 23:35:39?

8   A    Colfax and Penn, scout car for five.

9   Q    So, I see a whole bunch of reports of taking rocks at 14th

10  and Penn, and then a scout car.  What does this CAD entry tell

11  you?

12  A    Those CAD entries?

13  Q    Yes.  What do those CAD entries tell you about what was

14  happening at the time?

15  A    The officers are taking rocks at that location.  They're

16  making some arrests.  They call -- a scout car is a vehicle by

17  the Denver Sheriff's Department that transports prisoners for

18  us.  So, a scout car is going up there, and it says they're

19  transporting five.  So, it looks like five individuals are under

20  arrest, I imagine for curfew, or I don't know what they were

21  arrested for, but five individuals under arrest.

22  Q    Okay.  And in the situation where officers are taking

23  rocks, what is the type of resistance that's permitted under

24  DPD's policy?

25  A    Defensive.

20-cv-1878-RBJ   PATRICK PHELAN - Cross   03-15-2022

1   Q    Did you say defensive?

2   A    Yes.

3   Q    Is taking rocks considered active aggression under DPD's

4   policy?

5   A    It can.  Absolutely.

6   Q    So, it depends on the circumstances?

7   A    Level of intent.  It would be probably the size of the

8   rocks, who got hit, how injured they were would determine the

9   severity.

10  Q    Okay.  On this night, how late did you guys end up policing

11  the protest?  If you recall.

12  A    Late, I'm sure.  I don't know.

13  Q    After midnight?

14  A    Oh, definitely.  Usually it was like 1:00, 2:00 in the

15  morning.

16  Q    Okay.

17  A    Later, 3:00, could be.

18  Q    And do you believe you had enough officers to police the

19  protest that day?

20  A    The third day?  We could use -- we could have used probably

21  more officers, too, but there was a better response.  We had

22  more -- the issue we had, and why we needed more individuals,

23  more officers, we had to surround District 6.  We surrounded

24  headquarters.  We put officers inside that perimeter, inside the

25  perimeter of headquarters.  We put officers inside the perimeter

Kevin P. Carlin, RMR, CRR

20-cv-1878-RBJ    PATRICK PHELAN - Cross    03-15-2022

1    of District 6 so we wouldn't have that confrontation.  So, they

2    were assigned inside those locations.

3           So, they were static, had to stay at that location.

4    So, we needed officers to be in those locations.  We also put

5    officers inside the State Supreme Court building.  Several

6    buildings, public buildings, we put officers inside there, but

7    they were assigned to those locations and couldn't leave, which

8    means we still needed officers to respond for mobile response

9    throughout the city and throughout that area, so we could use

10   the officers.

11   Q    Okay.  And on day three, was Colorado State Patrol also

12   present doing the same thing that they were doing the days

13   before?

14   A    I'm sure.

15   Q    Okay.  Now, let's move on to May 31st.  Was this day much

16   different from the three prior days?

17   A    No.

18   Q    Okay.  You started the day with command post, a briefing,

19   talking about all the same things?

20   A    Right.  Same things.  There's marches.  We would facilitate

21   the marches.

22   Q    Okay.  Now, what differences were there in the mutual aid

23   jurisdictions that you called upon for this day, if you recall?

24   A    As far as which mutual aid?

25   Q    Yeah.  Were there additional --

20-cv-1878-RBJ   PATRICK PHELAN - Cross   03-15-2022

1   A     Mutual aid, I think Douglas County and Arapahoe County came

2   on those days.  So, there's several different outside

3   jurisdictions.

4   Q     Okay.  Do you believe Commerce City or Brighton --

5   A     Yes.  Commerce City and Brighton.

6   Q     Okay.  Now, let's just look at Exhibit 470, just briefly.

7   This is the after-action report for this day.  Just to get a

8   brief synopsis of what was going on.  So, if you could, by

9   looking through this, briefly tell us, you know, what did

10  May 31st look like during the day and as it shifted into the

11  evening?

12  A     Like I said, more of the same activity.  During the

13  daylight hours, it's -- crowd march -- no.  Crowd marching to

14  DCPA, which is Denver Center for Performing Arts, convention

15  center.  Crowd at Veterans Park.  Just the same thing during the

16  day.

17  Q     And as we move on to the evening hours.

18  A     Do you have it highlighted?  I can't --

19  Q     No.  This version does not appear to be highlighted, but

20  does it look, based upon these entries in this report --

21  A     Yes.  Right.  We're getting curfew -- talking about curfew,

22  12th and Lincoln on parties with flak jackets.

23  Q     Oh.  I guess we're switching to the highlighted version.

24  Apologies.

25          MALE SPEAKER:  So sorry.

20-cv-1878-RBJ   PATRICK PHELAN - Cross   03-15-2022

1   Q.   (By Ms. Birkholz) All right.  So, as we're heading into

2   the evening hours --

3   A   Right.  Cover of darkness.  It's dark now.  Crowd starting

4   to throw bottles and rocks at officers.  Stationed at

5   District 6.  Less-lethal deployed for officer safety.  Dumpster

6   fire at Colfax and Emerson.  They're breaking into the Hyatt

7   Hotel, 650 15th Street.  They're trying to break in.  Large

8   group throwing rocks at officers, 1100 block Acoma-Bannock

9   alley.

10   Q   Okay.  So, much -- much of the same.  As it turned to

11   darkness, things -- events started happening?

12   A   Right.

13   Q   Okay.  So, I'd like to go up just a little bit on this,

14   because we talked earlier -- you talked earlier with Ms. Wang

15   about the kettling, as they classify it, incident at the

16   Basilica.  Do you recall your conversation?

17   A   Yes.

18   Q   Okay.  So, I'd like to draw your attention to this section

19   of events, through 2209 or so.  Okay.  And describe for me what

20   was happening in the area of Colfax around the Basilica to the

21   District 6 station.

22   A   Crowds started throwing bottles and rocks at officers

23   stationed at District 6.  We talked about that.  Crowd seems to

24   be heading to District 6.  Attacked two officers, bottles and

25   rocks.  Gas deployed District 6 area.  Denver Health Medical

20-cv-1878-RBJ    PATRICK PHELAN - Cross    03-15-2022

1  Center responding to a party with a head injury, 14th and

2  Washington.  Dumpster fire, Colfax and Emerson.  Colfax and

3  Washington, officers taking rocks and bottles.  LRAD

4  announcements starting, advising of curfew violations, ordering

5  parties to leave area.  First announcement made regarding curfew

6  information and advising to leave area.  Announcements will be

7  made every five minutes.

8       Arrests starting to be made.  Announcements with LRAD

9  being made every two minutes.  Scout car being sent to Colfax

10  and Logan for arrest.  Team advised that media are not to be

11  arrested.  Announcements being made every minute now.  Reports

12  of group trying to break into the Hyatt, 650 15th Street.  Group

13  at 13th and Cherokee blocking the intersection.  Two officers

14  down at Colfax and Penn, Natural Grocers lot.  Denver Health

15  Medical Center en route, code ten.

16  Q    All right.  You can stop there.  So, with the exception of

17  this one, which I'm going to line out, is all of this activity

18  that was happening in that area that you discussed with

19  Ms. Wang?

20  A    Yes.  It appears to be.

21  Q    Okay.  I'd now like to show you Exhibit 451, which is in

22  evidence.  And that's the CAD from this day.  All right.  And

23  we're going to go down to the page marked Den 2068, 2069.  I

24  think it's on 2069.  All right.  And I'd like to draw your

25  attention to 2143.  So, I think we're looking for the CAD from

20-cv-1878-RBJ   PATRICK PHELAN - Cross   03-15-2022

1    May 31st.  Is that Exhibit 452, perhaps?  All right.  So, we

2    will come back to that as he's pulling this up.

3             So, what is your recollection as to what was going on

4    in this area, just to refresh the jury's recollection as to your

5    testimony?

6    A    As I recall, as we saw earlier, a large crowd was moving

7    eastbound on Colfax towards District 6.

8    Q    Okay.  And I'd like to draw your attention to 21:34:35.

9    Right here.  Taking explosives, Pearl and Colfax.

10   A    Right.

11   Q    And that's what you testified to on direct examination?

12   A    I remember, yes.

13            MS. BIRKHOLZ:  Okay.  All right.  So, now, I would

14   like to move to admit Exhibit 528, which is Air One video, and

15   playing essentially the first minute and 15 seconds.

16            THE COURTROOM DEPUTY:  Has this already been admitted?

17   I'm sorry.

18            MS. BIRKHOLZ:  This is a different day, so it has not

19   actually been admitted yet.

20            MS. WANG:  No objection to this time.

21            MS. BIRKHOLZ:  All right.  So, we've already talked

22   about your tactical plan, and now I would like to play the radio

23   with respect to what your plan was.

24            THE COURT:  All right.  It's admitted.

25            MS. BIRKHOLZ:  I am so sorry.

20-cv-1878-RBJ   PATRICK PHELAN - Cross   03-15-2022

1      THE COURTROOM DEPUTY:  He said admitted.

2      MS. BIRKHOLZ:  Okay.  Thank you.  All right.  So,

3  we're going to start at about, I don't know, 15 seconds on the

4  clock, and play until about one minute.

5      (A video was played.)

6      MS. BIRKHOLZ:  All right.  So, I want you to listen to

7  the next comment that you make.  Go ahead.

8      (A video was played.)

9  Q.   (By Ms. Birkholz) All right.  So, let's stop there.  You

10 said make sure they have an escape route.  If they choose to

11 take it, that's their own choice, or something like that; right?

12 A    Yes.

13 Q    Okay.  So, now we're going to turn to the HALO video at

14 Exhibit 546, which is already into evidence.  So, as we pull

15 that up, you've already told us you ordered a mass arrest of

16 that group of people; correct?

17 A    Started making arrests, yes.

18 Q    Now, the tactical move of moving in on a crowd that you

19 have the ability to arrest, is that permissible?

20 A    It's permissible, yes.

21 Q    Why is that?

22 A    Because there's probable cause to make those arrests.

23 Q    Okay.  So, had you not had the curfew order or probable

24 cause to arrest them, would moving two groups of officers

25 together be permissible?

20-cv-1878-RBJ   PATRICK PHELAN - Cross   03-15-2022

1  A     If I didn't -- if I did not have the curfew?

2  Q     If you did not have the curfew --

3  A     No.

4  Q     -- would the answer to that question be different?

5  A     No.  No.

6  Q     So, we are working on pulling up some HALO video that

7  you've already seen from -- okay.  Perfect.  So, we're going to

8  open this up.  And at this point in time, you know, I just want

9  to kind of lay the land a bit.  We can move it forward a little

10  bit.

11        (A video was played.)

12  Q     Okay.  So, at this point in time you already testified that

13  Aurora was down the street a bit.  Is that consistent with your

14  recollection?

15  A     Yes.

16  Q     Okay.  And we've already set the stage with respect to what

17  Aurora was facing.  Move it forward a bit more.  All right.  So,

18  now we see a crowd of people heading -- you mentioned toward the

19  District 6 station; right?

20  A     Mm-hmm.

21  Q     Okay.  At this point in time, do you see anyone with the

22  Denver Police Department in this shot?

23  A     No.

24  Q     Okay.  Do you see Aurora down there at the end of the --

25  end of the screen?

20-cv-1878-RBJ   PATRICK PHELAN - Cross   03-15-2022

1   A     You know, I can't say I do, no.  They're down there.  I

2   just can't see them.

3   Q     Okay.  Now, we've already established this is over here,

4   the Basilica, and this is Logan Street; is that correct?

5   A     Correct.

6   Q     Now, it looks like quite a group is moving toward the

7   District 6 station.  Were the police pushing them there, or were

8   they voluntarily walking in that direction?

9   A     They had left the capitol, and were walking that direction.

10  Q     Okay.  Now, what -- what is happening down there?  Can

11  you -- is that the flashlight that -- hold on.  Pause real

12  quick.

13  A     When you say down where?

14  Q     So, right here.  What's that?

15  A     I don't know what that is.

16  Q     Fair answer.

17  A     You might have to back it up a bit.  It looks like -- it

18  looks like fireworks or somebody is doing -- it could be a

19  flashlight.  It's hard to say.  It might even be just -- hard to

20  say what that is.

21        (A video was played.)

22  Q     Okay.  So, at a certain point, now the crowd is coming this

23  direction?

24  A     Correct.

25  Q     Do you know what prompted that to occur?

20-cv-1878-RBJ   PATRICK PHELAN - Cross   03-15-2022

1   A   No.  Unless there's something -- something went off there.

2   It's hard to say.  I can't see what it is.  I have to kind of

3   keep going with that, or -- I -- something made them move back.

4   Q   So, we watched a different version on your -- I guess it

5   was the actual HALO cam.  Do you remember the flash of light

6   that you saw at that location?

7   A   We talked about that, I think earlier in the other video.

8   It was a green flash.  We saw it on the one video we watched

9   earlier.  There was that flash of green.

10   Q   And what do you think that was?

11   A   Probably --

12          MS. WANG:  Objection.  Calls for speculation.

13          MS. BIRKHOLZ:  If you know.

14          THE COURT:  The objection is overruled.

15          THE WITNESS:  I think it might -- I would speculate

16   that was probably fireworks, some sort of explosion that they

17   tossed at the officers.  We talked about that explosive device.

18   Maybe that's what that was.  I don't know.

19   Q.   (By Ms. Birkholz) Okay.  So, now when we push play, you

20   can see people going this way and this way.

21   A   Right.  They're going both north and south on Logan.

22   Q   Okay.  So, at this point in time, there's a mode of egress

23   for people to leave if they choose to do so; is that correct?

24   A   Correct.

25   Q   Okay.  Can you tell what this is down here now?

20-cv-1878-RBJ    PATRICK PHELAN - Cross    03-15-2022

1   A    That looks like chemical agent has been deployed there on

2   the ground.

3   Q    Okay.  And is it permissible for the Aurora officers in

4   this situation to deploy gas in response to the explosives that

5   were noted on the CAD report?

6   A    Yes.

7   Q    Okay.  Now, at some point we see the crowd move back toward

8   the line of Aurora officers.  Do you have any idea why that was?

9   A    They could see officers coming from the other direction.  I

10  don't know.

11  Q    Okay.  At this point in time, do you see Denver Police

12  anywhere in this shot?

13  A    No.

14  Q    Now, we will just -- we will just keep watching it, and you

15  will soon see on the screen smoke, things, things go off, and I

16  would like you to kind of describe what's happening as you watch

17  this.

18       (A video was played.)

19  A    Okay.  The crowd is moving up towards the Aurora officers.

20  It looks like they're coming back.  They were going north and

21  south on Logan.  I guess they decided they wanted to come back

22  and go to District 6.

23  Q    So, that method of egress is still available to them?

24  A    It's still available.  They're coming back in, both sides.

25  Q    Is this a DPD car over here?

20-cv-1878-RBJ   PATRICK PHELAN - Cross   03-15-2022

1   A     No.  They had several vehicles that would kind of travel

2   with them.

3   Q     And what were those vehicles called?  Did the protesters

4   have a term for those cars?

5   A     Not that I know of.  I mean, they'd use them to like hand

6   out whatever they were handing out.  They would hand out

7   backpacks and stuff with all their -- who knows what they were

8   doing with them.

9   Q     Okay.  So, what was this down here?

10  A     You have to back that up again.  I was watching the car.  I

11  apologize.

12  Q     Okay.

13        (A video was played.)

14  Q     Down here.  Did you see that?

15  A     Yeah.

16  Q     What was that?

17  A     It looked like probably fireworks there.

18  Q     Okay.  And now we see more of the crowd dispersing over

19  here and over here.

20  A     Yeah.

21  Q     Oh.  What was that?

22  A     That was an explosion.  Explosive.  That's nothing -- I

23  don't know what that -- that looks like -- the first one looked

24  like fireworks.  It's hard to say from here.  To me it looks

25  like fireworks, something going off that high in the air.

20-cv-1878-RBJ   PATRICK PHELAN - Cross   03-15-2022

1    Q    Okay.  At this point do you see any gas or smoke being used

2    on the other side of the screen?

3    A    No.

4    Q    Do you see any DPD officers to that side of the screen?

5    A    No.

6    Q    What was that?

7    A    Could be fireworks.

8    Q    Okay.  And do you see folks now going down the alley right

9    through here?

10   A    Yeah.  There's an alley.  They used the alley quite a bit.

11   They were always up and down the alleys.

12   Q    Was DPD pushing them there?

13   A    No.

14   Q    So, they were headed down the alley at their own behest, if

15   you will?

16   A    And there's another -- yeah.

17   Q    Okay.  And at this point in time, is DPD in the picture?

18   A    No.

19   Q    Okay.  Now, do you see this, though?

20   A    Yes.

21   Q    What is that?

22   A    It looks like a chemical agent.

23   Q    Okay.  Why would the use of chemical agents be permissible

24   in that time and at that spot?

25   A    Same reason.  There's explosives being deployed by the

20-cv-1878-RBJ   PATRICK PHELAN - Cross   03-15-2022

1  crowd.  They're not moving.  We have a curfew violation.

2  Q    Okay.  So, you had probable cause to arrest all these

3  people, or have them arrested, order their arrest?

4  A    Correct.

5  Q    Okay.  Was this tactical plan in compliance with DPD's

6  policy?

7  A    Yes.

8  Q    Was the use of chemical munitions at this time and place in

9  compliance with DPD's policy?

10  A    Yes.

11  Q    All right.  We can take that down.  Let's shift to

12  June 1st.  How was this day different?

13  A    June 1st, it started kind of settling down.

14  Q    Why was that?

15  A    You know, the reason it started settling down, we made all

16  the curfew arrests.  I think in two or three days, we made so

17  many curfew arrests, I think people realized there is a

18  consequence for doing what you're doing.  So, the fun is over.

19  The people that came down from wherever, they wanted to throw or

20  engage in that type of activity, realized there's a consequence,

21  I had to go to jail.  So, the numbers really came down.

22          Also, I think on that day, I believe Chief Pazen

23  marched with the protesters, you know, trying to do what he can

24  to get this violence to stop, get this behavior or activity to

25  stop.

Kevin P. Carlin, RMR, CRR

20-cv-1878-RBJ   PATRICK PHELAN - Cross   03-15-2022

1   Q    Now, we could look at the after-action report, but I will

2   not do that, but would you say that the same trend occurred

3   that, you know, it was very peaceful during the day, and was it

4   as violent as it had been at night?

5   A    No.  It wasn't.  It was calming down.

6   Q    All right.  So, Commander Phelan, I'm going to wrap up

7   here.  Would you say that being the commander of this operation

8   was one of the more challenging experiences in your career?

9   A    Well, you know, incident commander is always challenging.

10  I don't know if that's -- from my career is something we did

11  quite a bit of.  I think what I felt about it, it was one of the

12  most disappointing times of my career, to see what people would

13  actually do, the property damage, the way they treated the

14  police.  It was actually sad.  That's what I felt.  It was

15  disappointing.  Not challenging.  I did that all the time.  But

16  that's how I felt about it.

17  Q    Were you aware of the community members' impressions of

18  what was going on in Denver?

19             MS. WANG:  Objection.  Foundation.

20             THE COURT:  Sustained.

21  Q.   (By Ms. Birkholz) Now, you observed what was going on

22  during the protests?

23  A    Yes.

24  Q    Okay.  And community members reached out to you?

25  A    Yes.

20-cv-1878-RBJ   PATRICK PHELAN - Cross   03-15-2022

1    Q    What was the message that they directed?

2    A    It was a message of support, appreciation.  What we had to

3    go through, what we were doing.  Appreciate, you know,

4    protecting the property.  Protecting them.

5    Q    Okay.  Now, during this trial, Seattle's former police

6    chief, Norman Stamper, who retired after the WTO conference in

7    Seattle, talked to us last week about Denver's actions, Denver's

8    behavior, their use of munitions, which he expressed was

9    excessive.  Do you personally remember the WTO conference in

10   Seattle?

11   A    Yes, I do.  I was a lieutenant in the Metro SWAT unit.

12   Q    What do you personally recall about that?

13   A    It was hectic.  It was probably the biggest -- biggest

14   failure of crowd control so far that I've ever heard of.

15   Q    How did that affect what you -- how it -- how did that form

16   you or alter your vision as you stepped into the incident

17   commander role?

18   A    Well, I think we were always changing to do things better,

19   and that's what we have to do.  With any incident, whether it's

20   there or here or anywhere, you know, what can we do better to

21   serve the public?

22   Q    Okay.  How in your opinion did Denver's response to the

23   George Floyd protests look compared to the WTO conference?

24   A    Completely different.  I mean, we were in control, as best

25   we can be.  They didn't -- you know, what happened, if you saw

20-cv-1878-RBJ    PATRICK PHELAN - Cross    03-15-2022

1   what subsequently happened in -- after the George Floyd in

2   Portland and Seattle, they were in possession of areas for

3   hundred, three months, four months.  They had areas of -- they

4   took over a police station.  They had an area there which is a

5   no-fly zone.  It was just different there.  So, we stopped the

6   activity the best way we could at the time.

7   Q    Now, what is your belief with respect to Denver's response

8   to the George Floyd protests in balancing the First amendment

9   rights of the protesters along with the community's interests?

10  A    Well, we have our -- you know, it's our responsibility to

11  safeguard the public and safeguard property.  So, that's our

12  responsibility as police officers.  There has to be a balance.

13  It's okay.  We welcome protests.  We welcome assemblies.  That's

14  our job.  That's what we do, you know, hundred, 150 times a

15  year.

16        So, we have to balance that.  And they're allowed, and

17  we facilitate -- like I've said numerous times, we facilitate

18  them going on these protests, whatever the protest is about,

19  fine.  You know, we enjoy communication.  So, we can confer on

20  that, but when it changes from a peaceful protest into violence

21  and, you know, criminal behavior against property, and violence

22  against people and cars, that's different.  That's not peaceful

23  protesting.  That's violence.

24        MS. BIRKHOLZ:  No further questions.

25        THE COURT:  Redirect?

20-cv-1878-RBJ   PATRICK PHELAN - Redirect   03-15-2022

<strong>REDIRECT EXAMINATION</strong>

BY MS. WANG

Q    Just to clarify, you were not a lieutenant in Seattle -- in

the Seattle Police Department at the time of the WTO; right?

A    Thank God, no.

Q    Okay.  You were with the DPD at that time?

A    Yes, ma'am.

Q    Okay.  Just wanted to make sure I heard you properly.  Now,

you talked at the end here with Ms. Birkholz about how community

members appreciated what DPD did in response to the protest;

right?

A    Yeah.  We'd go -- any time we were on a break, or I --

everywhere I went, especially in uniform, people made an effort,

and that was happening department-wide.  It was really -- it was

nice.

Q    Are you aware that city council, Denver City Council

ordered the Office of Independent Monitor to investigate the DPD

for its response to the protests?

A    That would be the monitor's job to do that.

Q    But the city council asked for an investigation of DPD,

asked for an investigation of the DPD response to the protest;

right?

A    Yes.

Q    Okay.  So, there were at least city council members who

were very concerned about the DPD's response to the protest;

20-cv-1878-RBJ   PATRICK PHELAN - Redirect   03-15-2022

1  right?

2              MS. BIRKHOLZ:  Objection.  Speculation.

3              THE COURT:  Sustained.

4  Q.     (By Ms. Wang) Were you aware of the concerns expressed by

5  city council?

6  A     There was members of city council that supported us.  Some

7  don't.  So --

8  Q     Okay.  And afterwards, the Office of Independent Monitor

9  conducted an extensive investigation into the DPD response to

10  the protest; right?

11  A     Correct.

12  Q     And you were interviewed as part of that; right?

13  A     Yeah.  I didn't have to be, but I did.  I know the

14  independent monitor.  I wanted to be helpful for him.

15  Q     Okay.  And the independent monitor interviewed other people

16  at the DPD regarding how they responded to the protests; right?

17  A     I believe so.

18  Q     And the independent monitor created a lengthy report

19  summarizing his findings and conclusions; right?

20  A     Correct.

21  Q     And there were certain criticisms against the DPD for its

22  response; right?

23  A     Correct.

24  Q     Okay.  So, there were at least members of the community who

25  were very concerned about the DPD's response to the protest,

20-cv-1878-RBJ   PATRICK PHELAN - Redirect   03-15-2022

1   which resulted in an extensive investigation from OIM; right?

2   A    The members I talked to in the community, at least

3   personally, expressed thank you to me.

4   Q    Okay.  Let's talk about the kettling.  Now, let's put up

5   Exhibit 546.  So, Ms. Birkholz asked you at various times if you

6   ever saw any DPD officers come in from the west in this video;

7   right?

8   A    Yes, ma'am.

9   Q    Okay.  Let's go to the end.  Keep going.  Now, to be clear,

10  there's tear gas on the Colfax and Pennsylvania side; right?

11  A    Yes, ma'am.

12  Q    Okay.  And then there's tear gas that has been thrown from

13  the Colfax and Logan side; right?

14  A    If it has, I haven't seen it.

15  Q    We're going to get the full -- the full video up.

16  A    I appreciate that.  Thank you.

17  Q    All right.  All right.  Go to about 9:42 p.m.  Great.  Now,

18  you can let it play from here.  We're at 9:42 p.m.

19       (A video was played.)

20  Q    Now, this thing that's smoking down here, that's a tear gas

21  canister; right?

22  A    That's correct.

23  Q    So, there's tear gas on one side and tear gas on the other

24  side; right?

25  A    It looks like this is a chemical agent here below that you

Kevin P. Carlin, RMR, CRR

20-cv-1878-RBJ   PATRICK PHELAN - Redirect   03-15-2022

1   have circled.  It looks like possibly one canister.

2   Q    I'm sorry.  I had trouble hearing you.

3   A    I'm sorry.  Yes.  There's a canister -- it looks like a

4   canister was deployed here closer to Logan, and the majority is

5   up on Penn.

6   Q    So, there's tear gas on this entire block; right?

7   A    Well, there's open sections, but yes.  There's tear gas on

8   that block, yes.

9   Q    But you would agree that, you know, this section where we

10  don't actually see the smoke, you can still smell the tear gas

11  and inhale it; right?

12  A    Most likely.  It could be tear gas.  That could be smoke.

13  Q    All right.  So, the modes of egress, as Ms. Birkholz said,

14  were -- where were they supposed to go exactly?

15  A    Well, they're going -- it looks like they're almost all

16  gone.  It looks like they're going down the alley, southbound on

17  the alley.  And then of course several left the first time, I

18  guess decided to come back, but the second time, they had access

19  to Logan, both north and southbound.

20  Q    Okay.  So, if they wanted to get past this tear gas

21  canister down here, they could run past it, inhale the tear gas,

22  and then run around either corner; right?

23  A    If that is tear gas, if it isn't smoke, but this looks

24  pretty clear over here.  But yes.  To answer your question, yes,

25  they do still have access to leave on Logan.

20-cv-1878-RBJ   PATRICK PHELAN - Redirect   03-15-2022

1  Q    So, they could choose voluntarily to run past tear gas to

2  the east or to the west; right?

3  A    They could have made a selection to choose to leave a lot

4  earlier that they didn't make.  So --

5  Q    But now you're making them make the choice of running past

6  tear gas; right?

7  A    We have probable cause to make arrests.  Based on their

8  behavior of throwing the explosive, chemical agent was

9  introduced.

10  Q    You have no idea what that flash was back there, do you?

11  A    Not -- it was -- it was a flash that looked like it was

12  green.  It was nothing to do with the Denver Police Department.

13  Q    Okay.  So, when you ordered the Aurora officers to come in

14  from the east, they were just operating on their own volition?

15  A    No.  They were in -- they were holding -- they were holding

16  at, I think it was Colfax and Penn.

17  Q    Are you aware that people had to try to climb a spikey

18  six-foot tall fence over here on this side to escape the tear

19  gas?

20  A    Like I said, they could have left down the alley, or

21  earlier when the warnings were given, too.  They could have gone

22  either way on Logan.

23  Q    All right.

24  A    But they continued that activity.

25  Q    Let's continue playing.  And you can fast-forward a little

20-cv-1878-RBJ    PATRICK PHELAN - Redirect    03-15-2022

1    bit, do it like two times speed, since we've seen this before.

2         (A video was played.)

3    Q    So, now people -- do you know how big that alley is that

4    people are trying to squeeze through?

5    A    Yeah.  It's your standard alley, your standard-size alley

6    in Denver.  Looks like they're going through it now.

7    Q    And that was acceptable to you?

8    A    That they escaped through the alley?

9    Q    Yeah.  Forcing people to go down this alley was acceptable

10   to you?

11   A    If they had to go down the alley to leave, they went down

12   the alley.  That was their choice to go down the alley.  I

13   couldn't -- I can't expand the alley.  I'm not sure what your

14   question is.

15   Q    Let's pause it here.  This is DPD; right?

16   A    Correct.

17   Q    Okay.  So, DPD was in fact at Colfax and Logan throwing

18   tear gas into this block?

19   A    I saw one canister either of chemical agent or smoke.  I

20   wasn't sure what that was.

21   Q    Okay.  Let's play Exhibit 709.  It's Denver --

22        (A video was played.)

23   A    There's nobody there now.  I don't know where everybody --

24   Q    I'm sorry?

25   A    I didn't see anybody left there.  It looked like they all

20-cv-1878-RBJ   PATRICK PHELAN - Redirect   03-15-2022

1    left.

2    Q    So, because they actually were able to escape the clouds of

3    tear gas coming in from both sides, it was all good with you how

4    that happened?

5    A    The purpose of that chemical agent is to make people leave

6    an area, and that's what that did.

7              MS. WANG:  Showing Exhibit 709.  I move for admission.

8              MS. BIRKHOLZ:  No objection.

9              THE COURT:  It's admitted.

10             MS. WANG:  Okay.  You can play 709.

11        (A video was played.)

12   Q.   (By Ms. Wang) So, this is a Denver body-worn camera worn

13   by Officer Hockeffer [sic], and the date is 9:41 -- pause it

14   there -- on May 11th, 2020, given the six hours back from this

15   time.  Okay?

16   A    Mm-hmm.

17   Q    Do you recognize --

18   A    Yes.  Sorry.

19   Q    Do you recognize the Basilica over here?

20   A    Yes.  I've gone to church there several times.

21   Q    Okay.  And this guy right here is a Denver police officer;

22   correct?

23   A    Yes.  It looks like it is.

24   Q    And he just threw a tear gas canister into the crowd;

25   right?

20-cv-1878-RBJ   PATRICK PHELAN - Redirect   03-15-2022

1   A     He threw a canister.  Whether it was smoke or gas, I

2   couldn't tell you.

3   Q     Okay.  Let's continue playing it for a little bit.

4         (A video was played.)

5   Q     And this explosive came from the crowd -- or from the

6   officers; right?  Did you see that?

7   A     No, ma'am.

8   Q     Let's go back.

9         (A video was played.)

10  A     Right there, that one there?

11  Q     Just a little bit.  Right -- let's watch here.  Okay?  This

12  is a police line.  This officer is part of a police line;

13  correct?

14  A     This guy is going by the line here on the left as you're --

15  Q     I'm asking you about the officer wearing the camera,

16  Officer Hockeffer.  He's part of a line of police officers;

17  right?

18  A     He's facing up Colfax, and the individual just left that

19  area right to his left.

20  Q     This guy got away?  Okay.  Let's watch the canisters being

21  thrown.  Go ahead.

22        (A video was played.)

23  Q     Did you see those two -- did you see those two things that

24  flashed and exploded in the air, and then were smoking?

25  A     Yes.  I saw those.  I don't know -- I don't know what --

Kevin P. Carlin, RMR, CRR

20-cv-1878-RBJ   PATRICK PHELAN - Redirect   03-15-2022

1   those are air dispersal, and I don't know what that would be.

2   Q    Okay.  Let's put up Exhibit 528, the radio communication

3   that Ms. Birkholz talked about.

4             THE COURT:  While you're looking at that, how much

5   more are you going to do?

6             MS. WANG:  Not -- well, not that much, but maybe like

7   ten minutes, Judge.

8             THE COURT:  Maybe what?

9             MS. WANG:  Ten minutes.

10            THE COURT:  Ladies and gentlemen, do you anticipate

11   having some questions for the witness?  Yes.  It looks like

12   quite a few.  All right.  We will stop here.

13            MS. WANG:  So, we're going to stop?

14            THE COURT:  We're stopping here.

15            MS. WANG:  Thank you, Judge.

16            THE COURT:  For the day.  I was hoping we could get

17   the commander done, but we can't.  Ladies and gentlemen, have a

18   nice evening.

19        (Jury out at 4:28 p.m.)

20            THE COURT:  All right.  The jury has been excused.

21   Anything for either side that you want to put on the record

22   before we recess?

23            MS. WANG:  No, Judge.

24            MR. RINGEL:  Nothing from the defendants.

25            THE COURT:  All right.  Sorry, sir.  We couldn't quite

1401

20-cv-1878-RBJ   PATRICK PHELAN - Redirect   03-15-2022

1    get it done.

2              THE WITNESS:  No problem, Judge.

3              THE COURT:  Are you okay for tomorrow?

4              THE WITNESS:  If you tell me, I am.  Yes.  I will be

5    okay.

6              THE COURT:  If tomorrow is a conflict, we can schedule

7    you another day to finish.

8              THE WITNESS:  I would have to look.  I was supposed to

9    be playing pickleball, but I will let you know.

10             THE COURT:  Well, I'm going to play pickleball at 5:30

11   in the morning.  How do you like that?  Maybe I should invite

12   you to play.

13             THE WITNESS:  You'd probably beat me.

14             THE COURT:  All right.  9 o'clock tomorrow.

15        (Proceedings concluded at 4:30 p.m.)

16

17

18

19

20

21

22

23

24

25

1402

1          REPORTER'S CERTIFICATE

2

3

4          I, KEVIN P. CARLIN, Official Court Reporter for the

5   United States District Court for the District of Colorado, a

6   Registered Merit Reporter and Certified Realtime Reporter, do

7   hereby certify that I reported by machine shorthand the

8   proceedings contained herein at the time and place

9   aforementioned and that the foregoing pages constitute a full,

10  true, and correct transcript.

11          Dated this 6th day of April, 2022.

12

13

14

15

16          _____
            Kevin P. Carlin, RMR, CRR
17          Official Court Reporter

18

19

20

21

22

23

24

25

                    Kevin P. Carlin, RMR, CRR