1    IN THE UNITED STATES DISTRICT COURT

2    FOR THE DISTRICT OF COLORADO

3   Civil Action No. 20-cv-1878-RBJ

4   ELISABETH EPPS AND SARA FITOURI, ET AL.,

5       Plaintiffs,

6       vs.

7   CITY AND COUNTY OF DENVER, ET AL.,

8       Defendants.

9   ----------------------------------------------------------------

10   REPORTER'S TRANSCRIPT

11   Jury Trial, Vol. 8

12   ----------------------------------------------------------------

13       Proceedings before the HONORABLE R. BROOKE JACKSON,
     Judge, United States District Court for the District of
14   Colorado, commencing on the 16th day of March, 2022, in
     Courtroom A902, United States Courthouse, Denver, Colorado.

15

16                   APPEARANCES
     For the Plaintiffs:
17   TIMOTHY R. MACDONALD, MATTHEW J. DOUGLAS, ANDREAS E. MOFFETT,
     and DIANA K. STERK, Arnold & Porter Kaye Scholer LLP, 1144
18   Fifteenth Street, Suite 3100, Denver, CO 80202

19   ELIZABETH C. WANG and MAKEBA RUTAHINDURWA, Loevy & Loevy, 2060
     Broadway Street, Suite 460, Boulder, CO 80302

20

21   For the Defendants:
     ANDREW D. RINGEL, KATHERINE HOFFMAN, and ROBERT A. WEINER, Hall
22   & Evans LLC, 1001 Seventeenth Street, Suite 300, Denver, CO
     80202

23
     HOLLIE R. BIRKHOLZ and LINDSAY M. JORDAN, Denver City Attorney's
24   Office, 201 West Colfax Avenue, Denver, CO 80202

25   Reported By KEVIN P. CARLIN, RMR, CRR, 901 19th Street, Room
     A259, Denver, CO 80294, (303)335-2358

     Proceedings reported by mechanical stenography; transcription
                   produced via computer.

                    20-cv-1878-RBJ    Jury Trial    03-16-2022

1                              I N D E X

2    PLAINTIFFS' WITNESSES                                        PAGE

3    PATRICK PHELAN
          Redirect Examination By Ms. Wang . . . . . . . . . 1406
4
     JONATHAN CHRISTIAN
5         Direct Examination By Mr. Macdonald . . . . . . . 1460
          Cross Examination By Mr. Ringel  . . . . . . . . . 1498
6         Redirect Examination By Mr. Macdonald . . . . . . 1525

7    KELSEY TAYLOR
          Direct Examination By Ms. Wang . . . . . . . . . . 1542
8         Cross Examination By Mr. Weiner  . . . . . . . . . 1570
          Redirect Examination By Ms. Wang . . . . . . . . . 1608
9
     ASHLEE WEDGEWORTH
10        Direct Examination By Ms. Sterk  . . . . . . . . . 1613
          Cross Examination By Mr. Weiner  . . . . . . . . . 1629
11        Redirect Examination By Ms. Sterk  . . . . . . . . 1648

12

13   PLAINTIFFS' EXHIBITS:

14

                                    Identified                Received
15

16        9g                        1554                      1554
          45                        1624                      1624
17        108                       1476                      1477
          299                       1426                      1427
18        351                       1450                      1450
          392                       1448                      1449
19        471                       1437                      1437
          502                       1468                      1468
20        545                       1620                      1620
          559                       1547                      1550
21        562                       1443                      1443
          613                       1478                      1479
22        712                       1621                      1621
          739                       1491                      1491
23        795                       1423
          949                       1564                      1564
24        1106                      1517                      1517
          1260                      1429                      1429
25        1261                      1431                      1432
          1263                      1619                      1619

20-cv-1878-RBJ    Jury Trial    03-16-2022

1    DEFENDANTS' EXHIBITS:

2                                      Identified              Received

3         3031                          1419                    1419
          3070                          1410                    1410
4         3077                          1410                    1410
          3079                          1410                    1410
5         3082                          1410                    1410

6

7    Reporter's Certificate  . . . . . . . . . . . . . . . 1651

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

20-cv-1878-RBJ   PATRICK PHELAN - Redirect   03-16-2022

1      P R O C E E D I N G S

2          (Proceedings commenced at 8:58 a.m.)

3          (Jury in at 8:58 a.m.)

4          THE COURT:  Good morning, ladies and gentlemen.  How

5     are my buddies this morning?  Good.

6          JUROR:  I forgot my questions inside.

7          THE COURT:  You forgot your what?

8          JUROR:  Questions in the jury room.

9          THE COURT:  Oh, sure.  Absolutely.  All right.

10    Ms. Wang?

11                    **REDIRECT EXAMINATION**

12    BY MS. WANG

13    Q    All right.  Commander Phelan, yesterday we left off talking

14    about the kettling on Sunday, May 31st, in front of the

15    Basilica.  Do you recall that?

16    A    Yes.  Good morning.

17    Q    Yes.  Good morning.  Now, the kettling began at about 8:37

18    or 8:38 p.m.; right?  That's what was on the radio

19    communications I played for you yesterday?

20    A    There wasn't kettling.  That's not a tactic we use.

21    Q    Okay.  Your gassing of the protesters from two sides with

22    two different teams of officers began at about 9:37 to

23    9:38 p.m.; right?

24    A    Yes.

25    Q    Okay.  Let's play Exhibit 528.  Start at 56:49 minutes.

20-cv-1878-RBJ   PATRICK PHELAN - Redirect   03-16-2022

1        MS. BIRKHOLZ:  I'm sorry.  What number is this?

2        MS. WANG:  Exhibit 528.

3        MS. BIRKHOLZ:  Thank you.

4        MS. WANG:  56:49.  Great.  That's great.

5        THE COURT:  I don't have that in evidence.  Do you,

6   Julie?

7        MS. BIRKHOLZ:  We do not, Your Honor, because we have

8   only specific times, but defendants don't have an objection.

9        THE COURT:  Okay.  It's admitted.

10       (A video was played.)

11       MS. WANG:  All right.  We're going to skip a different

12  clip.

13  Q.    (By Ms. Wang) Yesterday, you would agree that the

14  kettling began at 9:38; right?

15       MS. BIRKHOLZ:  Objection.  Misstates testimony.

16  Q.    (By Ms. Wang) What we saw on video that happened between

17  in front of the -- in front of the Basilica on Colfax began at

18  9:38.  Those were the clips that we saw from HALO; right?

19  A    We saw some clips.  Yes, ma'am.

20  Q    Okay.  And Ms. Birkholz played for us a clip in which you

21  on the radio communications, as heard on the Air One helicopter

22  video, said that people should be allowed a route of escape;

23  right?

24  A    Yes.

25  Q    Okay.  That -- that -- you didn't say that until 9:42;

20-cv-1878-RBJ   PATRICK PHELAN - Redirect   03-16-2022

1    right?

2    A    If it's on there, yes, ma'am.

3    Q    Okay.  Let's go ahead and do Exhibit 528.  All right.  So,

4    this is the clip that Ms. Birkholz played for you yesterday;

5    right?  It's been admitted, Judge.  Is this the clip

6    Ms. Birkholz played for you yesterday?

7    A    You know, we played so many clips.  I'm sure it could be.

8    This looks on -- this is helicopter video with flair.

9    Q    Okay.  Go ahead and play it.

10        (A video was played.)

11   Q    What time does it say up here?

12   A    2141.

13   Q    That's 9:41; right?

14   A    Yes, ma'am.

15        (A video was played.)

16   Q    Okay.  Pause, please.  All right.  So, you don't talk about

17   giving people an escape route until 9:42; right?

18   A    Yeah.  Just reminding to give them an escape route.

19   Q    Okay.  And in the meantime, you've been watching all the

20   HALO that we've seen of what was happening on that block in the

21   six or seven minutes prior; right?

22   A    I don't know what I was watching at that time, ma'am.

23   Q    Okay.  So, if you testified yesterday that you were

24   watching the HALO, you don't recall that now?

25   A    I watched HALO.  There's 360 cameras of HALO, so I could

20-cv-1878-RBJ   PATRICK PHELAN - Redirect   03-16-2022

1   have been on.  I'm just --

2   Q    Okay.  So, we heard the radio communications of you

3   yesterday telling your teams of officers you wanted to make

4   arrests.  You wanted to push them there and make arrests; right?

5   A    Yeah.  We had probable cause at that time.  They were

6   violating the curfew ordinance, so we wanted to make arrests.

7   Yes, ma'am.

8   Q    But then you also say -- then you have your officers gas

9   them from both sides, and then you say, but let them a route of

10  escape?

11  A    We want to avoid any type of confrontation.  If people want

12  to leave and go home, that's great.  We want them to leave and

13  go home.

14  Q    Were you trying to arrest them, or were you trying to let

15  them leave and go home?

16  A    Both.

17  Q    Both?

18  A    So, if they wanted to leave, let them leave.  We had an

19  escape route, like I said here.  We were hoping they would

20  leave.  If not, anyone that we contact, we could arrest, because

21  we had probable cause to arrest them for curfew violation,

22  ma'am.

23  Q    And if they wanted to leave by running down an alley or

24  going around some tear gas or climbing a fence, they could do

25  that, too, if they chose to?

Kevin P. Carlin, RMR, CRR

20-cv-1878-RBJ   PATRICK PHELAN - Redirect   03-16-2022

1  A    If they wanted to go home, I hope they were going home.  If

2  they want to go to a friend's or whatever, I hope they were

3  leaving the area.

4  Q    Okay.  Ms. Birkholz yesterday, when you talked with --

5  well, let's start with this.  You know what TeleStaff is; right?

6  A    Yes, ma'am.

7  Q    Okay.  TeleStaff are the DPD reports that show what

8  officers were working on what days; right?

9  A    Correct.

10 Q    Okay.  Let's -- and so you have -- there is a record of all

11 the officers that were working on May 28th, May 29th, May 30th,

12 and May 31st; right?

13 A    Should be.  Yes, ma'am.

14        MS. WANG:  Let's move into admission Exhibit 3070.

15        MS. BIRKHOLZ:  No objection.

16        THE COURT:  Okay.  Admitted.

17        MS. WANG:  3077.

18        MS. BIRKHOLZ:  No objection.

19        THE COURT:  Admitted.

20        MS. WANG:  3079.

21        MS. BIRKHOLZ:  No objection.

22        THE COURT:  Okay.  Admitted.

23        MS. WANG:  And 3082.

24        MS. BIRKHOLZ:  No objection.

25        THE COURT:  All right.  That's admitted also.

20-cv-1878-RBJ   PATRICK PHELAN - Redirect   03-16-2022

1    MS. WANG:  Okay.  We're going to use the Elmo.

2    THE COURTROOM DEPUTY:  It's out of alignment.  There

3    you go.

4    Q.   (By Ms. Wang) Now, so, I'm showing you Exhibit 3070.  Do

5    you see that, Commander Phelan?

6    A    It's a little out of focus, but yes.

7    Q    Okay.  All right.  So, the point is this is a document that

8    shows all the officers who were on duty on May 28th; right?

9    3070?

10   A    Well, it looks like from District 6.  But I can't really --

11   it's not really in focus.  And there's a mall unit.

12   THE COURT:  It really isn't in focus.

13   MS. WANG:  All right.  Let's try the computer today.

14   3070.  There we go.  Okay.

15   Q.   (By Ms. Wang) So, we have a -- let's see -- several-page

16   report.  I believe it is seven pages.  That lists all the

17   officers who were on duty on this day; right?  Is this all the

18   officers, or is this just District 6?

19   A    This is District 6.  It also shows days off, too.  Yellow

20   is days off.  Special assignment.  There's a lot of notations

21   there.

22   Q    Okay.  So, there's actually more officers who were on duty

23   than what's on this document, because this is just District 6;

24   is that right?

25   A    I'm sorry.  Could you repeat that?

20-cv-1878-RBJ    PATRICK PHELAN - Redirect    03-16-2022

1  Q    So, from what you can tell from this document, you think

2  this may just be District 6.  We don't -- you don't know whether

3  we have TeleStaff for other districts; right?

4  A    Correct.

5  Q    Okay.  And so from what you can tell, there actually were

6  likely more officers on duty than the ones listed here, because

7  this is just District 6?

8  A    This is District 6.  This includes the whole District 6.

9  The detectives, actually patrol officers assigned to District 6

10  working precinct cars, everything in District 6.  Yes, ma'am.

11  Q    Okay.  So, if we've got the TeleStaff -- and you can pull

12  up 3077.  This is for May 29th; right?

13  A    Yes, ma'am.

14  Q    Okay.  And this also lists officers who were on duty that

15  day, perhaps only District 6, but it is a four-page document;

16  right?

17  A    Yeah.  But it lists officers that are on duty and on

18  special assignment and on days off and on vacation.

19  Q    And then Exhibit 3079.  This also lists officers who are on

20  duty; right?  For May 30th?

21  A    Yeah.  On duty, vacation.  It lists all officers assigned

22  to District 6.

23  Q    Are the grayed-out ones the ones who are on vacation?

24  A    I'm sorry?

25  Q    The grayed-out ones, the ones that are grayed out?

20-cv-1878-RBJ   PATRICK PHELAN - Redirect   03-16-2022

1  A     There's some brown ones.  I don't see any gray, but the

2  brown, there's a notation.  Do you see the Xs, ma'am?

3  Q     Yes.

4  A     The Xs show that they're working.  Everything else is a

5  different notation, whether they're on vacation or days off.

6  Q     Okay.  The Xs show that they're working.  And this is just

7  District 6 alone; right?

8  A     Correct.

9  Q     So, if we have got, let's just say on Friday -- on

10  May 28th, Thursday, May 28th, if we've got, you know, over 200

11  officers listed with Xs next to their names, that would indicate

12  those are just the officers on duty from District 6; right?

13  A     Correct.

14  Q     Okay.  Now, Ms. Birkholz -- you can take that down.

15  Ms. Birkholz showed you the CAD reports yesterday; right?

16  A     Mm-hmm.

17  Q     CAD reports?

18  A     Yes, ma'am.

19  Q     Okay.

20  A     Sorry.

21  Q     Can we show Exhibit 448.  This is a summary of the radio

22  communications; right?  That's basically what this document is?

23  A     Mm-hmm.

24  Q     Is that right?

25  A     Yes, ma'am.

20-cv-1878-RBJ   PATRICK PHELAN - Redirect   03-16-2022

1   Q    Okay.  Let's scroll down a little bit to page four.  You --

2   and so taking a look at page four, and then page five, you told

3   us yesterday these are all the officers who were on duty for

4   May 28th, that this is a roster.  Is that what this is?

5   A    This is a roster based on CAD of officers that are involved

6   in an incident.

7   Q    Okay.

8   A    So, it's --

9   Q    So, this is not a list of all the officers who were on duty

10  on May 28th, 2020?

11  A    This is a list of officers who were probably present at the

12  protest.  The other -- the roster you showed me, ma'am, is

13  officers of District 6 working 24 hours.  So, they have to cover

14  the district with 30 or 40 officers around-the-clock, so that's

15  about 90 officers, plus detectives, plus whatever special

16  assignments there are.

17  Q    That's great.  I'm asking you a very specific question.

18  The question is this document, I was under the impression after

19  your testimony yesterday that this document we're looking at

20  right here, Exhibit 448, pages four to five, is a list of all

21  the officers who were on duty on May 28th, 2020.  That is not

22  true; right?

23  A    This is a list of officers who were on duty working that

24  event.

25  Q    No.  I thought you said -- didn't you just say that this is

20-cv-1878-RBJ   PATRICK PHELAN - Redirect   03-16-2022

1    a list of officers who responded to events, and that is why

2    their radio call sign and unit number is listed here?

3    A    Right.  And as you can see, the different districts they're

4    assigned to on the left.  They're not all District 6 officers.

5    They're from all --

6       (Simultaneous discussion interrupted by the court reporter.)

7            THE COURT:  Come on, guys.  One at a time.  What's the

8    question?

9    Q.    (By Ms. Wang) This listing is a list of officers --

10   there's -- let me just be clear.  Where it says unit right here,

11   this --

12   A    Yes.

13   Q    That's the radio call sign?

14   A    That's a call sign, correct.

15   Q    Okay.  And this is a radio summary document.  So, it lists

16   the call signs on the subsequent pages; right?

17   A    Correct.

18   Q    Okay.  So, this is not a complete list of all the people

19   who were working that day?

20   A    That's not a list of people who were working that day.

21   This is a list of people that are working a protest during that

22   day.

23            (Lynyrd Skynyrd plays.)

24            THE COURT:  I think you can have a better song than

25   that.

Kevin P. Carlin, RMR, CRR

20-cv-1878-RBJ   PATRICK PHELAN - Redirect   03-16-2022

1    MR. WEINER:  My apologies.  I'm not sure what

2    happened.

3    THE COURT:  Is that Mr. Weiner that did that?

4    Mr. Weiner, go stand in the corner.

5    MR. WEINER:  I can't find it.

6    Q.    (By Ms. Wang) All right.  So, let's pull up Exhibit 451.

7    Let's take a look at page two.  Exhibit 451 is a CAD report for

8    day three, May 31st, 2020; right?  We can go back to the first

9    page if you need to.

10   A    Yes.

11   Q    Okay.  Let's go to page two.  There are approximately -- I

12   think I counted them -- 38 officers listed here; right?

13   A    Yes, ma'am.

14   Q    These are not all the officers who were working the

15   protests on day three; right?

16   A    Correct.

17   Q    Okay.  So, the CAD document listing of officers is not a

18   complete list of all the officers who were working the protest

19   on a particular day?

20   A    This dictates people that came onto the air that were

21   listed there.

22   Q    That's right.  And that is why their radio call signs are

23   listed; right?

24   A    Correct.  Yes.

25   Q    All right.  So, when you were asked questions yesterday

Kevin P. Carlin, RMR, CRR

20-cv-1878-RBJ   PATRICK PHELAN - Redirect   03-16-2022

1   about the CAD document for May 28th and look at these officers

2   who are listed and how they were so outnumbered by the thousands

3   of protesters that were -- that showed up on that day, that was

4   just misleading, wasn't it?

5   A    No.  Not at all.

6   Q    Okay.  Let's take a look at -- by the way, speaking of the

7   CAD report, let's take a look at Exhibit 450.  On 450,

8   Ms. Birkholz asked you some questions about an entry where there

9   was people throwing rocks at 14th and Pennsylvania.  Do you

10  recall that?

11  A    Yes.

12  Q    Okay.  I can't find that entry right now, but that's okay.

13  You have no idea who was doing that; right?

14  A    Who was throwing the rocks?

15  Q    Yeah.

16  A    No.  I don't know who was --

17  Q    You don't actually even know if it was true.  It's just

18  something reflected on some radio communication, which then is

19  transcribed into this document which you have no knowledge of;

20  right?

21  A    I don't know who threw the rocks.  Obviously someone

22  reported that they were taking rocks.  I expect that was true.

23  It happened all through the protest, so I imagine it was true.

24  Q    Right.  And so if there is some sort of -- well, let me

25  just ask it this way.  You don't know that Amanda Blasingame and

20-cv-1878-RBJ   PATRICK PHELAN - Redirect   03-16-2022

1   Maya Rothlein had anything to do with whatever that radio entry

2   was about people throwing rocks at 14th and Pennsylvania on

3   May 30th; right?

4   A    Correct.

5   Q    So, if there's been some suggestion about that, you have no

6   idea what the truth is; right?

7   A    I don't understand your question.

8   Q    Okay.  I withdraw that.  Thousands of people protested from

9   May 28th to June 1st 2020; right?

10  A    Yes, ma'am.

11  Q    And you have characterized the protests as mostly violent

12  and dangerous; right?

13  A    Yes.

14  Q    You said there were 25 guns recovered?

15  A    Yes, ma'am.

16  Q    Okay.  And presumably, if you recovered those guns, you

17  arrested those people; right?

18  A    Possibly.  Mm-hmm.

19  Q    Well, I mean, do you think that you recovered guns from

20  people and let them go?

21  A    No, ma'am.  A lot of times we will recover guns, if someone

22  is running or something, or they ditch them.  They will throw

23  guns.  They don't want guns on their person, because if they're

24  arrested, they don't want to be arrested with that weapon.  Very

25  frequently, criminals will throw the weapon.  So, we will

20-cv-1878-RBJ    PATRICK PHELAN - Redirect    03-16-2022

1  recover the weapons, or we will recover several weapons from a

2  car or whatever.  It's hard to say.  To say those were all

3  arrested wouldn't be true, no.

4  Q    You have no idea one way or another; right?

5  A    Each incident would be different, ma'am.

6  Q    You have no idea whether the people with the 25 guns that

7  you say were recovered threw them as they were fleeing or you

8  arrested them?

9  A    Ma'am, all I know is we recovered 25 guns.

10         MS. WANG:  Okay.  Let's show Exhibit 3031.  Now, I

11  move to admit page one of Exhibit 3031.

12         MS. BIRKHOLZ:  No objection.

13         THE COURT:  It's admitted.  Page one.

14  Q.    (By Ms. Wang) This is a document produced by the

15  Department of Public Safety that lists -- summarizes the protest

16  and curfew-related arrests from May 28th to June 1st; right?

17  A    Yes.  It appears to be.

18  Q    Okay.  So, it's got some statistics here.  It's got arrests

19  by race, arrests by ethnicity, gender, residence, and then down

20  here, we've got arrests by offense; right?

21  A    Mm-hmm.

22  Q    Is that a yes?

23  A    Yes, ma'am.

24  Q    Okay.  So, at least for these, what, four days, the 28th to

25  June 1st, this is the information right here for what kind of

20-cv-1878-RBJ    PATRICK PHELAN - Redirect    03-16-2022

1  offenses people were arrested for; right?

2  A    Correct.

3  Q    Okay.  And what we've got here is 161 curfew violations, or

4  51 percent; right?

5  A    Yes, ma'am.

6  Q    We've got 26 percent disobeying a lawful order?

7  A    Mm-hmm.

8  Q    Is that a yes?

9  A    Yes, ma'am.

10  Q    Thirteen percent fail to obey an order of police?

11  A    Yes, ma'am.

12  Q    Are you aware, by the way, that the curfew arrestees

13  frequently had an accompanying charge of failure to obey lawful

14  order?

15  A    They could have.

16  Q    Okay.  Ten people were arrested for concealed dangerous

17  illegal weapon or certain knives; right?

18  A    Right.

19  Q    Three percent; right?

20  A    Yes.

21  Q    Okay.  Six people, or two percent, were arrested for

22  interference?  That's like interfering with a police officer;

23  right?

24  A    Yes.  Mm-hmm.

25  Q    Criminal mischief, which could include graffiti?

20-cv-1878-RBJ    PATRICK PHELAN - Redirect    03-16-2022

1  A    It could.

2  Q    Three people; right?

3  A    Correct.

4  Q    Throwing stones or missiles, three people arrested; right?

5  A    Correct.

6  Q    Obstructing a peace officer, two people arrested; right?

7  A    Correct.

8  Q    And then we've got a few miscellaneous, criminal trespass,

9  and somebody had a warrant; right?

10  A    Yes, ma'am.

11  Q    Okay.  So, these are the percentages of crimes, you know,

12  people who were arrested for things other than just curfew

13  violation; right?

14  A    Mm-hmm.

15  Q    Is that a yes?

16  A    Yes, ma'am.

17  Q    Okay.  This does not indicate that there was a violent and

18  dangerous protest going on on these days; right?

19  A    Yes.  I think it does.  They were making arrests, 317.

20  Q    Well, most of them were for curfew violation, disobeying

21  lawful order, and failure to obey police; right?

22  A    Correct.

23  Q    Those are all dangerous crimes to you?

24  A    Ma'am, what we try to do, we don't want to deal with a lot

25  of confrontation.  Our goal is not to arrest.  Our goal is to

20-cv-1878-RBJ   PATRICK PHELAN - Redirect   03-16-2022

1    stop that type of behavior and activity by, like I said, at that

2    location, we want them to go home.  Okay?  We don't want a

3    confrontation to make things worse than they are.  We want

4    people to go home.  That's our goal.

5    Q    You testified on direct examination that the curfew was

6    needed to stop the criminal behavior; right?

7    A    Correct.

8    Q    Now, if there was criminal behavior such as criminal

9    mischief or carrying a concealed weapon or any of these things,

10   those are things that the City has laws for; right?

11   A    Right.

12   Q    Okay.  And so if you -- if anybody was engaging in these

13   kinds of crimes, you had the tools to arrest them if they were

14   committing those crimes?

15   A    If we could safely arrest them without causing a

16   confrontation.  Obviously so many people were throwing

17   projectiles at the police, it didn't make sense to go into a

18   crowd and have a confrontation and make the situation worse.

19   Q    So, you wanted to just -- so, instead of isolating the

20   people, the specific people who were throwing things and

21   arresting them, you just wanted to get everybody off the street?

22   A    No.  I'm trying to isolate people.  I can't say, can people

23   throwing rocks and bottles at the cops please step to your left,

24   peaceful protesters please step to your right, anybody that

25   can't make a decision stay in the middle.  That doesn't work

20-cv-1878-RBJ   PATRICK PHELAN - Redirect   03-16-2022

 1  that way, ma'am.

 2  Q    The City decided to enforce the curfew only against

 3  protesters, didn't they?

 4         MS. BIRKHOLZ:  Objection, Your Honor.  This is covered

 5  by pretrial rulings.

 6         MS. WANG:  She asked him what the purpose of the

 7  curfew was yesterday.  We should be allowed to talk about the

 8  purpose of the curfew.

 9         MS. BIRKHOLZ:  That's not with respect to --

10         THE COURT:  The objection is overruled.

11         THE WITNESS:  Can you repeat the question, ma'am?

12  Q.    (By Ms. Wang) The City decided to enforce the curfew only

13  against protesters; isn't that true?

14  A    The curfew -- what the mayor -- the mayor put out a

15  proclamation for a curfew against people that were on the street

16  after 8 o'clock or after 9 o'clock in that location.  There were

17  mainly people protesting.

18         MS. WANG:  Showing you Exhibit 795.  I move for

19  admission of 795.

20         MS. BIRKHOLZ:  Your Honor, pretrial ruling, 403,

21  foundation, hearsay.

22         MS. WANG:  It's about the purpose of the curfew, which

23  he made some claims yesterday, so we get to --

24         THE COURT:  I don't even know what you're talking

25  about.  I don't know what 95 is.

20-cv-1878-RBJ   PATRICK PHELAN - Redirect   03-16-2022

1    MS. WANG:  Text messages about the curfew enforcement.

2    THE COURT:  It says it's a video on the list of

3    exhibits.

4    MS. WANG:  795.

5    THE COURT:  Oh.  I thought you said 95.  All right.

6    Why are we making the curfew an issue?

7    MS. WANG:  They have made the curfew an issue by

8    asking him yesterday, what was the purpose of the curfew?  So if

9    they're going to talk about the purpose of the curfew, we get to

10   talk about the purpose of the curfew.

11   THE COURT:  In other words, if they do something

12   that's irrelevant, then you can too?

13   MS. WANG:  It is completely relevant to the --

14   THE COURT:  The curfew is not part of this case.

15   MS. WANG:  It's relevant to the First amendment claim

16   and why they were using force and arresting our clients in

17   violation of the First and Fourth amendments.  It's one

18   question.

19   THE COURT:  Ladies and gentlemen, before this trial

20   started, there was another part of this trial that had to do

21   with a curfew.  I bifurcated that for a separate trial.  It's

22   not part of this case.  There is a class action on behalf of

23   everyone who was arrested for curfew violation, a hundred and

24   some people.  This case was full of stuff already without

25   getting into that.  I put that into a separate trial to be held

20-cv-1878-RBJ   PATRICK PHELAN - Redirect   03-16-2022

1    later.  So, I don't think it's relevant to this case.  The

2    objection is sustained.

3    Q.    (By Ms. Wang) On May -- or, strike that.  You testified

4    on direct examination that the Colorado State Patrol was in

5    charge of the capitol grounds; right?

6    A    Yes, ma'am.

7    Q    And you drew -- or Ms. Birkholz drew on a little map where

8    you or she, I don't remember who, circled the entire grounds of

9    the state capitol.  Do you remember that yesterday?

10   A    Yes, ma'am.

11   Q    Okay.  So, are you suggesting that any actions that were

12   taken there were the responsibility of the Colorado State Patrol

13   and not DPD?

14   A    They're -- the responsibilities of the state patrol is the

15   state capitol grounds and the Veterans Park, if I understand

16   your question.

17   Q    Well, if DPD tear gassed protesters while they were

18   standing in a line on Colfax, that's DPD's responsibility;

19   right?

20   A    If -- yeah.  Whatever -- whoever launched the chemical

21   munitions, it's their responsibility.

22   Q    Okay.  So, if we've got multiple body-worn cameras from DPD

23   officers showing them gassing, shooting at, throwing explosives

24   at or taking any other enforcement action or use of force on

25   protesters in and around the capitol grounds area, that is the

20-cv-1878-RBJ   PATRICK PHELAN - Redirect   03-16-2022

1   responsibilities of DPD; right?

2   A    If they were doing that, yeah.  We work in conjunction with

3   state patrol.  They will call us for assistance if they're being

4   overrun.  I know the night that they were trying to break into

5   the state capitol, they were calling for some assistance up

6   there.

7   Q    Okay.  You testified yesterday that you were not aware that

8   mutual aid jurisdictions who came to Denver had less-lethal

9   shotguns; right?

10  A    Correct.

11  Q    You said that you learned --

12  A    Initially.

13  Q    I'm sorry?

14  A    Initially, yes.

15  Q    Okay.  You said that you -- so, when you say initially, you

16  mean when they came -- when DPD invited the other jurisdictions

17  into Denver, you did not know until a few days later that they

18  had shotguns?

19  A    They had -- we knew they had less-lethal options.

20  Q    You didn't know what they were?

21  A    No, ma'am.

22          MS. WANG:  Okay.  Let's take a look at Exhibit 299.

23  It's a Jefferson County Regional SWAT Team after-action review

24  report.  And I move to admit pages one through four.

25          MS. BIRKHOLZ:  Foundation, Your Honor.

Kevin P. Carlin, RMR, CRR

20-cv-1878-RBJ    PATRICK PHELAN - Redirect    03-16-2022

1    MS. WANG:  It's for --

2    THE COURT:  The objection is overruled.  The document

3  is admitted.

4  Q.    (By Ms. Wang) Now, this Exhibit 299 is a report --

5  after-action review report from the regional SWAT team of

6  Jefferson County; right?

7  A    Yes, ma'am.

8  Q    Okay.  Let's go down to page four.  Or page five.  Yes.

9  That's correct.  This is the right page.  Sorry.  Yes.  Now,

10  what this document says here is that -- under timeline, is that

11  on May 29th, 2020, at approximately 2100 hours, Denver Police

12  Department requested various -- requested mutual aid from

13  Jefferson County Regional SWAT Team; right?

14  A    Correct.

15  Q    JCRS, you had JCRS commanders in the command post; right?

16  A    I believe we did.

17  Q    And on May 31st --

18  A    I stand corrected, ma'am.  I'm not sure we had a commander

19  from Jefferson County.  I can't testify to that, that they were

20  in the command post that first night.  They came late.  They

21  came about 8:30, 9:30, and they were assigned.  They were

22  briefed and assigned.  So, anyway.

23  Q    You invited Jefferson County in; right?

24  A    Yes, ma'am.  Yes.

25  Q    You coordinated with their commanders; right?

20-cv-1878-RBJ   PATRICK PHELAN - Redirect   03-16-2022

1   A    Correct.  Yes.

2   Q    It appears the first day that they actually provided

3   assistance to DPD was on May 31st; right?

4   A    Right.  They were -- if I recall, they were trying to

5   assist the Denver Fire Department.

6   Q    They assisted only the Denver Fire Department?

7   A    No.  They assisted, but I remember that they were assigned

8   at one point in time to the Denver Fire.  I just recall that.

9   Q    So, right here in the third paragraph, it says JCRS Captain

10  Williams verified JCRS was still operating under mutual aid

11  guidelines and confirmed JCRS use of force guidelines were in

12  line with DPD's use of force policy.  Additionally, JCRS,

13  Sergeant Donohue verified with DPD the use of JCRS kinetic

14  projectiles and their platforms.  Do you see that?

15  A    Yes.

16  Q    Okay.  JCRS had the 12 gauge shotguns; right?

17  A    I don't know if they did or not.

18  Q    Well, let's take a look at page 25 of this document.  So,

19  JCRS had 40-millimeter foam baton round; right?

20  A    Yes.

21  Q    They had the bean bag shotguns; right?

22  A    Yes.

23  Q    Deployed from 870 less-lethal shotguns; right?

24  A    Correct.

25  Q    They also had rubber pellets, it says; right?

20-cv-1878-RBJ    PATRICK PHELAN - Redirect    03-16-2022

1    A    Correct.

2    Q    So, they verified all of that with DPD before they were

3    sent out into the field, didn't they?

4            MS. BIRKHOLZ:  Objection.  Misstates testimony.

5            THE COURT:  Well, I don't know if it misstates

6    testimony, but the objection is sustained.  Please rephrase your

7    question.

8    Q.    (By Ms. Wang) JCRS verified with DPD the use of their

9    specific kinetic energy projectiles; right?

10   A    They verified that they had less-lethal platforms.

11   Q    And the less-lethal platforms are the ones that are listed

12   here?

13   A    Right.

14           MS. WANG:  Okay.  Let's show Exhibit -- the Brighton

15   PD after-action report.  It was not listed as an exhibit, but

16   it's for impeachment, so we're offering it as Exhibit 1260.

17           MS. BIRKHOLZ:  Your Honor, we would object on the

18   basis of foundation and hearsay, with respect to his knowledge

19   at the time that he was the incident commander.

20           MS. WANG:  It's for impeachment, Judge.

21           THE COURT:  The objection is overruled.

22   Q.    (By Ms. Wang) So, we're going to call Brighton PD

23   after-action report Exhibit 1260.  Let's look at page 57.  Okay.

24   So, this is an after-action report from Brighton Police

25   Department; right?

20-cv-1878-RBJ    PATRICK PHELAN - Redirect    03-16-2022

1  A    Correct.

2  Q    Which also provided assistance to DPD; correct?

3  A    Correct.

4  Q    And in this document, in the highlighted paragraph, it

5  says -- this is from May 30th, 2020, at around 1700, I met with

6  Captain Sich and Lieutenant Berdahl from Denver Police.  It says

7  there was a briefing, and then the third sentence says, one of

8  the points covered by Lieutenant Berdahl was basic rules of

9  engagement.  He advised the rules for the Denver Police

10  Department was that PepperBalls were used to defend individual

11  officers, and bean bags and other specialty impact munitions,

12  40-millimeter, 37-millimeter, and LL shotguns, were used when

13  violent protesters were assaulting with weapons.  Do you see

14  that?

15  A    Yes, ma'am.

16  Q    So, the outside agencies -- and this is another example,

17  Brighton here -- verified with DPD the weapons that they would

18  be using; right?

19  A    It appears they talked to Lieutenant Berdahl and Captain

20  Sich.

21  Q    Right.  And Lieutenant Berdahl is the aide to Division

22  Chief Thomas; right?

23  A    Yes, he is.

24  Q    Okay.  And Division Chief Thomas is above you in the chain

25  of command; correct?

20-cv-1878-RBJ    PATRICK PHELAN - Redirect    03-16-2022

1   A    Yes, sir.  Yes, ma'am.

2   Q    Okay.  You also testified yesterday that the DPD sergeants

3   that were embedded with the outside agencies were just there to

4   give directions; right?

5   A    Yeah.  Communication issues.  We wanted to make sure --

6   outside jurisdiction, some outside jurisdictions do have our

7   comms, are able to break into our comms.  Some are not.  So, to

8   make sure that they had the communication, we made sure a

9   sergeant from Denver Police was with outside agencies for

10  communications, give them directions throughout the city.

11  Q    And so it's your testimony that they did not give any --

12  the DPD sergeants that were embedded with each of the outside

13  agency units were not giving any sort of direction on how to

14  deploy weapons; right?

15  A    Correct.  Those would be basic of each individual outside

16  jurisdiction.

17         MS. WANG:  Okay.  Let's take a look at what we're

18  going to call Exhibit 1261, which is for impeachment.  It is the

19  Adams County after-action report.

20         MS. BIRKHOLZ:  Your Honor, same objection, with

21  respect to foundation, hearsay, what he knew at the time.

22         THE COURT:  All right.  The objection is overruled.

23  You said 1261?

24         MS. WANG:  Yes.  It's not on the list, but it's for

25  impeachment, so we're calling it 1261.

20-cv-1878-RBJ   PATRICK PHELAN – Redirect   03-16-2022

 1   THE COURT:  Yeah.  1260 wasn't on the list either.

 2   All right.  It's admitted.

 3   MS. WANG:  Thank you.

 4   Q.   (By Ms. Wang) Now, this is a memorandum from Adams

 5   County; right?

 6   A    Yes, ma'am.

 7   Q    Okay.  And it's dated June 8th, but it's describing stuff

 8   that happened during the protest the week before, week or two

 9   before; right?

10   A    Correct.

11   Q    And it says on 5/29/2020 at 1030 hours, Commander Smalley

12   and myself attended a command briefing in the DPD incident

13   command center.  Do you see that?

14   A    Yes.

15   Q    And that would have been where you were, right?  The

16   command post?

17   A    Correct.

18   Q    And then let's scroll down a little bit.  It also says it

19   was also established that we would be directed to incidents as

20   necessary.  Commander Smalley was assigned to the command post

21   for direct communications with me in the field.  You talked

22   about that; right?

23   A    Yes, ma'am.

24   Q    But also it says once the team was mustered at Auraria

25   Campus, we were assigned DPD liaisons Sergeant Bronson and

Kevin P. Carlin, RMR, CRR

20-cv-1878-RBJ    PATRICK PHELAN – Redirect    03-16-2022

1  Sergeant Ujchect.   These liaisons were to give us direction on

2  deployment and maintaining the integrity of the DPD use of force

3  directives.   It was clarified that they would be directing the

4  response of our team on site for any incident we responded to.

5  Do you see that?

6  A    Yes.

7  Q    Okay.   So, DPD sergeants were directing the response of

8  outside teams for any incident they responded to; correct?

9  A    No.   I think it's a little confusing here, depending on

10  what he's saying.   They were to give us direction, deployment.

11  So, where they were going.   They didn't know -- the sergeants

12  there weren't getting their instructions from me.   We were -- I

13  was giving instructions to the command, like they said earlier

14  here.   We had a Commander Smalley and myself attend the briefing

15  from Exhibit 1261.   Commander Smalley was assigned to the

16  command post.   I would be talking to Commander Smalley, not

17  sergeants.   The sergeants are just there to give deployment

18  directions, here's how to get from here to here to here.

19  Q    These liaisons refers to these DPD sergeants; right?   The

20  DPD --

21  A    Correct.

22  Q    And then the second sentence also, they would be directing

23  the response of our team on site, also refers to the DPD

24  liaisons; right?

25  A    Right.   But it does not make sense from what he's saying

20-cv-1878-RBJ    PATRICK PHELAN - Redirect    03-16-2022

1   here that sergeants would be directing command officers from a

2   different jurisdiction.  That wouldn't be happening.  It's not

3   the chain of command.  It just would not be happening.

4   Q    Well, those DPD sergeants weren't acting on their own.

5   They were receiving direction from you in the command post;

6   right?

7   A    No.  They weren't receiving direction from me in the

8   command post.  My direction for this unit was going through

9   their represent -- Commander Smalley, who was assigned to the

10  command post, for direct communication with me in the field.

11  Q    Well, we can all read it and decide what it says.

12  A    Correct.

13  Q    Now, you testified also yesterday that DPD voluntarily

14  stopped allowing outside agencies to use less-lethal weapons

15  because the potential for injury is greater than the weapons DPD

16  used; right?

17  A    Yes.  I don't like the less-lethal shotgun.

18  Q    Okay.  And yesterday, you also testified that you were part

19  of a preliminary injunction hearing where people were seeking to

20  stop the DPD to use certain kinds of force; right?

21          MS. BIRKHOLZ:  Your Honor, 407, 403, pretrial rulings.

22          MS. WANG:  He testified yesterday to certain things

23  that I would like to show are inaccurate.

24          THE COURT:  You folks are playing with fire.  Now, if

25  you want to play, I'll play.  I know more about that injunction

20-cv-1878-RBJ   PATRICK PHELAN - Redirect   03-16-2022

1   than any of you do.  Now, how do you want to go?

2          MS. WANG:  Judge, if we could have a sidebar, I can

3   explain.

4          THE COURT:  I think it's a good idea to have a sidebar

5   on this issue.

6       (Proceedings held at the bench:)

7          THE COURT:  The jurors want to know about this too.

8          MS. WANG:  Judge, he testified yesterday, and just now

9   he affirmed that I did it voluntarily, telling the outside

10  agencies not to use different weapons than DPD, but your

11  injunction is what caused the DPD to stop.  So, he's lying about

12  that.  It is in the transcript.

13         THE COURT:  If you want to go there, she might be very

14  happy to have you go there.

15         MS. BIRKHOLZ:  We would certainly call for a mistrial.

16         THE COURT:  Not a mistrial.  There's your defense.

17  Your defense is that that was settled.  You changed your

18  procedures.  I don't know why you're not using that.  That's

19  where we're going.

20         MS. WANG:  I just want to have him -- I can try to

21  phrase the question so that -- I mean, the point is he did not

22  stop voluntarily.  DPD did not stop voluntarily, and he's lying

23  about that.

24         THE COURT:  All he said was that he asked them to stop

25  using the shotguns.

Kevin P. Carlin, RMR, CRR

20-cv-1878-RBJ   PATRICK PHELAN – Redirect   03-16-2022

1    MS. WANG:  Voluntarily.

2    MS. BIRKHOLZ:  Two days after he learned about them,

3    though, which other people are going to testify to as well.  His

4    memory is not ironclad, and I also am concerned that he's going

5    to --

6    THE COURT:  He asked them to stop using the shotguns

7    not because of anything I did.  He doesn't like shotguns.  He's

8    testified to that.

9    MS. WANG:  They stopped using the shotguns because you

10   issued an order.

11   THE COURT:  I doubt it.

12   MS. BIRKHOLZ:  That's not what he testified to either.

13   MS. WANG:  That is what the transcript of the hearing

14   reflects.

15   THE COURT:  Well, make your choice.  I'll tell the

16   jurors all about that injunction and the settlement and the

17   whole nine yards.  Do you want that?  It's public information.

18   Maybe the jurors ought to know the whole story.

19   MS. WANG:  Let me confer with Mr. Macdonald.

20      (Proceedings held in open court:)

21   Q.   (By Ms. Wang) All right.  Let's talk about Lieutenant

22   Wyckoff, who you said was your designated scribe; right?

23   A    Correct.

24   Q    Okay.  And you had him write down all of the activity from

25   each day in an after-action report; right?

20-cv-1878-RBJ   PATRICK PHELAN - Redirect   03-16-2022

1   A     Yes.  He's trying to capture everything he can capture.

2   Q     And he wrote those not after each day, but many, many days

3   afterwards; right?

4   A     I'm sorry?

5   Q     He wrote those reports many days afterwards; right?

6   A     No.  He's doing it at the time.

7   Q     He wrote them each day?

8   A     He was doing it in real time, yeah.

9   Q     Okay.  And they capture -- how did he collect the

10  information for those reports?

11  A     Chronologically, he captured either over the radio or some

12  information he received.

13  Q     So, he's like writing down everything that's going on on --

14  over the radio and putting it into the after-action report?

15  A     He's trying to capture everything.  It's -- it's happening

16  pretty fast.  Like I said, it's dynamic and fluid.  He's trying

17  to capture probably the most prevalent points.

18  Q     There were also after-action reports written by Captain

19  Sylvia Sich; correct?

20  A     Yes, ma'am.

21          MS. WANG:  And let's show you Exhibit 471.  All right.

22  So, 471 are the after-action reports -- I move for admission of

23  471.

24          MS. BIRKHOLZ:  No objection.

25          THE COURT:  Admitted.

Kevin P. Carlin, RMR, CRR

20-cv-1878-RBJ   PATRICK PHELAN - Redirect   03-16-2022

1  Q.    (By Ms. Wang) These are the after-action reports that

2  were written by Captain Sich; correct?

3  A    Ma'am, you would have to go to the bottom.

4  Q    Let's go to the bottom.  You can go to page three.

5  A    Yes, ma'am.

6  Q    Now, let's go back up to page two for a moment.  So, these

7  separate -- these are different after-action reports than the

8  ones that Wyckoff did; correct?

9  A    Correct.

10  Q    And these are focused on trying to capture all the uses of

11  force during the protest; right?

12  A    Yeah.  It's an attempt.  We were trying to capture what we

13  could.

14  Q    But for May 28th, it's got one page; right?  This is it for

15  May 28th; right?

16  A    Correct.

17  Q    Okay.  That's not all the uses of force that occurred on

18  May 28th; right?

19  A    Again, I'm trying to read her narrative at the top.  It

20  says this is an attempt to capture when and where a chemical

21  agent may have been used, and it's not all-inclusive.

22  Information has been gathered from the CAD incident data.  In

23  order to get a broader picture of the use of chemical agents,

24  officer statements, after-action reports, and use of force

25  reports must be reviewed -- also reviewed.

20-cv-1878-RBJ   PATRICK PHELAN - Redirect   03-16-2022

1   Q    All right.  So, there's not -- this document -- well, let's

2   just go through the rest of it.  Page five.  This is what she's

3   got for May 28th, these three entries.  Right?  May 29th.

4   Sorry.

5   A    Correct.

6   Q    And go to page seven.  This is what she's got for May 30th;

7   right?

8   A    Correct.

9   Q    And then page nine, these four entries are all she's got

10  for use of force by DPD on May 31st; right?

11  A    Based on the CAD incident detail report, yes.

12  Q    So, based on the CAD incident report, meaning -- and the

13  CAD is a summary of the radio.  So, what this means is that the

14  officers were not reporting on the radio all the times that they

15  used force on protesters; right?

16  A    Correct.

17            MS. BIRKHOLZ:  Objection.  Speculation.

18            MS. WANG:  Okay.  And --

19            THE WITNESS:  Sorry.

20            THE COURT:  What did you say?

21            MS. BIRKHOLZ:  I said speculation.

22            THE COURT:  Oh.  Okay.  Well, he answered the

23  question.  The objection is overruled in hindsight.

24            MS. BIRKHOLZ:  Thank you.

25  Q.    (By Ms. Wang) All right.  And the officers' statements --

20-cv-1878-RBJ   PATRICK PHELAN - Redirect   03-16-2022

1  so, there was the preamble that you were talking about before

2  where this lieutenant or Captain Sich says that this is a

3  summary, and you gotta look at the CAD, and you gotta look at

4  the officer statements; right?

5  A    Yes, ma'am.

6  Q    Have you looked at any of the officers' statements in this

7  case?

8  A    No, I have not.

9  Q    Okay.  You are aware though that they were completed over a

10  week after the protest; right?

11  A    Yes.  Some were.  I'm sure some use of force were completed

12  prior to that, some after, probably with arrests that were

13  completed that night, but based on those -- the timeline as far

14  as getting off and getting on, they were completed about a week

15  later when we had more time.

16  Q    The officers' statements did not include a complete

17  accounting of all the uses of force that each officer used;

18  right?

19          MS. BIRKHOLZ:  Objection.  Lacks foundation.  He

20  hasn't read them.

21          THE COURT:  Overruled.

22          THE WITNESS:  Can you repeat the question, ma'am?

23  Q.   (By Ms. Wang) The officers' statements don't include a

24  complete accounting of every use of force by each officer;

25  right?

20-cv-1878-RBJ   PATRICK PHELAN - Redirect   03-16-2022

1    A    An officer's statement would be reflective of his use of

2    force.

3    Q    Okay.  So, if the jury has heard testimony, say, from

4    Officer Valentine, and seen his officer statements and compared

5    it with the BWC of Officer Valentine showing him shooting

6    certain people or spraying certain people and none of that was

7    documented in his officer statement, then you don't know why

8    that would be; right?

9    A    It would be documented in his individual statement.  I

10   don't understand your question.  I'm sorry.

11   Q    It's okay.  I will move on.  You testified that at 14th and

12   Sherman, Lieutenant Pine gave a dispersal order because there

13   were people throwing rocks; right?

14   A    He was taking projectiles, if I recall.

15   Q    Okay.  Let's take a look at the radio communications for

16   14th and Sherman, Exhibit 720, which I believe has already been

17   admitted.  Let's play time 8:47 to 8:48 p.m.

18        (An audio recording was played.)

19   Q    Okay.  So, that's you talking to Metro two, who is

20   Lieutenant Pine; right?

21   A    Yes, ma'am.

22   Q    And he says he's good, at that time, at least; right?

23   A    At that time, yes.

24   Q    Let's play clip two, 8:58 to 9:02 p.m.

25        (An audio recording was played.)

20-cv-1878-RBJ    PATRICK PHELAN - Redirect    03-16-2022

1   Q    So, he's referring to -- Metro two, Lieutenant Pine is

2   referring to the announcement we heard on that body-worn camera

3   yesterday where the officer or somebody in the background was

4   saying you're in violation of blocking the street; right?

5   A    I believe so.

6   Q    Okay.  So, the announcement -- the radio we've listened to

7   so far combined with the body-worn camera that we looked at

8   yesterday is that there were announcements given because people

9   were blocking the street?

10             MS. BIRKHOLZ:  Objection.  Misstates testimony.

11             THE COURT:  Overruled.

12             THE WITNESS:  He's giving announcement that he's going

13   to disperse the crowd.

14   Q.    (By Ms. Wang) Because they're blocking the street; right?

15   A    I don't know.  He was surrounded at that location, so he's

16   making that determination based on what's happening,

17   circumstances right in front of him.

18   Q    Okay.  Well, did he say anything about being surrounded, or

19   did you ask him -- just ask him in that clip, are you okay, and

20   he said, we're good, sir?

21   A    We're good right now.  Mm-hmm.

22   Q    Okay.  So, nothing that we've listened to so far indicates

23   that he's being surrounded?

24   A    He's in the middle of a crowd.  Looking on HALO, he was in

25   the middle of a crowd.

20-cv-1878-RBJ   PATRICK PHELAN - Redirect   03-16-2022

1    MS. WANG:  Okay.  Now, let's take a look at

2  Exhibit 562.  It has not -- go ahead and play 562 to Commander

3  Phelan.  I move for admission of Exhibit 562.

4    MS. BIRKHOLZ:  No objection.

5    THE COURT:  It's admitted.

6  Q.  (By Ms. Wang) Okay.  Let's go to time -- yeah.  There we

7  go.  Now, let's orient you for a moment.  This is the body-worn

8  camera of Sergeant Beall.  You know Sergeant Beall; right?

9  A    I know who he is.  Yes, ma'am.

10 Q    He was under the command of Lieutenant Williams, who was at

11 14th and Sherman; right?

12 A    Okay.

13 Q    Now, this time -- again, this is six hours ahead right

14 here.  So, this is actually 9:05 p.m. on May 28th, day one;

15 right?  You don't have to agree.  We all agree.

16 A    It says 29th, but are you saying you're six hours -- the

17 date says May 29th.

18 Q    It's been established.  Everybody agrees, this is 9:05 p.m.

19 Okay?

20 A    Okay.

21 Q    All right.  Now, let's play the clip.

22    THE COURT:  I guess the timestamps are kind of goofy.

23    THE WITNESS:  That's fine.

24    (A video was played.)

25 Q.  (By Ms. Wang) This is Lieutenant Williams; right?

20-cv-1878-RBJ   PATRICK PHELAN - Redirect   03-16-2022

1   A    Correct.

2   Q    Now, just now he said we're going to give them a push, and

3   they're probably going to push back.  Okay?  Right?

4   A    Okay.  He's briefing his officers.  Yes, ma'am.

5   Q    Go ahead.

6        (A video was played.)

7   Q    So, basically what Lieutenant Williams tells his officers,

8   including Sergeant Beall at 9:05, is we're going to push them.

9   They're probably going to push back.  Then we're going to throw

10  smoke, and then we're going to gas them; right?

11  A    It sounded like he said -- he's briefing his supervisors

12  there.  He said what we're going to do is move them to the curb.

13  If they don't move, we're going to deploy smoke.  After that, we

14  will have to make decisions based on what they want to do.

15  Q    Well, he said, hold your asses, because the gas is coming;

16  right?

17  A    Hold your asses?

18  Q    Yeah.  That's what he said?

19  A    I didn't hear that.

20  Q    Okay.  So, that's at 9:05.  Let's play the radio again,

21  Exhibit 720.  Clip three from 9:07 p.m.

22       (An audio recording was played.)

23  Q    So, it wasn't until 9:07 that Lieutenant Pine tells you

24  they're starting to take rocks; right?

25  A    He's telling me right now they're starting to take rocks,

20-cv-1878-RBJ    PATRICK PHELAN - Redirect    03-16-2022

1   yes.

2   Q    So, you had already decided to disperse the crowd through

3   announcements and telling them they were blocking the street;

4   right?

5   A    Yes.

6   Q    And Lieutenant Williams had also made the decision on the

7   ground to disperse everybody at 9:05; right?

8   A    Yes, ma'am.

9   Q    And there was no discussion about rocks until 9:07; right?

10  A    Obviously circumstances changed.

11  Q    So, it's just not true that Lieutenant Pine was telling you

12  that they were taking rocks, and that's why you ordered

13  everybody to disperse?

14  A    He just said we were taking rocks.

15  Q    You had made the decision to disperse them long before

16  that; right?

17  A    Or had incident commanders on the ground, Lieutenant

18  Williams there that was in the incident at the time making that

19  decision to move them out of the street.  We heard that.  After

20  that, circumstances changed.  Now they're taking projectiles.

21  Q    Okay.  You had earlier testified that you don't want to be

22  confrontational with protesters; right?

23  A    Try not to be.

24  Q    Do you consider it confrontational to PepperBall people who

25  haven't been doing anything wrong?

20-cv-1878-RBJ   PATRICK PHELAN - Redirect   03-16-2022

1   A    People that haven't -- aren't doing anything wrong

2   shouldn't be direct fired into them.  Is that what you're

3   saying?

4   Q    Yeah.

5   A    What type of application of PepperBall, ma'am?

6   Q    Well, is there some type of application of PepperBall that

7   you think is appropriate on peaceful protesters?

8   A    No.  But we sometimes, based on what's happening at the

9   situation at that time, will saturate an area.  PepperBall also

10  has the capability of deploying OC chemical.  So, it's the same

11  thing that the mailman carries.  So, they will shoot in front of

12  them.  If we're taking rocks and bottles and projectiles,

13  whatever they're throwing at us, we can't put a line in front of

14  them to back them up so they can't do that.

15  Q    I'm talking about peaceful protesters.  Okay?  People who

16  haven't thrown anything, do you think it's confrontational to

17  shoot them, let's say in the body with PepperBalls?

18  A    No.  You shouldn't be shooting people, direct firing of

19  someone that's just standing there.  You shouldn't be throwing

20  bottles at the police if they're just standing there, so no.

21  Q    Do you think that it's confrontational to tear gas people

22  who have been peacefully protesting?

23  A    It all depends on the circumstances.  I can't make a

24  blanket judgment.  We don't want a peaceful protest -- we want a

25  peaceful protest.  So, if they're marching, like I said, we

20-cv-1878-RBJ   PATRICK PHELAN - Redirect   03-16-2022

1    facilitate that.  If they're in a crowd with people throwing

2    projectiles at the police, that's a different situation, ma'am.

3    Q    All right.  Now, Ms. Birkholz showed you some -- went

4    through some after-action reports and the CAD reports yesterday,

5    and pointed out various times where it seemed like there was

6    radio communications about people throwing rocks or bottles or

7    damaging property; right?

8    A    Yes.

9    Q    Do you recall that sequence yesterday?

10   A    Yes, ma'am.  I'm sorry.

11   Q    Okay.  Now, none of that was committed by our plaintiffs in

12   this case; right?

13   A    I don't know.

14   Q    You have no information that any of that was committed by

15   any --

16   A    Correct.

17   Q    -- plaintiff in this case; right?

18   A    Correct.

19   Q    Now, showing you Exhibit -- let's take an example.

20   Exhibit 450.  This is the CAD report for May 30th, 2020.  Let's

21   go to page seven.  450.007.  Okay.  So, let's take -- we're

22   going to just use this as an example.  Okay?  So, this is on

23   May 30th at 1646.  Do you see that?

24   A    Mm-hmm.

25   Q    Okay.  So, that says 16th by Taco Bell and RadioShack.  Do

20-cv-1878-RBJ    PATRICK PHELAN - Redirect    03-16-2022

1   you see that?

2   A    Hundreds trying to pin officers against wall.  Above that,

3   16th?

4   Q    Yeah.  Right.  I'm just establishing where we are.

5   A    Okay.  16th, yeah, by Taco Bell and RadioShack.

6   Q    That's the 16th Street Mall; right near Welton?

7   A    Right.

8   Q    And then the next entry says, hundreds trying to pin

9   officers against wall; right?

10  A    Correct.

11  Q    And then there's one at 1647 that says, officers pinned

12  against wall.  Do you see that?

13  A    It says 530, rocks to windshield.  Then officers pinned

14  against wall.

15  Q    Well, we don't know whether this one has -- some of these

16  don't come in order of whatever event they're talking about;

17  right?

18  A    That looks like it's the same location.  They were probably

19  changing locations.  It's hard to say.  That's from 530 -- 530

20  Baker is a supervisor putting that information out, ma'am.

21  Q    Okay.  But let's focus on 16th and Welton by the RadioShack

22  and Taco Bell.  What this would seem to indicate is that there

23  were officers pinned to the wall; right?

24  A    Yes.

25            MS. WANG:  Let's take a look at Exhibit 392.  It's a

20-cv-1878-RBJ   PATRICK PHELAN - Redirect   03-16-2022

1    body-worn camera from Officer Carlson -- Lieutenant Carlson,

2    actually.  I'm going to move for admission of Exhibit 392.

3            MS. BIRKHOLZ:  No objection.

4            MS. WANG:  Let's go to ten minutes.  You can do

5    playback --

6            THE COURTROOM DEPUTY:  Hold on a second.

7            THE COURT:  It's admitted.  392.

8            THE COURTROOM DEPUTY:  Thank you.

9            MS. WANG:  Okay.  So, actually -- well, let's play

10   this, and then her hand is blocking the camera a little bit, so

11   we're going to have to go back a little bit to see where she's

12   at, but let's just play it first.

13       (A video was played.)

14   Q.   (By Ms. Wang) So, this is Aurora Lieutenant Cassidee

15   Carlson, who says on the radio or on the phone or talking to

16   somebody, we're at 16th and Welton.  There's no issues yet.

17   They're just chanting.  They're just chanting?

18   A    Correct.

19   Q    Okay.  Let's go back a little bit so we can see where she's

20   at.  Her camera is kind of crooked, and she's blocking a lot of

21   it, but there's a nice little sliver of a view.  So, this is the

22   incident that's being referred to on the CAD report at 16th and

23   Welton; right?  There's a RadioShack right there on the other

24   side on the 16th Street Mall?

25   A    Yeah.  Her camera is just one direction, so it's

20-cv-1878-RBJ    PATRICK PHELAN - Redirect    03-16-2022

1  one-dimensional, but I can't really see where that is.

2  Q    Let's look at another one.

3  A    It looks like -- I don't know if it's on the mall or not,

4  ma'am.

5          MS. WANG:  Exhibit 351.  I move for admission of

6  Exhibit 351, which is the body-worn camera of Aurora Officer

7  Smick.

8          MS. BIRKHOLZ:  No objection.

9          THE COURT:  All right.  Admitted.

10          MS. WANG:  Let's go to minute -- six minutes, 35

11  seconds.

12      (A video was played.)

13  Q.    (By Ms. Wang) See that RadioShack?

14  A    Yes.

15  Q    This is the RadioShack -- this is the incident -- the

16  location that's being discussed on the CAD report; right?

17  A    It appears to be.  Yes, ma'am.

18  Q    Okay.  And before we paused it, we heard Officer Smick

19  telling his officers to line up against the wall; right?

20          MS. BIRKHOLZ:  Your Honor, I'm going to object to this

21  line of questioning, as it exceeds the scope of the cross

22  examination yesterday.

23          MS. WANG:  It's for impeachment, Judge.

24          THE COURT:  Well, the objection is overruled, but at

25  some point you're going to end; right?

20-cv-1878-RBJ   PATRICK PHELAN - Redirect   03-16-2022

1     MS. WANG:  Yes, Judge.

2     THE COURT:  I mean, we've got three weeks to give you

3  for trial.  Don't take it all.

4     MS. WANG:  I won't.  I'm almost finished.

5  Q.   (By Ms. Wang) So, this is the location that is discussed

6  on the CAD report; right?

7  A   It appears to be.  Yes, ma'am.

8  Q   Okay.  So, the officers decided to line up against the

9  wall, and then protesters came to chant in front of them; right?

10  A   Yeah.  It looks like they're backing up.  It's Aurora

11  officers, so they're under the direction of Aurora command.

12  Q   Okay.  Let's go to --

13  A   I don't know what they're telling them there.

14  Q   All right.  Let's go to minute 13:24.

15     (A video was played.)

16  Q   So, this is when Denver came in and started shooting at the

17  protesters at this location; right?

18  A   I don't know.

19  Q   Okay.  So, the CAD report does not match up with what

20  actually happened; right?  In this incident, at least?

21  A   It said the officers had their -- were backed up to the

22  wall.  That appeared to be happening there.

23  Q   Okay.  I'm just trying to ask you whether for this incident

24  at least, the CAD report, we can't necessarily rely on what's in

25  the CAD report for what actually happened on the scene?

Kevin P. Carlin, RMR, CRR

20-cv-1878-RBJ   PATRICK PHELAN - Redirect   03-16-2022

1   A    That's radio transmission from Aurora.  They're picking

2   up -- they're talking about they're backed up against the wall.

3   That appeared to be happening.

4   Q    Okay.  And the CAD report doesn't reflect that actually the

5   Aurora officers lined up against the wall and then protesters

6   came to deliver their message to them; right?

7            MS. BIRKHOLZ:  Objection.  Asked and answered,

8   argumentative.

9            THE COURT:  All right.  Overruled to that objection.

10            THE WITNESS:  Could you repeat the question again,

11   please.

12   Q.   (By Ms. Wang) The CAD report does not reflect that what

13   actually happened is that Aurora officers lined up against the

14   wall, as you saw on this video, and protesters came to deliver

15   their message to them?

16   A    What message were they delivering to the police that they

17   were coming up at them?

18   Q    You don't think they were delivering a message here?

19   A    Yeah.  The protesters are approaching the police, because I

20   think they said -- that's what the radio transmission said.

21            MS. WANG:  No further questions.

22            THE COURT:  All right.  Questions from the jurors?  I

23   know you have some, because you went and got them.

24      (Proceedings held at the bench:)

25            THE COURT:  This is number 21.

Kevin P. Carlin, RMR, CRR

20-cv-1878-RBJ   PATRICK PHELAN - Redirect   03-16-2022

 1       MS. WANG:  No objection.

 2            MS. BIRKHOLZ:  No objection.

 3       THE COURT:  This is 22.

 4            MS. BIRKHOLZ:  No objection.

 5       MS. WANG:  No objection.

 6       THE COURT:  Twenty-three.

 7            MS. BIRKHOLZ:  No objection.

 8       MS. WANG:  No objection.

 9       THE COURT:  Twenty-four.

10       MS. WANG:  I don't have an objection to this question,

11  but we were just trying to interpret these words.

12       THE COURT:  What it says?

13       MS. WANG:  Yeah.  I think it says severe injuries.

14       THE COURT:  Severe, I would say.

15       MS. WANG:  Severe injuries.

16            MS. BIRKHOLZ:  You don't have an objection?

17       MS. WANG:  No objection.

18       THE COURT:  Twenty-five.

19            MS. BIRKHOLZ:  We've got someone else to testify about

20  it, but he can answer.

21       THE COURT:  You were saying no objections?

22       MS. WANG:  No objection.

23       THE COURT:  Twenty-six?

24            MS. BIRKHOLZ:  Which one was that?  No objection to

25  that one.  That was the arrest log we showed yesterday.

20-cv-1878-RBJ   PATRICK PHELAN - Redirect   03-16-2022

1    MS. WANG:  I see.  Okay.  No objection.

2    MS. BIRKHOLZ:  We might have to show the exhibit,

3  but --

4    THE COURT:  Twenty-seven.  Good chance to learn how

5  people are thinking over there.

6    MS. BIRKHOLZ:  No objection.

7    MS. WANG:  No objection.

8    THE COURT:  Twenty-eight, I already said no objection.

9  Don't let me down now.

10    MS. WANG:  No objection.

11    MS. BIRKHOLZ:  No objection.

12    THE COURT:  Okay.

13    (Proceedings held in open court:)

14    THE COURT:  All right.  Commander, we have a number of

15  questions for you from the jury.  Question, are less-lethal

16  weapons available for use at any type of protest?

17    THE WITNESS:  Yes, they are.

18    THE COURT:  Next question, after what activity did you

19  see the crowd change their demeanor from peaceful to unpeaceful

20  protest?

21    THE WITNESS:  I think on the first day when they took

22  the highway, and then they attacked the police officers that

23  were moving them off the highway.

24    THE COURT:  Question, when officers work long days

25  like during the protests, are they required to take breaks and

20-cv-1878-RBJ   PATRICK PHELAN – Redirect   03-16-2022

1    rest, or did they just work straight through?

2            THE WITNESS:  Obviously they worked several long

3    hours, and what we try to do is rotate them through what we call

4    down rooms.  And down rooms was nice that the businesses on the

5    16th Street Mall, some of the hotels and businesses furnished us

6    with down rooms with some food.  So, yes, they are.

7            THE COURT:  Maybe we need down rooms here.

8            THE WITNESS:  I was going to say.  I could use one.

9            MR. WEINER:  I have the music, Your Honor.

10           THE COURT:  By the way, was that Lynyrd Skynyrd?

11           MR. WEINER:  It was, Your Honor.  I take requests.

12           THE COURT:  I don't credit myself for that.  Our

13   reporter noted Lynyrd Skynyrd playing.  That's how good he is.

14           MR. WEINER:  He's good.

15           THE COURT:  All right.  Let's see.  Where are we here?

16   Next question.  If the 40,000 protesters had the intention to

17   harm police officers, how are there not more severe injuries and

18   deaths of officers en masse?  It is more likely that the number

19   of people will intend to do harm to officers was less than

20   one percent of protesters; is that correct?

21           THE WITNESS:  No.  I think in this instance, there was

22   a lot higher percentage, and what was the first part of that

23   question, Judge?

24           THE COURT:  Yeah.  It's kind of two questions, I

25   think, maybe.  If the 40,000 protesters had the intention to

20-cv-1878-RBJ   PATRICK PHELAN - Redirect   03-16-2022

1  harm police officers, how are there not more severe injuries and

2  deaths of officers en masse?

3         THE WITNESS:  Well, thank goodness there's not, but

4  the officers are provided with ballistic helmets and some what's

5  called PPE, personal protection equipment, so that, you know,

6  especially when they do get hit, it's a little bit of protection

7  against that.

8         THE COURT:  Is it more likely that the number of

9  people who had the intent to do harm to officers was less than

10  one percent of protesters?

11         THE WITNESS:  No.  I think there was above that -- it

12  was stated, yes, there was a larger percentage than one percent.

13         THE COURT:  Okay.  Question, what parts of the body

14  are DPD officers trained to shoot at for PepperBall, OC spray,

15  flash-bang, et cetera?

16         THE WITNESS:  Well, with less-lethal PepperBall

17  kinetic energy systems, you're talking about PepperBall, you

18  want to hit them below the sternum from the chest down.  Try to

19  avoid head, neck, eyes, groin.  With the 40-millimeter you want

20  to hit large muscle mass, the thighs, shoulders, back, for

21  those.  So, there are designated areas to -- for that

22  application for less-lethal.

23         THE COURT:  OC spray?

24         THE WITNESS:  OC spray would be used at the

25  individual's face, just like, you know, a lot of people carry

20-cv-1878-RBJ   PATRICK PHELAN - Redirect   03-16-2022

1    mace.  A lot of women carry mace on their keyring, and it's the

2    same application to ward off an attack.

3              THE COURT:  Flash-bangs?

4              THE WITNESS:  Flash-bangs are used for disruption.

5    They're deployed to the ground.

6              THE COURT:  Okay.  Question, for Exhibit 3021, does

7    this show the arrest record for all Denver, not just the

8    protest-related incidents?

9              THE WITNESS:  That's just -- if I refer -- if I recall

10   that, that's just the protest-related incidents.

11             THE COURT:  Question, what options to protect

12   themselves or others, including protesters, would officers have

13   available to them to use if less-lethal weapons were not

14   available or authorized for use during the protest?

15             THE WITNESS:  If I understand that question, you know,

16   luckily, you know, things change in policing.  They become

17   evolved.  You're talking about DNA.  You're talking about

18   community policing.  You're talking about less-lethal weapons.

19   These are all new things to help officers and help the public.

20   So, without them, I think the confrontation would be close up,

21   probably a lot of baton and much more physical.

22             THE COURT:  Please explain why arrest teams in this

23   crowd is a good or bad option in more detail.

24             THE WITNESS:  Arrest teams, which we've used in

25   several situations, it's just, kind of going away from it,

20-cv-1878-RBJ   PATRICK PHELAN - Redirect   03-16-2022

1   because it does cause confrontation.  You're sending a team into

2   a large crowd, especially this crowd, which is violent, and so

3   what will happen, if you're trying to get one individual out of

4   there, those officers are at risk, and so are the people around

5   them at risk, because they're trying to keep people back while

6   they try to make one arrest.  There's a chance for physical

7   confrontation that we try to avoid.

8           THE COURT:  Question, do you feel that less-lethal

9   weapons used on an individual is a safer or a more predictable

10  outcome for use in the environment officers were experiencing or

11  witnessing in the crowd?

12          THE WITNESS:  One more time, Judge?  Excuse me.

13          THE COURT:  Yeah.  Do you feel that less-lethal

14  weapons used on an individual is a safer or a more predictable

15  outcome for use in the environment the officers were

16  experiencing?

17          THE WITNESS:  Yes.  It's a much safer, much safer

18  option.  Less-lethal was developed for such incidents, and it

19  also was developed for suicidal parties with weapons so the

20  officers didn't have to use lethal force.  That's a basic reason

21  for less-lethal.  They don't have to use lethal force.  It

22  reduces shootings.

23          THE COURT:  Question, are less-lethal weapons

24  potentially less confrontational than other means of crowd

25  control?

Kevin P. Carlin, RMR, CRR

20-cv-1878-RBJ   PATRICK PHELAN - Redirect   03-16-2022

1    THE WITNESS:  I believe they are, yes.

2    THE COURT:  Any other questions from the jurors?  All

3    right.  Follow-up by Ms. Wang, if any?

4    MS. WANG:  No, Judge.

5    THE COURT:  By Ms. Birkholz?

6    MS. BIRKHOLZ:  None, Your Honor.  Thank you.

7    THE COURT:  All right.  Then, Commander, you are

8    excused and free to go.

9    THE WITNESS:  Thank you.

10   THE COURT:  You're welcome to stay and watch if you

11   want.  Yeah.  I know.  You will say no to that.  Does anybody

12   want a break yet over there in the jury?  Everybody okay?  Next

13   witness?

14   MR. RINGEL:  Your Honor, I could use two minutes, if

15   that's okay?  I apologize.  Too much coffee this morning, Your

16   Honor.

17   THE COURT:  Okay.  For Mr. Ringel, let's take a

18   12-minute break.

19       (Jury out at 10:18 a.m.)

20   THE COURT:  Okay.  10:30.

21       (Recess at 10:18 a.m., until 10:31 a.m.)

22       (Jury in at 10:31 a.m.)

23   THE COURT:  Okay.  Next witness.

24   MR. MACDONALD:  The plaintiffs call Jonathan Christian

25   to the stand, Your Honor.

20-cv-1878-RBJ   JONATHAN CHRISTIAN - Direct   03-16-2022

 1        (The Witness is Sworn)

 2             THE COURT:  Have a seat.

 3                      **DIRECT EXAMINATION**

 4    BY MR. MACDONALD

 5    Q    Good morning, Mr. Christian.  My name is Timothy Macdonald.

 6    A    Good morning.

 7    Q    We've never met before, have we?

 8    A    No.

 9    Q    You were a police officer for the Denver Police Department

10    policing the George Floyd protest; right?

11    A    Yes, sir.

12    Q    And you started the DPD police academy in 2015; is that

13    right?

14    A    Yes, sir.

15    Q    You entered the DPD patrol force in 2016?

16    A    Yes, sir.

17    Q    And during the first week of the George Floyd protests, you

18    worked every day except June 2nd; is that right?

19    A    I believe so.  Yes, sir.

20    Q    And you're represented by the City's same lawyers in this

21    case; right?

22    A    Yes, sir.

23    Q    You were a member of the gang unit?

24    A    Yes, sir.

25    Q    It's now, we've heard it referred to, the SORT team?

20-cv-1878-RBJ   JONATHAN CHRISTIAN - Direct   03-16-2022

1    A    Yes, sir.

2    Q    At the time it was known as the gang unit?

3    A    Yes, sir.

4    Q    There were about 20, 24 officers in the gang unit?

5    A    I believe so.  Yes, sir.

6    Q    All right.  You knew those folks pretty well?

7    A    Yes, sir.

8    Q    There were four sergeants for the gang unit; is that right?

9    A    Yes, sir.

10   Q    Sergeant Anthony Tak?

11   A    Yes, sir.

12   Q    Sergeant Vince Lombardi?

13   A    Yes, sir.

14   Q    Sergeant Ed Arnold?

15   A    Yes.

16   Q    Sergeant Scott Hughes?

17   A    Yes.

18   Q    And there were two lieutenants; right?

19   A    Yes, sir.

20   Q    Lieutenant Carroll?

21   A    Yes.

22   Q    And Lieutenant O'Donnell?

23   A    Yes, sir.

24   Q    And you worked the gang unit every day.  You didn't switch

25   to different units; right?

20-cv-1878-RBJ    JONATHAN CHRISTIAN - Direct    03-16-2022

1    A    Correct.

2    Q    The gang unit typically handles violent crimes; true?

3    A    Yes, sir.

4    Q    During the George Floyd -- during the protests, you carried

5    a PepperBall gun; true?

6    A    At certain points, yes, sir.

7    Q    Okay.  You also handled other weapons like an OC fogger and

8    a 40-millimeter launcher; true?

9    A    Yes, sir.

10   Q    You deployed your PepperBall during the protest; right?

11   A    Yes, sir.

12   Q    At times quite a lot?

13   A    Yes, sir.

14   Q    Shot at numerous people during the course of the protest?

15   A    Yes, sir.

16   Q    You ran out of PepperBalls a number of times?

17   A    Yes, sir.

18   Q    Your weapon holds approximately 180 PepperBalls; right?

19   That's a full hopper?  Is that the right word?

20   A    That's a good question.  I believe so.

21   Q    All right.  Did you use any grenades during the protest,

22   sir?

23   A    Yes, sir.

24   Q    Did you witness other members of the gang unit deploying

25   grenades?

20-cv-1878-RBJ   JONATHAN CHRISTIAN - Direct   03-16-2022

1   A    Yes, sir.

2   Q    Were you trained in the use of grenades?

3   A    Not at the time, sir.

4   Q    I'm sorry, sir?

5   A    I said not at the time, sir.

6   Q    You were certified for PepperBall use in 2019?

7   A    Yes, sir.

8   Q    You took another PepperBall course in February of 2020?

9   A    Yes, sir.

10  Q    And these are approved curriculum of the Denver Police

11  Department?

12  A    Yes, sir.

13  Q    PepperBalls contain an OC -- an OC powder, at least some of

14  the ones?

15  A    Yes, sir.

16  Q    There's also an inert PepperBall; is that right?

17  A    Yes, sir.

18  Q    Those are typically used for training?

19  A    Correct.

20  Q    All right.  During your deployment at the George Floyd

21  protests, were you using the chemical PepperBalls with the OC

22  powder or the inert, or do you know?

23  A    They were mixed.

24  Q    They were mixed?  And one of the reasons they were mixed is

25  because the Denver Police Department was running out of the

20-cv-1878-RBJ    JONATHAN CHRISTIAN – Direct    03-16-2022

1    chemical PepperBalls; true?

2              MR. RINGEL:  Objection.  Lack of personal knowledge.

3              MR. MACDONALD:  If you know, sir.

4              THE WITNESS:  Could you repeat the question?

5    Q.    (By Mr. Macdonald) Yes.  You said during the protest, you

6    were using a mix of the inert PepperBalls and the chemical OC

7    PepperBalls; right?

8    A    Yes, sir.

9    Q    And one of the reasons -- you typically during a deployment

10   would only use the chemical PepperBalls; right?

11   A    Depending on the circumstance, yes, sir.

12   Q    Typically your weapon is loaded with the chemical -- your

13   PepperBall weapon is loaded with the chemical PepperBalls?

14   A    Yes, sir.

15   Q    All right.  But during the protests, the DPD was running

16   out of the chemical PepperBall, so they used some of the inert

17   to mix in.  Are you aware of that?

18             MR. RINGEL:  Lack of personal knowledge.

19             THE COURT:  Sustained.  You need more foundation for

20   that question.

21   Q.    (By Mr. Macdonald) Are you aware that the DPD was running

22   out of PepperBall on the first night of the protest?

23   A    On the first night, no, sir.

24   Q    The second night?

25   A    I'm not sure if it was the second or third night, but I do

20-cv-1878-RBJ   JONATHAN CHRISTIAN - Direct   03-16-2022

1   know that DPD requested more less-lethals.

2   Q    All right.  And when DPD started running out of the

3   PepperBalls, they began mixing the inert with the chemical,

4   either the second or the third day?

5   A    I believe so.

6   Q    OC powder in the PepperBalls contained an irritant like

7   pepper spray; right?

8   A    Powder form, yes, sir.

9   Q    Did you know that it was a form of pelargonic acid?

10   A    Those are some big words, but no.

11   Q    One situation in which you were trained to use PepperBalls

12   is for pain compliance; is that right?

13   A    That's one of the uses.  Yes, sir.

14   Q    And pain compliance is using pain to get someone to do what

15   you want them to do; right?

16   A    Yes, sir.

17   Q    PepperBalls can cause a feeling of burning; true?

18   A    Yes, sir.

19   Q    Burning sensation causes pain?

20   A    Yes, sir.

21   Q    And you can -- you can inhale the PepperBall -- the

22   parts -- the powder from the PepperBall when it's shot at

23   someone; right?

24   A    Yes, sir.

25   Q    Makes it difficult to breathe?

Kevin P. Carlin, RMR, CRR

20-cv-1878-RBJ   JONATHAN CHRISTIAN - Direct   03-16-2022

1   A    Yes, sir.

2   Q    Makes it -- make your eyes run?

3   A    Yes, sir.

4   Q    All right.  I want to talk about your use of force

5   statements that were prepared after the George Floyd -- after

6   the George Floyd protests.  Okay?  You didn't complete any use

7   of force statements at the end of your shifts during the

8   protest; true?

9   A    That is true.

10   Q    And you weren't told to complete use of force statements by

11   any of your superiors at the end of your shifts?

12   A    No, sir.

13   Q    And I think you took June 2nd off; is that right?

14   A    I believe so.  It's been a while since I've seen this

15   calendar.

16   Q    The days that you worked, May 28th, 29th, 30th, the 1st,

17   you didn't complete a use of force statement for those days on

18   June 2nd or 3rd or 4th or 5th; true?

19   A    Again, I'm not exactly sure when I completed the

20   statements, but if you're saying so, I will assume that's the

21   case.

22   Q    And we will take a quick look.  I believe you signed them

23   on June 8th, but I will take a look -- we will take a look so

24   you can confirm that.  At some point, someone asked you to fill

25   out a use of force statement after that first week of protests;

20-cv-1878-RBJ   JONATHAN CHRISTIAN - Direct   03-16-2022

1    is that right?

2    A    Yes, sir.

3    Q    Who was that?

4    A    I believe it was an order that came down from our

5    lieutenants to our sergeants and was discussed during roll call.

6    Q    And did someone actually tell you -- do you remember some

7    time after that first week, someone came to you or told all of

8    you during a morning briefing or something, it's time to fill

9    out use of force statements?

10   A    Yes, sir.  That's what happened in the roll call.

11   Q    Okay.  I'm sorry.  And do you know if it was -- would it

12   have been either Sergeant Tak, Lombardi, Arnold, or Hughes?

13   A    No, sir.

14   Q    Would it have been one of the lieutenants, either

15   Lieutenant Carroll or Lieutenant O'Donnell?

16   A    I'm sorry.  I should have been more clear.  It could have

17   been one of the sergeants.  It also could have been one of the

18   lieutenants.  Their offices are right next to each other, and

19   they both frequent roll calls.  And I know that we received the

20   order, but exactly who, I am unclear.

21   Q    Okay.  And you don't remember when you received that order

22   to fill out the use of force statements?

23   A    No, sir.

24   Q    Do you think it would have been the day you filled them

25   out?

20-cv-1878-RBJ   JONATHAN CHRISTIAN - Direct   03-16-2022

1    A    Possibly.

2    Q    Do you think that's likely?

3    A    Possibly.  Yes, sir.

4    Q    Let's take a look at Exhibit 502, please.  Do you recognize

5    Exhibit 502, Officer Christian?

6    A    Yes, sir.

7           MR. MACDONALD:  Plaintiffs move admission of 502, Your

8    Honor.

9           MR. RINGEL:  No objection.

10          THE COURT:  It's admitted.

11   Q.    (By Mr. Macdonald) Is that your signature on the bottom

12   of the first page, Officer Christian?

13   A    Yes, sir.

14   Q    All right.  And it's dated June 8th, 2020?

15   A    Yes, sir.

16   Q    Okay.  And if we -- and just to be clear, this is for

17   May 28th, 2020, if you look at the body of the summary.  Scroll

18   down, please.  Thank you, Dan.

19   A    Yes, sir.

20   Q    Okay.  And so this was signed, prepared by you, 11 days

21   after the incidents that you're describing; is that fair?

22   A    Yes, sir.

23   Q    And do you think, given your personality, that you would

24   have filled this out as soon as you got an order from one of

25   your lieutenants or one of the sergeants?

20-cv-1878-RBJ    JONATHAN CHRISTIAN - Direct    03-16-2022

1    A    Yes, sir.

2    Q    All right.  And if we turn to page four -- actually, turn

3    to page seven.  For some reason, our exhibit is out of order.

4    So, if we turn to page seven, you see this is dated -- this is

5    your summary from May 29th.  Do you see that?

6    A    Yes, sir.

7    Q    All right.  And if we go down to the bottom, this is also

8    June 8th, 2020?

9    A    Yes, sir.

10   Q    If we go back to page four, you will see this is your

11   statement for May 31st?

12   A    Yes, sir.

13   Q    Also dated June 8th, 2020?

14   A    Yes, sir.

15   Q    So, do you think it's likely you received an order from one

16   of your sergeants or one of your lieutenants on June 8th, 2020,

17   to fill out use of force statements, and then you promptly did

18   it for all your days that you worked at the protest?

19   A    Yes, sir.

20   Q    And we only have use of force statements for you for the

21   28th, the 29th, and the 31st.  Did you fill them -- did you fill

22   out use of force statements for all the days you worked during

23   the protest?

24   A    No, sir.

25   Q    And we don't have one for the 30th.  Is that because you

Kevin P. Carlin, RMR, CRR

20-cv-1878-RBJ   JONATHAN CHRISTIAN - Direct   03-16-2022

1    didn't fill one out for the 30th?

2    A    That is correct.

3    Q    All right.  And we don't have one for the 1st or the 2nd,

4    as you weren't there on the 2nd.  Sorry.  We don't have one for

5    the 1st.  That's because you didn't fill one out for the 1st?

6    A    Yes, sir.

7    Q    And for the other days, you didn't fill one out after when

8    you came back on the 3rd?

9    A    Statements for use of force, no, sir.

10   Q    Okay.  And given that you were filling them out 11 days

11   after the protest started on the 28th, I assume it was hard to

12   recollect exactly what happened 11 days previously; is that

13   fair?

14   A    Yes, sir.

15   Q    And maybe you didn't capture every use of force, because a

16   lot had happened since May 28th to June 8th; is that fair?

17   A    Yes, sir.

18   Q    While you were working the protest in the 28th, the 29th,

19   the 30th, you didn't think you had to fill out a use of force

20   statement; right?

21   A    No, sir.

22   Q    You thought you did have to fill one out?

23   A    We were told that we would fill out a use of force report,

24   but that we wouldn't have to worry about our statements until

25   everything had calmed down.

Kevin P. Carlin, RMR, CRR

20-cv-1878-RBJ   JONATHAN CHRISTIAN - Direct   03-16-2022

1   Q    Okay.  So, at some point later, you will be able to fill

2   them out.  That's what you were told?

3   A    Yes, sir.

4   Q    Okay.  If we turn to page one of your use of force

5   statement, this was from May 28th.  If we go down to the

6   statement.  Do you see that?

7   A    Yes, sir.

8   Q    All right.  And were you here when Officer Valentine

9   testified?

10  A    Yes, sir.

11  Q    All right.  And you were -- he was a member of the gang

12  unit.  He was one of the team?

13  A    Yes, sir.

14  Q    And you were deployed together on the 28th; is that right?

15  A    That's correct.

16  Q    Okay.  And you responded to 14th and Lincoln on the first

17  afternoon, early evening; right?  With the gang unit?

18  A    Yes, sir.

19  Q    And you were with Officer Valentine?

20  A    Yes, sir.

21  Q    Okay.  And you described that in the second paragraph, the

22  flat tire that your RDV received while at 14th and Lincoln;

23  right?

24  A    Yes, sir.

25  Q    Okay.  And what you say, if we look at that second

20-cv-1878-RBJ   JONATHAN CHRISTIAN - Direct   03-16-2022

1  paragraph, you say during this confrontation, R/O, and that's

2  reporting officer.  That means you?

3  A    Yes, sir.

4  Q    Heard a large bang, and when R/O turned to see what

5  happened, R/O observed that the rear driver side tire on unit

6  T7005 had been stabbed and was now flat; right?

7  A    Yes, sir.

8  Q    You remember when the RDV received a flat tire?

9  A    It received a flat tire.  Yes, sir.

10  Q    Okay.  You didn't write anything about an improvised

11  firework being deployed at the vehicle; right?

12  A    Sir, at that point, I was at the front of the RDV.  My back

13  was to it, and so no, I did not see a firework IED.

14  Q    All right.  And you said that you -- the R/O observed that

15  the rear driver side tire on the unit had been stabbed and was

16  now flat?

17  A    That was my inference.  Yes, sir.

18  Q    I'm sorry.  Did you say that was my inference?  I

19  apologize.

20  A    Yes.  As I stated earlier, I was at the front of the RDV

21  pushing the crowd back, and I heard a loud bang.  It was

22  extremely loud, and when I turned around, I heard one of the

23  members of my unit screaming he had a knife, he has a knife, and

24  I saw an individual with a large knife run back into the crowd.

25            And so when I found out that the tire was flat, because

20-cv-1878-RBJ   JONATHAN CHRISTIAN - Direct   03-16-2022

1   that just so happened to be my section on the rails, I made the

2   assumption that it had been stabbed.  Yes, sir.

3   Q    And this is what you wrote eight days later -- I'm sorry.

4   Eleven days later?

5   A    Eleven, yes.

6   Q    And then the unit was driven back.  The RDV was driven back

7   to the gang unit with a flat tire; right?

8   A    Yes, sir.

9   Q    Okay.  And that was about three miles?

10  A    Yes, sir.  I believe so.

11  Q    During your time policing the protest, you had your

12  body-worn camera on; is that right?

13  A    Yes, sir.

14  Q    At least on your body?

15  A    Yes.

16  Q    Okay.  And were you required to have that on during any

17  encounter with a citizen?

18  A    Any encounter at the time, no, sir.

19  Q    All right.  Any encounter that turned hostile or

20  confrontational?

21  A    Yes, sir.  That would be the goal.

22  Q    Okay.  And we have some BWC, body-worn camera footage from

23  you.  We have about a little less than three hours of body-worn

24  camera footage for you on two days of the protest, the 28th and

25  the 29th.  Do you believe that's the only time you had your

20-cv-1878-RBJ   JONATHAN CHRISTIAN - Direct   03-16-2022

1  body-worn camera on during the protest is the 28th and 29th?

2  A    My body-worn camera most likely would have been on the

3  entire time, but as far as activated, yes, sir.

4  Q    Okay.  You didn't have it on on the 30th or the 31st?

5  A    Again, it would have been on, but not activated.

6  Q    All right.  And by on, it's -- because it's running

7  continuously in the background, and then you activate it, and

8  then it saves for 30 seconds from before you activate it; right?

9  That's the buffering that the jury has heard for the first 30

10  seconds?

11  A    Yes, sir.

12  Q    Okay.  And so you didn't have any body-worn camera footage

13  activated on the 30th or the 31st?

14  A    Correct.

15  Q    Okay.  And that's even though you had a use of force

16  statement that you filled out on the 31st in which you describe

17  some uses of force; right?

18  A    Yes, sir.

19  Q    And why did you not activate your body-worn camera on the

20  31st, including making arrests and deploying your 40-millimeter

21  launcher?

22  A    Sir, I don't recall.

23  Q    Okay.  But you remember that you did not activate your

24  camera during that time?

25  A    According to the record, I did not.  It's very well

20-cv-1878-RBJ   JONATHAN CHRISTIAN - Direct   03-16-2022

1  possible that I attempted to.  Yes, sir.

2  Q    You don't have any recollection of that specifically?

3  A    No, sir.

4  Q    And you were not disciplined at any point for not having

5  your body-worn camera activated during any incident during the

6  protest; true?

7  A    True.

8  Q    You were not disciplined in any way for not having use of

9  force statements filled out until 11 days after the protest;

10  true?

11  A    True.

12  Q    All right.  I want to talk about your incident that

13  occurred on the second day of the protest.  Okay?

14  A    Yes, sir.

15  Q    An incident that happened at 14th and Lincoln on the

16  evening of May 29th, the second day of the protest.  This was

17  your second day policing the protest; right?

18  A    Yes, sir.

19  Q    You were stationed with members of the gang unit; right?

20  A    Yes, sir.

21  Q    You were stationed on the --

22  A    South side.

23  Q    South side of the capitol; right?

24  A    Yes, sir.

25  Q    You were on the capitol grounds?

20-cv-1878-RBJ    JONATHAN CHRISTIAN - Direct    03-16-2022

1   A    Yes, sir.

2   Q    Did you receive permission from the state -- Colorado State

3   Patrol to be on the south -- the grass of the capitol?

4   A    I assume so.

5   Q    And when you say you assume so, let me be more specific.

6   Do you remember whether you personally or heard others in your

7   unit get permission from the state patrol to be on the capitol

8   grounds that evening?

9   A    From the state patrol specifically, no, sir.

10  Q    And you were on the capitol grounds a number of times

11  during the protest; right?

12  A    Yes, sir.

13  Q    And you went there when either one of your sergeants or one

14  of your lieutenants told you to go there; right?

15  A    Yes, sir.

16  Q    All right.  And at approximately 9:00 p.m. on May 29th, you

17  were stationed in the grass looking out on 14th; right?

18  A    Yes, sir.  That's where we ended up.

19  Q    Okay.  Can we put up 1241, please, Dan.  This is the map.

20  If we can orient the jury.  You were stationed somewhere on that

21  grass; is that right?

22  A    Yes, sir.

23  Q    Okay.  Let's put up still from Exhibit 108.  Show that to

24  Mr. Christian, please.  Have you seen this still before, Officer

25  Christian?

20-cv-1878-RBJ   JONATHAN CHRISTIAN – Direct   03-16-2022

1    A    This still, no.  I have seen the video.

2    Q    Okay.  You saw a video from this; right?

3    A    Yes, sir.

4              MR. MACDONALD:  We move admission of 108, Your Honor.

5              MR. RINGEL:  No objection.

6              THE COURT:  Admitted.

7    Q.    (By Mr. Macdonald) And we see three officers standing

8    here; correct?

9    A    Yes, sir.

10   Q    And then we see one officer kneeling behind that pole?

11   A    Yes, sir.

12   Q    We see the state capitol behind the three officers; right?

13   A    Yes, sir.

14   Q    And you're the officer kneeling; right?

15   A    Yes, sir.

16   Q    And you're raising your weapon; right?

17   A    The less-lethal.  Yes, sir.

18   Q    Do you see any other officers raising their weapons?

19   A    No, sir.

20   Q    You were wearing your body-worn camera that evening;

21   correct?

22   A    Yes, sir.

23   Q    You were recording; correct?

24   A    Yes, sir.

25   Q    Why were you raising your weapon, Officer Christian?

20-cv-1878-RBJ   JONATHAN CHRISTIAN – Direct   03-16-2022

1  A    It was to address the individual in the roadway.

2  Q    To address the individual in the roadway?

3  A    Yes, sir.

4  Q    None of the -- none of the three officers besides you are

5  raising their weapons.  We've established that?

6  A    Yes, sir.

7  Q    Why did you see it necessary to raise your weapon and point

8  it at a citizen walking across the street?

9  A    I felt that it was reasonable in order to protect her

10  safety.

11  Q    You were pointing a weapon at a citizen for their safety?

12  A    Yes, sir.

13  Q    Is that something you did regularly during the protest,

14  Officer Christian?

15  A    I don't exactly understand the question.

16  Q    Did you point your weapon at Denver citizens for their own

17  safety regularly during the protest?

18  A    I don't recall.

19  Q    Let's look at your body-worn camera footage, please.  It's

20  Exhibit 613.  And if we do the time conversion, you see up here,

21  it's -- says that it's 3:04 on May 30th, and you understand that

22  that means the actual time, that's Greenwich Mean Time.  If we

23  subtract six hours, it's actually 9:04 p.m. on the 29th, the

24  second day of the protest; right?

25  A    Yes, sir.

20-cv-1878-RBJ   JONATHAN CHRISTIAN - Direct   03-16-2022

1          MR. MACDONALD:  Okay.  We move admission of 613, Your

2    Honor.

3          MR. RINGEL:  No objection.

4          THE COURT:  Admitted.

5          MR. MACDONALD:  All right.  If we can start this at

6    3:06, please, Dan.

7          (A video was played.)

8    Q.    (By Mr. Macdonald) Stop right there.  What's happening

9    right there, Officer Christian?

10   A     I'm taking a knee.

11   Q     Okay.  And so one of the reasons you take a knee is to get

12   a better aim at something; right?

13   A     Yes, sir.

14   Q     And that's what you were doing?

15   A     Yes, sir.

16   Q     All right.  Let's play a little more, Dan, please.

17         (A video was played.)

18   Q     Stop there.  You raise your weapon?

19   A     Yes, sir.

20   Q     This is for the citizen's own safety; right?

21   A     Yes, sir.

22   Q     Let's keep playing.

23         (A video was played.)

24   Q     Stop there.  What was that sound that we just heard?

25   A     That was a deployment of a PepperBall.

20-cv-1878-RBJ   JONATHAN CHRISTIAN - Direct   03-16-2022

1  Q    Okay.  You were shooting a PepperBall at the citizen for

2  their own safety?

3  A    Yes, sir.

4  Q    Did you give the citizen a warning?

5  A    No, sir.

6  Q    Did you hear any of your other fellow officers give the

7  citizen a warning?

8  A    Verbal warnings, no, sir.

9  Q    Okay.  Did you hear some other warning that was nonverbal

10  that your fellow officers gave?

11  A    Cars honking at the person in the street.  Yes, sir.

12  Q    Not your fellow officers?

13  A    No, sir.

14  Q    All right.  And you heard honking.  If we played your whole

15  body-worn camera, there's honkings almost consistently

16  throughout the evening; right?

17  A    Yes, sir.

18  Q    Okay.  So, you're not testifying that you heard a car honk

19  at the citizen that you fired your weapon at, are you?

20  A    That would have been my understanding.  Yes, sir.

21  Q    So, you think you heard a car honk at the person?

22  A    Yes, sir.

23  Q    All right.  And is that -- does that help persuade you to

24  fire your weapon after you heard the car honk at the citizen?

25  A    Yes, sir.

Kevin P. Carlin, RMR, CRR

20-cv-1878-RBJ   JONATHAN CHRISTIAN – Direct   03-16-2022

1    Q    All right.  Let's keep playing the video, please.

2         (A video was played.)

3    Q    All right.  Let's stop there.  The citizen you shot, you

4    understand that's one of the plaintiffs in this case, Ms. Epps?

5    A    I do now.  Yes, sir.

6    Q    At the time, did you know who Ms. Epps was?

7    A    No, sir.

8    Q    Did you know that she was -- had been serving on the Denver

9    Police Department advisory committee on the use of force?

10   A    No, sir.

11   Q    Now, we see her right here; correct?

12   A    Yes, sir.

13   Q    So, she's out of the street; right?

14   A    Yes, sir.

15   Q    And that's right at the time you just yelled, get out of

16   the street, after firing your weapon at her?

17   A    Yes, sir.

18   Q    Okay.  You warned her about five seconds after you shot at

19   her; right?

20   A    Yes, sir.

21   Q    Nobody else in the street?

22   A    Correct.

23   Q    Do you remember deploying your PepperBall at other people,

24   other citizens during the George Floyd protest --

25   A    Yes, sir.

20-cv-1878-RBJ   JONATHAN CHRISTIAN - Direct   03-16-2022

1   Q   -- to get them out of the street?

2   A   Yes, sir.

3   Q   And that was consistent with your training?

4   A   Yes, sir.

5   Q   Consistent with DPD policy?

6   A   Yes, sir.

7   Q   Not disciplined for any of the times in which you shot at

8   citizens for being in the street for their own safety?

9   A   No, sir.

10   Q   All right.  Let's keep rolling the tape, please.

11       (A video was played.)

12   Q   Stop there.  You heard another voice on the tape?

13   A   Yes, sir.

14   Q   What did the -- what did your fellow officer say to you?

15   A   He said, sarge said don't hit her.

16   Q   Who was it who told you that?

17   A   I don't know.

18   Q   Would have been a tightknit unit?

19   A   Yes, sir.

20   Q   You were standing next to three other officers?

21   A   Yes, sir.

22   Q   Do you know which sergeant told one of your colleagues to

23   tell you not to hit the citizen?

24   A   No, sir.

25   Q   Have you asked any of your fellow officers?

20-cv-1878-RBJ   JONATHAN CHRISTIAN - Direct   03-16-2022

1   A    No, sir.

2   Q    Did you ask any of the four sergeants?

3   A    No, sir.

4   Q    And this was about 11 seconds after you shot at Ms. Epps?

5   A    Yes, sir.

6   Q    Who was your supervising sergeant that night?

7   A    It would have been one of the four that night.

8   Particularly, I'm not entirely clear.

9   Q    When you shot at Ms. Epps, was she holding a weapon?

10  A    No, sir.

11  Q    Did you see Ms. Epps engaging in any active aggression?

12  A    No, sir.

13  Q    She was jaywalking?

14  A    Correct.

15  Q    Do you typically shoot at citizens for jaywalking?

16  A    No, sir.

17  Q    But it's your view that the utilization of the PepperBall

18  in this instance was authorized by your training, DPD policy and

19  custom; right?

20  A    Yes, sir.

21  Q    All right.  Because Ms. Epps was causing a hazard to

22  herself?

23  A    Yes, sir.

24  Q    You agree that your deployment of the PepperBall was a use

25  of force; right?

1   A    Yes, sir.

2   Q    And you recall seeing Ms. Epps' own video, because she was

3   taking a video while she was walking across the street; right?

4   A    Yes.

5   Q    Okay.  And you've seen that video?

6   A    I have now.  Yes, sir.

7   Q    Okay.  And when you shot at her, you knew she was taking a

8   video, or at least that you knew she was walking with her phone

9   out; right?

10  A    No, sir.  I don't recall that.

11  Q    You don't remember seeing that when you took a knee and

12  raised your weapon and trained it on her?

13  A    No, sir.

14  Q    Is there a reason -- she wasn't that far from you, was she?

15  A    Are you asking me to speculate to how far?

16  Q    I'm not asking you to speculate.  You were there.  I'm

17  asking you whether you think she was very far from you when you

18  took a knee to aim and shoot at her.

19  A    I guess far would be relative.  She wasn't close enough for

20  me to be able to have a conversation with her like this.  I

21  would say far would be from here to your podium to the back

22  wall.

23  Q    You think that she was about where the back wall is from

24  you?

25  A    Possibly.  Somewhere in between your podium and the back

20-cv-1878-RBJ   JONATHAN CHRISTIAN - Direct   03-16-2022

1   wall.  Yes, sir.

2   Q    Can you see me holding my phone?

3   A    Yes, sir.

4   Q    And yet your testimony is you didn't notice that Ms. Epps

5   was holding her phone?

6   A    I believe it's different circumstances.

7   Q    Because you had a weapon, and you don't have one now?

8   A    Because it's nighttime, and it is a well-lit room that

9   we're in now.

10   Q    You recall that in Ms. Epps' own video, you saw she said,

11   he just shot me; right?

12   A    I believe so.  Yes, sir.

13   Q    You also understand -- strike that.  You understand that

14   inhaling PepperBalls can happen when a weapon is deployed -- a

15   PepperBall weapon is deployed on someone; right?

16   A    Yes, sir.

17   Q    And that you understand that Ms. Epps believes you shot

18   her; right?

19   A    I believe she believes I shot her.  Yes, sir.

20   Q    Okay.  And I think it's your testimony that you don't think

21   you hit her; right?

22   A    Correct.

23   Q    And you understand that she may have been inhaling some of

24   the particles from a PepperBall, and that may be why she thinks

25   she was hit; right?

20-cv-1878-RBJ   JONATHAN CHRISTIAN – Direct   03-16-2022

1    A    Yes, sir.

2    Q    And you understand that when you deploy your PepperBall,

3    one of the intentions is to have the PepperBall explode and get

4    PepperBalls, the powder, the OC powder on the person; right?

5    A    Yes, sir.

6    Q    That's one of the intended effects?

7    A    Yes, sir.

8    Q    Okay.  And you're not saying that the OC powder from your

9    PepperBall didn't get on Ms. Epps?

10   A    That's correct.  Yes, sir.

11   Q    Okay.  You understand that that would have been your

12   intention, to get some of the OC powder on Ms. Epps; right?

13   A    Yes, sir.

14   Q    Okay.  Your use of force statement for the 29th, for

15   May 29th that you filled out 11 -- ten days later, doesn't

16   discuss that use of force; right?

17   A    I don't believe so.  No, sir.

18   Q    Okay.  And it should have?

19   A    Yes, sir.

20   Q    And you already said there are other uses of force that you

21   had during the protest that you didn't include in your use of

22   force statement because you didn't remember them; right?

23   A    Yes, sir.

24   Q    Not disciplined for not including them; true?

25   A    True.

20-cv-1878-RBJ   JONATHAN CHRISTIAN - Direct   03-16-2022

1  Q    I want to talk about an exchange you had with one of your

2  fellow officers.  Okay?

3  A    Okay.

4  Q    On the evening of the 28th, do you remember you asked one

5  of your fellow officers whether he wanted to switch weapons with

6  you?

7  A    Yes, sir.

8  Q    And that officer said he was out of munition; right?

9  A    Yes, sir.

10  Q    You said that you were out also; right?

11  A    Yes, sir.

12  Q    That was at least the second time that your weapon had run

13  out of PepperBalls on that first day of the protest; right?

14  A    I think that I should probably clarify.  So, running out,

15  we use that term quite frequently.  That does not mean that we

16  ran out of PepperBalls.  The tanks on the PepperBalls are quite

17  small, and they only allow for a certain number of shots.

18  Q    Got it.  And do you know how many shots?  That's the air

19  cartridge?

20  A    Yeah.  The air tank on the bottom of it.

21  Q    Okay.  So, it may be that you still had PepperBalls in your

22  weapon.  It may be that your air cartridge had been exhausted?

23  A    Yes, sir.

24  Q    Okay.  And do you remember how many shots of PepperBall are

25  required before you're likely to run out of the air cartridge?

20-cv-1878-RBJ   JONATHAN CHRISTIAN - Direct   03-16-2022

1   A     Exactly, no, sir.

2   Q     Approximately?

3   A     About 30 to 50.

4   Q     And you replace -- you have actually replacement air

5   cartridges you can put back in?

6   A     No, sir.

7   Q     In the vehicles?

8   A     No, sir.

9   Q     Where are those?

10  A     The replacement cartridges?

11  Q     Yes, sir.

12  A     I think there's some confusion.  We would not replace the

13  cartridge.  We would refill it.  And so we had refilling tanks

14  after the first night in our RDV.  Yes, sir.

15  Q     Okay.  You got the tanks to refill the air cartridge in

16  your deployment vehicles, your RDVs?

17  A     After the first day, yes, sir.

18  Q     Okay.  And so you indicated to your fellow officer that you

19  will probably get refilled pretty soon; right?

20  A     Yes, sir.

21  Q     And your fellow officer responded, I hope so.  I like

22  shooting people; right?

23  A     Yes, sir.

24  Q     And how did you respond to that?

25  A     I said as long as it's reasonable, appropriate, and

20-cv-1878-RBJ   JONATHAN CHRISTIAN - Direct   03-16-2022

1   necessary, and legal, if I remember correctly.

2   Q    And you've seen that video?

3   A    Yes, sir.

4   Q    Your fellow officer then says, absolutely?

5   A    It's been a while, but yes, sir.  I believe so.

6   Q    And how did you respond to that?

7   A    I don't recall.

8   Q    You said, fuck, yeah?

9   A    Okay.  Yes, sir.

10       MR. MACDONALD:  Your Honor, may we approach?

11       THE COURT:  Why?

12       MR. MACDONALD:  Given the issue that Mr. Ringel raised

13  yesterday, I have talked to Mr. Ringel about an exhibit that we

14  would like to use.  It is not the exhibit we discussed

15  yesterday.  It is a different exhibit.  I believe Mr. Ringel --

16  I talked to him this morning about it.  I believe he has an

17  objection, and given your direction yesterday, I would like to

18  seek the Court's guidance.

19       THE COURT:  Well, I thought my guidance was pretty

20  clear yesterday.  You're saying it wasn't?

21       MR. MACDONALD:  Your guidance yesterday was clear,

22  Your Honor.  This is a different issue.  I would like to raise

23  it with the Court.

24       THE COURT:  All right.

25       (Proceedings held at the bench:)

Kevin P. Carlin, RMR, CRR

20-cv-1878-RBJ   JONATHAN CHRISTIAN - Direct   03-16-2022

1    MR. MACDONALD:  The first evening of the protest,

2  Officer Christian deploys his OC fogger.  It's not the incident

3  for which he was -- an IA file was opened.  On the first evening

4  before he shot at Ms. Epps, Officer Christian deployed his OC

5  fogger on two protesters, including one that was filming him,

6  and I think it is relevant to our First amendment claim, and it

7  is a -- goes to motive, intent, and I believe it is appropriate

8  to inquire.  There was no IA file.  There was no discipline, so

9  I don't think it's excludable under 404(b) or anything else.

10    MR. RINGEL:  I think it presents the same problem that

11  we discussed yesterday under 404(b).  It's a separate bad act,

12  and it's designed to provide propensity.  It's a thin read to

13  say that it's intent.  The intent is subjective, and Officer

14  Christian has already testified that he had no knowledge that

15  Ms. Epps was filming him.  The jury can look at Mr. Macdonald's

16  deposition -- or demonstration and make their determination, but

17  it doesn't make sense to include a separate incident involving a

18  separate device under separate circumstances.  I think it's --

19    THE COURT:  It was a separate person that was filming

20  him, he says.

21    MR. RINGEL:  That's what he's representing is on the

22  video.

23    THE COURT:  All right.  I think that maybe goes to

24  intent and motive.  Overruled.

25    (Proceedings held in open court:)

Kevin P. Carlin, RMR, CRR

20-cv-1878-RBJ   JONATHAN CHRISTIAN - Direct   03-16-2022

1          MR. MACDONALD:  Dan, can you please call up 739.

2    Q.    (By Mr. Macdonald) Officer Christian, this is your

3    body-worn camera from, doing my conversion, the evening of

4    May 28th, at 11:48 p.m.  Do you see that in front of you?

5    A    Yes, sir.

6          MR. MACDONALD:  Your Honor, we would move admission of

7    Exhibit 739.

8          MR. RINGEL:  Same objection.

9          THE COURT:  Okay.  Overruled.  Admitted.

10         MR. MACDONALD:  Let's please take it to 13:30.  And

11   let's play the tape, Dan.

12         (A video was played.)

13   Q.    (By Mr. Macdonald) Stop there, please.  Officer

14   Christian, you saw this man was holding his phone; right?

15   A    I saw a light.  Yes, sir.

16   Q    It looked like he was filming; right?

17   A    Possibly.  Yes, sir.

18   Q    All right.  You deployed your OC fogger on him; right?

19   A    Yes, sir.

20   Q    While he was on the sidewalk?

21   A    I would have to watch the video again.  We were in the

22   street right here.

23   Q    So, let's run it back again.  Start that at 13:30.  And you

24   first fog a woman who is right in front of you who is walking

25   across the street; right?  And you say, get out of here, fucking

20-cv-1878-RBJ   JONATHAN CHRISTIAN - Direct   03-16-2022

1    get out of here; right?

2    A    Yes, sir.

3    Q    And let's look at that again and watch the man who is

4    filming you do that.

5         (A video was played.)

6    Q    Let's stop it right there.  He's just leaving the street

7    while he's filming; right?

8    A    As I fogged him, yes, sir.

9    Q    Okay.  And you fogged him because he was --

10   A    Approaching the line.

11   Q    -- approaching the line with a camera?

12   A    Do you need me to repeat it?

13        THE COURT REPORTER:  I have it.  Thank you.

14   Q.   (By Mr. Macdonald) He was walking along.  You have a line

15   of officers that were more than 30 of you; right?

16   A    Possibly.  Yes, sir.

17   Q    There's one woman who is walking across the street rubbing

18   her eyes because there's already been a deployment of tear gas

19   and PepperBalls; right?

20   A    Possibly.  Yes, sir.

21   Q    And she's rubbing her eyes as she's walking across the

22   street, and you shove her out of the way while OC spraying her;

23   right?

24   A    Yes, sir.

25   Q    And then there's one other gentleman who is walking across

20-cv-1878-RBJ   JONATHAN CHRISTIAN - Direct   03-16-2022

1   the street, and you -- while filming, and you OC fog him?

2   A    He approached the line with a light.  I do not recall if he

3   was recording or not.  He possibly could have been.  I don't

4   know if he was able to submit his footage or not.  But we had

5   multiple people challenging our line, and so somebody when we're

6   saying move back that's moving the opposite direction back

7   towards us would have been deemed, at least in my opinion, a

8   threat, and I would have been trying to keep them away from us.

9   Q    The woman who was rubbing her eyes walking across the

10  street was a threat?

11  A    She could have been.  Yes, sir.

12  Q    You were in hardened battle gear; right?

13  A    I was in personal protective equipment.  Yes, sir.

14  Q    You could have taken her down and arrested her; right?

15  A    Possibly.  Yes, sir.

16  Q    You in fact did do that during the protest.  You arrested a

17  woman who was standing in the street.  Do you remember that?

18  A    Yes, sir.

19  Q    Okay.  Just took her, put her in cuffs, and she was

20  arrested for standing in the street; right?

21  A    Yes, sir.

22  Q    And you could have done that with this woman; true?

23  A    Yes, sir.

24  Q    You decided to OC -- use force on her instead; right?

25  A    Yes, sir.

20-cv-1878-RBJ   JONATHAN CHRISTIAN - Direct   03-16-2022

1   Q    Because she was a rioter?

2   A    Because she was up against our line.  Yes, sir.

3   Q    Would you describe her as a rioter?

4   A    If you review the footage again, I don't know exactly what

5   is in her left hand.  It looks like it could be used as a

6   weapon.

7   Q    You think she had a tissue in her hand and was --

8   A    In her left hand?

9   Q    What did she have -- so, I don't know.  Did you see

10  something she was rubbing her eyes with?

11  A    I saw her rubbing her eyes, yes, sir, with one of her

12  hands.

13  Q    With something in her hands?

14  A    Yes, sir.

15  Q    She might have had tear gas or OC spray in her eyes?

16  A    Possibly.

17  Q    Was the man you fogged filming you a rioter?

18  A    Again, sir, I don't know if he was filming me.  It was a

19  light that was approaching the line very quickly after a fogging

20  incident.  And it had been my experience up to that point that

21  that usually doesn't mean anything good for us.

22  Q    You could have taken him down; right?

23  A    Yes, sir.

24  Q    This evening, you actually got off your RDV and arrested

25  someone who threw a rock at the vehicle; right?

20-cv-1878-RBJ   JONATHAN CHRISTIAN - Direct   03-16-2022

1    A    Yes, sir.  I believe so.

2    Q    A bunch of you jumped off the vehicle, chased down a man,

3    sprayed people in an alcove with OC spray, and put the guy in

4    cuffs who had thrown a rock at you; right?

5    A    Yes, sir.

6    Q    Okay.  There was no curfew in effect this evening, this

7    first night of the protest; right?  Did you notice that the

8    thing that the woman was holding in her hand when you OC fogged

9    her was a sign, a protest sign?

10   A    It could have been.  Yes, sir.

11   Q    Could have been?  Earlier this same evening, 15 minutes

12   before, you were on your RDV shooting PepperBalls at people in

13   front of the Denver Public Library; right?

14   A    Yes, sir.

15   Q    You've seen that footage?

16   A    Yes, sir.

17   Q    You spray your weapon from -- while riding on the RDV at 20

18   or 30 or 40 people standing in front of the Denver Public

19   Library; isn't that true?

20   A    I was shooting at a very select group, yes, sir, while

21   riding on the RDV.

22   Q    While the vehicle was moving?

23   A    Yes, sir.

24   Q    And people were standing with their hands up; right, sir?

25   A    Potentially.  Yes, sir.

20-cv-1878-RBJ   JONATHAN CHRISTIAN - Direct   03-16-2022

1   Q    Okay.  Kind of hard to shoot at a single person when your

2   vehicle is driving down the street; right?

3   A    I never said I was shooting at a single person.

4   Q    You were shooting at a group of people?

5   A    There were numerous.  Yes, sir.

6   Q    When you were shooting at people while the vehicle was

7   moving, there was approximately 15 or 20 DPD officers in a line

8   walking in front of the public library.  Do you remember that

9   from the footage?

10  A    No, sir.

11  Q    The use of force we just witnessed, did you report the

12  spraying of the two people, the woman maybe carrying a sign and

13  rubbing her eyes, and the gentleman holding a rectangular object

14  up?  Did you put that in your use of force statements for the

15  first night of the protest?

16  A    I would have to review my statement.  I'm not sure.

17  Q    Let's do that.

18  A    Okay.

19  Q    Let's go back to 502, please, Dan.  If we go to the second

20  page and look at the bottom, the last line, you say, R/O, that's

21  reporting officer.  That's you; right?

22  A    Yes, sir.

23  Q    You say, switched less-lethal to an OC fogger.  That's

24  because you had either run out of PepperBalls or run out of

25  cartridge after the incident outside the library which you talk

20-cv-1878-RBJ   JONATHAN CHRISTIAN - Direct   03-16-2022

1    about in the paragraph just above; right?

2    A    Potentially.

3    Q    Okay.

4    A    Yes, sir.

5    Q    So, now you went back to the truck.  Do you remember

6    looking at that?  You went back to the truck and grabbed an OC

7    fogger?

8    A    Yes, sir.

9    Q    Okay.  You say, we then continued to move the crowd from

10   the roadway.  This is when you're walking down.  You're on

11   Broadway right in front of the public library, marching down

12   with about 30 officers, shoulder to shoulder; right?

13   A    Yes, sir.

14   Q    You say, we continued to move the crowd from the roadway,

15   and then next line, multiple parties refused, at which point you

16   utilized the fogger to disperse the rioters from the road?

17   A    Yes, sir.

18   Q    That was the woman holding the sign and the man filming

19   you, the rioters?

20   A    In my statement, yes, sir.

21   Q    I'm sorry?

22   A    In my statement, yes, sir.

23   Q    That's what you said in your statement?

24   A    Yes, sir.

25   Q    You called them rioters?

20-cv-1878-RBJ    JONATHAN CHRISTIAN - Cross    03-16-2022

 1  A     Yes, sir.

 2  Q     Did they look like rioters when you just watched the video?

 3  A     They did not.

 4          MR. MACDONALD:  No further questions, Your Honor.

 5          THE COURT:  All right.  Cross examination?

 6                      **CROSS EXAMINATION**

 7  BY MR. RINGEL

 8  Q     Good morning, Mr. Christian.

 9  A     Good morning, sir.

10  Q     I wanted to follow up on some of the questions that you

11  were just asked.  Let's start with some of your background so

12  the jury can understand that.  When did you graduate from

13  college?

14  A     I graduated from college in 2012.

15  Q     What did you do immediately after college?

16  A     Immediately after I got a job with a wildland firefighting

17  crew and worked on a fire mitigation team when we weren't

18  actively deployed on fires.

19  Q     And after your wildlife firefighting experience, what was

20  your next thing that you did?

21  A     I did quite a few things in between.  But primarily of

22  note, I was a manager for an RV park in Arizona for a little

23  while.  And then when I moved back, I worked on security before

24  I got a job with an ambulance crew.

25  Q     Okay.  So, what did you do on an ambulance crew,

20-cv-1878-RBJ    JONATHAN CHRISTIAN - Cross    03-16-2022

1   Mr. Christian?

2   A    I was an EMT.

3   Q    How long were you an EMT?

4   A    I was an EMT for a few years.

5   Q    And the firefighting experience and the EMT experience is

6   prior to when you became a police officer?

7   A    Yes, sir.

8   Q    Why did you want to become a police officer, sir?

9   A    Kind of similar to what Commander Phelan and what Keith

10  Valentine had said.  My family has a long history of service,

11  anything from military to police to fire.  And I was most

12  interested in law enforcement because I thought that I would be

13  able to make the most amount of difference on my day-to-day,

14  instead of pumping water through a truck.  That's the debate

15  that we have at Thanksgiving.

16  Q    I understand.  When did you become a police officer,

17  Mr. Christian?

18  A    I started the academy in 2015.

19  Q    And, let's see.  Can you sort of generally describe for the

20  jury what the academy is like and the kind of training you get

21  in the academy.

22  A    Sure.  So, the academy is approximately six months long.

23  In the academy, we go over anything from Denver municipal code

24  to state law to investigative techniques.  We learn arrest

25  control techniques, different versions of driving, whether it be

20-cv-1878-RBJ   JONATHAN CHRISTIAN - Cross   03-16-2022

1  in a nonemergency setting or an emergency setting.  We learned

2  about firearms.  We learn kind of what different units in our

3  department does, and then there is a day that we learn about

4  protests.

5  Q    Okay.  So, let's talk about learning about protests.  What

6  do you recall of the nature of the training in the academy that

7  you received involving crowd control and protests?

8  A    As far as -- so, the training overall would be we would go

9  over the different type of gear that we would be issued, and its

10  usage.  And we would have, I believe, half a day which would be

11  in the classroom, which would be going over different type of

12  verbal commands and formations that we may be put into.  You've

13  heard skirmish line, I think a thousand times by now.  That's

14  one of the formations.  And then the second part of the day is

15  the practical application where we would have a supervisor

16  making those orders and how to properly utilize those

17  formations.

18  Q    Okay.  During the academy, are you taught about the First

19  amendment and the rights of citizens?

20  A    Yes, sir.

21  Q    Would you describe the type of training that you received

22  at the academy on that topic.

23  A    I believe it was most likely a district attorney that would

24  have come in and talked about it.  That would have been more of

25  a subsection on First amendment and where we may end up

Kevin P. Carlin, RMR, CRR

20-cv-1878-RBJ   JONATHAN CHRISTIAN – Cross   03-16-2022

1  encountering that.  It wouldn't have been, I don't believe, a

2  part of the actual protest training.  It would have been a

3  separate section during the law portion.

4  Q   So, as part of the academy training, you're trained on a

5  variety of different applicable laws that govern your role as a

6  police officer?

7  A   Yes, sir.

8  Q   And one of the topics in that sort of part of the training

9  would be First amendment; right?

10  A   Yes, sir.

11  Q   Okay.  During the academy, are you trained on less-lethal

12  devices?

13  A   Yes, sir.

14  Q   Would you explain the kind of training you receive at the

15  academy on those devices.

16  A   Yes, sir.  So, we're trained and certified on two

17  less-lethals while we're in the academy.  That would be the

18  Taser and an OC canister which we carry on our belt.  It's much

19  like the -- it's a little bigger than the OC canisters you would

20  carry if it were in your purse or in a bag.  And then we have a

21  familiarization training as well, where we learn what other

22  less-lethal options we have, and how those are properly

23  operated.

24  Q   So, would that include the PepperBall?

25  A   Yes, sir.

Kevin P. Carlin, RMR, CRR

20-cv-1878-RBJ   JONATHAN CHRISTIAN - Cross   03-16-2022

1   Q    And would that include the 40-millimeter?

2   A    Yes, sir.

3   Q    And would that include the other sort of OC devices that

4   aren't the one you carry on your belt?

5   A    Yes, sir.

6   Q    Is there any other less-lethal that you had familiarization

7   with during the academy?

8   A    Not that I can recall at this time.

9   Q    Okay.  After the academy, what is the next step of becoming

10  a police officer?

11  A    It is field training.  Three months of field training.  As

12  long as you're doing okay, it's three months of field training.

13  Q    So, what -- describe what you mean by field training.  What

14  does that entail?

15  A    Sure.  So, the academy is basically building the foundation

16  of all the general knowledge you need.  Once you graduate from

17  the academy, then you start field training in the district

18  you're most likely going to be assigned to.  During field

19  training, you're assigned during different periods.  You would

20  be assigned a training officer, or also known as a corporal, and

21  you would spend a specific amount of time with one corporal

22  before moving on to another corporal.

23       That's to get kind of a different approach from

24  different training officers.  Everybody has their own

25  experiences that they're able to pass down to officers as

20-cv-1878-RBJ    JONATHAN CHRISTIAN - Cross    03-16-2022

1  they're being trained.  But that's where you put kind of the

2  foundational -- or the principles that you've learned in the

3  academy into use.

4  Q    So, essentially, you do aspects of the job as a police

5  officer under the guidance of a training officer?

6  A    Yes, sir.  You're a full-fledged police officer at that

7  point, but everything you're doing is being critiqued, and

8  you're learning how, if you've done something, how to better it,

9  and then some of the other items that weren't covered in extent

10 during the academy.

11 Q    So, like for example if you and your training officer have

12 an interaction with a citizen for whatever reason, after that

13 interaction, the training officer would give you feedback as to

14 what you did right and what you could improve upon?

15 A    Yes, sir.

16 Q    Okay.  Same thing with driving lights and sirens; right?

17 A    Yes, sir.

18 Q    Okay.  I understand.  How long does that field officer

19 training last?

20 A    It lasts three months.

21 Q    And then after that, there's other training that happens

22 during the time that you're a police officer with the Denver

23 Police Department?

24 A    Yes, sir.

25 Q    One of those other trainings is annual training; right?

1504

                20-cv-1878-RBJ    JONATHAN CHRISTIAN - Cross    03-16-2022

 1   A     Yes, sir.

 2   Q     Describe for the jury what annual training for Denver

 3   police officers is.

 4   A     Annual training would be training on perishable skills.

 5   Primarily to note would be driving, arrest control.  We

 6   consistently have to be recertified on our weapons to make sure

 7   that we know how to properly utilize and how to fire it.  And it

 8   could cover a wider range of things, of kind of whatever issues

 9   that the department has been seeing come up.

10   Q     Okay.  Is there some -- is there something known as

11   specialized training as well?

12   A     Yes, sir.

13   Q     What is that?

14   A     Specialized training would be exactly that.  It's focused

15   on a different aspect than what normal patrol officers would be

16   required to know or to be trained in.

17   Q     So, specialized training that you received would be how to

18   operate a PepperBall?

19   A     Yes, sir.

20   Q     Describe what the training was related to teaching you how

21   to operate the PepperBall system.

22   A     So, it's another day-long training where you're authorized

23   in the less-lethal.  The first half of the day would be

24   classroom portion, where they would actually show you the

25   different parts of a PepperBall, how it functions, and then they

20-cv-1878-RBJ   JONATHAN CHRISTIAN - Cross   03-16-2022

1   would go through different scenarios as far as acceptable uses

2   of the PepperBall, as well as your intended target areas for the

3   utilization of it.

4   Q    Did some of those scenarios include use of PepperBall in a

5   crowd situation or a protest situation?

6   A    Yes, sir.

7   Q    Okay.  So, that was something that you were specifically

8   trained on in your specialized training for PepperBall use?

9   A    Yes, sir.

10  Q    As you mentioned with Mr. -- on the direct examination, you

11  had a second PepperBall course; right?

12  A    Yes, sir.

13  Q    Describe what that was, Mr. Christian.

14  A    The second PepperBall course would have constituted two

15  different things.  One would have just been a refresher course

16  to make sure our certification is up to date.  And then I

17  believe that course took place when I was with the gang unit, if

18  I remember correctly.  And that was a different utilization of

19  it for an arrest of a -- a potentially extremely violent person

20  with a warrant.

21  Q    Okay.  Is there sort of built into the system of the Denver

22  Police Department mechanisms where you would get training and

23  instruction on an informal basis kind of like you did in the

24  field training program from your supervisors?

25  A    Yes, sir.  Continually.

20-cv-1878-RBJ    JONATHAN CHRISTIAN - Cross    03-16-2022

1    Q    How does that work, generally?

2    A    Primarily it would be during roll call, which is kind of

3    the morning briefing, as it were, where the officers sit down at

4    a table -- or at least in the gang unit, we sit down at one big

5    table.  It would be kind of like the pews with tables right now

6    with the sergeant sitting up front, and they go over anything

7    that may have happened the night before in the unit or in the

8    department -- in the district that you're working in, anything

9    to be on the lookout for.  And then any training that needs to

10   be addressed, and that could range from -- could range to be

11   anything.

12   Q    I want to shift gears and talk a little bit about what your

13   normal work was in the gang unit.  Can you sort of describe what

14   typical activities you would be doing as a member of the gang

15   unit.

16   A    Yes, sir.  So, the gang unit is a specialized unit, and we

17   primarily focused on what we call class 2 actions, or

18   self-initiated actions.  We would have a map of areas that have

19   seen the most increase in violent crimes, and that's the areas

20   that we would patrol.  Now, we were also responsible for

21   documenting and conducting follow-up on driveby shootings and

22   any other potentially gang-related crimes.

23   Q    Okay.  During the time that you were a member of the gang

24   unit and prior to the -- your response to the protests in May of

25   2020, did you have experience with responding to protests?

20-cv-1878-RBJ    JONATHAN CHRISTIAN - Cross    03-16-2022

1    A    Yes, sir.

2    Q    Would you describe that for us, please.

3    A    Yes, sir.  So, after the academy, the district that I was

4    assigned to is District 6.  It's the smallest district in

5    Denver, but I believe it has the highest population, and it's

6    the downtown district.  We're currently in District 6 right now.

7    I would have been a part of or assigned to multiple protests

8    during that time period.  I think 10 to 12 come to mind, but

9    there could have been more.

10   Q    What types of experiences did you have during those prior

11   protests before this one in May of 2020?

12   A    As far as my experience with the protesters?

13   Q    Yeah.  What -- just, explain what the -- your experience

14   working those protests was like as a general matter.

15   A    Primarily peaceful.

16   Q    Did you have the need to deploy a PepperBall system during

17   any of the prior protests?

18   A    No, sir.  I never had to use a less-lethal during any of

19   the prior protests.

20   Q    Did you experience violence during any of the prior

21   protests?

22   A    Not that I can recall.  No, sir.

23   Q    Okay.  All right.  I wanted to turn now to the protests.

24   As you discussed on your direct examination, you first responded

25   to the protests on the first day, May 28th of 2020; is that

20-cv-1878-RBJ    JONATHAN CHRISTIAN - Cross    03-16-2022

1    right?

2    A    Yes, sir.

3    Q    And what was the first event that you recall responding to

4    as a member of the gang unit as part of these protests?

5    A    It was that officers were surrounded, and that they were

6    calling for help, and that we needed to respond and get them out

7    of the area.

8    Q    Okay.  So, that was your introduction to what these

9    protests were about; right?

10   A    Yes, sir.

11   Q    Okay.  We -- you talked before about that you responded on

12   a variety of different days to the protest; right?

13   A    Yes, sir.

14   Q    And you were asked about there were a few days where you

15   didn't have a statement that you made related to use of force.

16   Can you explain to the jury why you didn't have a statement on

17   those days.

18   A    Those would have been most likely because I was either

19   driving the RDV or I was not involved in any use of force

20   incident.

21   Q    So, when your assignment on a particular day would be to

22   drive the RDV, you would be in the RDV for the entire day,

23   essentially?

24   A    Yes, sir.

25   Q    Okay.  So, you wouldn't have the opportunity to go out of

20-cv-1878-RBJ   JONATHAN CHRISTIAN - Cross   03-16-2022

1   the RDV and use force on anyone?

2   A    No, sir.

3   Q    So, there wouldn't be a need for you to write a statement

4   on a day that that was what you were doing?

5   A    Correct.

6   Q    Okay.  All right.  I wanted to talk to you a little bit

7   generally about your experiences in the protests.  What was the

8   normal timeframe that you were working on the different days

9   where you were working the protests, Mr. Christian?

10  A    That I was scheduled to work, or that I actually worked?

11  Q    That you actually worked.

12  A    I would have to look back at our TeleStaff, but I believe

13  we started work at 5:00 p.m. the first day.  I think that we got

14  off around 5:00 a.m., possibly, and then we ended up having to

15  come back, it may have been 3:00 a.m.  I'm not entirely sure,

16  and I don't want to say something that's going to make me

17  look -- I don't know.  So, after that, we would, I believe

18  Saturday and the subsequent days after that, we would come back

19  in, I believe around 9 o'clock.  And then we would work until we

20  were released.

21  Q    So, 9 o'clock in the morning?

22  A    Yes, sir.

23  Q    On the subsequent days of the protest?

24  A    Yes, sir.

25  Q    And then you would be released, typically after midnight?

20-cv-1878-RBJ   JONATHAN CHRISTIAN - Cross   03-16-2022

1   A     Yes, sir.

2   Q     Okay.  Do you recall ever getting home before midnight on

3   any day that you worked the protests?

4   A     No, sir.

5   Q     Okay.  So, these were long shifts?

6   A     Yes, sir.

7   Q     Okay.  What was your overall experience like working the

8   protests?

9   A     Overall experience, it was nothing like I would have --

10  I've ever encountered.  And it's the best way I can refer to it

11  is -- it just was -- it felt like complete lawlessness.

12  Q     What did you observe that makes you say that it felt like

13  complete lawlessness?  Describe for the jury some of those

14  things that you observed.

15  A     Well, to start off with, our first incident, we had bottles

16  and substances thrown at us when we were trying to move the

17  crowd away from the officers.  We had other projectiles thrown

18  at us.  I had a bicycle, I think, at one point thrown at me.  We

19  had people breaking squad car windows, spray painting buildings,

20  breaking business windows.

21          I know that -- I think every person on my unit at some

22  point had been injured.  And it was just the -- it's a lot of

23  what you've seen on the video, but like we've discussed,

24  there's -- the body-worn camera footage doesn't do justice to

25  just the absolute anarchy that was taking place.

20-cv-1878-RBJ    JONATHAN CHRISTIAN - Cross    03-16-2022

1  Q    Did you observe people throwing things at you and your

2  fellow officers?

3  A    Yes, sir.

4  Q    How frequently did that occur, Mr. Christian?

5  A    Extremely frequently.

6  Q    What types of things were being used as projectiles and

7  thrown at you?

8  A    We had anything ranging from metal ball bearings to smaller

9  rocks, all the way up through grapefruit-sized landscaping

10  rocks, bricks, canned food.  We had frozen water bottles,

11  unknown substance.  We had balloons filled with paint, balloons

12  filled with feces, which I don't know how they were able to do

13  that, but somehow they did it.  And we had -- as far as how they

14  used those items against us, they were thrown with lacrosse

15  sticks, tennis rackets, wrist rockets.

16  Q    What is a wrist rocket, Mr. Christian?

17  A    It's the slingshot, and it kind of looks like an L and

18  braces against your forearm.  And you grab on it with the handle

19  so you're able to brace and pull it farther back.

20  Q    You observed those kind of wrist rockets being used to

21  project things toward the police, including yourself?

22  A    Yes, sir.

23  Q    You also observed lacrosse sticks being used to project

24  things to the police and to yourself?

25  A    Yes, sir.

20-cv-1878-RBJ    JONATHAN CHRISTIAN - Cross    03-16-2022

1   Q    And tennis rackets?

2   A    Yes, sir.

3   Q    Okay.  Were you hit with any projectiles yourself?

4   A    Yes, sir.  I was.

5   Q    Do you have an estimate about how many times you were hit?

6   A    An estimate?  No, sir.  Multiple.  I can tell you that one

7   of them broke my foot.

8   Q    Describe your foot being broken as part of the protests.

9   A    So, we had formed a skirmish line at District 6 during one

10  of the times we thought they were trying to take it over, or

11  when they were going there and trying to damage it.  And I was

12  first on -- or I was on the front line of it.  And I remember

13  looking over my right, because an officer on my unit had just

14  fallen down.

15        He apparently had just gotten hit with a rock, and when

16  I looked over to my right, they were dragging him back.  And I

17  remember my left foot getting struck and almost dropping me to

18  the ground.  And that's when I saw the -- after it hit my foot,

19  I saw the grapefruit-sized rock rolling away.

20  Q    Do you remember what day that was?

21  A    I do not, but I would have to look at my statement.

22  Q    Okay.  But you were -- you were injured, and ultimately you

23  learned that you had broken a bone or bones in your foot?

24  A    Yes, sir.

25  Q    What bone or bones were broken in your foot, sir?

20-cv-1878-RBJ   JONATHAN CHRISTIAN - Cross   03-16-2022

1  A    It was on -- it was on the top of my foot on the left side.

2  That was fractured.  But I didn't go -- I didn't go to the

3  hospital for quite some time.

4  Q    What were the shoes or boots that you were wearing at the

5  time?

6  A    I wore departmental Danner boots -- or, sorry.  Not

7  departmental.  They're law enforcement boots that are just made

8  by Danner.  They're really thick leather and plastic.  Really

9  good boot made in the U.S.A.

10  Q    Are they substantial boots?  I mean, I'm picturing like a

11  work boot.  Is that a fair way to think about it?

12  A    Yes, sir.

13  Q    Okay.  So, it wouldn't be easy to break a foot by having

14  something hit the boot?

15  A    No, sir.  I wouldn't think so.

16  Q    A fair amount of force would have had to have been used;

17  right?

18  A    Yes, sir.

19  Q    Okay.  All right.  I want to turn to the event that you

20  discussed that occurred on May 29th at about 9:00 p.m. at the

21  intersection of 14th and Lincoln.  So, you watched part of your

22  body-worn camera video earlier during your examination, and I

23  wanted to understand from you what you and the gang unit were

24  doing in the previous time period, say the prior half hour to

25  hour before you get to the -- where your video starts.

20-cv-1878-RBJ     JONATHAN CHRISTIAN - Cross     03-16-2022

1   A     Yes, sir.  So, usually the reason we ended up on the

2   capitol grounds like that was after Colorado State Patrol had

3   requested assistance.  I can't speak to if that was in that

4   incident.  I don't recall.  But that was most likely why we were

5   there.  And so we had moved across from -- it would have been

6   Colfax up and over the hill to push protesters away from the

7   capitol building.  And then we would hold kind of higher up,

8   that way we had the advantage if anybody were to try and come

9   back and retake the capitol grounds.

10  Q     So, the idea on that day was to move all of the protesters

11  off the capitol grounds?

12  A     Yes, sir.

13  Q     Okay.  And that was what the gang unit was responsible for?

14  A     That was the gang unit.  I believe there were some other

15  units that were assigned -- or that assisted us with that during

16  the time.

17  Q     Okay.  All right.  You've watched your body-worn camera

18  video, or at least parts of it related to the event involving

19  someone who you now know to be Ms. Epps; right?

20  A     Yes, sir.

21  Q     And to be clear, you didn't know who that was at the moment

22  that you made the decision to deploy a PepperBall?

23  A     No, sir.

24  Q     You had never heard of Ms. Epps before?

25  A     No, sir.

20-cv-1878-RBJ   JONATHAN CHRISTIAN - Cross   03-16-2022

1  Q    Okay.  What I'd like you to do, Mr. Christian, is explain

2  in your own words what you were doing and why you made the

3  decision to deploy the PepperBall.

4  A    So, at that point, we had finally pushed everybody away,

5  and I think in my body-worn camera footage, off to the right,

6  you can kind of see the crowd moving along the street.  We had a

7  few break off, which was no problem, but I believe my mindset at

8  the time was Ms. Epps had stepped into the roadway, and cars

9  were honking and actually going around her.

10         And I remember watching, I believe it was two if not

11  three vehicles honk their horns at her as they're going around

12  her, before I had deployed the PepperBall at her in order to get

13  her to move from the roadway.  And after I deployed it, she

14  still hadn't moved from the roadway.  I then yelled for her to

15  move from the roadway, at which point she did.

16  Q    Okay.  So, where were you aiming?

17  A    I would have been -- and I should go ahead and specify.  I

18  don't -- I remember this incident, because I've been shown my

19  body-worn camera.  There was a lot that had happened that night.

20  I don't have any independent knowledge of this.  I can just kind

21  of based off of -- based off of who I am and my experiences, my

22  information or my intent would have been to shoot at her feet.

23  Q    Okay.  So, there is a concept related to deployment of

24  PepperBall called area saturation; right?

25  A    Yes, sir.

20-cv-1878-RBJ    JONATHAN CHRISTIAN - Cross    03-16-2022

1   Q    Describe what area saturation means.

2   A    Area saturation would include shooting an area with

3   PepperBall in order for the powder, the chemical agent to

4   disperse in order to get a person to move from one area to

5   another area, a person or a group of people.

6   Q    What -- were you employing area saturation with the

7   PepperBall on May 29th, 2020, at approximately 9:00 p.m.?

8   A    Yes, sir.

9   Q    Okay.  So, what you were trying to do is land the

10  PepperBall by where this person's feet were to cause them to

11  move?

12  A    Yes, sir.

13  Q    You weren't trying to target any part of the person's body?

14              MR. MACDONALD:  Objection.  Leading.

15              THE COURT:  It's cross examination.  Overruled.

16  Q.    (By Mr. Ringel) Were you trying to target any person --

17  any part of this person's body with your PepperBall?

18  A    No, sir.

19  Q    Okay.

20  A    I would have been trying to get it close enough for them to

21  understand that I was addressing them, though.

22  Q    Okay.  Now, there was discussion earlier this morning

23  related to Ms. Epps may be filming.  Do you believe you were

24  close enough to see a cell phone and reach the conclusion that

25  this person was filming?

                    Kevin P. Carlin, RMR, CRR

20-cv-1878-RBJ   JONATHAN CHRISTIAN - Cross   03-16-2022

1   A    No, sir.

2   Q    Why not, Mr. Christian?

3   A    As I stated earlier, she was far away.  It was dark.  She's

4   standing in -- in the street.  I wasn't looking at her hands.  I

5   was more looking at her and the vehicles traveling at her.  And

6   so that wasn't something that I registered.

7   Q    Okay.  You had indicated during the earlier questions that

8   you do not believe the PepperBall struck Ms. Epps; right?

9   A    Correct.

10        MR. RINGEL:  And if we could, I'd like to put up

11   Exhibit 1106.  This is Hastings' body-worn camera.

12        MR. MACDONALD:  No objection, Your Honor.

13   Q.   (By Mr. Ringel) So, to orient, this is a body-worn camera

14   from another member of the gang unit, Officer Hastings.  Do you

15   know who that is?

16   A    Yes, sir.

17        THE COURTROOM DEPUTY:  Mr. Ringel, the judge hasn't

18   said it's admitted yet.  I'm not showing it.

19        THE COURT:  I'm not finding it on the list.

20        MR. RINGEL:  It's 1106.

21        THE COURT:  Yeah.  I know.

22        MR. RINGEL:  It's on the plaintiffs' list, Your Honor.

23        THE COURT:  Correct.  I found it.  It's admitted.  Go

24   ahead.

25        MR. RINGEL:  Okay.  Thank you, Your Honor.  Is the

20-cv-1878-RBJ    JONATHAN CHRISTIAN - Cross    03-16-2022

1    jury seeing this now?  Thank you.

2          THE COURTROOM DEPUTY:  You're welcome.

3    Q.    (By Mr. Ringel) So, this is a body-worn camera of someone

4    else on the gang unit named Officer Hastings.  Are you familiar

5    with Officer Hastings?

6    A    Yes, sir.

7    Q    Do you remember working with him generally during the

8    protests?

9    A    Yes, sir.

10   Q    And he's a member of the gang unit?

11   A    Yes, sir.

12   Q    Okay.  If we --

13   A    According to my recollection.  I don't know if he is any

14   longer.

15   Q    At the time, he was a member of the gang unit?

16   A    Yes, sir.

17   Q    Fair enough.  It's two years ago.  I get that.  If we can

18   advance this to the 3:05 mark of this video, and then I would

19   like to play this and then ask you some questions about it.  All

20   right.  So, why don't we go ahead and play it, and then I want

21   you to watch it and see if you can watch it for where Ms. Epps

22   is.  And to orient the jury, where do you believe in the street

23   that we're looking at Ms. Epps was at the time, or will be when

24   this video gets played?

25   A    The only person I see, I believe, is right here.

20-cv-1878-RBJ   JONATHAN CHRISTIAN - Cross   03-16-2022

1    Q    Okay.  So, let me -- let me back up.  Let's take that down.

2    I'm interested in where the deployment of the PepperBall is

3    going to occur.

4    A    I would imagine -- and this isn't my angle, but I would

5    imagine it would happen somewhere in here.

6    Q    Okay.  I'm just trying to orient everyone to what they may

7    be -- what they're going to watch.

8    A    Yes, sir.

9    Q    Okay.  Let's go ahead and play this video, and then I'm

10   going to ask you some questions about it, Mr. Christian.

11        (A video was played.)

12   Q    Okay.  We can stop it here.  Did you see the PepperBall hit

13   on that video?

14   A    Yes, sir.

15   Q    And based on your training and experience, where do you

16   believe the PepperBall hit?

17   A    It would have hit facing the screen.  It would have hit to

18   the ground to the left of Mrs. Epps.

19   Q    Okay.  It looks to you like it hit the street?

20   A    Yes, sir.

21   Q    Okay.  All right.  We -- you talked earlier and were shown

22   some body-worn camera video related to something that happened

23   on May 28th, the day before this incident, where there was a

24   deployment of pepper spray by you?

25   A    Yes, sir.

20-cv-1878-RBJ   JONATHAN CHRISTIAN - Cross   03-16-2022

1   Q    Or OC spray by you.  And you addressed opposing counsel's

2   questions, but what I'd like you to do is put what was happening

3   at that moment in context.  You were on a police line; is that

4   right?

5   A    Yes, sir.

6   Q    And what was the line attempting to do, generally speaking,

7   at that time when then later the deployment of OC spray

8   occurred?

9   A    So, at that time, I don't know if anybody plays rugby, but

10  rugby has a defensive line.  You want everybody to stay in a

11  line together as you're moving forward.  That's kind of what a

12  skirmish line is.  So, at that time we had been working to move

13  people away from the roadway or down the roadway away from the

14  capitol.  I believe that was where that incident was.

15          And so in doing so, we can't create any gaps in the

16  lines.  We all have to stay shoulder-to-shoulder, and that

17  would -- anybody that would come within arm's reach would have

18  been deemed a threat to the line, just because of the likelihood

19  of injury to officers.

20  Q    Okay.  So, you were trying to clear the area, generally;

21  right?

22  A    Yes, sir.

23  Q    And you wanted all of the people to no longer be in the

24  roadway in that area?

25  A    Correct.

20-cv-1878-RBJ    JONATHAN CHRISTIAN - Cross    03-16-2022

1    Q    Okay.  That was the purpose of the line?

2    A    Yes, sir.

3    Q    And describe how it's a potential threat for anyone to come

4    too close to the line when you're in this kind of skirmish line.

5    A    Well, it makes it much easier.  We like to have what's

6    called a reactionary gap, which can be anywhere from six to

7    eight feet, just enough time where if something were to happen,

8    you have the ability for your mind to register it and to be able

9    to react to it.

10         When someone comes up to the line, that reaction gap is

11   no longer there.  Now we have multiple incidents where people

12   were close to the line, especially in that first incidents where

13   the cars got surrounded.  We were also hit with signs.  They

14   also would use lacrosse sticks or whatever and affix signs to

15   those, and then they would be signs at one point, and then they

16   would be used to injure officers at another point.

17         I did not see that woman get PepperBalled or fogged.

18   She was rubbing her eyes.  But her being close proximity to the

19   line, whenever we're trying to tell people to move away is

20   creating an officer safety issue.  And then after that

21   deployment when we have another individual running at the line,

22   or coming back to the line, that would also raise some red

23   flags, and you would want to keep that person away from the

24   line.

25   Q    Okay.  To maintain the distance so that if somebody did

20-cv-1878-RBJ   JONATHAN CHRISTIAN - Cross   03-16-2022

1   something inappropriate, you could react appropriately?

2   A    Yes, sir.

3   Q    Because if someone is closer to you, you have a much

4   smaller reaction time?

5   A    Yes, sir.

6   Q    All right.  Could you have broken the line and made a

7   decision at that moment on your own to arrest one or both of

8   those people?

9   A    In doing so, I would have been compromising the skirmish

10  line.  So, in theory, yes, sir, but I didn't want to leave the

11  line or leave my fellow officers exposed.

12  Q    So, when you're in a skirmish line like that, if there's

13  going to be something like an arrest, that would be something

14  that would be directed by a supervisor; right?

15  A    Yes, sir.

16  Q    Your role in that moment is to be in the skirmish line and

17  participate in the skirmish line?

18  A    Yes, sir.  So, arrestings are usually -- so, there's the

19  skirmish line, which would also -- using sports analogies, but

20  would be kind of like the linemen on an offense.  And then you

21  would have supervisors, which would be the quarterback, and then

22  you could have arrest teams, which would be whatever else is in

23  the backfield.

24        MR. RINGEL:  Your Honor, I am at a point where I can

25  stop.  I have some more with Mr. Christian, but I recognize it's

20-cv-1878-RBJ   JONATHAN CHRISTIAN - Cross   03-16-2022

1   the noon hour.

2         THE COURT:  All right.  No problem.  It's probably

3   just as good a place to stop as any.  1:15.

4         (Jury out at 12:00 p.m.)

5         THE COURT:  Okay.  1:15.

6         (Recess at 12:00 p.m., until 1:15 p.m.)

7         (Jury in at 1:15 p.m.)

8         THE COURT:  Okay.  Mr. Ringel?

9         MR. RINGEL:  Thank you, Your Honor.

10  Q.    (By Mr. Ringel) Mr. Christian, I don't have that many

11  more questions for you, but I realize I had forgotten to have

12  you do something with respect to Officer Hastings' body-worn

13  camera video.  So, if we could put up Exhibit 1106 again.  Thank

14  you.  And if you can go to -- at about 3:10 elapsed time, and

15  play until about 3:13, and stop it at 3:13.

16        (A video was played.)

17  Q    Okay.  Can you circle, Mr. Christian, where you see on this

18  screen the -- where the PepperBall was deployed?

19  A    Right there.

20  Q    Okay.  Thank you.  All right.  I wanted to move on to the

21  discussion that you had had this morning about statements.  And

22  it was pointed out to you that this incident that we just

23  watched was not included on the statement that you wrote on

24  February 29th of -- about February 29th, 2020.  Do you remember

25  that?

20-cv-1878-RBJ    JONATHAN CHRISTIAN - Cross    03-16-2022

1   A    Yes, sir.

2   Q    What was your understanding of the purpose of writing those

3   statements?

4   A    It was to give as detailed as we could recall the force

5   options we used during the protest.

6   Q    And what was the reason why the incident at 5/29 at

7   9 o'clock on the south side of the capitol was not included in

8   your written statement?

9   A    I don't know, sir.

10  Q    Okay.  Is it possible that you just simply had forgotten

11  about it?

12  A    Yes, sir.

13  Q    And isn't it right that until you were shown body-worn

14  camera related to this lawsuit, you never -- you didn't -- you

15  don't have a memory of that incident?

16  A    Correct.

17  Q    Okay.  Were you trying to hide anything by not including

18  that?

19  A    No, sir.

20  Q    Did you think -- was it not included because you thought

21  you had done something wrong?

22  A    No, sir.

23  Q    Okay.  All right.  Last thing I wanted to ask you about was

24  you had spoken about an incident outside the Denver Public

25  Library on Broadway, and you were asked a few questions about

20-cv-1878-RBJ   JONATHAN CHRISTIAN - Redirect   03-16-2022

1   that.  And I would like you to describe generally what was

2   happening then to the best of your memory, and why you were

3   deploying PepperBalls at that point in time.

4   A    Yes, sir.  So, at that point we were on the side of the

5   RDV, standing on the rail, holding on to the side.  And as we

6   were passing by the front of the library, there was a section --

7   it would be on the southern end of the library, I think it's

8   just about the entrance of a parking garage, but it's kind of

9   actually about the size of this desk that I'm sitting at now.

10   And there were four or five individuals that were throwing rocks

11   or bottles, both at our RDV and at some of the officers.  And I

12   saw that, and I addressed that while I was on the side of the

13   RDV from a position of advantage.

14   Q    So, what you were trying to do was stop that continued

15   behavior by deploying PepperBall at those particular individuals

16   that were engaged in that behavior?

17   A    Yes, sir.

18         MR. RINGEL:  Okay.  Those are my questions.  Thank

19   you, Your Honor.

20         THE COURT:  Okay.  Redirect?

21         MR. MACDONALD:  Yes, Your Honor.

22                    **REDIRECT EXAMINATION**

23   BY MR. MACDONALD

24   Q    Mr. Christian, I think I want to start near where you just

25   finished with Mr. Ringel.  I think you testified that the

20-cv-1878-RBJ    JONATHAN CHRISTIAN - Redirect    03-16-2022

1   purpose of the use of force statements was to give as detailed a

2   statement as you could regarding the force options that were

3   used.  That's right?

4   A    Yes, sir.

5   Q    Okay.  And you said you deployed grenades during the

6   protest; right?

7   A    I believe so.  Yes, sir.

8   Q    You didn't include any of that -- those deployments in your

9   use of force statements; right?

10  A    I believe that's correct.  Yes, sir.

11  Q    Okay.  Do you know how many grenades you threw?

12  A    No, sir.

13  Q    More than five?

14  A    I wouldn't think so.  No, sir.

15  Q    Less than five?

16  A    I would think so.

17  Q    And then when you were filling out your use of force

18  statements, did those slip your mind?

19  A    Yes, sir.

20  Q    Throwing a grenade, pretty significant event?

21  A    Well, I think that we would have to clarify.  I know that I

22  had deployed -- or I had deployed a grenade or two, I believe,

23  but there were multiple OC canisters that had been kicked back

24  at us that I had picked up and thrown back.  So, I would have

25  deployed those as well.

20-cv-1878-RBJ    JONATHAN CHRISTIAN - Redirect    03-16-2022

1    Q    So, you threw some OC canisters that you picked up that had

2    been kicked or somehow gotten back to the line?

3    A    Kicked or thrown back, yes, sir.

4    Q    Okay.  But the grenade, you -- someone handed you a grenade

5    at some point, or you obtained a grenade in some fashion?

6    A    Yes, sir.  I believe so.

7    Q    Okay.  Would you have gotten that from a supervisor, or

8    could anyone, even those like you who weren't trained on

9    grenades, just go and grab one from a vehicle or something?

10   A    I believe they would have probably been in the RDV at the

11   use of the supervisor.  And if the supervisor said, hey, grab

12   one and throw one, then I would have.

13   Q    And do you think that's what happened?  You did it on the

14   instructions of a supervisor?

15   A    Yes, sir.  I believe so.

16   Q    Do you know which supervisor, which of your sergeants?

17   A    No, sir.

18   Q    And did they direct you where to throw them?

19   A    As far as specifically?

20   Q    Yes.

21   A    It would have been -- it would have been

22   situation-dependent, but I think it would have been probably

23   pretty clear.

24   Q    Do you remember where you were when you threw the several

25   grenades you today recall throwing?

20-cv-1878-RBJ    JONATHAN CHRISTIAN - Redirect    03-16-2022

1    A    No, sir.

2    Q    Don't even remember a general location, whether it was at

3    the capitol or 14th and Lincoln or somewhere else?

4    A    I believe -- well, I believe there were, like you said,

5    numerous -- to the best of my recollection, I believe there was

6    one at the District 6 station that had gotten thrown back at us.

7    I believe there is one --

8    Q    I apologize.  That's a gas canister, not a grenade; right?

9    A    Well, I guess I'm having to clarify, then, on what you

10   consider a grenade.

11   Q    Maybe you can tell us what you meant when you said you

12   threw several grenades.

13   A    I imagine that you were saying grenade as in a device with

14   a spoon and a pin.

15   Q    Something that you pulled the plug on?

16   A    You pull the pin on.

17   Q    The pin.  Excuse me.

18   A    Yes, sir.

19   Q    I've never thrown a grenade.  My apologies.  So, you had a

20   grenade that you pulled the pin on and threw?

21   A    Yes, sir.

22   Q    Okay.  And didn't put them in your use of force statement?

23   A    Yes, sir.

24   Q    And you're not certain how many?

25   A    I'm sorry?

20-cv-1878-RBJ    JONATHAN CHRISTIAN - Redirect    03-16-2022

1    Q    You're not certain how many?

2    A    No, sir.

3    Q    And you're not certain which supervisor told you to?

4    A    No, sir.

5    Q    And you're not certain where?

6    A    Exactly, no.

7    Q    You said you were an EMT for several years?

8    A    Yes, sir.

9    Q    Did you render aid to the people -- the two people that you

10   sprayed with pepper spray as they were walking down the street?

11   A    That's not my job.

12   Q    That's someone else's job?

13   A    Yes, sir.

14   Q    All right.  You talked about the training you did at the

15   academy?

16   A    Yes, sir.

17   Q    And you did that in 2015?

18   A    2015 to 2016.  Yes, sir.

19   Q    And you talked on direct -- or in your examination with

20   Mr. Ringel about the crowd control training that you did then?

21   A    Yes, sir.

22   Q    And I think you described it as one day of crowd control

23   training, and you did some work in the morning.  And in the

24   afternoon, you did work on formations, and you would have a

25   supervisor who would make orders on how to properly utilize

20-cv-1878-RBJ    JONATHAN CHRISTIAN - Redirect    03-16-2022

1    those formations; right?

2    A    Yes, sir.

3    Q    That was essentially skirmish lines and instructions like

4    move right or other instructions while you're in a skirmish

5    line?

6    A    Yes, sir.

7    Q    Okay.  You haven't done any crowd control formal training

8    through the Denver Police Department since then; right?

9    A    That's incorrect.

10   Q    Okay.  You understand that Sergeant Knutson -- do you know

11   who Sergeant Knutson is?

12   A    Yes, sir.

13   Q    Okay.  He had developed a field force operations class.

14   Are you aware of that?

15   A    Yes, sir.

16   Q    That was back in 2015 and 2016; right?

17   A    Yes, sir.

18   Q    Did you do that class?

19   A    Is that the same class that we did in the academy?

20   Q    I don't know.  Sergeant Knutson did a three-day class that

21   was discontinued in 2016.

22   A    No, sir.  I don't believe so.

23   Q    You did not do that class?

24   A    No, sir.

25   Q    Were you aware that the Denver Police Department

20-cv-1878-RBJ    JONATHAN CHRISTIAN - Redirect    03-16-2022

1    discontinued that three-day training that Sergeant Knutson had

2    developed?

3    A    No, sir.

4    Q    In the crowd control training that you did, did you get

5    training on how to deploy a 40-millimeter in a crowd control

6    situation?

7    A    In the academy?

8    Q    Yes, sir.

9    A    Generally, yes, sir.

10   Q    You got training on 40-millimeter.  My question is did you

11   get training on -- as part of your crowd control training on how

12   to deploy a 40-millimeter?

13   A    So, in the crowd control class, they would have gone over

14   the formations.  They would have gone over where in an ordinary

15   circumstance, where PepperBall and 40-millimeter would have been

16   and how they would have been deployed.  Yes, sir.

17   Q    You mentioned perishable skills in your exam with

18   Mr. Ringel.  Do you remember that?

19   A    Yes, sir.

20   Q    One of the perishable skills is crowd control and crowd

21   management; right?

22   A    Yes, sir.

23   Q    When was the last time you got training from DPD in crowd

24   control and crowd management before the George Floyd protest?

25   A    I don't recall.

20-cv-1878-RBJ   JONATHAN CHRISTIAN - Redirect   03-16-2022

1   Q    You talked about the specialized training you had in -- in

2   the use of the PepperBall; right?

3   A    Yes, sir.

4   Q    The -- your deployment of PepperBalls during the George

5   Floyd protests was consistent with that training; right?

6   A    Yes, sir.

7   Q    And in your view, everything that you saw during the George

8   Floyd protest done by you and the other officers that you

9   witnessed was consistent with training and DPD custom; right?

10  A    Yes, sir.

11  Q    Mr. Ringel asked you some questions about your First

12  amendment training during the academy.  Do you remember that?

13  A    Yes, sir.

14  Q    During that training, did you learn to distinguish between

15  protesters and rioters?  Is that part of the training?

16  A    I don't recall.  I know that we went over the First

17  amendment, and what ideally a peaceful protest would be like.

18  Q    You don't remember any discussion or training about

19  distinguishing between peaceful protesters on the one hand and

20  rioters or lawbreakers on the other?

21  A    Not specifically.  No, sir.

22  Q    You talked about the First amendment training you received

23  in the academy back in 2015.  Had you received formal classes on

24  First amendment training after you became an officer at DPD?

25  A    As far as in a classroom, no, sir.

20-cv-1878-RBJ   JONATHAN CHRISTIAN – Redirect   03-16-2022

1   Q   You talked about people throwing things during the protest.

2   Do you remember that?

3   A   Yes, sir.

4   Q   Ms. Epps didn't throw anything; right?

5   A   No, sir.

6   Q   The woman holding the sign or dabbing her eyes across the

7   street didn't throw anything; right?

8   A   Correct.

9   Q   The man who had the phone in his hand that got pepper

10  sprayed didn't throw anything; right?

11  A   Correct.

12  Q   Your use of force statements don't mention anything about

13  lacrosse sticks, slingshots, wrist rockets, or tennis rackets;

14  right?

15  A   I'm going to assume that's correct.  Yes, sir.

16  Q   You talked about the incident involving Ms. Epps, and you

17  thought there was a crowd behind her?

18  A   Not behind her.  Off to the right and down by the light,

19  just around the side of the building, it looked like there was a

20  group of people that had been moving down the street.  I think

21  that would be -- I think Lincoln.

22  Q   And you saw -- Mr. Ringel showed you the body-worn camera

23  of Officer Hastings that showed all the way down to the Lincoln,

24  and did you see any people in the street in that body-worn

25  camera when you took the knee and fired the shot?

20-cv-1878-RBJ    JONATHAN CHRISTIAN - Redirect    03-16-2022

1    A    Ms. Epps.  Yes, sir.

2    Q    I understand.  Anyone else in that timeframe?

3    A    I would have to see the footage again.

4    Q    You're aware that the officers among you -- the DPD

5    officers had fired tear gas across 14th Street shortly before

6    you shot at Ms. Epps; right?

7    A    Potentially.  Yes, sir.

8    Q    Okay.  So, as Ms. Epps was walking up 14th Street, do you

9    remember there was a large cloud of tear gas because your fellow

10   officers had shot tear gas from the capitol across the street

11   that landed on the sidewalk of 14th Street?

12   A    I remember the cloud.  Yes, sir.

13   Q    You do remember that?

14   A    The cloud?  Yes, sir.

15   Q    All right.  You talked about deploying pepper spray.  I

16   think Mr. Ringel asked you some questions about area saturation.

17   And you shoot at the ground, and that makes people back up;

18   right?

19   A    Yes, sir.

20   Q    Okay.  So, when you were shooting at Ms. Epps, if it was

21   for purposes of area saturation, that would make her back up;

22   right?  That's the idea of shooting at someone's foot; right?

23   A    In that situation, yes, sir.

24   Q    Okay.  So, if Ms. Epps is walking towards you across the

25   street, and you've -- and she was, as I think we saw in the

20-cv-1878-RBJ    JONATHAN CHRISTIAN - Redirect    03-16-2022

1    film, in the video, about two-thirds of the way across the

2    street, because it's a three-lane street, and she had just

3    crossed over the last line, and if you fired at her, and she

4    backed up, where would she be?

5    A    She would still be in the street.

6    Q    Okay.  So, you firing at her is more likely to cause her to

7    back up and go into traffic; right?

8              MR. RINGEL:  Objection.  Calls for speculation.

9              THE COURT:  Sustained.

10   Q.   (By Mr. Macdonald) Based on your training, when you shoot

11   at someone's feet, you understand one of the reasons you do that

12   is to get them to back up; right?

13   A    Yes, sir.

14   Q    And did you think Ms. Epps would back up --

15   A    Go ahead.

16   Q    -- given that that is the training you have been put

17   through when you shot at her?

18   A    To get back up on the sidewalk, yes, sir.

19   Q    Well, if you're shooting at her, and it causes her to back

20   up, she won't be on the sidewalk.  She will be back in the

21   middle of the street; right?

22   A    Well, sir, if you remember, after I shot the PepperBall,

23   she was still in the street even though going forward.  So, at

24   any point after the PepperBall she was still going to be in the

25   street.  My goal was to get her back up onto the sidewalk and

20-cv-1878-RBJ    JONATHAN CHRISTIAN – Redirect    03-16-2022

1   away.

2   Q    You talked about a reaction gap with Mr. Ringel.  Do you

3   remember that?

4   A    Yes, sir.

5   Q    And you talked about having to maintain distance and making

6   sure that there weren't people close to you; right?

7   A    Yes, sir.

8   Q    And I think you described your experience at the protest as

9   complete lawlessness?

10  A    Yes, sir.

11  Q    And you described the incident right at the end of the

12  testimony at the Denver library; right?

13  A    Yes, sir.

14  Q    Okay.  Can we put up 739 again.  And we're going to take a

15  look at that incident.  So, this is the public library; right?

16  A    Yes, sir.

17  Q    It's on Broadway just south of 14th; right?

18  A    Yes, sir.

19  Q    This is your body-worn camera.  It is 11:16 p.m. on the

20  first night of the protest, May 28th.  Okay?

21  A    Okay.

22  Q    And there's no curfew in effect; correct?

23  A    Correct.

24  Q    All right.  This is -- I think when we start this, we'll be

25  in buffering mode.  So, that must mean that you turned your

20-cv-1878-RBJ    JONATHAN CHRISTIAN – Redirect    03-16-2022

1    body-worn camera on 30 seconds later.  So, it will be silent, I

2    believe for 30 seconds.  And I'd like you to see if you can

3    count the number of officers that you see.  And also before

4    we -- before we get going, do you see these people right here

5    standing that I just circled?

6    A    Yes, sir.

7    Q    And you see, it looks like they're filming; right?

8    A    Yes, sir.

9    Q    Okay.  Let's play the tape, please.

10        (A video was played.)

11   Q    Okay.  Can we stop there.  How many officers did you count?

12   A    I wasn't counting the officers.  I'm sorry.  I was watching

13   the corner.  But there was probably around 20.

14   Q    Okay.  And let's look at that guy.  Do you see what he's

15   holding?

16   A    I can't make out what that is.

17   Q    Does it look like a sign to you?

18   A    Possibly.

19   Q    It might be a phone?

20   A    Possibly.

21   Q    All right.  Let's keep rolling, please.

22        (A video was played.)

23   Q    Stop there.  Do you see this gentleman has a phone out?

24   A    Yes, sir.

25   Q    All right.

Kevin P. Carlin, RMR, CRR

20-cv-1878-RBJ    JONATHAN CHRISTIAN - Redirect    03-16-2022

1    A    If you're going to continue the video, though, I would just

2    like to point out the gentleman that dropped down behind him.

3    Q    All right.  Yes.  I will continue playing the video.

4         (A video was played.)

5    Q    Let's stop there.  So, you saw the shots fired at the

6    library?

7    A    Yes, sir.

8    Q    There was -- there were officers on the ground, at least

9    20; right?

10   A    Yes, sir.

11   Q    You didn't stop the vehicle or call for someone to arrest

12   anyone; correct?

13   A    Correct.

14   Q    You saw people with their hands up?

15   A    Yes, sir.

16   Q    Here, did you hear what either you or one of your

17   colleagues said to you about six seconds ago on this video?

18   A    The which one, the one with the backpack?

19   Q    Let's just back up to about 58 seconds, please.  And I want

20   you to listen for something and tell me what you hear at 1:05.

21        (A video was played.)

22   Q    Okay.  Stop there.  Did you hear -- tell me what you heard.

23   A    I heard, shoot that guy, the one with the backpack.  And he

24   said, yeah, fuck that dude.

25   Q    Someone shoot that fucking guy; right?

20-cv-1878-RBJ    JONATHAN CHRISTIAN - Redirect    03-16-2022

1    A    Okay.  Yes.

2    Q    And then was it you firing shots?

3    A    Yes, sir.

4    Q    And then after you fired shots, you said, which one, the

5    one with the backpack; right?

6    A    Yeah.

7    Q    And then one of your colleagues said, fuck that dude?

8    A    Right.

9    Q    And did you stop and try to arrest someone at this point?

10   A    No, sir.

11   Q    This was consistent with your training; right?

12   A    Yes, sir.

13   Q    This was approximately 12 minutes before the incident where

14   you sprayed the woman across -- who was crossing the street and

15   the man who was filming; right?  This is now 11:18, and that

16   took place at 11:30; right?

17   A    Yes, sir.

18   Q    Let's go to 32 minutes, please.  So, this is that same --

19   this is that same evening.  We're still -- it's still May 28th.

20   It's now 11:48, about 18 minutes later.  Okay?

21   A    Okay.

22   Q    The first night of the protest.  Let's run this tape,

23   please.

24        (A video was played.)

25   Q    All right.  This was that exchange we talked about earlier;

20-cv-1878-RBJ    JONATHAN CHRISTIAN - Redirect    03-16-2022

1   right?

2   A    Yes, sir.

3   Q    Kind of making a joke between you and your colleague at the

4   end of the night?

5   A    Yes, sir.

6   Q    About shooting people?

7   A    Making light of a dramatic situation, yes, sir.

8         MR. MACDONALD:  No further questions.

9         THE COURT:  All right.  Questions from the jurors for

10  this witness?  Yes?  All right.

11      (Proceedings held at the bench:)

12        THE COURT:  Question 29.

13        MR. MACDONALD:  No objection.

14        MR. RINGEL:  No objection.

15        THE COURT:  Question 30.

16        MR. MACDONALD:  No objection.

17        MR. RINGEL:  No objection.

18        THE COURT:  Okay.

19      (Proceedings held in open court:)

20        THE COURT:  All right.  Sir, a couple questions here

21  from the jurors for you.

22        THE WITNESS:  Yes, sir.

23        THE COURT:  Question, other than your crowd management

24  and protest training, what other parts of your basic academy

25  training prepared you for what you experienced during the George

20-cv-1878-RBJ   JONATHAN CHRISTIAN - Redirect   03-16-2022

1   Floyd protests?

2            THE WITNESS:  I don't think there was any training

3   available that could have prepared us for what happened during

4   the George Floyd protests.

5            THE COURT:  Question, were you ever exposed to OC

6   during the protest?

7            THE WITNESS:  Yes, sir.

8            THE COURT:  How often did that happen?

9            THE WITNESS:  Every night.

10           THE COURT:  Question, were there any other officers

11   hurt by police munitions?

12           THE WITNESS:  As far as being struck?

13           THE COURT:  Struck or OCed.

14           THE WITNESS:  I believe we all at some point inhaled

15   those OC, yes, sir.  As far as being struck, I don't believe so.

16           THE COURT:  You don't think any officers were struck

17   by a projectile from another police officer?

18           THE WITNESS:  From another police officer, I don't

19   believe so.  No, sir.  Not that I know of.

20           THE COURT:  Okay.  Any other questions over there at

21   the jury?  No?  Follow-up?

22           MR. MACDONALD:  No, Your Honor.

23           THE COURT:  No?

24           MR. RINGEL:  No.  Thank you, Your Honor.

25           THE COURT:  All right.  Thank you, Mr. Christian.

20-cv-1878-RBJ   KELSEY TAYLOR – Direct   03-16-2022

1    THE WITNESS:  Thank you, sir.

2    THE COURT:  Next?

3    MS. WANG:  We call Kelsey Taylor.

4    THE COURT:  Hello.

5    (The Witness is Sworn)

6    THE COURT:  Okay.

7                    **DIRECT EXAMINATION**

8    BY MS. WANG

9    Q    Could you please state your name, and spell it for the

10   record.

11   A    Yes.  My name is Kelsey Taylor.  K-E-L-S-E-Y, T-A-Y-L-O-R.

12   Q    Ms. Taylor, do you have a nickname?

13   A    I do.  It's Elle, E-L-L-E.

14   Q    Great.  Where do you live?

15   A    I live in Denver, Colorado.

16   Q    And how long have you lived here?

17   A    Almost nine years.

18   Q    Okay.  Can you tell us a little bit about your background.

19   A    I grew up outside of Philadelphia, Pennsylvania.  I went to

20   school in Boston, Massachusetts, at Berklee College of Music for

21   songwriting.

22   Q    And what interested you in music?

23   A    I always loved it, since I was a kid.  I'm kind of quiet,

24   so I like the songwriting process because it's a little bit more

25   quietly creative.

20-cv-1878-RBJ   KELSEY TAYLOR - Direct   03-16-2022

1   Q    And what do you do for a living?

2   A    I own a coffee shop, or a coffee company.

3   Q    And is that company based in Denver?

4   A    It is.

5   Q    How far away from it -- from here is it?

6   A    Not far.  It's at 11th and Broadway.

7   Q    And how long have you owned your own coffee company?

8   A    Seven years.

9   Q    Can you tell us a little bit about how you started your

10  business.

11  A    Yes.  I was working at another coffee shop here when I

12  moved.  And I used to work weekends by myself, so we had these

13  regulars who would come in.  It was an older couple, and they

14  one day after sitting at the bar with me for a couple hours,

15  they were like, what do you want to do with your life?  And at

16  the time I was like, I think it would be -- I think it would be

17  great to open a coffee shop that's more geared towards baristas

18  and like knowing what it's like to actually be a working person.

19  So, I told them that, and they helped me with some funding, and

20  here we are seven years later.

21  Q    How many staff members do you have?

22  A    PreCOVID we had 17, and now including my business partner

23  and I, we have four.

24  Q    So, did you have to lay off a lot of people during COVID?

25  A    We did.

20-cv-1878-RBJ    KELSEY TAYLOR - Direct    03-16-2022

1  Q    Was that difficult?

2  A    It was horrible.  Something that was always kind of like a

3  cornerstone of our business was that we got to -- we got to

4  provide for people.  We got to provide a working environment

5  that was healthy and safe, and doing that for five years for

6  people and really, like, working on those relationships, it was

7  really terrible to have to let all those people go and not

8  really know what was going to happen to them.

9  Q    Do you have any hobbies?

10  A    I do.  I like to hike.  I like to be outside.  I like to

11  play music.  I like to read.  I like to hang out with my cats.

12  Q    So, you -- did you attend the George Floyd protests in

13  Denver in May 2020?

14  A    I did, yes.

15  Q    And why did you decide to attend the protests?

16  A    As mentioned, working in the hospitality industry during

17  the pandemic was brutal.  And in a lot of ways, really opened my

18  eyes to so many unjust things that happen in our society, that

19  it's kind of easy to let them pass you by.  And so when I saw a

20  video of the murder of George Floyd, after having experienced

21  all of these other things, I was like, the choice was very

22  simple, to go and to not let that stand.

23  Q    Had you attended any protests before?

24  A    I had, yes.

25  Q    Let's talk about day one of the protest, May 28th, 2020.

20-cv-1878-RBJ    KELSEY TAYLOR - Direct    03-16-2022

1   Did you attend on the first day?

2   A    I did, yes.

3   Q    And did you march on that day?

4   A    Yes.

5   Q    Where did you march to?

6   A    We marched to -- from the capitol to the, I believe it's

7   called the Highland Bridge.

8   Q    And is that the pedestrian bridge over I-25?

9   A    It is, yes.

10  Q    Did you see how the police responded to the protesters on

11  I-25?

12  A    I did.

13  Q    And what did you see?

14  A    I saw the police immediately arrive the wrong way on the

15  highway and very quickly start kind of corralling protesters off

16  the highway and then shooting PepperBalls at them.

17  Q    Did you see anything thrown by anybody before the police

18  started shooting?

19  A    No.

20  Q    Did you inhale chemicals from the police PepperBalls there?

21  A    I did, yes.

22  Q    And how did that feel?

23  A    It was terrible.  It was very surreal.  I had never

24  experienced anything like that before in my life, and it was

25  something that -- it was almost unbelievable at first.  It was

20-cv-1878-RBJ   KELSEY TAYLOR - Direct   03-16-2022

1  really painful and disorienting, and all of a sudden all of your

2  senses are kind of attacked.  You can't -- like, your eyes are

3  watering.  Your nose is burning.  Even with a mask on for COVID,

4  it's all in your mouth, and it's really disorienting.

5  Q    Do you have asthma?

6  A    I do, yes.

7  Q    And did your asthma make inhaling the chemical weapons

8  worse?

9  A    I believe so.

10 Q    Where did you go after that?

11 A    I went to -- more further east to 16th and Platte.

12 Q    Okay.  Let's show Exhibit 1220, which has already been

13 admitted.  All right.  So, the Highland Bridge is what's on this

14 map here; right?

15 A    Yes.

16 Q    Okay.  And then you went over here to 16th and Platte?

17 A    Yes.

18 Q    Okay.  And what did you experience there?

19 A    I experienced, again, a lot of chaos.  And I heard there

20 was like a line of police officers then kind of on the west --

21 west side of Platte Street while the protesters were kind of

22 crossing the road to the east side, and I heard an officer say,

23 if anyone moves, light them up.

24 Q    Okay.  Now, what -- I mean, what were the protesters doing

25 when you heard that comment from the police?

20-cv-1878-RBJ    KELSEY TAYLOR – Direct    03-16-2022

1   A    They were standing.  They were chanting.  A lot of the

2   familiar chants of hands up, don't shoot, say his name, naming

3   George Floyd and other people who had been victims of police

4   brutality.

5   Q    Let's show Exhibit 559.  All right.  Showing the

6   Exhibit 559, do you see yourself in this video?

7   A    I do, yes.

8   Q    Can you circle yourself with the stylus.

9   A    Yes.

10            MS. WANG:  Okay.  We move for admission of 559.

11            MR. WEINER:  Your Honor, can we approach?

12            THE COURT:  Yes.

13        (Proceedings held at the bench:)

14            MS. WANG:  I'm not sure what the objection is.

15            MR. RINGEL:  This is a video, I believe that involves

16   a former consolidated plaintiff named Michael Acker who was hit

17   in the face with a 40, and we object on 403 grounds.  The claims

18   of Mr. Acker settled.  The City paid half a million dollars to

19   settle those claims, and it's not appropriate in my judgment to

20   have evidence related to that be part of this trial.

21            MS. WANG:  Ms. Taylor just identified herself in the

22   video.  She was there.

23            THE COURT:  So what?

24            MS. WANG:  It's relevant to her experiences there.

25            THE COURT:  It's relevant to her claim?

20-cv-1878-RBJ    KELSEY TAYLOR - Direct    03-16-2022

1           MS. WANG:  It's relevant to her claim.

2           THE COURT:  Is she going to say she got injured over

3   there on Platte Street?

4           MS. WANG:  She is going to say that the police shot

5   people for no reason, that they deployed PepperBall before they

6   shot Mr. Acker in the face.

7           THE COURT:  How does that relate to her claim?

8           MS. WANG:  They shot PepperBalls, which she inhaled,

9   at this location and time, which she's going to testify about,

10  and it's on this video.

11          THE COURT:  When is the Acker piece?

12          MR. RINGEL:  There is PepperBall before, and then

13  there is a part of this video where he is shot, and it's shown

14  on this video and other videos.

15          THE COURT:  Can you stop it before that?

16          MS. WANG:  I can stop it before that.  I can have it

17  played to when they're shooting PepperBalls, but there is a

18  further piece, because she actually saw Mr. Acker afterwards and

19  described how that impacted her.  So, are you ruling that she

20  can't talk about that either?

21          THE COURT:  No.  She can talk about that.  I just

22  don't see why they have to see somebody's bloody face.

23          MS. WANG:  It's not -- this video is not bloody.

24          MR. RINGEL:  The video is not bloody, but it's still

25  very prejudicial, and she can describe if she wants -- I don't

20-cv-1878-RBJ    KELSEY TAYLOR - Direct    03-16-2022

1  have any objection to her describing what she saw and what --

2           MS. WANG:  Describing what she saw after?

3           MR. RINGEL:  What she saw and what she experienced,

4  but showing the video of him being shot is 403 material,

5  particularly since it's the settled case, and particularly

6  because it -- it would require us to essentially litigate

7  aspects of the Acker case in here, and I don't think that's

8  fair.

9           THE COURT:  Look, she said that she can skip over the

10  part where he gets shot in the face.  If you can do that, I'm

11  okay with it.

12           MS. WANG:  Okay.

13       (Proceedings held in open court:)

14           MS. WANG:  All right.  So, we can put back up

15  Exhibit 559.  Let me just -- all right.

16  Q.    (By Ms. Wang) So, Ms. Taylor, you have circled yourself

17  here.  That's you?

18  A    Yes.

19  Q    Okay.  And then -- all right.  Let's --

20           THE COURTROOM DEPUTY:  I'm sorry.  Did the judge admit

21  it already?

22           MS. WANG:  Yes.  For -- yes.

23           THE COURT:  Well, I don't know if I did or not.  What

24  is it?

25           MS. WANG:  Exhibit 559.

20-cv-1878-RBJ   KELSEY TAYLOR - Direct   03-16-2022

1    THE COURT:  559.  Yes.

2    MR. RINGEL:  He admitted it in part.

3    THE COURT:  Yes.  In part.  Well, we were talking

4 about at the bench here, and it's admitted in part.  And they

5 know which part is not admitted.

6    MS. WANG:  Right.

7    THE COURT:  Okay.  On we go.

8    MS. WANG:  Okay.  Just one second, actually.

9 Q.    (By Ms. Wang) So, do you see this person right here,

10 Ms. Taylor?

11 A    I do.

12 Q    Did you see that person later?

13 A    Yes.

14 Q    Okay.  We will talk about him in a minute, but let's go

15 ahead and play Exhibit 559.

16    (A video was played.)

17 Q    Okay.  Did you see, there was a girl who threw a water

18 bottle there?

19 A    I saw that, yes.

20 Q    Now, were the police shooting PepperBalls before she threw

21 it?

22 A    Yes.

23 Q    Okay.  Now, if we back it up, just scroll a little bit

24 further back, please.  Right there.  Okay.  Just a little bit

25 forward.  All right.  The girl who throws the water bottle is

Kevin P. Carlin, RMR, CRR

20-cv-1878-RBJ    KELSEY TAYLOR - Direct    03-16-2022

1   right here; right?

2   A    Mm-hmm.

3   Q    Is that a yes?

4   A    Yes.

5   Q    Okay.  It's pretty clear who threw it; right?

6   A    Yes.

7   Q    Did you see any attempt by the officers to isolate that

8   person or arrest that person?

9   A    No.

10  Q    Okay.  And then let's continue playing it.

11       (A video was played.)

12  Q    Okay.  So, then did the police shoot more PepperBalls?

13  A    Yes.

14  Q    And were you still in this area at the time when that

15  happened?

16  A    Yes.  Walking eastward.

17  Q    All right.  So, back towards where the crowd is going?

18  A    Yes.

19  Q    And did you inhale the OC from that?

20  A    Yes.

21  Q    Now, this person who we saw earlier with this gas mask and

22  the red shirt, did you see that person later?

23  A    I did, yes.

24  Q    And tell me what you saw.

25  A    I saw them get escorted to a bench, kind of in the middle

20-cv-1878-RBJ     KELSEY TAYLOR - Direct     03-16-2022

1    of this walkway.  The mask was off, and they needed help to get

2    to the bench because they had been -- there was blood like

3    gushing from their face, and they were kind of like clutching

4    their face.  And when they sat down, the blood was pouring off

5    of their face and creating a puddle on the ground.

6    Q    What had happened to him?

7    A    He had been shot in the face with a PepperBall.

8    Q    Okay.  Or -- do you know if it was a PepperBall or

9    something else?

10   A    I don't.

11   Q    Okay.  But by some kind of police munition?

12   A    Yes.

13   Q    And did you try to help him?

14   A    Yeah.  We were -- we were really close to him.  So, we kind

15   of like stayed there, but there was already plenty of people

16   helping him.  There was somebody with bandages and medical

17   supplies who was already assisting him.

18   Q    And had you seen -- when you were in this area, had you

19   seen him throw anything or do anything that could have caused

20   the police to shoot him?

21   A    I did not see anything.

22   Q    Okay.  I think you mentioned you tried to assist him, but

23   then there were enough people to help?

24   A    Yeah.  I mean, we didn't have any sort of supplies with us.

25   He needed medical attention.

Kevin P. Carlin, RMR, CRR

20-cv-1878-RBJ   KELSEY TAYLOR - Direct   03-16-2022

1  Q   Okay.  And did you see any police officers try to help him?

2  A   No.

3  Q   Okay.  Who was trying to help him?

4  A   There was a handful of other protesters who had like

5  escorted him to the bench, and then someone -- yeah.  Someone

6  with like a medic, who had like a red taped cross on their bag

7  who had bandaging and like other kind of medical supplies, and

8  knew how to use them.

9  Q   Now, after this -- you can take this down, now.  After this

10  incident at 16th and Platte, did you go back towards the

11  capitol?

12  A   Yes.

13  Q   Okay.  And did you end up at 14th and Sherman?

14  A   I did.

15  Q   All right.  And what were you doing there?

16  A   Kind of the same.  We were standing, chanting.  There was a

17  crowd that had already gathered there.  So, we got back to the

18  capitol.  We walked over there and joined.

19  Q   And so 16th and Platte, the video that we just watched was

20  about 7:22.  Do you have an approximation of what time it was

21  when you were at 14th and Sherman?

22  A   It was already kind of dark.  So, I think that would have

23  to be around 8:00 p.m.  My best guess.

24  Q   Okay.  Were you with anybody else that you knew?

25  A   I was.  I was with Breezy Sanchez, who is my friend and

20-cv-1878-RBJ     KELSEY TAYLOR - Direct     03-16-2022

1   business partner.

2           MS. WANG:  Let's show Exhibit 9.  I believe it's

3   stipulated.  Actually, it may have already been admitted.

4           THE COURT:  I have 9d and 9f admitted.

5           MS. WANG:  Okay.  This is a different clip, then.  So,

6   we will call this Exhibit 9g.

7           MR. WEINER:  No objection.

8           THE COURT:  All right.  Admitted.

9           MS. WANG:  Now, it's a little bit hard to see, but

10  let's -- let's play it and see if we can find you in this crowd.

11       (A video was played.)

12  Q.    (By Ms. Wang) Pause it for a moment.  Can we zoom in a

13  little bit?  Right by this tree over here, can you see yourself

14  at all?

15  A    I can.  It's a little blurry, but I can see myself.

16  Q    Could you circle where you are.  There you go.  All right.

17  So, who was with you at this time?

18  A    Breezy Sanchez.

19  Q    Okay.  You can zoom back out.  So, tell us what was going

20  on at this time.  This is at 8:37 p.m. on day one.

21  A    Yeah.  Everyone, like the crowd, the protesters were

22  chanting.  People had -- somebody had like a boombox.  People

23  were kind of dancing and like riding their bikes around.  The

24  atmosphere was rather, like, calm, especially based on what we

25  had come from, and like almost jovial.

20-cv-1878-RBJ    KELSEY TAYLOR - Direct    03-16-2022

1    There were Black women protesters standing like right

2  up next to the line of police with their backs turned to the

3  police eating bags of chips in this like show of nonchalance or

4  like, you know, we're simply here with our bodies telling you

5  that we don't like what you're doing, but we're not doing

6  anything dangerous.

7  Q    All right.  And eventually did you move up towards a little

8  bit -- did you move positions, or did you sort of stay by the

9  tree?

10  A    We stayed by the tree for a while.  And then we moved,

11  like, forward a little bit in the crowd, and maybe off to the

12  left a little bit.  But we stayed rather in that same spot.

13  Q    Okay.  And did you see any protesters engage in any acts of

14  violence at this location?

15  A    I did not.

16  Q    Or any acts of property destruction?

17  A    No.

18  Q    Did you ever engage in any acts of violence or property

19  destruction at any time you were at the protests?

20  A    No.

21  Q    And was there a time when the police gassed the crowd?

22  A    There was, yes.

23  Q    And what happened?

24  A    It felt like it happened out of nowhere, and there was like

25  this huge cloud of gas, and then everyone just scattered.  It

20-cv-1878-RBJ    KELSEY TAYLOR - Direct    03-16-2022

1    was like instant chaos.

2    Q    Did you hear any warnings or announcements before you were

3    gassed?

4    A    I did not, no.

5    Q    Was the crowd loud?

6    A    I mean, people were chanting, and there was music playing.

7    But it -- it didn't -- it wasn't like uproariously loud.

8    Q    And can you draw with the stylus a little bit, you know,

9    the general area where you were standing at the time that you

10   were gassed?

11   A    Yeah.  I mean, I think -- I don't think I really moved from

12   like this general vicinity until we got gassed, and then we ran

13   that way.

14   Q    All right.  Now, let's show a screenshot of Exhibit 9, I

15   believe it's D.  The one that was already admitted.  Okay.  So,

16   this is a screenshot of a video that we've already seen, but

17   this is after the police gassing.  So, you were saying that you

18   were closer to where the police were, and then you ran to the --

19   I'm not sure what direction that is.  East.

20   A    Yes.

21   Q    Okay.  Now, do you see these police officers here?

22   A    I do.

23   Q    All right.  Now, had they moved up from where they were

24   earlier?

25   A    They had, yes.

20-cv-1878-RBJ   KELSEY TAYLOR - Direct   03-16-2022

1   Q     Okay.  And so you were farther away from this truck when

2   they gassed you; right?

3   A     Yes.

4   Q     Okay.  So, what did the police do -- between the earlier

5   clip that we saw at 8:37 and when they actually gassed the crowd

6   at 9:10, what had the police done?

7   A     They were kind of -- they were in this like semicircle, and

8   they had started pushing the crowd like out and back, like away

9   from those crosswalk lines.  Yeah.

10  Q     Okay.  So, earlier the police were over here; right?

11  A     Yes.

12  Q     And then they pushed people out in this sort of arc?

13  A     Yes.

14  Q     And then they gassed the crowd?

15  A     Yes.

16  Q     Now, did you go home after that?

17  A     I did, yes.

18  Q     And did you inhale the tear gas?

19  A     I did, yes.

20  Q     And how did that feel?

21  A     That was the worst of the day.  Probably compounded with

22  still feeling uncomfortable from the earlier incidents, and --

23  but this one was markedly the most terrible, which is why I went

24  home.

25  Q     Okay.  Before the police gassed the protesters, did you see

20-cv-1878-RBJ   KELSEY TAYLOR - Direct   03-16-2022

1   anyone throw anything?

2   A    No, I didn't.

3   Q    Okay.  On day two of the protests, the next day, May 29th,

4   did you attend?

5   A    No, I did not.

6   Q    Why not?

7   A    My experience on this night, the previous night, was enough

8   to shake me a little bit, and I was also working a lot at the

9   time.  So, I was tired, and it didn't seem like a good headspace

10  to go to that kind of situation with.

11  Q    Okay.  Let's -- we can take this exhibit down.  May 30th,

12  day three, did you attend the protest?

13  A    I did, yes.

14  Q    And were you at the intersection of Lincoln and Colfax

15  between 6:00 and 8:00 p.m.?

16  A    Yes, I was.

17  Q    What were you wearing that day?

18  A    I was wearing a green long sleeve shirt and black pants,

19  like a white respirator mask, and a backpack.

20  Q    Okay.  Let's show Exhibit 1225.  It's already been

21  admitted.  All right.  So, can you -- this is a map that we've

22  seen before of the Colorado State Capitol area and the

23  intersection of Lincoln and Colfax.  Can you circle where you

24  were, or sort of indicate the general area where you were when

25  you first arrived on that day.

20-cv-1878-RBJ   KELSEY TAYLOR - Direct   03-16-2022

1   A    Yeah.  When I first arrived, I was right where this like

2   Liberty Park bubble is.

3   Q    Okay.  And what was going on at that time?

4   A    There was -- there were protesters kind of all in this

5   park.  There was a bit of a police line at Colfax and Lincoln,

6   but it wasn't -- it was kind of -- people were just kind of like

7   milling about.

8   Q    Okay.  And then did you move up closer to the intersection

9   of Lincoln and Colfax at some point in time on that day?

10  A    I did, yes.

11  Q    All right.  Let's show Exhibit 879.  All right.  So, this

12  has already been admitted before.  It's a screenshot from a

13  video taken at 7:00 p.m. on May 30th.  Can you circle yourself?

14  A    Yes.

15  Q    Okay.  What are you doing in that photo?

16  A    I am standing rather timidly with my arms up.

17  Q    Now, what was the crowd doing at this time?

18  A    You know, more of the same.  A lot of chanting, hands up,

19  don't shoot, with hands in the air, holding up signs, kneeling,

20  the -- you know, the usual at this point, I think.

21  Q    Okay.  Let's show Exhibit 27.  So, I am not certain that

22  this one has been admitted previously -- it has been.  Okay.

23  So, showing you Exhibit 27, the time here is 7:05:59, so nearly

24  7:06 p.m.  Now, let's see.  Is this you?  Oh.  That's -- why

25  don't you do it, Ms. Taylor.  Can you circle yourself in this

20-cv-1878-RBJ    KELSEY TAYLOR - Direct    03-16-2022

1  crowd?  A little hard to see.  We can zoom in a little bit, or

2  actually just play it for a moment.

3  A    I can see me now.

4  Q    Okay.

5  A    My head is very small.

6  Q    All right.  Now, what -- so, this is at 7:06 p.m., and

7  you're facing the line of officers; right?

8  A    Yes.

9  Q    Okay.  So, do you recall what was happening between 7:00,

10  which is the screenshot we saw earlier, and 7:06?

11  A    Yeah.  It was this, like, kind of back and forth of

12  protesters kneeling with their hands up and chanting, and police

13  shooting PepperBalls and pushing the crowd back.  And then the

14  protesters would kind of come back to their line and do what

15  they were doing.  It was this back and forth like tug-of-war of

16  sorts.

17  Q    Okay.  Did you see anybody throw anything from the crowd to

18  the police?

19  A    I didn't, no.

20  Q    Did the police ever tell you you cannot be here in the

21  street, go to the park or go somewhere else where you can

22  peacefully demonstrate?

23  A    No.

24  Q    Did you ever hear any warnings that day?

25  A    No.

20-cv-1878-RBJ   KELSEY TAYLOR - Direct   03-16-2022

1   Q    All right.  And let's play the -- go ahead and play this

2   clip.

3          (A video was played.)

4   Q    Pause.  Okay.  Did you see this?

5   A    I did, yes.

6   Q    Okay.  Continue playing.

7          (A video was played.)

8   Q    Do you see this?

9   A    Yes.

10  Q    And what were those?

11  A    Those were tear gas canisters.

12  Q    And this is you right here?

13  A    Yes.

14  Q    Okay.  What are you doing here?

15  A    Ducking and putting my arms over my head.

16  Q    Had the crowd done anything that would -- that in your mind

17  would cause the police to throw those explosives or tear gas

18  into the crowd?

19  A    Not that I saw then or now.

20  Q    Okay.  Let's continue playing.  And so just we're going to

21  keep -- try to keep as much as we can, try to keep our eye on

22  you.  Let's zoom in a little bit.  All right.  Great.  So, this

23  is you; right?

24  A    Yes.  That's me.

25  Q    Let's just keep our eye on you.  We can play.

20-cv-1878-RBJ   KELSEY TAYLOR - Direct   03-16-2022

1    (A video was played.)

2  Q    Pause.  Okay.  What happened there?

3  A    You see this like spray of white bounce off my arm.  I just

4  got hit with a PepperBall.

5  Q    Okay.  Now, you can use the back button just to go back a

6  little bit.  Now, had you done -- had you done anything -- well,

7  strike that.  What were you doing at the time that you were hit

8  with the PepperBall?

9  A    I was running away, and I had paused to look back at the

10  line of police to see what was going on.

11  Q    Okay.  Great.  So, this is you; right?

12  A    Yes.

13  Q    Okay.  And where did you go after this?  We can continue

14  playing just for the rest of this little bit.

15    (A video was played.)

16  A    After this, I kind of jog away.  It was -- again, like

17  these moments are rather disorienting, and sometimes you just

18  want a minute to get your bearings.

19  Q    And where were you hit?

20  A    I was hit in my right arm.

21  Q    All right.  Were you hit in the leg as well?

22  A    I was.

23  Q    And how did that feel?

24  A    Once it like registered in my brain that I had been hit, it

25  felt really painful.  When I like jogged away, my arm was -- my

20-cv-1878-RBJ    KELSEY TAYLOR - Direct    03-16-2022

1   arm was burning and somehow the -- I thought that it was just

2   from those two gas canisters that like the pepper was so bad,

3   but I was struggling to -- my eyes were just like crying.  And I

4   realized it was happening because it was actually on my physical

5   body, the chemical agent was.  So, it was painful, and then like

6   not only physically, but then doubly, like on the area where I

7   got hit, and then it was just like you couldn't -- I couldn't

8   get away from myself.

9   Q    Were you gassed more than once while you were in this area

10  on May 30th?

11  A    Yes.  Repeatedly.

12  Q    Okay.  But did you -- did you -- each time did you run away

13  or walk away and then come back to the police line?

14  A    Some version of that, yes.  It was like a -- kind of moving

15  out of whatever area that was.  There were times when I would go

16  farther or less far, but it was kind of the same.

17  Q    Why did you come back each time you were gassed?

18  A    Because, you know, the heart of this protest was that, you

19  know, Black people, people of color, are treated by police

20  differently than white people are treated by the police.  And as

21  a white person who decided to attend this protest, it felt

22  important to me that my body was close to the front absorbing

23  some kind of impact, if that was possible.

24  Q    How long did your injuries last from being shot with the

25  PepperBalls?

Kevin P. Carlin, RMR, CRR

20-cv-1878-RBJ   KELSEY TAYLOR - Direct   03-16-2022

1   A   The welts lasted probably two to three weeks, maybe a

2   month.  They were rather pervasive, actually.

3   Q   And did you have scars?

4   A   I do.  I have two scars.

5   Q   Showing Exhibit 949.  Do you recognize this, Ms. Taylor?

6   A   I do.

7           MS. WANG:  And move to admit 949.

8           MR. WEINER:  No objection.

9           THE COURT:  Admitted.

10  Q.   (By Ms. Wang) What is this a photo of?

11  A   This is a photo of me and the welt from the PepperBall on

12  my arm.

13  Q   When was this photo taken?

14  A   This was taken probably two days after I got hit.

15  Q   Okay.  Is there a second page to this?  Okay.  Why did you

16  take this photo?

17  A   You know, I'm not a person that really documented these

18  protests a lot.  I didn't have my phone out.  I didn't have it

19  on me.  But once I realized, like, I was going to sustain an

20  injury from this, it felt like the right thing to do to document

21  that.

22  Q   Okay.  Now, you can take that down.  Did you remain in

23  this -- in -- out in the city after the curfew began at

24  8:00 p.m.?

25  A   I did.

20-cv-1878-RBJ    KELSEY TAYLOR - Direct    03-16-2022

1    Q    Why?

2    A    Because I did not believe that the curfew was

3    constitutional.

4    Q    Were you arrested for violating the curfew on May 30th?

5    A    I was.

6    Q    What were you arrested for?

7    A    I was arrested for a curfew violation and a failure to obey

8    a lawful order.

9    Q    And were those charges dismissed?

10   A    They were.

11   Q    Okay.  What happened at the time you were arrested?

12   A    We were kneeling at 14th and Sherman in the intersection,

13   and there was a line of officers walking towards us from Colfax

14   with police vehicles behind them.  We were kneeling with our

15   hands up in the air, chanting hands up, don't shoot, as the

16   officers advanced towards us.

17   Q    And so you -- how did it feel to see police officers

18   advancing towards -- were they holding weapons when they were

19   advancing towards you?

20   A    They were.  They had weapons out and drawn and pointed at

21   us.

22   Q    And how did that feel?

23   A    Horrifying.

24   Q    Go ahead.

25   A    Sorry.  I never expected to be in a situation like that.

Kevin P. Carlin, RMR, CRR

20-cv-1878-RBJ   KELSEY TAYLOR - Direct   03-16-2022

1    That was not, you know, even when you go out to a protest for

2    something that you -- you think is unjust, you have a

3    constitutional right to protest, and then you're met with a line

4    of armed policemen.  It's horrifying.

5    Q    Did you stand up eventually from your kneeling position

6    when they approached?

7    A    I did.  It was scary.  It was, you know, a sign of

8    vulnerability to be kneeling in the first place, and at some

9    point it felt too vulnerable.

10   Q    Okay.  And what happened at the moment you were arrested?

11   A    I was standing up, and standing next to me was a man I

12   didn't know.  And a police officer hit him, and I said, you

13   can't do that.  He wasn't doing anything.  And I don't know if

14   it was the same officer or a different officer, but someone

15   grabbed my arm and said, you're under arrest, and then to

16   someone else, said, bring me three more.

17   Q    And before your arrest, did you hear any announcements

18   about the curfew?

19   A    I did not, no.

20   Q    And you hadn't heard any announcements from police that

21   day; right?

22   A    No, I had not.

23   Q    The PepperBall dust chemicals were still on you at the time

24   you were arrested; right?

25   A    Yes.

20-cv-1878-RBJ   KELSEY TAYLOR - Direct   03-16-2022

1   Q     And how long did that stay on you?

2   A     A long time.  I was put in the back of a police vehicle,

3   and was -- I mean, sat in the same spot for a long time.  And

4   the vehicle was totally enclosed, so I was sitting back there

5   coughing and covered in, like, PepperBall residue and with my

6   hands tied behind my back so I couldn't do anything to -- like,

7   it was even a struggle to -- I had to take my mask off to

8   breathe.  And then I was trying to like use my shirt to wipe my

9   face, but the dust was on my shirt, so it was kind of

10  inescapable.  And then I spent a night in the detention center.

11  So, I wasn't able to get that off of my body until I went home

12  the next day.

13  Q     Okay.  Can you describe your injuries from the protest.

14  A     My physical injuries?

15  Q     Any kind of injuries.

16  A     Yeah.  You know, I mean, the physical ones are actually

17  easier to talk about.  My skin burned for a long time

18  afterwards.  And I obviously have a bruise and then a scar, two

19  scars.

20        And I think the -- the injuries that are more

21  challenging to talk about are the ones that are psychological or

22  emotional.  And those are pervasive and kind of show up at

23  different random times.  But there's a lot of -- I have a lot of

24  fear about people who are sworn to protect the people of this

25  country, which are the police.

Kevin P. Carlin, RMR, CRR

1    I at this time lived alone, and, you know, had so many

2  thoughts of like what if someone broke into my house, and I'm

3  supposed to call the officers that advanced on me with weapons

4  raised?  That doesn't feel like an option anymore either.  So, I

5  think there's -- there's a huge psychological impact that

6  happened for me and my confidence in this policing system.

7  Q    Have you had to call the police, you know, in your -- for

8  your business, and have there been effects from this for that?

9  A    Yes.  I suppose we've never had to call the police, but

10  that was the option that we had.  So, in the first couple years

11  we were in business, my landlord picked up the policemen's tab

12  when they would come in, so we would kind of keep a tab for the

13  police.  And the reasoning behind that was if the police were

14  around, maybe people would be deterred from stealing something

15  from our business or in a building with a bunch of other small

16  businesses.

17    So, everyone is -- everything is precious to everyone,

18  because small businesses are just trying to make it.  But, you

19  know, after -- after calling the police a couple times in --

20  even in those times, you kind of soon realize that the police

21  were never really there to help anybody.  Even if we called them

22  because someone was having like a mental health crisis that we

23  didn't know how to deal with or was consistently or persistently

24  bothering one of our staff members, the police would show up,

25  and it was a distressful situation for everyone.  And so since

20-cv-1878-RBJ    KELSEY TAYLOR - Direct    03-16-2022

1    these protests, as a staff, we've decided to not call the police

2    anymore, and try to deescalate those situations by ourselves.

3    Q    Can you give me an example of you doing that?

4    A    Yes.  There's an incident where someone came in on a busy

5    Saturday morning.  And we're short staffed right now, so we only

6    work with two people.  So, myself, I left my co-worker working

7    and serving people and kind of followed this person around the

8    coffee shop for a couple minutes.  And they were talking to

9    themselves, and obviously like kind of unsure of where they

10   were.  Kind of erratic with their movements, and I was trying to

11   get them to just sit down.

12        So, we have a patio.  So, I escorted them outside best

13   I could, and they sat down with me and they were -- they were

14   just kind of -- they were kind of a lot.  And so I had a friend

15   who was also there, and they came over and was like, do you want

16   some help?  And I was like, yes, I would like some help.

17        So, I was trying to talk to this person and ask them

18   their name, maybe what they needed, if they could tell me those

19   things.  And they kept kind of like -- they were crying and

20   sniffling, and they kept looking at me and calling me a

21   different name, like clearly not really seeing me or seeing me

22   for someone else.

23        And so they grabbed my hand.  They grabbed my friend's

24   hand and like held on super tightly.  And we were just sitting

25   with them telling them that they were okay, and that no one was

1   going to hurt them.  And someone else had called an ambulance,

2   so like these sirens kind of start blaring down the street.  And

3   this person just starts like weeping and screaming, like, I

4   didn't do it.  It wasn't me.  It's not my fault.  And at that

5   point, we were again just trying to tell them that it was okay.

6   And the paramedics got there, and it was kind of in their hands

7   after that.

8   Q    Can you tell us why you brought this lawsuit.

9   A    I brought this lawsuit because, as I said, I think 2020 and

10  the subsequent years have really spurred a different kind of

11  consciousness in myself, and I hope in other people, and I think

12  that in this moment, we have a -- not only an opportunity, but

13  maybe a responsibility to see some things change.  And I think

14  that this lawsuit could be part of some really good and healthy

15  change for the people of this country.

16            MS. WANG:  I have no further questions at this time.

17            THE COURT:  All right.  Cross examination?

18            MR. WEINER:  Yes, Your Honor.

19                      **CROSS EXAMINATION**

20  BY MR. WEINER

21  Q    Ms. Taylor, I want to begin with -- by asking you and

22  talking a little bit about your business, this small business

23  that you currently own.  It's a coffee company.  Do you produce

24  the coffee?

25  A    No.  Coffee doesn't grow in the global north.

20-cv-1878-RBJ   KELSEY TAYLOR - Cross   03-16-2022

1  Q   So, you kind of make these different blends, and then you

2  sell those blends in your coffee shop?

3  A   No.  We only roasted for a little while.  COVID kind of put

4  a stop to that for us too.  So, we actually purchase coffee from

5  a coffee roaster.  We're just a retail space.

6  Q   And then you bag it, and you sell it in your store; is that

7  correct?

8  A   No.  They bag it.  We sell it.

9  Q   Do you tell them what to put on, like what you want to name

10  it?  Like breakfast blend or mountain café or whatever?

11  A   Not currently, no.

12  Q   Okay.  You -- it sounds like your business struggled quite

13  a bit with COVID, as a lot of businesses did; correct?

14  A   It did.  We did.

15  Q   And I think you testified on direct you had some 17 people,

16  and then now you're down to how many?  Was it four or five?

17  A   Four.

18  Q   Four?  Okay.  And sounds like you put a lot of time and

19  effort and work into making your business go; is that right?

20  A   Yes.

21  Q   Okay.  And it's something special to you, something that

22  you're proud of, and that -- that's how you can afford to live;

23  correct?

24  A   In most ways, yes.

25  Q   Okay.  And so you understand the importance of having your

20-cv-1878-RBJ    KELSEY TAYLOR - Cross    03-16-2022

1  business protected and having that business not destroyed at the

2  hands of someone else; correct?

3  A    I do.

4  Q    And you would certainly agree that instances where police

5  may be necessary to protect your business, protect your

6  property; correct?

7  A    Well, I understand the -- I understand how it feels to

8  potentially have your -- that line crossed, and like -- but

9  technically, that's not our property.  We rent.  So, most of

10  that doesn't belong to us.

11  Q    I mean your business as a whole.  Your profits and how you

12  survive as a business.

13  A    We've never made a profit.

14  Q    Okay.  And certainly, you can empathize with other

15  businesses for example on the 16th Street Mall who may have been

16  destroyed, they're struggling not only with COVID, but now this

17  tornado hits them; correct?

18  A    With COVID?

19  Q    Well, this -- the riots that took place, that destroyed

20  their businesses on 16th Street?

21  A    I don't know exactly what you're asking.  Are you saying

22  they're like -- they can't operate anymore because they don't

23  have a business anymore?

24  Q    Well, what I'm asking you is you can certainly appreciate

25  the pain that it would cause a business owner to have their

20-cv-1878-RBJ   KELSEY TAYLOR - Cross   03-16-2022

1  business destroyed for no other reason than being at the wrong

2  place, for example the 16th Street Mall?

3  A    Hmm.  I don't -- I actually don't empathize with the fear

4  that property or physical space could be destroyed, no.

5  Q    And why not?

6  A    Because if -- you know, my business partner and I talked

7  about this before we went to the protest.  If something had

8  happened -- and we had floor-to-ceiling windows.  We're in an

9  old motel, so there's these like giant aluminum-framed windows,

10  and it was very likely at 11th and Broadway they were going to

11  get broken.

12         And we talked about this before we went to the protest.

13  And if our business had been physically destroyed in that way

14  because of these protests, it would have been something that was

15  acceptable to us.

16  Q    So, you would have been fine with that?

17  A    Yeah.

18  Q    Okay.  And I think you kind of touched on it, but just to

19  be clear, your business was not destroyed during the protest and

20  riots?

21  A    It was not, no.

22  Q    Okay.  Now, I want to ask you -- you were asked a question

23  on direct examination, but I just want to follow up with that

24  quickly.  You had mentioned, and the question was asked whether

25  you had been involved in any other riots -- or any other, excuse

20-cv-1878-RBJ    KELSEY TAYLOR - Cross    03-16-2022

1  me, protests.  And you had said yes.  Can you tell us a little

2  bit about what those protests were and how many, please.

3  A    Yes.  There were two.  One was after Ferguson, and I think

4  it was 2014 or 2015.  And then one I was involved in was the

5  Occupy movement, but that was in Boston.

6  Q    Okay.  And let's talk first about the Ferguson protests.

7  Where did you engage in that protest at?

8  A    Here in Denver.

9  Q    Okay.  And were there any issues with Denver at that time?

10  The Denver Police Department.

11  A    At that protest?

12  Q    Yes.

13  A    No.

14  Q    And so you would agree it was a similar-type message that

15  at the time, there was the belief that an African American man

16  was shot, which he was shot, but you took to the streets in

17  protest of that; correct?

18  A    We did.

19  Q    Okay.  And so it was, again, a similar message in the fact

20  that there was social injustice, and you wanted to engage in

21  that protest; correct?

22  A    Yes.

23  Q    Okay.  And at that point, the Denver Police Department did

24  not do anything to act upon that message.  Would you agree with

25  that?

20-cv-1878-RBJ    KELSEY TAYLOR - Cross    03-16-2022

1   A    I didn't notice anything at that protest.

2   Q    So, you weren't gassed?

3   A    No.

4   Q    You weren't pepper sprayed; correct?

5   A    Not at that protest, no.

6   Q    And were there signs at that protest?

7   A    Yes.

8   Q    Where did that protest take place?  And by that I mean,

9   were you at the capitol?  Were you in Veterans Park?  Did you

10  march anywhere?

11  A    Yeah.  Honestly, I struggle to remember a lot of that.  We

12  did march.  We were on the highway at one point.  There were

13  signs.

14  Q    What highway?

15  A    I-25, I believe.  Yeah.

16  Q    And did the police just let you walk down the highway then?

17  A    You know, I was in a big group of people, and it was like

18  one of my first protests, so I don't -- I don't really remember.

19  Q    Okay.  And so you left that highway at that point, and you

20  went somewhere else; correct?

21  A    We did, yeah.

22  Q    And at that point, there was, again, no pepper spray, no

23  PepperBalls or anything shot at you or other protesters;

24  correct?

25  A    There was not.

20-cv-1878-RBJ    KELSEY TAYLOR - Cross    03-16-2022

1  Q    And did you see at that point, that particular protest any

2  violence on the part of the individuals engaged in the protest?

3  A    No.

4  Q    Okay.  And then you -- the other protests that you

5  mentioned that you were a participant in was the Occupy Boston

6  protest?

7  A    Mm-hmm.

8  Q    What is Occupy?  What is that?

9  A    Occupy was a movement of -- I don't honestly remember the

10  year, but it was like the -- like, we are the 99 percent

11  movement, if you're familiar.  It's like a one percent that owns

12  most of the wealth, and then the 99 percent of people that

13  doesn't.

14  Q    And you engaged in that protest?

15  A    I did.

16  Q    And why?

17  A    You know, that point, it was driven a lot by like my peers.

18  A lot of my friends were going, and I wasn't very politically

19  aware, so I went with them.  And, you know, there are -- there

20  are -- even then, there were pretty obvious inequities in

21  society to me that that movement really spoke to me about.  I

22  was a working college student who was working full-time and

23  realizing that that was not the experience of a lot -- of all

24  people, but of a lot of people.

25  Q    In fact, you just mentioned that you -- you were brought

20-cv-1878-RBJ     KELSEY TAYLOR - Cross     03-16-2022

 1   along to that one because of peers, and you would agree with me

 2   that peers sometimes have influence over other people; correct?

 3   A    I would agree with that in a general statement.

 4   Q    Okay.  Now, let's go back and talk some more specifics

 5   about May 28th of 2020.  Do you recall, were you working that

 6   day?

 7   A    I was working that day.

 8   Q    Okay.  And I'm assuming that was at your coffee shop, am I

 9   pronouncing it -- is it a shop?

10   A    Yeah.  It's a shop.

11   Q    So, you were working at your coffee shop that day; correct?

12   A    Yes.

13   Q    And at some point you found out about the fact that there

14   was going to be a protest regarding George Floyd in the city of

15   Denver; correct?

16   A    Yes.

17   Q    And do you recall how you found out about that?

18   A    Yeah.  I think it was word of mouth.  The nice thing about

19   working in a coffee shop is that everyone comes to you.

20   Q    Okay.  So, when you say word of mouth, word of mouth back

21   in my day was something different than I think people now with

22   phones.  Was it a text word of mouth, or was it somebody

23   actually coming in your shop, hey, this is what's going on?

24   A    Yeah.  I meant like a verbal.

25   Q    All right.  Just want to be clear about that.

20-cv-1878-RBJ   KELSEY TAYLOR - Cross   03-16-2022

1    A    Totally.

2    Q    So, you found out, and you decide that you're going to go

3    to the protest; correct?

4    A    Yes.

5    Q    And you go up to the capitol?  Is that where you started?

6    A    Yes.

7    Q    Okay.  You go to the capitol.  How many people are there?

8    A    I don't know.  Maybe -- I mean, maybe a couple hundred.

9    Q    Okay.  Are people with signs?

10   A    Yes.

11   Q    People chanting?

12   A    Yes.

13   Q    People chanting things such as hands up, don't shoot,

14   justice for George, those type of things; correct?

15   A    Yes.

16   Q    Okay.  And you're at the capitol, and no one makes you

17   leave, do they?

18   A    No one -- no.  No one forces me to do anything.

19   Q    Okay.  So, police don't come in at that point and say, hey,

20   group, you're not allowed to protest, we don't like what you're

21   saying, leave?  You all decide to leave on your own; correct?

22   A    We decide to march.

23   Q    Okay.  You decide to march?

24   A    Yes.

25   Q    Okay.  But again, there was nothing preventing you from

20-cv-1878-RBJ    KELSEY TAYLOR - Cross    03-16-2022

1   getting your voice out at the capitol; correct?

2   A    There was nothing preventing us from staying at the capitol

3   or marching.

4   Q    Okay.  At that point, when you're at the capitol, you've

5   got basically free rein of the capitol outside to voice your

6   opinion, whether it's through a bullhorn, through signs or

7   whatever; correct?

8   A    Sure.

9   Q    Okay.  No one suppressed that ability to get that voice out

10  at that time; correct?

11  A    Not that I experienced, no.

12  Q    Okay.  Then at some point the group -- and has the group

13  enlarged at this stage?

14  A    Probably.  I feel like that kind of constantly happened.

15  At least when I -- when I got there, which is probably like in

16  the early evening, generally, there was more people after who

17  would come after like after work and things like that.

18  Q    So, after, as it got closer to dusk, dark, the numbers

19  would increase; correct?

20  A    It seemed that way.

21  Q    Okay.  And when you were at the capitol, can you tell us

22  approximately what time you were at the capitol and you were

23  protesting?

24  A    Yeah.  I would guess that based on earlier things kind of

25  being at Platte and 16th at 7:30, I would guess I was at the

20-cv-1878-RBJ    KELSEY TAYLOR - Cross    03-16-2022

1    capitol around 5:30 or 6:00.

2    Q    How long did you stay at the capitol?

3    A    Maybe half an hour to an hour.

4    Q    Was it your decision to leave the capitol and go march

5    elsewhere, or did you follow along with the group?

6    A    I don't believe there was any like one person making

7    decisions.

8    Q    Okay.  And but eventually you went along with the group;

9    correct?

10   A    Yes.

11   Q    Okay.  And you marched?

12   A    I did.

13   Q    You walked away from the capitol, and where did you go?

14   A    We went down the 16th Street Mall.

15   Q    Okay.  As you're walking across the capitol, do you cross

16   Colfax?

17   A    We would have had to, yes.

18   Q    Okay.  Police officers didn't stop you from doing that, did

19   they?

20   A    No.

21   Q    Okay.  They let you walk across Colfax; correct?

22   A    I mean, I think that people are allowed to walk across

23   streets.  So, they did.

24   Q    And the street was open at that time; correct?

25   A    I think so.

20-cv-1878-RBJ   KELSEY TAYLOR - Cross   03-16-2022

1    Q    So, the group -- how many -- to your estimate, how many

2    people were in the group at this point when you walked from the

3    capitol across Colfax to 16th Street Mall?

4    A    I'm the worst at this.  I would still say like a couple

5    hundred people.

6    Q    Okay.

7    A    I'm not sure.

8    Q    All right.

9    A    I'm sorry.

10   Q    Fair enough.  I'm only asking for an estimate.  I didn't

11   think you were there counting everybody.  So, but it's a pretty

12   large group; correct?

13   A    Yeah.  It was a rather large group.

14   Q    Did you see people with backpacks?

15   A    Yes.

16   Q    Did you see people with lacrosse sticks?

17   A    No.

18   Q    Did you see people with golf balls or slingshots?

19   A    No.

20   Q    Okay.  But of course you weren't looking in everybody's

21   backpack either; correct?  That's fair to say?

22   A    That's fair to say.

23   Q    So, this group as you're walking, are you chanting as

24   you're walking down 16th Street?

25   A    Yes.

20-cv-1878-RBJ    KELSEY TAYLOR - Cross    03-16-2022

1    Q    Okay.  And as you're walking down 16th Street, no one from

2    the Denver Police Department stops you, do they?

3    A    No.

4    Q    You're allowed to walk down 16th Street.  Do you know

5    whether you stopped for traffic lights, or you just kept

6    walking?

7    A    We just kept walking.

8    Q    Okay.  So, do you know -- did you take notice of the fact

9    that Denver Police Department were actually stopping traffic

10   from impeding your ability to march down 16th Street?  Were you

11   aware of that?

12   A    I didn't notice, no.

13   Q    Okay.  So, that's something you didn't notice either;

14   correct?

15   A    Yes.

16   Q    Okay.  So, you're walking down 16th Street, and you're

17   heading towards, I believe Confluence Park?

18   A    Yes.

19   Q    And you get to Confluence Park, and you stay there, and are

20   you still chanting?  And I say you.  I mean the group.  Are you

21   chanting at that point?

22   A    Yeah.  I mean, we kind of chanted on and off the whole

23   time, depending on like what position you're in in the march.

24   Q    Okay.  And up to that point, again, no one from the Denver

25   Police Department has stopped you; correct?

20-cv-1878-RBJ   KELSEY TAYLOR - Cross   03-16-2022

1   A    No.

2   Q    No one from the Denver Police Department has walked up to

3   you or anybody that you saw and said, hey, I don't like what

4   you're saying, stop your protesting; correct?

5   A    No.  But I never saw an officer do that.

6   Q    You never saw an officer do that?

7   A    Walk up to someone and calmly say, no, I don't like what

8   you're saying?  No.  I never saw an officer do that.

9   Q    Okay.  And so your observation -- you're with your friend

10  Breezy; is that correct?

11  A    Yes.

12  Q    And as I understand, Breezy is also a co-owner of the --

13  your shop?

14  A    Yes.

15  Q    Okay.  And so you and Breezy are together.  Do you meet any

16  other friends, talk to any other people?

17  A    We were with a couple other friends.  We probably talked to

18  some other people.

19  Q    How long were you at Confluence Park?

20  A    We kind of just walked through Confluence Park.

21  Q    So, you didn't sit and congregate there?

22  A    No.

23  Q    No one from Denver Police Department made you leave there;

24  correct?

25  A    Like I said, we just walked through the park.

20-cv-1878-RBJ   KELSEY TAYLOR - Cross   03-16-2022

1    Q    Okay.  But no one said, hey, you can't be here either, you

2    just walked through the park?  Do I understand that correctly?

3    A    Yes.

4    Q    Okay.  You walked through the park, and where did you go?

5    A    To the Highland Bridge.

6    Q    Okay.  And did you go down on the highway?

7    A    I did, yes.

8    Q    You actually stood on the highway?

9    A    I stood on the highway.

10   Q    And how did you get down to the highway?

11   A    There is like a small fence, and you get over it, and you

12   walk.

13   Q    So, there was a fence.  Did you climb the fence?

14   A    You don't really have to climb it.  It's rather short.

15   Q    But there was a barrier between where you were and the

16   highway, and you went over it and got on the highway; correct?

17   A    Yes.

18   Q    Okay.  And the purpose of getting on the highway was what?

19   A    The purpose of getting on a highway at a protest is to

20   disrupt the normal flow of daily life.

21   Q    Normal flow of potentially innocent people who had no dog

22   in this fight that you were interrupting their life; is that

23   correct?

24   A    Innocent people makes it sound like I have like harmed

25   someone or intended to hurt someone, so I don't know that I

20-cv-1878-RBJ    KELSEY TAYLOR - Cross    03-16-2022

1   fully want to agree with that, but people who were not engaged

2   in the protest, yes.

3   Q    And potentially emergency vehicles as well that would use

4   that highway; correct?

5   A    Potentially.

6   Q    Okay.  And so the purpose was to block the highway so you

7   could impact and get your voice out by impacting other people's

8   lives, emergency vehicles, et cetera; correct?

9   A    Yes.

10  Q    Okay.  And police responded?

11  A    Yes.

12  Q    And you left; correct?

13  A    Yes.

14  Q    And in fact, police deployed PepperBall against the grass

15  berm going back up towards the city; correct?

16  A    Yes.

17  Q    Were you exposed to PepperBall spray at that point?

18  A    Yes.

19  Q    And you indicated you smelled it; is that right?  Is this a

20  dust?  The powder?

21  A    Yeah.  I'm not super familiar with the substance

22  specifically, but it kind of gets in all of your senses.  It's a

23  smell, eyes, mouth, kind of thing.

24  Q    And when the police got there, did you see the bottles and

25  the rocks being thrown at law enforcement officers?

20-cv-1878-RBJ    KELSEY TAYLOR - Cross    03-16-2022

1   A    Sorry.  Where are we talking about?

2   Q    On I-25.

3   A    No.

4   Q    You didn't see any of that?

5   A    No.

6   Q    And have you watched videos of that in your preparation for

7   trial, videos of that bridge incident?

8   A    I have.

9   Q    You have?

10  A    I have, yes.

11  Q    I'm sorry.  I cut you off.  And certainly after watching

12  the video, you've seen that actually things were thrown at law

13  enforcement; correct?

14  A    When they were -- when the police were on the highway?

15  Q    Yes.

16  A    I'm sorry.  I don't know that I've seen that.

17  Q    Okay.  But you have watched the videos; correct?

18  A    Yes.

19  Q    And so even after watching the videos, you don't see things

20  being thrown at law enforcement?

21  A    Not that I remember seeing, no.

22  Q    Okay.  So, you leave the highway, and then where did you --

23  where do you go next?

24  A    Up back east, back towards Confluence Park.

25  Q    Okay.  And are police following you and shooting you as

1    you're going back to Confluence Park?

2    A    Yes.

3    Q    How often are they shooting PepperBalls?

4    A    I don't know.

5    Q    Okay.  Are you walking or running?

6    A    The general protest idea is that you walk so that -- so as

7    not to cause more chaos.

8    Q    So, the group is walking back to Confluence Park at that

9    point; correct?

10    A    I mean, yeah.  It would be maybe be a stretch to say

11    everyone is walking, because people are kind of panicked, but

12    the group is moving back towards Confluence Park.

13    Q    But you weren't panicked; correct?

14    A    I was kind of panicked.

15    Q    Okay.  But you continued to walk anyway; correct?

16    A    Yes.

17    Q    And then after Confluence Park, you proceed to, I believe

18    it was 16th Street and Platte?

19    A    Yes.

20    Q    And that's what you just testified to; correct?

21    A    Yes.

22    Q    That incident at 16th and Platte.  Now, you were

23    provided -- as part of this case, you took a deposition.  Do you

24    recall taking that deposition?

25    A    I do.

20-cv-1878-RBJ    KELSEY TAYLOR - Cross    03-16-2022

1  Q    Okay.  And you also were given a number of interrogatories,

2  which are questions to ask where you were and what happened to

3  you at certain places; correct?

4  A    Yes.

5  Q    Do you recall that?

6  A    Mm-hmm.  Yes.

7  Q    And you recall the importance of giving accurate

8  information with respect to both your deposition testimony and

9  your interrogatories; correct?

10  A    I do, yes.

11  Q    Okay.  And you are aware that at no time in either one --

12  either the interrogatories or your deposition did you indicate

13  that you were subjected to gas at 16th and Platte?

14          MS. WANG:  Objection.  This is improper impeachment.

15  If he's got a page and a line, he can show it, or he can tell us

16  what it is.

17          THE COURT:  You want to tell her what page you're

18  reading from?

19          MR. WEINER:  It doesn't exist.  That's the reason I'm

20  asking the question if she recalls making a statement.

21          THE COURT:  Right.

22          MS. WANG:  Objection.  Not impeaching.  He doesn't

23  have a page and line.

24          THE COURT:  How can he have a page and line if it's

25  not there?

20-cv-1878-RBJ    KELSEY TAYLOR - Cross    03-16-2022

1    MS. WANG:  What is there to impeach her with if it

2   doesn't exist?

3    THE COURT:  Okay.  Objection overruled.

4   Q.    (By Mr. Weiner) Do you recall whether you said anything

5   about being -- being gassed at 16th and Platte either in your

6   interrogatories or your deposition?  Do you recall mentioning

7   anything about that?

8   A    I actually do.  I remember being kind of confused in my

9   deposition about what chemical agent was used.  I remember being

10   confused between what was a PepperBall and what was like a cloud

11   of gas.  So, I thought, even in this moment, that we were

12   talking about PepperBalls.

13   Q    Okay.  And you don't have any law enforcement training;

14   correct?

15   A    No.

16   Q    Okay.  And because you didn't know the difference between

17   PepperBall and OC spray; correct?

18   A    I do now.

19   Q    You do now, but at the time?

20   A    I did not.

21   Q    Okay.  My understanding now from direct is after you left

22   the 16th and Platte location, you and your group -- and I

23   believe was Breezy Sanchez, Ms. Sanchez with you that entire

24   time?

25   A    She was.

20-cv-1878-RBJ   KELSEY TAYLOR - Cross   03-16-2022

1  Q   And was she subjected to gas?

2  A   Yes.  Or, well, now I think I should be clear.  It was not

3  gas.  We are talking PepperBalls.

4  Q   PepperBalls?

5  A   And the subsequent substance.

6  Q   The dust?

7  A   Yes.

8  Q   Okay.  So, Ms. Sanchez was with you the entire time;

9  correct?

10 A   Yes.

11 Q   Do you know if Ms. Sanchez was ever hit by a PepperBall?

12 A   On this day?

13 Q   Any day during the protests.

14 A   I do know.

15 Q   Okay.  And was she?

16 A   Yes.

17 Q   And where was she hit, to your recollection?

18 A   In the leg somewhere.

19 Q   Okay.  Did she receive a bruise?

20 A   Yes.

21 Q   Okay.  And correct me if I'm wrong, but she's not part of

22 this suit, is she?  The litigation?

23 A   No.

24 Q   Okay.  Now, you went to 14th and Sherman.  And I think we

25 saw a video, kind of an overhead; correct?  Do you recall that?

20-cv-1878-RBJ    KELSEY TAYLOR - Cross    03-16-2022

1  A    Yes.

2  Q    Okay.  And at that point, you were -- everybody was kind of

3  standing at that intersection chanting, and you mentioned that

4  you saw some police officers eating chips?

5  A    No.  The police officers weren't eating chips.  The

6  protesters were eating chips.

7  Q    The protesters were eating chips.  What were the police

8  officers doing?

9  A    Standing in a -- like a line, sort of a semicircle around a

10 police vehicle at 14th and Sherman, in all of their -- their

11 armor with all of their weapons drawn.

12 Q    All of their armor, all of their weapons?  Is that what

13 your testimony is?

14 A    From what I could tell, yes.

15 Q    Okay.  And you weren't privy to any -- it's fair to say any

16 law enforcement communications about what was going on during

17 other parts of this protest; correct?

18 A    I was not.

19 Q    Okay.  You weren't aware of whether, for example, law

20 enforcement had knowledge of shootings, shots fired; correct?

21           MS. WANG:  Objection.  Foundation.

22           THE COURT:  Overruled.  It's kind of the whole point

23 of the question.

24           THE WITNESS:  Could you repeat the question?  I'm

25 sorry.

20-cv-1878-RBJ    KELSEY TAYLOR - Cross    03-16-2022

1    Q.    (By Mr. Weiner) You weren't aware as the police officers

2    were there, you're saying in all of the armor, all of the

3    weapons, whether there was reports of shots fired?

4    A    I was not aware.

5    Q    Okay.  Were you aware because you weren't part of the law

6    enforcement that officers had things thrown at them?  Were you

7    aware of that?

8    A    I was not aware that -- well, no.  At this time, I was not

9    aware that officers had had things thrown at them.

10   Q    Because it's fair to say your knowledge of this protest was

11   limited to what was going on around you; correct?

12   A    Yes.

13   Q    Okay.  You don't know about all this other information that

14   may be in the disposal, in the hands and knowledge of law

15   enforcement; correct?

16   A    Also correct.  But, you know, part of what I saw in this

17   protest was police not acting like there was anything else going

18   on except for the people standing directly in front of them.

19   Q    Okay.  And you don't know whether the police officers had

20   information that may lead them to believe that those people

21   might be threats to their safety; is that correct?

22   A    What people?

23   Q    The individuals that were standing in front of them.

24   A    I'm sorry.  Could you repeat the question?

25   Q    You don't know whether law enforcement officers had

20-cv-1878-RBJ   KELSEY TAYLOR - Cross   03-16-2022

1  information that made them concerned about some of those

2  individuals who may be in the line or behind the line pose a

3  threat to the officers?

4  A    No.  I don't know that.

5  Q    Because, again, you weren't privy to any of that

6  information; correct?

7  A    Correct.

8  Q    And kind of in that same question, you had testified on

9  direct -- that same area, you had testified on direct, you said

10 it felt like it came out of nowhere, in terms of the gas being

11 deployed, or the PepperBalls; correct?

12 A    The gas or the PepperBalls?

13 Q    Either one.

14 A    Which incident are we talking about?

15 Q    Were you subjected to that at -- now I moved on to 14th and

16 Sherman.

17 A    Okay.  So, we're talking about the gas canister?

18 Q    Yes.

19 A    Yes.  That is what I testified.

20 Q    But again, you don't know what else was going on.  You

21 couldn't see anybody in the crowd; correct?

22 A    Correct.

23 Q    You don't know whether someone else in the crowd was in

24 fact an agitator who was doing something threatening to either

25 fellow protesters or law enforcement officers; correct?

20-cv-1878-RBJ    KELSEY TAYLOR - Cross    03-16-2022

1  A    I don't -- I don't know, but, you know, based on the video

2  that we watched, I did not see anything like that.

3  Q    Okay.  Well, you also didn't see anything being thrown from

4  the pedestrian bridge on I-25, either?

5  A    You're right.

6  Q    Okay.  And you indicated on that video that we just saw a

7  couple minutes ago -- and I've got, I believe it was 9g?

8          MS. WANG:  Yes.  At 14th and Sherman?

9          MR. WEINER:  Yes.

10  Q.    (By Mr. Weiner) You didn't see anything being thrown at

11  that -- at that point?

12  A    When I was in the protest?

13  Q    Yes.

14  A    No.

15  Q    Or when you watched the video afterwards?

16  A    No.

17  Q    Would it shock you that there were things being lobbed at

18  the police department -- at the police officers?

19  A    It would not be shocking.

20  Q    Why wouldn't it be shocking?

21  A    Because I've been present for other days of this trial, and

22  I've seen this same scenario used as, you know, some kind of

23  idea that protesters lobbing things at cops who are wearing

24  protective gear is somehow a threat.

25  Q    So, you -- in your opinion, that's not a threat to

20-cv-1878-RBJ    KELSEY TAYLOR - Cross    03-16-2022

1   officers; correct?

2   A    In my opinion and my experience as someone who attended

3   these protests wearing nothing but a cotton T-shirt and denim

4   pants, and getting hit by a projectile that caused me a lasting

5   scar, I -- and, you know, doing my best to not feel threatened

6   and to compose myself, and to remain calm even when I was

7   panicking, and to walk instead of run, I struggle to understand

8   how police officers felt it was threatening to have something

9   lobbed at them.

10  Q    Okay.  You would agree with me that this -- that this was a

11  riot; correct?

12  A    I would not.

13  Q    Okay.  Well, one of your coffee blends is actually called

14  ACAB, which stands for all cops are bastards; correct?

15  A    It doesn't exist anymore, but it did.

16  Q    It did.  And in fact, you referred to that as riot fuel,

17  coming in handy.  Do you recall that?

18  A    I don't.

19  Q    Okay.  And it also refers to the ACAB blend as the blend

20  that radicalizes you.  Do you recall that?

21  A    That sounds more familiar.  Where did that come from?

22  Q    I'm asking you if that's the name of the blend.

23  A    The name of the blend is the ACAB blend, yes.  Well, it

24  was.  It doesn't exist anymore.

25  Q    And do you recall referencing it on your social media

20-cv-1878-RBJ    KELSEY TAYLOR - Cross    03-16-2022

1    account as the blend that radicalizes you?

2    A    That sounds right.

3    Q    Okay.  And on the bottom -- on the bag, it says, we always

4    serve the decaf -- the decaf anyway.  Now we don't serve them,

5    as they don't serve us.  Do you recall that?

6    A    Yes.

7    Q    Okay.  And you also indicated on direct examination that

8    you found out about the curfew through social media; correct?

9    Do you recall that testimony?

10   A    In my deposition, or on direct examination?

11   Q    Direct examination here, ma'am.

12   A    I don't think I said that.

13   Q    Okay.  Well, in fact, you in part found out about it

14   through a public safety announcement from the City and County of

15   Denver indicating that there was a curfew in place, and you

16   reposted that with the quote, let's fucking go.  Do you recall

17   that?

18   A    Not specifically, but if you say it, then it must be true.

19   Q    Does it ring a bell to you?

20   A    It does.

21   Q    Okay.  So, did you in fact, when you got the announcement

22   with regards to the curfew, repost, stating, let's fucking go?

23   A    Yes.

24   Q    Okay.  And you would agree with me that that indicates that

25   you didn't care what it said.  You were going to go anyway;

Kevin P. Carlin, RMR, CRR

20-cv-1878-RBJ    KELSEY TAYLOR - Cross    03-16-2022

1  correct?

2  A    I would agree that when something is, you know, framed as a

3  public safety announcement when really it's a suppression of our

4  very constitutional right to protest, that I would like to

5  challenge not only the framing of that public safety

6  announcement, but also the curfew itself.

7  Q    Well, and you were asked by counsel on direct examination

8  with respect to why you brought this lawsuit; correct?  And in

9  fact, your purpose is a little bit broader, because you're

10  actually more radicalized.  Because, for example, you believe,

11  based on your communist beliefs, that there should be a complete

12  overhaul and reduction of our current government, don't you?

13  A    I think that an overhaul of our system is necessary, yes.

14  Q    Okay.  And part of that would actually be the beliefs that

15  you've espoused in terms of Lenin is the dismantling of our

16  current Constitution; correct?

17  A    Yes.

18  Q    Okay.  So, this First amendment right that you're now

19  claiming is something that you want destroyed; isn't that

20  correct?

21  A    No.  That is not correct.

22  Q    Now, I want to go back to that 14th and Sherman.  I believe

23  that was when you indicated that you got sprayed, I think you

24  turned around, and you eventually ran.  Do you recall that?

25  A    We didn't get sprayed.  There was a gas canister.

20-cv-1878-RBJ    KELSEY TAYLOR - Cross    03-16-2022

1   Q    Okay.  But am I talking about the right one?

2   A    14th and Sherman, the gas canister was deployed, and we

3   turned and ran east on 14th.

4   Q    Okay.  And the -- when you watch the video, the big -- the

5   vehicle, the police vehicle that you saw there was an Aurora

6   Police Department; is that correct?  Did you see that?

7   A    There was a police vehicle there.  I don't know what

8   department it belonged to.

9   Q    Okay.  So, you didn't see the Aurora Police on the side of

10  it?

11  A    I didn't.

12  Q    Okay.  And so it's fair to say that you don't know actually

13  who deployed the munitions, the gas, whatever you want to say,

14  that caused you to have some eye irritation or the bruises on

15  your shoulder or on your arm?

16  A    It's fair to say that I don't know which officer caused

17  those, yes.

18  Q    Do you know which department?

19  A    I don't.

20  Q    Okay.  And so your testimony is now in terms of your

21  injuries, that those bruises that you received from those

22  PepperBalls have now scarred?

23  A    Yes.

24  Q    At any point after being hit by PepperBall or whatever it

25  was, did you seek medical attention?

Kevin P. Carlin, RMR, CRR

20-cv-1878-RBJ   KELSEY TAYLOR - Cross   03-16-2022

1    A    I don't have health insurance, so no.

2    Q    So --

3             THE COURT:  Mr. Weiner, we have to take a break at

4    some point.  What's a good point to stop?

5             MR. WEINER:  Judge, this is fine.

6             THE COURT:  All right.  Let's take our afternoon

7    break.

8         (Jury out at 3:02 p.m.)

9             THE COURT:  All right.  3:15.

10        (Recess at 3:02 p.m., until 3:15 p.m.)

11        (Jury in at 3:15 p.m.)

12             THE COURT:  Okay.

13   Q.    (By Mr. Weiner) Ms. Taylor, I don't have a ton more

14   questions.  Okay?  I want to go back to, I believe it was

15   May 30th, and you were talking, and I believe you used the words

16   tug-of-war that was going on between protesters and law

17   enforcement officers.  Do you recall that line of questioning

18   from direct examination?

19   A    I do.

20   Q    Okay.  And so you had testified when I was asking you

21   questions before we took the break about when you walked down to

22   Confluence Park, you were, you know, at the Highlands Bridge,

23   you were on I-25, and the numbers of protesters were between 100

24   and 200.  Again, I don't need the exact number.  Had those

25   numbers swelled at the point of when you -- when this back and

20-cv-1878-RBJ   KELSEY TAYLOR - Cross   03-16-2022

1   forth was taking place?

2   A    Those are separate days.

3   Q    Okay.  Right.  I just want to know in terms of the overall

4   picture of the protest, there was a fair amount more people on

5   the 30th, I believe that was the 14th and Sherman date.  Do I

6   have that correct?

7   A    No.  The 14th and Sherman is the 28th.  And then Colfax and

8   Lincoln is the 30th.

9   Q    That's the one I'm thinking of.

10  A    Okay.

11  Q    Okay.  And I know, and I will tell you, I'm not great with

12  dates, and I apologize.  And, you know, I also looked at the --

13  that Platte area, and I see where there was some confusion about

14  the munitions and stuff.  And so there was some reference, so

15  I'm not good with my dates.

16  A    I'm not good with numbers of people, so --

17  Q    Okay.  Well, apparently I'm not good with my phone and

18  music either, so let's -- the 29th, then?

19  A    I was not present on the 29th.

20  Q    See?  All right.  The 30th.

21  A    Yes.  The 30th.

22  Q    Back and forth, the tug-of-war?

23  A    Yeah.

24  Q    How many people in your estimation were present at that

25  time?

Kevin P. Carlin, RMR, CRR

20-cv-1878-RBJ    KELSEY TAYLOR - Cross    03-16-2022

1  A     Yeah.  More people.

2  Q     Okay.  Significantly more, or -- I'm trying to get a gauge

3  in your personal opinion, how many more people?

4  A     I mean, what's challenging about this question for me is

5  that we're talking about like a march of people, and then people

6  concentrated in one intersection.  So, like, of course that

7  intersection feels like there's more people, but now that I'm

8  thinking about it, I don't actually know that, because it's such

9  a different set of circumstances.  In a march you're all spread

10 out, but in an intersection you're, like, very close together.

11 So, it could actually well have been the same number of people.

12 Q     So, when you -- when you testified on direct and you

13 received some of those -- the chemical agents that referred to,

14 or smoke, you were part of -- kind of in a big crowd; correct?

15 A     I was, yes.

16 Q     And you couldn't see being in that big crowd everything

17 else that was going on in that crowd; correct?

18 A     Correct.

19 Q     And you couldn't see, for example, I know you've been

20 through -- you've been here through a lot of testimony, you're

21 aware now that people would come up from behind, lob stuff at

22 officers, and then there was a response; correct?

23 A     I have seen -- I have seen that happen, but I've also seen

24 the police do things seemingly unprovoked, even when looking at

25 video.

20-cv-1878-RBJ    KELSEY TAYLOR - Cross    03-16-2022

1  Q    Seemingly unprovoked to your eye and what's captured in the

2  video, but again, you're not a trained law enforcement officer;

3  correct?

4  A    No.

5  Q    Okay.  And when you say no, that's --

6  A    You are -- you are correct.

7  Q    Okay.  Probably a bad question.  So, and you're not seeing

8  what law enforcement officers are seeing; correct?

9  A    No.  I am seeing the opposite of what they are seeing.

10  Q    The opposite of what they're seeing.  So, it's fair to say

11  that they're seeing things going on behind you that you can't

12  see; correct?

13  A    Yes.

14  Q    Okay.  And this back -- again to this idea, this

15  tug-of-war, so, as I understand it, something would happen,

16  officers would deploy some either OC, PepperBalls, something to

17  get the crowd to move back; correct?

18  A    Yes.

19  Q    They would disperse?

20  A    Yes.

21  Q    But then they would come back again; correct?

22  A    Yes.

23  Q    Okay.  And after they dispersed and were away, people were

24  going to the park, going up to the capitol, able to chant; is

25  that correct?

20-cv-1878-RBJ   KELSEY TAYLOR - Cross   03-16-2022

1  A    It wasn't that much of like a dispersal.  It wasn't like

2  people were leaving that immediate vicinity and then like, you

3  know, free to just go wherever else and do whatever else.

4  Something else that watching all this video has shown me is that

5  I was not present for a lot of -- like, I was present at the

6  specific situations that I was in during these protests, but

7  there was so much that went on where the police were.  So, it

8  wasn't like it was just like oh, now that I'm not right in this

9  specific area, now I'm free, and like safe to protest and have

10 my voice heard.

11 Q    Right.  And because there was so much more going on;

12 correct?  So much more that you weren't privy to; correct?

13 A    Sure.  Yes.

14 Q    For example, you've now heard testimony that you, I am

15 assuming weren't aware of, about what was going on at the

16 District 6 police department up on Colfax and Washington;

17 correct?

18 A    On which day?

19 Q    Any day.  Don't hold me to dates.

20 A    Just trying to be clear, because you'll try to catch me.

21 Yeah.  I was not present at the District 6, no.

22 Q    Okay.  And again, the point is that there's a lot more

23 going on here than even you were aware of; correct?

24 A    Right.  And I think that could be said for any officer as

25 well.

20-cv-1878-RBJ    KELSEY TAYLOR - Cross    03-16-2022

1  Q    Okay.  And so you weren't watching HALO cameras and all

2  that; correct?

3  A    I was not.

4  Q    Okay.  And after the crowd would disperse, go back to the

5  park, there was nothing preventing people from protesting in

6  there, having their voice heard in that park; correct?

7  A    I mean, we were in the park.  This whole area was engaged

8  in whatever was happening at this intersection.  It was just a

9  matter of like how willing were you to expose yourself to police

10 violence based on how close you were to the line of police.

11 Q    So, let me ask you some questions about that.  How willing

12 you were to expose yourself to police violence.  Okay.  That's

13 what you just testified to; correct?

14 A    Yes.

15 Q    Okay.  So, it's fair to say that the purpose of going back

16 to the police was to antagonize and engage the police to have

17 them do something to you as a protest group; isn't that correct?

18 A    Absolutely not.  I think it's clear by the video that we've

19 seen of myself standing in front of police with my arms in the

20 air, not doing anything, that there wasn't antagonistic

21 behavior.

22 Q    That's you individually in a group of a numerous amount of

23 people, number of people; correct?

24 A    Yes.

25 Q    Okay.  And again, we've established you don't know what

20-cv-1878-RBJ    KELSEY TAYLOR - Cross    03-16-2022

1   else was going on; correct?

2   A    Yes.

3   Q    Okay.  And there was no one or nothing forcing the

4   protesters back at law enforcement; correct?

5   A    I'm sorry?

6   Q    On the 30th, when you just testified to, there was nothing

7   forcing the group back to in this tug-of-war, that was

8   independent action on the part of the protest group, that peer

9   group that you talked about, they're going back and confronting

10  law enforcement; correct?  Yes or no.

11  A    They're going back, and again, delivering their message,

12  and in a large group of people, which is what a protest is, and

13  how your voice is heard.  We all know that singularly, as one

14  voice, you have a certain amount of reach, and then as a group

15  of people, you have a different amount of reach, and it is

16  important to be united and together in that message.

17         And that was what that was about.  It was about

18  standing with each other and not, you know, making sure that

19  because this injustice, this like murder of a Black man spoke to

20  each of us individually so strongly that we all decided to come

21  together and send our message together.  So, the point was stay

22  together.

23  Q    And the focus and anger of that was directed towards men

24  and women, Black, white, whatever color, who were wearing police

25  uniforms; isn't that correct?

1  A    I mean, the challenging thing about this protest was that

2  you -- we were standing directly in front of the people we were

3  protesting.  That was really, you know, it's not -- it wasn't

4  simple.  It wasn't easy to stand there and say, hey, like, I

5  don't -- I don't agree with the way this system works to the

6  people who carry out that system.  That was scary and often

7  confusing, and it did make it seem like this, you know, this

8  singled out, like, you know, like you're saying, this individual

9  officer thing, but it wasn't about that.

10        It was about saying, like, this system doesn't --

11  doesn't protect the people.  And we are the people standing in

12  front of you, asking to be protected, and asking you to do

13  something, whether it's -- whether you're an officer and you --

14  you know, there were parts of the protest where like protesters

15  were like, hey, like, you want to take off the uniform and come

16  join us?  Like, happily.  We will have you.  Like, if you don't

17  agree with the things that, you know, you've -- as a police

18  officer, if you don't agree with the things that you're asked to

19  do or told to do, like, we will happily also accept you into

20  this struggle of trying to change.

21        So that, you know, all these officers can do what they

22  say they had become a police officer to do, which is to protect

23  people, and to incite change and to make society safer.  Like,

24  that is also what we want.  So, to deliver that message, that

25  like nuanced kind of complicated message in front of people with

20-cv-1878-RBJ    KELSEY TAYLOR - Cross    03-16-2022

1    weapons, like, that was a challenge that, you know, talk about

2    not being prepared.  Like, I don't know how we would have

3    prepared for that.

4    Q    And so the answer to my question was what?

5    A    I don't remember what your question was.

6    Q    Okay.  I don't either.

7    A    Okay.

8              THE COURT:  Maybe it's time to call it a day.

9    Q.     (By Mr. Weiner) So, Ms. Taylor, in terms of your overall

10   impression with the police, who -- I'm going to go back to

11   coffee.  It's tired and late in the day.

12   A    Let's do it.

13   Q    You indicate that you got rid of that brand, that

14   particular brand, All Cops Are Bastards.  But you also have a

15   tattoo, don't you?

16   A    I do.

17   Q    Okay.

18   A    A recently touched-up tattoo.  Would you like to see it?

19   Q    That's okay.

20   A    It's very accessible.

21   Q    But you had a tattoo with All Cops Are Bastards

22   contemporaneous to this, did you not?

23   A    I did.

24   Q    Yes or no.

25   A    I did, and recently, Breezy Sanchez, the aforementioned

20-cv-1878-RBJ     KELSEY TAYLOR - Redirect     03-16-2022

1    friend and business partner, I asked her to touch up that tattoo

2    and to change it, because I actually feel like, you know, in the

3    process of trying to understand -- trying to understand the

4    systems that we live with and under, it's easy to be -- it's

5    easy to be reactionary.  It's easy to latch on to phrases or,

6    you know, things that feel good in the moment and kind of are

7    grounding or make you feel vindicated in some way.

8         But as I'm growing in my understanding of the world and

9    my understanding of people, I asked my friend to touch up that

10   tattoo and to cover it up, because I actually think it lacks --

11   I think it lacks empathy.  I think it lacks understanding for

12   the way that some people get funneled into being a police

13   officer or, you know, decide to become a police officer, and

14   that there might actually be good intentions behind that.

15        But once they enter into a system that is actually not

16   designed to do what all of these people aspire to do, which is

17   to protect society and make it a safe place, things change.  And

18   so I think that, you know, All Cops Are Bastards, or ACAB as a

19   slogan lacks the nuance and -- basically lacks the nuance to

20   communicate, so I actually no longer have that tattoo.

21             MR. WEINER:  No further questions, Your Honor.

22             THE COURT:  Okay.  Redirect?

23                      **REDIRECT EXAMINATION**

24   BY MS. WANG

25   Q    Mr. Weiner asked you about when you had the ACAB -- or he

20-cv-1878-RBJ    KELSEY TAYLOR - Redirect    03-16-2022

1   didn't ask you when you had the ACAB.  When did you have that

2   ACAB blend which you no longer have?

3   A    That would have started later in the summer of 2020.  I

4   don't know that I can recall exactly when, but after -- after

5   the nights of May 29th through June 2nd.

6         MS. WANG:  Now, Mr. Weiner stated earlier that you had

7   not testified at your deposition or stated in your interrogatory

8   responses that you had been impacted with chemical irritants at

9   16th and Platte.  So, I would like to display your interrogatory

10  response.  May we display her interrogatory responses?

11        THE COURT:  Sure.

12  Q.    (By Ms. Wang) Okay.  So, let me just go up to the top.

13  These are your interrogatory responses, responses to a set of

14  written questions from the City and County of Denver; right?

15  A    Yes.

16  Q    So, here we are.  It's right in front of me.  Page three,

17  you state here when you're asked what the constitutional

18  violations included, May 28th, 2020, around Platte and the

19  pedestrian bridge near Confluence Park, protesters stood there.

20  Taylor heard one Doe defendant officer say something to the

21  effect of, quote, if anyone moves, light them up.  The officers

22  began shooting PepperBalls at the protesters without warning or

23  any orders.  Plaintiff was peacefully protesting at the time.

24  Plaintiff inhaled chemical irritants.  Do you see that?

25  A    I do.

20-cv-1878-RBJ    KELSEY TAYLOR - Redirect    03-16-2022

1    Q    And that's what you testified to here today; right?

2    A    That is.

3              MS. WANG:  Okay.  I'd like to display Ms. Taylor's

4    deposition transcript.  Your Honor, may I display that?

5              THE COURT:  Yes.

6    Q.   (By Ms. Wang) So, you gave a deposition, which is a

7    statement where you're asked questions and you give answers

8    under oath; right?

9    A    Yes.

10   Q    Okay.  And here, you were asked about your experience at

11   the 15th Street -- it says 15th Street there, but basically 16th

12   and Platte is what they're asking you about there; right?

13   A    Yes.

14   Q    And here you were asked, and my understanding is that you

15   inhaled chemical irritants at some point in time while you were

16   in this area; is that correct?

17             Answer, that is correct.

18   A    Yes.

19   Q    Okay.  And just in case there's any doubt, let's take a

20   look at page 75.  Now, on this page, Ms. Hoffman asks you, I

21   just have one follow-up question to that.  Ms. Taylor, regarding

22   when you were in the Confluence Park slash Platte River area on

23   September 28th -- she meant May 28th, I'm pretty certain -- it's

24   your testimony that there may be irritants in the air from

25   PepperBalls.  Can you describe what if anything you felt as a

1    result of those irritants being in the air?

2            Answer, yes.  And then you described it; right?

3    A    Yes.

4    Q    Okay.  So, when Mr. Weiner suggested that you had not

5    testified to these things previously, that was not true; right?

6    A    That was not true.

7    Q    Now, Mr. Weiner asked you a little bit about the prior

8    protests relating to Ferguson that you attended in Denver

9    several years ago?

10   A    Yes.

11   Q    Okay.  What was the difference -- we've heard your

12   testimony about the difference in the police response then and

13   at these protests.  What was the difference in the message of

14   the protesters between that protest and these protests at issue

15   here?

16   A    Yeah.  The message for like during the Ferguson protests

17   was more centered around like -- you know, both protests were

18   sparked by the murder of a man, and the Ferguson protests

19   centered around more of like a Black Lives Matter messaging.

20   And I think the George Floyd protest grew into more of a protest

21   about police brutality, which presented the contradictions that

22   I mentioned earlier.

23   Q    When you were shot with PepperBalls on May 30th, were you

24   doing anything other than peaceful protest?

25   A    No.

20-cv-1878-RBJ    KELSEY TAYLOR – Redirect    03-16-2022

1  Q    Do you believe that the First amendment protects the right

2  of everyone to peacefully express their views regardless of the

3  content of their beliefs?

4  A    I do.

5            MS. WANG:  I have no further questions.

6            THE COURTROOM DEPUTY:  Sorry.  The Judge usually asks.

7            THE COURT:  How about you, ladies and gentlemen?

8  Okay.  Good.

9        (The court reporter restarted the realtime feed.)

10           THE COURT:  They conferred about question 31, and

11 there are no objections.  I'm going to read it now.  Question

12 from the jury.  Your business is ensured, since it's a rental

13 space.  Would it make sense that all the shops on the 16th

14 Street Mall would be too?

15           THE WITNESS:  Yes.  Absolutely.  It's a stipulation in

16 our lease, and I imagine it's the same for a lot of small

17 business owners.

18           THE COURT:  Any other questions from the jurors?  Any

19 follow-up questions from you, Ms. Wang?

20           MS. WANG:  No, Judge.

21           THE COURT:  And how about Mr. Weiner?

22           MR. WEINER:  No, Your Honor.

23           THE COURT:  All right.  Thank you, Ms. Taylor.  Next?

24           MS. STERK:  The plaintiffs call Ashlee Wedgeworth.

25           THE COURT:  Okay.

20-cv-1878-RBJ   ASHLEE WEDGEWORTH - Direct   03-16-2022

1    (The Witness is Sworn)

2        THE COURT:  Thank you.

3                    **DIRECT EXAMINATION**

4  BY MS. STERK

5  Q    Good afternoon, Ms. Wedgeworth.  Can you please state your

6  name for the record.

7  A    My name is Ashlee Wedgeworth.

8  Q    Where do you live?

9  A    I live in the Denver metro area.

10 Q    And for how long have you lived in this area?

11 A    My entire life.

12 Q    Are you married?

13 A    I am.

14 Q    And do you have children?

15 A    I have four children.

16 Q    How old are they?

17 A    Sixteen, ten, seven, and five.

18 Q    Are you a little nervous speaking in front of people?

19 A    Yes.

20 Q    We'll try to get through this quickly.  Can you tell the

21 jury a little bit about your education after high school.

22 A    I have a bachelor's in psychology from the University of

23 Colorado at Denver, and a master's in social work from the

24 University of Denver.

25 Q    Where do you work currently?

20-cv-1878-RBJ    ASHLEE WEDGEWORTH - Direct    03-16-2022

1    A    I currently work for city council, District Nine, under

2    Councilwoman Candi CdeBaca.

3    Q    And what do you do for the city council?

4    A    I am a community engagement co-lead.  Essentially I work

5    with the community and the registered neighborhood organizations

6    on any issues of concern.

7    Q    And what were you doing for work before that?

8    A    Prior to that, my entire career has been in the behavioral

9    healthcare field, working with clients who struggle with mental

10   health and substance use concerns.  I worked at Arapahoe House

11   for ten years, Jefferson Center for Mental Health, and then Mile

12   High Behavioral Healthcare prior to working for the City.

13   Q    And outside of your job, what activities are you involved

14   in?

15   A    Yes.  I sit on several boards and committees.  I'm the

16   president of Urban League Young Professionals, which is a

17   networking group here in the Denver Metro area, but it's also

18   recognized nationally.  I'm on other boards, and I'm also a

19   mentor for young girls.

20   Q    And you're a plaintiff in this case?

21   A    Yes.

22   Q    I want to go through your experiences at the George Floyd

23   protests in Denver.  You attended the protests every day from

24   May 28th to June 2nd, 2020; is that right?

25   A    Yes.

20-cv-1878-RBJ    ASHLEE WEDGEWORTH - Direct    03-16-2022

1   Q     And at any time during the protests, were you shot at or

2   tear gassed by police?

3   A     Yes.

4   Q     Did that happen every day?

5   A     Every day.

6   Q     While attending the protest, did you engage in any

7   violence?

8   A     No.

9   Q     Did you throw anything at police?

10  A     No.

11  Q     Did you damage any property?

12  A     I did not.

13  Q     Engage in any vandalism?

14  A     I did not.

15  Q     And did any of the people you attended the protest with do

16  any of those things?

17  A     No.

18  Q     So, I want to start with day two of the protest, May 29th.

19  You went to the protest during the day that day; is that right?

20  A     Yes.

21  Q     And then you left and came back at around 9:00 p.m.?

22  A     Correct.

23  Q     And when you arrived at the protest at night on May 29th,

24  you were with your friend Skye and cousin Taylor?

25  A     Yes.

20-cv-1878-RBJ    ASHLEE WEDGEWORTH - Direct    03-16-2022

1    Q    At around midnight, did the Denver Police shoot PepperBalls

2    at you?

3    A    Yes.

4    Q    Where were you when that happened?

5    A    I was on the street of Colfax and Grant, near the

6    bookstore.

7    Q    And leading up to getting shot at by the police, what

8    happened?

9    A    We had first attempted to go down near the capitol, but the

10   pepper spray and tear gas was so thick in the air that the

11   closer you got to the capitol, it was very difficult to breathe,

12   so we were on Colfax and Grant when a police car sped down the

13   street heading south.  And then people on the opposite side of

14   the street began throwing objects towards the police car.

15   Q    Did they hit the police car?

16   A    No.

17   Q    Do you know what they were throwing?

18   A    Rocks, bottles.  I'm not quite sure.

19   Q    And were you with those people who were throwing anything?

20   A    I was not.

21   Q    What happened after that police car drove by?

22   A    So, the police car sped down the street, and immediately

23   after that, went -- when people were throwing things towards the

24   police car, there was a group of officers hanging in the parking

25   lot on Grant Street, and they just began randomly shooting

Kevin P. Carlin, RMR, CRR

20-cv-1878-RBJ    ASHLEE WEDGEWORTH - Direct    03-16-2022

1  towards our direction what appeared to be PepperBalls or rubber

2  bullets, and we immediately began to run.

3  Q    Before they started shooting PepperBalls, did they say

4  anything or warn you that they were going to start shooting?

5  A    No.

6  Q    And when the police were shooting, what direction did

7  they -- were they shooting at?

8  A    It was towards our direction, but it was random.  It did

9  not appear to be in the direction of the people who had thrown

10 the stuff toward -- towards the car.  It just -- it was random.

11 Q    So, based on what you saw, it didn't appear that they were

12 actually trying to just hit the people who had thrown the --

13 whatever they had thrown?

14 A    It appeared that they were trying to hit anyone in the

15 crowd.

16 Q    And after the police started shooting at you, what did you

17 do?

18 A    We ran across the street.  My friend had been shot on her

19 body, and began to form some welts.  We stopped at another lot

20 just to collect our breath.  We had inhaled tear gas, so we

21 struggled -- I struggled with breathing, watery eyes, chest,

22 lungs burning, disorientation.  So, we stopped to collect

23 ourselves and figure out how we were going to get to our car to

24 leave.

25 Q    And you said your friend was hit.  Where was your friend

20-cv-1878-RBJ   ASHLEE WEDGEWORTH - Direct   03-16-2022

1  hit on her body?

2  A   In her butt and back.

3  Q   So, the police were shooting at you as you ran away?

4  A   Correct.

5  Q   What was your reaction when this happened?

6  A   Well, I was extremely scared.  I didn't know, you know,

7  what we were being shot at with.  So, it was a terrifying

8  moment, and then on top of that, you know, all the tear gas in

9  the air, plus what was just shot towards us, I had a hard time

10 breathing.  Lots of chest pain, watery eyes.  So, it was a very

11 terrifying moment.

12 Q   And after you ran away and collected yourself, were you

13 able to help your friend Skye to her car?

14 A   Yes.  It took a while, because officers, you know, were on

15 the streets, and we didn't want to walk past them for fear of

16 being shot again or anything else happening.  But we were able

17 to get her to the car.

18 Q   And once you got Skye to her car, did you and your cousin

19 stay for a little bit longer at the protest?

20 A   We did, just because we had parked in an opposite

21 direction, and it took us a while to get to our car.

22 Q   So, I want to skip ahead to your experience on the fourth

23 day of the protest, May 31st.  You again went to the protest

24 that evening; is that right?

25 A   Correct.

20-cv-1878-RBJ    ASHLEE WEDGEWORTH - Direct    03-16-2022

1    Q    And you arrived that evening towards the protest around

2    9:20 or 9:30 p.m.?

3    A    Correct.

4    Q    Where on May 31st did you arrive to the protest in the

5    evening?

6    A    Around Colfax and Lincoln near the capitol.

7    Q    And at some point during that evening, did you go to Colfax

8    and Ogden?

9    A    Yes.  Actually, yes.  That night, we arrived to Colfax and

10   Ogden because the plan was to protest down to the capitol.

11   Q    And were you able to get down to the capitol after you

12   arrived?

13   A    We were not.

14        MS. STERK:  And can we pull up a map.  It's -- we will

15   mark it as 1263.  It's just a little bit bigger of a map than

16   our last one.  And I move to admit 1263.

17        MR. WEINER:  No objection.  I think it's just a little

18   bit expanded.  That's fine.

19        THE COURT:  It's pretty much the same one we've seen.

20        MS. STERK:  Exactly.  It just goes a little bit

21   further east.

22        THE COURT:  Admitted.

23   Q.   (By Ms. Sterk) Ms. Wedgeworth, is Colfax and Ogden right

24   in this area?

25   A    Yes.

20-cv-1878-RBJ    ASHLEE WEDGEWORTH - Direct    03-16-2022

1  Q    And so that's where you first started out on the night of

2  May 31st?

3  A    Correct.

4  Q    What happened after you arrived in that location?

5  A    We arrived.  We parked.  We noticed that, you know, the

6  crowd was just hanging in that area.  People were standing

7  around, holding signs, chanting.  We attempted to walk to the

8  front of the group when we noticed a barricade of police

9  blocking the street on Colfax and Emerson.

10  Q    And what happened after that?

11  A    We continued to, you know, stand in the area, you know,

12  chanting to police to let us through.  People were holding

13  signs, shouting out some of the normal protest chants.  And we

14  sort of were stuck in the area and could not move past.

15          MS. STERK:  Okay.  I'm going to mark Exhibit 545,

16  which is HALO footage at Colfax and Ogden on May 31st at

17  9:26 p.m.

18          THE COURT:  All right.  Any objection to 545?

19          MR. WEINER:  No objection.

20          MS. STERK:  I move to admit 545.

21          THE COURT:  All right.  It's admitted.

22  Q.    (By Ms. Sterk) Ms. Wedgeworth, do you recognize the

23  intersection shown in Exhibit 545?

24  A    Yes.

25  Q    And where is this?

20-cv-1878-RBJ   ASHLEE WEDGEWORTH - Direct   03-16-2022

1   A    It's Colfax and Emerson.

2   Q    And is this around the area that you were the night of

3   May 31st?

4   A    Correct.

5   Q    Can we play this.

6        (A video was played.)

7   Q    Can you stop the video for a second.  Ms. Wedgeworth, is

8   this you and your friend Skye on the right-hand side of the

9   video?

10  A    Yes.

11  Q    We can keep playing, please.  And where are you walking to

12  in this video?

13  A    We're walking down Colfax towards the -- essentially the

14  front of the protest.

15       (A video was played.)

16       MS. STERK:  You can stop it.  Now I want to turn to

17  Exhibit 712, which is body-worn camera footage of Sergeant

18  Lombardi on May 31st at 9:23 p.m.

19       MR. WEINER:  It's not admitted.  We would have no

20  objection.

21       THE COURT:  All right.  It's admitted.

22  Q.    (By Ms. Sterk) Now, before we start the video,

23  Ms. Wedgeworth, do you recognize the location here?

24  A    Yes.  That is Colfax and Emerson.

25  Q    And is this a sign for Wendy's that was on that

20-cv-1878-RBJ    ASHLEE WEDGEWORTH - Direct    03-16-2022

1    intersection?

2    A    Yes.

3    Q    We can play the video, please.

4         (A video was played.)

5    Q    Ms. Wedgeworth, did you hear the officer in that video say,

6    we're going to pinch them, we're going to let them have it, and

7    then we will arrest as many as we can?

8    A    Yes.

9    Q    And about how far were the protesters from the police that

10   you recall at this point in time?

11   A    I know that there was a line of protesters that were facing

12   the police.  They may have been about 10 to 15 feet apart, and

13   then just the bigger group standing behind them.

14   Q    And I'm going to show you another video from the same

15   body-worn camera, just I think less than two minutes later.  So,

16   this is again Exhibit 712.  And the time is 9:28 on May 31st.

17        (A video was played.)

18   Q    Sorry.  I put up the wrong video first.  I apologize.

19        (A video was played.)

20   Q    Stop it for one second.  So, this is, again, a body-worn

21   camera of Sergeant Lombardi, and this is 9:25 on May 31st.  Go

22   ahead.

23        (A video was played.)

24   Q    Can you stop there for a second.  Did you hear the officer

25   say something about sneaking up on them?

20-cv-1878-RBJ    ASHLEE WEDGEWORTH - Direct    03-16-2022

1  A    Yes.

2  Q    You can return to the video.

3       (A video was played.)

4  Q    Ms. Wedgeworth, did you hear the officer in that video say

5  we're going to get ahead of this, they're going to flank them

6  from the alley side too, so we get them from the street and the

7  alley?

8  A    Yes.

9  Q    And that video, Exhibit 712 that we just watched, again,

10 that was the same location that you were in on May 31st?

11 A    Yes.

12 Q    And I'm going to show you one last video from the same

13 body-worn camera.  Again, only a couple minutes later.  And this

14 one is at 9:28 on May 31st.

15      (A video was played.)

16 Q    Ms. Wedgeworth, can you describe your experience of what

17 was happening in this video.

18 A    So, the video is showing how within -- without reason,

19 warning, or announcement, officers just began bombing the crowd

20 with tear gas, flash-bangs, projectiles, into the crowd.

21 Protesters were standing around.  They were just chanting,

22 attempting to march down the street.  There was no violence,

23 nothing happening in the crowd to warrant such a reaction, and

24 the entire crowd was tear gassed and began running in all

25 directions.

20-cv-1878-RBJ    ASHLEE WEDGEWORTH - Direct    03-16-2022

1    And again, I was tear gassed.  I was not able to see.

2    I was not able to breathe.  I was disoriented, falling down from

3    running blindly from the tear gas, experienced chest pain,

4    watery eyes, burning in my throat and lungs.

5        MS. STERK:  And I'm going to show you one more video

6    from this event.  I'm going to mark Exhibit 45, which is

7    overhead footage from Channel Nine News.  I would move this into

8    evidence.

9        MR. WEINER:  As long as there's no sound, it's just a

10   video, we're fine with that.

11       MS. STERK:  There is no sound, Your Honor.

12       THE COURT:  It's admitted.

13   Q.    (By Ms. Sterk) And before we start playing the video, do

14   you see the Wendy's sign here?

15   A    Yes.

16   Q    And so can you tell us what the intersection is?

17   A    It says Colfax and Emerson.

18   Q    And is this the police line that you were talking about in

19   your testimony?

20   A    Yes.

21   Q    And can you mark on this video about where you were at this

22   time.

23   A    Should I use my --

24   Q    There should be a little pen.

25       THE COURTROOM DEPUTY:  There's a stylus right on the

Kevin P. Carlin, RMR, CRR

20-cv-1878-RBJ    ASHLEE WEDGEWORTH - Direct    03-16-2022

1  monitor, on the right.

2        THE WITNESS:  Oh.  I was probably around this area in

3  the crowd.

4        MS. STERK:  You can play the video, please.

5     (A video was played.)

6  Q.    (By Ms. Sterk) Ms. Wedgeworth, after the police started

7  throwing tear gas and flash bombs in those locations, what did

8  you do?

9  A    We began running in the opposite direction towards the car,

10  which was parked right on Colfax and Ogden in a parking lot.  We

11  were able to get to the car, and we were unable to drive off,

12  just because of the crowd of people, and also the -- because of

13  the effects of the tear gas.  Even with the windows, you know,

14  rolled up in the car, we were still feeling the effects of the

15  tear gas.

16        The smell was really strong, despite wearing masks.  We

17  were inhaling it, breathing it.  My throat was hurting.  My eyes

18  were watering.  I was trying to use water to get the tear gas

19  out of my eyes, again, experiencing chest pain, and inability to

20  breathe.  So, we sat in the car for a while.

21  Q    So, I know that you said that you had been to the protest

22  every night from the -- May 28th through June 2nd, and I'm not

23  going to go through every event, but you said you were tear

24  gassed on each of those nights?

25  A    Every single night, yes.

20-cv-1878-RBJ     ASHLEE WEDGEWORTH - Direct     03-16-2022

1   Q     And did you have the same effects every night after being

2   tear gassed?

3   A     Yes.

4   Q     Did there come a time when you learned that there was some

5   graffiti and damage to buildings in the 16th Street Mall area of

6   Denver?

7   A     Yes.  During the day, I noticed, you know, graffiti on

8   buildings.  There were lots of buildings that were boarded up,

9   and which I assume was to prevent windows from being broken.

10  Q     And did you hear reports about things like that on the

11  news?

12  A     Yes.  I was hearing different reports about things being

13  destroyed, not only locally, but nationally.

14  Q     And do you make -- or at the time, did you make a

15  distinction between people who were in Denver to protest versus

16  people who were, you know, rioting or trying to cause damage?

17  A     Yes.  There was definitely people who were not there to be

18  supportive of the cause, and, you know, were only there to

19  agitate or cause harm.

20  Q     And from your experience at the protests, when you were

21  actually in groups of protesters, were there the people who, you

22  know, you heard about causing damage within that group that you

23  saw?

24  A     There was only two incidents in which I witnessed this

25  happening, but for the most part, the people that were there

Kevin P. Carlin, RMR, CRR

20-cv-1878-RBJ   ASHLEE WEDGEWORTH - Direct   03-16-2022

1  were there to protest, and I didn't witness anything outside of

2  that.

3  Q    And one of the incidents that you're talking about, was it

4  somebody just knocking over a trash can?

5  A    Yes.  There was a night where, you know, someone knocked

6  over a trash can out of anger, but the group, you know, picked

7  up the trash can, picked up the trash, let the person know, you

8  know, this is not what we're here for, and that person left.

9  Q    And the other event you're talking about was on the 16th

10  Street Mall, not by the capitol; right?

11  A    Correct.  There was a time when I was driving home, and I

12  cannot recall the street, but the 16th Street Mall 7-Eleven, I

13  saw that a window was broken.  There was officers outside that

14  had some people handcuffed.  It looked like a group of kids.

15  They were addressing that situation, and it was nowhere near

16  where we were protesting.

17  Q    In the video we watched at Colfax and Ogden, did you

18  witness anyone in the crowd being violent?

19  A    No.

20  Q    And did you witness that crowd rioting, or were they

21  protesting?

22  A    They were protesting.

23  Q    So, I want to talk a little bit about the curfew.  You're

24  aware that the curfew went into effect on day three of the

25  protests?

20-cv-1878-RBJ    ASHLEE WEDGEWORTH - Direct    03-16-2022

1   A     Correct.

2   Q     And did you hear announcements about the curfew?

3   A     There were -- there was a time when I was down there, and

4   the closer you were to the capitol, you would hear the

5   announcement on an intercom.

6   Q     Did you ever hear a curfew announcement that said police

7   would deploy chemical weapons on anyone that didn't go home?

8   A     No.  It was just a general announcement about the curfew,

9   and there was no warning of what would happen if you were out

10  beyond curfew.

11  Q     What was your reaction to the curfew?

12  A     I mean, we knew -- I knew it was in effect.  However, I

13  knew that there was not reason for the curfew, and that it was

14  another way to oppress and prevent people from protesting, you

15  know, so I disregarded the curfew.  Again, as that was the

16  purpose, to be disruptive and challenge the system, and, you

17  know, be heard.

18  Q     And on the second day of the protest, when you and Skye,

19  your friend Skye were shot at, there was no curfew in effect at

20  that time; right?

21  A     I don't believe so.

22  Q     You talked about some of the physical effects you suffered

23  from the PepperBalls and the tear gas.  What other effects have

24  your experiences at the George Floyd protest had on you?

25  A     I would -- I would definitely say that I'm more cautious

1   when protesting.  You know, always have to have an exit plan,

2   you know, a plan for safety, a strategy, you know, to leave in

3   case something happens.  I would say, you know, I'm more fearful

4   just being in the presence of officers.  I suffered a lot of

5   insomnia after that, difficulty sleeping, and just general

6   anxiety.

7   Q    And why did you decide to be a plaintiff in this lawsuit?

8   A    It was important to me, because of everything that I

9   endured while protesting.  It wasn't called for.  It was

10  unwarranted.  I was never doing anything wrong, except for

11  exercising my right to protest, and the attack and violence on

12  behalf of the police was uncalled for, and they need to be held

13  accountable, and we need to -- and what we experienced needs to

14  be highlighted.

15           MS. STERK:  No further questions.

16           THE COURT:  All right.  Cross examination?

17           MR. WEINER:  Thank you, Your Honor.

18                      **CROSS EXAMINATION**

19  BY MR. WEINER

20  Q    Good afternoon, Ms. Wedgeworth.

21  A    Hello.

22  Q    It sounds like when you were -- began your testimony, it

23  sounds like you've given a lot back to the community.  It sounds

24  like you've -- involved in a number of different aspects of

25  trying to make our community better; is that correct?

20-cv-1878-RBJ   ASHLEE WEDGEWORTH - Cross   03-16-2022

1  A    Correct.

2  Q    Okay.  And it sounds like it's something that you hold very

3  near and dear to your heart, is the community in the City of

4  Denver.  You were born and raised here; correct?

5  A    Yes.

6  Q    Okay.  Is it fair to say that probably nothing, even the

7  gas, hurt you more than to see what happened to the city of

8  Denver back in May and June of 2020?

9  A    Can you repeat that?

10  Q    I mean, the destruction, the violence that you witnessed

11  and you've talked about, is it fair to say that -- I mean,

12  that's gotta be painful to you as well?

13  A    Yes.  The violence experienced on behalf of police was

14  extremely painful.

15  Q    Okay.  And certainly, you as a citizen and particularly

16  someone who has dedicated, sounds like, a large part of your

17  life to making the community -- and community involvement, that

18  the destruction, you talked about the 16th Street Mall, the

19  destruction of property of other people who give back to this

20  community as well certainly was something that had to have upset

21  you, didn't it?

22  A    To see the destruction of property is definitely upsetting,

23  but I would not put the value of property or a broken window

24  above the loss of life, which is exactly what we were

25  protesting.

Kevin P. Carlin, RMR, CRR

20-cv-1878-RBJ    ASHLEE WEDGEWORTH - Cross    03-16-2022

1    Q    Correct.  That would be George Floyd and his loss of life;

2    correct?

3    A    Correct.

4    Q    Okay.  And, you know, certainly life is important, the life

5    of protesters as well as the life of police officers; correct?

6    A    Correct.

7    Q    Just because somebody puts on a uniform, man or woman,

8    doesn't mean that they're immune or somehow they don't feel

9    pain; correct?

10   A    Correct.  Every human experiences pain.

11   Q    And police officers should be respected, and their value of

12   their life should be respected along with everyone else, and I'm

13   not, you know, speaking about George Floyd, but I'm just

14   speaking generally.  Would you agree with that?

15   A    Yes.  All people should be respected.

16   Q    And you had testified on direct examination that you

17   personally did not do anything in terms of destructive activity

18   during the period of time that you were at the protests;

19   correct?

20   A    Correct.

21   Q    And you didn't throw bottles?

22   A    I did not.

23   Q    You didn't have a lacrosse stick throwing rocks and golf

24   balls at police officers or anyone else; correct?

25   A    I did not, and I never witnessed that.

20-cv-1878-RBJ   ASHLEE WEDGEWORTH - Cross   03-16-2022

1    Q    Okay.  And you certainly then didn't throw any Molotov

2    cocktails at law enforcement officers or anything like that?

3    A    I did not.

4    Q    You were there to get your voice out and to protest what

5    happened not only to George Floyd, but social injustice in

6    general; correct?

7    A    Correct.

8    Q    Okay.  And part of that message you would agree was -- for

9    lack of a better phrase, was hijacked by some agitators in the

10   crowd; correct?

11   A    Yes.  There were reports of that, but I only witnessed the

12   two incidents that I described before.

13   Q    Okay.  And in fact, at one point, you know, referred to you

14   were kind of upset that people were kind of lumping some of the

15   activity that was going on with Black Lives Matters [sic], and

16   were kind of mixing the two, and you didn't want to be

17   associated with the violence and the destruction that was going

18   on; correct?

19   A    Correct.

20   Q    And you would agree with me that a lot of that destruction

21   and violence came after the sun went down; correct?

22   A    Again, there was only two incidents that I witnessed, which

23   were in fact during the night.

24   Q    Okay.

25   A    So --

20-cv-1878-RBJ    ASHLEE WEDGEWORTH - Cross    03-16-2022

1   Q    And you would agree that in your words that what you saw

2   and what was taking place -- and I'm just going to lump that

3   entire period of time, if you don't mind, so we can get out of

4   here, the entire period of time that there was rioting going on;

5   correct?  Rioting?

6   A    I did not witness any rioting.

7   Q    Okay.  And on your social media account, I believe, it was

8   your Twitter account, on May 30th, you posted, Black Lives

9   Matter, Black people have nothing to do with what takes place at

10  night.  Do you recall that?

11  A    I do.

12  Q    And then do you recall also following up with that, the

13  protests began about noon today, and it's happening.  The riot

14  is at night.  Make sure you address them accordingly when

15  discussing it.  Don't get it confused.  My understanding of that

16  is, again, that's back to the point, you were upset because your

17  movement, what was near and dear to you, was kind of, again,

18  being hijacked by some of this riotous activity that was taking

19  place at night; correct?

20  A    Yeah.  So, that tweet was one of a series of tweets, and

21  sort of explaining the thought process of people accusing the

22  movement, the Black Lives Matter movement or even Black people

23  per se of being just protesting and breaking things and causing

24  violence, which was not occurring.  And also, in terms of, you

25  know, speaking of a riot, that that was to explain the

20-cv-1878-RBJ   ASHLEE WEDGEWORTH - Cross   03-16-2022

1   difference that I was experiencing and what was happening during

2   the day, and what was happening during the night in terms of the

3   feeling of the entire environment.

4   Q    So, what you were trying to do is compare the actual

5   rioting activity to what you were personally observing?

6   A    Not -- yes.  What I was observing, and the feel of the

7   entire environment.  During the day, you know, things were

8   organized, officers engaged with the crowd, were passing out

9   water.  There were speakers and different activities.  Whereas

10  at night, there were marches and chanting and some speakers, but

11  it did not mirror what was taking place during the day.  And the

12  environment and experience with the officers was way more

13  hostile at night.

14  Q    Okay.  And do you know what started that hostility at

15  night?  In other words, it's kind of a chicken or the egg;

16  right?  I mean, was it, to your knowledge, personal knowledge,

17  the violence towards police officers that caused the response?

18  A    There was never any violence towards police officers that I

19  witnessed.  And as I've stated before, and in all of the footage

20  and photos that I've submitted, a lot of the violence on behalf

21  of the officers came without warning, was for no reason, and was

22  used as an attempt to just clear the crowd and oppress our right

23  to protest.

24  Q    Well, in fact, you did provide a reason for at least one of

25  the occasions where you were, quote/unquote, shot at by police.

1 And I believe again on May 30th, you indicated, we got shot at

2 by police for standing there because white people threw rocks at

3 the police.

4 A     Yeah.

5 Q     Okay.  So, in fact, you did have a reason, and you did know

6 why you were being -- first of all, you don't know whether they

7 were actually targeting you or the white people that were

8 throwing rocks at police.  And so in fact, you did have a

9 reason.  You did know of a reason why law enforcement were

10 reacting, and that was because white people threw rocks at

11 police; is that correct?

12 A     Absolutely not.  White people threw objects, rocks, or

13 bottles in the direction of a police car, and I don't think that

14 the response to that would be unleashing chemical weapons on an

15 entire crowd when you're not even sure who the person is that

16 was throwing things.

17 Q     Do you remember, again on the 30th of May, also writing on

18 your social media account, same account, now, come nighttime,

19 it's a riot, and you all can blame Black people all you want,

20 but it's the white folks down there tearing shit up,

21 provocateurs, supremacists, people not even really for the

22 cause.  White people, you hear me, but we are the thugs,

23 question mark?

24 A     Yeah.  Absolutely.

25 Q     Do you recall -- I'm sorry.  Do you recall making --

20-cv-1878-RBJ    ASHLEE WEDGEWORTH - Cross    03-16-2022

1    posting that statement?

2    A    Yes.

3    Q    Okay.  And then you continue on, we went to protest at

4    2:00 p.m. yesterday.  It was peaceful.  There were speeches.  It

5    was organized.  Leaders spoke.  Do you recall making that

6    statement?

7    A    Yes.

8    Q    Okay.  And so that's at 2:00 p.m., and so that's during the

9    daytime.  And your voice was able to be heard.  We had speakers

10   protesting, expressing their feelings, and allowed to express

11   themselves; correct?

12   A    Correct.

13   Q    There was no interference at that point from the police

14   department, was there?

15   A    No.

16   Q    Okay.  There was no PepperBall or gas being deployed when

17   people were speaking and actually expressing the views that you

18   have; correct?

19   A    That's true.

20   Q    You also posted on June 2nd -- do you recall posting this,

21   ma'am?  Also, as we're running up 13th, a few white boys yelled,

22   let's -- and this is in quote, let's tear shit up, end quote.

23   We definitely shut that down.  Everyone isn't down there to

24   riot.  White people definitely are, though.  Do you recall

25   making that statement?

20-cv-1878-RBJ   ASHLEE WEDGEWORTH - Cross   03-16-2022

1   A    Yes.  I absolutely did.  And again, I made a series of

2   tweets, and also had some arguments with Twitter trolls who were

3   again blaming the Black Lives Matter movement, labeling Black

4   people as thugs, when in my experience, here are white people

5   down here wanting to cause chaos and tension and whatever it is

6   that may be.  And again, we shut it down.  We didn't allow that.

7   That's not what we were here for.

8   Q    Because you were there to get your peaceful voice out?

9   A    Yes.

10  Q    Okay.  But again, to use one of your other words, there was

11  provocateurs who were there to just tear -- pardon the

12  language -- tear shit up; correct?

13  A    Correct.

14  Q    And you and your group tried to put an end to it?

15  A    Yeah.  We would not allow that to happen.  Of course.  And

16  again, that tweet is showing some of the thought process of some

17  of these people there, and an entire movement should not be

18  overshadowed by two, you know, bad apples.  And again, I only

19  witnessed two incidents where it did happen, in which a trash

20  can was knocked over, and then the windows at the 7-Eleven.

21  Q    But based upon this, there clearly were people that were

22  there to do damage, and what you did as a protester, you

23  recognized that your voice was being drowned out by this

24  violence, and you put an end to it to allow your voice as well

25  as many, many, many other peaceful protesters to be heard;

20-cv-1878-RBJ    ASHLEE WEDGEWORTH - Cross    03-16-2022

1    correct?

2    A    Correct.  I don't think that I was alone in that, but

3    again, that's not what we're here for.  We're here to protest,

4    and we weren't going to tolerate anything other than that.

5    Q    Okay.  And when you say you shut that down, what

6    specifically did you do to shut that down?

7    A    Just let them know, like, no.  You know, that's not what

8    we're here for.  We're not doing that.  Just like with the trash

9    can.  We're not here to knock over trash cans.  Let's pick it

10   up.  If you're not here to protest, you can leave.  So, just

11   redirecting them and reminding them of why we're here.

12   Q    And is it fair for me to assume that you were not subjected

13   to violence at that time?  In other words, no one was throwing

14   rocks at you, throwing bottles at you, throwing golf balls at

15   you when you tried to shut down those provocateurs?  Is that

16   fair?

17   A    No.  No one threw anything at me or did -- no other

18   protesters did any of that to me, no.

19   Q    Okay.  Because you were able to address them and knock that

20   off; correct?

21   A    Yes.

22   Q    And I believe on -- and part of the problem was, as I

23   understand it, part of this provocateurs were people who may

24   have a different or more violent intention, and I point to a --

25   another posting by you from May 31st, and it -- and just ask you

20-cv-1878-RBJ   ASHLEE WEDGEWORTH - Cross   03-16-2022

1  if you recall posting this.  Two white supremacists down here

2  with Blue Lives Matter flags.  They gave them a pass, but

3  definitely ran them out of here.  And then it's SMH.  What's

4  SMH?

5  A    SMH means shaking my head.  And yes, at a protest in which

6  we are protesting police brutality and police violence, someone

7  arriving to that protest with flags in support of officers,

8  again, are people there who are trying to cause agitation and

9  chaos.  So -- and we've seen, and we've heard of some of the

10  things that have happened at protests as a result of challenging

11  parties coming to cause chaos.

12         So, in that instance, those -- they were asked to

13  leave.  This is not what we're here for.  Don't come down here

14  starting stuff.  You need to leave.  And that's what happened in

15  that situation.

16  Q    Okay.  And you in fact have actually in part of your --

17  part of your beliefs and action, you've called for -- you've

18  called for the dismantlement, if you will, of law enforcement as

19  we know it; correct?

20  A    Correct.

21  Q    Do you believe in defunding them?

22  A    Correct.  Yes.

23  Q    Okay.  And I apologize for jumping around, but on June 5th,

24  you retweeted this statement:  For those that want to throw

25  bottles and whatever else at the police, comma, cool, fuck them,

20-cv-1878-RBJ    ASHLEE WEDGEWORTH – Cross    03-16-2022

1    but please bring your scary asses to the front when you do so.

2    There are children and elderly, and it's PPL, I'm assuming

3    that's people, at these protests, and you are basically using

4    them as your shields when you doing that shit from the back.

5            And again, that wasn't something that you tweeted, but

6    you retweeted that?

7    A    Right.

8    Q    Did you -- because you retweeted that, did you agree with

9    that sentiment?

10   A    Yes.  Again, this is not anything that I witnessed, but

11   what I assume that person experienced is, again, a provocateur,

12   someone who is not there for the cause, probably came down and

13   stood in the back and threw something to the front of the line,

14   so those in the front who are risking their lives and their

15   bodies for the movement would be retaliated against for that.

16           So, I identified with what that person was experiencing

17   and did agree with that.  You know, children are down there.

18   Babies are down there, you know, why cause violence and harm if

19   you're not going to be the one to stand up to that?

20   Q    And so you -- you disagreed with in fact by retweeting

21   this, you were kind of calling this action out of, hey, you

22   can't use other people as a shield when you run up behind them

23   in the group and you start throwing stuff, understanding that

24   there's going to be a response from law enforcement; correct?

25   A    Yeah.  I don't think that I called that out.  Again, I

20-cv-1878-RBJ    ASHLEE WEDGEWORTH - Cross    03-16-2022

1    identified with the message that that person may have

2    experienced.  I don't -- I don't even know what this situation

3    was in relation to, but I agree with that.  I wouldn't throw

4    something and then hide behind another person.  You need to be

5    the one to be accountable for your actions.

6    Q    So, are you personally aware of that going on?

7    A    No.

8    Q    Okay.  But obviously based on that retweet, it sounds like

9    that was something that was happening in the crowd.  You just

10   weren't personally aware of it?

11              MS. STERK:  Objection.  Speculation.

12              THE COURT:  Pardon me?

13              MS. STERK:  Calls for speculation.  She already said

14   she doesn't know about this.

15              THE COURT:  Overruled.  Go ahead.

16              THE WITNESS:  Oh.  I don't -- yeah.  I'm not aware of

17   where that situation was and when it took place.  It could have

18   not even been here in Denver.  Again, this is -- these are

19   things that were happening nationally.  It may not even have

20   been a real situation.  You know, and just a hypothetical of

21   don't do this.

22   Q.    (By Mr. Weiner) But you would agree with me, that would

23   be a dangerous situation that should be addressed at some level?

24   Would you agree?

25   A    If it was happening, yes.

20-cv-1878-RBJ   ASHLEE WEDGEWORTH - Cross   03-16-2022

1   Q    Okay.  And certainly you would expect -- even though I know

2   you don't agree with law enforcement, you would agree that's

3   something law enforcement should address, not just allow people

4   to be injured when they're trying to protest; correct?

5   A    Can you repeat that?

6   Q    Would you agree that if that was taking place, and it's

7   going to be a little bit different question, but if you agree

8   that that was taking place, and law enforcement observed that,

9   that they should do something about it so people like you who

10  were peacefully trying to protest could allow their voice to be

11  heard rather than people being injured who were being used for

12  shields by some knucklehead coming up behind lobbing rocks?

13  A    Yeah.  I'm not exactly sure what you mean by that in your

14  sentence, but I think that there are appropriate measures and

15  responses that law enforcement can take that fit the crime that

16  a person may be committing.

17  Q    Okay.  Ms. Wedgeworth, I'm going to try to get done here.

18  I apologize.  So, my understanding is the first -- you protested

19  on May 28th; correct?  The first day?

20  A    The first day, I don't believe I protested.  We did go down

21  there.  It may have been later in the night, and I remember the

22  air was filled with tear gas so strong that it was coming into

23  the car even with the windows rolled up.  So, I don't believe

24  that we actually protested that day -- that night.

25  Q    Okay.  And so that night, the date of May 28th of 2020, you

20-cv-1878-RBJ    ASHLEE WEDGEWORTH - Cross    03-16-2022

1   stayed in your car?

2   A    Yes.

3   Q    Okay.  And when you say they, just so we're clear, who were

4   you with on that day?  Same person?

5   A    Yes.  My friend Skye.

6   Q    Okay.  Thank you.  And then so on May 29th of 2020, I

7   believe you indicated you went -- you were protesting again;

8   correct?

9   A    Yes.  I protested every single day that there were

10  protests.  So, forgive me if I can't recall exact days.

11  Q    Well, you probably heard, I'm not exactly great with dates

12  either.  But on the 29th, if I remember correctly, and I don't

13  want to misstate this, but is the 29th the date that your friend

14  Skye got hit with what you believe to be PepperBall or

15  something?

16  A    If that was the day where we have the footage of me being

17  on Colfax and Grant, then yes.  But again, I can't remember the

18  exact date.

19  Q    Okay.  And were you aware at that time of people throwing

20  stuff at the police officers?

21  A    No.

22  Q    Okay.  You just didn't notice it, but you're not saying

23  that it couldn't have happened; correct?

24  A    I didn't see anything like that at any time that I was ever

25  protesting.

Kevin P. Carlin, RMR, CRR

20-cv-1878-RBJ     ASHLEE WEDGEWORTH - Cross     03-16-2022

1   Q    Okay.  But it's fair to say that you weren't seeing

2   everything that was going on; correct?

3   A    That's true.

4   Q    Okay.  I mean, you're with your friend Skye.  You're

5   protesting.  You're using your voice, but you're not necessarily

6   looking all around; correct?

7   A    I mean, I'm not monitoring the crowd of hundreds, possibly

8   even thousands of people, no.  But what was quickly a common

9   theme is that every night at a certain point, the crowd was

10  going to be tear gassed and flash bombed and whatever else to

11  disperse the crowd.

12  Q    Okay.  And to that point, again, you say approximately

13  every night.  Okay.  And once again, you don't know --

14  personally know whether that gas was deployed because of some

15  actions of some of those, to use your words, provocateurs;

16  correct?

17  A    I don't believe that was the reason, no.

18  Q    Okay.  But you don't know; correct?

19  A    I can't say for sure, but the way that things were

20  happening, I'm pretty sure that was not the reason.

21  Q    Well, I mean, I think we have established that during the

22  day there was peaceful protesting, and during the nighttime, as

23  you've indicated in your tweets, the white people, some of those

24  people that were just out there to cause damage would now come

25  in and things would change; correct?

Kevin P. Carlin, RMR, CRR

20-cv-1878-RBJ    ASHLEE WEDGEWORTH - Cross    03-16-2022

1  A    That actually was happening during the day as well, because

2  when you discuss me talking about the people who showed up with

3  Blue Lives Matter flags, that was actually during the day at a

4  women's protest.  So, these things would happen during the day

5  as well.

6  Q    Okay.  So, provocateurs would come in during the day, but

7  it's fair to say when the night starts, the sun started setting

8  at night, it kind of changed; correct?

9  A    Again, I only witnessed the two incidents, the knocking

10 over the trash cans, the situation at 7-Eleven.  Those both were

11 at night.  The situation in which people arrived with Blue Lives

12 Matter flags, that was happening during the day.

13 Q    Okay.

14         THE COURT:  Mr. Weiner, are you closing in on the end

15 of your cross?

16         MR. WEINER:  I am, Your Honor.

17         THE COURT:  Like a minute?

18         MR. WEINER:  Maybe a little bit more than that.  I

19 would say probably three to four.

20         THE COURT:  Yeah.  And how about redirect?

21         MS. STERK:  Very short, Your Honor.

22         THE COURT:  All right.  Let's see if we can finish.

23         MR. WEINER:  I will speed up, Your Honor.

24 Q.    (By Mr. Weiner) Ms. Wedgeworth, going to your injuries

25 real quickly, you did not have to seek any medical attention;

20-cv-1878-RBJ   ASHLEE WEDGEWORTH - Cross   03-16-2022

1  correct?

2  A    I didn't have health insurance at the time, so I did not

3  seek medical attention, and for any injuries sustained.  I have

4  nurse friends that I consult with before I would ever go to the

5  emergency room anyway.

6  Q    And you're better now; correct?

7  A    As far as inhaling?

8  Q    Inhaling gas or any --

9  A    Inhaling gas, yeah.  Those effects have definitely wore off

10  by now.

11  Q    And your friend Skye, she was -- she was hit by something;

12  correct?

13  A    She was.

14  Q    Okay.  And she's not party to this lawsuit; is that

15  correct?

16  A    She is not.

17  Q    Okay.  And you were shown a video, I believe it was

18  Plaintiffs' Exhibit 545, and I believe -- as I recall, that was

19  a body-worn camera footage, and you had showed yourself.  Did

20  you hear on the radio the announcement that there were people on

21  top of the Cheba Hut, and what they were doing?  Did you hear

22  that part of that body-worn camera?

23  A    I did not.

24  Q    Okay.  So, you don't know -- you're not personally aware,

25  then, of people climbing trees and being on rooftops and

20-cv-1878-RBJ    ASHLEE WEDGEWORTH - Cross    03-16-2022

1    attacking law enforcement, and that was something they were

2    addressing?  Did you have any personal knowledge of that?

3    A    What I heard in that video was the officers trying to

4    corral protesters into a group so that they could, what did they

5    say?  Fire off, let off, bomb them, arrest as many as you can?

6    So, that's what I heard in that video.  They were trying to get

7    us together to bomb the crowd.  I didn't hear anyone swinging

8    from trees.

9    Q    So, you didn't hear anything about people being on top of

10   Cheba Hut?

11   A    Yeah.  No.

12   Q    Okay.  And you're aware at that point there was a curfew in

13   place, and there had been several days of riots and destruction.

14   You were aware at that point that -- in that point in time what

15   had transpired; correct?

16   A    I hadn't heard of any riots or destruction.  All that I was

17   ever aware of was the extreme measures of violence that officers

18   were using on peaceful protesters.

19   Q    So, you weren't, again, aware of the gunshots being fired

20   and the other violence in the crowd?  You weren't aware of that?

21   A    No.

22   Q    Okay.  And so my last question, so when you testified on

23   direct, you said that when officers used gas, it was without

24   reason, but that's your perception; correct?  You were not

25   walking in the shoes of police, seeing what they were seeing,

20-cv-1878-RBJ   ASHLEE WEDGEWORTH – Redirect   03-16-2022

1  addressing what they were trying to address; correct?

2  A    No.  But the footage that we all just watched here, and

3  that I provided, and the testimony that I made about, you know,

4  being bombed and tear gassed, and then seeing it from the

5  officers' perspective, it didn't look like anything was

6  warranting that at all.

7            THE COURT:  Now, you asked your last question.

8            MR. WEINER:  That's my last question.

9            THE COURT:  Redirect?

10                    **REDIRECT EXAMINATION**

11  BY MS. STERK

12  Q    Ms. Wedgeworth, I want to go back to day two, the 29th,

13  when you were shot at with PepperBalls by the police.  Can you

14  indicate on here -- can we blow it up a little bit on Grant and

15  Colfax.  It's a little bit to the east.  Perfect.  Can you

16  indicate on here where you were standing at the bookstore.

17  A    So, the bookstore is on the corner of Colfax and Grant.

18  So, like probably -- let me mark it.  I'm sorry.  Was standing

19  right here, the group of officers was -- they were across the

20  alley in a parking lot, so about right here.

21  Q    And I believe you testified that the people who threw the

22  rocks at the car were across the street from you?

23  A    Yes.

24  Q    Closer to here; right?

25  A    No.  So, if I'm here, standing --

20-cv-1878-RBJ    ASHLEE WEDGEWORTH - Redirect    03-16-2022

1   Q    Sorry.

2   A    I'm on the west side of Grant.  So, then they would have

3   had to have been across the street on the -- no.  I was on the

4   east side of Grant.  Excuse me.  And they were on the west side.

5   Q    And the police were around where I just put a dot?

6   A    Correct.

7   Q    And so when the people across the street from you threw

8   something at the police, the police shot -- sorry.  My thing is

9   wide, but shot all these directions; is that right?

10  A    Yes.  Safe to assume so, but we were busy running, because

11  they were shooting in our direction.

12  Q    And so they didn't just shoot straight across the street at

13  the people who were throwing rocks.  They shot towards the north

14  where you were instead of straight across the street where the

15  people were who threw the rocks?

16  A    Correct.

17  Q    You were asked on cross whether you felt like people who

18  were rioters were drowning your voice.  Did you feel like it was

19  the police or other protesters or other people who were drowning

20  your voice?

21  A    I would have to say it was the police.  Again, the

22  situations that I mentioned in which there were people here

23  trying to overshadow the movement, you know, we were able to put

24  an end to that, or they were asked to leave.  It was never a big

25  deal.

Kevin P. Carlin, RMR, CRR

1650

20-cv-1878-RBJ   ASHLEE WEDGEWORTH - Redirect   03-16-2022

1        MS. STERK:  Nothing further.

2        THE COURT:  Any questions from the jury?  No.  Okay.

3   Ladies and gentlemen, thank you for your attention and service

4   today.  We will recess here.  See you in the morning.  Now, it

5   could be really snowy, and if it is, don't worry about being

6   late.  I just want you to be safe.

7        (Jury out at 4:39 p.m.)

8        THE COURT:  All right.  The jury has been excused.

9   Either side have anything to put on the record?

10        MR. MACDONALD:  No, Your Honor.

11        MR. RINGEL:  Nothing from the defense.  Thank you,

12   Your Honor.

13        THE COURT:  Okay.  Same for you folks.  Take it easy

14   tomorrow, and if you can't get here on time because of the snow,

15   I'm not going to worry about it.

16        (Proceedings concluded at 4:40 p.m.)

17

18

19

20

21

22

23

24

25

<u>REPORTER'S CERTIFICATE</u>

     I, KEVIN P. CARLIN, Official Court Reporter for the United States District Court for the District of Colorado, a Registered Merit Reporter and Certified Realtime Reporter, do hereby certify that I reported by machine shorthand the proceedings contained herein at the time and place aforementioned and that the foregoing pages constitute a full, true, and correct transcript.

     Dated this 7th day of April, 2022.

_____
Kevin P. Carlin, RMR, CRR
Official Court Reporter