1         IN THE UNITED STATES DISTRICT COURT

2            FOR THE DISTRICT OF COLORADO

3    Civil Action No. 20-cv-1878-RBJ

4    ELISABETH EPPS AND SARA FITOURI, ET AL.,

5         Plaintiffs,

6         vs.

7    CITY AND COUNTY OF DENVER, ET AL.,

8         Defendants.

9    ----------------------------------------------------------------

10                  REPORTER'S TRANSCRIPT

11                  Jury Trial, Vol. 9

12   ----------------------------------------------------------------

13        Proceedings before the HONORABLE R. BROOKE JACKSON,
     Judge, United States District Court for the District of
14   Colorado, commencing on the 17th day of March, 2022, in
     Courtroom A902, United States Courthouse, Denver, Colorado.

15

16                     APPEARANCES
     For the Plaintiffs:
17   TIMOTHY R. MACDONALD, MATTHEW J. DOUGLAS, and ANDREAS E.
     MOFFETT, Arnold & Porter Kaye Scholer LLP, 1144 Fifteenth
18   Street, Suite 3100, Denver, CO 80202

19   ELIZABETH C. WANG and MAKEBA RUTAHINDURWA, Loevy & Loevy, 2060
     Broadway Street, Suite 460, Boulder, CO 80302

20

21   For the Defendants:
     ANDREW D. RINGEL, KATHERINE HOFFMAN, and ROBERT A. WEINER, Hall
22   & Evans LLC, 1001 Seventeenth Street, Suite 300, Denver, CO
     80202

23
     HOLLIE R. BIRKHOLZ and LINDSAY M. JORDAN, Denver City Attorney's
24   Office, 201 West Colfax Avenue, Denver, CO 80202

25   Reported By KEVIN P. CARLIN, RMR, CRR, 901 19th Street, Room
     A259, Denver, CO 80294, (303)335-2358

          Proceedings reported by mechanical stenography; transcription
                        produced via computer.

1653

20-cv-1878-RBJ    Jury Trial    03-17-2022

1                           I N D E X

2    PLAINTIFFS' WITNESSES                                PAGE

3    JACQUELYN PARKINS
          Direct Examination By Ms. Rutahindurwa . . . . . . 1662
4         Cross Examination By Ms. Birkholz  . . . . . . . . 1689
          Redirect Examination By Ms. Rutahindurwa . . . . . 1700
5
     NICHOLAS MITCHELL
6         Direct Examination By Mr. Macdonald  . . . . . . . 1705
          Cross Examination By Mr. Ringel  . . . . . . . . . 1768
7         Redirect Examination By Mr. Macdonald  . . . . . . 1815

8    ELISABETH EPPS
          Direct Examination By Mr. Macdonald  . . . . . . . 1828
9

10   PLAINTIFFS' EXHIBITS:

11

                              Identified                Received
12

13       17               1858                      1858
         20               1860                      1860
14       62               1867                      1867
         64               1867                      1867
15       66               1867                      1867
         67               1867                      1867
16       108              1850                      1850
         569              1838                      1838
17       571              1840                      1840
         605              1855                      1855
18       636              1688                      1688
         674              1678                      1678
19       754              1710                      1711
         861              1721                      1722
20       864              1736                      1737
         874              1731                      1731
21       989h             1694                      1694
         1250             1867                      1867
22

23   Reporter's Certificate  . . . . . . . . . . . . . . . . 1870

24

25

20-cv-1878-RBJ   Jury Trial   03-17-2022

1        P R O C E E D I N G S

2        (Proceedings commenced at 8:54 a.m.)

3            THE COURT:  What can I do for you?

4            MR. RINGEL:  There are several issues related to

5    Mr. Mitchell, who is the second witness today, that I believe

6    the Court needs to make some rulings on from an evidentiary

7    perspective.  May I use the podium, Your Honor?

8            THE COURT:  Of course.  The lectern.

9            MR. RINGEL:  The lectern.  Sorry.  So, as the Court is

10   aware, Mr. Mitchell was the independent monitor for the City and

11   County of Denver and wrote a report based on his looking into

12   what happened with respect to the protest.

13       I think for context, it's important for the Court to

14   understand two things.  One, Mr. Mitchell has no personal

15   knowledge about what occurred in the protests.  All of the

16   information that he has is derivative of watching video or

17   reading documents or talking to people, and all of that

18   information can be presented to the jury.

19       The other thing I think is important for context, Your

20   Honor, is that Mr. Mitchell was not designated as an expert, and

21   as a result, any opinion of Mr. Mitchell has to be a lay opinion

22   under Rule 701.  And as the Court knows, the first part of a

23   Rule 701 analysis is the lay opinion has to be rationally based

24   on the witness' perception.

25       Here, the absence of personal knowledge means there is

20-cv-1878-RBJ    Jury Trial    03-17-2022

1  nothing that's rationally based on the witness' perception.

2  What Mr. Mitchell would testify to is his own assessment, his

3  own conclusions, his own opinions, and the OIM's opinions

4  related to the -- what his looking into the protests were.

5       The other -- so, that's the context I wanted to provide

6  to the Court.  The other issues that I think are important are

7  the report was attached to the Denver defendants' initial trial

8  brief, and the context of the report is important.  The report

9  is not an assessment -- when one looks at the report as a whole,

10  it is not simply an assessment related to what occurred with

11  respect to the protests.  What it is is some information about

12  what occurred, but the purpose of the report and the focus of

13  the report is the 16 recommendations that Mr. Mitchell made were

14  changes in the policies and procedures and training and

15  operations of the Denver Police Department.

16       And so the context of it isn't simply just this is what

17  occurred.  The this is what occurred context is within the

18  overall scope of this is what we need to do about it.  And it's

19  prospective in nature.

20       And as a result, it's our view that the -- any

21  testimony about the report and the report itself is inadmissible

22  under Rule 407 as a subsequent legal measure, and this Court's

23  decision in the *Davies* case, which the Court can find at 2016

24  U.S. District Lexis 18348, it's 14-cv-1285-RBJ, and it was

25  decided by this Court on February 16th of 2016.  I think that

20-cv-1878-RBJ    Jury Trial    03-17-2022

1  that analysis that the Court did in *Davies* is applicable to the

2  report as considered as a whole.

3       In addition, we believe that the report shouldn't be

4  admitted for 403 reasons, because the idea of the report is

5  essentially invading the jury's conclusions about what occurred.

6  The jury has to decide here about what occurred, and it's

7  inappropriate for the Court to allow a report to essentially put

8  the thumb on the scale and say -- by someone who has an

9  association with the City and County of Denver, or had it, to

10  say that this is what occurred.  It's remarkably prejudicial in

11  our view.

12       Last night, late, Mr. Macdonald sent to me a redacted

13  version of the OIM report which scrubs the recommendations and

14  then keeps the rest of it, and inquired of me as to whether that

15  was sufficient to deal with the Rule 407 concerns that I had

16  raised.  I don't believe it is under Rule 407, that it makes

17  sense.

18       The problem from my point of view is that it then

19  provides no context.  The whole point, the whole context of the

20  report is the recommendations that arose from the report.  And

21  divorcing the context of the report from the rest of the report

22  presents a false and inaccurate picture, and would be

23  prejudicial and doesn't solve the issues from our perspective.

24       The last thing I would point out to the Court is there

25  is nothing in the report or that Mr. Mitchell can testify to

20-cv-1878-RBJ    Jury Trial    03-17-2022

1  that links anything to the plaintiffs themselves in any of the

2  events that happened with the plaintiffs themselves.  There is

3  no assessment in the report about any specific event that

4  happened during the protest.  No individual protester is

5  mentioned in the report.  No individual officer is mentioned in

6  the report.

7           And then the last thing I would say is --

8           THE COURT:  You've said the last thing about three

9  times now.

10           MR. RINGEL:  I apologize, Your Honor.

11           THE COURT:  And that brings up, Mr. Ringel, why is an

12  issue as difficult and multifaceted as this being brought up

13  minutes before he's called to testify, and on the 13th or 14th

14  day of trial?

15           MR. RINGEL:  It was raised in the trial brief, Your

16  Honor, and we had a discussion about these issues in the

17  pretrial conference, and the Court addressed the issue, but

18  never provided us guidance.  And so I didn't know another way to

19  raise it other than at this point, Your Honor.

20           THE COURT:  All right.  What's plaintiffs' response?

21           MR. MACDONALD:  Thank you, Your Honor.  They already

22  filed a motion to exclude Mr. Mitchell.  We had this discussion,

23  and the Court indicated -- it did give us quite clear guidance

24  that Mr. Mitchell was allowed to testify.  You remember we had a

25  back and forth --

20-cv-1878-RBJ    Jury Trial    03-17-2022

1        THE COURT:  No.  I don't remember.

2        MR. MACDONALD:  Okay.

3        THE COURT:  I can't remember everything.

4        MR. MACDONALD:  Understood, Your Honor.

5        THE COURT:  You guys have peppered me with so much in

6   this case, it's impossible for me to remember everything.

7        MR. MACDONALD:  And Mr. Mitchell was, as you know, the

8   independent monitor.  He issued a report.  We're not seeking to

9   get in his recommendations.  We're not seeking to ask him about

10  his recommendations.  And the colloquy we had at the last final

11  pretrial, I think what you said to me is why do you need to get

12  the report into evidence, Mr. Macdonald?  You can simply ask

13  Mr. Mitchell the questions, and I'm prepared to do that today.

14       I do think it's admissible as a public record and a

15  business record.  That's why we redacted the recommendations

16  that Mr. Mitchell made and sent that to Mr. Ringel last night.

17  It's absolutely appropriate.  The Tenth Circuit has said that

18  reports like this are appropriate in the parent case.  I have a

19  bench brief that I can provide to Your Honor.  I can provide the

20  parent case.  His testimony is absolutely admissible.  It's

21  important to our --

22       THE COURT:  I think you saying it's absolutely

23  admissible doesn't help me at all.

24       MR. MACDONALD:  Understood, Your Honor.  Mr. Mitchell

25  evaluated as the independent monitor the events of the George

20-cv-1878-RBJ    Jury Trial    03-17-2022

1  Floyd protests, interviewed DPD witnesses, DPD command officers,

2  and issued a public report that is admissible as a public

3  record, admissible as a business record.  And if the Court

4  doesn't want us to have the report in evidence, then we will

5  proceed to ask him questions about what his conclusions were as

6  an independent monitor, and it is directly tied to our *Monell*

7  claim, Your Honor.

8           THE COURT:  All right.  Thank you.  You know what this

9  brings to mind is something I've said to you folks before, and

10  that I alluded to at least during the bench conference when you

11  got into the thing about the injunction.  And probably what I'm

12  about to say just is my view of the case versus your view on

13  behalf of your clients.

14           I do not for the life of me understand why Denver is so

15  nervous about the injunction or about the independent monitor's

16  opinions, or his fact findings.  And my reason is this:  The

17  evidence in the case, as I see it, is that the Denver Police

18  Department faced a huge, extremely difficult situation because

19  of the size of the protest, the violence, the rock throwing, the

20  bottle throwing, all the rest of it.  And I think that will come

21  across to the jury very clearly.

22           To me, it is equally clear that there were excessive

23  applications of force.  I think the videos demonstrate that.  I

24  found that in my temporary restraining order, and I think that,

25  too, clearly will come across to the jury.  What happened as a

20-cv-1878-RBJ     Jury Trial     03-17-2022

1    result of that unique event is that not just did a Court issue

2    an injunction, but the City and County of Denver entered into a

3    settlement in which they recognized that certain of their

4    practices needed to be improved, and they committed to changing

5    those practices.

6           The opinions or the fact findings of the Office of the

7    Independent Monitor are to the same effect.  Namely, it was

8    recognized by the OIM as well as by the City and the police

9    department that certain things had to be improved.  And

10   presumably, they've done that.

11          To me, that is compelling evidence in favor of the

12   defendant in a case like this.  People make mistakes.  And if

13   you own up to your mistakes, and if you fix things, people will

14   rally around you, and we've seen that throughout history.

15          But in my view, Denver doesn't want to admit that it

16   made even a single mistake.  They don't want to have the jury

17   know that they acknowledged those mistakes and corrected their

18   practices, and they're going to defend this case to the end of

19   the Earth on the proposition that we did absolutely nothing

20   wrong.

21          I just don't get it.  The one thing that may save the

22   defendants, in my view, in this case, is that the defendants --

23   plaintiffs for the most part did not sustain, as I heard the

24   evidence, significant damages.  But to me, it's bizarre.

25          However, you guys are defending the case the way you

20-cv-1878-RBJ    Jury Trial    03-17-2022

1  want to defend it, and if you want to go into the valley of the

2  shadow of death proclaiming that we did zero wrong, so be it.

3         Now, to the point, 407 reads, when measures are taken

4  that would have made an earlier injury or harm less likely to

5  occur, evidence of the subsequent measures is not admissible to

6  prove culpable conduct.  It's very clear.  It's very

7  straightforward.  You cannot, plaintiff, put into evidence any

8  measures that have been taken by Denver, even though I think it

9  would help Denver, that if taken before, would have made

10  culpable conduct less likely.

11         You say that you've eliminated that problem because

12  you're not going to ask the OIM about the recommendations that

13  he made.  Basically, you're going to have the OIM take the stand

14  and say, well, you know, I was hired to be a jury, just like

15  this jury, and I've reviewed the evidence just like this jury,

16  and this is what I found.

17         Boy, that bothers me.  I think you're risking your

18  entire case by doing that, but I think you're entitled to it.  I

19  think it's a huge mistake on your part to do that.  And it's a

20  huge mistake on the defense part to oppose it, but hey, that's

21  not for me to say.

22         This was a public investigation, a public report, paid

23  for by the taxpayers, and it seems to me that these taxpayers

24  sitting in the jury box are entitled to hear about it.  And the

25  points that Mr. Ringel made about how he didn't really have any

20-cv-1878-RBJ   JACQUELYN PARKINS - Direct   03-17-2022

1   personal knowledge, and he just reviewed -- just interviewed

2   people and compiled his findings based on that, that's a matter

3   for cross examination, in my view.  So, I will permit him to

4   testify just like I permitted the plaintiffs to have his

5   interview memos.

6          And if it causes your case to be -- your verdict,

7   plaintiffs, to be reversed, that's on you.  I think you're

8   making a mistake.  That's my ruling.

9          Now, let's keep going.

10      (Jury in at 9:11 a.m.)

11          THE COURT:  Good morning, ladies and gentlemen of the

12   jury.  Happy Saint Patrick's Day.  I see some of you have worn

13   your green.  I want to show you that I've worn my green too.

14   The snow isn't quite as bad yet as I was afraid it would be.

15   Let's hope that continues.  All right.  Where are we?

16          MS. RUTAHINDURWA:  Thank you, Your Honor.  Plaintiffs

17   call Jackie Parkins.

18          THE COURT:  Okay.  Good morning.

19          THE WITNESS:  Good morning.

20      (The Witness is Sworn)

21          THE COURT:  Thank you.

22                         **DIRECT EXAMINATION**

23   BY MS. RUTAHINDURWA

24   Q    Good morning.

25   A    Good morning.

20-cv-1878-RBJ   JACQUELYN PARKINS - Direct   03-17-2022

1    Q    Can you please state your name, and spell your last name

2    for the record.

3    A    Sure.  My first name is Jacquelyn.  I go by Jackie.  My

4    last name is Parkins, P-A-R-K-I-N-S.

5    Q    And where are you from?

6    A    I grew up in Connecticut, outside of New Haven, but I've

7    lived in Denver for 11 years.

8    Q    What brought you to Denver?

9    A    Ostensibly grad school, but I only applied to one grad

10   school so that I could move here.

11   Q    What did you get your graduate degree in?

12   A    I got my master's in social work from the University of

13   Denver's graduate school of social work.

14   Q    Do you use your social work degree in your job or your

15   life?

16   A    Yes.

17   Q    Can you tell us a little bit about that.

18   A    Sure.  So, one of the reasons I really like the discipline

19   of social work is my undergrad degree is in psychology, and with

20   a minor in anthropology, and I think social work really helps to

21   meld both the high level and the personal level, and to think

22   about how humans behave and how to, you know, make people's

23   lives better.

24        And so I use it in my analysis of situations.  I work

25   with the teacher's union, work directly with educators every

20-cv-1878-RBJ   JACQUELYN PARKINS - Direct   03-17-2022

1  day, solving problems and organizing folks to take action for

2  the betterment of students and education.  And then I also use

3  it in my personal life, therapeutic techniques.  I am often

4  accused of social working my husband and friends.

5  Q    Outside of work, do you have any passions?

6  A    Yeah.  So, my husband and I both play video games.  We love

7  to enjoy the Colorado outdoors, go hiking.  We have two dogs.

8  Love to read.  I crochet and knit, do needlepoint.  I love

9  stupid crafty things.  And then my husband and I are currently

10 working on converting our spare bedroom into a nursery that

11 we're going to need in September.

12 Q    Congratulations.

13 A    Thank you.

14 Q    How many days of the George Floyd protest did you attend?

15 A    I believe Sara Fitouri and I attended 15 days straight.  14

16 or 15 days straight.

17 Q    And had you attended protests before?

18 A    Yes.  Many.

19 Q    Can you give an example of just a few protests you've

20 attended.

21 A    Sure.  You know, I have -- I kind of consider it my

22 responsibility to show up.  And so I've been to protests for --

23 I've been to the women's marches.  I've been to protests around

24 immigrant rights, gun safety.  You know, I'm drawing a little

25 bit of a blank right now, but many.  Many.  I couldn't even

20-cv-1878-RBJ    JACQUELYN PARKINS - Direct    03-17-2022

1  count how many I've been to at this point.

2  Q    And in your opinion, what was the main difference between

3  the George Floyd protests and the other protests you've

4  attended?

5  A    At the other protests I've attended, I was never attacked

6  by police with chemical munitions.

7  Q    So, I want to talk about the protests, and you've been in

8  the courtroom for almost all of the trial; right?

9  A    Yes.

10  Q    And as you know, a lot of the events have already been

11  covered?

12  A    Right.

13  Q    And you were with Sara Fitouri during all times at the

14  protest; correct?

15  A    Yes, I was.

16  Q    So, for every event that she's already described and

17  discussed, you were right there next to her?

18  A    Yes, I was.

19  Q    Okay.  Let's talk about your experiences, directing you to

20  day one.

21  A    Okay.

22  Q    You were at the incident on I-25 and the Highland Bridge;

23  correct?

24  A    I was.

25  Q    Can you tell us about your experience there.

20-cv-1878-RBJ    JACQUELYN PARKINS - Direct    03-17-2022

1    A    Yes.  So, you know, I had started out at the capitol,

2    marched down the 16th Street Mall with all of the other folks,

3    gone through the park by the Highlands Bridge, and was on the

4    Highland Bridge when a contingent of protesters found a way onto

5    the highway and stopped traffic.  And then witnessed as the

6    police arrived very quickly and seemingly just immediately began

7    to use force on protesters.

8    Q    And were you subjected to chemicals at that location?

9    A    I did get my first experience of the PepperBall.

10   Q    How did it feel?

11   A    OC.  I wasn't -- I didn't get too much of it at the time,

12   but it was -- it was just burning my face and my nose and my

13   mouth.  My eyes burned, kind of like if you get hairspray in

14   your eyes, or when you like put mascara on and poke yourself in

15   the eye and it won't stop watering, that's kind of how it felt.

16   Q    Did that first day change your behavior and how you would

17   attend protests in the future?

18   A    Yes.

19   Q    How?

20   A    Over the subsequent days -- and so that day, we left.  We

21   left earlier than we normally would have.  We didn't feel

22   prepared; right?  That was scary, something none of us had

23   experienced before.  A friend of ours who was with us had just

24   had ACL repair surgery, and so he couldn't move quickly, and we

25   decided it wasn't safe.

20-cv-1878-RBJ   JACQUELYN PARKINS - Direct   03-17-2022

1    And so over the next few days, this was when the Hong

2    Kong protests were happening; right?  And so there was a lot of

3    discourse on how folks were dealing with chemical munitions in

4    other places.  And so we did research, tried to find goggles,

5    went to multiple, you know, retail outlets to get as many masks

6    as we could, and get goggles that would protect our eyes, things

7    like that.

8    Q    But you still went out to protest the next day?

9    A    I did.

10   Q    And I'm directing you now to day two, May 29th.  And you

11   were there that evening at Lincoln and Colfax when DPD used

12   weapons on protesters and were throwing grenades from across the

13   street at Colfax?

14   A    Yes, I was.

15   Q    Can you tell us about your experience at that location?

16   A    Yeah.  That was -- that was really surreal to me.  I could

17   not believe how things had escalated.  My first real experience

18   with a PepperBall is I was walking on the sidewalk on the north

19   side of Civic Center, Veterans Park -- Veterans Park, and the

20   police had created that skirmish line by the bus station.  I at

21   the time did not understand why they had chosen to stake out

22   that space.  It seemed very arbitrary and confrontational for no

23   particular reason.

24        And I remember just like a PepperBall flew past my

25   face.  And I remember just being absolutely shocked and had no

20-cv-1878-RBJ   JACQUELYN PARKINS - Direct   03-17-2022

1  idea why I might be targeted and why something would be that

2  close to my face.  And that was when I really experienced tear

3  gas for the first time.

4  Q   Why did you go out again, despite what you experienced on

5  that Thursday?

6  A   In my job, working with educators and their union, it seems

7  like every day I'm talking to folks about why it's important to

8  take action to make their workplace better, why it's important

9  to stand up for public education, to, you know, be activists, to

10  be advocates for students and their profession, and I'm

11  constantly speaking with educators who are afraid; right?

12         They're afraid I'm going to get a bad evaluation.  I'm

13  going to get written up.  I might lose my job.  And I find

14  myself often speaking about the folks who died so that we could

15  have a 40-hour workweek and an eight-hour workday and no

16  eight-year-olds in coal mines; right?  The suffragettes who took

17  arrests; right?  Who were beaten in order for us to have the

18  right to vote.  The civil rights movement; right?

19         I feel as though all of us are part of a legacy of

20  folks who fought really hard for us to have the privileges and

21  rights and benefits that we have today.  And it is our

22  responsibility to live up to take what they have earned for us

23  and purposely for us, and continue to build on it and do what's

24  right even when it's really hard and scary and painful.

25  Q   And I know this has been stated over and over, but

20-cv-1878-RBJ    JACQUELYN PARKINS - Direct    03-17-2022

1   particularly to you, did you engage in any property destruction?

2   A    No.

3   Q    Did you engage in any violence whatsoever?

4   A    No.

5   Q    Did you ever throw anything at the officers?

6   A    No.

7   Q    And this was the day the officers pushed you and

8   Ms. Fitouri into oncoming traffic?

9   A    Yes.

10  Q    Can you tell us about that experience.

11  A    That was, like -- so, Sara Fitouri and I were together the

12  whole time; right?  Sara is my best friend.  She's going to be

13  my child's godmother.  And she's tougher than me; right?  And so

14  she was always going to go out whether I went out or not.  So,

15  in addition to my high-minded principles, I also, like, I just

16  couldn't let her be out there by herself.  It was really

17  important to me to help be there to make sure she was safe.  I

18  would not have been okay to be at home while she was out not

19  safe.

20        And so we were, you know, constantly debriefing with

21  each other, speaking with each other.  And I remember the moment

22  of saying, okay, it's safer to run into traffic.  Good to know.

23  And just looking at each other and realizing how absolutely

24  surreal that was that we were looking at police officers who,

25  you know, protect and serve, and who we've seen in other

Kevin P. Carlin, RMR, CRR

20-cv-1878-RBJ   JACQUELYN PARKINS - Direct   03-17-2022

1   protests take actions to keep people safe who closed down the

2   roads, who we had never been to a protest of any kind where

3   police had allowed for traffic to continue during an active

4   protest.

5          And then realizing not just was traffic continuing to

6   run during our protest, but that they were actively pushing us

7   into it, and multiple times, and that was the safer option at

8   the time.

9   Q    At one point during the evening, did you encounter a woman

10  in an alcove?

11  A    Yes.

12  Q    Can you tell us what happened.

13  A    Sara and I were -- I want to say we were running south on

14  Lincoln, and there's a building there that has, you know, about

15  a person-sized little alcoves in the architecture of the

16  building.  And as we ran past, we heard a woman who was sitting

17  in that alcove who was having a panic attack.  And we stopped,

18  and we ran back to her, and she was this Black woman.  She was

19  in a silk bonnet in what looked like her pajamas, and she had

20  been gassed really badly, and was alone, and was panicking in

21  this alcove.

22          And so Sara and I, you know, rinsed her face as best we

23  could and called for a medic and a man who identified himself as

24  an off-duty nurse came and rendered aid to her, and we helped

25  her find her friends again.  And, you know, did our best to make

20-cv-1878-RBJ    JACQUELYN PARKINS - Direct    03-17-2022

 1  sure she was okay.  That was one of the scarier moments for

 2  sure.

 3  Q    At any point on day two, did you hear any warnings by

 4  officers?

 5  A    No.

 6  Q    Did you hear any dispersal orders?

 7  A    No.

 8  Q    Anything else from this day that we haven't mentioned?

 9  A    I believe this was also the day -- so, Sara Fitouri, again,

10  we were always talking about how to stay safe.  And so we would

11  go south, because we felt that was safer.  It was easier to kind

12  of avoid police going south.  We were in an intersection, and I

13  couldn't tell you exactly which one.

14           It was really chaotic, where there was a group -- so,

15  the police would break up a group, and we would try to come

16  together.  It was always safer to be with a larger group of

17  people.  And so we were in this intersection regrouping to start

18  marching back towards the capitol, when one of those ARVs, the

19  armored vehicles that look like tanks -- I think somebody

20  referred to it as a Bearcat recently -- just comes incredibly

21  quickly into the intersection, throws a flash-bang, throws tear

22  gas; right?

23           And people are scattering.  And there was a young man,

24  I think he was in his 20s, who had his leg in a full cast.  It

25  was over his knee, down covering his foot.  And he was on

20-cv-1878-RBJ   JACQUELYN PARKINS - Direct   03-17-2022

1  crutches -- no.  He was in a wheelchair that day.  And his

2  friend was pushing him.  And in this intersection, there was

3  construction, and the whole corner of the sidewalk was just

4  gone; right?  And there was caution tape around it because it

5  was being excavated.  And so that was the safety.  That was the

6  way away from the police, and he --

7          THE COURT:  Could you slow down just a little bit,

8  please.

9          THE WITNESS:  I'm sorry.  I'm from New England.

10          THE COURT:  It's hard for the reporter to keep up.

11          THE WITNESS:  It's a bad habit.  I appreciate it.

12  Thank you, Your Honor.

13          So, I see this young man get up out of his wheelchair,

14  and hobble, hopping on one foot.  And his friend takes the

15  wheelchair to get it onto an intact portion of the sidewalk.

16  And as the young man is trying to get back to the wheelchair,

17  and he's in front of me, and I just -- one of those slow motion

18  moments where he starts to fall backwards.  And I remember -- I

19  just like reached out and put my hand under his armpit and held

20  him up, and he turns to me and says, thanks, friend.

21          And I helped him get onto the sidewalk and get back to

22  his friend.  And I think all the time about what would have

23  happened.  He couldn't get out of there himself.  And it didn't

24  seem like I had ever seen any police officer render aid to

25  anyone in any circumstance.  And it was so important for us to

20-cv-1878-RBJ   JACQUELYN PARKINS - Direct   03-17-2022

1  be there because of situations like this when people weren't

2  safe, and my being there helped keep some people safe.

3  Q.    (By Ms. Rutahindurwa) Moving on to day three, that's

4  Saturday, May 30th.  On this date, you were with Sara Fitouri

5  and Joe Deras?

6  A    Yes.

7  Q    You were at the intersection of Lincoln and Colfax between

8  6:00 and 8:00 p.m.?

9  A    Yes.

10  Q    Can you tell us about your time at that intersection.

11  A    Yeah.  So, I felt, you know -- was this the first day of

12  the curfew?

13  Q    That's correct.

14  A    Yeah.  And so that day felt different.  The day before, the

15  tear gassing and the violence had started earlier with cops

16  deploying chemical munitions a lot earlier in the day.  No.  Or

17  am I confusing?  It all runs together.  It was so chaotic and

18  scary.  Was this the day that Youssef was hurt?

19  Q    I can give you a little more direction.

20  A    I'm sorry.  I'm so very nervous up here.

21  Q    No problem.  This is the day the intersection of Lincoln

22  and Colfax, you were there for several hours with Sara.  There

23  was a flash-bang incident by Sara's foot.

24  A    Oh, yes.

25  Q    Youssef was also injured.

20-cv-1878-RBJ   JACQUELYN PARKINS - Direct   03-17-2022

1   A    Yes.

2   Q    Do you remember that happening?

3   A    Yes.  I remember that.

4   Q    Can you tell us about your experience personally.

5   A    Yeah.  So, we spent most of our time that afternoon on the

6   capitol lawn.  Again, the police had set up a skirmish line that

7   seemed really arbitrary and confrontational.  We -- so, what I

8   witnessed over and over again was protesters would approach the

9   line of police with hands up, take the knee.  You know,

10  essentially hands up, don't shoot.  And with what I believed and

11  saw was the intent of having the police officers leave.  What we

12  wanted was for them to leave us alone so that we could protest

13  in peace, and they just continually created confrontations by

14  doing so.

15          And so we were coming up.  There was a large group of

16  people who had knelt in front of the police with their hands up,

17  and we were coming in to join them when there was a flash-bang

18  that landed directly on Sara Fitouri's foot.  And we were tear

19  gassed again.  Folks were hit with PepperBalls, and it just

20  became kind of an ebb and flow, ebb and flow.  We would approach

21  the police, trying to get them to leave.  They would fire on us,

22  and it just kind of came back and forth, back and forth.

23  Q    Can you describe your physical injuries at that location.

24  A    My physical injuries?

25  Q    Yes.

20-cv-1878-RBJ   JACQUELYN PARKINS - Direct   03-17-2022

1  A    I inhaled a lot of chemical munitions.  Really, my eyes, my

2  throat, my lungs, my nose, my mouth, my skin just constantly

3  burning.

4  Q    And you were aware there was a curfew in place on May 30th?

5  A    I was.

6  Q    What time did that curfew start?

7  A    8:00 p.m.

8  Q    Did you comply with the curfew order?

9  A    I did not.

10  Q    Can you tell us why?

11  A    So, I believed at the time, and I still believe that that

12  curfew was unconstitutional, and was a violation of our First

13  amendment rights.  I, again, believe that I am part of a legacy

14  of folks who thoughtfully and intentionally perform civil

15  disobedience peacefully, perform civil disobedience for the

16  purpose of preserving life and the rights of marginalized

17  people.

18         And my, you know -- my husband is a Black man in

19  America; right?  My child is going to be a Black person in

20  America.  I could not justify going home when I believed the

21  curfew was unconstitutional and telling my child someday that

22  I'm going to be this person's ancestor, and saying, yeah, I

23  fought for you, and I fought to make this world better for you,

24  but only until it got too hard or I might get arrested.  That

25  was not an acceptable option for me, so I stayed.

20-cv-1878-RBJ    JACQUELYN PARKINS - Direct    03-17-2022

1    Q    You heard Ms. Fitouri and Mr. Deras talk about their

2    experiences that evening being chased through alleyways?

3    A    Yeah.

4    Q    You were present for that?

5    A    I was.

6    Q    Can you explain what happened to you.

7    A    Throughout the night, it felt as though officers were just

8    having fun chasing us, breaking us up into groups by firing

9    PepperBalls at us.  They would approach really quickly, hop off

10   the trucks that they were hanging off of, and start firing

11   without saying anything, without giving any orders, without even

12   attempting to arrest anyone.

13        I was prepared to take arrest.  I was prepared to

14   perform civil disobedience, peacefully take arrest and make my

15   case in court about why it was unconstitutional.  I had a right

16   to do so.  And I was not given that opportunity.  And so we were

17   just constantly running for our lives, and it was chaotic, and

18   it felt like they were playing a game, while I was thinking at

19   the time it was only a matter of time before they started using

20   live ammunition.  That's where my brain was going.  And it

21   was -- it was a really, really awful evening.

22   Q    You were at the CEA parking lot about to get into your car

23   when you -- an incident occurred at that location?

24   A    Yes, I was.

25   Q    And we've already seen footage from one angle of the

20-cv-1878-RBJ    JACQUELYN PARKINS - Direct    03-17-2022

1   officers approaching that parking lot and shooting protesters

2   running away.  Do you have anything to add about that

3   experience?

4   A    Yes.  I think Joe mentioned that we were speaking to --

5   there was a car, an SUV, with girls in it, 17 -- I think

6   seventeen-year-old girls.  They looked about that age -- who had

7   pulled up as we were getting into our cars.  And they were like,

8   where is everybody?  We came here to protest.  And we knew that

9   they were in high school, because they had the car paint on

10  their windows about homecoming; right?

11        And at that point, I was so afraid and just a raw

12  nerve, and I remember being like, girls, go home.  You don't

13  want to be here.  Go home.  They're going to hurt you.  Go home.

14  And that was when the group of teenagers, also looked like, came

15  marching down Colfax past the parking lot, and then the police

16  immediately started PepperBalling those folks.

17        We dived behind our cars, and I was shaking, and you

18  know, you have backpacks, or they have a little thing where you

19  can attach your keys towards the top so you can find them easily

20  and not lose them?  I couldn't find them.  I was so panicked,

21  and I was shaking, and I was trying to get my keys out and get

22  into the safety of my car.  I really thought that the police

23  were going to pull around and PepperBall us where we were

24  crouching behind our cars.

25        And so I was finally able to find them.  It felt like

20-cv-1878-RBJ   JACQUELYN PARKINS - Direct   03-17-2022

1   an eternity.  And we got into our cars and pulled out through

2   the backside of the parking lot.  And as I did that, I rolled

3   down my window and I would yell to the kids, go.  Get out.  Go,

4   go, go.  And try as best I could to keep my vehicle between the

5   police and the kids, because they had come around the other side

6   of the building as kids fled under the overhang and were

7   continuing to shoot at them from the other angle and drive them

8   through the alleys and break up the group that had been doing

9   nothing but chanting.

10          MS. RUTAHINDURWA:  I'm showing you Exhibit 674, which

11   describes the latter half of that incident you just discussed.

12   This is a body-worn camera from Officer McNabb.  And we move to

13   admit at this time.

14          MS. BIRKHOLZ:  No objection.

15          THE COURT:  Sorry.  What was the number?

16          MS. RUTAHINDURWA:  Exhibit 674.

17          THE COURT:  Okay.  Admitted.

18          MS. RUTAHINDURWA:  So, let's just play for a little

19   bit, and I'm going to ask you some questions.

20          (A video was played.)

21   Q.   (By Ms. Rutahindurwa) Can you pause there.  So, do you

22   see the protesters on the street?

23   A    Yes.

24   Q    And what are they doing as the police approach?

25   A    Marching and chanting.

20-cv-1878-RBJ    JACQUELYN PARKINS - Direct    03-17-2022

1  Q    And did you see anything happening other than marching and

2  chanting in this video?

3  A    No, I did not.

4  Q    Okay.  Let's continue playing.  Oh, wait.  Pause again.

5  Sorry.  Do you see this building right here?

6  A    Yes.

7  Q    What building is that?

8  A    That's the Colorado Education Association state

9  headquarters building.

10  Q    And were you there at the time trying to get into your car?

11  A    Yes.

12  Q    All right.  We can continue playing.

13       (A video was played.)

14  Q    Dan, can you pause there.  Did you hear those popping

15  sounds?

16  A    I did.

17  Q    What are those?

18  A    PepperBalls.

19  Q    Did you see anything that was going on at that time?

20  A    That would warrant the use of PepperBalls on protesters?

21  Q    Yes.

22  A    No.

23  Q    We can continue playing.

24       (A video was played.)

25  Q    Can you pause right there.  Did you see the officers

20-cv-1878-RBJ   JACQUELYN PARKINS - Direct   03-17-2022

1    turning on the street?

2    A    Yes, I do.

3    Q    Do you know if this is a one-way street?

4    A    It is.

5    Q    And so they're going the wrong direction?

6    A    They are.

7    Q    You can continue playing.

8         (A video was played.)

9    Q    Were you able to leave the protest that evening?

10   A    I was.

11   Q    And can you tell us what happened.

12   A    We went to Sara Fitouri's house.  At the time, Sara lived

13   alone.  Our friend Joe lived alone.  Our friend Youssef lived

14   alone.  And it had been a really awful night for all of us, and

15   so I called my husband and told him to meet us at Sara's house

16   so that we could be together and kind of process some stuff and

17   talk through and get to a place where maybe we could get some

18   sleep later that night.

19   Q    And what happened when you were at Ms. Fitouri's house?

20   A    My husband was already there.  And I remember he wrapped me

21   up in this big hug even though I was covered in tear gas.  And

22   we -- Sara gave me a change of clothes.  We all changed, and we

23   sat in the backyard and just went over the events of the day and

24   tried to talk things through.

25        And, you know, I had to tell my husband about

20-cv-1878-RBJ   JACQUELYN PARKINS - Direct   03-17-2022

1   everything that happened.  And we reviewed injuries, talked

2   about the flash-bang, talked about Youssef.  And, yeah, just

3   tried to support each other as best we could when we were all

4   feeling really, really horrified and traumatized.

5   Q    And Dan, can you pull up Exhibit 674 one more time.  I

6   forgot to ask a question.  Thank you.  Do you see here -- do you

7   remember watching the video, Exhibit 676 that was played during

8   Ms. Fitouri's examination from the other side?

9   A    Yes, I do.

10  Q    And when we watched this video, that was 30 seconds of no

11  sound; right?

12  A    Right.

13  Q    And we know that no sound means that the officer turned off

14  their body-worn camera?

15  A    Yes.

16  Q    And then turned it back on, because there was that lag;

17  right?  Those 30 seconds?

18  A    Yes.

19  Q    So, Officer McNabb turned off his body-worn camera between

20  the first incident for those 30 seconds?

21  A    That sounds correct to me.

22  Q    We can take the exhibit down.  Did you make a Facebook post

23  after your experience on May 30th?

24  A    I did.

25  Q    What did you write?

20-cv-1878-RBJ    JACQUELYN PARKINS - Direct    03-17-2022

1   A    I wrote that I would have nightmares about that night for

2   the rest of my life.

3   Q    And do you still have nightmares about that night?

4   A    I do.

5   Q    I know this is going to be hard, but can you tell us what

6   your nightmares are about.

7   A    Since I was a kid, I had a recurring dream about being in a

8   labyrinth, like with Bowie and muppets, and the whole time,

9   that's just a recurring dream.  It's never been a bad dream.

10  And now I still have those dreams, but in those dreams police

11  are chasing me into dead ends.  And it's really -- it's not

12  great anymore.  It used to be fun.

13  Q    But you returned the next day, May 30th?

14  A    I did.

15  Q    At some point you're marching down Colfax with Ms. Fitouri,

16  Mr. Deras, and your two friends, Emma and Richael?

17  A    Correct.

18  Q    And the march stops at about 8:30 p.m. at Colfax and

19  Washington?

20  A    I'm not sure that the march actually stopped.  The march

21  was interrupted.

22  Q    That's a great clarification.  Can you explain to us what

23  happened.

24  A    We were towards maybe the back third of the group, and we

25  were marching.  The police hadn't -- hadn't attacked us yet that

20-cv-1878-RBJ    JACQUELYN PARKINS - Direct    03-17-2022

1  night, and it was -- we were waiting, feeling a sense of, maybe

2  they won't, cautious optimism.

3         And as we approached the building, the precinct six,

4  District 6 building, which ironically has a really beautiful

5  mural about how the streets are for the people on the side of

6  it, we were approaching that intersection when out of nowhere,

7  flash-bangs and tear gas are thrown into the intersection and

8  bifurcated the march.

9         It was pretty close to right in front of us.  I

10 remember another protester shouting, what the F?  This was

11 peaceful.  This was peaceful.  And that's when the shenanigans

12 started that night.

13 Q    And were you exposed to tear gas at that location on

14 Sunday, May 31st?

15 A    I was.

16 Q    Can you tell us what happened.

17 A    We -- Sara and I were -- we were giving everybody who came

18 out that we knew buddies, creating a buddy system to keep people

19 safe.  And so we confirmed folks had buddies, and we started to

20 move backwards, expecting to kind of have the same ebb and flow

21 that we had experienced in previous days, but Joe was missing.

22 He abandoned his buddy.

23 Q    Were you able to relocate with Joe?

24 A    Yes.  We were really nervous when we realized that he was

25 not with us anymore.  I believe Sara was able to reach him on

20-cv-1878-RBJ    JACQUELYN PARKINS - Direct    03-17-2022

1    the phone, and we heard that he was in a parking lot, Argonauts,

2    I think, or maybe Cheba Hut, and were able to get around the

3    scare -- the dangerous area, the chemical munitions, and connect

4    with him and help him find a medic that could splint his thumb,

5    because he believed it was broken.

6    Q    And did you stay at the protest afterwards?

7    A    I did.

8    Q    Can you tell us about your experience at around 9:30 p.m.

9    that evening.

10   A    So, after we put Joe in the car with Richael to go to the

11   hospital, we joined another group of folks at the capitol,

12   because, you know, we would get broken up, and we would regroup

13   and get broken up and regroup, and so there was a group of folks

14   at the capitol.  They had shut off all the lights there,

15   probably to get us to go home.  And that group began again

16   marching up Colfax.  I didn't understand us to be going anywhere

17   in particular, but we marched east on Colfax, past the CEA

18   building, and to the Basilica.

19   Q    And what happened once you arrived at the Basilica?

20   A    There was a skirmish line that had been set up in front of

21   us, and police officers began deploying tear gas and flash-bangs

22   again.

23   Q    Can you tell us about that experience from your

24   perspective.

25   A    Yeah.  So, as we started to consider moving backwards to

Kevin P. Carlin, RMR, CRR

20-cv-1878-RBJ    JACQUELYN PARKINS - Direct    03-17-2022

1   get out of the fumes, we could see the other group of officers

2   coming from the other direction.  And we had almost -- you know,

3   Joe had been hit in the head with a projectile that night.  We

4   were really scared.  Running towards an officer was not an

5   option.  And so Sara, Emma, and I were pushed up against the

6   wrought iron fence that's been described before.  And kind of

7   paralyzed and breathing in gas, and not sure what to do.

8        When I was 17, I took an EMT course, and I remember in

9   that moment, I remember really clearly remembering one of the

10  war stories; right?  They've been a paramedic for 30 years, let

11  me tell you a war story about a teenager who had climbed a chain

12  link fence and slipped and had his neck impaled on the top of

13  the fence.  And how lucky he was that his friends were, you

14  know, had the wherewithal to just support his weight until the

15  firemen could come and cut the fence away, and he lived.  And by

16  some miracle he didn't hit anything major, and his friends were

17  smart and he lived.

18       And in that moment, that memory came back to me, and I

19  looked at that fence, and I vividly saw myself impaled on that

20  fence.  And I knew that if I climbed that fence, I was going to

21  die.

22       And so I looked at Sara Fitouri, and she knew that we

23  were not climbing the fence.  Also, I think Emma is 5'2" on a

24  good day, probably not getting over that fence.  And so we

25  looked at the alley and said, alley, and ran through the tear

1   gas into that alley and were crushed in people.  And I couldn't

2   breathe, and this was the part of my brain -- this was the

3   moment that the part of my brain that could remember things and

4   make choices was gone, and I was just thinking I was going to

5   die.

6          And I was just pushing forward, and people were pushing

7   behind me, and I was rinsing my face and putting the Milk of

8   Magnesia and water in my mouth and spitting it out and doing it

9   like over and over again, and I just felt it was really unsafe.

10  And I can't believe nobody was more badly injured or trampled in

11  that moment.  We were really lucky that the alley was relatively

12  short, and it went up into a parking lot.

13         And we only had a few moments to regroup and breathe

14  before the police started to come down the alley shooting

15  PepperBalls at people's backs, and the alley as well.  And so we

16  ran.  I remember like half Dukes of Hazard like jumping over the

17  hood of a car trying to get away as quickly as we could.  And

18  getting to a parking lot a few blocks away, and looking at Sara

19  and Emma and saying, we're done.  We gotta go home.

20  Q    At any point during the night of May 30th and May 31st, did

21  you see people out on the streets who were not protesters?

22  A    I did.

23  Q    Did you observe how the police interacted with them?

24  A    They didn't.

25  Q    And when you say they didn't, what do you mean?

20-cv-1878-RBJ    JACQUELYN PARKINS - Direct    03-17-2022

1   A    They ignored them.

2   Q    How did seeing those officers' actions towards people who

3   were not protesting impact your experience at the protests?

4   A    It just made it really obvious that the curfew existed in

5   order to prevent protesting, peaceful protesting.  And that the

6   police would use any reason, any excuse to conduct violence and

7   hurt us.

8   Q    Did you do anything to report the behavior of the officers

9   that you witnessed during the protests?

10  A    I did.

11  Q    What did you do?

12  A    So, a city councilor named Candi CdeBaca had hosted a

13  reporting form for folks who had concerns about the protests,

14  and I filled that out, and I believe that report was forwarded

15  both to the Office of the Independent Monitor, which is the

16  independent organization that reviews police conduct and those

17  kinds of things, and then also to internal affairs at DPD.

18  Q    And what was the outcome of those complaints that you

19  filed?

20  A    I got a phone call from a Sergeant Molyneaux, and I believe

21  I'm pronouncing that correctly, from internal affairs.  You

22  know, I spoke to a friend I have who is an attorney, and she

23  said, can't hurt.  File -- you know, talk to the sergeant.  And

24  so I did.  I called her back, and we had a brief conversation

25  where she asked me what happened.

20-cv-1878-RBJ   JACQUELYN PARKINS - Direct   03-17-2022

1    And I, you know, didn't feel like she asked me very

2    many follow-up questions, and it was -- it felt kind of

3    perfunctory.  And then I didn't hear from her again until I

4    received a letter in the mail saying they couldn't do anything

5    because I couldn't identify any officers.

6    Q    I'm showing you Exhibit 636.  Do you recognize this as the

7    decline letter that you received?

8    A    I do.

9         MS. RUTAHINDURWA:  Move to admit and publish to the

10   jury.

11        MS. BIRKHOLZ:  No objection.

12        THE COURT:  Admitted.

13   Q.   (By Ms. Rutahindurwa) And you see the date here is

14   August 31st, 2020?

15   A    Yes.

16   Q    It's addressed to you?

17   A    That is not spelled correctly, but yes, it is.

18   Q    And if we scroll down, the third bullet, it says, due to

19   the inability to identify an officer, no further disciplinary

20   review of this matter is possible?

21   A    Right.

22   Q    Ms. Parkins, why did you file this lawsuit?

23   A    You know, I almost didn't.  My husband and I talked a lot

24   about whether being public would subject us to, you know, our

25   names have to be public when we do this, and we were really

20-cv-1878-RBJ    JACQUELYN PARKINS - Cross    03-15-2022

1    worried about being harassed or doxed by people who don't agree

2    with our actions or our beliefs.  But we believe that it was

3    necessary to continue to push for change and push for

4    accountability, especially considering the internal affairs gave

5    us exactly what we expected, which was nothing.

6            And, you know, we talk about damages, but we haven't --

7    I don't think anybody has talked about the injunctive relief.

8    Through this lawsuit we have also made demands around policy

9    changes at DPD --

10           MS. BIRKHOLZ:  Your Honor, objection.

11           THE COURT:  Yeah.  Just answer her question, please.

12           THE WITNESS:  And so filing this lawsuit felt like a

13   continuation of doing whatever is possible and within my power

14   to do in order to make this a world that is safer, including

15   from the people who claim to protect and serve.

16           MS. RUTAHINDURWA:  No further questions.  Thank you.

17           THE COURT:  Cross examination?

18                        **CROSS EXAMINATION**

19   BY MS. BIRKHOLZ:

20   Q    Good morning.

21   A    Good morning.

22   Q    All right.  So, during your exam this morning, you have not

23   indicated any instance where you were actually impacted by any

24   of the less-lethal munitions like PepperBall, flash-bang, pepper

25   spray, any of that; correct?

20-cv-1878-RBJ    JACQUELYN PARKINS - Cross    03-15-2022

1    A    No.  I was extremely lucky.

2    Q    Okay.  But it's your testimony that you were targeted;

3    correct?

4    A    Yes.  I believe so.

5    Q    Okay.  And I'd like to move to day two, which is

6    May 28th -- sorry.  May 29th.  And you talked about an incident

7    where you claimed you were pushed into traffic on Colfax;

8    correct?

9    A    Correct.

10   Q    And do you remember seeing a video with Ms. Fitouri during

11   her testimony earlier in this trial?

12   A    You would have to be more specific.

13   Q    Well, in the video that I'm thinking of, I recall you guys

14   turning on to the sidewalk on Colfax.  Is that your recollection

15   of what happened at this incident?

16   A    Yes.

17   Q    Okay.  So, you weren't actually pushed into traffic.  You

18   were able to take the sidewalk?

19   A    There were multiple times later that day when we were

20   pushed into traffic.

21   Q    Okay.  And you mentioned several instances on May 29th when

22   you were on the capitol grounds; correct?

23   A    Correct.

24   Q    And one of your instances involves Stormtrooper-looking

25   people storming out of the capitol doors; correct?

20-cv-1878-RBJ    JACQUELYN PARKINS - Cross    03-15-2022

1    A    Correct.

2    Q    Okay.  And you understand through the testimony at this

3    trial that that would have been Colorado State Patrol; correct?

4    A    Yes.

5    Q    Now, moving to the next day, which is May 30th, 2020, you

6    spoke about an incident at Colfax and Lincoln, where there was a

7    flash-bang that landed on Ms. Fitouri's foot.  Do you recall

8    that?

9    A    Yes.

10   Q    Okay.  And at that time, you were 30 or 40 yards from the

11   front line; correct?

12   A    It's hard to remember exactly.

13   Q    Okay.  Do you remember giving your deposition in this case?

14   A    Yes.

15   Q    Okay.  And you remember being asked that during your

16   deposition?

17   A    Yes.

18   Q    Okay.  And that was closer in time to these events?

19   A    Yes.

20   Q    And so if you said you were 30 or 40 yards from the front

21   line, that would have been more accurate?

22   A    I think it's safe to assume that would be accurate, then.

23   Q    Okay.  And with respect to that item, you don't actually

24   know that it was a flash-bang; am I correct?

25   A    I saw many flash-bangs deployed.  I don't know what else it

20-cv-1878-RBJ    JACQUELYN PARKINS - Cross    03-15-2022

1  could possibly have been.

2  Q    Okay.  And you don't know who threw that munition?

3  A    No.  It was impossible to know.

4  Q    And you were far enough from the front line that you didn't

5  know exactly what was happening?

6  A    I could see that there were protesters on their knees with

7  their hands in the air.

8  Q    But you don't know what prompted that to be fired, because

9  you didn't see the police perspective?

10 A    I'm not sure I could ever tell you what prompted chemical

11 munitions to be fired.

12 Q    I'd like to move on to later that evening to the Colorado

13 Education Association parking lot.  Now, you recall describing

14 this incident as really scary and horrifying?

15 A    Yes.

16 Q    And you were hiding behind your car, trying not to get

17 struck by the PepperBalls?

18 A    Yes.

19 Q    Okay.  And you recall the group coming through the parking

20 lot, and a group of cops coming behind them and trying to corner

21 them and hit them with PepperBalls at all angles?

22 A    Yes.

23        MS. BIRKHOLZ:  So, I'd like to now move to admit

24 Exhibit 989g.

25        MS. RUTAHINDURWA:  No objection.

20-cv-1878-RBJ   JACQUELYN PARKINS - Cross   03-15-2022

1       THE COURT:  Well, actually, I have it already

2   admitted.

3       MS. BIRKHOLZ:  Okay.  Perfect.  Fabulous.  Let's pull

4   it up, and we're going to go to four minutes on the video.

5   Q.    (By Ms. Birkholz) So, we're going to press play, and is

6   this you guys right here?

7       (A video was played.)

8   A    Yes.  I believe so.

9   Q    And this is your car right here?

10  A    No.  That is Sara Fitouri's car.

11  Q    Is this your car?

12  A    Yes, it is.

13  Q    Okay.  So, this is playing in real time.  Pretty soon we're

14  going to see some kids run through.

15      (A video was played.)

16  Q    Did you see a single PepperBall being fired through that

17  parking lot?

18  A    I thought I just saw something bounce.

19  Q    Okay.  So, let's follow that.  Let's go back to about 4:15,

20  and I believe that's a fly that you're talking about, but let's

21  take another look.

22      (A video was played.)

23  Q    Okay.  Did you see that fly right there by the light?

24  A    Yes.

25  Q    So, that's not a PepperBall; right?

Kevin P. Carlin, RMR, CRR

20-cv-1878-RBJ   JACQUELYN PARKINS - Cross   03-15-2022

1   A     Right.

2           MS. BIRKHOLZ:  Okay.  So, let's now move to admit

3   989h --

4           THE COURT:  That was a fly?  One of those little

5   things that --

6           THE WITNESS:  Kind of looked like a moth to me, Your

7   Honor.

8           MS. BIRKHOLZ:  Fair enough.  Some insect.  Anyway,

9   Your Honor, move to admit 989h as well.

10          MS. RUTAHINDURWA:  No objection.

11          THE COURT:  Yes.  Admitted.

12          MS. BIRKHOLZ:  All right.  And this is the middle view

13  of the parking lot.  And we're going to go to six minutes and 11

14  seconds.

15      (A video was played.)

16          MS. BIRKHOLZ:  And my question to you is whether you

17  see any PepperBalls coming through this garage, or any

18  officers --

19      (A video was played.)

20  Q.    (By Ms. Birkholz) And we can stop it there.  Did you see

21  any officers coming through this parking lot?

22  A     Now, at the beginning of the clip I thought I saw some in

23  the alley, but not actually in the parking lot.

24  Q     You showed us a video, or you were given a video or shown a

25  video on direct exam, and they were on Colfax at that time;

20-cv-1878-RBJ   JACQUELYN PARKINS - Cross   03-15-2022

1   correct?

2   A    Correct.

3   Q    And you never saw any officers drive through the alley?

4   A    I don't recall.  Not in this video.

5   Q    Okay.  And you don't see any PepperBalls coming through

6   this parking lot either?

7   A    Not in this video.

8   Q    Did you ever talk to Mr. Deras after he had his deposition

9   taken?

10   A    Yes.  I'm sure.  We spoke many times.  We work together.

11   Q    And did he tell you that after I showed him this video that

12   he admitted that his constitutional rights weren't violated

13   based upon this incident?

14          MS. RUTAHINDURWA:  Objection.  Foundation.

15          MS. BIRKHOLZ:  Asking her what she knows.

16          THE COURT:  Overruled.  You can answer.

17          THE WITNESS:  I do not believe that we discussed our

18   depositions at length, because we didn't believe that was

19   appropriate.

20   Q.    (By Ms. Birkholz) Okay.  But you are seeking money from

21   this jury for this incident; correct?

22   A    I am seeking accountability from the Denver Police and the

23   City of Denver for their actions.

24   Q    All right.  And after this incident, that's when you went

25   to have the hot tub party at Sara's house?

20-cv-1878-RBJ    JACQUELYN PARKINS - Cross    03-15-2022

1   A    We did not have a hot tub party at Sara's house.

2   Q    You got in the hot tub; right?

3   A    I don't know if I did.  I know that doing things for self

4   care is a really good idea after being traumatized, and I think

5   characterizing it as a party is not okay.

6   Q    Well, that's what you testified to in your deposition, that

7   you went to Sara's house to sit in the hot tub; right?

8   A    We went to Sara's house to debrief and comfort one another.

9   Yes, I did.

10  Q    Now, let's move to May 31st.  You said at the capitol that

11  the lights were not working, but you actually recall those

12  lights not working because they were destroyed; right?

13  A    No.  I do not recall them being destroyed.

14  Q    You don't recall the lights being busted out?

15  A    I just remember that they were not on.

16  Q    Okay.  Now, you were asked about the kettling incident, as

17  it's being referred to in this trial.  And you were here for

18  Mr. Deras' testimony, too; correct?

19  A    I believe so.

20  Q    Okay.  When Ms. Jordan showed him the individual launching

21  fireworks directly at the police line, had you seen that person

22  earlier in the day?

23  A    I could not say.  There were a lot of people.

24  Q    Did you see Mr. Deras kick more than two canisters that

25  night?

1  A    I don't -- I did not see him kick either canister.  I just

2  knew he wasn't with us.

3  Q    Now, when we showed that HALO video to Commander Phelan, he

4  pointed out how along Logan, people were permitted to leave if

5  they wanted to do so.  Why didn't you take that opportunity?

6  A    That was not a real opportunity.  We had been breathing gas

7  for what felt like an extended period of time, and there was a

8  line of officers approaching from that direction.  It was not

9  safe to go that way, and I think to imply that it was is also

10  not okay.

11  Q    That line of officers couldn't even be seen in that camera

12  footage which is on the northwest corner of Logan?

13  A    I think we've established multiple times that cameras don't

14  always display everything as it looked at the time.

15  Q    You heard the announcements to leave, multiple

16  announcements to leave; correct?

17  A    In that moment?

18  Q    Before.  Earlier in that evening.

19  A    I heard one announcement to leave.

20  Q    You were by the capitol; right?

21  A    Yes.  It was a prerecorded announcement to leave.

22  Q    Which was on repeat; correct?

23  A    I don't recall it being on repeat.  I remember hearing it

24  once.

25  Q    Why do you believe it's productive to disobey police

20-cv-1878-RBJ   JACQUELYN PARKINS - Cross   03-15-2022

1  orders?

2  A    Again, I think that civil disobedience is something that

3  has been done for the entirety of the history of this country.

4  I think when it is done thoughtfully and with intention, it has

5  led to important change that has bettered the lives of people in

6  this country, and that it is important that folks continue to

7  stand up for what they believe in in nonviolent and peaceful

8  ways.

9  Q    And giving you money is the way to do that?

10 A    I think Claire said it really well, in that the -- if

11 internal affairs had led to any kind of accountability for any

12 of the officers that assaulted me, I might not be here.  The

13 only thing that we know how to do, it seems, the only way that

14 we are able to find accountability in the system that is

15 currently broken is to put a dollar amount on pain.

16       And I believe that the things that happened to me

17 mattered, and that the City and the police need to be held

18 accountable for the ways in which they violated my rights and

19 hurt me and my friends.

20 Q    Do you know that the police -- the Denver Police Department

21 has a citizen insight board?

22 A    I could not tell you anything specific about it.

23 Q    Well, if you want to change Denver's policies, are you

24 aware that you can go directly to the police department and

25 provide your insight?

20-cv-1878-RBJ    JACQUELYN PARKINS - Cross    03-15-2022

1    A    I believe I did that through making a complaint to the

2    Office of the Independent Monitor and through internal affairs.

3    Q    You understand internal affairs is to discipline police

4    officers, and to do that you need to know the identity of that

5    individual?  You understand that; correct?

6    A    Yes.  And I believe that police were very purposefully

7    acting in such ways that made it impossible for us to identify

8    them.

9    Q    Now, at any given time, you don't have any idea what

10   jurisdiction the officer was from that deployed munitions in

11   your vicinity?

12   A    There was no way to know.  Officers never identified

13   themselves or in any way communicated with me.

14   Q    And again, you have no medical bills as a result of this?

15   A    No.

16   Q    And despite that you have described these horrible frequent

17   nightmares and terrible anxiety, you haven't received any

18   counseling?

19   A    No.

20   Q    And again, you were never hit with any munition at all,

21   PepperBall, 40-millimeter, bean bag, any of those munitions that

22   the police had?

23   A    I was never struck by a projectile, no.

24   Q    And then even after May 30th being the worst day of the

25   protest for you, you still came back another 11 days?

20-cv-1878-RBJ   JACQUELYN PARKINS - Redirect   03-17-2022

1    A    Yes, I did.

2              MS. BIRKHOLZ:  No further questions.  Thank you.

3              THE COURT:  Redirect?

4                    **REDIRECT EXAMINATION**

5    BY MS. RUTAHINDURWA

6    Q    I'm showing you Exhibit 676.  Dan, are you able to find

7    676?  This video has already been admitted into evidence.  And

8    if we can go up to the 13-second marker.

9         (A video was played.)

10   Q    So, on cross examination, Ms. Birkholz talked a lot about

11   the CEA parking lot incident, and she stated that there weren't

12   any PepperBalls that were going through the parking lot.  But

13   does this depiction right here on -- demonstrate that officers

14   jumped off of the RDV and PepperBalled the protesters, who then

15   ran through the CEA parking lot?

16   A    Yes, it does.

17   Q    And did you hear the PepperBalls being shot?

18   A    Yes, I did.

19   Q    And so this aligns with the testimony that you gave on

20   direct that you were terrified of being PepperBalled, and hid

21   behind your car?

22   A    I believe so.

23   Q    And in the video that Ms. Birkholz showed, you were hiding

24   behind your car; correct?

25   A    Yes, I was.  We were waving for the kids to come through.

20-cv-1878-RBJ   JACQUELYN PARKINS - Redirect   03-17-2022

1        MS. RUTAHINDURWA:  I don't have any further questions.

2   Thank you.

3        THE COURT:  All right.  How about the jury?  Yes?

4   Okay.

5        MS. RUTAHINDURWA:  I apologize, Your Honor.  I have

6   one more question.

7        THE COURT:  Okay.

8   Q.    (By Ms. Rutahindurwa) I'm pulling up Exhibit 989h.  This

9   is a video that Ms. Birkholz showed you.  And right back here,

10  is that the RDV van behind that car that pulled up and

11  started -- with the officers in it?

12  A    I believe so.

13  Q    Okay.  Can you play just a little bit, Dan.  I think you

14  see the car move.

15       (A video was played.)

16  Q    Right there.  Coming through.  That's the RDV officer van?

17       MS. BIRKHOLZ:  Objection, Your Honor.  Speculation.

18  Q.    (By Ms. Rutahindurwa) You've seen it from the other

19  angle.  Does that align with where that car, the police vehicle

20  was coming through?

21  A    Yes.

22       MS. RUTAHINDURWA:  Thank you.  No further questions.

23       THE COURT:  All right.  We'll take the jury's question

24  now.

25       (Proceedings held at the bench:)

20-cv-1878-RBJ    JACQUELYN PARKINS - Redirect    03-17-2022

1      THE COURT:  Question number 32.

2      MS. BIRKHOLZ:  No objection.

3      MS. RUTAHINDURWA:  No objection.

4   (Proceedings held in open court:)

5      THE COURT:  So, here is a question from the jury.  As

6   an experienced protester, would you have felt safer if there was

7   more communication or direction from the police or from the

8   protest organizers as to where you could and could not protest?

9      THE WITNESS:  That's a good question.  I absolutely

10  think it would have been less awful if police had ever treated

11  me like a human being.  And then, yes.  I think if it had been

12  more structured, if we had had clearer understandings, if there

13  was any reason to why and when police decided to use violence

14  against us, that would have been helpful, and I think a lot of

15  us out there would have acted in such a way to avoid being

16  harmed.

17      THE COURT:  Actually, I think the question also asks

18  about where you could or could not protest.  In other words,

19  location.  And it is asking if you would have felt safer if

20  there was more communication or direction from either the police

21  side or the protester organization side as to where you could

22  and could not protest.

23      THE WITNESS:  It's hard to speculate, but I would say

24  that when I show up to protests that are for issues that are not

25  really mine; right?  When showing up in allyship with someone

Kevin P. Carlin, RMR, CRR

20-cv-1878-RBJ    JACQUELYN PARKINS - Redirect    03-17-2022

1    else who hasn't been systemically subjected to police brutality

2    throughout my life, I always follow the instructions of

3    organizers of the protest, because I'm there to support them.

4    And I would have -- I'm not sure if I would have felt safer.

5         THE COURT:  Okay.  Any other questions from the jury?

6    Follow-up from plaintiff?

7         MS. RUTAHINDURWA:  No, Your Honor.  Thank you.

8         THE COURT:  How about from defendant?

9         MS. BIRKHOLZ:  No, Your Honor.  Thank you.

10        THE COURT:  Okay.  Thank you.  Who is next?

11        MR. MACDONALD:  The plaintiffs call Nick Mitchell to

12    the stand.

13        THE COURT:  All right.  You know, I want to talk with

14    you about that briefly before, so let's take about a

15    seven-minute break here.  I want to speak to the lawyers about

16    something.

17        (Jury out at 10:13 a.m.)

18        THE COURT:  All right.  The jury has been excused.  We

19    talked about this witness earlier, and I ruled on the

20    defendants' objections, but it has occurred to me thinking about

21    it that there was at least one objection that Mr. Ringel made

22    that I didn't discuss, and that was that he had not been listed

23    as an expert.

24        If he wasn't listed as an expert, then that restricts

25    his ability to express opinions; right?

20-cv-1878-RBJ    JACQUELYN PARKINS - Redirect    03-17-2022

1    MR. MACDONALD:  Your Honor, I think he can express his

2  conclusions based on what he observed and concluded from the

3  interviews of the DPD and what he communicated to the public in

4  his report.

5    THE COURT:  What he did is a matter of fact, and I

6  don't have a problem with his talking about facts.  But he has

7  to be restricted to the opinions that he expressed at the time.

8    MR. MACDONALD:  Understood, Your Honor.

9    THE COURT:  Not new opinions, because you didn't

10  endorse him as an expert.

11    MR. MACDONALD:  That's right, Your Honor.  We don't

12  intend to ask him about new opinions.

13    THE COURT:  And you agree with that, don't you?

14    MR. RINGEL:  I agree with that, but I don't think

15  there's anything that he's going to be asked that's not an

16  opinion.

17    THE COURT:  Correct.

18    MR. RINGEL:  And the problem, Your Honor, is you have

19  the -- as I argued earlier, the 702 lay opinion rule allows

20  opinions that are based on personal knowledge that help the jury

21  understand and assist the actual knowledge of the witness.

22  Mr. Mitchell has no personal knowledge.  They could have

23  endorsed him as an expert.  They didn't.  He shouldn't be

24  allowed to testify.

25    THE COURT:  Okay.  Well, I think the opinions that he

20-cv-1878-RBJ    NICHOLAS MITCHELL - Direct    03-17-2022

1   expressed and that were fully disclosed in his report are fair

2   game, but any new opinions would not be.  All right.  Let's take

3   a brief recess, and then we will hear from Mr. Mitchell.

4         (Recess at 10:16 a.m., until 10:27 a.m.)

5         (Jury in at 10:27 a.m.)

6              THE COURT:  Okay.

7              MR. MACDONALD:  Thank you, Your Honor.  The plaintiffs

8   call Nick Mitchell to the stand.

9              THE COURT:  Good morning.

10             THE WITNESS:  Good morning, Your Honor.

11        (The Witness is Sworn)

12             THE COURT:  Thank you.  Have a seat.

13                     **DIRECT EXAMINATION**

14  BY MR. MACDONALD

15  Q    Good morning, Mr. Mitchell.

16  A    Good morning.

17  Q    Would you like a water bottle?

18  A    Yeah.  That would be great.  Thank you.

19  Q    Could you state your name for the record, please.

20  A    Nicholas Ethan Mitchell.

21  Q    What do you do for work, Mr. Mitchell?

22  A    I'm a lawyer, and I was formerly the independent monitor of

23  the Denver Police Department.

24  Q    And tell the jury what you're doing currently for work.

25  A    I was appointed by a federal court to monitor a consent

20-cv-1878-RBJ    NICHOLAS MITCHELL - Direct    03-17-2022

1    decree between the United States Department of Justice and the

2    Los Angeles County Sheriff's Department.

3    Q    And just very briefly tell the jury what you're doing in

4    that role where you were appointed by a federal court to oversee

5    a consent decree in Los Angeles.

6    A    I'm working with the justice department, the Court, and the

7    County of Los Angeles to reform the jail system in Los Angeles

8    County, which is the largest municipal jail system in the world,

9    and was found to be unconstitutional in a variety of ways.  And

10   so I'm working with those key stakeholders to create the

11   necessary reforms to make that jail system constitutional and

12   legal in terms of its conditions of confinement.

13   Q    And how long have you been doing that?

14   A    I was appointed in July 2020.  And I should say for the

15   first several months, I did it on a very part-time basis, but in

16   January of 2021, I began to do it on a much more full-time

17   basis.

18   Q    And we haven't had an opportunity to talk about your

19   testimony or what you're going to say today, have we?

20   A    We have not.

21   Q    And you've been represented by the City of Denver attorneys

22   at least since a little bit before your deposition was taken in

23   this case back in June 2021; right?

24   A    That's correct.

25   Q    All right.  And you said you're a lawyer?

20-cv-1878-RBJ    NICHOLAS MITCHELL - Direct    03-17-2022

1    A    I am.

2    Q    Where did you go to law school?

3    A    Fordham Law School in New York.

4    Q    What did you do after you finished law school,

5    Mr. Mitchell?

6    A    I joined a large law firm in New York City, where I

7    practiced for about four, four and a half years.

8    Q    And before you went to law school, did you work for the New

9    York City Civilian Complaint Review Board?

10    A    I did.

11    Q    Tell us a little bit about that work and how long you did

12    it.

13    A    That was and still is an agency under the mayor of New York

14    City that is charged with investigating allegations of police

15    misconduct in the NYPD.  And so I worked as first an

16    investigator within that agency and later a supervisor of

17    investigations.

18    Q    How long did you do that in New York, roughly?

19    A    Maybe four years-ish.

20    Q    And that was before you went to law school?

21    A    Correct.

22    Q    And was that sort of New York City's version of what you

23    then did here as an Office of Independent Monitor?

24    A    Yeah.  I think that's fair to say.  They're very different

25    in terms of the structure and the mandate of the two agencies,

20-cv-1878-RBJ     NICHOLAS MITCHELL - Direct     03-17-2022

1   but I think you could look at them as equivalent.

2   Q    When did you become the independent monitor for the City of

3   Denver?

4   A    August 2012.

5   Q    And you did that until you took the full-time, essentially

6   shift to doing the work for Los Angeles, the Los Angeles

7   Sheriff's Department in January of 2021?

8   A    Correct.

9   Q    All right.  And so you were the independent monitor during

10  the George Floyd protests?

11  A    That's correct.

12  Q    And so you were the independent monitor for about eight and

13  a half years, if I have my numbers right?

14  A    Yes.

15  Q    And Denver created the Office of the Independent Monitor in

16  2004; right?

17  A    Correct.

18  Q    Tell the jury a little bit about the purpose of the Office

19  of the Independent Monitor here in Denver.

20  A    Well, the office is charged with -- it's outside the police

21  department hierarchy in structure, so the independent monitor

22  reports to the mayor, not to the police chief or the director of

23  safety for the City of Denver, to give it independence.

24       And the office reviews -- receives complaints alleging

25  misconduct by members of the Denver Police Department.  The

20-cv-1878-RBJ    NICHOLAS MITCHELL - Direct    03-17-2022

1  office is involved in overseeing how those complaints are

2  investigated.  The office issues public reports that enhance

3  transparency about accountability within the police department

4  and sheriff's department, and in those reports and in other ways

5  makes recommendations to improve policies and practices within

6  the Denver Police Department and the Denver Sheriff's

7  Department.

8  Q    And at the time of the George Floyd protests, you had a

9  staff, including yourself, of about 14 people?

10  A    I think that's right, yes.

11  Q    How many were lawyers like you?

12  A    I think there were five lawyers at that time, who were my

13  deputy monitors.

14  Q    And you and your staff, I think you said have conducted

15  many investigations over the course of the eight and a half

16  years in which you were the independent monitor; right?

17  A    We conducted or oversaw many investigations, yes.

18  Q    And you prepared a report on the 2012 Occupy Denver

19  protest; right?

20  A    I'm not sure that the report was specifically about -- I

21  think there may have been a chunk or a portion of that report

22  that touched on issues related to those protests, but I think

23  the report was probably an annual report from the office that I

24  held.

25  Q    Got it.  So, you would do annual reports, and the annual

20-cv-1878-RBJ   NICHOLAS MITCHELL - Direct   03-17-2022

1    report would address certain issues that had come up in that

2    year; is that fair?

3    A    That's correct.

4    Q    Okay.  And you recall that one of the issues that you

5    addressed in one of your reports was the Occupy Denver protest,

6    and the police response to that; right?

7    A    Correct.

8    Q    And do you recall concluding that there was a missed

9    opportunity for the Denver Police Department in the way in which

10   it analyzed its response to the Occupy Denver protest?

11            MR. RINGEL:  Objection, Your Honor.  701, 702.

12            THE COURT:  Sustained.  Let's focus on this case.

13   Q.    (By Mr. Macdonald) As part of your role as the

14   independent monitor, you prepared a report entitled The Police

15   Response to the 2020 George Floyd Protests in Denver, an

16   Independent Review; right?

17   A    That's correct.

18   Q    And the city council asked you to assess the Denver Police

19   Department's response to the protests; right?

20   A    Yes.

21   Q    If we could show Mr. Mitchell Exhibit 754, please.  754 is

22   a letter from the city council to you, dated June 5th, 2020; is

23   that right?

24   A    Yes.

25            MR. MACDONALD:  Move to admit 754.

20-cv-1878-RBJ   NICHOLAS MITCHELL - Direct   03-17-2022

1    MR. RINGEL:  Objection.  Relevance.

2    THE COURT:  I gotta look at it, then.  May I see the

3    next page, please.  Back to the first page.  All right.  The

4    objection is overruled.  754 is admitted.

5    Q.    (By Mr. Macdonald) If we can focus in on that third

6    paragraph, Mr. Mitchell, and this is a letter that was signed by

7    all the members of the Denver City Council on June 5th, 2020; is

8    that right?

9    A    I think that's right.  I would have to look at the

10   signature page to verify that every single member signed, but my

11   recollection is that it was a unanimous letter.

12   Q    Okay.  And the city council members that signed the letter

13   indicated that numerous news accounts and public complaints have

14   surfaced alleging excessive use of force by the Denver Police

15   Department personnel; right?

16   A    They did, yes.

17   Q    And then if we look at the next paragraph, they asked you

18   to focus on DPD's use of force policy, the use of various forms

19   of riot gear and equipment, chemical agents, rubber bullets, and

20   other crowd control measures?

21   A    They did.

22   Q    Okay.  And is that what you did?

23   A    Among other things, yeah.  Among other topics.  That was

24   not -- we didn't limit ourselves to those topics as we did our

25   investigation and review, but we certainly included those topics

20-cv-1878-RBJ   NICHOLAS MITCHELL - Direct   03-17-2022

1   among those that we were evaluating in our investigation and

2   review.

3   Q    And you and your team wrote a 50-something-page report?

4   A    Yes.

5   Q    And you made that report public?

6   A    Correct.

7   Q    The report issued in November of 2020?

8   A    Yes.

9   Q    And so it took about six months to complete, give or take?

10   A    To -- yeah.  I think we probably wrote it in closer to four

11   months and then had -- you know, my practice was always to share

12   draft reports with the agency that was affected, in this case

13   the Denver Police Department, and give them an opportunity to

14   comment.  So, I think the writing process probably took fourish

15   months.

16   Q    And did you follow your normal course here and provide

17   drafts to the City and to the police department?

18   A    I did.

19   Q    All right.  And in your report, you recognized that there

20   were challenges presented by policing mass protests when the

21   demonstrations concern police conduct itself; right?

22        MR. RINGEL:  Objection.  Leading.

23        THE COURT:  Correct.  Sustained.  Please don't lead

24   this witness.  We want to hear what he has to say.

25   Q.    (By Mr. Macdonald) Mr. Mitchell, how did you consider the

Kevin P. Carlin, RMR, CRR

20-cv-1878-RBJ    NICHOLAS MITCHELL - Direct    03-17-2022

1    challenges that were presented by policing mass protests that

2    involved demonstrations concerning police conduct?

3    A    Can you say that again?

4    Q    Sure.  As part of your report, how did you consider the

5    fact that there were challenges in policing protests that

6    involved police misconduct?

7    A    Well, we evaluated research that has considered the

8    challenges of policing protests that involves allegations of

9    police misconduct and found in some cases that police

10   departments tend to respond more aggressively to such protests.

11         We spoke with dozens of officers and command personnel

12   within the Denver Police Department during our review who

13   described for us in pretty exacting detail how challenging it

14   was for them personally to police a protest in which the

15   participants were extremely angry and in some cases hostile

16   towards the Denver Police Department, and we -- I think given

17   our experience working in these areas, we recognized how

18   challenging it is for police departments to police such

19   protests.

20   Q    Did you consider whether there were risks that officers

21   would seek to punish protesters for speech they found

22   objectionable?

23   A    We did.

24   Q    And tell us a little bit about that.

25   A    Well, there are fundamental differences for a police

20-cv-1878-RBJ   NICHOLAS MITCHELL - Direct   03-17-2022

1   department -- you know, the Denver Police Department, for

2   example, responds to many protests that are about a whole

3   variety of topics.  They respond to protests at the state

4   capitol about potential legislation that's being issued that has

5   nothing to do with policing.  And I think generally speaking,

6   for many police officers, that's not controversial.  That's not

7   challenging.

8        But it can become extremely challenging when officers

9   are in a position in which they are being confronted by

10  protesters who have signs about, you know, their anger about

11  police conduct who are in some cases angry, maybe cursing at

12  police.

13       And so there is a risk that has been recognized in, you

14  know, certain national research that under such circumstances,

15  police departments will respond more aggressively given how

16  provocative it is to be a police officer in a protest that's

17  about police conduct.

18  Q    Given that research that you described, what is the

19  controls on police use of force -- how is it important to have

20  controls on police use of force in such protests that involve

21  protests on police misconduct?

22  A    Well, it's important for police leaders to recognize the

23  risk that officers may be provoked, may be emotionally

24  challenged.  It can be traumatic for some officers to be in that

25  circumstance when they're being confronted with antipolice

20-cv-1878-RBJ    NICHOLAS MITCHELL – Direct    03-17-2022

1    messages, and police managers around the country have developed

2    a variety of tools for helping officers to manage and regulate

3    their own behavior under those circumstances.  We call them in

4    the report internal controls on officer use of force.

5    Q    And in your report, what did you conclude about whether the

6    Denver Police Department sufficiently met this challenge that

7    you've just described?

8    A    We concluded that there were deficient internal controls on

9    officer use of force during the George Floyd protests in Denver.

10    Q    In preparing your report, what type of information did you

11    and your team gather, Mr. Mitchell?

12    A    We made a variety of document requests to the Denver Police

13    Department, and we had access to documents and records from

14    within that agency by Denver revised municipal code.  So, we

15    obtained all of the body-worn camera footage recorded by Denver

16    police officers during the protests.  We had access to the

17    stationary video camera system so we could review all of the

18    video gathered by stationary video cameras from the downtown

19    corridor during those events.

20        We obtained all rosters of police officers assigned to

21    work at the protest to the extent that such rosters existed.

22    Use of force policies and practices, lists of munitions and

23    equipment deployed by the police department during the protest,

24    and presumably many other categories of information that if I

25    could look at my report, I could -- this is now a year and a

20-cv-1878-RBJ   NICHOLAS MITCHELL - Direct   03-17-2022

1    half, plus, ago.

2          So, my memory of the particulars might need to be

3    refreshed, but I remember that it was voluminous information

4    that it took us -- took -- I put together a team of staff

5    members, and it took us quite a long time to review all of the

6    voluminous information that we gathered.

7          MR. MACDONALD:  Your Honor, may I provide Mr. Mitchell

8    the copy of his report?

9          THE COURT:  For what purpose?

10          MR. MACDONALD:  He indicated he thought it would be

11   helpful to refresh his recollection.

12          THE COURT:  For that purpose, sure.

13       (Pause in the proceedings.)

14          THE COURTROOM DEPUTY:  We're getting some feedback.

15   You guys can make sure your hotspots are under the table.  Maybe

16   that will help.  Also, phones, hotspots.  Thank you.

17   Q.    (By Mr. Macdonald) And before we go there, do you

18   remember about how much video footage of body-worn camera that

19   the City ultimately provided to you, Mr. Mitchell?

20   A    200-something hours, but the particular number doesn't

21   stick out in my head.

22   Q    Okay.  And how about -- you had mentioned the stationary

23   cameras that are on streetlights, street signs and the like.

24   Your team had access to those as well?

25   A    We did, yes.

20-cv-1878-RBJ    NICHOLAS MITCHELL - Direct    03-17-2022

1    Q    And if you look at page nine -- and without reading it out

2    to the jury, if you look at the third paragraph --

3    A    I see it.

4    Q    All right.  Does that refresh your recollection about the

5    amount of hours of HALO cam footage that your team had available

6    to you?

7    A    It does, yes.

8    Q    And what was the approximate amount of hours of HALO camera

9    footage?

10   A    More than 1,500 hours of potentially relevant HALO camera

11   video footage.

12   Q    1,500, or --

13   A    15,000.  I'm sorry.

14   Q    I take it you and your team did not look at 15,000 hours of

15   HALO footage?

16   A    It felt like it at times, but no.

17   Q    I think the jury may feel the same way.

18   A    We looked at -- we focused on -- we identified the dates

19   and times and intersections that appeared to us to involve the

20   greatest amount of conflict between protesters and police

21   officers, and we focused our review on those dates and times and

22   locations.

23   Q    And did you review any material from what the jury has

24   heard referred to as Denver's mutual aid partners, the agencies

25   that Denver invited in to help police the protest, like Aurora

20-cv-1878-RBJ    NICHOLAS MITCHELL - Direct    03-17-2022

1    and Jefferson County?

2    A    We reviewed a limited amount of information from the mutual

3    aid partners.

4    Q    Okay.  Did you interview DPD officers and command staff?

5    A    Yes.

6    Q    Approximately how many, to the best of your recollection,

7    Mr. Mitchell?

8    A    Several dozen.

9    Q    Did you memorialize -- you and your staff memorialize in

10   memos the information you received from Denver police officers

11   and command staff?

12   A    Yes, we did.

13   Q    And you made some sort of high-level conclusions about the

14   Denver officers' use of force during the protests; right?

15   A    Correct.

16   Q    And you set those out, some of them, on page 32 of your

17   report?

18   A    Yes.

19   Q    And based on your review, did you find any of the DPD

20   examples of DPD officers deploying less-lethal munitions in ways

21   that were extremely troubling?

22   A    I did, yes.

23   Q    Could you describe some of those for the jury, please.

24   A    Well, we saw examples of DPD officers deploying OC spray

25   and PepperBall rounds at persons who were only verbally

20-cv-1878-RBJ   NICHOLAS MITCHELL - Direct   03-17-2022

1  objecting to police behavior, and not engaged in any apparent

2  physical resistance.

3           We saw examples of officers deploying PepperBall rounds

4  and other projectiles at prohibited areas of the body, including

5  the head, face, and groin areas.

6           We saw officers continuing to deploy chemicals, gas,

7  impact, or explosive munitions after their initial deployments

8  had already caused people to disperse and leave an area.

9           We saw officers -- DPD officers throwing explosive

10 devices at or extremely close to individuals, sometimes

11 resulting in people being knocked to the ground with apparent

12 injuries, and we saw the deployment of OC spray at drivers or

13 throwable munitions being thrown into lanes of traffic in ways

14 that may have interfered with the ability of drivers to safely

15 operate motor vehicles.

16 Q    Did you also see examples of uses of force where Denver

17 police officers pushed protesters into traffic themselves by the

18 use of force?

19 A    I don't specifically recall that, but it's possible.

20 Q    And you don't have information about what happened to the

21 12 plaintiffs that are in this case; is that true?

22 A    I don't know who the 12 plaintiffs are in this case.

23 Q    All right.  And we haven't asked you to review the video

24 and form any opinions about what happened to the people in this

25 case, have we?

20-cv-1878-RBJ    NICHOLAS MITCHELL - Direct    03-17-2022

1    A    During my deposition, I was asked by a lawyer to do that.

2    But with that exception, no, you have not.

3    Q    And for clarity, that was not a lawyer who is involved in

4    this case?

5    A    I don't see him here, no.

6    Q    Your job as the independent monitor wasn't to evaluate

7    whether a particular use of force was compliant with the

8    Constitution or a violation of the Constitution, was it?

9    A    Not specifically, but certainly the Constitution -- my job

10   was to determine whether uses of force by DPD officers were

11   compliant with DPD policy, and the constitutional use of force

12   standard certainly impacts DPD policy.  So, indirectly, the

13   Constitution did play a role in our analysis, but no.  Generally

14   speaking, our evaluation was about compliance with Denver Police

15   Department policy.

16   Q    You didn't issue any conclusions about whether any use of

17   force in your report violated the Constitution or not?

18   A    That's correct.

19   Q    And the City hasn't asked you to review the videos from the

20   12 plaintiffs in this case and form any opinions about it, have

21   they?

22   A    No, they have not.

23   Q    During the course of your investigation, you interviewed a

24   training academy Lieutenant John Coppedge?

25   A    That's right.

20-cv-1878-RBJ   NICHOLAS MITCHELL - Direct   03-17-2022

1  Q    And you memorialized Mr. Coppedge -- the interview with

2  Mr. Coppedge in a memo; is that right?

3  A    I believe so, yes.

4  Q    I'd like to show you Exhibit 861, please.

5           MR. RINGEL:  Objection.  May we approach, Your Honor?

6           THE COURT:  Yes.

7      (Proceedings held at the bench:)

8           MR. RINGEL:  Two objections to this.  Number one, it's

9  hearsay.  And number two, it's not a regularly-conducted

10  activity of the government.  This is not something that OIM has

11  ever done before, these kind of memos.  It isn't a

12  regularly-conducted activity to fit within any hearsay,

13  objection number one.

14           And then number two, the content of the document is

15  hearsay.  If Mr. Macdonald wants to call Mr. Coppedge and ask

16  him about his facts, and then potentially impeach him with it

17  based on this memo, that's a different story, but trying to get

18  this memo in through Mr. Mitchell is problematic.

19           MR. MACDONALD:  It's non-hearsay under 801(d)(2)(D).

20  It is a statement of the agent within the scope of the

21  employment.  It is defined as non-hearsay.  So, there is no

22  hearsay objection, Your Honor.

23           MR. RINGEL:  That's only if the agent is a manager,

24  and a training person is not a manager.  It's the same argument

25  that we had before related to the definition of whether

1  something is a statement against interest when --

2      MR. MACDONALD:  It's actually a different rule and a

3  different language.  He's talking about Rule 32 of the federal

4  civil procedure, which refers to agents -- excuse me -- refers

5  to managing agents.  The hearsay rules, 801(d)(2)(D) speaks to

6  the testimony of an agent within the scope of the employment.

7  And if an agent speaks within the scope of the employment, then

8  it is defined as non-hearsay.  It has nothing to do with whether

9  it's a managing agent.  It has to do with whether it's an

10  employee of the company that's speaking to a topic --

11      THE COURT:  The objection is overruled.

12    (Proceedings held in open court:)

13      MR. MACDONALD:  Again, can we put 861 back up, please,

14  and publish this to the jury, please.

15      THE COURTROOM DEPUTY:  I'm sorry.  Your Honor, has it

16  been admitted?

17      THE COURT:  861 is admitted.

18      THE COURTROOM DEPUTY:  Thank you.

19      MR. RINGEL:  Your Honor, can the Court explain to the

20  jury the redactions on this document?

21      THE COURT:  Sure.

22      MR. RINGEL:  Thank you, Your Honor.

23      THE COURT:  So, when those memos were produced by the

24  defendant to the plaintiff, there were some parts of them that

25  were redacted, as you can see on the one in front of you.  They

20-cv-1878-RBJ    NICHOLAS MITCHELL - Direct    03-17-2022

1  redacted by blocking out certain parts of the memo.  And the

2  reason for that was because there are certain privileges that

3  parties have.  There is what is called a deliberative process

4  privilege.  There is a law enforcement privilege.  There is an

5  attorney-client privilege.  There's certain privileges that the

6  law creates that says that the party does not have to permit an

7  opposing party to see privileged material.  Okay?

8          It wouldn't surprise you, I don't think, to hear that

9  the two parties here didn't always agree on what parts of those

10  memos were properly protected by privileges, and that meant that

11  it was my job to review all of these memos and look at the parts

12  that were not redacted, and then make a decision as to whether

13  the redactions were appropriate, which I did.

14          And so what you will see in this memo are portions that

15  are redacted that I have determined as a matter of law were

16  properly redacted by the defendant.  The other portions are fair

17  game.  Okay?  Onward.

18          MR. MACDONALD:  Thank you, Your Honor.

19  Q.    (By Mr. Macdonald) Mr. Mitchell, can you describe for the

20  jury what Exhibit 861 is.

21  A    This is a memo prepared by my former deputy, a lawyer,

22  Kevin Strom, to our internal file on September 9th, related --

23  2020, related to an interview that I conducted of Lieutenant

24  John Coppedge of the Denver Police Department training academy

25  on that same day.

Kevin P. Carlin, RMR, CRR

20-cv-1878-RBJ    NICHOLAS MITCHELL - Direct    03-17-2022

1  Q    All right.  And Lieutenant Coppedge was a police officer

2  for the DPD during the George Floyd protest?

3  A    He was a police lieutenant for the DPD during the George

4  Floyd protests, yes.

5  Q    And he led the training academy?

6  A    He was a leader of the training academy.  I think there was

7  a captain above him at the academy.

8  Q    All right.  And in the section entitled leadership failure,

9  what did Lieutenant Coppedge describe to you and your colleague

10 about the leadership failure that he observed?

11         MR. RINGEL:  Objection.  The document speaks for

12 itself.  The witness can describe what the document says, but

13 this isn't necessarily what Mr. Coppedge said.

14         THE COURT:  Agreed.  Sustained.

15 Q.    (By Mr. Macdonald) Mr. Mitchell, what did you and your

16 colleague conclude from Mr. Coppedge's -- the interview you did

17 of him with respect to the leadership failure?

18 A    Well, we interviewed him about -- I think our purpose was

19 specifically to find out about the training that had been

20 provided to Denver police officers on crowd control and field

21 force operations.

22         So, the training that the academy provided to prepare

23 officers for the kinds of incidents that they might face during

24 a mass protest event like the George Floyd protests, while we

25 were discussing the training with Lieutenant Coppedge, he

20-cv-1878-RBJ    NICHOLAS MITCHELL - Direct    03-17-2022

1    described his own personal views of a variety of problems that

2    he identified in his estimation with the command who were in

3    charge of the George Floyd protests.  And I see some of them

4    reflected here on the document under leadership failure.  I also

5    see that there's some material blacked out there, and I don't

6    recall of course what was under that material.

7    Q    And did you conclude from your interview with Mr. Coppedge

8    that it was his perception that the officers on the ground were

9    reacting to what they saw without any sort of leadership?

10   A    That's what he conveyed to us during that interview, yes.

11   Q    All right.  And what he conveyed to you is that he saw what

12   happened during the George Floyd protests as a symptom of what

13   had been happening in the Denver Police Department for the last

14   few years?

15   A    I see that.  I don't specifically remember that, but I see

16   that in the memo, yes.

17   Q    If you could turn to the second page, please.  And if you

18   look up at the top, do you recall Mr. Coppedge describing to you

19   at length a change in attitude toward training between prior

20   chiefs of police and the current administration?

21   A    I do remember him describing that, yes.

22   Q    And tell the jury what you remember about that.

23   A    I remember him articulating his perception that during

24   prior administrations of the police department, there had been a

25   greater focus on training in crowd control, crowd management,

20-cv-1878-RBJ   NICHOLAS MITCHELL - Direct   03-17-2022

1  and field force operations.  And he specifically focused on the

2  lead-up to the 2008 Democratic National Convention in Denver, in

3  which officers were given days of training to prepare for what

4  was potentially a very large mass protest event.

5        And his perception that it had been very difficult to

6  get police officers to be freed from their other duties to come

7  out to the academy to receive equivalent training in recent

8  years.

9  Q   And based on your knowledge and experience, what did you

10 conclude about the importance of having ongoing training from a

11 crowd control -- strike that.  Are crowd control skills

12 perishable?

13 A   They are.  Police officers are trained in crowd control and

14 crowd management field force operations in the police academy,

15 and often are -- don't really have much of an opportunity to

16 practice them in their day-to-day work, picking up 911 calls and

17 doing the normal day-to-day work of being a police officer.

18        And so we think of them as skills that are perishable

19 that need to be frequently or periodically refreshed so that

20 officers can stay fresh on the techniques that they should use

21 when responding to large-scale protests.

22 Q   And did you hear any desire from the officers that you

23 interviewed for your report about a desire for more crowd

24 control training?

25        MR. RINGEL:  Objection.  Hearsay.

20-cv-1878-RBJ   NICHOLAS MITCHELL - Direct   03-17-2022

1    THE COURT:  Overruled.

2    THE WITNESS:  We did hear that frequently in our

3    discussions with Denver police officers who had responded to the

4    George Floyd protests, that they felt a need for greater

5    emphasis on training in crowd management and field force

6    operations.

7    Q.    (By Mr. Macdonald) And Lieutenant Coppedge of the

8    training academy described to you that there had been a change

9    in attitude from the -- in recent years, leading up to the

10   George Floyd protests, where it made training less of a

11   priority.  Is that fair?  Training on crowd control.  Let me be

12   specific.

13   A    That's how he presented it, yes.

14   Q    Okay.  And if we look at the paragraph down below, what did

15   he describe the view of the current chief of police with respect

16   to training?

17   A    He characterized the current chief's attitude as being that

18   training was not important, or not as important as other chiefs

19   had indicated in the past.

20   Q    And if there's no mandate from the top that training is

21   important, what have you observed happens?

22   A    Can you say that again?

23   Q    Yeah.  If there's not a mandate from the top that officers

24   need to take time out of their busy schedules to go and do other

25   training, what have you observed over the course of your career

20-cv-1878-RBJ   NICHOLAS MITCHELL - Direct   03-17-2022

1   happens?

2   A    Well, my observation is that police resources are often

3   stretched thin in a variety of ways.  Officers have to -- you

4   know, there's demand in each patrol district for more police

5   officers to respond to 911 calls.  Denver has been in a period

6   of rising crime, and I think that has an impact on whether or

7   not police resources can be freed up to go for a few days or a

8   week to the training academy to train when 911 calls are rising.

9         So, I think without an emphasis and demand from the top

10   to get officers training on perishable skills like field force

11   operations and crowd management and control, it's likely that

12   those other demands for resources will mean that cops don't end

13   up out at the academy receiving those kinds of trainings.

14   Q    If we turn to the next page, the top there under the

15   section less-lethal crowd management and field force training,

16   Lieutenant Coppedge, do you remember him discussing with you a

17   shift to inventory management, that the focus had changed more

18   from inventory management instead of less-lethal training?

19   A    I don't specifically remember that.  I see that in the

20   memo.  I do remember him talking about -- yeah.  I remember him

21   talking about it going out to the districts and the inventory

22   being managed downtown by the police technician.  I remember

23   parts of what's reflected in this paragraph.

24   Q    And just tell us what inventory management would be with

25   respect to less-lethal munitions.  What does that mean?

20-cv-1878-RBJ   NICHOLAS MITCHELL - Direct   03-17-2022

1   A    It would be tracking the supply of each kind of less-lethal

2   munition that the department has in inventory.  Less-lethal

3   munitions generally have an expiration date, so they can be used

4   for a period of years, usually, after which -- and after they

5   expire, they should no longer be deployed in the field.

6           So, part of an inventory management system is tracking

7   expiration dates like at the grocery store and making sure that

8   there is a fresh supply, if you will, of each kind of munition

9   that the department might use ready to be deployed into the

10  field if necessary.

11  Q    Do you recall Lieutenant Coppedge describing the fact that

12  the training academy no longer trains on less-lethal crowd

13  management tactics or weapons?

14  A    I remember him saying that, and that the training and the

15  certification process was now done by others within the police

16  department.

17  Q    If we go down near the second-to-last paragraph.  It's

18  fairly -- yeah.  The redacted -- mostly redacted one.  Here,

19  Lieutenant Coppedge is talking about one of the biggest failures

20  is supervisors not recognizing when officers had taken too much

21  abuse.  Is this something that you heard from other officers

22  during your review and investigation?

23  A    It certainly was a theme that we heard when talking with

24  other officers and supervisors that officers were taking a lot

25  of abuse, to use the language of Lieutenant Coppedge as

20-cv-1878-RBJ    NICHOLAS MITCHELL – Direct    03-17-2022

1   reflected in this memo, and needed to be rotated off the

2   skirmish lines to get a mental break, and an emotional break to

3   avoid the possibility that they might come to overreact if they

4   reached their emotional limit while policing the protest.

5   Q    This goes back to one of the issues you mentioned earlier

6   in your testimony, that at some point there's a risk that an

7   officer will use force as punishment or retaliation for taking

8   abuse or bad language or having something thrown at them earlier

9   in the day; right?

10  A    That's correct.

11  Q    And Lieutenant Coppedge said that tempers and clarity of

12  mind would run short and the result was an overuse of

13  PepperBalls, and that he did not think PepperBalls were a tool

14  to be used for shooting at people, but instead were supposed to

15  be shot at the ground to disperse crowds.  Did you observe this

16  same issue that Lieutenant Coppedge testified that there was an

17  overuse of PepperBalls, and that PepperBalls were being used

18  during the protest to shoot at people instead of shot at the

19  ground?

20  A    I observed PepperBalls being shot at the ground, and I also

21  observed PepperBalls being shot at people, sometimes in

22  circumstances in which I could identify the reason why a person

23  was being targeted with a PepperBall, and other times in which I

24  could not identify a legitimate reason for targeting a

25  particular person with a PepperBall.

20-cv-1878-RBJ    NICHOLAS MITCHELL - Direct    03-17-2022

1   Q    We can take that down, please.  You also interviewed a DPD

2   Captain Sylvia Sich.  Do you remember that?

3   A    I do.

4   Q    Can we put up 874, please.  Is 874 a memo of -- that your

5   office prepared on your interview of Captain Sylvia Sich?

6   A    It is.

7            MR. MACDONALD:  Move admission of 874, Your Honor.

8            MR. RINGEL:  Objection for the previously articulated

9   reasons, Your Honor.

10           THE COURT:  All right.  The objection is overruled.

11  874 is admitted.

12  Q.    (By Mr. Macdonald) Captain is above a lieutenant?

13  A    It is.

14  Q    Just below commander?

15  A    Yes.

16  Q    And Ms. Sich was in the command post during the protest;

17  right?

18  A    For at least some of the days of the protest, that's

19  correct.

20  Q    And do you recall that Ms. Sich described to you that Chief

21  Paul Pazen would lose it if he was presented with a differing

22  opinion?

23  A    Can you show me the section of the memo that says that?

24  Q    Yeah.  Let's look at the top of the second page.

25  A    I do, yes.

20-cv-1878-RBJ    NICHOLAS MITCHELL - Direct    03-17-2022

1    Q    And you remember that Captain Sich described Chief Pazen as

2    losing it if he's presented with a differing opinion, and that

3    he was often angry or paralyzed during the George Floyd

4    protests?

5    A    She did say that, yes.

6    Q    And if we go back to page one, Captain Sich described that

7    others in the command post were scared to make a decision or to

8    contradict Chief Pazen?

9    A    I believe that's correct, yes.

10   Q    And do you remember this discussion with her that she was

11   worried that people were essentially in the command post,

12   command officers were worried that they would lose their job if

13   they spoke up, or be demoted?

14   A    That's how she presented it, yes.

15   Q    What do you remember about that?

16   A    I remember her describing a somewhat chaotic environment in

17   the command post that was rudderless in some ways.  I think by

18   the time that I interviewed Captain Sich, I had spoken with

19   others who had been in the command post, so I had multiple bases

20   of information about what had happened in the command post.  So,

21   she was one perspective, but I do remember her indicating all of

22   the things that are indicated here on page one.

23   Q    And if we look at the second paragraph under introductions,

24   she -- in the second sentence, you say as she would repeat and

25   emphasize throughout the interview, Captain Sich said that

20-cv-1878-RBJ    NICHOLAS MITCHELL - Direct    03-17-2022

1   Denver's culture is unique in that no one can make suggestions

2   or tell command staff what to do, and as she rose in the ranks,

3   she asked why the DPD doesn't address problems proactively, and

4   was met with obstacles and difficulty with the attitude that

5   it's not a problem until it becomes a problem, and it will be

6   addressed once it is a problem?

7   A    That's how she presented it, yes.

8   Q    And do you know if she's still -- she was still a captain

9   when you interviewed her?

10  A    She was.

11  Q    All right.  Do you know if she's still a captain today?

12  A    I have no idea.

13  Q    If we look at the second page, if we go down near the --

14  the second-to-last paragraph from the bottom, second-to-last

15  sentence, Captain Sich described that she believed that a lot of

16  officers and protesters may have been injured due to a lack of

17  supervision and command?

18  A    Yes.  She said that.

19  Q    And not just protesters being injured, but her view was

20  that it -- the lack of supervision and command resulted in

21  injuries to both officers and protesters.  Do you remember that?

22  A    I do.

23  Q    If we look up at the top of this same first full paragraph,

24  do you remember Captain Sich relaying to you and your staff that

25  in the command post, criticism of officers on the ground was

20-cv-1878-RBJ     NICHOLAS MITCHELL - Direct     03-17-2022

1   nonstop, and that people outwardly wondered why lines weren't

2   moving or why they weren't disciplined, and she kept thinking,

3   what are they supposed to do without training or supervision?

4   A     Yes.

5   Q     And this was -- Captain Sich was not the only person who

6   described these problems, was she?

7   A     Some of the problems we've discussed may have only been

8   Captain Sich describing them, but this particular problem, no.

9   I heard that from other officers in the DPD.

10  Q     If we turn to page three, and she discussed -- there's a

11  section under training inadequacies.  And at the end of that

12  second sentence, she's discussing the communications between

13  Commander Phelan and tactical cars and units like the SWAT and

14  the gang unit.  And she explained that it appeared that no one

15  was communicating with the rank and file officers serving in the

16  skirmish lines.  Do you see that?

17  A     I do.

18  Q     What problems did you observe arising if the rank and file

19  officers who are out on the skirmish line weren't getting

20  communication from the leadership?

21  A     Well, it was something I heard repeated in various

22  interviews that I conducted with DPD personnel that officers did

23  not have a clear sense of their tactical objectives when they

24  were on skirmish lines.  Should they advance?  Should they hold

25  ground?  Should they cede territory to protesters or attempt to

20-cv-1878-RBJ    NICHOLAS MITCHELL - Direct    03-17-2022

1  engage physically with protesters?  That there was a lack of

2  clear communication to officers working on those skirmish lines

3  during the protest.

4  Q    Captain Sich also talked a bit about the coordination with

5  the outside agencies like Aurora and Jeff. Co. and others that

6  came into the protest; right?

7  A    I see that here in the memo, yes.

8  Q    Now, if we blow up that few paragraphs, she confirmed to

9  you that the outside agencies were told to follow their own

10  policies regarding force and arrest; right?

11  A    Yes.

12  Q    And that she was not aware of actual mutual aid agreements

13  or memorandum of understanding between the DPD and the outside

14  agencies, and that she had never seen one?

15  A    Yes.

16  Q    If we turn to the next page, there's a section on DPD

17  records, officer statements and munitions deployment.  Blow up

18  the first couple paragraphs, please, Dan.  And do you recall

19  hearing from Captain Sich and other DPD officers that officers

20  were not required to complete use of force statements during the

21  protest?

22  A    I do.

23  Q    And here, Ms. Sich is telling you that she was in the

24  command post in the second paragraph, there was difficulty

25  learning of when officers had deployed PepperBall, and she began

20-cv-1878-RBJ   NICHOLAS MITCHELL - Direct   03-17-2022

1   asking about other ways to learn when officers had deployed

2   them, and she asked Commander Phelan if she could review the

3   officers' statements.  So, this was during the George Floyd

4   protest; right?

5   A    Yes.

6   Q    And then she learned at that time, wait a second, officers

7   are not completing their use of force statements, so there's

8   nothing for me to review to evaluate when officers have deployed

9   their PepperBall; right?

10  A    I think there would have been perhaps some other records

11  reviewed, but yes, it would not have been use of force reports

12  documenting when PepperBall or other less-lethal munitions were

13  deployed.

14  Q    We can take that down, please, Dan.  Do you also recall

15  interviewing DPD Sergeant Eric Knutson?

16  A    I do.

17  Q    All right.  Can we put up Exhibit 864, please.  Is 864 the

18  memo that you and your staff prepared about your interview with

19  Sergeant Knutson?

20  A    It is.  I think it's Knutson, if I'm not mistaken.  I think

21  his name is Knutson, if I'm not mistaken, but yes, it is the

22  memo that I prepared.

23         MR. MACDONALD:  Thank you.  Move admission of 864,

24  Your Honor.

25         MR. RINGEL:  Objection on a previously articulated

Kevin P. Carlin, RMR, CRR

20-cv-1878-RBJ   NICHOLAS MITCHELL - Direct   03-17-2022

1    basis, Your Honor.

2            THE COURT:  Overruled.  864 admitted.

3    Q.    (By Mr. Macdonald) Mr. Mitchell, you recall that Sergeant

4    Knutson was the DPD's primary crowd control trainer, and was at

5    that time assigned to DPD's training academy?  Do you see that

6    in the second paragraph?

7    A    I do.

8    Q    And he had that role since 2013; right?

9    A    Yes.

10   Q    And he developed a three-day field force operation class

11   back in 2015?  Let's go down a little bit to the bottom -- the

12   bottom paragraph under crowd control field force training.

13   A    Yes.  Correct.

14   Q    And describe for the jury what a field force operations

15   class is.

16   A    My best understanding is that it's a class that focuses on

17   the choreography, if you will, of movement of police officers on

18   skirmish lines, how they communicate, you know, with their

19   supervisors and across the skirmish line, how they -- the kinds

20   of steps they take, the kind of movements they use in response

21   to particular behavior by crowds at protests.

22   Q    And this was a three-day course that he worked to develop

23   back in 2015?

24   A    Correct.

25   Q    And he put officers through that course approximately once

20-cv-1878-RBJ    NICHOLAS MITCHELL - Direct    03-17-2022

1   a month in 2015 into the beginning of 2016?

2   A    Yes.

3   Q    And in mid 2016, several DPD commanders said they would no

4   longer send officers to that training?

5   A    Yes.

6   Q    And this was the issue -- similar to the issue we talked

7   about earlier, it was a question of manpower and essentially

8   money, resources; right?

9   A    I think that's accurate, yes.

10  Q    And so that was the end of the three-day course back in

11  2016?

12  A    Correct.

13  Q    If we look at page three, do you recall -- blow up those

14  first two paragraphs there.  That he was on -- Sergeant Knutson

15  was on vacation during the beginning of the George Floyd

16  protests, and he actually called people and said, I'm prepared

17  to come in if you need me.  Do you remember him talking about

18  that?

19  A    I do.

20  Q    And he watched a lot of the video, and after watching the

21  video, he expressed his view that the formations were nothing --

22  the formations that were being used were nothing that I have

23  ever trained on.  That's one of the things he described?

24  A    Yes.

25  Q    And he also talked about an absence of command and control

20-cv-1878-RBJ    NICHOLAS MITCHELL - Direct    03-17-2022

1  down in that next paragraph.  He noted that from the video he

2  had seen, there was an absence of command and control, and too

3  much reliance on PepperBall.

4  A    Yes.

5  Q    And that later should have required officers to use batons

6  and encourage proper formation and half-steps?

7  A    Correct.

8  Q    And when Officer -- Sergeant Knutson?  Excuse me.  When

9  Sergeant Knutson was -- when he offered to come in, he was told

10 he wasn't needed; right?

11 A    He said that, yes.

12 Q    And if we turn to the next page, he had asked previously

13 for officers -- to bring officers to the academy for the

14 training, but that was squashed; right?

15 A    Yes.

16 Q    Again, this was another resources, another money issue;

17 right?

18 A    Yes.

19 Q    We can take that down.  Do you recall, Mr. Mitchell,

20 interviewing DPD Lieutenant Kim Lovato?

21 A    I do.

22 Q    And Ms. Lovato -- Lieutenant, excuse me.  Lieutenant

23 Lovato, she was one of the people who was helping police the

24 protest for the DPD; right?

25 A    She was.

20-cv-1878-RBJ    NICHOLAS MITCHELL - Direct    03-17-2022

1  Q    And do you remember that she described the DPD as being

2  caught with their pants down?

3  A    I don't specifically remember that, but it sounds like

4  something that Lieutenant Lovato might have said.  If you could

5  show me the document, I would be happy to take a look and

6  refresh my memory.

7  Q    I will.  Let's show Mr. Mitchell 865, please.  If we turn

8  to page four.  Look at this and just read it to yourself, and I

9  will ask you a question.  The top.

10 A    Yes.  I've read it.

11 Q    Okay.  Does this refresh your recollection that Ms. Lovato

12 informed you that the Denver Police Department's operational

13 response to the protests were not pretty, and that the

14 department was caught with their pants down?

15 A    I do remember that, yes.

16 Q    And that as a result, chaos ensued?

17 A    Yes.

18 Q    Do you recall that Lieutenant Lovato described to you that

19 the shooting of protesters who had turned their backs and were

20 running away was likely a mixture of tunnel vision and a lack of

21 discipline?

22 A    Is there a portion of the memo that speaks to that?

23 Q    Yeah.  Let's turn to page three, please.  If we look down

24 at the bottom, towards the bottom paragraph.

25 A    Yes.

20-cv-1878-RBJ    NICHOLAS MITCHELL - Direct    03-17-2022

1  Q    Does this refresh your recollection that Ms. Lovato

2  described to you that videos showing officers shooting at

3  protesters after they had turned their back and were running

4  away was likely a mixture of tunnel vision and a lack of

5  discipline?

6  A    Yes.

7  Q    Do you recall interviewing Deputy Chief Bob Archer?

8  A    I do.

9  Q    Do you remember Deputy Chief Archer describing to you that

10 many people were affected by PepperBalls and tear gas who were

11 not the intended targets because there were just so many

12 protesters out on the street?

13 A    Could I see the memo to refresh my recollection?

14 Q    Yes, you may.  Let's put up 857, please, Dan.  If we look

15 down at the bottom of the page.

16 A    Can I see the continuation of the last sentence?

17 Q    Yes.  Please turn.

18 A    Yes.

19 Q    All right.  And if we stay there, when Deputy Chief Archer

20 was asked how the department can ensure that the use of pepper

21 hits its intended target, she simply said training; right?

22 A    Yes.

23 Q    Do you remember interviewing Lieutenant Robert Wyckoff?

24 A    I do.

25 Q    And Lieutenant Wyckoff was another one of the officers who

20-cv-1878-RBJ   NICHOLAS MITCHELL - Direct   03-17-2022

1  policed the protest; right?

2  A    I think he spent much of his time in the command post, but

3  my recollection is that he also went into the field to command

4  officers at various points in time during the first five days.

5  Q    And Lieutenant Wyckoff was in the command post with

6  Commander Phelan for some of the protest?

7  A    Correct.

8  Q    And what do you recall him telling you about how much

9  authority had been placed in one person, Commander Phelan, to

10  make all the decisions?

11  A    Is there a portion of the memo that would refresh my

12  recollection?

13  Q    Yes, there is.  If we can put up 875, page four, please.

14  If you could read to yourself that redacted paragraph.

15  A    Yes.

16  Q    Do you recall that Lieutenant Wyckoff, who was in the

17  command post, described to you that too much authority had been

18  placed in one person, Commander Phelan, to make all the

19  decisions?

20  A    I remember him sharing a bunch of observations about the

21  incident command system used by the DPD during the protests, and

22  I think one of those observations was that too much authority

23  had been placed in one person, Commander Phelan, to make all the

24  decisions.

25  Q    And he concluded from his experience in the command post

20-cv-1878-RBJ    NICHOLAS MITCHELL - Direct    03-17-2022

1    that the command structure failed us, meaning the DPD's

2    officers, on nights one and two; right?

3    A    Yes.

4    Q    And do you recall discussing the use of force -- the use of

5    force statements that officers filled out a couple weeks after

6    the protests began?  Do you remember talking about that with

7    Lieutenant Wyckoff?

8    A    I remember talking about it with a lot of people in the

9    command post.  Probably Lieutenant Wyckoff, but I would have to

10   look at the portion of the memo to refresh my recollection.

11   Q    All right.  Let's take a look at page six, Mr. Mitchell.

12   And you can read to yourself that second paragraph under the use

13   of force reporting.

14   A    Yes.

15   Q    And do you recall that Lieutenant Wyckoff described that

16   Commander Ron Thomas contacted him to help collect the use of

17   force reports 10 to 12 days after the event?

18   A    Yes.

19   Q    And that some officers didn't feel comfortable writing the

20   reports so long after the use of force, because so much time had

21   passed; right?

22   A    I do remember that, yes.

23   Q    And events were chaotic, and memories were not as clear for

24   describing the force 10 or 12 days later as they would have been

25   had they been filled out at least closer in time?

20-cv-1878-RBJ    NICHOLAS MITCHELL - Direct    03-17-2022

1   A    Yes.

2   Q    You can take that down, please, Dan.  Do you remember

3   interviewing gang unit Officer Joseph Stadler?

4   A    I do.

5   Q    Do you recall Officer Stadler describing a lack of

6   communication and strategy on the use of less-lethal force?

7   A    I would have to look at the document to refresh my

8   recollection.

9   Q    Certainly.  Let's put up 873, please.  If you look at page

10  three, that second full paragraph in the middle.

11  A    Yes.

12  Q    Okay.  And Officer Stadler described a lack of

13  communication and strategy regarding less-lethal deployment,

14  especially on the first night of the protest; right?

15  A    Yes.

16  Q    And one of the things he described is that throwing tear

17  gas, gas canisters, are not always the best tool because they --

18  there must be excellent communication and strategy used for gas

19  to be effective?

20  A    Yes.

21  Q    And is that consistent with your experience over all the

22  years you've done work as an independent monitor in reviewing

23  police conduct?

24  A    You know, I would probably say I've more closely evaluated

25  when use of gas is appropriate and justified.  I'm not sure that

20-cv-1878-RBJ   NICHOLAS MITCHELL - Direct   03-17-2022

1    I'm qualified to opine on when it is most effective.

2    Q    Officer Stadler described to you that people were not

3    getting clear instructions, in that DPD teams were pushing

4    people out of the park and throwing gas just to deploy gas

5    instead of making tactical decisions; right?

6    A    Yes.

7    Q    And because of this, DPD officers used too many munitions

8    on the first night?

9    A    Yes.

10   Q    And he didn't fault any of the officers, because he didn't

11   feel they had the tactical experience, and the command post had

12   too many things to do; right?

13   A    Correct.

14   Q    Do you recall Officer Stadler talking to you about

15   protesters complaining to him that they couldn't hear dispersal

16   orders?

17   A    I don't remember that specifically, but I'm happy to

18   refresh my recollection if it's in the memo.

19   Q    Let's take a look at page three.  If you look up at the

20   top.  The bottom of the first paragraph.

21   A    Mm-hmm.  Yes.  I see it.

22   Q    And that some protesters complained that they couldn't hear

23   the dispersal orders?

24   A    Yes.

25   Q    And his view was that wasn't the officers' fault; right?

20-cv-1878-RBJ    NICHOLAS MITCHELL - Direct    03-17-2022

1    A    That's what he indicated, yes.

2    Q    Do you remember interviewing Technician Ryan Grothe?

3    A    I do.

4    Q    And Technician Grothe was the less-lethal coordinator for

5    Denver; right?

6    A    Yes.

7    Q    And do you recall Lieutenant Grothe discussed with you that

8    there were officers who were not certified to use the PepperBall

9    or the 40-millimeter systems that could have received them and

10   used them; right?

11   A    I believe so, but I'd prefer to look at the memo and

12   refresh my recollection.

13   Q    Certainly.  Let's look at 862, please.  If we look at page

14   three, down near the bottom, the paragraph right above the

15   munition shortage and purchases.

16   A    I see that section.

17   Q    Okay.  And does this refresh your recollection that

18   Technician Grothe indicated to you that there may have been

19   exigent circumstances in which officers who were not certified

20   with the PepperBall or 40-millimeter system could have received

21   them and used them during the protest?

22   A    My recollection is that he wasn't certain if that had

23   happened, and that he was saying if it had happened, it would

24   only have been in exigent circumstances.

25   Q    And do you recall from your report that you concluded that

20-cv-1878-RBJ   NICHOLAS MITCHELL - Direct   03-17-2022

1  it in fact did happen, that officers who were not certified

2  based on your review of the use of force statements and all the

3  other materials had deployed munitions for which they weren't

4  certified?

5  A    We did conclude that.  We reviewed use of force statements

6  and training records from the department and concluded that

7  officers who were not certified on PepperBall and 40-millimeter

8  received some kind of emergency field training, and received

9  those less-lethal weapons when they arrived at the protest.  At

10 least a small number of officers.

11 Q    And do you recall that Technician Grothe talked to you

12 about flash-bangs?

13 A    I am sure I asked him about flash-bangs.  I would have to

14 look at the memo to refresh my recollection on what he said.

15 Q    And did you ask most of the officers that you -- or command

16 staff about flash-bangs during the course of your interviews?

17 A    I think we probably asked anyone in specialized tactical

18 unit, like SWAT or the SORT team or the gang unit about

19 flash-bangs.  I'm not sure that we would have asked regular

20 officers who were working on skirmish lines or supervisors who

21 were supervising those officers.

22 Q    If we look at -- let's go back to page two down near the

23 bottom, there's a section entitled less-lethal equipment and

24 munitions?

25 A    Yes.  I see that.

20-cv-1878-RBJ    NICHOLAS MITCHELL - Direct    03-17-2022

1   Q    Do you recall that when you asked Technician Grothe about

2   flash-bangs, he explained that Metro SWAT is the only unit with

3   access, and that they are not meant to be used as part of crowd

4   control activities?

5   A    I remember him saying that, yes.

6   Q    And you observed from your review of videos that in fact

7   Denver officers did use flash-bangs as part of crowd control

8   even though they weren't meant to be; right?

9   A    That's correct.

10  Q    Do you recall hearing from officers in the course of your

11  interviews that some believed that the 40-millimeter launcher

12  was too heavy of a response to use on protesters during the

13  George Floyd protests, that they were concerned about how people

14  were equipped?

15  A    I don't remember that offhand.  I'd have to look at the

16  document to refresh my recollection.

17  Q    All right.  Let's put up 872, please.  This is another

18  interview memo that you did with a police Sergeant Eranda

19  Piyasena?

20  A    Piyasena, I think.

21  Q    Do you see that?

22  A    I do.

23  Q    If we look at the second page, Sergeant Piyasena described

24  his dissatisfaction of how the group was equipped because he

25  felt that for most of what they would encounter, the

20-cv-1878-RBJ     NICHOLAS MITCHELL - Direct     03-17-2022

1   40-millimeter launcher was too heavy of a response, and the OC

2   grenades were only to be deployed on the order of a lieutenant;

3   right?

4   A     Yes.

5   Q     Do you recall several officers telling you they hadn't

6   received crowd control or field force training for several years

7   prior to the onset of the George Floyd protest?

8   A     I remember that being a theme that arose in multiple

9   interviews, but which officers communicated that, I don't

10  recall.

11  Q     Do you remember interviewing Lieutenant Ken Chavez?

12  A     I do.

13  Q     And do you remember Lieutenant Chavez describing a lack of

14  communication and direction from the command post to him?

15  A     I do.

16  Q     All right.  And that at times when he couldn't get through

17  Commander Phelan to receive authorization to deploy tear gas, he

18  decided to deploy it anyway?

19  A     I would have to look at the memo to refresh my

20  recollection.

21  Q     Let's look at 859, please.  If we look at the second page,

22  please.  And if you read that -- scroll down a little bit, that

23  big paragraph.  If you read that to yourself.

24  A     Which paragraph?

25  Q     The one that begins Lieutenant Chavez and his officers.

Kevin P. Carlin, RMR, CRR

20-cv-1878-RBJ    NICHOLAS MITCHELL - Direct    03-17-2022

1   A     Okay.  Yes.

2   Q     And if we turn to the next page, page three, do you recall

3   that a Lieutenant Chavez found PepperBall and gas to be the most

4   effective forms of less-lethal during George Floyd protests

5   because they functioned as dispersal tools?

6   A     Yes.

7   Q     And that PepperBall systems lacked precision, especially at

8   a distance?

9   A     Yes.

10  Q     And he talked about also the 40-millimeter was not as

11  effective of a dispersal tool as PepperBall and gas, because

12  those rounds tend to float, which means they can -- I think it

13  means they tend to rise when fired; is that right?

14  A     You know, I don't know what "float" meant, if it meant rise

15  or veer off course.  I mean, the 40 is not generally thought of

16  as a dispersal tool.  It is a tool for targeting a specific

17  individual.  So, I do remember him discussing the problems with

18  the way that rounds would move, particularly over long

19  distances.  But I don't think anyone represented that the 40 was

20  a dispersal tool.

21  Q     If you look at page four right above the redactions, do you

22  recall that -- actually, let's go up to the top of the page,

23  please.  That Lieutenant Chavez conveyed to you that some

24  supervisors stepped up and were proactive, but many others stood

25  by and waited for directions from the command post?

20-cv-1878-RBJ   NICHOLAS MITCHELL - Direct   03-17-2022

1    A    Yes.

2    Q    But there was unfortunately in his view a lack of

3    communication and direction from the command post, so sometimes

4    it was necessary for supervisors to just make decisions and

5    adjust strategy on the ground?

6    A    He said that, yes.

7    Q    And that it was apparent to him that not all sergeants and

8    lieutenants were confident or comfortable making these calls,

9    but he was?

10   A    Yes.

11   Q    Do you recall learning from your interviews that DPD did

12   not train with its mutual aid partners?

13   A    I do.

14   Q    And that they never worked with outside jurisdictions on

15   crowd control?

16   A    I believe that's accurate, yes.

17         MR. MACDONALD:  Your Honor, I'm about to shift a

18   little bit, and happy to take a break or just press forward.

19         THE COURT:  Well, we're going to take a break at noon,

20   and it's 11:51.  If you want to stop now, fine.

21         MR. MACDONALD:  I'm happy to keep going, Your Honor.

22         THE COURT:  It's up to you.

23         MR. MACDONALD:  All right.  I will keep going.

24   Q.   (By Mr. Macdonald) I'd like to shift to talking about

25   some of the conclusions in your report.  If we could put up the

20-cv-1878-RBJ   NICHOLAS MITCHELL - Direct   03-17-2022

1   slide of the weapons that was used with Chief Stamper, please.

2   We're going to talk about some of the weapons just very briefly

3   that you concluded were used by the DPD.  So, one of them was

4   the -- and this begins at page 13 of your report, if you need it

5   to refresh your recollection, Mr. Mitchell.  One was the

6   PepperBall launcher, and the jury has heard a lot about that.

7   The PepperBall rounds come out at a velocity of between 280 and

8   350 feet per second; right?

9   A    Correct.

10  Q    They're filled with a pelargonic acid -- I don't know how

11  to say the last word -- vanillylamide; is that right?

12  A    I don't know either.

13  Q    You don't know how to pronounce it?

14  A    Yeah.  The pronunciation also is a mystery to me, but that

15  is technically correct.

16  Q    It's a -- a powdered acid that is designed to impair

17  breathing, cause skin inflammation, tightness and pain in the

18  chest, involuntary eye closure, profuse tearing; correct?

19  A    Correct.

20  Q    And the manufacturer cautions that PepperBall launchers

21  should never shoot at the head, the face, the eyes, the ears,

22  the throat, or the spine; correct?

23  A    Right.

24  Q    Because impact in these areas could result in unintended

25  consequences like severe injury or death; right?

20-cv-1878-RBJ   NICHOLAS MITCHELL - Direct   03-17-2022

1   A    Yes.

2   Q    Okay.  And the DPD also used the 40-millimeter launcher.

3   We just talked about that a moment ago; right?

4   A    Yes, it did.

5   Q    And those -- the projectile that comes out of that also

6   comes out at about 295 to 325 feet per second?

7   A    Correct.

8   Q    And some contain an OC powder.  Some of the projectiles

9   that come out contain the oleoresin capsicum; right?

10  A    Yes.

11  Q    And so that's also designed to make it difficult to breathe

12  and difficult to see; correct?

13  A    Yes.

14  Q    All right.  And impact of a 40-millimeter launcher can

15  cause serious injuries, eye injuries, skull fractures, and the

16  like; true?

17  A    True.

18  Q    And the manufacturer there warns it's only to be used by

19  trained law enforcement, corrections, and military personnel;

20  right?

21  A    Yes.

22  Q    Because that can cause serious injury or death as well?

23  A    Yes.

24  Q    And the DPD deployed those during the protests on citizens;

25  true?

20-cv-1878-RBJ   NICHOLAS MITCHELL - Direct   03-17-2022

1  A    Yes.

2  Q    And next, they deployed OC foggers; right?

3  A    Yes.

4  Q    And the OC fogger, that contains an oleoresin or OC aerosol

5  pepper spray?

6  A    Yes.

7  Q    Also designed to cause a burning sensation of the skin, the

8  eyes, inflammation of the breathing passages, temporarily

9  restrict breathing; is that right?

10  A    Yes.

11  Q    And the manufacturer there says that the minimum

12  recommended distance -- in other words, you should be six feet

13  away before you're deploying an OC fogger; right?

14  A    Yes.

15  Q    And the effective range is 18 to 20 feet?

16  A    Yes.

17  Q    Maybe as far as I am away from you?  I am not great with

18  distance, but something like that?

19  A    Could be.

20  Q    All right.  And next is the gas grenades.  Gas and smoke

21  grenades.  DPD --

22  A    Wait.  I'm sorry.  When you say next, are you suggesting

23  there was some chronological order to the DPD's deployment of

24  the tools?

25  Q    No.  Apologies.  I was going next in your report, the next

20-cv-1878-RBJ    NICHOLAS MITCHELL - Direct    03-17-2022

1   weapon that you described the DPD using during the protest.

2   A    Thank you.

3   Q    You talked about the deployment where you described the CS

4   gas, commonly referred to as tear gas; right?

5   A    Correct.

6   Q    And causes irritation, burning sensation, blisters,

7   coughing, shortness of breath, chest tightness?

8   A    Yes.

9   Q    Also only to be used by authorized and trained law

10  enforcement, corrections, or military personnel, according to

11  the manufacturer?

12  A    Yes.

13  Q    Here again, the gas and smoke grenades can cause serious

14  injury or death?

15  A    Yes.

16  Q    And your report next addresses the rubber ball grenades.

17  Those were used by DPD and its mutual aid partners during the

18  protests?

19  A    Yes.

20  Q    And the rubber ball grenades sometimes are known as sting

21  balls or Stinger grenades; right?

22  A    Correct.

23  Q    And this is a hand-thrown explosive device, emits a bright

24  flash, 175-decibel noise, and it projects up to 180 rubber balls

25  in 360 degrees with a 50-foot radius; right?

20-cv-1878-RBJ   NICHOLAS MITCHELL - Direct   03-17-2022

1   A     Correct.

2   Q     The light and sound can disorient individuals?

3   A     Yes.

4   Q     Rubber pellets cause pain?

5   A     Yes.

6   Q     And some of the rubber ball grenades also contain an OC

7   powder that makes it difficult to breathe and has the impacts

8   that the OC powder has; right?

9   A     Correct.

10  Q     All right.  And neither the DPD use of force policy or its

11  crowd management manual includes any discussion about the

12  appropriate use of rubber ball grenades; true?

13  A     True.  True at the time that we issued the report.

14  Q     Thank you.  You also discussed noise flash diversionary

15  devices.  We talked about that earlier.  Flash-bangs.

16  A     Yes.

17  Q     This is another hand-thrown explosive device that emits a

18  bright flash and a loud noise?

19  A     Correct.

20  Q     Designed to disorient and cause temporary blindness?

21  A     Yes.

22  Q     The heat they release is up to 4,900 degrees Fahrenheit;

23  right?

24  A     Yes.

25  Q     Cause fires, severe burns?

20-cv-1878-RBJ   NICHOLAS MITCHELL - Direct   03-17-2022

1   A     Yes.

2   Q     Not intended for the direct application of force against a

3   person; right?

4   A     Generally speaking, no.

5   Q     Shouldn't be thrown directly at a person; right?

6   A     I think under all but the most extreme circumstances,

7   that's true.

8   Q     And the flash-bang should only be deployed by officers who

9   receive specialized training in their use?

10  A     Correct.

11  Q     Here again, the DPD use of force policy, neither that nor

12  its crowd management manual include any discussion of the

13  appropriate use of the flash-bangs; right?

14  A     Not at the time we issued the report.

15        MR. MACDONALD:  Your Honor, it's noon.

16        THE COURT:  Yes.  We will stop.  1:15?  Okay.

17        (Jury out at 11:59 a.m.)

18        MR. RINGEL:  Your Honor, may I raise an issue?

19        THE COURT:  Yes.

20        MR. RINGEL:  Just the issue of timing, Your Honor.

21  The Court has previously indicated that we have three weeks for

22  trial.  The plaintiffs, we are now on day nine.  After

23  Mr. Mitchell, Mr. Macdonald has indicated there are six more

24  witnesses for the plaintiffs.  We would really like to have

25  sufficient time to put our defense on.

20-cv-1878-RBJ    NICHOLAS MITCHELL - Direct    03-17-2022

1       THE COURT:  That's fair.

2       MR. RINGEL:  And if the Court is going to cut us off

3   next week, I don't think that's realistic or fair to the

4   defendants.

5       THE COURT:  That's the risk that the plaintiffs are

6   taking by drawing things out like they have been.  We've had

7   repetition.  We've had more repetition.  We've had wastes of

8   time.  That's the risk they're taking.

9       MR. RINGEL:  Okay.

10       THE COURT:  We start the DaVita criminal trial on the

11   28th of March.

12       MR. RINGEL:  So, if we're not done with the evidence

13   on the 25th, then there will be a mistrial?

14       THE COURT:  Could be.

15       MR. RINGEL:  I just wanted to understand where we

16   were, Your Honor.  Thank you.

17       (Recess at 12:01 p.m., until 1:17 p.m.)

18       (Jury in at 1:17 p.m.)

19       THE COURT:  Okay.  You folks signed up for jury duty

20   right at the time when all the snow was coming.  Oh, yeah.  We

21   made you come, didn't we.  I forgot that part.  Okay.

22   Q.    (By Mr. Macdonald) Good afternoon, Mr. Mitchell.

23   A    Hi.

24   Q    When we left off, we were talking about some of the weapons

25   that were used during the George Floyd protests, and I just want

                20-cv-1878-RBJ    NICHOLAS MITCHELL - Direct    03-17-2022

1    to talk about a couple more.  Mutual aid agencies, the police

2    departments that Denver invited in to help with the protests,

3    they used less-lethal shotguns; right?

4    A    Some did.  I believe some did not, but some did, yes.

5    Q    And do you recall concluding that the mutual aid partners

6    reported deploying more than 150 less-lethal shotgun rounds?

7    A    If you will give me a moment.

8    Q    Yeah.  It's on page 47.

9    A    Yes.  I did reach that conclusion.

10   Q    And the mutual aid partners that Denver invited in also

11   used something sometimes referred to as a bean bag round; right?

12   A    Yes.

13   Q    And this is Kevlar bags filled with lead shot; right?

14   A    Yes.

15   Q    And based on your review, you concluded that officers from

16   the folks invited in by Denver used more than 200 of these

17   Kevlar bag rounds; right?

18   A    Correct.

19   Q    You also concluded that the mutual aid partners used at

20   least 73 rubber ball rounds, which is another kind of munition

21   that was used during the protest; right?  That's on page 46?

22   A    Yes.

23   Q    And the rubber ball round is a munition that contains

24   rubber balls similar to the rubber ball grenades that contain

25   approximately 180 rubber balls that travel at a velocity of 280

20-cv-1878-RBJ     NICHOLAS MITCHELL - Direct     03-17-2022

1   to 330 feet per second?

2   A    Correct.

3   Q    I want to talk just briefly about what you concluded about

4   the amount of munitions that the Denver and the mutual aid

5   agencies deployed during the first five days of the protests,

6   and that's what you sort of focused on as part of your report;

7   right?

8   A    Yes.

9   Q    All right.  And if you look at page 17, to the extent you

10  need to refresh your memory, do you recall concluding that DPD

11  had at the start of the protest more than 30,000 PepperBall

12  rounds in inventory?

13  A    Correct.  Yes.

14  Q    Okay.  And that on the first night of the protest,

15  May 28th, DPD officers began reporting that they had exhausted

16  their supply of less-lethal?

17  A    Yes.

18  Q    Okay.  And so DPD went through about 30,000 PepperBalls and

19  then sent a Colorado State Patrol plane to Wyoming on day two to

20  try to get more munitions; right?

21  A    I'm not sure that we could conclude that they exhausted

22  30,000 on the first day.  It may be that they were in the hands

23  of other teams, but I think the second part -- I can agree with

24  the second part of your statement, that on the second day, that

25  they did receive a resupply on the second day.

20-cv-1878-RBJ    NICHOLAS MITCHELL - Direct    03-17-2022

1   Q    Got it.  And that was by, they sent a plane to Wyoming to

2   pick up more PepperBalls, more gas grenades, more 40-millimeter

3   rounds?

4   A    Correct.

5   Q    Okay.  And you do recall that by the first night, DPD

6   officers were reporting that their unit had exhausted supplies

7   of their less-lethal; right?

8   A    Yes.

9   Q    Okay.  And that included the gang unit and the Metro SWAT

10  both reported by 10:30 on the first night that they had depleted

11  their supply of PepperBall rounds and their throwable munitions;

12  true?

13  A    Yes.

14  Q    All right.  And so DPD sent a plane to Wyoming, and they

15  ordered more than 66,000 more PepperBall rounds; right?

16  A    Yes.

17  Q    Okay.  And the 40-millimeter rounds that had -- in

18  inventory preprotest were just under 700.  688 40-millimeter

19  rounds; right?

20  A    Correct.

21  Q    And they did this emergency order and got another 670

22  40-millimeter rounds?

23  A    My recollection is that there were several orders, several

24  resupply orders.  So, I'm not sure that the 670 came all in one

25  resupply order, but yes.  That number is accurate.  They ordered

20-cv-1878-RBJ    NICHOLAS MITCHELL - Direct    03-17-2022

1  an additional 670 40-millimeter rounds.

2  Q    And during this same time period, they ordered an

3  additional 300 rubber ball grenades, 250 gas grenades, 250 smoke

4  grenades, and 200 OC foggers.  That's just in that first few

5  days of the protest; right?

6  A    Yes.

7  Q    And the cost just for that emergency set of munitions that

8  was being delivered was $202,000?

9  A    Yes.

10 Q    All right.  I want to talk briefly about the body-worn

11 camera issues that you identified during the protest.  You found

12 a footage gap in the body-worn camera footage; is that right?

13 A    That's right.

14 Q    And please describe for the jury what that footage gap was.

15 A    Well, we attempted to identify each piece of body-worn

16 camera footage recorded by Denver police officers during the

17 protest, and of course we requested all of that footage from the

18 police department, and received a -- received a lower or a

19 smaller quantity of footage than we expected to receive based on

20 the number of DPD officers who were policing the protest.

21       So, we called that the footage gap.  We evaluated the

22 number of officers that DPD sent to police the protest, and the

23 number of officers for whom footage was provided to us, and

24 identified that there were many, many police officers from the

25 Denver Police Department who had not recorded body-worn camera

20-cv-1878-RBJ   NICHOLAS MITCHELL - Direct   03-17-2022

1   footage during those first five days of the protest.

2   Q    And by one example that you gave in the report, that on

3   June 1st, which would have been the fifth day of the protest,

4   based on the roster of officers you had received, there were at

5   least 150 DPD officers that worked the protest that day; right?

6   A    Yes.

7   Q    And you only received body-worn camera for 38 of those

8   officers?

9   A    Correct.

10  Q    Okay.  So, less than a quarter of the officers had any

11  body-worn camera footage on that day from the protest; right?

12  A    Yes.

13  Q    All right.  And on May 30th, DPD -- well, let me step back.

14  DPD couldn't figure out or tell you exactly how many officers

15  worked the protest on those first five days; right?

16  A    The first -- the first five days or first four days?

17  Q    Well, let's talk about the first four days.

18  A    Yeah.  That's correct.

19  Q    Okay.  And so they gave you -- you were able to determine a

20  range, for example, on May 30th, that the Denver Police

21  Department estimated that between 150 and 200 officers worked

22  the protest.  Somewhere in that range?

23  A    Yes.

24  Q    Because they didn't keep rosters of who was working the

25  protest; right?

20-cv-1878-RBJ   NICHOLAS MITCHELL - Direct   03-17-2022

1   A     Correct.

2   Q     And this was one of the internal controls that you found

3   deficient; right?

4   A     It was.

5   Q     And on May 30th, when the Denver Police Department

6   estimated there was between 150 and 200 officers, they only

7   provided you with body-worn camera for 75; right?

8   A     I think that's right, but where does that appear in the

9   report?

10  Q     Top of page 23.

11  A     Yes.  That's right.

12  Q     So, less than half, under any calculation, even had one

13  minute of body-worn camera footage for May 30th; right?

14  A     Correct.

15  Q     And the lack of body-worn camera footage hinders

16  supervisors from determining whether a protest was being managed

17  properly; right?  Is that fair?

18  A     Yeah.  I think that's fair to some extent.  You know, I

19  wouldn't expect supervisors to be able to watch a lot of

20  body-worn camera footage while the protests were going on.  It

21  certainly hindered our ability to investigate allegations made

22  after the fact.

23  Q     And you're familiar with research that shows the presence

24  of an active body-worn camera can impact officer behavior;

25  right?

20-cv-1878-RBJ    NICHOLAS MITCHELL - Direct    03-17-2022

1   A    I am.

2   Q    And please describe for the jury why.

3   A    There is research that suggests that when officers know

4   they're being recorded on their own body-worn cameras and when

5   citizens know that they are being recorded, that it can have a

6   deescalating effect on everyone's behavior.  Just knowing that a

7   camera is rolling can make everyone behave a little bit more

8   civilly, perhaps, in the interaction, use force at reduced

9   rates, and so on and so forth.

10  Q    You think having activation of body-worn cameras is

11  important to reduce incidents of excessive force; right?

12  A    Yeah.  Incidents of excessive force, as well as potentially

13  assaultive behavior towards police officers.

14  Q    And you have had -- Denver Police Department actually put

15  in a pilot program back in June of 2014 when it first decided to

16  pilot using body-worn camera; right?

17  A    Correct.

18  Q    And then they instituted it across the department in 2015?

19  A    I think that's right in terms of the date.

20  Q    And back in 2014, you thought it was important for SWAT

21  officers to have body-worn camera; right?

22  A    I did.

23  Q    And are you aware that during the protests, the SWAT

24  officers did not have their body-worn cameras activated?

25  A    Yes.

20-cv-1878-RBJ    NICHOLAS MITCHELL - Direct    03-17-2022

1    Q    You are aware of that?

2    A    Mm-hmm.

3    Q    All right.  You concluded as part of your investigation

4    that the DPD's use of the mutual aid partnerships during the

5    George Floyd protests was deficient in certain ways; right?

6    A    I did.

7    Q    And part of that was the lack of training?

8    A    The lack of joint training amongst agencies?

9    Q    Yes.

10   A    Yes.

11   Q    In your report, you also addressed the DPD's failure to

12   track less-lethal munitions; right?

13   A    I did.

14   Q    And one of your conclusions is that the effective tracking

15   of less-lethal munitions is critical in protest management;

16   right?

17   A    Yes.

18   Q    Why is that?

19   A    Because it's important for police commanders to know who is

20   using what munitions and at what rates, and to be able -- for

21   example, to look at teams of officers and compare, you know, if

22   one squad is -- has used 100 PepperBalls and another has used a

23   thousand, that's a potential management issue.  Is the second

24   squad in a more dangerous location, or are they using

25   PepperBall, by way of hypothetical example, in a more permissive

1  manner than the first squad?

2       So, measuring the quantity of each kind of less-lethal

3  munition being deployed into the field and how quickly it's

4  being expended is an important component of managing police

5  response to protests.

6  Q   And Denver Police Department didn't do that during George

7  Floyd protests, did it?

8  A   Not at the beginning.  I think there were some adaptations

9  during the protest.  They developed some kind of a tracking log,

10 but in the first five days, I think there was no such tracking

11 log.

12 Q   And if we look at page 19 of your report, if you look at

13 that top paragraph, the last sentence of the first paragraph,

14 and read that to yourself, please.

15 A   Yes.

16 Q   And you concluded that the Denver Police Department

17 maintained no log of the munitions distributions nor an

18 accounting of the rate at which teams were expending them;

19 right?

20 A   Correct.

21 Q   As part of your report, you concluded that officer

22 identification was also a problem during the George Floyd

23 protests; right?

24 A   I did.

25 Q   And tell me what you concluded about that.

20-cv-1878-RBJ    NICHOLAS MITCHELL - Cross    03-17-2022

1    A    Well, it's extremely important that officers should be

2    wearing their badges and name tags visibly on the exterior of

3    their uniform or their riot gear so people know who they're

4    interacting with.  And we identified numerous examples in which

5    Denver police officers for one reason or another were not

6    wearing their nametags and badge numbers on the exterior of

7    their uniforms or riot gear, or it was covered up in such a way

8    that it wasn't visible to members of the public.

9    Q    And it's important for accountability for officers to be

10   identifiable to the citizens they're interacting with.  Would

11   you agree with that?

12   A    I would.

13   Q    And would you agree that an officer's failure to have

14   identification so that the citizen can see who they're

15   interacting with can inflame a crowd or protesters?

16   A    We saw it happen in certain instances, yes.

17              MR. MACDONALD:  No further questions, Your Honor.

18              THE COURT:  All right.  Cross examination?

19                        **CROSS EXAMINATION**

20   BY MR. RINGEL

21   Q    Good afternoon, Mr. Mitchell.

22   A    Good afternoon.

23   Q    I wanted to follow up on some of the questions that

24   Mr. Macdonald asked you this morning and this afternoon.  To

25   start with, you indicated you're trained as an attorney?

20-cv-1878-RBJ    NICHOLAS MITCHELL - Cross    03-17-2022

1   A    Yes.

2   Q    You've never worked as a police officer?

3   A    I have not.

4   Q    I wanted to focus a little bit more on the issues of what

5   the role of the Office of the Independent Monitor is.  You

6   explained that a little bit.  It was created in 2004; right?

7   A    Yes.

8   Q    You became the monitor in 2012?

9   A    Correct.

10  Q    And you served until January of 2021; is that right?

11  A    Yes.

12  Q    Okay.  And there are -- the monitor is created in the

13  charter of the City and County of Denver; right?

14  A    Yes.

15  Q    And there are -- there's a scope of what the monitor's role

16  is vis-a-vis the Denver Police Department and the Denver

17  Sheriff's Department within the charter of the City and County

18  of Denver?

19  A    Correct.

20  Q    Okay.  And the design of the office of independent monitor

21  is to do certain things, and that's sort of within the purview

22  of the monitor's office; right?

23  A    Can you say that again?

24  Q    Sure.  There is -- the duties and responsibilities of the

25  monitor are defined by the charter?

20-cv-1878-RBJ    NICHOLAS MITCHELL - Cross    03-17-2022

1   A    By the charter and the revised municipal code working

2   together, yes.

3   Q    Okay.  That makes sense.  And one of the things that the

4   monitor does in its oversight role is to receive and process

5   complaints about police and sheriff personnel?

6   A    Correct.

7   Q    And if there's a complaint from a member of the public or a

8   fellow officer and it's investigated by internal affairs, the

9   monitor's office would be involved in monitoring that

10  investigation?

11  A    Yes.

12  Q    Okay.  And nothing about what's in the content of your

13  report that Mr. Macdonald asked you has anything to do with the

14  monitor's role of monitoring IA investigations; right?

15  A    Correct.

16  Q    Okay.  The other things that the monitor's office is

17  involved with in terms of investigations is any officer-involved

18  shooting?

19  A    Yes.

20  Q    And with respect to the sheriff's department, any

21  in-custody death?

22  A    Correct.

23  Q    Okay.  And then when an IA investigation occurs, they do --

24  monitor's office, you or your deputy monitors participate in a

25  couple different ways.  You might sit in or monitor an interview

20-cv-1878-RBJ    NICHOLAS MITCHELL - Cross    03-17-2022

1  related to that investigation; true?

2  A    Yes.

3  Q    And you could provide questions to the sergeant conducting

4  the IA as part of that process if there were areas of inquiry or

5  holes in the questions that that particular sergeant was asking

6  a particular witness?

7  A    We could recommend questions, but it's a power of

8  recommendation.  We can't compel the internal affairs sergeant

9  to ask those questions.

10  Q    Fair enough.  So, you can say -- if you're sitting in on an

11  interview or watching it on closed circuit, you could say to the

12  sergeant at a break, Sergeant, I think you should really ask

13  these areas of inquiry to follow up about what you're indicating

14  with this witness, and then the sergeant chooses whether to do

15  that or not?

16  A    Correct.

17  Q    Okay.  And then once there are findings in an IA

18  investigation, the monitor's office can and does comment on

19  those findings; right?

20  A    Yes.

21  Q    Okay.  And then with respect to discipline, the monitor's

22  office is also involved in the disciplinary process; right?

23  A    Yes.

24  Q    So, after there's an IA investigation, there is what's

25  called in the police department conduct review; right?

20-cv-1878-RBJ    NICHOLAS MITCHELL – Cross    03-17-2022

1    A    Yes.

2    Q    And the purpose of the conduct review office is essentially

3    to take the facts as found by IA and analyze those facts against

4    the policies of the police department to determine whether

5    there's been any departure from policy?

6    A    Correct.

7    Q    Okay.  And the monitor has a role in the conduct review

8    process too; right?

9    A    Yes.

10   Q    You review information created by the conduct review about

11   policy, potential policy violations or not, and the monitor's

12   office has the ability to comment on those things too; right?

13   A    Yes.

14   Q    And if you disagree with assessments about whether there's

15   a violation of policy, that would be something that would be

16   part of the process, and it would go up the chain for purposes

17   of consideration of discipline?

18   A    Correct.

19   Q    Okay.  All right.  The monitor's office also makes

20   recommendations on policy issues and issues of improvements for

21   the police and the sheriff on their practices, their training,

22   and even potentially their operations?

23   A    Correct.

24   Q    And those are all recommendations that the departments have

25   the authority to decide to implement or not?

                20-cv-1878-RBJ    NICHOLAS MITCHELL - Cross    03-17-2022

1    A    Yes.

2    Q    Okay.  The monitor's office conducts community outreach?

3    A    Correct.

4    Q    And the monitor's office makes annual and other reports to

5    the public on patterns of complaints, issues that are happening

6    in those departments, discipline, all of that sort of stuff; is

7    that fair?

8    A    That's fair.

9    Q    Okay.  Is that sort of generally the basic universe of what

10   the scope of the monitor's role is, or did I miss something?

11   A    Well, the monitor also manages a staff.  So, there are lots

12   of responsibilities that come along with it, having city budgets

13   and managing personnel.  There were other duties associated with

14   being an appointee within city government, but I think you've

15   generally summarized some of the key duties.

16   Q    Yeah.  You have human resources duties.  You have budget

17   duties.  You have personnel duties.  You have training of your

18   own staff duties, all that stuff?

19   A    Yes.

20   Q    Hiring, firing?

21   A    Yes.

22   Q    Okay.  Fair enough.  All right.  I want to be crystal clear

23   about your knowledge of the George Floyd protests.

24   A    Okay.

25   Q    You weren't on the street during any of the days of the

20-cv-1878-RBJ   NICHOLAS MITCHELL - Cross   03-17-2022

1  protests?

2  A    I was not.

3  Q    You didn't -- you were not personally present to observe

4  anything that happened either amongst the protesters or by the

5  police?

6  A    I was not.

7  Q    So, the information that you have related to the protests

8  is information that was provided to you for review.

9  A    Information that was provided to me or information that I

10  gathered, yes.

11  Q    Correct.  That makes sense.  And what you gathered was a

12  whole bunch of video?

13  A    Yes.

14  Q    Body-worn camera video?

15  A    Yes.

16  Q    HALO camera video?

17  A    Correct.

18  Q    Traffic camera video?

19  A    I'm not sure about that, but --

20  Q    Maybe?

21  A    Possible.

22  Q    Okay.  Video from the Colorado State Patrol about the

23  grounds of the capitol building?

24  A    I think we had some of that, yes.

25  Q    Okay.  And all of those videos, as far as you were aware,

20-cv-1878-RBJ    NICHOLAS MITCHELL – Cross    03-17-2022

1    could be presented during this trial to the jury; right?

2           MR. MACDONALD:  Objection.  Lack of foundation.

3           THE COURT:  Overruled.

4           THE WITNESS:  I would presume that any video could be

5    shown to the jury, yes.

6    Q.    (By Mr. Ringel) And you and the OIM staff reviewed a

7    variety of records of the Denver Police Department?

8    A     We did.

9    Q     And all of those records, as far as you know, could be

10   available and presented to the jury?

11   A     Yes.

12   Q     And as we talked -- as you talked about with Mr. Macdonald

13   and we're going to talk about it in a little bit, there were a

14   variety of people that you interviewed?

15   A     Correct.

16   Q     And everybody that you interviewed could be a witness at

17   this trial; right?

18   A     I would think so, yes.

19   Q     Okay.  What I wanted to -- let's see.  Where did I want to

20   go next?  I want to talk to you about the report that you

21   issued.  The report was issued in -- I'm looking at the date.

22   Is it like November of 2020?  Is that about right?  Does that

23   seem right to you?

24   A     It seems right, but I don't remember the particular date.

25   Q     Yeah.  I don't remember.  I can't find the date.  Okay.

20-cv-1878-RBJ    NICHOLAS MITCHELL - Cross    03-17-2022

1    Anyway.  The report was designed to assess what occurred and to

2    analyze what occurred; right?

3    A    Yes.

4    Q    It wasn't -- there's nothing in your report that factually

5    examines any one specific event in the protest; right?

6    A    When you say one specific event, do you mean like a

7    specific use of force?

8    Q    Correct.  Yeah.  We will talk about it in use of force

9    terms.  Nothing in your report analyzes any specific use of

10   force that occurred during the protests?

11   A    Correct.

12   Q    Whether that use of force involved any of the 12 plaintiffs

13   in this case or any other person; right?

14   A    Correct.

15   Q    There aren't -- there's no conclusions in the report about

16   anything that caused anybody to get injured; right?

17   A    Yeah.  We don't evaluate -- this feels like it's related to

18   your last question.  We did not evaluate the circumstances of

19   individual uses of force, what caused them, who was responsible,

20   what was responsible.  We didn't do that analysis in this

21   report.

22   Q    Right.  And that's not within the scope of what you did and

23   what you looked at?

24   A    No.  There was a separate process operating -- at the same

25   time that we were doing this investigation, there were also, I

20-cv-1878-RBJ    NICHOLAS MITCHELL - Cross    03-17-2022

1  think, over 100 complaints and internal affairs investigations

2  opened.  And in that context, in that process, we were

3  evaluating specific incidents, what caused them, who was at

4  fault, et cetera, et cetera.  But in this report, we did not do

5  that analysis.

6  Q    Right.  And in the process of internal affairs that we

7  talked about earlier that the monitor's office has a role, that

8  would be the place where there would be an analysis of a

9  specific use of force and whether it was consistent or

10  inconsistent with Denver public -- or Denver Police Department

11  policy?

12  A    Correct.

13  Q    Okay.  That's not something that's addressed in the report

14  that we've -- that you've spent time today discussing?

15  A    It's not.

16  Q    Okay.  And in fact, as part of your review of video, or as

17  part of your office's review of video, you identified 24

18  incidents that you wanted IA to look at?

19  A    We did.

20  Q    Okay.  And as far as you know, IA looked at all of those

21  incidents?

22  A    I can't speak to that, because I was no longer the monitor.

23  I do remember there being some discussion or pushback about

24  which ones would be opened by internal affairs as

25  investigations, but then I quickly transitioned into a new role.

20-cv-1878-RBJ    NICHOLAS MITCHELL - Cross    03-17-2022

1    So, what happened with those 24, I can't speak to.

2    Q    Okay.  And just like there's no individual citizen that's

3    named in the report, there's no individual police officers that

4    are named in the report; right?

5    A    That's correct.

6    Q    And there's no assessment of any of the police officers'

7    individual conduct in your report?

8    A    There is not.

9    Q    That was the separate process of IA?

10   A    That's correct.

11   Q    Okay.  I wanted to talk to you about some of the basic

12   information about the protests and your sort of overall

13   assessment of it.  Do you agree that the protests following the

14   murder of George Floyd in May and June of 2020 were different

15   than other protests that had happened in the past in Denver?

16   A    I would.

17   Q    Okay.  You do agree with that?

18   A    I do.

19   Q    Could you explain how they were different, Mr. Mitchell.

20   A    I think there was a, you know, a level of chaos that played

21   out on the streets of Denver in many of the protests that

22   occurred while I was the independent monitor of the Denver

23   Police Department.  There was often a sort of a clear path that

24   a protest would take.  It started at point A and ended at point

25   B.  It had a clear sort of start time and end time.  I'm

20-cv-1878-RBJ    NICHOLAS MITCHELL - Cross    03-17-2022

1   generalizing, but that was usually true.

2        The George Floyd protests were a little bit formless

3   and shapeless.  They moved throughout the downtown area.  There

4   were different groups moving in different parts of the downtown

5   area.  And they certainly lasted late into -- at least during

6   the first five days, late into the early morning hours, which

7   was also unusual.

8        The amount of -- the number of injuries to police

9   officers and citizens was certainly unusual.  The amount of

10  property damage that was created was unusual and distinct, and

11  probably the loss of trust in the police department that

12  resulted after -- or that we observed after the protest was also

13  unique compared to other protests that I had seen while I was

14  the monitor in Denver.

15  Q    Is there a difference between a planned protest and a

16  spontaneous protest in how the police respond?

17  A    I think there is.  I think that's probably fair to say.

18  Q    And the George Floyd protests were spontaneous?

19  A    I think that's also probably fair to say.  I think there

20  were people who were organizing to bring folks to join the

21  protest, but, you know, in many ways, they were spontaneous.

22  Q    I noticed in looking at your analysis that you described

23  the George Floyd protests as multidirectional as opposed to

24  unidirectional.  What do you mean by those two concepts?

25  A    It's just a different way of saying they didn't start at

20-cv-1878-RBJ    NICHOLAS MITCHELL - Cross    03-17-2022

1   point A and end at point B.  There were groups moving at

2   different -- through different parts of the city in different

3   directions, which I think was certainly a complicating factor

4   for the police department as it attempted to respond and police

5   the protests.

6   Q    And you mentioned that some of the times the protests ended

7   in the early morning.  Is it fair to conclude the length of the

8   protest days were much longer than anything that had previously

9   been seen in Denver?

10  A    I think that's right, yes.

11  Q    What about the number of protest days in a row?

12  A    Also unusual.

13  Q    Do you recall in your tenure as the independent monitor

14  before May of 2020 there being any multiple-day protests?

15  A    There may have been, but as I sit here today, I don't

16  remember.

17  Q    Okay.  Nothing is coming to mind saying, yes, this was a

18  multiple-day protest that the police had to respond to?

19  A    Probably the Occupy Denver protest in 2011 or 2012.  I

20  recall that there were multiple days, multiple consecutive days,

21  but I don't remember the particulars.

22  Q    But those protests were in one specific location?

23  A    I think that's right, but I don't remember the specifics.

24  Q    And in these protests, there were different groups of

25  protesters and different crowds in multiple locations among --

20-cv-1878-RBJ    NICHOLAS MITCHELL - Cross    03-17-2022

1   in Denver at the same time?

2   A    Correct.

3   Q    Okay.  And you would agree that that's challenging for the

4   police?

5   A    I would.

6   Q    Would you agree that the sort of area where the protests

7   occurred was larger than has been typically the case involving

8   protests in Denver?

9   A    I would.

10  Q    Can you describe the differences with the geographic area

11  that was involved in these protests as opposed to earlier

12  protests that you're familiar with.

13  A    You know, I think many of the protests that I've seen in

14  Denver have started somewhere and ended at a government

15  building, you know, the state capitol, City Hall, or elsewhere,

16  and have generally been in a single location.  But during the

17  George Floyd protests, again, there were groups heading out to

18  the highway.  There were groups moving south on Broadway.  There

19  were groups in Civic Center Park and at the capitol, and so the

20  geography, the amount of land, the amount of ground the police

21  department had to cover was much larger than it usually has to

22  cover during most protests in Denver.

23  Q    What about the number of protesters, the size of the

24  crowds?  How would you compare that?

25  A    Much larger than the average protest in Denver.

20-cv-1878-RBJ    NICHOLAS MITCHELL - Cross    03-17-2022

1    Q    Your report indicates and cites the possibility of there

2    being up to 10,000 people protesting.  Is that a number that

3    registers with you?

4    A    Yeah.  I seem to recall press reports indicating as much.

5    It was extremely hard to find any authoritative account of how

6    many people were involved, but it was a very large number.

7    Q    There were officers that were injured; right?

8    A    There were.

9    Q    Do you have a memory or an estimate of the number of

10   officers who were injured?

11   A    I seem to remember that there were 81 injuries to Denver

12   police officers.  I don't think that's 81 officers, because some

13   officers had multiple injuries.

14   Q    Fair enough.  All right.  In your review of what happened

15   in the protests, in addition to peaceful protesting, was there

16   also violent activity coming from the crowds?

17   A    I think it's important to distinguish -- I don't know that

18   I can talk about, excuse me, crowds in the aggregate.  And part

19   of the challenge for the Denver Police Department during this

20   event was disaggregating crowds into specific people.  So, I can

21   say that there were people who were at the locations -- whether

22   they were protesters or not, I don't know -- who were engaging

23   in violent and disruptive behavior alongside lots of people who

24   were there engaging in peaceful protests.

25   Q    And that's fair.  The way that I think about it, and see if

20-cv-1878-RBJ    NICHOLAS MITCHELL - Cross    03-17-2022

1    this makes sense to you, there were three groups of people that

2    were, generally speaking, at the protests.  There were people

3    there that were there to protest peacefully.  There were people

4    there who were there to be agitators and engage in destructive

5    behavior and violence.  And then there were people there that

6    could be characterized as recreational rioters.  Does those

7    three categories make sense to you based on your review of the

8    protests?

9    A    What's a recreational rioter?

10   Q    People that came to downtown Denver to sort of join in what

11   they perceived to be the fun of engaging in destruction of

12   property.

13   A    I'm not sure.  I don't know about that category.  I think

14   there were people there peacefully protesting.  There were

15   people there who were engaged in destructive behavior.  There

16   were people there acting as observers.  There were people there

17   who may have come downtown because it seemed exciting and they

18   saw it on the news.  There were people there who were acting as

19   medics.  I think there were probably a lot of categories of

20   folks who showed up on those days.

21   Q    Okay.  Let's focus on the category of people that you and I

22   agree on, which is there were some people that were engaged in

23   violence and destruction of property.

24   A    Correct.

25   Q    Okay.  And as you said, that was difficult for police to

20-cv-1878-RBJ    NICHOLAS MITCHELL - Cross    03-17-2022

1    differentiate between that subset of people versus some of the

2    other subsets of people that you looked at?

3    A    I think that's true, yes.

4    Q    Because in some of those crowds, there were all of those

5    different subsets of people?

6    A    Correct.

7    Q    Okay.  And that's something that you observed in your

8    review of the -- what occurred during the protest and the police

9    response?

10   A    I did.

11   Q    Okay.  The fire department from Denver had to respond to

12   fires during the protests; right?

13   A    Yes, it did.

14   Q    Do you have an estimate of the number of fires that the

15   Denver Police Department responded to during this time?

16   A    I know I do.  It's in here somewhere.  We got data from the

17   fire department.  If you could point me to the --

18   Q    Sure.  Take a look at the first paragraph of page eight of

19   your report, and see if that refreshes your recollection.

20   A    It does.  Yeah.  During the first -- or the Denver Fire

21   Department responded to more than 200 calls related to fires

22   during the protests.

23   Q    Okay.  Do you have any sense of how that compares to a

24   normal five-day period in the Denver area?

25   A    I don't have the data, but my sense is that that's far

20-cv-1878-RBJ    NICHOLAS MITCHELL - Cross    03-17-2022

1   larger.  That's a far larger number than -- was your question

2   about other protests?

3   Q    No.  Just a normal five-day period in Denver.

4   A    I think it's far larger than a normal five-day period in

5   Denver.

6   Q    And there was property destruction related to the protests;

7   right?

8   A    There was.

9   Q    And do you have a -- did you collect data related to the

10  total damages to private business in dollar terms?

11  A    We did.  I seem to remember that we talked to the downtown

12  Denver partnership, the business association, if memory -- if my

13  memory is accurate, and got a figure of approximately 2 million

14  in damage -- or, I'm sorry.  Let's see.  Private businesses --

15  yeah.  Approximately $2 million worth of damage to private

16  businesses.

17  Q    And there was damage to municipal buildings of the City and

18  County of Denver as well; right?

19  A    Yes.  Just over a million dollars' worth of damage to City

20  property.

21  Q    And there was also damage to the Colorado State Capitol

22  building?

23  A    Correct.

24  Q    How much was the damage to that building?

25  A    It was estimated at $1.1 million of damage.

20-cv-1878-RBJ    NICHOLAS MITCHELL - Cross    03-17-2022

1    Q    Okay.  Do you recall analyzing whether there were weapons

2    found and seized during the protests?

3    A    I remember getting that figure from either the police

4    department or the DA's office or the city attorney's office.

5    Q    And what types of weapons were seized, Mr. Mitchell?

6    A    There were firearms seized.  And I can't remember what else

7    may have been seized, but if there's a reference in my report, I

8    would be happy to look at it.

9    Q    Well, I don't know if your report analyzed other things,

10   but do you recall other things that could be used as weapons

11   being found in the protests?

12   A    I do.

13   Q    What kind of things do you recall generally?

14   A    I don't remember.  I do see a notation in the report that

15   there were 33 firearms seized.

16   Q    Okay.  All right.  One of the things that is not part of

17   your report, at least as I read it, is any comparison between

18   what happened in Denver versus what happened in any of the other

19   cities where there were also George Floyd protests during this

20   same period of time.

21   A    We did not do such a comparison.

22   Q    Okay.  Have you evaluated protest responses by the police

23   in any other jurisdiction?

24   A    Not personally, but I've seen reports analyzing other

25   protests -- other police responses to George Floyd protests from

20-cv-1878-RBJ    NICHOLAS MITCHELL - Cross    03-17-2022

1   other cities.

2   Q    Okay.  All right.  I wanted to move on and talk about some

3   of the -- I think Mr. Macdonald put it under a heading of

4   internal controls on police use of force.  That was one of the

5   things that you analyzed; right?

6   A    Yes.

7   Q    And what you were looking for was -- you looked at a -- a

8   few different items as to -- and concluded that there was issues

9   with an internal control by the police department during the

10  responses to the protests?

11  A    Correct.

12  Q    Let me talk to you about some of those issues.  The first

13  one that I wanted to talk to you about is use of force reports;

14  right?

15  A    Yes.

16  Q    There is -- you have some criticism of the Denver Police

17  Department related to whether there was sufficient use of force

18  reports related to force used during the protest; right?

19  A    Among other -- among other things about the reports, yes.

20  Q    Right.  And then you -- then the reports that were done

21  after the fact, you didn't find them particularly helpful,

22  because there were -- they were incomplete, and they weren't as

23  detailed as you would like them to have been?

24  A    Correct.  And in some cases, it was a, you know,

25  boilerplate language, essentially the same report filed day

20-cv-1878-RBJ    NICHOLAS MITCHELL – Cross    03-17-2022

1  after day for the same officers.

2  Q    Okay.  So, let's talk about sort of use of force reports in

3  a police context generally.

4  A    Sure.

5  Q    The typical situation where a use of force report would be

6  done would occur in daily police work; right?

7  A    Correct.

8  Q    So, in a daily police situation, if an officer needs to use

9  force to apprehend and arrest a suspect, that would trigger the

10  need to write a use of force report?

11  A    Correct.

12  Q    And the way that it works with the Denver Police Department

13  is the officer who uses that force has to write a use of force

14  report; right?

15  A    Yes.

16  Q    And the officer's supervisor, usually a sergeant, would

17  investigate that use of force by talking to anybody who was a

18  witness to that event right there and then; right?

19  A    Correct.

20  Q    So, Officer Smith, Officer Doe uses force to accomplish an

21  arrest, knows that he or she uses force, calls their supervisor.

22  The supervisor comes to the scene and investigates and talks to

23  everyone who might be a witness to the encounter between the

24  citizen and the police officer?

25  A    Yes.  Among other kinds of investigative techniques, like

20-cv-1878-RBJ    NICHOLAS MITCHELL - Cross    03-17-2022

1  gathering relevant video, obtaining any relevant medical records

2  reflecting treatment received as a result of the force, and so

3  on and so forth.

4  Q    Right.  It would be a complete investigation of that

5  particular incident?

6  A    One would hope so.

7  Q    Right.  And the policies of the Denver Police Department

8  about use of force reporting are designed for that kind of daily

9  police work; right?

10  A    Yes.

11  Q    There isn't a different use of force policy and reporting

12  policy that's specifically applicable to uses of force in a

13  protest context?

14  A    At the time of the report, I believe that's accurate.

15  Q    Okay.  And in some ways, you would agree, wouldn't you,

16  that it would be very cumbersome for an officer who was at the

17  protest who fires a PepperBall to at that moment in time trigger

18  the same kind of use of force analysis that we just talked about

19  related to the arrest of a suspect?

20  A    I think it would be cumbersome, but important to have a

21  mechanism for reporting force used even in the context of a

22  large protest.

23  Q    Okay.  How many use of force reports do you think would

24  have been needed in total related to the protests?

25  A    I can't even estimate.

20-cv-1878-RBJ    NICHOLAS MITCHELL - Cross    03-17-2022

1  Q    Thousands; right?

2  A    Yeah.  I don't have any way to estimate.

3  Q    Okay.

4  A    But it would be a big -- it would be a big number for sure.

5  Q    How many more police officers would have had to have been

6  available to respond to the protest to engage in the typical

7  mechanism of taking someone off the line, having them write a

8  report, and interviewing all of the other people on the line and

9  any witnesses in the crowd who would have been witnesses to that

10 particular use of force?

11 A    I'm not sure, but for most of these days, DPD had 150 to

12 200 police officers from its own ranks responding, but it's a

13 force of 1,500.  So, if more officers were needed, it certainly

14 had room within its ranks to deploy more officers.

15 Q    But wouldn't it require at least double if not triple the

16 number of officers to rotate all those people out to go ahead

17 and do the use of force reports?

18 A    I don't know how to estimate that number.  I would imagine

19 that one could do -- one might be able to do some consolidated

20 use of force reporting if there is a major clash that results in

21 lots of force being used.  Instead of having every officer

22 preparing a separate use of force report, one could do some

23 consolidated use of force reporting.  So, there might be ways

24 that the department could reduce the administrative burdens,

25 which are real, I'm not discounting them, but I think there

20-cv-1878-RBJ    NICHOLAS MITCHELL - Cross    03-17-2022

1  might be ways the department could reduce some of those

2  administrative burdens.

3  Q    Right.  But the way that the structure was set up at the

4  time of the protest wouldn't necessarily allow that kind of

5  out-of-the-box thinking that you just were talking about?

6  A    No.

7  Q    In some ways, the use of force reporting was one size fits

8  all; right?

9  A    I think that's fair.

10  Q    You're not aware of any police department that does the

11  kind of use of force reporting from an arrest situation during a

12  protest situation, are you?

13  A    I'm not sure that I've evaluated that closely.  I have read

14  about police departments doing creative things to address the

15  use of force reporting problem at mass protests, but I haven't

16  evaluated it closely.

17  Q    And part of what you were doing in your report related to

18  this use of force reporting issue was to identify the issue so

19  that the department could learn from it and potentially make

20  changes into the future?

21  A    Correct.

22  Q    Okay.  Let's talk about prior to the George Floyd protests.

23  A    Okay.

24  Q    The Office of Independent Monitor had never identified for

25  the Denver Police Department a problem related to use of force

20-cv-1878-RBJ     NICHOLAS MITCHELL - Cross     03-17-2022

1  reporting prior to these protests happening; right?

2  A   When you say use of force reporting, do you mean use of

3  force reporting specific to a mass protest situation?

4  Q   Yeah.  Let's start there.

5  A   Yeah.  I think that's accurate.

6  Q   So, prior to the George Floyd protests, at least during the

7  eight years that you were the independent monitor, there

8  wouldn't -- there wasn't anything that you were telling the

9  Denver Police Department, here is a problem related to use of

10  force reporting in this particular context.  Here is our

11  recommendations of what you need to do to solve it.

12  A   I think that's accurate.

13  Q   Okay.  No assessment of use of force reporting occurred by

14  the Office of the Independent Monitor until after the George

15  Floyd protests?

16  A   Well, we made a lot of recommendations about use of force

17  reporting in general or in specific incidents, but in the

18  context of how to do it during a mass protest situation, I think

19  you're right.  We did not make recommendations about that before

20  these protests.

21  Q   Okay.  And one of the things you talked about with

22  Mr. Macdonald was the issue of accountability, and how a use of

23  force report and the process related to analyzing uses of force

24  from those reports can provide accountability to police

25  officers; right?

20-cv-1878-RBJ    NICHOLAS MITCHELL - Cross    03-17-2022

1  A    Yes.

2  Q    That kind of accountability is retrospective in nature, is

3  it not?

4  A    It is.

5  Q    In other words, whether or not a police officer writes a

6  report related to a particular use of force doesn't say anything

7  about whether that officer used too much force?

8  A    Can you say that again?

9  Q    Sure.  The issue of whether an officer used too much force

10 is separate from whether the officer writes a report about the

11 use of force?

12 A    Correct.

13 Q    And the absence of a use of force report doesn't mean that

14 the officer used too much force; right?

15 A    No.  I think that's -- I think that's accurate.  You know,

16 I think there's a similar -- we talked earlier about body cams,

17 and how when body cams are rolling, it can have a deescalating

18 effect on everyone's behavior.  When officers are accountable

19 for reporting the force that they use and know that there will

20 be some follow-on inquiry, I think, though I can't prove, that

21 that may also have an effect of helping to deescalate the kinds

22 of force that are being used.  But I think what you said is

23 accurate.

24 Q    Okay.  And the sort of general accountability point that

25 you're making, which I understand, is a general point, and it's

20-cv-1878-RBJ    NICHOLAS MITCHELL – Cross    03-17-2022

1   based on the studies of the aggregation of interactions between

2   police officers and citizens; right?

3   A    Correct.

4   Q    It doesn't say anything about one specific incident

5   involving use of force; right?

6   A    Correct.

7   Q    So, in other words, there's no data that could exist to say

8   if Officer Smith used force on Mrs. Jones, and then didn't write

9   a report on it, somehow that impacted whether or not he was

10  going to use more force than was necessary under those

11  circumstances?

12  A    I'm not aware of any such data.

13  Q    Okay.  You anticipated what my next topic was, and that's

14  body-worn cameras, Mr. Mitchell.  You talked to Mr. Macdonald

15  and indicated that the Denver Police Department adopted

16  body-worn cameras with a pilot program in 2014, and then you

17  indicated sometime in 2015 it became used generally; right?

18  A    Yeah.  I'm a little fuzzy on the dates, but that sounds

19  right to me.

20  Q    Okay.  2015 or thereabouts?

21  A    Thereabouts.  Correct.

22  Q    Fair to say, you were the monitor at the time that

23  body-worn cameras were implemented?

24  A    I was.

25  Q    Okay.  And you were involved in reviewing and providing

20-cv-1878-RBJ   NICHOLAS MITCHELL - Cross   03-17-2022

1  input on the DPD body-worn camera policy when it was adopted?

2  A    Yes.

3  Q    Okay.  And the policy that was in effect at the time of the

4  protest did not contain any specific --

5              JUROR:  Sorry.

6              MR. RINGEL:  That's okay.  Is everything okay?

7              THE COURT:  You're going to have to go in the corner

8  with Mr. Weiner.

9              MR. RINGEL:  Your Honor, where is your penalty box,

10  Your Honor?

11              MR. WEINER:  I can show you.

12              MR. RINGEL:  I thought that was the woodshed,

13  Mr. Weiner.  Okay.  Everybody okay?  All right.  I have lost my

14  brilliant train of thought, but that's okay.  I will find it.

15  Q.    (By Mr. Ringel) Okay.  Let me back up a little bit.  You

16  were in -- the Office of Independent Monitor was involved in

17  reviewing and providing input to the body-worn camera policy of

18  the police department at the time it was adopted?

19  A    I think, to be precise, they adopted a policy for their

20  pilot, and then we commented on it, and they made revisions

21  before rolling it out and making it a permanent program of the

22  department.

23  Q    Fair enough.  But OIM had input?

24  A    We did.

25  Q    Okay.  And you don't recall having any major disagreement

20-cv-1878-RBJ    NICHOLAS MITCHELL - Cross    03-17-2022

1   with the department about the contours of that policy at the

2   time; right?

3   A    I'm not sure that I agree with that.

4   Q    Okay.

5   A    We made a series of recommendations about what should be

6   contained in the body-worn camera policy.  I think some were

7   adopted and some were not.

8   Q    Okay.  Fair enough.  At the time of the George Floyd

9   protests in May of 2020, the body-worn camera policy didn't have

10  any specific provision about how officers were supposed to use

11  their cameras during response to protest activity; right?

12  A    I think that's right.

13  Q    Okay.  And you don't recall having a recommendation to the

14  Denver Police Department on that topic that was not adopted?

15  A    I don't.

16  Q    Okay.  And that policy, you would agree, at least partially

17  explains the footage gap as you were talking about with

18  Mr. Macdonald?

19  A    I think so.

20  Q    Okay.  You're also aware, are you not, that there was some

21  difficulty at least for some period of time related to the

22  ability to affix a body-worn camera to the outer protective

23  equipment that the officers were using as part of the response?

24  A    I did hear that when I interviewed police officers who

25  responded, yes.

20-cv-1878-RBJ    NICHOLAS MITCHELL - Cross    03-17-2022

1  Q    And so let me explore that a little bit more.  My

2  understanding is that the body-worn camera is affixed to

3  officers' normal uniforms with a magnet?

4  A    Correct.

5  Q    And so the issue was the magnet wasn't strong enough to go

6  through the protective equipment, or something to that effect?

7  A    Yes.

8  Q    So that the body-worn cameras were falling off?

9  A    Right.

10 Q    And then you also heard about issues related to problems

11 with batteries and body-worn cameras because of the length of

12 time that people were on duty at the protests?

13 A    I think that's right.  I don't have a specific recollection

14 of that, but certainly batteries and storage time can become

15 issues when, you know, a police officer is deployed for a long

16 period.

17 Q    Okay.  Prior to the George Floyd protests, had the Office

18 of Independent Monitor identified any issue related to the use

19 of body-worn cameras in a protest setting?

20 A    Not that I recall.

21 Q    Okay.  And again, with respect to accountability, you would

22 agree that the accountability provided by a body-worn camera is

23 also retrospective; right?

24 A    Can you say more about what you mean?

25 Q    Sure.  Whether a police officer turns on their body-worn

1    camera, other than sort of the general proposition that you

2    talked about earlier that it may deescalate things generally if

3    people know that they're on camera, doesn't necessarily impact

4    the level of force that's used; right?

5    A    It may or may not.  I'm not sure -- I think knowing that

6    you're being recorded may have a significant impact on the kinds

7    of force that officers are willing to use and the kinds of

8    violence that citizens might use towards officers.

9    Q    Okay.  And you interviewed a bunch of people as part of the

10   OIM report on these protests, and we -- and Mr. Macdonald showed

11   you some of those memos; right?

12   A    Correct.

13   Q    Nobody in any of those memos commented that the use of

14   force that was used was dependent one way or the other on

15   whether the body-worn camera was on; right?

16   A    I don't remember that, but I haven't closely reviewed those

17   memos in a year and a half.

18   Q    I understand.  Okay.  But you would agree -- well, I'll

19   move on.  Let's talk about mutual aid.  One of the criticisms

20   that is outlined in your report is the use of mutual aid

21   partners by the Denver Police Department to assist them in

22   responding to the protests?

23   A    Yeah.  To be a little bit more precise, we weren't

24   criticizing the fact that they used mutual aid partners, but the

25   manner in which they did so and the framework they used with

20-cv-1878-RBJ    NICHOLAS MITCHELL - Cross    03-17-2022

1  those partners is what we specifically were criticizing.

2  Q    I understand.  And that was going to be one of my first

3  questions.  Generally it made sense to you, didn't it, that for

4  the Denver Police Department, if they felt they didn't have

5  adequate manpower resources to call in mutual aid?

6  A    Yes.

7  Q    Okay.  And there's a mechanism under Colorado law that

8  allows that to happen; right?

9  A    Correct.

10 Q    Okay.  And law enforcement engages in a variety of

11 different activities that involve mutual aid; right?

12 A    Yes.

13 Q    Not just in the context of protests?

14 A    Correct.

15 Q    Okay.  A chase across different jurisdictions might involve

16 more than one law enforcement jurisdiction?

17 A    Correct.

18 Q    There may be joint operations in particular contexts?

19 A    Yes.

20 Q    Okay.  What you were concerned about and what is identified

21 in the report are the way that mutual aid organizations were

22 used in terms of, number one, their use of their own use of

23 force policies as opposed to the use of force policies of

24 Denver?

25 A    Correct.

20-cv-1878-RBJ   NICHOLAS MITCHELL – Cross   03-17-2022

1  Q    Number two, their use of their own less-lethal munitions,

2  including some that weren't authorized for use in Denver?

3  A    Correct.

4  Q    And number three, the lack of joint training for a protest

5  involving the Denver officers and the mutual aid officers?

6  A    Yes.

7  Q    Okay.  Prior to your report in 2020, after the protest, had

8  the Office of Independent Monitor during the time that you were

9  a monitor identified any of those as problems or issues to the

10  Denver Police Department?

11  A    No.

12  Q    Are you aware of the DPD using mutual aid partners to

13  respond to a protest prior to 2020?

14  A    I don't have any specific recollection or information about

15  that.

16  Q    Okay.  Another issue that is raised in your report is the

17  manner in which the police generally used less-lethal munitions

18  during the response to the protests; fair?

19  A    Yes.

20  Q    And there were a variety of different issues that

21  Mr. Macdonald went over with you, but my question is more basic.

22  Prior to your report, had you as the independent monitor

23  identified any of those issues to the Denver Police Department

24  as issues or areas of concern?

25  A    When you say those issues --

20-cv-1878-RBJ    NICHOLAS MITCHELL - Cross    03-17-2022

1  Q    Any of the issues related to less-lethal -- deployment of

2  less-lethal devices in a protest context?

3  A    No.  We certainly made recommendations on specific cases

4  and incidents that touched on policy issues with respect to

5  less-lethal weapons, but I don't recall making them in the

6  context of response to a mass protest situation.

7  Q    Okay.  So, what you're talking about is there might be an

8  incident involving police in their daily activities, and they

9  may use a PepperBall?

10  A    Correct.

11  Q    And that you would evaluate the propriety of that

12  particular use of the PepperBall as part of your review of that

13  particular factual circumstance?

14  A    Yes.

15  Q    But there was never anything that you provided to the

16  police that talked at all about how to or how not to use

17  less-lethal devices in a protest context?

18  A    I think that's right.

19  Q    Okay.  Are you aware of the use of less-lethal devices in a

20  protest context by the Denver Police Department prior to 2020?

21  A    Yes.

22  Q    Okay.  What is the context in which you are aware?

23  A    Well, I don't have a specific incident in mind, but I'm

24  sure that there were other protests at which Denver police

25  officers used less-lethal weapons or munitions, but I don't have

20-cv-1878-RBJ    NICHOLAS MITCHELL - Cross    03-17-2022

1    a specific incident in mind, other than the one that

2    Mr. Macdonald asked me about from Occupy Denver in 2012.

3    Q    Okay.  Fair enough.  All right.  I wanted to move on to

4    discipline.  And we talked about earlier the monitor's role in

5    the IA investigation process, and then the conduct review

6    process.

7    A    Yes.

8    Q    Would you agree that investigations conducted by the

9    internal affairs bureau for the Denver Police Department are

10   triggered by some sort of complaint?

11   A    Generally speaking, yes.

12   Q    So, it would be a complaint from the public?

13   A    Right.

14   Q    Potentially; right?

15   A    Yes.

16   Q    It could be a complaint from the Office of the Independent

17   Monitor?

18   A    Right.

19   Q    It could be a complaint initiated by another police

20   officer?

21   A    Yes.

22   Q    But I -- the internal affairs bureau is not set up to do

23   things like review wholesale body-worn camera video to determine

24   whether there are violations of Denver Police Department policy?

25   A    When you say wholesale body-worn camera video, can you be

20-cv-1878-RBJ    NICHOLAS MITCHELL – Cross    03-17-2022

1    more specific?

2    Q    Sure.  So, the -- your office, the Office of the

3    Independent Monitor, reviewed a bunch of video related to the

4    protests?

5    A    Yes.

6    Q    And of all the video that you reviewed, you identified 24

7    incidents that you wanted IA to look at?

8    A    Other than the hundred-plus investigations that were

9    already open, correct.

10   Q    Correct.  So, there were complaints that existed?

11   A    Yes.

12   Q    And then you -- your office conducted a review, and then in

13   addition to the events involving the complaints that had already

14   triggered an IA investigation, you identified 24 other incidents

15   that hadn't been the subject of a complaint?

16   A    Yes.

17   Q    There isn't a mechanism, though, for the internal affairs

18   bureau to do that kind of video review, is there?

19   A    They don't generally conduct wholesale -- to adopt your

20   words, wholesale review of body-worn camera video, but there's

21   certainly nothing preventing them from doing it if they decided

22   they needed to do that.

23   Q    But generally speaking, internal affairs at the Denver

24   Police Department and all other police departments are

25   complaint-driven; right?

20-cv-1878-RBJ    NICHOLAS MITCHELL - Cross    03-17-2022

1  A    I think they're -- I think there are different set-ups.  In

2  some other police departments, there's integrity testing done by

3  internal affairs, which is proactive.  I think what you've said

4  is accurate about the Denver Police Department.  It is -- the

5  internal affairs bureau is reactive to specific complaints.

6  Q    Okay.  And the purpose of an internal affairs investigation

7  at the end of the day is to determine whether a specific officer

8  violated specific policies of the department?

9  A    Correct.

10  Q    So, if the officer that was involved in a particular event

11  cannot be identified, there's no way to continue with the

12  disciplinary process; right?

13  A    Yes.

14  Q    A little bit more about discipline.  Discipline is a

15  lengthy and multistep process?

16  A    Yes.

17  Q    It takes a long time, doesn't it?

18  A    It does.

19  Q    Typically, an officer that's subject to an internal affairs

20  investigation or discipline would have their own lawyer; right?

21  A    Certainly once it gets to the discipline stage, yes.  They

22  would have a lawyer, often provided by the union.

23  Q    And sometimes when it's in the investigation stage, they

24  have a lawyer?

25  A    Sometimes.

20-cv-1878-RBJ   NICHOLAS MITCHELL - Cross   03-17-2022

1  Q     And when there's an interview as part of an IA

2  investigation that the Office of Independent Monitor

3  participates in, as we talked about before, it's recorded in

4  some fashion; right?

5  A     It is.

6  Q     Either audio or video or both?

7  A     Correct.

8  Q     Okay.  Why is that?

9  A     Probably a number of reasons.  One, to make sure there is

10 an accurate, you know, when there's a disciplinary

11 investigation, there are rights of appeal that the officer may

12 have if he or she is disciplined, so it's important that there's

13 an accurate recording of, you know, of what they said about the

14 incident and why they took whatever actions they took, because

15 again, it -- the case will go up the chain.  Multiple

16 decision-makers will have to make a determination, and

17 ultimately the officer has a right of appeal.

18 Q     So, the officer has the right to a lawyer.  The officer has

19 the right to due process?

20 A     Correct.

21 Q     And an IA investigation cannot start until after any

22 criminal investigation occurs by the district attorney's office;

23 right?

24 A     That's sometimes true.  Those two investigations sometimes

25 blend and sort of become one with personnel from the DA's office

Kevin P. Carlin, RMR, CRR

20-cv-1878-RBJ     NICHOLAS MITCHELL - Cross     03-17-2022

1   involved in the internal affairs investigation in case the -- in

2   case the case becomes criminal in nature.

3   Q     Right.  But for instance, until the DA has decided not to

4   pursue criminal charges, the subject of the investigation

5   wouldn't have to talk to internal affairs?

6   A     He or she would not be compelled to talk to internal

7   affairs, but may choose to make a voluntary statement.

8   Q     Understood.  And the reason of -- for that, as you

9   understand from being a lawyer, is the Fifth amendment?

10  A     Correct.

11  Q     Right against self-incrimination?

12  A     Yes.

13  Q     So, sometimes a criminal investigation needs to be

14  concluded before all of the steps of an internal affairs

15  investigation can occur?

16  A     Yes.

17  Q     And that would increase the time span for the process?

18  A     It would.

19  Q     Okay.  Discipline at the Denver Police Department is not

20  conducted in public?

21  A     No.  That's true.

22  Q     Officers who are not involved in the internal affairs

23  investigation or a disciplinary process wouldn't have access to

24  all of the facts related to the investigation or the

25  disciplinary process?

20-cv-1878-RBJ   NICHOLAS MITCHELL - Cross   03-17-2022

1  A    Correct.

2  Q    If there's discipline, once a final discipline is issued,

3  that tends to be something that the media requests through Open

4  Records Act requests, and then publishes in the newspaper;

5  right?

6  A    Yes.

7  Q    And to the extent any officer reads that news reporting,

8  they would have a general understanding of what happened with

9  respect to discipline?

10  A    That and -- that's true, and also the police department

11  has -- there are lots of rumors that go around about who has

12  been disciplined and why.  So, by the time it appears in the

13  newspaper, most Denver cops probably know about it already.

14  Q    But the rumor mill wouldn't have access to all of the

15  details about what occurred?

16  A    Correct.

17  Q    It would be sort of partial and incomplete information?

18  A    Yes.

19  Q    So, would you agree that discipline, because of its nature

20  and being a private personnel action, generally speaking, has

21  limitations in how it teaches other officers how to behave?

22  A    Can you expand on that a little bit to make sure -- I want

23  to make sure I'm answering the right question.

24  Q    Sure.  So, discipline is a measure of accountability for a

25  particular officer after the fact; right?

20-cv-1878-RBJ    NICHOLAS MITCHELL - Cross    03-17-2022

1  A    Yes.

2  Q    So, if an officer does something wrong, they get

3  disciplined, provides accountability to that particular officer

4  after the fact?

5  A    Yes.

6  Q    But there's been some discussion about discipline as

7  potentially teaching other officers prospectively to modify

8  their behavior; right?

9  A    Yes.

10  Q    The problem with that, and from my perspective, and I'm

11  wondering if you agree with me, is that because it's not a

12  public process, and because the officers don't understand all of

13  the details about what happened, it has a limited ability to

14  teach in that fashion?

15  A    I think the -- I think you're right that some of the detail

16  may be lost, although the disciplinary orders, as you pointed

17  out, are often -- often become public through those media

18  requests, and they do have the essential facts that resulted in

19  discipline.

20        You know, I will say that police departments, including

21  the Denver Police Department, have attempted to take certain

22  data about the reasons why officers were disciplined and bring

23  it to the training academy, for example, to talk to cops about

24  what not to do.  So, I think discipline can and should become a

25  teaching tool to the extent possible.

20-cv-1878-RBJ    NICHOLAS MITCHELL - Cross    03-17-2022

1  Q    I understand that, but the fact of discipline, the way that

2  the disciplinary system works, it's not a teaching tool unless

3  those other steps are taken?

4  A    Correct.  The fundamental purpose of the disciplinary

5  process is accountability for individual -- on individual cases.

6  Q    Right.  After the actions have already occurred?

7  A    Right.

8  Q    Okay.  All right.  There was a lot of discussion with

9  Mr. Macdonald about the OIM memos.  The memos that were created

10  by your office related to interviews that your office conducted.

11  Do you remember that this morning?

12  A    I do.

13  Q    I wanted to talk to you about those and get a better

14  understanding of the process about how that worked.  So, the way

15  that I understand it is that you and your -- you and one of your

16  OIM staff, typically a deputy monitor, met with and interviewed

17  various Denver Police Department personnel?

18  A    Correct.

19  Q    And the interviews were not recorded by either video or

20  audio?

21  A    Correct.

22  Q    The only record of the interview was notes that you may

23  have taken and notes that your deputy monitor may have taken?

24  A    Yes.

25  Q    And then what happened was your deputy monitor typically

20-cv-1878-RBJ    NICHOLAS MITCHELL - Cross    03-17-2022

1  typed up the notes into a form like the memos that you were

2  shown earlier.  You reviewed them, and then they became the

3  memos as part of your file?

4  A    Correct.

5  Q    Okay.  All of the subjects to those interviews were

6  promised confidentiality to allow them to speak candidly with

7  you; right?

8  A    We indicated that their specific statements would not

9  appear in our report.

10  Q    Well, the memo that -- the memos that we looked at earlier

11  all at the top say confidential, don't they?

12  A    They do, but those memos were not shown to the individual

13  witnesses.

14  Q    Right.  Okay.  And that was my next question.  Why was

15  confidentiality important from your perspective?

16  A    We wanted to have -- or I should say I wanted to have

17  free-flowing discussions to the extent that I could with the

18  people who had actually been policing these protests.  I did not

19  want to create an impression that this was part of a

20  disciplinary process with a tape recorder in front of the

21  witnesses.  I had a concern that that would chill the

22  willingness of people to speak frankly with me.  So, we

23  attempted to structure the process in a way that we could get

24  people to just be honest and talk to us about what they really

25  saw, thought, did, and believe.

20-cv-1878-RBJ    NICHOLAS MITCHELL - Cross    03-17-2022

1   Q    Got it.  And after a memo was created, the subject of the

2   memo didn't have any opportunity to review it?

3   A    They did not.

4   Q    So, it's essentially the take of you and your deputy

5   monitor about what occurred in the interview?

6   A    Yeah.  It's our attempt to recount what happened in the

7   interview.

8   Q    It would not be accurate to think of it as a witness

9   statement of the interviewee?

10  A    I think that's -- well, when you say witness statement, can

11  you --

12  Q    So, when government agents interview people, sometimes they

13  create a document that summarizes the interview.  So, if the

14  National Labor Relations Board, an investigator for the NLRB

15  investigates and talks to a witness, that investigator might

16  create a document as part of that interview and then give the

17  witness the opportunity to review it and make any corrections to

18  make sure it was complete and accurate from the witness'

19  perspective, and then it becomes the witness' statement.

20  Nothing like that happened with respect to these memos; right?

21  A    We did not give the witnesses an opportunity to review the

22  documents and make any corrections.  Otherwise, they sound

23  pretty similar to the -- in other respects, they sound similar

24  to what you described, with that one exception that we did not

25  give the witnesses an opportunity to make any corrections.

20-cv-1878-RBJ   NICHOLAS MITCHELL - Cross   03-17-2022

1  Q    Okay.  So, the witness didn't have the opportunity to check

2  it for accuracy and completeness?

3  A    They did not.

4  Q    Okay.  And the memo from the interview was not checked by

5  your office for accuracy; right?

6  A    I checked them.  So, they -- and I think I remember seeing

7  that in the first paragraph to the memos.  The deputy monitor

8  would prepare the memo on the same day that the interview was

9  conducted to make sure it was fresh, would show me the document.

10  I would review it to see if I could identify any errors or

11  corrections, and then it would be finalized on that same day.

12  Q    I understand that.  And my question was poor, and I think

13  you misunderstood what I was trying to ask you.

14  A    Okay.

15  Q    Any factual information in those memos was not checked for

16  accuracy by your office?

17  A    Correct.  That's accurate.

18  Q    It was essentially their subjective -- the subjective

19  perspective of the interviewee recorded in the memo?

20  A    Correct.

21  Q    Okay.  Just because there's information in that memo

22  doesn't necessarily mean that it's accurate or valid; right?

23  A    That's accurate.

24  Q    And just because it's a memo that your office created,

25  you're not attesting to the accuracy and validity of any

20-cv-1878-RBJ   NICHOLAS MITCHELL - Cross   03-17-2022

1   information in those memos?

2   A    No.

3   Q    Okay.  The idea was to get those memos as part of your

4   looking at the picture of everything that happened?

5   A    Yes.

6   Q    None of those memos were quoted in your report?

7   A    They were not.

8   Q    None of those memos were provided to anyone from the Denver

9   Police Department?

10  A    They were not.

11  Q    None of them were provided to the executive director of the

12  Department of Safety?

13  A    No.

14  Q    Or the chief of police?

15  A    No.

16  Q    Or the mayor?

17  A    No.

18  Q    Or the city council?

19  A    No.

20  Q    Why not, Mr. Mitchell?

21  A    Because they were for our review.  They were not

22  public-facing documents.  They were not for anyone's consumption

23  other than our own as we were formulating our conclusions and

24  our analysis.  You know, this report that I issued was a

25  distillation of many, many pieces of evidence, and the

20-cv-1878-RBJ    NICHOLAS MITCHELL – Cross    03-17-2022

1    interviews that we conducted was only one aspect of -- you know,

2    one piece of evidence that factored into the analysis reflected

3    in this final report.

4    Q    Understood.  The other thing that isn't -- that you didn't

5    do related to the memos is analyze particular motivations of any

6    of the interview subjects?

7    A    I did not.

8    Q    I mean, you didn't analyze whether anybody had a particular

9    agenda related to what they were saying in the interview with

10   you?

11   A    No.

12   Q    If a particular interviewee was disgruntled because they

13   had been disciplined by someone or didn't get a promotion from

14   someone, that's not something you looked at at all?

15   A    No.

16   Q    And you would agree that sort of as a general matter, those

17   kind of issues are important to assess in analyzing the validity

18   of what people say in an interview like the one that you

19   conducted?

20   A    I do.

21   Q    Because they may demonstrate bias or interest of the

22   interviewee?

23   A    Certainly possible.

24          MR. RINGEL:  Those are my questions for you,

25   Mr. Mitchell.  I believe my friend Mr. Macdonald has some more.

20-cv-1878-RBJ   NICHOLAS MITCHELL – Redirect   03-17-2022

1    THE COURT:  All right.  Redirect, if any, by his

2    friend Mr. Macdonald?

3    MR. MACDONALD:  Careful.  I'm going to hold you to

4    that.

5    MR. RINGEL:  I have no problem with you being my

6    friend.  Just because we're litigating doesn't mean I have to be

7    disagreeable.

8    **REDIRECT EXAMINATION**

9    BY MR. MACDONALD

10   Q    Okay.  Mr. Mitchell, Mr. Ringel asked you some questions

11   about whether or not you as the independent monitor had ever

12   given certain views on body-worn camera, on use of force

13   reporting, use of less-lethal weapons.  Do you remember those

14   questions?

15   A    I do.

16   Q    And in one of them, you referenced the -- your

17   recommendations and views about how Denver responded to the

18   Occupy protest.  Do you remember that?

19   A    I do.

20   Q    Okay.  And I think Mr. Ringel suggested that you had never

21   discussed with the DPD or put anything in writing about how to

22   use less-lethal weaponry in a protest context.  Do you remember

23   those questions?

24   A    I do.

25   Q    And in actual fact, in the Occupy protest, where it was a

20-cv-1878-RBJ   NICHOLAS MITCHELL - Redirect   03-17-2022

1   situation where people set up an encampment, for lack of a

2   better word, near Civic Center Park, Liberty Park; right?

3   A     Yes.

4   Q     Right in front of the capitol, where lots of the events

5   that the jury has heard about happened; right?

6   A     Correct.

7   Q     And the Occupy protests were described as you -- as

8   protests that were in order to bring attention to the issues of

9   income inequality in the United States; right?

10   A     I believe that's right.

11   Q     And one of the distinguishing features of that protest

12   movement was its reliance on the occupation of physical space as

13   a primary protest strategy; right?

14   A     Yes.

15   Q     And in fact there was at times a large number of people who

16   occupied that central square in Denver; right?

17   A     Correct.

18   Q     And there came a time when the Denver Police Department

19   responded to those protesters in or about October 29th, 2011;

20   right?

21   A     Yes.

22   Q     And the DPD officers deployed OC spray and PepperBalls,

23   among other less-lethal force options; right?

24   A     I believe that's right.  But it's so long ago, I don't

25   remember the particulars.

20-cv-1878-RBJ    NICHOLAS MITCHELL - Redirect    03-17-2022

1    Q    Let's put up Exhibit 1101, please.  Let's go to the first

2    page so we can let Mr. Mitchell see.  Do you recognize this as a

3    report that you prepared in the third quarter of 2012,

4    Mr. Mitchell?

5    A    I do, yes.

6    Q    All right.  And let's turn to page 17 of the exhibit,

7    please.  And you see you're addressing the incident that we were

8    just talking about relating to the DPD's use of less-lethal

9    munitions on a crowd of protesters; right?

10   A    Yes.

11   Q    And at the heading at the top, what did -- what's the

12   heading that you put this material under?

13   A    Missed opportunity for in-depth tactics review.

14   Q    Okay.  And if you look down at the second-to-bottom

15   paragraph, in the middle of the page, you see that you described

16   officers deployed OC spray and PepperBalls, among other

17   less-lethal force options to maintain a perimeter or skirmish

18   line?

19   A    Yeah.

20   Q    And that several civilians were injured during the ensuing

21   melee, and many in the crowd were affected by the OC spray and

22   struck with PepperBalls, including one civilian struck in the

23   face?

24   A    I do.

25   Q    And an officer was trampled, though thankfully not injured;

20-cv-1878-RBJ   NICHOLAS MITCHELL - Redirect   03-17-2022

1  right?

2  A    Yes.

3  Q    And you reported out publicly and to the DPD that there

4  were significant risks both to officer safety and civilian

5  safety created by this clash; right?

6  A    Yes.

7  Q    And another thing you concluded, that a more detailed

8  examination of the tactics used to determine whether different

9  methods could prevent similar confrontations in the future would

10 be helpful; right?

11 A    Yes.

12 Q    And one of the things that you concluded back in 2012 was

13 that conducting such a comprehensive tactics review would serve

14 to protect both the public and police officers, whose safety can

15 be jeopardized when tactical decisions fail to achieve intended

16 outcomes?

17 A    Yes.

18 Q    All right.  And the Denver Police Department, you actually

19 suggested something very specific, didn't you?

20 A    I think so, yes.

21 Q    What you suggested is that the Denver Police Department

22 employ its tactics review board to assess the tactics used in

23 that clash to determine if different policies, procedures would

24 better protect officer safety and protester safety; right?

25 A    Yes.

20-cv-1878-RBJ     NICHOLAS MITCHELL - Redirect     03-17-2022

1   Q     And the Department of Safety declined to accept that

2   recommendation; right?

3   A     Yes, they did.

4   Q     All right.  And they declined it in part over a concern of

5   resources, money; right?

6   A     I don't really remember what they said was the reason why

7   they declined it.

8   Q     Let's look at your report.  If you would take a look at

9   that third paragraph.  The Department of Safety also cited a

10  concern over resources as a reason for not doing the recommended

11  tactics review board review; right?

12  A     Yeah.

13  Q     Okay.  So, does this refresh your recollection that you had

14  in fact made a suggestion to DPD that in a protest situation

15  where they use less-lethal weapons, a deep dive would be

16  appropriate to make sure that officers and citizens would be

17  safer in the future?

18  A     It does, yeah.  I thought Mr. Ringel's questions were more

19  about specific recommendations on policies, but this -- you

20  know, this certainly refreshes my recollection that I thought

21  and continue to think that the DPD or the Department of Safety

22  need to be organizations that are willing to look at incidents

23  and learn to make sure that they can learn from mistakes that

24  were made.  And in this particular case, I raised this example

25  publicly of an incident that provided a good opportunity to

20-cv-1878-RBJ    NICHOLAS MITCHELL - Redirect    03-17-2022

1    learn about how to police protests successfully and more safely

2    for citizens and officers.

3    Q    And I didn't mean to blame you.  I think you mentioned the

4    Occupy -- your report in the Occupy in response to the

5    questioning from Mr. Ringel, but I just wanted to give a more

6    complete opportunity to answer that.

7    A    Thank you.

8    Q    Mr. Ringel also asked you some questions about body-worn

9    camera, and whether you had made recommendations or suggestions

10   to DPD prior to George Floyd protests.  Do you remember those

11   questions?

12   A    I do.

13   Q    And I think you said you had -- that you had made

14   recommendations, and the Denver Police Department had accepted

15   some of them and not accepted others; right?

16   A    Correct.

17   Q    Okay.  And one of the things that you suggested all the way

18   back in 2014 was that DPD plan to deploy body-worn cameras to

19   Metro SWAT officers, and that you thought that they should do

20   so?

21   A    I did.

22   Q    All right.  And the Denver Police Department did not take

23   you up on that suggestion; right?

24   A    Correct.

25   Q    And the Metro SWAT officers are the ones who wear more of

20-cv-1878-RBJ    NICHOLAS MITCHELL - Redirect    03-17-2022

1   the hardened gear?

2   A    I think that's generally accurate, yes.

3   Q    Okay.  And I think on the examination with Mr. Ringel, he

4   suggested that there were issues during the protest that the

5   magnets didn't work with certain of the hardened gear during the

6   George Floyd protests; right?

7   A    Yes.

8   Q    And so the Denver Police Department had at least five or

9   six years between your recommendation in 2014 and the protests

10   in 2020 to work those bugs out, but they didn't do that; right?

11   A    I think that's right.  I think my recollection is that at

12   some point in the intervening years, there was some policy

13   change under which officers assigned to SWAT would use body

14   cameras in certain non-tactical situations.  So, I think at

15   the -- there was a policy change in the intervening years that

16   did not -- that addressed the recommendation partly, but not

17   fully.

18   Q    And then during the protests, the SWAT officers were told

19   that this would be akin to the -- policing the protest would be

20   akin to a tactical operation, so that they did not have to

21   activate their body-worn cameras; right?

22   A    I am not sure what the specific instructions they received

23   were.

24   Q    But you're aware they didn't activate the -- generally the

25   SWAT officers did not activate their body-worn cameras during

20-cv-1878-RBJ    NICHOLAS MITCHELL - Redirect    03-17-2022

1    the protest; right?

2    A    That's my understanding.

3    Q    Also in 2014, you expressed concerns over the quality and

4    thoroughness of the documentation of body-worn camera usage

5    included in some of the officers' use of force reports.  Do you

6    remember that?

7    A    I don't specifically remember that, no.

8    Q    All right.  Let's quickly put up Exhibit 1047, please.

9    This is the 2014 annual report of your office.  Do you see that,

10   Mr. Mitchell?

11   A    I do.

12   Q    And if we could turn to page 37, please.  And if you see at

13   the top of the page, you described this heading title is

14   supervisors' use of force cover reports sometimes lacked

15   sufficient detail to properly assess uses of force; right?

16   A    Yes, it does.

17   Q    Does this help refresh your recollection?  And I know that

18   was now eight years ago, but that you had in fact made

19   recommendations to the Denver Police Department about

20   inadequacies in their use of force reporting?

21   A    Yes.

22   Q    All right.  Mr. Ringel also asked you some questions about

23   prior to the George Floyd protests whether you had made

24   recommendations about any of the other kinds of less-lethal

25   weapons.  We talked about PepperBall already from the Occupy

20-cv-1878-RBJ    NICHOLAS MITCHELL - Redirect    03-17-2022

1  protest.  Do you recall you also made recommendations in 2017 to

2  the City of Denver Police Department about your concerns that

3  Denver's use of force policy allowed gas munitions in any

4  situation where the officer can clearly articulate the need for

5  deployment?  In other words, it was sort of a vague and nebulous

6  standard?  Do you remember making that criticism and

7  recommendation to do something else?

8  A    It sounds familiar, but I don't have a specific memory of

9  that.

10            MR. MACDONALD:  Your Honor, may I approach?

11            THE COURT:  Yeah.

12  Q.    (By Mr. Macdonald) If you could turn to page four.

13  Without reading it out loud, read that second full paragraph,

14  Mr. Mitchell.

15  A    I've read it.

16  Q    Does this refresh your recollection that you had expressed

17  concern about a draft use of force policy that the Denver Police

18  Department had put out relating to aerosol and gas munitions

19  that could be used for a variety of reasons, including any

20  situation where the officer can clearly articulate the need for

21  deployment?

22  A    It does.

23  Q    And you suggested that there needed to be more specific

24  guidance to individual officers because this was ambiguous?

25  A    Yes.

Kevin P. Carlin, RMR, CRR

20-cv-1878-RBJ   NICHOLAS MITCHELL - Redirect   03-17-2022

1    Q     And you also in your -- in 2017 thought that it was

2    important to have a prohibition on the use of force of people

3    who were only verbally confrontational and do not impede

4    legitimate law enforcement functions; right?

5    A     Can you point me to the specific --

6    Q     Yes, sir.  Page six, sixth bullet.

7    A     Yes.

8    Q     And you also thought it was important for the Denver Police

9    Department to have a prohibition on the use of force in

10   retaliation or to punish citizens; right?

11   A     I did.

12   Q     The Denver Police Department didn't make these recommended

13   changes, did they?

14   A     I would have to compare this document to their use of force

15   policy to give you a definitive answer on that question.  I

16   think they made some of the changes I recommended in 2017, and

17   not others.

18   Q     All right.  Mr. Ringel asked you some questions about use

19   of force reporting, and whether it was retrospective in nature,

20   and I just want to make sure I understand that testimony.

21   Mr. Ringel kept saying other than the general accountability

22   point and asking you some questions, what's the general

23   accountability point, the importance of officers knowing in

24   advance, I have to fill out a use of force report for each use

25   of force in a protest situation?

20-cv-1878-RBJ    NICHOLAS MITCHELL – Redirect    03-17-2022

1    A    I think the point that I was trying to articulate is that

2    when officers know that they are being observed, are being

3    recorded, and may be held accountable in connection with force

4    that they're using, I believe that that tends to have a

5    deescalating effect on the kinds of force that are likely to be

6    used.

7        And so an important component of that accountability

8    framework in the Denver Police Department, as in most other

9    large police departments, is requiring officers to fill out use

10   of force reports, which puts them on notice that they may be

11   asked questions later about the force that they used.  It puts

12   officers on notice that some supervisor may evaluate the force

13   described in the use of force report.  And so if you do not

14   require officers to complete use of force reports, I think it

15   may contribute to an environment that is not conducive to

16   deescalation.

17   Q    And here, the Denver Police didn't require that from

18   officers contemporaneously during the first two weeks of the

19   protest; true?

20   A    True.

21        MR. MACDONALD:  No further questions, Your Honor.

22        THE COURT:  Questions from the jurors?  Yes?  Okay.

23        (Proceedings held at the bench:)

24        THE COURT:  This is number 33.

25        MR. MACDONALD:  No objection.

Kevin P. Carlin, RMR, CRR

20-cv-1878-RBJ   NICHOLAS MITCHELL - Redirect   03-17-2022

1  MR. RINGEL:  That's fine.

2  (Proceedings held in open court:)

3  THE COURT:  Question for you, Mr. Mitchell, from the

4  jury.  Question, if the policy was to report each use of force

5  the same day, would it be a breach of policy not to document the

6  force used each time, since it reduces the transparency of the

7  policy's response and use of force?

8  THE WITNESS:  Yeah.  I think it would be fair -- if I

9  understood the question correctly, it would be fair to view that

10  as a breach of policy.  When we think about breaches of policy,

11  we often think about accountability and discipline.  In this

12  context, because it was really the police -- the police

13  department as a whole did not focus on making sure that each

14  officer was completing use of force reports, we aren't really

15  too concerned or worried, if you will, about individual officers

16  breaching policy by not completing use of force reports.

17  We evaluated the decision by the entire department not

18  to require officers to do that.  I think it was a breach of

19  policy, although as Mr. Ringel pointed out or questioned me

20  about earlier, there was no specific policy that addressed use

21  of force reporting at these large-scale protests.  The policy in

22  general did require police officers to complete use of force

23  reports for every use of force.  Did that answer the question?

24  THE COURT:  Well, if that was your answer, that's the

25  answer.

Kevin P. Carlin, RMR, CRR

20-cv-1878-RBJ   NICHOLAS MITCHELL - Redirect   03-17-2022

1    THE WITNESS:  Okay.

2    THE COURT:  Any other questions over there?  How about

3  Mr. Macdonald?

4    MR. MACDONALD:  No, Your Honor.

5    THE COURT:  Mr. Ringel?

6    MR. RINGEL:  Nothing further, Your Honor.

7    THE COURT:  All right.  Mr. Mitchell, you are headed

8  back to sunny Los Angeles?

9    THE WITNESS:  Well, I live here, Judge.  I'm headed

10  out there in a week for a week of work out there.

11    THE COURT:  You're going to have to put up with a

12  little more of our snow.

13    THE WITNESS:  Yes, indeed.  Thank you, sir.

14    THE COURT:  You're excused.

15    THE WITNESS:  Thank you very much.

16    THE COURT:  We will take our afternoon break.  3:15.

17      (Jury out at 3:01 p.m.)

18    THE COURT:  3:15.

19      (Recess at 3:01 p.m., until 3:15 p.m.)

20      (Jury in at 3:15 p.m.)

21    THE COURT:  All right.  Next witness?

22    MR. MACDONALD:  The plaintiffs call Elisabeth Epps,

23  Your Honor.

24    THE COURT:  Okay.  Hello.

25    THE WITNESS:  Good afternoon.

20-cv-1878-RBJ   ELISABETH EPPS – Direct   03-17-2022

1    (The Witness is Sworn)

2         THE COURT:  Thank you.

3                      **DIRECT EXAMINATION**

4  BY MR. MACDONALD:

5  Q    Good afternoon, Ms. Epps.  Could you state your name for

6  the record.

7  A    Good afternoon.  I'm Elisabeth Epps.

8  Q    Ms. Epps, where do you live?

9  A    I live in Denver.

10 Q    How long have you lived in Denver?

11 A    Almost 11 years.

12 Q    Where did you grow up?

13 A    I grew up in North Carolina and Virginia.

14 Q    Do you have any immediate family?

15 A    I do.  I have a baby brother.  He's grown, but a baby

16 brother and an older sister, and I have a son who is 25.

17 Q    All right.  What does your son do?

18 A    He is a basketball coach, and he works in athletic

19 administration at a college in Boston.

20 Q    Ms. Epps, do you have a college degree?

21 A    I do not have an undergraduate degree.

22 Q    Did you take college classes?

23 A    I took lots of college classes.

24 Q    Where?

25 A    In North Carolina.

20-cv-1878-RBJ   ELISABETH EPPS - Direct   03-17-2022

1    Q    For how many years?

2    A    From '97 to 2001 or 2.

3    Q    And did there come a time when you left North Carolina?

4    A    I did.

5    Q    Where did you go?

6    A    I moved one state north to Virginia.

7    Q    What did you -- why did you move to Virginia, and what did

8    you do there?

9    A    I found out that you did not need an undergraduate degree

10   to apply to graduate school, and so I applied to graduate school

11   and moved to Virginia to do more school.

12   Q    What did you start in in Virginia?  What kind of graduate

13   work?

14   A    I started at University of Virginia working on a master's

15   in medical ethics and biomedical ethics with a plan to move on

16   to an MPH, a master's in public health.

17   Q    And did you do any jobs while you were doing that?

18   A    I did.

19   Q    What jobs?

20   A    I always worked.  I became a mom at 16, so during those

21   years, I nannied.  I delivered phone books.  I was a bank

22   teller.  I worked at call centers.  And in Virginia, I became

23   the patient care coordinator at a free clinic in

24   Charlottesville, Virginia.

25   Q    What is Charlottesville Free Clinic?

Kevin P. Carlin, RMR, CRR

20-cv-1878-RBJ   ELISABETH EPPS - Direct   03-17-2022

1  A    I loved that job.  Charlottesville Free Clinic, part of the

2  answer is right there in the name.  It's a free clinic.  But who

3  we saw was the working uninsured.  So, we would always talk

4  about the doughnut hole of people who were working, but their

5  employer didn't offer health insurance, or they couldn't afford

6  health insurance, but they earned too much for Medicaid or for

7  free healthcare through the hospital.  So, that's who we saw.

8  Q    How long were you doing that work for the Charlottesville

9  Free Clinic?

10 A    I was with the free clinic in different capacities, but I

11 finished being the patient care coordinator in 2007.

12 Q    Why did you finish being a patient care coordinator?  What

13 did you do next?

14 A    I like school.  I decided to go to law school.

15 Q    All right.  And so where did you decide to go to law

16 school?

17 A    In Charlottesville at the University of Virginia.

18 Q    And did you get a law degree?

19 A    I did.

20 Q    And what did you do after you got a law degree?

21 A    So, I moved -- as they say, I wasn't born here, but I got

22 here as soon as I could.  I moved straight to Colorado from

23 Charlottesville, drove 1,600 miles in about 24 hours with my dog

24 and family, and pretty much haven't looked back.

25 Q    How old was your son at the time?

20-cv-1878-RBJ   ELISABETH EPPS - Direct   03-17-2022

1  A    Starting ninth grade, so 14, 15.

2  Q    So, you had your son as you went through law school?

3  A    Yes.  He jokes that he got an honorary law degree as well.

4  Q    What work did you come out here to do -- come out to

5  Colorado to do?

6  A    I came to do my dream job.  I had always worked supporting

7  my most vulnerable neighbors, and I wanted to be a public

8  defender.  I wanted to keep innocent folks and poor people out

9  of jail.  And a lot of folks don't know it, but Colorado has the

10  best public defender system in the nation, so if you want to do

11  that work, this is the place you want to come.

12  Q    Have you been involved in politics over the course of your

13  life?

14  A    Yes.

15  Q    Are you doing anything with respect to politics now?

16  A    I am.  I've volunteered or worked on campaigns for 30

17  years, as a precocious 12-year-old, but I am now running for

18  office myself.  I'm running to represent State House District 6,

19  which is actually the area that covers the capitol, most of the

20  areas we've talked about during this trial.

21  Q    And what's your current job?

22  A    I am the executive director of an organization I founded

23  several years ago called the Colorado Freedom Fund.

24  Q    What is the Colorado Freedom Fund?

25  A    So, the Freedom Fund is a nonprofit organization that works

20-cv-1878-RBJ    ELISABETH EPPS - Direct    03-17-2022

1  to reunite families, to support folks who are facing criminal

2  charges.  And particularly the focus is on helping poor folks

3  get out of jail pretrial.  These are folks who have been charged

4  with a crime, but who haven't had, as we say, their day in

5  court.  They're innocent.  They haven't been convicted yet, and

6  they're being held in jail only because of their inability to

7  pay money bond, so we support them.

8  Q    Approximately how many people has the Colorado Freedom Fund

9  helped since you founded it three, three and a half years ago?

10 A    We have posted bond and helped support folks getting back

11 to trial, over a thousand of them all across Colorado: Weld

12 County, Pueblo, certainly many in Denver.  I won't start listing

13 all the counties, but all across Colorado.

14 Q    I'd like to talk about your experience with the Denver

15 Police Department's use of force advisory committee.  Tell the

16 jury what that is and what your involvement with it was.

17 A    Sometime in 2015, I was a part of an organization called

18 Denver Justice Project, and -- DJP.  And we along with other

19 community groups really were encouraging over those next couple

20 of years the Denver Police Department to bring community into

21 the rework of the use of force policy.  And sometime in 20 --

22 end of 2016, start of 2017, that ask was answered.  Denver

23 Police Department did create that group.  And I was invited,

24 appointed to be a member of that policy group.

25 Q    And that was by then Police Chief White?

20-cv-1878-RBJ   ELISABETH EPPS - Direct   03-17-2022

1   A     That's right.  Chief Robert White was then the chief of

2   police in Denver.

3   Q     And what did you do on the DPD use of force advisory

4   committee?

5   A     It was a lot of work.  So, we did everything from -- so,

6   the goal was to create a working document use of force policy

7   that did two things, that both gave a set of guidelines that

8   police officers could have as a clear understanding, but also

9   that community members would know what expectations we could

10  have of our police.  It was supposed to be a shared process.

11          And I was also on the subcommittee that actually did

12  the detailed working.  So, the bigger group that worked on sort

13  of high-level policy and ideas and values, and then there were

14  working groups that did things like actually, you know,

15  correcting punctuation and drilling down on the actual words,

16  and I did that.

17  Q     And how much work were you doing on this over the course of

18  2017, 2018, and 2019?

19  A     So, the bulk of the work was through -- was in 2017.  And

20  during that period, we met weekly.  And our agenda was most

21  weeks the meetings were set for two hours, so that would be the

22  minimum that we were working, but of course there was always a

23  lot of prep work before and after.

24          We created a finished product sometime the end of '17,

25  early '18, and for the next couple years, the time decreased,

Kevin P. Carlin, RMR, CRR

20-cv-1878-RBJ    ELISABETH EPPS - Direct    03-17-2022

1  maybe meeting once a month or something like that, sort of

2  depending on what was going on.

3  Q    All right.  How involved were the Denver Police in the use

4  of force advisory committee?

5  A    When we started the process in early 2017, Denver Police --

6  and here I mean line officers, patrol officers, I think there

7  were some technicians, were active and were present at the

8  beginning.

9  Q    Was there a time when the Denver Police Department pulled

10  back from the committee?

11  A    They did.

12  Q    And when was that?  And describe what happened.

13  A    Not that long into the process, the police officers -- it

14  was almost like they took their ball and went home.  They were

15  not happy that community was giving input.  It was clear that

16  they wanted a process where they just told us what was

17  happening, and weren't interested in working reciprocally at

18  that point.  And so they left fairly publicly, actually.

19  Q    And did the Denver Police Department ultimately adopt the

20  suggestions of the advisory committee?

21  A    It's my understanding that they adopted some of the

22  suggestions in conjunction with the independent monitor, but

23  certainly not wholesale.  They may have incorporated some

24  suggestions.

25  Q    And did there come a time in which you stepped down from

Kevin P. Carlin, RMR, CRR

20-cv-1878-RBJ   ELISABETH EPPS - Direct   03-17-2022

1   the use of force advisory committee?

2   A    Yes.

3   Q    When was that?

4   A    I decided to quit the use of force committee with the

5   Denver Police on May 28th of 2020.

6   Q    The jury has heard a lot about that being the first day of

7   the protest on the George Floyd protest.  Did that have anything

8   to do with your decision to step down from the advisory

9   committee that you've been serving on for the last three plus

10  years?

11  A    It had everything to do with it.  I actually had a meeting

12  with -- when we started this process, there was Chief White, and

13  we went through a new search for a new police chief.  And by

14  2020, we had a new police chief, Paul Pazen.  And I actually had

15  a meeting with Paul Pazen on the afternoon of Thursday the 28th.

16  Myself and a half dozen other committee members who were the

17  folks who were still hanging in there years later.  That

18  afternoon we had a meeting with Chief Pazen, and a few hours

19  later, it was clear to me that I needed to quit.

20  Q    And that's May 28th, 2020, the first day of the protest?

21  A    Yes, sir.

22  Q    Okay.  What's your role in this case?

23  A    I am a plaintiff.

24  Q    Why are you a plaintiff?

25  A    What Denver Police did to us, it has to stop.  It can't

20-cv-1878-RBJ   ELISABETH EPPS - Direct   03-17-2022

1   happen again.

2   Q    When did you first hear about the murder of George Floyd?

3   A    I'm sure that I heard about it when police killed him on

4   Monday the 25th, maybe the morning of the 26th.

5   Q    And did you attend the protest here in Denver?

6   A    Yes.

7   Q    Why did you decide to come out?

8   A    Denver wasn't one of the first cities to have protests.

9   Other cities bigger and smaller -- Memphis, Louisville -- had

10  been protesting earlier.  It wasn't so much a decision as a

11  realization.  I needed -- I had been protesting -- I had been to

12  protests for many years.  I needed to be in community.  I wanted

13  to be in fellowship.  I live near -- not far from downtown.  I

14  knew people would be in our public square.  I didn't want to be

15  alone in my grief and protest, and I wanted to document what was

16  happening.

17  Q    All right.  So, did you go down to the protest on the

18  evening of the 28th?

19  A    Yes.

20  Q    What were you wearing?

21  A    This was maybe two months into the global pandemic, so I

22  would have had a cloth mask on.  My hair was in braids and a

23  handkerchief, a T-shirt and jeans.

24  Q    Where did you go first?

25  A    I went to our capitol, our state capitol.

Kevin P. Carlin, RMR, CRR

20-cv-1878-RBJ   ELISABETH EPPS - Direct   03-17-2022

1   Q    What were you doing?

2   A    I was there to protest and to live stream, to film and

3   record, to talk to people who were down there protesting, to

4   document and share what was happening.

5   Q    And even though I have kids, I still am not exactly sure

6   how live streaming works, so what does that mean?  Explain it to

7   the jury.

8   A    It means that as opposed to just recording onto my phone

9   and saving something that I would just have, that I was actually

10  live broadcasting from my phone to people who could watch it in

11  real time as I'm recording.

12  Q    And I will confess, I don't use Twitter, but this was some

13  streaming app that is Twitter adjacent; is that right?

14  A    It is.  I was using Periscope, which doesn't exist anymore,

15  but at the time was a product of Twitter.

16  Q    When you arrived, was the crowd peaceful?

17  A    Yes.

18  Q    And approximately when do you think you arrived that

19  evening, the 28th?

20  A    It was recently dark, so close between 8:00 and 9 o'clock.

21  Closer to 9:00.

22  Q    And you said you were interviewing protesters?

23  A    I was.

24  Q    All right.  What happened while you were interviewing

25  protesters?

20-cv-1878-RBJ   ELISABETH EPPS - Direct   03-17-2022

1   A     I was interviewing two women specifically, and on the

2   steps, or on the landing, really, of the side of our capitol.

3   And as the one woman had literally just said the phrase,

4   referencing Eric Garner, and said, "I can't breathe," we were

5   tear gassed without warning by the Denver Police.

6   Q     Let's just quickly put up 1241.  I think hopefully the jury

7   knows what we're talking about, but let's just put that up and

8   orient ourselves.  Can you show -- mark on your screen where

9   approximately you were when you arrived at the capitol on the

10  evening of the 28th.

11  A     Yes.  About there on the south side on the landing.

12            MR. MACDONALD:  Okay.  And the jury has seen some

13  body-worn camera footage from this event.  We're going to show

14  just a couple more quickly from a few different angles.  Let's

15  put up Exhibit 569.  This is the body-worn camera footage of

16  Denver Officer Horton on the evening of May 28th at 9:00 p.m.

17  We move admission.

18            MR. WEINER:  No objection.

19            THE COURT:  It's admitted.

20            MR. MACDONALD:  And let's go to 27:47, please, Dan.

21  Q.    (By Mr. Macdonald) And do you see in the background, is

22  that the state capitol?

23  A     Yes.

24  Q     Okay.  And I know it's a -- you just marked on the map

25  where you were on the two-dimensional map, but how about here on

20-cv-1878-RBJ   ELISABETH EPPS - Direct   03-17-2022

1    this?  Can you sort of show us directionally where you were

2    standing at approximately this time.

3    A    Yes.  This is 14th and Sherman, and I am right up close to

4    the capitol.

5    Q    Okay.  So, somewhere down here behind this crowd?

6    A    Yes.

7    Q    Okay.  Let's roll the tape, please.

8        (A video was played.)

9    Q    Stop there.  Did you hear what the officer said to his

10   fellow officers?

11   A    Yes.

12   Q    What was it?

13   A    He says, here it comes, here it comes, here it comes, here

14   comes the gas.

15   Q    And did you see any protesters launching projectiles at the

16   officers?

17   A    No.

18   Q    Did you see any protesters acting violently in that crowd?

19   A    No.

20   Q    And did you, when you were standing at that intersection

21   out of the street over by the capitol, hear any warnings?

22   A    No.

23   Q    And did you -- while you were standing there, did you hear

24   after the gas was deployed the police begin to shoot PepperBalls

25   into the crowd?

20-cv-1878-RBJ   ELISABETH EPPS - Direct   03-17-2022

1    A    Yes.

2         MR. MACDONALD:  Okay.  Let's show this from one other

3    angle.  Let's put up Exhibit 571, please.  This is the body-worn

4    camera of a Denver Officer O'Neal at approximately the same time

5    on the other side of the street, the left side of 14th.  And

6    let's go -- this is at -- let's go to eight minutes, 40 seconds,

7    please, Dan.  And this is also approximately 9:10 or 9:11 p.m.

8    on May the 28th.  Move admission of 571, Your Honor.

9         MR. WEINER:  No objection.

10        THE COURT:  Admitted.

11        MR. MACDONALD:  All right.  Let's play the tape from

12   eight minutes, 40 seconds, please.

13        (A video was played.)

14   Q.    (By Mr. Macdonald) Stop for a minute.  And do you see

15   these protesters over here are standing on the sidewalk?

16   A    Yes.

17   Q    All right.  And you are still somewhere back interviewing

18   two people somewhere back there; is that right?

19   A    That's right.  I'm pretty close to that -- it's frozen odd

20   there, but that collection of -- that light post with four

21   globes, kind of.

22   Q    All right.  Let's continue running the tape.

23        (A video was played.)

24   Q    Stop.  Did you see the officer right here walk up and lob a

25   tear gas canister into the middle of that crowd?

20-cv-1878-RBJ   ELISABETH EPPS – Direct   03-17-2022

1   A     Yes.

2   Q     Let's back it up about three seconds, Dan.  I'd like you to

3   look, I think it's this officer, but look for someone walking

4   and then throwing something into the crowd there.

5         (A video was played.)

6   Q     Stop it.  Did you see the officer throw the tear gas

7   canister actually into the crowd?

8           MR. WEINER:  Judge, I'm going to object.  There's no

9   foundation that it was tear gas and not smoke.  She can't

10  speculate.  602.

11          THE COURT:  Sustained.

12  Q.    (By Mr. Macdonald) Did you see the officer throw

13  something into the crowd that was deploying some type of

14  munition?

15  A     Yes.

16  Q     Let's back up about two seconds, please, Dan.  Now, listen

17  to what you hear here, what you hear just in a moment from this

18  other officer, a DPD officer.

19        (A video was played.)

20  Q     So, what did you just hear someone from the sidewalk area

21  yell?

22  A     The person on the sidewalk I hear yell, you're supposed to

23  deescalate.

24  Q     And at the beginning of that clip, what did you hear that

25  the officer said to one of his colleagues?

20-cv-1878-RBJ   ELISABETH EPPS - Direct   03-17-2022

1   A   I hear the officer say, get some direct impact on them.

2   Get some direct impact on them.

3   Q   And do you recall while you were conducting your interviews

4   the sounds of PepperBalls and people being shot with PepperBalls

5   around you?

6   A   Yes.

7   Q   Now let's go to Exhibit 106, please, which is already

8   admitted, Your Honor.  And let's start at the six-minute mark.

9   And let's -- first of all, do you recognize what this is?

10   A   Yes.

11   Q   What is it?

12   A   It's a still frame from a live stream video that I took on

13   May 28th.

14   Q   All right.  So, this is the video of you at the capitol

15   interviewing two people -- or at least one person in front of us

16   and another person standing to the side just when the incident

17   we're -- that we just saw is about to happen; right?

18   A   That's right.

19   Q   Let's play here.

20       (A video was played.)

21   Q   Let's stop there.  Why -- what happened in that scene that

22   we just witnessed, Ms. Epps?

23   A   Standing at the capitol, I was interviewing two women,

24   talking to one specifically at that point.  And without any

25   warning, a very rapid series of sounds and sensations, and we

20-cv-1878-RBJ   ELISABETH EPPS - Direct   03-17-2022

1   were gassed.  The police gassed us.

2   Q    Let's keep playing the video, please.

3        (A video was played.)

4   Q    Let's stop here.  Why did you yell out, I'm okay?

5   A    It was a thing I said a lot over the course of the protest.

6   I am -- why did I say it?  I was saying it for a couple of

7   reasons.  I'm saying it because I know my son and my brother are

8   watching, and I'm trying to convince them that I'm okay.  I'm

9   saying it to talk myself into it, that I'm okay.  I'm saying it

10  because I know that people, friends and neighbors, community

11  members are watching.  And I'm saying it to try and make it so.

12  I'm clearly not okay, but I'm trying to will it to be the case.

13  Q    Let's go to 7:45, please.  Play that, Dan.

14       (A video was played.)

15  Q    Let's stop there.  How did you know at that point the

16  language of what a dispersal order was?

17  A    So, at this point, May of 2020, for some three years, I've

18  been working with police officers and police adjacent folks on

19  the use of force policy.  And "disperse" is a very common word,

20  and I feel naïve saying this, but I expected in this moment that

21  surely we would at least get some warning, and we didn't.

22  Q    Let's go to nine minutes, please.

23       (A video was played.)

24  Q    Stop there.  And go to 10:55.  Play there, please.

25       (A video was played.)

20-cv-1878-RBJ   ELISABETH EPPS - Direct   03-17-2022

1   Q    Stop there.  When you say, I've done the training enough to

2   know not to rub my eyes, what are you referring to?

3   A    I'm referencing having been in trainings, both formal and

4   informal, with protesters, folks who support protests, training

5   what to do if you're tear gassed by police.

6   Q    And why are you not supposed to rub your eyes?

7   A    You know, the chemical agents that they're unleashing on us

8   are designed to cause pain and to disorient and hurt, and so

9   they teach you that what's natural, human, is to protect

10  yourself, to try and get out the thing that's hurting you.

11  That's your natural biological, physiological reaction, but you

12  have to override that, because what you will be doing is pushing

13  the chemicals further into your eyes.  And it's a hard thing to

14  do in the moment, but it's important.

15  Q    And are you speaking to the people who would be observing

16  your live stream during this point, including maybe your son and

17  your younger brother?

18  A    I am.

19  Q    All right.  Let's roll this for just a little bit longer,

20  and then we will move off this.

21       (A video was played.)

22  Q    Stop there.  What did you mean there, Ms. Epps?  The

23  difference between a guardian mentality and a warrior mentality,

24  and what you were talking to Chief Pazen about?

25  A    When you see on the side of police vehicles, they often say

Kevin P. Carlin, RMR, CRR

20-cv-1878-RBJ   ELISABETH EPPS - Direct   03-17-2022

1  to protect and serve, or to serve and protect, depending on

2  where you are.  And the idea of a guardian mentality versus a

3  warrior mentality is public servants, our police should be there

4  to protect and serve us, the community members, and that would

5  be a guardian mentality, versus a warrior mentality is treating

6  community members like we're in a war zone, like we're all enemy

7  combatants, and them being militarized.

8          And this phrase is one that had come up just that day,

9  earlier this day on the 28th in conversation with Chief Pazen.

10  And I was just having a moment of realization that this had been

11  lip service, because a guardian mentality, if it were being

12  displayed, I wouldn't have just been tear gassed by my police.

13  Q    And you seem a little disoriented -- no offense -- during

14  that.  Were you?

15  A    I was very disoriented.

16  Q    What did you do next when you left the capitol after that

17  tear gas and after gathering yourself on the south steps?  Let

18  me ask one more question.  When the police deployed the tear

19  gas, the protesters were pushed towards the capitol; right?

20  A    Yes.

21  Q    The police were not guarding the capitol and preventing you

22  and other protesters from sacking it, were they?

23  A    No.  That's the -- what you can see behind me is the doors

24  that enter into the capitol.  They're lit behind me.  There's --

25  I'm closer to the capitol than the police were, and they pushed

20-cv-1878-RBJ   ELISABETH EPPS - Direct   03-17-2022

1   others that way, in that direction.

2   Q    All right.  Where did you go next that evening?

3   A    So, I was on the south side of our capitol, and I walked

4   back west along 14th is the direction I headed.

5   Q    And did you encounter someone at the corner of 14th and

6   Lincoln?

7   A    I did.

8   Q    Who is that?

9   A    I don't know his name, but I ran into a gentleman who was

10  in a wheelchair.

11  Q    And is this someone you had seen around the community

12  before?

13  A    This is someone I had seen around the community before.

14  Q    All right.  And we're going to move through this fairly

15  quickly, because the jury has seen some evidence about this.

16  Let's put up the still of 598.  Thank you.  And they heard, I

17  think, in a couple different people's testimony, different of

18  our plaintiffs who were at this event, this is approximately 30

19  minutes later on the -- now we're on the west side of the

20  capitol with the man in the wheelchair giving the universal sign

21  of displeasure at a police line.  Was this the man in the

22  wheelchair that you remember encountering just a half or quarter

23  block from where he's sitting?

24  A    That is our neighbor in the wheelchair who I was

25  referencing.

20-cv-1878-RBJ   ELISABETH EPPS - Direct   03-17-2022

1   Q    All right.  And this, we -- is the time when Commander

2   Phelan ordered his officers to, as soon as you get there,

3   launch, throw smoke first, then chemical right after?

4            MR. WEINER:  Objection.  Leading.

5            THE COURT:  Sustained.  You were leading.

6   Q.    (By Mr. Macdonald) Do you recall, Ms. Epps, that -- what

7   do you recall happening next?

8   A    So, I -- this is the intersection of 14th and Lincoln.

9   Another neighbor was talking with this gentleman for a minute,

10  kind of checking on him.  When that person moved on, I got down

11  and checked on him as well, talked with him for a moment, and

12  then I headed away.  I was going to point the direction, but I

13  headed back towards the grass.

14  Q    Up on the capitol grass?

15  A    Up on the capitol grass.

16  Q    Okay.  Let's put up Exhibit 24, the still from Exhibit 24.

17  We won't play this video, but this has been admitted, and we saw

18  it with Chief Stamper.  This here is a vehicle, an RDV full of

19  SWAT officers who deployed gas on that evening.  Let's put up

20  Exhibit 598b.  That's another admitted exhibit.  This is also

21  from that same location.  From your perspective, what happened

22  in this event, to the best of your recollection?

23  A    Yeah.  This was scary, but disorienting.  I was already

24  very shaken from -- we had been gassed at that point a couple

25  times at the -- on the 14th side of the capitol.  And then there

20-cv-1878-RBJ   ELISABETH EPPS - Direct   03-17-2022

1   was another barrage of sensations, what I understood to be --

2   what I understand to be a mix of PepperBalls and rubber bullets

3   and gases, just all raining down on us at once.

4   Q    Did you experience the effects of chemical munitions here?

5   A    Yes.

6   Q    And what did you do next that evening?  Did you stay and

7   keep protesting?

8   A    On this night, I did not stay that much longer.

9   Q    What did you do when you got home that night?

10  A    So, on Thursday the 28th, I got home.  I debriefed.  I was

11  dealing with some personal things that I needed to tend to, and

12  sort of reset, and tried to steel myself to decide what I was

13  going to do the next day.

14  Q    Did you return to the protest the next day?

15  A    Yes.

16  Q    Why?

17  A    Well, I mean, in large part, because we hadn't -- we hadn't

18  reformed the police in a day, so we were -- protests were still

19  necessary.

20  Q    All right.  What time did you arrive at the protest the

21  next day on May 29th?

22  A    On Friday the 29th, it was dark again.  So, closer to

23  9 o'clock, between 8:00 and 9 o'clock.

24  Q    Where did you park?

25  A    We parked somewhere along Lincoln.

20-cv-1878-RBJ   ELISABETH EPPS - Direct   03-17-2022

1  Q     What happened when you arrived there sometime close to

2  9 o'clock on May 29th?  Where did you go?

3  A     When I -- pardon me.  When I got towards downtown on the

4  29th, pretty soon after getting out of the vehicle, I started

5  filming, streaming.

6  Q     And let's just put up Exhibit 1241 quickly and orient

7  ourselves with the map.  You arrived, parked somewhere on

8  Lincoln, and where were you walking?

9  A     And I was walking north in the white part, but along

10  Lincoln.

11  Q     And then what happened when you got to 14th Street?

12  A     When I got to 14th -- so, this intersection, I turned

13  right.  And it looks flat, of course, here, but it's a bit of a

14  hill.  I turned right on 14th back towards the capitol, which is

15  always sort of my north star, or the magnet for me, where I was

16  always planning to go during these times.

17  Q     And so you started walking up 14th Street?

18  A     Yes.

19  Q     And then what happened?

20  A     So, I -- I'm not -- I wasn't that far into 14th when I

21  basically had a decision point.  There were clouds of what I

22  understood from the day before and was already experiencing of

23  chemical weapons, gases in the air, and particularly larger ones

24  in front of me up the hill on 14th.  So, I decided to cross over

25  14th towards the capitol.  I was filming the police.  I was

20-cv-1878-RBJ    ELISABETH EPPS - Direct    03-17-2022

1    protesting, and yeah.  So, I turned right.  I was walking up the

2    hill, and I started to cross the street to my left.

3    Q    And what happened as you were crossing the street?

4    A    14th is three lanes.  There's not much traffic at all on

5    14th.  There was a lot of traffic on other roads.  I was

6    about -- so, I was crossing the three lanes, and I -- it was

7    just a surreal sight.  There were police officers or law

8    enforcement on our capitol grass just looking, I mean, to me

9    like an occupying force, like a military.

10            And I -- as I'm about two-thirds, so past two lanes,

11   I'm crossing, and it was only like five cars.  Slow cross.  I

12   take a few steps, let a car pass, take a few steps.  No cars

13   were honking at me, anything like that.  And at about two --

14   after the second lane, I see -- I see this officer drop to his

15   knee and point a weapon at me.  It happened very fast, but he

16   dropped, took a knee, and shot something into my leg.

17   Q    Did you hear a warning first?

18   A    No.

19            MR. MACDONALD:  All right.  Let's put up Exhibit 108,

20   please.  Move admission of Exhibit 108.

21            MR. WEINER:  No objection.

22            THE COURT:  Admitted.

23            MR. MACDONALD:  Let's play this from this spot,

24   please, Dan.

25        (A video was played.)

20-cv-1878-RBJ   ELISABETH EPPS - Direct   03-17-2022

1    Q.     (By Mr. Macdonald) Let's stop here.  You are now facing

2    east on 14th?

3    A    Yes.

4    Q    And do you see any tear gas, or at least what you believe

5    to be tear gas in front of you based on what you had experienced

6    the evening before?

7    A    Yes.

8    Q    Can you draw what you observed as the clouds of tear gas in

9    front of you.  Okay.  Let's keep playing, please.

10         (A video was played.)

11   Q    Let's stop there.  Ms. Epps, why do you think that Officer

12   Christian shot you?

13   A    What do I think his reason was, or how do I know it

14   happened?

15   Q    How do you know it happened?

16            MR. WEINER:  Objection.  Calls for speculation.  602.

17            MR. MACDONALD:  I will rephrase, Your Honor.

18   Q.     (By Mr. Macdonald) You -- as you were walking across the

19   street, you said, he just shot me, and you gave a little laugh.

20   Tell us what you were experiencing.

21   A    I felt it, for one, in my calf.  The same place that I had

22   a bruise later.  You know, I know that you asked me how did I

23   know.  We all know of course that it's a PepperBall gun now, but

24   in that moment, just fixated on this man dropping to his knee

25   with his weapon trained on me, and I felt it.  And the exhale

20-cv-1878-RBJ    ELISABETH EPPS - Direct    03-17-2022

1  was like a mix of, oh, I'm okay, I just felt this thing happen

2  and saw this man shoot something at me, so that I mean, the

3  exhale was just -- it was surreal.

4       I was just filming crossing the street.  I wasn't

5  calling out.  Nothing was happening.  I wasn't doing anything.

6  And the exhale was as much is this real life? as anything.

7  Q    How has your interaction with Officer Christian affected

8  you?

9  A    It is hard to explain how relieved I was that he's not here

10  today, because I would be sitting six feet from him.  There was

11  a long period after May 29th where I saw him every day and every

12  night and every interaction with a cop, I was looking close to

13  see is that that one?  Because I didn't know what he looked

14  like, couldn't see him.

15       And that lessened, but starting March 7th, now I see

16  him every day again.  And it is -- I know it's just a -- just a

17  PepperBall.  I do the work of working with police and going into

18  these meetings and reexposing myself to trauma and being willing

19  to do it, but it has affected me deeply, and it's almost like

20  we're back at May 29th.

21  Q    And do you have nightmares about Officer Christian?

22  A    Yes.

23  Q    Let's keep playing the tape, please.

24       (A video was played.)

25  Q    Did you hear what the gentleman on the bicycle -- as he's

20-cv-1878-RBJ   ELISABETH EPPS - Direct   03-17-2022

1  the only person we see on that sidewalk, do you hear what he's

2  yelling?

3  A    I do hear what he's yelling.

4  Q    What is it?

5  A    He's yelling, that was an excessive use of force.

6  Q    Let's keep playing the tape, please.

7       (A video was played.)

8  Q    Let's stop here.  These were the steps that you were on the

9  night before?

10  A    These are the steps I was on the night before.

11  Q    Wind back just two seconds, please, Dan.

12       (A video was played.)

13  Q    Let's stop here.  What did you just hear yourself say?

14  A    I said, ah, shit, there's another couple for me.  And I was

15  saying they're shooting at us from the capitol steps, and then

16  one of them did shoot a couple more times at me.  Or some of

17  them did.

18  Q    Let's keep going.

19       (A video was played.)

20  Q    Let's stop here.  Ms. Epps, where did you go next?

21  A    I was on 14th, and I -- I cycled back.  I turned back and

22  walked the other direction up 14th.  I wanted to record that

23  distance from where they were shooting the protestors, but I

24  turned around and walked back towards Lincoln.

25  Q    So, you went back down to 14th and Lincoln?

20-cv-1878-RBJ   ELISABETH EPPS - Direct   03-17-2022

1   A    That's right.

2   Q    What did you observe at 14th and Lincoln, just 15 minutes

3   later?

4   A    14th and Lincoln, there were protesters on Lincoln, and

5   there were a significant number of cops in a line, some sort of

6   formation.

7   Q    Let's put up 1241 just quickly, and we will orient

8   ourselves.  And so you were just walking here just on the south

9   side of the capitol?

10  A    Yes.

11  Q    And then where did you go?  Where did you see the

12  protesters and the lines of police on Lincoln, approximately?

13  A    I came back and turned this way.

14  Q    Okay.

15  A    Sorry.

16  Q    And what were the police doing on Lincoln 15 minutes later?

17  A    Marching.

18  Q    There was a line of officers moving south on Lincoln?

19  A    Yes.

20  Q    And there were protesters?

21  A    Yes.

22  Q    And protesters were down somewhere in this general

23  vicinity?

24  A    That's right.

25  Q    All right.  What happened to you at this incident?

20-cv-1878-RBJ   ELISABETH EPPS - Direct   03-17-2022

1   A    So, this drawing is right.  Protesters are here.  Line of

2   police are marching this way.  I'm kind of in between, and I'm

3   saying, I'm okay, as I tend to say.  And I'm filming, protesting

4   and filming the police.

5   Q    And what happened while you were filming the police?

6   A    I turned my back to the police.  It was a surreal image

7   that I was trying to share with folks who were watching.  And I

8   turned my back to the police, and it's dark, with my lit phone

9   up, and the police shot my phone out of my hand and then just

10  began to pummel me up and down my back and legs with something.

11  Q    With some kind of impact projectiles?

12  A    Impact projectiles.

13  Q    Shooting you in the back while you were filming?

14  A    Yes.

15  Q    Before we look at your video, which is relatively short,

16  because your phone was destroyed, I would like to look at

17  Exhibit 605, please.  This is the body-worn camera of a Denver

18  Officer Adevisian [sic] at 9:16 on May 29th.  So, this is about

19  15 minutes after you were shot by Officer Christian.

20            MR. WEINER:  Objection, Your Honor.

21            THE COURT:  Sustained.

22            MR. MACDONALD:  Move admission of 605, please.

23            MR. WEINER:  No objection.

24            THE COURT:  All right.  605 is admitted.

25            MR. MACDONALD:  If we can turn to 45 seconds and play

20-cv-1878-RBJ   ELISABETH EPPS - Direct   03-17-2022

1   this, and I want you, when the shooting counts, to see if you

2   can see from the timer how long the shooting lasts.  And we will

3   stop it to see if we can identify you as well.  Go ahead and

4   play that.

5        (A video was played.)

6   Q.    (By Mr. Macdonald) Stop there.  Back up for just one

7   moment, a few frames.  There are some blue dumpsters in the

8   middle of the street.  Do you see those?

9   A     Yes.

10  Q     And where were you in relation to the dumpsters?

11  A     I was between the dumpsters and the police with my back

12  turned to the police.

13  Q     You were on the police side of the dumpsters?

14  A     Yes.

15  Q     All right.  Let's -- can you see yourself in this video?

16  It's a little grainy when we pause it.

17  A     Not yet, but I know where I am, but not yet.

18  Q     Did you have on a backpack of some kind at this location?

19  A     I did have one -- a red backpack.

20  Q     All right.  Let's play, please.

21       (A video was played.)

22  Q     Stop.  Did you see yourself in that?

23  A     Yeah.

24  Q     Where are you?

25  A     This is me with my back turned.

20-cv-1878-RBJ   ELISABETH EPPS - Direct   03-17-2022

1  Q    And what kind of backpack is that?

2  A    It's a canvass one-ply.  It's my son's middle school

3  bookbag.

4  Q    All right.  Let's keep playing, please.

5       (A video was played.)

6  Q    Let's stop there.  Are you still on the screen?

7  A    I am still on the screen.

8  Q    And what was happening to you at this moment?

9  A    So, I'm by myself, and I don't drop.  I don't run.  I am

10 standing.  The first shot shot my phone.  They shot my phone out

11 of my hand, and they're just shooting my back, my lower back and

12 my legs.  And I'm, I guess just taking it, terrified, in shock.

13 Q    Was there some kind of loud explosive device going off just

14 to your right?

15 A    Yeah.  I don't -- yeah.  There was an explosion or

16 grenade-type thing, something that was right next to me.

17 Q    Why don't you run?

18 A    I was in part -- I'm by myself.  I was in shock.  I was --

19 I had just been saying I'm okay.  I was in shock, frozen.  I

20 didn't run when I had been shot crossing the street.  I guess,

21 just because I -- as best I can gather, I was just in shock.

22 Q    Let's keep playing, please.

23      (A video was played.)

24 Q    Let's stop there.  Did you see someone came and pulled you

25 away?

                  20-cv-1878-RBJ   ELISABETH EPPS - Direct   03-17-2022

1   A     Yes.

2   Q     All right.  And did you -- I know we've stopped a couple

3   times, but based on the counter, did you hear how long the shots

4   were being fired, approximately?

5   A     Looked to me like uninterrupted, at least 15, 16 seconds.

6   Q     Let's keep playing, please.

7         (A video was played.)

8   Q     Stop there.  Did you hear any warnings before the police

9   fired on you?

10  A     No.

11  Q     Did any of the police officers stop to render you aid as

12  they walked through and pushed the dumpsters out of the way?

13  A     No.  Not then.  Not later.

14        MR. MACDONALD:  Let's put up Exhibit 17, please.  Move

15  admission of Exhibit 17.

16        MR. WEINER:  No objection.

17        THE COURT:  It's admitted.

18        MR. MACDONALD:  Let's start it at 9:15:50, please.

19  This is from a different angle.  This is from behind the

20  dumpsters.  And let's play it from 9:15:50.  And there's no

21  sound on these videos.

22        We're having some technical difficulties, Your Honor.

23  Let me just see.

24        (A video was played.)

25  Q.     (By Mr. Macdonald) As we're looking at this, do you see

                        Kevin P. Carlin, RMR, CRR

20-cv-1878-RBJ     ELISABETH EPPS - Direct     03-17-2022

1   yourself, Ms. Epps?

2   A    Yes.

3   Q    Where are you?

4   A    This is me with the bright blue.

5   Q    We can see the bright of your phone.  You have the phone

6   face towards you?

7   A    Yes.

8   Q    Okay.  Let's keep playing.

9        (A video was played.)

10  Q    Can you stop there.  Where are you at this moment,

11  Ms. Epps?

12  A    Until the person pulls me out of the street, this is where

13  I'm standing with my back to the police, and they shoot my

14  phone, and I pretty much don't move until someone drags me away.

15  Q    Let's run this for another --

16       (A video was played.)

17  Q    We can stop there.  Ms. Epps, did you place those dumpsters

18  on the street?

19  A    No.

20  Q    Let's look at Exhibit 108, please.  What is Exhibit 1308,

21  Ms. Epps?  I'm sorry.  108.  Apologies.

22  A    This looks like a still in motion of a video from the 29th.

23  Q    This is your camera that you were taking?

24  A    Yes, sir.

25           MR. MACDONALD:  Okay.  Move admission of 108.

20-cv-1878-RBJ   ELISABETH EPPS - Direct   03-17-2022

1    MR. WEINER:  The whole video?

2    MR. MACDONALD:  Yes.

3    MR. WEINER:  No objection.

4    THE COURTROOM DEPUTY:  I already have 108 as in.

5    MR. MACDONALD:  Apologies.  Let's start the video

6  here, please, Dan.

7    (A video was played.)

8  Q.   (By Mr. Macdonald) What happened in that moment?

9  A    I was filming, and the police shot the phone out of my

10  hand.

11  Q    That's the incident we just saw from the other angle where

12  you turn around to film the line of officers coming down at you?

13  A    Yes.

14    MR. MACDONALD:  We're going to show one more video,

15  and then we will move away from this.  Let's put up Exhibit 20,

16  please.  It's another Colorado State Patrol video from the

17  north, looking south.  Move admission of Exhibit 20.

18    MR. WEINER:  No objection.

19    THE COURT:  It's admitted.

20    MR. MACDONALD:  Let's start here, please.

21    (A video was played.)

22  Q.   (By Mr. Macdonald) Let's stop.  Do you see yourself on

23  the screen?

24  A    Yes.  This is -- kind of drew a line through me, but that's

25  me with the red backpack.

Kevin P. Carlin, RMR, CRR

20-cv-1878-RBJ   ELISABETH EPPS - Direct   03-17-2022

1   Q     And the bright light is your phone --

2   A     Yes.

3   Q     -- while you're filming?  Let's roll the tape, please.

4         (A video was played.)

5   Q     Let's stop there.  When the -- some type of explosion was

6   beside you, what did you observe when you watched it from the

7   video?

8   A     They threw something right at me, and I -- it's hard to

9   describe, but I was trying to make myself small or something.  I

10  was not prepared for how -- sorry.  I see them throw something

11  at me, and I freeze, and --

12  Q     Okay.  Let's move the shot -- no.  Keep that up, please,

13  Dan.  Let's move it forward three minutes to 9:19:06, please.

14  Okay.  This is the same scene, same camera.  Let's keep

15  watching.

16        (A video was played.)

17  Q     Let's stop there.  Is that you?

18  A     Yes.

19  Q     Okay.  And what are you doing there?

20  A     In the midst of everything that was happening, I was really

21  concerned about my phone and finding my phone.  Filming the

22  police had been a priority of mine for many, many years, and I

23  was trying to find my phone.  And when they shot -- the police

24  shot my phone out of my hand.  It had this OtterBox, like this

25  three-level intense case that you can't just snap on and off.

20-cv-1878-RBJ   ELISABETH EPPS - Direct   03-17-2022

1  And I've had some experience with dropping a phone

2  before, so I had learned, I had this really intense case, and

3  the -- when they could have hit the back of my head, but they

4  shot the phone, and it separated the entire case from the phone.

5  And the case had my license, my bank card, my debit hard, my

6  home address.  So, I'm trying to find both of these things, and

7  the person who is with me is helping me look, and I am digging

8  in the trash that's on the street looking for my phone and my

9  license.

10  Q    All right.  Let's go back to Exhibit 17, and see if we can

11  look at this from a different angle.  Did you find your phone in

12  the street?

13  A    I did find my phone in the street.

14  Q    Did you find your driver's license and your credit cards

15  and the things that were in the back pocket of the OtterBox

16  case?

17  A    Not quite.  I found the phone.  And then some days later, I

18  actually got an Instagram message from a stranger who said I

19  picked up your phone case, and I found this phone case.  So, I

20  did get it back eventually, but I did not find it that night.

21  Q    All right.  Let's look at Exhibit 17 and go to 9:19:06.

22  So, these are the same dumpsters that we were looking at.

23  They're still there?

24  A    Yes.

25  Q    The police didn't remove them or do anything with them

20-cv-1878-RBJ   ELISABETH EPPS - Direct   03-17-2022

1   other than push them to the side?

2   A    They didn't do anything.

3   Q    Let's play this, Dan.

4        (A video was played.)

5   Q    Stop there.  And can you identify yourself on the screen?

6   A    Yes.  I'm here.

7   Q    And is this someone you're with picking up the phone?

8   A    Yes.

9   Q    All right.  Let's keep watching, please.

10       (A video was played.)

11  Q    And I'd like you to watch for someone who walks across the

12  screen somewhere over here.

13       (A video was played.)

14  Q    Do you see that?

15  A    Yes.

16  Q    What do you understand that to be?

17  A    Cops shooting a PepperBall or something like that at a

18  woman crossing the street.

19  Q    Did she look like she was holding something in her hand?

20  A    Yes.

21  Q    Do you know if she was filming?

22  A    I thought she was filming.

23  Q    Let's keep watching.  This is you now looking in the trash

24  for your ID and your wallet?

25  A    That is me looking in the trash for my phone case and

20-cv-1878-RBJ   ELISABETH EPPS - Direct   03-17-2022

1    license and bank cards.

2         (A video was played.)

3    Q    Let's stop there.  What did you see there, Ms. Epps?

4    A    Yeah.  In a weekend of surreal moments, this is one of

5    them.  As I'm looking through the trash for my things and the

6    cops are shooting at me, these -- I wouldn't have known what to

7    call them then, but what I understand now to be PepperBalls,

8    these things that are making us cough as I'm looking for my

9    things.

10   Q    And let's keep playing, please.

11        (A video was played.)

12   Q    Did you see that, Ms. Epps?

13   A    Yes.

14   Q    What's that?

15   A    They're still shooting.  It's like they're in a video game

16   or something.  They're still shooting things at folks.

17   Q    At any point during any of the encounters we've just been

18   talking about, did you hear any warnings from the police?

19   A    No.

20   Q    Were you throwing things yourself?

21   A    No.

22   Q    Committing acts of property destruction?

23   A    No.  The only property destruction was them shooting my

24   phone here.

25   Q    All right.  I'd like to jump forward about ten minutes,

20-cv-1878-RBJ   ELISABETH EPPS - Direct   03-17-2022

1    please, to 9:28:04.  And let's play that, Dan.

2         (A video was played.)

3    Q    Do you see yourself here, Ms. Epps?

4    A    Yes.

5    Q    Where are you?

6    A    I'm walking south on the sidewalk here.

7    Q    This is about 12 minutes later?

8    A    Yes.

9         (A video was played.)

10   Q    What are you doing here, Ms. Epps?

11   A    I am crawling.  I -- for me, by far the most intense

12   physical pain of what the police did to us were the chemicals.

13   I don't know what the chemicals are doing to our Earth or our

14   water or our land, but to my lungs, these things that pop and

15   break, whether they hit my body, which they did, or whether they

16   hit near me, which they did as well, just gets into my lungs,

17   and I am crawling.

18        I am trying to get help digging through a bag.  The

19   irony is I'm looking for an inhaler, but I'm conflicted because

20   an inhaler by definition is going to have me bringing things

21   into my lungs, and I don't know if that's what I should do.

22   Q    Do you have asthma, Ms. Epps?

23   A    I do have asthma.

24   Q    Were you having trouble breathing?

25   A    Yes.

20-cv-1878-RBJ     ELISABETH EPPS - Direct     03-17-2022

1   Q     Were you in physical pain from receiving shots of some type

2   of projectiles in your back?

3   A     Yes.

4   Q     Let's keep playing the tape for just one more minute,

5   please.

6         (A video was played.)

7   Q     That's you on all fours?

8   A     Yeah.  I obviously had no idea -- I did not realize I was

9   being -- yes.  That is me on all fours, is the answer.

10  Q     You're spitting something out of your mouth in that

11  picture?

12  A     Yeah.  I mentioned, and I think we saw part of the clip

13  from when they gassed us at the capitol, I had a sense of what

14  to do if I got something in my eyes.  I did not know what to do

15  when my lungs were just -- I didn't know what to do, and I

16  couldn't breathe, and I was scared to swallow, so I was scared

17  to inhale.  I am spitting.  I am gargling, trying to get this

18  poison that the police had unleashed on us out of my mouth and

19  lungs.

20  Q     And you're still on all fours in this picture as the camera

21  is rolling?

22  A     Yes.

23  Q     Let's stop there.  Do you see -- there's actually a lone

24  man who put up traffic cones, and pushing at least one of the

25  dumpsters back out into the street; right?

20-cv-1878-RBJ   ELISABETH EPPS - Direct   03-17-2022

1   A    I do see that now.

2   Q    All right.  Let's play a few more seconds, Dan.

3        (A video was played.)

4   Q    You can stop that, Dan.  Take that down.  What did you do

5   after this, Ms. Epps?

6   A    I made it home.  Where I lived at the time had a porch, and

7   I almost completely disrobed.  There was chemicals that the

8   police had unleashed on us all over.  I left my boots, almost

9   completely stripped down, turned what clothes I brought inside,

10  inside out.  It was a really old, carpeted house.  I didn't want

11  to track it through.  I disrobed, and I went inside, tried to

12  take care of myself, and I started making plans to replace my

13  phone, is what I did.

14            MR. MACDONALD:  I'd like to move into evidence

15  pictures of Ms. Epps.  They're Exhibit 62, 64, 66, 67, and 1250.

16  I will move through these quickly.

17            MR. WEINER:  I don't have an objection, Your Honor.

18            THE COURT:  64, 62, what else?

19            MR. MACDONALD:  62, 64, 66, 67, and 1250.

20            THE COURT:  Are you objecting to those?

21            MR. WEINER:  No, Your Honor.  Sorry.

22            THE COURT:  All right.  Admitted.

23  Q.   (By Mr. Macdonald) Let's put up Exhibit 62, please.  What

24  is this a picture of, Ms. Epps?

25  A    It's the back of my leg, bruises from Denver Police.

20-cv-1878-RBJ    ELISABETH EPPS - Direct    03-17-2022

1   Q    How many shots do you think that encompasses, or do you

2   know?

3   A    It's at least three, but I don't know how many.  I was

4   being pounded in the same spot repeatedly.  I was standing

5   there.

6   Q    Let's look at Exhibit 64.  What are these, Ms. Epps?

7   A    More bruises from Denver Police.

8   Q    These were shots from the Denver Police that we've just

9   witnessed you receiving?

10  A    Yes.

11  Q    How long did the bruises last?

12  A    The last pictures I have are in the beginning of June.

13  These bruises, I'm not sure.

14  Q    Let's look at Exhibit 66, please.  What's this a picture

15  of?

16  A    That's where Officer Christian shot me.

17  Q    Let's look at Exhibit 67, please.  What is this a picture

18  of?

19  A    Bruises from being shot on the 29th of May by Denver

20  Police.

21  Q    Let's look at Exhibit 1250, please.  What is this,

22  Ms. Epps?

23  A    That's me in a hearing about police accountability of the

24  capitol in June.  And that's the bruise where -- that's the

25  bruise where Officer Christian shot me.

20-cv-1878-RBJ   ELISABETH EPPS - Direct   03-17-2022

1   Q    Do you still have any marks to this day from the shootings

2   that we've witnessed?

3   A    I still have one mark, yes.

4   Q    Where is that?

5   A    It is right here.  It is on my back.  It's where the bra

6   strap is on the right side if you're behind me, between the size

7   of a dime and a quarter.

8           MR. MACDONALD:  Your Honor, I know it's 4:30.  I have

9   one more incident to discuss with Ms. Epps.  If you'd like me to

10  do it now, I can do it.

11          THE COURT:  How long is it going to take?

12          MR. MACDONALD:  I think it will be at least ten

13  minutes, Your Honor.  Maybe 15.

14          THE COURT:  Then we're going to have cross

15  examination; right?

16          MR. WEINER:  Correct.

17          THE COURT:  9 o'clock in the morning.

18          MR. MACDONALD:  Thank you, Your Honor.

19      (Jury out at 4:36 p.m.)

20          THE COURT:  All right.  Anything for the record,

21  plaintiff?

22          MR. MACDONALD:  No, Your Honor.

23          MR. RINGEL:  Nothing for the defendants.

24          THE COURT:  Have a nice evening, everyone.

25      (Proceedings concluded at 4:37 p.m.)

Kevin P. Carlin, RMR, CRR

1      REPORTER'S CERTIFICATE

2

3

4          I, KEVIN P. CARLIN, Official Court Reporter for the

5   United States District Court for the District of Colorado, a

6   Registered Merit Reporter and Certified Realtime Reporter, do

7   hereby certify that I reported by machine shorthand the

8   proceedings contained herein at the time and place

9   aforementioned and that the foregoing pages constitute a full,

10  true, and correct transcript.

11          Dated this 8th day of April, 2022.

12

13

14

15

16   _____
     Kevin P. Carlin, RMR, CRR
17   Official Court Reporter

18

19

20

21

22

23

24

25

Kevin P. Carlin, RMR, CRR