```
 1                  IN THE UNITED STATES DISTRICT COURT

 2                     FOR THE DISTRICT OF COLORADO

 3    Civil Action No. 20-cv-1878-RBJ

 4    ELISABETH EPPS AND SARA FITOURI, ET AL.,

 5          Plaintiffs,

 6          vs.

 7    CITY AND COUNTY OF DENVER, ET AL.,

 8          Defendants.

 9    -----------------------------------------------------------------

10                       REPORTER'S TRANSCRIPT

11                       Jury Trial, Vol. 10

12    -----------------------------------------------------------------

13          Proceedings before the HONORABLE R. BROOKE JACKSON,
      Judge, United States District Court for the District of
14    Colorado, commencing on the 18th day of March, 2022, in
      Courtroom A902, United States Courthouse, Denver, Colorado.
15

16                          APPEARANCES
      For the Plaintiffs:
17    TIMOTHY R. MACDONALD, MATTHEW J. DOUGLAS, LESLIE C. BAILEY, and
      DIANA K. STERK, Arnold & Porter Kaye Scholer LLP, 1144 Fifteenth
18    Street, Suite 3100, Denver, CO 80202

19    ELIZABETH C. WANG and MAKEBA RUTAHINDURWA, Loevy & Loevy, 2060
      Broadway Street, Suite 460, Boulder, CO 80302
20

21    For the Defendants:
      ANDREW D. RINGEL, KATHERINE HOFFMAN, and ROBERT A. WEINER, Hall
22    & Evans LLC, 1001 Seventeenth Street, Suite 300, Denver, CO
      80202
23
      HOLLIE R. BIRKHOLZ and LINDSAY M. JORDAN, Denver City Attorney's
24    Office, 201 West Colfax Avenue, Denver, CO 80202

25    Reported By KEVIN P. CARLIN, RMR, CRR, 901 19th Street, Room
      A259, Denver, CO 80294, (303)335-2358
```

Proceedings reported by mechanical stenography; transcription
produced via computer.

1872

20-cv-1878-RBJ    Jury Trial    03-18-2022

1                            I N D E X

2    <u>PLAINTIFFS' WITNESSES</u>                                    <u>PAGE</u>

3    ELISABETH EPPS
          Direct Examination By Mr. Macdonald  . . . . . . . 1873
4         Cross Examination By Mr. Weiner  . . . . . . . . . 1888
          Redirect Examination By Mr. Macdonald  . . . . . . 1925
5
     KATHERINE HOLLIS LYMAN
6         Direct Examination By Ms. Bailey . . . . . . . . . 1928
          Cross Examination By Ms. Hoffman . . . . . . . . . 1964
7
     EDWARD MAGUIRE, PhD
8         Direct Examination By Ms. Sterk  . . . . . . . . . 1993
          Cross Examination By Mr. Ringel  . . . . . . . . . 2044
9

10   <u>PLAINTIFFS' EXHIBITS:</u>

11
                                <u>Identified</u>                  <u>Received</u>
12

13        61                    1881                      1881
          63                    1881                      1881
14        68                    1881                      1881
          70                    1938                      1938
15        84                    1971                      1971
          107                   1895                      1895
16        109                   1915                      1915
          110                   1877                      1877
17        137                   1953                      1953
          138                   1957                      1957
18        455                   2021                      2021
          457                   2030                      2030
19        461                   2010                      2010
          465                   2008                      2009
20        535                   1937                      1937
          1264                  1945                      1946
21

22   Reporter's Certificate . . . . . . . . . . . . . . . 2084

23

24

25

                      Kevin P. Carlin, RMR, CRR

20-cv-1878-RBJ   ELISABETH EPPS – Direct   03-18-2022

1                          P R O C E E D I N G S

2          (Proceedings commenced at 9:02 a.m.)

3          (Jury in at 9:02 a.m.)

4              THE COURT:  How y'all doing this morning?  Excellent.

5    It's Friday; right?  Happy Friday.  Go.

6              MR. MACDONALD:  Thank you, Your Honor.

7                         **DIRECT EXAMINATION**

8    BY MR. MACDONALD

9    Q    Ms. Epps, when we left off yesterday, we just finished

10   watching the video of what happened to you on the night of the

11   29th.  So, tell us what activities did you do during the day on

12   the 30th, the third day of the protest, given what happened to

13   your phone the evening of the 29th?

14   A    The morning of the 30th?  Saturday, May the 30th, I went to

15   the AT&T store.  I was at the AT&T store the moment that it

16   opened to start the process of replacing my phone.

17   Q    All right.  And did you in fact buy a new phone that day?

18   A    I did buy a new phone.

19   Q    Approximately how much did you spend on that phone?

20   A    The phone itself was about $700.

21   Q    And did you make any efforts to recover the data that you

22   had on your phone?

23   A    I did.

24   Q    And what did you do to try to recover that data?

25   A    I actually had to do this in the past, and so I tried it

                         Kevin P. Carlin, RMR, CRR

20-cv-1878-RBJ   ELISABETH EPPS - Direct   03-18-2022

1  again with this phone, like a data recovery service that you can

2  hire, give them your phone, and they will try to recover lost

3  data.  My phone wasn't just the screen shattered.  When the

4  police shot it, it was hot for days, just kind of -- it was

5  broken into many more pieces than a normal phone break.  And I

6  did take it to the data recovery place, and they sent it off to

7  try to recover whatever they could from the phone.

8  Q    And how much did you spend on that?

9  A    That was also $700.

10  Q    And was the data recovery outfit able to recover the data

11  that was on your phone?

12  A    They were not able to get anything off my phone.

13  Q    What type of data and photos did you lose?  I know we keep

14  much of our lives on our phone these days, unfortunately.

15  A    Yes.  So, that was the night of May 29th that the police

16  shot it, and so I -- in the most immediately, I lost my photos

17  and things from the protest, May 28th and May 29th.  I keep

18  my -- I keep a diary on my phone.  I lost almost all of that.

19  Countless pictures.  I have triplet nephews.  Lost countless

20  pictures, calendar entries.  It was actually, I didn't even

21  realize until the weeks and months started to go by how many

22  things weren't there anymore that are saved on a phone that

23  weren't.

24  Q    Did you have photos of your mother on the phone?

25  A    I did.

Kevin P. Carlin, RMR, CRR

20-cv-1878-RBJ    ELISABETH EPPS - Direct    03-18-2022

1    Q    And when did she pass?

2    A    In 1989.  I was nine.  She was 33.

3    Q    All right.  Did you go back to the protest on May 30th?

4    A    I did go back to the protest on May 30th.

5    Q    What did you do to prepare to go back to the protest on

6    May 30th?

7    A    So, May 28th and May 29th, I was wearing just a regular

8    cloth COVID mask that we all were wearing.  No particular

9    protection otherwise, but after what the police did to us Friday

10   night, actually my co-worker insisted that I wear -- she brought

11   to me one of -- it's like a painter's mask, almost, home

12   construction mask that her husband had in the garage.  So, I

13   prepared by wearing this sort of respiratory painter's mask.

14   She also brought me some ski goggles.  I wore those.

15        The preceding two days I had my son's old middle school

16   bookbag as my bookbag, but I swapped that out for a bag that had

17   like some padding for a laptop, so just a little bit of more of

18   a backpack than sort of a bookbag.

19        I put more milk and water in my bag, understanding that

20   there was a possibility that the police would tear gas us again.

21   So, I worked to protect my lungs, my eyes.

22   Q    Why did you go back for a third day after what happened to

23   you on the 28th and the 29th?

24   A    We still hadn't reformed the police.  I had been protesting

25   all my life.  It's an important part of my life.  By the 30th,

Kevin P. Carlin, RMR, CRR

20-cv-1878-RBJ    ELISABETH EPPS - Direct    03-18-2022

1  though, it was just so much more clear that we needed to be

2  there.  The 28th and 29th, we had been out for George Floyd and

3  Breonna Taylor.  The way we were treated, we needed to be back

4  out there for ourselves, for myself.

5  Q    Approximately when did you arrive at the protest on the

6  evening of May 30th?

7  A    It was still light when I got toward the capitol on

8  Saturday the 30th, in the 7 o'clock hour.  Certainly after 5:00,

9  between 7:00 and 8:00.

10 Q    Where did you go on May 30th?

11 A    I headed to the capitol.

12 Q    All right.  And were there protesters around Colfax and

13 Lincoln on the 30th?

14 A    Yes.  So, I headed to the -- I wound up at the west side of

15 the capitol as opposed to the south, and there were a lot of

16 protesters out.

17 Q    And what were you doing when you arrived on the 30th?

18 A    As ever, I was filming the police.

19 Q    And the jury has heard from Chief Stamper about some of the

20 things that went on on May 30th at the intersection at Colfax

21 and Lincoln.  Did you have your new phone out?

22 A    I did.

23 Q    All right.  And were you subjected to any munitions at that

24 Colfax and Lincoln corner on the evening of the 30th?

25 A    Yes.

20-cv-1878-RBJ    ELISABETH EPPS - Direct    03-18-2022

1  Q    Did you receive any warnings?

2  A    No.

3  Q    Let's take a look at Exhibit 110, please.  Do you recognize

4  Exhibit 110, Ms. Epps?

5  A    Yes.

6  Q    What is it?

7  A    This is a still frame from a video -- or from a stream that

8  I was recording on Saturday, May 30th.

9        MR. MACDONALD:  Move admission of 110.

10        MR. WEINER:  No objection to the entire video.

11        THE COURT:  All right.  Admitted.

12  Q.   (By Mr. Macdonald) Ms. Epps, while you were videoing here

13  on May 30th, did you tell the people on your live stream and the

14  people around you not to throw things?

15  A    I did.

16  Q    Why?

17  A    So, as I'm live streaming, there's people watching.

18  There's definitely conversation.  People can make comments, or

19  they're leaving comments as I'm streaming, and I am talking back

20  to them.  And there were people who wanted to come downtown,

21  wanted to come and support, and I was encouraging them,

22  absolutely come.  Come downtown.  But I probably said it kind of

23  colorfully, but don't throw things if you come.

24        We were a peaceful group.  Overwhelmingly.

25  Overwhelmingly, but I didn't want -- I mean, I didn't want

20-cv-1878-RBJ    ELISABETH EPPS - Direct    03-18-2022

1   things thrown.  I didn't see it as helpful, and I was

2   particularly afraid that given how the police had been treating

3   us, that they would -- as they had been, would

4   disproportionately respond.  I didn't want anyone to do anything

5   that police would use to say someone threw a plastic water

6   bottle, so we're going to tear gas you.

7   Q    During this intersection, the time at the intersection on

8   the evening of May 30th, were you struck with any projectiles

9   fired by the police?

10   A    Yes.

11   Q    If we can play the video from 27:40, please.

12        (A video was played.)

13   Q    You can stop it there, Dan.  What happened in the video

14   that we just watched, Ms. Epps?

15   A    So, I'm filming.  We're protesting, and again, without a

16   warning, they started to -- the police started to shoot --

17   sometimes it was difficult to distinguish the different things

18   that were coming at us, but I was getting hit in my legs.  They

19   were shooting.  I was getting hit in my legs.  They were

20   throwing things that exploded into gas.  Just were unleashing

21   again.

22   Q    And you said something like, that don't hurt.  Why would

23   you say things like that?

24   A    Yeah.  It's important to me that I'm clear that I'm

25   speaking for my own experience of it.  In comparison to -- I

20-cv-1878-RBJ    ELISABETH EPPS - Direct    03-18-2022

1   think we watched this yesterday.  In comparison to labor, in

2   comparison to a knee on a neck, it didn't hurt that badly.  I'm

3   sure that in that moment I was both talking to myself, and

4   trying to be brave and have bravado.

5          There's also a lot of adrenaline chemically happening

6   that I'm trying to say doesn't hurt that bad.  I also

7   believed -- I knew that they were doing it to suppress our

8   rights to keep us from protesting, and I didn't want people to

9   be deterred.  Both talking myself into it, and it's an accurate

10  reflection of in the moment, it did not to me hurt that bad.

11  Q    Were there times during this incident in Colfax and Lincoln

12  where you saw protesters fall down from the effects of the tear

13  gas or other chemicals?

14  A    Yeah.  I did.  And remember, so this is Saturday.  I was

15  surprised that more people didn't have better masks.  I guess I

16  realized that some people hadn't been out Thursday and Friday.

17  So, my experience of it, I also had on long pants.  I saw women

18  in sun dresses who were collapsing, recognizing they had on

19  less -- you know, less clothing than my jeans.  There were a lot

20  of people who were having very strong reactions to the gas and

21  to being shot with things by the police.

22  Q    Let's go to 52:57, this same video.  And play this for

23  about 40 seconds.

24       (A video was played.)

25  Q    Let's stop here for a moment.  Back the screen up just a

20-cv-1878-RBJ   ELISABETH EPPS - Direct   03-18-2022

1    couple beats, Dan. let's go back to 52:57.

2         (A video was played.)

3    Q    Let's stop here.  Do you remember seeing this woman with a

4    pink megaphone?

5    A    I do remember the woman with the pink megaphone.

6    Q    And the jury has seen some videos and Chief Stamper's

7    testimony about her.  I just wanted to highlight that.  Okay.

8    Let's keep playing, please.

9         (A video was played.)

10   Q    Let's stop there.  Describe what happened in the video we

11   just saw, Ms. Epps.

12   A    I mean, once again, the police are shooting at us and

13   hitting my legs.  Just before this, Keith Valentine shot me in

14   my face with something and broke that mask.  Not a lightweight

15   mask.

16   Q    And do you see some sort of residue on your face just

17   underneath your eye?

18   A    Yeah.  So, it -- whatever he shot broke the mask and both

19   left a mark, and there was that chemical -- chemical rubble of

20   sorts on my face.

21   Q    Let's go to still at 54:24.  This is about a minute later.

22   What's this?

23   A    Yeah.  It's --

24   Q    Whose hand is that?

25   A    That's my hand.

20-cv-1878-RBJ   ELISABETH EPPS - Direct   03-18-2022

1   Q    This is your hand from the same video?

2   A    That's my hand.

3   Q    And why are you taking -- why are you showing your hand on

4   the video?

5   A    I have told you that I didn't in the moment find the

6   experience of the -- all the things that shot my legs and back

7   to be the worst pain, but the things in our lungs and eyes were

8   a terrible pain, and this stuff was everywhere.  And the night

9   before, I told you I disrobed on my porch.  This is the stuff

10  that was all over my clothes and in my hair and in my braids,

11  and they were firing it on us.  Yeah.  That's my hand.  I was

12  just astounded at the visual, and I'm breathing it.  It was a

13  lot, but yeah.  It was covering us.

14          MR. MACDONALD:  Let's take a look at Exhibit 61.  And

15  move in 61, 63, 68.  These are pictures of Ms. Epps after this

16  incident.

17          MR. WEINER:  No objection.

18          THE COURT:  Well, 61 is admitted.  63 was -- that's

19  admitted too.  68, yeah.  None of them was in before.

20  Q.   (By Mr. Macdonald) What is Exhibit 61, Ms. Epps?

21  A    A picture of my cheek where then Officer Valentine shot the

22  thing in my face.  This is what it looks like with that mask on.

23  He would have broken my cheekbone, bones in my face if I hadn't

24  had that mask on.

25  Q    What is -- let's look at Exhibit 63, please.

20-cv-1878-RBJ   ELISABETH EPPS - Direct   03-18-2022

1   A     That's just another angle of my cheek.

2   Q     All right.  Let's put up Exhibit 68, please.  What is

3   Exhibit 68?

4   A     This is a picture of me outside our state capitol, sitting

5   on the grass of our state capitol on Saturday, May 30th.  As I

6   had said, most people did not have on eye protection, certainly

7   not heavy-duty masks.  This was after Officer Valentine shot at

8   me.

9   Q     And so do you see a contusion on your face on this picture,

10  Exhibit 68?

11  A     Yeah.  You can see the contusion on my face.  You can also

12  see the exploded chemical -- chemical particles on the bookbag

13  strap.

14  Q     Are you referring to this right here?

15  A     I am.

16  Q     And do you know if you were shot multiple times, or was

17  that one shot that hit your face and exploded?

18  A     I don't know.

19  Q     But in any event, you have what appears to be residue on

20  your right shoulder, and then the bruise on your face?

21  A     Yes.

22  Q     And the mask is now around your neck in this picture.  Was

23  that covering your face?

24  A     Yes.  It covered right -- so, from above the bridge of nose

25  to below chin, and then all the way over to both ears.  And the

20-cv-1878-RBJ    ELISABETH EPPS - Direct    03-18-2022

1  portion -- I just don't know what the name for it is, but the

2  portion, sort of cheek portion that you -- that provides

3  respiration is where I was shot and cracked and broken.

4  Q    What did you do when you got home on the evening of the

5  30th?

6  A    This was another day where I disrobed on the porch, turned

7  things out, tried to bring as little of the chemical dust into

8  my home.

9  Q    And I think you testified that you returned to the protest

10 over several ensuing days.   Why?

11 A    I don't remember even having to think it through.   I knew

12 that's where I needed to be.   Civil disobedience and protests

13 and standing up for civil rights has been a part of my life most

14 of my life.   My community was still out mourning and grieving

15 and in fellowship, and that was where I was going to be.   I

16 needed to -- I needed to document.   I needed to film what was

17 happening.   I needed to film what the police were doing, and

18 that's why I kept going back.

19 Q    And on the May 30th, the police line where the officers

20 were who shot you in the face and in your body were at Colfax

21 and Lincoln?

22 A    Yes.

23 Q    And were they preventing the protesters, you and other

24 protesters from being near the capitol that's behind you in this

25 picture?

20-cv-1878-RBJ   ELISABETH EPPS - Direct   03-18-2022

1   A   No.

2   Q   Was there a line of officers behind you protecting a siege

3   against the capitol?

4   A   Never.

5   Q   Did you witness anyone sack the capitol?

6   A   No.

7   Q   At any point during the protest, did you throw anything?

8   A   No.

9   Q   Did any of your friends, people you were with throw

10   anything?

11   A   No.

12   Q   Did you commit any acts of violence?

13   A   No.

14   Q   Any acts of property destruction or graffiti or vandalism?

15   A   No.  We actually cleaned up as we went, but no.

16   Q   And you talked about resigning from the advisory committee,

17   the DPD use of force advisory committee.  You made that decision

18   on the first day of the protest.  Are you still involved with

19   anything related to the Denver Police Department today?

20   A   Yes.  I have both continued some reform activity and

21   started and become engaged with others.  I serve on the criminal

22   justice cabinet of Senator Coleman.  I serve alongside, actually

23   Chief Thomas, who has been here many days.  We serve together on

24   that.

25           I was appointed to Denver's reimagining policing safety

20-cv-1878-RBJ    ELISABETH EPPS - Direct    03-18-2022

 1  group.  I also was appointed to -- the highest law enforcement

 2  officer in our city is the district attorney.  I was appointed

 3  to her advisory board.  I serve on that with DA McCann.  I also

 4  am a community member who participates in -- the city attorney

 5  asked a question about the citizen insight board.  There's no

 6  such thing, but there is a Citizen Oversight Board.  We actually

 7  meet this morning at 10:00.  And I participate in that.

 8  Q    So, the Citizen Oversight Board, I think that's a question

 9  that counsel for Denver asked whether Jackie Parkins

10  participated or was aware of the citizen advisory board.

11  A    Yes.  I think she called it the citizen insight board, but

12  I'm imagining she meant the Citizen Oversight Board.

13  Q    And you participate in that even still today,

14  notwithstanding what happened to you during the protest?

15  A    Yes.

16  Q    Why?

17  A    I believe I want the best for my city.  Denver has been

18  good to me in many ways, and I believe in the diversity of

19  strategies.  I believe that protest and civil disobedience is

20  important.  I believe that being engaged politically for those

21  who choose to is important.  I believe working within the

22  systems for those of us who can is important.  I am deeply

23  committed to the work and to reform, and I believe that if I'm

24  not there, my voice isn't going to be represented.  That's why I

25  was on the use of force committee for years.

20-cv-1878-RBJ    ELISABETH EPPS – Direct    03-18-2022

1   Q    How did your experience during the George Floyd protests

2   compare to other times you have protested in your life?

3   A    I've never personally experienced being abused by police

4   like we were in May and June of 2020.  Never seen it –- I've

5   never seen anything personally like that.  I'm aware of it in

6   other circumstances, but you said how does it compare?  They

7   were just much more brutal.

8   Q    How did the Denver Police Department's actions measure up

9   to the suggestions that you and others had made on the use of

10  force advisory committee in the 2017, 2018 timeframe?

11  A    I feel, like I said, such a perpetual optimist to say that

12  I really expected better when all evidence to the contrary

13  should have shown me otherwise.  We talked so much in the years

14  on that committee of use of force about force being necessary

15  and reasonable and appropriate.  And it was very clear to me

16  during the protests that Denver's police leadership thought and

17  approved of the way we were treated as being reasonable,

18  necessary, and appropriate.

19  Q    Based on your experience, did you believe that the police

20  were reacting to the message that you and other protesters were

21  delivering about police violence?

22           MR. WEINER:  Objection.  Leading.

23           THE COURT:  Sustained.

24  Q.    (By Mr. Macdonald) What did you think about how police

25  were reacting to the message you and other protesters were

20-cv-1878-RBJ    ELISABETH EPPS - Direct    03-18-2022

1    trying to deliver?

2    A    I was confident and clear that Denver Police were

3    reacting -- "reacting" is really too general a word, but were

4    imposing force on us in large part due to the message that we

5    were there to deliver.

6    Q    What were you doing when you were shot at by Officer

7    Christian that evening?

8    A    When Officer Christian shot me, I was filming the police.

9    Q    What were you doing when you were shot on Lincoln in front

10   of the blue dumpsters?

11   A    I was filming the police with my back to them, but filming

12   the police.

13   Q    What were you doing when you were shot in the body and the

14   face at Colfax and Lincoln on day three?

15   A    I was protesting and filming the police.

16   Q    Why were you filming the police during all these times?

17              THE COURT:  This is getting so repetitive.  We've

18   heard this and heard this.  Are you going to take up all the

19   time, or are you going to leave some for the defense case?

20              MR. MACDONALD:  That's my last question, Your Honor.

21              THE COURT:  I hope so.

22              THE WITNESS:  I will be brief.  It's hard to keep

23   talking about it.  I was filming the police because, as I have

24   said online for years, probably hundreds of times, we have to

25   film the police.  Their behavior was so outlandish, so targeted,

20-cv-1878-RBJ   ELISABETH EPPS - Cross   03-18-2022

1    so disproportionate to anything that we were saying that no one

2    would believe us if we weren't filming the police.

3           The only reason anyone knows George Floyd's name is

4    because a teenage girl, a teenage Black girl stood outside a

5    convenience store and filmed the police.  The only reason anyone

6    would believe what happened to Stanford Smith and to my

7    co-plaintiffs, would believe what they're saying is because we

8    filmed the police.

9           Filming the police alone is not going to save us, but

10   it is a necessary component of saving us.  It is a part of our

11   First amendment right, and it is one of the few tools that are

12   available to community members to document what is happening.

13   It is as important to me as almost any activity I participate

14   in.  And that is briefly why I think it is important to film the

15   police.

16              MR. MACDONALD:  No further questions.

17              THE COURT:  Cross examination?

18              MR. WEINER:  Thank you, Your Honor.

19                        **CROSS EXAMINATION**

20   BY MR. WEINER

21   Q    Good morning, Ms. Epps.  You indicated just a few moments

22   ago that you were abused by the police during the period of this

23   protest.  Do you recall that?

24   A    Say the last part again, sir?

25   Q    Do you recall that, that you were abused?

20-cv-1878-RBJ   ELISABETH EPPS - Cross   03-18-2022

1    A    I remember what I said, yes.

2    Q    Yes.  You would certainly agree with me that police

3    officers were abused during these protests too, wouldn't you?

4    A    I would not agree with you about that.

5    Q    So, you don't think running over police officers with a

6    vehicle is abuse?

7    A    You just made a giant leap there, sir.  I think running

8    over a police officer is a violent act that is terrible.

9    Q    Okay.  And certainly throwing rocks and hitting police

10   officers would be abuse, wouldn't it?

11   A    I think it could be characterized as abuse, yes.

12   Q    Hitting a police officer in the groin with a can of corn is

13   abusive, wouldn't you agree?

14   A    Right.  So, there it gets a little more nuanced.

15   Q    Nuanced?

16   A    Yes.

17   Q    Hitting a human being in the groin with a can of corn is

18   nuanced to you?

19   A    I think "abuse" is a loaded term, and I think that power

20   differentials matter.  And I think that when one of the people

21   is wearing body armor, and there's a certain amount of distance,

22   that reasonable people can talk about the circumstances.  I also

23   think that if you've been tear gassed, and you respond by

24   throwing a plastic water bottle, no, I don't think that's abuse.

25   Q    Well, you're certainly aware that there were more than just

20-cv-1878-RBJ   ELISABETH EPPS - Cross   03-18-2022

1    plastic water bottles thrown at police officers; correct?

2    A    I have heard police officers say that repeatedly.

3    Q    Well, you've actually -- you actually filmed and observed

4    rocks being thrown at police officers' cars; correct?  Do you

5    recall filming that?

6    A    I do recall one incident with a rock.  I have not looked at

7    it, but I do recall an incident with a rock.

8    Q    Okay.  Because that wasn't presented here yet, but you --

9    you in fact actually then filmed the rocks, because you thought

10   it was pretty funny that -- and you were actually quite

11   impressed that people were able to throw such big rocks at a

12   police car; correct?

13   A    No.  That's not correct.

14   Q    Okay.  Well, in speaking of abuse, you had talked a lot

15   about your city and how important the city was.  You would

16   certainly agree that it was abusive to the city as a whole to be

17   setting fires; correct?

18   A    I don't think things can be abused.

19   Q    So, you don't think that capitol, when you say our state

20   capitol, what was done to that capitol is abuse?

21   A    The capitol is pretty close to sacred to me, and things

22   cannot be abused, no matter how sacred they are.

23   Q    And small businesses and storefronts that were destroyed

24   and looted, you don't consider that abusive to the city as a

25   whole?

20-cv-1878-RBJ   ELISABETH EPPS - Cross   03-18-2022

1  A    I never was aware of any looting.  I absolutely have deep

2  empathy for any store owners or property owners who experienced

3  damage.

4  Q    So, let's talk about the first day that you got to the

5  protests, and that would have been May 28th of 2020; correct?

6  A    That's correct.

7  Q    Okay.  And were you working that day?

8  A    I work every day.

9  Q    And you were working from home because of the pandemic;

10 correct?

11 A    I would need to look back at my day planner.  I'm sure I

12 did part of my work at home, at a minimum.

13 Q    Okay.  And so you still have information in your day

14 planner that existed prior to May 29th; correct?

15 A    If it was a work calendar, I would have a lot of work

16 records, yes.

17 Q    Okay.  So, you get to the capitol -- you get to the capitol

18 area.  We saw a video, I believe it was Plaintiffs' Exhibit 106.

19 And you have your phone with you; correct?

20 A    I don't remember the exhibit number, but yes.

21 Q    Video that you were shown yesterday?

22 A    Yes.

23 Q    Okay.  And you interviewed people; correct?

24 A    Yes.

25 Q    Okay.  And so you're using this app called Periscope to

20-cv-1878-RBJ   ELISABETH EPPS - Cross   03-18-2022

1   interview people; correct?

2   A    Using -- yes.  To record.  To stream.

3   Q    And to record and stream what is -- what is taking place at

4   the capitol, or where you're at at that point; correct?

5   A    Yes.

6   Q    Okay.  And you don't carry a sign; correct?

7   A    Say that again?

8   Q    You don't have a sign with you.  You just have your phone;

9   correct?

10   A    Sometimes I have a sign.

11   Q    Okay.  But on May 28th, you didn't have a sign; correct?

12   A    I don't think I had a sign on May 28th.

13   Q    So, you take your phone.  You start recording, and you

14   start interviewing people; correct?

15   A    That's correct.

16   Q    Okay.  And then at some point there is -- you see people

17   running, and there is the smell of gas; correct?

18   A    No.  That's not the order.

19   Q    Okay.  You tell me what the order was.

20   A    I'm interviewing the young woman from New York.  She's

21   talking about Eric Garner.  She's using --

22   Q    We don't need to know what she's talking about.  I asked

23   you the order, so please stick with my question.

24   A    Correct.  That's the order.  So, I'm interviewing her.

25   She's interrupted, because the police gassed us.  And after

20-cv-1878-RBJ   ELISABETH EPPS - Cross   03-18-2022

1  that, people ran.

2  Q    Okay.  And you weren't up next to the police officers at

3  that time; correct?

4  A    I was not very close to the police officers.  That's right.

5  Q    Right.  You weren't very close at all; correct?

6  A    I wasn't very close to the police officers.

7  Q    Okay.  And you don't know -- and you were shown some videos

8  yesterday, some body-worn camera videos.  You don't know whether

9  the first items deployed were gas or simply smoke; correct?

10  A    That's right.  They were in rapid succession.  That's

11  right.  You're right about that.

12  Q    So, you don't know what that was, what was actually

13  deployed first; correct?

14  A    I know what I experienced.

15  Q    Right.  But you weren't on the front line.  You weren't

16  seeing anything that was going on at that point; correct?

17  A    I was seeing a lot that was going on.

18  Q    You were interviewing people?

19  A    Yes.

20  Q    But you were pretty far distance away from that -- let's

21  just call it the front line of where the police officers were;

22  correct?

23  A    I'm not comfortable with that characterization.  I was on

24  the steps of the capitol.  Police officers were at 14th and

25  Sherman.

20-cv-1878-RBJ   ELISABETH EPPS - Cross   03-18-2022

1   Q    Okay.  And you start wiping your eyes, and you start

2   talking to the phone, people are following you; right?  You're

3   having conversations with people; correct?

4   A    That is correct.

5   Q    And at that point, you tell them -- you tell the video --

6   or the people watching on video that it didn't hurt.  This stuff

7   doesn't hurt, or something to that effect; correct?

8   A    There are points when I say that.  And I think that date is

9   one of those times.

10  Q    Okay.  And you said it because it didn't hurt; correct?

11  A    Being -- so, it depends which you're talking about.  When I

12  said that about being struck with the --

13  Q    I'm talking about the gas on the 28th.

14  A    It hurt terribly.

15  Q    But you told people who were watching your video it didn't

16  hurt; correct?

17  A    I think that I -- I need to see it, but because what I

18  think I said is it doesn't hurt that bad.  I compared it to

19  labor.  It was consistent that it hurt.

20  Q    So, it didn't hurt that bad?

21  A    I have given birth to a child.  It did not hurt that bad as

22  labor.

23  Q    So, you stand by the statement that the gas didn't hurt

24  that bad?

25  A    No.  I stand by the statement that it was excruciating,

20-cv-1878-RBJ   ELISABETH EPPS - Cross   03-18-2022

1   that I was unable to breathe, that it was one of the most

2   painful things of my life, and that it was less painful than

3   childbirth.

4   Q    In fact, you didn't say it was excruciating on that video,

5   did you?

6   A    I said it -- I absolutely said that multiple times in those

7   videos.

8   Q    And after you stopped the video when you're up on the

9   capitol, you actually continued to videotape; correct?  Where do

10  you go after the capitol?

11  A    That characterization isn't right that I stopped the video.

12  On the 28th, I was at or near the capitol until I went back to

13  the -- within two blocks of the capitol in most directions,

14  until going to my vehicle and heading back.

15  Q    Did you have any encounters with any police officers after

16  that, after that being the time at the capitol?

17  A    Yes.

18          MR. WEINER:  Okay.  At this time, Your Honor, I would

19  move to admit Plaintiffs' Exhibit 107.

20          MR. MACDONALD:  No objection, Your Honor.

21          THE COURT:  Admitted.

22          MR. WEINER:  Permission to publish?

23          THE COURT:  Yes.  Of course.

24  Q.    (By Mr. Weiner) Ms. Epps, what we've got pulled up here

25  is Plaintiffs' Exhibit 107.  That is in fact you; correct?

20-cv-1878-RBJ   ELISABETH EPPS - Cross   03-18-2022

1   A     Yes.

2   Q     Okay.  We're going to play this a little bit, but at times

3   I'm going to stop.  If you could begin, hit play, please.

4         (A video was played.)

5   Q     Pause, please.  And how long after the incident we were

6   just talking about on the 28th did you take this video?

7   A     I'm not sure.

8   Q     Was it a matter of minutes?  Was it an hour?  To the best

9   of your recollection.

10  A     I'm fairly confident about what I was wearing those days,

11  so I know that -- so, I believe it was at night, but I'm not

12  sure.

13  Q     Continue playing, please.

14        (A video was played.)

15  Q     Pause, please.  Ms. Epps, your cell phone clearly captured

16  the voice of police officers telling you to turn around and go

17  away; correct?

18  A     No.  It clearly captures them saying -- then a police

19  officer saying something like, if you're walking towards us,

20  turn around and go away.  It's more clear to me than it was

21  then, but your characterization isn't quite right.

22  Q     Okay.  Well, the video speaks for itself.  If you would

23  continue to play, please.

24        (A video was played.)

25  Q     We can pause there, please.  Thank you.  Ms. Epps, you

20-cv-1878-RBJ   ELISABETH EPPS - Cross   03-18-2022

1   would agree with me that you could see that officer's badge on

2   his chest; correct?

3   A    No.   I would not agree with you.   I wasn't looking, but --

4   Q    And you had never met that officer before; correct?

5   A    I might have.

6   Q    Okay.   And did you learn that level of advocacy during your

7   police reform meetings?

8   A    That level of advocacy?   I don't know what you mean by

9   that.

10  Q    Well, do you often, when you were in those meetings that

11  you just talked about, is that the way you would express

12  yourself?

13  A    That is consistently how I express myself after having been

14  tear gassed.

15  Q    Okay.   And you weren't tear gassed in that situation;

16  correct?   Yes or no.

17  A    Yes.   I've been tear gassed this night.

18  Q    When those officers told you you could film all you want,

19  they never tear gassed you?   Yes or no.

20  A    I don't think those officers were the ones who tear gassed

21  us, no.

22  Q    Okay.

23  A    But I don't know.

24  Q    Could you go to minute ten, please.

25       (A video was played.)

Kevin P. Carlin, RMR, CRR

20-cv-1878-RBJ   ELISABETH EPPS - Cross   03-18-2022

1   Q    You can pause.  Ms. Epps, you were allowed to stand there,

2   yes or no, and film?

3   A    I have a right to stand there and film.

4   Q    And the police didn't prevent you from filming them at that

5   point; correct?

6   A    The police did not prevent me from filming them at that

7   point.

8   Q    And in fact, you weren't prevented from filming at any

9   point; correct?

10  A    That is patently incorrect.

11  Q    Okay.  Well, Ms. Epps, you had talked a little bit

12  yesterday about your employment, and you work for the Colorado

13  Freedom Fund, which is an organization that you founded;

14  correct?

15  A    That is correct.

16  Q    And you also work for the ACLU; correct?

17  A    I couldn't hear clear enough to hear if you said work or

18  worked.

19  Q    Worked for the ACLU?

20  A    I did work, past tense.

21  Q    And at this point in time, this point being May 28th of

22  2020, you worked for the ACLU; correct?

23  A    I was an independent contractor, but I did work with the

24  ACLU.  That's correct.

25  Q    And in fact at that point, you had participated in probably

20-cv-1878-RBJ   ELISABETH EPPS - Cross   03-18-2022

1  hundreds of protests; correct?

2  A    I think that is correct.

3  Q    Okay.  And you had asked -- you were asked a question

4  yesterday about a comment you made with regards to the tear gas

5  and the training you've received, but you weren't very specific

6  about that training.  What training had you received with

7  regards to protesting?

8  A    The question is -- as I remember it was about how to take

9  care of yourself when the police spray tear gas or chemical

10  munitions.  And the training was, as I described, folks told us

11  to have milk on hand, water on hand, not rub, not rub it into

12  your eyes.  Things like that.

13  Q    And when you say we were told, who told you?  What

14  training?  Who told you this?

15  A    I couldn't begin to tell you the person's name.

16  Q    So, this was a person, not a group?

17  A    Yes.

18  Q    Okay.  And this Colorado Freedom Fund, it is designed and

19  receives funds to get people out of jail?  Yes or no.

20  A    You asked a couple things.  We do receive -- people donate

21  so that we can post bond for poor people who can't afford to

22  post their own bond.  That's correct.

23  Q    And do you ever track how many of these people when they're

24  out on bond commit more crimes?

25  A    We -- that was just so loaded.  We track our folks.  We

20-cv-1878-RBJ   ELISABETH EPPS - Cross   03-18-2022

1  help folks get back to court.  So, we do certainly do work

2  really hard to stay in touch with folks and help them complete

3  their cases and move on with their life.

4  Q    And do you keep statistics about reoffending?

5  A    Well, remember, as I explained, we assist people who are

6  pretrial.  So, these are folks who are factually, legally

7  innocent.  It's before their day in court.

8  Q    Correct.  In fact, you are an abolitionist; correct?

9  A    I am.

10  Q    Which means you don't want any jails or any, as you call

11  them, cages; correct?

12  A    That's not what "abolition" means.

13  Q    You tell me what it means.

14  A    Abolition is about creation.  Abolition is, as an

15  abolitionist, I start with the belief that all of our neighbors

16  deserve to be safe and healthy and free.  And so the work, doing

17  work through an abolitionist lens means that we commit to giving

18  people what they need to be safe and healthy and free.  It's

19  about abolishing poverty.  It's about abolishing educational

20  disparities, abolishing that which leads to the necessity for

21  incarceration.

22  Q    And in fact, you would like to get rid of all cages, as you

23  refer to them, jails; correct?

24  A    That's just an oversimplification.  It isn't correct.  I

25  would like to get rid of all interpersonal harm.

Kevin P. Carlin, RMR, CRR

20-cv-1878-RBJ   ELISABETH EPPS - Cross   03-18-2022

1  Q     Interpersonal harm?

2  A     Yes.  I would like that to end.

3  Q     Can you explain that to me.

4  A     Yeah.  I'm -- I come to this work to abolition because I'm

5  a survivor of very serious violence, domestic violence,

6  interpersonal violence, intimate partner violence, and I'm very

7  committed to doing the work that provides people the resources

8  and the opportunities to be free of that harm.

9  Q     And you would agree with me that there is a place, then,

10  for law enforcement; correct?

11  A     There is a place for law enforcement.

12  Q     And you would agree that there's good police officers;

13  correct?

14  A     I think there are good people.

15  Q     But not good police officers?

16  A     I think that that's a separate analysis entirely.  I like

17  Chief Thomas very much.  I think he's probably a very good

18  person.  I don't know how he is as a police officer.

19  Q     In fact, you have stated in the past that some individuals

20  that you have the most trouble with are actually Black

21  individuals who become police officers.  You understand why

22  Black people -- you support them as prosecutors, but not as

23  police officers.  Do you recall making that statement?

24  A     You just said a whole lot.  No.  I don't know what you

25  mean.  From cops to prosecutors, I did not track that well, sir.

20-cv-1878-RBJ   ELISABETH EPPS - Cross   03-18-2022

1    I'm going to need you to rephrase that.

2    Q    Well, we will move on.  Now, talking a little bit about

3    your training as a professional protester, you have certain

4    policies and procedures that you put in place; correct?

5    A    We gotta go back to professional protester, sir.

6    Q    You've done over 100 protests; correct?

7    A    My family has been taking me to rallies and labor strikes

8    and union marches since I was a girl.  And there's been

9    hundreds.  I have never been paid.  That would not be a

10   professional activity.

11   Q    Okay.  Well, as part of your filming of protests, one of

12   your policies or procedures is you try not to film the actual

13   protesters or what they're doing; correct?  Just yes or no.

14   A    Throw in phrases like "policies and procedures" --

15   Q    Okay.  You try not to film people who are committing

16   crimes; correct?  Yes or no.

17   A    Other than police, that is correct.  If I see a crime in

18   progress, I would -- at a protest, I would probably try to not

19   film it.  That's correct.

20   Q    And in fact, if we could play 107 at approximately 18:30,

21   please.

22        (A video was played.)

23   Q    Stop there.  In fact, at one point there, and it was hard

24   to hear, it kind of skipped out of this audio feed today, but

25   you indicated that you were trying not to film people committing

20-cv-1878-RBJ   ELISABETH EPPS - Cross   03-18-2022

1    crimes.  Do you recall making that statement?

2    A    Yeah.  I do.

3    Q    Okay.  And so you are not capturing the entire event.

4    You're only capturing select portions that you want to capture,

5    namely the police officers; correct?

6    A    No.  That's a mischaracterization.

7    Q    Okay.

8    A    These folks were doing drugs.  That doesn't have anything

9    to do with the protest, and I shouldn't have been filming that.

10   That was a mistake.

11   Q    Okay.  Now, Ms. Epps, the next day, which would be the

12   29th, you go back to the protest; correct?

13   A    Yes.

14   Q    And this is the day that you claim that you were shot by

15   Officer Christian; correct?

16   A    Yes.

17   Q    Okay.  And you were shown a video yesterday during your

18   direct examination when you claim that you were shot by Officer

19   Christian.  Do you remember that?

20   A    Yes.

21   Q    And I believe you started that video, Plaintiffs'

22   Exhibit 108, at approximately two minutes.  I'm going to replay

23   this, and we're going to start from the beginning, please.

24        (A video was played.)

25   Q    We're going to flip it hopefully sideways so we won't have

20-cv-1878-RBJ   ELISABETH EPPS - Cross   03-18-2022

1    to pay for massage therapists.  Thank you.

2         (A video was played.)

3    Q    Can you pause, please.  Ms. Epps, did you hear individuals

4    in that crowd yelling there was a spotter on the roof?

5    A    I didn't hear that, but that doesn't ring untrue.

6    Q    Because people would be looking to make sure that people

7    weren't watching them and what they were doing; correct?

8    A    No.  That's not correct.

9    Q    Hit play, please.

10        (A video was played.)

11   Q    Can you pause.  Now, Ms. Epps, you see individuals in the

12   crowd running towards you, and you see police officers in the

13   back.  You continue filming and walking right towards the police

14   officers; correct?  Yes or no.

15   A    There were police officers both in front of me and behind

16   me.

17   Q    So, the answer would be yes or no?

18   A    I didn't understand your question.  Say it again?

19   Q    As you're walking, you're filming; correct?

20   A    That's correct.

21   Q    Okay.  You see people running past you; correct?

22   A    Yes.

23   Q    You hear noises that you now know are consistent with

24   PepperBall; correct?

25   A    Yes.

20-cv-1878-RBJ   ELISABETH EPPS - Cross   03-18-2022

1   Q    You continue walking towards the police officers; correct?

2   A    I continue walking.

3   Q    Okay.  Can you hit play, please.

4        (A video was played.)

5   Q    Can you pause, please.  Ms. Epps, you see the police

6   officer there in the street directing traffic towards the road

7   to your right as you're filming this; correct?

8   A    I see the police officers in the street.

9   Q    Okay.  And none of those police officers prevent you from

10  filming; is that correct?  Yes or no.

11  A    None of these police officers prevented me from filming.

12  Q    None of those police officers shot at you; correct?

13  A    I don't know that that's correct.

14  Q    Okay.  And by the way, you were asked on -- some questions

15  on direct, and you talked about PepperBall.  My understanding is

16  the only thing you were subjected to was PepperBall, PepperBalls

17  and gas; is that correct?

18  A    No.

19  Q    Okay.  What else were you subjected to?

20  A    I have one here.  There's -- it's like a -- it's not a

21  PepperBall.  Not gas.  They were these -- it feels like it

22  minimizes it to call it rubber, but these hard plastic bullet

23  type things.

24  Q    40-millimeters?

25  A    I don't know how to identify it by that name, but that

20-cv-1878-RBJ   ELISABETH EPPS - Cross   03-18-2022

1   could be correct.

2   Q   And you were hit by one of those?

3   A   I was hit by those, yes.

4   Q   How many?

5   A   I don't know.

6   Q   Where?

7   A   I believe this was -- would be between the Colfax and 14th

8   block, on the Lincoln side of the capitol.

9   Q   Poor question.  Where on your body were you hit?

10   A   My back and legs.  Other than when Valentine shot me in my

11   face, I was only ever hit in my back and legs.

12   Q   Back and legs?

13   A   Yes.

14   Q   Okay.  And were some of those with a 40-millimeter?

15   A   I don't -- I don't know how to discern that, sir.

16   Q   But the 40-millimeter, that rubber thing didn't hurt at

17   all; right?

18   A   It's wrong to say "at all."

19   Q   It didn't hurt?

20   A   It didn't hurt as much as labor.  Of course it hurt.  You

21   don't get bruises like that if there's not pain.

22   Q   All right.  Can you continue playing, please.

23       (A video was played.)

24   Q   Can you pause, please.  It's fair to say where that gas

25   was -- or that smoke up the hill and that noise came from -- you

20-cv-1878-RBJ   ELISABETH EPPS - Cross   03-18-2022

1  have no idea what's happening up there; correct?

2  A    That's not correct.

3  Q    So, you actually saw what was happening up there that

4  caused law enforcement to shoot something off?  Is that what

5  your testimony is?

6  A    You jumped from have no idea to know exactly what happened.

7  There's things in between.

8  Q    Tell us what was happening up there.

9  A    The police had gassed folks again.

10  Q    Oh.  And you know that -- do you know the reason why they

11  gassed folks?

12  A    I don't know the reason why they gassed folks.

13  Q    So, you have no idea whether the police officers were under

14  attack.  You're just assuming that it was for no reason?

15  A    No.  I have an idea.

16  Q    Okay.  Can you hit play, please.

17       (A video was played.)

18  Q    Pause, please.  Ms. Epps, you would agree that you're in

19  the middle of the street at that time with cars going by?  Yes

20  or no.

21  A    At that time, I needed to -- I jaywalked, sir.

22  Q    At that time you were in the middle of the street with cars

23  going by?  Yes or no.

24  A    The reason why I can't answer at that time is I was not

25  looking at the moment you said, but I absolutely jaywalked.

20-cv-1878-RBJ   ELISABETH EPPS - Cross   03-18-2022

1   Q    And cars were honking at you?

2   A    Not a single car honked at me.

3   Q    Not one?

4   A    Not one.

5   Q    Okay.  Hit play, please.

6        (A video was played.)

7   Q    Pause, please.  So, it was at that moment you were shot;

8   correct?

9   A    I was shot -- he shot me right around the line of between

10  the second and third lane closest to him.  I was almost out of

11  the street.

12  Q    And you were walking towards him; correct?

13  A    I was walking towards the capitol, towards our capitol.

14  Q    And where he was at?  Because you could see him?

15  A    I could see him.

16  Q    And you were walking towards him?  Yes or no.

17  A    Yes.  I was walking towards him.

18  Q    Can you publish, please, I'm going to switch -- this has

19  previously been admitted, Exhibit 1106.  Can we start at 2:51,

20  please.  Do you recall this is the body-worn camera of Officer

21  Hastings?

22  A    Yes.

23  Q    Do you recall that?

24  A    Yes.

25       (A video was played.)

20-cv-1878-RBJ   ELISABETH EPPS - Cross   03-18-2022

1  Q    Pause.  Did you see that smoke on the ground?

2  A    I do see dust on the ground.

3  Q    Okay.  And you see that the dust is -- I'm going to try

4  this pen for the first time.  No.  Maybe not.  Maybe that's why

5  I shouldn't try it.  Oops.  I did it again.

6        THE COURTROOM DEPUTY:  You can't touch the screen with

7  your hand.  You just have to use the stylus.

8  Q.   (By Mr. Weiner) Do you see how the dust is going in that

9  direction?  You're looking at me and not the screen.  Do you see

10 how the dust is going in that direction?  Yes or no.

11 A    Just give me a second, please.  I see the dust.

12 Q    Okay.  And you would agree that the dust is going in the

13 direction of that arrow; correct?

14 A    I can't see that.

15 Q    Okay.  If we could put up Plaintiffs' Exhibit 66.

16 Ms. Epps, you testified yesterday this is your left leg;

17 correct?

18 A    Yes.

19 Q    And this is the leg that you testified that you claim

20 Officer Christian hit you?

21 A    Yes.

22 Q    So, that is, to be clear, the inside of your left leg?

23 A    That is almost with -- I'm pulling -- I mean, it's -- it's

24 embarrassing to describe, but I'm pulling -- taking the picture

25 myself, and I'm pulling my calf taut.

20-cv-1878-RBJ   ELISABETH EPPS - Cross   03-18-2022

1   Q    Well, to be clear, you were shot on the inside of your left

2   calf?  Yes or no.

3   A    That's how -- yes.  That's how I experienced it.

4   Q    Okay.  Can we go back to Exhibit 108, please.  We will get

5   that flipped around.  And when you get the chance, would you go

6   to minute 12, please.

7          Now, Ms. Epps, after you claim that you were hit by

8   Officer Christian, you continued to kind of walk around --

9   actually, just back up a little bit more than that, please.  Go

10  to 11:00.  You continued to walk around; correct?

11  A    Say that again?

12  Q    Okay.  We will hit play.

13       (A video was played.)

14  Q    Hit pause.  At that point we were just looking at, you had

15  just put some milk or something on your eyes to alleviate some

16  of the effects of the gas; is that correct?  Do you recall that?

17  A    I don't.

18  Q    You don't recall that?

19  A    I do not recall if just before this I put milk on.

20  Q    Okay.  Can you hit play, please.

21       (A video was played.)

22  Q    And hit pause.  Now, Ms. Epps, this is the street corner

23  that you had just walked up before you said that you were hit by

24  Officer Christian; is that correct?  Do I have the right

25  location?

Kevin P. Carlin, RMR, CRR

20-cv-1878-RBJ   ELISABETH EPPS - Cross   03-18-2022

1   A    I believe this is -- yes.

2   Q    With the officer waving people through?

3   A    I did not notice that.

4   Q    Okay.  You didn't notice that.  All right.  You can hit

5   play, please.

6        (A video was played.)

7   Q    Pause, please.  Now, we watched a number of videos

8   yesterday that you were shown on direct, HALO cameras and other

9   things.  But we didn't see this that led up to your phone

10  getting hit.  So, did I hear correctly you said, oh, look at

11  this?  Is that what you said?

12  A    I would be okay if you played it again.  I heard look at

13  them.

14  Q    Can you back it up just a little bit to help her out.

15       (A video was played.)

16  Q    Can you pause.  So, you just -- you said, I told you all,

17  you should get some white friends like my white friends.  Do you

18  recall saying that?

19  A    I do.

20  Q    And the reason you said that is because you're excited that

21  these white friends are creating a barricade in the middle of

22  the street; correct?

23  A    No.

24  Q    Okay.  Hit play, please.

25       (A video was played.)

20-cv-1878-RBJ   ELISABETH EPPS - Cross   03-18-2022

1  Q    Pause.  You just saw people throw trash on the road;

2  correct?

3  A    No.  That's not what just happened.  It's close, but it's

4  not right.

5  Q    That wasn't trash that came out of the dumpster onto the

6  road?

7  A    They didn't throw it onto the road.  It's like there was

8  four of them.  One of them got opened as they were moving them.

9  The others did not.

10 Q    And then of course seeing that, you go over and pick it up;

11 correct?  Or help them pick it up?

12 A    I did not go through the trash at that point, no.

13 Q    Okay.  Can you play, please.

14      (A video was played.)

15 Q    Can you pause.  Can you go back and play that.

16      (A video was played.)

17 Q    Can you hit pause.  I work so hard to keep our people off

18 the screen, but it's hard sometimes.  And the reason it was hard

19 at this particular occasion is you were pretty excited about the

20 fact that they had just put dumpsters in the middle of the road?

21 Yes or no.

22 A    No.

23 Q    Okay.  Can you hit play, please.

24      (A video was played.)

25 Q    Can you pause.  If you can just go back like five seconds,

Kevin P. Carlin, RMR, CRR

20-cv-1878-RBJ   ELISABETH EPPS - Cross   03-18-2022

1    please.

2         (A video was played.)

3    Q    Hit pause, please.  Thank you.  Ms. Epps, you can see the

4    police officers in a line standing above that -- or underneath

5    the traffic signals; correct?

6    A    Yes.

7    Q    Okay.  Hit play, please.

8         (A video was played.)

9    Q    Pause.  Ms. Epps, you see the police officers walking down

10   the street towards this barricade that's now been placed in the

11   road; correct?

12   A    I see them walking towards the dumpsters.

13   Q    And you are between those individuals who created that

14   barricade in the street and the police officers; correct?

15   A    I am between the dumpsters and the police, yes.

16   Q    Hit play, please.

17        (A video was played.)

18   Q    Pause.  And in fact, somebody in the group that were

19   manning the dumpsters advised you to leave and get out of the

20   way.  And you said you were okay?  Do I have that correct?

21   A    No.

22   Q    Hit play, please.

23        (A video was played.)

24   Q    And that's the point when your phone gets hit?

25   A    That's the point where the police shot my phone.

20-cv-1878-RBJ   ELISABETH EPPS - Cross   03-18-2022

1    Q    Now, we understand that you went and got your phone -- a

2    new phone the next day; correct?

3    A    Yes.

4    Q    And so this would be the 30th that you went back?

5    A    I did go back the 30th.

6    Q    Okay.  Well, when you claim that you were shot by Officer

7    Christian, that was on the 29th; correct?

8    A    Yes.

9    Q    Do I have the date right?

10   A    Yes.  The night of the 29th.

11   Q    Okay.  And then you go back after you get your phone.  You

12   go back the next day; correct?

13   A    Yes.

14   Q    And you begin by documenting what is happening in a similar

15   fashion that you've done on the 28th and 29th; correct?

16   A    Yes.

17   Q    And that would be with your Periscope app and people that

18   are communicating with you; correct?

19   A    Yes.

20   Q    You have an audience on the phone that you're speaking to,

21   and you're recounting what's happened; is that fair?

22   A    That's a general description.  That's not inaccurate.

23   Q    And you in fact recorded some of the events the next day;

24   correct?

25   A    Yes.

20-cv-1878-RBJ   ELISABETH EPPS - Cross   03-18-2022

1   Q    Okay.  And in fact, I think we just saw and was played

2   snippets of Plaintiffs' Exhibit 110, which is about a two and a

3   half hour video; correct?

4   A    I don't doubt that, but I don't know it.

5   Q    But prior to that, you also took an additional video;

6   correct?

7   A    Again, I don't have reason to doubt that, but I don't

8   independently remember how many different videos on the 30th.

9        MR. WEINER:  Okay.  At this time I would move to admit

10   Plaintiffs' Exhibit 109.

11        MR. MACDONALD:  No objection.

12        THE COURT:  Admitted.

13        MR. WEINER:  Play 109, please.

14        (A video was played.)

15        MR. WEINER:  We're trying to figure out the audio.

16   May I have one moment, Your Honor, so we can try to fix this?

17   Not we.  Someone that actually knows what they're doing.

18        (Pause in the proceedings.)

19        (A video was played.)

20   Q.    (By Mr. Weiner) Hit pause.  So, did you say that at that

21   point, those rubber bullets, that shit don't hurt?

22   A    No.  I said the rubber bullets don't, that eye -- sorry.

23   That eye shit hurts.

24   Q    So, the rubber bullets do not hurt; correct?

25   A    I didn't -- they did not hurt at all in comparison to my --

20-cv-1878-RBJ   ELISABETH EPPS - Cross   03-18-2022

1    what happened to our eyes and lungs.  Of course they hurt.

2    Q    Okay.

3    A    That's the point of them.

4    Q    But I'm correct, you said on that video when you're playing

5    to your audience that they don't hurt?

6    A    Not playing to an audience.  You played a couple clips

7    where you didn't mention me saying, us too.  I said, it hurts,

8    it hurts.  Of course it hurts, sir.

9    Q    Now, after this, you walk up to the capitol, and I believe

10   then you have Plaintiffs' Exhibit 110.  If you could cue up 110,

11   please.

12        (A video was played.)

13   Q    Hit pause.  Ms. Epps, what we're looking at here where your

14   camera is pointed, we see a crowd of people, and behind them law

15   enforcement officers; is that correct?

16   A    I can't see that right here, but I do think that's correct.

17   Q    Well, that's the location where you indicate that you were

18   able to identify Officer Valentine shooting you.  It was that

19   street corner up there that we're looking at; correct?

20   A    There are at least two things wrong with what you just

21   said.  I did not know that was Valentine then, and the other is

22   I'm not sure what time this is.  I do believe this is that

23   location, but I don't otherwise know what time this is.

24   Q    And behind that, you're aware the RTD lot that contained

25   the rocks is directly behind that; is that correct?  Certainly

Kevin P. Carlin, RMR, CRR

20-cv-1878-RBJ   ELISABETH EPPS - Cross   03-18-2022

1   you know that by now?

2   A    I do know that now.

3   Q    Okay.  Can you play, please.

4        (A video was played.)

5   Q    Hit pause, please.  Ms. Epps, did you see the stuff being

6   thrown at the officers from the crowd?

7   A    I did not.

8   Q    Okay.  Can you hit play again, please.

9        (A video was played.)

10  Q    Pause.  Did you just see that individual in the black on

11  the left of that pole throw something?

12  A    I did.

13  Q    Do you know what he threw?

14  A    I do not.

15  Q    Okay.  Do you know whether he made it to the police

16  officers or potentially hit somebody in the crowd?

17  A    I do not.

18  Q    You can't.  All right.  Hit play, please.

19       (A video was played.)

20  Q    Can you hit pause.  Ma'am, I just heard you testify on

21  direct examination that you didn't want anything thrown at

22  police.  Do you recall that testimony?

23  A    I do.

24  Q    Okay.  And that was your voice here yelling, throw that

25  shit back?  Yes or no.

20-cv-1878-RBJ   ELISABETH EPPS - Cross   03-18-2022

1   A    That is my voice.

2   Q    Play.

3        (A video was played.)

4   Q    Hit pause.  Fast-forward to minute seven, please.  That's

5   fine.  Thank you.

6        (A video was played.)

7   Q    Hit pause.  Do you hear that individual say, we outnumber

8   them?

9   A    I do hear that.

10  Q    Okay.  And is it safe -- is it reasonable to conclude that

11  the "them" is law enforcement officers?

12  A    Is it reasonable to conclude that?  I think so.

13  Q    Hit play, please.

14       (A video was played.)

15  Q    Hit pause, please.  So, Ms. Epps, it's fair to say that

16  watching this video, there's times when people, the masses,

17  approach law enforcement, and then something is deployed.  They

18  move back into that area of Liberty Park around the capitol, and

19  then they go back again to the police; correct?

20  A    That's neither fair to say nor correct.

21  Q    Can you continue to hit play.

22       (A video was played.)

23  Q    Pause, please.  Did you see that individual on the left of

24  the screen in kind of a maroon shirt just hucking stuff towards

25  the law enforcement officers?

20-cv-1878-RBJ   ELISABETH EPPS - Cross   03-18-2022

1   A     I didn't, but --

2   Q     Could you back up just a little bit.

3         (A video was played.)

4   Q     Pause.  Keep your eye on this person.

5         (A video was played.)

6   Q     Pause.  Did you see him that time?

7   A     Yes.

8   Q     And he's throwing several things; correct?

9   A     I don't -- I saw him throw something, and someone yelled,

10  don't throw shit.

11  Q     Yeah.  People were yelling at him, don't throw stuff?

12  A     People were yelling, don't throw stuff, yes.

13  Q     And it's fair to say people were yelling, don't throw

14  stuff, because people were aware, once they threw stuff, then

15  police had to react; correct?

16  A     Neither fair nor correct.

17  Q     Okay.  Go to 14:40, please.  And again, this is the same

18  video.  I'm just -- because it's two and a half hours long, it's

19  been a long week, I am not going to play the entire thing.  So,

20  let's just go to 14:00.  Hit play, please.

21        (A video was played.)

22  Q     Hit pause, please.  Ms. Epps, you would agree with me that

23  law enforcement officers are not infringing on those

24  individuals' rights to express their chants and say George

25  Floyd; correct?

20-cv-1878-RBJ   ELISABETH EPPS - Cross   03-18-2022

1  A    I don't have a position.

2  Q    Okay.  Well, you don't see any law enforcement officers in

3  this area in front of the capitol suppressing anyone's rights to

4  protest.  Would you agree with that?  Yes or no.

5  A    It's just that I -- I don't think that's incorrect.

6  Q    Okay.  Can you go to hour 1:04, please.

7       (A video was played.)

8        MR. WEINER:  It has the same problem as my phone, Your

9  Honor.

10      (A video was played.)

11       MR. WEINER:  Can you pause, please.  Can you back up

12  just a little bit.

13      (A video was played.)

14  Q.   (By Mr. Weiner) Pause, please.  So, Ms. Epps, I don't

15  want to put words in your mouth, but you were holding up that

16  40-millimeter round, and it was your statement to the audience

17  that you were talking to that that didn't hurt.  You thought

18  those things were meant to scare people.  Was that what you

19  said, or something to that effect on the video?

20  A    That's about a third of the quote.  And then I said the

21  thing that follows it is they put their knee on that man's neck

22  for ten minutes.

23  Q    I'm talking about those 40-millimeter rounds.  Prior to

24  saying they put their knee on that man's neck, you said, I'm

25  fine.  But before that, you were talking about the 40-millimeter

20-cv-1878-RBJ   ELISABETH EPPS - Cross   03-18-2022

1   rounds.  They don't hurt, and they're just meant to scare you.

2   A    Yeah.  That is the first half of my sentence, yes.

3   Q    Okay.  We will move on.  Can you fast-forward like a

4   minute.

5        (A video was played.)

6   Q    Pause.  So, you consider law enforcement officers fascists;

7   is that correct?

8   A    No.  That's not even what I said, nor what I think.

9   Q    Can you back up like 30 seconds, please.

10       (A video was played.)

11  Q    Can you go to 1:10, please.

12       (A video was played.)

13  Q    Let's just try four minutes ahead, please.

14       (A video was played.)

15  Q    Hit pause.  So, it's fair to say, Ms. Epps, in this part of

16  the video, everybody is congregating.  There's nothing going on;

17  correct?  I mean, there's no shots being fired.  There's no gas

18  being -- people are sitting on the grass on the capitol lawn;

19  correct?

20  A    From where I'm sitting, I don't notice at this point any

21  shots fired or gas.

22  Q    Can you fast-forward to 1:30, please.

23       (A video was played.)

24  Q    Hit pause.  This is a shot again at approximately 1:30 in

25  Plaintiffs' Exhibit 110 where you're looking out from the

20-cv-1878-RBJ   ELISABETH EPPS - Cross   03-18-2022

1   capitol; correct?  Looking west, and certainly you would agree

2   with me there's a lot of people down there protesting, hanging

3   out, doing whatever they want; correct?

4   A   They're not -- I don't know -- doing whatever they want is

5   a bit much, but there certainly are a lot of people protesting.

6   Q   And you don't see any law enforcement in there; correct?

7   A   I can't see that in this still.

8   Q   You don't see law enforcement interrupting them from doing

9   what they're doing; correct?

10  A   I can't see law enforcement in this still at all.

11  Q   Hit play, please.

12      (A video was played.)

13  Q   Pause, and go about five minutes ahead, please.

14      (A video was played.)

15  Q   Pause, please.  Ms. Epps, you would agree with me that

16  there is firecrackers now being deployed in the middle of all

17  those people; correct?

18  A   I would not agree with you that -- that certainly seems

19  possible.

20  Q   Okay.  That -- you would agree with me that wasn't law

21  enforcement?

22  A   I would not agree with you.

23  Q   Do you think that was law enforcement that just did what we

24  saw on that video?

25  A   I do not know.

20-cv-1878-RBJ   ELISABETH EPPS - Cross   03-18-2022

1   Q    Okay.  Hit play, please.

2        (A video was played.)

3   Q    Pause.  So, that thing that just went up in the air, you

4   don't know whether that was possibly law enforcement that was in

5   the crowd shooting that off?

6   A    I don't know.  That thing did not scare me.

7   Q    Play, please.

8        (A video was played.)

9   Q    Hit pause, please, and fast-forward about ten more minutes.

10       THE COURT:  You know, Mr. Weiner, this is pretty hard

11  to watch.  You're stopping and starting and stopping and

12  starting.  Does anybody need a break from this?  Yes?  I do too.

13       (Jury out at 10:48 a.m.)

14       THE COURT:  All right.  Take at least ten minutes.

15       (Recess at 10:49 a.m., until 11:03 a.m.)

16       (Jury in at 11:03 a.m.)

17       THE COURT:  Okay.

18  Q.   (By Mr. Weiner) Ms. Epps, hopefully we've got this

19  figured out so we don't make people seasick.  During your direct

20  examination you had testified that there was no one surrounding

21  the capitol and protecting the capitol.  Do you recall that

22  testimony?

23  A    Not exactly, but --

24  Q    Okay.  Going back to Plaintiffs' Exhibit 110, play, please.

25       (A video was played.)

20-cv-1878-RBJ   ELISABETH EPPS - Cross   03-18-2022

1   Q    All right.  If you could pause.  You would agree with me,

2   Ms. Epps, that you could see a number of law enforcement

3   officers surrounding the entrance to the capitol in that

4   approximate minute 57 of Plaintiffs' Exhibit 110?  Would you

5   agree with that?

6   A    I do not see them surrounding.  I definitely see officers

7   in front of the capitol.

8   Q    You would consider that surrounding the entrance to the

9   capitol?

10  A    No.  I wouldn't consider that surrounding.

11  Q    Okay.  You would have been comfortable just walking through

12  and walking into the capitol in that situation?

13  A    I'm not sure.

14  Q    And Ms. Epps, the night of May 30th of 2020, you said

15  earlier in this video that it was a -- you were aware that

16  allegedly there was a curfew in place.  Do you recall that

17  testimony?

18  A    Yeah.  I said a word immediately after "allegedly."  I knew

19  there was a curfew, that there had been a curfew order, yes.

20  Q    Can you fast-forward to two hours and eight minutes,

21  please.  Do we have the sound?

22        (A video was played.)

23  Q    If you can hit pause, please.  Ms. Epps, you can clearly

24  hear in that notice of please disperse, clear the area.  Did you

25  hear that?

20-cv-1878-RBJ    ELISABETH EPPS - Redirect    03-18-2022

1   A    I heard someone say, clear the area, yes.

2   Q    And but you didn't hear the please disperse part?

3   A    I did not.

4         MR. WEINER:  Okay.  Thank you, Your Honor.  No further

5   questions.

6         THE COURT:  All right.  Redirect?

7                    **REDIRECT EXAMINATION**

8   BY MR. MACDONALD

9   Q    Ms. Epps, Mr. Weiner played you a video where you yelled

10  something like throw that shit back, cops are littering.  Do you

11  remember that?

12  A    Yes.

13  Q    And what were you yelling at the crowd to throw back?

14  A    I was -- I was yelling -- the cops had thrown tear gas

15  canisters right next to us and right next to a child, which is

16  what I yelled.  And I was glad that someone was throwing it away

17  from the child, returning it, throwing it back.

18        MR. MACDONALD:  No further questions, Your Honor.

19        THE COURT:  All right.  Questions from the jury?  Yes.

20  Okay.

21      (Proceedings held at the bench:)

22        THE COURT:  Thirty-four?

23        MR. MACDONALD:  No objection.

24        MR. WEINER:  No objection.

25        THE COURT:  And here is 35.

Kevin P. Carlin, RMR, CRR

20-cv-1878-RBJ   ELISABETH EPPS - Redirect   03-18-2022

1    MR. MACDONALD:  No objection.

2    MR. WEINER:  No objection.

3    (Proceedings held in open court:)

4    THE COURT:  A couple questions here for you from the

5    jury.  Question, attending every day of the protest, was your

6    intention to document and broadcast the protest and peacefully

7    protest, or to look for documentation of police misconduct

8    and/or use of force, or both?

9    THE WITNESS:  A, B, or both?  Every day that I

10   attended, I intended to protest and document.  After -- after

11   being tear gassed, it was certainly an additional motivation to

12   document the use of force.  But that was not what I went out

13   thinking I was going to be doing.

14   THE COURT:  Question, do you feel that live streaming

15   media coverage, the evidence that you captured filming the

16   protest and lawsuits like this lawsuit make change more quickly

17   and effectively than the meetings of advisory boards and

18   committees and policymakers that you regularly attend?

19   THE WITNESS:  I don't know about faster.  I think both

20   are necessary.  I think that -- I'm a part of this lawsuit

21   because I want this to never happen again.  I think it's both.

22   I think it's both, and I think -- I believe in the phrase "many

23   hands make light work."  We can't all protest.  We can't all be

24   a part of committees, but I think that if we do those things

25   together, we can advance the change we want.  I don't know about

20-cv-1878-RBJ   ELISABETH EPPS - Redirect   03-18-2022

1   faster.  I would need some time to think about that, but I think

2   it's both.

3          THE COURT:  All right.  Any other questions from you,

4   ladies and gentlemen?  All right.  Follow-up, sir?

5          MR. MACDONALD:  No, Your Honor.

6          MR. WEINER:  No, Your Honor.

7          THE COURT:  All right.  Thank you, Ms. Epps.  All

8   right.  Who's next?

9          MR. MACDONALD:  Your Honor, may we have two minutes to

10   briefly address the jury, one of our opportunities?

11          THE COURT:  Yes.

12          MR. MACDONALD:  Thank you.  Ladies and gentlemen of

13   the jury, our case is hopefully quickly coming to a close.  Our

14   intention at this point is to call just two more witnesses,

15   hopefully both done today.  We are going to call our last

16   plaintiff, Ms. Hollis Lyman, and then we're going to put on our

17   second expert witness, the professor from Arizona State.

18          So, that is what our plan is for the rest of our case,

19   and then the defendants obviously put on some of their witnesses

20   in our case: Commander Sanchez, the man who talked about what he

21   learned of PepperBalling out in Capitol Hill; Commander Levens,

22   who was the IA discipline officer; Commander O'Donnell, who we

23   played by video; Commander Phelan, who was the incident

24   commander; and of course we have Chief Stamper, who you heard

25   from yesterday.  So, this will be the entirety of our case, we

20-cv-1878-RBJ    KATHERINE HOLLIS LYMAN – Direct    03-18-2022

1    hope today.  Fingers crossed.

2              THE COURT:  All right.  Thank you.  You can call your

3    witness.

4              MS. BAILEY:  Good afternoon, Your Honor.  Leslie

5    Bailey of Arnold & Porter on behalf of the Epps plaintiffs.  The

6    plaintiffs now call Katherine Hollis Lyman.

7              THE COURT:  All right.  Good morning.

8              THE WITNESS:  Good morning.

9         (The Witness is Sworn)

10              THE COURT:  All right.  Have a seat.

11                         **DIRECT EXAMINATION**

12    BY MS. BAILEY

13    Q    Good afternoon, Ms. Lyman.

14    A    Hi.

15    Q    Could you please state your full name, and spell your last

16    name for the record.

17    A    My name is Katherine Hollis Lyman.  I go by Hollis, and

18    last name L-Y-M-A-N.

19    Q    Where did you grow up?

20    A    I grew up in Colorado Springs, Colorado.

21    Q    And where do you currently live?

22    A    I live in Capitol Hill in Denver.

23    Q    Have you always lived in Colorado?

24    A    No.  I lived in Ohio for about six years.

25    Q    What were you doing in Ohio?

20-cv-1878-RBJ    KATHERINE HOLLIS LYMAN – Direct    03-18-2022

1  A    I attended The Ohio State University for undergraduate.

2  Q    And what did you major in in college?

3  A    I majored in criminology and psychology.

4  Q    What got you interested in criminology?

5  A    I thought I wanted to be a forensic psychologist.  My

6  father was a firefighter for 34 years in Colorado Springs, and

7  eight years in the air force before that.  My stepmother was an

8  emergency room nurse.  I saw a lot of people that they

9  interacted with on a regular basis were returning and

10 reoffending, and often involved mental health disorders, and I

11 wanted to be a part of preventing recidivism, and I thought

12 mental health needed to be a part of that.

13 Q    Can you tell us about some of the requirements for your

14 criminology degree.

15 A    Sure.  A lot of the coursework was the same as psychology,

16 which is really nice.  But the biggest difference was that I had

17 to do an internship.

18 Q    And where did you do your internship?

19       THE COURT:  Can everybody hear her okay?  No.  I

20 didn't think so.

21       THE WITNESS:  I'm sorry.

22       THE COURTROOM DEPUTY:  You can scoot up.  This chair

23 is not easy.

24       THE WITNESS:  I'm short, too.

25       THE COURT:  Don't worry about being nervous.

Kevin P. Carlin, RMR, CRR

20-cv-1878-RBJ    KATHERINE HOLLIS LYMAN - Direct    03-18-2022

1  Everybody is nervous in here.  It's going to be fine.

2          THE WITNESS:  Thank you, Your Honor.

3          THE COURT:  And by the way, since we're talking, why

4  do you people call it The U of Ohio?

5          THE WITNESS:  That's such a good question.  I don't

6  know, but it's indoctrinated to you when you're there.  I will

7  correct you if you don't say it.  Sorry.  Can you say the

8  question again?

9  Q.    (By Ms. Bailey) Yes.  So, you were saying that you did an

10 internship as part of your criminology degree?

11 A    Correct.

12 Q    And I asked where you did that internship.

13 A    So, I started at the security department at The Ohio State,

14 and then that led to an opportunity to work with The Ohio State

15 Police Department.

16 Q    And tell us a little bit about your experience working with

17 The Ohio State Police Department.

18 A    I started there in records, which is a great job for an OC

19 person.  You get to know everything that happens, every

20 interaction.  I was trained there, and then that led to a

21 full-time job opportunity as the person doing all of the

22 background checks and fingerprinting for Ohio State.

23 Q    So, your work continued beyond the internship?

24 A    Correct.

25 Q    Did you do any other activities in college?

20-cv-1878-RBJ    KATHERINE HOLLIS LYMAN - Direct    03-18-2022

1   A    Yeah.  I was the president of our traveling team.  I also

2   did ROTC for my first year.

3   Q    Have you received any further education since graduating

4   from college?

5   A    I have.  I got a master's in sports and performance

6   psychology from DU, and I'm now getting a master's in biomedical

7   sciences.

8   Q    And what were some of the requirements for the sport and --

9   the sport and performance psychology degree?

10  A    I had to do field placements.  It's really an applied

11  degree, so that ranged from working with kiddos who were on the

12  Rapids soccer team and adaptive sled hockey team, but the people

13  who actually hire the most performance psychologists are

14  high-risk occupations like the military, police, and fire, and I

15  worked with the fire department.

16  Q    What do you hope to do with your degrees once you graduate

17  from the second master's degree?

18  A    I was introduced to a traumatic brain injury in sports and

19  performance psychology, and I am now incredibly interested in

20  working with folks who have brain injury and are exposed to

21  psychological trauma, because those often go together.

22  Q    In addition to being in graduate school, do you also

23  currently work?

24  A    I do.  I work full-time at the University of Denver.  I'm

25  also an adjunct faculty at DU and at Regis, and I'm an interning

20-cv-1878-RBJ    KATHERINE HOLLIS LYMAN - Direct    03-18-2022

1   therapist at the Brain Injury Alliance of Colorado.

2   Q    I know you don't have a lot of free time, but what do you

3   like to do for fun?

4   A    I'm a runner.  I have been my whole life.  I have a dog who

5   keeps me entertained, and I play a really dorky card game called

6   Magic: The Gathering.

7   Q    Ms. Lyman, what is your role in this case?

8   A    I'm a plaintiff.

9   Q    How many days of the George Floyd protest did you attend?

10  A    I went to the first seven days in a row, and then I took

11  one day off, and then went for several weeks after that.

12  Q    Prior to those protests, had you attended protests before?

13  A    I've been to a couple.

14  Q    And were those also in Denver?

15  A    There was one in Denver before this protest, and one in

16  Denver after this protest.

17  Q    And was the DPD in attendance at those other protests?

18  A    Yes.

19  Q    How would you describe the DPD's presence at those other

20  protests?

21  A    They -- they acted as traffic monitors, mostly.  They

22  helped protesters stay in locations that we were supposed to be

23  to safely protest.  So, that could be just a protester

24  accidentally stepping on private property, they would say they

25  need to move over, things like that.  It was very collegial.

20-cv-1878-RBJ    KATHERINE HOLLIS LYMAN - Direct    03-18-2022

1   Q    And did you witness regular communication between DPD and

2   the protesters at those other protests?

3   A    Yes.  You could walk up to a police officer and talk to

4   them, quite often thank them for being there.  They were often

5   working overtime to be with us.

6   Q    And I want to go to day one of the protests, May 28th.  You

7   told us that you attended the first seven days in a row.  Why

8   did you decide to join the protests on that first day?

9   A    I think like many people, I saw the murder of George Floyd,

10  and -- an image.  I've still never watched the video.  I have no

11  interest in watching a man be murdered.  But I heard that there

12  was going to be a protest, and it was incredibly important to me

13  to be there, because I believe protesting is a way to put your

14  physical body in a form that allows the raising of voices that

15  need to be heard, so that policymakers who influence law can

16  visibly see what the people are wanting to change.  So, I needed

17  to be there.

18  Q    What time did you arrive that first night?

19  A    It was after work, so probably 9:00.  I'm not sure.  I

20  didn't have my phone with me.

21  Q    Was it dark when you arrived?

22  A    It was.

23  Q    And where did you go first?

24  A    I tried to go to the capitol lawn.  That's where every

25  protest I've ever seen in Denver takes place.  And when I

20-cv-1878-RBJ    KATHERINE HOLLIS LYMAN - Direct    03-18-2022

1  arrived, there were far more police officers than I've ever seen

2  at a protest, and no protesters on the lawn.  There was a

3  strange smell in the air that I have now come to know as tear

4  gas.  And so I tried to get kind of a bird's-eye view of what

5  was going on, try to find where the protesters were, and found

6  the parking garage to go on top so I could look.

7  Q    And where was that parking garage?

8  A    It's on 14th and Lincoln, I believe.

9  Q    And what did you see from the top of the parking garage?

10  A    Looking directly below me, there were cop cars just lining

11  14th.  There was some officers there as well, cop cars lining

12  Lincoln in front of the capitol, and a huge plume of smoke, like

13  as tall as the parking garage was.  And protesters kind of

14  scattered, some of them in Liberty Park.

15  Q    So, what did you do after that?

16  A    I got engulfed by the cloud and realized what it was, and

17  needed to exit the area.  So, I left the area and went to

18  Liberty Park to be with the other protesters.

19  Q    What did you see when you arrived at Liberty Park?

20  A    There was still gas in the air.  Protesters were

21  distraught, confused.  And as we started kind of regathering to

22  continue our protest, we were gassed again.  Police officers

23  threw tear gas into the crowd.

24  Q    I'd like to bring up Exhibit 529, which has been admitted

25  into evidence.  This is a -- do you recognize this scene,

20-cv-1878-RBJ   KATHERINE HOLLIS LYMAN - Direct   03-18-2022

1   Ms. Lyman?

2   A    Yes.

3   Q    Can you describe what this was.

4   A    This was the crowd that I was in that was trying to

5   regather to protest.

6   Q    And so this is on Lincoln facing north towards Colfax?

7   A    Yes.  Capitol Hill is on our right in this image.

8   Q    And the timestamp is 9:48.  And where were you in this

9   scene?

10  A    I was off the screen to the left in Liberty Park.

11  Q    And this was the first day of the protest.  Was there a

12  curfew in place at that time?

13  A    No.

14  Q    Did you hear the officers in this line give any

15  announcements before tear gassing the crowd?

16  A    No.

17  Q    Was anyone in the crowd throwing anything towards the

18  officers?

19  A    No.

20  Q    This was the first day that you experienced tear gas;

21  correct?

22  A    Correct.

23  Q    And how did it feel?

24  A    Awful.  I think most people have described it well here.

25  It attacks your mucus membrane specifically, so your eyes, your

20-cv-1878-RBJ    KATHERINE HOLLIS LYMAN - Direct    03-18-2022

1  nose, your mouth.  And the more that you tear up, the more that

2  you snot, the more that you spit, the worse it is, because it's

3  reinfecting you as you're there.

4  Q    Did you decide to stay and continue to protest that night

5  after being tear gassed?

6  A    I did not.  I was not prepared.  All I had was a COVID mask

7  on.  I was in pain, so I went home.

8  Q    Did you decide to go back out again on day two, May 29th?

9  A    I did.

10  Q    Why did you decide to go back to the protests?

11  A    It seemed more important than ever.  The whole reason we

12  were here was to protest police brutality, specifically in

13  response to George Floyd, but what I experienced that night and

14  what I saw others go through showed me that police brutality was

15  alive and well in our Denver Police Department as well, and I

16  wanted to go back to hold that mirror up and show them exactly

17  what we were there to protest for.

18  Q    Did you prepare differently for the second night of the

19  protests?

20  A    Absolutely.

21  Q    How so?

22  A    I wore long sleeves and a hood so I could cover my hair,

23  long pants and snowboarding goggles, because I'm a Coloradan,

24  and that's all I had.  Just tried to cover as much of my skin as

25  possible.

20-cv-1878-RBJ    KATHERINE HOLLIS LYMAN - Direct    03-18-2022

1   Q    Where did you go when you first joined on day two?

2   A    I tried to go back to Capitol Hill.  And again, things were

3   scattered, chaotic as soon as I got there.  So, when I arrived,

4   I ended up in Liberty Park.

5   Q    Could you show us on this -- we have up Exhibit 1241, which

6   has been admitted into evidence.  Could you demonstrate on the

7   map where you arrived.

8   A    I was here.

9   Q    And about what time was this?

10  A    I think closer to 10:00.

11  Q    And what was the scene when you first arrived?

12  A    Chaos.  There was already smoke in the air.  There was

13  protesters running.  There were some people administering aid to

14  protesters.  There was a white unmarked police vehicle driving

15  across Liberty Park's lawn, and police officers everywhere.

16  Q    I want to skip ahead to what happened to you about an hour

17  later.  Could you demonstrate on this map where you were at

18  around 11:15.

19  A    I was in this intersection.

20         MS. BAILEY:  Okay.  Could we please pull up

21  Exhibit 535.  And I would move to admit Exhibit 535.

22         MS. HOFFMAN:  No objection.

23         THE COURT:  Admitted.

24  Q.    (By Ms. Bailey) This is a still image from the HALO

25  camera at the intersection of Colfax and Broadway, and it's

20-cv-1878-RBJ    KATHERINE HOLLIS LYMAN – Direct    03-18-2022

1    timestamped 11:17 p.m.  Ms. Lyman, are you in this photo?

2    A    I am.

3    Q    Could you circle yourself, please.

4    A    This is me holding the sign.

5    Q    So, you're kneeling and holding a sign?

6    A    Correct.

7    Q    What is the sign that you're holding?

8    A    This is the sign I made at home.  On the side we see here

9    it says Black Lives Matter, and on the opposite side it has a

10   list of names of Black and Brown people who were unarmed and

11   killed by police officers in the United States.

12   Q    Could we pull up Exhibit 70, please.  Thank you.  Do you

13   recognize this photo, Ms. Lyman?

14   A    Yes.  This is the other side of my sign.

15            MS. BAILEY:  Okay.  Can we admit Exhibit 70, please.

16            MS. HOFFMAN:  No objection.

17            THE COURT:  Admitted.

18   Q.    (By Ms. Bailey) So, this is the sign that you made on

19   that night?

20   A    Correct.

21   Q    And why did you decide to make the sign?

22   A    That was part of my protest, was a reminder to protesters

23   why we were there, but also to police officers why we were

24   there.  These are the people who couldn't speak for themselves

25   anymore.  This was a reminder that this has happened already.

20-cv-1878-RBJ    KATHERINE HOLLIS LYMAN - Direct    03-18-2022

1    These people were murdered, and quite often justice was not

2    served.

3    Q    If we could return to Exhibit 535, please.  Could you

4    describe what was happening in this scene.

5    A    Yeah.  Initially this is actually a really beautiful scene.

6    There were protesters surrounding officers, kneeling, sitting,

7    hands up, and the officers were not defensive.  And we were

8    appealing to their humanity.  We were trying to talk to them

9    about our cause, what we were there for, and to ask, like, what

10   they were doing?  Why were they gassing us?  Why were they

11   shooting us?  And this was just a small moment to appeal to them

12   as humans.

13   Q    And how long did that moment last?

14   A    Maybe five minutes.

15   Q    And at some point did the situation change?

16   A    Yes.

17   Q    Can you describe what happened.

18   A    To the left of the vehicle that we can see here, another

19   police vehicle came in, and officers got out and started pepper

20   spraying everyone.  And the officers that are here that we can

21   see started pepper spraying us too.

22   Q    Let's see that on video.  Could we play this clip, please,

23   starting at 11:18.

24        (A video was played.)

25   Q    Can you pause it there, please, Dan.  So, Ms. Lyman, is

20-cv-1878-RBJ   KATHERINE HOLLIS LYMAN - Direct   03-18-2022

1    this the moment in which you were pepper sprayed?

2    A    Yes.

3    Q    And the officers came -- yeah.  Could you point on the

4    image here where the -- where you were sprayed from?

5    A    They came in from here, and they sprayed everywhere.

6    Q    Do the officers make any announcements prior to deploying

7    pepper spray on this crowd?

8    A    No.

9    Q    And again, this was day two.  Was there any curfew in place

10   that night?

11   A    No.

12   Q    When the officers started spraying, were you or anyone else

13   in the crowd throwing water bottles?

14   A    No.

15   Q    Throwing rocks?

16   A    No.

17   Q    What about throwing urine or feces at the officers?

18   A    No.

19   Q    Was anyone engaging in any other sort of violence?

20   A    No.

21   Q    Was anyone using a slingshot to launch something towards

22   the officers?

23   A    No.

24   Q    What about a tennis racket or a lacrosse stick?

25   A    No.

20-cv-1878-RBJ    KATHERINE HOLLIS LYMAN - Direct    03-18-2022

1  Q    And I just want to take a step back.  You attended many

2  days of the protests.  Did you ever at any point see anyone

3  using any of those tools, a tennis racket, a slingshot, a

4  lacrosse stick, anything else to launch something towards the

5  officers?

6  A    I did not.

7  Q    What effect did the pepper spray have on you?

8  A    It's worse than tear gas.  It feels more concentrated, and

9  it soaks your clothing so you're reinfecting yourself, but it

10 has the same effects.  It burns and causes you to cough, gag,

11 snot, tear up.  I felt like I swallowed it.  It was inside of

12 me.  It was awful.

13 Q    And on this still that we have up on the screen, can you

14 show us where you were at this point.

15 A    I had run off screen.  I was initially standing here so

16 that my sign wouldn't block people, and ran away.

17 Q    What did you do next after you ran away?

18 A    I ran up towards the RTD station so I could be away from

19 everybody, officers and protesters, and texted my ex-partner for

20 help.

21 Q    Can we pull up Exhibit 1241 again, please.  And could you

22 demonstrate on the map where you ran.

23 A    Sure.  This is the intersection, and I ran up here.

24 There's a little transformer box that I was behind here.

25 Q    Did you continue to protest after that?

        20-cv-1878-RBJ    KATHERINE HOLLIS LYMAN - Direct    03-18-2022

1   A    I did.

2   Q    Where did you go next?

3   A    I got help from my ex-partner and a neighbor in this area

4   here.  They drowned me in milk, which was pretty disgusting, but

5   slightly helpful, and ended up here at some point.

6   Q    So, what happened at this location?  You put an X over

7   Broadway and 14th.  What happened there about half an hour, an

8   hour later?

9   A    We were protesting in a group, and officers were lining

10  Broadway, pushing up -- pushing their protest away, pushing

11  back.  And at some point I decided I was over that, so I stopped

12  on the sidewalk and held my sign straight up in the air.

13  Q    Why did you decide to stop on the sidewalk and hold up your

14  sign?

15  A    The officers were using explicit fear at that point --

16  implicit, I apologize -- fear to move the crowd.  They never

17  made announcements about where we were supposed to go, and I was

18  over it.  I decided I no longer wanted fear to dictate how I was

19  going to protest, and defiantly chose to stand there.

20           MS. BAILEY:  Your Honor, permission to have the

21  witness demonstrate with the reproduction of the sign outside of

22  the witness box to the jury how she was standing in this moment?

23           THE COURT:  Sure.

24  Q.    (By Ms. Bailey) Ms. Lyman, could you please step out of

25  the witness box.  Can we take down Exhibit 1241.  Thank you.

20-cv-1878-RBJ   KATHERINE HOLLIS LYMAN - Direct   03-18-2022

1  And so Ms. Lyman, do you have a reproduction of the sign?  So,

2  when you were standing on the corner by yourself, this is the

3  posture that you were in?

4  A   Yes.

5  Q   And what happened next?

6  A   At the same time, all of the officers raised their weapons

7  and started shooting us, and I ducked behind my sign.

8          THE COURT:  It's hard to hear her if she's not with

9  the microphone.  After she puts that down, then maybe she can go

10 back and answer your question.

11         MS. BAILEY:  Okay.  Thank you very much.  Thank you.

12 Q.   (By Ms. Bailey) Could you describe what happened when you

13 were holding the sign in the air as you just showed us.

14 A   At the same time, all of the officers raised their weapons

15 and started shooting us.  I ducked behind my sign to try and

16 avoid getting hit.  I've never been shot by a PepperBall or

17 whatever shot me, so I don't know why I thought that it would

18 help, but that was my reaction.

19 Q   Did the PepperBall strike the sign?

20 A   Yes.

21 Q   And did it go through the sign?

22 A   It did.

23 Q   Where did it hit on your body?

24 A   It hit me in the forearm.

25 Q   So, it hit you in the forearm when you had your arms up

1944

20-cv-1878-RBJ    KATHERINE HOLLIS LYMAN - Direct    03-18-2022

1   protecting your face?

2   A    Yes.

3   Q    And where on the sign did the ball -- the PepperBall strike

4   through?

5   A    They shot straight through Philando Castile's name.

6   Q    And who is Philando Castile?

7   A    Philando Castile is a Black man who was stopped at a

8   traffic stop and was killed in front of his girlfriend by a

9   police officer in Minneapolis.

10  Q    How did it feel when you got hit with the PepperBall?

11  A    It hurt, but more so, it was enraging.  Not only did they

12  shoot me, they shot straight through my sign, and it felt like

13  either they were shooting indiscriminately at everybody -- I was

14  maybe 15 feet in front of other protesters, 15 feet in front of

15  officers -- or that they targeted me and they shot me

16  specifically.

17  Q    Did the officers give any warnings or announcements prior

18  to firing at you?

19  A    No.

20  Q    Was anyone in the crowd being violent towards the officers?

21  A    No.

22  Q    Did you continue protesting after that?

23  A    Briefly.

24  Q    Where did you go?

25  A    I ran away from that situation, and back towards the other

20-cv-1878-RBJ   KATHERINE HOLLIS LYMAN - Direct   03-18-2022

1  protesters.  My ex-partner was actually in that crowd and could

2  see me be shot.  We discussed that it didn't feel safe anymore

3  to be there, and agreed to meet at the corner of Broadway and

4  14th -- no.  Colfax.  Apologies.  Broadway and Colfax.  So, he

5  went to tell our neighbor that we were leaving, and I waited for

6  him there.

7          MS. BAILEY:  Can we bring up Exhibit 1263, please,

8  which I would move to admit.

9          THE COURTROOM DEPUTY:  I have 1263 as a map already

10 admitted.

11         MS. BAILEY:  Oh.  I apologize.  So, this would be

12 1264.  This should be 1263.  No?  Okay.

13         THE COURT:  Are you saying 1253 or 63?

14         MS. BAILEY:  1263, but it appears that has already

15 been admitted as a map.

16         THE COURT:  Yes.  True.

17         MS. BAILEY:  Okay.

18         THE COURT:  So, do you want something else now?  1264?

19         MS. BAILEY:  1264.  Thank you.

20         THE COURT:  And what is that?

21         MS. BAILEY:  This is a HALO camera of the corner of

22 Colfax and Broadway.

23         THE COURT:  It's a photo, or it's a video?

24         MS. BAILEY:  It's an actual video, but we're just

25 showing a still.

20-cv-1878-RBJ    KATHERINE HOLLIS LYMAN – Direct    03-18-2022

1    MS. HOFFMAN:  No objection.

2    THE COURT:  Okay.  It's admitted.

3    MS. BAILEY:  Thank you.

4  Q.    (By Ms. Bailey) Ms. Lyman, do you see yourself in this

5  still image that's on the screen?

6  A    I do.

7  Q    Could you circle yourself, please.

8  A    This is me again with my sign.

9  Q    And around what time was this?

10  A    I'm not sure.  Probably closer to midnight.

11  Q    Okay.  And when you were on the corner standing here, did

12  you see anything that sticks out in your memory?

13  A    Yes.

14  Q    Tell us what you saw.

15  A    That I had to wait here for a significant amount of time

16  standing right next to police officers who I did not think would

17  be at this corner.  I thought since they were pushing protesters

18  on the other side, that this would be empty.  And I saw a person

19  in their car start to shout at officers and pull over on the

20  street here, which is Broadway, and officers approached him and

21  pepper sprayed him straight in the face while he was driving.

22  Q    Dan, could we have the next still, please.  Is this the --

23  this is the car that you're talking about?

24  A    Yes.

25  Q    And could you circle yourself on this screen.

Kevin P. Carlin, RMR, CRR

20-cv-1878-RBJ    KATHERINE HOLLIS LYMAN - Direct    03-18-2022

1   A    This is me.

2   Q    Okay.  And can we pull up Exhibit 1126, please.  This is a

3   still from an image that the jury has seen with the testimony of

4   Chief Stamper.  Is this the same incident that you saw?

5   A    Yes.

6   Q    Okay.  Thank you.  We can take that down, please.

7            THE COURTROOM DEPUTY:  Hang on.  The jury did not see

8   that, as I was checking to make sure it was admitted.

9            MS. BAILEY:  Could we put it back up, please, and can

10  we admit 1126.

11           THE COURTROOM DEPUTY:  It's admitted.  I just was

12  checking.

13           MS. BAILEY:  Okay.  Thank you.

14  Q.    (By Ms. Bailey) Ms. Lyman, what is happening in this

15  scene that you're seeing at 1126?

16  A    This is an officer pepper spraying this man in the face

17  while he's driving his car.

18  Q    And this was the incident that you witnessed from the

19  corner?

20  A    Yes.

21  Q    Okay.  Thank you.  We can take that down.  What happened

22  next?

23  A    I was done.  I decided that it was time to go home.  And so

24  as I began to walk back up Colfax, I looked over and the capitol

25  was empty, and I decided to walk over, walk up the steps, and

20-cv-1878-RBJ     KATHERINE HOLLIS LYMAN - Direct     03-18-2022

1    leave my sign on the capitol door on the north side.

2    Q    Why did you decide to leave the sign at the door that

3    night?

4    A    I didn't want that sign anymore.  It felt ironically gross

5    to have, and I hoped that somebody who worked inside the

6    capitol, lawmakers, policy enforcers, would see that sign on the

7    way into work the next morning.

8    Q    And did anyone impede you as you approached the capitol?

9    A    No.

10   Q    What happened when you got home that night?

11   A    The adrenaline wore off while I was walking and still

12   covered in pepper spray and tear gas, and I just felt exhausted.

13   I got home and got sick and ended up vomiting.  I think it was

14   from swallowing pepper spray.

15   Q    Did you go back to the protest on day three, May 30th?

16   A    I did.

17   Q    Why did you decide to go back that day?

18   A    It seemed more important than ever.

19   Q    Tell us what time you arrived and what happened to you over

20   the course of the first couple of hours at the protest that day.

21   A    This was Saturday.  So, I didn't have to work as much, and

22   arrived around 3:00.  I found protesters out marching away from

23   the capitol downtown and joined them.  I connected with my

24   friend Alyssha who I planned to meet up with, and her two

25   friends who had come from Boulder to protest as well.

20-cv-1878-RBJ    KATHERINE HOLLIS LYMAN – Direct    03-18-2022

1   Q    And if we could pull back up the map from Exhibit 1241,

2   please.  Could you demonstrate on the map where you were

3   protesting during the afternoon of the 30th.

4   A    We were at least a mile or so away from this area.

5   Q    So, you weren't in this area that we have been seeing?

6   A    Correct.

7   Q    Thank you.  We can take that down.  And so at a certain

8   point, did you take a break from protesting that day?

9   A    We did.  All of our protests started and ended at the

10  capitol, and at some point we decided to go try to eat.  And so

11  we left and went downtown to a sushi restaurant.

12  Q    And where did you go when you rejoined the protest after

13  dinner?

14  A    So, at the dinner, Alyssha and I largely experienced

15  peaceful protesting that entire time.  And her friend who had

16  come was a professional photographer, he showed us an image of a

17  man kneeling down with his back to police officers, who were

18  shooting him point blank with PepperBalls, and knew it wasn't

19  going to be a peaceful afternoon.  So, we left from there and

20  tried to go back to Capitol Hill.

21         MS. HOFFMAN:  Objection.  Foundation, relevance.  Move

22  to strike.

23         THE COURT:  What are you trying to strike?  The sushi?

24         MS. HOFFMAN:  The witness' answer about seeing a

25  photograph.

Kevin P. Carlin, RMR, CRR

20-cv-1878-RBJ   KATHERINE HOLLIS LYMAN - Direct   03-18-2022

1   THE COURT:  Okay.  Overruled.

2   Q.   (By Ms. Bailey) Okay.  If we could pull back up the map

3   at 1241, please.  Ms. Lyman, could you show us on the map once

4   it's up where you went when you rejoined the protest after

5   dinner?

6   A    We came back to Capitol Hill through here.

7   Q    And then did you arrive at Lincoln between Colfax and 14th?

8   A    Yes.

9   Q    And about what time was that?

10  A    It was close to 8:00 p.m., but it was before.

11  Q    So, this was day three, May 30th, and that was the first

12  night of the curfew; correct?

13  A    Correct.

14  Q    Were you aware that the curfew was going into effect at

15  8:00 p.m.?

16  A    I was.  I became aware.

17  Q    Did you leave by 8:00 p.m.?

18  A    No.

19  Q    Why did you decide to stay at the protest after the curfew?

20  A    It was an act of civil disobedience, which I believe has a

21  very long history in this country.  Some very good examples are

22  Rosa Parks and Martin Luther King, Junior.  And from these very

23  protests in another city, Ieshia Evans was a part of a peaceful

24  protest, was part of being able to bring the conversation to a

25  larger audience if necessary.

20-cv-1878-RBJ    KATHERINE HOLLIS LYMAN - Direct    03-18-2022

1    Q    Were you prepared to be arrested for violating the curfew?

2    A    I was.

3    Q    We've heard some testimony that protesters who stayed past

4    the curfew had the name of a lawyer written on their arm in the

5    event they got arrested.  Did you have that or anything similar?

6    A    I didn't have anything written on my arm, but someone

7    handed me a card of an organization that would help me if I got

8    arrested.

9    Q    So, is it fair to say that protesting police brutality was

10   important enough to you to stay out there at the risk of being

11   arrested?

12   A    Yes.  And from those examples that I just gave who were all

13   arrested, great changes came from Martin Luther King, Junior,

14   being in jail.  He wrote the letter from Birmingham jail there.

15   Rosa Parks being in jail brought forth a conversation to a room

16   like this where a democratic decision could be made about the

17   issue that was being raised.  And in those cases, it was civil

18   rights.  And here, it was police brutality.

19   Q    What happened around 8:00 p.m. just as the curfew was going

20   into effect?

21   A    Protesters were afraid.  We started to erect a barrier

22   across Lincoln Avenue.

23   Q    Can you demonstrate on the map where that barrier was?

24   A    Here.

25   Q    And what was your understanding as to why protesters were

20-cv-1878-RBJ    KATHERINE HOLLIS LYMAN - Direct    03-18-2022

1  building that barrier in that block at that time?

2  A    To create space.  We were afraid of what would happen after

3  curfew fell.  Not just arrest, but violence that we had already

4  experienced, so we were trying to create a safe space to

5  protest.

6  Q    Were you in the courtroom when Chief Stamper testified last

7  week about the series of events that occurred on Colfax and

8  Lincoln between about 6:30 and 7:30 on this day?

9  A    Yes.

10  Q    And so this is the same block that those events occurred

11  at?

12  A    Correct.

13  Q    Okay.  And this was about half an hour after those events?

14  A    Correct.

15  Q    Okay.  Where did the barricade materials come from?

16  A    There was a temporary fence that had been put up by the

17  City around Liberty Park, and we temporarily moved it across

18  Lincoln Street instead.

19  Q    Did you touch the barrier at all?

20  A    I did.  I moved one piece maybe two feet to my right.

21  Q    Was there any violence involved in constructing this

22  barrier?

23  A    No.

24  Q    Was the barrier blocking traffic?

25  A    No.  The police had already blocked the street.

20-cv-1878-RBJ    KATHERINE HOLLIS LYMAN - Direct    03-18-2022

1   Q    I'd like to bring up a still from Exhibit 670, which has

2   been entered into evidence.  And this is a body-worn camera from

3   Officer Hastings looking south on Lincoln towards 14th, and it

4   is timestamped 7:59, right before the curfew went into effect.

5   Ms. Lyman, are you in this scene?

6   A    I am.

7   Q    Could you circle where you are in this crowd.

8   A    I'm standing here.

9   Q    I'd like to pull up Exhibit 137, please.  Ms. Lyman, do you

10  recognize this picture?

11  A    I do.  I took this picture.

12           MS. BAILEY:  Move to admit Exhibit 137.

13           MS. HOFFMAN:  No objection.

14           THE COURT:  Admitted.

15  Q.   (By Ms. Bailey) And what is this a picture of?

16  A    This is a picture of me on the other side of the fence,

17  taking a picture back towards the officers who were lining the

18  street on Lincoln.

19  Q    And this is also at around 8:00 p.m.?

20  A    Yes.

21  Q    Okay.  We can take that down, please.  Were you in court

22  when Commander Phelan testified that DPD waited half an hour

23  after 8:00 p.m. to begin enforcing the curfew?

24  A    I was.

25  Q    Is that consistent with your experience?

Kevin P. Carlin, RMR, CRR

20-cv-1878-RBJ   KATHERINE HOLLIS LYMAN - Direct   03-18-2022

1   A     No.

2   Q     What happened in your experience?

3   A     Standing there, we were counting the minutes, the seconds

4   down to 8:00 p.m. to see what would happen, to see if we could

5   be able to stay and safely protest.  And at maybe 8:02, officers

6   started throwing flash-bangs and tear gas and started

7   PepperBalling us.

8   Q     Can we pull up Exhibit 670 again, please.  We will play a

9   short clip from this, and then I will ask you what you see.  And

10  this is timestamped 8:04.  If we could begin playing, Dan.

11        (A video was played.)

12  Q     And stop, please.  Ms. Lyman, what happened in this moment?

13  A     So, in this moment, officers crossing -- or lining the

14  street, and also all the way up to the capitol started

15  approaching us and throwing flash-bangs, tear gas, and pepper

16  shooting us.

17  Q     So, could we play this again in slower motion, please, and

18  could you indicate to us on the image where the -- where you

19  started seeing the officers coming down from the hill.

20  A     Yes.  We started running in through here.  You can see one

21  of the officers throw something into the crowd.

22  Q     And again, could you circle where you are around in this

23  crowd?

24  A     I am here.

25  Q     Can we play that, please.

1955

20-cv-1878-RBJ   KATHERINE HOLLIS LYMAN - Direct   03-18-2022

1        (A video was played.)

2   Q    Stop it there, please.  So, at 8:04 and about 35 seconds,

3   we saw an explosion go off above where you were?

4   A    Yes.

5   Q    What was that?

6   A    Something concussive.  It exploded over our heads, and was

7   extremely loud, and actually ended up hitting Alyssha in the leg

8   and leaving a burn mark on her pants.

9   Q    And Alyssha is your friend who was right beside you?

10  A    Yes.

11  Q    What impact did that have on you?

12  A    It damaged her hearing.  We couldn't hear very well for

13  most of that night, and was scary.  I didn't know what that was

14  at the time.  I never had one explode that close to me, and made

15  us run away.

16  Q    I'd like to play through that clip a few more seconds,

17  please.

18       (A video was played.)

19  Q    Did you hear what the officer said at the end?

20  A    Yes.  He said, get good shots.  See good shots.

21  Q    What did you experience during this period of time that we

22  just watched?

23  A    We were tear gassed.  The explosion went off over our head,

24  and just terror.  Grabbed each other's hands and started

25  running.

Kevin P. Carlin, RMR, CRR

20-cv-1878-RBJ    KATHERINE HOLLIS LYMAN - Direct    03-18-2022

1  Q    Could we pull up Exhibit 1241 again.  The map.  And could

2  you indicate to us where you were at the end of that clip, and

3  then where you went from there.

4  A    Yes.  So, the barrier was here.  We ran back here, and then

5  ended up having to run back towards the officers and towards the

6  gas.

7  Q    Why did you run back towards the officers and towards the

8  gas?

9  A    As we were running and got to that corner, there was a man

10  on crutches trying to get down the stairs there, and a friend of

11  his trying to help him.  I watched an officer run up behind them

12  as they were leaving and pull off the friend's goggles and mask

13  and pepper spray him straight in the face.  He started

14  screaming.  And they couldn't get down by themselves, so we ran

15  up to help.

16  Q    Could we pull up Exhibit 349, which has been entered into

17  evidence.

18            MS. HOFFMAN:  I have specific portions that were

19  removed.

20            MS. BAILEY:  I apologize.  I gave the wrong number.

21  It's 666, which has also been entered into evidence.

22            MS. HOFFMAN:  Thank you.

23  Q.    (By Ms. Bailey) Ms. Lyman, do you recognize this man who

24  is circled?

25  A    I do.

20-cv-1878-RBJ    KATHERINE HOLLIS LYMAN - Direct    03-18-2022

1  Q    And who is that?

2  A    He's the guy on crutches who was trying to get down the

3  stairs.

4  Q    Okay.  Thank you.  And this is a still from an image that

5  we saw last week during Chief Stamper's testimony in which this

6  man was PepperBalled.

7            MS. HOFFMAN:  Objection.  Leading.

8            THE COURT:  Yes, it was.  Nice try, though.

9            MS. BAILEY:  We can take that down.  Thank you.  I

10  would like to introduce Exhibit 138.  So, this is on this

11  screen, we have 137, which has been entered into evidence, but

12  138, I'd like to move to admit.

13  Q.    (By Ms. Bailey) Ms. Lyman, do you recognize this exhibit?

14  A    Yes.  This is the Instagram post that I made.

15            THE COURT:  All right.  138.  Any objection to 138?

16            MS. HOFFMAN:  No objection.

17            THE COURT:  Okay.  Admitted.  137 was already in.

18            MS. BAILEY:  Thank you.

19  Q.    (By Ms. Bailey) Ms. Lyman, when did you make this

20  Instagram post?

21  A    I think it was the next morning.  I was there pretty late

22  and had to take Alyssha home, and so I think I wrote this the

23  next morning.

24  Q    So, again, this is a continuation of the post that we saw

25  at 137, so the picture is of a fence.  Could you confirm what

Kevin P. Carlin, RMR, CRR

20-cv-1878-RBJ    KATHERINE HOLLIS LYMAN - Direct    03-18-2022

1    picture that is?

2    A    Yeah.  This is the picture we saw earlier.  I'm on the

3    other side of the fence taking a picture back towards the

4    officers.

5    Q    Okay.  And you write in the caption moments before a

6    concussion grenade bounced in front of me and hit my POC friend

7    in the leg.  And POC there is?

8    A    Person of color.

9    Q    And who is that?

10   A    Alyssha.

11   Q    We barricaded ourselves with fencing away from the police

12   to resist the 8:00 p.m. curfew placed so the police could corral

13   and arrest protesters.  Yes, some people were throwing things,

14   water bottles, some firecrackers, et cetera, at the fully

15   outfitted in riot gear police after three long days of being

16   harassed, attacked, and no justice for George, Ahmaud, or

17   Breonna or many others in sight.

18        So, you write there that some people were throwing

19   things such as water bottles and some firecrackers.  Can you

20   explain what you meant.

21   A    Yes.  I did see people throw plastic water bottles.  I saw

22   people throw firecrackers.  I never saw them hit police, but I

23   was trying to be honest about what I had seen there, and I never

24   saw anyone throw anything at an officer until after officers had

25   either fired a PepperBall or thrown tear gas at us.  It was

20-cv-1878-RBJ   KATHERINE HOLLIS LYMAN - Direct   03-18-2022

1   always in response.

2   Q    And when you saw people throwing a water bottle, for

3   example, what did you do?

4   A    We stopped them.  There was an incident behind this

5   barricade where someone went to throw a water bottle and we

6   stopped them.

7   Q    And you continue, moments before that same friend and I ran

8   back towards the cops to help a man off the steps on crutches

9   who had been pepper sprayed, and his friend who had been sprayed

10  after the cops ripped his goggles and mask off.  And there

11  you're referencing the man who we just saw in the photo from

12  Exhibit 666?

13  A    Correct.

14  Q    You continue, moments after the crowd had knelt, hands up,

15  at the feet of the police and chanted, who do you protect, who

16  do you serve?  When did you chant that?

17  A    Right as the curfew went into effect, right before the

18  officers came at us and started throwing things and

19  PepperBalling us.

20  Q    And you end with, stay safe, stay angry, stay strong, Black

21  Lives Matter.  What did you mean by stay angry?

22  A    That it was okay to be angry.  It was okay to be angry at

23  the murder of a man, and many other people with often no justice

24  or unfair amount of justice being served.  It was okay to be

25  angry and to stay out and protest.

20-cv-1878-RBJ    KATHERINE HOLLIS LYMAN – Direct    03-18-2022

1   Q    Can we take that exhibit down, please.  Did you hear DPD

2   make any attempt to arrest people prior to deploying less-lethal

3   weapons after the curfew went into effect?

4   A    No.

5   Q    If we could bring up Exhibit 1241 again, the map.  At a

6   certain point after helping the man to first aid, you and

7   Alyssha continued on.  Could you show us where on the map you

8   went.

9   A    We did.  We tried to find other protesters, and ended up

10  finding ourselves alone with just other police officers.  We

11  were here on the street, and there was an officer here who

12  ordered us to keep walking up 14th to Grant Street here, and to

13  go back to where the other protesters were.

14  Q    Did you follow that instruction?

15  A    I did.  When we got to Grant Street, there were maybe 30 or

16  40 other officers.  We were surrounded.  It felt really unsafe.

17  I thought for sure we were about to be arrested, and a man ran

18  up to us and screamed in our face to walk back across the police

19  line and back to where the protesters were on the other side of

20  Grant and 13th.

21          THE COURT:  Are you close to being finished?

22          MS. BAILEY:  Yes, Your Honor.  I have less than five

23  minutes.

24          THE COURT:  Okay.  Go ahead.

25          MS. BAILEY:  Thank you.

20-cv-1878-RBJ   KATHERINE HOLLIS LYMAN - Direct   03-18-2022

1  Q.    (By Ms. Bailey) And what happened when you tried to

2  comply with the officer's order?

3  A    When we got to the police line, I put Alyssha in front of

4  me so she could look back towards the officers walking backwards

5  so I could put my body between her and the police, and we

6  started walking across the street.

7  Q    And what happened at that point?

8  A    We made it about three-fourths of the way across, and

9  police officers shot me in the back three times.

10  Q    And why did you put Alyssha behind you in this moment?

11  A    We were there to protest police brutality, specifically

12  against Black and Brown bodies.  And Alyssha is Black, and she's

13  my friend, and I didn't want her to experience more violence.  I

14  thought that as a white woman, not only was I less likely to be

15  harassed or assaulted by the police, but I just didn't want my

16  friend to experience that.

17  Q    So, what happened when you were hit three times in the

18  back?

19  A    We made it back to the other side where the protesters

20  were, and there's a transformer box that we got behind.  Police

21  officers started shooting the crowd and throwing tear gas, and

22  so we ran away and escaped out by an alley and over a parking

23  garage to our right.

24  Q    And this interaction happened on Grant around 13th Street;

25  is that correct?

20-cv-1878-RBJ    KATHERINE HOLLIS LYMAN - Direct    03-18-2022

1  A    Yes.

2  Q    Did you continue protesting after that?

3  A    Not for very long.  We ended up walking home pretty quickly

4  after that.

5  Q    So, we've now talked about days one through three of the

6  protests, and you continued to protest many days after that; is

7  that correct?

8  A    Yes.

9  Q    And in that time, we've heard about situations in which you

10  experienced less-lethal weapons being deployed, and there were

11  some in which you didn't -- in your experience, what was the

12  difference between those instances when less-lethal weapons were

13  not deployed?

14  A    Largely when the police were there and when they weren't.

15  It was really hard to understand if there was logic on whether

16  or not officers chose to use less-than-lethal weapons, and quite

17  often, there was no difference.

18  Q    Can you describe your injuries from the protest.

19  A    I was shot.  I was gassed.  I was pepper sprayed.  But more

20  so, I have changed my opinion on how I feel about the police.  I

21  no longer feel safe.  I still live in Denver.  I still have to

22  call 911 sometimes.  I still see police officers every day in

23  the city.  I don't know if they're the ones who shot us.  I've

24  had nightmares.  I already have PTSD from other incidents, so

25  I'm susceptible in some ways, but I had nightmares for months

        20-cv-1878-RBJ    KATHERINE HOLLIS LYMAN - Direct    03-18-2022

1    after this.  And they still come, especially now we're back in

2    trial, and I have seen all the footage.

3    Q    Ms. Lyman, you were the 12th and final plaintiff that the

4    jury will hear from in this case.  Why did you decide to join

5    this lawsuit?

6    A    My constitutional rights were aggressively violated.  I

7    know what better policing can be.  I worked very closely with

8    The Ohio State Police Department, and they dealt with rowdy and

9    disrespectful and often destructive college students and

10   community members, and yet they still were able to handle that

11   with grace, and never tear gassed them.  They were able to

12   uphold their duty to protect and serve.

13           And I did not see that in the Denver Police Department.

14   I saw them exemplify some of the worst aspects of policing.  I

15   saw abuse of power.  I saw violence, lack of communication.  And

16   there's been no apology.  There's been no reconciliation.  The

17   people that were hurt there, both officers and protesters still

18   live here.  No one has recognized the damage that was done in

19   Denver and to us.  I am here so that this Court can decide,

20   these jurors can decide whether or not this happens in Colorado

21   again.

22           MS. BAILEY:  Thank you.  No further questions at this

23   time.

24           THE COURT:  All right.  This is a good time, I think,

25   to take our noon break.  Is 1:15 enough, or do you want a little

20-cv-1878-RBJ   KATHERINE HOLLIS LYMAN – Cross   03-18-2022

1   more than that?  1:20?  1:20.  Okay.

2        (Jury out at 12:05 p.m.)

3            THE COURT:  All right.  The jury has spoken.  1:20.

4        (Recess at 12:05 p.m., until 1:24 p.m.)

5        (Jury in at 1:24 p.m.)

6            THE COURT:  Okay.  Cross examination?

7            MS. HOFFMAN:  Thank you, Your Honor.

8                       **CROSS EXAMINATION**

9   BY MS. HOFFMAN

10  Q    Good afternoon, Ms. Lyman.  How are you today?

11  A    I'm doing.

12  Q    I'm good as well.  I have a few follow-up questions for you

13  based on the questions that your attorney asked.  I'm just going

14  to jump right in to May 28th.  That's the first day you

15  protested; correct?

16  A    Correct.

17  Q    And my understanding is that you arrived sometime in the

18  evening hours to the Capitol Hill area?

19  A    I tried to, yes.

20  Q    And do you recall what time that was that you first

21  arrived?

22  A    I don't.

23  Q    And when you first arrived, you noticed a strange smell;

24  correct?

25  A    Correct.

20-cv-1878-RBJ   KATHERINE HOLLIS LYMAN - Cross   03-18-2022

1    Q    And upon your initial arrival, you didn't see any

2    protesters gathered in the capitol area; correct?

3    A    Not on Capitol Hill.  At least not en masse.

4    Q    And you didn't see any police deploy any less-lethal

5    munitions at that time?

6    A    Not at that time.

7    Q    And so at that point, you then walk over to a parking

8    garage at about 14th and Lincoln?  Was that your testimony?

9    A    I think so, yes.

10   Q    And you walked to the top level of the parking garage?

11   A    Yes.

12   Q    And that's so you can get a better perspective of what's

13   going on so you can actually meet up with the protesters?

14   A    Yes.

15   Q    Understood.  And when you get to the top of the parking

16   garage, you haven't started protesting yet.  You're still just

17   trying to locate the other protesters so you can in fact start

18   your protesting; is that correct?

19   A    I think that's a little confusing.

20   Q    Sure.  I will break that down.  It was a pretty compound

21   question.  So, you walked to the top of the parking garage;

22   correct?

23   A    Correct.

24   Q    And at this point in time, you're still trying to locate

25   where the protesters have gathered?

20-cv-1878-RBJ    KATHERINE HOLLIS LYMAN - Cross    03-18-2022

1  A    Correct.

2  Q    So, when you're at the top of the parking garage, you

3  haven't started yourself protesting yet?

4  A    There isn't really a start time and a stop time to

5  protesting.  Protesting is about putting your physical body in a

6  space that elucidates your emotional and political views or

7  policy views.  So, I think in some ways, the moment I left my

8  house to put my body in a space to talk about that was

9  protesting.

10 Q    Okay.  And you didn't have any signs with you on May 28th;

11 correct?

12 A    No.  Not that day.

13 Q    And you weren't chanting at the top of the parking garage;

14 correct?

15 A    Correct.

16 Q    So, when you get to the top of the parking garage, was it

17 your testimony that you see some protesters in the distance

18 around Veterans Park?

19 A    I think it's Liberty Park, but yes.

20 Q    Just so I want to make sure we're talking about the same

21 park, are you talking about the park directly next to the

22 capitol?

23 A    Yes.  Right in front of it.

24 Q    Understood.  And when you're at the top of the parking

25 garage, you see some clouds of gas; correct?

20-cv-1878-RBJ   KATHERINE HOLLIS LYMAN - Cross   03-18-2022

1  A    Yes.

2  Q    You didn't witness what actually caused the clouds of gas;

3  correct?

4  A    Not firsthand.

5  Q    So, you just observed the aftermath of whatever had

6  occurred?

7  A    Correct.

8  Q    And the wind started blowing the clouds towards you, and

9  that's when you left the parking garage; is that correct?

10  A    Correct.  First I went into an elevator that was there,

11  because it took a minute to recover, but then I left, yes.

12  Q    And then from the parking garage, do I understand that you

13  next went to the Liberty Park area?

14  A    Yes.

15  Q    And about how many protesters are in that area when you

16  arrived at Liberty Park?

17  A    I'm not sure.

18  Q    One hundred?  Thousands?

19  A    Less than thousands.  Probably closer to the hundred

20  number.

21  Q    And were people chanting in this area?

22  A    Yes.

23  Q    Were you chanting?

24  A    Eventually, yes.

25  Q    Was it loud?

20-cv-1878-RBJ    KATHERINE HOLLIS LYMAN – Cross    03-18-2022

1  A    I think that's subjective, but it was -- it was as loud as

2  a chanting crowd of that number would be.

3  Q    And I believe it was your testimony that at this particular

4  location, you observed officers deploy some gas canisters?

5  A    Correct.

6  Q    And that you inhaled gas from those canisters?

7  A    Correct.

8  Q    And you can't identify the specific officer that threw the

9  canister that you inhaled; correct?

10  A    Correct.

11  Q    And do I understand that you felt symptoms from that gas

12  exposure for approximately an hour?

13  A    It lasts longer than that overall, but the immediate acute

14  effects, I would say, are about an hour.

15  Q    And you agree with me that your symptoms got better over

16  time; correct?

17  A    My physical symptoms from gas, yes.

18  Q    And you didn't protest at any other locations after that.

19  It was at that point in time you went home; correct?

20  A    I think so.  It's a little hard to remember this day.

21  Q    And at the time of the protests, you lived in the Dowling

22  Street area?

23  A    Downing, yes.

24  Q    Thank you for correcting me there.  And that's about

25  two miles between the capitol and your home?

20-cv-1878-RBJ    KATHERINE HOLLIS LYMAN - Cross    03-18-2022

1   A    That's my best guess.

2   Q    And you were able to walk home without any issues?

3   A    Yes.  But I was still teared and snotting and like -- I

4   don't think I was gagging at that point on the walk home, but I

5   wasn't better by the time I was walking home, if that's what you

6   mean.

7   Q    Sure.  Understood.  So, it wasn't the most pleasant walk

8   you've ever made back to your home, but you were in fact able to

9   walk home without any issues?

10  A    Yes.

11  Q    So, I want to move on to the second day of the protest,

12  May 29th.  You protested that day as well?

13  A    Correct.

14  Q    So, you would agree with me the injuries you received on

15  May 28th didn't prevent you from attending the protest the

16  following day, May 29th?

17  A    They didn't prevent me from protesting the next day, but

18  they did cut short my protest the day of.

19  Q    And I believe you testified previously that you came better

20  prepared on May 29th; correct?

21  A    Correct.

22  Q    And by that I mean you brought your ski goggles, or your

23  snowboarding goggles?

24  A    Correct.

25  Q    And you had some water bottles?

20-cv-1878-RBJ   KATHERINE HOLLIS LYMAN - Cross   03-18-2022

1   A    I don't think I had a water bottle that day, but I did

2   later in the protests, yes.

3   Q    What about masks?  Did you have any masks with you on

4   May 29th?

5   A    COVID masks, yes.

6   Q    COVID masks, okay.  And the first -- actually, I want to

7   make sure that I understand.  On May 29th, you're making

8   allegations that you were pepper sprayed at Colfax and Broadway

9   and that you were hit with a PepperBall at 14th and Broadway.

10  Am I understanding your claims correctly?

11  A    Yes, ma'am.

12  Q    But backing up a little bit, you first arrived to Liberty

13  Park, Veterans Park, the park next to the capitol; correct?

14  A    Correct.

15  Q    And one of the first things you observed was a large

16  dumpster fire?

17  A    No.  The first things that I observed were smoke that I

18  believe to be tear gas, lots of cop cars, lots of protesters

19  running.  There was a dumpster fire, but that was not the first

20  thing that I observed.

21  Q    And you haven't received any sort of law enforcement

22  training when you were employed by The Ohio State Police

23  Department in terms of recognizing gas versus smoke?

24  A    Correct.

25  Q    And at some point in time after -- after noticing or making

20-cv-1878-RBJ   KATHERINE HOLLIS LYMAN - Cross   03-18-2022

1   note of the smoke -- or, sorry.  The gas in the air, you at some

2   point noted that there was a large dumpster fire in the Veterans

3   Park area?

4   A    Correct.

5   Q    Did you call the police or the fire department to report

6   the fire?

7   A    I did not.

8   Q    And instead of calling the fire department, you took a

9   video on your phone; correct?

10   A    Correct.  There were already people attending to the fire

11   by the time I was there.

12   Q    So, you saw fire department personnel on scene?

13   A    I'm not sure who they were, but there were already people

14   aware it was a fire, including an unmarked police van that drove

15   over the Liberty Park lawn towards the dumpster fire.

16          MS. HOFFMAN:  At this point I would ask that the

17   witness be shown a screenshot of Exhibit 84.  Ms. Lyman, I would

18   like to show you this screenshot.  It's -- I represent that it's

19   taken from a video that was sent to us by counsel as being a

20   video that you took on May 29th of the Veterans Park area.

21          THE COURT:  Is there an objection to this?

22          MS. BAILEY:  No objection.

23          THE COURT:  Admitted.

24   Q.    (By Ms. Hoffman) Do you recognize the contents of what's

25   contained in this photograph?

Kevin P. Carlin, RMR, CRR

20-cv-1878-RBJ    KATHERINE HOLLIS LYMAN - Cross    03-18-2022

1   A    Yes, ma'am.

2   Q    Okay.  And the large fire in the left corner of the

3   photograph, is that the dumpster fire that we've been talking

4   about?

5   A    Yes, ma'am.

6   Q    So, I want to move on to the PepperBall incident at 14th

7   and Broadway.  I believe it was your testimony that you were in

8   front of the group of protesters at the time you were struck

9   with PepperBalls?

10  A    Yes.

11  Q    The rest of the protesters were about 10 to 15 feet behind

12  you?

13  A    That's my best guess.

14  Q    And how many protesters in total were behind you?

15  A    I'm not sure.

16  Q    Again, sorry.  And I'm not going to hold you to a precise

17  number, but are we talking hundreds of protesters?  Are we

18  talking thousands of protesters?

19  A    Closer to 100 or less.  I'm not great with number

20  estimations.

21  Q    I'm not either.  It's fair.  And you would agree with me

22  that since you were in front of the other protesters, that you

23  couldn't see necessarily everything that was taking place behind

24  you regarding the other protesters?

25  A    Sure.

20-cv-1878-RBJ    KATHERINE HOLLIS LYMAN - Cross    03-18-2022

1  Q    So, you would agree with me that the individuals behind you

2  may have thrown projectiles, and you may not have seen them?

3  A    No.  They would have had to pass me to be even anywhere

4  near officers.  And I saw nothing thrown.

5  Q    So, it's your testimony that even though the rest of the

6  protesters were behind you, had they thrown something, you would

7  have been aware of that?

8  A    Probably, yes.

9  Q    You would also agree with me that it's harder to discern a

10  projectile such as a rock at nighttime?

11  A    I think that depends on what the lighting situation is

12  like, but potentially.

13  Q    And why don't you tell me about the lighting situation

14  where you were in the Veterans Park area.  Or, sorry.  You were

15  at 14th and Broadway?

16  A    Correct.  That's right next to the Colorado Supreme Court,

17  as I understand it.  So, there's lighting on the sidewalk, and

18  it's a roadway there, so it's sort of driving condition lights.

19  There's an intersection.

20  Q    And you can't identify the specific officer who shot the

21  PepperBall through the sign that struck you in the arm; correct?

22  A    No, I cannot.

23  Q    And the PepperBall left a bruise?

24  A    Yes.

25  Q    And I'm assuming that bruise went away in a few days?

20-cv-1878-RBJ    KATHERINE HOLLIS LYMAN - Cross    03-18-2022

1    A    It took a little longer than that, but yes.

2    Q    How long?

3    A    I'm not sure.  If you've ever had someone take your blood

4    and accidentally blow the vein, it looked a lot like that.  It

5    was quite large, and maybe closer to two weeks or so.

6    Q    And you didn't take any photographs of that bruise;

7    correct?

8    A    No.  I saw no reason to.

9    Q    Sorry.  What was that?  I didn't mean to cut you off.

10    A    I saw no reason to.

11    Q    And was it your testimony you also got sick that night from

12    inhaling some pepper spray?

13    A    Correct.  I think it was from swallowing it.

14    Q    And you didn't seek any medical attention that evening

15    either for the PepperBall bruise or from inhaling pepper spray

16    and getting sick as a result?

17    A    That's correct.  I think it's really important that we

18    remember that this was the depths of COVID.  People were

19    literally dying in the hospital.  There's no vaccine in sight.

20    So, it wasn't a real option unless you had a life-threatening

21    emergency to even go to the urgent care.  If the same thing

22    happened to me today, I absolutely would have gone to urgent

23    care.

24    Q    Understood.  But my question was you did not seek any

25    medical attention for the injuries you received on May 29th?

20-cv-1878-RBJ    KATHERINE HOLLIS LYMAN - Cross    03-18-2022

1   Yes or no.

2   A    Correct.  Due to the context I just gave.

3   Q    Okay.  So, moving on to May 30th, you protested this day as

4   well?

5   A    Yes.

6   Q    And we went over some of the equipment that you had on

7   May 29th, the goggles, the masks.  Did you have all that same

8   equipment with you on May 30th?

9   A    I did.

10  Q    Did you have any additional equipment?

11  A    I also had a backpack this day.

12  Q    And what was in the backpack?

13  A    Water and some more masks.  I also think I may have brought

14  additional goggles for Alyssha.

15  Q    So, you brought another pair of snowboarding goggles?

16  A    They were swim goggles that I purchased.  I also remember

17  bringing her long pants, the ones that got ripped.

18  Q    And the masks you mention on this date, were those again

19  COVID masks, or were those gas masks?

20  A    Those were COVID masks.

21  Q    I'm sorry.  I didn't hear that.

22  A    Sorry.  I didn't own a gas mask.

23  Q    So, on this day, the day being May 30th, you arrived around

24  3:00 p.m.?

25  A    Yes.

20-cv-1878-RBJ   KATHERINE HOLLIS LYMAN - Cross   03-18-2022

1  Q    And it was your testimony that you protested from 3:00 p.m.

2  to 8:00 p.m. without any issues?

3  A    I protested from 3:00 to about 6:00 or so, and then went

4  and got dinner, and then returned closer to 8:00 p.m., and did

5  not experience any personal issues with police at that time.

6  Q    Between 3:00 p.m. and 6:00 p.m.?

7  A    Correct.

8  Q    And at some point between 3:00 p.m. and 8:00 p.m., you

9  received an alert on your phone notifying you about the City's

10  emergency curfew order; correct?

11  A    It was on our way back from dinner.  So, it was closer to

12  like 7:30 that we received it, yes.

13  Q    And was that the first time you learned of the City's

14  emergency curfew order, or did you know of it previously?

15  A    That was the first time.

16  Q    And did you -- strike that.  You didn't go home after

17  receiving that text message alert; correct?

18  A    Correct.

19  Q    And instead, you along with a group of other protesters

20  barricaded yourselves behind a large amount of fencing and

21  whatnot on Lincoln Street; correct?

22  A    We erected a barrier, yes.  It was largely symbolic to

23  create space so that we could try to safely protest.  As you saw

24  in the video, it was very easy to walk around.

25  Q    You would agree with me that was a pretty big barrier we

20-cv-1878-RBJ   KATHERINE HOLLIS LYMAN - Cross   03-18-2022

1  saw in the video?

2  A    I don't know what you mean by big, but it reached across

3  the street, which was the intention, yes.

4  Q    So, it went from one end of Lincoln Street all the way to

5  the other end of Lincoln Street; correct?

6  A    Widthways, yes.

7  Q    And Lincoln Street is a four-lane street; correct?

8  A    Yes.

9  Q    And just looking at things that I saw in the video, the

10  barricade had some cones, some fencing, some signs?

11  A    Yes.

12  Q    And you helped construct that barricade?

13  A    I moved one piece of fencing about two feet to the right.

14  Q    And you did that to help ensure that the barricade reached

15  all the way across Lincoln?

16  A    Correct.

17  Q    And you would agree with me that barricades are inherently

18  confrontational?

19  A    No.

20  Q    You wouldn't agree with that?

21  A    No.  There was no violence in creating a barrier.

22  Q    And the purpose of the barricade in this case was to keep

23  the police from enforcing the curfew?

24  A    No.  As I said, you could have easily walked around it.  It

25  was an attempt to create safe space so that we would not be

20-cv-1878-RBJ    KATHERINE HOLLIS LYMAN - Cross    03-18-2022

1  attacked.

2  Q    And you remember on direct examination when your counsel

3  asked you about a social media post that you had made to

4  Instagram regarding the barricade?

5  A    Yes.

6  Q    And in that post, you write, we barricaded ourselves with

7  fencing away from the police to resist the 8:00 p.m. curfew

8  placed so the protesters could corral and arrest protesters.  I

9  may have written that down wrong.  I'm guessing that the first

10 one was police instead of protesters?

11 A    Correct.

12 Q    Okay.  But you recall posting that to Instagram?

13 A    Yes.

14 Q    And in addition to the phone notification, you would agree

15 that there were numerous loudspeaker announcements prior to the

16 police actually marching down Lincoln Street?

17 A    I heard one very loud announcement -- I'm not sure where it

18 came from -- at some point announcing the curfew.

19 Q    And about how many people were in the crowd behind the

20 barricade?  Again, not holding you to exact numbers.  I know

21 you're not a numbers person.  That's fine.

22 A    Many people chose to leave at the curfew.  So, it was a

23 smaller number, but I would say maybe 100 to 300 at a maximum.

24 Q    And I want to make sure that I understand your location.

25 And I understand that your counsel showed you, I think a

20-cv-1878-RBJ   KATHERINE HOLLIS LYMAN - Cross   03-18-2022

1   screenshot of a video, and you circled yourself.  And my

2   understanding of where you pinpointed yourself is that you were

3   closer to the barricade?

4   A    Yes.

5   Q    Was there anybody in front of you?

6   A    No.

7   Q    And then you circled yourself closer to the Capitol Hill

8   side of the street?

9   A    Correct.

10  Q    How close were you to the sidewalk on the Capitol Hill

11  side?

12  A    I think I might have been standing on the sidewalk or just

13  off of it.

14  Q    And it was your testimony on direct examination that the

15  crowd was scared?

16  A    Yes, ma'am.

17  Q    And you would agree with me that there were numerous

18  fireworks that went off in the minutes prior to the police

19  marching down Lincoln Street?

20  A    I'm not sure about that.  We arrived pretty close to 8:00.

21  I did see fireworks occasionally at the protest.

22  Q    How long were you standing there before the police marched

23  down Lincoln?

24  A    Maybe five, ten minutes, is the maximum.

25  Q    And you testified that you did observe some protesters

20-cv-1878-RBJ    KATHERINE HOLLIS LYMAN – Cross   03-18-2022

1   throw firecrackers and water bottles; correct?

2   A    Plastic water bottles, yes.  But not at that time.  This

3   was just during the protest.  There was someone who tried to

4   throw a plastic water bottle, and we stopped them.

5   Q    So, when you saw the person try to throw the water bottle,

6   you said, hey, don't do that?

7   A    Yes.

8   Q    And did they stop?

9   A    They did.

10  Q    So, other than the person that you instructed to stop, did

11  you see any other water bottles tossed?

12  A    At that time, no.

13  Q    At that time.  Did you see water bottles thrown at a

14  different time?

15  A    I saw water bottles thrown at different times, yes.

16  Q    Okay.  And which of the incidents that we've talked about

17  have you seen water bottles being thrown?

18  A    It's hard to remember exactly what incidents, but in my

19  recollection, things like plastic water bottles got thrown at

20  officers after officers either started PepperBalling or throwing

21  gas at us.

22  Q    And you don't know the contents of those water bottles you

23  saw thrown; correct?  You don't know if they're filled with ice

24  or water or urine?

25  A    That's correct.

20-cv-1878-RBJ    KATHERINE HOLLIS LYMAN - Cross    03-18-2022

1   Q    And you would agree with me that throwing water bottles at

2   police officers is not a peaceful protest activity?

3   A    I think because it was often in response to chemical

4   munitions, that it's hard to see it as a violent action.  It's

5   not something I ever engaged in, but it's hard to see it as

6   violent.

7   Q    So, if -- I just want to make sure I understand.  So, was

8   your opinion of people throwing water bottles at police

9   officers, it was okay because it was in response to something

10  that the police did?

11  A    I never said it was okay.  I just said that that is what

12  happened.

13  Q    But you don't condone it?

14  A    I never personally engaged in it.

15  Q    But my question was you don't condone it?

16  A    I'm not quite sure how I feel about other people's actions,

17  because they are not my own.  I can say I never engaged in it,

18  and it is also not entirely my business to tell other people how

19  to protest unless it puts the safety of somebody at risk, and I

20  do not believe that throwing plastic water bottles put the

21  safety of officers or protesters at risk.

22  Q    So, it's your testimony that it's not your position, or it

23  wasn't your role to tell other people how to protest?

24  A    Sometimes.  Unless it put somebody at risk.

25  Q    Okay.  And in that situation, it wasn't your position to

20-cv-1878-RBJ    KATHERINE HOLLIS LYMAN - Cross    03-18-2022

1   tell the people to stop throwing water bottles, because that was

2   their form of protest?

3   A    Sometimes.  We did tell people to stop throwing water

4   bottles when it felt like it was incorrect to do, meaning that

5   as an instigation, we stopped people throwing water bottles.

6   Q    And you also mentioned seeing firecrackers.  How many

7   firecrackers did you see?

8   A    I recall seeing one.  It didn't hit an officer, but it was

9   thrown into that awkward no man's land between protesters and

10  officers.

11  Q    So, the firecracker was thrown from the protesters towards

12  the police?

13  A    Yes.

14  Q    And you would agree with me that that's also not a peaceful

15  protest activity?

16  A    I think I would give the same answer.  It never hit an

17  officer, and I don't see it as violence.  Officers who are fully

18  outfitted in riot gear and had face shields.

19  Q    So, going back to the water bottle situation and applying

20  that to the current firecracker situation, am I to understand

21  that again, you didn't view it as your role to tell other people

22  how to protest, and in that instance they were protesting by

23  throwing firecrackers?

24  A    If I had seen someone attempting to throw a firecracker and

25  I felt that it was unsafe to do so, I would have stopped them.

20-cv-1878-RBJ   KATHERINE HOLLIS LYMAN - Cross   03-18-2022

1  I never actually saw someone in time to stop them.  I saw the

2  result of someone throwing one.

3  Q    So, in this instance on Lincoln Street, prior to the police

4  marching down, you saw somebody throw firecrackers, and you

5  didn't tell them to stop?

6  A    No.  I did not see anybody throw firecrackers at that time.

7  Other points during the protest, I did.

8  Q    And it was your testimony that the police approached both

9  down Lincoln as well as coming down Capitol Hill?

10  A    Yes.

11  Q    And that they threw gas canisters, flash-bangs, and

12  PepperBalls?

13  A    Yes.

14  Q    And again, you haven't received any formal law enforcement

15  training in terms of recognizing a flash-bang versus a firework

16  or firecracker?

17  A    I have not received any formal training in that, but they

18  look quite different.

19  Q    You weren't hit with any flash-bangs at this location;

20  correct?

21  A    Yes, I was.

22  Q    You were hit with a flash-bang at this location.  I believe

23  your testimony was your friend was hit with a flash-bang at this

24  location?

25  A    With the shrapnel.  She was hit with the shrapnel, but it

20-cv-1878-RBJ    KATHERINE HOLLIS LYMAN - Cross    03-18-2022

1   exploded over our heads, and I would consider that being hit

2   with a concussion grenade or whatever it was, flash-bang,

3   because I don't think the intention is to actually hit you with

4   the canister.

5   Q    So, my question is did anything from the flash-bang

6   physically hit your person?

7   A    No.

8   Q    And you weren't hit with any PepperBalls at this location;

9   correct?

10  A    No.

11  Q    So, your injury was inhaling gas and being disoriented from

12  the flash-bang?

13  A    Disoriented and damage to my hearing, yes.

14  Q    And you've sat in for numerous days of this trial?

15  A    Yes, ma'am.

16  Q    And you're aware that the Colorado State Patrol patrols the

17  capitol, the capitol grounds, and Veterans Park; correct?

18  A    Along with DPD, yes.

19  Q    And you're also aware that there were other law enforcement

20  agencies who were assisting the Denver Police Department with

21  its response to the George Floyd protests?

22  A    I am now, yes.

23  Q    And you're in part aware of that because you're part of a

24  lawsuit in which the City of Aurora has been named as a

25  defendant?

Kevin P. Carlin, RMR, CRR

20-cv-1878-RBJ   KATHERINE HOLLIS LYMAN - Cross   03-18-2022

1  A    I don't think so.  I'm just part of this lawsuit.

2  Q    You're not aware that Aurora is named in your lawsuit?

3  A    In this lawsuit?

4  Q    Yes.  Are you aware of that?

5  A    I am now.  There was a split that happened between some of

6  the plaintiffs who have injuries from Aurora, and I'm not sure

7  entirely how that worked.

8  Q    As you sit here today, you don't know if the police officer

9  who threw the flash-bang or the gas canister that affected you

10 was a Denver Police Department officer, a Colorado State Patrol

11 officer, or from some other agency?

12 A    That's correct.  As you identified, I was disoriented.

13 Q    And you recovered your hearing from the flash-bang after a

14 few days?

15 A    After a few days, yes.

16 Q    And that was a full recovery; right?

17 A    I think so.  No one has told me I have bad hearing yet.

18 Q    Fair.  Okay.  So, moving on, you were then PepperBalled in

19 the area of 14th and Grant?

20 A    Yes, ma'am.

21 Q    And you don't --

22 A    13th and Grant.  Sorry.

23 Q    13th and Grant?

24 A    Yes, ma'am.

25 Q    Thank you.  And you don't have any photos of the bruises

20-cv-1878-RBJ   KATHERINE HOLLIS LYMAN - Cross   03-18-2022

1  from those injuries; correct?

2  A    Some of the PepperBalls hit me in a backpack that I was

3  wearing, but one of them hit me in the back of the neck, and I

4  do not have a picture of that.

5  Q    So, my understanding is it was three PepperBalls that hit

6  you?

7  A    Correct.

8  Q    So, am I understanding that two hit your backpack and one

9  hit the back of your neck?

10  A    Yes, ma'am.

11  Q    And you don't have a photo of the one that actually hit the

12  back of your neck?

13  A    No, ma'am.

14  Q    And understanding that you were facing away from the

15  officers at the time that you were struck with PepperBalls, were

16  you ever able to turn around and get a good view of the officer

17  who struck you?

18  A    I'm not sure how I would have done that.  There were about

19  30 officers there in their full riot outfits.  Nobody raised

20  their hand after they shot me and said, it was me.  There would

21  have been no way for me to see that.

22  Q    So, fair enough.  So, you don't know, again, the identity

23  of the officer who fired the PepperBalls?

24  A    Yes, ma'am.

25  Q    And you attended the protest on dates following that

20-cv-1878-RBJ    KATHERINE HOLLIS LYMAN - Cross    03-18-2022

1   May 30th we were just discussing?

2   A    I believe so.  That was Saturday.

3   Q    You attended -- I believe your testimony was you attended

4   seven days, you took a break, and then you attended some

5   additional days of the George Floyd protests?

6   A    Yes.  Several weeks.

7   Q    And you are not claiming any injuries following May 30th?

8   A    Correct.

9   Q    It's my understanding that one of the nights you were at

10  the protest, so either May 28th, 29th, or 30th, you observed

11  individuals throwing things at cars and saw some evidence of

12  cars being destroyed; correct?

13  A    Yes, ma'am.  I saw someone throw a rock at an empty police

14  vehicle, and I did see evidence of destroyed cars.

15  Q    Do you recall what -- strike that.  So, you saw a police

16  car being damaged, and then you saw some damage to some other

17  cars?

18  A    Correct.

19  Q    Did you make those observations all on the same night, or

20  were those different nights?

21  A    That's a good question.  I'm not quite sure.

22  Q    Approximately how many cars did you see with damages?

23  A    Between five and ten.  Some ranged from like a dent in the

24  sides, or their windshields were cracked.

25  Q    So, some had dents; some had broken windows?

20-cv-1878-RBJ    KATHERINE HOLLIS LYMAN - Cross    03-18-2022

1   A    Mm-hmm.

2   Q    And going back to the police car, with respect to that

3   incident, you actually saw the individuals taking action against

4   the police car that caused damage?

5   A    I saw one person throw a rock at the empty police vehicle,

6   yes.

7   Q    And you believed that the rocks being thrown at the car

8   were from the transit center; correct?

9   A    I have no idea.

10  Q    Do you recall being deposed in this case?

11  A    Yes, ma'am.

12  Q    And that took place around July 2021?

13  A    Sure.

14  Q    Sorry.  And you swore to tell the truth in that deposition;

15  correct?

16  A    Yes, ma'am.

17  Q    And do you recall testifying you saw people throw things at

18  cars, and you believe the rocks were from the transit area?

19  A    Sure.

20       MS. HOFFMAN:  It is 101, line 23 to 25.  101, 23 to

21  25.  That's not it.  Let's try again.  102, one through five.  I

22  don't see it there either, so I'm going to move on.

23  Q.   (By Ms. Hoffman) Did you tell the person that you saw

24  throwing rocks at the police car to stop?

25  A    I did after I saw them throw it.  It was too late of when

20-cv-1878-RBJ    KATHERINE HOLLIS LYMAN - Cross    03-18-2022

1    they were throwing it to stop them from that incident, but they

2    didn't throw anything after that.

3    Q    Okay.  So, you saw the person throw a rock at the police

4    car.  You told them to stop.  They stopped?

5    A    Yes.

6    Q    And did you call the police to report what you saw?

7    A    No.

8    Q    Okay.  And you were a criminology major in college;

9    correct?

10   A    Yes, ma'am.

11   Q    So, you understand that throwing rocks at a police car, or

12   really any car for that matter, is a crime?

13   A    Yes, ma'am.

14   Q    Did you photograph or video what you saw?

15   A    No, ma'am.

16   Q    And additionally, you observed lots of buildings with all

17   sorts of property damage, including graffiti and broken windows

18   over the course of the protest; correct?

19   A    Yes, ma'am.

20   Q    Tell me where you saw this damage.

21   A    I think it has been elucidated in this court.  It was quite

22   widespread in some places, but it was also very hard to tell

23   what was damaged and what was just boarded up to prevent any

24   damage.  So, I'm not sure.  There was graffiti on the capitol

25   and graffiti on the courthouse.  Sorry.  Not the courthouse.

20-cv-1878-RBJ   KATHERINE HOLLIS LYMAN - Cross   03-18-2022

1  The Supreme Court that's over there, or whatever that is, right

2  next to the capitol on some of the statues, things like that.

3  Q    So, you saw some property damage to some City and State

4  buildings; correct?

5  A    Yes.

6  Q    Did you see any of this tagging or broken windows in the

7  16th Street Mall area?

8  A    I recall seeing that at some point.  I think either during

9  a march or maybe when I was walking by.  But most of those

10 businesses were boarded up I think as a preventive measure.

11 Q    And you agree with me that destroying property is not a

12 peaceful protest activity?

13 A    I think that's difficult.  I think that property damage is

14 a small price to pay for people exercising their constitutional

15 rights, and sometimes that is part of a protest.  It did no

16 damage to humans.

17 Q    So, you believe that people protesting have a right to

18 break windows?

19 A    I did not say that.

20 Q    Okay.  Do you believe that that's okay, though?

21 A    I don't believe that it's okay.  It's not something that I

22 engaged in, necessarily, but again, I think it was done by very

23 few people who were at the protest.  Whether they were

24 protesters or not was hard to know.  But I think acts like that

25 by a minute few does not justify the use of chemical munitions

20-cv-1878-RBJ   KATHERINE HOLLIS LYMAN - Cross   03-18-2022

1  against everyone.

2  Q     And as you sit here today, you have no idea of the numbers

3  of people who were actually involved in property destruction?

4  A     No.  But I have seen the arrest record in this court, and

5  it was very small.

6  Q     And you understand that not everybody who actually engaged

7  in property destruction was located and apprehended; correct?

8  A     Yes, ma'am.

9  Q     And in addition to seeing evidence of actual property

10 destruction, you yourself witnessed an individual breaking a

11 window?

12 A     A car window, yes.

13 Q     A car window.  You didn't witness any building windows

14 being broken?

15 A     I don't recall that, but I might have.

16 Q     And as you sit here today, you don't believe police

17 departments serve anyone; correct?

18 A     I don't think I said that.  I think in my deposition, which

19 I believe is what you're referring to, is that police forces --

20 I no longer believe police forces serve anyone, and I was

21 comparing that to my prior belief that police forces did not

22 serve Black and Brown people.  And I still believe that to be

23 true.  After what I experienced at the George Floyd protests, I

24 no longer believe that police forces serve any person, despite

25 color of skin, age, sex, gender.

20-cv-1878-RBJ    KATHERINE HOLLIS LYMAN - Cross    03-18-2022

1    Q    You didn't miss any time off from work during the protests;

2    correct?

3    A    That's correct.

4    Q    And you didn't receive any professional medical treatment

5    for any injuries received over any of the nights we discussed,

6    May 28th through May 30th?

7    A    Correct.  For the same context I gave before.

8    Q    And you never filed any complaint with the Denver Police

9    Department or with the City of Denver relating to any of the

10   allegations that we've discussed here today?

11   A    I did not believe that that would be fruitful, and I

12   believe that me being in court here today is officially filing

13   my complaint.

14   Q    And you worked for a police department before?

15   A    Yes, ma'am.

16   Q    And how long in total did you work for The Ohio State

17   Police Department?

18   A    I'm not sure.  My internship was about a year, and then I

19   worked for them full-time for about a year after that, I

20   believe.

21   Q    So, about two years, approximately?

22   A    I think so.

23   Q    So, you're well aware that police departments have internal

24   affairs departments that process complaints?

25   A    Yes, ma'am.

20-cv-1878-RBJ   EDWARD MAGUIRE, PhD - Direct   03-18-2022

1    Q    And instead of filing a complaint, you filed this lawsuit?

2    A    Sort of.  It's been -- it wasn't instead of, necessarily.

3    I didn't think it would be fruitful to file an internal

4    investigation, and I was asked to join this lawsuit after what

5    happened to me, and agreed to do so.

6              MS. HOFFMAN:  I have nothing further.

7              THE COURT:  All right.  Redirect?

8              MS. BAILEY:  No further questions, Your Honor.

9              THE COURT:  Any questions from the jurors?  I don't

10   see any.  All right.  Thank you.

11             THE WITNESS:  Thank you, Your Honor.

12             THE COURT:  We have one more witness?

13             MR. MACDONALD:  We do, Your Honor.  Plaintiffs call

14   Dr. Ed Maguire to the stand.

15        (The Witness is Sworn)

16             THE COURT:  All right.

17                        **DIRECT EXAMINATION**

18   BY MS. STERK

19   Q    Professor, can you please state your name for the record.

20   A    Edward R. Maguire.

21   Q    And what is your current job?

22   A    I'm a professor of criminology and criminal justice at

23   Arizona State University in Phoenix.

24   Q    And does that involve both teaching and research?

25   A    Yes, it does.

20-cv-1878-RBJ   EDWARD MAGUIRE, PhD - Direct   03-18-2022

1   Q      How long have you been a professor at ASU?

2   A      For six years.

3   Q      Can you tell us a little bit about your education.

4   A      I have a PhD in criminology -- sorry, PhD in criminal

5   justice, a master's in criminal justice, and an undergraduate

6   degree in criminal justice.

7   Q      And where is your degree in criminal -- or your PhD in

8   criminal justice from?

9   A      From the State University of New York at Albany.

10  Q      Did you write a dissertation for your PhD?

11  A      Yes, I did.

12  Q      And what was that on?

13  A      It was a study of American police organizations.

14  Q      After you got your PhD, where did you work?

15  A      After I got my -- well, while I was still working on my

16  PhD, I worked at the crime prevention and criminal justice

17  branch at the United Nations in Vienna, Austria.  From there I

18  went to the U.S. Department of Justice in Washington, D.C.  And

19  then from there I began my academic career where I worked at

20  three universities prior to my current one.

21  Q      And what did you do while you were at the Department of

22  Justice?

23  A      I worked for the Office of Community Oriented Policing

24  Services, which was charged with trying to basically spread

25  police innovation throughout the United States.

20-cv-1878-RBJ    EDWARD MAGUIRE, PhD - Direct    03-18-2022

1   Q     When did you start teaching criminology and criminal

2   justice?

3   A     In 1996, I believe.

4   Q     And as a professor in criminology and criminal justice,

5   what does your work focus on?

6   A     I focus primarily on two topics, on policing and on

7   violence, and then the intersection between those two topics.

8   Q     And in the last -- in recent years, has your work focused

9   on policing of crowd events and protests?

10  A     Yeah.  I've been working on that topic for about a decade

11  now.

12  Q     And does that include the psychology of crowds as it

13  relates to police actions and protests?

14  A     Yes, it does.

15  Q     And can you tell us a little bit more about what type of

16  work you've done in that area.

17  A     Well, it started during the Occupy movement in 2012, where

18  we did interviews and surveys with protesters in multiple

19  cities.  And then from there we got a grant from the justice

20  department to go out and do a nationwide study.  I had looked at

21  it from the side of protesters.  We wanted to see the other

22  side.

23          So, we went out and worked with police departments

24  around the country to understand from their perspective, you

25  know, what had gone right, what had gone wrong, what kind of

20-cv-1878-RBJ   EDWARD MAGUIRE, PhD - Direct   03-18-2022

1   lessons were learned.  That was the main project.  Since then we

2   have continued to kind of do both sides of that, like working

3   with police departments, but also surveying and interviewing

4   protesters, and then lots of observations of protests in person.

5   Q    And did you write a guidebook relating to policing of

6   protests?

7   A    Yes, I did.

8   Q    Can you tell us a little bit about that guidebook.

9   A    Yeah.  So, based on that national study that we did of

10  police agencies where we were really trying to focus on, you

11  know, when we went around to the different police departments,

12  what lessons did they learn from the Occupy movement?  What went

13  right?  What went wrong?  What would you have done differently?

14       And then combining that with, there's a long history of

15  research on crowd psychology, on understanding how crowds

16  function, how they think, how they behave, and in particular,

17  how they interact with police departments.

18       And so that guidebook really represented kind of the

19  joint product of what we've learned from crowd psychology and

20  what I learned from those police departments that we studied.

21  Q    And where did you get the funding to publish that

22  guidebook?

23  A    From the U.S. Department of Justice.

24  Q    And was that -- who was the guidebook given to?

25  A    It was distributed to all of the largest police departments

20-cv-1878-RBJ    EDWARD MAGUIRE, PhD - Direct    03-18-2022

1  in the -- I think it was every police department in the country

2  that had 100 or more officers.  And then internationally to

3  police agencies in English-speaking countries.

4  Q    And when was that guidebook published?

5  A    I think it was January of 2020.

6  Q    Have you written articles on the policies and practices

7  relating to policing protests and crowd events?

8  A    Yes.

9  Q    Approximately how many do you think you've written?

10  A    I'm guessing here, but probably 12.  Twelve or so.

11  Q    And are you part of the Police Executive Research Forum?

12  A    I'm a -- I serve at a pro bono capacity as chair of their

13  research advisory board, yes.

14  Q    And what is the Police Executive Research Forum?

15  A    It's a membership organization of police leaders that

16  focuses on basically spreading best practices, testing police

17  strategies, and basically just a kind of a nucleus for police

18  innovation.

19  Q    And that group includes people who actually work in police

20  departments?

21  A    Almost exclusively people who work in police departments.

22  Yes, ma'am.

23  Q    And you are also a researcher for something called

24  CrimeSolutions.gov; is that right?

25  A    Yes.

20-cv-1878-RBJ   EDWARD MAGUIRE, PhD - Direct   03-18-2022

1  Q     What is that?

2  A     So, CrimeSolutions.gov is an effort by the U.S. Department

3  of Justice to take all of the research evidence that we know

4  about in criminal justice and criminology and make it available

5  at a user friendly way to criminal justice agencies.  So, police

6  departments, correctional agencies, and various other entities.

7  And so I served as the lead researcher for anything in

8  CrimeSolutions.gov that pertains to law enforcement and

9  policing.

10  Q     Have you also consulted for police departments about their

11  policies and trainings related to protests or crowd events?

12  A     Yes, I have.

13          MS. STERK:  At this time, the plaintiffs tender

14  Dr. Maguire as an expert under Rule 702 concerning police

15  training, policies, and practice for crowd events and protests.

16          MR. RINGEL:  No objection.

17          THE COURT:  Okay.

18  Q.     (By Ms. Sterk) Professor, what did you review to learn

19  about DPD's training practices and responses relating to the

20  George Floyd protest?

21  A     So, official documents like the crowd management manual,

22  the operations manual, training materials.  So, the materials

23  used by the DPD to train its officers in this area.  I reviewed

24  a lot of depositions, OIM memos, some videos, and some radio

25  traffic.

20-cv-1878-RBJ    EDWARD MAGUIRE, PhD - Direct    03-18-2022

1    Q    And during the course of your evaluation for this case, did

2    you receive everything that you believed you needed to support

3    the opinions that you will be talking about today?

4    A    I received everything I requested.  Some of the materials

5    were redacted, so I wouldn't be able to comment on the redacted

6    portions of what I reviewed, but with that exception, I received

7    everything I requested.

8    Q    And you wrote several reports detailing your conclusions in

9    this case that was provided to the defendants; is that right?

10   A    Yes, I did.

11   Q    So, I want to go through your opinions.  What is your

12   overall opinion about DPD's written guides or policies?

13   A    I found that the written guides and policies pertaining to

14   crowd control and crowd management were really only available

15   sort of in paper form.  I didn't see them as being consistent

16   with either the training materials that I reviewed -- they were

17   sort of loosely connected.  And then the actual practices that I

18   observed in the videos that I watched were sort of inconsistent

19   with those written guides and policies.

20   Q    So, the written guides and policies that DPD had were

21   different than -- on paper than what you saw in practice, both

22   in training and during the protests?

23   A    Yes.

24   Q    I want to back up a little bit.  All police departments

25   have policies that are meant to govern the actions of officers;

20-cv-1878-RBJ   EDWARD MAGUIRE, PhD - Direct   03-18-2022

1   is that right?

2   A    Yes.

3   Q    And what's the purpose of having policies within a police

4   department?

5   A    To help officers and other employees understand what types

6   of behavior are permissible, and to provide them with some

7   guidance on how to behave when performing their day-to-day

8   duties.

9   Q    And from what you reviewed, how much discretion did DPD

10  give to its officers to determine what actions were acceptable?

11  A    I felt like in the crowd control context, it gave a wide --

12  a wide degree of discretion.

13  Q    And was the degree of discretion you saw given to officers

14  in the DPD broader than what you would commonly see?

15  A    Yes.  I thought the officers were given much more latitude

16  than what I would ordinarily expect to see.

17  Q    And is it your opinion that the broad discretion that

18  officers were given contributed to the practices of DPD officers

19  being different than what was actually written down in the

20  manuals?

21  A    Yes, ma'am.

22  Q    And I want to talk a little bit about DPD's planning for

23  the protests.  Is it your opinion that DPD failed to adequately

24  plan for the protests?

25  A    Yes, it is, ma'am.

20-cv-1878-RBJ   EDWARD MAGUIRE, PhD - Direct   03-18-2022

1   Q    George Floyd was killed on May 25th; right?

2   A    Yes.

3   Q    And the next day, there were massive protests in

4   Minneapolis?

5   A    Yes.

6   Q    What should police departments in major cities like Denver

7   have done or been doing when they first learned about George

8   Floyd's killing and the Minneapolis protest?

9   A    Well, I think, you know, this was a pretty cataclysmic

10  event in the United States, and we've had a Black Lives Matter

11  movement that's been very mobilized very heavily over the past

12  decade.  There were also protests in many other cities

13  immediately after the death of George Floyd, and so I think

14  police leaders in any major American city would be expecting

15  protests.

16          You know, like we always say, you hope for the best,

17  and you plan for the worst.  So, you're hoping that you won't

18  face any major events, but if those events happen, that you've

19  prepared properly for them, that you've planned.

20  Q    And in your review, what did DPD do between May 25th and

21  the afternoon of May 28th to prepare for protests in Denver?

22  A    In the materials that I reviewed, I didn't see any evidence

23  of preparation for those events.

24  Q    And have you reviewed any materials from the OIM relating

25  to the George Floyd protests?

20-cv-1878-RBJ    EDWARD MAGUIRE, PhD - Direct    03-18-2022

1   A    Yes, I have.

2   Q    And did you review a memo in which Lieutenant Lovato said

3   that DPD was caught with their pants down and had a mentality

4   that George Floyd's death and the resulting protests were

5   occurring far away and would not affect Denver?

6   A    Yes, I did.

7   Q    Is it surprising to you that DPD thought that the protests

8   and events elsewhere wouldn't affect Denver?

9   A    Yes.

10  Q    Why is that?

11  A    We've learned in the United States that protests tend to

12  spread.  We saw the massive spread of protests during the Occupy

13  movement in 2011 and 2012.  We saw massive spread of Black Lives

14  Matter protests in the aftermath of the death of Michael Brown

15  in Ferguson in 2014 and several other events.  And so, you know,

16  I think the precedent is there to expect that when a major event

17  like this happens, certainly to be ready for it, and to be

18  planning for it, just in case.

19  Q    And in terms of being ready, what is it that Denver could

20  have been doing between May 25th and May 28th to prepare for the

21  protests?

22  A    I think there are a lot of things that could have been

23  happening.  I mean, there's just the basic criminal intelligence

24  function of, you know, I mentioned in my guidebook like you

25  shouldn't be surprised at what lands on your doorstep.  You

20-cv-1878-RBJ    EDWARD MAGUIRE, PhD - Direct    03-18-2022

1    should be basically doing your homework.

2            So, part of that is the criminal intelligence function

3    in police departments, just mining all of their usual sources to

4    try to figure out, is there anything coming our way?  What might

5    we expect?  The other thing is, you know, quite simply just

6    reaching out to people in your own community, reaching out to

7    Black Lives Matter activists, reaching out to other social

8    justice groups, reaching out to the African American faith

9    community, reaching out to anybody who might be able to help you

10   understand what's coming, and to help you plan appropriately for

11   it.

12   Q    And we heard from Commander Phelan that the DPD did reach

13   out to some community leaders, and that they didn't get a

14   response.  So, how could or should DPD have gotten information

15   in light of not receiving a response from some of those groups?

16   A    I mean, this is -- this is a moment where you really need

17   to capitalize on all the work you've done over the years in

18   cultivating relationships with your community.  You know, to

19   make a phone call and not get a response, you don't just stop

20   there.  You rely on all of those relationships that hopefully

21   you've spent a lot of time and energy building over the years,

22   and then essentially capitalizing on those relationships in a

23   moment where you really need them.

24   Q    And have you seen evidence that the Denver Police

25   Department was creating those relationships in advance -- well

20-cv-1878-RBJ   EDWARD MAGUIRE, PhD - Direct   03-18-2022

1  in advance of the protest to be in a position to do that?

2  A    I didn't see any indication of that in the materials that I

3  reviewed, ma'am.

4  Q    And why is failing to put plans in place in the few days

5  prior to the protest or before, why is that a problem?

6  A    Well, police departments, much like any of us as human

7  beings, they're not at their best when they're surprised.

8  They're not at their best when they're trying to kind of

9  mobilize at the last minute to try to put things together.  You

10  know, police departments are at their best when they are able to

11  plan things out, to think about the various considerations, to

12  build operational plans, to get their staff, their equipment,

13  and their supplies ready for whatever might be coming their way.

14  Q    So, we've talked about planning that DPD should have been

15  doing prior to the protest.  Does part of the longterm planning

16  also involve making sure to train officers and supervisors well

17  in advance of facing events like this?

18  A    Yes, it does.

19  Q    And what is your opinion on DPD's training of its officers?

20  A    I can't comment on its training of its officers generally,

21  but on its training related to crowd control and crowd

22  management, I found the training to be deficient.

23  Q    And is one of the reasons that you found the training

24  deficient because the department didn't seem to put an emphasis

25  on training?

20-cv-1878-RBJ   EDWARD MAGUIRE, PhD - Direct   03-18-2022

1   A     Yeah.  Yeah.

2   Q     I'm going to put up Exhibit 861, which has already been

3   admitted.  And you said that you had reviewed OIM memos; right?

4   A     Yes, ma'am.

5   Q     And so what did John Coppedge -- Lieutenant John Coppedge,

6   a lieutenant in the training academy, have to say about DPD's

7   attitudes towards training?

8             MR. RINGEL:  Objection.  Hearsay.

9             THE COURT:  Well, in the first place, it's an admitted

10  exhibit.  So, overruled.

11            THE WITNESS:  So, this was a stunning statement,

12  because Lieutenant Coppedge was assigned to the DPD training

13  academy at the time.  And what he said, according to the OIM

14  memo, was that under the current chief of police, the prevailing

15  attitude is that training is not important.

16  Q.    (By Ms. Sterk) And did Lieutenant Coppedge also tell

17  Mr. Mitchell that trainings were not receiving organizational

18  support?

19  A     Yes.

20  Q     What's the problem with leaders at the top not mandating or

21  being supportive of training?

22  A     You know, policing is a human resource intensive industry,

23  and the skills that police officers possess are perishable

24  skills, and we need to not only initially train officers

25  appropriately on how to handle what they face on the street, but

20-cv-1878-RBJ   EDWARD MAGUIRE, PhD - Direct   03-18-2022

1   we need to refresh those skills on a routine basis to ensure

2   that they're prepared for whatever they encounter.

3   Q    And do you recall that there were other DPD officers who

4   also echoed what Lieutenant Coppedge's observations were about

5   DPD's attitude towards training?

6            MR. RINGEL:  Objection.  Leading.

7            THE COURT:  Sustained.

8   Q.    (By Ms. Sterk) What did you see, if anything, of what

9   other officers had to say about DPD's emphasis on training?

10  A    So, some of the OIM -- some of the people interviewed by

11  OIM indicated in those OIM memos points of view that were

12  consistent with what Lieutenant Coppedge said.

13  Q    Should training be emphasized above other resources within

14  police departments?

15  A    I think training is essential because in a -- you know,

16  policing is a life-or-death industry, both for officers and for

17  those who they interact with on the streets.  And, you know, in

18  such a high-stakes industry, ensuring that your workforce is

19  properly trained and trained to the best of your ability is

20  absolutely essential, and it needs to be prioritized.

21  Q    And I know within your opinion you have several reasons for

22  which -- or reasons for your opinion that DPD's training was

23  inadequate.  Is one of those that there was improper training on

24  crowd psychology?

25  A    Yes.

20-cv-1878-RBJ    EDWARD MAGUIRE, PhD - Direct    03-18-2022

1   Q    And what is crowd psychology?

2   A    Crowd psychology is simply the study of crowds, how they

3   think and behave.  It's been around for a century or more, but

4   what's most, I think, relevant for us today is for about the

5   past four decades, there has been just a lot of research,

6   hundreds of studies, about how crowds interact with police, and

7   it's a really practical body of research because we can derive

8   lessons from it that help police prepare more properly to handle

9   these types of events.

10  Q    And when it comes to protests, what does research show as

11  to how crowds react to the use of force by police?

12  A    It depends on what type of force the police are engaged in.

13  If the police are engaged in very focused use of force against

14  people who are engaging in property damage or violence, it tends

15  not to provoke much of a crowd reaction.  But if the police use

16  of force is highly indiscriminate, so that people who have not

17  committed any crime or people who have not been, you know,

18  ordered to disperse or leave the area, if those folks have force

19  used against them, a very common reaction we've seen in the

20  literature for the last 40 years is that crowds tend to fight

21  back and tend to get very angry, and they tend to sort of dig in

22  their heels.  Not everybody, but members of the crowd.  And so

23  what happens as a result is greater conflict, not lesser

24  conflict.

25  Q    So, indiscriminate use of force by police can actually

20-cv-1878-RBJ   EDWARD MAGUIRE, PhD - Direct   03-18-2022

1   cause crowds to become more volatile or violent than if lesser

2   non-force options are used?

3   A    Yes, ma'am.

4   Q    And why is it important for officers, police officers, to

5   understand the concepts of crowd psychology?

6   A    I think it's really -- it's really easy for police to

7   unknowingly trigger conflict and violence based on how they

8   behave when interacting with crowds.  And so if they have just

9   even an introductory understanding of what's known from the

10  field of crowd psychology, they can take caution to ensure that

11  their actions prevent violence as opposed to instigating or

12  escalating it.

13  Q    And you testified earlier that you had reviewed DPD's --

14  some of DPD's training.  When you looked through the training

15  materials, how much information was there -- or training was

16  there that you saw on crowd psychology?

17  A    In the basic recruit training course, there was one slide,

18  and it really didn't cover anything meaningful, and it had some

19  incorrect information.  I mean, some outdated information that's

20  been long known from crowd psychology to be inaccurate.  And in

21  two other courses for supervisors and leaders, there was simply

22  none at all.

23         MS. STERK:  At this time I move to admit Exhibit 465,

24  which is DPD's crowd control recruit training, which has been

25  stipulated, I believe.

20-cv-1878-RBJ     EDWARD MAGUIRE, PhD – Direct     03-18-2022

1    MR. RINGEL:  No objection.

2    THE COURT:  It's admitted.

3  Q.    (By Ms. Sterk) So, we're currently showing one side of

4  the recruit training that you were just talking about.  You

5  reviewed this entire slide; is that correct?

6  A    That's correct.

7  Q    And it was about 125 pages?

8  A    Yes, ma'am.

9  Q    And this was the only slide in that 125 slides that related

10  to crowd psychology?

11  A    Yes, ma'am.

12  Q    In your opinion, is this slide a sufficient training for

13  recruits on crowd control, or on crowd psychology?

14  A    No, ma'am.

15  Q    Why not?

16  A    Well, it covers virtually none of the major concepts from

17  crowd psychology that would be important to police that would

18  assist them in formulating appropriate strategies.  And its

19  mention of contagion theories –– contagion theories have been

20  outmoded for decades now.  And typically contagion theories,

21  this is the idea that if you have one person in a crowd who is

22  kind of an agitator, that that person will unduly influence the

23  others in a crowd and kind of make them do similarly

24  inappropriate –– engage in similarly inappropriate behaviors.

25  And these theories have just been long –– long been disproven.

20-cv-1878-RBJ    EDWARD MAGUIRE, PhD - Direct    03-18-2022

1    I mean, 40 or 50 years ago.  And so it has no place in a police

2    training material.

3    Q     And what's the problem with having something like contagion

4    theories as part of the training on crowd psychology?

5    A     Contagion theories have been associated with indiscriminate

6    use of force against crowds, and so it's preferable to focus on

7    individual behavior, the individuals who are engaging in

8    violence or property damage.

9    Q     And you said that the leadership and supervisor trainings

10   that you reviewed didn't have any slides on crowd psychology; is

11   that right?

12   A     That's correct.

13   Q     With the training not focused on crowd psychology, what was

14   the focus, based on your review?

15   A     It was focused almost entirely on what officers should wear

16   at this event.  So, you know, protective equipment, commonly

17   thought of as riot gear.  It was focused on gas masks.  It was

18   focused on formations, which is, you know, the positions the

19   officers stand in at these types of events.  And it was focused

20   on the use of force.

21            MS. STERK:  At this time, I would move to admit

22   Exhibit 461, which is DPD's crowd leadership training.  Again, I

23   think it's stipulated as admissible.

24            MR. RINGEL:  No objection.

25            THE COURT:  Admitted.  I think it was already admitted

20-cv-1878-RBJ    EDWARD MAGUIRE, PhD - Direct    03-18-2022

1    anyway.

2              MS. STERK:  Even better.  Thank you.

3    Q.     (By Ms. Sterk) And is this one of the kind of sections of

4    the crowd management training that you looked at?

5    A    Yes, ma'am.

6    Q    And a separate part of the crowd management training also

7    had a schedule for the training; is that right?

8    A    Yes.

9    Q    And how long was that schedule of training?

10   A    Eight hours.

11   Q    And before we get into the content of it, what's your view

12   of having, you know, one eight-hour schedule for training?

13   A    It's not sufficient.

14   Q    And why is that?

15   A    You just can't teach officers, supervisors, or leaders what

16   they need to know about handling these events in eight hours.

17   There's just too much material to cover.

18   Q    And so if we look at the schedule again, I believe you said

19   that most of this seemed to be focused on movements and gear.

20   We see at the first half hour there is some, it looks like some

21   training on intel and planning and communication with

22   protesters.  What's your opinion as to whether that's a

23   sufficient amount of time to deal with topics like that?

24   A    So, the material listed from 8:15 to 8:45 of that class is

25   really some of the most important material to cover, and should

20-cv-1878-RBJ    EDWARD MAGUIRE, PhD - Direct    03-18-2022

1   be, you know, you could do an entire day on that to teach

2   officers about the importance of -- essentially what all of this

3   material would cover in that 30 minutes is how to avoid using

4   force, how to avoid triggering conflict, how to deescalate, how

5   to communicate, and constitutional law associated with handling

6   these types of events.  Hugely important stuff that it's just

7   simply not possible to cover in 30 minutes.

8   Q    In your review of materials, did you see that Sergeant

9   Knutson previously had a three-day training that in 2016 got cut

10  down to just eight hours?

11  A    Yes, ma'am.

12  Q    So, what information -- actually, we've talked about how a

13  lot of time has been spent in this course -- it appears to be on

14  formations and gear and whatnot.  Does that include things like

15  skirmish lines?  Would formations include skirmish lines?

16  A    Yes.

17  Q    And what is the role of skirmish lines in a crowd control

18  situation?

19  A    So, skirmish lines are very important in crowd control for

20  achieving a particular objective, and that is you form a

21  skirmish line because there's something behind the skirmish line

22  that you're looking to either protect, imagine a hotel full of

23  dignitaries or something like that, at an international

24  convention, or there's a critical piece of infrastructure that

25  you're looking to deny access to, or there's a part of town that

2013

20-cv-1878-RBJ    EDWARD MAGUIRE, PhD - Direct    03-18-2022

1   for some reason you're looking to deny access to.  But typically

2   it's there for a strategic purpose, typically because you're

3   trying to prevent movement to behind where the skirmish line is

4   located.

5   Q    And are skirmish lines always necessary in protest

6   situations?

7   A    No.

8   Q    And you said you've watched a lot of video of the protest.

9   What's your opinion of how Denver was using skirmish lines at

10  the protest?

11  A    There appeared to be a default to using skirmish lines

12  routinely.

13  Q    And what's your opinion on whether that was a good thing or

14  a bad thing?

15  A    It was not clear to me that many of those formations had

16  any clear strategic purpose.  It just seemed to be almost like a

17  knee-jerk reaction, like let's form a skirmish line.  And, you

18  know, I think that the DPD's crowd management manual even says

19  we do not form skirmish lines as a default way of responding to

20  these events.  And I don't think that the DPD actually honored

21  that principle in how it responded to the George Floyd protests.

22  Q    And you said earlier that the leadership and supervisor

23  trainings didn't have explicit training on crowd psychology in

24  the slides.  Did those trainings include protester profiles?

25  A    Yes.

20-cv-1878-RBJ   EDWARD MAGUIRE, PhD - Direct   03-18-2022

1        MS. STERK:  And if we could put up Exhibit 465, which

2   I believe is admitted already.  Somebody please check me.

3        MR. RINGEL:  It is.

4        MS. STERK:  Okay.

5   Q.    (By Ms. Sterk) And are these pictures some of the

6   pictures from the crowd control -- or the protester profiles of

7   the crowd control leadership training?

8   A    Yes, ma'am.

9   Q    Based on your experience and research, what is the effect

10  of -- well, let me back up.  What did you see in the training

11  relating to these protester profiles?

12  A    So, crowds -- we know that -- we know from years of

13  research that protest crowds are very heterogeneous.  They

14  contain lots of different subsets, different types of people.

15  And what I saw in the training was really an exclusive focus on

16  folks who are the most violent, or sort of the most willing to

17  engage in criminal activity at protests, without a really clear

18  sense that they tend to constitute a distinct minority of

19  virtually all protest crowds.  And so I think it gives the

20  course participants an inaccurate representation of what protest

21  crowds actually look like.

22  Q    And by giving leaders at DPD an inaccurate representation

23  of what protesters look like, what's the effect of that?

24  A    My concern is that given that inaccurate representation

25  would fuel overresponses to protests.

20-cv-1878-RBJ   EDWARD MAGUIRE, PhD - Direct   03-18-2022

1   Q    So, I want to switch to a different topic in crowd

2   psychology.  We've heard a lot in this trial and read a lot in

3   the DPD materials about people in the crowds who may have been

4   throwing things like rocks or water bottles.  Is it within DPD's

5   own manual that they should disperse, control, or arrest the

6   specific people engaged in violent conduct instead of issuing a

7   general dispersal order?

8   A    Yes, it is.

9   Q    Can you please put up Exhibit 452, which has also been

10  admitted.  So, this is the DPD crowd management manual's

11  instructions?

12  A    Yes, ma'am.

13  Q    In your opinion, what happens in terms of crowd psychology

14  when police officers do nothing to try to single out individuals

15  in order to arrest or control them?

16  A    Well, if there are people who are engaging in acts of

17  violence, for instance like throwing rocks or bottles, and

18  police do not take action to arrest or somehow deal with those

19  individuals, one of the consequences is kind of an environment

20  of permissiveness, where the police are sort of nonverbally

21  communicating that this is okay.  This is -- we are -- this is

22  acceptable behavior.  We are not going to take enforcement

23  action against people who do this.  That places the crowd at

24  risk, and it places the officers themselves at risk.

25  Q    So, by not arresting people in the crowds who are throwing

20-cv-1878-RBJ    EDWARD MAGUIRE, PhD - Direct    03-18-2022

1    things, there may be more people who take similar actions?

2    A    Yes.

3    Q    When there's a crowd, are there tactics or strategies for

4    the police to be able to go into a crowd to arrest some

5    individual who is throwing rocks?

6    A    Yeah.  So, if, you know, we just start with the assumption

7    that officers are already in a skirmish line, just in the

8    policing industry, there are standard types of formations and

9    movements that are -- that enable -- so, for instance, you could

10    position an arrest team behind a skirmish line.  The skirmish

11    line opens up.  The arrest team enters through the gap, goes and

12    arrests the person.

13          These would be officers who would be sort of very

14    heavily armored to protect their safety, and these would be

15    things that would have to be trained and choreographed, so that

16    this is well rehearsed, so that when you get to a protest, it's

17    not the first time you're having to do something like this.  You

18    arrest the person.  You move back behind the line, and then you

19    submit them to an arrest processing protocol from there.

20    Q    And we've heard testimony that entering crowds can

21    sometimes seem too dangerous.  Based on the videos you reviewed,

22    were there instances in which you believe that the DPD could

23    have gone in and arrested people who were throwing water bottles

24    by using some of these techniques that you're talking about?

25    A    Yeah.  I think there are instances in which it can be

20-cv-1878-RBJ    EDWARD MAGUIRE, PhD - Direct    03-18-2022

1  dangerous to enter a crowd, but in the video evidence that I

2  reviewed, there were many instances, I think, where officers

3  simply could have gone and arrested a person to send a clear

4  signal that, you know, this type of behavior, throwing rocks and

5  bottles at officers, is simply not going to be tolerated.

6          And ideally you would couple that arrest with a

7  communication strategy that actually says that to members of the

8  crowd, whether one-on-one, as communicated by officers to people

9  near them, or through some sort of an amplified sound system.

10 Q    And going back to kind of the safety of going into crowds,

11 if there were a situation where there was a legitimate reason to

12 think that it was unsafe to go into the crowd, are there other

13 alternatives for trying to target one individual?

14 A    Yeah.  I mean, another alternative that's mentioned, I

15 think at least two or three times in the DPD's training

16 materials is for -- is to essentially mark the people who are

17 engaged in that type of behavior for later arrest.  And so both

18 in the 40-millimeter platform and in the paintball -- or the

19 PepperBall platform that the DPD uses, there are rounds

20 available that are essentially like paintballs.

21         And so they don't contain the chemical agent.  You just

22 shoot them at the individual.  You target them at the individual

23 engaging in violence, and it will leave kind of like a paint

24 splatter on them so they're marked for later arrest.  It's

25 harder for them to then run away and blend into the crowd.

20-cv-1878-RBJ    EDWARD MAGUIRE, PhD - Direct    03-18-2022

1    Q    And what happens, again, based on your knowledge of crowd

2    psychology, when the police, instead of arresting one individual

3    who is throwing things, instead throw tear gas or PepperBalls

4    into a crowd of people?

5    A    So, this is where I think police really begin to instigate

6    or escalate violence.  One of the very common findings that we

7    see in research on sort of violence between police and crowds is

8    that police used some indiscriminate use of force, like impact

9    weapons -- impact projectiles against large numbers of people,

10   or some sort of chemical agent, and then in the aftermath of

11   that, the crowd begins either to throw rocks and bottles or

12   other projectiles at police, or disperses, but as they're

13   dispersing, they set fires, break windows, engage in vandalism

14   and so forth.

15          And so part of the reason we try to encourage police to

16   avoid those indiscriminate uses of force is to avoid the kind of

17   chaos that ensues when they do.

18   Q    And to be clear, when you're saying that when police use

19   violence on a crowd, that kind of escalates the violence back at

20   them, is that -- has your research shown that everybody would do

21   that, or still just a small minority?

22   A    No.  It's usually a subset of people.

23   Q    What's your opinion as to DPD's decision to use force to

24   disperse entire crowds of protesters instead of targeting or

25   arresting the individuals who were assaulting the officers?

20-cv-1878-RBJ   EDWARD MAGUIRE, PhD - Direct   03-18-2022

1   A    So, whenever possible, the preferred strategy is always to

2   target individual lawbreakers who are engaged in violence or

3   property damage.  When that's not possible, and it's necessary

4   to disperse a crowd, this is where you really need to use your

5   words before you use your weapons.  And you just need to tell

6   the crowd, you know, issue an order to disperse, make sure that

7   order to disperse is sufficiently audible, and communicate to

8   people where you want them to go.

9          A lot of times when a crowd disperses, they don't know

10  where to go.  So, you need to tell them where to go.  Go down

11  this street.  Go in that direction.  And so those are the

12  typical approaches for dispersing a crowd prior to using

13  less-lethal weapons.

14  Q    And I'm going to get to the communication in a minute, but

15  in terms of DPD's response specifically, what's your opinion as

16  to their use of force against protesters as a whole instead of

17  targeting individuals?

18  A    I thought it was widespread.

19  Q    So, moving on to the communication point that you just

20  raised, what is your opinion as to DPD's use of communication at

21  the protests?

22  A    I mean, I heard occasional warnings to the crowd to

23  disperse or to move back, but in virtually all of the video

24  footage that I reviewed, I heard no communication, or very

25  little communication.  It appeared to me that DPD was largely

20-cv-1878-RBJ    EDWARD MAGUIRE, PhD - Direct    03-18-2022

1  communicating nonverbally with its less-lethal munitions, rather

2  than verbally either individually one-on-one between officers

3  and people located near them, or through some sort of amplified

4  sound system.

5  Q    And why is communication important, especially in protests

6  that are geared towards police?

7  A    So, the most appropriate strategies for handling these

8  types of events are known as dialogue-based strategies.  They

9  involve extensive communication with crowd members before,

10 during, and after an event.  These are the strategies that we

11 know work well to avoid violence, avoid property damage, and

12 avoid, quite frankly, injuries to police officers themselves.

13 Q    So, I want to pull up Exhibit 472, which has already been

14 admitted as a DPD operations plan.  And this is one of the

15 documents that you reviewed for your work in this case?

16 A    Yes, ma'am.

17 Q    And in this portion of the operations plan, it says that

18 three warnings will be given using an amplified sound system.

19 And then it also says that the command officer that gives the

20 dispersal order is required to write a written statement.  Have

21 you seen any written statements of dispersal orders?

22 A    No, ma'am.

23 Q    And did you see when you were watching the videos that

24 police officers were generally giving three warnings before --

25 using an amplified sound system before trying to use force on

2021

20-cv-1878-RBJ    EDWARD MAGUIRE, PhD - Direct    03-18-2022

1   the crowds?

2   A    No, ma'am.  Not only didn't I see three warnings given, I

3   often didn't see any warnings given.

4            MS. STERK:  So, I want to go next to Exhibit 455,

5   which I would like to admit at this time.  It has been

6   stipulated as admissible.

7            MR. RINGEL:  No objection.

8            THE COURT:  It's admitted.

9   Q.    (By Ms. Sterk) And this is the crowd -- Denver's crowd

10  control supervising training, and a sample dispersal order that

11  was in that training.  And at the end, it says, if you do not

12  leave, you will be arrested.  Do you see that?

13  A    Yes, ma'am.

14  Q    And it doesn't discuss that if you don't leave, you will be

15  hit with chemical munitions; right?

16  A    That's correct.

17  Q    In your review, what did you determine about the importance

18  that DPD officers and supervisors placed on communicating with

19  protesters?

20  A    It just didn't seem to be a priority.  I saw very little

21  communication at all.

22  Q    And did you read any testimony from DPD officers on this

23  topic?

24  A    Yes, ma'am.

25  Q    And what reasons did you find that officers were giving for

20-cv-1878-RBJ    EDWARD MAGUIRE, PhD - Direct    03-18-2022

1    not providing warnings to protesters?

2    A    I heard -- I saw several excuses like I was too busy, it

3    was too dangerous to give warnings, warnings didn't seem like a

4    good idea.  Those were the general types of excuses that I saw.

5    Q    And those were from people as high up as Commander Phelan

6    and Lieutenant Pine?

7    A    Yes, ma'am.

8    Q    What did that testimony tell you about DPD's practices and

9    customs when it comes to warnings and communication?

10   A    Well, I mean, there was not -- there was no real training

11   provided on communicating with crowds.  And then in practice, I

12   didn't see them communicating with crowds.  So, it just

13   appeared -- although communication with crowds played an

14   important role in the crowd management manual, I saw no evidence

15   of its importance or its coverage in the training materials, or

16   of them actually doing it out on the street during the protests.

17   Q    So, I want to turn to some still shots from Exhibit 656,

18   which has also already been admitted.  The jury has seen this,

19   so I'm not going to play the whole video.  Do you recall

20   watching this video?

21   A    Yes, ma'am.

22   Q    And this was taken -- or the video was taken on May 30th

23   near the bus station.  And on the body-worn camera of Officer

24   Carmody, on the bottom left, what did you see in the scene there

25   in terms of communication?

20-cv-1878-RBJ   EDWARD MAGUIRE, PhD - Direct   03-18-2022

1   A     In the video that I watched, there was no communication.

2   The officers just began firing on a crowd that appeared to be

3   behaving peacefully.  And as you can see in the picture there,

4   they continued firing on the crowd even once the crowd was

5   actually dispersing.  And so they were firing toward the back of

6   the crowd as the crowd members were walking away.

7   Q     And you didn't hear warnings about using chemical weapons

8   on the protesters before they started shooting?

9   A     I did not.

10  Q     Is there a problem with using PepperBalls, even if shot at

11  the ground, as a form of communication to protesters?

12  A     Yes.  We typically train police to use their words instead

13  of their weapons, whenever humanly possible.  And as a way of

14  avoiding ever having to use those weapons, because words are

15  powerful.  If we communicate with crowd members, we can engage

16  in deescalation.  We can compromise.  We can work things out so

17  that things don't spin out of control and require the use of

18  less-lethal weapons.

19  Q     In your expertise, if Denver had provided adequate warnings

20  about where they wanted people to go and why they were

21  dispersing the crowd, would there have been fewer injuries of

22  protesters and police?

23              MR. RINGEL:  Objection.  Calls for speculation.

24              THE COURT:  Sustained.

25              MR. RINGEL:  Outside the scope of the report.

20-cv-1878-RBJ    EDWARD MAGUIRE, PhD - Direct    03-18-2022

1              THE COURT:  Sustained.

2   Q.    (By Ms. Sterk) In your research, when police departments

3   provide clear and loud explanations of their actions, what

4   effect does that have on the violence in the crowds?

5              MR. RINGEL:  Outside the scope of the report.

6              THE COURT:  Is it?

7              MS. STERK:  I don't believe it is, Your Honor.  He's

8   talking about crowd psychology, which is throughout his report,

9   and how that affects crowds and the police.

10             MR. RINGEL:  Not this opinion, Your Honor.

11             THE COURT:  Well, if you think it's there, show me.

12             MS. STERK:  I believe it's there, Your Honor, but I

13  will come back to it.  Skip it for now.  It's fine.

14             THE COURT:  By the way, Kevin, are you in need of a

15  break yet?

16             THE COURT REPORTER:  I'm okay, Your Honor.

17             THE COURT:  How about you folks?  Sort of?  Maybe five

18  more minutes and then, but it's Friday afternoon, so you're not

19  really sure.  Okay.  Keep going for a few more minutes.

20             MS. STERK:  Sure.  And can we put back up the pictures

21  from Exhibit 656.

22  Q.    (By Ms. Sterk) The pictures on the right are also from

23  the same video.  And can you tell us what your conclusions were,

24  what your opinions were on the -- well, first tell us what do

25  you recall of what was happening in that video on the right?

20-cv-1878-RBJ    EDWARD MAGUIRE, PhD - Direct    03-18-2022

1   A    So, the man who is standing with his arms up in the air is

2   standing on top of a pedestal that looks like it's three or

3   four feet off the ground.  So, he's standing up in the air on

4   this elevated platform, and an officer comes up and shoves him

5   off the platform onto the ground.

6          And I found this to be a particularly disturbing and

7   egregious use of force, because there are several instances of

8   protesters being seriously injured, and in one well-known case

9   dying from being shoved while they're standing actually on the

10  ground.  This person is standing on an elevated platform, so

11  when an officer came up and shoved him off the platform, he

12  crashed into the ground in just an absolutely inappropriate and

13  disturbing use of force.

14  Q    And after he fell to the ground, he was yelling at the

15  police officers, you're the ones bringing the aggression, you're

16  the ones bringing the aggression.  What does that tell you about

17  the protester reaction in terms of the interactions between

18  police and protesters?

19          MR. RINGEL:  Objection.  Leading.

20          THE COURT:  Sustained.

21  Q.    (By Ms. Sterk) What did the words of this protester tell

22  you about the interactions between police and protesters at the

23  protests?

24  A    His reaction was completely consistent with what we would

25  expect from crowd psychology.  He had force used against him

20-cv-1878-RBJ   EDWARD MAGUIRE, PhD - Direct   03-18-2022

1  without having done anything to require or -- require the use of

2  force on the part of police.  He was just simply standing there

3  with his hands in the air, and the police came along and

4  assaulted him, and he then accused them of bringing the

5  aggression.

6  Q    And I want to move on to a different opinion that you have.

7  Is one of your opinions that DPD failed to train on dangerous --

8  on certain munitions?

9  A    Yes, ma'am.

10 Q    And what is your opinion on what DPD failed to train on in

11 that respect?

12 A    The training materials that I reviewed provided no evidence

13 of training on two particularly dangerous types of munitions.

14 One was flash-bang grenades, and the other was -- they're known

15 by various names, but Stinger grenades or sting ball grenades.

16 Q    And I'm going to go through those one at a time.  Let's

17 talk first about sting ball grenades -- or, sorry.  Flash-bangs.

18 What is your opinion on when if ever flash-bangs should be used

19 in crowd control?

20 A    So, flash-bangs are really important for certain types of

21 police operations where it's important to kind of stun a person,

22 really kind of shock a person so that they can't reach for a

23 weapon or hide evidence or something like that.  But that's

24 really not our objective in crowd control operations.  In fact,

25 it's the opposite.  Typically you're looking to disperse people,

20-cv-1878-RBJ    EDWARD MAGUIRE, PhD - Direct    03-18-2022

1   not sort of stun them.  And so I really don't see a legitimate

2   use for flash-bang grenades in that particular aspect of

3   policing.

4   Q    And were flash-bangs -- flash-bang grenades used at the

5   Denver protests?

6   A    Yes.

7   Q    In terms of the risks -- or what are the risks of

8   flash-bang grenades?

9   A    There are many.  So, it's a pyrotechnic device that

10  explodes, so you have the risk of burns from the explosion or

11  from the very high temperature canister that contains the

12  flash-bang.  In addition to that, it's a bright flash of light

13  which can cause damage to the eyes, and there is a very loud

14  noise that's the bang part, that's approximately 175 decimals --

15  decibels.

16          And there's a -- you know, there's evidence of

17  permanent hearing damage from people where these devices have

18  exploded too close to them.  These devices are not only

19  dangerous for the people who police lob them toward, but they

20  can also be very dangerous to police officers themselves,

21  particularly police officers who have not been trained on their

22  proper use.

23  Q    So, turning to the sting ball grenades, can you first tell

24  the jury what exactly that is.

25  A    So, these are grenades that contain rubber pellets, many of

20-cv-1878-RBJ   EDWARD MAGUIRE, PhD - Direct   03-18-2022

1    them also, when you order these devices, you can order -- you

2    can kind of customize them.  So, sometimes they also contain a

3    chemical agent.  Sometimes they also contain a flash-bang

4    capacity, but they all contain a number of rubber balls, and

5    when the -- you lob the device, when it detonates, the rubber

6    balls spread out 360 degrees from the grenade itself, traveling

7    up to approximately 50 feet.

8            And one of the concerns with these devices is that they

9    are inherently indiscriminate.  You can't aim them.  And so

10   you're not in control of who is hit, and so these rubber balls

11   can easily hit people who are not engaging in any crime, and you

12   can't control where on the body they hit, and so they can hit

13   you in the eye and other vulnerable places that can injure you.

14   Q    So, I want to turn to Exhibit 687.  This is a still from a

15   video that is already in evidence.  And this is a video from

16   Officer Valentine's body-worn camera on May 30th.  What do we

17   see on the top left?  Is that a grenade?

18   A    Yes.

19   Q    In your opinion, when -- well, let me back up.  Should

20   grenades ever be thrown over lanes of live traffic?

21   A    Certainly not if it's an active street.  That would

22   endanger motorists, potentially.

23   Q    And you've seen the video that goes with this still;

24   correct?

25   A    Yes, ma'am.

20-cv-1878-RBJ     EDWARD MAGUIRE, PhD - Direct     03-18-2022

1   Q     And what is the problem in this particular video of

2   throwing that grenade into the park over there?

3   A     So, this device appears to have a pyrotechnic or a

4   flash-bang component to it.  And it lands, I can't tell exactly

5   where it lands from the video, but it lands either on or near a

6   tent.  And part of the problem with that is that this is a

7   pyrotechnic device.  It can cause a fire, and so, you know,

8   tents are made of cloth.  They're flammable.  And so by throwing

9   this device on or near a tent, you are potentially risking that

10  tent catching on fire, and anybody who is inside of that tent,

11  endangering them.  So, this appears to be sort of a pretty

12  irresponsible use of that device.

13  Q     And if we can go to Exhibit -- sorry.  One second.  1120,

14  which again, is a video that's already been admitted.  These are

15  just stills from that video.  And this was again a video of

16  Mr. Valentine.  On the top left, is that what looks like a sting

17  ball grenade?

18  A     Yes, ma'am.

19  Q     And what is the danger or potential danger of having

20  someone who has not been trained on these grenades throwing them

21  into the road or into crowds?

22  A     Well, I think there's a danger both to the people they're

23  being deployed against as well as a danger to the officer using

24  the device, because if you're not trained on it, you don't

25  understand how to use it properly and what dangers it poses.

20-cv-1878-RBJ   EDWARD MAGUIRE, PhD - Direct   03-18-2022

1      MS. STERK:  And Your Honor, I'm about to move on to a

2  different section.  I don't know if this is a good time for a

3  break?

4      THE COURT:  Okay.  That's a good idea.  It's 2:56.

5  How about we break until 3:10.

6      (Jury out at 2:56 p.m.)

7      THE COURT:  Okay.

8      (Recess at 2:56 p.m., until 3:13 p.m.)

9      (Jury in at 3:13 p.m.)

10     THE COURT:  Okay.

11 Q.     (By Ms. Sterk) Professor Maguire, you have talked about

12 how your opinion is that DPD inadequately trained its officers.

13 Is another reason that you believe that the training was

14 inadequate because there were some misleading or inaccurate

15 pieces in the training materials?

16 A     Yes, ma'am.

17 Q     Did you review DPD's 40-millimeter operator certification

18 training slides?

19 A     Yes, I did.

20     MS. STERK:  At this time, I would like to admit

21 Exhibit 457.

22     MR. RINGEL:  No objection.

23     THE COURT:  Okay.  Admitted.

24 Q.     (By Ms. Sterk) And we won't go through all the slides of

25 this training course, but what do we see on this slide from that

20-cv-1878-RBJ   EDWARD MAGUIRE, PhD - Direct   03-18-2022

1   course?

2   A    So, the projectile impacts the body but leaves the body

3   surface intact while causing sufficient pain to incapacitate the

4   subject without causing serious bodily injury or death.

5        The issue here is that these devices do sometimes cause

6   bodily injury or death.  There's medical literature on the

7   injuries and deaths that result from the use of less-lethal

8   weapons, and I think it's really important when training

9   officers on the use of these devices not only to train them on

10  how to use -- on how to operate the machinery; right?  How to

11  use the weapon, but on the consequences that can occur if

12  they're misused.

13  Q    And we've seen in some of the other slides in this training

14  that it talks about not shooting people with 40-millimeters in

15  the head unless lethal force is necessary, and some other

16  language about that it could kill someone.  So, why is it a

17  problem to have a slide like this accompanying those other

18  slides?

19  A    We just need to communicate very clearly to officers the

20  risks that they face when they make the choice to pull that

21  trigger, and not to pull that trigger if they don't have a good

22  sight picture on a part of the body that is appropriate to

23  impact, like, you know, like the abdomen or the large muscle

24  groups or something like that.  If you shoot somebody in the

25  head, you can kill them.

20-cv-1878-RBJ    EDWARD MAGUIRE, PhD - Direct    03-18-2022

1   Q     And so even though there are some training slides that

2   show, you know, where you should be shooting, it's still

3   problematic to have a slide that seems to equate that we're

4   trying not to kill people?

5   A     Yes.

6   Q     So, and what are the results -- the potential results of

7   shooting somebody with a 40-millimeter?

8   A     There are lots of examples in the medical literature of

9   people with broken bones.  You know, you can have -- you can

10  knock out teeth.  You can break the nose, break bones in the

11  face, break the skull, and you can kill people.

12  Q     And I want to go to Exhibit 455, which is already admitted.

13  This is the supervisor training.  And we also have Exhibit 136

14  shown as well, which has also been admitted.  On the top right,

15  is that a slide from the supervisor training for crowd control?

16  A     Yes, ma'am.

17  Q     And what's the problem that you see with that training

18  slide?

19  A     These officers are deploying that device too close to the

20  people they're shooting it at.  And this is in police training

21  material, so you really, unless you're using that as an example

22  of what not to do, it shouldn't be in the police training

23  materials.

24  Q     And did the materials that you looked at seem to indicate

25  that this is something you shouldn't do?

20-cv-1878-RBJ   EDWARD MAGUIRE, PhD - Direct   03-18-2022

1   A     No.

2   Q     So, I want to turn to a different opinion of yours.  Is it

3   your opinion that DPD failed to appropriately supervise its

4   officers?

5   A     Yes, ma'am.

6   Q     And what do we -- what do you mean when we're talking about

7   lack of supervision?

8   A     Just providing officers on the street with appropriate

9   guidance on acceptable and unacceptable behavior.

10  Q     And is supervision kind of considered an extension of the

11  in-course, or, you know, classroom training for officers?

12  A     Certainly one aspect of being a good supervisor is sort of

13  training officers in real time about how to do the job well.

14  Q     And in the materials that you reviewed and the videos, did

15  you see instances in which supervisors either allowed or told

16  officers to take actions that you would consider inappropriate?

17  A     Yes, ma'am.

18            MR. RINGEL:  Objection.  Leading.

19            THE COURT:  Sustained.

20  Q.    (By Ms. Sterk) In the materials that you reviewed, what

21  did you see in terms of the supervision of officers during the

22  protests?

23  A     So, several pieces.  One was simply supervisors themselves

24  behaving inappropriately.  Two, supervisors encouraging officers

25  to behave inappropriately.  And three, supervisors ignoring

20-cv-1878-RBJ    EDWARD MAGUIRE, PhD - Direct    03-18-2022

1   officers who were behaving inappropriately in front of them.

2   Q    So, I want to go through a few examples.  And if we can

3   turn to Exhibit 452, which is the crowd control manual that's

4   already been admitted.  And this is guidance in DPD's crowd

5   control manual that if protesters or participants in crowd

6   events fail to abide by time, place, and manner restrictions,

7   the enforcement is through issuance of citations and/or arrests

8   of noncompliant persons; right?

9   A    Yes.

10  Q    And we talked about this earlier, but the first part says

11  that -- after the highlight says that there -- there's

12  voluntary -- they should first try to get voluntary compliance;

13  right?

14  A    Yes, ma'am.

15  Q    And what did you see in terms of -- in the videos in terms

16  of the Denver Police Department trying to get voluntary

17  compliance from protesters?

18  A    So, seeking voluntary compliance requires communication,

19  verbal communication, talking to people, telling them what you

20  want them to do, and then hopefully they do it.  And so that's

21  an attempt to seek voluntary compliance.  I saw very little of

22  that.

23  Q    So, I want to go to 455, and that is the crowd management

24  training for the supervisors that has already been admitted.

25  And here we see that the crowd management training says you must

20-cv-1878-RBJ    EDWARD MAGUIRE, PhD - Direct    03-18-2022

1    separate your response to take those who have committed or are

2    committing a law violation into custody while still allowing the

3    majority to peacefully assemble.  What was -- in your opinion,

4    what was happening -- or was DPD allowing the majority to

5    peacefully assemble at these protests?

6    A    No.

7    Q    What was DPD doing instead of arresting or citing people

8    who didn't comply with any of their orders to the extent there

9    were orders given?

10   A    Its primary strategy appeared to be using less-lethal

11   weapons or crowd control formations to move crowds back in

12   absence of any type of communication, and not separating and

13   arresting those who were engaged in violence or property damage.

14   Q    So, next I want to turn back to the crowd management

15   manual, Exhibit 452.  And here we see that it talks about

16   40-millimeter operators being responsible for every round they

17   fire, and not to intentionally deploy the 40-millimeter at head,

18   eyes, neck, or throat.  Is that -- is that something that you

19   saw happening in the videos?

20   A    So, I saw in the videos several instances of people being

21   struck in the head by 40-millimeter projectiles.

22   Q    And I next want to go to Exhibit 457, which is the

23   40-millimeter training.  And here we see it says never let the

24   muzzle point at anything you are not willing to destroy?

25   A    Yes, ma'am.  So, the muzzle of the weapon is the end of the

20-cv-1878-RBJ   EDWARD MAGUIRE, PhD - Direct   03-18-2022

1   weapon where the projectile exits the weapon.  It's where the

2   bullet, or the projectile comes out.  And so this is -- this is

3   wise advice.

4   Q    So, turning to a still of Exhibit 1243, which is already in

5   evidence, and this is a video that the jury has seen.  How does

6   the picture, the still of the video relate to the instruction to

7   never point the muzzle of a 40-millimeter at anyone you're

8   willing to destroy [sic]?

9   A    So, just to be perfectly clear, that's a weapon that at

10  that distance can kill that individual if it strikes him in the

11  head.  And so there is -- that individual in that video is not

12  behaving in any way that would authorize the use of lethal

13  force, and that use of force is potentially lethal.  And so it's

14  just simply unacceptable.

15  Q    And in the video, do you recall that there was kind of a

16  whole skirmish line across the street?

17  A    Yes, ma'am.

18  Q    And where there's a skirmish line, typically supervisors

19  would be present?

20  A    Yes.

21  Q    And when you were watching the video, was there anything in

22  the video that indicated supervisors were telling this officer

23  not to do this?

24  A    I did not see any supervisors take action to prevent this

25  type of activity on the part of the officers.

20-cv-1878-RBJ    EDWARD MAGUIRE, PhD - Direct    03-18-2022

1  Q    And was this officer disciplined?

2  A    I actually don't know.

3  Q    So, I want to turn to Exhibit 638.  Again, this is a still

4  shot from an admitted exhibit.  And here, we see, again, an

5  officer -- what is the officer pointing at on the left-hand side

6  of the screen?

7  A    He appears to be pointing a weapon at an individual who is

8  far more flexible than I am, who is doing yoga in the street.

9  Q    And again, was this occurring in a skirmish line?

10  A    Yes.

11  Q    So, I want to move back to the crowd management manual,

12  which is Exhibit 452.  And it has a section on PepperBall

13  operators being responsible for every round they fire, and that

14  they must ensure that innocent protesters -- or innocent persons

15  are not struck unintentionally.  What is your opinion as to

16  whether DPD supervisors were ensuring that this section or this

17  guide was followed as part of the guide?

18  A    I saw officers using PepperBalls in an indiscriminate and

19  inappropriate manner in a widespread fashion in many of the

20  videos that I observed.  So, I don't think supervisors were

21  ensuring that officers were behaving appropriately in their use

22  of the PepperBall.

23  Q    So, I want to turn to Exhibit 658, which is a still -- it's

24  a video that is already in evidence, and we're just going to put

25  up a still of that video that the jury has already seen.  Can

20-cv-1878-RBJ    EDWARD MAGUIRE, PhD - Direct    03-18-2022

1  you explain to the jury what -- how this scene relates to your

2  opinion on not -- or keeping track of every round of

3  PepperBalls?

4  A    So, this officer goes to a police vehicle.  He secures

5  these two weapons, one of which is a PepperBall launcher on the

6  right, and one of which is an OC fogger on the left.  He then

7  walks by a sergeant, comes to the front of the line, and deploys

8  both weapons simultaneously.

9        So, it's a highly irresponsible use of the weapons.

10  There's just no reason to be using two weapons simultaneously,

11  and I'm particularly concerned about the use of the PepperBall,

12  because when you're shooting two weapons simultaneously, which

13  is not in any training I have ever seen in my lifetime, then you

14  can't properly aim that one weapon, which is the PepperBall

15  here, to ensure that you're only striking people who -- who have

16  done something to cause you to shoot them.

17  Q    And I may have missed it, but did you already -- did you

18  talk about whether you had seen any supervisors present here?

19  A    Yes.  This officer walked right by a sergeant right before

20  the picture that you see here.

21  Q    So, I want to go on to just the last example of this, and

22  let's turn back to the 40-millimeter training course, which is

23  Exhibit 457.  And here, we see that the training instructs that

24  officers are -- have a responsibility to provide medical

25  attention?

20-cv-1878-RBJ    EDWARD MAGUIRE, PhD - Direct    03-18-2022

1    A    Yes.

2    Q    Is that something that you saw in other trainings of the

3    DPD as well for other less-lethal munitions?

4    A    Yes.

5    Q    And in your -- what conclusion did you reach as to whether

6    supervisors were ensuring that their officers provided aid to

7    injured protesters?

8    A    In the materials that I reviewed, I didn't see a single

9    instance of officers either rendering or arranging medical aid

10   for somebody who had been injured by the less-lethal munitions

11   that they used.

12   Q    And what's your reaction to seeing people injured in the

13   videos and not seeing police providing aid for them?

14   A    It's an abdication of their responsibility to provide aid

15   to people they injure.  It's just built into the job of

16   policing, and I'm not sure what would have led them to believe

17   that they shouldn't do that.  It's just part of the job.

18   Q    And I think the jury has heard that when officers in a

19   skirmish line -- you can't really provide aid because you can't

20   break the line.  What's your opinion on that?

21   A    Well, if you're using a skirmish line, the same types of

22   formations and movements that I mentioned earlier to create a

23   gap in the line, come through the gap in the line with an arrest

24   team can be used.

25        That arrest team would essentially be a rescue team at

20-cv-1878-RBJ   EDWARD MAGUIRE, PhD - Direct   03-18-2022

1   that point, and would come through, would extract the person,

2   and would, you know, ensure that they received appropriate

3   medical aid, for instance having an ambulance available behind

4   the skirmish line so the EMTs could work on that person and make

5   sure they get the treatment that they need.

6   Q    So, I want to turn to a different topic.  Do you have

7   opinions on DPD's discipline of its officers?

8   A    Yes.

9   Q    What's your opinion as to its discipline?

10   A    It appears that the DPD -- I mean, I saw widespread sort of

11   policy violations and misbehavior on the part of officers who

12   were working at these protests, and very little discipline given

13   to officers as a result.

14   Q    Officers are typically disciplined through internal

15   affairs?

16   A    Yes, ma'am.

17   Q    And supervisors or officers can submit complaints to

18   internal affairs?

19   A    Yes.

20   Q    What's your opinion about how DPD's policies related to

21   body-worn cameras affected the course of those investigations?

22   A    There was a widespread pattern of officers not adhering to

23   the DPD's body cam policy, and that -- what that looked like was

24   officers either just not wearing body cameras at all or wearing

25   them and failing to activate them when they were required to do

20-cv-1878-RBJ   EDWARD MAGUIRE, PhD - Direct   03-18-2022

1    so.

2            As a result, they were simply missing a lot of footage

3    of what happened at this event, and that footage would have

4    played an important role in internal affairs investigations of

5    officers -- of allegations of misconduct.

6    Q    And to back up in terms of policies, were there policies

7    that officers -- or there weren't policies that officers had to

8    put body-worn cameras on during the whole protest; right?

9    A    I'm not familiar with if there were specific policies

10   associated with the protest.

11   Q    But fair to say that there wasn't everybody wearing

12   body-worn camera or activating their body-worn cameras?

13   A    Oh.  I see what you're saying.  No.  There was a widespread

14   practice of not wearing body cameras during the protests.

15   Q    Why is it a problem to not have body-worn cameras on during

16   protests?

17   A    Because body camera footage in this era is a fundamental

18   part of holding officers accountable for complying with laws and

19   with departmental policies and regulations.

20   Q    What effect does not holding officers accountable through

21   discipline have -- and officers and supervisors have on the

22   other officers in a police department?

23   A    It sends --

24            MR. RINGEL:  Objection.  Calls for speculation.

25   Outside the scope of the report.

20-cv-1878-RBJ   EDWARD MAGUIRE, PhD - Direct   03-18-2022

1          MS. STERK:  This is in the report on pages 17 to 18,

2     where Professor Maguire specifically discusses in a heading

3     called insufficient internal controls for identifying officer

4     misconduct or for addressing officer misconduct.

5          THE COURT:  Give Mr. Ringel a chance to look at that

6     and see if he agrees with you.

7          MR. RINGEL:  This topic is covered, but the opinion

8     she's trying to elicit is not covered.

9          MS. STERK:  The topic of officer discipline is covered

10    over three different pages.

11         THE COURT:  I don't want to spend more time on it.

12    The objection is overruled.  I think we know what his answer is

13    going to be anyway.

14    Q.    (By Ms. Sterk) In your opinion, Professor Maguire, what

15    effect does it have on other officers in a police department if

16    supervisors and officers who engage in misconduct are not

17    disciplined?

18    A     It sends a clear message to officers that the kinds of

19    behavior they observe during the protest that were a form of

20    misconduct will be tolerated by the agency.

21    Q     So, I want to go to your last opinion.  Is it your opinion

22    that DPD escalated violence and quashed lawful assembly?

23    A     Yes.

24    Q     I want to turn to slide -- or, sorry.  The crowd management

25    manual, Exhibit 452.  And the crowd management manual of Denver

20-cv-1878-RBJ   EDWARD MAGUIRE, PhD - Direct   03-18-2022

1    acknowledges and understands that police officers are present in

2    order to facilitate the peaceful and lawful expression of First

3    amendment rights; right?

4    A    Yes.

5    Q    And it also says at the beginning that the goal is

6    deescalation of violence?

7    A    Yes.

8    Q    Based on your review of DPD's manual and policies, was DPD

9    aware of proper limits on use of force?

10   A    Definitely.

11   Q    And did DPD's manuals and guides show that it understood

12   what it needed to do in order to protect First amendment rights?

13   A    Yes.

14   Q    Based on your expertise -- excuse me.  Is it your opinion

15   that Denver, despite having the knowledge of what they needed to

16   do, failed to take those steps to ensure that they weren't

17   exceeding proper limits of force?

18   A    Yes, ma'am.  Their behaviors on the street during the

19   protest were inconsistent with their own crowd control manual,

20   and their training is inconsistent with their own crowd control

21   manual.

22   Q    The George Floyd protests that we're talking about lasted

23   for six days; right?

24   A    Yes.

25   Q    And during those six days, did you see evidence of DPD

20-cv-1878-RBJ   EDWARD MAGUIRE, PhD - Cross   03-18-2022

1  working to address the excessive uses of force that its officers

2  were using on protests --

3  A    Not at this -- sorry, ma'am.  Not in any of the materials

4  that I reviewed.

5  Q    And had it been routinely failing to train its officers in

6  the several years before the protests about how to not use

7  excessive amounts of force during protests?

8  A    Yes.

9  Q    Based on your expertise, did DPD's repeated failure to

10  train its officers present an obvious potential for excessive

11  use of force?

12  A    Yes, it did.

13  Q    And did it also present an obvious potential for violation

14  of First amendment rights of protesters?

15  A    Yes, it did.

16        MS. STERK:  Nothing further.

17        THE COURT:  Okay.  Cross examination, Mr. Ringel?

18                    **CROSS EXAMINATION**

19  BY MR. RINGEL

20  Q    Good afternoon, Professor Maguire.

21  A    Good afternoon, sir.

22  Q    My name is Andrew Ringel.  I represent the defendants in

23  this case.  You and I have never met?

24  A    That's correct.

25  Q    Never had a conversation?

20-cv-1878-RBJ   EDWARD MAGUIRE, PhD - Cross   03-18-2022

1   A    That's correct.

2   Q    You have been a professor at various universities since

3   1997?  Do I have that about right?

4   A    I think since 1996, sir.

5   Q    Okay.  So, for more than 25 years?

6   A    Yes, sir.

7   Q    And the focus of your academic career is criminology and

8   criminal justice?

9   A    Yes, sir.

10  Q    Okay.  Just want to be clear, however, you've never been a

11  police officer?

12  A    No.  I have been a police officer, sir.

13  Q    When was that, sir?

14  A    1988.  It's a long time ago.  1988 to 1990.  Somewhere

15  around there.

16  Q    And where were you a police officer in 1998 [sic] to --

17  A    In Yarmouth, Massachusetts, sir.

18  Q    So, you were a police officer in Yarmouth, Massachusetts,

19  for how many years, sir?

20  A    I was a seasonal police officer.  So, this is when I was in

21  college, and it's something that I did during the summers.  So,

22  I think it was a total of coming up on a year, but spread over

23  three summers.

24  Q    Okay.  So, 1998 -- or 1988, 1989, 1990?  Is that what we're

25  talking about?

20-cv-1878-RBJ   EDWARD MAGUIRE, PhD - Cross   03-18-2022

1    A    I believe so.  Yes, sir.  But this was a long time ago.

2    I'm just giving you my best guess.

3    Q    And the Yarmouth where -- is Yarmouth in Massachusetts,

4    sir?

5    A    It's in Cape Cod.

6    Q    So, this was a seasonal police officer position to help

7    deal with the increase in tourists and population in the Cape

8    Cod area of Massachusetts?

9    A    That's exactly right, sir.

10   Q    Fair to say that you didn't participate in the response to

11   a protest during your seasonal work for the Yarmouth Police

12   Department at Cape Cod?

13   A    No, sir.  I mean, I did participate in the response, is

14   what I'm trying to say.

15   Q    Oh, you did.  Okay.

16   A    Yes, sir.

17   Q    How many times?

18   A    Only one time, sir.

19   Q    Okay.  And during that time, did you work on a skirmish

20   line?

21   A    No, sir.

22   Q    Okay.  And during the time that you worked as a Yarmouth

23   police officer, did you have to decide, when something was

24   thrown at you, whether or not to deploy a projectile?

25   A    At that time, sir, I didn't have a weapon capable -- a

20-cv-1878-RBJ   EDWARD MAGUIRE, PhD - Cross   03-18-2022

1    less-lethal weapon available to me.

2    Q    So, fair enough, you've never as a police officer made a

3    decision about whether or not to fire a projectile when

4    something is thrown at you?

5    A    That's correct, sir.

6    Q    Okay.  And when something is thrown at a police officer,

7    they have to make a split-second decision assessment of what it

8    is that is thrown at them.  You would agree?

9    A    Yes, sir.

10   Q    And then in the next split second, they have to decide what

11   to do about whatever it is that's thrown at them; right?

12   A    Yes, sir.

13   Q    They have to assess the danger of what's being thrown at

14   them; correct?

15   A    Yes, sir.

16   Q    And then they have to understand the danger and decide what

17   an appropriate response would be; right?

18   A    Yes, sir.

19   Q    And those decisions are made by a police officer in split

20   seconds; right?

21   A    Yes.

22   Q    And you understand that from your studies of policing?

23   A    Yes.

24   Q    But that's not something that you've ever had to do;

25   correct?

20-cv-1878-RBJ    EDWARD MAGUIRE, PhD - Cross    03-18-2022

1  A    That's correct.

2  Q    And one of the things that a police officer has to decide

3  in terms of whether they're using force is whether the actions

4  that they're confronting at a particular moment in time

5  constitute something that's called defensive resistance; right?

6  A    Yes, sir.

7  Q    Tell the jury what defensive resistance is, Professor

8  Maguire.

9  A    I don't remember the exact definition.  This is a term that

10  I'm not familiar with.  I see it in the Denver PD training

11  materials, but my understanding is it doesn't involve aggression

12  on the part of the person.  It doesn't involve, you know,

13  actually engaging in offensive behavior.  It's just resisting

14  the officer's commands.  But again, I don't recall the precise

15  answer from the Denver PD policy or training materials.

16  Q    Fair enough.  There's also a concept called active

17  aggression; right?

18  A    Yes, sir.

19  Q    And what is that from your understanding?

20  A    That's when an individual is actively engaging in

21  aggression toward the officer or toward another individual.

22  Q    And as an example, you reviewed the PepperBall materials of

23  the Denver Police Department as part of forming your expert

24  opinion; right?

25  A    Yes, sir.

20-cv-1878-RBJ   EDWARD MAGUIRE, PhD - Cross   03-18-2022

1    Q    Okay.  You reviewed the policy related to PepperBall?

2    A    Yes, sir.

3    Q    You reviewed the training related to PepperBall?

4    A    Yes, sir.

5    Q    And you were shown one slide, I believe, that had some

6    information related to the PepperBall course; right?

7    A    I'm not sure I understand that question, sir.

8    Q    During your direct examination --

9    A    Oh, yes, sir.

10   Q    -- was something put on the screen related to the

11   PepperBall course, and that was one single slide; right?

12   A    I reviewed one single slide today.  Yes, sir.  Of course, I

13   reviewed the entire training materials previously.

14   Q    I understand.  But you haven't discussed the entire

15   training materials today, have you?

16   A    I didn't mention every slide I reviewed, if that's what

17   you're asking, sir.

18   Q    Okay.  In the context of the use of PepperBall, both in the

19   policy and the training, you would agree that there are two ways

20   that Denver police officers are trained how to use PepperBall;

21   right?

22   A    Yes, sir.

23   Q    One of them is called area saturation; correct?

24   A    Yes.

25   Q    And under the policy of the Denver Police Department, that

20-cv-1878-RBJ   EDWARD MAGUIRE, PhD - Cross   03-18-2022

1   is a technique that is appropriately used when there's defensive

2   resistance; right?

3   A     Yes, sir.

4   Q     Okay.  Do you have a criticism of that?

5   A     No.

6   Q     Okay.  And the other way a PepperBall is used by Denver

7   police officers is as a direct impact weapon?

8   A     Yes, sir.

9   Q     And that's when the PepperBall is fired and designed to hit

10  an appropriate area of the person's body?

11  A     Yes, sir.

12  Q     And under Denver Police Department policy and training,

13  that's when there is active aggression; right?

14  A     Yes, sir.

15  Q     And you don't have any problem with that being a use of a

16  PepperBall; right?

17  A     It's what I recommend, sir.

18  Q     Okay.  Fair enough.  You've never used a PepperBall system

19  yourself?

20  A     I have not.

21  Q     You've never used a 40-millimeter system yourself?

22  A     I have not.

23  Q     You've never used tear gas yourself?

24  A     I have not.

25  Q     You've never worked as an incident commander responding to

20-cv-1878-RBJ   EDWARD MAGUIRE, PhD - Cross   03-18-2022

1   a protest?

2   A    That's correct.

3   Q    You've never worked as a lieutenant responsible for

4   deciding how to address a large crowd of protesters and

5   agitators; right?

6   A    That's correct, sir.

7   Q    Okay.  Your experience and knowledge about protests is

8   based on your academic study as a professor, largely; right?

9   A    That's correct, sir.

10  Q    Okay.  And the focus of your studies, and we will come back

11  to this later, is crowd psychology; fair?

12  A    That's a piece of it.  Yes, sir.

13  Q    Okay.  You were hired as an expert by counsel for the

14  plaintiffs; right?

15  A    Yes.

16  Q    And of course you're being paid, aren't you?

17  A    Yes.

18  Q    And because you're being paid, you keep track of the number

19  of hours that you've spent on this case, don't you?

20  A    Yes, sir.

21  Q    How many hours total have you spent on this case?

22  A    I'm not exactly sure, sir, but I think it's probably

23  somewhere around 100.

24  Q    So, 100 total hours?

25  A    In that ballpark.

20-cv-1878-RBJ   EDWARD MAGUIRE, PhD - Cross   03-18-2022

1   Q   Okay.  And your hourly rate for your work when you're in

2   your office is $250 an hour; right?

3   A   That's correct, sir.

4   Q   Your hourly rate for the time that you're spending in court

5   is $350 an hour?

6   A   Yes, sir.

7   Q   And your travel time from Phoenix to Denver is also billed

8   at $350 an hour?

9   A   Yes, sir.

10  Q   And the hundred hours includes your travel time?

11  A   Like I said, I am guessing about the 100 hours, but

12  whatever number of hours it is, it includes my travel time.

13  Q   And you've been attending parts of this trial this week,

14  have you not?

15  A   Yes, I have.

16  Q   And that would include all of that time, too, would it not?

17  A   Yeah.  But just to be clear, I am guessing about that

18  number of hours.  I'm not exactly certain of it.

19  Q   Okay.  I understand, but it's not 200, is it?

20  A   It's not 200, sir.

21  Q   Okay.  It's 100 or thereabouts?

22  A   Yes, sir.

23  Q   Okay.  The magnitude of the total amount of time you spent

24  in this case is 100 hours, give or take?

25  A   Yes, sir.

Kevin P. Carlin, RMR, CRR

20-cv-1878-RBJ   EDWARD MAGUIRE, PhD - Cross   03-18-2022

1   Q    Twenty-five hours above would be about the maximum that

2   could be more?

3   A    I think that's about right.

4   Q    Okay.  Fair enough.  So, you were here yesterday during

5   Mr. Mitchell's testimony; right?

6   A    Yes.

7   Q    And he testified that there was several hundred hours of

8   body-worn camera that was provided to the Office of Independent

9   Monitor by the Denver Police Department; right?  You heard him

10  say that?

11  A    Yes, I did.

12  Q    You have not reviewed several hundred hours of body-worn

13  camera if you've only spent about 100 hours on the case;

14  correct?

15  A    That's correct, sir.

16  Q    And you also learned from Mr. Mitchell that there was

17  approximately 15,000 hours of HALO and other fixed camera video;

18  right?

19  A    Yes, sir.

20  Q    You haven't read -- you haven't reviewed all of that

21  materials either, have you?

22  A    I have not.

23  Q    Okay.  Somebody else selected the videos that you've

24  reviewed; right?

25  A    For the most part.  I think there were moments during my

20-cv-1878-RBJ    EDWARD MAGUIRE, PhD - Cross    03-18-2022

1  report preparation process when I requested certain videos, but

2  for the most part, yes, sir.

3  Q     Okay.  You didn't survey all the video and then select ones

4  that you thought were important?

5  A     That's correct, sir.

6  Q     The video that you reviewed was generally selected by

7  plaintiffs' counsel, who was paying you; right?

8  A     Yes.  Or in some instances, if I was missing something that

9  I thought I needed to review, I would request it, and they would

10  provide it.

11  Q     Okay.  How many times did you request something that wasn't

12  provided?

13  A     I don't remember, sir.  This was last summer.

14  Q     Less than a handful, would you guess?

15  A     I'm guessing it was just a few times.  Yes, sir.  But I

16  wouldn't want to speculate.

17  Q     Fair enough.  I wouldn't want you to speculate either.

18  There's a lot of audio and radio information that was -- as part

19  of what happened during these protests; right?

20  A     Yes, sir.

21  Q     Did you spend any time looking -- listening to any of that

22  audio?

23  A     A little bit of time, yes, sir.

24  Q     Okay.  Sort of generally perusing it or looking at --

25  listening to audio that was provided specifically for you by

20-cv-1878-RBJ   EDWARD MAGUIRE, PhD - Cross   03-18-2022

1    plaintiffs' counsel?

2    A    Listening to audio around the event -- the specific events

3    that I was examining.  So, I don't remember to what extent I

4    would have requested it or it was provided to me.

5    Q    Okay.  And you've reviewed a lot of documents in this case;

6    right?

7    A    Yes, sir.

8    Q    Thousands of pages?

9    A    I wouldn't want to speculate about the number of pages, but

10   mostly depositions and training materials and OIM memos.

11   Q    Okay.  Did you review the OIM report?

12   A    Yes.

13   Q    And you reviewed Mr. Stamper's report?

14   A    Yes.

15   Q    Okay.  Did you review any of the depositions of the

16   plaintiffs?

17   A    I just don't recall.

18   Q    Okay.  All right.  You had talked about in your direct

19   examination the book you wrote in January of 2020?

20   A    Yes, sir.

21   Q    And it's called Policing Protests, Lessons from the Occupy

22   Movement, Ferguson, and Beyond, a Guide for Police?

23   A    Yes, sir.

24   Q    And it was written with a co-author named Meghan Oakley?

25   A    Yes.

20-cv-1878-RBJ   EDWARD MAGUIRE, PhD - Cross   03-18-2022

1   Q    And Ms. Oakley is also an academic?

2   A    No.

3   Q    What is Ms. Oakley's role?

4   A    She was at the time my research associate.  So, basically

5   somebody who assisted me in many of my projects.

6   Q    Okay.  Did Ms. Oakley help you with any of your review of

7   any of the documents in this case?

8   A    No.

9   Q    Did anyone?

10  A    No.

11  Q    Okay.  All right.  And your book, published in

12  January 2020, analyzes and draws lessons from the Occupy

13  movement; right?

14  A    As well as other protests, yes, sir.

15  Q    Understood.  And we will get to those.  And the Occupy

16  movement happened in 2011; right?

17  A    2011 and 2012, sir.

18  Q    Right.  But the Occupy movement started in, what is it

19  called?  Zuccotti Park in -- by Wall Street in New York City in

20  maybe November of 2020 -- 2011?

21  A    Yeah.  September of 2011.  Yes, sir.  In Zuccotti Park.

22  Q    And your book also talks about Ferguson, Missouri; right?

23  A    Yes, sir.

24  Q    And that's a reference to protests and related activity

25  that happened in Ferguson as a result of the death of Michael

20-cv-1878-RBJ   EDWARD MAGUIRE, PhD - Cross   03-18-2022

1    Brown; right?

2    A    Yes, sir.

3    Q    And that happened beginning in 2014; right?

4    A    It was the summer of 2014.  Yes, sir.

5    Q    And then it happened -- there were -- the protests in

6    Ferguson happened related to events that were happening related

7    to criminal proceedings of the officer who was involved in that

8    shooting?

9    A    Yes, sir.

10   Q    So, there was some when it initially happened.  There were

11   some when, for example, a grand jury decided not to indict that

12   particular officer?

13   A    That's right, sir.

14   Q    And that was in 2015?

15   A    Some in 2014 and some in 2015.  Yes, sir.

16   Q    Okay.  And then you also talked about in your policing

17   protest book, the activities of the Unite the Right that

18   occurred in Charlottesville, Virginia, in 2016?

19   A    Yes, sir.

20   Q    Nothing about your policing protests talks about the George

21   Floyd protests; right?

22   A    That's correct.

23   Q    Because the book was prior to that time?

24   A    Yes, sir.

25   Q    Okay.  But you would agree that the Occupy movement and the

20-cv-1878-RBJ   EDWARD MAGUIRE, PhD - Cross   03-18-2022

1   lessons from Ferguson were still under active academic research

2   and scholarship when you wrote your book in 2020?

3   A    Yes, sir.  I mean, research continues on these topics often

4   for decades.  So, yes, sir.

5   Q    Right.  Understood.  And you wrote two expert reports in

6   this case; right?

7   A    No, sir.

8   Q    No, sir?  Okay.  So, there was a report that was written on

9   August 2nd of 2021?

10  A    Yes, sir.

11  Q    And then there was a second report, a rebuttal expert

12  report of Dr. Edward R. Maguire that was written on

13  December 22nd of 2021?

14  A    Yes, sir.  I don't remember all the dates, but there were

15  four reports in total.

16  Q    Oh.  Four reports in total.  Okay.  And some of your

17  reports deal with the City of Aurora; right?

18  A    That's correct, sir.

19  Q    And some deal with the County of Jefferson?

20  A    I don't recall anything about the County of Jefferson.

21  Q    Okay.  But you wrote reports about the City of Aurora?

22  A    There was one supplemental report that was based on my

23  examination of some materials from Aurora.  Yes, sir.

24  Q    Okay.  Fair enough.  And so of the 100 to 125 hours, some

25  of your attention was focused on things related to the City of

20-cv-1878-RBJ    EDWARD MAGUIRE, PhD - Cross    03-18-2022

1   Aurora and not the City and County of Denver?  Do I have that

2   right?

3   A    So, my recollection, which is a bit fuzzy, is that the

4   video footage that I reviewed happened within the City of

5   Denver, but that the training materials I reviewed were from the

6   Aurora Police Department.

7   Q    Okay.  I understand, I think.  All right.  So, your book --

8   you quote -- you quote or cite your book in your expert reports

9   multiple times; right?

10  A    Yes, sir.

11  Q    And you consider your book an example of the national

12  standards for policing that you talk about; right?

13  A    National standards, to an extent, yes, sir.

14  Q    Okay.  And are you -- as we talked about before, your book

15  came out in January of 2020?

16  A    Yes.

17  Q    And you indicated on your direct examination that it was

18  distributed to larger police departments in the United States

19  and elsewhere?

20  A    Yes, sir.

21  Q    And are you aware of any police department adopting the

22  lessons from your book in their policy or training between

23  January 2020 when it came out and May of 2020 when the George

24  Floyd protests occurred?

25  A    I'm not exactly sure about that.  I received phone calls

20-cv-1878-RBJ   EDWARD MAGUIRE, PhD - Cross   03-18-2022

1  from police departments seeking advice on these matters, and so

2  I provide that advice.  But I haven't followed up to determine

3  whether they actually put in place the things that they were

4  planning.  So, my answer is I'm just not sure.

5  Q    Fair enough.  But what I'm wondering is that five-month

6  period of time, you would agree, is a pretty short period of

7  time for any police department to change its crowd management

8  policies or its crowd management training in response to the

9  input of your book; right?

10  A    Yes, sir.  Although the crowd psychology material in that

11  book is four decades old.

12  Q    Okay.  You have not worked with the Denver Police

13  Department; right?

14  A    I do not recall working with the Denver Police Department.

15  No, sir.

16  Q    And you don't even know if anyone at the Denver Police

17  Department has knowledge of your book; right?

18  A    I don't know, sir.

19  Q    Okay.  And you talked about surveying police departments as

20  part of your research, particularly after the Occupy events

21  around the country; right?

22  A    We visited and conducted interviews with those police

23  departments.  No actual surveys.

24  Q    Fair enough.  It was interviews, and there were 15 police

25  agencies that were talked to or interviewed, I guess?

20-cv-1878-RBJ   EDWARD MAGUIRE, PhD - Cross   03-18-2022

1   A    That's my recollection.  Yes, sir.

2   Q    And one of them was the Boulder Police Department?

3   A    I don't recall that, but yes, sir.  I will take -- I will

4   assume you're telling me the truth about that.

5   Q    Fair enough.  But Denver wasn't one of them, to your

6   recollection?

7   A    That's right, sir.

8   Q    Okay.  All right.  I wanted to talk to you about sort of

9   your general approach and your general opinions about protests

10  and the notion of crowd psychology being an important component

11  to understanding how police should appropriately police

12  protests.  Okay?

13  A    Okay.

14  Q    And then I'm going to talk to you about how that works in

15  the context of the George Floyd protests of Denver and

16  elsewhere.  Okay?

17  A    Okay.

18  Q    So, the way that I understand your approach is that as

19  outlined in your book, is that what you want police departments

20  to do is focus on education, facilitation, communication, and

21  differentiation; right?

22  A    That's right, sir.

23  Q    Okay.  And education means understanding -- you believe

24  it's important for the police to learn about the different

25  social identities of the different subgroups in a crowd,

20-cv-1878-RBJ    EDWARD MAGUIRE, PhD - Cross    03-18-2022

1  including their overall values and goals and their specific

2  intentions for the protest.  Do I have that right?

3  A     Yes, sir.  You do.

4  Q     Okay.  In terms of facilitation, you mean that a police

5  response can be effective if the response to a protest is to

6  facilitate peaceful protesters engaging in their protest

7  activities?

8  A     That's right, sir.

9  Q     In terms of communication, you believe it's important for

10  police to communicate with protest leaders before, during, and

11  after the protest to understand their aims, and therefore be

12  able to help facilitate those aims if those aims are reasonable?

13  A     So, yes.  I agree with everything you said.  There are many

14  other reasons to communicate with them, but yes, sir.

15  Q     Okay.  Fair enough.  Communication is broader than what I

16  just said, is what you're telling me?

17  A     Yes, sir.

18  Q     Okay.  But the idea of communication being a central part

19  of how you believe police should respond to protests is

20  something that you agree with?

21  A     Yes, sir.

22  Q     Okay.  And then the last thing that you believe is

23  important is for police to differentiate between peaceful

24  protesters and those engaged in violence and destruction with

25  the goal of police targeting people who are agitators and

20-cv-1878-RBJ    EDWARD MAGUIRE, PhD - Cross    03-18-2022

1  destroyers, essentially; right?

2  A    I don't use the word "agitators" in any of my work, sir.

3  But yes, differentiating people who are behaving in a violent or

4  destructive manner, yes, sir.

5  Q    And you would agree as a general matter that there are in

6  protests in the United States people that are peacefully

7  protesting, and also people that are engaged in violent and

8  destructive behavior?

9  A    In some protests, yes, sir.  I would agree with that.

10  Q    All right.  Okay.  Let's talk about education as applied to

11  the George Floyd protests.  And for now, I want to focus on

12  Denver.  You would agree, would you not, that it's harder for

13  police to educate themselves about different subgroups in a

14  protest when the protest is spontaneous as opposed to planned?

15  A    Yes, sir.

16  Q    Okay.  And the reason that it's harder is because it's not

17  always easy in a spontaneous protest to identify either the

18  groups or the leaders who are putting together the spontaneous

19  protest?

20  A    I agree, sir.

21  Q    Okay.  And you talked about in your direct examination that

22  one of the ways to do that is for police to use all of their

23  sources, methods, things like that; right?

24  A    The relationships that they have previously built with the

25  community to sort of capitalize on those and tap into those in

20-cv-1878-RBJ   EDWARD MAGUIRE, PhD - Cross   03-18-2022

1   moments of need, yes, sir.

2   Q     Right.  And one of the ways that police operate is through

3   intelligence; right?

4   A     Yes.

5   Q     You understand that from your study of policing in the

6   United States?

7   A     Yes, sir.

8   Q     And none of the material that you reviewed had anything

9   from the intelligence folks of the Denver Police Department

10  about these protests; right?

11  A     I did not have access to the criminal intelligence of the

12  DPD.

13  Q     Okay.  And one of the reasons for that is that's closely

14  guarded information from law enforcement, because if they reveal

15  their sources and methods in terms of gathering intelligence,

16  that compromises their ability to gather intelligence in the

17  future?

18  A     Yes, sir.

19  Q     And that's something that's standard by -- for police

20  departments all over the United States, is it not, sir?

21  A     Yes, sir.

22  Q     Okay.  And it's not -- it doesn't surprise you that police

23  departments closely guard their intelligence-gathering

24  capabilities?

25  A     That's correct.

20-cv-1878-RBJ   EDWARD MAGUIRE, PhD - Cross   03-18-2022

1   Q    Okay.  Similarly to the United States government not

2   disclosing its sources and methods about how it gained

3   information related to what Vladimir Putin was going to do with

4   respect to Ukraine; right?

5   A    Yes, sir.

6   Q    The government put out what they thought President Putin

7   was going to do, but they didn't explain it in terms of their

8   sources and methods; right?

9   A    Right.

10  Q    Police departments act on intelligence in a similar

11  fashion?

12  A    Yes, sir.

13  Q    Okay.  It wouldn't surprise you to learn that police

14  departments try to monitor social media about things like

15  protests?

16  A    Not only wouldn't it surprise me, I actively encourage it,

17  sir.

18  Q    Right.  That would be something that makes sense for them

19  to try to understand?

20  A    Yes, sir.

21  Q    Okay.  And one of the things that I didn't understand about

22  your book, and maybe you can explain it to me, is I get the

23  notion of trying to understand what the protesters' goals are

24  and what their values are and what they're trying to accomplish

25  with respect to their protest, because that would allow the

1   police to educate themselves and therefore help with

2   communication about how protests could be facilitated; right?

3   A    Yes, sir.

4   Q    Okay.  In a planned protest, something like the Women's

5   March as an example that happened all over the country after the

6   election of Donald Trump as president of the United States --

7   you're familiar with that?

8   A    Yes, sir.

9   Q    Those were planned protests, and the people that were

10   involved in those protests were identifiable; right?

11   A    Yes, sir.

12   Q    And they presumably sat down with police departments all

13   over the United States and had communications of this is what

14   we're trying to accomplish.  This is where we want to go.  This

15   is what we're going to do with respect to the protest?

16   A    I wouldn't know, sir.

17   Q    Would you assume that that would have occurred?

18   A    I would assume it occurred in some places and not others.

19   Q    Okay.  Fair enough.  But good policing of that kind of

20   event from a crowd psychology perspective would -- you would

21   have encouraged somebody like the Denver Police Department to do

22   that; right?

23   A    Absolutely.

24   Q    Okay.  Because that's what you're saying they should have

25   done with respect to the George Floyd protests; right?

20-cv-1878-RBJ   EDWARD MAGUIRE, PhD - Cross   03-18-2022

1   A    Yes, sir.

2   Q    Okay.  One of the things I don't understand is why does it

3   matter for the police to understand the values, goals, and

4   intentions of people who want to engage in violence and

5   destruction?

6   A    One of the major things that we encourage police to do is

7   essentially, you know, not sort of start off on a negative

8   footing with the crowd.  And so the more you understand them,

9   the more you're able to sort of communicate with them in a way

10  that doesn't set things off in a negative light right from the

11  beginning.  And so that's why we encourage that, sir.

12  Q    I understand that, but if someone is wanting to engage in

13  violence and destruction, wouldn't you agree that their values

14  and their goals don't really matter?

15  A    Yes.  If somebody is engaging in violence or property

16  damage, they should be arrested when they do that.  Of course.

17  Q    Okay.  Fair enough.  All right.  Then in terms of

18  facilitation, you agree that the crowd management manual by the

19  Denver Police Department exhibits a philosophy of the department

20  to facilitate peaceful protests?

21  A    Yes, I would.

22  Q    Okay.  And have you reviewed the deposition testimony of

23  Division Chief Ron Thomas and the deposition testimony of

24  Commander Patrick Phelan?

25  A    Yes, sir.

20-cv-1878-RBJ   EDWARD MAGUIRE, PhD - Cross   03-18-2022

1    Q    And you understand from their deposition testimony that as

2    a matter of practice from a historical perspective, Denver and

3    its police tries to facilitate protests and allows protesters to

4    march downtown and helps them by blocking streets and

5    facilitating their protest activities?  You understand that?

6    A    I just have a fuzzy memory of those depositions.  I

7    probably haven't looked at them now in about eight or nine

8    months.

9    Q    Okay.  You were not here for Commander Phelan's testimony

10   in court?

11   A    I believe I was here for a portion of it.

12   Q    Okay.  Do you recall him testifying that during some of the

13   George Floyd protests, there was the ability to facilitate

14   things like marches and protest activities, particularly during

15   the day?

16   A    I remember him commenting on the difference in tone between

17   the day -- the protests during the day and the evening.  Yes,

18   sir.

19   Q    And you also remember him describing how people would --

20   how the police would facilitate marches of protesters during the

21   day in particular; right?

22   A    I am not sure I remember that, but I remember the general

23   discussion.  Yes, sir.

24   Q    Okay.  In your opinions as presented earlier this

25   afternoon, you don't differentiate between daytime and

20-cv-1878-RBJ   EDWARD MAGUIRE, PhD - Cross   03-18-2022

1   nighttime, do you?

2   A    I don't recall in my reports if I differentiated between

3   them or not.

4   Q    Okay.  You would agree that there are differences between

5   what occurred in Denver during the protests and related

6   activities at night in comparison to the day?

7   A    Yes, sir.

8   Q    Okay.  And that's -- do you believe that it was more

9   violent at night?

10   A    Potential -- yeah.  I think probably, yes, sir.

11   Q    And you would agree that there was more destruction of

12   property and vandalism at night?

13   A    I think so.  Yes, sir.

14   Q    Okay.  And let me come back to that.  All right.  The next

15   thing I wanted to talk to you about was communication.  And we

16   talked a little bit about communication in the context of the

17   Women's March, and I think you would agree that in a spontaneous

18   protest where leaders are not readily identifiable,

19   communication is a harder activity; right?

20   A    Yes, sir.

21   Q    All right.  And as a basic principle, wouldn't you agree

22   that policing protests is hard work?

23   A    Absolutely.

24   Q    And probably the hardest thing that police departments are

25   faced to do?

20-cv-1878-RBJ    EDWARD MAGUIRE, PhD - Cross    03-18-2022

1    A    I wouldn't say it's the hardest, but I would say it's very

2    difficult.  Yes, sir.

3    Q    Okay.  And when the protests involve the police, the

4    ability to communicate with protest leaders is much more

5    difficult, is it not?

6    A    Yes, sir.  It's more challenging.

7    Q    Right.  And in your book, you talk about it as being

8    exceptionally challenging.  Would you agree with that?

9    A    I don't recall my exact wording, but I agree with the

10   sentiment.  Yes, sir.

11   Q    And the more decentralized and multifaceted a protest is,

12   the harder it is for the police to communicate with the leaders

13   of such a protest; isn't that right?

14   A    Could you clarify your question for me, sir?  I'm not sure

15   I understood.

16   Q    Okay.  Sometimes in protests, there is one central

17   activity.  Women's March as an example, in Denver, there was a

18   rally at the city and county building with speeches, and then

19   there was a march following the rally.  And so there's

20   essentially one activity that the protesters are doing at any

21   one given time; right?

22   A    Yes, sir.

23   Q    You get that as a potential concept?

24   A    Yes, sir.

25   Q    Unlike that in the George Floyd protest, those were

20-cv-1878-RBJ   EDWARD MAGUIRE, PhD - Cross   03-18-2022

1  decentralized.  There was protests and related activity at a

2  variety of different locations in a large geographic area of

3  Denver at the same time that the police were needing to respond

4  to simultaneously?

5  A    Yes, sir.  So, yeah.  So, I understand your question now.

6  So, yes.  I think that protests that occur in one place without

7  movement tend to be easier than protests that occur in multiple

8  locations, or where protesters are actually mobile.  And so,

9  yes, those mobile protests and protests that are scattered in

10  multiple locations are certainly more challenging for police to

11  address.

12  Q    Right.  And it's not -- it's common, isn't it, for

13  protesters that are targeting the police with their protest to

14  not want to engage with the police, not want to communicate with

15  the police related to what their intentions, their values, and

16  their goals are; right?

17  A    That question is a little challenging to answer.  I mean, I

18  think usually when people want to protest against the police,

19  they want the police there to be able to hear their protest.

20  And so I think they definitely want their message heard, and I

21  think that's pretty common throughout the Black Lives Matter

22  movement.

23  Q    I'm talking about before --

24  A    So, prior to a protest?

25  Q    Correct.

Kevin P. Carlin, RMR, CRR

20-cv-1878-RBJ   EDWARD MAGUIRE, PhD - Cross   03-18-2022

1  A     Yes, sir.  So, it can be more challenging, certainly, when

2  the protest is about the police, for police to be able to make

3  contact with those protesters.  That's where those longstanding

4  relationships that agencies -- if they invest in them, that's

5  where those relationships really bear fruit.

6  Q     Okay.  And you don't have any knowledge one way or the

7  other about the nature of those relationships by the City and

8  County of Denver and its police department?

9  A     I do not, sir.  That was not part of my inquiry, sir.

10  Q     And you don't know what -- whether there was any effort by

11  the Denver Police Department or others with the City to tap into

12  those kind of networks to try to have an engagement?

13  A     My only knowledge is from Commander Phelan's testimony, and

14  that's all I know about that topic.

15  Q     Right.  And he testified that there was an effort to engage

16  with people that they believed were going to be involved in a

17  protest, and that the -- the outreach by the police was

18  rebuffed?

19  A     Yes, sir.

20  Q     Okay.  And you would agree that it takes two sides to

21  communicate; right?

22  A     Of course.

23  Q     Okay.  One of the things that you didn't mention in your

24  testimony this afternoon, but which was in your report was

25  the -- when the chief of police of Denver, Paul Pazen, marched

20-cv-1878-RBJ   EDWARD MAGUIRE, PhD - Cross   03-18-2022

1   with the crowd on June 1st.

2   A   Yes, sir.

3   Q   Okay.  So -- and then you also mentioned in your report

4   that Murphy Robinson, the executive director of the public

5   safety, marched with the crowd on June 2nd?

6   A   Yes, sir.

7   Q   Okay.  So, there was an effort by the Denver Police

8   Department to effectively communicate with protesters that --

9   and their leaders to lead to the marches that happened with

10  Chief Pazen and Director Robinson; right?

11  A   There was an attempt, yes.  And those were appropriate

12  efforts; however, they came much too late.  I think they were

13  several days into the protest at that point.  Typically you

14  would want to see that kind of outreach at the beginning of an

15  event, before it starts to turn bad.

16  Q   Understood, but isn't it equally logical to suggest that

17  the protest leaders weren't willing to engage with the police

18  until the ability of Chief Pazen to do so, and then to meet with

19  them, as Commander Phelan said, and then march with people on

20  June 1st?

21  A   I don't agree with that logic, sir.

22  Q   Okay.  What facts do you have that that's not what

23  occurred, sir?

24  A   Can you clarify your question for me?

25  Q   Sure.  What facts do you have in anything that you reviewed

20-cv-1878-RBJ    EDWARD MAGUIRE, PhD - Cross    03-18-2022

1   that there wasn't efforts ongoing to try to communicate with the

2   protesters, and they only bore fruit based on the protesters'

3   unwillingness to communicate until Chief Pazen marched with them

4   on June 1st, and when that was set up?  Do you have any facts to

5   support that?

6   A    Thank you for clarifying, sir.  I understand your question

7   now.  No, I don't, sir.  I don't have any information about

8   that.

9   Q    Okay.  Because no such information was provided to you?

10  A    I didn't see any information on that topic, sir.  That's

11  correct.

12  Q    Okay.  All right.  The last piece of your model that I

13  wanted to talk to you about related to the George Floyd protests

14  was the issue of differentiation.

15  A    Yes, sir.

16  Q    Okay.  And one of the criticisms you have with respect to

17  the Denver Police Department is a failure to differentiate

18  between those who were engaged in violence and destruction and

19  those who were peacefully protesting?

20  A    That's correct, sir.

21  Q    Okay.  You would agree that there was violence and

22  destruction as part of the protests and related activities in

23  Denver?

24  A    Yes, sir.

25  Q    Okay.  Significant violence and destruction?

20-cv-1878-RBJ   EDWARD MAGUIRE, PhD - Cross   03-18-2022

1  A    I guess that's a relative term, but yes, sir.  There was

2  violence and destruction at the --

3  Q    Okay.  There were 81 police officer injuries.  You heard

4  Mr. Mitchell say that?

5  A    I know there -- yeah.  I don't remember the exact number,

6  but yes.  I remember there being a significant number of officer

7  injuries at the event.  Yes, sir.

8  Q    Okay.  And officers typically are not injured when

9  half-filled water bottles are thrown at them; right?

10  A    I guess they could be.  It depends on where it hits them

11  and what they're wearing.

12  Q    Okay.  If officers are wearing personal protective

13  equipment, it is unlikely that they would be injured by a

14  half-filled water bottle?

15  A    If that water bottle were made of plastic, I would agree

16  with you, sir, yes.

17  Q    Which suggests, if there are 81 officer injuries, there was

18  more violent activity directed to the police officers than

19  simply throwing plastic half-filled water bottles; correct?

20  A    I'm just -- I'm not sure about the source of the officers'

21  injuries, sir, so I'm not able to testify about that.

22  Q    Okay.  All right.  Do you think the officers injured

23  themselves?

24  A    No.  No.  I didn't mean anything like that, sir.  It's just

25  sometimes people can fall down.  Sometimes people can have a

20-cv-1878-RBJ   EDWARD MAGUIRE, PhD - Cross   03-18-2022

1    collision or something.  There are many potential sources of

2    injury during a protest.  I'm just not sure.  I didn't study --

3    to be clear, that wasn't part of my inquiry to study the causes

4    of police officer injuries.

5    Q    Okay.  But it doesn't strike you that if 81 police officers

6    are injured during a response to the protest, that it has

7    significant violence?  You can't reach that conclusion based on

8    all of the studies you've done related to protests?

9    A    Well, not reaching out to those other studies, but just in

10   the materials that I reviewed, there were certainly incidents of

11   violence where people threw objects at police officers, and

12   those officers were injured.  I don't know how many times that

13   happened, because that wasn't part of my inquiry, but I would

14   acknowledge that certainly some of those injuries were caused by

15   projectiles thrown at officers.  Yes, sir.

16   Q    Okay.  Fair enough.  Enough to cause 81 -- at least 81

17   separate injuries?

18   A    Again, how many injuries resulted from protesters, I'm not

19   sure.  But I'm acknowledging that in the materials that I

20   reviewed, several instances, both in depositions and other

21   materials of protesters throwing rocks at police that resulted

22   in injuries, yes, sir.

23   Q    Okay.  Fair enough.  Even in the videos and materials that

24   were selected for your review?

25   A    I am not sure if I observed -- and I guess I wouldn't know

20-cv-1878-RBJ    EDWARD MAGUIRE, PhD - Cross    03-18-2022

1   from a video if an officer was injured or not.  So, that

2   material for me came more from depositions and the summaries of

3   the OIM interviews.

4   Q     Fair enough.  Okay.  And Mr. Mitchell also testified that

5   there was more than $4 million of property damage when you count

6   the state capitol and City and County of Denver buildings and

7   private businesses?

8   A     Yes, sir.

9   Q     Would you agree that's a significant amount of property

10  damage?

11  A     Yes, sir.

12  Q     Okay.  Which suggests there was a significant amount of

13  destructive behavior going on as part of the protests?

14  A     Yes, sir.

15  Q     Okay.  In terms of differentiation, it's harder to

16  differentiate people who are peacefully protesting from people

17  who are with the protests who are doing violent and destructive

18  activities at night, particularly; right?

19  A     If I understand your question, sir, you're asking if it's

20  more difficult because it's dark out?

21  Q     Yes.

22  A     Yes, sir.  I agree with you.

23  Q     Okay.  Fair enough.  And you would agree that people who

24  are in crowds of protesters who want to engage in violence and

25  destructive behavior take steps to try to make it difficult for

20-cv-1878-RBJ   EDWARD MAGUIRE, PhD - Cross   03-18-2022

1   the police to differentiate between them and the peaceful

2   protesters?

3   A     Some of them do.  That's right, sir.

4   Q     Okay.  And there's tactics for people who are engaged in

5   violent and destructive behavior at protests; right?

6   A     For people who are more experienced, yes, sir.

7   Q     Okay.  There's communication across the United States by

8   those kind of people; right?

9   A     And globally, sir, yes.

10  Q     Right.  And they swap information about how to go about

11  being an agitator and engaging in violence and engaging in

12  destructive behavior at protests; right?

13  A     So, I don't use the term "agitator" in any of my work, but

14  yes.  There are -- you know, there's a small number of -- or a

15  small minority of participants at protest events who tend to be

16  more experienced and who tend to be plugged into those types of

17  networks that you talked about.  I would agree with that, sir.

18  Q     Okay.  And they communicate with each other and compare

19  notes about what the police are doing; right?

20  A     I think that -- yes.  I mean, as long as we're being clear,

21  here, I think that the people who engage in this type of

22  activity are very experienced protesters who are plugged into

23  those communities.  They tend to be a distinct minority of

24  protest crowds.  But yes, there are people who engage in that

25  type of activity, sir.

20-cv-1878-RBJ   EDWARD MAGUIRE, PhD - Cross   03-18-2022

1   Q     Right.  And those people who engage in those kind of

2   activities try to keep it from the police that they're the ones

3   who are engaging in those activities; right?

4   A     Yes.  So, some people who are very experienced protesters

5   are more challenging for police to be able to apprehend, because

6   they rely on tactics that they've learned either at other

7   protests or from other protesters.  Yes, sir.

8   Q     Okay.  And some of the tactics are to sort of hide oneself

9   in the back of the crowd and throw something over people in the

10  front of the crowd at the police to make it so that it's

11  difficult to identify a particular person who is throwing a

12  projectile; right?

13  A     Yes, sir.

14  Q     Okay.  That's a common tactic by some people that are

15  engaged in violent behavior in a protest context?

16  A     So, just to be clear, with regard to the word "common,"

17  it's common among a small number of protesters.  Yes, sir.

18  Q     Okay.  Some people come to these protests from out of

19  state; right?

20  A     Yes, sir.

21  Q     It's -- there is data that exists about people who travel

22  to different protests to engage in violent and destructive

23  behavior?

24  A     I'm not sure about the to engage in violent, destructive

25  behavior, piece, but yes, certainly there are people who attend

20-cv-1878-RBJ   EDWARD MAGUIRE, PhD - Cross   03-18-2022

1   protests from outside the community where the protest is being

2   held.

3   Q    Okay.  Sometimes people who are self-identified as

4   anarchists come to protests; right?

5   A    Yes, sir.

6   Q    Okay.  And you -- you're familiar with data and information

7   related to the George Floyd protests generally; right?

8   A    Yes, sir.

9   Q    And there is data from various police departments that

10  suggests that there was some segment, a subgroup, if you will,

11  who -- of people that were engaged in protests or with protest

12  activity all over the United States that were part of the

13  anarchist community; true?

14  A    Yes, sir.

15  Q    Okay.  And how would you describe the tactics and approach

16  of anarchists?  Would you describe that for the jury, please.

17  A    So, anarchists tend to believe that -- don't believe in the

18  legitimacy of government and government agencies, and tend to

19  reject the idea of government and governmental authority.  And

20  yeah.

21          MR. RINGEL:  Okay.  I can keep going, Your Honor.  I'm

22  at a place where I'm going to transition.  I have probably about

23  a half hour left.

24          THE COURT:  And then there's going to be redirect?

25  No.  That's enough for now.

20-cv-1878-RBJ   EDWARD MAGUIRE, PhD - Cross   03-18-2022

1        MR. RINGEL:  Okay.

2        THE COURT:  Thank you, ladies and gentlemen.  You're

3   being a terrific jury, but I have to ask you to come back on

4   Monday.

5        (Jury out at 4:23 p.m.)

6        THE COURT:  Okay.  The jury has been excused for the

7   evening.  Does either side have anything they wish to say or put

8   on the record at this time?  No?

9        MR. RINGEL:  No, Your Honor.  I just wanted to raise

10  one issue and ask how the Court wanted to handle it.  Obviously

11  when the plaintiffs rest, we're going to have a Rule 50 motion.

12  Does the Court want to do that now, or do you want me to stand

13  up and raise it and then hear it at lunch or at the end of --

14       THE COURT:  You can do it now if you wish.

15       MR. RINGEL:  I don't want to do it now.  At the time

16  where the plaintiffs rested, is what I'm wondering.  Do you want

17  to do it contemporaneously, or do you want to defer it so the

18  jury is away?  That's the only thing I was asking.

19       THE COURT:  Well, let's see where we are when you

20  finally get them to rest.

21       MR. RINGEL:  Okay.  All right.  Sounds good.

22       THE COURT:  Are you planning to be lengthy?

23       MR. RINGEL:  There are a lot of issues to cover, Your

24  Honor.  So, my guess is it will probably take me about 20

25  minutes to go through.

20-cv-1878-RBJ   EDWARD MAGUIRE, PhD - Cross   03-18-2022

1        THE COURT:  You understand that I'm going to construe

2   the evidence in favor of the plaintiffs?

3        MR. RINGEL:  I understand, and I suspect that most if

4   not all of the Rule 50 motion will be denied.  I have some hope

5   related to the pro se plaintiff that didn't show up for trial,

6   but other than that, I understand.  But the Court also

7   understands that I need to make a record, because that's

8   something that my -- that I need to do.

9        THE COURT:  Yeah.  That's okay.  So, let me ask, now

10  that you've heard almost all the evidence, are the plaintiffs

11  still of the belief that they've got a claim against Christian?

12       MR. MACDONALD:  Yes, Your Honor.

13       THE COURT:  Explain it.

14       MR. MACDONALD:  I believe the evidence shows that

15  Mr. Christian used force against Ms. Epps.  He acknowledged

16  doing so.  And I don't think it was reasonable force under the

17  circumstances for a Denver police officer to shoot at -- even if

18  his testimony was credited, to shoot at a citizen who was

19  jaywalking, Your Honor.

20       THE COURT:  The thing that distinguishes Christian,

21  and the reason he's still in the case, is because Ms. Epps and

22  you lawyers believe that he shot her in the leg.  We talked

23  about that before trial.  Now you've seen the evidence.  The

24  video shows, or at least appears to show, that the PepperBall

25  didn't hit her directly.  It hit on the street.  And she

2083

20-cv-1878-RBJ   EDWARD MAGUIRE, PhD - Cross   03-18-2022

1   acknowledged today that her bruise is on her inner left thigh.

2   The PepperBall from the video hit on the street to her right.

3   Now, how did she get hit by that PepperBall in the inner left

4   thigh?

5           MR. MACDONALD:  It's the calf, Your Honor.  Not the

6   thigh.

7           THE COURT:  Or calf.

8           MR. MACDONALD:  And this way, Your Honor.  A step.  He

9   is over here.  She is stepping, and it hits her left thigh --

10  her left calf, excuse me.

11          THE COURT:  Okay.  Well, we'll see you Monday.

12          MR. MACDONALD:  Thank you, Your Honor.

13      (Proceedings concluded at 4:27 p.m.)

14

15

16

17

18

19

20

21

22

23

24

25

1                    REPORTER'S CERTIFICATE

2

3

4           I, KEVIN P. CARLIN, Official Court Reporter for the

5     United States District Court for the District of Colorado, a

6     Registered Merit Reporter and Certified Realtime Reporter, do

7     hereby certify that I reported by machine shorthand the

8     proceedings contained herein at the time and place

9     aforementioned and that the foregoing pages constitute a full,

10    true, and correct transcript.

11           Dated this 9th day of April, 2022.

12

13

14

15

16    _____
      Kevin P. Carlin, RMR, CRR
17    Official Court Reporter

18

19

20

21

22

23

24

25

                    Kevin P. Carlin, RMR, CRR