1                    IN THE UNITED STATES DISTRICT COURT

2                        FOR THE DISTRICT OF COLORADO

3      Civil Action No. 20-cv-1878-RBJ

4      ELISABETH EPPS AND SARA FITOURI, ET AL.,

5            Plaintiffs,

6            vs.

7      CITY AND COUNTY OF DENVER, ET AL.,

8            Defendants.

9      ----------------------------------------------------------------

10                         REPORTER'S TRANSCRIPT

11                        Jury Trial, Vol. 11

12     ----------------------------------------------------------------

13           Proceedings before the HONORABLE R. BROOKE JACKSON,
       Judge, United States District Court for the District of
14     Colorado, commencing on the 21st day of March, 2022, in
       Courtroom A902, United States Courthouse, Denver, Colorado.
15

16                              APPEARANCES
       For the Plaintiffs:
17     TIMOTHY R. MACDONALD, MATTHEW J. DOUGLAS, and DIANA K. STERK,
       Arnold & Porter Kaye Scholer LLP, 1144 Fifteenth Street, Suite
18     3100, Denver, CO 80202

19     ELIZABETH C. WANG and MAKEBA RUTAHINDURWA, Loevy & Loevy, 2060
       Broadway Street, Suite 460, Boulder, CO 80302
20

21     For the Defendants:
       ANDREW D. RINGEL, KATHERINE HOFFMAN, and ROBERT A. WEINER, Hall
22     & Evans LLC, 1001 Seventeenth Street, Suite 300, Denver, CO
       80202
23
       HOLLIE R. BIRKHOLZ and LINDSAY M. JORDAN, Denver City Attorney's
24     Office, 201 West Colfax Avenue, Denver, CO 80202

25     Reported By KEVIN P. CARLIN, RMR, CRR, 901 19th Street, Room
       A259, Denver, CO 80294, (303)335-2358

          Proceedings reported by mechanical stenography; transcription
                          produced via computer.

2086

20-cv-1878-RBJ   Jury Trial   03-21-2022

1                          I N D E X

2   PLAINTIFFS' WITNESSES                                    PAGE

3   EDWARD MAGUIRE, PhD
         Cross Examination By Mr. Ringel  . . . . . . . . 2087
4        Redirect Examination By Ms. Sterk  . . . . . . . 2113

5

6   PLAINTIFFS' EXHIBITS:

7
                            Identified                Received
8

9       141                 2223                        2223
        509                 2225                        2225
10      581                 2197                        2197
        582                 2239                        2239
11      606                 2256                        2256
        1265                2245                        2245
12      1266                2301                        2302

13  DEFENDANTS' WITNESSES                                    PAGE

14  MICHAEL O'DONNELL
         Direct Examination By Ms. Hoffman  . . . . . . . 2149
15       Cross Examination By Mr. Douglas . . . . . . . . 2235
         Redirect Examination By Ms. Hoffman  . . . . . . 2285
16
    THOMAS PINE
17       Direct Examination By Ms. Birkholz . . . . . . . 2293

18

19  DEFENDANTS' EXHIBITS:

20                          Identified                Received

21      3056                2207                        2207
        3096                2198                        2198
22      3103                2216                        2216
        3137                2217                        2217
23      3152                2233

24

25  Reporter's Certificate  . . . . . . . . . . . . . . . 2303

20-cv-1878-RBJ   EDWARD MAGUIRE, PhD – Cross   03-21-2022

1                        P R O C E E D I N G S

2          (Proceedings commenced at 8:59 a.m.)

3          (Jury in at 8:59 a.m.)

4               THE COURT:  Good morning.  Let's go.

5               MR. RINGEL:  Thank you, Your Honor.

6                     **CROSS EXAMINATION**

7    BY MR. RINGEL

8    Q    Good morning, Professor Maguire.

9    A    Good morning, sir.

10   Q    I wanted to shift to talk about some of your opinions

11   related to the policies and the training of the Denver Police

12   Department related to crowd management and crowd control, if we

13   could do that.  You've concluded that they were outdated.  Do I

14   have that correct?

15   A    Yes, sir.

16   Q    Okay.  And the training that was provided was outdated, in

17   your opinion; right?

18   A    Yes, sir.

19   Q    Okay.  In your assessment of the training, you looked at

20   the training materials; right?

21   A    That's correct, sir.

22   Q    But you've never listened to or participated in an actual

23   training class to see how those training materials were

24   delivered in practice; right?

25   A    My assessment of the training materials was based solely on

20-cv-1878-RBJ    EDWARD MAGUIRE, PhD – Cross    03-21-2022

1   the written materials.  That's correct, sir.

2   Q    Okay.  So, to the extent that some of those slides are

3   utilized by someone like Sergeant Knutson to have a broader

4   discussion about crowd psychology, you wouldn't know that that's

5   the case, because of the limitation on what your review was; is

6   that fair?

7   A    If I understand your question correctly, I wouldn't know if

8   an instructor deviated from the written training materials.

9   That's correct, sir.

10  Q    Okay.  You say deviated, but one could also expand upon the

11  written training materials; correct?

12  A    That's correct, sir.

13  Q    I mean, there is a crowd psychology slide in the written

14  training materials; correct?

15  A    I believe there is one in one of the courses.  Yes, sir.

16  Q    Okay.  And so you wouldn't know what the discussion related

17  to that was in any of the training classes, because you're not

18  privy to that information; correct?

19  A    That's correct, sir.

20  Q    Okay.  You rely in part on some of the Office of

21  Independent Monitor memos related to training; correct?

22  A    To some extent, yes, sir.

23  Q    Okay.  You haven't spoken to any of the people who are in

24  the -- who were interviewed and their interviews reflected in

25  those memos; right?

20-cv-1878-RBJ   EDWARD MAGUIRE, PhD - Cross   03-21-2022

1   A    That's right, sir.

2   Q    You don't have any idea of any context that any of those

3   people might be able to provide about information provided in

4   those memos; correct?

5   A    I'm not sure I understand your question, sir.

6   Q    Okay.  You were shown Lieutenant Coppedge's memo as part of

7   the direct examination on Friday.  Do you remember that?

8   A    Yes.

9   Q    Okay.  You've never spoken to Lieutenant Coppedge, as an

10  example?

11  A    That's right.

12  Q    If Lieutenant Coppedge has context about the discussions

13  that he had with the Office of Independent Monitor, you wouldn't

14  know what that context is.  You're just relying on the language

15  in the memo itself; right?

16  A    That's right.

17  Q    Okay.  Same would be true with respect to the memo

18  involving Sergeant Knutson?

19  A    Yes.

20  Q    And also the memo involving Technician Grothe?

21  A    Yes.

22  Q    Okay.  My impression, Professor Maguire, is your central

23  criticism related to the training materials is an insufficient

24  focus on crowd psychology.  Do I have that right?

25  A    No, sir.

20-cv-1878-RBJ   EDWARD MAGUIRE, PhD - Cross   03-21-2022

1   Q    No, sir?  You don't think that that's the central focus?

2   A    I think -- I think the -- what's missing from the training

3   materials in my opinion goes well beyond just crowd psychology.

4   Q    Okay.  Fair enough.  But one of the focuses of your

5   research and your book is the issue of crowd psychology; right?

6   A    Yes.

7   Q    Okay.  And that is one of the criticisms that you have

8   about the training materials of the Denver Police Department;

9   right?

10  A    Yes, sir.

11  Q    Okay.  And would you agree that many police departments in

12  the United States have not adopted the crowd psychology

13  perspective that you outlined in your book?

14  A    I wouldn't know, sir.

15  Q    Okay.  You haven't sort of generally studied police

16  departments in the United States to see how well or how poorly

17  they are at including crowd psychology concepts in their crowd

18  management policies and training; right?

19  A    So, you know, there are 18,000 state and local police

20  departments in the United States, and I'm not aware of any

21  research evidence on the extent to which those agencies have

22  adopted crowd psychology.

23  Q    Your -- I mean, one of the things that you testified to was

24  after your book was published in January of 2020, it was sent to

25  a variety of jurisdictions related to some -- that it could

20-cv-1878-RBJ   EDWARD MAGUIRE, PhD - Cross   03-21-2022

1   potentially inform their decisions into the future related to

2   how to handle crowd management and crowd control; right?

3   A    Yes, sir.

4   Q    And if there was very wide adoption of the ideas in your

5   book, it wouldn't have been necessary, number one, to write your

6   book, and number two, send it to all those jurisdictions; right?

7   A    So, I'm not sure I understand your question.  Could I get

8   you to repeat your question, please, sir?

9   Q    Okay.  You wrote your book because you thought there was a

10  need to express what is in your book as a guide to police to --

11  for them to adopt about crowd management and crowd control for

12  their policies and training in the future; correct?

13  A    Yes, sir.

14  Q    You sent it to police departments throughout the United

15  States because you thought there was a need to have more police

16  departments adopt the model and philosophy that's outlined in

17  your book; right?

18  A    Yes, sir.

19  Q    Okay.  One of the things that you talked about on your

20  direct examination was some criticisms that you had about the

21  use of the 40-millimeter system.  If we could put up

22  Exhibit 457, please.  And specifically, page 57.  And this was

23  previously admitted.  Fifty-seven.  Okay.  So, you remember

24  looking at this during the direct examination on Friday,

25  Professor?

20-cv-1878-RBJ    EDWARD MAGUIRE, PhD - Cross    03-21-2022

1   A    Yes, sir.

2   Q    Okay.  And this was the only slide that you were shown as

3   part of the discussion related to the 40-millimeter operator

4   certification portion; right?

5   A    I don't recall, sir, but if you're saying it is, I believe

6   you.

7   Q    Okay.  Could you go to page 48, please, Mr. Atencio.  Okay.

8   So, the slide that you looked at is within the module of the

9   40-millimeter operator course related to the physiological and

10  psychological effects of the use of the 40-millimeter; right?

11  A    I don't recall, sir.

12  Q    Okay.  And what does "physiological" mean in this context?

13  A    The types of injuries that could result from being struck

14  by a 40-millimeter round.

15  Q    Physical injuries?

16  A    Yes, sir.

17  Q    Okay.  And psychological effects means the effects on

18  people's psychology from the potential use of a 40-millimeter

19  round; right?

20  A    I agree, sir.

21  Q    Okay.  Can we go to the next slide, Mr. Atencio.  All

22  right.  So, these are some of the physiological effects that are

23  trained to the 40-millimeter operators; right?

24  A    Could you rephrase your question for me, sir?

25  Q    Okay.  This slide reflects physiological effects of the

20-cv-1878-RBJ   EDWARD MAGUIRE, PhD - Cross   03-21-2022

1   40-millimeter; right?

2   A    Yes, sir.

3   Q    And this is part of the training to 40-millimeter operators

4   as part of their certification course; right?

5   A    Yes.

6   Q    Okay.  Let's go to the next slide.  All right.  This, too,

7   is about the physiological effects of the 40-millimeter system;

8   right?

9   A    Yes.

10   Q    Let's go to the next slide.  This talks about the issue of

11   blunt trauma as a potential impact; right?

12   A    Yes, sir.

13   Q    Can we go to the next slide.  This talks about penetrating

14   trauma; right?

15   A    Yes, sir.

16   Q    Okay.  So, in combination, those two slides talk about the

17   notion of hitting someone and not penetrating their skin, and

18   this second slide talks about the potential for penetration as a

19   potential impact of the 40-millimeter; right?

20   A    Yes, sir.

21   Q    Let's go to the next slide.  This talks about -- the first

22   bullet point talks about the potential for death or serious

23   physical injury with less-lethal projectiles, including the

24   40-millimeter; right?

25   A    Yes, sir.

20-cv-1878-RBJ    EDWARD MAGUIRE, PhD - Cross    03-21-2022

1   Q    And the second bullet point and the three sub bullet points

2   talk about the potential impact of this weapon system; right?

3   A    Yes, sir.

4   Q    Okay.  Let's go to the next slide.  This talks about the

5   particular round that was used by the Denver Police Department

6   during the response to the protests after the murder of George

7   Floyd; right?

8   A    Yes, sir.

9   Q    Okay.  So, we can take down this exhibit.  Those slides are

10  part of the training related to the 40-millimeter; right?

11  A    Yes.

12  Q    Not just that one slide that you looked at on your direct

13  examination?

14  A    That's correct.

15  Q    Okay.  More broadly, with respect to training, you have not

16  offered any opinions about the knowledge of the leadership of

17  the Denver Police Department regarding any deficiencies in their

18  policies or training on crowd management; right?

19  A    Well, certainly in the OIM memos, some of the leaders

20  within the police department rendered their opinions about

21  training.  So, I did draw on some of those materials.  Yes, sir.

22  Q    Right.  But you don't know what the senior leadership of

23  the Denver Police Department knew at the time -- prior to the

24  George Floyd protests about what was the status of their

25  policies and training related to crowd control and crowd

20-cv-1878-RBJ   EDWARD MAGUIRE, PhD - Cross   03-21-2022

1   management; right?

2   A    Yeah.  I don't recall if those issues came up in deposition

3   or not.  It's been some time since I've reviewed the deposition,

4   but I -- you know, on the spot, I'm not recalling any

5   information about training expressed by senior leaders.  That's

6   correct.

7   Q    Okay.  You have not offered any opinions about any prior

8   protests or crowd management event managed by the Denver Police

9   Department; right?

10  A    That's right.

11  Q    Your opinions are exclusively related to the George Floyd

12  protests?

13  A    Yes, they are.

14  Q    You don't offer any opinion about whether any prior event

15  related to a protest or crowd management was successful or

16  unsuccessful; right?

17  A    That's right.

18  Q    And you don't analyze how any policies or training of the

19  Denver Police Department related to crowd management or crowd

20  control worked or did not work in any prior event; right?

21  A    That's right, sir.

22  Q    You haven't analyzed whether the police department learned

23  from any of its prior experiences; right?

24  A    I have a faint recollection that some of that may have come

25  up in depositions, but again, it's been some time since I

20-cv-1878-RBJ   EDWARD MAGUIRE, PhD - Cross   03-21-2022

1    reviewed the depositions, so I'm not certain.

2    Q    But just because something comes up in deposition, that

3    doesn't necessarily mean you've offered an expert opinion about

4    it; right?

5    A    That's right, sir.

6    Q    Jury heard your expert opinions during the direct

7    examination; right?

8    A    Yes.

9    Q    Okay.  I want to shift gears and talk about your opinions

10   related to the strategy and tactics that were used in responding

11   to the protest, if we could do that.  You understand, Professor,

12   that the protests in Denver following the murder of George Floyd

13   were different than other prior experiences the Denver Police

14   Department had with protests; right?

15   A    Yes.

16   Q    And in your book, you acknowledge that protest policing is

17   admittedly difficult, and even the most well-intentioned leaders

18   make mistakes?

19   A    Yes, sir.

20   Q    You would agree with that statement?

21   A    Of course.

22   Q    And that isn't it fair to say that the nature of the George

23   Floyd protests made it even more difficult for the Denver Police

24   Department to respond?

25   A    I think the protests of 2020 were challenging for police

20-cv-1878-RBJ   EDWARD MAGUIRE, PhD - Cross   03-21-2022

1   departments around the country.  Yes, sir.

2   Q     Including Denver Police Department?

3   A     Yes, sir.

4   Q     And as you just indicated, there were protests all

5   throughout the United States and indeed the world following

6   George Floyd's death; right?

7   A     Yes.

8   Q     And one of the things that I didn't see in any of your

9   opinions was any comparative analysis to assess how the Denver

10  Police Department did in comparison to its peers.  Am I right

11  that that's not within the scope of your analysis and expert

12  opinions in this case?

13  A     Yes, sir.

14  Q     Okay.  Why not?

15  A     It just was beyond the scope of this engagement with what I

16  was asked to do.

17  Q     Okay.  Would you agree that many cities in the United

18  States struggled with the challenges of the protests in May and

19  June of 2020?

20  A     Yes, sir.

21  Q     And you would also agree, would you not, that many of the

22  cities did not follow the model that you advocate in your book

23  in their responses to the protests?  Right?

24  A     You know, I've only studied a limited number of cities, so

25  I'm not sure nationwide who did and who didn't.  I just don't

20-cv-1878-RBJ    EDWARD MAGUIRE, PhD - Cross    03-21-2022

1   have access to that information, sir.

2   Q    But you're a consumer of news and media information related

3   to police departments; right?

4   A    Yes, sir.

5   Q    That's what you spent 25 years studying; isn't that true?

6   A    Yes, sir.

7   Q    So, I assume that you consumed available news and

8   information related to some of the major protest events in

9   cities other than Denver; right?

10  A    Yes, sir.

11  Q    I mean, for example, I assume you know that there was

12  something in the city of Portland related to protests declaring

13  a zone where the police were not going to be allowed to do

14  anything; right?

15  A    That was in Seattle, sir.

16  Q    That was in Seattle.  Okay.  Fair enough.  So, you know

17  what I'm talking about?

18  A    Yes, sir.

19  Q    And that lasted a fair amount of time; right?

20  A    Yes, sir.

21  Q    And I assume you followed some of the information related

22  to protests and the response of the Minneapolis Police

23  Department; right?

24  A    Yes.

25  Q    Okay.  One of the things that you suggested in your

20-cv-1878-RBJ   EDWARD MAGUIRE, PhD - Cross   03-21-2022

1   opinions elicited on direct examination was the use of arrest

2   teams; right?

3   A    Yes.

4   Q    And one of your criticisms is there was not a use of arrest

5   teams to differentiate between the people that were engaged in

6   violent and destructive behavior and arrest them, as opposed to

7   others in the crowds that were engaged in peaceful protesting.

8   Do I have that right as a general proposition?

9   A    Yes.

10  Q    Okay.  You do understand from the materials that you read

11  that a variety of the police officers that were on the ground in

12  their depositions talked about why they did not believe that

13  arrest teams were a viable option with respect to the responses

14  of the -- for these protests; right?

15  A    Yes.

16  Q    Okay.  And you just disagree with their assessment.  Is

17  that a fair way to think about it?

18  A    It's a common reaction -- I won't say it's a common

19  reaction, but it's a reaction I've heard before.  And so there

20  are police departments in the United States that rely heavily on

21  arrest teams, and then there are police departments in the

22  United States that prefer to maintain what they call a standoff

23  distance and police these events from far away to avoid injury.

24  And so it's kind of a philosophical difference between police

25  tactics in the United States.

20-cv-1878-RBJ   EDWARD MAGUIRE, PhD - Cross   03-21-2022

1   Q    It's a philosophical difference to a certain extent, but

2   it's also a practical assessment of what's happening on the

3   ground, is it not?

4   A    I think, yeah.  I think people who disagree on this issue

5   disagree on which thing -- which approach is more threatening to

6   officer safety.

7   Q    Fair enough.  But you agree that the folks that testified

8   in their depositions that arrest teams weren't a viable option

9   in their opinion in this case were on the ground; right?

10  A    Yes, sir.

11  Q    And you weren't on the ground; right?

12  A    That's correct.

13  Q    Your review is at a distance after the fact; right?

14  A    That's right.

15  Q    And the principal way that you conducted your review was to

16  look at some video related to these protests; right?

17  A    Video and other written materials, yes.

18  Q    Understood.  But to see what's going on, or what went on,

19  you relied on video?

20  A    That's correct.

21  Q    And you would agree that there's some limitations related

22  to video evidence; right?

23  A    Yes, sir.

24  Q    Including limitations as to what a body-worn camera can

25  pick up; right?

20-cv-1878-RBJ   EDWARD MAGUIRE, PhD - Cross   03-21-2022

1    A    Yes.

2    Q    And also limitations in terms of what fixed cameras like a

3    HALO system or the fixed cameras that are at the capitol

4    operated by the Colorado State Patrol can pick up; right?

5    A    Yes.

6    Q    Okay.  Another of your opinions is related to the issuance

7    of dispersal orders and dispersal orders that were audible for

8    the crowd to hear; right?

9    A    Yes, sir.

10   Q    I wanted to unpack that a little bit.  One of the things

11   that I didn't see in your opinion was discussion of the

12   information that was conveyed related to the emergency curfew

13   when that first went into effect on May 30th.  You would agree,

14   would you not, that there was fairly robust communication about

15   the existence of the emergency curfew?  Right?

16   A    Yes.

17   Q    Including direct messages to people's cell phones that were

18   in the area?

19   A    Yes, sir.

20   Q    And an announcement system sort of generally over the

21   downtown area about the curfew; right?  You're aware of that?

22   A    Yes, sir.

23   Q    Okay.  And you understand that a variety of people chose to

24   ignore those instructions related to the curfew; right?

25   A    I'm not sure to what extent people ignored them or just

20-cv-1878-RBJ    EDWARD MAGUIRE, PhD - Cross    03-21-2022

1   didn't receive or hear them.  But, you know, it's possible that

2   some people ignored them.  Yes, sir.

3   Q    Okay.  Fair enough.  And would you agree that those are

4   notifications about, you know, sort of in the broadest sense,

5   dispersing from the areas affected by the emergency curfew?

6   A    Yes.

7   Q    Okay.  One of the other things about dispersal orders that

8   I wanted to ask you about was the circumstances in which -- in

9   which when a -- let me try that again.  I apologize.  With

10  respect to dispersal orders, would you agree that there are some

11  circumstances when OC or CS gas can be legitimately deployed

12  without a dispersal order?

13  A    Without an immediate dispersal order, yes, but one -- a

14  dispersal order should be given as soon as practicable.

15  Q    But you're aware that some of the deployments of OC and CS

16  gas as part of the response to the protest were done for what

17  the officers believed were officer safety reasons; right?

18  A    That's what I read in the depositions, and I believe some

19  of the OIM memos.  Yes, sir.

20  Q    And the concept is that the crowds are close to where the

21  police officers are deployed, and they're taking incoming

22  projectiles, and they need to move the crowd back generally

23  because of those incoming projectiles to create a distance

24  between where the police are and where the crowds are; right?

25  That's the concept as articulated in those depositions and OIM

20-cv-1878-RBJ   EDWARD MAGUIRE, PhD - Cross   03-21-2022

1   memos; right?

2   A    Yes, sir.

3   Q    And as a concept, you would agree that that can be

4   legitimate if the circumstances fit?

5   A    There are occasions in which that's an appropriate

6   response.  Yes, sir.

7   Q    Okay.  And but what I heard you say before is after that,

8   there should then be a dispersal order.  Is that what I'm

9   hearing?

10  A    There should always be a dispersal order if you're looking

11  to disperse a crowd.  If you're unable to give the dispersal

12  order prior to the use of force, which should be rare, then

13  immediately after the use of force, as soon as practicable, one

14  should be giving multiple dispersal orders.

15  Q    Okay.  I understand your perspective.  Let's turn to

16  discipline.  You have criticized the Denver Police Department

17  for not disciplining officers that you have concluded engaged in

18  inappropriate conduct based on your review of video; right?

19  A    That's correct, sir.

20  Q    Okay.  Can you explain to the jury how the discipline

21  system of the Denver Police Department works.

22  A    I mean, like all other police departments, there's an

23  internal affairs review of complaints that are received, whether

24  those complaints are externally or internally generated.

25  Q    Okay.  What is the Conduct Review Office's role in the

20-cv-1878-RBJ    EDWARD MAGUIRE, PhD - Cross    03-21-2022

1  Denver Police Department?

2  A    I don't recall, sir.

3  Q    What role does the Office of Independent Monitor have with

4  respect to the discipline system?

5  A    I don't recall, sir.

6  Q    What's the chief of police's role?

7  A    I don't know in Denver, but typically the chief of police

8  has the final word on any decision about discipline.

9  Q    Who -- what role does the executive director of the

10  Department of Public Safety play in the discipline system, sir?

11  A    I'm not certain, sir.

12  Q    Is there a judicial review available of Denver Police

13  Department disciplinary systems?

14  A    I assume so, sir, but I'm not certain.

15  Q    How does that work?

16  A    I don't know.

17  Q    Okay.  What is your understanding of the current status of

18  disciplinary proceedings generally related to events that

19  happened at the George Floyd protests?

20  A    So, I reviewed dozens of -- I believe Denver referred to

21  them as decline letters.  So, I know a number of the cases were

22  closed without finding wrongdoing on the part of the officer,

23  but I don't recall the exact number of them.

24  Q    Okay.  How many are still pending?

25  A    I don't recall.

20-cv-1878-RBJ    EDWARD MAGUIRE, PhD - Cross    03-21-2022

1   Q    How many of the videos that you reviewed generated either

2   an internal or external complaint?

3   A    I don't recall.  I just knew the total number at one point,

4   but --

5   Q    Right.  But there was a total number of complaints; right?

6   A    Yes, sir.

7   Q    And then there were 24 instances where the Office of

8   Independent Monitor asked internal affairs of the Denver Police

9   Department to look?

10  A    I do recall that, sir.  Yes.

11  Q    Right.  But you don't know, do you, whether any particular

12  video that you identify as something that has a potential

13  failure to discipline is one of the events that was actually

14  examined by internal affairs or is pending examination; right?

15  A    No, sir.  My judgment was based primarily on the total

16  number of upheld or total number of officers who were

17  disciplined, which was really small, given the amount of time

18  that's gone by.  Typically these would have been resolved much

19  more quickly.  You know, at this point, that number is tiny

20  relative to the amount of misconduct that I observed.

21  Q    Okay.  But you would agree that a complaint has to be

22  initiated for anything to start internal affairs; right?

23  A    Yes.  I mean, the vast majority of what happens in internal

24  affairs nationwide is complaint-based.  There are some

25  techniques that internal affairs uses that are more proactive,

20-cv-1878-RBJ   EDWARD MAGUIRE, PhD - Cross   03-21-2022

1   but yes, I would agree that primarily it is a complaint-driven

2   process.  Yes, sir.

3   Q    Right.  And because it's a discipline system, the person

4   who is -- there needs to be an identification of the subject for

5   the potential discipline, for the process to work; right?

6   A    Yes, sir.

7   Q    Okay.  So, if there isn't an ability to identify someone as

8   the suspect or the subject of the event, there can't be a

9   disciplinary process; right?

10  A    That's correct, sir.

11  Q    And some of the decline letters that you reviewed from the

12  internal affairs bureau had -- were declined because there was

13  an inability to identify the subject; right?

14  A    Yes.

15  Q    And you would agree that that's legitimate decision-making;

16  right?

17  A    I mean, I think the Denver Police Department put itself in

18  that position by not requiring body cam footage of use of force

19  reports, but certainly the internal affairs department can't be

20  blamed for those other decisions by the Denver Police

21  Department.

22  Q    Fair enough.  And we're going to talk about those in a

23  minute.  I promise.  Your opinions about discipline are solely

24  based on the George Floyd protests; right?

25  A    That's correct, sir.

20-cv-1878-RBJ   EDWARD MAGUIRE, PhD - Cross   03-21-2022

1   Q    You have not evaluated the discipline system of the Denver

2   Police Department in any other context; right?

3   A    That's right.

4   Q    Okay.  Let's talk about body-worn camera.  As you just

5   indicated, you have criticisms related to body-worn camera

6   usage; right?

7   A    Yes.

8   Q    You were here for Mr. Mitchell's testimony; right?

9   A    Yes.

10  Q    And you heard him testify that at no prior occasion did his

11  office raise a body-worn camera issue related to protests with

12  the Denver Police Department; right?

13  A    I don't recall, sir.

14  Q    Okay.  You heard Mr. Mitchell also testify that he was

15  involved in the review of the body-worn camera policy; right?

16  A    I think I was here for a portion of his testimony, sir.

17  So, there may be pieces of it that I missed, but I trust you,

18  sir.

19  Q    Okay.  You don't remember that?

20  A    I don't remember, no.

21  Q    Fair enough.  You are aware that the body-worn camera

22  policy that was in effect in May and June of 2020 did not have a

23  specific provision about how body-worn cameras were supposed to

24  be used during the protests?

25  A    Yes, sir.

20-cv-1878-RBJ   EDWARD MAGUIRE, PhD - Cross   03-21-2022

1   Q    Okay.  And again, your criticisms about body-worn camera

2   are based solely on the George Floyd protests as an example;

3   right?

4   A    That's right, sir.

5   Q    You did not examine any prior issue related to body-worn

6   camera usage by the Denver Police Department at all?

7   A    I believe I reviewed some sort of -- I think it was an OIM

8   study of body cam compliance among patrol officers that showed

9   low compliance in 2015, higher compliance in 2016, and then

10  nearly universal compliance.  And I want to say it was 2017 to

11  2019.  I think that's the only prior information I reviewed

12  relative to body-worn camera footage.

13  Q    Fair enough.  So, none of your prior information that

14  you've reviewed had anything to do with using body-worn cameras

15  in a protest context?

16  A    That's correct, sir.

17  Q    Okay.  All right.  Use of force reports.  You're critical

18  of the use of force report system that was employed by the

19  Denver Police Department as part of the George Floyd protest;

20  right?

21  A    Yes.

22  Q    Okay.  Were you here for my discussion with Mr. Mitchell

23  related to the differences between writing a use of force report

24  related to force involving an arrest versus writing a use of

25  force report related to force involving protest context?

20-cv-1878-RBJ   EDWARD MAGUIRE, PhD - Cross   03-21-2022

1   A    I don't recall, sir, but I will acknowledge that there is a

2   difference between those two types of events.

3   Q    Right.  And so generally speaking, in an arrest context,

4   the way that it would work is a use of force report would be

5   written by the officer who used force on the suspect that was

6   being arrested; right?

7   A    Yes, sir.

8   Q    And then right then, there would be a supervisor review and

9   the potential for the supervisor to collect evidence related to

10   the use of force in effectuating the arrest; right?

11   A    Yes, sir.

12   Q    Potentially interviewing the person against who force was

13   used; right?

14   A    Yes.

15   Q    Potentially interviewing any other officer that was

16   present?

17   A    Yes.

18   Q    Potentially interviewing any witnesses to the event?

19   A    Yes, sir.

20   Q    And then gathering any video evidence of the event; right?

21   A    Yes, sir.

22   Q    Including body-worn camera?

23   A    Yes.

24   Q    Any HALO or other cameras?

25   A    Yes.

20-cv-1878-RBJ   EDWARD MAGUIRE, PhD - Cross   03-21-2022

1   Q    Any private cameras that might exist at a business if this

2   was in the context where there would be a private camera?

3   A    Yes, sir.

4   Q    Or if it was in the context of a home, any cameras that

5   people have at their homes, which is increasingly common now;

6   right?

7   A    That's right, sir.

8   Q    Okay.  And in the protest context, essentially what would

9   have to happen to do the same thing would be the officer

10  wouldn't be able to continue to work the protest after a

11  decision to deploy PepperBall, for instance, until all of that

12  use of force analysis could occur; right?

13  A    That's correct.

14  Q    Okay.  And you think that that's a practical way to go

15  about policing protests?

16  A    No, sir.

17  Q    Okay.  Are you aware of any jurisdiction in the United

18  States that does it that way?

19  A    No, sir.

20  Q    In a protest context?

21  A    In a -- just to clarify, in a very large mass

22  demonstration, that would not be the ordinary process.

23  Q    Okay.  So, what you think should have happened is the

24  officers who used force on the first day of the protest, at the

25  end of their shift, should have done use of force reports?

20-cv-1878-RBJ   EDWARD MAGUIRE, PhD - Cross   03-21-2022

1  A    Well, I mean, the officers at the end of their shift are

2  going to do what their supervisors or their commanders have

3  instructed them to do.  In this case, what they should have

4  done, if not able to complete a use of force report due to the

5  practical concerns you just outlined, then certainly to take

6  very detailed notes about what they did for inclusion in a later

7  group or mass report submitted by their unit leader.

8  Q    Okay.  Fair enough.  So that the idea being there should

9  have been a direction from the Denver Police Department to have

10  the officers write down their memory of what occurred on day one

11  of the protests at the end of their shift, if they weren't able

12  to do it beforehand?

13  A    That's correct, sir.

14  Q    And you understand that some of the shifts that happened

15  during the protest were an extremely long period of time?

16  A    Yes, sir.

17  Q    Okay.  And it would be a practical burden on the officers

18  to have been required to do what you're suggesting that they

19  should have done; right?

20  A    I mean, certainly it would take some time to do it, but I

21  think the interest of justice and accountability demand it, sir.

22  Q    Okay.  All right.  You as part of your analysis of the use

23  of force reporting did not evaluate the Denver Police

24  Department's use of force reporting in any other context except

25  the George Floyd protests; right?

20-cv-1878-RBJ   EDWARD MAGUIRE, PhD - Cross   03-21-2022

1   A     That's correct, sir.

2   Q     You didn't analyze whether there was a use of force

3   reporting problem generally; right?

4   A     I did not.

5   Q     And you didn't even analyze whether there was a use of

6   force reporting problem with respect to any other crowd or

7   protest context; right?

8   A     That's correct, sir.

9   Q     Okay.  And you don't have any knowledge or information that

10  anyone in the leadership of the Denver Police Department was

11  aware of use of force reporting being a potential issue prior to

12  the George Floyd protests?

13  A     That's correct, sir.

14  Q     Okay.  All right.  Among all the opinions that you have in

15  this case, none of your opinions focused specifically on any of

16  the events involving the 12 plaintiffs; right?

17  A     Could you repeat your question, sir?

18  Q     Sure.  In your expert reports, you do not mention any of

19  the 12 plaintiffs; correct?

20  A     I actually don't recall, sir.  I'm not sure.

21  Q     During your recitation of your opinions on Friday, you

22  didn't mention any of the 12 plaintiffs?

23  A     I believe there was a slide up there about one of the

24  plaintiffs.  It was a pepper spray incident.  But I just -- I

25  don't recall, sir.

20-cv-1878-RBJ   EDWARD MAGUIRE, PhD - Redirect   03-21-2022

1   Q     Fair enough.  And you don't offer any opinions on the issue

2   of causation related to what happened with respect to any of the

3   events involving the plaintiffs; correct?

4   A     I just don't recall, sir.

5          MR. RINGEL:  Okay.  Those are my questions.  Thank

6   you, Your Honor.

7          THE COURT:  Redirect?

8                    **REDIRECT EXAMINATION**

9   BY MS. STERK

10  Q     Good morning, Professor.

11  A     Good morning.

12  Q     On Friday, Mr. Ringel had asked you some questions about

13  whether you had reviewed all the 200 hours of body-worn camera

14  footage and 15,000 hours of HALO camera footage that

15  Mr. Mitchell of the independent monitor had been provided by the

16  Denver Police Department.  Do you remember those questions?

17  A     Yes, ma'am.

18  Q     And are you aware that the City of Denver refused to give

19  plaintiffs all of the video that it had provided to the

20  independent monitor?

21  A     Yes, ma'am.

22  Q     In your opinion, what should we look at to determine what

23  Denver Police Department's policies and practices were as it

24  related to the protests?

25  A     So, Denver has a crowd management manual which serves as a

20-cv-1878-RBJ    EDWARD MAGUIRE, PhD - Redirect    03-21-2022

1    guide for what officers should do during these events.  And so

2    that's a written document that is intended to provide guidance

3    to officers.  However, its training bears very little

4    resemblance to the crowd management manual, so the department

5    doesn't really train its officers on that manual.

6              And then in practice during the events that I observed

7    during the George Floyd protests via video, the practices that I

8    observed on the street also don't resemble really to any extent

9    what's in that manual.  So, the manual appears to just be

10   written words on a page.  To me, their policy in practice is

11   just how they train their officers and what they did on the

12   street.

13   Q    And Mr. Ringel asked you today about curfew orders.  Did

14   the curfew orders say that chemical munitions would be used on

15   protesters who stayed out past curfew?

16   A    No, they did not.

17   Q    And on Friday, Mr. Ringel had asked you about officer

18   injuries.  What actions by the police can increase the risk of

19   officer injuries?

20   A    So, when a police department relies insufficiently on

21   communication, on using its words to instruct protesters what

22   they want, for instance if they want a crowd to disperse,

23   telling a crowd to disperse, making sure that the announcements

24   are sufficiently audible so that the crowd can hear them is

25   really important.

20-cv-1878-RBJ   EDWARD MAGUIRE, PhD - Redirect   03-21-2022

1    There are many protests where police use amplification

2  devices that the protesters simply can't hear, particularly the

3  protesters in the back.  So, you often have police entering

4  crowds where -- and using force where the protesters are kind of

5  taken by surprise.  They don't know that's going to happen,

6  because they didn't know they were supposed to leave.

7    So, it's just really important to communicate and

8  deescalate with protesters to prevent violence.  And in the end,

9  that actually serves officer safety, because officers end up

10  becoming injured often by the conflict that they tend to

11  instigate or escalate.  And so it's an officer safety measure to

12  use communication when interacting with protesters.

13  Q    And at the end, Mr. Ringel was just asking you about the 12

14  plaintiffs in this case.  You've talked a lot about lack of

15  discipline, supervision, and training.  In your opinion, how

16  have those failures of the Denver Police Department affected the

17  constitutional rights of the plaintiffs and all protesters?

18  A    So, I think the insufficient training led officers to

19  engage in inappropriate conduct during the actual protests.  And

20  that inappropriate conduct involved widespread use of force

21  against many of the protesters, including the plaintiffs,

22  therefore denying them their right to assemble peacefully, and

23  their right to free speech.

24    THE COURT:  All right.  Questions from the jury?  Yes.

25    (Proceedings held at the bench:)

20-cv-1878-RBJ   EDWARD MAGUIRE, PhD - Redirect   03-21-2022

1         THE COURT:  Good morning.

2         MR. RINGEL:  Good morning.

3         MS. STERK:  Happy Monday.

4         THE COURT:  Number 36.

5         MR. RINGEL:  No objection.

6         MS. STERK:  No objection.

7         THE COURT:  And 37.

8         MR. RINGEL:  No objection.

9         MS. STERK:  No objection.

10         THE COURT:  Okay.

11     (Proceedings held in open court:)

12         THE COURT:  Mr. Maguire, some questions from the jury.

13 Dr. Maguire, I should say.  Question, you stated that the police

14 should be monitoring social media for aggressors.  If they had

15 been -- if they had been, would DPD have been able to inform the

16 officers on the street on what to look for?

17         THE WITNESS:  Yes.  So, it's standard police practice

18 in the criminal intelligence function to review sort of open

19 source social media, not only for aggressors, but simply to find

20 out that events are headed your way, what types of events are

21 headed your way, and then yes, of course they could use that

22 information to relay to officers on the street about things that

23 they need to be aware of, both for their own safety and for

24 crowd safety.

25         THE COURT:  Another question, in a mass protest

20-cv-1878-RBJ   EDWARD MAGUIRE, PhD - Redirect   03-21-2022

1   situation, is it common that officers don't know who is giving

2   orders, or is it an all hands -- is it an all hands on deck,

3   focus on the issue at hand?

4        THE WITNESS:  So, typically the incident command

5   system is a very structured system, where you have people at

6   multiple levels who are sort of controlling both the strategies

7   and tactics that are used by the officers.  So, the officers

8   should largely not be having to make decisions on their own.

9   They should be receiving instructions that are filtered down

10  through the incident command system.  That's the typical

11  approach in these events.

12       THE COURT:  Any other questions from the jury?  All

13  right.  Plaintiff?

14       MS. STERK:  Nothing, Your Honor.

15       THE COURT:  Mr. Ringel?

16       MR. RINGEL:  No, Your Honor.

17       THE COURT:  All right.  Thank you, sir.  You can go

18  home now.

19       THE WITNESS:  Much appreciated, Your Honor.

20       THE COURT:  All right.  Any other witnesses?

21       MR. MACDONALD:  No, Your Honor.

22       THE COURT:  So, plaintiff rests?

23       MR. MACDONALD:  Yes, Your Honor.

24       THE COURT:  All right.  So, I'm going to have to spend

25  a few minutes alone with the lawyers at this point in the case,

20-cv-1878-RBJ   EDWARD MAGUIRE, PhD - Redirect   03-21-2022

1   ladies and gentlemen, so we're going to have a little bit of an

2   early break for you.  We will come for you as soon as we're

3   ready.

4        (Jury out at 9:46 a.m.)

5        THE COURT:  The jury has been excused.  Mr. Ringel, do

6   you wish to make a motion?

7        MR. RINGEL:  I do, Your Honor.  Thank you.  At this

8   time, on behalf of the defendants the City and County of Denver

9   and Jonathan Christian, I move for judgment as a matter of law

10  on the following issues pursuant to Federal Rules of Procedure

11  50.  Initially, I incorporate all of the arguments and

12  authorities made in the Denver defendants' motion for summary

13  judgment and the applicable arguments in the trial brief and the

14  second trial brief.

15        The first issue I would like to raise, Your Honor, is

16  related to the claims involving plaintiff Cidney Fisk.  As the

17  Court knows, Ms. Fisk was previously represented by counsel for

18  the Epps plaintiffs.  She became pro se.  She has not appeared

19  in this matter in quite some time.  She has failed to appear at

20  trial, and offered no evidence to support her claims.  Because

21  no evidence has presented, it is our view that the defendants

22  are entitled to judgment as a matter of law related to Ms. Fisk.

23        THE COURT:  Is there any objection to that from

24  anybody?

25        MS. STERK:  We have no position on that, Your Honor.

20-cv-1878-RBJ    EDWARD MAGUIRE, PhD - Redirect    03-21-2022

1          THE COURT:  Winner, winner, chicken dinner.

2          MR. RINGEL:  I thought I would start with the easy

3    one, Your Honor.

4          THE COURT:  All right.  Your claim by Ms. Fisk is

5    dismissed for failure to prosecute.

6          MR. RINGEL:  All right.  Moving on, Your Honor.

7          THE COURT:  It has to be without prejudice.  Any

8    failure to prosecute is without prejudice, but --

9          MR. RINGEL:  Well, but shouldn't it be a dismissal

10   under Rule 50 for failure to present evidence?

11         THE COURT:  Good question.  You're probably right.

12         MR. RINGEL:  And that would be with prejudice under

13   Rule 50.

14         THE COURT:  You're right.  I agree.

15         MR. RINGEL:  Okay.  Moving on, I want to address the

16   claims of plaintiff Elisabeth Epps against Jonathan Christian.

17   The first of those claims is a First amendment retaliation

18   claim.  It is our position that Ms. Epps can't meet the

19   subjective intent requirement for a claim under *Worrell versus*

20   *Henry* for the causation claim aspect of the claim based on the

21   Tenth Circuit's decision that it has to be but for.

22         So, the issue here is whether Mr. Christian's firing of

23   a single PepperBall in the direction of Ms. Epps was

24   substantially motivated in our version of *Worrell*, or

25   substantial or motivated in the version from the plaintiffs for

20-cv-1878-RBJ    EDWARD MAGUIRE, PhD - Redirect    03-21-2022

1   her exercise of protected activity under the First amendment.

2          It is our view that there is not sufficient evidence in

3   the record of that subjective motivation by Mr. Christian.

4   There is not evidence that he specifically fired the PepperBall

5   because of any First amendment activity that Ms. Epps was

6   engaged in at that moment.  He said that he didn't know that she

7   was filming anything, and that he fired the PepperBall for the

8   purpose of being -- because she was in the street and to get her

9   out of the street.

10         And one can argue about the legitimacy of that, and we

11  will in a minute with respect to the Fourth amendment claim, but

12  I don't think it fits a First amendment theory or there's

13  sufficient evidence on that issue.

14         With respect to the Fourth amendment claim against

15  Mr. Christian, it is our view that on the -- under the totality

16  of circumstances it was objectively reasonable for him to have

17  deployed the single PepperBall in an area saturation method to

18  encourage Ms. Epps to get out of 14th Avenue where she was

19  obstructing traffic.  We think that it's simply not a Fourth

20  amendment violation.

21         In addition, Your Honor, we would renew the

22  articulation of qualified immunity.  I understand the Court has

23  ruled against us with respect to the clearly established prong

24  of the qualified immunity analysis, but we would just renew that

25  argument to preserve that issue for purposes of the record.

20-cv-1878-RBJ   EDWARD MAGUIRE, PhD - Redirect   03-21-2022

1        And then the last issue with respect to Mr. Christian

2   is Ms. Epps has asserted a claim for punitive damages against

3   Mr. Christian, and on these facts, it is our position that under

4   the *Smith versus Wade* standard from the Supreme Court in 1983,

5   that there isn't sufficient evidence that a reasonable jury

6   could find that Mr. Christian's actions meet the extremely high

7   threshold for punitive damages under federal law.

8        There isn't any evidence that he acted with an evil

9   motive, and there isn't any evidence that he acted in reckless

10  disregard for Ms. Epps' federally protected rights.  What we

11  have here is one single shot of a PepperBall.  If it was a full

12  cartridge of PepperBalls, maybe it could support punitive

13  damages, but in this instance, it is our position that no

14  reasonable jury could conclude that punitive damages are

15  appropriate, and it doesn't meet the threshold for punitive

16  damages as a matter of law.

17       Do you want me to go on to the municipal liability

18  issues?

19            THE COURT:  Yes.

20            MR. RINGEL:  Thank you, Your Honor.  Also, I am going

21  to move for judgment as a matter of law on the issue of

22  municipal liability with respect to Denver.  And as the Court

23  understands and has been briefed, there are essentially five

24  different ways that a plaintiff can establish municipal

25  liability against Denver.

20-cv-1878-RBJ    EDWARD MAGUIRE, PhD - Redirect    03-21-2022

1    And what I think the Court needs to appreciate and

2    understand here is under all of those ways, there still needs to

3    be a direct causal link between whatever mechanism is going to

4    impose liability against Denver and the actions related to each

5    of the individual plaintiffs and all of the events involving

6    each of the plaintiffs.

7    The municipal liability theories here are pled in what

8    I would characterize as a throwing spaghetti against the wall

9    fashion.  And I don't mean to be pejorative, but I think it's

10   very important for the Court to analyze from a causation

11   perspective, what are the specific municipal liability theories,

12   and how do they translate into an argument for causation related

13   to all of the specific events involving each of the 12

14   plaintiffs that we're talking about here?

15   So, let me talk about some of those theories so that

16   the Court understands my perspective.  The first way that you

17   can get municipal liability is a formal regulation or policy

18   statement.  The only evidence that I heard related to any formal

19   regulation or policy statement presented by the plaintiffs is

20   the references to the crowd management manual, and it allowing

21   encircling crowds under some specific incidents and some

22   specific circumstances.

23   But my understanding of the theory here is that it is

24   not that the -- that policy in itself is unconstitutional, but

25   that that policy allowed the application of the so-called

20-cv-1878-RBJ   EDWARD MAGUIRE, PhD - Redirect   03-21-2022

1  kettling that happened on Colfax between Pennsylvania and

2  William.

3         And so I don't think the formal regulation or policy

4  statement part of municipal liability applies.  I think what

5  this essentially is is an application of the policy in this

6  particular instance, because the way that I understand the

7  formal regulation and policy statement analysis to generally

8  apply would be like in the -- I think it's the *City of Los

9  Angeles versus Lyons* where there was a choke-hold policy at

10  issue, and that the policy on its face was challenged as

11  unconstitutional.  And I don't think that's what is being

12  asserted here, at least as I understand it.

13         With respect to the second way that this can be -- that

14  a policy can be formed is an informal custom amounting to a

15  widespread practice.  And I think it's important for the Court

16  to focus on what the Tenth Circuit has talked about, using

17  Supreme Court language about what that means.

18         A custom has to be persistent and widespread.  And

19  specifically, I would direct the Court to the *Carney versus City*

20  *and County of Denver* decision, which is 534 F.3d 1269, with a

21  pinpoint cite of 1274, Tenth Circuit decision of 2008.

22         And that decision says in pertinent part, a custom has

23  come to mean an act that, although not formally approved by an

24  appropriate decision-maker, has such widespread practice as to

25  have the force of law.  In order to establish a custom, the

20-cv-1878-RBJ    EDWARD MAGUIRE, PhD - Redirect    03-21-2022

1    actions of the municipal employees must be continuing,

2    persistent, and widespread.

3         The failure of the proof in this case, in my judgment,

4    is on the continuing, persistent, and widespread part of the

5    informal custom analysis.  And the basis of that argument, Your

6    Honor, is there is no evidence that has been presented related

7    to anything other than the response to the George Floyd protests

8    themselves.  There is no evidence that anything has been

9    continuing beyond the first five or six days of the response to

10   the George Floyd protest.

11        I am not aware of any decision from the Supreme Court

12   of the United States or the Tenth Circuit that has applied the

13   consistent -- the continuing, persistent, and widespread

14   language to something that is essentially a single incident,

15   albeit a single incident over a multiple-day period of time.

16        And in the absence of that, I don't think the evidence

17   is sufficient.  The whole point of the continuing, persistent,

18   and widespread language from the Supreme Court case law is to

19   avoid collapsing municipal liability in a 1983 case, and a

20   respondeat superior liability in a negligence case.  And in the

21   absence of issues in the past that have any knowledge of the

22   folks of the City and County of Denver that they were issues,

23   and it isn't something that is in my judgment sufficient.

24        The next way that somebody can establish a custom,

25   policy, or practice is a decision of someone with final

20-cv-1878-RBJ   EDWARD MAGUIRE, PhD - Redirect   03-21-2022

1   policymaking authority.  And this is, I think, the part of the

2   analysis that is going to require care for the Court, because

3   it's both legally and factually -- the causation issue is

4   legally important, but also factually important.

5        It is my understanding that the final policymaker that

6   the plaintiffs point to is Commander Phelan.  And I understand

7   the possibility that he can be considered a final policymaker

8   for purposes of his role as an incident commander in responding

9   to the protests.

10       And even if one accepts the proposition that Commander

11  Phelan is a final policymaker, there still has to be the moving

12  force causation that's required from the municipal liability

13  perspective between an actual decision of Commander Phelan and

14  an event involving the plaintiffs.

15       THE COURT:  I thought there was a stipulation that he

16  was one of the three final policymakers.

17       MR. RINGEL:  That's part of the jury instructions.

18  That was -- and I agree that that could be instructed by the

19  jury -- to the jury, but my point, Your Honor, is if he's a

20  final policymaker for this purpose, there still has to be a

21  causal connection between a decision of his and a violation of

22  the plaintiffs' constitutional rights.

23       We have heard a lot of evidence with respect to what

24  Commander Phelan did or didn't do, and if you -- the incidents

25  that there appears to be evidence -- or at least some evidence

20-cv-1878-RBJ    EDWARD MAGUIRE, PhD - Redirect    03-21-2022

1   that he was directly involved, are the so-called kettling

2   incident and the deployment of gas at 14th and Sherman.

3        But as an example, there is no evidence that directly

4   links Commander Phelan to Officer Christian's decision to fire

5   the pepper involving Ms. Epps, the pepper spray related to

6   Dr. Smith, the deployment of a bean bag shotgun related to

7   Zachary Packard, the deployment related to Joe Deras.  And we

8   can go on and on and on about some of these individual events,

9   and in the absence of a causal connection between a decision of

10  Commander Phelan and those particular actions, again, it

11  collapses into respondeat superior liability, and that's not

12  appropriate under these circumstances.

13       Another way that one can have a custom, policy, or

14  practice and liability against the City and County of Denver is

15  ratification by final policymakers of the decisions of

16  subordinates.  And the leading case that I found related to this

17  issue is *Jackson versus the City and County of Denver*.  That can

18  be found by the Court at 2022 U.S. App Lexis 1134.  It's a Tenth

19  Circuit decision from January 13th of this year.  And it

20  explained the ratification theory at pinpoint cite of star 11.

21       Moreover, a municipality will not be found liable under

22  a ratification theory unless the final decision-maker ratifies

23  employees' specific unconstitutional actions as well as the

24  basis for those actions.  That is if the authorized policymakers

25  approve a subordinate's decision and the basis for it, their

20-cv-1878-RBJ   EDWARD MAGUIRE, PhD - Redirect   03-21-2022

1    ratification would be chargeable to the municipality because

2    their decision is final.

3            Let's look at the bases of ratification as I understand

4    it from the evidence.  First, as we argued in the trial brief,

5    failure to discipline an officer does not as a general matter

6    create a ratification theory.  And there are a variety of cases

7    for that, and one that cites others is the *Sexton versus City of*

8    *Colorado Springs* case, 530 F. Supp. 3d 1044, pinpoint cite 1071

9    to 72.  It's a District of Colorado decision, and I believe it's

10   2021, if my notes are correct.

11           But even factually here, to get a ratification theory,

12   it would have to be an affirmative decision by a final

13   policymaker.  In this instance, that would have to be the

14   executive director of the Department of Public Safety.  So, what

15   would have to happen is there would have to be discipline that

16   goes all the way up to the executive director of the Department

17   of Public Safety, and that in this case, his name is Murphy

18   Robinson at the time, and he would have had to have made an

19   affirmative decision that the particular conduct involving the

20   plaintiff wasn't a violation of policy, and then you could

21   theoretically have a ratification theory.  Otherwise, it just

22   doesn't add up, and it's not an appropriate theory.

23           The other way that they're trying to argue that there's

24   ratification is the information that was presented related to

25   the press conference that we saw on video involving the chief of

20-cv-1878-RBJ   EDWARD MAGUIRE, PhD - Redirect   03-21-2022

1   police and Mayor Hancock, and the date of that press conference

2   is the second day, May 29th of 2020.  And there are general

3   statements made by the mayor and the chief related to the

4   officers using restraint, and specifically with respect to the

5   mayor, him saying he saw a video, and he didn't see any

6   violation of anybody's rights.

7         Fundamentally, the problem with that is that doesn't

8   provide any specific information from -- to a final policymaker

9   related to the specific events that are at issue.  A general

10  statement like that isn't enough to create ratification, because

11  under the *Jackson* decision, there has to be more information and

12  more knowledge of the specificity of what's going on.

13        The last way that one can get a municipal liability is

14  a failure to train theory.  And it is the defendants' position

15  that the deliberate indifference standard applies across the

16  board in municipal liability claims.  I understand the Court has

17  rejected that, but even the plaintiffs agree that deliberate

18  indifference is required for purposes of the failure to train

19  theory.

20        The barrier with respect to the failure to train theory

21  is what I've been harping on with respect to the plaintiffs'

22  experts and Mr. Mitchell, which is the lack of any evidence of

23  this being a problem and an issue prior to the protests

24  themselves.  So, deliberate indifference requires notice and

25  knowledge of deficiencies with respect to a policy or training,

20-cv-1878-RBJ    EDWARD MAGUIRE, PhD - Redirect    03-21-2022

1   and there is no -- there is nothing there that exists.

2           THE COURT:  Who was the insider who told the

3   independent monitor that under the current regime, training was

4   not emphasized and better training could have prevented this?

5           MR. RINGEL:  That's Lieutenant Coppedge, and the issue

6   is that there is no evidence that Lieutenant Coppedge had

7   that -- had any such conversation with anyone in leadership

8   prior to the protests.  And his statement to the monitor doesn't

9   establish deliberate indifference by the chief or the

10  department -- the executive director of the Department of Safety

11  or anyone who is in a position to do something about that.

12          I understand the evidence related to that OIM memo, but

13  I don't think that creates deliberate indifference, because no

14  knowledge of that has been presented prior to the protests.  And

15  in the absence of that, even if that was Lieutenant Coppedge's

16  opinion, if he doesn't announce it to anyone, it can't establish

17  deliberate indifference, and there is no evidence of that such

18  announcement.

19          The last issue that I wanted to highlight for the Court

20  is the importance of causation.  And I talked about that a

21  little bit, but I would encourage the Court to look at the *Board

22  of County Commissioners of Bryan County Oklahoma versus Brown*

23  decision, 520 U.S. 397, 1997.  And that talks about how there is

24  a rigorous causation requirement for municipal liability claims.

25          And essentially what that means, at least from my

20-cv-1878-RBJ    EDWARD MAGUIRE, PhD - Redirect    03-21-2022

1   perspective, is there has to be evidence established and a

2   causal connection, a direct causal link between the violation of

3   a particular plaintiff's constitutional rights on the one hand

4   and the municipal liability theory on the other hand.  And I

5   think that's mostly where the -- where things break down.

6        The last thing I wanted to raise with the Court related

7   to municipal liability is the issue of the mutual aid partners.

8   And it is undisputed, based on the testimony that was presented

9   in the plaintiffs' case that Mr. Packard was injured based on

10   the actions of the City of Aurora, and Mr. Deras was injured

11   based on the actions of the Jefferson County Regional SWAT.  And

12   as the Court knows, Mr. Packard has a pending claim against the

13   City of Aurora and people from there, and Mr. Deras had a claim

14   with respect to two people from Jefferson County.

15        The question before the Court is can Denver be held

16   liable with respect to those events under a municipal liability

17   theory?  And I think that it's my position that there is no

18   theory that allows that to exist.  There is no Supreme Court,

19   Tenth Circuit, or decision from this Court that recognizes that

20   one municipality can be held liable for the actions of officers

21   from another municipality.

22        And I just got a note that with respect to Stanford

23   Smith, that the action related to him -- related to Dr. Smith

24   was the City of Aurora as well.

25        Even if one accepts as a proposition that Denver could

20-cv-1878-RBJ   EDWARD MAGUIRE, PhD - Redirect   03-21-2022

1   be held liable for the actions of the officers from these other

2   municipalities -- so, even if I accept that arguendo, there has

3   to be a municipal liability-based link between it.  It can't

4   just be we invite you to our protest -- to respond to the

5   protests, you violate someone's constitutional rights, we buy

6   the violation of the constitutional rights.

7        It has to be considered and examined in the context of

8   municipal liability principles that exist, because otherwise, it

9   makes it a negligence case.  And there hasn't been any evidence

10  that those three events are directly linked to any of the

11  theories related to municipal liability.  The criticisms related

12  to the mutual aid partners have to do with Denver not training

13  with them, not requiring them to use their own -- use Denver's

14  use of force policies, allowing them to use their own munitions,

15  and all of those things, and all -- you know, those criticisms

16  are either fair or not fair in the Court's mind, but there isn't

17  a causal connection between those criticisms and what

18  specifically happened with respect to those three plaintiffs.

19  And as a result, I don't think that that fits.

20       The last thing I just wanted to raise sort of from a

21  housekeeping perspective is a few specific issues related to

22  individual plaintiffs.  When Mr. Deras testified, he talked

23  about getting medical care for his injuries, but he didn't

24  present any evidence related to the amount of damages for

25  medical care.  And as a result, he shouldn't be able to recover

20-cv-1878-RBJ    EDWARD MAGUIRE, PhD - Redirect    03-21-2022

1   for any of the medical care that he claimed that he received.

2        With respect to Amanda Blasingame, she talked about

3   having one event -- one session with the therapist related to

4   the events with respect to the protests, but again, she didn't

5   present any evidence related to the cost of that therapy, and

6   she shouldn't be allowed to recover for that.

7        With respect to Claire Sannier, she testified related

8   to having some therapy, but that that was free.  And then she

9   testified to having EDMR therapy, but again, didn't present any

10  evidence related to the cost of the EDMR therapy.

11       And then finally, plaintiff Ashlee Wedgeworth

12  specifically testified about two incidents of exposure to

13  chemicals, but then generally said she was exposed on other

14  nights, but just talked about it generally.  And I don't think

15  that's enough to meet her burden to provide specific evidence to

16  recover for anything other than those two incidents.

17       Unless the Court has questions, that's my presentation

18  related to Rule 50, Your Honor.

19        THE COURT:  Thank you.

20        MS. STERK:  Good morning, Your Honor.  I'm going to

21  talk about the argument on Officer Christian, and Ms. Wang is

22  going to talk about the remainder.  So, I heard a couple

23  arguments on Officer Christian, and the first was that there's

24  no evidence of his subjective intent.

25        I think here, there is plenty.  We've seen plenty of

20-cv-1878-RBJ    EDWARD MAGUIRE, PhD - Redirect    03-21-2022

1    evidence of his intent.  As the Court well knows, intent can

2    be --

3              THE COURT:  I understand all that.

4              MS. STERK:  Okay.  So, I guess before I start as well,

5    we want to make sure that we incorporate our responses to the

6    MSJ and our responses to the trial brief.

7              THE COURT:  What's your evidence of punitive damages?

8              MS. STERK:  Yeah.  Your Honor, I think there's a few

9    things that we've seen through the evidence against Officer

10   Christian to support punitive damages.  One is that he was not

11   just -- he was -- certainly had a pattern of aiming at people

12   with phones.  We saw the comment that he had to one of his

13   fellow officers, agreeing that -- or at least seeming to agree

14   that he likes shooting people.  And I think that that alone is

15   enough for the jury to determine that he was acting with evil

16   intent, and not just shooting to get her out of the street.

17             Again, he was shooting at multiple people with phones.

18   We've seen a lot of aggression from him in the videos, and there

19   is certainly evidence that has been presented to show that he

20   was not simply acting to get her out of the street, but was

21   acting because he wanted to be shooting at protesters for their

22   message.

23             He also understood and has testified that he understood

24   that what he did was a use of force, and that even if it wasn't

25   going to hit her, it was going to get the PepperBall residue on

20-cv-1878-RBJ   EDWARD MAGUIRE, PhD - Redirect   03-21-2022

1   her and cause her to not be able to, you know, breathe as well,

2   and cause all the effects that that causes.

3          THE COURT:  And how are you going to argue that his

4   shot caused her bruise?

5          MS. STERK:  Well, Ms. Epps testified as to that.

6          THE COURT:  Yes, she did.

7          MS. STERK:  Excuse me?

8          THE COURT:  I said yes, she did.

9          MS. STERK:  Yes, she did.

10          THE COURT:  And that's all you've got, isn't it?

11          MS. STERK:  Well, Ms. Epps testified to that, and we

12   believe, Your Honor, that the video shows that the shot was

13   landing right where her calf was, and that's going to be a jury

14   decision.

15          THE COURT:  No, it doesn't.  It shows that the shot

16   hit to her right, and she's claiming the injury to her left

17   calf, the inside of her left calf.  Of course, your partner,

18   Mr. Macdonald, tried to demonstrate how she was walking.  That's

19   pure speculation as to how that happened; right?

20          MS. STERK:  It actually isn't pure speculation, Your

21   Honor.  Ms. Epps testified that she was hit.  She was saying

22   that she was hit in the video she was taking at the time as

23   well.  She had a bruise on her leg, and the video shows that her

24   left leg was in the back, right where the PepperBall was

25   landing.  And further, Your Honor, in some ways it doesn't

20-cv-1878-RBJ    EDWARD MAGUIRE, PhD - Redirect    03-21-2022

1  matter whether it hit her or not, because it did affect her.

2          THE COURT:  It matters a lot if it affects the

3  credibility of your case.  I am going to deny the motion on

4  Epps, and in doing so, I am giving them a gift.  I think you're

5  making an advocacy mistake.  I have told you that before.  I

6  tell you that again now, but if you're willing to have the

7  credibility of your whole case affected by that argument on

8  Epps, I can't help you.

9          MS. STERK:  I understand, Your Honor.

10          THE COURT:  All right.  Let's hear the response on all

11  the rest of it, briefly.

12          MS. WANG:  Judge, we -- as with the other attorneys,

13  we incorporate our responses to the motion for summary judgment,

14  but I will specifically address some of the things that

15  Mr. Ringel asked, unless you have some specific questions you

16  would like me to target my argument to.

17          THE COURT:  No.  It is totally not helpful to the

18  Court for any of the three of you to incorporate all your prior

19  briefs and motions.

20          MS. WANG:  Okay.  Great.  So, with respect to

21  municipal liability, so we've heard a lot from Mr. Ringel in his

22  questioning of the experts and other witnesses about, you know,

23  whether or not Denver's official policies on BWC, meaning not

24  requiring officers to turn on or activate their body-worn

25  cameras during protests and not requiring officers to complete

20-cv-1878-RBJ   EDWARD MAGUIRE, PhD - Redirect   03-21-2022

1   use of force statements during the protests was causally

2   connected to the harms in this case.

3           Those were official policies of the City of Denver,

4   which appears to have been conceded by Denver.  If it is an

5   official policy of the City of Denver, then the only question is

6   whether it caused the constitutional violations.  And you heard

7   testimony, the jury has heard testimony from the experts as well

8   as from some of the DPD's own witnesses, including Commander

9   Levens that if the City had had policies in place requiring the

10  activation of BWC and requiring timely and accurate use of force

11  statements at the time, that they would have allowed officers to

12  be held accountable for their actions.

13          And the causation is that officers understood and knew

14  at the time that they were using force against the plaintiffs

15  and other protesters during the protests in May and June of 2020

16  that they would not be held accountable, because they did not

17  have to document what they did, and there would not be any

18  objective evidence of what they did.  Those are the official

19  policies of the City of Denver, and they're causally connected

20  to the harms caused to our clients.

21          Additionally, there were official policies as testified

22  to by Commander O'Donnell in his video deposition that we played

23  for the jury, particularly with respect to the crowd management

24  manual.  What he said about the crowd management manual is that

25  with respect to all of the weapons that were used, the chemical

20-cv-1878-RBJ    EDWARD MAGUIRE, PhD - Redirect    03-21-2022

1    munitions, the 40-millimeters, the PepperBalls, officers had an

2    extreme amount of discretion to use those weapons as they saw

3    fit, and that official policy of the City of Denver was what

4    caused the officers in this case to use their weapons against

5    our clients in situations when they should not have been using

6    them at all.  So, that is another policy of the City of Denver

7    that caused the constitutional violations in this case.

8         In addition, there were acts that Judge -- that, you

9    know, Mr. Ringel talked about how, you know, with respect to

10   practice -- widespread practice or custom, he talked about

11   whether there was any evidence of prior incidents or notice

12   given to the City.  Now, of course, with respect to the official

13   policy claim, there does not need to be a prior series of events

14   that put them on notice.  The question is simply -- and this is

15   in the jury instructions that Your Honor has already approved.

16   The question with respect to official policy is simply whether

17   or not there was an official policy that caused the violations.

18        With respect to custom or practice, there is

19   testimony -- Mr. Mitchell testified that there were failures

20   relating to the DPD's use of PepperBalls and chemical munitions

21   against protesters in Occupy in 2012.  There were failures about

22   use of force reporting and BWC policy known as far back as 2014.

23   There were failures relating to use of force reporting and

24   policies as far back as 2017.  So, all of these things were in

25   addition on top of what I've already stated, known to the DPD at

20-cv-1878-RBJ  EDWARD MAGUIRE, PhD - Redirect  03-21-2022

1  the time, and they never addressed it.

2          And as Your Honor pointed out, there was testimony or

3  evidence in the form of the OIM memos that people within the

4  DPD, Lieutenant Coppedge, as well as Captain Sich talked about

5  how there were failures in training, and there was a deemphasis

6  in training under the current chief of police.

7          Now, with respect to the failure to train, there's been

8  an extensive evidence about the failure of the DPD to train.

9  There's been testimony from DPD witnesses as well as the experts

10  regarding the fact that they haven't had crowd control training

11  or field force training for years, that the amount of training

12  that they received was inadequate and insufficient.

13          And let me emphasize, it is absolutely the law that to

14  prove a failure to train claim, all you have -- you do not have

15  to show a pattern of prior incidents.  You have to show that

16  there is a -- a failure to train in an area where there is an

17  obvious -- and let me read from the jury instruction that Your

18  Honor has approved.  When the City has failed to train its

19  employees to handle recurring situations presenting an obvious

20  potential to result in a constitutional violation.

21          I don't think it's even disputed in this case that the

22  kinds of failures to train on the use of potentially deadly

23  weapons during a protest is the kind of thing that you should

24  train officers to do, and it was not done in this case.  And so

25  we have sufficient evidence, you know, when Your Honor construes

20-cv-1878-RBJ   EDWARD MAGUIRE, PhD - Redirect   03-21-2022

1   the evidence in the light most favorable to the plaintiffs to go

2   forward on that theory.

3          With respect to the act of a final policymaker, the

4   final policymakers in this case, and the one in particular that

5   is discussed in the jury instructions is Commander Phelan.

6   There is a connection between Commander Phelan's actions and the

7   plaintiffs.  One example, but not the only example, is the

8   kettling incident that occurred on May 31st, 2020, in front of

9   the Basilica.

10          There really is not even a dispute, and Commander

11  Phelan agreed that he ordered the two teams of officers to

12  squish the protesters on that block, and that he wanted them to

13  do it.  Not only was this an act of him, a final policymaker,

14  but it was also authorized expressly in the crowd management

15  manual itself.  So, there's two ways to municipal liability on

16  that particular incident.

17          In addition, Commander Phelan ordered and authorized

18  the gassing of protesters on numerous incidents, not just 14th

19  and Sherman on May 28th or Lincoln and Colfax on May 28th, but

20  on virtually every other time when there was a gassing of

21  protesters, there has been testimony -- there was testimony and

22  evidence that those things were authorized by the commander

23  himself.

24          And so given those things, we have the ability to --

25  the jury has -- we -- the Rule 50 motion should be denied on

2140

20-cv-1878-RBJ    EDWARD MAGUIRE, PhD - Redirect    03-21-2022

1   that prong as well.

2            With respect to the ratification claim, there is

3   sufficient evidence to proceed on -- to deny the Rule 50 motion

4   with respect to ratification.

5            THE COURT:  I agree.

6            MS. WANG:  Okay.  Is there -- I mean, I want to

7   address Your Honor's specific questions, and I don't want to

8   just go on.  So, if there's something that you would like --

9            THE COURT:  What about Mr. Ringel's last point that

10  Deras, Blasingame, Sannier, and Wedgeworth didn't show any proof

11  of medical expenses?

12           MS. WANG:  Well, with respect -- I mean, with respect

13  to the amount of money for medical expenses, there were certain

14  plaintiffs, I believe Packard was the one who did provide

15  evidence of that.  And to the extent the others didn't --

16           THE COURT:  That wasn't my question.

17           MS. WANG:  Right.

18           THE COURT:  My question was do you dispute what he

19  says about Deras, Blasingame, Sannier, and Wedgeworth?

20           MS. WANG:  I don't dispute that there was -- I'm

21  sorry.  With respect to the medical expenses of Deras,

22  Blasingame, and Sannier, I agree there was not a specific dollar

23  amount presented as to the medical expenses.  With respect to

24  Wedgeworth --

25           MS. STERK:  Sorry.  I will address the questions as to

20-cv-1878-RBJ    EDWARD MAGUIRE, PhD - Redirect    03-21-2022

1  Wedgeworth.  I think that Mr. Ringel actually had said that the

2  problem with her is that she talked specifically and in detail

3  about two events, and there were other nights where she said she

4  was gassed but didn't go into huge detail.  And, you know, we

5  had done that in part, Your Honor, to move things along.  She

6  did testify that on the other nights she had similar experiences

7  to what she did testify about.

8          THE COURT:  That wasn't his point.  His point was very

9  simple and straightforward.  There was no evidence that she

10  incurred any economic damages in the form of medical expenses.

11          MS. STERK:  If that was the issue, that's true.  And I

12  don't think she testified about medical damages.  I don't think

13  that was the issue, but it is correct, Your Honor, that she did

14  not testify about medical expenses.

15          THE COURT:  All right.

16          MS. WANG:  Are there other specific questions that

17  Your Honor would like me to address?

18          THE COURT:  No.

19          MS. WANG:  Okay.  No?  All right.

20          THE COURT:  So, before getting into the details, I

21  will say this from the standpoint of the Court having witnessed

22  all of the evidence so far:  It is indisputable in my mind that

23  the plaintiffs have presented evidence that there were

24  widespread excessive applications of force to protesters.

25          To be totally fair, I think it's also indisputable that

2142

20-cv-1878-RBJ    EDWARD MAGUIRE, PhD - Redirect    03-21-2022

1    the Denver Police Department faced a Herculean task in this

2    case.  How you could cope with that number of protesters, that

3    degree of violence, property destruction, looting, breaking of

4    windows, throwing of rocks and water bottles and other things is

5    almost beyond my understanding.

6         There absolutely is evidence of fault on both sides,

7    the protesters' side and the police department's side.  But the

8    plaintiffs refuse to acknowledge any good things that the police

9    did.  The police refuse to acknowledge that they did anything

10   wrong.  The two sides are blinded by their biases, and that's, I

11   think, why we are having this trial.  I've said that before, and

12   I now say it again.

13        With respect to the motion, the Court is required to

14   construe all the evidence in favor of the plaintiff for purposes

15   of a Rule 50 motion.  And as part of that, to draw inferences

16   that rationally can be drawn in favor of the plaintiff, and then

17   take the case away from the jury only if no rational jury could

18   find in favor of any of the plaintiffs.

19        The motion will be denied.  I can't think of a case

20   that I've had or that I'm even aware of in this court that more

21   deserves the pulse of the people, the pulse of the community as

22   reflected in the eight jurors that have heard the case.

23        In terms of details, however, with respect to the claim

24   which is the main claim here, that the harms sustained by the

25   plaintiff, which were the plaintiffs' exposure to PepperBalls in

20-cv-1878-RBJ   EDWARD MAGUIRE, PhD - Redirect   03-21-2022

1  several cases, exposure to tear gas in all cases, exposure to

2  emotional as well as physical harm, were caused by policies,

3  practices, and/or customs of the City and County of Denver, I

4  find that there is evidence construed in favor of the plaintiff

5  that could support a *Monell* decision in their favor.  Not of

6  course that that necessarily will be or even should be the

7  jury's decision, but it rationally could be, first of all.

8       We have the testimony of Commander Phelan, who is in my

9  view a final policy authority.  I think that was stipulated, but

10  even if it wasn't, he was the incident commander in charge of

11  the entire response to the protests.  That certainly makes him a

12  final policymaker.  And his testimony was -- and there were

13  others who were similar -- was that all actions of all of the

14  officers who were involved in the response to the protests were

15  consistent with the City and County of Denver's policies.  That

16  in and of itself is sufficient in my view to send this case to

17  the jury.

18       It was notable to me that even the incident where the

19  officer reached into a car and shot a PepperBall and/or gas

20  through the window, into the car which was then moving into

21  traffic, even that, although he said he didn't like the look,

22  was consistent with policy.  That is sufficient to send the case

23  to the jury.

24       But there's more.  There is testimony from the experts,

25  the police chief retired from Seattle and Professor Maguire,

20-cv-1878-RBJ   EDWARD MAGUIRE, PhD - Redirect   03-21-2022

1   that the training was substandard, and the result was the

2   violations that we all saw in video after video.  Violations of

3   people's rights to speech and to assembly and to be free from

4   excessive applications of force.

5            There were criticisms by the experts of the body-worn

6   camera policies as it existed and as it was implemented,

7   criticisms of the use of nonlethal projectiles, the fact that it

8   was discretionary with the officers, all of that expert

9   testimony supported this Court's finding that a prima facie case

10  has been presented.

11           There was the Coppedge memo, which I thought was

12  particularly poignant in that he basically said -- and this is

13  an officer now, not a patrol officer, but a management level

14  officer of the Denver Police Department -- that frankly, said he

15  to the Office of Independent Monitor, under the present chief of

16  police, training has not been considered to be all that

17  important.  It's a big change from how it used to be.  Better

18  training could have prevented a lot of what happened.

19           In addition to all of that, I think there is support

20  for a ratification theory.  Again, Phelan's statement to

21  everything that happened was consistent with Denver policy is a

22  form of ratification.  The fact that there was almost no

23  discipline imposed even though it is evident to the Court that

24  there was evidence of widespread violations, inappropriate

25  applications of force, inappropriate response to peaceful

20-cv-1878-RBJ   EDWARD MAGUIRE, PhD - Redirect   03-21-2022

1  protesters, but no discipline, virtually was imposed, by itself

2  distinguishes this case in terms of ratification based on lack

3  of discipline from the *Jackson* case and the other cases which

4  had to do with individual officer actions as opposed to this

5  massive response that occurred in this case.

6      We also have, of course, the televised press conference

7  featuring the chief of police and the mayor, both of whom

8  assured the people of Denver that the police department had

9  responded with great restraint to the protests.  Not so.  There

10  was not great restraint, at least I would say there is certainly

11  evidence that suggests there was not great restraint.

12      As for the sister agencies, I think that's a closer

13  call, but the evidence is, from Phelan, that they were under his

14  direction -- under his direction, and as an example of that,

15  when he discovered that one of the agencies, I think it was

16  Jefferson County, was using shotguns, a particular method that

17  he did not approve of, he told them to stop, and they stopped.

18  That to me showed that they were acting under his direction.

19      Indeed, I think the video showed Aurora, Jeff. Co., and

20  other agency officers intermingled with Denver officers to the

21  point that they were all, as Phelan said, acting in effect under

22  the policies, procedures, and practices of the City and County

23  of Denver through the police department.

24      So, that takes me to the final issue, which is the one

25  that is like the tail wagging the dog, and that is the claim

20-cv-1878-RBJ   EDWARD MAGUIRE, PhD - Redirect   03-21-2022

1   against Officer Christian.  I have been fairly vocal in saying

2   what I thought of that claim.  I don't know what a jury will do

3   with the claim.  I have a pretty good suspicion as to what they

4   will do with the claim.

5           What the evidence is is that Ms. Epps, minding her own

6   business, walking across 14th Street, filming, doing nothing

7   offensive other than the fact that she was jaywalking, saw

8   Christian take a knee, aim his PepperBall rifle right at her,

9   and fire a PepperBall.

10          Now, she claims that it hit her and caused a bruise on

11  her inner left calf.  And I guess you could infer that when she

12  saw him fire, she heard or felt a sting on her calf, and later

13  found a bruise there.

14          However, the objective evidence from the video, which

15  in all other circumstances the plaintiffs have endorsed, shows

16  that the PepperBall did not, as I see it, hit her, but as

17  Christian testified, missed her, hit on the street to her right.

18  There was some flutter about which way the wind was blowing.

19  Nothing came of that.

20          If it hit on the road to her right as the video seems

21  to show, then it is difficult, if not almost impossible to

22  understand how that same PepperBall would have caused a bruise

23  to Ms. Epps' inner left calf.  And I have cautioned the

24  plaintiff, of course they don't listen, that their effort to

25  contort the evidence to support this claim against Christian

20-cv-1878-RBJ    EDWARD MAGUIRE, PhD - Redirect    03-21-2022

1    could easily backfire in terms of the credibility of their case,

2    I believe.

3         But there is evidence, which if believed, from Ms. Epps

4    could show that that PepperBall caused her a bruise.  If you

5    think that the bruise is a major damage, then I guess it's worth

6    to be in federal court suing about it.

7         In terms of his intent and the punitive damages, intent

8    has to be inferred.  It's rare in our life that somebody just

9    comes out and says, I intended to shoot her in the leg or I

10   intended to hit her with the PepperBall.  His testimony was to

11   the contrary, but one could infer, since he's a police officer,

12   after all, he took a kneeling position, lined up his sights at

13   her, and fired, that he intended to hit her, or at least scare

14   the bejeebies out of her.  And I can't say that that couldn't

15   support a finding of reckless disregard of Ms. Epps' rights.

16        So, I think to the plaintiffs' detriment, I deny the

17   motion to dismiss the claim by Ms. Epps against Christian, as

18   well as the main claim against the City and County of Denver.

19        I do want to say that with respect to causation, no,

20   you can't link something that Phelan specifically did to any

21   exposure of one particular plaintiff.  That would be impossible.

22   But what the evidence does show is that the overreaction of the

23   cops, the excessive application of PepperBalls and tear gas and

24   sometimes some of the other projectiles, if you infer in favor

25   of the plaintiff, you construe in favor of the plaintiff, which

20-cv-1878-RBJ    EDWARD MAGUIRE, PhD - Redirect    03-21-2022

1    I have to do, was what led to the exposure of the plaintiffs to

2    PepperBalls and tear gas, notwithstanding their peaceful

3    protesting.  And that to me establishes causal link.  That means

4    that the case has to go to the jury.

5          So, with respect to the claims of Fisk, which have been

6    dismissed with prejudice, and the Court's agreement with

7    Mr. Ringel that there is no evidence to support any award of

8    economic damages in the form of medical expenses or otherwise,

9    at least as to Deras, Blasingame, Sannier, and Wedgeworth, and

10   any such economic damages claims by them are now dismissed.

11   With those exceptions, the Court denies the motion, and we will

12   proceed to the defendants' case after taking a short break so we

13   can all refresh and regroup.

14          MS. STERK:  Your Honor, I have one very quick issue,

15   if it's okay to raise it?  We had played the deposition of

16   Michael O'Donnell, and I don't believe that there's anything in

17   the record, because that -- those designations are not typed out

18   by the court reporters, and I wanted to see if we can put a clip

19   report of the actual pieces of testimony that were played into

20   the record.

21          THE COURT:  Sure.

22          MR. RINGEL:  No objection.

23          MS. STERK:  And so I don't know if you would prefer me

24   to just mark it as a court exhibit?

25          THE COURT:  Just mark it as an exhibit, and it's

20-cv-1878-RBJ    MICHAEL O'DONNELL – Direct    03-21-2022

 1  admitted.  Let's take our break.  Ten minutes.

 2       (Recess at 10:43 a.m., until 10:56 a.m.)

 3       (Jury in at 10:56 a.m.)

 4          THE COURT:  So, who is our baker this morning?  Again?

 5  Will you be on all my juries?  Okay.  Defense can call a

 6  witness.

 7          MS. HOFFMAN:  The defendants call Commander O'Donnell

 8  to the stand.

 9       (The Witness is Sworn)

10          THE COURT:  Thank you.

11                    **DIRECT EXAMINATION**

12  BY MS. HOFFMAN

13  Q    Good morning, Commander.

14  A    Good morning.

15  Q    If you could please state your name, spelling your last

16  name for the record.

17  A    Absolutely.  It's Mike, or Michael O'Donnell, O apostrophe

18  D-O-N-N-E-L-L.

19  Q    And you're presently employed by the Denver Police

20  Department; correct?

21  A    That's correct.

22  Q    How long have you worked for the Denver Police Department?

23  A    Next month will be 30 years.

24  Q    And how did you decide to become a police officer?

25  A    It's an interesting experience.  My mother moved us out

20-cv-1878-RBJ    MICHAEL O'DONNELL - Direct    03-21-2022

1    here when I was a year old, from Chicago.  Growing up in a

2    single-parent family, we were living in the Baker neighborhood,

3    which is kind of First and Broadway area.  We would routinely go

4    to -- well, I'm dating myself -- to the soda jerk inside.

5            When we would walk along Broadway, there was an Officer

6    Ben Watkins.  He was on foot patrol, which we don't really do

7    that much anymore, but his impact was just amazing.  He would

8    always be kind, give fatherly advice of stay in school, don't

9    get in trouble, those kind of things.

10           It had such an impact on me, and more specifically my

11   mom.  She actually became a police officer as well.  She was

12   hired in 1979.  She is the longest-serving sergeant on the

13   police department right now, and has earned the distinction of

14   being the number one badge, the first time in our history of the

15   Denver Police Department.  I'm very proud of her.

16           So, obviously the impact of both my mother and Officer

17   Ben Watkins had awakened a desire in me to complete a sense of

18   duty to help others.  So, that's kind of the long story of why I

19   became a police officer.

20   Q    And how did you decide to join the Denver Police

21   Department?

22   A    I think that's following in the footsteps of family

23   tradition with my mom.

24   Q    Great.  And if you could briefly walk me through your

25   career with the Denver Police Department.

20-cv-1878-RBJ   MICHAEL O'DONNELL - Direct   03-21-2022

1   A    Sure.  I was hired in 1992.  I attended the police academy,

2   which is roughly six months.  Went to District 4, which is our

3   southwest district, ironically the same neighborhood I grew up

4   in.  I was there to complete the field training program.  Worked

5   in District 6 for probably about six years, was promoted to

6   field training officer, and was transferred to District 3, which

7   is our southeast district.  I was there for about two years,

8   promoted to sergeant, and then went to District 6, which is our

9   downtown district.

10       Worked a couple different assignments there, including

11   patrol, and additionally the impact team, which is

12   essentially -- they work on hot problems that are in the

13   district, open air drug dealing, meeting with community members,

14   what their concerns are.

15       I transferred to the Denver Police gang unit in 2005,

16   was there for about three years, I believe.  Transferred to the

17   internal affairs division to get investigative side of things.

18   Was there for about two years.  And then I transferred back to

19   District 3 as the investigative sergeant.  So, responsible for

20   property crimes, assault crimes, things like that.

21       I was promoted to the rank of lieutenant and went to

22   District 6.  That was about a year and a half in District 3,

23   roughly.  Went to District 6 as a lieutenant.  Worked the night

24   shift, and then also again into the administrative investigation

25   side of the District 6 command staff.  I was there for about a

20-cv-1878-RBJ   MICHAEL O'DONNELL - Direct   03-21-2022

1   year and a half, two years, I believe, and then went to SWAT.

2          I was a lieutenant in SWAT for about three years.

3   Recognizing my son was going into his junior year, I had missed

4   most of his football games because of that SWAT assignment.  I

5   didn't want to be an absent father.  And living that life

6   experience, I wanted to be there for that.  So, I went back to

7   patrol for about a year, and then I was in District 3 again,

8   year and a half, I would guess.  Once he graduated, I went back

9   to the gang unit lieutenant, and I was there until I was

10  promoted to commander.

11  Q    And do you presently hold the rank of commander?

12  A    I do.  Upon Commander Phelan's retirement, I was awarded

13  that position for special operations division.

14  Q    Okay.  So, you replaced Commander Phelan?

15  A    Yes, ma'am.

16  Q    And, sorry.  As commander, do you oversee any units?

17  A    Yes.  Most specifically SWAT, the Metro SWAT tactical

18  component, the Air One, which is the helicopter resource that we

19  have, the bomb squad.  Additionally, we have the traffic

20  division, and then also what used to be called the gang unit now

21  is Special Operations Response Team.  That was actually a

22  mission expansion for them, which is why they have the name

23  change and additional duties.

24  Q    And how long have you held the commander position?

25  A    Coming up on a year and a half.

20-cv-1878-RBJ   MICHAEL O'DONNELL - Direct   03-21-2022

1    Q    And in the event of a large-scale protest like Commander

2    Phelan, would you serve as the incident commander?

3    A    Yes.  And I have done so a couple of different times in

4    that short duration of my tenure as commander.

5    Q    Approximately how many times has [sic] you served as an

6    incident commander?

7    A    Well, it's been kind of a crazy couple years.  So, I would

8    say probably in the range of 20 or more, as far as protests.

9    There's been some other events where I was incident commander.

10   Probably one that caused me the greatest angst and stress was

11   the All-Star baseball game that was moved, and we had 13 weeks

12   to man.  I was not gray before that, just so you know what

13   happened in those weeks.

14   Q    And during the protests, where were you assigned?

15   A    During the protests, I was in the gang unit as a

16   lieutenant.

17   Q    Okay.  And I believe you testified that was previously --

18   or that's also known as SORT?

19   A    That's correct.

20   Q    And can you tell us a little bit about what is the purpose

21   of the gang unit slash SORT?

22   A    Absolutely.  Under the gang unit definitions -- and they

23   still have this primary duty is to investigate and intervene in

24   gang activity, shootings, stabbings, anything gang-motivated.

25   Another component of that is developing information on who our

20-cv-1878-RBJ   MICHAEL O'DONNELL - Direct   03-21-2022

1  gang members are, where are they living, that kind of thing.

2         Another really critical piece that we do is education

3  and prevention.  So, what we try to do is work with families as

4  a holistic approach, not just to the kids -- I know the old DARE

5  and some of those other programs had limited success because

6  you're not treating the whole family.

7         So, we walk them through the dangers of what gang life,

8  that culture of violence looks like, and then additionally

9  providing resources to families to keep the whole family on the

10 right track to keep the impacted youth out of that path, because

11 it's much more difficult to get them out of the gang lifestyle

12 once they've been in it for a while.

13        So, that's -- the gang unit still completes that

14 mission, SORT now, but they're also tasked with having an

15 increased level of tactical response.  So, they're not quite a

16 tier one team, which I know that's kind of a technical term

17 about -- when you think of a SWAT team, they're typically tier

18 one, meaning they can handle hostage barricades.  The gang unit

19 is in process to become -- excuse me -- the SORT team is in

20 process to become a tier two team, which means that they would

21 be able to address smaller barricades.

22        Any time there's a hostage situation, we would need

23 Metro SWAT.  Just given the limitations of those calls for

24 service now, at the workload, we had to have additional

25 capabilities.

Kevin P. Carlin, RMR, CRR

20-cv-1878-RBJ    MICHAEL O'DONNELL - Direct    03-21-2022

1    Q    And specifically as a lieutenant in the gang unit, what

2    were your duties and responsibilities?

3    A    When I was on the night shift portion, I was in charge of

4    mainly the patrol side of the house.  So, we would respond to

5    gang shootings, interview the witnesses, follow up on any kind

6    of suspect information.  On the other side of it as the

7    investigative lieutenant, you're responsible for the day shift

8    patrol officers, the investigative component of the SORT team,

9    gang unit at the time, and also the outreach efforts.

10          We also have a couple of task force individuals that

11   are assigned to larger, more complex investigations.  So, you

12   oversee those things, and the general routine of daily

13   administrative tasks, the end-of-period paperwork, those kind of

14   things.

15   Q    And did you supervise any officers?

16   A    Directly, yes.  Well, the sergeants directly, and then

17   corporal below them, but I had the day shift --

18   Q    Okay.

19   A    -- the detectives, and then the task force folks in our

20   outreach component.

21   Q    And how many officers would that be in total?

22   A    We've diminished quite a bit on that side of the house.  I

23   would say the total assigned bodies to the SORT team right now

24   are about 32.  So, probably on the detective side, you're

25   looking at -- including the day shift officers, probably 10 to

20-cv-1878-RBJ    MICHAEL O'DONNELL - Direct    03-21-2022

1   12.

2   Q    And fair to say you shoulder some of those supervisory

3   burdens with another lieutenant?

4   A    That's correct.  Lieutenant Kevin Carroll.

5   Q    I want to switch gears a bit and ask you a few questions

6   about your training.  Have you received any training in the area

7   of less-lethal munitions?

8   A    Yes, I have.  Obviously when I started, the less-lethal

9   capacity was not as robust as it is now.  We had at that time

10  just a little can of mace.  As those platforms roll out, those

11  are implemented department-wide.  So, as the Taser came out, I

12  went through training and got certified for those.  When I went

13  to SWAT as a lieutenant, that's when I trained on the other

14  less-lethal platforms, the PepperBall, the 40-millimeter.  At

15  that time I was certified in flash-bang deployment, the

16  grenades, the foggers, all of those things.

17  Q    Okay.  So, just to sum that up and make sure that I

18  understand, as platforms rolled out, you received some training

19  on different less-lethal munitions, and in addition you received

20  some specialized training when you were working in more

21  specialized units?

22  A    That's correct.

23  Q    And can you describe the certification process.  What does

24  that consist of?

25  A    Sure.  A portion of it is classroom instruction.

20-cv-1878-RBJ   MICHAEL O'DONNELL - Direct   03-21-2022

1   PowerPoint slides, limitations with it, and use within the use

2   of force policy.  Then there's a written test, and then there's

3   a practical test.  So, written test, you know, you have to score

4   whatever percentage it is, typically it's 80 percent or higher.

5   Then the practical component is actually displaying it, using

6   it, and showing proficiency.

7   Q    And how often do you have to get certified for these

8   munitions?

9   A    The flash-bangs, they're only assigned to the SWAT

10   division, are yearly.  The PepperBall and others are yearly as

11   well.  I can't remember specifically if it's a year or two years

12   for the 40.  I'm sorry.  I just can't remember that off the top

13   of my head.

14   Q    And do you have to be specifically certified for each

15   individual less-lethal munition platform?

16   A    Yes, you do.  So, you go through again the training, the

17   test, the written test, practical test, and you have to have the

18   letter through the division chief of patrol in most instances.

19   Since we work for the division chief of investigations, our

20   ultimate sign-off authority is the division chief, Chief

21   Montoya.

22   Q    And have you received any training in the area of gas

23   munitions?

24   A    Yes.  As they rolled out, I was initially introduced to gas

25   deployments as a sergeant.  As is typical, our grenadiers are

20-cv-1878-RBJ    MICHAEL O'DONNELL - Direct    03-21-2022

1   sergeants.  Additional training with -- during the DNC build-up

2   in anticipation of what may or may not occur, and then that was

3   also reinforced as a lieutenant in SWAT.

4   Q    And you referenced some training you received at the DNC,

5   or for the DNC build-up.  Can you tell me a little bit more

6   about that.

7   A    Yes, ma'am.  As with many things, when you have a lot of

8   time to plan, you can really ensure that everybody understands

9   and has trained up to the needed level.  So, we had a two-year

10  cycle.  Knowing that that was coming, they trained the entire

11  police department on field force tactics, movements, commands,

12  less-lethal, whatever we had available at the time.  I don't

13  believe 40s were available at the time.  I'm not a hundred

14  percent sure on that.  So, there was review of all those, review

15  of our First amendment issues, right to free assembly, all these

16  things.  It was very comprehensive.

17  Q    And is it similar for gas munitions, that certification

18  process that you described?

19  A    It is.  It covers on all of those topics.  We want to make

20  sure that the officers know when and when -- when and where and

21  why they can use those, what the limitations are, what the

22  unfortunate side effects can be of, in some instances being

23  indiscriminate.

24  Q    And you've already touched on this a little bit, so you

25  don't have to repeat yourself, but any additional training

20-cv-1878-RBJ    MICHAEL O'DONNELL - Direct    03-21-2022

1   you've received in the area of crowd management beyond what

2   you've now described in terms of DNC training?

3   A    Yes.  When I left SWAT, I attended the three-day FEMA

4   course that was taught at the police academy.  It's certified

5   also through MCATI.  It's kind of the national standards.  Our

6   policies are very much in line with those.  Maybe a little

7   different language here and there, but I did attend that

8   three-day course.

9   Q    Okay.  And now I have a couple questions about less-lethal

10   munitions and gas munitions used by the Denver Police

11   Department.  At the time of the George Floyd protests, did the

12   Denver Police Department have any policies regarding the

13   deployment of less-lethal munitions?

14   A    Yes, we did.

15          MS. HOFFMAN:  And if we could show the witness

16   Exhibit 467.  I believe this has been entered as an exhibit, but

17   I'm not 100 percent sure.

18          THE COURT:  It's the operations manual?

19          MS. HOFFMAN:  I'm just showing the witness the use of

20   force policy, which is contained within the operations manual.

21          THE COURT:  Yes.  That was admitted.

22          MS. HOFFMAN:  Thank you.

23   Q.    (By Ms. Hoffman) I'm just going to give it a minute to

24   work out the technical kinks.

25   A    No problem.

20-cv-1878-RBJ   MICHAEL O'DONNELL - Direct   03-21-2022

1    Q    Commander, do you recognize that document?

2    A    Yes, I do.

3    Q    Okay.  What am I showing you right now?

4    A    This is the operations manual, use of force policy.

5    Q    Okay.

6            THE COURT:  Well, it says on there, revised June 19,

7    2020.

8            MR. RINGEL:  Right.  It postdates the -- that

9    particular one, and we have the right one.  There was a mistake

10   in the exhibits, and we will correct it and deal with it after

11   lunch.

12           MS. HOFFMAN:  Apologies for the confusion on my end.

13   Q.    (By Ms. Hoffman) Okay.  So, why don't you tell me about

14   the type of less-lethal munitions that the Denver Police

15   Department had at the time of the George Floyd protests.

16   A    So, the officers have the standard smaller can of OC pepper

17   spray, which is commonly used, commonly referred to.  The

18   officers would have also had access to the Mark 9 fogger, which

19   is a little larger dispersal system.  It's about yay big.  The

20   officers would have also had access to PepperBall, obviously the

21   certified officers.  40-millimeter, certified officers, again.

22           There was also another device called the Mark 46 OC

23   dispersal.  Again, that's just a -- larger than the Mark 9, the

24   smaller one.  It's about the size of a fire extinguisher, for a

25   greater dispersal pattern.  It included -- some divisions,

20-cv-1878-RBJ   MICHAEL O'DONNELL - Direct   03-21-2022

1    obviously specifically Metro SWAT would have been the only one

2    who had flash-bangs, but the districts and SORT would have had

3    at the time some munitions on hand of CS gas, and I think there

4    might have been some OC grenades as well.

5            THE COURT:  Can everyone over there hear him okay?  A

6    little louder would be helpful.

7            THE WITNESS:  No problem.  Will do, Your Honor.

8    Q.   (By Ms. Hoffman) Maybe if you sit a little closer to the

9    microphone.

10   A    That's a heavy chair.  Okay.

11   Q    I want to specifically talk to you about PepperBall first.

12   Why does the Denver Police Department use PepperBall?

13   A    You use the PepperBall system in a multitude of operations.

14   Typically, in patrol service, you would use it for perhaps a

15   suicidal person that's refusing to drop a knife, is refusing to

16   comply with those directions.  It can be used for an individual

17   that's refusing to submit to arrest, that's very violent.

18           We can use them in tactical situations for encouraging

19   individuals to give up instead of forcing a lethal

20   confrontation.  In crowd control situations, they can be used

21   for area denial.  They can be used for individuals that are for

22   example in a tree that are refusing to come out, they're going

23   to be arrested.  For the safety of that individual and the

24   officers, they can use those in that capacity.  There's the --

25   also, they rise to the level of defensive resistance, but they

20-cv-1878-RBJ   MICHAEL O'DONNELL - Direct   03-21-2022

1  can also be used for area saturation, also known as area denial,

2  to keep a group back from a critical infrastructure, for

3  example.

4  Q    And I think you answered my next question.  We have heard

5  testimony about area saturation.  Area saturation and area

6  denial are the same thing?

7  A    Yes.  That's correct.

8  Q    And area denial or area saturation is directing the

9  PepperBall at the ground or another hard object to disperse the

10  powder?

11  A    That's correct.  You can also use it as a direct impact

12  device in certain crowd situations when you have someone

13  engaging in violent activities against the officers.

14  Q    Okay.  And specifically what's the standard for deployment

15  of PepperBall in an area saturation capacity?

16  A    That would be defensive resistance.

17  Q    And moving on to direct impact, what is the standard for

18  deployment of PepperBall in a direct impact situation?

19  A    That again is defensive resistance.

20  Q    Have you ever been struck with a PepperBall?

21  A    Yes, I have.

22  Q    Can you describe that experience for the jury.

23  A    Yes.  I was attending a SWAT leadership school.  It was

24  sponsored by an out-of-county jurisdiction.  We were -- as part

25  of the confidence course, which is another term that was used in

20-cv-1878-RBJ   MICHAEL O'DONNELL - Direct   03-21-2022

1   the military, just, it's a practical exercise in which you are

2   subject to getting hit by a PepperBall.  It was supposed to be

3   inert training rounds.  There might have been a mixup by the

4   instructor, and I was struck with a live round, and they quickly

5   discovered that and made adjustments to get it back to the

6   training rounds.

7   Q    Okay.  If you could tell me a little bit more about what

8   that felt when -- when you were hit with the PepperBall.

9   A    It stings, and it is -- I don't know if anybody has played

10  paintball, but it's very similar there.  It's the same

11  technology.  It's going to sting for a day or two.  Well, I

12  shouldn't say a day or two.  You might have bruises for a day or

13  two, depending upon distance, but it quickly dissipates.  And

14  even the effects of the OC, within 10 to 15 minutes, I was fine.

15  Q    Moving on to the 40-millimeter, why does the Denver Police

16  Department use the 40-millimeter platform?

17  A    The 40-millimeter platform, again, it is considered

18  less-lethal.  For the instances of active aggression, meaning

19  someone is armed with a weapon, and instead of engaging with

20  lethal activity, you want to have that opportunity to save

21  lives.

22       So, you can use the 40-millimeter to disable that

23  individual, encourage them to drop the weapon.  In protests, it

24  rises to the level of active aggression.  It can also be used

25  when individuals are throwing items at the officers, rocks,

20-cv-1878-RBJ    MICHAEL O'DONNELL - Direct    03-21-2022

1    concrete chunks, what have you.  That's the typical deployment

2    fashion for a 40-millimeter.

3    Q    Moving on to CS gas, why does the department use CS gas?

4    A    CS gas is considered a riot control agent.  When you have a

5    large number of individuals gathered, and you have a number of

6    them, significant percentage -- there's not a formula for that,

7    because each situation is unique, and you're dealing with the

8    human element.  So, when you have riotous conditions, or

9    individuals are throwing items at the officers, you may have to

10   use CS gas to dissipate that crowd, move them back.  It just

11   depends on each situation.  Every one is unique.

12   Q    Have you ever been exposed to CS gas?

13   A    Yes, I have.  I was also in the United States Army

14   Reserves.  So, early in my training, as part of basic training,

15   we call it the confidence course, you go into a room that is

16   typically about the size of a standard kitchen, ten by ten,

17   filled with tear gas, CS gas.  The idea is for you to understand

18   the effects and recognize that you're going to be okay.

19        So, when you walk in, a drill sergeant, the caring and

20   compassionate individuals they are, decide for you to take your

21   mask off.  And whenever they're tired of you coughing, they let

22   you out.  So, once you exit there, you start breathing again,

23   you can feel the -- and recognize that you're not going to die.

24   You're going to be fine, but it is concerning at times when you

25   first take it off and feel it.

20-cv-1878-RBJ    MICHAEL O'DONNELL - Direct    03-21-2022

1    Q    Moving on to the OC fogger pepper spray, and I believe you

2    testified that there's three different sizes of that device?

3    Did I understand that correctly?

4    A    That's correct.  There is the officer personal issue, which

5    is the small canister that they wear on their belt or out-gear.

6    Then there's the Mark 9, which is a little larger, probably --

7    obviously not as wide or as thick as this, but roughly the same

8    size.  And then there's the Mark 46, which is a larger fire

9    extinguisher type of deployment system.  And each one just has

10   different ranges.

11   Q    Understood.  And what is the purpose -- well, of the

12   various types of OC foggers that you just described?

13   A    So, the officer issue would be when you're -- for example,

14   if an officer rolls up on a disturbance, a bar fight, you've got

15   a bunch of people involved, two specifically, and you're trying

16   to get separation, but there's not enough additional officers

17   there to separate the combatants, you may use the small officer

18   one.

19        During a larger crowd size, I would say maybe a couple

20   hundred folks, you've got similar instances of combat within

21   those groups, and you have a small number of officers that

22   respond -- honestly, and I've actually seen this with LODO

23   crowds, there's a huge push of people that come out into the

24   street, into the parking lots, a lot of fights erupt.

25        So, officers are kind of moving around, trying to

20-cv-1878-RBJ   MICHAEL O'DONNELL - Direct   03-21-2022

1    separate the combatants, prevent injury, and they may have to

2    discharge the fogger type, the Mark 9 to dissipate the crowd,

3    stop the fighting, and then render aid.

4        The larger one is designed more specifically for larger

5    crowd control device application.  So, that one is a longer

6    distance.  I want to say the minimum distance is 12 feet before

7    you use that for whatever situation may occur that the officers

8    can clearly articulate the need and rationale for using it.

9    Q    And what was standard for deployment of the fogger at the

10   time of the George Floyd protest?

11   A    That would be defensive resistance.

12   Q    And I believe you mentioned trying to get a sense of what

13   is the appropriate distance for deployment of these foggers?  I

14   think you just testified that it's 12 feet for the largest size?

15   A    For the largest, that's correct.  The fogger and the

16   smaller officer one, and I want to say the officer one is about

17   a three-feet dispersal distance.  The MK-9 fogger is a six-feet

18   distance.

19   Q    And does the Denver Police Department train officers

20   regarding all these appropriate distances for deployment of the

21   OC fogger?

22   A    Yes, it does.  As part of the practical test, you will

23   stand on a line that is marked six feet, three feet, whatever

24   the case may be for whatever less-lethal platform you're

25   training with.

20-cv-1878-RBJ   MICHAEL O'DONNELL - Direct   03-21-2022

1   Q    And you mentioned a practical test.  What was that

2   practical test?

3   A    For each of those, typically the officer can is issued in

4   the academy.  So, it's the same kind of deal that you spray a

5   particular target so you can see the impact, how it's going to

6   focus on that individual.  Same thing with the MK-9, the fogger

7   one.  That's usually more through sergeant school.  When you are

8   promoted or are in the range of promoting, you will go to the

9   sergeant school.  They also open that up to corporals.

10          So, in those instances where they have to utilize the

11   MK-9, they can understand the effect.  So, it's again, target,

12   and then engaging.  The larger MK-46 system is really becoming

13   outdated, so we're actually in the process of switching to a

14   newer model of that, but very similar system.  You go through

15   the written portion of use of force, how you may apply it, test,

16   and then deployment on a target.

17   Q    And in any of these trainings, or at any other time, have

18   you been exposed yourself to pepper spray?

19   A    Yes.  Yes, I have.

20   Q    Can you describe that experience for the jury.

21   A    The difference between OC pepper spray and CS is CS kind of

22   attacks your nasal membranes and tears.  So, you're going to

23   cry, and you're going to have a bunch of mucus pouring out.

24   With OC, you're going to feel burning in your eyes, but it's a

25   different kind of burning.  It also burns on your skin.  So,

20-cv-1878-RBJ   MICHAEL O'DONNELL - Direct   03-21-2022

1  it's designed to temporarily incapacitate someone from whatever

2  activity they're occurring in.  With decontamination, you can

3  quickly recover.  And even without decontamination, if you get

4  out of the element, it's going to start calming down pretty

5  quickly.

6  Q   So, I'd like to move on to your 30(b)(6) testimony.  You

7  previously testified on behalf of the City of Denver at a

8  deposition regarding the City's crowd management policy;

9  correct?

10  A   Yes, I did.

11  Q   And the jury watched portions of that very interesting

12  video deposition.

13  A   Yes, they did.

14  Q   And I don't want to repeat and go over all the same

15  questions you were asked, but I do want to provide some context

16  to some of the terms that were discussed during your deposition.

17  A   Sure.

18  Q   Okay.  And I would ask that the witness be shown

19  Exhibit 452.  And I believe 452 has been previously admitted.

20  Can you see that document, Commander?

21  A   Yes.

22  Q   Great.  And is this the City's crowd management manual?

23  A   Yes, it is.

24  Q   Do officers have access to this manual?

25  A   Yes, we do.  As part of all training in the Denver Police

20-cv-1878-RBJ   MICHAEL O'DONNELL - Direct   03-21-2022

1   Department, it's -- the foundation was laid in the police

2   academy, and it continues.  Every year you have a certain number

3   of continuing education credits that you have to obtain to

4   maintain your POST certification as a police officer.  Every

5   time we update or train something, a review or refresher, it is

6   put out to all the officers in what's called PowerDMS.

7        PowerDMS is essentially an educational online tracking

8   program.  Officer has to open it, read it.  Sometimes there's a

9   test.  Sometimes there's not.  Depends on what the material is.

10  And then sign off that they have read it, understand it, and

11  they're in compliance with that policy or procedure.  And the

12  crowd management manual is available electronically as well in

13  that system.

14  Q    So, fair to say, based on your testimony, that the

15  department expects officers to familiarize themselves with the

16  policy and with any changes to the policy?

17  A    That's correct.  And I would say routinely sergeants also

18  provide additional training in roll call setting to answer any

19  questions or concerns that an officer may have.

20  Q    What's roll call?

21  A    Roll call is at the start of every shift in patrol.  On the

22  investigation side, it's more of a briefing.  It's not really

23  roll call, but roll call is these are your assignments today.

24  This is what occurred today.  This is whatever might be

25  happening, whether it's locally, nationally, whatever.

20-cv-1878-RBJ    MICHAEL O'DONNELL - Direct    03-21-2022

1   Information on wanted parties that we know may be in the area.

2   Training, whatever topic of training sergeants or a lieutenant

3   or the commander may push out to them for review.

4   Q    Okay.  So, fair to say that training starts at the academy,

5   but is it considered ongoing?

6   A    It is considered ongoing, yes.

7   Q    And one way it's ongoing is through that roll call process

8   you just described?

9   A    That's -- yes.  That's part of it.  As I mentioned, there's

10  continuing education.  There is definitely different training

11  that is required beyond the CEP and POST certification.  So,

12  that is sometimes at the academy, sometimes online, sometimes at

13  the district.  And then additionally, any kind of updates are

14  pushed out on that PowerDMS.

15  Q    And I just want you -- I think you mentioned CDP POST?

16  A    So, continuing education, and POST.  POST is police officer

17  standard training.  You have to be certified and trained and

18  abide by all the state regulations to be POST certified.

19  Q    So, there's some sort of state agencies that governs

20  whether or not officers are properly certified?  Am I

21  understanding that correctly?

22  A    That's correct.

23  Q    So, does the Denver Police Department recognize the

24  difference between force against individuals in a crowd and

25  force against the crowd as a whole?

20-cv-1878-RBJ   MICHAEL O'DONNELL - Direct   03-21-2022

1  A    Yes, we do.  It's stated a couple of different times in the

2  crowd management manual as well as the crowd control policy.

3  Q    Okay.  So, what I'd like to do with you today is really

4  focus on the latter, force against the crowd as a whole.

5  A    Okay.

6  Q    So, as I understand the manual, it talks about two

7  different categories of tactics, crowd management and crowd

8  control.  Are you familiar with those two terms?

9  A    Yes, I am.

10  Q    So, let's start with the first one.  Crowd management.  And

11  if we could direct the witness to pages five and six.  So, what

12  is crowd management?

13  A    Crowd management essentially is any activity that may

14  involve a large number of people, and our ability to recognize

15  their right to free speech and providing for that safety and

16  assembly, and then also providing for their safety when it comes

17  to individuals that may or may not be inside that group.

18         As part of that, there's a component of operation

19  planning, identifying crowd leadership.  Typically in a peaceful

20  protest or an organized event you can have those conversations

21  in advance, so it's really about managing how that group would

22  want to march.  Okay, we can accommodate that.  We welcome those

23  opportunities.  So, that's part of the traffic plan that is

24  included in those.

25         There's also the law enforcement component of it, of

20-cv-1878-RBJ   MICHAEL O'DONNELL - Direct   03-21-2022

1   identifying individuals that are intent on committing bad

2   behavior.  In some instances, you may have a group of

3   counter-protesters that get into that group.  So, we are trying

4   to separate them.  We might have to go in and put a line of

5   officers separating the two to ensure that the folks that are

6   there for the peaceful assembly have that opportunity, and the

7   others can be separate but prevented from violence.

8   Q    So, fair to say that crowd management techniques more apply

9   to a peaceful crowd?

10  A    Correct.

11  Q    And some of the techniques you just went over about

12  reaching out to event organizers and what not, those are

13  techniques that you employ for dealing with a peaceful crowd?

14  A    It is, but we also do that for unplanned or spontaneous

15  events as well.

16  Q    So, crowd management both applies for both planned as well

17  as spontaneous events?

18  A    That's correct.  There's a lot of language in there, and

19  it's mentioned a couple of different times about being flexible

20  and adaptable.  And you have to.  The other part that's in there

21  is you may -- it's a fluid and dynamic situation.  Whether it's

22  planned or unplanned, you have to continually reevaluate, what

23  can we do better?  What do we need to change to address whatever

24  threats or security concerns may be erupting, or even if they

25  decide to march, you have to adjust on that plan as well.

20-cv-1878-RBJ    MICHAEL O'DONNELL - Direct    03-21-2022

1    Q    Okay.  So, I think page five, which is what we have

2    displayed, talks more about the techniques for planned crowd

3    management situations.  So, if I could direct the witness to the

4    next page, where I believe it goes into techniques for

5    spontaneous crowd management events.  Can you walk me through

6    those three techniques listed at the top of the page?

7    A    Sure.  And as you may notice, it's very similar to planned

8    events, but you have the crowd leadership.  So, you're trying to

9    find an informal leader or a recognized leader, even in a

10   spontaneous event.  Thank you.  I appreciate that.  To find out

11   what their operational needs are.

12         Are they planning to march?  How can we accommodate

13   that, providing for vehicular safety and pedestrian safety?  The

14   traffic management, based on that information, we would hand

15   that off to the traffic resources.  Once we -- again, if you

16   have a little bit of lead time, you can start putting into the

17   permitting and that process.  But on spontaneous crowds, you

18   need to understand what the needs are.  How big is the crowd?

19   Are there violent offenders?  Is there criminal activity going

20   on right now?  Is there potential for criminal activity going

21   on?  Do we need additional resources?  And you have to start

22   identifying those.

23         When you talk about the law enforcement, again, we try

24   to make every opportunity to identify individual actions as

25   opposed to crowd actions.  But you always have to balance that

20-cv-1878-RBJ   MICHAEL O'DONNELL - Direct   03-21-2022

1   with, does your individual action, or going after an individual,

2   is that going to make the situation worse, or is it going to

3   make it better?  Do you have enough resources to effectively

4   safely make that arrest and withdraw?

5          So, it talks about rules of conduct, crowd management.

6   So, I can't stress enough that you have to have a lot of

7   flexibility when you're employing crowd management, and the

8   language is built into the manual as well.

9   Q    And so we've been speaking more generally, but do you have

10  any knowledge of whether the Denver Police Department made any

11  effort to apply these three spontaneous crowd management

12  techniques during the George Floyd protests?

13  A    I do.  I know that the chief and our intelligence section,

14  who usually tries to work with event organizers on the front

15  side of things, there was multiple efforts to try and get in

16  contact with community leaders and find out what their

17  intentions were on a given day.  Ultimately, that failed for the

18  most part.

19         There was an instance where our chief actually made

20  some connections with some of the local faith-based community

21  leaders, and actually marched in the parade with them -- or, not

22  the parade -- the protest march with them.  So, regardless of

23  spontaneous or planned, that is always what we do is try to

24  identify leadership.  How can we accommodate what you're looking

25  to do to get your message out?

20-cv-1878-RBJ   MICHAEL O'DONNELL - Direct   03-21-2022

1   Q    And if we could go down a little bit in the document.  I

2   now want to direct your attention to the crowd control section.

3   What is crowd control?

4   A    Crowd control is essentially a different resource

5   applications.  So, when you think of crowd management, that's

6   how we want to do it.  This is more the how to do it.  But

7   again, you will see that we have an operations plan.  We are

8   trying to identify crowd leadership to accommodate what their

9   desires are to get their message out.  Traffic management, in

10  this instance with George Floyd protests, there was no

11  communication on any of those sides, so we tried to base our

12  traffic plan on what we had experienced in the past.

13         There's usually a typical route down Lincoln, down 16th

14  Street Mall, and back around.  As you've heard previously, in

15  the days of testimony, that didn't happen.  They would take

16  random routes, and they would go counterflow to traffic.  So,

17  trying to move officers to mitigate the dangers to both the

18  protest participants and the vehicular traffic was almost

19  impossible.

20         There was also instances where traffic resources were

21  dedicated to a particular post, expecting the crowd to move

22  through there, when they were attacked with rocks and whatever

23  else.  They didn't typically have their police protective

24  equipment on to the level of -- that some of the other officers

25  did, so they would have to pull off that position, which just

20-cv-1878-RBJ   MICHAEL O'DONNELL - Direct   03-21-2022

1   made it very chaotic, and --

2   Q    So, I just want to keep this super simple.  My

3   understanding is crowd management applies for more peaceful

4   activities?

5   A    Yes.

6   Q    Is crowd control for more unruly activities?

7   A    That's correct.

8   Q    And then what we see here listed under crowd control, we

9   see a number of terms underlined, operational planning, crowd

10  leadership, traffic management.  Can we scroll down a little

11  bit.  Law enforcement, spontaneous event, and I believe arrests.

12  Are these the specific crowd control techniques for dealing with

13  that more unruly crowd?

14  A    Yes.  It's a list of what you need to be considering.

15  There's other tactics that are listed elsewhere.

16  Q    And specifically drawing your attention to the arrest

17  section, and I have a question about one of these factors.  So,

18  individuals will only be arrested based on probable cause.  In

19  making arrest decisions, the following may be considered: the

20  likelihood that police action will improve the situation given

21  the totality of the circumstances.  Can you tell the jury what

22  that means.

23  A    I kind of referenced this earlier.  That is a situation

24  where you're trying to identify someone engaged in unlawful or

25  criminal activity, and you're going to make an arrest.  Ideally

20-cv-1878-RBJ   MICHAEL O'DONNELL - Direct   03-21-2022

1    you would have an arrest team.  You would be able to move into a

2    crowd and take that individual.  During the George Floyd

3    protests, that was not safe or practical given the large number

4    of officers.

5            The reason that folks had gathered to express their

6    outrage was at the hands of police action in another state.

7    Recognizing that if you send officers in, that's going to

8    inflame the situation, not make it better.  The other

9    complication we had was that you couldn't identify individuals,

10   necessarily.  Everybody was wearing masks.  It was COVID.  So,

11   you're seeing an individual do something, but then they would

12   disappear into a crowd of thousands.  You can't identify them.

13           There were instances where we were able to stay with an

14   individual who had committed a criminal activity and arrest them

15   later when they were separated from the crowd.  So, this is our

16   desire, but it's not always practical.

17   Q    And if you could tell me a little bit more about some of

18   those instances where you were able to keep track of an

19   individual agitator and later apprehend him or her?

20   A    I know for one example, the gang unit had -- we had been on

21   a skirmish line identifying an individual wearing a particular

22   set of clothes, throwing rocks at us multiple times.  I believe

23   he threw some canned food as well.  He was later arrested in the

24   curfew operation.  When the curfew went into effect, he was

25   contacted, I think two and a half, three hours later, but we

20-cv-1878-RBJ     MICHAEL O'DONNELL - Direct     03-21-2022

1   recognized him from his clothing even though he had taken off

2   his glasses and everything else.  So, we were able to charge him

3   with the curfew, and then also the criminal actions he had done

4   earlier in the day.

5   Q    And I apologize if I missed this, but I believe you

6   testified that sometimes it was difficult to identify agitators

7   in a larger crowd.  What made it difficult to identify those

8   individuals?

9   A    The difficulty was that they had similar clothing, masks,

10  and they would engage in whatever criminal activity, and then

11  withdraw deep into the crowd.  And when you've got thousands of

12  individuals, you cannot keep what we call eyes on or

13  identification of a particular person as they're moving and

14  evading whatever efforts we had in place to try and capture that

15  individual.

16  Q    And I want to go back now to just generally talking crowd

17  management, crowd control.  During the George Floyd protests,

18  was the Denver Police Department applying crowd management,

19  crowd control, or both?

20  A    It was definitely both.

21  Q    How so?

22  A    I would say in most daytime events, it was crowd

23  management, not crowd control.  The crowd was peaceful.  They

24  marched, so there was a couple of different opportunities almost

25  every day where you would accommodate the traffic movement,

20-cv-1878-RBJ    MICHAEL O'DONNELL - Direct    03-21-2022

1    traffic management plan.  They would move around.  There would

2    be no instances of violence, and then they would return to

3    either Veterans Park, Civic Center, or the capitol.  And then at

4    night, it was a very different story.

5    Q    So, at the night, you were more using crowd management

6    techniques?

7    A    That's correct.  Crowd control.

8    Q    Sorry.  Crowd control?

9    A    Yes, ma'am.

10   Q    Thank you for correcting me.  If you could direct the

11   witness to pages 10 to 11.  So, I want to direct your attention

12   to that section entitled rules of engagement.  Specifically at

13   the top of page 11, I see a number of factors listed: the nature

14   of the violation, urgency of the crime, risk to officers and the

15   public, extent of property damage, and the importance of

16   removing violators who may be impacting the rights of those

17   involved.  Just briefly summarizing those, but what are those

18   factors?

19   A    These are factors that you evaluate when you're going to

20   take some sort of police action.  If you've identified someone,

21   not positive identification, but you know who it is, obviously

22   that kind of changes the dynamic.  You would have obligations to

23   put a warrant out for their arrest.  But when you don't know the

24   identification of that person, you have clothing description,

25   you're trying to gauge these circumstances in your formula of is

20-cv-1878-RBJ   MICHAEL O'DONNELL - Direct   03-21-2022

1    this going to make it better if we arrest somebody?  Is it too

2    dangerous to try and go in?  Is it going to make the crowd react

3    negatively?  And in certain instances, it did.

4    Q    So, this is guidance to officers on when force should be

5    applied?

6    A    Correct.

7    Q    Does the crowd management manual outline a procedure for

8    the use of force against the crowd as a whole?

9    A    It does.  When you are into the crowd management manual

10   matrix, it kind of lists different instances of what the crowd

11   may be doing and what level of force may be authorized.

12   Generally, you need an incident commander approval or lieutenant

13   command officer approval or supervisor, but there is exceptions

14   recognizing that conditions can be dynamic, fluid, and the

15   officers may not have the opportunity prior to making some sort

16   of deployment of less-lethal in regards to a crowd.

17         So, it is a carve-out that if the officers can clearly

18   explain and rationalize why it was needed and explain the

19   necessity of it, they have that availability.

20   Q    Okay.  So, I want to make sure I understand that.  So, this

21   manual outlines a process for an incident commander declaring an

22   unlawful assembly, and that's one way that force can be used

23   against the crowd as a whole?

24   A    Correct.

25   Q    And then secondly, there's a carve-out for emergency

20-cv-1878-RBJ    MICHAEL O'DONNELL - Direct    03-21-2022

1   situations.  Is that -- am I understanding that correctly?

2   A    Yes, you are.  It's specifically riot or mob-type

3   conditions.

4   Q    Okay.  So, let's talk about the unlawful assembly process

5   first.  And if I could draw the witness' attention to pages 11

6   through 14.  What is an unlawful assembly?

7   A    An unlawful assembly can be declared by the incident

8   commander, in rare instances a supervisor or lieutenant, when

9   certain time, place, and manner restrictions are not being

10  obeyed, there's a significant level of violence occurring,

11  property damage, or life is in danger.

12  Q    And if we can go up to the page above it, page 11.

13  Actually, go back down to 12.  I'm sorry.  I was wrong.  And I

14  want to draw your attention to the third paragraph at the top of

15  page 12, where it says the intent of the dispersal order is to

16  permanently disperse a crowd, not merely to relocate the problem

17  to another location.  Can you explain that sentence to the jury.

18  A    Absolutely.  When this type of situation happens, when you

19  get an unlawful assembly or you're issuing a dispersal order,

20  the idea is to stop the violence, property damage, the

21  life-preservation efforts, that needs to stop permanently.  So,

22  the idea is to have the crowd permanently leave the area.  That

23  was not what we experienced during George Floyd protests.

24  Q    And I believe you testified that it's normally the incident

25  commander who's tasked with declaration of unlawful assembly?

20-cv-1878-RBJ   MICHAEL O'DONNELL - Direct   03-21-2022

1   A    Yes.  Normally it is.

2   Q    And why is the incident commander tasked with making that

3   declaration?

4   A    The incident commander will have more available decision

5   factors than perhaps an officer or a sergeant or a lieutenant on

6   one particular scene.  The volume of this and the area that was

7   occurring with different areas, sometimes blocks apart, he has a

8   better -- or she has a better grasp of the totality of

9   circumstances versus one minor area.  So, global view versus

10  bird view.

11  Q    But in some instances, it doesn't have to be the incident

12  commander.  Somebody else can declare an unlawful assembly; is

13  that correct?

14  A    That's correct.  There's another carve-out in that matrix

15  formula that the sergeant, lieutenant can declare it prior to,

16  given riot or mob conditions and emergency exigent

17  circumstances.  There is even a level for an officer to have

18  that authority.

19  Q    And then I think you've touched on this, but what

20  specifically happens after the unlawful assembly is declared?

21  A    In normal situations, you go through a series of orders.

22  So, you read, I'm Commander so and so, I'm Officer so and so,

23  whatever the case may be, you're in violation of whatever city

24  ordinance or state law is in effect at the time.  And then you

25  tell them, you have X amount of time before less-lethal will be

20-cv-1878-RBJ    MICHAEL O'DONNELL - Direct    03-21-2022

1   deployed or you're subject to arrest.

2          Again, normal situations where you have calm, you can

3   wait five minutes, give another order.  Wait five minutes, give

4   another order, so there's ample time and opportunity for anybody

5   that is protesting that wants to leave, that they can leave.

6   Q    If I could draw the witness' attention to page nine.  So,

7   drawing your attention to the top of the document, a general

8   dispersal order will only be given under the following

9   circumstances, and then it lays out the two circumstances in

10  which it's appropriate to give a dispersal order; correct?

11  A    That's correct.

12  Q    Okay.  With one being a significant number or percentage of

13  participants fail to adhere to time, place, and manner

14  restrictions, and the second being a significant number or

15  percentage are engaging in or about to engage in tumultuous and

16  violent conduct?

17  A    Correct.

18  Q    Is significant number or percentage defined anywhere?

19  A    No.  You cannot put a formula in place that you have to

20  count, okay, there's ten bodies, that means that there's

21  significant number in there.  It's fluid.  It's subject to the

22  human element.  Significant can mean in some instances if you

23  have 100 people, you might have 20.  Is that a significant

24  number of 100?  It is.  But again, it depends on what they're

25  doing.  So, each situation is unique and has to be judged on the

20-cv-1878-RBJ    MICHAEL O'DONNELL - Direct    03-21-2022

1   merits of that situation and the totality of circumstances

2   available.

3   Q    So, we've now talked about the unlawful assembly dispersal

4   order process, and now I want to go back to what you said a few

5   questions ago in terms of the exigency carve-out.  Can you tell

6   me a little bit more about that?

7   A    The policy and manual clearly states in multiple instances,

8   it's a guide.  It's flexible.  It understands that no two

9   situations are the same.  The expectation is that the officers

10  or incident commander, whoever may be in charge, even the

11  officers deployed may have to deescalate, may have to escalate.

12        There may be a time when the officers can pull off and

13  it can dissipate, but the factor on the flip side of that is

14  that each situation -- I know I sound like a broken record, but

15  each situation is unique.  If you have individuals that are

16  committing vandalism, they're smashing windows, burning

17  vehicles, burning statues, you can't disengage.  You have to

18  protect property.  Our primary mission is to protect life, but

19  you have to kind of look at each one specific.

20  Q    And if we could draw the witness' attention to page two.

21  And here this indicates this manual serves as a guide for crowd

22  management and crowd -- and control operations.  Is this what

23  you were referring to when you indicated that the manual was a

24  guide?

25  A    Yes.

20-cv-1878-RBJ    MICHAEL O'DONNELL - Direct    03-21-2022

1   Q    And if we could direct the witness' attention to page four.

2   Here I'm directing your attention to the section under the

3   heading purpose, and specifically that first paragraph.

4   A    Okay.

5   Q    And fair to say that that has some similar language to what

6   we just reviewed about the manual being a guide?

7   A    That's correct.

8   Q    So, we've talked a lot about how the manual is a guide, and

9   therefore officers have some discretion to act with flexibility

10  based on the circumstances?

11  A    That's correct.

12  Q    Why does the Denver Police Department provide its officers

13  discretion in the crowd management context?

14  A    Each situation has to be gauged on the merits of what is

15  occurring, the totality of the circumstances that are present at

16  the time.  The officers have to have that level of discretion to

17  protect life, property, and their own safety.

18  Q    Do you believe that the Denver Police Department provides

19  its officers with too much discretion?

20  A    I do not.

21  Q    Are there any limitations on the discretion?

22  A    There is.  Obviously the officers have to be able to

23  clearly explain their rationale for whatever decision they make,

24  and that's -- even beyond crowd control.  Officers go through

25  ongoing training to make sure that their decisions are

20-cv-1878-RBJ    MICHAEL O'DONNELL - Direct    03-21-2022

1    reasonable and necessary.

2         So, it's -- you have to have that discretion, not just

3    in crowd control, but in every element of police work, because

4    you don't have a boss with you 24/7.  But we expect that those

5    officers can clearly explain the urgency and need for given

6    actions, and it has to be articulated in written form at the

7    completion of whatever activity they are performing.

8    Q    And if we could draw the witness' attention to page 16.

9    So, drawing your attention to the matrix, I know that you've

10   referred to this a few times during your testimony.  If you

11   could just explain to the jury what this matrix is?

12   A    Sure.  This is another representation of what is presented

13   in our crowd control training with recruits and the ongoing

14   training, but it talks about the behavior of individuals or

15   crowds, psychological intimidation, verbal noncompliance,

16   passive resistance.  And it kind of talks about what the

17   officer -- what -- behavior is defined, an example of each of

18   those, the strategy for dealing with those, and then the level

19   of force that may or may not be appropriate with whatever

20   situation.

21        So, you get down to aggravated active aggression

22   towards any person.  That's a higher level of force than would

23   be in the other lesser systems.  Who authorizes it is

24   essentially just a direction of, you know, is it an officer?  Is

25   it a supervisor?  Is it a lieutenant?  Some of the other pages

20-cv-1878-RBJ   MICHAEL O'DONNELL - Direct   03-21-2022

1   show that.  And then when it's appropriate as far as against a

2   specific individual.  The other pages talk about groups.

3   Q    And if we could scroll down a page, and then one more page.

4   Commander, I want to draw your attention to the yellow section

5   where the type of behavior is listed as riot, mob.

6   A    Yes.

7   Q    Why don't you talk specifically about that section.

8   A    This was the sense, or the -- the portion I was referencing

9   earlier, where you have an incident where even an officer may

10  have the discretion to release riot control agents, less-lethal

11  munitions.  The riot, mob talks about intense excitement around

12  agitation, loss of sense of reason, respect for law, property

13  damage, those kind of things.

14        They're following in lawless acts where you have people

15  just caught up in the moment, and there's no ability to reason

16  or rationale [sic] with them.  Again it references attempts to

17  subdue those individuals that are witnessed doing criminal acts

18  would be unsafe or ineffective.

19        And then it talks about the different force, control

20  options that the officers or incident commanders have, but the

21  important part to highlight in that is it's emergency

22  circumstances only.  But again, post this activity, the officers

23  need to be able to clearly articulate and explain in written

24  form why that was necessary.

25  Q    What is a riot?

20-cv-1878-RBJ   MICHAEL O'DONNELL - Direct   03-21-2022

1  A    A riot is defined by Colorado state law as three or more

2  individuals engaged in criminal conduct inside a group of

3  people.

4  Q    And do you believe some of the situations that you

5  encountered in that George Floyd protests would -- could be

6  considered riots?

7  A    Absolutely.

8         MS. HOFFMAN:  And if I could show the witness

9  Exhibit 467, beginning at page 243.  Scroll up one page.  And if

10  I could inquire if this has been admitted as an exhibit?

11         THE COURTROOM DEPUTY:  The use of force?

12         MS. HOFFMAN:  The use of force policy in the

13  operations manual.

14         THE COURTROOM DEPUTY:  Yes.

15         MS. HOFFMAN:  Great.

16  Q.    (By Ms. Hoffman) What is this document?

17  A    This particular portion of the document talks about a need

18  for emergency use with National Guard resources.  And then it

19  further describes some crowd management policy.  National Guard

20  was actually utilized during some of the George Floyd protests.

21  We were so resource-depleted, I don't know if Commander Phelan

22  mentioned that we had about 150 officers.  We had to use

23  additional resources from the National Guard to protect critical

24  structures, freeing up other officers to be out addressing the

25  protests.

20-cv-1878-RBJ    MICHAEL O'DONNELL - Direct    03-21-2022

1   Q    And do you recall what dates of the protest the National

2   Guard had to be called in?

3   A    I believe that was Saturday and Sunday.

4   Q    So, that would be the 30th and the 31st, you believe?

5   A    That sounds right, yes.

6   Q    And I should have been more clear.  I was trying to draw

7   your attention down to the bottom, 108.08, the crowd management

8   policy.  Do you have that?

9   A    I do.  I'm sorry.  When I saw that, it just reminded me of

10  when they were out deployed with us.

11  Q    We just spent a lot of time talking about the City's crowd

12  management manual, and now I'm showing you the City's crowd

13  management policy.  Can you tell the jury about the relationship

14  between these two documents.

15  A    Sure.  The crowd management policy essentially explains the

16  why.  Why do we do certain things?  Our goals and objectives.

17  The manual is the how to, including the matrix.  So, they are

18  similar language, very similar themes, and they build upon each

19  other.

20  Q    Thank you.  Okay.  I want to switch gears a little bit,

21  Commander, and talk to you about the George Floyd protest

22  generally.  Did you work the George Floyd protests?

23  A    Yes, I did.

24  Q    What days of the George Floyd protests?

25  A    I started on a Thursday, which I believe was the 28th, and

20-cv-1878-RBJ   MICHAEL O'DONNELL - Direct   03-21-2022

1   then I worked all the way through Monday, June 1st, I believe.

2   Q    And I assume that you worked the George Floyd protests in

3   your prior capacity as a lieutenant in the gang unit?

4   A    That's correct.

5   Q    Prior to the George Floyd protests, had you worked any

6   other protests?

7   A    Yes.  I had a lot of experience with protests over the

8   years.  Probably the biggest example would be Occupy Denver.  I

9   was a lieutenant in the gang -- excuse me -- District 6 at the

10  time.  So, that was a longterm protest, but by and large, there

11  was no violence in that instance.  There's been instances of

12  Avalanche celebration that turns riotous at the end.  I am not

13  exactly sure why we are celebrating and rioting, but that's --

14  who am I to ask?

15          There's been other instances.  In fact, almost every

16  day in District 6, you have some sort of protest.  The most

17  prolific recently was the Ukraine protest.  They're out there

18  every Saturday.  During Saint Patrick's Day, we had a parade

19  going, and we also had a parade of right to life versus

20  pro-choice.  So, we have protests all the time, and I've worked

21  a lot of them over the years.

22  Q    So, fair to say protests and large crowd situations aren't

23  anything new to the Denver Police Department?

24  A    No, it's not.

25  Q    In your opinion, was the George Floyd protest different?

20-cv-1878-RBJ    MICHAEL O'DONNELL - Direct    03-21-2022

1   A    It was incredibly different.

2   Q    How was it different?

3   A    I need to get some water.

4        THE COURT:  Maybe this would be a good time to break

5   for lunch.

6        MS. HOFFMAN:  Sounds good.

7        THE COURT:  Let's do.  1:15?  Okay.

8    (Jury out at 11:59 a.m.)

9        THE COURT:  All right.  1:15.

10   (Recess at 11:59 a.m., until 1:23 p.m.)

11   (Jury in at 1:23 p.m.)

12        THE COURT:  Okay.

13  Q.    (By Ms. Hoffman) Good afternoon, Commander.  I believe

14  when we took the lunch break, I had just asked you about some

15  prior protest work you had done, and the last question I asked

16  was how was the George Floyd protest different?

17  A    It was unlike anything I've ever experienced.  I went to

18  the Persian Gulf during Desert Storm.  I attended the FBI

19  national academy.  This was during a presentation on domestic

20  terrorists, and some of the carnage that would occur.

21        I remember seeing and thinking, how are these

22  businesses supposed to stay viable?  How are they going to keep

23  their staff employed, having survived through COVID, and now

24  their businesses are being destroyed?  Then it was about a year

25  later, or about a year ago I attended a national debrief by the

20-cv-1878-RBJ    MICHAEL O'DONNELL - Direct    03-21-2022

 1  Major Cities Chiefs Association talking about law enforcement

 2  response, violence.

 3          Denver, of all places, our city of Denver, was number

 4  one in the nation for violence during those five or six days.

 5  It just totally blew me away that we would be beyond Portland,

 6  beyond Seattle, beyond Minneapolis for the level of violence

 7  that we encountered.  To have that many days of sustained

 8  violent engagements, I just was astounded.  I have never been --

 9  had any experience that could have prepared me for something

10  like that.

11  Q    And did you observe individuals carrying certain types of

12  equipment during the protests?

13  A    Yes, I did.  There was a number of individuals that were

14  carrying items that we would associate with what's considered

15  black bloc tactics.  They are anti-government, antifa-type

16  mentality that practice tactics on how to evade police or

17  unarrest people when they've been arrested, how to engage with

18  officers in a violent manner using rocks, using tennis rackets,

19  lacrosse sticks.

20          They typically wear black clothes, hence the term black

21  bloc.  They had improvised shields that they were carrying.

22  They would frequently show up with backpacks loaded down with

23  various items to throw at us, concrete chunks, slingshots to

24  throw metal at you.  It was like something out of a movie.

25  Q    And you mentioned one phrase in there that the jury is

20-cv-1878-RBJ    MICHAEL O'DONNELL - Direct    03-21-2022

1  probably unfamiliar with.  What you did you mean when you said

2  "unarrest"?

3  A    "Unarrest" is when certain individuals that subscribe to

4  that black bloc mentality, they go in and surround officers, and

5  will use different methods to grab that person that you've

6  arrested and get them away from the officers.  Unarresting.

7  Q    And describe your attire during the George Floyd protests.

8  A    We were wearing the standard uniform, which was long sleeve

9  shirt, pants.  The officers had what is commonly referred to as

10 Turtle gear, although there was also -- Shield616 is an

11 organization that is providing ballistic plate carriers with

12 stuff on the -- not stuff.  It's a carrier that you can attach

13 different things to that you might need.

14         So, some of the officers would have had the Turtle

15 gear, more common that you see, but as we were rolling out more

16 donations, the officers are getting the Shield616 plate carrier

17 type system.  And riot helmets, which is ballistic protection,

18 and then also gas masks.

19 Q    And why were you outfitted in this way?

20 A    Based on the experiences the first night and how violent it

21 became, it was very evident to the police department that we

22 needed to have our officers outfitted in their proper police

23 protective equipment.

24 Q    Okay.  And earlier in your testimony we have discussed a

25 number of less-lethal and gas munitions that the Denver Police

20-cv-1878-RBJ    MICHAEL O'DONNELL - Direct    03-21-2022

1   Department generally possesses, but can you tell me what

2   less-lethal and gas munitions your team specifically had.

3   A    The gang unit, now SORT, would have had the PepperBall

4   system, the 40-millimeter, the Mark 9 foggers, their standard

5   issue mace.  I believe we also had some supply of CS grenades

6   and OC grenades.

7   Q    And can you tell me how it's allocated?  Does everybody

8   have all of the pieces of equipment, or are they spread amongst

9   the members of the teams?

10  A    No.  It's spread amongst the members of the teams.

11  Q    How so?  How many people are carrying PepperBall?  How many

12  people are carrying 40-millimeters?

13  A    All the officers in the gang unit are certified in

14  less-lethal platforms as far as PepperBall and the

15  40-millimeter.  Depending upon the number of those platforms

16  that we were deploying or how many we had, the officers would

17  carry either one of those, and then the officers that didn't

18  have those would have the Mark 9 fogger system.  And then the

19  sergeants were the typical grenadiers that carried the other

20  munitions.

21  Q    Thank you.  At this time I would like to direct your

22  attention to the first day of the protest, May 28th of 2020.  At

23  some point in time, was your team called back to assist with the

24  City's protest response?

25  A    Yes.  On May 28th, I believe that was a Thursday.  I was

20-cv-1878-RBJ   MICHAEL O'DONNELL - Direct   03-21-2022

1   already off duty.  I had completed my shift.  I was home.  First

2   Commander Phelan and then Chief Montoya called saying, hey,

3   we've got a large protest down here.  We need you guys down

4   here.  So, I called the sergeants that were working and told

5   them to hustle the team down to the area that Commander Phelan

6   had indicated.

7   Q    And at some point in time after that, did you end up

8   meeting up with your team?

9   A    I did.  I was concerned for the safety of everybody, the

10  officers -- protests, that is pretty uncommon that you have to

11  call for such urgency and immediacy for a team to be deployed.

12  I started monitoring on my radio, and as I heard more and more

13  transmissions, I very quickly concluded that they were going to

14  need more command officers present.  So, I put on my uniform and

15  responded with the gang unit when they responded back there.

16  Q    And can you describe the condition of your team when you

17  met with them.

18  A    They were a bit startled.  I don't think any of us had

19  expected that type of activity to occur.  The first RDV vehicle

20  that we had had suffered a punctured tire.  So, they had to limp

21  it back to the gang unit.  We outfitted the other RDV, and then

22  communicated with Commander Phelan on where he wanted us to be

23  positioned.

24  Q    Okay.  So, at this point I'd like to direct your attention

25  to the District 6 station at Colfax and Washington, Thursday,

20-cv-1878-RBJ   MICHAEL O'DONNELL - Direct   03-21-2022

1    May 28th, at 8:30 p.m.  I believe a number of plaintiffs have

2    testified about this incident as well as Officer Valentine.  I'm

3    not looking to go over in depth this incident with you, but I do

4    have a few follow-up questions.

5    A    Sure.

6    Q    At some point in time, were you directed to the District 6

7    station?

8    A    Yes, we were.  Commander Phelan told us to respond there.

9    There was a large group that was moving towards the police

10   station.  We already had information nationwide that police

11   facilities were being attacked, burned, even barricaded to some

12   degree.

13   Q    Okay.  And upon arrival, how many protesters were there?

14   A    I want to say several hundred, thousand, maybe more.

15   Q    And were the protesters throwing any projectiles?

16   A    Yes, they were.  They were throwing rocks, concrete chunks,

17   anything they could get their hands on to try and injure the

18   officers.  When I had the gang unit officers form up into a

19   position, I started looking around and noticing that many of the

20   officers that responded down from citywide request for

21   assistance didn't have the proper protective equipment on.

22        I remember conferring with, I believe it was Lieutenant

23   Rebeterano.  He didn't have the right equipment on either, and I

24   told him to pull those officers back, put them in a staging area

25   for perimeter security around the District 6 station, and then

20-cv-1878-RBJ   MICHAEL O'DONNELL - Direct   03-21-2022

1   we tried to address those threats that were coming in at us.

2           MS. HOFFMAN:  Okay.  At this time, I would ask to show

3   the witness Exhibit 581.

4           THE COURT:  Any objection?

5           MR. DOUGLAS:  No objection, Your Honor.

6           THE COURT:  Admitted.

7           MS. HOFFMAN:  And specifically, if you could show the

8   witness from 3:50 to 5:28.  And just before we start, if you see

9   any projectiles, if you could just ask to stop and point those

10  out for the jury.

11          THE WITNESS:  I did see somebody throw something.  I

12  don't know where it impacted.

13       (A video was played.)

14          THE WITNESS:  There's one.

15          MS. HOFFMAN:  There should be sound for this video.

16       (A video was played.)

17          THE WITNESS:  There's one.  There's another one.

18  Q.    (By Ms. Hoffman) We can stop it for a second.  Did you

19  hear one of the officers call out, watch the guy in white?

20  A    Yes, I did.

21  Q    You can play.

22       (A video was played.)

23  A    I hear things --

24  Q    If we could stop it for a second.  Commander, what was that

25  you were saying?

20-cv-1878-RBJ   MICHAEL O'DONNELL - Direct   03-21-2022

1   A   I said you could hear something hitting the metal behind

2   us.

3   Q   Thank you.

4       (A video was played.)

5   A   There's another one there.

6   Q   If you can pause it.  Sorry.  Where did you see the rock?

7   A   It impacted off the wall just out of camera view here.

8   Q   Thank you.

9       (A video was played.)

10  A   There's another item there.  In fact, it was the individual

11  that was behind the white SUV that the officers were trying to

12  watch before.

13  Q   And sorry if I missed it.  What specific item did you see

14  that individual throw?

15  A   It looked like a rock to me.

16          MS. HOFFMAN:  And if I could now show the witness

17  Exhibit 3096.  It's a body-worn camera of Officer Espinoza.

18          MR. DOUGLAS:  No objection.

19          THE COURT:  Okay.  Admitted.

20          MS. HOFFMAN:  And here I'm just going to play from

21  5:44 to 6:24.

22      (A video was played.)

23  Q.  (By Ms. Hoffman) Were you aware that Officer Espinoza had

24  been hit by any projectiles at this location?

25  A   Not at the time of the incident, but afterwards we talked

Kevin P. Carlin, RMR, CRR

20-cv-1878-RBJ   MICHAEL O'DONNELL - Direct   03-21-2022

1   about it.  There were multiple officers hit that night with a

2   barrage of different things: rocks, concrete chunks.  In some

3   instances they were using shoulder-mounted water balloon

4   launchers to get greater distance.  Typically you see that on

5   Lake Powell and the houseboats, kind of a fun thing.  It wasn't

6   fun that night.  I know I got struck a couple times as well.  I

7   know there were a bunch of us that were struck with items, but I

8   didn't know about it at that particular moment.

9   Q    And are you aware of the nature of the injury either to any

10  of the members of your team or to yourself?

11  A    Yes.  Yes, I am.  I became aware of the degree and extent

12  of injuries.  A lot of it was just bruising and immediate pain,

13  but it was after the engagement.

14  Q    Okay.  I am going to show you one final exhibit.  That's

15  Exhibit 532, which I believe has already been admitted as HALO.

16  And here, directing your attention to 8:32, and here just

17  showing you a different vantage point.

18       (A video was played.)

19  Q    And is this your team walking up?

20  A    That's correct.

21  Q    If you could pause it for a second.  So, I'm going to

22  direct your attention -- I'm going to try drawing with this

23  stylus for the first time -- right here to some activity around

24  the tree and those cars, and just have you keep an eye out

25  there.

        20-cv-1878-RBJ   MICHAEL O'DONNELL - Direct   03-21-2022

 1   A     Okay.

 2         (A video was played.)

 3   Q     And within the circle, I'm going to have you pay attention

 4   to an individual with a white shirt and black backpack who is

 5   walking over to the area now.

 6   A     Okay.

 7         (A video was played.)

 8   Q     Do you see those individuals throwing rocks at the police?

 9   A     Yes, I do.

10   Q     Okay.  Now I'm going to have you pay attention to the

11   crosswalk area, I believe on Colfax, an individual with a black

12   jacket and blond hair.

13   A     Yes.  I see him.

14         (A video was played.)

15   Q     You can pause it.  Did you witness any uses of force by

16   your team or any other Denver Police Departments at the

17   District 6 station on May 28th?

18   A     On May 28th, I would have witnessed the Denver police

19   officers using force -- less-lethal munitions trying to mitigate

20   those threats.

21   Q     And specifically, what less-lethal munitions?

22   A     I believe at this point we were strictly using PepperBall.

23   Later in the evening, I think we deployed some CS grenades as

24   well.

25   Q     And what was the purpose for deploying PepperBall and then

20-cv-1878-RBJ   MICHAEL O'DONNELL - Direct   03-21-2022

1  later on CS gas at this location?

2  A    The immediacy of this situation was to get distance,

3  because as you could see, as we were feeling them, multiple

4  items kept coming at us.  We needed a greater standoff distance,

5  a buffer zone, if you will, to limit their ability to engage us.

6        Obviously I was trying to balance their rights to

7  protest, but you start crossing the line when you're engaging in

8  violence or property destruction.  So, our immediate goal was to

9  move them back.  As they would ebb and flow and start engaging

10  more, direction came from Incident Commander Phelan to move the

11  crowd further back down Colfax, which would have been west.

12  Q    And at any point in time during this incident, did you give

13  warnings to protesters?

14  A    As you could hear initially, we were yelling, move back,

15  get back, move back.  It was pretty much consistent messaging as

16  we started putting up a skirmish line and moving people back,

17  just telling them to move back, get back.

18  Q    And in your opinion, was the use of force at this location

19  that you observed warranted?

20  A    Yes, it was.  The officers were clearly under attack, and

21  had to respond in a less-lethal capacity to minimize the risk to

22  officers.

23  Q    Okay.  I'm going to move on to May 29th.  So, that would be

24  Friday, May 29th, the second day of the protest.  And I want to

25  ask you about some time you spent at the capitol around

20-cv-1878-RBJ    MICHAEL O'DONNELL - Direct    03-21-2022

1   10:00 p.m.  Were you directed to the capitol -- or why were you

2   directed to the capitol?

3   A    If memory serves, there was a report of a party with a gun

4   in the crowd, and they were trying to get into the capitol.  CSP

5   did not have a ton of officers at the capitol at the time.  So,

6   Commander Phelan instructed us to move up and support them.

7   Q    And have you frequently worked with Colorado State Patrol,

8   CSP over the years?

9   A    Yes, we have.

10  Q    And is it your understanding that the Denver Police

11  Department has to be invited by CSP to take any sort of police

12  actions in the capitol area?

13  A    No.  That's not accurate.  The officers can take

14  enforcement action.  We are statewide certified, so we can take

15  police action anywhere.  Typically you don't do it out of

16  jurisdiction, but we have done that with CSP much the way they

17  would do something if they saw a law violation occurring on the

18  side of Denver.  They may detain individuals, and then you

19  respond to do appropriate paperwork based on jurisdiction.

20  Q    And can you describe CSP's uniform?

21  A    Yes.  CSP uniform is similar to ours.  Long sleeve shirts,

22  similar type of protective equipment.  However, theirs are blue,

23  and they also wear a shoulder patch.  Denver is the only entity

24  in -- law enforcement entity in the Metro area that does not

25  have shoulder patches.  Every other organization does.

20-cv-1878-RBJ   MICHAEL O'DONNELL - Direct   03-21-2022

1  Q    And are you aware what less-lethal munitions and/or gas

2  munitions CSP had at the time of the protests?

3  A    To the best of my recollection, they had PepperBall system.

4  They also had CS grenades.  I don't know what else they might

5  have had.

6  Q    And are you aware if CSP was involved in the George Floyd

7  protest response?

8  A    Yes, they were.

9  Q    What days?

10  A    Minimally Thursday, just because they didn't have enough

11  staffing.  Same on Friday, was a larger deployment of CSP

12  troopers to guard the capitol, but still not enough.  The

13  subsequent days they had a larger and more robust presence with

14  us.  In fact, they were on a couple of different skirmish lines

15  with us as well.

16  Q    So, between May 28th and June 2nd, do you believe that they

17  were present most of those days?

18  A    Yes, they were.

19  Q    Going back to the armed individual that we were discussing,

20  was this individual eventually located?

21  A    I believe he was later isolated and contacted.

22  Q    And you worked with CSP through that process?

23  A    We did.  But we -- our primary mission was to support them

24  at the capitol.  We didn't go and look for the suspect.  I think

25  another group of officers was doing that.

20-cv-1878-RBJ    MICHAEL O'DONNELL - Direct    03-21-2022

1    Q    Okay.  Moving on, directing you to the McNichols building.

2    At some time on May 29th were you directed to the McNichols

3    building?

4    A    Yes, we were.  We initially kind of pushed the crowd down

5    from the capitol.  Commander Phelan deployed us to a couple of

6    different areas.  In fact, there was a pawn shop that somebody

7    had called in and said they're breaking into trying to get guns.

8    So, we went to that location, and then ultimately over to the

9    McNichols facility for force protection for the Denver Fire

10   Department.  There was a City vehicle on fire, burning the

11   McNichols building that I believe caused permanent damage.

12   They're still trying to mitigate.

13        We were directed to go there because as the fire

14   department pulled up to try and put out the fire, they were

15   taking rocks and other items that was being thrown at them.  So,

16   we had to go do force protection, is what it's called,

17   essentially putting out a buffer line of officers to protect the

18   firefighters.

19   Q    And for those members of the jury that may not be familiar

20   with the McNichols building, where is the McNichols building?

21   A    The McNichols building is on the northeast corner of Civic

22   Center Park.  So, it's directly across from the city and county

23   building, located at Colfax and Bannock.

24   Q    Is it fair to say that the McNichols building was located

25   around a decent amount of protest activity that took place

20-cv-1878-RBJ   MICHAEL O'DONNELL - Direct   03-21-2022

1    between May 28th and June 2nd?

2    A    Yes, it is.  I believe the crowds would primarily gather at

3    the capitol and state park, but the sheer volume of people, they

4    would also gather in Civic Center Park, which is another large

5    area for assembly.

6    Q    And specifically, can you describe the fire damage that you

7    observed when you were on scene?

8    A    I remember when we first pulled up and deployed off of the

9    RDVs, there was a huge wall of fire, that the vehicle was parked

10   right next to the building, and the car was just consumed with

11   fire.  And it had to have been 10, 15 feet in the air, and it

12   was just all up that side of the building.  It was bizarre to

13   watch.  But immediately, it was a quick glimpse, and then we

14   were dedicated to our mission to do force protection.

15   Q    And are you aware why you had to be directed to that scene

16   to provide protection to the Denver Fire Department?

17   A    Yes.  There was other reports of fires throughout the area.

18   There was another fire on a statue.  I want to say that was in

19   Veterans Park.  And as the firefighters would try to go in to

20   put the fire out, they were attacked constantly.  There was

21   other reports even of dumpster fires where they would be trying

22   to put them out, and individuals would be attacking them as

23   well.  So, it became very commonplace for any time the fire was

24   reported in the command post that they would send out a team as

25   force protection.

Kevin P. Carlin, RMR, CRR

20-cv-1878-RBJ    MICHAEL O'DONNELL - Direct    03-21-2022

1    Q    And did you observe any protesters on scene when you were

2    then directed to the McNichols building?

3    A    Once we lined up, you could see them at a distance, but

4    they decided to move elsewhere, and did not engage with the gang

5    unit.

6    Q    And similar to what you did at the McNichols building, was

7    there any other incidents where you or your unit specifically

8    had to provide protection services to the Denver Fire

9    Department?

10   A    Yes.  And I don't know if that was Friday or Saturday.  I'm

11   sure you've heard this, but the days kind of blend together, but

12   there was other times where we had to respond to certain

13   locations.  I know there was a time on Colfax where there was a

14   couple of dumpsters that were rolling down the street on fire.

15   Officers initially tried to get there and put them out with fire

16   extinguishers that we have in our vehicles.  That was

17   unsuccessful, so the fire department would have to come in.

18            There was places inside the Capitol Hill area, kind of

19   the south of Colfax neighborhood that we had to go and respond

20   with fire to protect them.  It was multiple times we had to do

21   that.

22   Q    And do you have any knowledge of any other property damage

23   which took place during the George Floyd protests?

24   A    Yes.  There was multiple instances of significant vandalism

25   and property destruction along the 16th Street Mall, the Colfax

20-cv-1878-RBJ   MICHAEL O'DONNELL - Direct   03-21-2022

1  business corridor.  Even obviously the two statues in the parks.

2  I believe there was a -- I want to say it was a front end

3  loader, a construction type equipment that Colorado state had on

4  the capitol grounds.  They tried to burn that.  There was a

5  significant -- I mean, I know the estimates are 4 million or

6  more in property damages.  So, it was quite extensive.

7  Q    And you mentioned vandalism, I believe, and destruction,

8  but if you could give a little bit more detail of specifically

9  what property damage you witnessed.

10 A    Sure.  So, the obvious windows smashed, things burned, but

11 there was an extensive amount of graffiti.  One of the

12 operations of the gang unit that I didn't mention earlier is we

13 have two detectives that are attached as graffiti detectives,

14 and they investigate all instances of graffiti throughout the

15 city.

16       There was tons of graffiti on the state capitol, the

17 state courthouse, the city and county building, McNichols

18 building, just everywhere.  Sidewalks.  And it wasn't chalk.  I

19 mean, this is spray paint they were using, ACAB, FTP, all these

20 different derogatory terms directed against law enforcement.

21       MS. HOFFMAN:  If I could show the witness

22 Exhibit 3056.  I don't believe this has been admitted.

23       MR. DOUGLAS:  No objection.

24       THE COURT:  Admitted.

25 Q.    (By Ms. Hoffman) Commander, are you familiar with the

20-cv-1878-RBJ    MICHAEL O'DONNELL - Direct    03-21-2022

1  City's cleanup efforts through those graffiti detectives or

2  otherwise?

3  A    Yes, I am.  I'm very familiar with it.  That's part of the

4  outreach effort that we work with with the mitigation efforts.

5  So, there's a couple of different teams.  Some are City

6  employees.  Some are volunteers that go out and try to clean off

7  instances of graffiti.

8  Q    And Mr. Atencio, if you could just scroll down a bit.

9  Further down.  Okay.  If you could stop.  Are you also familiar

10  with the City's weapon recovery efforts?

11  A    Yes, I am.  I know that there was several firearms, I

12  believe 25 or more that were recovered.  Other items like the

13  hammer and the machete, and I know there was one instance the

14  gang unit was deployed to a certain area, and we recovered an

15  ax.  There was a couple knives inside backpacks.  So, yeah.

16  There was a lot of weapons out there as well.

17  Q    And if you could scroll down one more.  What is this

18  photograph of?  If you know.

19  A    I'm not sure.  I think the term was used earlier in the

20  week of a truncheon.  That looks like a medieval weapon,

21  obviously homemade design with a handle and some spikes on it.

22  The only intention of that would be to cause significant

23  physical harm.

24  Q    And was this something also located during the City's

25  weapon recovery efforts?

20-cv-1878-RBJ    MICHAEL O'DONNELL - Direct    03-21-2022

1   A    Yes, it was.

2   Q    Did you encounter any homemade IEDs on May 29th?

3   A    Yes, we did.  As I mentioned, Commander Phelan had moved us

4   to different locations.  I believe this was after the fire, we

5   were at Colfax and Broadway.  Commander Phelan had directed us

6   to assist with pushing a crowd back from Veterans Park -- excuse

7   me -- Civic Center Park, in an effort to try to move the crowds

8   out of there.

9         As we were walking across, we stepped up onto the

10  sidewalk there on the southwest corner, right onto the sidewalk

11  area, and we saw a smoking device come in, landing at our feet.

12  We had already seen multiple instances where people were kicking

13  CS deployments back at us.  We all thought that's what it was,

14  and then it immediately exploded.  I remember feeling the

15  particulates and material hitting my legs.  I closed my eyes,

16  obviously because of the explosion.  And I remember thinking,

17  please God, don't let --

18  Q    It's okay.  Take your time.

19  A    Don't let any of my team members be missing limbs.

20  Q    And do you believe that device you witnessed explode, that

21  it could possibly be a piece of either Denver Police or some

22  other piece of law enforcement equipment?

23  A    It was definitely not any police department equipment.  I

24  remember as I -- as I opened my eyes and looked, one of my

25  officers was down, and I thought, oh boy, here we go.

20-cv-1878-RBJ    MICHAEL O'DONNELL - Direct    03-21-2022

1    Fortunately, they pulled him up.  He didn't have any permanent

2    injuries, but that was definitely an improvised explosive

3    device.

4    Q    Did you see the individual who threw the IED?

5    A    No, I did not.  We were simply moving in that direction.

6    There was several hundred thousand people still there, throwing

7    different things.  And you would see fireworks going off.  But

8    I'm not talking about pop bottle rockets or firecrackers.  These

9    are the big industrial fireworks, the ones that really are meant

10   to have a safety and buffer zone and fire mitigation when they

11   go up in the air and they explode.  You would see those

12   consistently.

13          You would see a lot of laser beams that they would put

14   into officers' eyes to permanently blind them.  There was a

15   multitude of different dangerous items that were brought to

16   those protests.

17   Q    And were you able to track the general location where the

18   IED came from?

19   A    No, we weren't.  You would see things come in at the last

20   minute.  Your visibility is a little bit obscured when you're in

21   the gas mask, and obviously in darkness, you're not going to see

22   it until it's right upon you.

23   Q    Understood.  Okay.  I am going to direct your attention to

24   the third day of the protests, so now Saturday -- I believe

25   Saturday, May 30th.  Does that sound right?  I understand that

20-cv-1878-RBJ   MICHAEL O'DONNELL - Direct   03-21-2022

1  you -- that there were law enforcement briefings held every

2  morning?

3  A    Yes, there was.

4  Q    Okay.  And you've been present in court for Commander

5  Phelan and others' testimony?

6  A    Yes, I have.  I was.

7  Q    And at that briefing, were you provided an operations plan?

8  A    Yes.  Every day we were provided an operations plan, with

9  the exception of Thursday, just because it was so spontaneous

10  and sudden.

11  Q    Was the operation plan the same for every day, or did it

12  differ from day to day?

13  A    Certain elements of it are similar language, but we started

14  making adjustments based on what we were experiencing.  One of

15  those would have been areas of command.  Recognizing that you

16  have so many different things occurring at larger geographic

17  areas, it is too much for one incident commander to rely and

18  say, over here, over here, over here.  So, they divided it up

19  into area commands where you had three of the lieutenants, I

20  believe were in charge of those areas.  For the gang unit and

21  for SWAT, we stayed on the mobile response team, rapid response

22  teams.

23  Q    Can you show the witness Exhibit 474.  It's the operations

24  plan for day three.  It's already been admitted.  And if you

25  could scroll down to page four.  Okay.  What you were just

20-cv-1878-RBJ    MICHAEL O'DONNELL - Direct    03-21-2022

1   describing in terms of I believe the phrase you used was "area

2   commands," does that correspond with the document that you're

3   seeing on the screen right now?

4   A    Yes.   That's exactly what I was referencing.

5   Q    Okay.   So, that is one change that started to appear in

6   later operations plans?   Am I understanding that correctly?

7   A    That's correct.   Another piece that wasn't necessarily in

8   the operations plan was that deployment of body cams wasn't in

9   policy at the time, but recognizing the need for that, we

10   started encouraging the officers and directing the officers to

11   have their body cams on on their uniform's outermost garment.

12        One of the challenges we had with that was the magnet

13   that attached to a regular uniform was not strong enough to hold

14   it on the outer garment of riot protection gear or the ballistic

15   gear.   So, they ordered additional fitting attachments that we

16   could fashion and secure them.   I remember Thursday and Friday,

17   there was a couple of different times that our officers had lost

18   their body cams because of that magnet.   So, that's -- as you

19   would see something that night, they would make adjustments and

20   try to plan better for the next day.

21   Q    And I want to break down a few things that you just talked

22   about.   You mentioned the deployment of body-worn cameras was

23   not in policy.   If you could maybe talk a little bit about

24   Denver's body-worn camera policy at the time of the protests.

25   A    Sure.   So, specifically, the body camera was not outlined

20-cv-1878-RBJ    MICHAEL O'DONNELL - Direct    03-21-2022

1    in the policy that they would have to wear it during protest

2    activity.  Obviously we've adjusted that now.  The officers were

3    required any time they came in contact with -- on a regular

4    patrol call, they would actually turn it on until the situation

5    was stabilized.  And you would hear in the body cameras, scene

6    secure, and would power off.

7            At this time, only sergeants and below were required to

8    carry body cameras.  So, lieutenant, command officers were not

9    part of that.  Again, as part of that adjustment, recognizing

10   that need from the first two days, they did get body cams to all

11   command officers with the appropriate fitting material to secure

12   it.

13   Q    Okay.  So, over the course of the protest, it was something

14   that DPD leadership encouraged people to wear body-worn cameras?

15   A    Yes.  Once DPD command identified that need, they started

16   directing officers to do so.

17   Q    And they obtained the necessary additional materials for

18   the body-worn cameras to be hung over the Turtle suits?

19   A    That's correct.

20   Q    And you didn't have to wear a body-worn camera at the time,

21   because you were a lieutenant?

22   A    Thursday night, I did not.  Friday, I think Thursday and

23   Friday, I didn't, but Saturday was when I got the new piece of

24   equipment and started deploying it on my protective equipment.

25   Q    And as the message was relayed at these briefings for

20-cv-1878-RBJ   MICHAEL O'DONNELL - Direct   03-21-2022

1    officers to wear body-worn camera, did you then relay that to

2    the officers under your command?

3    A    Yes.  Both Lieutenant Kevin Carroll and myself directed the

4    officers to wear the body cams, and to have them active.  Part

5    of the problem is that the body cam, because of the long

6    operational days, 17, 18 hours, whatever it was, at the time

7    they got the camera back into the charger, and in the short

8    turnaround for the next deployment, which was typically six

9    hours or less, those cameras were not getting a full charge.

10   So, you're limited by the technology of the time, so that was

11   part of our challenge.

12   Q    Understood.  Okay.  So, I want to direct your attention now

13   to an incident that I believe that plaintiff, I believe Hollis

14   Lyman spoke about last week, but it's around 14th and Lincoln,

15   around curfew on May 30th.  Were you present at that time?

16   A    Yes, I was.

17   Q    And at some point in time, were you and your team tasked

18   with removal of a barricade on Lincoln?

19   A    Yes, we were.  There was a couple of different times that

20   we had to do that.

21   Q    Okay.  And specifically with respect to the barricade

22   present in the street around 8:00 p.m., were you involved in

23   that?

24   A    Yes, I was.

25   Q    And how were you involved in that?

20-cv-1878-RBJ    MICHAEL O'DONNELL - Direct    03-21-2022

1  A    The gang unit was positioned at 14th and Lincoln, and the

2  barricade was mid-block Lincoln.  So, that would be anywhere

3  between 75 and 125 yards down.  So, we could see it, recognizing

4  that we weren't going to enforce curfew immediately, but that

5  they were using that to launch items at us.  Commander Phelan

6  directed us to go in and remove that barricade.

7  Q    Are there any issues or dangers associated with barricades?

8  A    Yes.  They frequently would use whatever material they

9  could get, whether it was a traffic sign, the big diamonds, and

10  they would move up with those, concealing themselves behind

11  them, and launch items at us in a variety of ways, whether it

12  was a rocket launcher -- or the slingshot, rocks, concrete

13  chunks, vegetable cans.  Whatever they had on hand, they would

14  use that to defeat the PepperBalls into the ground to get them

15  to go back.

16  Q    And in terms of the removal of the barricade, did any

17  outside agencies assist with that process?

18  A    I believe CSP came down from the eastern side of the

19  capitol.  I know there was another jurisdiction with us on the

20  line, and I'm sorry.  I don't remember specifically who that

21  was.  Maybe Brighton, Broomfield.  At this point in this

22  protest, we were relying a lot on outside jurisdictions to come

23  and render assistance.

24  Q    Do you recall Commerce City, Brighton providing assistance?

25  A    Yes, I do.

Kevin P. Carlin, RMR, CRR

20-cv-1878-RBJ   MICHAEL O'DONNELL - Direct   03-21-2022

1        MS. HOFFMAN:  If I could show the witness

2   Exhibit 3103.

3        MR. DOUGLAS:  No objection.

4        THE COURT:  Admitted.

5   Q.    (By Ms. Hoffman) While they locate the document, I'm

6   going to move on and ask a few more questions, and we can come

7   back to it, but where was your team with respect to the

8   barricade?

9   A    So, we would have been north of where the barricade was.

10  You know, obviously another concern of that is emergency medical

11  services, can they get there?  We were diverting traffic around

12  the protest activity.  So, whether it was a need for an officer

13  or one of the participants, that's a problem to get through a

14  barricade, and it was a big barricade.  There were several

15  sections of chain link fence, also fortified with those yellow

16  diamond signs that I mentioned.

17        During that, I know that there was state patrol,

18  Brighton, Commerce City.  There could have even been Aurora.  I

19  don't recall specifically who all was there, but they were close

20  proximity to us.  So, where we were at on the north side, we

21  were -- to our west, it would have been an outside agency.  I

22  just don't remember exactly who that would have been.

23  Q    So, you're north.  You're at -- I'm terrible at geography,

24  so bear with me.  You're at Lincoln and Colfax?

25  A    Correct.

20-cv-1878-RBJ   MICHAEL O'DONNELL - Direct   03-21-2022

1   Q    And you said the outside agencies, you don't specifically

2   know where they are, but you believe they were west?

3   A    They would have been to the west of us, and then I believe

4   Denver, other Denver resources were to the west of them.

5   Because when you have that skirmish line up, you need so many

6   officers, usually about two feet apart, maybe sometimes less,

7   sometimes more.  It just depends.  But you try to keep your team

8   together for accountability reasons, and then also for a

9   headcount type system.

10  Q    And when you say west, are you talking capitol side?

11  A    West, I'm talking Broadway side.

12  Q    You're talking Broadway side?

13  A    As we're facing south, they're going to be to our right.

14  So, they would have been between Lincoln and Broadway.

15  Q    Okay.  How many protesters were still in the area around

16  8:00 p.m.?

17  A    Several thousand.

18          MS. HOFFMAN:  And are they -- strike that.  I'm going

19  to move on to Exhibit -- or 3137.  That is a body-worn camera of

20  Officer Groves that has not been entered as an exhibit.

21          MR. DOUGLAS:  No objection.

22          THE COURT:  Admitted.

23  Q.   (By Ms. Hoffman) So, I'm going to play from 30 seconds to

24  five minutes, and I'm going to ask my team to stop every once in

25  a while with some follow-up questions.

```
             20-cv-1878-RBJ    MICHAEL O'DONNELL - Direct    03-21-2022
```

1   A    Okay.

2   Q    That's assuming we can get it to play.

3        (A video was played.)

4   Q    Pause it.  Commander, can you tell me about the condition

5   of the ground.

6   A    As you can see, it's littered with all kinds of different

7   things.  Obviously there's some rocks.  There's some spent

8   less-lethal munitions, water bottles.  You can see some of the

9   PepperBall strikes on the ground that we were using for area

10  denial and area saturation.  There's just a multitude of things

11  in the street.

12       (A video was played.)

13  Q    What was that?

14  A    That looks to be firecrackers.

15  Q    Okay.  And I believe you testified previously that the

16  distance between your team and the protesters behind the

17  barricade, did you testify it was between 75 and 125 yards?

18  A    Yes.  That's correct.

19  Q    Thank you.

20       (A video was played.)

21  Q    Do you know what that noise was?

22  A    It sounds like industrial fireworks.  Perhaps some of the

23  launchers that they shoot up and explode.

24       (A video was played.)

25  Q    Did you hear the Denver curfew announcement?

```

20-cv-1878-RBJ   MICHAEL O'DONNELL - Direct   03-21-2022

1   A    Yes, I did.

2   Q    Okay.  And Ms. Lyman testified that the crowd was scared.

3   How did that crowd appear to you?

4   A    That doesn't seem scared to me.  They seem rather jubilant.

5   You hear some cheering and eruption of activity like that.

6   Q    I'm drawing two circles around what appear to be umbrellas.

7   Do those appear to be umbrellas to you?

8   A    Yes, they do.

9   Q    Did you see a lot of protesters carrying umbrellas during

10  the George Floyd protest?

11  A    Yes, we did.  As I explained earlier with reference to the

12  black bloc tactics, this is another common tactic that they

13  would use where they would come up and put the umbrellas up to

14  prevent the PepperBalls from striking, or other munitions.  So,

15  there was a lot of umbrellas that we saw.

16  Q    And this fence ran the entire width of Lincoln; correct?

17  A    Correct.  And even more so you can see it extending onto

18  the grass of Veterans Park.

19  Q    And can you tell me about the contents of that barricade?

20  A    You can see that there's some sections of chain link, but

21  it's also being fortified by what's called a type three

22  barricade.  That's the red and white barricade.  Those are used

23  to close off streets.  I don't think you can see it in here, but

24  I know that there was also some of the smaller diamond ones that

25  I was talking about earlier.

20-cv-1878-RBJ   MICHAEL O'DONNELL - Direct   03-21-2022

1        (A video was played.)

2   Q    What are those objects going up into the sky?

3   A    That again appears to be more of the industrial-type

4   fireworks.

5        (A video was played.)

6   Q    That object appeared to make it close to police officers.

7   Actually, I may have jumped in too early with my question.  I

8   will just give the video another second to play.

9        (A video was played.)

10  Q    What was that?

11  A    That is, again, one of the industrial-type fireworks.  You

12  can see it had a large dispersal of red sparks.  It's more

13  commonly associated with 4th of July celebrations.

14  Q    And are there any dangers posed by individuals deploying

15  industrial fireworks in a large crowd situation?

16  A    There's a significant fire danger, which is why when you go

17  to fireworks displays, they have a huge circle around those

18  areas for a safety zone with fire resources and apparatus that

19  can respond if anything becomes engulfed in flame.  The uniforms

20  that the officers are wearing are not fireproof.  They are just

21  standard issue uniforms.

22  Q    And as we can see, some of the objects thrown by the crowd

23  fall far short of the officers' line, but some make it all the

24  way to the officers, which I believe you indicated again was 75

25  to 125 yards.  Do you have any idea or understanding of how

20-cv-1878-RBJ   MICHAEL O'DONNELL - Direct   03-21-2022

1  protesters are able to launch objects at that type of distance?

2  A    Yes, I do.  We witnessed it a couple different times where

3  they would use lacrosse sticks and tennis rackets to increase

4  the distance and velocity.  And I believe a lacrosse stick runs

5  the gamut of about 75 miles an hour if they're good with a

6  lacrosse ball.  So, if you're throwing a rock or industrial

7  firework, you're going to get distance and velocity.

8  Q    You can play.

9       (A video was played.)

10 Q    Again, I assume that that was a -- another industrial

11 firework?

12 A    That's correct.

13      (A video was played.)

14 Q    And what did the crowd do after that firework deployed?

15 A    It sounded to me like they cheered.

16 Q    Thank you.

17      (A video was played.)

18 Q    Again, there is significant noise in the background of

19 something being deployed.  Do you have any understanding of what

20 that is?

21 A    It sounds very similar -- it sounded like there was a glass

22 break earlier.  You can hear things hitting and impacting.  You

23 can hear some announcements going in the background.  There's

24 clearly still some industrial fireworks, looked like a rock

25 earlier.

20-cv-1878-RBJ    MICHAEL O'DONNELL - Direct    03-21-2022

1          (A video was played.)

2    Q    Do you recall where Ms. Lyman indicated during her

3    testimony she was located with respect to the barricade?

4    A    Yes.  She would have been off on the left-hand side on the

5    capitol side in proximity to the chain link fence, I believe

6    holding the fence.

7    Q    And do you have access to a little stylus on the side

8    there?

9    A    I believe so.

10   Q    Can you just draw a circle, what your understanding from

11   Ms. Lyman's testimony as to where she was located.

12   A    Somewhere in this area right here.

13   Q    Great.  And now you hit the little dots at the bottom to

14   get rid of it.  I'm still learning too.

15          Did you witness any flash-bangs deployed during

16   officers' removal of the barricade?

17   A    No, I did not.

18   Q    And does your team use any flash-bangs?

19   A    No.  The only team that has flash-bangs is the SWAT bureau.

20          MS. HOFFMAN:  If we could show the witness

21   Exhibit 14 -- sorry.  Exhibit 659.  I don't believe it has been

22   admitted.  It's Officer Carmody's body-worn camera.

23          MR. DOUGLAS:  No objection.

24          THE COURT:  Admitted.

25          MS. HOFFMAN:  And if you could start from --

20-cv-1878-RBJ   MICHAEL O'DONNELL - Direct   03-21-2022

1   THE COURT:  Actually, I have it as already admitted.

2       (A video was played.)

3   Q.    (By Ms. Hoffman) Okay.  I'm going to draw the circle

4   right here.  Do you see this individual?

5   A    Yes, I do.

6   Q    Do you see what's in his hands?

7   A    Looks to me like it's a lacrosse stick.

8   Q    You can keep playing.

9       (A video was played.)

10  Q    Did you just hear Officer Carmody get hit?

11  A    Yes, I did.

12  Q    Are you aware where he was hit?

13  A    I believe he was hit in the hand on that particular

14  incident.

15  Q    And based on your understanding from Ms. Lyman's testimony

16  and watching that video, how close do you believe that she was

17  to the individual with the lacrosse stick?

18  A    Based on where we saw the lacrosse stick and where she said

19  she was at, she was very close.  Maybe 10, 15 feet.

20          MS. HOFFMAN:  If we could show the witness

21  Exhibit 141.

22          MR. DOUGLAS:  No objection, Your Honor.

23          MS. HOFFMAN:  Any chance you could make it bigger?

24          THE COURT:  All right.  It's admitted.

25          MS. HOFFMAN:  Thank you.

Kevin P. Carlin, RMR, CRR

20-cv-1878-RBJ   MICHAEL O'DONNELL - Direct   03-21-2022

1   Q.    (By Ms. Hoffman) So, Commander, I'm drawing your

2   attention to what I'm circling right now.  What do you see in

3   the circle?

4   A    That's a lacrosse stick.

5   Q    Thank you.  You can take that down.  And if you could put

6   up 450, which has already been entered as the CAD sheet.  And if

7   you could scroll down to page eight.  Commander, I have

8   highlighted a few entries on this particular CAD sheet from

9   May 28th, highlighted that the two large explosions went over.

10  Made the announcements for curfew violations.  Commerce City to

11  support state capitol.  Bringing in large fencing blocking,

12  fireworks.  Is that all consistent with your memory of events

13  and the removal of the barricade on May 30th?

14  A    Yes, it is.

15  Q    Were you injured during this incident?

16  A    Yes, I was.  I was actually struck more -- a few more times

17  with different items.  Earlier in the day, I had moved up on the

18  skirmish line, trying to kick one of the munitions that we had

19  deployed out of the way, because as you can see that kind of

20  obscures our vision as well.  As I stepped back, they had thrown

21  so many things that day that they had different contraptions of

22  grease, oil type material.

23       I lost my footing and went down on the line, twisting

24  my ankle.  So, the other officers grabbed me, pulled me up, and

25  threw me in the RDV.  So, as we were moving up in those videos,

20-cv-1878-RBJ   MICHAEL O'DONNELL - Direct   03-21-2022

1   I was in the RDV giving additional announcements on the PA

2   system to move back, that kind of thing.  So, yes, I was there,

3   and I was injured.

4   Q    And were you able to walk that night?

5   A    Later that night, I was, with a significant limp.

6   Q    Did you have to seek any medical treatment?

7   A    Eventually, I did.

8        MS. HOFFMAN:  And if we could show the witness

9   Exhibit 509.  And I believe that this has been stipulated to.

10        MR. DOUGLAS:  Objection.  Hearsay.

11        THE COURT:  Well, I guess I better look at it, then,

12   and see what it is.

13        MS. HOFFMAN:  It's the officer statement of Commander

14   O'Donnell.  It was my understanding it was on plaintiffs'

15   exhibit list, and we stipulated to it, but --

16        THE COURT:  Well, it is on the plaintiffs' list, yes.

17        MR. DOUGLAS:  Your Honor, it's a statement not being

18   offered against the party whose agent or employee made the

19   statement.

20        THE COURT:  Overruled.  Admitted.

21   Q.    (By Ms. Hoffman) Commander, do you recognize the document

22   on the screen?

23   A    Yes, I do.

24   Q    Okay.  And what is that document?

25   A    That's my statement in regard to the actions that we took

20-cv-1878-RBJ   MICHAEL O'DONNELL - Direct   03-21-2022

1   on May 31st.

2   Q    I believe this may be your statement from -- is there a

3   date on here?

4   A    Yeah.  I believe it's May 31st.

5   Q    You are right.  If you could scroll down a little bit.  Did

6   you write statements from May 28th through May 31st?

7   A    Yes.  We tried to capture notes of activity that we did

8   every day, kind of a scribe, if you will.  We later put that on

9   our big whiteboard so that the officers could complete their

10  statements.

11        We knew we had to do statements, but just because of

12  the operational hours, you couldn't get a statement done and

13  then be able to come back with any kind of rest.  So, we knew

14  that we were going to be doing those.  So, this is my statement

15  in regards to that.  I think I completed it on June 6th.

16  Q    And are there any photographs at the bottom of that?  Okay.

17  Officer, did you photograph -- or, sorry.  Commander, did you

18  photograph your injuries received during the protest?

19  A    I did.  That particular incident, there were several

20  officers that were injured.  One officer was hit so hard he

21  crumpled on the line.  We had to pull him off.  There was

22  another sergeant that was struck in the face.  Thankfully he had

23  his gas mask on.  It was a rock, knocking him backwards.  One of

24  the officers took a rock, which had to have been propelled with

25  a lacrosse stick.  It took some Kevlar out of her helmet.

Kevin P. Carlin, RMR, CRR

20-cv-1878-RBJ   MICHAEL O'DONNELL - Direct   03-21-2022

1   Again, that's a ballistic-rated helmet.

2          Another officer was knocked off of his feet with rocks,

3   the big landscape rocks that are three- to five-inch or bigger.

4   I took a rock, same kind of deal, that was thrown with a

5   lacrosse stick.  It hit me in my right ankle that I had somewhat

6   injured the day before.  I remember I went down on one knee,

7   because it was just exploding in pain.

8   Q    At any point in time during the protest, did an individual

9   throw a Molotov cocktail at you?

10  A    Not at me, but the officers, yes.

11  Q    So, not at you, but some of your team members?

12  A    That's correct.

13  Q    Okay.  And can you tell us about that incident.

14  A    I believe it was the Saturday.  We were moving the crowds

15  back, moving them south on, I want to say it was Broadway.  And

16  as we came around the corner to, I believe it was 13th and

17  Broadway, I remember something coming in, hitting obviously the

18  officers on the line, which were the gang unit, because I knew

19  where they were at.  And it went down, and it immediately went

20  into flames.  So, it was definitely a Molotov cocktail.

21  Thankfully it didn't explode when it hit the officers.

22  Q    And how are you convinced that it's a Molotov cocktail as

23  opposed to a piece of Denver Police Department?

24  A    Yes, sir.  We do not have any devices that explode in a

25  ball of flame like that.  And just based on the visual and the

20-cv-1878-RBJ   MICHAEL O'DONNELL - Direct   03-21-2022

1  distance and where it was hit, it was clearly a Molotov

2  cocktail.

3  Q    And do you recall where and when this event occurred?

4  A    It was Saturday night, but I don't remember exactly what

5  time.  And I think it was 13th and Broadway.  It could have been

6  13th and Lincoln.  It was right in that area.

7  Q    And, sorry if I missed this.  Do you recall the time?

8  A    I'm sorry.  I don't.  It was after the barricade incident.

9  Q    Does the City of Denver have any policies regarding the

10 documentation of uses of force?

11 A    Yes, we do.  In normal situations where you're on patrol,

12 the officer engaging in the use of force notifies his supervisor

13 or her supervisor.  They respond out.  They interview witnesses,

14 obtain any kind of camera video, marking the body camera video.

15 They complete -- the officer involved completes the use of force

16 report.  Any additional witnesses complete what's called a

17 witness statement.

18      The supervisor then completes essentially a letter

19 explaining the incident and how it happened, what occurred, what

20 degree of injuries, includes the interview that they may or may

21 not have done or been able to do with the individual that was

22 arrested.  All of that documentation is then reviewed by that

23 chain of command, forwarded to internal affairs for additional

24 review.

25      In a protest, it's a little different.  The chief has

20-cv-1878-RBJ    MICHAEL O'DONNELL - Direct    03-21-2022

1  permissions in the operations manual specifically in the use of

2  force policy outlining large-scale protest, riot conditions that

3  one use of force can be completed.

4  Q    Was it your understanding that whether or not the force was

5  documented in an individual report or in a bigger report, either

6  way officers had to document uses of force?

7  A    Yes.  I believe all the officers understood that, because

8  as part of training, you know you have to be able to explain and

9  articulate the need for that less-lethal deployment.

10  Q    And prior to your documentation of your uses of force, did

11  you make any effort to keep track of forces that occurred?

12  A    Yes.  As I mentioned, we had -- typically it was our RDV

13  driver that had a notepad next to him, recording incidents of

14  less-lethal deployment and locations and times so that we could

15  reference that when we completed our statements.

16  Q    And did you instruct your officers to do the same?

17  A    Yes.  When we would rotate drivers, we would have them do

18  the same thing as far as scribe activity so that we knew that

19  they would have reference that -- reference that material later.

20  Q    And with respect to the use of force process that you

21  outlined per the policy earlier, with a supervisor conducting an

22  investigation, in your opinion, was it possible to do that

23  during the George Floyd protests?

24  A    No.  You can't do that.  It's impractical.  When you think

25  of a use of force deployment, I mean, just watching some of

20-cv-1878-RBJ    MICHAEL O'DONNELL - Direct    03-21-2022

1   these videos, you would take the entire line and have to

2   interview every one of them, complete statements, try to

3   interview witnesses.  Just looking at the size of the crowd,

4   there's no way you can do that.  If you're pulling all the

5   officers off of the line, the mayhem and property destruction

6   that could occur, it's just impossible under those circumstances

7   to do what we normally do in our use of force policy.

8   Q    I've just got a couple more questions.  I am going to

9   switch gears with you.  Following the George Floyd protests, did

10  you have any conversations with Nick Mitchell, the independent

11  monitor?

12  A    Yes, I did.

13  Q    And to your knowledge, was that interview recorded?

14  A    No.  I believe they were just taking notes.

15  Q    And are you aware if Mr. Mitchell summarized your meeting

16  in writing, and did you have an opportunity to look at that?

17  A    He did summarize it.  I did not review it at that time.

18  Q    And why did you elect to speak with Mr. Mitchell?

19  A    In any police action, I think it's very important to look

20  at what was done.  Could we do things better?  How can we

21  improve?  I knew that he would have some element of the

22  protesters' account, but I also wanted the monitor to have the

23  perspective of what was going on on the police side of the

24  experience as well.

25  Q    And did you discuss with Mr. Mitchell your takeaways in the

20-cv-1878-RBJ   MICHAEL O'DONNELL - Direct   03-21-2022

1   George Floyd protests?

2   A    Yes, I did.

3   Q    And what were your takeaways from the George Floyd

4   protests?

5   A    The two greatest takeaways I had was first was radio

6   communications was incredibly challenging.  You could not hear

7   radio transmissions without an earpiece.  The ambient noise

8   level was just unbelievable.  The second takeaway that I saw was

9   that some officers were familiar with crowd control policy, but

10   not necessarily the movement and commands.  So, when you say

11   move forward at a half step, a lot of the officers, especially

12   the first night that were not assigned to the gang unit were

13   unfamiliar, hesitant, fearful.  I don't really know exactly why

14   they weren't doing what they were supposed to do.  So, that was

15   a challenge for us.

16   Q    And the discussion that you had or the observations that

17   you made to Mitchell, were those observations that you had made

18   prior to the George Floyd protests?

19   A    No, it was not.

20   Q    And did you realize that you even thought that way prior to

21   the George Floyd protest?

22   A    No.  Boy, I hate to use this word with COVID, but this was

23   truly unprecedented.  I don't think any law enforcement agency

24   in the nation was ready for something like this.  So, to say

25   that we had foreknowledge is not accurate.

20-cv-1878-RBJ    MICHAEL O'DONNELL - Direct    03-21-2022

1    Q    Are you aware of anyone else making similar observations

2    and reporting them prior to the George Floyd protests?

3    A    No.  To my knowledge, no other officer made those

4    recommendations.

5    Q    And did any of your observations relate to anything that

6    you saw with less-lethal or gas munitions?

7    A    No.  Not on the less-lethal deployments.  It was more the

8    formation movements and commands.

9    Q    And when you saw issues like this on the field, like an

10   officer taking a half step too far, what did you do?

11   A    When I was moving the line Thursday night, I was moving

12   behind the line, going from officer to officer, adjusting them

13   with their back, patting, saying forward a little bit, back up a

14   little bit, move forward, those kind of things trying to give

15   on-the-spot correction and direction.

16   Q    During the protest, did you and your team ever witness any

17   individuals with injuries?

18   A    Yes.

19   Q    And when you encountered individuals with injuries, what

20   did you do?

21   A    Are we talking on the protest side or officers?  I'm sorry.

22   Q    On the protest side.

23   A    The protest side?  There was one individual we came into

24   contact with, and I want to say it was Sunday night, maybe 13th,

25   12th and Emerson.  That area.  It was part of the curfew stuff.

20-cv-1878-RBJ   MICHAEL O'DONNELL - Direct   03-21-2022

1    He was obviously suffering the effects of less-lethal munitions.

2    There wasn't a huge crowd around him, so we were able to

3    effectively and safely render aid.  So, we decontaminated him

4    with water and got an ambulance to come up and further

5    decontaminate him.

6    Q    And in other instances with people potentially being hurt,

7    were you not able to render aid because of the large crowd

8    situation?

9    A    That's correct.  There was an instance where an individual

10   had been injured, and he was kind of pulled out near 14th and

11   Broadway.  We went in and pulled him back further, got him

12   medical attention.  But other than those, that was really the

13   only two times we could.  Just because of the behavior of the

14   crowd, you could not safely go in and try to decontaminate

15   anybody.

16          MS. HOFFMAN:  I hopefully have just one or two more

17   questions.  If you could show the witness Exhibit 3152.  I guess

18   it's a new exhibit.  I had intended previously, in full

19   disclosure with the Court, to introduce all of Commander

20   O'Donnell's police statements, and it was my understanding that

21   they were all together with some photographs at the end, but

22   that was clearly not the case.  So, I'm seeking to introduce

23   this as an exhibit.

24          MR. DOUGLAS:  Your Honor, objection.  We have never

25   seen this before.  I'm not sure what this is.

20-cv-1878-RBJ   MICHAEL O'DONNELL - Direct   03-21-2022

1          MS. HOFFMAN:  You've definitely seen it before.  It's

2    Commander O'Donnell's use of force report.  It was on

3    plaintiffs' exhibit list.  My understanding is the way it was

4    arranged on plaintiffs' exhibit list is they were all together.

5    I'm not sure what happened, but they've certainly been provided

6    this documentation during discovery.  It's not new.

7          THE COURT:  What number is it on plaintiffs' list?

8          MS. HOFFMAN:  I believe it was 509.

9          FEMALE SPEAKER:  Just a statement without the

10   photographs.

11         THE COURT:  509 has already been admitted.

12         MR. DOUGLAS:  Your Honor, this is different.  We

13   didn't have these photographs.

14         MS. WANG:  Our exhibit is different.

15         THE COURT:  So, you're telling me you've never seen

16   these photographs before?

17         MR. DOUGLAS:  There's been a lot produced.  I don't

18   know if this was in production, but it was not -- I don't have

19   any information that this was attached to those reports.  I just

20   can't -- this is the first I'm seeing it.  This was not on their

21   exhibit list or our exhibit list.

22         THE COURT:  All right.  The objection is sustained.

23         MS. HOFFMAN:  If I could just have a minute?  Nothing

24   further.

25         THE COURT:  Kevin, do you need a break before we get

1    into cross?  You're okay?  How about you folks?  You're nodding

2    your head, but I don't know if you're saying you're okay or you

3    need a break?

4              JUROR:  We're good.

5              THE COURT:  If anybody over there wanted a break --

6    you're good.  Okay.  I know you're good.  I just was asking if

7    you wanted a break.  Okay.  Go ahead.  Cross examination.

8              MR. DOUGLAS:  Thank you, Your Honor.

9                        **CROSS EXAMINATION**

10   BY MR. DOUGLAS

11   Q    Good afternoon, Commander O'Donnell.

12   A    Good afternoon, sir.

13   Q    My name is Matthew Douglas.  I'm going to ask you some

14   questions on behalf of the plaintiffs today.  First of all, you

15   provided some testimony regarding acts of violence, property

16   destruction, vandalism, fires, throwing rocks, a number of

17   things in that category; correct?

18   A    That's correct, sir.

19   Q    And you have no information to suggest that any of those

20   acts that you described in your testimony were committed by any

21   of the 12 plaintiffs in this case; correct?

22   A    That's correct, sir.

23   Q    Okay.  And none of that violence or property damage or

24   anything else you described along those lines would justify the

25   use of force by officers against individuals who did not commit

20-cv-1878-RBJ    MICHAEL O'DONNELL - Cross    03-21-2022

1   those acts; correct?

2   A    That's correct, sir, with the exception that in those

3   instances where violence was occurring and rocks were coming in,

4   you by policy were allowed to put in less-lethal in the form of

5   area saturation, area denial to move them back.

6   Q    Okay.  Area saturation, area denial would be the exception

7   to that, then?

8   A    Yes, sir.

9   Q    Okay.  And you agree that in order to use force on a

10  civilian, a police officer must have a reasonable justification

11  for using force on that individual based on what that individual

12  is doing; correct?

13  A    Yes, sir.

14  Q    Okay.  And you expect your officers -- who at the time were

15  the gang unit officers; correct?  First of all, during the time

16  of the protest, you were a lieutenant in charge along with

17  Lieutenant Carroll of the gang unit; correct?

18  A    That's correct, sir.

19  Q    You expected your officers to conduct themselves in a

20  professional manner; right?

21  A    That's correct, sir.

22  Q    Okay.  And those officers, the reason for that is they're

23  sworn to protect and serve the people of the City and County of

24  Denver, including protesters; correct?

25  A    That's correct, sir.

20-cv-1878-RBJ    MICHAEL O'DONNELL - Cross    03-21-2022

1    Q     And if officers behave unprofessionally in the form of

2    less-lethal force that may not be justified, that can incite

3    actions by protesters; correct?

4    A     Yes.  In theory, it can.

5    Q     That can escalate the situation; correct?

6    A     Yes.  In theory, it can.

7    Q     Okay.  And I wanted to clear up one thing.  Well, actually,

8    let me just ask.  So, you talked about you worked from -- every

9    night from May 28th through June 1st at the George Floyd

10   protests; correct?

11   A     Yes, sir.  I did.

12   Q     Okay.  And you said during the first two days, lieutenants

13   and above did not even have body-worn cameras; correct?

14   A     That's not exactly correct.  Lieutenants and above did have

15   body cam.  It just wasn't required by policy for them to wear

16   it.

17   Q     Okay.  And then starting May 30th, body-worn cameras were

18   required to be activated when -- well, under what circumstances

19   by you as a lieutenant?

20   A     Well, the commander made those adjustments at the time,

21   saying we need to have the body cams out, body cams active when

22   engaged with the crowd.  Now, some of that was that if you were

23   obviously in a violent crowd, yes.  You would be on active,

24   ideally.  Other times when it was peaceful -- and there were

25   moments of peaceful protest, to be sure, but in those moments,

20-cv-1878-RBJ   MICHAEL O'DONNELL - Cross   03-21-2022

1  you didn't necessarily have to have it on, trying to preserve

2  the battery life.

3  Q    Okay.  And did you in fact -- do you recall activating your

4  body-worn camera on May 30th, May 31st, or June 1st?

5  A    Not specifically, but I could have.  I don't know.

6  Q    Okay.  Is there any reason you know of why if you did

7  activate your body-worn camera, there's been no production of

8  your body-worn camera footage by the department from --

9  involving your camera?

10        MS. HOFFMAN:  Objection.  Lack of personal knowledge.

11        THE COURT:  Sustained.

12 Q.    (By Mr. Douglas) Okay.  I want to talk first about day

13 one of the protest.  May 28th, and first I want to clear up

14 something, because I think you may have misspoke.  And I think

15 you said when you went to District 6 on that first night, that

16 there were several hundred thousand protesters.  At least I

17 think that's what the record reflects.  I think you misspoke.

18 You meant there were several hundred, maybe a thousand; correct?

19 A    To thousands, yes.  That's correct.  Thank you for

20 clarifying that.

21 Q    Okay.  And you said you went down there, and we saw some

22 video.  It was about 8:30 p.m.  That's at Colfax and Washington,

23 District 6; correct?

24 A    Yes, sir.  That's correct.

25 Q    Okay.  And you -- well, is it correct, do you recall that

20-cv-1878-RBJ   MICHAEL O'DONNELL - Cross   03-21-2022

1  after responding to that location around that time where we saw

2  the video, that your officers, the gang unit, started a march

3  down Colfax, towards the capitol to the west?  Do you recall

4  that?

5  A    Yes, sir.  I do.  That was direction of Commander Phelan,

6  and that's the skirmish line I was referencing earlier, is that

7  some of it was the gang unit, but others were other officers

8  from throughout the city.

9  Q    All right.  And did you accompany your gang unit officers

10 on that march away from District 6 and down Colfax?

11 A    Yes, sir.  I did.

12         MR. DOUGLAS:  Okay.  I want to put up some video of

13 that.  Let's go to Exhibit 582, which is not in evidence.  It's

14 a body-worn camera from Officer Stadler, 8:36 p.m. on May 28th.

15 I would offer that into evidence at this time.

16         MS. HOFFMAN:  No objection.

17         THE COURT:  It's admitted.

18 Q.    (By Mr. Douglas) All right.  So, what we're looking at

19 here, do you recall in one of the videos you were shown earlier,

20 you guys were walking up from District 6, and you see the Slice

21 Works?  Do you remember that being part of the video we reviewed

22 with you?

23 A    Yes, sir.

24 Q    And we're now looking at that Slice Works, which is

25 directly across the street from District 6 at Colfax and

20-cv-1878-RBJ    MICHAEL O'DONNELL - Cross    03-21-2022

1  Washington; correct?

2  A    Yes, sir.

3  Q    And this is Officer Stadler, who is a member of the gang

4  unit.  His body-worn camera?

5  A    Yes.  It looks like it is.  Yes, sir.

6  Q    Okay.  And this is 8:36 p.m. on May 28th.  That's just a

7  few minutes after the video we were looking at -- or we looked

8  at when you were testifying a little earlier; correct?

9  A    Yes, sir.  I don't remember the times, but that sounds

10  right.

11  Q    Okay.  So, I want you -- circled on the screen is a woman

12  in the yellow circle, and you see that she is standing on the

13  outside patio, which has a little fence around it, or a rail of

14  Slice Works.  Do you see her?

15  A    Yes, sir.  I do.

16  Q    Okay.  And at this point, Slice Works was open for

17  business.  Customers are getting food, drink, and some of them

18  may be sitting on that outside patio; correct?

19  A    Yes, sir.

20  Q    Let's take a look at the video.

21        (A video was played.)

22  Q    Okay.  Let's stop.  So, did you see that woman, it looked

23  like she gave the middle finger and said F you or something to

24  the police?  Did you see and hear that?

25  A    I didn't hear or see that, but if you're saying it

20-cv-1878-RBJ    MICHAEL O'DONNELL - Cross    03-21-2022

1    occurred, I will take your word for it.

2    Q    And what happens is someone shoots a PepperBall at her, and

3    they hit the metal rail.  Did you see that?

4    A    I did see that.

5    Q    And you see the puff of smoke on her back, so it looks like

6    she's been hit by that.  Do you see that?

7    A    It looks like the smoke is on the rail, but I see your

8    point.

9    Q    Okay.  And I want to digress for a second.  This is Officer

10   Stadler right now is aiming a 40-millimeter launcher in her

11   direction.  Do you see that?

12   A    Yes, sir.  I do.

13   Q    And the 40-millimeter launcher you testified is only

14   authorized to be used against an individual who is engaged in

15   active aggression; correct?

16   A    That's correct, sir.

17   Q    Okay.  And you agree that woman was not engaged in active

18   aggression; right?

19   A    No.  It does not appear she was.

20   Q    Okay.  So, an officer should not aim a 40-millimeter

21   launcher at a person if they don't intend to use it, should

22   they?

23   A    I would agree with you, but you're saying pointing at her.

24   He could be deploying it in a cover position, looking for

25   additional threats that might be coming in given our previous

Kevin P. Carlin, RMR, CRR

20-cv-1878-RBJ   MICHAEL O'DONNELL - Cross   03-21-2022

1    engagements.  That is a possibility.

2    Q    Okay.  Let's watch a little more of this video.  Let's see

3    what happens to this woman.

4         (A video was played.)

5    Q    Okay.  Did you see her come back to the table on the

6    outdoor patio at Slice Works to grab her purse, maybe her drink?

7    Did you see that?

8    A    Yes, I did, sir.

9    Q    Did you see her get shot in the back with a PepperBall as

10   she was walking away?

11   A    Yes, I did, sir.

12   Q    What was the articulation by that officer of the need for

13   that woman to be shot in the back after she grabbed her purse

14   and her drink?

15   A    I don't know, sir.  I don't know who the officer was.

16   Q    Okay.  But your gang unit is right here, and this is the

17   video of your gang unit; correct?

18   A    That's correct, sir, but you could see some of the officers

19   didn't have the protective gear on.  They would not have been

20   gang unit officers.  So, I don't know who fired that to give you

21   any kind of explanation.  I will say, it's very concerning, and

22   based on that, I would like to see that recommended to internal

23   affairs for additional review.

24   Q    Okay.  So, this lawsuit is in fact bringing to light things

25   that were done by officers that hadn't previously come to light?

20-cv-1878-RBJ    MICHAEL O'DONNELL - Cross    03-21-2022

1   That's what you're saying?

2   A    That is accurate.  Again, I have never seen this video with

3   that officer impacting that individual.  So, I don't know what

4   that officer's camera captured.  I don't know what that

5   officer -- who he works for, or she, whatever the case may be.

6   Q    Okay.  We do know it was a DPD officer, because it was only

7   DPD that was on site that night; correct?

8   A    Yes, sir.  That's true.

9   Q    And this is the first night of the protest.  There's no

10  curfew; correct?

11  A    That's correct, sir.

12  Q    Okay.  All right.  By the way, on the subject of active

13  aggression, we talked about the 40-millimeter launcher, you

14  agree that kicking a tear gas canister that has been deployed by

15  officers back at the officers does not constitute active

16  aggression; correct?

17  A    Not necessarily rising to the level of active aggression.

18  Again, that would have to be the officer's articulation for why

19  that was deployed, if it was deployed in that kind of scenario.

20  Q    Okay.  So, that by itself would not constitute active

21  aggression?

22  A    Based on just the visual.  Again, you have to look at the

23  officers' statement on that as to why it was deployed, whether

24  it was inside or outside policy.

25  Q    Okay.  But there would have to be something in the

20-cv-1878-RBJ    MICHAEL O'DONNELL - Cross    03-21-2022

1   articulation other than merely kicking the canister in the

2   direction of the officers that would lead to that justification;

3   right?

4   A    There is some language in the crowd control matrix that we

5   referenced earlier about when riot control agents are released,

6   when individuals are throwing things back, covering the --

7   kicking, that they can deploy that.  So, it's -- without knowing

8   the full set of circumstances, I couldn't say yes or no, sir.

9   Q    You were on this line by Slice Works; right?  You said?

10  A    Yes, I was.  I don't know exactly where I was at during

11  this.

12  Q    Do you recall seeing that deployment of PepperBall on that

13  woman?

14  A    No.  I didn't see that at the time.

15  Q    So, you didn't say anything to anyone at the time about

16  that?

17  A    Well, had I seen that, I would have said something, but I

18  didn't see that at the time.

19  Q    Okay.  So, let's go, if we could -- so, this is 24 minutes

20  later.  You said you did join the gang unit to the march

21  eastbound on Colfax towards the capitol?

22  A    Yes.  I was with them most of the time during this

23  operation.

24  Q    Okay.  And this is the body-worn camera -- this is on --

25  okay -- of Officer Clyde Carmody.  He was a gang unit officer;

20-cv-1878-RBJ    MICHAEL O'DONNELL - Cross    03-21-2022

1   correct?

2   A    Yes, he is, sir.

3   Q    And this is 9:00 p.m., so it's 24 minutes after what we

4   just saw; is that correct?

5   A    Yes, sir.

6   Q    Okay.  And it's a couple blocks down, between Pearl and

7   Washington, or can you tell?

8   A    Yes.  It looks -- well, it's a still video, but that looks

9   like Pearl.

10          MR. DOUGLAS:  Okay.  I would offer, this is

11   Exhibit 1265 into evidence at this time.

12          MS. HOFFMAN:  I'm fine with the body-worn camera.  I

13   don't really know about the captions.  Are those added in

14   throughout?

15          MR. DOUGLAS:  We've added those, but that comes right

16   from the timestamp, and then the location, he just confirmed the

17   location.

18          MS. HOFFMAN:  It's fine.  No objection.

19          THE COURT:  Okay.  Admitted.

20          MR. DOUGLAS:  Let's watch this clip.

21      (A video was played.)

22   Q.    (By Mr. Douglas) Okay.  Did you see Officer Carmody

23   approaching that man who is standing there filming the police?

24   A    Yes, I did.

25   Q    And did you hear someone say, camera, camera?

20-cv-1878-RBJ    MICHAEL O'DONNELL - Cross    03-21-2022

1    A    Yes.  I don't know if that was in reference to officer body

2    cam or that camera.

3    Q    Okay.  All right.  Let's keep watching.

4         (A video was played.)

5    Q    Okay.  So, you saw Officer Carmody push the man to the

6    ground who was standing there holding a camera; correct?

7    A    Yes, sir.  I did.

8    Q    Okay.  And the man got back up, and then he was hit with

9    the shield and then pushed back into that pole.  You saw that?

10   A    Yes, I did, sir.

11   Q    And after that he's tackled to the ground.  Do you see

12   that?

13   A    Yes, I did, sir.

14   Q    Did you see any justification for those actions?

15   A    This is one perspective of it.  I would really want to

16   review all the documentation on this to find out, were you

17   arresting him?  Were you just giving him orders to move back,

18   and he didn't comply?  I don't know, but obviously it looks

19   troubling.

20   Q    Yeah.  And you were standing on that line; right?

21   A    I could have been anywhere on the line, sir.  Colfax is

22   five lanes across, and as I mentioned previously, I was giving

23   direction all across the line.  So, to say that I was right

24   there and witnessed that, I couldn't say that I was.  Had I been

25   right there, I would have been asking, what are we doing?  Why

20-cv-1878-RBJ    MICHAEL O'DONNELL - Cross    03-21-2022

1    are we doing it?  That kind of thing.

2    Q    Okay.  But you were on this line at this time; correct?

3    A    Somewhere on that line.  Yes, sir.

4    Q    Okay.  Let's keep watching.

5         (A video was played.)

6    Q    Okay.  So, you're somewhere on this line; right?

7    A    Yes, sir.

8    Q    Do you recall seeing or hearing any of that?

9    A    No, I don't.

10    Q    All right.  But this is your -- these are your officers

11    standing over that man?

12    A    On this side, yes, sir.  But you can also see there was

13    SWAT officers, and then on the fore side of the screen, you can

14    see other uniforms, which would have been other districts

15    response.

16    Q    Okay.  Now, this is -- we just backed it up a second or so.

17    Do you see this guy?

18    A    Yes, sir.  I do.

19    Q    Okay.  I'm going to ask -- so, he's going to come into play

20    right here.  You guys then march down a couple more blocks on

21    Colfax, made a left turn on Grant.  Do you recall that?

22    A    Not specifically, but that sounds about right.

23    Q    Okay.  We're going to go to that part.  You were in the

24    courtroom when Officer Valentine testified; is that correct?

25    A    I think so, yes.

20-cv-1878-RBJ    MICHAEL O'DONNELL - Cross    03-21-2022

1   Q    Okay.  And he's a member of the gang unit; correct?

2   A    Yes, he was.

3   Q    He was; right?

4   A    Yes, sir.

5   Q    All right.  Let's go to see what happens to this guy in a

6   couple blocks.  So, this is 13 minutes later, and let's just

7   watch.

8        (A video was played.)

9   Q    Okay.  Did you hear an officer say, give him a command, or

10  he's going to get PepperBalled?  Did you hear that?

11  A    I did hear that, sir.

12  Q    Okay.  And that really means give him a command so we can

13  PepperBall him, doesn't it?

14  A    No.  I think it's give him a command to move back so that

15  he complies so that we don't have to use PepperBall, but it

16  sounds to me like it was a warning to that individual, because

17  he even said, I don't want to get PepperBalled.

18  Q    And he was moving back.  He was complying; right?

19  A    To a minimal degree.  He's stepping back slowly, but he's

20  not following what the officer's direction is to try and move

21  back and clear that area.

22  Q    So, in your view, that was a justified deployment of

23  PepperBall?

24  A    I would say that it could be.  You would have to look at

25  the articulation on it, but he is showing signs of defensive

20-cv-1878-RBJ   MICHAEL O'DONNELL - Cross   03-21-2022

1   resistance.

2   Q   Do you know what the articulation was?

3   A   Not at this moment.  No, sir.

4   Q   Okay.  You were there; right?

5   A   I was there, sir.

6   Q   And you had six officers on that line.  Does that sound

7   right?

8   A   That's not correct, sir.  As I said, there was multiple

9   officers across the line.  So, I was moving between the patrol

10   district officers -- if SWAT was there, there probably would

11   have been a lieutenant there with them, and then also the gang

12   unit.  So, I wasn't physically present with the gang unit every

13   moment of the operation.

14   Q   Okay.  But you had -- other than you, if the internal

15   affairs -- by the way, you know, if you were in the courtroom

16   for Officer Valentine, that internal affairs did in fact look

17   into this one; correct?

18   A   I don't know.  At the time as a lieutenant, I wasn't

19   notified of complaints on officers.  As a commander, I am.

20   Q   I'm talking about what was in the courtroom, if you were

21   here that day, which I believe you were.  We presented the

22   internal affairs investigation into this incident.  Do you

23   recall that?

24   A   Yes.  I do, but I don't remember the outcome.

25   Q   Okay.  If the internal affairs file, in fact -- and that's

20-cv-1878-RBJ    MICHAEL O'DONNELL - Cross    03-21-2022

1   in evidence -- identifies six individual officers from the gang

2   unit on this line at this time, would you have any reason to

3   disagree with that?

4   A    Not if you say so, sir.  I don't know.

5   Q    And you recall that in the end, internal affairs was not

6   able to do anything, because they could not identify the officer

7   who actually fired those shots; correct?

8   A    Yes, sir.

9   Q    Okay.  Let's keep going.  So, I want to ask first, I'm

10  going to set the scene.  This is in evidence, Exhibit 739,

11  already admitted.  And this is Officer Christian's body-worn

12  camera from a little less than two hours later, same night, day

13  one, 11:30 p.m., and going south on Broadway just past 13th

14  Street.  Does that -- is that what this appears to be?

15  A    I think so.  When it's still, I can't really make out the

16  buildings very clearly.

17  Q    Okay.  Well, I think we established that with Officer

18  Christian.  By the way, do you recall being part of that march

19  south on Broadway the first night of the protest around

20  11:30 p.m.?

21  A    I know we were there.  I don't recall specifically, but

22  yeah.  I remember us being there.

23  Q    Okay.  Let's take a look at the video.

24       (A video was played.)

25  Q    Okay.  So, you saw Officer Christian spray that woman

Kevin P. Carlin, RMR, CRR

20-cv-1878-RBJ    MICHAEL O'DONNELL - Cross    03-21-2022

1    crossing the street in the face with pepper spray; correct?

2    A    Yes, sir.

3    Q    Okay.  And was that -- you described the different types of

4    pepper spray.  There's the fire hose or fire extinguisher

5    version.  There's then a medium, and then there's a small.  A

6    Mark 9, Mark 6, something like that?

7    A    Yeah.  That would have been a Mark 9, sir.

8    Q    That's a Mark 9.  So, you testified that the safe distance

9    for that one, the minimum distance is six feet; correct?

10   A    That sounds right, sir, yes.

11   Q    Was that less than six feet in that deployment?

12   A    I couldn't -- it doesn't look like it, but you're also

13   looking at the perspective of the camera, so I don't know how to

14   judge distance.

15   Q    Okay.  And was it consistent with DPD policy for him to

16   spray that woman crossing the street and then shove her like he

17   did?

18   A    At this point it appears that the officers are moving

19   people back, trying to get them to comply with moving out of the

20   area.  I don't know if there was commands given.  Obviously when

21   you capture a moment in time, you can certainly be curious about

22   why that occurred, and is it within policy?  But without looking

23   at the rest of the documentation, I couldn't tell you.

24   Q    All right.  Did you ever look into that to get more

25   information?

20-cv-1878-RBJ   MICHAEL O'DONNELL - Cross   03-21-2022

1  A     This is the first I've seen this video.

2  Q     So, we're again bringing this to light to the department?

3  A     Well, to this command officer.  Yes, sir.

4  Q     Okay.  But it may well be that that was consistent with

5  policy, if his articulation was good?

6  A     It could be.  As I explained earlier, with defensive

7  resistance you can use different less-lethal munitions.  On this

8  one, as I said, this is the first time I have seen the video.

9  Q     Now, I want you to focus just on this clip on this guy, who

10  I think you will see is filming the police as he crosses the

11  street.  So, let's take a look at that.

12        (A video was played.)

13  Q     Okay.  Did you see that?

14  A     Yes, sir.  I did.

15  Q     So, Officer Christian then sprays that person, who is

16  really basically getting up on the curb, with pepper spray;

17  correct?

18  A     Well, he's approaching the officers.  And then after the

19  spray, moves off to the curb.  So, yes, sir.

20  Q     Okay.  So, that's within policy?

21  A     It could be, yes.

22  Q     Okay.  I want to move to day two.  And this is -- I'm not

23  going to show the whole video, but was something that was seen

24  with Officer Valentine.  I want to ask first, your team, the

25  gang unit was deployed to a parking lot the evening of day two,

20-cv-1878-RBJ   MICHAEL O'DONNELL - Cross   03-21-2022

1   May 29th, on the north side of Colfax by the state auditor's

2   office; correct?

3           MS. HOFFMAN:  I'm going to object.  Outside the scope.

4           THE COURT:  Overruled.

5           THE WITNESS:  I'm sorry, sir.  Could you repeat that?

6   Q.    (By Mr. Douglas) Yeah.  Do you recall that your team, the

7   gang unit, was deployed to a parking lot by the state auditor's

8   office on the north side of Colfax sometime after 8:00 p.m. on

9   day two, May 29th?

10   A    When you say team, the gang unit was deployed in two

11   segments.  So, we had that lot that you're describing, and then

12   also a little bit down Colfax and Lincoln on the north side of

13   Colfax.

14   Q    Okay.  And we're right now looking at Officer Valentine's

15   body-worn camera from within that parking lot, looking south;

16   right?

17   A    That's correct, sir.

18   Q    Were you with this deployment of the gang unit or the other

19   one?

20   A    No, I was not.  I was on the other side.

21   Q    You were on the other side.  Okay.  All right.  And let's

22   just watch this here.

23        (A video was played.)

24   Q    Okay.  So, and we watched this whole video with Officer

25   Valentine.  I'm not going to show the whole thing again, but did

20-cv-1878-RBJ   MICHAEL O'DONNELL – Cross   03-21-2022

1   you see that explosion at the beginning of the video on the

2   right side of the screen right by those cars?

3   A    Yes, sir.  I did.

4   Q    Can you tell me what that was, or do you know what that

5   was?

6   A    It appears --

7           MS. HOFFMAN:  Objection.  Lacks foundation.  He wasn't

8   there.

9           THE COURT:  All right.  The question is do you know,

10   and that's the way you start asking for a foundation.  Do you

11   know?

12           THE WITNESS:  I have a guess, Your Honor.

13           THE COURT:  Okay.  Sustained.

14   Q.    (By Mr. Douglas) Okay.  You identified a number of

15   explosions on some prior videos and gave your view on what you

16   believe that to be.  Do you recall giving that testimony?

17   A    Yes, sir.  I do.

18   Q    Do you have a basis from reviewing this video of testifying

19   to what you believe that explosion may have been?

20   A    It would be --

21           MS. HOFFMAN:  Same objection.  He was there for the --

22           THE COURT:  Sustained.

23           MS. HOFFMAN:  Thank you.

24           MR. DOUGLAS:  All right.  Let's keep going.

25           THE COURT:  Actually, let's not.  I think we need to

20-cv-1878-RBJ   MICHAEL O'DONNELL - Cross   03-21-2022

1   take a break.  It's been a long time.

2        (Jury out at 3:08 p.m.)

3            THE COURT:  All right.  Ten minutes.

4        (Recess at 3:09 p.m., until 3:22 p.m.)

5        (Jury in at 3:22 p.m.)

6            THE COURT:  All right.

7            MR. DOUGLAS:  Thank you, Your Honor.

8   Q.    (By Mr. Douglas) Welcome back, Commander O'Donnell.

9   A    You as well, sir.

10  Q    Commander O'Donnell, you testified -- you told the jury

11  about an incident that happened on the evening of May 29th that

12  we were just looking at some video from, where you said an IED,

13  an improvised explosive device was -- or exploded in the

14  vicinity of you and the gang unit; correct?

15  A    That's correct, sir.  A few of the officers of the gang

16  unit.  Not the entire gang unit.

17  Q    And I learned that today.  IED.  I hadn't heard that

18  before.  Improvised explosive device?  Did I get that right?

19  A    That's correct, sir.

20  Q    So, after that explosion, would you or someone at the scene

21  have called that in on the radio?

22  A    We would have followed up with the command post.  Whether

23  it was on the radio or the phone, I'm not entirely sure.

24  Q    Okay.  And if it was reported on the radio, it would be in

25  that CAD report that you were shown and the jury has seen?

20-cv-1878-RBJ    MICHAEL O'DONNELL - Cross    03-21-2022

1   A    If it was on the radio, yes, sir.  It would be on the CAD.

2   Q    And if you reported it by cell phone or on the radio, it

3   would be in an after-action report from that day?

4   A    It could be or should be.  Typically, whether that

5   information was passed to the commander via telephone, our

6   protocol is that the bomb unit goes out and tries to look for

7   any kind of evidence, gathering it for later prosecution,

8   potentially.

9   Q    Okay.  And that's something -- that was a significant

10  incident that you would have included in your officer statement

11  that you wrote about that day?

12  A    It would have, except that we didn't deploy any kind of

13  less-lethal munitions post that event.  So, had there been

14  additional less-lethal deployed, we would have articulated that

15  in our statement, but as I said, I believe that would have been

16  a phone call to the command post.

17          MR. DOUGLAS:  Okay.  All right.  I want to go to

18  another video from that day.  This is -- if we can just put up

19  for the witness the first shot of Exhibit 606, please.

20          THE COURTROOM DEPUTY:  I'm sorry.  What is 606?

21          MR. DOUGLAS:  Oh, now it's on the -- thank you, Julie.

22  606.

23          MS. HOFFMAN:  Officer Bothwell's body worn?  No

24  objection.

25          THE COURT:  Admitted.

Kevin P. Carlin, RMR, CRR

20-cv-1878-RBJ   MICHAEL O'DONNELL - Cross   03-21-2022

1    Q.    (By Mr. Douglas) So, Officer Bothwell is another of the

2    gang unit officers under your command; correct?

3    A    Yes, sir.  Whether he was Kevin Carroll's or mine, I'm not

4    100 percent sure, but he is part of the gang unit.

5    Q    And this is May 29th, 8:39, day two, across the street from

6    the capitol; correct?

7    A    Yes, sir.

8    Q    Okay.  Let's take a look.

9         (A video was played.)

10   Q    Okay.  By the way, this is one of your sergeants working

11   that --

12   A    Yes, sir.  That would be one of the sergeants in the gang

13   unit.

14   Q    Do you know which sergeant it is?

15   A    No, I don't.

16   Q    Okay.  And did you see him walk over and spray that man in

17   the face with OC spray who was filming the officers?

18   A    I did.

19   Q    Okay.  Let's keep watching.

20        (A video was played.)

21   Q    In the interest of time, let's jump ahead maybe 45 seconds.

22        (A video was played.)

23   Q    Okay.  Did you see Officer Bothwell deploy the grenade, and

24   then it exploded in the middle of three cars of traffic on

25   Colfax?

20-cv-1878-RBJ   MICHAEL O'DONNELL - Cross   03-21-2022

1    MS. HOFFMAN:  I'm going to object and assert the same

2    objection as with Officer Valentine.  The commander has already

3    testified he wasn't there at this location on May 29th.  So, he

4    doesn't have personal knowledge.  Lack of foundation.

5    THE COURT:  Yes, but the question is did you see?

6    Overruled.

7    Q.   (By Mr. Douglas) And whether Officer Bothwell was with

8    you that night, he reports to you; right?  He's one of your team

9    members, and you're one of the two heads of the team; correct?

10   A   He is part of the gang unit, but as I mentioned earlier,

11   you have the patrol side of nights that reports to Lieutenant

12   Kevin Carroll, and then you have the day shift and detectives

13   and officers that are assigned to the task force.  They report

14   to me.  So, yes, we share authority, but typically they report

15   to Lieutenant Kevin Carroll.

16   Q   Okay.  But you know Officer Bothwell?

17   A   Yes, sir.  I do.

18   Q   Do you know if he had been trained in grenades before being

19   handed that one and throwing it into Colfax?

20   A   I do not know, sir.

21   Q   Would you expect -- by the way, did you work with all --

22   there were four sergeants in the gang unit total; correct?

23   A   We have five total.

24   Q   Five total.  Okay.

25   A   Yes, sir.

20-cv-1878-RBJ   MICHAEL O'DONNELL - Cross   03-21-2022

1    Q    And did you work with all five of them at different times?

2    A    At different times, yes, sir.

3    Q    Okay.  Would you expect that whichever sergeant that was

4    who had handed that grenade would have given some instruction to

5    Officer Bothwell after that first -- after that grenade he

6    threw?

7    A    It appeared that the sergeant gave him some direction of

8    where to put it.  So, I don't know if that answers your

9    question.

10   Q    Okay.  After it landed and exploded, would you expect the

11   sergeant on scene to talk to the officer about that deployment?

12   A    Possibly.

13           MS. HOFFMAN:  Same objection.  Lack of foundation.

14           THE COURT:  Overruled.

15           THE WITNESS:  Possibly.  I would think that the

16   sergeant would say, we want it there, not here, or something to

17   that effect.

18   Q.    (By Mr. Douglas) All right.  Let's take a look at the

19   rest of this.

20       (A video was played.)

21   Q    Okay.  So, the sergeant in fact handed him another grenade.

22   You saw that?

23   A    Yes, sir.

24   Q    Okay.  Does that look like a sting ball grenade to you?

25   A    I only caught a glimpse of it.  I don't know, sir.

20-cv-1878-RBJ   MICHAEL O'DONNELL - Cross   03-21-2022

1   Q    Okay.  All right.  We can put that down.  Okay.  I want to

2   talk about May 30th, the next day, day three.  You testified

3   about that day; correct?

4   A    Yes, sir.  I did.

5   Q    Okay.  And you were deployed that day; correct?

6   A    Yes, sir.  I was.

7   Q    You were shown Exhibit 474.  I'd like to put that up,

8   please.  That was the May 30th operations plan, sort of the

9   orders of the day for that day.  Do you recall testifying about

10  that?

11  A    Yes, sir.  I do.

12  Q    Okay.  I want to go to the bottom of page three.  Okay.

13  The deployment plan.  Do you see that?

14  A    Yes, sir.  I do.

15  Q    And this is going to carry over into the next page.  It

16  says, all officers will be divided into teams, deployed as

17  needed.  Then it says, officers are advised to monitor

18  demonstrators for illegal acts and advise their supervisor prior

19  to taking action, if possible.  Do you see that?

20  A    Yes, I do, sir.

21  Q    And then in bold it says, the benefit of taking immediate

22  action should be weighed against the possibility of further

23  inciting the crowd and possibly creating a more serious breach

24  of the peace.  Do you see that?

25  A    Yes, sir.  I do.

20-cv-1878-RBJ   MICHAEL O'DONNELL - Cross   03-21-2022

1   Q    Okay.  So, those are the orders of deployment for May 30th;

2   correct?

3   A    That's correct, sir.

4   Q    Let's -- we can put that down.  Okay.  You -- we'll talk --

5   on May 30th, you talked about the barrier and walking up to the

6   barrier and some fireworks and rocks.  You remember that

7   testimony; correct?

8   A    Yes, sir.  I do.

9   Q    Okay.  And you testified that when you circled where Hollis

10  Lyman was, one of the plaintiffs in this case, your officers

11  were 75 to 100 yards from that spot; is that correct?

12  A    That's my best guess, sir.  Yes.

13  Q    And then you were shown a picture or a still of the video

14  after you pushed the barrier down, or right around that time

15  when you were right up near the fence where someone had a

16  lacrosse stick or a slingshot.  Do you remember that?

17  A    Yes, sir.  It was a lacrosse stick.

18  Q    And you testified that Ms. Lyman was 10 to 15 feet away

19  from that person.  Do you recall that?

20  A    Again, that was my best guess, sir.  Yes.

21  Q    Okay.  But you don't know where she was at that particular

22  time after you had marched forward, do you?

23  A    No, sir.  I don't.

24  Q    And if she testified that she actually had fled, then you

25  couldn't say that she was within 10 to 15 feet of that person

Kevin P. Carlin, RMR, CRR

20-cv-1878-RBJ    MICHAEL O'DONNELL - Cross    03-21-2022

1  who you saw when you were right up at the barrier, can you?

2  A    Not with definitiveness, no.

3  Q    Okay.  I want to go to Exhibit 644, which is already in

4  evidence.  So, let's orient.  This is day three, May 30th,

5  6:54 p.m., the corner of Colfax and Lincoln; correct?

6  A    That's correct, sir.

7  Q    Okay.

8         MS. HOFFMAN:  Objection.  Outside the scope of direct.

9         THE COURT:  Overruled.

10  Q.   (By Mr. Douglas) And you were deployed with your gang

11  unit members at this spot at this time; correct?

12  A    Yes, sir.  Myself, Lieutenant Carroll, and wherever I was

13  in this, most likely behind those officers to the right.

14  Q    Okay.  And the red circle here, or the -- it's like red

15  tape.  Is that -- is it like tape on the back of the helmets?

16  A    Yes, sir.  That's correct.

17  Q    And that signifies those are your gang unit members;

18  correct?  That red tape?

19  A    Yes, sir.  That's correct.  It's more of a headcount

20  system, but yes.

21  Q    And I want to just orient us, because we're going to go to

22  a different shot.  You see these protesters.  One, two, three,

23  four, five, six.  Do you see those six protesters?

24  A    Yes, sir.  I do.

25  Q    Okay.  We're going to go to an overhead shot.  I just want

20-cv-1878-RBJ   MICHAEL O'DONNELL - Cross   03-21-2022

1   to make sure we can confirm we're looking at the same place at

2   the same time.  So, let's go to this overhead shot.  This is

3   already admitted Exhibit 42.  It is helicopter footage from a

4   9News helicopter.  So, if you take a look at that, did you see

5   the same six protesters that we just saw in that last shot?

6   A    Yes, sir.  I can.

7   Q    Okay.  So, this is an overhead view of Lincoln and Colfax

8   at around the same time, or at the same time?

9   A    Yes, sir.

10  Q    Okay.  And -- whoops.  Let me go back.  I just want to ask

11  you while we're looking at this, you said you would have been

12  somewhere behind this line.  This is the gang unit line here;

13  right?

14  A    Yes, sir.  Can I draw on this?

15  Q    Sure.  Yeah.

16  A    So, the gang unit line would have been here and down.  So,

17  anywhere in this area, I could have been.

18  Q    Okay.  So, you are one of those people.  You just can't

19  tell from this angle or this distance which one?

20  A    I would say it's very likely I'm in that area somewhere.

21  Q    Okay.  And just so we can get some perspective, this police

22  line -- I'm not saying it was gang unit, but this was police

23  line -- went all the way down that entire block, quite a long

24  block, all the way to Broadway at that time; correct?

25  A    Yes, sir.  That's correct.

20-cv-1878-RBJ   MICHAEL O'DONNELL - Cross   03-21-2022

1   Q    Okay.  So, would you say there was over 100 officers there

2   at that time?

3   A    That would be a safe bet.  Maybe even more.  I don't really

4   know.

5   Q    Okay.  Okay.  Now, I want to -- this is back to

6   Exhibit 6 -- by the way, 644 is body-worn camera of Keith

7   Bishop.  He's one of your gang unit members; correct?

8   A    Keith Bishop?  I don't think we have a Keith Bishop.  We

9   have a Bishop, but not Keith.

10  Q    Let me pull up my roster.  I may have that wrong.  Blake

11  Bishop?

12  A    Blake Bishop.  Yes, sir.

13  Q    Okay.  I think we have the caption incorrect.  Okay.  So,

14  the jury has seen this video, and I'm not going to show it, but

15  have you seen this before, where this person over here was

16  approaching the line asking the officers to identify which one

17  of them had shot him with a PepperBall, and then he got sprayed

18  in the face?  Do you recall that?

19         MS. HOFFMAN:  Your Honor, I'm just going to object to

20  the body-worn camera being shown to the witness in terms of it

21  having the caption, and it's argumentative.

22         MR. DOUGLAS:  Your Honor, the caption is not on the

23  admitted exhibit.  I am happy to take it off if that's better.

24         THE COURT:  Okay.  Take it off.

25         MR. DOUGLAS:  Okay.  Give me one second.  Okay.  Thank

20-cv-1878-RBJ   MICHAEL O'DONNELL - Cross   03-21-2022

1    you.

2    Q.    (By Mr. Douglas) So, do you recall seeing this previously

3    where the man approaches the officer, says, which one of y'all

4    shot me, and then gets sprayed in the face with pepper spray?

5    Have you seen that?

6    A    Yes, I have, sir, in relation to an internal affairs case.

7    Q    Okay.  So, I want to move to -- oh.  Hang on.  Good.  There

8    we are.  Okay.  So, now we're back on the overhead 9News

9    footage.  This is Exhibit 42.  And this guy who we just saw is

10   right here, and I want you to keep an eye on him, and we're

11   going to roll this video.  And there is no sound, which makes it

12   a little better, because we can actually talk if we need to, so

13   let's start it.

14        (A video was played.)

15   Q    I want you to focus on this woman.  Did you see her come

16   and help him to the curb?

17   A    Yes, sir.

18   Q    Okay.  I just want you to get a good look at her so you can

19   recognize her.

20        (A video was played.)

21   Q    Actually, can we pause that for a second?  This is a

22   closer-up shot.  I am just curious if you can identify --

23   probably one of these, or maybe one of these folks?  Any idea

24   which one of those you are?

25   A    No, sir.

20-cv-1878-RBJ   MICHAEL O'DONNELL - Cross   03-21-2022

1    Q    Okay.  But you're one of those folks behind that line;
2    right?
3    A    It's possible, but as I showed on the previous video, I
4    would have been somewhere in that larger area.  So, I don't
5    know.
6    Q    Okay.  You're somewhere on the ground in the vicinity of
7    your line, which is these folks at this time; correct?
8    A    As I explained, move further to the west, so I could be
9    anywhere in that square that I had illustrated earlier.
10   Q    Okay.  But in any event, you had a -- well, part of what
11   you were doing there was watching your officers and giving them
12   any necessary instructions; correct?
13   A    Yes, sir.
14   Q    Okay.  So, you had a good view from wherever you were of
15   your officers and this general scene; correct?
16   A    Not everything at the same time, no.  It depends on where
17   my attention was focused and where I was in that area of
18   deployment.
19   Q    Okay.  Let's keep playing.
20        (A video was played.)
21   Q    This woman is still tending to the man who got sprayed.  Do
22   you see that?
23   A    Yes, sir.
24        (A video was played.)
25   Q    Do you see any objects coming at the officers at this

20-cv-1878-RBJ    MICHAEL O'DONNELL - Cross    03-21-2022

1    point?

2    A    I'm sorry.  Say that again?

3    Q    Do you see any officers -- sorry.  Any objects coming at

4    the officers during any of this time we're watching?

5    A    Not at this moment, sir.

6    Q    Okay.

7         (A video was played.)

8    Q    Did you see a deployment of pepper spray just there?

9    A    Yes, I did, sir.

10   Q    Okay.  All right.  Now I want you to focus on this woman

11   again.  See, she's got something in her hand?

12   A    It appears so.

13   Q    She throws it at the officers.  Do you see that?

14   A    Yes, I do, sir.

15   Q    Okay.  So, does that appear to be a plastic water bottle?

16   A    I couldn't tell you what that was.

17   Q    Okay.  We'll get a better view of it.  So, this person who

18   threw that water bottle was easily identified to the line of

19   officers.  Would you agree with that?

20   A    At that moment in time, yes, sir.  But you have a

21   significant number of people surrounding that area.  Had you

22   made an effort to go and arrest her individually, that crowd

23   would have -- based on my experience at the time, it was a very

24   volatile and dynamic situation.  Had you tried to go and arrest

25   her, that would have inflamed the crowd, making the situation

20-cv-1878-RBJ   MICHAEL O'DONNELL - Cross   03-21-2022

1   worse.

2   Q    Okay.  And about how far is she from the line of officers,

3   would you say?

4   A    I would say that's maybe 10 to 15 feet.

5   Q    Okay.  So, 10 to 15 feet away.  By the way, your gang unit

6   officers are trained to chase down and arrest, if necessary,

7   armed and dangerous criminals; correct?

8   A    Yes, sir.

9   Q    Okay.  So, 10 to 15 feet away is this woman who just threw

10  a -- something, we will see if we can figure out what it is --

11  at the officers, but it was too dangerous for these officers or

12  for an arrest team that would be standing behind the officers to

13  arrest her for risk of inciting the crowd?

14  A    What you're not seeing on the rest of this particular frame

15  is that you've got several hundred people gathered behind on

16  Lincoln, into the park.  So, if you send an element in to try

17  and arrest her, and that crowd encircles those team of arrest

18  officers, now you've got a bigger problem.

19       So, you're always -- we talked about that earlier.

20  You're weighing your options.  Is it going to inflame the

21  situation, or is it going to resolve the situation?  Based on

22  our decision at the time, it appears we decided not to inflame

23  the situation.

24  Q    Okay.  Not to inflame the situation.  Would it potentially

25  inflame the crowd to use less-lethal force on more individuals

1  than just the one who threw the water bottle?  Would that incite

2  the crowd?

3  A    It depends on how it was deployed, but it has a possibility

4  of doing so.

5  Q    Okay.  We're going to look at that.  I just want to close

6  this out real quick, if we can.  Okay.  So, it doesn't look like

7  her projectile hit the officers?

8  A    That's correct.  Arguably, you don't know what was in that

9  projectile, but yes, that's correct.

10  Q    Okay.  Let's see if we can figure that out.  Let's go to

11  the next clip.  Okay.  Does this appear to be -- in the yellow

12  circle, the same woman who just threw that object?  It may

13  become clear -- sorry.  Go ahead.

14  A    I'd say roughly.

15  Q    Okay.  Roughly.  And then I think it might become clearer

16  when we watch it.  So, let's watch this one.

17       (A video was played.)

18  Q    Okay.  Does that appear to be the same person throwing that

19  object?

20  A    Yes, sir.  It does.

21  Q    Okay.  And that looks to you to be a plastic water bottle,

22  doesn't it?

23  A    When you slow it down to the speed that you did, it does

24  appear to be a water bottle.  However, it would have been coming

25  in a lot faster, so you would have no way of identifying what it

20-cv-1878-RBJ   MICHAEL O'DONNELL - Cross   03-21-2022

1   was.

2   Q    Okay.  And actually, one of your officers seems to have

3   kind of batted it out of the air.  Do you see that?

4   A    It does appear so.

5   Q    Okay.  All right.  Now let's look at what the gang unit and

6   other officers' response was to this.

7        (A video was played.)

8   Q    And there's more.  The jury has seen this clip.  I don't

9   want to play the whole thing.  Do you see that response?

10  A    I did see that, sir.

11  Q    Was that an appropriate response to that situation?

12  A    Again, you have to look at the totality of the

13  circumstances.  You're capturing moments in time that are very

14  selective.  You're not getting the perceptions of what the other

15  officers are seeing or what they are perceiving.  So, to

16  increase that buffer zone, they could deploy and be within

17  policy on this.  Again, you have to look at all the

18  documentation on there.

19  Q    So, that deployment -- you were on the ground.  You were

20  standing right there for this; right?

21  A    As we've covered, sir, I was in the area.  I don't know

22  exactly where I was in relation to those officers.

23  Q    And your officers, your gang unit officers start deploying

24  less-lethal force.  You're probably watching them while they're

25  doing that, aren't you?

20-cv-1878-RBJ   MICHAEL O'DONNELL - Cross   03-21-2022

1   A    It's a possibility.  I don't know.

2   Q    And in your view, based on what you saw at the time and

3   what you've seen on this video and what we saw in two minutes of

4   overhead shot of this leading up to this, that was within DPD

5   policy?  That deployment of force?

6   A    As I explained, sir, the buffer zone was an ebb and flow

7   kind of movement, most of that day.  When officers would not do

8   any kind of less-lethal, people would continue to creep in, and

9   then agitators would come in and throw items.  So, in response

10  to this, again, you have to look at the perceptions of officers,

11  the documentation of why it was necessary.  So, yes, it could be

12  within policy, and that clearly rises to defensive, perhaps even

13  active aggression, not knowing what's in that bottle.

14  Q    Okay.  There were Aurora officers in this vicinity at this

15  time as well; correct?

16  A    Yes.  To my recollection, they were west of us on Colfax.

17  Q    Okay.  And you agree that Aurora officers would not have

18  been authorized to take any actions that they were not

19  authorized to take by the incident commander, Commander Phelan;

20  correct?

21              MS. HOFFMAN:  Objection.

22              THE COURT:  Objection?

23              MS. HOFFMAN:  Sorry.  I will withdraw the objection.

24              THE COURT:  Did I miss something over there?

25              MS. JORDAN:  She just said objection and then said, I

20-cv-1878-RBJ   MICHAEL O'DONNELL - Cross   03-21-2022

 1   don't know the basis, and then she withdrew it, and it made me

 2   laugh.  I'm sorry, Your Honor.  Apologies.

 3            THE COURT:  It's okay.  It happens.

 4            THE WITNESS:  I'm sorry, sir.  Could you repeat the

 5   question?

 6   Q.   (By Mr. Douglas) Absolutely.  You agree that -- by the

 7   way, we're not looking at Aurora officers deploying any

 8   less-lethal here.  I just want to clarify.

 9   A    It does not look like it.

10   Q    Those were down the street a little bit?

11   A    That's correct, sir.

12   Q    I'm digressing, and I apologize, but you agree that Aurora

13   officers on the scene during the protest would not have been

14   authorized to take any actions that they were not authorized to

15   take by the incident commander, Commander Phelan?

16   A    Yes.  But as Commander Phelan testified, he gave authority

17   to those individuals to use in accordance with their policy.

18   Q    But you don't think that Aurora officers would have acted

19   independently, do you?

20   A    It would be up to those Aurora officers' perceptions and

21   articulations as to why they did or did not use less-lethal.

22   Q    Okay.  I'm not sure that answered my question.  You don't

23   think that Aurora officers would have acted independently, do

24   you?

25            MS. HOFFMAN:  Objection.  Calls for speculation.

20-cv-1878-RBJ    MICHAEL O'DONNELL - Cross    03-21-2022

1        THE COURT:  Overruled.

2        THE WITNESS:  I'm sorry.  Can we go through the

3   question one more time?

4   Q.    (By Mr. Douglas) Yes.  You don't think that Aurora

5   officers would have acted independently, do you?

6   A    They had the autonomy to do so based on the briefings that

7   Commander Phelan pushed out.

8   Q    Okay.  Do you remember testifying at a deposition in this

9   case?

10  A    I do, sir.

11  Q    Okay.  And actually twice; right?

12  A    Yes, sir.

13  Q    And your first deposition was on August 4th of 2020 --

14  2021.  Sorry.

15  A    That's correct, sir.

16  Q    Okay.  Can we put up the August 4th deposition transcript,

17  page 84, lines 18 through 25, please.  You were under oath at

18  the time of your deposition; correct?

19  A    Yes, sir.  I was.

20  Q    And the question was asked, okay, would the Aurora officers

21  have been authorized to take any actions that they were not

22  authorized to take by the incident commander, Commander Phelan?

23        And your answer was, I don't believe so, because they

24  were part of the briefings every day and understood what the

25  mission was, so I don't think they would have acted

20-cv-1878-RBJ   MICHAEL O'DONNELL - Cross   03-21-2022

1  independently.

2        That was your testimony at your deposition; correct?

3  A   Yes, it was.  I certainly have learned more information

4  since that deposition.

5  Q   So, you're changing your testimony?

6  A   Yes.  Based on the information I received, I was uninformed

7  on this particular matter.

8  Q   All right.  Now, let's go to -- oh.  Let's go back to 644,

9  please.  That's admitted, so -- okay.  So, we were just looking

10  at this scene, the deployment of less-lethal force.  Do you see

11  that?

12  A   Yes, sir.

13  Q   Okay.  You would agree that that deployment of less-lethal

14  force included far more people than the person that threw the

15  water bottle; correct?

16  A   Yes, sir.  I do.  And as I mentioned previously, there was

17  that crowd behind that was up on the steps, several hundred

18  would be an estimate.  I don't know what the officers'

19  perceptions or reaction was.  Were they throwing additional

20  items that we didn't see?  I don't know.

21  Q   Okay.  You were standing right there.  Did you ask him?

22  A   As we've discussed, sir, I wasn't standing directly with

23  them.  I would have been in the area.  So, when the situation

24  was calm, either Lieutenant Kevin Carroll or myself would have

25  talked to the officers.

20-cv-1878-RBJ   MICHAEL O'DONNELL - Cross   03-21-2022

1  Q   Okay.  You were the supervising officer, the lieutenant for

2  these officers who had just deployed that less-lethal munition;

3  correct?

4  A   That's not accurate, sir.  As I said, Lieutenant Kevin

5  Carroll was there as well.  We each had a team.  I don't know

6  exactly where my team was on this, and I don't know where I was

7  at.  So, to say they were my officers is not entirely accurate.

8  Q   Okay.  So, you don't recall them doing this, or you talking

9  to them?  You don't recall one way or the other?

10 A   I remember vaguely after the fact, but I don't think that

11 those officers were mine.  I don't think I discussed this with

12 them.

13 Q   Okay.  So, you think Lieutenant Carroll would have been the

14 one to talk about this?

15 A   I think so.  I couldn't say what he did or didn't know or

16 do.

17 Q   Okay.  You do know that no one was disciplined for that;

18 right?

19 A   For this particular deployment?  I do not know that, sir.

20 Q   You don't know one way or the other?

21 A   I do not.

22 Q   Okay.  I want to just focus in on Officer Carmody.  He's a

23 member of the gang unit; correct?

24 A   Yes, he is, sir.

25 Q   And you can see his name -- we've blown it up on the gas

20-cv-1878-RBJ    MICHAEL O'DONNELL - Cross    03-21-2022

1    mask; right?

2    A    Yes, sir.

3    Q    Okay.  And you can see here, he's deploying in his left

4    hand, is that the fire extinguisher, the big OC spray?

5    A    It looks like the MK-46.  Yes, sir.

6    Q    Okay.  And then with his right hand, he's deploying

7    PepperBall?

8    A    I don't know if he was actually deploying it or just

9    holding it.  I couldn't tell you if he actually deployed it or

10   not.  He may have been out of PepperBall rounds.  He may have

11   been out of air.  I don't know.

12   Q    Okay.  Well, he's holding the weapon up pointing it at

13   someone; right?

14   A    It appears so, yes.

15   Q    And the video would show, and we don't need to watch it

16   again, whether he was deploying both, but if he were deploying

17   both of those less-lethal weapons at the same time, it would

18   make it difficult for him to aim precisely on targeting specific

19   individuals; correct?

20   A    Yes, sir.

21   Q    Okay.  I'm going to go -- you can put that down.  Let's go

22   to Exhibit 666, which is -- well, no.  Actually, I don't.  My

23   apologies, Your Honor.  I'm jumping around a little bit.  I

24   actually want to go to Exhibit 452, which is already in

25   evidence.

20-cv-1878-RBJ   MICHAEL O'DONNELL - Cross   03-21-2022

1    You testified about the crowd control manual at some

2    length this morning; correct?

3    A    Yes, sir.  I did.

4    Q    And one of the things the crowd management manual says is

5    PepperBall operators are responsible for every round they fire.

6    They must ensure that innocent persons are not struck

7    unintentionally.  Do you see that?

8    A    Yes, sir.  That's correct.

9    Q    Okay.  All right.  I want to go to another video from the

10    same timeframe.  It is actually, yes, 666.  Already in evidence.

11    Okay.  And I just -- let's just watch this one.

12        (A video was played.)

13    Q    Okay.  Let's stop there.  And so this is, again, gang unit

14    officers.  We see the red tape here, here, here.  We saw it on

15    some of the other people who are now off screen; right?

16    A    Yes, sir.

17    Q    And I want you to focus on this scene, and there's a woman

18    with a white shirt or blouse or something, and there's a man

19    holding a milk jug.  Do you see that?

20    A    I will take your word on the milk jug, but yes, I see them.

21    Q    Okay.  And you see the woman has her back turned towards

22    the line of officers?

23    A    Yes, sir.  I do.

24    Q    And the man is maybe helping her or something, it looks

25    like?

20-cv-1878-RBJ   MICHAEL O'DONNELL - Cross   03-21-2022

1    A    It's possible.

2    Q    Okay.  Let's take a look at what happens.

3         (A video was played.)

4    Q    Okay.  Did you see that woman get shot in the back with at

5    least one, maybe two PepperBalls?

6    A    Yes, sir.

7    Q    Okay.  And this guy, does it look like he's holding his

8    camera in his hand, or phone?

9    A    He's holding something.  I can't tell from the still shot.

10   Q    Okay.  And did you see him get shot in the face area?

11   A    I missed that, sir.

12   Q    You missed that.  That's a short clip.  Let's watch that

13   one again.  It's quite short.

14        (A video was played.)

15   Q    Okay.  Do you see that puff?

16   A    Yes, sir.  I didn't see it in his face, though.

17   Q    Okay.  Let's move on.  Okay.  So, this is -- and by the

18   way, this is -- ah, man.  I didn't do the math.  This is bad.

19   7:06 p.m.; is that right?

20   A    I know we went through the math.  I'm going to take your

21   word for it, sir.

22   Q    7:06 p.m., and because that then carries over past

23   midnight, it's May 30th, day three; right?

24   A    I'm just going to agree with you, sir, on that one.

25   Q    All right.  And all these videos we've just been watching

20-cv-1878-RBJ   MICHAEL O'DONNELL - Cross   03-21-2022

1    from this intersection are in that timeframe, 6:00 to 8:00 p.m.,

2    May 30th; correct?

3    A    Yes, sir.  That's correct.

4    Q    And they're all before curfew.  Curfew started at

5    8:00 p.m.; right?

6    A    Yes, sir.  That's correct.

7    Q    All right.  So, I want to go to another video in that same

8    timeframe, same location.  This is 670 -- well, no.  That's not

9    right.  Yeah, it is.  Yes.  This one.  And this is already

10   admitted.  All right.  So, this is, again, Lincoln and Colfax.

11   Now it's 7:32 p.m.  Do you see that?

12   A    Yes, sir.

13   Q    Okay.  And I want you to focus on this guy.  And he -- he's

14   a little closer up.  He is holding a milk jug, isn't he?

15   A    It looks like it, sir.  Yes.

16   Q    And you realize that protesters brought milk to help people

17   who had been affected by tear gas or pepper spray.  It seems to

18   help with the effects of that; correct?

19   A    Yes, sir.  I'm familiar with that now.

20   Q    Okay.  Let's watch this video.  We can keep an eye on that

21   guy.

22        (A video was played.)

23   Q    Okay.  Do you see he's pepper sprayed there?  Do you see

24   that?

25   A    Yes.

20-cv-1878-RBJ    MICHAEL O'DONNELL - Cross    03-21-2022

1    Q    OC sprayed?

2    A    Yes, sir.

3    Q    Okay.  Let's keep going.

4         (A video was played.)

5    Q    Okay.  Do you see they shot his milk jug?

6    A    Yes, sir.  It struck the milk jug.

7    Q    And it looks like that's milk coming out of the milk jug;

8    right?

9    A    It appears consistent with that.  Yes, sir.

10   Q    Let's go forward just a little bit.  About a minute later,

11   look at the same guy.

12        (A video was played.)

13   Q    All right.  Did you see he was struck maybe four or five

14   times in the abdomen with PepperBalls?

15   A    Yes, sir.  It appears that they're trying to push the crowd

16   back.  This level of activity is definitely rising to the level

17   of defensive resistance.  Obviously it's troubling to watch, but

18   again, you would have to look at the officer's statement and

19   articulation for why that was used.

20   Q    Okay.  So, you think that's within policy?

21   A    It very well could be, sir.

22   Q    Okay.  All right.  Let's go to the last video, I promise.

23   I can't promise, but I think it's the last video.  And this is

24   666, already in evidence.  Okay.  Same intersection, a little

25   bit earlier.  7:08 p.m.  But same intersection, about the same

        20-cv-1878-RBJ   MICHAEL O'DONNELL - Cross   03-21-2022

1    time.  Oh.  I'm sorry.  I misspoke.  We're fighting about what

2    exhibit it is, and I got it wrong.  It's 662.  No.  Did I say

3    662?  What's the right number?  It's 662.  Already in evidence.

4    My apologies.  Let's take a look at it.

5         (A video was played.)

6    Q    Okay.  All right.  So, did you -- so, this guy, did you

7    hear him say, I'm a goddamn U.S. Marine?

8    A    I did not hear that, sir.

9    Q    All right.  Let's try that again.  It's a little quiet.

10   Well, you know what?  Forget that.  Let's go to the next one.

11        (A video was played.)

12   Q    Okay.  This is the body-worn camera of Officer Tana

13   Cunningham.  She's one of the gang unit members; correct?

14   A    Yes, sir.

15   Q    And did you see her shoot this protester in the mouth and

16   chest?  Did you see that?

17   A    I didn't see the mouth, but I did see rounds impacting on

18   the chest.

19   Q    Okay.  You didn't see him get hit in the face with one?

20   A    I'm sorry?

21   Q    You didn't see him get hit in the face with one of those?

22   A    I didn't.

23   Q    And you also saw this guy hit in the head and chest area;

24   correct?

25   A    Yes, sir.

20-cv-1878-RBJ   MICHAEL O'DONNELL - Cross   03-21-2022

1   Q    Okay.  And that's also within policy?

2   A    Again, capturing a few seconds of video, I don't know what

3   the officer's perception and articulation was for the need of

4   this less-lethal.  So, I don't know.  It was pretty evident

5   based on some of the other video that they're trying to have

6   that buffer zone.  So, I don't know without looking at the rest

7   of the material.

8   Q    And those guys are, what?  About 20 feet from the officers?

9   A    Or less.

10  Q    Fifteen?  Twenty feet?

11  A    I'd go with 10 to 15.

12  Q    And that's too close, so it's okay to shoot them in the

13  face and chest area?

14  A    If they've given orders to move back.  We've talked about

15  the buffer zone and dispersal, then the defensive resistance

16  that they're exhibiting, it could be.  Again, I don't know

17  without looking at all the information.

18  Q    I thought you said defensive resistance with PepperBall

19  would be area dispersal at their feet?

20  A    In some instances, but also in the crowd management matrix

21  spells out that you can use direct impact if someone is using

22  defensive resistance.

23  Q    Okay.  Okay.  We can put that down.  Now, we just looked at

24  a number of videos from this time period, this intersection.

25  The jury has seen more.  I'm not going to show all the same

20-cv-1878-RBJ   MICHAEL O'DONNELL - Cross   03-21-2022

1   stuff, but 6:00 to 8:00 p.m.  Lincoln and Colfax, day three;

2   correct?

3   A    Yes, sir.

4   Q    All right.  And you've given your views on whether those

5   are within policy.  Are you aware that nobody was disciplined

6   for any of the uses of force at that intersection during that

7   timeframe?

8        MS. HOFFMAN:  Objection.  Misstates his testimony.  He

9   hasn't offered any sort of opinions as to policy violations.

10       THE COURT:  Okay.  The question was are you aware.

11  The objection is overruled.

12       THE WITNESS:  I'm not aware, sir, but that's -- they

13  could have come down before I took the position at commander, so

14  I don't know.

15  Q.    (By Mr. Douglas) Okay.  Are you aware that internal

16  affairs in fact received 30 separate complaints about this

17  intersection and the deployment of less-lethal force during this

18  timeframe that they consolidated into one big complaint?  Are

19  you aware of that?

20  A    I was not aware of that, sir.

21  Q    Okay.  And are you aware that internal affairs' conclusion

22  was that the deployment of crowd control munitions, including

23  chemical munitions, were consistent with the Denver Police

24  Department's training and use of force policy?  Are you aware of

25  that?

1    A    I was not aware of that, sir.

2    Q    Okay. And in all the days you worked the protest with your

3    gang unit members as their supervisor -- or as their

4    supervisor's supervisor; right?

5    A    Yes, sir.

6    Q    You never saw anything, a single use of force by any of

7    those gang unit members that in your view violated policy, DPD

8    policy?

9    A    Not that I recall, sir. But as we've discussed, those

10    cases would have been investigated, reviewed by internal

11    affairs, and with input from the Office of the Independent

12    Monitor, so I would base their decision much more wholly than

13    mine.

14    Q    Okay. But I'm asking the first instance, based on what you

15    saw when you were there at the time, you never saw anything by

16    any of the gang unit members that you believed was a potential

17    violation of policy?

18    A    Not in live time, sir. Some of the images that you've

19    shown me earlier, I was unaware of. So, they are troubling. I

20    would like to have those reviewed and investigated. But I don't

21    know who the officer is. But as far as what I knew at the time

22    and live real time, no, I didn't see anything. But you can't

23    see everything that's occurring.

24    Q    Okay. And do you know whether or not any gang unit members

25    were disciplined for any actions they took at the protest at any

20-cv-1878-RBJ   MICHAEL O'DONNELL - Redirect   03-21-2022

1   time?

2   A    I actually don't know that, sir.

3            MR. DOUGLAS:  Okay.  I have no further questions.

4            THE COURT:  All right.  Redirect?

5            MS. HOFFMAN:  Thank you, Your Honor.

6                    **REDIRECT EXAMINATION**

7   BY MS. HOFFMAN

8   Q    I will be brief.  Commander, you were just shown a number

9   of videos on cross examination.  Any of the incidents contained

10  in those videos, did you see them in real time?

11  A    No.  Not -- I don't remember any of those in real time.

12  Q    And as you sit here today just watching small snippets of

13  videos, are you able to form an opinion one way or another

14  whether or not any of the incidents you saw violate Denver

15  Police Department policy?

16  A    No.  You're capturing a second, maybe three seconds of

17  video.  That is one element that is necessary for the

18  investigation, but you also have to have the officer's statement

19  and articulation for the need for those less-lethal deployments.

20  There might be additional HALO video.  There may be additional

21  body cam video that shows or correlates or corresponds with

22  those deployments.  So, I can't make an informed decision based

23  on cherrypicked moments.

24  Q    But fair to say, some of those videos you thought were

25  concerning, and you would recommend those to internal affairs

20-cv-1878-RBJ    MICHAEL O'DONNELL – Redirect    03-21-2022

1   for further review?

2   A    Absolutely.  Especially the one at Colfax and Washington

3   with the Slice Works.  That's very alarming, because that does

4   not appear to be consistent with policy.  And it may have

5   already been investigated.  I don't know.  But after -- based on

6   that information, I will definitely be looking in to see if we

7   can identify who the officer was that deployed that PepperBall.

8   Q    And specifically you were shown a couple of videos relating

9   to incidents that took place at Colfax and Lincoln on May 30th

10  from 6:00 to 8:00 p.m.?

11  A    Yes, ma'am.

12  Q    Can you give me a little bit more context, what was going

13  on in that area at that time?

14  A    As it's been mentioned in previous testimony throughout the

15  weeks, the area that was on the north side of Colfax, it was a

16  giant parking lot filled with -- it wasn't a parking lot.  Let

17  me clarify.  It was just a lot with a bunch of landscape rocks.

18  So, the previous couple days they had been going in, certain

19  individuals, grabbing those rocks, and throwing them at the

20  officers as weapons.

21       Commander Phelan coordinated with, I believe it was

22  Department of Transportation and infrastructure, maybe parks and

23  rec, I don't know exactly who, but to mitigate that rock stash.

24  So, that was in process all day, which is why we were out there

25  holding that line, preventing them, keeping the area of denial

20-cv-1878-RBJ   MICHAEL O'DONNELL - Redirect   03-21-2022

1   so that they could work -- those workers could mitigate that --

2   those rock piles without interference.

3   Q    And you mentioned a few times in your cross examination

4   testimony buffer zone, the importance of keeping a buffer zone.

5   What is a buffer zone, and what's the importance of maintaining

6   that?

7   A    So, the buffer zone is essentially a distance.  Each

8   situation is kind of unique, but the idea behind a buffer zone

9   is to keep the protesters at a far enough distance so that

10   they -- individuals cannot come up and throw weapons at the

11   officers, or to mitigate the items that they throw.  Because

12   there were times where there was enough of a buffer zone where

13   items were thrown and we didn't use any kind of less-lethal.  We

14   didn't need to.  It was impacting ahead of us.  But when it

15   starts striking the officers, that changes the dynamics.

16   Q    And we just saw a few snippets of video from that location

17   and that time, but do you generally recall taking projectiles

18   while you were at Colfax and Lincoln on May 30th from 6:00 to

19   8:00 p.m.?

20   A    Yes, I do.  Multiple officers took rocks, bottles, concrete

21   chunks.  I know there was a couple of us that got hit with

22   canned food of some sort.  I couldn't tell you what kind, but

23   yeah.  There was multiple items coming in.

24   Q    And I believe you were also asked about whether or not you

25   were aware of whether any gang unit officers had been

20-cv-1878-RBJ    MICHAEL O'DONNELL - Redirect    03-21-2022

1   disciplined for actions taken during the George Floyd protests.

2   In your previous position as a lieutenant in SORT, a/k/a gang

3   unit, were you made aware of discipline?

4   A    If it was -- yes. So, if it was my officer specifically,

5   that's kind of a long story, but essentially, the officers are

6   tracked in different databases. Even though it's all one

7   TeleStaff, the officers that work day that are reporting to --

8   Lieutenant Kevin Carroll gets notification. The officers that

9   work on day shift, the detectives, et cetera, report to me. So,

10  if there's a notification of discipline, it comes to whoever

11  that lieutenant is.

12  Q    So, you would have received a notification for the officers

13  directly under your command, not necessarily the officers under

14  Lieutenant Carroll's command? Am I understanding that

15  correctly?

16  A    Yes. That's correct.

17            MS. HOFFMAN:  I have nothing further.

18            THE COURT:  Questions from the jurors?  Okay.

19        (Proceedings held at the bench:)

20            THE COURT:  Number 38.

21            MR. DOUGLAS:  No objection.

22            MS. HOFFMAN:  That's fine.

23            THE COURT:  Thirty-nine.

24            MR. DOUGLAS:  No objection.

25            MS. HOFFMAN:  No objection.

20-cv-1878-RBJ   MICHAEL O'DONNELL - Redirect   03-21-2022

1           THE COURT:  Forty.

2           MR. DOUGLAS:  No objection.

3           THE COURT:  Forty-one.

4           MS. HOFFMAN:  No objection.

5           MR. DOUGLAS:  No objection.

6           THE COURT:  Forty-two.

7           MS. HOFFMAN:  No objection.

8           MR. DOUGLAS:  No objection.

9           THE COURT:  Thank you.

10       (Proceedings held in open court:)

11          THE COURT:  All right.  Some questions from the jury

12  for you, sir.

13          THE WITNESS:  Yes, Your Honor.

14          THE COURT:  During your training, you were only struck

15  with one PepperBall, not multiple balls?

16          THE WITNESS:  No.  The way the training was designed,

17  it was not a crowd control, but more of a tactical scenario, a

18  barricade.  So, the idea was to show you the impact of the

19  PepperBall, how it felt, and how you would comply, or the

20  individual would comply.  So, it was a limited engagement.  It

21  wasn't multiple PepperBalls.  Which is typically the case with a

22  PepperBall.  Whether it's a tactical scenario in patrol, you

23  only fire the one that you need fired.  You don't fire tons of

24  them.

25          THE COURT:  Question, if there was training for the

20-cv-1878-RBJ   MICHAEL O'DONNELL – Redirect   03-21-2022

1   SWAT team on the handling of flash-bangs, then why didn't

2   Officer Valentine know how to use it?

3           THE WITNESS:  Officer Valentine is not assigned to

4   SWAT, and he did not throw a flash-bang.  He threw a CS grenade

5   or an OC grenade.  Something like that.  So, it's not -- only

6   flash-bangs are in SWAT.

7           THE COURT:  There was a scene, as I recall, where I

8   think before he threw whatever he threw, he had to be shown how

9   to prime it.

10          THE WITNESS:  Yes, sir.  I do recall that video.

11          THE COURT:  And so maybe the question is why didn't he

12  know how to use it if he had been trained on it?

13          THE WITNESS:  I don't know that he was trained on it,

14  sir, quite honestly.  That would have been the grenadier

15  sergeant making the determination of who is throwing the

16  grenades, typically.  There is a carve-out in the policy that an

17  officer can throw it, but typically it's a sergeant that's a

18  grenadier.

19          THE COURT:  Question, what is an OL blast grenade?

20          THE WITNESS:  That's actually OC.

21          THE COURT:  OC, yeah.

22          THE WITNESS:  Yes, sir.

23          THE COURT:  I probably just misread it.  OC blast

24  grenade.

25          THE WITNESS:  No problem, Your Honor.  An OC blast

20-cv-1878-RBJ   MICHAEL O'DONNELL - Redirect   03-21-2022

1   grenade is essentially -- that's one of the terms that's used.

2   It's designed to be deployed, and then it pops at the top,

3   dispersing the chemical agent, which is OC in this question,

4   into the air.  So, it's a dispersal pattern, but it's called an

5   OC blast ball, OC grenade, same thing.

6           THE COURT:  And what does it blast out?

7           THE WITNESS:  It only blasts out the micro-pulverized

8   OC particles.  So, there's nothing else in there as far as

9   fragmentation.  It's just OC powdered form.

10          THE COURT:  Question, what constitutes an injury to an

11  officer?  Is it a report made or a worker's comp claim or

12  receiving medical treatment?

13          THE WITNESS:  Short answer, Your Honor, is all three.

14  If the officer reports it to a sergeant, that counts as an

15  injury.  If the officer reports it to the OUCH line, which is

16  for workmen's compensation medical treatment, that would

17  qualify.  A lot of the officers sustained injuries as far as

18  bruising and things like that, not significant enough that they

19  would lose time, necessitating workmen's compensation or taking

20  them off line.  So, it was more of just tracking the injuries to

21  the officers.

22          THE COURT:  And how did they do that?

23          THE WITNESS:  I'm sorry, sir?

24          THE COURT:  How did they track the injuries to the

25  officers?

20-cv-1878-RBJ    MICHAEL O'DONNELL – Redirect    03-21-2022

1        THE WITNESS:  Typically that would be reported to the

2   OUCH line, and then it reports to the professional development

3   unit.  They track all the injured officers who is on full duty,

4   limited duty, surgical status, that kind of thing.  So, when

5   they report it to the OUCH line or a supervisor finds out about

6   it, they inform the professional development unit.

7        THE COURT:  And question, if an officer learns how to

8   use a less-lethal weapon during the George Floyd protests, do

9   they have to go through training after?

10        THE WITNESS:  It would depend on the specific

11   less-lethal, but all the officers that were using as far as

12   PepperBall and 40s were certified.  So, that doesn't change

13   their recertification cycle, which I believe is every year for

14   those platforms.

15        THE COURT:  Yeah.  I think I didn't read the question

16   very well, but maybe you answered it better than I read it.  I

17   think what the question says is if an officer learns how to use

18   a particular less-lethal weapon just on the spot, on-the-job

19   training, so to speak, during the protests, do they then have to

20   go back and go through training afterwards?

21        THE WITNESS:  Yes, sir.  They would.  To keep the

22   certification, yes, sir.  They would still need to.

23        THE COURT:  Okay.  Any other questions from the jury?

24   Follow-up questions from counsel?

25        MR. DOUGLAS:  No, Your Honor.

20-cv-1878-RBJ    THOMAS PINE – Direct    03-21-2022

 1           MS. HOFFMAN:  Nothing further, Your Honor.

 2           THE COURT:  Okay.

 3           THE WITNESS:  Thank you, Your Honor.

 4           THE COURT:  All right.  Do you have someone else who

 5    you want to start?

 6           MS. BIRKHOLZ:  Sure, Your Honor.  We call Lieutenant

 7    Thomas Pine.

 8           THE COURT:  We will just go a few minutes and then

 9    stop, but we will get him going, at least.

10        (The Witness is Sworn)

11           THE COURT:  Okay.  Right there, please.

12                        **DIRECT EXAMINATION**

13    BY MS. BIRKHOLZ

14    Q    Good afternoon.

15    A    Good afternoon.

16    Q    Can you state your name, and spell your last name for the

17    record.

18    A    Thomas Pine, P-I-N-E.

19    Q    And you are a lieutenant with the Denver Police Department?

20    A    Yes.

21    Q    How long have you been with the Denver Police Department?

22    A    Since 1994.

23    Q    And what division are you in within the Denver Police

24    Department?

25    A    Currently I'm in the patrol division.

20-cv-1878-RBJ     THOMAS PINE - Direct     03-21-2022

1  Q    Okay.  At the time of the George Floyd protests, what

2  division were you with?

3  A    I was in the special operations division.  I worked in the

4  SWAT team.

5  Q    Okay.  Now, we've heard the term SWAT used quite a bit

6  during this trial, but what types of operations does the SWAT

7  team typically handle?

8  A    So, typically we handle barricaded suspects.  We handle

9  high-risk fugitives, protests.  We do search warrants.  A lot of

10  intense situations.

11  Q    In the context of a protest, what would SWAT's role be?

12  A    Generally, we are not necessarily on a front line, but we

13  are supporting the officers on the front line with special

14  weapons and tactics that we use.

15  Q    Okay.  Now, what types of special weapons or equipment does

16  SWAT have available to it that other officer divisions do not

17  have?

18  A    Generally we carry the same equipment.  We just train with

19  them more and have a lot more experience with them.  We have

20  foggers.  We have gas grenades.  We have -- we do have a step

21  up, as far as riot control agents, chemical agent.  We have

22  40-millimeters.  We have the PepperBall guns.

23  Q    And how many different teams are there on the SWAT

24  department?

25  A    In Denver, we have two teams.

20-cv-1878-RBJ    THOMAS PINE - Direct    03-21-2022

1    Q    Okay.  And how many -- did those two teams police the

2    George Floyd protests?

3    A    Yes, we did.

4    Q    How many people are on each of the SWAT teams?

5    A    There is 11 officers -- we call them technicians -- two

6    sergeants, and a lieutenant.

7    Q    Okay.  And is that eleven, two, and one total, or is that

8    one team?

9    A    That's one team.  So, two teams like that.

10   Q    Okay.  Now, how many other protests have you been involved

11   with as a Denver police officer before the George Floyd

12   protests?

13   A    Hundreds.

14   Q    Now, we already talked about SWAT's role with respect to

15   the George -- or with respect to a typical protest.  And we've

16   already heard how this protest was different from a lot of other

17   witnesses.  Can you provide for us a couple of specific examples

18   of behavior that you observed personally that was different from

19   prior protests.

20   A    Certainly.  I'd say on the very first night, one of our

21   main objectives was to keep the crowd from getting onto the

22   highway.  Obviously that's a dangerous situation for them.  We

23   don't want that happening.  So, in the past, we'd faced that

24   with Occupy and other protests, but when we lined up -- and I

25   remember this was at 20th and, I think it was at Chestnut, we

20-cv-1878-RBJ     THOMAS PINE - Direct     03-21-2022

1   stopped them.

2           In past protests, the crowd would -- just stood there,

3   yelled at us for a while, and then disperse, but this was

4   completely different.  And it was very obvious initially,

5   because they did not stop.  They started looking for other ways

6   onto the highway, and they moved that way, and they ended up

7   actually getting on the highway.  And that was the first night.

8   Q   Can you think of any other specific examples of how this

9   protest differed?

10  A   The size and the vitriol we faced was different.  Another

11  example was the first night as well, we went to 14th and Sherman

12  area.  We were asked to assist with some motorists who had been

13  trapped by the crowd.  And we showed up, and we went to try to

14  get to those motorists, and we were attacked.  We got sticks

15  swung at us, punches thrown at us.  So, we pulled out, made

16  three arrests, and then had to call for a line to eventually get

17  that crowd dispersed.

18  Q   How did your team of SWAT technicians -- how did the role

19  differ for your team in comparison to other protests?

20  A   The amount of things that we went to.  We generally were

21  called to a certain hotspot area where something was going on or

22  a fire had started or something.  This was unusual in that

23  normally -- normally we're just kind of monitoring the

24  situation, unless something happens, which is very rare.  This

25  time it was pretty much constantly for six days.

20-cv-1878-RBJ    THOMAS PINE - Direct    03-21-2022

1    Q    And were you personally injured from the protests?

2    A    Yes.

3    Q    Tell me what happened.

4    A    Well, I got hit with a rock in the hand once.  I was hit at

5    16th and Washington roughly, a rock hit my helmet, broke my

6    helmet and knocked me down to the ground at one point.

7    Additionally, I at one point, dodging a rock, I jumped off our

8    armored personnel vehicle, armored -- it's called a Bearcat.

9    Jumped off that, and I injured my foot, which didn't officially

10   get diagnosed until about October with an MRI that I ruptured a

11   tendon up to my knee.

12   Q    Okay.  And have you -- what's the result of your injured

13   tendon that you got --

14   A    They could not fix it surgically, so I am basically

15   declared two percent overall physically disabled, and

16   six percent with my foot disabled.

17   Q    Is the -- is the occurrence of that injury one of the

18   reasons that you had to switch departments?

19   A    Yes.

20   Q    And after you were injured, did you take time off to

21   recover during the protests?

22   A    No.

23   Q    Were other members of your team injured?

24   A    Yes.

25   Q    What types of injuries did other members of your team

20-cv-1878-RBJ    THOMAS PINE - Direct    03-21-2022

1    experience?

2                 MS. WANG:  Objection.  Foundation.

3                 THE COURT:  Overruled.

4                 THE WITNESS:  One officer was -- he broke his hand,

5    also with a rock.  Another officer, the first night, was hit

6    with a glass bottle down on the highway, and actually cut an

7    artery.  So, he was out for the rest of it due to that injury.

8    And other officers, minor injuries like mine.

9    Q.    (By Ms. Birkholz) Now, I'd like to move on to a different

10   topic, which is that of statements, and we've had a lot of

11   discussion during this trial about officer statements.  Did you

12   happen to personally review any of the other statements for

13   other members of your team following the protest?

14   A    No.

15   Q    Did you ever get a sense from DPD's leadership that by

16   writing these statements, they instructed you to hide something

17   or --

18   A    Not at all.

19   Q    Okay.  Do you feel as though as a result of having written

20   these statements, you are able to provide additional details

21   that you otherwise wouldn't be able to provide here today?

22   A    Yes.

23   Q    Do you think that those statements that you prepared

24   contain the level of detail that was reasonable and appropriate

25   considering the circumstances?

20-cv-1878-RBJ    THOMAS PINE - Direct    03-21-2022

1   A     Yes.

2   Q     Okay.  Now, I'd like to move on to the topic of

3   flash-bangs.  Commander O'Donnell just told us that flash-bangs

4   are a tool specific to members of the SWAT team.  Is that

5   consistent with your understanding?

6   A     Yes.

7   Q     Okay.  I'd like to discuss the training that SWAT members

8   receive with respect to flash-bangs.  Can you tell me what

9   training you received when you got on the SWAT team.

10  A     So, it's -- I could be wrong, but I think it's an

11  eight-hour course, classroom.  And then once you have passed a

12  written test, you go and you have to be in -- you practice.  You

13  throw a flash-bang, and you also have to be in a room to

14  experience what a flash-bang is like.

15  Q     And that eight-hour course that you described for us, what

16  types of things did you learn?

17  A     Nomenclature, what various parts of the actual device

18  itself are made of, how to pull it, how to throw it, when to

19  throw it.

20  Q     And what are flash-bangs typically used for?

21  A     The vast majority of the time we use them they're on search

22  warrants.  We're making an entry into a room, we will distract

23  and theoretically prevent a suspect from arming themselves.

24  Q     And in a crowd control scenario, what is a flash-bang used

25  for?

20-cv-1878-RBJ    THOMAS PINE - Direct    03-21-2022

1    A    As a last resort to do the same thing.

2    Q    Now, you mentioned that two teams policed the protest from

3    SWAT?

4    A    Yes.

5    Q    Now, how many members on your team deployed flash-bangs

6    during the George Floyd protests?

7    A    None.

8    Q    So, you also mentioned with respect to the training that

9    you received from flash-bangs that you experience it.  Can you

10   tell us what that experience is like.

11   A    It's a very loud noise and a very bright light very

12   quickly.  And it's intense, and it disorients you for five

13   seconds or ten seconds.

14   Q    After that five or ten seconds, what -- does it continue?

15   A    No.  You get back to normal once you get your bearings.

16   Q    Okay.  Anything else from a disorienting sensation for five

17   to ten seconds?

18   A    No.

19   Q    Now, I'd like to discuss body-worn camera, which is another

20   topic that's been discussed during this protest -- or, sorry --

21   during this trial.  What is your understanding with respect to

22   Denver Police Department's policy with respect to SWAT members

23   and body-worn camera use?

24   A    At the present time, when the protest started, we only had

25   to activate our body-worn cameras on regular duty.  So, for

20-cv-1878-RBJ    THOMAS PINE - Direct    03-21-2022

1   example, if we didn't have any SWAT activities going on and we

2   made a traffic stop, then we would have to activate them.

3   During a tactical operation, we were not required to operate

4   them or turn them on.

5   Q    And is it your understanding that the response to the

6   protest was a tactical operation for the SWAT members?

7   A    Yes.

8   Q    Okay.  Now, can you tell the jury why you would not want

9   tactical operations on body-worn camera.  What's the rationale

10  for that policy?

11  A    The rationale is these are dangerous situations that may be

12  repeated, and we don't want anyone or anyone that we might face

13  in the future on something like this knowing what we're doing or

14  how we're doing it.  It exposes the officers to danger.

15       MS. BIRKHOLZ:  Your Honor, I'm in a good spot to stop

16  for the evening.

17       THE COURT:  Well, your timing is perfect.  Ladies and

18  gentlemen, tomorrow let's make it 9:15, because I have a medical

19  appointment outside the court at 8:10, and I'm not sure I can be

20  here by 9:00.  So, 9:15.  Thank you for your service.

21       (Jury out at 4:30 p.m.)

22       THE COURT:  The jury has been excused for the evening.

23  Is there anything to put on the record, plaintiff?

24       MS. STERK:  Your Honor, I just wanted to mark, as I

25  said earlier, the deposition clip report as Exhibit 1266.

2302

20-cv-1878-RBJ    THOMAS PINE - Direct    03-21-2022

1          THE COURT:  Okay.  It's admitted.  Defense?

2          MR. RINGEL:  Nothing from the defendants.  Thank you,

3    Your Honor.

4          THE COURT:  Have a nice evening, everybody.

5       (Proceedings concluded at 4:31 p.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

2303

1                          REPORTER'S CERTIFICATE

2

3

4          I, KEVIN P. CARLIN, Official Court Reporter for the

5    United States District Court for the District of Colorado, a

6    Registered Merit Reporter and Certified Realtime Reporter, do

7    hereby certify that I reported by machine shorthand the

8    proceedings contained herein at the time and place

9    aforementioned and that the foregoing pages constitute a full,

10   true, and correct transcript.

11          Dated this 9th day of April, 2022.

12

13

14

15

16                                    _____
                                      Kevin P. Carlin, RMR, CRR
17                                    Official Court Reporter

18

19

20

21

22

23

24

25

                          Kevin P. Carlin, RMR, CRR