1              IN THE UNITED STATES DISTRICT COURT

2                  FOR THE DISTRICT OF COLORADO

3     Civil Action No. 20-cv-1878-RBJ

4     ELISABETH EPPS AND SARA FITOURI, ET AL.,

5          Plaintiffs,

6          vs.

7     CITY AND COUNTY OF DENVER, ET AL.,

8          Defendants.

9     ----------------------------------------------------------------

10                      REPORTER'S TRANSCRIPT

11                      Jury Trial, Vol. 12

12    ----------------------------------------------------------------

13         Proceedings before the HONORABLE R. BROOKE JACKSON,
      Judge, United States District Court for the District of
14    Colorado, commencing on the 22nd day of March, 2022, in
      Courtroom A902, United States Courthouse, Denver, Colorado.
15

16                          APPEARANCES
      For the Plaintiffs:
17    TIMOTHY R. MACDONALD, MATTHEW J. DOUGLAS, and DIANA K. STERK,
      Arnold & Porter Kaye Scholer LLP, 1144 Fifteenth Street, Suite
18    3100, Denver, CO 80202

19    ELIZABETH C. WANG and MAKEBA RUTAHINDURWA, Loevy & Loevy, 2060
      Broadway Street, Suite 460, Boulder, CO 80302
20

21    For the Defendants:
      ANDREW D. RINGEL, KATHERINE HOFFMAN, and ROBERT A. WEINER, Hall
22    & Evans LLC, 1001 Seventeenth Street, Suite 300, Denver, CO
      80202
23
      HOLLIE R. BIRKHOLZ and LINDSAY M. JORDAN, Denver City Attorney's
24    Office, 201 West Colfax Avenue, Denver, CO 80202

25    Reported By KEVIN P. CARLIN, RMR, CRR, 901 19th Street, Room
      A259, Denver, CO 80294, (303)335-2358

         Proceedings reported by mechanical stenography; transcription
                        produced via computer.

20-cv-1878-RBJ    Jury Trial    03-22-2022

1                          I N D E X

2    PLAINTIFFS' EXHIBITS:

3                          Identified              Received

4        6              2332                    2332
         9              2314                    2314
5        462            2521                    2521
         467            2406                    2407
6        469            2387                    2387
         510            2320                    2320

7

8    DEFENDANTS' WITNESSES                          PAGE

9    THOMAS PINE
         Direct Examination By Ms. Birkholz . . . . . . . . 2306
10       Cross Examination By Ms. Wang  . . . . . . . . . 2326
         Redirect Examination By Ms. Birkholz . . . . . . 2339
11
     ERIC KNUTSON
12       Direct Examination By Ms. Hoffman  . . . . . . . 2341
         Cross Examination By Ms. Sterk . . . . . . . . . 2411
13       Recross Examination By Ms. Sterk . . . . . . . . 2428

14   MATTHEW WOODS
         Direct Examination By Ms. Hoffman  . . . . . . . 2429
15       Cross Examination By Ms. Sterk . . . . . . . . . 2445

16   VINCE PORTER
         Direct Examination By Mr. Weiner . . . . . . . . 2449
17       Cross Examination By Ms. Wang  . . . . . . . . . 2490
         Redirect Examination By Mr. Weiner . . . . . . . 2505
18
     RYAN GROTHE
19       Direct Examination By Ms. Jordan . . . . . . . . 2508

20   DEFENDANTS' EXHIBITS:
                          Identified              Received
21
         3010           2386                    2386
22       3039           2443                    2443

23

24   Reporter's Certificate  . . . . . . . . . . . . . . 2536

25

20-cv-1878-RBJ    THOMAS PINE – Direct    03-22-2022

1              P R O C E E D I N G S

2       (Proceedings commenced at 9:15 a.m.)

3       (Jury in at 9:15 a.m.)

4          THE COURT:  Good morning, ladies and gentlemen.  How

5  are y'all this morning?  Excellent.  Okay.

6                   **DIRECT EXAMINATION**

7  BY MS. BIRKHOLZ

8  Q    Good morning, Lieutenant.

9  A    Good morning.

10  Q    This morning I would like to talk to you about two discrete

11  incidents that the plaintiffs are making claims regarding.  The

12  first one is May 28th at 13th and Sherman, where plaintiffs

13  Lyman, Blasingame, Epps, and Rothlein have made claims with

14  respect to a gas deployment.  On May 28th, where was your team

15  located?

16  A    We were -- we started all over.  That was the actual first

17  night.  So, we moved around quite a bit and responded to calls

18  from the command post where we needed to go.

19  Q    Okay.  So, how about after 8 o'clock on the first night of

20  the protest, May 28th?  Where was your team located?

21  A    It was right about that time that they called us to some

22  cars that were supposedly trapped by protesters, 14th and

23  Sherman.  So, at that point my team and my team alone rolled up

24  there and attempted to get those cars freed from the protesters.

25  Q    Okay.  So, I'd like to turn to Exhibit 448, which has been

20-cv-1878-RBJ     THOMAS PINE - Direct     03-22-2022

1   admitted.  And I'd like to kind of provide an overview of what

2   was happening through the picture of the CAD report.  All right.

3   And we're going to scroll to around, I don't know, shortly

4   before 8:00 that day.  And we have highlighted some activity

5   that appears to relate to the 14th and Sherman location.  Okay.

6   If you could kind of review what's highlighted here and tell us

7   what was going on at this location.

8           Can we look in the 1900?  Okay.  So, this actually is

9   not the highlighted version, but can you look through this CAD

10  shortly before the 8 o'clock hour and tell me generally, point

11  out some areas where 14th and Sherman is mentioned and what was

12  happening there.

13  A   Forgive me.  I'm reading slowly.

14  Q   No worries.  And if you need us to switch to the next page,

15  just let us know.

16  A   I mean, the summary is it was very chaotic because there

17  was radio traffic coming in from at that time District 6 station

18  was also being surrounded, but there's obviously a car that's

19  either abandoned or surrounded at 14th and Lincoln.  An officer

20  called that out and didn't know what was going on.  So, what I

21  remember is then after that, the command post called us to get

22  there and try to rescue any people that were trapped.

23  Q   Okay.  Let's go ahead and switch to Exhibit 525, which is

24  the Air One that has been admitted already through another

25  witness, and we are going to look to timestamp 23:25.  Apologies

20-cv-1878-RBJ   THOMAS PINE - Direct   03-22-2022

1   for the delay.  Here we go.  All right.  And we're going to skip

2   ahead to 23 minutes and 25 seconds on the bottom bar.  All

3   right.  And if you could, watch as we proceed, and then I'm

4   going to ask you a few questions about what was happening.

5   A    Okay.

6        (A video was played.)

7   Q    Okay.  And let's pause the video right there.  What are we

8   looking at right here?

9   A    Okay.  So, that first police car that you could see with

10  the lights going on is the actual car that me and my team were

11  in that night.

12  Q    Can you circle it, what you're referring to.  Okay.

13  A    So, that is our -- we call it an RDV, a rapid deployment

14  vehicle.  So, initially, in response to that call of the

15  motorist trapped, we came in there alone, just my team, which is

16  about nine guys and myself, tried to get those people -- or get

17  to some cars that at that time were basically right in here

18  where this car is.

19        We got off the RDV, started moving towards them.  As we

20  moved through the crowd, we were attacked.  People were swinging

21  signs at us.  There were some punches thrown.  We did end up

22  taking three people into custody.  As we walked them back to our

23  car, we called for cover, because the crowd was very hostile.

24  And that -- at that point, I believe it was District 1, District

25  2, and District 5 responded with their field force units.

20-cv-1878-RBJ     THOMAS PINE - Direct     03-22-2022

1          And they -- at this point in this picture, as you can

2   see there's kind of a delineation between where the cars are and

3   where the crowd is.  They formed a line which crossed 14th from

4   north to south, and then they also lined up along the curb line

5   to the state capitol, because there was still a lot of people in

6   the crowd which you can't see because of the trees, and that

7   just kept them from getting into the police cars.  Additionally,

8   those three prisoners were now in those police cars.

9   Q    Okay.  And right up here, what time is this at?

10  A    So, that's at 8:45 p.m.

11  Q    Okay.  And those three people that were arrested, what were

12  they arrested for?

13  A    Interfering with a lawful order, and one was arrested for

14  assault.

15  Q    And were you able to ever reach those cars?

16  A    No.

17  Q    Now, I'm going to play just a little bit longer, through

18  maybe the next minute or so, just to get a better idea of what's

19  going on on the radio at this time.

20       (A video was played.)

21  Q    Okay.  Now, as we see, there's people walking down here as

22  well; correct?

23  A    Correct.

24  Q    And did you hear Commander Phelan on the radio say, if you

25  need to deploy chemical agent, go ahead?

20-cv-1878-RBJ    THOMAS PINE - Direct    03-22-2022

1   A    Yes.

2   Q    For what reason was chemical agent appropriate in this

3   circumstance?

4   A    Simply because we had a crowd that was unlawfully on that

5   street.  They were -- they wouldn't let us, and assaulted us

6   when we tried to get to some cars.  And Lieutenant Williams and

7   I had discussed -- he was another lieutenant on the scene that

8   night, and we declared it an unlawful assembly.

9   Q    Okay.  What was happening on this street we saw as the

10  picture panned around?

11  A    I'm sorry.  I see some cars turning around that were

12  obviously trying to get there, and I also saw the cars going the

13  wrong way on 14th trying to get out of there.

14  Q    Okay.  So, pursuant to Denver's policy, the deployment of

15  chemical munitions was appropriate at this location, just to be

16  crystal clear, on what basis?

17  A    On the basis it was an unlawful assembly.  And as the

18  incident moved on, we were actually under attack by bottles and

19  rocks.

20  Q    So, at this point, though, when the decision was made, it

21  is as a result of the street being blocked?

22  A    Correct.

23  Q    Okay.  So, you mentioned -- what was done next?  We can

24  take this exhibit down.

25  A    So, at that point, the officers on the front lines, who are

20-cv-1878-RBJ   THOMAS PINE - Direct   03-22-2022

1   patrol officers, they're dressed like I am today, they had their

2   helmets on, but in preparation for the potential of chemical

3   munitions, we actually started a line support masking, which

4   means -- and it's a kind of lengthy process, especially with new

5   officers.  They have to get back.  One will stand behind another

6   on the line, drop down to the knee, put their gas mask on and

7   stand back up, and then they switch.

8           So, you can hear me on the radio there, I clearly

9   already had my mask on.  So, it was a lengthy process.

10  Lieutenant Williams, while I was kind of walking the line making

11  sure the guys were getting masked up and they were doing it

12  right, he started giving announcements over the PA from our car,

13  which was again that one that was in front, which is a

14  microphone in the car.  So, he was the one giving announcements,

15  told the crowd it was an unlawful assembly, they needed to

16  disperse either eastbound or southbound.

17  Q   Okay.  So, let's break that down a little, but first, with

18  respect to when the decision was made to deploy at this

19  location, to when the, you know, munitions were actually

20  deployed, how long had passed?

21  A   I honestly don't remember, but I would guess around 15

22  minutes.

23  Q   Okay.  Now, let's talk first about the dispersal order.

24  And we've already discussed dispersal orders throughout the

25  course of this trial, so I won't ask you what a dispersal order

20-cv-1878-RBJ    THOMAS PINE - Direct    03-22-2022

1   is, but who gave the orders to disperse at this location?

2   A    Lieutenant JD Williams.

3   Q    And how was that communicated?

4   A    He reads a card which is issued to all command officers

5   that has the exact verbiage that the department wants us to use,

6   and he did that over the PA again.

7   Q    Do you know, is that the same language contained in the

8   operations plan for the George Floyd response?

9   A    Yes.

10  Q    Okay.  How many times did JD Williams, Lieutenant Williams

11  announce this?

12  A    Three times.

13  Q    And how much time passed between each announcement?

14  A    I guess about three to four to five minutes.

15  Q    Okay.  And why -- strike that.  Did anyone go to the back

16  of the crowd to see if the crowd could hear the announcement

17  being made?

18  A    No.

19  Q    Why not?

20  A    It would have been unsafe.

21  Q    Why?

22  A    Based on the activity of the crowd earlier when we moved

23  into them and we were attacked, I was not willing to send any

24  other officers in to do that.

25  Q    Okay.  Now, let's talk about the process of masking up for

20-cv-1878-RBJ    THOMAS PINE - Direct    03-22-2022

1   those on the front line.  Was that effort to mask up hidden from

2   the individuals who were in that location?

3   A    No.  Not at all.  They were right on the front line.

4   Q    Would it have been apparent to those members of the crowd

5   that you were going to deploy?

6           MS. WANG:  Objection.  Foundation.  Calls for

7   speculation.

8           THE COURT:  All right.  Sustained to that question.

9   Q.    (By Ms. Birkholz) Okay.  What did the crowd do in

10  response to you masking up?

11  A    Nothing that I saw.  Their behavior did not change.

12  Q    Okay.  Now, you mentioned at a certain point the crowd

13  began throwing objects?

14  A    Yes.

15  Q    Tell us about that.

16  A    They -- I heard a lot of bottles.  I don't know what was in

17  them.  And then there was some rocks, which again, I heard.  And

18  then finally, I was struck in the face with a bottle.

19  Q    Okay.  You mentioned hearing bottles being thrown.  Were

20  they glass bottles or plastic?

21  A    No.  Plastic.

22  Q    Okay.  Now, prior to the point where objects were thrown by

23  the crowd, had the decision to deploy already been made?

24  A    We had been authorized to do it, but on scene, JD and I

25  were still hoping that they would listen to our commands.  So,

20-cv-1878-RBJ    THOMAS PINE - Direct    03-22-2022

1   no, we did not decide to deploy until that started.

2   Q    Okay.  Now, we've seen video of this, and I'm about to show

3   you a little bit of video as well.  But at the time that the

4   deployment is made, the crowd looks largely peaceful.  Why, if

5   it looks that way on video, was the -- was the gas and smoke

6   deployed?

7   A    Because it was not completely peaceful.  We could not

8   differentiate between who was throwing stuff and who was not

9   throwing stuff.  And there was enough stuff coming in, we had

10  made announcements and declared they needed to move.  We gave

11  them directions to move, and they did not do so.

12  Q    What was the course of the deployment at this location?

13  A    So, I talked to my guys, the SWAT officers that were behind

14  the line -- no.  Actually on the front line, and told them that

15  they were going to throw smoke first.  And then if that did not

16  work, then we would escalate and throw chemical munitions.

17  Q    Okay.  So, let's now turn to Exhibit 9, which has been

18  admitted into evidence, and go to 9:10.

19         THE COURTROOM DEPUTY:  I have some of 9 in.  9g, f,

20  and d, I believe.

21         MS. BIRKHOLZ:  I don't know what plaintiffs' segments

22  are.  So, just Exhibit 9.

23         MS. WANG:  No objection.

24         THE COURT:  All right.  And the rest of 9 will be

25  admitted.

20-cv-1878-RBJ    THOMAS PINE - Direct    03-22-2022

1      MS. BIRKHOLZ:  Thank you.  All right.

2  Q.    (By Ms. Birkholz) We're going to go to 9:10 p.m. on the

3  clock.  And we're going to watch this, and I want you to kind of

4  describe, because there's no sound on this video, what is

5  happening at this location, and as we proceed through.

6      (A video was played.)

7  A    So, at this point it looks like we've already masked up.

8  We have checked and made sure all of the officers on the front

9  line are masked up, and we're just kind of standing by, getting

10  ready to deploy.

11  Q    No.  This is the wrong one.  This is 63.  Or this is -- we

12  are -- this is 29.  Let's just -- apologies.  All right.  So,

13  we're going to go to 9:10, and again, go through the same

14  exercise.  This is admitted as well, I believe.

15      (A video was played.)

16  Q    Okay.  This is the correct version of Exhibit --

17  A    Okay.

18  Q    -- 9.  So, again, if you would tell us what's going on

19  here.

20  A    So, I can see, and you probably just saw it, but there's me

21  right there.  And I just pointed to where the bottle had come

22  from that hit me in the face.  And I instructed that officer

23  right next to me to throw a smoke.  He was ready to throw a

24  smoke.

25  Q    Okay.  And can you circle the smoke canister that was

20-cv-1878-RBJ    THOMAS PINE - Direct    03-22-2022

1    deployed.

2    A    Well, I can't see where it is now, but it's right in here.

3    Q    Okay.  And how many smoke canisters were deployed?

4    A    Just one that I remember.

5    Q    Okay.  And why, again, did you deploy -- or did you point

6    to it to be deployed at the location in which it was deployed

7    at?

8    A    Because I saw out of my -- I saw the bottle coming from

9    that exact location.

10   Q    Okay.  Now, as a member of the SWAT team who deploys these

11   munitions, have you ever had the opportunity to be exposed to

12   smoke without a mask on?

13   A    Yes.

14   Q    Tell us about that experience.

15   A    Depending on how close you are, it's essentially like

16   walking through a barbecue kind of thing when it's really smoky.

17   It's irritating, but it's not -- not definitely on the same

18   level as a chemical munition.

19   Q    Okay.  We've heard about CS canisters making you kind of

20   snot up in your membranes, you know --

21   A    Yes.

22   Q    -- weep.  Does that happen with smoke?

23   A    No.  Not with me.

24   Q    Okay.  And how long does that sensation, if you breathe in

25   some of the smoke, last?

20-cv-1878-RBJ    THOMAS PINE - Direct    03-22-2022

1   A    Minimally.  You know, it may take a couple seconds when you

2   get clear of it to get clear of it and breathe in some fresh air

3   and I'm fine.

4   Q    Okay.  Now, outside of this immediate cloud, which I am

5   circling, in your experience, can you -- can you smell the smoke

6   outside of that cloud?

7   A    You can smell it outside the cloud, but I don't believe it

8   would affect you at all.

9   Q    Okay.  And how quickly does smoke dissipate?

10  A    A lot of that depends on the wind and the location you

11  throw it, but within 30 seconds, probably.

12  Q    Okay.  After the smoke canister -- and we're going to play

13  the video a bit longer.  I am going to ask you if you can tell

14  us if you see, as the crowd is clearing out, when the next

15  canister of CS was deployed.  So, we will push play.

16       (A video was played.)

17  Q    What happened right there?

18  A    They threw the smoke back to us, it looked like.

19  Q    Okay.

20  A    And there's some PepperBalls that are being shot at the

21  ground right on the front line there on 14th.

22  Q    At this point in time, had the gas canister been deployed?

23  A    I don't think so.  I don't know.  I don't see any evidence

24  of that, unless it was this stuff down at the very bottom.

25  Q    Okay.  All right.  And we can stop there.  All right.  Do

20-cv-1878-RBJ    THOMAS PINE - Direct    03-22-2022

1  you recall specifically whether gas was deployed at this

2  location?

3  A    Yes.  I believe it was.

4  Q    Okay.  Was the crowd -- you can take this down.  Had the

5  crowd cleared out mostly by the time --

6    (Simultaneous discussion interrupted by the court reporter.)

7  Q    Had the crowd mostly cleared out by the time the gas was

8  deployed?

9  A    Mostly, yes.

10  Q    Okay.  And for what reason was the gas deployed?

11  A    There was pockets, especially -- and I can't be 100 percent

12  positive, but I believe they were on the capitol grounds that

13  were still hostile and were not dispersing.

14          MS. BIRKHOLZ:  Okay.  I'd like to now turn to

15  Exhibit 7, which I believe has already been admitted into

16  evidence?  I'm not sure if in full or in part.

17          THE COURTROOM DEPUTY:  In full.

18          MS. BIRKHOLZ:  Okay.  Great.

19  Q.    (By Ms. Birkholz) So, we're going to go to Exhibit 7,

20  which is another view of what we just looked at.  All right.

21  And I'm going to represent to you that again, the plaintiffs who

22  are making claims at this location are plaintiffs Rothlein,

23  Blasingame, Lyman, and Epps.  So, is this the picture of what we

24  just looked at, but from a different angle?

25  A    Yes.

Kevin P. Carlin, RMR, CRR

20-cv-1878-RBJ    THOMAS PINE - Direct    03-22-2022

1   Q     Can you point out where you are standing.

2   A     I would have been back somewhere in this area.

3   Q     Okay.  At that location, would the smoke have had any

4   effect on you?

5   A     No.

6   Q     Okay.  So, I'd like to go just five nanoseconds and pause

7   it at 9:10:15.  Okay.  So, now, we see the smoke -- can you

8   circle the smoke canister?

9   A     Yeah.  You can see the cloud right back in there.

10  Q     Okay.  Now, based upon your familiarity with the capitol

11  grounds and how these munitions act, if people were standing in

12  this area, would those people be impacted by the effect of that

13  smoke canister?

14  A     No.

15  Q     Okay.  Now we're going to push play.

16        (A video was played.)

17  Q     Okay.  And if the folks that are running around here, do

18  you believe that those folks would have had exposure to that

19  smoke?

20  A     No.

21  Q     Okay.  All right.  We can take that down.  All right.  I'd

22  next like to move on to one other incident, which was --

23  involves the plaintiff Mr. -- or Dr. Smith on May 30th at

24  4:00 p.m., near the District 6 station.  Do you recall being

25  present at that location on May 30th around 3:30 p.m.?

20-cv-1878-RBJ     THOMAS PINE - Direct     03-22-2022

1    A    Yes.

2             MS. BIRKHOLZ:  Okay.  I'd like to move to admit

3    Exhibit 510, which are Lieutenant Pine's statements.

4             MS. WANG:  Objection.  Hearsay.  It's not -- it's not

5    hearsay when we offer it, but it is hearsay when they offer his

6    own statements.

7             THE COURT:  The objection is overruled.  It's

8    admitted, 510.

9    Q.    (By Ms. Birkholz) Okay.  And I'd like to turn to Denver

10   3420.  Okay.  And we will enlarge this second paragraph here.

11   A    Can you tell I need my readers?

12   Q    We're going to enlarge it for you.  I promise.  So, if you

13   would, give us a rundown of -- I believe I might have the wrong

14   one that we're looking at.  Nope.  All right.  If you could,

15   give us a rundown of what was happening here, based upon your

16   statement.

17   A    So, essentially, we were called there because the crowd had

18   moved towards District 6, and we obviously responded there

19   because they were worried that they were going to break into the

20   station, break into the parking lot, whatnot.

21            So, we got there.  We did hold the line, which was

22   initially back towards closer to 16th.  District 6 is between

23   15th and 16th on Washington Street, and that's where we were.

24   We were a little further north.  At some point, people started

25   climbing the fences.  We were authorized to get them moved off

20-cv-1878-RBJ    THOMAS PINE - Direct    03-22-2022

1    those fences, so we pushed them initially down to the corner of

2    the building so they were not able to access the fence.  And

3    there's a brick building that kind of faces it.

4         So, we stood there for a little bit, and then rocks

5    started flying.  I personally was standing on the curb line

6    talking to one of my sergeants, and I caught out the corner of

7    my eye a rock, and it hit me right here, and it actually broke

8    my helmet, broke a screw in my helmet.  And being old, I slipped

9    and fell down to the ground.  The crowd cheered, and when I was

10   getting up, they had started dispersing them with chemical

11   agent.

12   Q    Okay.  Now, the helmet that was cracked as a result of the

13   rock being thrown at your head, are those the ballistic helmets

14   that other officers have perhaps discussed during this trial?

15   A    Yes.

16   Q    Now, were munitions utilized at all before objects

17   became -- were thrown at the police line?

18   A    No.

19   Q    What is Denver's policy with respect to the use of

20   munitions at that time and location given the circumstances you

21   just described for us?

22   A    Given the circumstances, based on all the officers seeing

23   me get hit in the head and go down, it was exigency.  It was

24   pure and simple that it was dangerous for us to be there, and it

25   was dangerous for us to let that crowd stay there and keep

20-cv-1878-RBJ    THOMAS PINE - Direct    03-22-2022

1   throwing stuff at us.

2   Q    And the jury has seen snips of video at this location, but

3   how long do you recall the protesters allowed to be there before

4   the crowd was dispersed due to the agitators in the crowd

5   throwing things?

6   A    As it says in my statement, it was probably a half an hour

7   before we actually moved anybody, and then once we moved them

8   down to the end of the building, I would say it's another five

9   minutes.

10  Q    All right.  Thank you.  So, we will take this down.  Now,

11  to kind of wrap up with you, Lieutenant, you've described the

12  scene for us as, you know, including hostile, or agitators.

13  Were the agitators in the crowd intermingling themselves with

14  the peaceful protesters?

15  A    Yes.

16  Q    Was it possible for you to separate the aggressive -- the

17  aggressors in the crowd from the peaceful individuals?

18  A    No.

19  Q    Why not?

20  A    They were very well hidden.  It was a very large crowd, and

21  it's easy for them to disappear in that crowd.

22  Q    At the two locations we have discussed, was sending

23  officers into, you know, those crowds to make arrests an option?

24  A    No, it was not.

25  Q    Okay.  And based upon your 30 years in law enforcement,

20-cv-1878-RBJ     THOMAS PINE - Direct     03-22-2022

1   what if any concerns did you have if your team failed to take

2   action to address the agitators in the crowd?

3   A    I didn't -- this crowd was not a normal crowd.  They were

4   violent.  They were -- they had already demonstrated that they

5   were breaking windows.  I had no idea what they'd do if we just

6   left them alone, but I mean, our job is to protect, you know,

7   the people that live in that area who don't want their cars

8   getting broken into, broken windows, none of that.  We had to

9   protect the city.

10  Q    Okay.  Would it have been appropriate in your opinion for

11  DPD to just sit this one out, let people do what they wanted?

12  A    No.  Absolutely not.

13  Q    Why not?

14  A    Again, if we let them do what they wanted to do with no

15  control, they were going to do unknown amounts of damage, loot

16  whatever they wanted to loot.  I can't predict exactly what

17  happened -- if we just stood down, you know, and eventually

18  they're dealing with streets.  You're going to have traffic

19  issues where people are, one, getting annoyed by not getting

20  traffic, but two, threatened and hitting protesters because

21  they're in the streets.

22  Q    Based upon your personal observations regarding the

23  agitators in the crowd, what were they trying to accomplish, in

24  your opinion?

25  A    Hurt officers.

20-cv-1878-RBJ   THOMAS PINE - Direct   03-22-2022

1   Q    Now, over the first few days, how would you describe the

2   crowd and the events at the George Floyd protests?

3   A    It was nothing I had ever seen before.  We -- I mean, the

4   first night before we were assigned to the Bearcat, which is the

5   armored vehicle, they put us back in our regular SWAT police

6   cars, which are SUVs.  I was merely driving, trying to get down

7   Lincoln at one point, and a brick took out a back window of

8   mine.

9        Once we got anywhere where we were on those RDVs or the

10  ATV -- or the Bearcat, everywhere we stopped, everywhere we

11  slowed down, we got hit with rocks or bottles.  And I'm not

12  kidding.  Every single time.  Every single intersection, no

13  matter where we were going.  I cannot -- I can't even describe

14  it.  Unless you were there, you can't really understand how it

15  was.

16  Q    Now, at a certain point in time, did the protests continue,

17  but the attitude of the crowd or the behavior of the crowd

18  changed?

19  A    The protests, yeah.  They went on and on.  Now, I will say

20  that during the day, it was generally well-behaved, and there

21  was no -- it wasn't like we deployed munitions on these crowds

22  that were just merely taking the streets and walking and

23  exercising their rights.  But as the sun went down, every night

24  that entire time, it was the same thing.

25  Q    Okay.  And did that -- did that stop at a certain point?

20-cv-1878-RBJ    THOMAS PINE - Direct    03-22-2022

1    A    Only after, you know, the curfew and it got really late,

2    and people just dispersed, I think, naturally.

3    Q    Okay.  What day was it that you observed the protester

4    behavior to change?

5    A    What day?

6    Q    Yeah.  What day?

7    A    Oh, it was from the very first night.

8    Q    When did the calm begin?

9    A    Oh.  The calm?

10   Q    Yes.

11   A    It settled down significantly after there was an order

12   issued, and that would have been, I believe, Saturday.

13   Q    Okay.

14   A    And it became more of a crowd control situation versus a

15   riot situation.

16   Q    Okay.  And do you -- have you formed any personal beliefs

17   as to what contributed to the behavior of protesters changing,

18   why that occurred?

19   A    As a personal belief?  I believe there was communication

20   that we were not allowed to do certain things.  And I think they

21   tried to test us, and when they found out -- with the order, we

22   followed that order, and there was no -- there was no

23   confrontation.  There was no violence, and it settled down.

24          MS. BIRKHOLZ:  No further questions.  Thank you.

25          THE COURT:  All right.  Cross examination?

20-cv-1878-RBJ     THOMAS PINE - Cross     03-22-2022

1                         **CROSS EXAMINATION**

2    BY MS. WANG

3    Q    Let me start with where Ms. Birkholz left off.  You're

4    aware that the 300-plus people who were arrested for violating

5    the curfew, their charges were all dismissed; right?

6    A    Yes.

7    Q    Okay.  And those people were not charged with anything

8    other than violating curfew; right?

9    A    Not that I know of.

10   Q    Okay.  Now, you have no knowledge that any of the 12

11   plaintiffs in this case threw any rocks; right?

12   A    No.

13   Q    That was phrased poorly.  The 12 plaintiffs in this case

14   did not throw any rocks; right?  To your knowledge.

15   A    To my knowledge, no.

16   Q    They didn't throw any -- engage in any violence?

17   A    Not that I know of.

18   Q    They didn't engage in any property destruction?

19   A    Not that I know of.

20   Q    They were not the ones who threw the rocks at you?

21   A    I don't know.

22   Q    You have no information that that's the case; right?

23   A    No.

24   Q    Okay.  You have no indication that they had any weapons?

25   A    No.

Kevin P. Carlin, RMR, CRR

20-cv-1878-RBJ   THOMAS PINE - Cross   03-22-2022

1   Q    And you understand based on your decades of experience as a

2   police officer that in order to use force on an individual, you

3   have to have a reasonable justification to use force with

4   respect to what that individual is doing; right?

5   A    Correct.

6   Q    It's just police work; right?

7   A    Right.

8   Q    Okay.  Now, with respect to Dr. Stanford Smith on May 30th

9   at 4:00 p.m., approximately 4:00 p.m. at District 6 station, you

10  don't know what time Stanford Smith was shot at Colfax and

11  Washington on that day; right?

12          MS. BIRKHOLZ:  Objection, Your Honor.  Misstates the

13  evidence in the case.  He was not shot.

14  Q.   (By Ms. Wang) You don't know what time police used force

15  on Dr. Smith at District 6 on May 30th; right?

16  A    No.

17  Q    You don't know if it was before or after you were hit with

18  a rock; right?

19  A    No.

20  Q    You don't know if there's any connection whatsoever between

21  what Dr. Stanford Smith was doing and the actions that you

22  described; right?

23  A    Not him specifically, no.

24  Q    Okay.  Did Dr. Smith climb a fence, as you indicated some

25  people were doing in your report?

20-cv-1878-RBJ     THOMAS PINE - Cross     03-22-2022

1    A     I do not know who Dr. Smith is, so I do not know.

2    Q     No effort was made by you or any of your officers to

3    isolate any of the people who may have been committing violent

4    acts at that time; right?

5    A     No.

6    Q     Okay.  And likewise, with respect to the events on May 28th

7    at 14th and Sherman, the plaintiffs who were gassed there, which

8    include Elle Taylor, Amanda Blasingame, Maya Rothlein, Elisabeth

9    Epps, you have no idea if they were engaging in any

10   object-throwing at that time; right?

11   A     Correct.

12   Q     Okay.  You would agree that blocking a street is not a

13   reason to gas people; right?

14   A     Merely blocking a street, no.

15   Q     Okay.  And you don't know if what -- any of the plaintiffs

16   who were at 14th and Sherman on May 28th were just blocking the

17   street, or if they were even in the street; right?

18   A     Correct.

19   Q     Okay.  Now, you would agree that body-worn cameras are

20   important to officer accountability; right?

21   A     Yes.

22   Q     They are objective evidence of what occurred between a

23   citizen and a police officer; right?

24   A     Yes.

25   Q     They may serve to show that an officer did not engage in

20-cv-1878-RBJ   THOMAS PINE - Cross   03-22-2022

1   some kind of misconduct; right?

2   A    Correct.

3   Q    And they may serve conversely to show that an officer did

4   engage in some inappropriate use of force or misconduct; right?

5   A    Absolutely.

6   Q    Okay.  And under DPD policy at the time of the protests,

7   you testified yesterday that Metro SWAT officers were not

8   required to activate their BWCs; right?

9   A    Not during tactical operations.

10  Q    Right.  And the protests were considered a tactical

11  operation; right?

12  A    Yes.

13  Q    Even though during a protest, you use force on civilians,

14  and your officers did use force on civilians during these

15  protests; right?

16  A    Yes.

17  Q    And you didn't want people to know what you were doing;

18  right?  Which is why you didn't have your BWC on; right?

19  A    That's not the purpose of it, no.

20  Q    Okay.  So, if you testified yesterday that the rationale

21  for not having your BWC during tactical operations such as

22  protests is, quote, these are dangerous situations that may be

23  repeated, and we don't want anyone or anyone that we might face

24  in the future on something like this knowing what we're doing or

25  how we're doing it?

20-cv-1878-RBJ    THOMAS PINE - Cross    03-22-2022

1    A     Right.

2    Q     That's true testimony; right?

3    A     Correct.  I can't speak to the motivation behind it.

4    Q     None of your officers had any problems attaching their BWC

5    to the uniforms; right?

6    A     No.

7    Q     We don't have any BWC from any of your officers from the

8    protests, right, from the Metro SWAT officers?

9    A     I didn't get to review, but I don't think so, no.

10   Q     Okay.  And that was by design, per DPD policy?

11   A     Correct.

12   Q     Okay.  DPD policy also did not require officers to complete

13   use of force statements for uses of their less-lethal weapons on

14   protesters during the protest; right?

15   A     That's correct.

16   Q     And your officers understood that at the time of the

17   protests?

18   A     Yes.

19   Q     Okay.  And this was consistent with your practice during

20   many, many other protests that you had attended in Denver;

21   right?

22   A     Yes.

23   Q     All the actions that you took and observed by other DPD

24   officers during the first six days of the protest were

25   consistent with policy, practice, and training of the DPD;

20-cv-1878-RBJ    THOMAS PINE - Cross    03-22-2022

1    right?

2    A    Yes.

3    Q    And you didn't see any actions by any of your officers in

4    Metro SWAT or any other DPD officers that should subject them to

5    discipline of any kind, in your view?

6    A    No.

7    Q    Okay.  And this included actions of your officers on

8    May 30th at the intersection of Lincoln and Colfax; right?

9    A    I'm sorry.  I couldn't hear that very well.

10   Q    You were present on May 30th before curfew from about 5:30

11   or 6 o'clock to 8:00 p.m. on May 30th.  You were present at the

12   intersection of Lincoln and Colfax; correct?

13   A    On May 30th --

14   Q    Saturday.

15   A    I could have -- I could have been.  I was there many times.

16   I don't specifically remember that, but it sounds right, and I

17   was there many times.

18   Q    Okay.  Were you generally with Lieutenant Canino's team

19   during the protests?

20   A    I would say about 70 percent of the time, yes.

21   Q    Okay.  During various occasions on the first six days of

22   the protests when you or members of your team threw canisters of

23   chemical munitions, that was authorized by Commander Phelan in

24   the command post; right?

25   A    Correct.

20-cv-1878-RBJ    THOMAS PINE - Cross    03-22-2022

1    Q     You didn't read the OIM report, did you?

2    A     No.

3    Q     Okay.  Now, let's talk about 14th and Sherman briefly.

4    Your testimony is that there were cars that were trapped on 14th

5    Street, and you could not rescue them until after the crowd was

6    gassed at 9:10; is that right?

7    A     We never rescued them.  In fact, I saw in the video those

8    cars turning the wrong way on 14th and getting out of there.

9    Q     They were on 14th; right?

10   A     Yes.

11              MS. WANG:  Okay.  Let's show Exhibit 6.

12              THE COURT:  Is there an objection to Exhibit 6?

13              MS. BIRKHOLZ:  No objection, Your Honor.

14              THE COURT:  It's admitted.

15   Q.    (By Ms. Wang) We agree that the gassing was at 9:10.

16   Those were the videos that Ms. Birkholz showed you; right?

17   A     Correct.

18              MS. BIRKHOLZ:  Objection, Your Honor.  Misstates his

19   testimony.  It's not gas.  It's smoke.

20              THE COURT:  Okay.  Why don't you just ask him what it

21   was.

22   Q.    (By Ms. Wang) You threw smoke and then gas; right?

23   A     Yes.

24   Q     Okay.  So, that half an hour before you gassed the

25   protesters at 9:10, let's take a look at what happened.

20-cv-1878-RBJ   THOMAS PINE - Cross   03-22-2022

1   Exhibit 6.  These are your officers right there, rolling up at

2   8:17; right?

3   A    It would appear so, yes.

4   Q    This is 8:17 p.m. on May 28th, 2020; right?

5   A    Yes.

6   Q    Okay.  And we've got a tow truck here.  We've got a car --

7   a gray car here and a blue car here; right?

8   A    Yes.

9   Q    Those are the trapped cars?  Are those the trapped cars?

10  A    No.  That's not what I remember.  I remember cars facing us

11  with headlights on us.

12  Q    Okay.  Let's take a look at Exhibit 7.  This one shows the

13  crowd at 9:09.  We can go ahead and play it.  There's no cars

14  here; right?

15  A    Correct.

16  Q    Okay.  So, there's not -- this is the minute or so before

17  the crowd is dispersed with smoke and then gas; right?

18  A    Correct.

19  Q    There's no cars anywhere in this --

20  A    There's one on the left here.

21  Q    This?  That's not on 14th; right?

22  A    No.  It's on Sherman.

23  Q    And if you testified in your deposition under oath that the

24  trapped cars were on 14th, that's what you would -- that's true;

25  right?

20-cv-1878-RBJ    THOMAS PINE - Cross    03-22-2022

1    A    That's the cars we were sent to get.

2    Q    Okay.  So, let's watch the moment of the gassing.  You can

3    fast-forward it a little bit.

4         (A video was played.)

5    Q    There's no cars here; right?

6    A    Nope.

7    Q    Is that right?

8    A    That's correct.

9    Q    Okay.  Now, let's show Exhibit 7.  This is at 8:21 p.m.

10   And your officers are here; right?

11   A    Yes.

12   Q    Are you in this crowd too?

13   A    Yes.

14   Q    Okay.  We've got a car here, a car here, the tow truck

15   here; right?  And two cars back here; right?

16   A    Right.

17   Q    Okay.  Go ahead and play it.

18        (A video was played.)

19   Q    Is this the crowd that you said was throwing things at you

20   and punching you?

21   A    No.  This was after.

22   Q    This was after?  You went into the crowd to arrest the

23   person who you say was assaulting an officer; right?

24   A    No.

25   Q    You did not go into the crowd to arrest a person who was

20-cv-1878-RBJ    THOMAS PINE - Cross    03-22-2022

1   assaulting an officer?

2   A    We went into the crowd to get those people out and were

3   assaulted, including myself.

4   Q    I'm sorry.  You went into the crowd --

5   A    We went into the crowd initially because we saw cars

6   trapped, and we went in there to get the cars free, and then we

7   were assaulted.  I was already in the crowd when that happened.

8   Q    Right.  But you arrested that person; right?

9   A    We arrested three people, yes.

10  Q    Okay.  And you placed those people in a police vehicle?

11  A    Yes.

12  Q    This is a Metro SWAT officer; right?

13  A    Yes.

14  Q    Right here?  They're waving this car through; right?

15  A    Correct.

16  Q    Okay.  Let's take a look at Exhibit 9, clip six.  All

17  right.  So, here, we've got the tow truck again.  It's at 8:34;

18  right?

19  A    Mm-hmm.

20  Q    Is that a yes?

21  A    Yes.

22  Q    And that's a couple minutes after that other car left that

23  you waved through; right?

24  A    Yes.

25  Q    We've got the tow truck.  We've got this blue car.  Go

20-cv-1878-RBJ    THOMAS PINE - Cross    03-22-2022

1    ahead and press play.

2        (A video was played.)

3    Q    Those cars just left, the tow truck and the blue car;

4    right?

5    A    Yes.

6    Q    Okay.  Fast-forward to 8:36.  You can play it a little bit

7    faster.

8        (A video was played.)

9    Q    We've got one more car right here; right?

10   A    Yes.

11   Q    This is about half an hour before the crowd is gassed;

12   right?

13   A    Started with smoke, but yes.

14   Q    That car just left; right?

15   A    Yeah.

16   Q    Okay.  There's no other cars on 14th; right?

17   A    No.

18   Q    Is that correct?

19   A    That is correct.

20   Q    Okay.  And this is your RDV right here?

21   A    Yes.

22   Q    Okay.  Now, Ms. Birkholz asked you some questions about

23   whether or not you visibly put on your gas masks before the

24   smoke and gas were deployed.

25   A    Yes.

20-cv-1878-RBJ    THOMAS PINE - Cross    03-22-2022

1    Q    Okay.  Are you suggesting that if you put on a gas mask,

2    that the protesters have warning that they might be gassed?

3    A    Common sense would say yes.

4    Q    Is that consistent with your training and policy and

5    practice in the DPD?

6    A    There's nothing that says that.  But if you see the police

7    putting gas masks on, I would say it's logical to infer that

8    there might be some gas thrown.

9    Q    Okay.  So, is that sufficient warning in your view?

10   A    No.

11   Q    Okay.  So, it's neither here nor there, really, whether or

12   not some people might have seen you put on your gas masks?

13   A    I'm not sure what the question is.

14   Q    It's not sufficient warning that you put on your gas masks;

15   right?  That's not sufficient warning to know that they might be

16   gassed?

17   A    Yes.  That was not the only warning we gave.

18   Q    Okay.  And you made no efforts to make sure that the crowd

19   could hear; right?

20   A    No.

21   Q    Now, your officers are trained to do barricades; right?

22   A    Yes.

23   Q    Hostage situations?

24   A    Yes.

25   Q    Active shooters?

20-cv-1878-RBJ    THOMAS PINE - Cross    03-22-2022

1   A    Yes.

2   Q    There is intense physical fitness requirements to be a

3   Metro SWAT officer; right?

4   A    Yes.

5   Q    And you bust drug houses; right?

6   A    Yes.

7   Q    Capture high-risk fugitives; right?

8   A    Yes.

9   Q    Okay.  And so your officers are also trained to deal with

10  people who are actually shooting at them; right?

11  A    Correct.

12  Q    Okay.  And your testimony is that your officers, your two

13  sergeants, yourself, and the 11 trained Metro SWAT officers

14  could not deal with this crowd that we saw on the video at 14th

15  and Sherman without gassing them; right?

16  A    Correct.  But our numbers were not that -- we didn't have

17  everybody there.  We had guys on vacation.  So, I don't remember

18  exactly how many of us there were, but there was not 11.

19  Q    All right.  So, the still that we saw earlier at 8:17 of

20  those ten officers rolling up --

21  A    Uh-huh.

22  Q    -- that wasn't everybody?

23  A    That would have been myself and the sergeants included.

24          MS. WANG:  Okay.  No further questions.

25          THE COURT:  Redirect?

20-cv-1878-RBJ    THOMAS PINE - Redirect    03-22-2022

<b>REDIRECT EXAMINATION</b>

BY MS. BIRKHOLZ

Q    Lieutenant Pine, with respect to the last question that Ms. Wang just asked you, how did the number of SWAT members versus the number of the crowd compare?

A    We would have been vastly outnumbered.  There was hundreds in the crowd and nine of us.

Q    Okay.  Now, I'd like to go back to 14th and Sherman, and I'd like to pull the HALO video up again, which was 525.  And I'd like to go to 23:40 on the bottom bar.  Now --

     (An audio recording was played.)

Q    Apologies.  Air One.  Yes.  And we're going to go back to 23:40, and we will just pause it.  Now, we talked about this when I first spoke to you.  Okay.  And we can just play it for a few seconds.

     (A video was played.)

Q    Okay.  We can go ahead and pause there.  So, on direct, when I was speaking to you, you mentioned that cars were trapped in this location; is that correct?

A    Yes.

Q    And you see people walking down the street this way; right?

A    Yes.

Q    And you also see this crowd?

A    Yes.

Q    Okay.  Great.  We can take that down.  Now, when we spoke

20-cv-1878-RBJ   THOMAS PINE - Redirect   03-22-2022

1   on direct, you know, we discussed the totality of circumstances

2   for the deployment of the munitions that were used at those two

3   locations.  And we discussed the reasons why those munitions

4   were used.  Even though some of the folks that were in the

5   crowds at these locations, you know, they weren't agitators, why

6   is it appropriate under Denver's policy to utilize those

7   munitions?

8   A    Simply because of the numbers.  If they have -- we can't

9   tell who is who in that crowd, and we had declared it an

10  unlawful assembly and made announcements, and they refused to

11  leave.

12  Q    Now, you were asked about whether you knew about any of the

13  plaintiffs specifically.  Do you know what any of the plaintiffs

14  look like?

15  A    I have no idea.

16  Q    Do you know specifically if those plaintiffs were members

17  of the crowds where agitators were present and you needed to use

18  those munitions?

19  A    No, I don't.

20         MS. BIRKHOLZ:  Okay.  No further questions, Your

21  Honor.

22         THE COURT:  Questions from the jurors?  Not this time.

23  Okay.  Thank you, sir.

24         THE WITNESS:  Thank you.

25         THE COURT:  All right.  Who is next?

20-cv-1878-RBJ   ERIC KNUTSON - Direct   03-22-2022

1       MS. HOFFMAN:  Defendants call Sergeant Knutson to the

2   stand.

3       THE COURT:  Good morning.

4       THE WITNESS:  Good morning, Your Honor.

5     (The Witness is Sworn)

6       THE COURT:  Okay.  Thank you.

7                       **DIRECT EXAMINATION**

8   BY MS. HOFFMAN

9   Q   Good morning, Sergeant.  If you could please state your

10  name, spelling your last name for the record.

11  A   My name is Eric Knutson.  Spelling of my last name is

12  K-N-U-T-S-O-N.

13  Q   And you're presently employed by the Denver Police

14  Department?

15  A   Yes, I am.

16  Q   And how long have you worked for the Denver Police

17  Department?

18  A   Coming up on 27 years for the department.

19  Q   How did you decide to become a police officer?

20  A   Well, my -- it was by accident.  1992, I started working

21  for the Denver Sheriff's Department as a way to make a little

22  more money to put myself through school for computer science.  I

23  was there for about a year, and I realized that I think I have,

24  you know, better skills for working with people than I do

25  computers.

20-cv-1878-RBJ    ERIC KNUTSON - Direct    03-22-2022

1          I enjoyed the work of working in the jail at the

2    sheriff's department, but I decided that I wanted to do a little

3    bit more than just work in the jail.  So, I applied at the

4    Denver Police Department, and I was accepted there in 1995.

5    Q    And if you could briefly walk me through your career with

6    the Denver Police Department.

7    A    Briefly, 1995 through training, assigned to a district.  I

8    became a training officer and then a corporal in that same

9    district.  2003, I was promoted to sergeant, moved districts, as

10   we do, and worked as a patrol sergeant for about a year and a

11   half.  And I was asked to take on the role of the training

12   sergeant in that district.  I held that role for about ten

13   years.

14          And then 2013, I was asked to move to the academy and

15   oversee our field training program.  And not briefly, but that

16   program is the program that the officers go through when they

17   complete their six months of field training.  They then -- they

18   then go to the patrol, and they go through this field training

19   program.  So, my job was to oversee that program and keep it

20   standardized for all six districts.  So, that's why I was asked

21   to move to the academy.  I did that in 2013, took on a role of

22   some training at the academy, and that's where I am today.

23   Q    Okay.  So, if I understand correctly, you've been assigned

24   as a sergeant to the academy since 2013?

25   A    Yes, ma'am.

20-cv-1878-RBJ    ERIC KNUTSON - Direct    03-22-2022

1  Q    And one of your duties as a sergeant in the academy is to

2  oversee certain types of recruit training?

3  A    Yes.  One of my -- yes.  I take on a role as a trainer for

4  several different areas, verbal judo, community policing and

5  partnerships, ethics, leadership, and crowd control.

6  Q    And how long have you overseen recruit training in the area

7  of crowd control?

8  A    Since 2013.

9  Q    You also mentioned another one of your duties as a sergeant

10 in the academy is making sure that training is standardized

11 between the different Denver Police Department police districts?

12 A    Yes, ma'am.

13 Q    Can you tell me a little bit more about that.

14 A    So, we want to make sure that all the trainees, all the

15 recruits are getting the same level of training, and that one

16 district is not holding recruits for a higher or lower standard

17 in any area.  My job is also to coordinate if there are any

18 challenges that we see, where a recruit gets through the

19 six-month academy or a pattern of recruits gets through the

20 six-month academy and doesn't have the skills to do the job.

21 There's some kind of training miss at the academy.

22       So, I act as that liaison for the program and within

23 the six districts.  I oversee kind of the daily operations of

24 where those recruits are going, and if there are training issues

25 or learning issues, what we can do to work together to address

20-cv-1878-RBJ    ERIC KNUTSON - Direct    03-22-2022

1   that.

2   Q    Thank you.  So, at this point, I'd like to really focus in

3   on crowd control training that you oversee for recruits.

4   A    Okay.

5   Q    If you could tell me about what training the Denver Police

6   Department gave to recruit officers at the academy in the area

7   of crowd management prior to the George Floyd protests.

8   A    Well, it's a difficult question to answer, because the POST

9   requirements -- POST is the Colorado Police Officer

10  Standardization and Training bureau, if you will, or agency.

11  Their job is to make sure that every police officer gets a

12  certain amount of training.

13        They have to categorize training in different areas,

14  and say you have to give a recruit officer this much training in

15  this area.  And so they require, at least at the time, four

16  hours of training in crowd control.

17        The reason that's a hard question to answer is because

18  all of the training that they receive over six months, very

19  nearly all of that training relates to crowd control.  There's

20  use of force training.  There's understanding of laws.  There's

21  understanding of our constitutional amendments.  There's

22  communication.  There's the treatment of the public.  All of

23  those things go into that training.  And so specifically for

24  crowd control, four hours are required.  I was providing five

25  hours of in-classroom training and an additional hour of

Kevin P. Carlin, RMR, CRR

20-cv-1878-RBJ    ERIC KNUTSON - Direct    03-22-2022

1   equipment issue and familiarization.  So, six hours total.

2   Q    Okay.  And you mentioned an organization by the name of

3   POST, and that POST requires, I believe you testified four hours

4   in the area of crowd management for recruits?

5   A    Yes.

6   Q    Okay.  And what is POST's general role with respect to

7   police departments?

8   A    Again, across the state maintaining and ensuring a minimum

9   level of training for all police officers, and seeing what's

10  needed and raising or lowering training requirements in specific

11  areas to make sure that our peace officers are fully trained and

12  competent to do the job.

13  Q    Understood.  So, all recruits, in order to start working as

14  a police officer for the Denver Police Department, have to enter

15  and complete that academy; correct?

16  A    Yes.

17  Q    And the academy is how long?

18  A    Our academy is six months long.  It's roughly about a

19  thousand hours, give or take.  Normally give a thousand hours or

20  more of training for the recruit officers.  POST requires about

21  700 right now, and so we provide more than that.

22  Q    And in terms of timing of that six-month academy, when is

23  the crowd management class taught?

24  A    It's taught as close to the end as we can get it.  Again,

25  this idea that this crowd control encapsulates so much of their

20-cv-1878-RBJ    ERIC KNUTSON - Direct    03-22-2022

1    learning throughout the six-month period, we want to grab what

2    they've learned, put it together, and one, assure them that what

3    they've learned all the way up until now is what is needed in

4    order to handle crowd control.

5           This isn't something new that they have to worry about,

6    that, you know, forget everything you've learned up until now,

7    this is crowd control.  Everything that they've continued to

8    learn in those six months is an important piece of what they're

9    going to bring to crowd control.  It's kind of necessary in

10   order to be successful in crowd control.

11   Q    And if you could show the witness Exhibit 465, which I

12   believe has already been admitted.  And do you recognize the

13   document on the screen?

14   A    Yes, I do.

15   Q    What is that document?

16   A    This is the introduction page to recruit training and crowd

17   control.  This is our first slide.

18   Q    Okay.  So, I understand that the Denver Police Department

19   essentially does -- understanding that crowd management builds

20   on other concepts, but it does a five-hour course on crowd

21   management specifically.  Why don't you walk me through hour one

22   through hour five of your course on crowd management.

23   A    So, we start with a reintroduction -- not a

24   reintroduction -- a refamiliarization and reminding, I should

25   say, of their -- the constitutional amendments, especially the

20-cv-1878-RBJ     ERIC KNUTSON - Direct     03-22-2022

1    First, Fourth, and 14th amendment.  We talk about the fact that

2    it's just police work that they're going to be doing, nothing to

3    worry about there.

4         We talk about the principles in crowd management.  We

5    talk about different kinds of crowds.  We talk about some crowd

6    psychology very briefly, and then we go into protester or

7    demonstrator tactics.  Back then we called it protester tactics.

8    And preparing them for what they may see in this crowd

9    management or specifically crowd control environment.  And so

10   what they're going to experience along those lines.

11        And then we go into our tactics to address the behavior

12   of the crowd, the tools that we have and what we utilize.  And

13   specifically, what they have to utilize, the recruits, and what

14   they can expect as far as our field force formations and those

15   kind of things.  We then go into those formations, work through

16   those.  We spend some time on batons, and then we walk through

17   some of those scenarios.

18        We have a few videos as well of formations and some

19   protester activities as well, and then we finish off with going

20   outside, working -- and I mentioned the batons already, but

21   working with the batons.  We work with our masks as well,

22   throughout the day, and then finish off with walking through --

23   not walking through, but marching through, first slowly and then

24   at full speed through some formations.

25   Q    And as the jury will see, this document up on the screen

20-cv-1878-RBJ     ERIC KNUTSON - Direct     03-22-2022

1  has both PowerPoints as well as what appears to be some notes at

2  the bottom.  Can you tell the jury what those notes are.

3  A    So, they're just a few notes to remind me of things that I

4  want to touch on on some of these slides.  I've been teaching

5  this so long that I kind of know what I'm going to hit where I'm

6  going to hit it, and how to do so, but over time, change a

7  couple of things up as new information comes in that I want to

8  add to it.  So, those notes are for me.  They're instructor

9  notes.

10  Q    So, are you expanding on some of the ideas and photographs

11  contained in the slides in this PowerPoint?

12  A    Yes.  Our PowerPoint is intended the best way to reach

13  learners.  Adult-based learning is not through just lecture.

14  It's not through putting on -- some of the slides are going to

15  disagree with this.  It's not through putting a whole bunch of

16  slides with a whole bunch of words and just reading verbatim.

17  We don't learn very well that way.

18        It's by either grabbing some attention in some way or

19  putting information up on the slide, but that slide is intended

20  to start discussion and have a discussion back and forth so that

21  the learning can take place that way.

22  Q    Understood.  So, there's a few slides that I'd like to

23  direct your attention to, and I have a couple of follow-up

24  questions for you.  But if you could scroll down to slide five.

25  I think you touched on this with respect to a prior answer, but

20-cv-1878-RBJ    ERIC KNUTSON - Direct    03-22-2022

1   this particular slide is entitled crowd psychological

2   influences.  Do you instruct recruits regarding crowd

3   psychology?

4   A    Yes.

5   Q    Okay.  And what specifically do you -- what do you teach

6   recruits about crowd psychology?

7   A    We teach recruits that they're not there to predict

8   behavior so much, and that they're not psychologists, but we

9   want -- I want the recruits to know that some of what you see a

10  crowd doing is some natural phenomena that occur when people get

11  together in groups for a specific cause.

12       And then also, my main point for this is to let the

13  recruits know that if they see some of these things, that this

14  is an indicator of some possible escalating behavior.  And so to

15  be aware of that if they see that.  If they see -- anonymity

16  occurs in crowd size.  You're going to automatically, especially

17  if it's a tight crowd, you're going to feel anonymous in there.

18       But specifically with the recruits, with the officers,

19  if they see people masking up, that is covering their face so

20  that they can't be identified or anything like that, that's an

21  indicator, this idea of spontaneity, nature of events and those

22  kind of things, as well as opportunity -- might be a little bit

23  off topic, but I don't think people go out and -- really violent

24  occurrences that have happened in the past, for years, they

25  don't go out and say, I'm going to go looting today.

20-cv-1878-RBJ    ERIC KNUTSON - Direct    03-22-2022

1    I think the opportunity is there, and then they find

2  themselves in that position where, you know, the crime of --

3  what we call the crime of opportunity occurs.  I'm not saying

4  that that has anything to do with it, other than I do mention

5  that kind of idea of spontaneity that may take form.

6    Individual behaviors, if they see that escalating

7  individual behaviors.  And then the idea of contagion, meaning

8  these individual behaviors, if there is anonymity and then that

9  spontaneity is happening, and if you see some individual

10 behaviors and there's no response to those individual behaviors,

11 if you are of -- angry or emotive or something along those

12 lines, that may be something where you then decide, well, if

13 that person is doing it, and I feel the same way, there's no

14 response to it, I am going to take place -- take -- I'm going to

15 take action as well.  And so that's that idea of contagion.

16    And all of these things kind of coming together, and we

17 can see a boiling in that escalation.  So, that's what I hit on

18 for psychological influences.  Again, I don't expect our

19 officers or trainees to get into psychological things, just

20 understanding that idea of crowd behavior.

21 Q    And the concepts included in this particular slide, where

22 did you get them from?

23 A    These came from a course called field force operations.

24 It's put on by Center for Disaster Preparedness, and slash

25 Federal Emergency Management Administration.  So, CDP FEMA is

20-cv-1878-RBJ    ERIC KNUTSON - Direct    03-22-2022

1    the organization.  They are in my mind the go-to for actual

2    training specifics and how-tos for crowd management and crowd

3    control.  And so I've been aware of them for many years, and

4    I've worked with them as well.  And so that's where I found

5    this.

6    Q    Thank you.  And if we could scroll down to slide ten.  So,

7    directing you to the tenth slide on this presentation, which is

8    entitled First amendment, and specifically directing you to a

9    sentence in red that reads, recent court decisions tell us that

10   we must adapt to the complexities of any crowd management

11   situation.  Can you tell me what that means, and what you

12   instruct your recruits regarding that language.

13   A    Yeah.  This is -- this is an important slide, where we

14   touch on -- and especially in Denver, this idea of First

15   amendment protection.  We are -- a lot of times, we find

16   ourselves in the crowd management, just managing a crowd, a

17   peaceful crowd, and being able to do that, and the crowd

18   marching or whatever, or if it's just leaving a sporting event,

19   whatever the case is, managing crowds as they move around.

20        When we start to see some minor criminal action, some

21   destruction of property, minor, minor violence of throwing

22   missiles or something along those lines, when we start to see

23   that, or even some spray painting, we see chalk writing, we see

24   those kind of things happening, that we are not going to declare

25   a crowd -- there's not going to be a situation where we

20-cv-1878-RBJ    ERIC KNUTSON - Direct    03-22-2022

1    immediately go into crowd control and start dispersing a crowd.

2              We want our officers to know, that does not occur.  Our

3    job is public safety and protection of First amendment rights,

4    constitutional rights there.  And so what we do is we will

5    attempt to -- and what it says in red there is make our best

6    attempt to address individual criminal behavior and handle that

7    criminal behavior so that the majority of the crowd that we see

8    there who is demonstrating can continue to do that.  We have had

9    much success with that, being able to do that over the years.

10   Q    And that's a concept that I do want to come back to, but

11   I'm going to stick to the slides for now, because I have a

12   couple specific questions with respect to this PowerPoint

13   presentation.  So, I'm going to move on.  If you could scroll

14   down to slide 19.  So, slide 19, entitled types of protesters.

15   Can you tell the jury what's the importance of this slide?

16   A    So, the importance of this slide for the trainees is

17   letting them know of the different kinds of crowds that they're

18   going to see, and actions -- demonstrator actions, if you will.

19   Everything from the people who are out there who want their

20   voice heard and are completely lawful, there's nothing going on,

21   and this idea of crowd management.

22             So, the question there is how do you think we would

23   handle this?  Again, that adult-based learning concept of

24   bringing up discussions, and then making it clear that this is

25   our -- where we are, if they're marching, we're stopping traffic

20-cv-1878-RBJ    ERIC KNUTSON - Direct    03-22-2022

1    for them.  We are not going to be in PPE, personal protective

2    equipment or anything like that.  We are just there.

3           The idea of a professional protester -- and I don't

4    mean professional in the idea of they're getting paid for it or

5    anything like that, but a well-thought-out protest where

6    individuals will use tactics that they know are effective, they

7    will have some organization involved where they know that they

8    will have people that will sit down in areas and do these

9    things, and that they want to be arrested, and that that's part

10   of the message that they want to get out.  And so that idea.

11          Additionally, some of those actions that we see here,

12   this is our idea of crowd intervention, where again, we will go

13   in, we will make the arrests that we need to, continuing to

14   allow the rest of the crowd to peaceably assemble, get its

15   message out, and do that, but there are probably things that we

16   have to address.  A lot of times I also mentioned that we start

17   seeing some locking devices being used in these kind of

18   activities.

19          And then the last one, it says anarchist.  When we were

20   teaching this way back when, and I have never changed that title

21   on there, but it's the idea of a strong emotion and some chaos

22   that's happening, and those kind of things, and not so much --

23   well, even a message is being portrayed, but that message is --

24   tends to be a lot more violent, and therefore that picture there

25   that you see there.  And so -- and I let them know that we have

20-cv-1878-RBJ    ERIC KNUTSON - Direct    03-22-2022

1   to deal with this situation as well, and we have to do so

2   appropriately.

3   Q    And I just want to make sure that I'm understanding the

4   training as you give it.  Are you training recruits that in a

5   potential crowd, they could encounter any one in these three

6   categories, the everyday-citizen category, the professional

7   category, or the anarchist category?

8   A    Yeah.  These are there, yeah.

9   Q    And in teaching recruits about these different types of

10  protesters, do you train them on how to potentially recognize

11  individuals for being in those categories?

12  A    Sure.  By their actions.  The idea here is that -- and it's

13  throughout their training -- again, with regard to use of force,

14  it's a response to the actions that they're seeing.  And so

15  their training is to recognize the actions for what they are.

16  If something fits a crime, if they can, then they're supposed to

17  address that crime as a group, get someone's attention, and then

18  have a plan to go in and address that crime if they can.

19         We today use a lot of specialty units to actually

20  address those crimes.  And so their job is to get someone's

21  attention, let someone know that they are -- they are trained to

22  recognize actions that they've been trained on throughout the

23  academy.

24  Q    And if we could scroll down to the 35th slide.  So, drawing

25  your attention to the 35th slide in here, entitled additional

Kevin P. Carlin, RMR, CRR

20-cv-1878-RBJ    ERIC KNUTSON - Direct    03-22-2022

1   protester tactics, and my question specifically pertains to an

2   entry towards the bottom of the slide entitled puppy pile, which

3   sounds cute, but if you could tell us a little bit about what a

4   puppy pile is.

5   A    So, this slide, we go through some other things that we

6   have seen, and so then I describe the puppy pile, and that's

7   actually in my notes.  And I let the recruits know before this,

8   actually following this, there is a slide that says no

9   individual action.  We do not want our officers taking

10  individual action.  We want a thought-considered response, and

11  we want a group of officers to take action.

12        And so I tell a story about a lieutenant that was at

13  the Occupy demonstrations down at Civic Center Park.  And the

14  lieutenant -- at the time, there was a no camping ban, and

15  someone had set up a tarp across some trees and those kind of

16  things.  He reaches up and he pulls down the tarp, and he's

17  going to take the tarp, and someone from the crowd reaches out

18  and snatches the tarp out of his hands and runs away into this

19  crowd.

20        The lieutenant just takes off and chases the

21  individual, and disappears into the crowd like that.  The squad

22  is standing there and have no idea where the lieutenant is.

23  They wait for about 30 seconds, thinking that the lieutenant is

24  going to come back, and he never shows up.  So, they actually

25  have to form up in a squad, in a column, a column of two, and

20-cv-1878-RBJ   ERIC KNUTSON - Direct   03-22-2022

1   penetrate the crowd and go in there, and they have to go back

2   there about 50 yards, and they found the lieutenant at the

3   bottom of a pile of demonstrators.

4        And that's the idea of a puppy pile.  It says multiple

5   protesters piling on top of a single responder.  And the

6   lieutenant was in fact at the bottom of that pile.

7   Q    Thank you.  If you could scroll down to slide 89.  So, here

8   we've got a slide that appears to pertain to the use of force

9   policy.  Does this slide build on any other components of

10  recruit training?  And how so?

11  A    Yeah.  As I've mentioned, the very first thing, it says all

12  of our use of force is governed by the CRS and the policies of

13  our department.  And then in red, nothing changes because it's a

14  crowd control.

15       So, everything that they've learned regarding use of

16  force, all the scenarios that they have experienced about proper

17  control techniques and arrest control and all of those things,

18  none of those things go out the window.  We want them to know

19  it's still the same.  So, again, this idea of building on

20  previous training is again and again and again.

21  Q    And this slide and the notes below appear to have some

22  information to recruits regarding how to document uses of force

23  in the protest context.  And specifically, I am drawing your

24  attention to the last note on the page, beginning UOF, which I

25  assume is use of force reporting?

20-cv-1878-RBJ    ERIC KNUTSON - Direct    03-22-2022

1    A    Yeah.

2    Q    Specifically, what do you train recruits on how to report

3    force in a protest setting?

4    A    So -- and I use this slide, and I try to use all of the

5    slides between different trainings.  So, this slide is the same

6    slide that I use for recruits.  I use it for a refresher

7    training, and I use it in leadership training too, I believe.

8    And so I want to make sure that it's continuous throughout all

9    the different groups that I'm training.

10          The important piece here for the recruits is that they

11   are capturing -- and not just the recruits, all the officers --

12   is this idea of use of force reporting.  The one blanket report

13   is where this is introduced to the recruits.  They are still

14   going to report every use of force that they use, that they --

15   every incident of force that they use, they are still going to

16   report that.

17          However, we have a method of capturing force when we

18   are unable to take a person that force was used against into

19   custody and render aid.  So, if we're unable to do that, we are

20   still going to document that force, but we've got a way to do

21   that on what's called a blanket use of force.

22   Q    And this jury has had a lot of -- heard a lot of testimony

23   about what's called an after-action report, and they've seen

24   some examples of that.  Is the blanket report that you're

25   talking about now and the after-action report, are those the

20-cv-1878-RBJ    ERIC KNUTSON - Direct    03-22-2022

1    same thing?

2    A    No.  No, they're not.  No.  The after-action is intended to

3    capture the incident as a whole, and, you know, what -- what

4    happened during the incident, and basically tell a beginning and

5    walk through chronological events.  And that's what the effect

6    of the after -- that's the intent of the after-action is to

7    provide an overview of this incident or what happened here.

8          The use of force reporting is something completely

9    separate, and is intended to capture uses of force.  In the

10   after-action, it may mention force and force that was used in

11   different areas, but that's not a replacement for our use of

12   force reporting.

13   Q    If you could scroll down to slide 100.  So, drawing your

14   attention to slide 100, riot control agents and less-lethal

15   weapons.  Riot control agents, are those chemical munitions such

16   as CS gas?

17   A    Yes.  Riot control agents for the purposes of the recruits

18   and our officers is smoke or CS gas canisters.

19   Q    And drawing your attention to the second bullet, which

20   reads, used only after personnel have received training on their

21   use.

22   A    Yes.

23   Q    Is that something that you train your recruits regarding?

24   A    Absolutely.  We -- this -- I want the recruits to know that

25   this course is not your course for utilizing any less-lethal

20-cv-1878-RBJ    ERIC KNUTSON - Direct    03-22-2022

1  weapons or systems, PepperBall, 40-millimeter, gas, smoke, none

2  of that.  I want them to know that these things are there and

3  they will be utilized, but they don't utilize those things until

4  they get training.

5  Q    Let's scroll down to slide 125.  And you don't -- I think

6  you mentioned this in your last answer.  You're not certifying

7  any recruit officers for any sort of less-lethal or gas

8  munitions through your crowd management program?

9  A    That's correct.

10  Q    And that includes pepper spray?

11  A    Pepper spray is something that they do receive training in

12  the academy.  They do receive training in the MK-4 Sabre, which

13  is their personal OC spray.  The fogger they will be able to

14  utilize if they get into a crowd control environment.  And so

15  the reason this slide is on here is I want them to see the

16  dispersal of the fogger, which is different than their MK-4,

17  their personal OC, which comes out as a gel and as a stream, and

18  that that -- that targeting the way this disperses.

19  Q    And do you happen to know if the distance contained in this

20  photograph between the officer who is deploying a fogger and the

21  individuals on the other end, if that's an acceptable distance?

22  A    No, it's not.  And I don't -- I don't draw attention to

23  this during the training.  What I draw attention to is the --

24  the aerosol effect of how this spreads out.  But that is too

25  close.  And in fact, Sabre teaches that if you are at a distance

20-cv-1878-RBJ    ERIC KNUTSON - Direct    03-22-2022

1    that -- something like this, the aerosol should be -- or the

2    canister should be held up close to the body trying to keep

3    distance.

4         Being that close like that, they receive training in

5    something called the hydraulic needle effect.  And so the

6    recruits receive training on that, if you utilize these systems

7    too close.

8    Q    But just to be clear, this photo is not used for purposes

9    of training officers on how to deploy the pepper spray?

10   A    No.  This is intended to show the trainees the dispersal of

11   the -- of this particular delivery system.

12   Q    So, you can take that down.  And you mentioned a section at

13   the end of your training where you take the recruits outside and

14   practice formations and holding batons.  Can you tell the jury

15   about the importance of that section of training.

16   A    Yeah.  We want them to be familiar with what it is that

17   they're going to be doing.  Again, keeping in mind that this

18   training is at the end of six months.  And I equate it to -- and

19   it's probably something everyone has heard of before, but

20   drinking from a fire hose.

21        These people have been drinking from a fire hose for

22   six months, and so expectation of training and retention, it

23   can't be everything that you will ever need to know about crowd

24   control.  And these are all the nuanced techniques.  We want

25   them to go through and have an expectation of what they're going

20-cv-1878-RBJ    ERIC KNUTSON - Direct    03-22-2022

1    to experience.  And so what they're -- and so we tell them and

2    we have played some videos throughout the classroom portion of

3    the noise that's involved.

4         And I remind them, you're going to be out here, and

5    it's going to be noisy.  There are going to be people screaming.

6    There's going to be people moving around, and those kind of

7    things.  This is what we do.  And then I walk them through basic

8    formations.  I walk them through a skirmish line formation, or

9    what is called a line formation.  I walk through guard or

10   flanking formations, where we set those up.

11        We walk through what's -- some other formations, a

12   crossbow line formation, moving out into a crowd.  We talk about

13   an encirclement separation, and we walk through that.  We do

14   that.  And that's pretty much what we finish up with very last

15   thing.

16        MS. BIRKHOLZ:  Your Honor, I do have quite a bit more

17   questions for the sergeant, so now may be a nice time for a

18   break, if anyone is --

19        THE COURT:  Sure.  We can do that.  How much time

20   would you like for a break today?

21        JUROR:  Yes.

22        THE COURT:  Okay.  Shall we say 2:30?

23        THE WITNESS:  My classes are normally a little more

24   lengthy.

25        THE COURT:  All right.  We will take 10 or 15 minutes

20-cv-1878-RBJ   ERIC KNUTSON - Direct   03-22-2022

1   here.

2        (Jury out at 10:40 a.m.)

3            THE COURT:  Okay.  We'll take our break.

4        (Recess at 10:41 a.m., until 11:00 a.m.)

5        (Jury in at 11:00 a.m.)

6            THE COURT:  Now, how was that for a nice long break?

7   Okay.  Here we go.

8   Q.   (By Ms. Hoffman) Sergeant, just to recap, we talked a lot

9   about training for recruit officers prior to the break, and now

10  I want to direct your attention to training in the area of crowd

11  management for supervisors.  Does the Denver Police Department

12  provide training in this area specifically for supervisors?

13  A    Yes, it does.

14  Q    And what officers are considered supervisory officers?

15  A    So, anyone sergeant or above is considered that

16  supervisory, starting to hit that supervisory rank.

17  Q    Are you familiar with sergeant school?

18  A    Yes.

19  Q    What is sergeant school?

20  A    Sergeant school is a -- now it's a two-week course that all

21  newly promoted or soon to be promoted sergeants complete.  It

22  covers everything that they need to know, both in preparation

23  for the how-to kind of things, the nuts and bolts, supervisory

24  management, and then another week of leadership.  So, one week

25  of each.

20-cv-1878-RBJ   ERIC KNUTSON - Direct   03-22-2022

1  Q    And is the topic of crowd management covered in sergeant

2  school?

3  A    Yes, it is.

4  Q    And like the academy, I have a question about timing.  When

5  in terms of the timing of sergeant school is the crowd

6  management course taught?

7  A    Taught on the last day -- usually the last day of the first

8  week.  I instruct that, and I follow that up with some scenarios

9  and some tabletops of other things that are happening.  And so

10 since it fits in my schedule that way, it lands there.

11          And it also lands there because it -- similar to

12 academy training, they're learning about their responsibilities

13 with regard to investigating use of force, critical incidents,

14 those kind of things, investigating those challenges, as well as

15 the internal affairs process, all of that kind of stuff.  And

16 then we finish up Friday, normally first thing after lunch or

17 last thing just before lunch on Friday with the crowd control

18 training.

19 Q    And if you could specifically tell me what you teach

20 sergeants and sergeants-to-be in the supervisory crowd

21 management course?

22 A    As I said, I want to keep the training itself the same.  If

23 we are teaching them -- everyone the same thing, everyone is on

24 the same page.  The focus with our training for our sergeants is

25 letting them know of their change in scope, meaning their change

20-cv-1878-RBJ    ERIC KNUTSON - Direct    03-22-2022

1    in responsibilities.  We need to -- and that's a lot of what

2    this school is, is letting them know you already know how to do

3    these things.  Now you need to know how to do them as a

4    supervisor or as a leader.  And so that change in scope and

5    change in responsibilities is what the school focuses on, and

6    that's what the school -- the crowd control training focuses on

7    as well.

8    Q    And how do you teach these sergeants and sergeants-to-be

9    about their new more leadership roles?

10   A    So, we go back through, and we -- in regards to crowd

11   control, we go back through, and we recap the same things that

12   we did before.  We quickly hit on the constitutional amendments.

13   We quickly hit on what our responsibilities are.  And then we go

14   into updated and the latest in protest tactics that we're seeing

15   now, in case it's -- in case they haven't seen these things yet.

16        And so then we finish off with the formations, proper

17   use of shields and batons, and then I saw -- I got that

18   backwards.  Proper use of shields and batons, and then finish

19   off with formations.  And there we focus on reminder of what the

20   formations are, but also their responsibility in calling

21   commands.  It's a challenging thing to do is call commands for

22   getting in these formations and to do so appropriately.  And we

23   want them to be comfortable in doing that.  So, we walk through

24   that.

25   Q    And what kind of commands are sergeants instructed to call

20-cv-1878-RBJ   ERIC KNUTSON - Direct   03-22-2022

1    out?

2    A     All of the formations.  Line formations, separation,

3    encirclement, right guard, left guard, close support, all of

4    these different formations that we utilize.

5            MS. HOFFMAN:  And if you could please display

6    Exhibit 455.  And I believe it's already been admitted.

7            THE COURTROOM DEPUTY:  It is.

8    Q.    (By Ms. Hoffman) And Sergeant, is the material that I

9    have in front of you, is this part of your supervisory crowd

10   management course --

11   A     Yes, it is.

12   Q     -- that we've been talking about?

13   A     Yes.

14   Q     Now, a number of the slides in both this particular

15   PowerPoint displayed on the screen right now as well as the

16   recruit PowerPoint that we were looking at previously are

17   blacked out.  Do you generally know what information is

18   contained underneath the blackouts?

19   A     Yes.  Those are -- when I went through this --

20           MS. STERK:  Objection, Your Honor.  The blackouts were

21   not provided.  It was redacted by the defendants, so I think for

22   them to talk about it now seems inappropriate.

23           THE COURT:  She hasn't gotten there yet.

24           MS. STERK:  She just asked him to talk about what was

25   underneath the blackouts.

20-cv-1878-RBJ    ERIC KNUTSON - Direct    03-22-2022

1          THE COURT:  She asked if he knew what was underneath

2   the blackouts.

3          MS. STERK:  Correct, Your Honor.  And he started

4   talking about what was underneath the blackouts.

5          THE COURT:  He was going to say, yes, I know

6   everything, I'm probably the one that blacked it out, he's

7   probably going to say.  Don't worry.  She's not going to ask

8   him.  Or if she does, I will sustain your objection to what's

9   under the black, yes.  That's off limits.

10          MS. HOFFMAN:  Sure.  I just want him to explain the

11   purpose of the blackout so the jury isn't confused when they see

12   pages that are blacked out.

13   Q.    (By Ms. Hoffman) So, if you could just, to the extent you

14   understand why, what's the importance of blackouts?

15   A    Underneath the blackouts is specific tactics that we

16   utilize.

17   Q    And that's just to protect tactics that could potentially

18   compromise them?

19   A    Yes.  To protect the tactics and keep them where they need

20   to be within our wheelhouse.

21   Q    Thank you.  So, is DPD's training based on its crowd

22   management policy?

23   A    Yes.

24   Q    And are there any differences between the crowd management

25   manual and policy and training?

20-cv-1878-RBJ     ERIC KNUTSON - Direct     03-22-2022

1    A     No, there isn't.

2    Q     What is the essence of the Denver Police Department's

3    training regarding crowd management?

4    A     So, again, going back to this idea that it's just police

5    work, we want our officers to understand the same requirements

6    and the same responsibilities they have on the street are the

7    same here, but taking it one level further.

8          So, on the street, our job is public safety.  Nothing

9    changes with regard to crowd management.  It's still public

10   safety, and along with that is a protection of First amendment

11   rights.  So, it's a twofold focus, which is why the screen that

12   we looked at earlier on First amendment, that's very early in

13   the training.

14         And so understanding that especially here in Denver, we

15   take that protection of First amendment rights very seriously,

16   and we will go to the Nth degree in order to allow assemblies to

17   continue to do that as much as we can.  That's the training that

18   we provide and continue to do so.

19   Q     So, at this point, we've spoken about recruit training.

20   We've spoken about supervisor training.  I want to move on to

21   the area of refresher training.  Does the Denver Police

22   Department provide any sort of refresher training to its

23   officers in the area of crowd management?

24   A     Yes, we do.

25   Q     And at some point in time, did the Denver Police Department

20-cv-1878-RBJ    ERIC KNUTSON - Direct    03-22-2022

1    offer a three-day refresher class in this particular area?

2    A    Yes.

3    Q    And when was that?

4    A    When I arrived at the academy in 2013, started looking for

5    crowd control training, and found -- and I went to -- back to,

6    again, CDP FEMA, Center for Disaster Preparedness --

7    federation -- federation -- Federal Emergency Management

8    Administration.  I went back to them, reached out to them, and

9    found their three-day course.  And this three-day course we had

10   taken in preparation for the Democratic National Convention.

11   It's what we based some of our -- most of our tactics on in 2008

12   for that event.

13          And back then it was called MCATI.  And so when I

14   reached out to them, it had been rebranded and titled field

15   force operations, and acronym heavy, FFO is what we wound up

16   calling it.  I apologize for all the acronyms.

17   Q    And so if I missed it, I apologize, but how long did the

18   Denver Police Department offer this three-day refresher course?

19   A    So, the course was offered from 2014, is when we started

20   it, and we stopped it in 2016.

21   Q    And why did the Denver Police Department stop giving this

22   three-day course?

23   A    At the time, we were also running training for a class,

24   mandatory class, this class was mandatory, as well was the --

25   the one-day course that we were providing at the time, and it

20-cv-1878-RBJ    ERIC KNUTSON - Direct    03-22-2022

1  was called Respectives.  And Respectives focused on treatment of

2  the public, working with the public, our idea of community

3  partnerships, and First amendment was also in this Respectives

4  course.

5              So, we had both of those courses going on at the same

6  time, and the determination was made that this three-day course

7  for field force operations was too intensive for staffing, and

8  we had to put it on -- indefinite, you know, hiatus at the time.

9  Turned into indefinite hiatus at the time.

10  Q   And what are some of the staffing concerns presented by

11  taking officers off the street for three days for a training?

12  A   As with anything, you can -- as you can imagine, operations

13  come first.  The service to the public comes first.  We have to

14  be there and have as many officers as we can on the street in

15  order to maintain public safety and service to the public.

16              And so the draw that was happening in our districts was

17  too much.  In order to hold this training, this three-day

18  course, we wanted and asked for at least 24 officers in every

19  single class.  And so that is a big draw on our staffing.  It's

20  not something that's easily just, oh, yeah, we can send -- we

21  can send four officers three days, and do that a couple of times

22  a month or once a month for an extended period of time.

23  Q   And in lieu of the three-day refresher training we've been

24  talking about, do you offer anything in its place?

25  A   Yes.  So, a built -- eventually built a one-day refresher

20-cv-1878-RBJ    ERIC KNUTSON - Direct    03-22-2022

1   course to try and address the three-day stuff, and pull out what

2   I believed that we needed out of that, and shrink that

3   information down to a one-day without going overboard and just

4   taking everything from FFO and those kind of things.  So,

5   drilling that down to a one-day course.

6   Q    And in your opinion, did the three-day class contain any

7   information or training that was kind of extraneous to the

8   Denver Police Department?

9   A    Yes.  It was good, valuable training.  However, it is a

10  national provided class.  And so some things that were maybe

11  important for some departments as far as the introduction of

12  even the idea of crowd control, it was a -- very much a crawl,

13  walk, run, kind of a course, which is a great way to teach

14  something.

15         However, our crawl did not be -- need to be quite so

16  much of a crawl.  The first afternoon of that three-day course

17  was spent using formations that we did not intend to use.  A

18  formation called the wedge formation, and it spent a lot of time

19  getting all of the officers to walk through some formations that

20  we wouldn't want our officers to continue to utilize.

21         So, that first afternoon was spent utilizing some of

22  those things.  So, looking at some of the equipment, because

23  it's a national class, they went through some equipment that we

24  don't have.  And they didn't go through deeply, but they

25  introduced some equipment.  And so we don't need that, and so

20-cv-1878-RBJ    ERIC KNUTSON - Direct    03-22-2022

1   there are some things that we were able to not include in the

2   one-day training and still be effective.

3   Q    And that replacement one-day refresher class, does the

4   Denver Police Department offer that to this day?

5   A    Yes.

6   Q    And is that a mandatory or a voluntary course?

7   A    It's a voluntary course.

8   Q    And are most refresher courses offered by your office

9   mandatory or voluntary?

10  A    Most of them -- refresher courses of this nature are

11  voluntary.  We like to give our officers the understanding that

12  they're responsible for themselves, and what are their

13  interests?  What are their weaknesses?  And what kind of

14  training that they feel that they need that's going to improve

15  them, and so we make these classes voluntary courses, and they

16  get to pick and choose what they go to.

17  Q    Do you believe that you and the academy have been supported

18  by Denver Police Department leadership?

19  A    Yes.

20  Q    How so?

21  A    Very much so.  Our leadership has taken a strong stance in

22  looking towards the direction of policing around the country and

23  trying to address training to look towards our needs for the

24  future.  And we've done -- we -- I am not part of that upper

25  leadership, but we as a department have done a very good job of

20-cv-1878-RBJ    ERIC KNUTSON - Direct    03-22-2022

1   looking at things and seeing what's happening around the country

2   and trying to address our training so that we are one step ahead

3   of the needs of our public.

4        It's -- I won't go -- I won't go deep into all the

5   courses that we've done that with.  I could probably talk for

6   hours about the various different forty-hour courses that are a

7   full one-week course that we put together for the needs of the

8   public that we saw happening in 2718 -- 2017 and 2018, the fact

9   that might come up.  Sorry.

10  Q    If you could just display Exhibit 461 for the witness.  And

11  I believe that has already been admitted as well.  So, Sergeant,

12  I am displaying the presentation materials for that one-day

13  refresher course that we've been discussing.  And it appears to

14  start with an eight-hour schedule.  Can you walk the jury

15  through the beginning of the one-day refresher class to the end,

16  and what you cover.

17  A    So, this is the same training schedule that we utilized for

18  the leadership course.  We wanted to kind of walk through

19  beginning to end is what this -- the way I set this course up.

20  And so prior to deployment, you can see there from that 8:15 to

21  8:45, intel and planning, the importance of that, and if you are

22  receiving intel of any sort, make sure you get that over to our

23  intelligence unit.

24        What we found over the years is that if we are able to

25  preplan, if we are able to communicate with our demonstrators,

20-cv-1878-RBJ    ERIC KNUTSON - Direct    03-22-2022

1   our organizers of our demonstrations, things go well -- very

2   well for us.  And so we've seen that time and again.  So, make

3   sure that that's there.  Communication with protesters, and

4   so -- and then rehitting, as again, the same thing that we teach

5   in the same slides from the recruit training, and going back and

6   hitting that same information again so that they're familiar,

7   and it should be a spark of, oh, I remember that.  Yes, that's

8   right.  Those kind of things.  If it's even that, because it's

9   just very, very basic information.

10  Q    If you could jump to slide 11.  So, you were just talking

11  about the importance of communication with event organizers.

12  So, I just had a quick follow-up question on that.  There's been

13  some testimony in this case that the Denver Police Department

14  attempted to reach out to event organizers and received no

15  response until a few days in.  Does Denver Police Department

16  training teach that communication is a two-way street?

17  A    Yeah.  And that's a basic tenet, a basic understanding of

18  communication.  Without communication going both ways, it's not

19  true communication.

20  Q    And what does the Denver Police Department do when it

21  doesn't receive a response from event organizers?

22  A    We go forward as best we can.  We prepare for what we

23  expect to experience.

24  Q    And if you could move forward to slide 29.  And I believe

25  you've touched on this in some of your prior answers, mentioning

1   having a video review section.  If you could explain to the jury
2   what is the importance of the video review section of training?
3   A    So, I look for events that are happening across the world.
4   I was looking at -- this course also includes some information
5   from Hong Kong demonstrations.  And so I'm looking for either
6   updated protester tactics, trying to look for things that we
7   need to prepare for, and those kind of things.
8          And this one, June 2019, things that were going on in
9   Portland, and some of the volatility going back and forth
10  between two different groups that were demonstrating there.  And
11  things to be aware of, and -- so that they are prepared.
12         Along the lines of this is if they haven't experienced
13  it before, these individuals are quite loud.  They're noisy.
14  They're raucous.  And those kind of things -- and desensitizing
15  our officers to that and preparing them for hearing those loud
16  sounds.
17  Q    And as you're seeing and tracking some of these events
18  taking place across the country and across the world relating to
19  protests and crowd management type events, do you try and
20  incorporate that into the training?
21  A    Yes.  Yes.  If it looks like it's something that we've
22  never seen before, I want us to be prepared for it and be
23  prepared to handle it.
24  Q    And if you could jump ahead to page 142.  And again, I
25  think this is something you touched upon earlier, this tabletop

20-cv-1878-RBJ    ERIC KNUTSON - Direct    03-22-2022

1   scenario.  If you could explain to the jury what is the tabletop

2   scenario portion of training?

3   A    So, the tabletop scenario is especially for the leadership

4   side.  It's to walk our leaders through of what are we going to

5   look for?  What's the objective?  Of course, public safety,

6   First amendment protection, but at what point in time?  What

7   kind of formations might I need?  How am I going to deploy those

8   formations?  What other resources might I use?  And so, you

9   know, this is setting them up with a tabletop for that.

10  Q    And this particular one-day refresher class we've been

11  talking about, is that available to all officers, or just

12  regular officers?  Just leadership officers?

13  A    And so, no, the two courses are available to all.  The

14  officer course and the leadership course are their standalone

15  courses.  Again, mostly the same information, but we focus on

16  what are your responsibilities as an officer.  What can you

17  expect?  What can we prepare you for?  And what are your

18  responsibilities as a leader?  What can you expect?  What can we

19  prepare you for?

20  Q    And with respect to prior trainings we covered for recruit

21  officers and at sergeant school, you described kind of a

22  practical section that took place outside at the end.  Does that

23  take place with respect to this refresher course as well?

24  A    Yes, it does.  And I will -- sorry.  Specifically, we want

25  the leaders to, again, as we had discussed in sergeant school,

20-cv-1878-RBJ     ERIC KNUTSON - Direct     03-22-2022

1   this is a practice portion for them to call out commands.  And

2   so we practice those commands.  We practice getting people in

3   those formations.

4   Q    You can take this down.  So, I want to switch gears with

5   you a little bit.  Yesterday Commander O'Donnell testified

6   regarding the City's crowd management policy, and he defined

7   crowd management and crowd control for the jury.  Do you also

8   teach your officers regarding those two, I guess, techniques?

9   Crowd management techniques and crowd control techniques?

10  A    That's a widely accepted and understood and beneficial

11  separation and understanding of, in fact the field force

12  operations course has got crowd management, crowd intervention,

13  and crowd control.  And so this separating of responses and kind

14  of categorizing what it is we're seeing so that we're not

15  responding to the wrong -- the actions of the crowd with the

16  wrong plan and those kind of things.  So, crowd management

17  versus crowd control.

18  Q    Sure.  And so we don't need you to define crowd management

19  and crowd control again, but you mentioned crowd intervention.

20  If you could explain to the jury, what is crowd intervention?

21  A    So, that goes back to that first slide, and that's where I

22  first introduced the idea of crowd intervention, and that is

23  between crowd management, perfectly peaceful, no issues, maybe

24  stopping traffic, and then crowd control, where we do have

25  crimes are being committed, and that we are not able to address

Kevin P. Carlin, RMR, CRR

20-cv-1878-RBJ   ERIC KNUTSON - Direct   03-22-2022

1  the individual crimes, and that we are no longer able to keep

2  this First amendment assembly, and we're not allowed -- we're

3  not going to be able to allow it to continue due to the public

4  safety concern, in between there is this idea of crowd

5  intervention.

6          And that is -- and I've mentioned it already.  We want

7  to address the individual crimes and remove those individuals

8  who are committing those crimes so that the rest of that

9  assembly can continue.  And that's one of the reasons why that

10 precommunication with our demonstrators has been so valuable in

11 years past.  This has been used quite effectively during the

12 Occupy demonstrations here in Denver.  And our working with our

13 organizers, we would let them know, this is possibly some things

14 that are going to happen, and there may be people infiltrating

15 your groups and those kinds of things.

16          If we see anything like this, we ask you if you can get

17 away from those individuals, separate yourselves so we can go in

18 and assert ourselves so that you can continue your demonstration

19 and we can surgically remove those individuals, or as they split

20 off, take those individuals into custody.  So, that's that idea

21 of crowd intervention.

22 Q    And in training your officers regarding these concepts, do

23 you provide training to them in recognizing this is a crowd

24 management situation, this is a crowd intervention situation,

25 versus this is a crowd control situation?

20-cv-1878-RBJ     ERIC KNUTSON - Direct     03-22-2022

1    A    Yeah.  And the behaviors of the crowd as they -- we --

2    through video, through discussion, we talk about behaviors of

3    the crowd.  Even in that slide where we talked about the

4    everyday citizens, the professional protester, and the

5    anarchist, those three groups, we talk about what those look

6    like, and, you know, what to be prepared -- and what to be

7    prepared to experience.

8              If you see something, say something.  If you see some

9    criminal behavior as an officer on the line, no individual

10   action.  Your job is to tap the back of the helmet, wave a hand,

11   get someone's attention to it so we can address that over --

12   communicate that up the chain as we need to as well.

13   Q    And in your previous answer, you mentioned that in a crowd

14   intervention context, the ideal would be going in and extracting

15   the individual violators.  Did I understand that?

16   A    Yes.  That is the goal.

17   Q    And is that kind of synonymous with the idea of an arrest

18   team?

19   A    Yes.

20   Q    Okay.  And does the Denver Police Department train its

21   officers regarding the concept of an arrest team?

22   A    We train our officers in the concept of going in and making

23   an arrest from the line.  So, from in front of being able to go

24   in and make an arrest.  However, that would be from the line in

25   front of the protesters.  We train our officers that we're not

20-cv-1878-RBJ   ERIC KNUTSON - Direct   03-22-2022

1   going to try to go deep into the line and disrupt a whole bunch

2   of people, possibly putting them and ourselves in harm's way

3   further than necessary.

4        If the criminal -- the individual committing criminal

5   action that we're going to arrest is within 15 yards, we may go

6   in about that far, normally ten, and go in about that far, but

7   no further than that.  We get separated from the line at that

8   point in time, and we are completely encased in the crowd.

9        So, we do train that for the officers, but we mostly

10  rely on our specialized units to come in from the sides in order

11  to make those arrests.  Normally, rapid deployment vehicles or

12  something, mounted officers will come in.  And again, our crowd

13  has separated themselves from those individuals committing those

14  crimes.  They can go in, and they can make that arrest very

15  easily without disrupting the crowd significantly.

16  Q    So, does the success of a potential arrest team extraction

17  depend in part on the crowd separating itself from individual

18  aggressors?

19  A    It makes a huge world of difference.  And if you think

20  about even identification, you know, we -- again, that crowd,

21  tight together, anonymity, things are happening, and we have

22  even a difficult time identifying the individuals to be arrested

23  unless we can get eyes on them.  And so that's another, you

24  know, some techniques that we're seeing.

25  Q    And this phenomenon you're describing of a larger crowd of

1  primarily peaceful people separating itself from aggressors, is

2  that something the Denver Police Department has seen in past

3  protests?

4  A    Yes.  Yes.  Very much so.  Again, when we have that

5  communication, that separation occurs, Occupy, they would go in.

6  And even in Occupy, we had bicycle officers that would go in and

7  would be able to corral someone aside, and then make an arrest

8  that way.  So, different techniques of being able to do that

9  depends on the crowd behavior and what's happening with the

10  crowd.

11  Q    And is the use of arrest teams in protest situations always

12  an effective resource?

13  A    No.  Unfortunately, no.  And that's why that level of crowd

14  control is there.  If arrest teams were always effective, we

15  wouldn't need crowd control at all, and we would be able to make

16  those arrests, and our good demonstrators would be able to

17  continue to exercise those First amendment rights.  So,

18  unfortunately not.

19  Q    Is identification of agitators in a crowd always possible?

20  A    As I mentioned, that anonymity that occurs, we can't make

21  an arrest -- and again, it goes back to the idea -- and I'm

22  sorry to keep going back to this -- it's just police work.  We

23  have to identify an offender before we can make an arrest, and

24  we have to show probable cause to arrest that individual.  And

25  if we can't do that, we can't make an arrest.  So, that

1    identification piece is such an important piece of this process.

2    Q    And I think you have touched on this somewhat, but can you

3    detail for the jury some of the safety risks to officers or

4    other individuals from attempting to go in either individually

5    or with a small team to isolate agitators in a larger crowd?

6    A    So, first, no individual action.  Our officers are trained

7    not to go into crowds individually and try to effect an arrest.

8    That's individual action.  That is -- we could -- an officer

9    could disappear and decide to do something, and we wouldn't know

10    that the officer isn't on the line anymore.  Everything is

11    supposed to be directed and concerted.  So, individuals going

12    into the crowd, we wouldn't do that much.  So, I wanted to

13    correct that.  So, I forgot your question.

14    Q    Me too, a little bit.  So, you've addressed now individual

15    action, but are there safety risks to a small team like an

16    arrest team from attempting to go in and isolate agitators in a

17    large crowd?

18    A    As you can imagine, especially coming from the line, that's

19    an aggressive movement, coming into a crowd.  And if that crowd

20    is peaceful, it could agitate the crowd.  That's -- we're

21    wanting not to agitate the crowd.  We're wanting to allow those

22    people to continue to do what they're doing, and separate those

23    individuals that we need to.

24         And so by doing that, one, it's coming off the line.

25    It's aggressive.  Two, we have to push into crowds.  We have to

20-cv-1878-RBJ    ERIC KNUTSON - Direct    03-22-2022

1    push people out of the way, peaceful protesters.  We have to

2    push them and get them out of the way, and then get the

3    individual that's there that we're trying to arrest.

4            And so that's one of the other reasons why we don't do

5    that.  Additionally, it is extremely dangerous for our officers

6    to go out there.  And so in the field force operations class, it

7    talks about when you do go out and you send an arrest team out

8    there, that arrest team has to be shoulder-to-shoulder so tight

9    together so that we don't lose an officer out there.  And then

10   we are going to have to perform a -- what's called a crossbow

11   rescue instead of a crossbow arrest.  So, we're going to have to

12   use a different tactic to go out and rescue someone now rather

13   than an arrest.

14   Q    And I want to touch upon another topic that Commander

15   O'Donnell testified to yesterday in court.  Specifically he

16   testified regarding the unlawful assembly dispersal order

17   process.  And so we don't need to repeat that, but is that --

18   that process, the declaration of the unlawful assembly and the

19   issuance of dispersal orders, is that something that you train

20   officers on?

21   A    I train our officers that that takes place, and that --

22   it's a careful thing here.  We don't want to train our officers

23   that if you see these things, it's an unlawful assembly.  What

24   we train our officers on is if you see these things, let someone

25   know.  Incident commander determines an unlawful assembly.

20-cv-1878-RBJ    ERIC KNUTSON - Direct    03-22-2022

1    So, we want our officers to know the process that's

2    going to take place, that there will be at that point in time,

3    if not already, what's prescribed in field force operations and

4    in IECP and in -- a demonstration of force, so lining officers

5    up.  And that's a recommended tactic to let the crowd know

6    what's occurring.

7    And so at that point in time, that's going to happen,

8    as well as provide the dispersal orders and those things that

9    have already occurred.  So, we want our officers to know that,

10   and then to know that at that point in time, there will be at

11   the end of those dispersal orders, a command to move forward.

12   If the crowd has not already started to dissipate and leave, if

13   necessary, then close distance.

14   Q    From the incident commander declaring an unlawful assembly

15   through the issuance of dispersal orders, approximately how long

16   does that process take?

17   A    It depends on circumstances.  But as you can imagine, it's

18   two things.  One, it's not a thing that can happen quickly.  We

19   have to get -- do we have the officers there?  Do we have enough

20   that can actually move this crowd and start to disperse the

21   crowd?  So, is that all there?  Additionally, give time for the

22   crowd to leave.  We have done this in the past, and there are

23   sometimes families with children there.

24   And so we want to give those -- the peaceful

25   demonstrators that were there, and we weren't able to allow this

20-cv-1878-RBJ   ERIC KNUTSON - Direct   03-22-2022

1    assembly to continue anymore, an opportunity to leave before

2    actually moving and dispersing the crowd, which is why the three

3    orders with time in between and those kind of things.  So, it

4    could be 15, 20 minutes, half an hour, depending on how long it

5    takes.

6    Q    And can officers use force against the crowd without an

7    unlawful assembly being declared in an emergency situation?

8    A    Yes.  Against individuals, our officers are trained.  It

9    says no individual action, but if there's something that's

10   happening with an individual, then you address that.

11          As far as force used against the crowd, the only time

12   that an officer or officers or squad or anything like that would

13   be able to use force against a crowd, then it has not -- is an

14   exigent circumstance.  So, it's gotta be a significant issue

15   where it's not just an individual behavior, but so much behavior

16   that life and significant property is in jeopardy.  And so if

17   something like that is happening, then they will -- under

18   exigent circumstances, they will deploy and disperse a crowd if

19   they have to.  It's not ideal.

20   Q    Did the Denver Police Department have crowd management

21   trainings scheduled in 2020 prior to the George Floyd protests?

22   A    We were in the process.  We recognized 2020 being an

23   election year.  We were meeting, and we were preparing our

24   training for the election year, expecting it, as we had had

25   demonstrations 2016 and all through the 2016 to 2020 year, we

20-cv-1878-RBJ    ERIC KNUTSON - Direct    03-22-2022

1   had had demonstrations through Denver.  We recognized that 2020

2   was going to be a hot year for possibly demonstrations related

3   to the election.  And so we were meeting and building our plan

4   and our training plan to address that.

5   Q    And unfortunately, did those plans have to be adjusted a

6   little bit?

7   A    Two days after our last meeting, we were told that we are

8   not getting together.  We're not doing anything.  Stop

9   everything.  We couldn't conduct training.  Everyone had to

10  leave.  We were considered -- the word blanks.  We were not

11  mandatory.  We didn't have to be there.  And I can't remember --

12  I apologize.  But we were -- we weren't essential personnel.

13  Thank you for that.  We were nonessential personnel at that

14  time, and we didn't know what we were getting into.  We couldn't

15  meet.  We were told to -- we were not going to be getting

16  together.  There were all sorts of training classes that we were

17  in the middle of that we had to stop.

18  Q    And they had to be stopped because of COVID-19?

19  A    Because of COVID.  Yes, ma'am.

20  Q    I want to move on to training bulletins with you.  What is

21  a training bulletin?

22  A    A training bulletin is something that's put out by the

23  department.  Normally command, or a specialized unit or an

24  expert in an area, recognizing that there is a -- either

25  something that has occurred that we need to address for our --

20-cv-1878-RBJ    ERIC KNUTSON - Direct    03-22-2022

1    our personnel or something that we've seen across the country

2    that we need to address, and so we put out a training bulletin

3    to help our officers appropriately respond to things.  Training

4    bulletins kind of regularly come out, and it's one way rather

5    than waiting for an operations manual update or something like

6    that that we can get information to officers very quickly.

7    Q    And is that a form of continuing education for officers?

8    A    Yes, it is.

9    Q    And how does the Denver Police Department issue these

10    training bulletins to officers?

11    A    So, the bulletin will be posted onto an application called

12    PowerDMS and get sent out to all personnel.  They receive an

13    email notice to go into PowerDMS and take care of their training

14    bulletins.  They read it, and they sign off that they've read it

15    and that they understand it.  And if you're me, then you print

16    it, and you put it in your book of training bulletins.  But

17    that's what happens with those and how those are disseminated.

18              MS. HOFFMAN:  If you could show the witness

19    Exhibit 3010.  It's a training bulletin, and I don't believe

20    it's been admitted yet.

21              MS. STERK:  No objection.

22              THE COURT:  Admitted.

23    Q.    (By Ms. Hoffman) Sergeant, this is a training bulletin.

24    And if you look at the top, it looks like it indicates the date

25    of issue is August 16th of 2018.  Are you familiar with this

20-cv-1878-RBJ    ERIC KNUTSON - Direct    03-22-2022

1   training bulletin?

2   A    Yes, I am.

3   Q    And if you could walk us through what's covered in this

4   training bulletin.

5   A    This is a four-page training bulletin, and a significant

6   amount of information, but if you zoom out just a hair and

7   scroll through the pages real quickly, you will see that this is

8   mostly about our First amendment gatherings, or First amendment

9   assemblies, and how-to examples of free speech.

10        And if you go on to page two, things that are protected

11   and not protected.  Counters, protesters, crowd management, we

12   want our officers -- and this is something that we come back to

13   regularly, recording of police officers, and how to

14   appropriately handle that, which is to ignore it and go about

15   your business.  And it goes further into these topics.

16        So, this is more of the same.  Some limitations on

17   First amendment and that kind of thing.  Issues there with

18   standing in highways and those kind of things.  So, mostly this

19   is -- relates well to this idea of First amendment and

20   protection of those rights and crowd management.

21        MS. HOFFMAN:  And if you could show the witness

22   Exhibit 469.  It's another training bulletin from 2019 which has

23   not been admitted.

24        MS. STERK:  No objection.

25        THE COURT:  It's admitted.

Kevin P. Carlin, RMR, CRR

20-cv-1878-RBJ    ERIC KNUTSON - Direct    03-22-2022

1  Q.    (By Ms. Hoffman) Sergeant, I am directing your attention

2  to another training bulletin.  This one was issued June 6th of

3  2019.  If you just want to take a look at that.  Let me know if

4  you need to zoom out or scroll down.

5  A    Yes.  If we could, please, zoom out and scroll down.  It

6  looks like just for awareness, what it's saying across the top

7  there, this was initially published June 6th of 2019, and then

8  June 10th, this amendment occurred to this, the amendment to the

9  First amendment training bulletin.

10        And all the highlighted information was either added,

11 or they wanted to specifically address that.  But again, it

12 comes down to this protection of First amendment rights of our

13 individuals.  And not just in crowd management situations, but

14 on the streets.  Recording of officers, statements to officers,

15 this has been such a hot topic button across the country that we

16 want our officers to be prepared for it.

17        Additionally, we have a course called advanced skills

18 that we further go into this topic deeper and deeper into

19 protection of First amendment.

20 Q    Can you tell me a little bit more about the advanced skills

21 course.

22 A    Yes.  As far as the First amendment stuff, we will actually

23 go through not the training bulletins themselves, because

24 officers have already read them, but discuss it.  What do they

25 understand from that?  And then we will actually put them in a

20-cv-1878-RBJ    ERIC KNUTSON - Direct    03-22-2022

1    scenario.  We have a room with five screens that go 300 degrees

2    around the officer, and we built our own video in front of the

3    Pepsi Center of making an arrest on a scalper there, and

4    individuals come out and start walking by.  They're recording

5    the officers.  They start cursing at the officers.  They start

6    calling the officers names, all sorts of things like that.

7              And we have the officer standing in the middle there.

8    There are a cover officer for the officer that's making the

9    arrest, and erroneously told go handle that, go take those

10   phones and that kind of thing.  And it's training the officers,

11   don't go handle that.  Don't go handle the phones.

12             And after going through the training, this is their

13   capstone, if you will, of I know how to handle this.  I don't do

14   that.  That's protected First amendment.  That recording is

15   protected First amendment.  There's nothing to do here.  And so

16   that's one of those pieces of training in that advanced skills

17   course.

18   Q    Do you believe Denver Police Department's training in the

19   area of crowd management and as it overlaps with other training

20   was sufficient at the time of the George Floyd protests?

21   A    The training was sufficient -- sorry.  I'm going to take a

22   drink.  So, the training at the time of the George Floyd

23   protests was sufficient for everything that we had handled up to

24   the George Floyd protests.

25   Q    Have Denver Police Department officers dealt with protests

20-cv-1878-RBJ     ERIC KNUTSON - Direct     03-22-2022

1    and other large crowd events prior to the George Floyd protests?

2    A     Regularly.  We are a capitol city.  We have a strong group

3    that -- not group, but groups, or citizenship, exercises their

4    First amendment rights regularly.  We support that.  We want

5    that.  That's a form of just society that we understand our

6    responsibility as far as that goes.

7    Q     And have Denver Police Department officers dealt with other

8    protests which dealt with police-related issues prior to the

9    George Floyd protests?

10   A     Yes.  Specifically, the Ferguson, when Ferguson happened,

11   and we saw what was happening in Missouri.  We were expecting

12   some crowds and some protests here, and sure enough, we did.

13   And we had those.  We addressed those with our crowd management

14   techniques -- not crowd control, but crowd management.  We

15   stayed back.  We weren't involved.  There was meetings at the

16   capitol.  There were demonstrations there.  There were marches

17   through the streets.  Daytime, nighttime, that happened, I

18   believe for several days through that.

19          And part of my -- part of my responsibility is that I

20   reach out, and I find out, what did we learn from this, and how

21   did things go?  And as I'm reaching out to the officers, I'm

22   finding out that as our demonstrators are walking by and we are

23   stopping traffic for them, they are thanking our officers.  And

24   that felt good to me -- excuse me.  I can't -- I'm getting

25   emotional.  Not expected.  That was what I expected, and what I

20-cv-1878-RBJ    ERIC KNUTSON - Direct    03-22-2022

1  have experienced with our populous is our relationship that we

2  have worked so hard to build over these years, that is being

3  demonstrated.  Excuse me.

4  Q    So, you believe Denver Police Department training prepared

5  officers for previous protests that officers had handled up to

6  the George Floyd protests?

7  A    Yes.  Yes, it did.

8  Q    Are there certain units or districts that handle the

9  majority of protest work for the Denver Police Department?

10 A    Yes, there are.

11 Q    And what are those units and districts?

12 A    District 6 is our downtown patrol district.  And so the

13 capitol grounds around the city and county building to some

14 extent, and into downtown where the streets go wonky, all of

15 that area is District 6.  And so as you can imagine, because of

16 their location, they handle a lot of that, our SWAT and our SORT

17 teams as well handle a lot of these events.

18 Q    And do you believe that these specialized units as well as

19 District 6 officers have gained additional experience and

20 on-the-job training from their work policing these previous

21 protests?

22 A    Absolutely.  It's -- it's normal for them.  In fact,

23 District 6, if you're familiar with what's called outcrowd,

24 Fridays and Saturday nights as the bars close and those kind of

25 things, they use forms of crowd management to help get the

20-cv-1878-RBJ    ERIC KNUTSON - Direct    03-22-2022

1    crowds out of lower downtown, and to get the crowds home.

2            So, it is a regular function for those individuals, and

3    so they learn.  They train.  That is on-the-job training.  They

4    see what works.  They get direction from supervisors, and again,

5    it becomes regular for them.

6    Q    You didn't police the George Floyd protests?

7    A    No.  I was -- one, I'm not on patrol side.  And two, I was

8    on vacation.

9    Q    And I believe in a previous answer, you mentioned making

10   efforts to familiarize yourself with the protest events, I

11   believe it was related to Ferguson, but maybe I misheard that,

12   but did you make similar efforts to find out what happened with

13   respect to the George Floyd protests?

14   A    Absolutely.

15   Q    And why do you do that?

16   A    To learn from what we experienced, so that if there were

17   areas that we made mistakes, if there were areas that we can

18   improve, if there are areas -- it's a SWOT analysis: strengths,

19   weaknesses, opportunities, and threats.  It's an analysis of

20   what we are doing well, what we are not doing well, and how to

21   address those things.  So, I try to do that as I'm finding out

22   information regularly.

23   Q    And to the best of your knowledge, based on that follow-up

24   investigation, for lack of a better word, you did, how were the

25   George Floyd protests different than other protests Denver has

20-cv-1878-RBJ   ERIC KNUTSON - Direct   03-22-2022

1   experienced?

2   A    Well, I want to say -- you know, I almost went down the

3   road of the SWOT analysis, but the George Floyd protests from

4   the feedback that I received was confusing at first, because it

5   didn't make sense.  The -- what I was seeing on -- from my easy

6   chair at home, Monday morning quarterbacking everything that's

7   occurring, it -- I did not understand what I was seeing and what

8   was happening.

9        And it took me months to figure out what was

10  actually -- what had occurred there.  And not even months.  I'm

11  still learning today, because my method of doing so is to

12  capture officers that are out for training or those kind of

13  things.  I reach out to our training sergeants, that position

14  that I held in the districts for a while.  I reach out to them,

15  ask them what they know.  I know some subject matter experts in

16  patrol as well.  I reach out to them and find out what their

17  experiences are.  And still learning things today.

18  Q    Okay.  So, you mentioned watching some things on the news.

19  Some things may have been consistent with what you saw.  Some

20  things may have been inconsistent -- sorry.  Inconsistent with

21  training -- I'm going to start over with that question.  Sorry.

22       You mentioned that you tracked the George Floyd

23  protests on the news.  Did you do that?

24  A    I did as much as I could.

25  Q    Okay.  And were some things that you saw on the news

20-cv-1878-RBJ   ERIC KNUTSON - Direct   03-22-2022

1   consistent with the way you train officers?

2   A    Some things were consistent with the way I train officers.

3   Q    And were some things that you saw inconsistent with the way

4   you train officers?

5   A    Yes.  Some things were inconsistent.

6   Q    Okay.  So, let's take the -- let's take consistency first.

7   What did you see that was consistent with how you train

8   officers?

9   A    I saw line formations being utilized.  I saw during those

10  line formations, I could pick out the command and control of

11  those line formations, and I could see what was happening with

12  that.  And based on that, I could see what the effort was, if it

13  was -- and if it was to help -- if it was to disperse a crowd

14  and those movements, I recognized line formations, and I kind of

15  raised my eyes to that, because it's nothing that we've ever had

16  to do before, put a line formation to block a street to stop

17  demonstrators from taking over a district station, and violent

18  actions against our officers attempting to get to that station.

19  I'm not going to say attack the station or anything like that.

20       I don't know -- you know, I don't know the minds of the

21  individuals, but I do know seeing other things that were going

22  on across the country at about the same time, I can reasonably

23  expect, you know, what was happening there.  So, but I saw line

24  formations there.  I saw some appropriate use there of

25  eventually breaking out the shields and being able to utilize

20-cv-1878-RBJ    ERIC KNUTSON - Direct    03-22-2022

1   those at those fixed posts like that, which is something that we

2   train.

3   Q    And what did you see that was inconsistent with the

4   training you give?

5   A    To be perfectly honest, there were a lot of

6   inconsistencies, especially when I was watching those first few

7   nights.  I was concerned and not understanding what I was

8   seeing, which is -- I called my boss and asked him if he wanted

9   me to come in from vacation, report downtown.

10        Inconsistent activities of deploying small groups of

11   officers being deployed, and moving around with PepperBall guns.

12   That's not something that I train at all.  It's not something we

13   train or anything like that.  So, as I'm seeing that, I'm not

14   understanding what it is that I'm looking at.  So, that is a

15   definite inconsistency.

16   Q    So, you mentioned calling your boss.  Who was your boss?

17   A    Lieutenant John Coppedge.

18   Q    So, you called Lieutenant Coppedge and asked if you should

19   come in to assist with the protest response?

20   A    Yeah.

21   Q    Okay.  And what did Lieutenant Coppedge tell you in

22   response?

23   A    Well, he rightly reminded me that I don't belong in patrol,

24   and that I am a trainer in the academy, and that I am not needed

25   in the command post or anywhere down there, and I'm probably

20-cv-1878-RBJ   ERIC KNUTSON - Direct   03-22-2022

1    going to do more harm than good.  He didn't mention the more

2    harm than good part.  I kind of read that into what he said.  I

3    understood what he was trying to tell me.

4    Q    And did you have any other conversations regarding your

5    offer to come in with any other Denver Police Department

6    employees other than Lieutenant Coppedge?

7    A    No.  He gave me the correct information, and I stood down

8    at that point in time.  It's not my place to go running around

9    downtown and creating more chaos by me being there trying to do

10   whatever I was thinking that I was going to try to do by heading

11   downtown.

12   Q    And going back to things that you observed that were

13   potentially inconsistent with training, have you now gained

14   greater information and context from conversations with people

15   about the George Floyd protests?

16   A    Yes.  Again, over time, as continued to happen, the

17   absolute unprecedented nature of what our officers were facing

18   and dealing with, I now realize that when I saw those small

19   groups of officers that were moving, it was because of -- and it

20   was now appropriate, they were reacting and responding -- not

21   reacting.  They were responding to the behaviors and the actions

22   of the individuals and the groups that they were following and

23   addressing.

24           And so I now understand that what they were dealing

25   with was tactics that were being used that were -- I -- I don't

20-cv-1878-RBJ    ERIC KNUTSON - Direct    03-22-2022

1    want to use the word "warfare."  That's not accurate or

2    appropriate.  But when I think about it, I picture small-unit

3    tactics being utilized against our line formations and large

4    group of officers who are there to move a crowd and to disperse

5    a crowd.

6            And these small-unit tactics that are being used,

7    coming around, going around blocks, coming up behind lines and

8    those kind of things, they had to deploy small groups of

9    officers in order to address those groups, and either keep tabs

10   on them or to get them away from the crowd or to continue to try

11   and disperse those small groups that were not dispersing, but

12   were utilizing tactics, and I don't know -- I won't say that.

13   But were utilizing tactics to actually attack the officers.

14   Q    So, some of the tactics you've now learned that were

15   employed by agitators during the George Floyd protests, were

16   those tactics that you had ever seen in any protests in the city

17   before?

18   A    Absolutely not.  And by looking for -- trying to find

19   information leading up to this, I did not see that there either.

20   This is the first time I had ever experienced it, which was why

21   I was so confused those first few nights as I'm sitting at home

22   watching this.

23   Q    When you say looking for information, just want to make

24   sure I understand that.  Are you going back to like looking from

25   videos at Portland and Hong Kong and tracking what's going on --

20-cv-1878-RBJ   ERIC KNUTSON - Direct   03-22-2022

1   A     Yes.

2   Q     -- in other cities and --

3   A     Yes.  Just my regular looking for information that I'm

4   always doing.  I didn't see anything like that.  The Portland

5   video was large groups moving through streets.  Hong Kong, large

6   groups moving around, and those kind of things.  And field force

7   tactics being effective and appropriate to address those things,

8   and everything that I'm seeing fits our tactics that we utilize,

9   and what we train on.  And then, as I said, you know, and then I

10  saw these small groups of officers moving through, and did not

11  understand what I was seeing.

12  Q     But is it now your understanding with this increased

13  information that officers were responding to unprecedented

14  circumstances?

15  A     Yes, ma'am.  That's --

16  Q     Okay.  I want to switch gears and ask you a couple of

17  questions about training that you provide regarding use of force

18  reporting.

19  A     Okay.

20  Q     And I will touch on this briefly, because we spoke about it

21  already.  Do officers either at the academy or at any other time

22  receive training regarding when to report uses of force?

23  A     Yes.

24  Q     And when do they receive that training?

25  A     Throughout the academy.  We have classes, and then we do

20-cv-1878-RBJ    ERIC KNUTSON - Direct    03-22-2022

1  scenarios.  We do what's called a dynamic action drill day where

2  they actually utilize force appropriately, and then finish up

3  with a use of force report.  So, they are familiar with it

4  throughout that process.  There's a course on use of force and

5  use of force reporting that walks them through.  And then

6  streets as well, there's use of force updates.

7          We completely revamped our use of force policy in 2018.

8  We provided every officer eight hours of training, and we did

9  that amazingly over a four-month window.  We trained every

10  single one of our officers, 1,500-plus, gave them an eight-hour

11  class on this revamp.  And then it was updated in 2019 to

12  include a little bit more information.  So, that use of force

13  training, and documentation of use of force goes into all of

14  that.

15  Q    If you could show the witness Exhibit 467, which has

16  already been admitted.  And specifically drawing the witness'

17  attention to the use of force policy.  And if you could scroll

18  down to page 15.  Okay.  Is it fair to say that the training

19  that the department gives its officers in the area of use of

20  force reporting is based on policy?

21  A    Yes, it is.

22  Q    Okay.  And is that policy the one that we're looking up at

23  the screen right now?

24  A    Yes, it is.  That's our recording policy.

25  Q    So, drawing your attention to section 1A -- or, sorry.

20-cv-1878-RBJ    ERIC KNUTSON - Direct    03-22-2022

1   1A2.

2   A    Okay.

3   Q    Does everything in this section pretty much outline when an

4   officer is required to document force?

5   A    Yes.  And it -- right across the top there, through use of

6   the following, regardless of whether an arrest was made, the

7   individual dies, is injured, or complains of injury.  So, the

8   idea here is whatever it is that we're doing, if we are causing

9   injury or there's a complaint of injury or a likelihood of

10  injury, then we are going to report that.

11  Q    And now moving down to section two, so if you could scroll

12  down in the document.  So, tell me about this section.  What

13  does section two outline?

14  A    So, section two is all about the investigation into a use

15  of force.  And so specifically when force is used, we take

16  someone into custody, we render aid, a supervisor responds to

17  every one of those uses of force and conducts an investigation

18  on scene.  This is part of that supervisor school that -- the

19  sergeant school.

20       They go.  They talk to the officers, get a general

21  brief information from the officers of what occurred.  They then

22  talk to the individual that force was used against, get their

23  information and what happened from their point of view.  They

24  then go look for witnesses.  They look for any evidence on the

25  scene, and then they come back to the officers after all that

20-cv-1878-RBJ    ERIC KNUTSON - Direct    03-22-2022

1   has been gathered and get the full information from the

2   officers.

3   Q    If you could scroll down a little bit.  So, what you just

4   testified to, the interview of witnesses, the collection of

5   evidence, that's all contained on the screen right here.  Do you

6   see that?

7   A    Yes, I do.

8   Q    And how much time does this process take?

9   A    Hours.  For a simple use of force, it will take the

10  supervisor hours to not just conduct the investigation, but

11  actually then to write it up.  It may take, for a simple use of

12  force, an individual -- it's a use of force that is reported on

13  a use of force, if an officer places hands on someone and pushes

14  them and they fall down on their backside.

15       So, if an individual falls to the ground because of

16  officer contact, even if there was no intended injury, we report

17  that on a use of force.  So, something simple like that is going

18  to be fairly straightforward, but that is probably going to

19  take -- the officer complete statements, the use of force report

20  itself, and then the supervisor writes up a cover letter that

21  breaks down the entire situation, and then goes through

22  chronologically what occurs and then what their findings are.

23  So, something like that is probably a three-hour process.

24       THE COURT:  All right.  Let's stop here for a break at

25  lunchtime.  1:15?  Okay.

Kevin P. Carlin, RMR, CRR

20-cv-1878-RBJ    ERIC KNUTSON - Direct    03-22-2022

1      (Jury out at 12:03 p.m.)

2          THE COURT:  Okay.  1:15.

3      (Recess at 12:04 p.m., until 1:19 p.m.)

4      (Jury in at 1:19 p.m.)

5          THE COURT:  So, Julie told me that one of you has a

6   doctor's appointment early in the morning and probably won't

7   make it here on time.  No problem.  If you will just tell Julie

8   during the break when you think you can get here, then we will

9   start then.

10         JUROR:  Thank you.

11         THE COURT:  Actually, Wednesday morning is my

12  pickleball day.  I play pickleball indoors, of course, this time

13  of year, at a YMCA at 5:30 in the morning on Wednesday.  We

14  typically finish up around 7:00 to 7:15, and I scoot down here

15  and change my clothes and I'm ready to go.  So, if I have a

16  little extra time because of somebody's appointment, good for

17  you, good for me.  All right.  Onward.

18  Q.    (By Ms. Hoffman) Sergeant, I think before we took the

19  lunch recess, we were discussing training regarding the

20  documentation of uses of force, and you had just outlined some

21  of the steps that a supervisor takes after a use of force is

22  submitted to him by an officer.

23         So, I now want to ask you, when an officer reports a

24  use of force in the middle of his or her shift, does he continue

25  working, or does he step off the line to go write up that

Kevin P. Carlin, RMR, CRR

20-cv-1878-RBJ    ERIC KNUTSON - Direct    03-22-2022

1   report?

2   A    Yeah.  On the streets, again, it's just police work.  The

3   idea there is that the use of force has to be investigated right

4   there and then.  Investigations, we don't want witnesses to go

5   away.  We don't want anything else to happen.  Supervisor drops

6   everything.  Officer stops whatever they're doing, and the

7   investigation on the streets starts immediately.

8   Q    So, this whole process you've walked the jury through from

9   the original documentation of the use of force through the

10  supervisor's investigation, how would that process have worked

11  during the George Floyd protests?

12  A    Obviously it does not work in crowd control situations,

13  when force is used.  We don't have the ability to take the squad

14  leader, the sergeant or the supervisor, off of that event and

15  have them just go away and start an investigation.  And so

16  operations have to still continue.  We are still in those

17  circumstances.  So, they're unable to perform that duty at that

18  point in time.

19        And so if an arrest is made, the officer completes the

20  use of force paperwork at the end of the shift.  It has to be

21  done by then if that arrest is made, but the arrest is dropped

22  off, and supposed to be -- that's the process for that when an

23  arrest is made.  If an arrest is not made, I believe we spoke --

24  and my memory is we covered the blanket use of force already.

25  So, if an arrest is not made, then that's where it would fall

1   under that blanket use of force.

2   Q    You got right what I was -- where I was going to go.  We

3   did talk about a blanket use of force earlier.  Who's completing

4   this blanket use of force?

5   A    So, the -- as it was on that screen, depending on the size

6   of the event and what's going on and the amount of force that's

7   been used, it may be a platoon, which is four full squads of

8   officers.  If not a lot of force was used, then it can be

9   reported on one blanket use of force if it's a short event and

10  not a lot of force was used.  If it was greater amount of force

11  or a longer event, it would go down to that squad level.

12          Again, the idea there is no individual action.  So, our

13  squads should be taking action together, and so that blanket use

14  of force is appropriate for that.  And so the way that's lined

15  up is for the entire incident, the squad writes out what they

16  did and what they saw and what they experienced as far as force

17  goes, and then the supervisor looks at that, was there and saw

18  the entire thing, and then completes that cover sheet for that

19  blanket use of force.  So, that's what that looks like.

20  Q    And what you just explained to the jury, is that what you

21  explained to recruit officers when you're going through that

22  PowerPoint presentation?

23  A    When we hit that point, I talked about it's just police

24  work.  The same thing.  This is the only change that you will

25  see.

20-cv-1878-RBJ    ERIC KNUTSON - Direct    03-22-2022

1    Q    So, just so I understand the Denver Police Department's

2    policy and training, regardless of whether it's an individual

3    use of force report or a blanket use of force report, does

4    Denver train its officers every use of force needs to be

5    accounted for?

6    A    One hundred percent.  That's key to our success as far as

7    working with our community.  The idea of transparency, force is

8    something that's -- it's divisive.  Peel's Principles of

9    Policing talk about four of those principles, which is he's the

10   father of -- I'm getting off topic.  I'm teaching again.  I

11   apologize.  Father of law enforcement, four of his principles

12   deal with use of force.  And that's the understanding of how big

13   of a deal use of force is.  So, it's something that we want to,

14   and we understand that we must capture and document.

15   Q    Thank you.  So, I have one more topic I want to cover with

16   you, and then I will turn it over to plaintiffs' counsel, but

17   the last topic I want to address with you is training the

18   department gives regarding body-worn cameras.  Does the

19   department provide training to officers regarding body-worn

20   cameras?

21   A    Yes, it does.

22   Q    And when is the first time that the department starts

23   training its officers regarding body-worn cameras?

24   A    So, the first time the officers see it is of course in the

25   academy, introduce it to them, and they start wearing that piece

20-cv-1878-RBJ    ERIC KNUTSON - Direct    03-22-2022

1   of equipment early on.  They start learning how to turn on that

2   piece of equipment during scenarios as they go through that.

3   And so they're introduced to it very early, and it becomes

4   second nature by the time they're out on the street as far as

5   tapping the camera to turn it on.

6   Q    And I actually want to back up a little bit.  If you could

7   briefly describe for the jury the Denver Police Department's

8   history with the body-worn camera.

9   A    So, we received our first version of the body-worn camera

10  in 2015.  Back then, it was a -- like a cigar-looking camera,

11  and it could be attached to a lapel or the side of glasses.  We

12  initiated that in one of the districts, brought it out in 2015.

13  We wanted to make sure we worked all the bugs out.  We did.  And

14  it was very positively received, because of the ability to

15  record officers' behaviors and others' behaviors and explain,

16  and very useful for that.

17         So, that was the first version in 2015.  Training came

18  out with that on how to use it, when to turn it on.  The policy

19  came out at the same time.  We then got a new version in 2018,

20  which is the one that everyone is familiar with, or has seen

21  today, and it's essentially that square box that normally sits

22  in the center of the chest of police officers, and that one came

23  out in 2018.

24         MS. HOFFMAN:  And if you could show the witness

25  Exhibit 467.  So, if you could go to page 389.  And I'm not sure

20-cv-1878-RBJ     ERIC KNUTSON - Direct     03-22-2022

1   that this portion of the operations manual has been admitted

2   into evidence.  This is the body-worn camera policy.

3           MS. STERK:  No objection to this section.

4           THE COURT:  Okay.

5   Q.     (By Ms. Hoffman) So, Sergeant, I am displaying the

6   operations manual at section 11904, which is entitled body-worn

7   camera technology.  Are you familiar with this policy?

8   A     Yes, I am.

9   Q     And the training that you just briefly described, is it

10  fair to say that the body-worn camera training is based on this

11  policy?

12  A     Yes.  It focuses 100 percent on the policy.

13  Q     And if we could scroll down a bit to section three.  A

14  little further down.  Okay.  So, directing your attention to

15  section 3A, does that outline the situations where officers are

16  required to activate their body-worn camera?

17  A     Yes.  Yes, it does.  And the training essentially is

18  attempting to capture if an officer is in contact with someone

19  and may be in a position to take any kind of police action, then

20  they should turn on that camera.  And so that's -- it outlines

21  some of them, but anything where we may take police action,

22  that's when officers are instructed to turn the camera on.

23  Q     And if you could scroll down a little bit, I think that

24  there's some additional -- and you indicated that officers are

25  trained regarding this policy.  How specifically are they

1   trained regarding how to turn it on for what you said, any sort

2   of police action?

3   A    So, it's on the new one, which is a great benefit, there's

4   a -- it's a large button that sits in the middle, and they just

5   reach up and tap it, activating the device.  It's got a

6   30-second backlog where it's capturing video but no audio.  So,

7   when you hear -- or when you see the camera footage and you

8   don't hear any audio for 30 seconds, that's the prior 30 seconds

9   to when the officer activated that camera.

10  Q    And does either DPD policy or DPD training specifically

11  address body-worn camera activation in a protest setting?

12  A    Yes, it does.  And you saw the information in there about

13  body-worn cameras.  We also include in there that if you're

14  using PepperBall, 40-millimeter, anything like that, the BWC is

15  useful for capturing what we saw there, and helping the officer

16  to capture the information of when they're using -- when they're

17  deploying, and what they are.

18  Q    Fair to say that nothing actually in this section mentions

19  the word "protest"?

20  A    No.  In here there's nothing about protest from the policy

21  side, but the -- my training information does carry that

22  information.  It does refer to the policy, if you will.

23  Q    Okay.  And if you could specifically describe how you train

24  officers to activate their body-worn cameras in a protest

25  situation.

                    20-cv-1878-RBJ    ERIC KNUTSON - Direct    03-22-2022

1    A    It's just police work.  If you're going to be conducting

2    police activity, have the body-worn camera on.  If you are

3    standing on a street corner and nothing is happening, and you've

4    just been assigned to a block or something like that, you don't

5    have to turn the body-worn camera on.  But if you're conducting

6    any kind of police activity, the body-worn camera gets turned

7    on.

8    Q    Does policy -- does this policy we're looking at now have

9    any provisions that specifically apply to the SWAT team?

10   A    Yes.  So, SWAT is not required turn on their body-worn

11   camera when they're conducting their specific tactics that they

12   utilize.

13   Q    And what's the purpose of that tactical operations

14   provision?

15   A    So that their specific tactics aren't being recorded or

16   widely used or anything like that, and doesn't get out there,

17   and keeps those tactics safe the way it should be.

18   Q    Are you aware of any of the issues officers encountered

19   with their body-worn cameras during the George Floyd protests?

20   A    Yes, I am.  Unfortunately, the second version of the

21   body-worn camera that came out is the chest-placed -- chest

22   attachment piece.  We looked at the first piece, that first

23   version, and it had the clip on it.  It was going to work very

24   well on lapels as well as on the personal protective equipment

25   chest protector, and so no problem with that.

20-cv-1878-RBJ   ERIC KNUTSON - Direct   03-22-2022

1        When we got the new version, it came with two sets of
2    magnets.  There was a lighter magnet that was going to work very
3    well for shirts, and then there was a heavier magnet that was
4    intended for coats, and my belief at the time when that came out
5    was that that magnet was going to be strong enough to go through
6    that padding on the chest protector and hold the body-worn
7    camera to the chest protector.  That was my belief when that new
8    version came out.

9        We did not conduct training with the new one.  When I
10    trained the recruits and they put their equipment on, they are
11    in their -- their fitness attire, since we're going to be
12    getting sweaty and that kind of thing, and kneeling and standing
13    and those kind of things, and so they don't have the body-worn
14    camera with that.  They wear the body-worn camera with their
15    recruit uniform.  So, they don't have that.

16        I really never saw it.  I never worked with them with
17    that new version.  And as we found out during this event during
18    the George Floyd demonstrations, the camera -- the magnet that I
19    thought was strong enough to hold that unit on was obviously
20    not.

21    Q   And it sounds like you were not aware of this issue until
22    the George Floyd protests?

23    A   I was not.

24        MS. HOFFMAN:  If I could just have a minute to confer
25    with counsel?  Nothing further.

Kevin P. Carlin, RMR, CRR

20-cv-1878-RBJ   ERIC KNUTSON - Cross   03-22-2022

1    THE COURT:  Okay.  Cross examination?

2    MS. STERK:  Sorry.  Just organizing myself.

3                    **CROSS EXAMINATION**

4  BY MS. STERK

5  Q    One second.  Good afternoon, Sergeant Knutson.  I am Diana

6  Sterk.  I am going to be asking you some questions on behalf of

7  the plaintiffs this afternoon.

8  A    Good afternoon.

9  Q    You are not aware of any of the plaintiffs throwing

10 anything or committing any acts of violence or property

11 destruction; correct?

12 A    As far as was I specifically there and saw anything, or am

13 I aware post that those things occurred?

14 Q    You're not aware that any of the plaintiffs in this case --

15 A    Oh.

16 Q    -- threw anything or caused any property destruction?

17 A    No, I am not.  I don't know who the plaintiffs are.  I am

18 not familiar.

19 Q    And you've talked a bit about the crowd management manual,

20 but that manual is not discussed in field force trainings;

21 right?

22 A    The crowd control manual is referred to in field force

23 training that it exists.  Every recruit officer when they come

24 through the academy receives a thumb drive of various

25 information, and on that thumb drive is a crowd control manual.

Kevin P. Carlin, RMR, CRR

20-cv-1878-RBJ    ERIC KNUTSON - Cross    03-22-2022

1    Q    Right.  So, they receive the crowd control manual, but the

2    contents of the crowd control manual are not discussed in

3    training?

4    A    No.  And the training supports the crowd control manual,

5    but you are correct.  We don't -- we don't go through the manual

6    at all.

7    Q    And there's no training on Stinger grenades in the crowd

8    control training; correct?

9    A    Correct.

10   Q    You're aware that officers were deploying Stinger grenades

11   during the protests?

12   A    I was told afterwards that there were Stinger grenades

13   being used.  Sting balls, as they are called.

14   Q    You've talked about training to single out people in a

15   crowd taking violent actions today; correct?

16   A    Yes.

17   Q    Did DPD have paintball type weapons that allowed officers

18   to mark and identify people who might be throwing something in a

19   crowd with paint?

20   A    We had had that in the past, and it's the same system.

21   They're actual balls that go into the PepperBall system.  But I

22   don't know that those were being used.  And I know that we had

23   used them in the past, but my understanding and the training

24   that I provided the recruits, I don't talk to the recruits about

25   it, because my understanding is that we didn't have those

20-cv-1878-RBJ   ERIC KNUTSON - Cross   03-22-2022

1   available.

2   Q    You had an interview with Nick Mitchell, the independent

3   monitor; is that right?

4   A    Yes, ma'am.

5   Q    And you spoke to him about your impressions of training and

6   what you saw going on during the protests?

7   A    Yes, ma'am.

8   Q    You were on -- excuse me.  And in that interview with

9   Mr. Mitchell, you were truthful about what your thoughts were?

10  A    Of course.  Yes, ma'am.

11  Q    And if we can put up Exhibit 864.  And this has already

12  been admitted.  And you were aware that Mr. Mitchell was --

13  strike that.  You had told Mr. Mitchell, if we go down to the

14  bottom of this memo, and I think you've talked about this a bit

15  today, you told him that you had developed a three-day field

16  force training course in 2015; right?

17  A    2014.  Yes, ma'am.

18  Q    2014?

19  A    And I believe I had mentioned 2015 at some point in time,

20  but it was 2014.

21  Q    And you believe that was a valuable course?

22  A    Yes.

23  Q    And you put that course on once a month -- approximately

24  once a month from 2015, or I guess 2014, and to the beginning of

25  2016?

20-cv-1878-RBJ    ERIC KNUTSON - Cross    03-22-2022

1    A    Yes, ma'am.

2    Q    But in 2016, DPD commanders told you that they would no

3    longer send officers to the training because it was too

4    time-intensive and caused manpower issues in the districts?

5    A    That's what I was told by my supervisor.

6    Q    And that training was a FEMA course?

7    A    Yes.

8    Q    And you told Mr. Mitchell that you couldn't offer a FEMA

9    course anymore if you weren't doing three days, because FEMA

10   wouldn't let you bastardize it; is that right?

11   A    That's the term that I used, and I -- Mr. Mitchell called

12   me while I was on vacation.  I was sitting in my house, and I

13   was having a conversation with Mr. Mitchell, who I respect, and

14   had that -- and I did use that word.

15          So, what I was trying to get across with that is that

16   we weren't allowed to take their material, teach our own stuff,

17   and then say that we are a FEMA training or anything like that.

18   That was made very clear when we signed up for that three-day

19   course.

20   Q    And so when DPD commanders told you that you could no

21   longer do a three-day training, that was the end of the

22   three-day course?

23   A    For a time, until I could come up with a way to create a

24   course that captured the ideas and the principles and some of

25   the tactics that are utilized.  I don't think they're protected

20-cv-1878-RBJ    ERIC KNUTSON - Cross    03-22-2022

1    or anything like that.  With the understanding that we are not

2    proposing this as a replacement for that three-day course, but

3    trying to get our officers what they needed out of that three

4    days of training, and whittle it down to something useful.

5    Q    To be clear, after 2016, you never again had a three-day

6    course for field force training?

7    A    That is correct, ma'am.

8    Q    And you also -- you know, in 2019, you told him that you

9    developed a new field force training for leadership; right?

10   A    Yes.

11   Q    And if we can go to the next page of the memo, at the top,

12   you had talked to him about that.  And that was a one-day course

13   instead of a three-day course?

14   A    Correct.

15   Q    And only seven supervisors attended; is that right?

16   A    And there may have been a few more.  This was our

17   conversation with me sitting at home.  There may have been a few

18   more, but not an outstanding number.  It was not a full class,

19   for sure.

20   Q    And the DPD force is about 1,500 officers; right?

21   A    Yes, ma'am.

22   Q    And there are hundreds of supervisors?

23   A    Yes.  Hundreds.

24   Q    During that course, the supervisors didn't get a chance to

25   run through formations with their actual officers, with their

20-cv-1878-RBJ    ERIC KNUTSON - Cross    03-22-2022

1   team; right?

2   A    No, they didn't.  And -- I'm not -- the team concept is a

3   challenge there, but I won't go -- I won't go into that.  But

4   no, it was the supervisors that were there running other

5   supervisors in groups through the same thing.

6   Q    And that was actually something that people -- either the

7   supervisors or yourself viewed as a negative of the course that

8   they didn't actually get to run through it with the officers?

9   A    Can you ask me the question again?  I'm not sure I --

10  Q    Sure.  You had told Mr. Mitchell that one of the negatives

11  of the course -- of that course was that officers weren't

12  training with the supervisors on the commands?

13  A    I don't know if I mentioned that to him, but if I did, I

14  don't know if that would be erroneous or not.  A lot of times

15  when officers are deployed and supervisors are deployed, the

16  team that they have might not be their actual team that they

17  work with.

18          Additionally, these teams change every day, and so a

19  supervisor would have to be training with a bunch of different

20  people to train his or her exact people that they work with.  I

21  don't think that I said that.  And if I did, it was inaccurate.

22  However -- I'm sorry.  Go ahead.  I'm sorry.

23  Q    I just wanted you to look back at the memo to see that Nick

24  Mitchell wrote the memo that from feedback you received,

25  participants thought it was a good refresher, but didn't get a

20-cv-1878-RBJ   ERIC KNUTSON - Cross   03-22-2022

1   chance to actually run through the formations with officers,

2   which is a negative.  Do you see that?

3   A    Yes.  Okay.  So, with officers, meaning not with their

4   officers.  They didn't get a chance to do it on large scale.

5   So, what they wanted was to be able to run large full squads,

6   multiple squads, platoons, and those kind of things.  That's

7   what they were referring to.

8   Q    I see.  And they didn't get a chance to do that during the

9   training?

10  A    No, they did not.

11    (Simultaneous discussion interrupted by the court reporter.)

12  Q    Other than the supervisor course, I think you also talked

13  about there being a one-hour online refresher course?

14  A    Yes.

15  Q    And you weren't sure how effective that one-hour refresher

16  course is, or at least that's what you had told Mr. Mitchell;

17  right?

18  A    Correct.

19  Q    And you weren't sure if officers were -- or, let me take

20  that back.  You felt that if officers were paying attention,

21  they could have gotten a useful refresher?

22  A    Yes.

23  Q    But you weren't sure if they were paying attention to that

24  or not?

25  A    It's an online training course, and I'm not there in the

20-cv-1878-RBJ    ERIC KNUTSON - Cross    03-22-2022

1   room with them, and so we provide that.  My hope would be online

2   training on field force, hopefully they're going to pay

3   attention to it.

4   Q    So, I want to turn back to the protests themselves.  You

5   had said you were on vacation during the protests; right?

6   A    Yes, ma'am.

7   Q    Okay.  And while you were on vacation, though, you

8   testified that you had watched some of the footage of the

9   protests?

10  A    Yes, ma'am.  On television.

11  Q    And you testified that you had called Lieutenant Coppedge

12  the first few days of the protest to see if you could come in

13  and help; right?

14  A    Yes, ma'am.

15  Q    And if we can go to Exhibit 861.  Are you aware that

16  Lieutenant Coppedge -- this has already been admitted.  Are you

17  aware that Lieutenant Coppedge also sat down with the

18  independent monitor for an interview?

19  A    I am now.

20  Q    If we can turn to the last page.  And Lieutenant Coppedge

21  told the independent monitor, you see in the last paragraph

22  here, that you had called him while you were on vacation and

23  asked if you should come to the command post.  He says, Sergeant

24  Knutson told Lieutenant Coppedge that he was seeing things done

25  wrong, and asked if he should go help.  And that's what you've

20-cv-1878-RBJ   ERIC KNUTSON - Cross   03-22-2022

1   testified about today; right?

2   A    Yes.

3   Q    And Lieutenant Coppedge told you, no, the administration

4   doesn't want it.  They'll just get mad that someone is inserting

5   themselves; is that correct?

6   A    I don't recall what his -- my recollection is that he told

7   me, Eric, you belong in training.  That's not your job.  I don't

8   know if he said anything of this nature.  It's a conversation

9   that he had had, so I don't know, thinking back that far.  I

10  would think that I would remember if they would just get mad, or

11  maybe I interpreted that as, because I don't know my place, and

12  I'm getting out of my area.  I don't know.  Maybe I interpreted

13  that word that way.

14  Q    So, you don't necessarily disagree with what Lieutenant

15  Coppedge told the independent monitor.  You may have just

16  interpreted it differently than he did?

17  A    I don't disagree that it's not my place to go running

18  downtown and inserting myself into something as a trainer when

19  they've got operations going on.  It's probably going to confuse

20  issues.

21  Q    So, I want to turn to your own interview, back to your own

22  interview with the independent monitor.  That was conducted on

23  September 10th, 2020; is that correct?

24  A    Yes.

25  Q    And that was about three months after the protests?

20-cv-1878-RBJ    ERIC KNUTSON - Cross    03-22-2022

1   A      Okay.

2   Q      Is that right?

3   A      Four?

4   Q      Four months after the protest?  Excuse me.  Thank you.  And

5   prior to -- between the time of the protests and September 10th,

6   you had watched a lot of video; right?  Of the protests?

7   A     I watched video for the first few days.  I did not -- this

8   is my vacation, and my time.  When I was told that I'm not going

9   to go down there, I decided that I can only watch so much of

10  this stuff, and this is my wellness time that I am now losing,

11  and this is not adding to my wellness.

12          And so after the first few days, I shut it off, didn't

13  look at it.  I caught a little bit, snippets on the news and

14  those kind of things, but my attitude at that point in time was

15  that what I'm seeing on the television, I'm going to get more

16  information from the officers afterwards, and there's going to

17  be more complete information.  And at the time, it was every

18  night, helicopter flying above, and you'd just be looking down

19  on people moving all over the place and that kind of thing

20  anyway.  So --

21  Q      So, let's go to the third page of this memo.  And in the

22  first paragraph we see there, Nick Mitchell writes that you were

23  on vacation, but he watched a lot of video of the GFP.  Do you

24  see that?

25  A      Yes.

20-cv-1878-RBJ   ERIC KNUTSON - Cross   03-22-2022

1    Q    And at the time of this interview with the independent

2    monitor in September, you would also, in addition to watching

3    some of the video, you had an 80-page report.  If we can go to

4    the last page of this memo.  On the last bullet, it says

5    somebody had recently sent around an 80-page report about recent

6    protest events and best practices?

7    A    Yes, ma'am.

8    Q    And was that the 82-page Guide on Policing Protests,

9    Lessons from the Occupy Movement, from Ferguson, and Beyond, by

10   Edward -- Ed Maguire?

11   A    Is that Ed Maguire that presented that?

12   Q    Well, it says here that somebody had sent around an 80-page

13   report, and I'm wondering if that was the 82-page report on

14   policing protests by Ed Maguire?

15   A    Yes.  That was --

16   Q    Thanks.  And by September of 2020, when you -- you can take

17   that down.  When you sat down with the independent monitor, you

18   had also spoken to colleagues in that intervening four months

19   about the protests?

20   A    Yes.

21   Q    And you discussed some of your observations of the protest

22   footage that you watched with Mr. Mitchell; right?

23   A    Yes.

24   Q    If we can bring the exhibit back up on page three.  And I

25   just want to walk through some of what you told Mr. Mitchell.

20-cv-1878-RBJ   ERIC KNUTSON - Cross   03-22-2022

1    A    Yes.

2    Q    So, on page three, in the first paragraph there, we see

3    that you told Mr. Mitchell that some of the formations that were

4    being used are nothing I have ever trained on.  Do you see that?

5    A    Yes, ma'am.

6    Q    And you also believed in the next sentence that there was

7    an absence of riot batons on the line?

8    A    Yes, ma'am.

9    Q    And then the last sentence, it says that you saw officers

10   moving a crowd with PepperBall only; right?

11   A    Yes, ma'am.

12   Q    And that was another one of your criticisms?

13   A    Yes, ma'am.

14   Q    And then if we go to the next paragraph, I think the second

15   sentence, you told Mr. Mitchell that in the video you saw, there

16   was an absence of crowd -- absence of command and control, and

17   too much reliance on PepperBall.  Do you see that?

18   A    Yes, ma'am.

19   Q    And you also told him that leaders should have required

20   officers to use batons and encouraged proper formations and half

21   steps?

22   A    Yes, ma'am.

23   Q    And you agree that using improper formations can increase

24   the risks of an operation; right?

25   A    In a -- in our standard practices, the reason we practice

20-cv-1878-RBJ    ERIC KNUTSON - Cross    03-22-2022

1    the formations that we do is that crowd -- is that force

2    multiplier effect.  We are acting in a way that is very

3    disciplined and moving forward in a -- such a manner.  So, yes,

4    that's -- on a normal basis, that would be a problem.

5    Q    And all of these observations that you discussed with

6    Mr. Mitchell again were four months after the protests had

7    already ended; right?

8    A    Yes, ma'am.

9    Q    At the time of your deposition, the memo that we've just

10   gone through was almost completely -- the City gave to the

11   plaintiffs was almost completely redacted.  Are you aware of

12   that?

13   A    No, I am not.

14   Q    And so with a completely redacted memo, you're aware that

15   the plaintiffs, when we took your deposition, weren't aware of

16   your -- your views regarding the inconsistencies of training?

17            MS. HOFFMAN:  Objection.  Lack of personal knowledge.

18            THE COURT:  Sustained.

19            MS. STERK:  Nothing further.

20            THE COURT:  All right.  Redirect?

21            MS. HOFFMAN:  Nothing further.

22            THE COURT:  Okay.  Any questions from the jurors?

23   Yes, there are.  Okay.

24       (Proceedings held at the bench:)

25            THE COURT:  Forty-three.

Kevin P. Carlin, RMR, CRR

20-cv-1878-RBJ   ERIC KNUTSON - Cross   03-22-2022

1           MS. HOFFMAN:  I'm having a hard time reading that one.
2    That's fine.
3           MS. STERK:  No objection.
4           THE COURT:  Forty-four.
5           MS. STERK:  No objection.
6           MS. HOFFMAN:  No objection.
7           THE COURT:  Forty-five.
8           MS. STERK:  No objection.
9           MS. HOFFMAN:  No objection.
10          THE COURT:  And 46.
11          MS. HOFFMAN:  No objection.
12          MS. STERK:  No objection.
13      (Proceedings held in open court:)
14          THE COURT:  Sergeant, we have a few questions from the
15   jurors for you.
16          THE WITNESS:  Yes, Your Honor.
17          THE COURT:  Question, does contagion crowd psychology
18   affect officers as well?  Does contagion crowd psychology affect
19   officers as well, and do you cover that in your class?
20          THE WITNESS:  So, the idea of contagion as far as this
21   crowd philosophy, where that -- I can picture being involved in
22   officer behavior is if -- and something that has to be trained,
23   because it's a natural thing, this idea of this contagion --
24   it's not contagion, because it's what we call sympathetic
25   reflex, or when we see an officer do something -- true

20-cv-1878-RBJ   ERIC KNUTSON - Cross   03-22-2022

1  sympathetic reflex is you squeeze something with one hand, the

2  other hand squeezes as well.

3          But we will see an officer do something, and another

4  officer will say, if that officer sees something, I must also do

5  this thing as well.  And so the training there is each officer

6  looks and has to determine for themselves what it is they're

7  seeing.  And so it's a historic incident that has happened over

8  the years with policing that we have to try to train out of the

9  officers.  We don't spend time doing this specifically in the

10  crowd control class, but it is in other areas as far as firearms

11  training, most specifically.

12          THE COURT:  Question, if an officer deploys

13  less-lethal weapons during an event like a football tailgating

14  or protest, should they turn on their body-worn camera?

15          THE WITNESS:  I'm sorry, sir?  Can you read it one

16  more time?  The football threw me.

17          THE COURT:  Okay.  Sometimes I don't read the

18  questions quite right the first time.

19          THE WITNESS:  I'm sure it was fine.  I'm sure it was

20  me, Your Honor.

21          THE COURT:  No.  Here goes.  If an officer deploys

22  less-lethal weapons during an event like a football tailgating

23  or protest, should they turn on their BWC?

24          THE WITNESS:  So, the simple answer to that is any

25  time an officer is deploying any kind of less-lethal munitions,

20-cv-1878-RBJ   ERIC KNUTSON - Cross   03-22-2022

1    any time we're taking any kind of police action, and most

2    especially when we're using force, the answer is yes.  We will.

3    We are trained to, and we shall turn on the BWC.

4            A challenge with that is we shouldn't be deploying any

5    kind of less-lethal munitions at a football tailgate.

6            THE COURT:  Well, if it were the Dallas Cowboys.

7            THE WITNESS:  Those are opportunities, again, for

8    Broncos celebrations now.  So, we're not going to need those

9    things.

10           THE COURT:  All right.  Next question.  If an officer

11   has or had been disciplined for their use of force, is the

12   refresher course then mandatory?

13           THE WITNESS:  That's a good question.  And no, it's

14   not.  The refresher course and discipline for use of force?

15           THE COURT:  Yes.  If an officer had been disciplined

16   for their use of force, is the refresher course then mandatory?

17           THE WITNESS:  And so use of force, if they're

18   disciplined for that, we look at what the issue was with that

19   use of force.  And we will often, if it is an issue with

20   training, then we will often prescribe some form of training.

21   If it was related to crowd control, then it was conceivable, and

22   it has not happened yet, that crowd control training refresher

23   course would be mandated.

24           We do mandate, for instance, tactical communication.  A

25   lot of times we will see issues in use of force where an officer

20-cv-1878-RBJ   ERIC KNUTSON - Cross   03-22-2022

1    could have utilized verbal judo -- sorry.  Tactical

2    communication, verbal judo, synonymous.  A lot of times we will

3    see communication issues that exacerbated the problem, and if

4    the officer correctly used verbal judo, that wouldn't have

5    happened.  And so we look for kind of what the root cause there

6    is and assign training if it's a training issue to address that

7    root cause.

8              THE COURT:  Next question says, riot gear obscures an

9    officer's identity.  Is there any policy regarding a requirement

10   to have a badge number and name visible while on duty?

11             THE WITNESS:  That's a good question.  And while on

12   duty, I believe the question is asking about on the Turtle gear.

13   Is that the way you would read that, Your Honor?

14             THE COURT:  Well, they're talking about an officer

15   being on duty.  I guess the question is, is there a general

16   requirement to have a badge number and name visible while an

17   officer is on duty?  And then how does that square with riot

18   gear that obscures their identity?

19             THE WITNESS:  Very good.  That's what I caught as

20   well.  Thank you, sir.  Yes.  Our badge number has to be -- it's

21   on our badge.  So, that is on there.  When the Turtle gear is

22   worn, we have patches that show who they are.  For a while,

23   there was a period, and -- that we did not have patches with

24   badge numbers that were coming out.  And so what it said was

25   police and those kind of things, but no badge number.  We have

20-cv-1878-RBJ   ERIC KNUTSON - Recross   03-22-2022

1    now addressed that, and the patches now come out with the badge

2    numbers on there already.  They don't get to the officers in the

3    academy, but they do get to the officers afterwards, and get

4    issued at that time.

5            THE COURT:  And when did that new policy come out with

6    those new badges?

7            THE WITNESS:  I believe that's just been within the

8    last couple of years.  It's something that we had in place for

9    the DNC, and at some point in time, it must have gone away.

10   Again, it doesn't happen in the academy on my side where I'm

11   training them.  And so at some point in time, that must have

12   happened.

13           THE COURT:  All right.  Any other questions from the

14   jurors?  All right.  Follow-up questions starting with defense

15   counsel?

16           MS. HOFFMAN:  Nothing for the defendants.  Thank you.

17           MS. STERK:  Just one question, Your Honor.

18                        **RECROSS EXAMINATION**

19   BY MS. STERK

20   Q    Following up on the crowd control refresher mandate, has

21   anyone who was disciplined for their actions during the George

22   Floyd protests, have any of those people been mandated to take a

23   crowd refresher -- crowd control refresher training?

24   A    So, our crowd control training right now is ongoing and

25   constant right now.  So, every police officer is receiving a

20-cv-1878-RBJ   MATTHEW WOODS - Direct   03-22-2022

1    significant amount of training.  We have taken it upon ourselves

2    to train the entire department with 16 hours a year of crowd

3    control since then.  So, every police officer across the

4    department is receiving crowd control training.

5           But to answer your specific question, no, ma'am.  I

6    apologize for taking a long time to answer that question.

7               THE COURT:  Thank you, sir.

8               THE WITNESS:  Thank you, Your Honor.

9               THE COURT:  Next defense witness?

10              MS. HOFFMAN:  Defendants next call Matthew Woods to

11   the stand.

12          (The Witness is Sworn)

13              THE COURT:  All right.

14                      **DIRECT EXAMINATION**

15   BY MS. HOFFMAN

16   Q    Good afternoon.  If you could please state your name,

17   spelling your last name for the record.

18   A    Matthew Woods, W-O-O-D-S.

19   Q    And you're presently employed by the City of Denver?

20   A    Yes.

21   Q    And how long have you worked for the City?

22   A    Three years.

23   Q    And what is your current position?

24   A    I'm a project manager.

25   Q    And what does that entail?

20-cv-1878-RBJ   MATTHEW WOODS - Direct   03-22-2022

1  A    So, we are the Department of Transportation and

2  Infrastructure, and I am on the infrastructure team.  So, my

3  group, we work in vertical construction.  So, we work on

4  buildings.  I have a supervisor, manager, director, but we are

5  assigned projects through our supervisor and manager.  So, we

6  will -- we will get a project assigned to us for the needs of

7  different organizations within the city, and we will work to

8  hire an architect, engineer, services to design what we need to

9  design.  And then we will work on hiring out the construction,

10 contractors, builders, to go in and execute the design, you

11 know, to complete the project.  And we will oversee all those

12 activities until it's complete.

13 Q    Okay.  So, I just want to make sure I understand that,

14 because construction is probably not my strong suit.  You

15 oversee vertical construction projects for the City of Denver?

16 A    Yup.  So, buildings.

17 Q    Great.  Thank you.  Were you present in the City of Denver

18 during the George Floyd protests?

19 A    Yes.

20 Q    And describe your experience.

21 A    So, at the time I was living at West 12th Avenue and

22 Cherokee, in a condo.  So, I was present during the protests.

23 Q    And did you witness any protest activity from your home?

24 A    Yes.  So, on the weekend of -- the last weekend of May, I

25 witnessed, you know, protest activities up and down the street.

20-cv-1878-RBJ    MATTHEW WOODS - Direct    03-22-2022

1    And then also at one point in time, there was some people that

2    had broke the windows out of the bar adjacent, catty-corner to

3    where I live.  And so I was outside at the time, and I saw that

4    happen.

5              And then I also saw at some point in time a couple

6    people walk into our building.  You know, they followed a car

7    that came out, so the gate was open.  They came in on foot, and

8    then, you know, came out with some bikes.  So -- or one bike,

9    one skateboard.  And that was my -- that's what I witnessed.

10   Q    And you mentioned witnessing of some windows broken out of

11   a bar.  What was the name of the bar?

12   A    It was called Dulce Vida.  It was also on the corner of

13   12th and Cherokee.

14   Q    Moving on, back to your work for the City, at some point in

15   time were you assigned a project involving repair to damages to

16   City buildings that was caused during the George Floyd protests?

17   A    Yes.

18   Q    And who assigned you the project?

19   A    The project came directly from my manager.

20   Q    And do you recall when you were assigned the project?

21   A    Yes.  It would have been the 1st of June, I believe, which

22   is the Monday after that weekend.

23   Q    And specifically what was the assignment that was given to

24   you?

25   A    So, the assignment was to assess the damages on a handful

20-cv-1878-RBJ   MATTHEW WOODS - Direct   03-22-2022

1    of City buildings around Civic Park and more of an emergency

2    response to go and make those repairs.

3    Q    And did the assignment have a name?

4    A    Well, we named it civil unrest damage repairs.

5    Q    And you indicated we.  Was anybody else working on this

6    project with you?

7    A    No.  It was -- it was just me in collaboration with

8    facility managers who manage each one of these buildings, and

9    then also my manager and I kind of, you know, we said we need to

10   come up with a name for this project to call it, so that's what

11   my manager and I came up with.

12   Q    And so you're assigned this project.  What's your first

13   step?

14   A    Yes.  So, my first step is to go out, you know, to visit

15   all these buildings and just walk them, meet with the facility

16   managers, and, you know, get a list, compile a list of all the

17   damages that were done.

18   Q    Okay.  And I want you to walk me through some of those

19   buildings.  Can you recall specifically the City buildings that

20   were assigned to you as part of this original assignment.

21   A    Yes.  So, the buildings that were assigned were the

22   McNichols building, the Wellington Webb building, the city and

23   county building, which is the courthouse, the Minoru Yasui

24   Building, the elections building, Lindsey-Flanigan Courthouse,

25   Van Cise Detention Center, the Rose Andom Center, and I believe

20-cv-1878-RBJ    MATTHEW WOODS - Direct    03-22-2022

1   that is -- I believe that's all the buildings.

2   Q    Were you assigned any damages with respect to the Denver

3   Police Crime Lab?

4   A    Yes.  I'm sorry.

5   Q    And how about the Denver Public Library?

6   A    Denver Public Library as well.  Sorry I left those two off.

7   Q    No worries.  Okay.  So, I want to take those buildings one

8   at a time and have you walk me through the damages that you

9   assessed at each of those locations and the necessary repairs.

10  So, let's start with the McNichols building.  What damages was

11  caused during the George Floyd protests to the McNichols

12  building?

13  A    Sure.  So, the McNichols building, it's located in Civic

14  Park off of Colfax on the northwest corner.  The building in

15  general, it's a historic building in Denver.  You know, it was

16  Denver's original public library.  And that building sustained

17  some pretty significant damages.  Original -- the original scope

18  was about 14 windows were broken out of that on the first floor,

19  and I think there was one or two on the second floor.

20          And in the process of breaking out the windows on the

21  first floor, there was some -- there was some paint being stored

22  in the receiving room on the first floor, and that paint just so

23  happened to be really highly flammable oil-based paint that they

24  were using to paint Bannock Street, which was being closed down

25  for traffic permanently.

 1          It was going to become a pedestrian roadway.  So, the

 2   City had commissioned an artist to, you know, paint a mural all

 3   the way down that pedestrian street.  And it was just a

 4   coincidence that, you know, that paint happened to be stored in

 5   that room at that time.  So, when the windows were broken out,

 6   you know, somebody had discovered, you know, that paint was

 7   flammable.  So, it started to get poured around on the sidewalk

 8   in the window opening that they had broken out and lit on fire.

 9          So, you know, that lit up on the edge of the building

10   and kind of burning up a little bit on the inside.  And then

11   also it had been taken over to the other side of the building

12   where there was a City vehicle owned by McNichols and the arts

13   and venues district, and that Ford Explorer was burned.  And it

14   lit up on the side of the building and kind of charred the

15   building in a couple different areas.  So, that was a bit of a

16   mess to clean up.

17          And then so on top of the windows, also the City went

18   through a, you know, sort of an emergency effort to board up

19   windows.  So, broken windows and unbroken windows, boards were

20   put up, you know, to protect future damages or from anybody

21   getting through those broken windows.  So, boards were put up

22   all around.  So, there was some damages caused, you know, just

23   in the nature of trying to respond to that emergency.

24          So, also, there was graffiti tagged around the building

25   in various places.  So, you know, in removing the burn and the

1  char from the fire, you know, the graffiti was a similar kind of

2  item that needed to be removed off sort of the limestone

3  surfaces of that building.

4  Q    So, I just want to make sure that I understand where the

5  damages caused by the fire occurred to.  I believe you indicated

6  some of it went into the inside of the building, some to the

7  outside of the building, and then also there was some fire

8  damage to a City vehicle?

9  A    Correct.

10  Q    And you seem to have some knowledge as to what took place

11  at the McNichols building.  How are you in a position to have

12  that knowledge?

13  A    Yeah.  So, when I went to scope the building originally,

14  the facility manager and the security that worked there, they

15  have cameras around the building.  So, you know, when I was in

16  the process of scoping the building, we looked at the security

17  footage.  They showed it to me.  So, you know, I was able to

18  witness through looking at it, you know, what had happened.

19       And it was, you know, basically that there's some poles

20  that line Civic Park going east to west that are -- you know,

21  they're removable for events.  There's a lot of events that come

22  in there.  So, those were picked up out of the ground and used

23  as battering rams to break the windows out.  So, you know, you

24  could see that on the film.  You know, the Explorer being

25  burned, the windows being broken, the fire being started.

20-cv-1878-RBJ    MATTHEW WOODS - Direct    03-22-2022

1  Q    And describe how the people that you saw causing this
2  damage in the surveillance video, how were they dressed and
3  equipped?
4  A    Yeah.  I mean, I don't -- I don't recall exactly, you know,
5  what they were wearing, and I don't even think the video was in
6  color.  You know, it was black and white, and it was dark.  It
7  was nighttime.  So, I don't recall exactly what the attire was.
8  Q    Okay.  I am going to move on to the city and county
9  building.  Can you describe the damages to the city and county
10  building caused during the George Floyd protests.
11  A    Sure.  So, in that original scope of damage, there was 84
12  windows broken out of that building, and graffiti was tagged
13  around the building in various areas.  So, and that was, again,
14  it was pretty standard for all the buildings that I'm talking
15  about right now, which was that, when the windows were broken
16  out, you know, the City came in with an emergency effort to
17  board up any unbroken windows or broken windows to make sure
18  that nobody could enter the facility.  So, boards were put
19  around the city and county building completely around the first
20  floor.
21  Q    So, were all of those 84 windows, those were all
22  first-floor windows?
23  A    I believe so.
24  Q    Okay.  Moving on to Wellington Webb.  Where is Wellington
25  Webb?

Kevin P. Carlin, RMR, CRR

20-cv-1878-RBJ    MATTHEW WOODS - Direct    03-22-2022

1    A    Wellington Webb is just across Colfax, adjacent,

2    catty-corner to McNichols and city and county building.  So,

3    they're all in the same corner of, I believe it's Bannock and

4    Colfax.

5    Q    And why don't you tell me about the damages to the

6    Wellington Webb building.

7    A    Sure.  So, there was ten windows broken out there at the

8    Webb building.  Graffiti tagged around the building similar to

9    McNichols and city and county building, and then again, boards

10   put up around the first floor completely on all windows.

11   Q    Moving on to the elections building.  What if any damage

12   did the elections building sustain?

13   A    So, the elections building was -- there were no broken

14   windows there, but plywood was put up around the exterior of

15   that building to protect the windows.

16   Q    And I'm going to call it the MY building.

17   A    Yeah.  That's what we call it.

18   Q    Okay.  And what is the actual name of the building again?

19   A    Minoru Yasui.

20   Q    Is this in the same area as the other buildings that you've

21   located for us?

22   A    Yes.  It's next to the Wellington Webb building on Colfax,

23   and across from the city and county building on Colfax.

24   Q    And what damages did the MY building sustain?

25   A    Sure.  So, the MY building, it sustained -- it was boards

20-cv-1878-RBJ    MATTHEW WOODS - Direct    03-22-2022

1    put up all along the first floor windows, and then there was a

2    couple windows that were broken out as well on that one.

3    Q    Do you recall approximately how many windows?

4    A    I think there was two windows broken on that facility.

5    Q    Okay.  Moving on to the Lindsey-Flanagan Courthouse.  Can

6    you describe the damages that that building sustained.

7    A    Sure.  So, that -- the Lindsey-Flanagan Courthouse and the

8    Van Cise Detention Center is more of a campus.  So, it's two

9    separate buildings with a plaza in between.  And it was -- I

10   believe that plaza was at one point fenced off, but the damage

11   sustained there was graffiti around the campus.  So, around the

12   retaining walls that go around that block, and then there was a

13   few spots on the building where graffiti had been tagged on the

14   actual building.

15   Q    And any broken windows and/or boarded-up windows at the

16   Lindsey-Flanagan Courthouse?

17   A    So, in the original scope, I don't believe that we had any

18   broken windows or board up there.  I know that later on, we did.

19   So, I don't think original scope.

20   Q    So, when you say original scope, are you referring to your

21   original project as assigned by your manager on Monday,

22   June 1st?

23   A    Correct.  Yup.

24   Q    Okay.  And at some point in time, were you assigned

25   additional damages to City buildings?

20-cv-1878-RBJ    MATTHEW WOODS - Direct    03-22-2022

1   A     Yeah.  The damages continued, you know, over a, you know, a

2   few months, couple months.  You know, various weekends here and

3   there, there was -- continually, you know, damages caused.

4   Q     And I really just want to focus your attention for purposes

5   of this trial on the damages caused between May 28th and

6   June 2nd.

7   A     Mm-hmm.

8   Q     Has everything you described so far to the jury to the city

9   and county building, McNichols, Webb, elections, MY, and

10  Lindsey-Flanagan Courthouse, those were all in your original

11  assignment as given on June 1st?

12  A     That's correct.

13  Q     So, moving on to Van Cise.  And I think you already

14  described that that's part of the Lindsey-Flanagan campus?

15  A     Yes.

16  Q     So, did it sustain similar campus damages as

17  Lindsey-Flanagan, since they're together?

18  A     Correct.

19  Q     And did Van Cise sustain any additional damages other than

20  the graffiti and the campus?

21  A     No.

22  Q     What if any damages did the Denver Police Crime Lab

23  sustain?

24  A     So, the crime lab, to my knowledge, sustained board-up.

25  So, at that time, there were no broken windows or graffiti that

20-cv-1878-RBJ    MATTHEW WOODS - Direct    03-22-2022

1   I scoped, but it was -- the boards were put around the building

2   to protect the windows.

3   Q     And the process of putting those boards up on an emergency

4   basis to protect people from coming in, does that cause damage?

5   A     It can, yeah.  You know, in a rush, you know, it can --

6   it's screwed up -- you know, screwed up through the metal window

7   frame.  So, when it's taken down, you know, there's holes.

8   There's holes in the window.  Not the glass, but the metal

9   frame.

10  Q     Moving on to the Denver Public Library.  What if any

11  damages did the Denver Public Library sustain?

12  A     The Denver Public Library sustained graffiti around the

13  building.

14  Q     Any broken windows or boarded-up windows that were part of

15  your original scope of work for the Denver Public Library?

16  A     No.

17  Q     And then I think one final one, Rose Andom.  What if any

18  damages were caused to Rose Andom?

19  A     So, there were damages to that building, but we were asked

20  not to -- my scope of work, we were asked to not make those

21  repairs.  The facility manager was going to -- would take that

22  upon themselves to make those repairs.

23  Q     And notwithstanding the fact that they weren't part of your

24  original scope of work, but do you have any knowledge of the

25  damages to Rose Andom?

20-cv-1878-RBJ   MATTHEW WOODS - Direct   03-22-2022

1   A    Yeah.  When we scoped it, there was approximately three

2   windows broken, a small amount of graffiti, and there were some

3   boards up as well on that -- the front of that building.

4   Q    And you've described that several of these buildings that

5   we just discussed had graffiti tags on them.  Can you tell the

6   jury about some of the messages that you recall seeing, and some

7   of the tags?

8   A    Sure.  So, some of it was not legible.  You know, or I

9   don't recall all of it, but I distinctly do recall, you know, at

10  the Denver Public Library, there was a mural of a pig on the

11  building.  There was initials FTP on some of the buildings.  And

12  I know there was anarchy, like the anarchy sign with the A with

13  the circle around it, which I think means anarchy.  And there

14  was some taggings of BLM as well.

15  Q    And through this repair process, did the City have to deal

16  with any nonstandard building components?

17  A    Sure.  So, at the city and county building, you know, the

18  windows there were, you know, they're single pane.  They're old

19  style windows, steel.  So, as we started to scope that project,

20  we discovered that there was, you know, some amounts of asbestos

21  and lead in the building material.  So, before we could go and

22  start to disturb that stuff, we had to bring in an environmental

23  consultant to safely remove that material.  And, you know, in

24  doing so, you know, it added a lot of cost, added a lot of time

25  to repairs.

20-cv-1878-RBJ   MATTHEW WOODS - Direct   03-22-2022

1    And then also, you know, just to replace the windows

2    without the environmental, you know, concerns and the materials,

3    you know, the window stops on the side.  These pieces of metal

4    on the side had to be broken out, glass replaced, and weld back

5    some metal onto the window.  So, it wasn't traditional at all.

6    And it was, you know, it was a challenge.

7    Q    And I believe you previously mentioned in one of your

8    earlier responses that McNichols is made of limestone.  Was

9    that -- am I getting that right?

10   A    Yeah.  That's correct.  So, a lot of these buildings, the

11   city and county building, the Webb building, McNichols

12   especially, you know, the materials that are on the outside of

13   these buildings are, you know, they're granite.  They're

14   limestone.  You know, so when they're sprayed with graffiti,

15   it's really difficult to get that graffiti out of that stone.

16   It's really porous.  It sucks it in.

17   And then when they do get the graffiti out of the

18   stone, it leaves a textured finish that doesn't match an

19   undamaged area that wasn't treated.  Then you've gotta go

20   through this effort to try to blend the materials, to try to

21   blend them back together to make it look like it matches, and

22   it's a challenge.  It's really difficult to do.

23   Q    And do you believe that the materials have been

24   sufficiently blended at this point that you can't tell where

25   those tags were, or is there still some marking there?

20-cv-1878-RBJ   MATTHEW WOODS - Direct   03-22-2022

1   A     It's hard to say.  You know, I look at it all the time, so

2   I know where it is.  I think we did a pretty good job.  I don't

3   know if a normal person that wasn't aware of where it was would

4   know the difference.  It's visible, though.

5   Q     And did the McNichols have any art pieces that were damaged

6   during the protest?

7   A     Yes.  So, McNichols has a commissioned art piece at the

8   front entry, some big doors with some slatted glass in it that

9   was a commissioned art piece.  And in scoping the project, there

10  were a handful of those panes of glass on that -- on those doors

11  that were broken.  It wasn't included in our scope of work just

12  because the artist needed to make that repair, and it just so

13  happens that the McNichols building is managed by arts and

14  venues, who commissions art, so they took that upon themselves

15  to work with the artist to make that repair.

16          MS. HOFFMAN:  And if you could please show the witness

17  Exhibit 3039.  And this has not been admitted.

18          MS. STERK:  No objection.

19          THE COURT:  Admitted.

20  Q.    (By Ms. Hoffman) Do you recognize the document displayed

21  on the screen right now, Mr. Woods?

22  A     Yes.

23  Q     Does this relate in some way to your scope of work that we

24  just walked through?

25  A     Yes.

20-cv-1878-RBJ   MATTHEW WOODS - Direct   03-22-2022

1    Q    Okay.  And how does this relate to your scope of work?

2    A    So, this document was created by general services, as you

3    can see in the top left-hand corner.  And they manage the

4    buildings listed on this -- on this list.  So, when the damages

5    occurred, their group asked each facility manager to get

6    together a scope of work of what -- what they assess the damages

7    of.  So, yes.  I received this document at the beginning of the

8    project.

9    Q    And how long has the repair process taken?

10   A    So, the project was started -- by the time we could get

11   contractors out there to scope things and price it out and get

12   moving forward, it's taken, you know, a good year and a half

13   where right now we're substantially complete with the project,

14   and that just occurred, and we're wrapping up just a couple --

15   fine-tuning a couple little things.  So, I would call it

16   substantially complete.

17   Q    Okay.  So, as we sit here today, it's substantially

18   complete, but still not completed?

19   A    Yes.

20   Q    And to date, how much money has the City incurred on this

21   civil unrest project?

22   A    Sure.  The dollar amount right now is $953,000.

23   Q    And are you aware of any other damages to City buildings or

24   properties?

25   A    There was the new Denver Art Museum extension that's on

20-cv-1878-RBJ   MATTHEW WOODS - Cross   03-22-2022

1    13th Street on the south side of Civic Park.  So, that I was

2    aware of -- it wasn't part of my project, but I was aware of one

3    of the new curved pieces of glass on that building that had been

4    broken.  I am not aware if it was done on that weekend or exact

5    timing on that, but that's the only other damage that I'm aware

6    of that happened on a City building.

7              MS. HOFFMAN:  If I could just have a minute, Your

8    Honor?  I have nothing further at this time.

9              THE COURT:  Okay.  Cross examination?

10                        **CROSS EXAMINATION**

11   BY MS. STERK

12   Q    Good afternoon, Mr. Woods.

13   A    Hi.

14   Q    You don't have any information that any of the 12

15   plaintiffs caused any of the property damage that you've

16   testified about today; correct?

17   A    Correct.

18   Q    And you don't have any information at all other than the

19   one video -- security camera you saw on who caused the damage to

20   any of these buildings?

21   A    Correct.  Other than my -- me witnessing the bar damage.

22   Q    Correct.  Sorry.  So, for the City buildings, you don't

23   know who damaged any of those, other than seeing that one

24   videotape?

25   A    Correct.

20-cv-1878-RBJ    MATTHEW WOODS - Cross    03-22-2022

1   Q    And you don't know if the people who were on the security

2   camera that you saw, you don't know who those people are?

3   A    I don't have knowledge of that.

4   Q    And you don't know if it was protesters or if it was

5   somebody else who caused any of the damage; right?

6   A    Correct.

7   Q    You talked about some of the repairs that needed to be made

8   were screw holes for plywood that was put on windows; is that

9   right?

10  A    Correct.

11  Q    And that wasn't broken windows.  That was just the City

12  deciding, you know what?  Maybe we will put up plywood, and they

13  screwed the plywood into their own window frames; right?

14  A    Not exactly.  It was broken windows and unbroken windows.

15  Q    Okay.  But a lot of the plywood you testified about, in

16  fact there were some buildings you said no windows were broken,

17  but they had put up plywood; right?

18  A    Correct.

19  Q    And so some of the costs of repairs were just fixing the

20  holes that the City put into its own buildings?

21  A    Sure.

22  Q    And your scope of work did not include the capitol

23  building; right?

24  A    That's correct.

25  Q    And so you don't have specific knowledge of damage that was

20-cv-1878-RBJ    MATTHEW WOODS - Cross    03-22-2022

1   done to the capitol building?

2   A    I don't.

3   Q    You also testified that the repairs to date have been

4   around $950,000?

5   A    Correct.

6   Q    Your scope of work increased over time; right?  And let me

7   back up.  You said originally you were given a scope of work or

8   created a scope of work on June 1st?

9   A    Correct.

10  Q    And then additional things were added to that scope of work

11  between August of 2020 and April of 2021?

12  A    Correct.

13  Q    And so those damages occurred later?

14  A    Yes.

15  Q    So, of the $953,000 of damage, some of that damage wasn't

16  included -- or was not caused during the protests at all?

17  Sorry.

18  A    The original protests?

19  Q    Let me restate the question.  Some of that damage wasn't

20  created -- caused during the May 28th to June 1st time period?

21  A    Correct.

22  Q    And you don't know the breakdown and cost of how much of

23  the damage was caused between May 28th and June 1st versus other

24  time periods?

25  A    I don't, off the top of my head, no.

20-cv-1878-RBJ    MATTHEW WOODS - Cross    03-22-2022

1   Q    And you talked a little bit about your experience being at

2   the protests; right?

3   A    Yes.

4   Q    And you saw people going by your house as part of the

5   protest on your street?

6   A    Yes.

7   Q    And you saw something like 100 to 150 protesters going by

8   your condo on several different nights?

9   A    Yes.

10  Q    You didn't witness any protesters throwing things at the

11  police; correct?

12  A    No.

13  Q    And during the times you observed the protest activity from

14  May 28th to June 2nd, most of the protesters you saw were

15  peacefully protesting?

16  A    Yes.

17  Q    But you did witness tear gas being thrown; correct?

18  A    I didn't see tear gas being thrown.  I could feel it in the

19  air.

20         MS. STERK:  Nothing further.

21         THE COURT:  Redirect?

22         MS. HOFFMAN:  Nothing further.

23         THE COURT:  Questions from the jurors?  Yes?  Okay.

24     (Proceedings held at the bench:)

25         THE COURT:  This is 47.

20-cv-1878-RBJ    VINCE PORTER - Direct    03-22-2022

1       MS. HOFFMAN:  That's fine.

2       MS. STERK:  No objection.

3     (Proceedings held in open court:)

4       THE COURT:  There's a question, Mr. Woods, from the

5  jury.  Question, are you aware that Denver is claiming

6  $4.2 million in damages from the protest -- or in damage from

7  the protest?

8       THE WITNESS:  No.

9       THE COURT:  Do you have any knowledge about what the

10 total damage amount is?

11      THE WITNESS:  I don't.

12      THE COURT:  You just know about your part?

13      THE WITNESS:  Yes.

14      THE COURT:  Okay.  Any other questions from the jury?

15 Follow-up questions from either side?

16      MS. HOFFMAN:  Nothing further.

17      MS. STERK:  None, Your Honor.

18      THE COURT:  Okay.  Thank you, Mr. Woods.  You are

19 excused, free to go.  Next?

20      MR. WEINER:  The defense would call next Vince Porter.

21    (The Witness is Sworn)

22      THE COURT:  All right.  Thank you.

23                    **DIRECT EXAMINATION**

24 BY MR. WEINER

25 Q    Sir, when you get comfortable, why don't you state for the

20-cv-1878-RBJ   VINCE PORTER - Direct   03-22-2022

1   jury and the court reporter your name, and if you could also

2   spell your last name for the court reporter.

3   A     Vince Porter, P-O-R-T-E-R.

4   Q     Mr. Porter, I see you in uniform, but I have to ask the

5   question.  Where are you presently employed?

6   A     Denver Police Department.

7   Q     And how long have you worked for the Denver Police

8   Department?

9   A     About 27 years.

10  Q     What is your current position with the Denver Police

11  Department?

12  A     I am a lieutenant in the patrol division.

13  Q     And prior to getting on with the Denver Police Department

14  27 years ago, did you have any educational background?  Did you

15  have any upper level education?

16  A     While I've been a cop, I've obtained my bachelor's degree

17  and my master's degree.

18  Q     Okay.  Lieutenant Porter, I am going to draw your attention

19  to the timeframe of May 28th of 2020.  And you obviously, given

20  what you just testified to, were employed by the City of Denver

21  as a police officer at that time.  Can you tell us exactly what

22  your responsibilities and/or duties were on May 28th of 2020.

23  A     May 28th was just a normal workday for me.  I went home

24  that night, and then seeing that we were having some large-scale

25  riots and protests, I did not work that first night.

20-cv-1878-RBJ    VINCE PORTER - Direct    03-22-2022

1   Q    Okay.  And that was a poor question on my part.  What -- on

2   May 28th of 2020 -- you mentioned you work in the patrol

3   division.  Where were you assigned on May 28th of 2020?

4   A    District 2.

5   Q    In what capacity?

6   A    The lieutenant in charge of the special units and the

7   detectives.

8   Q    Okay.  So, can you explain to the jury what the -- your

9   responsibilities were on May 28th in terms of your assignment,

10  you know, with the detectives.

11  A    So, I have narcotics detectives and general property crime

12  detectives, two totally separate entities for the most part.

13  The property crimes detectives investigate the auto thefts, the

14  burglaries, and stuff like that.  Obviously the narcotics

15  detectives investigate narcotics.

16         I also have a uniformed support team of uniformed

17  officers that's attached to my narcotics team, and then I'm in

18  charge of the community resource officers as well.

19  Q    Okay.  And when you say you're in charge of, would you

20  explain a little bit for the jury in terms of what that

21  responsibility -- the scope of that responsibility was on

22  May 28th of 2020.

23  A    Just making sure that we get all of our cases done, that we

24  get out to our community meetings, that we're doing proactive

25  police work within the district.

1    Q    And did you have a specific team assigned to you on

2    May 28th of 2020?

3    A    Yes.

4    Q    Okay.  And what was that team made up of?  In other words,

5    were they strictly detectives, or were there other individuals

6    that you were responsible for?

7    A    There was both.  I have uniformed personnel and

8    plainclothes detectives.

9    Q    Okay.  And as part of your responsibility zone or scope of

10   authority, did you oversee any training involved with your

11   particular team?

12   A    Yeah.  The uniformed support team, we trained often on

13   various special tactical aspects.  The sergeant who ran the team

14   at the time, he was an ex-Metro SWAT operator, so training was

15   very important.  So, we would train weekly on various tactical

16   things.

17   Q    Can you explain a little bit more when you say tactical

18   things, what were the tactical things that y'all were training

19   on?

20   A    We would train on crowd management.  We would train on

21   crowd -- how to, you know, properly stop a car, how to enter a

22   house if we needed to enter a house.  Just various aspects like

23   that.

24   Q    And so the purpose of why we're all here, can you explain a

25   little bit more in terms of the crowd management what type of

20-cv-1878-RBJ   VINCE PORTER - Direct   03-22-2022

1  training that consisted of.

2  A    We would go over the crowd control policy.  We would also

3  get on our mobile vehicles, getting on, getting off, making sure

4  we were all comfortable doing that.  And then we would go out

5  and do skirmish lines in the parking lot.

6  Q    Okay.  And your specific team back on May 28th of 2020, was

7  it pretty well intact?  And by that, I mean, was it training

8  every day?  Every hour?  When you talk about this training, this

9  crowd management training, was it a consistent group of people

10 that you were training with?

11 A    Yes.

12 Q    Okay.  Now, going back to, again, May 28th of 2020, and you

13 were beginning to talk a little bit about what your day was like

14 that day.  Can you explain a little bit more on May 28th what

15 you were doing and whether you participated in any of the

16 protests, the riots that were taking place.

17 A    I did not participate on May 28th.  However, seeing what

18 was going on in Minnesota and some other places across the

19 country, I informed my team before I left that they needed to

20 make sure that they had their gear ready for them, because there

21 was a chance they might be called downtown.

22 Q    Okay.  So, can you explain a little bit, why did you take

23 that step of advising your team, hey, get your gear ready?

24 A    I've worked a lot of protests in my career, and so when you

25 start seeing things ramping up across the country, a lot of

20-cv-1878-RBJ   VINCE PORTER - Direct   03-22-2022

1   times that will come into Denver as well.  So, I just wanted

2   them to be prepared in case they were needed downtown.

3   Q    And the first time that you had this information, was that

4   on May 28th of 2020?

5   A    That's the first time that I -- yes.

6   Q    Okay.  Now, you just mentioned in your last answer that you

7   had worked a lot of protests and riots.  Can you explain for the

8   jury a little bit about your history and experience with working

9   those.

10  A    Back in 2013, 2014, we had something that was called Occupy

11  Denver, was going on in the city.  It was daily protests,

12  sometimes multiple in a day.  And so a lot of those, for that

13  two-year timeframe, I was in charge of running those specific

14  protests.

15  Q    Okay.  And any additional experience that you were involved

16  with with regards to protesting?

17  A    The first two Bronco Super Bowls, the Avalanche two Stanley

18  Cup championships, and then some other small ones.

19  Q    Okay.  Anything up -- for example, Denver covers Red Rocks.

20  Any issues with concerts and stuff up there?

21  A    We did have to respond to Morrison for a Phish concert that

22  was getting kind of out of control.  They were going into

23  Morrison and smashing out windows and stuff.

24          MR. WEINER:  And for the court reporter, that's

25  spelled P-H; right?

20-cv-1878-RBJ   VINCE PORTER - Direct   03-22-2022

1    THE COURT:  This court reporter knows more about music

2    than you do, Mr. Weiner.

3    MR. WEINER:  We know he knows about Lynyrd Skynyrd.  I

4    lost my train of thought.

5    Q.    (By Mr. Weiner) But going back now to May 28th, and you

6    had mentioned, I want to flip back to your involvement in terms

7    of the crowd management and your training.  You talked a little

8    bit about the tactical stuff, and going over the policies.  Part

9    of the policies also involved respect for the First amendment?

10   A    Yes.

11   Q    Okay.  Can you explain that a little bit for the jury?

12   A    We would go over -- along with our use of force policy and

13   our crowd management policy, we would just go over First

14   amendment training that was put out by the department on

15   bulletins.  When we can act, when we can't act.  It's always

16   been my -- with all these protests, it's always just been my

17   deal that we try to stay out of it, if at all possible.  We do

18   not want to get involved.

19   Q    What do you mean by that?  When you say we try to stay out

20   of it?

21   A    So, we would sit and monitor -- the majority of them I was

22   on, we would sit and monitor from a distance.  We wouldn't get

23   involved unless some really good -- some acts of violence like

24   breaking into things or injuring people or something like that.

25   I mean, a lot of times we even turn a blind eye to graffiti,

20-cv-1878-RBJ    VINCE PORTER - Direct    03-22-2022

1    minor crimes, taking over roadways.  We provide traffic control

2    so that the protesters wouldn't get hurt.  And that was the

3    majority of them.

4    Q    And why did you take that stance, or that position?

5    A    Because we're not trying to get into a conflict with them.

6    That's the last thing we want.

7    Q    Okay.  Now, going back to the time where you was talking

8    about the 28th of May, before you went and you told your team

9    get ready, get your gear ready, what type of gear are you

10   talking about?

11   A    They would have over-vests that would protect them, riot

12   helmets, gas masks, riot batons.

13   Q    Okay.  And what was the purpose of having that ready?

14   A    In case they needed to go downtown and protect themselves.

15   Q    Okay.  And at the time, were you and your team assigned

16   body-worn cameras?

17   A    Yes.

18   Q    Okay.  And --

19   A    I was not.  They were.

20   Q    Okay.  Why weren't you?

21   A    It was the policy of the department at the time that

22   lieutenants and above didn't have to have them.

23   Q    Okay.  And is that in part because you're not engaging

24   individuals, you're giving orders to law enforcement officers,

25   but maybe not one-on-one with citizens?

20-cv-1878-RBJ    VINCE PORTER - Direct    03-22-2022

1   A    I don't know why they had that policy back then.

2   Q    Okay.  Fair enough.  So, on May 28th, my understanding is

3   you did not participate in any of the events.  You went home?

4   A    Yes.

5   Q    Were you getting information or intel with respect to what

6   was transpiring in the city of Denver?

7   A    No.  Just off of what was on the news.

8   Q    So, you went home, and did you come back, then, the next

9   day on May 29th of 2020?

10  A    Yes.

11  Q    Okay.  And approximately what time did you get into work?

12  A    I believe it was around 8:00 or 9 o'clock in the morning.

13  Q    Okay.  And where did you go?

14  A    I went to the station, picked up my team.  We loaded up

15  everything, and then we responded downtown.

16  Q    Okay.  Did you have specific orders to go downtown?

17  A    Yes.

18  Q    And where did they come from?

19  A    They came from Commander Phelan's office.

20  Q    Okay.  And did you have -- before you met with your team,

21  did you have any briefings that you were provided information

22  with respect to what you and your team's responsibilities were

23  going to be on that day?

24  A    Yes.  When we went downtown, then we had a briefing first

25  thing.

20-cv-1878-RBJ    VINCE PORTER - Direct    03-22-2022

1   Q    Okay.  And what information did you glean at that time?

2   A    That the -- we were having riots slash protests.  Some of

3   the people were peaceful.  Some of the people were violent,

4   engaging in throwing rocks, breaking stuff.  The night before,

5   they had several things broken out, and several officers hit

6   with rocks.  But as always, and Commander Phelan would always

7   end with this, is their actions dictate our response.

8   Q    And what did that mean to you?

9   A    It meant that we would respond if it became violent.  If

10  not, we were not going to get involved.

11  Q    And what was your team's responsibility -- your and your

12  team's responsibility on May 29th of 2020?

13  A    We were a mobile -- we call them RDVs, a mobile vehicle

14  where the officers stand on the outside.  So, I had a tail car

15  with me.  And initially, we were just assigned to the area south

16  of 14th on Broadway.

17  Q    Okay.  And when you say mobile unit, so, what's the purpose

18  of having a mobile unit in place?

19  A    If we need to get somewhere, we can get in quickly, and

20  then mount back up and get out quickly.

21  Q    Okay.  So, you're kind of going where needed as assigned by

22  Commander Phelan?

23  A    Yes.

24  Q    Okay.  And approximately how many people, part of your team

25  were in place on the 29th?

20-cv-1878-RBJ    VINCE PORTER - Direct    03-22-2022

1    A    I believe 14.

2    Q    Okay.  And you mentioned you had a tail car.  What was the

3    tail car?

4    A    The tail car was just another car to, one, hold all of our

5    gear, and then if we needed to get somebody out, whether it was

6    somebody who was injured or somebody who was in custody, we

7    could put them in that car and get them out.

8    Q    Okay.  And so you received your briefing from Commander

9    Phelan.  You've given -- are you given any, what's been termed

10   sometimes, can be termed as rules of engagement?

11   A    The rules of engagement were simple.  It's -- like I said,

12   it was, we will respond to how they act.  Don't take stuff into

13   your own hands.  You know, and then there was -- there was an

14   operations plan that had a dispersal order in it if we needed to

15   give orders to disperse.

16   Q    Okay.  Now, you talked a little bit about the equipment

17   that was used on May 28th.  How about the equipment that you and

18   your team were assigned on May 29th before you went downtown?

19   A    We had the same equipment that I mentioned.  We also had

20   some gas that was given to us, PepperBall, and 40-millimeter.

21   Q    Did you yourself have a PepperBall?

22   A    I did not.

23   Q    Why not?

24   A    One, I'm not certified in it, but two, that's not my role

25   as the lieutenant.  That's, you know, the officers' role.  My

1    role is to stay back, make sure that everything that -- we're

2    being safe, and that we're doing the things the right way.

3    Q    Okay.  Would you give the orders in this situation, or

4    walking in this, to for example deploy PepperBall if needed?

5    A    I could give the orders.  The officers also could deploy on

6    their own if they wanted to, if they seen defensive resistance

7    at that time, and they could deploy on their own.  They didn't

8    need my order to deploy the PepperBall.

9    Q    Okay.  So, let's talk a little bit about that.  When you

10   say defensive resistance, what is defensive resistance?

11   A    It's not physical.  It's just not listening, not doing

12   orders, or being in an area where you've been told you can't be.

13   Q    And in that particular situation, are officers authorized

14   to use PepperBall?

15   A    Yes.

16   Q    Okay.  And why would that be?

17   A    Why would they be authorized?

18   Q    Why would they utilize PepperBall in that situation with

19   defensive resistance?

20   A    If we needed to clear a street, because the -- they're

21   blocking traffic.  If they were blocking buildings, many

22   reasons.

23   Q    Okay.  And was your entire team assigned PepperBall guns?

24   A    No.

25   Q    Why not?

1   A     Not all of them were trained, and then the others had the

2   40-millimeter.

3   Q     Okay.  And the individuals that had the 40-millimeters, did

4   they have to be trained?

5   A     Yes.

6   Q     Did they have to be certified?

7   A     Yes.

8   Q     And the individuals that were carrying those weapons, were

9   they in fact trained and certified?

10  A     Yes.

11  Q     Okay.  And you mentioned some other gas.  What was that?

12  A     Gas canisters that we can throw.

13  Q     Okay.  And can you describe a little bit more detail what

14  that was.

15  A     There was a couple of different ones.  One is just filled

16  with smoke that we can use to throw for distraction or for -- to

17  provide cover.  Another one is filled with CS gas.

18  Q     Okay.  Did you guys have what's referred to as flash-bang

19  devices?

20  A     We did not have flash-bangs.

21  Q     Okay.  Did your team ever carry flash-bangs?

22  A     I did not see any flash-bangs on my team.

23  Q     Okay.  Now, after you've got your orders and got that

24  initial intel, where do you initially respond?

25  A     So, the first thing that I remember is we were sent to the

20-cv-1878-RBJ    VINCE PORTER - Direct    03-22-2022

1    100 block of East Colfax.

2    Q    And where -- what was the purpose of you being sent to that

3    location?

4    A    There was some of our motorcycle officers that were there,

5    and they were taking rocks and bottles and explosives from the

6    park across the street and from behind them on the walkway to

7    the RTD turnaround.

8    Q    So, describe for the jury what you did in response to being

9    ordered to assist with those motorcycle officers.

10   A    When we pulled up, I could see that there was already smoke

11   or gas or something in the air.  So, I immediately ordered my

12   officers to put on their gas masks.  I knelt down to put on my

13   gas mask, and a large rock came right over my head and smashed

14   the window out to our police car.  We held the line across the

15   street from the protesters.  I called for other officers to come

16   and clear the area behind us, because they had the high ground,

17   and we were taking rocks and bottles from that side too.

18   Q    When you say that side too, were you in effect surrounded

19   at that point?

20   A    Not surrounded, but they were all in the front and all in

21   the back of us.

22   Q    Okay.  And so why did you call for that assistance again?

23   A    So we could clear off the high ground, and then we would

24   just be dealing with across the street instead of what was

25   behind us.

20-cv-1878-RBJ    VINCE PORTER - Direct    03-22-2022

1   Q    Okay.  And did you give any orders at that point to utilize

2   any gas or any PepperBalls?

3   A    No.

4   Q    Okay.  Did you see any use of gas or PepperBalls?

5   A    Lieutenant Chavez gave the order, who was also on scene

6   with me, to deploy munitions, and they were deployed.

7   Q    Okay.  And do you know why that order was given at that

8   point?

9   A    Because we were un -- basically felt like under attack.

10  One of our officers got hit with a -- what I call an explosive,

11  and we had to get him out, get him into an ambulance.  We were

12  taking large rocks, bottles, frozen water bottles.

13  Q    So, explain that explosive that you just mentioned that

14  injured one of the officers.  Can you explain a little bit more

15  detail for the jury.

16  A    They had handmade -- I don't want to call them fireworks,

17  because they were a lot bigger than that, but they had handmade

18  explosive devices that they could throw, and it would blow up.

19  Q    And you mentioned one of them caused some injuries that

20  required an ambulance to take an officer away.  Did you witness

21  that explosion?

22  A    Yes.

23  Q    Can you describe that for the jury.

24  A    He was standing by his motorcycle, and a -- this object was

25  lobbed out of the crowd.  Landed right next to him, and

20-cv-1878-RBJ    VINCE PORTER - Direct    03-22-2022

1  detonated right next to him.  So, he had injuries to his ankle

2  and his leg.

3  Q    And was it after that that the order was given by

4  Lieutenant Chavez to deploy some gas to disperse this crowd?

5  A    Yes.

6  Q    Okay.  And what happened after that?  So, you had the

7  explosive that injures the officer.  The order is given by

8  Lieutenant Chavez to deploy some less-lethal munitions.  Does

9  that disperse the crowd?

10 A    No.

11 Q    What happened?

12 A    The state patrol called for help, because apparently they

13 were trying to get into the state capitol.  So, we responded

14 over there.  And the crowd just kind of turned, so it was right

15 in Veterans Park.  So, initially the crowd is facing us

16 northbound, and we're facing southbound.  When we went over to

17 the capitol grounds, we were now facing westbound, and the crowd

18 was facing eastbound.

19 Q    From your impression and observations, did the crowd follow

20 you, or did they remain over at the 100 block of Colfax?

21 A    No.  They mostly followed us.

22 Q    Okay.  And then what happened when you got to the capitol?

23 A    We were holding a skirmish line.  It was dark by this time,

24 and there was really bright lights coming out of the park so we

25 can't really see very well across the street into the park what

20-cv-1878-RBJ   VINCE PORTER - Direct   03-22-2022

1   was going on.  At one point, I was standing up the hill, and a

2   very large rock came, hit me in the wrist, caused -- you know, I

3   was bleeding everywhere, and we were just taking rocks and

4   bottles.

5   Q    Okay.  And let's talk a little bit about the injury to your

6   wrist.  Did that prevent you from continuing with your

7   responsibilities and duties on that day?

8   A    No.

9   Q    Did you have to seek medical attention for -- and I'm going

10  to just ask on that day, did you have to seek medical attention?

11  A    When it got a little calmer, we went and found an

12  ambulance, and they cleaned it up and bandaged it.

13  Q    Did you subsequently have to have medical treatment on that

14  wrist?

15  A    Yes.

16  Q    And what did that entail?

17  A    They had to go in and stretch the tendon back out, because

18  if kind of got crushed by the rock, and I wasn't able to -- my

19  grip strength was just going away.

20  Q    And so when you say they had to go in, I'm assuming -- it

21  sounds like you had to have surgery?

22  A    Yes.

23  Q    And how long were you out of service with the City of

24  Denver as a police officer?

25  A    About six weeks.

20-cv-1878-RBJ    VINCE PORTER - Direct    03-22-2022

1   Q    Okay.  Now, going back to May 29th, you said it was about

2   dark when you took this rock to your wrist at the state capitol.

3   I want to back up.  My understanding is you got a call or orders

4   to go help defend the state capitol.  Who did those orders come

5   from?

6   A    Command post.

7   Q    Okay.  So, that would have been Commander Phelan?

8   A    Yes.

9   Q    Okay.  And were you given specific orders, or was it just,

10  hey, the capitol is under attack, go help?

11  A    I don't recall if he specifically called us or not, or just

12  asked for teams to go over there.

13  Q    Okay.  So, you're at the capitol, and you mentioned

14  something about some bright lights.  Can you explain that a

15  little bit more for the jury and how that impacted what you and

16  your team were doing.

17  A    It was -- just made it almost impossible to see what was

18  going on in the park.  I don't know if it was media lights or

19  where the lights came from, but they were pointing right at us,

20  big bright spotlights.

21  Q    And after you took the rock to your wrist, or some item to

22  your wrist, did you guys have to move positions to address this

23  situation with the lights, or did you just stay there and kept

24  taking rocks?

25  A    Not with the lights.  They lit a large fire in the middle

1   of the park, and then they hot-wired a forklift that was in the

2   park.  So, we had to move into the park and clear it out so the

3   fire department could come in and put the fire out.

4   Q    Okay.  So, why not just leave the fire go?

5   A    Because you can't just leave an open fire in the middle of

6   the park, and then you have all the protesters and everybody

7   else around, so somebody really could have got hurt.

8   Q    Okay.  And so you indicated you had to go help the

9   firefighters.  Can you explain that a little bit?  Why did you

10  have to help the firefighters?

11  A    We didn't have to help the firefighters.  We went and moved

12  the protesters out of the park so that the fire department could

13  come in behind us and put the fire out.

14  Q    Okay.  And did you deploy any less-lethal munitions in

15  order to make a safe zone for the firefighters?

16  A    I did not, but my team did.

17  Q    Okay.  And was that under your direction and/or orders?

18  A    When we -- when we moved, yeah.  It would have been.

19  Q    Okay.  And so can you explain to the jury why you would

20  have given that order, why less-lethal was deployed in that

21  particular situation.

22  A    Because they weren't moving just based upon verbal.  They

23  weren't listening when we were trying to tell them to move back,

24  and so we would deploy for an area denial or into the ground

25  just to start moving back.

20-cv-1878-RBJ   VINCE PORTER - Direct   03-22-2022

1   Q    Okay.  And were you able to get a safe zone in place for
2   the firefighters?
3   A    Yes.
4   Q    You said they were hot-wiring a forklift.  What do you mean
5   by that?
6   A    They were doing construction in the park, and somebody
7   didn't move the forklift out of the park, and so they hot-wired
8   the forklift.
9   Q    And what were they doing, if anything, based on your
10  personal observations, with that forklift?
11  A    They got it started right as we walked up, and they all
12  ran.
13  Q    Okay.  And was -- they ran -- was that after less-lethal
14  munitions was deployed?
15  A    I don't recall.
16  Q    Okay.  So, now at the point where you've got the
17  firefighters are there putting out this fire, you've got the
18  forklift, you chase those people off, what happens after that?
19  A    I believe that night, then, we walked -- we moved down to
20  14th and Lincoln, and that's where we took the Molotov cocktail
21  that was thrown at us.  We had to run -- there was -- they were
22  doing damage to the art museum, causing damage to the art
23  museum, so we pushed through the art museum to clear that
24  complex.
25  Q    Let's back up and kind of break that down a little bit.

20-cv-1878-RBJ   VINCE PORTER - Direct   03-22-2022

1  So, you moved to 14th and Lincoln?

2  A    Yes.

3  Q    Okay.  And what was the purpose of going to that specific

4  location?

5  A    That's where we ended up after we moved through the park.

6  Q    Okay.  And so that wasn't as -- you weren't directed there

7  by Commander Phelan's orders?

8  A    No.  Not that I recall.

9  Q    Okay.  So, that was an area that you went after you cleared

10 the park?

11 A    Yes.

12 Q    Okay.  And you mentioned something about Molotov cocktail.

13 Can you explain -- I know we hear that on the news, and we hear

14 that around, but can you explain that for the jury a little bit

15 about what it is and what damage it can cause to you and your

16 fellow officers.

17 A    It's generally usually a glass bottle that's filled with

18 some sort of accelerant like gasoline or something, and a rag

19 stuffed down in it so when you light it and you throw it, it

20 causes an explosion.

21 Q    Okay.  And how close did that explosive, that Molotov

22 cocktail, come to you and fellow officers?

23 A    I'd say within like 15 feet.

24 Q    Okay.  And what if anything did you and your team do in

25 response to receiving or being attacked by that cocktail?

20-cv-1878-RBJ   VINCE PORTER - Direct   03-22-2022

1    A    We didn't do anything.

2    Q    Why not?  Why didn't you find the person and go arrest

3    them?

4    A    Well, we had no idea where it came from.  We could just see

5    it come out from the crowd.

6    Q    Okay.  And at this point in time, when you're taking that

7    Molotov cocktail, was it -- I'm assuming it was dark, because

8    you mentioned the lights before at the capitol, but I just want

9    to be clear, was it in fact dark at that point?

10   A    Yes.

11   Q    Was there, in your experience -- and I'm just kind of

12   broadly speaking.  Was there an issue with individuals attacking

13   police officers during the nighttime when they couldn't -- they

14   weren't visible to you?

15   A    Yes.

16   Q    Can you explain that just a little bit more for the jury.

17   A    It almost appeared that there was two totally separate

18   crowds, for the most part.  You had the day crowd that was there

19   protesting, and really wouldn't interact with us, and we

20   wouldn't interact with them.  But as soon as it turned to night,

21   it became much more violent.

22   Q    So, in fact, were you at some point assigned to this mobile

23   unit during the daytime, when you didn't deploy any less-lethal

24   munitions?

25   A    Yes.

20-cv-1878-RBJ    VINCE PORTER - Direct    03-22-2022

1   Q    Were there times during the daytime when the crowd was

2   peaceful, and you're standing minding your own business and

3   letting them exercise their First amendment rights?

4   A    Yes.

5   Q    Okay.  But at nighttime, that changed, for the most part?

6   A    Those first four days -- well, three days, because I wasn't

7   there for the first one.  Those three days I was there, yes, it

8   did.

9   Q    And going back to you talked about the explosive that

10  resulted in one officer going to the hospital.  You talked about

11  the Molotov cocktail.  Did you ever see any incidents where some

12  of the protesters injured themselves with explosives?

13  A    I don't recall seeing that, no.

14  Q    Okay.  Now, after you're at 14th and Lincoln, you take the

15  Molotov cocktail, you mentioned something about the museum.  Can

16  you explain that.

17  A    Yeah.  They were tagging and trying to break into the art

18  museum.  So, we just formed a skirmish line and pushed them

19  through the art museum and off that complex.

20  Q    Okay.  And the skirmish line was formed -- just so we're

21  clear, what was the purpose of that?

22  A    To clear that complex.

23  Q    Okay.

24  A    And get everybody out of there so nobody would be breaking

25  into the art museum.

20-cv-1878-RBJ    VINCE PORTER - Direct    03-22-2022

1   Q    And were less-lethal munitions used at that point?

2   A    Yes.  I believe they were.

3   Q    Okay.  And would that have been in what form?

4   A    PepperBall.

5   Q    Okay.  And was that directed at the feet, or at an

6   individual?

7   A    It would have been directed at individuals, because they

8   were throwing rocks and stuff at us as we were pushing them

9   back.

10  Q    And is that consistent with policy and your orders?

11  A    Yes.

12  Q    And why is it consistent with policy and your orders if

13  you're focusing on one individual?

14  A    Well, because you want to try to target the individual

15  that's actually -- you don't want to indiscriminately just be

16  doing that, so you try to target the individual that's causing

17  the -- or individuals that are causing the problems.

18  Q    Okay.  Now, you have mentioned that you had kind of that

19  gas ball that would explode and -- not explode, but it would

20  send stuff around.  Had you used any of those munitions at that

21  point?

22  A    Yeah.  We used them off the -- at the very beginning when

23  we were at 100 East Colfax.

24  Q    All right.  And is that indiscriminate in its use?  I mean,

25  you don't use that to target an individual, do you?

20-cv-1878-RBJ   VINCE PORTER - Direct   03-22-2022

1   A     No.

2   Q     Why do you use that?

3   A     Because we wanted to try and disperse the crowd that was

4   being hostile.

5   Q     Okay.  Was it feasible at that point to -- when you have

6   that big crowd and you're taking explosives, to pinpoint an

7   individual if you don't know who is doing it?

8   A     No.  It was very difficult, and even if we would have

9   pinpointed him, we wouldn't have been able to probably get to

10  them.

11  Q     Why is that?

12  A     We were extremely outnumbered.  It would have been very

13  dangerous for us to go into that crowd and do that.  So, it

14  would have been difficult.

15  Q     Okay.  Now, jumping ahead to the point where you were

16  talking about dealing with the art museum and damage to that,

17  you indicated that you had deployed and authorized the

18  deployment of PepperBalls.  Were you able to secure the art

19  museum?

20  A     Yes.

21  Q     Was there any damage done that -- based on your

22  observations prior to you guys being able to clear the crowd

23  out?

24  A     I believe there was.

25  Q     What did you do after that?

20-cv-1878-RBJ    VINCE PORTER - Direct    03-22-2022

1   A     After that, we were told to go patrol downtown along the

2   16th Street Mall and the surrounding areas, because they were

3   breaking into all the businesses and looting all the businesses

4   downtown.

5   Q     Okay.  And did you in fact respond to downtown?

6   A     Yes.

7   Q     And can you describe for the jury what you observed and

8   what actions you and your team did.

9   A     The first thing I observed was several people smashing out

10  all the windows to the Denver Post building.  So, we deployed

11  PepperBall there to get them out of that area.  And then we

12  would just go downtown, turn the corner, and be met with rocks

13  and bottles, so we would deploy PepperBall there.  But a lot of

14  those stores were broken into, so we would stop at each store

15  and go through and clear it, make sure nobody was inside

16  stealing stuff.

17  Q     Okay.  And at any point did you find people inside any

18  businesses on the 16th Street Mall?

19  A     Yeah.  They were inside a couple of them, but when they

20  would see us, they would run.

21  Q     Okay.  And were you able to make any arrests?

22  A     No.

23  Q     Did you try to make any arrests?

24  A     No.

25  Q     Why not?

20-cv-1878-RBJ    VINCE PORTER - Direct    03-22-2022

1   A    We were just trying to clear the area.

2   Q    And you mentioned the Denver Post building windows being

3   broken out, and you're now walking along the 16th Street Mall,

4   and there's businesses that are being, you know, windows that

5   are being broken into.  Is this a large crowd like you

6   experienced over by the capitol, or are these smaller groups of

7   individuals?

8   A    This was smaller pockets of individuals.

9   Q    Okay.  And anything else of note that you remember that

10  took place on the 16th Street Mall?

11  A    No.

12  Q    Okay.  Where did you go, if anywhere, after that?

13  A    That was the end of it for that night.

14  Q    So, at that point you kind of stayed down at the 16th

15  Street Mall?

16  A    Yes.

17  Q    All right.  Now, the -- were you -- in fact then did you

18  work on the next day, which would be the 30th?

19  A    Yes.

20         THE COURT:  Let's take our break before we get to the

21  30th.

22      (Jury out at 3:06 p.m.)

23         THE COURT:  Okay.

24      (Recess at 3:06 p.m., until 3:20 p.m.)

25      (Jury in at 3:20 p.m.)

Kevin P. Carlin, RMR, CRR

20-cv-1878-RBJ   VINCE PORTER - Direct   03-22-2022

1    THE COURT:  Okay.  Mr. Weiner?

2    MR. WEINER:  Your Honor, thank you.

3  Q.    (By Mr. Weiner) Lieutenant Porter, before we took our

4  break, I believe we left off going into beginning to discuss

5  what took place on May 30th.  To begin with, what time,

6  approximately, did you respond that morning?

7  A    I reported for work around 8:00 or 9 o'clock in the

8  morning.

9  Q    Okay.  And how long the day before -- being the 29th, how

10 long of a shift did you work that day?

11 A    About a 17-hour shift.

12 Q    And I had mentioned earlier, asked the question earlier

13 with regards to the body-worn cameras and the assignments of

14 that, was your team utilizing body-worn cameras on the 29th?

15 A    No, we were not.

16 Q    Why not?

17 A    They tried to affix them to their outermost garment on the

18 28th, and we ended up losing one.  And so we didn't have a way

19 to affix them to our vests.

20 Q    Okay.  And so your team didn't have body worns on the 29th?

21 A    No.

22 Q    So, now going into the 30th, what time, again, did you get

23 into work that day?

24 A    Around 8:00 or 9 o'clock.

25 Q    And where did you respond?

20-cv-1878-RBJ   VINCE PORTER - Direct   03-22-2022

1   A    Downtown.

2   Q    All right.  And when you say downtown, where specifically?

3   Is that to DPD headquarters?

4   A    Yeah.  The DPD crime lab.

5   Q    Okay.  And is that where the command post, the mother ship,

6   if you were, was situated?

7   A    Yes.

8   Q    All right.  And did you receive any information on that

9   day?

10  A    The same type of information that we received the day

11  before.

12  Q    Okay.  And was it the same rules of engagement issued by

13  Commander Phelan in terms of we react?

14  A    Yes.

15  Q    Okay.  Were you assigned the same team on May 30th?

16  A    The majority of the same team.  One or two officers could

17  have been different.

18  Q    Okay.  And why would that be?

19  A    I had my team, but I had to get some additional officers

20  from the detail, because we just didn't have enough with just my

21  team.

22  Q    And when you say you didn't have enough, you didn't have

23  enough bodies to deal with what was going on?

24  A    Yes.

25  Q    Okay.  And so after you receive your briefing at the

20-cv-1878-RBJ   VINCE PORTER - Direct   03-22-2022

1   command post, where do you and your team deploy, if anywhere?

2   A    We were sent to the area of around the 16th Street Mall

3   area, just to stay in the area.

4   Q    Okay.  And was your team the mobile rapid deployment

5   vehicle and the Tahoe?

6   A    Yes.

7   Q    And what was the purpose of you and your team responding to

8   the 16th Street Mall area?

9   A    There was large crowds gathering down around the 16th

10  Street Mall area.  So, they just wanted us in the area.

11  Q    Okay.  And tell us what happened, if any -- were you asked

12  to respond to a -- to 16th Street and Welton?

13  A    A call came over the radio that stated that Aurora was

14  completely surrounded and was taking rocks and bottles, and we

15  were a block away.

16  Q    Okay.  And so what did you do?

17  A    We responded down.  When we got there, I could see Aurora

18  with their backs up against the brick building, completely

19  surrounded with no escape route, so I gave the orders to deploy

20  PepperBall in the building up above where the crowd of officers

21  were standing.

22  Q    Did you try to talk to the crowd and talk them out of that?

23  A    No.

24  Q    Why not?

25  A    There was lots of people around downtown, and it was a very

20-cv-1878-RBJ    VINCE PORTER - Direct    03-22-2022

1   volatile and unsafe situation.  So, I really just wanted to get

2   Aurora back to their vehicles and get us out.

3   Q    And what were your instructions to your team with regards

4   to the deployment of the PepperBall to the surrounded Aurora

5   officers?

6   A    To deploy above their heads against the brick wall.

7   Q    Why above the heads against the brick wall?

8   A    Well, because we had the Aurora officers were in our direct

9   line of fire.  So, you weren't going to deploy there, but alls I

10  really wanted to do was disperse that crowd, get them out, get

11  Aurora out.  We would get in and out as fast as we can.

12  Q    And tell us exactly what happened.  Tell the jury what

13  happened.

14  A    We deployed.  The crowd all started running.  I looked at

15  one of the Aurora officers and said, get your people out of

16  here.  They cleared out.  We loaded up, and we cleared out.

17  Q    And did you engage any further with any of the protesters?

18  A    No.

19  Q    Okay.  Where did you go from there?

20  A    Let's see.  This all runs together.  Can I take a look at

21  my statement?

22  Q    Would it have been to the District 6 substation?

23  A    Yes.

24  Q    And what was the purpose of deploying there?

25  A    They were trying to gain entry into the District 6 station.

20-cv-1878-RBJ   VINCE PORTER - Direct   03-22-2022

1   Q    And what were your responsibilities -- why -- because

2   people were trying to gain entrance into District 6, why is that

3   even an issue?  Why not just let them have it?

4   A    Because it's not safe.  Worried that they would cause

5   damage, that they will try to light fires.  So, it's an unsafe

6   situation.

7   Q    And where did you and your team deploy to?

8   A    We were in the parking lot of District 6.

9   Q    And what did you do -- what did you and your team do there?

10  A    We just -- we held the parking lot.  At one point a couple

11  of people tried to come through the fence, and one of my

12  officers deployed PepperBall on that person trying to come over

13  the fence.

14  Q    Okay.  Any other munitions used at that point?

15  A    Not by us, no.

16  Q    Okay.  Did you see any other munitions used by other

17  officers, whether it was Denver officers, Jeff. Co. SWAT,

18  Aurora, anybody else?

19  A    I don't recall.

20  Q    Okay.  And after that, did you and your team respond to the

21  Capitol Hill area?

22  A    Yes.

23  Q    Okay.  And why did you respond -- why did you and your team

24  respond to that area?

25  A    Blockades were being put up in the streets throughout the

20-cv-1878-RBJ   VINCE PORTER - Direct   03-22-2022

1   neighborhoods.  Dumpsters being lit on fire and then pushed into

2   the middle of streets.  Mattresses lit on fire.  Anything to try

3   to block the street traffic.

4   Q    Okay.  Were there any damage to any homes?

5   A    I don't know if there was damage to homes.

6   Q    Okay.  And so what did you and your team do when you

7   responded to that area?

8   A    When we got in the area, we were immediately confronted

9   with rocks and stuff, so we deployed PepperBall, and then we

10  would get off the truck and try to clear the roadway for -- so

11  that people could get through.

12  Q    And at this point, you and your team, was there any

13  deployment of munitions proactively, or was it all reactively,

14  consistent with Commander Phelan?

15  A    Reactive.

16  Q    Okay.  And was this no exception?

17  A    No.

18  Q    Okay.  And at some point were you advised that an

19  individual, a security, private security officer was injured?

20  A    Lieutenant Chavez called for help around Colfax and Logan,

21  I believe.  We were -- we pulled up on that.  There was a

22  private security patrol vehicle that was completely engulfed in

23  flames, and one of the security guards had been hit in the head

24  with a rock.

25  Q    And did this private security officer need help?

20-cv-1878-RBJ   VINCE PORTER - Direct   03-22-2022

1   A    Yes.

2   Q    Okay.  And can you tell us a little bit about that.

3   A    He said he was knocked unconscious.  So, we called for an

4   ambulance for him.

5   Q    And this -- again, this was not a police officer?

6   A    No.

7   Q    And were you able to get this individual medical

8   assistance?

9   A    Yes.

10  Q    And at some point was there -- did you learn about

11  individuals following you and your team?

12  A    I learned about it a couple of days later.

13  Q    Can you tell us about that.

14  A    There was a gentleman who was following our team, and he

15  was video recording it all on his cell phone.

16  Q    Okay.  And was there any time when officers were struck by

17  a vehicle intentionally?

18  A    Yes.

19  Q    Okay.  Can you tell us -- tell the jury about that.

20  A    So, this individual in this car, we had gotten off our RDV,

21  and he had drove past us.  He went up a block, and then he

22  intentionally rammed the District 6 RDV with the officers on it.

23  Q    And was this the same person that was following you all?

24  A    That I found out about later, yes.

25  Q    So, same individual that was basically stalking you and

20-cv-1878-RBJ   VINCE PORTER - Direct   03-22-2022

1  then ran intentionally hitting officers was the same person?

2  A    Yes.

3  Q    Okay.  At any point did you become aware of any weapons

4  that were on or found on protesters and rioters?

5  A    Yeah.  I was -- there was several firearms found.

6  Q    Okay.  And at any point did you assist in any arrest of any

7  individuals?

8  A    Not on that night, I did not.

9  Q    Okay.  Were you asked to respond to the area of 15th and

10 Logan by Douglas County?

11 A    Yes.

12 Q    Can you tell us what happened there.

13 A    Douglas County aired that they needed additional help, that

14 they were taking projectiles being thrown at them.  We were just

15 up the street where the officers got struck, and so we responded

16 on foot down to the area to cover Douglas County.

17 Q    And describe for the jury what you observed and what you

18 and your team did there.

19 A    There was lots of people blocking Colfax along the

20 roadways, throwing objects.  We deployed less-lethal munitions,

21 PepperBall, and a second team came in from a different

22 direction, and some of the officers made some arrests.

23 Q    When you say second team, second team of Denver police

24 officers, or some other law enforcement group?

25 A    I don't know.

20-cv-1878-RBJ    VINCE PORTER - Direct    03-22-2022

1   Q    Okay.  So, I mean, given the -- the chaotic nature of this

2   whole thing, were you able to tell necessarily what officer was

3   with what group?

4   A    You could tell the different uniforms, but as far as Denver

5   officers, it was difficult to know which -- who was on my team

6   and who wasn't.

7   Q    Okay.  And as you're going along, and we talked about the

8   29th, and now we're on the 30th, are you relaying the

9   information that you're observing?  You know, for example, the

10  security guard that's been hit with a rock and needs medical

11  attention, is this being relayed by you to the command post?

12  A    I don't know if it's specifically me, but it would have

13  been one of the officers on scene.

14  Q    So, this sharing of information in terms of you're getting

15  information from Commander Phelan, in terms of your instruction,

16  somebody at least on your team is then relaying information of

17  what you guys are experiencing back to the command post?

18  A    At times, but other times, we would be with other teams,

19  and so they may be taking care of the radio traffic.

20  Q    Okay.  Now, let's move on to the 31st of May.  Did you

21  basically follow the same procedure that morning in terms of

22  when you got to work?

23  A    Yes.

24  Q    Okay.  Was it consistent with the same thing as on the 30th

25  and on the 29th?

Kevin P. Carlin, RMR, CRR

20-cv-1878-RBJ   VINCE PORTER - Direct   03-22-2022

1   A    Yes.

2   Q    All right.  How long had you worked on -- I think you

3   mentioned -- you had testified you had worked approximately 17

4   hours on the 29th.  How long did you work on the 30th?

5   A    About another 17 hours.

6   Q    Okay.  Approximately how much sleep had you been getting?

7   A    Three, four hours, tops.

8   Q    Okay.  So, now on the 31st, you come into work.  Do you

9   have the same equipment?

10  A    Yes.

11  Q    Okay.  Do you have the same team as you had on the 30th?

12  A    For the most part, yes.

13  Q    Okay.  With some variations in terms of trying to establish

14  respectable numbers?

15  A    Yes.

16  Q    Okay.  So, were you first requested to respond to the area

17  of Clarkson from 14th?

18  A    We were requested to respond to the District 6 substation.

19  Q    Okay.  And what was the purpose of responding to that area?

20  A    There were several teams on scene.  They had a very hostile

21  crowd that was blocking Colfax and throwing large rocks and

22  other objects at them.

23  Q    And what did you and your team do?

24  A    It was requested by the teams that somebody comes from the

25  south and deploy gas to try to disperse the crowd.  So, we came

1   from the south, and we deployed gas to disperse the crowd.

2   Q    And was that effective?

3   A    Yes.

4   Q    And you're taking rocks.  Were they also taking bottles?

5   A    They were -- they aired that they were taking projectiles.

6   Q    Okay.  All right.  Did you -- your team receive any attacks

7   when you came to disperse the crowd?

8   A    There was smaller pockets of individuals on the sides that

9   was throwing stuff at us, but we were just running up there.

10  Q    So, explain that a little bit.  When you mean smaller

11  pockets that were throwing things, did you kind of --

12  A    There was open parking lots on the sides, and there was

13  groups of people in there.  And when they seen us, they would

14  throw rocks or objects at us.

15  Q    Had you done anything to them?

16  A    No.

17  Q    Had you given them any orders, or was it just you guys were

18  walking by, and they were winging stuff at you?

19  A    We were running, but yeah.

20  Q    Okay.  And so you get to the area, you deploy gas, and that

21  disperses.  What do you and your team do next?

22  A    The crowd basically splits.  A bunch of them went to the

23  east, and a bunch of them went to the west and stayed on Colfax.

24  The teams that were at the District 6 substation reinforced our

25  skirmish lines, and at one point we -- there was attempts to

20-cv-1878-RBJ     VINCE PORTER - Direct     03-22-2022

1   have arrests made.  I don't know if it was successful or not.

2   Q    Okay.  And was your team ever part of a skirmish line?

3   A    Yes.

4   Q    As a commander -- as a lieutenant, were you watching to see

5   what abuse your team may be receiving verbally?

6   A    Yes.

7   Q    Okay.  Did you take any actions -- did you at any point

8   have some concerns about certain individuals that are being

9   targeted on your team that are being picked on, so to speak?

10  A    I had a couple of opportunities where I actually pulled the

11  officer off the line and replaced him with another officer.

12  Q    Can you explain that for the jury in terms of what you

13  observed and then why you took the action that you took.

14  A    The first one, one of my officers, they were -- she's --

15  they were in her face yelling at her because she's overweight.

16  And so they were fat-shaming her, basically, and screaming and

17  yelling at her, calling her names.  So, I removed her from the

18  line so she wouldn't have to take that.

19         A second occasion was an African American officer, and

20  they were really close to him, screaming, yelling, telling him

21  he's an Uncle Tom, he's a traitor, and so I removed him from the

22  line so he wouldn't have to be subject to that.

23  Q    And after you were at District 6, where did you and your

24  team go after that?

25  A    To the state capitol.

20-cv-1878-RBJ   VINCE PORTER - Direct   03-22-2022

1  Q     What was the purpose of that?

2  A     Again, they were causing damage at the capitol and trying

3  to get in.

4  Q     Okay.  And describe what you personally observed.

5  A     I actually pull off with the rest of my team.  We were on

6  foot, and I observed an Aurora officer who was fighting with

7  somebody on the ground.  So, I pulled away from my team and went

8  over and helped this officer and gave him my handcuffs so he

9  could handcuff this individual.

10 Q     And were you able to learn from this Aurora officer or

11 otherwise why the Aurora officer was wrestling with this

12 individual?

13 A     No.

14 Q     Okay.  Was that individual placed under arrest?

15 A     Yes.

16 Q     Okay.  Do you know if there were any weapons or anything

17 found on them?

18 A     Not that I know of.

19 Q     Okay.  And so you're protecting the capitol.  Can you

20 explain what you're observing at that location when you're

21 protecting the capitol.

22 A     I never made it up onto the capitol grounds.  My team did,

23 but I did not.

24 Q     Where did you go then?

25 A     I was with the Aurora officer who was making the arrest.

20-cv-1878-RBJ    VINCE PORTER - Direct    03-22-2022

1   Q     And how long did you stay with him?

2   A     Probably about ten minutes, maybe.  I walked with him and

3   the prisoner back to where they were going to transport, got my

4   cuffs back, and then rejoined my team.

5   Q     Okay.  And then where did you and your team go?

6   A     We were sent to enforce the curfew ordinances down around

7   12th and Acoma area.  We encountered this group of juveniles

8   that was throwing rocks at us, kind of followed them around the

9   area until we were able to get them in an alley and get them --

10  we were able to get them in custody in the alley.

11  Q     When you say you were able to get them in an alley, why

12  didn't you just get them when you were following them around?

13  Explain that.  Why didn't you contact them in the middle of --

14  A     They were throwing stuff and running, so it was hard for us

15  to get them until they went in the alley and we were able to

16  block off both ends.

17  Q     And approximately how many individuals were they?

18  A     About 20.

19  Q     You already said that, didn't you?  And were you -- then

20  you were able to get them in custody for curfew violations?

21  A     Yes.

22  Q     Okay.  And were you able to learn where they were from or

23  what their purpose was there?

24  A     Yeah.  We engaged with them in conversation, and they said

25  that they had come in from Nebraska because they heard about all

20-cv-1878-RBJ    VINCE PORTER - Cross    03-22-2022

1   of this going on, and it sounded like fun.

2   Q    And how long were you -- did you and your officers, your

3   team spend with these individuals?

4   A    It was well over an hour.

5   Q    Okay.  And what are you doing during that time?

6   A    My officers pretty much build a rapport with these guys.

7   Some of them we actually took the cuffs off of them and put the

8   cuffs on in front or left -- and then a couple of my officers

9   were showing them how the PepperBall guns work, and we just

10  ended up sitting there with them and just having a conversation.

11          MR. WEINER:  No further questions, Your Honor.

12          THE COURT:  Thank you.  Cross examination?

13                    **CROSS EXAMINATION**

14  BY MS. WANG

15  Q    Let me start at the end where Mr. Weiner left off.  On

16  May 31st, you arrested a bunch of people after you had blocked

17  off an alley and chased them into an alley; right?

18  A    We chased them into the alley and got them in custody

19  there.

20  Q    You chased them into an alley, and you blocked off both

21  ends?

22  A    We came from both ends, yes, to try to prevent their

23  escape.

24  Q    Okay.  And that was at Tenth and Acoma?

25  A    Yes.

20-cv-1878-RBJ    VINCE PORTER - Cross    03-22-2022

1   Q    Are you aware that one of the people that you arrested

2   there for curfew was named Francesca Lawrence, a social worker?

3   A    I do not know.

4   Q    She's from Denver.  Are you aware of that?

5   A    No.

6   Q    Are you aware that her charges and those of all the other

7   people that you arrested after you had blocked off the alley

8   were dismissed?

9   A    Yes.

10  Q    Okay.  They were not charged or arrested for any property

11  crimes or crimes of violence.  It was just curfew; right?

12  A    Curfew.

13  Q    Now, you talked a lot about things that happened at the art

14  museum, on the 16th Street Mall, when there was looting on the

15  29th at the Denver Post building.  There was the guy who hit

16  officers with a car.  There were some firearms that you say that

17  you found.  Do you remember all that testimony?

18  A    Yes.

19  Q    None of the 12 plaintiffs in this case had anything to do

20  with any of that; right?

21  A    I don't know.

22  Q    You have no -- well, you know the guy who hit the officers

23  with the car was arrested; right?

24  A    Yes.

25  Q    Okay.  You also understand that based on your 27 years, is

20-cv-1878-RBJ   VINCE PORTER - Cross   03-22-2022

1   it, of experience with the DPD?

2   A    Yes, ma'am.

3   Q    Yes.  You also understand that in order to use force on a

4   citizen, you must have a justification that relates to what that

5   person is doing; right?

6   A    Yes.

7   Q    Okay.  So, all these things that you've talked about at

8   other places, other times, where you don't even know our clients

9   were there, have nothing to do with our plaintiffs, do they?

10  A    I don't know if they do or not.

11  Q    Okay.  None of that other stuff, as unfortunate as it is,

12  justifies gassing, shooting, or otherwise injuring the

13  plaintiffs in this case; right?

14  A    I don't know what your plaintiffs were doing.

15  Q    Okay.  You would agree with me, though, that other people

16  doing other things at other times does not justify using force

17  on the plaintiffs in this case, assuming that the plaintiffs

18  haven't done any of that; right?

19  A    I don't know what your plaintiffs were doing, so I don't

20  know --

21  Q    You have no information that any of our plaintiffs were

22  involved in any of these things that you testified to; right?

23         MR. WEINER:  Judge, I'm going to object.  Asked and

24  answered.

25         THE COURT:  Sustained.

Kevin P. Carlin, RMR, CRR

20-cv-1878-RBJ   VINCE PORTER - Cross   03-22-2022

1    Q.    (By Ms. Wang) Now, you testified with Mr. Weiner that you

2    didn't have any BWC because you were a lieutenant; right?

3    A    Correct.

4    Q    Okay.  And your team members didn't have any BWC either for

5    any of these things that you've described during the first four

6    days of the protest; right?

7    A    They did not.

8    Q    And you say that it was because you could not -- they could

9    not attach it to their vests; is that right?

10   A    Yes.

11   Q    But when you figured out that was a problem, you went to

12   the TSUE?

13   A    TSUE.

14   Q    What's that stand for?

15   A    I don't know.  It's a -- where all of our cameras and

16   electronic stuff is.

17   Q    And you got it fixed pretty quickly; right?

18   A    After I was informed that we had the clips in TSUE, then

19   yes.

20   Q    Okay.  And you didn't bother to go there to get the cameras

21   attached for your officers to their uniforms before --

22   A    I didn't even know those clips existed.

23   Q    Okay.  The Denver Police Department has had body-worn

24   cameras since 2014 or 2015; right?

25   A    Yes.

20-cv-1878-RBJ    VINCE PORTER - Cross    03-22-2022

1    Q      You never figured out this issue before then?

2    A      We were always attaching them by magnet.

3    Q      Okay.  Now, you would agree that one of the purposes of

4    body-worn camera is to provide documentation of interactions

5    between police officers and civilians; right?

6    A      Yes.

7    Q      And that it's important for officer accountability; right?

8    A      Yes.

9    Q      And it may even also exonerate an officer of accusations of

10   misconduct; right?

11   A      Yes.

12   Q      It would provide some objective evidence other than just

13   what you say and what other people might say; right?

14   A      Yes.

15   Q      We don't have any body-worn camera that documents anything

16   that you just described on direct examination; right?

17   A      None from my team.

18   Q      And Mr. Weiner didn't show you any camera from anybody

19   else; right?

20   A      No.

21   Q      Now, you talked about this explosive that you say you

22   encountered on May 29th on the evening of May 29th after it got

23   dark, or as it was getting dark?

24   A      There was a couple, but yeah.

25   Q      Oh.  There was more than one?

20-cv-1878-RBJ   VINCE PORTER - Cross   03-22-2022

1   A    Yeah.  There was several explosives devices thrown at us.

2   Q    You didn't call any of that in on the radio, did you?

3   A    No.

4   Q    Your officers didn't call that in on the radio?

5   A    Actually, I can't answer.  I don't know if I did or not.

6   Q    Well, if you did call it in on the radio, it would be on

7   the CAD report; right?

8   A    Yes.

9   Q    Okay.  So, the jury can look at the CAD report for

10  May 29th, which has been entered into evidence as Exhibit 449,

11  and decide whether it sees anything about an explosive called in

12  or more than one explosive called in on May 29th; right?

13  A    Yes.

14  Q    Okay.  And you would also expect that such things as an

15  explosive might appear on the after-action report, which is also

16  in evidence as Exhibit 470?

17  A    I didn't do the after-action report.  I don't know.

18  Q    Okay.  But it seems like something that would be pretty

19  important that would be on an after-action report; right?

20  A    I don't know who did the after-action report.

21  Q    So, you would agree with me, though, that the jury can take

22  a look at the after-action report from May 29th, Exhibit 470,

23  and decide whether it sees anything about an explosive or more

24  than one explosive on May 29th; right?

25  A    Yes.

Kevin P. Carlin, RMR, CRR

20-cv-1878-RBJ    VINCE PORTER - Cross    03-22-2022

1    Q     Now, it wasn't until 12 days after the protests that you

2    learned that you and your officers would need to provide use of

3    force reports or officer statements; right?

4    A     Officer statements, yes.

5    Q     Officer statements.  Okay.  And you had a conversation with

6    Lieutenant Berdahl about that; right?

7    A     Yes.

8    Q     Aide to Division Chief Thomas; right?

9    A     Correct.

10   Q     And you said to him that you had never done such reports

11   before for protests; right?

12   A     We didn't do -- no.  We didn't usually do them unless we

13   made individual arrests or got into individual use of forces.

14   Q     And you would agree with me that officers' statements

15   documenting the uses of force that officers use on civilians

16   like body-worn cameras might provide some accountability for

17   officers for their uses of force on civilians; right?

18   A     Yes.

19   Q     Okay.  And you had never been required in your 27 years

20   with the DPD and the hundreds of protests that you've handled --

21   never been required to have your officers complete those things?

22   A     If they made individual arrests, then yes.  They would

23   complete them.

24   Q     Right.  But if they were just shooting people with

25   PepperBalls or gassing them or chasing them into alleys, you

20-cv-1878-RBJ   VINCE PORTER - Cross   03-22-2022

1   wouldn't have to do it; right?

2   A    It would have been a general use of force policy, or just a

3   general use of force would have been completed for the event.

4   Q    The after-action report?

5   A    Use of force report.

6   Q    A single use of force report?

7   A    Yes.

8   Q    And so completed by whom?

9   A    Whoever the incident commander was for that particular

10  event.

11  Q    Have you seen any such document for these protests?

12  A    No, I have not.

13  Q    So, we're not talking about the after-action report; right?

14  A    Right.

15  Q    We're talking about something that is titled use of force

16  report that's completed by Commander Phelan?

17  A    Or his designee, yes.

18  Q    Or his -- do you know who his designee might have been?

19  A    I don't.

20  Q    Okay.  Now, you in fact received an email from Lieutenant

21  Berdahl on June 9th, 2020, telling you that you had to tell your

22  officers to complete these officer statements and avoid

23  problematic language in the reports, and that they should look

24  at their BWC and HALO and look at the use of force training and

25  policies before they write their statements; right?

20-cv-1878-RBJ    VINCE PORTER - Cross    03-22-2022

1   A    Yeah.  That's -- something to that effect.

2   Q    Okay.  And you -- you told your officers, you received that

3   email from Lieutenant Berdahl, and you told your officers what

4   they were directed to do; right?

5   A    I informed them to write statements.

6   Q    Okay.  And if Lieutenant Berdahl told you that your

7   officers should avoid problematic language in their officer

8   statements, and that they should make sure to review the

9   training and policy documents of the DPD before writing their

10  statements, you would have passed along that message to your

11  officers; right?

12  A    Most likely not.

13  Q    Most likely not?

14  A    Not.

15  Q    Okay.  Let's take a look.  So, you gave a deposition --

16  now, are you -- let me just make sure I understand.  You did not

17  communicate the information from Lieutenant Berdahl's email to

18  your team?

19  A    I told them to write statements.  I don't recall what the

20  rest of the stuff I said to them was.

21  Q    Okay.  But you did generally communicate the information

22  from Lieutenant Berdahl to your team?

23  A    I don't believe that I directed them to go review stuff.

24  Q    But you did communicate the information from Lieutenant

25  Berdahl to your team?

20-cv-1878-RBJ   VINCE PORTER - Cross   03-22-2022

1    A    Yes.  Probably not verbatim, but yes.

2    Q    Okay.  The officer statement that you typed up was on

3    June 15th, 2020, many days after the protests; right?

4    A    Yes.

5    Q    Let's talk about 16th and Welton on May 30th.  Now, that

6    incident that you described where there were Aurora officers who

7    you say were surrounded by protesters, that happened at

8    4:48 p.m.; right?

9    A    Okay.  Yeah.  Sometime around there.

10   Q    During the day?

11   A    Yes.

12   Q    And you have testified that you heard a communication on

13   the radio that the officers were surrounded; right?

14   A    Yes.

15   Q    Okay.  Let's show Exhibit 392.  Julie -- okay.  So, this

16   has already been admitted into evidence.  This is an Aurora

17   body-worn camera footage from Lieutenant Cassidee Carlson.  Do

18   you see that?

19   A    My screen is kind of blank.

20   Q    Well, do you see this date up here?

21   A    Yes.

22   Q    Okay.  She's blocking her camera at the moment, but do you

23   see up here it says Carlson, Cassidee?

24   A    Yes.

25   Q    Okay.  Great.  So, let's go ahead and play it.

20-cv-1878-RBJ    VINCE PORTER - Cross    03-22-2022

1        (A video was played.)

2    Q    So, that is Lieutenant -- Aurora Lieutenant Cassidee

3    Carlson at the intersection of 16th and Welton reporting that

4    they're fine.  They're just chanting; right?

5    A    That's what she says, yes.

6    Q    Okay.  Your actions and the actions of your team at the

7    intersection of 16th and Welton on May 30th were consistent with

8    DPD policy and practice at the time; right?

9    A    Yes.

10   Q    As well as your training; right?

11   A    Yes.

12   Q    Okay.  We don't have any body-worn camera from you or your

13   officers showing what they saw and what they were doing at this

14   intersection; right?

15   A    No.

16   Q    So, all we've got is whatever videos we have entered into

17   evidence regarding this incident from the Aurora officers and

18   any other third-party video; right?

19   A    Yes.

20   Q    So, the jury can watch those videos, you would agree, and

21   decide what happened there?

22   A    Yes.

23   Q    Now, on the evening of May 30th, you and your officers

24   patrolled the Capitol Hill neighborhood in the evening; right?

25   A    Yes.

20-cv-1878-RBJ    VINCE PORTER - Cross    03-22-2022

1  Q    And it was generally between Fourth -- I'm sorry -- 14th

2  and 12th Streets and Lincoln and Pearl; right?

3  A    Yeah.

4  Q    Okay.  And so you were on an RDV; right?

5  A    Yes.

6  Q    And you drove around with your officers on the RDV -- now,

7  were your officers, like -- is that right?  You drove around

8  with your officers on the RDV?

9  A    Yes.

10 Q    Were there officers hanging off the sides, like standing on

11 the sides, on the railing?

12 A    Standing on the rails, yes.

13 Q    How many cars did you have in your caravan?

14 A    Two.

15 Q    All right.  So, there were two RDVs, or is it just the RDV

16 and then the tail car?

17 A    RDV and then the tail car.

18 Q    Okay.  Were you driving the RDV, or somebody else?

19 A    I was front-seat passenger.

20 Q    Okay.  So, your officers who were on the sides had

21 PepperBall guns?

22 A    Some of them.

23 Q    Others had 40-millimeter launchers?

24 A    Some.  And then some didn't have anything.

25 Q    So, then during this time, you patrolled the Capitol Hill

Kevin P. Carlin, RMR, CRR

20-cv-1878-RBJ    VINCE PORTER - Cross    03-22-2022

1   neighborhood looking for smaller groups of protesters, and you

2   chased them into alleys like you did with Francesca Lawrence on

3   the 31st?

4   A    We did not chase anybody into an alley that night.

5   Q    You didn't have your officers get off the RDV, shoot at

6   them --

7   A    We did deploy.

8   Q    Okay.  You did have your officers get off the RDV, shoot,

9   and then get back on?

10  A    Yes.  And we actually made an arrest.

11  Q    Okay.  Were you with Lieutenant Ken Chavez and his group at

12  that time?

13  A    No.  I don't believe so.

14  Q    Are you aware that he and his team were also roaming around

15  the Capitol Hill neighborhood shooting at people?

16  A    There were several teams that were designated to go to the

17  Capitol Hill neighborhood.

18  Q    Were they all doing the same thing your team was?

19  A    I don't know.  I can't comment what they were doing.

20  Q    Were the actions of you and your team on that evening

21  consistent with the DPD policy, training, and practice?

22  A    Yes.

23  Q    We don't have any BWC of that either, do we?

24  A    Nope.

25  Q    On May 31st, at the intersection of Colfax and Washington,

Kevin P. Carlin, RMR, CRR

20-cv-1878-RBJ   VINCE PORTER - Cross   03-22-2022

1   you were at District 6 at 8:30 p.m.; right?

2   A    Yes.

3   Q    Okay.  And some of your team was on the east side of the

4   station, but others of you were on the west side of the station;

5   right?

6   A    The majority of us were on the east side.  There were a few

7   that were displaced from us and on the west side.

8   Q    So, the east side of District 6 at Colfax and Washington --

9   well, Colfax and Washington is the west side; right?

10  A    Yes.

11  Q    Colfax and Clarkson is the east side; right?

12  A    Yes.

13  Q    So, at 8:30 p.m., there were DPD officers on the west side

14  of the station; right?

15  A    I don't know.  I didn't go over to the west side of the

16  station.

17  Q    But you know that you were in charge of your team that was

18  there at the time?

19  A    Yeah.  My officers, once we responded up there, went to

20  that side, some of them.

21  Q    And DPD Sergeant Jason Simmons was one of the officers on

22  the west side?

23  A    I don't know.

24  Q    Well, if you testified at your deposition that he was, is

25  that truthful testimony?

20-cv-1878-RBJ    VINCE PORTER - Cross    03-22-2022

1   A    Okay.  Yes.

2   Q    Okay.  You were on the east side, though, so you don't

3   know -- if there was tear gas thrown on the west side of the

4   station at 8:30 p.m., you don't know why that was?

5   A    No.  Because we were focusing on the east side.

6   Q    Okay.  You talked in the direct examination about

7   respecting people's First amendment rights.  For all the days

8   that you were at the protest, you would agree -- or do you agree

9   that none of the actions of -- let me phrase this differently.

10  All of the actions that you took, that your officers took, and

11  that you observed taken by other DPD officers were consistent

12  with DPD policy, training, and practice?

13  A    I don't recall seeing officers violate policy, training, or

14  practice.

15  Q    Right.  So, you would agree with me that what you saw was

16  consistent with --

17  A    Yes.

18  Q    -- policy, training, and practice; right?

19  A    Yes.

20  Q    And if you had seen something that you thought was wrong,

21  you would have reported it; right?

22  A    Yes.

23  Q    But you never did?

24  A    No.

25  Q    I'm sorry.  That one is a little bit of a double negative.

20-cv-1878-RBJ    VINCE PORTER - Redirect    03-22-2022

1    You never did report anything that you thought should be subject

2    to discipline?

3    A    I did not see anything that I thought needed to be

4    reported.

5              MS. WANG:  No further questions.

6              THE COURT:  Redirect?

7              MR. WEINER:  Briefly, Your Honor.

8                      **REDIRECT EXAMINATION**

9    BY MR. WEINER

10   Q    Lieutenant Porter, a few quick questions, follow-up.  With

11   regard to the body-worn camera, the clips that were mentioned,

12   were you aware that those were originally designed for SWAT and

13   the SORT team?

14   A    No.  I knew nothing about them until I was informed that

15   they had them over there.

16   Q    Because your team didn't have them and didn't utilize them?

17   A    No.  We didn't utilize those outer garments very often.

18   Q    Okay.  And then with respect to this 16th and Welton that

19   you were just asked a few questions about, my understanding is,

20   again, you got in approximately 9 o'clock that morning.  What

21   time did you and your team deploy?

22   A    I don't know.

23   Q    Okay.  Would it have been soon thereafter?

24   A    Yeah.  We would have went downtown soon thereafter.

25   Q    And so there was nothing that took place between when you

Kevin P. Carlin, RMR, CRR

20-cv-1878-RBJ     VINCE PORTER - Redirect     03-22-2022

1    deployed soon after 9 o'clock and almost 5 o'clock that

2    afternoon when you had the -- to assist the Aurora Police

3    Department?

4    A    Nothing that I can remember, and I didn't put it in my

5    statement.

6    Q    Was that a period of time, then, when you were talking

7    about there was peaceful protesting going on and no action had

8    to be taken?

9    A    Could have been, yes.

10          MR. WEINER:  No further questions.

11          THE COURT:  All right.  Questions from the jury?

12   Okay.

13       (Proceedings held at the bench:)

14          THE COURT:  Question 48.

15          MR. WEINER:  No objection.

16          MS. WANG:  No objection.

17       (Proceedings held in open court:)

18          THE COURT:  Lieutenant, a question here for you from

19   the jury.  Can you explain how your experience and encounters

20   were different from your experience working other protests?

21          THE WITNESS:  Yes.  This protest was different than

22   any other one that I've ever worked.  It was much more violent,

23   meaning there was numerous people within this crowd that wanted

24   to hurt us, that were trying to hurt us.  And most of the

25   protests, even the big sports ones that we've had, people would

20-cv-1878-RBJ    VINCE PORTER - Redirect    03-22-2022

1    party.  They might break stuff.  They might light fires, but

2    they -- this is the first one I seen where I felt that there was

3    many people within the crowd that was trying to hurt us.

4            THE COURT:  And a follow-up question from the jury,

5    what event or moment has stuck with you the most?

6            THE WITNESS:  I think the event was the very first

7    thing when the rock was thrown and went over the top of my head

8    and busted the window out, because I had just removed -- I had

9    just removed my helmet, and if I had got hit in the back of the

10   head with that, that would have been not good for me.

11           THE COURT:  Any other questions, ladies and gentlemen?

12   Follow-up, Mr. Weiner?

13           MR. WEINER:  No.  Thank you, Your Honor.

14           MS. WANG:  No, Your Honor.

15           THE COURT:  All right.  Thank you, sir.

16           THE WITNESS:  Thank you.

17           THE COURT:  You're excused, free to go.  Next?

18           MS. JORDAN:  Defendants call Technician Ryan Grothe.

19           THE COURT:  Okay.  Hello.

20        (The Witness is Sworn)

21           THE COURT:  All right.  Thank you.

22           MS. JORDAN:  It's been a while, so for the court

23   reporter, Lindsay Jordan for the defendants.

24

25

                        Kevin P. Carlin, RMR, CRR

20-cv-1878-RBJ   RYAN GROTHE - Direct   03-22-2022

1                       **DIRECT EXAMINATION**

2    BY MS. JORDAN

3    Q    Good afternoon.  Could you please state your name for the

4    record, and spell your last name.

5    A    My name is Ryan Grothe, G-R-O-T-H-E.

6    Q    And are you currently employed with the Denver Police

7    Department?

8    A    Yes, ma'am.

9    Q    And how long have you been a member of the Denver Police

10   Department?

11   A    I am in my 28th year.

12   Q    And what is your current role with the DPD?

13   A    I'm assigned to the special operations division as the

14   less-lethal coordinator.

15   Q    And how long have you been the less-lethal coordinator?

16   A    Since 20 -- mid 2019.

17   Q    And briefly, just tell the jury what are your

18   responsibilities as the less-lethal coordinator?

19   A    As the less-lethal coordinator, I am responsible for

20   ensuring that all of our curriculum is up to date and following

21   best practices.  I also make sure that all of our instructors

22   receive the proper training and are certified in the proper way

23   to teach our officers.  In addition to that, I manage the

24   inventory of a lot of the less-lethal tools that we use.  And I

25   would say that would be my main purpose.

20-cv-1878-RBJ   RYAN GROTHE - Direct   03-22-2022

1   Q    And when you became the less-lethal coordinator, what sort

2   of, for lack of a better word, projects did you take on when you

3   first started?

4   A    The first thing I did was to find out what type of

5   curriculum the officers were already being taught out in the

6   districts.  And by doing that, I was actually looking at the

7   PepperBall and our 40-millimeter systems first, because those

8   are actually used in the patrol division as well as in the crowd

9   control situations.

10          We also have chemical munitions, but due to -- if you

11   look at the track record of a lot of the different crowd

12   management scenarios we've had, we hadn't used chemical

13   munitions in a long time with those.  So, I figured the best

14   place to start was to look at the PepperBall and the

15   40-millimeter systems.

16   Q    And once you looked at the PepperBall and 40-millimeter

17   systems, what did you do?

18   A    I asked all the districts to send me the curriculums that

19   they were currently using to teach the officers their current

20   training records, to figure out who was certified or who needed

21   to be recertified.  But more than anything, I wanted to make

22   sure that we standardized all the curriculum, that all the

23   officers were going through the same type of training and

24   receiving the same type of information.

25   Q    And prior to becoming the less-lethal coordinator, what

20-cv-1878-RBJ   RYAN GROTHE - Direct   03-22-2022

1   other roles did you have with the police department?

2   A    I spent 18 years in our Metro SWAT division.

3   Q    And while you were in the Metro SWAT division, what are

4   some of the duties and roles that you had?

5   A    There was a multitude of duties and responsibilities over

6   there.  I was also a K-9 officer over there, but the first part

7   of my tour over there as an operator, I was actually tasked with

8   being the less-lethal instructor for the Metro SWAT team.  I was

9   sent to a school the manufacturers put together that's actually

10  taught by officers from other departments with experience as

11  well.  And then I come back, and I instruct our operators in the

12  use of the less-lethal systems and chemical munitions.

13  Q    And when you were a trainer in the SWAT division, how often

14  would you train those members on the less-lethal munitions?

15  A    We would usually go over annually.

16  Q    And you personally, are you certified on the PepperBall

17  system?

18  A    Yes, ma'am.  I'm an instructor on the PepperBall and the

19  40-millimeter system.

20  Q    And you just told us that you were in SWAT for 18 years,

21  and you were a trainer in SWAT.  The jury has heard a lot about

22  flash-bangs, and SWAT being the only unit that has those

23  flash-bangs.  What sort of training do the SWAT members get on

24  the flash-bang?

25  A    The flash-bangs, same type of training.  We still do

20-cv-1878-RBJ    RYAN GROTHE - Direct    03-22-2022

1   classroom work, as far as going over things and doing a written

2   test.  From policy, from legal standpoints, things like that,

3   how they work, how to safely deploy them, and then we actually

4   go out, and the officers have to actually deploy those devices.

5   Q    And I understand that you're not an actual academy trainer,

6   so, you know, not necessarily talking about recruits, but are

7   officers trained on the DPD operations manual?

8   A    The Metro SWAT officers, or all officers?

9   Q    All officers.

10  A    Yes, ma'am.

11  Q    And specifically to the use of force policy, are officers

12  trained on the use of force policy?

13  A    Yes, ma'am.

14  Q    And how often are officers trained on the use of force

15  policy?

16  A    I don't know if there's a mandatory every year, but any

17  time there's a revision to the use of force policy, officers are

18  required to read that and acknowledge that they've read it.

19  Whenever they go through any of our less-lethal training for the

20  40-millimeter and PepperBall systems, whether it's the original

21  certification or their recertification, we cover all use of

22  force policy with regards to those systems.

23  Q    Okay.  So, let's pull up Exhibit 467, which I believe is

24  already admitted.  And go to the use of force, 105.  Section

25  105.  This isn't the correct one.  Correct.  Okay.  Thank you.

20-cv-1878-RBJ   RYAN GROTHE - Direct   03-22-2022

1    And what -- with respect to the use of force policy, what is

2    Denver's police department's goal for the protection -- or what

3    is their goal of the use of force?  And if you could just

4    highlight that second paragraph, enlarge it.

5    A    Specifically the department's goal as stated in the

6    operations manual is for the protection of both officers and the

7    community that officers should attempt to use non-force

8    alternatives, including deescalation, when time and

9    circumstances permit.  And when needed, officers must use only

10   the amount of force reasonable and necessary under the totality

11   of the circumstances to safely accomplish their lawful purpose.

12   Q    Okay.  And then there's a phrase in there that the jury has

13   heard repeatedly over the last two weeks, this is the totality

14   of the circumstances.  If we could go to the next page, and

15   highlight the totality of the circumstances.  Could you explain

16   for the jury what the totality of the circumstances means.

17   A    Yes, ma'am.  Basically it's all of the facts and the

18   circumstances that the officer knew or reasonably should have

19   known at the onset of that use of force.  And that's based on a

20   continual assessment, because situations are dynamic and rapid.

21   This includes but is not limited to the seriousness of the

22   threat or injury posed to the officer or other persons, the

23   seriousness of the crime in question, of the officer's use of

24   deescalation techniques, if they have that ability and time, or

25   the tactical and control options, which would be verbal

20-cv-1878-RBJ    RYAN GROTHE - Direct    03-22-2022

 1  advisements, warnings, command presence, time, distance, and

 2  cover, all viewed from the perspective of a reasonable officer.

 3  Q    And when you say the amount of force must be reasonable and

 4  necessary, where do those requirements come from?

 5  A    Our decision -- the DPD decision-making model.

 6  Q    All right.  So, let's go back to the page ahead of that,

 7  paragraph two.  And here we find the decision-making model.  Can

 8  you explain to the jury what the decision-making model is?

 9  A    Yes, ma'am.  First and foremost, do we have the authority

10  to be there?  Our force, if we don't have the authority to be

11  there, whether it was reasonable and necessary doesn't matter.

12  So, do we have the legal authority or mandate to act?  When we

13  get into the reasonableness, that's an objective reasonableness.

14  The actions should be generally consistent with what a trained

15  officer would do under similar circumstances.  And then is it

16  necessary?  Is that intended action required based on the

17  circumstances, and will only consist of the amount of force

18  needed to safely accomplish that lawful purpose?

19  Q    And this decision-making model, is that included in the

20  training that officers receive when being certified on a

21  PepperBall and a 40-millimeter?

22  A    Absolutely, ma'am.  We have that within the curriculum.

23  It's in the pretest and the post-test where they have to list

24  those three things.

25  Q    And then let's go back -- sorry -- to the second page.  I'm

20-cv-1878-RBJ    RYAN GROTHE – Direct    03-22-2022

1   jumping all over the place.  Can you -- paragraph three are the

2   different types of resistance that an officer may encounter.

3   Can you explain to the jury what is psychological intimidation?

4   A    Psychological intimidation, as stated in the operations

5   manual, is nonverbal cues and attitude, appearance, demeanor, or

6   posture that indicate an unwillingness to cooperate or comply or

7   threaten an officer or other person.  Simply stated, it's

8   basically mean-mugging.  I'm not going to comply with you, but

9   I'm not saying anything, and there may be a threat there, but

10  they may not have the ability to carry out that threat.

11  Q    Okay.  And then moving on to the next type of resistance,

12  you have verbal noncompliance.  Could you please explain what

13  that is to the jury.

14  A    Yes, ma'am.  Verbal noncompliance is those verbal responses

15  instead of just it being that psychological, I'm not saying

16  anything, now they're telling you, I'm not going to comply with

17  you.  You know, they may even threaten to injure a person, but

18  again, it comes down to do they have that present ability to

19  carry out that threat?

20  Q    And then moving on to C, we have passive resistance.  What

21  is passive resistance?

22  A    Passive resistance are physical actions that do not prevent

23  an officer's attempt to exercise control of a person or place

24  them in custody.  For example, a person who remains in a limp or

25  prone position.  A lot of times you may see that in some crowd

20-cv-1878-RBJ    RYAN GROTHE - Direct    03-22-2022

1   control situations, where someone is not necessarily fighting

2   you or trying to get away from you, but they will just go limp

3   in the street, or even if we're contacting someone on a regular

4   call, and we have to make contact with them and maybe take them

5   into custody, they just go limp.  They're not fighting you.

6   They're not pulling away or running, but they're not going to

7   help you out at all.

8   Q    All right.  And can you move to the next page.  We've got a

9   couple more of these.  I know policy talk is exciting.  So, can

10  you explain for the jury what defensive resistance is.

11  A    Yes, ma'am.  Defensive resistance are physical actions that

12  actually attempt to prevent an officer's control, including the

13  flight or attempt to flee, but do not involve attempts to harm

14  the officer.  We're not -- they're not actually trying to harm

15  us.  They may be trying to take them in custody, and they pull

16  away and take off running.  That would be defensive resistance.

17        Or a lot of times when if you're trying to arrest

18  someone or contact them, and they will pull their arms in.

19  You've probably seen that a lot.  That's called turtling.

20  They're taking a physical action.  They're not trying to harm

21  us, but they're not going to let us take them into custody.

22  Q    And moving on to E, active aggression, what is active

23  aggression?

24  A    Active aggression is an overt act or threat of an assault

25  coupled with the present ability to carry out the action, which

1   reasonably indicates that an assault or injury to a person is

2   likely.

3   Q    Okay.  And what is aggravated active aggression?

4   A    A lethal force encounter.

5   Q    And these principles behind the reasonable, necessary use

6   of force and the types of resistance, these are applicable to

7   less-lethal munitions; correct?

8   A    Yes, ma'am.

9   Q    Okay.  You can take that down.  Moving on to just

10  generally, please inform the jury of what type of less-lethal

11  munitions or systems that DPD has available for its officers.

12  A    DPD has the 40-millimeter system.  They have the PepperBall

13  system.  In addition to those other systems, they also have the

14  chemical munitions, the OC sprayer, commonly referred to as

15  pepper spray, and then we also use a Taser.

16  Q    And the jury has heard a lot about these chemical

17  munitions, so we're going to try to not repeat as much as we

18  can, but generally, what is the purpose of the less-lethal

19  munitions for officers to use?

20  A    For the personal use on the OC sprays or as a chemical

21  munition in crowd control?

22  Q    Let's start with the personal use of the OC spray.

23  A    All right.  So, officers are issued -- they're trained in

24  the academy, and they're issued personal issue OC spray.  And

25  the use of that, the suspect has to meet the level of defensive

20-cv-1878-RBJ   RYAN GROTHE - Direct   03-22-2022

1   resistance prior to us deploying that.

2   Q    Okay.  And so then moving on, what is the general purpose

3   of using chemical munitions in a crowd control setting?

4   A    Chemical munitions in a crowd control setting, a lot of

5   times are to disperse a crowd that has been declared unlawful or

6   may be violent, and we need to get control of that.

7   Q    Okay.  And just so maybe I'm confused, you have this

8   umbrella of less-lethal munitions; correct?

9   A    Yes.

10  Q    And chemical munitions fall under that umbrella of

11  less-lethal munitions; right?

12  A    Yes, ma'am.

13  Q    Okay.  And then you have your PepperBall and your 40 also

14  fall under that umbrella?

15  A    Yes, ma'am.

16  Q    Okay.  And why do officers need the option to use

17  less-lethal munitions?

18  A    Well, a lot of times that can actually reduce the amount of

19  force necessary to gain compliance, up to not having to use

20  lethal force.  When we have a more -- greater amount of tools on

21  our tool belt, we can -- we can accomplish that lawful purpose

22  that we're set out with possibly not having to use our lethal

23  force.

24         For example, if I were to contact a subject in a

25  parking lot that had a knife that was a threat to the people

20-cv-1878-RBJ    RYAN GROTHE - Direct    03-22-2022

1   around him versus me having to close the distance and walk up on

2   him and possibly get in a fight over a knife, which would end up

3   being a lethal force encounter, I may be able to use time,

4   distance, and cover, contact him, talk with him, try to

5   deescalate it.  And if all else fails, I can use those

6   less-lethal systems in order to create that distance, affect the

7   suspect with pain compliance, because that's what it basically

8   is, and take him into custody in a safer manner.

9   Q    And the jury heard a lot from Sergeant Knutson about crowd

10  control, but just as part of the less-lethal curriculum, if

11  officers didn't have the less-lethal options available to them

12  in a crowd control setting, what other alternatives would they

13  have to use then?

14  A    Basically it would come down to either going hands on and

15  closing that distance, or using batons, which are an impact

16  weapon in and of itself.

17  Q    So, let's talk a little bit more about the chemical

18  munitions.  You had mentioned earlier about the personal OC

19  spray.  Is there other forms in which OC can be deployed?

20  A    There's several ways that it can be deployed.  There's

21  also -- not to use technical jargon, but the smaller one is the

22  Mark 4.  The Mark 9 is often called a fogger.  It's a little bit

23  bigger.  It looks like a personal fire extinguisher that you

24  would see in a kitchen, maybe.  And then also the Mark 46, which

25  is a larger unit that looks like a bigger fire extinguisher.

20-cv-1878-RBJ     RYAN GROTHE - Direct     03-22-2022

1    But they all utilize the same type of oleoresin capsicum, or

2    that pepper formula.

3    Q    And for those three different ways in which it can be

4    dispersed, what is the safe distance for each one in which it

5    should be dispersed?  That was a terrible question.  Let me

6    strike that.  For the three different ways that it can be

7    dispersed, what is the safe distance for each one?

8    A    Well, it should be three-foot, six-foot, and twelve-foot,

9    respectively, to the small, to the fogger, and into the larger

10   one.

11   Q    And are officers trained on what that safe distance is?

12   A    Yes.  They're even trained to understand if they extend

13   their arm, that decreases the distance.

14   Q    Are officers trained to give a warning before they deploy

15   OC spray?

16   A    When possible.

17   Q    And when would it not be possible to give a warning?

18   A    The dynamics of the situation, where any sort of delay may

19   cause someone else to be injured, either the officer or a third

20   person.

21   Q    And would that decision be left up to the discretion of the

22   police officer?

23   A    Yes.

24   Q    And Commander O'Donnell testified yesterday about the

25   difference between OC and CS, so we won't get into that, but

20-cv-1878-RBJ    RYAN GROTHE - Direct    03-22-2022

1   what are ways that CS can be deployed?

2   A    The way that we use it the most is in pyrotechnic form

3   where actually you use it within the grenades and it burns off

4   that micro-pulverized pellet.  It can be dispersed in the fogger

5   systems like OC.  It can be used in the blast balls that you may

6   have heard about as well, and it comes out in powder form.  But

7   the most that we use it is usually in that pyrotechnic sort of

8   way.

9   Q    And the -- is that different than we have seen videos of

10  munitions that are in a ball form?  What is that?

11  A    Those Stinger-type grenades or OC Blast balls can also be

12  made in CS blast balls.  So, you can have that CS powder -- just

13  like in an OC Blast ball, you can have that in a CS blast ball

14  as well or a CS Stinger or an OC Stinger.  There's a variety of

15  it, and they use it with the different chemical munitions.

16  Q    And the policies regarding chemical munitions, the jury has

17  seen some videos of officers deploying OC Blast balls over six

18  lanes of traffic.  Would that be within policy?

19  A    If the officer can articulate it based on our use of force

20  policy and their legal standards, of course it would.

21  Q    And what is the minimum type of resistance -- we went

22  through all of those resistances, but what is the minimum type

23  of resistance that can be used for chemical munitions in a crowd

24  control setting?

25  A    Defensive resistance.

20-cv-1878-RBJ   RYAN GROTHE - Direct   03-22-2022

1   Q     Now, I want to shift gears and talk about the PepperBall

2   system.  What is the PepperBall system?

3   A     It's basically a compressed air system that shoots little

4   round spheres filled with pepper powder.  It's called PAVA.

5   It's a pure form of a natural-occurring substance in the cayenne

6   pepper plant.

7             MS. JORDAN:  I'd like to move into evidence

8   Exhibit 462.  It's the PepperBall operator course.

9             MR. MACDONALD:  No objection, Your Honor.

10            THE COURT:  Well, 452 is already in.

11            MS. JORDAN:  462.

12            THE COURT:  462.

13            MS. JORDAN:  It should be the PepperBall operator

14   course.

15            THE COURT:  All right.  Let's try to avoid repeating

16   things we've heard quite a bit about, please.

17            MS. JORDAN:  Yes, Your Honor.

18   Q.    (By Ms. Jordan) And I'd like to go to slide 16.  And the

19   jury has heard about the PepperBall and how to use it.  I want

20   to touch upon the operator course about when is it acceptable to

21   use a PepperBall in a crowd control situation?

22   A     As listed in the crowd management manual, to support the

23   skirmish line, which is that line of officers you've often

24   seen -- see in front of a crowd.  To use a standoff force

25   application to encourage individuals to come down from trees,

20-cv-1878-RBJ     RYAN GROTHE - Direct     03-22-2022

1    fences, walls, poles, or signs when their elevated positions or

2    actions pose a threat to the field force.

3           The safety of the target and subject must be considered

4    in the event that PepperBall strikes cause them to fall.  We

5    don't necessarily encourage it in that use, unless some exigent

6    circumstance where someone is going to be seriously injured, for

7    that simple reason of the safety of the targeted subjects.

8           And then again, subjects within a crowd who are

9    actively throwing rocks at police officers, to mark individuals

10   for future identification and arrest, and then to provide cover

11   while arrest teams penetrate a crowd or against individuals who

12   attack the arrest team or violently interfere with the team or

13   the arrest process.

14   Q    There's been testimony that the PepperBall would be used in

15   an aerial [sic] denial situation.  Can you explain that for the

16   jury.

17   A    Yes.  So, area saturation is basically if I have the

18   ability, or if I've met that threshold of resistance, that

19   defensive resistance, as opposed to me having to use that

20   PepperBall system directly on you and having that kinetic

21   impact, I can hit around you and have that powder affect you.

22          So, I'm not actually hitting you with that kinetic form

23   of energy.  I am using, what you will, a lesser degree of force.

24   It's almost that here's my deescalation offer to you.  I'm going

25   to let it -- if it doesn't work, then maybe we're going to have

20-cv-1878-RBJ   RYAN GROTHE - Direct   03-22-2022

1  to step it up, but I can do that.

2  Q     Okay.  And what is the difference between area saturation

3  and just shooting indiscriminately into a crowd?

4  A     Shooting indiscriminately into a crowd?

5  Q     Yes.

6  A     Area saturation is a targeted event.  I have a purpose, and

7  I have a reason, and I'm within policy with my defensive

8  resistance in order to do that.  We do not teach people to shoot

9  indiscriminately into a crowd.

10  Q     Could you go to slide 45.  And what warnings are officers

11  trained to give prior to deploying a PepperBall in a crowd

12  control situation?

13  A     Well, when possible, they should try to give clear and

14  concise verbal commands prior to deploying.  This is what I

15  have.  This is what's going to happen to you unless you comply

16  with what I'm telling you to do.  If they decide not to do that,

17  and we've come to the point where I need to deploy, then we --

18  if we have time, we will say, PepperBall, PepperBall,

19  PepperBall.  This is to alert the officers around us that

20  there's also a deployment happening, and, you know, it alerts

21  the subject as well.

22  Q     So, is the announcement for the benefit of the person who

23  is subject to the PepperBall as well as surrounding officers?

24  A     Yes, ma'am.

25  Q     And you said, when possible.  Would officer safety be a

20-cv-1878-RBJ    RYAN GROTHE - Direct    03-22-2022

1    reason that a warning could be not given prior to deployment?

2    A    Officer safety or the safety of, you know, an innocent

3    bystander that may be affected if we don't take immediate

4    action.

5    Q    All right.  Can you go to the next slide.  The next slide.

6    And what training do officers receive regarding the -- the sort

7    of considerations they should use before making deployment of

8    their PepperBall?

9    A    Outside of the threshold of meeting defensive resistance in

10   the legal standard, they also -- we also talk about the

11   deployment zones, and the areas that you're not supposed to hit,

12   the prohibited zones, as well as the best zones to hit in order

13   to reduce the amount of injury to that subject.

14   Q    All right.  So, let's talk about the deployment zones.  Can

15   you go to slide 59.  Sorry.  Next one.  There should have like

16   target areas.  You can just take it -- what is the target

17   area -- you can take it down.  What is the target area that

18   officers are trained to aim at when deploying their PepperBall?

19   A    Outside of area saturation, which I already explained where

20   you're not directly impacting, if I want to directly impact

21   someone and I have a clear view of their lower sternum, that's

22   where we would like to impact if we can, because you're getting

23   that kinetic energy.

24        And when that powder form or that sphere breaks open,

25   that powder comes up into their face, and it affects them in a

20-cv-1878-RBJ    RYAN GROTHE - Direct    03-22-2022

1   quicker manner.  The quicker I can affect the subject and gain

2   his or her compliance, it helps in reducing the amount of force

3   I may have to use to that subject.

4   Q    And what sort of -- because this is an impact projectile,

5   what sort of physical injuries could a subject receive if they

6   had a direct impact?

7   A    They could get abrasions, welts.  Depending on what type of

8   clothing they were wearing, they may not get anything.

9   Sometimes if they have a nice puffy jacket on, that sphere won't

10  even break.  But if they have a T-shirt on, you know, spheres,

11  welts, you probably saw on those pictures within the slides, and

12  officers are trained on that.  We understand that these

13  munitions do cause injuries.  They do cause pain.  The

14  compliance comes from that pain that we achieve.

15  Q    And is there a potential for a serious bodily injury or

16  even death with the deployment of a PepperBall?

17  A    With any less-lethal system, you always have to keep that

18  in mind.

19  Q    And are officers trained on the potential injuries that a

20  PepperBall system can cause to a subject?

21  A    Yes, ma'am.

22  Q    Including potential for death or serious bodily injury?

23  A    Yes, ma'am.

24  Q    And how does an officer become certified on a PepperBall?

25  A    Officers have to -- they're graduated from the academy, and

1  they're not certified in the academy.  They graduate from the

2  academy.  They have to complete probation on the police

3  department, successfully complete it.

4        If they want to become an operator, they must submit a

5  letter through their chain of command that has to be reviewed by

6  their command to ensure that their command approves of it, all

7  the way up through their respective division chief.  The

8  division chief will then forward me the approval, and I will --

9  I will be aware of that.  Then they will go through a course for

10  that certification with the certified PepperBall instructor or

11  certified 40-millimeter instructor, depending on the platform.

12  Q    And other than this operator course that they go through,

13  what else do they have to do to pass that certification?

14  A    So, they have to do a pretest in and a post-test, which I

15  told you, the written test, and they have to do a practical

16  application where we actually go out and utilize the system,

17  firing inert rounds at a target based on a scenario.

18  Q    And once an officer is certified on a PepperBall, how often

19  do they have to be recertified?

20  A    Every two years prior to their expiration date.

21  Q    So, let's move on to the 40-millimeter system.  The jury

22  has heard a lot about it, so we will do our best not to repeat

23  any of that.  What sort of resistance does an officer have to be

24  faced with for a 40-millimeter to -- 40-millimeter launcher to

25  be used?

20-cv-1878-RBJ   RYAN GROTHE - Direct   03-22-2022

1    A    Active aggression.

2    Q    And is that the same when it is involved in a crowd control

3    setting?

4    A    Yes.

5    Q    And what potential injuries could a subject -- strike that.

6    Let's start over.  What are the target areas that officers are

7    trained on to aim at when deploying a 40-millimeter?

8    A    Because a 40-millimeter fires that sponge round, which I

9    assume you've seen pictures of, it's considered a high-energy

10   munition.  So, we try to aim for the areas that have the most

11   mass.  That would be the buttocks, the thigh, the calf, in order

12   to avoid any sort of serious injury.

13   Q    What training do officers receive regarding deploying their

14   40-millimeter at center mass or higher?

15   A    Center mass or higher?  To avoid it if they can.

16   Prohibited areas are the head, eyes, threat -- throat, neck, as

17   well as the breasts of female, genitalia, and then the spinal

18   column.  But in addition to that, we also advise them not to

19   necessarily hit the chest because of the high energy coming off

20   of that.  Even though the breasts of female are included in our

21   prohibited areas, even a male, we try to have them avoid any

22   sort of upper shots if we can.

23   Q    And do these targeted areas also apply in a crowd control

24   setting?

25   A    Yes, ma'am.

Kevin P. Carlin, RMR, CRR

1    Q    Okay.  And what are the potential bodily injuries that can

2    result if someone is struck by a 40?

3    A    Bruises -- in the targeted areas, bruises, contusions, if

4    it even glances off or whatever, it could cut your skin

5    depending on what part of the body you hit.  If you hit close to

6    bone, if for whatever reason they're hitting your arm, and if

7    you can feel right here on here, there's not much muscle mass,

8    and if I hit there that could tear the skin, possibly.  Things

9    like that.

10    Q    And what if a subject is struck in a restricted area, what

11    sort of injuries can occur?

12    A    They can be severe.  Depending -- I mean, if someone gets

13    hit in the face, if it hits them in the eye, it's going to be a

14    severe injury.

15    Q    And are officers trained on the injuries that could occur

16    with the use of a 40 on a subject?

17    A    Absolutely, ma'am.

18    Q    And are they instructed on the fact that it could also lead

19    to death or serious bodily injury?

20    A    Absolutely.

21    Q    And how does one become certified on a 40-millimeter?

22    A    It's the same process as the PepperBall.  They have to be

23    off probation, out of the academy.  They have to put a letter

24    forward to their command staff.  The command staff has to

25    approve it through their division chief, and then it comes to

20-cv-1878-RBJ    RYAN GROTHE - Direct    03-22-2022

1   me, and they have to complete the course with a certified

2   instructor.

3   Q    And in addition to completing the course with a certified

4   instructor, is there any other sort of testing or anything else

5   they have to do to get certified?

6   A    Well, that certified course includes the written exams as

7   well as the practical certification where they go out and do a

8   scenario-based application.

9   Q    And does the 40-millimeter course also address the

10  applicable uses of the 40 in crowd control situations?

11  A    Yes, ma'am.

12  Q    And what are those acceptable uses?

13  A    It would be the same as the active aggression, and then

14  also within the crowd management manual, it lists anyone that's,

15  you know, actively violent within that crowd.  Or if they're

16  throwing things at the officers, that's listed in there as well.

17  Q    And at the time of the George Floyd protests, were the

18  officers permitted to use 40-millimeter launchers for the

19  purpose of crowd control?

20  A    Yes, ma'am.

21  Q    And the jury has heard a lot about use of force reporting.

22  Is there any requirement of an officer who deploys their

23  PepperBall or 40-millimeter and having to do a use of force

24  report after that deployment?

25  A    Yes.  So, any time you deploy any of our less-lethal tools,

20-cv-1878-RBJ   RYAN GROTHE - Direct   03-22-2022

1  and specifically the 40-millimeter and PepperBall, since that's

2  what we're talking about, you are required to notify a command

3  officer or supervisor and complete a use of force report.

4  Q    And there's been a lot of testimony regarding officers'

5  statements about when they completed their officers' statements

6  when they deployed PepperBall and 40-millimeters.  Were you

7  involved at all in the decision-making of those statements of

8  when they should be completed?

9  A    No, ma'am.

10  Q    And you were involved in the George Floyd response;

11  correct?

12  A    As far as out on the street?  I was not out on the street,

13  but I was in the command post.

14  Q    And when did you first arrive to the command post?

15  A    The first night that -- it was the Thursday.  I don't

16  recall the date, but I think it was the first night of the

17  protest.  They had called and said that they needed munitions

18  because of the violence that was happening within the city.  And

19  I responded and brought those out.

20  Q    And what was your role, then, in the command post in the

21  days that followed?

22  A    In the days that followed, I just made sure that whatever

23  the command staff needed, as far as less-lethal tools or

24  resources, that they were able to get those, and then also to

25  issue those to supervisors that came to the supervisors'

20-cv-1878-RBJ   RYAN GROTHE - Direct   03-22-2022

1    briefing, that they may distribute those to their officers on

2    the street.

3    Q    And prior to May 28th, what sort of methods did you use to

4    track the less-lethal munitions?

5    A    Prior to May 28th, it was usually a quarterly report.  And

6    I hadn't been in there that long, since 2019, as you can

7    imagine, within those quarterly reports, based on what the

8    districts had in their inventory.

9    Q    And what sort of efforts did you take during the George

10   Floyd response to track the inventory that was being used?

11   A    Honestly, I could have done a better job at tracking that

12   inventory and the way that it was being used.  I have since

13   revised that, and, you know, moved forward from that.  But at

14   the time, we weren't making a real effort, mainly because there

15   was an urgency to get those munitions out on the street because

16   of the violence that was happening, to make sure that the

17   officers had the tools that they needed to quell that violence.

18   But we have improved that.

19   Q    And how did you disperse each day the munitions to the

20   troops?

21   A    I didn't disperse them personally to the troops.  I was in

22   the command post, and more often than not the supervisors that

23   had come up for the supervisors' briefing prior to hitting the

24   streets, they would come to me and let me know, we need this.

25   I'm out of munitions.  And I trusted their experience and their

20-cv-1878-RBJ    RYAN GROTHE - Direct    03-22-2022

1  knowledge as supervisors, and I issued what I could to them.

2  And they went out and gave it to their officers.

3  Q     And there's been testimony that at some point that DPD ran

4  out of less-lethal munitions; is that correct?

5  A     We ran very low, yes.

6  Q     And what did you do to re-up the inventory?

7  A     We were in contact with other agencies, and asking if they

8  had munitions that we could utilize, and we also were offered

9  by -- as well as I was trying to get with our vendors that

10  usually supply it in a non-emergent fashion, can you get us

11  these munitions quicker?

12         And much of those munitions are manufactured up in

13  Wyoming from the vendor that we buy from.  So, Colorado State

14  Patrol had offered to fly up there and get those munitions so

15  that we wouldn't be short.

16  Q     Do you recall when that was?

17  A     I'm sorry?

18  Q     Do you recall when that was -- when CSP went up to Wyoming?

19  A     I want to say that Friday or Saturday.  It was pretty

20  quick, in order to obtain those, but I'm not positive.

21  Q     And during this trial, it's been told to the jury that at

22  some point you spoke with Nick Mitchell, the independent

23  monitor; correct?

24  A     Yes, ma'am.

25  Q     Why did you speak with Nick Mitchell?

20-cv-1878-RBJ   RYAN GROTHE - Direct   03-22-2022

1   A    They had asked if anyone wanted to speak with him, and I

2   volunteered.

3   Q    And why did you volunteer?

4   A    Because I believe in transparency, and I also believe that

5   we should not only look for the ways that we did things well,

6   but we should look for things that we can improve upon.

7   Q    And after you -- was that interview recorded?

8   A    I don't believe so.

9   Q    And there's been a memo of that interview that was

10  completed.  Did you ever get to review that memo after OIM

11  reviewed -- or interviewed you to make sure it was correct?

12  A    OIM never gave me a copy of it.

13  Q    And during that interview, you learned that there were some

14  officers that were provided PepperBall and 40-millimeter systems

15  that weren't certified; is that correct?

16  A    Yes, ma'am.

17  Q    And during that interview, you were told that they were

18  given emergency training.  You didn't provide that training, did

19  you?

20  A    No, ma'am.

21  Q    And that training that they would have received in the

22  field would not make them certified; correct?

23  A    No.  That would be outside of policy.

24  Q    Okay.  And if they were to need to -- or in order for them

25  to use a PepperBall or a 40 again after that day, they would

20-cv-1878-RBJ    RYAN GROTHE - Direct    03-22-2022

1   have to go through the certification process?

2   A    The actual certification course.  Yes, ma'am.

3              THE COURT:  Are you pretty close to being done?

4              MS. JORDAN:  I am pretty close to being done,

5   actually, Your Honor.  Actually, that might have been my last

6   question.  No further questions.

7              THE COURT:  And do you have more on the plaintiffs'

8   side than five minutes or so?

9              MR. MACDONALD:  We do, Your Honor.

10             THE COURT:  All right.  We will stop here.  Ladies and

11  gentlemen, have a nice evening.  How about 9:20?

12        (Jury out at 4:41 p.m.)

13             THE COURT:  9:20 is when the one juror with the

14  medical appointment said she could be here, or he.  I don't

15  know.  Anything the plaintiff wants to put on the record?

16             MS. WANG:  No, Your Honor.

17             THE COURT:  Defendant?

18             MR. RINGEL:  Nothing, Your Honor.  Thank you.

19             THE COURT:  What about the jury instructions?  We've

20  given you back our set.

21             MR. RINGEL:  I haven't had a chance to look at them.

22  When should we be prepared to discuss them with the Court?

23             THE COURT:  Well, we're going to have to instruct, I

24  hope, Thursday.

25             MR. RINGEL:  Okay.

2535

20-cv-1878-RBJ   RYAN GROTHE - Direct   03-22-2022

1           THE COURT:  So, you should be looking at them.  The

2    one question I have is do the instructions as they now exist

3    adequately cover the issue about the partner agencies?

4           MR. RINGEL:  I think there needs to be an additional

5    instruction on that issue.  We've been looking at that issue,

6    and we will propose an instruction and confer with plaintiff and

7    see if we can reach agreement.  If not, provide them to the

8    Court.

9           THE COURT:  All right.  9:20 tomorrow.

10       (Proceedings concluded at 4:42 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

2536

REPORTER'S CERTIFICATE

1

2

3

4        I, KEVIN P. CARLIN, Official Court Reporter for the

5   United States District Court for the District of Colorado, a

6   Registered Merit Reporter and Certified Realtime Reporter, do

7   hereby certify that I reported by machine shorthand the

8   proceedings contained herein at the time and place

9   aforementioned and that the foregoing pages constitute a full,

10  true, and correct transcript.

11        Dated this 10th day of April, 2022.

12

13

14

15

16   _____
     Kevin P. Carlin, RMR, CRR
17   Official Court Reporter

18

19

20

21

22

23

24

25

Kevin P. Carlin, RMR, CRR