2537

1                   IN THE UNITED STATES DISTRICT COURT

2                       FOR THE DISTRICT OF COLORADO

3    Civil Action No. 20-cv-1878-RBJ

4    ELISABETH EPPS AND SARA FITOURI, ET AL.,

5          Plaintiffs,

6          vs.

7    CITY AND COUNTY OF DENVER, ET AL.,

8          Defendants.

9    ----------------------------------------------------------------

10                        REPORTER'S TRANSCRIPT

11                        Jury Trial, Vol. 13

12   ----------------------------------------------------------------

13          Proceedings before the HONORABLE R. BROOKE JACKSON,
     Judge, United States District Court for the District of
14   Colorado, commencing on the 23rd day of March, 2022, in
     Courtroom A902, United States Courthouse, Denver, Colorado.
15

16                        APPEARANCES
     For the Plaintiffs:
17   TIMOTHY R. MACDONALD, MATTHEW J. DOUGLAS, BRIAN M. WILLIAMS, and
     R. REEVES ANDERSON, Arnold & Porter Kaye Scholer LLP, 1144
18   Fifteenth Street, Suite 3100, Denver, CO 80202

19   ELIZABETH C. WANG and MAKEBA RUTAHINDURWA, Loevy & Loevy, 2060
     Broadway Street, Suite 460, Boulder, CO 80302
20

21   For the Defendants:
     ANDREW D. RINGEL, KATHERINE HOFFMAN, and ROBERT A. WEINER, Hall
22   & Evans LLC, 1001 Seventeenth Street, Suite 300, Denver, CO
     80202
23
     HOLLIE R. BIRKHOLZ and LINDSAY M. JORDAN, Denver City Attorney's
24   Office, 201 West Colfax Avenue, Denver, CO 80202

25   Reported By KEVIN P. CARLIN, RMR, CRR, 901 19th Street, Room
     A259, Denver, CO 80294, (303)335-2358

       Proceedings reported by mechanical stenography; transcription
                       produced via computer.

```
              20-cv-1878-RBJ   Jury Trial   03-23-2022
```

1                          I N D E X

2   PLAINTIFFS' EXHIBITS:

3
                            Identified              Received
4

5       382              2598                    2598
        500              2710                    2710
6       552              2694                    2696
        555              2696                    2696
7       663              2650                    2651
        716              2608                    2608
8

9   DEFENDANTS' WITNESSES                            PAGE

10  RYAN GROTHE
        Cross Examination By Mr. Macdonald . . . . . . . . 2540
11      Redirect Examination By Ms. Jordan . . . . . . . . 2551

12  JOHN COPPEDGE
        Direct Examination By Mr. Weiner . . . . . . . . . 2554
13      Cross Examination By Mr. Macdonald . . . . . . . . 2556
        Redirect Examination By Mr. Weiner . . . . . . . . 2568
14
    ANTHONY HAMILTON
15      Direct Examination By Ms. Birkholz . . . . . . . . 2571
        Cross Examination By Ms. Rutahindurwa  . . . . . . 2598
16      Redirect Examination By Ms. Birkholz . . . . . . . 2618

17  TANA CUNNINGHAM
        Direct Examination By Ms. Jordan . . . . . . . . . 2623
18      Cross Examination By Ms. Wang  . . . . . . . . . . 2647
        Redirect Examination By Ms. Jordan . . . . . . . . 2655
19
    ROBERT PARSONS
20      Direct Examination By Ms. Hoffman . . . . . . . . 2658
        Cross Examination By Mr. Williams . . . . . . . . 2671
21      Recross Examination By Mr. Williams . . . . . . . 2677

22  MATTHEW CANINO
        Direct Examination By Ms. Hoffman . . . . . . . . 2678
23      Cross Examination By Ms. Sterk . . . . . . . . . . 2712
        Redirect Examination By Ms. Hoffman . . . . . . . 2723
24      Recross Examination By Ms. Sterk . . . . . . . . . 2723

25

                    Kevin P. Carlin, RMR, CRR

2539

20-cv-1878-RBJ    Jury Trial    03-23-2022

1  DEFENDANTS' EXHIBITS:

2                                  Identified                Received

3        3018                        2667                      2667
         3022                        2665                      2665
4        3091                        2575                      2578
         3098                        2604                      2607
5        3102                        2582                      2582
         3151                        2639                      2640
6

7  Reporter's Certificate  . . . . . . . . . . . . . . . 2796

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

20-cv-1878-RBJ   RYAN GROTHE - Cross   03-23-2022

1              P R O C E E D I N G S

2         (Proceedings commenced at 9:19 a.m.)

3         (Jury in at 9:19 a.m.)

4              THE COURT:  Good morning, ladies and gentlemen.  I

5    hope everybody is healthy and happy this morning.

6              JUROR:  Did you have a good pickleball game?

7              THE COURT:  Absolutely.  That is not to say that I'm a

8    good player.  Okay.  Let's go.

9                        **CROSS EXAMINATION**

10   BY MR. MACDONALD

11   Q    Good morning, Officer Grothe.

12   A    Good morning, sir.

13   Q    You have no personal knowledge of any of the plaintiffs

14   throwing a rock, water bottle, or any other projectile; true?

15   A    True.

16   Q    You're not aware of any act of property destruction or

17   violence from any plaintiff; true?

18   A    True.

19   Q    Only officer that was terminated as a result of actions

20   during the George Floyd protests was one officer for an

21   Instagram post; true?

22             MS. JORDAN:  Objection.  Foundation.

23   Q.   (By Mr. Macdonald) If you know.

24   A    I have no idea, sir.

25   Q    You remember hearing about one officer who posted, let's

                    Kevin P. Carlin, RMR, CRR

20-cv-1878-RBJ    RYAN GROTHE - Cross    03-23-2022

1    start a riot, on Instagram when you were in the command post?

2    A    No, sir.  I don't remember that.

3    Q    All right.  You agree that the use of both PepperBalls and

4    40-millimeter rounds are a use of force that must be justified

5    by the actions of the individual; right?

6    A    Yes, sir.

7    Q    Same with the use of OC spray?

8    A    Yes, sir.

9    Q    Has to be justified by what the person on whom that

10   less-lethal weapon is deployed; true?

11   A    It has to be justified based on our level of resistance and

12   the objective, reasonable standard for totality of the

13   circumstances in order to use that force.

14   Q    To use the force on that person, you have to determine what

15   that person is doing on whom force is used; right?

16   A    Yes, sir.

17   Q    Have you seen video of officers deploying OC spray on

18   protesters simply walking across the street?  Have you seen any

19   of that video?

20   A    I have not.

21   Q    How about officers deploying OC spray on people who were

22   simply standing there and filming with their cameras, their

23   phones?

24   A    I have not.

25   Q    How about video of officers spraying OC spray on people who

20-cv-1878-RBJ   RYAN GROTHE - Cross   03-23-2022

1   were standing with their hands in the air?

2   A    I have not; sir.

3   Q    You were interviewed by Nick Mitchell of the Office of

4   Independent Monitor; right?

5   A    Yes, sir.

6   Q    All right.  Have you read the independent monitor's report?

7   A    He had not presented it to me, but I have since read it.

8   Q    Have you read it since your deposition?

9   A    Yes, sir.

10   Q    You hadn't read it at the time of your deposition; true?

11   A    No.

12   Q    That's true?

13   A    I had not read it before my deposition.

14   Q    You did not receive any specific training for your position

15   as the less-lethal coordinator; true?

16   A    As far as -- I did receive training as a less-lethal

17   instructor, and had significant experience in the Metro SWAT

18   bureau.

19   Q    And that was during your 18 years as a SWAT officer; right?

20   A    Yes, sir.

21   Q    And when you were brought in by Commander Phelan into his

22   office, originally it was not to be the less-lethal coordinator;

23   is that fair?

24   A    Yes, sir.

25   Q    All right.  But then Deputy Chief Archer asked you to take

20-cv-1878-RBJ     RYAN GROTHE - Cross     03-23-2022

1   over the management of the less-lethal equipment and munitions;

2   right?

3   A     Yes, sir.

4   Q     And you didn't receive any special training for that?

5   A     No.  No additional training on top of my experience and the

6   training I already had.

7   Q     At the time of the George Floyd protests, you had not

8   developed any chemical munitions course; true?

9   A     True.

10   Q     In fact, at the time, you hadn't even looked at any course

11   material for any sort of chemical munition deployment; true?

12   A     True.

13   Q     The Denver Police Department does not train its officers in

14   the use of flash-bangs for crowd control; true?

15   A     True.

16   Q     And in fact, flash-bangs are not meant to be used as part

17   of crowd control activities at all; right?

18   A     When you're talking about the flash-bangs, the type that

19   Metro SWAT uses in order to do entries or high-risk tactical

20   operations, no, they're not.

21   Q     And you understand that the OIM report concluded that DPD

22   did use flash-bangs during the protests; right?  You're aware of

23   that?

24   A     No, sir.

25   Q     All right.  I want to talk about some use of grenades

20-cv-1878-RBJ    RYAN GROTHE - Cross    03-23-2022

1    during the protests.  Okay?

2    A    Okay.

3    Q    DPD used Stinger grenades during the protests; right?

4    A    Yes, sir.

5    Q    And Stinger grenades can perform like flash-bangs; right?

6    A    Yes.  The fuse assembly does perform similar to a

7    flash-bang.

8    Q    And Stinger grenades, some have .60 caliber rubber pellets,

9    and some have OC and CS spray that comes out after the munition

10   is deployed; right?

11   A    In powder form, and they also have .32 caliber pellets.

12   That's normally the ones that are included with OC.

13   Q    All right.  And there's no training on the use of Stinger

14   grenades for protests; right?

15   A    None that I've provided prior to that date.

16   Q    I'd like to talk about PepperBalls.  Officers are supposed

17   to get supervisor approval before targeting a specific

18   individual with PepperBalls, unless it's an emergency; right?

19   A    No.  That's incorrect.

20   Q    So, you can target -- an officer can target someone with

21   PepperBalls even outside an emergency?

22   A    If it's just an individual, yes.  If it's an individual

23   within a group setting or a crowd control setting, then they're

24   supposed to get their division or unit supervisor approval.

25   Q    Thank you for the clarification.  In a protest scenario,

20-cv-1878-RBJ    RYAN GROTHE - Cross    03-23-2022

1    where there's crowd control or crowd management going on by

2    officers, officers are supposed to get supervisor approval

3    before targeting a specific individual with PepperBall unless

4    it's an emergency?

5    A    Yes.  Minus emergency circumstances.

6    Q    Officers have discretion to decide what constitutes an

7    emergency; right?

8    A    Yes, sir.

9    Q    Have you seen video from the George Floyd protests of DPD

10   officers targeting individuals without supervisor approval and

11   outside of an emergency?

12   A    No, sir.

13   Q    All right.  Have you seen video of DPD officers shooting at

14   someone with a PepperBall at a pizza restaurant?

15   A    At a pizza restaurant?

16   Q    Yeah.  Slice Works?

17   A    No, sir.

18   Q    All right.  Have you seen video of DPD shooting at someone

19   with a PepperBall while jaywalking?

20   A    No, sir.

21   Q    How about have you seen video of people -- officers

22   shooting people in the back who are running away?

23   A    No, sir.

24   Q    Have you seen video of officers shooting at people standing

25   still with their arms up?

20-cv-1878-RBJ    RYAN GROTHE - Cross    03-23-2022

1    A    No, sir.

2    Q    Have you seen video of DPD officers shooting at a man

3    standing outside his car screaming about his pregnant girlfriend

4    inside the car?

5    A    I did see news coverage of that.  But outside of news

6    coverage, no, sir.

7    Q    Have you seen video of DPD officers shooting at people

8    while on a moving vehicle in front of the Denver Public Library?

9    A    No, sir.

10   Q    You're not aware of any specific training that the Denver

11   Police Department did before the George Floyd protests which

12   instructed officers not to use less-lethal weapons as a means of

13   retaliation or punishment; true?

14   A    It's within our policy, so they have to be familiar within

15   our policy that they cannot do that.

16   Q    Is there anything in the policy that specifically instructs

17   officers not to use less-lethal force as a means of retaliation

18   or punishment?

19   A    Yes, there is.

20   Q    And by that you mean there's information on when they can

21   deploy PepperBalls; right?

22   A    No.  I believe if you looked up 105.01, paren 4B4 -- I

23   don't know the exact numbers.  I think the exact sentence

24   references not using that for retaliation.

25   Q    Officers are supposed to be responsible for every round of

20-cv-1878-RBJ     RYAN GROTHE - Cross     03-23-2022

1    PepperBall they fire; right?

2    A    Yes, sir.

3    Q    And have you seen any attempt by DPD after the George Floyd

4    protests to make sure that officers were responsible for the

5    more than 33,000 rounds of PepperBall they deployed in the first

6    five days of the protest?

7    A    I am aware that there are investigations, but I am not part

8    of those investigations at this time.

9    Q    Officers are supposed to be responsible for every round of

10   40-millimeter shots they fire; true?

11   A    Yes, sir.

12   Q    Have you seen any attempt to make sure that the Denver

13   Police Department officers were responsible for every one of the

14   more than 600 40-millimeter rounds they deployed during the

15   first five days of the protest?

16   A    Again, sir, I know that there's probably investigations

17   underway, but I am not privy to those.

18   Q    Officers are supposed to get supervisor approval to use

19   40-millimeter rounds unless it's an emergency; right?

20   A    Within a crowd control setting, yes, sir.

21   Q    And an emergency is if someone is going to be seriously

22   injured and/or killed; right?

23   A    Yes, sir.

24   Q    This would not include someone kicking a tear gas canister

25   five to ten feet into the road when officers are 30 to 40 feet

20-cv-1878-RBJ   RYAN GROTHE - Cross   03-23-2022

1   away, would it?

2   A    Based on what you're telling me, and me not knowing the

3   totality of the circumstances of what happened prior to or after

4   or during that event, I would say that that doesn't constitute

5   serious injury, but it does constitute defensive resistance.

6   Q    So, not enough to shoot someone in the head with a

7   40-millimeter; true?

8   A    No.  That would not be enough to shoot someone in the head

9   with a 40-millimeter.

10  Q    Or shoot them with a 40-millimeter at all; right?

11  A    Correct.

12  Q    All right.  You agree that an officer should never let the

13  muzzle of a 40-millimeter point at anything that they are not

14  willing to destroy; right?

15  A    That is one of our firearm safety rules.  And normally yes,

16  we tell officers to hold it in a low ready position, so you're

17  not sweeping your muzzle on anything until they're up and on

18  target and ready to engage.

19  Q    Have you seen video from the George Floyd protests of DPD

20  officers pointing their 40-millimeter at protesters, for example

21  doing yoga or the splits in the street?

22  A    No, sir.

23  Q    Have you seen video of DPD officers pointing their

24  40-millimeter at people filming -- doing nothing but standing in

25  front of the officers filming?

20-cv-1878-RBJ   RYAN GROTHE - Cross   03-23-2022

 1   A     I have not, sir.

 2   Q     First night of the protests, you retrieved all the

 3   munitions you could out of the police administration armory and

 4   distributed them to Metro SWAT; true?

 5   A     Yes.

 6   Q     And there was no tracking of the munitions distributed that

 7   first evening; right?

 8   A     No, sir.

 9   Q     What I said is true?

10   A     Yes.  That's true.

11   Q     During subsequent days of the protest, you would give

12   munitions to supervisors at the daily briefing; right?

13   A     Correct.

14   Q     And those supervisors would distribute them as they saw

15   fit; right?

16   A     Yes, sir.

17   Q     And I think on your direct exam, you acknowledged that in

18   retrospect, you could have done -- DPD could have done a better

19   job of trying to track the less-lethals that it put out in the

20   field; right?

21   A     Yes, sir.

22   Q     All right.  And it's true that DPD used inert PepperBalls

23   during the protest as kinetic impact munitions because the

24   officers ran out of the LIVE-X PepperBalls; right?

25   A     Yes, sir.

20-cv-1878-RBJ   RYAN GROTHE - Cross   03-23-2022

1   Q   On the second day of the protest you worked to obtain

2   additional munitions from other agencies; true?

3   A   Yes, sir.

4   Q   And you didn't keep track of what DPD received from the

5   other agencies; right?

6   A   No, sir.

7   Q   Again, that's a bad phrasing.  Did you do that?

8   A   Did I keep track of those?  No, sir.  I did not.

9   Q   All right.

10  A   Other than the fact -- by sheer number, no.  Other than the

11  fact that I made sure that they were something that was viable

12  for us to be using.

13  Q   All right.  You understand that there were officers who

14  were not certified to use PepperBalls or 40-millimeter

15  launchers, but who did actually use those weapons during the

16  George Floyd protests?

17  A   I have heard that.

18  Q   And you're aware that some of those officers received

19  on-the-job training when they arrived, for example, at the

20  capitol or other locations; right?

21  A   I am only aware because I was told that.  Yes, sir.

22  Q   And you're not sure even what training they got; right?

23  A   No, sir.

24  Q   It wouldn't have been the training that you provide; right?

25  A   No, sir.

Kevin P. Carlin, RMR, CRR

20-cv-1878-RBJ    RYAN GROTHE - Redirect    03-23-2022

1    Q    And it wouldn't have been the quality of training that you

2    provide; right?

3    A    I'm not aware of the training that they were provided.  If

4    they were provided the course by a certified instructor, the

5    quality would have been the same, but I am not aware of what

6    training they received.

7    Q    All right.  And do you know who provided that training?

8    A    No, sir.

9    Q    And there's nobody who was disciplined as far as you're

10   aware for the officers using weapons during the protest for

11   which they were not trained; right?

12   A    To my knowledge, no, sir.

13           MR. MACDONALD:  No further questions, Your Honor.

14           THE COURT:  Redirect?

15                      **REDIRECT EXAMINATION**

16   BY MS. JORDAN

17   Q    Good morning.  Quickly, why hadn't you developed a standard

18   equalized course for chemical munitions prior to the George

19   Floyd protests?

20   A    That was -- I think I talked about it briefly yesterday,

21   but when I took over the position in 2019, there was, as you

22   know, we had many less-lethal munitions or less-lethal platforms

23   that we had to certify officers on.  The PepperBall and the 40

24   are also used in a patrol setting, which is in addition to

25   the -- any crowd control.

20-cv-1878-RBJ   RYAN GROTHE - Redirect   03-23-2022

1       So, I had to make sure that the officers' standardized

2    curriculum and stuff like that was up on par and their training

3    and certification process.  I was working -- I was working

4    towards the chemical munitions, but I put that at a lower level

5    just because I think I said yesterday, we had done numerous --

6    you could look at probably the track record for several years,

7    monitored these different protests and crowd management

8    scenarios, and never had to deploy chemical munitions because of

9    the cooperation of the crowd or their ability to just maintain

10   that management position.  So, I hadn't got to that part.

11   Q    And if the incident commander would authorize the use of

12   less-lethal munitions in a crowd control situation, would that

13   satisfy the requirement that an officer would need to have in

14   order to deploy either PepperBall or 40 in a crowd control

15   situation?

16   A    If they were to receive that -- the incident commander were

17   to give that okay, and then the division unit supervisor were to

18   tell their people, yes.

19       MS. JORDAN:  Those are the questions I have.

20       THE COURT:  All right.  Any questions from the jury

21   for this witness?  Okay.

22       (Proceedings held at the bench:)

23       THE COURT:  Was that your closing argument that we

24   just heard?

25       MR. MACDONALD:  Part of it.  Just wanted to see what

20-cv-1878-RBJ    RYAN GROTHE - Redirect    03-23-2022

1    he had seen, Your Honor.

2         THE COURT:  It really wasn't cross examination, was

3    it?  Question 49.

4         MR. MACDONALD:  No objection.

5         MS. JORDAN:  No objection.

6         THE COURT:  And 50.

7         MR. MACDONALD:  No objection.

8         MS. JORDAN:  No objection.

9      (Proceedings held in open court:)

10         THE COURT:  The jury has a couple questions for you.

11         THE WITNESS:  Okay.

12         THE COURT:  Question, how many chemical munitions did

13   DPD use during the protest?

14         THE WITNESS:  I do not have an exact number of the

15   chemical munitions that were deployed.

16         THE COURT:  Do you have any estimate or ballpark?

17         THE WITNESS:  No, sir.

18         THE COURT:  Okay.  How many PepperBalls were used?

19         THE WITNESS:  I would -- same answer.

20         THE COURT:  You don't know?

21         THE WITNESS:  No, sir.

22         THE COURT:  And the same with respect to OC Blast

23   grenades?

24         THE WITNESS:  Same answer, sir.  All the chemical

25   munitions and less-lethal munitions that were used, I do not

20-cv-1878-RBJ   JOHN COPPEDGE - Direct   03-23-2022

1   have that running track record.  If they were recorded within

2   the use of force reports, they could probably be brought up that

3   way, but I do not have that record.

4           THE COURT:  Okay.  Question, if an officer uses OC

5   spray at too close of a distance, is that a policy violation?

6           THE WITNESS:  Not necessarily.  The distance, it's not

7   a policy.  It's more of a safety concern for the safety of the

8   subject that they're deploying on.

9           THE COURT:  Okay.  Any other questions for the -- from

10  the jury?  No.  How about from defense counsel?

11          MS. JORDAN:  No, Your Honor.

12          MR. MACDONALD:  No, Your Honor.

13          THE COURT:  All right.  Thank you.

14          THE WITNESS:  Thank you, Your Honor.

15          THE COURT:  Next?

16          MR. WEINER:  Defense calls Mr. John Coppedge.

17          THE COURT:  Good morning.

18          THE WITNESS:  Good morning, sir.

19       (The Witness is Sworn)

20          THE COURT:  Okay.  Thank you.

21                      **DIRECT EXAMINATION**

22  BY MR. WEINER

23  Q    Sir, once you get comfortable, if you would please

24  introduce yourself to the jury, and spell your last name for the

25  court reporter, please.

20-cv-1878-RBJ    JOHN COPPEDGE - Direct    03-23-2022

1  A    Yes.  My name is John Coppedge.  My last name is

2  C-O-P-P-E-D-G-E.

3  Q    Mr. Coppedge, what do you presently do in terms of

4  employment work?

5  A    I have a private counseling practice.

6  Q    On May 28th of 2020, where were you employed?

7  A    May -- Denver Police Department.

8  Q    And in what capacity were you employed?

9  A    I was a lieutenant with the training division.

10  Q    And were you requested by the Office of Independent Monitor

11  to conduct or do an interview with them?

12  A    Yes.  Several months after May.  It was September, I think.

13  Q    September 9th of 2020?

14  A    Yes.

15  Q    What was your understanding of the purpose or the framework

16  of that particular interview?

17  A    He wanted to talk about training, and specific to George

18  Floyd, which I told him I had no firsthand knowledge about

19  George Floyd, but I would be happy to talk about training.

20  Q    So, to touch on that just a little bit, you had no

21  firsthand knowledge about the George Floyd protest in terms of

22  what happened on the ground, so to speak?

23  A    Right.  I was -- I wasn't there.

24  Q    Okay.  And did you -- were you aware whether that

25  interview -- that discussion with Mr. Nick Mitchell of the

20-cv-1878-RBJ   JOHN COPPEDGE - Cross   03-23-2022

1   independent monitor, whether that was recorded?

2   A    No.  I don't think it was.

3   Q    Okay.  Do you know whether there was a memo written or

4   drafted after you conducted that interview?

5   A    Not until it was shared by your office a couple weeks ago.

6   Q    Okay.  So, no one from the Office of Independent Monitor

7   bothered to check with you to see whether your impressions or

8   the opinions that were in that document were actually accurate?

9   A    No.

10            MR. WEINER:  No further questions.

11            THE COURT:  Cross?

12            MR. MACDONALD:  Yes, Your Honor.

13                      **CROSS EXAMINATION**

14   BY MR. MACDONALD

15   Q    Lieutenant Coppedge, my name is Timothy Macdonald.  I

16   represent the plaintiffs in this case.  We've never had a chance

17   to meet, have we?

18   A    No.  And I'm not a lieutenant.  Mr. Coppedge is fine.

19   Q    That's perfect.  I've gotten used to trying to make sure I

20   do that.  Mr. Coppedge, you were a police officer for almost 30

21   years?

22   A    Twenty-eight years.

23   Q    You started in 1992?

24   A    Yes.

25   Q    Before you served with the Denver Police Department, you

20-cv-1878-RBJ   JOHN COPPEDGE – Cross   03-23-2022

1  served eight years in the United States Air Force?

2  A    Six and a half years active duty and then a year and a half

3  on inactive reserve.

4  Q    You have an undergraduate degree in communication with a

5  leadership emphasis from Regis?

6  A    Yes.

7  Q    Regis University?

8  A    Yeah.  Minor in psychology.

9  Q    All right.  You graduated summa cum laude?

10  A    Yes.

11  Q    Did you recently get your master's degree in counseling?

12  A    I graduated in December.

13  Q    Congratulations.

14  A    Master's in clinical mental health counseling, yes.

15  Q    All right.  And at the time of the George Floyd protests,

16  you were a lieutenant with the Denver Police Department?

17  A    Yes.

18  Q    And you also supervised the DPD's employee wellness and

19  resiliency program?

20  A    Yes.

21  Q    And you provided presentations on leadership, emotional

22  intelligence, trauma, stress, vicarious trauma, peer support?

23  A    Yes.

24  Q    You presented at the White House in 2016 --

25         MR. WEINER:  I'm going to object, Your Honor.  This is

20-cv-1878-RBJ   JOHN COPPEDGE - Cross   03-23-2022

1   outside the scope.

2          THE COURT:  It is, but the objection is overruled.

3   Q.    (By Mr. Macdonald) In 2016, you presented at the White

4   House on mental health?

5   A    Well, I was part of a roundtable discussion.  I didn't

6   present, but yes.

7   Q    You helped develop the International Association of Chiefs

8   of Police first line leadership training program?

9   A    Yes.  You guys looked at my LinkedIn profile recently.

10  Q    We did.  We didn't have a lot of information about you.

11  You were hard to track down.

12  A    I think I'm pretty easy.  I'm open to clients.

13  Q    I was thinking about making an appointment, but I thought

14  your counsel might object.  You think it's important that police

15  leaders demonstrate excellence in transparency through a

16  value-based policing approach; right?

17  A    Yes.  That's -- that is a value I have about leadership.

18  Q    As Mr. Weiner said, you were interviewed by the Office of

19  Independent Monitor in September of 2020; right?

20  A    Yes.

21          THE COURT:  His name is Weiner.

22          MR. MACDONALD:  Weiner.  Sorry, Your Honor.

23  Q.    (By Mr. Macdonald) That was three -- three and a half

24  months after the protest?

25  A    Yes.

Kevin P. Carlin, RMR, CRR

20-cv-1878-RBJ    JOHN COPPEDGE - Cross    03-23-2022

1   Q    And the Office of Independent Monitor wanted to gather

2   different perspectives, including those of the people in charge

3   of training.  That's what they told you?

4   A    Yes.

5   Q    And it sounds like you have been shown your -- the memo

6   that the Office of Independent Monitor did?

7   A    Yes.

8   Q    Mr. Weiner showed you that?

9   A    Yes.

10  Q    And you saw DPD's response to the George Floyd protest from

11  your perspective as a total leadership failure?

12  A    That was my opinion.

13  Q    And it was your opinion that officers on the ground were

14  reacting to what they saw without any sort of leadership?

15  A    That was within the context of a hypothetical discussion

16  about what I saw on the news.

17  Q    And this was three and a half months later, so I assume

18  during -- between May 28th and September the 9th when you were

19  interviewed by the Office of Independent Monitor, you had talked

20  to your -- some of your fellow officers; right?

21  A    Well, I talked to fellow officers all the time, but yeah.

22  Q    Okay.  So, in the three and a half months, you had had

23  training sessions with lots of officers?

24  A    I did not.  I was -- really, I was in a managerial role.

25  Q    You oversaw Mr. Knutson?

20-cv-1878-RBJ   JOHN COPPEDGE - Cross   03-23-2022

1    A    He was a sergeant in the training division, yes.

2    Q    Do you remember during your interview with Mr. Mitchell of

3    the Office of the Independent Monitor that you discussed the

4    change in attitude toward training between prior chiefs of

5    police and the current administration?

6    A    Yes.  The philosophical shift.

7    Q    Right.  And you talked in that interview with the Office of

8    Independent Monitor that in 2008, when the Democratic National

9    Convention had been held in Denver, that the crowds were

10   significantly larger during those -- that the City experienced

11   during the George Floyd protests; right?

12   A    Yes.  That was a preplanned event, though.  So, it's easier

13   to plan for those things.

14   Q    Certainly.  And one of the things you talked about with the

15   Office of the Independent Monitor was that former Chief Robert

16   White was very open to partnership with other agencies for

17   training; right?

18   A    We had a conversation about working with other agencies.  I

19   don't know if it was specific to what Robert White did or what

20   Paul Pazen did.  It just was a general conversation about

21   training with other agencies.

22   Q    Do you remember telling Mr. Mitchell that under the current

23   chief of police at that time, and still today --

24        MR. WEINER:  Judge, I'm going to object again.  This

25   is outside the scope.

20-cv-1878-RBJ   JOHN COPPEDGE - Cross   03-23-2022

1       THE COURT:  Yes.  Overruled.

2   Q.    (By Mr. Macdonald) Do you remember discussing with

3   Mr. Mitchell that under the current chief of police, Paul Pazen,

4   the prevailing attitude is that training is not important?

5   A    Not that -- that's not the right words.  It's not that it

6   wasn't important.  It's that it was -- under White, my

7   perception was that staffing and training had equal value.

8   Under Paul Pazen, staffing had greater value.  Still, training

9   was happening.  Training was still important.  It was more of an

10  emphasis now on hiring and recruit-based training rather than

11  in-service-based training.  So, it shifted the priority from

12  being equal in-service and recruit training to being a priority

13  on recruit training to get the staffing numbers up.

14  Q    And one of the things you told Mr. Mitchell was that patrol

15  and district commanders say that in-service training kills their

16  staffing; right?

17  A    Patrol -- the commanders have a vested interest in keeping

18  their staffing numbers up, for sure.

19  Q    And one of the problems that you described to Mr. Mitchell

20  was that in-service trainings receive no organizational support,

21  and that unless there's an instruction to fill classes from the

22  chief, people don't attend; right?

23  A    And that was specific to the field force conversation.  But

24  yeah, field force training in particular.

25  Q    And so that's something that had been going on -- there had

20-cv-1878-RBJ    JOHN COPPEDGE - Cross    03-23-2022

1  been more field force training, and under Paul Pazen, there was

2  less field force training; isn't that fair?

3  A    Yeah.  And that had more to do with the logistical

4  challenges we had of space and availability of instructors, but

5  with the chief's support, we could have overcome those.

6  Q    And you put on an in-service field force training for

7  supervisors, and only a very small handful, six or seven people

8  attended.  Do you remember that?

9  A    Yes.  That was, I think, in October 2019.

10  Q    And do you recall that you spoke to Deputy Chief Barb

11  Archer to begin a weekly eight-hour field force refresher course

12  after recruits had -- were graduating from the academy?  You

13  talked to her about that; right?

14  A    We did have that conversation.  Time-wise, I don't know if

15  that was pre-George Floyd or after George Floyd, to be honest

16  with you.

17  Q    Yeah.  Let's take a look at 861, which is already in

18  evidence.

19          THE COURTROOM DEPUTY:  What exhibit number?  I'm

20  sorry?

21          MR. MACDONALD:  861.  If we go to the second page,

22  please.  Down at the bottom, the last paragraph.

23  Q.   (By Mr. Macdonald) It says, Lieutenant Coppedge asked

24  Deputy Chief Barb Archer to begin a weekly eight-hour field

25  force refresher course after lateral recruits graduated in July.

20-cv-1878-RBJ    JOHN COPPEDGE - Cross    03-23-2022

1    After she spoke to Chief Pazen, she said, yes, to schedule it.

2    Do you see where I'm reading?

3    A    Yes.

4    Q    And then after you brought the plan to other lieutenants

5    and they spoke to other command staff, Lieutenant Coppedge was

6    told to scrap that plan; right?  Do you recall that?

7    A    Yeah.  I can't say that that language is accurate as far as

8    what we said, but the context is accurate, and that tells me it

9    was after George Floyd.

10   Q    So, even after George Floyd, you tried to do that

11   particular training, and you were told to scrap the plan, and

12   instead to have a train the trainer class that could be taught

13   at the districts to the rank and file; right?

14   A    Right.  And some of this had to do, again, with logistics

15   and COVID protocols that were in place, which put severe

16   restrictions on how many people we could have in a space at a

17   given time.  If you remember the early stages of COVID, we were

18   really severely limited how many people we could even have in a

19   classroom.

20   Q    If we look at that next paragraph, do you recall telling

21   Mr. Mitchell and his colleague that the training academy no

22   longer trains on less-lethal crowd management tactics or weapons

23   such as the PepperBall system?

24   A    That language is inaccurate.  What I told him is that the

25   less-lethal systems use to be housed at our firearms range,

20-cv-1878-RBJ     JOHN COPPEDGE - Cross     03-23-2022

1   which was under my purview, and we had a firearms instructor who

2   managed the less-lethal program.  And that meant training the

3   instructors at a district level so they could do it in the

4   field, and managing the inventory.

5          As the program was going forward, it didn't have much

6   of a training component anymore, because the instructors were

7   set in the districts.  It became a management program of the

8   systems, of the inventory.

9          That firearms instructor was being pulled from his

10  duties to manage that inventory, when what I really needed him

11  to do was firearms training.  So, there was a conversation about

12  can we move this somewhere else that would be more efficient and

13  more effective?  And that's why it moved under special

14  operations for the management of the program and to train new

15  instructors as needed at a district level.

16  Q    And at some point, less-lethal training became more about

17  inventory management and tracking?

18  A    Very much so.  Once the training piece of the instructors

19  were trained and they were in the districts, it became about

20  managing the inventory at that point.

21  Q    And do you recall that the -- you were asked to review

22  video to help determine whether various incidents were in

23  policy.  Do you recall that?

24  A    They were -- I wasn't asked about whether it was in policy

25  or not.  There were cases that internal affairs had, and they

20-cv-1878-RBJ    JOHN COPPEDGE - Cross    03-23-2022

1  would sometimes send me a body cam video and just say, what is

2  your opinion of this?  And then I would share it with whoever

3  the expert was in my training area.

4  Q    Okay.  So, at the time that you were being interviewed, you

5  had reviewed footage from internal affairs that they had sent

6  you on incidents during the George Floyd protests?

7  A    On a few -- very few cases, yeah.

8  Q    They didn't send you very much?

9  A    No.

10 Q    All right.  Do you recall during your interview with

11 Mr. Mitchell that you described one of the biggest failures as

12 supervisors not recognizing when officers had taken too much

13 abuse?

14 A    That was a huge hypothetical conversation that he and I

15 had.  And it wasn't specific to George Floyd.  It was if

16 officers are -- can officers get mental fatigue.  That was kind

17 of the context.  And I said, yeah.  I said, if an officer is

18 left standing -- and not just officers.  Any human being is left

19 standing for 12 hours, multiple days in a row, and subjected to

20 violence, abuse, a violent attack, a violent assault,

21 eventually, over days, their cognition will start to flip, and

22 emotions will start to take over.  And that's just human nature.

23 That's human beings.

24       And he said, well, would it be important for a

25 supervisor to be aware of that?  I said, yes, but supervisors

20-cv-1878-RBJ   JOHN COPPEDGE - Cross   03-23-2022

1   are under the same strain.  So, it's all a challenge.

2   Absolutely.  And then he said, is that a leadership challenge?

3   And I said, of course it is.

4   Q    And so field force -- more extensive field force training

5   could help with respect to the issue you just described; right?

6   A    I don't think so.  You're talking about human behavior and

7   mental fatigue.  I think that -- I don't know that training can

8   overcome that, necessarily.

9   Q    Could it help?

10  A    It wouldn't hurt.

11  Q    It wouldn't hurt.  All right.  Let's put up 861 and go to

12  the third page again, please.  And this may be if we go to that

13  second-to-the-last from the bottom, that paragraph there,

14  please, Dan.  And this may be along the lines of what you just

15  described.  Do you recall telling Mr. Mitchell that tempers and

16  clarity of mind would run short, and the result was the overuse

17  of PepperBalls?  Sound like something you would have said?

18  A    I would not have -- because the way that's phrased, it's

19  like it's specific to George Floyd, but I was talking more --

20  and the conversation was about a hypothetical.  And yes.  If

21  cognition drops because of fatigue, mental fatigue, yes, any

22  system can start to be abused.

23  Q    Including the overuse of PepperBalls?

24  A    Yes.

25  Q    All right.  And do you remember telling Mr. Mitchell you

20-cv-1878-RBJ    JOHN COPPEDGE - Cross    03-23-2022

1   did not think PepperBalls were a tool to be used for shooting at

2   people, but instead, were supposed to be shot at the ground to

3   disperse crowds?

4   A    And that was my understanding of the system.  I have never

5   been trained on it.  It wasn't something that I had knowledge

6   in.  I said my understanding of the system is you shoot at the

7   ground, and the capsicum or the mace disperses in the air.  That

8   was my understanding of the system.

9   Q    Let's go back to the second page, please.  Second full

10  paragraph.  And you understand Mr. Mitchell, when you gave this

11  interview, was the independent monitor.  You knew that at the

12  time; right?

13  A    Right.

14  Q    And you knew there was -- one of his colleagues was with

15  him during that interview?  Do you recall that?  Kevin Strom, a

16  deputy monitor?

17  A    Yeah.  I would say this was his statement.

18  Q    And you understand Mr. Mitchell was trying to determine how

19  the police responded to the George Floyd protests to try to

20  make -- to try to analyze what had happened?

21  A    Sure.  That was his agenda.

22  Q    All right.  And we talked a moment ago about this first

23  sentence, under the current chief of police, the prevailing

24  attitude is that training is not important; right?  We talked

25  about this?

20-cv-1878-RBJ    JOHN COPPEDGE - Redirect    03-23-2022

1    A    Right.

2    Q    And patrol district commanders say that in-service training

3    kills their staffing?

4    A    Yeah.  That's -- staffing is their priority.

5    Q    And that there's no mandate from the top ordering the

6    training classes be filled, and so classes do not get filled?

7    A    And that was specific to the field force training.

8        MR. MACDONALD:  No further questions.  Thank you,

9    Mr. Coppedge.

10        THE COURT:  Redirect?

11        MR. WEINER:  Thank you, Your Honor.

12                  **REDIRECT EXAMINATION**

13    BY MR. WEINER

14    Q    Mr. Coppedge, we're going to follow up on one of the last

15    answers that you gave to counsel with respect to Mr. Mitchell

16    and the agenda.  Did you get a sense that -- from Mr. Mitchell

17    in this interview that there was an agenda?

18    A    Yes.  He -- he must have asked several times about

19    PepperBall, even though I kept going back to, I wasn't there, I

20    wasn't present, and I don't have training or knowledge on the

21    system.

22    Q    And he kept going back to that?

23    A    Yes.

24    Q    Despite the fact that you had indicated you have no

25    knowledge of those areas and no factual understanding of what

Kevin P. Carlin, RMR, CRR

20-cv-1878-RBJ   JOHN COPPEDGE - Redirect   03-23-2022

1  happened during the protests?

2  A    Yes.

3  Q    Having now had actually somebody giving -- given you this

4  memo, and read it, how many actual quotations are there?

5  A    One.  About the leadership.

6  Q    One quote?

7  A    Right.

8  Q    In your opinion, based now having read this -- this being

9  this memo from the Office of Independent Monitor, were there a

10 number of items in your opinion that were taken out of context?

11 A    Yes.  It's very skewed towards supporting a finding of

12 wrongdoing during George Floyd, in my opinion, when that was not

13 my perception of our conversation.

14 Q    And were you just generally giving opinions with regards to

15 training in an overall theoretical setting?

16 A    Yes.  And there's stuff in there that's -- or there's stuff

17 missing.  We had a lengthy conversation about crowd dynamics,

18 and that's nowhere in there.

19 Q    Is there anything in there with regards to the questions

20 that were actually posed to you?

21 A    No.  There's nothing to indicate there was even a dialogue

22 going on.

23 Q    And at the point that you gave this interview, were you --

24 had you made a decision to leave the Denver Police Department

25 to --

2570

20-cv-1878-RBJ   JOHN COPPEDGE - Redirect   03-23-2022

1   A     Yes.  I was in the process of getting ready to retire and

2   leave and start my new path.

3   Q     And so, again, you were just generally speaking about

4   training in a theoretical setting?

5   A     Yes.

6   Q     Okay.  And Mr. Mitchell kept trying to bring you back to

7   pointing blame to the George Floyd protest?

8   A     Yes.

9   Q     Were you doing that in your responses?

10  A     No.

11  Q     Did you have any factual knowledge about what took place

12  during the George Floyd protests?

13  A     No.

14  Q     And did you again make that clear to Mr. Mitchell and the

15  other individual who was present?

16  A     Several times.

17          MR. WEINER:  No further questions.

18          THE COURT:  Questions from the jury for this witness?

19  None.  All right, then.  Sir, thank you.  You are excused, free

20  to go.  Next?

21          MS. BIRKHOLZ:  Defendants call Sergeant Anthony

22  Hamilton.

23          THE COURT:  Good morning.

24          THE WITNESS:  Good morning, Your Honor.

25      (The Witness is Sworn)

20-cv-1878-RBJ   ANTHONY HAMILTON - Direct   03-23-2022

1        THE COURT:  Okay.

2                    **DIRECT EXAMINATION**

3    BY MS. BIRKHOLZ

4    Q    Good morning.

5    A    Good morning.

6    Q    Can you please introduce yourself for the jury.

7    A    My name is Anthony Hamilton.  I work for the Jefferson

8    County Sheriff's Office.

9    Q    And what is your current role with the Jefferson County

10   Sheriff's Office?

11   A    I am currently a sergeant assigned to patrol.

12   Q    Is that the same role that you held with Jefferson County

13   in May or June of 2020?

14   A    It is not.

15   Q    Okay.  What role did you have at that point in time?

16   A    At that point I was a deputy sheriff and an operator on our

17   regional SWAT team.

18        THE COURTROOM DEPUTY:  I'm sorry to interrupt.  Can

19   you scoot up and speak into the microphone.  Thank you.

20   Q.   (By Ms. Birkholz) And why did you join Jefferson County

21   SWAT?

22   A    The biggest reason was because I wanted to -- similar to

23   why I joined law enforcement in general was to help people, but

24   our SWAT team is involved in a number of advanced tactics and

25   different situations that allow me to do that even more so.

20-cv-1878-RBJ    ANTHONY HAMILTON - Direct    03-23-2022

1  Q    Now, we've heard a lot about Denver SWAT department, but

2  can you tell me a little bit about Jefferson County SWAT team.

3  A    Yes.  It's a regionalized SWAT team, which means it's

4  comprised of several agencies: the Jefferson County Sheriff's

5  Office, the Golden Police Department, the Arvada Police

6  Department, and the Edgewater Police Department.

7  Q    And comparing that with your role now, is that -- can you

8  contrast that with your current role.

9  A    Yes.  Now I'm still assigned to the team, but I'm a team

10  leader, given my sergeant role.  It's a supervisory role on the

11  team now.

12  Q    Okay.  Now, the jury has learned that Jefferson County has

13  helped Denver's response to the George Floyd protests, and you

14  understand you're here to talk about Jefferson County's role

15  with that?

16  A    Yes.

17  Q    Okay.  How many days did Jefferson County assist with the

18  George Floyd protest response?

19  A    I believe it was four.  Three or four.

20  Q    And of those days, how many days were you there?

21  A    All of them.

22  Q    Okay.  And what was the first day that Jefferson County

23  assisted Denver with the response?

24  A    I believe it was May 29th.

25  Q    Now, before we get into the specifics, how many protests

20-cv-1878-RBJ   ANTHONY HAMILTON - Direct   03-23-2022

 1   have you policed before George Floyd?

 2   A    None.

 3   Q    Okay.  What was your experience, if you can give us just

 4   your impression of the George Floyd protests?

 5   A    It was pretty chaotic.  It was something I've never

 6   experienced before.  There was a lot going on.  Most days the

 7   demonstrators were peaceable, at least during the daytime.  And

 8   it typically started off that way, and then it kind of devolved

 9   from there into a little bit more chaos.

10        There was a lot going on, a lot of things happening

11   around the city.  And we moved around.  We were tasked with

12   different things, moving around the city.  But, you know,

13   ultimately it was just -- there was a lot going on.

14   Q    What was the first signal to you that this was a lot?

15   A    The first night that we were downtown, we were tasked with

16   providing security and assistance to support the Denver Fire

17   Department, who was kind of traveling around putting out fires.

18   That was the first -- once nightfall on the first night that we

19   were down there came, that was probably the first time that I

20   realized that it was getting pretty serious.  There were fires,

21   dumpster fires going on, a lot of fireworks going off, a lot of

22   people in various places around the city.

23   Q    Now, you mentioned that you were providing support or

24   cover, I guess, is what other witnesses have called it, to the

25   Denver Fire Department.  Can you tell me a little bit more about

20-cv-1878-RBJ   ANTHONY HAMILTON - Direct   03-23-2022

1   your experience with that.

2   A    We were just assigned to mainly the capitol area.  Fire

3   trucks were trying to move in and get some fires put out, and so

4   we were -- we were tasked with providing security.  So, our

5   convoy would kind of rally up with fire trucks, and we would

6   dismount or get out of our vehicles and basically provide a line

7   of security as they worked to get fires put out.

8   Q    And why was that necessary?

9   A    There was, again, a lot of people.  There were a lot of

10  obscenities being yelled and screamed, and stuff being thrown.

11  Bottles and trash and a lot of things being thrown, rocks and

12  things like that.  So, Denver Police requested that we assist

13  them to again provide security, just given the number of people.

14  Firefighters are focused on putting out the fire, and they don't

15  have the capability to necessarily protect themselves, so --

16  when they're focused on that.

17  Q    Now, you mentioned a number of items being thrown.  Were

18  those objects being thrown from the crowd at the fire

19  department?

20  A    Not that I recall.  But I don't know if they were actually

21  hit with anything or if they were targeted at all.  That I

22  didn't see, but it's certainly possible.

23  Q    Do you recall other specific objects that you saw being

24  thrown by the members of the crowd?

25  A    On various nights -- it would change, but there were golf

20-cv-1878-RBJ   ANTHONY HAMILTON - Direct   03-23-2022

1  balls that were being thrown, bottles filled with liquid.  There

2  were rocks, eggs.  And I think that's about all that I remember

3  that was being thrown.

4  Q    Do you recall being scared at all?

5  A    Yes.

6  Q    And in what way?

7  A    Projectiles, number one.  Those were -- I was actually hit

8  with a golf ball and a rock.  We were hit with eggs.  So,

9  there's a pain element to that, too, that was -- I was fearful

10  of getting hurt.  But the other concerning part was with the

11  number of people, it was concerning that there might be other

12  weapons present as well.

13  Q    Now, in the moment when objects are being thrown at you,

14  can you necessarily tell what's being thrown at you?

15  A    Not always, no.

16  Q    Did you see members of the crowd being violent with each

17  other?

18  A    Prior to -- there was one incident where two individuals

19  ended up in a physical fight.  I don't know if they were -- they

20  were part of the demonstration, if they were there for that

21  purpose.  I couldn't say for sure, but there were two that ended

22  up physically fighting, and one of them did get the upper hand,

23  and to where some of our operators actually had to intervene

24  with impact munitions.

25          MS. BIRKHOLZ:  Now, I'd like to move to admit

Kevin P. Carlin, RMR, CRR

2576

20-cv-1878-RBJ    ANTHONY HAMILTON - Direct    03-23-2022

1    Exhibit 3091.

2                 MS. RUTAHINDURWA:  Objection.  Foundation.

3                 THE COURT:  Okay.  You will have to lay a little

4    foundation, then.

5    Q.    (By Ms. Birkholz) If you would, Sergeant Hamilton, can

6    you take a look at these photographs.  And we will go to the

7    second page, just so you can see.  Do these items look familiar

8    to you?

9    A    Yes.

10   Q    How do they look familiar to you?

11   A    Those are items that were removed from a couple of

12   individuals that we took into custody.  They were out after

13   curfew.  We took them into custody and ended up search incident

14   to arrest discovered these items on their person.

15                MS. BIRKHOLZ:  Okay.  Move to admit this exhibit, Your

16   Honor.

17                MS. RUTAHINDURWA:  No objection.

18                THE COURT:  Is it just one page?  You said something

19   about page two.

20                MS. BIRKHOLZ:  I thought there were two pages, but

21   perhaps not.  No?  Okay.  Just one page.

22                THE COURT:  All right.  It's admitted.

23                MS. BIRKHOLZ:  Oh.  Okay.  Can you scroll, please.

24                MS. RUTAHINDURWA:  Your Honor, I'm going to object to

25   some of the photos.  It's unclear Sergeant Hamilton was present

20-cv-1878-RBJ   ANTHONY HAMILTON - Direct   03-23-2022

1   for --

2            THE COURT:  You're going to have to lay the foundation

3   of each page, then.

4            MS. BIRKHOLZ:  Okay.  No problem.

5   Q.    (By Ms. Birkholz) Let's turn to the second page.  Is this

6   largely a depiction of the same thing in the first page?

7   A    Yes.

8   Q    Okay.  And so with respect to your knowledge of this

9   incident, that's the same as with respect to the first page?

10  A    Yes.  To my knowledge.

11  Q    Okay.  Let's turn to the second page.

12           THE COURT:  Third page.

13           MS. BIRKHOLZ:  Or, sorry.  Apologies.  Third page.

14  Q.    (By Ms. Birkholz) What is pictured here?

15  A    To my understanding, it's the same -- or similar items that

16  we discovered on an arrestee.

17  Q    Okay.  By your members of your squad?

18  A    I believe so, yes.

19  Q    Okay.  Can we turn to the fourth page, please.  What is

20  this?

21  A    That looks like the window of one of our equipment trucks.

22  Q    Okay.  And do you recall that being damaged during your

23  policing of the George Floyd protests?

24  A    Yes.

25  Q    Okay.  And let's turn to the next page.  Similar question

20-cv-1878-RBJ   ANTHONY HAMILTON - Direct   03-23-2022

1  with respect to this page.

2  A   Yeah.  It looks like items that were removed from

3  arrestees.

4  Q   Okay.  By Jefferson County individuals?

5  A   I do believe so.

6  Q   Okay.  And next page.  What is depicted here?

7  A   One of our equipment trucks.  I don't recall if that's the

8  same one or a different one.  But that's a -- the shattered

9  window on one of our trucks.

10       MS. BIRKHOLZ:  Okay.  And if there's another page?

11  Okay.  That's it.  We will move to admit this exhibit.

12       MS. RUTAHINDURWA:  I'm going to object on foundation

13  grounds.  Sergeant Hamilton said he believes it looks like.  It

14  doesn't seem like he is completely confident in what the

15  pictures are depicting.  And also on relevance grounds.

16       THE COURT:  Relevance grounds?  How so?

17       MS. RUTAHINDURWA:  Because there's no indication that

18  this has anything to do with any of the plaintiffs in our case.

19       THE COURT:  Oh.  Overruled.  Admitted.

20  Q   (By Ms. Birkholz) All right.  Let's turn to the first

21  page of Exhibit 3091.  And you've kind of described this without

22  the jury seeing these -- this photograph, but can you kind of

23  point out the types of weapons that the Jefferson County

24  individuals recovered from suspects during the protests?

25  A   It looks like a couple handguns with magazines, some boxes

20-cv-1878-RBJ    ANTHONY HAMILTON - Direct    03-23-2022

1    of ammunition.

2    Q    Okay.  And are these the weapons you just mentioned?

3    A    Yes.

4    Q    Are those lethal weapons, or are those considered

5    less-lethal munitions like the ones that officers had?

6    A    Those are lethal.

7    Q    Okay.  Let's turn to the next page.  And what additional

8    items are we seeing here?

9    A    Additionally, it looks like maybe some edged weapons.

10   There's definitely an edged weapon, at least one.

11   Q    Can you circle that?  And what is an edge weapon?

12   A    Like a knife, a blade, a cutting instrument.

13   Q    And what else do you see?

14   A    There's another item that is in some sort of pouch or

15   holster.  I'm not sure what it is, though.  It has a handle on

16   it.

17   Q    Okay.  And do you see anything else that you can make out?

18   A    Other than what's been mentioned, maybe a holster.

19   Q    Okay.  Let's go to the next page.  And what are these

20   things?

21   A    Those are brass knuckles.

22   Q    And can you tell me how those are used?

23   A    They're designed to fit over the hand to create a -- it

24   creates a ridge that's got protrusions that comes up from the

25   knuckles.  It's designed to reinforce the knuckles to strike

Kevin P. Carlin, RMR, CRR

2580

20-cv-1878-RBJ    ANTHONY HAMILTON - Direct    03-23-2022

1   someone with.

2   Q    And is this yet another -- another lethal weapon that was

3   found in addition to the others?

4   A    It could be, yes.

5   Q    All right.  Let's go to the next page.  And do you recall

6   this vehicle being damaged?

7   A    I do recall.  I'm not sure which vehicle -- we have two

8   equipment trucks that are similar.  I'm not sure which one this

9   is, but I do recall that.

10  Q    And how were protesters using -- or what were protesters

11  using to damage the windows of your vehicles?

12  A    They were throwing rocks and bottles.  I don't recall if it

13  was this vehicle or our other truck, but I was in one of them

14  when we were moving, and someone threw something.  I don't know

15  what it was in that instance, but something hit and broke the

16  window.

17  Q    Okay.  And let's look at the next page.  And this is

18  another picture of what we've already seen.  So, we will go to

19  the last page.  And is this yet another broken window?

20  A    Yes.

21  Q    Okay.  We can take this exhibit down.  Sergeant Hamilton,

22  were any of you or your fellow Jefferson County members of the

23  SWAT team or the sheriff's department injured?

24  A    Yes.

25  Q    How so?

Kevin P. Carlin, RMR, CRR

20-cv-1878-RBJ   ANTHONY HAMILTON - Direct   03-23-2022

1    A    We were hit with projectiles.  I know personally, I can

2    speak personally, I was hit with a couple projectiles, causing

3    some bruising.

4    Q    Did those injuries to yourself for instance cause you to,

5    you know, stop policing the protest?

6    A    No.

7    Q    Did you ever end up reporting those injuries?

8    A    I did notify my chain of command, yes.

9    Q    Okay.  And what types of injuries were other members of

10   your team receive?

11            MS. RUTAHINDURWA:  Objection.  Foundation.

12            THE COURT:  Overruled.

13            THE WITNESS:  Similar.  I don't know for sure, but I

14   know there were a number of other operators that were hit with

15   impact -- or, excuse me -- with projectiles.

16   Q.   (By Ms. Birkholz) Can you -- in your knowledge, can you

17   tell me what percentage of your team was injured during the

18   protest response?

19   A    I can't say for sure.

20   Q    Would you say the majority of your officers were injured in

21   some way, shape, or form?

22   A    I can't say.

23   Q    Okay.  Now, you told us at the beginning of your testimony

24   that, you know, during the day, it looked different.  Can you

25   tell me how it looked during the day.

20-cv-1878-RBJ   ANTHONY HAMILTON - Direct   03-23-2022

1   A     It was more along the lines of what I had expected a

2   peaceful demonstration to look like.  There were crowds of

3   people.  They were marching.  They had signs, and -- but for the

4   most part, they were -- they were very peaceable.

5          MS. BIRKHOLZ:  Okay.  I'd like to move to admit

6   Exhibit 3102.

7          MS. RUTAHINDURWA:  No objection.

8          THE COURT:  It's admitted.

9          MS. BIRKHOLZ:  All right.  So, we will go ahead and

10  show Exhibit 3102 to the jury, and then I will ask you a couple

11  questions about it.

12         (A video was played.)

13  Q.    (By Ms. Birkholz) All right.  So, was that an example of

14  what you just described?

15  A     Yes.

16  Q     And when, you know, people were just peacefully marching,

17  was the crowd permitted to express their language or their

18  message?

19  A     Yes.

20  Q     And at that point in time, when the crowd was peaceably

21  protesting, did your team use any less-lethal munitions on the

22  crowd?

23  A     No.

24  Q     All right.  I'd like to shift gears and talk to you about

25  Jefferson County's training.  When you -- when you began with

20-cv-1878-RBJ     ANTHONY HAMILTON - Direct     03-23-2022

1   the Jefferson County SWAT department, what sort of training was

2   required?

3   A    I had to attend a basic SWAT school that's comprised of

4   some different tactics, basics in terms of movement.  I had to

5   certify on less-lethal munitions.  That includes impact

6   munitions as well as chemical munitions, and then flash-sounder

7   diversionary devices.  And then we also trained to do -- as a

8   basic to do vehicle-borne apprehensions.

9   Q    Did Jefferson County train you on what constitutes the

10  appropriate use of force?

11  A    Yes.

12  Q    And you mentioned Jefferson County does require additional

13  certification for training on less-lethal munitions?

14  A    Yes.

15  Q    Which types of munitions?

16  A    For SWAT, we have a less-lethal 12 gauge shotgun, which is

17  designed to shoot what are called Super-Socks.  And then we also

18  certify on the 40-millimeter, either single launcher or

19  multi-launcher.

20  Q    And you are certified in both of those?

21  A    I am.

22  Q    Okay.  And you kind of hinted that Jefferson County has

23  some crowd control training.  Can you tell me a little bit more

24  about that.

25  A    Yeah.  Along with basic academy training, we do basics for

20-cv-1878-RBJ   ANTHONY HAMILTON – Direct   03-23-2022

1  mobile field force type movements, which is for crowd control

2  and riot control.  So, those basics are covered in our regional

3  academy.  Furthermore, with SWAT, we train hand-in-hand with our

4  mobile field force to kind of support them in their role.

5  Q    Now, have you ever received any training from Denver on

6  crowd control?

7  A    No.

8  Q    Have you ever received any training from Denver on the use

9  of force?

10  A    No.

11  Q    Did you clearly understand when you were working these

12  protests that you were acting under Jefferson County's force

13  policy?

14  A    Yes.

15  Q    And did you clearly understand that you were acting under

16  Jefferson County's crowd control policies when assisting with

17  the protest response?

18  A    Yes.

19  Q    Now, did you appreciate this to be an emergency situation?

20  A    Yes.

21  Q    And Denver needed help immediately?

22  A    Yes.

23  Q    Now, in your opinion, would it have even been practical for

24  Denver to try to train on its policies in the short amount of

25  time that you were asked to respond and from the time that you

20-cv-1878-RBJ    ANTHONY HAMILTON – Direct    03-23-2022

1   actually did respond?

2   A    Probably not.

3   Q    Now, I want to switch to, I guess the topic of mutual aid

4   generally.  You mentioned that Jefferson County assisted for

5   approximately four days of the protest response, beginning on

6   June 29th; correct?

7   A    I believe it was May 29th.

8   Q    May 29th.  I'm sorry.  Okay.  And you mentioned SWAT

9   responded.  Did the other Jefferson County group also respond?

10  A    I know our -- we had a contingent of our mobile field force

11  that responded.  I'm not sure in what capacity or how many days.

12  Q    Okay.  And with respect to Jefferson County SWAT group, did

13  the group that you brought to police the protests, was it

14  consisting of varying ranks of individuals?

15  A    Yes.

16  Q    Okay.  What ranks did the group consist of?

17  A    For our team, there's operators who are line level, and

18  then we report to team leaders who are typically sergeants, but

19  they're a formal leadership role on the team who then report to

20  a SWAT commander.

21  Q    And within those teams, did the supervisors provide

22  guidance to the team members under them on the ground?

23  A    Yes.

24  Q    Okay.  And did Jefferson County supervisors provide the

25  direction to its own troops?

Kevin P. Carlin, RMR, CRR

20-cv-1878-RBJ    ANTHONY HAMILTON - Direct    03-23-2022

1   A    Yes.

2   Q    And did Jefferson County supervisors provide the

3   supervision to its own troops?

4   A    Yes.

5   Q    And in what -- in what way?  If you can tell the jury.

6   A    They received -- typically the way that works is they

7   receive tasks from whoever we're assisting, and those tasks are

8   given to our commander, who then hands those down to our team

9   leaders, who then organized the actual -- the actual operators

10  to complete that task.

11  Q    Okay.  So, let's break that down a little.  You said that

12  you received tasks.  Who is it that you received tasks from?

13  A    I received tasks from my team leader.

14  Q    Okay.  Do you have any knowledge that there was a Denver

15  officer occasionally placed with your team?

16  A    Yes.

17  Q    And how frequently did that occur?

18  A    I think I recall one -- one instance for certain, where we

19  had a Denver officer with us.  I can't recall his name or rank,

20  but he was kind of a liaison.

21  Q    What do you mean, liaison?

22  A    So, he kind of facilitated communicating between Denver's

23  command post and with our commanders, and thusly our team

24  leaders and operators on the ground to accomplish different

25  tasks.

20-cv-1878-RBJ    ANTHONY HAMILTON - Direct    03-23-2022

1   Q    And what sort of direction did you, I guess, get from the

2   individual who was communicating from Denver?

3   A    I really wasn't privy to a lot of it.  He was talking a lot

4   with our team leaders.  My understanding is that he relayed,

5   again, locations or tasks, incidents that may have been

6   occurring that we were tasked with dealing with.

7   Q    Okay.  So, if I understand your testimony, he basically

8   told you where to go?

9   A    Yes.

10  Q    Okay.  Now, do you recall at any point in time that Denver

11  officer giving you any direction as to when to deploy your

12  less-lethal munitions?

13  A    No.

14  Q    Do you recall anyone from Denver ever directing any

15  Jefferson County SWAT members to fire a less-lethal munition at

16  a specific person?

17  A    No.

18  Q    Do you recall anyone from Denver directing Jefferson County

19  SWAT to deploy a flash-bang?

20  A    No.

21  Q    Or use pepper spray in a particular instance?

22  A    No.

23  Q    Would you agree with me that Jefferson County used its

24  discretion to deploy its munitions?

25  A    Yes.

20-cv-1878-RBJ    ANTHONY HAMILTON - Direct    03-23-2022

1   Q    Okay.  Now, Jefferson County, did you guys have any

2   body-worn camera at the time?

3   A    Not at that time, no.

4   Q    Do you know why not?

5   A    We didn't have any that were assigned at that time.  That's

6   not a technology that we had in place at the time.

7   Q    Okay.  And is that true for the entire Jefferson County

8   group of officers?

9   A    At that time, I believe we still had no body cameras.

10   Q    And that's simply because Jefferson County hadn't

11   implemented a program for its officers to have body-worn camera?

12   A    I'm not sure the timeline.  They may -- we may have had

13   them by then for patrol, in a patrol capacity, but I know for

14   certain they weren't assigned for SWAT.

15   Q    Okay.  Now, I'd like to go to a specific day of the protest

16   and direct your attention to May 31st at the District 6 police

17   station around 8:00 p.m.  Do you recall being in that location

18   at that time?

19   A    Yes.

20   Q    Okay.  Do you recall generally what the protest was like at

21   that time and location?

22   A    Yes.

23   Q    What was it like?

24   A    It was chaotic.

25   Q    Okay.  Can you give me a little more?

20-cv-1878-RBJ   ANTHONY HAMILTON - Direct   03-23-2022

1   A    Yeah.  Initially, we were tasked with going to District 6

2   to protect the building itself.  We got word that there was

3   large crowds moving that direction.  We set up a skirmish line,

4   and the crowd arrived and seemed to continue growing and

5   growing.

6           And the protesters that were there were yelling and

7   screaming, and some were shouting obscenities.  Some at times

8   would even sit down on the street in front of us and -- but they

9   weren't there for very long before it started to get out of

10  hand.  We started getting projectiles thrown at us, and that's

11  when we deployed -- began deploying CS smoke, which is the tear

12  gas, to disperse the crowd as it turned hostile.

13  Q    Now, do you know why you were at the police station?

14  A    I surmised it was because it's a government building, more

15  so a police building.  And so there was some concerns that large

16  crowds could gather there and potentially overrun the building.

17  Q    Okay.  And on May 31st, we've had testimony that a curfew

18  was in place in Denver.  Did you hear repeated curfew

19  announcements at the point of 8:30 in the evening?

20  A    I don't recall hearing them that night.  I do recall

21  hearing them other nights.  But I don't recall that night

22  whether I -- whether they were or not.

23  Q    Do you have a specific recollection one way or the other

24  with respect to the curfew announcement on that night?

25  A    I couldn't tie it to that night.

20-cv-1878-RBJ   ANTHONY HAMILTON - Direct   03-23-2022

1    Q    And at that time and location, did you see any property

2    damage occurring?

3    A    I'm sorry.  At District 6?

4    Q    Yes.  On May 31st, around 8:30.

5    A    I mean, there were dumpsters being used as barricades that

6    were being lit on fire and rolled around the streets, and I

7    never witnessed any specific damage with a dumpster that I could

8    recall.  But that was probably the extent of it that I saw.

9    Q    Okay.  With respect to the objects being thrown by the

10   crowd, what do you recall specifically happening at this time

11   and location?

12   A    Again, objects were being thrown.  There was a number of

13   different objects, bottles filled with liquid, plastic bottles,

14   glass bottles, golf balls, eggs, rocks.  I never saw it, but we

15   heard that some people were actually throwing golf balls using

16   lacrosse sticks.  I never witnessed that myself.

17   Q    Did you ever witness any mortar-style fireworks?

18   A    Yes.

19   Q    Tell me about that.

20   A    There were several that went off a couple of nights.  The

21   night in question, May 31st, there was one that -- specifically

22   that I remember.  Once we were able to begin pushing the crowd

23   west down Colfax, it was maybe 10 or 15 feet from me, there was

24   a mortar that went off underneath a car, and that was -- we were

25   pretty much right on top of that.  We were eating the sparks

20-cv-1878-RBJ   ANTHONY HAMILTON - Direct   03-23-2022

1    from that.

2    Q    Do you recall any laser pointers?

3    A    Yes.

4    Q    Can you tell me about that experience.

5    A    Yeah.  As we continued down Colfax, we were directed to

6    some individuals down an alleyway.  I don't recall off the top

7    of my head.  It was in a north-south alley.  They were kind of

8    gathering there, and were pushing dumpsters down the alley

9    towards us on Colfax.  So, we were directed to the mouth of the

10   alley to kind of assess what was going on.  They kind of ducked

11   and hid, and as I was standing there, kind of watching them from

12   maybe a couple hundred yards further south, and maybe a few

13   stories up from a building, someone shined a laser pointer at me

14   and my -- one of my partners.

15   Q    And was that concerning to you?

16   A    Absolutely.

17   Q    Why so?

18   A    There's handheld laser pointers, but it's often an aiming

19   device for a weapon system, typically a rifle.

20   Q    All right.  Now, in response to say rocks and bottles being

21   thrown at your line, what is the appropriate response under

22   Jefferson County's policy?

23   A    If we can isolate the individual, that's assaultive

24   conduct, which falls under active aggression.  And our use of

25   force policy allows for the deployment of less-lethal platforms,

20-cv-1878-RBJ    ANTHONY HAMILTON - Direct    03-23-2022

1   either impact munitions or conducted electrical weapons.  The

2   other option is to go hands on with someone.

3   Q    Now, if someone kicks a gas canister back at the police

4   line, what type of force is authorized under Jefferson County's

5   policy?

6   A    That also meets active aggression.  So, it would be a

7   similar application.

8   Q    Now, with respect to the violence in the crowd at this time

9   and location, did you observe any violence among the crowd that

10  was not related to, you know, the police response?

11  A    Other than the incident I mentioned earlier with the two

12  individuals, who again, I wasn't sure of their involvement with

13  the demonstration, but other than that, no, I do not -- I don't

14  recall anyone.

15  Q    Okay.  So, I'd like to turn to Exhibit 544, which I believe

16  has been admitted into evidence, and look at the time 8:30.  Do

17  you recall being present at this time and location?

18  A    Yes.

19  Q    Okay.  I'm going to push play for about two minutes, and

20  I'd like you to describe what is happening.  And I will push

21  pause at a couple times here as we go forward.  So, if you could

22  describe for the jury what's happening here.

23       (A video was played.)

24  A    So, down the street, kind of behind this wall of smoke is

25  where we're at.  This is after the crowd had begun to -- their

20-cv-1878-RBJ    ANTHONY HAMILTON - Direct    03-23-2022

1  aggressive actions towards us and becoming violent.  Those,

2  looked like our gas canisters, or CS canisters that were being

3  kicked back and forth.

4  Q   Okay.  So, let's set the stage here.  Can you circle where

5  your line of officers is.  Great.  And how many SWAT members do

6  you have at that location?

7  A   We deployed with about 20.

8  Q   Okay.  And were 20 on this line at this time?

9  A   I couldn't say for sure at this time.

10  Q   Okay.  And as we were watching, tell me, you know, was

11  there a combination of things being thrown from the crowd and

12  munitions being thrown from the police line?

13  A   Yeah.  There were things being thrown at us, including the

14  CS canisters that we were -- that we had deployed.

15  Q   Okay.  I'd like to back it up to 8:30:16.

16      (A video was played.)

17  Q   And pause it once we get there.  Do you see this guy here?

18  A   Yes.

19  Q   Okay.  One of the plaintiffs in this case, Mr. Deras has

20  identified that as himself.  What is he doing at this location?

21  A   You mean in this instance?

22  Q   Yes.  In this instance.

23  A   It looks like he's kicking a gas canister.

24  Q   Okay.  And under Jefferson County's policy, again, can you

25  refresh us what type of force is permitted in response to this

Kevin P. Carlin, RMR, CRR

20-cv-1878-RBJ   ANTHONY HAMILTON - Direct   03-23-2022

1   action?

2   A    It's seen as active aggression.  On our use of force

3   continuum, less-lethal munitions can be -- or less-lethal

4   weapons can be used.

5   Q    Okay.  So, we're going to push play on this, and go to

6   about 20 seconds later.  Let it play for 20 seconds, and then we

7   will pause it at 8:30:36.

8        (A video was played.)

9   Q    A little bit more.  Sorry.

10       (A video was played.)

11  Q    Oh.  There we go.  Sorry.  Did you see this guy again?

12  A    Yes.

13  Q    And what did he do for the second time?

14  A    He kicked a gas canister.

15  Q    And what, again, sort of response is permitted under

16  Jefferson County's force policy?

17  A    Again, active aggression, so less-lethal munitions and

18  less-lethal weapons can be used.

19  Q    Okay.  Do you know what was -- what response was taken by

20  your group up here?

21  A    In this instance?

22  Q    Yes.

23  A    I can't say for sure.

24  Q    Okay.  So, let's go ahead and watch it through just a

25  little bit forward.

20-cv-1878-RBJ   ANTHONY HAMILTON - Direct   03-23-2022

1      (A video was played.)

2  Q   Okay.  And if you could, just kind of finish describing

3  this scene for us.

4  A   I guess it's kind of more of the same.  There was a lot of,

5  you know, back and forth with these gas canisters.  We were

6  trying to keep them deployed in a position that would be

7  effective for dispersing the crowd, and then as they were coming

8  back to us, you can see there's pretty heavy volume of smoke

9  back towards us.

10 Q   Do you recall -- you know, can you tell if all of this is

11 smoke canisters deployed by your line, or does it include other

12 types of, I guess, explosives?

13 A   It looks like -- for the smoke, those look like our

14 chemical munitions canisters.  There are some sparks and stuff

15 going off that -- like that, that looked like a mortar firework.

16 So, a handful of fireworks coming back at us too.

17 Q   Okay.  And we will go about ten seconds further to stop it

18 at 8:32.  And I will ask you when there is another explosion

19 that comes into the picture, what you believe that to be.  That

20 green thing.  What was that?

21 A   That looked to be another firework.

22 Q   I would like to show you a screenshot from Exhibit 548,

23 which is another HALO camera from about a block down the way,

24 which has already been admitted as well.  Okay.  And this is a

25 HALO camera from about a block down the way.  Does this guy with

20-cv-1878-RBJ   ANTHONY HAMILTON - Direct   03-23-2022

1    this thing look like what it was that exploded at the

2    intersection that you were located at?

3    A    Yeah.  It certainly could be.

4    Q    Did you see people like this in the crowd shooting off

5    mortar-style fireworks?

6    A    Yes.

7    Q    And we can go ahead and take that down.  Now, did members

8    of the crowd ever try and bait your team?

9    A    Yes.

10   Q    Can you tell me about that.

11   A    Yeah.  There was an instance where the crowd began yelling

12   at us, telling us that there was someone hurt.  It would have

13   been to the south and east.  If I recall, there was a

14   restaurant, maybe a little parking area, and just south of

15   there, they had said that someone had been hit in the head and

16   had a pretty serious head injury.  And they kept telling us that

17   we should go over there and help them.

18          We kept telling them, bring them to us.  You know, we

19   could provide medical aid.  We have our medic with us, as well

20   as facilitate transferring them to Denver paramedics.  But it

21   became really apparent they kept telling us that we needed to go

22   out to them.  And the crowd was still pretty large at that

23   point.

24   Q    Okay.  So, did they ever bring that person up?

25   A    No.

20-cv-1878-RBJ   ANTHONY HAMILTON - Direct   03-23-2022

1   Q    What was your impression of that request?

2   A    That they were trying to lure us out and break our line

3   down.

4   Q    And now, during the course of this trial, plaintiffs'

5   expert Mr. Stamper suggested that, you know, everyone should be

6   sending in arrest teams to pluck out these agitators.  And, you

7   know, we just watched two minutes of, you know, this crowd

8   behaving as they were.  Why did you not do that here?

9   A    Why did we not form an arrest team?

10  Q    Yeah.  Why did you not go out to the crowd and start

11  arresting people?

12  A    It was a numbers thing.  There's sheer -- came out in

13  numbers.  We were outnumbered, and there was a large crowd.  It

14  wouldn't have been safe to do so.

15  Q    And comparing the number of agitators in that crowd that

16  you could have arrested versus the number in your team, how does

17  that comparison shake out?

18  A    I don't know.  It's hard to say.  I'm not sure who all at

19  that point were agitators and who were just onlookers,

20  spectators, more still peaceably demonstrating amidst the chaos.

21  Q    Okay.  Was it possible for you to differentiate in order to

22  even make arrests at that time and location?

23  A    It was very difficult to do so.

24  Q    And was it also unsafe to do so?

25  A    Very much.

20-cv-1878-RBJ   ANTHONY HAMILTON - Cross   03-23-2022

1        MS. BIRKHOLZ:  No further questions, Your Honor.

2        THE COURT:  Cross?  Does anybody over there need a

3   break before we go to cross?  Yes?  Okay.  Let's do that.  Ten

4   minutes.

5        (Jury out at 10:42 a.m.)

6        (Recess at 10:42 a.m., until 10:54 a.m.)

7        (Jury in at 10:54 a.m.)

8        THE COURT:  All right.  Cross examination?

9        MS. RUTAHINDURWA:  Thank you, Your Honor.

10                   **CROSS EXAMINATION**

11  BY MS. RUTAHINDURWA

12  Q    Good morning, Sergeant Hamilton.

13  A    Good morning.

14  Q    I'd like to start off where you left off during direct

15  examination.  You said you felt that there were protesters who

16  were baiting you and your team by asking you to go into the

17  crowd and help a protester who was injured; right?

18  A    Yes.

19        MS. RUTAHINDURWA:  Okay.  I'm showing you Exhibit 382,

20  which I'd like to move into evidence.

21        MS. BIRKHOLZ:  No objection.

22        THE COURT:  Admitted.

23        MS. RUTAHINDURWA:  And let's play about 30 seconds,

24  and then I'm going to ask you some questions.

25        (A video was played.)

20-cv-1878-RBJ    ANTHONY HAMILTON - Cross    03-23-2022

1   Q.     (By Ms. Rutahindurwa) We can pause now.  So, just for

2   reference, this is the body-worn camera of an Aurora police

3   officer on May 31st, at around 8:57 p.m.; correct?

4          MS. BIRKHOLZ:  Your Honor, lacks foundation.

5   Q.     (By Ms. Rutahindurwa) Okay.  This is what the camera

6   shows right up here, and you would agree with me that Aurora

7   officers were at the location of Colfax and Washington at some

8   point after 8:30 p.m. to help you with that intersection; right?

9   A     Yes.

10  Q     Okay.  And did you hear what the protesters were saying in

11  that clip?

12  A     I didn't -- I couldn't make it out.

13  Q     So, you didn't hear them -- one of the officers say, get

14  him over here?  The protester is screaming, I can't, they're on

15  the fucking ground, we need an ambulance.  And one of the

16  officers saying, drag him.  Did you hear that?

17  A     I did not.

18  Q     Let's play it one more time.

19         (A video was played.)

20  Q     Pause it again.  Did you hear it that time?

21  A     Yes.

22  Q     Okay.  And this is what you described as protesters baiting

23  you into the crowd?

24         MS. BIRKHOLZ:  Objection, Your Honor.  Misstates

25  testimony.

Kevin P. Carlin, RMR, CRR

20-cv-1878-RBJ   ANTHONY HAMILTON - Cross   03-23-2022

1           THE COURT:  Overruled.  You can answer.

2           THE WITNESS:  There was -- I don't recall experiencing

3   that action itself.  I know that there was someone that was

4   being -- that was claimed to have been injured, and we kept

5   advising them to bring them to us.  We would get them out.

6   Q.    (By Ms. Rutahindurwa) You're aware that moving someone

7   with a serious injury can be dangerous in itself; right?

8   A    It can be.

9   Q    It can cause more injury?

10  A    That's possible.

11  Q    And it takes a little bit of strength to move someone who

12  is, like dragged, dead weight on the ground; right?

13  A    Strength or a number of people.

14  Q    And at that intersection, you and your team did not render

15  any aid to any of the protesters who claim that they were

16  injured?

17          MS. BIRKHOLZ:  Objection, Your Honor.  He hasn't

18  established that he was present.

19          THE COURT:  Overruled.

20          THE WITNESS:  I didn't help anyone.  I didn't render

21  aid, no.

22  Q.    (By Ms. Rutahindurwa) Are you aware that a protester

23  named Susie Dennis was shot by Jefferson County SWAT officers at

24  the intersection of Colfax and Washington on May 31st that

25  evening and had part of her finger shot off?

Kevin P. Carlin, RMR, CRR

20-cv-1878-RBJ   ANTHONY HAMILTON - Cross   03-23-2022

1   A     I was not aware.

2   Q     Are you aware that a journalist named Trevor Hughes was

3   also shot by JCRS officers at the same exact time and was

4   seriously injured?

5   A     I was not aware.

6   Q     I'd like to move on to questions around mutual aid and your

7   understanding of what your assignments were.  So, you would

8   agree that because Denver asked the Jefferson County SWAT team

9   to assist them and provide mutual aid, it is Denver that is

10  ultimately responsible for the actions of all of the officers

11  involved in policing the protests?

12         MS. BIRKHOLZ:  Objection, Your Honor.  Speculation.

13         THE COURT:  Sustained.

14  Q.     (By Ms. Rutahindurwa) Do you remember taking a deposition

15  in December of 2021?

16  A     Yes.

17  Q     And at that deposition, you were asked this question,

18  whether or not you believed that Denver was responsible for the

19  actions of all of the Jefferson County officers involved in

20  policing the protests; right?

21         MS. BIRKHOLZ:  Objection, Your Honor.  Speculation.

22  Improper impeachment.

23         THE COURT:  It's the same question.  Sustained.  The

24  way you're asking the question, sustained.

25  Q.     (By Ms. Rutahindurwa) Let's talk about your training.

20-cv-1878-RBJ   ANTHONY HAMILTON - Cross   03-23-2022

1   So, you've been a member of the Jefferson County SWAT team since

2   2018?

3   A    Yes.

4   Q    And prior to the George Floyd protest, you received very

5   little training focused specifically on using less-lethal force

6   during protest situations?

7   A    During protest situations, yes.

8   Q    Okay.  And you already testified that you had never policed

9   a protest before; right?

10  A    Yes.

11  Q    And despite that, you were asked by Denver to help with the

12  protests; correct?

13  A    Correct.

14  Q    And in doing so, your team was told by Denver that you

15  should follow your own training and policies while you were

16  policing the protests; right?

17  A    I don't recall if that was actually said.  That's what we

18  were operating under.

19  Q    Do you recall on May 31st DPD Sergeant Robert Stack was

20  assigned to be the liaison for your team?

21  A    I don't recall who it was.

22  Q    But you remember that it was a DPD sergeant that was

23  assigned to your team?

24  A    It was an officer.  I'm not sure what the rank was.

25  Q    Okay.  And you testified earlier that you were not

20-cv-1878-RBJ    ANTHONY HAMILTON - Cross    03-23-2022

1    wearing -- neither you nor your team were wearing body-worn

2    cameras; right?

3    A    Correct.

4    Q    And Denver didn't ask you to wear body-worn cameras; right?

5    A    No.

6    Q    So, you were allowed to protest -- or to police the protest

7    without body-worn cameras?

8    A    Yeah.

9    Q    Do you recall on May 31st that DPD -- the DPD liaison

10   actually provided you more than just directions of where to go?

11   They provided you with orders from the command post; right?

12   A    They provided -- I'm assuming he communicated with our team

13   leaders and our commanders for that.  I took orders directly

14   from my team leaders.

15   Q    So, it wouldn't surprise you if Sergeant Stack, who was the

16   liaison assigned to your team on May 31st, told you, hey,

17   command says you guys need to kill your emergency lights,

18   they're asking for mobile units to kill all emergency lights so

19   these guys don't see us coming?

20            MS. BIRKHOLZ:  Objection, Your Honor.  Lacks

21   foundation.

22            THE COURT:  Overruled.

23            THE WITNESS:  I'm sorry.  Can you repeat the question?

24   Q.    (By Ms. Rutahindurwa) Yup.  It would not surprise you

25   that the DPD liaison, who is Sergeant Robert Stack, provided you

20-cv-1878-RBJ    ANTHONY HAMILTON - Cross    03-23-2022

1   with more orders saying, hey, command says can you guys kill

2   your emergency lights, they're asking for the mobile units to

3   kill all their emergency lights so these guys don't see us

4   coming?

5   A    You're asking if it would surprise me?

6   Q    Yes.

7   A    I guess it would surprise me.

8   Q    Why would it surprise you?

9   A    I don't know that in an emergency situation, if we have to

10  navigate using our lights and sirens, we can do that, but it is

11  a -- it's a viable tactic that we can use to -- when we arrive

12  is we turn off lights and sirens.  It depends on the situation,

13  though.

14  Q    So, if you do have your sirens on, would it surprise you

15  that command orders you -- ordered you and your team to turn off

16  your lights?

17  A    No.

18        MS. RUTAHINDURWA:  I'd like to show you Defendant's

19  Exhibit 3098, and move to admit.

20        MS. BIRKHOLZ:  Your Honor, we would object on the

21  basis of foundation.

22        THE COURT:  Okay.  I guess we will need some

23  foundation for that one, then.

24        MS. RUTAHINDURWA:  This is the body-worn camera of DPD

25  Sergeant Robert Stack on the evening of May 31st, and he was the

20-cv-1878-RBJ   ANTHONY HAMILTON - Cross   03-23-2022

1  liaison assigned to your team; correct?

2             MS. BIRKHOLZ:  Again, Your Honor, foundation.

3             THE COURT:  Sustained.  He says he doesn't know who it

4  was.

5             MS. RUTAHINDURWA:  I'd like to show you -- let's pull

6  that down -- Exhibit 299, page 12.

7  Q.    (By Ms. Rutahindurwa) And this is the Jefferson County

8  after-action report; correct?

9  A    I don't recognize that.

10 Q    Let's go to the first page again.  It says Jefferson County

11 Regional SWAT team after-action review.

12 A    Okay.

13 Q    Okay.  Go down to page 12.  And on this paragraph here, it

14 says DPD Sergeant Stack was the JCRS-DPD liaison.  Do you see

15 that here?

16            MS. BIRKHOLZ:  Your Honor, lack of personal knowledge,

17 and foundation.

18            THE COURT:  The question is does it say that right

19 there?  Overruled.

20            THE WITNESS:  It does say that.

21 Q.    (By Ms. Rutahindurwa) Okay.  And this was Sunday,

22 May 31st?

23 A    Yup.

24 Q    And so does this refresh your recollection of who exactly

25 was the liaison that you remember was assigned to JCRS on

20-cv-1878-RBJ    ANTHONY HAMILTON - Cross    03-23-2022

1   May 31st?

2   A    Again, I think it's in the report.  I don't have personal

3   knowledge of who it was that was assigned to us.

4   Q    But if it says so on this after-action review which was

5   prepared by you and your team -- correct?  By the command

6   leaders on your team?

7   A    Not me.  It was by my team, by command, probably.

8   Q    And your team would be aware of who was assigned as the

9   liaison?

10          MS. BIRKHOLZ:  Again, Your Honor, lack of personal

11   knowledge.  Asked and answered.

12          THE COURT:  Overruled.

13          THE WITNESS:  If it's in the report, I would assume

14   that it's correct.  But I don't -- I didn't author the report.

15   Q.    (By Ms. Rutahindurwa) So, moving forward -- so, based on

16   the report which is created by team leaders that you fall under,

17   and it says DPD Sergeant Stack was the liaison assigned to your

18   team on May 31st, do you have any reason to doubt that DPD

19   Sergeant Stack was the person who was assigned as the liaison on

20   that date?

21   A    No.

22   Q    So, moving forward, we will assume that DPD Sergeant Stack

23   was the liaison on May 31st; correct?

24   A    Okay.

25   Q    Okay.  I'd like to pull up Exhibit -- Defendant's

Kevin P. Carlin, RMR, CRR

20-cv-1878-RBJ   ANTHONY HAMILTON - Cross   03-23-2022

1   Exhibit 3098.  This is the body-worn camera of Sergeant Robert

2   Stack who was assigned with JCRS, which is the team that

3   Sergeant Hamilton was a part of.

4            MS. BIRKHOLZ:  Your Honor, same objection with respect

5   to this admitted -- this exhibit which was not admitted.  He

6   lacks personal knowledge with respect to it.

7            THE COURT:  How do we know that this was Stack's

8   video?

9            MS. RUTAHINDURWA:  The City of Denver provided it to

10  us.  The file name is --

11           THE COURT:  How do we know this is Stack's video?

12           MS. RUTAHINDURWA:  The file name is Exhibit 3098, DEN

13  8060, Robert Stack one.

14           THE COURT:  That's good enough for me.  Overruled.

15           MS. RUTAHINDURWA:  Thank you.  Let's go to the one

16  minute and 35-second marker, and play from here.

17       (A video was played.)

18  Q.   (By Ms. Rutahindurwa) Did you see that interaction?

19  A    Yes.

20  Q    It's between Sergeant Stack and a Jeff. Co. officer;

21  correct?

22  A    It appears like it's a Jeff. Co. operator, yes.

23  Q    And he's relaying to you orders from command post; right?

24  A    Yes.

25  Q    Okay.  And to make it even more clear, at the end, the

2608

20-cv-1878-RBJ   ANTHONY HAMILTON - Cross   03-23-2022

1   Jeff. Co. SWAT guy says, you want lights off?  And Stack says,

2   please; right?

3   A    Yes.

4         MS. RUTAHINDURWA:  Okay.  And just another example of

5   liaisons providing more than just geographic locations and

6   directions, I'd like to pull up Exhibit 716 and admit it into

7   evidence.  This is also Sergeant Stack's body-worn camera.

8         MS. BIRKHOLZ:  Your Honor, lacks foundation with

9   respect to time and location.  So, if she could lay foundation

10  that he was present, that may change that.

11        MS. RUTAHINDURWA:  I can happily do that.  This is

12  Sergeant Stack's body-worn camera on May 31st at 9:19 p.m.,

13  right by the District 6 police precinct.

14  Q.   (By Ms. Rutahindurwa) That is where you and your officers

15  were; correct?

16  A    That is where we were.

17        MS. RUTAHINDURWA:  Okay.  At this time I move to

18  admit.

19        THE COURT:  716, did you say?

20        MS. BIRKHOLZ:  No objection.

21        THE COURT:  Admitted.

22        MS. RUTAHINDURWA:  And I'd like to start at the 2:15

23  minute marker and play for a bit.

24      (A video was played.)

25  Q.   (By Ms. Rutahindurwa) And this, again, is Sergeant Stack

Kevin P. Carlin, RMR, CRR

20-cv-1878-RBJ   ANTHONY HAMILTON - Cross   03-23-2022

1   giving orders to both Jeff. Co. SWAT and Aurora about directions

2   from the command post; right?

3   A    It appears that way.

4   Q    And the order was, let's just grab the low-hanging fruit?

5   A    I didn't hear that.  I may have missed it.

6   Q    Did you hear an Aurora officer say, Sergeant Redfearn is

7   the leader, tell him?

8   A    No.

9   Q    But you would agree that Sergeant Stack is going around the

10  mutual aid agencies and providing direction from command post;

11  right?

12  A    It appears so.

13  Q    On May 31st, you were equipped with a 12 gauge shotgun?

14  A    Yes.

15  Q    And that shotgun shoots out bags filled with lead pellets;

16  right?

17  A    Yes.

18  Q    You would agree that shooting -- that less-lethal shotguns

19  can cause serious bodily injury or death?

20  A    They can, yes.

21  Q    And because of that, there are certain areas that are

22  prohibited; right?

23  A    That's correct.

24  Q    Those areas include the head, the neck, most of the back,

25  particularly the spine area, the groin, and the breast area;

20-cv-1878-RBJ   ANTHONY HAMILTON - Cross   03-23-2022

1   correct?

2   A     Correct.

3   Q     So, the only way an officer would be justified in shooting

4   someone in the head is if deadly force is required; right?

5   A     For targeting that area, yes.

6   Q     Okay.  And you agree that kicking a tear gas canister does

7   not allow for the use of deadly force?

8   A     Not at face value, no.

9   Q     And you would also agree with me that you can only use

10  force that is reasonably necessary to stop the perceived threat?

11  A     That's correct.

12  Q     So, shooting someone who has their back turned to you and

13  is running away would be unreasonable; right?

14  A     That would be unreasonable.  Yes.

15  Q     Let's go back to Colfax and Washington on the evening of

16  May 31st.  The assignment that was given to you and your team

17  members from Denver was to protect the police building; right?

18  You testified to that?

19  A     That's what I understood it to be, or I surmised that that

20  was the case.

21  Q     And so you were tasked with setting up a line on Washington

22  and Colfax -- on Washington, north of Colfax?

23  A     Yes.

24  Q     And you were near the District 6 station on two separate

25  occasions that evening; right?

20-cv-1878-RBJ   ANTHONY HAMILTON - Cross   03-23-2022

1    A    Yes.

2    Q    The first was at around 8:10 p.m.?

3    A    I believe so.  I don't recall the time exactly.

4    Q    And then the next one was a few minutes before 8:30 p.m.?

5    A    Again, I don't recall the time, but it sounds about right.

6    Q    Ms. Birkholz showed you Exhibit 3102, which was an example

7    of protesters marching peacefully past the skirmish line of

8    officers.  Do you agree with that?

9    A    Yes.

10   Q    You would agree with me the protesters a few minutes before

11   8:30 p.m. were also marching peacefully; right?

12   A    Yes.

13   Q    And in fact, there was no evidence of protesters doing

14   anything but marching peacefully until you and your team got to

15   the District 6 station; right?

16   A    That evening, I don't recall there was any -- any unrest

17   prior to that.

18   Q    Before you got to that intersection, command post had

19   already given instructions to let the group of protesters march

20   past Clarkson, and then to shoot up the crowd to do traffic

21   control; right?

22        MS. BIRKHOLZ:  Objection, Your Honor.  Lacks

23   foundation.

24        THE COURT:  Overruled.

25        THE WITNESS:  I don't recall that at all.

2612

20-cv-1878-RBJ   ANTHONY HAMILTON - Cross   03-23-2022

1      MS. RUTAHINDURWA:  Okay.  I'm going to show you

2 Exhibit 528.  This is Air One video camera from May 31st at

3 8:25 p.m.  And I am -- it's already in evidence, I believe.  And

4 can we play a little bit, and I will ask you some questions.

5      (A video was played.)

6 Q.    (By Ms. Rutahindurwa) Pause here.  So, did you hear that?

7 A    Yes.

8 Q    It said, as soon as the tail passes Clarkson, let's shoot

9 up in front of this crowd and try to do some traffic control;

10 right?  And the time here is 8:26 p.m.

11 A    Yeah.  It appears that way.  Yes.  Thank you.

12 Q    And so this is before any incident that occurred at

13 8:30 p.m. on Washington and Colfax; right?

14 A    It would appear that way, yes.

15 Q    You can take that down.  Thank you.  I want to show you

16 screenshots from Exhibit 528, the video we just played.  The

17 first photo is stamped up here.  You see 8:28:46 p.m.; correct?

18 A    I do see that.

19 Q    And do you see this big flash of light right here?

20 A    Yes.

21 Q    That's the flash-bang that you and your team deployed at

22 that intersection?

23 A    I don't know.  I'm not sure.

24 Q    Do you recall deploying -- your team deploying a flash-bang

25 to the intersection at around 8:28 p.m.?

Kevin P. Carlin, RMR, CRR

20-cv-1878-RBJ    ANTHONY HAMILTON - Cross    03-23-2022

1    A    I believe someone did, but I don't -- I can't say.  I

2    didn't -- I don't know who it was.

3    Q    And let's go to the second photo.  Right here, I see smoke.

4    That's the remnants of the grenade that was thrown; right?

5    A    The smoke canister, it looks like it could be.

6    Q    Yeah.  And you see the time here, it's actually exactly two

7    seconds after the first photo?

8    A    I see that.

9    Q    So, that checks out?

10   A    Checks out?

11   Q    As the remnants of the flash-bang grenade?

12   A    Oh.  I don't know.  They can smoke a little bit, but

13   typically once the flash goes off, then it's -- it will smoke a

14   little bit, but it's not usually a lot of smoke.

15   Q    Would you characterize this as a lot of smoke?

16   A    It's hard to tell from this scale.

17   Q    And do you see here that there are cars actually right at

18   or near the flash-bang grenade?

19   A    I see there are cars there, yes.

20   Q    So, Jefferson County SWAT team deployed flash-bangs despite

21   the fact that there were cars still at that intersection; right?

22   A    Again, I didn't witness it, so I can't say for certain.  It

23   appears on the video that something was deployed there.

24   Q    And we can take that down.  I'm showing you screenshots

25   from Exhibit 544, which has already been introduced to the jury.

20-cv-1878-RBJ   ANTHONY HAMILTON - Cross   03-23-2022

1   Let's go to page six.  This large flash of light right here, do

2   you see that?

3   A    I do.

4   Q    And that looks like the same grenade that we just saw on

5   the prior clip from Exhibit 528; right?

6   A    It looks like a diversionary device, yes.

7   Q    And then circling a group of people here, do you know who

8   these people are?

9   A    I do not.

10  Q    So, you're not aware that these folks are plaintiffs in

11  this case?

12  A    I'm aware that one person is.  I'm not -- I don't know if

13  that is them, if that's that person or not.  I've seen the HALO

14  cam video before, but I'm not sure if it was a different

15  perspective or different angle.  So, I would have to follow

16  those people to see if that's who I remember was in the video.

17  Q    You would agree with me that the people that are circled

18  here have not yet made it to the intersection; right?

19  A    It appears that way, yes.

20  Q    And the grenade that was launched, the diversionary device

21  occurred before they got to that intersection; right?

22  A    It looks like it.

23  Q    We can take that page down.  Thank you.  So, around 8:00 --

24  you stated in your use of force report that you shot three or

25  four protesters who were throwing or kicking gas canisters;

20-cv-1878-RBJ   ANTHONY HAMILTON - Cross   03-23-2022

1   right?

2   A    Yes.

3   Q    But you have no independent recollection of shooting

4   plaintiff Deras at that intersection; right?

5   A    Correct.  I have no recollection.

6   Q    I'm showing you Exhibit 299, which has already been -- yup.

7   This is the Jefferson County after-action review.  And let's go

8   to page 18.  One more page down.  Thank you.  Can you go one

9   more page, Dan.  Sorry.  There we go.

10           These are photos of weapons that the Jeff. Co. SWAT

11   team recovered; right?

12   A    Yes.

13   Q    And these are the photos that Ms. Birkholz showed you on

14   direct?

15   A    Yes.

16   Q    And so these photos were recovered on May 31st at the 1300

17   block of Sherman Street when you and your team apprehended two

18   suspects; right?

19   A    As I recall, yes.

20   Q    And so the first photo are the weapons on subject one from

21   the arrest?  Do you see that?

22   A    Yes.

23   Q    And the second are subject two from the arrest?

24   A    It appears that way from the report.

25   Q    Are you aware that Commander Phelan testified last week

2616

20-cv-1878-RBJ   ANTHONY HAMILTON - Cross   03-23-2022

1  that 25 guns were recovered during the protest?

2  A    I am not aware.

3  Q    Are you aware that Commander Phelan confirmed that out of

4  thousands of protesters, only ten people were arrested for

5  weapons violations during the protests?

6  A    I was not aware.

7  Q    The fact that your team apprehended two people, and it

8  looks like eight to ten guns, a lot of weapons here,

9  demonstrates that the amount of weapons recovered does not

10  represent the number of people who were in the crowd actually

11  carrying weapons; right?

12  A    I agree with that.

13  Q    And none of the plaintiffs in this case were responsible

14  for the damage caused to Jefferson County SWAT vehicles?

15  A    I can't say for sure.

16  Q    You have no information one way or another whether or not

17  the plaintiffs were involved in the damage to the Jefferson

18  County vehicles; right?

19  A    Yeah.  I can't say one way or another.

20  Q    And you have no idea if the people who were -- who you

21  arrested for carrying weapons were even protesters; right?

22  A    Yeah.  I couldn't say one way or another.

23  Q    And none of the plaintiffs were arrested for carrying

24  weapons; right?

25  A    Not that I recall, no.

20-cv-1878-RBJ   ANTHONY HAMILTON - Cross   03-23-2022

1   Q    And you don't personally know who the plaintiffs are in

2   this case?

3   A    I don't know them.

4   Q    You don't know what happened to them?

5   A    I know -- I have an idea of what happened to Mr. Deras.

6   Q    What about all the other plaintiffs in this case?

7   A    I've heard what was said earlier about someone missing part

8   of a finger, and I don't know -- I haven't heard any other

9   plaintiffs, though.

10  Q    But it would be fair to say that you don't know the names

11  of the plaintiffs in this case, apart from Mr. Deras?

12  A    And I believe it's Ms. Epps.

13  Q    Okay.

14  A    That's the only other name I know of.

15  Q    And you would agree that each use of force has to be in

16  response to something that that person is doing?

17  A    Yes.

18  Q    When you came to Denver, you complied with the rules of

19  engagement that were given to you by DPD command; right?

20  A    I don't recall being given rules of engagement.

21  Q    What were you told would be the rules of engagement for

22  Jefferson County SWAT team?

23  A    We reviewed our use of force policy.  We reviewed

24  less-lethal impact munition target zones.  We had some of those

25  discussions, kind of as a team.  But I never received anything

20-cv-1878-RBJ   ANTHONY HAMILTON - Redirect   03-23-2022

1   directly from any DPD command.

2   Q    You received it from your team leaders?

3   A    Correct.

4   Q    And there was a team leader at the DPD command post; right?

5   A    I don't know if they were at the command post.  From what I

6   recall, our commanders and team leaders were communicating by

7   phone and radio with DPD.

8          MS. RUTAHINDURWA:  No further questions.  Thank you.

9          THE COURT:  Redirect?

10                      **REDIRECT EXAMINATION**

11   BY MS. BIRKHOLZ

12   Q    Good morning again.

13   A    Good morning.

14   Q    Now, going back to the scenario of the Aurora officer

15   body-worn camera that was shown to you on cross examination

16   where the protester allegedly said some things about somebody

17   that was injured in the crowd.  Do you remember that?

18   A    Yes.

19   Q    Okay.  Now, that was not the interaction that you described

20   about being baited into the crowd as you described to us on

21   direct examination.

22   A    Correct.

23   Q    That was something else?

24   A    I don't recall hearing that before.  I recall someone

25   saying that there was someone that was badly hurt.

20-cv-1878-RBJ   ANTHONY HAMILTON - Redirect   03-23-2022

1  Q    Okay.  So, you don't actually even recall being present or

2  overhearing the scenario that was shown to you on body-worn

3  camera?

4  A    I don't recall that, no.

5  Q    Okay.  Now, you were also shown some video regarding the

6  DPD liaison for Jefferson County and where he was, I don't know,

7  directing people to turn off some lights.  Now, again, you don't

8  recall any orders from the DPD liaison telling you when to

9  deploy your less-lethal munitions; correct?

10 A    Correct.

11 Q    Okay.  And so you never received any direction from DPD as

12 to when to -- how to respond to a particular scenario as you

13 were facing it?

14 A    I did not.

15 Q    Okay.  Now, you were shown also some video with respect to

16 the location of Colfax and Washington near the District 6

17 station before Mr. Deras kicked the canister.  Do you recall

18 anyone telling you to shoot up the crowd because of traffic

19 control reasons?

20 A    No.

21 Q    Okay.  Did you personally take any action to shoot up the

22 crowd because of traffic control?

23 A    No.

24 Q    Now, do you have a personal recollection as to that -- that

25 device which was classified as a flash-bang actually being

20-cv-1878-RBJ   ANTHONY HAMILTON - Redirect   03-23-2022

1   deployed at the time?

2   A   I don't.  I don't remember specifically when that was

3   deployed.

4   Q   So, with respect to the rationale for that deployment,

5   assuming it even was a flash-bang, you would have to ask the

6   person that actually deployed that to understand the totality of

7   the circumstances.  Would you agree?

8   A   Yes.

9   Q   Okay.  Now, just to be very clear, when Mr. Deras kicked

10  that canister two times, or kicked a canister two times in the

11  direction of officers, that was classified as active aggression

12  under Jefferson County's policy; correct?

13  A   Yes.

14  Q   And that was a perfectly warranted response for whoever it

15  was to deploy that less-lethal munition in his direction?

16  A   I believe so.

17          MS. RUTAHINDURWA:  Objection.  Calls for speculation.

18          THE COURT:  The objection is sustained as leading.

19  Q.   (By Ms. Birkholz) Was the response taken with respect to

20  Mr. Deras in conformity with Jefferson County's policy?

21          MS. RUTAHINDURWA:  Objection.  Calls for speculation.

22  He's not saying that he shot Mr. Deras.

23          THE COURT:  Overruled.

24          THE WITNESS:  Yeah.  That would be an appropriate

25  response given that fact pattern.

20-cv-1878-RBJ   ANTHONY HAMILTON - Redirect   03-23-2022

1          MS. BIRKHOLZ:  Okay.  Thank you very much.  No further

2   questions.

3          THE COURT:  Questions from the jurors?  Okay.

4      (Proceedings held at the bench:)

5          THE COURT:  Well, this one will be 51.

6          MS. BIRKHOLZ:  Are we nearing the most questions

7   you've ever gotten in a trial?

8          THE COURT:  I had a case when I had 1,200.

9          MS. BIRKHOLZ:  That's fine by me.

10          MS. RUTAHINDURWA:  No objection.

11          THE COURT:  Counting some of the ones that there was

12   more than one on one paper, but counting individual questions,

13   1,200 in one case.

14          MS. BIRKHOLZ:  That's so many.

15          THE COURT:  900 of which were by one juror.

16          MS. BIRKHOLZ:  I bet they were the foreman, huh?

17          THE COURT:  Yes.

18          MS. BIRKHOLZ:  No objection.

19          MS. RUTAHINDURWA:  No objection.

20          THE COURT:  Okay.

21      (Proceedings held in open court:)

22          THE COURT:  Sergeant, I have a couple of questions for

23   you from the jury.

24          THE WITNESS:  Certainly.

25          THE COURT:  Question, how many Jeff. Co. officers,

20-cv-1878-RBJ   ANTHONY HAMILTON - Redirect   03-23-2022

1   including SWAT, assisted the DPD during the protest?

2            THE WITNESS:  I know it was about 20 for our team, and

3   then I don't know how many others were deployed with our mobile

4   field force, or in even a traffic control capacity.

5            THE COURT:  Question, how many arrests did Jeff. Co.

6   make during the protest?

7            THE WITNESS:  The two subjects that I'm aware of were

8   the two that we removed weapons from.  Other than that, I am not

9   aware of any other arrests that we made.

10           THE COURT:  Other questions, folks?  How about you?

11  No?

12           MS. BIRKHOLZ:  No follow-up questions.  Thank you.

13           THE COURT:  Plaintiff?

14           MS. RUTAHINDURWA:  No, Your Honor.  Thank you.

15           THE COURT:  Okay.  Thank you, sir.

16           THE WITNESS:  Thank you, Your Honor.

17           THE COURT:  Next?

18           MS. JORDAN:  The defendants call Officer Tana

19  Cunningham.

20           THE COURT:  Hello.

21           THE WITNESS:  Good morning, Your Honor.

22           THE COURT:  Good morning.

23       (The Witness is Sworn)

24           THE COURT:  Okay.  Thank you.

25

20-cv-1878-RBJ   TANA CUNNINGHAM - Direct   03-23-2022

1                        **DIRECT EXAMINATION**

2   BY MS. JORDAN

3   Q    Good morning.  Could you please state your name, and spell

4   your last name for the jury.

5   A    Yes.  My name is Tana Cunningham, last name

6   C-U-N-N-I-N-G-H-A-M.

7   Q    And are you currently employed with the Denver Police

8   Department?

9   A    Yes, ma'am.  I am.

10  Q    And how long have you been a police officer with the Denver

11  Police Department?

12  A    I went through the academy and was hired officially in

13  November of 2016.

14  Q    And how long was the academy?

15  A    A couple months.  I want to say about six months or so.

16  Q    And so would you have graduated the academy in June of

17  2017?

18  A    Around there, yeah.

19  Q    And prior to becoming a police officer, did you ever serve

20  in the military?

21  A    I did, yes.  I served in the Minnesota Army National Guard

22  from 2011 to 2017.

23  Q    And why did you decide to become a police officer?

24  A    So, I had somewhat of an interesting upbringing.  I was

25  homeless on and off from 15 to 18 years old.  As I'm sure you

20-cv-1878-RBJ    TANA CUNNINGHAM - Direct    03-23-2022

1  can imagine, I had numerous run-ins with law enforcement during

2  that phase of my life.  Some good, some not so good.  There were

3  certain officers during that time that really made an effort to

4  get to know me as a person and that made an actual difference in

5  my life.  And from there, it kind of just became something that

6  I became passionate about and decided to pursue on my own as

7  well.

8  Q    And what positions have you held with the Denver Police

9  Department?

10 A    When I first got hired outside of the academy, I was

11 assigned to patrol in District 1.  So, I worked there right out

12 of the academy.  And then from there, I went to the impact team

13 in District 1, which is a specialty unit.  And from the impact

14 team, I got moved to the gang unit in Denver, which has been

15 rebranded to Special Operations Response Team, or SORT.

16 Q    And the jury has heard a lot about what SORT does, so I'm

17 just going to ask you what was it about SORT that made you apply

18 to that unit?

19 A    There are lots of different paths, I guess, and directions

20 that you can go as a police officer, especially in a city like

21 Denver.  We've got so many different units, and whatever kind of

22 interests you, you can kind of start working your way towards

23 that.  So, there's, you know, child investigations, and there's

24 domestics, there's traffic investigations.  And my passion was

25 always just to get the worst criminals, I guess, off the streets

20-cv-1878-RBJ    TANA CUNNINGHAM - Direct    03-23-2022

1  of Denver.  I love taking guns from bad guys so that they can't

2  continue to cause harm to people in the community.

3  Q    And when did you become a member of SORT?

4  A    That was in February of 2020.

5  Q    And prior to the George Floyd protest, had you ever been

6  involved in any crowd management or crowd control?

7  A    I was in the district one impact team when we responded to

8  one protest.  It was fairly small.  It was a BP protest

9  downtown.

10  Q    And were any sort of less-lethal munitions used during that

11  protest?

12  A    No, ma'am.

13  Q    Okay.  And what training did you receive in regards to

14  crowd management?

15  A    We received crowd management training throughout the Denver

16  Police Academy.  I believe there's a couple days dedicated to

17  just crowd control training and movements, different techniques.

18  And then I would say the next training that I received after

19  getting out of the academy, which was in 2016, the next formal

20  training, I guess, crowd control would have been when I was

21  assigned to SORT.

22        And they have a different sort of opportunity there,

23  since they're not tied to the radio calls, to provide extra

24  training.  And I was provided some instruction and training when

25  I first went over there in February of 2020.

20-cv-1878-RBJ     TANA CUNNINGHAM - Direct     03-23-2022

1   Q     And that was before the George Floyd protests; correct?

2   A     Yes.

3   Q     Do you believe that the training that you received on crowd

4   management and crowd control prior to the George Floyd protest

5   was sufficient?

6   A     Sufficient how?

7   Q     Sufficient to handle a crowd management situation?

8   A     It was sufficient enough to handle the first protest that I

9   had responded to when I was on the impact team, but I don't -- I

10  don't know what kind of additional training we could have

11  received to prepare us for what occurred with George Floyd's.

12  Q     And why is that?

13  A     It was so large-scale and so hostile and violent that I

14  don't know -- I don't -- I have certainly never seen anything

15  like that before, and I'm not sure the department had either.

16  Q     And what less-lethal systems are you certified on?

17  A     I am certified with my Taser system, PepperBall, and the

18  40-millimeter.

19  Q     And when did you become certified on the 40-millimeter and

20  the PepperBall?

21  A     Initially?

22  Q     Yes.

23  A     Initially, I believe we got certified in the academy.  You

24  have to maintain your -- your certification, I believe it's

25  every two years.  I know after the academy, I went through the

Kevin P. Carlin, RMR, CRR

20-cv-1878-RBJ    TANA CUNNINGHAM - Direct    03-23-2022

1    certification again with my training officer while I was in

2    District 1.  I went through the training again when I was

3    assigned to the District 1 impact team, and the most recent

4    training I received prior to George Floyd protests was when I

5    was assigned to SORT in February of 2020.

6    Q    And now, moving forward to the George Floyd protests, did

7    you work the first night, May 28th, 2020?

8    A    Yes, I did.

9    Q    And how did you come about working that response?

10   A    So, that was -- I was actually off on that first night on

11   the 28th.  During the time I'm sure we all remember when

12   businesses and everything were closed down due to COVID.  They

13   had assigned certain officers from different units throughout

14   Denver, throughout the city to work high-visibility patrol.

15        So, I was assigned to work that for four weeks, which

16   was just to prevent these businesses that were closed down, they

17   kept getting broken into and things stolen from them.  So, we

18   were supposed to be out in marked patrol cars sort of trying to

19   deter people breaking into these businesses.

20        The businesses were obviously having a hard enough

21   time.  They didn't need any extra issues with people breaking in

22   and stealing things, vandalizing things.  So, I was working

23   high-visibility patrol when it started, and it was Thursday,

24   May 28th, was my first day off from working that.  At the time I

25   lived downtown, and I could hear things happening, obviously,

20-cv-1878-RBJ    TANA CUNNINGHAM - Direct    03-23-2022

1   sort of downtown in that area from where I lived.

2          And I assumed that the people I worked with were going

3   to need some help, so I called one of my sergeants.  He didn't

4   answer, and he always answers his phone.  So, I just grabbed my

5   stuff, and I headed to the unit to get ready to help however I

6   could.

7   Q    And what was your role that first night of the George Floyd

8   protests?

9   A    I responded to the unit.  My supervisor, my sergeant had

10  called me back and said that there was an RDV truck at the unit

11  that had been repaired after it had been vandalized.  I think

12  the tires were slashed by protesters.  So, I drove that RDV to

13  the District 6 station to eventually meet up with my fellow SORT

14  officers and bring supplies and medical supplies and things like

15  that.

16  Q    What observations did you make when you drove the RDV to

17  meet up with our unit?

18  A    It was kind of a surreal experience, I guess.  And it's --

19  it's honestly kind of embarrassing to say, because you're a cop,

20  you're in the gang unit, you should be tough, but it was

21  terrifying.  I was by myself in this truck, and I didn't even

22  have that long of a drive to make.  But going down Colfax, I

23  distinctly remember people who were heading towards downtown

24  throwing things at the vehicle.  I was moving in traffic, and

25  people were trying to approach my vehicle, screaming, hollering,

20-cv-1878-RBJ    TANA CUNNINGHAM - Direct    03-23-2022

1  and again, just throwing things at me.  And it felt -- it was

2  scary.

3  Q    And did you deploy any less-lethal that first night?

4  A    No, ma'am.  I did not.

5  Q    And what did you do the rest of the evening once you met up

6  with your team?

7  A    I maintained control of the RDV and drove for the first

8  night.

9  Q    And what observations did you observe, then, the rest of

10 that night when you were driving the RDV?

11 A    I observed numerous officers getting struck with things

12 from people throwing things at them from the crowds.  Again,

13 it's sort of surreal.  You're looking out, and there's these

14 masses of people, and you see literal fires everywhere, and

15 there were dumpsters lit on fire that were pushed towards the

16 officers that I work with, them constantly getting hit with

17 things, people falling.  It was -- it was just chaos.

18 Q    And moving on, then, to the second night -- or the second

19 day, did you work the protest on May 29th?

20 A    Yes, ma'am.

21 Q    And what was your role on May 29th?

22 A    I was in the same role as I was the night before.  I was

23 driving the RDV on the second day.

24 Q    And so is it fair that you didn't deploy any less-lethal on

25 the 29th?

Kevin P. Carlin, RMR, CRR

20-cv-1878-RBJ    TANA CUNNINGHAM - Direct    03-23-2022

1   A    Yes, ma'am.  I did not deploy less-lethal on the 29th.

2   Q    And similar, what were the observations that you

3   observed -- strike that.  Let me start again.  What did you

4   observe on the second day?

5   A    It was pretty much the same as the first night.  Again,

6   with the fires and the screaming and officers being attacked

7   with different items and just general chaos downtown.

8   Q    And on those first two days when you were driving the RDV,

9   did you observe any of your team members get injured?

10  A    Yes.

11  Q    What sort of injuries did you observe that they sustained?

12  A    Again, like I said, you -- the first two nights when I

13  wasn't out with them, you're sort of parked behind them in the

14  RDV, and unfortunately, you're seeing them in a line in front of

15  you, and you're seeing when they're getting hit with rocks the

16  size of grapefruits and glass bottles and frozen water bottles

17  and things like that.

18  Q    And how did you feel when you were watching your fellow

19  team members getting hit with projectiles?

20  A    I felt helpless.

21  Q    Now, I want to focus on May 30th, and you were issued a

22  less-lethal system on May 30th; correct?

23  A    I was -- I had the PepperBall system with me on May 30th.

24  Q    And how was it determined that you would have the

25  PepperBall system on May 30th?

20-cv-1878-RBJ    TANA CUNNINGHAM - Direct    03-23-2022

1   A    When we responded to our unit in the morning, we would sort

2   of get all of our gear together, get all of the supplies that we

3   would need together.  I made it pretty clear from the beginning

4   that I did not want a 40-millimeter, because it's heavy, and I

5   work with a bunch of guys.  So, I was like, you're taking that.

6   I will take the PepperBall system.

7          So, I would go in, and I would grab a PepperBall

8   system.  And then once we were loaded up, we had two RDVs, and

9   we would kind of go around and check and make sure that everyone

10  had the appropriate items.  So, we knew who had PepperBalls on

11  them.  We knew who had 40-millimeter, and we knew who was on

12  lethal cover as well.

13  Q    And did your supervisors know who had what less-lethal

14  systems, to your knowledge?

15  A    Our supervisors would be on the trucks with us prior to

16  pulling off, and they were kind of the ones that would do the

17  checks with us.  Like, hey, who has got the 40?  Who has got the

18  PepperBall?  Who has lethal?

19  Q    All right.  And so I want to focus on May 30th at the

20  intersection of Colfax and Lincoln between 6:00 and 8:00 p.m.

21  There has been body-worn camera from your body-worn camera that

22  has been shown to a bunch of witnesses, and I want to ask you

23  some questions about that.  So, if we could pull up Exhibit 662,

24  which has already been admitted.  And start at the 3:35 into the

25  video.  And could you just play that for a couple seconds, and

20-cv-1878-RBJ    TANA CUNNINGHAM - Direct    03-23-2022

1    then I'm going to ask you some questions.

2         (A video was played.)

3    Q    Stop, please.  Why are you yelling, back up?

4    A    It's hard to see, because my -- unfortunately, my camera is

5    a little bit covered there, but assuming that the crowd is

6    continuing to advance on the line of officers, and I do

7    specifically remember this intersection and being struck with

8    numerous items at this intersection.  So, giving orders for

9    people to maintain their distance.  We didn't obviously want

10   anything to escalate or to have to go hands on with anybody

11   either.

12   Q    All right.  So, moving forward to -- in the video, it's

13   timestamped 3:59.  Let's play that for a few seconds, and then I

14   will ask you some questions.

15        (A video was played.)

16   Q    Stop there.  Now, did you hear the clicking on your

17   body-worn camera?

18   A    I can hear some clicking on my body-worn camera, yes.

19   Q    What is that clicking?

20   A    The PepperBall gun.

21   Q    Is that you deploying your PepperBall gun?

22   A    I would have to watch it again to be entirely sure.

23   Q    Let's watch it again.

24        (A video was played.)

25   Q    Did you deploy your PepperBall gun in that situation?

20-cv-1878-RBJ   TANA CUNNINGHAM - Direct   03-23-2022

1  A    So, I -- it's obvious to me that my PepperBall gun was

2  malfunctioning there, because you can see at the end when I am

3  pulling the lever back on the end there.  I do believe at the

4  beginning of it, I was shooting my PepperBall gun there, yes.

5  And you can see the gun sort of jerk and tilt when I am

6  physically shooting it.

7  Q    And what were you shooting at?

8  A    There is a point in the video where you can see, I believe

9  a water bottle of some sort of substance explode in front of my

10  feet.  And then if you saw by the tree, an object comes up and

11  comes directly towards me, and I was directing my fire towards

12  where those objects were coming from.

13  Q    Can you continue to play.

14       (A video was played.)

15  Q    Stop.  And what were you deploying your PepperBall at in

16  that situation?

17  A    Again, it's sort of hard to see on the cameras.  I believe

18  I was aiming towards behind the tree where objects were

19  continuing to be thrown in my direction.

20  Q    All right.  Can you continue to play.

21       (A video was played.)

22  Q    And what are you deploying your PepperBall at there?

23  A    There you can see individuals were running towards

24  something that had been thrown towards -- in the park.  Which

25  was pretty standard.  They would grab things off the ground just

20-cv-1878-RBJ   TANA CUNNINGHAM - Direct   03-23-2022

1  to throw directly back at us, which became extremely dangerous

2  for us to be in a position where we couldn't see.  So, I was

3  aiming that towards those individuals in the park who have

4  homemade shields and things of that nature who were trying to

5  pick up projectiles to throw back at us.

6  Q    So, the purpose of your deployment of the PepperBall there

7  was to keep people from picking up the canister and throwing it

8  back?  Do I have that right?

9  A    That's correct.

10 Q    Can you move to 1401, and play here.

11       (A video was played.)

12 Q    You can stop.  Were you deploying your PepperBall in this

13 situation?

14 A    No, ma'am.

15 Q    And how can you tell you weren't deploying your PepperBall?

16 A    You can't hear the specific click of my trigger on this

17 PepperBall.  And again, it sort of makes a slanted jerking

18 motion when I'm firing this PepperBall, which is not happening

19 here.  Also, you can see me continuing to try and adjust it to

20 get the malfunction out and to be able to use it.

21 Q    And did you at some point while you were here have anybody

22 examine or help with the jamming of your PepperBall?

23 A    Yes, ma'am.

24 Q    Tell us about that.  How did you get it fixed?

25 A    I remember trying to fix it, not being able to figure out

20-cv-1878-RBJ    TANA CUNNINGHAM - Direct    03-23-2022

1  why my PepperBall system wasn't working.  I took myself off the

2  line.  I stepped back and walked back towards the RDV where

3  there were other officers present, and I don't remember who I

4  specifically handed it to, but I handed it to one of them and

5  asked them to look at it for me, and he was able to clear the

6  malfunction for me.

7  Q    And then did you have any other problems with it jamming

8  after that?

9  A    I honestly don't remember.

10  Q    Can we move forward to 16:11.  And go ahead and play.

11       (A video was played.)

12  Q    You can stop it.  Do you see your PepperBall deploying in

13  the timeframe we just watched?

14  A    I did see it deploy a few times, yes, at the very

15  beginning.

16  Q    And what were you deploying at?

17  A    It appeared to be southbound in the -- that would be the

18  1400 block of Lincoln Street.

19  Q    And do you know what you were deploying at?

20  A    Again, it's hard to say from this video what exactly I was

21  seeing in that moment.

22  Q    Can you go ahead and keep playing.

23       (A video was played.)

24  Q    Can you stop.  And have you deployed your PepperBall in

25  that segment that we just watched?

Kevin P. Carlin, RMR, CRR

20-cv-1878-RBJ   TANA CUNNINGHAM - Direct   03-23-2022

1  A    No, ma'am.

2  Q    And do you see the -- I'm going to use the stylus.  This

3  gentleman here that I circled, and it looks like he has some

4  white on his chest?

5  A    Yes, ma'am.

6  Q    Did you deploy the PepperBall that hit that gentleman?

7  A    No, ma'am.

8  Q    Continue to play.

9       (A video was played.)

10 Q    Did you deploy your PepperBall in that segment?

11 A    No, ma'am.

12 Q    And do you know who deployed the PepperBall that struck

13 that gentleman?

14 A    I do not.  And I believe that was the same gentleman who

15 had been on the corner earlier.  You showed a clip where I had

16 been firing into the park, but you can physically see me going

17 around him while he was standing there earlier in this body

18 camera clip as well.

19 Q    And why were you going around him?

20 A    My use of PepperBall all throughout the George Floyd riots,

21 protests, were in direct response to people using active

22 aggression against me.  That is what I felt comfortable with,

23 and I made that very clear in my officer statements that any

24 time I deployed PepperBall, it was a result of being attacked.

25 Q    And based on your training, do you have any opinion on the

20-cv-1878-RBJ   TANA CUNNINGHAM - Direct   03-23-2022

1   use of PepperBall on that gentleman on the corner?

2   A    I know PepperBall systems at the time were used in

3   defensive resistance situations.  I can't speak as to what that

4   officer decided to do with their system.

5   Q    And based on your training, the gentleman standing there

6   with his hands up who was not moving, would that have been

7   considered defensive resistance?

8   A    Again, I think it's all dependent on the situation.  I

9   don't know how many commands that specific individual was given

10  to get back, to leave the area, to move out of the way.  I don't

11  know exactly, because he was never anybody that I directly

12  interacted with.

13  Q    You can take that down.  And I will represent to you that

14  that was around 7:09 p.m., and did you remain in that location

15  after this incident?

16  A    Yes, ma'am.

17  Q    And were you in that location at 8:00 p.m. when the curfew

18  went into effect?

19  A    Yes, ma'am.  I was.

20  Q    And was Commander O'Donnell one of your lieutenants at the

21  time?

22  A    He was, yes.

23  Q    And he has already testified to that location around

24  8:00 p.m., so we're not going to go into it too much, but he was

25  shown video in which fireworks were shot at the officers.  Were

20-cv-1878-RBJ   TANA CUNNINGHAM - Direct   03-23-2022

1  you there for that?

2  A    Yes.  They went off pretty much directly in front of me.

3  Q    I was just going to ask you, how far from the firework were

4  you -- the fireworks were you when they deployed?

5  A    I was a few officers to the right, or I guess the west of

6  where the firework landed, and I remember it being incredibly

7  disorienting and loud, and your ears sort of ring for a bit.

8  So, yes.  I do remember that.

9  Q    Okay.  And then your team went forward and took down a

10  barricade on -- that was going across Lincoln at about

11  8 o'clock; is that correct?

12  A    That's correct.

13  Q    And then once you all took the barricade down, where did

14  you go next, or what did you do next?

15  A    We continued to push through the park and continued to give

16  commands as we did so, that it was past curfew, that everybody

17  needed to leave.  So, we just continued to move through the park

18  sort of in a line of officers to get people to leave the area.

19  Q    And as you were attempting to get people to leave the area,

20  was less-lethal munitions deployed?

21  A    By myself personally?

22  Q    That you recall either yourself personally or the team.

23  A    I believe less-lethal was used during that time, yes.

24  Q    And as you cleared the park, where did you head?

25  A    I don't remember the exact route that we took.  I know we

Kevin P. Carlin, RMR, CRR

20-cv-1878-RBJ    TANA CUNNINGHAM - Direct    03-23-2022

1    went -- continued southbound on Lincoln, and I believe ended up

2    over on Broadway at one point.

3    Q    Okay.  And when you were up on Broadway, do you recall

4    being at 13th and Broadway?

5    A    Yes, ma'am.

6    Q    And what do you recall occurred when you were at 13th and

7    Broadway?

8    A    I remember there was a lot of traffic.  So, we had -- we

9    were moving southbound this entire time.  There was traffic

10    moving, heavy traffic and vehicles on 13th.  A lot of the crowd

11    that had been pushed out of the park was now on the other side

12    of traffic.  So, we would have been on the north side of 13th.

13    A lot of the crowd was on the south side of 13th continuing to

14    throw objects at us over the moving vehicles, getting -- moving

15    in and out of traffic to try and approach us, and throw more

16    objects at us and attack us further, and at one point at that

17    intersection, there was an explosion.

18    Q    Okay.  And when you were at that intersection, the SORT

19    team was with you; correct?

20    A    Correct.

21    Q    And do you know who Blake Bishop is?

22    A    Yes, ma'am.

23    Q    Who is Blake Bishop?

24    A    He is one of my co-workers assigned to SORT.

25         MS. JORDAN:  I would like to show the witness

20-cv-1878-RBJ    TANA CUNNINGHAM - Direct    03-23-2022

1   Exhibit -- Defendant's 3151.  It's body-worn camera of Officer

2   Bishop.  And before -- I'm laying foundation.  It was added to

3   the supplemental list on Monday.

4            MS. WANG:  Okay.  Lay a foundation.

5            MS. JORDAN:  No objection?  Okay.

6   Q.    (By Ms. Jordan) Going to -- is this you?

7   A    Yes, ma'am.  I believe that's me.

8            MS. JORDAN:  Okay.  I would like to offer

9   Exhibit 3151.

10           MS. WANG:  No objection.

11           MS. JORDAN:  All right.  And then if we could move

12  that to --

13           THE COURT:  It's a photo or a video?

14           MS. JORDAN:  It's a video.  We're going to play that.

15           THE COURT:  It's admitted.

16           MS. JORDAN:  Go ahead to, is it 27:29?  And we're

17  going to play this, and then I'm going to ask you some

18  questions.

19       (A video was played.)

20  Q.    (By Ms. Jordan) Stop it.  Is that your team moving the

21  group across Colfax?

22  A    Not across Colfax.

23  Q    I mean 13th.

24  A    But continuing -- yes.  That is the SORT unit.  I mean,

25  there are other officers in there as well that I wouldn't be

Kevin P. Carlin, RMR, CRR

20-cv-1878-RBJ    TANA CUNNINGHAM - Direct    03-23-2022

1    able to tell you where they're assigned, but I can see that

2    there are other SORT officers with me there, yes.

3    Q    And, I'm sorry.  Were you saying that there's other

4    officers outside of SORT that was with you as well?

5    A    Yes.  I believe so.

6    Q    And if you can go to 27:55.

7         (A video was played.)

8    Q    Stop there.  Is that the explosion that you were telling us

9    about?

10   A    Yes, ma'am.

11   Q    And where were you in location to that explosion?

12   A    So, I am up -- oh.  Sorry.  It went away.

13   Q    There's a stylus next to the screen that you can draw on

14   there for us.

15   A    I recall being sort of in front of where this man is here,

16   off to the right a little bit.  So, like pretty much right in

17   front of where this man is.

18   Q    Okay.  And when this explosion occurred, what do you

19   remember feeling?

20   A    Scared.  I remember that was one of the points that I felt

21   like people were genuinely trying to kill us.

22   Q    And if we can just play it a little bit -- can we go back

23   to the 27:55, and just play it just a little bit longer.

24        (A video was played.)

25   Q    What did you hear the crowd do after that explosion?

2642

                20-cv-1878-RBJ    TANA CUNNINGHAM - Direct    03-23-2022

1   A    They began cheering.

2   Q    And how did that make you feel?

3   A    It was difficult.  There were numerous instances where, you

4   know, we go out, and you try to keep in your head that this was

5   about something that happened 900-plus miles away, and people

6   were there to have their voices heard, and you try to be

7   understanding and compassionate.  But as time went on, it did

8   become more and more clear that people were genuinely out there

9   to seriously hurt and kill us.

10          I remember a specific incident as well where I was

11  struck in the back of the leg with an object, and I remember

12  falling.  And again, the entire crowd behind you erupting in

13  cheers.  It's incredibly disheartening to see that.

14  Q    And why couldn't you or any of your team members go into

15  the crowd and arrest bad actors?

16  A    So, there were certain points where we did make arrests

17  after curfew for certain serious violations.  It was not

18  possible for us to go into such a large, hostile crowd and be

19  able to safely effect an arrest, even if we could positively

20  identify someone who was continuing to attack us or put rocks in

21  lacrosse sticks to huck our way or shoot fireworks at us.

22          It was not feasible for us to go into this massive

23  hostile crowd, and it would have only increased agitation of the

24  crowd.  And we wouldn't have safely been able to insert

25  ourselves into that crowd or safely to get somebody else out.

                    Kevin P. Carlin, RMR, CRR

2643

20-cv-1878-RBJ    TANA CUNNINGHAM - Direct    03-23-2022

1   It would have been dangerous for not only the officers, but for

2   the party that we were attempting to effect an arrest on.

3            MS. JORDAN:  Your Honor, I have a little bit more.

4   Would you like to take the lunch break now?

5            THE COURT:  Yes.  Let me guess.  1:15?

6        (Jury out at 12:02 p.m.)

7        (Recess at 12:02 p.m., until 1:16 p.m.)

8        (Jury in at 1:16 p.m.)

9            THE COURT:  Okay.

10  Q.    (By Ms. Jordan) All right.  As we saw before the lunch

11  break, we watched some of your body-worn camera.  So, you were

12  wearing body-worn camera during the George Floyd protests;

13  right?

14  A    Yes, ma'am.

15  Q    And what was your training that you received on when you

16  should activate that body-worn camera?

17  A    The training we receive on body-worn cameras is that you

18  obviously want to activate it when -- any time you're able to,

19  that you're directly interacting with an individual.

20  Unfortunately, during the protests, we did not have an option to

21  do that.  Our technology is only as good as it is, and we were

22  working 18-plus-hour days, and the battery life on those cameras

23  just doesn't last that long.

24  Q    And body-worn camera is supposed -- one of the reasons for

25  body-worn camera is to help with officer accountability.  Is

20-cv-1878-RBJ   TANA CUNNINGHAM - Direct   03-23-2022

1   that your understanding?

2   A    Yes, ma'am.

3   Q    What are some of the drawbacks, though, with body-worn

4   camera when it comes to an officer accountability?

5   A    So, the cameras obviously don't -- they're just not able to

6   capture everything that you're seeing.  Even while reviewing my

7   body-worn camera here, it's attached to the outside of my

8   outermost vest, and it's pointed this way, but the time I'm

9   standing on the line with other officers, your head is

10  constantly moving back and forth as you're surveying the crowd

11  and the people that you're interacting with.

12          It also appears further away in camera than it is in

13  reality.  They're definitely useful tools and have been super

14  helpful in a lot of different situations, circumstances that

15  I've been involved in.  Unfortunately, they just don't capture

16  everything that you see with your physical eye.  It's just

17  impossible.

18          And in this camera, it looks like just a crowd of

19  people that you can't see at all.  It's just a mass of faceless

20  humans, it sort of looks like on the camera, but in person, it's

21  completely different.

22  Q    And you mentioned the long shifts that you worked and the

23  battery life.  Did you ever have occasion where your body-worn

24  camera ran out of its battery?

25  A    Yes.  So, like I said before, obviously you want to turn it

20-cv-1878-RBJ    TANA CUNNINGHAM - Direct    03-23-2022

1  on any point that you can.  We did know that the camera

2  batteries don't last very long, and we try to preserve our

3  battery and turn it on if situations were escalating or if we

4  knew that we were going to have to take a direct action, like

5  when we pushed through the park after curfew, things like that,

6  you wanted it on for.

7         There was a situation where we had to respond to a

8  protester who had his face cut off with a machete.  And my

9  camera was dead at that point, but that would have been a really

10  ideal time, obviously, to have my body-worn camera.

11  Q    And you said the battery doesn't last very long.  What is

12  your understanding of the length of the body-worn camera

13  battery?

14  A    Usually, when I work a typical shift, we would work around

15  ten-hour shifts.  On the shifts where you had to activate your

16  camera numerous times, or if it was a busy night, usually

17  towards the end of your shift, your camera is about dead.  And I

18  don't know exactly what the timeframe for that would be, but a

19  typical ten-hour shift for us, we're a very busy unit.

20         They tend to be dying towards the end of our shift, and

21  ideally we would have liked to have had them on the entire time.

22  You know, there were times, too, where you want to say, hold on,

23  crowd, don't assault me until I turn this on, but you just don't

24  have the option to do that.

25  Q    And you talked to us, and we saw on your body-worn camera

20-cv-1878-RBJ    TANA CUNNINGHAM - Direct    03-23-2022

1    when you were at Colfax and Washington that, you know,

2    projectiles were thrown at you.  Were there any other locations

3    where you were subjected to projectiles?

4    A    Yeah.  There were many.

5    Q    What other locations were you subjected to projectiles?

6    A    The most notable, I guess, to me, would be around Colfax

7    and Lincoln, 13th and Broadway, Colfax and Washington, Colfax

8    and Clarkson, I believe, kind of over by District 6, and Denver

9    Police headquarters.

10   Q    And what kind -- what type of items were thrown at you?

11   A    There were -- I mean, pretty large rocks that were thrown

12   at us throughout, glass bottles.  Patrón bottles seemed to be a

13   crowd favorite.  Packages of frozen bacon.  There were water

14   bottles filled with gasoline, water bottles filled with human

15   waste, frozen water bottles, I think just regular water in water

16   bottles, different canned goods, things like that.

17   Q    Were you personally ever struck by any of the projectiles?

18   A    Yes, ma'am.  I was.

19   Q    And did you receive any injuries from your time working the

20   protests?

21   A    Yes.  I distinctly remember getting home from one of the

22   days working, and peeling my uniform off and seeing my body

23   before I got in the shower, and it was almost unrecognizable to

24   me.  We were completely swollen from working these long shifts,

25   and we got 45-plus pounds of extra gear on us, as we're hanging

20-cv-1878-RBJ    TANA CUNNINGHAM - Cross    03-23-2022

1   off a truck for the entire day getting hit with different items.

2   I was covered in bruises and cuts and just completely swollen

3   head to toe.

4   Q    Did you need any medical treatment for the injuries you

5   received?

6   A    I did not seek out medical treatment for my physical

7   injuries, no.

8   Q    Did you have other injuries than physical injuries?

9   A    I did start going to therapy after some of these events.

10  So, I went and I utilized different resources to get some

11  therapy and work through some of my emotional issues with what

12  had occurred.

13        MS. JORDAN:  Those are all the questions I have.

14        THE COURT:  Okay.

15                    **CROSS EXAMINATION**

16  BY MS. WANG

17  Q    Good afternoon.  Based on your training, knowledge, and

18  understanding, all of the actions that you saw other officers

19  take during the protests were consistent with DPD policy,

20  training, and practice; right?

21  A    I'm sorry.  Can you repeat one more time?

22  Q    All the actions that you saw other officers take during the

23  protests were consistent with DPD policies, procedures, and

24  training?

25  A    Yes, ma'am.  All of the actions of my fellow SORT

20-cv-1878-RBJ   TANA CUNNINGHAM - Cross   03-23-2022

1  colleagues and myself while we were out interacting with the

2  public during this time would have been consistent with our

3  training, yes.

4  Q    Sure.  And that included the two protesters who were shot

5  in the face while they were standing on the sidewalk of Lincoln

6  and Colfax on May 30th at approximately 7:08 p.m.; right?

7  A    I can't speak as to why the officer made that decision to

8  do so.  I'm not -- I don't know what they were perceiving at

9  that time.  I can't testify to that, unfortunately.

10  Q    Sure.  And I'm not asking you to.  But you do agree that

11  those actions of the officers who shot those two protesters in

12  the face and the body at that intersection and that time were

13  consistent with your understanding of DPD policy, practice, and

14  training; right?

15  A    As far as -- as far as what, I guess?

16  Q    Well, did you report those officers for shooting those

17  people in the face and the body?

18  A    I don't even recall seeing that in person, until

19  afterwards.  Obviously I've seen the video now, and again, I

20  don't know -- we were all sort of responsible for our own area,

21  assessing our own threats, actions.  And I don't know how many

22  orders were given to these individuals to back up or to clear

23  the area.  I wasn't the one who took action against them, so I

24  couldn't say.

25  Q    Great.  So, my question was did you report any officers for

20-cv-1878-RBJ    TANA CUNNINGHAM - Cross    03-23-2022

1   the actions that were taken against those protesters standing

2   with their hands up on the corner?

3   A    No, ma'am.

4   Q    Corporal Sampson of the SORT team, formerly known as the

5   gang unit, was one of your trainers; right?

6   A    Yes, ma'am.

7   Q    And he was standing next to you on the skirmish line at

8   about 7:00 p.m. on May 30th at Lincoln and Colfax; right?

9   A    I honestly don't know, ma'am.

10  Q    Okay.  Let's take a look at Exhibit 662.  Still one.  This

11  is a still image from your body-worn camera, which has already

12  been admitted as Exhibit 662.  This is from the intersection of

13  Lincoln and Colfax on May 30th at 7:07 p.m.  So, you turn at

14  this moment.  This is one of the moments when you go to get your

15  gun fixed; right?

16  A    Again, I'm not sure exactly what I'm turning for at this

17  moment without watching, but --

18  Q    Okay.  This -- these are corporal chevrons; right?

19  A    Yes, ma'am.

20  Q    There's two chevrons here; right?

21  A    Yes, ma'am.

22  Q    Do you recognize this to be Corporal Sampson?

23  A    From this still photo, I unfortunately can't tell just due

24  to the gas mask over his face.  I do know that that is a

25  corporal due to the stripes, but I wouldn't be able to say who

20-cv-1878-RBJ    TANA CUNNINGHAM - Cross    03-23-2022

1   specifically it was.

2   Q    Okay.  It's a corporal in your unit who had a PepperBall

3   gun; right?

4   A    Yes, ma'am.

5   Q    And at this time, at least, they're standing next to you on

6   the line?

7   A    At this point, yes.

8   Q    Okay.  Let's take a look at the next still, still two from

9   Exhibit 662.  This is about 40 seconds later when you return to

10  the line after getting your gun fixed.  Do you recall that?

11  A    I recall returning, yes.

12  Q    Okay.  And this is still a corporal; right?

13  A    Yes, ma'am.

14  Q    Okay.  And this is about a minute before these individuals

15  here standing on the sidewalk with their hands up are shot;

16  right?

17  A    Again, I'm not sure of the exact times, but --

18  Q    Okay.  Let's take a look at Exhibit 663.  Actually, wait.

19  Let me ask you a question first.  You can take that one down.

20  During the time that you were at Lincoln and Colfax on May 30th,

21  you saw officers throw explosives into the crowd of protesters;

22  right?

23  A    Yes, ma'am.

24        MS. WANG:  Okay.  Let's take a look at Exhibit 663,

25  video four.

2651

20-cv-1878-RBJ    TANA CUNNINGHAM - Cross    03-23-2022

1      THE COURT:  It's not in evidence.

2      MS. WANG:  I move for admission of Exhibit 663, which

3  is a body-worn camera from Officer Cunningham.

4      MS. JORDAN:  No objection.

5      THE COURT:  Admitted.

6      MS. WANG:  Let's play it from four minutes, 55

7  seconds.

8      (A video was played.)

9  Q.    (By Ms. Wang) All right.  Did you see this explosive

10  device that was thrown and then exploded right here?

11  A    Yes, ma'am.

12  Q    Okay.  That was a device thrown by some officer, either on

13  your skirmish line or behind you; right?

14  A    Somewhere near where I am.  Yes, ma'am.

15  Q    Okay.  Somebody from your unit.  You don't know who?

16  A    I couldn't say if it was someone from my unit or not.

17  There were multiple agencies with us here, multiple different

18  officers from different units or districts throughout city.  So,

19  there's no way for me to tell.

20  Q    Let's take a look at the still for Exhibit -- still three

21  for Exhibit 663.  That device exploded, emitted a sound, smoke,

22  and light; right?

23  A    Yes, ma'am.

24  Q    Okay.  Showing you a still, this is the thing that

25  exploded; right?

Kevin P. Carlin, RMR, CRR

20-cv-1878-RBJ    TANA CUNNINGHAM - Cross    03-23-2022

1    A    Yes, ma'am.

2    Q    Okay.  Do you know if anybody from your unit had those

3    grenades?

4    A    I don't know, ma'am.

5    Q    Do you know if Metro SWAT had those grenades?

6    A    Again, I'm not sure whose -- who had them.

7    Q    Okay.  Metro SWAT are the guys in green fatigues; right?

8    A    Yes, ma'am.  But again, there were multiple agencies, and I

9    don't know if everyone in green fatigues was just Denver Metro

10   SWAT or if -- I know there were other SWAT members from other

11   agencies as well.

12   Q    You don't actually recall if there were other SWAT at this

13   intersection at this time; right?

14   A    I have no idea, ma'am.

15   Q    You're just saying generally there were other guys in

16   green; right?

17   A    Yes, ma'am.

18   Q    Now, how many days -- how many hours were you on duty on

19   May 28th?  You can take that down.

20   A    On May 28th?

21   Q    Yeah.

22   A    That was the day that I came in on my own, so that would

23   have been the shortest of my days working.  I couldn't say

24   exactly how long I had been there.  I want to say I got there to

25   the unit around 5:00 or 6:00, and probably left around 2:00 a.m.

20-cv-1878-RBJ    TANA CUNNINGHAM - Cross    03-23-2022

1   Q    All right.  So, just do the math for me.  Tell me how many
2   hours you were on duty on May 28th.
3   A    So, that would have been from around 1700 to 0200 hours.
4   Q    Can you tell me how many hours that is?
5   A    I mean, it would be around eight or nine hours, I would
6   say.
7   Q    Thank you.  I'm bad at math.  That's why I became a lawyer.
8   May 29th, tell me how many hours you were on duty.
9   A    Again, I would have to guess, probably around 15 or so.
10  Q    Okay.  May 30th, can you tell me how many hours you were on
11  duty?
12  A    Fifteen to eighteen.
13  Q    All right.  So, and then did you work on the 31st?
14  A    I did.  Yes, ma'am.
15  Q    So, we've got how many hours did you work on the 31st?
16  A    Probably about the same.  Fifteen to eighteen or so.
17  Q    Okay.  So, we've got like over 50 hours over those four
18  days alone; right?
19  A    It was a very long, long time, yes.
20  Q    Sure.  And are you aware, yes or no, that we received a
21  total of one hour, 21 minutes of video for all those days from
22  you?
23  A    No, ma'am.  I was not aware.
24  Q    Not aware of that?
25  A    Correct.

Kevin P. Carlin, RMR, CRR

20-cv-1878-RBJ    TANA CUNNINGHAM - Cross    03-23-2022

1   Q    Okay.  And based under DPD policy and training, you made

2   your own decisions about when to turn on and turn off your

3   camera; right?

4   A    Yes, ma'am.

5   Q    Now, you testified on direct examination about being --

6   having multiple kinds of items thrown at you: canned goods,

7   bottles filled with human waste, packages of frozen bacon.  We

8   didn't see any of that video when you were asked questions by

9   the City's counsel, did we?

10  A    I do remember multiple items being thrown towards me in

11  some of these videos that we just watched, yes.

12  Q    Videos that we've watched today with your testimony?

13  A    Yes.  Yes, ma'am.

14  Q    You saw frozen bacon?

15  A    No.  I saw -- earlier I remember something had exploded at

16  my feet, and I think it was a water bottle.

17  Q    You mean the water bottle that exploded water?

18  A    Right.  I think it was water.  I'm not sure.

19  Q    Okay.  Did we see any other items?

20  A    Again, I don't -- not from the couple of minutes that we've

21  watched in here today.

22  Q    Okay.  Well, you would agree that if the videos are in

23  evidence, the jury can watch them and decide what they see;

24  right?

25  A    Yes, ma'am.

20-cv-1878-RBJ    TANA CUNNINGHAM - Redirect    03-23-2022

1    Q    Okay.  Now, you have also testified that the cameras are

2    limited because, you know, they're just on your chest -- or

3    where are they attached, exactly?

4    A    So, they were attached to my outermost vest, and it would

5    have been either center or sort of offset just a bit to the left

6    on my outermost vest.

7    Q    Would you agree that there's a limitation to cameras, that

8    the camera only sees what the camera sees?

9    A    Yes, ma'am.

10   Q    Are you aware that the person who said that led Derek

11   Chauvin's defense in his trial for the murder of George Floyd?

12              MS. JORDAN:  Objection.

13              THE COURT:  Sustained.

14              MS. WANG:  I have no further questions.  Redirect?

15                    **REDIRECT EXAMINATION**

16   BY MS. JORDAN

17   Q    When you were driving the RDV on May 28th and May 29th,

18   would you have activated your body-worn camera?

19   A    No.  At that point I would not have, because I was not

20   directly interacting with any individuals.

21              MS. JORDAN:  That's the only question I have, Your

22   Honor.

23              THE COURT:  Questions from the jurors?  Not any.

24   Okay.  Thank you.

25              THE WITNESS:  Thank you, Your Honor.

20-cv-1878-RBJ   TANA CUNNINGHAM - Redirect   03-23-2022

1          THE COURT:  You're excused, free to go.

2          MR. RINGEL:  May we approach, Your Honor?

3          THE COURT:  Sure.

4      (Proceedings held at the bench:)

5          MR. RINGEL:  Moving for a mistrial based on that last

6  comment.

7          THE COURT:  Oh, come on.

8          MR. RINGEL:  That's completely inappropriate and out

9  of bounds, and --

10          THE COURT:  You really want a mistrial?  Maybe I will

11  give you one.  Is that what you want?

12          MR. RINGEL:  I think that was inappropriate, and I'm

13  moving for a mistrial.

14          THE COURT:  I do too, but that's not mistrial stuff.

15          MR. RINGEL:  I respectfully disagree, Your Honor.

16          THE COURT:  Why?

17          MR. RINGEL:  Because to have the specter and to

18  compare the Denver Police Department to what happened with Derek

19  Chauvin is inappropriate, and counsel should know better, and

20  there have to be consequences for counsel making that kind of

21  statement.

22          THE COURT:  How about an instruction from me?

23          MR. RINGEL:  That's fine, Your Honor.

24          THE COURT:  What do you want it to say?

25          MR. RINGEL:  That it was completely inappropriate and

20-cv-1878-RBJ   TANA CUNNINGHAM - Redirect   03-23-2022

1   out of bounds, and that they must disregard it, and that --

2          THE COURT:  They probably figured that out from the

3   tone of my sustaining the objection, but I will do that.  Do you

4   have something to say about this?

5          MR. MACDONALD:  Yes.

6          THE COURT:  She should not have done that.

7          MR. MACDONALD:  Your Honor, what I would say is I

8   think your tone conveyed your views, and I think it's

9   appropriate if you deem it necessary to say that they should

10  ignore that question.

11         THE COURT:  All right.

12         MR. RINGEL:  Thank you, Your Honor.

13     (Proceedings held in open court:)

14         THE COURT:  Ladies and gentlemen, you probably could

15  tell from the tone of my sustaining that last objection that I

16  was not amused.  There is no basis whatsoever for counsel to

17  have asked a question that suggests a comparison of what

18  happened in Denver to what happened in the Chauvin case in

19  Minnesota.  Please don't be prejudiced by that in any way.  This

20  case stands on its own evidence, its own facts, and I don't want

21  any counsel to be suggesting something different than that to

22  you.  Okay?  Onward.

23         MS. HOFFMAN:  The defendants call Sergeant Parsons to

24  the stand.

25         THE COURT:  Okay.

20-cv-1878-RBJ   ROBERT PARSONS - Direct   03-23-2022

1        (The Witness is Sworn)

2            THE COURT:  Okay.  Thank you.

3                    **DIRECT EXAMINATION**

4    BY MS. HOFFMAN

5    Q    Good afternoon, Sergeant.

6    A    Good afternoon.

7    Q    If you could please state your name, spelling your last

8    name for the record.

9    A    Yes.  My name is Robert Parsons, P-A-R-S-O-N-S.

10   Q    And you're presently employed by the Denver Police

11   Department?

12   A    Correct.

13   Q    How long have you worked for the Denver Police Department?

14   A    Twenty-four years.

15   Q    And if you could briefly walk me through your career with

16   the Denver Police Department.

17   A    Yes, ma'am.  In 1998, I started at the academy for the

18   police department, and was positioned in District 6, until 2005.

19   At that time I promoted to sergeant, and I worked in District 3

20   patrol as a sergeant until 2010.  At that time I transferred to

21   internal affairs until 2013.  I spent about seven months in

22   investigations in the child abuse unit.  At that point in time,

23   I was transferred to the performance development unit, where I

24   currently am still assigned.

25   Q    And I think I missed the timeframe, but how long have you

20-cv-1878-RBJ    ROBERT PARSONS - Direct    03-23-2022

1   been assigned to the performance development unit?

2   A    Yes.  Since 2013.

3   Q    2013.  And I'm just going to refer to that as PDU for

4   short.

5   A    Yes, ma'am.

6   Q    But can you tell me a little bit about what PDU does.

7   A    The performance development unit has a multitude of

8   assignments, the main one being the limited duty function, which

9   monitors the injuries of officers, whether it be line-of-duty

10  related or non-line-of-duty related.  We also oversee the XO94,

11  which is the drug and alcohol testing program for the

12  department.  We work hand-in-hand with the chief of police in

13  regards to fitness for duty evaluations for physical or

14  psychological problems that may concern the officer's ability to

15  perform their functions.  We also produce reports relating to

16  early intervention for officers.

17  Q    Thank you.  And what department or division is your unit in

18  within the general Denver Police Department structure?

19  A    Under the administrative side of the department, working

20  directly underneath the deputy chief of administration.

21  Q    And how big is the -- is PDU?

22  A    We have two sergeants assigned to our unit.

23  Q    And you described a number of functions performed by your

24  unit, and particularly what I want to spend the most time

25  talking to you about is what you talked about at the foremost,

20-cv-1878-RBJ     ROBERT PARSONS - Direct     03-23-2022

1   the limited duty section.  So, if you could talk me through more

2   of your duties and responsibilities, specifically with respect

3   to that section.

4   A    Yes.  We receive all information regarding injuries

5   relating to officers in their line of duty assignment or if

6   they -- if they do happen to be injured outside of the job, we

7   receive that information from the officer or their chain of

8   command.  We provide weekly updates to the administration in

9   regards to the injuries that have occurred and that have been

10  reported.

11        That information is maintained on a weekly basis to

12  provide those updates if the injuries are longterm or short

13  term, and the officers have returned to full duty.  The biggest

14  key component of that is it assists with staffing and also

15  provides those updates to the administration for the injuries.

16  Q    So, why don't you talk to us about if an officer is

17  injured, how does he or she report their injury?

18  A    There are two ways that those injuries can be initiated --

19  or the reports can be initiated, excuse me.  One is to notify

20  the immediate supervisor or any supervisor of the injury, and a

21  supervisor report is completed at that time by a supervisor that

22  is assigned to the officer.

23        The second way is through a call to what we call the

24  OUCH line.  That is a phone call that the officer makes,

25  contacts Denver Health Medical Center, which has a nurse answer

20-cv-1878-RBJ   ROBERT PARSONS - Direct   03-23-2022

1   the phone lines there.  The information about the injury and how

2   it happened, how it occurred, and the officer's personal

3   information is recorded.  The nurse at Denver Health Medical

4   Center basically triages the call and determines what type of

5   medical assistance the officer would need.  If they haven't

6   already received emergent care leading up to that, this call to

7   the OUCH line could come after that fact.

8   Q    Okay.  So, whether the officer goes the supervisor route or

9   the OUCH line route, what kind of information is being collected

10  as part of those reports?

11  A    Yes.  On the OUCH line, more personal information is

12  collected: name, address, date of birth, et cetera.  Demographic

13  information, date and time of the injury, what the details of

14  the injury was to -- as to what body part, the severity of the

15  injury, and a general synopsis of how the injury occurred.

16       The supervisor report, on the other hand, is not as

17  detailed.  It does include date and time of the injury, the

18  officer's name, of course is on that report as well, but it's

19  more of an internal document for the City in regards to what the

20  nature of the injury was.

21       But if it occurred because of any situation that is

22  correctable, if for instance an officer tripped in the hallway

23  over a rolled piece of carpet, it would indicate that there's a

24  maintenance matter that needs to be tended to, and that carpet

25  needs to be fixed.  So, those type of questions are asked on the

20-cv-1878-RBJ   ROBERT PARSONS - Direct   03-23-2022

1   supervisor report.

2   Q     And then whether it's reported again via the supervisor

3   route or the OUCH line route, either way it makes its way to

4   your unit?

5   A     That's correct.  We end up getting copied or getting an

6   additional copy of those two reports.  Both those reports are

7   required for each injury.  However, a copy of both are routed to

8   our office.

9   Q     Thank you.  So, to clarify, it's not an either/or route.

10  Officers have to report via the OUCH line as well as to their

11  supervisor?

12  A     Yes.  Both do have to be done, but one can be done first or

13  second.  That part of it does not matter.

14  Q     Thank you for clarifying.

15  A     You're welcome.

16  Q     And then what do you do with that information once

17  collected?

18  A     Once that information is collected, we review the

19  documents.  We determine whether or not the officer has had to

20  go to a medical facility for treatment.  If that officer has

21  received treatment from a doctor and that doctor ordered the

22  officer to be on what we call -- excuse me -- what we call

23  limited duty where the doctor has identified the officer cannot

24  perform their functions at a full-duty capacity, then we ensure

25  that the officer works from a modified duty assignment.

Kevin P. Carlin, RMR, CRR

20-cv-1878-RBJ    ROBERT PARSONS - Direct    03-23-2022

1      We also produce a weekly report for the administration

2   to review in regards to all injuries, and also we maintain a

3   spreadsheet that holds information of all present injuries that

4   are being tended to within the department, and what the status

5   of those injuries are so the administration knows where we're at

6   so they can make administrative decisions, i.e. staffing

7   decisions.

8   Q    I just want to recap and make sure I understood everything

9   you just said.  Part of your function is to assess whether or

10  not an individual can perform the essential functions of the

11  job, whether they need to be offered a limited duty capacity if

12  they're not able to work on the street?

13  A    That's correct.  And that's based upon the doctor's

14  recommendation.  I don't make those evaluations.

15  Q    And then you mentioned another part of your job function is

16  making weekly reports?

17  A    That's correct.

18  Q    And who is that weekly report being made to?

19  A    It is addressed directly to the chief of police.  It is

20  copied to division chiefs, the deputy chief, several lieutenants

21  that work for the chief's office as well.

22  Q    And I believe you mentioned earlier in your testimony that

23  the purpose of that weekly report is for staffing reasons?

24  A    That is one of the reasons as well, yes.

25  Q    Okay.  And what are the other reasons of this weekly

20-cv-1878-RBJ    ROBERT PARSONS - Direct    03-23-2022

1    report?

2    A    Notification to the administration of those who are

3    injured, and the basics of how they're injured.  Not all the

4    details are in it.  It's just a summary of how it occurred based

5    upon what's written in the supervisor report and the OUCH line

6    report so that the administration knows what has happened in

7    those situations to those officers, general knowledge.

8    Q    And I want to now direct your attention to the George Floyd

9    protests.  I understand you being in this unit from 2013 that

10   you were there at the time of the protest; correct?

11   A    I was working for the department, but I was not on the

12   street at the time of the protest.

13   Q    Sorry.  So, you were -- that was a terrible question.  You

14   were working for the performance development unit at the time of

15   the George Floyd protests?

16   A    That's correct.

17   Q    And you did not go out on the street and help police the

18   protests?

19   A    No, I did not.

20   Q    Were any Denver Police Department officers injured during

21   the protests?

22   A    Yes, there were.

23   Q    And approximately how many Denver Police Department

24   officers were injured during the protests?  And to be clear,

25   when I say the protests, I am referring to -- from May 28th

20-cv-1878-RBJ    ROBERT PARSONS - Direct    03-23-2022

1  through June 2nd.

2  A    During those dates that you referenced, there were 73

3  injuries that were reported.

4  Q    And with respect to those 73 individuals, I'm assuming that

5  that specifically includes individuals who have actually

6  reported their injuries through the OUCH line and the supervisor

7  report to the department?

8  A    Correct.

9  Q    So, if an individual got a bruise and elected not to report

10 that, your office would have no knowledge of that?

11 A    Correct.

12       MS. HOFFMAN:  If you could show the witness

13 Exhibit 3022.  And this has not been admitted yet.

14       MR. WILLIAMS:  No objection.

15       THE COURT:  Okay.  It's admitted.

16 Q.    (By Ms. Hoffman) Sergeant, do you recognize the document

17 displayed on the screen?

18 A    Yes, I do.

19 Q    Did your office create this document?

20 A    Yes, we did.

21 Q    And is this one of those weekly reports to the chief that

22 you referenced in your testimony earlier?

23 A    That's correct.

24 Q    And the date of this particular report is July 10th, 2020;

25 correct?

20-cv-1878-RBJ    ROBERT PARSONS - Direct    03-23-2022

1   A    Correct.

2   Q    And if you could walk us through this document a little

3   bit.

4   A    Yeah.  The subject line on this contains June 29th, 2020,

5   through July 10th of 2020, protest injury report.  We had

6   produced reports similar to this on previous weeks as well.

7   This includes three updated reports for this particular week to

8   the running list of injuries that we had in relation to the

9   protests and the riots that had been -- excuse me -- had been

10  occurring.

11          Below the summary information at the top are district

12  related reports of officer injuries, the date of the injury, if

13  there was any lost time that week, and a one- or two-sentence

14  summary of what was disclosed about the injury.

15  Q    And why was this document -- why does this document protest

16  injuries separate from the other weekly reports that you

17  referenced earlier?

18  A    There had been so many injuries related to the protests and

19  the riots that we produced a separate report for clarification

20  purposes for the administration.

21  Q    And if you could scroll down a little bit.  Keep going.  If

22  you could stop.  So, you've described now what limited duty is

23  in the law enforcement capacity.  And if you could see on the

24  current page that I have displayed in red, it writes, RTFD.

25  What does that mean?

2667

                    20-cv-1878-RBJ    ROBERT PARSONS - Direct    03-23-2022

1   A    That stands for return to full duty.

2   Q    Okay.  So, am I to assume correctly that that references an

3   individual who was previously on a limited duty status, and now

4   has been returned to full duty?

5   A    That's correct.

6   Q    And does that individual have to be cleared by a doctor to

7   be returned to full duty?

8   A    Yes.

9   Q    And, let's see.  So, I just also want to make sure I

10  understand this document.  So, once you're directed to start

11  keeping protest injuries separate, is this a running log?

12  A    That's correct.

13  Q    Okay.  So, every week, then, you would add on to it with

14  additional injuries that occurred through protest activities?

15  A    That part as well as any updates that were received, if an

16  officer had gone into limited duty because they did seek

17  treatment after the fact for those injuries, or if they had

18  returned to full duty from the injuries that they were

19  originally out of work for.

20          MS. HOFFMAN:  And you can take this down.  If you

21  could put up Exhibit 3018.  This has also not been entered, so

22  moving to enter now.

23          MR. WILLIAMS:  No objection.

24          THE COURT:  Admitted.

25  Q.    (By Ms. Hoffman) And do you recognize the document

                        Kevin P. Carlin, RMR, CRR

20-cv-1878-RBJ    ROBERT PARSONS - Direct    03-23-2022

1    displayed on the screen now?

2    A    This document, I had reviewed pretrial.

3    Q    And does this document contain essentially the same

4    contents as the previous memo we all looked at together, just in

5    the slightly different format?

6    A    Correct.

7    Q    So, I'd like to talk to you a little bit more in depth

8    about some of the specific injuries received by officers during

9    the George Floyd protests.  Can you tell me how many officers

10    were injured by projectiles?

11    A    There were 54 reports in our reports that we received

12    indicating officers were injured in that fashion.

13    Q    Okay.  And drawing your attention to the document in front

14    of you, in order for ease, and to reduce confusion, we have

15    attempted to highlight just the entries of individuals who have

16    reported being struck by a projectile.  Is that consistent with

17    your review and understanding?

18    A    Yes.

19    Q    And you can scroll down.

20    A    Yes, it is.

21    Q    Thank you.  And based on your review, what kinds of

22    projectiles did officers report being struck with during the

23    George Floyd protests?

24    A    There were reports -- or the reports that we received had

25    indicated there were rocks, bottles, bricks, chunks of concrete,

20-cv-1878-RBJ    ROBERT PARSONS - Direct    03-23-2022

1   cinder blocks, landscaping rocks -- or, I'm sorry -- landscaping

2   bricks.  That's all I remember.

3   Q    And -- sorry.  What were you saying?

4   A    That's all I remember.

5   Q    In what areas of the body did officers report being struck?

6   A    There were a multitude of areas that were described in the

7   reports.  Anywhere from head, neck, shoulder, arm, chest, ribs,

8   groin, legs, feet.

9   Q    And where in the city did most officers report receiving

10  their injuries?

11  A    The majority of the reports indicated areas in the downtown

12  area: Civic Center Park, the Colfax corridor leading up to

13  District 6 on Washington Street, that immediate area.

14  Q    And did any officers report being injured during the

15  protests without having any direct physical contact with

16  protesters or agitators?  And just to illustrate an example of

17  that, an individual who, say, sprained their ankle while they

18  were trying to effectuate an arrest?

19  A    Yes.  There were injuries like that.

20  Q    And how many of -- injuries along those lines?

21  A    There were ten injuries similar to that.

22  Q    Did any officers report more than one injury?

23  A    Yes.  Some officers were injured a multitude of times.

24  Q    Did any officers have to work light duty as a result of

25  injuries incurred during the George Floyd protests?

20-cv-1878-RBJ   ROBERT PARSONS - Direct   03-23-2022

1   A    Correct.  We had 14 officers that had to be on light duty

2   or limited duty because of their injuries.

3   Q    And specifically with respect to those 14 individuals, do

4   you have knowledge of how long they had to be on limited duty

5   status?

6   A    Of those 14 limited duty officers, one officer was out for

7   21 months before they had to take a medical retirement.  One

8   officer was out for nine and a half months before returning to

9   full duty.  There were five officers that were out for less than

10  a month.  And there were seven officers that were out between

11  one and seven months.

12  Q    Were you aware of an incident where an individual drove a

13  car into police officers?

14  A    Yes.

15  Q    And what is your awareness of that incident?

16  A    Based upon the reports that were submitted to our office,

17  it indicated that a vehicle had driven into three officers that

18  sustained injuries.

19  Q    And tell me about the injuries incurred by these three

20  officers as a result of that accident.

21  A    One officer had his back and ankle injured.  That was the

22  officer that was out for 21 months before having to take a

23  medical retirement.  Another officer had suffered a broken leg,

24  and he was out for nine and a half months.  And the third

25  officer was out for six months due to a broken ankle.

Kevin P. Carlin, RMR, CRR

20-cv-1878-RBJ   ROBERT PARSONS - Cross   03-23-2022

1    Q    With the individual who had to take off 21 months and then

2    medically retired, is it your understanding that that individual

3    was never able to perform the essential functions of the job

4    after receiving these injuries at the protest?

5    A    That was what the doctor reported.

6    Q    Are you aware of any officers reporting being struck with

7    unknown substances during the protests?

8    A    There were two officers who had reported that.

9    Q    Are you aware of any officers who were injured by fireworks

10   or other homemade explosive devices during the protests?

11   A    Yes.  There were five officers that reported that.

12            MS. HOFFMAN:  If I could just have a minute, Your

13   Honor?  I don't have anything further at this time.

14            THE COURT:  Cross examination?

15            MR. WILLIAMS:  Good afternoon, Your Honor.  Brian

16   Williams on behalf of the plaintiffs.

17                          **CROSS EXAMINATION**

18   BY MR. WILLIAMS

19   Q    Sergeant Parsons, you have no information that any of the

20   plaintiffs caused injury to any DPD officer; correct?

21   A    I don't know of any of the plaintiffs in this case, no.

22   Q    Exactly.  So, sitting here today, you can't say one way or

23   another whether any plaintiff in this case caused any injury to

24   a DPD officer?

25   A    That's correct.

20-cv-1878-RBJ   ROBERT PARSONS - Cross   03-23-2022

1   Q    And you're not aware of any evidence that any plaintiff

2   threw any kind of projectile or committed any act of violence

3   against a DPD officer?

4   A    No, I'm not.

5   Q    And during your direct examination, you discussed the

6   July 10th summary of officer injuries.  You recall that?

7   A    Yes.

8   Q    And you mentioned that you created this document with your

9   co-sergeant; is that right?

10   A    That's correct.

11   Q    And you created that summary based on injury reports that

12   you received?

13   A    Correct.

14   Q    So, you don't have firsthand knowledge of any of the

15   injuries?

16   A    No, I do not.

17   Q    And you received several of the injury reports from the

18   worker's comp unit; is that right?

19   A    If I may explain?

20   Q    Go ahead.

21   A    The reports do go directly to the worker's comp unit.  We

22   receive a copy from the worker's comp unit in the way of

23   supervisory reports.  The OUCH line reports are sent to us

24   directly, as well as the worker's comp unit.

25   Q    And you mentioned that there were certain category of

20-cv-1878-RBJ    ROBERT PARSONS - Cross    03-23-2022

1   injuries that were caused by projectiles; right?

2   A    Correct.

3   Q    And some of the injuries sustained by officers were to

4   undercover officers working among the protesters; is that right?

5   A    There were a couple listed, yes.

6   Q    In fact, the undercover agents were injured by the DPD's

7   own use of less-lethal munitions, weren't they?

8        MS. HOFFMAN:  Objection.  Foundation, personal

9   knowledge.

10        THE COURT:  Okay.  Ask him the foundation questions,

11   then.

12   Q.    (By Mr. Williams) Okay.  Dan, could we pull up

13   Exhibit 3022.  And Sergeant Parsons, we already established that

14   this is the document that you created with your co-sergeant?

15   A    That's correct.

16   Q    If we could go to page two and look at the fourth entry.

17   And you see this entry states the officer suffered injuries to

18   his ankle and shoulder and was exposed to CS gas and pepper

19   spray during his undercover work in the riots?

20   A    Yes.

21   Q    So, this was an officer who was working undercover among

22   the protesters?

23   A    That's what he stated, yes.

24   Q    And he was exposed to CS gas and pepper spray?

25   A    Yes.

20-cv-1878-RBJ   ROBERT PARSONS - Cross   03-23-2022

1   Q    And you're aware that in fact he was shot by fellow

2   officers with PepperBalls, aren't you?

3   A    It does not state that here.

4   Q    There was another officer injured while working undercover,

5   wasn't there?

6   A    I think there was another one.  I would have to review the

7   rest of the document to see that.

8   Q    Okay.  And that officer was struck in the foot by a

9   40-millimeter rubber bullet; is that right?

10  A    I would have to review that to confirm that.  There's a lot

11  of injuries on here.  I don't have all the details.

12  Q    Okay.  Let's take a look at page 11.  And do you see that

13  states, while working undercover, the officer was struck in the

14  foot with an unknown object?

15  A    Correct.

16  Q    And you testified that you created an earlier -- earlier

17  versions of this document; right?

18  A    Correct.  It was produced weekly.

19  Q    And there was a June 26th version of this document?

20  A    I believe that was the date.  I would have to look at it to

21  confirm.

22  Q    Okay.  And in this version of the document, that entry

23  states, while working undercover, the officer was struck in the

24  foot with a 40-millimeter rubber bullet; is that right?

25  A    I would have to look at that to confirm that.

20-cv-1878-RBJ   ROBERT PARSONS - Cross   03-23-2022

1    MR. WILLIAMS:  Okay.  I'm going to hand that to you.

2   May I approach, Your Honor?

3    THE COURT:  Sure.

4   Q.   (By Mr. Williams) And if you look on page 11 of that

5   document.  And does that refresh your recollection that the

6   earlier version of this document states, while working

7   undercover, the officer was struck in the foot with a

8   40-millimeter rubber bullet?

9   A    Yes.  That's what it says.

10  Q    And you're aware that he was shot by a fellow officer while

11  he was marching with protesters; right?

12   MS. HOFFMAN:  Objection.  Foundation, personal

13  knowledge.

14   THE COURT:  Sustained.

15  Q.   (By Mr. Williams) There were other officers injured by

16  DPD's use of less-lethal munitions, weren't there?

17  A    I don't have actual knowledge of that in regards to which

18  officer.

19  Q    Okay.  On your report, do you recall an officer who

20  reported suffering hearing loss and ringing in ears after a

21  flash-bang exploded near his head during the protest?

22  A    Yes.  I recall reading that.

23  Q    And several of the officer injuries, as we have

24  established, weren't caused by a protester throwing a

25  projectile; right?

20-cv-1878-RBJ   ROBERT PARSONS - Cross   03-23-2022

1    A    Correct.

2    Q    For example, your summary identifies officers who rolled

3    ankles while advancing a line or broken elbow after stepping off

4    a curb; right?

5    A    Correct.

6         (The court reporter asked counsel to slow down.)

7              THE COURT:  There's a sign there on the lectern.

8              MR. WILLIAMS:  Thank you, Your Honor.

9    Q.    (By Mr. Williams) Another entry states that an officer

10   was monitoring protests by headquarters when a gust of wind came

11   up and debris entered his eyes, scratching his cornea; is that

12   right?

13   A    Yes.  I recall that one.

14   Q    The summary also describes two officers who were injured

15   after their vehicle struck a curb; right?

16   A    Yes.

17   Q    And a couple of officers were injured twisting their knees

18   or straining their biceps from throwing gas canisters?

19   A    Correct.

20             MR. WILLIAMS:  No further questions, Your Honor.

21             THE COURT:  Redirect?

22             MS. HOFFMAN:  Nothing further.

23             THE COURT:  Questions from the jury?  Yes?  Okay.

24        (Proceedings held at the bench:)

25             THE COURT:  Question 53.

2677

20-cv-1878-RBJ   ROBERT PARSONS - Recross   03-23-2022

1      MS. HOFFMAN:  No objection.

2      MR. WILLIAMS:  No objection.

3      THE COURT:  All right.

4   (Proceedings held in open court:)

5      THE COURT:  Sergeant, one of the jurors has a question

6   for you.  If a single officer had multiple injuries, would there

7   be multiple reports?

8      THE WITNESS:  Yes, there would.  Each injury,

9   especially if it occurred on different dates, would be indicated

10  in that fashion.

11     THE COURT:  Any other questions, ladies and gentlemen?

12  Any follow-up questions?  Oh, is there another one?  It's okay

13  if you have one.  No?  Any follow-up questions or questions from

14  the defense?

15     MS. HOFFMAN:  Nothing further, Your Honor.

16     THE COURT:  Or the plaintiff?

17     MR. WILLIAMS:  Just one, Your Honor.

18                   **RECROSS EXAMINATION**

19  BY MR. WILLIAMS

20  Q   So, the number of 73 is the total number of injuries, not

21  the total number of officers?

22  A   Number of injuries reported.

23     MR. WILLIAMS:  Thank you.  No other questions, Your

24  Honor.

25     THE COURT:  Okay.  Thank you, Sergeant.  You're

20-cv-1878-RBJ   MATTHEW CANINO – Direct   03-23-2022

1    excused, free to go.

2           THE WITNESS:  Thank you, sir.

3           THE COURT:  Of course you're welcome to stay and watch

4    if you want to.

5           MS. HOFFMAN:  Defendants next call Lieutenant Canino

6    to the stand.

7           THE COURT:  Hello.

8        (The Witness is Sworn)

9           THE COURT:  Okay.  Thank you.

10                     **DIRECT EXAMINATION**

11   BY MS. HOFFMAN

12   Q    Good afternoon, Lieutenant.  If you could please state your

13   name, spelling your last name for the record.

14   A    My name is Matt, Matthew Canino, C-A-N-I-N-O.

15   Q    And I have to ask this.  You are presently employed by the

16   Denver Police Department; correct?

17   A    Yes, I am.

18   Q    Thank you.  How long have you worked for the police

19   department?

20   A    For 30 years.

21   Q    And if you could briefly walk us through that 30-year

22   career.

23   A    The bulk of it has been under the SWAT unit for 20 years,

24   every rank up to lieutenant.  The balance of that for the most

25   part has been in patrol.

20-cv-1878-RBJ    MATTHEW CANINO - Direct    03-23-2022

1   Q    And how long have you specifically held the rank of

2   lieutenant?

3   A    Since 2014.  So, was that eight years?

4   Q    I'm bad at math.  I will give you that.  Sounds right.  At

5   present --

6            THE COURT:  You're not that bad at math.

7            MR. RINGEL:  It's a theme, Your Honor.

8   Q.    (By Ms. Hoffman) Are you assigned to a unit presently?

9   A    I am in the strategic investigations bureau, and I -- with

10  the main focus on arresting violent criminal offenders.  So,

11  fugitive unit, you know, violent criminal task force.

12  Q    And if you could tell us a little bit about your work in

13  the fugitive unit.

14  A    We just primarily focus on the most dangerous, violent

15  criminals who have warrants, and I have detectives who

16  investigate them, and they search for them, and we arrange to

17  have them arrested, usually with uniformed resources.

18  Q    And how long have you been assigned to the fugitive unit?

19  A    Just under a year.

20  Q    And prior to that, where were you assigned?

21  A    I was assigned to the SWAT unit.

22  Q    So, at the time of the George Floyd protests, you were

23  assigned as a lieutenant to the SWAT unit; correct?

24  A    Yes.  Correct.

25  Q    And if you could briefly tell the jury about your training

20-cv-1878-RBJ    MATTHEW CANINO - Direct    03-23-2022

1    in the area of less-lethal munitions.

2    A    We receive training in 40-millimeter and PepperBall, and

3    flash-bang use.

4    Q    And if you could tell us about what that training consisted

5    of.

6    A    So, the 40-millimeter and the PepperBall, it's every two

7    years, and you get certified, you go through a PowerPoint

8    presentation.  We have certified instructors that go over a very

9    thorough PowerPoint presentation.  And then when you first get

10   certified on those devices, you have to deploy a certain amount

11   of rounds, use -- like a practical test.  And then, you know,

12   following that, you generally don't have to.  You just go

13   through the presentation, and then you are certified if you

14   complete the training every two years.

15   Q    And if you could tell us about your training that you've

16   received in the area of crowd management and field force

17   tactics.

18   A    So, I received training at the police academy, which I

19   attended back in 1991.  But the most recent training I received

20   in crowd control was a three-day class at the police academy on

21   crowd control and field force.

22   Q    And the jury has heard testimony from your counterpart,

23   Lieutenant Pine.  So, you and Lieutenant Pine were the two

24   lieutenants who supervised the SWAT unit at the time of the

25   George Floyd protests; correct?

20-cv-1878-RBJ   MATTHEW CANINO - Direct   03-23-2022

1    A    Yes.  Correct.

2    Q    And so Lieutenant Pine supervised a group of officers, and

3    you then supervised a separate group of officers?

4    A    Yes.  Correct.

5    Q    How many officers did you supervise?

6    A    Roughly two sergeants and eight to nine people, depending

7    on the night, but it was generally fully staffed with about

8    eight to nine, with two sergeants.

9    Q    And the jury has heard testimony about SWAT and that it is

10   a specialized unit.  If you could briefly tell the jury about

11   specialized training that you've received with all your time in

12   the SWAT unit.

13   A    So, the SWAT unit receives a lot of the similar tactics

14   that patrol officers receive, but they just train in those

15   tactics a lot more frequently.  But they also train in

16   specialties like hostage situations, serving warrants, high-risk

17   search warrants, and things like that.  So, we train together as

18   a team, you know, to work in these tactics in a team

19   environment, and that's kind of the specialized training we get.

20   Q    And you previously mentioned being trained in the

21   flash-bang.  The flash-bang is just a device possessed by the

22   SWAT unit; correct?

23   A    Yes.  Correct.

24   Q    So, any training you received with respect to the

25   flash-bang occurred during one of the incidents when you were

20-cv-1878-RBJ    MATTHEW CANINO - Direct    03-23-2022

1    specifically assigned to SWAT?

2    A    Yes.  Correct.

3    Q    And unlike regular patrol officers, SWAT doesn't respond to

4    regular calls for service; correct?

5    A    Not generally.  They can.  You know, it's not something

6    that they're forbidden to do.  They can do that, but generally

7    don't.

8    Q    Does SWAT handle operations along the nature you talked

9    about earlier, barricades, hostage situations?

10   A    Yes.

11   Q    And after operations is a debriefing held?

12   A    We -- yes.  I say we, because I was in SWAT for so many

13   years, but SWAT debriefs after every single operation, yes.

14   Q    And what is discussed at a debrief?

15   A    It's a basic rundown of what happened and what we did,

16   what, you know, each officer goes around and discusses what they

17   did and what they saw.  They discuss what they think the team

18   could have done better or that they could have done better as an

19   individual, and then they discuss, you know, the things that

20   went well, too, that we would do again.

21   Q    And what's the purpose of that debrief?

22   A    It's training.  You learn from your mistakes, and you also

23   learn from the things that you do well.  So, it's -- we consider

24   it training.  It's very valuable training, because it's based

25   on, you know, a real-time occurrence.

20-cv-1878-RBJ    MATTHEW CANINO - Direct    03-23-2022

1    Q    So, I'm going to jump back to the flash-bang for a minute.

2    The jury has heard a lot of testimony about flash-bang, and a

3    couple of the plaintiffs in this case are claiming injuries from

4    flash-bangs.  Did your unit deploy flash-bangs during the George

5    Floyd protests?

6    A    They did.

7    Q    Okay.  How many in total?

8    A    Seven on the 28th, and one on the 30th.

9    Q    So, with respect to the seven flash-bangs that your unit

10   deployed on May 28th, do you have an idea of when -- or,

11   sorry -- of where those flash-bangs were deployed?

12   A    I think it was the 1500 Lincoln or Broadway area.

13   Q    And with respect to the one flash-bang deployed on

14   May 30th, do you have an understanding of where that flash-bang

15   was deployed?

16   A    That was in the Lincoln-Sherman alley, I believe it was, in

17   like the 1300 block.

18   Q    And how do you know the dates and locations of these

19   flash-bangs?

20   A    We track each device that we issue.  We track, there's a

21   serial number.  Each device has a serial number on it.  We track

22   that when it's actually received in the unit.  We track it when

23   we assign it to an officer so they get assigned that specific

24   serial number device, and then when that device is deployed,

25   they need to report that device usage and give us a date and a

20-cv-1878-RBJ    MATTHEW CANINO - Direct    03-23-2022

1    time and location where it was used.

2    Q    And once it's -- once that flash-bang is deployed, then

3    does the Denver Police Department report that to any other

4    agencies?

5    A    The ATF tracks all flash-bang issues and -- so, we purchase

6    it with -- you need certain ATF paperwork.  So, they track them,

7    I guess is the bottom line, is they track all those devices.

8    Q    So, you report from the receipt of the flash-bang through

9    the deployment of the flash-bang, and it's all reported to ATF?

10    A    Those serial numbers are assigned to the Denver Police

11    Department.  So, we don't necessarily report that that

12    flash-bang was deployed.  We just have accepted responsibility

13    for those number flash-bangs.  So, if they come to us and they

14    say where is flash-bang serial number whatever, we have to have

15    documentation.  So, like an audit, we would have to have

16    documentation showing where that flash-bang was used or if it

17    was still in the field or if we still had it like in our armory.

18    Q    And other than the flash-bang device, are any other

19    less-lethal munitions specifically reported to ATF?

20    A    No.

21    Q    So, if a plaintiff claimed to be exposed to flash-bangs on

22    May 29th, June 1st, or June 2nd, that wasn't from your team?

23    A    It wasn't a flash-bang of ours, no.

24    Q    And through your training, are officers trained when

25    specifically or what type of situations to use flash-bangs?

20-cv-1878-RBJ    MATTHEW CANINO - Direct    03-23-2022

1    A    Generally speaking, flash-bangs are used to prevent

2    shootings.  So, we use them as a distraction device.  Generally

3    against a person that -- or group of people that would present a

4    threat.  And so it's used as a distraction device.  It's very

5    loud.  It's very bright.  And that's the use for it, to prevent

6    generally shootings or other violent acts.

7    Q    And flash-bangs are not necessarily intended for protest

8    situations?

9    A    No, they're not.  Not normally used for that.

10   Q    Did you witness any of the eight flash-bang deployments

11   that your officers reported to you during the protests?

12   A    No, I did not.

13   Q    They reported to you after the fact?

14   A    Yes.

15   Q    Do you have an understanding of why your officers deployed

16   flash-bangs when they did during the protests?

17   A    Yes.  We were -- we as a group and as an agency really were

18   out of gas munitions, and those circumstances where those

19   flash-bangs were deployed were when we were out of gas and, you

20   know, crowd -- as it was explained to me, the protest crowd was,

21   you know, in a threatening type -- it was a threatening

22   situation.  The officers perceived it as a threatening

23   situation.  They didn't have any gas to deploy, and so they felt

24   that a flash-bang was warranted in that situation.

25   Q    So, as I understand it, it was somewhat of a last-ditch

20-cv-1878-RBJ    MATTHEW CANINO - Direct    03-23-2022

1    effort to protect officers when they didn't have any other

2    munitions available?

3    A    Yes.  Correct.  That's how they used it.

4    Q    Okay.  I want to direct your attention to the George Floyd

5    protests and speak about them generally for a moment.  Prior to

6    the George Floyd protests, I'm assuming based on your 30-year

7    career, you've policed quite a bit of protests?

8    A    I have.  Quite a few, yes.

9    Q    And if you could briefly describe your personal experiences

10   protesting -- not protesting.  Sorry.  Policing protests prior

11   to George Floyd protests.

12   A    So, my experience has been in Denver that we've had a

13   variety of different protests and causes.  Generally speaking,

14   they give you advanced notice.  They tell you we're going to

15   protest on this day.  Some of them were spontaneous, but for the

16   most part, a group of people would show up.  They would gather

17   generally at the capitol.  Not always, but most of the time they

18   would gather at the capitol.

19        A lot of times they would go on a march, sometimes down

20   the 16th Street Mall.  Sometimes they would go down one of the

21   streets near the capitol.  Generally through downtown, was the

22   route.  That was just the common route.  They would march around

23   for a bit.  We would block traffic for them.  If they were in

24   the street, we would try to encourage them to use the sidewalk

25   and obey traffic laws, but in the interest of allowing them to

20-cv-1878-RBJ    MATTHEW CANINO - Direct    03-23-2022

1  express their, you know, their freedom of speech and so forth,

2  we would block streets for them.

3           And then at some point -- they were normally a one-shot

4  deal.  They would be there the one day.  Towards the end of the

5  night, they would generally move back towards the capitol, and

6  disperse at some point.

7  Q    And based on your experiences, were the protests that

8  you've policed prior to the George Floyd protests less

9  aggressive?

10 A    They were -- my experiences were that they were much less

11 aggressive, yes.

12 Q    A number of officers have testified that George Floyd

13 protests were different.  Do you agree with that?

14 A    I agree with that completely, yes.

15 Q    And specifically, how was the George Floyd protest

16 different?

17 A    So, a lot of the protests that I experienced weren't

18 antipolice, but some were.  The George Floyd protests were

19 primarily antipolice.  They were -- in particular, these groups

20 were much more ferocious, if you will, much more verbally

21 abusive towards police specifically, you know, towards

22 individual officers.

23          Not because they knew you, but they would single out

24 officers a lot of times, make threats to them, make threats that

25 they're going to go to our houses while we're down at the

20-cv-1878-RBJ   MATTHEW CANINO - Direct   03-23-2022

1   protest and assault our families and worse.  So, that was one of

2   the things that we didn't really experience in the other

3   protests.

4   Q   And the comment that you described, going to the house and

5   assault officers, is that something that a protester

6   specifically told you, or did you witness that said to one of

7   your fellow officers?

8   A   They told me, and they told that to many other officers

9   that I witnessed, yes.

10  Q   And were the George Floyd protests different in terms of

11  tactics?

12  A   Their tactics were different in that they threw a lot more

13  things at the officers, assaulted officers with just flying

14  projectiles, where at most of the other protests, occasionally

15  you would have, you know, something come out of the crowd, but

16  it wasn't the common theme.  At the George Floyd protests, that

17  seemed like it was a much more common occurrence.  It happened

18  almost every single time that we were near a crowd, something

19  would come towards the officers, and a lot of times it was

20  numerous objects coming towards the officers.

21       One of the other things I noticed that they used in

22  this protest that they hadn't before were umbrellas to shield

23  their activities, to shield people that were throwing objects at

24  officers.  And then I also noticed that in this particular

25  protest, they started bringing lacrosse sticks to throw much

20-cv-1878-RBJ    MATTHEW CANINO – Direct    03-23-2022

1   larger rocks at officers from a great distance as well.  And I

2   have not seen that before.

3   Q    And you've described now umbrellas and lacrosse sticks.

4   Was there any other equipment that you saw protesters and

5   agitators carrying during the George Floyd protests?

6   A    Well, the normal things that they carry, you know, as I

7   also saw them carrying hammers, sticks and poles that I saw them

8   breaking windows with.  Occasionally they would have soup cans.

9   Q    And generally, during the protests, did you and your team

10   travel by RDV, rapid deployment vehicle?

11   A    Most of the days we did.  The very first day we did not.

12   We were called in from our regular shift, so we were all in

13   separate vehicles.  But being that that's not ideal, after the

14   first day, we deployed in an RDV or rapid deployment vehicle.

15   Q    And in traveling on the RDV, is it -- it's my understanding

16   that you would drive to various areas as directed by Commander

17   Phelan?

18   A    Yes.  Correct.

19   Q    And do you know where the RDV was procured, and if it was

20   procured from the army?

21   A    No, it was not.  It was specifically designed and built for

22   municipal law enforcement.

23   Q    Did you work on May 28th?

24   A    I did.

25   Q    Did you work a regular shift that day?

20-cv-1878-RBJ    MATTHEW CANINO - Direct    03-23-2022

1   A    I worked a regular shift, yes.

2   Q    And at some point in time, were you and your team requested

3   to assist with the protest response?

4   A    Yes.  We were called down to 20th and Chestnut.  We were

5   told that -- 20th and Chestnut, to assist some officers there

6   that were trying to block the highway from being occupied by the

7   protesters.  So, we responded at 20th and Chestnut.  There was

8   already a line of officers blocking the 20th Street ramp,

9   protecting a highway.

10       The protesters had reached that intersection.  They

11  were on the other line of the officers, and it was just kind of

12  static for the moment.  The protesters were chanting and doing

13  their thing, and the officers were just forming the line.  We

14  supported the line of officers, and then that group of

15  protesters ended up moving down Chestnut to 16th Street.

16  Q    And then from 16th Street, where did the protesters go?

17  A    So, there's a bridge there called the Millennium Bridge,

18  and they got up on the bridge and kind of shifted back and

19  forth.  They looked like they were going to cross over to

20  Commons Park.  Then it kind of looked like they were going to

21  come on back to downtown, but eventually they made their way in

22  the Commons Park, crossed the park, down the embankment, and

23  took the highway and stopped I-25.

24  Q    And I do want to talk to you about this I-25 incident.  A

25  number of plaintiffs are making claims with respect to this

20-cv-1878-RBJ    MATTHEW CANINO - Direct    03-23-2022

1   incident.  You just tracked the progression of protesters

2   starting at 20th and Chestnut.  How were you following the

3   protesters?

4   A    So, the bridge goes over -- the bridge goes over some

5   railroad tracks over there, so we have to go all the way around,

6   through -- it's a couple-block round trip through downtown, and

7   then into the Little Raven area.  It's very congested and kind

8   of a narrow area.

9        So, we were actually taking our cars, because we were

10  in individual cars, and driving back and forth that couple,

11  three-block round trip to Commons Park, and then back down to

12  16th Street, depending on what the crowd looked like they were

13  going to do.  So, we were all separated in our individual cars

14  and just trying to make that maneuver, just to kind of stay in a

15  position where we could try to block the highway.  But of course

16  that did not work that time.

17  Q    And if you could show the witness Exhibit 530, which I

18  believe has been admitted.  And if you could play from starting

19  at 7:01.

20       (A video was played.)

21  Q    Okay.  So, showing you some HALO footage of the protesters

22  entering I-25, which you were just alluding to.  I'd like to

23  take this opportunity to ask you a few additional questions, as

24  there's no sound on this.  But what are the dangers with

25  allowing protesters to protest on a highway such as I-25?

20-cv-1878-RBJ   MATTHEW CANINO - Direct   03-23-2022

1  A    Well, it's dangerous for both the people on foot and the

2  cars.  So, the danger to the folks on foot is clear.  You have

3  high -- you have cars going at high rates of speed down the

4  highway, not prepared to avoid pedestrians on the highway in

5  general.

6         But so it's dangerous of course being on a highway as a

7  pedestrian, but it's also dangerous for the motorists who are

8  also traveling at a high rate of speed.  And so they need to

9  make evasive maneuvers, and that can be very dangerous.  I think

10 it's a very obviously dangerous situation.

11 Q    Fair enough.  And if you could jump ahead to 7:03, and then

12 play.  And at some point in time, the protesters on I-25 ended

13 up taking over both the northbound and the southbound lanes;

14 correct?

15 A    Yes.  Correct.

16 Q    To your knowledge, has the Denver Police Department ever

17 allowed protesters to protest on I-25?

18 A    We have never allowed that, to my knowledge.  No.

19 Q    Just going to let this play a little bit further, and then

20 I have a few more questions for you.

21       (A video was played.)

22 Q    And you can stop it.  What was the police response to

23 protesters assembling on I-25?

24 A    So, when we were informed that the protesters had stopped

25 I-25, we moved down to the 20th Street ramp and went southbound

20-cv-1878-RBJ    MATTHEW CANINO - Direct    03-23-2022

1   on the northbound lanes, and stopped a little short of -- you

2   see the protesters there, and upon arrival, upon my arrival, the

3   protesters were already off the highway.  Some officers that got

4   there before I did were able to, you know, convince them to get

5   off the highway.

6   Q    And if you could jump ahead to 7:05:30.

7        (A video was played.)

8   Q    The protesters are clearly leaving the highway?

9   A    Yes.

10  Q    Do you see any less-lethal munitions being deployed at the

11  protesters?

12  A    No.  There doesn't appear to be anybody using less-lethal

13  at that point, no.

14  Q    And we've seen from other video that PepperBall in an area

15  denial capacity leaves white marks on the ground.  Do you see

16  any white marks on the ground on the highway?

17  A    No, I don't.

18  Q    Did you see any puffs of gas?

19  A    No, I did not.

20  Q    And the officers, as they get out, do you see them with

21  their weapons aimed?

22  A    It doesn't appear that they have anything in their hands,

23  no.

24  Q    And if you could play.

25       (A video was played.)

2694

20-cv-1878-RBJ     MATTHEW CANINO - Direct     03-23-2022

1   Q    And so from the highway, why don't you tell us about where

2   protesters are assembling.

3   A    So, they're on the ramp that leads up to -- that's the

4   Highland Bridge there that goes over I-25.  So, they moved up to

5   the ramp that goes up to the Highland Bridge, and it looks like

6   most of them have moved over the other side of the fence.  And

7   so that unfortunately gave them high ground on the officers that

8   were coming up from down below on the highway.

9   Q    And you would agree that the officers are fairly

10  outnumbered?

11  A    They are largely outnumbered, yes.

12  Q    And you can pause.  And is there an interaction between

13  police and protesters here?

14  A    Well, I don't believe I was there on scene quite yet, but

15  clearly they are directing them to move up and back.

16  Q    And at some point in time in the immediate future, you do

17  arrive on scene?

18  A    Yes.

19  Q    And when you arrived on scene, were protesters and

20  agitators in that crowd throwing any projectiles?

21  A    They were.  They were throwing some rocks and bottles, both

22  glass and water bottles, plastic water bottles.

23          MS. HOFFMAN:  And if you could take this down and put

24  up Exhibit 552.  This is a body-worn camera of Officer

25  Calabrese.  It's Exhibit 552.

Kevin P. Carlin, RMR, CRR

20-cv-1878-RBJ   MATTHEW CANINO - Direct   03-23-2022

1        THE COURT:  Any objection?

2        MS. STERK:  I think they're putting up a different

3    exhibit.

4        MS. HOFFMAN:  I'm trying to put on the body-worn

5    camera of Officer Calabrese.  Just trying to work that out.

6        THE COURT:  It looks like that might be 550.  Well,

7    maybe it's 552.  Anyway, you want that admitted?

8        MS. HOFFMAN:  I would like that admitted if it hasn't

9    been admitted already.

10        THE COURT:  It has not.

11        MS. STERK:  And Your Honor, I would just like to

12    establish foundation that the witness was there, as he said for

13    a lot of this time he wasn't there.

14        MS. HOFFMAN:  Sure.  I am happy to play it for just

15    him if he wants to point out when he does get here.

16        THE COURT:  Okay.

17        MS. HOFFMAN:  You can jump ahead to about 30 seconds,

18    and then play.

19        THE COURTROOM DEPUTY:  Can we do it without sound?

20    Because it's not admitted yet.  Sorry.

21        (A video was played.)

22    Q.    (By Ms. Hoffman) And Lieutenant, as you're watching, if

23    you could just point out when you believe you arrived on scene.

24    A    Okay.  So, that looks like me coming up on the left right

25    there.  Left of the screen, walking on the shoulder -- actually,

Kevin P. Carlin, RMR, CRR

20-cv-1878-RBJ    MATTHEW CANINO - Direct    03-23-2022

1   up on the berm.

2           MS. HOFFMAN:  Okay.  Any objection?

3           MS. STERK:  I object to the portions before he

4   arrives, since there's no foundation for that.  But after he

5   arrives, no objection.

6           THE COURT:  The objection is overruled.  The document

7   is admitted.

8           MS. HOFFMAN:  If we could back up to 30 seconds, and

9   play to the jury.

10          (A video was played.)

11  Q.    (By Ms. Hoffman) You can stop it.  So, the circle

12  obviously didn't stay put like I had thought it out in my head,

13  but did you see some projectiles thrown at officers?

14  A    Those looked like two plastic water bottles.

15  Q    Okay.  And in addition to the water bottles that were

16  captured in this particular body-worn camera, what if any

17  projectiles do you recall taking along with your team at this

18  location?

19  A    I also remember glass bottles being thrown, and rocks.

20          MS. HOFFMAN:  And if we could now show the exhibit --

21  the witness Exhibit 555.  This is body-worn camera of Officer

22  McNabb, and let me just get rid of this.

23          MS. STERK:  No objection, Your Honor.

24          THE COURT:  Admitted.

25          MS. HOFFMAN:  And if you could start at 30 seconds,

1   with sound.

2        (A video was played.)

3   Q.     (By Ms. Hoffman) Pause.  Did you just hear the officer

4   say, I want that bridge lit up, I don't want anyone hit?

5   A    Yes.  I do.

6   Q    So, we've heard testimony in this trial that PepperBall can

7   be used in a multitude of capacities, but primarily for direct

8   impact as well as for area saturation?

9   A    Yes.  Correct.

10  Q    Okay.  And how is PepperBall being used here?

11  A    That's area saturation, or area denial, sometimes we call

12  it, just to move them, so to deny them that area of high ground

13  where they could throw things at the officers.  So, that's area

14  denial, area saturation.

15  Q    So, the purpose would be not to hit anyone, but to hit the

16  bridge so that the powder then disseminates?

17  A    Yes.  Correct.

18  Q    Do you recall if any individuals were specifically targeted

19  with the PepperBall system via the direct impact?

20  A    I don't believe in that -- this particular situation

21  anybody was directly impacted.  If they were, I didn't witness

22  it, but generally what I remember were most of those objects

23  were kind of coming from an area behind the front group of

24  people, and so when you don't -- when you have a group that's,

25  you know, higher up than you, it's hard to see behind that first

20-cv-1878-RBJ   MATTHEW CANINO - Direct   03-23-2022

1   group.  So, it would have been hard to pick out anyone that was

2   throwing things.  It was generally people in the back that were

3   throwing things.

4   Q    And if you can't identify who it is, then you don't engage

5   in direct impact?

6   A    Correct.

7   Q    Did you witness any gas deployed at this location?

8   A    No.  There wasn't any.

9   Q    And other than the PepperBall system being used in an area

10  saturation capacity, did you witness any other less-lethal

11  munitions being deployed?

12  A    No, I did not.

13  Q    If you could play another 10 to 15 seconds.

14       (A video was played.)

15  Q    Did you hear, he's bleeding pretty good?

16  A    Yes, I did.

17  Q    Do you know what that's in reference to?

18  A    Yes.  One of the SWAT officers, one of the officers

19  assigned to my team was hit in the hand.  He said he was hit by

20  a glass bottle, and it severely cut his hand.  I looked over,

21  and I could see his hand bleeding profusely.  It was bleeding

22  like a faucet of blood coming out of his hand.  So, I went over

23  and applied direct pressure to his hand for a short time until

24  another officer arrived who took that over for me.

25  Q    And did -- EMS had to be called to the scene to assist this

Kevin P. Carlin, RMR, CRR

20-cv-1878-RBJ    MATTHEW CANINO - Direct    03-23-2022

1   officer?

2   A    Yes.  I called an ambulance for him, and he was transported

3   so he could be fixed up.

4   Q    And do you believe that injury could have been caused by a

5   plastic water bottle?

6   A    No, I don't.

7   Q    And if we could show the witness Exhibit 448, which has

8   been admitted.  It's the CAD sheet for this day.  You can scroll

9   down to some highlighted entries.  A little further.  I'm not

10  sure this is the right CAD sheet.  Further down.  Okay.  Yup.

11  If you could go back up.  Okay.  Sorry about the confusion.  So,

12  I'm going to draw your attention to some -- no.  That's still

13  not right.  I will move on for a minute.  We will figure it out.

14        Okay.  So, I think that takes care of all my questions

15  for I-25.  And now I want to just move on and try and get a

16  little bit more context for some of the decisions made on scene

17  by you.

18  A    Okay.

19  Q    Did you authorize the deployment of gas at any locations?

20  A    Yes.  I asked for gas to be deployed at Colfax and

21  Washington near the District 6 station.

22  Q    Okay.  And when did you authorize the deployment of gas at

23  the District 6 station?

24  A    We were sent to District 6, the command post expressed

25  their concern that the crowd was moving towards District 6 and

20-cv-1878-RBJ   MATTHEW CANINO - Direct   03-23-2022

1    may be intent on lighting it on fire.  So, we were sent over to

2    Colfax and Washington to form a skirmish line.  There was

3    already a skirmish line formed there.  District officers were

4    already there, maybe some other units, but my team came in later

5    to help support that team.

6          At that location, we were being barraged with rocks and

7    bottles, primarily rocks at that location.  Numerous officers

8    were being hit and injured at that location at that time,

9    including me.  I was hit multiple times in the arms and legs.

10   One officer was hit very -- with a very large rock in the

11   helmet, kind of turned to me and looked at me with some very

12   dazed-looking, confused eyes.  I realized right at that minute

13   that it was an emergency situation.  The officers were at

14   serious risk.

15   Q    And I just want to stop you there.  You're referring to

16   May 28th; correct?

17   A    Oh, yes.

18   Q    At approximately 8:30 p.m.?

19   A    Yes.

20   Q    Now, the jury has heard a lot of testimony about this

21   particular incident, so I'm not really going to spend a lot of

22   time getting into the specifics of what happened, and what I

23   more want to focus on is your thought process.

24   A    Okay.  Yeah.  So, I saw the officers being hit.  I was

25   being hit.  And realizing that it was a dangerous situation, and

20-cv-1878-RBJ   MATTHEW CANINO - Direct   03-23-2022

1   that there was not time to give any announcements.  It was an

2   imminent, dangerous situation.  I radioed that I wanted gas

3   deployed at that location.

4   Q   So, I'd like to back up and explain to the jury how we got

5   there.  Based on your observations and time on scene, in your

6   opinion, was it possible to identify and isolate individual

7   agitators in a larger crowd?

8   A   No.  Again, generally they were in the back, the rear of

9   the crowd.  So, you have the bulk of the protesters up front in

10  the street, and then the people throwing objects are generally

11  in the back, and very difficult to identify.  Most of the time,

12  the first thing you just see is objects coming over the front of

13  the crowd, or the back of the crowd.

14  Q   Any other issues that you had identifying agitators in

15  addition to the fact that oftentimes they concealed themselves

16  at the back of the crowd?

17  A   Well, they concealed themselves at the back of the crowd,

18  but they also dressed similar.  So, generally it's kind of just

19  black -- black pants, black shirt, so that they can intermingle

20  and mix in the crowd, and it's hard to pick them out as

21  individuals.

22  Q   Have you ever participated in an arrest team?

23  A   Yes.

24  Q   Okay.  And if you could describe some of those contexts

25  where you participated in an arrest team before.

20-cv-1878-RBJ    MATTHEW CANINO - Direct    03-23-2022

1    A    So, an arrest team is when you are going to make an arrest

2    in a crowd control, crowd management situation, you have a group

3    of officers that will separate the crowd, move into the crowd,

4    and encircle somebody that they're going to arrest.

5            Generally speaking, there are people in the arrest team

6    who are for arrest team protection, so they're moving in with

7    the arrest team, separating the crowd from the officers so that

8    they can place somebody under arrest.  And then you move that

9    person back out of the crowd, or you can -- in field force

10   tactics, you sometimes will move the field force that will then

11   encompass the arrest.

12           But -- so, you can do it either way.  You can pull them

13   out of a crowd, or you can just pass them by and move the crowd

14   past the arrest.

15   Q    Okay.  And I don't think this is covered by your last

16   answer, but have you ever participated in a crowd management

17   technique where you're pinching from the side and grabbing

18   people?

19   A    No.  I mean, I don't -- I don't remember a specific time

20   that we pinched somebody from the side.  We have made arrests

21   maybe on the fringe of a group before, but I don't know if

22   there's a specific tactic for that.

23   Q    Okay.  So, going back to the arrest team, then, based on

24   your experiences handling those maneuvers before, sometimes do

25   those maneuvers work?

20-cv-1878-RBJ   MATTHEW CANINO - Direct   03-23-2022

1   A    Occasionally they work.

2   Q    Okay.  And would they have worked in the situation you

3   encountered at Colfax and Washington on May 28th?

4           MS. STERK:  Objection.  Calls for speculation.

5           THE COURT:  Sustained.

6   Q.   (By Ms. Hoffman) Prior to the -- prior to your decision

7   to authorize gas, had it -- had you witnessed any other

8   less-lethal munitions being used?

9   A    They were using PepperBall as an area denial, area

10  saturation.

11  Q    And was that working?

12  A    It did not appear to be working, no.

13  Q    And when we both -- when you say it wasn't working, do you

14  mean you're still taking projectiles?

15  A    Correct.  Yes.  Correct.

16  Q    And some instances prior to the deployment of CS gas, you

17  deploy smoke?

18  A    In some instances, we do, yes.

19  Q    And in this instance, do you believe deploying smoke first

20  would have worked?

21  A    No.

22          MS. STERK:  Objection.  Calls for speculation.

23          THE COURT:  Overruled.

24          THE WITNESS:  No.  I don't think it -- I don't think

25  smoke would have been effective, and again, it was a very

20-cv-1878-RBJ   MATTHEW CANINO - Direct   03-23-2022

1   dangerous situation.  I don't think that smoke would have been

2   an appropriate tool to use in that situation.

3   Q.    (By Ms. Hoffman) And why didn't your team just leave?

4   A    Well, if we would have left, we would have exposed

5   District 6 that had officers, you know, there that would have

6   been unable to prevent -- if their intent was to burn the

7   station, if we had left that area, that would have left

8   District 6 vulnerable.

9   Q    And are you familiar with the -- the Denver Police

10  Department's crowd management manual?

11  A    Yes.

12  Q    And are you familiar with the unlawful assembly dispersal

13  order process outlined in the manual?

14  A    Yes, I am.

15  Q    And did you declare an unlawful assembly before authorizing

16  the deployment of gas?

17  A    No, I did not.

18  Q    Why not?

19  A    Again, it was an emergency.  Officers were being injured.

20  I knew that if immediate action wasn't taken, that it was only

21  going to escalate, and my thought was it was going to result in

22  somebody being seriously injured.

23  Q    Did you believe it was an emergency situation?

24  A    Yes, I did.  Yes, I do.

25  Q    And you mentioned an individual being struck in the head

20-cv-1878-RBJ   MATTHEW CANINO - Direct   03-23-2022

1   with a rock and appearing dazed?

2   A    Yes.

3   Q    Okay.  And did that officer have a helmet on?

4   A    Yes.

5   Q    Based on your experience during the protests, did your

6   protective gear always protect you from some of the projectiles

7   that you encountered?

8   A    Well, my -- the tactical vest that I wore certainly did

9   protect me from the rocks that hit me there, but the helmet, you

10  know, it's not designed for large rocks like that.  If that's

11  not what your -- obviously we wore it for protection from those

12  rocks, but you can -- he still appeared to have sustained an

13  injury to me, in spite of the fact that he was hit in the

14  helmet, because the rock was rather large.

15  Q    And what other areas of your body are not covered by --

16  like, you mentioned a tactical vest.  How far does that protect?

17  A    That just protects your vital area.  So, basically the

18  waist down and your arms, neck, face are all exposed.

19  Q    I believe you mentioned this previously, but going back to

20  your authorization of gas, did you issue any warnings?

21  A    No.

22  Q    Why not?

23  A    It was an emergency, and I do not believe that warnings

24  were appropriate at the time.

25  Q    Did you report your authorization of gas afterwards?

20-cv-1878-RBJ    MATTHEW CANINO - Direct    03-23-2022

1    A    Yes.  To the command post.

2    Q    And why did you do that?

3    A    We need to report any uses of force.  Gas being a use of

4    force, I needed to report that.

5    Q    And so you did that to be accountable for your decision?

6    A    Yes.

7    Q    And how did you report?

8    A    Over my radio, over the radio to the command post.

9    Q    And now I want to talk about some other situations that you

10   were involved in over the course of the protests where you were

11   able to take individual action.  Drawing your attention to an

12   incident on May 29th, were you involved in the arrest of an

13   individual for destruction of property at the city and county

14   building?

15   A    Yes.  We were driving westbound on Colfax.  I observed an

16   individual throw a street sign through one of the windows at the

17   city and county building.  He was kind of on the outside --

18   outskirts, I guess, of the crowd, of the group that was in front

19   of him.  And I was able to keep my eye on that individual, and

20   directed my team to arrest that person.

21   Q    And you were able to make that arrest?

22   A    Yes, we were.

23   Q    And you just saw that individual throw the sign through one

24   window; correct?

25   A    Yes.  Correct.

20-cv-1878-RBJ    MATTHEW CANINO - Direct    03-23-2022

1   Q    Are you aware of any other damages to the city and county

2   building?

3   A    My recollection is that every single window on the city and

4   county building was broken on the first level.

5   Q    And just so I understand how you were able to make an

6   arrest in this instance, it was because the individual was on

7   the outskirts of a crowd?

8   A    Yes.

9   Q    And moving on, on May 30th, were you able to arrest an

10  individual for possession of a BB gun?

11  A    Yes.  Again, that person was identified, reported to have

12  what the person reporting thought was a real gun.  It was a

13  replica.  It looked like a real gun, but we were able to monitor

14  that person's movement, and when they moved away from the

15  general protest crowd, again, my team moved in and arrested that

16  person.

17  Q    Sorry.  It was believed to be a gun, but upon arrest, it

18  was found to be a BB gun?

19  A    It was found to be a BB gun, yeah.

20  Q    And where was the location of this particular arrest?

21  A    It was at about -- I think it was 17th and Broadway,

22  roughly.

23  Q    And the individual was near a crowd, but on the outskirts?

24  A    He was in a crowd initially, then moved kind of on the

25  outskirt of the crowd.  And once he got far enough away from the

20-cv-1878-RBJ   MATTHEW CANINO - Direct   03-23-2022

1  crowd where we could make the arrest without fear of inciting

2  the protesters, we made the arrest.

3  Q    And when you say without fear of inciting the protesters,

4  what do you mean by that?

5  A    For the most part, we tried to stay out of sight of the

6  protesters.  At the direction of the command post, but also

7  just, you know, for common sense purposes, if the protesters are

8  being peaceful and, you know, expressing -- expressing their

9  First amendment, then we don't want to be there and give them a

10  reason to change what they're doing.  They're being peaceful.

11  So, we try to stay out of sight as much as we could.

12  Q    And how long did you have to track this individual in the

13  crowd before he or she moved to the outskirts?

14  A    It was probably ten minutes or so.

15  Q    And how many people had to track that individual?

16  A    Well, there was a number of people tracking that person.

17  The number, I don't know.

18  Q    Was your whole team involved in this?

19  A    Oh, for the arrest, yes.  My whole team was involved, yes.

20  Q    Okay.  Moving on to June 2nd, on June 2nd, did you act as

21  incident commander on that date?

22  A    I did.

23  Q    Okay.  And how were you selected to act as incident

24  commander on that date?

25  A    Bad luck.  So, Commander Patrick Phelan at the time had

20-cv-1878-RBJ   MATTHEW CANINO - Direct   03-23-2022

1   been the incident commander for all the previous nights, and so

2   on that night, June 2nd, he took the day off.  It was

3   well-deserved.  He needed it, and so he selected me to run the

4   command post for him for that one night.

5   Q    And can you tell us about your time as the incident

6   commander on June 2nd.

7   A    Fortunately, it was a fairly uneventful night, with the

8   exception of one individual that showed up to the protest that

9   day with a handgun on her belt -- her beltline.

10  Q    And tell me about what actions were taken with respect to

11  the individual with the firearm on her belt.

12  A    So, she was in the protest group.  They were in the Civic

13  Center Park area, and kind of in the front of the crowd opposing

14  officers that were down there.  I don't recall any projectiles

15  that night.  They were, for all intents and purposes, fairly

16  peaceful, with the exception of I was very concerned that she

17  had a handgun on her out in the open.

18        And so we monitored her through HALO cameras, and

19  officers on scene kept track of her.  And when she decided to

20  leave for the night, she walked down Broadway towards 14th, and

21  when she was singled out -- or when she was separated from the

22  crowd well enough, I directed the SWAT officers to move in and

23  make an arrest.

24  Q    So, we've now covered what happened at District -- at the

25  District 6 station on Friday -- sorry.  Thursday, May 28th,

20-cv-1878-RBJ   MATTHEW CANINO - Direct   03-23-2022

1   versus three situations you have now outlined for us where you

2   were able to take individual action.  What's the difference?

3   A    The difference is that we were able to identify the people

4   and keep an eye on those people, and then follow them or keep

5   track of them until they got separated from the group.

6   Q    And again, that wouldn't have been possible based on your

7   experiences at the District 6 station?

8   A    No.

9           MS. STERK:  Objection.  Leading.

10          THE COURT:  Yes.  It's leading, and it is --

11          MS. STERK:  And speculation.

12          THE COURT:  We've gone over this.  You're getting

13   repetitive now.

14          MS. HOFFMAN:  If we could show the witness

15   Exhibit 500.

16          THE COURT:  We will do that, and then we will stop

17   after that for a break.

18          MS. HOFFMAN:  These are Officer Canino's police

19   reports.

20          MS. STERK:  Your Honor, we object.  It's hearsay.

21          THE COURT:  Overruled.

22   Q.    (By Ms. Hoffman) And just briefly, do you recognize these

23   documents?

24   A    Yes.

25   Q    And these are your police reports from May 28th through

20-cv-1878-RBJ    MATTHEW CANINO - Direct    03-23-2022

1  May 31st?

2  A    Well, I only see the 28th document, but that is the 28th

3  document.

4  Q    If you could scroll down.

5  A    The 29th.  30th.  And 31st.  Yes.

6           MS. HOFFMAN:  Now is a good time to take a break.

7  Thank you, Your Honor.

8           THE COURT:  Okay.  3:10.

9       (Jury out at 2:57 p.m.)

10          MR. RINGEL:  Your Honor, I have a scheduling issue I

11  wanted to raise with the Court.

12          THE COURT:  Okay.

13          MR. RINGEL:  I apologize to the Court.  After

14  Mr. Canino, we have one more witness.  That's Division Chief

15  Thomas, and he is not available today.  So, I understand that we

16  may be wasting some of the time of the Court, and for that I

17  apologize.  Things went faster today than I thought they were

18  going to.

19          THE COURT:  What punishment do you think I should

20  impose?

21          MR. RINGEL:  Any punishment that the Court thinks is

22  appropriate.  Pushups.  I will drop and do 20 if the Court

23  thinks that's appropriate, Your Honor.

24          THE COURT:  I will consider that during the break.

25          MR. RINGEL:  I appreciate that.  Thank you.

20-cv-1878-RBJ   MATTHEW CANINO - Cross   03-23-2022

1      (Recess at 2:58 p.m., until 3:10 p.m.)

2      (Jury in at 3:10 p.m.)

3          THE COURT:  Okay.

4          MS. HOFFMAN:  I have nothing further, and will turn it

5    over to plaintiffs' counsel.  Thank you.

6                         **CROSS EXAMINATION**

7    BY MS. STERK

8    Q    Good afternoon.

9    A    Good afternoon.

10   Q    You are not aware of any of the plaintiffs throwing

11   anything or committing any acts of violence or property

12   destruction; correct?

13   A    I don't know any of the plaintiffs, no.

14   Q    And so you therefore don't know -- don't have any

15   information that they were throwing anything or committing acts

16   of violence?

17   A    Correct.

18   Q    You talked a little bit on your direct about throwing -- or

19   giving the order to throw tear gas at Colfax and Washington on

20   May 28th.  You agree that the majority of protesters at that

21   location were peaceful; correct?

22   A    Correct.

23   Q    And after the protesters had -- protesters had cleared out

24   of District 6 on that same night, May 28th, you were directed to

25   form a skirmish line with the gang unit to move towards 14th and

                    Kevin P. Carlin, RMR, CRR

20-cv-1878-RBJ   MATTHEW CANINO - Cross   03-23-2022

1    Sherman; correct?

2    A    Correct.

3    Q    And the SWAT team -- just to make sure that everybody is on

4    the same page, the SWAT team has the green uniforms; is that

5    right?

6    A    Yes.  Correct.

7    Q    And so around 8:30 p.m. or a little bit after that, you and

8    your SWAT team started moving west on Colfax with the gang unit?

9    A    Yes.  Correct.

10   Q    And you were with that gang unit on the skirmish line until

11   you reached around 14th and Sherman?

12   A    Yes.  Correct.

13   Q    And you started at Colfax and Washington around the

14   District 6 area; right?

15   A    Yes.  Correct.

16   Q    And that's where there was like a Slice Works pizza place

17   on that corner?

18   A    Yes, there is.

19   Q    And then you turned west from that corner to go west on

20   Colfax?

21   A    Yes.  Correct.

22   Q    Okay.  If we can put up Exhibit 1265.  And this has already

23   been admitted, and I'm just putting up a screenshot.  When you

24   were west on Colfax, do you remember seeing this man who was

25   filming the skirmish line?

20-cv-1878-RBJ   MATTHEW CANINO - Cross   03-23-2022

1    A    No, I don't.

2    Q    And can we go to the next photo.  And do you remember him

3    being kind of pushed against a pole and then pulled down?

4    A    I don't remember that, no.

5    Q    In this photo of Exhibit 1265 -- and again, sorry to back

6    up, but this is -- we see on the top, it's actually May 28th at

7    9:00 p.m.  And do you recognize this location as Colfax between

8    Pearl and Pennsylvania?

9    A    Yes, I do.

10   Q    And we see in the photo that there is an officer with three

11   chevrons.  So, that's a sergeant there; right?

12   A    That's correct.

13   Q    And you were still on the line with the gang unit at this

14   time, at 9:00 p.m. on the 28th of May?

15   A    I would have been in the general area of the gang unit,

16   yes.

17   Q    So, I'm going to next show a short clip, and this is going

18   to be from Officer Valentine's body-worn camera.  Again, this is

19   May 28th.  This is one minute later at 9:01 p.m.  And again, you

20   recognize this intersection as where you were at that time on

21   May 28th?

22   A    I was in that general area, yes.

23   Q    And do you recall hearing the man who we just saw screaming

24   to stop, stop, I didn't do anything, I can't breathe, please

25   stop?

Kevin P. Carlin, RMR, CRR

20-cv-1878-RBJ   MATTHEW CANINO - Cross   03-23-2022

1   A    I don't understand the question.

2   Q    The man we saw in the prior photos --

3   A    Did I hear him say -- yelling that?

4   Q    Correct.

5   A    No, I did not.

6   Q    So, I want to go back to the body-worn camera of Officer

7   Valentine.  This is Exhibit 585, which has already been

8   admitted.  And let's just play that.

9        (A video was played.)

10  Q    Did you hear that man screaming, I can't breathe?

11  A    I did hear that.

12  Q    And we saw two men in green kind of coming up to the front

13  of the screen.  Those were officers within your SWAT unit;

14  correct?

15  A    It looks like they are, yes.

16  Q    And you don't recall hearing this man screaming in the

17  street?

18            MS. HOFFMAN:  Objection.  Asked and answered.

19            THE COURT:  It was.  Sustained.

20  Q.    (By Ms. Sterk) All of the actions and orders that you

21  took during the protests were within DPD policy?

22  A    Yes.

23  Q    And all of the actions you observed from other officers

24  were within DPD policy?

25  A    Yes.

Kevin P. Carlin, RMR, CRR

20-cv-1878-RBJ   MATTHEW CANINO - Cross   03-23-2022

1    Q    And that would include the actions that were taken on this

2    skirmish line walking down Colfax?

3    A    Yes.

4    Q    You and your team were also at Colfax and Lincoln on

5    May 30th, between 6:00 p.m. and 8:00 p.m.; correct?

6              MS. HOFFMAN:  Objection.  Outside the scope.

7              THE COURT:  Overruled.

8              THE WITNESS:  Excuse me.  Tell me the day and the

9    location again, please?

10   Q.   (By Ms. Sterk) Sure.  May 30th, which was Saturday, you

11   and your team were at Colfax and Lincoln between around

12   6:00 p.m. and 8:00 p.m.?

13   A    It's possible.  I would have to refer to my statement to

14   verify that.

15             MS. STERK:  And actually, we can go to Exhibit 338,

16   which is the body-worn camera of Aurora Officer Redfearn from

17   May 30th at Colfax and Lincoln.  And this has not been admitted

18   yet.

19             THE COURTROOM DEPUTY:  I have 338 as admitted.

20             MS. STERK:  Oh.  Thank you.

21             THE COURT:  I do too.

22   Q.   (By Ms. Sterk) So, Exhibit 338 is on the screen.  Is that

23   one of your officers in the SWAT unit?

24   A    Yes, it is.

25   Q    And we see at the top that this says it was at -- on

20-cv-1878-RBJ    MATTHEW CANINO - Cross    03-23-2022

1    May 30th at 7:08 p.m.  Do you see that?

2    A    Yes.

3    Q    And do you recognize this intersection as Colfax and

4    Lincoln?

5    A    Yes.

6    Q    So, does this refresh your recollection that your officers

7    were at that intersection on May 30th?

8    A    Yes.  And I would have been there too.

9    Q    So, I want to -- we can take that down.  I want to talk a

10   little bit about training.  You testified that SWAT is trained

11   on the use of PepperBall guns; correct?

12   A    Yes.

13   Q    But you don't recall SWAT officers being trained in the use

14   of PepperBall guns with respect to crowd control or protest

15   situations; correct?

16   A    I don't recall them being trained in crowd control and use

17   of PepperBall specifically, no.

18   Q    And that's the same for 40-millimeters.  You recall that

19   SWAT officers were trained on 40-millimeters, but not

20   specifically for their use in crowd control situations?

21   A    True.  That's true.

22   Q    PepperBall guns, they don't have like the sights on it to

23   help figure out where exactly you're going to shoot; right?  Do

24   I have the right description of what a sight is?

25   A    Yes.  That's correct.  They don't, no.

20-cv-1878-RBJ   MATTHEW CANINO - Cross   03-23-2022

1    Q    And because of that, sometimes officers have to kind of

2    walk their projectiles to their target by shooting several shots

3    to figure out exactly where they're going to be shooting; is

4    that right?

5    A    Yes.  Correct.

6    Q    Now, you testified on direct that you recall the last -- at

7    least before the George Floyd protests, the last crowd control

8    training session that you attended was a three-day course; is

9    that right?

10   A    Yes.

11   Q    And you were aware that that three-day course was

12   discontinued by the department in 2016; correct?

13   A    I have heard that's the case.  I was not aware until this

14   trial, no.

15   Q    So, you haven't been to a crowd control training since

16   2016; is that right?

17   A    It was 2015, I believe.

18   Q    2015.  Thank you.

19   A    Yes.

20   Q    And the SWAT team in general, as you said, I believe is

21   trained during the academy on crowd control training; right?

22   A    The SWAT team?

23   Q    Well, your officers on the SWAT team --

24   A    Oh, yes.

25   Q    -- during the academy would have gone to crowd control

20-cv-1878-RBJ   MATTHEW CANINO - Cross   03-23-2022

1   training at the academy?

2   A    Yes.

3   Q    But SWAT doesn't generally participate in field force

4   training other than what they learn in the academy?

5   A    That's not altogether correct.  We received pretty

6   extensive training prior to DNC coming to Denver.  The SWAT team

7   received a lot of training in crowd management.

8   Q    Okay.  And the DNC was in 2011?

9   A    2008.

10  Q    Excuse me.  2008.  So, I want to switch to flash-bangs,

11  which you talked about.  And you said your team threw eight

12  total flash-bangs during the protests?

13  A    Yes.

14  Q    And you weren't present when at least seven of those were

15  used?

16  A    I don't -- I was probably present or nearby.  I don't

17  remember when those were deployed.  I didn't witness or notice

18  it.

19  Q    I see.  So, you didn't witness the flash-bangs being

20  deployed by your team?

21  A    No, I did not.

22  Q    And you didn't discipline any of your officers for using

23  those flash-bangs; correct?

24  A    No, I did not.

25  Q    You just accepted their articulation of why they threw the

20-cv-1878-RBJ    MATTHEW CANINO - Cross    03-23-2022

1   flash-bangs?

2   A    Yes, I did.

3   Q    Your team also used other concussive devices during the

4   protests like sting ball grenades; correct?

5   A    Yes, they did.

6   Q    And those devices make a loud bang; is that right?

7   A    Yes, they do.

8   Q    They're called a concussive device as a type of weapon; is

9   that right?

10  A    We don't call them that, no.  It's -- they aren't designed

11  nor intended to cause concussions, or -- they are very loud,

12  just like flash-bangs are, but we don't call them concussive

13  devices.  We call them sting ball grenades.

14  Q    But they do make a loud bang and a big flash as well;

15  correct?

16  A    Yes, they do.

17  Q    And those sting ball grenades contain rubber shrapnel; is

18  that right?

19  A    The sting balls particularly do have rubber pellets in

20  them, yes.

21  Q    And they also can contain gas in addition to those pellets?

22  A    Yes.  Correct.

23  Q    And you agree that a lot of officers had sting ball

24  grenades at the protests?

25  A    I don't believe a lot of officers had them.  We didn't have

20-cv-1878-RBJ   MATTHEW CANINO - Cross   03-23-2022

1   a lot of sting balls in our inventory.  The vast majority of our

2   gas grenades were not sting balls.

3   Q    But your team did use sting balls?

4   A    But we did use some, yes.

5   Q    And you're aware that other teams also used sting balls?

6   A    Yes.

7   Q    But you didn't -- did you track the number of sting balls

8   you used?

9   A    No, I did not.

10  Q    So, you did track the flash-bangs, but you didn't track the

11  sting balls; is that right?

12  A    Yes.  Correct.

13  Q    During supervisor briefings during the protests, Commander

14  Phelan gave direction to DPD officers as well as officers from

15  other jurisdictions on how they should conduct themselves during

16  the protests; is that right?

17  A    Yes.  That's right.

18  Q    And the officers from other jurisdictions were expected to

19  follow the guidelines that DPD set forth; correct?

20  A    Yes, they were.

21          MS. STERK:  Nothing further.

22          THE COURT:  Redirect?

23          MS. HOFFMAN:  Nothing further.

24          THE COURT:  Okay.  Question?  Yes.

25      (Proceedings held at the bench:)

20-cv-1878-RBJ   MATTHEW CANINO - Cross   03-23-2022

1           THE COURT:  Fifty-four.

2           MS. STERK:  I'm impressed by your ability to keep

3    track so well.

4           MS. HOFFMAN:  No objection.

5           MS. STERK:  No objection.

6       (Proceedings held in open court:)

7           THE COURT:  Question from the jury for you, sir.

8           THE WITNESS:  Yes, Your Honor.

9           THE COURT:  Was it common for DPD to separate the

10   large crowds into manageable sizes to make arrests, track the

11   agitators via HALO, since arrest teams were not viable?

12          THE WITNESS:  No.  We did not try to separate the

13   crowd to make arrests.

14          THE COURT:  Well, you did talk about those instances

15   where you did make arrests.

16          THE WITNESS:  Yes.  We absolutely did that, but we

17   didn't separate that person or try to separate that person out

18   of the crowd.  We waited for that to kind of happen organically

19   and naturally, and then we would just track them to that point

20   where they were separate.  And yes, we did use HALO quite a bit

21   to track those people.

22          THE COURT:  All right.  Any other questions, ladies

23   and gentlemen?  Follow-up questions?

24          MS. HOFFMAN:  Just one follow-up question.

25

20-cv-1878-RBJ    MATTHEW CANINO - Recross    03-23-2022

<b>REDIRECT EXAMINATION</b>

BY MS. HOFFMAN

Q    Why do you wait for the crowd to separate organically as opposed to trying to force that to happen?

A    Because we don't want to incite -- we don't want to incite the crowd.  If we try to force that separation, it's just going to cause a fight, and that's the last thing we want.  We want to just let that happen naturally, so that way it kind of happens outside the crowd's view, and our intention is to keep it as peaceful as possible.

         MS. HOFFMAN:  Nothing further.

<b>RECROSS EXAMINATION</b>

BY MS. STERK

Q    You can track people from the HALO cameras to identify where the lawbreakers are; correct?

A    That is possible, yes.

Q    And you also have the Air One helicopter that can do the same thing?

A    Yes.  That's correct.

         MS. STERK:  Nothing further.

         THE COURT:  All right.  Has everybody exhausted their stock of questions for this witness?  Okay.  Thank you.  You're excused.

         THE WITNESS:  Thank you, Your Honor.

         THE COURT:  Thank you.  Free to go.  Next witness?

Kevin P. Carlin, RMR, CRR

20-cv-1878-RBJ    MATTHEW CANINO - Recross    03-23-2022

1    MR. RINGEL:  As indicated, Your Honor, our next

2    witness, and our last witness, is not available this afternoon,

3    and I apologize to the Court and to the jury for that reality.

4    THE COURT:  I knew he was going to say that, but I

5    made him do it in front of you as punishment.  He deserved at

6    least that.

7    MR. RINGEL:  It was either that or pushups.

8    THE COURT:  So, that works out okay, because we have

9    some work to do on jury instructions, and this will give us the

10   chance to do that.  There's only one witness left for the

11   defendant, and that's Thomas, Commander or Chief Thomas, Ron

12   Thomas; right?

13   MR. RINGEL:  That's right, Your Honor.  Division Chief

14   Ron Thomas.

15   THE COURT:  And then the plaintiff can, if they wish,

16   call a rebuttal witness, but at this point they don't think they

17   will.  So, I think we're going to be finished with the evidence,

18   and we'll probably be on to the process of instructing you and

19   closing arguments and so forth.  So, we're on schedule with

20   getting this done this week.

21   I'm going to give you a little early afternoon.  Have a

22   nice evening.  9 o'clock tomorrow.

23   (Jury out at 3:28 p.m.)

24   THE COURT:  Okay.  Before we get into the jury

25   instructions, does either side have anything else to put on the

20-cv-1878-RBJ   MATTHEW CANINO - Recross   03-23-2022

1   record?

2          MR. RINGEL:  Not from the defendants.  Thank you, Your

3   Honor.

4          THE COURT:  All right.  If you want to take your

5   jackets off, feel free.  I don't care.  And everybody in the

6   back, you're welcome to stay or equally welcome to go.  Whatever

7   you prefer.

8          Now, you have a copy of the latest version of the

9   instructions, and the last version of your verdict forms.  So, I

10  am going to go over that sort of in order.  Do you have one

11  there?  Do you need more than one?

12         MR. MACDONALD:  Sorry.  What was the question, Your

13  Honor?  I apologize.  I couldn't hear that.

14         THE COURT:  The question was why did the Chiefs trade

15  Tyreek Hill to Miami?

16         MR. MACDONALD:  I'm from Kansas.  I didn't know they

17  did that.  I'm a Chiefs fan, so I was --

18         THE COURT:  No, the question was whether or not you

19  had a copy of these instructions.

20         MR. MACDONALD:  The ones that you had sent us before

21  trial, yes.  We do have that, Your Honor.

22         MR. RINGEL:  I have those.  I don't have the proposed

23  verdict form.  And just so the Court is aware, I have two

24  additional proposed instructions, and some interrogatories that

25  I had presented to counsel for the plaintiffs this morning.  I

20-cv-1878-RBJ   MATTHEW CANINO - Recross   03-23-2022

1  haven't heard yet what their thoughts are on it.

2          THE COURT:  Okay.  Well, we will take those when we

3  get to them.

4          MR. RINGEL:  We can get to that at some point.  Thank

5  you, Your Honor.

6          MR. ANDERSON:  And Your Honor, we have -- excuse me.

7  My name is Reeves Anderson for the Epps plaintiffs.  We have a

8  new court reporter since the last time I was here.  We have

9  updated the verdict form to streamline it.  Based on the

10  rulings, we can send that to Your Honor electronically

11  momentarily if that would be helpful.

12          THE COURT:  Sure.

13          MR. ANDERSON:  Okay.

14          THE COURT:  We will make copies then.

15          MR. ANDERSON:  We will do that.  Thank you, Your

16  Honor.

17          THE COURT:  All right.  Actually, I'm going to take my

18  mask off.  Now you know what I look like.  So, let's just go

19  through them one at a time and make our record.  Instruction

20  number one.

21          MR. RINGEL:  So, with respect to paragraph one, at

22  least the version I have has Cydney Fisk as a named plaintiff,

23  and I think that needs to be taken out.

24          THE COURT:  I can't hear you.

25          MR. RINGEL:  I apologize, Your Honor.  The first

20-cv-1878-RBJ   MATTHEW CANINO - Recross   03-23-2022

1   paragraph of instruction one has Cydney Fisk as a named

2   plaintiff, and based on the Court's Rule 50 decision, I think

3   that needs to be taken out.  Other than that, instruction number

4   one is fine with the defendants.

5            THE COURT:  Is everybody comfortable with leaving

6   Christian as Denver Police Officer Jonathan Christian?

7            MR. MACDONALD:  Yes, Your Honor.

8            THE COURT:  It wouldn't matter, except it never came

9   out that he wasn't.

10           MR. RINGEL:  Yeah.  I think that's fine, Your Honor.

11   I think it may have -- there may have been that he was former,

12   but obviously the reasons for him being former didn't come out

13   in front of the jury.

14           THE COURT:  Right.  We talked about that.

15           MR. RINGEL:  Right.  But I don't have any problem with

16   him being identified as a DPD officer.

17           THE COURT:  By the way, who -- obviously you are -- I

18   can't remember your name.  I'm sorry.

19           MR. ANDERSON:  Reeves Anderson, Your Honor.

20           THE COURT:  Anderson?

21           MR. ANDERSON:  Yes.  Anderson.  Like the wide receiver

22   for the Broncos back in the day.

23           THE COURT:  And who is the jury guru for the defense?

24           MR. RINGEL:  That's me today, Your Honor.

25           THE COURT:  Who is going to prepare the final set once

                20-cv-1878-RBJ   MATTHEW CANINO - Recross   03-23-2022

1    we've gone through and made our decisions?

2            MR. ANDERSON:  I would be happy to do that, Your

3    Honor.

4            MR. RINGEL:  That's fine with me, Your Honor.

5            THE COURT:  Okay.  Thank you, Mr. Anderson.

6            MR. ANDERSON:  You're welcome, sir.

7            THE COURT:  So, on number one, there's no objection

8    from either side.

9            MR. ANDERSON:  We have one further addition, Your

10   Honor.

11           THE COURT:  Okay.

12           MR. ANDERSON:  It's in the final paragraph on page

13   one.  To conform with the other instructions, it lists two of

14   the three *Monell* theories.  We would propose after the first

15   semicolon to add that Denver had insufficient training or

16   supervision that caused their injuries, semicolon, and.

17   Further, there's a stray quotation mark before final, and I

18   believe --

19           THE COURT:  Okay.  Give me just a minute.  So, the

20   plaintiffs claim that Denver Police Department either had

21   official policies, comma, or that they had practices or customs

22   that caused their injuries, semicolon.  And you wanted to add

23   something there?

24           MR. ANDERSON:  I do.  I want to add the failure to

25   train theory, that Denver had insufficient training or

20-cv-1878-RBJ   MATTHEW CANINO - Recross   03-23-2022

1   supervision that caused their injuries, semicolon.  And --

2          THE COURT:  Just a minute.  And that the Denver Police

3   Department.

4          MR. ANDERSON:  To make it similar, you would like it

5   to be Denver Police Department?  Okay.

6          THE COURT:  Denver Police Department had, what did you

7   say?  Deficient?

8          MR. ANDERSON:  Insufficient.  I'm trying to use the

9   same words from the later instruction.  Had insufficient

10  training or supervision that caused their injuries.  So, it will

11  be parallel to the prior clause.

12         THE COURT:  Semicolon, or that certain --

13         MR. ANDERSON:  I would make that "and," Your Honor,

14  just because we bring all these theories, rather than in the

15  disjunctive.  So, I think "and" would be the right word there.

16         THE COURT:  "And."  Defense?

17         MR. RINGEL:  I think the language as proposed is fine.

18  As you will see, I have some things to say about some of the

19  substantive instructions, but as a statement of claims, I am not

20  going to object.

21         MR. ANDERSON:  And there is one stray word just in the

22  next clause, Your Honor.  It says that certain final

23  policymaking officials, and then there's a stray word "it."  We

24  would delete "it."

25         THE COURT:  And you want the quote mark out too?

20-cv-1878-RBJ    MATTHEW CANINO - Recross    03-23-2022

1          MR. ANDERSON:  Yes, Your Honor.

2          THE COURT:  Okay.  Instruction number two, any

3    objection?

4          MR. ANDERSON:  No objection, Your Honor.

5          MR. RINGEL:  None from the defendants, Your Honor.

6          THE COURT:  Instruction number three, evidence in the

7    case.  Any objection?

8          MR. ANDERSON:  None from the plaintiffs.

9          MR. RINGEL:  None from the defendants.

10          THE COURT:  Instruction number four, all litigants

11    equal before the law.  Any objection?

12          MS. WANG:  I just noticed, Judge -- I don't have an

13    objection to this one, unless Mr. Anderson does, but I notice in

14    the second paragraph, it says in this case one of the defendants

15    is a former police officer.

16          THE COURT:  Oh.  Good.  Good catch.  Shall we just

17    strike the word "former"?

18          MR. ANDERSON:  We can strike the word "former," Your

19    Honor.

20          THE COURT:  Okay with everybody?

21          MR. RINGEL:  Yes, Your Honor.

22          THE COURT:  Okay.

23          MR. RINGEL:  No objection to number four as revised

24    for the defendants.

25          THE COURT:  Okay.  Number five on witness testimony,

Kevin P. Carlin, RMR, CRR

20-cv-1878-RBJ   MATTHEW CANINO - Recross   03-23-2022

1   any objections there?

2           MR. ANDERSON:  No objection from the plaintiffs.

3           MR. RINGEL:  No objection from the defendants.

4           THE COURT:  Number six, prior inconsistent statements.

5   Any objection to that one?

6           MR. ANDERSON:  No objection from the plaintiffs.

7           MR. RINGEL:  No objection from the defendants.

8           THE COURT:  Number seven, all available witnesses or

9   evidence need not be produced.  Any objection?

10          MR. ANDERSON:  No objection from the plaintiffs.

11          MR. RINGEL:  No objection from the defendants to

12  number seven.

13          THE COURT:  Number eight, concerning deposition

14  testimony, I did the Grothe deposition, and then you didn't use

15  it.

16          MR. MACDONALD:  We apologize for that, Your Honor.  I

17  am happy to do whatever number of pushups is necessary.

18          THE COURT:  I can see the two of you out there in the

19  hall.  Okay.

20          MR. RINGEL:  I'm glad we're before Your Honor and not

21  in front of Judge Nottingham.

22          THE COURT:  Well, no comment there.  Any objection to

23  number eight?

24          MR. ANDERSON:  No objection from the plaintiffs.

25          MR. RINGEL:  None from the defendants.

20-cv-1878-RBJ   MATTHEW CANINO - Recross   03-23-2022

1      THE COURT:  Number nine, burden of proof?  Is there an

2  affirmative defense of failure to mitigate?

3      MR. RINGEL:  There is, and that happens in a later

4  instruction.  And I believe that the last -- at the continued

5  trial preparation conference, Mr. Anderson explained from a

6  stylistic perspective that because the affirmative defense is

7  just to damages, and it's not to liability, that it makes sense

8  to put it where it is in the damages instructions, and that was

9  agreeable to the defendants.

10      THE COURT:  And so you want to take it out of this?

11      MR. RINGEL:  I don't think it's in here.

12      THE COURT:  Second paragraph?

13      MR. RINGEL:  Oh.  You're right.  I'm sorry.  No.  It

14  should be in here.

15      THE COURT:  It should be here?

16      MR. RINGEL:  I believe it should be in there.

17  Although it is only a damages defense.  It's not a liability

18  defense.  We agree with that.

19      THE COURT:  Any objection to number nine?

20      MR. ANDERSON:  So, Your Honor, just to clarify for the

21  record, we have obviously been through a lot of these

22  instructions already, including at the February 23rd conference

23  where Your Honor made some rulings.  We don't -- we understand

24  the prior rulings, and accept those.

25      As Mr. Ringel just explained, we think that we would

20-cv-1878-RBJ   MATTHEW CANINO - Recross   03-23-2022

1   prefer not to have the instruction here on the defendants'

2   burden of proof for defenses, since it doesn't go to liability,

3   and introduce it later only with the mitigation instruction, but

4   we're happy -- we've already made our record on the last

5   conference where we discussed the jury instructions.  So, with

6   that caveat, we are fine with this, Your Honor.

7            MR. RINGEL:  No objection for the defendants to number

8   nine.

9            THE COURT:  All right.  Instruction number ten, claims

10   generally?

11            MR. ANDERSON:  No objection from the plaintiffs.

12            MR. RINGEL:  So, in the -- I believe it's the second

13   sentence that begins the proof required, at the end -- towards

14   the end of that sentence, it refers to an individual officer,

15   and I just think for consistency, it should just refer to

16   Officer Christian, because he's the only individual defendant,

17   as it does in the first sentence of that paragraph.  So, I would

18   propose constitutional claims, and depending on whether the

19   defendant is Denver or, and then get rid of an individual, and

20   then capitalize officer and add Christian.

21            THE COURT:  Any objection to that?

22            MR. ANDERSON:  No objection.

23            THE COURT:  Are you two going to be like lambs for the

24   rest of the instructions?

25            MR. RINGEL:  No, Your Honor.

20-cv-1878-RBJ   MATTHEW CANINO - Recross   03-23-2022

1    MR. ANDERSON:  You would ask that before we turn to

2    number 11, wouldn't you, Your Honor?

3    MR. RINGEL:  We try to be agreeable as much as

4    possible.

5    THE COURT:  So, 11 and 12 are your basic did the

6    police officers breach the First and the 14th -- or Fourth

7    amendments.  So, let's start with number 11.  What's the

8    objection that the plaintiff has to 11?

9    MR. ANDERSON:  No objection to 11.  We have already

10   discussed the substance of those and accept the Court's rulings.

11   And so as it's presented here, we have made our record, but we

12   are prepared to go forward on this instruction, Your Honor.

13   MR. RINGEL:  So, from the defendants' perspective, as

14   previously discussed, and as rejected by the Court -- and I

15   understand the reasons for the Court's rejection -- it is our

16   position that under *Worrell versus Henry*, 219 F.3d 1197, Tenth

17   Circuit, 2000, that the appropriate language is substantial

18   motivating factor in item number three, and not substantial or

19   motivating factor.  The Court, as the Court recalls, made the

20   call -- or made the decision to disagree with that, but I just

21   want to raise that issue for purposes of the record.  And that's

22   all.

23   THE COURT:  You know, I agree with you.  I think I

24   said that when we talked about it before, but the cases use this

25   phrase, "substantial or motivating factor."

20-cv-1878-RBJ   MATTHEW CANINO - Recross   03-23-2022

1            MR. RINGEL:  I think they do in the *Mount Healthy*

2    context.  And Mr. Anderson and Ms. Hoffman had a colloquy with

3    the Court on that issue at the -- I think it was the

4    February 23rd conference, the continued trial preparation

5    conference.  I think that in the nonpublic employee context, it

6    should say -- the law is substantial motivating factor.  I

7    understand the disagreement of the other side, and the Court did

8    rule that it's this way.  I just happen to believe that it

9    should be the other way.

10           THE COURT:  Well, I would like to get it right.  What

11   did the Court do in that case you just cited?

12           MR. RINGEL:  So, *Worrell versus Henry* discusses both

13   tests.  At the beginning part of it it talks about the public

14   employee context for retaliation claim.  And in that context,

15   under *Mount Healthy* and *Pickering*, and it's those kind of cases,

16   it is clear that it is substantial or motivating.  It is our

17   contention in the nonpublic employment retaliation context that

18   the language in *Worrell* at the last part of the decision says

19   that it's substantial motivating factor.

20           THE COURT:  Did the Court actually -- did the Court

21   address the difference and explain why it was a different

22   standard?

23           MR. RINGEL:  The Court talks about the difference in

24   the employment context versus the nonemployment context.  I

25   don't remember the specific discussion, frankly, in the *Worrell*

20-cv-1878-RBJ    MATTHEW CANINO - Recross    03-23-2022

1   *versus Henry* case, but I know from the work that I've done in

2   the area generally that in the nonemployment context, it is at

3   least my position that the language is substantial motivating

4   factor.

5          And in some ways that makes sense, because if the Court

6   thinks about *Mount Healthy* and *Pickering*, substantial or

7   motivating is essentially a mixed motive kind of language that

8   would have been derived from the employment context of Title

9   Seven initially, and then some of the other employment statutes.

10  There isn't the kind of mixed motive context in a nonemployment

11  context, and I believe that that's the difference between the

12  two contexts.  But again, I understand the Court's prior ruling.

13  I am not trying to convince the Court other than to make an

14  appropriate record on behalf of my clients.

15          THE COURT:  Well, the plaintiffs might want to change

16  their mind.  It's not in my opinion going to make any difference

17  at all in this case, but it could make a difference if you win

18  this case and Mr. Ringel is right.  This worth betting your

19  verdict on?

20          MS. WANG:  Judge, the cases that we had cited in our

21  pretrial conference on February 23rd included most importantly

22  *Nieves versus Bartlett*, 139 Supreme Court 1715.  That's the 2019

23  decision from the Supreme Court that specifically uses the

24  language, plaintiff must show that the retaliation was a

25  substantial or motivating factor.  It was in the case of a

20-cv-1878-RBJ    MATTHEW CANINO - Recross    03-23-2022

 1  police action, and that is directly on point and controlling

 2  precedent here.

 3          THE COURT:  And you're probably right.  My question

 4  was a practical question.  You can win these little skirmishes

 5  and lose the war.  Sometimes it's worth fighting these little

 6  skirmishes, and sometimes it's not.  I'm not sure this is one of

 7  those times where you want to fight it, but you're saying you

 8  do.

 9          MS. WANG:  That is the law set forth by the Supreme

10  Court.

11          THE COURT:  Okay.  So, I will leave it the way it is,

12  but I hope you folks pay attention to what I'm saying once in a

13  while.  I've been around a little while longer than you folks

14  have.  You want the instruction to be right, and you don't want

15  to, I don't think, unless you're afraid you're going to lose the

16  case, build instructional error in.  You don't want to lose your

17  verdict over something that is insignificant that makes no

18  difference to the outcome.

19          But you have to understand that the judges upstairs

20  aren't in the same position to decide whether it's going to make

21  a difference in the outcome, but they or their law clerks can

22  read these cases and decide, oh, there was an error made by the

23  judge there.  And then if they don't think it's a big deal, they

24  will call it harmless error, something that trial judges are not

25  particularly enamored with when they say that.  But if they

20-cv-1878-RBJ   MATTHEW CANINO - Recross   03-23-2022

1   think there's any significance to it, they can use that to

2   reverse a three-week trial.  So, I will keep it the way it is,

3   but you got fair warning on that one, plaintiff.

4          Any other problems with number 11?

5          MR. RINGEL:  Not from the defendants, Your Honor.

6          MR. ANDERSON:  No, Your Honor.  And again, we went

7   about two hours of rounds last time, and so we feel like we

8   fully made our record during that conference, and --

9          THE COURT:  Well, but you didn't.  Let me explain that

10  to you.  Number one, I can't remember all of the details of

11  things that we discussed at a pretrial conference.  But number

12  two, regardless, this is your chance to make your record on

13  instructions.

14         The fact that you might have squawked about something

15  in a pretrial conference, we're now at a point where we've heard

16  the evidence, and you've gotta make your objections to these

17  instructions so that the Tenth Circuit can understand what they

18  are.  And more importantly, so that I can understand if I'm

19  making a mistake, which I don't want to do.

20         So, don't feel too comfortable just saying, well, way

21  back then we went round and round about this.  Do you have an

22  objection to number 11?

23         MR. ANDERSON:  No, Your Honor.

24         THE COURT:  How about to number 12, folks?

25         MR. RINGEL:  So, the defendants have an objection to

20-cv-1878-RBJ   MATTHEW CANINO - Recross   03-23-2022

1   number 12 based on the language in 1B.

2           THE COURT:  1B?

3           MR. RINGEL:  Yeah.  We don't believe that the evidence

4   as presented at trial warrants the additional language in 1B.

5   Other than that, instruction number 12 is fine from the

6   defendants' perspectives.

7           THE COURT:  Is there any evidence that the plaintiffs'

8   freedom of movement was restricted through a show of authority?

9           MR. MACDONALD:  I think the short answer is yes, Your

10  Honor.  That includes the shooting of weapons is a show of

11  authority, and so I think the answer is yes.

12          THE COURT:  Well, of course weapons are a show of

13  authority, but I thought your case, the way you presented it was

14  your plaintiffs suffered injuries from -- emotional or physical

15  injuries from the physical force applied, not that they were

16  kept from going from Colfax to Washington.

17          MR. MACDONALD:  I think there are elements of both

18  throughout the various incidents, Your Honor.

19          THE COURT:  Okay.  Well, I will be interested to

20  listen to your closing argument when you talk about that.  Any

21  other objections to 12?  That's kind of an insignificant one.

22          MR. RINGEL:  No other objections to 12, Your Honor.

23          MR. ANDERSON:  No other objections.

24          THE COURT:  Thirteen is the instruction on Jonathan

25  Christian.  Is either party objecting to that?

20-cv-1878-RBJ   MATTHEW CANINO - Recross   03-23-2022

1      MR. RINGEL:  So, just for the record, Your Honor, we

2  object to this instruction being given, because we don't believe

3  there's sufficient evidence for a reasonable jury to conclude a

4  violation by Mr. Christian.  The only other objection that I

5  have is to the last sentence in the second-to-last paragraph.

6  The sentence that reads, any officer who causes a person to be

7  deprived of their constitutional rights can be held liable even

8  if the officer does not directly participate in the act that

9  causes the deprivation.

10      While that's a general -- generally potential correct

11  statement of law, there aren't facts with respect to Ms. Epps'

12  claim against Mr. Christian that fit that part of the

13  instruction, in my view.

14      THE COURT:  Mr. Anderson?

15      MR. ANDERSON:  We're okay with striking that, Your

16  Honor.

17      THE COURT:  And with respect to your first objection,

18  Mr. Ringel, I agree that the evidence is pretty thin.  I tried

19  to make that point a couple of times.  As I've intimated,

20  sometimes people don't listen when they hear my unsolicited

21  opinions about aspects of their case.

22      But from a judge's standpoint, there is evidence.  Not

23  good evidence, but evidence.  The evidence is that Ms. Epps was

24  walking across 14th with her phone in her hand, taking her

25  streaming video of what was happening.  There were cars from

20-cv-1878-RBJ    MATTHEW CANINO - Recross    03-23-2022

1    time to time going by on that same road.  She was looking at the

2    police officers, of course, because she was filming them.

3         There were three or four of them at least over there on

4    the grass across the street on the capitol grounds.  And one of

5    them, namely Christian, took a knee, aimed his PepperBall at

6    her, according to her perception, fired one PepperBall, and she

7    claims it hit her in the leg, causing her a bruise on the inside

8    of her left calf.

9         Now, that's evidence in the form of testimony,

10   eyewitness testimony.  I think it's pretty thin, because I think

11   the video evidence contradicts it fairly persuasively.  I have

12   also wondered why of all the things that happened to people on

13   both sides of this, a bruise on the left calf is enough to make

14   a man go through a trial like this.

15        I say that as somebody who gets bruises all over his

16   body on a weekly basis from my racquetball buddies who whack me

17   with their racquetballs, one of whom is the clerk of this Court.

18   I have noticed that when you're playing racquetball or

19   pickleball, there's no deference to your position as a federal

20   judge.  In fact, if anything, they are delighted to whack me

21   with a racquetball.

22        But anyway, my judgment is that there's enough that

23   this has to be decided by the jury.  Anything else?

24        MR. RINGEL:  Not on number 13.  Thank you, Your Honor.

25   I understand the Court's position.

20-cv-1878-RBJ   MATTHEW CANINO - Recross   03-23-2022

1   THE COURT:  Okay.  Then we get to number 14, claims

2   against Denver introduction.  Is there a claim -- objection to

3   14?

4   MR. ANDERSON:  No objection to 14, Your Honor.

5   THE COURT:  Defendant?

6   MR. RINGEL:  No objection to 14, Your Honor.

7   THE COURT:  Fifteen is the instruction that discusses

8   official policy, comma, practice, comma, or custom.

9   MR. ANDERSON:  Your Honor, the final paragraph of this

10  instruction we think is incorrect, because if we could turn back

11  to the final paragraph of instruction 14, which is the claims

12  generally, it explains that these -- the *Monell* theories are

13  independent theories of liability.  And so if the plaintiffs

14  establish any one of the theories, then the verdict is for the

15  plaintiff.  Only if they fail to prove any of the theories would

16  the verdict be for the defendant, for the City.

17  THE COURT:  But isn't -- that doesn't refer to three

18  theories.  It refers to three elements.  You've got to prove the

19  three elements, don't you?

20  MR. ANDERSON:  If you find the plaintiff has proved

21  the elements of any one of these theories.  And so the first

22  paragraph introduces the three theories of *Monell*, policy,

23  practice, or custom.  Second theory is failure to train.  Third

24  theory is ratification.  And so we think an individual paragraph

25  that says if we fail to prove policy, practice, or custom, for

20-cv-1878-RBJ   MATTHEW CANINO - Recross   03-23-2022

1    example, that would not lead to a verdict for the defendant,

2    although it would lead to a verdict for the plaintiff.  They

3    have to run the table on the theories.  We have to establish

4    one.

5         THE COURT:  That's what number two says.  Number two

6    says, the officer acted pursuant to an official policy, comma,

7    or a practice --

8         MR. ANDERSON:  Excuse me.  Page 20?

9         THE COURT:  There should be a comma, or custom of the

10   City of Denver.

11        MR. ANDERSON:  I'm specifically referring on page 20,

12   to the last paragraph.  And it's specifically the last sentence.

13   If you find that the plaintiff has failed to prove any one or

14   more of these three elements, then your verdict should be for

15   Denver on this claim.

16        THE COURT:  Okay.  Look at the three elements and tell

17   me which one you don't have to prove.

18        MR. ANDERSON:  In order to prevail on the *Monell*

19   theory based on policy, practice, or custom, you're correct.  We

20   would need to prove all three.  But it doesn't mean that there

21   is a verdict for the defendant.  This is -- this is one claim

22   with three theories, Your Honor.  And so --

23        THE COURT:  Oh.  I see what you're saying.  Then your

24   verdict must be for the defendant -- for Denver on plaintiffs'

25   official policy, practice, or custom claim.

20-cv-1878-RBJ   MATTHEW CANINO - Recross   03-23-2022

1    MR. ANDERSON:  Or if we use the word "theory."  On the
2    verdict -- excuse me.  The reason I think it's important is that
3    the verdict form doesn't break out those theories.  And so there
4    is just a *Monell* claim against the City of Denver.  And so I
5    think the clearest way to do this would be to not have any
6    paragraph on the bottom of page 20, to strike the final
7    paragraph, but at a minimum, we would either strike the final
8    sentence or clarify that it's not that there is a verdict for
9    Denver.  It's that you then proceed to the next theory.
10    THE COURT:  Okay.  I think I agree with you, because
11    you're saying that official policy, practice, or custom includes
12    training.
13    MS. WANG:  Judge, what we're saying is that the
14    verdict form asks, for instance, for --
15    THE COURT:  We don't have a verdict form yet.
16    MS. WANG:  Well, so, in order for plaintiffs to
17    prevail on their *Monell* claim, they may -- the jury may find in
18    plaintiffs' favor on the *Monell* claim on any one of the three
19    *Monell* theories.
20    THE COURT:  I agree.
21    MR. RINGEL:  I agree too.  Either the elements of 15,
22    the elements of 16, or the elements of 17 have to be met.
23    MS. WANG:  Right.
24    MR. RINGEL:  Or -- and I agree that it's disjunctive.
25    THE COURT:  Pardon me?

Kevin P. Carlin, RMR, CRR

20-cv-1878-RBJ    MATTHEW CANINO - Recross    03-23-2022

1    MR. RINGEL:  I agree that it's disjunctive.  They need

2    to meet one of those and make the elements.

3    THE COURT:  So, what do you want to do to change this

4    instruction, then?

5    MR. ANDERSON:  Your Honor, we would delete the final

6    paragraph on page 20.

7    MR. RINGEL:  So, I -- I think that that's okay, but

8    then I think you're going to need to add an instruction that

9    says if they don't meet the elements of 15, 16, or 17, then the

10   verdict has to be for the City and County of Denver.

11   MR. ANDERSON:  That instruction is the last paragraph

12   on page 18 already.

13   MR. RINGEL:  That's true, but typically the way that

14   instructions are done is it tells the jury the effect of their

15   finding just like the Court did at the end of 15, 16, or 17.

16   So, I think there needs to be something that has the -- guides

17   the jury in addition to the introductory language in instruction

18   14 related to what is the meaning of their finding.

19   Because it's pretty typical to have the kind of

20   language that the Court has on page 20 that Mr. Anderson is

21   referencing.  I agree it shouldn't be the way that it is in this

22   instruction, but I think the global notion of if you find a

23   particular plaintiff has proved the elements in instruction

24   number 15, instruction number 16, or instruction number 17, then

25   your verdict must be for the plaintiff on this claim.  If you

20-cv-1878-RBJ    MATTHEW CANINO - Recross    03-23-2022

1   find the plaintiff has failed to prove the elements in 15, 16,

2   and 17, then your verdict must be for Denver on this one.

3                THE COURT:  So, on 15, if we look back at the page

4   before, last paragraph on instruction 14, if you find the

5   plaintiff has proved the elements in any one of these theories,

6   if they fail to prove any one of these theories, then you are

7   for the defendant.  And why are we calling 15, 16, and 17

8   claims?  They're your theories.

9                MR. ANDERSON:  We can adjust that to theories, Your

10  Honor, to be consistent throughout.

11               MR. RINGEL:  Yeah.  That makes sense to me as well.

12               THE COURT:  So, it should say the plaintiffs' first

13  theory of its claim.  How about if we say that?

14               MR. ANDERSON:  Yes.  That's very good, Your Honor.

15               THE COURT:  Of its claim against the City of Denver.

16  I think I just called it Denver.  So, why don't we just say

17  against Denver.  Is that -- I changed it to Denver all the way

18  through, but I must have missed it on number 15.  So, back to 18

19  again.  Against Denver.  And the last, right toward the end.

20  Then your verdict should be for the City.  Plaintiffs' first

21  claim -- first theory of its claim against Denver is that the

22  City had official policies and so forth.  In order for the

23  plaintiffs to prevail on this theory --

24               MR. ANDERSON:  I think claim still works there because

25  of the remainder of the sentence.  Based on an official -- that

2747

20-cv-1878-RBJ    MATTHEW CANINO - Recross    03-23-2022

1  is then the theory.  Just trying to avoid extra words wherever

2  possible, Your Honor.

3            THE COURT:  In order for the plaintiff to prevail

4  based on -- no.  It's based on -- it's based on -- no.  That's

5  right.  In order for the plaintiff to prevail based on an

6  official policy, practice, or custom; right?

7            MR. ANDERSON:  We agree.  And you would have it read

8  in order for a plaintiff to prevail on a claim against Denver

9  based on an official policy, practice, or custom.  So, we're

10  just removing the words "the city of."

11            THE COURT:  I thought you wanted to remove the whole

12  section on a claim against Denver.  I thought you wanted it to

13  just say, in order for the plaintiff to prevail based on an

14  official policy, et cetera?  No?  That isn't what you want?

15            MR. ANDERSON:  I think it will be more understandable,

16  Your Honor, to keep it as in order for a plaintiff -- it's

17  paralleling the first paragraph.  In order for a plaintiff to

18  prevail on a claim against Denver based on an official policy or

19  practice.  So, it says the claim is based on that theory.

20            THE COURT:  I don't care.  Mr. Ringel, do you care?

21            MR. RINGEL:  I do not.  I have a different issue with

22  this instruction, but let's finish this first.

23            THE COURT:  So, you want to take out "the city of"?

24            MR. ANDERSON:  If you'd like us to do that throughout

25  to be consistent with your prior edits, we can do that.

Kevin P. Carlin, RMR, CRR

20-cv-1878-RBJ    MATTHEW CANINO - Recross    03-23-2022

1            THE COURT:  Okay.  All right.  Mr. Ringel, what's your

2    deal?

3            MR. RINGEL:  So, on page 20, the last sentence in the

4    second-to-last paragraph.

5            THE COURT:  All right.  Well, there's only one full

6    paragraph, and that's coming out; right?

7            MR. RINGEL:  Right.  So, it will be the last sentence

8    in the last paragraph that's not coming out, that reads a

9    practice or custom also can be established by repeated

10   constitutional violations that were not properly investigated

11   and for which the violators were not disciplined, reprimanded,

12   or punished.

13           That's an incorrect statement of the law in my view,

14   and is not -- has no place in this case.  And I can cite cases

15   if the Court would like me to.  It's wrong factually.  It's

16   wrong causally.  It makes no sense.  And, you know, if the

17   plaintiffs want to put that in evidence, we will see them across

18   the street.

19           THE COURT:  Do you have authority for that?

20           MR. ANDERSON:  I do, Your Honor.  This had been a

21   stipulated instruction between the two of us, and so I don't

22   have it at my fingertips.  Through negotiations, the parties had

23   agreed that this was correct, and had never raised this until

24   now.  I actually don't have -- because it wasn't -- we don't

25   have authorities at my fingertips to defend it, because it had

20-cv-1878-RBJ    MATTHEW CANINO - Recross    03-23-2022

 1   been agreed.  I can certainly provide those in due course, Your

 2   Honor.

 3          MR. RINGEL:  The case that I would cite to the Court

 4   for the Court's edification has to do with the investigation

 5   piece of it.  It's called *Casey versus the City of Federal*

 6   *Heights*.  It's a 2005 decision by Judge Blackburn.  You can find

 7   it as -- or it's a 2005 case.  It's 2008 U.S. District Lexis

 8   116681 at star 5-6, District of Colorado, June 24th, 2008.  And

 9   quoting, quote, the more immediate flaw in plaintiff's argument

10   is that the failure to adequately investigate the officer's

11   actions in plaintiff's case cannot constitute the moving force

12   behind the use of force that already had occurred.  It is

13   logically impossible for an investigation that postdates the

14   alleged constitutional deprivation to have caused that

15   deprivation.  Absent evidence of prior instances in which the

16   City and Chief Archer failed to adequately investigate uses of

17   force or other incidents of misconduct on the police force, the

18   investigation of the incident involving plaintiff is no evidence

19   of a policy or custom that causally led to the use of force

20   against the plaintiffs.

21          The same analysis exists with respect to discipline,

22   Your Honor.  And we cited those cases in the defendants' -- the

23   Denver defendants' trial brief.

24          THE COURT:  You're saying what happened after the fact

25   is irrelevant.

20-cv-1878-RBJ   MATTHEW CANINO - Recross   03-23-2022

1           MR. RINGEL:  It can't cause -- from a causation

2   perspective, it cannot have caused the underlying constitutional

3   violation.  As I said before, time moves in a linear fashion

4   forward.

5           THE COURT:  When we get to the ratification theory,

6   it's different.

7           MR. RINGEL:  I understand that it's potentially

8   different in the ratification theory.  As I argued at Rule 50,

9   and as I will argue again now, I don't think there's evidence to

10  support the ratification theory, but it isn't appropriate in

11  this instruction in my opinion at all.

12          THE COURT:  Why didn't he have a good point here?

13          MS. STERK:  One moment, Your Honor.

14          MS. WANG:  Judge, let me mention in terms of the

15  evidence, so the evidence -- it's not about whether -- there was

16  evidence presented that the City of Denver and the DPD knew

17  about, for instance in 2012 the DPD's use of PepperBalls and

18  chemical munitions against protesters during the Occupy protest,

19  and Mick -- Nick Mitchell testified about that.

20          I believe -- I don't recall offhand, but one or two

21  other DPD witnesses may have testified about that, and they were

22  alerted to the fact that this was problematic.  And Mr. Mitchell

23  testified that this was a missed opportunity.  So, there is

24  evidence of prior --

25          THE COURT:  That's what this sentence is about?  The

20-cv-1878-RBJ   MATTHEW CANINO - Recross   03-23-2022

1   2012 protests?  It sure doesn't say that.  It looks like you're

2   talking about failure to investigate what happened here and

3   failure to discipline for what happened here.

4          MR. ANDERSON:  Your Honor, this sentence comes

5   directly from the Ninth Circuit model jury instruction 9.5,

6   which is the source we originally provided.  The reason this is

7   relevant is that custom and practice is always going to be an

8   inference.

9          You look at how things proceed, and this -- the keyword

10  here is repeated constitutional violations.  If there are

11  repeated constitutional violations, that is an inference that

12  can be drawn that that was in fact the practice or custom of the

13  City.  And so this sentence comes verbatim from the model

14  instruction that was used as the model for this full

15  instruction.  So, to say there is no authority for it, that was

16  the source that we had originally provided to the Court.

17         THE COURT:  Yes.  But what Blackburn said is exactly

18  right if you're talking about the investigation of this case.  I

19  don't care what the Ninth Circuit said.  In this case, the

20  investigations that occurred afterwards couldn't have caused --

21         MR. MACDONALD:  So, Your Honor, I think the point is

22  that it is evidence that a jury -- from which a jury can draw

23  the conclusion that the official practice or the official custom

24  was the constitutional being widespread, or here, the repeated

25  constitutional violations.  It's not that the failure to

Kevin P. Carlin, RMR, CRR

20-cv-1878-RBJ    MATTHEW CANINO - Recross    03-23-2022

1   discipline caused the use of force.  It is evidence of the

2   official custom or official practice that has happened.  And

3   here, we think there's substantial evidence.

4        THE COURT:  You're not even in sync with your partner

5   from the Fitouri plaintiffs.  She says that she's talking about

6   something that happened back in 2012, not something that

7   happened to investigate this case, and you're talking about

8   investigating this case.

9        MR. MACDONALD:  So, Your Honor, I think it is a both

10  and.  I think the evidence from the 2012 Occupy protest is

11  relevant, but I also think that the evidence of the repeated

12  constitutional violations here can be -- we can use that as an

13  inference to say this was the official custom or the official

14  policy or the practice, based on the failure to investigate,

15  discipline, reprimand, or punish.  That's the evidence from

16  which we can draw that conclusion, not that the failures caused

17  the harm.

18        THE COURT:  Okay.  The objection is sustained.  I

19  agree with Mr. Ringel.  That sentence comes out.  So, the last

20  paragraph will end after the sentence that says, a practice or

21  custom can be established in several ways.  For example, a

22  practice or custom can be established by a series of decisions

23  by a subordinate official of which a supervisor was aware.

24  After that, you're going to have to count on your argument

25  skills.  The rest of that is out.

20-cv-1878-RBJ   MATTHEW CANINO - Recross   03-23-2022

1           Next, number 16.  Plaintiff?

2           MR. ANDERSON:  Your Honor, we would -- on page 21,

3    delete the second sentence of the second element.  The Court

4    added a first sentence, and we think that the second is

5    unnecessary.

6           THE COURT:  I thought that came right out of a case.

7           MR. RINGEL:  I think that there is law that says

8    negligence or mere lack of care isn't enough.  I don't think

9    it's duplicative.  I think it's explanatory.

10          MR. ANDERSON:  I'm sorry.  We must be talking about --

11          THE COURT:  We're talking about something different.

12   He's talking about paragraph number two.

13          MR. RINGEL:  Oh.  Number two.  I'm sorry.

14          THE COURT:  Page 21.  The first sentence says, the

15   City of Denver.

16          MR. RINGEL:  I was reading somewhere.  No.  The second

17   sentence is critical, because the whole point of the cross

18   examination of Professor Maguire is that sentence, Your Honor.

19   And that is in the law.

20          THE COURT:  Well, I don't care if you think it's

21   critical.  I care as to whether there's authority that supports

22   it.

23          MR. RINGEL:  There is authority that supports it.  I

24   don't have it at my fingertips.

25          THE COURT:  I think there is, too, because I put it in

20-cv-1878-RBJ   MATTHEW CANINO - Recross   03-23-2022

1    there for a reason.

2           MR. ANDERSON:  Your Honor inserted the first sentence

3    of that second element.  Again, our objection is not necessarily

4    one of substance.  It's that both sentences cover the same

5    thing.

6           THE COURT:  Okay.  The objection is denied.  Any other

7    objections to number 16?

8           MR. RINGEL:  Only on the basis that we don't think it

9    should be submitted because of a lack of sufficient evidence of

10   prior indications of a failure to train.

11          THE COURT:  Okay.

12          MR. ANDERSON:  The final paragraph on page 22, it's

13   the same discussion we've just had.  We would delete the final

14   paragraph, as these are alternative theories.

15          THE COURT:  Yes.  Okay.  I'm all right with that.

16          MR. RINGEL:  I agree with that as well, Your Honor.

17          THE COURT:  Number 17, ratification?

18          MR. RINGEL:  So, it is the defense position that there

19   isn't sufficient evidence to meet item number two here, that

20   there isn't evidence that any final policymaker ratified a

21   deliberate choice -- in a deliberate fashion any officer's act

22   that caused injury to the plaintiffs.  That's the crux of the

23   Rule 50 argument.

24          THE COURT:  Well, you've got Phelan, who said that the

25   officers' actions were all consistent with Denver's policies.

20-cv-1878-RBJ    MATTHEW CANINO - Recross    03-23-2022

1      MR. RINGEL:  The problem, Your Honor, is they've

2  elicited general testimony from a lot of witnesses about that,

3  but the language is you have to specifically know what the

4  officers' actions are.  And that was the case that I cited to

5  the Court in the Rule 50 motion.  I believe it's the *Jackson*

6  decision.

7      It essentially stands for the proposition that the

8  final -- the ratifier, the final policymaker has to have

9  specific knowledge of what the officer did, and there hasn't

10  been any evidence -- take Commander Phelan as an example.  He

11  has no knowledge of what Officer Christian may have done with

12  respect to Ms. Epps.  And in the absence of him having specific

13  knowledge, that's why we don't think there is a ratification.

14  And I know the Court in the Court's ruling on Rule 50 thinks

15  that it could be general.  I just don't think that's the

16  applicable law, Your Honor.

17      THE COURT:  Don't you think there would be some irony

18  in the fact that if they don't bother to find out what the

19  individual officers did and just say everything was fine, that

20  doesn't count?  But if they really dig in and find out what

21  their officers did and then they ratify, then you're in trouble?

22      MR. RINGEL:  I understand the Court's point, and I

23  don't think that -- I don't think it would be good public policy

24  to not find out what your officers did.  But in the instance of

25  not looking into it, that would be negligence, and as the Court

20-cv-1878-RBJ   MATTHEW CANINO - Recross   03-23-2022

1   knows, the standard for a 1983 claim is much greater than

2   negligence.

3          And so what we have to do here is actually have a final

4   policymaker that had specific knowledge of the specific actions,

5   and all the facts are is general knowledge of acts -- actions

6   generally.  And I don't think that meets the requirement of the

7   ratification theory.  I understand the Court disagrees with me,

8   and I respect that.  I just need to make the record.

9          THE COURT:  I want to hear what the plaintiffs have to

10  say.

11         MS. WANG:  Judge, Commander Phelan testified that

12  he -- I mean, he was in the command post watching the HALO

13  camera footage the entire time.  And so he was not only doing

14  that, but he was ordering the officers to do what they were

15  doing.  In addition, we had the press conference statements from

16  the chief of police and Mayor Hancock saying that they watched

17  all the video.  And Mayor Hancock was pretty specific about

18  watching the entire video feed and said that the officers acted

19  with tremendous restraint.  So, I think that is sufficient to

20  submit this to the jury.

21         MR. RINGEL:  The one thing I would say about the press

22  conference, I don't think it's sufficient in and of itself, but

23  there is no dispute that Mayor Hancock's statement was on

24  May 29th.  And so that evidence that occurred on the morning of

25  May 29th is inapplicable to any claim that happened after the

20-cv-1878-RBJ   MATTHEW CANINO - Recross   03-23-2022

1    morning of May 29th.

2         THE COURT:  So, let me ask you this, plaintiffs:  Of

3    your three theories, what's your best one?

4         MS. WANG:  I mean, the one and two.  Official policy,

5    practice, and custom, and failure to train.

6         THE COURT:  So, you want to bet your case on this

7    ratification theory?

8         MR. MACDONALD:  I guess from my perspective for our

9    clients, I'm not betting our case on it, Your Honor.  I think

10   it's a correct statement of the law, and it's appropriate to go

11   to the jury.

12        THE COURT:  It's your weakest claim.  Your co-counsel

13   says so.  I agree.  Mr. Ringel makes a point that has some

14   validity to it, which is that in his view, in his interpretation

15   of the law, you can't ratify something if you don't know it

16   happened specifically.  You want to go with it?

17        MR. MACDONALD:  If we can confer for a moment, Your

18   Honor?

19        THE COURT:  Mr. Ringel, you're causing all kinds of

20   trouble.

21        MR. RINGEL:  I like to be a fly in the ointment, Your

22   Honor.  I learned that from Judge Portulio.

23        MR. MACDONALD:  Mr. Ringel has not yet persuaded us on

24   this issue, Your Honor.

25        THE COURT:  I denied the Rule 50 because I thought

20-cv-1878-RBJ     MATTHEW CANINO - Recross     03-23-2022

1   there was evidence to support it, and therefore I will stand on

2   my decision.  Number 18.

3              MS. WANG:  Judge, just one more thing on 17 is that on

4   page 23, the last paragraph is the same -- or not the last

5   paragraph.  The last two sentences is the same issue that we've

6   just --

7              THE COURT:  Okay.  Good.

8              MR. RINGEL:  I agree with that, Your Honor.

9              THE COURT:  Now, before we get to 18, this is where

10  you're going to want to talk to me about your two new

11  instructions; right?

12             MR. RINGEL:  That's right.  There are two

13  instructions, and I can provide them to the clerk and give them

14  to you.  I can explain them first.  I can read them in the

15  record.  Whatever the Court wants me to do.

16             THE COURT:  This is about your sister agencies?

17             MR. RINGEL:  There are two.  The first one is about

18  the sister agencies.  And essentially what it does is it

19  identifies the three plaintiffs that have claims based on the

20  conduct of the sister agencies.  That's Mr. Packard, Dr. Smith,

21  and Mr. Deras.  And then it refers the jury to instruction

22  number 15 that basically says Denver can only be liable for the

23  acts of these other officers if it is pursuant to an official

24  policy, practice, or custom of Denver that caused the

25  violations.  And then it says the fact that Denver asked for

20-cv-1878-RBJ   MATTHEW CANINO - Recross   03-23-2022

1   assistance from other jurisdictions cannot by itself amount to a

2   policy that caused a violation of a plaintiff's constitutional

3   rights.

4          The idea is it has to be more than the fact that they

5   were there.  There has to be some linkage under the *Monell*

6   theory to a policy, custom, or practice of Denver.

7          THE COURT:  You know, I asked my law clerks whether

8   they thought this was an issue of law or an issue of fact, and

9   they convinced me that it's an issue of fact, this agency

10  theory.

11         MR. RINGEL:  I agree with the Court -- that the

12  possibility that it's an issue of fact, but I think the jury

13  needs guidance, because I don't think that it can be enough for

14  the jury just to conclude these officers are agents of Denver.

15  Because we have a *Monell* theory here.  If we were in a

16  respondeat --

17         THE COURT:  That's right.  Their theory depends on the

18  agency.  The only way they can prevail with respect to those

19  three plaintiffs is if the jury is convinced that those officers

20  acted pursuant to a policy, practice, or custom of Denver.

21         MR. RINGEL:  That's exactly right.  Because we're not

22  in a respondeat superior world.  We're in a *Monell* world.

23         THE COURT:  And they've got the evidence from Phelan,

24  who said he directed the entire operation.  And then they got

25  some evidence just this afternoon from Canino in response to

20-cv-1878-RBJ   MATTHEW CANINO - Recross   03-23-2022

1   their cross examination that seconded Phelan.

2         MR. RINGEL:  Right.

3         THE COURT:  On the other hand, you've got testimony

4   from several witnesses, including the Jeff. Co. guy this

5   afternoon, or this morning, who said, no, we responded to our

6   commander and applied our own policies and our own practices

7   with respect to nonlethal munitions.

8         MR. RINGEL:  Right.  And that's the factual issue that

9   the jury is going to have to wrestle with.  The point of this

10  instruction is only that the jury needs to wrestle with it with

11  guidance from this Court.  Because otherwise, the -- my fear is

12  that they will -- the jury will just conclude they were called

13  in by Denver, therefore Denver is responsible for their actions

14  without --

15        THE COURT:  Well, you're not going to let them make

16  that mistake.  You're going to be screaming about it, because

17  your one plaintiff that you're concerned about is Packard.

18  You're going to be all over that issue in your closing argument;

19  right?

20        MR. RINGEL:  I suspect that that is true, Your Honor.

21  But I think it's important for the Court to give guidance,

22  because what we say in closing argument is obviously not

23  evidence, and we want the jury -- we would like to be able to

24  explain to the jury in the closing argument based on a grounding

25  in the Court's instructions.

20-cv-1878-RBJ   MATTHEW CANINO - Recross   03-23-2022

1    THE COURT:  You know, one interesting thing that I

2    thought about a little bit, but I don't have to make any

3    decision about it, not today, anyway, is what happens if the

4    plaintiffs lose?  They can't -- or can they go back in their

5    second lawsuit against Aurora and try to resuscitate the Packard

6    claim?  Unless they lose on the basis that that was Aurora's

7    deal, not Denver's.

8         So, you guys should want this instruction that he

9    drafted so that if you lose on Packard, you won't have thrown

10   the baby out with the bathwater; right?  It's like a patent

11   case.  I saw some somewhat experienced lawyers make a huge

12   mistake in a patent case where they asked the jury to decide in

13   this order: whether the defendant infringed, and whether the

14   patent was invalid.  That's a horrendous mistake, because you

15   don't want them to go to the validity if they find there was no

16   infringement.  You lose your whole patent that way.

17        I'm suggesting that that's a fairly poor analogy, but

18   you don't necessarily want -- or maybe you do.  Maybe you want

19   to put all your guns in the Packard case here, and take your

20   loss.  Do you follow what I'm saying?

21        MR. MACDONALD:  I do understand, Your Honor, but I

22   don't think his instruction changes the calculus.

23        THE COURT:  Well, let me see the instructions.

24   There's gotta be some instruction on this.

25        MR. MACDONALD:  While you're looking at that, I will

20-cv-1878-RBJ    MATTHEW CANINO - Recross    03-23-2022

1  raise one other issue, which is a narrower issue.  The

2  defense -- or the proposed instruction includes Stanford Smith

3  in their -- in there, and I don't think that's accurate.  Aurora

4  has said it's not Aurora.  Denver has I think not elicited

5  anything as to whether or not they think it was Aurora that

6  sprayed Dr. Smith in the face.  And so no matter what we do with

7  respect to Mr. Packard or Dr. Deras -- Dr. Smith would not be in

8  any special instruction if Your Honor chose to have one on this

9  issue.

10          MR. RINGEL:  My recollection was that Dr. Smith

11  admitted that he had sued Aurora and blamed them for the issue

12  related to the spray in the face.  That was my understanding of

13  what the state of the evidence was.

14          MR. MACDONALD:  So, it is true that we -- Dr. Smith,

15  we asserted a claim against Aurora in this case.  Aurora swore

16  on a stack of Bibles the person who sprayed them is not us

17  because of a whole variety of reasons.  And so we're left with

18  the evidence.  He did not say that he blamed Aurora for this at

19  all in this case.  What he testified to was, I couldn't see

20  anything, because I had OC spray in my face.  The evidence has

21  established that there are Denver officers on that line

22  between -- at the time when he is sprayed, as does the body-worn

23  camera footage.

24          THE COURT:  Couldn't we even see in the video which

25  officer sprayed him?

20-cv-1878-RBJ    MATTHEW CANINO - Recross    03-23-2022

1       MR. MACDONALD:  They have refused to -- we have asked

2   interrogatories, Your Honor, and you can see an officer, we

3   originally thought it was Denver.

4       THE COURT:  But you don't know -- you can't agree on

5   what uniform he had on?

6       MR. MACDONALD:  I mean --

7       THE COURT:  Was it the same guy that was the Two Gun

8   Charlie?

9       MR. MACDONALD:  It was not Officer Yosemite Sam, no.

10  It was not Two Gun Charlie.  It was a different officer down

11  that line that included Denver officers.

12      THE COURT:  Were there Aurora officers there?

13      MR. MACDONALD:  There was at least an Aurora officer

14  on that line, because we have -- we have evidence that we put

15  into the record of an Aurora officer saying these guys in green,

16  referring to Metro SWAT, are getting out of hand.  So, we have

17  body-worn camera footage, and I believe that the body-worn

18  camera footage that we have showing Dr. Smith getting sprayed

19  out of the corner may be an Aurora body-worn camera footage, but

20  it's a person five or six or seven people away from Dr. Smith

21  being sprayed.

22      We included a claim against Aurora because at one time

23  we believed it may have been Aurora.  That evidentiary issue was

24  Aurora has, as I said, stated unequivocally in deposition

25  testimony and in their responses, it wasn't us.  So, that's the

20-cv-1878-RBJ   MATTHEW CANINO - Recross   03-23-2022

1    issue with Dr. Smith, Your Honor.

2           MR. RINGEL:  So, Denver has always taken the position

3    that that was an Aurora event.  And I mean, my understanding --

4    you know, I understand that counsel for the plaintiffs has taken

5    the position that it might be Denver.  It might be Aurora.  But

6    I still think the instruction is appropriate, because Dr. Smith

7    from the witness stand said that he had sued Aurora, and the

8    jury can raise the reasonable inference that he believed that it

9    was Aurora that did that to him.  And that's in evidence.

10          THE COURT:  Do you guys remember?  No?

11          THE LAW CLERK:  I can't say I do, no.  He did testify

12   that he raised a claim against Aurora.  I did not draw the

13   inference Mr. Ringel did, but that's not to say the jury didn't.

14          THE COURT:  These are my Sergeant Schultz sitting over

15   here.

16          MR. MACDONALD:  And Mr. Ringel is free to argue to the

17   jury, if he wants, he thinks it's Aurora.  What he's asking for

18   is an instruction from this Court.

19          THE COURT:  I can fix that for you.  I can fix that.

20   Don't you worry.  So, let's forget about Smith for a second.

21   The claims of plaintiffs Packard and Deras against Denver are

22   based in part -- oh.  In part on the acts of police officers

23   from other jurisdictions.  These officers were present at the

24   protest in their mutual aid requests from Denver.  Okay.  As

25   described in 15, Denver may be liable for the acts of individual

20-cv-1878-RBJ   MATTHEW CANINO - Recross   03-23-2022

1    officers only if they acted pursuant to an official, and of

2    course you folks won't agree with that.  That gets back to your

3    theory business.  The fact that Denver asked for assistance does

4    not by itself amount to a policy.  Okay.

5          MR. RINGEL:  The reason, Your Honor, that I only

6    referred to 15 in that instruction and not 16 and 17 is because

7    I don't think that there's any notion that, one, that a person

8    from one jurisdiction can ratify the action of someone from

9    another jurisdiction.  And then a failure to train doesn't make

10   sense for somebody who is not your officer.

11         THE COURT:  Well, that's true.  There is no way they

12   could train those guys.

13         MR. MACDONALD:  Your Honor, on the failure to train,

14   that's one of the reasons we have elicited testimony that they

15   failed to train jointly.  It's one of the points that

16   Mr. Mitchell made, that they could have trained.  They should

17   have trained jointly before inviting them in.

18         THE COURT:  Yeah.  You make that argument to the jury

19   and see what they think of that.

20       (Pause in the proceedings.)

21         THE COURT:  So, Mr. Ringel, the "in part" language

22   that you put in here?

23         MR. RINGEL:  The reason for that was Mr. Deras and

24   Dr. Smith have claims that are not related to other

25   jurisdictions.  So --

Kevin P. Carlin, RMR, CRR

20-cv-1878-RBJ    MATTHEW CANINO - Recross    03-23-2022

1          THE COURT:  But Packard doesn't.

2          MR. RINGEL:  I don't believe that Packard does,

3    although he has one.  I'm corrected.  He has one.  So, that's

4    why I had the "in part," because I thought that that was the

5    appropriate way to do it.

6          THE COURT:  Well, the plaintiffs won't object to that,

7    at least.  So, listen.  See if this sounds acceptable:  The

8    claims of plaintiffs Zachary Packard and Joe Deras, comma, and

9    possibly Stanford Smith, comma, against the City of Denver are

10   based in part on the acts of police officers from other

11   jurisdictions, period.  The parties disagree as to whether

12   Dr. Smith was sprayed with pepper spray by a Denver or an Aurora

13   officer.  These officers were present at the protest under a

14   mutual aid request from Denver.

15         Next paragraph:  Denver may be liable for the acts of

16   individual officers from other jurisdictions if they acted

17   pursuant to an official policy, practice, or custom of Denver

18   that caused a violation of plaintiffs' constitutional rights.

19   The fact that Denver asked for assistance from other

20   jurisdictions cannot by itself amount to a policy that caused a

21   violation of a plaintiff's constitutional rights.  It is for the

22   jury to determine by a preponderance of the evidence whether the

23   officers from the other jurisdictions were acting pursuant to an

24   official policy, practice, or custom of Denver, or pursuant to

25   the official policies, practices, or customs of their own

20-cv-1878-RBJ   MATTHEW CANINO - Recross   03-23-2022

1    jurisdictions.  Mr. Ringel?

2            MR. RINGEL:  That instruction is fine with the

3    defendants, Your Honor.

4            MR. MACDONALD:  I think for the reasons stated, we

5    object to that, Your Honor.

6            THE COURT:  What reason?

7            MR. MACDONALD:  So, I think the instructions as stated

8    already adequately set forth the *Monell* theory that we have to

9    establish either a custom, policy, practice -- policy, practice,

10   or custom, failure to train, or ratification of Denver.  And I

11   think this injection injects confusion into what can't be by

12   itself a policy violation.

13           I don't know of any law that supports the sentence that

14   Mr. Ringel suggests that the fact that Denver asked for

15   assistance from other jurisdictions cannot by itself amount to a

16   policy that caused a violation of plaintiffs' constitutional

17   rights.  I don't know where that comes from.

18           THE COURT:  Where does that come from, Mr. Ringel?

19           MR. RINGEL:  So, it's on the authority that is on that

20   right -- on the page, it's directly from the Southern District

21   of Florida in the *Rauen versus City of Miami* case, 613 F. Supp.

22   2d 1324, pinpoint 1336, Southern District of Florida, 2007.

23   Quote, the fact that the City asked for assistance from other

24   agencies cannot by itself amount to a policy of violating

25   constitutional rights.

20-cv-1878-RBJ   MATTHEW CANINO - Recross   03-23-2022

1       MR. ANDERSON:  What Mr. Ringel just read from the

2  source is different from the instruction that he is proposing in

3  a very material way.  The last clause.  It is true the case says

4  that a policy -- the invitation -- excuse me.  The fact that the

5  City asked for assistance from other agencies cannot by itself

6  amount to a policy of violating constitutional rights.

7       That is materially different than saying that it

8  doesn't amount to a policy that caused a violation of

9  constitutional rights.  In context, the case was rejecting an

10  illogical theory.

11       And the second case does exactly the same.  The quote

12  is, plaintiffs fail to demonstrate that a mutual assistance

13  agreement represents a policy intending to suppress speech.  We

14  would never argue that, but as written, that is not a correct

15  statement of law, and there's no authority for that sentence.

16       THE COURT:  I agree with you.  That sentence has to

17  come out.  But the rest of it is good; right?

18       MR. ANDERSON:  Could you please read the final

19  sentence again?  I didn't capture all of it.

20       THE COURT:  The final sentence?

21       MR. ANDERSON:  It was for the jury to determine, I

22  believe.

23       THE COURT:  It is for the jury to determine by a

24  preponderance of the evidence whether the officers from the

25  other jurisdictions were acting pursuant to an official policy,

20-cv-1878-RBJ   MATTHEW CANINO - Recross   03-23-2022

1  practice, or custom of Denver, or pursuant to the official

2  policies, practices, or customs of their own jurisdictions.

3       MR. MACDONALD:  I think the problem with that is it --

4  they could be operating pursuant to their own policies,

5  practices, and customs, and also acting pursuant to policies,

6  practices, and custom of Denver, Your Honor.  In other words,

7  they could be using weapons that are consistent with their

8  custom, policy, and practice, like Aurora did, like less-lethal

9  shotguns.

10      THE COURT:  Mr. Ringel, we could take off the, or

11 pursuant to the official custom, policies, prior practices or

12 customs of their own jurisdictions, and you could argue that.

13      MR. RINGEL:  I think that makes sense, Your Honor.

14      THE COURT:  Now, do you have any objection?

15      MR. MACDONALD:  The only final objection I have on

16 that issue, Your Honor --

17      THE COURT:  You're just impossible to please, aren't

18 you?

19      MR. MACDONALD:  Well, some people say that, Your

20 Honor.  I'm not sure we disagree.  With respect to Stanford

21 Smith, what I heard you said is the parties disagree --

22      THE COURT:  You say he's not Aurora, and they say he

23 is Aurora.  That sounds like a disagreement.

24      MR. MACDONALD:  I'm not -- we're saying we don't know,

25 because Aurora has said it's not Aurora.  Denver has said it's

20-cv-1878-RBJ   MATTHEW CANINO - Recross   03-23-2022

1   not Denver.  And so I don't know how to fix that problem, but we

2   are -- we're in the scenario where we can't identify who the

3   officer is on the line.

4        THE COURT:  There is case law that if you can't

5   identify who the wrongdoer is, you are out of luck.  For

6   example, if a bunch of police officers go chasing after a

7   suspect and catch him and put him on the ground face down, and

8   one of them beats the bejesus out of him with a baton, but he

9   didn't see who did it because he was facedown, and nobody is

10  willing to say it was that guy, they wouldn't tattle on their

11  fellow officers, then the plaintiff loses.

12       MR. MACDONALD:  Not on a *Monell* theory.  On an

13  individual officer theory, I agree with you.  That's why we

14  don't have an individual officer named with respect to

15  Dr. Smith, Your Honor.

16       THE COURT:  So, are you going to take a position or

17  not?  I guess you're not?  You're not going to say Denver did

18  it.  You're not going to say Aurora did it.  You're going to

19  say, we don't have any earthly idea who did it?

20       MR. MACDONALD:  Yeah.  We're going to say Denver is

21  responsible for the violation.

22       THE COURT:  Okay.  All right.  This will be

23  instruction number 18.

24       MR. ANDERSON:  Could I get one clarification on the

25  instruction that Your Honor read?  It's the beginning of what

20-cv-1878-RBJ    MATTHEW CANINO - Recross    03-23-2022

1    would be the second paragraph.  I believe you said Denver may be

2    liable for the acts of individual officers.  We strike the word

3    "only"; correct?

4          THE COURT:  Acts of individual officers from other

5    jurisdictions, strike the word "only"?

6          MR. ANDERSON:  Correct.  If they acted pursuant to an

7    official policy, then to make it consistent with the other

8    instruction, we would say an official policy or a practice or

9    custom, to make it consistent with how Your Honor described it

10   in instruction 15.

11         THE COURT:  Or a practice or custom.  Okay.

12         MR. RINGEL:  That's fine, Your Honor.

13         THE COURT:  Now, anything else?

14         MR. ANDERSON:  Not on this instruction.

15         MR. RINGEL:  I have a different proposed instruction

16   that I would --

17         THE COURT:  Well, we're done with this instruction

18   now?

19         MR. RINGEL:  I believe so, Your Honor.  Now, number

20   18.

21         THE COURT:  Okay.  You're the scrivener.  Do you want

22   this?

23         MR. ANDERSON:  Thank you, Your Honor.  I'll take it.

24   We also have the record here, or I can take that.  I would love

25   it.  Thank you.

20-cv-1878-RBJ   MATTHEW CANINO - Recross   03-23-2022

1        THE COURT:  Just don't lose it.  Okay.  What else,

2   Mr. Ringel?

3        MR. RINGEL:  So, it's a very simple instruction.  It's

4   based on all of the evidence principally from the presentation

5   of Norman Stamper, and it's two sentences.  It says the

6   following:  Each plaintiff may only recover for any violations

7   of their own constitutional rights.  No one may recover for a

8   violation of someone else's constitutional rights.  And the

9   reason I want that --

10        THE COURT:  I just want to hear Mr. Anderson's

11   objection.

12        MR. ANDERSON:  We have an instruction on this.  It's

13   instruction number four, and it reads, you should decide this

14   case as to each party separately.  We don't think that needs

15   further elaboration.

16        MR. RINGEL:  Respectfully, I disagree.  And the reason

17   for that is the potential exists here for the jury to be angered

18   by videos that happened with people who are not the plaintiffs,

19   of which there were about 50 presented into evidence, Your

20   Honor.  And it is not okay to have the jury compensate the

21   plaintiffs for things that didn't happen to the plaintiffs.  I

22   can provide the proposed instruction to your clerk for the

23   Court's review.

24        THE COURT:  Okay.  Let's put it into number four, if

25   you don't mind.

Kevin P. Carlin, RMR, CRR

20-cv-1878-RBJ   MATTHEW CANINO - Recross   03-23-2022

1    MR. RINGEL:  That's fine.

2    THE COURT:  You should decide the case as to each

3  party separately.  And then what was your language?

4    (Pause in the proceedings.)

5    THE COURT:  All right.  Any objection to that?

6    MR. ANDERSON:  We object to the inclusion of the

7  instruction, but we understand your Court's -- Your Honor's

8  ruling, and we will add it to number four.

9    THE COURT:  Your objection is that it's cumulative?

10  That was the only objection you made was that it's already in

11  number four.

12    MS. WANG:  Judge, the other objection which I will

13  state for the record is that it is potentially misleading in

14  terms of our *Monell* claim.  The point of Mr. Stamper's testimony

15  was not to inflame the jury to the point that they were going to

16  award damages on our clients based on things that happened to

17  other people.  It was to talk about the DPD's widespread

18  practices, customs, and official policies as shown by how they

19  treated everybody during the protests.

20    THE COURT:  Yeah, I know.  But that's not what this

21  says.  I want to correct your grammar.  Other than that --

22    MR. RINGEL:  Correct away, Your Honor.

23    THE COURT:  It's true.  They can only recover for

24  their own injuries, not for somebody else's.  That has nothing

25  to do with the *Monell* claim on liability.  Each plaintiff may

20-cv-1878-RBJ   MATTHEW CANINO - Recross   03-23-2022

1   only recover for a -- for violations -- for any violations of

2   his or her own constitutional rights.  You said their own

3   constitutional rights, but it's for his or her.

4         MR. RINGEL:  I agree with you, Your Honor.

5         THE COURT:  Own constitutional rights.  No one may

6   recover for a violation of someone else's constitutional rights.

7   And then the last sentence will be, unless otherwise stated in

8   the instructions, apply to all parts.  Okay?  Now, back to the

9   numbered ones.

10         MR. ANDERSON:  I just want to make sure I'm clear.

11   We're adding to number four the following sentence:  Each

12   plaintiff may only recover for any violations of his or her own

13   constitutional rights?

14         THE COURT:  Period.

15         MR. ANDERSON:  Period.  Thank you, Your Honor.

16         THE COURT:  And then the second sentence is that no

17   one may recover for a violation of someone else's constitutional

18   rights.

19         MR. ANDERSON:  Understood.

20         THE COURT:  I will give you my draft here when we're

21   done, if you want it.  Number, now it's 19, compensatory

22   damages.  Any objection to that one?

23         MR. RINGEL:  Your Honor, the only issue that came to

24   mind when I reviewed this is with respect to item number one and

25   the economic losses or injuries, I didn't know if the Court

Kevin P. Carlin, RMR, CRR

20-cv-1878-RBJ    MATTHEW CANINO - Recross    03-23-2022

1    wanted to incorporate anything on the Court's Rule 50 order on

2    this.

3         To me, I mean, the problem with it is there are certain

4    plaintiffs, as the Court found, that didn't present evidence of

5    this.  And so to leave it open, I think, has at least the

6    potential for problems.

7         THE COURT:  And if you put it in there, it has the

8    potential for suggesting that all the other --

9         MR. RINGEL:  I understand the dilemma, which is why I

10   raise it in the way that I did.

11        THE COURT:  My suggestion would be to leave it the way

12   it is, and in your argument --

13        MR. RINGEL:  That's fair, Your Honor.  Okay.  No

14   objection to 19.

15        THE COURT:  Plaintiffs?

16        MR. ANDERSON:  No objection to 19, Your Honor.

17        THE COURT:  Twenty, punitive damages.  Are we really

18   going to do this, punitive damages against Christian?  Who is

19   going to do the closing argument and is going to have to stand

20   up in front of the jury and argue for that?

21        MR. MACDONALD:  I will, Your Honor.

22        THE COURT:  Put it to him, ladies and gentlemen.  Hit

23   him for $5 million of punitive damages.  Of course, the Court

24   might reduce those damages to the zero that you're going to get

25   for liability damages, compensatory damages, because they will

20-cv-1878-RBJ   MATTHEW CANINO - Recross   03-23-2022

1   be so put off by your argument that they won't give him

2   anything.

3          MR. RINGEL:  I don't object to the language of the

4   instruction.  I object to the fact of the instruction being

5   given because of the argument that there is an insufficient

6   evidence to meet the requirement to submit punitive damages to

7   the jury.  But I understand the Court has rejected that argument

8   already.

9          THE COURT:  So, basically, what the plaintiffs are

10  hoping is that maybe the jury will give Epps something for her

11  bruise, or for her emotional damages, but think that Christian

12  is a schmuck, and whack him for punitive damages?  I don't think

13  so, but they can try.  The Court can always reduce a punitive

14  damages award.

15         Okay.  Because -- and frankly, all joking aside, if

16  Epps' theory as to what happened is true, then you could say --

17  you could infer that Christian acted with reckless disregard of

18  her rights, because his testimony was I was just trying to get

19  her off the street so she didn't get hit by a car.  But you

20  don't shoot somebody for that.  It's farfetched, but I think

21  there was enough for them to at least get to the jury there.

22         Okay.  Twenty-one, affirmative defense, failure to

23  mitigate.

24         MR. RINGEL:  No objection from the defendants.

25         MR. ANDERSON:  We would ask for additional instruction

20-cv-1878-RBJ    MATTHEW CANINO - Recross    03-23-2022

1    to be -- not additional instruction.  Additional language to be

2    given.  At the end of the second paragraph on page 27, we would

3    ask for the following sentence, which was previously stipulated

4    by the defendants.  It is the defendants' burden to prove the

5    amount of damages that would have been avoided by reasonable

6    mitigation.

7             THE COURT:  So, what's your theory, Mr. Ringel, on

8    this failure to mitigate?

9             MR. RINGEL:  The theory is when various plaintiffs say

10   that they suffered emotional distress related to the events of

11   the protest, and that it had no treatment, or they say this

12   really hurt me, and I had this bruise for a long period of time,

13   and there is no treatment, our theory is that a reasonable

14   person who complains about such injuries would have sought

15   either medical or mental health treatment.  That's it.

16            THE COURT:  So, what's the stock instruction on

17   failure to mitigate damages in the CJI?

18            MR. RINGEL:  I think this one is generally based on

19   it.

20            MR. ANDERSON:  We had proposed the CJI instruction.

21   They composed a competing instruction, and Your Honor went with

22   the competing instruction.

23            MR. RINGEL:  I didn't remember that, but I take

24   Mr. Anderson's word for it.

25            THE COURT:  Well, why not just use the stock

20-cv-1878-RBJ    MATTHEW CANINO - Recross    03-23-2022

1   instruction?

2          MR. RINGEL:  If the Court would prefer that, that's

3   fine with me.

4          THE COURT:  I don't know what -- of course, we're not

5   talking about Colorado law.  We're talking about federal law,

6   but there isn't a stock federal instruction.

7          MR. RINGEL:  I think this is probably from the federal

8   jury practice and instructions book, which is essentially --

9   used to be -- it used to be Devitt & Blackmar, but I know it's

10  not that anymore.

11         MR. ANDERSON:  Your Honor, we're comfortable with the

12  instruction as drafted, with the addition of the sentence that I

13  proposed.  It's the other side of the compensatory damages coin.

14  If we have the burden to establish the quantum of damages, they

15  have the burden to establish the quantum of mitigation that

16  would reduce those damages.  This is a quantum point.

17         THE COURT:  I've never seen that sentence in the

18  mitigation to damages instruction in all the times I've given

19  it.  That's why I was asking what the stock instruction says.

20  And I don't -- I don't know.  I've never had a case where I

21  thought that the jury paid any attention at all to that issue.

22         MR. RINGEL:  If I may, Your Honor?

23         THE COURT:  Mm-hmm.

24         MR. RINGEL:  With respect to the quantum point that

25  Mr. Anderson raises, I think that would potentially be

20-cv-1878-RBJ    MATTHEW CANINO - Recross    03-23-2022

1    applicable if we were talking about economic damages, if we were

2    talking about lost wages or something along those lines.  But

3    that's not what we're talking about here.  We're in the fuzzy

4    world of compensatory damages for emotional distress and for

5    injury.  And as a result, I don't think it is appropriate to

6    include that kind of quantum requirement on the defendant.

7            MR. ANDERSON:  The standard CJI instruction, Your

8    Honor, says that if defendants establish the failure to

9    mitigate, then you must determine the amount of damages caused

10   by the plaintiff's failure to take such reasonable steps.  And

11   we know that for all elements of the failure to mitigate, the

12   burden is on the defendants.

13           THE COURT:  So, it's already there, you're saying?

14           MR. ANDERSON:  CJI, civil, 5.2.

15           THE COURT:  Well, do you want that one?  He said he

16   doesn't mind that one.  And if you don't want that one, why did

17   you just say what you said?

18           MR. ANDERSON:  I was trying to respond to the Court's

19   question about whether the quantum is an element of the -- an

20   element of the instruction, and --

21           THE COURT:  Do you want the CJI 5:2?

22       (Pause in the proceedings.)

23           THE COURT:  And while they're pondering that, would

24   the defendant be willing to -- if you decide that you want to go

25   with this version, on page 27, adding at the end, after a

20-cv-1878-RBJ   MATTHEW CANINO - Recross   03-23-2022

1   plaintiff's conduct was not reasonable, the words, and this

2   failure resulted in the plaintiff -- plaintiffs sustaining an

3   amount of damages that they could reasonably have avoided?

4            MR. RINGEL:  I have no problem with that language.

5            THE COURT:  Mr. Anderson, you probably should like

6   that?

7            MR. ANDERSON:  I think I do.  Could you -- you're

8   talking about adding this to the end of the instruction; is that

9   correct?

10           THE COURT:  Yeah.  Where it says using sound

11  discretion in deciding whether defendants have satisfied this

12  burden of proving that the plaintiff's conduct was not

13  reasonable, and this failure resulted in the plaintiff's,

14  apostrophe S, sustaining an amount of damages that he or she

15  could reasonably have avoided.

16           MR. ANDERSON:  That works, Your Honor.  Thank you.

17           THE COURT:  Sold.

18           MR. RINGEL:  Sold.

19           THE COURT:  Number 21, duties upon retiring.  There's

20  not going to be any big dispute about that one, I assume.

21           MR. RINGEL:  No objection.

22           MR. ANDERSON:  I just have six points on that one,

23  Your Honor.

24           THE COURT:  Now, we've got the set of instructions.

25  Let's talk about the verdict.  All I've got is the plaintiffs'

20-cv-1878-RBJ   MATTHEW CANINO - Recross   03-23-2022

1    proposed verdict form.

2         MR. RINGEL:  Your Honor, I had circulated to the

3    plaintiffs' counsel this morning before court some proposed

4    special interrogatories, and what we tried to do was identify

5    each incident involving each plaintiff, because I think it's

6    important to --

7         THE COURT:  Each incident?

8         MR. RINGEL:  Yes, Your Honor.  And the reason for that

9    is -- should make sense to the Court, based on the discussion

10   related to the other officers.  So, if there's a general verdict

11   and the Court is wrong about the issue of whether Denver can be

12   responsible for the actions of the other officers, it therefore

13   isn't necessarily an issue that we can appeal, because there

14   will be no way to know what the jury's verdict is.  And because

15   I think we need a differentiation with respect to those events

16   for sure, I didn't know any other way to do it than to

17   differentiate between all of the events.

18        THE COURT:  Why don't we just have a question to ask

19   them to say, did the actions of the partner jurisdiction's

20   officers with respect to Packard, Deras, and Smith, were they

21   pursuant to the official policy, comma, practice, comma, or

22   custom of Denver, or their own jurisdictions?

23        MR. RINGEL:  Well, I mean, we think that the

24   plaintiffs need to establish each of the events that they're

25   claiming about, and that a general verdict isn't an appropriate

20-cv-1878-RBJ   MATTHEW CANINO - Recross   03-23-2022

1   way to do this.  I understand the Court's concern with

2   cumbersomeness, and I appreciate that, but each of these facts,

3   each of these factual incidents is separate and should be

4   considered individually.

5            THE COURT:  So, you're saying that the jury should

6   be -- or we should be writing out the specific testimony of each

7   plaintiff?

8            MR. RINGEL:  No.  The way that we did it, Your Honor,

9   is we have a -- we have each plaintiff, and then we have all of

10  the events that at least from our understanding they believed in

11  terms of time, date, and location.  And then it just says, is

12  there a Fourth amendment violation?  Is there a First amendment

13  violation?  And then with respect to the ones that involve --

14           THE COURT:  Why is there a 14th amendment thing on

15  here, by the way?

16           MR. ANDERSON:  There shouldn't be, Your Honor.  The

17  current version we have removed all the 14th amendment from the

18  verdict form.

19           THE COURT:  And I don't -- I don't know what he wrote

20  out the incidents were on each one, but I can imagine how you

21  would be all excited about that.  It puts some specifics to your

22  claims.  Maybe you don't want to have any specifics.  You want

23  to just leave it kind of vague.

24           MR. MACDONALD:  We don't think there should be 48 or

25  52 different questions, Your Honor.  138.  I'm sorry.  They have

20-cv-1878-RBJ    MATTHEW CANINO - Recross    03-23-2022

1   138.

2           MS. WANG:  Judge, it's a ten-page form with 138

3   questions, and several of them are actually inaccurate.  So, I

4   don't know if there's some misunderstanding about what the

5   testimony is, but it --

6           THE COURT:  Okay.  I'm not going to put 138 different

7   events on the verdict form.  So, now I've got a different

8   plaintiffs' proposed verdict form.  I still haven't seen the

9   defendants'.

10          MS. WANG:  They never disclosed one to us, Judge.

11          THE COURT:  So, right now, Mr. Ringel, all I've got is

12  there's --

13          MR. RINGEL:  So, I would tender the Court the

14  defendants' proposed special interrogatories that I previously

15  identified.

16          THE COURT:  That asks me to make a judgment as to what

17  the testimony was, and I don't think that's right for me to do

18  that.

19          MR. RINGEL:  Well, I understand the Court's --

20          THE COURT:  I invited the plaintiff to stipulate to it

21  if they wanted to, because I thought maybe they would want to do

22  that, because that would give the jurors something very concrete

23  to look at.  But they don't want to do that.

24          MR. RINGEL:  Well, I understand.  I think that's the

25  appropriate way to do it.  I understand the Court disagrees with

20-cv-1878-RBJ    MATTHEW CANINO - Recross    03-23-2022

 1   me.  But I think at a minimum, there needs to be a specific

 2   interrogatory with respect to Dr. Smith, Mr. Packard, and

 3   Mr. Deras, and whether there is a finding of liability.

 4              THE COURT:  Yeah.  I agree with that.

 5              MR. RINGEL:  Okay.

 6              THE COURT:  All right.  So, we're working on the

 7   plaintiffs' verdict form, because that's all I've got.

 8              MR. RINGEL:  So, if --

 9              THE COURT:  We the jury, upon our oaths, find and

10   state as follows.  And then they go through each one of these.

11              MR. RINGEL:  So, I don't think it's appropriate for it

12   to be First amendment and then unreasonable force.  I think it

13   should be Fourth amendment.

14              THE COURT:  Well, you can't blame them for trying, can

15   you?  Shouldn't we have -- this is too general of a verdict.  We

16   don't learn anything from this verdict.  We need to learn what

17   we can from this jury after all this time and all this evidence.

18   So, they've got three theories now.  They've got the official

19   policies, comma, practice, or custom.  And they've got their

20   training theory, and they've got their --

21              MR. RINGEL:  Ratification, Your Honor.

22              THE COURT:  Ratification theory.  So, I think we need

23   to have them answer whether they are rendering a verdict on one

24   or more of those specific theories.  Why wouldn't we -- why

25   wouldn't the first question be -- would be whether the

20-cv-1878-RBJ   MATTHEW CANINO - Recross   03-23-2022

1  plaintiffs proved by a preponderance of the evidence any one or

2  more of their theories that individual actions of officers --

3  how would we do this?

4           MR. ANDERSON:  Your Honor, may I propose something?

5           THE COURT:  Yeah.

6           MR. ANDERSON:  On that first box, this is Claire

7  Sannier's claims only against the City of Denver, and we have

8  instructed them on the elements.  Instead of just a yes or no

9  column, we could include each of the three liability -- *Monell*

10 liability theories.  Check all that apply.

11          THE COURT:  Yeah.  See, I think you have to find out a

12 couple things.  The first thing you need to find out is whether

13 the plaintiffs proved that the actions of any one or more Denver

14 police officers violated her First amendment claims, violated

15 her Fourth amendment claims.  And then if the answer is yes,

16 then you have to ask, and did the officer or officers who

17 violated her rights act pursuant to an official policy, a

18 custom, or a practice?  Yes or no.  Or because of insufficient

19 training?  Yes or no.  Or because of -- or were their actions

20 ratified?  Yes or no.

21          So, that way we know -- we know -- we need to have the

22 jury tell us did any of these Denver officers -- did any of the

23 Denver officers or Aurora or Jeff. Co. officers violate -- well,

24 with Sannier, it would just be did any Denver police officer or

25 officers violate her First amendment rights?  Yes or no.  Her

20-cv-1878-RBJ   MATTHEW CANINO - Recross   03-23-2022

1   Fourth amendment rights?  Yes or no.  First amendment rights, as

2   instructed in number 11?  Yes or no.  Fourth amendment as

3   instructed in 12?  Yes or no.

4          If the answer is yes, then were those officers acting

5   pursuant to an official policy, comma, custom, comma, or

6   practice of Denver?  Yes or no.  Were they acting -- were their

7   acts due to insufficient training?  The deliberate indifference

8   is built into that training instruction, official policy,

9   practice, or custom as defined in instruction 13, or training as

10  in 14, or were their actions ratified as in 15?  Yes or no to

11  each of those.

12         So, in other words, for Sannier to get money, she has

13  to prove that her rights were violated by some police officers,

14  and that that happened either on a policy, training, or

15  ratification theory; right?  And that has to be true of all of

16  them, except that when we get to those three, Packard and Deras

17  and Smith --

18         MR. RINGEL:  There has to be an additional question.

19         THE COURT:  There has to be an additional check --

20  well, on Packard or Deras --

21         MR. RINGEL:  See, that's the problem.

22         THE COURT:  The question would be by the Jeff. Co.

23  officer or by an Aurora officer, whichever one.

24         MR. RINGEL:  So, the complicating factor with respect

25  to those three individuals is some of their claims are based on

20-cv-1878-RBJ   MATTHEW CANINO - Recross   03-23-2022

1   Denver officers, and some of them, their claims are based on

2   officers from other jurisdictions.  That goes back to the "in

3   part" language of the proposed instruction that we talked about

4   earlier this afternoon, because for example -- so, that's why I

5   went to the special interrogatories on an event-by-event basis.

6   But I understand the cumbersomeness of that, and I understand

7   why the Court doesn't want to do that, but it is complicated,

8   because Dr. Smith --

9          THE COURT:  It's a little bit complicated, but it's

10  not that hard.  It only affects three of them, and all you have

11  to do is ask the additional question if the harms -- if their

12  rights were violated by a sister agency, was that pursuant to an

13  official policy or custom of Denver?

14         MR. RINGEL:  And you could, with respect to those

15  three incidents, identify the time and location.

16         THE COURT:  All right.  You agree with this; right?

17         MR. ANDERSON:  I think it gets quite cumbersome, Your

18  Honor, and I think the instructions --

19         THE COURT:  You want to go to this cumbersome?

20         MR. ANDERSON:  I'm still trying to wrap my head around

21  how it will look on the page, Your Honor.  And so apologies for

22  not having an answer.

23         THE COURT:  We're not going to just say to this jury

24  after all this time, does Sannier win?  Yes or no.  How much?  I

25  want to get more out of this jury than that.

20-cv-1878-RBJ   MATTHEW CANINO - Recross   03-23-2022

1    MS. WANG:  Judge, if I may?  So, I think if we can

2    formulate -- and you were sort of talking out loud and thinking

3    out loud in terms of what the questions could look like.  And I

4    think at some point you had mentioned that -- I mean, if we

5    could pose a question that gets them to answer which *Monell*

6    theories, if any, they're finding for us on without restating

7    the entire instruction, but instead referring back to the

8    instruction that we've already worked very hard on, I think we

9    could figure something out along those lines, at least for me.

10   But I would need a moment to think about what that would say.

11            THE COURT:  Well, Gavriel has just thought it through

12   for you.  Send them a copy of that email, please.

13            THE LAW CLERK:  I will print it out.

14            THE COURT:  Which email recipient do you want to have

15   receive --

16            MS. WANG:  Elizabeth W --

17            THE LAW CLERK:  You can just write it down.

18            THE COURT:  If you got it in front of you where you

19   can see where he just --

20            THE LAW CLERK:  I think we're going to do both, but if

21   you will pass me your emails, I will give it to him.

22            THE COURT:  I'm not sure that his proposal on Packard

23   is sufficient, but it shows how easily we can do this without

24   being cumbersome.  So, if you look at what he's done there, on

25   Sannier it says, were rights violated by Denver officers?  Yes

20-cv-1878-RBJ   MATTHEW CANINO - Recross   03-23-2022

1   or no.  If the answer is no --

2          MR. MACDONALD:  We don't have it yet, Your Honor.

3          THE COURT:  If the answer is no, then that's it for

4   her.  She loses.  If the answer is yes, then they answer

5   question two.  Were rights violated pursuant to policy, custom,

6   practice, training, ratification, none?  For the First amendment

7   and for the Fourth amendment.  That's pretty succinct.  On

8   Packard, I think you have to -- you have to add a second

9   question, were rights violated by Aurora officers?  Yes or no.

10  And then if they say yes, either Denver or Aurora --

11         MR. RINGEL:  So, it looks like the second box on that,

12  is what that concept is.  So, there's the first one.

13         THE COURT:  I see.  I didn't see the box.  Okay.

14  Yeah.  I think he's got it.

15         MR. RINGEL:  That conceptually makes sense to me.

16  Does the Court want to refer in this to the instructions so that

17  there's sort of a roadmap for them?

18         THE COURT:  I usually do.

19         MR. MACDONALD:  What was the question, Your Honor?

20         THE COURT:  So, look at just the Sannier as an

21  example, the first one.  The first question, I think, is were

22  rights violated by -- were her constitutional rights violated by

23  Denver officers?  Yes or no.  Underneath that you put, if the

24  answer is no, then move to the next plaintiff.  If the answer is

25  yes, go to question two.  Were her rights violated pursuant to

20-cv-1878-RBJ    MATTHEW CANINO - Recross    03-23-2022

1  First amendment?  You put in parentheses instruction 11.  Fourth

2  amendment, instruction -- in parentheses, instruction 12.  And

3  then under policy, custom, and practice, you could say in

4  parentheses, instruction 13.

5          MR. RINGEL:  I think it's 15, but yeah.

6          THE COURT:  Yeah.

7          MR. RINGEL:  But wouldn't you need --

8          THE COURT:  Fifteen, and then training would be 16,

9  and then ratification would be 17.

10          MR. RINGEL:  And then some instruction that says

11  please check all that apply?  Something like that?

12          THE COURT:  Yeah.  We could do that.

13          MR. RINGEL:  And then I would think you would need

14  boxes under the constitutional rights violation for both the two

15  amendments as well.

16          THE COURT:  Is this concept acceptable to the

17  plaintiff?

18          MR. MACDONALD:  I think for the Epps plaintiffs, I

19  think the first one for the folks other than, for us Packard --

20  I'm having trouble with the Packard one, because I think it

21  could be confusing in that there's a binary choice here.  So,

22  I'm having trouble with the fact that --

23          THE COURT:  Packard there has to be -- well, he's got

24  the binary choice.  He's got the block for Denver and the block

25  for Aurora or Jeff. Co.  Packard is just Aurora; right?  Nobody

20-cv-1878-RBJ   MATTHEW CANINO - Recross   03-23-2022

1  says Jeff. Co. shot him, do they?

2          MR. MACDONALD:  That is true.  I think having the two

3  sets of questions for him, I'm having trouble wrapping my head

4  around that, Your Honor, if I'm a juror.

5          THE COURT:  Actually, Mr. Ringel, that's his "in part"

6  stuff.  He did that out of intellectual honesty for you.

7          MR. RINGEL:  Well, because my understanding is

8  Mr. Packard has a claim other than the one that he was seriously

9  injured where he's alleging that someone from Denver shot at

10 him.  So, I agree with Mr. Macdonald, because it's not a binary

11 choice with respect to all incidents involving Mr. Packard.

12 It's essentially, is there a constitutional violation on

13 incident one, and is it pursuant to a Denver policy?  Is there a

14 constitutional violation on incident two, and is it pursuant to

15 Denver policy?  But I think there needs to be --

16         THE COURT:  What do you mean, incident one, incident

17 two?

18         MR. RINGEL:  My memory is that Mr. Packard is

19 complaining about two events that happened to him, two different

20 incidents.  The first one just involved Denver.

21         THE COURT:  I'm not getting incident by incident.  We

22 already passed that.  Look, this concept that my law clerk

23 figured out while we were stewing about it generally looks like

24 it would work.  It has to be modified a little bit.  After the

25 first question, were rights violated by Denver officers?  For

                    Kevin P. Carlin, RMR, CRR

20-cv-1878-RBJ    MATTHEW CANINO - Recross    03-23-2022

1    example, if the answer is no, then they go to question two.  If

2    the answer is yes -- or no.  On Packard, if the answer is yes,

3    they answer two right underneath it.  If the answer is no, then

4    they should go down and answer the question about Aurora.  We've

5    gotta put those instructions in there, but the basic idea is

6    right there.  Does anybody object to it?

7          MR. RINGEL:  I don't object to it as a concept, Your

8    Honor.  I think we need to see the actual verdict form, but I

9    understand as a concept --

10          THE COURT:  If they will say they don't object to it

11   as a concept, but they need to see it in writing, and you say

12   that, then we're done here.  You two are going to figure this

13   out tonight.

14          MS. WANG:  Judge, I think -- and the Packard concept

15   applies to Joe Deras too.  I think to resolve the question that

16   Mr. Macdonald raised, for Packard and Deras, it would have to be

17   that they answer both the first box regarding Denver officers

18   and the box that goes with it, and also the second one.  Not

19   that --

20          THE COURT:  Yes.  Yes.

21          MS. WANG:  Okay.  Not that -- they have to answer

22   both?

23          THE COURT:  Yes.

24          MS. WANG:  We will work on the language.

25          THE COURT:  Deal?  Deal?  Good luck.  We will see your

20-cv-1878-RBJ   MATTHEW CANINO - Recross   03-23-2022

1  verdict form, the Gavriel Schreiber Memorial Verdict Form.  He's

2  in mourning today.  He's in mourning.  He did this despite his

3  sorrow.

4            MR. RINGEL:  What is his sorrow, Your Honor?

5            THE COURT:  He's a Kansas City Chiefs fan.  Gave away

6  their famous wide receiver.

7            MR. RINGEL:  He doesn't get any sympathy from a Denver

8  Broncos fan.

9            THE COURT:  Oh, no.  I think he's full of beans.

10            MR. MACDONALD:  Your Honor, do you want us to close

11  tomorrow afternoon or Friday, or do you have a preference?

12            THE COURT:  I think you could probably close tomorrow.

13            MR. MACDONALD:  Just wanted to know your preference,

14  Your Honor.

15            THE COURT:  And that would give the jury -- I don't

16  like to have you close at 3 o'clock in the afternoon on a

17  Friday, especially since your buddy Walsh was in here walking

18  and shaking your hand.  He's wanting to see if his case is going

19  Monday.

20            MR. MACDONALD:  He's been in my ear the last two

21  weekends, Your Honor.

22            MR. RINGEL:  So, my assumption is that Division Chief

23  Thomas will take most of the morning, if not all morning with

24  cross examination.

25            THE COURT:  Then I will instruct as soon as he's done

20-cv-1878-RBJ   MATTHEW CANINO - Recross   03-23-2022

1   with that.  And then depending on where we are in the day, we'll

2   go right into closing arguments, or we'll have lunch first.

3            MR. RINGEL:  Okay.  How does the Court handle it if

4   closing isn't going to be finished in the afternoon of tomorrow?

5   I mean, because my assumption is that there's going to be

6   closing for both sets of plaintiffs, and then closing from us,

7   and then rebuttal from both sets of plaintiffs.  So, that is

8   going to take a fair amount of time.

9            THE COURT:  So, then we will split.  Maybe yours will

10  have to be Friday morning.  Good for you.  You get overnight to

11  refine it.  Are you guys suggesting something different than

12  that?

13           MS. WANG:  No.

14           MR. RINGEL:  No.  I just wanted to understand what the

15  Court's preference is.  That's all.

16           THE COURT:  My preference would be to get as much done

17  as we can tomorrow, just so the jury has plenty of time, because

18  there's a lot for them to consider.  I don't think the jury is

19  going to give you a 30-minute verdict here.

20           MR. RINGEL:  I don't either, Your Honor.

21           THE COURT:  Ideally, I would love to see them have all

22  day Friday to think about it.  And by the way, you folks have

23  gotta rein yourself in in terms of the length of your closings.

24  Going over all the evidence is not going to work.  They're not

25  going to want that.  Get your highlights.  Use the instructions.

20-cv-1878-RBJ   MATTHEW CANINO - Recross   03-23-2022

1    You know how to do it.  All right.  Thank you, Kevin.

2         (Proceedings concluded at 5:40 p.m.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

2796

1                    REPORTER'S CERTIFICATE

2

3

4         I, KEVIN P. CARLIN, Official Court Reporter for the

5    United States District Court for the District of Colorado, a

6    Registered Merit Reporter and Certified Realtime Reporter, do

7    hereby certify that I reported by machine shorthand the

8    proceedings contained herein at the time and place

9    aforementioned and that the foregoing pages constitute a full,

10   true, and correct transcript.

11         Dated this 10th day of April, 2022.

12

13

14

15

16                              _____
                                Kevin P. Carlin, RMR, CRR
17                              Official Court Reporter

18

19

20

21

22

23

24

25

                    Kevin P. Carlin, RMR, CRR