1                    IN THE UNITED STATES DISTRICT COURT

2                       FOR THE DISTRICT OF COLORADO

3     Civil Action No. 20-cv-1878-RBJ

4     ELISABETH EPPS AND SARA FITOURI, ET AL.,

5            Plaintiffs,

6            vs.

7     CITY AND COUNTY OF DENVER, ET AL.,

8            Defendants.

9     ----------------------------------------------------------------

10                       REPORTER'S TRANSCRIPT

11                       Jury Trial, Vol. 14

12    ----------------------------------------------------------------

13           Proceedings before the HONORABLE R. BROOKE JACKSON,
      Judge, United States District Court for the District of
14    Colorado, commencing on the 24th day of March, 2022, in
      Courtroom A902, United States Courthouse, Denver, Colorado.

15

16                            APPEARANCES
      For the Plaintiffs:
17    TIMOTHY R. MACDONALD, MATTHEW J. DOUGLAS, and R. REEVES
      ANDERSON, Arnold & Porter Kaye Scholer LLP, 1144 Fifteenth
18    Street, Suite 3100, Denver, CO 80202

19    ELIZABETH C. WANG and MAKEBA RUTAHINDURWA, Loevy & Loevy, 2060
      Broadway Street, Suite 460, Boulder, CO 80302

20

21    For the Defendants:
      ANDREW D. RINGEL, KATHERINE HOFFMAN, and ROBERT A. WEINER, Hall
22    & Evans LLC, 1001 Seventeenth Street, Suite 300, Denver, CO
      80202

23
      HOLLIE R. BIRKHOLZ and LINDSAY M. JORDAN, Denver City Attorney's
24    Office, 201 West Colfax Avenue, Denver, CO 80202

25    Reported By KEVIN P. CARLIN, RMR, CRR, 901 19th Street, Room
      A259, Denver, CO 80294, (303)335-2358

        Proceedings reported by mechanical stenography; transcription
                      produced via computer.

20-cv-1878-RBJ     Jury Trial     03-24-2022

1                              I N D E X

2  PLAINTIFFS' EXHIBITS:

3                         Identified              Received

4

5      634               2904                    2904

6

7  DEFENDANTS' WITNESSES                            PAGE

8  RONALD THOMAS
       Direct Examination By Mr. Ringel . . . . . . . . 2801
9      Cross Examination By Mr. Douglas . . . . . . . . 2899
       Redirect Examination By Mr. Ringel . . . . . . . 2916
10

11 Closing Argument by Mr. Macdonald . . . . . . . . . 2939

12 Closing Argument by Ms. Wang  . . . . . . . . . . . 2972

13 Reporter's Certificate  . . . . . . . . . . . . . . 2989

14

15

16

17

18

19

20

21

22

23

24

25

20-cv-1878-RBJ     Jury Trial    03-24-2022

1                     P R O C E E D I N G S

2        (Proceedings commenced at 9:07 a.m.)

3            MR. MACDONALD:  Before we bring in the jury, can I

4   raise one issue, Your Honor?

5            THE COURT:  Okay.

6            MR. MACDONALD:  We worked last night to do the Gavriel

7   Schreiber Memorial Verdict Form.  We sent it to defense counsel.

8   We haven't heard back from them.  I think they're still looking

9   at it.  Would you like us to wait to give you an opportunity to

10  look at it?

11           THE COURT:  Absolutely.

12           MR. MACDONALD:  Would you like a copy of it now?

13           THE COURT:  No.

14           MR. MACDONALD:  Okay.  Thank you.

15           MS. WANG:  Judge, I do have one issue prior to Deputy

16  Chief Thomas' testimony, and that is I just want to make sure

17  that the defendants are not going ask him about the purpose of

18  the curfew.  Because we raised this issue before and bifurcated

19  the curfew claim.  So, I just want to raise that now so that we

20  don't have him asking about it and then having a dispute about

21  it during the testimony.

22           MR. RINGEL:  There is no intent to raise the curfew

23  with Chief Thomas in his direct examination.

24           THE COURT:  Why didn't you just ask Mr. Ringel?

25  Really.  You're not going to answer me?

Kevin P. Carlin, RMR, CRR

20-cv-1878-RBJ     Jury Trial    03-24-2022

1          MS. WANG:  I forgot.

2          THE COURT:  All right.

3          MR. RINGEL:  Your Honor, I would advise the Court I

4   would make a mini-statement to the jury prior to Chief Thomas'

5   testimony.

6          THE COURT:  Sure.

7          MR. RINGEL:  Okay.  Thank you.

8      (Jury in at 9:09 a.m.)

9          THE COURT:  Good morning.  Happy Thursday.  Happy

10  almost last day.  And we have a witness, but you were going to

11  make one of those mini-statements first, and then we will have

12  the witness?

13          MR. RINGEL:  Correct, Your Honor.

14          THE COURT:  Go ahead, Mr. Ringel.

15          MR. RINGEL:  Good morning, members of the jury.  You

16  made it.  We're about to have our last witness.  I don't know

17  whether I'm more excited about that or you are more excited

18  about that.

19          During the defense presentation this week, we've tried

20  to provide you with some sort of specific information related to

21  individual officers' experiences in the protests, training,

22  injuries to officers, and damage to City buildings.  Our last

23  witness is Division Chief Ron Thomas.  Chief Thomas is the

24  division chief in charge of the patrol function of the Denver

25  Police Department, and what we're going to hopefully talk about

20-cv-1878-RBJ   RONALD THOMAS - Direct   03-24-2022

1   with Chief Thomas is more of a big picture, sort of an

2   understanding of the context and generally things that were

3   happening with -- related to the protests.

4          THE COURT:  Okay.

5          MR. RINGEL:  Defendants call Ron Thomas, Your Honor.

6          THE COURT:  Good morning.

7      (The Witness is Sworn)

8          THE COURT:  Have a seat, please.

9                    **DIRECT EXAMINATION**

10  BY MR. RINGEL

11  Q    Good morning, Chief Thomas.

12  A    Good morning.

13  Q    Would you state your name, and spell your last name for the

14  record, please.

15  A    Ronald A. Thomas, and that's T-H-O-M-A-S.

16  Q    And the first thing I wanted to ask you about is your

17  educational background.  Would you describe your education for

18  the jury, please.

19  A    Certainly.  So, I earned a bachelor's degree of science

20  with a major in criminal justice from the University of Colorado

21  Denver.  I've also had quite a bit of postgraduate education as

22  well.  I attended the FBI National Academy in 2011.  Also

23  attended the Senior Management Institute for Police, which is

24  sponsored by PERF.  Also attended Leadership in Police

25  Organizations, which is sponsored by IECP.  I also attended an

20-cv-1878-RBJ   RONALD THOMAS - Direct   03-24-2022

1  executive leaders program that is sponsored by the Naval

2  Postgraduate Academy, and I also attended the Northwestern

3  Command College.

4  Q    Chief, how long have you been a police officer?

5  A    Since 1989.

6  Q    What made you initially decide you wanted to pursue a

7  career in law enforcement?

8  A    Well, it's kind of a long story.  So, my parents gave

9  service to their community.  My mother worked for the department

10  of services, social services.  My father was a mail carrier.

11  So, I kind of had that in my blood.  So, didn't know initially

12  how I was going to give back to my community when I was young,

13  but as I was entering college, I became aware of a program --

14  the cadet program where the Denver Police Department essentially

15  provides like an internship opportunity where they pay for your

16  schooling, and you do some clerical work for the police

17  department.

18        Also involved in that is giving you opportunities to

19  do, you know, ride-along experiences with the different safety

20  components within the City of Denver.  And it didn't take me

21  very long to realize that the best way that I could give back to

22  my community was by being a police officer.

23  Q    And so I want -- you've been a police officer, you said,

24  for -- I don't know.  My math is bad.  As we've all established,

25  the lawyers don't do math here, but essentially 33 years?  Does

20-cv-1878-RBJ   RONALD THOMAS - Direct   03-24-2022

1    that sound right?

2    A    Roughly, yes.

3    Q    Okay.  I don't want to ask you in detail about your career

4    with the Denver Police Department, but if you could give the

5    jury an overview of your career so they can kind of understand

6    the different roles that you've fulfilled in the department.  I

7    think that would be helpful.

8    A    Certainly.  So, I graduated from the academy in 1989.  My

9    first patrol assignment was in District 2, which is Northeast

10   Denver, and I served in a number of patrol and specialized unit

11   functions as a patrol officer in District 2.  Mid '90s, I was

12   given an opportunity to be a detective.  Did some property and

13   persons crimes investigations as a detective.  I was also a

14   member of the mayor's executive security staff.

15        In 1997 I was promoted to the rank of sergeant and

16   assigned to District 4, which is in Southwest Denver.  Again,

17   supervised patrol officers and also managed some specialized

18   units as a sergeant in District 4.  I then went and became a

19   supervisor in our narcotics bureau.  And then was assigned as a

20   sergeant in the internal affairs bureau.

21        From there, I was promoted to the rank of lieutenant,

22   where I went to Northwest Denver in District 1, was a shift

23   lieutenant, and then was the administrative lieutenant in

24   District 1.  Even served in the capacity of the active commander

25   in District 1.  Then was selected to manage the complex

20-cv-1878-RBJ   RONALD THOMAS - Direct   03-24-2022

1  investigations section in Denver, where I managed the fugitive

2  unit, internet predators, and the complex investigations team.

3       From there, I was selected to be a lieutenant in the

4  internal affairs bureau. Soon after that, I was promoted to the

5  rank of commander, where I became the commander of the internal

6  affairs division. I then was chosen to become a district

7  commander, where I went to District 5, which is the far

8  northeast section of our city.

9       Spent a number of years there, and then had a brief

10 stint as the commander of District 2, which is Northeast Denver.

11 And then in 2018, Chief Pazen was selected to be the chief of

12 police, and I was appointed to the rank of division chief.

13 Q   And you serve as division chief of what division?

14 A   The patrol division.

15 Q   And we're going to talk about that in a little bit, what

16 you do as division chief in the patrol division, but to sort of

17 orient the jury, can you describe generally what roles you have

18 served in with respect to responding to protests and crowd

19 management or crowd control situations?

20 A   Certainly. So, my first recollection of being involved in

21 crowd management is as a supervisor. I remember being a

22 sergeant supervising a team of officers that was deployed, I

23 think it was, you know, one of the Bronco Super Bowl victories

24 in the late '90s. So, I managed a team of officers that were

25 called to respond to that.

20-cv-1878-RBJ    RONALD THOMAS - Direct    03-24-2022

1       I've been, as a lieutenant, had the opportunity to lead

2    a team of officers, sergeants and officers assigned to them to

3    manage crowds.  And then even as a commander, managed an even

4    larger contingent of officers, managing, I think as a commander,

5    it was the Broncos Super Bowl 50 victory.

6    Q    Thank you, Chief.  Let's turn now to your role as the

7    division chief of patrol.  Can you generally describe for the

8    jury what that role entails and what your duties and

9    responsibilities were.

10   A    Certainly.  So, the city is divided into six police

11   districts, and each police district has a commander that's the

12   commanding officer for that particular district.  Those six

13   commanders are my direct reports.  So, I manage all of the

14   patrol functions for the city, and that would include police

15   officers responding to calls for service, as well as

16   investigators who are investigating property and some persons

17   crimes.  I like to say that I actually work for them, because I

18   am supplying them with the tools that they need to be successful

19   at their jobs.

20   Q    How many people work in the patrol division, approximately?

21   A    You know, just under 1,000, I think.  I think that some

22   districts have, you know, roughly 120, 125 officers.  Others

23   have as many as 180.

24   Q    And we've heard some testimony during this trial about

25   SWAT.  Is SWAT within the scope of your responsibilities as the

20-cv-1878-RBJ   RONALD THOMAS - Direct   03-24-2022

1   division chief of patrol?

2   A   No, sir.  They are assigned to special operations, which is

3   under the division chief of investigations.

4   Q   Okay.  We've also heard about what is now called SORT, but

5   what used to be called the gang unit.  Is that a function that's

6   within your scope as the division chief of patrol?

7   A   No.  Again, that's under special operations, and managed by

8   the division chief of investigations.

9   Q   Okay.  Who is -- who are your -- who are your supervisors

10  in your role?

11  A   So, Deputy Chief Barb Archer is my immediate supervisor,

12  and then also Chief Pazen, the chief of police.

13  Q   Okay.  Are there more than -- you're not the only division

14  chief; right?

15  A   That is correct.

16  Q   What other positions are there division chiefs for other

17  than the division chief of patrol?

18  A   Certainly.  So, as I just mentioned, there's the division

19  chief of investigations, as well as the division chief of

20  administration.

21  Q   Okay.  So, there are three division chiefs?

22  A   Correct.

23  Q   A deputy chief, and the chief of police?

24  A   That's correct.

25  Q   Is that considered sort of the senior leadership team of

20-cv-1878-RBJ   RONALD THOMAS - Direct   03-24-2022

1   the Denver Police Department?

2   A   Yes, sir.

3   Q   Okay.  Do sometimes the five of you make decisions

4   collectively?

5   A   Yes.

6   Q   Okay.  I mean, ultimately, the chief of police is the one

7   who makes the decision, and the rest of you provide insight and

8   recommendations?  Is that how that works?

9   A   Certainly.

10  Q   Okay.  All right.  I wanted to drill down a little bit

11  about what the patrol division does so that the jury can

12  understand the context of what occurs.  So, where do the

13  officers in the patrol division work specifically?

14  A   They specifically work in the districts to which they're

15  assigned.

16  Q   Okay.  And as I think you said, there are six district

17  stations in the City and County of Denver?

18  A   Correct.

19  Q   Are some of them larger than others?

20  A   Yes.  Larger in land mass, and also larger in terms of the

21  number of officers that are assigned.

22  Q   Okay.  What's sort of the range of the sort of number of

23  officers at each of the different districts?

24  A   So, District 5 probably has the smallest number of

25  officers, roughly 120, 125 officers.  And then District 6, even

20-cv-1878-RBJ    RONALD THOMAS - Direct    03-24-2022

1   though it may be the smallest district in terms of land mass has

2   the largest number of officers, roughly 180.

3   Q    And where is District 6 located?

4   A    Central downtown.

5   Q    And that's the -- so, central downtown is the geographic

6   scope of District 6?

7   A    Correct.

8   Q    And the physical building is at Colfax and Washington?

9   A    That is correct.

10  Q    All right.  Why are there more patrol officers assigned to

11  District 6 as opposed to District 5, as an example?

12  A    So, personnel assignments are made based on workload.  And

13  so certainly the workload is much heavier in District 6 than it

14  is in the other districts.  So, more reported crimes, more calls

15  for service.  Certainly during the day, there is a large

16  collection of people in the downtown core.  Certainly has more

17  challenges than the other districts.  You know, quite a

18  population of unhoused community members.

19  Q    Okay.  I understand.  That makes sense.  All right.  What

20  does a patrol officer at, say, District 6 do on a day-to-day

21  basis?

22  A    So, they really have two functions.  Their primary function

23  is to respond to calls for service.  They are also aware of the

24  crime trends in the districts, and do some proactive work

25  patrolling the streets that are in their particular precinct to

20-cv-1878-RBJ   RONALD THOMAS - Direct   03-24-2022

1   which they're assigned, trying to prevent crime from occurring.

2   Q    You've used the phrase a "call for service."  Can you

3   explain what that means to the jury.

4   A    Yes.  So, when a citizen needs -- when a crime has occurred

5   or a citizen needs some sort of emergency assistance, they would

6   either call 911 or call the nonemergency number.  A dispatcher

7   would then assign that call to an officer, and that officer

8   would respond and handle that call.

9   Q    Okay.  That's sort of the principal function of patrol

10  officers; is that fair?

11  A    Yes.

12  Q    And then they also -- when they're not responding to a call

13  for service, they're patrolling a particular segment of the

14  district for which they work?

15  A    That's correct.

16  Q    So, if one thinks about it as a grid, there are different

17  officers in patrol are assigned to different parts of the grid

18  related to a district.  Is that a fair way to think about it?

19  A    That is a fair statement.

20  Q    Okay.  All right.  What types of issues do you face in

21  supervising sort of the general patrol functions of the patrol

22  division?  In other words, what comes to your attention where

23  you're going to have to make a decision or put input on those

24  kind of -- those kind of functions?

25  A    Certainly personnel assignments.  Direction from the chief

20-cv-1878-RBJ   RONALD THOMAS - Direct   03-24-2022

1   of police that needs to be passed down through the ranks, that

2   would be given to me through -- to the -- to the district

3   commanders, and then I would assure that that communication

4   goes -- you know, goes down the line and is received by the line

5   officers.

6   Q   So, how do you -- what kinds of things do you do in terms

7   of oversight and supervision of the patrol function?  Can you

8   explain that to us, please.

9   A   There's a number of things I do.  So, each shift in each

10  district, they complete an end of watch, which basically details

11  all their activity for their shift, and I review each of those

12  throughout the day.  I am also familiar with some of the -- some

13  of the challenges in each district.  Sometimes community

14  concerns are brought directly to me, and then I facilitate

15  through those patrol districts getting those issues addressed.

16       I'm also involved in the training aspect.  So, in

17  particular, officers that are assigned less-lethal.  For

18  instance, they need to make a request through their supervisor

19  to their -- through their chain of command to the commander.

20  Then that commander sends that request to me, and then I review

21  that request and approve whether or not that person can be

22  certified or recertified on less-lethal.

23  Q   Understood.  Do you have a philosophy, or does the

24  department have a philosophy about how patrol officers should

25  appropriately interact with the public?

20-cv-1878-RBJ   RONALD THOMAS - Direct   03-24-2022

1    A    Yeah.  I mean, you know, our -- you know, our strategic

2    plan is built on, you know, preventing crime while treating

3    people with dignity and respect.

4    Q    Okay.  And what does that mean in practice?

5    A    In practice, it means, you know, respecting people.

6    Respecting people's rights, to include the First amendment.

7    Q    Okay.  Is communication an important skill for patrol

8    officers?

9    A    Absolutely.

10   Q    Why is that important for them?

11   A    Well, I think it's important to be able to communicate with

12   people to understand what they need, and then for us to be able

13   to understand what we can and cannot do for them.

14   Q    Is the issue of communication something that from your

15   experience, is regularly -- is part of the training curriculum

16   from the beginning when an officer goes to the academy?

17   A    Certainly.

18   Q    And how does that work?  Is it scenario-based?  Is it

19   skills-based?  Is it -- explain sort of the way that officers

20   are taught how to be effective in their communications with

21   members of the public.

22   A    Certainly.  So, I think that particularly with respect to

23   communication, there is a lot of scenario-based training that

24   goes on in the academy and then even post-academy.

25   Q    Is communication and sort of corrections about

20-cv-1878-RBJ   RONALD THOMAS - Direct   03-24-2022

1   miscommunications something that supervisors watch for for their

2   officers as a general matter?

3   A    Yes.

4   Q    And why is that important?

5   A    Well, I think it's important that we maintain good

6   relationships with our community, and sometimes officers not

7   understanding how their -- the way that they are communicating

8   can be ineffective in helping us maintain that positive

9   relationship I think is important for supervisors to step in and

10  help correct that behavior.

11  Q    And that would be an expectation that you would have for

12  all of the supervisors that work in the patrol division?

13  A    Yes.  In fact, there's an expectation that the supervisors

14  spend a significant portion of their shift out, you know,

15  overseeing their officers' activities.

16  Q    Okay.  Does the Denver Police Department try to instill

17  values about how the department wants to police to its officers?

18  A    Yes.

19  Q    What are those values, and how does the department

20  communicate those to the rank and file officers?

21  A    Certainly.  So, there's, you know, a number of values,

22  again, treating people with dignity and respect, you know,

23  recognizing that being able to appreciate cultural differences,

24  understanding the rights that people -- that people have.  So,

25  there are, you know, that's I think woven throughout a lot of

20-cv-1878-RBJ   RONALD THOMAS - Direct   03-24-2022

1   the training in the academy.  It's also woven into a lot of our

2   postgraduate training.

3   Q    Do the police try to partner with the community to address

4   issues that are impacting the community?

5   A    Yes.

6   Q    How does that work?  Can you give us an example of

7   something that you're familiar with where either you or someone

8   in the patrol division has done that kind of partnership effort?

9   A    Certainly.  So, you know, every district has a number of

10  community groups within their area of responsibility.  There are

11  commanders advisory group meetings that occur generally monthly,

12  where community members come in and express their issues, their

13  challenges, their concerns, and there's sort of a partnership

14  that we expect that officers and the leadership maintain with

15  the community to try to address these problems together.

16  Q    Are you a presence in the community to have -- so that

17  community members would have the ability to raise issues of

18  concern with you personally?

19  A    Absolutely.  I spend quite a few of my weekends attending

20  community events.  I attend a lot of the district's community

21  events, just to be a presence in the community and to understand

22  what the challenges are that the communities are facing.

23  Q    Okay.  I want to shift gears, Chief Thomas, and start

24  talking about the George Floyd protests and your experiences

25  related to the George Floyd protests.  When did you first learn

20-cv-1878-RBJ   RONALD THOMAS - Direct   03-24-2022

1   that there were protests in Denver towards the end of May of

2   2020?

3   A    So, my recollection is, you know, right after the incident,

4   which I think is maybe the 24th of May, we, I think reasonably

5   assumed that there would be protest activity.  It has happened

6   in the past where incidents that have occurred in other parts of

7   the country, sometimes even other parts of the world, have

8   resulted in demonstrations, protest activity in Denver.

9        So, we do a pretty good job of preparing for that,

10   having our intelligence unit track, you know, information

11   relative to that.  And then we base our response and

12   preparations for that based on the information that we have.

13   Q    So, to unpack that a little bit, fair to say that the

14   intelligence unit is not something that you supervise?

15   A    That's correct.

16   Q    And also fair to say that the -- sort of the Commander

17   Phelan, as an example, isn't within your chain of supervision?

18   A    No, sir.

19   Q    Okay.  So, you understand how those things work, but you're

20   not directly involved with them?

21   A    That is correct.

22   Q    Okay.  So, what is your role with respect to responding to

23   protests like the City experienced in May and June of 2020?

24   A    So, my role is certainly these events occur within some

25   patrol districts, so I would have some responsibility for

20-cv-1878-RBJ   RONALD THOMAS - Direct   03-24-2022

 1  managing within that patrol district.  Most protest events --

 2  certainly some of the larger protest events need to be staffed

 3  with members from the patrol division.  So, that would be my

 4  function to make sure that there is sufficient staffing to

 5  manage a protest.

 6  Q    Okay.  And I wanted to sort of talk about the issue of

 7  staffing a little bit more with you.  So, in this instance, the

 8  protests were generally centered in District 6; is that right?

 9  A    That's correct.

10  Q    So, you would have the responsibility to oversee the

11  officers of District 6 in conjunction with the commander of

12  District 6 related to their own response to the protest; is that

13  true?

14  A    Correct.

15  Q    Okay.  And then once the decision is made that more

16  officers are needed to respond to the protests, you -- one of

17  your roles is to gather enough officers from the other districts

18  who work in patrol to be able to respond?

19  A    Yes.

20  Q    Okay.  Do the calls for service and the normal activities

21  of the functions of all of the districts in the city stop when

22  protests occur in downtown Denver?

23  A    Certainly not.

24  Q    So, how do you balance the needs between what's still

25  happening in the other five districts and what the needs are

20-cv-1878-RBJ    RONALD THOMAS - Direct    03-24-2022

1   with respect to additional staffing to help with the protest

2   response?

3   A    Yes.  So, thankfully, we do have a number of proactive

4   teams assigned to each district, and so those are usually the

5   first draw for personnel to staff a protest event.  If we were

6   to need more, then certainly we would have to evaluate the

7   number of officers to be drawn to respond so that we could still

8   maintain a presence in order to address calls for service.

9   Q    Okay.  So, policing is 24/7/365; right?

10  A    Yes.

11  Q    So, there has to be sufficient staffing to fulfill all of

12  the functions of the districts on that basis; right?

13  A    Yes.

14  Q    Okay.  And are there -- I mean, what was staffing like for

15  the department generally in May of 2020 when these protests

16  started?

17  A    I'm not sure I understand what you're --

18  Q    Okay.  Were there enough patrol officers?  Did you have a

19  full complement of patrol officers in all of the positions in

20  the districts in May of 2020?

21  A    Yes.

22  Q    Okay.  Was there excess staffing?

23  A    I don't know if that would be fair to say that there was

24  excess staffing, but certainly enough staffing to appropriately

25  address the calls for service.

20-cv-1878-RBJ   RONALD THOMAS - Direct   03-24-2022

1   Q    Okay.  Is it fair to say that staffing has been a general

2   challenge for the Denver Police Department over the last several

3   years?

4   A    Yes.

5   Q    And why is that?  What has been the experience of the

6   department related to staffing?

7   A    So, you know, call load has continued to increase.  I think

8   the population of the city has continued to increase.  There's

9   been continued challenges, some related to the pandemic, some

10  related to social unrest.  So, there's been a number of

11  challenges that I think have increased the workload.  And then,

12  you know, we've obviously had staffing challenges based upon our

13  inability to hire.

14  Q    What has been the department's experience in terms of an

15  inability to hire?

16  A    Well, I think there was a period of time where the City,

17  because of the pandemic, had to cut some budget.  And part of

18  those budget cuts involved us suspending our academies and not

19  hiring officers.

20  Q    And that lasted for a few years, did it not?

21  A    A couple years, I believe.

22  Q    Okay.  And then has there been retirements and resignations

23  and attrition from the department as well?

24  A    Absolutely.

25  Q    Have the ability to add new officers filled the attrition

Kevin P. Carlin, RMR, CRR

20-cv-1878-RBJ   RONALD THOMAS - Direct   03-24-2022

1   gaps, or is the department still behind a little?

2   A   We're still significantly behind.

3   Q   Okay.  All right.  Okay.  You had talked earlier about what

4   you called impact teams as being sort of the first responders

5   from the districts to the protests.  What is an impact team?

6   A   So, an impact team essentially is a proactive team that is

7   not beholden to answer radio calls.  Certainly they can fill

8   that function if there's a need, but they generally are assigned

9   to address challenges identified within that district.  It could

10  be a particular crime pattern that they're seeing.  It could be

11  a particular neighborhood that needs additional support and

12  attention.

13  Q   Okay.  Is the gang unit considered something similar to an

14  impact team?

15  A   I would consider them similar in that they are not

16  responsible for handling calls for service generally.

17  Q   Okay.  So, initially, when you learned about the protests,

18  what did you do specifically?

19  A   So, initially, I allowed for the impact teams in the

20  districts to be assigned to the initial protest response.

21  Q   And how many people was that, approximately?

22  A   From the districts, I would say roughly 25 to 30.  You

23  know, each impact team is a supervisor, and four or five, at the

24  most six officers.

25  Q   Okay.  All right.  That makes sense.  Not with respect to

20-cv-1878-RBJ    RONALD THOMAS - Direct    03-24-2022

1    staffing -- and we're going to come back to staffing, but when

2    you learned about the protests, what did you do personally,

3    specifically related to having learned that information?

4    A    Is this as the protest was occurring, or prior to the

5    protest occurring?

6    Q    As the protest was occurring.

7    A    So, you know, certainly I was aware of the protest.  We had

8    planned, I thought adequately for the protest.  There -- you

9    know, the protest began.  I was called to some other duties.  I

10   don't recall exactly what they were.  When I finished that

11   meeting or that engagement, whatever that was, I then became

12   aware of the fact that the protest was larger than we had

13   anticipated, that they were at the time moving towards the

14   Millennium Bridge.  I got a different sense of how this protest

15   was evolving in terms of larger in scope, seemed to be much more

16   agitated and violent.

17   Q    How soon after the protest started did you reach those

18   conclusions, Chief?

19   A    Pretty quickly.  I -- you know, I remember getting in my

20   car upon learning how things were developing and actually trying

21   to drive in that direction to try to get sort of a ground sense

22   of what was occurring.  I could certainly hear what was going on

23   over the radio, what was being aired.  I was never actually able

24   to get close enough to see for myself exactly what was happening

25   because, you know, traffic was so congested that I just couldn't

20-cv-1878-RBJ   RONALD THOMAS - Direct   03-24-2022

1   get close enough, and it was at that time that I retreated to

2   the command post.

3   Q    Why did you want to get your own look about what was

4   happening?

5   A    Just because I could hear over the radio that it just

6   sounded different.  And so I wanted to -- I just had, I think, a

7   basic curiosity.  I just wanted to kind of see it for myself so

8   I could evaluate what next steps to take.

9   Q    At some point did you increase staffing for the protest

10  from the districts as a result of your -- what you were just

11  talking about, the larger in scope than what was originally

12  anticipated?

13  A    Yes.  It became clear that we didn't have enough officers

14  initially assigned, so I reached out to each of the district

15  commanders and asked that they send one team, which is

16  essentially a sergeant and four or five officers.

17  Q    Okay.  So, essentially another 25 officers, basically,

18  roughly?

19  A    Roughly, yes.

20  Q    Twenty-five to thirty?

21  A    Certainly.

22  Q    Okay.  And at that point do you have a sense of how many

23  officers in total were responding to the protest after you

24  elicited more support from the districts?

25  A    I think at that point it was certainly over 100 officers

20-cv-1878-RBJ   RONALD THOMAS - Direct   03-24-2022

1   that were assigned.

2   Q    And how does that compare to the staffing patterns from

3   other protests that you've experienced during your career?

4   A    Significantly more than other protests.  You know, district

5   six, they regularly manage protests and demonstrations that

6   they're able to staff and manage with sometimes their own

7   resources.  Often they will have to recruit the assistance from

8   Metro SWAT or the gang unit, but I can't recall an instance

9   where we needed to draw additional officers from the district.

10  Q    Okay.  And in this instance, it was both the impact teams

11  that you drew initially, and then another set of officers,

12  because the impact teams from the district wasn't enough?

13  A    Correct.

14  Q    Okay.  All right.  You said you went to the -- when you

15  weren't able to observe the protests on the ground by yourself,

16  you went to the command post.  Where is that, Chief Thomas?

17  A    1351 Cherokee, I believe is the exact address.  It's

18  basically at the corner of 14th and Cherokee.

19  Q    Okay.  And what were you doing in the command post?

20  A    So, I entered the command post.  There were already a

21  number of individuals in the command post.  Commander Phelan was

22  in the role of the incident commander.  There were also

23  representatives from state patrol, Denver Fire, Denver sheriffs.

24  And so I began getting a sense of what the personnel needs were,

25  and then, you know, making those personnel assignments so that

20-cv-1878-RBJ    RONALD THOMAS - Direct    03-24-2022

1   we could have enough people to manage what was going on.

2   Q    Okay.  Did you make the decision to enlist -- or, that

3   wasn't a good question.  Let me start again.  You said you

4   decided that you needed more resources from the district.  When

5   was that decision implemented?  Was that implemented while

6   you're still on the road, or was that implemented while you're

7   in the command post?

8   A    That was implemented once I was in the command post.

9   Q    So, you reached out to all of the commanders that report to

10  you and got more personnel to respond?

11  A    Yes.

12  Q    What were others doing in the command post?

13  A    Well, you know, Commander Phelan was managing the event.

14  There were several, you know, cameras, you know, monitors where

15  we were monitoring, you know, camera feeds throughout the city.

16  Just, you know, kind of seeing what was going on.  There were

17  people that were directing officers to move in certain locations

18  in order to manage what was happening.

19  Q    So, I wasn't in the command post, and neither was the jury.

20  Is it a chaotic place?  How would -- you know, what is it like

21  to sit there and watch Commander Phelan be the incident

22  commander on something like this?  What's going on?  Are things

23  calm?  Is it chaotic?  What's happening?

24  A    Well, I think it's probably important to say that, you

25  know, most of the time -- we manage most of our demonstrations

20-cv-1878-RBJ   RONALD THOMAS - Direct   03-24-2022

1  and other activities out of the command post, and most of the

2  time it's actually quite boring.  We're really just kind of

3  monitoring what's happening, making personnel movements and

4  assignments.  There's usually only one or two people talking.

5  There's not often a whole lot of people in the command post.

6          And so -- but for this particular incident, I would

7  never describe what was happening as chaotic, but certainly

8  there was a lot of energy in the room.

9  Q    Is it loud?

10  A    Not particularly loud.  I mean, you can certainly hear

11  people talking.  You can certainly identify that there are

12  sometimes more than one person talking.

13  Q    But -- okay.  Fair enough.  I mean, as an example, today, I

14  read in the newspaper that the First Lady is in Denver.

15  A    Yes.

16  Q    And her presence in Denver would trigger a response from

17  the same command post; right?

18  A    Correct.

19  Q    And that would be more of what hopefully would be a boring

20  event in the command post?

21  A    Yes.

22  Q    Do you recall sort of differences of opinion and

23  differences of approach being discussed and debated in the

24  command post?

25  A    I don't really recall any debates.  I mean, certainly there

20-cv-1878-RBJ   RONALD THOMAS - Direct   03-24-2022

1   was discussion.  Certainly there were discussions about how to

2   move personnel, where to draw personnel from, how much personnel

3   was going to be needed.

4   Q    Was there -- was everybody sort of task-oriented in the

5   command post?  Is that a good way for me to think about it?

6   A    Yes.  So, certainly, you know, there were people there

7   representing each of the different entities that were involved.

8   So, you know, Denver Fire, Denver sheriffs, state patrol all had

9   individuals that they were communicating directly with.  We had

10  people informing us, you know, of intel, kind of at real time.

11  There were individuals whose sole task was to track where people

12  were, where teams were assigned so that we would have a sense of

13  teams that were available to be moved to a location.

14  Q    So that you could know who was in the general area and who

15  might be able to respond to the next issue quicker than someone

16  who is across the city?

17  A    Yes.

18  Q    Okay.  The way that I conceptualize the command post is

19  that Commander Phelan is getting information from all of the

20  different sources that are available to him.  Is that a good way

21  to think about it?

22  A    Yes.

23  Q    And then he's providing direction to everyone who is in the

24  command post to help him implement the plan for responding to

25  the protests?

20-cv-1878-RBJ   RONALD THOMAS - Direct   03-24-2022

1   A    Correct.

2   Q    So, with respect to you, if Commander Phelan thought he

3   needed more resources from patrol, he would say, Chief Thomas, I

4   need some more resources from patrol, can you help me get more

5   resources, or something to that effect?

6   A    Yes.

7   Q    And if there was an issue with respect to a fire, he would

8   liaison with the representative from the Denver Police

9   Department -- or the Denver Fire Department?

10  A    Yes.  Correct.

11  Q    Okay.  And if there was an issue with -- related to the

12  capitol, his communications would probably be with the

13  representative from the Colorado State Patrol?

14  A    Yes.

15  Q    Okay.  But he's the team leader of the response to the

16  protests?

17  A    Yes.

18  Q    How would it work in terms of if anybody like -- well, I

19  will use you as an example.  If you had a suggestion or a

20  recommendation or an idea that you thought it was worthy of

21  Commander Phelan to consider, how would that kind of thing be

22  presented to him?

23  A    That would be just a direct conversation.

24  Q    Okay.  Is the same true with respect to anyone else who had

25  those kind of opinions, ideas, recommendations, that sort of

20-cv-1878-RBJ   RONALD THOMAS - Direct   03-24-2022

1   thing?

2   A    Yes.

3   Q    Was -- did you observe Commander Phelan being open to that

4   kind of input from everybody else that was in the command post?

5   A    Certainly.  He always has been.

6   Q    And in this instance, he was open as well?

7   A    Yes.

8   Q    Okay.  Do you recall individual officers or the conduct of

9   officers who were responding to the protests being criticized by

10  the people in the command post?

11  A    If I understand what you're asking, do I recall people in

12  the command post criticizing what officers on the ground were

13  doing?  No, I don't recall that.

14  Q    Right.  Okay.  What was your typical work schedule during

15  the protests?

16  A    Well, you know, as you alluded to before, work doesn't

17  stop.  So, I come to work at 8 o'clock every day, so I came to

18  work at roughly 8 o'clock every day.  You know, managed all of

19  my other responsibilities, and then at the time that these

20  protests were beginning, as our intel had led us to understand,

21  I would eventually make it to the command post.

22  Q    When did your workday or night end generally during the

23  protests?

24  A    Often in the wee hours of the next day.

25  Q    Were the other sort of senior leaders of the Denver Police

20-cv-1878-RBJ   RONALD THOMAS - Direct   03-24-2022

1   Department working those same hours?

2   A    Yes.  Generally.

3   Q    Was Commander Phelan?

4   A    Yes.

5   Q    What about the individual officers that were responding to

6   the protests on the ground themselves?

7   A    Yes.

8   Q    What is a normal shift for you?  And maybe you don't have a

9   normal shift.

10  A    Well, I mean, I will say that I always come to work roughly

11  at 8 o'clock in the morning, and it's not uncommon that I get

12  home 6:00, 7:00, 8 o'clock in the evening.

13  Q    Right.  And then the electronic leash that you have in your

14  pocket may require you to do more work in the evening; right?

15  A    Certainly.

16  Q    I mean, if a major event happens at 10 o'clock at night in

17  Denver, and the police are responding, you're going to get

18  contacted; right?

19  A    That is correct.

20  Q    And you're going to have to do something about that?

21  A    Yes.

22  Q    Okay.  What is a normal shift for a patrol officer?

23  A    I think the majority of patrol officers are on ten-hour

24  shifts.  So, they would come to work at the beginning of their

25  shift, and then unless they had some call that took them beyond

20-cv-1878-RBJ   RONALD THOMAS - Direct   03-24-2022

1    the end of their shift, they would leave about ten hours later.

2    Q    Okay.  So, in May of 2020, patrol officers in your division

3    worked four ten-hour shifts a week?  Is that how that would

4    work?

5    A    Yes.

6    Q    Okay.  And then would typically have three days off during

7    that week?

8    A    Correct.

9    Q    All right.  I wanted to shift ground a little bit and talk

10   to you about how the DPD has historically responded to protests

11   of the kind that -- you know, just protests generally, if I

12   could.  Does the DPD have an overall general philosophy about

13   how to respond to protest activity?

14   A    Yes.

15   Q    And would you describe that overall philosophy for the

16   jury, please, Chief.

17   A    I would call it kind of a crowd management philosophy.  So,

18   we certainly recognize that there's likely to be large crowds,

19   and we want to be able to manage those crowds so that they're

20   safe and so that they have the opportunity to express themselves

21   the way that they -- the way that's used to allowing for them to

22   express their First amendment rights.

23   Q    So, how does the department generally try to implement that

24   philosophy in protests that you've experienced historically?

25   A    So, I think to begin with, we try to gather as much intel

20-cv-1878-RBJ   RONALD THOMAS - Direct   03-24-2022

1   as we can, try to identify who may be leading this particular

2   protest or demonstration, try to make contact with them,

3   establish some -- you know, some rules, try to get an

4   understanding of what they intend to do, if they intend to

5   march, you know, trying to address that through staffing, you

6   know, making sure that we have individuals that are able to kind

7   of follow along the route of the march, and then be able to

8   block traffic so they can do so safely, and try to get a sense

9   of the number of people so that we can appropriately staff it.

10  Q    Okay.  Has that approach been generally successful with

11  respect to past protests?

12  A    Yes.

13  Q    Okay.  Sometimes in the past, protests have involved

14  protests about police activity; is that fair?

15  A    It is.

16  Q    Has that approach of the Denver Police Department been

17  successful for those kind of protests?

18  A    Yes.

19  Q    Were there protests in Denver following the death of

20  Michael Brown in Ferguson, Missouri?

21  A    I believe so.

22  Q    Were you involved in the response by the Denver Police

23  Department related to those protests?

24  A    I don't have a specific recollection of that particular

25  protest, but I do know that there were other instances in which

20-cv-1878-RBJ    RONALD THOMAS - Direct    03-24-2022

1   community members were killed in their interactions with police,

2   and there were protests that happened throughout the country,

3   including in Denver, and there was -- there was a management of

4   that particular event.

5   Q    In similar ways as you describe from a crowd management

6   perspective?

7   A    Yes.

8   Q    And that -- the philosophy of the Denver Police Department

9   in those instances to keep it as a crowd management response

10  worked, essentially?

11  A    Yes.

12  Q    And sometimes there have been protests in Denver related to

13  specific police activity in Denver; right?

14  A    Yes.

15  Q    Sometimes the community is critical of events that happened

16  that the Denver Police Department itself is involved in?

17  A    Yes.

18  Q    And there's been protest activity related to those events?

19  A    Yes.

20  Q    And has the crowd management model that you described for

21  the jury also worked in those contexts?

22  A    Yes.

23  Q    Did the department try to implement its general philosophy

24  related to the George Floyd protests as a crowd management

25  issue, as you've described it?

20-cv-1878-RBJ   RONALD THOMAS - Direct   03-24-2022

1   A     Oh, yeah.  Certainly.

2   Q     Did that work?

3   A     No.  Obviously, it did not work.  You know, the crowd was

4   much more violent, much more destructive than anything that we

5   had anticipated or were prepared for.

6   Q     Okay.  So, fair to say that based on your long experience

7   with the Denver Police Department and responding to protests,

8   the nature of the George Floyd protests were different than

9   prior protests you had experienced?

10  A     Yes.

11  Q     All right.  I want to talk about those differences and see

12  if we can identify a variety of different differences that

13  existed with respect to the protests.  One of the areas that you

14  had mentioned before was size.  How did the George Floyd

15  protests compare in size to other protests that you have

16  experience with during the time that you've worked at the Denver

17  Police Department?

18  A     Well, larger, if we're talking about protests -- I mean,

19  certainly we have managed far larger crowds, but those crowds

20  were not violent.  They were not destructive.  But in terms of

21  managing a crowd that was violent and destructive, I mean, far

22  greater numbers than we had ever experienced, at least in my

23  career.

24  Q     And so when you're talking about a larger crowd in size,

25  you're talking about something like the parade after Super Bowl

20-cv-1878-RBJ   RONALD THOMAS - Direct   03-24-2022

1   50 and the gathering that happened at Civic Center Park; right?

2   A    Yes.

3   Q    And generally speaking, most people in that crowd were

4   happy to be there; right?

5   A    Yes.

6   Q    All right.  In terms of where the protest and related

7   activities occurred with respect to the George Floyd protests,

8   was that different than earlier protests that you had

9   experienced?

10  A    Yes.  I mean, you know, most of our protest activity tends

11  to occur right around the capitol.  There are some -- or, you

12  know, they could occur at a location where we have a large

13  encampment of people experiencing homelessness.  We often have

14  demonstrations that lead to marches that may go up or down

15  Colfax or may go down the 16th Street Mall.  My recollection is

16  the first time where there was a significant attempt to get onto

17  the highway --

18  Q    Okay.  And then there was protest activity at the capitol

19  for a lot of what was occurring in the George Floyd protest;

20  right?

21  A    Yes.

22  Q    There was also a fair amount of protest activity at

23  District 6?

24  A    Yes.

25  Q    Had you had the experience before with respect to protests

20-cv-1878-RBJ   RONALD THOMAS - Direct   03-24-2022

1   of those kind of centers of protest happening simultaneously?

2   A     Yeah.   There was some experience with that.   I mean, we've

3   had school walkouts.   We've had students protesting something,

4   and we've had a number of school walkouts where each district is

5   impacted, and so our resources are really kind of divided trying

6   to manage that particular challenge.   I think this is the first

7   time in which, you know, such a large number of people were

8   bifurcated that way.

9   Q     Okay.   Let's talk about the violence that you observed

10  and -- with respect to the George Floyd protests.   You said a

11  couple times that they were more violent than other protests

12  that you've experienced.   Can you describe for the jury what

13  kinds of things that you observed that lead you to conclude that

14  they were more violent.

15  A     So, you know, throwing things, throwing, you know, rocks,

16  throwing frozen water bottles, using, you know, sporting

17  equipment to hurl things at officers, even, you know, improvised

18  explosives, you know, commercial grade fireworks, other kinds

19  of, you know, IED devices being thrown at officers.   Again,

20  something that I had never experienced in my entire career.

21  Q     What about the destruction of property and vandalism?   How

22  did that compare in the George Floyd protests with other

23  protests that you've experienced in the past?

24  A     Substantially more.   I mean, there have been protest

25  demonstrations that have resulted in windows being broken,

20-cv-1878-RBJ   RONALD THOMAS - Direct   03-24-2022

1   stores being broken into, but not to the level and degree and

2   severity that occurred during the George Floyd protest.

3   Q    During the protests, were you concerned about the safety of

4   the Denver police officers that were responding?

5   A    Absolutely.

6   Q    Why?

7   A    Well, because I was aware that there were officers that

8   were being -- that had been injured.  You know, I was aware that

9   there were, you know, dangerous implements that were being

10  thrown at them, directed at them.  I was aware of the fact that

11  some officers had actually been injured.  I even became aware of

12  the total number of officers that had been injured.  So, I was

13  constantly concerned about the safety of officers.

14  Q    Do you have a sense of the number of officers that were

15  injured with respect to the protests, approximately?

16  A    I think it was over 80 officers.

17  Q    Okay.  Do you believe all of the officers reported their

18  injuries?

19  A    Probably --

20           MR. DOUGLAS:  Objection.  Calls for speculation.

21           THE WITNESS:  Can you repeat the question?  I'm sorry.

22  Q.    (By Mr. Ringel) Sure.  Do you believe all of the officers

23  who were injured reported their injuries?

24  A    Probably not.  I mean, I'm sure that there was some

25  bruising that occurred, some people that were hit with things

20-cv-1878-RBJ   RONALD THOMAS - Direct   03-24-2022

1   that certainly hurt, but I think that they wanted to continue to

2   support their fellow officers.

3   Q   Okay.  In your view, did the Denver Police Department in

4   its response to the protest try to impede the protesters'

5   ability to get their message across?

6   A   No.

7   Q   Did the department try to allow protesters to communicate

8   their message?

9   A   Yes.  As we always do.

10  Q   How did that manifest itself during the George Floyd

11  protests, Chief?

12  A   Well, I mean, it manifests in us blocking traffic to keep

13  routes open, you know, allowing them to essentially take entire

14  intersections or the entire street, you know, so keeping --

15  doing our best to try to keep cars from getting there and

16  injuring somebody.

17  Q   Okay.  How does the department -- or, let me ask it a

18  different way.  One of the values of the department is to try to

19  allow protesters to communicate whatever message they have?

20  A   Yes.

21  Q   Another value of the department is public safety and public

22  order; right?

23  A   Certainly.

24  Q   How did the department try to balance those two things

25  during the George Floyd protest response?

20-cv-1878-RBJ    RONALD THOMAS - Direct    03-24-2022

1   A    Well, you know, I think our primary value is allowing them

2   to express their First amendment rights, express their

3   viewpoints, and doing so safely.  So, that was our aim.  But we

4   also had, I think, an obligation to protect other members of the

5   public, protect ourselves, protect property.  And so, you know,

6   we had to -- you know, we had to address those challenges as

7   well.  And I think unfortunately, us doing that and the

8   situation that we were confronted with I think is what drowned

9   out their opportunity to express their reasonable message.

10  Q    Okay.  You had no criticism with the message that the

11  protesters were conveying or attempting to convey?

12  A    Certainly not.

13  Q    Okay.  Was that message understandable to you?

14  A    Absolutely.

15  Q    Okay.  Why was that message understandable to you?

16  A    Well, I guess I have two perspectives on it.  One, I'm a

17  Black man, so I understand, you know, some of the disparity that

18  exists in America.  Excuse me.

19       I also have a great deal of respect for our profession

20  and our responsibility to treat people humanely and certainly

21  not, you know, violate people's rights to the point where

22  they're killed.

23  Q    Understood.  You talked about it was a challenge for the

24  department to balance those competing interests, the interests

25  of public safety and public order, and the protesters' ability

20-cv-1878-RBJ   RONALD THOMAS - Direct   03-24-2022

1   to protest.  What specifically about these protests and related

2   activity made it such a challenge?

3   A    Well, I think what made it such a challenge is that there

4   were, you know, a lot of people who were doing what we expect

5   them to do, which is voice their concern, voice their opinion.

6   But unfortunately, infiltrated within that group were a number

7   of agitators that were assaulting police, engaging in, you know,

8   violent criminal destructive behavior that we had to, you know,

9   do our best to mitigate.

10  Q    Okay.  We talked earlier about sort of a general philosophy

11  to communicate with members of the public that is taught for

12  patrol officers, and is one of your expectations for the patrol

13  officers under your command.  Is there a philosophy of the

14  Denver Police Department to try to communicate with protesters

15  related to protest activity?

16  A    Yes.

17  Q    And how does that generally work as a matter of historical

18  practice?

19  A    So, I think it begins initially, I'm trying to, you know,

20  communicate with the leaders of these demonstrations to try to

21  get them to understand what our goals are, try to get -- try to

22  understand what their goals are, and try to figure out a way for

23  them to communicate their message with as little disruption

24  to -- certainly to safety, but to the rest of the public.

25           And then, you know, during a protest, certainly, you

20-cv-1878-RBJ    RONALD THOMAS - Direct    03-24-2022

1   know, when protesters are starting to do something that is

2   presenting a significant challenge to us, like blocking an

3   intersection, for instance, or trying to get on the highway, I

4   think initially trying to verbally express to them that you

5   can't do what you're attempting to do.  We don't want you to do

6   what you're attempting to do.

7   Q    Okay.  Were there efforts that you're aware of by the

8   department to try to communicate with protest leaders before the

9   George Floyd protests started?

10  A    Before the protest started?  Yes.

11  Q    Were those efforts successful?

12  A    I think they were successful in that certainly we had great

13  dialogue, and I think a number of these protests went on without

14  issue at all.  And then it wasn't until the protest went later

15  into the day, and often, I think, became leaderless that it

16  became a challenge for us to control.

17  Q    Okay.  So, let's talk about that.  Was the -- your

18  experience with these protests different between what was

19  generally occurring in the day and what was generally occurring

20  in the evening, at night?

21  A    Yes.  I mean, you know, one, I often participated in some

22  of these demonstrations during the day, and they were to my

23  recollection entirely peaceful during the day.  You know, people

24  still carried signs.  People still shouted their message.

25  People still communicated their dislike, their distrust for the

20-cv-1878-RBJ   RONALD THOMAS - Direct   03-24-2022

1   police, which is all fine.  It wasn't until later in the day,

2   often under the cover of darkness that the violence and

3   destruction began to occur.

4   Q    Okay.  You just mentioned that you had participated in the

5   protests.  Can you explain your own participation to the jury,

6   please.

7   A    Yeah.  So, there was two or three opportunities that I took

8   to actually march with protesters.  One, I agreed with the

9   general message.  I think as a department, we agreed with the

10  general message.  I thought it was important for us to show to

11  our community that we agreed with that, and actually, you know,

12  kind of be shoulder-to-shoulder with the community.

13  Q    Did you do that in uniform, Chief?

14  A    I did.

15  Q    Did you do that during the day?

16  A    Yes.

17  Q    And where did you do that?

18  A    I think one particular demonstration that I was involved in

19  began at Civic Center Park, and kind of walked to the DCPA.

20  Another that I participated in, I believe began at the MLK

21  statue in City Park and traversed down East Colfax to the

22  capitol steps.  I believe there was another one, I don't recall

23  the beginning point of that, but I would estimate about three

24  demonstrations I participated in personally.

25  Q    And when you sought to participate, did you communicate

20-cv-1878-RBJ   RONALD THOMAS - Direct   03-24-2022

1   with the leaders of the protests during the day?

2   A    Yes.

3   Q    And describe how those communications -- how that happened.

4   A    Well, you know, often we would understand, you know, where

5   the protest was to begin, you know, the time that it was to

6   begin.  So, we would arrive early enough to meet with them,

7   clarify that they were comfortable with our participation and

8   involvement, you know, express our appreciation for them, you

9   know, standing up for what we all believe in.

10  Q    Okay.  Was there a similar ability to communicate with

11  people at night as you experienced as you've just described

12  during the day?

13  A    No.

14  Q    And why is that, from your experience, Chief?  Why was

15  that, from your experience?

16  A    Well, I think primarily it was quite leaderless.  So, there

17  was not a particular individual that we could reach out to and

18  try to get them to control the individuals that were engaging in

19  the protest and demonstration.  It was difficult for us to get

20  close enough, often, to larger bodies of protesters, because of

21  the assaults that were occurring.

22  Q    When did your march that you've just described for the jury

23  occur in time?  Do you have a memory of which days they

24  occurred?

25  A    My recollection is probably the third or fourth day.  So,

20-cv-1878-RBJ   RONALD THOMAS - Direct   03-24-2022

1   you know, maybe as early as the 30th or 31st of May and then

2   into June.

3   Q    Okay.  Are you aware of Chief Pazen, the chief of police

4   also marching with protesters?

5   A    Yes.

6   Q    Are you aware of Murphy Robinson, the executive director of

7   the Department of Public Safety marching with protesters?

8   A    Yes.

9   Q    And both of those opportunities also happened during the

10  day?

11  A    Correct.

12  Q    Did the police department's tactics and approach change

13  over time as the protests continued to go along?

14  A    Yes.

15  Q    How did those tactics and approach change?

16  A    I think in a couple of ways.  I think we made greater

17  attempts to create buffer zones so that marchers, protesters

18  could do the movements that we would anticipate.  We would often

19  try to be close enough so that we could respond if we needed to,

20  if there was some kind of violent or destructive behavior that

21  was occurring, but try our best to not be visible, because we

22  recognized that sometimes just being visible was enough to

23  agitate a crowd.

24  Q    So, when you say a buffer zone, what do you mean by a

25  buffer zone?

20-cv-1878-RBJ   RONALD THOMAS - Direct   03-24-2022

1    A    Well, for instance, you know, if a crowd has decided to

2    march down the 16th Street Mall, what has happened in the past

3    is we may have bicycle officers for instance who are kind of

4    riding along the storefronts, just kind of being a visible

5    presence and certainly being there to respond to anything that

6    may happen.

7            We can no longer do that.  We would be on the opposite

8    streets on either side, still close enough to respond in an

9    emergency, but well out of view.

10   Q    Okay.  So, that's the kind of -- that's one tactic that --

11   an approach that was changed during the course of the protests?

12   A    Yes.

13   Q    Is there others that you can recall?

14   A    Specifically, I recall that we recognized that the

15   40-millimeter was not an appropriate tool to be using in this

16   particular crowd control situation, so we took that off line.

17   Q    And when did that happen, Chief?

18   A    I don't have a specific recollection, but, you know, within

19   the first few days.

20   Q    Okay.  All right.  I want to shift gears and talk about

21   mutual aid that we've heard about during this trial.  We had

22   talked about staffing previously, and your efforts to provide

23   additional staff from the patrol divisions and the district

24   stations.  At some point was the determination made that there

25   needed to be additional staffing that wasn't available by the

20-cv-1878-RBJ   RONALD THOMAS - Direct   03-24-2022

1   Denver Police Department?

2   A    Yes.

3   Q    And when did that determination get made, if you recall?

4   A    I believe that was the second day.

5   Q    Okay.  And just so that the jury understands, because I'm

6   not sure we've talked about this specifically, what is mutual

7   aid among police departments?

8   A    So, mutual aid is basically an agreement that another

9   jurisdiction would come to our aid.  And quite often it's, you

10  know, border agencies coming to cover officers that are handling

11  a call for service near the border, because we don't have enough

12  officers to safely execute that particular police action.

13  Q    So, like as an example, if a Denver police officer has a

14  call for service near the Denver-Aurora border up on Colfax, and

15  there isn't a Denver officer to be cover available, there might

16  be tapping into Aurora resources to provide cover in that

17  specific instance?  Is that the kind of thing you're talking

18  about?

19  A    Yes.

20  Q    Okay.  Does mutual aid happen all the time among the law

21  enforcement jurisdictions in metropolitan Denver?

22  A    It happens regularly, I suppose, is maybe the best way to

23  state that.  Certainly there are staffing challenges, you know,

24  given call load, in particular calls that the call for a greater

25  number of officers that leave a district shorthanded, and so

20-cv-1878-RBJ    RONALD THOMAS - Direct    03-24-2022

1    they rely on nearby resources.

2           In terms of planned events in which we ask for mutual

3    aid, I mean, my last recollection is like during the DNC,

4    certainly it occurred in the City of Denver, but we knew that

5    the safety challenge, the need to protect both the event and the

6    individuals involved in the event and the rest of the community

7    that we needed to solicit the assistance of several other

8    jurisdictions.

9    Q    Understood.  Okay.  Do you recall some of the jurisdictions

10   that assisted in a mutual aid role with respect to the George

11   Floyd protests?

12   A    I do.

13   Q    Can you identify some of those jurisdictions.

14   A    Yes.  So, I think I have already talked about state patrol,

15   Denver Sheriff's Department, but we also had representation from

16   Aurora, I believe Arapahoe County, Douglas County, Jefferson

17   County, Broomfield.

18   Q    Okay.  So, I wanted to talk to you about the way that the

19   police department worked with the mutual aid agencies, sort of

20   in an on-the-ground fashion.  There's been testimony about a

21   representative of the Denver Police Department being with

22   officers from the mutual aid agencies.  Is that something that

23   you're familiar with?

24   A    It is.

25   Q    Okay.  And what is your understanding of the role of that

20-cv-1878-RBJ   RONALD THOMAS - Direct   03-24-2022

1   officer with respect to the mutual aid agencies?

2   A    A couple of things.  So, one, you know, communications.  A

3   number of these jurisdictions don't have the capacity to tune

4   into our -- the radio channel that we were using.  So, they were

5   certainly used to communicate messages to those teams.

6   Orientation, you know, these are people from -- that don't work

7   in the city of Denver, and certainly not in the downtown core,

8   and so making sure that they understood where they were being

9   directed to deploy and respond, and also, you know,

10  communicating our tactics and what we're trying to do.

11  Q    Okay.  So, how generally were the mutual aid officers

12  utilized as a resource during the response to the protests?

13  A    So, those that responded, you know, came down.  We -- they

14  announced to the command post that they were here.  We made sure

15  that a Denver Police supervisor was embedded into that

16  particular group.  And then they just were generally, I think,

17  deployed to certain sections of the area that we were trying to

18  protect.  And then just kind of waited for instruction.

19  Q    Okay.  So, I wanted to talk about that.  So, who would

20  deploy the mutual aid officers to a particular location or give

21  them a particular task?

22  A    That would be Commander Phelan.

23  Q    Okay.  And in your experience being in the command center,

24  how would such a detail or task be communicated by Commander

25  Phelan to get to the mutual aid personnel?

20-cv-1878-RBJ    RONALD THOMAS - Direct    03-24-2022

1    A    So, we would have recorded, you know, who was supervising

2    which particular team and the location that that team was

3    assigned.  So, Commander Phelan would communicate over the radio

4    directly to that command officer or supervisor, and then let

5    them know what he was wanting them to do.

6    Q    So, using the example of Jefferson County Regional SWAT

7    Team for purposes of this discussion, Commander Phelan would be

8    able to radio either the Jefferson County regional SWAT team

9    commander who is on the ground, or the embedded DPD officer, and

10   relay the assignment or the task.  Is that how it would work?

11   A    Yes.  But I want to clarify that.  It would be a DPD

12   supervisor.

13   Q    Okay.  It would be a DPD supervisor.  So, it would be

14   someone who is at least a sergeant?

15   A    Yes.

16   Q    Were they typically sergeants?

17   A    Typically, but it could be lieutenants on some occasions.

18   Q    Okay.  Fair enough.  How much detail did Commander Phelan

19   provide in terms of the direction or the task or the

20   instructions to the commander of a mutual aid unit?

21   A    I'm not sure I understand the question.

22   Q    Okay.  So, can you give me an example of something that you

23   recall Commander Phelan directing a mutual aid unit to do as

24   part of the response to the protest.

25   A    Yes.  So, that could be an instance where we're trying to

20-cv-1878-RBJ   RONALD THOMAS - Direct   03-24-2022

1   keep people from accessing something or keep from -- or maybe

2   even move people out of an intersection.  The resource that is

3   currently there is unable to do it with the staffing that they

4   have, and so he would call in, say, Jefferson County or someone

5   to support that effort.

6   Q    So, if the assignment or the task is provide support at the

7   District 6 station, how much detail would Commander Phelan's

8   directions be related to that type of assignment?

9   A    You know, I think the detail would be, you know, where he

10  wanted them to go, why he wanted them to go there.  Maybe even

11  included, you know, the route that he would prefer that they

12  take, you know, maybe taking 16th Street or 17th as opposed to

13  taking Colfax or something like that.

14  Q    Okay.  But would he provide specific instructions as to

15  things like individual decisions officers would make about using

16  particular force if they're on a line at the District 6 station?

17            MR. DOUGLAS:  Objection.  Leading.  Lacks foundation.

18            THE COURT:  Overruled.

19            THE WITNESS:  He may give some direction relative to

20  establishing a skirmish line, but wouldn't be giving, you know,

21  direction about, you know, the deployment of less-lethal, you

22  know, responding to an individual event or an attack.

23  Q.    (By Mr. Ringel) Okay.  And did Commander Phelan generally

24  provide direction to any DPD officers about how to deploy

25  less-lethal at a particular skirmish line in response to a

20-cv-1878-RBJ   RONALD THOMAS - Direct   03-24-2022

1    particular event?

2    A     No.

3    Q     Okay.  Did you ever experience one of the supervisors that

4    was embedded with a mutual aid partner provide that kind of

5    level of detail about individual decisions on a skirmish line?

6    A     No.

7    Q     Is it your understanding that each officer who was working

8    on a skirmish line, whether they were DPD or whether they were

9    from another jurisdiction, had to make their own assessment, for

10   example, about whether to fire a PepperBall?

11   A     Yes.

12          MR. DOUGLAS:  Objection.  Lacks foundation.  Calls for

13   speculation.

14          THE COURT:  Overruled.

15   Q.    (By Mr. Ringel) How were the officers from other

16   jurisdictions informed about the DPD's rules of engagement?

17   A     So, those supervisors that were embedded with them had

18   previously attended our briefings, and so it was during those

19   briefings that a number of things were discussed to include our

20   rules of engagement.

21   Q     So, was there some times that the command officers from the

22   mutual aid partners also attended Commander Phelan's briefings

23   directly?

24   A     Yes.

25   Q     Okay.  So, sometimes, on some days, they would hear it

Kevin P. Carlin, RMR, CRR

20-cv-1878-RBJ   RONALD THOMAS - Direct   03-24-2022

1    themselves about what the rules of engagement were; is that

2    right?

3    A    Yes.

4    Q    And on other days, if they weren't able to attend, they

5    might have the rules of engagement relayed by the Denver Police

6    Department supervisor?

7    A    Yes.

8    Q    Were there -- were there -- was there a presence of

9    representatives of at least some of the mutual aid partners in

10   the command post itself?

11   A    Yes.

12   Q    So, like for example, would there be someone from Jefferson

13   County in, you know, regional SWAT, or the City of Aurora Police

14   Department in the command post?

15   A    You know, I do specifically recall a representative from

16   Aurora.  I don't recall if there was a specific representative

17   from the Jefferson County, but certainly there were

18   representation from the various mutual aid partners.

19   Q    Okay.  So, if the -- you do recall someone from Aurora

20   being in the command post; is that fair?

21   A    Yes.

22   Q    Would Commander Phelan communicate directly with the person

23   from Aurora as part of his responsibilities as the incident

24   commander?

25   A    I think there would be some conversation between the two,

20-cv-1878-RBJ   RONALD THOMAS - Direct   03-24-2022

1   you know, general placement, you know, other general guidelines,

2   but in terms of in-the-moment decisions, those would, I think,

3   reasonably be made directly with that person that was embedded

4   in that group.

5   Q    Okay.  Do you have an understanding of what use of force

6   policies govern the actions of the officers from the mutual aid

7   jurisdictions?

8   A    Yes.

9   Q    What policies -- as an example, what would be the policy on

10  use of force that would be applicable to personnel from the City

11  of Aurora responding to the protests?

12  A    Well, you know, every jurisdiction has their own use of

13  force policy, but I think we are all governed by POST.  We're

14  all governed by state law relative to the need to report use of

15  force, the need to respond appropriately.

16  Q    Okay.  So, let me unpack that a little bit.  You mentioned

17  POST.  What is POST?

18  A    That's basically a state governing board that governs, you

19  know, police policy and sets general guidelines for police.

20  Q    Okay.  So, POST is the police officer standards and

21  training; right?

22  A    That is correct.

23  Q    Okay.  And it's a state, sort of regulatory body that's

24  created under Colorado law.  Is that a fair way to think about

25  it?

20-cv-1878-RBJ    RONALD THOMAS - Direct    03-24-2022

1   A    It is.

2   Q    Okay.  And POST evaluates all of the -- or, let me back up.

3   Does POST establish standards for police departments in Colorado

4   generally related to use of force?

5   A    Yes.

6   Q    And there are some requirements about use of force by any

7   police officer in Colorado that are related to state law; is

8   that right?

9   A    Correct.

10  Q    Okay.  And POST is an agency that evaluates whether all of

11  the use of force policies from any jurisdiction comply with

12  state law?

13  A    Correct.

14  Q    Okay.  You had mentioned before the Democratic National

15  Convention in 2008, and the experience of having mutual aid

16  partners as part of that effort.  Do you remember that?

17  A    Yes.

18  Q    Okay.  Whose use of force policies governed any use of

19  force by a mutual aid partner in the context of the Democratic

20  National Convention in 2008?

21  A    Whose use of force policy?

22  Q    Correct.

23  A    I think, again, they were governed by their own individual

24  use of force policies while within the framework of POST and

25  state law.

20-cv-1878-RBJ   RONALD THOMAS - Direct   03-24-2022

1   Q    Understood.  Okay.  So, there wasn't an effort even with a

2   planned event where there's, you know, years to plan with

3   respect to the Democratic National Convention having been

4   awarded to Denver to have all of the mutual aid organizations --

5   partners learn, be trained on, and comply with Denver's use of

6   force policy?

7   A    At that time, no.

8   Q    Okay.  Who paid the officers from the mutual aid

9   jurisdictions for their work during the protests?

10  A    They were paid by their own jurisdictions.

11  Q    If any of those officers engaged in misconduct, whose

12  responsibility was it to investigate the behavior of those

13  officers?

14  A    Those jurisdictions.

15  Q    If there was any need to discipline one of the mutual aid

16  officers, who would be responsible for that discipline?

17  A    Their respective jurisdictions.

18  Q    Okay.  Is there any possibility of the Denver Police

19  Department investigating the context -- or the conduct, excuse

20  me, of an officer of another jurisdiction?

21  A    Not in a -- not in a typical use of force situation.  But,

22  you know, we do have some mutual aid agreements in which we

23  investigate lethal force that is used.

24  Q    Okay.  So, let me -- so, typically, there wouldn't be an

25  ability of one office -- one jurisdiction to investigate the

20-cv-1878-RBJ   RONALD THOMAS - Direct   03-24-2022

1   behavior of an officer from another jurisdiction absent a pretty

2   specific and unique situation?

3   A    Correct.

4   Q    So, for instance, if there's an officer-involved shooting,

5   sometimes another jurisdiction is called in as part of a

6   critical incident team to do the investigation of another

7   jurisdiction's officer who, you know, might have used force and

8   killed someone; right?

9              MR. DOUGLAS:   Objection.  Leading.

10              THE COURT:   Sustained.

11   Q.    (By Mr. Ringel) Describe for me the circumstances in

12   which there would be one jurisdiction investigating the conduct

13   of another jurisdiction.

14   A    So, in instances of lethal force, so a police-involved

15   shooting that occurred in Denver involving Denver officers,

16   previously we had partnered with the Aurora Police Department.

17   I think currently we're partnered with CBI and state patrol to

18   do kind of a joint investigation of that incident.

19   Q    Okay.  But if there was discipline as a result of the

20   investigation, who would be in charge of the discipline of a

21   Denver officer?

22   A    Denver.

23   Q    And if Denver was involved in investigating a lethal force

24   incident for another jurisdiction, who would be responsible for

25   discipline related to the officer of that other jurisdiction?

20-cv-1878-RBJ    RONALD THOMAS - Direct    03-24-2022

1   A    That respective jurisdiction.

2   Q    And nothing about a mutual aid context changes those basic

3   principles?

4   A    No.

5            MR. RINGEL:  Your Honor, I am at a change of ground

6   time.  So, I notice that it's about time when we typically take

7   breaks, and this would be a good stopping place for at least me.

8            THE COURT:  Okay.  How much time would you like for a

9   break?  Fifteen?  So, 10:53.

10       (Jury out at 10:38 a.m.)

11           THE COURT:  Okay.  10:53.

12       (Recess at 10:53 a.m., until 10:56 a.m.)

13       (Jury in at 10:56 a.m.)

14           THE COURT:  Okay.  Julie, did you order lunches today?

15           THE COURTROOM DEPUTY:  I did not.

16           THE COURT:  Can you?

17           THE COURTROOM DEPUTY:  I cannot.

18           THE COURT:  How come?

19           THE COURTROOM DEPUTY:  I can order it for late, like

20   2 o'clock, but we have to get it in by 10:00.

21           THE COURT:  Okay.  Would you folks like lunch if it's

22   late?

23           JUROR:  Yes.

24           THE COURT:  Do it.

25           THE COURTROOM DEPUTY:  I need to get menus, and they

20-cv-1878-RBJ   RONALD THOMAS - Direct   03-24-2022

1    have to fill them out.  So, would you like to take a break?

2         THE COURT:  Yeah.  Sure.  Once you've got the menus,

3    then we will let them fill it out, and take another little break

4    for that.  Go ahead for now.

5         MR. RINGEL:  Okay.  Thank you, Your Honor.  Now I'm

6    the man standing in between the jury and lunch.  That's not a

7    good thing, Your Honor.

8    Q.    (By Mr. Ringel) I wanted to change to a different topic,

9    Chief Thomas, and we've heard a lot about the issue of use of

10   force reporting, and I wanted to have you share your perspective

11   with the jury related to that issue.  On May 28th of 2020, the

12   first day of the protest, was there any discussion among the

13   leadership of the Denver Police Department related to

14   documentation of use of force?

15   A    Yes.

16   Q    Okay.  Describe that discussion on the first day of the

17   protest, Chief Thomas.

18   A    So, the first day of the protest went far longer than we

19   would have ever anticipated, you know, well into the early

20   morning hours of the next day.  So, towards the end of that

21   operational period, it was a collective decision that we made to

22   allow these officers that we knew were going to have to come

23   back the very next day to be part of our protest response, to

24   allow them to go home without them following the proper

25   procedure, which is to complete their use of force statements

20-cv-1878-RBJ   RONALD THOMAS - Direct   03-24-2022

1   and reports at the end of their shift.

2   Q    Why was that decision made by DPD leadership?

3   A    Again, out of concern for their wellbeing.  I mean, we knew

4   that they had worked a very long shift, were exposed to quite a

5   bit of violence and hostility, and we thought it best to allow

6   them to go home and rest and recover, and then come back the

7   next day, not understanding that the next day would be just as

8   long as the first.

9   Q    Okay.  So, and was that a decision that you supported?

10  A    Yes.

11  Q    And what was your personal thinking about that decision?

12  A    My personal thinking was that understanding just how long

13  they had worked, many of them not anticipating having to work

14  near that long, not ever having been subjected to that kind of

15  violence, understanding that they needed to come back the next

16  day, wanting them to be in the best frame of mind and the best

17  state of health that they could the next day.  So, I did support

18  that decision to allow them to go home, you know, at 3 o'clock

19  in the morning or whatever time that was.

20  Q    Okay.  And did you and the other leadership of the

21  department realize that in making that decision, it would result

22  in difficulty with documentation of the reasons for uses of

23  force that occurred?

24  A    I think we certainly recognized the difficulty that that

25  caused, but I felt like that was outweighed in the moment with

20-cv-1878-RBJ   RONALD THOMAS - Direct   03-24-2022

1  the need to get them home so they could rest and recover.

2  Q    Okay.  And did that decision continue during the course of

3  the first five or six days of the protest?

4  A    No.  It didn't continue for that long.

5  Q    Okay.  So, when did -- when was there further discussion

6  among the leadership of the department related to use of force

7  reporting?

8  A    I don't recall the exact day.  It could have been the

9  second or third day.  We recognized the issue that we had kind

10  of -- you know, kind of the situation that we created for

11  ourselves by allowing so much time to elapse between the time

12  that they engaged in the force incident and being able to report

13  it appropriately.  And so we -- you know, we put a plan in place

14  in order to get them to record their statements, and then try to

15  kind of recreate that report.

16  Q    Describe that plan for the jury, Chief Thomas.

17  A    So, my recollection is that that task was assigned to

18  Lieutenant Bob Wyckoff, who was I think the scribe as well as

19  the aide to Commander Phelan in the command post, and I think he

20  was given the assignment of collecting all of the statements and

21  then creating the use of force to document all of these

22  applications of force.

23  Q    Okay.  And when you're talking about a statement, what are

24  you specifically referring to, Chief?

25  A    A statement that details the specifics of that particular

20-cv-1878-RBJ   RONALD THOMAS - Direct   03-24-2022

1  application of force, why it was used, when it was used,

2  articulating the justification for using that force.

3  Q    Okay.  And those are some of the statements from individual

4  officers that we've seen as evidence in this trial; is that

5  right?

6  A    Yes.

7  Q    Okay.  And do you recognize that there's some issues

8  related to the ability of an officer to recreate what happened

9  days after the event happened?

10 A    Certainly.

11 Q    And did you -- did the department conclude that that was

12 something that needed to be tolerated because of the other

13 considerations that you mentioned?

14 A    Yeah.  You know, again, I think it was -- you know, we

15 weighed the challenge and the concern about not being able to,

16 you know, accurately and appropriately document those things

17 with the need to care for those officers' safety.

18 Q    Was there any option to not have the officers report the

19 next day to respond to the protests, and instead fill out use of

20 force statements, you know, say on May 29th?

21 A    Unfortunately not.

22 Q    And why was that not an option for the department?

23 A    Because there was, again, another significant demonstration

24 and protest that we had to manage.

25 Q    Was there any ability to sort of rotate officers with

20-cv-1878-RBJ   RONALD THOMAS - Direct   03-24-2022

1   respect to different assignments so that some -- so that the

2   same officers weren't the ones protesting -- policing the

3   protests?

4   A    Definitely not the first day, and, you know, in subsequent

5   days, difficult, but we -- we ultimately figured out a way to do

6   that.

7   Q    And how did you figure out how to do that, Chief?

8   A    Well, we finally were able to significantly increase the

9   staffing of the officers assigned to the protest with our mutual

10  aid partners.  Also, I didn't mention, you know, I had to, you

11  know, cancel days off for the entire patrol division.  I had to

12  put all of the officers on 12-hour shifts.  So, the day shift

13  could cover the first half of the day, the graveyard shift.

14  Overnight shift could cover the second half of the day, and then

15  that night shift, that detail two as we call it, could be

16  dedicated to the protest.

17         So, some staffing adjustments that we made as well as

18  securing those mutual aid partners finally did give us the

19  opportunity to pull people off line immediately after having

20  engaged in force.

21  Q    Okay.  So, let me understand the change in staffing from

22  10-hour shifts to 12-hour shifts for patrol.

23         THE COURT:  Okay.  Are you finished with use of force

24  reports?

25         MR. RINGEL:  Not quite, but we can stop here, and I

20-cv-1878-RBJ   RONALD THOMAS - Direct   03-24-2022

1   can continue.

2          THE COURT:  Okay.  Let's do that so we can have the

3   jurors fill out their menus.

4          MR. RINGEL:  I am not going to stand in the way of

5   that, Your Honor.

6          THE COURT:  It won't take long.

7      (Jury out at 11:06 a.m.)

8          THE COURT:  That gives us the chance to visit.  Do you

9   have your verdict form, I believe, now?

10          MR. MACDONALD:  We have not heard.  We haven't heard

11   anything from the defendants.  Did you say you'd like to take a

12   look at it, Your Honor?

13          THE COURT:  No.  I said have you agreed yet?  You've

14   got enough people sitting at the tables that somebody could have

15   been doing that while somebody else was doing something else.

16          MR. RINGEL:  Yeah.  Ms. Hoffman has been reviewing

17   that, and she can speak for us on that topic.

18          THE COURT:  All right.  Ms. Hoffman, he put all of the

19   eyes on you.

20          MS. HOFFMAN:  He did.  He was having too much fun

21   yesterday, so I had to step in.  We've still been discussing as

22   a team some comments with respect to the verdict form that was

23   circulated last night by plaintiffs' counsel, and I think if we

24   could just have the Court's indulgence with a few more minutes,

25   then we should be able to get a response to the Court.

20-cv-1878-RBJ   RONALD THOMAS - Direct   03-24-2022

1   Apologies.

2           THE COURT:  Okay.  Are there problems, or do you think

3   you're in agreement?

4           MS. HOFFMAN:  I think that for the most part we will

5   be in agreement, but we will have some suggestions.  One thing

6   that I remember seeing, I know there was a large discussion

7   about insertion of the mutual aid, like, responsibility language

8   for the three plaintiffs that it's applicable to, and I know

9   that was omitted with respect to Stanford Smith.  So, that's one

10  edit that had to be made.  But other than that, I think for the

11  most part what was submitted was in line with what was discussed

12  yesterday.

13          THE COURT:  Well, if you need to excuse yourself -- I

14  don't see Mr. Anderson here at the moment.  Who is working out

15  the verdict form on your side?

16          MR. MACDONALD:  We can figure that out, Your Honor.

17          THE COURT:  So, the two of them can go out and try to

18  resolve things.  We will have to print copies for everybody.

19  How about the jury instructions?  Are those all --

20          MR. MACDONALD:  They're all done.  They've been

21  submitted to your chambers, Your Honor.

22          THE COURT:  And also copied?

23          MR. MACDONALD:  I have a few copies, and we did submit

24  them to your chambers, but I do have a few copies.

25          THE COURT:  Well, we need one copy for each of the

20-cv-1878-RBJ   RONALD THOMAS - Direct   03-24-2022

 1  eight jurors, plus a copy for plaintiff, copy for the defendant,

 2  copy for the Court.  There's 11 right there.

 3          MR. MACDONALD:  We can get that done, Your Honor.

 4          THE COURT:  All right.

 5          MR. RINGEL:  They were submitted electronically to

 6  your chambers, Your Honor, and we -- the changes were made by

 7  Mr. Anderson, and we agreed on all of them, so those are ready

 8  to go.  So, we did make a little progress last night, Your

 9  Honor.

10          THE COURT:  Good.  Since the jurors are going to be

11  eating late, is there any possibility that we could have a

12  shorter lunch hour for all of you?  Of course that includes

13  Kevin also.

14          MR. RINGEL:  That's fine, Your Honor.

15          THE COURT:  I'm just trying to get us through this.

16  But we can provide lunches for jurors if they're deliberating.

17  I interpret that liberally sometimes.  These people have been

18  here for three weeks, and I don't know if they'll get to

19  deliberations for sure or not today, but they might, and that's

20  good enough for me to give them lunch.

21          MR. RINGEL:  That seems like a reasonable decision,

22  Your Honor.  And if you need to pass the kitty, we can help with

23  that.

24          THE COURT:  No.  That won't be necessary.

25          MR. RINGEL:  That was a joke, Your Honor.

20-cv-1878-RBJ   RONALD THOMAS - Direct   03-24-2022

1         THE COURT:  Well, actually, if we do something for the

2    jury that's not within the rules of the federal establishment, I

3    pay for it myself.  Which I don't mind.  I can afford it.  But

4    that won't be -- I won't have to pay for the lunches.

5         (Jury in at 11:11 a.m.)

6         THE COURT:  Okay.  Thank you.  Sorry, Chief.  We had

7    to interrupt your testimony a little bit there.

8         MR. RINGEL:  Okay.  Thank you, Your Honor.  Let's go

9    back to talking about use of force reports.  If we could put up

10   Exhibit 787 for Chief Thomas, please.  We need Julie to help us

11   with presenting the exhibit.  My Lady is gone, but not

12   forgotten.

13        THE COURT:  Okay.  She should be shortly.  Can you go

14   on to something else and come back to that?  There she is.

15        MR. RINGEL:  Your presence is needed, My Lady.

16        THE COURT:  And don't give her a swelled head here.

17   Q.   (By Mr. Ringel) So, Chief Thomas, this is a series of

18   emails that were presented earlier in this case, and it relates

19   to the communications about the officers' statements.  Was this

20   the first time that the Denver Police Department discussed the

21   notion and requested officer statements?

22   A    Certainly not.

23   Q    Okay.  So, when did that occur in a timeframe, as you

24   recall, Chief?

25   A    When did the request for officers to complete statements

Kevin P. Carlin, RMR, CRR

20-cv-1878-RBJ   RONALD THOMAS - Direct   03-24-2022

1    occur?

2    Q    Correct.

3    A    I would say probably two weeks prior to this email.

4    Q    Okay.  And what was the purpose of this email?

5    A    So, this particular email, I think the purpose of this, I

6    think that Lieutenant Wyckoff, who had been given the task of

7    collecting statements and preparing the overall use of force

8    report hadn't gotten all of the reports that he needed, and so

9    he reached out to Lieutenant Berdahl here, who is my

10   administrative assistant, and chief of staff, and I think

11   helped -- used him to kind of facilitate the gathering of these

12   statements.

13   Q    Okay.  Understood.  During the date -- we can go ahead and

14   take down Exhibit 787.  During the daily briefings from

15   Commander Phelan, were there discussions related to

16   documentation about what was occurring during the protests?

17   A    Yes.

18   Q    What do you recall about those discussions and those daily

19   briefings?

20   A    So, my recollection is that within those first couple of

21   days of the protest, we realized the challenge that we had

22   created for ourself, the difficulty in accurate recollection of

23   circumstances surrounding use of force.  And so it was

24   communicated to the supervisors at the briefing to take back to

25   their officers assigned to them that they need to at least make

20-cv-1878-RBJ    RONALD THOMAS - Direct    03-24-2022

1   some notations of individual instances of force being used so

2   that they can later refresh their recollection when completing a

3   full statement.

4   Q    The idea being take notes about what's happening during the

5   protests, during the day, to allow you to document as

6   appropriate later?

7   A    Yes.

8   Q    And was that a direction provided by Commander Phelan to

9   the supervisors that attended those briefings?

10  A    Yes.  It was part of that briefing.

11  Q    And was it your understanding that it was the

12  responsibility of those supervisors to communicate that

13  direction to individual officers that were responding to the

14  protests?

15  A    Yes.  And that's kind of the purpose of having only

16  supervisors attend the briefing.  You know, the command post is

17  not large enough to hold all of the individuals that may be

18  involved in a protest or a demonstration response, but we want

19  those supervisors there so that they can get the important

20  messages relative to intelligence, relative to specifics that we

21  understand, relative to the protest, rules of engagement, and

22  things like that, expecting that they will go back and have

23  conversations with their officers, providing them with all of

24  that detail.

25  Q    And that's how an organization like the Denver Police

20-cv-1878-RBJ   RONALD THOMAS - Direct   03-24-2022

 1   Department generally functions, isn't it?

 2   A    Yes.

 3   Q    That's chain of command; right?

 4   A    Yes.

 5   Q    Okay.  I don't want to dwell on the next issue, but I

 6   wanted to get your perspective about it.  We've heard testimony

 7   related to use of force reporting being generally force -- for

 8   individual incidents of force like using force incident to an

 9   arrest, and the mechanisms for reporting and investigating that

10   circumstance.  Keeping that circumstance in mind, do you believe

11   there are differences related to using less-lethal tools like a

12   PepperBall in a crowd control context from sort of the

13   traditional use of force context in which the policy was

14   designed?

15   A    Yes.  I think there are some differences.

16   Q    Explain your perspective on those differences for the jury,

17   Chief.

18   A    So, if I understand your question, so most use of force

19   reports involve an individual or individuals -- individual

20   officer's application of force against a known individual,

21   someone who has been arrested.  There are also occasions where

22   officers would complete a use of force report, but it would be

23   more of a generalized report, not listing the subjects upon

24   which the force was used, because they're not known.

25        You know, I think a prime example would be a large

20-cv-1878-RBJ   RONALD THOMAS - Direct   03-24-2022

1  disturbance out in front of a bar.  And you've got a couple of

2  officers that are trying to control a large crowd, and not being

3  able to do so safely by going hands on with maybe aggressors.

4  And so understanding that the appropriate thing to do would be

5  to discharge their OC spray to disperse that crowd, everybody

6  runs.  You're never able to take anybody into custody.  You

7  still need to document that application of force, but it's going

8  to be more generalized, because there's no specific individual

9  that we are aware of that force was used on.

10  Q    Okay.  And how -- are the uses of force in the context of a

11  crowd control situation, do officers typically know who the

12  force was used upon?

13  A    In a crowd control situation, no.  You know, we are -- you

14  know, area saturation, area denial, I mean, we're talking about

15  large crowds of people, most of whom we never even get close

16  enough to to identify them.

17  Q    Okay.  Understood.  All right.  I wanted to shift to a

18  different topic now, and that topic is body-worn cameras, Chief.

19  A    Yes.

20  Q    When did the Denver Police Department adopt body-worn

21  cameras?

22  A    If my memory serves me, like roughly 2015.

23  Q    Okay.  Was the George Floyd protest the first time

24  body-worn cameras were used in a protest setting where there was

25  a significant amount of violence and resulting deployment of

20-cv-1878-RBJ   RONALD THOMAS - Direct   03-24-2022

1   less-lethal?

2   A    Absolutely.

3   Q    Okay.  So, there was no prior experience before the George

4   Floyd protests related to using body-worn cameras in that

5   context?

6   A    I don't believe so, no.

7   Q    Do you believe the body-worn camera policy prior to the

8   protests was clear about when the body-worn camera should be

9   turned on in a crowd management or crowd control context?

10  A    You know, frankly, I don't think that the body-worn camera

11  policy even contemplated a situation like the George Floyd

12  protest.

13  Q    Okay.  And what leads you to that conclusion, Chief Thomas?

14  A    Well, primarily because I don't know that anyone

15  contemplated that such an event would occur in the city of

16  Denver.

17  Q    And did the policy itself have any language about how to

18  use a body-worn camera during protest-related activity?

19  A    I think the -- the body-worn camera policy specifies

20  instances in which the body-worn camera needs to be activated,

21  specific calls, you know, confrontations that officers are

22  involved in, but I don't believe it speaks to, you know, being

23  on a skirmish line, for instance, or, you know, being in a

24  crowd-control environment for an extensive period of time.

25  Q    Okay.  It's just not a topic that was included in the

20-cv-1878-RBJ    RONALD THOMAS - Direct    03-24-2022

1   policy one way or the other at all; right?

2   A    Correct.

3   Q    And as a result, it leaves you to conclude that there

4   wasn't clarity on that issue?

5   A    That's fair.

6   Q    Okay.  How many years have you worked for the Denver Police

7   Department prior to when body-worn cameras came into use?

8   A    Well, like you, my math isn't that great, but from 1989 to

9   2015, I had no exposure or experience with body-worn cameras.

10  Q    Okay.  So, about 25 years, and maybe a little more than

11  that?

12  A    Yes.

13  Q    Okay.  Prior to body-worn cameras becoming regularly used

14  by the Denver Police Department, did you observe widespread

15  improper use of force in violation of DPD policy?

16  A    No.

17  Q    All right.  Shifting gears, you were here when Division

18  Chief Aaron Sanchez testified; right?

19  A    Yes.

20  Q    And I wanted to talk to you about an issue related to a

21  lieutenant in District 6, a lieutenant by the name of Ken

22  Chavez.  During the George Floyd protests, did you learn of any

23  complaint related to the conduct of Lieutenant Chavez?

24  A    I did.

25  Q    What did you learn specifically?

20-cv-1878-RBJ   RONALD THOMAS - Direct   03-24-2022

1  A     Not a lot in terms of specifics at the time.  My

2  recollection is that then Commander Sanchez had been notified

3  that Lieutenant Chavez seemed to not be, you know, kind of

4  following our philosophy in terms of managing the protest.

5  Q     Did you have an understanding of what that meant at the

6  time that you learned that information from Commander Sanchez?

7  A     No.

8  Q     Okay.  Did you have an understanding that that meant that

9  the lieutenant was potentially asking his officers under his

10 command to use force in inappropriate ways?

11 A     I certainly had no understanding that that was happening.

12 Q     Okay.  Did the -- did any of your communications with

13 Commander Sanchez relate to use of force by Lieutenant Chavez or

14 anyone on his team?

15 A     No.

16 Q     You were present when Division Chief Sanchez testified, and

17 he talked about his decision to make the lieutenant --

18 Lieutenant Chavez the acting commander in District 6 while he

19 was on vacation.  Do you remember that?

20 A     Yes, I do.

21 Q     Was that something that you knew about at the time that it

22 occurred?

23 A     It was, yes.

24 Q     Okay.  Based on the information that you've just relayed

25 related to your understanding of the complaint against

20-cv-1878-RBJ   RONALD THOMAS - Direct   03-24-2022

1    Lieutenant Chavez, do you believe this was an appropriate

2    decision?

3    A    At the time, yes.

4    Q    Okay.  And why did you believe it was an appropriate

5    decision at the time?

6    A    Well, again, at the time, I was not aware of the fact that

7    Lieutenant Chavez had engaged in any misconduct.  I knew that

8    then Commander Sanchez really had four choices to make in order

9    to identify an acting commander to serve in his stead while he

10   was on vacation.  I knew that one of his lieutenants was very

11   junior.  I knew another one of his lieutenants was responsible

12   for overnight activity, so he really, I think, effectively had

13   two choices, and he chose the more senior of the two.  He chose

14   the lieutenant who not only manages the day shift, but also

15   manages some other units that work generally during the day.

16   So, it seemed to be -- to be the appropriate decision at the

17   time, not understanding what we know today.

18   Q    Okay.  Fair enough.  Do you now know more about the issues

19   related to Lieutenant Chavez than you did previously?

20   A    I do.

21   Q    When did you learn more about the nature of the complaint

22   and the allegations against the lieutenant?

23   A    Quite frankly, I really learned the true details of all

24   that he was accused of as I was sitting at the defense table.

25   Q    Okay.  In court?

20-cv-1878-RBJ   RONALD THOMAS - Direct   03-24-2022

1    A    Yes.

2    Q    During the time that Commander -- or that then Commander,

3    now Division Chief Sanchez was testifying?

4    A    Yes.

5    Q    All right.  As the division chief overseeing the patrol

6    division, would you have knowledge of an internal affairs

7    investigation being conducted related to anybody under your

8    supervision?

9    A    Yes.

10   Q    How much detail would you know about an active internal

11   affairs investigation, if any detail?

12   A    With regard to someone --

13   Q    Within the scope of your responsibilities in the patrol

14   division.

15   A    You know, I would receive a notice of complaint that would

16   basically outline the specific department charge that they were

17   being investigated for.  Details beyond that, I would only know

18   if I made inquiry.

19   Q    Okay.  So, as an example, if a particular officer in patrol

20   is accused of inappropriate use of force, there's a particular

21   policy section of the conduct review manual that says this is an

22   inappropriate use of force.  It has a section number and a

23   policy number; right?

24   A    Yes.

25   Q    And so what you would know is Officer Smith or Officer

20-cv-1878-RBJ   RONALD THOMAS - Direct   03-24-2022

1   Jones was being investigated for inappropriate use of force?

2   A   Yes.

3   Q   You wouldn't -- the notice that you would receive wouldn't

4   provide you with detail?

5   A   No.

6   Q   Okay.  And that's why you didn't know the detail about what

7   happened with the lieutenant until sitting in court last week?

8   A   Well, actually, in addition to not being provided details

9   relative to anyone being under investigation, at my direction,

10  he was no longer a member of the patrol division.

11  Q   Okay.  And when did that happen, Chief Thomas?

12  A   I believe my conversation with him letting him know that I

13  was moving him out of the patrol division occurred, I think on

14  the 17th of June.

15  Q   And what had you learned between the time that he was made

16  acting commander of District 6 and June 17th that led you to

17  that decision?

18  A   That he had provided direction to officers that I think was

19  against our values and our way of wanting to address situations.

20  Q   Okay.  And did you -- what specifically did he do that

21  caused you to make the decision?

22  A   Well, in the most recent incident, he actually told his

23  downtown motorcycle unit officers who are assigned to him that

24  there was going to be a -- sort of a no-tolerance policy on the

25  16th Street Mall, that we were going to take back the mall, I

Kevin P. Carlin, RMR, CRR

20-cv-1878-RBJ    RONALD THOMAS - Direct    03-24-2022

1  think is maybe how he would have phrased it.

2         Meaning that, you know -- that, you know, very minor

3  infractions, he wanted his -- those officers to enforce those

4  infractions up to, you know, jailing people for those

5  infractions.  And it was communicated to, I think then

6  Commander Chavez [sic] that he had given that direction.

7         Commander Sanchez then addressed Lieutenant Chavez and

8  told him that he was to talk to those officers, tell them that

9  that's not the direction that they are to follow, and reinforce

10  what our direction is, what our philosophy is, relative to those

11  minor infractions.

12         And then it was clear that he didn't do that, because

13  an officer did in fact arrest somebody for a very low-level

14  offense.

15  Q    Okay.  And you found out about all of that information?

16  A    I did find out about that information, and immediately lost

17  confidence in Lieutenant Chavez's ability to communicate my

18  messages to the officers that are under his command.  So, I made

19  the decision that he needed to not be in the patrol division

20  anymore, not be able to have that kind of impact on officers.

21         So, I brought my concern to Chief Pazen, and

22  collectively, we decided that that day he was going to be

23  notified that he was no longer a member of the patrol division.

24  We found another assignment for him to hold, and I communicated

25  with him, you know, in the command post later that evening, I

20-cv-1878-RBJ   RONALD THOMAS - Direct   03-24-2022

1  believe, letting him know what my decision was.

2  Q    Okay.  And what was his new assignment as of June 17 of

3  2020?

4  A    Back then, I think it was the city security division.

5  Q    What does that mean, Chief?

6  A    I don't know what it was intended to mean, but, you know, I

7  think that there were, you know, issues of city security that

8  that particular bureau was responsible for.  Responsible for,

9  you know, understanding general safety concerns relative to the

10  city, and then communicating those -- that intelligence and that

11  understanding to the chief to make decisions.

12       One of the things that he was primarily responsible for

13  was kind of understanding the significance at the time of the,

14  you know, the pandemic and orders that were being issued or

15  about to be issued by the governor and the mayor.

16  Q    Okay.  So, it was more of an administrative role?  Is that

17  a fair way to think about it?

18  A    Absolutely, yes.

19  Q    So, he was no longer directing officers on the street to

20  implement anything?

21  A    Correct.  And that was the aim.

22  Q    Understood.  Okay.  And once you understood that different

23  misconduct by the lieutenant, you took action?

24  A    Yes.

25  Q    And in comparison, you didn't have enough detail to take

20-cv-1878-RBJ    RONALD THOMAS - Direct    03-24-2022

1   action when the issue was raised to you previously involving the

2   lieutenant and the complaints against him?

3   A    No.  At the time I didn't have any of those details.

4   Q    Okay.  Understood.  All right.  I wanted to shift gears and

5   talk about some things that were in some of the memos from the

6   Office of Independent Monitor.  During this trial, you

7   understand there have been memos created by the Office of

8   Independent Monitor related to interviews of Denver Police

9   Department personnel presented as evidence?

10  A    Yes.

11  Q    Okay.  Did you observe, Chief Thomas, any leadership

12  failure with respect to the department's response to the

13  protests?

14  A    I did not.

15  Q    How would you characterize the response by the department

16  generally, sir?

17  A    I would characterize our response as being really the best

18  that we could do, given the circumstances.  I think we did the

19  best we could to manage the situation at hand, and ultimately

20  did, I think, get the situation under control.

21  Q    What did you observe about the engagement of DPD leadership

22  in response to the protests?

23  A    I think our engagement was very healthy.  We were all in

24  the command post.  We were all huddling, discussing various

25  issues.  You know, how to handle situations in the moment, how

20-cv-1878-RBJ   RONALD THOMAS - Direct   03-24-2022

1   to prepare for situations that may occur later.

2   Q    Did the healthy leadership include the chief of police?

3   A    Yes.

4   Q    Was Chief Pazen engaged in the response to the protests?

5   A    Certainly.

6   Q    What was he doing on a daily basis with respect to the

7   response to the protests, generally?

8   A    Generally, I mean, he was certainly in the command post at

9   various times observing what was occurring, overseeing the

10  direction that was being given to officers.  He certainly had

11  many other things that he needed to attend to, being the chief

12  of police, but certainly was well informed and very much engaged

13  in our response and activities.

14  Q    Okay.  How many chiefs of police have you worked for during

15  your career with the Denver Police Department?

16  A    I have lost count.  I mean, it might be a double-digit

17  number.

18  Q    Okay.  I wanted to focus on the predecessor to Chief Pazen

19  is a gentleman by the name of Robert White; is that right?

20  A    Yes.

21  Q    Okay.  So, focusing on the transition between Chief White

22  and Chief Pazen, when did that occur?

23  A    2018.

24  Q    Okay.  With respect to that transition between Chief White

25  and Chief Pazen, have you observed any changes to the emphasis

20-cv-1878-RBJ   RONALD THOMAS - Direct   03-24-2022

1    on training conducted by the department?

2    A    I would say that we probably have an enhanced emphasis on

3    training since Chief Pazen has become chief.

4    Q    And what sort of decisions or programs that Chief Pazen has

5    adopted lead you to that conclusion?

6    A    Well, it's an expressed pillar of our foundation.  It's

7    part of our strategic plan.  So, there's I think a very strong

8    commitment to training.  I think we all, you know, focus on, pay

9    attention to best practice, as informed by PERF, IECP, other

10   departments that are doing things well.  I think we constantly

11   look at ways to improve, ways to enhance our training, ways to

12   reengage people and train specific to trends and legislative

13   changes, issues of concern, even like the First amendment.

14   Q    Okay.  So, what is a strategic plan of the Denver Police

15   Department?

16   A    So, it's basically a plan that I think informs all of our

17   activities.

18   Q    Okay.  And how often are strategic plans developed?

19   A    I think they're quite often developed as an administration

20   begins, and they may change over time.  They certainly will

21   change as the administrations change.  I think that they are

22   updated with the times.  I think that they are updated relative

23   to the understanding of, you know, changes in the environment,

24   changes in the community.

25   Q    Okay.  So, if I'm understanding you, once Chief Pazen

20-cv-1878-RBJ   RONALD THOMAS - Direct   03-24-2022

1   became the chief of police and there was a new administration,

2   there was a new strategic plan developed under Chief Pazen?

3   A    Yes.

4   Q    And if I also understood you, one of the pillars in that

5   strategic plan is training?

6   A    Yes.  Clearly defined pillar.

7   Q    Okay.  And how is it defined generally in that strategic

8   plan?

9   A    Well, I think it's -- I think it's an understanding of the

10  value of training, a commitment to innovative training, a

11  commitment to make sure that our officers are the best trained

12  to really stay on the -- on the forefront of, you know, the law

13  enforcement community in terms of our -- you know, how to

14  address, you know, new challenges, how to do things better.

15  Q    Okay.  Can you give the jury an example of some sort of

16  training issue that demonstrates in your mind a -- fulfilling

17  the pillar of training in the strategic plan as you've described

18  it?

19  A    I can think of a couple.  There have been some significant

20  legislative changes that have changed the way that we have to do

21  business, the way that we have to, you know, document contacts,

22  for instance.  So, there will be training.  It could be from a

23  training bulletin to a recorded video where somebody provides

24  training.  It could be, you know, officers being drawn to a

25  central location to be provided two hours of training, and maybe

20-cv-1878-RBJ   RONALD THOMAS - Direct   03-24-2022

1  even a full day of training specific to those legislative

2  changes.

3          I can think of not too long ago, it became obvious to

4  us that officers didn't understand that you can -- that someone

5  can actually record you as you're engaging in your law

6  enforcement activities.  And so we built a training bulletin

7  explaining that, you know, what people's rights are, their

8  ability to be able to record you.  You know, understanding that,

9  you know, that there is a safety component there, but letting

10  people know that, you know, that you cannot stop people from

11  recording you.

12  Q    The fact of recording is something that needs to be allowed

13  by the police?

14  A    Certainly.

15  Q    Okay.  If the recording interferes with legitimate police

16  activity, that -- or the safety of officers or other people in

17  the public, that could be an issue?

18  A    Yes.

19  Q    Okay.  All right.  Were there complications related to the

20  ability of the department to train its officers because of

21  COVID-19?

22  A    Absolutely.

23  Q    Could you describe some of those issues for the jury,

24  please.

25  A    I think there were mandates from the City that limited the

20-cv-1878-RBJ   RONALD THOMAS – Direct   03-24-2022

1   number of people that could be in a certain space.  I think even

2   POST mandated that only a certain number of people could be in

3   the academy at any particular time.  We did have small academy

4   classes at the time.  So, much of the academy space was occupied

5   by those officers.  Bringing officers down to train them would

6   have exceeded that capacity.  We certainly have other spaces

7   where we can train officers, but again, still limited by

8   numbers.

9   Q    Okay.  We all remember having all lived through the

10  pandemic that police still had to do their jobs during the

11  pandemic; right?

12  A    Yes.

13  Q    Was there an effort not to bring officers together who were

14  not in the same sort of units and cohorts, if that makes sense?

15  A    It does not.  I'm sorry.

16  Q    It does not make sense.  Okay.  So, if I'm an officer that

17  works at District 6, and I'm interacting with officers from

18  District 6, if you bring an officer who works at District 6 and

19  start having them interact with officers in District 1, there's

20  the potential for more spreading of something like COVID-19.

21  Does that generally make sense to you?

22  A    Oh, sure.

23  Q    Was that something that the department was focused on at

24  the time?

25  A    Absolutely.  I mean, we were holding roll calls outside.

20-cv-1878-RBJ   RONALD THOMAS - Direct   03-24-2022

1   We were really trying to limit our exposure to one another.

2   Q    Okay.  Because at the time -- early on in the pandemic,

3   there was no ability to really control what was happening with

4   COVID-19?

5   A    Yes.  And we were significantly concerned about our

6   staffing being impacted, our ability to respond, and, you know,

7   protect the community was -- would be impacted if a number of

8   officers contracted COVID.

9   Q    Okay.  All right.  Have you experienced resistance by the

10  commanders of the districts to sending their officers to

11  training?

12  A    No.

13  Q    Okay.  That's not something that you've experienced as the

14  division chief?

15  A    No.  I think it's fair to say that I don't have any

16  resistance by my direct reports.  I mean, certainly they will

17  express challenges that they may have with the direction that I

18  would give them, but ultimately I think they understand the

19  direction.  And there may be some accommodation for the

20  particular challenge that training might present, but at the end

21  of the day, the training is a key component.

22  Q    Okay.  And do you believe that it's generally recognized in

23  the department that training is something that's important to

24  Chief Pazen?

25  A    Again, it's a strong pillar of our foundation.

20-cv-1878-RBJ   RONALD THOMAS - Direct   03-24-2022

1   Q     And do you believe the people that work in the division of

2   patrol understand that that's a strong value for you personally?

3   A     Absolutely.

4   Q     Are there sometimes competing considerations about training

5   versus other things that need to happen in terms of the

6   department's operations?

7   A     Yes.

8   Q     How do you balance those kind of competing considerations

9   as the division chief over patrol?

10  A     Well, you know, we -- we make adjustments to staffing.  We

11  make adjustments to the way -- modify the way that training is

12  rolled out.  It may be split over the course of a couple days so

13  that we're not, you know, taking an officer off line for an

14  entire day.  You know, we may supplement those patrol resources

15  or those -- you know, those sector and precinct resources with

16  officers from the gang unit or even Metro SWAT or even impact

17  teams to make sure that everyone gets training without impacting

18  our ability to respond.

19  Q     Okay.  Do you think those are things that can be and have

20  been balanced in your experience as the chief of the division of

21  patrol?

22  A     Yes.

23  Q     Did you observe anyone in the command post paralyzed?

24  A     No.

25  Q     How much time did you spend in the command post?

20-cv-1878-RBJ    RONALD THOMAS - Direct    03-24-2022

1    A    Countless hours.

2    Q    Okay.  Did the operations of the command post generally

3    function smoothly in your view?

4    A    Yes.  I think there was a great coordination between Denver

5    Police and Denver Fire, Denver sheriffs, state patrol, our

6    federal partners, those other law enforcement jurisdictions that

7    joined us.  So, I don't think that we had communication issues

8    in the command post.  Certainly there was a lot of energy.  You

9    know, what was at hand was certainly very serious.  We were

10    concerned about the safety of officers.  We were concerned about

11    the safety of the community.  We were concerned about managing

12    these crowds.

13    Q    So, when you say energy, what do you mean?  I have not

14    heard using the term "energy" in that kind of context.  I mean,

15    other than sort of a crowd that's buzzing with energy and

16    anticipation, do you mean something different than that?

17    A    I mean, "buzzing" is a good word.  You know, quite often in

18    the command post, it's very quiet.  Everybody is just kind of

19    sitting there looking at monitors, waiting for something to

20    happen.  And then if there is communications, it's very short

21    communications.

22        Whereas in this setting, there was a lot of

23    communication that was going on.  There was a lot of, just, I

24    think that -- I think that people truly recognized the

25    seriousness of what was going on, and wanted to make the right

20-cv-1878-RBJ   RONALD THOMAS - Direct   03-24-2022

1   decisions, and were anxious for things to work out as we

2   anticipated.

3   Q    Okay.  Did you observe anybody angry in the command post?

4   A    I wouldn't characterize anybody's attitude or disposition

5   as angry.

6   Q    Was Chief Pazen ever angry in the command post, to your

7   observation?

8   A    No.

9   Q    Is the chief someone who displays visible anger on a

10  regular basis?

11  A    I don't know that I've ever seen Chief Pazen to be what I

12  would describe as angry.  Certainly animated.  Certainly

13  emotional.  You know, he was truly upset at what was happening,

14  truly upset about what his officers were experiencing, truly

15  upset about the unrest that was going on -- going on in the

16  community that he grew up in.

17  Q    Okay.  But you didn't observe any anger from Chief Pazen?

18  A    Not at all.

19  Q    Okay.  Did you observe criticism of the officers responding

20  to the protests from the people in the command post?

21  A    No.

22  Q    Okay.  There wasn't constant criticism of those officers?

23  A    No.  You know, I know that there was, you know, anxiety,

24  certainly, about, you know, hopefully we can get those officers

25  where they need to be quick.  Hopefully the officers that we

Kevin P. Carlin, RMR, CRR

20-cv-1878-RBJ   RONALD THOMAS - Direct   03-24-2022

1   send are enough to support the effort that we're trying to, you

2   know, engage in at a particular location.  So, certainly no

3   anger, no criticism, but certainly a lot of anxiety about hoping

4   that things worked the way that we planned to.

5   Q    Were the commanders of the six district stations sometimes

6   present in the command post?

7   A    Yes.

8   Q    Sometimes were those commanders out in the field?

9   A    Yes.

10  Q    How did that work generally during the protests?

11  A    There's really no direction by me relative to that.  I

12  think some wanted to really kind of see what was happening out

13  there within the area that we were trying to control.  Some of

14  them wanted to see it, you know, on the monitors in the command

15  post.  Some people wanted to manage what was going on in their

16  particular districts.  So, there was always command

17  representation for every district that was supplying officers,

18  but it wasn't always the commander in the command post.

19  Q    So, sometimes it might be the commander, and then sometimes

20  it might be, say, a lieutenant?

21  A    Correct.

22  Q    Okay.  I understand.  All right.  You've talked a fair

23  amount about the monitors in the command post.  How many

24  monitors were there, approximately?

25  A    My recollection is three very large monitors and a couple

20-cv-1878-RBJ   RONALD THOMAS - Direct   03-24-2022

1   of smaller monitors.

2   Q    Okay.  And what was being projected on the monitors?

3   A    Images from the hundreds of cameras that we have available

4   to us, whether that be HALO cameras or traffic cameras.

5   Q    Okay.  So, at any one given moment in time, there could be

6   viewing five images from all of the potential places in the city

7   that cameras exist?

8   A    Yes.

9   Q    Okay.  Was there any record of which cameras were being

10  watched at any particular time?

11  A    I don't believe so.  I think that activity that we were

12  observing that was being called out on the radio that was

13  occurring was being recorded by the scribe.

14  Q    Okay.  Did cameras -- did the cameras that were used follow

15  the kind of activity that was hearing on the radio?  So, in

16  other words, if there was something that was discussed related

17  to the District 6 station, would the command post be looking at

18  things related to the District 6 station?

19  A    Yes.

20  Q    But there also could be -- let me ask a different question.

21  Were multiple things happening that the command post was paying

22  attention to all the time?

23  A    Yes.  I mean, there could have been a march going up East

24  Colfax.  There could have been a large collection of folks at

25  District 6, in addition to a large collection of people in front

20-cv-1878-RBJ   RONALD THOMAS - Direct   03-24-2022

1   of the capitol, and maybe even a large collection of people at

2   the downtown detention center or going down the 16th Street

3   Mall.

4   Q    Okay.  Because of all of the different things that were

5   happening all at once, did you think that Commander Phelan's job

6   and responsibilities as the incident commander were difficult?

7   A    Oh, certainly.

8   Q    How so, Chief Thomas?

9   A    Well, because I mean, I think first and foremost, this was,

10  you know, I think his career spanned 35 years or more, and over

11  these 35 years, I doubt that he faced a situation quite like

12  that.  He had managed, you know, more protests and

13  demonstrations and large-scale events than anyone can count, but

14  I think that that particular challenge was greater than any he

15  had ever faced.  I think that having to deploy to multiple

16  locations to address multiple threats I think was a significant

17  challenge.

18  Q    Okay.  And Commander had to make decisions in real time;

19  right?

20  A    Yes.

21  Q    And did he have perfect information as he was having to

22  make all of those decisions?

23  A    No.  Not all the time.

24  Q    Okay.  Sometimes he would have limited information; right?

25  A    Certainly.

20-cv-1878-RBJ   RONALD THOMAS - Direct   03-24-2022

1  Q    And he would still have to make a decision about how to

2  proceed with respect to the response to the protests?

3  A    Yes.

4        MR. RINGEL:  Your Honor, I am at a change of ground

5  time.  I don't have a ton left with Chief Thomas, but I think if

6  it's okay with the Court, now would be a good stopping place.

7        THE COURT:  Well, I'm not sure.  So, let me ask, and I

8  will start with perhaps the most important person in the room,

9  and that's Kevin.  You're doing okay?  Because Julie has somehow

10 finagled to get the jurors their lunches by 1 o'clock.  I wonder

11 if we could keep going, and take our lunch hour a little late?

12       MR. RINGEL:  That's okay with me, Your Honor.

13       THE COURT:  But I don't know if it's okay with

14 everybody else, and I will start with the eight people in the

15 jury box.  Okay?  Everybody?  And how about you folks?  Do any

16 of you have other appointments during the lunch hour?

17       MR. DOUGLAS:  It's fine with us, Your Honor.

18       THE COURT:  Sir, how about you?

19       THE WITNESS:  Perfectly fine with me.

20       THE COURT:  Julie?

21       THE COURTROOM DEPUTY:  Yes, Your Honor.  May I let you

22 know if the lunches come earlier, or would you just like to have

23 the --

24       THE COURT:  Oh, no.  You let us know.  I'm just trying

25 to use our time as best we can to make sure we get through this.

20-cv-1878-RBJ   RONALD THOMAS - Direct   03-24-2022

1        MR. RINGEL:  I appreciate that, Your Honor.  I will

2    continue, then.

3        THE COURT:  Are you okay?  You've been doing the hard

4    work this morning.

5        MR. RINGEL:  I'm just standing here and asking

6    questions.  It's not that hard.

7        THE COURT:  All right.

8        MR. RINGEL:  But if I collapse from exhaustion, my

9    friend Mr. Macdonald will pick me up.  I appreciate that.

10       THE COURT:  Well, if anybody needs a restroom break or

11   anything like this, please don't be shy.  We're all good friends

12   now.  If you need a break, just tell us.  Onward.

13   Q.    (By Mr. Ringel) I wanted to talk to you about a couple

14   sort of specific incidents that I think you can shed some

15   information on that occurred with respect to the protests that

16   we've heard about before.  The first one is the removal of rocks

17   at the RTD Civic Center station on May 30th of 2020.

18   A    Yes.

19   Q    Are you familiar with that -- what occurred generally?

20   A    Yes.

21   Q    Okay.  So, what was happening with respect to rocks that

22   were at the RTD Civic Center station from your perspective?

23   A    So, my recollection was that there was a large collection

24   of rocks, I think it was part of the landscaping there at the

25   RTD station.  They were being used as weapons.  They were being

Kevin P. Carlin, RMR, CRR

20-cv-1878-RBJ   RONALD THOMAS - Direct   03-24-2022

1   picked up and thrown at officers.

2          A lot of things were being thrown at officers, but we

3   felt as though this was something that we could control.  We

4   could remove those particular implements that were being used

5   against officers.  So, we coordinated with RTD, and I think

6   maybe with DOTI, Department of Infrastructure to -- and

7   Transportation to remove those.

8   Q    Okay.  And where is the RTD Civic Center station located?

9   A    It's right at like Colfax and Broadway.

10  Q    Okay.  So, it's Colfax between Broadway and Lincoln, is the

11  area that we're talking about; right?

12  A    Yes.

13  Q    Okay.  And what were law enforcement doing during the time

14  that the removal of these rocks was occurring by RTD and the

15  Department of Transportation and Infrastructure?

16  A    They were in the area to guard that area to allow them to

17  complete that work.

18  Q    Were they in a skirmish line or skirmish lines?

19  A    Yes.

20  Q    And where generally were those skirmish lines located?

21  A    I think my recollection is kind of across -- across

22  Broadway there.

23  Q    Okay.  The idea would be to keep the protesters and the

24  crowds away from the area where the rocks were being mitigated?

25  A    Yes.

20-cv-1878-RBJ   RONALD THOMAS - Direct   03-24-2022

1   Q    Okay.  So that the RTD maintenance folks or construction

2   folks and the DOTI maintenance folks and construction folks

3   could do their job?

4   A    Yes.

5   Q    How long -- let me back up.  Did it take at least a couple

6   hours to remove these rocks?

7   A    Yes.  I believe so.

8   Q    And were the officers on the skirmish lines for that entire

9   time period?

10  A    Yes.

11  Q    Okay.  Is that a long time to be on a skirmish line?

12  A    Certainly.

13  Q    How come at that moment in time there was not a -- an

14  unlawful assembly declared and the area around the capitol just

15  simply cleared of people?

16  A    You know, I honestly don't know.  I mean, I don't know that

17  the entire assembly was unlawful.  Certainly we were concerned

18  about those workers that were removing the rocks, just as we

19  were concerned about Denver Fire that were being attacked as

20  they responded to fires.

21  Q    Right.  So, there was -- was there an effort to allow

22  protest activity to occur as long as it wasn't interfering with

23  what was happening at the RTD Civic Center station?

24  A    Yes.

25  Q    Okay.  All right.  I wanted to talk to you about the

20-cv-1878-RBJ   RONALD THOMAS - Direct   03-24-2022

1   uniforms of the Denver Police Department.  Do the uniforms of

2   Denver police officers have any insignia on their shoulders?

3   A    Other than sergeant chevrons, no.

4   Q    Okay.  Are you familiar with officers from other

5   jurisdictions having patches on the shoulders of their uniforms?

6   A    I think most other jurisdictions in the State of Colorado

7   have patches on their shoulders.

8   Q    Okay.  So, the Denver Police Department is unique, as far

9   as you understand, at least in metropolitan Denver, of not

10  having patches on their uniforms?

11  A    That's correct.

12  Q    Okay.  All right.  Chief Thomas, based on what the DPD has

13  learned since the George Floyd protests, please tell the jury

14  whether you believe DPD officers may have made some mistakes in

15  response to what was happening with respect to the protests.

16  A    There's no doubt that there were mistakes made.

17  Q    What types of mistakes are you now aware of, Chief?

18  A    I'm aware of applications of force that were -- that appear

19  to be clearly inappropriate.

20  Q    Do you believe that any additional training would have

21  avoided those mistakes?

22  A    That's hard to say.  I'd like to think that there was

23  significant training.  You know, you can never have enough

24  training, I don't think, but I don't believe that those

25  officers' missteps and inappropriate behavior was due to a lack

20-cv-1878-RBJ    RONALD THOMAS - Direct    03-24-2022

1    of training.

2    Q    What do you believe caused any mistakes that were made by

3    individual officers during their responses to the protests?

4    A    Well, you know, without minimizing the misconduct, I mean,

5    you know, we're all human.  And certainly, you know, these

6    officers were being subjected to a lot of angry, violent

7    behavior.  And, you know, that's not something that's new to us.

8    Certainly, we have all confronted people that are not fans of

9    the police department, but it was certainly a new experience to

10   me, and I'm sure a new experience to the large majority of the

11   officers that were out there of being specifically targeted,

12   people trying to harm them, you know, with, you know, rocks,

13   bottles, explosive devices.

14   Q    Do you consider the George Floyd protests that occurred in

15   Denver unprecedented based on your career as a Denver police

16   officer for more than 30 years?

17   A    Undoubtedly.

18   Q    And why do you consider those protests and related

19   activities unprecedented, Chief?

20   A    Again, you know, we've dealt with a lot of protests.  We've

21   dealt with a lot of large demonstrations, large-scale events.  I

22   mean, thankfully we have a successful football team, so we've

23   been able to manage a lot of celebratory parades and things of

24   that nature.  We had the good fortune of having the Democratic

25   National Convention occur here in Denver.

20-cv-1878-RBJ   RONALD THOMAS - Direct   03-24-2022

1      So, we've had a long history of dealing with crowds,

2  even dealing with crowds that have differing of opinions and

3  philosophies of the Denver Police Department.  But this is the

4  first time in my career and certainly most other officers'

5  careers where they were the targets of violence.

6      You know, and there was just so much destruction.  I

7  mean, certainly, windows have been broken, stores have been

8  looted, people have fired weapons at officers individually, you

9  know, done things to harm individual officers, but in terms of

10 the volume that that was occurring, never been seen before.

11 Q   So, things like what happened in the George Floyd protests

12 have occurred, just not to the extent that was experienced in

13 these particular protests?

14 A   Not to the extent -- not to the -- nowhere near the volume.

15 Q   Okay.  What about the duration?  Have there been protests

16 of this size that have occurred in as many days in a row as

17 happened with respect to the George Floyd protests?

18 A   You know, not to my recollection.  I remember dealing with

19 the Occupy movement, and so there were certainly a number of

20 demonstrations, certainly a number of large collections of

21 people in front of the capitol and in Civic Center and Lincoln

22 Park there.  But again, there weren't the large numbers of

23 people that were engaging in violent and destructive behavior.

24 Q   Do you believe that the department has learned from the

25 George Floyd protests?

20-cv-1878-RBJ   RONALD THOMAS - Direct   03-24-2022

1   A     Yes.

2   Q     What has the department learned, in your view?

3   A     A few things.  I mean, you know, they certainly say plan

4   for the worst, and I think we have always planned for the worst.

5   I think what we have learned is to plan for the unimaginable.  I

6   think that we learned that there are certain tactics and

7   implements that are not effective for use in a crowd control

8   environment.

9          I think that we have learned to be -- I think, you

10  know, one of the things that we learned is that it was a mistake

11  to allow those officers to go home without completing their

12  statements that first night.  You know, in hindsight being 20/20

13  and not recognizing that we would have been in that same lengthy

14  operational period for several days in a row, which, you know,

15  compounded the challenge there.

16  Q     Okay.  What have you personally learned from your

17  experience with respect to the George Floyd protests?

18  A     All of the same things that I mentioned, but I've also

19  learned that we don't have as good a relationship with the

20  community as we thought we did, and we need to work on that.

21  Q     How have you attempted to work on that since, Chief?

22  A     Well, as I said, I participated in a number of those

23  marches and protests, demonstrations.  I've had a number of

24  engagements with some of the groups that were involved in those

25  protests, you know, Ten For Ten; No Justice, No Peace.  I have

20-cv-1878-RBJ   RONALD THOMAS - Direct   03-24-2022

1   attended a lot of events where we are trying to reconnect and

2   better connect with our community.

3   Q    You've worked in internal affairs during your career;

4   right?

5   A    Yes.

6   Q    What has the department done in terms of investigating

7   individual officer conduct during the protest and taking

8   discipline when that's appropriate?

9   A    So, we were given a lot of information.  You know, we were

10  provided video.  We were provided testimony by people that had

11  made allegations against the police.  And cases were opened, and

12  those things were investigated.  A number of those things are

13  still being investigated.

14  Q    Is internal affairs a complaint-driven process?

15  A    Yes.

16  Q    And why is that, Chief Thomas?

17  A    Well, you know, primarily, we just don't have the capacity

18  to be proactive.  We don't have the capacity to review the

19  thousands and thousands of hours of body-worn camera to identify

20  and address misconduct.  We actually rely on supervisors to do

21  much of that.

22       So, we are reliant on people coming and making

23  complaints to us.  And I think we try to make the community

24  understand that we're open to that.

25  Q    Okay.  So, for an internal affairs investigation to be

20-cv-1878-RBJ   RONALD THOMAS - Direct   03-24-2022

1   initiated, there needs to be some kind of complaint?

2   A    Yes.  And that could even be internally generated.

3   Q    Understood.  Either from a member of the public or a member

4   of the department?

5   A    Yes.

6   Q    Are you aware of any police department in the United States

7   that does things differently than a complaint-driven process

8   involving internal affairs?

9   A    I am not.

10          MR. DOUGLAS:  Objection.  Lacks foundation.

11          THE COURT:  The question was are you aware.  That's a

12   foundation question.  Overruled.

13   Q.    (By Mr. Ringel) Chief Thomas, what do you want the jury

14   and the community to understand about the DPD response to the

15   George Floyd protests?

16   A    Just that we did the best that we could given the

17   circumstances.  Certainly we made a lot of mistakes.  We have

18   learned from a lot of those mistakes.  Certainly there was

19   misconduct.  I am hopeful that we can hold those accountable

20   that were engaged in that misconduct, and I think it's fair to

21   say angry that the reasonable message of protesters was muted,

22   but it was muted by the violent activity of those agitators.

23   Q    That makes you personally angry?

24   A    Yes.

25          MR. RINGEL:  Those are my questions of Chief Thomas.

20-cv-1878-RBJ   RONALD THOMAS - Cross   03-24-2022

1   Thank you, Your Honor.

2           THE COURT:  All right.  Cross examination?

3                    **CROSS EXAMINATION**

4   BY MR. DOUGLAS

5   Q    I've lost track of the time.  Is it still morning or

6   afternoon?  It is afternoon.  Good afternoon, Chief Thomas.

7   A    Good afternoon.

8   Q    My name is Matthew Douglas.  I am going to ask you some

9   questions on behalf of the plaintiffs today.  And first I want

10  to ask, you've talked a lot about protester violence, property

11  destruction, things like that.  I just need to ask, do you have

12  any information that any of the 12 plaintiffs in this case

13  committed any acts of violence or property destruction during

14  the George Floyd protest?

15  A    I don't.

16  Q    Okay.  And I also want to talk to you a little bit about

17  communication.  You spent some time talking about the importance

18  of communication in the management of protests; correct?

19  A    Yes.

20  Q    And you talked about community leaders and also

21  communication on the ground; right?

22  A    Yes.

23  Q    You agree that communication on the ground is a critical

24  component of crowd management; right?

25  A    Certainly.

20-cv-1878-RBJ    RONALD THOMAS - Cross    03-24-2022

1   Q    And that means the lieutenants, sergeants, other officers

2   talking to the protesters at the protest to help the protesters

3   understand what the police are doing and what is expected of the

4   protesters; correct?

5   A    When that's safe to do, yes.

6   Q    And that can be done with bullhorns, other amplification,

7   or sometimes just with conversation; right?

8   A    It could be, yes.

9   Q    And if that communication doesn't occur, there's a risk of

10  inciting the crowd based on the police actions; correct?

11  A    There is that risk, yes.

12  Q    For example, if officers deploy less-lethal munitions on a

13  crowd, such as PepperBalls, CS gas or grenades, without any

14  warning or an apparent reason, that could incite the crowd,

15  couldn't it?

16  A    It could, but that's why we typically provide those

17  warnings, unless there's just no time or opportunity to do that.

18  Q    Right.  You should only give -- you should only not give

19  those warnings before deploying less-lethal munitions if it's an

20  emergency circumstance that substantially threatens the health

21  or safety of officers or others; correct?

22  A    Yes.

23  Q    All right.  I want to briefly touch on the use of force

24  report issue that you discussed.  You were shown Exhibit 787.

25  And if we could pull that up, please.  And this is already in

20-cv-1878-RBJ    RONALD THOMAS - Cross    03-24-2022

1   evidence.  I see the jury sees it.  Okay.  Let's go to page

2   nine, please.  And the bottom email from Robert -- is it

3   Wyckoff?

4   A    Yes.

5   Q    Okay.  You discussed this email and this request for

6   officer statements on Saturday, June 6th, by Robert Wyckoff;

7   correct?

8   A    Yes.

9   Q    Okay.  And you said that requests to officers to complete

10  those statements actually took place sometime before this, not

11  by email, but through conversations with supervisors?

12  A    Yes.

13  Q    Is that your testimony?  I'm sorry.  Did you get that

14  answer, Kevin?  We were talking at the same time.  I apologize.

15  Okay.  But this email in fact was not to the officers directly;

16  right?

17  A    No.

18  Q    I'm sorry.  Was that correct?

19  A    Maybe I didn't understand the question.

20  Q    Okay.  Line officers who -- or sergeants or people who you

21  wanted to fill out the use of force reports, this was not a

22  direct communication to them; correct?

23  A    It was not.

24  Q    Okay.  It still had to be filtered down through their

25  supervisors to the officers; correct?

20-cv-1878-RBJ   RONALD THOMAS - Cross   03-24-2022

1  A    Correct.

2  Q    Let's go to the next page.  Let's go to the top, see what

3  this says.  See who sent this email.  A little higher.  Oh.  I

4  apologize.  I wanted to go back a page, and I went forward a

5  page.  Okay.  Let's go to page seven, please.  Okay.  So, this

6  is higher up in the chain, so it's a later email, and this is

7  Jesse Campion, a DPD sergeant in District 6; correct?

8  A    Correct.

9  Q    And so this is his forwarding of the Wyckoff email request

10  to the sergeants in District 6 who were then to communicate with

11  their officers as well in filling out these reports; right?

12  A    Yes.

13  Q    Okay.  And this one didn't occur until Thursday, June 11th;

14  correct?

15  A    Correct.

16  Q    So, that's two weeks after the start of the protest?

17  A    Correct.

18  Q    Okay.  And are you aware of a single use of force report

19  relating to the George Floyd protest that is dated prior to

20  June 6th, the date of that Bob Wyckoff email?

21  A    I have no personal awareness of that, no.

22  Q    Okay.  Okay.  I want to ask you about the uniform you were

23  asked about.  So, Dan, if you could pull up Exhibit 30, which I

24  believe is already in evidence.  All right.  Chief Thomas, we're

25  looking at -- let me ask you if you recognize this.  Colorado

20-cv-1878-RBJ   RONALD THOMAS - Cross   03-24-2022

1   State Patrol camera footage.  Is that what this appears to be?

2   A    It appears to be, yes.

3   Q    Okay.  And go to the -- yeah.  Go to the still.  We've

4   taken a still from this video.  And I want to ask you about it,

5   please.  Okay.  So, do you see here this officer in the circle,

6   and there's spray coming out, and it's going at someone to the

7   left of the circle?  Do you see that?

8   A    I do.

9   Q    Okay.  And is this an officer deploying OC spray, pepper

10  spray?

11  A    It would appear to be, yes.

12  Q    All right.  And you see here that the officer in the

13  picture does not have a patch on his shoulder; correct?

14  A    Correct.

15  Q    Okay.  So, that means that's a Denver officer, based on

16  your testimony; correct?

17  A    Very likely, yes.

18  Q    Okay.  And are you aware that the individual being sprayed

19  here is plaintiff in this case Stanford Smith?

20  A    I'm not specifically aware of that, no.

21  Q    Okay.  Okay.  You talked about internal affairs and

22  discipline.  You were head of internal affairs for, it sounds

23  like a couple of years; is that right?

24  A    Correct.

25  Q    And you said that there was -- let me get my notes.  There

20-cv-1878-RBJ   RONALD THOMAS - Cross   03-24-2022

1   were a lot of mistakes made involving excessive force.  You said

2   that?

3   A    No.  I think I said that there were a lot of mistakes made

4   throughout our management of that protest.

5   Q    Okay.  You're aware that there was only one DPD officer who

6   was terminated as a result of actions relating to the response

7   to the George Floyd protests?

8   A    Currently, that might be accurate.

9   Q    Okay.  And that officer was terminated for a post on

10  Instagram where he posted an image with himself and other DPD

11  officers in riot gear, captioned, let's start a riot?

12  A    I'm aware of that, yes.

13  Q    And that officer was Thomas McClay?

14  A    Yes.

15  Q    And I just want to pull up Exhibit 634 for the witness,

16  please.  Okay.  Do you recognize that as Officer McClay's

17  Instagram post?

18  A    Yes.

19          MR. DOUGLAS:  Your Honor, I would offer this into

20  evidence at this time.

21          MR. RINGEL:  Relevance.

22          THE COURT:  Overruled.  It's admitted.

23  Q.   (By Mr. Douglas) Okay.  Chief Thomas, we're looking at

24  Exhibit 634, which you recognize as the Instagram post by Tommy

25  McClay; correct?

20-cv-1878-RBJ    RONALD THOMAS - Cross    03-24-2022

 1  A    Yes.

 2  Q    And you see in the picture there's three -- three DPD

 3  officers?

 4  A    Correct.

 5  Q    Okay.  And the comment caption, I'm not sure what you call

 6  that, at the bottom is let's start a riot?

 7  A    Yes.

 8  Q    Okay.  And if we go to the next page -- that's hard to

 9  read.  Okay.  He's got -- I gotta clear this.  Okay.  So, here,

10  he's got, let's start a riot, hashtag police, hashtag riot,

11  hashtag Denver cops, hashtag blue line, hashtag cops on

12  Instagram.  Do you see that?  Cops of Instagram.  Do you see all

13  that?

14  A    Yes.

15  Q    And the date -- if we go to the bottom of the next page,

16  the date on this is May 31st, 2020?

17  A    Yes.

18  Q    Okay.  So, that was during the protest?

19  A    Yes.

20  Q    Okay.  And this Instagram post led to the only termination

21  of an officer related to the protests; correct?

22  A    Yes.

23  Q    Okay.  We can put that down.  You personally know on a

24  professional level one of the plaintiffs in this case; correct?

25  A    I do.

20-cv-1878-RBJ    RONALD THOMAS - Cross    03-24-2022

1   Q     Okay.  And that's plaintiff Elisabeth Epps?

2   A     Correct.

3   Q     You currently serve on Senator Coleman's criminal justice

4   public safety cabinet; correct?

5   A     That is correct.

6   Q     And there's around eight people on that cabinet?

7   A     Roughly, yes.

8   Q     And one of those people is Elisabeth Epps; correct?

9   A     Correct.

10  Q     And both you and Ms. Epps were invited to serve on that

11  cabinet by the Denver sheriff?

12  A     I believe that's correct, yes.

13  Q     And the role of Ms. Epps is to provide a community

14  perspective on the issues discussed by that cabinet involving

15  criminal justice and public safety; correct?

16  A     Yes.

17  Q     And the cabinet meets every month?

18  A     I think, yeah.  There was some time that we took off when

19  the legislature was not in session, but yes, I think as a matter

20  of course, yes, once a month.

21  Q     So, and you and Ms. Epps have been meeting, to the extent

22  you make every meeting, monthly since -- on that cabinet since

23  October of 2020?

24  A     I'm sorry.  Can you repeat the question?

25  Q     Yeah.  And you and Ms. Epps have both served on that

20-cv-1878-RBJ    RONALD THOMAS - Cross    03-24-2022

1   cabinet meeting monthly since around October of 2020?  Does that

2   sound right?

3   A    Yes.  We both served on that cabinet.

4   Q    So, over roughly a year and a half?

5   A    Yes.

6   Q    Okay.  And you respect the work that Ms. Epps has done as

7   part of that cabinet?

8   A    I do respect Ms. Epps.

9   Q    Now, I want to clarify one thing.  You talked about the

10  march that you participated in with Chief Pazen, with the

11  protesters on one of the days of the protest?

12  A    Yes.

13  Q    If the evidence has suggested that march occurred on

14  June 1st, does that sound about right?

15  A    That sounds about right, yes.

16  Q    Okay.  I want to turn now to an incident that you were

17  asked about involving Lieutenant Ken Chavez.  Do you recall

18  testifying about that?

19  A    Yes.

20  Q    And you were also in the courtroom the day that I asked

21  Commander -- now Division Chief Sanchez some questions about

22  that incident; correct?

23  A    Correct.

24  Q    And you recall when we went through that testimony -- and

25  I'm not going to go through all the details with you as well --

20-cv-1878-RBJ    RONALD THOMAS - Cross    03-24-2022

1   that there were allegations by DPD officers, including a DPD

2   sergeant that Lieutenant Chavez was leading officers, a caravan

3   of officers through the Capitol Hill neighborhood, there was

4   driveby PepperBalling, grenades, threatening civilians on their

5   private property.  Do you recall all that?

6   A    I recall that testimony, yes.

7   Q    And you also recall -- well, you testified that you were

8   made aware of general allegations involving Lieutenant Chavez on

9   the day they occurred, May 30th; correct?

10  A    Yes.

11  Q    Okay.  And in fact, if we can pull up Exhibit 1094, this is

12  already in evidence, page 74, please.  Chief Thomas, this is

13  your statement to internal affairs involving Ken Chavez;

14  correct?

15  A    It is.

16  Q    That's part of the internal affairs investigation?

17  A    Yes.

18  Q    Okay.  Let's go down to the Q and A.  And the question is,

19  what concerns were you referencing about Lieutenant Chavez's

20  judgment when you met with him?  That's about the meeting on

21  June 17th you discussed; correct?

22  A    Yes.

23  Q    And they're asking were these incidents the same as those

24  that are being investigated by the internal affairs bureau;

25  correct?

```
                20-cv-1878-RBJ    RONALD THOMAS - Cross    03-24-2022
```
1    A    Yes.

2    Q    They ask how, by whom, and when did you come to know about

3    these incidents; correct?

4    A    Yes.

5    Q    Okay.  And then the answer, the last sentence, you say, I

6    became aware of these events, which I believe are the same

7    incidents being investigated by IAB, through Commander Sanchez

8    the day of and the day after these engagements; correct?

9    A    Yes.

10   Q    And you testified that you didn't have enough detail when

11   you learned on May 30th to take any action at that time;

12   correct?

13   A    Correct.

14   Q    Did you ask Commander Sanchez or anyone else for more

15   details?

16   A    I did not.

17   Q    Okay.  Did you do anything to investigate to try to find

18   more details at that time?

19   A    No.  Because my recollection of the conversation that I had

20   with then Commander Sanchez was not that he had engaged in any

21   particular misconduct, as much as it was that he was providing

22   direction that we did not want officers following.

23   Q    Okay.  Direction to have officers who were reporting to him

24   take actions with less-lethal force that were not justified?

25   A    No.  That's not how it was characterized to me.

20-cv-1878-RBJ    RONALD THOMAS - Cross    03-24-2022

1   Q    Okay.  Well, did you ask any details about what the orders

2   were that he was giving that were unacceptable?

3   A    The details and the conversation and the understanding that

4   I took away was that he was not representing our philosophy

5   relative to how we wanted to handle protesters in most

6   situations, and that he was inclined to have a different

7   response.  And so we communicated to him that that was not the

8   response that he was to have his officers carry out.

9   Q    Okay.  Did you ask the commander at the time, Sanchez, what

10  that meant?  How he was not representing your philosophy?

11  A    I don't recall exactly the wording of the conversation, but

12  again, you know, he, you know, told me that Lieutenant Chavez

13  was -- well, he told me that the report provided to him was that

14  the messaging from Lieutenant Chavez to his officers was

15  different than that which we wanted him to communicate.

16  Q    Okay.  And you had -- did you have an understanding on

17  May 30th when you learned of this that then Commander Sanchez

18  had talked to Lieutenant Chavez and said to the extent you're

19  giving orders that are not good, stand down?

20  A    Yes.

21  Q    Okay.  And so because of that, and not knowing any other

22  details, you were comfortable with Commander Sanchez putting

23  Lieutenant Chavez in charge of all of District 6 three days

24  later during the protest; correct?

25  A    Yes.  Given the limited information that we had, given the

20-cv-1878-RBJ   RONALD THOMAS - Cross   03-24-2022

1   limited choices that were available to Commander Sanchez at the

2   time, yes, I was comfortable with that decision.

3   Q    And you said District 6 is a total of about 180 officers?

4   A    Correct.

5   Q    Okay.  And Officer Sanchez put Lieutenant Chavez in charge

6   of that when he went on vacation; right?

7   A    Yes.

8   Q    And Chief Sanchez now went on -- he testified that he went

9   on vacation on June 1st.  Is that -- do you recall that?

10  A    That seems correct, yes.

11  Q    Okay.  So -- and he said that he made Lieutenant Chavez his

12  acting while he was on vacation; correct?

13  A    Yes.

14  Q    And at that time, Chief Sanchez was the operations chief

15  for the entire protest; correct?

16  A    Yes.

17  Q    Okay.  And in addition to leading District 6 during the

18  time that Chief Sanchez was on vacation, Lieutenant Chavez also

19  for some of that vacation served as operations chief for the

20  protest, didn't he?

21  A    Yes.  It's likely that he would have been assigned as the

22  operations chief.

23  Q    And the operations chief is one step below Commander Phelan

24  in the incident response; correct?

25  A    Yes.  If you're strictly following the ICS model.

20-cv-1878-RBJ   RONALD THOMAS - Cross   03-24-2022

1   Q    And you testified you were following the ICS model;

2   correct?

3   A    I didn't testify to that, but yes, it's been testified that

4   we were following the ICS model.

5   Q    You're right.  I think that was Commander O'Donnell who

6   testified to that.  Okay.  So, and that vacation -- so, strike

7   that.  Commander Sanchez, now Chief Sanchez, returned from

8   vacation on June 15th; is that correct?

9   A    That sounds correct.

10  Q    Okay.  So, two weeks?

11  A    Yes.

12  Q    And you -- let's actually look at page 121 of Exhibit 1094,

13  please.  And let's go down -- so, on the answer to the first

14  question, how did you become aware of the allegation Lieutenant

15  Chavez had told officers to take back the mall?  You talked

16  about that; correct?

17  A    Yes.

18  Q    You said, my recollection is that the Monday Commander

19  Sanchez returned from his scheduled vacation he informed me by

20  phone while he was away, Lieutenant Chavez in his acting

21  commander capacity had told the mall guys to take back the mall.

22  That's what you testified to; correct?

23  A    Yes.

24  Q    So, what happened is that Commander Sanchez told Lieutenant

25  Chavez to stand down with the orders that were not consistent

1  with the philosophy you said; right?

2  A    Correct.

3  Q    But while Commander Sanchez was on vacation for two weeks

4  and Lieutenant Chavez was in charge of District 6, and the

5  operations chief, he continued to issue orders that were

6  inconsistent with the philosophy; correct?

7  A    I don't know that.  I know that the day that I was informed

8  by Commander Sanchez that he had done so on that day, I know

9  that he was addressed that day.  I know that he was addressed

10  upon Commander Sanchez's return from vacation, and him finding

11  out what direction Lieutenant Chavez had provided, that he asked

12  him to change that.  What other decisions and directions he

13  provided over those two weeks, I am not aware of.

14  Q    Okay.  But ultimately what you learned was Commander

15  Sanchez asked him to stand down, and he did not?

16  A    Yes.

17  Q    Okay.  And that's what led to the transfer on June 17th;

18  correct?

19  A    Correct.

20  Q    Did you do anything to investigate whether Lieutenant

21  Chavez had given orders along the lines of what was reported by

22  three DPD officers on May 30th during that two-week period where

23  he was in charge?

24  A    I didn't know that at the time.

25  Q    Okay.  And when you learned about that, did you do anything

20-cv-1878-RBJ   RONALD THOMAS - Cross   03-24-2022

1   to investigate that?

2   A    At that point in time, he was no longer in my chain.  So, I

3   was aware of the fact that those allegations were being

4   investigated.

5   Q    Okay.  And you talked about this transfer to the city

6   security and protection division; correct?

7   A    Yes.

8   Q    And that was a role for Lieutenant Chavez at the same rank,

9   lieutenant; correct?

10  A    Yes.

11  Q    The same pay?

12  A    Yes.  I'm sorry.

13  Q    And he was never prosecuted for any of the actions that we

14  heard about, was he?

15  A    I don't believe so, no.

16  Q    Okay.  And do you know whether DPD told the prosecutor who

17  was evaluating the case that it had been named in a lawsuit in

18  June of 2020 by Amanda Blasingame and Maya Rothlein who alleged

19  in the complaint that they had been the victims of exactly what

20  DPD officers reported Lieutenant Chavez did?

21  A    I'm not aware of that.

22  Q    Okay.  And that's the confronting them on their private

23  property with the OC fogger in the 1400 block of Pennsylvania

24  Avenue.  You're aware that that was one of the things that the

25  officers said that Lieutenant Chavez did; correct?

20-cv-1878-RBJ   RONALD THOMAS - Cross   03-24-2022

1    A    That was testimony that I heard, yes.

2    Q    Okay.  Do you know whether DPD told the prosecutor that it

3    had a separate internal affairs complaint from another

4    individual on the 1400 block of Pennsylvania who said she was a

5    victim of someone throwing a grenade onto her property, again,

6    exactly what the DPD officers reported Lieutenant Chavez did?

7    A    I am not familiar with any conversation that DPD internal

8    affairs had with the prosecutor.

9    Q    So, you don't know one way or the other?

10   A    I do not.

11   Q    Shouldn't the district attorney have been given the names

12   of alleged victims of Lieutenant Chavez's actions in order to

13   fully evaluate the case against Lieutenant Chavez?

14           MR. RINGEL:  Objection.  Calls for speculation.

15           THE COURT:  Overruled.

16           THE WITNESS:  I'm sorry.  Can you repeat the question?

17   Q.   (By Mr. Douglas) Yes.  Shouldn't the district attorney

18   have been given the names of the alleged victims that DPD was

19   aware of of Lieutenant Chavez's actions in order to fully

20   evaluate a criminal case against Lieutenant Chavez?

21   A    That seems reasonable, yes.

22           MR. DOUGLAS:  If I could have just one moment, Your

23   Honor?  No further questions, Your Honor.

24           THE COURT:  All right.  Redirect examination?

25           MR. RINGEL:  Thank you, Your Honor.  If the assistant

20-cv-1878-RBJ   RONALD THOMAS - Redirect   03-24-2022

1   of counsel for the plaintiff can put up the screenshot from

2   Exhibit 30 that was previously inquired about.  Okay.

3                      **REDIRECT EXAMINATION**

4   BY MR. RINGEL

5   Q    Chief Thomas, Mr. Douglas pointed out one arm of an

6   officer; correct?

7   A    Yes.

8   Q    Can you see the other arm of that officer in this

9   photograph?

10   A    I can't.

11   Q    Okay.  Do you have knowledge as to whether -- as to what

12   shoulders all of the jurisdictions that may have been present at

13   this moment in time have their shoulder patches?

14   A    No.  No specific understanding.

15   Q    Okay.  Thank you.  You can go ahead and take that down.

16   You were asked some questions about discipline, and in

17   particular the Instagram post discipline that occurred.  Officer

18   McClay was a probationary officer; is that right?

19   A    That is correct.

20   Q    Does the discipline system for a probationary officer

21   differ from the discipline system for officers who are no longer

22   on probationary status?

23   A    Significantly.  You know, they no longer have, you know,

24   the civil service protections that officers who are not on

25   probation have.  So, we were able to take what we believed to be

20-cv-1878-RBJ   RONALD THOMAS - Redirect   03-24-2022

1    appropriate action without going through a process.

2    Q    Okay.  And so as soon as the department learned of that

3    Instagram post, immediate action could be taken against that

4    officer because of his probationary status?

5    A    That's correct.

6    Q    Had that same post been done by an officer who has civil

7    service protection, how would that have worked?

8    A    That would have initiated an internal affairs

9    investigation.  That investigation would have run its course,

10   and then the results of that investigation would have been

11   presented to the chief for him to make a decision on what level

12   of discipline was appropriate in context with the disciplinary

13   matrix.

14   Q    Okay.  And the disciplinary matrix has specific guidelines

15   that inform the type of discipline that the chief can impose

16   based on the nature of the conduct?

17   A    Yes.

18   Q    And any decision by the chief of -- for discipline of an

19   officer who is no longer on probationary status can be appealed;

20   is that true?

21   A    That is correct.

22   Q    And who would that initially be appealed to?

23   A    Initially it would be appealed to -- well, there would be a

24   chief's hearing, and then there could be an appeal to the

25   executive director of safety, and then there are other court

20-cv-1878-RBJ    RONALD THOMAS - Redirect    03-24-2022

1   appeals that are appropriate -- well, appeal to the civil

2   service commission, and then court appeals.

3   Q    Right.  It can go to a District Court like this one and

4   then a Court of Appeals or other Courts of Appeals; right?

5   A    Exactly, yes.

6   Q    Okay.  I wanted to talk to you about the statement that you

7   made with respect to Lieutenant Chavez that was shown to you.

8   If we could put up Exhibit 1094, and page 74, please.  The

9   answer that is on page 74, and this question, what did you --

10   when did you give this interview to IA, or this statement to IA?

11   A    Well, I think it was probably sometime in mid to late June.

12   Q    Okay.  So, by the time that you gave this statement, did

13   you know more information about the allegations involving

14   Lieutenant Chavez than you did when you had that first

15   conversation with then Commander Sanchez?

16   A    I did have more details, but not significantly more, no.

17   Q    Okay.  But you knew enough to give this particular answer?

18   A    Yes.

19   Q    Okay.  And you knew at that point in time that it was being

20   investigated by IAB, which means internal affairs bureau?

21   A    Correct.

22   Q    Okay.  But you didn't have the information in this answer

23   when you concluded it was appropriate to allow Lieutenant Chavez

24   to be the acting commander of District 6?

25   A    That's correct.

20-cv-1878-RBJ   RONALD THOMAS - Redirect   03-24-2022

1   Q    Okay.  In terms of -- I just lost my train of thought.

2   Give me a second.  During the time period that Lieutenant Chavez

3   was the acting commander of District 6, and potentially the

4   operations commander for the protests, you were present and

5   observing what was happening generally in your role as division

6   chief; is that fair?

7   A    Yes.

8   Q    Did any issue come to your attention related to the

9   lieutenant acting inappropriately while he was serving in an

10  active role?

11  A    Not at all.

12  Q    Do you believe that if there was an issue related to

13  Lieutenant Chavez acting inappropriately as the commander, that

14  that would be something that you would learn about?

15          MR. DOUGLAS:  Objection.  Leading.  Calls for

16  speculation.

17          THE COURT:  Overruled.

18          THE WITNESS:  Can you repeat the question?

19  Q.   (By Mr. Ringel) Sure.  When Lieutenant Chavez is the

20  acting commander, you as division chief are -- would be his

21  direct supervisor; is that right?

22  A    That is correct.

23  Q    So, you would have the responsibility to oversee his

24  conduct as the acting commander; is that right?

25  A    Yes.

20-cv-1878-RBJ    RONALD THOMAS – Redirect    03-24-2022

1    Q    Okay.  Would you expect that anyone who had an issue with

2    Acting Commander Sanchez [sic] to raise it with you?

3    A    That would be my expectation, yes.

4    Q    And why would that be your expectation?

5    A    Because, you know, I was in charge of the patrol division.

6    District 6 is included in that assignment.  So, I would expect

7    that anyone who had an issue with directions being given or

8    actions being taken by Lieutenant Chavez in his role as the

9    district commander or acting district commander would bring

10   those to my attention.

11   Q    And the fact that you were his direct supervisor when he

12   served as acting district commander would have been known to

13   everyone in the district; right?

14   A    Yes.

15   Q    The organizational chart of the Denver Police Department is

16   not a secret?

17   A    That is correct.

18   Q    I forgot to ask you a question related to the issue of

19   shoulder patches on uniforms.  Are you aware that mutual aid

20   jurisdictions were using personal protective equipment as part

21   of their responses to the protests?

22   A    I was aware of that, yes.

23   Q    Okay.  Do you know one way or the other whether any of

24   those mutual aid jurisdictions' personal protective equipment

25   covered or didn't cover shoulder patches?

20-cv-1878-RBJ   RONALD THOMAS - Redirect   03-24-2022

1  A    I don't have any specific knowledge or understanding of

2  that, but certainly I know that protective equipment could cover

3  shoulders.

4          MR. RINGEL:  Okay.  Those are my redirect questions.

5  Thank you, Your Honor.

6          THE COURT:  All right.  Questions from the jury?

7       (Proceedings held at the bench:)

8          THE COURT:  Fifty-five.

9          MR. RINGEL:  Not quite yet, Your Honor.  Sorry.  No

10 objection to 55.

11         MR. DOUGLAS:  Yeah.  No objection.

12         THE COURT:  Okay.  Here is 56.

13         MR. RINGEL:  No objection.

14         MR. DOUGLAS:  No objection.

15         THE COURT:  Fifty-seven.

16         MR. RINGEL:  No objection.

17         MR. DOUGLAS:  No objection.

18         THE COURT:  Fifty-eight.

19         MR. RINGEL:  No objection.

20         MR. DOUGLAS:  No objection.

21         THE COURT:  And 59.

22         MR. RINGEL:  The only issue with this one is the first

23 reference to the curfew.  And they know about a curfew, so I

24 guess there's no -- that's the only issue.

25         MR. DOUGLAS:  No objection from me.

                    Kevin P. Carlin, RMR, CRR

20-cv-1878-RBJ   RONALD THOMAS - Redirect   03-24-2022

1        MR. RINGEL:  No objection.  That's fine.

2     (Proceedings held in open court:)

3        THE COURT:  All right.  Chief, we have a few questions

4  for you from the jury.

5        THE WITNESS:  Okay.

6        THE COURT:  Question, what is the civil service --

7  what is civil service protection?

8        THE WITNESS:  So, Civil Service Commission is actually

9  the hiring body that hires police and fire, and there are

10  certain protections for employees, civil service protections for

11  employees that, I guess, inform our ability to discipline,

12  ability to terminate.  So, you can't be terminated without

13  cause.  So, there are a number of protections for your

14  employment that are in place by civil service.

15        THE COURT:  And procedures is part of that?

16        THE WITNESS:  Correct.  Yes.

17        THE COURT:  Next question, we heard that lots of

18  internal affairs cases were dropped due to the fact that

19  officers were unable to be identified.  Has DPD changed their

20  uniforms to allow for easier identification of officers?

21        THE WITNESS:  Yes.  Very good question.  So, we

22  actually at some point in time during the protest ordered like

23  patches that allowed for their badge number to be very visibly

24  and clearly displayed.  We ordered that.  Prior to those being

25  ordered, I actually directed that stenciling be used to create

20-cv-1878-RBJ   RONALD THOMAS - Redirect   03-24-2022

1   very large numbers to be placed on officers' riot helmets.

2            THE COURT:  Question, it starts by saying all officers

3   should have the expectation that they are being recorded

4   regardless of activating -- wearing a body-worn camera.  Did you

5   feel that what you witnessed during the protest was protesters

6   trying to capture moments of police bad behavior, the focus

7   being on your officers rather than on a message related to

8   George Floyd and change needed?

9            THE WITNESS:  I'm not sure I completely understand the

10  question.

11           THE COURT:  Want me to go through it again?

12           THE WITNESS:  Yeah.  Please.

13           THE COURT:  So, it started off by saying that officers

14  should have the expectation that they're being recorded.  All

15  right?

16           THE WITNESS:  Yes.

17           THE COURT:  And then the question is did you feel that

18  what you witnessed during the protests was protesters trying to

19  capture moments of police bad behavior, the focus being on your

20  officers rather than on a message related to George Floyd and

21  the change needed?

22           THE WITNESS:  So, I think really, it was both.  I

23  think that, you know, our experience has been that individuals

24  use their cell phones and such to record a lot of our behaviors.

25  Whether we're managing an encampment cleanup or a protest or

20-cv-1878-RBJ   RONALD THOMAS - Redirect   03-24-2022

1  something like that, I think that often during engagements that

2  citizens have with police, they are recording, I think to try to

3  maintain in posterity their version of the events, as well as to

4  see if maybe they can't provoke some kind of inappropriate

5  response.

6       THE COURT:  Question, what does a peaceful protest

7  look like to you?

8       THE WITNESS:  I think peaceful protests has a very

9  wide range.  I mean, I think that, you know, peaceful protests

10  certainly can range anywhere from large numbers of people

11  standing on the steps of the capitol to marching up the sidewalk

12  up East Colfax, even taking over the street, taking over

13  intersections.  I think that none of those things are -- become

14  violent protests.  I don't even -- I don't believe that holding

15  signs, chanting things, even antagonizing police officers

16  verbally, I don't believe that that is non-peaceful protest.  I

17  think those are all examples of peaceful protest.

18       What I would characterize as not peaceful protests

19  would be assaulting officers, damaging property, you know,

20  throwing things.

21       THE COURT:  Did you expect the protest message to be

22  all cops are bad, or to focus on the injustice of the murder of

23  George Floyd and the need for police reform?

24       THE WITNESS:  Good question again.  You know, I was

25  hopeful that the message would be relative to the injustice that

20-cv-1878-RBJ    RONALD THOMAS - Redirect    03-24-2022

1    occurred with George Floyd.  I understood, though, that people

2    were protesting against police violence, protesting against

3    police in our station within the community.  All reasonable

4    justifications for protest.

5           So, I understood that there were a lot of reasons for

6    protests.  Our previous experience has been that the community

7    understands that those things that happened in, you know,

8    Missouri or Minnesota didn't happen in Denver, wouldn't happen

9    in Denver.  And so while they would certainly protest their

10   belief that there needs to be change, not necessarily in the

11   Denver Police Department, but throughout the community of

12   policing.  Certainly we understood that.

13           THE COURT:  Question, does an imposed curfew take

14   priority over individual rights?

15           THE WITNESS:  I don't believe so, no.

16           THE COURT:  Declaring a gathering unlawful, is that

17   like a martial law light to focus on safety and security in an

18   area?  Should individual free speech outweigh safety of many?

19           THE WITNESS:  You know, that's a delicate balance.  I

20   think --

21           THE COURT:  They're not asking easy questions.

22           THE WITNESS:  That's for sure.  You know, can you

23   repeat that?  I'm sorry.

24           THE COURT:  All right.  I will read the whole thing.

25   Does an imposed curfew take priority over individual rights?

20-cv-1878-RBJ   RONALD THOMAS - Redirect   03-24-2022

1   Declaring a gathering unlawful, is that like a martial law light

2   to focus on safety and security in an area?  Should individual

3   free speech outweigh safety of many?

4            THE WITNESS:  Yeah.  So, no, I don't believe that --

5   you know, I don't believe that the imposition of a curfew is

6   meant to suppress people's rights.  I think that was meant to

7   help us enhance safety.  I do think it's a delicate balance,

8   trying to allow for the expression of people's opinions, values,

9   with the threat to the community safety.  And certainly our

10  primary obligation is to keep community members safe, which is

11  why we go through the efforts that we do to divert traffic away

12  from protesters so that they can engage in their activities

13  safely.

14           THE COURT:  Any other questions from the jurors?  All

15  right.  Follow-up, Mr. Ringel?

16           MR. RINGEL:  Nothing from the defendants.  Thank you,

17  Your Honor.

18           THE COURT:  Plaintiff?

19           MS. WANG:  Judge, can we have a very brief sidebar?

20           THE COURT:  Well, okay.

21      (Proceedings held at the bench:)

22           MS. WANG:  So, Judge, the problem -- the problem with

23  Chief Thomas' last answer is that he said that the curfew was

24  meant to ensure safety, and was not meant to target protesters,

25  but that's not what the text messages say.  And so I had assumed

20-cv-1878-RBJ    Jury Trial    03-24-2022

1  that Mr. Ringel had instructed him about that.  And his original

2  answer was fine, but when he expanded on it, it opened our door

3  to being able to show the curfew text messages.

4          THE COURT:  No.  The question was approved by both

5  sides.  The plaintiffs' side and the defendants' side approved

6  that question.

7          MR. DOUGLAS:  And then he gave an answer that was

8  acceptable, but then he went on.

9          THE COURT:  I'm not going to dictate what his answer

10  is.  No.  His answer was his answer.

11      (Proceedings held in open court:)

12          THE COURT:  All right.  So, my question was does the

13  plaintiffs' side have any redirect in light of the jurors'

14  questions?

15          MR. DOUGLAS:  No, Your Honor.

16          THE COURT:  Or recross, it would be.  All right.

17  Thank you.

18          THE WITNESS:  Thank you.

19          THE COURT:  Now, that's it, right, for the defense?

20          MR. RINGEL:  The defense rests.  That's correct, Your

21  Honor.

22          THE COURT:  Okay.  And do you have any rebuttal

23  evidence?

24          MR. MACDONALD:  No, Your Honor.

25          THE COURT:  Okay.  Then the evidence is closed.  What

20-cv-1878-RBJ    Jury Trial    03-24-2022

1    about the lunches?

2              THE COURTROOM DEPUTY:  They are not here yet, but the

3    jury would like a break anyway.

4              THE COURT:  Yes.  We need to finish up the instruction

5    discussion too.  So, we will stop now.  The jury will get their

6    lunches.  We will all have our lunch, and we will come for you

7    when we're ready.

8         (Jury out at 12:59 p.m.)

9              THE COURT:  All right.  The jury has been excused, and

10   before all of us go off and have our lunch, where are we now

11   with the -- I think I know where we are on the instructions.

12   How about the verdict form?

13             MS. HOFFMAN:  I did send Mr. Reeves about an hour ago

14   our proposed revisions to the verdict form.  They're essentially

15   what I summed up earlier, just the additional with respect to

16   Smith and then some formatting changes, but that's about it.

17             MR. MACDONALD:  Your Honor, we don't have any

18   objection to formatting changes.  We do have an objection to the

19   adding of a question for Stanford Smith, given that we now have

20   testimony after 18 months of litigation that it is very likely

21   it was a Denver officer.

22             We have not put on any evidence that Stanford Smith was

23   sprayed by an Aurora officer or anyone else, and we think it is

24   both confusing and prejudicial to have a question on the jury

25   form asking whether or not we have proved that Stanford Smith

20-cv-1878-RBJ    Jury Trial    03-24-2022

1   was injured by a mutual aid partner.  So, we object to that

2   question.  We accept it for Zach Packard and for Mr. Deras.

3          MR. RINGEL:  So, the problem with that is that counsel

4   has a Rule 11 obligation to not plead something in a pleading

5   that isn't substantially related.  And my understanding is

6   Dr. Smith testified from the witness stand -- my memory is that

7   he had made allegations about that event related to the Aurora

8   Police Department.  And as a result of that, there is evidence.

9   Chief Thomas' evidence that counsel just referred to is

10  equivocal at best.  The jury should have the right to weigh the

11  evidence, and the parties should be able to argue that issue and

12  have it be presented to the jury.

13         MR. MACDONALD:  There's no evidence that Mr. Smith

14  testified to that he thought it was an Aurora officer or anyone

15  else.  The only questions, and we can go to the transcript, Your

16  Honor, was whether he had filed a claim, a lawsuit against an --

17  against Aurora.  And it is true we did that, and it's because

18  Denver, until -- until Chief Thomas took the stand, refused to

19  ever acknowledge that it was a Denver officer.  And they tried

20  to blame Aurora during discovery, so that is why we brought an

21  amended complaint and added Aurora.  There's no factual basis

22  today to add a question with respect to Aurora or a mutual aid

23  partner with respect to Dr. Smith.

24         THE COURT:  What does the transcript say?  I don't

25  have it, but you do.

20-cv-1878-RBJ    Jury Trial    03-24-2022

1          MR. MACDONALD:  I do, Your Honor.  And I will --

2          MR. RINGEL:  I don't -- I don't disagree with that.  I

3    agree that the question that was asked is whether he pursued a

4    claim, not whether he believed that it was an Aurora officer.  I

5    think that that is correct.

6          THE COURT:  And why are we making such a big deal

7    about this?

8          MR. RINGEL:  Because he didn't identify one way or the

9    other, and the fact that he made a claim against an Aurora

10   officer is evidence that the jury should be allowed to consider

11   on this issue.

12         THE COURT:  He didn't make the claim.  These lawyers

13   made the claim.

14         MR. RINGEL:  Well, he testified that he made a claim.

15         MR. MACDONALD:  And Your Honor, we're not saying

16   that -- he can argue anything he wants.  He can make an argument

17   that Denver ought not be liable for Dr. Smith's injuries

18   notwithstanding the testimony of Division Chief Thomas, but --

19         THE COURT:  Right.  But you can also argue anything

20   you want.

21         MR. MACDONALD:  That's true, but there shouldn't be a

22   special interrogatory, because it looks like the burden is upon

23   us to prove something that --

24         THE COURT:  Let me see it.

25         MR. MACDONALD:  The transcript, or --

Kevin P. Carlin, RMR, CRR

20-cv-1878-RBJ    Jury Trial    03-24-2022

1           THE COURT:  No.  I want the verdict form with the

2    question so I can see it.

3           MR. MACDONALD:  I don't have a printed copy with

4    Ms. Hoffman's change.  We did not include it in ours.  She

5    included it in a proposed change.  I have not been given a copy

6    of that.

7           MS. HOFFMAN:  I don't have a printed copy, but I'm

8    happy to send the Court what I sent to Mr. Reeves [sic]

9    previously.

10          MR. MACDONALD:  Mr. Anderson has one.

11          THE COURT:  We're going to have to give him a raise,

12   then.  Anything else?

13          MR. RINGEL:  The only point I would make is there's no

14   dispute that the Aurora officers were there, and also -- let's

15   see.  Exhibit 338 is a video from Officer Redfearn, I believe,

16   that is admitted into evidence, who is an Aurora officer.  It's

17   his body-worn camera, and it clearly shows that the Aurora

18   officers there, that their patches are covered by their

19   protective equipment.

20          THE COURT:  Take it off.  You can argue your way.

21   They can argue their way.  I'm agreeing with the plaintiff on

22   this one.

23          MR. MACDONALD:  Thank you, Your Honor.

24          THE COURT:  Anything else?

25          MR. MACDONALD:  No other issues with the verdict form

20-cv-1878-RBJ    Jury Trial    03-24-2022

1    from our perspective.

2            THE COURT:  Okay.  And what about the copy?  Can you

3    arrange for that during our recess?

4            MR. MACDONALD:  The jury instructions, yes, but

5    obviously we didn't know the Court's result on the verdict form.

6            THE COURT:  If you send us a final version, we will

7    get the copies made.

8            MR. MACDONALD:  We have final versions of the

9    instructions, Your Honor.

10           THE COURT:  How many copies did you make?

11           MR. MACDONALD:  I think 20.

12           THE COURT:  All right.  Give those to Julie, or take

13   whatever you need for yourself and for the defendants, and give

14   the rest to Julie, and we will make 20 copies of the verdict

15   form once we have it.  And I suggest you -- do they have their

16   lunches now?

17           THE COURTROOM DEPUTY:  They do.

18           THE COURT:  Go have lunch if you want to.  2:00?  Is

19   that enough time?  Okay.  2 o'clock, then.

20       (Recess at 1:07 p.m., until 2:09 p.m.)

21       (Jury in at 2:09 p.m.)

22           THE COURT:  Ladies and gentlemen of the jury, we're

23   going to have the instructions now.  You have each been given a

24   copy of the set.  I have an identical copy.  And you also have,

25   each of you, a verdict form.

20-cv-1878-RBJ    Jury Trial    03-24-2022

1          My job is to read these instructions out loud to you.

2    We've made a copy for you so that you can follow along if you

3    want, or just listen.  And so you will have a copy to refer back

4    to during deliberations.  After I read the instructions to you,

5    then we will have closing arguments in the case.  Because the

6    plaintiff has the burden of proof in a civil case, the plaintiff

7    makes the first closing argument or arguments.

8          There are -- I don't know.  They're going to divide up

9    their speeches, but there are two cases that you may remember

10   seven of the plaintiffs belong to one case, and five belong to

11   another.  They are consolidated for the trial, but they have

12   different lawyers representing the different groups, so you

13   might hear a couple of speeches there.

14         Then the defendant gets to make their closing argument,

15   and the plaintiff with the burden of proof gets the final

16   rebuttal.  I don't think these speeches will take terribly long,

17   but it's going to take a while to get through them this

18   afternoon.

19         So, let's start with the jury instructions.

20   Instruction number one.  And I should tell you before I even

21   start reading number one, number one talks about the claims and

22   defenses.  That won't be anything new to you, but as we go

23   forward -- and I think I said this at the beginning of

24   instruction number two -- you will have some general

25   instructions that we always use.  You will have some

20-cv-1878-RBJ     Jury Trial     03-24-2022

1    instructions just for this case, and some instructions for the

2    verdict form.  Okay?  Instruction number one.  Tell me if you

3    can't hear me, because these masks sometimes make it difficult.

4         (Jury instructions read to the jury)

5             THE COURT:  There is one more, instruction number 22.

6    I will get back to that after the speeches.  Now, you should

7    have a verdict form.  Yes?  Let's talk about the verdict form.

8    It's kind of lengthy, but it's very repetitive, so I think you

9    will be able to get through it.  It has the caption of the case,

10   of course.  It says Elisabeth Epps, et al.  That's just because

11   her name was the first one on the list on one of the cases, and

12   everybody else became an et al.  It could be any one of the 12.

13   It just happened to be her.  Against the City and County of

14   Denver et al.  The et al. is Christian.  A one person et al.

15            We the jury upon our oaths find and state as follows.

16   And remember, you have to all agree.  It's a unanimous verdict.

17   So, let's take a look at the first one, which happened to be

18   plaintiff Claire Sannier.  Did you -- and your first question is

19   did Claire Sannier prove a violation of her First or Fourth

20   amendment rights?  Either one or both.  And you answer yes or

21   no.

22            And then it says, if yes, if you answered yes, continue

23   on to question two.  If no, you skip to question four.  In other

24   words, you don't have to -- there's no more to do about Sannier

25   if you say she didn't prove her case, she didn't prove a

20-cv-1878-RBJ    Jury Trial    03-24-2022

1   violation of her First or her Fourth amendment rights, and you

2   said no, then you move on.  If you say yes, then you go to

3   question two.

4        And question two is what I really was telling you

5   earlier I was going to come back to.  I know that you are a very

6   smart jury, and that you understand exactly what's happening,

7   but I want it to be totally clear to all of us.  Remember

8   instructions 11 and 12.  Okay?  They define what First amendment

9   violations were and what Fourth amendment violations were.  That

10  applied to all of the officers, not just to Christian.  You saw

11  very little about Christian in this case.  You saw a lot about

12  all kinds of officers that work for Denver and the other

13  agencies.

14       And the question is whether the actions of any and all

15  of those officers violated these people's rights.  But they're

16  not defendants except for Officer Christian.  He's a little bit

17  of an outlier in that sense.  I don't mean to diminish the claim

18  by -- against him at all, just other than him, none of these

19  individuals is a defendant.  That's the way the case was set up.

20       The question in the case, with the exception of Officer

21  Christian, is is the City and County of Denver liable for what

22  all these other officers did?  So, 11 and 12 go to whether there

23  were any constitutional violations by anybody.  But your job is

24  then to decide whether that makes Denver liable.  Those are the

25  three theories that we talked about.

20-cv-1878-RBJ      Jury Trial      03-24-2022

1        So, if you see on the verdict form, let's say that you

2   find plaintiff Claire Sannier did prove a violation, and you

3   answer yes -- I'm speaking hypothetically now.  I'm not saying

4   you should or shouldn't do that -- then you go to this question.

5   And it's got this little matrix here.  And it allows you to say

6   two things.  Did she prove her First amendment claim or her

7   Fourth amendment claim?  Could be both.  If you answered yes to

8   the question, then obviously you decided that at least one of

9   those is true, maybe both.

10       But then you also need to tell us whether Denver is

11  liable.  Okay?  Is Denver liable?  And you say -- it says check

12  all that apply.  And if none applies, do not check any of them.

13  So, let's just say hypothetically you found that Ms. Sannier

14  proved her First amendment claim.  Okay.  But then you have to

15  decide did she prove it against Denver?  Maybe her First

16  amendment rights were violated by somebody, Officer Jones or

17  Smith, whomever.  Is Denver liable?

18       And you consider whether the plaintiff proved any one

19  or more of their three theories of Denver's liability.  One, the

20  constitutional rights resulted from an official policy or a

21  practice or a custom of Denver.  And that's instruction 15.  And

22  if you find that that's been proved, you put a check there.  Or

23  two, maybe you decide that there wasn't any violation of

24  official policy or whatever, but there was a failure to train.

25  You put a check there.  Or ratification.  If you don't think

20-cv-1878-RBJ    Jury Trial    03-24-2022

1   that they proved that Denver is liable, because they didn't

2   prove any one of these three theories, you don't put any check

3   there.  So, that's really what this case is.  Again, with the

4   exception of Officer Christian.

5          This case is to determine by you whether Denver is

6   liable -- well, whether any constitutional violation occurred at

7   all by anybody, but then if it did, is Denver liable?  And if it

8   is liable, on which theory or theories?  Could be all three.

9   Does that make sense?

10          And for the most part, with each of these 12

11  plaintiffs, the questions are the same.  There are a couple of

12  exceptions.  I will explain those.  Let's say you did find that

13  she proved a constitutional violation, and you checked at least

14  one of these boxes.  You could check one.  You could check six.

15  If you check none, then there's not going to be any damage.

16  They didn't prove Denver caused it.  But if you check one of

17  these boxes, then you go to question three, which is what amount

18  of damages did she prove?  What are you going to award to her

19  for her damages?  And then you're done with Ms. Sannier.

20          And if you look at Smith, it's set up the same way.

21  Packard is a little different.  It's pretty much the same, but

22  the issue on Packard in addition to the other issues is that at

23  least with respect to that one incident that you saw on the

24  video, remember?  The skateboarder.  You remember him?  He got

25  hit by a PepperBall, and he went down on the ground, and he

20-cv-1878-RBJ    Jury Trial    03-24-2022

1   testified about the injuries that he -- he went to the hospital

2   for and all of that.  But the person who shot him was not a

3   Denver officer.  It was an Aurora officer.  And there's a

4   dispute as to whether or not Denver is liable for the acts of

5   Aurora officers.  There was an instruction on that, number 18.

6            And so when you get to Packard, if you answer no on

7   question seven, well, that's it for him.  But if you answer yes,

8   then question eight is is Denver liable?  It's the same question

9   as it was for the others, but for Denver to be liable, you have

10  to decide that Denver -- it's been proven that Denver is liable

11  for the acts of Aurora officers and the circumstances.

12           And then you go over to page three.  You will see that

13  you're asked to answer the question, do you find that any

14  officer from a mutual aid jurisdiction violated Zachary

15  Packard's constitutional rights by acting pursuant to an

16  official policy?  So, that would be the Aurora officer, yes or

17  no.

18           And maybe you think that that wasn't a violation of

19  anything, but you will say yes or no.  That will help us out,

20  because we will know if you say yes, Denver is liable, that will

21  help us know why you said that.  Okay?  And that gets into the

22  whole question about the mutual aid agencies.

23           Then we get to all these other plaintiffs one by one.

24  The questions are all the same until we get to Joe Deras, and

25  that's another one where there's the second question on the

Kevin P. Carlin, RMR, CRR

20-cv-1878-RBJ    Jury Trial    03-24-2022

1   mutual aid agency, because I think there was evidence that it

2   was a mutual aid officer who did at least some of the -- of what

3   Mr. Deras complains about.

4           That, and Taylor and Wedgeworth and so forth, it goes

5   through the list, all the way to poor Ms. Epps, whose name was

6   at the beginning of the case, and there she is in last place.

7   That doesn't mean she's any less important or more important

8   than anyone else.  I think it was pretty much in the order in

9   which they testified, largely.  So, that is how the verdict

10  works.

11          And once you have all agreed, then at the bottom the

12  foreperson will date and sign it.  And that's it.  You got some

13  work to do.  But now the lawyers are going to help you with that

14  job.  They're going to tell you what they think you should do.

15  I suspect that they won't agree.  Does anybody need a break

16  before we go to the first plaintiff's speech?  Then whomever the

17  first plaintiff speaker is, the lectern is yours.

18          MR. MACDONALD:  Thank you, Your Honor.  May it please

19  the Court, ladies and gentlemen of the jury, I'd like to start

20  by thanking you.  This has been a long three weeks, I'm sure,

21  for all of you, as it has for our teams on both sides.  You

22  know, it's an amazing experience watching a jury -- a pool of

23  people come in at the start of a case.

24          I have actually sat on a jury myself, and I know that

25  feeling.  Lots of people start out a little concerned.  They

20-cv-1878-RBJ    Jury Trial    03-24-2022

1    assume they're going to get dismissed.  And they are a little

2    anxious, and they're a little worried, and then ultimately the

3    eight of you were selected.

4         And we see this in every jury when a group of citizens

5    sit down in that jury box.  They roll their sleeves up.  They

6    work really hard to get it right.  And we've watched you do

7    that.  We have seen your questions with virtually every witness.

8    So, on behalf of myself, our team, my seven clients, I want to

9    say thank you for the diligence that each of you have shown.

10        Now, as this trial reaches a conclusion, I think it's

11   important to think about where we are.  We're here in this grand

12   courtroom, United States District Court in front of a judge that

13   was appointed by the president of the United States, confirmed

14   by the senate to a life term.  In this courtroom, we hear the

15   most important cases, and here, some ways, you have either the

16   good or the misfortune, depending on your perspective, of

17   hearing in our view one of the most important kinds of cases

18   there is, and that's a case about the constitutional rights of

19   the citizens that are our clients.

20        And this case won't end when you deliver your verdict.

21   This is a case that will be watched by the police agencies here

22   in Colorado, by the citizens of Colorado, and people around the

23   country.  And so you all have a super important task.  There are

24   few places where a private citizen can impact the course of our

25   country.  One, of course, is at the ballot box, where we're one

20-cv-1878-RBJ    Jury Trial    03-24-2022

1    of 180 million people casting our ballot.

2         A second is by going out to the street and protesting

3    and raising our voices, like our 12 clients, the plaintiffs here

4    did.  And another place you can impact the course of history is

5    sitting in a jury box and making a decision where each of you

6    are one of eight.

7         So, I'd like to talk a little bit about the plaintiffs

8    here.  I'm going to talk about the seven people that I

9    represent.  The first person you heard from was Dr. Stanford

10   Smith.  Dr. Smith is a dentist today.  You heard when he

11   testified that he was in his last year of dental school.  And

12   unlike some of our clients, Dr. Smith had never been to a

13   protest.  And he was so moved by the death of George Floyd that

14   he decided I need to go out, join the community, and have my

15   voice heard.

16        So, he didn't go out on the first night.  He didn't go

17   out on the second night, but he came out on the third night.

18   And you heard him testify.  He arrived here at Colfax and

19   Washington, and he arrived there because he was really going to

20   get lunch at the Cheba Hut that was across the street.  He had

21   no idea that there happened to be a police substation there.  He

22   parked a little bit away from that Cheba Hut.

23        He heard a crowd, and you heard him describe it as

24   electric.  There were people from all races, all creeds, young,

25   old.  You kind of heard when he testified the excitement in his

20-cv-1878-RBJ     Jury Trial     03-24-2022

1   voice.  You saw the video, which was a peaceful crowd.  There

2   were not rock throwers.  It wasn't nighttime.  We heard a lot of

3   discussion during the trial of bad things happening at night.

4   Well, this was at 4 o'clock.

5          And you heard him testify about what happened.  He was

6   wearing shorts that day.  The crowd began to flee when the

7   police started PepperBalling, throwing tear gas, and you

8   remember him talking about a grenade.  Now, he doesn't know what

9   kind of grenade it is, but he was standing right at this

10  intersection where he watched this grenade explode right on a

11  man's head, or certainly right near his head.

12         You heard him hit the -- hit the counsel -- the table

13  when he was testifying, the explosion that he heard.  He had

14  PepperBall residue on him, because as he ran along this wall,

15  the police fired at him and the other protesters as he ran.

16         But Dr. Smith didn't just go back to his car.  He was a

17  little shaken up, and you heard him testify that he started

18  walking a little bit down Colfax, and he ran into a pastor.  And

19  he found that moving, and so he walked with the pastor and the

20  group of people down to the capitol.  And he said this was sort

21  of a place of peace as they stood and then sat in a circle down

22  by the capitol.

23         He was still traumatized by what he had seen, though,

24  so he got up, and he walked along a police line, here on Colfax

25  between Broadway and Lincoln.  And you heard him testify that he

20-cv-1878-RBJ    Jury Trial    03-24-2022

1   walked up and down that line.  He had his hands raised, because

2   he was scared.  You actually saw him bow and try to keep people

3   calm, protesters and police.  And this is the still that you

4   heard Division Chief Thomas acknowledge it was very likely that

5   this was a Denver police officer who sprayed Dr. Smith in the

6   face for no reason with OC pepper spray.  Again, this is a

7   picture you saw when he testified.  A group of protesters

8   rendered aid to him.  You heard him talk about being on all

9   fours, and rubbing his face into the dirt like an animal to try

10  to get the chemicals off of his face.

11          The police rendered him no aid.  There was no one who

12  stepped up and told the officer who did that, wait a second,

13  that man had his hands up.

14          I'd like to talk briefly about Mr. Packard.  You heard

15  that Mr. Packard was a skateboard aficionado, had actually done

16  competitions around the world.  It was the thing that excited

17  him most.  Interestingly, Mr. Packard was another person who had

18  never been to a protest before.  And you recall during his cross

19  examination there was a suggestion that he might not really care

20  about social justice.

21          So, on the one hand, you had Zach Packard and Dr. Smith

22  who had never been to a protest, criticized for not really

23  believing in the cause, maybe.  And then you had other of our

24  clients like Ms. Epps who was called a professional protester,

25  because she went too much.

20-cv-1878-RBJ     Jury Trial     03-24-2022

1       Well, Mr. Packard had never been before, but he took

2  his African American -- he talked to his African American

3  friend, Mr. Perkins, and he said, let's go down there.  Let's go

4  down and raise our voices.  They were pushing their friend in a

5  wheelchair, and you heard him testify that on the first night

6  shortly after he arrived, he saw the police push a woman down

7  and shoot PepperBalls at her.  And he screamed to stop, and they

8  fired on him.  That was the first night, not long after

9  Mr. Packard arrived.

10       And then the second night, at Colfax and Washington,

11  Mr. Packard was shot in the head with a shotgun full of lead

12  shot.  Immediately rendered unconscious with a broken skull,

13  broken vertebrae, brain bleed.  And you saw the video, the

14  body-worn camera of an Aurora officer, who was told if they

15  start kicking that shit, go ahead and freaking hit him.  Just

16  about 20 paces across.

17       And Mr. Packard, who had gone there to protest

18  peacefully, when they fired tear gas at him, you saw the

19  picture.  He went and kicked it.  It went about five or ten feet

20  into the street.  And Denver's own witnesses, including

21  Technician Grothe, the trainer, said kicking a tear gas canister

22  five or ten feet into the street is not justification to shoot

23  someone at all, let alone with a 40-millimeter or a less-lethal

24  shotgun.

25       (A video was played.)

20-cv-1878-RBJ    Jury Trial    03-24-2022

1      MR. MACDONALD:  You heard a number of shots there.

2   And you heard Mr. Packard testify that he was shot in the head,

3   rendering him unconscious, but when he came to, the people that

4   helped drag his body away told him that he was shot while lying

5   on the ground.  And you saw those injuries.  First, this is him

6   in the hospital with a neck brace on.  This is him getting out,

7   and you remember him talking about the other wounds that he had

8   suffered from being shot while laying on the ground with a

9   shotgun while unconscious.  No officers went to render aid to

10  Mr. Packard.

11      We also know Denver officers were there as well at that

12  intersection at that time.  The City in this case, just like

13  with Dr. Smith, has refused to admit that what happened to

14  Mr. Packard was wrong.  They blamed him for kicking the tear gas

15  canister.  And on cross examination, they reminded him that the

16  severe pain only lasted about two and a half months from his

17  broken vertebrae and fractured skull.

18      I'd like to talk briefly about Maya Rothlein and Amanda

19  Blasingame.  At the time of the protest, Ms. Blasingame was just

20  finishing law school, and Ms. Rothlein was working as a patient

21  care specialist, like she does still today.  They lived about

22  two blocks from the capitol at 14th and Penn.  Maya had never

23  been to a protest before.  Amanda, a few.

24      And they went that first day of the protest, and this is

25  the picture they took just in front of that Slice Works.  And

20-cv-1878-RBJ    Jury Trial    03-24-2022

1    we've heard some testimony about a number of the gassings and

2    grenadings and shootings that happened just in front of that

3    Slice Works.  And this is a picture that Maya or Amanda took of

4    a line of officers, several with weapons raised shortly before

5    they deployed tear gas.  And again, you heard Ms. Blasingame and

6    Ms. Rothlein testify it was a peaceful crowd.

7        They went back home.  They stopped at home.  On their way

8    back towards -- they decided, we'll go to the capitol.  Home

9    was -- 14th and Penn was between where they were at Colfax and

10   Washington and downtown.  And this is them standing on the

11   capitol grounds, not in the street, not blocking traffic, where

12   they were tear gassed, along with a number of our other clients.

13       You remember the testimony and the videos here where

14   there's a group of women standing in front of officers.  Not

15   throwing things.  Not being violent.  And an officer came up to

16   his colleagues and told his colleagues, here it comes, here it

17   comes, here comes the gas, here comes the gas, here comes the

18   gas.  Didn't tell them.

19       There was a suggestion I think in the last few days

20   that some of the officers were starting to put on gas masks, and

21   that should have warned everyone to flee the area.  Well, you

22   can see where Ms. Rothlein and Ms. Blasingame are.  Couldn't

23   have even seen the officers putting on gas masks at that point.

24       You also heard Ms. Blasingame testify that she was in

25   this crowd on the third day of the protest.  Again, not at

1    night.  Not when scary things were happening, but she was here

2    among a peaceful group of protesters.  She testified she was on

3    her knees when the police approached, deployed tear gas and

4    PepperBalls on the crowd.  That's a picture of the tear gas and

5    PepperBalls beginning to fly.

6         And they went home.  Both Ms. Blasingame and

7    Ms. Rothlein went home before the curfew.  That was day three,

8    the first day of the curfew.  Some of our clients, and they

9    acknowledge this on the stand, did engage in civil disobedience

10   and didn't go home when the curfew was imposed, and I will talk

11   about that in a minute.  And those clients all said, we were

12   ready to be arrested.  That's part of civil disobedience.

13        But Ms. Rothlein and Ms. Blasingame said --

14   Ms. Blasingame said, I'm studying for the bar.  I don't want to

15   do that.  I don't want to jeopardize my law license, or what

16   hopefully will be my law license.  So, they went home at 14th

17   and Penn.  And you heard them testify about this white car,

18   which we now know was Lieutenant Ken Chavez, who was driving

19   around the Capitol Hill neighborhood ordering his men to conduct

20   driveby PepperBall shootings on citizens.

21        And he got out of the car.  He approached them.  He

22   threatened them with the OC fogger on their own property, and

23   then walked away that time when someone pulled out their phone,

24   and he thought they might be filming.

25        But either he or his men or perhaps another group of

20-cv-1878-RBJ     Jury Trial     03-24-2022

1   officers came back an hour later and conducted a driveby

2   shooting.  And Commander -- you heard Commander Levens,

3   Commander Sanchez -- Commander Sanchez described even the

4   allegation as outlandish.  And it is.  It is outlandish.  But we

5   now know that it happened.  And it didn't just happen to

6   Ms. Rothlein, Ms. Blasingame.  It happened to other citizens in

7   Denver.

8          We know that from the brave statements of some of the

9   officers who had incredible courage.  Officer -- Sergeant

10  Koenigsfeld, who described seeing Lieutenant Chavez exit his

11  vehicle and order people who appeared to be on their own

12  property back into their homes while pointing a fogger at them.

13         Officer Matthews, who you saw in that internal affairs

14  video saying there were some people inside of the railing in

15  front of their homes.  They were mouthing off to him.  He threw

16  something at them.  I don't know if it was a smoke grenade or CS

17  grenade.

18         This was a young man who had the courage to step up and

19  report a lieutenant, a 40-year lieutenant in the Denver Police

20  Department.  And you heard then Commander Sanchez, now Division

21  Chief Sanchez say, it was so outlandish, I couldn't believe it.

22  So, he put him in charge.  And today, you heard Division Chief

23  Thomas say, well, I was told, but I didn't know the details of

24  that.  And so this is a young officer doing the right thing, who

25  was hung out to dry.

20-cv-1878-RBJ    Jury Trial    03-24-2022

1          And what he said was, I don't think it was justified.

2    These people were running away from us.  They weren't attacking

3    our vehicles.  They weren't causing any property damage.  This

4    is the kind of person that the Denver Police Department needs to

5    hold up as a shining example, but instead, when he reported to

6    his up the chain, nothing happened.  Nothing meaningful

7    happened.  And that is a tragedy for all of us.  As we talked

8    about, Lieutenant Chavez retired with his full pension after a

9    lateral move.

10          Plaintiff Ashlee Wedgeworth, you heard her talking

11    about being on the second night down to the protest, here on

12    Logan Street.  Excuse me.  Grant Street.  Just across from the

13    state capitol, on the east side of the capitol, and that a group

14    of officers were in this parking lot here.  And that when some

15    people threw rocks at a police car driving down Grant, the

16    police opened fire on her and the person she was with.

17          You also heard Ms. Wedgeworth testify about being at

18    Colfax and Emerson, and you heard the video of one of the DPD

19    officers saying, we're going to pinch them.  We're going to let

20    them have it, and then we will arrest as many as we can.  This

21    was a peaceful protest.  You can see the people in the

22    background on their knees and sitting down.

23          We showed you the overhead footage from the 9News

24    helicopter of yet another kind of explosive device.  And we will

25    confess, we're not certain if it's a flash-bang, a Stinger

20-cv-1878-RBJ    Jury Trial    03-24-2022

1    grenade, an OC grenade, a rubber ball grenade.  That -- and I

2    think the City has made that point.  We are not experts in

3    munitions, but our citizens were affected by explosive devices

4    thrown while peacefully protesting, and that is the

5    constitutional violation.

6        You heard from Ms. Epps.  She described her pain, her

7    suffering from the tear gas as in comparison to labor or a knee

8    on the neck, it wasn't that bad.  Not been in labor, but I have

9    seen my wife, and I understand that is painful.  But Ms. Epps

10   put a brave face on it.

11       Was tear gassed the first night at 14th and Sherman.

12   Was tear gassed, grenaded here, also the first night in front of

13   the state capitol.  You remember the man giving the sign -- his

14   sign of what he was thinking about the police, the person that

15   Ms. Epps helped about ten minutes before this.  The police again

16   deploying chemical munitions, explosive devices on that crowd

17   who was not engaging in violence, was not throwing rocks.  You

18   saw no evidence of that in the incidents we're talking about.

19       They have shown you a few pictures of people throwing

20   rocks throughout their case in chief.  It has not been the

21   incidents where our clients were injured and attacked.

22       You saw the video of Officer Christian taking a knee

23   while Ms. Epps walked across the street, and him firing upon

24   her.  Shortly thereafter, you saw Ms. Epps walking in front of

25   the capitol while the police were continuing to shoot, including

20-cv-1878-RBJ    Jury Trial    03-24-2022

1   at her.  You saw an empty street while they were doing that.  An

2   officer with a raised 40-millimeter.

3          On May 29th, you saw Ms. Epps have the phone shot out

4   of her hand, then grenaded by the police as they marched down

5   Lincoln.  And I don't know if you were able to see it, but she

6   cowered off on the left-hand side after being shot for about 15

7   seconds.  And the police line rolled through, pushed the

8   dumpsters out of the way, left them there, left her there on the

9   ground after having shot and grenaded her.

10          Then she went back to try to find her ID, because it

11  had been -- just like I have, she has her ID on the back of her

12  phone, and it had separated when it was shot out of her hands.

13  And you saw her picking through the trash, and you remember the

14  PepperBall shots.  She's not a danger to anyone, and the police

15  are shooting at her.  And you saw later, as she struggled to

16  walk from what the police had done to her that night.

17          Ms. Epps, also shot in the face.  You saw that video.

18  I won't replay it.  That was the next day.  The chemicals that

19  they were inhaling.

20          And Mr. Weiner played actually quite a bit of Ms. Epps'

21  video from this day.  And you remember it was jumping all

22  around.  And when it jumped around, you saw a peaceful crowd out

23  on the steps and the grass around the capitol.

24          And just a quick -- the jury has had a number of, I

25  thought insightful and thoughtful questions about filming.  And

20-cv-1878-RBJ      Jury Trial      03-24-2022

1   Ms. Epps said something that really struck out to me -- struck

2   me as I was thinking about it and looking back at it, which is

3   she said the only reason anyone knows George Floyd's name is

4   because a teenage girl -- a teenage Black girl stood outside a

5   convenience store and filmed the police.  And I think if we

6   didn't have the videos that we've been able to show you during

7   this case, people wouldn't believe what happened during the

8   George Floyd protests.

9          And lastly, of my seven plaintiffs, is Hollis Lyman.

10  Hollis, you remember is the person who went to The Ohio State

11  University, worked for the police department for several years.

12  She is not antifa.  She is not a radical.  She is someone who

13  believes in criminal justice.  She has a degree in criminal

14  justice.

15         She was there on that first night when the SWAT

16  officers -- these are the guys in green who came up and deployed

17  gas and other munitions on that peaceful crowd in front of the

18  capitol.  And the bravery that Ms. Lyman showed is quite

19  stunning.  You saw her with her sign.  This is her on her knees,

20  on her knees holding her homemade sign.

21         And this is the sign.  She's pepper sprayed shortly

22  after this.  This is not a crowd -- these are not a group of

23  people here that are posing a threat to the officers.  She was

24  pepper sprayed from point-blank range.  She was later shot

25  through her sign while she was on the ground trying to hold up

20-cv-1878-RBJ   Jury Trial   03-24-2022

1    her cardboard sign in self-defense.

2            And yet, and yet Ms. Lyman came back.  And something

3    about this picture is just so stunning to me, standing on the

4    corner of Broadway and Colfax.  I go by it all the time.  A line

5    of police officers behind her.  And she just happened to be

6    there.  And you remember this video where an officer sprays

7    someone with pepper spray while driving their car, first on the

8    passenger side and then on the driver side, while he pulled away

9    into traffic, while Hollis was on the other side of the street

10   holding up her sign.

11           You heard Ms. Lyman say on the first night of the

12   curfew, I was prepared to get arrested.  And she gave a

13   beautiful, I thought, recitation of that.  All of us grew up

14   learning about Rosa Parks who didn't give up her seat, who --

15   people who didn't agree to sit where they were told in

16   segregated lunch counters.

17           And Hollis Lyman said, I was prepared, if I was going

18   to be cited and arrested, I could have accepted that, because

19   this -- calls of police reform is so important to me.  And yet

20   here she was shot at, tear gassed, grenaded.  This is when you

21   remember she talked about a grenade landing, hitting her friend

22   and exploding.

23           So, now let me just talk about the instructions that

24   the judge gave you.  So, as he said, there is a Fourth amendment

25   claim and a First amendment claim.  So, the elements of the

20-cv-1878-RBJ     Jury Trial     03-24-2022

1   Fourth amendment claim that the judge read to you are in

2   instruction 12.   And so the first thing we have to show is that

3   an officer intentionally applied physical force against the

4   plaintiff or restricted the plaintiff's freedom of movement

5   through a show of authority.

6        And we would submit that in each and every incident

7   that our plaintiffs talked about, they both showed that an

8   officer applied physical force against the plaintiff or

9   restricted their plaintiff's freedom of movement through a show

10  of authority, shooting them, gassing them, spraying them,

11  grenading them.

12       The force also was unreasonable.   There was no reason

13  to use force on a single one of our plaintiffs in a single

14  incident, and our clients suffered physical or emotional injury,

15  and I will talk a little bit about that later.

16       The judge described in determining when force was

17  unreasonable, you should consider all the circumstances, but

18  importantly, it's -- the force that will be reasonable under the

19  circumstances is related to the plaintiff's actions at the time,

20  and this is -- you saw we asked a number of officers, you

21  can't -- I can't use force on Mr. Douglas because Mr. Moffett

22  does something.   As a police officer, you could use force based

23  on what the person does.   I'm not going to use force on

24  Mr. Douglas though.

25       Could consider whether the plaintiff had committed a

20-cv-1878-RBJ     Jury Trial     03-24-2022

1   crime.  Here, as we've established unequivocally, our clients

2   committed no crime at any time, and the only possible exception

3   is a few of the curfew violations at a few of the occasions.

4   That's not a severe crime for which you can deploy any force on

5   someone.  If you want to arrest someone for that, they have the

6   authority to do it, but even that for our seven clients didn't

7   happen.

8       The judge's instructions tell us you can consider

9   whether the plaintiff posed an immediate threat.  Here, there

10  was no threat.  And again, the need for use of force against the

11  plaintiff.  And you can consider the officer's own reckless or

12  deliberate conduct, whether that contributed to the need to use

13  the force employed.

14      The First amendment instruction, the judge has already

15  instructed you that participating peacefully in a protest is

16  protected activity under the First amendment.  That's what each

17  of our clients did.  The second element is that actions would

18  chill a similarly-situated person of ordinary firmness to

19  continue to engage in the activity.  In other words, would a

20  person of ordinary firmness be chilled by getting shot or gassed

21  or grenaded?  And the answer we submit is yes.

22      And the last element, whether the plaintiff's

23  participation was a substantial or motivating factor in the

24  officer's decision to take action against the plaintiff.  Our

25  clients were only out there to protest the actions of the

20-cv-1878-RBJ     Jury Trial     03-24-2022

1    police.  That's why they were there.  And the Court's

2    instructions indicate that a substantial or motivating factor is

3    a significant factor, though not necessarily the only factor.

4          In considering whether it's a substantial or motivating

5    factor, it's not relevant whether a particular plaintiff

6    actually was prevented.  In other words, if our clients were

7    stubborn and came back because the cause mattered, you can't

8    hold that against them.  That's what the instructions tell us.

9          And the judge talked about scrutinizing the workings of

10   the human mind, because we never know exactly why someone takes

11   the actions, almost never, unless they tell us, but that usually

12   doesn't happen.  And so what the instructions say is that you

13   consider any of the statements made, the acts done or admitted,

14   or all other facts and circumstances in evidence indicating the

15   officer's state of mind.

16         And so we submit that when you look at the

17   circumstances at what happened to our clients based on what they

18   did to them and what they did to other people delivering their

19   message, that the answer is this was a First amendment

20   violation.

21         So, this -- the judge talked about the crux of the

22   issue is whether or not Denver is liable for the actions of its

23   officers and the mutual aid officers and the injuries sustained

24   by our clients.  And we submit the answer is yes, that it was

25   Denver's customs and practices that caused the violations.

20-cv-1878-RBJ    Jury Trial    03-24-2022

1    And I'm going to address a few of the custom and

2   practice theories as to why we think Denver is liable, and

3   Ms. Wang will address some of the others.  We have tried to

4   divide it up so we don't repeat the same things.

5    He read you the instruction number 15.  We first have

6   to establish a violation of the constitutional right which we

7   just talked about, the First or the Fourth amendment.  Next, we

8   have to establish that the officer acted pursuant to an official

9   policy or a practice or custom of Denver.  And that the policy,

10   practice, or custom caused the deprivation.  Those are the three

11   elements we have to show to prevail against the City of Denver.

12    Also, an official policy can include any of the actions

13   of Commander Phelan took or instructed others to take during the

14   protest.  And a practice or custom means a longstanding,

15   widespread, or well-settled practice or custom that constitutes

16   a standard operating procedure.  So, I'm going to talk about why

17   we think the evidence proves that what happened to our clients

18   was part of a well-settled practice or custom that constitutes a

19   standard operating procedure.

20    One of the things it can include is a series of

21   decisions by a subordinate official of which a supervisor was

22   aware.  So, let's look at some of this evidence.  I will try to

23   tick through this quickly, because I know you paid super close

24   attention.

25    There was widespread unjustified shootings on every day

20-cv-1878-RBJ    Jury Trial    03-24-2022

1    in almost every location.  You remember the man who stood

2    outside his car with his pregnant wife in it, who was shot,

3    Commander Levens said at least 23 times.  You remember Commander

4    Phelan saying that the optics of that were not good, but it was

5    within policy.  Shooting a man outside his car.

6         You remember this officer yelling, I'm a goddamn U.S.

7    Marine, while being shot in the face, and Officer Tana

8    Cunningham admirably said, I shot around this guy.  I made sure

9    not to hit him, because he wasn't doing anything.  But we know

10   from the video that her colleagues, she's not sure who, standing

11   probably to her left, shot Mr. Amghar, the Marine, at least 13

12   times in the face and the torso.

13        You remember the man with the target on his shirt that

14   they took literally and shot him, shot the milk jug out of his

15   hand.  You remember the woman at the Slice Works, shot once,

16   then shot again when she went back to get her purse and her

17   drink.

18        We've talked about Zach Packard.  This is the person

19   that went to put a cone on top of a tear gas canister where

20   Amanda Blasingame was standing about this distance, and the --

21   the protester was shot in the head, rendered unconscious.

22        Hopefully you remember from Officer Valentine's

23   body-worn camera the man in the black shirt being shot in the

24   back.  You remember next the guy giving also the universal sign

25   of disrespect to the police after the man to his right was shot

20-cv-1878-RBJ     Jury Trial     03-24-2022

1   on the left of our screen.  You remember he was filming the

2   police.

3           This is another man who told the police, why are you

4   bringing the aggression?  They shot him in the back.  This is a

5   woman they shot in the back at the corner of Colfax and Lincoln.

6           This was the man saying, I'm a guy holding noodles.

7   You remember he had an altercation with these folks.  This is

8   almost three weeks ago, but he was shot multiple times, spun

9   around.

10          You remember the man on crutches, shot not once, but

11  twice, knocked down.  Man in the brown shirt, you remember, who

12  was quite colorful in his interactions with the police.  Why did

13  you shoot?  Why is it always that guy?  Why is it always that

14  guy?  Gets shot in the back.  Here's the man on the crutches

15  getting shot again.

16          We showed you a lot of video and stills of unjustified

17  pepper spray.  This is a man who walked up and said, which one

18  of y'all shot me?  Because he had been shot just a little bit

19  ago, and he got pepper spray in the face.  Here's a man getting

20  pepper sprayed for standing there with a sign.

21          There's Stanford Smith getting pepper sprayed.  This is

22  the person alone by Civic Center Park, officers standing on top

23  of him, pepper spray.  Officer approaching with a weapon.

24          This was Officer Carmody, the corner of Colfax and

25  Lincoln, double barrel, OC sprayer in one hand, PepperBall in

20-cv-1878-RBJ    Jury Trial    03-24-2022

1  the other hand, because a woman near the front of the crowd

2  threw what was clearly a half-drunk plastic water bottle like

3  this one.  He shoots and sprays as many people as he can get.

4       You remember this man filming the officers throwing

5  grenades across six lanes of Colfax, gets sprayed in the face.

6       This is the man who gets sprayed while driving.  These

7  are the folks down on 12th and Broadway, sprayed, double barrel.

8  This is the woman in front of the Supreme Court, sprayed, told

9  it's not worth it.  It's not worth it.  Sprayed actually twice,

10 again, on the steps of the Supreme Court.  Another person, Black

11 Lives Matter sign, sprayed by a sergeant, setting example for

12 his team.

13      Officer Beall, spraying someone who is filming in a

14 very sparse crowd.  Man giving the universal sign of disrespect,

15 gets it in the face with a pepper spray.  People backing up in

16 front of the public library, pepper sprayed in the face.

17      Very quickly on the gassings, the grenades, done by

18 untrained officers, handed grenades by their sergeants who know

19 they're not trained.  Thrown into the street, landing on the

20 windshield of cars.  Bombing people who are getting out of an

21 Uber at Broadway and 13th.  OC Blast balls by Officer Valentine,

22 thrown into the park by the homeless encampment.  Ms. Epps,

23 Ms. Wedgeworth, Colfax and Broadway, more tear gas.  More tear

24 gas.  More tear gas.  More tear gas.  More tear gas.

25      This is a widespread custom and practice of violence

20-cv-1878-RBJ     Jury Trial     03-24-2022

1   and aggression against the protesters.  Our clients, while

2   numerous, 12 of them, suffered the same thing that the other

3   citizens of Denver suffered.  You remember the man standing on

4   the cement block, thrown to the ground, who yells, this is

5   peaceful.  You're bringing the aggression.  This is on you.

6          You remember the man who screamed, I can't breathe,

7   repeatedly.  Four of the officers who have testified in this

8   case all said they were on this line.  Four of them.  Commander

9   O'Donnell, Officer Christian, Officer Valentine, and Lieutenant

10  Canino.  This man screamed for at least a minute, help, help, I

11  can't breathe.  No one rendered aid to him.

12         You remember Officer Bolton, the man is taking pictures

13  of him.  He pushes him, calls him a name, a slur, while the man

14  is trying to photograph him.  You remember the man with the sign

15  who gets shot in the back.  You remember the man who was

16  sprayed, pushed into traffic, moving traffic by the police.

17         The woman who says, why are you doing this?  We've done

18  nothing wrong.  We're peaceful people.  Shoved, pushed into the

19  park.  People attacked.  The no justice, no peace sign.  Another

20  man filming, Officer Valentine's body-worn camera, pushes him

21  into the street.  Another man filming, shot.  Another person

22  with a sign that the police would -- some police officers,

23  probably most police officers and maybe most people would think

24  is antagonistic.  Pepper sprays.  The man pushed into traffic.

25         And I want to take you back to something that Commander

20-cv-1878-RBJ    Jury Trial    03-24-2022

1    O'Donnell said, which is if an officer acts outside of policy,

2    they're disciplined.  And if they're not disciplined, that shows

3    they were acting within policy; correct?

4         That's correct.

5         All of the stills and the videos we've seen today had

6    no discipline.  No accountability.  That is a custom and

7    practice and policy of the City of Denver during these George

8    Floyd protests.

9         Commander Levens acknowledged that out of the more than

10   111 cases, there were three that resulted in discipline, and

11   then the one guy who was fired because of the Instagram post

12   that we heard about today.  And the discipline was six days for

13   one officer, ten days for another officer, and a reprimand for

14   another officer.  And none of the cases that Commander Levens

15   talked about are the ones we just looked at.

16        Commander Phelan testified, seen some videos where I

17   might not agree with the application, but it was still within

18   policy.

19        I will turn to failure to train and failure to

20   supervise.  You heard His Honor talk about the failure to train

21   instructions.  That's instruction 16.  So, this is an

22   alternative theory.

23        We have custom and practice, which we think we

24   established.  We also think we established Denver's liability

25   because of a failure to train.  And so the elements we have to

20-cv-1878-RBJ    Jury Trial    03-24-2022

1   show here, again, the first is we have to show violation of the

2   constitutional right, and that Denver had insufficient training

3   or supervision.

4          The specific deficiencies in that training or

5   supervision, that it caused the deprivation, and that Denver

6   adopted the policy with deliberate indifference.  The Court read

7   to you the definition of deliberate indifference, which can

8   occur when a city fails to train its employees to handle

9   recurring situations presenting an obvious potential to result

10  in a constitutional violation.

11         The evidence here you heard from Dr. Maguire was our

12  last witness, who has written extensively on this, and done

13  training of police departments.  The DPD failed to adequately

14  plan, failed to adequately train, failed to adequately

15  supervise, failed to discipline the officers.

16         He explained that based on his experience, DPD's

17  repeated failure to train presented an obvious potential for

18  excessive force and violations of the First amendment.  And at

19  some level, it is a common sense, what we saw had to result from

20  a lack of training and supervision, because I don't think it is

21  possible for people who went into policing probably all or

22  almost all for the right reasons, could have taken the steps

23  they took with proper leadership, proper training, and proper

24  supervision.

25         You saw the memo from Captain Sylvia Sich.  This is a

20-cv-1878-RBJ    Jury Trial    03-24-2022

1    senior member who was in the command post, who believed a lot of

2    officers and protesters, both, may have been injured due to a

3    lack of supervision and command.  She described criticism of

4    officers on the ground as nonstop, and she kept thinking, what

5    are they supposed to do without training or supervision?

6          She described Chief Pazen as losing it if he's

7    presented with a differing opinion, and that he was often angry

8    or paralyzed.  And I know Division Chief Thomas had a different

9    view of that.  He did describe Chief Pazen as being animated, as

10   being emotional, and truly upset, and so maybe that's just a

11   difference of perception between Division Chief Thomas and

12   Captain Sich.

13         You heard from Lieutenant Coppedge.  He saw the DPD's

14   response as a total leadership failure.  And he confirmed that

15   again on the stand.  A gentleman who gives presentations and

16   training around the country on leadership.  He said that

17   officers on the ground were reacting without any sort of

18   leadership.  And that under the current chief of police, the

19   prevailing attitude is that training is not important.

20         And the City of Denver brought him in to say --

21   essentially try to walk that back and say, well, it's not that

22   it's not important, that maybe it's just less important than it

23   used to be.

24         I am confident that Nick Mitchell did not have an

25   agenda.  Nick Mitchell came.  He worked his tail off with his

20-cv-1878-RBJ     Jury Trial    03-24-2022

1   team, and I believe accurately surmised what Mr. Coppedge told

2   him.  But in any event, Mr. Coppedge confirmed on the stand,

3   it's true, training now is less important than it was under the

4   prior chief.  And he wasn't the only one who said that.

5        We heard it from Sergeant Knutson.  He developed a

6   three-day field force class back in 2014 or 2015, and then the

7   commanders put a stop to it.  They didn't want to invest the

8   money for proper training.  And when he saw all the videos and

9   talked to the officers, the formations that were being used were

10  nothing he had ever seen, and the officers were moving a crowd

11  with PepperBall only.  In other words, they were shooting

12  people, and that's not something he had ever trained.

13       He testified there was no training on the crowd

14  management manual.  No training on Stinger grenades.  Of the

15  hundreds of DPD supervisors, only seven attended the 2019 crowd

16  control training.  Interestingly, he said that after the

17  protests, he got a copy of Professor Maguire's book.

18       This is a statement of DPD Officer Jesse Trudel, when

19  asked how much training have you received that applies to this

20  type of situation and what happened during the protest?  That we

21  had received four to eight hours of training, which was nowhere

22  near sufficient, nor did it prepare me for this type of

23  incident.  Most of our training revolved around how to don our

24  gear and gas masks.  These are the words of the DPD officers.

25       Technician Grothe, you heard him testify no chemical

20-cv-1878-RBJ    Jury Trial    03-24-2022

1   munitions course, no flash-bang training for crowd control, no

2   Stinger grenade training.

3            Officer Lieutenant Canino, even SWAT not trained to use

4   PepperBall or 40-millimeter in crowd control or protest

5   situations, even though they did throughout the protests.

6   Hadn't been to crowd control training in seven years.  And

7   hadn't been required to do field force training after the police

8   academy for SWAT officers, a long, long time ago.

9            Nick Mitchell, the independent monitor, as we said at

10  the outset of this case what we thought the evidence would show.

11  We then brought Mr. Mitchell here, and what Mr. Mitchell

12  testified is what we hoped he would testify, what we told you we

13  thought he would testify to, even though we hadn't been able to

14  talk to him.

15           The deployment of less-lethal was extremely troubling.

16  He saw them deploying OC spray and PepperBall at people who were

17  only verbally objecting.  In other words, people who were

18  engaged in protected First amendment activity were being shot

19  and sprayed.  Shot in the head.  Shot in the face.  Shot in the,

20  you know.  Deploying chemical gas, impact munitions, after

21  people had dispersed.  You've seen that too.

22           He also talked about seeing officers throw the

23  explosive devices at people and see them explode.  You've seen

24  that as well.  And that they -- DPD deployed the OC spray and

25  munitions in ways that created traffic hazards, which you have

20-cv-1878-RBJ     Jury Trial    03-24-2022

1   seen as well.

2          With respect to the failure to train, Mr. Mitchell said

3   he frequently heard that officers felt a need for greater

4   emphasis on training in crowd management and field force, the

5   things that they had stopped to try to save money.  He talked

6   about people not being certified on the weapons who deployed

7   them, and that DPD never trained with its mutual aid, and never

8   worked with the outside jurisdictions on crowd control that they

9   invited in to help police the protest.

10          They didn't track the less-lethal munitions.  He said

11  that.  Grothe said that.  He talked about how many munitions

12  they used, 33,000 plus PepperBalls, an unknown number of other

13  chemical munitions, because nobody kept track.

14          During Mr. Mitchell's cross exam -- or the exam by

15  Mr. Weiner, there was a suggestion that he had some ax to grind.

16  And you all can be the judge.  Did Mr. Mitchell look like

17  someone who had an ax to grind?  There was also a suggestion

18  that some of the interviewees were disgruntled.  There has been

19  no evidence of that whatsoever.

20          You heard from the Chief Norm Stamper, Seattle, failure

21  in police leadership, a failure in training, failure in

22  supervision, a failure in discipline.

23          And Chief Stamper said that these failures resulted in

24  improper and excessive force, and that the police failed to warn

25  protesters or give clear orders to disperse before using force.

20-cv-1878-RBJ    Jury Trial    03-24-2022

1   In the City's case, you've heard a little bit about how there

2   were a couple occasions when an announcement might have been

3   given.  They have not played a single video for you where it was

4   audible so that citizens knew what was going to happen to them.

5        They have pointed out that there was some curfew

6   announcements, but a curfew announcement is not the same as

7   saying if you don't leave this area, we're going to gas you or

8   shoot you or grenade you.  There was no such announcements, no

9   announcements at all that you must leave this area in a way that

10  anyone heard.  There's no -- been no evidence of that.

11       Chief Stamper talked about the indiscriminate and

12  excessive deployment of force.  Again, the failure to warn

13  protesters or give clear orders to disperse, and the lack of

14  training with other agencies.

15       Interestingly, there was a little bit of an attack on

16  Chief Stamper for what he presided over in Seattle.  And in

17  contrast to what happened here, when he made mistakes, and he

18  acknowledged them in the WTO protests in Seattle in '99, he

19  stepped down.  And he said, I let my officers down, and I let my

20  citizens down, and he took responsibility.

21       Briefly on the mutual aid partners, this is the

22  instruction the judge read to you.  Ms. Wang will primarily

23  cover this.  For us, it relates to Mr. Packard, who was shot by

24  Aurora.  And what Mr. Phelan, Commander Phelan testified is that

25  these agencies operated under his command.  They were working as

20-cv-1878-RBJ     Jury Trial     03-24-2022

1   agents of the Denver Police Department, and Denver takes

2   responsibility for that.  He tried to walk away from that, but

3   that was his testimony.

4           You heard from Jeff. Co. Sergeant Hamilton, and the

5   testimony where he was getting orders as well from the Denver

6   people in charge.

7           And there's no dispute on our side that the protests

8   were large, that they had a significant impact on Denver

9   officers, and that there were people in the crowd at times doing

10  things they shouldn't have.  And policing the protests was

11  absolutely difficult for the officers.  There's no one on our

12  side who disputes that.

13          But what it doesn't do is justify what happened to our

14  clients.  And it was the lack of training and the widespread

15  custom and practice, lack of supervision that led to the

16  violations.

17          About to wrap up.  We've got the claim against Jonathan

18  Christian.  Our first element, we have to show that there is

19  a -- Ms. Epps was deprived of rights under the Constitution,

20  either the First amendment or the Fourth amendment, and that his

21  acts caused it.

22          The evidence shows that Officer Christian deliberately

23  took a knee and shot at a citizen who was walking across the

24  street.  He acknowledges that.  He acknowledged he used force at

25  her.  He disputes that it hit her.  She believes it did hit her.

20-cv-1878-RBJ    Jury Trial    03-24-2022

1  He acknowledges that he intended for her to inhale the

2  PepperBall.  That is a use of force.  It is unjustified.  It's a

3  violation of the Constitution.

4       The judge read you the punitive damages instruction.

5  These are intended to punish a wrongdoer for extraordinary

6  misconduct and to set an example or warning to others not to

7  engage in such conduct.

8       It's when a conduct -- an officer's conduct,

9  defendant's conduct was motivated by evil motive or intent or

10  involved reckless or callous disregard of the federally

11  protected rights of others.  You remember Officer Christian was

12  talking about --

13       (A video was played.)

14       MR. MACDONALD:  You recall what Officer Christian

15  testified the first night.  He's on his RDV, shooting at

16  protesters with their hands up in front of the public library.

17  Then there's a woman walking just a few minutes later across

18  Broadway.

19       (A video was played.)

20       MR. MACDONALD:  That's Officer Christian spraying a

21  woman, pushing her, pepper spraying her in the face while she's

22  holding a sign, pushing her off the roadway, pepper spraying the

23  man who is filming him.  At the end of that night, about 15

24  minutes later, in response to his colleagues' statement about

25  liking shooting people, he makes a joke about shooting citizens.

20-cv-1878-RBJ    Jury Trial    03-24-2022

1    We will close with compensatory damages.  The judge has

2  read that instruction to you.  To compensate folks for their

3  economic losses or injuries, medical, hospital, other expenses,

4  and then noneconomic losses or injuries, including physical and

5  mental pain and suffering, inconvenience, emotional stress,

6  impairment of the quality of life, loss of liberty, and the

7  inability to exercise one's constitutional rights.

8    Our clients have testified to these elements, how these

9  events have impacted them, made them have nightmares, unable to

10  sleep, the pain they suffered, their distrust in police and

11  policing, which would be natural to anyone who had any of these

12  things happen to them, some of whom will live with them for the

13  rest of their life.

14    The judge has given each of you the verdict form.  I'm

15  capable of putting up the Elmo.  I will try this.

16    THE COURT:  You're going to give Ms. Wang some

17  opportunity; right?

18    MR. MACDONALD:  Yes, Your Honor.

19    With respect to Stanford Smith, we ask you to find that

20  we proved a violation of his First or Fourth amendment rights,

21  and that he did so on all three theories.  And we ask you to

22  fill that out in the same way for each of our seven clients.

23    With respect to Mr. Packard, he's the one with the

24  mutual aid agency.  We ask you to conclude that we have proven a

25  violation of his First or Fourth amendment rights on all three

20-cv-1878-RBJ    Jury Trial    03-24-2022

1   theories.  And that when asked whether an officer from a mutual

2   aid jurisdiction violated Mr. Packard's rights while acting

3   pursuant to an official policy, practice, or custom of Denver,

4   the answer is yes.  Denver brought the mutual aid agencies here,

5   embedded their superiors, and Commander Phelan acknowledged that

6   they're responsible.

7          With respect to the damages, we ask you to award

8   Mr. Packard $4.5 million in damages, and for each of our other

9   plaintiffs, $1.1 million, and we thank you for your time.

10          THE COURT:  Ms. Wang?

11          MS. WANG:  Good afternoon.  I know you've had a long

12  day, so I'm going to try to keep this short and snappy.  So, I

13  think that one thing that has to be said is that we have sat

14  here -- you have sat here patiently listening to our case,

15  listening to the defendants' case, and when I have heard the

16  testimony from the defendants' witnesses and the questions that

17  the defense attorneys asked, the City's attorneys have asked of

18  our witnesses, what comes to mind is that saying, who are you

19  going to believe: me, or your lying eyes?

20          And let me give you a few examples.  We have, let's say

21  for instance the incident at 14th and Sherman.  That was on the

22  first night of the protests.  That was the one where Elle Taylor

23  was present and was gassed.  That was the one where Ashlee

24  Wedgeworth and Maya Rothlein were also present as well as

25  Elisabeth Epps.

20-cv-1878-RBJ    Jury Trial   03-24-2022

1        And what did Lieutenant Porter testify to about that?

2   He testified that there were trapped cars on 14th Avenue, and

3   that they could not rescue them until they gassed the crowd at

4   9:10.  Think back to his testimony, and you will have -- you

5   will receive from the Court all the videos, the exhibits, and

6   other things that have been admitted into evidence, and you

7   think back to the video that Ms. Birkholz showed Lieutenant

8   Porter during his testimony, and you look at that HALO camera

9   video, which is Exhibit 525, and you ask yourself whether it

10  looked like there were trapped cars, or whether half an hour

11  before that happened, Lieutenant Porter waved through the cars

12  that were on 14th Avenue.

13       And what does the other evidence show about that

14  particular incident?  What it shows is that Commander Phelan had

15  decided that he was going to give a dispersal order.  The one

16  and only dispersal order we have heard in this entire case about

17  any of the days of protest, a dispersal order that nobody could

18  hear.  What that dispersal order said is you are in violation of

19  blocking the street, and it did tell protesters where to go, but

20  nobody could hear it.

21       And the officers knew that nobody could hear it because

22  there were protesters asking the officers, including a sergeant,

23  Sergeant Beall on the scene whether or not -- what was it, this

24  announcement that they vaguely heard in the background?

25       So, that's -- that's one example.  And let me talk a

20-cv-1878-RBJ    Jury Trial    03-24-2022

1    little bit.  I will go through some of the official policies in

2    this case, and then circle back to the claims of our clients.

3          Mr. Macdonald gave you a -- showed you some of the jury

4    instructions.  And one of them has to do with the official

5    policies of the City of Denver.  So, official policy means a

6    formal policy, such as a rule or regulation adopted by the City

7    resulting from a deliberate choice to follow a course of action.

8    It also includes any actions by Commander Phelan.  So, let's

9    talk about what the official policies are that you've heard

10   about in this case.

11         First, the official policy of the City of Denver was to

12   give officers unlimited discretion to use their less-lethal

13   weapons as they saw fit.  You saw Commander O'Donnell's live

14   testimony as well as his video testimony, that's what he said.

15   How many times did he say it's a guide?  It's flexible.

16   Officers have discretion to do what they need to do, do what

17   they decide is appropriate under the circumstances as long as

18   they can provide some articulation.

19         And we saw, as Mr. Macdonald showed you in his closing,

20   all of the examples of exactly how the officers exercised their

21   discretion on the scene.  That was the official policy of the

22   City of Denver.

23         Back in 2017, the Office of Independent Monitor -- and

24   this is something that Nick Mitchell told you -- told the DPD

25   that the use of force policy allowing officers to use CS gas for

20-cv-1878-RBJ    Jury Trial   03-24-2022

1   a variety of reasons including any situation where an officer

2   could clearly articulate a need for deployment was problematic

3   because it was too ambiguous.  That was years ago.  Did DPD do

4   anything about it?  They did not.

5           A second official policy of the City of Denver was

6   their policy regarding use of force reports.  Lieutenant Pine

7   and other DPD witnesses testified that there was no requirement

8   for officers to complete use of force reports accounting for

9   their uses of force during protests.  And officers knew this at

10  the time, and it was the policy and practice of the City for

11  many, many years, including the hundreds of protests that

12  Lieutenant Porter had been through throughout his long career at

13  the DPD.

14          Now, counsel for the City may get up here, and they may

15  say something about the way in which time works in a linear

16  fashion, and just because you don't fill out a use of force

17  report later doesn't mean that you used force at the time, but

18  the concept is very simple.  And Norm Stamper told you about it.

19  Nick Mitchell told you about it, and Ed Maguire told you about

20  it.  And in fact several of the DPD witnesses admitted this

21  concept as well, including Commander Levens.

22          And the concept is if officers know at the time of the

23  protest or at the time of a particular event that they're going

24  to be required to explain their uses of force, then they will

25  make sure that they use force appropriately, because the normal

20-cv-1878-RBJ    Jury Trial    03-24-2022

1  course is for officers to account for their uses of force, to

2  report it to a supervisor, for a supervisor to review it.

3       None of these things were done, even though at the

4  protests, the City knew that officers may use force at a

5  protest, they had had protests before.  This is also something

6  that the OIM told the City about back in 2014, or years ago.  It

7  was back in 2014, Nick Mitchell said that the OIM made

8  recommendations to the DPD about the inadequacies in the use of

9  force reporting, and DPD did not implement these

10 recommendations.

11      Officers' statements were written weeks after the

12 protest.  They were vague.  They contained boilerplate language.

13 There was a lack of accounting for what was -- what force they

14 used.  You saw this with Officer Christian, Officer Valentine.

15 There was the testimony from Commander Sanchez on that score.

16 And what did the DPD do after the first week of protests?  They

17 decided, oh, no, we are getting complaints about the use of

18 force at these protests, and we need to paper this up.

19      And that was where Commander Sanchez, Division Chief

20 Sanchez, actually, testified about that email chain where the

21 DPD senior leadership decided that they needed to have the

22 officers paper up with their uses of force, and make sure that

23 their reports do not contain any problematic language.

24      Another official policy of the City is body-worn

25 camera.  And this is related, and it's the same concept as the

20-cv-1878-RBJ    Jury Trial    03-24-2022

1   use of force reports.  If officers and every -- this is really

2   undisputed.  DPD witnesses testified about this.  Our experts

3   testified about this.  If officers have a requirement to wear

4   their body-worn cameras during any interaction with a civilian,

5   they know that there will be some objective recording of what

6   happened.

7          And the DPD's policy was that it wasn't required for

8   protests at all.  Despite the fact that BWC has existed within

9   the DPD since 2015, it was not required for protests, and Metro

10  SWAT was not required to have it at all.  And in fact, what

11  Lieutenant Pine testified to was that they considered protests a

12  tactical situation where they didn't want people to know what

13  they were doing.

14         As Norman Stamper and Dr. Maguire testified about, this

15  gutted one of the major accountability mechanisms, and the point

16  is that if officers know they're being recorded, they will tamp

17  down on their uses of force.  In Nick Mitchell's words, they

18  will deescalate.

19         There were no DPD policies at all in the crowd

20  management manual or the operations manual regarding Stinger

21  grenades or flash-bang grenades.

22         And finally, there's the acts of the final policymaker,

23  Commander Phelan.  Commander Phelan made final decisions about

24  the police response to the protests.  He testified to that.  He

25  was responsible for the kettling at the Basilica.  And you heard

20-cv-1878-RBJ     Jury Trial     03-24-2022

1   the radio testimony or the radio communications regarding the

2   kettling.  You will get those too, since it was admitted into

3   evidence, but the City's defense when they were questioning

4   Commander Phelan about the kettling in front of the Basilica,

5   their defense was, well, they could run down this alley, or

6   maybe they could climb that fence, that six-foot tall

7   wrought-iron fence, or maybe they could run towards those Aurora

8   officers and the tear gas they're deploying, or maybe they can

9   run the other way towards the DPD officers that are throwing

10  explosives and grenades at them.

11          That is not a reasonable thing to do.  Commander Phelan

12  knew exactly what he was doing, because not only did he order

13  the officers from both sides to push in on that street, but he

14  was watching the HALO cameras as he was doing so, and he saw the

15  chaos that it caused.  That was an act directly attributable to

16  Commander Phelan.

17          With respect to the mutual aid agencies, as

18  Mr. Macdonald pointed out, Commander Phelan was at the top of

19  the chain of command.  And let me just pull out some pieces of

20  evidence that are important to this.  What you heard from

21  Officer Hamilton, from Jefferson County yesterday -- the days

22  blend together a little bit, but yesterday -- was that there was

23  a DPD sergeant embedded with his unit.  It's undisputed.

24          There's a DPD sergeant, and in fact Chief Thomas said

25  it could have been a sergeant or a lieutenant who was embedded

20-cv-1878-RBJ    Jury Trial    03-24-2022

1   with every DPD unit.  They were giving instruction and direction

2   including direction on what their tactics were and how to use

3   force and how to comply with the rules of engagement that DPD

4   was setting forth for it.

5          Commander Phelan moved around the different teams from

6   mutual aid agencies in exactly the same way that he did with

7   respect to DPD agencies.  And, you know, Commander Phelan tried

8   to walk this back a little bit during his -- during his

9   testimony, but I showed you that those reports from the outside

10  agencies -- Brighton was an example.  Adams County was another

11  example.

12         Those were examples where the agencies said, yes,

13  they're telling us what to do.  They're telling us that DPD

14  policy is that you should use your own use of force policy and

15  your own weapons, and we have verified your use of force

16  policies, and we have verified your weapons, and you're good to

17  go.

18         Not only that, but with respect to Joe Deras,

19  Lieutenant Porter testified that on May 31st at the intersection

20  of Colfax and Washington, there was Jeff. Co. officers, but also

21  half of Lieutenant Porter's unit from the DPD was on the west

22  side of the station at Colfax and Washington.  That's what

23  Lieutenant Porter said.  He also testified that there was

24  another DPD sergeant present, Sergeant Jason Simmons.  So, it

25  wasn't just JCRS, Jeff. Co. Regional SWAT team, at the

20-cv-1878-RBJ    Jury Trial    03-24-2022

1    intersection when Joe Deras was shot.

2            Commander Phelan also specifically authorized numerous

3    uses of force, including he testified that he authorized the use

4    of CS gas at the supervisor briefings.  He authorized it at

5    Lincoln and Colfax on May 28th.  You heard the radio

6    communications for that.  He said, as soon as you get there,

7    launch.  Throw smoke first, then chemical right after.  He

8    authorized gas at 14th and Sherman on the first day.  And he

9    authorized all of his commanders on the ground to use gas as

10   they saw fit whenever they needed to, and so these were also

11   acts of the final policymaker.

12           Finally, ratification.  Ratification is a theory where

13   plaintiffs have to show, you know, that our clients suffered a

14   constitutional right -- a violation of their constitutional

15   rights, and that an individual with final policymaking authority

16   from Denver ratified the officers' actions that deprived the

17   plaintiffs of their rights.  That is the final policymaker knew

18   of and made a deliberate choice to approve the officer's act and

19   the basis for it.

20           And we have a few pieces of evidence for it.  Number

21   one, Commander Phelan, who is right here in the instructions,

22   one of the final policymakers, he testified that officers in the

23   Denver Police Department acted within policy and training during

24   the protests.

25           Number two, we've got the press conference that

20-cv-1878-RBJ      Jury Trial      03-24-2022

1    occurred on May 29th with the mayor and Chief Pazen where they

2    said that they had been watching the video feed for the entire

3    day before, and that they believed the officers acted with great

4    restraint and tremendous restraint.

5           DPD also through its IA process found that many of the

6    actions that took place concerning our clients, including the

7    incidents at Lincoln and Colfax on May 30th, were within DPD

8    policy and training.  You heard that from Commander Levens.

9           Now, let me talk to you briefly about the incidents

10   concerning my plaintiffs.  Let's start with Claire Sannier.  She

11   was the first plaintiff that you heard from, and she was present

12   for numerous days of the protest until she was finally arrested

13   for curfew on June 1st.  She was present when -- and gassed on

14   numerous occasions, including the first day at Colfax and

15   Washington, and the second day on the grounds of the capitol.

16   She was with everyone else at the intersection of Lincoln and

17   Colfax on the 30th, and what she testified to is that I never

18   heard a police officer say a word the entire weekend.  They only

19   spoke through violence.

20          She was present for the Basilica kettling.  She was

21   present for the events of May 30th, which you heard a little bit

22   about from Lieutenant Porter.  Now, remember, on the evening of

23   May 30th, after everybody had been pushed out of the area of the

24   state capitol at Lincoln and Colfax, people broke up into

25   smaller groups.  Claire, Jackie Parkins, and Sara Fitouri, they

20-cv-1878-RBJ    Jury Trial    03-24-2022

1   weren't together, as well as Joe Deras were trying to find a

2   place to go to protest, and then they ended up being chased

3   around in the alleyways.

4        And you saw numerous pieces of evidence of this.  You

5   saw this from Lieutenant Porter, who talked about his caravans

6   where he and his officers would, you know, chase people into

7   alleys and block them off.  He talked about a bunch of curfew

8   arrests that he made on that evening.

9        You heard about this from Lieutenant Chavez, but do we

10  actually have any video for any of that?  No, we don't, because

11  DPD's policy was not to require the officers to wear body-worn

12  camera for any of that.

13       Claire, as you heard, is a software engineer at Oracle.

14  She suffered some -- what she said about her injuries is that

15  each day had some new horror to it.  That it's not the fault of

16  some individual officer.  It's the entire City's response to

17  this protest.  And she said that the whole experience amounted

18  to extreme psychological trauma.

19       Sara Fitouri and Jackie Parkins, they were good --

20  they're good friends, and they were together for a good deal of

21  the protest as well.  They were present for the kettling.  You

22  remember their testimony about being chased in the -- about

23  having to run down the alley during the kettling because they

24  first headed towards the fence, and then they said to

25  themselves, I'm not climbing that fence.  So, they went into the

20-cv-1878-RBJ     Jury Trial     03-24-2022

1   alleyway.

2         Fortunately, it opened up, but it was more tear gas

3   than any of them had ever experienced during all of the days of

4   the protest.  They talked about being chased around in the

5   Capitol Hill alleyways.  They were tear gassed on the grounds of

6   the capitol lawn numerous times.  Sara had a flash-bang go off

7   at her foot at the intersection of Lincoln and Colfax on

8   May 30th.

9         And as far as that day goes, all of my clients were

10  there, Lincoln and Colfax on the 30th.  You saw not only a lot

11  of video and slides from Norm Stamper about that incident, but

12  it was a major event.  We had Claire gassed.  She had a

13  flash-bang go off by her ear.  It injured her eardrum.  Joe

14  Deras also had a flash-bang go off near him, causing severe

15  ringing in his ears.

16        Sara was shot -- or not -- yeah.  Sara was shot with

17  PepperBalls.  Joe was shot with PepperBalls.  Sara had a

18  flash-bang go off at her foot, and Elle also was shot with

19  PepperBalls at the intersection of Lincoln and Colfax.  And

20  think back about the video that you have seen of what was going

21  on at that intersection.  There were people chanting.  There

22  were people kneeling, including my clients, whose photos you saw

23  of them chanting, kneeling, standing with their hands up, the

24  photo of Elle and Claire standing near each other, even though

25  they didn't know it at the time.

20-cv-1878-RBJ    Jury Trial    03-24-2022

1    That's what the protesters were doing at that

2    intersection at that time.  There is no evidence of what the

3    officers, and for instance Officer Cunningham testified about

4    what was happening at that intersection.  If the City had a

5    single video of canned goods or water bottles full of feces

6    being thrown at an officer, you would have seen it.

7    Joe Deras.  Joe Deras suffered very serious injuries on

8    the evening of Colfax -- of May 31st at the intersection of

9    Colfax and Washington.  As he had testified, given his

10   experiences on the evening before at Lincoln and Colfax, seeing

11   his friend Youssef, the guy who was standing on the corner with

12   his hands up being shot 14 times with PepperBalls.

13   It was very concerning to him what had happened to his

14   friend, and so then the next day, when he was at the

15   intersection of Colfax and Washington on the 31st, he -- when

16   the officers began tear gassing the crowd and sending explosives

17   into the crowd because they wanted to break up the crowd,

18   remember Sergeant Hamilton's testimony yesterday when the radio

19   communications were played for him saying that they intended,

20   minutes before Joe was shot in the head with a 12 gauge shotgun

21   full of lead pellets, minutes before that, they had already

22   decided that what they were going to do was to break up the

23   march.

24   So, this story from Hamilton about things being thrown

25   and all this stuff, it's not true.  It's disproven by the radio

20-cv-1878-RBJ    Jury Trial    03-24-2022

1    communications.  It's exactly what my clients testified to,

2    which is they let half the marchers go, and then they started

3    throwing explosives into the crowd to break them up into smaller

4    groups, and Joe decided that he needed to get this tear gas

5    canister away from other protesters, given the injuries he had

6    seen in the days before.

7           He kicked it out of the way.  It didn't go anywhere

8    near the officers.  He was shot in the head, which by the way,

9    is deadly force, and nothing he was doing warranted deadly

10   force.  Fortunately, he was wearing a helmet.  Otherwise, he may

11   have had injuries as serious as Zach Packard did.  And then he

12   was shot in the back, and he was shot in the hand.

13          Joe testified that his physical injuries were the most

14   pain that he had ever felt in his life, and he testified that he

15   was trying to process the days of the protest, but also deal

16   with his own pain and his inability to return to the protest

17   because of his injuries.  It was very hard to understand that

18   police would just start shooting at us in the middle of

19   alleyways and hunting us down through the city like animals.

20          And finally, we have Elle Taylor.  You heard from her.

21   She's a small business owner.  She owns a small coffee shop in

22   Denver.  She protested on the first day, the 28th, and day

23   three, the 30th.  And at the end of the 30th, the day of the

24   30th, she was arrested for curfew, which she had decided to

25   disobey in an act of civil disobedience.

20-cv-1878-RBJ     Jury Trial     03-24-2022

1      But she had gotten onto the highway on the first day,

2    but as she testified, the officers came.  They shot at people

3    who were on the walkway.  You saw the video.  People ran off the

4    highway.  They were getting back onto the walkway, and then the

5    officers started shooting.

6      And by the way, the other clients of mine who were

7    present that day, which actually I think is all of them, they

8    were on the pedestrian bridge.  And there was nothing thrown

9    from the pedestrian bridge.  The City has not shown a single

10   video or provided any testimony from anybody that there was

11   something thrown from the pedestrian bridge.

12     So, the idea that the officers would just shoot at the

13   bridge to get people to go away doesn't make any sense when they

14   knew exactly where people were that they say had been throwing

15   water bottles.

16     Elle was also shot with PepperBalls on -- or

17   PepperBalls in the leg and in the arm on the 30th at Lincoln and

18   Colfax.  And she was gassed on the first day as well at 14th and

19   Sherman.

20     As with Mr. Macdonald, I don't have a copy of the

21   verdict form.  It's okay, because Mr. Macdonald filled it out

22   for you.  So, fill it out exactly the same way.  All right.  I

23   don't have much to show you, because the questions are the same.

24   With respect to Joe Deras, it's got the same structure as with

25   respect to Zach Packard.  We would like you to check yes.  I

20-cv-1878-RBJ    Jury Trial    03-24-2022

1   don't have a pen, but yes in all the boxes.

2           THE COURTROOM DEPUTY:  Do you want me to switch to the

3   Elmo now?

4           MS. WANG:  Yes.  Okay.  So, and our suggestion -- and

5   the same -- the same structure with respect to Zach Packard and

6   Joe Deras is the case, and I don't remember where Joe is in

7   these instructions, but that's okay.  We also suggest that the

8   compensatory damages for our clients, for their nightmares,

9   their fear of the police, the physical and emotional injuries

10  that they suffered, the violation of their constitutional rights

11  is something in the range of 900 to 1.1 million dollars for the

12  plaintiffs, except for Joe, we do ask that you give him more,

13  because of the seriousness of his injuries.  And we request --

14  or we suggest, it's up to you as the fact finders, that you

15  award Joe $2 million.  Thank you.

16          THE COURT:  Mr. Ringel, what would you like to do?

17          MR. RINGEL:  Or Ms. Jordan?

18          MS. JORDAN:  Your Honor, I have more than like five

19  minutes.  So, I will defer to the Court.  I am more than willing

20  to go in the morning.  I probably have somewhere between 30 to

21  45 minutes, and I also need to use the restroom.  Sorry.

22          THE COURT:  That's okay.  All right.  And Mr. Ringel,

23  you're going to have something to say too?

24          MR. RINGEL:  I am not, Your Honor.

25          THE COURT:  Oh.

Kevin P. Carlin, RMR, CRR

20-cv-1878-RBJ     Jury Trial     03-24-2022

1          MS. JORDAN:  Surprise.

2          THE COURT:  Well, we're going to take a break for

3    sure.  Are you tired?

4          JUROR:  I just gotta use the bathroom too.

5          THE COURT:  Well, we have a choice here, and I'm going

6    to let you make the choice.  We can come back in the morning to

7    finish up with the closings.  Because the plaintiff has a

8    rebuttal opportunity also.  I think that makes probably sense.

9    Otherwise we'd go probably to 5:30.  So, tomorrow?

10         JUROR:  Yes.

11         THE COURT:  All right.  9 o'clock tomorrow.

12       (Jury out at 4:34 p.m.)

13         THE COURT:  The jury has been excused.  Anything else

14   anybody needs to put on the record tonight?

15         MR. MACDONALD:  Not for us, Your Honor.

16         THE COURT:  Defendant?

17         MR. RINGEL:  No, Your Honor.  Thank you.

18         THE COURT:  All right.

19       (Proceedings concluded at 4:35 p.m.)

20

21

22

23

24

25

1                        REPORTER'S CERTIFICATE

2

3

4          I, KEVIN P. CARLIN, Official Court Reporter for the

5   United States District Court for the District of Colorado, a

6   Registered Merit Reporter and Certified Realtime Reporter, do

7   hereby certify that I reported by machine shorthand the

8   proceedings contained herein at the time and place

9   aforementioned and that the foregoing pages constitute a full,

10  true, and correct transcript.

11          Dated this 11th day of April, 2022.

12

13

14

15

16                              _____
                                Kevin P. Carlin, RMR, CRR
17                              Official Court Reporter

18

19

20

21

22

23

24

25

                        Kevin P. Carlin, RMR, CRR