1            IN THE UNITED STATES DISTRICT COURT

2                 FOR THE DISTRICT OF COLORADO

3    Civil Action No. 20-cv-1878-RBJ

4    ELISABETH EPPS AND SARA FITOURI, ET AL.,

5            Plaintiffs,

6            vs.

7    CITY AND COUNTY OF DENVER, ET AL.,

8            Defendants.

9    ---------------------------------------------------------------

10                    REPORTER'S TRANSCRIPT

11                    Jury Trial, Vol. 15

12   ---------------------------------------------------------------

13         Proceedings before the HONORABLE R. BROOKE JACKSON,
     Judge, United States District Court for the District of
14   Colorado, commencing on the 25th day of March, 2022, in
     Courtroom A902, United States Courthouse, Denver, Colorado.

15

16                         APPEARANCES
     For the Plaintiffs:
17   TIMOTHY R. MACDONALD and MATTHEW J. DOUGLAS, Arnold & Porter
     Kaye Scholer LLP, 1144 Fifteenth Street, Suite 3100, Denver, CO
18   80202

19   ELIZABETH C. WANG and MAKEBA RUTAHINDURWA, Loevy & Loevy, 2060
     Broadway Street, Suite 460, Boulder, CO 80302

20

21   For the Defendants:
     ANDREW D. RINGEL, KATHERINE HOFFMAN, and ROBERT A. WEINER, Hall
22   & Evans LLC, 1001 Seventeenth Street, Suite 300, Denver, CO
     80202

23
     HOLLIE R. BIRKHOLZ and LINDSAY M. JORDAN, Denver City Attorney's
24   Office, 201 West Colfax Avenue, Denver, CO 80202

25   Reported By KEVIN P. CARLIN, RMR, CRR, 901 19th Street, Room
     A259, Denver, CO 80294, (303)335-2358

         Proceedings reported by mechanical stenography; transcription
                         produced via computer.

20-cv-1878-RBJ    Jury Trial    03-25-2022

1                          I N D E X

2    Closing Argument by Ms. Jordan  . . . . . . . . . . . . 2992

3    Closing Argument by Ms. Wang  . . . . . . . . . . . . 3028

4    Closing Argument by Mr. Macdonald . . . . . . . . . . 3037

5    Verdict by the Jury . . . . . . . . . . . . . . . . . 3047

6    Reporter's Certificate  . . . . . . . . . . . . . . . 3052

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

20-cv-1878-RBJ    Jury Trial    03-25-2022

1              P R O C E E D I N G S

2         (Proceedings commenced at 9:03 a.m.)

3         (Jury in at 9:03 a.m.)

4              THE COURT:  Good morning, ladies and gentlemen.

5    Almost there now.  Ms. Jordan?

6              MS. JORDAN:  Good morning.  And like we just said,

7    you're in the home stretch, and this has been a long three

8    weeks.  Three weeks is a long time for your daily routines and

9    lives to be interrupted, and so on behalf of the defendants, we

10   also appreciate the service that you have given both parties

11   these last three weeks.  A lot has been presented to you, and I

12   am sure you are ready to go deliberate and are sick of hearing

13   from us lawyers.

14             And I can appreciate that, but you also have to

15   understand that I do have some general topics that I need to get

16   to.  And I'm not going to rehash every aspect of this case.  If

17   I did, we would be here another three weeks, and nobody wants

18   that.  So, just please note if there's an aspect of this case

19   that I do not touch upon, it does not mean it's because the

20   defendants concede to it.  It just means that I want to give you

21   a general reminder of how the defendants view this case.

22             This case is about unexpected and unprecedented events

23   that occurred from May 28th to June 2nd, 2020, in Denver.

24   Witnesses called by both sides stated they had never encountered

25   anything like the first five days of the George Floyd protests.

20-cv-1878-RBJ     Jury Trial     03-25-2022

1  Chief Thomas said that the DPD always planned for the worst, but
2  now they learned they had to plan for the unimaginable.   This is
3  like preparing for cold and flu season and COVID hits.
4          Yes, in the past, there had been large-scale
5  demonstrations in Denver, but the City was given advanced notice
6  and lengthy periods of time to prepare for that.   Yes, they had
7  dealt with spontaneous demonstrations in the past.   They had
8  also dealt with demonstrations where some of the crowd targeted
9  their message at the police.   They had even dealt with riotous
10  behavior that occurred in unruly crowds after the Broncos and
11  the Avalanche won championships.   But what occurred during those
12  first five days was an unimaginable combination of magnitude,
13  duration, and violence.
14          We can all agree that during this time, the community
15  was greatly affected as a whole.   You saw photographs, videos.
16  You heard testimony about the level of violence and destruction
17  that happened to the community.   Matt Woods, who was involved in
18  a portion of the repair project, told you that his small scope
19  of work totaled $900,000.   And Nick Mitchell told you that
20  during his investigation, he learned that there was a total of
21  $4 million to the city, including damage to City buildings,
22  businesses, police property, and the state capitol.
23          The Denver Police Department was presented with a
24  challenging task of responding to an extremely chaotic
25  situation, all the while balancing various interests that

20-cv-1878-RBJ    Jury Trial    03-25-2022

1   impacted the community, such as the right for people to

2   peacefully protest, the right of Denver citizens to be free from

3   violence and destruction, the right of people driving cars

4   either on the city roads or on the interstate to not be stopped

5   by protesters in the lane of travel.  There was also the

6   rights -- the business rights to not be destroyed by an angry

7   mob.  And remember, no one has a right to throw projectiles at

8   people, even the police, even if you are protesting the police.

9        Chaos.  That is a word that you heard describe these

10  first five days, not just from the officers, but the plaintiffs.

11  At times, the crowds were numerous.  There were marches.

12  Demonstrations were occurring in different locations at

13  different times.  This was not a simple case of mostly peaceful

14  protesters subjected to chemical munitions because a few bad

15  actors were in the crowd.

16       Nothing about the George Floyd protests were simple.

17  Even Ms. Kelsey Taylor, one of the Fitouri plaintiffs, said

18  that.  Plaintiffs would have you believe that the violence the

19  officers and the community faced was simply half-empty water

20  bottles.  Facts don't cease being facts because you choose to

21  ignore them.  The evidence shows that more than half-empty water

22  bottles were thrown at officers.

23       Because of the magnitude and the mobility of the

24  crowds, the plaintiffs admit that they could not see every

25  action of the people in the crowd.  The 12 plaintiffs deny that

Kevin P. Carlin, RMR, CRR

20-cv-1878-RBJ     Jury Trial    03-25-2022

1   they ever threw objects at the police or destroyed property, but

2   in order to determine if any of their constitutional rights were

3   violated, you need to take into the entire context of what was

4   happening at these locations.

5       Although you must consider the full context when

6   evaluating any actions taken by the officers, it is important

7   for you to focus on what occurred to these 12 plaintiffs in this

8   case, and not the multitude of videos showing officers' use of

9   force on people who are not plaintiffs in this case.

10      Speaking of videos, from the very start of this trial,

11  I told you you were going to see some videos you didn't like,

12  but keep in mind, taking a 50-second clip that shows a use of

13  force without providing the context and justification is

14  misleading.  To determine whether the extent of the force was

15  reasonable and necessary to an officer at the time the force was

16  used, you must look at the totality of the circumstances.  That

17  includes in a crowd setting the overall actions of the crowd.

18  Individual decisions made by police officers do not occur in a

19  vacuum, and cannot be evaluated based on short video clips

20  devoid of context.

21      That is particularly true when one considers the

22  limitations of body-worn camera and the other videos that even

23  the plaintiffs' experts admit exist.

24      I also told you that some mistakes were made and the

25  police response evolved as the days passed.  But mistakes do not

20-cv-1878-RBJ    Jury Trial    03-25-2022

1    equal constitutional violations.  Your job as jurors is to

2    evaluate the evidence that has been presented these last three

3    weeks, and decide only if these 12 plaintiffs' constitutional

4    rights were violated while they were at the George Floyd

5    protests.

6          Now, let's talk -- before we talk about the claims

7    against Denver, let's focus on Ms. Epps' claim against Jonathan

8    Christian.  As you were told, he's the only individual defendant

9    in this case.  You heard from both Ms. Epps and Officer

10   Christian's testimony about this incident.  Ms. Epps told you

11   that she was walking straight at Officer Christian when she was

12   hit by a PepperBall.  Officer Christian explained to you his

13   observations of that incident.  At the time that he deployed a

14   single PepperBall in her direction, he believed that she was

15   obstructing traffic, and you saw the cars traveling on the road,

16   and you heard honking.

17         Ms. Epps' testimony that a single PepperBall hit the

18   inner back part of her left calf as she was walking straight on

19   to Mr. Christian defies basic principles of geometry.  It is

20   also contrary to the effective -- to the objective evidence in

21   this -- in the case that has been presented.

22         And I urge you to look at Officer Hastings' body-worn

23   camera, which is Exhibit 1106.  This video clearly shows that

24   the cloud of PepperBall hit the ground towards Ms. Epps' right

25   side of her body.

20-cv-1878-RBJ     Jury Trial     03-25-2022

1      You also saw the video from Ms. Epps' cell phone, and

2   that one is Exhibit 108.  I don't have the clip.  That's a black

3   screen.  Sorry.  Don't need to look at the screen for it.  You

4   see that she is recording the officers.  You also see her say,

5   he just shot me.  And there's no other reaction.  She doesn't

6   flinch.  Her phone doesn't move.  She doesn't jerk.

7      You heard other plaintiffs testify that a direct hit

8   from a PepperBall was painful, that it was worse than being

9   struck by a paintball, and yet her only reaction was to say, he

10  shot me.  It is for you to conclude that not only did Officer

11  Christian not engage in excessive force, but that there was no

12  force applied at all.

13      She also asserts a First amendment retaliation claim

14  for this incident, and that too fails.  Despite counsel's

15  attempt to establish that Officer Christian could clearly see

16  his cell phone in his hand when he stood at that door while he

17  was in a well-lit courtroom, Officer Christian pointed out that

18  his encounter with Ms. Epps was at night.  They were some

19  distance apart, and he was wearing a gas mask.

20      Counsel argued that the distance between Ms. Epps and

21  Officer Christian was close enough that Officer Christian should

22  have observed the phone in her hand, and yet her recording

23  doesn't pick up his warning to get out of the street.

24      I urge you to look at Officer Christian's body-worn

25  camera, which is Exhibit 613, and you will hear he yells, get

20-cv-1878-RBJ     Jury Trial     03-25-2022

1   out of the street.  Now, let's talk about her physical injury

2   that she's claiming from this.  A single bruise to her left

3   calf, which required no medical treatment, and went away with

4   time.

5            Not only does the objective evidence show that Officer

6   Christian's actions did not violate Ms. Epps' First and Fourth

7   amendment rights, but there's also no evidence that she suffered

8   any damages, and yet her counsel is asking you to award punitive

9   damages against Officer Christian.

10            As the jury instructions inform you, punitive damages

11   are intended to punish a wrongdoer for extraordinary misconduct,

12   and to set an example or warning to others not to engage in such

13   conduct.  One PepperBall does not equal extraordinary

14   misconduct.

15            Moreover, Ms. Epps must prove by a preponderance of the

16   evidence that Officer Christian's shooting of that one

17   PepperBall was motivated by evil motive or intent, or that his

18   conduct was reckless or callous indifference to the federally

19   protected rights of others.  This is an extremely high threshold

20   that cannot be met with one PepperBall that struck the street to

21   the right side of her body.

22            Officer Christian's actions that don't involve Ms. Epps

23   is irrelevant.  You must look at the intent that he had when he

24   deployed his PepperBall system in her direction, and not conduct

25   that he engaged in after that incident.  Therefore, it is

20-cv-1878-RBJ    Jury Trial    03-25-2022

1   appropriate for you to reject Ms. Epps' claims for punitive

2   damages.

3          One moment, please.

4          Now let's move on to the claims against Denver.  This

5   is the bulk of the case.  Plaintiffs' claims against -- in order

6   for the plaintiffs to prevail against the claims against Denver,

7   they must prove first that each of their own -- each plaintiff

8   sustained a violation of their constitutional rights.  They must

9   prove that some custom, policy, or practice of Denver was the

10  specific cause of their alleged constitutional violations.  It

11  is not enough for them to simply prove that Denver employed an

12  officer that violated their rights.

13         But before moving on to the plaintiffs' claims, I want

14  to address some comments or suggestions that were made yesterday

15  to you.  It was argued that a few rocks were thrown at police,

16  but not at the incidences where the plaintiffs were.  It is

17  clear that more than rocks were thrown from the barricade on

18  Lincoln or the crowds in front of District 6.  You heard

19  testimony, you saw video, and you are the judges of the

20  evidence.  So, I ask you to rely on your recollection of what

21  you saw and heard during this trial.

22         Also, it was suggested that if the -- that there was no

23  canned food ever thrown at officers, because there was never a

24  video or picture of it.  If you look at Exhibit 670, you will

25  see that there is a can of food right there on the ground.  So,

20-cv-1878-RBJ     Jury Trial     03-25-2022

1   I ask you, when you look through all of the videos at these

2   locations, check out the ground.  See what sort of projectiles

3   were thrown at officers.

4        Let's talk about Hollis Lyman.  She's asserting claims

5   for events that happened during the first four days of these

6   protests.  It is important to keep in mind that one of the

7   events she's seeking damages includes inhalation of dissipating

8   chemical irritants that were deployed before she arrived and for

9   reasons she did not observe.

10        Ms. Lyman also placed herself in the crowd that

11   constructed the barricade across Lincoln Street on May 30th.

12   This is the same crowd, you will remember, that shot fireworks

13   at the feet of the officers just before 8:00 p.m.  This crowd

14   was not scared.  In fact, you heard them cheer after those

15   fireworks exploded.

16        And yes, there is no evidence to suggest that Ms. Lyman

17   launched projectiles or deployed fireworks at the officers, but

18   the actions of this crowd must be considered when determining

19   the totality of the circumstances as to whether the force used

20   was reasonable and necessary to an officer on the scene.

21        There was deployment -- there was testimony that the

22   deployment at this location of the less-lethal was a result that

23   because as the officers were trying to take this barricade down,

24   objects were being launched at them, even by people that had

25   lacrosse sticks, which you heard testimony about was occurring

20-cv-1878-RBJ     Jury Trial     03-25-2022

1   in this location.

2          Amanda Blasingame and Maya Rothlein both claim they

3   suffered gas exposure while protesting outside of District 6 on

4   May 28th.  You heard at this time and location from Officer

5   Valentine, Commander O'Donnell, and Lieutenant Canino that they

6   were taking projectiles, and this was also shown on the HALO

7   camera or HALO footage, which is Exhibit 532 at 8:30 p.m.

8          Later in the evening, at 14th and Sherman, they were

9   present when smoke and then gas was deployed after dispersal

10  orders were given.  The Colorado State Patrol footage which was

11  Exhibit 7 at 9:15 showed that deployment.  Ms. Blasingame

12  identified herself and Ms. Rothlein in the video that it shows

13  them running away when that initial smoke was deployed, but

14  right before that video was played, Ms. Blasingame told you that

15  she walked right to the area where the smoke was deployed, and

16  that they were present when the gas was there as well, and that

17  is just not what the objective evidence shows.

18          Then there are the incidents that occurred at their

19  home on May 30th.  They claim that Lieutenant Chavez approached

20  them while they were on their stoop, threatened them with pepper

21  spray, but did not deploy.  When evaluating this claim, keep in

22  mind that twice in interrogatories and in depositions, they

23  identified a white male.  The fact that they finally identified

24  who that was at trial needs to be analyzed with scrutiny.

25          Ashlee Wedgeworth.  She's making general claims for

Kevin P. Carlin, RMR, CRR

20-cv-1878-RBJ    Jury Trial    03-25-2022

1   exposure to chemical irritants, and only testified as to two

2   specific incidences.  Her general claims fail, as she cannot

3   establish the elements of the First and Fourth amendment claims.

4   And I will discuss that when we get to the law portion of this,

5   but as for her specific events, one occurred when she was near

6   the bookstore on Colfax and Grant around midnight and

7   PepperBalls were deployed.

8         She did explain that she had seen that there were some

9   people throwing objects at police cars.  And again, she did not

10  engage in that behavior, but you have to look at the totality of

11  the circumstances when evaluating the deployment of the

12  less-lethal.

13        She's also seeking damages for exposure to gas on

14  May 31st at 9:30.  And again, keep in mind that she cannot

15  identify the jurisdiction that deployed these munitions, and we

16  will get to other jurisdictions' conduct in a bit.

17        Now let's talk about Ms. Epps' remaining claims.  She

18  also was present at 14th and Sherman, and that's when we all

19  know the dispersal orders were given.  I'm not going to rehash

20  all of these locations over and over for the plaintiffs, because

21  nobody wants to hear that go over and over again.  But after the

22  14th and Sherman, she continued to protest, and she testified

23  that she was exposed to some gas while she was on the capitol

24  grounds later that night.

25        It is important to remember that Colorado State Patrol

20-cv-1878-RBJ   Jury Trial   03-25-2022

1   was also present during this time, and they were not there at

2   the request of Denver.  They have their own independent duty to

3   secure the capitol.  They also had gas and PepperBalls.  So, it

4   is important for you, whenever evaluating a claim that occurred

5   on capitol grounds, to take that into consideration.

6           And let's not forget the incident where she claims

7   officers shot her phone out of her hand.  She says it broke it,

8   and while broken, it apparently remained hot overnight until she

9   took it to the store to get it repaired or replaced.  She claims

10   the officer targeted her for filming when she was standing in

11   front of a makeshift barrier protesters had constructed with

12   dumpsters, but she cannot identify the officer that deployed

13   that munition that allegedly struck her phone, and she cannot

14   establish that the munition was deployed to stop her from

15   recording.  Rather, the body-worn camera suggests that the

16   PepperBall was deployed to disperse the crowd so that the

17   dumpsters could be removed.

18           Now, the last two Epps plaintiffs are slightly more

19   complicated because they do involve potential claims against

20   mutual aid agencies.  So, let's first talk about Zach Packard.

21   On May 11th, shortly after his arrival, he was near Colfax and

22   Washington.  And he acknowledged that after a canister was

23   deployed, that he did kick it.  You know, whether it was towards

24   the officers or away from the protesters is for you to decide.

25           And he claims that he was struck in the head with a

20-cv-1878-RBJ    Jury Trial    03-25-2022

1   projectile.  And you heard during this trial, and you will see

2   on the verdict form that Mr. Packard's incident involves actions

3   taken by Aurora police officers.  As you heard yesterday, as you

4   will see in the jury instructions, and you know all I'm going to

5   talk about it here with you in a little bit, actions taken by

6   outside agencies cannot just automatically be put onto Denver

7   because Denver asked for its help.

8        You will have to make a decision on if an outside

9   agency's officer took action that violated one of these

10  plaintiffs' constitutional rights, that it was done under a

11  practice, policy, or custom of Denver.

12       Now, Stanford Smith.  Dr. Smith's main claim is that he

13  was pepper sprayed in the face.  The parties dispute the agency

14  that was involved in this incident, and you will have to decide

15  who it was, but Dr. Smith admitted that he had a lawsuit against

16  Aurora for the same event.  He testified that while he walked

17  back and forth in front of the line of officers, he did not

18  observe their uniforms, and he did not know what agency was

19  there.

20       I encourage you to look at the body-worn camera of

21  Officer -- Aurora Officer Redfearn, which is Exhibit 338.  His

22  body-worn camera around 7:09 p.m., which was about -- the math.

23  You know how good we are with the math.  About 24, 25 minutes

24  before Dr. Smith's incident shows that officers from Aurora were

25  in that location.  It also shows that many of those Aurora

20-cv-1878-RBJ    Jury Trial    03-25-2022

1   officers had on protective gear that covered their shoulders,

2   and would cover those patches that you heard about the testimony

3   throughout this trial.

4         You also heard testimony that the gang unit, Denver's

5   gang unit was at the intersection of Colfax and Lincoln, not in

6   the middle of Colfax where this incident occurred.  And by

7   middle of Colfax, I mean between Lincoln and Broadway.

8         You also heard that Denver SWAT team was there, and

9   they wear the green uniform.  And so it's up for you to evaluate

10  the evidence and determine which agency was involved in

11  Dr. Smith's incident.

12        And then also remember that 20 minutes later, after he

13  was sprayed, he resumed walking in front of that police line.

14  And I encourage you to look at Aurora Officer Woodyard's

15  body-worn camera, which is Exhibit 3131.

16        Oh.  Sorry.  I forgot the screen of Exhibit 338.  And

17  this shows you that protective gear that's covering his

18  shoulder.

19        Now, moving on to the next group of plaintiffs, the

20  Fitouri plaintiffs.  Let's talk about Claire Sannier.

21  Ms. Sannier was present near I-25 when protesters took the

22  highway.  She acknowledged that she did not take the highway,

23  because she believed that was unsafe.

24        In fact, the HALO footage, which is Exhibit 530, shows

25  you just how unsafe this event was.  The deployment of

20-cv-1878-RBJ     Jury Trial    03-25-2022

1   less-lethal in this area was not to silence protesters.  It was

2   to get people to leave the area so they did not return onto the

3   highway.  Counsel tried to downplay that projectiles were thrown

4   at officers during this encounter, but remember the testimony of

5   Lieutenant Canino.

6        He was there when one of the officers was hit on the

7   hand, and the impact caused a significant cut.  The officer was

8   bleeding profusely.  They had to apply pressure to the wound

9   until an ambulance arrived.  Plastic water bottles don't cause

10  injuries like that.

11       She was also present at many of the same locations as

12  the other plaintiffs, and when evaluating her claims, remember,

13  she was often near crowds displaying violent and destructive

14  behavior.  And there is no evidence that she ever engaged in

15  violent or destructive behavior.  There's no evidence that she

16  ever threw anything, but again, it's the totality of the

17  circumstances in the locations where she was when that force was

18  deployed.

19       She does have one claim that is unique to her, and that

20  was May 29th, I believe, at 16th and Cleveland.  And you will

21  remember this.  There was an incident in which two gentlemen

22  were yelling at officers, and a couple comes in, and then they

23  start yelling at each other, and then there's a deployment of

24  PepperBall.

25       And she's filming this.  And I encourage you to look at

20-cv-1878-RBJ    Jury Trial    03-25-2022

1    Exhibit 101b, because this video is several minutes long.  She

2    has been recording them for a long time, and she is struck with

3    a PepperBall at the end, but she cannot identify who that

4    officer was.  She cannot determine -- she cannot determine if

5    that PepperBall hit her intentionally or negligently.

6          Ms. Taylor, she admitted to getting onto the lanes of

7    I-25.  She also places herself in locations where it was

8    testified to repeatedly by officers that they faced violence

9    from the crowd, like on May 30th at 7:00 p.m. at Colfax and

10   Lincoln.

11         Similarly, she cannot identify the officers -- oh.

12   Sorry.  We all remember the picture of the protesters on the

13   highway.  She was one of them.

14         She also placed herself near 14th and Sherman on

15   May 30th, the same location where Officer Cunningham testified

16   and you saw on her body-worn camera -- or you saw on Officer

17   Bishop's body-worn camera, which was Exhibit 3151, of the

18   makeshift explosion that was deployed by that crowd.  There is

19   no evidence that Ms. Taylor threw anything or was violent and

20   destructive, but again, we go back to it, the totality of the

21   circumstances involved with that crowd and that location.

22         Now we have Sara Fitouri, Jackie Parkins, and Joe

23   Deras.  Group them together because they were generally in the

24   same locations at the same time.  We know from Mr. Deras' video

25   that they supported the protesters taking the highway.  On

20-cv-1878-RBJ     Jury Trial     03-25-2022

1   May 29th, Ms. Fitouri and Ms. Parkins claim that they were

2   exposed to gas repeatedly.  Mr. Deras was not present for these.

3   Neither can identify the officer or the agency, and this is

4   important, because they're making claims that on 5/29 they had

5   exposure to gas while they were on capitol grounds.  That could

6   have been Colorado State Patrol.

7          On May 30th, all three were present at the intersection

8   of Colfax and Lincoln between 8:00 and 6:00 p.m.  And you've

9   seen lots and lots of video.  You've heard lots and lots of

10  testimony of what was going on in that timeframe at that

11  location.

12         And then there's the incident that occurred in the

13  parking lot of the Colorado Education Association.  They claim

14  that while they were there, officers pulled up on Colfax,

15  started shooting PepperBalls in their direction.  The videos,

16  which are Exhibit 989 and 3032, show that no officers ever

17  entered that property, nor was any PepperBall ever fired at

18  them.

19         And then there's May 30th, 2020.  You saw the HALO

20  footage of the march down Colfax.  You saw Mr. Deras kick not

21  one, but two canisters in the direction of the officers.  And

22  you also had Sergeant Hamilton admit -- that's not the stylus --

23  that this row of officers was Jefferson County Regional SWAT.

24  He also told you that while they were assisting Denver, that

25  they were acting under their own use of force policy, and under

20-cv-1878-RBJ    Jury Trial    03-25-2022

1    their own -- their own customs and practices.

2            And let's not forget the unruliness of that crowd.

3    This is the person who was shooting fireworks at officers.  And

4    if you remember that video, it had -- at the very end it had one

5    that misfired and either almost struck or did strike a

6    protester.

7            Now, I told you I wanted to talk to you about the

8    outside agencies, and we have already covered why it's important

9    if Colorado State Patrol is the one that deployed chemical

10   munitions that these plaintiffs were exposed to, they did that

11   without any request from Denver.  You did hear Commander Phelan

12   say that at times they had to coordinate efforts, but they were

13   not there at the request of Denver.

14           So, what about the jurisdictions that came in at

15   Denver's request?  You know we like our jury instructions, so

16   let's look at one of them.  Jury instruction 18.  This addresses

17   the potential liability for the assistance to Denver.  You

18   learned that starting on May 29th, 2020, and for the days that

19   followed, Denver requested mutual aid from other jurisdictions.

20           For the purpose of this trial, you mostly heard about

21   Aurora and Jeff. Co. Regional SWAT.  You heard that supervisors

22   from outside jurisdictions attended the daily briefings and were

23   informed of the rules of engagement.  At times, some of their

24   supervisors were in the control post -- or the command post.

25           Commander Phelan did acknowledge that those outside

1    agencies were acting under his direction, but he also said that

2    they were acting pursuant to their own policies and their own

3    procedures.  Yes, Denver assigned sergeants and lieutenants as

4    liaison to this group.  That is so that they could stay in

5    communication.

6         And then there's this game of semantics that you heard

7    during this trial.  Counsel pulled out after-action reports from

8    other jurisdictions in which they said that Denver told these

9    people where to deploy.  Commander Phelan said what that meant

10   was that -- where to deploy in location, not when to deploy

11   their munitions.

12        Every outside jurisdiction has its own use of force

13   policy, and all were instructed to act within the compliance of

14   those policies.  Sergeant Hamilton told you that.  And remember,

15   Denver did not pay these other jurisdictions for their

16   assistance.  There were no written agreements with these

17   agencies, and Denver never accepted the liability that could

18   result from their actions.

19        And yes, Denver did not conduct any joint training

20   sessions with outside agencies between May 26th and May 28th,

21   because three days is not ample time to coordinate such

22   sessions, and Denver had not anticipated the need to call in

23   assistance for these protests.

24        Now, the lovely jury instruction.  Why is this

25   important?  Because as I said earlier, to hold Denver liable for

20-cv-1878-RBJ    Jury Trial    03-25-2022

1    the acts of these other officers, those officers must have been

2    acting pursuant to an official policy or a practice or custom of

3    Denver.

4            Let's talk about the First amendment claims.  Jury

5    instruction 11.  Plaintiffs must satisfy all three of these --

6    all three of these elements in order to succeed on their claims.

7    Plaintiffs first cannot satisfy element two.  And why is that?

8    Because the plaintiffs must prove that the officers' actions

9    would chill a similarly-situated person of ordinary firmness

10   from continuing to engage in a protected activity.

11           You've heard testimony that many of these plaintiffs

12   came back day after day, despite the fact that police had

13   deployed chemical munitions.  As the jury instruction states,

14   you should only consider whether the officers' actions would

15   deter an ordinary person in the plaintiffs' circumstances.  The

16   fact that thousands of other people returned day after day is

17   something that you should consider when evaluating this element.

18           Now, it's time to address why it's important that the

19   plaintiffs cannot identify the officers that deployed the

20   munitions for which they are claiming their exposure.  The

21   importance relates to this element.  Element three.  Plaintiffs

22   cannot identify the officers that claim -- they claim deployed

23   the less-lethal, and therefore, they cannot prove that their

24   participation in the protected activity was a substantial or

25   motivating factor in the officers' decision to take action

Kevin P. Carlin, RMR, CRR

20-cv-1878-RBJ     Jury Trial     03-25-2022

1  against them.

2          Even for the event claimed by Ms. Sannier at the corner

3  of 16th and Cleveland, as I talked about, there is no evidence

4  to suggest that that was intentional or that she was hit by an

5  errant PepperBall that was aimed at other people.

6          And while you're evaluating this claim, remember the

7  testimony that you heard from the officers who testified that

8  they deployed their less-lethal in response to violence and

9  destruction, not because of the protected activities that these

10  12 plaintiffs were engaging in.

11          Fourth amendment claims.  Another jury instruction.

12  Jury instruction number 12.  This jury instruction provides you

13  the elements that the plaintiffs need to establish in order to

14  prevail.  Again, they must meet all three elements to prevail.

15  The first element states that plaintiffs must prove that an

16  officer either intentionally applied force against them, or

17  restricted the plaintiffs' freedom of movement through a show of

18  authority.

19          So, let's talk about that first part.  The plaintiffs

20  need to prove that the person that used that force intended to

21  harm them.  They cannot do that if they don't know who it was.

22  But they also have to prove that they intentionally applied that

23  physical force to the plaintiff.  If an officer's intent was to

24  impact a bad actor to the crowd and miss, striking one of the

25  plaintiffs, that is not an intentional application of the

20-cv-1878-RBJ     Jury Trial     03-25-2022

1    physical force to that plaintiff.

2            As for the alternative one, B, plaintiffs must prove

3    that the officer restricted their freedom of movement through

4    the show of authority, and the majority of these plaintiffs

5    testified that they were able to leave the locations where the

6    munitions were deployed and continue to protest.

7            Now, let's shift to the second element, the force used

8    was unreasonable.  The instruction tells you to consider all of

9    the circumstances and that you must decide whether an officer's

10   use of force was unreasonable from the perspective of a

11   reasonable officer facing the same circumstances that the

12   officer that you're looking at his actions faced.  This means

13   that you must make a decision based on what the officer knew at

14   the time of the use of force, and not based on matters learned

15   after that use of force.

16           To evaluate this element, you must review the testimony

17   of the officers and the reasons why they stated they deployed

18   their less-lethal.  Many testified that they could not single

19   out bad actors, that at times the crowd was violent, posing

20   significant safety risks to the officers and other protesters in

21   the group.

22           Now, I want to talk about the expert opinions.  Let's

23   start with former Chief Norman -- former Chief Norm Stamper.  He

24   is the shining example of do as I say, not as I did.  Back when

25   Stamper -- or when Chief Stamper was the Seattle chief of

20-cv-1878-RBJ     Jury Trial     03-25-2022

1    police, he handled the WTO.  This was a protest that was planned

2    for months with communication with organizers, and yet chemical

3    munitions were deployed.  He testified that he resigned days

4    later, because he felt he failed the officers and the community.

5            On cross examination, though, he admitted in one of his

6    depositions of the many lawsuits that followed -- that were

7    filed against him and the City of Seattle as a result of the

8    police response to the WTO, that he stated his officers with the

9    Seattle Police Department, and I quote, did an extraordinary job

10   against all odds, and that he personally witnessed what he

11   called remarkable restraint.  He also admitted that his officers

12   were accused of the same thing he is now accusing the Denver

13   Police Department of.

14           He also told you that during the WTO that he identified

15   three groups of protesters, and he acknowledges that those three

16   groups still exist today.  First group, those who were assembled

17   to peacefully protest and express their opposition to the WTO.

18   Two, another category of people who were engaged in destructive

19   and violent activities.  And three, a third category he called

20   recreational rioters.

21           Chief Stamper admitted that these three types of people

22   were mixed in the crowd in Seattle, and have been mixed in

23   crowds since -- and has been mixed in crowds since then, and

24   that the tactics are used by the non-peaceful protests to make

25   it difficult for the police to differentiate between who is

20-cv-1878-RBJ    Jury Trial    03-25-2022

1   being violent and who is being peaceful.

2          Keep in mind, he is a hired hand, and his opinions

3   should be viewed with that in mind.  He admitted that he has

4   never worked as a defense expert.  After leaving the policing

5   world over 20 years ago, he wrote a book about a crisis in

6   policing in the United States.  It is clear his lens is critical

7   of the police.  In his own words he told you, I see the world

8   through my own filter.

9          Chief Stamper has his own viewpoint about policing in

10  the United States, and his opinions in this case are based on a

11  biased viewpoint.  He did not set out an -- he was not set out

12  to do an analysis of what occurred during the protest in an

13  objective way.  His opinions are based on his preconceived

14  notion about the crisis in policing in the United States.

15         He did acknowledge -- or he did not even acknowledge

16  the difficulties faced by the police in responding to these

17  protests, the violence, or the chaos.  Chief Stamper ignores the

18  overall context of the protest as explained to you by the

19  witnesses who were actually present during the time here in

20  Denver.

21         You heard from Commander Phelan and Chief Thomas of the

22  challenges the command post faced on a daily basis.  You heard

23  from Commander O'Donnell, who was on the line and described the

24  challenges that the officers faced.  So, you should consider

25  when weighing Chief Stamper's testimony that he has not actually

20-cv-1878-RBJ     Jury Trial    03-25-2022

1  policed a protest since the 1970s.

2          He was given videos that were provided by counsel, and

3  was told that he saw everything that he needed to see.  He never

4  listened to the radios.  He never addressed any of Denver's

5  actual policies, and yet was able to opine as to their practices

6  and patterns.

7          Stamper -- Chief Stamper could not find one positive

8  aspect of the Denver Police Department's response to the

9  protest.  He did not analyze anything from the perceptive [sic]

10 of the police, and he acknowledges confirmation bias.  And he

11 never once pointed to any evidence that established that the

12 Denver Police Department leadership knew of any problem or issue

13 prior to the George Floyd protests in the areas that he now

14 criticizes the department.

15         Let's move on to the professor, Ed Maguire.  Aside from

16 three summers as a seasonal officer on Cape Cod, he has never

17 been an actual police officer.  He's never attended the academy.

18 And he was never trained on either field force or crowd control.

19         He is a professor who wrote a manual.  And it was

20 suggested that this manual was provided to Denver, but after the

21 George Floyd protests.  He has no idea if any of the

22 jurisdictions throughout the country have ever adapted to any of

23 his concepts, but he is willing to testify and offer his ideas

24 for compensation.

25         He evaluated the written training materials on

20-cv-1878-RBJ     Jury Trial     03-25-2022

1   less-lethal training and told you that Denver failed to train

2   its officers on potential significant injuries that these

3   systems could cause.  But as you heard on cross examination, and

4   you will see if you look at those operating course slides that

5   there are numerous slides that address the significant potential

6   injuries that are caused by less-lethal munitions, including

7   death.  They are trained on that.

8        While he criticizes the lack of discipline for the

9   conduct that occurred during the George Floyd protest, he could

10  not provide you with any specifics about Denver's discipline

11  process.

12       He admitted that there were individuals -- that there

13  are individuals that attend numerous protests and have become

14  skilled at engaging in violence and using a peaceful crowd as

15  cover.

16       The plaintiffs also heavily rely on the investigation

17  by the independent monitor, Nick Mitchell -- or the former

18  independent monitor, Nick Mitchell, and those OIM memos.

19       John Coppedge came in here, and he provided you with

20  context about his interview that is clearly not captured in

21  those memos.  He explained that he was not even present at the

22  George Floyd protest, that Mr. Mitchell offered him a host of

23  hypotheticals.  Mr. Mitchell often tried to stir the

24  conversation or direct the conversation back to the use of

25  PepperBalls, even though Mr. Coppedge told you he was not

20-cv-1878-RBJ     Jury Trial     03-25-2022

1   certified on it, and he told Nick Mitchell, I am not certified

2   on this system.

3          None of that information is in that memo.  And based on

4   his memo, or based on the memo of his interview, he told you

5   that he felt that OIM memo was more of a statement of the person

6   who typed it than it was his.  And he suggested that he thought

7   there was an obvious agenda in his interview.

8          So, when reviewing these memos that have been admitted

9   into evidence, remember, they lack context, and they should be

10  taken with a grain of salt, unless the person who was actually

11  interviewed can provide you with that context.

12         And it's not surprising that Mr. Mitchell was critical

13  of the police response.  You saw many officers get up on that

14  stand and watch videos that they had only seen for the first

15  time on that stand, and many of them told you that although they

16  could not make a decision on whether it was in policy or not,

17  because it was just a video clip, they told you they thought it

18  was concerning and should be looked at.

19         And yes, mistakes were made.  What happened those first

20  five days were unimaginable, and because of that, corrections

21  were made.  Sergeant Knutson told you that now there is a

22  16-hour crowd control course for everyone.  Technician Grothe,

23  he improved his inventory skills.  He acknowledged on the stand

24  that yes, he could have done better tracking those inventories,

25  and now he is.  And he also explained to you why there was not a

20-cv-1878-RBJ    Jury Trial    03-25-2022

1    standardized course for chemical -- or for the air -- you know,

2    the chemical munitions, because it hadn't been used in protests

3    for years, and they prioritized the PepperBall and the

4    40-millimeter, because officers used that on patrol.

5          He had every intention of standardizing that.  You also

6    heard that there was supposed to be crowd control training in

7    the spring of 2020, because it was an election year, but COVID

8    canceled that.

9          And Chief Thomas, he told you that during those days,

10   they learned to make that buffer zone between the officers and

11   the protesters to be greater.  He also said that when they

12   learned that the 40-millimeter was not an effective tool for

13   crowd control, they took it off line.

14         Now, quickly, I want to focus on the Denver witnesses

15   that you heard from.  These are the people who were actually

16   involved in the response.  Commander Phelan had a 40-year career

17   with the Denver Police Department, and he has extensive

18   knowledge and experience with crowd control.

19         You also heard from Chief Thomas, from Commander

20   O'Donnell, and numerous lieutenants that have over 20 years of

21   experience.  I'm not going to go into their testimony, but

22   remember what they told you about the experience that happened

23   in real time, in real life.

24         The jury instructions we have reviewed -- don't worry,

25   I'm not going to pull them back up for you -- tell you that the

20-cv-1878-RBJ     Jury Trial     03-25-2022

1   actions of the officers must be viewed not from hindsight, but

2   from the perspective of a reasonable officer at the time that

3   force was used.  The decision to use force must be based on what

4   they knew and what they faced, and not based on matters that you

5   learn after the fact.

6        It is inappropriate to view the conduct of these

7   officers with the lens of hindsight.  The issue is not what

8   someone can -- or hear now when the video is played over and

9   over when it's slowed down, when captions are put on it.  What

10  is really at issue here is the real life split-second decisions

11  made by human beings, and whether those decisions made at the

12  time were objectively reasonable.

13       We're getting into the home stretch.  Okay?  We gotta

14  talk about those claims against Denver, those policy, practices,

15  and procedures.  These are the -- the claim -- these were -- you

16  heard all about this yesterday, and I'm sorry.  You're going to

17  see some more jury instructions.  Okay?  But these are the jury

18  instructions 14, 15, 16, 17, and 18.

19       And these jury instructions are complicated.  When you

20  look at them, you might feel like you need a roadmap, because it

21  tells you to go all over the place.  Same with the verdict form.

22  If you find this, you go here.  If you find that, you go there,

23  da da da da blah blah.  So, you need to look closely at the

24  language and carefully apply the facts to the law as stated in

25  the jury instructions.  There are a few issues respecting the

20-cv-1878-RBJ      Jury Trial     03-25-2022

1   plaintiffs' claim about Denver that I want to discuss with you.

2          First, it is not simply enough for the plaintiffs to

3   prevail on their claims against Denver because they prove that a

4   Denver police officer or even someone from a different

5   jurisdiction who you might find was an agent of Denver violated

6   the plaintiffs' constitutional rights.  As you already know, the

7   plaintiffs have to prove more than that.  They each have to

8   prove that their constitutional rights were violated by some

9   custom, practice, or policy of Denver.

10          Plaintiffs have identified multiple theories that they

11  seek to use to establish such an action against Denver.

12  Examination of plaintiffs' theories demonstrate the evidence is

13  just not there to establish any action fairly attributed to the

14  City of Denver actually caused the violation of any of these

15  plaintiffs' constitutional rights.

16          Now, like I said, it's complicated, so the best way

17  that I can think of to explain this to you is to use an example.

18  And to use that example, I am going to use Ms. Epps' claim

19  against Officer Christian.  And so -- and this analysis that I'm

20  giving you, you can use for each plaintiff and for each time

21  that they're claiming their constitutional rights were violated.

22          Instruction 15, the official policy, custom, and

23  practice.  Under this theory, initially, plaintiffs are

24  required -- or under this theory, using the example that I have,

25  Ms. Epps would be required to prove that Officer Christian

20-cv-1878-RBJ     Jury Trial     03-25-2022

1   violated her rights by deploying the PepperBall.

2          If she or the other plaintiffs meet this hurdle, they

3   also have to establish that Officer Christian's actions in

4   deploying the PepperBall towards Ms. Epps was not just his own

5   individual decision under the circumstances he faced.  Instead,

6   the plaintiffs must prove that Officer Christian or any of the

7   officers that they're talking about, acted pursuant to an

8   official policy or practice or custom of Denver.  In other

9   words, something Denver itself did was why Officer Christian

10  decided to deploy his PepperBall towards Ms. Epps.

11         Finally, plaintiffs have to prove Denver's official

12  policy, practice, or custom was the moving force that caused

13  Officer Christian to deploy his PepperBall, and thereby injure

14  Ms. Epps.  And again, this example can be used for each of the

15  plaintiffs when you're analyzing their claims.

16         Failure to train.  Under this theory, once again,

17  plaintiffs are required to prove that Officer Christian violated

18  Ms. Epps' constitutional rights by deploying the PepperBall.  If

19  the plaintiffs meet that burden, they also have to establish

20  that the reason Officer Christian deployed the PepperBall

21  towards Ms. Epps was because of a specific and identifiable

22  deficiency in Denver's PepperBall training that Officer

23  Christian received.

24         Further, plaintiffs have to prove the deficiencies in

25  Officer Christian's PepperBall training was the moving force for

20-cv-1878-RBJ    Jury Trial    03-25-2022

1   why Officer Christian made his decision to deploy that

2   PepperBall.  If plaintiffs can meet all of these requirements,

3   they also must prove that Denver was deliberately indifferent to

4   the deficiencies in the PepperBall training.

5           Deliberate indifference, as the instruction says,

6   requires actual or constructive notice by Denver of specific

7   deficiencies in training on PepperBall.  Again, this same

8   analysis can be used for the deployment of other chemical

9   munitions, for the 40-millimeter system, or for other incidents

10  that involve PepperBall.

11          You heard a lot about the training received, and I am

12  not going to rehash it, but when evaluating the training

13  provided, I urge you to draw from the testimony of what the

14  officers said they received, what Sergeant Knutson told you, and

15  what Technician Grothe told you.

16          And the third theory, plaintiffs' ratification theory.

17  Under this theory, once again, plaintiffs have to prove Officer

18  Christian violated Ms. Epps' constitutional rights by deploying

19  the PepperBall.  In addition, under the ratification theory,

20  plaintiffs have to establish that a final policymaker of Denver,

21  who in this case is either Mayor Michael Hancock, Chief of

22  Police Paul Pazen, or Commander Patrick Phelan.  That they knew

23  of and specifically made a deliberate choice to approve Officer

24  Christian's acts and the basis for it.

25          Here, there is simply no evidence to suggest that any

20-cv-1878-RBJ    Jury Trial    03-25-2022

1  of these three people were specifically aware of Officer

2  Christian deploying PepperBall on any of -- PepperBall towards

3  Ms. Epps.  And all the relevant circumstances of this event,

4  based on such knowledge, that they specifically approved of his

5  actions.

6         Plaintiffs have told you that Chief of Police Pazen and

7  Michael Hancock ratified all of the actions of the officers

8  based on comments in a press conference.  The comments do not

9  support a ratification claim.  The press conference occurred

10  after the first day of the protest.  It was the morning after.

11  One cannot ratify conduct that has not happened yet.

12         Now let's talk about damages.  Only if -- only if you

13  find that one or more of the plaintiffs' constitutional rights

14  were violated do you turn to the issue of damages.  If you end

15  up discussing damages, look at jury instruction four, and

16  remember, plaintiffs can only recover damages for the violations

17  of their constitutional rights, not the violations that you

18  might find for people that are not plaintiffs in this case and

19  are unrelated.

20         So, let's talk about these plaintiffs' damages.  Oh.

21  We went too fast.  Sorry.  I guess you know I'm almost done;

22  right?

23         Yesterday, the Epps plaintiffs asked you to award

24  $1.1 million to each one of them, except Mr. Packard, who asked

25  for an award of, I believe it was north of 4 million.  The

20-cv-1878-RBJ    Jury Trial    03-25-2022

1  Fitouri plaintiffs asked you to award 900,000 to $1 million to

2  each of them, except Mr. Deras, who asked for 2 million.

3         Should you find yourself in a position to award

4  damages, the damages in this case do not support those amounts.

5  Excluding Mr. Packard and Mr. Deras, these plaintiffs are asking

6  you to award each one of them over a million dollars for bruises

7  and temporary exposure to chemical munitions.  None of these

8  plaintiffs have provided evidence of economic losses.  They have

9  no medical bills.  And again, keeping Mr. Packard out of this,

10 they have no medical bills, no lost wages.  There is no evidence

11 that any of them will suffer future medical expenses or future

12 lost wages.

13        You heard these plaintiffs talk about emotional

14 distress they experienced after the protest.  Nightmares,

15 anxiety, depression, some of which claim they continue to go on

16 to this day.

17        Ms. Sannier, she acknowledged that she did some therapy

18 that she got for free, and she also has been doing EMDR.  None

19 of the bills for that treatment were ever presented into

20 evidence.

21        Ms. Blasingame, she told you that, you know, after the

22 protest, she talked about her experience in one of her sessions

23 with an already-existing relationship with a counselor.  And

24 Mr. Deras, yes, he continues to this day to get talk therapy,

25 and -- but he has not provided any evidence to support any

20-cv-1878-RBJ   Jury Trial   03-25-2022

1   damages for what that might have cost.

2          The rest, they sought no mental health -- no mental

3   healthcare.  And that is what's called a failure to mitigate.

4   The plaintiffs have a duty to take reasonable steps to address

5   their alleged injuries, and a reasonable person, if they are

6   aware that they suffered a physical or traumatic injury, would

7   seek some sort of intervention.

8          Assuming you find anyone has actual injuries, and

9   assuming you find that they have failed to mitigate it, then you

10  take that instruction into consideration.

11         Mr. Packard is asking for four -- just north of

12  $4 million.  He is the only plaintiff that has submitted proof

13  of his economic losses, and his medical bills were admitted into

14  evidence.  But what he didn't admit, he didn't admit any

15  evidence of lost wages.  He didn't admit any evidence of future

16  care.  He didn't admit any evidence of future lost earnings, and

17  that must be considered if you decide to go to the issue of

18  damages for him.

19         And as previously discussed, it is contended that

20  Aurora's officers are the ones that deployed the less-lethal

21  that struck him.

22         And Mr. Deras, he's asking you for an award of

23  $2.2 million.  And similarly, he did not provide any evidence of

24  economic damages to support such an amount.  I'm not going to

25  stand up here and show you how to fill out a verdict form.  You

20-cv-1878-RBJ    Jury Trial    03-25-2022

1   got enough of that yesterday, but what I will tell you is if you

2   get to the issue of damages, to look at the jury instruction,

3   which of course I didn't write down or put up, but that talks

4   about damages.  And what you need to do, if you get to the issue

5   of damages, is to award what is reasonable for the injuries that

6   are claimed.

7        I remind you that you are the judges of the facts.  It

8   is your duty to evaluate the evidence and rely on your

9   recollection of the testimony and determine who you believe.  As

10  you heard -- or as you head into the deliberations, remember

11  jury instruction number seven that says some of the incidents

12  were captured on the video, and some were not.  You do not need

13  video evidence of a fact for that fact to be proven, even if

14  counsel tells you otherwise.

15       To wrap this up, the police response to the George

16  Floyd protests was not to suppress these 12 plaintiffs'

17  constitutional rights.  Rather, the violence and destruction

18  occurring around the community required intervention and a need

19  to suppress the dangers to the community.

20       Chief Thomas told you that he was angered by the fact

21  that the message of the peaceful protesters was muted by the

22  agitators.  Remember, you should only consider the totality of

23  the circumstances, all the while focusing on the incidents that

24  involve these 12 plaintiffs, and not actions taken on

25  individuals who are not parties to this lawsuit.

20-cv-1878-RBJ    Jury Trial    03-25-2022

1       It's been a long three weeks, and I appreciate all of

2  your attention.  And on behalf of the City and County of Denver,

3  Officer Christian, and my co-counsel, we thank you for your

4  time.  Oh.  Yeah.  Here.  Thank you.  You guys already saw that

5  one.

6       THE COURT:  All right.  Rebuttal?

7       MS. WANG:  Good morning.  Maybe let's start with the

8  responsibility of Denver for the mutual aid agencies.  Let's

9  take a look at the testimony of Commander Phelan.  He testified

10 numerous times that the City of Denver directed the actions of

11 the outside agencies that they asked to come in.  Here is his

12 testimony from March 15th.  I asked him, does the City of Denver

13 take responsibility for the actions of other jurisdictions at

14 the Denver demonstrations in 2020?

15      THE COURT:  Do you have permission from the court

16 reporter to use a not-certified transcript?

17      MS. WANG:  No.

18      THE COURT:  Then please don't.

19      MS. WANG:  Okay.  You will recall that Commander

20 Phelan's testimony was that when asked whether or not the City

21 of Denver took responsibility for the actions of other

22 jurisdictions, that they're under our direction, they're under

23 my direction while they're there.

24      He also, you heard, was impeached when he tried to walk

25 away from that with his prior testimony at a hearing where he

20-cv-1878-RBJ     Jury Trial     03-25-2022

1   was asked the question, Commander Phelan, does the City of

2   Denver take responsibility for the actions of other

3   jurisdictions at the downtown Denver demonstrations?

4        At that hearing, he said, under oath, yes, they're

5   working as an agent for the Denver Police Department.  We ask

6   them for help, and they come to help us.  They're acting as an

7   agent for us.  He agreed.  He was asked that question, and he

8   gave that answer under oath.

9        Now they're trying to walk away from that a little bit,

10  but let me show you jury instruction number six, which concerns

11  prior inconsistent statements.  What this instruction tells you

12  is that you may consider the statements of any party or witness

13  who testified under oath before trial as evidence of the truth

14  of what he or she said in the earlier statements, as well as in

15  deciding what weight to give their testimony.

16       But let's also look at the facts that you know aside

17  from Commander Phelan's own statements.  Number one, Commander

18  Phelan admitted that on the first day of the protest, May 28th,

19  the only agency that responded was Denver.  So, anything that

20  happened on May 28th was the responsibility of Denver.  There

21  can't even really be a dispute about that.

22       Number two, Ms. Jordan suggested that perhaps there was

23  Colorado State Patrol releasing gas on the grounds of the state

24  capitol.  Have you seen any of that evidence?  Is there any

25  evidence of officers who have actually been identified as

20-cv-1878-RBJ    Jury Trial    03-25-2022

1  Colorado State Patrol throwing gas canisters?

2          What have you seen?  You have seen that on May 29th,

3  when Claire Sannier and Sara Fitouri and Jackie Parkins were

4  standing on the capitol grounds, across the street from the RTD

5  station, from 8:00 to 9:00 p.m., there were multiple DPD teams

6  there.

7          You heard testimony from Commander O'Donnell.  You

8  heard testimony from Lieutenant Porter.  You saw body-worn

9  camera from Lieutenant -- or from Officer Valentine, as well as

10 his own testimony.  Remember them standing in the fence area

11 throwing canisters across the street, including the one that

12 Officer Valentine threw because he -- it took him a few minutes,

13 because he couldn't even figure out how to pull the pin, because

14 he had not been trained?  Those are actions of DPD, and they

15 cannot walk away from that now.

16          Let's talk about the incident where Claire Sannier was

17 shot while filming the police, a protected constitutional right,

18 while she was on the 16th Street Mall at Broadway.  She

19 testified under oath that those were DPD vehicles.  And you can

20 watch the video.  It's in evidence.  You can look at those

21 vehicles and see if they look like DPD vehicles to you.

22          We have evidence of the events at Lincoln and Colfax on

23 May 30th.  We had Commander O'Donnell talking about how all the

24 members of his team were there.  Remember when Mr. Douglas

25 showed him screenshots and video from the scene there, and

20-cv-1878-RBJ     Jury Trial     03-25-2022

1   Commander O'Donnell identified all of those people with red tape

2   on the back of their helmets as gang unit?

3          Lieutenant Canino testified -- from DPD Metro SWAT

4   testified that his guys were also there.  And when you look at

5   the exhibits, Exhibit 638, the body-worn camera of Gang Officer

6   Altman, Exhibit 666, the body-worn camera of Officer Espinoza,

7   Exhibit 662 and 663, the body-worn camera of Officer Cunningham,

8   those are all gang unit officers.

9          And what Lieutenant Canino told you is that the guys in

10  green wearing the fatigues at that intersection and in all of

11  the other video that you have seen are DPD Metro SWAT.  The only

12  exception to that is that there were some guys in green who were

13  from Jefferson County SWAT team.

14         And let's talk about the evidence that was shown during

15  Sergeant -- I think he's a sergeant now -- Sergeant Hamilton's

16  testimony, when he was on the stand.  What he testified to is

17  that yes, they followed their own policies, but this was DPD

18  policy.  Let's take a look at the instruction.  Instruction

19  number 18.  Denver may be liable for the acts of the individual

20  officers from other jurisdictions if they acted pursuant to an

21  official policy or a practice or custom of Denver that caused a

22  violation of a plaintiff's constitutional rights.

23         The official policy as testified to by the final

24  policymaker, one of the final policymakers, Commander Phelan, is

25  that DPD's policy was to allow the other agencies to use their

20-cv-1878-RBJ     Jury Trial     03-25-2022

1    own policies and to use their own weapons.

2          Now, Ms. Jordan said, you know, in reference to

3    those -- remember those after-action reports I mentioned

4    yesterday, the ones that I showed with Commander Phelan in order

5    to impeach his testimony where it was from Brighton, and there

6    was one from Adams County -- it's Exhibits 1260 and 1261.  You

7    will find those in your materials.  And in addition, Exhibit 299

8    is the Jefferson County Regional SWAT team after-action report.

9          And what those materials show is that DPD was not only

10   telling them where to go in the city, but directing their

11   tactics, directing their actions.  And that is also corroborated

12   by the video from DPD Sergeant Robert Stack that was played

13   during Hamilton's testimony.

14         Now, Ms. Jordan said this is semantics.  You can read

15   the materials on your own and recall the testimony and decide

16   whether you think it's semantics, but you want to know where

17   else we heard the term "semantics"?  It's when Officer

18   Valentine, after testifying very emotionally to having --

19   allegedly having an IED placed under the tire of his truck, and

20   the truck exploding, and then when confronted with the video,

21   showing that what actually happened was that the tire was popped

22   by somebody in the crowd, he said, well, it's semantics.  You

23   are the judges of the facts.  You can decide whether it's

24   semantics or not.

25         Ms. Jordan talked about how DPD tried to balance

20-cv-1878-RBJ    Jury Trial    03-25-2022

1   people's rights, how there were businesses whose property was

2   destroyed, windows smashed, weapons, things like that, that we

3   had to consider the context of what was happening.  There is no

4   doubt that there were difficult situations that DPD was

5   confronted with, but when you look at what you are required to

6   do under the law when deciding for instance the Fourth amendment

7   claim, you are required to determine whether the force -- the

8   instructions say the force that will be reasonable under the

9   circumstances is directly related to the plaintiffs' actions at

10  the time the force was used.

11       Circumstances you may consider include whether

12  plaintiff had committed a crime and the severity of the crime at

13  issue, whether the plaintiff posed an immediate threat to the

14  safety of the officers or others, the need for the use of force

15  against the plaintiff, the relationship between the need for the

16  use of force on the plaintiff.  And it goes on.

17       Everything in this instruction is about the plaintiffs'

18  actions.  And it also, by the way, instructs you, you may also

19  consider whether an officer's own reckless or deliberate conduct

20  contributed to the need to use the force employed.

21       So, this -- the guns that were recovered, the things

22  that happened, this is a distraction.  What you must consider

23  under the law is what were the actions of the plaintiffs.  And

24  you have seen the evidence, and you will recall that what Elle

25  Taylor was doing at Lincoln and Colfax on May 30th was standing

20-cv-1878-RBJ     Jury Trial     03-25-2022

1    in front of the officers with her hands up when they threw

2    explosives or gas canisters into the crowd.  She ran or walked,

3    and then was shot with PepperBalls.

4         You will recall that at that same intersection, Claire

5    Sannier was in the very front lines on her knees with her hands

6    up, occasionally linked arms with other protesters, when again,

7    explosives were thrown into the crowd.

8         Have you been provided -- and I'm not going to go

9    through every one of the examples for our clients, but you will

10   remember the evidence, and you will recall that there has not

11   been a single thing said by Ms. Jordan, there has not been a

12   single piece of evidence from the City that any of our

13   plaintiffs did any of the things, anything that warranted any

14   use of force against them whatsoever.

15        With respect to the First amendment claim, Ms. Jordan

16   suggested that because the plaintiffs returned time and again to

17   exercise their rights and in fact were -- once they had

18   experienced the uses of force that were unwarranted on the first

19   few days continued returning, because I believe as Claire

20   Sannier and others said, this proved our point.  Our point was

21   to protest against police brutality, and their unwarranted use

22   of force in shooting and gassing us for no reason was just

23   proving why I needed to be there in the first place.

24        Let's talk about this element of whether an officer's

25   actions would chill a similarly-situated person of ordinary

20-cv-1878-RBJ     Jury Trial     03-25-2022

1    firmness from continuing to engage in the protected activity.

2    Sounds a little wonky.  It's language from the case law, but all

3    that means is does an ordinary person, would they be reluctant,

4    chilled to go -- continue to go to the protests if they had been

5    tear gassed, they had been shot, and had explosives thrown near

6    them, injuring their ears or their eardrums?

7            There's no doubt, really, that this element cannot be

8    contested.  Simply because our plaintiffs were particularly

9    motivated and particularly -- I don't know what the word is.

10   But they are not people of ordinary firmness.  They are people

11   who wanted to prove a point, and were not afraid to go out there

12   and exercise their First amendment rights.

13           The third factor of the First amendment claim is

14   whether or not the participation and the protected activity was

15   a substantial or motivating factor in the officer's decision to

16   take an action against the plaintiff.  In other words, was the

17   plaintiff doing something else, or was it a substantial -- their

18   activity a substantial or motivating factor?

19           And I would suggest that you should ask yourself

20   whether they were doing anything at all other than protesting.

21   When Claire Sannier was on her knees, when Elle Taylor was

22   standing there with her hands up, when Jackie Parkins and Sara

23   Fitouri and Joe Deras were marching past District 6 on the

24   evening of May 31st, were they doing anything that could have

25   constituted any action that the officers would have a reason to

20-cv-1878-RBJ     Jury Trial     03-25-2022

1    shoot them or gas them?

2         It was obviously a substantial or motivating factor,

3    and we've seen that time and again through other evidence that

4    we have in the case.  We have evidence of officers shooting

5    people who are filming them repeatedly.  Not just Elisabeth Epps

6    over and over again, but others as well.  We have officers

7    shooting that guy in the red parka at Lincoln and Colfax on

8    May 30th who has got the sign that says prosecute KKK killer

9    cops.  We've got the guy giving the middle finger to the

10   officers walking across that same -- at that same location,

11   sprayed in the face for no reason.

12        Why is it that the police officers -- that this event

13   became the way it was?  It was because of the message.  That is

14   what the evidence shows.

15        Mr. Macdonald will have an opportunity to address some

16   of the other issues that Ms. Jordan raised and that pertain to

17   his clients particularly, but I would like to say one more thing

18   about what Ms. Jordan has said and what the defense case has

19   been.

20        They talked about Division Chief Thomas and how he said

21   in his testimony that mistakes were made.  After two years,

22   nearly two years since these protests and a three-week trial

23   where they came in and paraded Commander Phelan, Lieutenants

24   O'Donnell, Pine, Porter, telling you not to believe your eyes,

25   not to believe what's in the video -- believe them.  I'm sure

20-cv-1878-RBJ    Jury Trial    03-25-2022

1   that Division Chief Thomas is a very nice man.  Elisabeth Epps

2   said so herself.  That is too little, too late.  And what we ask

3   you to do is to hold the City of Denver responsible for what

4   they did to our clients.

5          THE COURT:  All right.  Thank you.  Mr. Macdonald?

6          MR. MACDONALD:  I will be more brief than I was

7   yesterday.  Ms. Jordan, during her closing arguments, talked

8   about the Fourth amendment.  And what she said was that

9   plaintiffs need to prove that the person that used that force

10  intended to harm them.  That's what she told you in her closing

11  argument.

12         The instructions that the Court has given you say the

13  opposite.  And I'm going to show you, if I may, exactly what the

14  Court's instructions are.  So, Ms. Jordan said she identified

15  this first element, the officer either intentionally applied

16  physical force against the plaintiff or restricted the

17  plaintiff's freedom of movement through a show of authority.

18         We have both of those elements here, but I want to

19  focus on that first one, because the instructions tell you the

20  intentional application of physical force means that force is

21  purposefully applied.  And Ms. Jordan I think tried to

22  paraphrase that, but then what she left out, and what she

23  contradicted is this last sentence of the instruction, this

24  paragraph that says, for an application of force to be

25  intentional, there is no requirement that the person using force

20-cv-1878-RBJ    Jury Trial    03-25-2022

1  intends to do harm or that the use of force hits its intended

2  target.

3          And the reason this is so -- makes perfect sense,

4  because when an officer fires at one of our clients, that is a

5  constitutional violation when it hits our clients.  We don't

6  have to say, did Officer Christian intend to hit Ms. Epps?  We

7  know he testified that he did intend for her to inhale the

8  chemicals.  We don't have to show that the officer who shot Zach

9  Packard in the head intended to hit him in the head, although I

10 think a fair and reasonable inference is that he did.  The

11 instructions contradict what Ms. Jordan told you.

12         There was criticism of Chief Stamper in the closing

13 argument, that he hasn't been a police officer on the street in

14 a long time.  There was criticism of what he did in the protests

15 in Seattle.  Chief Stamper stood up and took responsibility, the

16 opposite of what happened here.  You heard Commander Sanchez,

17 now Division Chief Sanchez, when told that his officers were

18 shooting people in their own homes, what did he do?  Nothing to

19 stop it.  Nothing to stop it.

20         And he was promoted, and he is now a division chief.

21 That is the difference between Chief Stamper and the way Denver

22 has taken accountability.

23         The suggestion that Chief Stamper had confirmation

24 bias, Chief Stamper had truth bias.  He looked at the videos

25 that you've seen, and he said, this is appalling.  He looked at

20-cv-1878-RBJ      Jury Trial      03-25-2022

1    the videos that Nick Mitchell saw, or at least some of them.  We

2    know he didn't have all the videos.  We don't have all the

3    videos.  We showed you three weeks of evidence, and we don't

4    have all the videos that the City has.  Not today, not at any

5    point.

6           And we've shown you additional horrors day after day.

7    So, we don't have all the videos.  Not all the body-worn

8    cameras.  They weren't given to us.  Not all the HALO cameras.

9    They weren't given to us.  And we know that only 25 percent of

10   the officers had body-worn cameras on on given days of the

11   protest.  So, not only do we not have all of the evidence that

12   exists that would show additional misconduct, there's also all

13   the body-worn camera footage that was not taken.

14          So, Chief Stamper, I don't think the criticism of him

15   sits well.  They could have put up their own expert to look at

16   the videos.  All the videos --

17              MS. JORDAN:  Objection.  Improper.

18              THE COURT:  Sustained.

19              MR. MACDONALD:  Professor Maguire.  Only a professor.

20   Only someone who spent his entire career studying police

21   responses, who wrote a book about how to do proper police crowd

22   control that the Denver trainers got after the protest.  Another

23   too little, too late.

24          Criticism of Nick Mitchell.  His opinions lacked

25   context?  Nick Mitchell spent months with a team of experts

20-cv-1878-RBJ     Jury Trial     03-25-2022

1  looking at everything.  That doesn't lack context.  That's the

2  full picture, and you heard what he had to say.

3          The suggestion that mistakes were made.  We haven't

4  heard that it was a mistake to shoot Mr. Packard in the head.

5  Instead, they blamed him.  They suggested that a tattoo he got

6  maybe made him antifa.  They know full well the tattoo he got

7  was after the police shot him.  You can look at Exhibit 1098

8  where he has his shirt off after he came out from the hospital,

9  and there's no tattoo.  If I was shot in the head by the police,

10 fracturing my skull, fracturing my vertebrae, shot again while

11 I'm unconscious on the ground, I might get a tattoo as well.

12         We didn't hear it was a mistake to grenade and pepper

13 spray Dr. Smith in the face.  We didn't hear it was a mistake to

14 shoot Maya -- Ms. Rothlein and Ms. Blasingame in their own home

15 and gas them.  We didn't hear it was a mistake to grenade and

16 shoot Ms. Wedgeworth.  We didn't hear it was a mistake to shoot

17 Ms. Epps for 15 seconds while she stood cowering by the blue

18 dumpsters.  We didn't even hear it was a mistake to shoot

19 Ms. Lyman while she knelt on the ground with her sign above her.

20         When the independent monitor issued his report in

21 2017 -- or a report in 2012, and said go do additional tactics

22 review board investigation for the shootings during the Occupy

23 protests, the police said, nope.  We're not going to do that.

24         When Nick Mitchell said in 2017, go do additional

25 investigation because your use of force reporting is not working

20-cv-1878-RBJ    Jury Trial    03-25-2022

1   and your body-worn camera policy is bad, they didn't do that.

2   They've had fair warning.  Getting on the stand on day 14 and

3   saying mistakes were made, if you don't hold them accountable,

4   additional mistakes will be made.  The citizens of Denver will

5   suffer because of it.

6        You heard Ms. Jordan suggest that we have to prove

7   deficiency in the PepperBall training, that that's the specific

8   linchpin.  We've shown you there's deficiency in the crowd

9   control training, in the field force training, the First

10  amendment training, the use of force training, the body-worn

11  camera policy.

12       It's not -- they can't isolate and take one small

13  element and say, well, it was just -- it just has to be the

14  PepperBall.  It's all of the deficiencies their own witnesses

15  have testified about.

16       With respect to damages, as the instructions state,

17  your verdict against the City of Denver cannot be and should not

18  be about vengeance and punishment.  It should only be about

19  fully compensating every plaintiff for what happened here.

20       Zach Packard was physically injured, could have been

21  killed.  His life is changed forever because of it.  He couldn't

22  attend the remaining days of the protest.  He was in the ICU.

23  He wore the neck brace for months as his fractures healed.  Two

24  years later, he still can't do the work that he used to do.

25       And he lost his ability to do what he cares most about,

20-cv-1878-RBJ     Jury Trial     03-25-2022

1   skateboarding.  There's no question he should recover his

2   $181,000 in medical bills, and substantial sum for his pain, his

3   lost employment opportunities, the fear he experienced when

4   skateboarding the little bit he's been able to do it, and his

5   extraordinary pain and suffering.  He no longer trusts the

6   police.  Who would?

7          Dr. Stanford Smith.  It wasn't -- his main claim is not

8   just about getting sprayed in the face, although he was.  He was

9   also shot at and grenaded for no reason.  He went back to finish

10  dental school with a leathery and inflamed face, living in the

11  memory of the violence that police inflicted.  You heard him

12  talk about the positive relationship that he had with a police

13  officer when he was a young man in Texas, destroyed.  Destroyed

14  because of what the Denver Police have done.

15         Ms. Rothlein, Ms. Blasingame, driveby on their own

16  property.  These are the kinds of scars, the kinds of assault

17  that stays with a person forever.  You heard them talk about

18  that.  Not being able to go to a 4th of July event, not being

19  able to call the police for the rest of their days.

20         Ms. Wedgeworth, trying to make the community better.

21  You heard about all the things that she is doing.  Raising four

22  kids.  Now she fears the police, and has to explain to her

23  family how when she went out to do the right thing, that

24  horrible things happened to her.

25         Ms. Epps spent two years developing a relationship with

20-cv-1878-RBJ    Jury Trial    03-25-2022

1  the police, working constructively to try to make sure that

2  things like this didn't happen.  She has a solid relationship

3  with deputy chief -- with Division Chief Thomas.  You heard her

4  say that, you heard him say that, but those relationships and a

5  lifetime of service did not spare her from being shot by Officer

6  Christian, shot by Officer Valentine, shot for 15 seconds while

7  she stood with her phone after her phone was shot out of her

8  hands.

9        Ms. Lyman, another person who grew up with a great,

10  healthy relationship with the police, with whom she worked.  Her

11  dad was a first responder.  Her stepmom is an ER nurse.  She has

12  counseled firefighters.  She's not a radical, but she's brave.

13  What the police officers did to her has changed her.  She has

14  PTSD, as I think anyone would.  She doesn't feel safe.  And

15  she's here because she knows what better policing can be.

16        None of our clients are here for money.  They are here

17  because they're strong, kindhearted people who have worked to

18  make our city better.  I hope they're doing that.

19        You can't fire anyone.  You can't change Denver's

20  policies.  In our system, here, money is the only thing that you

21  can do.  The sums I said yesterday I think are the minimum

22  amounts that are a reasonable amount that fully compensates our

23  clients for their injuries and their suffering.

24        The last issue I want to discuss is Officer Christian.

25  Ms. Epps sued him for shooting her because she was walking

20-cv-1878-RBJ    Jury Trial    03-25-2022

1   across the street filming him.  Next time you cross the street,

2   and you're not in a crosswalk, think about whether it's okay if

3   a police officer shoots you.  The answer to that is no.  Not

4   here.  And you have the ability to send a message to the Denver

5   Police Department and police departments everywhere through a

6   punitive damage award against Officer Christian.

7           Now, the hard part of our work is done, and the hard

8   part of your work begins.  Thank you for your service.

9           THE COURT:  All right.  Thank you.  I skipped over the

10  last instruction.  I will read it to you now, ladies and

11  gentlemen.

12          Instruction number 22.  The court bailiff will now

13  escort you to the jury room.  After you get to the jury room,

14  you shall select one of your members to be the foreperson of the

15  jury.  That person will be in charge of your discussions.  You

16  must all agree on your verdict, and you must sign the original

17  forms of whatever verdict you reach.  Recall that there is only

18  the signature for one person, which is the foreperson.

19          Please notify the court bailiff when you have reached a

20  verdict, but do not tell the officer what your verdict is.  You

21  shall keep the verdict forms, these instructions, and the

22  exhibits until I give you further instruction.

23          Now, first of all, somebody is going to be the

24  foreperson.  And I don't want you to worry that you're going to

25  have to stand up in front of all of us and read off all the

20-cv-1878-RBJ    Jury Trial    03-25-2022

1   answers on the verdict.  No.  I won't have you do that.  It's

2   good theater.  You see it in the movies.  But I don't think it's

3   fair.  So, once you have a verdict, then I will read the answers

4   myself.

5          During your deliberations, if you have a question about

6   something, feel free to ask it.  Your foreperson should write

7   out whatever the question or questions are, and just call Julie

8   and say, we've got a question.  What happens then is she tells

9   me there's a question.  She notifies counsel.  We confer, and if

10  possible, I give you an answer.

11         Now, I'm not going to be able to give you more

12  evidence.  The evidence is what it is.  But if you have a

13  question about something on an instruction or whatever, I will

14  do the best I can.  Sometimes I can't for legal reasons answer

15  those questions, but if I can, I will.

16         Once you have a verdict, as the instruction said, just

17  tell Julie you have a verdict.  Don't tell her what it is.  It

18  takes a little while for us to reassemble.  I don't require the

19  lawyers to sit here in the room while you deliberate, because

20  you could be deliberating for several hours or literally, if you

21  decide, several days.  That's entirely up to you, but all we

22  require of them is that they are close enough that if we have a

23  question or a verdict, we can quickly get in touch with them and

24  reassemble as needed.  But it takes a little while, sometimes.

25         You can take breaks any time you want.  You don't have

20-cv-1878-RBJ    Jury Trial    03-25-2022

1   to ask.  If you're not, however, in the jury deliberation room

2   with the door closed deliberating with all of you present, then

3   stop talking about the case until you are back together again.

4           We will provide you again with lunch today.  I'm not

5   suggesting that you should stay around just so you can have

6   lunch.  I am suggesting that it probably is going to take you

7   some time to go over things and reach a verdict, and during that

8   time, we will provide another lunch for you as we did yesterday.

9           I want to tell you how much I respect what you're

10  doing.  It's been a lot of fun to have you here.  You've had a

11  great sense of humor.  One of you, at least, is a terrific

12  baker.  It's been quite an experience.  It's one that you won't

13  soon forget.  But as the lawyers said, you've got a hard job

14  ahead, and I wish you the very best in that effort.  Thank you

15  for your service.  We will be in recess at 10:40 for the jury to

16  begin their deliberations.

17          THE COURTROOM DEPUTY:  Your Honor, did you want to

18  swear me in?

19          THE COURT:  I love to swear at you, Julie.

20      (The Bailiff is Sworn)

21          THE COURT:  And here is the official verdict form,

22  which is the same as yours, of course, but we need to have one

23  that's the official one.

24      (Jury out at 10:40 a.m.)

25          THE COURT:  The jury has been excused.  Does either

Kevin P. Carlin, RMR, CRR

20-cv-1878-RBJ    Jury Trial    03-25-2022

1   side have anything further to put on the record at this time?

2           MR. MACDONALD:  No, Your Honor.

3           MR. RINGEL:  Nothing from the defendants.  Thank you,

4   Your Honor.

5           THE COURT:  What we need from you is one person from

6   each team to work with Julie to make sure that the right

7   exhibits that were admitted, and none other, are collected and

8   brought to the jury.  And we need to be able to get in touch

9   with you if we have a question or if we have a verdict.  You

10  don't have to stick around here, but stay within reasonable

11  distance if you can.  Good luck to both sides.

12          (Recess at 10:40 a.m., until 3:35 p.m.)

13          (Jury in at 3:35 p.m.)

14          THE COURT:  Members of the jury, have you reached your

15  verdict?

16          THE FOREPERSON:  Yes, sir.

17          THE COURT:  All right.  Madam foreperson, would you

18  hand the verdict to the bailiff, please.

19          THE FOREPERSON:  Yes, sir.

20          THE COURT:  Now, Julie hands me these verdicts upside

21  down, and I don't take a look at them until I say a couple of

22  things to you.  Number one, again, thank you for your service.

23  I can't tell you how much I respect what you've done.  You've

24  taken a dispute that was substantial, and it had gone on for two

25  years, and in the course of three weeks, you figured it out.

20-cv-1878-RBJ     Jury Trial     03-25-2022

1   So, good for you.

2           Number two, now you're free to talk about the case with

3   anybody and everybody if you want.  You can go on Channel Nine

4   News and talk about it if you want.  But the important thing for

5   me to say is that you can also decline to talk with anybody

6   about the verdict.  If someone wants to approach you and ask you

7   about your verdict, all you have to do is say, I'd rather not

8   talk about it, and that should end the discussion.  If it went

9   any further than that, just let me know, and we will deal with

10   it.

11           Finally, folks, if any or all of you wish to stay after

12   I announce your verdict, I would be more than happy to come into

13   the room back there, meet you personally, answer any questions

14   you might have, receive any criticisms you might have or

15   suggestions you might have for us, anything else you'd like to

16   talk about.  It's not required, folks.  Once you're discharged,

17   you're free to go.  But in case any of you would like to visit

18   for a few minutes, I would be happy to do that.  Okay?

19           All right, then.  The following is the verdict in the

20   case of Elisabeth Epps et al. versus City and County of Denver

21   et al.  We the jury upon our oaths find and state as follows:

22           Plaintiff Claire Sannier, question one, did Claire

23   Sannier prove a violation of her First or Fourth amendment

24   rights?  The answer, yes.

25           Question two, is Denver liable for violating Claire

20-cv-1878-RBJ    Jury Trial    03-25-2022

1  Sannier's First or Fourth amendment rights under any of the

2  following theories as explained in jury instructions 15, 16, and

3  17?  Check all that apply.  The jury has checked all six boxes,

4  that is the three First amendment boxes and the three Fourth

5  amendment boxes.

6        Question three, what amount of compensatory damages do

7  you award to Claire Sannier?  The answer is $1 million.

8        Please keep it in check back there, folks.  No

9  celebrations, please.

10       All right.  Number two, plaintiff Stanford Smith.  The

11 jury finds that he did prove a violation.  They've checked all

12 six boxes, and they have awarded $1 million.

13       Question -- or the next paragraph, Zachary Packard, the

14 jury has found that the plaintiff proved a violation.  It has

15 checked all the boxes, and has awarded -- oh, and has answered

16 the question, do you find that any officer from a mutual aid

17 jurisdiction violated Zachary Packard's constitutional rights

18 while acting pursuant to an official policy or practice or

19 custom of Denver, as explained in jury instruction 18?  They

20 have answered the question yes.  The compensatory damage awarded

21 is $3 million.

22       Plaintiff Sara Fitouri, again, yes.  They proved the

23 violation, checked all the boxes, $1 million.

24       Plaintiff Maya Rothlein, yes, checked the boxes, each

25 and every one, awarded $1 million.

20-cv-1878-RBJ      Jury Trial    03-25-2022

1        Plaintiff Amanda Blasingame, answered the question on

2    proof of violation yes, checked all the boxes, awarded

3    $1 million.

4        Next, plaintiff Joe Deras, the answer is yes.  Checked

5    all the boxes.  Do you find that any officer from a mutual aid

6    jurisdiction violated Joe Deras' constitutional rights by acting

7    pursuant to an official policy or practice or custom of Denver

8    as explained in jury instruction 18?  The answer is yes.  The

9    compensatory damage award is $1 million.

10       Plaintiff Kelsey Taylor, answer to the question whether

11   there was a violation of her rights, yes, checked all six boxes,

12   awarded $1 million.

13       Plaintiff Ashlee Wedgeworth, the jury has checked the

14   box yes, she proved her violation.  In her case, the jury

15   checked three boxes, that is the First amendment boxes: the

16   policy, practice, and custom box, the failure to train box, the

17   ratification box, but did not check the Fourth amendment boxes.

18   And the award to her was $750,000.

19       Plaintiff Jacquelyn Parkins, the jury found that she

20   proved a violation.  They checked all six boxes, awarded

21   $1 million.

22       Plaintiff Elisabeth Epps, the jury checked yes on the

23   violation, checked all the boxes, again meaning all three First

24   amendment and all three Fourth amendment boxes.  To the separate

25   question, did the plaintiff Elisabeth Epps prove by a

20-cv-1878-RBJ   Jury Trial   03-25-2022

1   preponderance of the evidence her claims against Jonathan

2   Christian?  First amendment, the answer is no.  Fourth

3   amendment, the answer is yes.  What amount of compensatory

4   damages do you award to Elisabeth Epps?  This would be against

5   Denver, $1 million.

6          What amount of punitive damages -- let's -- I don't

7   want to mess this up.  What amount -- question 35A, what amount

8   of compensatory damages do you award to Elisabeth Epps?

9   $1 million.  35B, what amount of punitive damages do you award

10  to Elisabeth Epps against Jonathan Christian?  $250,000.

11         Next is plaintiff Hollis Lyman.  The jury has checked

12  yes, has checked all six boxes.  Its compensatory damage is

13  $1 million.

14         That is the end of the verdict, except that it is

15  signed and dated by the foreperson as of today.

16         Madam Foreperson, did I correctly read the verdict?

17          THE FOREPERSON:  Yes, sir.  Yes, Your Honor.

18          THE COURT:  Does the defendant or defendants wish to

19  have the jury polled?

20          MR. RINGEL:  No need, Your Honor.  Thank you.

21          THE COURT:  All right.  And that is the verdict of the

22  jury in this case.  Congratulations to the plaintiffs.  Good

23  luck to all of you, and at this time, we will be in recess.

24  That concludes the case.

25         (Proceedings concluded at 3:46 p.m.)

Kevin P. Carlin, RMR, CRR

1                    REPORTER'S CERTIFICATE

2

3

4          I, KEVIN P. CARLIN, Official Court Reporter for the

5    United States District Court for the District of Colorado, a

6    Registered Merit Reporter and Certified Realtime Reporter, do

7    hereby certify that I reported by machine shorthand the

8    proceedings contained herein at the time and place

9    aforementioned and that the foregoing pages constitute a full,

10   true, and correct transcript.

11          Dated this 11th day of April, 2022.

12

13

14

15

16                              _____
                                Kevin P. Carlin, RMR, CRR
17                              Official Court Reporter

18

19

20

21

22

23

24

25