1            IN THE UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF COLORADO

3    Civil Action No. 20-cv-01878-RBJ

4

5    ELISABETH EPPS, et al.,

6         Plaintiffs,

7         vs.

8    CITY AND COUNTY OF DENVER, et al.,

9         Defendants.

10   ----------------------------------------------------------------

11              REPORTER'S TRANSCRIPT
                Trial Preparation Conference
12   ----------------------------------------------------------------

13
             Proceedings before the HONORABLE R. BROOKE JACKSON,
14   Senior Judge, United States District Court for the District of
     Colorado, commencing on the 3rd day of February, 2022, in
15   Courtroom A902, United States Courthouse, Denver, Colorado.

16                      APPEARANCES

17   For the Plaintiffs:
     TIMOTHY R. MACDONALD and ROBERT REEVES ANDERSON and MATTHEW J.
18   DOUGLAS, Arnold & Porter Kaye Scholer, LLP, 1144 Fifteenth
     St., Ste. 3100, Denver, CO 80202
19
     ELIZABETH C. WANG and MAKEBA RUTAHINDURWA, Loevy & Loevy, 2060
20   Broadway St., Ste. 460, Boulder, CO 80302

21   For the Defendants:
     ANDREW D. RINGEL and KATHERINE HOFFMAN, Hall & Evans, LLC,
22   1001 Seventeenth St., Ste. 300, Denver, CO 80202

23   LINDSAY M. JORDAN and HOLLIE R. BIRKHOLZ, Denver City and
     County Attorney's Office, 201 West Colfax Ave., Denver, CO
24   80202

25      Sarah K. Mitchell, RPR, CRR, 901 19th Street, Room A252,
               Denver, CO 80294, 303-335-2108
         Proceedings reported by mechanical stenography;
              transcription produced via computer.

 1   APPEARANCES (Cont'd):

 2   For the Defendants:
     ERIC T. BUTLER, Jefferson County Attorney's Office, 100
 3   Jefferson County Parkway, Ste. 5500, Golden, CO 80419

 4   ISABELLE EVANS and PETER R. MORALES, Aurora City Attorney's
     Office, 15151 East Alameda Parkway, Aurora, CO 80012
 5
     MICHAEL LOWE and HEATHER D. KUHLMAN and DAVID M. GODDARD,
 6   Bruno Colin & Lowe, PC, 1999 Broadway, Ste. 4300, Denver, CO
     80202
 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                    Proceedings reported by mechanical stenography;
                       transcription produced via computer.

20-CV-01878-RBJ    Trial Prep. Conference    02/03/2022   3

1              *        *        *        *        *

2     (The proceedings commenced at 9:01 a.m.)

3          THE COURT:  This is 20-cv-1878 and 20-cv-1922

4     consolidated, Epps, et al. versus City and County of Denver,

5     et al., set for a trial preparation conference.  Who's here

6     today representing the plaintiff?

7          MR. MACDONALD:  Good morning, Your Honor.  Tim

8     Macdonald on behalf of the Epps plaintiffs, and with me at

9     counsel table I have Matt Douglas and Reeves Anderson.

10         THE COURT:  I take it you're going to be the

11    spokesperson?

12         MR. MACDONALD:  Depending on the issue, Your Honor.

13    Mr. Anderson and Mr. Douglas may also -- depending on the

14    issue the Court would like to hear about may also do some

15    speaking.

16         THE COURT:  Now, Mr. Macdonald and your two

17    colleagues, which of the plaintiffs do you represent?

18         MR. MACDONALD:  We represent the Epps plaintiffs,

19    Your Honor.

20         THE COURT:  Okay.  All right.  Next?

21         MS. WANG:  Elizabeth Wang for the Fitouri plaintiffs,

22    and with me is my colleague Makeba Rutahindurwa.

23         THE COURT:  Thank you.  Any others?  We've got you

24    all?  All right.  City and County of Denver?

25         MR. RINGEL:  Good morning, Your Honor.  Andrew Ringel

20-CV-01878-RBJ    Trial Prep. Conference    02/03/2022    4

1    for the Denver defendants.  With me is Katherine Hoffman from

2    my firm and also Hollie Birkholz and Lindsay Jordan from the

3    Denver City Attorney's Office.

4              THE COURT:  Okay.

5              MR. BUTLER:  Good morning, Your Honor.  Eric Butler

6    on behalf of the Jefferson County Deputies Hamilton and

7    Dreith.

8              THE COURT:  Thank you.

9              MS. EVANS:  Good morning, Your Honor.  Isabelle Evans

10   and Peter Morales on behalf of the Aurora defendants and the

11   City of Aurora.

12             THE COURT:  Okay.

13             MR. LOWE:  Good morning, Your Honor.  Michael Lowe on

14   behalf of the individually named Aurora defendants, and with

15   me at counsel table is Heather Kuhlman and David Goddard.

16             THE COURT:  David whom?

17             MR. LOWE:  Goddard, Your Honor, G-o-d-d-a-r-d.

18             THE COURT:  Goddard, Lowe, and there was a third one.

19   Kuhlman, okay.  Thank you.  In a normal case at a trial prep

20   conference I have an agenda of five items:  Disputes that I

21   can address concerning witnesses, disputes that I can address

22   concerning exhibits, in limine issues, jury instructions, and

23   the trial and trial procedures.  Now, this isn't a normal

24   case, and Mr. Ringel has helped us out by giving his own

25   agenda for today in the form of what he called his trial

20-CV-01878-RBJ     Trial Prep. Conference     02/03/2022     5

1   brief.  I'm here to discuss any and every issue that any of

2   you want to bring up today, but included in that is the five

3   items that I mentioned.  And I want to start with the trial,

4   and then we'll work backwards.

5          You're set for trial March 7th.  There is pending a

6   motion for a continuance.  It has not been responded to.  Who

7   wants to speak to that issue?  I'll start with the counsel who

8   filed it.

9          MS. EVANS:  Thank you, Your Honor.  The motion to

10  continue was filed by the Aurora defendants on behalf of the

11  City of Aurora and the individually named Aurora defendants.

12  It's our position that the claims against Aurora and the

13  Aurora defendants individually should be both bifurcated and

14  continued at this point for the reasons articulated in the

15  motion to bifurcate filed by all defendants, and then

16  particularly on the continuance because the Aurora defendants

17  have had inadequate time to prepare for trial in this matter

18  having just been added a few months ago.

19         THE COURT:  Why is three months an inadequate amount

20  of time?

21         MS. EVANS:  Given the amount of discovery that had

22  been exchanged prior to the entry of the Aurora defendants,

23  there was an enormous task just to get up caught up to the

24  point where the other defendants -- Denver -- had been at the

25  point where we were added to the case.  There are thousands of

20-CV-01878-RBJ     Trial Prep. Conference     02/03/2022    6

1   documents exchanged in this matter, hundreds of body cameras,

2   and multiple different claims against multiple different

3   individuals.  The Aurora defendants have diligently attempted

4   to come up to speed on the case and participate in discovery

5   since their addition, but the remaining time before trial is

6   insufficient for us to prepare.

7        THE COURT:  People prepare for murder cases more

8   quickly than three months, and this is no murder case.  Now,

9   you tell me specifically what it is that despite your

10   diligence you have not been able to accomplish but that you

11   consider to be vital before trial.

12        MS. EVANS:  Well, Your Honor, I think the plaintiffs

13   would agree when I say that there has been insufficient time

14   to sufficiently review the evidence and conduct depositions.

15   As plaintiffs point out, there are witnesses who were only

16   recently disclosed, and although those names were contained in

17   the documents provided in this case, neither plaintiffs nor

18   defendants have had an opportunity to examine those witnesses

19   and more fully develop the facts necessary for this case.

20        THE COURT:  Do you know that it is possible to try a

21   case without deposing every witness?

22        MS. EVANS:  I would agree with that, Your Honor, but

23   I think the magnitude of this case is such that there are

24   hundreds of witnesses disclosed by the plaintiffs who they

25   anticipate to call at trial, and that number is just

Sarah K. Mitchell, RPR, CRR

20-CV-01878-RBJ     Trial Prep. Conference     02/03/2022     7

1    insurmountable for the Aurora defendants.

2              THE COURT:  You were joined when, in November,

3    something like that?

4              MS. EVANS:  Yes, I believe so.

5              THE COURT:  What's the plaintiffs' response?

6              MR. MACDONALD:  Your Honor, with respect to the

7    Aurora defendants, we have two incidents for our plaintiffs

8    and one incident for Ms. Wang's plaintiffs.  There are very

9    limited evidence for each of those.  We identified that

10   evidence for the Aurora defendants.  It includes one shooting

11   of one of our witnesses and one witness being sprayed in the

12   face.  It's about one minute of footage each for our incidents

13   and one minute for Ms. Wang's incidents give or take.

14             So there's not a wide swath of evidence that is

15   necessary.  We think they have had plenty of time, and we have

16   bent over backwards to identify for them this is the body

17   camera footage of this shooting.  There's another footage from

18   another angle of the shooting.  And so we think it's

19   absolutely been plenty of time for the Aurora defendants to

20   assimilate those three incidents with respect to three

21   plaintiffs, and that is it.

22             THE COURT:  Does anybody else have anything to say on

23   the subject?

24             MS. EVANS:  Your Honor, if I could just briefly

25   respond to that, I think that statement encapsulates one of

20-CV-01878-RBJ     Trial Prep. Conference     02/03/2022   8

1   the major issues that we have with this case, and that is

2   those three incidents did not occur in isolation.  They

3   occurred as part of the broader context of what was happening

4   during this entire protest, and so to isolate them into a

5   one-second clip or a one-minute clip of just that one incident

6   removes that entire context which is just an inaccurate way of

7   perceiving it.

8           THE COURT:  All right.  I think you're making a huge

9   mistake on behalf of your client, honestly.  You can sit here

10  through that trial and piggyback on Denver.  You're kind of a

11  minor player.  It would be cheaper for your client by

12  multiples.  Probably would be better for your client also in

13  the sense that you wouldn't be the center point of the case,

14  and certainly from the Court's standpoint it's not anything I

15  want at all.

16          Now, are you sure that your client, not you, your

17  client wants to give up the opportunity that it has to get

18  this over with now and set it for a whole new trial at some

19  future point?

20          MS. EVANS:  Yes, Your Honor.  I think on behalf of

21  all Aurora defendants that is the desire of our clients to

22  have those claims continued.

23          THE COURT:  Sir, I've heard from you already.

24          MR. MACDONALD:  May I make one other point, Your

25  Honor?

Sarah K. Mitchell, RPR, CRR

1          THE COURT:  For the record.

2          MR. MACDONALD:  Yes, Your Honor.  One issue we're

3   worried about is the empty chair defense if the Court were to

4   bifurcate.  There's an issue that Aurora is claiming that it's

5   not them, Denver is claiming that it was not them for the

6   incidents, and so what we're worried about is in a bifurcated

7   trial where we first try it against Denver, Denver gets to

8   say, Well, we think it's Aurora, and then in the Aurora trial,

9   Aurora says, Well, we think it is Denver.  And so we are

10  worried about that.  We've raised that issue with the Aurora

11  defendants, and they have not articulated to us a way to avoid

12  that prejudice in a bifurcation, and each of them we believe

13  would make that defense.

14         THE COURT:  All right.  Mr. Macdonald, I assure you I

15  don't want to try this case twice.  Absolutely don't.  I'm not

16  all that excited to try it once, but certainly not twice.  But

17  for whatever reason, you folks waited until November of 2021

18  to bring them in.  Now, all of this occurred back in May/June

19  of 2020, and I can't say that what counsel is saying in terms

20  of needing more time is not true.  I just can't say that.

21  They haven't had anywhere close to the amount of time that

22  defendant has had -- Defendant Denver has had.  I think

23  they're making a grave mistake, but if it affects your case,

24  it's something you brought on yourself.  Their motion to

25  continue as to them only is granted.  You may go.

20-CV-01878-RBJ    Trial Prep. Conference    02/03/2022    10

1            MS. EVANS:  Thank you, Your Honor.

2            THE COURT:  We might get down to you by yourself,

3    Mr. Ringel.

4            MR. RINGEL:  I can handle that, Your Honor.

5            MS. JORDAN:  You'll still have us.

6            MR. RINGEL:  Yes, I have friends at my table.

7    Thanks.

8            THE COURT:  I know you do.  All right.  So that's the

9    first trial-related question we've dealt with.  Now, the next

10   question I'll ask those who are still here is you've gone

11   through your mediation.  You were unsuccessful except for one

12   individual.  Are you done with that now?  No more talks, no

13   more settlement, you're going to trial.

14           MR. RINGEL:  There's one other plaintiff, one of

15   Ms. Wang's clients that there's still discussions occurring

16   related to resolution, but other than that, Your Honor, I

17   think the settlement discussions are done.

18           THE COURT:  The reason I'm asking is because we have

19   another case set the very same day, but you're in first

20   position.  They're just as eager to have their day in court as

21   you are.  I had the trial prep conference with them yesterday.

22   Totally different kind of a case, a civil case.  But I told

23   them they're going to have to be continued if you're going to

24   trial, and I promised them that I would put that question to

25   you, and I don't want you fooling around with me now.  If your

20-CV-01878-RBJ     Trial Prep. Conference     02/03/2022     11

1    honest, not puffing, not negotiating, not tactical opinion is

2    this case is going to trial on March 7th, I accept that, and

3    I'll tell them that.

4         MR. RINGEL:  That's my understanding from everything,

5    and the Court has had me before the Court on many occasions,

6    and I wouldn't blow smoke at the Court on something like that.

7         THE COURT:  I know you wouldn't.  Lawyers start out

8    with the Court's believing in them and trusting them, and then

9    they can sometimes by their conduct lose that trust.  You, on

10   the other hand, Mr. Ringel, have maintained my trust in you at

11   every time we've met.  I've ruled for you, and I've ruled

12   against you, but I trust you, so thank you for that.

13        Is that also the view of plaintiff counsel?

14        MR. MACDONALD:  Yes, Your Honor.

15        THE COURT:  All right.  Then that's that.  The next

16   issue is the -- I guess it's a request to bifurcate out the

17   arrest class.  Does anybody want to say anything about that?

18        MS. BIRKHOLZ:  Yes, Your Honor.  I believe we both

19   do.  Would you like the defense to start?  Denver made the

20   motion, and Jefferson County made the motion, or would you

21   like them to start.

22        THE COURT:  Jefferson County is kind of a different

23   kind of a deal.

24        MS. BIRKHOLZ:  Right.

25        THE COURT:  Let's take one thing at a time.  I'll get

20-CV-01878-RBJ     Trial Prep. Conference     02/03/2022   12

1    to Jeffco.

2          MS. BIRKHOLZ:  Wonderful, Your Honor.  Hollie

3    Birkholz from the City and County of Denver.  Yes, Your Honor,

4    it is our motion to bifurcate, and regardless of what just

5    happened with Aurora, regardless of what may happen with

6    Jefferson County, it's our position that as set right now for

7    the 12 to 15 days this trial is set for it is just

8    unmanageable, and there is very little chance that we would be

9    able to get that much done in the time that we have afforded.

10   Plaintiffs have disclosed --

11         THE COURT:  I don't know what you mean by that.  You

12   can all have the time you need.

13         MS. BIRKHOLZ:  Right, Your Honor.  But as set, this

14   trial would last probably two to three months because of the

15   amount of witnesses that have been disclosed.

16         THE COURT:  This case is not going to last two or

17   three months.  I promise you that.

18         MS. BIRKHOLZ:  Well, Your Honor, with all due

19   respect, so we have 14 different plaintiffs total.  Each of

20   them have about five different incidents, and they're very

21   different incidents.  With respect to Ms. Epps, for instance,

22   one of her incidents was she was walking slowly across the

23   street.  One of the officers told her to move along.  She

24   didn't.  One pepper ball was fired.  It did not hit her.  So

25   you've got a situation where she's obstructing traffic, she

20-CV-01878-RBJ     Trial Prep. Conference     02/03/2022     13

1  wasn't actually injured, wasn't actually hurt, and was told to

2  go.

3          THE COURT:  You're talking about the curfew.

4          MS. BIRKHOLZ:  Right, right, right.  And I'm talking

5  about separating the curfew from the underlying cases, and

6  they're two very separate things, Your Honor.

7          THE COURT:  I understand that.  Maybe I need to

8  bifurcate it just to save time if you're going to take this

9  much time telling me that they're different.  I understand

10  that they're different.

11          MS. BIRKHOLZ:  Yes.  The plaintiffs have very

12  different incidents.  You've got a use of force claim for each

13  of them.  That's over 40 incidents.  And then you've got a

14  very separate situation of the arrest class.  First of all,

15  was the actual order itself legal?  Was it enforced legally?

16  And so these are two very separate situations.  And just based

17  upon the girth of evidence and the girth of witnesses, the

18  1,092 exhibits the plaintiffs have listed, it's going to take

19  an enormous amount of time to get done.

20          THE COURT:  Okay.  I don't agree that.  I might agree

21  with your motion, but I don't agree with that.  Thank you.

22          Ms. Wang.

23          MS. WANG:  Judge, it doesn't make any sense to

24  bifurcate the class claims from there rest of the case because

25  the class claims are very straightforward.  Our two class

1   representatives, Kelsey Taylor and Claire Sannier, they were

2   arrested under the curfew.  They also have excessive force

3   claims and First Amendment claims against the City and County

4   of Denver.  Now, they're going to be -- if we had two trials

5   they would have to testify twice.  They would be testifying

6   about, you know, the arrest as well as the incident.  And as

7   far as the evidence that we'd have to present on the curfew,

8   the enforcement of the curfew itself, there's not that many

9   witnesses.  It's Division Chief Thomas, possibly the chief of

10  police regarding the curfew.  There's certain text messages

11  that the division chief sent.

12          THE COURT:  It's going to be presented anyway.

13          MS. WANG:  It's going to be presented anyway.

14          THE COURT:  It's part of the whole story.

15          MS. WANG:  It's relevant to the First Amendment

16  retaliation claims that the plaintiffs are alleging -- all the

17  plaintiffs are alleging, so it doesn't make any sense to

18  bifurcate.  Now, one part I will agree is that damages -- so

19  what I am envisioning for the damages for the class is that

20  this jury in this trial would determine the damages for the

21  class representatives and perhaps any class members that

22  testify, but damages determinations on a class-wide basis for

23  the rest of the class members would have to be determined

24  separately.

25          THE COURT:  Right.  Okay.  Thank you.  The motion is

20-CV-01878-RBJ    Trial Prep. Conference    02/03/2022   15

1    granted.  The Court finds that the issues concerning the

2    curfew class, first of all, might be determined as a matter of

3    law.  There's a motion pending on that.  But, second, it is an

4    entirely different situation than what we're dealing with in

5    the main case, and I don't want to fool around with the curfew

6    and the curfew class while I'm trying to deal with the main

7    case which is the pepper ball and bean bag case.  So you're

8    bifurcated, and we'll deal with that if we have to at a future

9    time.

10            Now, Jeffco, when did you come into the case?

11            MR. BUTLER:  Your Honor, Eric Butler on behalf of the

12   Jefferson County defendants.  I believe it was November as

13   well.

14            THE COURT:  But you haven't moved for a continuance.

15            MR. BUTLER:  We have added a section to the motion to

16   bifurcate asking to bifurcate the Jefferson County defendants.

17   A slightly different motion, same idea.

18            THE COURT:  Not only are you making the same mistake

19   that Aurora made, and I'm being honest about that, but that

20   would also cause the Court to postpone dealing with your

21   motion for summary judgment, which I think has a very good

22   chance of being granted.  Now, are you sure?

23            MR. BUTLER:  Your Honor, in light of the Court's

24   comments on the timing of dealing with the motion for summary

25   judgment, we might be inclined to move forward in March.

20-CV-01878-RBJ    Trial Prep. Conference    02/03/2022    16

1           THE COURT:  Good decision.  I don't know for sure,

2     but I think your motion is likely to be granted.  Just being

3     honest here.  So you can stick around and watch the show

4     today.

5           MR. BUTLER:  Thank you, Your Honor.

6           THE COURT:  Now, what other trial issues are there

7     from anybody?  I can talk about procedure.  I can talk about

8     length of trial.  I can talk about whatever you want.

9           Mr. Macdonald, you can go first.

10          MR. MACDONALD:  Thank you, Your Honor.  I would love

11    for our benefit to understand how you do your peremptories and

12    your strikes, whether you alternate sides, whether a juror who

13    is stricken moves into that juror's seat or everyone slides

14    around just for purposes of trial procedure.

15          THE COURT:  Happy to talk about that.

16          Mr. Ringel, there was something you wanted -- you

17    were starting to stand up.

18          MR. RINGEL:  I was going to ask the Court about COVID

19    protocols for the trial.

20          THE COURT:  About what?

21          MR. RINGEL:  COVID protocols for the trial, Your

22    Honor.

23          THE COURT:  So let's -- that relates to your question

24    too.  COVID, let's talk about a little history here.  You all

25    know that for all intents and purposes we can say that COVID

                    Sarah K. Mitchell, RPR, CRR

1    started in about mid-March of 2020.  I know that isn't true,

2    but in terms of it becoming a pandemic recognized, places

3    shutting down, all those things, I pin it to about March 10 to

4    15, somewhere in there.

5            This Court did its own homework, and I want to

6    commend publicly Chief Judge Brimmer who has been nothing

7    short of spectacular in leading the way through COVID.  But in

8    addition to the research done by the CDC, the Court did its

9    own research, including have engineers in the building doing

10   air flow studies and lots of other things like that, examining

11   different kinds of masks and face shields and plastic barriers

12   and all the different things.  And then we had discussed, and

13   then we had voted as an en banc, and so we shut down in March,

14   and we're down until late July.

15           We started up relatively briefly right toward the end

16   of July, implemented a whole new set of protocols, which you

17   could have read on the website, and began trying some cases

18   again.  But then as the numbers began to spike in the fall, we

19   shut down again.  I can't remember exactly when that happened,

20   but I would say mid-to-late October, something like that, and

21   we were down again through the end of February 2021, if I

22   remember correctly.  But then the numbers were focused on the

23   Delta variant, I think at this point, and we shut down again

24   for a while -- I might be getting my chronology a little off

25   -- and we're up again until just recently when we voted to

1   shut down again because of the Omicron numbers.  That occurred

2   on January 20th and goes through February 11th.  We haven't

3   met en banc formally, but I believe we will be issuing an

4   order -- the chief will be issuing a general order probably

5   that will start up again as of Valentine's Day.  So it's been

6   a roller coaster for us, like it has for everyone else.

7           During those periods of time when we were up -- Julie

8   knows the numbers -- I don't -- but I think she told me that

9   we've tried 22 cases during that time here in this court, an

10  extraordinary number, and we have back-to-back-to-back cases

11  set basically for the rest of my judicial life, which, because

12  of you folks, might not be too long.  The protocols that are

13  in effect now are that the jurors are selected while they are

14  sitting in the gallery.  Everybody, jurors and all of us,

15  remain masked at all times.  The jurors are socially

16  distanced, but whereas it was originally six feet, now it's

17  three.

18          We have relaxed where the jurors sit once they are

19  selected.  Originally they had to stay in the gallery at all

20  times during the trial.  For the sake of people's rear ends we

21  learned that that was workable but not good, and so I began a

22  rotation system where any three of them could sit in a jury

23  box at a time, and they could take turns.  That changed again,

24  and the rules now are that if the juror is vaccinated, he or

25  she may, if so electing, sit in the jury box once the jury is

1   selected, but if they're not vaccinated, they don't.

2           Every trial I've had under that procedure has had at

3   least one who is not vaccinated.  And, by the way, that's just

4   an honor system.  We don't require any proof.  But in the case

5   where we had one, we tried an experiment, and it turned out to

6   work beautifully.  That gentleman was totally satisfied, as

7   everyone was, and that is we put an extra nice chair right at

8   the jury box there, and he sat there by himself.  Didn't mind

9   a bit.  I talked to him afterwards.  He was cool with it.

10  We've had other cases where two or three had to sit and the

11  rest were up here.  We'll just play that by ear.

12          But we do that, and I explain it to them because I

13  feel absolutely that my duty is to make sure they can be as

14  healthy and safe while they're here as they can be, and the

15  same is true with respect to you guys and my court staff and

16  my reporter and me.  So we originally were using what used to

17  be Judge Krieger's courtroom next door as the jury

18  deliberation room so they could spread out.  Funny story

19  there.  After the first trial, we met -- I met with the jurors

20  like I always do -- almost always do, and learned that as soon

21  as they went into the Krieger courtroom, they all went into

22  the jury box and sat down together.  And they said one of them

23  was a doctor, the doctor said it was okay.

24          Anyway, we basically lost Krieger's courtroom because

25  Judge Brimmer -- Chief Judge Brimmer, as you may or may not

20-CV-01878-RBJ    Trial Prep. Conference    02/03/2022    20

1    know, tried an eight-week criminal antitrust trial that

2    concluded in December, and there are ten defendants, and each

3    defendant has its own team.  Just the lawyers, the paralegals,

4    and the client reps fill a courtroom by themselves, and he

5    needed this court next-door for overflow.  Well, unfortunately

6    when the case concluded in December, it was a mistrial after

7    all that, and so they're going to start again, and I can't

8    remember, but I think it's the 22nd.

9        THE COURTROOM DEPUTY:  It's set for the week or two

10   before this one.

11       THE COURT:  So that will be in full force for some or

12   all of your trial, so we don't have access to this next-door

13   courtroom, and therefore we'll be using the regular jury room

14   for the jury.  I will allow everybody, yourselves, your

15   witnesses, the jurors, if they feel comfortable to do this one

16   time, display their face, and after that this.  We prefer

17   because the research has shown over time surgical masks are

18   better.  The research has shown that the cloth masks are not

19   as good.  We have never permitted face shields.  I've been

20   amused to watch our former coach Fangio on the sideline during

21   televised game with his face shield.  Our research has shown

22   they are absolutely worthless except that they apparently met

23   the NFL's requirement.  Other than that, no.  And the same

24   with these plastic dividers that some courts have.  All that

25   does is cause your breath to escape and do what it does in

Sarah K. Mitchell, RPR, CRR

1     normal course.  The Southern District of New York, just as an

2     example, requires, what is it, KN-95 masks.  They say the

3     Cadillac of the line, but Cadillac isn't the Cadillac of old

4     anymore.  We haven't gone that far, but we prefer at least

5     surgical masks over cloth.

6          So that will be the case.  One other issue that we

7     need to understand at least is that there is always the

8     possibility during the trial or somebody involved testing

9     positive.  In all the trials I've had I dodged that bullet

10    until my second trial in December, just past.  Happened to be

11    a bench trial.  I had just finished a criminal trial Friday

12    before, started a bench trial on the 13th of December, and we

13    went through the first week of trial, and they needed -- they

14    felt they needed two or three more days to finish the trial.

15         Over the weekend, which would have been the 18th and

16    19th of December, disaster occurred in the sense that the

17    defense side buzzed the Court and plaintiffs that on Sunday of

18    that weekend that two of the three defense lawyers, the

19    defense client representative, who, by the way, had testified

20    for more than a day, the defendant's in-house counsel who had

21    been sitting back there in the gallery, and a witness who was

22    expected to be called probably Monday of the second week had

23    all tested positive, and we were told that the witness in

24    particular was very ill.  That resulted in a dispute as to

25    whether to continue.  I say that kind of with a twinkle in my

1   eye because in that case, unlike your case, frankly,

2   everything was disputed.  Almost everything.  Even that.

3          There was a dispute as to whether we would keep

4   going.  Ridiculous.  There was a dispute as to whether we

5   could keep going remotely.  I shut the trial down, which you

6   can do more easily in a bench trial.  Believe it or not, the

7   other side hired a private detective to do surveillance on the

8   guy that was supposedly ill, and I got a report and a motion

9   saying that they had caught the guy going to the store, buying

10  groceries and driving his car around, and this and that.  That

11  is the level of anger and animosity in that case.  You can

12  feel lucky that you're not a judge and have to deal with that,

13  although I know you have to deal with that in your own

14  practices sometimes.

15         But the point of the story is that you don't know

16  what's going to happen.  If somebody on the jury tests

17  positive, you have to deal with that.  You have to decide

18  whether you have to shut the trial down, and in a jury trial

19  that means a mistrial, or you can excuse that person and keep

20  going, and the same is if any of you guys test positive.  So

21  there's a risk in the longer the trial, the greater the risk,

22  and there's nothing I can do about that except try to keep

23  things safe here.  I don't think that the people that tested

24  positive got it in the court.  I think they got it during

25  their preparation and at night sessions.  But I can't prevent

 1   that.

 2          My civil juries are seven.  Have always been.

 3   24 years' worth of jury trials now, every civil trial I've

 4   done seven.  And the reason for that is because we have to

 5   have six.  The different judges here have different practices.

 6   I have seven, it's not an alternate, it's a regular juror.

 7   But it is so that if we lose somebody we still have six.  Some

 8   of the judges here do eight.  I think maybe at least one judge

 9   does 12.  I think Judge Kane does.  I'm thinking given the

10   length of your case I might want to think about eight.  What

11   do you think about that?

12          MR. MACDONALD:  We would be supportive of that, Your

13   Honor.

14          MR. RINGEL:  We would as well, Your Honor.

15          THE COURT:  Wouldn't be an alternate now.  I don't

16   believe in alternates.

17          MR. RINGEL:  Understood, and that's fine.  I think

18   for safety reasons, given that it's at least going to be a

19   three-week trial, that makes sense.

20          MR. MACDONALD:  Also fine for the plaintiffs, Your

21   Honor.

22          THE COURT:  So let me think.  I haven't even tried to

23   do the math.  Half of 13, which is the normal number, 13 and 3

24   strikes, you end up with 7.  What do we need, 15?

25          MR. RINGEL:  14.

                    Sarah K. Mitchell, RPR, CRR

20-CV-01878-RBJ    Trial Prep. Conference    02/03/2022   24

1          THE COURT:  14 and 3 strikes we end up with 8.  I

2    guess it's just that simple.  Okay.  We can do 8.  That

3    slightly increases the chance of somebody on the jury tests

4    positive, but, on the other hand, it gives us a little more

5    insurance that we can keep going.

6          MR. RINGEL:  On that subject, Your Honor, or at least

7    related, what's the Court's plan for how many people are going

8    to be called in for the venire in this case?

9          THE COURT:  I don't have a plan.  Usually we call --

10   I usually order 20 to 22, and they give us 25 to 30.

11         MR. RINGEL:  It just strikes me that the voir dire is

12   going to be extensive potentially and --

13         THE COURT:  Maybe.

14         MR. RINGEL:  And, yeah, and the potential for people

15   that know about the case given its publicity is going to be

16   significant, and so it would strike me that the Court should

17   err on the side of having more on the venire than less.

18         THE COURT:  Okay.  We'll have enough.  Don't worry.

19   We'll have enough.  But there are only so many we can fit in

20   the courtroom, and then the option -- the other -- if you

21   can't get them all in here, then you have to put them in the

22   jury assembly room and pipe it down by video, and that's not

23   as good.  We've done it, but it's not as good.  We'll figure

24   it out.  You'll have plenty.  Maybe, though, from what you've

25   said I need to put a time limit on you, Mr. Ringel.

1          MR. RINGEL:  That's within the Court's discretion

2     obviously, Your Honor.  But the other thing, just to let the

3     Court know, Mr. Macdonald communicated with everybody

4     yesterday, and we're talking about a jury questionnaire and

5     potentially submitting something to the Court along those

6     lines to help, you know, streamline the voir dire so we --

7          THE COURT:  That's fine.  Keep it short.  You have to

8     run it by me first.  Keep it short.  If you can keep it down

9     to a page, that's best.  But remember, folks, all joking

10    aside, I permit attorney voir dire.  I do not put a time limit

11    on it.  The only time limit is that if it gets too repetitive

12    or too boring, I'll interrupt and say move it along.  I don't

13    believe in micromanaging lawyers during trials.

14          I've tried a lot of cases myself.  I know how it

15    works.  I'll let you do your voir dire, and if you do it well,

16    you can win your case in voir dire.  If you do it poorly,

17    well, but that's up to your skill and experience, but you'll

18    have the opportunity to demonstrate your ability one way or

19    the other.  I won't stop you.  So if it takes all day or if it

20    takes two days, it takes whatever it takes to get the jury.

21          It's not just that they'll know about the case.  They

22    may or may not know about this particular case.  But if

23    they're at all keeping up with the local media, they'll know

24    that there are cases, and there are lawyers who as soon as

25    they get a settlement of one of these cases go right to the

20-CV-01878-RBJ    Trial Prep. Conference    02/03/2022    26

1  media and crow about it.  But even if they don't know about

2  that, they'll know all about -- they'll know about the

3  protests, and they'll have their own feelings about it, and

4  feelings can be very sharp.

5         You're all familiar with the Abay case.  That was a

6  Friday.  I had taken the afternoon off.  I played golf that

7  afternoon.  I was feeling pretty good about life.  I came home

8  from the golf course at 4:15, and my wife was saying you've

9  got all kinds of calls, law clerks, Mary, everybody.  There's

10  some sort of an emergency motion concerning a protest.  I was

11  down here at 6 o'clock.  We conducted a hearing.  We got a

12  written order out at 8:30, and Sunday -- Sunday I wasn't

13  playing golf.

14         I was home with my wife -- or my daughter who

15  happened to be with us that day, and I noticed that out in

16  front of my house was a fellow marching back and forth with a

17  great big blue American flag picketing.  Nice guy.  I went out

18  to talk to him.  A very nice fellow.  A retired Denver police

19  officer.  Wasn't causing any harm, wasn't threatening in any

20  way.  My wife was a little nervous at first, so was my

21  daughter, but the guy was fine.  Nice fellow.  But he said I

22  just want to literally show the flag for the Denver Police

23  Department because I spent my whole career there.  I

24  understood that.

25         People -- some people thought, you know, the police

Sarah K. Mitchell, RPR, CRR

20-CV-01878-RBJ    Trial Prep. Conference    02/03/2022    27

1   acted completely out of control and needed to be shut down and

2   needed to be punished.  And some people thought that the

3   protesters were out there burning things and throwing bottles

4   and being obnoxious and causing property damage.  And you'll

5   have people end of on the jury pool that have feelings about

6   that one way or the other about that.  I anticipate that.  So,

7   yes, it may take a little time to sort through that.  Any

8   other questions about voir dire?

9        MR. MACDONALD:  On the strikes, Your Honor, it sounds

10  like we would --

11       THE COURT:  We put the names on a list and pass it

12  back and forth.

13       MR. MACDONALD:  Okay.  Just pass it back and forth on

14  a list.

15       THE COURT:  Plaintiff, defendant, plaintiff,

16  defendant, plaintiff, defendant.  Now, causes are a different

17  thing, of course.  There are two ways that people get caused

18  off.  One way is, if it's obvious to me, I just excuse them.

19  It has to be pretty obvious.  Somebody gets up and says I

20  think the Denver Police Department is the worst bunch of

21  crooks in town and I don't like any of them, I'm going to

22  cause them off.  If somebody gets up and says I think the

23  police -- you know, I believe every word they say, I think the

24  protesters are lousy individuals and should be in jail, I'll

25  cause them off.

20-CV-01878-RBJ     Trial Prep. Conference      02/03/2022    28

1        Other than that, you'll have to approach the bench

2   after the plaintiff voir dire if either side wants to make a

3   motion to cause somebody off.  I'll hear it up here.  And then

4   after the defendant voir dire, the same thing.  And if I

5   agree, I'll grant it and out they go.  And if I don't agree,

6   I'll deny it.  But that's up to you.  If nobody says may we

7   approach the bench, I'll assume you don't have a cause and go

8   to the defense lawyer for his voir dire or her voir dire.

9        Any other questions about voir dire?  The jurors will

10  be out in the -- probably out in the gallery, so you'll be

11  looking out that direction.  Maybe some will be up here and

12  some back there depending on how many there are.  You might

13  have to turn here and turn there.  You'll get used to it very

14  quickly, and you can turn your back to me, and it's not a

15  problem at all.

16        MR. MACDONALD:  And, Your Honor, I've had some judges

17  who replace -- let's say one of us struck Juror 2, that they

18  actually replace someone from the gallery in the --

19        THE COURT:  Not physically, but each juror will have

20  a number, so you'll know exactly who the next juror is.

21        MR. MACDONALD:  We'll know who comes up next after --

22        THE COURT:  They won't come up.  They'll literally

23  stay where they are, but numbers 1 through 14, as soon as we

24  have a cause -- then Number 15 --

25        MR. MACDONALD:  15 is live.

Sarah K. Mitchell, RPR, CRR

20-CV-01878-RBJ     Trial Prep. Conference     02/03/2022    29

1         THE COURT:  -- is in.

2         MR. MACDONALD:  Perfect.

3         THE COURT:  And if there's another cause, 16 is in.

4         MR. MACDONALD:  Terrific.  Thank you, Judge.

5         THE COURT:  By the way, the numbers will be assigned

6  to them randomly by computer before they even come up here.

7  I've always during my career done it the old-fashioned way and

8  had Julie literally pull the names out of the box while

9  everybody is sitting here, but with COVID and the need to

10 spread people out and this and that, we've gone to the modern

11 way of having the computer generate randomly the numbers.  So

12 if you get Number 36, let's say, chances are you're not going

13 to be on the jury.

14        MR. RINGEL:  What does the Court want to do about all

15 the parties and their participation because of the number of

16 individual defendants and the number of individual plaintiffs?

17 Does the Court anticipate that everybody will be in the

18 courtroom or is there a different anticipation of the Court?

19        THE COURT:  How many people do you folks really want

20 in the courtroom?  I mean, think about safety for yourselves

21 and your families here.

22        MR. RINGEL:  Well, that's why I raise it, Your Honor,

23 because we would have -- I mean, it would seem to me that if

24 any individual is testifying, obviously they need to be here,

25 but do we need all 14 individual defendants sitting here for

20-CV-01878-RBJ    Trial Prep. Conference    02/03/2022    30

1    three weeks?  That doesn't seem like a good idea to me,

2    particularly from safety and also from operations because the

3    chief of police is a named individual defendant, and so I

4    don't think it's useful necessarily to have him sitting in the

5    courtroom for three weeks.  But I wanted some guidance from

6    the Court because we would want the jury to be instructed that

7    that doesn't mean that they don't care.

8            THE COURT:  Yeah, yeah.

9            MR. RINGEL:  It's for purposes of COVID and that sort

10   of thing.

11           THE COURT:  I think a party has a right to be here,

12   but not an obligation to be here.  The only obligation would

13   be if the other party wants to call a party as a witness, I

14   would expect for that purpose that party to be present.  Other

15   than that, I'm perfectly okay with parties not being here for

16   the duration.

17           Ms. Wang, you're nodding your head as if you agree.

18           MS. WANG:  Yes, Your Honor.

19           THE COURT:  Mr. Macdonald?

20           MR. MACDONALD:  Yes.

21           THE COURT:  I don't know where you want your parties

22   to be if they're not in here.

23           Julie, I don't know if we -- I don't even know if we

24   can put them in the jury assembly room and let them watch the

25   show on TV.

                     Sarah K. Mitchell, RPR, CRR

20-CV-01878-RBJ    Trial Prep. Conference    02/03/2022    31

1          THE COURTROOM DEPUTY:  It's not an option that I know

2   of yet because Judge Brimmer's trial is already using the

3   codec, and we only have four.

4          THE COURT:  They can listen in.

5          THE COURTROOM DEPUTY:  Yes.  I will have the audio

6   line, the telephone line, public line connected every day.

7          MR. RINGEL:  So does the Court have spectators during

8   COVID or do they listen on the public access line?

9          THE COURT:  It's open.  People can come in.  I would

10  rather they didn't, but it's a public forum.  You very

11  possibly will have media people that will be here.

12         MR. MACDONALD:  Your Honor, on the streaming issue, I

13  asked Julie, and she had told me about the codecs.

14         THE COURTROOM DEPUTY:  It just means that there can

15  only be four in the Arraj building.  We are working with IT to

16  try to get an overflow setup in a different building, in the

17  Rogers building, but we haven't secured that as of right now.

18         MR. MACDONALD:  I am not a technological savant so I

19  don't know if this is possible, but if we were able to bring

20  in equipment that allowed streaming to the defendants or the

21  plaintiffs who are not here, was that something --

22         THE COURTROOM DEPUTY:  That's not allowed through the

23  IT side of it.  They won't let us do that.

24         MR. MACDONALD:  Okay.

25         THE COURT:  While we're talking about IT, though, so

20-CV-01878-RBJ     Trial Prep. Conference     02/03/2022     32

1   we don't lose that, you folks can, and I recommend that you

2   should, somebody on your teams, not Mr. Anti-tech over there,

3   but somebody should meet with Julie just to coordinate how

4   your technology will work with ours.  You're going to be

5   putting documents, pictures, videos all that kind of stuff, up

6   on the screen.  You don't want a 10- or 15-minute gap every

7   time because something isn't working.  So make an appointment

8   with Julie, and she'll show you how it works and work with you

9   and help you.

10          The public line is going to be there, and here's the

11   thing, folks.  We can have a sequestration order, but because

12   of the public line, it's got to be an honor system.  Anybody

13   can get on the public line and listen in.  Your witnesses can

14   get on there and listen in.  Of course the parties are

15   absolutely entitled to listen in.  But if you want

16   sequestration, then you're going to have to speak to your

17   witnesses and tell them that they can't listen in, and we're

18   going to have to trust them.

19          I don't know what else we can do.  I mean, we sort of

20   have to trust you anyway because although I can see if

21   somebody is here that shouldn't be and say you can't be in

22   here, I can't govern what happens during the breaks and

23   certainly not at night.  So I always have to rely on the

24   lawyers to make sure the witnesses aren't told at night, for

25   example, what happened in the court that day.  That would

20-CV-01878-RBJ     Trial Prep. Conference     02/03/2022     33

1    violate the sequestration rule.  Well, this is just another

2    variant on that theme.

3         Any other questions about the voir dire process?

4    Don't worry.  It's going to be easy, easy peasy.

5         Now, you set this case for three weeks.  We've pared

6    it down a little bit here this morning, I think.  How much

7    time do you really think you need to try this case?

8         Plaintiff, you must have some concept of how long

9    your case is going to take.

10         MR. MACDONALD:  Yes, Your Honor.  From our

11    standpoint, we do have seven witnesses on the Epps' side, and

12    I think -- sorry -- seven plaintiffs on the Epps' side with

13    numerous incidents.  We have six, I believe now -- six or

14    seven on the Fitouri side.  So we think three weeks is still

15    the appropriate amount of time.

16         THE COURT:  It's okay.  Do you agree?

17         MR. RINGEL:  I think it's ambitious to get it done in

18    three weeks, Your Honor, and the reason -- I'll -- let me

19    explain, Your Honor.  So you'll recall my least favorite case

20    that I tried in front of you, the Booker case.

21         THE COURT:  Which case?

22         MR. RINGEL:  Marvin Booker, Your Honor.

23         THE COURT:  I do recall that case.

24         MR. RINGEL:  I know you do.  That case was a

25    single-incident case that was pretty narrow, and that took

20-CV-01878-RBJ     Trial Prep. Conference     02/03/2022     34

 1   more than three weeks.

 2          THE COURT:  No, it didn't.

 3          MR. RINGEL:  Yes, it did.  And there were --

 4          THE COURT:  The Booker case took more than three

 5   weeks?

 6          MR. RINGEL:  It went into the third week, Your Honor.

 7          THE COURT:  So it took more than two weeks.

 8          MR. RINGEL:  It took more than two weeks, that's

 9   right, because it was over a holiday weekend in October.  But

10   the point of that is there were approximately 30 witnesses

11   that testified in that case in that period of time.  The

12   plaintiffs have listed 192 witnesses.

13          THE COURT:  They're not going to do that.

14          MR. RINGEL:  I understand.  I just wanted to advise

15   the Court that in my opinion it's going to take longer than

16   three weeks, and I'm concerned that the defendants are not

17   going to have enough time to put their evidence on if the

18   Court is wanting to make sure it gets done in three weeks.

19          THE COURT:  I'll give you the last half week for the

20   defense.

21          MR. RINGEL:  I think we may need more than that, Your

22   Honor.  But I understand --

23          THE COURT:  Julie's going to tell you what the

24   insurmountable problem is.

25          THE COURTROOM DEPUTY:  Following your case we have a

 1   criminal trial that is also scheduled for three weeks

 2   immediately following your three weeks, so I don't know what

 3   your thoughts are.

 4        THE COURT:  All right.  We're going to start your

 5   case, and we're going to finish your case.  We're going to

 6   give both sides the time they need to prosecute or defend the

 7   case.  If it takes more than three weeks, we'll keep going.

 8   Now, having said that, in 24 years as a judge I've never had a

 9   case go more than three weeks.  Never once.  I will expect

10   that you put on your case efficiently.  I will interrupt if

11   you get repetitive.  Lawyers -- I'm not saying I wasn't one of

12   them -- tend to feel that they need to have a point repeated

13   half a dozen times for the jury to get it.

14        I'm going to tell you two stories, both very brief.

15   One time after a trial Julie was in shredding the jurors

16   notes, as we do.  She found this, and she said, Judge, you

17   might want to look at this.  Basically a juror had drawn a

18   picture of a horse lying on its side, a little cartoon thing,

19   the lawyer standing there with a crow, and the horse saying,

20   Don't beat me anymore.  I'm dead.

21        Second story, I was talking to a jury -- those are

22   both from federal court -- and one of the jurors said, Why do

23   the lawyers repeat everything?  Don't they think we get it?

24   And I said, Well, it's a problem.  She said, Well, Judge, let

25   me show you something.  She had one of those big humongous

20-CV-01878-RBJ     Trial Prep. Conference     02/03/2022   36

 1    purses that you can put a refrigerator in if you need to.  She

 2    reached in.  She was the foreperson.  She reached in, pulled

 3    out an eight-and-a-half-by-11 piece of paper, and on this

 4    piece of paper in great big block letters it said, We get it.

 5    She said I wanted to put that up, hold that up, but I thought

 6    I'd get in trouble.

 7         They do get it.  They don't need to be told, and

 8    there's great danger in your case of building in the same

 9    thing over and over.  I'm not going to permit that.  I will

10    interrupt and tell you to move on.  I'll ask you please just

11    don't do that.  Trust the jurors.  They will get it.  But if

12    we proceed that way, we'll get this case tried, and if it

13    takes more than three weeks, so be it.

14         Now, one thing that I've been doing -- what would you

15    say, Julie, in the last year, two years, something like that

16    -- is stopping court at 4:15 or 4:30.  I've been doing that,

17    and I've consulted with jurors, and they like it because it's

18    very exhausting.  You know that if you've tried any cases.

19    There's nothing that you do really -- maybe running a marathon

20    would be an exception -- that's as exhausting as a day of

21    trial.  And for you guys, it's not just a day, because you

22    can't help yourself.  You get up in early in the morning or

23    you stay up late at night going over what has happened,

24    preparing for the next day, whatever you do.  I did it too.

25    It's exhausting.  It's exhausting for the jurors.

                          Sarah K. Mitchell, RPR, CRR

20-CV-01878-RBJ      Trial Prep. Conference      02/03/2022    37

1        Second reason, letting them out right into the heart

2   of rush hour is a little bit difficult.  So I probably will be

3   stopping the trial around 4 o'clock, unless you have a witness

4   that is going to Jamaica tomorrow and you need to finish that

5   person today.  If there's something like that, sure.  So your

6   trial day might be just a little shorter than you thought, but

7   it's going to be tight and efficient.  We're going to get the

8   case tried that way.  Nobody's going to be squeezed for time.

9   I don't like chess clocks.  I think it's unprofessional, but

10  if you guys want a chess clock, I'll do it.

11        MR. RINGEL:  I don't believe we need a chess clock,

12  Your Honor.

13        THE COURT:  I do, just because I always have, keep

14  track of time just for my own sake.  I will know how much time

15  the plaintiffs' side has taken, how much time the defense side

16  has taken at any point during the trial, just because I keep

17  track of it.  Even things like voir dire, openings, whatever.

18  But I don't really make any use of it unless somebody is

19  whining we haven't had a reasonable opportunity so far, and I

20  tell them what the numbers are.  Oh, well, okay.

21        What else do we want to talk about concerning the

22  trial?

23        MR. MACDONALD:  Your Honor, I saw in your pretrial

24  procedures that you're willing to pre-instruct the jury.  I

25  raised the issue with Mr. Ringel, and I think we're both

20-CV-01878-RBJ     Trial Prep. Conference     02/03/2022     38

1    interested in having you do that, assuming we can get to

2    agreement on the jury instructions before then.

3         THE COURT:  If we get to agreement on the jury

4    instructions, I absolutely will do that.  I like to do it.  I

5    think it's got advantages for the jury because they know

6    something about the law right from the get-go.  I think it has

7    advantages for counsel because if you want you can shape your

8    opening statement to the instructions.  This is what we need

9    to prove on this claim and this is what the evidence we expect

10   to present that we think will prove that, or vice versa.  It

11   has advantages for me, because I don't have to worry about

12   late night sessions on jury instructions during trial, so,

13   yes, I'll do that.

14        Since you brought that up, I'll tell you a couple of

15   things that I think as an advocate that you should think

16   about.  One is, especially in a long trial, if you want to

17   agree that each side would have a certain number -- I would

18   suggest three or four opportunities during the course of the

19   trial to make a mini speech of, say, a couple of minutes,

20   three minutes, nothing more than that, at whatever time you

21   want, I'll permit it.

22        Lawyers never ask for anything creative, but I did,

23   and I permit you to do it.  I think there's a great advantage

24   to being able to step up and say, All right, the two witnesses

25   that we just heard from concern this part of our case, but now

1   we're going to move in a slightly different direction.  Now

2   we're going to call an expert witness who's going to express

3   opinions on X, Y, and Z.  It's great stuff, if you do it, if

4   you do it well, so talk with each other about that.

5        Timelines.  I will go to my grave urging lawyers to

6   have timelines.  It's so helpful to the jury.  It's so helpful

7   to the Court to have a chronology that we can see.  Now, you

8   can ruin a timeline by making it too full of stuff.  If it's

9   too busy, it loses its impact.  It's just like PowerPoint

10  slides.  If they're too busy, they lose their impact.  But if

11  you have a chronology, a timeline that can be displayed, maybe

12  even put on a whiteboard or an easel so that it sits there for

13  the jurors to see the entire trial -- maybe you do it in paper

14  so that each juror can have a copy -- I'm not going to tell

15  you how to do it -- I will suggest to you that it's a good

16  idea.

17       Here's another idea, especially in a long trial.  I

18  think it's very effective if you have a headshot of your

19  witnesses.  Back when I was trying cases, I would have a

20  photograph and put it up on a big display board on an easel.

21  Nowadays you can do it that way or electronically, but all it

22  has to be is a headshot and a name.  You'd be surprised how

23  well that can bring back who that person was and what that

24  person talked about.  Now, unfortunately, they won't be able

25  to see the face, but with the headshot you can have the face

20-CV-01878-RBJ    Trial Prep. Conference    02/03/2022    40

1    displayed.  Take the mask off.  It's just an idea.  I commend

2    it to you.

3            Any other questions about creative things you'd like

4    to do during trial?  And you don't have to exhaust your store

5    of ideas today.

6            MR. MACDONALD:  On the jury instructions front, Your

7    Honor, we saw your comments yesterday, which were extremely

8    helpful, and I think we will reconvene with the defendants and

9    on our side certainly commit to streamlining where we can and

10   possibly taking Your Honor's comments into account.  Would you

11   be amenable to having a final discussion --

12           THE COURT:  Yes, sir, I've already thought of that.

13           MR. MACDONALD:  Thank you.

14           THE COURT:  And I have times to give you.  We're able

15   to give you either some time on the morning or some time on

16   the afternoon of February 23rd.  So confer with each other and

17   let chambers know what you want, unless you can tell us now.

18   You can have the morning or the afternoon.  You can't have

19   both.  February 23rd is my go-to-the-doctor day.

20           MR. MACDONALD:  We're happy to confer.  Would you

21   like us to decide right now, Your Honor?

22           THE COURT:  If you want to.

23           MR. RINGEL:  We are available collectively on the

24   23rd, Your Honor.

25           MS. WANG:  We prefer morning, but we can do either.

Sarah K. Mitchell, RPR, CRR

20-CV-01878-RBJ    Trial Prep. Conference    02/03/2022    41

1          THE COURT:  Shall we say 9 o'clock on the 23rd?  I'm

2     going to come back to the jury instructions.  That's one of

3     the items on my list, but that is one reason why I thought we

4     were going to need another conference.  The other is that

5     we've got some motions to rule on.

6          Do you find it irresistible to stand up?  I can see

7     you're doing this.  Ms. Wang, do you want to say something?

8          MS. WANG:  No.  No, Judge.

9          THE COURT:  Oh, you're just kind of fidgety.  Okay.

10    Anything else about trial?  And you can raise other questions

11    that you might have when we meet again.  All right then.

12    Let's go back and talk about my list briefly, and then to the

13    extent that that doesn't cover all of Mr. Ringel's items, we

14    can talk about those too.

15         Witnesses, are there issues concerning, disputes

16    concerning witnesses that we can deal with today?  Now, I know

17    that there are some disputes under Rule 702 concerning

18    experts.  I think I've seen some motions.  I haven't read any

19    of them.  I don't even know who your motions are -- or your

20    experts are, but with respect to 702 *Daubert*, you have a right

21    to a hearing even an evidentiary hearing, if you want, or you

22    can submit it on the papers.  So do you know enough yet to

23    know what you want in that respect?

24         MS. WANG:  Judge, the plaintiffs don't need a

25    hearing.

                          Sarah K. Mitchell, RPR, CRR

20-CV-01878-RBJ    Trial Prep. Conference    02/03/2022    42

1        MR. RINGEL:  Yeah, my understanding of the challenges

2   are that it's something that can be done on the papers, and

3   it's mostly the defendants' perspective that they're

4   premature, and they need to wait until the evidence is

5   presented at trial, but we can talk about them on the 23rd if

6   the Court has the opportunity to read them by then.

7        THE COURT:  Well, I just wanted you to know that you

8   do have a right to a *Daubert* hearing if you want one.  But if

9   you feel, as you say, comfortable with the Court dealing with

10  those on the papers, so be it.  Any other issues concerning

11  witnesses?

12        MS. WANG:  Judge, with respect to the witnesses, we

13  have certain objections to some of defendant Denver's

14  witnesses as set out in our motions in limine, but other than

15  that, I don't think we have any other objections.

16        THE COURT:  What are your objections to their

17  witnesses?

18        MS. WANG:  Our objections are to their calling

19  witnesses that they disclosed on the very last day of

20  discovery even though they apparently knew that they were

21  going to present certain defenses.

22        THE COURT:  Who are they?

23        MS. WANG:  Jeffrey Martinez and Hohnholz are the two.

24        THE COURT:  Martinez and who?

25        MS. WANG:  Jeffrey Martinez and Heather Hohnholz.

Sarah K. Mitchell, RPR, CRR

20-CV-01878-RBJ    Trial Prep. Conference    02/03/2022    43

1   And it's the subject of our motion in limine number four.

2          THE COURT:  And what's the deal with those two

3   witnesses?

4          MS. JORDAN:  Lindsay Jordan from the Denver City

5   Attorney's Office, Your Honor.  With those two witnesses, they

6   were disclosed on the last day of discovery.  It was

7   essentially just putting a face to information that had been

8   provided throughout all of discovery and our disclosures.  And

9   what their topics are, generally speaking, about injuries that

10  officers received and the property damage that occurred down

11  in the downtown Denver area during the protests.  That's all

12  information that was disclosed throughout discovery, and

13  they're just essentially faces that we were putting with that

14  information.

15         MS. WANG:  Judge, they did not disclose that

16  information to us until the last day of discovery either.  On

17  the last day of discovery they disclosed Martinez and Hohnholz

18  to testify about officer injuries, which our plaintiffs did

19  not cause, and about property damage, which our plaintiffs did

20  not cause, as well as a bunch of documents relating to officer

21  injuries and property damage.  They disclosed all of that on

22  the very last day of discovery, and we asked them for an

23  opportunity to depose these late-disclosed witnesses.  They

24  said no.

25         THE COURT:  Well, I'll say yes.

                           Sarah K. Mitchell, RPR, CRR

1          MS. WANG:  To depose them, Your Honor?

2          THE COURT:  If you want to depose them, you can

3    depose them.  Get that done between now and February 23rd, if

4    you can, please.  I don't want to exclude witnesses if I don't

5    have to, and that will solve the problem.  And whether or not

6    your clients are responsible for any property damage, I don't

7    know.  You say they are not.  I don't know if the defendants

8    think they are.  I don't know.  There were obviously many,

9    many, many peaceful protesters out there.  There was some bad

10   apples out there.  There was a lot of property damage that

11   happened.  It's part of the context of this case.  It explains

12   the situation that the police were facing, and it's going to

13   be part of the evidence, but if it has anything to do with the

14   individual plaintiffs, I don't know that.  Do you have any

15   evidence that it does?

16         MS. JORDAN:  Your Honor, if I may -- and this kind of

17   goes to motion in limine number five that was filed a couple

18   days ago.  At this point we don't anticipate providing

19   evidence other than what you just said, the general context.

20   There is a situation in which one of the plaintiffs we know

21   arguably was engaged in active aggression, kicking a canister

22   after it had been deployed.  That has been a subject of many

23   depositions that have already been conducted.  That's

24   information that they know.  But as we sit here today, we

25   don't anticipate having -- I'll make up -- Officer Jones

20-CV-01878-RBJ    Trial Prep. Conference    02/03/2022    45

 1   getting up and saying I saw plaintiff Fitouri spray painting

 2   the capitol building.  We don't have any information like

 3   that.  It's just the general context of what was going on

 4   downtown.

 5            THE COURT:  I remember some discussion in one of the

 6   things that I read about the witness who, depending on your

 7   perspective, was kicking a gas canister back at the cops or

 8   was kicking it away out of the way.  It seemed like nobody

 9   really knew for sure what that person actually did or why.

10   You know what I'm talking about.

11            MS. WANG:  Yes.  That's -- Joe Deras is the

12   plaintiff, and what he says, what he testified to in his

13   deposition is that he was kicking it away from protesters who

14   did not have masks on, and it didn't go very far.

15            THE COURT:  And there might be a police officer who's

16   going to say, Well, I saw him kicking it back at me, and

17   that's one reason why I fired my bean bag gun.  Is that a

18   Jeffco officer?

19            MR. BUTLER:  That is the situation, Your Honor, that

20   involves the Jefferson County defendants.

21            THE COURT:  Right.  And that's a situation where,

22   according to the plaintiff at least, there were only two guys

23   on the truck that had the equipment to shoot bean bags, so

24   they claim one of the two had to be the one that shot the

25   plaintiff and caused the injury, but they don't know which one

20-CV-01878-RBJ     Trial Prep. Conference     02/03/2022     46

1    it was, right?

2           MS. WANG:  All the officers on that line had less

3    lethal projectile weapons of some kind, but those were the

4    only two that said in their reports that they shot at people

5    who were kicking canisters, and he -- and so that's why we

6    believe it's one of them, or both, because they were shot

7    three times.

8           THE COURT:  That is why I think the Jeffco motion for

9    summary judgment might have some merit to it.  I had a case a

10   few years ago, a very frustrating case from a judge's

11   standpoint, both John Kane and I had part of this case.

12   Basically what happened was there is a downstairs bar on

13   Market Street.  I can't remember the name of it.  It starts

14   with a P.  Maybe some of you frequent this bar.  Anyway, there

15   was a line to get in, and the guy who ultimately turned out to

16   be the civil plaintiff was in that line waiting to be admitted

17   into this nightclub or bar, whatever it is right downtown

18   here.  And he got into a fisticuffs with somebody else in the

19   line and ran.

20           I think, as I recall, he just absolutely cold-cocked

21   a guy and then ran, and there were police around, and they

22   gave chase, and they caught up with this fellow over pretty

23   close to Coors Field.  He was hiding behind a bush at some

24   commercial building, and there were I think, according to the

25   records, half a dozen or so, maybe more, Denver Police who had

Sarah K. Mitchell, RPR, CRR

1   him surrounded.  He wasn't armed or anything like that.  And

2   they told him to come out, hands up, which he did, and they

3   told him to go to the ground, which he did, and he was face

4   down on the ground when he was struck on the leg with a baton,

5   and if you saw the picture, it was ugly, the bruising and so

6   forth that was caused by this.

7           The problem from his perspective, though, was that he

8   was looking at the ground.  He was face down.  He didn't know

9   who hit him, but it had to be one of these half a dozen or so

10  police officers.  And so he sued, and I can't remember the

11  order in which it went, but there was a lawsuit in front of

12  Kane, which he granted a Rule 50 motion to dismiss because the

13  plaintiff couldn't identify who did it.  And then there was a

14  second lawsuit in front of me, which the plaintiff lost again,

15  and in both cases the jurors said there's something wrong

16  here.  Why -- why couldn't the other cops be required to

17  identify who did it?

18          And it went up to the Tenth Circuit.  You can read

19  about it.  It's a published case.  Qualified immunity.

20  There's no case from the Tenth Circuit or consensus among the

21  circuits that says that refusal to identify a perpetrator in

22  that kind of a circumstance is unconstitutional, qualified

23  immunity sustained by the Tenth Circuit.  The point of the

24  story is that if the plaintiff can't identify who did it, the

25  plaintiff could be in trouble.  Do I think it's a nice idea

20-CV-01878-RBJ    Trial Prep. Conference    02/03/2022    48

1    that police officers don't have to point the finger at each

2    other?  From my point of view, no, but that's what happened in

3    that case.

4          So how I get off on that tangent?

5          THE COURTROOM DEPUTY:  Nobody knows, Your Honor.

6    That was just me blurting out.

7          THE COURT:  My poor law clerks know that.  I tell

8    stories, and it's probably a sign of dementia, but it is what

9    it is.  So we were talking about witnesses, and we just talked

10    about the two depositions.  What else in the way of witnesses

11    do we need to talk about?

12          MR. RINGEL:  To date the plaintiffs haven't

13    identified will-call and may-call witnesses and order of

14    proof, and it's my understanding that the Court likes us to do

15    that so that we can cooperate as much as possible.

16          THE COURT:  I do want you to do that for each other.

17          MS. WANG:  We will --

18          THE COURT:  I'll be as flexible as you need really in

19    terms of order of witnesses.  If it's an expert that you're

20    paying by the hour, you can make an appointment for a specific

21    day, a specific time, and we'll stop whatever we're doing and

22    call the expert so he or she is not sitting out here running

23    up your bill waiting to be called.  We can call somebody

24    that's a critical person in the plaintiffs' case but not

25    available during the defendants' case and vice versa.  If

Sarah K. Mitchell, RPR, CRR

20-CV-01878-RBJ     Trial Prep. Conference     02/03/2022     49

1   you've got somebody who is going to Europe, and you've got to

2   get them on the stand, the plaintiff is still in their case,

3   we'll call them out of order.  You can call people remotely by

4   video or live.

5         I'll be as flexible as you need, but I want you as a

6   courtesy to the Court and to the other party to give them an

7   advance indication of who you're going to call in what order.

8   And then if something happens to change the order, fine.  When

9   can you do that?

10        MS. WANG:  We will be providing them an updated

11  witness list that distinguishes will-call from may-call, and

12  my question to you, Your Honor, is what are your procedures in

13  terms of alerting the other side to who we're going to call

14  the next day?  I've usually had judges say by five o'clock.

15        THE COURT:  I want you to do that so they can prepare

16  their -- or re-prepare their cross-examination outline the

17  night before if that's the way they do it.

18        MS. WANG:  Right.  So my question is do we -- do we

19  -- I've usually had judges say tell the other side who are the

20  witnesses you're going to call for a particular day by 5 or

21  6:00 p.m. the day before.  Is that your practice or something

22  else?

23        THE COURT:  I don't say by 5 or 6:00 p.m.  I say I

24  want you before the trial ever starts to tell them who you're

25  actually going to call for sure, who you honestly believe you

 1   might call.  I don't want a list of 192 may-calls.  That's

 2   unfair.  I want you to give Mr. Ringel and his colleagues, and

 3   I want them to give to you, your I'm going to call this

 4   person, and this is the order in which I expect we'll call

 5   them, and then when we get to the trial, and we know how fast

 6   things are going, I want you at a minimum each day during the

 7   trial to tell them who's next, who's on for tomorrow.  I don't

 8   want any surprises because you're jacking the other side

 9   around.

10           MR. RINGEL:  And, Your Honor, to give the plaintiffs'

11   counsel some comfort, if we're going to exceed the scope of a

12   witness, we'll tell them that too so that they can understand

13   that they may have to prepare differently.

14           THE COURT:  Okay.  Good.  I'm glad you brought that

15   up.  You can do it either way you want.  I happen to think

16   that it's best to put a witness on once.

17           MR. RINGEL:  I agree.  I mean --

18           THE COURT:  But if they're going to call somebody --

19   they're going to call people from your side, I imagine.

20           MR. RINGEL:  I think there's no question about that,

21   Your Honor.

22           THE COURT:  And you're entitled, if you wish, to ask

23   no questions and to put your guy on your own way at your own

24   time in your case, or you can go ahead and cross-examine right

25   then.

20-CV-01878-RBJ    Trial Prep. Conference    02/03/2022   51

1          MR. RINGEL:  I understand, but what I was telling the

2     Court and opposing counsel is we'll let them know which choice

3     we're going to make with each witness --

4          THE COURT:  Thank you.

5          MR. RINGEL:  -- so that everybody has an

6     understanding of that, because I think that's fair, just like

7     them telling us the order.

8          THE COURT:  All right.  Maybe that brings up an idea

9     that I'd like to share with you, and that is concerning

10    leading questions.  The lore is that you cannot ask leading

11    questions on direct, but you should ask only leading questions

12    on cross.  We've all heard that at some point in our career.

13    Any good lawyer knows that that isn't true at all.  If you

14    don't lead on direct, it gets boring in a hurry, and you're

15    wasting time because there are a lot of things on direct that

16    are not in dispute.  They're not controversial.

17         You don't have to say, What is your job, sir?  You

18    can say, Sir, you're the chief of police of the Denver Police

19    Department, right?  That's a leading question, but so what?

20    Transitions from one topic to another.  A witness forgets.  He

21    just freezes on the stand.  You got to put a bee in his

22    bonnet.  There are all kinds of situations where you lead.  On

23    the other hand, if it's something that's a substantive

24    dispute, important matter, you shouldn't lead on direct.

25         It's frustrating to me as a judge sometimes to sit

20-CV-01878-RBJ     Trial Prep. Conference     02/03/2022     52

1   here and watch critical testimony the lawyer is leading the

2   witness through by her ear, and I want to know what the

3   witness really has to say, but it's a jury trial, and I just

4   keep my mouth shut.  But that's how I view leading.

5           Now, when you get up to cross-examine the Denver

6   Police chiefs that they called, you know, he's on their side,

7   and so you shouldn't lead on important stuff, but there are

8   things that you can cross-examine him on.  You guys are good

9   enough to know the difference.  But if you're just going to

10  object as to leading any time there's a leading question,

11  you'll find out real early that I'll be denying those a lot of

12  the time.  Beyond the scope of direct, that's discretionary

13  with the Court.  I basically never sustain those objections.

14  It's a waste of your time to make them.

15          Hearsay, even to this day there are lawyers who

16  believe if it's testimony that wasn't here in the courtroom

17  it's hearsay.  Nonsense.  Nonsense.  It's an out-of-court

18  statement offered to prove the truth of what it asserts.  And

19  so think about that before you object on hearsay grounds.  Are

20  they really trying to prove what the statement is going to

21  assert or are they just trying to find -- find out something

22  about the witness's state of mind or whatever?

23          Anyway, I'm sorry.  I shouldn't be giving you a

24  course on evidence.  You don't need it at all.  Witnesses.

25  Anything else about witnesses that you need to discuss today?

20-CV-01878-RBJ    Trial Prep. Conference    02/03/2022    53

1           MS. WANG:  Judge, I did have a question.  Is it your

2    practice to ask questions of any witnesses?

3           THE COURT:  Do I ask questions?

4           MS. WANG:  Yes.

5           THE COURT:  Basically not.  In a bench trial, yes.

6    In a jury trial, I keep out of it.  But I let the jurors ask

7    questions, and the way that works is we have a form.  We give

8    them to each juror, and they can write up their questions, and

9    if the question hasn't been asked by one of the lawyers and

10   they want to ask it, at the end of the witness's testimony

11   I'll say does anybody have any question?  And if they show

12   that they do, Julie walks over, gets it, brings it up here.  I

13   put a number on it starting with one.  I'll show it to each

14   side.  You can say I object or I don't object, and I sustain

15   or don't sustain.  If I don't sustain your objection, then I

16   read the question.  It's not my question.  I'm reading the

17   juror's question.  And once in a while if I think a witness

18   didn't really answer the question, maybe didn't understand it,

19   I might clarify it a little bit.  Other than that, I stay out

20   of it.  So not to worry, Ms. Wang.  I'm not going to take over

21   the questioning of a witness.

22          Anything else about witnesses?  I have a question

23   that I'll keep for later when I get to Mr. Ringel's outline,

24   but if we're good, now let's talk about exhibits.  How many

25   exhibits are you going to have realistically?

                          Sarah K. Mitchell, RPR, CRR

1         MR. MACDONALD:  Realistically, Your Honor, that we

2    expect to move in much less than what is on our exhibit list.

3    I think the predominant exhibits we'll be putting in are

4    videos, halo cam videos, body-worn camera videos, some Air One

5    videos, some of our own clients' videos, some bystander

6    videos.  Then with respect to the Monell claim there will

7    certainly be some documentary e-mails back and forth or some

8    of the training for policy procedure manuals, but that's at

9    least categorically we expect it mostly to be video -- videos

10   and stills, Your Honor.

11        THE COURT:  All right.  What you need to do is two

12   things.  Number one, it's not going to be a guessing game for

13   the defendant to try to guess in advance out of a list of 200

14   documents which ones you're going to use.  You'll have to

15   narrow it way down to what you're actually going to use and

16   tell them, and the same for the defendant side.  And in a

17   perfect world, you'll give me either one or two exhibit lists,

18   and it will show whether they're stipulated.  I would like for

19   you to stipulate to every single exhibit.  You may not do

20   that.  Well, you may do that, but you might not do that.

21        But here's the thing.  It's almost never necessary to

22   object on authenticity grounds.  You have to really believe

23   that the document is a forgery or something before you do

24   that.  As far as admissibility, most documents you probably

25   know are going to come into evidence.  Just stipulate to them.

20-CV-01878-RBJ    Trial Prep. Conference    02/03/2022   55

1    If your exhibit list shows a stipulation, that doesn't mean I

2    automatically am going to admit it, but it does mean as soon

3    as you make any reference to it with a witness I will admit

4    it.  I don't make a habit of admitting documents that no one

5    is ever going to talk about just to beef up the appellate

6    record, but if you want to use it, just say I'd like to turn

7    to -- or whatever you say to your witness -- you know,

8    Exhibit 44, and I'll say admitted.  What I hope won't happen

9    very often is it's not shown as stipulated.  You'll offer 44.

10   The other side will say, oh, no objection.  If there's no

11   objection, stipulate to it.  It speeds up the trial.

12           MR. RINGEL:  I have a question about how the Court

13   wants to handle media and --

14           THE COURT:  Media?

15           MR. RINGEL:  Video and audio and that sort of thing.

16   In the sense of it's my understanding under the Rule of

17   Evidence 106 and the rule of completeness that if part of a

18   video would be played, we would have the opportunity to object

19   and ask the Court to play the entire video.

20           THE COURT:  Sure.

21           MR. RINGEL:  And how does the Court want to handle

22   that, right on the fly or --

23           THE COURT:  I want you guys to confer about that, and

24   you should be able to agree about that.  If a part of a video

25   is shown, then some other part of the video could be shown

20-CV-01878-RBJ     Trial Prep. Conference     02/03/2022   56

1   under the rule of completeness, assuming, of course, that

2   there's no evidentiary objection to something that's within

3   the part that you want to show.

4          MR. RINGEL:  Understood, Your Honor.

5          THE COURT:  So that I don't forget to say this, I'll

6   say it now, I've never understood -- maybe it's just me -- why

7   lawyers treat videos, photographs, visual stuff, drawings,

8   that kind of thing, under the label demonstrative evidence or

9   demonstrative exhibits and feel that they're a second-class

10  citizen and don't go to the jury.  I have yet to tell me a

11  lawyer where you find that in the rules.  Isn't there.  We all

12  learned that sometime from somebody who also didn't know where

13  it was in the rules.  It won't be in my rule.

14         Every exhibit has a label, video, photograph,

15  document, whatever.  Every exhibit that's going to be used has

16  a number, letter, and if it's admitted, it goes to the jury.

17  They're all equal.  As a matter of fact, I think the visual

18  stuff is usually the best in terms of quality, but it

19  certainly won't be considered to be a second-class citizen.

20  Anything else about exhibits today?

21         MR. MACDONALD:  A quick question on their use in

22  opening, Your Honor.  I take it -- do you have a rule on what

23  we can -- I did read the instructions in your practice

24  standards about not having to share the bullet points which is

25  essentially an outline of the words, but do you want us to

20-CV-01878-RBJ     Trial Prep. Conference     02/03/2022     57

1    share exhibits or demonstratives that we would use --

2              THE COURT:  Correct.

3              MR. MACDONALD:  -- in an opening?

4              THE COURT:  If it's something that's going to be an

5    exhibit, but there's a dispute as to its admissibility, you

6    probably ought to plan to bring that up on February 23rd when

7    we meet again.  Other than that, so long as you have a good

8    faith basis to believe that it's admissible, you may use it in

9    your opening.

10             MR. MACDONALD:  Thank you, Your Honor.

11             THE COURT:  What you don't have to disclose is what

12   you just said, your outline of your opening statement.  Now,

13   whether you've got a paper outline, whether you foolishly

14   write out your opening statement, whether you have PowerPoint

15   slides to basically put your notes up in front of the jury and

16   yourself, however you want to do it, that's the lawyer's work

17   product.  That doesn't have to be displayed.  But if it's a

18   document or any exhibit that's going to be admitted, you

19   should let the other side know that you're planning to use it,

20   and if there's a dispute, bring it to my attention on the 23rd

21   to get resolved.

22             By the way, as you probably know, I don't require you

23   to stand behind the lectern when you're examining or speaking.

24   I give you more or less free rein of the courtroom except that

25   you've always have to be conscious of the fact we have a court

1    reporter who's trying her best to get down everything we say

2    so you have to keep your voice up, and if your back is turned

3    to her, you have to keep it up even higher.  But that being

4    said, you're not required but certainly entitled to do what

5    you do at the lectern.

6            Probably none of you are old enough to remember Judge

7    Weinshienk.  Zita Weinshienk was a good judge and an even

8    better human being.  She had a big heart.  I loved practicing

9    in front of her.  There were two things about her practices

10   that I didn't care for too much, and one was she wanted you to

11   stay right at that lectern.  And I remember I'd inch away one

12   step and then another step, and at one point she'd say,

13   Mr. Jackson, just move back to the lectern.  The other thing

14   was she would do the voir dire.  There wasn't any attorney

15   voir dire.  She'd let you submit a list of questions, but I

16   learned that if you submitted a list of 20 questions, maybe

17   one or two would get asked, so you learn you submit the two

18   you want.  But despite that thought she was a terrific person

19   to appear in front of.

20           Okay.  Anything else about exhibits?  Motions in

21   limine.  Really, I guess you filed some.  I haven't had a

22   chance to really dig in, but I'll try to look at your motions

23   before the 23rd, if I can.  I'm going to be out of town

24   between now and then, but I'll be set up with my own office so

25   I can probably look at some of that.  Is there anything in

20-CV-01878-RBJ    Trial Prep. Conference    02/03/2022   59

1    limine that you need to have me look at right now?

2            MS. WANG:  We're happy with your reliance on the

3    briefing, Judge.

4            MS. JORDAN:  And, Your Honor, if I may, in respect to

5    motion in limine number five, we can get you some briefing on

6    that by Monday so that you can have it to look at it, and we

7    don't think we need to argue it now.

8            THE COURT:  Okay.  Don't worry about Monday unless

9    it's for their benefit, because Monday I'm going to be in

10   Arizona and --

11           MS. JORDAN:  Then like Tuesday or Wednesday.

12           THE COURT:  -- probably doing something besides

13   motions in limine.

14           MS. JORDAN:  Thank you, Your Honor.

15           THE COURT:  It's too cold here.  Okay.  Jury

16   instructions.  I gave you my initial comments, but that's all

17   I meant to have you take them as is comments.  Literally I

18   just opened the document, converted it into track changes, and

19   just started going through it and making comments as I went,

20   and I don't think it will be too productive to try to get a

21   final set today.  You need to think about my comments.  Some

22   of them might have been completely off base.  Confer and maybe

23   even come up with a new set.

24           But there is one subject that I want to bring up

25   because you can tell me if I'm completely off base, and I

20-CV-01878-RBJ     Trial Prep. Conference     02/03/2022   60

1    accept that, but it's this whole -- well, there are two

2    things, but the main one is this whole concept of seizure.

3    Now, we're talking about a Fourth Amendment claim, that's one

4    of the claims, excessive use of force in violation of the

5    Fourth Amendment.  The Fourth Amendment talks about search and

6    seizure.  Okay.  But to a layperson, I think, to me, without

7    my robe on, seizure is when you detain somebody.  Seizure is

8    when you grab ahold of somebody.  Seizure is when you arrest

9    somebody.  As far as I know, that's not what this case is.

10          This case is a different kind of excessive force that

11   has been deemed to fall within the rubrics of search and

12   seizure, but it is simply the excessive application of force,

13   in this case by projectiles.  To my mind, seizure does nothing

14   but confuse the issue.  In fact, as I said in my comments, I

15   don't see any reason why the jurors need to be instructed on

16   the words of 1983, which, after all, is just the way to get

17   your case into court.  I don't really think that they need,

18   unless you think they need a civics lesson, to be instructed

19   on the words of the Fourth Amendment.

20          What the jurors need is a set of elements and to be

21   told in order to establish a claim of excessive force under

22   the Fourth Amendment, the plaintiff must prove one, two,

23   three, four, five to a preponderance of the evidence.  If they

24   prove it, they win.  If they don't prove it, they lose.

25   That's what they need.  Now, is there some part of the word

Sarah K. Mitchell, RPR, CRR

20-CV-01878-RBJ   Trial Prep. Conference   02/03/2022   61

 1   seizure that you think necessarily does apply?  Were some of

 2   these people arrested?  Were they taken hold of?  Were they

 3   hauled off to the hoosegow?  Yes, on the curfew people, but

 4   that's gone now.  So do we need to worry about seizure or can

 5   we just go beyond that and give the jurors instructions that

 6   make sense to this case?

 7           MR. MACDONALD:  It's a great question, Your Honor.

 8   We've been wrestling with that on our side.  You've accurately

 9   framed the issue from the plaintiffs' perspective that it is

10   true that none of the remaining plaintiffs were arrested or

11   taken away somewhere, and from our perspective the use of the

12   projectiles, the pepper spray, the tear gas, the rubber

13   bullet, those are seizures under the law.

14           THE COURT:  Yes.

15           MR. MACDONALD:  What we're worried about is that the

16   defendants have not yet agreed with that point.  If they do

17   agree with that point, that's great.  We could proceed just

18   under the excessive force claim as you have described it.  But

19   since they haven't yet agreed that what happened to the

20   plaintiffs constitutes a seizure, that's why we also have the

21   Fourth Amendment -- Fourteenth Amendment as an alternative in

22   the event that they argue that there is no seizure of a

23   particular plaintiff for X, Y, and Z reason that we have a

24   Fourteenth Amendment claim.

25           THE COURT:  What is the law on that?  I've had lots

20-CV-01878-RBJ    Trial Prep. Conference    02/03/2022    62

1   of excessive force cases that didn't involve seizures, I

2   think, in the lay sense.

3           MR. RINGEL:  My understanding is that this is a

4   Fourth Amendment analysis, and the Fourteenth Amendment

5   doesn't apply.  And I understand I think conceptually what

6   Mr. Macdonald is saying, but the -- the excessive use of force

7   definitionally under the law if it's found to be excessive is

8   a Fourth Amendment seizure.  It triggers a Fourth Amendment

9   injury.

10          THE COURT:  Yes.

11          MR. RINGEL:  So the question is not whether it's an

12  injury to strike someone with a foam bullet.  You know, from a

13  Fourth Amendment perspective, the question is whether it

14  happened the way it's being portrayed as happening and what

15  are the other contexts in terms of whether it was objectively

16  reasonable or not.

17          THE COURT:  So you two are agreeing.

18          MR. RINGEL:  Generally, yes, but what I would suggest

19  Your Honor, is we do some more work on the Fourth Amendment

20  issue, and maybe we have the Court give an instruction to

21  define seizure, you know, generally and then put in the

22  language of the excessive force so that it doesn't have to be

23  cast in terms of seizure.  I think that makes the most sense

24  to me.

25          Similarly, Your Honor, when you're talking about the

20-CV-01878-RBJ    Trial Prep. Conference    02/03/2022    63

1    municipal liability claims, the Court had some questions about

2    the final policymaker instructions and things like that.  It's

3    our position that who is a final policymaker is an issue of

4    law for the Court.  Once that is determined, then it can be

5    put in the instruction.  If Chief Pazen is a final

6    policymaker, which I believe is likely, then that gets put in

7    the instruction.  Here are the people that are final

8    policymakers for that municipality liability theory.

9         THE COURT:  Who's a policymaker is a legitimate

10   question, but that isn't the one I was just raising.  I was

11   just raising this concept of seizure.  And, yes, I can say to

12   the jury, and would say if either party insists, we've got a

13   claim here under the Fourth Amendment.  The Fourth Amendment

14   prevents unlawful searches and seizures.  I could even read

15   the language if somebody thought that we needed to do that.

16   But I would go on to say, However, the Fourth Amendment has

17   been interpreted by the Courts as within the concept of

18   seizure prohibiting excessive use of force, and this is such a

19   case.

20        This is not a case about seizure in the lay sense of

21   the word.  This is a case about projectiles that caused

22   injuries, but that fits within the Fourth Amendment under the

23   law.  I can tell them all that, it's a civics lesson

24   basically, or we can just get right to the meat of the

25   coconut.  You guys think about that.  I like to keep the

20-CV-01878-RBJ     Trial Prep. Conference     02/03/2022     64

1    instructions as simple and straightforward as I can, not

2    because the jurors can't understand complexities.  They do,

3    and they will.  But just to make it efficient,

4    straightforward, let's get to the point.

5         Is there anything else about my comments or the jury

6    instructions generally you want to bring up before you have a

7    chance to digest what I did and talk about it to each other?

8         MR. MACDONALD:  I don't think so, Your Honor, and

9    just a final point on the seizure issue.  I think it gets in

10   sort of the rubber meets the road perhaps in the tear gas

11   situation.  So that -- we think that constitutes a seizure.  I

12   think the -- that's the area, though, for us we want to make

13   sure that we don't find ourselves down the road with

14   plaintiffs arguing it was just tear gas even though that is a

15   physical imposition on a plaintiff if the evidence supports

16   that, so that's the area --

17        THE COURT:  Do you have plaintiffs whose only injury

18   was exposure to tear gas?

19        MR. MACDONALD:  With respect to our seven, maybe one,

20   Your Honor, but I need to check with those who are more deeply

21   in the facts.

22        MS. WANG:  We have one, Your Honor.  The others were

23   all hit with something.

24        THE COURT:  Well, for whatever it's worth, you'd be

25   smart to settle those claims and get them out of there, I

20-CV-01878-RBJ    Trial Prep. Conference    02/03/2022    65

1   think, if you could.  Their damages aren't -- if you even

2   prove a case -- I think you've got a tough case to prove, but

3   if you can prove your case, I don't think the damages for the

4   tear gas people are going to be maybe what you're thinking

5   they're going to be.  People get tear gassed all the time.

6   Inmates in prison get tear gassed a lot, pepper spray.  I'm

7   not saying it's a good thing.  Don't get me wrong.  I don't

8   want to be tear gassed.  But to me there's a -- there's a

9   pretty big difference between getting choked up because one

10  was tear gassed and having some projectile wipe out your left

11  eye.  So think about it.

12          I mean, the more we can narrow this down to the

13  claims of the people that really had a serious physical injury

14  I think there's maybe some advantage to that.  As far as the

15  Fourteenth Amendment, I don't know if the Fourteenth Amendment

16  belongs in the case or not.  I can think of one reason why the

17  plaintiffs conceivably could want it, but as I said, on the

18  other side of the coin it might be difficult to prove it.  I

19  don't know.

20          MR. RINGEL:  It's my understanding from

21  Mr. Macdonald's comments, and we'll have a conversation about

22  it at some point in the next bit, that if the defendants take

23  the position that tear gas or exposure to chemical agent falls

24  within the scope of seizure under the Fourth Amendment, then

25  they would likely proceed under the Fourth Amendment and not

20-CV-01878-RBJ    Trial Prep. Conference    02/03/2022   66

 1   need to have a Fourteenth Amendment claim.  Is that -- is that

 2   a fair characterization?

 3         MR. MACDONALD:  I think that's a discussion we can

 4   have.

 5         THE COURT:  Subject to something I'm going to bring

 6   up later, probably you'd be smart to get rid of that

 7   Fourteenth Amendment claim if you can.  I'm not all that sure

 8   about your First Amendment claim either, but whatever.

 9         Anything else about jury instructions?  Okay.  That's

10   my list.  Now, Mr. Ringel has his list.  Let's take a break

11   before we tackle the list.  Ten minutes.

12         THE COURTROOM DEPUTY:  All rise.  Court is in recess.

13      (Break was taken from 10:56 a.m. to 11:11 a.m.)

14         THE COURT:  Before I forget to ask, when are you

15   thinking that you'll be able to get your responses to the

16   summary judgments filed?

17         MR. MACDONALD:  Your Honor, I think the date in Your

18   Honor's prior order was February 11th, so a week from today.

19         THE COURT:  Okay.

20         MR. MACDONALD:  That's what we were planning, and

21   given your motion -- or your severance of the Aurora

22   defendants, would you be amenable to us kicking out our

23   responses with respect to the Aurora summary judgment?

24         THE COURT:  Oh, yeah, absolutely.

25         MR. MACDONALD:  Okay.  Thank you.

20-CV-01878-RBJ    Trial Prep. Conference    02/03/2022    67

1           THE COURT:  So the 11th.  Yeah, there's a schedule

2      for that.  Do you have a date to reply?

3           MR. RINGEL:  Your Honor in the previous order said no

4      replies.

5           THE COURT:  I forgot that.

6           MR. RINGEL:  Which is why we asked for more pages,

7      which Your Honor didn't want us to have, which I understand.

8           THE COURT:  You know, that gives us, what, 12 days

9      before the 23rd to deal with your summary judgments, and

10     fortunately I have law clerk help, which I absolutely need,

11     and it's compounded a little bit by the fact that I'll be in

12     Arizona from tomorrow through the 21st.  But I'll be hooked up

13     and working, and we'll get it done.  But if by any chance

14     you've got it in sooner than the 11th, that would be better.

15          MR. RINGEL:  Your Honor, if the Court anticipates

16     argument on summary judgment on the 23rd, could the Court let

17     us know beforehand?

18          THE COURT:  Right.  I don't usually do that unless

19     somebody asks for it.  If somebody asks for it, I will grant

20     it.

21          MR. RINGEL:  I don't think we need it, but I was just

22     thinking as the Court and the Court's law clerks review, if

23     there are questions that would benefit from discussion with

24     counsel on the 23rd, I thought the Court could let us know.

25          THE COURT:  Okay.  Now, I was going to turn to the

20-CV-01878-RBJ      Trial Prep. Conference      02/03/2022    68

1    Ringel agenda, and the first item is the one that concerns the

2    evidence of violation of Denver Police Department policy or

3    training standards.  Now, is this even an issue?  What I mean

4    by that is is the plaintiff planning or hoping to put in

5    evidence that police officers violated Denver Police

6    Department's own policies as part of your attempt to show

7    unreasonable application of force?

8              MR. MACDONALD:  Two things, Your Honor.  To answer

9    your direct question, I think to some extent yes, and it's a

10   little complicated, because in some instances -- and our

11   expert report lays this out in some detail -- Denver with

12   respect to certain issues had a certain written policy that

13   they did not -- that officers did not comply with, and our

14   expert offers opinions about the widespread failure to comply

15   with certain of those policies, and in the depositions of

16   Denver officers they then testified that the various things

17   that they did were policy compliant.  So we have at least an

18   issue that some of our evidence is going to be the written

19   policy says one thing, the actual policy is another thing.  So

20   that's a little bit of a convoluted answer.  One thing we'd

21   like to do, Your Honor, if you're amenable to this, we just

22   got served with this on Monday.

23             THE COURT:  I understand.  You haven't had a chance

24   to respond.

25             MR. MACDONALD:  And we'd like an opportunity to do --

20-CV-01878-RBJ    Trial Prep. Conference    02/03/2022    69

1          THE COURT:  Is potentially a very big deal, and it's

2   one that if I were to permit you --

3          MR. RINGEL:  Can I help the Court's thinking on it?

4   I didn't mean to interrupt the Court, Your Honor.

5          THE COURT:  If you're going to say you're not going

6   to object, then that will help a lot.

7          MR. RINGEL:  No.  I was just going to say

8   Mr. Macdonald's comments crystallize the issue for me from the

9   plaintiffs' perspective.  It is conceivable that a violation

10  of policy could be relevant to a Monell claim, but it is not

11  relevant to a Fourth Amendment claim against an individual

12  officer.

13         THE COURT:  Well, that's what I want to talk about.

14  Because we've got the *Tanberg* case, *Tanberg* vs. Sholtis, 401

15  F.3d 1151, Tenth Circuit 2005, decided by a panel who's author

16  was then Judge McConnell.  One thing that that case said, but

17  I don't think there's any controversy about it, is that a

18  violation of a Denver Police Department policy or standard

19  does not establish a violation of constitutional rights.

20  That's clear.  That's been held by many courts, including the

21  Tenth Circuit.  The problem you get is in saying that officers

22  didn't follow a department policy or standard as evidence of

23  unreasonable conduct because you run into that *Tanberg* case.

24         Now, depending -- it potentially or conceivably could

25  turn on what the policy is that you're claiming they violated.

Sarah K. Mitchell, RPR, CRR

20-CV-01878-RBJ     Trial Prep. Conference     02/03/2022     70

1    For the moment I'm going to set that aside.  There are three

2    approaches that I can think of to the *Tanberg* case.  One is

3    you simply don't put in the evidence and don't make any

4    argument, whether it's through your expert or otherwise, about

5    violation of Denver Police Department policies, at least

6    vis-a-vis the individual defendants.  That ends the issue.

7    You don't have a *Tanberg* problem.

8            A second possibility is that I don't follow *Tanberg*.

9    That ain't going to happen.  I have to follow *Tanberg*, so that

10   leaves your possibility, and that is to somehow distinguish

11   *Tanberg*.  That's what Judge Wang did in her case -- is it the

12   *McCollum* case?  She discussed and interpreted *Tanberg* and

13   determined that it was distinguishable in the context of that

14   case.  But here we're talking directly about an excessive

15   force case, and that's what *Tanberg* was about.  And,

16   furthermore, in another case, *Davies vs. City of Lakewood* -- I

17   can't remember, Mr. Ringel.  Were you involved in that case

18   too?

19           MR. RINGEL:  I was, Your Honor.

20           THE COURT:  Yeah.  That was the case involving the

21   very unfortunate shooting death of one Lakewood police officer

22   who was shot by another Lakewood police officer, but in that

23   case I issued an order in which I followed *Tanberg* and applied

24   it.  So at a bare minimum, if the Court distinguishes *Tanberg*

25   somehow and evidence of violation of Denver Police Department

20-CV-01878-RBJ    Trial Prep. Conference    02/03/2022    71

 1   standards is admissible -- is admitted, you're risking your

 2   verdict if you get one.  You need to think about that.  You go

 3   through two years of litigation, three weeks of trial, and all

 4   that goes with that, only to have it taken away because some

 5   evidence that probably wasn't critical to begin with gets

 6   admitted by the Court under some theory of distinguishing

 7   *Tanberg*.  So when you write your response, you should think

 8   about that first.  I don't know whether it's distinguishable

 9   or not.

10        Now, one conceivable way that you could try to

11   distinguish *Tanberg* is to try to argue that, well, it only

12   concerns Fourth Amendment cases, and we've got Fourteenth and

13   First Amendment cases.  That strikes me as dubious, but there

14   is that.  So I can't decide that case before you've had a

15   chance to brief it.  I can't decide the issue before you've

16   had a chance to brief it.  But at a bare minimum you better be

17   very, very sure that you're on thick ice before you go down

18   that road.  It strikes me that there are other ways and other

19   types of evidence that you have that would bear on whether the

20   conduct was objectively unreasonable.  So I commend that to

21   you.

22        But I've heard your argument.  I've thought about

23   your argument.  My law clerk has briefed me on your argument.

24   I get it.  Whether or not if I were writing on a clean slate I

25   would come out the same way as the Circuit did, maybe yes,

1    maybe no.  But that isn't my clean slate.  I don't have a

2    clean slate.  I have an obligation, an oath to follow the law

3    that is set down by the Tenth Circuit.

4         I think your next point has to do with whether or not

5    individual officers completed use of force reports.  I'm not

6    sure I understand why that's a big deal.

7         MR. RINGEL:  Because there were not individual use of

8    force reports prepared, Your Honor.  The police department

9    decided to have general use of force reports daily for all of

10   the munitions that were used, so it's not a case where there's

11   an individual police report provided, you know, on a

12   particular use of force, and that's been a major issue in

13   discovery, and that's why it's in the trial brief, Your Honor.

14        THE COURT:  And your position is that whether they

15   did or did not comply -- whether they did or did not prepare

16   use of force reports is not relevant to whether or not their

17   conduct itself was reasonable.

18        MR. RINGEL:  Right.  Because it doesn't -- it doesn't

19   -- there's no separate claim.  It's not a violation of

20   anyone's constitutional rights to not do a report.  It

21   besmirches them in a way that I think is inappropriate and

22   distracts from the issue as -- which is what happened at the

23   moment where they used force and why did they do it.

24        THE COURT:  Do you know yet whether you disagree with

25   that?

20-CV-01878-RBJ    Trial Prep. Conference    02/03/2022    73

1           MS. WANG:  Judge, I do have a response.  So three and

2    four, the failure to complete use of force reports at the time

3    of the protest, as well as the failure to turn on body-worn

4    cameras at the time they were using force on the protesters

5    are related.  They are both essential to our Monell claim.  So

6    Denver Police policy was that use of force reports for

7    protests were not required for any officers.  They did not

8    have to account for their uses of force.  Same thing with the

9    body-worn camera policy with respect to protests.  They didn't

10   have to turn it on when they attended the protests and used

11   force on protesters.

12           We're saying it was consistent with DPD policy and

13   practice, and what our expert opines is that officers knew --

14   these are the two methods that you hold officers accountable

15   for their uses of force.  Did you document what use of force

16   you had, and can that be reviewed by a supervisor, and did you

17   record it so that there's some objective evidence of it on a

18   video, on a body-worn camera.  Policy was they didn't have to

19   do that, and officers routinely didn't do that, and what that

20   led to was a culture of unaccountability where officers knew

21   at the time of the protests they were using force that they

22   didn't have to account for their uses of force at all, and

23   it's led, and discovery has revealed that it has led to Denver

24   being able to say, Well, you didn't know which officer did

25   this, you don't know which officer did that.

                          Sarah K. Mitchell, RPR, CRR

1           And, in fact, after this Court issued the temporary

2    restraining order in *Abay*, it was the first time that DPD

3    brass said, Oh, no, we need to have everybody complete use of

4    force statements, and immediately they sent out e-mails after

5    your temporary restraining order saying, Everybody's got to

6    complete use of force statements, please review the policies

7    and the training materials in order to make sure your

8    statements are consistent with those materials, and then they

9    all wrote their reports two, three weeks afterwards.  So this

10   is part and parcel of our Monell claim, and it's not that it's

11   a violation of the policy.  In fact, it was consistent with

12   policy.

13           THE COURT:  So you're only offering that evidence as

14   too the Monell claim.

15           MS. WANG:  Yes.

16           THE COURT:  Does *Tanberg* have any application to the

17   evidence if it's only offered as to the Monell claim?

18           MR. RINGEL:  *Tanberg* is an individual officer claim.

19   It doesn't speak to the Monell claim which is why I said at

20   the beginning -- or earlier that the Monell analysis could be

21   different.  And the Court didn't -- the Court didn't address

22   it in the Court's ruling on the bifurcation issue, but one of

23   the things that we asked for bifurcation is the Monell claim

24   separate and apart from the individual claims, because I don't

25   think the Court can -- if all that evidence comes in, it has

1    the potential spillover effect on these individual officers

2    who are accused of using excessive force, and it's a distinct

3    issue.  And as the Court -- I can tell from the Court's

4    comments how to apply *Tanberg* in this situation is difficult

5    and requires prevision and thoughtfulness, and one way to deal

6    with it would be to separately deal with the Monell issues

7    because it's clear that the evidence is not admissible with

8    respect to the individual officers.

9         It doesn't matter -- you know, the law is pretty

10   clear that says if you don't turn on your body camera, that

11   doesn't demonstrate that you used excessive force or not.

12   It's separate.  And the cases that talk about things that

13   happen after the fact, whether you wrote your report or not,

14   had the same applicability.  I think it's a different question

15   as to whether it's admissible, as Ms. Wang says, on the Monell

16   issue.

17        THE COURT:  Why wouldn't you want the evidence

18   admitted and want the spillover if you're defending -- are you

19   defending any individual?

20        MR. RINGEL:  Yeah, so there are 14 individual

21   defendants in the case, and so it strikes me that the separate

22   evidence -- you know, if individual Officer Jones is on the

23   stand, and they're cross-examined, You didn't turn your body

24   camera on, you didn't write a use of force report, that has

25   the potential to impact the jury's appreciation and

1   understanding of whether they used force.  It makes them look

2   like they're covering up or something like that.  I get how --

3          THE COURT:  Why couldn't it do just the opposite and

4   explain that, Hey, what they did was consistent with their

5   training, what they did was consistent with their policy.  Why

6   wouldn't that be something that you would want?

7          MR. RINGEL:  If the Court rules against us, that's

8   likely what we would do, but I don't think --

9          THE COURT:  That raises the question are you in a

10  conflict position trying to represent the City and County of

11  Denver and the individuals?

12         MR. RINGEL:  I understand the Court's point, and we

13  continue to evaluate collectively those kinds of issues.  But

14  I think that this stuff, to any extent it's admissible, is

15  only admissible potentially on the municipal liability claims,

16  not on the individual use of force claims.

17         THE COURT:  So what is your concept, that we would

18  try the case as if it were just against the individuals, and

19  then when the jury comes in with a verdict, then say, wait a

20  minute, there's a second part of this case and that's against

21  the City and County, or are you saying I want yet another

22  trial where we have to go through all this again?

23         MR. RINGEL:  I think the former makes more sense, but

24  I think that's open to discussion and the Court's guidance on

25  how the Court makes -- wants to construct it.  But it doesn't

20-CV-01878-RBJ    Trial Prep. Conference    02/03/2022    77

1   make sense to me given *Tanberg*, which, as the Court

2   understands, is not equivocal.  *Tanberg* is very clear in

3   saying that this evidence doesn't come in in an individual

4   officer case, and I don't think the --

5        THE COURT:  Well, that isn't true.  Read Judge Wang's

6   decision in *McCollum*, and you'll see how she dealt with that

7   very question.  She distinguished *Tanberg*.  Now, maybe it's

8   not distinguishable in our case.  That's why I brought it up.

9        MR. RINGEL:  I understand.  I don't believe it is

10   distinguishable, but I understand -- and I'll study Judge

11   Wang's opinion and be prepared to talk to you -- to the Court

12   about it on the 23rd.

13        MS. WANG:  Judge, may I offer something which would

14   may shed a little bit of light?

15        THE COURT:  Oh, you're going to say, yeah, let's

16   bifurcate the Monell claim.

17        MS. WANG:  No, Judge.

18        THE COURT:  That would make it easy.

19        MS. WANG:  Well, this might make it easier.  We are

20   evaluating which of the individual defendants to dismiss.

21   Most of them are -- most of the claims against the individual

22   defendants that we filed -- my plaintiffs filed are against

23   supervisory or command level personnel.  We offered -- and we

24   did that because as part of an alternative to holding the city

25   accountable on the Monell claim, which to us has always been

20-CV-01878-RBJ     Trial Prep. Conference     02/03/2022     78

1    the focus of this case.

2         And at this point as we are evaluating your comments

3    on the jury instructions and everything else, we are

4    determining that we likely will dismiss many of the individual

5    defendants that my clients have sued, if not all of them.  We

6    did ask the city, Mr. Ringel and Ms. Birkholz and Ms. Jordan,

7    if the city -- we asked them before SJ was filed if they would

8    be willing -- if the city would be willing not to file an SJ

9    on Monell, which we think doesn't really have a basis because

10   there are facts of material fact, then we would be willing to

11   dismiss all these individual, and they wouldn't agree to it.

12        THE COURT:  Seriously?

13        MS. WANG:  Even despite their disagreement with that,

14   we're still going to evaluate whether to do it, and we

15   probably will, so this might remove the concerns about *Tanberg*

16   entirely.

17        THE COURT:  Why would you folks not agree to it, if

18   you can get your individuals out?  I mean, how can you even,

19   without a conflict, deny that?

20        MR. RINGEL:  I will just say it isn't my decision,

21   Your Honor.

22        THE COURT:  So she is saying that they're considering

23   dismissing some or all of the individuals and just going

24   against the City and County of Denver on the Monell claim, and

25   was hoping that that would cause you not to file a motion for

20-CV-01878-RBJ    Trial Prep. Conference    02/03/2022    79

 1   summary judgment, and somebody is saying no thank you.  Wow.

 2   How can Denver do that?  How can they -- how can Denver expose

 3   its individual officers to a possible trial and damages?

 4   Well, I don't know the answer, and it's out of your hands.

 5   They might do it anyway.  Well, if you're going to do that, do

 6   it quickly.

 7           MS. WANG:  Yes, Judge.

 8           THE COURT:  Because that would lighten the load a

 9   bit.

10           MS. WANG:  For sure.

11           THE COURT:  That removes the *Tanberg* issue.  That

12   removes the other issue about whether it does or doesn't --

13   they do or do not have a policy.  I could see how *Tanberg*

14   could apply to the absence of the policy just like it could

15   apply to the existence of a policy.  That would become a moot

16   issue, wouldn't it, if you do that.  Interesting.  All right.

17   And that applies to the body camera thing too.

18           Now, the next issue I think is the whole business

19   about the independent monitor, and that relates somewhat also

20   to the independent monitor reports.  And as I understand the

21   issue, it is that it's Mr. Macdonald who screwed up ethically,

22   and as a result as a sanction the independent monitor

23   shouldn't be allowed to testify.  That's the issue, isn't it?

24           MR. RINGEL:  That was the issue in ECF 169, Your

25   Honor, that the Court decided to table.  The issue in the

20-CV-01878-RBJ    Trial Prep. Conference    02/03/2022    80

 1    trial brief is 407 and 403 argument related to the monitor and

 2    the monitor's report.

 3         THE COURT:  So on the issue that you said is tabled,

 4    my understanding is that the claim is that Mr. Macdonald

 5    participated in ex parte conversations with the independent

 6    monitor and that you think he shouldn't have done that.  But

 7    my question would be two-fold:  Number one, how do you know

 8    that they had any discussion at all about the portions of

 9    those memos that the Court has still allowed you to redact?

10    And, number two, didn't those discussions occur before the

11    independent monitor was represented by legal counsel?

12         And if the answer to the second question is yes, then

13    I don't see what the argument is that Mr. Macdonald violated

14    the rule that you can't speak to a party who is represented

15    because he wasn't represented.  And with respect to the first,

16    I don't know how you could possibly know that they discussed

17    something in the very limited part of those memos that I have

18    still upheld under one of your two privileges.  How could you

19    know that?

20         MR. RINGEL:  So let me explain.  The issue is not --

21    because I understand that Mr. Macdonald can speak to

22    Mr. Mitchell as a former employee under the ethical rules.  I

23    happen to disagree with that given the level of Mr. Mitchell's

24    status at the City and County of Denver, but I understand that

25    that's not what the law is.  But there is a part of those

20-CV-01878-RBJ     Trial Prep. Conference     02/03/2022     81

1     ethics opinions that talk about you can't speak about anything

2     that's privileged, and those ethics opinions, as they point

3     out in their response, talk about the attorney-client

4     privilege.  But it seems to me that the analogy for the

5     privileges under deliberative process and law enforcement that

6     we asserted would be applicable as well.

7          It is clear based on Mr. Mitchell's testimony that

8     there was a general discussion of redaction and privilege.  I

9     don't have any evidence that -- to answer the Court's specific

10    question that there was any discussion of anything that was

11    still maintained as privileged based on the Court's recent

12    in-camera reviews.  I don't have that because there is no

13    evidence one way or the other.  But during Mr. Mitchell's

14    deposition he did talk about generally, and we provided that

15    to the Court with our initial motion, that there was

16    discussion about the general topic of the deliberative process

17    privilege and the general topic of redactions.  And if the

18    Court thinks that that's not enough to be crossing the line, I

19    understand the Court's perspective.  In my opinion, it's not

20    appropriate.

21          THE COURT:  Okay.

22          MR. MACDONALD:  Your Honor, may I be heard?

23          THE COURT:  Probably should, because it's you that

24    they're talking about.

25          MR. MACDONALD:  Yes, Your Honor.  So as the Court

20-CV-01878-RBJ    Trial Prep. Conference    02/03/2022    82

1    points out, Mr. Mitchell was not represented by counsel at the

2    time that I had a conversation with him.  We did in open

3    court, after Your Honor's ruling on our motion to compel in

4    which you denied our motion to compel the OIM memos, and so it

5    was public knowledge they had submitted redacted materials,

6    that we contested that, and I called Mr. Mitchell and said the

7    city has produced redacted -- your redacted memos.  I am

8    sorry.  We're going to have to take your deposition.  I know

9    that will be unpleasant for you.

10          So, yes, we -- and they deposed Mr. Mitchell, and

11   that's what he said.  Yeah, Mr. Macdonald told me there was a

12   dispute about the deliberative process.  I still don't know

13   what is under the black boxes.  There would have been no

14   vehicle, nor did I ask Mr. Mitchell what is deliberative about

15   what you did or what the city has redacted in the memos?  I

16   didn't show him the memos.  I apologized to him that we were

17   going to have to take his deposition because I knew that he

18   had moved on from the city and now had an important job with

19   the City of Los Angeles.

20          And so when Mr. Mitchell testified in his deposition,

21   Yeah, McDonald told me there was a dispute about the

22   deliberative process privilege and that there were redactions,

23   that's absolutely true.  That is the extent of what he said

24   because that's the extent of my conversation with him on that

25   issue.  And so I don't think today I did anything improper.  I

Sarah K. Mitchell, RPR, CRR

20-CV-01878-RBJ    Trial Prep. Conference    02/03/2022    83

1    didn't think then I did anything improper.  As you know, Nick

2    Mitchell is himself an attorney.  He's testified in your court

3    before in excessive force cases, and it was my belief then and

4    my belief now that I was entitled to call him, entitled to

5    tell him we were going to take his deposition, and entitled to

6    call him as a witness in this court.

7        THE COURT:  So the mystery, but there's no real way

8    to resolve it, is this:  You don't -- you didn't know then

9    what was redacted because it was redacted.

10       MR. MACDONALD:  Exactly.

11       THE COURT:  Even today you don't know what's still

12   redacted.

13       MR. MACDONALD:  Also true.

14       THE COURT:  They're less redacted now than there was

15   back then, but you don't know what's still redacted.  That way

16   you couldn't have asked him about the stuff that you don't

17   know what it is.  By the same token, you can't know whether

18   any of your discussion might have been about something that

19   was in the redaction because you don't know what's there.  But

20   Mr. Ringel says the same thing.  He has no evidence that you

21   discussed anything that was in the redaction.  You couldn't

22   have done it intentionally because you didn't know it was

23   there, but you could have inadvertently asked him about

24   something that's there, right?  I mean, isn't that just fact?

25       MR. MACDONALD:  I guess I don't think so.

Sarah K. Mitchell, RPR, CRR

20-CV-01878-RBJ    Trial Prep. Conference    02/03/2022    84

1          THE COURT:  Unless you said to him, Here are these

2    memos.  You can see that some of the stuff is redacted, but I

3    want you to tell me about the stuff that's redacted because

4    you, after all, know what's there, but you didn't do that.

5          MR. MACDONALD:  I didn't, Your Honor.  I didn't show

6    him the memos in any way or refer to --

7          THE COURT:  You didn't even show him the redacted

8    versions.

9          MR. MACDONALD:  Correct, Your Honor.  I didn't show

10   him the redacted memos.  I had no discussion about what might

11   be redacted.  As you recall from the redactions, there are

12   15 pages -- or I'm sorry -- 15 memos with large boxes over all

13   of the sections of the memos.  We have no idea other than the

14   titles of various sections.  I didn't ask him what was under a

15   single one of those, Your Honor.

16         THE COURT:  And nobody knows whether he might have

17   talked about anything that was under one of those.  In fact,

18   if he didn't have copies of the memos in front of him when you

19   talked to him, he probably doesn't remember exactly what's in

20   those.

21         MR. MACDONALD:  A hundred percent, Your Honor.  Even

22   during his deposition Mr. Ringel didn't -- sorry --

23   Mr. Mitchell didn't know what was under the redactions.  I was

24   not the person who deposed him, but I believe he was asked by

25   my colleagues, and Mr. Mitchell in the deposition when people

1  did show him at least some of the memos, and I think his

2  answers to those questions were, I don't know.  It was a long

3  time ago.  I don't know what's under here.

4          THE COURT:  Is he going to come here from LA to

5  testify?

6          MR. MACDONALD:  Mr. Mitchell I believe still lives in

7  Denver, and we would intend to call him as a witness, Your

8  Honor.

9          THE COURT:  You've got him under subpoena?

10          MR. MACDONALD:  We do not have him under subpoena.  I

11  understand since we got the letter from the city stating they

12  represent him that we would -- we have not communicated with

13  Mr. Mitchell, so we would serve the city with that trial

14  subpoena if they continue to represent him.

15          THE COURT:  So now you represent him too?

16          MR. RINGEL:  The city attorneys sent a letter of

17  representation to opposing counsel for the purposes of the

18  deposition and the scheduling of the deposition.  What

19  happened, Your Honor, was we got a note from opposing counsel

20  in an e-mail saying we scheduled Mr. Mitchell's deposition for

21  such and such a date, and so it was obvious that they had

22  communicated with Mr. Mitchell, and we thought that that

23  wasn't appropriate, and so the city attorney sent a letter

24  saying that we would represent him for purposes of the

25  deposition, which is what occurred.  We have not had any

20-CV-01878-RBJ     Trial Prep. Conference     02/03/2022   86

 1   conversation with him about representing him for purposes of

 2   trial, but we can obviously have a conversation with

 3   Mr. Macdonald about a subpoena and how to get that to

 4   Mr. Mitchell and that sort of thing.

 5        THE COURT:  Well, would there be any conflict if you

 6   were trying to represent Mr. Mitchell other than setting a

 7   deposition?  He's, after all, supposed to be independent of

 8   the city.

 9        MR. RINGEL:  I understand, Your Honor.  I have to

10   think about that.

11        THE COURT:  Okay.  Well, I think that the concern

12   about the ethical issue is probably not a concern.  Now, you

13   say you have other objections based on 407, 403.  I don't know

14   what your objections are.  I haven't studied that.

15        MR. RINGEL:  Yeah, that's in the trial brief, Your

16   Honor.  And my suggestion is I assume the other side would

17   like to respond, and then we can address it on the 23rd.

18        THE COURT:  Correct.  I mean, it seems to me from

19   what I understand about the independent monitor that his

20   testimony might be relevant.  Somebody said -- maybe you said

21   -- he's testified in my court before.  I'll just have to deal

22   with it once it's briefed.

23        Okay.  Then we get next, I think, to who is a

24   policymaker and who isn't, and you say that's an issue of law

25   for the Court, and I don't -- I don't know whether you

                    Sarah K. Mitchell, RPR, CRR

20-CV-01878-RBJ    Trial Prep. Conference    02/03/2022    87

1   disagree with that.

2          MS. WANG:  We don't disagree with that, Judge, and

3   it's part of the summary judgment briefing, so we intend to

4   have that -- hash that out.

5          THE COURT:  So whom do you think is a policymaker?

6          MS. WANG:  Well, the city has agreed when we

7   conferred about the jury instructions that the mayor and the

8   chief of police are certainly policymakers.  We also say that

9   for purposes of managing the operational control of the

10  protest and the police response to it that Commander Phelan,

11  who was the incident commander, was also a final policymaker

12  over, you know, how to deal with the protests, and they

13  haven't argued in their summary judgment motion that he's not.

14         THE COURT:  Well, maybe this isn't an issue then.

15         MR. RINGEL:  As the Court will see in the summary

16  judgment briefing, the issue essentially comes down to whether

17  Division Chief Ron Thomas is a final policymaker or not,

18  because the evidence on the as-applied challenge, which I

19  guess now that I'm saying it isn't really relevant for the

20  trial as it's now constituted, but the evidence on the

21  as-applied challenge for the curfew order unconstitutionality

22  is from Division Chief Ron Thomas.

23         THE COURT:  Okay.  But he's -- she just told us that

24  the three they're claiming are the mayor, the chief, and

25  Phelan.

Sarah K. Mitchell, RPR, CRR

20-CV-01878-RBJ     Trial Prep. Conference       02/03/2022    88

1          MR. RINGEL:  For purposes of what this trial is now,

2     I think that's -- if that's true, I don't think there's going

3     to be a dispute that Commander Phelan is a final policymaker

4     for purposes of response to the protests.

5          THE COURT:  Okay.  Another issue -- maybe the next

6     issue -- because I think your ratification issue has to do

7     with that same matter -- the next one on my list is whether

8     the Court's order in -- I call it *Abay* -- you call it *Abay* --

9     is relevant or irrelevant.  I don't know if you even are

10    thinking that you want to try to put that in evidence what

11    that order is.

12         MS. WANG:  Judge, the relevance is to our Monell

13    claim, because the day after the *Abay* decision came out is

14    when the top commanders at the DPD decided that they were

15    going to have officers retroactively write their use of force

16    statements.  And so we're not intending to make -- you know,

17    to present it as some sort of evidence of misconduct or

18    anything like that, but there may need to be references to it

19    in reference to the Monell claim.

20         And the argument is that DPD policy and practice was

21    not to require officers to write use of force reports for

22    protests, and as a result, officers knew that they wouldn't be

23    held accountable for their uses of force, and it wasn't until

24    *Abay* was decided that there's a bunch of e-mails going back

25    and forth between the deputy chief, Division Chief Thomas, and

 1    others at the top levels of the DPD saying, You've got to

 2    write this up, and you've got to make sure you look at the

 3    policy and training and make sure that you avoid problematic

 4    language in your officer statements, and make sure you look at

 5    the policies and training to make sure you document it.  And

 6    so there may be a reference to *Abay*, but I don't think it's

 7    going to be some central part of any of the claims.  We're not

 8    going to use it to try to demonstrate that there was a

 9    constitutional violation.

10         THE COURT:  Why can't it just be stipulated that

11    there wasn't any policy on X, Y, Z until the protests

12    happened, and then the policy changed.  Why does it have been

13    to be linked to my decision in *Abay*?

14         MS. WANG:  I mean, I think the relevance of it is

15    that the DPD was not concerned with having officers timely

16    document their uses of force, and the DPD knows in its own

17    right, in its own manual it requires timely use of force

18    statements for regular patrol, and the reason is for officer

19    accountability, but they did not have those accountability

20    mechanisms in place for protests.  And it wasn't until the

21    Court's order, you know, saying that there's a problem with

22    what was going on and that, you know, entering the temporary

23    restraining order that the DPD decided they needed to have

24    people paper over what happened.  And there's also an e-mail

25    from a commander that says this papering over of what happened

 1    is of utmost importance to protect you and your troops.  And

 2    we've got testimony from a lieutenant saying I understood that

 3    to mean we need to protect ourselves from lawsuits.

 4            So it's part of our Monell claim in the sense it is

 5    about the DPD's lack of accountability and culture of lack of

 6    accountability, and then when they realized they needed to

 7    document it because there had been a lawsuit filed, their

 8    method was to circle the wagons, to make sure everybody

 9    papered it up.  They were not interested in officer

10    accountability.  They were interested in making sure that

11    officers were not held accountable.

12            THE COURT:  Your concern is you don't want the jury

13    to hear that the Court found that some of the police officers

14    engaged in misconduct.

15            MR. RINGEL:  That's one.  And then the other thing

16    that is neglected in the argument and the Court should

17    understand, every single incident that's at issue in this case

18    happened before this Court's order in the *Abay* case.  So how

19    from a principle of linear time, as the Tenth Circuit says in

20    I think it's the *Cordova* case -- how does that possibly cause

21    from a moving force perspective the constitutional violation?

22    This Court's order didn't cause anything to happen prior to

23    it.  Their argument is circular because it suggests that you

24    have this culture of non-accountability.  But as we talked

25    about before, whether someone writes a report or not doesn't

1   mean that they used excessive force.  Whether someone -- when

2   they write a report doesn't mean whether they used excessive

3   force or not.

4           All of that after-the-fact stuff doesn't create the

5   causation issue, and, you know, if we get down to a Monell

6   case only, maybe we have something to -- maybe the issue is

7   easier to -- for the Court to wrestle with than for me to

8   wrestle with.  But I don't see how this makes any sense to

9   essentially brand the Denver Police Department as having

10  violated people's constitutional rights as this Court found,

11  and the Court obviously has the right to find that, but

12  interjecting that into this trial is not only irrelevant, but

13  it's completely prejudicial.

14          THE COURT:  I am concerned about that too, and in

15  particular because I was the judge, and the jury is going to

16  identify with me in this trial, and if they hear from -- hear

17  that I found that the cops did something wrong during the

18  protests, that's got the potential to be a big deal for the

19  jury.  Well, I'll wait and see what you say in your paper, but

20  my inclination is that *Abay* doesn't get into the case.

21  There's another way for you to handle the issue about the

22  change of the policy.

23          And the last one on the list is cumulative evidence

24  proposed by the plaintiffs in their list of witnesses and

25  exhibits.  It sounds to me like that's going to be pared way

20-CV-01878-RBJ    Trial Prep. Conference    02/03/2022   92

1    down now.

2            MR. RINGEL:  I agree, Your Honor.

3            THE COURT:  Maybe way down further than you even

4    dreamed.

5            MR. RINGEL:  I would be pleased, Your Honor.

6            THE COURT:  All right.  What else would anybody like

7    to talk about today?  We can talk about the new coach for the

8    Broncos if you want.

9            MS. WANG:  Judge?

10           THE COURT:  Yes, Ms. Wang.

11           MS. WANG:  With respect to our earlier requests to

12   kick the Aurora SJ response down the road, are you going to

13   set another date or just -- for our response to that?

14           THE COURT:  We'll have to set a new date in

15   conjunction with you and with their counsel.  I told them they

16   were making a big mistake.  If you're going to cut the

17   individuals loose, maybe you would have cut their individuals

18   loose.  I mean, I don't know why they weren't willing to stick

19   around at least for today.  I don't get it.  But you heard the

20   dialogue I had with the lawyer.  But, yes, we'll set a new

21   date for a trial and for pretrial stuff, and whatever you --

22   we'll have to do it in conjunction with them, and I hope that

23   maybe you and them -- you and they can do it in conjunction

24   with my judicial assistant.  What else?

25           MR. MACDONALD:  Nothing further from our side, Your

20-CV-01878-RBJ    Trial Prep. Conference    02/03/2022    93

1    Honor.

2           MR. RINGEL:  We don't have anything further for today

3    either.

4           THE COURT:  Oh, yes.  Gavri, do you have a question?

5           THE LAW CLERK:  I may have missed this, but in the

6    trial brief I think there was a question about a punitive

7    damages instructions as well.

8           THE COURT:  Okay.  Thank you.

9           What's the issue there, Mr. Ringel?

10          MR. RINGEL:  Well, if there isn't going to be

11   individuals, that issue goes away, because obviously you can't

12   get punitive damages against the City and County of Denver, so

13   I think we need to wait and see what they do on that issue.

14   But the basic issue was there shouldn't be argument on the

15   issue of punitive damages until the Court decides there's

16   sufficient evidence on punitive damages for it to go to the

17   jury after the plaintiffs' presentation at the Rule 50 stage,

18   Your Honor.

19          THE COURT:  Boy, if I were you I would possibly even

20   want the thing to be reversed.  Let them get up and crow about

21   punitive damages in opening statement, and then if the Court

22   doesn't permit it, you can say they talked about punitive

23   damages in their opening statement, but the judge didn't

24   permit it.  Whatever.  It may not be an issue anymore.

25          Let me ask this.  Now, that you've dropped this new

 1   bombshell on us, Ms. Wang, about maybe dropping all these

 2   individuals, would that be a reason to rethink the whole issue

 3   of settlement, or are we even then we're too far down the

 4   road?  And don't answer the question, please.  What else can

 5   we talk about?  That I do want you to answer.

 6        MR. RINGEL:  So there is one thing that just occurred

 7   to me, Your Honor.  How does the Court want to handle the

 8   issue of evidence related to the injunctive relief claims that

 9   wouldn't be admissible in front of the jury?  Does the Court

10   want to have a post-verdict injunctive relief hearing where we

11   present that evidence to the Court?  That would be my

12   suggestion.

13        THE COURT:  I think the evidence is going to come in

14   anyway, isn't it?

15        MR. RINGEL:  Well, the problem --

16        THE COURT:  You think there's going to be evidence

17   that won't come in the trial, but will be pertinent to the

18   injunction issue?

19        MR. RINGEL:  Yes, and the reason is because after the

20   monitor's report, the Denver Police Department made a variety

21   of different changes to its policies and procedures and a

22   whole host of things.  And so because any injunctive relief

23   order from this Court would be prospective in nature, the

24   Court is going to have to decide is there a basis for

25   injunction based on what the status of the things are now, and

20-CV-01878-RBJ    Trial Prep. Conference    02/03/2022   95

1    that wouldn't be admissible based on what occurred in May and

2    June of 2020, Your Honor.

3         THE COURT:  Okay.  And so I take it then that the

4    plaintiffs think that the settlement that finally emerged from

5    *Abay* wasn't enough, that there has to be something else

6    enjoined, right?

7         MR. MACDONALD:  That's right, Your Honor.

8         THE COURT:  I thought I did a pretty good job.

9         MR. MACDONALD:  We think you did a terrific job, and

10   you -- your injunction changed a lot of things on the ground

11   that were admirable and helpful to our -- to all the folks

12   that were protesting certainly.

13        THE COURT:  But you want some more stuff?

14        MR. MACDONALD:  That's correct, Your Honor.  Our

15   clients do.

16        THE COURT:  And you've told them what it is --

17        MR. MACDONALD:  Yes, we have.

18        THE COURT:  -- and they say, Forget about it.

19        MR. MACDONALD:  Basically, yes, Your Honor.

20        THE COURT:  Well, I have learned very recently that

21   when there is an injunction request, it is necessary no matter

22   what the situation might be or look like for the Court to

23   thoroughly go through the four factors or whatever the factors

24   are and make specific rulings on them, so I guess we'll have

25   to have some follow-up proceeding.  But how to predict that

20-CV-01878-RBJ     Trial Prep. Conference     02/03/2022     96

1   now?  I mean, things change.  We've seen a big change already

2   today.  More than one.  We've separated out a couple of

3   things.  We've heard that maybe there's going to be a whole

4   bunch of people dropped as defendants.  And assuming we have a

5   trial, we're going to learn a lot more.

6          I'm going to learn a lot more than I know now, but

7   then we can set a hearing on the injunction if they're still

8   eager to have some additional relief after they've heard their

9   evidence.  We can do that.  I don't know how else to handle

10  it, do you?  Then I'll have to make specific findings and

11  conclusions.  I'm a little surprised that we fell so short of

12  -- with our settlement in *Abay*, but maybe we did.  Or maybe

13  it's just Mr. Macdonald who is going to push as hard as he can

14  as far as he can and see what he can get.  What else, folks?

15         MR. MACDONALD:  Nothing further from our side, Your

16  Honor.

17         MR. RINGEL:  Nothing further.  Thank you, Your Honor.

18         THE COURT:  Stay healthy, stay safe, enjoy your cold

19  weather.  See you on the 23rd.

20         THE COURTROOM DEPUTY:  All rise.

21         THE COURT:  For the sake of the other case, if is

22  there any more movement on settlement given what has happened

23  here today, would you please let us know?  It doesn't affect

24  us as much as the case that's sitting there behind you.

25         MR. RINGEL:  We will, Your Honor.

                    Sarah K. Mitchell, RPR, CRR

1           THE COURT:  All right.

2           THE COURTROOM DEPUTY:  Court is in recess.

3       (The proceedings were concluded at 12:03 p.m.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Sarah K. Mitchell, RPR, CRR

1                        REPORTER'S CERTIFICATE

2

3           I, SARAH K. MITCHELL, Official Court Reporter for the

4    United States District Court for the District of Colorado, a

5    Registered Professional Reporter and Certified Realtime

6    Reporter, do hereby certify that I reported by machine

7    shorthand the proceedings contained herein at the time and

8    place aforementioned and that the foregoing pages constitute a

9    full, true and correct transcript.

10          Dated this 20th day of April, 2022.

11

12

13

14              _____ /s/ Sarah K. Mitchell _____

15                   SARAH K. MITCHELL
                    Official Court Reporter
16             Registered Professional Reporter
                 Certified Realtime Reporter
17

18

19

20

21

22

23

24

25

                     Sarah K. Mitchell, RPR, CRR