# EXHIBIT 1

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action Nos. 1:20-cv-01878-RBJ (consolidated)

ELISABETH EPPS, *et al.*,

     Plaintiffs,

v.

CITY AND COUNTY OF DENVER, *et al*.,

     Defendants.

---

**AFFIDAVIT OF MATTHEW J. DOUGLAS**

---

     I, Matthew J. Douglas, being over the age of 21, and having been duly sworn on oath,

state as follows:

**I.**     **MATTHEW DOUGLAS-PROFESSIONAL BACKGROUND AND QUALIFICATIONS.**

**EDUCATION**

1.     I graduated from University of Texas in 1991 with a Bachelor of Arts degree in

History. I attended the University of Colorado School of Law and received my law degree in

1995.

**LICENSURE**

2.     I was licensed to practice law in Colorado in 1995. I have also been admitted to

practice law in various United States District Courts and Courts of Appeal including:

the Supreme Court of Colorado; the United States District Court for the District of Colorado; the

United States Court of Appeals for the 10th Circuit; United States Judicial Panel on Multidistrict Litigation; United States District Court for the Southern District of Illinois; and United States District Court for the Southern District of New York.

## WORK EXPERIENCE

3.     After law school, I clerked at the Eight Judicial District, Colorado for the Honorable John-David Sullivan.

4.     Prior to joining Arnold & Porter Kaye Scholer LLP ("A&P"), I practiced general civil litigation and criminal defense with an emphasis on trial work.  My practice included a wide range of cases, including criminal, divorce, construction disputes, property disputes, and personal injury cases.  In October of 1998 I accepted a position as an associate attorney with A&P.

5.     I have been a partner at A&P since 2004.  I have been lead or co-lead counsel on scores of civil cases, including product liability actions, environmental enforcement and toxic tort claims, and commercial disputes.

6.     I have represented plaintiffs and defendants in complex civil litigation through settlement and trial in various courts throughout Colorado, including the United States District Court, and also in federal and state courts in many other states.  A number of my matters proceeded through trial with many of those resulting in verdicts in favor of my clients.

7.     I was involved in this case from the outset, including interviewing potential plaintiffs and working on the initial Complaint.  Over the course of this case, I participated in discovery, depositions, and work with experts, and was one of the lead lawyers at trial.  I have personal knowledge regarding the matters set forth in the Plaintiffs' Motion for Attorney Fees and Costs ("Fee Petition").

II.     **TIMOTHY MACDONALD-PROFESSIONAL BACKGROUND AND QUALIFICATIONS.**

### EDUCATION

8.      Timothy Macdonald graduated from Miami University in 1992 with a Bachelor of Arts degree in Political Science and a minor in Mathematics and Statistics. Mr. Macdonald obtained a Master's degree in Public Policy from Michigan University in 1996. He attended the University of Michigan Law School and received his law degree in 1996.

### LICENSURE

9.      Mr. Macdonald was licensed to practice law in Colorado in 1998. He has also been admitted to practice law in various United States District Courts and Courts of Appeal including: the United States District Court for the District of Colorado; United States District Court for the District of Columbia; United States Supreme Court; United States Court of Federal Claims; and the United States Court of Appeals Federal Circuit, DC Circuit, 1st Circuit, 2nd Circuit, 8th Circuit, and 9th Circuit.

### WORK EXPERIENCE

10.     After law school, Mr. Macdonald clerked at the United States Court of Appeals 5th Circuit for the Honorable Emilio M. Garza.

11.     In 1998, Mr. Macdonald accepted a position as an associate attorney with A&P. He has been a partner at A&P since 2005.

12.     Mr. Macdonald is an experienced litigator whose practice focuses on complex civil trials and appeals. He has tried cases across the country in various state and federal courts and before arbitration panels. Mr. Macdonald has far-ranging appellate experience, pursuing and

defending appeals in the Colorado Supreme Court, the Colorado Court of Appeals, the Federal

Circuit, First Circuit, Second Circuit, Eighth Circuit, Ninth Circuit, Tenth Circuit, DC Circuit,

and other state supreme courts.  Mr. Macdonald was involved with this case from the outset,

including scheduling and pre-trial conferences, discovery and depositions, working with experts,

and lead counsel at trial.

13.     Mr. Macdonald is a Fellow in the American College of Trial Lawyers.

Membership in this organization is limited to the top 1 percent of trial lawyers in a geographic

area and by invitation only.

### III.     ED ARO-PROFESSIONAL BACKGROUND AND QUALIFICATIONS.

### EDUCATION

14.     Ed Aro received his B.A. from the University of Denver in 1986, and his J.D.,

*magna cum laude*, from Boston University in 1989.  He spent the year following his law school

graduation as a law clerk for this Court.

### LICENSURE

15.     Mr. Aro was licensed to practice law in Colorado in 1989. He has also been

admitted to practice law in various United States District Courts and Courts of Appeal including:

the United States District Court for the District of Colorado; the Supreme Court of Colorado;

United States Court of Appeals 10th Circuit; and the United States District Court for the District

of Columbia.

### WORK EXPERIENCE

16.     After law school, Mr. Aro clerked at the United States District Court for the

District of Colorado for the Honorable Richard P. Matsch.

17.     After completing his clerkship, Mr. Aro started as an associate at Holme, Roberts & Owen LLP, becoming a partner at the firm.  In 1998 Mr. Aro accepted a position as a partner at Hogan & Hartson LLP (which became Hogan Lovells).  In 2010 Mr. Aro joined Arnold & Porter as a partner.

18.     Mr. Aro is a seasoned trial lawyer who represents companies in civil lawsuits and regulatory matters involving significant financial or reputational exposure.  He has served as lead trial counsel in dozens of jury trials, as well as in numerous bench trials and arbitrations.  He has tried complex contract, fraud, fiduciary duty, intellectual property, securities, tort and whistleblower cases.  Mr. Aro worked on this case from the outset, extensively involved in trial preparation, and presented a key witness at trial.

## IV. DIANA STERK-PROFESSIONAL BACKGROUND AND QUALIFICATIONS.

### EDUCATION

19.     Diana Sterk graduated from the Massachusetts Institute of Technology in 2006 with a Bachelor of Science degree in Civil Engineering. Ms. Sterk attended the Northwestern University School of Law and received her law degree in 2011.

### LICENSURE

20.     Ms. Sterk was licensed to practice law in New York in 2012. She has also been admitted to practice law in various United States District Courts, including: the United States

District Court for the Southern District of New York and the United States District Court for the Eastern District of New York.

## WORK EXPERIENCE

21.     Ms. Sterk started as an associate with Kaye Scholer in 2011, which later merged with A&P.  She has been a partner at A&P since 2021.

22.     Ms. Sterk's practice includes major product liability MDLs and class actions involving consumer products and prescription drugs, and a range of complex commercial litigations in state and federal courts throughout the country, including litigation related to financial services, breach of contract, and prescription drug pricing matters.  She has tried numerous cases to verdict in multiple jurisdictions.  Ms. Sterk was one of the lead lawyers at trial.

## V.     PATRICK REIDY-PROFESSIONAL BACKGROUND AND QUALIFICATIONS.

### EDUCATION

23.     Patrick Reidy graduated from Quincy University in 2008 with Bachelor of Science degrees in Mathematics and Computer Science.  Mr. Reidy attended the George Washington University Law School and received his law degree in 2013.

### LICENSURE

24.     Mr. Reidy was licensed to practice law in Illinois in 2013, and the District of Columbia in 2015.  He has also been admitted to practice law in the United States Patent & Trademark Office.

### WORK EXPERIENCE

25.     In 2013, Mr. Reidy started as an associate at Akin Gump Strauss Hauer and Feld.

In 2015 Mr. Reidy accepted a position as an associate at A&P.

26.     Mr. Reidy's practice focuses on litigating patents in U.S. District Court, Section 337 investigations at the International Trade Commission, and in *inter partes* review proceedings before the US Patent and Trademark Office.  He has experience litigating patents in multiple technical fields including graphics processing and rendering, computer vision, telecommunications, and semiconductors.  Mr. Reidy was extensively involved in all aspects of this case and developing the evidence for trial, took numerous depositions, and presented a witness at trial.

## VI.     MICHAEL SEBBA-PROFESSIONAL BACKGROUND AND QUALIFICATIONS.

### EDUCATION

27.     Michael Sebba graduated from Columbia University in 2006 with a Bachelor of Science degree in Mechanical Engineering.  Mr. Sebba attended the Fordham University School of Law and received his law degree in 2015.

### LICENSURE

28.     Mr. Sebba was licensed to practice law in New York in 2016.  He has also been admitted to practice law in various United States District Courts and Courts of Appeal including: the United States District Court for the District of Colorado; United States District Court for the Eastern District of New York; United States District Court for the Northern District of New

York; United States District Court for the Southern District of New York; United States Patent and Trademark Office; and the United States Court of Appeals Federal Circuit.

### WORK EXPERIENCE

29.     After law school, Mr. Sebba worked as an associate attorney at Amster Rothstein & Ebenstein LLP and Cadwalader Wickersham and Taft LLP.  He joined Arnold & Porter as an associate attorney in 2020.

30.     Mr. Sebba has represented plaintiffs and defendants in complex civil and patent litigation through settlement, trial, and appeal in various courts throughout New York, including the United States District Court for the Southern District of New York, and in various federal district courts outside New York including the district courts for the District of Delaware, Western District of Texas, District of Utah, Central District of California, and Northern District of California.  He also has represented clients in appeals to the Court of Appeals for the Federal Circuit and in administrative proceedings before the International Trade Commission and Patent Trial and Appeal Board.  Mr. Sebba was extensively involved in the discovery in this case, including numerous depositions, and presented a witness at trial.

## VII.   LESLIE BAILEY-PROFESSIONAL BACKGROUND AND QUALIFICATIONS.

### EDUCATION

31.     Leslie Bailey graduated from Columbia University in 2007 with a Bachelor of Arts degree in American Studies, and from University College London in 2011 with a Master of Arts degree in Modern History.  Ms. Bailey attended Brooklyn Law School and received her law

degree in 2014.

## LICENSURE

Ms. Bailey was licensed to practice law in New Jersey in 2014; New York in 2015; Pennsylvania

in 2017; and the District of Columbia in 2018. She has also been admitted to practice law in

various United States District Courts and Courts of Appeals including: the United States District

Court for the District of Colorado; the United States Court of Appeals for the Federal Circuit;

and the United States Court of International Trade.

## WORK EXPERIENCE

32.     During law school, Ms. Bailey held legal internship positions in various tribunal

and court settings, including with the United Nations Office of Staff Legal Assistance in 2012;

the Appeals Chamber of the United Nations International Criminal Tribunal for Rwanda in 2013;

and the United States Court of International Trade in 2014.

33.     After graduating from law school, Ms. Bailey held a legal fellowship position

with the International Refugee Assistance Project.

34.     In 2015, Ms. Bailey joined Fragomen, Del Rey, Bernsen & Loewy LLP as an

associate attorney.

35.     From 2016 to 2018, Ms. Bailey clerked at the United States Court of International

Trade for the Honorable Claire Kelly.

36.     In 2018, at the conclusion of her clerkship, Ms. Bailey accepted a position as an

associate attorney at A&P.

37.     Ms. Bailey has represented parties in complex civil litigation through settlement

and trial in various United States courts.  In addition to cases before the United States Court of

International Trade and United States Court of Appeals for the Federal Circuit, she has previously represented parties in civil rights litigation. This includes litigation against Montgomery County challenging Montgomery County Correctional Facility administrators' denial of ACLU attorneys' rights to visit with people detained at that jail and litigation against the Secretary of the State of Florida challenging provisions of restrictive voting legislation in Florida. Ms. Bailey was extensively involved in the discovery and development of evidence and presented a witness at trial.

## IX.   ANDREAS MOFFETT-PROFESSIONAL BACKGROUND AND QUALIFICATIONS.

### EDUCATION

38.     Andreas Moffett graduated from the College of William and Mary in 2015 with a Bachelor of Arts degree in Political Science and Government, summa cum laude. Mr. Moffett attended the New York University School of Law and received his law degree in 2020.

### LICENSURE

39.     Mr. Moffett was licensed to practice law in the District of Columbia in 2021.

### WORK EXPERIENCE

40.     After graduating law school, Mr. Moffett accepted a position as an associate attorney at A&P. Mr. Moffett's practice focuses on products liability, mass tort defense, and complex litigation. He has experience assisting clients with products liability, multidistrict

litigation, and civil litigation matters in a number of jurisdictions.  Mr. Moffett was extensively involved in the discovery and development of evidence and presented a witness at trial.

## X.   REEVES ANDERSON-PROFESSIONAL BACKGROUND AND QUALIFICATIONS.

### EDUCATION

41.   Reeves Anderson received his law degree from Yale Law School in 2007.  He graduated as valedictorian from North Carolina State University in 2002 degrees in Political Science and Chemistry and received his master's degree from the Irish School of Ecumenics at the University of Dublin, Ireland (Trinity College) in 2004.

### LICENSURE

42.   Mr. Anderson is licensed to practice law in New York (since 2008), the District of Columbia (since 2010), and Colorado (since 2014).  He is a member of the bar of the Supreme Court of the United States, of every federal circuit court in the United States, and the U.S. District Court for the District of Colorado, among others.

### WORK EXPERIENCE

43.   After law school, Mr. Anderson joined Arnold & Porter as an associate attorney in New York from 2007 until 2008.

44.   From 2008 to 2009, Mr. Anderson clerked for the Honorable Stephen C. Robinson on the United States District Court for the Southern District of New York.

45.   Following his clerkship, Mr. Anderson rejoined Arnold & Porter in Washington

D.C. as an associate attorney, where he worked from 2009 to 2014.

46.     In 2014, Mr. Anderson transferred to the Denver office of Arnold & Porter.  He became a partner in February 2016.

47.     Mr. Anderson is a *Chambers*-ranked lawyer with extensive experience litigating complex civil cases throughout the United States and in Colorado, specifically.  He has represented clients in over 50 cases before the U.S. Supreme Court and served as lead counsel in dozens of federal and state appeals around the country, securing favorable outcomes in multiple billion-dollar appeals.  He has served as trial counsel on five occasions, typically handling the legal aspects of a trial, including all stages of motions practice.  He has previously represented individuals in civil rights claims against law enforcement agencies, including high-profile lawsuits against the United States and state officials, in matters involving veterans' rights, prisoners' rights, voting rights, and various First Amendment protections, as well as cases addressing immigration reform, gun violence prevention, religious nondiscrimination, disaster relief, and wrongful convictions.  He also has defended such claims on behalf of local, state, and foreign governments and officials.  In 2021, *Chambers USA* recognized Mr. Anderson among the top five appellate lawyers in Colorado, remarking on his "notable expertise in complex disputes."

48.     Mr. Anderson was extensively involved in the development of the jury instructions and the briefing of dispositive motions.

## XI.     SAMUEL CALLAHAN-PROFESSIONAL BACKGROUND AND QUALIFICATIONS.

### EDUCATION

49.     Samuel Callahan graduated from Indiana University in 2013 with a Bachelor of

Arts degree in Economics and a Bachelor of Music degree in Trumpet Performance.  Mr.

Callahan attended Harvard Law School and received his law degree in 2016.

**LICENSURE**

50.     Mr. Callahan was licensed to practice law in Maryland in 2017 and the District of

Columbia in 2019.  He has also been admitted to practice law in various United States District

Courts and Courts of Appeal including: the United States District Court for the District of

Columbia; United States District Court for the District of Maryland; and United States Court of

Appeals DC Circuit and 1st-9th Circuits.

**WORK EXPERIENCE**

51.     Following law school, Mr. Callahan clerked at the United States District Court for

the District of Columbia for the Honorable Christopher R. Cooper, as well as the United States

Court of Appeals 4th Circuit for the Honorable Paul V. Niemeyer.

52.     After completing his clerkships in 2018, Mr. Callahan accepted a position as an

associate attorney at A&P.

53.     Mr. Callahan's practice focuses on appellate and complex civil litigation in state

and federal courts.  He has successfully argued cases in multiple federal courts of appeals;

represented parties at the certiorari and merits stages in the US Supreme Court; and briefed cases

raising high-stakes issues of constitutional interpretation, administrative law, and criminal

procedure, among others.  Mr. Callahan worked on the research and drafting of the jury

instructions in the case.

**XII.     MINDY GORIN-PROFESSIONAL BACKGROUND AND**

**QUALIFICATIONS.**

### EDUCATION

54.     Mindy Gorin graduated from the Ramapo College of New Jersey in 2017 with a Bachelor of Arts in Communication Arts and Social Science.  Ms. Gorin attended the University of Michigan Law School and received her law degree in 2019.

### LICENSURE

55.     Ms. Gorin was licensed to practice law in New York in 2021.

### WORK EXPERIENCE

56.     In 2021, Ms. Gorin stated as an associate attorney at A&P.

57.     Ms. Gorin is an attorney in the firm's general litigation practice group and represents clients in a wide range of litigation matters, including complex litigation and white collar defense.  She has represented clients in the District of Colorado, the District of Las Vegas, the District of New Jersey, New York State Supreme Court, and New York State Family Court. She has also assisted in representing corporations and government entities in both internal and government investigations.  Ms. Gorin was extensively involved in the discovery and development of evidence in the case, and presented a witness at trial.

## XIII.   GERARDO MIJARES-SHAFAI-PROFESSIONAL BACKGROUND AND QUALIFICATIONS.

### EDUCATION

58.     Gerardo Mijares-Shafai graduated from Duke University in 2010 with a Bachelor of Arts degree in Public Policy Studies with a Markets and Management Studies Certificate.  He additionally obtained a Master of Business Administration from Northwestern University in

2016. Mr. Mijares-Shafai attended Northwestern University Pritzker School of Law and received his law degree in 2016.

## LICENSURE

59.     Mr. Mijares-Shafai was licensed to practice law in Illinois in 2016 and the District of Columbia in 2020.  He has also been admitted to practice law in various United States District Courts and Courts of Appeal including: the United States District Court for the District of Colorado; United States District Court for the Northern District of Illinois.

## WORK EXPERIENCE

60.     Mr. Mijares-Shafai started as an associate with A&P in 2016.

61.     Mr. Mijares-Shafai's work at A&P involved representation of clients in all areas of corporate restructuring, bankruptcy and insolvency-related matters.  Mr. Mijares-Shafai left A&P in 2021 to start a position with Amazon.  Mr. Mijares-Shafai was extensively involved in discovery, depositions and working with experts prior to his departure from A&P.

## XIII.   COLIN O'BRIEN-PROFESSIONAL BACKGROUND AND QUALIFICATIONS.

## EDUCATION

62.     Colin O'Brien graduated from Truman State University in 2006 with a Bachelor of Science degree.  Mr. O'Brien attended the Washington University school of Law and received his law degree in 2009.

## LICENSURE

63.     Mr. O'Brien was licensed to practice law in Colorado in 2009.  He has also been

admitted to practice law in various United States District Courts and Courts of Appeal including: the United States District Court for the District of Colorado; United States District Court for the Eastern District of California; and the United States Court of Appeals 8th and 10th Circuits.

## WORK EXPERIENCE

64.     After law school, Mr. O'Brien clerked at the United States Court of Appeals 10th Circuit for the Honorable David Ebel.  After completing his clerkship, Mr. O'Brien accepted a position as an associate attorney at Morrison & Foerster.  In 2016, Mr. O'Brien started as an associate at A&P.  He has been a partner at A&P since 2020.

65.     Mr. O'Brien practices general litigation with an emphasis on complex commercial litigation and arbitration.  Mr. O'Brien has handled a broad range of substantive matters, including patent litigation, international mining disputes, contract disputes, and securities matters.  He also maintains an active pro bono practice with an emphasis on protecting the rights of the accused and civil rights generally.  Mr. O'Brien worked extensively on the briefing of dispositive motions in this case.

## XV.   GENERAL LEGAL STANDARDS.

### REASONABLENESS OF RATES

66.     The hourly rates for partners and associates at A&P are reviewed annually and adjusted based on an evaluate of the market rate for comparable services by peer law firms nationally.  The rates reflected in the Fee Petition for A&P employees are substantially below the rates A&P charges commercial clients for the time of those same individuals.  The requested rates in the Fee Petition are based on previous fee applications in recent civil rights cases in the

District of Colorado.

## THE NUMBER OF PEOPLE WHO WORKED ON THIS MATTER

67.     A&P is an international law firm with nearly 1000 lawyers and 13 offices.  The

Denver office of A&P opened in 1980.  The scope of this discovery, motions practice and trial

required a large team of lawyers and other professionals.  In total, over 60 people billed time to

this case, but the fee petition only includes time for the fourteen individuals who contributed

substantially to the three-week jury trial or to the development of evidence that was presented at

trial.  The team consisted of attorneys and legal assistants in Denver and from other A&P offices.

No travel expenses are included in this fee request.

68.     Pro bono representation is one of A&P's tenets.  From A&P's early days arguing

for a right to counsel in *Gideon v. Wainwright*, to the current work in the case at bar, A&P

believes that pro bono is an integral part of legal practice.  As such, A&P pro bono matters are

staffed to provide the same level of excellence in representation without excess billing.  Given

the complex legal theories, myriad facts, and voluminous discovery surrounding the claims,

A&P staffed this case with the necessary number of attorneys and support staff to provide

coverage of each Plaintiff's unique circumstance.

69.     I was involved in strategic decisions in the case.  Other partners at A&P and I

were responsible for the supervision of associates on this case, as well as the delegation of tasks

to associates and support staff.

70.     For example, fact and expert discovery in this case required reviewing of over

1000 hours of video footage produced by Defendants.  The video evidence was key to the entire

trial and a significant component in the success of the Plaintiffs' claims.  Video clips were used

with nearly every witness who testified at trial.  The initial review of the extensive video footage was delegated to junior associates at the firm, as well senior paralegals, such as Joseph Chang. After the initial video review, in which reviewers both quickly scanned the footage to identify events of interest to the claims in the case, certain video footage was selected for further review and analysis by more senior attorneys for potential use at depositions and trial. Despite the efficiency with which reviewers reviewed this footage, and with which approvers approved the selected clips, the sheer volume of the footage produced—covering the Defendants' conduct over many different locations, dates and times—required a substantial amount of rime. In preparation for and during trial, Mr. Chang and others made selected clips of the videos to streamline the presentation of evidence at trial.  Between video review and making clips, Mr. Chang alone billed around 750 hours on video-related tasks.  This is non-inclusive of other associates' preliminary review and video review in preparation for trial.

71.     This case required more than just video review.  Between preparation of the complaint, discovery, dispositive motions, and trial, at least 79 different timekeepers at A&P billed time on this case, amounting to over 14,000 total hours billed to this matter.

72.     The number of attorneys who worked on the case also reflects the complexity of the case before and at trial.  For example, in the discovery phase, nearly 60 depositions were taken, including eight 30(b)(6) depositions.

73.     At trial, there were 25 witnesses presented, requiring extensive preparation on direct and cross-examination, as well as further refinement of exhibits.

74.     Additionally, at trial, there were over 280 exhibits admitted into evidence, ranging

from video files to hundreds of pages of individual documents.

75.     A&P takes a prudent approach to billing in all of its practices, including in its representation of pro bono clients.  Although all of the time billed in this matter contributed to the successful prosecution of the claims, the other partners and I decided to write off the majority of time spent on this matter in presenting the Fee Petition.

76.     For instance, I wrote off all time billed for over 60 timekeepers, including some attorneys on the trial team, two paralegals who assisted with the trial, and dozens of other partners, associates, and support staff at A&P.  The amount of this write-off was at least 5,593 hours of time.

77.     Additionally, from the remaining 14 timekeeper's ledgers, I wrote off over 2,609 hours, including (a) any hours over 10 hours billed on any particular day, (b) hours for potentially duplicative tasks, (c) hours spent in internal conference meetings, and (d) other such hours that would normally be written off for a paying client.

78.     Ed Aro, Senior Counsel at A&P, also wrote off the majority of his time spent on this case, including all the time he spent during trial, and all time he spent on the case in 2022.

79.     In total, I wrote off more than 8,200 billable hours from this case, reducing the number of hours billed down to 5,969.4 hours.

80.     All of the lawyers who worked on this case were highly qualified.  Each attended well regarded colleges and law schools and has had excellent training or experience prior to the case.  All the lawyers are excellent writers, are proficient at legal research, and exemplary in oral

advocacy.

81.     Likewise, the paralegals who worked on this case were highly qualified.

82.     Accordingly, in my opinion, the case was staffed in an appropriate manner.  The number of billers was necessary considering the complexity and importance of the case.  All the work done was necessary and conducted in an efficient manner, particularly in light of the write-offs of most of the time billed on the case.

## REASONABLENESS OF FEES

83.     To determine the reasonableness of a fee request, a court must begin by calculating the so-called "lodestar amount" of a fee, and a claimant is entitled to the presumption that this lodestar amount reflects a "reasonable" fee.  *See* Pennsylvania v. Delaware Valley Citizens' Council for Clean Air, 478 U.S. 546, 563–65; Cooper v. Utah, 894 F.2d 1169, 1171 (10th Cir.1990).  The lodestar calculation is the product of the number of attorney hours "reasonably expended" and a "reasonable hourly rate."  *See* Hensley, 461 U.S. at 433; Phelps, 120 F.3d at 1131.  "Once an applicant for a fee has carried the burden of showing that the claimed rate and number of hours are reasonable, the resulting product is presumed to be a reasonable fee as contemplated by Section 1988."  Cooper, 894 F.2d at 1171[1].

## THE FEES ARE REASONABLE

84.     This case was vigorously defended by the City and County of Denver. As the

---

[1] Colorado Courts also apply a similar test. Once the lodestar amount is determined that basic amount may be adjusted upward or downward by application of several criteria including the degree of success achieved and those factors set forth in the Colorado Rules of Professional Conduct Rule 1.5.

In deciding whether the lodestar figure should be adjusted up or down based on the degree of success achieved, the amount of damages sought or recovered is relevant. Mau v. E.P.H. Corp.,

docket sheet reflects, the Defendants filed multiple dispositive motions including 12(b) motions to dismiss and multiple motions for summary judgment.

85.    Both myself and other partners have reviewed the bills in advance of this fee request.  We have eliminated any duplicate or redundant billing, and made substantial write-offs as described above.  The taking and defending of depositions was divided by witness and subject areas for efficiency.  Research and drafting was done by more junior lawyers and supervised and edited by more senior lawyers.  At every opportunity the person with the lowest hourly billing rate was assigned to the project.

86.    Both myself and other partners have reviewed the costs requested in the Fee Petition and Exhibits 3 and 4 to the Fee Petition.  The costs in Exhibit 3 reflect the reasonable and necessary costs of successfully litigating a large, complex matter with extensive discovery.  Those consist of filing and service fees, deposition costs (there were nearly 60 depositions

---

638 P.2d 777 (Colo. 1981); Robinson v. Lynmar Racquet Club, Inc., 851 P.2d 274 (Colo. App. 1993).

Rule 1.5(a) of the Colorado Rules of Professional Conduct instructs that all fees should be reasonable. The Rule contains 8 factors that can be considered in evaluating the reasonableness of a fee:
The time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly.
The likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer.
The fee customarily charged in the locality for similar legal services.
The amount involved and the results obtained.
The time limitations imposed by the client or by the circumstances.
The nature and length of the professional relationship with the client.
The experience, reputation, and ability of the lawyer or lawyers performing the services.
Whether the fee is fixed or contingent.
Under any accepted reasonableness formula, the fees and costs incurred by Plaintiffs and A&P are reasonable.

taken), trial transcripts, and payment to outside vendors for hard copy binders of the voluminous exhibits required to be available in court for witnesses and to go back to the jury.  Similarly, Exhibit 4 includes necessary costs of litigating this case, consisting of Westlaw research charges, mediation fees, and payments to an outside vendor for the hosting of the voluminous video and document productions to be available for use in the case.  These are all charges that are typically billed to clients.  Of note is that Exhibit 4 requests only Westlaw charges incurred from the filing of dispositive motions in the case through the end of trial, reflecting a write-off of over $50,000.  There was a need for substantial legal research throughout the case, but Exhibit 4 limits the request to the research necessary to respond to dispositive motions, trial briefs, motions in limine and jury instructions.  The costs expended in this matter are very reasonable for a litigation that was this hard fought and went on this long.

## XV.  CONCLUSION.

The fees and costs requested here are reasonable; they reflect substantial discounts to rates, time and costs, and should be awarded against the Defendants.

Dated: June 1, 2022                    */s/ Matthew J. Douglas*
                                       Matthew J. Douglas