IN THE UNITED STATES DISTRICT COURT
OF THE DISTRICT COURT OF COLORADO

| | |
|---|---|
| ELISABETH EPPS, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> CITY AND COUNTY OF DENVER, *et al.*, <br> Defendants. | Civil Action Nos. 1:20-cv-01878-RBJ & 1:20-cv-01922-RBJ-MEH |

**FITOURI PLAINTIFFS' MOTION FOR ATTORNEYS' FEES AND COSTS**

Plaintiffs Sara Fitouri, Jacquelyn Parkins, Joe Deras, Claire Sannier, and Kelsey Taylor, through their counsel, Loevy & Loevy, respectfully submit this Motion for Attorney's Fees and Costs, pursuant to 42 U.S.C. § 1988 and Federal Rule of Civil Procedure 54(d):[1]

After almost two years of litigation, during which Plaintiffs' counsel vigorously litigated the case to trial before any other George Floyd protest-related case in the country, there can be no dispute that Plaintiffs' counsel obtained an exceptional result for their clients. The end result was a $14 million total jury verdict in Plaintiffs' favor, which is among the largest civil rights verdicts in the history of this district. Plaintiffs' counsel has been unable to identify *any* case in this district over the last 25 years in which a jury issued an award in the millions of dollars for injuries short of death. Not only is this a tremendous jury verdict (and probably the largest jury verdict on a

---

[1] **Certificate of Conferral:** Pursuant to Local Rule 7.1, Fitouri Plaintiffs have conferred with counsel for Defendant Denver regarding this motion, and they oppose it.

*Monell* claim against Denver), but Plaintiffs won across the board on their *Monell* theories—official policy, widespread practice and custom, failure to train, and ratification.[2]

Plaintiffs achieved this remarkable outcome because of the skill, expertise, and unwavering dedication of their attorneys. Constitutional cases involving First and Fourth Amendment violations and seeking to hold the municipality liable for such violations are a highly specialized area of federal practice. Few law firms in the country are as experienced and dedicated to these areas of civil rights practice as Loevy & Loevy, which has won multiple *Monell* verdicts at trial. Nor was this an easy case. Denver refused to make concessions or compromises throughout the case, despite clear evidence of excessive force by its officers, and they were obstructive at every stage of the litigation. Plaintiffs' counsel were forced to build the case through time consuming work, including numerous waves of written discovery, 60 depositions, expert discovery, and reviewing over a thousand hours of video and over 62,000 pages of documents. Plaintiffs finally won an unequivocal victory, but only after extensive summary judgment briefing, despite the Court's advisement against it, and a lengthy three-week trial on the merits.[3] Fitouri Plaintiffs' counsel—and especially, their lead counsel, led the efforts in this case.

Moreover, the case was hard and very risky from an ex-ante perspective. Unlike Denver's counsel, who are paid regardless of the outcome, Plaintiffs' counsel undertook this commitment notwithstanding the very real possibility of receiving nothing for all of their labor and investment had summary judgment been granted, or had the jury decided the case the other way.

---

[2] The only other case in the last several decades that counsel could find where a plaintiff prevailed on a *Monell* claim is *Valdez v. Motyka*, 2022 WL 1092182, at *1 (D. Colo. Apr. 12, 2022). The jury awarded $131,000 against a defendant officer and $2.4 million against Denver. The plaintiff proved that Denver's failure to train its officers caused his injury.

[3] *Monell* claims are frequently alleged but rarely survive a motion to dismiss, much less a motion for summary judgment or a jury trial. *See, e.g., Martinez v. City and Cnty. of Denver*, 2013 WL 5366980, at *17 (D. Colo. Sept. 25, 2013); *Fernandez v. Bogert*, 2009 WL 2475114, at *2 (D. Colo. Aug. 11, 2009); *Watkins v. Breneman*, 2015 WL 5562185, at *2 (D. Colo. Sept. 22, 2015); *McAllister v. Kellogg*, 2015 WL 2329425, at *11 (D. Colo. May 14, 2015).

Additionally, for most of this case's history, the Defendants declined all of Plaintiffs' proposals to try to resolve the dispute before legal fees accumulated further. Defendants would not schedule a mediation before January 2022, towards the end of the case, and at that mediation, Denver refused to offer anything more than nuisance value to settle the claims of Plaintiffs Fitouri, Parkins, Deras, Taylor, and Sannier.[4] Defendants' decision to litigate without seriously considering the possibility of settlement for these Plaintiffs resulted in a remarkable number of billable hours. Having forced Plaintiffs to accomplish their goals the hard way, Defendants are hardly in a position to deny that Plaintiffs' counsel is entitled to fair compensation. And Plaintiffs' rates and hours are reasonable. Furthermore, despite not being required to do so, since they represent different parties, counsel for the Fitouri Plaintiffs and Epps Plaintiffs divided labor where possible, including for substantial briefings (such as summary judgment and pretrial motions) and at trial, so as not to incur duplicative and excessive expenses. Defendants thus benefited from the cooperation and courtesy of the consolidated Plaintiffs' counsel.

Having obtained great success in this litigation, Plaintiffs' proposed lodestar is the minimum measure of appropriate attorneys' fees. Plaintiffs seek only the lodestar, despite this case warranting an upward departure under the applicable caselaw.

## ARGUMENT

Courts may award the prevailing party in a successful § 1983 action reasonable attorney's fees. 42 U.S.C. § 1988(b).[5] The Tenth Circuit utilizes a lodestar analysis to calculate the

---

[4] Denver's offers to Plaintiffs Sannier, Deras, Fitouri, Parkins, and Taylor were in the low five figures. Plaintiffs' counsel did settle the claims of Youssef Amghar and Johnathen Duran against Denver. *Cellport Sys. Inc. v. Peiker Acustic GMBH & Co.*, 2016 WL 7375307, at *4 (D. Colo. Dec. 20, 2016) (Jackson, J.) ("Rule 408 'does not bar a court's consideration of settlement negotiations in its analysis of what constitutes a reasonable fee in a particular case.'").

[5] This includes not only attorney's fees, but also fees for the services of paralegals and other items that are normally itemized and billed, so long as they are reasonable. *Ramos v. Lamm*, 713 F.2d 546, 559 (10th Cir. 1983).

appropriate award of attorneys' fees. *Flitton v. Primary Residential Mortg., Inc.*, 614 F.3d 1173, 1176 (10th Cir. 2010). The lodestar reflects "[t]he number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." *Id.* (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983)). The lodestar amount is the presumptively appropriate measure of the fee award and should only be disturbed in rare circumstances. *Hensley*, 461 U.S. at 433; *Robinson v. City of Edmond*, 160 F.3d 1275, 1281 (10th Cir. 1998).

## I. PLAINTIFFS ARE THE PREVAILING PARTY

There is no doubt that Plaintiffs are the prevailing party. To be a prevailing party, the plaintiff "must obtain at least some relief on the merits of his claim." *Lippoldt v. Cole*, 468 F.3d 1204, 1222 (10th Cir. 2006) (quoting *Farrar v. Hobby*, 506 U.S. 103, 111 (1992)). After a three-week trial, a jury returned a verdict in favor of each of the Fitouri Plaintiffs on *every single one* of their legal theories and claims presented. Dkt. 343 (Verdict). The amount awarded to each—$1 million—was an impressive result for any civil rights case, much less one that did not involve permanent physical injuries. *Id.* Plaintiffs thus obtained "excellent results" and their attorneys "should recover a fully compensatory fee." *Hensley*, 461 U.S. at 435.

## II. PLAINTIFFS' ATTORNEYS' HOURLY RATES ARE REASONABLE

A reasonable hourly rate is the rate that lawyers of similar ability and experience in the community charge for their work. *Robinson*, 160 F.3d at 1281; *Blum v. Stenson*, 465 U.S. 886, 895 (1984). "The hourly rate should be based on the lawyers' skill and experience in civil rights or analogous litigation." *Ramos*, 713 F.2d at 555. The burden of proving the market rate is on the Plaintiffs, but "once an attorney provides evidence establishing [the] market rate, the opposing

party has the burden of demonstrating why a lower rate should be awarded." *Gautreaux v. Chicago Housing Authority*, 491 F.3d 649, 659-60 (7th Cir. 2007).

Plaintiffs' counsel and staff should be awarded the following hourly rates:

| Loevy & Loevy Employee | Rate | Hours | Lodestar |
|---|---|---|---|
| Jon Loevy (founding partner) | $650 | 8.50 | $5,525.00 |
| Elizabeth Wang (partner) | $595 | 1,709.75 | $1,017,301.25 |
| Steven Art (partner) | $545 | 2.50 | $1,362.50 |
| David B. Owens (partner) | $545 | 3.25 | $1,771.25 |
| Makeba Rutahindurwa (associate) | $375 | 675.25 | $253,218.75 |
| Katie Roche (associate) | $375 | 37.25 | $13,968.75 |
| Brian Swift (paralegal) | $175 | 785.00 | $137,375.00 |
| Andy Thayer (office manager) | $175 | 13.50 | $2,362.50 |
| **TOTAL** | | **3,235.00** | **$1,432,885.00** |

The total amount of fees that Plaintiffs' attorneys request at this time is $1,432,885.00. In addition, Plaintiffs seek $7,964.60 in expenses recoverable under § 1988, and $25,140.29 in costs under § 1920 (filed separately under Bill of Costs). The supporting declarations and timesheets of Loevy & Loevy attorneys and staff are attached as Exhibits A-F and H-I. Supporting documents for § 1988 expenses are attached as Exhibit M. The reasonableness of these amounts is also supported by the expert declaration of Erica Grossman, attached as Exhibit G.

A. The Hensley Factors Support Plaintiffs' Attorneys' Proposed Rates

The Supreme Court instructs lower courts to consider various factors in deciding the reasonableness of rates. *Hensley*, 461 U.S. at 430 n.3. By far the "'most critical factor' in determining the reasonableness of a fee award is 'the degree of success obtained.'" *Phelps v. Hamilton*, 120 F.3d 1126, 1132 (10th Cir. 1997) (quoting *Farrar*, 506 U.S. at 114). Plaintiffs' counsel achieved unprecedented success in this case. This is especially true given the novelty and difficulty of the factual questions (the second *Hensley* factor). On several occasions, this Court

noted what it believed to be the limited physical injuries in this case. Counsel's ability to adequately portray not only the physical harm, but significant damages from emotional distress and complete fracturing of trust between law enforcement and the community required tremendous skill and thoughtfulness.

The remaining *Hensley* factors also support Plaintiffs' attorneys' hourly rates. With respect to *Hensley*'s reference to "the experience, reputation, and ability of the attorneys," Plaintiffs' attorneys respectfully submit that their credentials are on par with the best civil rights attorneys practicing anywhere. *See* Ex. A (Wang Decl.); Ex. B (Rutahindurwa Decl.); Ex. C (Loevy Decl.); Ex. D (Owens Decl.); Ex. E (Art Decl.); Ex. F (Roche Decl.); *see also* Ex. G (Grossman Decl.). If they worked at large, commercial firms, Plaintiff's lawyers would command top tier market rates far exceeding the rates requested in this petition. Though Plaintiffs' attorneys chose a different path by devoting their careers to civil rights litigation, they strive to provide their clients with the same premium legal services enjoyed by the clients of the world's most prestigious firms. *See City of Riverside v. Rivera*, 447 U.S. 561, 578 (1986) (Section 1988 is designed "to encourage the bringing of meritorious claims which might otherwise be abandoned because of the financial imperatives surrounding the hiring of competent counsel").

Moreover, few civil rights firms in the country match Loevy & Loevy's experience and expertise litigating § 1983 cases. The credentials, experience, and past successes of each of Plaintiffs' attorneys—particularly in civil rights cases—are discussed in detail in their declarations *See* Exs. A-F. This *Hensley* factor, too, supports the proposed hourly rates.

Plaintiffs' attorney's rates are also justified given their specific work on this case, as discussed in their declarations. For instance, Elizabeth Wang was the lead litigation and trial

attorney and worked this case from its inception through trial. She did everything, from investigating and researching potential claims, drafting the complaint, conducting all fact and expert discovery, making strategic decisions about what legal theories to pursue and how to develop evidence during discovery to support Plaintiffs' claims, writing motions and responses to motions, summary judgment briefing, preparing pretrial motions, deciding what exhibits and witnesses were needed for trial, and leading Loevy's trial team. Without Ms. Wang's expansive factual knowledge and legal expertise, Plaintiffs would not have achieved the outstanding result that they did in this case.

Ms. Wang guided and shaped the litigation from beginning to end. Ex. A ¶¶ 3-4, timesheet. Her expertise in how to litigate (and win) *Monell* claims was especially valuable. *Id.* From the beginning, she determined what discovery needed to be done in order to gather the evidence necessary to support Plaintiffs' *Monell* theories. *Id.* ¶ 4. She decided what specific *Monell* theories to pursue. *Id.* She drafted written discovery and conducted oral discovery geared towards proving the *Monell* claim at trial. *Id.* She determined what depositions of officers and supervisors needed to be taken and helped shape the Rule 30(b)(6) deposition topics. *Id.* She was the first questioner at most of the depositions of the defendant officers, supervisors, and Rule 30(b)(6) witnesses. *Id.* She worked closely with the experts on their expert reports. *Id.* ¶¶ 3-4.

Finally, each of the other *Hensley* factors also favor the rates requested. *Hensley*, 461 U.S. at n. 3. Plaintiffs' attorneys spent thousands of hours litigating this case, which involved complex civil rights issues pertaining to excessive force at a protest and the infringement of a person's right to free speech. This case was complex not only because of the sheer volume of documents and video that had to be reviewed and digested, but Plaintiffs *had* to prove their *Monell* claim against

7

Denver in order to prevail. Due to Denver's faulty policies on BWC activation and officer use-of-force reporting, Plaintiffs were unable to identify specific line officers who shot them or threw gas or explosives at them. As the Court is aware, Plaintiffs had to prove not only that an officer committed a constitutional violation against Plaintiffs, but that it was a result of Denver's unconstitutional policies, practices, failure to train, or ratification of the misconduct. Plaintiffs proved all of the above. They did so with the real risk of recovering absolutely nothing and were also precluded from devoting time and resources to other cases. This case was "undesirable" in the sense that it was risky, difficult, and a drain on time and resources. Plaintiffs' attorneys' willingness to take on and navigate the risks of the case is further support for the proposed rates. *See* Ex. G ¶ 23. Plaintiffs' counsel took this case with an awareness that it could define future litigation surrounding protests in the United States. As for counsel's skill, this Court had a front-row view to the trial, and the skill demonstrated by trial counsel. Ms. Grossman's declaration provides further support for the rates requested, stating, in sum, that the work done by Plaintiff's attorneys was "exceptional," and that "[t]he result achieved here by this verdict, *which is the most important factor in attorneys fee applications*, is obviously exceptional." *Id.* ¶ 21. This Court should award Plaintiffs' attorneys their requested hourly rates.

      **B.**      **Hourly Rates Awarded in the Community Support the Proposed Rates**

Plaintiffs' counsel's hourly rates are also justified when considering fees awarded to other attorneys in the community. *Lippoldt*, 468 F.3d at 1224. *See* Ex. G ¶¶ 12-20.

Seeking $175 for paralegal work, $375 for associates, between $545-595 for partners, and $650 for the founding partner (who has more than a dozen jury verdicts over $5 million in civil rights cases under his belt) is reasonable, given the attorneys' impressive credentials and

8

substantial experience litigating difficult civil rights cases. Courts in this district have found similar rates to be reasonable. Three years ago, Judge Arguello approved the following rates for attorneys from Killmer, Lane, & Newman: David Lane and Darold Killmer (partners) at $650 per hour, Mari Newman (partner) at $600 per hour, and Andy McNulty (associate) at $375 per hour. Ex. J (Orders in *Willmeng v. City of Lafayette*).[6] In a recent civil rights case in which a plaintiff prevailed on a *Monell* claim against Denver, Judge Martinez granted the requested attorneys' fees of $575 to $595 per hour for shareholders and special counsel, $375 per hour for associates, $100 per hour for law clerks, and $100 to $200 per hour for work by paralegals. *Valdez v. Motyka*, 2022 WL 1092182, at *3 (D. Colo. Apr. 12, 2022).[7]

Loevy & Loevy attorneys have not had their rates adjudicated in this district before. However, they have had their rates adjudicated in other federal courts, as discussed in their declarations. Exs. A, C, D, E, F. More recently, in March 2022, Loevy & Loevy attorneys and paralegals were awarded the following hourly rates in a FOIA case: (1) $525 for a junior partner and 2006 law graduate; (2) $ 375 for an associate and 2018 law graduate; and (3) $200 for paralegals. Ex. L (3/17/22 Order in *Calloway v. CPD*) ¶ 12. The claims in this case are more complicated than those involved in the FOIA litigation.

Finally, this Court must consider the quality of counsel's work throughout this litigation. *Case v. Unified Sch. Dist. No. 233, Johnson Cnty., Kan.*, 157 F.3d 1243, 1257 (10th Cir. 1998); *see also Ryals v. City of Englewood*, 2014 WL 2566288, at *9 (D. Colo. June 6, 2014) (Jackson,

---

[6] In 2018, a court adjudicated David Lane and Darold Killmer at $590 per hour, their associates at $350-375 per hour, and their paralegal at $175 per hour. *Stroup v. United Airlines, Inc.*, 2018 WL 10613861, at *8 (D. Colo. Dec. 5, 2018).
[7] Plaintiffs' rates are especially reasonable when viewing them in light of the Fitzpatrick Matrix, which is used to assist with resolving requests for attorney's fees in complex civil cases in District of Columbia federal courts handled by the Civil Division of the United States Attorney's Office for the District of Columbia. The fee schedule places Ms. Wang's hourly rate at $666, Mr. Loevy at $745, Mr. Art at $625, Mr. Owens at $614, Ms. Roche, Ms. Rutahindurwa at $490, and paralegals at $207. *See* Ex. K (Fitzpatrick Matrix). This is another basis on which to approve the proposed hourly rates.

J.) ("Experience measured by years of practice is not the only indicator of value. The quality of one's work and its contribution to the result obtained obviously must be considered."). Elizabeth Wang and Makeba Rutahindurwa were the lead counsel for their clients. The Court witnessed their writing skill and oral advocacy at various stages of the litigation, including at trial. Counsel were extremely prepared, effective, passionate about the case, and committed to achieving excellent results on behalf of their clients. *See also* Ex. A ¶¶ 3-4.

### III. THE HOURS BILLED ON THIS LITIGATION WERE REASONABLE

Plaintiffs' total 2,436.50 hours of attorney time and 798.50 hours of paralegal/staff time are reasonable and should be approved. Plaintiffs' counsel's hours are documented on the time sheets attached to their declarations as Exhibits A-F, and H-I.

The Tenth Circuit considers the following factors to determine the reasonableness of a prevailing party's attorney's hours submitted in a fee petition: (1) whether the tasks being billed would normally be billed to a paying client, (2) the number of hours spent on each task, (3) the complexity of the case, (4) the number of reasonable strategies pursued, (5) the responses necessitated by the maneuvering of the other side, and (6) potential duplication of services by multiple lawyers. *Robinson*, 160 F.3d at 1281. All of these factors support the requested fees.

**Factors 1, 2, 3, and 4:** This case involved numerous complex legal theories, extensive discovery, and was hotly contested. At the outset, it is important to make clear that Plaintiffs' attorneys understand they were required to exercise billing judgment in deciding what hours to submit to the Court in a fee petition, and they spent time reviewing their time records to ensure they were appropriate. Plaintiffs' attorneys submit that their timesheets include only the core activities necessary to effectively prosecute the case, and not extraneous hours that would have

been "excessive, redundant, or otherwise unnecessary" to the result in this case. *Hensley*, 461 U.S. at 434. For example, Plaintiffs have excluded hours that were spent on tasks exclusively relating to Plaintiffs' claims that have not yet been tried (i.e., claims against the Aurora Defendants and the Arrest Class claims), as well as hours spent exclusively on Plaintiffs' claims that were dismissed or settled. *See* Ex. A ¶¶ 17-19; Ex. B ¶ 7. Plaintiff's paralegal, Brian Swift, also significantly reduced the number of hours that he spent downloading video (video which was essential to the case). Ex. H ¶ 4; note on timesheet at 14.[8]

Another factor supporting Plaintiffs' attorneys' hours is the voluminous evidence that needed to be reviewed and were necessary to litigating Plaintiffs' claims. The video evidence was critical to Plaintiffs' success at trial, from presenting important clips to the jury during expert testimony to substantiate Plaintiffs' *Monell* claims, to impeaching defendants' officer witnesses on their version of events. For example, Ms. Wang's knowledge of the video evidence led to her pulling out a video for use in impeaching Officer Valentine about an incident in which he claimed that protestors put an explosive device under his truck, causing it to explode. Ex. A ¶ 5; Ex. N (3/14/22 Trial Tr., Valentine). Given the unexpected testimony, counsel had to think quickly in order to make use of the evidence to impeach Valentine. Similarly, during Officer Hamilton's testimony, Denver's counsel elicited testimony that he did not render medical aid to protestors because the officers thought they were being "baited." This, too, was unanticipated testimony. Due to her extensive knowledge of the video, Ms. Rutahindurwa was able to quickly pull out a video for use in cross-examining Hamilton which showed a specific incident during which Hamilton was

---

[8] The Supreme Court has instructed that where claims for relief involve common facts, the Court assessing attorneys' fees under Section 1988 cannot attempt to subdivide the fee award among discrete claims. *Hensley*, 461 U.S. at 435.

present when he and other officers ignored protestors pleading desperately with them for medical help for a man with a serious head injury. Ex. O (3/23/22 Trial Tr., Hamilton).

And finally, as Ms. Wang and Ms. Rutahindurwa's timesheets demonstrate, they spent a reasonable number of hours on each task. This was due to their experience in civil rights cases. For example, Ms. Wang spent an average of 2.88 hours preparing for depositions. *See* Ex. A, timesheet at 12-22. The reason she was so efficient is because of her skill and experience in taking depositions and her deep knowledge of the facts. As another example, Ms. Wang conducted the examination of Incident Commander Patrick Phelan at trial. He was a very important witness. She spent approximately 10-11 hours preparing his examination, and then approximately 5.5 hours preparing his redirect. Ex. A, timesheet at 28. These are just a couple examples of efficient use of time reflected in Plaintiffs' counsel's timesheets.

**Factor 5:** Denver's litigation style forced a great expenditure of efforts by Plaintiffs. Their strategy was to fight Plaintiffs at every turn, file unnecessary motions, and attempt to conceal important facts through questionable discovery maneuvers. *Ramos*, 713 F.2d at 554 (in determining reasonableness, the court should consider "the responses necessitated by the maneuvering of the other side"); *City of Riverside*, 477 U.S. at 580 n. 11 ("The government cannot litigate tenaciously and then be heard to complain about the time necessarily spent by the plaintiff in response.") (internal quotation marks omitted). A prime example of this is when Denver refused to conduct a reasonable investigation into identifying officers present at specific locations, dates, and times that were relevant to the Plaintiffs' claims, even when Plaintiffs' counsel provided screen shots from video to narrow their discovery requests. The Court had to intervene and compel Defendants to answer the interrogatory. Dkt. 106. Even still, the City provided lengthy objections

and vague answers in its supplemental response to Plaintiffs' interrogatory. Plaintiffs thus had to depose numerous officers and review thousands of pages of officer statements and hundreds of hours of video in an attempt to obtain basic information about which officers and supervisors were present at which incidents.[9] This was important not only to identifying potential individual defendants, but also in determining which officers were witnesses to what incidents. Another example is the summary judgment motion filed by Denver *even after* the Court advised against it. Dkt. 248 (Minute Order). Plaintiffs spent a substantial amount of time responding to the motion.

**Factor 6:** Loevy & Loevy staffed this case very leanly. Elizabeth Wang, handled most of the case on her own. She envisioned this case's potential from its inception, led the charge in identifying and molding the *Monell* claims against Denver, and made numerous important strategic decisions that ultimately resulted in a favorable verdict. Ex. A ¶¶ 3-5; timesheet. Only one associate, Makeba Rutahindurwa, actively litigated the case with her. Ms. Wang's excellent supervision of Ms. Rutahindurwa allowed her to participate meaningfully in this litigation in a manner not normally accessible to younger attorneys, conducting depositions on her own, drafting important briefings, arguing motions before the Court, contributing to case strategy, and taking examinations of witnesses and presenting opening statement at trial. *See* Ex. B. As their timesheets reflect, Ms. Wang and Ms. Rutahindurwa divided tasks and responsibilities so that there was no duplication of services by multiple lawyers. *See* Exs. A, B. And, Plaintiffs' attorneys utilized their paralegal where possible, not only because he was capable but also to save on resources. Ex. H.

---

[9] Lt. Porter testified at his deposition that he was not interviewed about where he and his team were on May 31, 2020, which indicated that defense counsel did not conduct meaningful investigation before "supplementing" their interrogatory responses. Ex. P (Porter Dep.) at 84-86. Of course, it turns out that the fact that Denver could not identify officers turned out to be a feature, not a bug, of its own policies not requiring BWC activation and timely or accurate use of force reports during protests.

While Ms. Wang sought guidance and advice from her peers (Jon Loevy, Steve Art, and David Owens), she did so sparingly. *See* Exs. C, D, E. The fact that Plaintiffs' attorneys were able to take a case of this enormity to trial in under two years and with minimal staffing is no small feat.

In sum, Plaintiffs are simply requesting the lodestar, which is supported by all of the evidence set out above.[10] This has been the approach of Loevy & Loevy in all cases that involve litigation of a fee petition, and it is the reason courts have repeatedly upheld Loevy & Loevy's fee requests as reasonable. *See, e.g., Wheatt v. City of E. Cleveland*, 2019 WL 4071646, at *13 (N.D. Ohio Aug. 29, 2019) (awarding Loevy & Loevy $522,468.50 in attorneys' fees after request for $532,987.50); *Awalt v. Marketti*, 2018 WL 2332072, (N.D. Ill. May 23, 2018) (awarding $3,172,650 in attorneys' fees after subtracting only $14,525 from Plaintiffs' request); *Fox v. Barnes*, 2013 WL 4401802 (N.D. Ill. Aug. 15, 2013) (award of the lodestar and amount requested); *Warfield v. City of Chicago*, 733 F. Supp. 2d 950 (N.D. Ill. Aug. 17, 2010) (approving $624,387 in fees in a case with a verdict barely a third of that amount).

## IV. PLAINTIFFS' COSTS AND EXPENSES ARE REASONABLE

Finally, Plaintiffs' attorneys seek out-of-pocket expenses associated with their efforts in receiving a favorable verdict. When assessing a request to reimburse for expenses, the court considers whether "such expenses are usually billed in addition to the attorney's hourly rate." *M.B. v. Howard*, 555 F. Supp. 3d 1047, 1074 (D. Kan. 2021) (citing *Case*, 157 F.3d at 1257).

Plaintiffs' attorneys spent $25,140.29 in costs recoverable under § 1920 and $7,964.60 in expenses reasonably expended and recoverable under § 1988. *See* Ex. M (spreadsheet and

---

[10] Arguably, this case warrants an enhanced award because the risk associated with the case and the smaller value of damages expected to be awarded in these kinds of cases compared to other civil rights claims, such as wrongful convictions, would prevent many "competent counsel" from taking the case. *Perdue v. Kenny A. ex rel. Winn*, 559 U.S. 542, 543 (2010).

receipts). Plaintiffs incurred costs associated with legal research, paying for copies of video from Colorado State Patrol, mailing Plaintiffs' discovery production (such as videos on hard drives) and other communications, as well as mediation expenses. Plaintiffs' attorneys also incurred reasonable travel expenses (Ms. Rutahindurwa is based out of Chicago) to attend the pretrial conference and trial in Denver.[11] *Ysasi v. Brown*, 2015 WL 403930, at *51 (D.N.M. Jan. 7, 2015) ("The Tenth Circuit has held that these costs may include 'photocopying, mileage, meals, and postage,' if attorneys in the areas normally bill those costs separately to clients.") (citing *Sussman v. Patterson*, 108 F.3d 1206, 1213 (10th Cir. 1997)); *Rocky Mountain Christian Church v. Bd. of Cnty. Cmr's of Boulder Co.*, 2010 WL 148289, at *7 (D. Colo. Jan. 11, 2010) (allowing cost of mediation services, travel expenses, courier service, and computerized legal research in § 1988 fee award); *M.B.*, 555 F. Supp. 3d at 1079 (prevailing parties can recover attorney travel fees that are "incidental and necessary expenses incurred in furnishing effective and competent representation.").

For the foregoing reasons, Plaintiffs respectfully request that the Court grant Loevy & Loevy attorneys' fees in the amount of $1,432,885.00 and Section 1988 expenses in the amount of $7,964.60.[12]

|  |  |
|---|---|
|  | Respectfully submitted, |
|  | s/ Elizabeth Wang |
| Makeba Rutahindurwa | Elizabeth Wang |
| LOEVY & LOEVY | LOEVY & LOEVY |
| 311 N. Aberdeen St./Chicago, IL 60607 | 2060 Broadway, Ste. 460/Boulder, CO 80302 |
| O: 312.243.5900/makeba@loevy.com | O: 720.328.5642/elizabethw@loevy.com |

**Certificate of Service**

I, Elizabeth Wang, an attorney, hereby certify that on June 1, 2022, I served via CM/ECF the foregoing Motion, on all counsel of record.   s/ Elizabeth Wang

---

[11] Loevy & Loevy staffed Ms. Rutahindurwa on this case because the firm's Boulder office only has two attorneys.

[12] Plaintiffs have filed a Bill of Costs for the $25,140.29 in Section 1920 costs.