UNITED STATES DISTRICT COURT
DISTRICT OF COLORADO

Elisabeth Epps, *et al.*,

v.

City and County of Denver, *et al*.

Civ. No. 1:20-cv-1878-RBJ (consol.)

**OPPOSITION TO AURORA DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Zach Packard and Johnathen Duran were exercising their First Amendment right to protest police violence in May 2020 when Aurora police officers shot them—Packard in the head with a lead-filled Kevlar bag and Duran in the groin with a rubber bullet. Summary judgment is unwarranted because a reasonable jury could decide that Defendants violated Plaintiffs' rights.

Aurora's arguments are precluded by disputed fact questions or are simply wrong as a matter of law. Under the First Amendment, disputes over an officer's motivation are quintessential fact questions reserved for juries. For the Fourth Amendment excessive-force claims, defendants do not contend that the officers' conduct was reasonable (likely because Serrant has admitted it wasn't). Instead, they challenge whether Plaintiffs were seized within the meaning of the Fourth Amendment—an argument foreclosed by the fact that both Plaintiffs were shot, including Packard *being knocked unconscious.* For both claims, Plaintiffs have identified the specific officers personally responsible for violating their constitutional rights, and none of those officers is entitled to qualified immunity under clearly established circuit precedent.

**RESPONSE TO AURORA'S STATEMENT OF FACTS ("RSF")**

Plaintiffs, without conceding materiality, do not dispute the facts stated in ¶¶ 1–4, 6, 18–19, 29 for purposes of this Motion and otherwise respond as follows:

5–8. Object, immaterial, pertains to a different date; citations contain hearsay.

9–12. Object, pertains to a different date. Disputed. The crowd was not "violent," and officers used less-lethal weapons indiscriminately on peaceful protestors, regardless of whether any individuals were violent. *See* Dkt. 91-6 ¶¶ 5–7, 12–14; Dkt. 91-4 ¶ 11; Ex. 1 at 118–40.

13. Disputed. Unsupported by citation. The crowd was peaceful before officers threw explosives and gas into the crowd without justification or warning. Ex. 2 at 145–47; Ex. 3 at 706.

16. Disputed. Ex. 4 at 9:30–9:34 p.m.

17. Disputed in part. Budaj shot 15 rounds in conformity with his training, but his targets included Duran, who was not engaged in any criminal behavior. PSF ¶¶ 8–9, 15.

20. Undisputed that Serrant instructed APD officers to shoot less-lethal weapons at protestors who touched a gas canister; otherwise disputed. Unsupported by citation.

21. Disputed. Packard was struck by a lead-filled Kevlar bag fired from a shotgun. Ex. 5 ¶¶ 4, 6(d).

22. Undisputed that Brukbacher instructed APD officers to shoot less-lethal weapons at protestors who touched a gas canister and was a less-lethal weapons instructor for APD; otherwise disputed.

23–28. Disputed. Aurora's training on less-lethal weapons was "dated, incomplete, and deficient in numerous respects." APD officers routinely used less-lethal weapons against peaceful protestors such as Plaintiffs without warning or justification. Ex. 6 ¶¶ 5–18, 23; Ex. 5 ¶¶ 6(c)–9. APD had no policy or training on crowd management, and their use of force and less-lethal weapons policies were deficient. Ex. 6 ¶¶ 19–21, 24–27; Ex. 5 ¶¶ 6(c)–9, 11–12; Ex. 40 at 2; Ex. 41 at 18–21, 27; *see* Exs. 48–52. There is no training material for the 40mm launcher. Ex. 7 at 34. Aurora policy allows officers to use less-lethal weapons in their discretion. *Id.* at 38–39, 47–49.

30. Disputed. Unsupported by citation. *See* Dkt. 286-6 ¶¶ 146–47.

## PLAINTIFFS' STATEMENT OF MATERIAL FACTS ("PSF")

**Aurora Officer David McNamee Shot Zach Packard in the Head with a Lead-Shot Round**

1. After seeing video footage of George Floyd's murder, Packard joined the protests in Denver against police brutality. Ex. 10 at 253–60. On May 30, Packard marched and chanted alongside fellow protestors for about an hour before police suddenly began deploying tear gas and indiscriminately firing pepperballs on the crowd. *Id.* at 258–60. On May 31, Packard joined the protests near Washington and Colfax around 9 p.m. *Id.* at 261–62.

2. Soon after Packard arrived—and without warning or provocation—officers began throwing tear gas at the peaceful protestors. *Id.* at 265. One officer lobbed a tear canister near Packard, and "out of instinct," he "jumped into action to kick the can … out of harm's way," *id*., away from him, not toward any police officer, Ex. 12 at 30. The canister traveled around five to ten feet after being kicked. Ex. 10 at 271; *see* Ex. 13. The canister stopped about 20 feet short of the officers on the other side of the street, who were wearing full riot gear and gas masks. *See* Ex. 13.

3. Immediately after Packard kicked the canister, an officer shot him in the head with a shotgun round, knocking him unconscious. *Id.*; Ex. 10 at 265; Ex. 12 at 29–30; Ex. 14. Packard was shot around 9:12 p.m. Ex. 10 at 275. Shortly before Packard was shot, a loud siren blared for around eight seconds; Packard was struck between two and three seconds after the siren shut off. Ex. 13.

4. Seconds before Packard was shot, Serrant instructed officers, including McNamee, "If they start kicking that shit [*i.e.*, the gas canisters], go ahead and frickin' hit 'em." Ex. 15 at 21:12:26–21:12:30; Ex. 16 at 68. McNamee was standing next to Serrant when he gave that order, which can be heard on McNamee's BWC. Ex. 17 at 21:12:00–21:12:03.

5. When Packard was shot, McNamee was standing in a line of officers on the north side of

3

Colfax, facing south. Ex. 11; Ex. 17 at 21:09:00–21:13:00; Dkt. 259-2 at 68. McNamee fired three lead-filled Kevlar bags from his shotgun between two and three seconds after the siren shut off— the exact moment Packard was shot. Ex. 17 at 21:12:00–13.[1] McNamee acknowledged firing less-lethal shotgun rounds at protestors who were touching gas canisters. Dkt. 259-2 at 68. McNamee was the only officer firing less-lethal shotgun rounds at Colfax and Washington when Packard was shot. Ex. 13; Ex. 17 at 21:12:00–13; Ex. 15 at 21:12:28–41.

6. No Aurora officer rendered aid to Packard after he was knocked unconscious. Ex. 10 at 276. While he was lying on the ground, he was shot again in the shoulder. *Id.* at 283; Ex. 14 at 2. The shot to Packard's head fractured his skull, broke two discs in his neck, and caused brain bleeding, disrupting his employment. Ex. 12 at 35, 41, 44, 46, 60, 78; Ex. 14.

7. On May 30, Sgt. Brukbacher instructed officers to fire less-lethal shotgun rounds at protestors touching gas canisters. *See* Ex. 18 at 29. Brukbacher repeated that instruction the next day shortly after Packard was shot. Around 9:19 p.m., an officer asked Brukbacher, "If [the protestors are] messing with our canisters, bag 'em or no?" Ex. 19 at 21:19:25–21:19:29. Brukbacher responded, "Oh fuck yeah. Without a doubt. They touch any of our gas, they get hit." *Id.* at 21:19:29–21:19:34.

### Aurora Officer Cory Budaj Shot Journalist Johnathen Duran in the Groin

8. Johnathen Duran covered the protests as a credentialed member of the press. Dkt. 91-6 ¶¶ 1–4; Ex. 20 at 15, 32–34, 36, 67–69. On May 31, 2020, he wore a white helmet with the words "MEDIA" written on all sides. Dkt. 91-6 ¶ 19; Ex. 20 at 30, 63.

9. At 9:34 p.m., Duran was livestreaming at Colfax and Pearl, standing near the south sidewalk,

---

[1] The time stamps vary slightly in BWC videos. The most accurate way to compare when Packard was shot in relation to McNamee firing his shotgun is by timing how long each event occurs after the siren shuts off. As explained, both McNamee firing his shotgun and Packard being struck happen simultaneously.

4

when Aurora officers pushed forward and he started backing up. He was shot in the groin with a 40mm round. Dkt. 91-6 ¶¶ 24–25; Ex. 21 at 21:24–22:50 min.; Ex. 20 at 64–67, 111–15; Ex. 22 at 111–112; Ex. 23 at 9:34:07–9:34:24; Ex. 24.

10. At 9:34 p.m., Budaj was at Colfax and Pearl with Aurora officers pushing west on Colfax. He was on the left side of the Aurora Bear (a police vehicle), near the south sidewalk, armed with a 40mm launcher. Ex. 25 at Fitouri 19217; Ex. 22 at 48, 51, 73–76, 80; Ex. 4 at 9:33:28–9:34:23. Budaj shot his launcher between 9:15–9:46, when he did not have his BWC on. Ex. 22 at 67–68.

11. The officers with the Aurora Bear coming out of the alley were Aurora officers, who wore navy blue uniforms. Ex. 22 at 89, 92–93; Ex. 26 at 19, 45, 47.

12. Duran was hit 13 seconds after the light at Pearl turned green, at 9:34 p.m. Ex. 21 at 21:08–21:25 min.; Ex. 22 at 84–87; Ex. 23 at 9:34:24 (Duran doubled over at moment of impact).

13. Budaj is the officer with his 40mm raised standing on the left side of the Bear in Bubna's BWC. He fired at Duran approximately 12 seconds after the light at Pearl turned green. Ex. 27 at 21:34:23–21:34:36; Ex. 28; Ex. 22 at 108–15. The shooting occurred at the moment a firework went off next to the Aurora Bear. Ex. 22 at 111. The other two officers in the area with 40mm launchers did not shoot at that time. *Id.* at 112–15; Ex. 31 at 21:34:17–21:34:32. No other officers had a 40mm, shot at 9:34 or were at Colfax and Pearl. Ex. 25 at Fitouri 19217, 19193–94, 19253, 19268; Ex. 29 at Fitouri 19058; Exs. 17, 19, 30, 32–34; Dkt. 259-2 at 16, 74; Dkt. 259-9.

14. Budaj was wearing a hydration pack that covered up some of the "POLICE" lettering on his vest. Ex. 35 at 21:41:53–21:41:59; Ex. 30 at 21:40:51–21:48:19. Budaj had gray tape on his helmet (a reflection off the neon red Office Depot sign made Budaj's gray tape appear red). Ex. 22 at 59, 88–91; 96–101; Ex. 25 at Fitouri 19246; Ex. 27 at 21:34:10–21:34:36.

5

15. Budaj admitted that Duran had not done anything that warranted any use of force, and that Budaj could accurately target him from that distance. Ex. 22 at 78–84. Budaj is an experienced marksman and grenadier, *id.* at 34–40, who had been trained to shoot through tear gas, Ex. 7 at 57.

16. Duran described being shot in the groin as the worst pain he felt in his life. Ex. 20 at 89–92.

### Aurora's Official Policy, Widespread Practice or Custom, and Failure to Train

17. APD had inadequate training on 40mm launchers and repeatedly used them against peaceful protestors, which was caused by Aurora's policy of providing unlimited discretion to officers. Ex. 7 at 38–39; Ex. 5 ¶ 9(d)–(h); RSF ¶¶ 23–28.

18. Aurora reviewed officers' use of force during the protests and concluded all uses of force were "policy compliant." Ex. 5 ¶ 4; Ex. 36 at 10–12, 36–39, 53–54, 70–71. No officers were disciplined. Ex. 37 at 11–12; Ex. 38; Ex. 22 at 27–32. Aurora approved the uses of force, including on Duran and Packard. Ex. 5 ¶¶ 6, 9(j); Ex. 37 at 20–22; Ex. 7 at 46–47; Ex. 22 at 68–69.

19. The Colorado Attorney General, Aurora's own consultant (21CP Solutions), and Plaintiffs' experts Norman Stamper and Edward Maguire have concluded that Aurora has a widespread pattern and practice of using excessive force, which are caused by Aurora's inadequate policies and training. Ex. 5 ¶¶ 6(b), 6(h), 7–9, 12; Ex. 40 at 1–2, 13–15, 22, 67, 70, 80, 82–86; Ex. 41 at 18–21, 27; Ex. 8; Ex. 9; Ex. 6 ¶¶ 3–27.

20. Aurora did not require timely, accurate use-of-force reports, leading officers to believe they could use force with impunity. When APD did require reports, days after the protests, supervisors instructed officers to write them so that they could justify their uses of force if they were sued. Aurora's policy caused a lack of accountability. Ex. 5 ¶ 10; Ex. 42. Defendants wrote their reports on June 4, after Carlson's June 2 email about reports. Dkt. 259-2 at 14, 71–72; Ex. 22 at 116–24.

6

21. Aurora's use-of-force reporting policy did not require officers to document use of force during protests. There was no training on this. Officers were unprepared to document use of force. Ex. 37 at 25–26, 29–33. No officers were disciplined for failing to document use of force. *Id.* at 26.

22. Aurora's BWC policy covered only how to operate the cameras. *Id.* at 18–19. Budaj did not activate his camera while he was shooting 15 40mm rounds and throwing a grenade. Ex. 22 at 51–54, 63–68. No officers were disciplined for violating policy. Ex. 37 at 19–20, 28–29.

23. Aurora's policy and training failures caused Plaintiffs' injuries. Ex. 5 ¶¶ 6(h), 9(a); Ex. 6 ¶ 27.

## ARGUMENT

**I.   Plaintiffs Identify the Aurora Officers That Violated Their Constitutional Rights**

Aurora ignores ample evidence that identifies McNamee and Budaj as the officers who shot Plaintiffs. The video evidence confirms that McNamee shot Packard. PSF ¶¶ 3–6. Serrant told McNamee to "hit" anyone touching a gas canister; seconds later, McNamee fired three less-lethal shotgun rounds at the exact moment Packard was shot in the head. Notably, he was the only officer firing at that time. *Id.* The video evidence supports no other theory, and Aurora's motion identifies no alternative explanation. *See also* Ex. 10 at 275–76, 284–85.

Similarly, a reasonable jury could conclude that Budaj shot Duran. Duran was hit with a 40mm round, and Budaj was the only officer with a 40mm launcher in a position to shoot Duran at the moment that he was shot in the groin. PSF ¶¶ 9–14. Budaj was an experienced marksman who was shooting well within the recommended range of his launcher. PSF ¶ 15.

The record evidence likewise identifies Brukbacher and Serrant as having violated Packard's rights. Defendants argue that the sergeants' instructions were "a far cry from actively participating in unconstitutional acts or specifically ordering the application of excessive force."

7

MSJ at 6. That position is contradicted by the record evidence, in which both sergeants *specifically ordered* the use of force that injured Packard. PSF ¶¶ 4, 7. But even putting aside that material factual dispute, Aurora misrepresents the relevant inquiry. "For liability under section 1983, *direct participation is not necessary*. . . . The requisite causal connection is satisfied if the defendant *set in motion a series of events* that the defendant knew or reasonably should have known would cause others to deprive the plaintiff of her constitutional rights." *Buck v. City of Albuquerque*, 549 F.3d 1269, 1279–80 (10th Cir. 2008) (emphases added). Here, by instructing their officers to shoot any protestor that touched a gas canister regardless of whether the protestor's action actually threatened the safety of any officer (or anyone else), Brukbacher and Serrant set in motion a series of events they should have known would cause their officers to violate protestors' rights. *See infra* Part III.

Aurora's cases actually support Plaintiffs' claims against the sergeants. In *Holland v. Harrington*, 268 F.3d 1179 (10th Cir. 2001), and *Serna v. CDOC*, 455 F.3d 1146 (10th Cir. 2006), the court found no liability because the defendant officers either did not instruct their team to use force (*Holland*) or were not present when the violations occurred (*Serna*). Here, in contrast, the sergeants directly instructed their officers to use unreasonable force as they stood shoulder-to-shoulder with their subordinates. *Booker v. Gomez*, 745 F.3d 405, 413, 435 (10th Cir. 2014).[2]

## II. Factual Disputes Preclude Summary Judgment on the First Amendment Claims

Plaintiffs' First Amendment claims require proof of three elements: (1) protected activity, (2) government conduct that chills the protected activity, and (3) motive. *Worrell v. Henry*, 219 F.3d 1197, 1205–06 (10th Cir. 2000). Defendants contest the first and third elements.

Aurora's argument that Packard was not engaged in constitutionally protected activity

---

[2] A jury found Denver liable for the acts of its officers that caused Stanford Smith's injuries. *See* Dkt. 343 at 2.

contravenes basic First Amendment doctrine. On May 30 and 31, Packard marched and chanted with hundreds of others to protest the murder of George Floyd. PSF ¶ 1. Aurora does not (and cannot) contest that Packard was at Washington and Colfax on May 31 to protest police brutality. PSF ¶¶ 1–2. Protest is "classically political speech" protected by the First Amendment. *Boos v. Barry*, 485 U.S. 312, 318 (1988); *Hartman v. Moore*, 547 U.S. 250, 256 (2006). Packard was exercising his right to be present in a public place in solidarity with others protesting police brutality. The First Amendment protects that conduct. *Don't Shoot Portland v. City of Portland*, 465 F. Supp. 3d 1150, 1155 (D. Or. 2020). Duran is a journalist whose newsgathering is indisputably protected under the First Amendment. PSF ¶ 8. *Branzburg v. Hayes*, 408 U.S. 665, 681 (1972). The right to access, observe, and record the protests in public spaces is constitutionally protected for the press and the public. *Press-Enterprise Co. v. Sp. Ct. of Cal.*, 478 U.S. 1–2 (1986).

The third element (motive) "may be met with either direct or circumstantial evidence" and "involves questions of fact that normally should be left for trial." *Index Newspapers LLC v. United States Marshals Serv.*, 977 F.3d 817, 827 (9th Cir. 2020). Motive "is not easily ascertained and requires inferences drawn from the [defendant's] behavior" such that "summary judgment may be precluded." *Seamons v. Snow*, 206 F.3d 1021, 1027–28 (10th Cir. 2000). Here, a fact dispute about the officers' motives precludes summary judgment. Budaj knew that Duran was a journalist; Duran was wearing a helmet emblazoned with "MEDIA" in large font. PSF ¶ 8. The indiscriminate use of force on a peaceful journalist supports a reasonable inference that Duran's protected activity was a substantial or motivating factor for Budaj's actions. *BLM Seattle-King Cnty. v. City of Seattle*, 466 F. Supp. 3d 1206, 1214 (W.D. Wash. 2020). There is no basis for Defendants' speculation that Budaj could have negligently shot Duran; a reasonable jury could conclude

9

otherwise given his experience as a marksman. PSF ¶ 15.

Similarly, Brukbacher, Serrant, and McNamee all knew that Packard was protesting. McNamee used lethal force on Packard while he was protesting. That use of force (and the sergeants' directing that use of force) supports a reasonable inference that Packard's protected activity was a substantial or motivating factor for McNamee's actions. *BLM Seattle*, 466 F. Supp. 3d at 1214. That McNamee shot Packard as he was kicking a canister does not change the calculus. Even if McNamee was partially motivated to shoot Packard because he kicked a canister, Packard can still prove that his protest activity was nonetheless a substantial or motivating factor. *See Walton v. Powell*, 821 F.3d 1204, 1211 (10th Cir. 2016). A reasonable jury *already has concluded* on this evidence that the challenged conduct violated Packard's First Amendment rights. *See* Dkt. 343 at 2–3. A prior jury verdict in the non-movant's favor constitutes compelling evidence that summary judgment is inappropriate. *See Fatzinger v. Lehigh Valley Hosp.*, 130 F. Supp. 2d 674, 679 (E.D. Pa. 2001); *Shorter v. Baca*, 2019 WL 3064119, at *6 (C.D. Cal. Feb. 14, 2019).

Brukbacher cannot escape liability simply because his BWC captured him instructing officers to shoot protestors touching gas canisters minutes *after* Packard was shot. *Contra* MSJ at 8 n.4. Brukbacher admits that he instructed officers to fire less-lethal shotgun rounds at protestors touching gas canisters on May 30—the day *before* Packard was shot. Ex. 18. Given Brukbacher's role as a "less-lethal weapons instructor for APD," MSJ at 4, a jury could reasonably infer that he gave his instructions to Aurora officers assisting Denver with the protests, including McNamee.

### III. Factual Disputes Preclude Summary Judgment on the Fourth Amendment Claims

To prevail on their Fourth Amendment claims, Plaintiffs must show "both that a seizure occurred and that the seizure was unreasonable." *Roska v. Peterson*, 328 F.3d 1230, 1243 (10th

10

Cir. 2003). Defendants do not argue that the force used against Plaintiffs was reasonable. MSJ at 10–11. Rather, Defendants contend that no seizure occurred because there was no "intentional" application of force. *Id.* at 11. Defendants are wrong on the facts and the law.

The evidence contradicts Defendants' claim that McNamee and Budaj accidentally shot Plaintiffs. McNamee admitted that he targeted individuals touching gas canisters, like Packard. PSF ¶ 5. Budaj also shot his targets intentionally and was trained to do so at that distance. Dkt. 259-2 at 11; PSF ¶ 15; Ex. 7 at 57. But even if the Court impermissibly drew an inference in Defendants' favor that the officers unintentionally shot Plaintiffs, it would not shield the officers from liability. As this Court instructed the jury on the requisite "intent" to constitute seizure: "For an application of force to be intentional, there is no requirement that the person using force intends to do harm or that the use of force hits its intended target." Dkt. 340 at 15; *Nelson v. City of Davis*, 685 F.3d 867, 876 (9th Cir. 2012). So it is irrelevant whether McNamee or Budaj was aiming specifically at Packard or Duran. The officers' actions were intentional because they deliberately fired their weapons. And because the officers applied physical force to Plaintiffs' bodies with intent to restrain, they were legally seized. *Torres v. Madrid*, 141 S. Ct. 989, 1003 (2021); *Alsaada v. City of Columbus*, 536 F. Supp. 3d 216, 264 (S.D. Ohio 2021). In any event, it is "the jury's job" to resolve fact disputes about intentionality. *Arnold v. Curtis*, 359 F. App'x 43, 48 (10th Cir. 2009).

As explained above, Brukbacher and Serrant are liable because their conduct set in motion events that they should have known would cause other officers to violate Plaintiffs' constitutional rights. *See Buck*, 549 F.3d at 1279–80. Aurora argues only that the sergeants did not direct the use of "unconstitutional force." MSJ at 11. But they did. Both sergeants instructed officers to use potentially lethal force without regard for the factors relevant to whether an officer's use of force

is justified—the severity of the crime, whether the protestor posed an immediate threat to the safety of the officers or others, and whether he is actively resisting or evading arrest. *Graham v. Connor*, 490 U.S. 386, 396 (1989). Regardless, the relevant inquiry is not whether they directed the use of "unconstitutional force," but rather whether they set in motion a series of events that led to the application of unconstitutional force. Defendants do not dispute that a jury could so find.[3]

## IV. Factual Disputes Preclude Summary Judgment on the *Monell* Claims

Plaintiffs' § 1983 claims against Aurora require proof of (1) a city policy or custom and (2) a "causal link between the policy or custom and the injury alleged." *Waller v. Denver*, 932 F.3d 1277, 1283–84 (10th Cir. 2019). Genuine factual disputes preclude summary judgment.

### A. Aurora's Policies or Customs Caused Plaintiffs' Injuries

A policy or custom can be established in numerous ways, including by informal custom that amounts to a widespread practice, decisions of final policymakers, ratification, or a failure to adequately train employees with deliberate indifference to the attendant effects. *Hinkle v. Beckham Cnty. Bd. of Cnty. Comm'rs*, 962 F.3d 1204, 1239–40 (10th Cir. 2020).

There is extensive evidence of a widespread custom and practice of excessive use of force in the APD, which City policymakers have known about for years. RSF ¶¶ 23–28; PSF ¶ 19. As the Colorado Attorney General's Office summarized it, "Aurora Police has a pattern and practice of using excessive force," "consistent patterns of unlawful behavior," and "repeatedly engaged in unlawful and unconstitutional uses of force." Ex. 40 at 1–2. This is a direct result of APD's "culture" and inadequate training and policies. *Id.* at 2. Moreover, Aurora policymakers ratified its

---

[3] Contrary to Aurora's argument, MSJ at 10, Plaintiffs may pursue an alternative claim under the 14th Amendment. *Roska*, 328 F.3d at 1243. A jury can conclude Defendants' behavior—shooting Plaintiffs engaged in protected activity that caused horrific injuries—shocks the conscience and constitutes a clear abuse of government authority. *See Porro v. Barnes*, 624 F.3d 1322, 1326 (10th Cir. 2010); *Edrei v. Maguire*, 892 F.3d 525, 537–38 (2d Cir. 2018).

officers' excessive force by commending, rather than condemning, officers' acts. PSF ¶ 18.

For causation, Plaintiffs must show that the challenged policy or custom is "closely related to the violation of the plaintiff's federally protected right" so as to be the moving force that caused the injury. *Hinkle*, 962 F.3d at 1241. Defendants ignore the evidence. First, Plaintiffs' experts, the Colorado AG's Office, and Aurora's own consultant have all concluded that Aurora's use-of-force and less-lethal-weapons policies are grossly deficient. RSF ¶¶ 23–28; PSF ¶¶ 17, 19–22. Second, Aurora's reporting policy was that officers need not complete timely, accurate use-of-force reports for use of force at protests. PSF ¶¶ 20–21. Third, Aurora's BWC policy did not require officers to activate their BWC when using force during protests. PSF ¶ 22. These policies led to the use of excessive force (evidenced by Budaj's and McNamee's grossly excessive uses of force), as officers understood that they would not be held accountable. A reasonable jury could conclude from the evidence that Aurora's policies and customs caused Plaintiffs' injuries. PSF ¶ 23.

### B.     Aurora Was Deliberately Indifferent to the Effects of Its Failure to Train

Because a failure-to-train theory under *Monell* is based on municipal *inaction*, the Supreme Court requires plaintiffs also to show that a failure to train "amounts to deliberate indifference to the rights of persons with whom the police come into contact." *Canton v. Harris*, 489 U.S. 378, 388 (1989). Deliberate indifference requires "proof that a municipal actor disregarded a known or obvious consequence of his action." *Connick v. Thompson*, 563 U.S. 51, 61 (2011). It can be established by proving (1) that "the municipality has actual or constructive notice that its action or failure to act is substantially certain to result in a constitutional violation, and it consciously or deliberately chooses to disregard the risk of harm," *Barney v. Pulsipher*, 143 F.3d 1299, 1307 (10th Cir. 1998), or (2) "a violation of federal rights is a highly predictable or plainly obvious

13

consequence of a municipality's action or inaction," *Waller*, 932 F.3d at 1284.

There is significant evidence of Aurora's failure to train its officers on crowd management, proper use of less-lethal weapons, and use of force. Aurora provides no crowd management training. And Aurora's training on use of less-lethal weapons is woefully inadequate; there is little in the training material about the circumstances under which less-lethal weapons and force may be used at a protest. RSF ¶¶ 23–28; PSF ¶¶ 17–19. Violation of persons' rights during protests is a highly predictable or plainly obvious consequence of Aurora's failure to train. PSF ¶¶ 17, 19–23; RSF ¶¶ 23–28. Moreover, a reasonable jury could conclude that Aurora's policymakers were on notice of training deficiencies for years and were deliberately indifferent to it. PSF ¶¶ 17, 19.

## V. None of the Individual Defendants Is Entitled to Qualified Immunity

Clearly established law prohibits police officers from shooting less-lethal projectiles at individuals that pose no immediate threat and from employing deadly force unless there is a threat of serious physical harm. Yet Brukbacher and Serrant instructed their officers to shoot any protestor that touched a gas canister, irrespective of whether it posed a threat, and McNamee complied. Budaj likewise shot Duran even though he posed no threat. *See* PSF ¶ 15.

It was clearly established as of May 2020 that firing less-lethal munitions at a non-threatening protestor is unlawful. In *Fogarty v. Gallegos*, 523 F.3d 1147, 1159–62 (10th Cir. 2008), the court analyzed a similar fact pattern and held that an officer is not entitled to qualified immunity for "shooting [a protestor] with a pepper ball *or some other type of projectile*" (emphasis added) when he did not "pose[] an immediate threat to the safety of the officers or others," the protestor had committed (at most) "a petty misdemeanor," and the "police may have contributed to the need to use force." *See also Buck*, 549 F.3d at 1289–92. These factors compel the same

14

result here. The most Aurora can say to distinguish *Fogarty* is that Packard kicked a gas canister before being shot. That act posed no *immediate* threat to the safety of officers or others. Serrant said so at his deposition, acknowledging that a protestor kicking a canister across the street "was not a threat" and that "it wouldn't be reasonable" to "target and hit an individual" who had done so. Ex. 16 at 73–74. Other officers agreed, testifying at trial that kicking a gas canister was not a threat that would justify firing 40mm or less-lethal shotgun rounds. Ex. 44; Ex. 45. Packard was kicking the canister away from himself and others—not at the officers. PSF ¶ 2. The video footage confirms that the canister went nowhere near McNamee before he shot Packard in the head. *Id.* Every reasonable officer would have known that this conduct violated Packard's clearly established rights. *See also Myers v. Brewer*, 773 F. App'x 1032, 1037 (10th Cir. 2019).

Further, the law is clearly established that an officer may not use deadly force against an individual (like Packard) absent "probable cause to believe that there [is] a threat of *serious physical harm* to [the officer] or to others." *Tenorio v. Pitzer*, 802 F.3d 1160, 1164 (10th Cir. 2015) (denying qualified immunity) (emphasis added); *see* Ex. 46 at 1197 (headshot is deadly force). A reasonable jury could conclude that a gas canister 20 feet from officers in full riot gear posed no threat of serious physical harm. Packard's shooting was unjustified and unconstitutional.

| Dated: June 8, 2022 | Respectfully submitted, |
|---|---|
| By: /s/ Elizabeth Wang<br>LOEVY & LOEVY<br>2060 Broadway, Suite 460<br>Boulder, CO 80302<br>Telephone: (720) 328-5642<br>elizabethw@loevy.com | By: /s/ Timothy Macdonald<br>ARNOLD & PORTER KAYE SCHOLER LLP<br>1144 Fifteenth Street, Suite 3100<br>Denver, Colorado 80202<br>Telephone: (303) 863-1000<br>Timothy.Macdonald@arnoldporter.com |

**CERTIFICATE OF SERVICE**

I hereby certify that on June 8, 2022, I served via CM/ECF the foregoing **Opp'n to Aurora Defendants' Motion for Summary Judgment** on all counsel of record. /s/ Elizabeth Wang

**EXHIBIT LIST TO PLAINTIFFS' OPPOSITION TO AURORA DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

| Exhibit Number | Document |
|---|---|
| 1 | 3/8/22 Trial Tr., Claire Sannier Testimony |
| 2 | Joe Deras Deposition (excerpts) |
| 3 | 3/10/22 Trial Tr., Sara Fitouri Testimony |
| 4 | HALO, Colfax & Washington, 5/31 (DEN3871) |
| 5 | Report of Norman Stamper re: Aurora, with declaration |
| 6 | Report of Edward Maguire re: Aurora, with declaration |
| 7 | Patrick Shaker Rule 30(b)(6) Deposition |
| 8 | APD Directive Manual Section 05.08 – Less Lethal Devices, Weapons, and Techniques |
| 9 | APD Directive Manual Section 05.03 – Use of Physical Force (Fitouri 18538-18540) |
| 10 | 3/8/22 Trial Tr., Zachary Packard Testimony (excerpts) |
| 11 | HALO Screenshot, Colfax & Washington, 5/31 (Trial Ex. 544a) |
| 12 | Zachary Packard Deposition (excerpts) |
| 13 | Video Clip from Commerce City PD BWC, 5/31 (Trial Ex. 1012, Fitouri 18079) |
| 14 | Packard Photos |
| 15 | Serrant BWC, 5/31 (COABLM508; Trial Ex. 386) |
| 16 | Patricio Serrant Deposition (excerpts) |
| 17 | McNamee BWC, 5/31 (COABLM450; Trial Ex. 379) |
| 18 | COAEPP 25 at 29 |
| 19 | Brukbacher BWC, 5/31 (COABLM371) |
| 20 | Johnathen Duran Deposition |
| 21 | Johnathen Duran's video, 5/31 (Fitouri 228) |

| | |
|---|---|
| 22 | Cory Budaj Deposition |
| 23 | HALO, Colfax and Pennsylvania, 5/31 (DEN3874) |
| 24 | HALO Screenshots, Colfax and Pennsylvania, 5/31 (DEN3874) |
| 25 | APD Force Investigation Unit, Professional Accountability Division Powerpoint re: 5/31/20 (Fitouri 19063-19334) |
| 26 | Anthony Hamilton Deposition (excerpts) |
| 27 | Bubna BWC, 5/31 (COABLM375) |
| 28 | Bubna BWC, 5/31 (COABLM375), Screenshot |
| 29 | Memo to Force Review Board from Sgt. Serrant and Brukbacher (Fitouri 19054-19062) |
| 30 | Wilson BWC, 5/31 (COABLM547) |
| 31 | Smick BWC, 5/31 (COABLM514) |
| 32 | Chamberland BWC, 5/31 (COABLM402) |
| 33 | Queisner BWC, 5/31 (COABLM463) |
| 34 | Garcia BWC, 5/31 (COABLM416) |
| 35 | Sweeney BWC, 5/31 (COABLM526) |
| 36 | Mark Hildebrand Rule 30(b)(6) Deposition (excerpts) |
| 37 | Christopher Juul Rule 30(b)(6) Deposition (excerpts) |
| 38 | Email re: awards to APD officers (COAEPP 1595-1601) |
| 39 | Rule 30(b)(6) Notice of Depositions to Aurora |
| 40 | Colorado Attorney General Report on APD (Fitouri 20056-20173) |
| 41 | 21CP Solutions Report on APD (Fitouri 20179-20339) |
| 42 | Carlson Email forwarded from Brukbacher (COAEPP 1528-1529) |
| 43 | 3/21/22 Trial Tr., Commander Michael O'Donnell Testimony (excerpt) |
| 44 | 3/23/22 Trial Tr., Ryan Grothe Testimony (excerpt) |
| 45 | 3/23/22 Trial Tr., Anthony Hamilton Testimony (excerpt) |

| 46 | 3/15/22 Trial Tr., Patrick Phelan Testimony (excerpt) |
| --- | --- |
| 47 | Commerce City PD BWC, 5/31 (Trial Ex. 1012, Fitouri 18079) |
| 48 | Crowd Management (Powerpoint by Brukbacher) (COABLM 2801-2822) |
| 49 | Aurora Police Emergency Response Team 2020 Leadership Training Class (Powerpoint) (COAEPP 706-718) |
| 50 | Aurora Police Mobile Field Force Training Basic Class, APD Emergency Response Team (COAEPP 720-751) |
| 51 | 12 gauge Less Lethal User Certification (COAEPP 1023-1104) |
| 52 | APD Standard Operating Procedures, ERT 1.3 – Use of Force |