IN THE UNITED STATES DISTRICT COURT
DISTRICT COURT OF COLORADO

| | |
|---|---|
| ELISABETH EPPS, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> CITY AND COUNTY OF DENVER, *et al.*, <br><br> Defendants, | Civil Action Nos. 1:20-cv-01878-RBJ & <br> 1:20-cv-01922-RBJ-MEH (consol.) |

### DECLARATION OF NORMAN STAMPER

Pursuant to 28 U.S.C. § 1746, I, Norman Stamper, declare as follows:

1. I am over 18 years old and competent to make this declaration.

2. My expert report in the above-captioned case is attached hereto.

3. The contents of my report are true and accurate to the best of my knowledge, and the opinions offered therein are each to a reasonable degree of professional certainty. If called to testify, I would testify consistently with the opinions offered in my report.

I declare under penalty of perjury that the foregoing is true and correct.

6/3/22
Date

_[signature]_
Norman Stamper

1

Exhibit 5

IN THE UNITED STATES DISTRICT COURT
OF THE DISTRICT COURT OF COLORADO

Civil Action Nos. 1:20-cv-01878-RBJ & 1:20-cv-01922-RBJ-MEH (consolidated)

ELISABETH EPPS, *et al.*

Plaintiffs,

v.

CITY AND COUNTY OF DENVER, *et al.*,

Defendants

### EXPERT REPORT OF NORMAN STAMPER REGARDING CITY OF AURORA AND AURORA POLICE DEPARTMENT

1.  My experience and qualifications are set forth in my July 29, 2021 report and CV disclosed in this case. The list of materials I reviewed are attached as Exhibit B to my July 29, 2021 report and Exhibit 1 to my December 22, 2021 rebuttal report disclosed in this case. A list of additional materials that I was provided for review relevant to the policies, practices, and customs of the City of Aurora and Aurora Police Department is attached as Exhibit 1 to this report.

2.  As I opined in my July 29, 2021 and December 22, 2021 reports, the use of force on Plaintiffs Johnathen Duran, Zach Packard, Stanford Smith, and other plaintiffs was inconsistent with generally accepted police practices. (See 7/29/21 Report, Paragraphs 75-76, 81-82, 85-86, 89, 97; 12/22/21 Report, Paragraphs 8d, 18.) As I also explained in detail in my prior reports, the plaintiffs' conduct at the Denver protests did not create any officer safety concerns, and the use of force on the plaintiffs on the specific dates, times and locations discussed previously was not consistent with generally accepted police practices. The Aurora Defendants' expert disclosure does not identify or specify any evidence that shows otherwise, and I have seen no such evidence in the material I reviewed.

**City of Aurora's Policies. Procedures, Training, and Discipline Were Inadequate and Inconsistent with Generally Accepted Police Practices and Standards**

3.  The Aurora Police Department's Force Review Board reviewed Aurora police officers' use of force during the George Floyd Protests (GFP), including on May 30-31, 2020, and concluded that all uses of force by Aurora police officers were "policy compliant." (See COAEPP 25 2020-TIER2-0109_Use of Force Review 5-31 by FRB.pdf; COAEPP 23 2020-TIER2-0108_Use of Force Review 5-30 by FRB.pdf.)

1

4.There is no indication that any Aurora police officer was disciplined for any use of force during the GFP. Specifically, none of the Aurora police officers alleged to be responsible for the shooting of Plaintiff Packard with a less lethal shotgun (Defendants Brukbacher, Serrant, and McNamee); the shooting of Plaintiff Duran with a 40mm launcher (Defendant Budaj); or the pepper spraying of Plaintiff Smith were disciplined.

5.Nor were any of the Aurora officers or supervisors who participated in the May 31, 2020 kettling in front of the Basilica disciplined.

6.From the materials reviewed (as well as my law enforcement training and experience), I conclude the following:

a.Given that ***none*** of the officers involved in the incidents of use of force alleged by Plaintiffs were disciplined, Aurora has sanctioned the use of force alleged by Plaintiffs and deemed it appropriate pursuant to policy. In fact, Lieutenant Michael McClelland, Commander Stephen Redfearn, and Sgt. Matthew Brukbacher nominated all of the officers who provided mutual aid to Denver during the GFP (including themselves) for an award (the "Meritorious Service Ribbon"). (COAEPP 1595-1601.) According to Commander Redfearn's email to Lt. McClelland, "The Chief was gonna do MSR's for all but hasn't had a chance and the deadline was the 15th … The chief wants a list of names that went to Denver and she said she[']ll push the nomination through." (COAEPP 1595.) Thus, not only did Aurora approve the use of force alleged by Plaintiffs, but they deemed it worthy of an award.

b.As the report produced by 21CP Solutions, "Recommendations for the Aurora Police Department, August 2021," stated: "APD officers, third-party reviewers, and many community members all believe that the current system for addressing potential officer misconduct in Aurora is broken, cumbersome, and ineffective in promoting a culture of accountability with the Department." (21CP Solutions Report, p. 129.)

c.Apparently, Aurora policy, practice, and training allows officers to pepper spray individuals in the face without warning or orders, and while protesting peacefully (as happened to Plaintiff Stanford Smith on May 30, 2020 at the intersection of Lincoln and Colfax).

d.Aurora policy, practice, and training allows officers to shoot a less lethal shotgun at the head of an individual who had kicked a tear gas canister off a curb (posing no serious threat of bodily harm or injury to anyone) (as happened to Plaintiff Zach Packard on May 31, 2020 at the intersection of Washington and Colfax).

2

  e. Aurora policy, practice, and training also allows officers to shoot 40mm launchers at journalists who have committed no act warranting any use of force whatsoever (as happened to Plaintiff Johnathen Duran on May 31, 2020 at the intersection of Pearl and Colfax).

  f. There were no warnings or orders issued to Plaintiffs Packard, Smith or Duran prior to these uses of force on them.

  g. I have seen no materials produced by the Aurora Defendants that justify the actions alleged to have been taken by the Aurora Defendant Officers (Budaj, McNamee, Serrant, and Brukbacher.)

  h. Aurora's policy and training failures caused the uses of force on Plaintiffs Packard, Smith, and Duran.

  i. The uses of force on Plaintiffs Packard, Smith, and Duran were authorized and sanctioned by Aurora (as well as Denver, as I previously opined). Aurora's failure to discipline officers—including any officers for any of the incidents involving Plaintiffs—amounts to an approval of the officers' conduct.

  j. None of this is consistent with "best practices."

7. The Colorado Attorney General's (COAG) Office conducted an extensive investigation into the Aurora Police Department, titled, "Investigation of the Aurora Police Department and Aurora Fire Rescue, September 15, 2021." (COAG Report.) The report is quite damning. The COAG concluded, in relevant part, that:

  a. "[T]he Aurora Police Department … ha[s] a pattern and practice of violating state and federal law. Specifically, we find that Aurora Police has a pattern and practice of racially biased policing, using excessive force, and failing to record required information when it interacts with the community." (COAG Report, p. 1.)

  b. "Over the course of our investigation, we saw consistent patterns of unlawful behavior by Aurora Police…." (COAG Report, p. 1.)

  c. "We found that Aurora Police has repeatedly engaged in unlawful and unconstitutional uses of force, regularly applying greater force than reasonably warranted by the situation. … We observed officers using force on individuals who had not committed any crime and presented no danger but who simply refused to comply with orders…." (COAG Report, pp. 1-2.)

3

d. "Aurora Police's culture leads to the frequent use of force, often in excess of what the law permits. Training is ad hoc and does not address specific needs of the organization as shown by officer behavior. Policies are short on detail or practical guidance, often doing little more than reciting the legal requirements set forth in court cases and applicable statutes or regulations. In short, Aurora Police has failed to create and oversee appropriate expectations for responsible behavior." (COAG Report, p. 2.)

e. "Aurora Police does not meaningfully review officers' uses of force, relying on formal and informal systems that favor findings that officers followed policy and that hamper candid feedback on how to improve." (COAG Report, p. 2.)

f. Mechanisms to provide accountability for Aurora police officers who use excessive force are deficient, and "the overall lack of transparency makes it difficult to know how Aurora Police uses resident complaints to spot recurring problem behaviors, address policy gaps, or discipline officers for misconduct." (COAG Report, p. 13.) The existing accountability systems "do not work to provide sufficient feedback for Aurora Police on the behavior of its officers. The feedback that does occur is too cumbersome, ad hoc, and diffuse to provide meaningful input to the organization." (COAG Report, p. 15.)

g. The Aurora Force Review Board "falls far short of its potential, particularly in its focus simply on what can be justified under the law, rather than what is legal and appropriate in the circumstances." (COAG Report, p. 22.)

h. The recently-created Force Investigation Unit (which reviewed Aurora police officers' use of force during the GFP) supports the Force Review Board, but the COAG still saw "similar patterns in the review of force—a focus on justifying the force used rather than evaluating whether it was both legal *and* appropriate." (COAG Report, p. 22.) (emphasis in original).

i. "Aurora Police Generally approaches the use of force with a what-can-be justified-under-the-outer-limits-of-the-law approach rather than a what-force-is-necessary approach." (COAG Report, p. 67.)

j. Community members' "perception is that investigations into excessive use of force are designed to exonerate the officers, regardless of the actual acts. Until 2021, Aurora Police had an agreement with the Denver Police Department to support each other in critical incident review. Many in the community criticized the way that Aurora and Denver implemented this agreement." (COAG Report, p. 70.)

4

  k. The causes of Aurora Police's use of excessive force include: a culture in the APD that emphasized justification for force rather than whether force was lawful and appropriate; use-of-force policy and implementation that focuses on maximum force permitted under law; and inadequate documentation of use of force. (COAG Report, pp. 80, 82, 86.)

8. The City of Aurora engaged 21CP Solutions to conduct an assessment of the Aurora Police Department's policies, procedures and operations in order to provide recommendations for improvement. (21CP Solutions Report, p. ii.) Relevant conclusions in the report include:

  a. APD's use of force policies are too vague and should be "substantially revised to provide better, more specific guidance to officers on when force may and may not be used." (21CP Solutions Report, p. 18.)

  b. APD's policies on use of force and less-lethal weapons "rely on reprinting Colorado statutes," and "[i]n doing so, the Department's policies fail to address a host of critical concepts, lagging far behind peers and best practices. Even more critically, the deferral to Colorado state statutes suggests to officers that the City of Aurora and its police department expect them to meet nothing more than generic, minimum standards." (21CP Solutions Report, p. 18.)

  c. "Providing clear policies on when officers may and may not use force is a foundational obligation of all law enforcement agencies." (21CP Solutions Report, p. 18.)

  d. APD's use of force policies are confusing and "scattered across at least ten separate, interrelated policy provisions in Chapter 5 of APD's Directives Manual. More than the number of policies, the overlapping nature of the policies risks undue confusion." (21CP Solutions Report, p. 19.)

  e. "APD's current policies do not articulate the Department's overriding values and philosophy regarding the use of force." (21CP Solutions Report, p. 20.)

  f. "APD's force policies do not define a number of critical terms." (21CP Solutions Report, p. 21.)

  g. "APD's current force policy does not sufficiently address the core concept of proportionality. Requiring that an officer's force be proportional to the nature of a subject's threat or resistance ensures that an officer's response will be consistent with or aligned to the significance or gravity of the subject's actions." (21CP Solutions Report, p. 27.)

9. Based on my review of the COAG Report, the 21CP Solutions Report, APD policies, and other materials (as well as my law enforcement training and experience), I conclude that:

    a. The APD's inadequate policies, practices, training, and culture caused the uses of force that Plaintiffs Packard, Duran, and Smith allege violated their constitutional rights.

    b. The conclusions of the COAG, based on the COAG's extensive, nine-month-long investigation apply to the uses of force alleged by Plaintiffs against the Aurora Defendants.

    c. For instance, the APD Force Investigations Unit's investigation of the use of force by Aurora officers during the GFP appeared designed to exonerate officers and find any possible justification for the use of force, rather than designed to hold officers accountable for excessive uses of force.

    d. Based on my own review of the APD's written policies on use of force and less-lethal weapons which were in effect during the GFP, I agree with the conclusions in the COAG and 21CP Solutions Reports concerning the vague, minimal, and generic nature of the policies.

    e. For instance, in the use of force policy applicable to Emergency Response Team members (who were sent to provide mutual aid to Denver during the GFP), the policy states merely: "The Emergency Response Team expects its members to use force only when necessary and in accordance with Aurora Police Department Directives, State, Federal case and statutory law." (COAEPP 11 SOP ERT 01.03 – Use of Force.pdf.) There is no further explanation to provide guidance to officers on *when* the use of force is appropriate, and *what* force is appropriate under *what* circumstances.

    f. The APD's written policy, 05.03 Use of Physical Force, merely states "Physical force may be used as allowed by State statutes, CRS 18-1-704 and CRS 18-1-707." (APD 05.03 Use of Physical Force.pdf.) The policy then reprints the text of those statutes. This is an inadequate policy that provides insufficient guidance to officers on *when* the use of force is appropriate, and *what* force is appropriate under *what* circumstances.

    g. Similarly, APD's Less Lethal Devices and Weapons Policy provides in Section 5.8.2:

> The concept in the use of less lethal weapons is to meet operational objectives with less potential for causing death or serious injury than with the use of a firearm. Members are permitted to draw or display their less lethal weapons when there are grounds to believe that it may be necessary to employ the weapon(s).
>
> Justification for the use of less lethal force must be in compliance with Colorado Revised Statutes as well as appropriate components within directives.

(COAEPP 06 DM 05.08 – Less Lethal Devices, Weapons, and Techniques.pdf, Section 5.8.2.)

This policy provides *no explanation* to guide officers on "when there are grounds to believe that it may be necessary to employ the weapon(s)." It merely states that justification for use of less-lethal force must comply with state law.

h. Thus, Aurora policy (like Denver's policy) gives officers nearly unlimited discretion to use their less-lethal weapons as they see fit.

i. Although Aurora policy on less-lethal weapons, as written, provides that verbal warnings should be given to individuals before less-lethal weapons are used, "if circumstances allow," no such warnings were given in the incidents involving Plaintiffs. (See COAEPP 06 DM 05.08 – Less Lethal Devices, Weapons, and Techniques.pdf, Section 5.8.7.) In fact, the written policy (Section 5.8.7) only provides for the possibility of giving a warning in the case of OC spray; it does not even require warnings (when "circumstances allow") for the use of a less-lethal shotgun or 40mm launcher. This policy is inadequate and inconsistent with generally accepted police practices and policies.

j. Moreover, Aurora policy does not allow less-lethal impact weapons to be targeted at an individual's head, neck or groin. (COAEPP 06 DM 05.08 – Less Lethal Devices, Weapons, and Techniques.pdf, Section 5.8.5.) Yet, Plaintiffs Packard and Duran were shot with kinetic impact projectiles from less-lethal impact weapons in the head and groin, respectively. The officers involved in those uses of force were not disciplined, and I saw no indication in the materials that the City of Aurora or APD has made any effort to discipline any of the alleged involved individual Defendants (Budaj, McNamee, Serrant, and Brukbacher).

k. Likewise, although Aurora's written policy (COAEPP 06 DM 05.06 – Less Lethal Devices, Weapons, and Techniques.pdf, Section 5.8.7),

> provides circumstances under which OC spray should *not* be used, and it appears that Plaintiff Stanford Smith's actions would fall under those circumstances (as he was, from the available video and testimony, completely peaceful and protesting on a sidewalk), there is no evidence that Aurora has made any attempt to identify the officer involved or disciplined any officer. This shows that Aurora approves of and condones such conduct and does not enforce its policies as written.

10. As I discussed in my July 29, 2021 report, requiring officers to write timely and accurate use of force reports is important for officer accountability. (7/29/21 Report, Paragraphs 108-121.) DPD took what I described as a "circling the wagons" approach to the reports: officers were told what to write in the reports, and the emphasis (as documented in emails from command-level DPD supervisors to other officers) was on "protecting their troops" from lawsuits. (7/29/21 Report, Paragraph 119.) Apparently, Aurora had the same mindset. Lt. Cassidee Carlson wrote an email on June 2, 2020 to her "Team"[1] stating:

> If you used force – shot less lethal, baton strike, threw, gas, or any other use of force. [sic] Please write a report on the day that you used such force. Do your best to justify each use of force. Some of this will be generic wording. Where you were (holding a line at Colfax and Washington to protect District 6, etc), and best you can do for time. What you can remember now could be helpful for a potential lawsuit later.

(COAEPP 1528.) This email appears directed to all the officers who provided mutual aid, and it was also specifically forwarded from Sgt. Brukbacher to Officer Budaj (the defendant officer alleged to have shot Plaintiff Duran in the groin with a 40mm). As I opined regarding Denver, this is "circling the wagons." Aurora's view of the use of force reports was not to have officers accurately describe the actual uses of force and hold officers *accountable* for any unreasonable or non-policy-complaint use of force, but to have officers *justify* their uses of force on the unexamined assumption that all of their officers used force appropriately without question. This is exactly what the COAG described in its investigation report—Aurora's Force Review Board reviewed use of force incidents with an eye towards *finding justifications for* officers' use of force, not *holding officers accountable.*

11. As the Office of Independent Monitor report described, Denver and its mutual aid agencies used an extensive amount of munitions during the GFP, and more had to be ordered. (OIM Report, pp. 4-5) (indicating that on the third day of the protest, "the Colorado State Patrol flew its plane to Wyoming to purchase less-lethal munitions directly from a manufacturer, including some munitions that had been ordered by the DPD."). Emails produced by Aurora dated June 1, 2020 indicate that there was a munitions purchase from Defense Technologies in

---

[1] It is unclear from the documents alone to whom this email was addressed, but the contents are addressed to all the officers who provided mutual aid.

Wyoming made "because ERT depleted their munitions and gas by the second day of the protests in Denver and they had to borrow from APD swat to fulfill the mission, thus depleting the SWAT munitions and gas as well." (COAEPP 1511.) The fact that Aurora depleted their munitions by *the second day* of the protests is further evidence that the use of less-lethal weapons was excessive and inconsistent with generally accepted police practices.

12. In sum, in my professional opinion, the Aurora Police Department's inappropriate use of less-lethal weapons; its inappropriate tactics; and its failure to set and enforce sound policies on use of force and use of less-lethal weapons caused in significant part the violation of the constitutional rights of Plaintiffs Packard, Smith, and Duran during the GFP in Denver.

13. I may supplement my opinions based on any deposition testimony of Sgt. Sears, Officer Petrucelli, Defendant Officer Budaj, and the witnesses designated by the City of Aurora to provide binding testimony on Aurora's policies, procedures, and customs, and any other additional material that is provided as discovery continues.

Respectfully submitted,

*[signature]*

Norman Stamper

Dated: December 30, 2021