## IN THE UNITED STATES DISTRICT COURT
## DISTRICT COURT OF COLORADO

ELISABETH EPPS, *et al.*,

      Plaintiffs,

v.

CITY AND COUNTY OF DENVER, *et al*.,

      Defendants,

Civil Action Nos. 1:20-cv-01878-RBJ & 1:20-cv-01922-RBJ-MEH (consol.)

_____

## DECLARATION OF EDWARD MAGUIRE
_____

Pursuant to 28 U.S.C. § 1746, I, Edward Maguire, declare as follows:

1.      I am over 18 years old and competent to make this declaration.

2.      My expert report in the above-captioned case is attached hereto.

3.      The contents of my report are true and accurate to the best of my knowledge, and the opinions offered therein are each to a reasonable degree of professional certainty. If called to testify, I would testify consistently with the opinions offered in my report.

I declare under penalty of perjury that the foregoing is true and correct.

May 18, 2022
Date

_____
Edward Maguire

1

Exhibit 6

IN THE UNITED STATES DISTRICT COURT
OF THE DISTRICT COURT OF COLORADO

Civil Action Nos. 1:20-cv-01878-RBJ & 1:20-cv-01922-RBJ-MEH (consolidated)

ELISABETH EPPS, *et al.*

Plaintiffs,

v.

CITY AND COUNTY OF DENVER, *et al.*,

Defendants

---

**EXPERT REPORT OF DR. EDWARD R. MAGUIRE REGARDING THE**

**CITY OF AURORA AND THE AURORA POLICE DEPARTMENT**

1. My experience and qualifications are set forth in my August 2, 2021 report and CV disclosed in this case. The list of materials I reviewed is attached as Exhibit B to my August 2, 2021 report and Exhibit 1 to my December 22, 2021 rebuttal report disclosed in this case. A list of additional materials that I was provided for review that are relevant to the training and policies of the City of Aurora and the Aurora Police Department is attached as Exhibit 1 to this report.

2. For purposes of this report, my review of these materials focuses primarily on the Aurora Police Department's (APD's) training and policies relevant to the policing of crowds, including protests.

**APD Training**

3. APD's Expert Disclosure states that Sergeant Marc Sears will testify that the trainings provided by the APD "are best practices in instruction on crowd control, crowd management, and officer safety practices for police encounters with violent crowds and they are also standard officer safety practices which prevent harm and loss of life for both the officer(s) and the citizenry where the outcome is uncertain" (APD Expert Disclosure, p. 1).

4. APD's Expert Disclosure notes that Officer Jason Petrucelli will testify that the trainings provided by the APD "are best practices in instruction on less lethal munitions and officer safety practices which prevent harm and loss of life for both the officer(s) and the citizenry where the outcome is uncertain" (APD Expert Disclosure, p. 5).

5. My review of the training materials provided by the APD provides no evidence to support the conclusion that APD's training on crowd control, crowd management, or less lethal munitions

1

constitutes "best practices." To the contrary, I find the training to be dated, incomplete, and deficient in numerous respects. The remainder of this section will provide a detailed analysis of APD's training materials.

6. The document entitled "Crowd Management First Quarter In-Service" (COABLM_002801) is a presentation used by Sergeant Matt Brukbacher of the Emergency Response Team (ERT) to provide in-service crowd management training to APD officers in the first quarter of 2020. Despite its title, the presentation contains almost no coverage of *crowd management*. Instead it focuses primarily on *crowd control tactics* such as formations and the proper use of gas masks.

7. *Crowd management* refers to a wide variety of techniques used to manage crowds before, during, and after a crowd event in an effort to avoid conflict and violence. As applied to protests, crowd management involves considerations like the following:

  (a) understanding basic principles from crowd psychology, with a specific focus on how crowds perceive and react to police actions;

  (b) understanding how police might inadvertently escalate conflict with crowds, as well as how to avoid unintentional (or in some cases, intentional) escalation;

  (c) learning about the social identities and aims of protesters to help ensure that police can help to facilitate their aims whenever it is reasonable to do so;

  (d) engaging in dialogue with protesters before, during, and after a protest;

  (e) actively seeking to facilitate and protect protesters' First Amendment rights, including freedoms of speech and assembly;

  (f) relying on de-escalation techniques to reduce tensions and minimize the likelihood of conflict and violence;

  (g) adopting a "differentiated" approach in which officers take enforcement action against only those whose violent or destructive criminal behavior warrants it, while ensuring that no enforcement action (such as arrest or use of force) is taken against those who are behaving peacefully and lawfully.

8. *Crowd control* is defined by the International Association of Chiefs of Police as "techniques used to address civil disturbances, to include a show of force, crowd containment, dispersal equipment and tactics, and preparations for multiple arrests."[1]

9. Building an effective capacity for handling crowd events requires police agencies to establish training and policies that cover both crowd management *and* crowd control. My review of the materials submitted by the APD reveals very clearly that the agency focuses primarily on crowd control and very little (if at all) on crowd management.

---

[1] *IACP Model Policy on Crowd Management* (p. 1). https://www.theiacp.org/sites/default/files/2020-08/Crowd%20Management%20FULL%20-%2008062020.pdf

10. Page 3 of the "Crowd Management First Quarter In-Service" (COABLM_002801) document notes that the approach used by the APD "maximizes officer safety." This is an appropriate consideration in the development of police strategies and tactics. However, it is also important for these strategies and tactics to maximize the safety of the public, which in this case includes crowd members. This crowd management training mentions only officer safety, not crowd safety. A more balanced approach to the training would emphasize the safety of both police officers and crowd members. This opinion is consistent with observations in the Colorado Attorney General's (COAG) report, which discusses the need for training that focuses on "creating a guardian culture that emphasizes protecting the community Aurora Police serves (COAG report, p. 22).

11. Page 3 of the "Crowd Management First Quarter In-Service" (COABLM_002801) document notes that the approach used by the APD is a "munitions intensive system." This is a remarkable admission because it emphasizes that the APD's approach is built around the use of force, not around more judicious and effective approaches for *preventing* conflict and violence, such as communication, dialogue, and de-escalation techniques. The use of force should be a last resort. This opinion is consistent with observations in the Colorado Attorney General's (COAG) report, which found that "officers often approach scenes with a show-of-force mentality" and that the APD has "a pattern and practice of using force excessively" (COAG report, p. 67).

12. Page 21 of the "Crowd Management First Quarter In-Service" (COABLM_002801) document is entitled "What can ERT do for me?" The first bullet point notes that the Emergency Response Team (ERT) has "advanced crowd management knowledge." I see no evidence in the material provided by the APD that this statement is true. The ERT's focus is primarily on crowd control, not crowd management.

13. The document entitled "Standard Operating Procedures, Emergency Operations Team" (COAEPP_000018) notes that the ERT will provide "crowd control training for regular sworn members of the Aurora Police Department." This is noteworthy for two reasons. First, crowd control should be taught in concert with crowd management to ensure that officers think about more general, holistic strategies for handling crowd events. The current training is dominated by tactical considerations for controlling crowds. Second, this policy assigns the ERT, a unit that lacks the necessary training materials and infrastructure to effectively apply in practice the basic fundamentals of crowd management, the responsibility for training the remainder of the department on how to handle crowd events. This is a recipe for spreading bad practice throughout the department.

14. The document entitled "Aurora Police ERT 2020 Leader Training Class" (COAEPP_000706) is a presentation that appears to be used for educating APD leaders about the ERT, including its structure, capacities, and equipment. Page 12 of that document is entitled "crowd management." However, the contents of that page focus only on crowd control, including establishing a command presence and maintaining skirmish lines. As noted in the previous paragraph, the ERT appears to know very little about crowd management strategies, focusing primarily on crowd control tactics. The ERT should not be involved in educating other members of the APD on crowd management.

15. The document entitled "Aurora Police Mobile Field Force Training Basic Class (COAEPP_000720) notes that mobile field forces rely on tactics "that provide the best safety for officers…" Consistent with one of the other training presentations I reviewed earlier, this presentation does not mention the safety of the public generally or crowd members specifically. A more balanced approach to the training would emphasize the safety of both police officers and crowd members.

16. The document entitled "Test Questions for Crowd Control Class" is a two-page exam containing eight questions. Question 2 reads, "The use of skirmish line close support creates a _____ advantage." The correct response indicated on the exam is "psychological." This test question indicates a profound lack of familiarity with modern crowd psychology. Skirmish lines are sometimes necessary to contain a riotous crowd or to deny access to a specific area, but they come at a cost because they often escalate tensions and invite conflict and violence. As noted by Chris Burbank, former chief of the Salt Lake City Police Department, "if you line up a bunch of police officers with riot gear and shields, you are telling protesters 'to go ahead and throw rocks and bottles at us.'"[2]

17. The document entitled "12-Gauge Less Lethal User Certification (COAEPP_001023) provides training on the use of a 12-gauge shotgun for firing less-lethal munitions. Page 66 of the document discusses the individual-level psychological effects of less-lethal impact munitions. However, it does not acknowledge the group-level or social psychological effects that result from either brandishing or using these types of weapons. Understanding these social psychological effects is essential for developing effective protest policing strategies that enhance compliance, minimize defiance, and reduce the likelihood of conflict and violence.[3]

18. Crowd psychology research reveals that when crowd members do not perceive police as having a legitimate purpose for using force, they are likely to view its use (or its threatened use) as a form of escalation by police. In such circumstances, crowd members are more likely to "unite around a sense of opposition to the police."[4] Research shows that if crowd members view police actions as procedurally unjust, they are more likely to view the use of violence against police as morally justifiable.[5] Thus, any discussion of the use of less-lethal weapons during crowd events should go beyond just teaching officers how to use such weapons. It should also teach them that the presence and use of such weapons may escalate tensions and trigger conflict and violence. This type of training would help police officers make more well-informed

---

[2] Maguire, E. R., & Oakley, M. (2020). *Policing protests – Lessons from the Occupy Movement, Ferguson, and Beyond: A guide for police*. Harry Frank Guggenheim Foundation (p. 79).

[3] Maguire & Oakley (2020), see note 2.

[4] Drury, J., & Reicher, S. (2009). Collective psychological empowerment as a model of social change: Researching crowds and power. *Journal of Social Issues*, 65(4), 707-725. (p. 713).

[5] Maguire, E. R., Barak, M., Cross, K., & Lugo, K. (2018). Attitudes among Occupy DC participants about the use of violence against police. *Policing and Society*, 28(5), 526-540; Tyler, D. H., Barak, M., Maguire, E. R., & Wells, W. (2018). The effects of procedural injustice on the use of violence against police by Occupy Wall Street protesters. *Police Practice and Research*, 19(2), 138-152.

decisions about the conditions under which such weapons are most appropriate and when it might be best to keep them out of sight until the need arises for their use.

## APD Policies

19. The materials I reviewed did not provide any evidence that the APD has a policy on crowd management. This is inconsistent with generally accepted police practices and standards. For example, the International Association of Chiefs of Police (IACP) has a model policy on crowd management that establishes guidelines for "managing crowds, protecting individual rights, and preserving the peace during demonstrations and civil disturbances."[6]

20. The APD's policy on "Use of Physical Force" (Fitouri 018538) is too brief and lacks essential detail. I concur with the COAG report that the policy does not contain "specific guidance to structure officer decision-making when using force" and that a more detailed policy would help officers do their jobs well and reduce the likelihood of excessive force (COAG report, p. 83). I also concur with the 21CP Solutions report which recommends that "APD's use of force policies should be substantially revised to provide better, more specific guidance to officers on when force may and may not be used" (21 CP Solutions report, p. 17).

21. The APD's policy on "Less Lethal Devices, Weapons and Techniques" is too brief and lacks essential detail. I concur with the 21CP Solutions report which recommends that "APD policy should provide expanded, more specific direction on the use of various, authorized less-lethal instruments" (21CP Solutions report, p. 41). The existing policy contains very little detail about specific types of less-lethal force, the conditions under which they should be used, and the qualifications or certifications necessary to use them.

22. For example, a memo from Sergeant Brukbacher to the Force Review Board (COAEPP_000023) notes that APD officers deployed Sting-Ball grenades during the George Floyd protests. When these grenades explode, they disperse more than 100 rubber pellets in an indiscriminate manner for a certain radius around the device. Because these pellets cannot be aimed, it is possible for them to strike innocent people or to strike people in vulnerable areas such as the eyes and throat. Building effective internal controls around the use of this type of indiscriminate less lethal weaponry is important for public safety. Although the APD uses Sting-Balls, these weapons are not mentioned at all in the department's less lethal weapon policy.

23. The APD's policy on the "Emergency Response Team" (COAEPP_000008) lists the training that is required for ERT officers. One of the required courses is the "Basic MCATI crowd control training." This training alone does not provide ERT members with sufficient training on how to handle crowd events appropriately. It should be supplemented with additional training on crowd management principles, including modern crowd psychology, communication, and de-escalation. All ERT officers should also be provided with updated training on the First Amendment and its freedom of speech and assembly provisions.

---

[6] https://www.theiacp.org/sites/default/files/2020-08/Crowd%20Management%20FULL%20-%2008062020.pdf

24. The APD's policy on "Use of Force" by the Emergency Response Team (COAEPP_000011) contains only four sentences. It provides ERT officers with a wholly insufficient basis for making sound decisions about the use of force. This policy should either be expanded to provide more detailed guidance, or it should be eliminated and folded into APD's general use of force policy.

\* \* \*

25. The additional materials I reviewed in this case lead me to conclude that the APD's training and policies associated with crowd control, crowd management, and less-lethal weapons are dated, incomplete, and deficient. The APD's training focuses primarily on crowd control tactics and are centered around the use of force rather than the use of communication, dialogue, and de-escalation. The APD's policies on these issues are either non-existent (in the case of crowd management) or insufficiently detailed (in the case of use of physical force and less lethal weapons). In short, the training and policies provided by the APD on these issues are inconsistent with generally accepted police practices and standards.

26. There is no evidence that the APD provided its officers with any credible training on *crowd management strategies*. As a result, APD officers who respond to crowd events are not properly trained on core topics such as crowd psychology and the use of intergroup communication and de-escalation strategies when working with crowds. Moreover, the APD's policies do not provide officers with sufficient guidance on when it is appropriate to use force in a crowd management setting. These training and policy deficiencies shape every aspect of how the APD responds to crowd events, including the George Floyd protests (GFP) in Denver.

27. In my professional opinion, the Aurora Police Department's training and policy deficiencies contributed significantly to the constitutional violations committed by the APD against Plaintiffs Packard, Smith, and Duran during the GFP in Denver.

28. I may supplement my opinions as additional materials become available.


Respectfully submitted,

Edward R. Maguire, Ph.D.
Dated: December 30, 2021

6