

# Recommendations for the Aurora Police Department

21CP Solutions

August 2021

Fitouri 020179
Exhibit 41

21CP Solutions | Recommendations for the Aurora Police Department | August 2021

# TABLE OF CONTENTS

**SCOPE & APPROACH** ................................................................................................... **1**
   Scope of the Assessment ........................................................................................ 1
   Approach ................................................................................................................ 2

**CONTEXT & BACKGROUND** ..................................................................................... **5**
   What APD Does ..................................................................................................... 6

**AREA 1.  CRITICAL OPERATIONS** ......................................................................... **13**
   Use of Force .......................................................................................................... 13
   Stops, Searches and Arrests .................................................................................. 53
   Bias-Free Policing ................................................................................................. 59
   Crisis Intervention ................................................................................................ 63

**AREA 2.  COMMUNITY ENGAGEMENT & PARTICIPATION** ..................................... **73**
   Community Policing, Problem-Solving, and Engagement in Aurora ...................... 73
   The Role & Function of Police in Aurora Going Forward ..................................... 77

**AREA 3.  ORGANIZATION AND COMMAND STRUCTURE** ......................................... **92**
   Organizational Structure ....................................................................................... 92
   Deployment & Staffing .......................................................................................... 94
   Command Staff ..................................................................................................... 98

**AREA 4.  SELECTION, SUPERVISION, AND SUPPORT OF PERSONNEL** ................... **104**
   Recruitment, Hiring and Selection ....................................................................... 104
   Training ................................................................................................................ 116
   Field Training Officer Supervision, Selection, and Training ................................. 119
   Early Intervention & Peer Support ....................................................................... 124

**AREA 5.  ACCOUNTABILITY** .................................................................................. **129**
   Officer Misconduct & Complaints ........................................................................ 129
   Transparency & Oversight .................................................................................... 145

**AREA 6.  EQUIPMENT, TECHNOLOGY, AND DATA SYSTEMS** ................................. **149**

Fitouri 020180

# SCOPE & APPROACH

## Scope of the Assessment

The City of Aurora ("Aurora" or "the City") engaged 21CP Solutions ("21CP") to conduct an assessment of the Aurora Police Department's ("APD" or "the Department") policies, procedures, and operations and to provide recommendations for enhancing the Department's efforts at providing safe, just, effective, and equitable public safety to the Aurora community.

This engagement occurred in the context of other, separate inquiries into and relating to APD. The first was an investigation by members of the Independent Review Panel that addressed the death of Elijah McClain, which made a number of factual findings and specific recommendations.[1] The Independent Review Panel released their report on February 22, 2021.[2] Second, the Colorado Attorney General's Office is conducting a "patterns and practices" investigation of APD.[3] Finally, the Community Police Task Force has reviewed APD's practices and formulated specific recommendations.[4]

Mindful of these concurrent, independent processes, 21CP's assessment focused on comparing APD's practices, policies, and procedures against best, promising, and emerging national practices. This report therefore focuses on those areas of greatest opportunity within APD and on actionable recommendations for short- and intermediate-term improvements.

We note that to even as the recommendations of the Independent Review Panel and Community Police Task Force are not all directly, or even indirectly, addressed here, such omissions should not be read as disagreement with or an objection to such recommendations. Those reviews had different lenses and different inputs, and we urge the City of Aurora and APD to take seriously all findings and recommendations from those reviews. 21CP's review should be read not in lieu of, or in competition with, those reviews but, instead, as another, third source of guidance for the Department to consider as it moves forward.

---

[1] Independent Review Panel, *Investigation Report & Recommendations* (Feb. 22, 2021), https://www.auroragov.org/UserFiles/Servers/Server_1881137/File/News%20Items/Investigation%20Report%20and%20Recommendations%20(FINAL).pdf [hereinafter "Independent Review Panel Investigation Report"].

[2] *Id.*

[3] Jesse Paul, "Colorado Attorney General Opens Investigation into 'Patterns and Practices' of Aurora Police Department," *Colorado Sun* (Aug. 11, 2020), https://coloradosun.com/2020/08/11/aurora-police-colorado-attorney-general-patterns-and-practices/.

[4] Ryan Ross, Community Police Task Force, *City of Aurora Community Police Task Force Recommendations* (Mar. 20, 2021) https://auroragov.org/common/pages/DisplayFile.aspx?itemId=17557323 at 72–81.

Fitouri 020181

21CP Solutions | Recommendations for the Aurora Police Department | August 2021

Likewise, we note that our review did not independently investigate any cases or evaluate specific incidents. Instead, this report focuses on APD's overall practices and how its policies, procedures, protocols, and systems contribute to those practices.

This report also discusses long-term possibilities for Aurora to re-imagine the ways that police help to promote public safety in Aurora. We emphasize that nothing in this report should be read as foreclosing the opportunity for the Aurora community, elected officials, and City stakeholders to define public safety and identify response mechanisms that might reduce the City's overall reliance on APD in responding to various types of community problems or issues. However, because implementing broader changes in APD's role and response likely will require time, effort, and community collaboration, this report focuses on the specific steps that APD can take right now that can have a tangible impact across Aurora's communities.

## Approach

21CP's assessment and recommendations are based on an analysis of three primary sources of information or raw "data": paper, performance, and people; the assessment of APD is no exception.

First, 21CP requested and received an array of written materials and information about, and relating to, APD's operations. This included policies, procedures, protocols, training curricula, annual reports, and other similar materials. These were evaluated in light of an array of emerging and best practices and national standards. We detail or reference the specific APD materials alongside the particular emerging and best practices through which we considered those materials throughout the report.

Second, 21CP endeavored to evaluate the Department's performance in practice. This primarily took the form of evaluating a variety of APD performance data to understand long-term performance patterns, dynamics, and trends. We analyze various classes of overall, aggregated data throughout the report.

We note that, in some jurisdictions where we have conducted similar work, 21CP has reviewed individual use of force investigations, officer misconduct investigations, or documentation of stops and arrests. Mindful of the Attorney General's ongoing investigation on patterns across individual incidents and past performance, we focus here on APD's current operations and recent performance to get a sense of where APD can most readily improve.

Third, 21CP conducted conversations, focus groups, and interviews with a diverse array of Aurora stakeholders in which approximately 220 individuals participated. These included Aurora residents, elected officials, and representatives of community organizations. It also included APD officers across ranks, positions, and assignments.

Fitouri 020182

The individuals who spoke with us wanted to speak with us, making participation voluntary and self-selecting. Participants were not randomly selected, and the views of participants in our community conversations may or may not reflect Aurora as a whole. Additionally, although we had a number of conversations, our process did not endeavor to include a statistically-significant number of Aurora stakeholders. Consequently, it is near certain that some important views did not surface in our engagement simply because of the number of individuals and stakeholders with whom we were able to engage. Nevertheless, among those with whom we did speak, some common issues, concerns, experiences, and suggestions emerged.

Where this report discusses community feedback or views, the sentiments addressed are those that appeared to resonate across at least several individuals. The report cites, characterizes, and sometimes quotes stakeholder participants. To ensure candid discussions and to preserve the confidentiality of participants who sometimes shared sensitive or traumatic experiences, 21CP did not log the identities of who said what during our stakeholder engagement. Their affiliations were recorded, for context, and the specific contents of what they said. Accordingly, this report refers to particular stakeholders in generic ways – as "an officer," "a community member," or the like.

Although the assessment and this report aim to address the most critical and immediate steps that APD might take to enhance community well-being, improve public safety, and provide service in an equitable and just manner, it is not and should not be considered to be exhaustive.

First, any large organization like a police department performs a broad, complex array of functions and services. This makes the prospect of a single evaluation of every conceivable aspect of a department's performance, operations, and administration unrealistic. Indeed, large, substantial, and standalone evaluations could focus on various technology, operational, business, and administrative practices and could provide an array of highly detailed recommendations. Again, and in contrast, this report identifies significant recommendations in the areas of most urgent import.

Second, there are some areas of inquiry that, because of APD's current practices, simply cannot be as detailed. For example, as this report discusses, the Department does not currently require officers to report all non-voluntary encounters, e.g., *Terry* stops. Consequently, one of the core areas in which concerns about inequity and disparate impact surface – stops, searches, and seizures – 21CP could not conduct a detailed analysis of the Department's performance. Although this report identifies several specific steps that the City and APD should take with respect to new policies, reporting procedures, and training on non-voluntary encounters, 21CP cannot, in the absence of better information and data, readily determine whether the Department's stop activity disproportionately impacts Aurora's BIPOC communities.

Fitouri 020183

This report aims to provide specific guidance, and practical recommendations, for APD and the Aurora community based on its unique needs, values, and experiences. However, Aurora is not alone in confronting significant issues and concerns surrounding the role, actions, and performance of police in its community. 21CP has undertaken similar reviews for other jurisdictions that address many of the same issues and challenges. Perhaps unsurprisingly, given the shared challenges that communities and police departments face, some of the recommendations we propose for APD are the same. Even where we make common recommendations – and in some places discuss the logic and rationale for those recommendations using the same language, similar examples, or parallel references as in reports to other communities – the specific realities of APD and needs of the Aurora community are the focus of our recommendations throughout this report.

We approached this report, our work in Aurora, and our interactions with Aurora stakeholders with humility and respect. Although we believe that our assessment provides sufficient grounds for specific recommendations rooted in best practices, we are not from Aurora. Travel restrictions related to the COVID-19 pandemic also prevented 21CP from spending the type of on-the-ground, in-person time with community and APD stakeholders that is typically a part of our assessment methodology. It is entirely possible, if not probable, that these and other limits to our approach, may have led us to overlook details, miss nuance, or bypass some areas of importance. To this end, 21CP shared a finalized draft of the recommendations and analysis presented here with the Department and city leadership to ensure that our evaluation was not misstating or missing important facts. APD provided valuable follow-up information during this final review process. Although 21CP did not change or alter any of our core conclusions or recommendations, this report does describe the efforts that the Department has recently made or is currently making in areas relating to the report's recommendations.

Ultimately, this report does not have all of the answers. We do not have all of the answers. For that matter, it is unlikely that any one of Aurora's stakeholders alone have all of the answers. Instead, the purpose of this report is to identify methods by which that the Aurora community, APD, elected officials, and other stakeholders might promote ever-more inclusive, equitable, effective, and just public safety in Aurora tomorrow.

Fitouri 020184

## CONTEXT & BACKGROUND

Known as the "Gateway to the Rockies," Aurora was designed as a four-square-mile suburb to Denver in 1891. Amid and after World War I and II, Aurora experienced population booms, with military families moving to Aurora following the establishment of Lowry Air Force Base, Fitzsimons Army Hospital, and Buckley Air Base.[5] A number of elements of the community retain ties to the Air Force and Army bases in the region.

The Aurora Police Department is one of the largest police departments in Colorado. The Department received national attention on July 20, 2012, when APD quickly apprehended a gunman who opened fire in the Aurora Century 16 Theater, killing 12 and injuring 58 people.[6]

As 21CP heard from diverse Aurora stakeholders, APD and its performance has increasingly been the subject of criticism and concern from community members. In 2016, a man, suspected of pick-pocketing, accused APD officers of hog tying him and repeatedly tasing him while he was subdued.[7] In 2018, the Civil Commission reversed a decision of the Department's then-Chief to fire an officer recorded using a racial slur during a pursuit of a subject, prompting significant community condemnation.[8] The death of Elijah McClain on August 24, 2019[9] remains a source of outrage and anger both within Aurora's communities and nationally.

In August 2020, after serving as Interim Police Chief for seven months, Vanessa Wilson was named as Police Chief. In October, the Chief outlined her "New Way Plan," intended to restore public trust in policing, to the City Council.[10]

APD serves a population of 388,723. Aurora is the third-largest city in Colorado and the 52nd-largest in the United States.[11] The City of Aurora has a 1.23 percent annual growth rate, with the population increasing by 19.6 percent since the 2010 census.[12]

---

[5] City of Aurora, Things to Do, Aurora History Museum, *Aurora History*, https://www.auroragov.org/things_to_do/aurora_history_museum/aurora_history (last visited May 28, 2021).

[6] *Id.*

[7] Kirk Mitchell, "Suspected Pickpocket Sues Aurora Claiming Officers Tortured Him with Tasers," *Denver Post* (June 30, 2016), https://www.denverpost.com/2016/06/29/suspected-pickpocket-sues-aurora-police-claiming-torture/.

[8] Ryan Haarer, "Aurora Police Lieutenant Keeps Job After Getting Caught Using Racial Slur," KUSA.com, https://www.9news.com/article/news/local/aurora-police-lieutenant-keeps-job-after-caught-using-racial-slur/73-572606240.

[9] *See Independent Review Panel Investigation Report.*

[10] City of Aurora, News, What's New, "Aurora Outlines 'A New Way' Forward" (Oct. 20, 2020), https://auroragov.org/news/whats_new/aurora_outlines___a_new_way__forward.

[11] World Population Review, Aurora, Colorado, https://worldpopulationreview.com/us-cities/aurora-co-population (last visited Feb. 24, 2020).

[12] *Id.*

Fitouri 020185

Overall, the rate of major crimes grew by 250 crimes per 100,000 residents between 2011 and 2019.[13] It appears that violent crime drove the crime rate increase over these years, with the violent crime rate increasing by 83 percent from 250 per 100,000 residents in 2011 to 458 per 100,000 residents in 2019. More recently, reported violent crime increased by 22 percent from 2019 to 2020,[14] which is generally consistent with national trends.[15]

## What APD Does

APD is authorized 892.5 employees – 744 sworn and 148.5 non-sworn personnel.[16] Table 1 provides detail about the assignments of sworn and non-sworn employees, as well as about vacancies by division. Approximately 54 percent of the sworn employees are assigned to the Operations Division which is primarily the patrol function. Twenty-eight percent of sworn employees are in the Metro Division, which includes most of the Department's investigative functions and specialized units such as intelligence, traffic, SWAT, and K-9.

**Table 1. APD Staffing and Vacancies, April 2021**

|  | Sworn | | | Civilian | | |
|---|---|---|---|---|---|---|
|  | Employees | Billets | Vacant | Employees | Billets | Vacant |
| **Administration** | 20 | 21 | **(1)** | 10 | 9 | 1 |
| **Operations** | 404 | 429 | **(25)** | 13 | 16 | **(3)** |
| **Metro Division** | 208 | 217 | **(9)** | 39 | 45 | **(6)** |
| **Professional Accountability** | 99 | 71 | 28 | 3 | 3 | 0 |
| **Business Services** | 8 | 6 | 2 | 70.5 | 75.5 | **(5)** |

*Source: 21CP Analysis of APD Data*
*Note: 21CP has learned that, since these numbers were current as of April 2021, 25 officers have left the Department.*

Table 2 shows sworn staffing within APD's Operations Division for each of the patrol districts.

---

[13] DJ Summers, "Aurora's Violent Crime Rate Ranks 3rd Out of Colorado's Ten Largest Cities," *Fox 31/2 News* (Oct. 6, 2020), https://kdvr.com/news/auroras-violent-crime-rate-ranks-3rd-out-of-colorados-ten-largest-cities/.
[14] Aurora Police Department, *Year-End Report (2020)*, https://www.auroragov.org/UserFiles/Servers/Server_1881137/File/Residents/Public%20Safety/Police/Crime%20Data/2020%20Year-End%20UCR%20Report.pdf (last accessed May 24, 2021).
[15] Major Cities Chiefs Association, Violent Crime Survey – National Totals, https://majorcitieschiefs.com/wp-content/uploads/2021/02/MCCA-Violent-Crime-Report-2020-and-2019-Year-End-Final.pdf (last accessed May 24, 2021).
[16] Aurora Police Department, *Master Deployment File* (Apr. 1, 2021).

Fitouri 020186

**Table 2.  Current APD Operations Division Sworn Staffing by District and Rank**

|  | Commander | Captain | Lieutenant | Sergeant | Agent | Officer |
|---|---|---|---|---|---|---|
| **District 1** | | | | | | |
| **Command** | 1 | 1 |  | 3 | 14 | 1 |
| **Patrol** |  |  | 4 | 15 |  | 96 |
| **Sector** |  |  | 1 | 2 |  | 10 |
| **District 2** | | | | | | |
| **Command** | 1 | 1 | 1 | 2 | 12 |  |
| **Patrol** |  |  | 4 | 13 |  | 81 |
| **Sector** |  |  | 1 | 3 |  | 17 |
| **District 3** | | | | | | |
| **Command** | 1 | 1 |  | 3 | 9 |  |
| **Patrol** |  |  | 4 | 13 |  | 73 |
| **Sector** |  |  | 1 | 1 |  | 14 |
|  |  |  |  |  |  |  |
| **Total** | **3** | **3** | **16** | **55** | **35** | **292** |

*Source: 21CP Analysis of APD Data*

No single type of information or set of statistics can, by itself, establish everything that a police department does – or show whether the department is or is not allocating its time appropriately in light of community issues.  One type of data useful in understanding what a community asks of its police and what a police department spends its time doing relates to calls for service.  This includes analyzing what people call about, when such calls arise, the priority levels assigned to those issues when calls are received, and the correlation, between those calls and crime.

21CP evaluated APD's calls for service based on the priority type assigned by dispatch.  It appears that a majority of calls (about 69 percent) were classified as either priority 1 ("where immediate police intervention is required to avert personal injury, extensive property damage, or where prompt arrival is necessary to effect criminal apprehension") or priority 2 ("calls that are urgent in nature requiring a quick police response that have a potential, but no imminent, risk of personal injury").[17]

---

[17] SOP PSC 0.02 Call Processing Protocols.

Fitouri 020187

**Table 3.  Calls for Service by Priority Type, 2016 – 2020**

| Priority | Calls for Service | |
|---|---|---|
| 0 | 61 | 0.0% |
| 1 | 265,176 | 25.4% |
| 2 | 455,529 | 43.7% |
| 3 | 259,976 | 24.9% |
| 4 | 33,602 | 3.2% |
| 5 | 23,113 | 2.2% |
| 6 | 1,949 | 0.2% |
| 7 | 480 | 0.0% |
| 8 | 775 | 0.1% |
| 9 | 1,410 | 0.1% |

*Source: 21CP Analysis of APD Data*

An analysis of APD's calls for service suggests that APD is called upon to field a large volume of issues that have little to do with violent crime.  Table 4 summarizes APD's calls for service data, detailing the number of calls handled between 2016 and 2020 across some fifty-three Department categories.

**Table 4.  APD Calls for Service by Category, 2016 – 2020**

| Category | CFS | % of Total | Category | CFS | % of Total |
|---|---|---|---|---|---|
| Traffic Stop | 122,167 | 11.7% | Parking | 7,769 | 0.7% |
| Suspicious | 78,307 | 7.5% | Harassment | 7,055 | 0.7% |
| Traffic Accident | 70,930 | 6.8% | Transport | 5,521 | 0.5% |
| Area Check | 64,932 | 6.2% | Drugs | 4,820 | 0.5% |
| Traffic Enforcement | 63,125 | 6.1% | Animal Issue | 4,632 | 0.4% |
| Alarm | 53,797 | 5.2% | Court Order | 4,328 | 0.4% |
| Disturbance | 51,682 | 5.0% | Sex Offense | 4,255 | 0.4% |
| Welfare Check | 51,528 | 4.9% | Shots Fired | 3,914 | 0.4% |
| Follow Up | 44,886 | 4.3% | Behavioral Issue | 3,910 | 0.4% |
| Family Offenses, Nonviolent | 43,902 | 4.2% | Emergency Assist | 3,799 | 0.4% |
| Theft | 39,349 | 3.8% | Abuse/Neglect | 3,747 | 0.4% |
| Assist | 32,226 | 3.1% | Knock | 3,575 | 0.3% |
| Civil Issue | 31,482 | 3.0% | Fight | 3,098 | 0.3% |
| Unknown | 25,919 | 2.5% | Lost/Found Property | 2,961 | 0.3% |
| Assault | 20,310 | 1.9% | Juvenile Issue | 2,853 | 0.3% |
| Auto Theft | 17,465 | 1.7% | Robbery | 2,655 | 0.3% |
| Administrative | 15,547 | 1.5% | Abandoned Property | 2,466 | 0.2% |

Fitouri 020188

| | | | | | | |
|---|---|---|---|---|---|---|
| **Warrant** | 15,138 | 1.5% | | Trespassing | 2,184 | 0.2% |
| **Missing Person** | 12,807 | 1.2% | | Alcohol | 1,653 | 0.2% |
| **Unwanted Person** | 11,910 | 1.1% | | Miscellaneous Policing | 1,501 | 0.1% |
| **Burglary** | 9,674 | 0.9% | | Death | 754 | 0.1% |
| **Vandalism** | 8,895 | 0.9% | | Abduction/Kidnapping | 278 | 0.0% |
| **911** | 8,835 | 0.8% | | Shooting | 215 | 0.0% |
| **Other** | 8,318 | 0.8% | | Prostitution Offense | 189 | 0.0% |
| **Suicide** | 8,128 | 0.8% | | Bomb Threat | 74 | 0.0% |
| **Weapons Law Violation** | 8,111 | 0.8% | | Homicide | 54 | 0.0% |
| **Driving Under the Influence** | 7,803 | 0.7% | | | | |

*Source: 21CP Analysis of APD Data*

Over a quarter of calls for service handled by the Aurora Police Department between 2016 and 2020 were traffic-related, with the Department's 120,000 traffic stop incidents, accounting for 11.7 percent of all calls for service over that span. Although some traffic stops may be initiated on grounds that there is sufficient suspicion that individuals are, have been, or are about to engage in criminal activity, it is highly unlikely that all of APD's traffic stops implicate violent crime issues.

Across a number of other areas, APD officers spend their time focusing on public safety and well-being issues that do not immediately implicate violent crime. For instance, about 5 percent of calls involve conducting a "welfare check." Some 5 percent of calls are responding to alarms. Another 6 percent of calls are "area checks." Response to instances of theft are another 4 percent of calls. "Follow up" calls are 4 percent of calls, "civil issues" are 3 percent of calls, and "auto thefts" are approximately 2 percent of calls. Together, the seven categories detailed here account for nearly three out of ten (29 percent of) APD calls for service.

About 2.4 percent of all calls for service can be associated with the National Incident-Based Reporting System ("NIBRS") offenses that the FBI classifies as "violent crime." NIBRS is a classification scheme and reporting protocol established by the Federal Bureau of Investigation in 1930 to help standardize and "improve the overall quality of crime data collected by law enforcement."[18] An incident having a call for service associated with a NIBRS event does *not* necessarily mean that a NIBRS offense occurred. Still the methodology helps to approximate the percentage of incidents that may be violent in nature. About 8.9 percent of calls are associated with NIBRS offenses classified by the FBI as "society"-related concerns and 6.6 percent are "property crime." Even if categories such as "weapons law violation," "shots fired," and "fight" were included as "violent" rather than

---

[18] Federal Bureau of Investigation, Services, Criminal Justice Information Services, *Uniform Crime Reporting*, https://www.fbi.gov/services/cjis/ucr (last visited Apr. 28, 2021).

Fitouri 020189

"society" crime, approximately 3.8 percent of Aurora's calls for service would be considered
as violent crime.

Importantly, although an incident may be categorized as a non-violent offense, it does not
mean that a violent offense has not occurred within the context of such interactions, or that
the situation was not dangerous for the responding officers.  We provide details about these
numbers in Table 5, below, to offer context for the myriad of community issues that APD is
called on to address – and not to either minimize or exaggerate the potential threats of violent
crime that APD officers and the Aurora community may encounter.

**Table 5.  Calls for Service Associated with NIBRS Offenses, 2016 – 2020**

| NIBRS Category | Category | Calls for Service | % of Total |
|---|---|---|---|
| **Property Crime** | Theft | 39,349 | 3.8% |
| **Property Crime** | Auto Theft | 17,465 | 1.7% |
| **Property Crime** | Burglary | 9,674 | 0.9% |
| **Property Crime** | Robbery | 2,655 | 0.3% |
| **Property Crime** | **Total** | **69,143** | **6.6%** |
| **Society** | Family Offenses, Nonviolent | 43,902 | 4.2% |
| **Society** | Vandalism | 8,895 | 0.9% |
| **Society** | Driving Under the Influence | 7,280 | 0.7% |
| **Society** | Harassment | 7,055 | 0.7% |
| **Society** | Weapons Law Violation | 7,055 | 0.7% |
| **Society** | Drugs | 4,612 | 0.4% |
| **Society** | Shots Fired | 3,914 | 0.4% |
| **Society** | Abuse/Neglect | 3,747 | 0.4% |
| **Society** | Fight | 3,098 | 0.3% |
| **Society** | Alcohol | 1,036 | 0.1% |
| **Society** | Prostitution Offense | 173 | 0.0% |
| **Society** | **Total** | **93,187** | **8.9%** |
| **Violent Crime** | Assault | 20,310 | 1.9% |
| **Violent Crime** | Sex Offense | 4,255 | 0.4% |
| **Violent Crime** | Abduction/Kidnapping | 278 | 0.0% |

Fitouri 020190

| Violent Crime | Shooting | 215 | 0.0% |
| Violent Crime | Homicide | 54 | 0.0% |
| **Violent Crime** | **Total** | **25,112** | **2.4%** |

*Source: 21CP Analysis of APD Data*

Ultimately, data suggests that APD officers spend a significant amount of time addressing community issues, problems, needs, and concerns that do not directly relate to violent crime. 21CP emphasizes that the calls for service data discussed above should not be interpreted as showing that APD does not address serious instances of crime and violence. It does. Instead, the available data illustrates that APD is called on to provide services in response to a host of issues related to a substantial and broad array of community problems. Some relate directly to crime and violence, while many others relate to other community matters.

Separately, 21CP considered calls for service data to identify when APD fields the most calls. In Aurora, calls for service volume peaked between 2 and 3 PM between 2016 and 2020 though they are elevated from 10 AM to 7 PM and then again from 10 PM to midnight.

**Table 6.  Calls for Service by Time of Day, 2016 – 2020**

| Time | Calls for Service | Time | Calls for Service |
|---|---|---|---|
| 12:00 AM | 40,373 | 12:00 PM | 53,145 |
| 1:00 AM | 33,826 | 1:00 PM | 55,945 |
| 2:00 AM | 28,708 | 2:00 PM | 56,669 |
| 3:00 AM | 24,109 | 3:00 PM | 56,337 |
| 4:00 AM | 20,550 | 4:00 PM | 55,365 |
| 5:00 AM | 18,335 | 5:00 PM | 52,657 |
| 6:00 AM | 16,747 | 6:00 PM | 52,102 |
| 7:00 AM | 33,280 | 7:00 PM | 49,256 |
| 8:00 AM | 42,224 | 8:00 PM | 48,397 |
| 9:00 AM | 48,633 | 9:00 PM | 46,673 |
| 10:00 AM | 52,290 | 10:00 PM | 54,106 |
| 11:00 AM | 49,856 | 11:00 PM | 52,488 |

*Source: 21CP Analysis of APD Data*

Fitouri 020191

**Figure 1.  Calls for Service by Time of Day, 2016 – 2020**



*Source: 21CP Analysis of APD Data*

Fitouri 020192

21CP Solutions | Recommendations for the Aurora Police Department | August 2021

# AREA 1.  CRITICAL OPERATIONS

### Use of Force

To understand APD's practices with respect to use of force, 21CP, among other things, reviewed APD policies, protocols, training, and other materials; analyzed use of force data; and discussed issues relating to force with a number of APD members and community stakeholders.  With respect to performance data, 21CP requested information from 2016 through 2020.

For any use of force encounter, information may be analyzed in terms of both *incidents* and *applications*.  A use of force *incident* is an encounter involving officers and a distinct subject on a distinct occasion.  A use of force *application* is the use of a particular type of force by an officer.  In any given force *incident*, it is possible that officers use different types of force and/or apply force multiple times – such that one force *incident* may involve multiple *applications* of force to the same subject.

APD policy classifies force into categories, or Tiers, of force.  Specifically, a force *incident* may be classified as a Tier 1, Tier 2, or Tier 3 level of force based on the severity of the force used or the significance of the injury caused or issues resulting.  Tier 3 involves the most serious force, which is "the use of a deadly weapon, or deadly force, or potentially deadly force," or "the use of any degree of force or action, tools, or weapons, which results in hospitalization or death."[19]  Tier 2 involves mid-level force, which includes the utilization of various types of force instruments and force that involves an injury but not hospitalization.[20] Tier 1 involves the least-severe types of force, including the use of restraints and various types of force that do not result in injury.[21]  For force *incidents* where officers applied multiple types of force, the incident is generally categorized according to the most-significant level of force used – such that if an officer used restraints (a type of Tier 1 force) and deadly force (Tier 3 force) in the same encounter, the force incident would be classified as a Tier 1 incident.

APD's data, which the Department summarizes and analyzes in annual reports, shows that the overall number of incidents in which officers use force has gone down each year from 2016 through 2020.  It appears that officers are using force categorized as less significant or severe in recent years as compared to 2016 – that is, a larger share of use of force incidents are Tier 1 incidents in 2017 and more-recent years as compared to 2016.

---

[19] APD Directive, Section 5.4.2(d).  A supervisor may also independently classify a use of force incident as Tier three for purposes of notification, response, and investigation.  *Id.*
[20] APD Directive, Section 5.4.2(c).  The policy outlines a number of specific force types and types of encounters that constitute Tier Two force.  *Id.*
[21] APD Directive, Section 5.4.2(b).

Fitouri 020193

**Table 7.  Use of Force Incidents by Officer by Tier, 2016 – 2020**

|  | 2016 | | 2017 | | 2018 | | 2019 | | 2020 | |
|---|---|---|---|---|---|---|---|---|---|---|
| **Tier 1** | 382 | 58% | 450 | 75% | 404 | 68% | 423 | 72% | 378 | 81% |
| **Tier 2** | 268 | 41% | 145 | 24% | 179 | 30% | 159 | 27% | 86 | 18% |
| **Tier 3** | 8 | 1% | 5 | 1% | 9 | 2% | 9 | 2% | 2 | <1% |
| **TOTAL** | 658 | | 600 | | 592 | | 591 | | 466 | |

*Source: APD and 21CP Analysis of APD Data*

Aggregate use of force statistics must be situated, to at least some degree, within the larger context of a department's overall activity and number of interactions.  A department may use more or less force, in absolute terms, in a given year in part because it has been engaged in greater numbers of interactions with members of the public overall.

Table 8 inventories calls for service for each year from 2016 through 2020 and computes a rudimentary statistic that captures the number of force incidents per 10,000 calls for each year.  Force per calls for service was somewhat down and flat in the years 2017, 2018, 2019 compared to 2016.  Although the number of force incidents overall went down in 2020, the number of calls for service that APD received was also substantially down – which means that the rate of force incidents per calls for service was higher in 2020 than in prior years. 21CP cautions here that a much more detailed analysis of both calls for service data and of individual use of force incidents would be necessary to understand if this trend suggests a greater reliance on force in 2020 or if, instead, it might be explained by changes in the nature of the calls themselves.  Indeed, across the country, data for 2020 reflects substantially altered patterns of human and social behavior in light of the Covid-19 pandemic, which makes straightforward conclusions based solely on top-level aggregate data challenging. Further, numbers for 2020 include force used in the context of protest response, which may independently account for the elevated rate of force per 10,000 calls reflected in Table 8.

**Table 8.  Use of Force Incidents by Calls for Service, 2016 – 2020**

| Year | Calls for Service | Use of Force Incidents | Force Incidents Per 10,000 Calls |
|---|---|---|---|
| 2016 | 228,048 | 658 | 29 |
| 2017 | 229,663 | 600 | 26 |
| 2018 | 234,901 | 592 | 25 |
| 2019 | 230,914 | 591 | 26 |
| 2020 | 118,545 | 466 | 39 |

*Source: 21CP Analysis of APD Data*

21CP also considered the various force types, instruments, and tactics that APD officers employed in use of force incidents.  During our review, we learned from APD it has changed

Fitouri 020194

over time the way that it categorizes various force application types. Those changes make year-over-year comparisons more challenging. Consequently, for the purposes of understanding context, we considered force application data for the calendar year 2020, which is summarized in Table 9.

**Table 9. APD Use of Force Incidents by Type of Force Listed, 2020**

| Type of Force | Applications |
|---|---|
| Control Techniques Successful | 823 |
| Control Techniques Twist locks, takedowns, throws, etc. Successful | 142 |
| Hobble Successful | 67 |
| Restraining Subjects for Medical Personnel Successful | 54 |
| Other Successful | 42 |
| Control Techniques Unsuccessful | 42 |
| Other Restraints Successful | 42 |
| Personal Weapons/ Punches, strikes etc. Successful | 37 |
| Other Launchable Munitions Successful | 36 |
| Taser-Dart Probe Successful | 35 |
| Restraining Subjects for Medical Personnel | 35 |
| Baton Successful | 34 |
| Taser-Dart Probe Unsuccessful | 24 |
| Tactical Vehicle PIN Successful | 24 |
| Control Techniques Twist locks, takedowns, throws, etc. Unsuccessful | 20 |
| 12 Gauge Sock Round Successful | 16 |
| Taser-Stun Gun Successful | 16 |
| Baton not a strike Successful | 14 |
| Pepper Spray (OC) Successful | 13 |
| Other Launchable Munitions Unsuccessful | 13 |
| Police Canine Successful | 12 |
| Deadly Force Successful | 5 |
| Hobble Unsuccessful | 5 |
| Tactical vehicle PIN | 4 |
| Pepper Spray (OC) Unsuccessful | 4 |
| PIT Maneuver Successful | 3 |
| Subjects for Medical Personnel Successful | 3 |
| Vehicle Boxing Successful | 3 |
| Taser-Stun Gun Unsuccessful | 3 |
| Restraining Subjects for Medical Personnel Unsuccessful | 3 |
| 12 Gauge Sock Round Unsuccessful | 2 |
| Taser-Dart Probe SuccessfulTaser-Dart Probe Unsuccessful | 2 |
| Other Unsuccessful | 1 |

Fitouri 020195

| | |
|---|---|
| Personal Weapons Unsuccessful | 1 |
| PIT Maneuver Unsuccessful | 1 |

*Source: 21CP Analysis of APD Data*
*Note: The force types listed originate from APD's current classification scheme.*

Like many other police departments, government organizations, and private firms that must collect and analyze data about complex human interactions, APD should seek to continually strengthen its existing capacities for collecting data in a manner that facilitates and simplifies aggregation and analysis. Because APD is already collecting and tracking data on use of force, the opportunity for the Department going forward is to streamline *how* it collects data and to enhance its ability to *analyze* such data such that it can become ever-more committed to continuous self-analysis and improvement.

For instance, as Table 9 reflects, APD categorized data on the specific type of force that officers use across 35 distinct types in 2020. It is not immediately apparent – and it does not appear to be described in policies, protocols, or a data dictionary – how similar categories may be distinct. It is not readily apparent, for example, how the 823 "Control Techniques" applied in 2020 are distinct from the 142 "Control Techniques – Twist locks, takedowns, throws, etc." Even to the extent that there may be differences that some within the Department can explain, it is not apparent from APD protocols or policies that these similar categories are rigorously operationalized such that the distinction is useful and uniform across personnel and the Department. Separately, multiple applications of force are frequently contained in one cell, such as "Baton SuccessfulTaser-Dart Probe SuccessfulTaser-Dart Probe UnsuccessfulTaser-Stun Gun SuccessfulPersonal Weapons/ Punches, strikes etc. Successful," which makes analyzing force applications more challenging than it could be.

21CP also sought to evaluate the characteristics of subjects and officers involved in use of force incidents. Although 328 unique officers used some level of force in 2020, a small number of APD officers appear to apply a disproportionate amount of force. Specifically, 27 APD officers, which is about 8 percent of the total number of officers who used force and 3.5 percent of officers overall, were responsible for nearly one-quarter (24 percent) of all applications of force in 2020.

At the outset, it must be noted that the demographics of the subjects are not uniformly captured based on a variety of factors, such as in protest incidents where a subject may be wearing a mask and hoodie thus making demographics more challenging to identify. We note in our data analysis that race and gender information was missing for nearly one-fifth (19.2 percent) of all subjects of force. Without certainty in the data, based on what was missing or could not be gathered, an analysis of use of force trends with respect to subject characteristics cannot be as reliable as it should be.

Fitouri 020196

For the uses of force in which subject race/ethnicity and gender information was gathered, Black men were represented among force subjects at a rate significantly higher than their share of Aurora's population.  Specifically, Black men were the subject of 29% of force incidents even as they make up 9% of Aurora's population.  White men were also represented among force subjects at a rate somewhat lower than their population, with white men the subject of 23% of force incidents even as they are 31% of the population.  The results of this data analysis were consistent with prior assessments conducted of APD force data and presented to Aurora's City Council.[22]

**Table 10.  Use of Force Incidents by Subject Race/Gender Groups, 2020[23]**

| Race | Gender | Subjects | % of Total | % of Population | Difference |
|---|---|---|---|---|---|
| Asian | Male | 7 | 1% | 3% | -2% |
| Black | Male | 187 | 29% | 9% | 20% |
| Black | Female | 43 | 7% | 8% | -1% |
| Hawaiian/Pacific Islander | Male | 4 | 1% | 0% | 0% |
| Hispanic | Male | 72 | 11% | 14% | -3% |
| Hispanic | Female | 13 | 2% | 14% | -12% |
| Two or More Races | Male | 1 | 0% | 3% | -2% |
| Unknown | Unknown | 118 | 18% | N/A | N/A |
| Unknown | Male | 5 | 1% | N/A | N/A |
| White | Male | 149 | 23% | 31% | -7% |
| White | Female | 43 | 7% | 27% | -21% |

*Source: 21CP Analysis of APD Data*

To understand the issues and dynamics under which the aggregate performance summarized above has been occurring, 21CP spoke to numerous APD personnel and community stakeholders about the Department's policies, procedures, training, investigative and supervisory practices, and other protocols as well as reviewed a variety of related materials. The following recommendations are aimed at identifying improvements, enhancements, and changes that might foster enhanced subject, officer, and public safety across all APD interactions while promoting the resolution of incidents without force or a less impactful use of force.

---

[22] Quincy Snowdon, "Aurora Police Disproportionately Use Force Against Black People, Report Says," *Sentinel Colorado* (Oct. 18, 2020), https://sentinelcolorado.com/news/aurora-police-disproportionately-use-force-against-black-people-report-says/.

[23] The table only incudes subjects of race and gender groups for whom police used force more than twice.  Therefore, the table does not display those race or gender groups that only had 1 or 2 events, such as Asian/Indian Males (classified in APD data as a separate category from Asian Males).

Fitouri 020197

We note, at the outset, that APD indicates that it has identified outside consultants to help "review and re-write Use of Force policies" and that 21CP's "recommendations will be provided to such consultants for review and inclusion in the policy re-writes."[24]

**Recommendation 1.        APD's use of force policies should be substantially revised to provide better, more specific guidance to officers on when force may and may not be used.**

APD's primary policy on force (Directive 5.08), and supporting policies on firing a weapon (Directive 5.01) and Less-Lethal instruments (Directive 5.08), rely on reprinting Colorado statutes.  In doing so, the Department's policies fail to address a host of critical concepts, lagging far behind peers and best practices.  Even more critically, the deferral to Colorado state statutes suggests to officers that the City of Aurora and its police department expect them to meet nothing more than generic, minimum standards. Officers are left to feel on their own to determine how to comply with the broad parameters of state law in the context of the particular concerns and needs of the Aurora community.

Providing clear policies on when officers may and may not use force is a foundational obligation of all law enforcement agencies.  "To ensure fair, safe, and effective policing now and in the future, community members and police leaders should work together to create clear and specific guidance and expectations on appropriate use[] of force . . . ."[25]  Federal and state law "outlines broad principles regarding what police officers can legally do in possible use-of-force situations, but it does not provide specific guidance on what officers should do."[26]  Therefore, police departments must continually evaluate and ensure that their policies provide more sufficiently specific guidance and "rules of the road" to which officers can readily adhere in the real world.[27]

As Chief Justice Warren Burger reportedly observed, "[t]he officer working the beat makes more decisions and exercises broader discretion affecting the daily lives of people everyday and to a greater extent than a judge will exercise in a week."[28]  Recognizing that police officers need specific, before-the-fact guidelines as to what responses are and are not appropriate, departmental policies will often state their intention to provide subjects with more protection from use of force than the minimum requirements of state or federal law, for example:

---

[24] Aurora Police Department, *Response to 21CP Solutions Recommendations for the Aurora Police Department* (June 17, 2021) at 2.

[25] Leadership Conference on Civil and Human Rights, *New Era for Public Safety: A Guide to Fair, Safe, and Effective Community Policing* 112 (2019).

[26] Police Executive Research Forum, *Guiding Principles on Use of Force* 15 (2016).

[27] *Id.* at 17.

[28] Karen M. Hess, *Police Operations: Theory and Practice* 523 (5th ed. 2006).

Fitouri 020198

- **New Orleans Police Department** – "[T]he Department places restrictions on officer use of force that go beyond the restrictions set forth under the Constitution or state law."[29]

Compared to Colorado state law, the **Denver Police Department's** policies on use of force provide more detail and more specific guidance to officers than the broad requirements of federal and state law.[30]

As the following sub-recommendations will make clear, APD needs to revise its core use of force policies along a number of critical dimensions. Ultimately, APD policy should expressly provide that officers may use force only when necessary, proportional and objectively reasonable, to the nature of a subject's threat, and after de-escalation tactics and strategies have been attempted and failed, or are not feasible under the given circumstances. 21CP understands that APD has committed to conducting a comprehensive revision and update of its force policies, which 21CP commends them for doing. In support of that commitment, as the Department looks to enhance its policies, we offer an array of specific recommendations.

> **Recommendation 1.1.      APD should streamline its existing policies on use of force into a centralized policy, or a few core policies, addressing force.**

Currently, officer guidance on when they may and may not use force is scattered across at least ten separate, interrelated policy provisions in Chapter 5 of APD's Directives Manual. More than the number of policies, the overlapping nature of the policies risks undue confusion. For instance, with respect to the circumstances in which an officer may or may not fire a weapon at a subject, Directive 5.03, Use of Physical and Deadly Force, provides general standards for using deadly force such as firearms. Directive 5.01, Authorized Firing of a Weapon, contains additional limitations on the use of firearms (e.g., "[a]t persons who have committed only a misdemeanor or traffic violation" or "[t]o prevent the destruction of property or theft").[31] While another policy, Directive 5.05, Authorized Weapons and Ammunition, addresses issues surrounding what types of firearm equipment officers may carry.

As APD overhauls its force policies, it should make efforts to streamline and structure the revised policy materials in a way that provides clear guidance to officers on when they may and may not use force. Although its critical nature and the many important issues surrounding the application, response, investigation, and review of force make a single policy

---

[29] New Orleans Police Department, Chapter 1.3, Use of Force Policy at 5, https://www.nola.gov/getattachment/NOPD/Policies/Chapter-1-3-Use-of-Force-EFFECTIVE-4-01-18.pdf/ (last rev. Apr. 1, 2018).

[30] Denver Police Department, Operations Manual, Section 105.01, Use of Force Policy, https://www.denvergov.org/content/dam/denvergov/Portals/720/documents/OperationsManual/OMSBook/OM_Book.pdf (Sept. 1, 2020).

[31] APD Directive 5.1, Section 5.1.3.

Fitouri 020199

addressing all force issues seem impractical. However, some police departments, such as the Camden County Police Department of New Jersey, have successfully transformed their force policies to provide all expectations for officer performance in the field into a single policy.[32] Other departments, like the New Orleans Police Department, detail the majority of its specific instructions on when and how officers are authorized to use force in a single policy,[33] with specific, subsidiary policies addressing handcuffing and restraint devices,[34] control devices and techniques,[35] and Tasers.[36]   Regardless of approach, APD should work to streamline and centralize core guidance to officers on when force may and may not be used.

> **Recommendation 1.2.    APD's use of force policy should contain a comprehensive statement of purpose and the Department's values – expressly affirming the sanctity of human life, emphasizing the imperative that force be minimized or avoided when possible, and articulating the community's values and expectations regarding the preservation of life and use of force.**

APD's current policies do not articulate the Department's overriding values and philosophy regarding the use of force.  As the Department works to overhaul its force protocols, it should ensure that all of its policies – but especially its core policies on force – expressly affirm the sanctity of human life as an overriding value and organizational imperative.

President Obama's Task Force on 21st Century Policing reported that "a clearly stated 'sanctity of life' philosophy must . . . be in the forefront of every officer's mind."[37]  Some examples of overarching policy statements that more clearly make the connection between force and the sanctity of life, including the minimization or avoidance of force when possible, include:

- **Las Vegas Metropolitan Police Department** — "It is the policy of this department that officers hold the highest regard for the dignity and liberty of all persons, and place minimal reliance upon the use of force. The department

---

[32]    Camden County Police Department, Use of Force Policy, https://static1.squarespace.com/static/58a33e881b631bc60d4f8b31/t/5d5c89c2e3bc4c000192f311/1566345667504/CCPD+UOF+Policy+%288.21.19%29+%28FINAL%29.pdf (last rev. Aug. 21, 2019).

[33]    New Orleans Police Department, Chapter 1.3, Use of Force Policy, https://www.nola.gov/getattachment/NOPD/Policies/Chapter-1-3-Use-of-Force-EFFECTIVE-4-01-18.pdf/ (last rev. Apr. 1, 2018).

[34]    New Orleans Police Department, Chapter 1.3.1.1, Handcuffing and Restraint Devices, https://www.nola.gov/getattachment/NOPD/Policies/Chapter-1-3-1-1-Handcuffing-and-Restraint-Devices-EFFECTIVE-5-10-20.pdf/?lang=en-US (last rev. May 10, 2020).

[35]    New Orleans Police Department, Chapter 1.3.1.2, Control Devices and Techniques, https://www.nola.gov/getattachment/NOPD/Policies/Chapter-1-3-1-2-Control-Devices-and-Techniques-EFFECTIVE-4-01-18.pdf/ (last rev. Apr. 1, 2018).

[36]    New Orleans Police Department, Chapter 1.7.1, Conducted Energy Weapon (CEW), https://www.nola.gov/getattachment/NOPD/Policies/Chapter-1-7-1-Conducted-Energy-Weapon-EFFECTIVE-12-6-20.pdf/?lang=en-US (last rev. Dec. 6, 2020).

[37] *Final Report of the President's Task Force on 21st Century Policing* 19 (2015).

Fitouri 020200

respects the value of every human life and that the application of deadly force is a measure to be employed in the most extreme circumstances."[38]

- **New Orleans Police Department** — "The policy of the New Orleans Police Department is to value and preserve human life when using lawful authority to use force . . . ."[39]

**Recommendation 1.3.      APD's force policy, consistent with its other provisions and the other recommendations presented here, should provide more specific and comprehensive definitions of key terms and concepts to better aid officers in understanding the policy's performance expectations.**

APD's force policies do not define a number of critical terms.  For instance, Directive 5.03 Section 5.3.3, quotes Colorado state law as permitting the use of deadly force if an officer has "an objectively reasonable belief" that lesser force is "inadequate" and that the officer or someone else is "in imminent danger of being killed or receiving serious bodily injury." However, the concept of "objective reasonableness" is neither defined nor explained.

The force policies of many other departments, such as the Denver Police Department,[40] Cleveland Division of Police,[41] and Seattle Police Department,[42] find it useful to inventory a number of key terms and provide uniform definitions to ensure consistency and clarity. APD's revised policy should likewise expressly identify and define key terms.

**Recommendation 1.4.      APD's use of force policy should authorize force only when it is necessary under the circumstances.**

Currently, the concept of necessity surfaces only in APD policy's re-printing of Colorado state statute.[43]  Specifically, Directive 5.03 provides that officers "may use a degree of force which he reasonably believes to be necessary for" the purpose of defending the officer or another

---

[38]     Las       Vegas       Use       of       Force       Policy       at       1149, https://static1.squarespace.com/static/56996151cbced68b170389f4/t/569ad92b57eb8d0f11460ead/1452988719385/Las+Vegas+Use+of+Force+Policy.pdf.

[39]     New     Orleans     Police     Department,     Chapter     1.3,     Use     of     Force     Policy, https://www.nola.gov/getattachment/NOPD/Policies/Chapter-1-3-Use-of-Force-EFFECTIVE-4-01-18.pdf/ (last rev. Apr. 1, 2018).

[40]     Denver     Police     Department,     Operations     Manual,     Section     105.01,     Use     of     Force     Policy, https://www.denvergov.org/content/dam/denvergov/Portals/720/documents/OperationsManual/OMSBook/OM_Book.pdf (Sept. 1, 2020).

[41]     Cleveland Division of Police, General Police Order, Section 2.01.01, Use of Force – Definitions, https://www.city.cleveland.oh.us/sites/default/files/forms_publications/01.10.2018Definitions.pdf?id=12396 (Jan. 1, 2018).

[42]     Seattle     Police     Department,     Policy     Manual,     Section     8.050 – Use     of     Force     Definitions, http://www.seattle.gov/police-manual/title-8---use-of-force/8050---use-of-force-definitions     (June     19, 2020).

[43]     APD Directive 5.03, Section 5.3.1.

Fitouri 020201

from the threat of imminent physical harm.[44]  The concept of necessity is tied not to an officer's determination as to whether to use force but, instead, to the amount, type, or scope of force that an officer applies.

Going forward, APD policy expressly provide as a policy imperative that any force, regardless of level or severity, may be deployed only when and if it is necessary under the circumstances. For instance:

- **Denver Police Department** – "Force may only be used if non-force alternatives would be ineffective in effecting a detention for any lawful purpose, an arrest, preventing an escape or preventing an imminent threat of serious bodily injury or death to an officer or another person. The intended action must be required based on the circumstances and will only consist of the amount of force needed to safely accomplish a lawful purpose."[45]

- **Baltimore Police Department** – "Force is necessary only when no reasonably effective alternative exists. When force is Necessary, members shall use force in a manner that avoids unnecessary injury or risk of injury to members and civilians."[46]

- **Cleveland Division of Police** – "Officers shall use force only as necessary, meaning only when no reasonably effective alternative to the use of force appears to exist, and then only to the degree which is reasonable to effect the intended lawful objective." [47]

**Recommendation 1.5.        APD should refine and expand its treatment of de-escalation in its core force policy – more directly emphasizing that de-escalation is an affirmative duty of all officers in all circumstances.**

"De-escalation" refers to tactics, techniques, and strategies for successfully and safely resolving incidents with less significant, minimal, or no force.  "The term de-escalation can be viewed as a both an overarching philosophy that encourages officers to constantly reassess

---

[44] *Id.*

[45] Denver Police Department, Operations Manual, Section 105.01(2), Use of Force Policy, https://www.denvergov.org/content/dam/denvergov/Portals/720/documents/OperationsManual/OMSBook/OM_Book.pdf (Sept. 1, 2020).

[46] Baltimore Police Department, Policy 1115 at 4 (Nov. 24, 2019), https://www.baltimorepolice.org/1115-use-force.

[47] Cleveland Division of Police, General Police Orders, Use of Force: General at 1, https://static1.squarespace.com/static/5651f9b5e4b08f0af890bd13/t/582c54ac59cc685797341239/1479300270095/Dkt.+83--Use+of+Force+Policies+with+Exhibits.pdf.

Fitouri 020202

each situation to determine what options are available to effectively respond, as well as the grouping of techniques designed to achieve this goal."[48]

Currently, de-escalation is referenced in one policy paragraph in APD's core use of force policy:

> When practicable sworn members will attempt to use de-escalation techniques to control the situation so that lesser force, or possibly no force, is required. Additionally, when sworn members use force, they will de-escalate the amount of force used when that force is successful, and control is gained.[49]

Although these brief references to de-escalation are not necessarily "wrong," they do not operationalize or explain de-escalation as a concept as comprehensively or precisely as they should – and they do not sufficiently highlight the overriding importance of deploying techniques and strategies aimed at resolving situations with lesser or minimal force.  Topics related to de-escalation are briefly referenced in the policy relating to less-lethal force[50] but are likewise not substantially detailed.

APD policy should therefore establish that de-escalation is an affirmative duty of law enforcement officers – not something that officers should "attempt" to do but something officers *must* or *shall* do whenever the circumstances permit.  For instance:

- **IACP National Consensus Policy on Use of Force** – "An officer shall use de-escalation techniques and other alternatives to higher levels of force consistent with his or her training wherever possible and appropriate before resorting to force and to reduce the need for force."[51]

- **American Law Institute Principles on Use of Force** – "Agencies should require, through written policy, that officers actively seek to avoid using force whenever possible and appropriate by employing techniques such as de-escalation."[52]

---

[48] International Association of Chiefs of Police, *National Consensus Policy and Discussion Paper on Use of Force* 6 (Oct. 2017), http://www.theiacp.org/Portals/0/documents/pdfs/National_Consensus_Policy_On_Use_Of_Force.pdf [hereinafter "IACP Consensus Policy"].
[49] APD Directive 5.03, Section 5.3
[50] APD Directive 5.08, Section 5.8.
[51] International Association of Chiefs of Police, *National Consensus Policy and Discussion Paper on Use of Force* 3.
[52] *Principles of the Law: Policing* §5.04 (Am. Law. Inst. Revised Tentative Draft No. 1, 2017), *available at* https://www.ali.org/media/filer_public/f2/80/f2804962-6431-4535-9649-34c5f872140e/policing-uof-online.pdf.

Fitouri 020203

- **Seattle Police Department** – "When safe, feasible, and without compromising law enforcement priorities, officers shall use de-escalation tactics in order to reduce the need for force."[53]

- **New Orleans Police Department** – "When feasible based on the circumstances, officers will use de-escalation techniques, disengagement; area containment; surveillance; waiting out a subject; summoning reinforcements; and/or calling in specialized units such as mental health and crisis resources, in order to reduce the need for force, and increase officer and civilian safety. Moreover, the officers shall de-escalate the amount of force used as the resistance decreases."[54]

Consequently, a revised treatment of de-escalation should emphasize that the duty to de-escalate is applicable across all incidents and officer performance, regardless of whether the incident ultimately involves force. Some departments have established standalone policies on de-escalation to emphasize that the duty applies regardless of whether an officer ultimately uses force.[55] Other departments incorporate specific sections addressing de-escalation in their use of force policies that clarify that the affirmative duty to de-escalate applies across encounters and regardless of whether force is used.[56]

Regardless of whether APD chooses to implement a standalone de-escalation policy or expressly incorporates the duty to de-escalate into a more extensive use of force policy, specific policy guidance should inventory the variety of tactics and techniques that can constitute de-escalation. For example, the Cleveland Division of Police's policy on de-escalation lists a variety of techniques, including but not limited to "[s]eparating oneself from the threat and creat[ing] a safe distance to speak with subject(s)," "[s]lowing down the pace of the incident, from the time officers receive the radio broadcast, and utilizing Division trained anxiety and stress management techniques when necessary," "[s]trategic communication or voice commands to de-escalate the situation," and "[i]ncreas[ing] officer

---

[53] Seattle Police Department Manual, Section 8.100: De-Escalation (rev. Sep. 15, 2019), https://www.seattle.gov/police-manual/title-8---use-of-force/8100---de-escalation.
[54] New Orleans Police Department, Operations Manual, Chapter 1.3, Use of Force Policy at 5, *available at* https://www.nola.gov/getattachment/NOPD/NOPD-Consent-Decree/Chapter-1-3-Use-of-Force.pdf/.
[55] Baltimore Police Department, Policy 1107, De-Escalation (Nov. 24, 2019), https://www.baltimorepolice.org/1107-de-escalation; Cleveland Division of Police, De-Escalation (January 1, 2018), https://www.city.cleveland.oh.us/sites/default/files/forms_publications/01.10.2018De-Escalation.pdf?id=12397; Seattle Police Department Manual, Section 8.100: De-Escalation (rev. Sep. 15, 2019), https://www.seattle.gov/police-manual/title-8---use-of-force/8100---de-escalation.
[56] New Orleans Police Department, Operations Manual, Chapter 1.3, Use of Force (rev. Apr. 1, 2018), https://www.nola.gov/getattachment/NOPD/Policies/Chapter-1-3-Use-of-Force-EFFECTIVE-4-01-18.pdf/.

Fitouri 020204

presence, if necessary, to increase strategic options available for bringing a subject under control and/or reduce the severity of the threat."[57]

> **Recommendation 1.6.    APD should strengthen its policy on providing verbal warnings by clarifying that warnings are required whenever feasible, regardless of the type of force; by requiring that officers identify themselves as law enforcement officers whenever possible; and requiring that officers provide subjects with a reasonable opportunity to comply with officer commands before using force.**

APD's policies therefore appear to instruct officers to provide warnings before using force before using a firearm or a less-lethal instrument like a Taser, OC/pepper spray, or batons. Specifically, APD's current, primary policy on force requires that officers "give clear verbal warning of the intent to use a firearm or other deadly physical force with sufficient time for the warning to be observed."[58]  This requirement does not apply if "do[ing] so would unduly place the sworn member at risk of injury or would create a risk of death to other persons."[59]  Elsewhere, APD's policy on less-lethal force instruments provides that "[i]f circumstances allow verbalizing and warning without risk to the safety of the member or others, then a verbal warning should be given to the subject."[60]

21CP appreciates the extent to which APD's current policy recognizes the import of providing a warning in advance of using deadly force or less-lethal weapons.  Still, the logic behind these requirements – that it provides an opportunity for subjects to comply without the need to use force and provides express articulation of an officer's intent to use force to other on-scene police personnel in a manner that can aid officer coordination and safety – extends easily to the application of *all* types of force.   Indeed, providing a warning may be substantially more feasible in situations involving less-significant force and threats than those involving deadly force and threats.  If a warning should be provided where feasible before using a firearm or Taser, then a warning should also be provided before applying lower-level types of hands-on physical maneuvers.

Consequently, rather than splitting up the duty to provide a verbal warning among multiple, distinct policy provisions – governing deadly force and less-lethal force, respectively – APD policy should provide unified guidance that officers should provide a warning whenever feasible before using any force.  Indeed, if the rule is uniformly applicable across all force

---

[57]    Cleveland    Division    of    Police,    De-Escalation    (January    1,    2018), https://www.city.cleveland.oh.us/sites/default/files/forms_publications/01.10.2018De-Escalation.pdf?id=12397.
[58] APD Directive 5.03, Section 5.3.4.
[59] *Id.*
[60] APD Directive 5.08, Section 5.8.

Fitouri 020205

applications, officer compliance and the Department's ability to audit such compliance is likely to be substantially enhanced.

A number of police departments require a warning before *any* force is used, whether that force is lethal or less-lethal, severe or comparatively less severe:

- **Cleveland Division of Police** – "Where feasible, and to do so would not increase the danger to officers or others, officers shall issue a verbal warning to submit to their authority prior to the use of force."[61]

- **Northampton (Mass.) Police Department** – "When tactically feasible, an officer will identify themselves as a police officer and issue verbal commands and warnings prior to the use of force.  When feasible, an officer will allow the subject an opportunity to comply with the officer's verbal commands.  A verbal warning is not required in circumstances where the officer has to make a split second decision, or if the officer reasonably believes that issuing the warning would place the safety of the officer or others in jeopardy."[62]

> **Recommendation 1.7.        Consistent with the concepts of de-escalation and necessity, APD should consider expressly requiring that officers exhaust all other means reasonably available to them under the circumstances before using deadly force.**

A number of police departments require in policy that their officers exhaust all reasonably available alternatives before using deadly force:

- **Newark Police Division** – "In all instances, members should exhaust all other reasonable means before resorting to using force tactics, recognizing that members will use only force which is objectively reasonable and necessary."[63]

- **Tampa Police Department** – "Before resorting to the use of deadly force, an officer shall . . . Exhaust all reasonable alternatives."[64]

---

[61] Cleveland Division of Police, Use of Force: General, *available at* https://static1.squarespace.com/static/5651f9b5e4b08f0af890bd13/t/582c54ac59cc685797341239/1479 300270095/Dkt.+83--Use+of+Force+Policies+with+Exhibits.pdf.

[62] Northampton (MA) Police Department, AOM Chapter 0-101, Section II-H, *available at* https://www.northamptonpd.com/administration/policies-and-procedures.html (last rev. Feb. 2021).

[63] Newark Police Division, General Order No. 18-20, Section VII-A-3, https://www.newarkpdmonitor.com/wp-content/uploads/2019/04/Use-of-Force-Policy.pdf     (Nov. 8, 2018).

[64] Tampa Police Department, Standard Operating Procedure 537, Section VI-B, https://www.tampa.gov/document/sop-537-section-v-b8-33471.

Fitouri 020206

- **State of Tennessee Use of Lethal Force Statute** – An "officer may use deadly force . . . only if all other reasonable means of apprehension have been exhausted or are unavailable . . . ."[65]

APD's policy, quoting Colorado state law, provides that deadly force is authorized only when an officer "has an objectively reasonable belief that a lesser degree of force is inadequate."[66] 21CP recommends that APD consider revising its force policy to more directly and affirmatively require that officers exhaust all other reasonable means before using any force, and all other reasonable alternatives before using deadly force.  This approach allows officers to respond to deadly threats to others or themselves where the suddenness, imminence, or circumstances of the threat provide no reasonable alternatives while emphasizing the imperative to use such alternatives whenever they are, in fact, available under the circumstances.

> **Recommendation 1.8.      APD's use of force policy should authorize force only when it is proportional to the nature of the threat that a subject poses under the circumstances.**

APD's current force policy does not sufficiently address the core concept of proportionality. Requiring that an officer's force be proportional to the nature of a subject's threat or resistance ensures that an officer's response will be consistent with or aligned to the significance or gravity of the subject's actions.  "Proportionality requires that any use of force correspond to the risk of harm the officer encounters, as well as to the seriousness of the legitimate law-enforcement objective that is being served by its used."[67]  The "requirement of proportionality operates in addition to the requirement of necessity" and "means that even when force is necessary to achieve a legitimate law-enforcement end, its use may be impermissible if the harm it would cause is disproportionate to the end that officers seek to achieve."[68]

APD's policies contain a few references to the degree or extent of force used.[69]  However, they do not use the term "proportional" or explain the concept that an officer's response must reasonably correspond to the nature of a subject's threat.

---

[65] 2010 Tennessee Code Title 40, Chapter 7, Part 1, 40-7-108, Resistance to Officer, https://law.justia.com/codes/tennessee/2010/title-40/chapter-7/part-1/40-7-108#:~:text=%2D7%2D108.-,Resistance%20to%20officer.,or%20flees%20from%20the%20arrest.

[66] APD Directive 5.03, Section 5.3.3.

[67] *Principles of the Law: Policing* §5.05 cmt. a (Am. Law. Inst. Revised Tentative Draft No. 1, 2017), *available at* https://www.ali.org/media/filer_public/f2/80/f2804962-6431-4535-9649-34c5f872140e/policing-uof-online.pdf.

[68] *Id.*

[69] APD Directive 5.03, Section 5.3.1 ("When physical force is used, a member shall . . . Use only a degree of force consistent with the minimization of injury to others"); *id.* (allowing an officer to "use a degree of force which he reasonably believes to be necessary" to "defend himself or a third person from what he reasonably believes to be the use or imminent use of unlawful physical force" by a subject);

Fitouri 020207

21CP Solutions | Recommendations for the Aurora Police Department | August 2021

Over half of the country's fifty largest police departments have a proportionality requirement.[70]  For example:

- **Baltimore Police Department** – "Members shall use only the force Reasonable, Necessary, and Proportional to respond to the threat or resistance and to effective and safely resolve an incident . . . Proportionality measures whether the force used by the member is rationally related to the level of resistance or aggression confronting the member."[71]

- **Los Angeles Police Department** – "Officers may only use a level of force that they reasonably believe is proportional to the seriousness of the suspected offense or the reasonably perceived level of actual or threatened resistance."[72]

- **Newark Police Division** – "Police Division members shall consider a subject's level of resistance when using force . . . The level of control used shall be proportional to the threat or resistance the member encounters . . . . "[73]

**Figure 2.  Philadelphia Police Department Use of Force Decision Chart[74]**



*Source: Philadelphia Police Department, Directive 10.2.*

---

[70] Brandon L. Garrett & Seth W. Stoughton, "A Tactical Fourth Amendment," 103 *Virginia Law Review* 211 (2017).

[71] Baltimore Police Department, Policy 1115 at 1, 4 (Nov. 24, 2019), https://www.baltimorepolice.org/1115-use-force.

[72] Los Angeles Police Department, "Policy on the Use of Force – Revised," (June 29, 2020), https://www.lapdonline.org/home/news_view/66709.

[73] Newark Police Division, General Order No. 18-20, Section VII-A-1, https://www.newarkpdmonitor.com/wp-content/uploads/2019/04/Use-of-Force-Policy.pdf    (Nov. 8, 2018).

[74] Philadelphia Police Department, Directive 10.2 at 4, https://www.phillypolice.com/assets/directives/D10.2-UseOfModerateLimitedForce.pdf (last rev. Sept. 1, 2020).

Fitouri 020208

To capture the concept of proportionality, some jurisdictions have found it useful to create a graphical representation or flowchart categorizing the types of force responses that correspond with various threat levels. These so-called use of force continuums, spectrums, or matrices can clarify the concept that an officer's force response should be consistent with the nature of the threat. The **Philadelphia Police Department**'s "Use of Force Decision Chart" (see Figure 2) is a prototypical example. The **Denver Police Department** also uses a graphical representation to underscore the correspondence between subject actions and officer response.

**Figure 3.  Denver Police Department Resistance and Response Chart[75]**



*Source: Denver Police Department, Operations Manual, Section 105.01.*

---

[75] Denver Police Department, Operations Manual, Section 105.01, Use of Force Policy at 10, https://www.denvergov.org/content/dam/denvergov/Portals/720/documents/OperationsManual/OMSBook/OM_Book.pdf (Sept. 1, 2020).

Fitouri 020209

These graphical representations of force decision-making attempt to illustrate the requirement that an officer's response be closely consistent with the nature of the threat. They also typically underscore the extent to which the nature of such threats, like the selection of force necessary to counter it, may become more or less severe during the course of the same interaction.

However, some police departments and police organizations avoid such force matrices or continuums. For example, the Police Executive Research Forum has recommended against "rel[iance] on rigid, mechanical, escalating continuums of force" because:

> [C]ontinuums suggest that an officer, when considering a situation that may require use of force, should think, "If presented with weapon A, respond with weapon B. And if a particular response is ineffective, move up to the next higher response on the continuum . . .

> [A]sessing a situation and considering options as circumstances change is not a steady march to higher levels of force if lower force options prove ineffective. Rather, it entails finding the most effective and safest response that is proportional to the threat. Continued reliance on rigid use-of-force continuums does not support this type of thinking.[76]

Whether APD provides policy language requiring any officer force to be proportional to the threat that a subject poses, adopts a force model or continuum, or does both, the Department should much more specifically and expressly address the imperative for officer responses to be aligned with the nature and significance of a subject's resistance or threat.

> **Recommendation 1.9.    APD should substantially define and describe the core concept of "objective reasonableness,"  providing specific guidance to officers on factors that may be a part of the objective reasonableness inquiry. APD policy should clarify that the reasonableness inquiry with respect to force is an objective, not subjective, inquiry.**

Current APD policy provides that "[m]embers will only use reasonable and appropriate force; and only when legally justified."[77] With respect to the application of force, an officer must have "reasonable ground to believe, and does believe, that he or another person is in imminent danger of being killed or of receiving great bodily injury."[78]

---

[76] Police Executive Research Forum, *Guiding Principles on Use of Force* at 19–20 (2016).
[77] APD Directive 5.03, Section 5.3.
[78] APD Directive 5.03, Section 5.3.1.

Fitouri 020210

In *Graham v. Connor*, the Supreme Court articulated the basic, minimum standard under the United States Constitution for police officers to use force.[79]  All use of force must be "objectively reasonable" – or appropriate and consistent with what a reasonable officer would do in light of all the circumstances that the officer who used force encountered.[80]  The propriety of force depends not on the situation and circumstances as subjectively perceived or understood by the involved officer but, instead, on what a reasonable officer, under the circumstances, would have perceived and understood.  The involved officer's "underlying intent or motivation" is not relevant.[81]  In this way, the "underlying intent" or "subjective motivations of the individual officers . . . ha[ve] no bearing on whether a particular seizure is 'unreasonable' under the Fourth Amendment."[82]  This standard is analogous to the "reasonable person" standard, stating that the law applies more generally in the context of harm to others – where the inquiry is based on what a reasonable person, in the shoes of the individual actually involved, would have done under the circumstances.[83]

Currently, the concept of *objective* reasonableness surfaces only in APD policy's re-printing of the Colorado state statute relating to the use of deadly force.[84]  APD's policy should more specifically address the requirement that force is permitted only when it is objectively reasonable under the circumstances:

- **New Orleans Police Department** – "[O]fficers of the New Orleans Police Department shall use the minimum amount of force that the objectively reasonable officer would use in light of the circumstances to effectively bring an incident or person under control, while protecting the lives of the member or others."[85]

- **Seattle Police Department** – "An officer shall use only force that is objectively reasonable . . . ."[86]

---

[79] 490 U.S. 387 (1989).

[80] *Id.* at 397.  ("[T]he 'reasonableness' inquiry . . . is an objective one: the question is whether the officer's actions are 'objectively reasonable' in light of the facts and circumstances confronting them.").

[81] *Id.*

[82] *Id.*

[83] *See* Stephen G. Gilles, "On Determining Negligence: Hand Formula Balancing, the Reasonable Person Standard, and the Jury," 54 *Vanderbilt Law Review* 813, 822-23 (2001) ("For as long as there has been a tort of negligence, American courts have defined negligence as conduct in which a reasonable man . . . would not have engaged.").

[84] APD Directive 5.03, Section 5.3.3.

[85] New Orleans Police Department, Operations Manual, Chapter 1.3, Use of Force at 5 (rev. Apr. 1, 2018), https://www.nola.gov/getattachment/NOPD/Policies/Chapter-1-3-Use-of-Force-EFFECTIVE-4-01-18.pdf/.

[86] Seattle Police Department Manual, Section 8.000: Use of Force Core Principles (rev. Sep. 15, 2019), http://www.seattle.gov/police-manual/title-8---use-of-force/8000---use-of-force-core-principles.

Fitouri 020211

- **United States Department of Homeland Security** – An officer "shall use only the force that is objectively reasonable in light of the facts and circumstances confronting him or her at the time force is applied."[87]

- **Campaign Zero Model Use of Force Policy** – "Law enforcement officers shall use physical force only when it is objectively reasonable, necessary, and proportional to effectively and safely resolve a conflict."[88]

In addition to, expressly articulating the requirement that any force be *objectively* reasonable to conform to minimum constitutional standards, APD policy should also describe in greater detail the types of parameters and factors that enter into the objective reasonableness determination. Although an objective reasonableness inquiry may function for judges in the comfort of their courtrooms assessing a given application of force after it has happened, the standard is vague and potentially challenging for officers to apply without more particular, real-world guidance. Accordingly, APD policy should directly inventory the types of circumstances that relate to the objective reasonableness of force. For example:

- **Las Vegas Metropolitan Police Department** – "Objective factors that affect the reasonableness of the force include:
  1. The severity of the crime.
  2. Whether the subject poses an immediate threat to the safety of officers or others.
  3. Whether the subject is actively resisting arrest or attempting to evade arrest by flight.
  4. The influence of drugs/alcohol or the mental capacity of the subject.
  5. The time available to an officer to make a decision.
  6. The availability of officers or resources (including the number of officers present at the time) to de-escalate the situation.
  7. The proximity or access of weapons to the subject.
  8. The environmental factors and/or other exigent circumstances.[89]

- **New Orleans Police Department** – "When determining whether to use force and in evaluating whether an officer has used reasonable force, the facts and

---

[87] U.S. Department of Homeland Security, Memorandum re: Department Policy on Use of Force (Sept. 7, 2018), https://www.dhs.gov/sites/default/files/publications/mgmt/law-enforcement/mgmt-dir_044-05-department-policy-on-the-use-of-force.pdf.

[88] Campaign Zero, Model Use of Force Policy, https://static1.squarespace.com/static/56996151cbced68b170389f4/t/5defffb38594a9745b936b64/1576009651688/Campaign+Zero+Model+Use+of+Force+Policy.pdf (last accessed Apr. 13, 2021).

[89] Las Vegas Metropolitan Police Department, Directive No. PO-035-20, Use of Force, https://www.lvmpd.com/en-us/InternalOversightConstitutionalPolicing/Documents/PO-035-20%20Use%20of%20Force.pdf (last rev. May 15, 2020).

Fitouri 020212

circumstances, when they are known or reasonably should be known by the officer,
that should be considered include, but are not limited to:

   (a) The seriousness of the suspected offense or reason for contact with the
   individual;

   (b) Whether the subject poses a threat of injury to himself, officers or
   others, and the immediacy and severity of the threat;

   (c) The conduct of the individual being confronted as reasonably perceived
   by the officer at the time;

   (d) Officer/subject factors (age, size, relative strength, skill level, injuries
   sustained, level of exhaustion or fatigue, and the number of officers
   versus subjects);

   (e) The effects of drugs or alcohol;

   (f) The subject's mental state or capacity;

   (g) Proximity to weapons or dangerous improvised weapons/devices;

   (h) The degree to which the subject has been effectively restrained and
   his/her ability to resist despite being restrained;

   (i) The availability of other options and their possible effectiveness;

   (j) The training and experience of the officer;

   (k) The environment wherein the event is occurring;

   (l) Whether the person appears to be resisting in an active, aggressive, or
   aggravated manner;

   (m) The risk of escape;

   (n) The apparent need for immediate control of the subject for a prompt
   resolution of the situation versus the ability to step back, regroup and
   develop an alternative approach and the time available to the officer to
   make a decision;

   (o) Whether the conduct of the individual being confronted no longer
   reasonably appears to pose an imminent threat to the officer or others;
   and

   (p) Any other exigent and articulable circumstances.[90]

**Recommendation 1.10.    APD policy should specifically prohibit various
problematic types of force.**

As of June 9, 2020, APD policy was revised to expressly prohibit the chokehold and carotid
control holds.[91]  Citing Colorado statute, the definition of chokehold appears to appropriately
encompass any physical maneuvers that risk cutting off the supply of blood or oxygen to an
individual's brain.

---

[90] New Orleans Police Department, Operations Manual, Chapter 1.3, Use of Force at 7 (rev. Apr. 1,
2018),  https://www.nola.gov/getattachment/NOPD/Policies/Chapter-1-3-Use-of-Force-EFFECTIVE-4-
01-18.pdf/.
[91] APD Directive 5.08, Section 5.8.3.

Fitouri 020213

This type of clear prohibition on a class of force is the sort of specific guidance to officers that, in addition to inventorying the types of factors that go into the reasonableness inquiry as described above, helps them apply force only where appropriate.  Indeed, APD's current policy on Less Lethal Devices and Weapons (Directive 5.08) contains a small list of specific circumstances in which less-lethal force is prohibited, such as against subjects who are "securely handcuffed" and who "submit[] peacefully to arrest and compl[y] with lawful commands during the arrest."[92]  In this way, current APD already appears to embrace the logic of policy outlining specific guidelines and "rules of the road" for applying force that provide officers with greater detail about what is and is not permitted.

Accordingly, APD should join the ranks of departments that specifically prohibit various problematic types of force that are almost never objectively reasonable, necessary, or proportional.  These include:

- **Techniques and/or modes of transport that run a substantial risk of positional asphyxia.**  Positional asphyxia is "death as a result of body position," typically a face-down body position, "that interferes with one's ability to breathe."[93]  The issue of positional asphyxia is referenced in Directive 5.8.9 in the context of hobble restraints, but APD policy should specifically require that APD officers not position or orient individuals in a manner that threatens a subject's ability to breathe.  For example, the **New York Police Department** requires that officers, across all use of force encounters, "[p]osition the subject to promote free breathing, as soon as safety permits, by sitting the person up or turning the person onto his/her side."[94]

- **Use of force to subdue a subject who is not suspected of any criminal conduct.**  Force used against subjects not suspected of criminal conduct is unlikely to be necessary, proportional, and reasonable and should therefore be expressly prohibited.  The **Cleveland Division of Police** prohibits officers from using "force to subdue a subject(s) who is not suspected of any criminal conduct, other than to protect an officer's or another person's safety . . . ."[95]

- **Use of force against individuals who are solely engaged in exercising their First Amendment rights.**  Because individuals who are solely engaged in

---

[92] APD Directive 5.08, Section 5.8.

[93] National Law Enforcement Technology Center, National Institute of Justice, "Positional Asphyxia—Sudden Death" (June 1995) at 1, https://www.ncjrs.gov/pdffiles/posasph.pdf.

[94] New York Police Department, P.G. 221-02, Use of Force, https://www1.nyc.gov/assets/ccrb/downloads/pdf/investigations_pdf/io_35_16-use-of-force.pdf (May 31, 2016).

[95] Cleveland Division of Police, General Police Orders, Use of Force: General, https://static1.squarespace.com/static/5651f9b5e4b08f0af890bd13/t/582c54ac59cc685797341239/1479300270095/Dkt.+83--Use+of+Force+Policies+with+Exhibits.pdf.

Fitouri 020214

the exercise of their First Amendment rights do not, even if noncompliant with officer commands, pose an imminent threat of physical harm to officers or others, use of force against such individuals is unlikely to be necessary, proportional, and reasonable.

The use of force against individuals only engaged in First Amendment activity appears to be referenced in APD Directive 5.08, Section 5.8, which provides that officers should not use less-lethal weapons against a subject who "[i]s expressing mere verbal disagreement or directing offensive language at a member or another individual that does not present an imminent threat . . . ."[96] However, that section applies only to less-lethal instruments and does not explicitly apply to other types of force (such as hands-on physical maneuvers) that do not involve less-lethal instruments. APD should extend the logic of this current language into a general, straightforward prohibition on force against individuals solely engaged in First Amendment activity.

- **Use of force against subject(s) who only verbally confront officers.** As noted, current APD policy prohibits officers from using less-lethal instruments against subjects who are only verbally confronting officers. APD policy should more broadly prohibit the use of any force, regardless of whether the type of force is a less-lethal weapon, a hands-on physical maneuver, or something else.

- **Use of retaliatory force.** APD policy should expressly prohibit retaliatory force, which – because it is force deployed to "pay a subject back" rather than because the subject is posing a threat – is not necessary, proportional, or objectively reasonable under the circumstances.

- **Use of force against subject(s) who are handcuffed or otherwise restrained.** The application of force to an individual who is already handcuffed or restrained will almost always be disproportionate to the nature of the threat, unnecessary, and objectively unreasonable. Current APD policy on less-lethal instruments provides that less-lethal weapons should "not be used against a subject who is securely handcuffed (except in extreme situations)." However, this existing policy does not apply to types of force that do not involve less-lethal instruments (hands-on physical maneuvers, etc.). Furthermore, current APD policy does not adequately define what constitutes an "extreme situation[]" in which force applied to a handcuffed or restrained individual would nonetheless be appropriate (and, presumably, necessary, proportional, and objectively reasonable). APD policy should prohibit, across *all* types of force (rather than only less-lethal instruments), the use of force against handcuffed or restrained subjects. The **Cleveland Division of Police** prohibits "force against subject(s) who are

---

[96] APD Directive 5.08, Section 5.8.

Fitouri 020215

handcuffed or otherwise restrained, as the threat that the individual could pose has been dramatically reduced, if not eliminated, because of the restraint."[97]

- **Use of force to overcome only passive resistance.** The **Cleveland Division of Police**'s use of force policy defines "passive resistance":

> Passive Resistance: Refers to instances in which a subject does not comply with an officer's commands and is uncooperative but is nonviolent and prevents an officer from placing the subject in custody and/or taking control. Passive resistance may include but is not limited to standing stationary and not moving upon lawful direction, falling limply and refusing to move (dead weight), holding onto a fixed object, linking arms to another during a protest or demonstration, or verbally signaling an intention to avoid or prevent being taken into custody.[98]

That department, like many others, prohibits the use of force against subjects who are only passively noncompliant or resistant because such force will almost always be found to be unnecessary, disproportionate to the threat, and unreasonable under the circumstances.  APD policy should expressly preclude the use of force against individuals who are only passively resisting.

- **Use of head strikes with hard objects unless deadly force is authorized under the circumstances.**  Strikes to the head pose a particular, elevated risk of serious injury and death.  Accordingly, many departments classify strikes to a person's head with an impact weapon or hard object as deadly force that may be applied only where a firearm or other type of deadly weapon could be applied and no reasonable alternatives are available.[99]  APD should similarly prohibit strikes to a subject's head across all situations except those in which deadly force would be authorized and no other reasonable alternatives are available.

---

[97] Cleveland Division of Police, General Police Orders, Use of Force: General, https://www.city.cleveland.oh.us/sites/default/files/forms_publications/01.10.2018General.pdf (Jan. 1, 2018).

[98] Cleveland Division of Police, General Police Orders, Use of Force: Definitions, https://www.city.cleveland.oh.us/sites/default/files/forms_publications/01.10.2018Definitions.pdf?id=12396 (Jan. 1, 2018).

[99] Baltimore Police Department, Policy 1115 at 8 (Nov. 24, 2019), https://www.baltimorepolice.org/1115-use-force; *see also* Seattle Police Department, Manual, Section 8.050, Use of Force Definitions, http://www.seattle.gov/police-manual/title-8---use-of-force/8050---use-of-force-definitions (last rev. June 19, 2020).

Fitouri 020216

- **Use of firearm as an impact weapon.** As the **Denver Police Department**'s policy on force indicates, "[f]irearms are not an appropriate impact weapon because of the inherent danger of an accidental discharge."[100] APD policy should prohibit the use of firearms as impact weapons.

- **Firing of warning shots.** Current APD policy appears to prohibit the firing of "warning shots, unless, in exceptional cases where no lesser degree of force would be effective or practical and the firing of a warning shot is the only alternative to the use of deadly force."[101] It is not readily apparent to 21CP precisely when the firing of a warning shot – which can by definition only be effective not through physical impact but through the psychological effects of a subject appreciating the firing of an officer's firearm – would be the only effective or practical force option because all other force options had been tried and failed or were not feasible under the circumstances. APD should join departments like the **Baltimore Police Department** that instruct officers simply that "[f]iring warning shots is prohibited."[102]

**Recommendation 1.11.   APD's policies, procedures, and training should guide officers to seek a medical-based response whenever they encounter individuals they believe are experiencing "excited delirium."**

APD policy relating to so-called hobble restraints references the term "excited delirium."[103] Issues relating to excited delirium surfaced in the death of Elijah McClain and the Independent Review Panel's investigative report.[104] However, no APD policy clearly defines or explains what "excited delirium" is or how officers should best and most safely respond to individuals who they believe, based on the circumstances, may be experiencing the effects of such "excited delirium."

The validity and utility of the concept of "excited delirium" has been a subject of increasing criticism and debate within the policing, emergency response, and medical professions.[105] If

---

[100] Denver Police Department, Operations Manual, Section 105.01, Use of Force Policy, https://www.denvergov.org/content/dam/denvergov/Portals/720/documents/OperationsManual/OMSBook/OM_Book.pdf (Sept. 1, 2020).

[101] APD Directive 5.1, Section 5.1.3.

[102] Baltimore Police Department, Policy 1115 at 9 (Nov. 24, 2019), https://www.baltimorepolice.org/1115-use-force.

[103] APD Directive 5.08, Section 5.8.9.

[104] *Independent Review Panel Investigation Report* at 58.

[105] *Compare* Joshua Budhu, Méabh O'Hare, & Atlaf Saadi, "How 'Excited Delirium' Is Misused to Justify Police Brutality," *Brookings.edu* (Aug. 10, 2020), https://www.brookings.edu/blog/how-werise/2020/08/10/how-excited-delirium-is-misused-to-justify-police-brutality/ *with* Roger W. Byard, "Ongoing Issues With the Diagnosis of Excited Delirium," 14 *Forensic Science, Medicine and Pathology* 149 (2018), https://link.springer.com/article/10.1007/s12024-017-9904-3#ref-CR18; *see also Independent Review Panel Investigation Report* at 118 ("The Panel notes the existence of multiple

Fitouri 020217

APD continues to find the concept useful as a means of having officers identify individuals who may be in a particularly vulnerable physical or mental state, APD's efforts to provide more specific response protocols for how to gain the assistance of EMT, Fire, or other professionals when they believe that an individual may be exhibiting signs of "excited delirium" may be appropriate. Some police departments indeed have full policies that provide details on identifying and responding to instances of "excited delirium."[106]

APD indicated to 21CP that, going forward, it will be instructing officers that excited delirium is a medical diagnosis and that officers are not to make medical diagnoses. The Department indicates that it is currently formulating additional policy guidance on how APD should formally transition responsibility from police to emergency medical personnel in circumstances where individuals are exhibiting potential signs of "excited delirium." Those protocols will instruct APD personnel to focus on describing the subject's specific physical signs, symptoms, or indicators (such as sweating, unexpected physical strength, signs of panic or paranoia, and the like) to medical personnel rather than suggesting a clinical diagnosis. Additionally, APD referred 21CP to training it has provided to officers on "recogniz[ing] signs of excited delirium and positional asphyxia" and providing appropriate care and medical attention to individuals who may be exhibiting signs of "excited delirium."[107]

>**Recommendation 1.12.   APD's general use of force policy and its current specific firearms policy should better address issues involving exhibiting and pointing firearms.**

APD should provide specific policy guidance on when officers may unholster, draw, and exhibit firearms. Furthermore, the Department should ensure that these instances are reported. Recognizing that "drawing or exhibiting a firearm may limit an officer's alternatives in controlling a situation, may create unnecessary anxiety on the part of the public, and may result in an unwarranted or unintentional discharge of the firearm," the **Seattle Police Department** prohibits officers from drawing or exhibiting a firearm unless "the officer has reasonable cause to believe it may be necessary for his or her own safety or

---

controversies surrounding excited delirium, including ongoing debate regarding whether excited delirium is a legitimate diagnosis and whether 'the diagnosis is…used by law enforcement to legitimize police brutality and to retroactively explain certain deaths occurring in police custody.'").

[106] Seattle Police Department, Manual, Section 16.135, Excited Delirium, https://www.seattle.gov/police-manual/title-16---patrol-operations/16135---excited-delirium (last rev. May 7, 2019); City of Champaign, *Excited Delirium Response Protocol*, http://www.aele.org/delirium/champaign_police_protocol.pdf (last rev. Nov. 2009). Sonoma County Sheriff's Department, Policy 309, Excited Delirium (Sept. 27, 2006).

[107] Aurora Police Department, *Response to 21CP Solutions Recommendations for the Aurora Police Department* (June 17, 2021) at 2.

Fitouri 020218

for the safety of others."[108]   The **Los Angeles** and **Las Vegas Metropolitan Police Departments** maintain nearly identical policy requirements.[109]

Pointing a firearm *at* someone, rather than unholstering a weapon or keeping a firearm at the *sul* or "low ready position," constitutes a "seizure" under the Fourth Amendment[110] – because a reasonable person in the situation would not feel free to leave.  Departments from **Oakland** to **Seattle** to **Cleveland** all consider pointing a weapon *at* an individual to constitute reportable use of force.[111]

APD currently considers "intentionally point[ing] a firearm" to be a "Tier Zero, Statutory Use or Display of Force."  Although officers must make a notation in the Computer Aided Dispatch system that they have pointed a firearm, and supervisors are instructed to "ensur[e] the appropriate CAD notation/s are added," such "Tier Zero" force does not appear to be the subject of meaningful post-force review.

This report elsewhere discusses recommendations for APD to modify its force reporting and classification scheme.  Consistent with those recommendations, APD should consider the pointing of a firearm *at* an individual to constitute force warranting completion of a Use of Force Report and substantive, post-application supervisory review.

21CP observes here that, depending on the circumstances, officers are often justified in exhibiting their firearm or pointing a firearm at an individual.  In many instances, the safety of officers and bystanders requires a firearm to be immediately available to officers.  The purpose of this recommendation is not to discourage the exhibiting or pointing of a firearm in all instances.  Instead, the recommendation here is simply that APD (1) align its policies

---

[108] Seattle Police Department Manual, 8.300, *available at* https://www.seattle.gov/police-manual/title-8---use-of-force/8300---use-of-force-tools.

[109] Los Angeles Police Department, Use of Force Policy Section 556.10, http://www.lapdonline.org/lapd_manual/volume_1.htm#556; Las Vegas Metropolitan Police Department, Use of Force Policy, Section 6/002.00, *available at* https://www.lvmpd.com/en-us/InternalOversightConstitutionalPolicing/Documents/Use-of-Force-Policy-2017.pdf.

[110] *Thompson v. Rahr*, 885 F.3d 582, 586 (9th Cir. 2018) (concluding that the pointing of a firearm at an individual was not objectively reasonable and that the force was "not minor"); *accord Baird v. Renbarger*, 576 F.3d 340 (7th Cir. 2009) (finding that the pointing of a gun at an individual could be unreasonable under the Fourth Amendment without a threat to the safety of officers or others); *see also* Oakland Police Department Manual, General Order K-3, Use of Force Policy at 7, http://www2.oaklandnet.com/oakca1/groups/police/documents/webcontent/oak053209.pdf ("The pointing of a firearm at a person is a seizure and requires legal justification.").

[111] Seattle Police Department Manual, 8.300, *available at* https://www.seattle.gov/police-manual/title-8---use-of-force/8300---use-of-force-tools; Cleveland Division of Police, General Police Orders, Use of Force: General 1, at https://static1.squarespace.com/static/5651f9b5e4b08f0af890bd13/t/582c54ac59cc685797341239/1479300270095/Dkt.+83--Use+of+Force+Policies+with+Exhibits.pdf; Oakland Police Department Manual, General Order K-3, Use of Force Policy at 6, http://www2.oaklandnet.com/oakca1/groups/police/documents/webcontent/oak053209.pdf.

Fitouri 020219

to legal requirements, and (2) ensure that officers report when they do exhibit or point their firearm so that the Department can better review and analyze officer performance in the field.

APD indicated to 21CP that it "will explore the ability to use" a new electronic records environment to track the exhibition and pointing of firearms and that it will be "outlin[ing] a stronger review process in policies for these instances by the first-line supervisor."[112]

> **Recommendation 1.13.    APD's general use of force policy and its current specific firearms policy should include provisions that better ensure the safety of other officers and bystanders when officers use firearms.**

APD should consider providing officers with guidance or warning about the risks firearm discharges present to other officers or bystanders who may be positioned nearby.  A revised policy may require that officers consider their surroundings, or "backdrop," to a reasonable extent under the circumstances, before using a firearm – and should not discharge their firearm unless the target is clearly in view:[113]

- **Detroit Police Department** – "Use of deadly force is only authorized . . . [a]gainst a subject who poses an imminent threat of death or serious bodily injury to the officers or others, *and only when bystanders are not in jeopardy . . . .* "[114]

With respect to issues of backdrop and the safety of other individuals when discharging a firearm, APD referred 21CP to its current Directive 5.01, "Authorized Firing of a Weapon." Although the policy provisions there do address important issues relating to "always be[ing] certain of the target and beyond" when discharging a weapon,[115] 21CP recommends that APD's policy revision process include more specific policy guidance to officers on assessing the proximity and location of other officers and members of the public.

> **Recommendation 1.14.    APD should more clearly require that all officers carry, and be trained on, less-lethal instruments.**

---

[112] Aurora Police Department, *Response to 21CP Solutions Recommendations for the Aurora Police Department* (June 17, 2021) at 2.

[113] *See U.S. v. City of Ferguson*, Consent Decree, No. 4:16-cv-00180-CDP (D. Mo., 2016), ¶ 143.

[114] Detroit   Police   Department   Manual,   Section   304.2   –   4.2,   Deadly   Force, http://static1.squarespace.com/static/56996151cbced68b170389f4/t/57584dea22482e86c03111b3/1465404906983/DPD+Manual+Use+of+Force.pdf (emphasis added).

[115] APD Directive 5.01.

Fitouri 020220

Equipping officers with less-lethal tools has been associated with a lower rate of injuries for both officers and civilians.[116]   Numerous police department policies specifically require that officers carry less-lethal instruments:

- **Cleveland Division of Police** – "Uniformed officers shall carry the Conducted Electrical Weapon (CEW) if qualified, and a second intermediate weapon: ASP baton or Oleoresin Capsicum (OC) Spray.  If not CEW qualified, officers shall carry both approved intermediate weapons: ASP baton and OC Spray. Officers may elect to carry all three intermediate weapons."[117]

- **Seattle Police Department** – "Uniformed officers are required to carry at least one less lethal tool.  Uniformed officers who have been issued a TASER shall carry it."[118]

APD policy authorizes the use of less-lethal weapons, but, as presently worded, it is not as clear as it could be as to whether APD officers are required to carry them.[119]  APD told 21CP that Directive 5.8 "mandates uniformed officers carry OC spray or a taser."[120]   21CP recommends that this current expectation be more clearly articulated in policy in the manner of policies like those of Cleveland and Seattle referenced above.

> **Recommendation 1.15.     APD policy should provide expanded, more specific direction on the use of various, authorized less-lethal instruments.**

APD policy currently provides some policy guidance related to various types of less-lethal instruments that officers are authorized to carry.[121]   Although such guidance is useful, it should be expanded and more specific.

Given the detailed nature of some of the instrument-specific considerations, this report cannot exhaustively endeavor all potential policy guidance that APD may find useful to provide to officers in expanded policy guidance on less-lethal force.  We do briefly present

---

[116] John M. MacDonald, et al, "The Effect of Less-Lethal Weapons on Injuries in Police Use-of-Force Events," 99 *American Journal of Public Health* 2268, 2268 (2009) (finding that the "[i]ncidence of . . . injuries can be reduced dramatically when law enforcement agencies responsibly employ less-lethal weapons in lieu of physical force").
[117] Cleveland Division of Police, General Police Order, Section 2.01.04, Use of Force – Intermediate Weapons, https://www.city.cleveland.oh.us/sites/default/files/forms_publications/01.10.2018IntermediateWeapons.pdf?id=12399 (Jan. 1, 2018).
[118] Seattle Police Department, Policy Manual, Section 8.050 – Use of Force Tools, http://www.seattle.gov/police-manual/title-8---use-of-force/8300---use-of-force-tools (June 19, 2020).
[119] APD Directive 5.08.
[120] Aurora Police Department, *Response to 21CP Solutions Recommendations for the Aurora Police Department* (June 17, 2021) at 3.
[121] APD Directive 5.08.

Fitouri 020221

some additional policy guidance that APD should consider across some of the most-common less-lethal instrument types.

### Tasers

- Require that officers "[c]arry Tasers in weak-side holsters (i.e., on the side of their nondominant hand) to reduce" the risk of accidental discharge.[122]
- Require that officers make a reasonable effort to handcuff subjects between each cycle.[123]
- Prohibit "[u]sing Tasers against various high-risk groups, such as pregnant women, older people, young children, or people who are visibly frail."[124]
- Prohibit applying Tasers to "vulnerable body parts, such as the head, neck, chest, or groin."[125]
- Prohibit officers "[u]sing more than one Taser against one person at one time."[126]
- Prohibit officers from using Tasers in "'drive-stun' mode, which causes pain but not loss of muscle control."[127]
- Prohibit officers from deploying Tasers "for the sole reason of preventing flight."[128]

### Batons/Impact Weapons

- Classify "strikes to vulnerable body parts" as "lethal force because of their high risk of serious injury and death."[129] (Current APD policy indicates that "members should avoid targeting the head, neck, throat, heart, kidneys, spine, groin, and

---

[122] The Leadership Conference on Civil and Human Rights, *New Era for Public Safety: A Guide to Fair Safe and Effective Community Policing* 137 (2019). APD observes that Directive 5.08 was "recently . . . revised to mandate weak-side draw for tasers." Aurora Police Department, *Response to 21CP Solutions Recommendations for the Aurora Police Department* (June 17, 2021) at 3. The policy requires that officers "position the Taser holster in a manner to draw the Taser with the support hand." APD Directive 5.08. 21CP suggests that, to ensure maximum clarity, APD consider adopting more specific language simply requiring weak-side holsters rather than any potential position that the officer might determine would be consistent with permitting weak-side draw.
[123] Axon, General Taser Procedures, Using a Taser CEW, *Cuffing Under Power*, https://help.axon.com/hc/en-us/articles/360016312533-Cuffing-under-Power#:~:text=Applying%20handcuffs%20to%20a%20subject,safety%20to%20officers%20and%20subjects (last visited Apr. 14, 2021).
[124] The Leadership Conference on Civil and Human Rights, *New Era for Public Safety: A Guide to Fair Safe and Effective Community Policing* 137 (2019).
[125] *Id.*
[126] *Id.*
[127] *Id.*
[128] *Id.*
[129] The Leadership Conference on Civil and Human Rights, *New Era for Public Safety: A Guide to Fair Safe and Effective Community Policing* 138 (2019).

Fitouri 020222

knee joint areas"[130] but is not specific as to why, nor is such guidance a clear prohibition on such use.)

- Prohibit "[u]sing flashlights or other hard objects in place of batons."[131]

### *OC/Pepper Spray*

- Provide guidance that "especially in windy conditions" OC spray "can hit people other than intended targets, including other officers."[132]
- Prohibit "[u]sing pepper spray on passive resisters or to disperse crowds."

### *Canines*

- Develop a comprehensive Canine Deployment Manual that addresses a host of critical safety concerns specific to the deployment of canines.[133]

APD represents that its "[t]raining already includes most of the specific bullet points in this recommendation" and that it "will work" with contemplated consultants to consider changes to the Department's policy on less-lethal instruments.[134]

> **Recommendation 1.16.    APD should more concretely articulate a requirement that officers have an affirmative duty to render and/or request medical assistance whenever necessary after force is used.**

The subject of medical aid following the application of force is referenced in a few different ways in APD's current policies.  Reprinting Colorado state statutes, APD's general policy on force (Directive 5.03, Use of Physical and Deadly Force) indicates that "[w]hen physical force is used, a member shall . . . Ensure that assistance and medical aid are rendered to any injured or affected persons as soon as practicable . . . ."[135]   Although this guidance appropriately emphasizes that officers should "ensure" that medical attention is provided, the language of the statute alone does not clarify whether officers themselves have an affirmative duty to render the aid or if, instead, the statutory obligation is reasonably acquitted by promptly requesting fire or EMS to respond to the scene and provide aid.

---

[130] APD Directive 5.08, Section 5.8.5.

[131] *Id.*

[132] The Leadership Conference on Civil and Human Rights, *New Era for Public Safety: A Guide to Fair Safe and Effective Community Policing* 139 (2019).

[133] *See* California Commission on Police Officer Standards and Training, *Law Enforcement K-9 Guidelines* (Jan. 2014), https://post.ca.gov/Portals/0/post_docs/publications/K-9.pdf; San Jose Police Department, Canine Unit, *Policy and Procedural Manual* (March 2018), http://www2.sjpd.org/records/pc-13650_library/Unit%20Guidelines/Canine%20Unit%20SOP%20%20March%202018_Redacted.pdf.

[134] Aurora Police Department, *Response to 21CP Solutions Recommendations for the Aurora Police Department* (June 17, 2021) at 3.

[135] APD Directive 5.03, Section 5.3.1.

Fitouri 020223

Separately, Directive 5.08, Less Lethal Devices, Weapons and Techniques provides that
"[w]hen less lethal weapons are used on a subject, appropriate and reasonable first aid,
medical attention or decontamination will be provided to the subject."[136]  Even as this policy
guidance relates to the use of specific less-lethal instruments and not any application of force
more generally, the policy's specific protocols focus nearly exclusively on fire and EMS
response rather than on the steps that APD steps should take to provide first aid or medical
assistance.[137]  APD's Officer Involved Shootings policy is more direct in providing that "the
involved member will remain responsible for . . . rendering first aid and requesting necessary
emergency medical aid."[138]

Police agencies increasingly are providing specific, clear requirements that officers
themselves must render medical aid, whenever necessary, following a use of force encounter.

- **New Orleans Police Department** – "Immediately following a use of force, officers
  and supervisors shall inspect and observe subjects for injury or complaints of pain.
  Officers shall obtain medical assistance for any person who exhibits signs of physical
  distress, has sustained visible injury, expresses a complaint of injury or continuing
  pain, or who was rendered unconscious.  This may require officers to render
  emergency first aid within the limits of their individual skills, training and available
  equipment until professional medical care providers arrive on the scene.  Any
  individual exhibiting signs of physical distress after an encounter should be
  continuously monitored by the officer involved in the incident or an on-scene assisting
  officer until medical personnel can assess the individual . . . ."[139]

- **Philadelphia Police Department** – "After employing any force, including lethal or
  less lethal weapons, officers shall render appropriate medical aid and request further
  medical assistance, when necessary for the suspect and any other injured individuals,
  as soon as it is safe to do so.  Any aid provided shall be documented in the appropriate
  report."[140]

APD should accordingly clarify in its policy that, after the application of any type or level of
force, officers have an affirmative duty to provide medical assistance whenever necessary and
to summon medical aid as soon as possible under the circumstances.  Even as current APD
policies address the concept of medical aid across a patchwork of disparate policies, a
streamlined, unified requirement addressing the rendering of medical assistance following

---

[136] APD Directive 5.08, Section 5.8.11.

[137] *Id.*

[138] APD Directive 5.06, Section 5.6.2.

[139] New Orleans Police Department Use of Force Policy, at 6, *available at*
https://www.nola.gov/getattachment/NOPD/NOPD-Consent-Decree/Chapter-1-3-Use-of-Force.pdf/.

[140] Philadelphia Police Department, Directive 10.2 at 5,
http://www.phillypolice.com/assets/directives/D10.2-UseOfModerateLimitedForce.pdf.

Fitouri 020224

*any* use of force will provide more streamlined, straightforward guidance to officers in the field and may result in better medical outcomes for subjects injured in force encounters.

>   **Recommendation 1.17.   APD's duty to intervene should apply whenever an officer witnesses another officer engaging in conduct or behavior that runs a reasonable risk of violating APD policy or applicable law.**

"Duty to intervene" policies – requiring officers to intervene when they observe potential misconduct – have been associated with fewer officer-involved deaths,[141] and most officers indicate that they should be required to intervene to stop excessive force and improper conduct.[142]

APD's current policy indicates that an officer "shall, when in a position to do so given the totality of the circumstances, safely and immediately intervene to prevent another sworn member from using physical force that exceeds the degree of force permitted by CRS § 18-1-707 . . . ."[143]  Therefore, APD's policy requires intervention when an officer witnesses another officer violating Colorado state law but not when an officer witnesses an officer acting in a manner that is contrary to APD policy.

Furthermore, APD policy confusingly links the duty to particular types of enforcement contexts rather than across any and all interactions of any type or manner.  Specifically, the intervention requirement is activated only when another officer is "carrying out an arrest of any person, placing any person under detention, taking any person into custody, booking any person, or in the process of crowd or riot control . . . ."[144]  It is not immediately clear that observing an officer engaging in illegal behavior or misconduct in other contexts activates the duty to intervene.

Even more generally, APD's policy on intervention is linked predominantly to the use of force. Even as this duty is particularly important in the use of force context, the duty to intervene should be extended across all officer performance – such that an officer must intervene whenever they observe instances of potential misconduct.

The Department should revise its policy to provide clearer, simpler guidance that clarifies the duty to intervene as applying in all circumstances.  Specifically, it should clarify that an officer has an affirmative duty to intervene whenever an officer observes another officer running a reasonable, or (in the alternative) a foreseeable, risk of violating the Department's

---

[141] The Leadership Conference on Civil and Human Rights, *New Era for Public Safety: A Guide to Fair Safe and Effective Community Policing* 141 (2019).

[142] *Id.* (citing Rich Morin et al., Pew Res. Ctr., *Behind the Badge: Amid Protests and Calls for Reform, How Police View Their Jobs, Key Issues and Recent Fatal Encounters Between Blacks and Police* 13 (2017)).

[143] APD Directive 5.09, Section 5.9.1.

[144] *Id.*

Fitouri 020225

use of force policy, and a reasonable officer would determine that intervention is safe and feasible under the circumstances.  For instance:

- **Baltimore Police Department** – "All members must recognize and act upon the affirmative duty to Intervene to prevent or stop any member from conducting any act that is unethical or that violates law or policy, including, but not limited to:

    1.1.  Excessive force, including intentionally escalating an encounter absent a lawful, necessary purpose,
    1.2.  Stops, searches, and arrests that are unconstitutional or violate BPD policy,
    1.3.  Discriminatory policing (See Policy 317, Fair and Impartial Policing),
    1.4.  Retaliation against an individual participating in 1st Amendment protected activity,
    1.5.  Theft/fraud/waste,
    1.6.  Inappropriate language including discourteous language to members of the public,
    1.7.  Sexual misconduct,
    1.8.  Harassment,
    1.9.  Falsifying documents, and
    1.10. Inappropriate behavior.

    Additionally, members have an affirmative duty to Intervene when they see unsafe behavior and/or bad tactics, corner-cutting, and signs of a fellow member's stress and/or mental health issues that are affecting their performance . . . .[145]

Current APD policy helpfully, and commendably, details some of the types of actions that officers may take to intervene in the context of another officer engaging in inappropriate force – which include "[v]erbal or physical intervention;" "[i]mmediate notification to a supervisor"; and "[a] direct order by a supervisor to cease the use of unreasonable force."[146]  However, as APD looks to expand the scope of the duty to intervene to all potential misconduct, it should empower officers with skills, tactics, training, and confidence to effectively and actively intervene where warranted – that is, to immediately intervene in the moment and on the scene rather than relying on a supervisor to respond and intervene.  To this end, APD indicates that it is currently implementing training on peer intervention provided by the

---

[145] Baltimore Police Department, Policy 319, Duty to Intervene, https://public.powerdms.com/BALTIMOREMD/documents/355131#:~:text=The%20purpose%20of%20this%20policy,existing%20duty%20to%20report%20Misconduct. intervene (Dec. 4, 2020).
[146] APD Directive 5.09, Section 5.9.1.

Fitouri 020226

national Active Bystandership for Law Enforcement ("ABLE") Project.[147]   The full
implementation of the ABLE initiative is a strong, forward-thinking commitment that has
the potential to empower officers across ranks to promote and support high standards of
ethical performance.

**Recommendation 2.      APD should ensure that it provides regular training to all
personnel on force decision-making and de-escalation strategies.  As with APD's
training overall, this training should include dynamic, integrated, skills-focused,
and scenario-based training grounded in adult learning techniques.**

Traditional law enforcement training approaches too often "focuses on range shooting,
classroom-based learning, and minimal exposure to realistic scenarios."[148] Often, officers are
required to passively consume large streams of content about rules, laws, and regulations
rather than having an opportunity to practice implementing skills or confronting real-world
problems.

Consequently, President Obama's Task Force on 21st Century Policing emphasized the "need
for realistic, scenario-based training to better manage interactions and minimize force . . . .
"[149]  As the Leadership Conference for Civil Rights has recommended, "[o]fficers should
practice, in interactive environments . . . de-escalation techniques and threat assessment
strategies that account for implicit bias in decision-making."[150]  In the same way that
continued training for pilots puts them in flight simulators to practice the response to real-
world flight scenarios,[151] effective law enforcement training presents real-world scenarios
and asks officers to practice responding and implementing practical decision-making skills.
Many practical strategies grounded in adult learning techniques are effective police
instruction, including verbal scenarios, group discussions analyzing officer performance from
an incident captured on video, role playing, demonstration, group analysis of scenario
performance, "teach-backs" in which students provide instruction to fellow students on
designated topics, and many others.[152]

---

[147] Georgetown Law Innovative Policing Program, *Active Bystandership for Law Enforcement (ABLE)
Program*,        https://www.law.georgetown.edu/innovative-policing-program/active-bystandership-for-
law-enforcement/ (last visited Apr. 14, 2021).
[148]  Judith P. Andersen, et al, "Highly Realistic Scenario Based Training Simulates the
Psychophysiology of Real World Use of Force Encounters: Implications for Improve Police Officer
Performance,"      5    *Journal    of    Law    Enforcement*    1,    1    (2016),
https://tspace.library.utoronto.ca/bitstream/1807/73822/3/highly_realistic_scenario_based.pdf.
[149] *Final Report of the President's Task Force on 21st Century Policing* 52 (2015).
[150] The Leadership Conference on Civil and Human Rights, *New Era for Public Safety: A Guide to Fair
Safe and Effective Community Policing* 143 (2019).
[151] *See, e.g.*, Marcel Bernard, "Real Learning Through Flight Simulation: The ABCs of ATDs," FAA
Safety            Briefing            (Sept./Oct.            2012),
https://www.faa.gov/news/safety_briefing/2012/media/SepOct2012ATD.pdf.
[152]      NHI      Instructor      Development      Course      1,      2,
https://www.nhi.fhwa.dot.gov/downloads/freebies/172/pr%20pre-
course%20reading%20assignment.pdf (last accessed Jan. 17, 2021).

Fitouri 020227

Below, this report provides recommendations to APD about enhancing and updating its overall training approach and function by incorporating adult learning techniques, dynamic instructional paradigms, skills-based lesson plans, and scenario-based exercises.

With respect to use of force training, it appears that APD has previously used an extensive number of scenarios and practical exercises in their basic academy training. For instance, within its firearms training course, which encompasses 72 hours, student officers complete 12 hours of "decisional shooting" training and 30 hours of "tactical situations" – which both appear to be situation-based skills training.[153] Separately, in 2019, APD conducted a "skills week" as a part of basic Academy training. Each day, student officers proceeded through a wide range of scenarios or vignettes to test what they have learned, with Academy personnel providing feedback on their performance. Based on information made available to 21CP, it was not clear whether this "skills week" was a standard part of Academy training in other years.

Critically, 21CP had difficulty identifying training materials – whether for new APD officers in the Academy or current APD officers for in-service training – specifically addressing de-escalation. Although content covered in a two-hour class on "special populations" and an 8-hour instructional block on verbal defense and influence appeared to cover at least some concepts related to de-escalation, de-escalation did not seem regularly, squarely addressed as a core topic of APD training in years between 2015 and 2019.

Especially with respect to in-service training, instruction has not tended to be focused on decision-making skill development. In 2019, APD in-service training was approximately 18 hours, including 6 hours of arrest control training, 8 hours regarding firearms, and 4 hours on emergency vehicle operation ("EVOC"). In 2018, in-service training focused on firearms, Tasers, and driving techniques. Although elements relating to tactical and force decision-making, and de-escalation, were scattered across some elements of the training, content that might fairly be associated with de-escalation was not as highlighted as it likely should be going forward.

APD represented to 21CP that it "will explore implementing a specific de-escalation class" going forward.[154] It noted that "including de-escalation in all aspects of training is a viable method of reinforcing the concept" and referred 21CP to a training PowerPoint presentation on de-escalation and an instruction, printed in a poster format, entitled "Rules to Promote Voluntary Compliance."[155] 21CP agrees that this type of continual, ongoing reinforcement of de-escalation skills and strategies is critical. We would urge APD to continue to evaluate its

---

[153] Officers are required to complete eight hours of classroom instruction and 32 hours on the range prior to engaging in scenario training.
[154] Aurora Police Department, *Response to 21CP Solutions Recommendations for the Aurora Police Department* (June 17, 2021) at 3.
[155] *Id.*

Fitouri 020228

training programs, and overall training approach, to provide officers with the ability to practice and develop real-world skills through mechanisms that promote the resolution of incidents with minimal or no force.

**Recommendation 3.      APD policy should better outline what officers must describe and articulate in narratives regarding the use of force.**

APD's policy on force reporting (Directive 5.04) is specific and commendably aligns with a best-practice approach to force reporting.  In classifying reportable force into various "Tiers" based on the severity or significance of the force, APD's policy allows for post-incident response, investigation, and review to be indexed to the nature of the force deployed in the manner that policies in cities like **Baltimore**[156] and **Seattle**[157] do.

APD could further improve its force reporting policy by providing more specific guidance to officers on what use of force reports, and narrative accounts of use of force encounters, should include.   Specifically, APD's current policies outline when officers need to notify the Department that force has been used and what the departmental response to such force will be.  However, APD's policies would be enhanced by including the general information that should be included in an officer's narrative account of what transpired (at least for those Tier One and Tier Two uses of force in which the officer, per APD policy, is unlikely to be interviewed).  For example:

- **New Orleans Police Department** – "The officer [using or witnessing force] shall independently prepare his or her Force Statement and include facts known to the officer, to include:
    - (a) A detailed account of the force incident from the officer's perspective;
    - (b) The reason for the initial police presence, e.g.: response to (nature of) call, on-view suspicious activity (describe the suspicious activity), flagged by a citizen (nature of citizen's concern), shots fired, or screams heard, etc.;
    - (c) A specific description of the acts that led to the use of force;
    - (d) The specific description of resistance encountered;
    - (e) A description of every type of force used or observed;
    - (f) Names of all assisting officers and supervisors participating in the actions leading up to the use of force;
    - (g) The name of the supervisor the involved officer notified, and the time of the notification;

---

[156] Baltimore Police Department, Policy 1115 (Nov. 24, 2019), https://www.baltimorepolice.org/1115-use-force.

[157] Seattle Police Department, Policy Manual, Section 8.400 – Use of Force Reporting and Investigation, http://www.seattle.gov/police-manual/title-8---use-of-force/8400---use-of-force-reporting-and-investigation (Apr. 15, 2021).

Fitouri 020229

(h) The name of the supervisor who responded to the scene;

(i) Names, if know, of any civilian witnesses;

(j) A description of any injuries suffered by the officer, subject, or witnesses;

(k) Whether a body-worn camera was activated and its identifiable file location;

(l) Whether a vehicle camera was activated and its identifiable file location; and

(m) Whether a CEW activation occurred, even if the CEW was not discharged.[158]

- **Cleveland Division of Police** – Officers using force must "provid[e] a detailed account of the incident from the officer's perspective and including all of the following information:
  a. The reason for the initial police presence
  b. A specific description of the acts that preceded the use of force, to include attempts to de-escalate
  c. The level of resistance encountered
  d. A complete and accurate description of every type of force used or observed[.][159]

To this end, APD referred 21CP to a "Guide for Writing Use of Force Reports" prepared by the Force Investigation Unit ("FIU"), which was "emailed to officers" and posters of which "will be placed in the report-writing rooms at all districts."[160]  21CP agrees that the material in that guide provide the type of specific, practical instructions to officers that are necessary to ensure thorough reporting.  We would still recommend that APD incorporate expectations for what should be included in a use of force report directly in the Department's core operational policies rather than auxiliary documentation – and that the Department provide continual instruction to officers on report writing.

**Recommendation 4.      APD should ensure that use of force reporting is standardized and uniform with respect to aggregate data.**

As this report has referenced elsewhere, the quality and completeness of Department's current data on use of force could and should be improved.  For instance, the race and/or

---

[158]   New Orleans Police Department, Chapter 1.3.6, Reporting Use of Force at 4–5 https://www.nola.gov/getattachment/NOPD/Policies/Chapter-1-3-6-Reporting-Use-of-Force-EFFECTIVE-4-01-18.pdf/ (last rev. Apr. 1, 2018).

[159] Cleveland Division of Police, General Police Order 2.01.05, Use of Force – Reporting at Section III-A                    (Apr.                    5,                    2019), https://static1.squarespace.com/static/5651f9b5e4b08f0af890bd13/t/5d810f7314d346709f38f943/1568739188208/Ex+D+Reporting.pdf.

[160] Aurora Police Department, *Response to 21CP Solutions Recommendations for the Aurora Police Department* (June 17, 2021) at 3.

Fitouri 020230

gender of the subject of use of force was not identified in current data in nearly one-quarter (24 percent) of incidents. Although some demographic information may be captured in narrative or incident reports, rather than in the type of force reporting that can easily aggregate data, the Department needs to ensure that basic information about its enforcement and response activities is, indeed, captured in an easily aggregable and analyzable format – so that it and external stakeholders can have accurate, real-time views on the overall performance of the Department across the Aurora community. Likewise, the 111 distinct types into which force applications were classified over the period of 2016 through 2020 makes identifying trends and patterns more difficult than it should be. Ultimately, APD's goal should be to make basic and vital information about force encounters easily accessible and easy to evaluate on the face of the quantitative data recorded. The Department tells 21CP that it has secured funding for procuring a new electronic system that "should provide the ability to organize and gathering uniform aggregate data," the implementation of which "is pending IT scheduling."[161]

**Recommendation 5.        APD policy should outline more specific procedures and guidelines for the conduct of post-force investigation and review.**

Although Directive 5.04, Reporting and Investigating the Use of Tools, Weapons and Physical Force, provides substantial and sound detail on *reporting* force, and on how the department responds to notification that an officer has used force, APD policy provides comparatively little detail on how force incidents are investigated, reviewed, and adjudicated.

Specifically, the policy provides that, based on the level or "Tier" of force, use of force incidents are investigated either by a supervisor or an investigative unit determined by the Investigations Bureau Commander. However, it does not provide sufficiently specific protocols about how the investigation should proceed to ensure a fair, thorough, and timely investigation.

21CP recommends that Directive 5.04 be revised, or an additional directive be added, to address the mechanics of the force investigation itself – as well as the mechanics of chain of command review of force investigations. Departments like the **Seattle Police Department** articulate specific procedures and protocols for investigations – including conducting interviews, whether investigators reach findings or simply articulate facts, how video is collected and reviewed, and the like.[162] Since 21CP was not provided with any independent manuals or auxiliary protocols regarding the conduct of force investigations, APD should consider establishing more formalized protocols with the weight of policy that govern the conduct of force investigations.

---

[161] *Id.* at 4.

[162] Seattle Police Department, Policy Manual, Section 8.400 – Use of Force Reporting and Investigation, http://www.seattle.gov/police-manual/title-8---use-of-force/8400---use-of-force-reporting-and-investigation (Apr. 15, 2021).

Fitouri 020231

APD indicates that "[w]ith the creation of FIU (Force Investigation Unit), post-force investigations and review" are "more comprehensive and will ensure a fair, thorough and timely investigation."[163]   "Policy will be updated to reflect current practices."[164]   21CP recommends that provided Standard Operating Procedures for FIU be more comprehensively and exhaustively detailed in Departmental material having the full weight and effect of policy.

**Recommendation 6.       APD should update its policies and procedures for its Force Review Board to ensure objective, fair, timely, and comprehensive review and adjudication of use of force incidents.**

Consistent with best practices, APD policy currently provides for the convening of a Force Review Board ("FRB") "to review Use of Force Reports" – or, specifically, all Tier Two and Tier Three force.[165]  Where the FRB determines that "a use of force was in violation of policy, or that there is insufficient information to make a determination, the FRB" sends the force report to the Internal Affairs Bureau for investigation.[166]

Even as the policy is clear as to *what* is reviewed, it could be much more specific as to *how* the FRB should consider and evaluate uses of force.  21CP recommends that additional policy guidance be provided to ensure uniform and thorough review.  In particular, policy should require that the Board analyze all individual applications of force for fidelity to all APD policy provisions.  An FRB deliberation checklist may assist the Board in making the appropriate structure determinations across various types of force.[167]

Additionally, the FRB's current decision-making process is based on consensus, with the FRB's Chair making determinations where a consensus is not possible.[168]   APD should consider modifying this to ensure that the FRB votes in all instances, with Board decisions "made by majority vote."[169]

---

[163] Aurora Police Department, *Response to 21CP Solutions Recommendations for the Aurora Police Department* (June 17, 2021) at 4.
[164] *Id.*
[165] APD Directive 5.04, Section 5.4.7.
[166] *Id.*
[167] *See* Seattle Police Department, Policy Manual, Section 8.500, Reviewing Force, https://www.seattle.gov/police-manual/title-8---use-of-force/8500---reviewing-use-of-force (Apr. 15, 2021).
[168] APD Directive 5.04, Section 5.4.7.
[169] Seattle Police Department, Policy Manual, Section 8.500, Reviewing Force, https://www.seattle.gov/police-manual/title-8---use-of-force/8500---reviewing-use-of-force (Apr. 15, 2021).

Fitouri 020232

In June 2021, APD noted to 21CP that "[t]he FRB has updated its procedures with the creation of the Force Investigation Unit (FIU) as being the sole investigative arm of FRB."[170] Additionally, "[p]olicy will be updated . . . during the Use of Force policy review and re-write."[171] A provided FRB case review template that outlines, providing a structured array of considerations and questions for FRB to take into account during evaluations of force incidents, appears, based on a preliminary review, to be a promising platform for innovation.

---

**Stops, Searches and Arrests**

---

**Recommendation 7.        APD should substantially revise and expand its current policy Directives Manual to address, in detail, the conduct of stops, detentions, searches, and arrests.**

APD's current directives fail to provide substantive guidance to its members on the legal requirements necessary to effect constitutional stops, searches and arrests. Although the Department's manual is voluminous and includes policies governing a vast host of subject-matter areas, it is largely void of any explanation of core Fourth Amendment legal standards relating to non-voluntary encounters. Beyond highly cursory and incomplete guidance on stops generally in Section 8.32.1 and traffic stops in Section 8.32.2, within APD's policy on Bias-Based Policing (discussed further below), APD's policies do not meaningfully address when and how officers may initiate a stop, detain an individual, and search individuals within those non-voluntary encounters.

The absence of key legal concepts and standards leaves APD members without sufficient direction necessary to carry out their duties lawfully and appropriately. It is a significant omission that the Department should correct expeditiously. Laws and obligations surrounding stops, searches, seizures, and arrests are notoriously complicated.[172] The differences among various types of encounters with individuals, the boundaries and restrictions on various types of searches, and the requisite levels of legal justifications that officers must have before conducting various types of stops, searches, and arrests are complex and nuanced. Instead of providing specific guidance on these issues, APD is silent on these fundamental issues of constitutional import.

---

[170] Aurora Police Department, *Response to 21CP Solutions Recommendations for the Aurora Police Department* (June 17, 2021) at 4.

[171] *Id.*

[172] *See generally* Stephen Budiansky, "Rescuing Search and Seizure," *The Atlantic* (Oct. 2020), https://www.theatlantic.com/magazine/archive/2000/10/rescuing-search-and-seizure/378402/ (observing that Fourth Amendment-related legal "rules are hard for a layperson to make much sense of," with the application of various exceptions to the warrant requirement especially "bewildering").

Fitouri 020233

Many of APD's peer departments maintain specific, detailed guidance within their policies on when and how various types of stops, searches, and arrests may and may not be permissible.  For instance:

- **Baltimore Police Department** – Among other policies, the agency maintains a comprehensive, standalone policy on "Field Interviews, Investigative Stops, Weapons Pat-Downs & Searches."  It provides guidance on the legal requirements and parameters governing interactions ranging from voluntary contacts to arrests, including traffic stops.[173]

- **New Orleans Police Department** – The department maintains policies on Search and Seizure generally, Stops/*Terry* Stops, Search Warrants, and Vehicle Stops.[174]

- **Cleveland Division of Police** – The agency maintains separate but inter-related policies on Search and Seizure, Investigatory Stops, Strip Searches & Body Cavity Searches, Probable Cause/Warrantless Arrests, and Miranda Warnings & Waivers.[175]

The policies of these agencies not only provide guidance to officers on when officers may initiate a stop but on what they may do during such non-voluntary encounters and when and how such encounters may conclude.

21CP understands that the Department has recently issued a video training to officers on Fourth Amendment-related issues.  As APD provides more specific and comprehensive guidance to officers on these issues, in-person, scenario-based training grounded in contemporary adult education techniques will be critical for ensuring meaningful implementation of new expectations.

In response to this recommendation in June 2021, APD indicated that "[p]olicy will be updated as determined to provide guidance and referencing training material provided in videos being produced."[176]  The Department provided 21CP with a training video on search and seizure and a script for another training video on high-risk traffic stops that is currently

---

[173] Baltimore Police Department, Policy 1112: Field Interviews, Investigative Stops, Weapons Pat-Downs & Searches (Oct. 12, 2020), https://www.baltimorepolice.org/1112-draft-field-interviews-investigative-stops-weapons-pat-downs-and-searches.

[174] New Orleans Police Department, Chapters 1.2.4, 1.2.4.3, available at https://www.nola.gov/nopd/policies/ (last visited Jan. 17, 2021).

[175] City of Cleveland, Search and Seizure Policies, http://www.city.cleveland.oh.us/CityofCleveland/Home/Government/CityAgencies/PublicSafety/Police/PoliceSettlementAgreement/SearchandSeizures (last visited Jan. 17, 2021).

[176] Aurora Police Department, *Response to 21CP Solutions Recommendations for the Aurora Police Department* (June 17, 2021) at 4.

Fitouri 020234

being produced.   The search-and-seizure training video is an approximately 32-minute
"talking head"-style presentation that moves quickly through topics including the legal
standards for stops, searches, and seizures; reasonable suspicion; probable cause; consent;
and effective communication.  Although the presentation covers useful content, the style of
presentation – and the references to case law, statutes, and directives and the need for
officers to independently review such material – is not as dynamic or as grounded in adult
learning techniques as it could be.  Separately, although 21CP's review could not yield more
details without seeing the final version of the video based on the script addressing high-risk
traffic stops, the script shows some promise toward APD integrating more pragmatic,
scenario-focused instructional approaches.

**Recommendation 8.      APD should provide personnel with detailed, dynamic,
and scenario-based training on consensual interactions and non-consensual
encounters between police and members of the public – including stops,
detentions, searches, and arrests.**

As this report describes elsewhere, APD, like other police departments, provides ongoing, in-
service training to current police officers.  This training amounts to continuing professional
education for officers that enhances their knowledge base, allows for the development of new
skills, and refreshes potentially perishable skills and substantive knowledge.

APD provided 21CP with training materials used for in-service training for the years 2015
through 2020.  Even as APD provided substantial training on topics such as the Taser, control
hold techniques, and a variety of force maneuvers, the Department does not appear to have
provided officers with in-service training on stops, searches, and seizures.  Topics relating to
arrest focused on physical tactics for successfully taking someone into custody rather than
applicable legal requirements and policy considerations.

This report elsewhere recommends that APD overhaul its approach to ongoing, in-service
training for current APD officers.  With respect to stops, searches, and arrests, APD should,
consistent with the suggested new training paradigm, provide comprehensive training to
officers on the law and new APD policies on stops, searches, and arrests.  That training should
provide significant, scenario-based opportunities for officers to practice decision-making with
respect to initiating, conducting, and concluding stops.  In 21CP's experience, the type of
adult learning techniques that other recommendations urge APD to incorporate into its
training – such as role-playing, verbal scenarios, the viewing and discussing of video
scenarios, and the like – are especially well-suited to stops, searches, seizures, and arrests.

In response to this recommendation, APD notes:

>     APD agrees with this recommendation and will research how other agencies
>     are accomplishing this kind of training during in-service.   Scenario-based

Fitouri 020235

training requires staff, time, resources, and funding in small group learning
sessions. Existing scenarios are primarily done in recruit training or Crisis
Intervention Team (CIT) training. The Academy has recently doubled the
training time on this recommendation for recruits.[177]

**Recommendation 9.    APD should require officers to document, and provide
specific information about, all interactions with the public that are not voluntary.**

Current APD Directive 8.10 provides details on when reporting is required by APD officers.
These circumstances are when (1) a citizen reports a crime or complaint; (2) an officer is
dispatched for service; (3) an officer is assigned an investigation or to take action; (4) an
officer makes an arrest; or (5) an officer issues a summons.[178]

No APD policy currently requires that officers document, log, or provide information about
all of their stop encounters. Even if officers alert dispatch that they are stopping an
individual, this often provides no information about the legal justification for the encounter,
who was involved in the encounter, what happened during the encounter, and what the
outcome of the encounter may have been. Thus, even if some details about a stop incident
may or may not be logged in the Department's Records Management System or Computer-
Aided Dispatch system, information about the specific nature and grounds of the incident
need to be more systematically logged.

Practically, the Department does not know when its officers are involuntarily stopping and
detaining individuals and what transpires during such interactions. By not requiring that
officers provide detailed information about any and all non-voluntary encounters they have
with members of the public, APD supervisors, the Department in general, elected officials,
and community members alike are essentially "flying blind" with respect to what officers are
doing in the field and how frequently officers are engaging in activity that activates
important constitutional and legal considerations.

Because "[s]top data collection is an essential practice for every law enforcement agency, no
matter how small or specialized,"[179] APD policy should expressly require that, for all non-
voluntary encounters – that is, all those that implicate significant Fourth Amendment
considerations and guidelines because they are interactions in which a reasonable subject,
under the circumstances, would not feel free to leave – officers provide information about:

---

[177] *Id.* at 5.
[178] APD Directive 8.10, Section 8.10.
[179] Marie Pryor, et al, Center for Policing Equity & Policing Project at NYU School of Law, *Collecting,
Analyzing, and Responding to Stop Data: A Guidebook for Law Enforcement Agencies, Government,
and                          Communities                   13                  (2020),*
https://static1.squarespace.com/static/58a33e881b631bc60d4f8b31/t/5f7335d7294be10059d32d1c/160
1385959666/COPS-Guidebook+Final+Release+Version.pdf.

Fitouri 020236

- The location of the investigatory stop or encounter;
- The race, ethnicity, gender, and age of the subject;
- A specific, free-response description of the legal justification for the stop or encounter (such as the reasonable articulable suspicion necessary to justify a *Terry* stop);
- The duration of the stop or encounter;
- Whether a frisk or other search was conducted, and what, if anything, was discovered pursuant to the search; and
- The outcome of the interaction (such as an arrest, citation, warning, or the interaction concluding without any specific action or activity).[180]

Indeed, there is an ever-growing body of national guidance on the topic of systematically capturing information about non-voluntary police-civilian interactions.[181]

21CP emphasizes here that collecting information about individual stops does not involve the collection of "data" for the sake of it. Instead, it involves logging critical information about important encounters that go to the heart of issues of police legitimacy, equity, public confidence, and overall community well-being.

APD has indicated to 21CP that it is in the process of implementing a new data collection platform that will assist it in gathering information about stop encounters. It has also indicated that Colorado Senate Bill 217 and House Bill 1250 may likely require data collection consistent with this recommendation.[182]

**Recommendation 10. To enhance officer safety, expand the quality of supervision, and provide meaningful opportunities for the department to understand its overall performance, APD policy should articulate clear requirements for supervisory review and aggregate analysis of overall trends regarding stops, searches, and arrests.**

---

[180] *See, e.g.*, Cleveland Division of Police, General Order, Investigatory Stops (Apr. 25, 2019), https://static1.squarespace.com/static/5651f9b5e4b08f0af890bd13/t/5d81088a7a152a6219030763/156 8737418788/Ex+B+Investigatory+Stops.pdf (listing required types of information and data that officers must report).

[181] The Leadership Conference on Civil and Human Rights, *New Era for Public Safety: A Guide to Fair Safe and Effective Community Policing* 104–05 (2019); Marie Pryor, et al, Center for Policing Equity & the Policing Project at NYU School of Law, Collecting, Analyzing, and Responding to Stop Data: A Guidebook for Law Enforcement Agencies, Government, and Communities (2020), https://policingequity.org/images/pdfs-doc/COPS-Guidebook_Final_Release_Version 2-compressed.pdf.

[182] Aurora Police Department, *Response to 21CP Solutions Recommendations for the Aurora Police Department* (June 17, 2021) at 5.

Fitouri 020237

The reporting of all non-voluntary encounters enhances the abilities of supervisors to monitor and review officer performance as appropriate and of the Department to analyze and understand how it is interacting with the public overall.

With respect to supervisory review, APD policy should require that supervisors review the documentation of all non-voluntary encounters to ensure that the stops were conducted in a manner consistent with relevant legal standards and policy requirements. Many departments require supervisors to review officer stops:

- **New Orleans Police Department** – "After receiving a submitted FIC [Field Interview Card, which documents stops], a supervisor of the submitting officer's unit shall review the FIC to determine if each stop, frisk, or search was supported by documentation of reasonable suspicion of probable cause; whether it is consistent with NOPD regulations, policy, and federal and state law; and whether it showed a need for corrective action or review of agency policy, strategy, tactics, or training . . . . "[183]

- **Cleveland Division of Police** – "Supervisors shall review all documentation of investigatory stops for completeness and adherence to law and Division policy."[184]

- **Newark Police Division** – "All entered investigative stop data information will be reviewed and approved by the appropriate desk . . . by the end of the submitting officer's tour of duty . . . Investigative stop entries failing to meet the reasonable suspicion standard shall be rejected . . . . "[185]

By ensuring that officers document and supervisors review all stops, APD policy can ensure meaningful, real-time accountability and can provide substantive feedback to officers about the quality and nature of their performance.

In addition to reviewing individual stops and particular officer performance, the collection of information on stops can allow APD to conduct regular aggregate analyses of stop data. Department-wide trends across individual stops implicate the efficacy and efficiency of the department, staffing and workload demands, the effectiveness of various departmental approaches aimed at addressing crime and public safety issues, and the identification of

---

[183] New Orleans Police Department, Operations Manual, Chapter 41.12, Field Interview Cards ¶ 25, https://www.nola.gov/getattachment/NOPD/Policies/Chapter-41-12-Field-Interview-Card-EFFECTIVE-12-20-20.pdf/?lang=en-US (Dec. 20, 2020).

[184] Cleveland Division of Police, General Police Orders, Investigatory Stops, https://static1.squarespace.com/static/5651f9b5e4b08f0af890bd13/t/5d81088a7a152a6219030763/1568737418788/Ex+B+Investigatory+Stops.pdf (Apr. 25, 2019).

[185] Newark Police Division, General Order 18-14, https://www.newarkpdmonitor.com/wp-content/uploads/2019/04/Stops-Policy.pdf (Dec. 31, 2018).

Fitouri 020238

group-based disparities among enforcement activities.  APD observes that its new data analytics and records platform will facilitate this type of analysis.[186]

| Bias-Free Policing |
| --- |

**Recommendation 11.    APD should revise its current policy on bias (Directive 08.32, "Biased Based Policing") to provide more specific and detailed guidance to officers.**

APD's current policy addressing bias-based policing is Directive 8.32.  It defines biased-based policing and expressly prohibits officers from taking "enforcement action based on a trait common to a group, without actionable intelligence to support consideration on that trait," including race, ethnicity, gender, national origin, language, religion, sexual orientation, gender identity, age, and disability.[187]

21CP recommends that APD revise its policy to include, first, a broader statement of the values that drive the Department's requirements relating to bias-free policing.  This stronger, broader statement can better reflect that "bias-free policing is a critical cornerstone for upholding professional ethics in law enforcement" and that "public trust and confidence can be easily destroyed if we let biased decision making control police behavior or to serve as a short cut in performing law enforcement duties."[188]  For instance:

- **Newark Police Department –** "It is the policy of the Newark Police Division that all decisions and actions by members shall be fair, impartial, and free of bias and unlawful discrimination.  This policy applies equally to all law enforcement activities and the provision of all police services.

  Bias-based conduct is strictly prohibited . . . . Treating a person differently based upon that person's specific characteristics degrades the public's confidence in the Division and is detrimental to effective law enforcement because it fosters distrust in the community and undermines the Division's ability to enforce the law."[189]

- **Seattle Police Department –** "The Seattle Police Department is committed to providing services and enforcing laws in a professional, nondiscriminatory, fair, and equitable manner.  The Department recognizes that bias can occur at both an

---

[186] Aurora Police Department, *Response to 21CP Solutions Recommendations for the Aurora Police Department* (June 17, 2021) at 5.
[187] APD Directive 8.32, Section 8.32.
[188] International Association of Chiefs of Police, *Bias-Free Policing* (Nov. 1, 2003), https://www.theiacp.org/resources/resolution/bias-free-policing-0.
[189] Newark Police Division, General Order 17-06), http://www.newarkpdmonitor.com/wp-content/uploads/2018/07/NPD-Bias-Free-Policing-Policy.pdf (Sept. 19, 2017).

Fitouri 020239

individual and an institutional level and is committed to eradicating both.  Our objective is to provide equitable police services based upon the needs of the people we encounter.   The intent of this policy is to increase the Department's effectiveness as a law enforcement agency and to build mutual trust and respect with Seattle's diverse groups and communities."[190]

Second, like the Newark policy above, APD's policy should reflect that bias-free policing principles extend to all of an officer's activities and actions – and not just "enforcement action."[191]   For instance, it is not clear that APD's current bias-free policing policy would extend to issues arising in the context of voluntary encounters, individuals expressing a desire to make a complaint, and other circumstances.

Third, most of APD's current policy on biased-based policing focuses on either instances where issues surrounding bias most frequently arise (pedestrian and traffic stops) or where individuals make complaints alleging bias.  As noted above, the policy guidance surrounding stops is insufficiently specific.  The other policy guidance on complaints is useful but does not address core officer performance.  The **Newark** and **Seattle** policies cited above contain substantially more general guidance to officers relating to bias-free and discriminatory policing issues.  APD should likewise expand its treatment of these issues in revised policies.

APD says that "[t]he newly added Community Relations Section Manager will be establishing and implementing guidance on Diversity, Equity and Inclusion (DEI) training which has already occurred" and that "[p]olicies will continue to be updated as guidelines are established."[192]

**Recommendation 12.      APD should provide training to officers about revisions to its policies relating to bias, the histories and experiences of Aurora's diverse communities, and cross-cultural communication.**

To implement updated policies on bias-free policing, and to enhance officer awareness of the histories and experiences of communities from across Aurora, APD should collaborate with the community to design in-service training for all officers on bias-free policing, discriminatory policing concerns, the histories and experiences of Aurora's communities, and approaches to optimize understanding and empathy in cross-cultural exchanges.

---

[190]   Seattle   Police   Department,   Policy   Manual,   Section   5.140,   Bias-Free   Policing, https://www.seattle.gov/police-manual/title-5---employee-conduct/5140---bias-free-policing   (Aug.   1, 2019).
[191] APD Directive 8.32, Section 8.32.
[192] Aurora Police Department, *Response to 21CP Solutions Recommendations for the Aurora Police Department* (June 17, 2021) at 5.

Fitouri 020240

President Obama's Task Force on 21st Century Policing recommended that "[l]aw enforcement agencies . . . engage community members in the training process."[193]  In some jurisdictions, this type of engagement has included community members giving input into the type and design of training provided to officers in order to ensure that instruction reflects the specific needs and characteristics of their communities.  In others, community members serve as presenters or instructors for relevant training, which can be especially impactful where the training focuses on experiences, backgrounds, and histories of particular communities.   Regardless of the form and type of engagement, police-community collaboration on officer training can enhance the quality of training and foster enhanced police-community relationships.

To this end, APD conducted a training on diversity, equity, and inclusion in February 2021 via Zoom with an outside facilitator for Department personnel, which 21CP attended.  Even as future opportunities could benefit from in-person training opportunities and the addition of expanded community voice, 21CP personnel found the training to be an important start to ongoing training in the area.  We also understand from APD representatives that additional cultural competency training will be provided by APD's Chief Community Relations Officer going forward, in addition to culturally-specific training conduct by community leaders. "APD has already incorporated community members of color into our Academy Training curriculum where their experiences involving police are shared with the recruits."[194]

**Recommendation 13.   APD policy should require the regular, independent analysis of data on officer and aggregate departmental performance to determine if any of its activities, programs, or enforcement approaches are having a disproportionate impact on specific groups, communities, or types of individuals.**

As discussed previously in the context of non-voluntary encounters, the Department needs to regularly and systematically analyze data on officer performance to determine if any of its activities, programs, or approaches may be disproportionately affecting particular groups, communities, or individuals.  That is, across all forms and types of officer performance and APD activities, collected information should be systematically analyzed to determine whether the Department's performance or activities are having unwanted, disparate impacts.

Police departments are increasingly working with their communities to formalize approaches to systematically consider the ways that their activities may be burdening or affecting some individuals more, or differently, than others.   For instance, the **Seattle Police Department**'s policy on bias-free policing commits that department "to eliminating policies

---

[193] *Final Report of the President's Task Force on 21st Century Policing* 54 (2015).
[194] Aurora Police Department, *Response to 21CP Solutions Recommendations for the Aurora Police Department* (June 17, 2021) at 6.

Fitouri 020241

and practices that have an unwarranted disparate impact on certain protected classes."[195]
To foster this objective, the policy expressly requires the department to "periodically analyze
data which will assist in identification of SPD practices . . . that may have a disparate impact
on particular protected classes relative to the general population . . . . Where unwarranted
disparate impacts are identified and verified," the Department must work with community
stakeholders to identify if, "equally effective alternative practices . . . would result in less
disproportionate impact."[196]

Commendably, APD told 21CP that its "staff will reach out [to] other agencies to gauge
current best practices for gathering and reporting this data."[197]   The process of a law
enforcement agency systematically gathering data about its activities, analyzing such
information to determine if the burdens or impacts are falling disproportionately on
particular populations or communities, and exploring whether alternative approaches could
address or alleviate disparity is critical to implementing a comprehensive approach to
policing that is committed to equity and fairness.

**Recommendation 14.      APD should make information about complaints relating
to bias, profiling, and discrimination available on its website, along with
information about the adjudication of investigations of such complaints.**

"Open data in areas like public complaints, officer-involved deaths, and use of force provides
the foundation for informed research, policy reforms, and oversight."[198]   The United States
Conference of Mayors indicates that "[i]n an effort to promote transparency, departments
should . . . publicly report data related to biased policing."[199]

Although APD "provides an annual report that is posted online which includes information
pertaining to officer complaints,"[200] as part of an ongoing commitment to identify and address
bias in a meaningful and transparent manner, APD should make information about civilian
complaints pertaining to bias, profiling, and discriminatory policing available on its website.
In doing so, the Department should provide information about the status and/or ultimate
adjudication of such complaints.   APD tells 21CP that it "will reach out to other agencies that

---

[195]   Seattle   Police   Department   Policy   Manual   Section   5.140,   Bias-Free   Policing,
https://www.seattle.gov/police-manual/title-5---employee-conduct/5140---bias-free-policing.
[196] *Id.*
[197] Aurora Police Department, *Response to 21CP Solutions Recommendations for the Aurora Police
Department* (June 17, 2021) at 6.
[198] Open Government Partnership, *Transparency and Accountability at the Frontlines of Justice: Police
Data Transparency* (July 8, 2020), https://www.opengovpartnership.org/documents/transparency-and-
accountability-at-the-frontlines-of-justice-police-data-transparency/.
[199]   The   United   States   Conference   of   Mayors,   *Equality   and   Due   Process*,
https://www.usmayors.org/issues/police-reform/equality-and-due-process/ (last visited Apr. 20, 2021).
[200] Aurora Police Department, *Response to 21CP Solutions Recommendations for the Aurora Police
Department* (June 17, 2021) at 6.

Fitouri 020242

have interactive complaint tools to determine best practices and feasibility for implementation."[201]

---

**Crisis Intervention**

---

**Recommendation 15.    APD and the City of Aurora should either recommit to the full implementation of its current CIT model or consider implementing alternative response mechanisms to individuals experiencing mental health and behavioral crisis.**

The Centers for Disease Control estimates that more than 50 percent of Americans will be diagnosed with a mental health disorder at some point in their life; one in five will experience a mental illness in any given year; and approximately one in 25 Americans are living with a chronic, serious mental illness, such as schizophrenia, bipolar disorder, or major depression.[202]   Consequently, police officers frequently respond to situations involving individuals experiencing mental health, substance abuse, and other behavioral health challenges.  Indeed, studies suggest that as many as 10 percent of all police encounters with the public involve individuals experiencing a behavioral health crisis.[203]

Especially over the past 20 years, some communities and their police departments have looked to provide specific tools, resources, or mechanisms for addressing the particular needs of individuals experiencing mental and behavioral health crises.  One major paradigm is the so-called "Memphis Model" of crisis intervention.  Officers receive training on responding to individuals in crisis, with specially-trained "CIT officers" being dispatched to calls implicating behavioral health issues.[204]   Steering committees of community stakeholders, including social service providers, clinicians, individuals of affected populations, and other community representatives, come together to discuss system-wide responses to mental health, substance abuse, and other behavioral issues.

At least on paper, the Department appears to be structured to implement the "Memphis Model."  Specifically, Directive 6.13 requires that, when possible, one or more members of the Crisis Response Team ("CRT") should be assigned to handle calls involving a person in crisis as a result of a mental health issue.  If the CRT is not available, Crisis Intervention Trained ("CIT") members or any sworn member may respond.  Meanwhile, APD Directive 8.36

---

[201] *Id.*

[202] Centers for Disease Control and Prevention, *Mental Health, Learn About Mental Health* https://www.cdc.gov/mentalhealth/learn/index.htm (last visited Apr. 21, 2021).

[203] Martha W. Deane, "Emerging Partnerships Between Mental Health and Law Enforcement," 50 *Psychiatric Services* 99 (1999).

[204] *See, e.g.,* Amy C. Watson & Anjali J. Fulambarker, "The Crisis Intervention Team Model of Police Response to Mental Health Crises: A Primer for Mental Health Practitioners," 8 *Best Practices in Mental Health* 71 (2012); University of Memphis, *CIT Center*, http://www.cit.memphis.edu/overview.php?page=2 (last visited Apr. 21, 2021).

Fitouri 020243

provides that an officer may request the assistance of a member certified in CIT in situations where intervention offers a viable option and members certified in CIT should volunteer for calls for service involving individuals with mental health issues or disabilities and/or threats of suicide.

APD provided 21CP with data on the response of its Crisis Response Team.  From January 2019 through August 2020, a 20-month period, there were over 3,300 CRT incidents.  CRT was deployed in response to 0.9 percent of all calls for service during that period.

CRT response was associated with some 97 Call for Service (CFS) event types.[205]  Incidents involving individuals identified as suicidal were the most common cause for CRT incidents, accounting for more than one-quarter (28 percent) of all CRT responses.  Welfare checks (16 percent) and follow-up visits (15 percent) were the next most-common incident types associated with CRT response.  These top three event types accounted for over half of all CRT incidents, with the top five listed event types accounting for nearly three-quarters of all incidents.

**Table 11.  Event Types Associated with CRT Response, January 2019 – August 2020**

| Event Type | Count | % of Total |
|---|---|---|
| Suicidal | 941 | 28.4% |
| Welfare | 520 | 15.7% |
| Follow-Up | 485 | 14.6% |
| Behavioral/Mental | 319 | 9.6% |
| Assist | 191 | 5.8% |

*Source: 21CP Analysis of APD Data*

A CRT event occurred in response to over half of all calls for service involving a suicidal person or suicide attempt.  Domestic incidents also frequently involved CRT, with 32 percent of domestic calls for service and 15 percent of family calls for service receiving a CRT response.

APD uses 65 unique disposition categories to describe what was found on the scene of a CRT deployment though a plurality (35 percent) had a mental health crisis disposition.  The top five disposition types accounted for over 70 percent of all dispositions.

---

[205] Some CRT event types were slightly edited in some circumstances during 21CP's data analysis to match CFS event type categories. Not all CRT event types match a CFS event type.

Fitouri 020244

**Table 12.  Disposition of CRT Responses, January 2019 – August 2020**

| Disposition | Count | % of Total |
|---|---|---|
| Mental Health Crisis | 1,143 | 34.8% |
| Default | 340 | 10.3% |
| Checked Welfare | 295 | 9.0% |
| Contact Made | 290 | 8.8% |
| Follow-Up/Report Write | 279 | 8.5% |

*Source: 21CP Analysis of APD Data.*

Over 55 percent of CRT events occurred between noon and 6 PM, with the most common time being between 2 and 3 PM (more than 11 percent).  No CRT events occurred between midnight and 4 AM, while just 68 events occurred after 9 PM.  21CP wonders whether this lack of CRT response between 12AM and 4AM may have more to do with the availability of CRT response during that period than with individuals not experiencing behavioral crises during that time.

Indeed, as noted in this report's previous discussion of calls for service data, although the period of 12AM to 4AM sees a lower number of calls for service, the volume of calls is not insignificant – some 127,016 calls during the time period over the years 2016 through 2020. It would appear to 21CP, then, that the relatively low number of CRT responses during the period is likely more due to personnel availability rather than the possibility that no crisis-eligible incidents occurred among the nearly 130,000 calls occurring between 12:00AM and 4:00AM from 2016 to 2020.

**Table 13.  CRT Responses by Time of Day, January 2019 – August 2020**

| Time of Day | Incidents | % of Total |
|---|---|---|
| 12 to 6 AM | 2 | 0.1% |
| 6 AM to 12 PM | 889 | 26.9% |
| 12 to 6 PM | 1,843 | 55.7% |
| 6 PM to 12 AM | 574 | 17.4% |

*Source: 21CP Analysis of APD Data*

CRT events are relatively evenly spread out geographically among APD's three districts.

Fitouri 020245

**Table 14.  CRT Responses by APD District, January 2019 – August 2020**

| District | Events | % of Total |
|----------|--------|------------|
| 1 | 1,299 | 39.3% |
| 2 | 972 | 29.4% |
| 3 | 924 | 27.9% |
| PCW | 113 | 3.4% |

*Source: 21CP Analysis of APD Data*

Even as APD is dispatching its CRT in some instances, it does not appear that APD is fully, effectively, and meaningfully implementing its current CIT model/program and its various policies addressing crisis response as comprehensively as it could.  Indeed, several APD personnel told 21CP that CIT officers are not required to respond to requests or calls.  The decision to send a CIT officer to a call can be made by dispatch, but, as one stakeholder indicated, "there is no mandate to dispatch CIT."  To the extent that CIT is extra or optional, it does not appear that it is a central resource that APD officers use to address the response to particular individuals or incidents.

APD can either re-double its focus on fully implementing the current model or work with community stakeholders to establish an alternative response model, whether a co-responder model or social service response model.  Some jurisdictions have successfully and comprehensively implemented the "Memphis Model," with various studies linking the CIT program to positive changes in officer attitudes and knowledge, lower arrest rates, lower criminal justice costs, and better subject outcomes.[206]  Indeed, research suggests that officers who have received CIT training "do a good job at identifying patients in need of psychiatric care"[207] – making the deployment of specially-trained officers in a structured, promising way to respond to individuals experiencing mental and behavioral health crises.

As communities across the country explore mechanisms for promoting community well-being and safety in ways that do not exclusively rely on police, other models are being discussed and implemented.  These alternatives to the "Memphis Model" approach include:

- ***Community Co-Response.***  Officers and specially-trained clinicians or social workers respond to calls involving behavioral health issues.  These non-sworn specialists and officers are specially dispatched as primary responders in situations that may involve individuals in crisis.  "Thus, co-response teams go

---

[206] Michael T. Compton, et al, "A Comprehensive Review of Extant Research on Crisis Intervention Team (CIT) Programs," 36 *Journal of the American Academy of Psychiatry and the Law* 47, 52–53 (2008), http://jaapl.org/content/36/1/47.

[207] Gordon Strauss, et al, "Psychiatric Disposition of Patients Brought in by Crisis Intervention Team Police Officers," 41 *Community Mental Health Journal* 223, 223 (2005), https://link.springer.com/article/10.1007/s10597-005-2658-5.

Fitouri 020246

beyond training police officers by integrating officers with trained professionals who specialize in behavioral health problems."[208]    Programs launched in Colorado[209] and Dallas[210] are examples.

- ***Primary Community Response/"CAHOOTS" Model.***  Social service providers or clinicians are dispatched in teams, without police, as the primary response to individuals in crisis where the call indicates that the individual is not posing a threat.  Police are dispatched when these primary, community-based responders require such assistance.  The City of Eugene, Oregon has for three decades dispatched "two-person teams consisting of a medic and a crisis worker who has substantial training and experience in the mental health field," rather than immediately sending police, to "deal with a wide range of mental health-related crisis, including conflict resolution, welfare checks, suicide threats, and more . . . , " which has been associated with positive outcomes and significant cost savings to the City.[211]

Even as a number of cities have enjoyed positive outcomes with the Memphis Model, many others are seeing encouraging outcomes with co-response and community response models that de-emphasize police presence or involvement.

21CP defers to APD, the City, and the Aurora community as to the response type or system that may be best suited for Aurora's needs.  To this end, we understand that the City is currently engaged in a number of initiatives related to crisis intervention.  First, the City is launching a pilot of its own version of the CAHOOTS program (the "Right Response" program).  The pilot will run for approximately six months, with the potential to expand across the City thereafter based on lessons learned and insights gleaned from that pilot process.

Second, the Chief of Police has indicated that she would like to increase the size of the CRT Team so that crisis-trained specialists can be more broadly available across the Department to take the lead on encounters involving individuals experiencing crisis.  Indeed, the Chief expressed to 21CP that she would like for as many officers to receive CIT training as possible.

Third, APD is looking to incorporate clinicians within the dispatch function as a means of enhancing that function's overall ability to make nuanced assessments about what types of

---

[208] Katie Bailey, et al, "Barriers and Facilitators to Implementing an Urban Co-Responding Police-Mental Health Team," 6 *Health and Justice* 21, 22 (2018).

[209] Colorado Department of Human Services, *Co-Responder Programs*, https://cdhs.colorado.gov/behavioral-health/co-responder (last visited Mar. 6, 2021).

[210] Press Release, "Dallas Launches Coordinate Response Program for Behavioral Health Calls" (Jan. 22, 2018), https://mmhpi.org/wp-content/uploads/2018/04/01.22-RIGHTCareTeam_PressRelease_FMT_FINAL2.pdf.

[211] White Bird Clinic, *What is Cahoots?* (Sept. 29, 2020), https://whitebirdclinic.org/what-is-cahoots/.

Fitouri 020247

calls for service might benefit from crisis response resources.  Finally, City stakeholders indicated to 21CP that the CRT program will be a priority for the City's internal audit function going forward.

In June 2021, APD further reported to 21CP that:

> APD is committed to the Crisis Intervention Team (CIT) program and is in the process of implementing new training opportunities for officers who are not yet CIT trained.  This effort was stalled due to the pandemic.  We are already in the process of scheduling a CIT class in September or October of 2021 for all patrol officers, with a goal of certifying the entire agency.  APD plans to expand the Crisis Response Team (CRT) program as staffing allows and incorporate this with the city's newly formed co-responder initiative.[212]

Taken together, APD's various initiatives both explore response models rooted in non-police response and enhance the quality of the Department's current crisis response model.  To the extent that the Aurora community determines that APD's current CIT/CRT model should be an ongoing part of the crisis response system in Aurora going forward, the Department would need to take a number of steps, including but not limited to embracing the following recommendations, to more completely and effectively realize the potential of the approach:

> **Recommendation 15.1.    APD and the City should update its policies to ensure more streamlined, comprehensive treatment of crisis intervention issues and operational response details.**

Many of the recommendations below contemplate changes to, or updates of, APD's policies regarding crisis intervention.  Although APD's current Directive 6.13 provides some appropriate guidance to officers on "Dealing with Persons with Mental Health Disorders," APD should partner with social service providers, community stakeholders, clinicians, and mental and behavioral health advocates to expand existing policies to address the larger universe of behavioral health, substance abuse, and mental health challenges.  That is, APD's policies should formally detail response expectations and protocols across a range of behavioral health conditions, not solely mental health disorders.  These policies should more precisely inventory a host of considerations outlined below for the nature and type of

---

[212] Aurora Police Department, *Response to 21CP Solutions Recommendations for the Aurora Police Department* (June 17, 2021) at 6.

Fitouri 020248

appropriate responses.[213]  APD has indicated that it "agrees with this recommendation and will implement a policy review for changes as necessary."[214]

> **Recommendation 15.2.    The Aurora Police Department should establish a practice of dispatching CRT and CIT officers on calls they on calls that utilize their specialized training..**

Crisis-trained officers tend to have:

> Increased knowledge of mental illness (which manifests as an improved ability to recognize and respond, reduced stereotyping/stigmatization, greater empathy toward consumers and their caregivers, more patience when dealing with consumers, and fewer arrests/more redirection toward treatment), as well as practical application of learned skills (evidenced by an ability to put individuals with mental illnesses at ease, reduced unpredictability of the crisis situation, and reduced risk of injury).[215]

For departments and communities to realize these potential benefits, the CIT approach must be "more than just training"[216] – with a department working to establish mechanisms to identify instances where specialist officers can be useful and ensuring that such officers are available and dispatched as appropriate:

> CIT is an organizational and community intervention that involves changes in police department procedures as well as collaboration with mental health providers and other community stakeholders . . . Call dispatchers are trained to identify mental health disturbance calls and assign these calls to CIT trained officers.[217]

---

[213] *See, e.g.*, Seattle Police Department, Manual, Section 16.110, Crisis Intervention, https://www.seattle.gov/police-manual/title-16---patrol-operations/16110---crisis-intervention (Oct. 1, 2020); New Orleans Police Department, Operations Manual, Chapter 41.25, Crisis Intervention, https://www.nola.gov/getattachment/NOPD/Policies/Chapter-41-25-Crisis-Intervention-EFFECTIVE-5-10-2020.pdf/?lang=en-US (May 10, 2020); Baltimore Police Department, Policy 712, Crisis Intervention Program, https://www.baltimorepolice.org/712-draft-crisis-intervention-program (July 3, 2019); Cleveland Division of Police, General Police Order 5.11.02, Crisis Intervention Team Program, https://www.city.cleveland.oh.us/sites/default/files/forms_publications/1.10.2018CrisisInterventionTeamProgram.PDF?id=12402 (Jan. 1, 2018).

[214] Aurora Police Department, *Response to 21CP Solutions Recommendations for the Aurora Police Department* (June 17, 2021) at 7.

[215] Sonya Hanafi, et al, "Incorporating Crisis Intervention Team (CIT) Knowledge and Skills into the Daily Work of Police Officers: A Focus Group Study," 44 *Community Mental Health Journal* 427, 427 (2008).

[216] Amy C. Watson & Anjali J. Fulambarker, "The Crisis Intervention Team Model of Police Response to Mental Health Crises: A Primer for Mental Health Practitioners," 8 *Best Practices in Mental Health* 71 (2012), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3769782/.

[217] *Id.*

Fitouri 020249

APD told 21CP that it has "been using a Crisis Response Team (CRT) staffed with Crisis Intervention Team (CIT) trained officers on calls they are trained to handle when they are available to respond since 2018," with "[o]fficers assigned to the CRT . . . easily identified on the Dispatch screen as available "David Units," and CIT officers are included on the daily staffing rosters available at briefings for all officers on duty."[218]

21CP's recommendation here is for APD to meaningfully ensure the availability and deployment of CRT and CIT officers across all shifts and geographic units. Likewise, all APD officers, whether CRT, CIT-trained, or otherwise, should receive training on recognizing potential mental and behavioral health issues and affirmatively requesting the dispatch of specially-trained CIT officers.

> **Recommendation 15.3. APD should provide training to dispatchers so they may be better able to identify calls for service that may require or benefit from a CRT or CIT officer response.**

Consistent with the previous recommendation, APD should provide dispatchers with additional and ongoing training on recognizing calls for service that might require or could benefit from a crisis-trained officer. APD informs 21CP that it "will work in coordination with the Public Safety Communications Division (PSCD) through their Dispatch Committee to review current guidelines and revise as necessary."[219] Additionally, "[t]he city's non-police response to crisis calls is in the development phase for training and will include the 21CP recommended training for dispatchers."[220]

> **Recommendation 15.4. APD should establish and use a tracking system which identifies calls for services requiring the CRT Team/CIT officer, the response of crisis resources, and the outcomes of the call.**

Based on discussions with APD personnel and command staff, and review of APD's various policies and procedures, it does not appear that APD systematically and uniformly tracks instances where the CRT Team and/or CIT officers are requested, where such officers respond, and the resolution of calls where the CRT Team or CIT officers are involved. To better gauge the effectiveness of CIT calls and interactions with individuals in crisis, APD should collect in-depth data on crisis calls and analyze said data for performance patterns and trends. The Department notes that it "is in the process of hiring a program analyst for CRT who may be able to do this task" and provided 21CP with a job description for the position.[221]

---

[218] Aurora Police Department, *Response to 21CP Solutions Recommendations for the Aurora Police Department* (June 17, 2021) at 7.
[219] *Id.*
[220] *Id.*
[221] *Id.*

Fitouri 020250

**Recommendation 15.5.   APD should conduct a review of the number of current CIT officers, their current assignments, and the recency of their training.  Based on this information, APD should determine:**

- **How to best ensure geographic and temporal distribution of CIT assigned to patrol; and**
- **A specific training plan for ensuring that CIT officers have sufficient support and training both in the short-term and throughout their careers.**

For the "Memphis Model" of crisis response to function effectively, crisis-trained officers need to be available to respond to incidents that may implicate behavioral or mental health crises. APD should conduct an in-depth review to ensure that it retains a sufficient number of APD officers to have available throughout the City and at all times.  APD should likewise ensure that CIT-trained officers are assigned broadly, across the City and various shifts.

Additionally, CIT officers tend to benefit from routine refresher training on basic crisis intervention skills and from ongoing skills development that includes additional information about particular mental health challenges, new research, in-depth information about response techniques or community diversion resources, and other topics.  Going forward, APD should formalize a program for ongoing, substantive training for CIT officers.

In response to this recommendation, APD informed 21CP that "[t]he continued implementation of agency certification will ensure CIT trained officers are on duty during all shifts" and that "[t]raining material will continuously be incorporated in APD's annual training to address routine refresher training."[222]

**Recommendation 15.6.   APD should craft updated, more specific policy guidance on the Crisis Response Team.  The directive should contain information about the composition, roles, and responsibilities of the Team, as well as procedures for requesting, dispatching, tracking, and reporting on the use and outcomes of CRT.**

Current APD policy does not address any of a number of details surrounding the Crisis Response Team.  Directive 8.36 addresses CIT-trained officers but does not reference the Crisis Response Team.  Directive 6.13 references CRT twice, and positions them as the primary individuals who "should be assigned to handle calls involving a person in crisis as a result of a mental health issue,"[223] but it provides no detailed information about the Team, its composition, its operations, how APD ensures that CRT members are available throughout the City and across time, and the detailed mechanics for what APD officers should do as they may await CRT response.

---

[222] *Id.* at 8.
[223] APD Directive 6.13, Section 6.13.

Fitouri 020251

21CP recommends that the Department establish a detailed directive addressing CRT that provides parameters for CRT's composition, working protocols, response, documentation of response, training requirements, and other response considerations.  APD has responded by noting that "[s]ome of this is already covered in the CRT's SOP's [Standard Operating Procedures]" but that "those areas will be reviewed and updated to reflect current information and practices."[224]

---

[224] Aurora Police Department, *Response to 21CP Solutions Recommendations for the Aurora Police Department* (June 17, 2021) at 8.

Fitouri 020252

## AREA 2.   COMMUNITY ENGAGEMENT & PARTICIPATION

The killing of George Floyd and the significant national conversations about race and policing
that it precipitated have underscored that the relationship between police and community is
complex and challenging.  The differing experiences, histories, and values of communities
lead many people to advance different views about how the police should or should not
interact with the public and roles for the police department in promoting public safety within
their communities.

Since the early 1990s, after the passage of the Violent Crime Control and Law Enforcement
Act, the United States Department of Justice and other federal agencies have given over $14
billion to jurisdictions across the country for community policing initiatives.[225]  The objective
of many of these programs was, according to the Department of Justice's Office of Community
Oriented Policing Services ("COPS"),  to "promote[ ] organizational strategies that support
the systematic use of partnerships and problem-solving techniques to proactively address the
immediate conditions that give rise to public safety issues such as crime, social disorder, and
fear of crime."[226]

However, the term "community policing" has "suffered from conceptual confusion in both
research and practice."[227]  First, different agencies have tended to group widely varying types
of initiatives, approaches, and programs under the banner of "community policing."[228]
Second, in many departments, "community policing" refers to isolated and disconnected
community engagement programs – like providing popsicles to children on summer days or
having officers participate in youth basketball games – rather than an overriding, operational
approach to policing.  Third, and relatedly, a number of purported community policing efforts
devoid of proper execution and design ultimately have become "check the box" activities
rather than meaningful methods of cultivating community collaboration and problem-
solving.  Finally, and as this section discusses further below, 21CP has regularly heard from
community and law enforcement alike that "community policing" is, at this point, a dated
term that lacks a true definition across the field – and can often be perceived as a framework
for expanding police presence in historically marginalized communities.

### Community Policing, Problem-Solving, and Engagement in Aurora

---

[225]   U.S. Department of Justice, Office of Community Oriented Policing Services,
https://cops.usdoj.gov/grants (last visited May 10, 2021).
[226] U.S. Department of Justice, Office of Community Oriented Policing Services, "Community Policing
Defined" at 1 (2014), http://www.cops.usdoj.gov/pdf/vets-to-cops/e030917193-CP-Defined.pdf.
[227] A. Gersamos Ginakis, et al, "Reinventing or Repackaging Public Services? The Case of Community-
Oriented Policing," 58 *Public Administration Review* 485 (1998).
[228] The Leadership Conference on Civil and Human Rights, *New Era for Public Safety: A Guide to Fair
Safe and Effective Community Policing* (2019).

Fitouri 020253

As noted at the outset of this report, 21CP met with a number of community stakeholders.  A good deal of discussion focused on the relationship between police and community, APD's engagement with the community, and the role of the police in Aurora.

### Public Safety-Related Committees and Task Forces

Aurora has appeared to develop a wealth of public committees or task forces related to policing and public safety issues over the years.[229]  The various public safety task forces in the City of Aurora are seen by a number of stakeholders as useful environments for Aurora residents to provide feedback or surface concerns on targeted issues.  However, both city leaders and members of the community indicated to 21CP that the various bodies have been less effective at building relationships between community and police or at identifying and implementing specific solutions to problems – largely because there are so many groups that work in silos, on different issues at different times, and that often have differing opinions on the same issues when the areas for consideration do align.  This leaves the APD in the position of determining whose opinion to prioritize when setting policy. Later in the report, we will reflect on the homelessness issue in Aurora – a primary example of the diverse landscape of community opinions that the APD must navigate.

Additionally, it was the perception of many community members and several of those selected to serve in these committees or task forces that the same, few community representatives seem to have an outsized voice with other, valuable types of community voices simply not represented.

These dynamics within Aurora's task forces and committees mean that, even as the city structurally is attempting to engage substantively with the community on issues relating to policing and public safety, many Aurora residents do not feel like those structures adequately reflect their views, allow their participation, or are effective in setting the vision for how public safety works in Aurora and the specific agenda for how APD helps to further that vision.

### Police Area Representatives ("PAR") Unit

APD's Police Area Representatives ("PAR") Unit was created to engage in deeper problem-solving throughout the communities of Aurora. The Unit's efforts are meant to engage in active relationship-building and community-based problem-solving in a manner that can promote to improved quality of life, decreased crime/violence in Aurora, and a fluidity of resources across various City entities and stakeholders that allows for holistically sustainable problem-solving solutions for the Aurora community.  The PAR Unit Procedural Handbook identifies problem-solving and community relationship building as a principle

---

[229]   City of Aurora, City Hall, *Boards and Commissions* https://www.auroragov.org/city_hall/boards___commissions (last visited May 19, 2021).

Fitouri 020254

tenant of the Police Area Representatives (PAR) Unit.[230] This essentially leaves the critical responsibility of building strong relationships with the community to a select few in the department. Their objective, on paper, is to coordinate resources – both public and private – to impact crime, solve problems, and improve quality of life. In many discussions with 21CP, when residents said that they could identify an officer that added value to their community, it was very likely that the officer was their PAR officer.

However, other residents in Aurora suggested that they have had disappointing experiences with PAR officers. Indeed, a majority of residents with whom 21CP spoke were unable to identify their PAR officer or describe the duties of a PAR officer, suggesting that the program is not as widely or meaningfully implemented as it might be. There appears to be a perception in some quarters that PAR officers do not endeavor to build the type of deeper relationships with community that can help address specific community issues and help solve community problems. As one resident related:

> I sometimes see them at our neighborhood association meetings but they simply report out crime statistics. When I reach out about specific nuisance issues like illegal parking in my community or congregating during COVID, I get no answer or engagement.

As 21CP analyzed this gap in understanding around community engagement and problem-solving in the community, we learned more broadly that the PAR officers themselves see their role more as a tool for their fellow patrolman more than that of a resource for the community. As one former PAR officer said,

> The PAR Unit is the junk drawer of the department. One day they could be serving a warrant on the S.W.O.T team, the next they may be helping to distribute free groceries to residents experiencing food insecurity.

PAR officers report being required to handle everything from parking violations and animal control issues to homelessness challenges while also serving as conduits to various city entities in order to allow their peers to be more readily available to move from call to call. This stems, it appears, from the fact that PAR officers take their direction from patrol officers – leaving the PAR officers as an auxiliary resource rather than a primary problem-solving mechanism.

21CP found that some confusion regarding the PAR officer's role is indeed reflected in APD's PAR Officer Handbook. For instance, the PAR Unit's intense focus on training that addresses crime prevention through environmental design and property management risks giving the impression that community policing begins with partnership with landlords and

---

[230] Aurora Police Department, *Police Area Representative Handbook* 8 (2020).

Fitouri 020255

management of nuisance properties and their tenants over community care. Specifically, about one-third of PAR officer training focuses on how to manage, cite, and address problematic properties.[231] In their interviews, PAR officers tended to focus on proprieties and locations that were problematic for homelessness, ill repair, and vagrancy issues – noting that they did the follow up in these spaces because patrol officers didn't have the time. Although, there is likely a need for a holistic response to such spaces through partnership with 3-1-1 and other City-wide entities, the focus of PAR officers on this band of issues may not be resulting in the types of stronger community relationships that the program appears intended to foster.

The PAR Unit Handbook also contains a detailed analysis of the tools, resources, and training for all officers in the Unit. The Handbook encourages officers to undergo four required trainings. Two of those trainings are offered by the department: a 40-hour annual bicycle training and a 40-hour Crisis Intervention Training. Two additional trainings offered outside the Department: a Crime-Free training, which addresses mitigating crimes by tenants and addressing property management issues, and a training on Crime Prevention Through Environmental Design. When interviewed, PAR officers told 21CP that the trainings offered outside the department were not regularly offered and most on-boarding into a PAR position was done by fellow PAR officers. The outside trainings required pre-approvals, which are historically hard to obtain due to low staffing and limited budgets. In any event, it is likely that PAR officers should receive much more comprehensive training on issues relating to community problem-solving, cross-cultural communication, and other issues that provide community stakeholders and residents with opportunity to provide community-specific instruction and resources to PAR officers.

Although APD should be commended for the creation of a PAR Unit, as many peer departments have not gone as far as to formally devote resources to community problem-solving initiatives, there remains room to grow, streamline, and redefine this Unit and the work of all APD officers to give a larger focus to community problem-solving.

### Community Relations Section

Chief Wilson created APD's Community Relations Section in January 2021. This section is led by the City's former Community Relations Director, Claudine McDonald, and includes Recruiting, Community Relations Officers, Aurora for Youth Programs, Police Explorers, the Chief's Community Police Advisory Team, and the Chief's Youth Advisory Team. 21CP understands that the new section is tasked with leading community engagement and problem-solving. Although its charge appears somewhat similar to the PAR Unit, it appears that where the PAR Unit currently is a catch-all for patrol overload and follow up, the new

---

[231] *Id.* at 13.

Fitouri 020256

Community Relations Section wants to engage the community where they are to build collaboration, problem-solving, and healing.

At present, the Community Relations Section is too new for 21CP to meaningfully review or evaluate.  However, the amount of programming that the group has planned and the growth of its activities is encouraging.  Although APD will need to be mindful of the current, on-paper overlap between the PAR and Community Relations functions, the existence of a broader, community-focused function with the Department beyond individual PAR officers provides a stronger foundation for ongoing relationship-building with the community, as certain recommendations below suggest.

## Future Roles & Functions of Police in Aurora

Going forward, Aurora's many communities must define what public safety is and what the role of policing should be in advancing such safety.  As this section details, one approach that some communities are taking is to implement "community policing" not simply as an "extra" program or a task of some, specialized officers but, instead, as a fundamental, overriding philosophy that guides everything that officers do.  In these communities, the focus of officers is just as much, if not more, on addressing community needs and solving community problems than on traditional law enforcement.  Some community members appeared to desire this type of engagement with one community leader underscoring the gaps in prior "community policing" approaches:

> I haven't seen the police in the time I have lived in Aurora even try to build a relationship.  If anything, I feel like they distance themselves.

At the same time, however, other jurisdictions are more comprehensively re-imagining public safety by exploring what mechanisms and resources may be available to respond to community needs such that their presence can be reduced when an armed law enforcement officer is not the best or appropriate response.  As one resident summarized:

> I think we need to get out of the concept of policing and look at public safety.  Policing is 'let me uphold the law and terrorize people to enforce it if need be.'  Public safety is pushing the philosophy of care for the community forward as a priority for leadership.

These two approaches – changing the nature of police response while standing up meaningful alternatives to police response for particular community issues – need not be mutually exclusive and can, in fact, be complementary.  The following sections briefly describe the paths that the Aurora community, in partnership with APD and elected officials, might take in the future to better serve the community's needs and provide for community well-being.

Fitouri 020257

***Community Policing as an Overriding Philosophy***

To the extent that the Aurora community continues to find the "community policing" framework useful for addressing how police can help to foster community safety and well-being, APD must view "community policing" as a foundation of the entire department and an overriding philosophy for everything that it does.  As the President's Task Force on 21st Century Policing stated in its report to President Obama in 2016, real "community policing" is not just a standalone activity or a set of outreach initiatives but rather a core approach that "should be infused throughout the culture and organizational structure of law enforcement agencies."[232]

> [Community policing] should be the standard operating method of policing, not an occasional special project; (2) it should be practiced by personnel throughout the ranks . . . ; (3) it should be empirical, in the sense that decisions are made on the basis of information that is gathered systematically; (4) it should involve, whenever possible, collaboration between police and other agencies and institutions; and (5) it should incorporate, wherever possible, community input and participation, so that it is the community's problems that are addressed (not just the police department's) and so that the community shares in the responsibility for its own protection.[233]

Jurisdictions elsewhere have implemented approaches geared toward establishing a more comprehensive community policing philosophy.  For example, the Seattle Police Department partnered with Seattle University to design a survey and comprehensive community policing strategy that was tailored to each of Seattle's neighborhoods.

> The Micro Community Policing Plans (MCPP) were designed to address the distinctive needs of each community.  The plans take a three-prong approach that brings community engagement, crime data and police services together to get direct feedback on perceptions of crime and public safety. MCPP are tailored to meet the individual needs of each community, with a unique approach owned by the community . . . . The MCPP neighborhoods were defined through police-citizen engagement including community meetings, focus groups, survey data, and the realities of geographic boundaries SPD can use to collect and report on events.  The MCPPs and their neighborhoods will be routinely reevaluated with attention to the ways in which citizens who live in Seattle neighborhoods define their communities.[234]

---

[232] *Final Report of the President's Task Force on 21st Century* Policing (2015).

[233] Gary W. Cordner, "Community Policing: Elements and Effects," 5 *Police Forum* 1 (1995).

[234] Seattle Police Department, *About* MCPP, https://www.seattle.gov/police/about-mcpp (last visited May 10, 2021).

Fitouri 020258

Similarly, in Dover, New Jersey, the Dover Police Department worked in conjunction with their community to create a mission statement and subsequent plan that "promote[s] a partnership between the community, businesses, government, the media, and law enforcement designed to reduce crime and improve the overall quality of life while encouraging the community to determine its own needs through the exchange of ideas and problem-solving techniques."[235]

In Aurora, materials indicate that the development of community policing strategy is left to "all Districts, Bureaus, and Sections of the Department" and encourages members to use a Community Policing Problem-Solving workbook to individually come up with plans which risks that some plans may be more comprehensive for one community and less for another. Although likely designed so that command of each district could target individual needs of their unique communities, much like those done in Seattle, 21CP found indications that this simply was not the case. Rather, as mentioned previously, PAR Units seem to be considered the community policing conduit across *all* districts and multiple cross-departmental functions. Consequently, there appears to be relatively little District-specific design of community policing efforts of the sort suggested by the Department's materials.

The implementation of a comprehensive community policing philosophy requires three basic elements: partnerships, problem solving and organizational transformation. With respect to partnerships, departments and communities must work together to define the overall mission of the police department and its purpose in public safety across the municipality. This partnership should be ongoing and engage a diverse group of stakeholders who are active in their community. The scope of this engagement should go far beyond the participation of a small cadre of community leaders who purport to speak for communities to also include a true investment toward hearing from all voices.[236]

Organizational transformation is the foundation for instilling community policing throughout the culture and organization of a police department. Community policing is something that must be practiced by all officers across all ranks and assignments, not something done by an isolated or small unit.

However, patrol is the primary organizational unit charged with achieving community policing. Typically, this means that patrol officers should be assigned to specific geographic locations for extended periods.[237] There must be sufficient number of officers assigned to Patrol and they must also be given the time to work with the community in their assigned

---

[235] Dover Police Department, *Community Policing*, http://www.doverpolicenj.org/newpage3.htm (last visited May 10, 2021).

[236] Leadership Conference on Civil and Human Rights, *New Era for Public Safety: A Guide to Fair Safe and Effective Community Policing* (2019).

[237] Yucel Ors and Nicole DuPuis, National League of Cities, *City Officials Guide to Policing in the 21st Century* (2016), https://www.nlc.org/wp-content/uploads/2016/12/NLC-Community-Policing-Guide-updated-71516.pdf.

Fitouri 020259

areas and to problem-solve.   Furthermore, cities including Chicago,[238] Cleveland,[239] and New York[240] have worked to implement community policing models that focus on providing officers with time "off the radio" when they can engage in meaningful relationship-building and work to proactively solve community problems.   The International City/County Management Association recommends that sixty percent of a department's sworn members at the rank of officer be assigned to patrol and that no more than 60 percent of available patrol officer time be spent on answering calls-for-service.[241]   Not needing to respond to emergency calls during such time, officers instead have sustained opportunities to engage with residents on issues relating to community well-being.   Individual officer efforts to address community problems are logged and tracked.   In this way, "community policing" becomes a core, day-to-day responsibility of all officers – and helps to permeate all aspects of what they do.

This organizational approach to community policing can present a number of implementation challenges, including officer resistance, securing interagency support, creating necessary community partnerships, and building community involvement.[242]   In police departments that give officers specific time to conduct community engagement and problem-solving, organizational and workload analyses were conducted and formed the basis for shifting officer assignments and expanding available discretionary time.   New codes in Computer Aided Dispatch systems were created to track how officers used this discretionary time as well as computerized forms to capture community policing activities and outcomes.   In the case of Baltimore,[243] the entire police department is being trained on their roles and responsibilities under community policing.

---

[238] NYU School of Law Policing Project, Neighborhood Policing Initiative, https://www.chicagonpi.org/npi (last visited Jan. 15, 2020) (describing program to "provide all officers uncommitted time in which to engage in relationship-building and problem-solving within the neighborhoods they serve").

[239] Cleveland Division of Police, Community and Problem-Oriented Policing Plan 6 (2019) https://static1.squarespace.com/static/5651f9b5e4b08f0af890bd13/t/5c796361e2c48323a6b4064b/1551459170892/CPOP+Ex+A.pdf (providing patrol officers with 20 percent of their time to devote purely to community engagement opportunities).

[240] New York Police Department, Neighborhood Policing, https://www1.nyc.gov/site/nypd/bureaus/patrol/neighborhood-coordination-officers.page (last visited Jan. 15, 2020) (describing "off-radio time" provided to officers "so they are not exclusively assigned to answering calls for service" and "used to engage with neighborhood residents, identify local problems, and work toward solutions").

[241] James McCabe, *An Analysis of Police Department Staffing: How Many Officers Do You Really Need?*, https://icma.org/sites/default/files/305747_Analysis%20of%20Police%20Department%20Staffing%20_%20McCabe.pdf (last accessed May 25, 2021).

[242] Susan Sadd and Randolph M. Grinc, "Implementation Challenges in Community Policing," *National Institute of Justice Research Brief* (Feb. 1996), https://www.ojp.gov/pdffiles/implcp.pdf.

[243] Baltimore Police Department, *Community Policing Plan*, https://www.baltimorepolice.org/bpd-community-policing-plan (last accessed May 25, 2021).

Fitouri 020260

Some studies have found community policing programs to be associated with enhanced resident satisfaction and police legitimacy.[244] A 2019 random-control study found that positive contact with the police in a nonenforcement activity substantially improved residents' attitudes toward police, including a greater willingness to cooperate and greater sense of police legitimacy, particularly among non-white populations[245]:

> The results reported here provide clear empirical support for the efficacy of policing strategies aimed at improving attitudes toward the police via positive nonenforcement contact between officers and the communities they serve.[246]

Effects of community policing on public safety are mixed. The 2019 study found that community policing has only "a small impact on violent crime, a nonsignificant impact on property crime, and a small effect on fear of crime."[247] However, a study of community policing in Chicago in the 2000s found that violent crime dropped 56 percent, property crime dropped 37 percent, and public confidence in police increased during the implementation of a community policing approach.[248] A program in Philadelphia prioritizing foot patrols found that, relative to areas without foot patrols, violent crime decreased by 23 percent.[249]

Ultimately, the Aurora community and stakeholders might determine that "community policing" is the best approach for policing in Aurora going forward. However, APD's current "community policing" initiatives functionally delegate the work of community partnership and problem-solving to particular personnel – whether the PAR Unit, the Community Relations Section, or even the City various task forces and committees that address public safety issues. If the Aurora community wants APD to engage more closely and meaningfully with the Aurora community, the philosophy of community problem-solving and sustained relationship-building will need to be woven into the day-to-day, minute-to-minute fabric of what the Department, and all of its personnel, do across functions.

### Re-Imagining the Role of Policing

One recurring issue with "community policing" is that it does little to address the concerns of those in the community – and especially those of Black, Latino and Hispanic, and other communities of color – for whom the very presence of police in their neighborhoods is a source

---

[244] Center for Evidence-Based Crime Policy, *What Works in Policing*, https://cebcp.org/evidence-based-policing/what-works-in-policing/research-evidence-review/community-policing/ (last visited May 25, 2021).
[245] Kyle Peyton, Michael Sierra-Arevalo and David G. Rand, "A Field Experiment on Community Policing and Police Legitimacy, 116 *PNAS* 19894 (2019), https://www.pnas.org/content/116/40/19894.
[246] *Id.*
[247] *Id.*
[248] Wesley Skogan, *Police and Community in Chicago: A Tale of Three Cities* (2006).
[249] Jerry Ratcliffe, et al, "The Philadelphia Foot Patrol Experiment: A Randomized Controlled Trial of Police Patrol Effectiveness in Violent Crime Hotspots," 49 *Criminology* 795 (2011).

Fitouri 020261

of fear and distrust. That is, rather than reducing the imprint and role of police in communities that have been disproportionately impacted by police, "community policing" calls for expanded and sustained interaction between police and communities.

To this end, and with respect to the role of police – what police do and how they do it – many say that our society over-relies on police to address social issues that have little to do with the enforcement of laws. Police officers themselves have increasingly maintained that "[w]e're asking cops to do too much in this country."[250] Although research in the field is somewhat lacking across all 18,000 departments in the country, a *New York Times* article analyzing major cities such as, Sacramento, New Orleans, and Montgomery County, MD suggested that "officer[s] spend roughly 4% of their time addressing violent crime."[251] Indeed, APD's calls for service data, summarized elsewhere in this report, show APD officers spend the vast majority of their time addressing community problems and issues that are not related to violent crime. With law enforcement officers devoting a comparatively small proportion of their time enforcing the serious violations of law, the vast majority of their time is spent addressing a variety of "social problems – substance abuse, mental illness, homelessness, domestic disputes, even civil unrest"[252] that have little to do with violent crime or law enforcement.

Consequently, many jurisdictions across the country are engaging in process aimed at re-imagining public safety": systematically considering what its community needs to do to provide for the well-being and safety of its community, who the right people or resources are to meet those needs, and how the jurisdiction can establish systems or ensure structures that allow for all of its diverse communities to thrive.

A meaningful process of re-imagining public safety does not reflexively assume that police are the best or most appropriate response simply because they have historically been the only ones who are available and accessible. Instead, a practical process of re-imagining public safety systematically considers (1) what functions the police currently perform, (2) whether the police are positioned and supported to perform those functions, and, if not, (3) what other services either exist or need to be built to perform them instead. It inventories the community's problems, issues, and needs and will consider whether a police response is the best, most appropriate response in each instance – and whether some alternative resource may be better equipped to address the situation and provide for community well-being.

---

[250] Clarence Page, "Are We Asking Too Much of Police?," *Chicago Tribune* (Sep. 4, 2020), https://www.chicagotribune.com/columns/clarence-page/ct-column-daniel-prude-police-david-brown-page-20200904-bmps6mdxzrcmlbipai6s6achau-story.html (quoting Chicago Police Department Superintendent David Brown).
[251] Jeff Asher and Ben Horwitz, "How Do the Police Actually Spend Their Time," *New York Times* (June 19, 2020), https://www.nytimes.com/2020/06/19/upshot/unrest-police-time-violent-crime.html.
[252] Barry Friedman, "Disaggregating the Policing Function," NYU School of Law, Public Law Research Paper No. 20- 3 26 (Apr. 6, 2020).

Fitouri 020262

In Aurora, a number of stakeholders raised community issues and problems that may not require an armed police response and are, therefore, immediately ripe for alternative response systems not related to APD, including but not limited to:

- **Crisis Intervention.**  As this report details elsewhere, Aurora could establish a model of behavioral crisis response that establishes non-police social service providers as the primary response to individuals in crisis.

- **Traffic Accidents.**  Law enforcement officers may not be necessary at the scene of many types of traffic accidents, allowing for alternative mechanisms of recording accident reports or conducting traffic management tasks.

- **Response to Residential and Commercial Alarms.**  Aurora could examine mechanisms for minimizing the reliance on police to respond to certain types of alarms.

- **Property Considerations.**  Although some types of theft or property issues might require the filing of a police report, an immediate response by an armed police officer may not be necessary.  Aurora might consider an online reporting system, or designating individuals who community members can contact, and who are dispatched, when issues arise regarding personal property on campus.

- **Welfare Checks.**  It is not always obvious that APD is best equipped, specialized, or trained to respond to and conduct welfare checks on people when there is no reason to believe that those individuals are armed or dangerous.

In discussions with APD command staff and City leadership, 21CP learned about some early initiatives aimed at identifying community needs that may be best situated for a response that does not involve sworn APD personnel.  First, as discussed elsewhere in this report, Aurora is piloting a version of the CAHOOTS program aimed at sending trained, non-police professionals to the scene of incidents involving individuals in mental or behavioral health crisis.  City officials noted that this initiative is being called the "Right Response" program because there is an increasing awareness that the appropriate and best response to instances where individuals are concerned about someone's well-being often does not involve the police.

Second, the Chief is working to establish a civilian traffic unit.  Within this model, non-sworn, civilian Community Service Officers ("CSOs") would receive training and conduct investigations on traffic stops, address calls involving non-injury accidents, and manage the scene of traffic issues (such as waiting for cars to be towed, waiting for scenes to be cleared, and the like).  These CSOs might also address motor vehicle theft in instances where there is no specific suspect information.  Although this will require substantial coordination with Dispatch and the creation of clear protocols with respect to what CSOs address and what

Fitouri 020263

APD officers address, the Chief observes that this is a potentially promising way to better calibrate the City's response to community needs.

**Recommendation 16.        Aurora should ensure that the Community Policing Task Force, or the like, serves as a permanent, standing body going forward that leads the City in creating a new, shared vision of public safety in Aurora. Among other primary tasks, it should be responsible for helping to facilitate, with input from Aurora's diverse stakeholders and communities:**

- **A definition of public safety in Aurora that defines the roles and responsibilities of the Police Department and the roles and responsibilities of other government and City stakeholders with respect to community safety and well-being;**
- **The creation and maintenance of a Community Safety Plan geared toward translating Aurora's vision of public safety into operational milestones, deliverables, and deadlines;**
- **Convene regular listening sessions that incorporate relevant subject-matter expert testimony, as appropriate, to assist in the collaborative planning necessary to establish a Community Safety Plan; and**
- **Coordinate across Aurora's many government and institutional stakeholders on issues relating to public safety.**

In the last two years, the Mayor and Aurora City Council have taken the steps to more intentionally hear from community; to "further explore their concerns, provide a voice to the community, and educate those concerned on the community's perspective, several rounds of community forums were conducted."[253] Following these forums, Mayor Pro Tem Johnson, "sponsored a resolution to improve APD communication and develop recommendations for a civilian-involved oversight system on police procedures and processes. The successful Resolution led to the Aurora City Council appointing the [Community Policing] Task Force in June 2020 to develop recommendations." [254]  The group met monthly to hear from the community in numerous forums and then to work amongst themselves to develop recommendations, "to improve the community and police relationship and keep citizens of Aurora (especially Black, Brown, and Poor people) safe."[255]

The group – made up of community stakeholders including educators, advocacy groups, and healthcare workers, Aurora Police, and City Council members – worked to evaluate, discuss, and develop, "recommendations to improve effective and transparent communication

---

[253] Ryan Ross, Community Police Task Force, *City of Aurora Community Police Task Force Recommendations* (Mar. 20, 2021) at 71–81, https://auroragov.org/common/pages/DisplayFile.aspx?itemId=17557323.
[254] *Id.*
[255] *Id.*

Fitouri 020264

between APD and the community, including recommendations for a citizen-involved/citizen-based review of critical incidents, police operations, and police practices and procedures."[256]

In their final report, the group addressed that their recommendations were designed to be, "the very beginning or foundation of important work that must follow and is not a catch-all solution."[257] 21CP Solutions agrees, and observes a body such as this provides important insight into community and stakeholder needs that can remain a critical, ongoing tool.

More specifically, for Aurora's residents to come together to define public safety and the role that APD should play in community well-being, the effort will need to be credibly facilitated by a major stakeholder. To this end, a city-wide stakeholder group, such as a Community Relations Board (CRB) or Community Advisory Board (CAB), would be a valued addition and likely well-situated to provide a process for diverse City stakeholders and residents to come together and explore how policing should work in Aurora in the future. Among other things, CRB- or CAB-type group could consider what safety is for Aurora and what APD's role should and should not be to properly align with that conception of safety. APD also notes that it "currently uses the Community Policing Advisory Team (CPAT)," with "[t]he Chief's office regularly communicat[ing] with this team and seek[ing] recommendations and guidance with regard to public safety and APD functions."[258] "Also, the Chief's Youth Advisory Team (CYAT) was recently formed and provides a similar function from a different perspective."[259]

The concept of community members partnering with police to engage in structured, candid discussions about public safety and the role of policing is not novel, even if it is used far less frequently than is likely optimal. For instance, the San Francisco Police Department developed a Community Policing Plan as part of a collaborative reform initiative undertaken with the Department of Justice's Community Oriented Policing Services Office.[260] Writing in *Police Chief* about the development of such a plan for the City of San Francisco, the Chief of Police and Commander of the Department's Community Engagement Division cited four lessons learned, all of which point to the fundamental importance of community collaboration in the development of a community policing approach:

- Development of the plan must be a true partnership. Community policing necessitates that the community itself have a voice and so should officers of all ranks . . . .

---

256 *Id.*
257 *Id.*
258 Aurora Police Department, *Response to 21CP Solutions Recommendations for the Aurora Police Department* (June 17, 2021) at 8–9.
259 *Id.* at 9.
260 *See generally* U.S. Department of Justice, Office of Community Oriented Policing Services, Collaborative Reform Initiative, *An Assessment of the San Francisco Police Department* (2016).

- Beginning the process by outlining desired outcomes from community policing will serve as a guide for the work.  It is very difficult to define a process if the end goal is not articulated . . . .
- Diverse viewpoints (by demographics, geography, politics, background, opinion of the police, and more) are critical for creating a plan that can be accepted as legitimate by the community.
- Transparency and an open, accessible process are just as important as the resulting plan in earning the community's trust; the act alone of creating a community policing plan is not enough.  The community members involved in creating the plan should provide input about how to make the process as inviting and available as possible.[261]

Similarly, the Cleveland Division of Police, as part of reform under a federal Consent Decree in the wake of controversial use of force incidents, including the shooting of 12-year-old Tamir Rice, developed a community and problem-oriented policing plan in 2019.[262]  That Plan was the culmination of a major initiative that included City-wide roundtables, meetings in various police districts, and discussions and outreach with substantial numbers of community organizations comprised of or representing Cleveland's diverse communities.[263]

As these, and similar efforts and plans in cities like Washington, D.C. and Philadelphia illustrate, a community safety plan can translate community concerns, needs, objectives, and values into actionable realities.[264]  The plan, and the process of establishing the plan, provides a level of transparency to the community that can build trust.[265]

**Recommendation 17.    To the extent that the Police Area Representatives ("PAR") Unit and Community Relations Section remain core elements of its community engagement strategy, APD should endeavor to enhance the quality and impact of the Units.**

---

[261] William Scott and David Lazar, "Community Policing Strategic Plans," *Police Chief* (Oct. 3, 2018).
[262] Cleveland Division of Police, *Community and Problem-Oriented Policing Plan* (2019), https://static1.squarespace.com/static/58a33e881b631bc60d4f8b31/t/5c6c64fc15fcc006885690b1/1550607613358/CDP+Community+and+Problem-Oriented+Policing+Plan.pdf.
[263] *See* Cleveland Police Monitoring Team, *Sixth Semiannual Report* 14–19 (March 2019), https://static1.squarespace.com/static/5651f9b5e4b08f0af890bd13/t/5c7fe982104c7baa2a3479d4/1551886726000/Sixth+Semiannual+Report--FINAL.pdf (describing development of Community and Problem-Oriented Policing Plan); "Clevelanders Discuss Ideas for Community Policing Policy," WOSU.com (Mar. 22, 2017), https://radio.wosu.org/post/clevelanders-discuss-ideas-community-policing-policy (addressing process of public input for community policing plan).
[264] Jack Ferraro, *Project Management for Non-Project Managers* 172 (2012).
[265] *See, e.g.*, Joshua Chanin and Salvador Espinosa, "Examining the Determinants of Police Department Transparency: The View of Police Executives," 27 *Criminal Justice Policy Review* 498, 499 (2015).

Fitouri 020266

This report elsewhere describes some of the limits of the existing PAR Unit. Pursuant to the prior recommendation, it may determine that PAR officers are unnecessary or counter-productive going forward. It may also be that a revised and clear set of responsibilities can be crafted that can better integrate PAR officers into the APD's broader roles and objectives for APD that a Community Safety Plan may articulate. 21CP can see APD being successful either with a renewed, reinvigorated PAR contingent or by abandoning the Unit in favor of new, alternative approaches.

However, to the extent that this Unit, as well as the Community Relations Unit, remain significant elements of APD's strategies going forward, we make some specific recommendations about how these structures might better help to support APD's broader mission and community problem-solving objectives. To this end, APD observes that "[o]ur PAR Unit includes officers who have gained certification in the Crime Prevention Through Environment Design (CPTED) program, a nationally recognized specialized training which includes community problem solving and crime reduction practices" and that "PAR and Community Relations Officers will continue to actively engage in all of these recommendations."[266]

**Recommendation 17.1.    APD should ensure alignment between current PAR officer roles, the values and mission of the PAR Unit as set forth in APD policy, and the expectations and needs of the Aurora community.**

As previously observed, it appears that PAR officers view their primary role as relieving their peers from the day-to-day problem-solving of community engagement and policing so that they may be more responsive to calls for service. They did not express or appear to believe that taking the time to develop meaningful community relationships was their first priority.

To the extent that APD intends to use the PAR Unit as an extension of community problem-solving, it must then be sure that the standards of operating procedure align with the mission of the APD, the Unit, and the community, especially as articulated in a Community Safety Plan.

**Recommendation 17.2.    APD should consider mechanisms for PAR officers to engage in alternatives to motorized patrol.**

PAR officers told 21CP that the availability of bicycles and bicycle maintenance are inconsistent within APD. Although there have been times when the bicycle fleet was well-stocked, maintenance was always a challenge. As bikes fell into ill-repair, they were not replaced and the fleet got smaller.

---

[266] Aurora Police Department, *Response to 21CP Solutions Recommendations for the Aurora Police Department* (June 17, 2021) at 9.

Fitouri 020267

Many PAR officers agreed that bicycles would be a critical tool to make their job easier and give them more direct access to the community.  They stressed that increased care and management of this resources would be deeply valuable in the daily execution of their role.

Many studies suggest that the effective implementation of alternatives to motorized patrol, including foot and bike patrols, are one common and successful step that can support an overriding "community policing" approach.[267]  These non-vehicle-based patrol strategies can serve as expanded opportunities for APD officers to say hello to those they pass, stop for one-on-one conversation, and establish clearer routines within the community through a casual observation and interaction with day-to-day life in Aurora.

Separately, foot patrols may also be an alternative to motorized patrol that could assist PAR officers in being more effective with community problem-solving.  A 2016 Police Foundation study evaluating foot patrol programs nationwide found that, among other benefits, foot patrols "facilitate relationship-building between officers and the community," "[e]nhance the enforcement and problem-solving capability of law enforcement," "can change how the community views police officers," and can "increase the legitimacy of the police in the eyes of the community."[268]  Although some argue that foot patrols are overly resource-intensive because they limit the ability of an officer to move quickly to respond to calls, the use of foot patrols by PAR officers, who should be focusing primarily on community problem-solving engagement rather than call response, could likely be accommodated in future staffing approaches.

Of course, some within the Aurora community may not desire the sense of added presence that foot patrols or bicycle patrols might create.  Consequently, the benefits and disadvantages of alternatives to motorized patrol will need to be weighed through careful community deliberation.

In response to 21CP's recommendations, APD noted the following:

> For decades, APD PAR Officers have been trained and equipped with bicycles to use for patrol, crime suppression and community policing.  While Districts 2 and 3 in the past have been equipped with bicycles for their PAR Units, due to the geographical nature of these districts and the massive growth, bike patrol has not been as present in those Districts.  District 1, being the highest in population density, and more urban

---

[267] Gary W. Cordner, "Community Policing: Elements and Effects," 5 *Police Forum* 1, 4 (1995); A. Gerasimos Gianakis, et al, "Reinventing or Repackaging Public Services? The Case of Community-Oriented Policing," 58 *Public Administration Review* 485 (1998).

[268] Brett M Cowell & Anne L. Kringen, Police Foundation, *Engaging Communities One Step at a Time: Policing's Tradition of Foot Patrol as an Innovative Community Engagement Strategy* iv (2016), https://www.policefoundation.org/wp-content/uploads/2016/09/PF_Engaging-Comminities-One-Step-at-a-Time_Final.pdf.

Fitouri 020268

and compact (vs. spread out neighborhoods), bike patrol can be easily utilized and is much more effective.

In 2019, with the formation of the Neighborhood Policing Unit (NPU), all the bike patrol functions transitioned to that new unit. This resulted in all of the District PAR bicycles being collected and managed by the NPU. In 2020, with the civil unrest in Aurora, an Emergency Response Team (ERT) bike unit was formed to be used in protests and other events. Training was provided . . . and in 2020, the only bicycles that were being used for policing were by the NPU and ERT for protests.

In April of 2021, we re-allocated some of the bicycles back to the District PAR Units and PAR Officers are again utilizing police bicycles in their duties . . . .

Additionally, several times per month, the PAR units are conducting foot patrol operations in the Business Districts.[269]

**Recommendation 17.3.   APD should provide PAR officers with annual trainings on key community problem-solving topics to ensure that all Unit officers develop in-depth skills relating to:**

> • **Best practices in community-centered and problem-solving policing approaches including but not limited to procedural justice, bias-free policing, least-intrusive response approaches, and strategic and cross-cultural communication skills.**

The APD training materials that 21CP reviewed miss a significant chance to train PAR officers on the community engagement strategy of the Department as a whole. Materials indicate that the development of the strategy is left to "all Districts, Bureaus, and Sections of the Department" and encourages members to use a Community Policing Problem-Solving workbook to individually come up with plans, which risks that some community's plan may be more comprehensive than a neighboring community.

Even as the Department's PAR Handbook contains useful information, and even as APD notes that PAR officers receive "on-going in-depth training" on the PAR Manual and problem-oriented policing,[270] all PAR officers should receive comprehensive and ongoing training on new community policing expectations. This training should address, among other things:

- Problem-oriented policing tactics;
- Conflict resolution, including verbal de-escalation of conflict;

---

[269] Aurora Police Department, *Response to 21CP Solutions Recommendations for the Aurora Police Department* (June 17, 2021) at 9.
[270] *Id.* at 10.

Fitouri 020269

- Cultural awareness training that addresses the history and culture of Aurora's diverse communities;
- Public safety and crime prevention strategies through community engagement, neighborhood partnerships, and addressing quality-of-life issues; and
- Methods of ongoing, person-to-person community engagement.

**Recommendation 17.4.   APD should provide formalized, regular mechanisms for PAR officers and the Community Relations Section to share their expertise, experience, and community relationships with the broader Department, including in the contexts of roll call and in-service trainings.**

To the extent that PAR officers have interactions and build relationships with community members that are distinct in kind, scope, and volume from other officers, they should have formalized opportunities to share their experiences and specific knowledge with the broader Department.  This includes informal, ongoing debriefings at roll calls and more formalized presentations in the context of in-service training.  Ultimately, knowledge about community problems, the creation of potential solutions, and the fostering of relationships is not as beneficial to the Department if only a small cadre of specialized officers is aware of what PAR officers are accomplishing.

APD indicated to 21CP that "PAR Officers regularly attend patrol briefings to pass on information, projects and current events" and that, "[a]t the same time, patrol can then relay current issues back to PAR Officers that they can help address."[271]  "Additionally, the Community Relations Section will be presenting at Divisional Training."[272]  Although 21CP did not hear much about this in interviews with APD personnel and stakeholders, the regular feedback between PAR Officers and patrol is a welcome and important commitment.

**Recommendation 18.   The City of Aurora should undertake a study on homelessness to gauge the current impact of various outreach mechanisms across all relevant city agencies and stakeholders and explore innovative problem-solving regarding individuals experiencing housing instability.**

In conversations with 21CP, several community stakeholders blamed the police for moving homeless encampments.  Meanwhile, a number of police officers blamed the City's leadership for requiring them to do so.  It would appear that both the police and community felt frustrated by inconsistencies in the methodologies of the City of Aurora to address this vulnerable population.

For a number of stakeholders, the discussion about homelessness overlapped substantially with the discussion about community safety and policing.   Consequently, even as

---

[271] *Id.*
[272] *Id.*

Fitouri 020270

homelessness is not and cannot be an issue exclusively addressed by APD, it clearly impacts views about community well-being. Therefore, going forward, an evaluation and strategic plan such as a Homeless Outreach Team ("HOT") comprised of Department of Health and Law Enforcement representatives might be warranted to interface with those dealing with housing instability and address encampments.

Ultimately, a dynamic, proactive problem-solving approach that attempts to address the underlying nature of the homelessness in Aurora can strengthen public safety in the long-term. For instance, in Philadelphia, a coordinated city services meeting was held once a quarter and issues, identified by police and community alike, were brought before city agencies to be addressed and remedied.[273] Dashboards were created to ensure follow-through. The process has been credited with addressing important, underlying public safety issues in the city.[274]

---

[273] Philadelphia Police Department, *The Philadelphia Police Department Moving into the 21st Century 2018–2015*, https://www.phillypolice.com/assets/directives/MovingThePhiladelphiaPoliceDepartmentIntoThe21st Century.pdf (last visited May 10, 2021).

[274] Jerry Ratcliffe, *Philadelphia Foot Patrol Experiment*, https://www.jratcliffe.net/phila-foot-patrol-experiment (last visited May 19, 2021).

Fitouri 020271

# AREA 3.  ORGANIZATION AND COMMAND STRUCTURE

## Organizational Structure

The way that an organization is structured bears significant influence on the way that it accomplishes its mission, goals, and objectives.  Generally, the work of a police organization can be structured by function, program or geographical area:

- ***Functional.***  This is the most common type.  The work is divided on the basis of the type of work being done - patrol, investigation, administration.
- ***Program.***  Work and responsibilities are divided on the basis of the type of program (e.g., type of crime, narcotics, homicide, sex crimes).
- ***Geographical.***  Work is divided on the basis of geography (e.g., District 1, West Division).[275]

Most police organizations are hybrids, incorporating all three organizational approaches into their structure.  Designing a suitable organizational structure for a police department also requires an understanding of the distinctions between line, staff and support functions:

- ***Line functions*** are those that work directly to achieve the department's objectives (e.g., Patrol, Investigations, Traffic).
- ***Staff functions*** are those that assist management in directing the organization and in accounting for the organization's activities (e.g., Budget, Planning, Legal).
- ***Support functions*** are those that provide support to the entire organization and cut across all functions (e.g., Personnel, Information Technology, Training).[276]

Furthermore, a good organizational structure within a police department reinforces the principle of *unity of command* such that an individual employee reports to and receives direction from one consistent, long-term supervisor.

APD's organizational structure is typical of many police departments.  It is, at a high level, a functional structure, with some elements of program and geographical structures included.  For the most part, APD's structure treats line, staff, and support functions in an appropriate manner.

At the same time, all organizational structures contain some idiosyncrasies that reflect important priorities or unique problems.  For example – the Community Relations Section (a support function) is a direct report to the Chief, which is somewhat unusual.  The Chief of Police moved it from the Investigations Bureau as a part of a number of organizational

---

[275] Darrel Stephens, "Organization and Management," *Local Government: Police Management* (2003).
[276] *Id.*

Fitouri 020272

changes that were effective on October 3, 2020. Given the current challenges with community trust and confidence, Chief Wilson appeared to want to be directly engaged with the work of the section and send a message of the importance of strong community relationships, both internally and externally.

In addition to moving the Community Relations Section, the October 3, 2020 organizational structure moved the Operations Support Section from the Operations Division to the Metro Division. We understand from interviews with APD command staff that this change was made to improve the staffing balance between the two divisions and because the Metro Division serves the entire city. The Department's structure was modified again on March 20, 2021 to implement a plan that moved the Public Safety Communications Center from APD to the Deputy City Manager Public Safety Group.

**Recommendation 19.    The APD should ensure that its directives reflect the recent changes in the organization structure that became effective in 2020 and 2021.**

A review of all of the directives related to the Department's organizational structure identified a number of areas that should be updated to reflect the changes made in 2021 and 2021. For instance:

- Directive 3.1 contains descriptions of the Neighborhood Policing Unit and Interpreter Coordinator, but these functions are no longer a part of the Operations Division. It also refers to a "Night Captain" role that no longer exists.
- Directive 3.3 does not reflect the name change to the Professional Accountability Division.
- Directives 1.2, 1.4 and 3.9 have not been updated since 2015.

APD notes that policy changes can lag because it maintains only a limited number of policy writers to memorialize such operational changes into policy. It says that "[t]he Professional Standards Section is revising directives at a rapid pace and will update this directive."[277]

Although 21CP understands these dynamics, and that organizational changes may need to be made quickly, they should be formally memorialized with appropriate changes to the directive system to ensure everyone is clear about the Department's structure and the various responsibilities of individuals, units, and the like.

**Recommendation 20.    The crime analysis function should have a lead or supervisory analyst to provide supervision to analysts and coordinate efforts, training and quality control.**

---

[277] Aurora Police Department, *Response to 21CP Solutions Recommendations for the Aurora Police Department* (June 17, 2021) at 10.

Fitouri 020273

APD has seven crime analysts spread across a variety of units, assignments, and locations. Specifically, APD maintains one crime analyst in each of the three patrol districts, one in Major Investigations, one in the Executive Officer, one in Investigative Support Section, and one in Traffic Section. 21CP heard from analysts that it would be beneficial to have a central place to house queries and to make crime analysis more streamlined, efficient, and effective. 21CP concluded that the Department would be well-served to have a lead or supervisory analyst charged with ensuring quality control, appropriate oversight, and coordination of efforts where appropriate. We understand from the Department that a staff member was promoted in November 2020 to the position of Lead Crime Analyst and assigned to the Chief's office.[278]

**Recommendation 21.     APD should consider hiring a fulltime video specialist for the Chief's office and another for the Training Academy to meet the coming demands of SB217 and the necessity of the Training Academy to have a more readily accessible video specialist.**

Police departments are encountering an increased need to process, analyze, and address video. For instance, the newly-passed SB217 requires that body-worn camera footage be released within 21 days after an allegation of misconduct, or within 45 days if the release could jeopardize a criminal investigation. Police departments are utilizing body worn camera footage and creating their own videos for training purposes both in an academy setting and remotely. To meet these types of public disclosure and training needs, APD should have sufficient support staff available for addressing video issues. APD agrees with the recommendation, noting that it "currently ha[s] a Visual Media Specialist (videographer/photographer) assigned to the Media Relations Detail in the Chief's Office" but that "the academy does not have a dedicated videographer."[279]

---

**Deployment & Staffing**

---

A police department's deployment strategy is a complex and extremely important component of delivering effective police services. In April 2017 the City of Aurora contracted with the Novak Consulting Group to conduct a staffing analysis of the police department and the emergency communications center.[280] The analysis report is a comprehensive document that included 43 recommendations for the police department's consideration.[281] Although the policing environment has changed between 2017 and 2021, many of that report's recommendations are still valid, and it appears that APD can still take fuller advantage of that analysis' findings and identified options for future deployment strategies.

---

[278] *Id.* at 11.

[279] *Id.*

[280] Novak Consulting Group, *City of Aurora Police Department and Communications Center Staffing Study* (Sept. 7, 2017).

[281] *Id.*

Fitouri 020274

**Recommendation 22.      APD should create, in partnership with other relevant City stakeholders and the Aurora community, a Deployment and Staffing Plan that might enhance APD's responsiveness to community needs.**

APD suggests that "the creation of the new Community Relations Section" will help to address the development of a Deployment and Staffing Plan that can maximize the Department's responsiveness to community issues and problems.[282]   As that Section contemplates work in this area, 21CP has some more specific recommendations.

**Recommendation 22.1.      APD should systematically inventory previous recommendations and consider, in collaboration with other City stakeholders and community members, potential new changes to improve the call response that can promote better, more effective, more efficient, and more equitable responses to calls not relating to violent crime.**

As this report summarizes elsewhere, many communities are engaged in identifying how responses or services other than police might be best situated to handle community problems or issues that law enforcement currently addresses.  The calls for service data summarized above point to a host of community challenges that do not relate to violent crime or the enforcement of laws that the Aurora community could determine would be better addressed through formalized responses that separate from the APD.  To this end, some prior recommendations from previous reviews highlighted the amount of time that APD officers spend addressing non-emergency issues and made recommendations for alternative response mechanisms.  For example, a 2016 Efficiency Committee report "identified several types of service calls, such as incorrigible children and medical calls, which could rely on emergency call takers to direct callers to alternative resources rather than deploying a Patrol Officer."[283]  The recommendations, "if fully implemented, the service level adjustments recommended by the Efficiency Committee would yield approximately 22,000 hours of additional patrol labor availability per year."[284]

**Recommendation 22.2.      APD should collaborate with City stakeholders and the Aurora community to identify and implement outstanding recommendations in the Redistricting Study[285] and Staffing Study.[286]**

The 2017 Staffing Study and 2018 Redistricting Study both make a number of promising recommendations that the City and APD should work to more fully implement.  Specifically,

---

[282] Aurora Police Department, *Response to 21CP Solutions Recommendations for the Aurora Police Department* (June 17, 2021) at 11.
[283] Novak Consulting Group, *City of Aurora Police Department and Communications Center Staffing Study* (Sept. 7, 2017) at 93–94.
[284] *Id.* at 95.
[285] *Id.*
[286] Corona Solutions, *Redistricting Study for Aurora, CO Police* (July 29, 2018).

Fitouri 020275

the City, APD, and the community might work together to establish a formal target for community engagement, which the 2017 Staffing Study contemplates. Additionally, given that APD's police districts are relatively large, with travel times for officers exceeding 30 minutes when call volume is high, the City, APD, and the community could review the effectiveness of District and Beat boundaries.

> **Recommendation 22.3. APD should conduct a comprehensive organizational review which examines each unit and assignment, its purpose, workload and outcome to ensure that the patrol function is adequately staffed to respond to calls for service and work with the community.**

A police department's organization and functional units should reflect the service needs of the community. Often, police executives add new programs, functions, and priorities without assessing the effectiveness of current programs or reviewing the operational structure of the entire department. 21CP recommends that, instead, APD work to ensure that its staffing allocation and organization reflect both the priorities of the community and the actual, day-to-day workload of its personnel. This is of particular import to patrol staffing.

The Novak Staffing Study, which analyzed 2017 data, indicated that APD required an additional 80 officers to meet a target of officers using one-third (33 percent) of their time to work directly with the community and address crime and disorder problems. (This assumed that APD would maintain a ten-hour shift.) Many police departments use higher benchmarks in terms of how much of an officer's time should be spent working on community problem-solving. Additional patrol staff can be made available by re-assigning officers from specialized functions to patrol or civilianizing work currently being done by officers and returning those officers to patrol, and not just by hiring more officers.

APD indicates that there are 492 patrol officers at APD, of which approximately 250 are assigned to the Patrol Team. This means that about half (50 percent) of all officers work in patrol. A standard often used is between 60 and 66 percent of all patrol officers in a department should be responding to calls for service and working with the community.[287] In other words, about two-thirds of APD members with the rank of officer should be assigned to patrol, respond to 911 calls, and engage the community. APD notes that, in addition to the patrol team, the Department's other units (such as SWAT, Traffic, PAR, and others) also

---

[287] *See* James McCabe, ICMA Center for Public Policy Analysis, "An Analysis of Police Department Staffing: How Many Officers Do You Really Need?," https://icma.org/sites/default/files/305747_Analysis%20of%20Police%20Department%20Staffing%20%20McCabe.pdf (last accessed May 12, 2021); Jeremy M. Wilson and Alexander Weiss, Office of Community Oriented Policing Services, U.S. Department of Justice, "A Performance-Based Approach to Police Staffing and Allocation," (rev. 2014), https://cops.usdoj.gov/RIC/Publications/cops-p247-pub.pdf.

Fitouri 020276

respond to calls for service, which means that more than three-quarters (76 percent) of sworn staff can field calls.[288]

The percentage of officer time dedicated to proactive policing should include the time a special unit or dedicated officers spend on community policing work. 21CP understands, based on interviews, that the PAR sections were originally designed to be the community policing unit of APD. However, during these same interviews, we heard that the majority of the PAR's time is being used to address the homeless problem in Aurora.

> **Recommendation 22.4.     APD should continue to ensure that a lieutenant is working on every patrol shift and working the same shift schedule as other patrol personnel.**

Personnel interviews with 21CP indicated that APD previously did not "always have a lieutenant on every shift because lieutenants work twelve-hour shifts while sergeants and officers work a ten-hour shift in Patrol." Currently, four Patrol Lieutenants are assigned to each District. They work a unique twelve-hour shift: two work from 5:00 a.m. to 5:00 p.m. and two work from 3:00 p.m. to 3:00 a.m., on a three-week rotation of three days on, four days off, three days on, four days off, four days on, three days off.[289] Their days off are staggered. Because of the rotation, no Lieutenants work from 3:00 a.m. to 5:00 a.m., and no Lieutenants work every third Wednesday.

During our evaluation, 21CP formed the preliminary conclusion that APD should work to ensure that a lieutenant is available and working on all patrol shifts. To do so, it appeared likely that having lieutenants work the same schedule as other patrol personnel would be beneficial. 21CP understands from APD that, as of May 2021, the Department has gone to 24/7 coverage with a lieutenant on every shift. To the extent that this change is an enduring one, the Department has addressed the concern that we previously identified, and we commend the command staff for identifying and addressing the issue.

In response to this recommendation, APD told 21CP:

> We agree with this recommendation, but it should be noted that to accomplish this, 6 additional Lieutenant positions would need to be created. It should be noted that in March of 2021 the Patrol Lieutenants schedule was altered to provide 24/7 coverage. This involves one Lieutenant being on duty in the city at all times. The Duty Lieutenant schedule rotates between the Lieutenants in all 3 Districts. Instead of working the normal night shift Lieutenant

---

[288] Aurora Police Department, *Response to 21CP Solutions Recommendations for the Aurora Police Department* (June 17, 2021) at 12.
[289] Novak Consulting Group, *City of Aurora Police Department and Communications Center Staffing Study* 35 (Sept. 7, 2017).

Fitouri 020277

schedule (3PM-3AM), each week a Duty Lieutenant now works 5PM-5AM which allows for there to be a Lieutenant on-duty at all times in one of the three Districts.  The other two Districts still have a Sergeant covering as an Acting Lieutenant from 3AM-5AM.[290]

## Command Staff

APD's promotional processes are managed by the Civil Service Commission for all ranks, with the exception of Commander, Division Chief, and Deputy Chief, who all serve at the Chief's pleasure.  The promotional process for the ranks above Captain are the responsibility of the Chief of Police.  21CP understands that, in the past, the Chief conducted individual interviews of potential candidates and made their decision based on the interview and personal knowledge of the candidate's background and suitability for promotion.

Chief Wilson has made several promotions to the upper ranks since her permanent appointment as Chief, including the Deputy Chief, who was promoted to Commander from Lieutenant and then to Deputy Chief.  Chief Wilson currently plans to use the most recent promotional processes described below to fill future vacancies in these positions:

> ***Deputy Chief (1).***  Deputy Chief shall be selected from the position of Division Chief. The positions of Division Chief and Commander shall be selected from the ranks of either Captain or Lieutenant.  The current Deputy Chief was selected by the Chief on the basis of her personal knowledge of his qualifications, past performance, and a determination that he was a good match for her vision for the direction of the Department. He also has significant time before retirement, leading the Chief to believe they could work together long enough to make substantial enhancements in the department and strengthen community relationships.

> ***Division Chief (4)***.  In the last process, Chief Wilson asked candidates to submit a resume, respond in writing to two questions so she could get a better sense of their writing skills, and participate in one-on-one interviews.  She made the selection on the basis of this information and her personal knowledge of the candidate's past performance and ability to support her vision of the department going forward.  A Division Chief can be promoted from the Captain and Commanders rank.

> ***Commander (6).***  There were eight Lieutenants and Captains that participated in the most recent process for promotion to commander.  That process involved a presentation and interview with a group of the division chiefs that was video-recorded. The video was shared with members of the Community Advisory Team, which

---

[290] Aurora Police Department, *Response to 21CP Solutions Recommendations for the Aurora Police Department* (June 17, 2021) at 12.

Fitouri 020278

provided feedback to the Chief on who they believed were best suited for the position. The Chief then made the final selection based on the input from the Division Chiefs, Community Advisory Team, and her personal knowledge of the candidates' past performance and suitability for the position.  Commanders can be promoted from the Lieutenants and Captains rank.

**Captain (4).**  The Captain's promotional process is managed by the Aurora Civil Service Commission.  A candidate for Captain must have two years in grade as an Aurora Lieutenant, currently be holding the rank of Lieutenant, and have earned a bachelor's degree from an accredited college or university.  Additionally, any candidate who has a combination of 80 hours suspension or greater in the two years preceding the first day of testing is ineligible to test.  The Civil Service Commission scheduled a Captain's assessment center for the week of February 8, 2021.

The Department only has 4 Captain positions.  There are 6 Commanders.  It is unusual to find more positions at a higher rank in a police structure.  21CP understands that, over the past number years, the former Chief had been increasing the number of Commanders and reducing the number of Captains.

**Recommendation 23.      APD should consider non-sworn and external applicants to fill command staff vacancies.**

The APD command staff is not as representative of the diversity of the Aurora's communities as it should be.  There are three women and two black command staff members.  Although the Latino population comprises 28 percent of the Aurora community, there are no Latinos on the staff.

**Table 15.  Aurora PD Command Staff By Race, Gender**

| Rank | Male | Female | White | Black |
|------|------|--------|-------|-------|
| **Chief** | | 1 | 1 | |
| **Deputy Chief** | 1 | | 1 | |
| **Division Chief\*** | 4 | | 4 | |
| **Commander** | 5 | 1 | 5 | 1 |
| **Captain** | 4 | | 4 | |
| **Manager** | | 1 | | 1 |
| **Total** | **14** | **3** | **15** | **2** |

\*One Division Chief is nonsworn
*Source: 21CP Analysis of APD Data.*

21CP understands that there are changes expected in the near future among the command staff ranks, as there are pending retirements, and the Division Chief will be leaving the Department to take a Chief's position in Abilene, Texas.

Fitouri 020279

Like most police agencies the APD has historically promoted from within its agency. Promotion to Sergeant and Lieutenant requires that candidates have served in the rank below. Table 16 shows the current demographics of the APD ranks of Sergeant and Lieutenant.

**Table 16.  Demographics, APD Sergeant and Lieutenants\***

|  | Lieutenant** | Sergeant** |
|---|---|---|
| Male | 29 (94%) | 112 (96.5%) |
| Female | 2 (6.5%) | 4 (3.4%) |
| Race/Ethnicity |  |  |
| White | 28 (90%) | 97 (84%) |
| Black | 2 (6.5%) | 6 (5%) |
| Latino | 1 (3.2%) | 12 (10%) |
| 2 or More |  | 1 |
| American Indian |  | 1 |
| Hawaiian/Pacific Islander |  | 1 |
| Total | 31 | 116 |

\* Sworn Demographics as of October 26, 2020.
\*\* Includes 4 Acting Lieutenants and 4 Acting Sergeants.
*Source: 21CP Analysis of APD Data*

APD's current practice is to fill vacancies from within the organization – Commanders are promoted from the ranks of Captain and Lieutenant.  Division Chiefs are promoted from the ranks of Captain and Commander.  The diversity in these ranks is limited as well – Captains are all White Males.  There are two female Lieutenants, two Black Lieutenants, and one Latino Lieutenant.  It is 21CP's understanding that the ranks above Captain are not govern by the CSC.

To enhance the diversity of background and experience of the command staff, APD should consider opening command staff positions to external applicants, both sworn and non-sworn. Civilians increasingly are holding leadership positions in police departments across the country.  The Los Angeles Police Department appointed a civilian manager of their Counterterrorism and Special Operation Bureau.[291]   The Chicago Police Department appointed a civilian Deputy Superintendent of its Administrative Bureau.[292]   The Philadelphia Police Department appointed a civilian Deputy Commissioner as the third

---

[291] William King and Jeremy Wilson, Office of Community Oriented Policing Services, U.S. Department of Justice, *Integrating Civilian Staff into Police Agencies* (2014).
[292] *Id.*

Fitouri 020280

highest ranking person in the department and in charge of Services, Strategic Planning and Innovation.

Hiring civilians can have many benefits. For one, "[p]olice agencies can hire civilians who are more representative of the population without the limitations imposed by the physical or background requirements for sworn officers."[293] More important still is that bringing sworn members into executive and command ranks, like civilians, can quickly diversify the upper ranks and allow a department to benefit from skills and experiences that might otherwise be lacking in the organization. As APD considers its hiring and staffing approaches in the future, the broader civilianization of appropriate functions within the Department can bring highly skilled professionals and outside perspectives to the organization in a meaningful way.

21CP understands from APD that, in early 2021, it hired a civilian Chief, who oversees Community Relations. A civilian at the Chief level separately oversees Business Services. The Department noted to 21CP that a civilian head of Internal Affairs or of its employee assistance programs may be something for consideration in the future. APD notes that "[a]t this time, there are no vacancies in Command, however, this could be considered going forward depending on qualifications of interested external candidates."[294]

**Recommendation 24.    APD should develop, and codify in policy, a more formal process for selecting Commanders and Division Chiefs. The process should consider including external interview panels (police executives and community members).**

Involving community representatives in the promotional process for Commanders and Division Chiefs can help establish legitimacy and transparency. For example, a structured interview panel consisting of community stakeholders can provide insights, feedback, and recommendations to the Chief which can inform final decisions. The selection of Commanders and Division Chiefs is critical in ensuring progress is made in reform efforts.

Just as it is essential to involve community representatives in the recruitment of officers, so it is in the selection of APD leaders. "After all, these are the people who are the primary recipients of police services, and they have a vested interest and a unique perspective on what constitutes effective policing."[295] By asking for the community's input on the selection of command personnel, APD will get a better idea of what leadership capacity it needs to build.

---

[293] *Id.* at 8 (2014).

[294] Aurora Police Department, *Response to 21CP Solutions Recommendations for the Aurora Police Department* (June 17, 2021) at 12.

[295] Kevin Morison, Office of Community Oriented Policing Services, U.S. Department of Justice, *Hiring for the 21st Century Law Enforcement Officer: Challenges, Opportunities, and Strategies for Success* (2017).

Fitouri 020281

The Chief of Police has been utilizing the Community Police Advisory Team (CPAT) in the processes to select the last two Commanders. Because of Covid-19 restrictions, the Department recorded interviews and provided videos to CPAT members. The CPAT has provided the Chief with formal feedback, and the Chief has indicated that CPAT has received nearly as much input as command staff in the hiring decisions. To that end, for these prior selection processes, CPAT and representatives of the Department selected the same top candidates, which APD believes lends even greater confidence to the promotional decisions.

**Recommendation 25.       The APD should implement a leadership and professional development program for command staff.**

APD does not currently have a training or leadership development program specifically aimed at command staff or Lieutenants. The traditional approach in developing police leaders is to move people through a variety of assignments and promote up the ranks. "Instead of treating leadership as the property of the leader, with individual enhancements resulting in hoped for benefits to the organization, developing leadership must focus on creating social capital within an organization."[296]  This requires investing in developing leaders throughout a police department, which must be operationalized by offering opportunities to learn and developing essential leadership skills and knowledge:

> Highly regarded programs and schools that provide leader development opportunities for mid- and senior-level managers include the University of Louisville's Southern Police Institute, Northwestern University's Center for Public Safety, and Johns Hopkins University's Division of Public Safety Leadership. In addition, the FBI National Academy, the Police Executive Research Forum, and individual organizations utilizing the International Association of Chiefs of Police's Leadership in Police Organizations (LPO) course offer opportunities specifically for police leadership development.[297]

APD should also explore partnerships with academic stakeholders and the Aurora business community aimed at developing and implementing structured, ongoing professional and leadership development programs.

The Department has noted to 21CP that it does send a number of people to external course opportunities and maintains an annual budget to do so. It indicated that it usually offers the opportunities to people who are testing or who say that they are interested in moving up in the ranks. The Department has sent personnel to the FBI Academy, the FBI Trilogy course, local university leadership courses, and to the Leadership Aurora program, among others. 21CP recommends that the Department go further and codify these, and other, opportunities

---

[296] Edward Flynn and Victoria Herrington, Harvard Kennedy School and National Institute of Justice, "Toward a Profession of Police Leadership," *New Perspectives in Policing* at 4 (June 2015).
[297] *Id.* at 6.

Fitouri 020282

into a formalized program that personnel can consult and understand as they look for pathways to professional growth. APD "[a]grees [that] a more formal program would be beneficial and would supplement many programs we currently utilize."[298]

**Recommendation 26. APD command staff should develop and implement a plan to increase their level of visibility throughout the department. This should include an internal communications plan aimed at ensuring that department employees are kept informed on important issues**.

In both focus groups and individual interviews, Department members expressed concern about the visibility of command staff members. Particular concern was expressed by some that Command-level personnel are not present after critical incidents.

Additionally, significant concern was expressed about the communication from the Chief and command staff about prominent issues relating to law, policy, and performance expectations. One example that APD personnel cited related to Colorado Senate Bill 217. Although the Department arranged for a briefing on the bill by legal staff, the video-presentation format provided no opportunity for personnel to ask operational and policy questions.

APD should develop a plan for ensuring open, ongoing communication with personnel about important issues, job expectations, and community dynamics. Such a plan can help to ensure that internal communications are not considered "extra" or something to be provided "as needed" but instead become an integral part of the Department's day-to-day operations. APD told 21CP that it "agree[s] [that] a more formal process should be instituted to enhance visibility and communication to our internal audiences."[299]

---

[298] Aurora Police Department, *Response to 21CP Solutions Recommendations for the Aurora Police Department* (June 17, 2021) at 13.
[299] *Id.*

Fitouri 020283

# AREA 4.  SELECTION, SUPERVISION, AND SUPPORT OF PERSONNEL

For as much as sound policies, detailed procedures, and effective training on performance expectations are essential, it is ultimately a Department's individuals – the organization's people – that determine how successfully a police department delivers service consistent with the needs and values of their community.

General best practices in human resource management emphasize six principles: (1) building and implementing a human resources strategy; (2) hiring the right people; (3) keeping them; (4) investing in them; (5) empowering them; and (6) promoting diversity.[300]  These general principles are applicable to police departments.

The selection, supervision, and support of employees are the bases for ensuring staff are sufficiently skilled, accountable, and resilient.  Selecting the right people and empowering them with knowledge, skills, and resources can prevent or counteract the emergences of damaging subcultures or informal ways of "doing business" that are inconsistent with a department's vision and goals.[301]

For these reasons, the following sections consider APD's recruitment, hiring, and selection of officers; its Field Training Officer program for providing in-depth, on-the-job training for new officers after new recruit training is complete; the Department's training function generally; and APD's early intervention and peer support initiatives.

## Recruitment, Hiring and Selection

Any assessment of a police force's effectiveness must include a discussion of who the police are and how they are recruited and selected.  This includes a consideration of the experiences, characteristics, and backgrounds of sworn personnel.

Although demographic diversity is unlikely to address, by itself, the concerns of fair and impartial policing, a police organization comprised of people that reflects the demographics of the population it serves can increase trust between the department and the communities that it serves.  As President Obama's Task Force on 21st Century Policing observed:

> Achieving diversity in entry level recruiting is important but achieving systematic and comprehensive diversification throughout each segment of the

---

[300] *See, e.g.*, P.G. Aquinas, *Human Resource Management: Principles and Practice* (2009); Michael Armstrong, *A Handbook of Human Resource Management Practice* (2006).
[301] *See* Steve McCartney and Rick Parent, *Ethics in Law Enforcement* 119–126 (2015), http://opentextbc.ca/ethicsinlawenforcement/; Barbara Armacost, "The Organizational Reasons Police Departments Don't Change," *Harvard Business Review* (Aug. 19, 2016), https://hbr.org/2016/08/the-organizational-reasons-police-departments-dont-change.

Fitouri 020284

department is the ultimate goal.  It is also important to recognize that diversity means not only race and gender but also the genuine diversity of identity, experience, and background that has been found to help improve the culture of police departments and build greater trust and legitimacy with all segments of the population. [302]

A diverse police organization can help, among other things, to:

- Foster trust, which can ease tensions between the department and the community;
- Instill a greater willingness in victims to report incidents and cooperate with the police in investigations; and
- Establish a police culture open to differences, receptive to change, and accustomed to managing different viewpoints and perspectives.

This section describes APD's current practices with respect to recruitment, hiring, and retention.  It offers recommendations aimed at reflecting within the APD the demographics, experiences, and values of the communities it serves.

At the outset, it must be observed that in the wake of the killing of George Floyd in May 2020 and national discussions on issues relating to policing and race, cities across the country report that they are encountering challenges in attracting high-quality new officers with the desired diversity of experience and backgrounds.  Among those who might be interested in advancing public service or exploring a career aimed at enhancing community well-being, careers in law enforcement may not as readily align as other forms of service or careers. Recruiting qualified applicants, hiring diverse candidates, and retaining high-performing officers is, in many ways, an ever-evolving challenge for police departments nationally.  As the discussion and recommendations below outline, the Department's opportunities for navigating this climate likely resides with coordinated, city-wide efforts to cultivate relationships and in collaborating with community stakeholders on the recruitment and hiring process.

Currently, APD's sworn staff does not wholly reflect the diversity of the Aurora community. An overwhelming number of APD personnel are white males.  Indeed, they are represented at a rate substantially beyond their representation in the Aurora community at-large. Specifically, as Table 16 summarizes, whites are overrepresented within the Department by a margin of some 45 percent as compared to the Aurora population.  Black, Asian, and Hispanic or Latino[303] officers are underrepresented compared to the population.  Focusing solely on those officers assigned to patrol, only 2 percent of officers are Black, and nine percent Hispanic or Latino.  Nearly four out of five (79 percent) are white.  Meanwhile, among

---

[302] *Final Report of the President's Task Force on 21st Century Policing* at 17 (2015).

[303] Because APD's internal data uses the classification "Hispanic or Latino," this report adopts the classification to ensure consistency with APD's data.

Fitouri 020285

APD's command staff, 15 leaders are white, 2 are Black, and officers of other racial or ethnic groups are not represented.

Meanwhile, female officers account for twelve percent of the sworn members.  Only two members of APD's 17-member command staff are women, and only 3 out of 50 officers (6 percent) at the rank of lieutenant or above are women.

**Table 17.  Demographics of APD, APD Command Staff, and City of Aurora, 2020**

| Demographic Characteristics | Aurora, CO[304] | | Aurora Police Department | | APD Command Staff Only[305] | |
|---|---|---|---|---|---|---|
| **Race and Hispanic Origin** | **Number** | **Percent** | **Number** | **Percent** | **Number** | **Percent** |
| White, not Hispanic or Latino | 170,680 | 45.0% | 610 | 79% | 14 | 87.5% |
| Black or African American Alone | 60,686 | 16.0% | 31 | 4% | 2 | 12.5% |
| American Indian and Alaska Native Alone | 3,414 | .9% | 4 | 0.1% | 0 | 0% |
| Asian | 23,895 | 6.3% | 15 | 1.9% | 0 | 0% |
| Native Hawaiian and Other Pacific Islander | 1,138 | .3% | 1 | 0.5% | | 0% |
| Hispanic or Latino | 107,718 | 28.4% | 80 | 10.4% | 0 | 0% |
| Two races or more | 20,482 | 5.4% | 31 | 4% | 0 | 0% |
| **Gender** | | | | | | |
| Male | 186,989 | 49.3% | 675 | 87.4% | 15 | 93.8% |
| Female | 192,300 | 50.7% | 97 | 12.6% | 1 | 6.3% |

*Source: 21CP Analysis of APD Data; United States Census Bureau.*

Recruitment is the first step in the selection and hiring process.  Recruitment efforts help to identify and encourage potential, qualified candidates to apply to be an APD officer.  To be an eligible recruit, the candidate must meet certain minimum requirements: they must be 21 years of age or older; a U.S. citizen or a lawful, permanent resident; and have a high school diploma or GED.[306]

---

[304] United States Census Bureau, Quick Facts for Aurora, CO (July 1, 2019), https://www.census.gov/quickfacts/fact/table/auroracitycolorado/PST045219.

[305] Aurora Police Department, APD Sworn Demographics (Oct. 26, 2020).

[306] There are other minimum requirements including no felony convictions, a valid driver's license, and no marijuana usage within one year of the date of application. City of Aurora, Residents, Public Safety, Police, Join the APD, *Entry Level Applicants*, https://www.auroragov.org/cms/One.aspx?portalId=16242704&pageId=16900652 (last visited July 16, 2021).

Fitouri 020286

An analysis of APD recruitment data for 2018, 2019, and 2020 found that, of 5,964 applicants, approximately 10 percent were Black and 22 percent were Hispanic. About 19 percent were female.

Available population data suggests a healthy diversity in the greater Aurora community among individuals between the ages of approximately 21 and 54, who are the most likely to apply to be a police officer.[307] The opportunity and possibility to recruit racially diverse candidates who are already a part of the Aurora community is present.

It is a common practice in jurisdictions across the United States for hiring and promotional processes to be split, or shared, between a police department and a city agency. The city agency may be a Civil Service Commission or City Human Resource Department, or a combination of both. It is 21CP's experience which was also illustrated by the presentation to the Aurora's Public Safety, Courts and Civil Service Committee that a city's Human Resource Department, and appropriate operational departments like Police and Fire have a more active and supportive role in the hiring of personnel. This is true even when a Civil Service Commission has the final authority.[308]

The Aurora Civil Service Commission ("CSC") as established by the City Charter in 1967 and is responsible for administrating a Civil Service system for uniformed members of the Fire and Police Department. The Rules and Regulations of CSC states the Commission is responsible for:

1. Establishing qualifications and service requirements, examination and certification of all applicants for original (cadet and entry- level) and lateral-entry appointment to the Civil Service system; and
2. Promotional appointment within the Civil Service system; and
3. Conducting Civil Service disciplinary review hearings.[309]

The CSC has sole authority over these various processes.

There are multiple steps in the CSC hiring process for APD – and many ways a candidate can fall out of the process, either by choice or by failing to pass a particular step.

In discussions with stakeholders, 21CP heard that CSC must be acknowledged for being responsive to APD requests and recommendations like year-round hiring, a streamlined out-

---

[307] Statistical Atlas, Race and Ethnicity in Aurora, Colorado, https://statisticalatlas.com/place/Colorado/Aurora/Race-and-Ethnicity (last visited May 5, 2021).
[308] Presentation by Aurora Department of Human Resources to the City Council, "Civil Service Comparisons," August 17, 2020.
[309] City of Aurora, *Rules and Regulations of the Civil Service Commission,* https://www.auroragov.org/UserFiles/Servers/Server_1881137/File/City%20Hall/Boards%20&%20Commissions/Civil%20Service%20Commission/CSCRulesRegsFinal.pdf (last visited May 5, 2021).

Fitouri 020287

of-state applicant process, and the elimination of the citizenship requirement.[310]  (As noted previously, the U.S. Citizenship requirement was amended to accept applications from legal permanent residents.[311])

APD has the authority to administer the process for making lateral hires – or individuals who already are sworn police officers and typically are coming from other police agencies. Within this process, the CSC is responsible for accepting and screening applications for minimum eligibility requirements.  When a candidate meets these minimum requirements, APD's Background Detail and Professional Standards Section Lieutenant then has the responsibility for managing the selection process. Background investigations are conducted by APD's Background Detail.  Historically, APD's Lateral Academy has been 12 to 14 weeks in length.  In recent years, the training has been reduced to approximately 8 to 10 weeks based on the number of lateral recruits in the class.

We note here that APD has been experiencing – as many other police departments have been – an elevated rate of sworn personnel leaving the department.  In 2020, "[p]olice civil service turnover" was "the highest since 2015 at 19.9%, with a total of 87 law enforcement officers."[312] At least 63 of these individuals either retired or voluntarily resigned – with the rate of retirements in 2020 nearly double that of 2019.[313]

**Recommendation 27.     APD and the City of Aurora must commit to expanding the diversity of APD so that it reflects the backgrounds and lived experiences of Aurora's various communities.**

The Aurora Police Department's guiding policy for recruitment is Directive 8.8, Police Department Involvement in Recruitment, Selection and Promotion.[314] That policy indicates that the Chief of Police has the authority and responsibility for the recruitment activities of the Police Department. The Chief may designate the responsibility – and does so, tasking the responsibility to the Department's Recruitment Unit, which is responsible for recruiting candidates for entry-level and lateral police officers.  Nevertheless, this directive makes clear that all members of APD should be aware of positive recruitment techniques and help the Department in seeking qualified individuals for employment.

Standard Operating Procedures (SOP) RU 1.1, Recruiting Unit Administration, details some of the more specific roles and responsibilities of the Recruiting Unit.  The Unit's mission statement commits it to proactively locating, contacting, and recruiting the most qualified

---

[310] Aurora Police Department, *2019 Recruitment Analysis and 2020 Recruitment Plan* (Dec. 19, 2019).
[311] *Id.*
[312] City of Aurora, PSC Report, "Civil Service Police & Fire Turnover and Reasons," *in* City of Aurora, City Council, Public Safety, Courts and Civil Service Police Committee, Agenda (Feb. 25, 2021) at 88.
[313] *Id.* at 89.
[314] APD Directive 8.8 at 1.

Fitouri 020288

men and women that will, among other things, "mirror the diversity within the City of Aurora."[315]  Practically, the responsibility for doing so falls to the APD officers and employees assigned to the Unit.  The officers must "promote minority recruitment by utilizing EEOC goals of the department to better reflect the ethnic makeup of the community."[316]  They are to "work with diverse groups within the City, such as the Human Relations Commission, on recruitment issues."[317]  Ultimately, the objective of the Recruiting Unit is to "recruit the highest quality individuals to the organization with an emphasis on increasing the diversity of our workforce, as well as recruiting within our community."[318]

In discussions with APD personnel, it appears that relationship-based recruiting – including prior interactions between current police officers and potential candidates in the community, and positive word of mouth – were identified as some of the most effective recruiting methods.[319]

Separately, APD's use of a referral incentive program existing personnel receive monetary incentive for successfully recruiting or referring a hired candidate to the Department – was cited as an effective tool that aligns with the recognition reflected in APD's current policy that recruitment is, and should be, a part of the Department's everyday interactions with the public.

The responsibility for enhancing the diversity of APD officers cannot be relegated solely to APD and the Civil Service Commission.  Although the CSC makes the final decisions on what specific candidates to hire, responsibility for attracting members to a dynamic, diverse police department must be shared across the City and City stakeholders.

To this end, APD should consider adopting a Community Collaboration model for recruitment.[320]  Within this model, utilizing community-based organizations to help recruit and having community members participate in interview panels can help to ensure that more qualified, diverse candidates progress further through the process while helping to distribute ownership of hiring outcomes and the composition of the police department more broadly. Such work should be coordinated by a city official or entity with sufficient authority to bring together representatives from across city government and the Aurora community – helping to ensure that tangible progress is being made.

---

[315] APD, Standard Operating Procedures (SOP) RU 1.1, *Recruiting Unit Administration* (last rev. May 12, 2011) at 1.

[316] *Id.* at 3.

[317] *Id.* at 4.

[318] Aurora Police Department, *2019 Recruitment Analysis and 2020 Recruitment Plan* (Dec. 19, 2019) at 1.

[319] ICMA and VERA Institute of Justice, *The Model Police Officer: Recruitment, Training, and Community Engagement* (2018).

[320] Walter A. Tangle and Andrew Morabito, "Minority Recruitment: A Working Model," *Police Chief*, https://www.policechiefmagazine.org/minority-recruitment-a-working-model/?ref=18db8ea35917d5e4e56108d950ed98b4 (last accessed May 5, 2021).

Fitouri 020289

APD indicates that its "recruitment unit actively works to market APD to diverse candidates both locally and nationally.  Additionally, the lateral process provides APD more latitude to intentionally select" candidates with diverse backgrounds and experiences.[321]  "Because [o]f this they can aspire to recruit as many minority candidates as possible."[322]  In contrast, "[t]he basic, or entry-level officer, hiring authority is controlled by the Civil Service Commission (CSC)."[323]

> **Recommendation 27.1.    Targeted recruiting materials and efforts should be funded, developed, and used to attract a diverse range of candidates. The effectiveness of these marketing efforts should be routinely assessed.**

Inspiring greater diversity among APD applicants will likely require a coordinated and strategic effort to forge relationships and have conversations with communities that the Department may not have regularly interacted.  For example, APD might elect to visit local high schools and community colleges with diverse populations, forge relationships in Black and Latino churches, and conduct outreach to LGBTQ+ organizations could expand minority applicants.  The Department might focus its advertising and social media outreach to outlets with strong engagement from historically underrepresented and marginalized communities.  Visiting historically Black Universities, forging relationships in Latino churches; and conducting outreach to LGBTQ+ organizations could attract minority applicants.  Rather than defining success by the number of events attended or amount of contact details collected, as the Department conducts new types of outreach, it should analyze how the applicants that were successfully hired became involved with APD – subsequently, recruitment efforts leading to successful efforts can be replicated and grown.  APD notes that its "Community Relations section can assist with" these efforts.[324]

**Recommendation 28.        The City and APD should invest more of its resources on recruitment efforts.**

APD's Recruitment Unit currently is comprised of one Sergeant, two full-time Recruiters, and three Auxiliary Recruiters.  According to the Recruitment Unit,[325] APD attended approximately 80 events in 2019.  The Unit ran 46 "So You Want to Be a Cop" seminars – which prospective applicants are required to attended.  Additionally, they provided support and coaching with state applicant testing and physical fitness tests.

---

[321] Aurora Police Department, *Response to 21CP Solutions Recommendations for the Aurora Police Department* (June 17, 2021) at 13.
[322] *Id.*
[323] *Id.*
[324] *Id.*
[325] Aurora Police Department, *2019 Recruitment Analysis and 2020 Recruitment Plan* (Dec. 19, 2019).

Fitouri 020290

Even as these efforts are commendable, APD personnel indicated to 21CP that they see room for improvement and innovation. As one APD stakeholder said, "the Recruitment Unit tries, but they are only two people" – referring to the full-time Recruiters who, by the accounts of multiple personnel, carry the bulk of the day-to-day responsibility and work for recruitment. This level of full-time commitment seems to be one of the primary reasons why, as the Department's 2019 Recruitment Analysis and 2020 Plan noted, a number of "projects have [unfortunately] taken the backseat in recent years, [such as] recruiting women and Muslim outreach[]." [326]

> **Recommendation 28.1.    The City should evaluate whether APD's recruitment initiatives are appropriately resourced to meet community needs and the Department's overall role and mission.**

The City Council has previously allocated funds in support of APD's recruitment efforts. 21CP understands that these funds were used for media campaigns and to support recruiting trips outside of Aurora. We recommend that APD and the City conduct a comprehensive assessment of the Department's recruitment needs in light of community conceptions of APD's role in public safety going forward and develop a multi-year recruitment plan that addresses those needs, including estimated costs. APD noted to 21CP that the Department "agree[s] that the recruiting unit could benefit from a multi-year recruiting plan and examination of estimated costs."[327]

> **Recommendation 28.2.    APD's recruiting unit should consider increasing its focus on online recruiting opportunities**.

A representative survey conducted by the International City/County Management Association ("ICMA") found four out of five (79 percent of) Human Resource professionals identify social media as top police recruiting strategy.[328] This is consistent with APD's experience. In fact, nearly three-quarters (71 percent of) Recruit Class 2020-1B said that there were drawn to APD through some form of electronic media; department website, online industry, job search, social media, governmentjobs.com and others. Given the significance of online-based recruiting activities, APD's recruiting unit should consider investing more of its time and focus on web- and social-media-based recruiting activities. APD told 21CP that it agrees with this recommendation.[329]

---

[326] *Id.* at 6.
[327] Aurora Police Department, *Response to 21CP Solutions Recommendations for the Aurora Police Department* (June 17, 2021) at 14.
[328] ICMA and VERA Institute of Justice, *The Model Police Officer: Recruitment, Training, and Community Engagement* 11 (2018).
[329] Aurora Police Department, *Response to 21CP Solutions Recommendations for the Aurora Police Department* (June 17, 2021) at 14.

Fitouri 020291

**Recommendation 29.     The Civil Service Commission ("CSC") should conduct a review of current hiring criteria to determine their impact in terms of attracting and hiring candidates of varying races, ethnicities, genders, sexual orientations, socio-economic backgrounds, experiences, and characteristics.  The Commission should identify what changes might be made to enhance APD's diversity.**

21CP strongly encourages the Civil Service Commission to partner with the Aurora Department of Human Resources, City Attorney, and Police Department to do this review. The Baltimore Police Department recently revamped their hiring process and established a RecruitStat which is a weekly review of progress on recruiting, hiring, and retention.[330] Aurora may benefit talking with Baltimore about their efforts.

Aurora's Civil Service Commission provided data on APD's selection and hiring process for the years 2018 through 2020.  Among other things, analysis of the data allows for a more specific understanding of where particular types of candidates are falling out of the process.[331]

For the three-year period from 2018 through 2020, the CSC received 5,964 applications.  Of these applicants, 183 (3 percent) were hired overall.  At the same time, fewer than 1 percent of Black applicants, and slightly more than 2 percent (2.4 percent) of applicants identified as Hispanic, made it through the selection process and were ultimately hired.

**Table 18.  APD Recruitment, Selection, Hiring, 2018–2020**

| | Total | Male | Female | N/R* | White | Black | Hispanic | Asian | 2+/Other |
|---|---|---|---|---|---|---|---|---|---|
| **Applications** | 5,964 | 4,762 | 1,151 | 87 | 3,267 | 591 | 1,317 | 165 | 624 |
| **Written Exam \*\*** | 4,949 83% | 3,958 83% | 927 81% | 64 74% | 2,809 86% | 454 77% | 1,057 80% | 139 84% | 510 82% |
| **Submit personal history\*\*\*** | 1,621 27% | 1,329 28% | 277 24% | 15 17% | 975 28% | 122 21% | 297 23% | 48 29% | 179 29% |
| **Job Suitability, Polygraph, Background** | 665 11% | 546 11% | 116 10% | 3 3% | 413 13% | 42 7% | 112 9% | 18 11% | 80 13% |
| **CSC Review, Medical Exam** | 183 3% | 142 3% | 40 3.5% | 1 1% | 109 3% | 5 .08% | 32 2.4% | 5 3% | 22 3.5% |

* Gender not recorded.

---

[330] Baltimore Consent Decree Monitoring Team, *First Comprehensive Re-Assessment* (Sept. 30, 2020).
[331] Aurora Civil Service Commission, *2020 Overview and Recent Entry Level Hiring*, Presentation to the Public Safety, Courts and Civil Service Policy Committee (Sept. 17, 2020).

Fitouri 020292

\*\*Percentage represents the proportion remaining from those submitting applications.
\*\*\*Indicates applicant passed the Ergometrics Exam.
*Source: 21CP Analysis of CSC Data.*

Once the hiring process is underway, more white applicants successfully proceed through each stage of the selection and hiring process. For instance, close to 35 percent of white applicants proceeded past the written test to submit their personal histories, while approximately 27 percent of Black applicants proceeded to the same stage. About 42 percent of white applicants proceeded through the personal history stage to the job suitability, polygraph, and background stage. About 34 percent of Black applicants proceeded through this stage. While about 26 percent of white applicants proceeded through the job suitability, polygraph, and background stage, approximately 12 percent of Black applicants proceeded through this stage.

21CP recommends that CSC conduct a more in-depth analysis to understand more fully where particular types of candidates may be falling out of the hiring process – and determine whether the hiring process should be modified or amended to ensure more broadly diverse and maximally well-qualified pools of new APD hires. The work under the following, specific recommendations should be conducted in collaboration with the APD, vendors used in the process, and City personnel. As one stakeholder said, "All the entities involved in the hiring process need to sit down and discuss the process and desired outcomes to identify and correct disconnects."

> **Recommendation 29.1.    The CSC may want to move the physical fitness test further into the hiring process to allow candidates to get into shape and work toward the fitness standards.   Additionally, APD should open up academy facilities to interested applicants in regular weekly intervals to begin preparing for the physical fitness test.**

21CP understands that, in Aurora, the physical fitness test is the second step in the hiring process, occurring immediately after the acceptance of the application. This differs from what appears to be the current practices in nearby, peer organizations. For instance, Colorado Springs gives the physical abilities test after a conditional offer has been made. In Denver, the physical test occurs after the applicant passes tests, submits the background packet, passes the polygraph, and has interviewed with a psychologist. 21CP understands that "[t]he Civil Service Commission (CSC) conducts the fitness test early as a cost-saving measure."[332]

A number of cities have found that moving the physical fitness requirement further back in the process, as well as working directly with applicants to help them meet those standards, improved the pass rate. One promising approach is used in Madison, Wisconsin. There, early

---

[332] Aurora Police Department, *Response to 21CP Solutions Recommendations for the Aurora Police Department* (June 17, 2021) at 14.

Fitouri 020293

in the recruiting process, the police department conducts a basic physical screening for each candidate.  Then as potential hires progress through the process, the department's training team provides them with hands-on guidance on how to prepare for the state-mandated, entry-level physical ability test based off that exam.[333]

APD told 21CP that it "could consult with Risk Management to discuss the possibility of opening the police facilities to unvetted, not yet employed people."[334]  21CP agrees that this is worth exploration.

> **Recommendation 29.2.    The CSC should closely review how the suitability interview, polygraph, and full background impacts the consideration of a candidate's overall depth of life experience.**

For many law enforcement agencies, certain findings in a background investigation became automatic disqualifiers.  These have often included financial problems and past drug use.  However, in recent years:

> [A]s the candidate pool has changed, and as social mores and even some drug laws have evolved over time, agencies have reconsidered some of their traditional thinking about candidates' histories and prior activities.  At the same time, agencies have also been forced to re-evaluate some of the tools, such as polygraph exams, voice stress analyzers, and psychological screenings, that they have relied on in the past. [335]

As described above, it appears that the phase of the suitability interview, polygraph, and full background is where Black applicants are dropped from consideration more than white and Hispanic/Latino candidates.  CSC should further explore what specific factors are causing this rejection rate and assess what changes might be made.

21CP understands that CSC decided to suspend the use of the polygraph examination for the next recruiting cycle.  There should be an evaluation of the impact of this suspension on candidate acceptance and the quality of candidate to understand if this and other changes should become permanent.

> **Recommendation 29.3.    The CSC should explore using preference points to attract candidates who are city residents.**

---

[333] Kevin P. Morrison, *Hiring for the 21st Century Law Enforcement Officer: Challenges, Opportunities, and Strategies for Success* (2017).

[334] Aurora Police Department, *Response to 21CP Solutions Recommendations for the Aurora Police Department* (June 17, 2021) at 14.

[335] *Id.* at 13.

Fitouri 020294

Currently, preference points are added to the final passing score of an entry-level applicant who successfully completes the initial testing and prior to being given a position on a Prospective Employment List which is used to fill APD officer vacancies. Preference points are given for military experience, speaking a second language, and having served in a police or fire explorer program. Applicants who are currently police officers elsewhere also get preference points for being POST certified.

The CSC should explore using preference points in additional ways to attract the type of diverse, qualified candidates who have existing ties to and understanding of Aurora. Specifically, CSC should consider awarding points for candidates who live within Aurora. It might also consider providing points to candidates with higher levels of education or other types of prior professional expertise.

**Recommendation 30.    APD should consider leveraging its lateral hiring program and civilianization efforts to enrich the diversity in the department.**

Lateral hires – or hires of existing police officers from other jurisdictions – were somewhat more diverse in terms of race and ethnicity than new recruit hires. Specifically, Black lateral hires accounted for 8 percent of total lateral hires, and lateral hires classified as Hispanic accounted for 6 percent of total lateral hires. Nevertheless, over 86 percent of the lateral applicants are white males.

21CP understands that, by City Charter, up to half of an academy class can be made up of lateral recruits. APD should explore how the lateral program in particular might be used to cultivate academy classes of qualified, diverse hires, which the Department suggests it is already focused on doing.[336] Over the past eighteen months it has become increasingly difficult to attract not only new hires but also lateral hires. Denver, Colorado Springs and other Colorado police departments are competing with Aurora for good officers who are certified in the state and looking to move. There is an additional challenge in attracting out-of-state officers because of the lack clarity of recent legislation. 21CP recognizes these challenges, but, nonetheless, we believe the lateral program is a good way to increase diversity in the ranks of APD.

Hiring officers from other departments involves potential issues and risks that hiring new individuals into the policing profession does not. In particular, lateral hiring involves the possibility of hiring officers with performance, misconduct, or behavioral issues at their prior department. 21CP was told that APD investigators make personal visits to the lateral applicant's former agency. During a site visit, investigators should review the applicant's personnel files and other documents and interview personnel who are knowledgeable about the lateral's background. To the extent that this additional backgrounding of lateral hires is

---

[336] Aurora Police Department, *Response to 21CP Solutions Recommendations for the Aurora Police Department* (June 17, 2021) at 15.

Fitouri 020295

thorough and fair, attracting existing officers to come to Aurora is a promising mechanism to
expand and enhance APD's overall diversity.

**Recommendation 31.      APD should ensure that all members work together
toward increasing the diversity of the department.**

APD's use of a referral incentive program, as noted above, is good practice that can form the
foundation for a Department-wide orientation toward attracting dedicated, high-quality, and
diverse members.   A department whose philosophy is one of interaction, relationship-
building, and partnerships with the public can tap into internal recruitment strategies.
Recruitment can become part of the department's everyday interactions with the public, with
every APD member becoming a recruiting ambassador.   APD should consider adopting
formalized mechanisms for further enhancing such internally-driven recruitment among
APD personnel across all ranks and assignments.   To this end, APD says that its "new
Community Relations Section will be able to help formalize some specific strategies."[337]

## Training

Police training in the twentieth century tended to take the form of static, classroom-based
instruction focused on technical skills and legal principles.[338]   Training was siloed,
redundant, and often limited to that which was necessary to meet state requirements or
retain qualification.   If new topics were introduced, they were often driven by headlines,
lawsuits, or new technologies[339] rather than strategic determinations about professional
development.   Training was typically provided by in-house instructors, often simply
supervisors called in to preside over classroom-based instruction, recycling existing
knowledge and beliefs without introducing new ideas and concepts.

Especially over the past few decades, standards and best practices in police training have
transformed significantly.   Modern police training is built on a foundation of adult learning
theory, which, among other things, recognizes that training is most effective when adults are
motivated to learn, are treated as equal partners in the learning process, and can connect the
instruction to their experiences.[340]

As part of this shift, there has been an ever-growing focus in policing on using "realistic,
scenario-based training," rather than static classroom instruction, "to better manage

---

[337] *Id.*
[338] *See, e.g.*, David Bradford and Joan E. Pynes, "Police Academy Training: Why Hasn't It Kept Up
With Practice?," 2 *Police Quarterly* 283 (1999) (describing historical deficiencies in police training).
[339] *See generally* Michael Buerger, "Educating and Training the Future Police Officer," 73 *FBI Law
Enforcement Bulletin* 26 (2004) (summarizing static nature of law enforcement training).
[340] Mark R. McCoy, "Teaching Style and the Application of Adult Learning Principles by Police
Instructors," 29 *Policing* 77 (2006); Michael L. Birzer, "The Theory of Andragogy Applied to Police
Training," 26 *Policing* 29 (2003).

Fitouri 020296

interactions and minimize force."[341] For instance, rather than having officers passively consume a never-ending progression of slides or written material about policy provisions or recent legal cases regarding the use of force, "[o]fficers should practice, in interactive environments" topics like "de-escalation techniques and threat assessment strategies that account for implicit bias in decision-making."[342] In the same way that pilots must continually practice their skills in flight simulators, rather than studying aerodynamics or passively studying checklists of things to do in the event that mechanical issues arise, police officers need to be provided with training programs that allow them to develop skills, practice techniques, and navigate realistic situations so that they can apply lessons learned to their everyday work in the field.

Many of 21CP's recommendations apply to both academy training, for new hires, and in-service training, for existing APD officers. However, they have particular applicability to in-service training – the type of ongoing professional development that officers should receive throughout their policing careers.

**Recommendation 32. APD should overhaul its general approach to training and professional development to focus on integrated, scenario-based training that uses adult learning techniques and focuses on providing opportunities for officers to practice and cultivate real-world skills.**

A number of APD officers and supervisors expressed a specific desire for more, and improved, training. One noted simply that "we need more decision-making training, scenario training, and critical event training." Even as many officers recognize the need for more de-escalation training, "we have this ancient [training] simulator" that does not provide the type of realistic, scenario-based training that many want. Instead, as one officer summarized, "right now, our training is Power Point slides" rather than dynamic, decision-making-based instruction.

Consequently, APD should endeavor to overhaul its overall approach to training to emphasize the development of real-world decision-making skills; the use of a diversity of adult learning techniques; and realistic, scenario-based training opportunities. To this end, "scenarios" do not need to be, and should not be, confined to the use of "shooting simulators" that gained prominence in police departments in the 1990s and 2000s. Instead, "scenarios" can be role-playing exercises, real-world videos or verbal descriptions of situations that officers discuss and analyze, and other sorts of presentations of situations that form the basis for officers to apply APD policy and grow their skills. APD told 21CP in May 2021 that it is now using mock "cities" inhabited with actors to expand the Department's use of role-playing scenarios and to make such exercises as realistic as possible. It has separately said that "[t]he Academy has recently increased scenario training significantly," is "in the process of

[341] *Final Report of the President's Task Force on 21st Century Policing* 52 (2015).
[342] The Leadership Conference on Civil and Human Rights, *New Era for Public Safety: A Guide to Fair Safe and Effective Community Policing* 143 (2019).

acquiring a state-of-the-art simulator," has "changed [the] teaching environment at the Academy to a more adult-based model," and "[w]ith the easing of COVID restrictions," expanded the use of scenario-based instruction.[343]

**Recommendation 33.    APD and the City should ensure that APD's training function has sufficient access to training management platforms and training resources that can promote effective, ongoing officer training and professional development.**

APD personnel expressed a number of concerns to 21CP about the existing training infrastructure – including potential issues with the range, driving track, and classrooms. Because of the COVID-19 pandemic, 21CP was not able to spend meaningful time in Aurora to independently assess the suitability of APD's facilities and infrastructure for training and professional development. Consequently, we recommend that APD and the City conduct an assessment of APD's current training resources and potential needs, especially as the Department endeavors to transition to an updated training model.

In response to these concerns and this recommendation, APD told 21CP:

> APD uses AuroraLearn, an online Learning Management System (LMS) program, to deliver certain types of training. LMS also allows officers to complete external trainings that can be tracked and documented. All sworn officers have access to the online PoliceOne platform and the additional resources that encompasses. With regard to physical resources, track, range, classrooms, these are generally running at full capacity and rarely have availability.[344]

**Recommendation 34.    APD needs to establish a comprehensive professional development program for both officers and civilian staff that takes full advantage of both in-house and external resources. Training priorities and needs should be identified in a Professional Development Program Plan that the Department updates regularly with specific objectives, training programs, milestones, and deadlines.**

Department personnel say that there are limited professional development opportunities for mid-level personnel. Separately, some civilian staff are required to have a minimum number of training hours to become and maintain their professional certifications. However, this is not always supported by the department. There is also a perception among some APD personnel that the selection process for external training programs is unfair.

---

[343] Aurora Police Department, *Response to 21CP Solutions Recommendations for the Aurora Police Department* (June 17, 2021) at 15.
[344] *Id.*

Fitouri 020298

As it re-thinks its general training function, APD should also focus on creating long-term pathways for career and professional development for all personnel. Training imperatives should align with real-world trends and issues, officer career stages, and rank responsibilities. Professional development opportunities can be tailored specifically for Aurora personnel based on the needs and realities of the Aurora community and can be provided through external resources or programs that align with the Department's mission and priorities.

To this end, 21CP recommends that the Department develop a Professional Development Program Plan that identifies particular goals, specific training programs that will be provided to meet those goals, milestones for the Department and its personnel to meet to implement the plan, and deadlines for meeting the various milestones and completing various training initiatives. The purpose of such a Plan is to ensure that APD is not simply providing sporadic, one-off trainings to officers but are, instead, providing a thoughtful, focused professional development arc that builds skills and grows professional competencies. APD has indicated that it "agrees this would benefit all employees."[345]

## Field Training Officer Supervision, Selection, and Training

Field training is an important part of preparing police officers to effectively carry out their duties and responsibilities. In most programs and departments, new officers participate in the field training program for approximately 12 to 16 weeks following completion of academy training. Those officers start their work in the field under the guidance and supervision of a Field Training Officer ("FTO") who is generally a senior patrol officer that has been specifically trained for the role.

Most police agencies have modeled their FTO program after one established by the San Jose Police Department in the early 1970s.[346] In this model, trainee performance is assessed each day against 30 standards on a defined, five- or seven-point scale.[347]

A different approach was introduced in 1999 by the Reno, Nevada Police Department that focuses on using adult learning methods and emphasizes problem-solving.[348] As noted in the Final Report of President Obama's Task Force on 21st Century Policing, the "Reno Model," developed in collaboration with the Department of Justice's COPS Office and the Police

---

[345] *Id.* at 16.
[346] San Jose Police Department, About Us, Organization, Bureau of Field Operations, *Field Training Officer (FTO) Program*, https://www.sjpd.org/about-us/organization/bureau-of-field-operations/field-training-program (last visited May 5, 2021).
[347] *Id.*
[348] U.S. Department of Justice, Office of Community Oriented Policing Services, *A Problem-Based Learning Manual for Training and Evaluating Police Trainees: PTO An Overview and Introduction* (2004), https://cops.usdoj.gov/RIC/Publications/cops-w0150-pub.pdf.

Fitouri 020299

Executive Research Forum ("PERF"), "use[s] adult learning theory and problem solving tools to encourage new officers to think with a proactive mindset, enabling the identification of and solution to problems within their communities."[349]  The Reno method modifies the San Jose model by focusing the FTO environment on new officers learning about the community challenges and problems officers encounter in the field.  The model attempts to ensure that academy graduates' initial experiences as law enforcement officers reflect policing in the 21st century and reinforce problem-solving and community engagement skills.[350]

Both the more traditional San Jose model and the newer Reno model are based on the idea that a seasoned officer is the best teacher for an officer who is making the transition from the controlled, structured environment of a training academy to the day-to-day work of an officer in the community.  This assumption is valid if and only if a department selects the best officers to be FTOs.  If a department does not, new officers may learn poor practices that will stay with them throughout their career.

APD's Field Training Evaluation Program ("FTEP") is based on the San Jose Model, with some modifications.  FTEP is 7 weeks for lateral entry officers and 14 weeks for entry level officers.[351]  FTOs complete daily observation reports that assess the trainee against 14 performance tasks using a five-point scale.  FTOs note in a narrative the most satisfactory and least satisfactory performance of each day.

In Aurora, FTOs are considered "specialists" and receive a 7 percent increase in pay for serving in this role.  Despite this elevated pay scale, APD reports that it is having increasing difficulty filling FTO positions.

The FTO program has traditionally been managed by a Sergeant who reports directly to the Operations Division Chief.  Eight sergeants supervise the FTOs in the field.

Based on conversations with APD stakeholders in May 2021, 21CP understands that APD is making a number of changes to the FTO program.  First, APD is putting a lieutenant in charge over the FTO program, which enables APD to have someone more directly involved on the day-to-day monitoring of FTO performance.  Second, through changes to the FTO selection process, APD has sought to clarify expectations about who can serve as FTOs.  According to APD, the Department is emphasizing that it wants people aligned with the cultural changes that it is seeking to cement.  Third, recognizing that senior officers are often best-positioned to be FTOs, the Department is trying to change scheduling parameters to allow FTOs to enjoy some of the scheduling benefits associated with seniority while still

[349] *Final Report of the President's Task Force on 21st Century Policing* 60 (2015).
[350] Margaret A. Fischer, U.S. Department of Justice, International Association of Chiefs of Police, *Best Practice Guide Field Training for Today's Recruits*, https://www.theiacp.org/sites/default/files/2018-08/BP-FieldTrainingforTodaysRecruits.pdf (last accessed May 5, 2021).
[351] APD Standard Operating Procedure, *Recruit Field Training* (last rev. July 19, 2013).

Fitouri 020300

allowing those individuals to work as FTOs. Fourth, expectations have been clarified about what is necessary to remain within an FTO position. Fifth, APD has been taking steps to increase and enhance the diversity of FTOs. Finally, APD indicates that it is trying to get more FTOs to attend further training more often.

In June 2021, APD clarified the steps it has been taking with respect to the FTO program:

> In November of 2020[,] the Field Training and Evaluation Program (FTEP) was moved from the Background and Recruiting Section under one dedicated Lieutenant. This Lieutenant's only responsibility is the FTEP and related certifications and training. This Lieutenant . . . along with the FTEP Sergeants, have worked to completely revamp the program. This Lieutenant reports directly to the Operations Division Chief.

> Sub-standard FTO's were removed from the program and numerous new FTO's were brought into the program which also subsequently increased diversity amongst the ranks of FTO's. In 2020, the FTEP program added several additional FTO's to include 4 women, 1 African American, and currently have several FTO's that identify as LGBTQ+.

> The FTO selection process has changed dramatically and interviews for new FTO's now consist of a comprehensive selection process. This process includes enhanced interviews by an oral board, which consists of members from each patrol district (captain or commander), a current FTO Sergeant, and the Division Chief of Operations. A copy of the FTO interview questions is attached.
> While the Field Training and Evaluation Program standard operating procedure is currently being revised, in early 2021, [the designated Lieutenant] and the FTO Sergeants authored a brand-new manual for training officers, of which a copy is attached.

> [The designed Lieutenant] has changed the Remedial Training Plans for recruits and we have seen drastic improvements in the ability of recruits to respond to additional/remedial training, resulting in the successful completion of FTEP, whereas in the past, they may not have succeeded. The Remedial Training Plan document is attached.

> In response to concerns of increasing consistency of Field Training, we have updated and enhanced our use of critical task logs and training. In order to ensure consistency through the program, we created the task logs (example provide is from a recently graduated recruit) which direct FTOs to the appropriate Directives, SOPs, and training videos. During each training

Fitouri 020301

session, the FTO is required to complete this training one-on-one with the recruit. This training ensures consistency from the Academy to Field Training, as well as ensuring the training matches current directives and protocols. Notable inclusions in the attached documents are updates to the UOF Policy, Duty to Intervene, and Suspicious Occurrences just to name a few. Each of these logs is linked to take the trainer and trainee directly to the most current policy, as well as provides direction towards talking points and specific items of note.

This task log is set to be evaluated annually and updated to reflect current policy and training.[352]

The changes that APD indicates that it has been making recently appear to align with the recommendations that 21CP developed over the course of the assessment. So long as APD meaningfully implements them and reduces them to policies and formal procedures, the quality and effectiveness of the FTO program stands to be enhanced in the future.

**Recommendation 35.    APD should take steps to ensure FTOs are representative of the diversity of the department and community.**

Of APD's 42 current FTOs, all but one are male. Four out of five (79 percent) are white and 17 percent are identified as Hispanic. There are no Black FTOs. The lack of diversity among field training personnel was referenced by several APD stakeholders who spoke with 21CP. It is important for the Department going forward that this function be, in the short-term, at least as diverse as the Department as a whole and, in the intermediate- to longer-term, as diverse as the communities that APD serves.

We note that current FTO officers appear to be relatively experienced, with nearly three-quarters (74 percent) of FTOs having more than five years of service.

**Recommendation 36.    The Field Training Standard Operating Procedure should be updated to reflect changes made in 2020 to the FTO selection process and enhanced to provide more specific guidance on the overall program, the process by which APD members qualify and are selected to be FTOs, how the program proceeds, and how FTOs are evaluated.**

APD's field training Standard Operating Procedure ("SOP") was last updated on July 19, 2013. Based on conversations with APD stakeholders, we understand that the FTO selection process was changed in 2020. However, this is not reflected in the current SOP reviewed by 21CP. APD should codify recent changes to the FTO program in its SOPs and policies.

---

[352] Aurora Police Department, *Response to 21CP Solutions Recommendations for the Aurora Police Department* (June 17, 2021) at 16–17.

Fitouri 020302

Additionally, the current SOP does not adequately explain the FTO evaluation process. We also recommend that APD expand the coverage of evaluation considerations in its SOPs and policies going forward.

**Recommendation 37.      The APD should re-evaluate its FTO evaluation process to ensure consistency and effectiveness.**

The average rating given by FTOs for APD's 203 basic trainees 2018 through November 2020 was 2.70 – which is below the rating of 3 identified by APD as "acceptable." This suggests that the average rating for trainees in the FTO program was less than "acceptable." When staff was asked about this, 21CP was told:

> They always average out below a "3 acceptable" over the program as a whole. In the first phase, trainees being new, get a lot of 1s and 2s and a few 3s or higher. In the second phase as they get exposure and learn the job, they get a few 1s, but mostly 2s and some 3s or higher. In the third phase and test out, they pretty much function on their own and will be getting an occasional 1 or two (due to an occasional bad call or random learning mistake which we all still make), but mostly their scores are at the acceptable range of 3s or higher. Our software only allows us to pull the average score.

However, during 21CP's review, it appears that the 14 performance tasks on which FTOs rate students each day may not be as well-defined and uniformly understood as they should be – such that varying or poorly understood standards could be part of the reason for the low ratings.
 APD data on basic *and* lateral entry officers over a five-year period (2015 to 2020) indicates that 30 (11 percent) of the 268 trainees failed the FTO training and were separated from the department. In addition, some one-quarter of trainees (24 percent) had their training time extended so that they could more satisfactorily demonstrate acceptable performance. Over one-third of Hispanic male trainees had their training time extended; approximately 14 percent failed to satisfactorily complete the program. Fourteen percent of the Black males were also separated from the department for failure to complete the program. About 22 percent of the White saw their training time extended and 12 percent were separated.

For comparison, San Jose Police Department's goal for their FTO program is a 90 percent success rate. There is considerable cost to the City and the Department to lose an officer at their final stage of training – after the individual has spent substantial time in proceeding through the training academy. Although 21CP is in no way suggesting that APD retain poorly performing officers, a review of the reasons for the relatively high rates of training extension and separation rates should be explored.

Fitouri 020303

## Early Intervention & Peer Support

Policing is a stressful and unpredictable profession.  Officers frequently respond to the scene of situations that others have not been able to address themselves – and to resolve situations in which people are often at their worst or most vulnerable.

When compared with the general population, police officers report "higher rates of depression, PTSD, burnout and other anxiety related mental health conditions."[353]  In 2016, more officers died of suicide than any single cause of death.[354]

Ongoing stress and trauma affect not just officers but their families and, indeed, the communities that they serve.  Mental and physical health challenges often result in increased administrative costs from absenteeism, increased use of workers' compensation and sick days, and more frequent use of early retirement.  Likewise, "[w]hen exhausted, officers are unable to effectively communicate with community members and may even incite agitation among them."[355]  In contrast, "[o]fficers who are equipped to handle stress at work and at home . . . are more likely to make better decisions on the job and have positive interactions with community members."[356]

Given the importance of officer wellness, President Obama's Task Force on 21st Century Policing recommended:

> Support for wellness and safety should permeate all practices and be expressed through changes in procedures, requirements, attitudes, and behaviors.  An agency or work environment in which officers do not feel they are respected, supported, or treated fairly is one of the most common sources of stress.  And research indicates that officers who feel respected by their supervisors are more likely to accept and voluntarily comply with departmental policies. This transformation should also overturn the tradition of silence on psychological problems, encouraging officers to seek help without concern about negative consequences.[357]

[353] National Alliance of Mental Illness, *Law Enforcement*, https://www.nami.org/Advocacy/Crisis-Intervention/Law-Enforcement?gclid=CjwKCAiA6aSABhApEiwA6Cbm_2sKB-oajSH3XdC9c5ZGyS8VdbOcLHL5GnUs3nJ9MOvbUeEZjBS5CBoCqI8QAvD_BwE (last visited May 5, 2021).
[354] John M. Volanti, et al, "Law Enforcement Suicide: A National Analysis," 15 *Int'l J. Emergency Mental Health & Human Resilience* 289, 289 (2013).
[355] Police Executive Research Forum, *Building and Sustaining an Officer Wellness Program: Lessons from the San Diego Police Department* 7 (2018).
[356] The Leadership Conference on Civil and Human Rights, *New Era for Public Safety: A Guide to Fair Safe and Effective Community Policing* 312 (2019).
[357] *Final Report of the President's Task Force on 21st Century Policing* 62 (2015).

Fitouri 020304

Officer wellness can be supported through a variety of mechanisms within a police organization:

> There is clearly a continuum of mental health and wellness strategies, programs . . . that begins with recruitment and hiring and goes through retirement. It includes proactive prevention and resiliency building; early interventions; critical incident response; treatment, reintegration; and ongoing support for officers, staff members, and their families.[358]

### *Peer Support*

One mechanism for officer support is a peer support program. APD's Peer Support Program was established in 2009.[359] The Employee Support and Wellness Unit ("ESWU") coordinates the program, which is supervised by a psychological services clinician who assists in the selection and training of peer support advisors and provides consultation services.[360]

Peer support advisors are used in a wide variety of personal or professional crisis situations, which range from providing support when officers are involved in a shooting incident to officers facing marital or financial challenges.

To serve as a peer support advisor, employees must have at least three years of service and submit a letter of interest to the coordinator explaining their interest and qualifications. Candidates appear before an interview panel comprised of the psychological services clinician, the program coordinator, and two current peer support advisors. The panel recommends candidates to the Chief of Police for final approval. After selection, new advisors participate in a 40-hour basic peer support training program.

The Peer Support Program appears to be an active group. Those working with the program recorded 913 contacts, or 2.5 per day in 2019.[361] A total of 528 contacts were made by sworn officers (including 55 from outside agencies). In 2020, the number of contacts increased by 23 percent to 1,122. Fifty-five percent (621) of the 2020 contacts were from sworn officers, with nearly one-third (342) of contacts involving stress/fatigue issues.[362] Indeed, the most frequent reason for contact with peer support in 2020 was career stress (27 percent of

---

[358] 21CP Solutions, U.S. Department of Justice, Office of Community Oriented Policing Services, *Law Enforcement Mental Health and Wellness Programs: Eleven Case Studies* (2019), https://cops.usdoj.gov/RIC/Publications/cops-p371-pub.pdf.

[359] APD Directive 8.35.

[360] *Id.*

[361] Measuring workload is a challenge for all peer support programs, as not necessarily all contacts are documented. 2019 Data was provided by the ESWU on December 2, 2020, with limited data for 2020 provided on January 26, 2021.

[362] The remaining 45 percent that did not originate with sworn officers came from non-sworn personnel, officer family members, and other individuals or stakeholders outside APD.

Fitouri 020305

encounters). One-quarter (24 percent) involved supervisor or discipline/Internal Affairs issues. Fourteen percent of the contacts involved marital relationships and 11 percent involved alcohol. Twenty-three contacts were related to suicide attempts. Ultimately, the number of contacts and the range of issues suggests the peer support team has earned the trust of a significant number of employees in the department, which is not necessarily the case in similar programs in other departments. APD should be commended for establishing a program that officers appear to find value in using.

APD personnel told us that APD is a client of an employee wellness organization in which a former APD Chief and former APD psychologist are involved. In our interviews, some officers expressed concern about these dynamics, with one summarizing, "This is problematic because officers do not feel there is confidentiality when former APD members are employed by" the outside firm.

### Early Intervention

Another mechanism for officer support is one in which concerns about officer wellness and performance accountability can merge. Police departments and the communities that they serve have a strong interest in establishing mechanisms to identify potential performance issues before they become significant, result in misconduct, or produce bad outcomes – so that departments can proactively intervene to address issues that may be impacting the quality of an officer's performance.

This approach is known as an Early Intervention System ("EIS"). Grounded in "basic principles of personnel management and human resource development that have developed in the private sector," an EIS provides a means and process for supervisors to "identify[] officers with potential behavioral problems" that can benefit from proactive intervention.[363] "The ideal purpose of an EIS is to provide officers with resources and tools in order to prevent disciplinary action, and to promote officer safety, satisfaction and wellness."[364]

Police departments began developing early intervention systems ("EIS") in the 1970s, with research suggesting that a small number of officers tend to be responsible for a significant proportion of citizen complaints and uses of force. By 2007, nearly two-thirds (65 percent) of

---

[363] Geoffrey P. Alpert & Samuel Walker, "Police Accountability and Early Warning Systems: Developing Policies and Programs," 2 *Justice Research & Policy* 59, 61 (2000).

[364] Karen L. Amendola and Ronald C. Davis, National Police Foundation, *Best Practices in Early Intervention System Implementation and Use in Law Enforcement Agencies* (Mar. 2019), https://www.policefoundation.org/publication/best-practices-in-early-intervention-system-implementation-and-use-in-law-enforcement-agencies/?gclid=Cj0KCQiAw_H-BRD-ARIsALQE_2NhWMKF-4jCLw69DL0nywU-pW84-Xb5jXAlgbNo5zT4h0JTnk1n-v8aAsthEALw_wcB.

Fitouri 020306

American police departments with over 250 officers had some form of early intervention system.[365]

The APD implemented its Personnel Early Intervention System ("PEIS") in November 2002.[366] APD Directive 8.35 describes PEIS, provides procedures, and identifies the various performance risk factors considered. Specifically, the Directive lists 31 performance risk factors that are considered in flagging an officer for potential intervention. The Directive outlines a point system that assigns points to individual risk factors, ranging from 1 to 10. Some risk factors like substance abuse, being arrested or making a false arrest are assigned 10 points. The risk criteria are populated from within the Administrative Investigations Management ("AIM") system, the CAD system, a scheduling system, and by supervisory entry.

An officer that reaches 10 points within a 12-month period is flagged for intervention. Supervisors may also initiate an intervention without an accumulation of 10 points within a year. A supervisor may be aware, for example, of an employee having a difficult time going through a divorce so an intervention can be made to provide options for assistance. In 2019, there were three supervisory interventions which resulted in one referral to Internal Affairs, one referral to peer support, and one referral to training.[367]

PEIS is automated. The department acquired the AIM software platform from On Target Performance in 2010, and it was operational in 2011. Several APD stakeholders told 21CP that the AIM software is not user-friendly and has not changed in the past ten years. 21CP understands that the Department has been looking for an alternative for about two years.

Between 2018 and September 22, 2020, there was a total of 404 flags, with 87 percent requiring no further action. The remaining 13 percent resulted in some type of intervention with three-quarters (76 percent) of the recommended interventions being counseling.

**Recommendation 38.      The Peer Support Team should consist of officers who reflect diverse backgrounds.**

APD's Peer Support Team current has 42 members. The team is a mix of Sworn (31) and non-sworn (11) employees. Of the membership, 11 have 3-8 years on, 9 have 9-14 years on, 11 have 15-19 years on, 11 have 20+ years of service. [368] Most are male (69 percent) and white (78 percent). Although not noted statistically, several members identify as LGBTQ+,

---

[365] J. Helsby, et al, "Early Intervention Systems: Predicting Adverse Interactions Between Police and the Public," 29 *Criminal Justice Policy Review* 190 (2018).
[366] APD Directive 8.35.
[367] APD, *Annual Report: Personnel Early Intervention System 2019*.
[368] Aurora Police Department, *Response to 21CP Solutions Recommendations for the Aurora Police Department* (June 17, 2021) at 17–18.

Fitouri 020307

according to Chief Wilson.  There are no Black individuals serving as part of the Peer Support Team.  One participant remarked that, in their experience, the Peer Support program is "a bit cliquey."  APD should continue their efforts to expand diversity in the program making it more  broadly helpful to officers of diverse backgrounds.

**Recommendation 39.    The APD should evaluate and analyze its current threshold-based, risk analysis early intervention system ("EIS") and make changes to enhance its effectiveness.   APD should make changes in policy, procedure, practice, and technology infrastructure to permit the implementation of an enhanced EIS.**

In recent years, the efficacy of the traditional EIS model has been called into question, with a growing body of empirical research suggesting that the model is ineffective at consistently identifying the right officers for intervention and is significantly inefficient for departments.[369]  EIS systems too often are either over-inclusive, requiring supervisors to continually evaluate large numbers of officers who reach the defined triggering points and overwhelm the process, or under-inclusive, triggering too few officers or triggering officers along the wrong dimensions.  Whether a system results in too many, too few, or the wrong officers triggering the system, any of these errors risk a department not identifying officers with genuinely problematic trends that might be addressed through intervention, thereby usurping the purpose of an EIS.

As it currently functions, APD's PEIS is potentially over-inclusive.  During the period from January 2018 to September 22, 2020, the Personal Early Intervention System ("PEIS") flagged 404 officers, and 87 percent of the flags may be considered false positives where no further action was needed.  Thus, the system may be flagging individuals for attention who are not exhibiting performance issues.

APD reported that there were fifty instances in which PEIS failed to provide the expected alerts on employees who reached the ten-point threshold because of a vendor-initiated maintenance action earlier in the year.[370]  21CP understands that APD is in the process of implementing a new platform, Benchmark Analytics' Benchmark Management System (BMS), to help facilitate and strengthen their early intervention system, which they believe "will allow for greater flexibility in assigning data points to enhance effectiveness."[371]

---

[369] University of Chicago Crime Lab, *The Officer Support System: Developing a Data Driven Early Intervention System in Chicago* (Feb. 26, 2019); Stephen James, Lois James and Liz Dotson, "Evaluating the Effectiveness of a Police Department's Early Intervention System, James, James, and Dotson," *Journal of Experimental Criminology* (Feb. 7, 2020); Joel Rubin, "Report Questions LAPD Program to Flag Misconduct," *L.A. Times* (Aug. 25, 2016).
[370] Aurora Police Department, *Annual Report: Personnel Early Intervention System 2019.*
[371] Aurora Police Department, *Response to 21CP Solutions Recommendations for the Aurora Police Department* (June 17, 2021) at 18.

Fitouri 020308

## AREA 5.  ACCOUNTABILITY

### Officer Misconduct & Complaints

Public trust in the police depends in part upon a department's degree of transparency and the presence of procedurally just mechanisms that hold line officers and agency leadership accountable for complying with law, policies, and the agency's sanctioned protocols and practices. Among many other things, accountability requires the routine documentation and public dissemination of **officer** and agency actions and outcomes, including the resolution of citizen complaints, open and honest communications with victims of both community and police violence, and transparency surrounding corrective and punitive actions taken in response to instances of officer misconduct.

**Recommendation 40.     APD should work in collaboration with community, city administration (including City Human Resources), police officer organizations, and the Civil Service Commission to re-align the entire system of handling complaints, investigations, and disciplinary decisions to comport with the principles of procedural justice and to ensure the fair, objective, thorough, and timely investigation of all allegations of potential officer misconduct.  Consistent with these objectives and as part of this process, APD should re-draft and replace its current directives, and/or related policy and manual guidance, on administrative investigations, complaint investigations, Internal Affairs investigations, and any other investigations relating to officer misconduct.**

APD officers, third-party reviewers, and many community members all believe that the current system for addressing potential officer misconduct in Aurora is broken, cumbersome, and ineffective in promoting a culture of accountability with the Department.

During interviews and focus groups, many officers with various ranks and years of service expressed the perception that APD's disciplinary system is generally unfair.  Some officers cited instances where it appeared that different officers received different treatment in terms of investigative rigor and penalty for the same alleged offense.  Additionally, with near unanimity, officers expressed a lack of trust in the current system and a belief that officers are treated more or less harshly based upon media coverage and public sentiment rather than the seriousness of the alleged misconduct or the actual cause for discipline.

Many of the personnel interviewed cited cases where officers received discipline which was not consistent with CRB and/or IRB recommendations as examples of disparate treatment. Some officers also cited cases where minority officers received different treatment than Caucasian officers in light of when, what, and how the investigation was conduct.

Fitouri 020309

Similarly, community members and elected officials expressed a general lack of trust in the disciplinary system. There was a perception among community members, similar to that of officers outlined above, regarding the appearance of disparate treatment of officers based on race.

21CP requested and examined aggregate data on officer misconduct investigations. Between 2017 and 2020, there were 171 APD officers with at least one allegation of misconduct, accounting for a total of 478 total allegations.

A relatively concentrated number of officers account for a disproportionately large share of misconduct cases (or individual investigations) and allegations (akin to charges or specific types of misconduct infractions investigated within the context of individual investigations). Specifically, there were 35 officers – 20 percent of all officers with at least one misconduct allegation – who accounted for 40 percent of misconduct cases. Indeed, just 12 officers – 7 percent of officers with at least one misconduct allegation – accounted for 19 percent of misconduct cases between 2017 and 2020. Expanding slightly outward to the level of allegations, only about 32 officers accounted for 44 percent of misconduct allegations, and 12 officers accounted for nearly one-quarter (24 percent) of allegations.

As Table 19 indicates, most misconduct allegations, findings, and actions taken involve white male officers, so discrepancies between demographic groups may reflect a low number of misconduct cases involving non-white officers. Black officers were somewhat more likely to have allegations of misconduct than white officers relative to their size within APD. White male officers made up 66% of all cases and allegations but they are 70% of officers within APD. Black male officers are 3.3% of APD officers but received 7% of misconduct allegations, while Black female officers make up fewer than 1 percent of APD's total officers but made up over 4 percent of all allegations between 2017 and 2020.

**Table 19. APD Misconduct Allegations by Officer Race and Gender, 2017 – 2020**

| Gender | % of Cases | % of Allegations | % of Officers |
|---|---|---|---|
| White Male | 65.8% | 66.1% | 69.6% |
| Black Male | 6.2% | 7.3% | 3.3% |
| Hispanic Male | 6.7% | 5.4% | 8.8% |
| Two or more Races Male | 3.6% | 2.7% | 3.1% |
| Asian Male | 1.8% | 1.5% | 1.8% |
| White Female | 8.9% | 9.0% | 9.6% |
| Black Female | 3.6% | 4.4% | 0.8% |
| Hispanic Female | 2.2% | 2.1% | 1.4% |
| Two or more Races Female | 0.9% | 1.0% | 0.8% |

Fitouri 020310

| Asian Female | 0.4% | 0.4% | 0.1% |
|---|---|---|---|

*Source: 21CP Analysis of APD Data.*

Allegations against female officers were less likely to be sustained than allegations against male officers, with nearly 48 percent of allegations against female officers receiving a finding of exonerated, not sustained, or unfounded compared to 38 percent of male officers.

**Table 20.   Misconduct Investigation Outcomes/Findings by Officer Race and Gender, 2017 – 2020**

| | Sustained | Exonerated | Not Sustained | Unfounded | Policy Failure | Resignation in Lieu | % Not Sustained |
|---|---|---|---|---|---|---|---|
| **White Male** | 187 | 4 | 120 | 1 | 1 | 3 | 39.6% |
| **Black Male** | 22 | 1 | 11 | 0 | 1 | 0 | 34.3% |
| **Hispanic Male** | 18 | 0 | 8 | 0 | 0 | 0 | 30.8% |
| **White Female** | 22 | 0 | 16 | 3 | 1 | 0 | 45.2% |
| **Black Female** | 9 | 0 | 10 | 2 | 0 | 0 | 57.1% |

*Source: 21CP Analysis of APD Data.*

Ultimately, the byzantine and convoluted nature of APD's current discipline system – involving various tracks, review boards, and adjudication levels – does not seem to be inspiring confidence, neither within the community nor the Department, in the fairness of process or outcomes of the misconduct process.  Figure 4, provided to 21CP by APD, shows the complexity of the current disciplinary system.

Some of the complex processes and steps embedded within APD's disciplinary process include the following:

- "All complaints will generally start with the named member's immediate supervisor; however, any supervisor may receive and conduct an initial inquiry into a complaint. Additionally, if the supervisor believes the alleged conduct is such that it may result in discipline beyond a 40-hour suspension, or bring the agency into disrepute, the supervisor may forward the complaint directly to IAB for review and determination."[372]

- "An initial inquiry is designed to gather necessary facts and information concerning the allegation, to determine if any law, ordinance, directive, standard operating

---

[372] APD Directive 10.02, Section 10.2.5.

Fitouri 020311

procedure, or other city policy may have been violated or a potential for a policy failure exists."[373]

**Figure 4.  APD Discipline System**



*Source: APD*

- If, through the "initial inquiry" process *or* on the "face" of the complaint "it appears there is a violation which[,] if sustained, would result in discipline greater than a written reprimand, the supervisor will serve a Notice of Investigation" and a Preliminary Administrative Investigation will commence.[374]
  - o  If, at the conclusion of the preliminary investigation, the investigator believes the allegation cannot be handled at the District/Bureau/Section level, or believes the final discipline could be greater than a forty-hour suspension, the case is forwarded or tracked, with an entry requesting that the case be investigated by the IAB, through the chain of command to the subjects' commander or equivalent rank in the complaint management system.  The commander or equivalent position in the chain-of-command makes the determination as to whether an investigation should be concluded by the Internal Affairs Bureau or at the district/bureau/section level.[375]

---

[373] *Id.*
[374] *Id.*
[375] APD Directive 10.02, Section 10.2.6.

Fitouri 020312

- The Chief, or designee, may assign the investigation to any member or appropriate outside entity should the Chief or designee decide *not* to have IAB investigate an allegation.[376]

- The Investigative Review Process ("IRP") occurs at the conclusion of the IAB investigation and prior to the IAB report being sent to the IAB Commanding Officer for recommendations.
    - The member who is the subject of the investigation has fourteen (14) calendar days to review the report and make note of any issues in dispute. However, this fourteen-day review period may be reduced or extended by mutual agreement.[377]

- The Chief's Review Board ("CRB") reviews the case, discusses the recommendation of finding from the IAB Commander, and decides among the following potential outcomes or next steps:
    - Send the case back to IAB for more investigation;
    - Accept, reject, or modify some, all, or none of the recommended findings of the IAB Commander.
    - Recommend a post-CRB accelerated disciplinary process :
        - A finding of a sustained violation
        - A recommended discipline of no more than a 40-hour suspension
    - If the CRB determines a finding of sustained for any allegation of misconduct, or noncompliance for any compliance review, the CRB will make a recommendation of discipline to the Chief of Police.[378]

- Prior to the imposition of any discipline other than a reprimand, the member must be provided with a pre-disciplinary hearing before the Chief or a designee.[379]

- In many instances, an appeal process, with multiple stages or steps, starts after the Chief or designee's discipline determination.[380]

In short, the route that potential misconduct may take within the APD to be investigated or adjudicated, and for corrective action to be determined where appropriate, has been convoluted, opaque, and needlessly complicated. Regardless of the reasons why such a complex system has evolved in Aurora, APD personnel and the Aurora community would likely both benefit from a more streamlined, uniform system designed with the goal of

---

[376] APD Directive 10.02, Section 10.2.10.
[377] APD Directive 10.02, Section 10.2.11.
[378] APD Directive 10.02, Section 10.2.13.
[379] APD Directive 10.02, Section 10.2.14.
[380] APD Directive 10.2, Section 10.2.17 (cross-referencing to APD Directive 10.5).

Fitouri 020313

conducting fair, thorough, complete, and timely investigations of all allegations of potential officer misconduct.

We observe that the leadership of any police department must examine how its process for investigating and adjudicating misconduct of all types can incorporate and embody procedural justice. As discussed further below, procedural justice refers to the way that decisions are made, how such decisions are communicated, and how they are implemented. It requires that decisions be neutral, based on fact, and consistent with the nature of underlying conduct. When community members and officers alike believe problems will be resolved fairly, equitably, and honestly, they will have greater confidence in the decision and outcome. Employers must therefore create and follow procedures and policies that embody procedural justice, ensuring the response will be fair and consistent regardless of who is involved in the situation.

In response to this recommendation, APD says that it:

> [A]grees that there are multiple components related to this recommendation and we are currently evaluating our internal processes related to complaints and discipline. Recommendations provided in this report will assist with that endeavor.[381]

**Recommendation 40.1.    Complaint and discipline procedures should be codified in separate directives with an emphasis on enhanced clarity.**

At the time of 21CP's assessment, APD's Complaint and Discipline Procedures policy, which pertains to "all allegations of misconduct except that complaints determined to be related to internal discrimination or harassment,"[382] was 32 pages long.[383]  Specifically, Directive 10.02 addresses issues and procedures regarding:

- Complaint processing;
- Complaint investigations;
- The rights of accused officers under investigation;
- The process of determining discipline;
- The discipline appeals process;
- Records maintenance; and
- Statutory reporting requirements.

---

[381] Aurora Police Department, *Response to 21CP Solutions Recommendations for the Aurora Police Department* (June 17, 2021) at 18.
[382] Allegations related to internal discrimination and harassment are covered in a separate APD Directive 10.9 and allegations which imply "potential criminal conduct" are also governed by a separate Directive (10.10).
[383] APD Directive 10.02.

Fitouri 020314

The conglomeration of these topics in the same Directive is confusing and unclear for officers, including some supervisors, community stakeholders, elected officials, and even some members of the Civil Service Commission[384] with whom we spoke.

Accordingly, 21CP recommends that the APD reconfigure this policy[385] into separate policies regarding (1) Complaint Processing, (2) Investigations, and (3) Dispositions.  In June 2021, APD told 21CP that "[r]evision of Directive 10.2 Complaint and Discipline Procedures for Sworn has eliminated some practices (NDSA, Accelerated discipline, etc.) and provided more clarity."[386]  21CP has not had an opportunity to meaningfully review the latest version of the policy, revised May 19, 2020.[387]

> **Recommendation 40.2.   The current process for handling external complaints should be streamlined.   Currently, it is convoluted and substantially more complex than it should be.   Policies relating to administrative investigations and external complaints should be consolidated.**

21CP recommends that APD use a streamlined, simplified process for adjudicating all instances of potential officer misconduct – whether that potential misconduct is identified internally (by a supervisor or another officer) or externally (by a member of the public). Whether complaints originate within the Department or outside of the Department, the specific processes of investigating the performance related to the complaint, reaching a finding based on the investigation, and imposing discipline as appropriate should be uniform and consistent.

> **Recommendation 40.3.    Allegations of misconduct against employees that may result in discipline or other corrective actions should be identified and categorized by the severity of rule, policy, practice violation in the rewritten directive.**

A number of agencies have incorporated the use of a "discipline matrix" as a means of providing fair notice to officers and the community about the expected disciplinary ramifications of

---

[384] Pursuant to the Aurora City Charter, the Civil Service Commission is the final level of review (or appeal) for disciplinary decisions related to sworn police department employees.
[385] It should be noted that at the time of our review 21CP was informed that APD was attempting to "clean up" this policy and that specifically Section 10.2.23 – Post CRB accelerated discipline process and Section 10-2-14 – Negotiated Disciplinary Settlement Agreement Process would both be removed.
[386] Aurora Police Department, *Response to 21CP Solutions Recommendations for the Aurora Police Department* (June 17, 2021) at 18.
[387] APD Directive 10.02.

Fitouri 020315

specific classes or types of misconduct or deficient performance.[388]  As of a 2015 study, some 37 percent of responding police agencies used, or planned to use, matrices, with a higher rate of use in larger jurisdictions.[389]

> A discipline matrix is a formal schedule for disciplinary actions, specifying both the presumptive action to be taken for each type of misconduct and any adjustment to be made based on an officer's previous disciplinary record.
>
> The primary purpose of a discipline matrix is to achieve consistency in discipline: to eliminate disparities and ensure that officers who have been found to have committed similar forms of misconduct will receive similar discipline.[390]

A matrix helps to establish, "in advance, the most appropriate penalty for common forms of misconduct" and to ensure that individuals "committing the same act[s] of delinquency will receive equal punishment[s]."[391]  To do so, it establishes certain classes of misconduct allegations and detailing the particular ranges of discipline outcomes that are associated with sustained allegations of specific types.   Various complaints of potential misconduct are therefore rigorously categorized into a pre-set universe of allegation types.

While the adoption of a matrix can support the overall integration of procedural justice into an agency's disciplinary process, it is not a panacea and can create troubling procedural and outcome results if it does not allow for some amount of flexibility to reflect unusual or unforeseen circumstances.  Because it is practically impossible for any discipline matrix to outline, in advance, every possible misconduct scenario or type of performance issues, a matrix must be combined with fair and procedurally just mechanisms for (1) the Department to classify types of misconduct or performance that do not meet the definition of defined categories or classes of misconduct a matrix, and (2) supervisors to consider aggravating and mitigating factors during the course of discipline decisions.

Accordingly, the APD should work closely with external stakeholders, including community, officers, the police union, Aurora's Human Resources function, the Civil Service Commission, and others, to fashion a procedurally just, transparent, efficient, and fair disciplinary process.

---

[388] Jon Shane, "Police Employee Disciplinary Matrix an Emerging Concept," 15 *Police Quarterly* 62 (2012).

[389] Christopher J. Harris, et al, "The Prevalence and Content of Police Discipline Matrices," 38 *Policing* 788 (2015).

[390] Sam Walker, *The Discipline Matrix: An Effective Police Accountability Tool?*, Conference Report, University of Nebraska (2004); *quoted in* Darrel W. Stephens, National Institute of Justice, "Police Discipline: A Case for Change" (June 2011) at 10, https://www.ncjrs.gov/pdffiles1/nij/234052.pdf.

[391] Richard R. Johnson & Matt Nolan, Federal Bureau of Investigation, "Making Discipline Stick Beyond Arbitrator Review," *Law Enforcement Bulletin* (Dec. 9, 2019), https://leb.fbi.gov/articles/featured-articles/making-discipline- stick-beyond-arbitrator-review.

Fitouri 020316

In response to this recommendation, the Department told 21CP that "[a] discipline matrix has been explored in the past" but that "[a] dedicated matrix would create troubling procedural and outcome results if it does not allow for some amount of flexibility to reflect unusual or unforeseen circumstances."[392]   21CP agrees that a matrix needs to allow the Department to weigh aggravating and mitigating factors specific to the circumstances of each particular instance, and it has confidence that APD and the City could fashion a fair and transparent matrix that does so.

> **Recommendation 40.4.   APD's policy should clearly identify types of allegations to be investigated by first-line supervisors (typically lower-level misconduct) and the types of allegations that will be investigated by Internal Affairs (typically serious misconduct).   Wherever a first-line supervisor conducts an investigation, the allegation of misconduct should be reported to the complaints management system, as it is done currently and the Internal Affairs to ensure centralized supervision and administration of all misconduct complaints, allegations, and investigations.   Internal Affairs should become the administrative hub of all inquiries into allegations relating to officer performance.**

Generally, "all complaints made by members of the public and all internal complaints of a serious nature . . . must be investigated. . .. The rules and procedures for an [internal affairs] investigation must be framed to ensure its integrity, thoroughness, and fairness."[393] Although APD's current Directive 10.2 appears to identify the types of allegations to be investigated by first-line supervisors, based generally around conduct that if sustained would be more or less significant than a 40-hour suspension, a more detailed categorization scheme for purposes of intake and assignment may be useful to the Department going forward.

> **Recommendation 40.5.   The investigation and disciplinary process directive should include reasonable timelines for the conclusion of the investigation and the adjudication of findings.**

There was widespread agreement among various stakeholders that the process for investigating and adjudicating misconduct complaints takes too long.   Officers who had been investigated, regardless of outcome, expressed frustration with the length of time their case was "under investigation."   Some officer felt that they were "on the bubble" for several months unsure about the outcome or what, if any, discipline could follow.   There was also uncertainty about what type of process would apply if a "sustained" finding occurred.

---

[392] Aurora Police Department, *Response to 21CP Solutions Recommendations for the Aurora Police Department* (June 17, 2021) at 19.

[393] United States Department of Justice, *Office of Community Oriented Policing Services, Standards and Guidelines for Internal Affairs: Recommendations from a Community of Practice* 27 (2008), https://cops.usdoj.gov/ric/Publications/cops-p164-pub.pdf.

Fitouri 020317

Even officers that have never been investigated appeared to resent the treatment of their peers and the added stress prolonged investigations had on their working conditions. Some officers cited prolonged disciplinary investigation and appeal processes as a cause for lower staffing due to officers being on leave while the investigation was pending.

Supervisors also expressed great frustration about the length of the entire process. One supervisor noted that an officer he supervised did not immediately remember what the conduct was when they were served discipline:

> It makes no sense . . . An officer can have discipline pending for several months. Meanwhile, the officer is continuing to work with a chip on their shoulder. The process pisses them off and it takes a long time for them to get past it. Some never do. They either quit and go work somewhere else or spend the rest of their career here and they stay bitter about it – even if it's for something relatively minor.

Meanwhile, community stakeholders, including residents that had made complaints against officers, also expressed frustration with the length of time it took the department to reach a finding or disposition on complaints. Many interpreted long periods of silence regarding the disposition of their complaints to mean that nothing was happening, that their complaints were being intentionally ignored, or that the APD was covering up misconduct. This caused them to question the legitimacy of the department and its work. In other words, the inefficiency of the current process seriously undermines the credibility of the process and the overall department in the eyes of community members. Notably, this view was also echoed by a number of Aurora's elected officials.

The views of officers, community members, and elected officials appear to be supported by APD data. Between 2017 and 2020, misconduct investigations took just over 200 days on average (measured from the day of the misconduct allegation to the day that the investigation was closed) – or nearly seven months. Nearly one out of ten (8 percent) of cases took in excess of a year to close.

Cases involving white officers were closed slightly faster than average, while cases involving Black officers or officers with two or more races took longer on average to close. However, this discrepancy appears likely to be largely driven by a single case that occurred in 2019, in which the investigation of two female officers took 644 days to close. Both the average and median time to closures is largely consistent regardless of the officer's race.

**Table 21. Length of Officer Misconduct Investigation, 2017 – 2020**

| Race | Average | Median | Cases |
|---|---|---|---|

Fitouri 020318

| | | | |
|---|---|---|---|
| **White** | 196.8 | 182 | 168 |
| **Hispanic** | 200.8 | 181 | 20 |
| **Black** | 224.3 | 155.5 | 22 |
| **Two or more Races** | 223.0 | 225.5 | 10 |
| **Asian** | 202.6 | 163 | 5 |
| **Overall** | 201.1 | 179 | 225 |

*Source: 21CP Analysis of APD Data.*

An action was taken against an officer in 60 percent of misconduct complaint allegations
between 2017 and 2020. Black officers were far more likely to receive a suspension as an
action taken relative to other demographic groups. Black officers received a suspension in
response to 58% percent of allegations where an action was taken, compared to a suspension
in 38 percent of actions involving all other officers. Conversely, Black officers received a
written reprimand in 6 percent of actions taken compared to 19 percent for all other officers.
Further analysis of individual cases would be needed to determine the cause of these
discrepancies.

**Table 22.  Corrective Action for Sustained Misconduct Investigations, 2017 – 2020**

| Action | White | Black | Hispanic | 2 or More Races | Asian | Total |
|---|---|---|---|---|---|---|
| **Suspension** | 84 | 18 | 8 | 5 | 0 | 115 |
| **Written Reprimand** | 39 | 2 | 6 | 2 | 1 | 50 |
| **Resignation prior to discipline** | 38 | 7 | 2 | 0 | 2 | 49 |
| **Termination** | 15 | 1 | 2 | 4 | 0 | 22 |
| **Corrective Action** | 15 | 1 | 3 | 0 | 1 | 20 |
| **Resignation in lieu of termination** | 15 | 1 | 2 | 1 | 0 | 19 |
| **Final** | 2 | 0 | 0 | 1 | 1 | 4 |
| **PAE – Negative** | 3 | 0 | 1 | 0 | 0 | 3 |
| **Fine** | 1 | 1 | 0 | 0 | 0 | 2 |

*Source: 21CP Analysis of APD Data.*

21CP recommends that APD revise its directives to articulate clear investigative timelines
that promote the comprehensive but timely investigation of all allegations of potential officer
misconduct. The Department and City will need to work to ensure that the Department's
internal accountability functions, including Internal Affairs, are staffed and supported in a
manner that allows for the adherence to definitive investigation timelines.

In response to this recommendation, APD notes:

Fitouri 020319

The timeline example used by 21CP reflects extended timelines from the previous administration. Since the change of administration, investigations are taking considerably less time. Additionally, the duration of some Investigations are extended due to outside factors such as criminal investigations that precede administration investigations.[394]

**Recommendation 40.6.    The current IRB and CRB structures should be evaluated and either modified to ensure that they contribute value toward ensuring objective, fair, thorough, and timely investigations or be replaced with a streamlined process that does.**

It appears, based on a variety of discussions with departmental, City, and community stakeholders, that APD's IRB and CRB, in their current forms, provide little value. In the context of the system that was operational during 21CP's engagement, the Chief's Review Board ("CRB") consists of the Deputy Chief of Police, who acts as the Chair of the Board, the Internal Affairs Bureau, the officers' chain of command, the subject officer's Division Chief, APD Legal Advisor, and a Human Resource representative. Human Resources oversees the policies and procedures for the Independent Review Board.[395] The Board is given access to the internal affairs investigatory files seven to ten days prior to meeting to review each case. After the Board is presented with the case by the Commander of Internal Affairs, it deliberates and recommends disciplinary action. The Chief can, and does, deviate from CRB recommendations. Ultimately, the final decision as to discipline and nature of corrective action is at the Chief's sole discretion.

The Independent Review Board ("IRB") process can be initiated by the Chief at their sole discretion (prior to making a disciplinary decision) *or* can be requested by an accused officer. The sole purview of the IRB, which is comprised of four members of the public and four members of the Department, is to make a recommendation about the appropriate corrective action and not to re-weigh factual findings of the Internal Affairs investigation. If requested by the accused officer, the Chief has the sole discretion to grant or deny an IRB review. Similar to the CRB process, the Chief can and does deviate from IRB's findings or recommendations. Multiple stakeholders indicated that the IRB process can add up to three months of additional time to the disciplinary process.

Of the many concerns that stakeholders discussed, the CRB and IRB elements of the current disciplinary investigation scheme were cited repeatedly as sources of inconsistency and unfairness. Some officers believed that having their case heard by the IRB was a right. Others understand it to be discretionary at the pleasure of the Chief. Under department

---

[394] Aurora Police Department, *Response to 21CP Solutions Recommendations for the Aurora Police Department* (June 17, 2021) at 19.
[395] *Id.*

Fitouri 020320

policy, officers can request an IRB review – but it is in fact at the Chief's discretion to grant one.

Additional concerns were amplified in the minds of officers by inconsistency in following either the CRB and/or the IRB's recommendations. One officer described both the CRB and IRB as "cover for the Chief to do what she wants to do." Others described the IRB as a pointless exercise, with one officer summing up this view by noting, "If they agree with the Chief, their recommendation is followed to the letter. If they disagree, it is just ignored . . . . It is a waste of time."

Many community stakeholders do not know what the role of the IRB is – or that half of the IRB consists of community members. Even some stakeholders that did know about community participation on the IRB expressed that it felt like "window dressing" and that community input was largely ignored in the process.

Consequently, 21CP recommends that the APD collaborate with community, the city's HR department, the police union, and the Civil Service Commission to develop a more efficient and procedurally just investigative and deliberative process.

> **Recommendation 40.7. Officers, supervisors, and administrators should receive internal procedural justice training.**

Internal procedural justice, as noted above, refers to the concept of fairness in processes that resolve disputes and allocate responsibilities. Procedural justice, as a general, is supported by four principled pillars: (1) being fair in processes; (2) being transparent in actions; (3) providing opportunity for voice; and (4) being impartial in decision-making[396]. Even as these pillars frequently are used in the policing context to guide officers through interactions with members of the public, they bear equal weight in deciding how a police department applies rules and makes decisions internally:

> People want an opportunity not only to understand what is happening but also to feel they have an opportunity for voice [sic] to ensure their side of the story is heard. No one likes to feel their future is being decided upon at another person's whim; rather, people want voice or representation in decisions that may directly affect them. We all want decision making to be guided

---

[396] The Justice Collaboratory, Yale Law School, *Procedural Justice*, https://law.yale.edu/justice-collaboratory/procedural-justice (last visited June 1, 2021).

Fitouri 020321

by impartiality, ensuring that biases did not influence the
decision and ultimately the outcome.[397]

APD should provide training on procedural justice to all officers that emphasizes the
applicability of the concept, both to interactions with the general public and interactions
within the Department.  21CP understands that "[t]his has been done is the past and will be
re-implemented in training going forward."[398]

> **Recommendation 40.8.    The Department should create a detailed Internal
> Affairs Manual that provides specific procedures and protocols for all aspects
> of misconduct investigations.**

21CP recommends that, in addition to overhauling its basic procedures and policies on officer
misconduct and misconduct investigations, APD create an Internal Affairs Manual that sets
forth detailed protocols, procedures, and processes for how IA functions and how
investigators must proceed through their investigations, including but not limited to:

- How complaint allegations are classified or categorized.
- Timelines and requirements for notification to implicated personnel and
  communication requirements for complainants on the status of ongoing
  investigations. "Completion of Internal Affairs investigations should occur as
  rapidly as is reasonably necessary to fulfill the investigative mission."
- Requirements surrounding the interview of complainants, officers, and witnesses.
  This includes whether various interviews must be audio- or video-recorded.
- An investigative checklist of tasks that must be completed during an investigation
  or a detailed investigative chronology. "A sound investigative practice common to
  investigations includes the use of a chronological log in which investigators make
  entries as they advance their investigations." Such a log "allow[s] supervisors to
  determine the effectiveness of their investigators and also helps other
  investigators take over a case when the original investigator is on leave or is
  removed from the case."
- COPS Office guidelines for an investigative report and what should be included:
  - All allegations are clearly stated and clearly answered.
  - All relevant facts bearing on the truth of each allegation are clearly stated.
  - All evidence (e.g., photos, recordings, etc.) is included or its means of
    retrieval specified.

---

[397] U.S. Department of Justice, Office of Community Oriented Policing Services,    (Apr. 2015),
*Organizational Change through Decision Making and Policy: Procedural Justice Course for Managers
and Supervisors*, https://cops.usdoj.gov/html/dispatch/04-2015/a_new_procedural_justice_course.asp.
[398] Aurora Police Department, *Response to 21CP Solutions Recommendations for the Aurora Police
Department* (June 17, 2021) at 20.

Fitouri 020322

- Contact and identification information for all persons interviewed and for the investigator(s) is included.
- The report is impartial, with no bias for or against any party.
- The report is logically organized with the aim of helping the reader understand it.
- Its language is clear, and where special terms of art are used, they are defined. The reader should not have to presume or guess the meaning of a term.
- It avoids conclusory statements wherever possible.
- Sentences and paragraphs are direct, simple, and easy to understand, using the fewest words to clearly convey the point.
- Estimates of time, distance, or other quantities should be as precise as reasonably useful but need not be precise beyond that.
- Unless explicitly permitted by agency policy, personal opinions should be avoided. If they are permitted, they should include explicit evidence to support the opinion.[399]

APD tells 21CP that the "Internal Affairs Bureau (IAB) uses forms and documents that outline those investigative steps. However, they are not in the form of a manual. Staff will reach out to other agencies for exemplars."[400]

**Recommendation 40.9.    All officers, including supervisors, assigned to IA should receive formal Internal Affairs investigation training.**

APD should ensure that Internal Affairs investigators receive continued training on conducting administrative investigations. This should include basic investigative skills and more specialized training addressing the particular issues and concerns that arise during the investigation of police conduct and performance. Training conducted by outside agencies and third-party vendors may be especially useful in this regard. APD indeed notes that "Internal Affairs (IA) staff are sent to IA investigation specific training hosted by professional organizations and attend as the training becomes available."[401]

**Recommendation 41.    The City of Aurora should examine its Civil Service Commission to ensure hiring and disciplinary decisions that are fair, efficient, timely, equitable, and consistent with the mission and goals of the City, APD, and community.**

[399] United States Department of Justice, Office of Community Oriented Policing Services, *Standards and Guidelines for Internal Affairs: Recommendations from a Community of Practice* 27-38 (2008), https://cops.usdoj.gov/ric/Publications/cops-p164-pub.pdf.
[400] Aurora Police Department, *Response to 21CP Solutions Recommendations for the Aurora Police Department* (June 17, 2021) at 20.
[401] *Id.*

Fitouri 020323

In the City of Aurora, the Civil Service Commission ("CSC") serves as both the initial decisionmaker on hiring and the final level of disciplinary appeal for all sworn officers employed by the APD.

The Civil Service Commission is empowered by Aurora's City Charter as the final level of disciplinary appeal for all sworn officers employed by the APD.[402]   Aurora's City Charter provides all civil servants, including police officers, the option of appealing any disciplinary decisions made by the Chief.   The only exception to this right is for oral and written reprimands.[403]   21CP's review of the City Charter as well as the Commission's Rules and Regulations reveals that this broad right of appeal is essentially only limited temporally by nature of filing deadlines.[404]   All appeals, without regard for substantive basis, are set for hearing by the Commission without any opportunity for APD to respond to its employee's asserted reason for appeal.[405]   The CSC's disciplinary review process is quasi-judicial and litigious in nature in that it makes provision for initial disclosures, discovery, motion practice, subpoenas, exhibits a de novo standard of review, and many other hallmarks of full-scale litigation.[406]   Under the current Civil Service Commission review process, appeals of disciplinary action are heard by the Commission between 15 and 30 days of the Commission receiving a Petition for Appeal (which is different from the date on which discipline was initially issued by the Chief).  That timeframe can be extended by mutual agreement of the involved parties.

Additionally, for nearly 54 years, the Commission has – among other things – designed and administered the Civil Service examination to purportedly select the most qualified applicants, whether be it for an initial hire or promotion. The Commission serves as the "sole judge of qualification for new hires.[407]   In this way, the Civil Service Commission serves as a gatekeeper to positions within the Aurora Police Department.  As discussed in more detail below, the City Charter also provides the CSC with vast authority to be the final arbiter of discipline within the City.

The Commission is staffed by an administrator, three analysts, and a team of individuals responsible for conducting background investigations of prospective employees.  The entity

---

[402] Decisions of the Civil Service Commission may, under certain circumstances, be appealed into the civil court system.  However, those appeals are very rare, and the burden for overturning a Civil Service Commission adjudication under administrative review is high.

[403] City of Aurora Charter §3-16 (8)(j).

[404] Rules and Regulations of Civil Service Commission at Sec. XI. 62, https://www.auroragov.org/UserFiles/Servers/Server_1881137/File/City%20Hall/Boards%20&%20Commissions/Civil%20Service%20Commission/CSCRulesRegsFinal.pdf (last visited May 27, 2021) [hereinafter "Rules and Regulations of Civil Service Commission"].

[405] Rules and Regulations of Civil Service Commission at Sec. XI. 63.  The Chief is expected to provide specific information regarding the charges, evidence and the officer's disciplinary history prior to the CSC's appellate hearing but, nonetheless, after a full hearing has been scheduled and noticed.

[406] Rules and Regulations of Civil Service Commission at Sec. XII.

[407] Rules and Regulations of Civil Service Commission at Sec. II.4.

Fitouri 020324

also includes up to five registered voters, appointed to serve by the City Council, who currently reside in Aurora and are otherwise unaffiliated or not employed by the City.[408] These members are appointed to serve three-year terms for up to nine consecutive years.[409]

A review of the City Charter and CSC Rules and Regulations alone might suggest that the organizational structure of the Commission allows it to fulfill its stated purpose of selecting "the most qualified applicants" and "to inspire public confidence."   However, interviews conducted by 21CP of police officers, elected officials, and the broader Aurora community suggested challenges in meeting these goals.   Interviewees readily identified the essentially unchecked gatekeeping and decision-making authority of the Commission as a chief obstacle to: (1) hiring police officers representative of the community they serve, and (2) holding police accountable for misconduct.   Police officers and community members alike spoke to what they characterized as an inordinately lengthy application process that spans more than several months and ultimately leads qualified applicants to pursue other employment.   Several community members also expressed great concern about the lack of actual transparency to CSC processes as well as the lack of accountability for their hiring and firing decisions.   Finally, many identified the authority of the Commission to override the Chief's disciplinary decisions as undermining the ability of the APD to effectively manage its employees and pointed to, its historical decisions to reinstate officers whose conduct in highly publicized, racially charged incidents, as an ongoing betrayal of the values and expectations of the community it serves.

> **Recommendation 41.1.    The Civil Service Commission appeal process should be modified and expedited to ensure it takes no more than 30 days from the date the discipline is issued by the Chief.**

21CP recognizes that exigencies may occur that warrant a reasonable extension of time for an appeal to be processed.   However, these circumstances should be relatively infrequent and, when they occur, the procedures for extensions should be specifically codified, strictly adhered to, and uniformly enforced in the same manner that they would be in any judicial or arbitration proceeding.

---

**Transparency & Oversight**

---

**Recommendation 42.    APD, in consultation with the community it serves, should develop processes and protocols – with standard timelines – by which information and details related to critical incidents are released in a timely and transparent manner.**

---

[408] City of Aurora Charter § 3-17.
[409] *Id.*

Fitouri 020325

In conversations with community members and elected officials, 21CP heard concerns about the timing of release and overall availability of information to the public about misconduct investigations and critical incidents such as use of force. For some stakeholders, lack of advance understanding about what is chosen to be released, when they release it, and the circumstances under which information becomes available fuels skepticism and mistrust.

As the President's Task Force on 21st Century Policing noted:

> Policies on use of force should clearly state what types of information will be released, when, and in what situation, to maintain transparency. This should also include procedures on the release of a summary statement regarding the circumstances of the incident by the department as soon as possible and within 24 hours. The intent of this directive should be to share as much information as possible without compromising the integrity of the investigation or anyone's rights.[410]

Several jurisdictions have found establishing clear protocols for the public release of information in the wake of critical incidents to have significant benefits. For instance, the Las Vegas Metropolitan Police Department has established a detailed policy on "Response to Deadly Force Incidents" that provides protocols and procedures for the public release of information about deadly use of force encounters.[411]

APD should work in collaboration with its employees, their union, community and other government stakeholders, to establish protocols for the release of information regarding use of force and other critical incidents so that there is clarity among APD supervisors and staff, city administration, elected officials, and the community, well before an incident may occur, about what should be released to the public, and when. APD indicates that the Department "agrees with this recommendation and will evaluate processes and best practices with collaboration from the District Attorneys."[412]

**Recommendation 43.        APD should collaborate actively with the community in the development and revision of its policies, procedures, and training.**

"When people talk about accountability in policing, they usually are referring to the back end. Something bad has happened, it is not what should have happened, and so someone

---

[410] *Final Report of the President's Task Force on 21st Century Policing* 22 (2015).

[411] U.S. Department of Justice, Office of Community Oriented Policing Services and Crime and Justice Institute, Community Resource for Justice, *Assessment of the Collaborative Reform Initiative in the Las Vegas Metropolitan Police Department: A Catalyst for Change* 20-22 (2017), https://www.crj.org/assets/2017/07/5_COPS_LVMPD report.pdf.

[412] Aurora Police Department, *Response to 21CP Solutions Recommendations for the Aurora Police Department* (June 17, 2021) at 21. APD also observes that "some portions of SB 20-217 stipulate release of some such details in critical incidents as well." *Id.*

Fitouri 020326

must be held accountable."[413]  The recommendations above, focusing on the officer misconduct investigation and discipline processes, address strengthening Aurora's back-end accountability systems.

At the same time, forward-thinking approaches in policing are emphasizing the primacy of community participation in policing with respect to ensuring clear "rules in place before officials act, which are transparent, and formulated with public input."[414]

> The community's voice should inform all aspects of department operations, from how departments are structured to how officers use their time. Department leaders should seek community members' concerns and desires when devising policing strategies, and community members should be able to provide input when policies are created and revised.[415]

Communities and departments benefit when citizens can participate in setting ground-level expectations about what the police do and how they do it.  This type of *front-end* accountability seeks to incorporate the community's voice, input, feedback, and experiences into the performance expectations that APD sets to ensure that the Department's performance affirmatively aligns with community needs.  For the community to promote this type of upfront police accountability the community needs to be involved in the Department's development and refinement of policies, procedures, and training initiatives.

APD tells 21CP:

> We are engaging community groups to become involved in these areas. We're in the process of bringing a civilian on to the Force Review Board (FRB), who will be a voting member/contributor.  We are also presenting training and academy curriculum to the Community Policing Advisory Team (CPAT) for recommendations.  APD will investigate additional strategies to engage the community in policy development.[416]

---

[413] Maria Ponomarenko and Barry Friedman, "Democratic Accountability and Policing," *in* 4 *Reforming Criminal Justice: Punishment, Incarceration, and Release* 5, 5 (Erik Luna ed., 2017).

[414] *Id.* at 8; *see, e.g.*, Barry Friedman, *Unwarranted: Policing Without Permission* (2017); Tracey Meares, "Policing and Procedural Justice: Shaping Citizens' Identities to Increase Democratic Participation," 111 *Northwestern University Law Review* 1525 (2017); Imani J. Jackson and Frank LoMonte, "Policing Transparency," *Human Rights* (Jan. 7, 2020).

[415] Leadership Conference on Civil and Human Rights, *New Era for Public Safety: A Guide to Fair Safe and Effective Community Policing* 22 (2019).

[416] Aurora Police Department, *Response to 21CP Solutions Recommendations for the Aurora Police Department* (June 17, 2021) at 21.

Fitouri 020327

**Recommendation 44.      The City of Aurora should move expeditiously to select an individual responsible for independently monitoring and auditing APD's adherence to, and the efficacy of, the Department's policies, disciplinary processes, and performance appraisal outcomes.**

The City has announced the intention of hiring an Independent Monitor.  21CP understands that, among other functions, such a Monitor will work to identify and address gaps in the existing accountability structure.  The institutionalization of such external oversight has the promise of leading to greater transparency and accountability.

Fitouri 020328

## AREA 6.  EQUIPMENT, TECHNOLOGY, AND DATA SYSTEMS

As with most other enterprises in modern life, police departments increasingly rely on technology and specialized equipment to help them fulfill their missions.  This section considers APD's current use of equipment, technology, and data systems.

21CP stresses at the outset that this is not a comprehensive review of these topics, as standalone evaluations could likely be completed on the particular elements of APD systems and ways in which that the Department might better use them to enhance the quality of its service and the transparency of its activities.  Instead, we focus on those issues that surfaced in interviews and focus groups of APD and community stakeholders or that we discovered in the course of our analysis of the Department's policies, practices, and data.

As the National Institute of Justice has observed, "technology is having a positive impact on U.S. law enforcement agencies in terms of increasing efficiency, providing communication, enhancing information-sharing practices, and improving informational and analytical capacities."[417]  Technology can make at least some aspects of policing more effective, efficient, and safe – and can provide communities and their elected officials with expanded transparency and accountability.

It is also true that, at the same time, police technology and its use often moves faster than the laws, regulations, and ethical guidelines governing it.  Often, the adoption of new technologies and systems can have unintended consequences. As President Obama's Task Force on 21st Century Policing noted:

> [D]espite (and because of) the centrality of technology in policing, law enforcement agencies face major challenges including determining the effects of implementing various technologies; identifying costs and benefits; examining unintended consequences; and exploring the best practices by which technology can be evaluated, acquired, maintained, and managed.[418]

Privacy remains one of the most significant concerns raised as technologies like camera systems, facial recognition, and license plate readers have proliferated.  Issues have also been raised about the possibility for bias to result from, or be embedded into, algorithms that may be used to predict crime locations, identify "hot spots" for police attention, or otherwise synthesize information of potential risks

Mindful that many technologies and tools carry both potential benefits and potential harms, many agencies are increasingly adopting new technologies pursuant to public input and the

---

[417] RTI International and the Police Executive Research Forum, *Research on the Impact of Technology on Policing in the 21st Century,* 2-3 (May 2016), https://www.ncjrs.gov/pdffiles1/nij/grants/251140.pdf.
[418] *Final Report of the President's Task Force on 21st Century Policing* 31 (2015).

Fitouri 020329

crafting of specific use policies in collaboration with community stakeholders. As President Obama's Task Force on 21st Century Policing recommended, "[l]aw enforcement agencies should encourage public engagement and collaboration, including the use of community advisory bodies, when developing a policy for the use of a new technology."[419]

Like other major city agencies, the APD uses a wide array of technology to improve operational capability and efficiently manage the organization. The scope and type of APD's technology and data systems are summarized in Figure 5.

**Figure 5. Current APD Technology Applications**

| Software | Function | Organizational Responsibility |
|---|---|---|
| AIM | Internal Affairs, Early Intervention, Performance Appraisal Documentation | Professional Standards, City IT |
| Power DMS | Directive Management, Training Management | Professional Standards, City IT |
| RMS – Versadex | Records Management, arrest/booking, case management, evidence, CAD information, court case filings, etc. | Business Services – Police Systems Coordinator, City IT. Upgrade Underway |
| CAD - Intergraph | CAD – Moving to Versaterm | PSCC, City IT |
| Field Training - LEFTA | Field Training Officer Evaluation | Operations Division – FTEP Sergeant, City IT |
| Telestaff - Kronos | Scheduling, Tracking Work Time, Subpoena Management | Business Services – Police Systems Coordinator |
| Aurora Police Personnel System | Personnel Orders, Personnel Information, organization management/reporting | Business Services – Police Systems Coordinator |
| DMSS Foray | Digital Evidence | Electronic Support Section (ESS), City IT |
| PoliceOne Academy | Training Courses | Training Section |
| Aurora Learn | City Training Program | City IT, Training Section |
| Body Worn Cameras | Digital Storage, VieVue (RFP for replacement) | Electronic Support Section |
| ALPR/BOSS | License Plate Readers | Electronic Support Section, City IT |
| MORPHO TRAK | Portable Fingerprint Scanners | Colorado Bureau of Investigation |
| AFIS | State System | |

---

[419] *Id.* at 35.

Fitouri 020330

| CO Criminal Information System | State System | |
|---|---|---|
| CO LE Emergency Radio (CLEER) | State System | |
| UCR/NIBRS | State System | |
| GIS | Geographic Information System | City IT |
| Microsoft Access | Database Software | City IT |
| SQL Software | Search and access databases – reporting | City IT |
| ProQA | Call Taking Software | City IT, PSCC |
| Mobile Data | Panasonic Tough Books | City IT, ESS |
| MESH Camera System | Stationary cameras in strategic locations (e.g., Colfax Avenue) | Electronic Support Section |
| COPLOGIC Nexis Lexis | Online Crime Reports (Will be replaced in the CAD system change) | Front Desk Supervisor |
| Justice Trax - LIMS | Crime Lab Requests | City IT |
| LINyX (coming on-line) | Similar to Lumen but managed by NCIC | Crime Analysts |
| Xtra Duty | Manages APD off duty jobs | Court Liaison/City IT |
| Code Red | Emergency Notification System (SWAT/ERT, etc.) | IT and Power Users in PD and Dispatch |
| Crime Free Properties | In-house app to report when APD responds to housing complex that register for APD program | City IT |
| Lumen (CISC) | Crime Analytics and metro search tool | Crime Analysts, City IT |
| Background Solutions | Processes potential APD recruits through background investigation | APD Background |
| Muni/State eSubpoena | Digital subpoenas from various courts | Court Liaisons |
| State eDiscovery | Case Filings with District Courts | State System |
| Coban & Milestone | Interview Room software | ESS and City IT |
| Imprivata | 2 Factor Authentication | Used by 9-1-1/PD, City IT |
| Exacom | Records 911/Radio Traffic – APD call pull the recordings | City IT |
| Picture Link | Mugshots and line ups | City IT |
| BRAZOS | e-ticketing for MET/Traffic | City IT |
| Versadex | e-ticketing Patrol | City IT |
| Perfect Mind | cash register | Parks & Rec |
| Report Beam | Accident reporting (Will be replaced in the CAD system change) | City IT |

*Source: APD, 21CP Synthesis of APD Information.*

Fitouri 020331

The City IT Department is responsible for many of the programs the APD uses and provides technical support or maintenance for others. Human resources devoted to supporting technology used in the department is shown in Figure 6. Eleven of the 13.5 full-time employees roles ("FTE"s) assigned to APD technology functions are filled by sworn personnel. They are supported by 6 city IT professionals.

**Figure 6.  APD Technology Staffing**

Electronic Support Section
  7 Sworn
    1-  Lieutenant, 1- Sergeant, 1- Agent, 4 Officers

Business Services
  2.5 Nonsworn
    1 - Police Systems Coordinator
    1 - Sr. Financial Analyst –nonsworn
    .5 - Manager Business Services

Professional Standards Section
  4 Sworn
    1 - AIM
    2 - PowerDMS  1 - Sergeant 1- Officer
    1 - Versadex – Sergeant

City IT
  6 FTE

*Source: APD*

APD technology personnel are primarily assigned to the Professional Accountability and Business Services Divisions. These functions are described below.

**Professional Accountability Division**

***Electronic Support Section ("ESS").***  ESS is a 7-person section that manages the largest concentration of technology outside of the city IT Department. In addition to serving as the primary liaison for the IT Department, the Section is "responsible for the management of the Department's shared resource files on the City Computer Network."[420] It is also accountable for development of technology initiatives, purchasing standardization, a department wide resource for technology, and assisting investigative units. ESS is responsible for coordinating:

- Mobile Data Computer development and training;

---

[420] APD Directive 3.09, Section 3.09.

Fitouri 020332

- Radio accountability to include call signs and profile development and management;
- License plate reader system management and training;
- Surveillance camera system management and training; and
- Body-worn camera footage (digital storage).

***Professional Standards Section ("PSS").*** PSS is a 14-person section that has a range of responsibilities that include technology. The Section manages accreditation, staff inspections, policy research and development, and Force Review Board case preparation. The section has a Sergeant that is currently accountable for all of the training associated with APD's upgrade of the Versadex records management software. The other person working on the records management software is in the Business Services Division. PSS also has a sworn officer responsible for the Department's AIM system, an officer performance-tracking platform, and another officer for PowerDMS, a system which primarily relates to training.

**Business Services Division ("BSD")**

BSD provides a range of support services to the APD. It handles records, property & evidence, budget development, personnel functions, and serves as the liaison to the City Fleet Services Department.[421]

BSD also includes the Police Systems Coordinator ("PSC"). As indicated in APD Directive 3.05:

> [The] Police Systems Coordinator is responsible for maintaining advanced level of technical proficiency concerning all aspects of Department software applications including reporting, system interfaces, testing system upgrades, maintaining data updates and permissions, monitoring licensing, proposing business process changes, coordinating improvements with IT, troubleshooting, and personnel training and documentation. Systems include:
>
> - Police Records Management
> - Scheduling
> - On-line Crime Reporting
> - Directive Management System
> - Aurora Police Personnel System
> - 

---

[421] APD Directive 3.05.

Fitouri 020333

The Police Systems Coordinator will be responsible for Department training relating to the above systems and provide consultation regarding all new and existing systems which may interface with the above systems.[422]

In contrast to most other full-time IT positions within APD, which are filled by sworn officers, the PSC is a non-sworn employee with an IT background. The PSC spends most of their time supporting the Versadex records management system, Telestaff, and Aurora Police Personnel System ("APPS"). Telestaff is the department's scheduling application that informs payroll. It also supports subpoena management and tracks training hours. APPS is a locally developed program that contains data from Human Resources and the police department. It tracks personnel assignments, basic data on each employee (demographics, rank, shift, days off, etc.) and produces personnel orders for assignments and promotions.

There are other employees in the APD that are responsible for working with various technology systems, but doing so is not a primary role or responsibility. Training staff, for example, interact with the training management system as part of their responsibilities.

**Recommendation 45.     APD should develop a three-to-five-year Technology Plan that identifies technology-related priorities; provides clear deadlines, milestones, and deliverables relating to technology implementation; and identifies structural and process changes for the selection, implementation, maintenance, and oversight of technological systems and tools.**

APD does not currently have an overall technology strategic plan to guide and manage their technology investments. As the Department of Justice's Community Oriented Policing Services Office as observed, the creation of a technology strategic plan is a primary "best practice" with respect to data systems:

An agency's use of technology should support and enhance the organization's functions, expand its ability to make intelligence-based decisions, and provide solutions to complex problems—not create complexity and inefficiencies. Whether an agency is developing a new data system or leveraging existing internal or external resources for data collection, analysis, and sharing, law enforcement executives should begin by developing a formal technology strategic plan.[423]

As the above discussion details, although the ESS is the lead technology entity in APD, key parts of the technology portfolio are spread across the Professional Accountability and

---

[422] Id.

[423] U.S. Department of Justice, Office of Community Oriented Policing Services, *Law Enforcement Best Practices: Lessons Learned from the Field* (2019), https://cops.usdoj.gov/RIC/Publications/cops-w0875-pub.pdf.

Fitouri 020334

Business Services Division – and are all subject to the support of City IT.  The development and execution of a technology strategic plan can help better coordinate priorities, resources, and efforts.

Interviews with APD personnel also suggested the Department could do a better job of planning for the replacement or upgrade of out-of-date technology.  A strategic plan that specifically addresses maintenance costs, replacement requirements, and the acquisition of new systems might ensure more efficient and timely technology improvements.  APD says that it "agrees with this recommendation and will work with our Electronic Support Section (ESS) and City IT to develop a plan."[424]

> **Recommendation 45.1.    In the development of the Technology Plan, APD should establish a Technology Working Group that includes the City IT public safety team, representatives from all areas of APD, and community members.**

Based on stakeholder interviews, it appears that there is a good working relationship between City IT's public safety team and APD personnel with respect to technology implementation and maintenance.  Consequently, APD and the City should leverage and grow this existing relationship by including a diverse group of stakeholders in the process of developing the Technology Plan.

It is also essential that APD personnel from operational units participate in this planning effort, as they know the challenges and problems that technology can best address.  For example, 21CP heard general dissatisfaction with the Department's AIM system.  As one stakeholder noted, "Nobody likes AIM. We are making the best of it, but we need a new system."  "The system is bad, things can be deleted and lost."  Other personnel discussed how the Department's multiple, disparate systems don't work well together.  As a stakeholder summarized, "We have so many applications that should integrate with each other but don't. For example, digital evidence does not talk with RMS."  Operational personnel also identified specific, new systems that might benefit the Department's operations, including an inventory management system, enterprise learning solution, and cloud-based digital media storage.

Individuals who work regularly with data collection and analysis within the Department should also be a part of the process of developing a Technology Plan.  For instance, crime analysts are a good source for understanding the limitations of current systems and data quality.

This recommendation recognizes that the use of technology in the law enforcement context has become a high-profile issue and concern to some members of the community in recent

---

[424] Aurora Police Department, *Response to 21CP Solutions Recommendations for the Aurora Police Department* (June 17, 2021) at 21.

Fitouri 020335

years. Greater transparency and the ability for the community to help shape front-end priorities may help address community concerns and ensure the adoption of tools that are consistent with community values. Accordingly, community members should be directly involved in helping to set priorities, consider new technologies, and develop policies for their implementation and use.

With respect to this recommendation, APD says that the Department "will partner with IT to establish identification of roles and responsibilities."[425]

### Recommendation 45.2.    APD should work to streamline technology roles and responsibilities.

Again, major APD technology functions are spread across several units and locations, including Professional Accountability, Business Services, City IT, and Public Safety Technology. The manner in which coordination between the areas takes place is not clear. For example, responsibilities for the Versadex RMS upgrade are spread between City IT, Business Services, and Professional Accountability. This disjointed approach risks making the implementation and maintenance of technology systems less efficient than it should be.

For this recommendation, APD also says it "will partner with IT to establish identification of roles and responsibilities."[426]

### Recommendation 45.3.    APD should explore the civilianization of IT and technology-related responsibilities.

As described previously, APD has 13.5 full-time employees dedicated to supporting technology in the department. Most (11) are sworn officers. Although many large departments have a mix of sworn and nonsworn employees working in IT, the trend among police departments is increasingly toward filling technology positions with nonsworn technology personnel. Doing so frees sworn personnel to work in assignments for which being a law enforcement officer is necessary while providing the opportunity to benefit from professionals specifically trained and experienced in technology. For instance, the Charlotte-Mecklenburg North Carolina Police Department staffs all of the IT positions with nonsworn personnel.[427] The Fairfax County, Virginia Police Department has 21 non-sworn personnel supporting their technology needs, including CAD and RMS.[428] APD noted to 21CP that it is actively looking to civilianize the IT function.

---

[425] *Id.*

[426] *Id.* at 22.

[427] 21CP Conversation with Crystal Cody, Public Safety Technology Director, City of Charlotte.

[428] Fairfax County Police Department, *5-Year Strategic Staffing Plan FY 2019 - FY 2023*, https://www.fairfaxcounty.gov/police/sites/police/files/assets/images/chief/reports/fcpd%205-year%20strategic%20staffing%20plan.pdf (last visited May 11, 2021).

Fitouri 020336

**Recommendation 46.    APD should purchase, issue, and maintain all firearms. An assessment should be conducted to determine if there are other less-lethal devices that should be purchased as well.**

Currently, all APD officers are required to purchase their own firearms. All are required to purchase Glock handguns now, but other makes and models have been grandfathered into use. Some officers continue to carry guns they purchased decades ago. To ensure standardization, promote safety, and consistently articulate that all aspects of a police officer's duties are regulated by and in service of the City for which the officer works, APD should purchase, issue, and maintain all firearms. 21CP understands that APD has a budget request pending that would include purchasing weapons, which would align with this recommendation.

**Recommendation 47.    The City should conduct a facilities and equipment review to ensure that APD officers continue to have the tools that they need to address community needs and problems.**

In interviews and focus groups, APD personnel raised a number of concerns about equipment and facilities. As one member put it, "We are not keeping current with our equipment. We are using ten-year-old equipment that should have been replaced five years ago." Officers identified what they say are specific needs. "We need a bigger and better dispatch center," said one officer. "There are not enough cars available when needed," according to another.

21CP is always mindful that many people, especially those working for government agencies, can cite ways that their employer could support them better in terms of equipment, on-the-job resources, or facilities. Because 21CP began and completed its work in the context of the COVID-19 pandemic, we were not able to survey the Department and reach our own, independent conclusions about the adequacy of APD's equipment and facilities.

Nevertheless, we also encourage any employer or police department to respect feedback from employees about access and availability of tools and infrastructure that facilitate the performance of their duties. As such, 21CP recommends that the City conduct a facilities and equipment review to ensure that APD have the specific tools and infrastructure that they need to meet the communities' needs. APD indicates that it "provides input and participates with city management in establishing capital improvements."[429]

We note that the recommendation to conduct a review does not assume that more expenditures will necessarily be required. It may be that no major needs are identified. It may be that APD's existing tools and infrastructure should be modified to better align with

---

[429] Aurora Police Department, *Response to 21CP Solutions Recommendations for the Aurora Police Department* (June 17, 2021) at 22.

Fitouri 020337

policing strategies focused on community problem-solving.   It may be that certain enhancements are necessary and sufficiently align with community needs and values. Ultimately, the process of conducting the review is the process of considering the subjects of equipment, infrastructure, and personnel tools in the context of larger discussions about the role of police in enhancing public safety in Aurora going forward.

Fitouri 020338



Matthew Barge
Jessica Drake
Ayesha Hardaway
Kathleen O'Toole
Charles H. Ramsey
Sean Smoot
Darrel Stephens
**Project Team**

Jeff Asher
Ben Horwitz
**Data Analytics**

21CP Solutions

Fitouri 020339