| | |
|---|---|
| 1 | IN THE UNITED STATES DISTRICT COURT |
| | FOR THE DISTRICT OF COLORADO |
| 2 | |
| | Civil Action No. 20-cv-01878-RBJ |
| 3 | |
| | ELISABETH EPPS, |
| 4 | AMANDA BLASINGAME, |
| | ASHLEE WEDGEWORTH, |
| 5 | MAYA ROTHLEIN, |
| | ZACH PACKARD, |
| 6 | HOLLIS LYMAN, |
| | CIDNEY FISK, |
| 7 | STANFORD SMITH, |
| | SARA FITOURI, |
| 8 | JACQUELYN PARKINS, |
| | KELSEY TAYLOR, |
| 9 | JOE DERAS, and |
| | CLAIRE SANNIER, |
| 10 | |
| | Plaintiffs, |
| 11 | |
| | vs. |
| 12 | |
| | CITY AND COUNTY OF DENVER, and |
| 13 | JONATHAN CHRISTIAN, |
| 14 | Defendants. |

_____

**REPORTER'S TRANSCRIPT**
TRIAL TO JURY – DAY ONE

_____

        Proceedings before the HONORABLE R. BROOKE JACKSON,

Senior Judge, United States District Court for the District of

Colorado, commencing at 2:17 p.m., on the 7th day of March,

2022, in Courtroom A902, United States Courthouse, Denver,

Colorado.

                THERESE LINDBLOM, Official Reporter
                 901 19th Street, Denver, Colorado 80294
                Proceedings Reported by Mechanical Stenography
                    Transcription Produced via Computer

1          **A P P E A R A N C E S**

2              TIMOTHY R. MACDONALD, ROBERT REEVES ANDERSON, and
3     EDWARD PACKARD ARO, Attorneys at Law, Arnold & Porter Kaye
      Scholer LLP, 1144 Fifteenth Street, Suite 3100, Denver,
      Colorado, 80202, appearing for the Plaintiffs.
4

5              DIANA K. STERK, Attorney at Law, Arnold & Porter Kaye
      Scholer LLP, 250 West 55th Street, New York, New York, 10019,
6     appearing for the Plaintiffs.

7              ELIZABETH C. WANG, Attorney at Law, Loevy & Loevy,
      2060 Broadway Street, Suite 460, Boulder, Colorado, appearing
8     for the Plaintiffs.

9              MAKEBA RUTAHINDURWA, Attorney at Law, Loevy & Loevy,
      311 North Aberdeen Street, Chicago, Illinois, 60607, appearing
10    for the Plaintiffs.

11             ANDREW DAVID RINGEL, KATHERINE HOFFMAN, and ROBERT
      ALAN WEINER, Attorneys at Law, Hall & Evans, 1001 Seventeenth
12    Street, Suite 300, Denver, Colorado, 80202, appearing for the
      Defendants.

13             HOLLIE RENEE BIRKHOLZ and LINDSAY MICHELLE JORDAN,
14    Attorneys at Law, Denver City and County Attorney's Office, 201
      West Colfax Avenue, Denver, Colorado, 80202, appearing for the
      Defendants.
15

16                          *   *   *   *   *

17         **P R O C E E D I N G S**

18             (Jury Selection not herein transcribed.)

19             (Hearing continued in open court at 2:17 p.m.)

20        *THE COURT:*  Have a seat.  Let's just talk about how

21   it's going to work and answer any more questions that you might

22   have.

23             First -- I put this first because it's that

24   important -- we have tremendous respect for jurors here.  As I

25   said earlier, I've been doing this for 24 years; and my

1   experience has convinced me that jurors are fabulous.  They

2   listen, they pay attention, they do their level best, they

3   bring common sense to the task, and they render very good

4   decisions.  And there is not enough that I can say to express

5   my respect and my appreciation to you, but there are a few

6   things that we can do.

7           One -- it's minor, symbolic; but it's something I've

8   always done in my trials -- is from now on, when you enter the

9   room or leave the room, every time, the bailiff will ask all of

10  us to stand for you.  Remember when I came into the room after

11  a break or after lunch, she would say, Please rise, or

12  whatever?  Well, now that's over; and now you are the judges.

13  You are the judges of the facts, the judges as to whether or

14  not the plaintiffs do or do not meet their burden of proof.

15  And so to show respect for your role, we'll now, all of us,

16  stand for you.

17          During recesses and at night, or after court, your

18  room, where you can leave your coats, your snacks, drinks,

19  anything you want to leave, is right through that door there,

20  just on the other side of the hall.  And so from now on, you'll

21  go in and out of that room -- that door, not the front door

22  here, and Julie will take you and show you that space.  It's

23  pretty nice, really.  It's got a microwave, it's got a

24  refrigerator, a couple of restrooms.  It's big enough that you

25  can spread out if you want to.

1          During the early part of the pandemic, we didn't use

2    the jury deliberation room -- each court has one -- but,

3    instead, I used the courtroom next door.  There are two

4    courtrooms per floor, except on the second floor, where there

5    is only one.  I used the judge's courtroom next door for my

6    juries so they could spread out more.  We don't spread out

7    quite as much anymore.  Plus, we found by asking jurors after

8    trials how they liked the procedures, that once they went into

9    the courtroom next door, they gathered together anyway; so we

10   just went back to using our own jury room.

11         During the course of the trial, you may take notes.

12   We provide pen and paper for that.  Also, you may ask questions

13   to witnesses.  Most judges don't permit that; although, in our

14   state court system here, it's common.  In federal court, it is

15   not.  I come from a background not only as a trial lawyer, but

16   as a state court judge before I was appointed to the federal

17   court; and I brought with me procedures that I liked.  And one

18   is to permit jurors to ask questions.  Now, we don't expect you

19   to stand up and start firing off questions like Perry Mason.

20   For one thing, you might be intimidated and not ask questions

21   just because you didn't want to do that.  I suppose it's

22   possible that somebody might feel it's an opportunity of a

23   lifetime and take over the proceedings.  We don't do that

24   either.  What we do is we provide you with forms; and you write

25   out your questions, if you have any.

1        Now, if your question gets asked by one of the

2   lawyers, then just don't ask it.  Just cross it off, if you've

3   written it out already.  But if at the end of a witness's

4   testimony he or she hasn't answered a question because he or

5   she hasn't been asked a question by the lawyers that you think

6   is important, you'd like to know the answer, go ahead and write

7   it out.  We want you to have as much information as possible to

8   help you with your job.

9        Now, I have to tell you that there are rules that

10  affect what questions the lawyers can ask.  So you've heard, if

11  you've been in a trial situation or on TV, "Objection.

12  Hearsay."  "Objection.  That is irrelevant."  Hamilton Burger,

13  the foil of Perry Mason in the original series would say,

14  "Objection.  Irrelevant, incompetent, and immaterial," which

15  basically meant he objected on all possible grounds.  But

16  you'll hear the lawyers making objections from time to time;

17  and when they do, I rule.  "Sustained," then the question can't

18  be answered.  "Overruled," the question can be answered.

19       Well, those rules are complex -- quite complex.  The

20  hearsay rule itself is complicated, and it has literally dozens

21  of exceptions.  Lawyers sweat bullets trying to learn those

22  rules, like judges do too.  We don't expect you to know the

23  rules or to care about the rules at all.  Just write out your

24  questions.  But if one of those rules applies and a question

25  can't be asked -- could have been a perfectly common sense,

1    good question -- but maybe there is a rule of evidence -- as we

2    call it -- that won't allow that question to be asked, I simply

3    won't ask it.  Because what happens is the bailiff, Julie,

4    comes around.  If anybody has any questions -- we ask after

5    every witness is finished.  And if anyone does, she comes and

6    collects the form with your questions.  I look at the questions

7    at the same time the lawyers are looking at them up here,

8    because I have to give them an opportunity to object to your

9    question if they want to.  So you'll see them come up here,

10   they'll look at the written questions, they'll tell me, kind of

11   whispering, "no objection," or they might say, "I have an

12   objection to this one," whatever.  I make my rulings, just like

13   if they had done it.  Then if there is nothing objectionable

14   about the question, I ask the witness that question.

15        You can go through a witness, you can go through a

16   whole trial without any questions at all.  No one requires that

17   you make any -- ask any questions.  On the other hand, there

18   can be a lot of questions.  Depends on the case.  That's

19   something we do to help you do your job, let's say.

20        The trial day starts at 9 o'clock; goes to about noon,

21   usually; picks up again somewhere around 1:00, 1:15; and like I

22   said this morning, I try to look for a break point somewhere in

23   the range of 4:15, 4:30.  It might be later.  Might go all the

24   way to 5:00.  It won't go past 5:00, but I try to give you a

25   little bit of an early recess so that we don't tire you out too

7

1    much and so you can beat the traffic somewhat.

2         All right.  We take breaks.  The court reporter, for

3    example, needs a break physically.  As a matter of fact, my

4    normal court reporter, whose name is Sarah, is not here today

5    because we just finished a trial Friday; and she's been having

6    some real pains in her arms and wrists from all that work.

7    It's kind of an occupational hazard for court reporters.  And

8    so Terri, who is normally assigned to Judge Rodriguez, has been

9    kind enough to volunteer to step in for our trial.  But it's a

10   difficult physical job, as well as mental job, to stay alert;

11   so we have to take a break every hour and a half to two hours

12   for that reason.  All of us need breaks, to use the restroom,

13   just to wake up and get more alert, whatever, make phone calls.

14   So we'll do that.

15        And any time any of you wants to request a break, all

16   you have to do is just raise your hand, get Julie's attention,

17   whatever, my attention, you say, "Could we have a break?"  You

18   don't have to explain why; just, "Can we have a break?"  And

19   we'll do it.

20        Now, what should you not do?  You should not go home

21   and tell people at home or your friends or your co-workers what

22   this case is about or how the evidence is going.  It's

23   perfectly okay to say it's a civil case in federal court, they

24   expect that it might last as long as three weeks, but the judge

25   has asked us not to really talk about what it's about until

1    it's over.  That's in order to make sure that somebody doesn't

2    start talking about what they think, what they've read, or what

3    they've heard, and you pick up information that is not admitted

4    into the evidence, that didn't come to you all as a group of

5    eight, but just was a stray piece of intelligence -- or maybe

6    not intelligence -- and it's not fair to the parties.  We want

7    this to be squeaky clean and fair to everybody, and that's one

8    way we make it that way.

9         Another thing:  Social media.  No problem with

10   Twitter, Facebook, any of that, as long as you don't tweet or

11   Facebook about what is going on.  There are stories -- I

12   haven't had it happen in my cases -- but I've read about cases

13   where a juror takes it upon herself or himself to tweet about

14   the evidence, the juror's reaction to witnesses, who is

15   winning.  And that eventually is disclosed, and we have a

16   mistrial.  Again, keep it fair, keep it clean.  Don't do that.

17   Tweet about something else.  Tweet about what is going on in

18   the Ukraine or tweet about the Broncos, are they or are they

19   not going to get Aaron Rodgers as their quarterback?  Tweet

20   about anything, the woeful state of Major League Baseball right

21   at the moment, the weather, anything, the judge -- I don't

22   care -- just not what is going on in this trial.

23        You're all I think wearing your yellow badge; right?

24   I see them.  There is a good reason for that while you're in

25   the building; and that is, that way we can all -- all of these

9

1    people, their witnesses, everybody involved can spot you as a

2    juror from a distance.  And that's important because they are

3    not permitted to have any communication or contact with you.

4    But they can't avoid some things, such as maybe they'll see you

5    in the hall; maybe they'll see you downstairs; maybe you'll end

6    up on the same elevator with somebody involved in the case.  If

7    that happens, they're going to be stone-faced and not talk to

8    you.  They're not going to say, How's it going?  What do you

9    think about the weather?  Thank you for your service.  They

10   shouldn't do any of that.  They should -- you're hands off.

11   And you shouldn't initiate any communication with them either.

12   So that, again, we keep it fair, clean, no mistakes.

13           So that's what the yellow badge is for.  Obviously,

14   you don't have to wear it if you don't want to; but I would ask

15   that you do it, if you don't mind.

16           What else, Julie?

17           COURTROOM DEPUTY:  Probably a lot, Your Honor.

18           THE COURT:  Any questions from anybody?

19           Then we'll take a break here.  But just very briefly,

20   the way the case goes is that now that we have a jury, and

21   after you've been shown your room and get your paper and pen --

22   of course, you don't have to take notes.  That's just in case

23   you want to -- then the next stage in a case such as this is

24   that each side has the right to make an opening statement.

25   That's a speech, a speech by a lawyer, where the lawyer is

1    telling you what to anticipate, what they think the evidence is

2    going to be -- not all of the evidence over three weeks, but

3    briefly, a summary -- from their perspective so that you get an

4    idea what is coming from both sides.  They're relatively short

5    speeches.  They don't have to make them, but they typically do.

6            Bear in mind, when the lawyer is talking, that is not

7    evidence.  It could be very useful information -- hopefully, it

8    will be.  These are good lawyers -- but they're not testifying

9    under oath; it's not evidence; so their speeches are literally

10   for what they're worth, in terms of giving you an idea of what

11   their position is.

12           Once the lawyers have made their opening statements,

13   then we start into the evidence from the plaintiffs.  The

14   plaintiffs have the burden of proof in civil case, meaning,

15   they have to prove the claims that they are making by a

16   preponderance of the evidence.  That means, more likely than

17   not.  Doesn't mean beyond any reasonable doubt.  That's for

18   criminal cases.  But they have to prove more likely than not --

19   put another way, they have to prove probably that what they say

20   is true.  They have the burden of proof.  So they go first, and

21   they present their witnesses.

22           Once in a while we interrupt the plaintiffs' case to

23   take a defendant witness, because sometimes witnesses have

24   conflicts that mean they can only be here on a certain day.

25   The plaintiff can if they wish call people on the other side as

1    their witnesses, and they can call the Denver police officer as

2    a witness if they want to.  There is no limit on that.  As long

3    as they have disclosed to the other side in advance they are

4    going to do that, they can do that; but it's part of their

5    presentation of their case.

6          Once their case is finished, then we turn to the

7    defendants' side; and they present their witnesses.  Sometimes

8    it's a second time you will have heard from a witness that the

9    plaintiff already called.  More often, it's new witnesses.

10   Once all of that is done, the plaintiff has the right to

11   present some rebuttal witnesses if they wish to respond to the

12   defendants' witnesses.

13         Once the witness part of the case is over, then two

14   more things happen before you deliberate.  One is, I give you

15   instructions on the law.  I will give those to you verbally and

16   in writing.  And each of you will have your own set of the

17   written instructions to use.

18         Then the lawyers have the right to make their final or

19   closing arguments.  Those are sometimes called summations.  Now

20   the evidence has been presented, they're not talking about what

21   they think the evidence is going to be; they're going to be

22   talking what the evidence has been and, more importantly,

23   perhaps, what inferences they want you to draw from the

24   evidence.

25         A very large part of trials is inferences.  You get

 1   direct evidence -- what people saw, what people heard, and so
 2   forth -- but you get circumstantial evidence, which means
 3   inferences that you draw from the direct evidence.  And the
 4   lawyers can talk with you about inferences; they can talk with
 5   you about how they think you should decide the case; they can
 6   go over certain instructions with you and talk about how you
 7   think that fits their case; whatever they want to do.
 8         Once all of that speaking by the lawyers is over, then
 9   is when you go back into the jury room and the eight of you
10   decide the case.  Your decision has to be unanimous, as you
11   will be instructed.
12         That's basically how it works.  The evidence that has
13   been admitted in writing is called exhibits.  We have
14   testimony, and we have exhibits.  All the exhibits that you
15   will be hearing about and seeing during the trial will be made
16   available to you to look at again when you are deliberating.
17   There will be no limit on how long you deliberate; that will be
18   up to you.  You'll decide the case, and then we'll take your
19   verdict, and we'll be done.  That's how it works.
20         Any questions about any of that?
21         During the course of the trial, if there is anything
22   at all we can do to make you more comfortable or help you out
23   in any way, let us know.
24         Now, I did mention earlier today the masks.  I haven't
25   been looking at the computer to see if the chief judge has

1   issued the order on the masks yet.  I would anticipate it will

2   come out today or tomorrow, and I anticipate -- because I was

3   there at the judges meeting -- that it will be, masks are

4   voluntary.  It's perfectly okay to wear them.  I may well

5   myself wear the mask throughout the trial, even if it's

6   voluntary.  If you don't feel comfortable because not everybody

7   else is masked, then you can bring that to Julie's attention,

8   and we'll see what we can do.

9         Julie is the person that will be your contact.  You

10  can ask Julie anything you want -- complaints, questions,

11  anything.  Now, if it's about the case, how should we decide

12  the case?  What do you think of that witness?  No, she won't

13  talk with you about that.  She might have her opinions, but

14  she'll keep it to herself.  But anything we can do for you,

15  just let Julie know, and we'll try to do it for you.  Because,

16  again, we respect you and we appreciate you.

17        Anything else?  If not, we'll be in recess for

18  probably ten minutes or twelve to get the jury set up in their

19  room, then we'll be ready to go with the speeches of the

20  lawyers.

21        (Recess at 2:38 p.m.)

22        (In open court at 2:53 p.m.)

23        *THE COURT:*  I understand that because there are two

24  cases consolidated into one trial and different lawyers

25  representing parties to the two different cases, we'll hear

1    from two of the plaintiffs' lawyers for that reason.  I don't

2    know who is going to go first.

3             MR. MACDONALD:  I am going to go first, Your Honor,

4    followed by Ms. Rutahindurwa.

5             THE COURT:  All right.  So you'll give a nice but

6    brief opening statement for your group of plaintiffs.

7             MR. MACDONALD:  That's correct, Your Honor.

8             THE COURT:  All right.  Go for it.

9             MR. MACDONALD:  May I proceed, Your Honor?

10            THE COURT:  Yes.

11            Wait a minute.  We have -- are your screens -- I can

12   see one that is malfunctioning there.

13            Can everybody see what is up there on the screen?

14   Says "Epps opening statement."

15            Onward.

16                        **OPENING STATEMENT**

17            MR. MACDONALD:  Thank you, Your Honor.

18            May it please the Court, members of the jury.  As I

19   said earlier, my name is Tim Macdonald, and I represent what we

20   refer to as the Epps plaintiffs in this case.

21            And in May of 2020, members of the Denver community

22   came down to the public square, down here at the state capitol,

23   to exercise one of the most fundamental of American rights, the

24   right to speak out, to try to make change, and to protest

25   peacefully.  And that followed the murder of George Floyd in

1    Minneapolis.

2         And all of our clients protested peacefully, Stanford

3    Smith, Zach Packard, Maya Rothlein, Amanda Blasingame,

4    Elisabeth Epps, Ashlee Wedgeworth, and Hollis Lyman -- those

5    are the seven people that I represent -- and every one of them

6    came down to the capitol and central Denver to raise their

7    invoices, to protest police violence, and to do it peacefully.

8    The Denver police responded with more violence.  To the

9    protests against police brutality, they responded with

10   brutality.

11        For our constitutional rights to have any meaning --

12   to have any meaning -- we need people like the seven folks I

13   represent to stand up, to safeguard those rights when they come

14   under attack; and I believe the evidence will show at the end

15   of this trial that that's exactly what happened.  And we're

16   here to ask you to help safeguard those fundamental

17   constitutional rights.

18        So throughout this trial, the evidence will show that

19   after the murder of George Floyd, citizens across the country

20   came out to protest.  We talked a little bit about that in *voir*

21   *dire*, and I think all of you yourselves indicated awareness of

22   that tragic event.  And here in Denver, the evidence will show

23   that law enforcement responded to the protests with

24   overwhelming and unconstitutional uses of force.

25        For many days Denver and its agents, other police

1    departments that were invited in, deployed less-lethal physical

2    and chemical weapons on peaceful protesters; and they did it in

3    ways that their own city officials found extremely troubling.

4    That's what the evidence will show.  These assaults injured and

5    terrified the plaintiffs and other citizens, violating their

6    constitutional right to free speech, to assemble, to protest,

7    and to be free from excessive use of force.

8         The evidence will show, these were not the actions of

9    rogue officers.  The evidence will show that it was Denver's

10   policies, practices, and customs that led to the constitutional

11   violations.  The evidence will show that it was a failure of

12   leadership, a failure of training, a failure of supervision

13   that led to the harms that our clients suffered; and at the end

14   of this case, we will ask you to hold Denver accountable.

15        This is a picture of George Floyd and Derek Chauvin,

16   the officer that kneeled on his neck for more than nine

17   minutes.  When this ricocheted around the world, people were

18   outraged, justifiably so.  And that was May 25 of 2020, just a

19   few months into this pandemic that we've now been living

20   through for two years.

21        And this is a picture of protesters out on the streets

22   the next day in Minneapolis, May 26, 2020, where people came

23   out to mourn and to express their First Amendment rights.

24        And, interestingly, nothing happened in Denver for a

25   few days, even as protests began in major cities across

1   America.  But three days after George Floyd's murder, people

2   began to assemble.  And this is a picture of people at the

3   state capitol on May 28, 2020, the first day of the protests.

4   And the evidence will show that even in those intervening days,

5   Denver's leadership took no meaningful action to prepare; and

6   you will hear testimony that they had an opportunity to do so.

7   They didn't take it.

8          Now I want to talk about the unconstitutional part of

9   the use of force.  The judge is going to instruct you on what

10  the law is at the end of this case, and you are the judges of

11  the facts.  But when we talk about the First Amendment --

12  Mr. Ringel asked you all a few questions, What does the First

13  Amendment mean to you?  Well, it's one thing, a foundation of

14  our democracy.  It protects all of us from government

15  overreach.  It allows us the freedom of speech, the freedom of

16  the press, the freedom of the people to peaceably assemble and

17  to seek redress from their government.  This sits at the

18  foundation of what we are as a country and as a people.

19          And these aren't just my words.  This is a slide from

20  Denver's own police crowd control leadership training.  And

21  what Denver tells its officers is that when the majority of an

22  assembly is trying to peacefully voice their rights under the

23  First Amendment, and a small group within the crowd are in

24  violation of the law, what do they have to do as officers?

25  What do they train their officers to do?  Well, this is what

1   they put on paper.  They say, "We must separate our response to

2   take those who have committed or are committing a law violation

3   into custody, while still allowing the majority to peacefully

4   assemble."  Take the people who are throwing rocks, take the

5   people who are breaking windows, doing vandalism, and take them

6   into custody.  That's what they should be doing, because they

7   must allow peaceful protesters to express their voice.  So

8   that's what Denver puts on paper.  The evidence will show that

9   what they do in practice is the opposite.

10        This is Denver's crowd control manual.  It also

11   addresses how a police department should recognize the First

12   Amendment rights of its citizens.  The crowd -- the Denver

13   crowd control management manual explains that the overriding

14   goal of police actions at the onset of a civil disturbance

15   problem is the de-escalation of violence and that police

16   officers are present in order to facilitate the peaceful and

17   lawful expression of First Amendment rights.  One of their jobs

18   is not just to get the bad guys, but is to facilitate the First

19   Amendment rights of the citizens.  That's one of their

20   obligations that they put on paper.  The evidence will show, in

21   practice, that's not what they do.

22        This is one more slide from the Denver crowd recruit

23   training, and this is what they tell their recruits.  This is a

24   little bit wonky, but bear with me.  It says at the top,

25   *"Graham v. Connor*."  This is a United States Supreme Court case

1    from 1989.  Again, the judge will tell you what the law is; but

2    this is what Denver puts in its paper manuals for its recruits.

3    And it addresses when an officer can use force, because this is

4    one of the mightiest things.  We give police officers a badge

5    and a weapon, so that's a mighty responsibility.  So they put

6    on paper, here is when you're going to use force in a crowd

7    control scenario, where people are out protesting.  Officers,

8    look at the severity of the crime.  Look at whether the suspect

9    posed an immediate threat.  Look at where -- look at whether

10   the suspect actively resisted arrest.

11          What the evidence will show here, our clients

12   committed no violent crime, no attack on officers, they posed

13   no threat to anyone at any time, they never fled, because, in

14   fact, they were never arrested.

15          Mr. Ringel mentioned the curfew.  There will be a few

16   times where some of our clients at certain moments were out

17   protesting.  The curfew went into effect on day three of the

18   protest, not day one, not day two.  That's what the evidence

19   will show, the curfew went into effect on day three.  Some

20   people stayed and continued to protest.  But being out after

21   curfew is not a license to shoot someone with a 40-millimeter

22   weapon or shoot someone with a pepper ball or pepper-spray

23   someone.  It is not a crime that justifies a police use of

24   force, like jaywalking is not a crime that allows a police

25   officer to use a weapon and shoot a citizen.

1          For several days, starting on May 28, 2020, Denver and

2     its agents used these less-lethal physical and chemical

3     weapons.  And to be clear, less lethal does not mean nonlethal.

4     I made the same mistake when I first asked questions of Denver

5     police officers in this case, and I said, You were using

6     nonlethal weapons?  And the officer corrected me and said, No,

7     no, sir.  They're not nonlethal, they're just less lethal,

8     because they can kill you.

9          And let's talk about Nick Mitchell.  You're going to

10    hear from Mr. Mitchell.  He is -- or was -- the independent

11    monitor for the City of Denver.  The Office of the Independent

12    Monitor -- you'll hear us sometimes refer to them as the OIM,

13    Office of the Independent Monitor.  Sometimes we'll call

14    Mr. Mitchell the independent monitor.  Mr. Mitchell will come

15    and testify.  Mr. Mitchell himself is a lawyer, and he ran the

16    OIM, which is a civilian oversight agency of the Denver Police

17    Department.  It was created 18 years ago, in 2004 by the mayor

18    and the city council.  Mr. Mitchell had a material staff, 14

19    people, working for him to investigate citizen complaints about

20    police misconduct.  That was his job for the City.

21         During the protests, he was asked by the city council

22    to investigate the police response to the George Floyd

23    protests.  And so Mr. Mitchell and his team watched hundreds --

24    hundreds -- of hours of video from HALO cameras -- and you'll

25    learn about what HALO cameras are.  They're cameras in and

1    around the capitol and some of the downtown streets that are

2    constantly on.  Now, they have some limitations; but they're up

3    on the street signs or light poles.  And Mr. Mitchell and his

4    team watched that.  And he watched some body-worn camera

5    footage.  Those are cameras that some officers have to film

6    what they're doing.  And Mr. Mitchell interviewed dozens of

7    people, including more than 20 officers, including command

8    officers of the police department, as part of his months-long

9    investigation.  And then he wrote a comprehensive report about

10   the police response to the George Floyd protests in Denver, and

11   then he made that public for all to see.

12          And in that report, Mr. Mitchell concluded that Denver

13   and its partners -- the other agencies that were brought in,

14   like Aurora and Jefferson County -- committed extremely

15   troubling acts.  Those were his words, the government official

16   from the city of Denver tasked with investigating the police.

17   They committed extremely troubling acts with very dangerous

18   weapons.

19          We talked a little bit in *voir dire* about what these

20   weapons are that were used.  The evidence will show the Denver

21   police and its agents used all of these weapons on our fellow

22   citizens during those days of the protests in Denver.  The

23   first one is the pepper ball launcher.  Mr. Ringel talked to

24   you a little bit about that.  The pepper ball launcher -- the

25   actual projectile comes out at over 200 miles an hour, and it's

1      filled with something called a PAVA powder.  PAVA is a

2      pelargonic acid that makes it difficult to breathe.  It can

3      cause anaphylactic shock.  It burns your eyes.  It's quite

4      different than a paintball.

5             They also used 40-millimeter launchers.  That's the

6      second one down.  Looks a little bit like a grenade launcher,

7      the black one.  Projectiles comes out of that -- you'll hear

8      them referred to as foam batons.  They come out also at over

9      200 miles an hour.  They have a hard plastic shell.  The

10     manufacturer will tell us and tells the City of Denver that

11     these are extremely dangerous.  They can cause skull fractures

12     and death.

13            The next weapon that was used on our citizens is the

14     12-gauge shotgun.  You'll hear this referred to I think and see

15     in some of the documents called a less-lethal shotgun.  The

16     evidence will show it's actually just a 12-gauge shotgun that

17     they use a different cartridge in it.  But it's a pump-action

18     shotgun like I had as a kid in my house with a family of

19     hunters.  And what goes in it?  You'll hear it referred to as a

20     beanbag round.  The evidence will show that the, quote-unquote,

21     beanbag round is a Kevlar bag filled with lead shot.  Very

22     different than the beanbags we had as kids.  The manufacturer

23     tells the City of Denver and others that this also is an

24     extremely dangerous weapon that can cause serious injury and

25     death.

```
 1              The next weapon used on the citizens of Denver during

 2    the George Floyd protests is the OC fogger.  That's the red

 3    bear-spray-looking canister.  And the evidence will show that

 4    the Denver police had a variety of these sort of

 5    industrial-strength pepper spray with oleoresin capsicum,

 6    another chemical.  And the manufacturer -- sprays can go up to

 7    20 feet effective range.  Manufacturer also says, minimum range

 8    is 6 feet.  So shouldn't be spraying this too close, because

 9    this is, again, a dangerous chemical used on the citizens of

10    Denver during these protests.

11              The next weapon, tear gas and smoke grenades.  You

12    will see footage and hear testimony of Denver citizens out

13    peacefully protesting and getting tear-gassed with no warnings.

14              Next, noise flash diversionary device.  It's a

15    mouthful, a new word for me when I started this case.  You'll

16    see most of the police and the materials often refer to this as

17    a flash-bang.  And they call it that because it's a hand-thrown

18    explosive.  And when it explodes, it produces heats up to 4,900

19    degrees Fahrenheit, enough to melt steel, and a loud explosion

20    that can knock people out and knock them down.  And you will

21    see video of Denver police doing that to peaceful protesters,

22    including our clients.

23              The last weapon we'll talk about right now is the

24    rubber-ball grenade or the stinger grenade, another hand-held

25    explosive device.  A picture of one is down in the right-hand
```

1    corner.  You'll see during the next three weeks, sometimes

2    they're orange.  And it's another hand-held explosive, only

3    this one shoots out hundreds -- maybe 180 rubber balls in a

4    360-degree radius, with a loud explosion, intended to disorient

5    and cause pain.  And that is what it did on peaceful protesters

6    in our city.

7            So what did Nick Mitchell tell the community after his

8    detailed investigation?  Well, he said that the officers

9    deployed OC spray and pepper balls at people who were only

10   objecting to police behavior with words.  And you'll see

11   evidence of that, because these were, after all, protests

12   against police brutality.  So it is true that people yelled at

13   the police; it is true that people cursed at the police.  But

14   Mr. Mitchell explains, and other witnesses will explain,

15   getting yelled at is not a justification for shooting people

16   with less-lethal weapons.

17           Mr. Mitchell also concluded and will testify that the

18   police deployed projectiles at prohibited areas of the body,

19   including the head, the face, and the groin.  And you will see

20   that, and you will hear the testimony.

21           Mr. Mitchell also concluded that the police continued

22   to deploy chemicals, gas, and explosive munitions after crowds

23   dispersed, unjustified manner, depriving the people of their

24   right to protest their government.

25           Mr. Mitchell also concluded that the police threw

1   explosive devices close to individuals, contrary to all

2   appropriate police practices.  Mr. Mitchell also will testify

3   that the police deployed munitions that created traffic hazards

4   and dangers.  And you will see that, police pushing people,

5   shooting people, pressing people into traffic.

6           I want to talk a little bit now about what happened to

7   the seven people that I represent.

8           This is Dr. Stanford Smith, who is a dentist now.

9   Dr. Smith graduated from the University of Colorado Dental

10  School in 2021, did his undergraduate at Morehouse College in

11  Atlanta.  He loves to scuba dive, something we have in common.

12  And he moved to Dallas, Texas, not too long ago to start his

13  career as a dentist.

14          The evidence will show that this was the first protest

15  that Dr. Smith had gone to in his life.  He was so moved by

16  what happened to George Floyd that he wanted to come out and be

17  part of the community.  So on day three -- because he has other

18  things -- as he's finishing dental school in the midst of the

19  pandemic, he came downtown -- he was living in Aurora -- and he

20  came down to the protest.  And within ten or fifteen minutes,

21  you will see that Dr. Smith was shot at, had a flash-bang

22  grenade thrown, protesters around him shot in the back as they

23  ran.  That's what Dr. Smith will explain to you.

24          This is another picture of Dr. Smith a few hours

25  later.  He went down -- the first incident happened at

1    Colfax -- right around Colfax and Washington in broad daylight

2    on a Saturday afternoon.  So Dr. Smith walked down to the

3    capitol to gather himself and to exercise his rights of free

4    speech.  And because he was shaken up by what he had

5    experienced, you will see that Dr. Smith is walking with his

6    hands up in front of a line of police officers, trying to

7    de-escalate, telling people in the crowd, Let's stay calm.  You

8    will see him turn and thank an officer.  You will also hear and

9    see that not long after that, an officer reaches over with his

10   pepper spray inches from Dr. Smith's face and sprays him for no

11   reason.

12          And this is Dr. Smith not long after.  Dr. Smith, on

13   the ground, temporarily blinded, fearing for his life, worried

14   if his promising career as a dentist is over.  Police did

15   nothing to help him.  Other citizens, fellow protesters came to

16   his aid.

17          This is Zach Packard.  Mr. Packard loves to

18   skateboard.  He's born and bred here in Denver.  He's an

19   artist, a musician, an outdoor enthusiast, a gardener, he wants

20   to start his own business.  You'll hear that Mr. Packard was

21   pepper-balled -- shot at with pepper balls -- again, not long

22   after arriving at the protests for the first time on day three,

23   when he yelled at the police for shooting at another protester,

24   a woman who had fallen on the ground.

25          But Dr. Packard -- excuse me -- he's not a doctor

1    yet -- Mr. Packard came back the next day.  And this is a

2    picture of Mr. Packard almost at the moment in which he is shot

3    in the head with a shotgun round, just seconds after kicking a

4    tear gas canister that had been fired by the police at the

5    protesters at Colfax and Washington, and he kicked it 5 or 10

6    feet away from the protesters in the street.

7            This is a picture of Mr. Packard unconscious, as he is

8    falling, laying on Colfax with a fractured skull, a broken jaw,

9    two vertebrae broken, for coming out to protest police

10   violence.

11           This is Mr. Packard in the hospital, where he spent

12   days in intensive care.

13           You'll hear from Mr. Packard that skateboarding was

14   one of the things he loved.  He's a young man, after all.  It's

15   like one of his passions, and he was really good at it.  The

16   City of Denver has taken that away from him, for going out to

17   raise his voice for other people.

18           This is Maya Rothlein.  Maya attended Metro State.

19   She works as a patient care specialist for a pharmacy.  She's

20   been a speaker for the University of Colorado Department of

21   Women and Gender Studies.  She loves basketball, another thing

22   we have in common.  You'll see a trend, I kind of put the

23   things on that I like, that I do with some of our clients.  She

24   now lives in Redding, California.

25           This is Amanda Blasingame.  She works as an attorney

1    for Legal Aid, representing people who couldn't otherwise get a

2    lawyer.  She was just graduating from the University of

3    Colorado Law School when George Floyd was murdered.  She worked

4    for nonprofits before law school; and she's now, as I said,

5    working for people who otherwise wouldn't get a lawyer in

6    Redding, California.

7           This is a picture of Maya and Amanda with their arms

8    up on the south side of the capitol, coming down to protest, to

9    raise their voices.  This is a tear gas canister dropped feet

10   away from them, with no warning, no announcement, no

11   declaration that it's time to leave or we're going to tear gas

12   you.

13          Amanda and Maya on the third day of the protest went

14   home early.  You'll hear one of the reasons they went home is

15   because Amanda, who is about to take the bar exam, worried that

16   she didn't want to be out past curfew.  We don't think there is

17   any justification for any use of force even if people are out

18   after curfew.  But Maya and Amanda said, We've got to go home.

19   We're going to leave.  They happen to live very near the

20   capitol, 14th and Pennsylvania, for those of you who are

21   familiar with central Denver.  Five or six blocks down from the

22   capitol.

23          They were on the front porch, on their own property.

24   And as a convoy of police vehicles rolled down their street,

25   with officers hanging off the side with their weapons, they and

1    their friends yelled at the police, Get the "F" out of our

2    neighborhood, because they were angry, and justifiably so, as

3    to what they had witnessed the police doing to them and others.

4         So the evidence will be, they cursed at the police.

5    That convoy stopped.  An officer jumped out of his vehicle, ran

6    over to their property, pulled out his OC sprayer, and screamed

7    back at them, You get the "F" back in your house.  You get the

8    "F" away, on their own property.  Now, he didn't spray them,

9    because some of their neighbors were smart, and unlike when I

10   grew up and we didn't have phones, now people record

11   everything.  And they pulled out their phones, and the officer

12   went away.

13        But that wasn't the end of that encounter, because

14   within an hour -- within an hour -- our Denver Police

15   Department drove down their street and shot them in a drive-by

16   shooting with pepper balls.  It's almost impossible to believe.

17   Splattering the pepper balls on their front porch and entering

18   their home, for expressing their right to challenge the

19   government.

20        The evidence will show, this is not the only incident

21   of its kind, as shocking -- as shocking as that is and should

22   be to all of us.

23        This is Elisabeth Epps.  Ms. Epps grew up in

24   North Carolina and Virginia.  She, too, has a law degree from

25   the -- this time from the University of Virginia.  Ms. Epps in

1    the two years running up to these protests gave her time, her

2    energy, her spirit, working with the Denver Police Department

3    to change their use-of-force policy, again, acting for the

4    better of all, to try to make sure that the Denver police had a

5    humane, ethical, and equitable way in which they would handle

6    force.  She is also a candidate for the Colorado State House, a

7    proud single mother of a wonderful 25-year-old young man out in

8    Boston.

9           This is a picture of Ms. Epps tear-gassed at the

10   capitol while documenting the crowd.  Ms. Epps often had her

11   phone because she wanted to document the abuses that the police

12   were putting on innocent protesters.

13          This is a picture from a video.  That's the grass

14   beside the capitol at 14th and Lincoln.  This is a picture of

15   Officer Christian, who is in the courtroom today.  He's the

16   only individual defendant in this case.  The rest of our claims

17   are against only the City of Denver.  And we can talk a little

18   bit about why that is.  But this is a picture of Officer

19   Christian, taking a knee, sighting his weapon, and shooting at

20   Ms. Epps, and shooting at Ms. Epps for crossing the street.

21   And he will testify that it's because she was jaywalking,

22   because she was not in a crosswalk.

23          This is another picture of Ms. Epps, holding her phone

24   with a line of officers behind her.  Shortly after this

25   picture -- it's a video -- it's a still from a video --

1    Ms. Epps is shot in the back, had her phone shot out of her

2    hand and destroyed.

3          Because Ms. Epps cares about black lives and policing

4    and trying to change the way in which policing happens in

5    America, she came back after getting tear-gassed on day one and

6    shot on day two and shot again on -- later that same day two.

7    This is a picture of her after she is shot in the face with a

8    pepper ball, while peacefully protesting.

9          This is a picture of Ashlee Wedgeworth.  She has a

10   master's in social work from the University of Denver.  She

11   worked in mental healthcare centers for over 15 years.  Another

12   Denver born and bred native.  Involved in so many things,

13   president of the Urban League, Young Professionals of Denver,

14   the mother of four wonderful children.

15         Ms. Wedgeworth, tear-gassed near the capitol while

16   peacefully demonstrating, day one; shot at with pepper balls,

17   day two; tear-gassed again, day four; flash-bang, hit with a

18   blast of the grenades while with a peaceful crowd; corralled

19   with other peaceful protesters.

20         You'll hear testimony about something called kettling,

21   where lines of officers try to pinch the protesters in and let

22   them have it with gas.  Those are the words you'll hear from

23   Denver officers.

24         And, finally, Hollis Lyman.  Hollis is another grad

25   student.  She's getting a master's in biomedical science.  This

1    will be her second master's.  She already has a master's in

2    sports psychology.  She runs her own business as a personal

3    trainer and a coach.  She has an undergraduate degree from Ohio

4    State.  She was ROTC in college.  She's worked in police

5    departments.  She worked for the Ohio state police department

6    while in college and afterwards.  She cares about good

7    policing.

8         This was a sign Ms. Lyman was holding during the

9    protests, the names of black and brown Americans shot by,

10   killed by police, vigilantes.  So she brought that down,

11   handwritten sign.  You see right there, Philando Castile's

12   name, we have circled in red.  That's a hole.  While she was

13   kneeling on the ground with her sign, shot by our own police

14   department, hit by flash-bangs, tear-gassed, shot in the back.

15        These are not people committing violence and breaking

16   windows.  These are people raising their voices.  And, again,

17   it's Denver's policies, practices, and procedures that led to

18   the violation of these rights.

19        These are just some of the policies and practices that

20   led to the violations.

21        During the protests, Denver officers were not required

22   to prepare use-of-force statements.  Why does that matter?

23   Because the evidence will show and the witnesses will tell you

24   that if an officer has to account for every use of force, if

25   they know they're going to have to account for every use of

1    force, they behave better.  It's human nature.  If any of you

2    have kids, you know what I'm talking about.  If you have -- if

3    you know that someone is going to be watching, you're going to

4    behave better.  But here, the Denver officers will testify,

5    nope, during the protests, we knew we didn't have to do it.

6         And Denver is going to show you some use-of-force

7    statements, because a couple of weeks later, after the pepper

8    balls, the grenades, and -- you will be a little bit blown away

9    by the amount of munitions that were used during these

10   protests.  The evidence will show that it's huge numbers.

11   Denver doesn't have a count, and we'll talk about that in a

12   minute.  But it's tens of thousands of pepper balls deployed,

13   hundreds and hundreds of grenades and 40-millimeter munitions.

14        And so what happened, the evidence will show, that a

15   couple of weeks went by, and then Denver said, uh-oh.  All

16   right, everyone prepare use-of-force statements.  We need to

17   write this all down.  The evidence will also show that officers

18   said, Wait a second.  I worked long shifts.  I deployed my

19   weapon I can't even tell you how many times, or I threw

20   grenades, or I shot or sprayed.  And so what you will see from

21   these use-of-force statements that were prepared several

22   weeks -- in some instances, three weeks later -- and Nick

23   Mitchell will tell you -- that the officers' statements were

24   vague, conclusory, often verbatim.  And that the officers were

25   told by their command, Go look at the manual before you fill

these out and avoid problematic language. Those are their words to their officers, "avoid problematic language." In other words don't say things that will get us in trouble if we get hauled into court.

Second, Denver did not require its officers to activate their body-worn cameras. A similar principle to number one, if an officer knows that they can turn their camera on or off, more bad things will happen. And the evidence will show here that a huge number of officers did not have body-worn cameras turned on. The defendants will say, well, it was hard to get them on their what is called turtle suits, the riot gear that they put on. Some officers couldn't figure out how to put them on and couldn't figure out how to affix them.

But what Nick Mitchell will tell you is that for some days of the protests, only a quarter of the officers had any footage whatsoever. And the officers who did have footage, the evidence will show they turned them off sometimes right before they shot people. And we know that because maybe a person sitting to their left or their right forgot to turn theirs off, or didn't, or in principle said, I'm not turning mine off. And there were those officers who kept them on.

When you see the spraying of Stanford Smith, you will see a long line of officers -- a long, long line of officers, and one of them had a body-worn camera on. And it won't be a great picture -- won't be a great video. It's out of the

1    corner, because the person is quite a long way from Dr. Smith

2    when he's sprayed in the face, but you can see it.  We looked

3    and scoured.  We wanted -- where are all of the other officers'

4    body-worn cameras?  They weren't on, because Denver didn't

5    require their officers to have them on.  The officers knew

6    that, and that led to the violations.

7            Denver also did not track the less-lethal munitions.

8    To this day, neither we nor anyone from the City will be able

9    to come before you and say, here is how much we used.  But

10   there are some things we do know.  Mr. Mitchell will testify

11   about this.

12           Mr. Mitchell was able to determine how much they had

13   in inventory, and he will tell you they had 30,000 pepper balls

14   before the protests.  Thirty thousand -- more than 30,000.

15   He's a math guy -- and they ran out on day two.  And they had

16   to send the Colorado State Patrol plane to Wyoming to buy more

17   pepper balls, more grenades, more 40-mill launcher weapons.

18   And they went and bought 66,000 more pepper balls, 800 more

19   grenades because they had used so many on the citizens of

20   Denver.

21           With respect to the fourth point, Denver invited in

22   other agencies.  They embedded a Denver police command officer

23   with those agencies, and the evidence will be that Denver takes

24   that responsibility.  Denver allowed them in some instances to

25   use weapons that Denver itself doesn't have, like the 12-gauge

1    shotgun.  Denver's own officers don't carry a 12-gauge shotgun

2    with the Kevlar lead-shot bags.  These officers acted as Denver

3    agents, and Denver's responsible as a result.

4         You will hear from Chief Norman Stamper.

5         THE COURT:  Are you going to leave a little bit of

6    time for your colleagues to make their speeches?

7         MR. MACDONALD:  Yes, Your Honor.  I'll move more

8    quickly.

9         Chief Stamper was a former chief of police for the

10   city of Seattle.  He was a line officer and detective for 30

11   years.  Chief Stamper will tell you that improper and excessive

12   force stemmed from a failure in police leadership, a failure in

13   training, a failure in supervision, a failure in discipline.

14   That's what Chief Stamper will tell you, a guy who has been

15   doing this all of his life.  He'll tell you that these failures

16   cause Denver police to use improper and excessive force, that

17   they failed to warn protesters or give clear orders to

18   disperse, that they indiscriminately and improperly used

19   weapons against peaceful protesters, that they enlisted the

20   other agencies to the protest and never trained with them.

21        You'll also hear from Edward Maguire, Dr. Maguire, a

22   Ph.D., professor of criminology at Arizona State, who spent 25

23   years studying and teaching and training police forces.  He's

24   authored books.  He published a guide funded by the

25   United States Department of Justice on policing protests.  And

1   what Dr. Maguire will tell you, that the mission to policing

2   protests is to guarantee a safe and lawful assembly and to

3   de-escalate that's the job of the police.  But here, Denver

4   failed in all respects.  They failed to use appropriate

5   tactics, they relied heavily on reckless deployment of

6   potentially deadly weapons, they failed to identify discipline

7   or condemn officer misconduct, and they quashed lawful

8   assembly.  That's what Dr. Maguire would tell you.

9        And to be clear, we agree that being a police officer

10  is a very hard job.  And it's harder in a protest, and

11  undoubtedly harder in a protest when the topic is police

12  brutality.  You will not hear any quarrel from us on that

13  topic.  And that's why training is important; that's why

14  supervision is important.

15       What you'll hear from Denver's own officers -- this is

16  a memo.  When Nick Mitchell prepared his report, I told you he

17  interviewed Denver's own officers, and then he wrote memos

18  about it.  And what Mr. Mitchell -- he interviewed and wrote a

19  memo about his -- about Training Academy Lieutenant John

20  Coppedge, the person helping run the training academy for

21  Denver.  And Lieutenant Coppedge saw the Denver Police

22  Department's response to the protest as a total leadership

23  failure.  He explained that officers on the ground were

24  reacting to what they saw without any sort of leadership.  This

25  is the person in Denver doing training -- lieutenant at the

38

1    training academy.

2          Lieutenant Coppedge explained that under the current

3    Chief of Police, the prevailing attitude is that training is

4    not important.  That's the words of a Denver lieutenant in

5    charge of training at the academy.

6          This is a memo about the interview with Captain Sylvia

7    Sich.  She's higher up the food chain.  She was in the command

8    post during the protest.  And what Captain Sylvia Sich said was

9    that a lot of officers and protesters may have been injured due

10   to a lack of supervision and command.  She said that Chief

11   Pazen -- he was the chief of police then; he is the chief of

12   police today -- she explained that he loses it if he's

13   presented with a different opinion and that he was often angry

14   or paralyzed during the protests.  She explained that in the

15   command post, criticism of officers on the ground was non-stop.

16   And her response, she kept thinking to herself, What are they

17   supposed to do without training or supervision?  So being a

18   police officer is, indeed, a hard job.  And when you are not

19   trained or supervised, citizens get hurt.

20         This is Commander Patrick Phelan.  He was the incident

21   commander.  You'll hear from him.  And Commander Hans Levens,

22   you'll hear from him.  Commander Levens ran the IA -- internal

23   affairs department -- within the Denver Police Department.  And

24   to this day, Denver fails to acknowledge their excessive use of

25   force.  Officers who caused injury, not disciplined.  Officers

1    who injured our clients, not disciplined.  Officers who turned

2    off their body cameras, not disciplined.  Officers who failed

3    to write use-of-force reports, not disciplined.  These were the

4    policies, practices, and customs of Denver that led to the

5    violations.

6         Stanford Smith, tear-gassed, shot, pepper sprayed.

7    Zach Packard, tear-gassed, shot in the head, knocked

8    unconscious, fractured skull.  A picture of him as he got out

9    of the hospital.  Elisabeth Epps, shot in the face, shot in the

10   legs, shot in the back.  Amanda Blasingame, Maya Rothlein,

11   tear-gassed, shot at at their own home.  Ashlee Wedgeworth,

12   tear-gassed, flash-bang grenade.  That's the fireball in the

13   back on that picture.  Hollis Lyman, shot while kneeling,

14   flash-bang grenade.

15        Let me conclude.  The plaintiffs came down to the

16   capitol to protest police violence, to speak out, to effect

17   change.  Denver suppressed their voices and responded with

18   violence.  That's what the evidence will show, and we ask you

19   to hold Denver accountable at the end of this case.

20        *THE COURT:*  All right.  Thank you.

21        Now, who else wants to speak for the plaintiffs -- the

22   other group of plaintiffs?

23        *MS. RUTAHINDURWA:*  May I proceed?

24        *THE COURT:*  Yes.

25

1                          **OPENING STATEMENT**

2          *MS. RUTAHINDURWA:*  May it please the Court.  Good

3    afternoon members of the jury.  Thank you very much for being

4    here with us today.  I know it's been a long day, and we really

5    appreciate your time.

6          My name is Makeba Rutahindurwa, and along with

7    Elizabeth Wang, we represent the other set of plaintiffs in

8    this case, the Fitouri plaintiffs.  They are Claire Sannier,

9    Sara Fitouri, Joe Deras, Jackie Parkins, and Elle Taylor.

10         Now, you heard from co-plaintiffs' counsel about how

11   the City of Denver failed its officers and failed its

12   residents; and they did so because of the policies and

13   practices in place at the time during the George Floyd

14   protests.

15         I promise I won't repeat everything that was just

16   said, but I would like to highlight a couple of things and

17   introduce you to a few more of the plaintiffs that you'll be

18   hearing from in this case.

19         Just as the Epps plaintiffs, the Fitouri plaintiffs

20   engaged in no acts of violence and no property destruction,

21   period.  Hard stop.  You will hear that our plaintiffs were

22   compelled to take to the streets and to voice their opinion

23   after watching a man die on video by a police officer.  They

24   wanted to be heard.  They wanted to create change.  So for five

25   days, they chanted; for five days, they kneeled; for five days,

1    they held their hands up in the air and they marched.  And in

2    return, these plaintiffs were targeted; they were tear-gassed;

3    they were shot in the body, in the head, in the groin with

4    pepper balls; they were attacked by the police.  And this

5    happened not because they were doing anything wrong, but

6    because the Denver police officers did not like the message

7    that they were expressing.  They were protesting police

8    violence; they were protesting the police.

9            The First Amendment doesn't care about what message

10   you are protesting.  It protects all of us; it protects all of

11   our opinions.

12           I'd like to talk about a specific incident, the

13   kettling incident that you heard about from Mr. Macdonald on

14   May 31.  Here is a picture taken from a HALO video camera

15   showing just what the incident looks like.  And as you'll see,

16   there is officers on one side of the line, there is a group of

17   protesters who are marching peacefully down the street, and

18   there is a tear gas canister -- that big, white puff of

19   smoke -- on the other side.  The protesters are being

20   tear-gassed from both sides of the street.  This tactic is a

21   highly controversial tactic called kettling.  A lot of

22   departments reject this tactic because of how dangerous it is.

23           You will hear how the plaintiffs were terrified of

24   being trampled, didn't know where to go, were climbing over the

25   fence, were trying to run through a narrow alleyway, were

1       trying to escape.  You will hear that no officer gave any

2       warnings, no officer told them that what they were doing was

3       wrong, no officer said anything to them at all.  They shot at

4       them; they tear-gassed them; they used violence.

5               This specific incident was authorized by the commander

6       of the protest, Commander Patrick Phelan.  It was authorized by

7       the person in charge of the protest.  And you'll see throughout

8       this case that oftentimes the highest levels of command

9       authorized, approved, and directed the use of force that was

10      unjustified against our plaintiffs.

11              Commander Phelan over -- you will hear over radio

12      communications, that Commander Phelan directed officers to

13      kettle protesters to make some arrests.  And that's exactly

14      what the City will argue.  They will argue, there was a curfew

15      in place, our plaintiffs were out past curfew, and we were

16      going to use the tactic of kettling in order to make arrests.

17      But what the evidence will show is not a single one of our

18      protesters, nor anyone else in the crowd, was arrested based on

19      this tactic.  Instead, the officers surrounded them, trapped

20      them, gassed them with noxious chemicals.  They did not do so

21      to make arrests; they did so to use violent force.

22              And I mentioned the curfew just now.  The City will

23      also argue that they were entitled to use whatever force is

24      necessary because the protesters were out past curfew.  But, as

25      you know, that is not the case.  You cannot justify violence,

1    you cannot do anything you want just because someone breaks the

2    law.  It has to be reasonable.  The force used here was

3    unreasonable.  Our plaintiffs were prepared to be arrested.

4    They were aware that there was a curfew in place; and they had

5    protested in the past and knew that one of the consequences of

6    protesting something that may be unlawful, like a curfew, is

7    they could get arrested.  What they were not prepared for is

8    the amount of violence and force that the Denver Police

9    Department inflicted on them.  They were not prepared to be

10   tear-gassed; they were not prepared to be shot at with

11   shotguns; they didn't even know what a shotgun was or looked

12   like.  To our plaintiffs, they looked at the officers and

13   thought, I am being attacked by the police with guns.

14          And the City may want to argue that the plaintiffs are

15   collateral damage, that there were a few bad apples in the

16   crowd.  But collateral damage should not be a thing in the

17   first place.  And what the evidence will show is our plaintiffs

18   were not collateral damage; they were the intended target.

19   They were protesting a message against police violence; and

20   they were met with police violence, because the police

21   department did not like what they had to say.

22          I'd like to introduce you to some of our plaintiffs

23   now.

24          And, Claire, if you could please stand up so the jury

25   can see you.

1          This is Claire Sannier.  She's called Denver home

2     since 2012.  She has a degree in mathematical sciences from

3     Arizona State University, so she's a math whiz.  She's a

4     principal software engineer at Oracle, and she's also quite

5     musical.  She plays three instruments.

6          Claire attended every single day of the protests, from

7     May 28 through June 2.

8          On the next slide you'll see that Claire was filming

9     the police officers' interaction with a group of people who are

10    not on the screen, and the officers targeted her.  They shot

11    her with the pepper ball directly in the chest for filming the

12    police.  And this is not an unusual incident.  It happened over

13    and over.  On the dates that Claire attended the protests, she

14    was repeatedly tear-gassed, she was repeatedly shot at with

15    pepper balls, she was repeatedly subjected to flash-bang

16    grenades, she inhaled large amounts of chemicals.  She was

17    disoriented and had ringing in her ears, so much so that other

18    people had to help her move out of the way because she needed

19    to escape.

20         This is a picture of Claire kneeling on the ground

21    just as officers are shooting into the crowd for no reason

22    whatsoever.  Claire did not threaten anyone; Claire did not

23    commit any acts of violence; Claire did not receive any

24    instruction from anyone, including any police officer, that she

25    was not allowed to be there or that she was doing anything

1    wrong.  You will hear from Claire shortly.

2         Sara Fitouri.  This is Sara.  Sara was born and raised

3    in Colorado.  She has a law degree from the University of

4    Denver.  She works at the Colorado Education Association, and

5    she's spent her entire career committed to public education and

6    to helping teachers.  Sara also attended every single day of

7    the protests.  During her time, she was also tear-gassed,

8    numerous times; she was shot at with pepper balls; she was

9    subjected to flash-bangs.  Officers trapped Sara and other

10   protesters like animals being corralled, and they chased her

11   through the alleys while shooting at her fleeing back.  Sara

12   will share with you the experience of protesting, how she has

13   many nightmares to this day, and the pain she experienced when

14   a flash-bang grenade exploded on her foot.

15        Joe.  This is Joe Deras.  Joe was born in Southern

16   California, but he was raised in the Denver area.  He also

17   worked at the Colorado Education Association with Sara and one

18   of our plaintiffs, Jackie.  Like Sara, Joe attended the

19   protests and shared similar terrifying experiences.  And if it

20   sounds repetitive, it's because it is, because it kept

21   happening over and over and over again.  They were tear-gassed,

22   they were shot with pepper balls, they -- and they were

23   subjected to flash-bang grenades.

24        While Joe was marching peacefully down Colfax on

25   May 31, a flash-bang grenade suddenly exploded, separating the

1  large crowd of peaceful protesters.  This image is what the

2  flash-bang looks like from the side, that large yellow flash of

3  light.  Officers then started throwing tear gas canisters into

4  the crowd.  Concerned for the safety of the fellow protesters

5  around them, many of whom were young teenagers and had

6  previously, like he had seen many families in that area, Joe

7  kicked the tear gas canister out of the way.  And the officers'

8  retaliation was swift and horrific.  They shot him three times.

9  They shot him in the head -- fortunately, he was wearing a

10  helmet, so he wasn't injured -- they shot him in the hand, and

11  they shot him in the lower back.  These are the injuries that

12  Joe suffered on May 31.

13      Joe immediately had to go to the emergency room to get

14  treatment for his hands, and he will tell you about his

15  experience as a protester and about the injuries that he

16  suffered.

17      Jackie, Ms. Parkins has -- Ms. Parkins grew up in

18  Connecticut.  She has a master's degree in social work, and she

19  also works at the Colorado Education Association.  Just like

20  her peers, she has made a career out of her passion.  Jackie is

21  a dedicated wife, mother to two dogs, and she's also expecting

22  an addition to her family.  Jackie attended every single day of

23  the protests.  You will see that Jackie and Sara spent most of

24  their time together.  And just like Sara, Jackie was repeatedly

25  tear-gassed, she was shot at, she was subjected to flash-bang

1   grenades.

2           Jackie was also present when officers surrounded

3   protesters and threw tear gas into the crowd from both sides.

4   Jackie was chased through alleys as officers shot her in the

5   back, and she remains afraid of the police because of what

6   happened.

7           And, finally, we have Elle Taylor.  Ms. Taylor grew up

8   in Pennsylvania.  She has a beautiful voice and a songwriting

9   degree from Berklee College of Music.  She's an impressive

10  young woman and a local business owner.  She owns the Amethyst

11  Coffee Shop in downtown Denver.

12          During her time at the protests, she was also

13  repeatedly tear-gassed, shot at with pepper balls, and

14  subjected to flash-bang grenades.  This image shows a picture

15  of a welt on Ms. Taylor's shoulder that she received after

16  being shot at with a pepper ball from an officer.  Just like

17  all of the other plaintiffs in this case, she did nothing to

18  warrant the excessive force on her.  She was peacefully

19  protesting, she was exercising her constitutional rights, and

20  officers responded with violence.

21          Ms. Taylor was -- Ms. Taylor was arrested for

22  violating the curfew only after she yelled at an officer for

23  using force against another black man next to her, who was

24  peacefully protesting and kneeling.  An officer hit this man

25  across the chest with a baton, and Elle will felt compelled to

1   say something, and then she was arrested.

2         So these are the Fitouri plaintiffs that you'll hear

3   from throughout the case.  I also want to note that today is

4   not only an important day for all of our plaintiffs, it's an

5   important day in history.  And I promise I won't do a history

6   lecture.  But on this day 57 years ago, civil rights leaders

7   marched in Selma demanding a right to vote, and the police

8   responded with cruelty and with violence and with hatred.  And

9   footage of this attack spurred demonstrations throughout the

10  country; and five months later, the Voting Rights Act was

11  passed.  Today we look back on the civil rights movement very

12  differently than the people did back then.  And it's easy to

13  say that that's completely different from the situation we're

14  in now, but the plaintiffs were there to exercise their right

15  to vote.  And you will hear that they thought they were doing

16  what they were constitutionally allowed to do -- to express

17  their opinion, to end police violence.  And today, plaintiffs

18  ask that you hold Denver accountable for its actions.

19        *THE COURT:*  All right.  Thank you.

20        Defendant.

21        *MS. JORDAN:*  May I proceed, Your Honor?

22        *THE COURT:*  Sure.

23                     **OPENING STATEMENT**

24        *MS. JORDAN:*  Thank you.

25        Jury members, my name is Lindsay Jordan; and I'm one

1    of the counsel for the defendants here, the City and County of

2    Denver and Officer Christian.

3          You've heard a lot about the First Amendment, you've

4    heard a lot about our Constitution, so I'm not going to go into

5    it.  But why are those documents important?  Because, freedom.

6    Freedom is the basis of this country, and our founding fathers

7    wanted it so that they created those documents.

8          It takes courage to exercise that First Amendment

9    right, to go out and openly protest in favor of -- against or

10   for an issue, particularly when it's involving the government.

11   That is brave.  One must believe in something so strongly that

12   they are willing to take a stand and make their voice heard.

13         As you heard, on May 28, 2020, three days after the

14   horrific death of George Floyd, thousands of people flocked to

15   downtown Denver, as they did in other cities throughout the

16   country and the world, to protest not just his death, but

17   social injustice.

18         The First Amendment affords many protections to those

19   who want to exercise those rights, and the City and County of

20   Denver and its police department honor those protections.

21   Officers are trained to safeguard free speech and public

22   assembly.  They block streets, they redirect traffic to allow

23   for marches and demonstrations, but the protections of the

24   First Amendment are not unlimited.  What can limit these

25   protections?  Unlawful behavior.

1            You've heard a lot today; and not surprisingly, I have

2    some more to lay out for you.  Bear with me, as I try to

3    discuss with you the general picture of what was occurring from

4    May 28 to June 2, 2020, and what the community and the police

5    officers faced day after day.  I will introduce you to some of

6    the members of the police department that you're going to hear

7    from.  I'm also going to give you a little bit of what they're

8    going to tell you about, and we're going to talk about the

9    different kinds of training and policies that the department

10   provides its officers.  I'll tell you a little bit about the

11   evidence that you're going to see throughout this trial, and

12   then I'm going to quickly touch upon the plaintiffs' claims.

13           Handling protest events is not new to the police in

14   Denver.  In fact, the department manages multiple protests a

15   year, with the mission to uphold constitutional rights of

16   freedom, speech, and assembly, all the while also protecting

17   life, property, and maintaining public peace and order.

18           Chief Ron Thomas -- give them a little wave.  He's the

19   division chief of patrol, and he has been with the Denver

20   Police Department for over 30 years.  He will explain the

21   policies and procedures -- protocols that go into managing a

22   protest.  He and the other officers that you will meet

23   throughout this trial, they will tell you that sometimes the

24   Denver Police Department has weeks, months, even years to

25   prepare for a demonstration; sometimes they get very little

1    notice.  He will explain that it's not new for protesters to

2    target their message at officers, as this has happened in past

3    events, but on a much smaller scale.  Because of this reality,

4    it is protocol for police officers to wear or have close by

5    their protective gear in crowd management scenarios.

6            Sergeant Eric Knutson.  He's a trainer at the Denver

7    Police Academy, and he's been part of the department for over

8    25 years.  Part of his job responsibilities is assisting with

9    field force and crowd control training.  He gives this -- he is

10   part of the -- this training goes to recruits, and it also goes

11   to existing officers.  He will explain to you the type of

12   training officers receive when handling crowd control

13   management.  Because police work is fluid, he will explain, the

14   officers are trained to take all elements and factors into

15   consideration when determining the best course of action.

16           Starting on May 28, 2020, and continuing for days, the

17   downtown Denver community experienced unprecedented violence,

18   destruction, and chaos displayed by agitators embedded in the

19   massive protest crowds.  The violence and destruction was not

20   only directed at the officers, it affected the community as a

21   whole.  Businesses on the 16th Street Mall, like Target and

22   CVS, were subject to significant damages and reports of

23   looting.  Local businesses near the Capitol Hill area were

24   vandalized for no other reason than being in the vicinity.

25   This unprecedented violence and destruction is what placed the

1    police response in unchartered territory.  Yet, you will hear

2    from officers who were out in the field.  And they will tell

3    you they relied on their training, not to just keep themselves

4    safe, but also to keep the members of the community safe, as

5    well.

6         Commander Patrick Phelan.  You've seen his picture a

7    couple of times today.  You just saw it earlier today.  He

8    retired from the police department in September of 2020, and he

9    spent more than 40 years with Denver Police Department before

10   that retirement.  As you heard, he was the incident commander

11   for the majority of the George Floyd protests.  And the reason

12   that he was incident commander, because at that time he was

13   commander of what is called the special operations and response

14   team.  Sometimes you might hear me refer to it as SORT, and

15   sometimes I might remember to say all of those words.

16        As the incident commander, it was Commander Phelan's

17   job to coordinate the response.  On May 28, when the police

18   department became aware that protests were going to occur in

19   downtown Denver, Commander Phelan, with the help of others,

20   started to put together an operation plan.  They were expecting

21   about 700 protesters to arrive.  When thousands turned out in

22   the first few hours, both Commander Phelan and Chief Thomas

23   will tell you they quickly realized these demonstrations were

24   like nothing they had ever seen before in their lengthy

25   careers.

1           The evidence will show at times, these were not just

2      peaceful protests with a few isolated agitators.  The evidence

3      will show that the George Floyd demonstrations were different

4      from protests the department had managed in the past due to the

5      magnitude, the extent of the violence, and that the destruction

6      was that directed not just at the police, but the community.

7           To help you with an understanding of what was going

8      on, here is a general picture of what was happening in those

9      first five days.

10          At around 5:30 on May 28, 2020, there were reports of

11     gunshots fired at the capitol state building, causing those

12     inside to have to shelter in place.  People outside the capitol

13     engaged in violent and destructive behavior by taking hammers

14     and breaking windows in the cars that were parked nearby.

15     Commander Phelan -- remember, I told you he was the incident

16     commander -- he is going to tell you that he was in the command

17     center, and he was monitoring video footage, fielding calls and

18     radio communications, and learned that gunshots reported more

19     than five times that first night in areas where the protests

20     were occurring.

21          While a portion of the crowd stayed at the capitol,

22     another portion marched around downtown and eventually made

23     their way onto Interstate 25.  Why is this unlawful?  Commander

24     Phelan will tell you about the very serious public safety risks

25     that are created when people run out onto a highway, where

1    vehicles are traveling 65 miles an hour or more and are not

2    expecting pedestrians to just appear in their lane.

3            Lieutenant Matthew Canino, he is a member of the SWAT

4    team.  And he has been with the Denver Police Department since

5    1992.  He's held many roles and had many ranks during his

6    lengthy career.  For the last six years, he supervised a team

7    of eleven officers in the SWAT unit.  He and some of his team

8    members arrived to I-25.  And he will tell you, while officers

9    were making arrests of those on the highway, some of the

10   agitators off to the side were throwing objects at them, as

11   they tried to do nothing more than to clear -- to make the

12   highway clear so the public could continue their commute.

13           After the highway was cleared, marchers continued

14   downtown, which often blocks traffic.  At times, cars of people

15   who just happened to be in the area were surrounded and their

16   ability to leave restricted.  They marched in the opposite lane

17   of traffic down Colfax.  The District 6 police station on

18   Washington Street, because command staff learned agitators in

19   other cities were attempting to or had destroyed police

20   stations, a perimeter was set up around the station to protect

21   it.

22           Officers who were on that line will tell you that they

23   were pelted with large rocks and bottles.  Some were injured.

24   Commander Michael McDonald is now the commander of that SORT

25   team.  He filled that role after Commander Phelan's retirement.

1    During the George Floyd demonstrations, he was the lieutenant

2    of the special operations response team; and he will tell you

3    about the conditions his team encountered when they arrived at

4    Colfax and Washington to assist officers that were being

5    assaulted with projectiles.  He will tell you, this was not the

6    first or the last time that his team was attacked.  Earlier in

7    the night, one of his team's vehicles had its tires punctured.

8         Throughout the late hours of the first night,

9    agitators continued to vandalize government buildings and

10   private businesses, as well as set fires.  Officers who

11   responded on the first night and the days that followed will

12   tell you they were on duty for over 15 hours.  No one can

13   deny -- and the officers will confirm -- the events of the

14   first few days took their toll.

15        The following day, May 29, 2020, thousands of

16   protesters returned to downtown Denver to continue the

17   demonstrations.  During the day, the protests were mostly

18   peaceful; but as the evening approached, the violence returned.

19   Agitators continued to destroy buildings and businesses and set

20   dumpster fires throughout the area.  Commander Phelan and

21   officers who were in the field will describe how they had to

22   provide cover for the Denver Fire Department and paramedics,

23   because as they responded to these fires or to aid injured

24   people, they, too, were met with violence.  People within the

25   crowd threw rocks, bottles, and other projectiles at them.

1          By the end -- by the third day of the protest, as the

2    violence and destruction continued, you heard the mayor of

3    Denver, Michael Hancock, enacted a curfew.  Starting on May 30,

4    2020, unless exempt, being out in Denver after the stated

5    curfew time was unlawful.  The curfew was then extended on

6    June 1 to help further try to curb the violence.

7          Commander Phelan and Chief Thomas will explain, Denver

8    requested the assistance of outside agencies like Jefferson

9    County Regional SWAT and the Aurora Police Department to help

10   them manage the response because the magnitude and violence and

11   destruction was not stopping.  These assisting officers will

12   tell you that they were also the target of violence and

13   destruction.

14         On May 30, 2020, at the intersection of Colfax and

15   Lincoln, agitators shot large fireworks at officers that

16   exploded at their feet.  You will hear from lieutenants and

17   officers who worked these protests, and they will tell you that

18   they believed the agitators wanted to cause them significant

19   harm.  The officers observed that the crowd was angry, and we

20   all understand why.  As was already pointed out, a jury in

21   Minneapolis found what happened to George Floyd was murder.

22   However, as the officers will tell you, when justifiable anger

23   turns into violence and destruction, it is the responsibility

24   of the police to intervene as a matter of public safety.

25         Commander O'Donnell and other officers will tell you

1    that while they were in the field, every single day they were

2    subjected to rocks; bottles; M-80s; containers filled with

3    urine, feces, and unidentified substances; pieces of concrete

4    were thrown at them; fireworks with shrapnel were sent off in

5    their direction.  This was all done by the agitators that were

6    in the crowd.  Sometimes they even used the -- they used the

7    help of lacrosse sticks or tennis rackets or slingshots to

8    fling those projectiles at the police.

9          Sergeant Robert Parsons has been with the Denver

10   Police Department since 1998, and he's assigned to the

11   performance development unit.  Sergeant Parsons acts as a

12   liaison between the workers compensation and police department,

13   and he also lets the chief of police know when officers are

14   injured so that they can address staffing needs.  He will tell

15   you that despite the protective vests and helmets that the

16   police officers were outfitted with, over seven Denver officers

17   were injured from the violence displayed by the agitators.

18   That number doesn't include injuries to officers from other

19   agencies who came to assist Denver, and it doesn't include the

20   very severe injuries caused to the three officers that were hit

21   by a car, and one of them had to be medically retired.

22         Officer safety was not the only concern during those

23   first five days.

24         Oh, I said seven?  More than 70 -- if I said seven

25   injuries, I meant seventy officers were injured.  Sorry.  My

1    bad.  Okay.  Sorry.

2         In addition to officer safety, the other concern was

3    the violence and destruction that was continuing day after day

4    posed risk to the surrounding community.  The areas where the

5    protests were mostly concentrated, as you heard, are made up of

6    a mix of commercial and residential neighborhoods.  So, you

7    know what?  The demonstrations did not just affect the police,

8    the protesters, or the agitators; it affected the residents and

9    the business owners and the people who just wanted to come

10   downtown to do something else.

11        The evidence will show that some protesters, including

12   the plaintiffs, had no intention of leaving when the violence

13   started, as they brought goggles, helmets, umbrellas, milk,

14   apple cider vinegar, and other home remedies with them.  The

15   evidence will show that the crowd constructed barriers.  And it

16   will also show that some of the aggressors in the crowd took it

17   a step further; and they armed themselves with weapons, like

18   guns and knives.  Those weapons could have resulted in

19   significant injuries, if not death.

20        Commander Phelan and the officers themselves will tell

21   you that due to the hostility of the crowd, going into the

22   crowd to arrest -- to make arrests of the isolated agitators

23   posed significant safety concerns; but they did arrest

24   agitators when they could.

25        Technician Ryan Grothe.  He spent more than 20 years

1   with the department.  And after a lengthy career with SWAT, he

2   moved over to the academy to assist in training.  In 2019, he

3   became the coordinator of our less-lethal program.  He's going

4   to explain to you as to how officers are trained as to use

5   force and when not to.  He will also tell you about the various

6   tools, which you've already seen, that are available to the

7   officers.

8           You've already seen the pepper ball system, and you've

9   seen that it deploys a ball that is filled with a pepper

10  substance.  What you didn't hear is they also used inert balls,

11  which are just filled with a scented powder.  And, again, he's

12  going to tell you about the 40 system and the different kinds

13  of munitions that it deployed.  And he's also going to tell you

14  about the pepper spray, the OC foggers, and the gas and smoke

15  canisters.  He will explain the training that an officer

16  receives to be certified on a pepper ball and/or a

17  40-millimeter system.  He will explain to you the levels of

18  resistance and how an officer evaluates when to use force to

19  address the situation, and he will explain to you the use of

20  those chemical munitions.

21          Now, let's go back to Sergeant Knutson.  Remember, we

22  talked about him at the beginning?  Again, he's a trainer at

23  the academy.  And he is going to, then, tie in what Technician

24  Grothe tells you about those less-lethal systems, how they're

25  used in a crowd management setting, and how these options may

1   prove effective in situations where the use will prevent injury

2   to officers or to third persons, it will also stop rioting, and

3   also to disperse an unlawful crowd.  He will explain that

4   officers are trained in a crowd management setting when they

5   should use force and when they should not.

6        Much consideration has gone into preserving people's

7   rights to express their opinions and have their voices heard,

8   all the while protecting life, public safety, property, and

9   public order.  He will describe how, yes, ideally, violators in

10  a crowd would be isolated and arrested while others continued

11  to exercise their First Amendment rights.  This is how the

12  Denver Police Department has managed protests in the past; but

13  as I previously told you, isolation of individual violators was

14  not always an option here.  You will hear from the officers,

15  this is why they had to rely on tools, including pepper balls,

16  smoke, and gas to disperse the crowd.

17       Now, let's move on to the plaintiffs.  You've already

18  heard a lot about their claims.  But I ask you, when you listen

19  to their testimony, keep in mind, most of them came back day

20  after day, despite being exposed to chemical irritants.  Some

21  attended for weeks.  Most of them came back after the curfew

22  was in effect and during the night hours when it was well-known

23  that agitators, bent on violence and destruction, were

24  increasingly present.  Some even supported the unlawful acts of

25  others.  And as you've already heard, you'll hear that

1    Mr. Deras and Mr. Packard were in the act of kicking a canister

2    when they claim they were struck by a projectile.

3            Now I'd like to introduce you to Officer Christian.

4    Don't forget about him.  Give a little wave.  He was a member

5    of that special operations team in May of 2020, and he's a

6    defendant in this case.  He joined the Denver Police Department

7    in 2015; and before joining the SORT unit, he was a patrol

8    officer.

9            Let me explain to you why he is here.  Ms. Epps claims

10   on May 28, 2020, as she was crossing the street filming the

11   police, Officer Christian shot her with a pepper ball without

12   warning and hit her in the body.  Officer Christian will

13   explain to you his observations leading up to that incident

14   with Ms. Epps.  He will explain to you that he believed she was

15   blocking the flow of traffic.  His intent when he deployed a

16   pepper ball in the direction of her feet was to get her out of

17   the street, not to stop her from filming.  You will see

18   Ms. Epps' footage, you will see Officer Christian's body-worn

19   camera, as well as another body-worn camera from an officer

20   nearby.

21           As you know, the plaintiffs are making claims that

22   they were subjected to excessive force and that their First

23   Amendment rights were violated.  You will learn during this

24   trial the elements to prevail on excessive force are different

25   than on a First Amendment violation.  Many of these plaintiffs

1    have multiple events on multiple days, and it is your role as

2    the jurors to analyze each event separately.

3            The evidence will show that most plaintiffs cannot say

4    who used the pepper ball, gas, or other chemical irritant that

5    subjected them to exposure.  In some instances, they cannot

6    tell you if their claim involved a Denver officer or an officer

7    from another jurisdiction.  Why is that important?  Because

8    they need to prove such information to succeed on their claim.

9            You will learn for most of the events claimed,

10   plaintiffs were present in or near a crowd that was engaging in

11   unlawful behavior.  Even if a particular plaintiff did not

12   throw or kick anything at the officers, the behavior of the

13   crowd as a whole may be considered to determine if the actions

14   of the officers were reasonable.

15           Each plaintiff in each of their claims must be looked

16   at individually.  However, they cannot be analyzed in a vacuum.

17   In order to truly understand what the officers knew at the time

18   they were responding to the protests or the force that they

19   used, you will be asked to look at the totality of the

20   circumstances the responding officers faced at each of those

21   particular times.

22           And you've heard a lot about chemical irritants being

23   deployed without warning.  The officers will tell you that they

24   did give warnings when they could.  In fact, on the first

25   evening, at 14th and Sherman, repeated dispersal orders were

1   given over a loud speaker.  Yes, the crowd was extremely loud;

2   and possibly warnings were not heard.  You will hear at other

3   times, while warnings could not be given, due to the rapidly

4   evolving nature of these events.  In those situations, officers

5   will tell you that officer and public safety did not allow for

6   a prior announcement before necessary responsive action was

7   needed.  However, many of these times, officers were yelling

8   for people to move back.

9       You will learn that once curfew went into effect,

10  numerous dispersal orders were given.  Push notifications were

11  sent to cell phones, and repeated announcements were played

12  over loud speakers.  Many of these plaintiffs will admit that

13  they knew about the curfew and either chose to arrive after it

14  went into effect or refused to leave when it did.

15      You have already heard about what plaintiffs believed

16  Denver didn't do to make their officers accountable.  The

17  plaintiffs claim that the officers failed to adequately

18  document their use of force.  You heard Denver -- you may hear

19  that Denver has a policy that during protests, you only need to

20  do a single use-of-force report.  However, you will hear from

21  many of the officers that they always knew that they needed to

22  document their force that they used.  Because of this, you will

23  see written statements from each officer for the dates that

24  they worked between May 28 and June 2.  And, yes, some of these

25  reports were done a couple of weeks late; and that's because

1    the supervisors felt that after these long shifts, that these

2    officers should go home and rest before completing paperwork.

3           In addition to the statements, you will see a lot of

4    video footage, including officer body-worn cameras.  There are

5    hundreds of body-worn videos from Denver officers that captured

6    the events of the first five days of the George Floyd protests.

7    And in addition to the body-worn camera, there is helicopter

8    footage, traffic camera, and as it was mentioned before, the

9    HALO camera.  And in addition to all of these recordings, you

10   have the Colorado State Patrol.  They have security cameras

11   that are outside of the capitol that are constantly recording

12   the exterior and the nearby grounds.  And let's not forget

13   about the body-worn camera of the officers from assisting

14   jurisdictions.  In other words these events were heavily

15   documented on video.

16          That being said, not every event involving a plaintiff

17   was captured on video.  This is in part because a camera may be

18   facing in a different direction, panned to a different

19   location, or, simply, the leaves on trees were blocking the

20   view.  You will also hear that body-worn camera does not give

21   you a full picture of what truly is going on.  The view is less

22   than 180 degrees.  And what is captured on a body-worn camera

23   only shows you a portion of what the officer is observing.  It

24   also shows you just a portion of what that officer is

25   experiencing.  The officers will tell you that their eyes have

1   a much greater field of vision than the lens of a body-worn

2   camera.

3          You will be shown a variety of evidence for you to

4   evaluate the totality of the circumstances for each plaintiff's

5   claim.

6          Was the Denver police response to the George Floyd

7   protests perfect?  Certainly not.  At any time a person or even

8   a governmental agency encounters circumstances they have never

9   experienced before, there is possibility for mistakes.

10  Learning as the situation evolved -- as the protests evolved,

11  so did Denver's response.  And learning as the situation

12  evolved benefits everyone who is involved.  Some of these

13  mistakes you will see on video.  Like I said, the protests were

14  heavily documented.  There will likely be some videos in which

15  you won't like what you see.  But remember, your role is to

16  have all of the evidence presented to you before making a

17  decision.  So please wait until you have an opportunity to hear

18  from the officers who were there before you make up your mind.

19         As the Court will instruct you, for the City of Denver

20  to be held liable for the actions of any of its officers, it is

21  not simply enough that the officer was an employee of Denver or

22  that it was an officer of an agency that came in to help in the

23  response at Denver's request.  Instead, what is required is for

24  the plaintiff to demonstrate an action or an omission of Denver

25  itself.  And that is called a custom, policy, or practice of

1    Denver.  And they must show that a custom, policy, or practice

2    of Denver was the cause of violation of plaintiffs'

3    constitutional rights.

4         At the conclusion of this case during my closing

5    argument, I will have more to say about that and the legal

6    standard about holding Denver liable.

7         Now, you have heard a lot of information presented to

8    you by both sides; and during the next three weeks, you will be

9    presented with an extensive amount of evidence; and it will be

10   important for you to consider it all.

11        On behalf of the City and County of Denver, Officer

12   Christian, and my colleagues, we thank you for your jury

13   service.

14        *THE COURT:*  All right.  Thank you.

15        Well, ladies and gentlemen, I think you've earned the

16   substantial pay that we give to jurors today.  Even though

17   there are 28 minutes left before 5 o'clock, I think we've done

18   enough.

19        Do you have any questions?

20        All right.  Thank you again for doing what you're

21   doing.  Go home and have a nice evening.  Don't tell anybody

22   about what is going on; don't do any research on the internet

23   or otherwise; just forget about the case, if you can.  Need to

24   see you tomorrow at 9 o'clock.

25        (Jury out at 4:32 p.m.)

1              *THE COURT:*  The jury has been excused for the evening.

2              I have a question, and it concerns your deposition

3      designations.  I haven't had a chance to look at any of them.

4      I think I received an email from chambers maybe even over the

5      weekend that we had received some.  So what is your schedule

6      with respect to those?  I'll try to take a look at them when I

7      can, but I would sure appreciate some advance warning.  You

8      need that too in order to prepare what you're going to present.

9              *MR. MACDONALD:*  The first one is O'Donnell, Your

10     Honor, that we would intend to play.  I'm not sure whether that

11     would be tomorrow or the next day.  But if you get to it -- I

12     understand we got it to you late based on the exchange of

13     objections.

14             *THE COURT:*  O'Donnell is your first priority?

15             *MR. MACDONALD:*  Correct, Your Honor.

16             *THE COURT:*  All right.  So I'll do what I can.  I'm

17     not sure I have the energy to do much about it tonight, because

18     I'm in the midst of writing an order right now on another case.

19     That's what I do during the breaks, but I'll try to get it done

20     for you.

21             Is there anything else either side would like to put

22     on the record tonight before we recess?

23             *MR. MACDONALD:*  The only thing, Your Honor, we're

24     going to invoke the rule of exclusion.

25             *THE COURT:*  The rule what?

1            *MR. MACDONALD:*  Exclusion of witnesses, Your Honor.

2            *THE COURT:*  Oh, sequestration of witnesses.  Okay.

3            *MR. RINGEL:*  We don't have any problems with that.

4    The only other issue is that we have made arrangements, because

5    of the rules of the Denver Police Department, that Chief Thomas

6    and Commander O'Donnell alternate as the advisory witness.

7    They have a problem with that.

8            *THE COURT:*  I don't have any problem with that.

9            So the rule works this way:  The parties -- namely,

10   all the plaintiffs -- are entitled to be here the entire time,

11   if they want to be; or they're free to come and go as their

12   other business requires.  Denver is entitled to have a

13   representative here at all times.  And given the length of the

14   trial, I have no problem with your switching out your

15   representative, as long as you hold it down to the two guys

16   that you mentioned.  Of course, the individual defendant can be

17   here the entire time, if he wishes to be.

18           Now, for other witnesses -- we always allow your

19   expert witnesses to come and observe if they need to before

20   they testify.  But bear in mind, they are limited to the scope

21   of their reports and disclosure.  They can watch what's going

22   on; but that can't fortify their opinions, because their

23   opinions are already disclosed, and they're limited to that.

24           As for fact witnesses, they'll have to stay outside

25   the courtroom until their turn comes to testify.  But in

1   addition to that, of course, you can't tell them what the

2   testimony has been.  That would be absurd if they are

3   sequestered.  I can't remember -- maybe you remember -- Julie

4   would know -- whether we have a public line open so that people

5   can listen in by telephone.

6            *MR. RINGEL:*  I believe there is a public line.

7            *THE COURT:*  There is?  And so please -- it's got to be

8   an honor system.  We can't tell who is listening in, but your

9   witnesses have to be told they can't listen in.

10           Anything else?

11           *MR. MACDONALD:*  Not from our side, Your Honor.

12           *MR. RINGEL:*  Nothing from the defendants.  Thank you,

13  Your Honor.

14           *THE COURT:*  All right.  Have a nice evening.  We'll

15  see you at 9 o'clock.

16           (Recess at 4:37 p.m.)

17

18                    REPORTER'S CERTIFICATE

19           I certify that the foregoing is a correct transcript
    from the record of proceedings in the above-entitled matter.

20

21           Dated at Denver, Colorado, this 30th day of March,
    2022.

22

23                                        *Therese Lindblom*

24                    _____
                      Therese Lindblom,CSR,RMR,CRR

25

1                              I N D E X

2    **Item**                                                   **Page**

3
     Opening Statement By Mr. Macdonald                           15
4    Opening Statement By Ms. Rutahindurwa                        41
     Opening Statement By Ms. Jordan                              49
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25