```
 1                    IN THE UNITED STATES DISTRICT COURT
                        FOR THE DISTRICT OF COLORADO
 2
      Civil Action No. 20-cv-01878-RBJ
 3
      ELISABETH EPPS,
 4    AMANDA BLASINGAME,
      ASHLEE WEDGEWORTH,
 5    MAYA ROTHLEIN,
      ZACH PACKARD,
 6    HOLLIS LYMAN,
      CIDNEY FISK,
 7    STANFORD SMITH,
      SARA FITOURI,
 8    JACQUELYN PARKINS,
      KELSEY TAYLOR,
 9    JOE DERAS, and
      CLAIRE SANNIER,
10
          Plaintiffs,
11
      vs.
12
      CITY AND COUNTY OF DENVER, and
13    JONATHAN CHRISTIAN,
14        Defendants.
```

---

**REPORTER'S TRANSCRIPT**
TRIAL TO JURY – DAY TWO

---

```
19         Proceedings before the HONORABLE R. BROOKE JACKSON,

20    Senior Judge, United States District Court for the District of

21    Colorado, continuing at 9:00 a.m., on the 8th day of March,

22    2022, in Courtroom A902, United States Courthouse, Denver,

23    Colorado.

24              THERESE LINDBLOM, Official Reporter
                901 19th Street, Denver, Colorado 80294
25          Proceedings Reported by Mechanical Stenography
                Transcription Produced via Computer
```

1          **A P P E A R A N C E S**

2               TIMOTHY R. MACDONALD, ROBERT REEVES ANDERSON, and
   EDWARD PACKARD ARO, Attorneys at Law, Arnold & Porter Kaye
3  Scholer LLP, 1144 Fifteenth Street, Suite 3100, Denver,
   Colorado, 80202, appearing for the Plaintiffs.
4
                DIANA K. STERK and MICHAEL J. SEBBA, Attorneys at Law,
5  Arnold & Porter Kaye Scholer LLP, 250 West 55th Street, New
   York, New York, 10019, appearing for the Plaintiffs.
6
                PATRICK CONOR REIDY, Attorney at Law, Arnold & Porter
7  Kaye Scholer LLP, 70 West Madison Street, 3 First National
   Plaza, Suite 4200, Chicago, Illinois, 60602, appearing for the
8  Plaintiffs.

9               ELIZABETH C. WANG, Attorney at Law, Loevy & Loevy,
   2060 Broadway Street, Suite 460, Boulder, Colorado, appearing
10 for the Plaintiffs.

11              MAKEBA RUTAHINDURWA, Attorney at Law, Loevy & Loevy,
   311 North Aberdeen Street, Chicago, Illinois, 60607, appearing
12 for the Plaintiffs.

13              ANDREW DAVID RINGEL, KATHERINE HOFFMAN, and ROBERT
   ALAN WEINER, Attorneys at Law, Hall & Evans, 1001 Seventeenth
14 Street, Suite 300, Denver, Colorado, 80202, appearing for the
   Defendants.
15
                HOLLIE RENEE BIRKHOLZ and LINDSAY MICHELLE JORDAN,
16 Attorneys at Law, Denver City and County Attorney's Office, 201
   West Colfax Avenue, Denver, Colorado, 80202, appearing for the
17 Defendants.

18                              *   *   *   *   *

19              **P R O C E E D I N G S**

20              (In open court at 9:00 a.m.)

21              *THE COURT:*  Good morning.

22              *MR. MACDONALD:*  Good morning, Your Honor.

23              *MR. RINGEL:*  Good morning, Your Honor.

24              *COURTROOM DEPUTY:*  Your Honor, we are missing two

25 jurors.

1          MR. RINGEL:  Your Honor, there was one preliminary

2    issue that I know Mr. Macdonald wanted to raise with the Court.

3          MR. MACDONALD:  Your Honor, we reached a stipulation

4    on some narrowed facts with the defendants.  We filed it with

5    the Court on Sunday.  Do you want to read it to the jury; can

6    we mark it as an exhibit?  What's your preference?

7          THE COURT:  I don't care.

8          MR. MACDONALD:  Our preference would be to mark it as

9    an exhibit, have it admitted so it's part of the evidence.

10          THE COURT:  That's fine.

11          MR. MACDONALD:  Thank you, Your Honor.

12          MS. WANG:  Judge, we do have one other issue that we'd

13    like to address before the jury comes out.

14          THE COURT:  What's that?

15          MS. WANG:  That is, there were arguments made by the

16    City yesterday during opening statements and suggestions made

17    during *voir dire*, that because there was a curfew, that the

18    officers --

19          THE COURT:  You say because there was a curfew, the

20    officers were entitled to use force?

21          MS. WANG:  Right.  There was a -- there was an -- the

22    argument in opening statement by the defense counsel --

23          THE COURT:  Arguments aren't made in opening

24    statements.

25          MS. WANG:  The statements that they made during

74

1    opening statement --

2            THE COURT:  All three opening statements contained

3    argument.

4            MS. WANG:  Right.

5            THE COURT:  No one objected, but you did that.

6            Anyway, go ahead.

7            MS. WANG:  What we would like, Judge -- we understand

8    that the curfew class action has been bifurcated, but we would

9    request that you simply inform the jury that the -- some of the

10   plaintiffs in this case have alleged that the curfew was

11   unconstitutionally enforced against protesters, that is not an

12   issue that they need to decide in this case, it has been set

13   for a separate trial for a separate jury to decide, and that's

14   it.

15           THE COURT:  Okay.  I don't think so.  Things are said

16   in opening statements; it's not my job to start correcting

17   opening statements.  You should have made a contemporary

18   objection.  But in any event, that's just lawyer talk, as the

19   jurors know.

20           COURTROOM DEPUTY:  I have seven jurors now, Your

21   Honor.  Working on No. 8.

22           THE COURT:  Maybe it's the fellow that was questioning

23   about parking.

24           (Jury present at 9:09 a.m.)

25           THE COURT:  Good morning, ladies and gentlemen of the

1    jury.  How are my favorite jurors this morning?

2          A couple of things.  One, this morning our chief judge

3    circulated an order for comments.  There won't be any comments,

4    and it will be issued sometime today concerning the mask rule.

5    And I'll let you know when that happens, but he has asked us to

6    hold off until he's issued his order.  I think he's been

7    delayed because he's the judge that is in the eight-week

8    antitrust case downstairs.

9          Also we talked yesterday about not doing any research

10   on your own about the case or the issues.  I want to ask you

11   also, try to avoid any media coverage if you can.  I noticed

12   that this morning there was an article -- either last night or

13   this morning -- online in the *Denver Post* about yesterday's

14   opening statements in the case; and I suspect that there will

15   be other media coverage, whether it's print media or broadcast

16   media of this case.  So please do try to avoid it.  If you see

17   an article in the *Post*, just skip it.  And if you see -- hear

18   something coming on the news, on the radio or television, just

19   turn it down or turn away, if you can.

20         I'm not suggesting there would be articles that are

21   inaccurate, necessarily or accurate, it's just that it is

22   something besides what is actually happening in here, and

23   that's what I want you to consider.

24         All right.  We're ready to go with the first witness.

25              *MS. WANG:*  Yes, Your Honor.

1          *THE COURT:*  All right.

2          *MS. WANG:*  We'd call Claire Sannier.

3          (**CLAIRE SANNIER, PLAINTIFFS' WITNESS, SWORN**)

4                     **DIRECT EXAMINATION**

5    *BY MS. WANG:*

6    *Q.*  Could you please state your name and spell it for the

7    record.

8    *A.*  My name is Claire Sannier.  C-L-A-I-R-E, S-A-N-N-I-E-R.

9    *Q.*  What do you do for a living, Claire?

10   *A.*  I am a software engineer.

11   *Q.*  And how long have you been a software engineer?

12   *A.*  Just about ten years.

13   *Q.*  Do you live in Denver?

14   *A.*  I do.

15   *Q.*  How long have you lived here?

16   *A.*  I've been here for also just about ten years.

17   *Q.*  Do you have a college education?

18   *A.*  I do.  I went to Arizona State University and got my

19   bachelor's in computational mathematical sciences.

20   *Q.*  Where did you grow up, Claire?

21   *A.*  I was born in Michigan, and I grew up in Iowa and also in

22   Arizona.

23   *Q.*  Can you tell us just a little bit about your interests and

24   hobbies.

25   *A.*  Yes.  I like music a lot.  I go to concerts all the time,

Claire Sannier - Direct

1    and I play three instruments.  I also read a lot and play video

2    games.

3    Q.  Are you involved in any social activism?

4    A.  I am.  Yeah.  For the last several years I have been.

5    Q.  What kind of activism are you involved in?

6    A.  Generally, social justice activism, a lot of anti-racist

7    activism.  I've also helped out with homeless encampments

8    around my neighborhood.  I've done a lot of canvassing for

9    local candidates, things like that.

10   Q.  Have you attended prior protests in Denver?

11   A.  I have.

12   Q.  How many?

13   A.  Probably at least a dozen.

14   Q.  Over what period of time?

15   A.  The first one that comes to mind was in 2016 after Donald

16   Trump was elected.

17   Q.  Okay.  And what other kinds of protests have you been to?

18   A.  I mean, all different kinds.  I've certainly been to sort

19   of planned -- preplanned marches like for Martin Luther King

20   Day, things like, and also more spontaneous marches like the

21   one after the Trump election.

22   Q.  These all took place in Denver?

23   A.  That's right.

24   Q.  What was your experience with Denver police during those

25   other protests?

Claire Sannier - Direct

1   A.   I never experienced any sort of aggression or violence from

2   the police in those prior protests.

3   Q.   Were there other Black Lives Matter protests that you

4   attended in Denver?

5   A.   There were.

6   Q.   And can you tell me about how the police behaved during the

7   protests.

8   A.   It was much the same.  These protests were probably a

9   little smaller and less directed at the police, I would say, in

10  terms of the message.  It was a lot more about mourning the

11  deaths of black people who had been killed by police.  And they

12  were completely peaceful.  Police would, you know, block

13  traffic where needed and keep a respectful distance.

14  Q.   What was different about the protests you attended in

15  Denver in 2022?

16  A.   The main difference I noticed was the messaging was

17  directed at police.

18  Q.   Tell us about how that was.

19  A.   So, I mean, from pretty much the very beginning, police

20  would form these really aggressive and intimidating lines,

21  either next to or directly in front of where people were trying

22  to march, including places I've marched many times in the past.

23  They were outfitted with complete riot gear.  And as a result,

24  people would deliver their message directly to the police,

25  saying, you know -- I think one of the first chants I heard

Claire Sannier - Direct

1   was, "I don't see a riot here.  Why are you in riot gear?"

2   Q.  Okay.  What other ways did the protesters in May and June

3   or 2020 deliver their message directly to the police?

4   A.  Yeah.  We had signs about police brutality, calling for an

5   end to it, calling for individual police officers to consider

6   quitting their jobs or changing careers as a way to avoid being

7   a part of the harm that had been done by police over the last

8   several decades.

9   Q.  And did you ever, you know, engage in chants that were

10  directed at the police?

11  A.  Yeah, I certainly did.

12  Q.  Like what kind of chants?

13  A.  We would chant, "Quit your job."  Sometimes we would chant,

14  "Go home."  In particular when we were engaged in a peaceful

15  march, and police would attempt to intimidate us to get us to

16  leave, we would ask them to instead leave, because there was

17  nothing unsafe going on.  And I think that's most of it.

18  Q.  Was it intimidating seeing police in their riot gear?

19  A.  Yeah, it was incredibly intimidating.  It's one of the

20  scariest things I've experienced in my life.  And over the

21  course of the weekend, it turned into an even scarier thing.

22  Q.  How did you hear about the death of George Floyd?

23  A.  It would have been on social media and some other -- I'm

24  sure I was texting other activists that I know about it, as

25  well.

Claire Sannier – Direct

1    *Q.* How did you feel when you heard about it?

2    *A.* I mean, kind of a combination of exhausted and enraged and,

3    obviously, really sad.  There had been so many deaths like this

4    in the past; and hearing this particular one described, knowing

5    that this man knelt on his neck for nine minute and that he was

6    killed -- I didn't even watch the video.  I already knew, like,

7    what my response needed to be.

8    *Q.* Okay.  What was your response?

9    *A.* My response was to find out where protests were going to be

10   and then to attend them.

11   *Q.* What was the first day that you attended the protests?

12   *A.* Thursday, March 28.

13   *Q.* And --

14   *A.* Sorry.  May 28.  Excuse me.

15   *Q.* Why did you decide to join the protests?

16   *A.* Because I -- I mean, it's a combination of several things.

17   My community was out in protest, and I felt that I needed to be

18   a part of that.  I also feel that as a white person I have a

19   lot of privilege that I can bring to bear in a protest to try

20   to keep people safe.  It's just my civic responsibility to join

21   in that sort of activity.

22         *THE COURT:*  Claire, would you mind trying to slow down

23   just a little bit.

24         *THE WITNESS:*  Sure.  Sorry.

25         *THE COURT:*  I know it's kind of intimidating being

Claire Sannier - Direct

1    here.  It's kind of like riot gear in court here.  Just slow

2    down a little bit.

3            *THE WITNESS:*  Thank you, I will.  Thank you, Your

4    Honor.

5            *THE COURT:*  Okay.

6    *BY MS. WANG:*

7    *Q.*  Where did you go on the first day of the protests?

8    *A.*  I went straight to the capitol.  As I understood it, that's

9    where people were gathering.

10   *Q.*  Do you know why people were gathering there?

11   *A.*  I mean, that's the seat of power.  Anybody who is going to

12   be able to make the kinds of changes that we wanted to see

13   would be either at the capitol or, certainly, people would be

14   watching on the news or wherever else.

15   *Q.*  Okay.  And how were you dressed that first day?

16   *A.*  Just in street clothes.  I had maybe like a T-shirt and

17   jeans on.

18   *Q.*  What time did you get to the protests?

19   *A.*  Sometime in the late afternoon, maybe 4 or 5 o'clock.

20   *Q.*  What did you do when you got there?

21   *A.*  I basically just sort of got the lay of the land.  There

22   were already hundreds, maybe a couple thousand people there.

23   And I sort of -- it became clear that the crowd was going to

24   march up 16th Street Mall.

25   *Q.*  Did you join --

Claire Sannier - Direct

1   A.   I apologize.  I did join them.

2   Q.   You joined the march up 16th Street Mall?

3   A.   Yes.

4   Q.   What kind of signs did people have?

5   A.   All different kinds.  Some simply said "Black Lives

6   Matter," which is sort of the central message of the movement;

7   some had messages that were critical of policing, critical of

8   white supremacy and different hate groups; and also a lot of

9   signs that just had the names of the dozens and dozens of black

10  people that had been murdered by police in the last decade or

11  so.

12  Q.   Where did you end up once you marched up 16th Street Mall?

13  A.   So the end of 16th Street Mall is this bridge that crosses

14  the freeway, I-25, there.  So the march -- I mean, I lived on

15  the 16th Street Mall, at California and 16th, at the time, and

16  marches went -- I mean, every weekend there were marches that

17  went up and down 16th Street Mall.  A lot of times they would

18  end at this bridge.

19  Q.   What's the bridge?

20  A.   I think it's called the Highland Bridge.

21  Q.   Okay.  When you got to --

22       Well, showing you Exhibit 1220.  Okay.

23       THE COURT:  Is this an exhibit?

24       MS. WANG:  It is an exhibit, Exhibit 1220.

25       COURTROOM DEPUTY:  You will not see it unless the

83

Claire Sannier - Direct

1    Judge admits it.

2          THE COURT:  Okay.  1220.  And I can't tell if it's

3    stipulated or not.  It doesn't appear to be.  I don't know why

4    it wouldn't be.

5          MS. HOFFMAN:  Defendants have no objection to the

6    admission of this exhibit.

7          THE COURT:  Okay.  I don't see stipulations in this

8    whole exhibit list.  What's the story there?

9          MS. HOFFMAN:  The defendants certainly did stipulate

10   to a number of exhibits, including some stipulations to

11   authenticity and some stipulations to admissibility.  I would

12   agree with you that that isn't reflected --

13         MS. WANG:  Judge, the parties did exchange

14   stipulations on the exhibits.  The versions both sides filed

15   did not have the stipulations on it.

16         THE COURT:  So you'll be able to get me a set that

17   does?

18         MS. WANG:  Yes, Judge.

19         THE COURT:  1220 is admitted.

20         (Exhibit 1220 admitted.)

21         MS. WANG:  I move to publish Exhibit 1220 to the jury.

22         THE COURT:  As soon as it's admitted, she can.

23         The lawyers say "publish," that just means show it to

24   you.

25         MS. WANG:  May we publish, Your Honor?

84

Claire Sannier - Direct

1      THE COURT:  Like I said, as soon as I admit it, then

2  you may publish it.  You don't have to ask.

3      MS. WANG:  I see.  Okay.

4      THE COURT:  It should be up on everybody's screen now.

5  Yes.

6      MS. WANG:  Okay.  Thank you.

7  BY MS. WANG:

8  Q.  Claire, can you tell us -- so we've got -- what's this a

9  depiction of, Claire?

10  A.  This is an overhead map of the area I was just talking

11  about.  At the bottom right -- I don't know if I'm allowed to

12  draw on this -- no, it doesn't look like it.  At the bottom

13  right of the image, you see the end of the 16th Street Mall, as

14  you go up it, and then there is this bridge that crosses the

15  freeway.

16      THE COURT:  By the way, if you need to at any time,

17  you've got a stylus there.  You can draw right on that.

18      COURTROOM DEPUTY:  Your Honor, she normally could;

19  however, this morning, it stopped working.  So IT is working on

20  it.

21      THE COURT:  Oh, it's not working.  It's the

22  government.  What can I say?  Sorry.

23      MS. WANG:  I'll assist.

24  BY MS. WANG:

25  Q.  So, Claire, you were saying -- where did you end up when

85

Claire Sannier - Direct

1    you marched up to the Highland Bridge?

2    A.   So I went onto that walkway that you see, the sort of

3    circular walkway there.  There is also a staircase that leads

4    up to the bridge, and I was in and around that area.

5    Q.   Okay.  When you were on -- so at what time -- was there a

6    time when you saw protesters get onto the highway?

7    A.   There was.  Yes.

8    Q.   Where were you when you saw that?

9    A.   I was on that Highland Bridge walkway, in the circled area.

10   Q.   Okay.  So just to orient us, going in the lower -- lower

11   right-hand corner is downtown?

12   A.   That's right.

13   Q.   Okay.  And this Highland Bridge that is circled in yellow

14   is a walkway that goes from the street up to the pedestrian

15   bridge; is that right?

16   A.   That's correct.

17   Q.   Okay.  Now, can you describe what you saw the protesters do

18   when you were on that walkway area.

19   A.   Yeah.  So I stayed behind them on the other side of -- you

20   can kind of see the fence there.  And protesters relatively

21   slowly climbed over the fence onto that lawn area and then

22   climbed over the next fence onto the side of the freeway, at

23   which point they sort of got the attention of the drivers on

24   the freeway, who slowed to a stop, and then the pedestrians

25   entered the freeway.

Claire Sannier – Direct

1   *Q.*  Okay.  There is actually a fence here by the walkway, and

2   then there is another one by the freeway?

3   *A.*  That's correct.

4   *Q.*  Okay.  So what did you see the cars do in response?

5   *A.*  Cars slowed to a stop.  I don't think traffic was moving

6   particularly fast at the time.  And a lot of folks actually

7   honked in support, like sort of rapid honks with their horns.

8   *Q.*  Okay.  Did the police arrive at one point?

9   *A.*  Yeah.  Probably four or five minutes later, the police

10  arrived, going the wrong way down that lane.  So coming from

11  the top right of the image.  And they were -- had their sirens

12  on and then pretty much immediately got out of their cars.

13        *MS. WANG:*  Okay.  I'm showing you Exhibit 530.

14        *THE COURT:*  Touch the screen in the lower right, and

15  it should go away.

16        *MS. HOFFMAN:*  I believe we stipulated to 530.

17        *THE COURT:*  530 is admitted.

18        (Exhibit 530 admitted.)

19        *MS. WANG:*  May we publish to the jury?

20  *BY MS. WANG:*

21  *Q.*  Claire, does -- okay.

22        So pause it, please.

23        All right.  Claire, at this time were you present in

24  the area of I-25, as depicted in this video?

25  *A.*  I was.  Yes, I was.

Claire Sannier - Direct

1    *Q.*  All right.  And where were you?

2    *A.*  So I was on -- I probably am in that crowd on the other

3    side of the fence on that pedestrian walkway, which is the

4    circular walkway we saw in the map earlier.

5    *Q.*  So this walkway?

6    *A.*  That's right.

7    *Q.*  You're somewhere in this group of protesters?

8    *A.*  I believe so.  Yes.

9    *Q.*  Now, Claire, so you were still in the walkway area at the

10   time these protesters got onto the highway?

11   *A.*  That's right.

12   *Q.*  All right.  Did you -- did you -- what were you doing at

13   that time?

14   *A.*  I was basically just observing.  I think some of the folks

15   in the crowd were also chanting, and I was probably also

16   chanting at this time.

17   *Q.*  Okay.  So have you been to other protests in Denver when

18   protesters got onto the freeway or blocked traffic?

19   *A.*  I have.

20   *Q.*  Okay.  And can you tell us about that.

21   *A.*  Yeah.  In that first protest right after Donald Trump was

22   elected, several protesters jumped onto actually the same

23   freeway.  They climbed over the barricade on an exit ramp on

24   I-25 at a different location.

25   *Q.*  What time of day was that?

Claire Sannier - Direct

1    A.   I mean, it was pitch dark out, probably 8 or 9 o'clock p.m.

2    It was in November, so --

3    Q.   Okay.  What was the police response to that?

4    A.   It was at first quite the same.  The police entered the

5    freeway going the wrong direction so that traffic couldn't

6    continue and had their sirens on.  They blocked off traffic in

7    the area and kept their distance from the protesters, who

8    eventually decided to leave the freeway.

9    Q.   Okay.  Did you see the police use any force during that

10   incident where protesters blocked traffic?

11   A.   I did not.

12   Q.   How long did these protesters remain on the highway before

13   they got off?

14   A.   Probably another three or five minutes.

15   Q.   We're continuing to display Exhibit 530 at time 7:05.

16            (Video played.)

17            Now, Claire, at this time when the police arrived,

18   where were you?

19   A.   I was still behind the second fence there, on the

20   pedestrian walkway.

21   Q.   Okay.  What did the police do after they arrived?

22   A.   So, yeah, they arrived.  And you can see them in the video

23   walking -- the protesters pretty much immediately left the

24   freeway when the police arrived.  And then within a couple of

25   minutes from this, they just started shooting at the crowd, who

Claire Sannier – Direct

1    was no longer on the freeway.

2    Q.   Okay.  So they were shooting at people who were running

3    away?

4    A.   Yeah.  That's right.  They shot at people's back as they

5    ran towards the pedestrian walkway.

6    Q.   Did they arrest anyone on the highway?

7    A.   I believe I saw one person being arrested who didn't leave

8    the freeway, but all the other protesters were only attacked by

9    these chemical weapons.

10   Q.   Did you see anybody throwing anything?

11   A.   I did not.

12   Q.   Okay.  Is blocking traffic a form of peaceful protest?

13   A.   Yeah.  It is.  It's been done in this country for at least

14   several decades.  Martin Luther King famously blocked many

15   roadways and bridges as a way to disrupt the normal order of

16   things in order to deliver his message.  It's a vital part of

17   protesting.

18   Q.   Why is it important for a vital part of protesting?

19   A.   It's important for peaceful protests to be able to reach

20   people who might otherwise be able to ignore a message.  So, I

21   mean, even walking down the street and chanting is a form of

22   disruption -- a peaceful form of disruption, of course -- but

23   it's one that calls people's attention.  And blocking a freeway

24   is not a significant difference from that.

25   Q.   Okay.  Were you surprised, then, when the Denver police

Claire Sannier - Direct

1    arrived on this day and began shooting at protesters?

2    A.  I was astonished.  It was the first time I had ever seen

3    anything like this in my life.

4    Q.  Did you hear the police give any warnings or announcements

5    before using their weapons?

6    A.  I did not.  In fact, I never heard a police officer say a

7    word the entire weekend.

8    Q.  Where were you when the officers were shooting at

9    protesters?

10   A.  I was on the pedestrian walkway; and I eventually went up

11   onto the bridge, as well.

12   Q.  You were on the walkway leading up to the bridge?

13   A.  That's right.

14   Q.  All right.  How tall is the fence on that bridge?

15   A.  It's probably 10 or 12 feet tall.

16   Q.  Do you see anything thrown by anybody from the bridge?

17   A.  I did not.

18   Q.  Okay.  Were you exposed to the chemical weapons used by the

19   police?

20   A.  I was.  This was the first time of very, very many times,

21   and the first time in my life.

22   Q.  And how did that feel?

23   A.  Horrible.  It was -- first of all, it was just sort of a

24   shocking betrayal.  I mean, I was certainly critical of police

25   violence against black people and otherwise, but I didn't

Claire Sannier - Direct

1  really understand what they were capable of.  And I -- it felt

2  like this huge betrayal from people who were ostensibly there

3  to keep us safe and protect our constitutional rights, for them

4  to come out with no warning whatsoever and just

5  indiscriminately start shooting these what I later learned were

6  pepper balls at the crowd.  I mean you can't breathe; you are

7  coughing involuntarily; you start crying.  People were trying

8  to get down the stairway from the bridge so that they could get

9  to safety, and they couldn't see.  So they're, like, running

10  down stairs with their eyes completely blinded.  It was very

11  dangerous and chaotic.

12          MS. WANG:  Okay.  I'm showing you Exhibit 554.

13          THE COURT:  Is this another photograph?

14          MS. WANG:  It is a body-worn camera from a Denver

15  police officer.

16          THE COURT:  Any objection?

17          MS. HOFFMAN:  No objection.

18          THE COURT:  Admitted.

19          (Exhibit 554 admitted.)

20  BY MS. WANG:

21  Q.  Claire, let's display Exhibit 554.  Go ahead.

22          (Video played.)

23          Now, you heard the protesters -- did you hear any

24  protesters yelling at the police?

25  A.  I did.

Claire Sannier - Direct

1   Q.  And why were they yelling at the police?

2   A.  I mean, we were frustrated with specifically the police.

3   This was the form that our protest speech took in a lot of

4   cases.

5   Q.  Was there a time when the police officers shot at the

6   bridge -- at the protesters on the bridge?

7   A.  Yeah, absolutely.  Almost immediately after this, if I'm

8   not mistaken.  They shot at the bridge; they shot at the fence

9   on the left that you can see there where protesters were on the

10  pedestrian walkway; they shot all over this whole area.

11          And I think it's important -- I mean, obviously this

12  is something I learned in this moment.  But every one of these

13  little pepper balls explodes, and then there is a cloud of

14  noxious gas that affects everyone in the area.  You can hear

15  every one of those little pops -- which I became incredibly

16  familiar with over the course of this weekend -- those -- each

17  corresponds to, like, one of these rounds being fired at this

18  crowd.

19          (Video played.)

20  Q.  All right.  At that time, did you hear the pops in the

21  video?

22  A.  I'm sorry?

23  Q.  Did you hear the pops?

24  A.  I did, yeah.  All of those individual pops.

25  Q.  What were those?

Claire Sannier - Direct

1   *A.*   That's pepper balls being fired at the crowd.

2   *Q.*   Now, did you see a couple of objects thrown from the

3   walkway area?

4   *A.*   On this video, yes.  I didn't see them at the time.

5   *Q.*   Okay.  And what were those objects that you saw in the

6   video?

7   *A.*   They looked like plastic water bottles.

8   *Q.*   Were those thrown before or after the police had been

9   shooting at people who were running away?

10  *A.*   They were thrown after people had passed.  Seemed to me

11  like a sort of desperate frustration response.  You know,

12  people were drinking a water bottle and then just had to run

13  away, so they would toss it.

14  *Q.*   After the police shot at you and the other protesters on

15  the bridge, what did you do?

16  *A.*   So --

17          *MS. HOFFMAN:*  Objection --

18  *BY MS. WANG:*

19  *Q.*   Did the police shoot at you or the other protesters on the

20  bridge?

21  *A.*   Sorry.  I thought I heard --

22  *Q.*   Yes.

23  *A.*   Yes.  They continued to shoot at us on the bridge.  People

24  were trying to flee in both directions because we had no idea

25  where we were supposed to go, because the officers hadn't told

Claire Sannier - Direct

 1   us anything; so I ended up running back down towards

 2   16th Street.

 3   Q.  Okay.  Did you encounter any police on the way back to the

 4   capitol -- I'm sorry.  Where did you go after that?

 5   A.  Yeah.  So we went back to the top of 16th Street Mall

 6   there, and the police continued to shoot at us as we were

 7   trying to get to safety.  Eventually, when we got back to the

 8   mall, we were able to walk back to the capitol, which is,

 9   essentially, on the other side of 16th Street Mall, like, the

10   full length of it.

11   Q.  Okay.  Later that evening, at 8:30 p.m., did you march --

12   had you marched somewhere else?

13   A.  Yeah.  Around that time, just after sunset, I believe, we

14   started to march on Colfax to the east.

15   Q.  And where were you marching to?

16   A.  I mean, I had marched on Colfax just because it's a busy

17   thoroughfare and a good way to get your message to people.

18   Many times preplanned marches end in spontaneous marches.  So,

19   I mean, as far as I knew, we were just marching on Colfax.

20   Later, as the crowd began discussing it, it became clear to me

21   that we were heading to a police station that's on Colfax.

22   Q.  Okay.  And why were -- do you know why the marchers were

23   headed towards the police station?

24   A.  I think it's very much the same as the reason we would

25   address the police directly when they were in lines around us.

Claire Sannier - Direct

1   That's the people we needed to hear our message, and so the

2   police station is where they were.

3   Q.  Okay.  Was the march peaceful?

4   A.  Yes, it was.

5   Q.  How did you feel at that time?

6   A.  I mean, I felt pretty scared.  I really didn't know what to

7   expect next.  This was unchartered territory for me, even

8   though I had been to many, many protests in the past.  And I

9   didn't know what to expect.  But people in the crowd were

10  remaining calm.  We were trying to keep each other safe and

11  calm, and so I was -- I felt comfortable enough to continue,

12  certainly.

13  Q.  What did you do -- did you arrive at the police station at

14  some point, or near the police station?

15  A.  Yeah.  So the police station is on Washington and Colfax,

16  and so we were in the intersection between the two streets in

17  the street.

18  Q.  How close to the police station did you get?

19  A.  I was at least 150 feet away.  I was within the

20  intersection.

21  Q.  Okay.  What were you doing there?

22  A.  Chanting, demonstrating, and also just observing.  It was

23  important to me to sort of be of witness to what was happening

24  here.

25  Q.  And how big was the crowd?

Claire Sannier - Direct

1   A.   I would have estimated maybe -- I mean, it seemed like

2   thousands of people, to me.   I was certainly surrounded by

3   hundreds at any given time.

4   Q.   Okay.   And what was the demeanor of the crowd?

5   A.   I mean, people were definitely frustrated.   We had all been

6   attacked with these chemical weapons, most of us, I'm sure, for

7   the first time.   Certainly, it was my first time.   And people

8   were very angry and frustrated with the police and were voicing

9   that frustration.

10  Q.   Did you see anyone throw anything?

11  A.   I didn't see the actual person who threw it, but I did see

12  a rock hit a window at the police station.   I didn't see

13  anything thrown at any officers or any people.

14  Q.   Did you see any -- were there police officers outside the

15  police station at this time?

16  A.   They were.   They were in the street on Washington.   So the

17  police station is on the northeast corner of those two streets,

18  and they were sort of blocking access to the street next to the

19  police station.

20  Q.   Okay.   Did you see any attempts by any police officer to

21  isolate anybody who had thrown anything at the police station?

22  A.   No.   And, in fact, I never saw that.   I never even saw a

23  police officer react to something that was thrown.   It -- all

24  of the behavior of the police officers was completely random,

25  from my perspective.   I never had any idea when anything was

97

Claire Sannier – Direct

1   going to happen.

2   Q.   While you were in that intersection at Colfax and

3   Washington -- well, do you recall about what time it was?

4   A.   It was probably somewhere around 9:00.

5   Q.   Okay.  Did you -- did you see any acts of violence when you

6   were at the intersection?

7   A.   Dozens.  Absolutely.

8   Q.   Yes.

9   A.   I saw -- I mean, the police committed acts of violence the

10  entire time.  Police would shove people with batons; police

11  would throw grenades at us.  That's the first time I actually

12  experienced actual tear gas.  I didn't even know the difference

13  before.  Yeah, I mean, I saw them commit a ton of acts of

14  violence; but that was the only kind of violence I saw.

15  Q.   Was there a time when you and others were pushed back from

16  the police station?

17  A.   Yes.  By this giant cloud of tear gas.  They would throw it

18  right into the middle of the crowd, and people would

19  immediately have to start fleeing.  It was incredibly chaotic

20  and scary and painful, obviously.  It makes it harder to

21  breathe, it makes it hard to see, so people eventually fled to

22  the south onto Washington.

23          MS. WANG:   Okay.  Showing you Exhibit 532.

24          It's a HALO camera, and I believe it is stipulated,

25  Your Honor.

1          THE COURT:  All right.  It doesn't show that, of

2     course.  Admitted.

3               (Exhibit 532 admitted.)

4          MS. WANG:  I'm showing Exhibit 532.

5               (Video played.)

6     BY MS. WANG:

7     Q.  All right.  Claire, what was that, that was thrown into the

8     intersection in that video right there?

9     A.  I believe that's a tear gas canister.  It was thrown into

10    the intersection, and then they explode in this massive spray

11    of sparks, and then they immediately start this hissing noise,

12    and then you can see all of this gas starts to be released.  I

13    mean, that will spread for hundreds of yards.  Everybody

14    anywhere on this block was feeling the effects of this gas.

15    Q.  So let's orient ourselves a little bit here.  Where is the

16    police station in this video?

17    A.  It's right at the top of the frame.  It's got that big

18    brick wall surrounding it.  So that's Washington Street, that's

19    going north from where the camera is pointed.  And protesters

20    at this point were already south off of Colfax, sort of behind

21    this camera.

22    Q.  Okay.  The street that is going horizontally -- east-west,

23    is Colfax?

24    A.  That's correct.

25    Q.  And the street going diagonally from the view of this video

Claire Sannier - Direct

1   is Washington?

2   A.  That's right.

3   Q.  Okay.  Where were you at this time?

4   A.  I was behind this camera, down south on Washington.

5   Q.  You were somewhere down here?

6   A.  That's right.

7   Q.  All right.  Where were the other protesters?

8   A.  Most of them were behind me.  We were all kind of

9   scattered, trying to -- I mean, people were coughing; some

10  people looked like they were about to vomit; people had fallen

11  over in the cloud of gas in the middle of the street, had to

12  be, you know, picked up and helped away; and a lot of people

13  were administering, essentially, home remedies for this

14  chemical weapon, which I later learned is like Milk of Magnesia

15  mixed with water.  You buy Milk of Magnesia at Walgreens, I

16  guess; and you kind of wash your eyes out so you can see again.

17  So there was a lot of that going around down in that south area

18  as people tried to recover from each successive attack.

19  Q.  Let's continue displaying Exhibit 532.

20         (Video played.)

21         So the camera has panned to the south.  So were you

22  and the other protesters -- or most of them -- south at this

23  point?

24  A.  Yes, we were.

25  Q.  Okay.  Did the police stop traffic for the -- when they

Claire Sannier – Direct

1   were throwing tear gas into the intersection?

2   *A.*  No, they did.  In fact, for one of the very early attacks,

3   a lot of protesters had to figure out how to let traffic

4   through, because there were people with children in their cars.

5   One guy in particular was driving a family sedan and had

6   children in the back of his car who were in extreme distress

7   because of this chemical.  We had to figure out how to let them

8   through.  The police didn't even try to stop traffic.

9   *Q.*  Did the police give you or the other protesters any warning

10  or announcements before they threw this tear gas?

11  *A.*  No.  I never heard a single word from the police officers,

12  either this night or any other day.

13  *Q.*  Where did you go after this?

14  *A.*  After this, I decided to go home.  It was late, I was

15  pretty traumatized and frightened, so I went and found my car

16  and drove home.  At the time I was staying with my parents.

17  And then the next day I actually moved back downtown, where I

18  lived at 16th and California.

19  *Q.*  What did you have to do with your clothes when you got

20  home?

21  *A.*  I had to wash them immediately.  I didn't really want my

22  family to be afraid for my safety from smelling what was

23  leftover on my clothes.  My car was completely full.  I had to

24  drive home with the windows open.  And so I had to wash them

25  immediately.

Claire Sannier - Direct

1    Q.   Did you attend day two of the protests?

2    A.   I did.

3    Q.   And how were you dressed that day?

4    A.   I think I was wearing a long-sleeved shirt and shorts.

5    Q.   Okay.  Did you have any supplies with you?

6    A.   Yeah.  I brought some water, and I also went to Walgreens

7    to pick up some of this Milk of Magnesia that I had heard

8    helped, that I had people help me with, because I wanted to be

9    able to protect people.  I also bought some swim goggles at

10   Walgreens, hopefully to be able to see better if they were to

11   continue attacking us in this way.  And I bought some

12   sandwiches and some water.

13   Q.   About what time did you get to the protest on day two?

14   A.   I think kind of early afternoon, maybe late afternoon.

15   Q.   Okay.  And where did you go?

16   A.   I went straight to the capitol.  That was sort of the

17   central -- I mean, it's the central park in Denver.  It's this

18   big, huge grassy area around the capitol building, and it's the

19   frequent site of demonstrations basically every weekend.

20   Q.   Was there a time around twilight on May 29 that you were

21   gassed?

22   A.   There was.

23   Q.   Okay.  And tell us about that.

24   A.   Yeah.  So, I mean, it's pretty -- this one was completely

25   arbitrary, from my perspective.  There wasn't even a particular

Claire Sannier – Direct

1    demonstration happening, that I was aware of.  I was just sort

2    of on the capitol lawn, and I just saw this massive plume of

3    smoke off in the distance.  And even at that distance, I was

4    able to feel the effects of the gas quite quickly.

5    *Q.*  And so who -- were you with anybody at this time?

6    *A.*  I was.  I was with my friend John Connor.

7    *Q.*  And what were you doing on the lawn?

8    *A.*  We were -- I mean, we were mostly just sort of

9    demonstrating.  A lot of people had sort of brought megaphones

10   and were delivering speeches.  One demonstration people would

11   do frequently is sort of lay on the ground face first and sort

12   of wait for nine minutes and hold a moment of silence for

13   George Floyd, to honor his memory and the way he was killed and

14   also to sort of imagine the very small part of what that

15   experience must have been like.  So a lot of mourning, as well

16   as chanting of the familiar slogans.

17            *MS. WANG:*  All right.  So showing you Exhibit 1007.

18            *MS. HOFFMAN:*  No objection.

19            *THE COURT:*  Admitted.

20            (Exhibit 1007 admitted.)

21   *BY MS. WANG:*

22   *Q.*  Claire, did you take this photo?

23   *A.*  I did.

24   *Q.*  And tell us what was going on when you took this photo.

25   *A.*  So, here, I'm standing right on the lawn outside the

Claire Sannier - Direct

1    capitol.  And -- I mean, this is my city.  My house is on the

2    other side of that building.  And it -- just seeing it in this

3    state, essentially under siege by the police, this giant cloud

4    of tear gas -- I mean, we could feel that cloud from where we

5    were.  It's not just where you can see it.  And it was just

6    horrifying to me, and I didn't want to forget it.

7    Q.  Do you remember about what time it was?

8    A.  Yeah.  I mean, the sun was going down.  It was probably, I

9    don't know, 6:00 or 7:00.  I may not remember exactly when I

10   took it.

11   Q.  Okay.  So this -- let's orient ourselves a little bit.

12   This is Lincoln; right?

13   A.  That's right.

14   Q.  That's the street diagonally across the photo, but it goes

15   north-south?

16   A.  That's right.  I'm looking to the northwest in this photo.

17   Q.  All right.  What's this street going this way?

18   A.  That's Colfax.

19   Q.  Okay.  And what is across the street here?

20   A.  That's like a bus station.  There is this big, huge open

21   area out in front of it.

22   Q.  Okay.  So where were most of the protesters?

23   A.  The protesters were pretty much all on the south side of

24   Colfax.  There is a park across the street from the capitol

25   that is off to the left of this screen.  Protesters were in the

Claire Sannier - Direct

1   lawn on both of those places.

2   Q.  Is that a public park?

3   A.  Yes, it's a public park.  People are there all of the time.

4   Q.  And did you hear any warnings before the police started

5   gassing people?

6   A.  No.  I mean, it was the same as the previous day; I never

7   heard the police say a single word.

8   Q.  Did you see anyone throw anything?

9   A.  I did not.

10  Q.  Did you throw anything?

11  A.  No.  Certainly not.

12  Q.  Did your friend throw anything?

13  A.  No.  Certainly not.

14  Q.  Did you engage in any acts of violence?

15  A.  No.  Certainly not.

16  Q.  Did you engage in any acts of property destruction?

17  A.  No.

18  Q.  Then, how did it feel when you experienced this cloud of

19  gas?

20  A.  This started -- I mean, this was already 24 hours after the

21  first time I had been tear-gassed; and I was starting to

22  wonder, I mean, how long they were going to do this for, how --

23  like, how we could avoid it, I mean, what we could possibly do

24  to make this stop.  And, I mean, I was horrified; and I felt

25  really betrayed.  I mean, like I say, this is my city; this is

105

Claire Sannier - Direct

1    my home; and it was in this condition because of the police's

2    behavior.

3    Q.  Would this cloud of gas that we see here in this photo --

4    is this the first time that you were gassed at this location

5    that day?

6    A.  I honestly couldn't say.  I know I was gassed several times

7    at that location on that day.  I don't know which ones were

8    before or after.  It's all so incredibly chaotic.

9    Q.  Okay.  How many people would you estimate were in the area

10   of the park -- the public park across the street and the

11   capitol lawn?

12   A.  I mean it seemed like thousands to me.

13   Q.  Okay.  What was the behavior of the crowd?

14   A.  It was much the same.  I mean, people were very frustrated;

15   people were chanting; people were yelling things at police when

16   they would -- like, periodically police would just start lining

17   up in someplace in this really aggressive and intimidating kind

18   of way.  They had these big clubs; they had all of these

19   different kinds of guns we didn't recognize.  We all saw the

20   same thing in opening statements.  So I know what those are

21   now.  But, I mean, we saw those being brandished at us with no

22   word of warning or anything.  And so people would respond to

23   that frustratedly.  They would chant things -- like I say, we

24   would say, "Go home."  We would say, "We don't want you here,"

25   "You're not helping," and things like this.

106

Claire Sannier - Direct

1    Q.   Where did you go after -- after you were at this location?

2    A.   After I was at this location, I believe a -- I believe I

3    headed home.

4    Q.   Okay.  Was there a time later in that evening on May 29

5    that you were shot with a pepper ball?

6    A.   There was.  Yeah.  So I live, like I said, right on the

7    16th Street Mall.  So I started to head north on 16th towards

8    my house, which is only a few blocks away.  So I was walking.

9    As I was walking, I saw this giant -- this large group of

10   police sort of messing with their gear.  They were putting a

11   bunch of armor on, helmets, gas masks, face shields, knee pads,

12   elbow pads, body armor, sort of all of this gear; and they were

13   next to the SUVs that I recognized as Denver police vehicles.

14   Q.   And you lived off 16th Street Mall at the time?

15   A.   That's right.

16   Q.   Do you recall about what time it was?

17   A.   Yeah.  I think it was somewhere after 9 o'clock.

18   Q.   So what did you see on your way home besides the police?

19   A.   Yeah.  So, basically, when I saw the police in this

20   formation, this far away from the protests, their behavior had

21   been so unpredictable and arbitrary that I was worried about

22   what might happen, so I started to film them.  And an officer

23   made eye contact with me.  I could tell that they knew I was

24   filming, so I was somewhat afraid of what they might do.  And

25   as I was filming them, a black man walked out of a nearby

Claire Sannier - Direct

1    noodle shop and started to engage in conversation with the

2    police.

3              MS. WANG:  All right.  Showing you Exhibit 947.

4              MS. HOFFMAN:  No objection.

5              THE COURT:  Admitted.

6              (Exhibit 947 admitted.)

7    BY MS. WANG:

8    Q.  Displaying Exhibit 947.

9              (Video played.)

10             What -- do you hear the yelling in the video?

11   A.  Yeah, I do.  That was the black man I was referencing

12   earlier.

13   Q.  Is this the video that you took?

14   A.  It is.

15   Q.  All right.  Where is the black man standing?  We don't see

16   him.

17   A.  I think the camera -- if I remember the video right, he's

18   just off to the left.

19   Q.  Okay.  What was he saying to the police?

20   A.  He was saying, "Why are you afraid of me?  I'm a black man

21   with noodles."

22   Q.  Why was he referencing the noodles?

23   A.  Because the notion is always that police are afraid for

24   their lives when they shoot these unarmed black men.  He had

25   his hands full of a bowl of noodles, which obviously is not

108

Claire Sannier - Direct

1   threatening.

2          (Video played.)

3   *Q.*  How long did this occur, this taunting?

4   *A.*  I mean, a minute or two.  Maybe three.

5   *Q.*  Okay.  And then did you recognize these officers?

6   *A.*  Certainly not individually.  In fact, it was very difficult

7   to identify individual officers.  Sometimes we would ask them

8   their names or for their badge numbers, and they would stare at

9   us.  Completely ignore us.  But I did recognize their vehicles

10  as the same Denver Police Department vehicles that drive around

11  downtown all the time.

12  *Q.*  Okay.  And what happened next?

13  *A.*  Yeah.  So at one point the officers aimed their weapons at

14  this man, which is when he says, I think, "Put that shit up,"

15  or something like that.  Shortly after that -- shortly

16  afterwards, a white couple walked next to this man, and they

17  engaged in a verbal altercation.

18  *Q.*  Showing Exhibit 947 again.

19         (Video played.)

20         All right.  Did the police give you any warning before

21  they started shooting?

22  *A.*  No.  This was -- I mean, this was such an escalation even

23  from what I had seen before.  You can see how far the capitol

24  was.  This is hundreds of feet from any protest.  And,

25  certainly, these people weren't being polite to one another;

Claire Sannier - Direct

 1    but I don't think that's cause for chemical weapons to be

 2    deployed.  You can see -- I mean, in the shot there, you can

 3    see those four little puffs.  Each of those is a shot.  So they

 4    just started to shoot along towards this man.  Shortly after

 5    this part, I was struck in the chest.

 6    Q.  All right.  So there was a lot of popping that we heard in

 7    that.  What were those?

 8    A.  Each one of those is someone pulling the trigger and

 9    shooting a pepper ball.

10    Q.  Was there more than one officer shooting?

11    A.  Yes.  Certainly.

12    Q.  And where were you shot?

13    A.  I was shot right in my chest.  I was at least 100 feet away

14    from these officers.  I took them to be aiming at me.  The

15    other people had already dispersed.

16    Q.  Did you -- did you feel the effects of the chemicals that

17    came out of the pepper balls?

18    A.  Yeah.  At one point you hear me cough in the video.

19    Basically, if you can see these things going off, you're going

20    to feel the effect of them.

21    Q.  How did it make you feel when you were shot?

22    A.  I mean, this was such an incredibly -- I mean, it was

23    astonishing to me that they would behave in this way.  It

24    seemed completely out of control.  There was no sense to it at

25    all.  There was no need for the police to be in that location

Claire Sannier – Direct

1    at all; nobody was doing anything; there was no protesting;

2    there was certainly no vandalism or anything like that.  These

3    people got in an argument in the street and were shot for it,

4    and then I was shot for filming it.  So I was enraged.

5    Q.  Have you played paintball before?

6    A.  Yeah, I played paintball.

7    Q.  Okay.  How does being shot with a pepper ball feel compared

8    to being shot with a paintball?

9    A.  I mean, paintball is a game.  You engage in that for fun.

10   It doesn't hurt nearly as much as this did.  It was -- I was

11   very far away; it hit me very hard; it was going very fast.

12   And then there is just the psychological trauma of these people

13   who you see every day -- like, I'll never know if a police

14   officer in Denver is one of the people who shot me.

15   Q.  Did you attend day three -- well, actually, did you go --

16   you were on your way home when you were shot; right?

17   A.  That's right.

18   Q.  Did you go home after that?

19   A.  No.  At that point I was so astonished that I wanted to see

20   what else they were going to do.  I wanted to be able to bear

21   witness to what other acts of violence the police might do at

22   that point.

23   Q.  So what did you do the rest of that evening?

24   A.  So I stood on the corner of, I believe it's 16th and

25   Broadway, which is very close to where the video was shot, and

111

Claire Sannier - Direct

1   just observed the rest of the protest and the police behavior.

2   Q.   Did you see a dumpster fire at some point that evening?

3   A.   I did see a dumpster fire.

4   Q.   Did you set it?

5   A.   No.

6   Q.   Did you know anybody who set it?

7   A.   Certainly not.

8   Q.   Did you see any police respond to it?

9   A.   No, actually.

10  Q.   Did you ever see any broken windows around town?

11  A.   Sure.  I saw some broken windows.

12  Q.   Did you see police ever respond to those?

13  A.   No.  I never saw police do anything about -- the only thing

14  I ever saw police do is line up in a location, refuse to

15  respond to requests for information, never deliver a warning,

16  and then at some random point start attacking people with

17  chemical weapons.  I never saw them trying to stop people from

18  doing anything in particular; I never saw them respond to an

19  act of vandalism; it was all completely arbitrary.

20  Q.   Did you attend day three of the protests, May 30?

21  A.   I did.  Yes.

22  Q.   What time did you arrive on that day?

23  A.   I think I arrived shortly after noon.

24  Q.   And what did you have with you that day?

25  A.   So that morning, after two full evenings of being attacked

Claire Sannier - Direct

1   with chemical weapons, I went to a paint store and bought a

2   respirator.  So one of the ones with, like, a filter on the

3   side you might use to paint your house.

4   Q.  Why did --

5   A.  I was hoping it could help me breathe so I didn't have to

6   deal with the effects quite so much.

7   Q.  Did you have anything else with you?

8   A.  Yeah.  I had, again, some Milk of Magnesia that I was

9   hoping would help with the burning sensations.  I had some

10  water, a couple sandwiches, a first-aid kit, as well.

11  Q.  Where did you go when you first arrived at the protests on

12  day three?

13  A.  I went to the capitol lawn again.

14  Q.  What was going on at that time?

15  A.  At that time people -- I mean, certainly, people were

16  getting a little bit more organized.  There were people who had

17  megaphones who were giving speeches that I recognized from

18  previous days.  And people were just peacefully demonstrating,

19  chanting.  And then at one point in the afternoon we started to

20  march back towards 16th Street.

21  Q.  Was there a time on May 30 as you were marching up 16th

22  Street that you experienced chemical weapons again?

23  A.  There was.  And, again, we -- this was -- each day

24  represented this, like, further increase in violence.  And this

25  was I think Saturday at around, like, 4:30, in broad daylight,

Claire Sannier - Direct

1    in the middle of -- I was two blocks from my house when this

2    happened.  And there was a large line of police officers for

3    some reason standing by the side of the road, in full riot

4    gear, helmets, gas masks, face shields, truncheons, all of this

5    stuff.  And it was very intimidating.  So people started to

6    line up against them and chant at the distance of probably 5 or

7    10 feet.

8    Q.  So before the protesters lined up in front of the officers

9    and started chanting, what were they doing?

10   A.  They were peacefully marching down a public thoroughfare

11   that's a pedestrian walkway and chanting and holding signs.

12   Q.  And did you stop with the other protesters when you saw the

13   police lined up in their riot gear?

14   A.  I did.  I mean, I was already well aware -- at least I

15   thought -- of what police were capable of doing in these

16   situations, what they were willing to do, and I was ready to be

17   present for that and to bear witness to it.

18   Q.  Were the protesters delivering a message to those police

19   officers?

20   A.  They were.  They chanted, "Go home."  This -- again, this

21   is the city we all live in, and they were terrorizing us, and

22   so we were calling on them to go home.  At one point I think

23   people also chanted, "Take off your riot gear and join us,"

24   like, why are you on that side of the line?  We're all humans

25   here; we should all be appalled by the video, by the killing of

Claire Sannier - Direct

1    this man.  Why are you attacking us instead of helping us?

2    Q.   So why is the police -- why is it intimidating simply for

3    the police to show up and line up in riot gear?

4    A.   Because we already saw what they did in their riot gear.

5    They attacked us indiscriminately.

6              MS. WANG:  Exhibit 946.

7              MS. HOFFMAN:  No objection.

8              THE COURT:  Admitted.

9              (Exhibit 946 admitted.)

10             (Video played.)

11   BY MS. WANG:

12   Q.   Did you record this video, Claire?

13   A.   I did.

14   Q.   Okay.  So what location is this at?

15   A.   So this is 16th Street and Welton.

16   Q.   What is the -- looks like a lot here.

17   A.   Just a bunch of gravel.  I think it's, like, a parking lot.

18   Q.   Okay.  And then these -- are those police officers against

19   the wall?

20   A.   That's right.  Yeah.  They were lined up next to the 16th

21   Street Mall, brandishing clubs and guns and weapons.

22   Q.   Now, what -- what is in this direction, where I'm

23   indicating with the arrow?

24   A.   That's an empty alleyway that leads off to the other -- to

25   the next street.

Claire Sannier - Direct

1          *MS. WANG:*  Displaying the video.

2          (Video played.)

*BY MS. WANG:*

4    *Q.*  So what were the protesters saying at this time?

5    *A.*  At that point they were saying either -- at the beginning

6    of the video, there was a really frequent chant, which has been

7    part of Black Lives Matter protests for a decade, which is,

8    "Hands up.  Don't shoot."  In these protests, it was both a

9    reference to that message but also a plea.  I mean, you can see

10   the whole crowd at the time, you have your hands up, that's a

11   way to show you're completely vulnerable, you're unarmed, and

12   you ask them not to shoot you.  Because we knew any time the

13   police were in a line like this, we were in a risk of being

14   attacked.

15         You also heard people chanting, "Join us," as I

16   explained earlier.

17         (Video played.)

18   *Q.*  Now, was there anybody making any comments about the alley?

19   *A.*  Oh, yes.  That's right.  So they were trying to keep the

20   alley clear.  The notion was that we wanted these police

21   officers to leave so that we could continue with our march.  We

22   wanted to make sure that they had a direction to leave in, and

23   that alley was an obviously safe place to do that.  So whenever

24   somebody would step towards the alley, whether they were

25   filming or anything else, people would say, "Keep that alley

116

Claire Sannier – Direct

 1    clear.  Give them a way to get out."

 2    *Q.*  Did anyone block the alley?

 3    *A.*  Certainly not.

 4    *Q.*  Did you see anyone throw anything?

 5    *A.*  No.

 6    *Q.*  So protesters were telling each other not to block the

 7    alley?

 8    *A.*  That's right.

 9    *Q.*  Did you ever hear the police officers say anything to the

10    protesters?

11    *A.*  I never heard a police officer say anything any of these

12    days.

13    *Q.*  What happened next?

14    *A.*  So next, people were chanting.  At some point I think I

15    kneeled down in front of the protesters as a similar show of

16    just complete vulnerability and peacefulness.  And then at a

17    completely arbitrary time, they started shooting at us.

18    *Q.*  Did you hear -- did the police make any announcements

19    before they started shooting?

20    *A.*  They did not.

21    *Q.*  Did the police tell anyone to back up?

22    *A.*  No.

23    *Q.*  And did the police tell anybody they couldn't be in that

24    parking lot?

25    *A.*  No, they did not.

Claire Sannier - Direct

1    *Q.*  Or that they couldn't march down 16th Street?

2    *A.*  No.

3         *MS. WANG:*  Showing you Exhibit 398.

4         *THE COURT:*  Any objection to 398?

5         *MS. HOFFMAN:*  No objection.

6         *THE COURT:*  It's admitted.

7         (Exhibit 398 admitted.)

8         (Video played.)

9    *BY MS. WANG:*

10   *Q.*  What did you do when the police arrived and started

11   shooting?

12   *A.*  I mean, we had to run away.  There is no way to stay in

13   that cloud of gas.

14   *Q.*  What were they shooting with?

15   *A.*  They were shooting with pepper balls, and they were also

16   brandishing these grenade launcher looking things.

17   *Q.*  Did you inhale any chemicals from the pepper balls?

18   *A.*  I certainly did.  It was 5 o'clock.  I wasn't expecting to

19   be gassed, so the respirator was in my bag.

20   *Q.*  Was there anything unusual about this event?

21   *A.*  Honestly, this was so typical.  The unusual thing is how

22   early in the day it happened and where it happened.  Because

23   the 16th Street Mall -- I mean, I would hear protests through

24   my window in my apartment every weekend down the 16th Street

25   Mall; and nothing like this had ever happened.  Yeah.  But,

Claire Sannier - Direct

1    otherwise, it was quite typical.  The police line up, they act

2    very threatening, people chant, and then at some point we all

3    get attacked.

4    Q.  After this event, where did you go next?

5    A.  So at this point, we needed to regroup.  One of my friends

6    was wearing contact lenses at the time, and these pepper balls

7    are extremely painful if you have contact lenses, because the

8    particulate, I guess, gets stuck behind your contacts, and it's

9    stuck in your eyes, and it's just burning.  She was completely

10   blinded for maybe as much as an hour.  So we had to wash her

11   eyes out and try to help her get her contacts out, so we went

12   to a nearby parking lot.

13   Q.  And, then, did you engage in some more marching that day?

14   A.  Yeah, we did.  We marched back towards the capitol, and I

15   think at some point we marched on Colfax.  There were a couple

16   of different marches.

17   Q.  Did you go back to the capitol lawn area at some point on

18   day three?

19   A.  Yeah.  In the evening, we stopped on the capitol lawn.  And

20   for a while, we were mostly let to stay there in the park.  The

21   police were across the street at that bus station that you saw

22   from the previous night, but they were letting us be for a

23   little while.  So we ate some food and tried to, like,

24   recuperate.  People were demonstrating in the street on

25   Lincoln, and then the police just started attacking over and

Claire Sannier – Direct

 1   over and over again.

 2           *MS. WANG:*  Showing you Exhibit 1225.

 3           *MS. HOFFMAN:*  No objection.

 4           *THE COURT:*  It's admitted.

 5           (Exhibit 1225 admitted.)

 6   *BY MS. WANG:*

 7   *Q.*  So I'll point.  Where did you end up when you were talking

 8   about being on the capitol lawn?

 9   *A.*  Yeah.  So you can see the capitol building on the far

10   right, and then there is that big stairway that leads up to it.

11   We were just north of that, in the lawn there.

12   *Q.*  All right.  This area that I scribbled in?

13   *A.*  That's right.

14   *Q.*  Okay.  Now, this is Lincoln Street; right?

15   *A.*  That's right.

16   *Q.*  And this is Colfax here?

17   *A.*  That's correct.

18   *Q.*  Okay.  So when you came back down from the mall, did you

19   come this way?

20   *A.*  Yeah.  We came from 16th Street, which then meets Broadway,

21   and then you just cross Colfax, and you're in the park.

22   *Q.*  Okay.  And the bus station that you mentioned earlier,

23   where is that?

24   *A.*  It's where you just circled, but it's on the north part of

25   the frame.

120

Claire Sannier - Direct

1   Q.   Okay.  And so where -- how many protesters were in this

2   general area at that time?

3   A.   There were still thousands of people, as I recall.

4   Q.   Okay.  And, then, so you relaxed for a while with friends

5   on the lawn?

6   A.   That's right.

7   Q.   Who were you with?

8   A.   It was a pretty large group of people.  My friend Mariah

9   was there, her boyfriend Jake, a bunch of other people.

10  Q.   Now, when you came back to this area of the capitol after

11  marching up and down 16th Street Mall, did you already smell

12  tear gas?

13  A.   Yeah.  I mean, you could smell tear gas in the morning.  It

14  was just -- the whole city was soaked in it.

15  Q.   Now, was there a time when you joined protesters in the

16  street on Lincoln?

17  A.   There was.  Yeah.  So the police decided -- again, as best

18  we could tell, it was totally arbitrary.  They certainly didn't

19  say anything to us.  They started to line up on Colfax in this

20  big, long line, brandishing all of their weapons.  And people

21  got into the street on Lincoln and lined up, you know, two

22  dozen feet away and knelt on the ground, put our hands up, held

23  up signs, and chanted a lot of the same stuff you've already

24  heard.

25  Q.   All right.  So the police formed a line going across

Claire Sannier - Direct

1  Colfax?

2  *A.*  Yes, that's right.

3  *Q.*  And then there was a group of protesters on Lincoln, here?

4  *A.*  That's right.

5  *Q.*  Okay.  And you joined them?

6  *A.*  I did.  Yes.

7  *Q.*  Okay.  And so what -- what were the police who were in this

8  line on Lincoln wearing?

9  *A.*  They were wearing --

10  *Q.*  -- on Colfax wearing?

11  *A.*  I'm sorry.  They were wearing all black.  They had boots,

12  knee pads, elbow pads, body armor, helmets, face shields, gas

13  masks.  They had handguns, they had pepper spray, they had

14  tasers.  Everything I've ever seen a police officer have, they

15  all had all of it.

16  *Q.*  Were they intimidating?

17  *A.*  Incredibly intimidating.  They looked like an occupying

18  army.  It felt like we were under siege in our own city at the

19  state capitol.

20  *Q.*  What were the protesters wearing?

21  *A.*  The protesters were wearing clothes.  I mean there were a

22  couple of people that had respirators that they bought at paint

23  stores.  There were people with T-shirts and jeans and

24  backpacks.

25  *Q.*  And you had your respirator?

Claire Sannier - Direct

1    A.   I did.

2    Q.   Okay.  Did you see any protesters with weapons?

3    A.   Certainly not.

4    Q.   Okay.  And so how -- how far -- well, you were up and down

5    between the street and the lawn; is that right?

6    A.   That's right.  Yeah.  So -- when you say "up and down," I

7    mean, it was because they kept gassing us.  So we would be

8    demonstrating in the middle of the street, at some random

9    interval they would decide to shoot us and throw grenades at

10   us, we would have to flee back to the lawn.  We would treat

11   those injuries, regroup, and go back into the street.

12   Q.   Was there an ebb and flow between the protesters and the

13   police action?

14   A.   Yeah, pretty much.  I mean, the police certainly never told

15   us where to go; they never said that we weren't allowed to be

16   anywhere we were; and they never actually, like, continued to

17   push us.  They would stand in the one line and keep shooting at

18   us, letting us all run away in terror; wait for a while; we

19   would line back up; and then eventually they would shoot us

20   again.  That happened at least a half dozen times.

21   Q.   Okay.  So you were ultimately on the street on Lincoln with

22   a bunch of protesters?

23   A.   Yeah.

24   Q.   If you were being gassed, you would run up to the lawn or

25   somewhere farther away?

Claire Sannier - Direct

1  A.  That's right.

2  Q.  And did the police ever tell you, like, no, you can't be in

3  the street, but you can be here in this park?

4  A.  They never told me a single thing.

5  Q.  Did you hear any announcements that day before or any

6  warnings that you would be gassed if you didn't obey some

7  order?

8  A.  No.

9       THE COURT:  Ms. Wang, she has said maybe a dozen times

10  she never heard anything from the police at all.  I think you

11  can stop asking her that.

12  BY MS. WANG:

13  Q.  Did you ever see anyone throw a water bottle?

14  A.  Yeah.  A couple times after the police would throw these

15  grenades, people would toss a water bottle that would land

16  somewhere in between the police and the protesters, as people

17  ran away.

18  Q.  And did you ever see any attempt by the police during this

19  incident to isolate anybody throwing anything?

20  A.  No, absolutely not.  They would basically just shoot the

21  entire crowd, the whole crowd would run away, and that was it.

22  There was never any -- it didn't ever seem to be in response to

23  something.  It didn't seem to be focused on some particular

24  person or action.

25  Q.  Did you see any pattern in how other officers responded

124

Claire Sannier – Direct

1    when one officer would fire?

2    A.  Yeah.  That was one thing that really stuck out, actually.

3    Occasionally, one officer would start shooting at some random

4    interval, and then everybody would just be shooting.  It would

5    either be, like, someone would pepper-spray someone, and then

6    the whole crowd would be shot and grenades would be thrown.

7    There was never any sense to it.

8           *MS. WANG:*  Showing you Exhibit 879.

9           *THE COURT:*  879?

10          *MS. HOFFMAN:*  No objection.

11          *THE COURT:*  It's admitted.

12          (Exhibit 879 admitted.)

13   *BY MS. WANG:*

14   *Q.*  So this is a screenshot from a video that was shot at the

15   intersection of Lincoln and Colfax at 7:00 p.m. on May 30.  Do

16   you see yourself in this screenshot?

17   *A.*  I do.  Yeah.  I'm just near the center of the frame.  I

18   have, like, a purple baseball cap on; and my hands are in the

19   air.

20   *Q.*  What are you wearing there?

21   *A.*  A T-shirt -- a black T-shirt and jeans.

22   *Q.*  Okay.  How far back from the police line were you at this

23   time?

24   *A.*  Probably a couple dozen feet.

25   *Q.*  Okay.  Do you see the girl over here in the green shirt?

Claire Sannier - Direct

1   A.   Yes, I do.

2   Q.   Do you recognize her?

3   A.   Yeah.  She's one of my co-plaintiffs.  I think that's Elle

4   Taylor.

5   Q.   Did you know her at the time?

6   A.   I did not.

7   Q.   So what was going on at this time, 7:00 p.m.?

8   A.   This was one of those repeated events -- I could not

9   possibly say which one -- but we were lined up and

10  demonstrating against the police, asking them to stop attacking

11  us.

12  Q.   Okay.  So you had earlier described this pattern where you

13  would be gassed, go up to the lawn, you'd come back to the

14  street.  Why did you come back?

15  A.   I mean, it's the same reason I came back every day.

16  Everything the police did was proving my point.  Like, my

17  concern is, the police seemed to be out of control and capable

18  of doing an extreme amount of violence against specifically

19  black people.  And then every time I showed up to say so, they

20  did a bunch of violence to me; and they just continued to prove

21  it.  I mean, it was -- it was brutality to justify brutality.

22  Q.   What did you observe about the general demeanor of the

23  crowd at this time?

24  A.   So this crowd was doing a lot of, like, calming each other.

25  This was obviously an incredibly tense and scary situation.

126
Claire Sannier - Direct

1    Nobody has armor on, and they're shooting us with projectiles.

2    So people were obviously very tense, and people were very

3    angry.  So, periodically, you know, if someone to shout

4    particularly loudly or started to go sort of closer to the

5    officers, somebody would try to calm them down and pull them

6    back into the crowd.  There was a lot of deescalation among

7    protesters.

8    Q.  Was there a time when you walked closer to the front of the

9    line?

10   A.  There was.  Yeah.  I usually tried to be about as close to

11   the front of the line as I could.  The notion was that I was

12   able-bodied, I had at least some idea of what these weapons

13   would do, and I knew a lot of people were there for the first

14   time.  I had, you know, a paint respirator and some goggles

15   that hopefully would help some; so I tried to be as close to

16   the front as I could.

17            MS. WANG:  Showing you Exhibit 27.

18            THE COURT:  All right.  That's a video?

19            MS. WANG:  It's a screenshot from the video, Your

20   Honor.

21            THE COURT:  Any objection?

22            MS. HOFFMAN:  No objection.

23            THE COURT:  It's admitted.

24            (Exhibit 27 admitted.)

25

Claire Sannier - Direct

1    *BY MS. WANG:*

2    *Q.* All right.  This is a screenshot from a video from a

3    Colorado State Patrol camera.  The time is 7:02:23 p.m.

4    Mountain Time on May 30.

5              Now, do you see yourself in this?

6    *A.* Yeah, I do.  It's -- I'm sort of off to the left.  I'm in

7    that same -- the same -- it seems very close to the same

8    moment.  I'm on my knees; I've got my hands in the air.  Yeah,

9    that's me.

10   *Q.* That's you circled in the yellow?

11   *A.* That's correct.

12   *Q.* What are you doing at this time?

13   *A.* The same thing I had been doing for at least a half hour,

14   just kneeling and demonstrating.

15   *Q.* Why did you kneel?

16   *A.* Kneeling was a way of being even more vulnerable.  Right?

17   Like, the chant was, "Hands up.  Don't shoot," and it was -- I

18   mean, it was about asking the police to stop attacking us.  And

19   being on my knees, it's -- I'm just completely non-threatening;

20   and that was the image I wanted the police to see before they

21   shot us.  I'm basically saying, my hands are in the air, I'm on

22   my knees, are you going to shoot me anyway?  And they did over

23   and over again.

24   *Q.* You earlier talked about attempts at deescalation by the

25   protesters.

Claire Sannier – Direct

 1   A.  I did.  Yeah.

 2   Q.  Did the police ever make any attempt to deescalate tension

     with the protesters at this point in time?

 4   A.  No.  I never saw the police do anything other than

 5   constantly escalate.  Every time that they attacked us with

 6   tear gas, that was this huge escalation that was unwarranted.

 7   And they also often would laugh at us, which I didn't think was

 8   a particularly calming behavior for a professional on the job

 9   to have.

10   Q.  They would laugh at you?

11   A.  Yeah.

12   Q.  Can you describe any attempts by -- any specific attempts

13   by protesters to deescalate during the time that you were

14   kneeling in the front line there?

15   A.  Yeah.  There was one time in particular.  This guy was

16   doing yoga in the middle of the group.  Obviously, can't speak

17   for him; but for me, it was sort of a calming and almost absurd

18   thing, that this man was doing, essentially, stretching in the

19   middle of this incredibly tense situation.  And it really drew

20   sort of the -- like I said, like, the absurdity of the

21   situation, that this group of people in armor is facing off

22   against a bunch of people in T-shirts, and then this guy starts

23   doing yoga in the middle.

24          MS. WANG:  Showing you Exhibit 638.

25          MS. HOFFMAN:  No objection.

129

Claire Sannier - Direct

1                *THE COURT:*  Admitted.

2                (Exhibit 638 admitted.)

3    *BY MS. WANG:*

4    *Q.*  All right.  Now, is this what you were just describing,

5    this guy right here?

6    *A.*  Yeah, that's right.  It's that guy in the mask.

7    *Q.*  Okay.  What was he doing?

8    *A.*  He started just doing yoga positions.  He did the splits,

9    and he did like some kind of handstand later on.  It was very

10   impressive.  And also it had this kind of, like I said, almost

11   a humorous effect that was calming.  To me, at least.

12   *Q.*  What's the mask he's wearing?

13   *A.*  So the mask is a Guy Fawkes mask, which is a reference to

14   this political figure from, like, Victorian England, who is

15   against tyranny and state violence.

16   *Q.*  And where are you?

17   *A.*  I'm, like, right behind that guy -- yeah -- where you were

18   circling.  Next to the purple umbrella.

19   *Q.*  Okay.  So what happened -- what did the officers do in

20   response to this guy doing the splits?

21   *A.*  They pointed their guns at him.

22   *Q.*  This officer right here?

23   *A.*  That's right.

24   *Q.*  Okay.  And what -- what was he pointing?

25   *A.*  That looks like a .45 -- one of those 40-millimeter

Claire Sannier - Direct

1   canister launchers that shoots these, you know, plastic

2   bullets.

3   Q.   So how did the protesters respond to that?

4   A.   They tried to deescalate.   They asked that man, Why are you

5   pointing their gun at him?   I think one of the protesters

6   called it a bazooka.

7            MS. WANG:   Okay.   So -- showing you Exhibit 638.

8            (Video played.)

9   BY MS. WANG:

10  Q.   So what has happened up to this point?

11  A.   I mean, basically, this guy sort of did the splits in the

12  street, started to do this yoga, and then an officer pointed

13  his gun at him.   And then the woman with the megaphone there

14  was saying, "Oh, you're going to shoot him for doing the

15  splits?"

16  Q.   Okay.   So this girl with the pink megaphone?

17  A.   That's right.

18  Q.   How did the officer respond to that?

19  A.   The officer eventually stopped pointing his gun, I believe;

20  but they also advanced on these people.   And you can see

21  another officer starts threatening to pepper-spray them.

22            (Video played.)

23  Q.   All right.   Did you see this guy in the brown shirt

24  yelling, "What are you doing?"

25  A.   I did, yeah.   I also thought that was a particularly

Claire Sannier - Direct

1    powerful moment, to me.  It seemed like what he was doing was

2    essentially asking each officer to consider themselves like an

3    individual making choices in this behavior.  Like, why are you

4    doing the thing that you're doing?  Why are you on that side of

5    this line?  Why are you threatening all of us with weapons?

6    What is it that you're doing?  To me, that was also an attempt

7    to deescalate.

8              (Video played.)

9    Q.  All right.  So what is happening here?

10   A.  Yeah.  This is another example -- this happened, I mean,

11   dozens of times.  As that person became more and more upset,

12   another member of the protest crowd tried to keep that person

13   safe in case those police officers wanted to retaliate for what

14   he was saying.

15             (Video played.)

16   Q.  So what happened here?

17   A.  Yeah.  So the guy said, "What is so funny?"  That was an

18   officer laughing at him for some reason, and then they just

19   pepper-sprayed them.  And they got all four of those people

20   directly in that line for no reason at all.  And this -- I

21   mean, this is so typical.  This happened dozens of times over

22   the course of the weekend.

23   Q.  What is this guy in the red parka -- what does his sign

24   say?

25   A.  It says "Prosecute Killer Cops" -- KKK, killer cops.

Claire Sannier - Direct

1   Q.  Did you see the girl with the pink megaphone come over?

2   A.  I did.

3   Q.  What was she doing?

4   A.  She is basically trying to protect those people.

5   Q.  Did the officer give any warning before spraying?

6   A.  No.  He didn't say anything.

7   Q.  Were any of these people doing anything that seemed to

8   warrant spraying?

9   A.  No.  It was the opposite.  Those people were doing exactly

10  what we came there to do, was to tell the police we don't

11  approve of their behavior.  And then they just continued to

12  behave in this way.

13  Q.  What is the stuff on the ground?

14  A.  Yeah, this is a good point.  This crap was all over the

15  city.  There is these shells from the different weapons that

16  they're firing; there is all of these empty canisters all over

17  the place; and all of those streaks on the ground, every one of

18  them is a pepper ball.  I would see them all over the city.  I

19  would see them for months afterwards.  They were destroying my

20  town.

21  Q.  Were you still kneeling at this time in the front?

22  A.  I was.  I'm basically right behind the guy with the

23  skateboard, still on my knees.

24  Q.  Was there a time when you could not continue kneeling?

25  A.  Yeah.  I think it's pretty shortly after this, they just

Claire Sannier - Direct

1   lobbed two grenades at us; and at that point I had to leave.

2   Q.  Showing you Exhibit 666.

3          MS. HOFFMAN:  No objection.

4          THE COURT:  I didn't hear an objection?

5          MS. HOFFMAN:  Sorry.  No objection.

6          (Exhibit 666 admitted.)

7          (Video played.)

8   BY MS. WANG:

9   Q.  Did you see this guy that was walking across the street?

10  A.  Yeah, I did.

11  Q.  What was he doing?

12  A.  He was holding his middle finger up to the police to

13  indicate, I presume, disapproval, which I shared.

14  Q.  And what did the officer do to him?

15  A.  Pepper-sprayed him.

16  Q.  So are you right here still?

17  A.  Yep, that's me.

18  Q.  Okay.  What happened at this time?

19  A.  Yeah.  So after that guy got pepper-sprayed, I mean, it was

20  kind of the same thing.  The guy in the brown shirt was

21  indicating that this one person seemed to have some kind of

22  temper problem.  He kept attacking people and threatening

23  people, and then the police threw two grenades at us.  That's

24  what those two explosions you heard were.

25  Q.  Now, did you see the protesters do anything that would

Claire Sannier - Direct

1   warrant the throwing of explosives?

2   A.   I didn't see the protesters do anything at all.  This just

3   happened.

4   Q.   Okay.  Let's take a look at this from another angle.

5   Showing you Exhibit 338.

6           MS. HOFFMAN:  No objection.

7           THE COURT:  Admitted.

8           (Exhibit 338 admitted.)

9           (Video played.)

10  BY MS. WANG:

11  Q.   Are these the same two explosions that caused you to get up

12  from the line and flee?

13  A.   The first two were, and there were several after.

14          MS. HOFFMAN:  Objection, Your Honor.

15  BY MS. WANG:

16  Q.   What happened after the protesters -- after you ran away

17  from this line?

18  A.   Yeah.  So I actually didn't run.  We would periodically --

19  I actually started chanting, "Walk, don't run," as a way of

20  trying to encourage people not to run.  Running in a crowd is

21  dangerous, especially when you can't see or breathe.  I was

22  walking away from the line of police at this time.

23  Q.   And then what happened next?

24  A.   A flash-bang landed directly next to my foot and exploded.

25  Q.   How did that feel?

Claire Sannier - Direct

1    *A.*  This was -- I mean, each day had some new horror to it.

2    This was something -- it was incredibly disorienting; it was

3    extremely loud and bright; my ears rang afterwards.  I mean, it

4    really is like it is in the movies when an explosion goes off

5    next to someone.  I was stunned; I stopped walking; I didn't

6    know where I was.  Another protester came back into the cloud

7    of tear gas I was in and grabbed my arm and said, time to go,

8    kind of snapped me out of it, so I could get back to safety.

9    *Q.*  And where did you go after that?

10   *A.*  We went back onto the lawn and tried to recover.

11   *Q.*  Okay.  Was there a curfew on May 30?

12   *A.*  I believe so.  Yes.

13   *Q.*  What did you think of the curfew?

14   *A.*  The curfew was a further attempt to suppress our speech.

15   Right?  We had come out to speak; the police had attacked us.

16   We had come out the next day; the police attacked us more.  The

17   next day they decided, okay, we're going to make it illegal to

18   be in the street.  That to me seemed like an overreach.  It was

19   exactly the kind of thing we were protesting, so I was

20   unwilling to comply with that.

21   *Q.*  Later that evening were you subjected to more force by

22   police officers?

23   *A.*  Yeah, we were.

24   *Q.*  And what happened then?

25   *A.*  So people -- a lot of people after, you know, the hours of

Claire Sannier - Direct

1    this particular exchange did get tired and go home; and then

2    some of the rest of us continued to march.  We ended up down in

3    the Capitol Hill neighborhood.  That's just south and east of

4    the capitol building.

5    Q.  And what force were you subjected to at that time?

6    A.  So this was another completely new experience.  We were

7    marching through the streets, chanting, as I've done, like I

8    said, a lot in the past.  And the police were just chasing us

9    around.  They would kind of block us off at one street, and

10   then we would turn and go down a different street, and then

11   they would drive around and get behind us, and then we would

12   run away.  The whole time, every time they showed up, they

13   would just start shooting at us.  Sometimes they would shoot at

14   us while hanging off of these vehicles.  Again, nobody ever

15   said anything.

16   Q.  On day four of the protest -- sorry.  Strike that.  When

17   you were being chased around in the neighborhood southeast of

18   the capitol, were you hit with anything?

19   A.  Yeah.  A couple times I was hit with pepper balls when I

20   was running away.

21   Q.  On day four, May 31, did you attend the protest again?

22   A.  I did.

23          THE COURT:  Let's take a break here.  Let's take ten

24   or twelve minutes here.

25          (Recess at 10:42 a.m.)

137
Claire Sannier - Direct

1          (In open court at 10:59 a.m.)

2          THE COURT:  It's starting to get a little bit

3    repetitive.

4          MS. WANG:  I'm on the last two days.

5          THE COURT:  It can turn from interesting to tedious,

6    I'm just giving you some advice.  So far, though, it's

7    interesting.

8          (Jury present at 11:00 a.m.)

9          MS. WANG:  May I proceed, Your Honor?

10         THE COURT:  Sure.

11   BY MS. WANG:

12   Q.  I'm showing you Exhibit 338, which has been moved into

13   evidence.

14         So I just want to orient you to the time here.  So do

15   you see this date and time in the corner here?

16   A.  Yes, I do.

17   Q.  Okay.  So this is a -- this is an Aurora body camera video;

18   right?

19   A.  Sure.  Yeah.

20   Q.  And it's May 30, 2020, at 17:07?

21   A.  That looks right.

22   Q.  I'm sorry.  19:07.

23   A.  7:00 p.m.

24   Q.  That's military time for 7:07 p.m.?

25   A.  That's right.

Claire Sannier - Direct

1   Q.   Okay.   It was at this time that you were tear-gassed and

2   flash-banged while you were kneeling?

3   A.   That's right.   One of many times, yes.

4           MR. RINGEL:   That's GMT.

5           MS. WANG:   Minus 6.

6           MR. RINGEL:   Got it.   I'm sorry.   Never mind.

7   BY MS. WANG:

8   Q.   So the Aurora videos are at the correct time.   The GMT

9   minus 6 is Mountain Time.

10  A.   Yeah.

11          MS. HOFFMAN:   I'm going to object to the attorney

12  testifying.

13          MS. WANG:   I mean, it's stipulated, so I just want

14  to -- we can either talk about the stipulation, however you

15  want, but --

16          THE COURT:   Sorry.   What's your problem?

17          MS. WANG:   The stipulation -- I can read the

18  stipulation if you'd like, counsel.

19          MR. RINGEL:   Why don't we admit it in evidence.

20          MS. WANG:   I'm moving Exhibit 1240 into evidence, the

21  stipulations, Your Honor.

22          THE COURT:   All right.

23          MS. HOFFMAN:   No objection.

24          THE COURT:   1240 is stipulation about something.

25          MS. WANG:   It's not on the list, but it was filed at

Claire Sannier - Direct

1    Docket 313.  We can give you a copy, Your Honor.

2              THE COURT:  Okay.  Thank you.  So it's admitted.

3              (Exhibit 1240 admitted.)

4          MS. WANG:  Okay.  So you can take that down.

5              THE COURT:  It says 313 but you're calling it 1230.

6          MS. WANG:  Well, Judge, it was filed on the docket as

7    Docket No. 313; but we're just calling it Exhibit 1240.

8              THE COURT:  All right.  It's admitted.

9          MS. WANG:  Now, that -- so we just want to read to the

10   jury some of the stipulations.

11             THE COURT:  Yes, you can do that.

12         MS. WANG:  I'm sorry?

13             THE COURT:  Go ahead.

14         MS. WANG:  So the date time stamp reflected in the

15   Denver police officers' body-worn camera video is Greenwich

16   Mean Time, which is six hours ahead of Mountain Time.  The date

17   and timestamps reflected in Aurora police officers' body-worn

18   camera is Mountain Time.  The body-worn camera video produced

19   in this litigation by both Denver Police Department and Aurora

20   Police Department have a buffering mode.  The body-worn camera

21   continuously loops a video recording for up to 30 seconds

22   before the recording is started by the officer.  And while

23   buffering only video, no audio, is being recorded.  In

24   addition, for the body-worn camera videos produced by Denver,

25   the last name of the officer is indicated in the file name of

Claire Sannier - Direct

1   the video.

2          It's also stipulated that the locations of the

3   produced HALO camera videos that were provided in Denver's

4   supplemental disclosure documents is true and correct.  And

5   it's also agreed by the parties that Denver and DPD did not

6   enter into any written mutual aid agreements with any of the

7   agencies that occurred during the GFP -- George Floyd protests.

8          THE COURT:  Okay.  When you get to the times, you

9   should feel free to remind the jurors and me as to what you've

10  stipulated that it means.

11         MS. WANG:  Yes, Your Honor.  All right.

12  BY MS. WANG:

13  Q.  Now, Claire, day four, May 31, did you attend the protests

14  again on that day?

15  A.  I did.

16  Q.  Was there a difference in this day compared to other days?

17  A.  Yeah.  So where each of the previous days had been further

18  police escalation, this was a day where they seemed to stay a

19  pretty good distance from us.

20  Q.  And when they stayed away from you, what was the reaction

21  of the crowd?

22  A.  The crowd got to the business we were there to do.  We were

23  completely peaceful, we marched, we chanted, we demonstrated,

24  and we were -- everything -- all of the chaos and pandemonium

25  of the previous days was, you know, not present.  There was no

Claire Sannier - Direct

 1   violence, there was no discomfort of any kind.

 2   Q.  Was there a time later that evening on May 31 that you did

 3   experience police violence?

 4   A.  Yes.  And, basically, we started to march down Colfax

 5   again, as we've done many times before.  And we were marching

 6   east a little bit after sundown, I believe.  It was nighttime.

 7   And when we got to I think it was Pennsylvania, which is well

 8   before the police station that's on that street, we were next

 9   to this church, and we just saw this massive -- like, bigger

10   than anything I had ever seen in the previous days -- this

11   massive crowd of tear gas smoke in front of us with police

12   sirens and lights within it, so we knew they were in front of

13   us.  And then when we turned behind us, there was a similarly

14   large cloud of smoke with a bunch of police lights flashing

15   behind us.  So now for the first time, the police have

16   surrounded us.

17   Q.  Okay.  I'm showing you Exhibit 546.

18           I believe it's stipulated, Your Honor.

19           THE COURT:  Okay.  It's admitted.

20           (Exhibit 546 admitted.)

21           MS. WANG:  We can display Exhibit 546.

22           (Video played.)

23           Pause it for a moment.

24   BY MS. WANG:

25   Q.  Just to orient us, Claire -- I do believe your screen is

142

Claire Sannier - Direct

 1    working now, so can you tell us what is on the left-hand side

 2    of the screen?

 3    A.   Over here -- look at that.  Over here, there is a basilica,

 4    which is this big huge church.  And so this is Colfax

 5    eastbound, and the crowd was marching this way.  And so just

 6    off camera, that direction, we saw this massive cloud of smoke,

 7    and then looking back in the other direction, there was a

 8    similarly massive cloud of smoke.

 9    Q.   What is this street on the western side of the basilica

10    that is closest to the camera?

11    A.   This I believe is Pennsylvania Street.

12    Q.   Well, is Pennsylvania Street on the east or the west?

13    A.   Oh, I'm sorry.  I misremembered my map.  Yeah, Pennsylvania

14    is actually this one.  I'm afraid I forget the cross street

15    that the basilica is on.

16    Q.   Okay.  So the point is, the basilica pretty much takes up

17    the block?

18    A.   That's right.  The basilica is basically half the block,

19    and then there is huge fenced-in parking lot.

20    Q.   What is the fence like?

21    A.   The fence is -- it's like one of these that is impossible

22    to climb.  It's bent out with spikes towards the street.

23    Q.   Okay.  Were you with this group of marchers -- do you see

24    the time at the top?

25    A.   I do.  Yeah.  I was with this group of marchers at this

Claire Sannier - Direct

1    time.  I don't see myself in the frame or anything, but this

2    crowd was very, very large; and I was among it.

3    Q.  Okay.  So the camera -- the time shown on the camera of

4    this HALO camera from DPD at Colfax and Logan is May 31, 2020,

5    at 9:37 p.m.

6         So you were somewhere in this crowd?

7    A.  That's right.

8    Q.  Now, what happened when you -- well, let's continue

9    displaying it, actually, Exhibit 546.

10        (Video shown.)

11        Now, what's the behavior of the crowd?

12   A.  The crowd at this point was calm and relieved, honestly.

13   We had gotten to spend all day doing what we were there to do,

14   which was to peacefully march and protest; and so we were

15   continuing to do so.  People had I think let some of their

16   guard down from where we had been previously.  I don't believe

17   I was wearing my respirator at this time, for example; and

18   people were just calmly marching and chanting.

19   Q.  Did you have a sign or anything on this day?

20   A.  No.  I never carried a sign.

21   Q.  Were -- what were you wearing on that day?

22   A.  I believe I was wearing a blazer and a tie.  I kind of had

23   a theory that they might be less likely to shoot at us if

24   people looked what they might consider to be respectful --

25   respectable -- excuse me.

Claire Sannier – Direct

1   Q.  At this moment in the video, at 9:38:36 p.m., the crowd

2   started moving back a little bit.

3   A.  Yeah, that looks to be true.

4   Q.  And so what was happening then; do you recall?

5   A.  I do.  Yeah.  You can see it right up here at the top of

6   the frame.  This is where we started to see these giant plumes

7   of tear gas, larger than any we had seen, which had already

8   been significant.

9   Q.  Let's continue displaying Exhibit 546.

10          (Video played.)

11          What do you see off in the distance on the other end

12  of the block?

13  A.  I see what looks like yet another very long line of police

14  officers in riot gear, right here.

15  Q.  What are those clouds?

16  A.  Those clouds are tear gas.

17  Q.  How many protesters would you say were in this area at the

18  time?

19  A.  I would say there were a couple thousand.

20  Q.  Did you see anybody with weapons in the crowd?

21  A.  No.  I never saw any weapons, except for the police's

22  weapons, of course.

23  Q.  Now, was there any discussion in the crowd about the fact

24  that you were not able to continue marching?

25  A.  Yeah --

Claire Sannier - Direct

1          MS. HOFFMAN:  Objection.  Hearsay.

2          THE COURT:  Overruled.

3          THE WITNESS:  Yeah.  There was a great deal of

4    discussion in the crowd about a tactic known as kettling.  I

5    didn't really know what it meant other than it was scary, and

6    it looked like we were trapped --

7    BY MS. WANG:

8    Q.  Okay.

9    A.  -- in a cloud of smoke.

10   Q.  And did you try to turn around?

11   A.  Yeah.  I mean, I saw a bunch of people in the video just

12   now.  We tried to go back the other direction, and there were

13   also police and tear gas in that direction, so people didn't

14   have anywhere to go.

15   Q.  Now, were you with any friends at this time or by yourself?

16   A.  Yeah.  I was with a couple of different friends that I had

17   spent most of the day with.

18   Q.  So at this time there is -- there is people running; is

19   that right?

20   A.  That's right, yeah.  I was among them at some point.

21   Q.  Do you remember which direction you went?

22   A.  I believe that I went around this direction.  It was

23   incredibly chaotic.  All I know is I got to a parking lot that

24   was, you know, free of this cloud of smoke eventually.  I think

25   I went in this direction.  But a lot of folks went this way,

Claire Sannier - Direct

1    which is this very narrow alley.  When I saw that, I didn't

2    think it was a safe place to be for so many people.  And then I

3    did see people trying to climb this fence, which also seemed

4    much too dangerous, and I didn't want to do that.  So I found

5    my way around the building.

6    Q.  Was there tear gas coming from the other side of the

7    street, as well?

8    A.  Yeah.  That's right.  There was tear gas -- that's when we

9    looked behind us, so west on Colfax, this direction, we -- we

10   saw a giant cloud of tear gas.  As people started to scatter

11   here, that's when the gas just started to overwhelm everybody.

12   It was in the middle of the crowd.

13   Q.  Okay.  Those sparks that went off in the middle of the

14   street, what was that?

15   A.  Those were more tear gas canisters.  I don't know if they

16   were thrown or shot at us, but it was more tear gas.

17   Q.  Was this a greater amount of tear gas than you experienced

18   on other days?

19   A.  Yeah.  This is probably the worst I saw it.  It was

20   completely overwhelming.  People were vomiting, coughing,

21   falling over, needed to be picked up and carried away.  I took

22   the people I was with and tried to get everybody to safety.

23   Q.  Did you see what this vehicle is over here?

24   A.  It looked like some kind of tank.  Again, it was even

25   further escalation in the police tactics that they were using.

Claire Sannier - Direct

1    It was some kind of massive vehicle with a huge search like

2    spotlight on it.  You can see that guy falling over just there.

3    That person is crying in the street.  Scenes like this were

4    completely typical, like, throughout the entire crowd.

5    Q.  Now, were you on -- at the end -- after this event, where

6    did you go?

7    A.  At this point I went home.  I called a friend and got a

8    ride home.  I was within walking distance of my house, but I

9    didn't feel safe going there alone.

10   Q.  Now, you were in violation of curfew on this day, on

11   May 31; right?

12   A.  Yeah, that's true.  I was civilly disobeying the curfew.

13   Q.  Did you ever see the police enforce the curfew in a way

14   that was targeted against protesters only?

15   A.  Exclusively.  The protesters were the only people who were

16   ever affected by curfew.

17          MS. HOFFMAN:  I'm sorry.  I know it's untimely, but I

18   am objecting to that question.

19          THE COURT:  Sustained.  That answer is stricken.

20   BY MS. WANG:

21   Q.  On day five, June 1, did you return again to the protest?

22   A.  I did.

23   Q.  And how was the day -- daytime protest?

24   A.  This proved our point even further.  I mean, that's

25   basically why I kept coming back.  Right?  Every time I would

Claire Sannier - Direct

1   try to show up and do my, you know, constitutional duty and

2   protest peacefully, I was brutally attacked by police for no

3   reason, so I felt the need to continue to do so.  This was

4   Monday, I believe was the fifth day, there was -- the police

5   were never within three blocks of us.  They would stay several

6   blocks away from the protest crowds, which, again, all day

7   marched completely peacefully.  I never saw a single act of

8   violence or vandalism or anything of this sort.  We just

9   marched, chanted, demonstrated, did what we were there to do.

10  Q.  Was there a time near midnight when you were by the capitol

11  steps?

12  A.  Yeah.  That's right.  So the marches went on the 16th

13  Street Mall again, they also went through some of the rest of

14  downtown where I lived, and then eventually we ended up back at

15  the capitol.  And getting towards midnight, we were talking

16  amongst ourselves -- I was talking with a friend and a couple

17  of other protesters that, like, they're proving our point.  The

18  only reason there has been any violence in my city is because

19  the police are attacking protesters indiscriminately.  They

20  continued to prove that until about midnight on Sunday.

21  Q.  All right.  Showing you Exhibit 32, which is video from the

22  Colorado State Patrol that is stipulated.

23          THE COURT:  32.

24          MS. HOFFMAN:  No objection.

25          THE COURT:  Admitted.

149

Claire Sannier - Direct

1            (Exhibit 32 admitted.)

2                *MS. WANG:*  Okay.  Displaying Exhibit 32.

3            (Video played.)

4   *BY MS. WANG:*

5   *Q.*  So this is a video from the Colorado State Patrol.  And

6   the -- do you see the time up here?

7   *A.*  I do.

8   *Q.*  Okay.  So it's June 2, 2020, at 12:03 a.m.?

9   *A.*  That's right.

10  *Q.*  Is that when you were down here in this crowd?

11  *A.*  Yeah.  I was on the lawn or somewhere in the street here.

12  *Q.*  Okay.  So what was going on in the crowd at this time?

13  *A.*  This was honestly massive relief and calm.  We had gotten

14  to spend an entire day doing what we were there to do, and

15  people were relieved and to some extent grateful for the peace.

16  We had been able to deliver our message to the police, to other

17  fellow citizens, and we weren't being attacked.

18            And then just after midnight, I saw this massive group

19  of police officers.  They had actually turned the lights off at

20  the capitol, and this huge line of at least 50 fully armored

21  police officers just appeared in the darkness outside the

22  capitol.  And so people started to return to demonstrating in

23  the street, even though we were all very, very tired, and just

24  asking the police to go home and to let us be.  And then they

25  just attacked from both that direction, which is the east, and

Claire Sannier - Direct

1    also from the north.  And so here, all of these people, like --

2    they're running from something I had never seen before.  It was

3    like something out of a movie.  It was hundreds of police, all

4    of these vehicles driving on the lawn and in the street, these

5    huge lights.  There was something that protesters were calling

6    an LRAD, which is some kind of audio cannon that a friend of

7    mine told me she had experienced during the Occupy Wall Street

8    protests eight years prior.  So people were terrified and

9    exhausted and started to run as fast as we could away from that

10   attack.

11          MS. WANG:  You can taken down Exhibit 32.  All right.

12          Showing you Exhibit 35.  I believe this is stipulated,

13   as well.

14          MS. HOFFMAN:  No objection.

15          THE COURT:  Admitted.

16          (Exhibit 35 admitted.)

17   BY MS. WANG:

18   Q.  This is also Colorado State Patrol video, and the date is

19   again June 2 at 12:03 a.m.  What is happening here?

20   A.  I think this is a view of basically the same scene.  You

21   can see all of these police here with various flashlights.

22   They were very, very hard to see.  It was frightening.  They

23   honestly felt like storm troopers from a movie.  And then from

24   this direction, this huge just wall of police and vehicles

25   started to attack us from this direction.  People tried to

Claire Sannier - Direct

1    demonstrate as we had been in the past, to continue to hold

2    this mirror up to the police, asking them to see what they were

3    doing to their fellow citizens.  As before, they didn't respond

4    in any way; and they just fired an astonishing amount of

5    chemical weapons at us.

6    Q.  Now, what are these clouds that appear in the distance?

7    A.  Even more tear gas.  All of these explosions are flash-bang

8    grenades.  Everything that we had seen in the prior days and

9    more was deployed in the street here.

10   Q.  Were you with anybody at this time?

11   A.  I was with one friend.  Her name is Amy Schneider.

12   Q.  How many police officers would you say were on the line?

13   A.  There were over a hundred in this whole group.  I think at

14   least 50 who were on the lawn, and then they joined in this

15   marching line and just started driving down the street like

16   this.

17   Q.  And are these the -- what did you think these vehicles

18   were?

19   A.  The only way I could describe them was tanks.  They

20   certainly weren't civilian vehicles of any kind.

21   Q.  Now, after you saw this, what did you do?

22   A.  We ran.  I mean, I tried to stay as calm as possible, but

23   this was even scarier than all of the stuff I had been

24   subjected to already.  So I ran down Broadway to about 13th

25   Street.

Claire Sannier - Direct

1   Q.   Now, what happened there, at Broadway and 13th?

2   A.   So we tried to regroup.  We were trying to figure out how

3   to get home at this point.  It was obvious that they had

4   decided once again that they needed to -- they wanted to use

5   this kind of force on us.  But my house was north of here, so I

6   needed to somehow get to the other side of this giant police

7   line, which felt unsafe.  So I was trying to figure out how to

8   do that.  We were washing out our eyes.  I had already lost the

9   swim goggles I bought, so I was in extreme distress in that

10  way.

11        And I found a group of medics, who were all wearing

12  still street clothes, but they had put red duct tape in a big

13  cross on it so that people knew that they had supplies to help,

14  I found that group and tried to stay with them.

15  Q.   And were you subjected to any use of force at this time?

16  A.   I was, yeah.  We passed over to 13th and Lincoln -- which

17  is an insection I still have to drive by all the time, and I

18  never forget what happened -- police came from behind us and in

19  front of us -- this was a small group of people.  We were maybe

20  eight or ten people.  And they just shot hundreds and hundreds

21  and hundreds of pepper balls at us.  I was struck easily a

22  dozen times.  There was pepper spray in the air I had to

23  breathe.  It was all directed right at me, in the way it had

24  only been directed at a crowd before, other than the time I was

25  shot.  It's hard to keep it all straight.  But, yeah, it was

Claire Sannier - Direct

1   completely overwhelming.  And then I was tackled from behind

2   and arrested.

3   Q.  Was anything said to you at that time?

4   A.  This was the very first time I ever heard an officer speak

5   in all five days, you know, these over 100 hours of protesting.

6   I finally heard an officer speak to me; and he said, "Get on

7   the fucking ground."

8   Q.  What you were arrested for?

9   A.  I was arrested for curfew violation and failure to obey a

10  lawful order.

11  Q.  Were the charges dismissed?

12  A.  The charges were dismissed.

13          MS. HOFFMAN:  Objection.

14          THE COURT:  What objection?

15          MS. HOFFMAN:  I'm objecting on the basis that it's

16  covered by Your Honor's bifurcation order.

17          THE COURT:  Overruled.

18  BY MS. WANG:

19  Q.  Did you continue -- how long did you continue to feel the

20  effects of the pepper balls that were shot at you at that time?

21  A.  So I wasn't able to get any of the Milk of Magnesia

22  solution on me.  I was unable to see for at least an hour and a

23  half, with just extreme pain any time I tried to open my eyes.

24  My whole body was burning, on fire.  I mean, my clothes were

25  soaked in this gas and these chemicals.  My hands burned for at

154

Claire Sannier - Direct

1    least 24 hours afterwards.  I would periodically try to run

2    water over them, but nothing was helping.

3    *Q.*  Claire, what are your injuries from the actions of the

4    Denver police during the protest other than what you've already

5    described today?

6    *A.*  I mean, this whole experience amounted to extreme

7    psychological trauma.  At every turn, what we were trying to

8    say was, please stop hurting us and other people; and they

9    continued to harm us over and over and over and over again.

10   And we were desperate for any kind of way to make it stop.  And

11   appealing to the officers' humanity wasn't working.  There was

12   no way to get any relief from this constant attacks.

13            I was in my neighborhood, and I no longer feel safe.

14   I don't trust the police anymore.  I don't feel that I could

15   call them for help.  I don't know if any police officer I see

16   patrolling my neighborhood -- and they are always there in my

17   neighborhood -- I don't know if any of them are the people who

18   had attacked me and my friends for no reason.  So it's had an

19   incredible impact on my life psychologically.  For days

20   afterwards I had nightmares; for weeks afterwards, I felt

21   unsafe in crowds.  I still continue to protest because I

22   believe it's my right and I believe that it's the most

23   important thing I could do in response to the attacks, but it

24   was hard, and it remains hard.

25   *Q.*  Why did you file this lawsuit?

Claire Sannier – Cross

1    A.   There just have to be some kind of consequences for this.

2    I mean, our system only really allows for trying to put a

3    dollar amount on pain.  I don't really have a choice but to

4    bring a lawsuit against the city.  I mean, this is not the

5    fault of some individual officer; this is not the fault of some

6    singular policy; it's the entire city response to this protest.

7    From moment one, everything was violent, aggressive,

8    escalatory, and harmful; and I need to find some way to make it

9    stop.

10           MS. WANG:  Thank you.  No further questions at this

11   time.

12           THE COURT:  Okay.  Cross-examination.

13           MS. HOFFMAN:  May I proceed?

14           THE COURT:  Yes.

15                       **CROSS-EXAMINATION**

16   BY MS. HOFFMAN:

17   Q.   Good morning, Ms. Sannier.  My name is Kate Hoffman.  How

18   are you today?

19   A.   I'm doing okay.

20   Q.   Okay.  I understand that you've testified now that you

21   attended the George Floyd protests on numerous dates.  What I'd

22   like to do is go over date by date with you with a couple more

23   follow-up questions.

24   A.   Okay.

25   Q.   You attended the protest May 28; correct?

Claire Sannier - Cross

1    A.   I did.

2    Q.   And the first location where you are claiming any injuries

3    was I-25 and the pedestrian bridge; that's correct?

4    A.   That's correct.

5    Q.   And do you recall when you arrived?

6    A.   I believe I arrived there around 6:00 p.m., somewhere in

7    the evening.  It was probably closer to 7:00.

8    Q.   And as you testified on direct examination, you saw a

9    number of protesters enter the highway, that being I-25;

10   correct?

11   A.   That's correct.

12   Q.   How many protesters would you estimate entered I-25?

13   A.   A couple dozen.  Certainly, a small portion of the crowd.

14   Q.   And you didn't enter the highway; correct?

15   A.   I did not.

16   Q.   And you would agree with me, based on the footage that you

17   watched during your direct examination, that the cars were

18   still driving at the time that the protesters entered I-25?

19   A.   What I saw was each lane, once a protester was entering it,

20   no cars were driving in it.

21   Q.   But you would agree with me that as the protesters entered

22   the highway, there were still some cars in the lane of

23   traffic -- and was that the northbound or the southbound lane

24   of travel that the protesters had entered onto?

25   A.   I believe that's the northbound lane.

Claire Sannier – Cross

1    Q.   Okay.  So you would agree with me there were some cars

2    driving on the northbound lanes of travel as the protesters

3    walked into them?

4    A.   Yeah.  The protesters walked lane by lane as cars stopped.

5    I agree.

6    Q.   And you testified that you believed that cars were honking

7    in support of protesters?

8    A.   Yes.

9    Q.   And you agree with me that you can't know what is in the

10   mind of another person?

11   A.   Sure.  But I've been to a lot of labor pickets, and it's a

12   very common way to show support.

13   Q.   And you would agree with me that the cars could be honking

14   in support, and they could also be honking in frustration that

15   somebody is blocking their means of travel on the highway?

16   A.   I'm sure some people were frustrated.

17   Q.   And do you believe protesters have a right -- strike that.

18   I believe you testified on direct examination that you believe

19   blocking traffic is a form of peaceful protest?

20   A.   It's certainly peaceful.  There is no violence or harm

21   involved.

22   Q.   Am I correct in then saying, you believe that blocking

23   traffic on an interstate highway is an acceptable form of

24   peaceful protest?

25   A.   I believe it is a form of peaceful protest.  I did not

Claire Sannier - Cross

1   engage in it.

2   Q.  And do you believe the police were wrong to prevent

3   protesters from entering I-25?

4   A.  I believe the police were wrong by administering force

5   without warning for that behavior.

6   Q.  And have you considered that allowing protesters to march

7   on interstate highways could be dangerous?

8   A.  I'm sure there is some danger involved, yes.

9   Q.  And it could be dangerous to motorists?

10  A.  I think it's more likely dangerous to the protesters who

11  are making those choices.

12  Q.  And do you believe any other areas are off limits for where

13  people should be allowed to protest?

14  A.  I imagine private property would be an ineffective and

15  disallowed way to protest.

16  Q.  So you believe there are limits on where people can protest

17  under the First Amendment?

18  A.  I think it's very frequently the case that protests require

19  civil disobedience of certain laws.  And so I would not call

20  that illegitimate protest for something like that.

21  Q.  And if you believed that protesters had the right to

22  peacefully protest on I-25, why didn't you join them?

23  A.  I didn't say I believe they had the right.  I just said

24  that I believe it was a form of peaceful protest, and I didn't

25  join them because I didn't deem it to be safe.  I also don't

Claire Sannier – Cross

1    believe that it warrants chemical weapons being sprayed on them

2    and everybody else within 200 feet of them.

3    Q.   And you joined a blockade line preventing officers from

4    getting to people on the highway; correct?

5    A.   I did line up along with some other protesters to make

6    space between the officers and the people who were on the

7    freeway.

8    Q.   And what was the purpose of you doing so?

9    A.   I was hoping that it would give the protesters time to get

10   off of the freeway before they were attacked or arrested.

11   Q.   And at some point in time after the protesters had left

12   I-25, as you previously described, officers discharged some

13   pepper balls?

14   A.   Yeah.  Several hundred pepper balls.

15   Q.   And you weren't struck with any pepper balls at that time;

16   correct?

17   A.   Not at that time.

18   Q.   And you didn't see the officer who discharged the pepper

19   balls that you inhaled?

20   A.   No, I certainly did.

21   Q.   Can you describe him or her?

22   A.   I saw a whole host of officers in intentionally obfuscated

23   military style gear, shooting indiscriminately into a crowd.

24   There were easily six or twelve of them.

25   Q.   And as you sit here today, are you able to identify the

160

Claire Sannier – Cross

1   person or persons that shot the pepper ball that you inhaled?

2   A.   As I said, any time we tried to identify an officer, they

3   refused to give us their name or badge number.  It was

4   impossible to identify an individual officer, and I believe

5   they did it on purpose.

6   Q.   Did you ask any officers to identify themselves at this

7   location, at I-25 and the Highland Bridge?

8   A.   I believe some protesters, myself included, asked for badge

9   numbers and were met with complete silence.

10  Q.   And do you recall when you did that?

11  A.   It would have been when I was on the fence, in between the

12  lawn and then the freeway, when the police were shooting into

13  the crowd.

14  Q.   And can you describe the officer that you asked for him or

15  her to give you --

16  A.   Yeah, sure.  They looked exactly like every other officer.

17  They were dressed in completely black or camouflage

18  military-style body armor and full face coverings.  There was

19  no way to identify an individual officer.

20  Q.   And after you inhaled gas, you then moved south with the

21  crowd?

22  A.   That's correct.

23  Q.   And you were able to use water to address your symptoms?

24  A.   No.  I needed -- I needed help from some of the medics who

25  had milk and Milk of Magnesia.

Claire Sannier – Cross

1    *Q.*  And did the milk help address your symptoms?

2    *A.*  It did somewhat, yes.  It made it so I could see enough to

3    walk.

4    *Q.*  And you were able to continue protesting after inhaling gas

5    from the pepper balls; correct?

6    *A.*  Physically, I was capable of resisting that pain.  Yes.

7    *Q.*  And you were able to walk down the stairs from the

8    pedestrian bridge?

9    *A.*  I was.

10   *Q.*  And so you could see at that time?

11   *A.*  I could see well enough to walk down the stairs.

12   *Q.*  Okay.  And you were able to walk from the pedestrian bridge

13   to the capitol?

14   *A.*  That's correct.

15   *Q.*  And then from the capitol, you were able to walk to the

16   intersection of Colfax and Washington?

17   *A.*  That's right.

18   *Q.*  And how long was that walk in total?

19   *A.*  Probably a mile and a half, maybe two.

20   *Q.*  And you next ended up around Colfax and Washington sometime

21   around 8:30?

22   *A.*  That sounds right.

23   *Q.*  I believe it was your testimony on direct examination that

24   at some point in time in that walk, you were made aware that

25   there is a Denver Police Department police station at the

Claire Sannier - Cross

1   intersection of Colfax and Washington?

2   A.   That's correct.

3   Q.   Do you know how you became aware of that?

4   A.   I overheard a conversation in the crowd.

5   Q.   Do you recall what the conversation was about?

6   A.   People said we were going to protest at the Denver police

7   station.

8   Q.   So it was your understanding that protesters specifically

9   wanted to protest outside of a Denver Police Department police

10  station?

11  A.   That's correct.  In the public thoroughfare outside the

12  police department.

13  Q.   And you were within the general mass of the crowd?

14  A.   That's right.

15  Q.   Okay.  And there was about a couple hundred people in front

16  of you at this time?

17  A.   At various times, there were a couple hundred people around

18  me.  I certainly could see the police station.

19  Q.   You would agree with me that if an object was thrown, you

20  may or may not have seen it, given the amount of people around

21  you.

22  A.   I certainly couldn't see every single thing that happened.

23  Q.   And you inhaled some gas at this location; correct?

24  A.   Yeah, an extremely distressing amount of gas.

25  Q.   Did you feel the same physical effects as you did when you

Claire Sannier – Cross

1  were at the I-25 pedestrian bridge area?

2  A.  Significantly worse.

3  Q.  And you believed the police were retaliating against

4  protesters for what they believed was an attack on their

5  position; is that correct?

6  A.  I believe the police were retaliating against protesters

7  for criticizing them.

8  Q.  And did any police officer ever say anything to you to that

9  effect?

10  A.  Police officers never said a single word to me.  They only

11  spoke through violence.

12  Q.  And after you inhaled gas at the District 6 station, you

13  were then able to walk back to your car; correct?

14  A.  Eventually, after receiving treatment, yes.

15  Q.  What treatment did you receive?

16  A.  I had milk -- basically, you need a base to counteract the

17  acid.  So milk was dumped into my hands several different

18  times, and I was able to splash it into my face, it took

19  probably ten or fifteen minutes of that in order to feel

20  flushed enough to feel safe driving home.

21  Q.  After you received that treatment, you then walked back to

22  your car?

23  A.  That's correct.

24  Q.  Where was your car?

25  A.  I don't really remember.  It was somewhere in Capitol Hill.

Claire Sannier – Cross

1   *Q.*  And can you estimate how long that walk was?

2   *A.*  Maybe five or ten minutes.  I do remember it took me a long

3   time to find my car, because I was very distressed and I

4   couldn't remember where I parked.  I don't remember how long I

5   walked.

6   *Q.*  And after you found your car, you then drove to your

7   parents' house?

8   *A.*  That's correct.

9   *Q.*  And your parents lived in Littleton at the time?

10  *A.*  That's right.

11  *Q.*  And how long was that drive?

12  *A.*  About 30 or 45 minutes.

13  *Q.*  And you drove, not somebody else?

14  *A.*  That's true.

15  *Q.*  Any issues with the car ride?

16  *A.*  No.

17  *Q.*  So you could see at that time?

18  *A.*  I could see well enough to drive, yes.

19  *Q.*  And if you couldn't see, you would have stopped?

20  *A.*  Of course.  Yeah.

21  *Q.*  And you didn't receive any professional medical treatment

22  for any of the injuries you claimed to have received on May 28;

23  correct?

24  *A.*  No.  Though I did receive professional help with the

25  psychological trauma later on.

165

Claire Sannier – Cross

 1    *Q.*  Great.  I do want to get into that later.

 2          I would ask that the document marked as Exhibit 3105

 3    be shown to the witness.

 4          *MS. WANG:*  No objection, Your Honor.

 5          *THE COURT:*  All right.  3105 is admitted.

 6          (Exhibit 3105 admitted.)

 7    *BY MS. HOFFMAN:*

 8    *Q.*  Do you recognize this document?

 9    *A.*  I do.

10    *Q.*  What is this document?

11    *A.*  This is a journal I wrote the night after.

12    *Q.*  So when you say "the night after," can you specifically

13    tell me what night you wrote it?

14    *A.*  It was I think after midnight on Thursday.

15    *Q.*  So the --

16    *A.*  It would have been within a few hours of the events.

17    *Q.*  So the early morning hours of May 29?

18    *A.*  I believe so.  Yes.

19    *Q.*  This is your handwriting on the document?

20    *A.*  It was.  Yeah.

21    *Q.*  And in this journal, it's fair to say that you detailed

22    some of your experiences at the protests on May 28?

23    *A.*  That's right.

24    *Q.*  And directing your attention to the second paragraph,

25    beginning, "The march," can you clearly see that?

Claire Sannier - Cross

1    A.   I can.

2    Q.   So I'm going to direct your attention to the sentence which

3    reads, "There was the usual stuff, a couple people being

4    perhaps more aggressive than maybe useful."  Do you recall

5    writing that?

6    A.   I do.

7    Q.   And what did you mean by that?  What kind of aggressive

8    conduct did you observe?

9    A.   Just people being -- swearing, shouting at officers out of

10   frustration.

11   Q.   So the aggressive conduct that you're describing in this

12   journal is entirely verbal; or did you observe any physical

13   aggressive actions, as well?

14   A.   I never observed any physical aggressive actions.  I'm

15   describing verbal speech.

16   Q.   And where did you observe this verbal speech that appeared

17   aggressive to you?

18   A.   Yeah.  It was -- I mean, mostly shortly before we got to

19   the Highland Bridge.  There was a large line of police officers

20   that I had never seen before at prior protests, and I saw

21   protesters line up very much like the rest of the events I

22   described, maybe five or ten feet away.  And people were

23   shouting at the officers, asking them to acknowledge the harm

24   that their -- their co-workers had done.

25   Q.   And you yourself engaged in similar conduct, as you

167

Claire Sannier - Cross

1   described on your direct examination; correct?

2   A.  Yeah.  Sure.

3   Q.  So was it your testimony today that you also were engaging

4   in aggressive conduct?

5   A.  No.  I would not describe what I did as aggressive.

6   Q.  So how was your conduct different than the aggressive

7   conduct that you're talking about in your journal?

8   A.  I didn't curse quite so much, I guess.

9   Q.  Is that the only difference, that the other individuals you

10  saw cursed, and you didn't curse?

11  A.  I also didn't tend to be in the space between police and

12  protesters, because it seemed unsafe.  Certainly, it didn't

13  seem that there was anything violent about that behavior, but I

14  didn't want to risk retaliation.

15  Q.  And a little further in this line -- if we could just

16  continue displaying this journal -- you then write, "There was

17  a white dude wandering through the crowd being unpredictable."

18  Do you see where I just read that from?

19  A.  I do.

20  Q.  Can you tell me more about that?

21  A.  Yeah.  I mean, it's two years ago at this point, but I

22  remember pretty much a guy who appeared to be inebriated was

23  sort of walking back and forth.  I remember him antagonizing

24  some protesters and telling them to go home.  And that seemed

25  like a thing that could escalate tensions with the officers,

Claire Sannier - Cross

1  who were, obviously, already prepared to engage in violence,

2  given their equipment.

3  Q.  And you specifically write here that you didn't think the

4  aggressive conduct was useful?

5  A.  Yeah.  I didn't -- some of that conduct, it didn't seem to

6  me to be productive protest; but, certainly, it was legal

7  protest.  I didn't do anything about it.

8  Q.  Again, that's the cursing?  You didn't believe the cursing

9  was useful?

10  A.  It's less cursing -- at that time I believe it was more

11  concerned about singling out individual officers.  I was

12  nervous that it was retaliation.  Later when I saw retaliation

13  for no reason at all, I started to see that sort of behavior as

14  appealing to the humanity of individual officers.  So my

15  opinion has changed since.

16  Q.  Did you see protesters single out individual officers?

17  A.  Yeah.  I would see protesters say, "What is your name?"

18  "What is your badge number?"  Police officers did not respond.

19  Their badge numbers were not visible.  And I would see

20  individual protesters shout.  I heard some homophobic slurs.  I

21  certainly don't approve of that.  I heard some kind of personal

22  attacks like that.  And I was much less interested in personal

23  attacks on the police; what I wanted to see was the police

24  behave better.  So that sort of conduct, I found much more

25  productive.

Claire Sannier - Cross

1    Q.  Okay.  I'm going to direct -- if we could show the witness
2    the second page of the journal.  Directing your attention to
3    the bottom paragraph that begins, "They kept gassing."
4            Do you see that, where I'm directing your attention
5    to?
6    A.  I do.
7    Q.  Great.  I want to draw your attention to what appears to be
8    maybe the second sentence.  "At some point much earlier,
9    everyone was made aware of shots fired at the capitol.  Still
10   don't know who did it or if anyone was hurt."  Do you recall
11   writing that?
12   A.  I do.
13   Q.  Okay.  So you recall on the first day of the protests,
14   May 28, being made aware that shots were fired at the capitol?
15   A.  Yeah.  I heard some people talking about it.  I was of
16   course worried it was a police officer who had shot a
17   protester.
18   Q.  And is it your understanding that it was, in fact,
19   protesters --
20   A.  I have no idea what it was.  I never learned.
21   Q.  And you would agree with me that shooting -- that a
22   shooting of any sort of shots at a protest is not a peaceful
23   protest activity?
24   A.  I would say that if someone is shooting, that's not
25   peaceful.  I don't think it has anything to do with protesting

Claire Sannier - Cross

1    at all.

2    Q.  Directing your attention to the third page in the journal,

3    towards the top of the page.  And I want to direct your

4    attention to the line, "When I got off the capitol, some

5    anarchist types were blocking off Broadway, but the group was

6    way too small.  Some very loud."

7    A.  Okay.

8    Q.  Do you see where I just directed your attention to?

9    A.  I do.

10   Q.  Okay.  How could you tell these individuals were anarchist

11   types?

12   A.  I really don't remember why I wrote it that way.  I think I

13   was probably extrapolating from the behavior of making a

14   blockade.

15   Q.  Sorry.  You were extrapolating from the behavior of what?

16   A.  Of blocking off Broadway.

17   Q.  So the anarchist types that you described in the journal

18   weren't wearing any clothing or engaging in any behavior that

19   specifically identified them as anarchists?

20   A.  No.  I don't really think I had cause to call them that in

21   this century.  It was kind of an offhand remark.

22   Q.  Were you aware of anarchist types that were present with

23   you at any point in time during the protests?

24   A.  No, not specifically.

25   Q.  And you made no -- just after where I was directing your

Claire Sannier – Cross

1    attention to, to some very loud fireworks.  Do you see that?

2    A.  I do.  Yeah.

3    Q.  And the fireworks came from the crowd; correct?

4    A.  Firecrackers -- I didn't see where they came from.  I just

5    saw that they went off in the street.

6    Q.  And did you see fireworks throughout the protests?

7    A.  I saw a couple of other times fireworks in the --

8    generally, they were in empty areas of the park.

9    Q.  And in this instance, you write that the firecrackers

10   caused actual palpable distress to a young woman?

11   A.  I believe that was awful palpable distress.  Yeah, there

12   was an unhoused person who was in a tent on a corner.  I was

13   certainly distressed that someone would risk -- whoever

14   happened to do that would risk burning their tent down.

15   Q.  And in that instance, the shooting off of firecrackers

16   actually caused somebody distress?

17   A.  Sure.  Yeah.  I don't think people should have been doing

18   that.  I didn't see anybody do it.  It wasn't a part of the

19   protest.

20   Q.  And how many firecrackers did you witness go off on May 28?

21   A.  I couldn't possibly put a number on it.  Certainly fewer

22   than six.

23   Q.  Was it all in this area?  Is this the capitol area that

24   you're writing about?

25   A.  Yeah, I believe so.  Yeah, it would have been around there.

Claire Sannier - Cross

1   It was during a moment of quiet in between the sort of police

2   attacks.

3   Q.  And now I'm directing your attention to about halfway

4   through the same page.  You write, "I stayed there while some

5   men busted up random cars in the parking lot.  One looked like

6   a cop car.  I can't seemed helpful or that I was upset by it."

7          MS. WANG:  Objection.  Misreading the journal.

8          THE COURT:  You think she misread it?

9          MS. WANG:  Yes.

10          THE COURT:  What part did she misread?

11          MS. WANG:  She misread the second sentence.

12          MS. HOFFMAN:  I'm happy to try again.  I am trying to

13   interpret handwriting.

14          THE COURT:  Go ahead and read it.  I thought she read

15   it right.

16   BY MS. HOFFMAN:

17   Q.  "I stayed there while some men busted up three random cars

18   in the parking lot.  One looked like a cop car.  I can't say it

19   seemed helpful or that I was upset by it."  Did I read that

20   correctly?

21   A.  Yeah.  I think you skipped a word the first time, but

22   that's correct.

23   Q.  How long did you stay in that area watching men damage cars

24   in the parking lot?

25   A.  I don't know.  It only lasted probably five minutes.

Claire Sannier - Cross

1   *Q.*  And were the men you saw damaging these cars using any

2   equipment?

3   *A.*  I saw someone trying to use a skateboard.  But, obviously,

4   that's not a weapon; so it didn't work very well.

5   *Q.*  And did you see specifically how they damaged these three

6   cars?

7   *A.*  I think I saw a couple of windows break, maybe a rearview

8   mirror got knocked off.

9   *Q.*  And why did you believe one of the cars was a police car?

10  *A.*  It just looked -- I think I might have seen -- I mean, I

11  don't remember.  Maybe it was just the kind of cars that police

12  use for undercover that you sometimes see pulling people over,

13  or whatever.  I don't know.

14  *Q.*  So the police car you saw was not a marked police cruiser?

15  *A.*  I don't believe so.

16  *Q.*  And the other two cars you saw being damaged did not appear

17  to be police cars to you?

18  *A.*  I couldn't say what they were.

19  *Q.*  But you write here in your journal that you believe only

20  one of them was a police car; is that correct?

21  *A.*  I could interpret that as at least one.  I really don't

22  know.

23  *Q.*  And did you tell the men to stop damaging these cars?

24  *A.*  No.  That didn't seem appropriate.

25  *Q.*  Why didn't it seem appropriate?

Claire Sannier – Cross

1   A.   I didn't want to risk any kind of escalation.

2   Q.   And you didn't call the police to report this?

3   A.   No, I certainly didn't call the police, I was already

4   skeptical as to the police's ability to respond peacefully to

5   these protests at this point.

6   Q.   And you would agree with me that damaging cars is not a

7   peaceful protest activity?

8   A.   I don't think that violence against property exists.  I

9   think damaging property needs to be very carefully separated

10  from violence to people.  So I wouldn't consider it productive

11  protest activity, but I'm not willing to describe it as

12  unpeaceful.  I think peace is about harming humans, and that's

13  much more important to me than harming property.

14  Q.   So I just want to make sure I understood your answer.  You

15  were okay with what you witnessed because it wasn't violence

16  against another person; it was violence against property?

17  A.   No, I didn't say I was okay with what I witnessed.

18  Q.   But you didn't take any action to stop the individuals from

19  doing it?

20  A.   It was not under my power to stop those individuals from

21  doing that.  I had no ability to do that.

22  Q.   Did you try to do so?

23  A.   No.

24  Q.   And you write in your journal that watching the men damage

25  cars in the parking lot didn't upset you.

Claire Sannier – Cross

1   *A.*   I don't remember exactly what I wrote.

2   *Q.*   "I can't say it seemed helpful or that I was upset by it."

3   *A.*   Yeah, okay.  To me, it seemed like an understandable

4   voicing of frustration, in the sense that -- I think it was --

5   I think it was counterproductive; I think it was bad; I wish

6   they had not done it; that's why I say I can't say it seemed

7   helpful.  I didn't find myself reacting more strongly to that

8   than to the violence against humans I had already witnessed

9   that day.

10  *Q.*   And you didn't film the individuals who were damaging cars

11  in the parking lot; correct?

12  *A.*   No, I did not.

13  *Q.*   Why not?

14  *A.*   I don't know why I would have.

15  *Q.*   Okay.  Moving on.  I want to direct your attention to a

16  little lower in the document.  And if you believe at any point

17  in time that I misread anything, certainly draw my attention to

18  that.  But here it appears to detail that you then go to the

19  District 6 station.  And you write, "When we got to the

20  station, some rocks were thrown at windows."  Did I read that

21  correctly?

22  *A.*   Yes, you did.

23  *Q.*   Did you know the individuals who were throwing rocks at the

24  District 6 station?

25  *A.*   I didn't see any individuals actually throw rocks.  I just

Claire Sannier - Cross

1   saw the rocks hit the windows.

2   Q.  How many rocks did you see hit the windows?

3   A.  Probably two.

4   Q.  And you would agree with me that throwing rocks on a

5   crowded street is dangerous?

6   A.  Yeah, I suppose in the abstract.  This certainly didn't --

7   there were no people near where these rocks landed.  I didn't

8   think it was particularly dangerous to humans.

9   Q.  You testified earlier there were approximately 1,000 people

10  in the area of Colfax and Washington at approximately 8:30?

11  A.  Probably.

12  Q.  And have you considered what would have happened if the

13  person throwing the rock misjudged the distance and came up

14  short?

15  A.  Sure.  Yeah.  It doesn't seem like a safe thing to do, and

16  I certainly didn't engage in that or see anyone else engage in

17  it at that time.

18  Q.  And you didn't photograph or take any video of the rock

19  throwing; correct?

20  A.  No.  There is no way I could have.  It happened in, like,

21  two seconds.

22  Q.  And according to your journal, the rocks were thrown before

23  officers deployed any gas; correct?

24  A.  No.  I believe that -- I can't recall exactly when the

25  rocks were thrown.  We had certainly already been attacked that

Claire Sannier - Cross

1   evening.

2   Q.  Already been attacked at the area of Colfax and Washington?

3   A.  I don't recall.

4   Q.  You would agree with me that as ordered in your journal,

5   you discussed rocks being thrown before you discuss gas?

6   A.  Yeah.  I mean, this -- the whole point of this journal -- I

7   mean, obviously, I never expected it to be evidence in a trial.

8   It was really just to help me sort of remember what the chaos

9   felt like, that the police had brought to my city.

10          MS. HOFFMAN:  And now if I could direct the witness's

11  attention to Exhibit -- sorry, page 7.  I believe it's the

12  Fitouri 022831.  I'm specifically directing the witness's

13  attention to the bottom paragraph.

14  BY MS. HOFFMAN:

15  Q.  Do you see that, Ms. Sannier?

16  A.  I do.

17  Q.  And you write, "By now, my Twitter was just brutality

18  captioned ACAB."  Do you see that?

19  A.  I do.

20  Q.  And ACAB is an acronym which stands for all cops are

21  bastards?

22  A.  That's as I understand it.

23  Q.  And you communicated with friends during the protest using

24  Signal?

25  A.  Generally.

Claire Sannier - Cross

1    *Q.*  And what is Signal?

2    *A.*  Signal is a popular messaging app.

3    *Q.*  And does it encrypt messages?

4    *A.*  Yeah.  Like most other modern messaging apps, it does

5    encrypt messages.

6    *Q.*  Did you use Signal before the protests?

7    *A.*  Yes.

8    *Q.*  Why did you believe it was necessary to use Signal to

9    communicate with your friends during the protests?

10   *A.*  I always use Signal to communicate.  I still do.  It's my

11   normal messaging app.

12        *MS. HOFFMAN:*  Okay.  We can take that off the screen.

13   Thank you.

14   *BY MS. HOFFMAN:*

15   *Q.*  Okay.  I'd like to talk about the next day, May 29.  You

16   also attended that day of protest activity; correct?

17   *A.*  Yes, I did.  Yes.

18   *Q.*  So you would agree with me that the injuries you received

19   on May 28 didn't prevent you from protesting on May 29?

20   *A.*  No.  I essentially took increasing precautions each day, as

21   I was injured further.

22   *Q.*  And so the increasing precautions that you reference on

23   May 29 would be water bottles, goggles, and milk?

24   *A.*  That's right.  Milk of Magnesia; but, yes.

25   *Q.*  Thank you.

Claire Sannier - Cross

1          THE COURT:  It's noon.  Do you have quite a bit more

2    for this witness?

3          MS. HOFFMAN:  I do.

4          THE COURT:  Stop here.  How much time would you like

5    for lunch today, ladies and gentlemen?  Can we negotiate?

6          We've got a bunch of stand-ups over here.  How about

7    an hour and a quarter.  1:15.  Done.

8          (Jury out at 12:00 p.m.)

9          (In open court at 1:20 p.m.)

10         THE COURT:  Okay.

11         MS. HOFFMAN:  May I proceed, Your Honor?

12         THE COURT:  Yes.

13         MS. HOFFMAN:  Thank you.

14   BY MS. HOFFMAN:

15   Q.  I believe when we broke for lunch, you were discussing

16   May 29.

17   A.  That sounds right.

18   Q.  Great.  On May 29 you described an incident during your

19   direct examination where you inhaled gas in the capitol area;

20   is that correct?

21   A.  That's true.  Yeah.

22   Q.  And you described over the course of your direct

23   examination doing a lot of chants?

24   A.  Yes.

25   Q.  And, in fact, there were a lot of different chants you

180

Claire Sannier - Cross

1    described?

2    A.   Yes.

3    Q.   And were other protesters doing chants, as well?

4    A.   Yes.

5    Q.   And in the capitol area on May 29, I believe that incident

6    occurred in the afternoon; is that correct?

7    A.   Yeah.

8    Q.   Okay.  Approximately how many protesters were in that area?

9    A.   Seemed like a couple thousand to me.

10   Q.   So you would agree with me that with all of the chanting

11   going on, it would make it hard to hear if an order was issued?

12   A.   I don't think it would be at all difficult to deliver an

13   order.  I've heard police during many protests.

14   Q.   So you would agree with me that the numerous people doing

15   chants made it quite loud in the area?

16   A.   No louder than any other protest I've been to.

17   Q.   Okay.  But the question was, did it make it loud?  Was it

18   loud with all of the chanting?

19   A.   Sure.

20   Q.   And you can't identify the officer who threw the gas that

21   you inhaled on May 29; correct?

22   A.   No.

23   Q.   Okay.  Okay.  Moving onto the incident around 16th and

24   Cleveland.  That occurred around 9:47 p.m.?

25   A.   Yes, that sounds right.  I'm sorry.  16th and Cleveland

Claire Sannier - Cross

1    doesn't, though.

2    *Q.*  In the 16th Street Mall.

3    *A.*  This is on Friday, you said?

4    *Q.*  This was on Friday, May 29, where you testified that you

5    were shot with the pepper ball in the chest?

6    *A.*  Oh, yes, I'm sorry.  I understand that intersection.  Thank

7    you.  That's right.

8    *Q.*  And your counsel showed you some video that you took

9    earlier during your direct examination?

10   *A.*  That's right.  That was at 16th and Cleveland?

11   *Q.*  And you indicated the video is substantially longer than

12   what you were shown in court?

13   *A.*  That's true.

14   *Q.*  Is it about ten minutes in duration, maybe a little less?

15   *A.*  That sounds right.

16          *MS. HOFFMAN:*  Mr. Atencio, could you please show 101B

17   to Ms. Sannier.

18          *THE COURT:*  This is Exhibit 101?

19          *MS. HOFFMAN:*  I believe it's 1010.

20          *THE COURT:*  Oh, 1010.  1011B --

21          *MS. HOFFMAN:*  1010B.

22          *THE COURT:*  That's a photo.

23          *MS. WANG:*  No objection, Your Honor.

24          *THE COURT:*  1011B, admitted.

25

Claire Sannier - Cross

 1    *BY MS. HOFFMAN:*

 2    *Q.* Mr. Atencio, can you please play the video, beginning at

 3    the very beginning and just playing --

 4         *COURTROOM DEPUTY:* I'm sorry. You admitted a photo,

 5    1011B over and over.

 6         *THE COURT:* 1011B is a photograph.

 7         *MS. HOFFMAN:* It's 1010.

 8         *THE COURT:* 1010 --

 9         *MS. HOFFMAN:* I'm sorry. My original phrasing created

10    the issue, so apologies for that.

11         *THE COURT:* You want 1010 admitted now?

12         *MS. HOFFMAN:* 1010.

13         *THE COURT:* Is there an objection to that?

14         *MS. WANG:* No, Judge.

15         *THE COURT:* All right. Admit that one.

16         (Exhibit 1010 admitted.)

17         (Video played.)

18    *BY MS. HOFFMAN:*

19    *Q.* Ms. Sannier, you would agree with me during that one minute

20    that we just watched, the police officers have taken no action

21    in response to the two individuals with the noodles who are

22    protesting?

23    *A.* No. They fired their gun at him. He responded to them, he

24    said, "Point that at me." He was sort of daring them to.

25    Yeah, they pointed their weapon at him.

Claire Sannier - Cross

1    *Q.*  Did the police officers -- you would agree with me, they

2    haven't discharged any pepper ball or any less-lethal munitions

3    at the two individuals with the noodles protesting?

4    *A.*  Not to that point, no.

5    *Q.*  And you're filming the entirety of this minute; correct?

6    *A.*  That's correct.

7    *Q.*  And you would also agree with me that during this minute,

8    the police officers have taken no action in response to you

9    filming?

10   *A.*  No.  That's true, yes.

11   *Q.*  And you were filming for a couple of minutes prior to when

12   this video starts; correct?

13   *A.*  That's correct.

14        *MS. HOFFMAN:*  And, Mr. Atencio, can you please play

15   this video to the two-minute mark.

16        (Video played.)

17   *BY MS. HOFFMAN:*

18   *Q.*  Ms. Sannier, you would agree again that the police officers

19   have not discharged pepper ball or any other less-lethal

20   munitions at the two individuals protesting with the noodles --

21   *A.*  I would.

22   *Q.*  -- during this second minute of the video?

23   *A.*  I would agree.  Yes.

24   *Q.*  Same question:  You would agree that police officers have

25   taken no action in response to you filming?

Claire Sannier - Cross

 1   *A.*  Not that I noticed, no.

 2           *MS. HOFFMAN:*  Mr. Atencio, would you please play to

 3   the three-minute mark.

 4           (Video played.)

 5   *BY MS. HOFFMAN:*

 6   *Q.*  Again you would agree with me the police officers have

 7   taken no action during this third minute of the video to deploy

 8   pepper ball or any other less-lethal munitions at the two male

 9   individuals protesting with noodles?

10   *A.*  I would agree with that.

11   *Q.*  And you would agree that the police officers have taken no

12   action in response to you filming?

13   *A.*  Not so far.

14   *Q.*  And fair to say in this video, we watched a couple people

15   walk by with signs.  Was it your understanding those

16   individuals were protesters?

17   *A.*  There were a couple protesters in and out of the area where

18   the protest was, yes.

19   *Q.*  You would agree with me, the police officers took no action

20   with respect to those individuals?

21   *A.*  Not at this time.  No.

22           *MS. HOFFMAN:*  Mr. Atencio, can you please play the

23   video to 332.

24           (Video played.)

25

Claire Sannier - Cross

1    *BY MS. HOFFMAN:*

2    *Q.*  Did you hear that noise just before the video ended?

3    *A.*  Yes.

4    *Q.*  Was it a rock?

5    *A.*  No, I don't believe so.

6    *Q.*  Was it a bottle?

7    *A.*  Not that I have any reason to believe.  No.

8    *Q.*  Did you see the object that led to that noise?

9    *A.*  I don't know what that noise was.

10        *MS. HOFFMAN:*  Mr. Atencio, can you please just play

the next ten seconds of the video.

12        (Video played.)

13   *BY MS. HOFFMAN:*

14   *Q.*  So you would agree with me that within seconds of that

15   noise we just talked about is when the police officers deployed

16   their pepper ball?

17   *A.*  It was about the same time.  Yes.

18   *Q.*  So it's only after the loud noise that we're seeing police

19   deploy pepper ball; correct?

20   *A.*  Not only.  It's also after the two people get in an

21   argument, and that's who they shoot at.

22   *Q.*  You would agree with me that there is about five seconds

23   between the noise and the pepper ball deployment?

24   *A.*  Yep.

25   *Q.*  And you were struck with pepper ball in the middle of your

Claire Sannier – Cross

1    chest?

2    A.   That's right.

3        MS. HOFFMAN:   I'd ask that the witness be shown a copy

4    of Exhibit 1008.

5        MS. WANG:   No objection.

6        THE COURT:   Admitted.

7        (Exhibit 1008 admitted.)

8    BY MS. HOFFMAN:

9    Q.   Ms. Sannier, do you recognize the document that's being

10   displayed on the screen right now?

11   A.   Yes, I do.

12   Q.   And what is that document?

13   A.   It's a photo of a welt after that pepper ball shortly after

14   I was hit.

15   Q.   And you took that photograph on May 30; correct?

16   A.   I believe so.   Yes.

17   Q.   Okay.   So this photograph reflects the marking from the

18   pepper ball as it was on your body one day later?

19   A.   No.   I believe it was that evening.

20   Q.   So it was the early morning hours of May 30?

21   A.   I think so.   Yes.

22   Q.   So a few hours after it occurred?

23   A.   That's right.

24   Q.   And you didn't seek any medical attention for this pepper

25   ball marking; correct?

Claire Sannier – Cross

1  *A.*   No.

2  *Q.*   And you were able to remain in the area after that?

3  *A.*   I was.  Physically.

4  *Q.*   And you were able to walk back home that night?

5  *A.*   I was.

6  *Q.*   Moving on to the third day of the protest, May 30, 2020.

7  You went to the protest on that date, as well; correct?

8  *A.*   I did.

9  *Q.*   Again, your injuries from May 28 and May 29 didn't stop you

10  from going to the protest on May 30?

11  *A.*   No.  I wasn't physically disabled from these injuries.

12  *Q.*   Okay.  So moving to the first event you talked about during

13  your direct examination.  I believe we spoke about an incident

14  on 16th and Welton; is that your understanding?

15  *A.*   Yeah.

16  *Q.*   And it's possible that somebody threw a water bottle at

17  police officers at this location; correct?

18  *A.*   I don't believe so.

19  *Q.*   You don't have a memory of police officers throwing any

20  water bottles at this location?

21  *A.*   The things I saw police officers throwing were tear gas

22  canisters.

23  *Q.*   Sorry.  My question, in case I didn't ask it correctly,

24  was, did you see any protesters throwing any water bottles in

25  the direction of police officers at 16th and Welton?

Claire Sannier - Cross

 1   A.   No.  Not at this time.

 2   Q.   Did you see over the course of the protests water bottles

 3   thrown in the direction of police officers?

 4   A.   Occasionally, yes.

 5   Q.   And you don't view water bottles thrown at police as a

 6   threat; correct?

 7   A.   I don't think that it's a significant threat to a person

 8   who is wearing a helmet and body armor.  I also don't think

 9   it's a particularly good idea or something good to do.  I

10   certainly didn't do it myself.

11   Q.   Have you ever been hit with a water bottle?

12   A.   I don't think so.

13   Q.   You would agree with me that it makes a difference whether

14   the bottle is empty, whether it's filled with water, whether

15   it's filled with ice?

16   A.   Yes.

17   Q.   It matters how fast the water bottle is thrown?

18   A.   I suppose that would matter, yeah.

19   Q.   Matters if it's thrown underhand, overhand?

20   A.   I guess so, yeah.

21   Q.   Matters whether it's thrown from 5 away or 20 feet away?

22   A.   I'm not sure.  I think mostly it would be falling at that

23   point, so it might be the same.  I don't know.

24   Q.   Fair to say the size of the bottle matters?

25   A.   Yes.

Claire Sannier - Cross

1    *Q.*  So you would agree with me that a water bottle under

2    certain circumstances could very well constitute a threat to

3    police officers?

4    *A.*  I mean, I'm really not sure, hypothetically speaking.

5    Again, they were wearing helmets.  It didn't seem like a

6    threat.

7    *Q.*  Okay.  So what size, weight, velocity of an object in your

8    mind does it take to become a threat to an officer?

9    *A.*  I don't think I can speak to that.

10   *Q.*  What about a rock?

11   *A.*  I don't think it would be a good idea to throw a rock at a

12   person.  No.

13   *Q.*  Bottle?

14   *A.*  What kind of bottle -- like a water bottle, we were just

15   talking about?

16   *Q.*  A glass bottle.  Thank you for clarifying.

17   *A.*  No.  Yeah, that could clearly hurt someone.

18   *Q.*  When you saw people throwing bottles, did you tell them to

19   stop?

20   *A.*  I did.

21   *Q.*  And how many people did you tell to stop?

22   *A.*  Maybe three or four, over the course of all of the days.

23   *Q.*  And are you aware if they did, in fact, stop?

24   *A.*  At that moment, they did stop, yes.  I couldn't recognize

25   the people or anything.

Claire Sannier - Cross

1    *Q.*  And you didn't track their movements afterwards to ensure

2    that they didn't throw anything else; correct?

3    *A.*  No, I did not.

4    *Q.*  And I believe you indicated that at this particular

5    location, 16th and Welton, you inhaled gas; is that correct?

6    *A.*  That's correct.

7    *Q.*  You weren't shot with any pepper balls at this location?

8    *A.*  I don't think I was hit directly.  No.

9    *Q.*  And you mentioned that the officers had truncheons?

10   *A.*  Yeah.

11   *Q.*  Is that like a baton?

12   *A.*  Yeah, like a big, huge stick.

13   *Q.*  And you weren't hit with a baton; correct?

14   *A.*  No, I was not.

15   *Q.*  And I believe we watched some Aurora footage of this

16   incident.  Do you recall that during your direct examination?

17   *A.*  Yes, I do.

18   *Q.*  So it's your understanding that there was more than just

19   the Denver Police Department at 16th and Welton?

20   *A.*  It is now my understanding.  Yes.

21   *Q.*  And you can't tell me if it's Denver or Aurora that

22   deployed the tear gas -- that deployed the gas that you

23   inhaled; correct?

24   *A.*  There were no identifying markings on the police officers.

25   They were all dressed the same.

Claire Sannier - Cross

1   *Q.*  Okay.  Moving on to the next event you described.  That

2   would be Lincoln and Colfax?

3   *A.*  That sounds right.

4   *Q.*  And you testified you were kneeling on and off at the front

5   of the line?

6   *A.*  That's true.

7   *Q.*  You weren't struck by my projectiles or flash-bang --

8   strike this.  You weren't struck by pepper balls or any other

9   less-lethal munitions at this location; correct?

10  *A.*  I believe I was shot in the back.  I had a backpack on, so

11  it's hard to know for sure; but there was residue left on the

12  backpack.

13  *Q.*  And did you feel that impact?

14  *A.*  Yes.

15  *Q.*  Did that cause any sort of injury?

16  *A.*  No.  I mean, other than the inhalation, which is

17  immediately afterwards.

18  *Q.*  But no bruise or marking that occurred to your back through

19  the backpack; correct?

20  *A.*  No.

21  *Q.*  And you testified that a flash-bang went off near you?

22  *A.*  That's correct.

23  *Q.*  Did you see the officer who deployed the flash-bang?

24  *A.*  No, I did not.

25  *Q.*  What is a flash-bang?

Claire Sannier - Cross

1    *A.*  It's a type of grenade that when it explodes, it makes an

2    extremely loud noise and extremely bright flash that is

3    intended to disorient people, which it did.

4    *Q.*  Did you know what a flash-bang was prior to this protest?

5    *A.*  I had seen them in video games before, but I had certainly

6    never seen them in real life.

7    *Q.*  Did you see the flash-bang in the air, or did you not see

8    the flash-bang until it landed?

9    *A.*  I believe I saw the flash-bang shortly before it landed

10   next to my foot.

11   *Q.*  Did the flash-bang -- tell me what happened to the

12   flash-bang once it landed on the ground?

13   *A.*  It exploded immediately.

14   *Q.*  Any sort of markings on the ground?

15   *A.*  I don't know.  I couldn't see.  It was a very bright flash.

16   And then, as I mentioned, I was really disoriented, and I was

17   already trying to walk away, so I didn't look back to see what

18   was on the ground.  There were canisters left all over the

19   ground there.

20   *Q.*  And you had seen protesters light firecrackers and

21   fireworks throughout the protest; right?

22   *A.*  I never saw anyone light anything.  I saw a couple of

23   fireworks go off.

24   *Q.*  Okay.  And you continued to protest after that incident on

25   May 30; correct?

Claire Sannier - Cross

1    *A.*   That is correct.

2    *Q.*   And you're aware that the City and County of Denver had

3    imposed an 8:00 p.m. curfew on May 30?

4    *A.*   Yes.

5    *Q.*   How did you know that?

6    *A.*   I knew that from both the news, and I think we received

7    like a notification on our phones.  I never heard anyone speak

8    about it or warn us about that.

9    *Q.*   So knowing the city had a curfew, you made a conscious

10   decision to stay out in the downtown Denver area?

11   *A.*   I was civilly disobeying the curfew.  That's correct.

12   *Q.*   So you believe you had the right to unilaterally decide

13   whether or not to follow a curfew order?

14   *A.*   I believe that people have a right to stand up to and make

15   comment on protest laws that they feel are unjust, yeah.  I

16   think it's of long-standing tradition in this country.

17   *Q.*   So moving on, you describe a third event during your direct

18   examination, where you were chased around and shot with pepper

19   balls.

20   *A.*   That's true.

21   *Q.*   Do you recall being deposed in this case?

22   *A.*   I do.

23   *Q.*   And at your deposition, you were asked a number of

24   questions -- and at your deposition, you were asked a number of

25   questions by another attorney from my office; is that correct?

Claire Sannier - Cross

1   *A.*   I believe so.

2   *Q.*   And that was under oath?

3   *A.*   Yes.

4   *Q.*   And that took place sometime in summer of 2020 -- 2021 --

5   sorry.

6   *A.*   Yeah.  It was about a year later.

7           *MS. HOFFMAN:*  I would ask that the witness be shown a

8   copy -- a certified copy of the deposition transcript.

9           *COURTROOM DEPUTY:*  I have it, but if you have it on

10   your computer, you can show that, as well.

11   *BY MS. HOFFMAN:*

12   *Q.*  Ms. Sannier, I'm going to direct your attention to

13   page 107.  Let me know when you get there, please.

14   *A.*   Okay.

15   *Q.*  So at your deposition, you were asked about what happened

16   on Sunday, May 30 -- Saturday, May 30; correct?

17   *A.*   That is correct.

18   *Q.*  Directing you to line 6 -- I'm sorry -- lines 4 through 11.

19   *A.*   Okay.

20   *Q.*  Sorry.  I had it right the first time.  Sorry.  6 through

21   11.

22           Question:  "Okay.  And" --

23           *MS. WANG:*  Objection.  Not impeaching.

24           *THE COURT:*  I don't know.  I don't know what it says.

25           What are you trying to impeach?

Claire Sannier – Cross

1        MS. HOFFMAN:  I'm trying to impeach with her answer as

2   to what happened on Sunday -- Saturday night, May 30, in her

3   deposition.

4        THE COURT:  Okay.

5        MS. HOFFMAN:  So it is offered for rules of

6   impeachment.

7        THE COURT:  Just a minute, Ms. Wang.

8        What's the answer that you want to impeach?  What did

9   she say?

10       MS. HOFFMAN:  Do you want me to read it aloud?

11       THE COURT:  Her answer here, what did she say?

12       MS. HOFFMAN:  Her answer here was that she was chased

13   around the downtown area and shot with pepper balls.

14       THE COURT:  All right.  The passage that you're going

15   to have her look at says that she was not chased around

16   downtown or she was not charged -- shot with pepper balls?

17       MS. HOFFMAN:  It asks what happened Saturday night and

18   sums up that she went to the police station, had chemical

19   weapons deployed, which she inhaled, and then left.

20       THE COURT:  Okay.  It doesn't impeach the testimony.

21   Sustained.

22   BY MS. HOFFMAN:

23   Q.  Before today, have you ever indicated in any sort of

24   response or in your deposition hearing that you believe you

25   were chased around Saturday May 30 and shot with pepper balls?

Claire Sannier - Cross

1   *A.*  I don't remember it coming up in the deposition, no.  I do

2   remember I had confusion around which date at one point in the

3   deposition.  It's possible this is where.  No, it didn't come

4   up in the deposition, as I recall.

5   *Q.*  Moving on to May 31 of 2020.  You protested on this date,

6   as well?

7   *A.*  I did.  Yes.

8   *Q.*  It looks like you had some additional equipment with you

9   this day.  You had a respirator, goggles, as well as vinegar?

10  *A.*  I had a respirator.  I already had the goggles from the

11  previous day, which were, again, swim goggles.  And then I

12  bought some vinegar.  I was told that if you soaked --

13  obviously, everybody was wearing masks for COVID -- if you

14  soaked that mask in vinegar, it would help neutralize the tear

15  gas somewhat.  I didn't find it effective, but I was trying it

16  that day.

17  *Q.*  Again, you were aware on Sunday, May 31 that there was a

18  curfew in place?

19  *A.*  That's true.  I was.

20  *Q.*  Again, it was 8:00 p.m.?

21  *A.*  I believe so.

22  *Q.*  You were aware of the 8:00 p.m. curfew on Sunday, May 31?

23  *A.*  Yes, I was.

24  *Q.*  And, again, you made a decision not to comply with the

25  curfew order?

Claire Sannier - Cross

1    *A.* That's true. I did. I knew it would be a misdemeanor

2    offense.

3    *Q.* So directing your attention to the basilica incident that

4    we -- that you spoke about on your direct examination, that

5    took place after curfew; correct?

6    *A.* I believe it did, yes.

7    *Q.* Was it around 9:30 p.m.?

8    *A.* That sounds right.

9    *Q.* And you testified earlier, you inhaled gas at this

10   location; correct?

11   *A.* Significantly. Yes.

12   *Q.* And you were not struck with any pepper balls or any other

13   less-lethal munitions?

14   *A.* Not that I specifically recall.

15   *Q.* And you talked about on your direct examination, you

16   believe you were kettled?

17   *A.* Yes, that was my understanding.

18   *Q.* You were able to get through the police lines to the north

19   and ended up in a parking lot; correct?

20   *A.* There were no police lines to the north. I didn't cross a

21   police line.

22   *Q.* Okay. So you were able to leave the area without crossing

23   any police lines?

24   *A.* There were small avenues that were accessible, with a giant

25   cloud of gas on either side of us. I had to go through the gas

Claire Sannier - Cross

1  to get through.

2  Q.  Okay.  So you left through a small avenue that was left

3  open?

4  A.  I don't know whether it was left open or if it just

5  happened to be.  Like I said, this was an incredibly

6  disorienting experience, I couldn't give you the intersection I

7  crossed or anything.

8  Q.  Did you encounter any resistance on your way out through

9  the small avenue?

10  A.  What do you mean by "resistance"?

11  Q.  Was there a police officer there who tried to stop there?

12  A.  No.  A police officer never gave me any kind of

13  instruction.

14  Q.  And you didn't seek any medical treatment for any injuries

15  received on May 30 or May 31; correct?

16  A.  No.  I mean, that is correct.  Sorry.

17  Q.  Moving on to June 1, 2020.  You attended the protests this

18  day as well?

19  A.  I did.

20  Q.  This would be a Monday?

21  A.  That sounds right.

22  Q.  And, again, you stayed out after curfew?

23  A.  Yes, I did.

24  Q.  And the curfew was 9:00 p.m. on June 1; correct?

25  A.  Yes.

199

Claire Sannier - Cross

1   Q.  And in and after -- in and after 9:00 p.m., you were in the

2   capitol area?

3   A.  That's right.

4   Q.  And you observed some fireworks at this time?

5   A.  I saw a couple of fireworks go off while we were marching

6   at one point, into the sky.

7   Q.  Do you recall testifying at your deposition that the

8   fireworks annoyed you because it seemed unnecessary?

9   A.  Yes.

10  Q.  Okay.  Why did you believe it unnecessary?

11  A.  I was -- I mean, the police officers didn't seem to need

12  much of an excuse, if any at all, to cause us harm.  And I felt

13  that by launching fireworks, it could provoke an unnecessary

14  police response.

15  Q.  And, ultimately, you inhaled some gas at the capitol area

16  and left the area?

17  A.  On Monday night?

18  Q.  On Monday night.

19  A.  That's when I was arrested.

20  Q.  Did you inhale any gas at the capitol prior to being

21  arrested?

22  A.  Yeah.  I was shot a dozen times with pepper balls.

23  Q.  Do you have any photographs of those injuries?

24  A.  No.  I was in jail for days afterwards, and I didn't have

25  photographs taken.

200

Claire Sannier - Cross

1   *Q.*  When you got out of jail, were the markings gone?

2   *A.*  I don't recall even looking for them.  I think there were

    some on my legs, but I didn't take pictures of them.

4   *Q.*  So you didn't make any note of having marks on your body

5   from the pepper balls from June 1?

6   *A.*  No, I didn't take any record of them.

7   *Q.*  And you didn't seek any professional medical treatment for

8   any injuries received over the course of the protests; correct?

9   *A.*  Not for any physical injuries, no.

10  *Q.*  And do you believe you suffered from acute PTSD from the

11  protests?

12  *A.*  I do, yes.  Obviously, I'm not a doctor; but I do.

13  *Q.*  And you haven't received any official diagnoses to that

14  effect; correct?

15  *A.*  I don't believe so.

16  *Q.*  And you sought some treatment for feelings of emotional

17  distress from a Dr. Varosa (ph)?

18  *A.*  Yes.  That's right.

19  *Q.*  Apologies if I have mispronounced that.

20  *A.*  That's pretty close.

21  *Q.*  You didn't have to pay for that; correct?

22  *A.*  No.  This was a friend -- the wife of a friend who was

23  willing to do this work *pro bono*.

24  *Q.*  And you never took any medication to help with any feelings

25  of emotional distress you suffered from the protests; correct?

Claire Sannier – Cross

 1   *A.*   That's correct.

 2   *Q.*   And you also sought some EMDR therapy?

 3   *A.*   That's true, yes.

 4   *Q.*   That was related to issues from the protest as well as

 5   other issues that we won't get into today?

 6   *A.*   That's true.  Yes.

 7   *Q.*   How many sessions of EMDR therapy did you attend?

 8   *A.*   I don't remember exactly.  I believe it was between six and

 9   eight sessions.

10   *Q.*   And you only went to EMDR therapy for a month and a half;

11   correct?

12   *A.*   That sounds right.  Once a week, somewhere between six and

13   eight.

14   *Q.*   Did you have to pay out of pocket --

15   *A.*   I did.  Yes.

16   *Q.*   None of that was covered by insurance?

17   *A.*   No.  I didn't get anything from insurance for that.

18   *Q.*   And approximately how much did you have to pay for that?

19   *A.*   It was a couple thousand dollars.

20   *Q.*   And your emotional distress has improved over time;

21   correct?

22   *A.*   I have -- yeah, it has gotten better.

23   *Q.*   And you didn't sustain any wage loss in connection with the

24   protests; correct?

25   *A.*   That's true.  That's correct.

Claire Sannier - Cross

1   Q.  You didn't file a complaint regarding any of the events

2   that occurred at the protests with the Denver Police

3   Department, with their Internal Affairs department; correct?

4   A.  No.  I don't believe that that's a worthwhile process.

5   Q.  But you filed this lawsuit?

6   A.  That's right.

7   Q.  And you're aware if you're successful in this lawsuit, you

8   can get money for your damages?

9   A.  I am.

10  Q.  Did you see any buildings that had been tagged with

11  graffiti during the protests?

12  A.  Yes, I did.

13  Q.  Was there a particular area of the city where you saw those

14  buildings, or were they kind of interspersed throughout the

15  downtown area?

16  A.  It was mostly along let's say 16th and around Colfax; but

17  it was dispersed throughout the city, for sure.

18  Q.  Approximately how many buildings can you estimate you

19  observed tags on?

20  A.  Maybe a couple dozen.

21  Q.  Sorry.  I didn't hear the response.

22  A.  Sorry.  A couple dozen buildings, probably.

23  Q.  And you observed some broken windows during the protests?

24  A.  A few, yes.

25  Q.  And what area of the city did you observe those broken

Claire Sannier – Cross

1    windows?

2    A.   I mean, they were around where I lived.  So around the 16th

3    Street Mall.

4    Q.   Approximately how many broken windows did you see?

5    A.   That would be hard to estimate.  Maybe a dozen.

6    Q.   In fact, you observed somebody breaking a window during the

7    protest; correct?

8    A.   I did see the one rock hit the window at the police

9    department.  That's right.

10   Q.   And did it break the window?

11   A.   As far as I could tell.

12   Q.   Prior to the George Floyd protests, you believe the police

13   were primarily a force for brutalizing poor and marginalizing

14   people in defense of capital; correct?

15   A.   I mean, yeah, the history of policing I think is an

16   extremely problematic one and one that I've been highly

17   critical of in the past.  Yes.

18   Q.   And you still believe that today?

19   A.   Yeah.  If anything, this proved my point.

20   Q.   Do you believe law enforcement does anything good for the

21   community?

22   A.   I believe individual police officers are capable of all

23   kinds of great acts.  I think that individual police actions

24   have sometimes resulted in good outcomes.  I think by and large

25   what police are here to do is the kind of violence and

Claire Sannier - Cross

1    brutality I experienced and also protecting property over

2    protecting human life.

3    Q.   And you believe prison should be abolished, as well?

4    A.   I do.

5    Q.   What do you believe prisons should be replaced with?

6    A.   I believe that prisons should be replaced with restorative

7    justice systems.  I think almost everybody sitting in prison,

8    of the 1 percent of the United States population that is in

9    prison, very few of them are in prison for reasons that in any

10   way justify putting a human being in a cage.  Especially drug

11   crimes come to mind as a huge motivator of imprisonment of

12   people that I think is extremely unjust.

13   Q.   What about people who committed murder?

14   A.   People who committed murder I think in many cases need

15   rehabilitation and need care.  And I think also in a lot of

16   cases, that the resources that we use to keep them in cages

17   could instead be used to prevent the initial circumstances of

18   the crime.

19   Q.   What about sexual assault on a child?

20   A.   Yeah.  I mean, there are heinous acts that are committed,

21   for sure.  I think that -- when I talk about abolishing

22   prisons, I'm talking about the end of this carceral system,

23   which is responsible for imprisoning almost no people who have

24   committed those sorts of acts and many, many -- you know,

25   millions of other people.  The percentages just don't work out

Claire Sannier - Redirect

1   for me.

2           MS. HOFFMAN:  If I could have a minute to confer with

3   co-counsel?

4           Nothing further.

5           THE COURT:  Redirect?

6           MS. WANG:  I have some redirect, Your Honor.

7           THE COURT:  Okay.

8           What about -- I should ask whether there is any cross

9   from the individual defendant.

10          MR. RINGEL:  Your Honor, we all jointly represent both

11  the individual and the city, so we're not having separate

12  questions.

13          THE COURT:  All right.

14          So redirect, then.

15                      **REDIRECT EXAMINATION**

16  BY MS. WANG:

17  Q.  Ms. Hoffman asked you about why you wrote in your journal

18  that your Twitter was brutality captioned ACAB?

19  A.  Yes.

20  Q.  What does ACAB mean to on you?

21  A.  The point of that statement is that -- again, it's a focus

22  on the system of police rather than this idea of a few bad

23  apples.  And the saying is a few bad apples spoil the bunch;

24  right?  To me, the bunch is well spoiled.  Individual officers

25  are perfectly capable of being good people off the job.  I know

Claire Sannier – Redirect

1   that they are.  When police are in uniform, their job is very

2   frequently to either do the sort of harm or to protect other

3   officers who are doing that sort of harm.  And that kind of

4   behavior I think is unavoidable in the police system as we

5   currently have it today.

6           THE COURT:  I think the question was, what does ACAB

7   mean?

8           THE WITNESS:  Sorry.  It means all cops are bastards,

9   Your Honor.

10  BY MS. WANG:

11  Q.  And what does that mean to you?

12  A.  It means what I just said, that the notion is that the job

13  of policing makes one behave in ways that otherwise they might

14  not.

15  Q.  Is it about any individual police officer?

16  A.  It's not about individual police officers, no.

17  Q.  Have your allegations about the constitutionality of the

18  curfew been set for a separate trial?

19  A.  Yes, they have.

20          MS. WANG:  Nothing further.

21          THE COURT:  All right.  Now, any of the jurors have

22  any questions for this witness?

23          Yes?

24          COURTROOM DEPUTY:  I can't tell.  Let me see.

25          She needs to write it down, Your Honor.

Claire Sannier – Redirect

1              *THE COURT:*  Okay.

2              (Hearing commenced at the bench.)

3              *THE COURT:*  The procedure is, I'll put a number on a

4    question and show it to you; you either say no objection or

5    give a reason; and then I'll rule.

6              Question No. 1.

7              *MS. HOFFMAN:*  I have no objection.

8              *MS. WANG:*  I have no objection.

9              *THE COURT:*  Question No. 2.

10             *MS. WANG:*  No objection to No. 2.

11             *MS. HOFFMAN:*  No objection either.

12             (Hearing continued in open court.)

13             *THE COURT:*  All right.  We have a couple questions for

14   you from the jurors.

15             *THE WITNESS:*  Thanks, Your Honor.

16             *THE COURT:*  Question:  "For the parking lot where the

17   police shot at you kneeling" -- wait a minute.  Okay.  Forgive

18   me if I don't read this properly.

19             "For the parking lot when the police shot at you

20   kneeling, were the police against the wall and behind you?"

21             *THE WITNESS:*  No, they weren't behind me.  I was

22   facing them.

23             *THE COURT:*  Did I read it right?

24             *JUROR:*  Yeah.  I was confused with the orientation.

25             *THE WITNESS:*  The parking -- sorry.  The officers had

Claire Sannier – Examination

1   their lineup on the north side, and then the protesters were in

2   the parking lot facing those protesters.

3           JUROR:  Thank you.

4           THE COURT:  And another question is, "What is EMDR

5   therapy?"

6           THE WITNESS:  This is eye movement desensitization and

7   response therapy, I think, which is a form of therapy that

8   helps with feelings of PTSD.

9           THE COURT:  Okay.  Any other questions from the

10  jurors?

11          (No response.)

12          Any follow-up to the jurors' questions from the

13  plaintiff?

14          MS. WANG:  Just one, Judge.

15          THE COURT:  Yes.

16                          **EXAMINATION**

17  BY MS. WANG:

18  Q.  In the parking lot incident at 16th and Welton, do you know

19  if it was the officers lined up against the wall who shot at

20  you or other officers that arrived?

21  A.  Having reviewed the video since, there were officers that

22  arrived from the alley that we had been keeping clear; and I

23  believe it's them who shot.  At the time I couldn't tell which

24  officers.

25          MS. WANG:  Nothing further.

Stanford Smith – Direct

1          *MS. HOFFMAN:*  Nothing further.

2          *THE COURT:*  Thank you.

3          *THE WITNESS:*  Thanks very much, Your Honor.

4          *THE COURT:*  You're free to leave or go back to the

5     seat that you have in the gallery, if you'd like.

6          *THE WITNESS:*  Thank you.

7          *THE COURT:*  Next witness.

8          *MR. SEBBA:*  Good afternoon.  Plaintiffs call Stanford

9     Smith.

10              (**STANFORD SMITH, PLAINTIFFS' WITNESS, SWORN**)

11          *THE COURT:*  Have a seat.

12          *MR. SEBBA:*  Good afternoon.  And I'm sorry, I skipped

13    introducing myself, Your Honor.  My name is Michael Sebba on

14    behalf of the plaintiffs.  It's my first time in front of a

15    jury.  Sorry about that.

16          *THE COURT:*  That's okay.  We all have to start.

17          Say that again.

18          *MR. SEBBA:*  Sebba, S-E-B-B-A.

19          *THE COURT:*  Welcome to jury trial.

20          *MR. SEBBA:*  Thank you, Your Honor.

21                        **DIRECT EXAMINATION**

22    *BY MR. SEBBA:*

23    *Q.*  Dr. Smith, can you please state your name for the record.

24    *A.*  My name is Dr. Stanford Daniel Smith.

25    *Q.*  Good afternoon, Dr. Smith.  Can you tell the jury where you

210

Stanford Smith - Direct

1  grew up?

2  A.  I grew up between Dallas, Texas, Natchez, Mississippi, and

3  Vidalia, Louisiana.

4  Q.  Where do you live now?

5  A.  I currently reside in Dallas, Texas.

6  Q.  And did you go to college?

7  A.  Yes, sir.  I went to Morehouse College, the same college

8  Martin Luther King -- Dr. Martin Luther King went to.

9  Q.  What did you study there?

10  A.  I got a bachelor's of science in biological sciences.

11  Q.  Okay.  And did you ever live in Denver or the Denver area?

12  A.  Yes.  I lived in Denver -- I lived in Colorado between the

13  years of 2017 and 2021.

14  Q.  What brought you to Colorado?

15  A.  The great school of University of Colorado School of Dental

16  Medicine.

17  Q.  So you attended the University of Colorado to study

18  dentistry?

19  A.  Yes, sir.  I did.

20  Q.  Did you graduate?

21  A.  Yes, sir.  I did.

22  Q.  What year did you graduate?

23  A.  2021.

24  Q.  Congratulations.

25  A.  Thank you very much.

Stanford Smith - Direct

1   *Q.*  So what is your role in this case, Dr. Smith?

2   *A.*  I'm a victim and a plaintiff.

3   *Q.*  And so on May 30, 2020, day three of the protests, were you

4   in Denver?

5   *A.*  Yes, sir.

6   *Q.*  What were you doing in Denver on that day?

7   *A.*  I was protesting.

8   *Q.*  What were you protesting?

9   *A.*  I was protesting the brutality of the police department on

10  George Floyd.

11  *Q.*  And had you attended -- have you attended any protests

12  prior to May 2020?

13  *A.*  No, sir.  I had never been to a protest before.

14  *Q.*  What brought you to this protest?

15  *A.*  Well, during this time period, it was -- there was a lot of

16  cases with police brutality, and it was -- it became heavy on

17  my heart, and I wanted to speak up and be a part of a movement

18  to help stop some of these brutal acts.

19  *Q.*  And so how did you arrive at the protests?

20  *A.*  So I was studying, and then time went by.  It was a

21  Saturday afternoon, so by the time I got done studying, I was

22  ready to get some lunch.  So I called one of my friends to go

23  grab some lunch, eat, and then walk down to the capitol to

24  protest.

25  *Q.*  Where were you meeting your friend?

212

Stanford Smith - Direct

1   A.   We were going to go to Cheba Hut.

2   Q.   What's Cheba Hut?

3   A.   Cheba Hut is a Colorado staple, sandwich place, top of the

4   line.  If you haven't heard of it, you've got to try it.

5   Q.   Understood.  Thank you, Dr. Smith.  Did you drive directly

6   to the Cheba Hut?

7   A.   No.  I was coming down -- I lived -- at this time I lived

8   on the corner of Peoria and Colfax, just right across from

9   Anschutz medical campus; and so I took Colfax down.  When I got

10  close to the area, the streets started getting really packed, a

11  lot of traffic; so I just pulled off and parked and got out of

12  the car and started walking.

13  Q.   So you were -- you walked to the Cheba Hut.  Did you make

14  it there?

15  A.   No.  When I got out of the car, I heard liveliness in the

16  city and in the streets; so I -- I just started following the

17  sound.

18  Q.   And what did you -- well, when you got there, what was

19  making the sounds?

20  A.   It was people, people of all races, nationalities, creeds,

21  genders, ages.  It was just a sense of community.  It was -- it

22  was electric, seriously.  It was -- it was something very

23  moving to me, to see so many people of every different -- all

24  walks of life coming together to fight something -- to protest

25  for something that is so meaningful to me.  So I decided --

Stanford Smith - Direct

1  like, it just -- it really captured my attention, and it -- it

2  was electrifying.  That's all I can say.

3          MR. SEBBA:  Mr. Bupp, can you please show Dr. Smith

4  Exhibit 1206.

5          COURTROOM DEPUTY:  At the back table?

6  BY MR. SEBBA:

7  Q.  Dr. Smith, do you recognize this exhibit?

8  A.  Yes.  This is a video that I took with my phone.

9          MR. SEBBA:  All right.  Plaintiffs would move

10  Exhibit 1206 into evidence.

11          MS. JORDAN:  No objection, Your Honor.

12          THE COURT:  Did you say 1206 and another one, or just

13  1206?

14          MR. SEBBA:  1206.

15          THE COURT:  1206 is admitted.

16          (Exhibit 1206 admitted.)

17          (Video played.)

18  BY MR. SEBBA:

19  Q.  Dr. Smith, can you tell us what is happening?

20  A.  Yes.  Peaceful protesters were standing there.  Like I

21  said, it was Denver.  Denver was standing there, a

22  representation of all types of people from Denver in unity,

23  some putting their hands up and saying, "Hands up.  Don't

24  shoot."  Saying, we have no weapons.  Our hands are up.  Don't

25  shoot us.

Stanford Smith – Direct

1   *Q.* And once you saw this, did you walk through the crowd at

2   all?

3   *A.* Yeah. So I decided to see what was going on, what was

4   everybody facing, because I can't see from here really; so I

5   decided to walk to the front.

6        *MR. SEBBA:* Okay. Mr. Bupp, can you please show the

7   witness Exhibit 1207.

8   *BY MR. SEBBA:*

9   *Q.* Dr. Smith, do you recognize this exhibit?

10  *A.* Yes. That's a video I took a few seconds after the first

11  one.

12       *MR. SEBBA:* Your Honor, plaintiffs move -- yeah --

13  move Exhibit 1207 into evidence.

14       *MS. JORDAN:* No objection, Your Honor.

15       *THE COURT:* It's admitted.

16       (Exhibit 1207 admitted.)

17       (Video played.)

18  *BY MR. SEBBA:*

19  *Q.* Dr. Smith, can you tell us what was happening in this

20  video?

21  *A.* So this is -- this is right when I got to the front. All

22  of that unity that I was telling you about, it came to a hard

23  stop. It was a -- it was a line of protesters; and then right

24  between the line, there was in this sort of no man's land,

25  where police officers weren't inside that space, nor

Stanford Smith - Direct

1   protesters.  And then on the other side of the no man's space

2   was police with their weapons -- their billy clubs and guns.

3   And people are just chanting.  And then there was also a guy in

4   there saying -- pointing at different police officers saying,

5   "That's illegal."

6          If you heard -- I'm not sure if you heard it or not,

7   but he was saying that you had your identities concealed.  And

8   that's why he was pointing saying, "That's illegal."  "That's

9   illegal."

10         *MR. SEBBA:*  Okay.  Mr. Bupp, can you please pull up

11   Exhibit 626.

12   *BY MR. SEBBA:*

13   *Q.*  All right.  Dr. Smith, do you recognize this scene here?

14   *A.*  Yes, I do.  It's a -- the exact opposite of the video I was

15   shooting.  And you can see me in between the white car, the

16   Focus, and the guy that was pointing saying, "That's illegal.

17   That's illegal."  And I can be identified by --

18   *Q.*  Dr. Smith, this hasn't been published to the jury yet so --

19         *THE COURT:*  Any objection to this one?

20         *MS. JORDAN:*  No, Your Honor.

21         *MR. SEBBA:*  Okay.  Plaintiffs move 626 into evidence.

22         *THE WITNESS:*  That's me in my Muhammad Ali T-shirt

23   with shorts and a red backpack.

24         *MR. SEBBA:*  This is body-worn camera of Denver police

25   Officer Conners.

Stanford Smith - Direct

1      Mr. Bupp, can you please show the video.

2      (Video played.)

3    BY MR. SEBBA:

4    Q.  Dr. Smith, can you tell us what happened there?

5    A.  Yes.  I can.  So as we were chanting, the police -- there

6    was a police -- police started firing into the crowd.  It was

7    like one or two, couple shots; and then all of a sudden, we

8    started running trying to get away.  And as we were running,

9    they just excessively started shooting and firing at us,

10   towards our backs, as we were running away.  And then all of a

11   sudden, they started throwing smoke bombs and tear gas

12   grenades.  I don't know exactly what it was, but you can see it

13   right there.

14       And I just -- I ran up here, as they were shooting.

15   And you can sit here and see where they were shooting at the

16   wall as we were running away -- as we were running away, man.

17   And then right here, you see all of this smoke everywhere.

18   They just threw this grenade, and it just went boom, and it --

19   it was so loud.  I can feel it now, like -- I -- the ringing in

20   my ears; I was discombobulated; I was scared, and I -- and I

21   was -- all of this smoke was in my lungs; it was in my eyes; it

22   was burning my eyes; it was making it hard for me to breathe;

23   it felt like I was trying to breathe in something -- a solid or

24   something, a solid or something like I was trying -- it created

25   a discontinuous feeling between my brain and my body.  I just

Stanford Smith - Direct

1    couldn't breathe very well at all, and it was panic.

2          As they were shooting, the ricochets of the pepper

3    balls were splattering against the wall and popping off and

4    hitting me.  It was hitting me in my legs.  I was wearing

5    shorts at the time.  It was hitting my neck as I was running,

6    and I just tried to get out of there.  At the end, you could

7    tell how loud and how powerful these weapons are.

8          Did you see this part right here?  That -- the thing

9    knocked the guy out.  It just completely knocked him out,

10   unconscious, laying there, unable to defend himself or do

11   anything.  Just laying there in the street like a dog.

12   Q.  And prior to any of these shots or tear gas, did the police

13   issue any warnings?

14   A.  The first warning I got was the shots fired.

15   Q.  And -- sorry that happened to you.  Once you ran out of

16   there, what did you do?

17   A.  I'm not sure how to erase this -- thank you.

18         I went right here, and I was right in this area behind

19   this wall.

20         MR. SEBBA:  You know, let's get our bearings a little.

21   Mr. Bupp, can you please pull up the map.

22         This is a demonstrative.  We're not going to admit it

23   into evidence.

24         THE COURT:  I don't care if it's a demonstrative or

25   not an demonstrative, it has to have an exhibit number to get

Stanford Smith - Direct

1   admitted.

2          *MR. SEBBA:*  All right.  We'll call it Exhibit 1241.

3          *THE COURT:*  1241.

4          *MS. JORDAN:*  No objection, Your Honor.

5          *THE COURT:*  It's a diagram, I guess.  It's admitted.

6          *MR. SEBBA:*  Thank you, Your Honor.

7   *BY MR. SEBBA:*

8   *Q.*  That incident happened at the corner of Colfax and

9   Washington; is that correct?

10  *A.*  Yes, sir.

11  *Q.*  That's right here?

12  *A.*  Yes, sir.

13  *Q.*  And then where did you go next?

14  *A.*  I just stayed in this area for a few minutes, to

15  reorientate myself.  And then I called my friend to see where

16  he was at and figure out what was next, like, what -- what I

17  was going to do next.  And I sat there and was talking to

18  people about what was going on.

19  *Q.*  Okay.  And did you manage to meet up with your friend?

20  *A.*  Yes.  He came a little bit later.

21  *Q.*  Okay.  And where did you go next?

22  *A.*  Well, when we -- when I met with him, I -- we started

23  walking down -- we kind of got -- people started coming

24  together again.  And then we started walking towards the

25  capitol.

219

Stanford Smith - Direct

1   Q.  So you were walking down Colfax towards the capitol?

2   A.  Yes, sir.

3   Q.  This way?

4   A.  Yes, sir.

5   Q.  What happened along this walk?

6   A.  We just start -- more and more people started coming

7   together.  Some had been at that scene, and then some people

8   were just new, coming.  So I started trying to warn people

9   about what just happened, letting them know to be safe, be

10  careful, make sure that you -- they're vigilant and just be

11  careful.

12  Q.  Okay.  And then you kept walking?

13  A.  Yes, sir.

14  Q.  So where did you go?

15  A.  So I took a left right here on Grant Street.

16  Q.  Okay.

17  A.  And then I started hearing like a unified crowd again, and

18  it -- and I was interested to see what was going on.  And so I

19  ended up running into a church and its congregation, I passed

20  there, with a bullhorn leading the congregation.

21  Q.  Did you join that pastor?

22  A.  Yes.  I joined the pastor and the congregation.

23  Q.  So where did you go next -- where did you and the pastor

24  and the congregation go next?

25  A.  So the pastor led the congregation to the capitol -- to the

Stanford Smith - Direct

 1  front of the capitol right there.  And the congregation made a

 2  circle.  And in that circle, he led it -- once he created --

 3  once they created the circle, he led the people in a prayer.

 4  Q.  Did you join them in prayer?

 5  A.  Yes, I did.

 6  Q.  Okay.  And what did you do next?

 7  A.  We just stayed there for about -- about an hour or so.  And

 8  we were just chanting.  Some people were saying little -- gave

 9  little speeches.  People just spoke their mind.  It was just --

10  it became a new place of peace, a very calm place for me,

11  reassuring, like, everything is okay, everything is going to be

12  okay.  And it was just -- it created a harmony amongst the

13  people of the city again right there.

14  Q.  And so how long did you stay there?

15  A.  I stayed there for about an hour.

16  Q.  And why did you end up leaving?

17  A.  Because I -- I wanted to see -- well, one, my friend was

18  getting ready to leave.  So he was going to leave.  And then I

19  also saw another crowd right in between Lincoln and Broadway on

20  Colfax.

21  Q.  Right in this general area?

22  A.  More so along -- yes.  In that area, but it was in this

23  area right here.

24  Q.  Okay.

25  A.  Close enough.

Stanford Smith - Direct

1   *Q.* Did you walk over there?

2   *A.* Yes, I did.

3   *Q.* What happened when you were over there?

4   *A.* People were just chanting, holding their hands up, saying,

5   "Hands up.  Don't shoot."  "Hands up.  Don't shoot."  And I was

6   over there for about maybe 15, 20 minutes or something.  And my

7   phone died, so I went to go look for a place on -- at the RTD

8   station so I could plug my phone up.  The RTD, for those who

9   don't know, this is RTD station right here.

10  *Q.* Did you manage to find somewhere to plug your phone in?

11  *A.* No.  I managed to see a seemingly endless line of police

12  officers come from down the steps.  It was like a humongous

13  amount -- a large amount of police officers come.  It just

14  seemed like they were endless coming.

15  *Q.* Where were they?

16  *A.* They were coming this way.

17  *Q.* Okay.  And --

18  *A.* And then they created a line right here, impenetrable,

19  unstoppable line of police officers was right there.

20  *Q.* So what did you do when you saw those police officers?

21  *A.* I got scared.  I got scared.  And they made everybody push

22  us -- they pushed us this way, towards the park.

23  *Q.* Okay.  So once you were in the park, what did you do?

24  *A.* Once I was in the park -- once I got to the park, I saw

25  some homeless people, I saw some elderly people.  Like I said,

Stanford Smith - Direct

1    it was a humongous -- I mean, it was a diverse place.  It was

2    full of people from everywhere, again, including elderly people

3    and, like, children.  And so when I saw this line, I remembered

4    about what had just happened not too long ago, so I became

5    frightened.  And I wanted to make sure that people were safe.

6    So I started walking up and down the line -- the line of police

7    officers in that area, with my hands up, asking them to please

8    be peaceful.  Please be peaceful.  And I was going in -- trying

9    to mediate between protesters and the police officers, because

10   I knew what just happened.  And I knew that if it became

11   violent, the protesters had no -- no chance of protecting

12   themselves.  So I just wanted people to be safe.

13   Q.  So you were asking protesters and police officers to be

14   peaceful?

15   A.  Yes.

16   Q.  And did you speak with any of the police officers at this

17   point?

18   A.  I spoke to both police officers and protesters.  Some of

19   the -- a couple police officers were even telling me thank you,

20   and I thanked them as well.  I told them, I understand that

21   this is a tough job, and I -- I appreciate what you're doing.

22   And one of the police officers reached out to give me a fist

23   bump.  So, you know, we bumped fists as he was thanking me.

24   Q.  Just to be clear, that was a friendly fist bump?

25   A.  Yes, friendly.  Both ways.

Stanford Smith - Direct

1   *Q.*  Great.  And how close to the police officers more or less
2   were you at this point?
3   *A.*  Arm length.
4        *MR. SEBBA:*  Okay.  Mr. Bupp, would you please pull up
5   Exhibit 30.
6        Your Honor, this is stipulated; so plaintiffs move
7   this into evidence.
8        *THE COURT:*  Okay.  It's admitted.
9        (Exhibit 30 admitted.)
10       *MR. SEBBA:*  Just for reference, this is Colorado State
11  Patrol video, so it's from a distance and has no sound.
12       (Video played.)
13  *BY MR. SEBBA:*
14  *Q.*  So, Dr. Smith, do you see yourself on the screen anywhere?
15  *A.*  Yes.  I'm right here.  You can see my arm.
16  *Q.*  Okay.
17  *A.*  The T-shirt that I had, that said "Me, We."
18  *Q.*  And --
19  *A.*  That's Muhammad Ali gave a speech at a school, and they
20  asked him, tell us a poem.  So the poem was, "Me, We."  And
21  they asked him, "What does that mean?"  And he said, It's me
22  and we, as a community.  "Me, We."
23  *Q.*  Thank you.  And is there -- do you have anything else
24  identifiable on so the jury can see you in the video?
25  *A.*  Yes.  I have the same outfit I had on, black shorts and a

Stanford Smith - Direct

 1   red backpack.  And I'll be pacing in between here, as I just

 2   explained to you.

 3   Q.  What are you doing with your hands while you're pacing?

 4   A.  (Demonstrating.)

 5          MR. SEBBA:  Mr. Bupp, could we play a few seconds of

 6   this.

 7          (Video played.)

 8          Thank you, Mr. Bupp, will you pause this.

 9   BY MR. SEBBA:

10   Q.  So you're in there -- you're in here in this area, pacing.

11          And, now, Mr. Bupp, before we play more of the video,

12   would you mind zooming in a little bit.

13          Thank you.  Can you please continue playing that.

14          (Video played.)

15   BY MR. SEBBA:

16   Q.  Here you are pacing; right?

17   A.  Yes, sir.

18          MR. SEBBA:  Can you please pause that.

19   BY MR. SEBBA:

20   Q.  So, Dr. Smith, can you tell us what happened there?

21   A.  Yeah.  As I was walking back and forth, I looked -- I was

22   looking to my right, and I was just looking at what was going

23   on.  And then all of a sudden, I saw something in my eye -- in

24   the corner of my eye, my left.  And as soon as I -- I turned

25   around, I just see this huge white cloud, and I just -- coming

Stanford Smith - Direct

1    at me, and just, splat.  It felt like a slap in the face with a

2    fire hand, like -- it just -- it just sprayed like out of the

3    blue, like -- with no warning.  It -- this chemical just

4    engulfed me, drenched me.  Like, it was all in my face; it was

5    all in my hair; it was all over my clothes; I was just

6    drenched.  And this tool, weapon, that they sprayed me with --

7              MR. SEBBA:  Okay.  And I think we're going to try to

8    take a look at this from another angle.

9              Mr. Bupp, would you please pull up Exhibit 678.

10   BY MR. SEBBA:

11   Q.  So, Dr. Smith, do you see yourself anywhere in this video?

12   A.  (Indicating.)

13             MR. SEBBA:  Your Honor, plaintiffs move Exhibit 678

14   into evidence.

15             MS. JORDAN:  No objection, Your Honor.

16             THE COURT:  Okay.  Admitted.

17             (Exhibit 678 admitted.)

18   BY MR. SEBBA:

19   Q.  Before we play this, Dr. Smith, can you tell the jury where

20   you are in this?

21   A.  Yes.  This is me right here.

22   Q.  So you're only in the bottom right-hand corner?

23   A.  Yes.  I'm in the bottom right-hand corner.

24   Q.  All right.  Thank you.

25             Mr. Bupp, can we play that?  Excuse me.

226
Stanford Smith - Direct

1              (Video played.)
2              Dr. Smith, can you tell us what we saw in the scene?
3    A.   Yes.  That was me being sprayed with the chemical weapons.
4    Q.   Okay.  And I'm sorry, just before we move on, I want to
5    note that this is Denver body-worn camera, which means the time
6    stamp is about six hours ahead.  So it's 7:34 p.m. at this
7    point.  Does that sound about right?
8    A.   Yes, that's about right.
9    Q.   Okay.  So what did you do after you were sprayed?
10   A.   I immediately ran for my life.  I couldn't see; I couldn't
11   breathe.  It got in my mouth; it got in my face; it got in my
12   eyes.  I felt -- I just -- I feared for my life, and I ran.  I
13   went the opposite way of the attack, and I ran into the park.
14   Q.   And what did you do once you got to the park?
15   A.   I tripped and fell.  I couldn't see where I was going, so I
16   tripped and fell.  And I fell into the grass and then the dirt.
17   Q.   What happened next?
18   A.   I just started trying to wipe my face with my arms and my
19   hands, and it just -- it kept on getting into my eyes even
20   worse.  So I decided to use the grass and the dirt to try to
21   clean and wipe my face off; so I just started smearing my face
22   into the dirt, trying to get it off of me.
23   Q.   Did that help?
24   A.   No.
25   Q.   So did you manage to get the spray out of your face at all?

Stanford Smith - Direct

1    *A.*  Eventually, yes.

2    *Q.*  And how did that happen?

3    *A.*  Some angelic other protesters came to my aid.

4         *MR. SEBBA:*  Okay.  So I'd like to take down this

5    video, which, again, was the body-worn camera of Officer

6    Randall.  And now we'd like to move Exhibits 132 through 136

7    into evidence.

8              These are stipulated, Your Honor.

9              *THE COURT:*  Okay.  Admitted.

10             (Exhibits 132-136 admitted.)

11        *MR. SEBBA:*  Mr. Bupp, can you please pull up

12   Exhibit 135.

13   *BY MR. SEBBA:*

14   *Q.*  Dr. Smith, can you tell us what is happening in this photo?

15   *A.*  Yes.  That's a picture of me immediately after I fell, when

16   some protesters were helping me up, and I had -- that was the

17   white cloud that I was telling you about, the chemicals.  You

18   can see it in my hair; you can see it on my face, dripping off

19   my nose, in my mouth, just all over my clothes.  You can see

20   it.

21        *MR. SEBBA:*  Can we look at 132 now.

22   *BY MR. SEBBA:*

23   *Q.*  Dr. Smith, can you tell us what is happening here?

24   *A.*  Me crying in agonizing pain.  I was trying to breathe, like

25   trying to wipe my hands off.  It was just me there and people

Stanford Smith – Direct

1   trying to help me.

2   Q.  And it looks like your shirt is off here.  Why did you take

3   your shirt off?

4   A.  Actually, I didn't take it off.  They helped me take it

5   off -- they took it off for me, because it had so much mace on

6   it, it just kept reinfecting me.

7   Q.  So your shirt was making your face feel worse?

8   A.  Yes.

9        MR. SEBBA:  Okay.  Can we look at Exhibit 134.

10  BY MR. SEBBA:

11  Q.  Dr. Smith, what is happening here?

12  A.  This is actually a picture used by Dave Chappelle in his

13  standup, "8:46" on YouTube.  It's a picture of people trying to

14  rinse and wash my face out.  You can look at my face and see

15  how red it is, and my face is in agonizing pain.  It's just --

16  it's disturbing to look at for me.

17  Q.  Look at 136, please.  And what's happening here?

18  A.  Once I ran out -- once they ran out of that water bottle

19  that they used, a nearby protester offered their water that

20  they had been drinking and used it to help rinse more of the

21  chemicals off of my face.

22       MR. SEBBA:  And can we look at 133.

23  BY MR. SEBBA:

24  Q.  Dr. Smith, what's happening here?

25  A.  That's me just laying down, just trying to catch my breath

229

Stanford Smith - Direct

1   and trying to regain my composure.  Just trying to collect

2   myself and get back to my feet.

3   *Q.*  So at this point, once the other protesters have helped

4   you, were you feeling better?

5   *A.*  I was feeling less intense; but, no.  I -- I knew that

6   other people needed help, so I asked the protesters that were

7   able to help people to go and find somebody else, if they -- if

8   they could render aid to them.

9   *Q.*  And prior to being sprayed -- or at any point in the day,

10  did you hear any warnings from the police?

11  *A.*  The only warnings I heard were shots fired.

12  *Q.*  Did you throw anything while you were at the protest?

13  *A.*  No.  I did not throw anything.

14  *Q.*  Did your friend throw anything?

15  *A.*  No.  My friend did not throw anything.

16  *Q.*  Did you engage in violence?

17  *A.*  No.  I did not engage in violence.

18  *Q.*  And did you engage in acts of property destruction?

19  *A.*  Absolutely not.  I don't condone that.

20  *Q.*  Okay.  So after this spraying, how long were you in pain?

21  *A.*  I was in pain for the rest of the night, and I felt the

22  effects for days after.

23  *Q.*  What were the effects.

24  *A.*  I had -- my skin was peeling; I had, like, dry -- really

25  dried skin.  It started feeling like alligator skin.  Like, it

Stanford Smith - Direct

1   just didn't feel like skin anymore.  It felt rough and hard.

2   It -- and it just -- it was discomforting for about seven days

3   afterwards.

4   Q.  And were there any emotional effects from being sprayed?

5   A.  Yeah.  I felt -- I was embarrassed to go to school.  I had

6   to go and see patients with my skin looking like that.  I had

7   to go and talk to my principal -- I mean, not my principal --

8   the dean, excuse me, Dr. Kassebaum, I had to go and -- in front

9   of my classmates and just -- it was completely open to

10  criticism.  It was just very embarrassing for me.

11  Q.  And after the fact, how has what happened at the protest

12  affected you?

13  A.  I have a very real fear of police officers.  I have not

14  gone back to any type of protest.  I don't want to be in, like,

15  protest-like activities, where a large people are subjected to

16  police brutality.  I -- I just -- I just feel like -- honestly,

17  I feel like if you -- if you think about it, it's just like

18  those videos that we used to watch of the '70s, like feeling --

19  having no regard -- absolutely -- very little to no regard for

20  people.  Like those dogs that they used to release, those fire

21  hoses they used to spray people on, they would just run down

22  the street and just get slammed into the building by a huge

23  thing of water.  And today they don't use water hoses, they

24  didn't use dogs, they used chemical weapons; they used grenade

25  launchers; they used grenades; they used pepper balls.  And

231

Stanford Smith - Direct

1    these things hurt.  These things hurt.  It's not a fun thing,

2    and it -- but whatever has to be done to create some change,

3    that's what we need to do.  We, as citizens, you -- you make

4    this decision on what we can do and how -- how we can move

5    forward.  Like, these things are not okay.  They're hurtful to

6    people.  And if it's hurtful, then what are we to do?  How can

7    we stop this as a team?  It's just not right.  That's how I

8    feel.

9    *Q.*  Thank you for that.

10          And were you scared of police before these protests?

11   *A.*  No.  I had a healthy relationship with police officers.

12   One of my best friends growing up, his mom was a police

13   officer; and she treated me very nicely, very kindly.  I used

14   go to the DPD -- Dallas Police Department -- to eat lunch with

15   her.  Another one of my football teammates back in high school,

16   his dad was a police officer who would throw the football with

17   us.  It was a healthy relationship.

18   *Q.*  And has -- why did you decide to become a plaintiff in this

19   lawsuit?

20   *A.*  Because I don't feel like what happened was right.

21   *Q.*  And has it been easy for you to bring this lawsuit?

22   *A.*  No.  I have to relive this over and over again,

23   depositions, talking about it, running -- like just -- even

24   right now, just going through and talking about it in front of

25   a courtroom, in front of the media, it -- people -- it's a

Stanford Smith - Direct

1    reoccurring, living thing.  But it was something that needs to

2    be done.

3    Q.  And what are you hoping to accomplish in this lawsuit?

4    A.  To create a place of harmony where people don't have to go

5    through this.  Just -- I don't want people to have to suffer to

6    be able to get their voices heard.  I don't want people to be

7    beaten for standing up for what they believe in.  We have -- we

8    have justice systems that are supposed to be working to help

9    the people, not beat them into submission.  And I'm asking the

10   jury to please create -- help create an environment like that,

11   where there is -- where we don't have to protest in ways that

12   end up in court systems like this, where we can be heard and

13   things can be changed without violence.  That's what I'm asking

14   for.

15            MR. SEBBA:  Thank you for your time, Dr. Smith.  I

16   have no further questions for now.

17            THE WITNESS:  Thank you.

18            THE COURT:  All right.  Cross-examination.

19            MS. JORDAN:  I'm sorry, what was that, Your Honor?

20            THE COURT:  Cross-examination.

21            MS. JORDAN:  Okay.  I wasn't sure if you said

22   something else.

23            Lindsay Jordan for the defendants.

24

25

Stanford Smith - Cross

1                        **CROSS-EXAMINATION**

2    *BY MS. JORDAN:*

3    *Q.*  Good afternoon, Dr. Smith.

4    *A.*  Thank you.  Good afternoon.

5    *Q.*  I'm going to just kind of ask you some follow-up questions

6    to the testimony that you just gave.  And I want to start back

7    at when you were at Colfax and Washington on May 30, 2020.

8    Okay?

9    *A.*  Okay.

10   *Q.*  And you were shown some videos that you took, as well as

11   some body-worn camera.  Do you remember that footage?

12   *A.*  Yes, I do.

13   *Q.*  Okay.  And the body-worn camera footage that you saw, you

14   were off -- the officers were on Washington facing Colfax; is

15   that correct?

16   *A.*  Yes, ma'am.

17   *Q.*  Okay.  And you would have been, then, on the west side of

18   Washington Street; is that correct?

19   *A.*  Is --

20   *Q.*  Across from the police station?

21   *A.*  I don't know where the police station is.

22   *Q.*  Okay.  So you're not aware that there is a police station

23   on Colfax and Washington?

24   *A.*  No, I did not.

25   *Q.*  And when you were in that area, did you observe anybody

Stanford Smith - Cross

1   trying to climb the fence that surrounds the police station?

2   A.   No.  I didn't see that.

3   Q.   Okay.  And a body-worn camera that we saw right before the

4   pepper balls were deployed, did you see objects being thrown at

5   the police officers?

6   A.   I saw something that was thrown.

7   Q.   Okay.  And when the pepper ball was deployed, I believe you

8   testified -- correct me if I'm wrong -- that you immediately

9   then ran towards Colfax; is that correct?

10  A.   When they started shooting?

11  Q.   When they deployed pepper ball, yes.

12  A.   Yes, when they started shooting, I ran.

13  Q.   Okay.  And then you turned the corner and started to head

14  down Colfax.  I think you said you stopped a little bit past

15  the building; is that correct?

16  A.   I took refuge on the side of the building.

17  Q.   Okay.  So you did not see which officers deployed those

18  canisters that you said came later?

19  A.   No.

20  Q.   And --

21  A.   Yes.  I don't know which particular officer.  I don't know.

22  I can't tell you.

23  Q.   And you --

24  A.   I don't have the badge number.  I don't know a name.

25  Q.   Let's get back to that.  You were also shown footage of

235

Stanford Smith - Cross

 1  somebody yelling, "That's illegal," because they couldn't see

 2  the badge numbers; is that correct?

 3  *A.*   I didn't say badge numbers -- well, if I did say that,

 4  meant to say identity.

 5  *Q.*   That individual who is yelling, "That is illegal," didn't

 6  you hear when that video was shown to you, that he actually did

 7  start identifying some officers?

 8  *A.*   He did start calling out some badge numbers.

 9  *Q.*   Okay.  And then you testified when you were on the side of

10  Colfax after the chemical munitions were deployed, there was a

11  gentleman that fell down; correct?

12  *A.*   He got knocked unconscious.

13  *Q.*   Did you go and check on him?

14  *A.*   I didn't -- I didn't -- I was discombobulated at the time.

15  *Q.*   How do you know he was unconscious?

16  *A.*   His body went limp.  Did you see it?

17  *Q.*   I saw a gentleman fall down.  But you did not go and check

18  on him, did you?

19  *A.*   I was discombobulated.

20  *Q.*   Okay.  And so then once you left Colfax and Washington, you

21  went towards the capitol; correct?

22  *A.*   Yes.

23  *Q.*   When you got to the capitol -- strike that.

24        When you were walking down Colfax, at any time did you

25  see what looked like prior property damage that could have

Stanford Smith - Cross

 1   occurred to the businesses that are on Colfax?

 2   A.  I don't -- I don't know.

 3   Q.  Did you see any buildings spray-painted?

 4   A.  I did see spray paint.

 5   Q.  Did you see any windows boarded up?

 6   A.  I saw boards on windows.  I don't know if they were broken

 7   or if they were boarded before they were broken or -- I have no

 8   idea.  I can't see beyond that.

 9   Q.  So you get to the capitol.  When you get to the capitol,

10   did you see any spray-painting on the capitol building?

11   A.  Yes, I did.

12   Q.  Did you see any boarded up windows to the capitol building?

13   A.  Yes, I did.

14   Q.  Did you see anybody engaging in spray-painting the capitol

15   building when you were in that area?

16   A.  I saw -- there was one guy that I saw spray-painting.

17   Q.  And what was he spray-painting?

18   A.  The statue.

19   Q.  And did you take a picture of it?

20   A.  Of the guy?  I don't think so.  I'm not sure.  Maybe.

21   Maybe not.  I don't recall.  But every picture that I have, I

22   submitted to both -- to my legal team, which gave to you; so

23   you have everything that I have.

24        MS. JORDAN:  Can you pull up 3112 for the witness.

25

Stanford Smith – Cross

 1   *BY MS. JORDAN:*

 2   *Q.*  I'll represent to you that this is a picture your counsel

 3   gave to us.

 4   *A.*  Yes.

 5   *Q.*  Do you recall taking this picture?

 6   *A.*  Yes.

 7          *MS. JORDAN:*  I would submit 3112 to be admitted.

 8          *MR. SEBBA:*  No objection.

 9          *THE COURT:*  It's admitted.

10          (Exhibit 3112 admitted.)

11   *BY MS. JORDAN:*

12   *Q.*  Is this the photograph that you were saying of the

13   gentleman that was spray-painting the statue?

14   *A.*  Yes, that is.

15   *Q.*  And would you consider the spray-painting of the statue to

16   be property destruction?

17   *A.*  Yes.  I would think it was vandalism.

18          *MS. JORDAN:*  You may take that down.

19   *BY MS. JORDAN:*

20   *Q.*  And I believe you testified that you were in this area for

21   about an hour, you re-collected yourself, it was peaceful; is

22   that correct?

23   *A.*  Yes.  It was a place of peace.

24   *Q.*  Okay.  In that hour that it was a place of peace for you,

25   you weren't subjected to any sort of force from the police; is

Stanford Smith - Cross

1   that correct?

2   A.  There were no police officers right in that area.  The next

3   time I saw police officers --

4   Q.  You can wait for my next question, Dr. Smith.

5            So after you left the capitol area, you testified that

6   you went -- you saw a group over by the RTD station; correct?

7   A.  Correct.

8   Q.  Okay.  And by this time, your friend had left; correct?

9   A.  Right around that -- in that time frame, yeah.

10  Q.  When you headed over to the RTD station, were you still

11  having any eye irritation or any of the effects you were having

12  when you were exposed to the gas over at Colfax and Washington?

13  A.  I still felt effects of the smoke.

14  Q.  And this would have been, then, about an hour after you had

15  had the exposure to the gas?

16  A.  Yes.

17  Q.  Okay.

18  A.  It was, like, irritating feeling.  Irritating stimulant.

19  Q.  Thank you.  That was going to be my next question, what it

20  felt like.  How long were you at the RTD station again?  I'm

21  sorry.  You told the jury.

22  A.  I can't recall.  It was maybe 15, 20 minutes, something

23  like that.  It wasn't very long.

24  Q.  Okay.  And then I believe you testified that the officers

25  formed a line and pushed the protesters across Colfax into the

Stanford Smith - Cross

1   park; is that correct?

2   A.   Yes.  I was looking for a charger, and that's when the line

3   of police came.

4   Q.   Once the line of police pushed people into the park, I

5   believe your testimony was that then you started to do the

6   pacing back and forth in front of the line with your hands up;

7   is that correct?

8   A.   Yes.  I started pacing back and forth.

9   Q.   And how long did you pace back and forth?

10  A.   Maybe about an hour.  I don't remember.  I was just

11  asking -- I remember I asked both the protesters and the police

12  officers that, Let's show all of Denver that we can protest in

13  peace, and we can do it peacefully.  We don't have to be

14  violent.  There has to -- no reason to be violent.  I'm in the

15  medical healthcare for a reason.

16  Q.   And when you were pacing back and forth in front of the

17  police line for about an hour, at any time did anybody throw

18  objects at the police officers in the area where you were?

19  A.   Not that I can recall.

20  Q.   You don't recall an object being thrown and you turning to

21  the people in the park telling them, "We're not going to do

22  that down here?"

23  A.   I don't remember saying those exact words; but it sounds

24  like something I might have said, trying to keep peace.

25  Q.   And you were shown the footage of when you were sprayed in

240

Stanford Smith - Cross

1    the face.  Prior to that, within the 20 seconds before then,

2    did any officer leave the line and approach you before you were

3    sprayed in the face?

4    A.  If they did, I don't recall.

5    Q.  At any time prior to you being sprayed in the face, did any

6    officer tell you to back up?

7    A.  They may have -- one may have.  I'm not sure.

8    Q.  And when you spent an hour walking back and forth in front

9    of the police line, did you observe any sort of badges on any

10   of the officers' uniforms?

11   A.  I didn't pay attention to people's badges.  I was -- I was

12   afraid, and I was trying to keep peace.  I mean, there was a

13   lot of people -- a lot of different voices.  I spoke with -- I

14   spoke -- like I told you, I do remember that I -- me and one

15   officer spoke in peacefulness.  I do remember that.

16   Q.  I believe you said he thanked you for helping to keep the

17   peace?

18   A.  Correct.  For both sides.

19   Q.  Okay.  So you don't know which officers sprayed you with

20   pepper spray?

21   A.  I was too busy being blinded.

22   Q.  And you filed a lawsuit against the City of Aurora and its

23   officers for this incident too; correct?

24   A.  Yes.

25   Q.  Okay.  And your claims against Aurora and its -- is that

Stanford Smith - Cross

1    the same as it is against Denver, that your incident was a

2    result of some policy, custom, or practice of Aurora; correct?

3    A.  Can you rephrase that, please?

4    Q.  Yes.  Your claims against Aurora are that your injuries

5    were caused by some custom, practice, or policy of Aurora;

6    correct?

7        MR. SEBBA:  Objection.  That's a legal issue that

8    Dr. Smith may not know the details of.

9        THE COURT:  Okay.  Overruled.  You can answer that if

10   you're able to.

11       THE WITNESS:  I'm not totally sure about what you're

12   saying.  Like, if I'm --

13   BY MS. JORDAN:

14   Q.  Okay.  We can look at the Complaint.

15       Can you pull up the Complaint.

16   A.  I think that what you're saying might be true.

17   Q.  Okay.

18   A.  But I don't know the legal jargon.

19   Q.  Okay.  That's fair.  That's fair.  I wouldn't know the

20   dental jargon either.  So we'll say that.  But it's fair to say

21   that you're bringing the same claims against Aurora for this

22   incident as you're bringing against Denver?

23   A.  Yes.

24   Q.  Okay.  And you -- we saw the body-worn camera, and your

25   counsel established that the spraying happened at about 7:34.

Stanford Smith - Cross

1  Does that sound about right?

2  *A.*  Yeah.

3  *Q.*  Okay.

4  *A.*  Give or take.

5  *Q.*  And then you went off into the park, and some other

6  protesters helped you get treatment.  Correct?

7  *A.*  They provided aid for me.

8  *Q.*  Okay.  And did you receive any other sort of treatment

9  after --

10 *A.*  Yes.

11 *Q.*  Let me finish my question, because it could go either way.

12 *A.*  Okay.

13 *Q.*  -- at that park or that night?

14 *A.*  That night?

15 *Q.*  Uh-huh.

16 *A.*  No, not after that night.

17 *Q.*  Okay.  On that night?

18 *A.*  Yes.

19 *Q.*  What sort of treatment was that?

20 *A.*  I was on the way back to my car, trying to get back to my

21 car, I still couldn't see.  As I was walking, it started making

22 me sweat.  My pores were oozing out -- oozing these chemicals,

23 which kept on getting in my eyes.  And I ended up tripping and

24 falling at somebody's -- off of the curb and landed into

25 somebody's yard.  And then the people came out, the

Stanford Smith - Cross

1    residents -- I think they were having a barbecue.  And they

2    came out and started pouring water in my face.  And they called

3    the paramedics, and the paramedics came and poured some

4    solution.  And they asked me if they wanted me -- if I wanted

5    to go to the hospital, to the emergency room; and I told them,

6    no, I think that you -- you need to stay here.  I think that

7    people are out here serious -- more injured than I am right

8    now, and I think that they needed to stay in that area in case

9    there is an emergency that they need to attend to, like a

10   life --

11   Q.   What time was this?

12   A.   I'm not totally sure.  I wasn't looking at my watch.  I

13   couldn't -- well, I didn't have a watch on.  And my phone was

14   dead, so I have no idea.

15   Q.   That's fair.  I wouldn't know what time it was either if my

16   phone died.

17        So how much longer did you stay at the protest after

18   you were sprayed in the face?

19   A.   Not too much longer.

20   Q.   What did you do after the protesters helped alleviate your

21   face at first?

22   A.   I tried -- I drenched my shirt in water and tried to get

23   the chemicals out and then walked around, because I didn't want

24   to walk around with my shirt off.  I've been in dental school,

25   so I've got kind of a gut, so I was kind of embarrassed.  I put

244

Stanford Smith - Cross

1   my shirt back on.  But I just went -- I just went home.

2   Q.  You didn't continue to protest?

3   A.  I -- I went home.

4        MS. JORDAN:  Okay.  Can you pull up 3131.

5        Can you push it to where -- just play one second for a

6   second.

7        Before I move to admit this, I'm going to play you a

8   second of this video, and I want you to tell me if this is you.

9        THE COURT:  This is 3131?

10       MS. JORDAN:  This is 3131.

11       THE COURT:  But you don't want it admitted?

12       MS. JORDAN:  I want him to identify himself first.

13       (Video played.)

14       THE WITNESS:  Can you -- I don't see myself.

15       MS. JORDAN:  It should be 28 at 46 -- no, wait.  Hold

16   on.

17       I'm sorry.  I thought I had this -- 46.  46.

18       (Video played.)

19   BY MS. JORDAN:

20   Q.  Is that you, Dr. Smith?

21   A.  Yes.  That is me.

22       MS. JORDAN:  Okay.  I'd like to admit 3131.

23       MR. SEBBA:  No objection.

24       THE COURT:  All right.  Admitted.

25       (Exhibit 3131 admitted.)

245

Stanford Smith – Cross

1    *BY MS. JORDAN:*

2    *Q.*  And we've got to turn our heads a little bit.  This is

3    Aurora body cam.  Do you see the time, this little thing right

4    here?  It says 20:03:53.  Is that the time?

5    *A.*  Yeah, I see that.

6    *Q.*  Okay.  And as we established earlier, the Aurora body-worn

7    camera is in Mountain Standard Time.  And if I do my math

8    correctly -- hopefully I do -- that would be 8:03 p.m.?

9    *A.*  Yeah.

10   *Q.*  Okay.  And that would have been, then -- more math for

11   me -- 20 plus minutes after you were sprayed in the face?

12   *A.*  Yeah.

13   *Q.*  Close to half an hour after.  Do you recall continuing to

14   protest after you were sprayed?

15   *A.*  I was -- like I said, I was going to go home.

16   *Q.*  You were going to --

17   *A.*  Yeah.  I was looking -- I was going home after all of that.

18   *Q.*  Okay.  So, then, if you're going home after all of that,

19   why did you continue protesting?

20   *A.*  I didn't -- I wouldn't say I was protesting.  I was ready

21   to go.  I was trying to get my bearings together.  I was

22   disoriented, and I didn't want to be attacked again.

23   *Q.*  Okay.  And do you recall -- you don't recall what time you

24   left that day?

25   *A.*  Like I said, I -- I don't know.  I didn't have my phone.

Stanford Smith - Cross

1   But I know I didn't get home -- when I got home, I just went

2   and started washing my face out into the tub.

3   Q.   Okay.  All right.  Do you recall having your deposition

4   taken earlier this year?

5   A.   Yes, I do.

6   Q.   Okay.  And we can pull it out if you need to.  But do you

7   recall saying that -- you testified under oath that you stayed

8   until 10:00 p.m. that night?

9   A.   I don't recall the time.

10   Q.   Was it dark when you left?

11   A.   Yeah.

12   Q.   And then you drove yourself back to Aurora; correct?

13   A.   Peoria and Colfax.

14   Q.   How far is that drive?

15   A.   Four miles, maybe.  I'm not sure.  Five miles.  I don't

16   know.  You'd have to pull it up on Google Maps.  It would be

17   more accurate.

18   Q.   Have you ever done that drive before that night, drove from

19   the capitol area from your house on Colfax and Peoria?

20   A.   Did you say at night, have I ever --

21   Q.   No.  Have you ever done that drive before?

22   A.   Yes.

23   Q.   Okay.

24   A.   Of course.

25   Q.   And how long did that drive usually take you?

Stanford Smith - Cross

1    A.   I'm not sure.  Maybe -- depends on the traffic, time of

2    day, what's going on.

3    Q.   And the ambulance that -- did the ambulance come and treat

4    you?

5    A.   Yes.

6    Q.   Okay.  Did you ever receive a bill for that treatment?

7    A.   No, I did not receive a bill.

8    Q.   Okay.  And you testified that you did not get any further

9    medical treatment for your skin on your face; correct?

10   A.   No.

11   Q.   Okay.  Despite that you said it felt like it was crocodile

12   skin, you never felt the need to go see a doctor?

13   A.   No.

14   Q.   You testified you were embarrassed by it because you had to

15   go in front of your classmates.  Now, this would have been in

16   May of 2020, and the COVID pandemic started in March of 2020.

17   Were you having in-person class at that time?

18   A.   Yes -- well, not class, no.

19   Q.   So what sort of interactions did you have -- what sort of

20   personal physical interactions did you have with your

21   classmates in May of 2020?

22   A.   Clinic doesn't stop.  I was treating patients.

23   Q.   Okay.  And did you miss any of your clinics because of your

24   alleged injuries?

25   A.   We didn't -- I didn't see patients every day, so -- and I

248

Stanford Smith - Cross

1    also know that if you miss clinics, you miss enough, you'll be

2    there longer than you need to be.  And if you're there longer

3    than you need to be, fine -- tuition is quite hefty at dental

4    school.

5    Q.  Do you get paid for clinic?

6    A.  No, ma'am.  We pay to go to clinic.

7    Q.  Okay.  It's part of the curriculum to becoming a dentist?

8    A.  Yes, ma'am.

9    Q.  Okay.  Did you have a job outside of going to school and,

10   you know, getting your dental degree, did you have an outside

11   job?

12   A.  No.

13   Q.  It's fair that you don't have any sort of lost wages for

14   your claim?

15   A.  Not at this time, no.

16   Q.  And you don't have any medical expenses?

17   A.  Not now.

18   Q.  You mentioned earlier that you filed this lawsuit because

19   you want change.  Did you ever file a complaint with the Denver

20   Police Department's Internal Affairs department?

21   A.  No.  I never filed anything personally, myself.  And I --

22   at the time I didn't even -- I just -- since this case, I've

23   learned about -- learned about all of that.  I'm not very

24   abreast of the legal issues of the police department.

25   Q.  That's fair.  You don't know the procedures.  But have you

Stanford Smith – Redirect

1    heard of the Office of the Independent Monitor?

2    A.  I learned about it since the beginning of this case.

3    Q.  And when you learned about it, you still didn't file a

4    complaint with the Office of the Independent Monitor, did you?

5    A.  I allowed my attorneys to take care of my legal affairs.

6         MS. JORDAN:  Those are all the questions I have.

7         THE COURT:  Redirect?

8         MR. SEBBA:  Yes.  I have a few questions, Your Honor.

9                    **REDIRECT EXAMINATION**

10   BY MR. SEBBA:

11   Q.  Hi, Dr. Smith.

12   A.  Yes.

13   Q.  So when you were lying on the ground in the park after

14   being sprayed, about how long was that, when you were receiving

15   aid from the protesters?

16   A.  It was a while.  I can't recall, but I know I was in

17   that -- in the grass for quite a few -- quite a while.

18   Q.  Okay.  And then you parked your car further west than

19   Colfax and Washington; correct?

20   A.  Yeah.  I didn't make it to Colfax and Washington because

21   the streets were blocked off at the time, and I told you that I

22   had to park -- because of all of the traffic, and the people, I

23   had to park -- I had no idea, so I had to wander around for a

24   while.

25   Q.  Thank you.  And I think I misspoke.  I said west, but I

250

Stanford Smith - Redirect

1    meant east.  Is that what you meant when you said "beyond"?

2    A.  Further away from the capitol, closer to Aurora.

3    Q.  And so you had to walk back to your car before you could

4    drive home?

5    A.  Yes.

6    Q.  And so -- and then how long after -- while this was

7    happening, how long did it take until the paramedics came?

8    A.  It -- I really can't recall.  I know that I was with those

9    people -- I wish I knew exactly where they were.  I'd go by and

10   thank them personally, because they sat there, and they were

11   very generous and kind to me.  I'm very thankful for how they

12   helped me.

13   Q.  And then do you know how long you were with the ambulance?

14   A.  Once they got there, I was with them for about maybe

15   30 minutes or so.

16   Q.  And then is there a reason you didn't keep track of the

17   exact amount of time you were spending at each of these places

18   after you got sprayed in the face?

19   A.  I -- time was my least concern at this time -- during this

20   time period.  I was in agonizing pain.  Regardless if I could

21   walk, regardless if I could talk, that still doesn't -- it

22   doesn't take away from how much pain I was feeling.  I mean, it

23   was -- pain is pain.  You can't -- I was focused on trying to

24   be safe, trying to see, trying to be -- and trying to get home.

25   I -- so time was not of concern to me at this time.

251

Zachary Packard – Direct

1           MR. SEBBA:  Thank you.  No further questions.

2           THE WITNESS:  Thank you.

3           THE COURT:  How about the jurors, do you have any

4   questions for this witness?

5           (No response.)

6           Okay.  Let's take our break here.

7           THE WITNESS:  Thank you.

8           (Recess at 3:07 p.m.)

9           (In open court at 3:22 p.m.)

10          THE COURT:  Next witness.

11          MR. REIDY:  Good afternoon, Your Honor.  My name is

12  Patrick Reidy on behalf of the Epps plaintiffs.  And our next

13  witness is Mr. Zachary Packard.

14          May I proceed, Your Honor?

15          THE COURT:  Yes.

16          (**ZACHARY PACKARD, PLAINTIFFS' WITNESS, SWORN**)

17                     **DIRECT EXAMINATION**

18  BY MR. REIDY:

19  Q.  Mr. Packard, can you please state your name for the record.

20  A.  My name is Zachary Daniel Packard.

21  Q.  Mr. Packard, could you please tell us a little bit about

22  yourself.

23  A.  Yeah.  I was born in Duluth, Minnesota.  I grew up in

24  Golden, Colorado, from the age of 5.  I grew up working with my

25  dad at a young age doing construction, learning carpentry.  I'm

252

Zachary Packard – Direct

1   a hard worker.

2   Q.  What do you do for a living now?

3   A.  Now I'm still in the construction industry, and I work part

4   time at a restaurant.

5   Q.  You said you learned construction from your dad?

6   A.  Yes, sir.

7   Q.  What did you learn from him?

8   A.  He was mainly into kitchen remodels -- kitchen and bath

9   remodels, so he was teaching me carpentry, cabinetry, tile,

10  pretty much everything.

11  Q.  Would you go out to work with him?

12  A.  Yes.

13  Q.  What kind of stuff would he let you do?

14  A.  He loved letting me demo, which I also loved doing.

15  That's, like basically what I started on.  And then as I grew

16  older, I started learning more and more, to the point that I

17  could pretty much do everything he could.

18  Q.  Okay.  So what do you do for fun?

19  A.  I love gardening.  I'm pretty passionate about

20  skateboarding.  I like being outside, camping, hiking.

21  Q.  Can you tell me a little bit more about your gardening.

22  A.  Yeah.  So I lived in LA for, like, three years, from 2008

23  to 2011.  And when I moved back, I started working for a man

24  named Kelly Grummons.  He owned a nursery called Timberline

25  Nursery and Gardens.  There I was being taught horticulture,

253

Zachary Packard – Direct

1   basic plant care, stuff like that.

2   Q.  You're also a skateboarder, huh?

3   A.  Yes.

4   Q.  Tell me about that some more.

5   A.  Yeah.  I started skateboarding when I was ten years old.  I

6   used to compete when I was in high school.  I've been to

7   Barcelona to go skateboarding.  And, you know, getting into my

8   20s -- I'm 30 now -- but in my 20s, I started doing it more

9   just for fun and less for competition.

10  Q.  Anything else you like to do in your free time?

11  A.  Yes.  I'm an artist.  I do collage, using, like, old

12  magazines from the '50s and '60s.  Found items that I see

13  laying on the ground, stuff like that.

14  Q.  What's your favorite piece?

15  A.  It's my biggest piece, actually.  It's 4 feet by 4 feet,

16  hanging in my kitchen right now, on plywood.

17  Q.  What does it look like?

18  A.  It's pretty dynamic.  There is a lot of, like, really

19  intricate detail.  You could stare at it from this close and

20  see something you wouldn't see from, you know, like, 4 feet

21  away.

22  Q.  Okay.  All right.  Can you tell us why you're here today?

23  A.  Yeah.  I'm here because in 2020, I saw the video of George

24  Floyd's murder, and it deeply upset me.  I heard that there was

25  protests happening in major cities, and I heard that Denver was

Zachary Packard – Direct

1    one of them.  I had never protested before, but I felt like it

2    was my obligation for my generation, my age, to go out and join

3    the protests.

4            *MR. REIDY:*  Mr. Bupp, could you please present

5    Exhibit 1118.

6    *BY MR. REIDY:*

7    *Q.*  Mr. Packard, do you recognize Exhibit 1118?

8    *A.*  Yes, sir.  That's George Floyd.

9            *MR. REIDY:*  Your Honor, I'd like to move Exhibit 1118

10   into evidence.

11           *MS. BIRKHOLZ:*  No objection.

12           *THE COURT:*  Okay.  It's admitted.

13           (Exhibit 1118 admitted.)

14   *BY MR. REIDY:*

15   *Q.*  Do you remember seeing this photo of Mr. Floyd?

16   *A.*  Yes, sir.

17           *MR. REIDY:*  Mr. Bupp, could you please present

18   Exhibit 1117.

19   *BY MR. REIDY:*

20   *Q.*  Mr. Packard, do you recognize Exhibit 1117?

21   *A.*  Yes.  That is Derek Chauvin with his knee on George Floyd's

22   neck.

23           *MR. REIDY:*  Your Honor, I'd like to move Exhibit 1117

24   into evidence.

25           *MS. BIRKHOLZ:*  No objection, Your Honor.

Zachary Packard – Direct

1          *THE COURT:*  All right.  It's admitted.

2          (Exhibit 1117 admitted.)

3     *BY MR. REIDY:*

4     *Q.*  All right.  Mr. Packard, you testified that you saw the

5     video of George Floyd's murder; right?

6     *A.*  Correct.

7     *Q.*  Do you recognize Exhibit 1117 from that video?

8     *A.*  Yes, sir.  I do.

9     *Q.*  And is this the video that motivated you to go out and

10    protest?

11    *A.*  Absolutely.

12    *Q.*  All right.  What days did you protest?

13    *A.*  I -- my first night there was May 30.

14    *Q.*  Okay.  Did you --

15    *A.*  And -- as well as May 31.  Sorry.

16    *Q.*  Okay.  So day three and day four of the protests; right?

17    *A.*  Correct.

18    *Q.*  Okay.  So starting with May 30, can you tell us a little

19    bit about how you got down to the protests?

20    *A.*  Yeah.  I took the light rail downtown.  My friend Nate

21    Perkins texted me, telling me that he was down there with some

22    friends of ours, but that some of them were leaving, so he was

23    just asking if I wanted to go down there and join with him.

24    *Q.*  Who is Nate Perkins?

25    *A.*  Nate Perkins is a family friend of mine.  We grew up

Zachary Packard – Direct

1   together, since a young age.  And for what it's worth, he's

2   Native -- sorry -- not Native American -- he is

3   African-American, so not only does he know how passionate I am

4   about social injustice, but I also know a little of what, like,

5   he's had to go through as a black man growing up in America.

6   Q.   So you said he texted you on May 30?

7   A.   Correct.

8   Q.   About what time was that?

9   A.   It was the afternoon sometime.

10  Q.   Okay.  And then did you meet up with him downtown or before

11  you got on the light rail?

12  A.   Once I was downtown, we met up.

13  Q.   Where did you get on the light rail?

14  A.   I got on the light rail at the courthouse in Golden, the

15  last stop on the W line, which is very close to where I live.

16  Q.   Okay.  Where did you get off?

17  A.   Not exactly sure where I got off.  The whole thing is

18  pretty blurry, and I wasn't paying attention.  I just knew like

19  where they were to go meet them.

20       MR. REIDY:  Okay.  Mr. Bupp, would you present

21  admitted Exhibit 1241.

22  BY MR. REIDY:

23  Q.   Mr. Packard, could you please mark on the map, you know,

24  approximately where you met up with Nate?

25  A.   Yeah.  I know for sure it was the Capitol Hill area.  I

Zachary Packard – Direct

1    know it was near Colfax.  So this is kind of a big guesstimate,

2    but I'm going to draw -- sorry -- I was not -- I was not

3    anywhere on capitol grounds.  It was like here.

4    Q.  Okay.  So you were a little east of the capitol?

5    A.  Correct.

6    Q.  On those streets just east of the capitol?

7    A.  Yes, sir.

8    Q.  And what time did you get there?

9    A.  I believe it was right around 7 o'clock.

10   Q.  And other than Nate, did you meet with anybody else?

11   A.  Yeah.  My friend Carl was down there.  He was in a

12   wheelchair.  He had just gotten ACL surgery, but he had also

13   seen the video and felt like he wanted to go, so I told him I

14   would push him around.

15   Q.  Okay.  So you got down there around 7 o'clock.  Was that

16   around sunset?

17   A.  Yeah -- like, just before, maybe.

18   Q.  Okay.  Other than you and Carl, anybody else you were with?

19   A.  Well, yeah.  It was, me, Carl, Nate, and a lady named Cat

20   Porter (ph), who I had just met, like, getting down there.  And

21   there was some other friends of ours, but they were deciding to

22   leave at that point.

23   Q.  Okay.  All right.  So tell us what -- tell us what happened

24   next after you got downtown.  You met up with Nate, Carl, and

25   Cat?

Zachary Packard – Direct

1    *A.*   Yeah.  We went to join one of the marches, which we did;

2    and it was beautiful.  It was a nice summery night.  I saw

3    people from, like, all backgrounds, all ages, singing,

4    chanting, some dancing, even.  It was very beautiful.  Very

5    unified.

6    *Q.*   How big was the crowd, do you think?

7    *A.*   A couple hundred, maybe close to a thousand.  I'm not

8    exactly sure.

9    *Q.*   How long did you march?

10   *A.*   We marched for around an hour, maybe a little more than an

11   hour.

12   *Q.*   Do you remember what you wore that night?

13   *A.*   No, I do not remember.

14   *Q.*   Did you wear a gas mask that night?

15   *A.*   No, sir.

16   *Q.*   Did you wear goggles that night?

17   *A.*   No, sir.

18   *Q.*   All right.  So you marched around for about an hour?

19   *A.*   Correct.

20   *Q.*   Okay.  What happened next?

21   *A.*   The sun was, like, fully set at that point.  It was dark

22   out.  And, like, pretty much out of nowhere, the march got

23   broken up by riot police and tear gas.

24   *Q.*   You said out of nowhere the police broke up the protests?

25   *A.*   Correct.

Zachary Packard - Direct

1    Q.   What do you mean by that?

2    A.   I -- I mean, I didn't hear a warning.  I didn't -- I didn't

3    see any, like, crazy behavior.  And then all of a sudden, we

4    just saw tear gas, and we were being rushed by the police

5    officers.

6    Q.   You said you didn't hear any warnings?

7    A.   No, sir.

8    Q.   Did you throw anything?

9    A.   No, sir.

10   Q.   Did any of your friends throw anything?

11   A.   No.

12   Q.   Did you engage in any violence?

13   A.   No.

14   Q.   Did you see anybody else engaging in violence?

15   A.   No, sir.

16   Q.   Did you engage in any property destruction?

17   A.   Absolutely not.

18   Q.   What about your friends?

19   A.   No.

20   Q.   Did you see anybody else engage in any property

21   destruction?

22   A.   No, sir.

23   Q.   All right.  So the police deployed -- what did you say they

24   deployed?

25   A.   There is clouds of tear gas coming down the street; and

260

Zachary Packard – Direct

1  there was two officers moving forward ahead of other officers,

2  using the pepper ball guns.

3  Q.  Okay.  And what did you see those officers do?

4  A.  They were just firing indiscriminately at people.  There

5  was a woman running opposite their direction, and they were

6  just shooting at her.  At one point she tripped and fell, and

7  the two officers continued to shoot her with pepper balls.  At

8  that point I started screaming at them to stop.  And at that

9  point, one of the officers closest to me turned to me and shot

10  a pepper ball at me.

11  Q.  Did you get hit?

12  A.  No.  I was shielding my face with my skateboard at that

13  time.

14  Q.  If not for your skateboard, would you have been hit?

15  A.  Yes.  In the face.

16  Q.  How did that feel?

17  A.  It was kind of scary, and I didn't feel like it was

18  justified.

19  Q.  Did you experience the effects of the pepper ball or the

20  tear gas?

21  A.  Absolutely.  I could already smell the tear gas in the air;

22  but even just from that one pepper ball hitting my skateboard,

23  even though it was blocked by wood, I could still smell it and

24  feel it on my face.

25  Q.  And what did that feel like?

Zachary Packard - Direct

1   A.   It was burning.  Burning and itchy.

2   Q.   All right.  So what happened -- what happened next?

3   A.   At that point we decided to go back to my friend Cat's

4   house.  She said that she uses it, protest or not, as a place

5   for people to go when they need a safe place.  So we went back

6   to her house and, like, organized a ride home.

7   Q.   That was it for the third night of the protest for you?

8   A.   Yes.

9   Q.   All right.  Then you attended the next day; right?  Day

10  four, May 31?

11  A.   Yes, that's correct.

12  Q.   Okay.  Can you tell us a little bit about how you got

13  downtown and made -- on day four?

14  A.   Yeah.  I took the light rail again.  I called my friend Joe

15  and asked him if he wanted to go down there with me, and he

16  said yes.  I stopped at the King Soopers on my way to the

17  courthouse to take the light rail.  I picked up some swim

18  goggles to try to avoid having tear gas in my eyes again.  Joe

19  met me at the light rail station, and we took the light rail

20  downtown.  We took it to the Auraria station, at which point we

21  found out that the protest was, like, pretty far away from

22  there.  So I called my friend Carl from the night before, he

23  drove down to pick me up -- to pick me and Joe up and just

24  drive us closer to where it was.

25  Q.   Okay.  So, again, using the telestrator, Exhibit 1241, can

Zachary Packard - Direct

1   you help orient us about where you think the -- your friend

2   Carl dropped you off?

3   *A.*  Yeah.  I know it was, like, a few blocks from Washington

4   and Colfax, because we ended up walking, like, a little ways.

5   So I want to say it was somewhere around here.

6   *Q.*  Okay.  And about what time of day was that?

7   *A.*  It was nighttime.  It was after dark, maybe like -- and the

8   sun had just gone down, so I want to say it was around 9:00.

9   *Q.*  Okay.  And so Carl had given you and Joe a lift over there?

10  *A.*  Correct.

11  *Q.*  Okay.  Were you with anybody else?

12  *A.*  No, sir.

13  *Q.*  Okay.  So once you got out of the car, can you tell us what

14  happened next?

15  *A.*  Yeah.  We got out, and we started walking down Colfax.

16  *Q.*  Did you see anything along the way?

17  *A.*  I mean, I saw, like, graffiti here and there; but there

18  wasn't a lot of people on the streets.  At some point we met up

19  with the protests -- what was left of the protest at Washington

20  and Colfax.

21       *MR. REIDY:*  Okay.  Mr. Bupp, could you please present

22  Exhibit 544A.

23  *BY MR. REIDY:*

24  *Q.*  Mr. Packard, do you recognize Exhibit 544A?

25  *A.*  Yes, sir.

Zachary Packard – Direct

1    *Q.*  What do you see depicted in Exhibit 544A?

2    *A.*  So as we walked up, one --

3    *Q.*  Sorry, I don't mean to interrupt.  For purposes of getting

4    this into evidence, just -- is this --

5            *THE COURT:*  Is there an objection to it?

6            *MS. BIRKHOLZ:*  No objection, Your Honor.

7            *THE COURT:*  544 what?

8            *MR. REIDY:*  A.

9            *THE COURT:*  544A is admitted.

10           (Exhibit 544A admitted.)

11   *BY MR. REIDY:*

12   *Q.*  Sorry about that.  Okay.  So Mr. Packard, go ahead, tell us

13   what you see in Exhibit 544A.

14   *A.*  Right when we walked up, the first thing I noticed is that

15   there was this group of people sitting on the ground right in

16   front of the officers.  And the other thing that sticks out the

17   most was this -- sorry -- this man holding the sign.

18   *Q.*  Okay.  And so this is a HALO camera -- Denver HALO camera

19   at the intersection of Colfax and Washington.  Do you see the

20   time at the top left corner?

21   *A.*  Yes, sir.

22   *Q.*  What does that say?

23   *A.*  22:11:10.

24   *Q.*  Okay.  So I believe there is -- I think there is -- the

25   time is probably in Central Time here.  You arrived at the

264

Zachary Packard - Direct

1   intersection at about 9:00 p.m.; right?

2   A.  Correct.

3   Q.  Okay.  Okay.  Do you remember seeing the red umbrella

4   turned up in the intersection?

5   A.  No.  Actually, I -- I do not have a memory of that.

6   Q.  Okay.  How many people -- protesters would you say were in

7   the intersection at this time?

8   A.  Outside of the ones that you can see in the picture, there

9   was not that many.  It was pretty scattered.  I want to say

10  less than 100.

11  Q.  Okay.  And did you see police officers at the intersection?

12  A.  Yes, sir.  I immediately noticed the line of officers here,

13  and there is also a line of officers further down Colfax on the

14  right.

15  Q.  Okay.  Off camera a little bit?

16  A.  Yes.

17  Q.  Okay.  Do you remember what the officers were wearing?

18  A.  They were all wearing riot gear.  Some were wearing, like,

19  green fatigue colored, some were just in all black.

20  Q.  Were they wearing gas masks?

21  A.  Yes, sir.

22  Q.  Okay.  And at this point at about 9:00 p.m., you arrived at

23  the intersection, it was just you and Joe; right?

24  A.  Correct.

25  Q.  But there was some scattered protesters in the

Zachary Packard – Direct

1   intersection, as well?

2   A.   Yes, sir.

3   Q.   Okay.  Can you tell us what happened next.

4   A.   Yeah.  Almost immediately after we arrived, the police

5   started deploying tear gas, at which point one of them got

6   lobbed across the street and right up to, like, where I was

7   standing.  Just almost out of instinct, I jumped into action to

8   kick the can, like, out of harm's way.

9   Q.   Okay.  Then what happened after that?

10  A.   I was almost immediately struck in the head by something

11  and knocked unconscious.

12       MR. REIDY:  Okay.  And I know this is a little bit

13  difficult to look at; but, Your Honor, I'd like to admit into

14  evidence exhibits -- which I believe are stipulated -- 243,

15  246, 247, 248, 249, and 251.

16       THE COURT:  All right.  Say it again.  243 --

17       MR. REIDY:  243, 246, 247, 248, 249, and 251.

18       THE COURT:  No objection?

19       MS. BIRKHOLZ:  No objection, Your Honor.

20       THE COURT:  All right.

21       (Exhibits 243, 246-249, and 251 admitted.)

22       MR. REIDY:  All right.  Mr. Bupp, could you please put

23  up Exhibit 243, please.

24  BY MR. REIDY:

25  Q.   Mr. Packard, what do you see in Exhibit 243?

266

Zachary Packard - Direct

1    A.  This is a picture of me in the foreground as I'm attempting

2    to kick the tear gas canister.

3    Q.  Do you see the Washington sign -- Washington Street sign up

4    at the top?

5    A.  Yes, sir.

6    Q.  Okay.  What do you see in the background?  Do you see the

7    line of officers?

8    A.  Yes, I do.

9    Q.  Is that the line of officers you testified about

10   previously, talking about the prior image that was off camera

11   to the right?

12   A.  Yes, sir.

13   Q.  To give people some orientation, were you -- by reference

14   to Exhibit 544A, the HALO camera we were just looking at, where

15   are you relative to that?

16   A.  I was -- I was actually not pictured.  I was in the

17   crosswalk on the corner, just at the bottom left corner.

18   Q.  Okay.  So you -- you're -- in Exhibit 243, you're

19   underneath the HALO camera, essentially?

20   A.  Yes, sir.

21   Q.  Okay.  Who -- do you know who took this photo?

22   A.  A man named T.R. Bowell (ph).

23   Q.  What do you know about how he was able to capture this?

24   A.  I don't know him personally.  I just know that he is a

25   Denver-based photographer.  He was there to document those

Zachary Packard - Direct

1    nights.

2    Q.   Okay.  So he just happened to be there at this moment,

3    taking these pictures?

4    A.   That's correct.

5         MR. REIDY:  All right.  Mr. Bupp, could you please put

6    up Exhibit 246.

7    BY MR. REIDY:

8    Q.   Mr. Packard, what do you see in Exhibit 246?

9    A.   That is me and my foot making contact with the can of tear

10   gas.

11        MR. REIDY:  Okay.  Mr. Bupp, could you please put up

12   Exhibit 247.

13   BY MR. REIDY:

14   Q.   What do you see in this picture, Mr. Packard?

15   A.   I see the red umbrella on the left.  This is either moments

16   before -- seconds before or after I was hit in the head.

17        MR. REIDY:  Okay.  Mr. Bupp, could you please put up

18   Exhibit 248.

19        Mr. Bupp, could you please put up Exhibit 249.

20        All right.  Mr. Bupp, Exhibit 251.

21   BY MR. REIDY:

22   Q.   Mr. Packard, what do we see in Exhibit 251?

23   A.   This is me laying unconscious in the gutter.

24   Q.   Where were you hit, Mr. Packard?

25   A.   I was hit in my right temple, right next to my ear.

Zachary Packard – Direct

1    *Q.* You were immediately knocked out?

2    *A.* Immediately.

3    *Q.* All right. I know this is tough, but I want to show a

4    couple of these photos again, but I want to focus on the

5    different aspect. Okay?

6    *A.* Okay.

7        *MR. REIDY:* So, Mr. Packard -- Mr. Bupp, could you

8    please put up Exhibit 243.

9    *BY MR. REIDY:*

10   *Q.* Mr. Packard, behind the gas in the background, do you see a

11   car -- a sedan?

12   *A.* Yes, sir.

13   *Q.* Okay. I'm going to show -- I want you to focus on that in

14   the next couple of photos too.

15       Exhibit 249, Mr. Bupp, please.

16       Do you see that? Do you see the car in the background

17   again?

18   *A.* Yes, sir.

19       *MR. REIDY:* All right. Mr. Bupp, Exhibit 252, please.

20       *COURTROOM DEPUTY:* I don't have 252 as admitted.

21       *MR. REIDY:* My apologies. Exhibit 251.

22   *BY MR. REIDY:*

23   *Q.* Mr. Packard, do you see the car in the background here?

24   *A.* Yes, sir.

25   *Q.* Between Exhibits 243, 249 and 251, you see that car pulling

Zachary Packard – Direct

1    a U-turn in the intersection; right?

2    A.  That's right.

3    Q.  Had DPD blocked traffic at this intersection while you were

4    there?

5    A.  Yes, they did.

6    Q.  To be clear, did they block traffic east of Colfax and

7    Washington?

8    A.  East and north.

9        MR. REIDY:  Okay.  All right.  Mr. Bupp, could you

10   please present Exhibit 1012, please.  It's 1012.

11       I apologize in advance.  There was a siren.  If

12   anybody was asleep, they are now awake.

13       THE COURT:  You want that admitted?

14       MR. REIDY:  Yes, Your Honor.  I would move to admit

15   Exhibit 1012.

16       THE COURT:  I don't hear any objection.

17       MS. BIRKHOLZ:  No objection.

18       (Exhibit 1012 admitted.)

19       (Video played.)

20       MR. REIDY:  Mr. Packard -- sorry -- Mr. Bupp, pause

21   that.

22   BY MR. REIDY:

23   Q.  Mr. Packard, I'm going to show you this video once, and I'm

24   going to ask you the questions about it.

25       Mr. Bupp, please --

270

Zachary Packard – Direct

1        (Video played.)

2        Okay.  Thank you, Mr. Bupp.

3        All right.  Mr. Packard, did you see --

4        You can keep Exhibit 1012 up.

5        Mr. Packard, do you recognize the scene in

6    Exhibit 1012?

7    A.  Yes, sir.  This is the perspective of the officers

8    eastbound of Washington, facing westbound on Colfax.

9    Q.  Okay.  And is this -- the time stamp in the upper

10   right-hand corner reads 21:12:09.  Do you understand that to be

11   9:12 p.m.?

12   A.  Yes, sir.

13   Q.  Did you see the sedan pull a U-turn in the street?

14   A.  Yes, sir.

15   Q.  Does that look like the same sedan we saw in the photos of

16   you getting knocked out?

17   A.  Yes, I believe it is.

18        MR. REIDY:  Okay.  Mr. Bupp, could we show the

19   zoomed-in version of Exhibit 1012.

20        (Video played.)

21        Pause it for just a moment.

22   BY MR. REIDY:

23   Q.  Mr. Packard, could you please, using the zoomed-in version,

24   circle on the screen where you are --

25   A.  Yes.

Zachary Packard – Direct

1   *Q.*  -- approximately?

2   *A.*  So you see the intersection is here, this Office Depot sign

3   is here, and I would have been right about there.

4   *Q.*  Okay.  So in the intersection underneath the southeast --

5   sorry -- southwest light pole --

6   *A.*  Yes.

7   *Q.*  -- stoplight?

8   *A.*  Yes, sir.

9        MR. REIDY:  Okay.  Mr. Bupp, could you please play the

10   video.

11        (Video played.)

12   *BY MR. REIDY:*

13   *Q.*  Mr. Packard, what did you see in that video?

14   *A.*  I saw me kick the can, then I was immediately knocked

15   unconscious.  Then you can see another protester coming to try

16   to drag me to safety.

17   *Q.*  How far did the can go that you kicked?

18   *A.*  Five or ten feet.  It wasn't a very good kick.

19        MR. REIDY:  Mr. Bupp, can you please play that video

20   one more time.

21   *BY MR. REIDY:*

22   *Q.*  Mr. Packard, this time I want you to pay attention to the

23   alarm that you hear, the time between the alarm stops and when

24   you see yourself kick the can and get knocked out.  Okay?

25   *A.*  Okay.

Zachary Packard - Direct

1           MR. REIDY:  Mr. Bupp, please play the zoomed-in

2    version again.

3           (Video played.)

4    BY MR. REIDY:

5    Q.  The alarm is off -- okay.  About how much time do you think

6    elapsed between when the alarm went off and when you got hit?

7    A.  Ten -- maybe not even ten seconds.

8    Q.  You sure it was even ten seconds?

9    A.  No.  It was probably -- it was a couple of seconds.

10          MR. REIDY:  Okay.  All right.  Mr. Bupp, could you

11   please present Exhibit 386, starting at the 32-minute mark and

12   30 seconds.  Just leave it paused for a moment.

13          THE COURT:  386?

14          MR. REIDY:  Yes, 386.  I would like to move 386 into

15   evidence.

16          MS. BIRKHOLZ:  No objection.

17          THE COURT:  Okay.  Admitted.

18          (Exhibit 386 admitted.)

19          MR. REIDY:  Mr. Bupp, are we able to blow that up at

20   all?  It seems a little small.

21   BY MR. REIDY:

22   Q.  So this is an Aurora body cam video.  Mr. -- Mr. Packard,

23   do you see the time stamp in the upper left-hand corner?

24   A.  Yes, sir.

25   Q.  What -- do you see 21:12:16; right?

1   *A.*   Correct.

2   *Q.*   GMT minus 6.  As we learned earlier, this corresponds to

3   9:12 p.m.; right?

4   *A.*   Yes, sir.

5        MR. REIDY:  So could we -- Mr. Bupp, could you please

6   play this video.

7        (Video played.)

8   *BY MR. REIDY:*

9   *Q.*   Mr. Packard, do you recognize the location of that video?

10  *A.*   Yes, sir.

11  *Q.*   Okay.  Where was it?

12  *A.*   That was from the line of police officers northbound

13  Washington.

14  *Q.*   Okay.  So going back to the HALO camera snapshot we first

15  saw, is that officer in that line across Washington on the --

16  towards the top of the camera?

17  *A.*   Yes.

18  *Q.*   Okay.  Did you hear what the officer said in that camera,

19  towards the end?  If not, I can replay it.

20  *A.*   Yeah.  The officer said, "If you see them trying to kick

21  the can" -- "if you see them trying to kick the shit, go ahead

22  and fricking hit them" -- or "go ahead and try and hit them,"

23  maybe.

24        MR. REIDY:  Okay.  Mr. Bupp, could you please put up

25  Exhibit 379, starting at 31:55.  Just leave it paused for a

274

Zachary Packard – Direct

1   moment.

2         *THE COURT:*  379.  Any objection?

3         *MS. BIRKHOLZ:*  No objection, Your Honor.

4         *THE COURT:*  It's admitted.

5         (Exhibit 379 admitted.)

6   *BY MR. REIDY:*

7   *Q.*  Okay.  All right.  So Mr. Packard, I'm going to play this

8   video for you and ask you a couple questions.  Okay?

9   *A.*  Okay.

10        *MR. REIDY:*  Mr. Bupp, go ahead.

11        All right, Mr. Bupp, you can stop it.

12  *BY MR. REIDY:*

13  *Q.*  That was an Aurora body cam video.  Mr. Packard, do you

14  recognize the intersections in that video, as well?

15  *A.*  Yes, sir.

16  *Q.*  Is that the same intersection you've been talking about?

17  *A.*  Yes.  And I believe the same line of officers, as well.

18  *Q.*  Okay.  Did you hear in that video the same things you heard

19  in Exhibit 386?

20  *A.*  Yes, sir.

21  *Q.*  Okay.  I want to play that video one more time.  This time

22  I want you to listen for the siren, just like we were in the

23  other video.

24  *A.*  Okay.

25  *Q.*  Starting at 31:55.

Zachary Packard – Direct

1          (Video played.)

2          Now, just a moment, just for the record, we can see up

3     in the upper left-hand corner the time stamp here is 21:11:29;

4     correct?

5     A.   Correct.

6     Q.   9:11 and 30 seconds p.m.

7     A.   Yeah.

8     Q.   Okay.  Now this time, I want you to listen for what we

9     heard in the prior video about -- from the officers who said,

10    you know, If they start kicking this, go ahead and see if you

11    can hit them.  Listen for that, listen for the siren, when the

12    siren stops, and when you hear the officer in this camera fire

13    a shot.  Okay?

14    A.   Okay.

15         MR. REIDY:  All right, Mr. Bupp.  Go ahead.

16         (Video played.)

17         Sorry, go ahead.

18    BY MR. REIDY:

19    Q.   If you -- do you recognize the weapon that that officer was

20    firing?

21    A.   Yes, sir.  That was a 12-gauge shotgun.

22    Q.   Okay.  What do you understand by the combination of the

23    video we watched at Exhibit 356 with the officer who said, Go

24    ahead and see if you can hit them, and Exhibit 379, that we

25    just watched?

Zachary Packard - Direct

1   *A.*  That he did, indeed, go ahead and hit me.

2   *Q.*  All right.  Mr. Packard, did -- after you were knocked out,

3   did the police come to your aid?

4   *A.*  No, sir.

5   *Q.*  What do you remember next?

6   *A.*  I woke up down the block some ways.  I was in someone's

7   arms, and there was another person pouring saline solution in

8   my eyes.  And they laid me down and continued to give me

9   medical aid.

10  *Q.*  How much pain were you in at this point?

11  *A.*  A lot.  It was like a nine or a ten.

12  *Q.*  Can you describe some of the things you felt?

13  *A.*  Yeah.  I was -- felt like I was on fire.  I was burning

14  everywhere.  I was -- I was very -- I was very loopy.  I was

15  having a hard time like thinking straight.  I was not talking

16  well.  Yeah, very disoriented, is the word I was looking for.

17  *Q.*  All right.  So after you came to, what do you remember

18  next?

19  *A.*  I asked them to get my phone out of my bag and call my

20  friend Christian.  Christian McDonald.

21  *Q.*  Why did you ask them to call Christian?

22  *A.*  At the time he was living up on Grant Street, and I knew he

23  was getting off of work around that time and would be in the

24  area on his way home.

25  *Q.*  Okay.  So where -- did Christian come to pick you up?

Zachary Packard – Direct

1    *A.*   Yes.  He came to pick me up and took me to the hospital.

2    *Q.*   Which hospital did he take you to?

3    *A.*   He took me to Rose Medical Center.

4    *Q.*   Okay.  What did they do at Rose?

5    *A.*   While I was still in the ER waiting room, they pulled a

6    bunch of machines up and scanned my brain and determined that I

7    had a hemorrhage, a fractured skull, a fractured jawbone, and

8    two broken disks in my neck.

9    *Q.*   That sounds pretty serious.  What did -- what did Rose

10   Medical do next?

11   *A.*   They decided that because of the severity of my injury was

12   too great and that Swedish Medical Center had a better

13   neurological program; so they called an ambulance and had me

14   taken to Swedish Medical Center.

15   *Q.*   And what happened once you were at Swedish?

16   *A.*   They got me a room in the ER.  They plugged me into all of

17   the machines and, like, continually gave me brain scans all

18   night to make sure the bleeding wasn't getting worse.

19          *MR. REIDY:*  Okay.  Mr. Bupp, could you please put up

20   Exhibit 76.

21          Your Honor, I would like to move Exhibit 76 into

22   evidence.

23          *MS. BIRKHOLZ:*  No objection.

24          *THE COURT:*  All right.  It's admitted.

25          (Exhibit 76 admitted.)

278

Zachary Packard – Direct

 1   *BY MR. REIDY:*

 2   *Q.*  Mr. Packard, what do we see in Exhibit 76?

 3   *A.*  That is me in the hospital, in a neck brace.

 4   *Q.*  What else are you wearing?

 5   *A.*  That is a hospital gown that they gave me.

 6   *Q.*  What happened to your other clothes?

 7   *A.*  They had to take them off because they were completely

 8   soaked with tear gas.

 9        *MR. REIDY:*  All right.  Mr. Bupp, could you please put

10   up Exhibit 1097.

11        Your Honor, I would like to move Exhibit 1097 into

12   evidence.

13        *MS. BIRKHOLZ:*  No objection.

14        *THE COURT:*  Admitted.

15        (Exhibit 1097 admitted.)

16   *BY MR. REIDY:*

17   *Q.*  Mr. Packard, what are we looking at in Exhibit 1097?

18   *A.*  I believe this is a bruise from another projectile on my

19   bicep.

20   *Q.*  What do you mean by another projectile?

21   *A.*  I think I was hit by more than one round.

22   *Q.*  Okay.  So in addition to being hit in your temple, you

23   understand you were hit in your arm, as well?

24   *A.*  Yes.

25        *MR. REIDY:*  All right.  Mr. Bupp, could you please put

Zachary Packard - Direct

1    up Exhibit 1098.

2            Your Honor, I'd like to move Exhibit 1098 into

3    evidence.

4            *MS. BIRKHOLZ:*  No objection.

5            *THE COURT:*  All right.  It's admitted.

6            (Exhibit 1098 admitted.)

7    *BY MR. REIDY:*

8    *Q.*  Mr. Packard, what do we see in Exhibit 1098?

9    *A.*  That is me, the day I got out of the hospital.  I have a

10   shaved head now because when I got home, I asked my girlfriend

11   to give me a haircut.  When she did, there was a cloud of tear

12   gas that came out of my scalp that was resting in my hair.

13   They didn't bathe me while I was in the hospital because I

14   couldn't walk.  That is also a bruise on my shoulder, and still

15   in a neck brace.

16   *Q.*  All right.  And so -- what is this on the side of your

17   head?

18   *A.*  That is the bruise -- also, it broke the skin pretty good.

19   That is where I was struck in the head.

20   *Q.*  Okay.  You mentioned earlier that you were hit in the arm;

21   right?

22   *A.*  That's correct.

23   *Q.*  Did that happen before or after you were struck in the

24   head?

25   *A.*  Well, it would have to be after, because I didn't feel

280
Zachary Packard – Direct

1   anything anywhere else -- any pain anywhere else on my body

2   before I was hit.

3   Q.  Mr. Packard, how long did you have to wear that neck

4   brace?

5   A.  I wore that neck brace for around three and a half months.

6   Q.  How did that feel?

7   A.  It was bad.  When they told me I was bleeding in my brain,

8   I thought I was going to die.  That was the worst injury I've

9   ever experienced.  And afterwards, it just felt like my life

10  had fallen apart.

11       MR. REIDY:  All right.  Mr. Bupp, could you please

12  present Exhibit 1099.

13       I'd like to move Exhibit 1099 into evidence.

14       MS. BIRKHOLZ:  No objection.

15       THE COURT:  All right.

16       (Exhibit 1099 admitted.)

17  BY MR. REIDY:

18  Q.  Mr. Packard, do you recognize Exhibit 1099?

19  A.  Yes, sir.

20  Q.  What is it?

21  A.  That is my bill from Rose Medical Center.

22  Q.  Okay.  Do you see about halfway down the page, there is a

23  line item for totals?  Do you see that?

24  A.  Yes, sir.

25  Q.  What does that number read?

281

Zachary Packard – Direct

1  A.  That is $44,329.89.

2  Q.  What do you understand that number to be for?

3  A.  That was for the hour I was at Rose Medical, before they

4  put me on an ambulance.

5      MR. REIDY:  Okay.  Mr. Bupp, could you please put up

6  Exhibit 1100.

7      MS. BIRKHOLZ:  No objection.

8      THE COURT:  Okay.

9      (Exhibit 1100 admitted.)

10      MR. REIDY:  Thank you, Your Honor.

11      Thank you.

12  BY MR. REIDY:

13  Q.  Mr. Packard, can you see -- what is Exhibit 1100?

14  A.  This is my bill from Swedish Medical Center.

15  Q.  Okay.  Do you see about halfway down the page, there is a

16  line item for totals?

17  A.  Yes, sir.

18  Q.  What does that number read?

19  A.  $136,735.68.

20  Q.  What do you understand that number -- what do you

21  understand that amount to be for?

22  A.  That was for the four days I was in the hospital at

23  Swedish.

24  Q.  So between your bill as shown in Exhibit-- your bill from

25  Rose Medical, as shown in Exhibit 1099 and your bill from

Zachary Packard – Direct

1   Swedish, as shown in Exhibit 1100, the total is about $181,000;

2   right?

3   A.   Yes, sir.

4   Q.   All right.  What has recovery been like?

5   A.   Really, really hard at first.  I actually had to get my

6   pain medication refilled, because the pain was excruciating.  I

7   was really scared.  I didn't know what I was going to do from

8   there.

9   Q.   Okay.  And so how else -- how did this affect the way you

10  earn a living?

11  A.   I couldn't work because -- due to my neck injury.  I

12  couldn't lift anything over, like, 20 pounds I think is what it

13  was.  And my work prior to this was very physically demanding.

14  I was working for a company called Black Diamond Construction,

15  where we did basically every type of remodeling you can think

16  of.  So I had to quit working for them because I was unable to

17  do the work.  And I was also in the process of starting my own

18  landscaping and garden business.  I had clients set up.  I was

19  in the middle of buying tools, getting my logo made, which I

20  actually had logos made, and I had to give that up for the time

21  being because I couldn't work.  And so, basically, all of my

22  clients ended up finding other people to work for them.

23  Q.   What about skateboarding?

24  A.   Yeah, I feel like that was taken from me.  It's a risky

25  sport already.  And for those that don't know about

Zachary Packard - Direct

1   skateboarding, if you take care of your body and you're

2   healthy, you live a healthy lifestyle, you can skate at a

3   technical level into your 40s and 50s.  So I still had some

4   glory years left.  But at this point, it's more of a risk than

5   there is a reward.  I don't have the confidence that I used to

6   have to, like, push myself and challenge myself.  So my

7   relationship with skateboarding is not what it used to be.

8   Q.  Okay.  So before -- before we close, just a couple more

9   questions.

10          Did any police officers at any time provide you any

11  aid after you were knocked out?

12  A.  No, sir.

13  Q.  How did you learn that you were shot in the shoulder after

14  you were shot in the head?

15          MS. BIRKHOLZ:  Objection.  Speculation.

16          THE COURT:  Overruled.

17          THE WITNESS:  Two people that rescued me told me that

18  they were taking fire while they were trying to get me to

19  safety.

20  BY MR. REIDY:

21  Q.  So you were shot again while you were lying on the ground?

22  A.  Yes, sir.

23  Q.  What do you hope to accomplish with this lawsuit?

24  A.  I would like measures to be put in place that will ensure

25  that police are held accountable for the way they act, I would

Zachary Packard – Cross

1   like to feel safe around police officers again, and I want to

2   see change.  I want to know that all of this work is actually

3   going to go somewhere positive and do something good.

4           MR. REIDY:  All right.  No further questions.

5           THE COURT:  Cross-examination.

6           Do you expect it to be long?

7           MS. BIRKHOLZ:  I sure hope not, Your Honor.  Hollie

8   Birkholz for the defendants.

9           THE COURT:  Thank you.

10          MS. BIRKHOLZ:  May I proceed?

11          THE COURT:  Yes.

12          MS. BIRKHOLZ:  Thank you.

13                     **CROSS-EXAMINATION**

14  BY MS. BIRKHOLZ:

15  Q.  Good afternoon, Mr. Packard.  As I said, my name is Hollie

16  Birkholz; and I represent the defendants in this action.

17          Mr. Reidy showed you a bunch of body-worn camera from

18  the Aurora officers.  And you know from that that it was the

19  Aurora officers that were on the north side of Colfax at the

20  time you were shot; correct?

21  A.  That's correct.

22  Q.  I'm sorry.  Did you say correct?

23  A.  That's correct.

24  Q.  Okay.  And so you believe it was an Aurora officer, Officer

25  McNamee, that shot you; is that correct?

Zachary Packard – Cross

1  A.  That's correct.

2  Q.  And, in fact, you've sued Officer McNamee with the Aurora

3  Police Department; is that correct?

4  A.  Yes.

5  Q.  You've also sued the Aurora Police Department for the same

6  types of claims you're suing Denver; correct?

7  A.  That's correct.

8  Q.  Now, you mentioned that you have a passion for social

9  injustice; but you had never protested before these protests.

10  How did you express that passion prior to your attendance at

11  these protests?

12  A.  By being a good person, just helping my friends and family

13  wherever I can.

14  Q.  And how does that address social injustice?

15  A.  I mean, yes, I am very passionate about social justice.

16  This is something that I was starting to grow into more in my

17  20s.  And I don't really know the avenues in which I could do

18  anything about social injustice other than to protest.

19  Q.  But you had never protested before these protests; correct?

20  A.  That's correct.

21  Q.  Okay.  Let's go to the May 30 date, when you went to the

22  George Floyd protest for the first time.

23        You indicated that you did observe graffiti everywhere

24  downtown when you arrived; correct?

25  A.  I didn't say everywhere; but, yes, I observed it.

Zachary Packard - Cross

1   Q.  You also saw a dumpster fire burning upon your arrival?

2   A.  That was the first night, the 30th.

3   Q.  Right.  Yes.

4   A.  It wasn't --

5   Q.  Just to make clear, we are talking about the 30th now.

6   A.  Okay.

7   Q.  So compared to your prior trips to Denver, it looked pretty

8   trashed downtown, didn't it?

9   A.  Yes.

10  Q.  You were telling Mr. Reidy about an incident that occurred

11  out of nowhere, the police rushed in and used tear gas.  You

12  mentioned you were in a group of about a thousand or so

13  marching; correct?

14  A.  Maybe not at that time.  But the march I was with right up

15  to that incident, yes, it was pretty large.

16  Q.  And because of that, you didn't see everything that

17  everybody in the crowd did?

18  A.  That's correct.

19  Q.  And you didn't see the police officers prior to them

20  deploying their munitions?

21  A.  That's correct.

22  Q.  You couldn't hear anything because it was very loud?

23  A.  Yeah, it was pretty loud.

24  Q.  And you would agree with me that the further away from

25  officers that you were, the less you were able to hear them?

Zachary Packard - Cross

1    A.   Yes.

2    Q.   Now, you mentioned an incident about a woman being hit by a

     pepper ball unjustifiably.  That's speculation; am I correct?

3

4    A.   I mean -- no.  I witnessed her getting shot, and it wasn't

5    just one pepper ball.

6    Q.   Well, you didn't actually see what happened before she got

7    hit, did you?

8    A.   No, I did not.

9    Q.   Okay.  So you don't know what prompted them to fire?

10   A.   That's correct.

11   Q.   Okay.  So that is speculation?

12   A.   Okay.  Yeah, I guess.

13   Q.   All right.  And so at around -- let's see -- you stayed at

14   the protest that evening -- when did you leave that evening?

15   A.   I'm not exactly sure what time it was.  I know when we --

16   when we left where the protest was getting broke up and went

17   back to Cat's house, I know that was somewhere between 9 and

18   10 o'clock, maybe.

19   Q.   Okay.  So you were out after the curfew that was in

20   enforced in Denver?

21   A.   Yes, but I didn't have any knowledge about the curfew that

22   night.

23   Q.   You didn't hear any announcements where you were located?

24   A.   No.

25   Q.   You estimated there were still about 100 people out at that

Zachary Packard - Cross

1   time; correct?

2   A.  Yeah.  Or more.  Maybe a little more.

3   Q.  Now, you mentioned to the jury, you used your skateboard to

4   block a pepper ball from hitting your face.  You can't tell me

5   who fired that shot, can you?

6   A.  No.  I was too far away to get a badge number or any type

7   of information.

8   Q.  You don't even remember where this happened?

9   A.  No.

10   Q.  Okay.  And you don't know what department those police

11   officers were from?

12   A.  No.

13   Q.  And you weren't very close to the police officers.  You

14   were about 100 feet away, weren't you?

15   A.  Yes.

16   Q.  And because you couldn't see any badges or identification

17   on the officers, you agree with me that you can't say what

18   jurisdiction those officers were from?

19   A.  That's correct.

20   Q.  And you weren't actually injured by that pepper ball, were

21   you?

22   A.  No.  It was just minor.  It was an irritant more than

23   anything.

24   Q.  And that went away fairly quickly, didn't it?

25   A.  That night.

Zachary Packard - Cross

1  Q.  Now, you mentioned you went to a safe house when you left

2  the protest; is that correct?

3  A.  That's -- yeah, that's what Cat called it, so -- yeah.

4  Q.  Do you know whether that safe house that Cat brought you to

5  was associated with Antifa?

6  A.  I don't think it was.

7  Q.  You know what Antifa is; right?

8  A.  Yes.

9  Q.  Can you tell the jurors what Antifa is.

10  A.  Antifa means you're antifascist.

11  Q.  Are you associated with Antifa?

12  A.  No.

13  Q.  Now, you returned to the protest the next day on May 31,

14  2020; correct?

15  A.  Correct.

16  Q.  Okay.  And you returned knowing that the police had these

17  munitions.  They did not deter you from coming back to the

18  protest?

19  A.  That's correct.

20  Q.  Okay.  Now, you talked at length with Mr. Reidy regarding

21  this incident.  Now, you arrived at the protest after curfew

22  that night; is that correct?

23  A.  That's correct, but I was unaware at that time.

24  Q.  Okay.  So I would like to direct your attention to

25  Exhibit 713.

290

Zachary Packard – Cross

1          THE COURT:  713?

2          MS. BIRKHOLZ:  Yes, Your Honor.

3          THE COURT:  Any objection to that?

4          MR. REIDY:  No objection, Your Honor.

5          THE COURT:  Okay.  Admitted.

6          (Exhibit 713 admitted.)

7          MS. BIRKHOLZ:  Thank you.

8   BY MS. BIRKHOLZ:

9   Q.  So you mentioned that you arrived at these protests at

10  9 o'clock in the evening; correct?

11  A.  That's correct.

12  Q.  Okay.  And so, as we mentioned before, as Ms. Wang

13  represented when she read the stipulation, this is the

14  body-worn camera of a Denver officer.  And so, therefore, the

15  time is six hours in advance.  So if you do some math, it is

16  actually 9:09 p.m., is what we're looking at right now.

17          And I would like to scoot ahead to -- let's see --

18  3:09:04 and play a few seconds of this for the jury.

19          Then let's start at 3:10:26.

20          (Video played.)

21          MS. BIRKHOLZ:  Okay.  We'll pause right there.  Thank

22  you.

23          And then I would like to go forward to 3:11:42 on the

24  clock.

25          We'll go ahead and play a few seconds of that.

Zachary Packard – Cross

1          (Video played.)

2     *BY MS. BIRKHOLZ:*

3     *Q.*  You heard those curfew announcements; correct?

4     *A.*  Just now, yes.

5     *Q.*  Yes.  And that was before you were actually hit, because

6     you were hit at about 9:12; correct?

7     *A.*  That's correct.

8     *Q.*  Okay.  So you did know it was curfew, but you didn't leave?

9     *A.*  So as I arrived -- like, I was not even there for ten

10    minutes.  As I arrived, I did hear that; and that's when I knew

11    that there was a curfew.  But, like, I really didn't have time

12    to go anywhere.  I had just heard it.

13    *Q.*  It didn't deter you from leaving?

14    *A.*  I mean, not immediately.  I didn't turn around and run

15    away, but -- so, yes, I knew about it.

16    *Q.*  Okay.  So now we're going to skip ahead on this video to

17    3:12 on the clock.  Okay.  And I just want to kind of get the

18    landscape here, because you've talked about this intersection.

19          So you see the -- gosh -- the yellow sign on the kind

20    of right -- right here.  Do you see that?

21    *A.*  Yes, I do.

22    *Q.*  Do you understand that to be the north side of Colfax and

23    Washington?

24    *A.*  Yes.

25    *Q.*  Okay.  And this building right here, do you understand that

Zachary Packard - Cross

1  to be the District 6 police station?

2  A.  No.  I was not aware of that until today, actually.

3  Q.  Okay.  Did you understand it was a police station at all

4  for the Denver Police Department?

5  A.  No.

6  Q.  Okay.  Now, the line of officers -- we obviously see a line

7  of officers in front of us, but you -- the line of Aurora

8  officers that you discussed with Mr. Reidy, that was right

9  here; right?

10  A.  Yes.

11  Q.  On the north side of Colfax?

12  A.  That's correct.

13  Q.  Okay.  So just to orient us, you were on the south side of

14  this intersection, around here; correct?

15  A.  Correct.

16      MS. BIRKHOLZ:  Okay.  So we'll just play this -- this

17  is one more angle -- through about 12:05 or so.

18      (Video played.)

19  BY MS. BIRKHOLZ:

20  Q.  And did you see yourself kind of in that lower corner,

21  again, kicking the canister toward the officers from Aurora?

22  A.  Well, I wasn't kicking them at the officers; but, yes, that

23  was me.

24  Q.  Okay.  Well, the officers were standing in the direction in

25  which you kicked the canister; correct?

293
Zachary Packard - Cross

1    A.   Yes.

2         MS. BIRKHOLZ:  Okay.  Now I'd also like to look at

3    some pictures.  I think we already looked at 243, but 244, 245,

4    and 246.  And move to admit those, as well.

5         THE COURT:  243 is already in.

6         MS. BIRKHOLZ:  So 244 through 246.

7         THE COURT:  245 through 246 is admitted.

8         MS. BIRKHOLZ:  Perfect.  I apologize.

9         COURTROOM DEPUTY:  I think she was looking for 244 and

10   245.  I don't have any of those admitted.

11        THE COURT:  244 and 245.

12        MR. REIDY:  No objection.

13        MS. BIRKHOLZ:  Right.

14        THE COURT:  Those are admitted too then.

15        MS. BIRKHOLZ:  Thank you, Your Honor.

16        (Exhibits 244-246 admitted.)

17   BY MS. BIRKHOLZ:

18   Q.   Right now we're looking at Exhibit 243.  This, again,

19   shows -- shows you with your leg back holding your skateboard.

20   This is, indeed, you; correct?

21   A.   That's correct.

22   Q.   Okay.  And this is the start of your kicking motion;

23   correct?

24   A.   Correct.

25   Q.   Let's look to the next exhibit, which is 244.  All right.

Zachary Packard – Cross

1   This looks as though you're still in your kicking motion; is
2   that correct?
3   *A.*   That's correct.
4   *Q.*   Okay.  And then we'll look to the next exhibit, which is
5   245.  And this, again, shows you in the act of kicking;
6   correct?
7   *A.*   Correct.
8   *Q.*   Okay.  Now, your leg looks like it's pretty far up, even
9   north of your waist; is that correct?
10  *A.*   I would say it -- like, yeah, waist level.
11  *Q.*   Okay.  And it looks like you're putting a lot of power
12  behind that kick.  Was that your recollection?
13  *A.*   Yeah.  I mean, they make really big clouds.  I wanted it as
14  far away from my fellow protesters as it could be.
15  *Q.*   Okay.  Now, let's look to the next exhibit, 246.  And then
16  at this point your leg is pretty far up on the follow-through.
17  Do you recall that?
18  *A.*   Yes.
19  *Q.*   Okay.  And so you agree with me, you're trying to put a lot
20  of power behind this kick?
21  *A.*   Yes.
22  *Q.*   When you were trying to kick the canister directly at the
23  line of officers across from you?
24  *A.*   I wasn't kicking it at the officers.  I was trying to kick
25  it off to the side.

Zachary Packard - Cross

1   Q.  Well, it went to the officers, didn't it?

2   A.  It went about halfway across the street.

3   Q.  Okay.  All right.  I'd like to shift gears to talk about

4   your injuries briefly.

5           You can take that down.  Thank you.

6           Now, you mentioned you had to wear the neck brace for

7   about three and a half months; is that correct?

8   A.  That's correct.

9   Q.  Okay.  But as it stands today, now, aside from minor

10  annoyances, your neck feels pretty good, doesn't it?

11  A.  No, I wouldn't say it feels pretty good.

12  Q.  Okay.  What would you say it feels like?

13  A.  It grinds, and it's restricted in certain spots, and it

14  just doesn't feel right or like it used to.

15  Q.  Okay.  Well, do you recall giving your deposition back

16  in -- let's see -- pardon me -- back on July 16 of 2021?

17  A.  Yes.

18  Q.  Okay.  And do you recall being asked about how your neck

19  feels as of July of 2021?

20  A.  Yes.

21          MS. BIRKHOLZ:  Okay.  Can I have you show him page 41,

22  lines 8 and 9?

23          THE COURT:  Speed it up.  Just read it through.

24          MS. BIRKHOLZ:  Thanks, Your Honor.

25          Of course, now I'm on the wrong page.  That does not

1    speed things up.

2    *BY MS. BIRKHOLZ:*

3    Q.  Okay.  The question was, "And currently, like in the

4    present time, not at this exact moment, but how does your neck

5    feel now?"

6            "It feels good.  There are some minor annoyances, but,

7    like, nothing serious."

8            Do you recall saying that?

9    A.  Yeah.  I just feel like what I just testified to is along

10   those same lines.

11   Q.  Well, as to the fracture that you experienced, after about

12   four months, that also felt back to normal; correct?

13   A.  I wouldn't say back to normal; but, yes, it was better.  It

14   was much better.

15   Q.  The severe pain lasted only about two, two and a half

16   months; correct?

17   A.  Yeah.  Around there.

18   Q.  Okay.  And you have not gotten any additional treatment

19   after your visit that you showed us -- the medical treatment

20   that you discussed earlier with Mr. Reidy.

21   A.  Like I said earlier, when I went -- I ended up actually in

22   the urgent care because of the pain.  So when I said that I

23   went -- I got my pain medication refilled, it was at the urgent

24   care.  And while I was there, they did some checkup.

25   Q.  When was that?

Zachary Packard - Cross

1    A.   Oh, a few months -- yeah, like a couple months later.

2    Q.   Okay.  But you have not presented any bills for that visit;

3    right?

4    A.   No.

5    Q.   Okay.  So we're not including that visit in our discussion

6    here today?

7    A.   No.

8    Q.   Okay.  And you are not claiming that you require any future

9    treatment either; am I correct?

10   A.   That's correct.

11   Q.   Okay.  Now, you also discussed skateboarding with

12   Mr. Reidy.  And you have since this injury actually

13   skateboarded; correct?

14   A.   Yes, I have.

15   Q.   Okay.  And it's not the actual injury that you sustained

16   here that is preventing from you skateboarding; it's the fear

17   of being injured again?

18   A.   I think it's a little of both.  Yes, I have stood on a

19   skateboard since.  But I have not like tried anything like

20   that -- so, like, the level that I was at before, I have not

21   tried anything at that same level since.

22   Q.   Now, Mr. Packard, you have a tattoo on your chest of a

23   severed pig head; is that correct?

24   A.   That's correct.

25   Q.   And it's wearing a police hat?

Zachary Packard – Redirect

1  | A.  That's correct.

2  | Q.  And it's got a noose around its neck?

3  | A.  That's correct.

4  | Q.  And as you sit here today, you're seeking money from the

5  | Denver Police Department even though you know it was Aurora

6  | that injured you; correct?

7  | A.  I think that Denver inviting them into their jurisdiction

8  | makes it both their fault.

9  | Q.  So you're seeking the same recovery from both cities;

10 | correct?

11 | A.  Correct.

12 |       MS. BIRKHOLZ:  No further questions, Your Honor.

13 |       THE COURT:  Redirect.  Briefly.

14 |                **REDIRECT EXAMINATION**

15 | BY MR. REIDY:

16 | Q.  Mr. Packard, Ms. Birkholz just asked you some things about

17 | your claims against Aurora; right -- some questions about your

18 | claims against Aurora; right?

19 | A.  Yes.

20 | Q.  You brought those claims in this case; right?

21 | A.  That's correct.

22 | Q.  And you maintain your claims against Aurora and Denver;

23 | right?

24 | A.  That's correct.

25 | Q.  You have always maintained that Denver is also responsible

Zachary Packard - Redirect

1   for your injuries; right?

2   A.   That's correct.

3   Q.   And you didn't have anything to do with why Aurora is not

4   here now; right?

5   A.   No, sir.

6   Q.   Ms. Birkholz also played the curfew announcement for you;

7   do you remember that?

8   A.   Yes.

9   Q.   Did the curfew announcement warn the use of less-lethal

10  weapons on you for failure to leave immediately?

11  A.   Absolutely not.

12  Q.   And we've listened to the alarm and the amount of time it

13  took before you were shot in the head.  Do you remember that?

14  A.   Yes.

15  Q.   It was a couple seconds; right?

16  A.   That's correct.

17  Q.   Ms. Birkholz also asked you a question about May 30 and the

18  woman who was shot with the pepper ball; do you remember that?

19  A.   Yes.

20  Q.   You saw the woman running away; right?

21  A.   Yes.

22  Q.   And the police officers continued to fire multiple pepper

23  balls at this woman as she was running away; right?

24  A.   Yes.

25  Q.   That's not speculation; right?

1    *A.*   No.

2            *MR. REIDY:*   No further questions.

3            *THE COURT:*   Do the jurors have any questions for this

4    witness?

5            (No response.)

6            Thank you, sir.

7            *THE WITNESS:*   Thank you, Your Honor.

8            *THE COURT:*   This would be an appropriate time to stop

9    for the day.   Now, as we have been sitting here and literally

10   seven minutes ago -- no, thirteen minutes ago, I received a

11   notification that our mask policy now is no longer in effect.

12           Not so fast.   Not so fast.   I'm okay starting tomorrow

13   if people take their masks off, so long as you people in the

14   jury are okay with that.   I'm serious about that.   In other

15   words, if you don't feel comfortable being in a room where

16   people are not masked, we'll mask, even if it's only one of

17   you, because we summoned you in here.   You're not here

18   voluntarily, and I don't want to put you at any risk or

19   discomfort that you don't like.

20           So think about that tonight.   If all of you are fine

21   with taking your masks off, hey -- if you -- if you're fine

22   with having some people unmasked but you want to keep your mask

23   on, fine.   But if you -- any of you feel like, I don't even

24   want to be in this room if everybody isn't masked, then just

25   tell me that.   It's perfectly okay, and we'll stay masked.

1    We're used to it now.

2           Now, have a nice evening.  I'm sorry to report that

3    the Broncos apparently have hired Russell Wilson to be their

4    next quarterback.  Whatever.

5           (Jury out at 4:38 p.m.)

6           THE COURT:  Now, you asked me to go over a deposition.

7    You didn't get to them today.  That's fine.  Are you going to

8    get to a deposition tomorrow?

9           MR. MACDONALD:  If we get to a deposition, it will be

10   Mr. O'Donnell.  I think the times were a little long with

11   respect to this morning.  I think if we do a deposition

12   tomorrow, it will only be O'Donnell.

13          THE COURT:  Is there anything else tonight on either

14   side that you want to put on the record?

15          MR. MACDONALD:  No, Your Honor.

16          MR. RINGEL:  Not from the defendants.  Thank you, Your

17   Honor.

18          THE COURT:  All right.  Go relax; don't work all

19   night; stay healthy.

20          MR. MACDONALD:  Thank you, Your Honor.

21          THE COURT:  Get your sleep; have a nice meal.  See you

22   tomorrow at 9 o'clock.

23          MR. MACDONALD:  Terrific.  Thank you, Your Honor.

24          MS. BIRKHOLZ:  Thank you, Your Honor.

25          (Recess at 4:39 p.m.)

1                              I N D E X

2     Item                                                    Page

3
        CLAIRE SANNIER
4            Direct Examination By Ms. Wang                     78
             Cross-examination By Ms. Hoffman                  157
5            Redirect Examination By Ms. Wang                  207
             Examination By Ms. Wang                           210
6       STANFORD SMITH
             Direct Examination By Mr. Sebba                   211
7            Cross-examination By Ms. Jordan                   235
             Redirect Examination By Mr. Sebba                 251
8       ZACHARY PACKARD
             Direct Examination By Mr. Reidy                   253
9            Cross-examination By Ms. Birkholz                 286
             Redirect Examination By Mr. Reidy                 300
10

11                            EXHIBITS

12    Exhibit        Offered   Received   Refused   Reserved   Withdrawn

13    27                         128
      30                         225
14    32                         151
      35                         152
15    76                         279
      132-136                    229
16    243 and 251                267
      244-246                    295
17    246-249                    267
      338                        136
18    379                        276
      386                        274
19    398                        119
      530                         88
20    532                        100
      544A                       265
21    546                        143
      554                         93
22    638                        131
      666                        135
23    678                        227
      713                        292
24    879                        126
      946                        116
25    947                        109

```
1                         EXHIBITS

2    Exhibit      Offered   Received  Refused  Reserved  Withdrawn

3    1007                     104
     1008                     188
4    1010                     184
     1012                     271
5    1097                     280
     1098                     281
6    1099                     282
     1100                     283
7    1117                     257
     1118                     256
8    1206                     215
     1207                     216
9    1220                      85
     1225                     121
10   1240                     141
     3105                     167
11   3112                     239
     3131                     246
12

13

14

15                   REPORTER'S CERTIFICATE

16          I certify that the foregoing is a correct transcript
     from the record of proceedings in the above-entitled matter.
17
            Dated at Denver, Colorado, this 17th day of March,
18   2022.

19

20                         Therese Lindblom

21                      _____
                        Therese Lindblom,CSR,RMR,CRR
22

23

24

25
```