1              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF COLORADO
2
   Civil Action No. 20-cv-01878-RBJ
3
   ELISABETH EPPS,
4  AMANDA BLASINGAME,
   ASHLEE WEDGEWORTH,
5  MAYA ROTHLEIN,
   ZACH PACKARD,
6  HOLLIS LYMAN,
   CIDNEY FISK,
7  STANFORD SMITH,
   SARA FITOURI,
8  JACQUELYN PARKINS,
   KELSEY TAYLOR,
9  JOE DERAS, and
   CLAIRE SANNIER,
10
        Plaintiffs,
11
   vs.
12
   CITY AND COUNTY OF DENVER, and
13 JONATHAN CHRISTIAN,
14      Defendants.
   _____
15
16                   **REPORTER'S TRANSCRIPT**
                     TRIAL TO JURY – DAY THREE
17
   _____
18
19        Proceedings before the HONORABLE R. BROOKE JACKSON,
20 Senior Judge, United States District Court for the District of
21 Colorado, continuing at 9:03 a.m., on the 9th day of March,
22 2022, in Courtroom A902, United States Courthouse, Denver,
23 Colorado.
24              THERESE LINDBLOM, Official Reporter
                901 19th Street, Denver, Colorado 80294
25         Proceedings Reported by Mechanical Stenography
                Transcription Produced via Computer

1                    **A P P E A R A N C E S**

2          TIMOTHY R. MACDONALD, ROBERT REEVES ANDERSON, EDWARD
3   PACKARD ARO, and MATTHEW J. DOUGLAS, Attorneys at Law, Arnold &
    Porter Kaye Scholer LLP, 1144 Fifteenth Street, Suite 3100,
4   Denver, Colorado, 80202, appearing for the Plaintiffs.

5          DIANA K. STERK, Attorney at Law, Arnold & Porter Kaye
    Scholer LLP, 250 West 55th Street, New York, New York, 10019,
6   appearing for the Plaintiffs.

7          ELIZABETH C. WANG, Attorney at Law, Loevy & Loevy,
    2060 Broadway Street, Suite 460, Boulder, Colorado, appearing
8   for the Plaintiffs.

9          MAKEBA RUTAHINDURWA, Attorney at Law, Loevy & Loevy,
    311 North Aberdeen Street, Chicago, Illinois, 60607, appearing
10  for the Plaintiffs.

11         ANDREW DAVID RINGEL, KATHERINE HOFFMAN, and ROBERT
    ALAN WEINER, Attorneys at Law, Hall & Evans, 1001 Seventeenth
12  Street, Suite 300, Denver, Colorado, 80202, appearing for the
    Defendants.

13         HOLLIE RENEE BIRKHOLZ and LINDSAY MICHELLE JORDAN,
14  Attorneys at Law, Denver City and County Attorney's Office, 201
    West Colfax Avenue, Denver, Colorado, 80202, appearing for the
15  Defendants.

16                        *   *   *   *   *

17                    **P R O C E E D I N G S**

18         (In open court at 9:03 a.m.)

19         *THE COURT:*  The jury is fine with no masks, so am I.

20         (Jury in at 9:04 a.m.)

21         Good morning, ladies and gentlemen.  You're even more

22  beautiful than I thought.  I'm wearing my mask because my wife

23  would insist that I wear it if she were here.  I will probably

24  take it off.

25         *JUROR:*  We won't tell her.

Aaron Sanchez – Direct

1          *THE COURT:*  But I'm more than happy to have you folks

2    more comfortable, if you are more comfortable this way.

3          All right.  Let's go.

4          *MR. DOUGLAS:*  Your Honor, plaintiffs called Commander

5    Aaron Sanchez.

6          *THE COURT:*  Good morning, sir.

7          *THE WITNESS:*  Good morning.

8          *THE COURT:*  Under our rules, you're free to take your

9    mask off or leave it on, whichever you prefer.

10          (**AARON SANCHEZ, PLAINTIFFS' WITNESS, SWORN**)

11          *THE COURT:*  Have a seat.

12          *MR. DOUGLAS:*  Your Honor, may I proceed?

13          *THE COURT:*  Yes.

14          *MR. DOUGLAS:*  Thank you.

15          *THE COURT:*  Of course.

16                      **DIRECT EXAMINATION**

17    *BY MR. DOUGLAS:*

18    *Q.*  Good morning, Commander Sanchez.

19    *A.*  Good morning.

20    *Q.*  Would you please state your name for the record, your full

21    name.

22    *A.*  Yes, sir.  My name is Aaron Sanchez.  S-A-N-C-H-E-Z.

23    *Q.*  You are, I guess, as your title would suggest, a commander

24    in the Denver Police Department; correct?

25    *A.*  Two days ago that switched to division chief.

Aaron Sanchez – Direct

1    Q.   Oh, congratulations.

2    A.   Thank you.

3    Q.   Just so -- I'm not sure we've talked to the jury about what

4    the ranks are, so let me see if I have this right.  It would go

5    officer, corporal, sergeant, lieutenant, captain, commander,

6    and then division chief, and then chief?

7    A.   Deputy chief, and then chief of police.

8    Q.   Got it.  Missed the deputy chief.

9    A.   Yes, sir.

10   Q.   Thank you for correcting me.

11        Okay.  So -- and you were at the commander level,

12   then, until a few days ago; correct?

13   A.   Yes, sir.

14   Q.   Okay.  So during the George Floyd protests, you were a

15   commander?

16   A.   I was a commander assigned to District 6, downtown Denver.

17   Q.   Great.  That was my next question.  And the District 6

18   police station is at the intersection of Colfax and Washington;

19   correct?

20   A.   Yes, sir.

21   Q.   Is that the closest police station to the state capitol?

22   A.   Yes.

23   Q.   And you were assigned, in addition to being the commander

24   of District 6, as the operations chief during the George Floyd

25   protests; correct?

Aaron Sanchez – Direct

1    A.   Yes, sir.

2    Q.   What does that mean, operations chief?

3    A.   So an operations chief -- and these terms go back to 9-11,

4    where the federal government was trying to get all

5    departments -- police, fire, paramedics -- talking in the same

6    terminology.  In the major and significant events, you would

7    have what is called the incident commander -- and that's kind

8    of the highest ranking individual of that event.  They're

9    usually off site, or they're kind of in a different staging

10   area.  And then usually the next person in line would be the

11   operations chief.  They're generally on site, and they're

12   working with the incident commander, but they're actually the

13   one that's physically there.

14   Q.   Okay.  And the incident commander at the time of the

15   protests was Commander Patrick Phelan?

16   A.   Yes, sir.

17   Q.   Okay.  And so you reported directly to Commander Phelan

18   during the protests?

19   A.   Yeah.  I reported directly to Division Chief Ron Thomas

20   overall, and then I also -- in regards to the events would

21   report alongside and to Pat Phelan.

22   Q.   Okay.  And part of the role of the operations chief was to

23   implement the plan for each day developed by Commander Phelan;

24   is that correct?

25   A.   Implement the plan and then kind of oversee it, just to

Aaron Sanchez – Direct

1    make sure things were progressing as such.

2    Q.  Okay.  Is that called the operations plan?

3    A.  The operations plan, yes, sir.

4    Q.  Okay.  What is the operations plan?

5    A.  Generally, an operations plan -- not generally -- an

6    operations plan is an overall plan for an event.  The event

7    could be many different things, drug operations, many different

8    types of operations that police would engage in.  These

9    operations plans were specific to protest-related events.

10   Q.  Okay.  And what types of things are in the operations plan?

11   A.  So generally in an operations plan, you'll have, like, the

12   staffing.  Who is the incident commander, who is the operations

13   chief, who the officers are that are going to be assigned.

14   You'll generally have an overview of the locations, a breakdown

15   of who was assigned to what specific areas, and then what their

16   areas of responsibility are within that area.

17   Q.  Okay.  And you implemented and oversaw that plan from the

18   command center; correct?

19   A.  I -- well, I was hybrid; so I would start every day in the

20   command center.  Generally, in regards to protests, a lot of

21   the times my job was to try to get to event organizers and try

22   to open up the lines of communication, the idea being, DPD

23   wants to know, you know, what the event is planning so that we

24   can have an idea of, for instance, movements.  If a protest is

25   going to march, where are they going to march, what is the

Aaron Sanchez – Direct

1   thought process, so we can have some type of an idea.

2   Generally, in regards to protests, that was to set up a traffic

3   contingency.  Because we have large people that are mobile,

4   traffic becomes a significant issue.

5   Q.  Okay.  And where was the command center located for the

6   protests?

7   A.  The Denver police crime lab.

8   Q.  Where is that?

9   A.  13 -- I think the address is 1351 Cherokee, so it's at the

10  corner of 14th and Cherokee.  That's adjacent to the police

11  headquarters.

12  Q.  Okay.  And as operations chief, you would issue orders to

13  lieutenants to implement the operations plan on a daily basis;

14  is that correct?

15  A.  I would -- a lot of those orders would come from the

16  overall incident command at our daily briefings.  And then my

17  job a lot of times was just to ensure that those plans were

18  being carried out.  So many times, lieutenants, command

19  officers, would carry out those plans without, really, much

20  direction from me.  More oversight from my point.

21  Q.  Okay.  But they would attend a daily briefing about the

22  plan; right?

23  A.  Yes, sir.

24  Q.  Would you give that daily briefing?

25  A.  I would not.  That would come from Commander Pat Phelan.

Aaron Sanchez – Direct

1    *Q.*  And the jury has heard that Denver invited mutual aid

2    partners, such as Aurora and Jeffco, to assist Denver with the

3    protest.  You're aware of that; correct?

4    *A.*  Yes, sir.

5    *Q.*  And Denver -- the Denver Police Department embedded a

6    supervisory officer on the ground with every squad of the

7    mutual aid partners; correct?

8              *MS. HOFFMAN:*  Objection.  Foundation.

9              *THE COURT:*  Overruled.

10             *THE WITNESS:*  I don't know the answer to that.  I

11   believe that there was Denver supervision.  I don't know if

12   they were specifically assigned for every event or every

13   movement by mutual aid.

14   *BY MR. DOUGLAS:*

15   *Q.*  Okay.  Did you communicate the orders and the operations

16   plan to the mutual aid partners?

17   *A.*  Our mutual aid partners would be at the overall briefing

18   with Commander Pat Phelan.  So it would be a supervisor

19   briefing, so you would call in their command and their

20   sergeants.  And then they would -- we would have the supervisor

21   briefings, where the orders of the day would come from

22   Commander Pat Phelan.

23   *Q.*  Okay.  I appreciate all of that.  That's very helpful.  I

24   want to move to a different subject.

25             Do you recall learning about allegations by Denver

312

Aaron Sanchez – Direct

1   Police Department officers of excessive or unjustified use of

2   force during the George Floyd protests involving Lieutenant Ken

3   Chavez?

4   *A.*   I received a phone call, I believe it was Saturday night --

5   so the -- Saturday night, the 30th.  Yes, sir.

6   *Q.*   Okay.  And that was day three of the protests, May 30?

7   *A.*   Thursday, Friday, Saturday -- yes, sir.  Day three.

8   *Q.*   And you were Lieutenant Chavez's direct supervisor in

9   District 6, where he was a lieutenant; correct?

10  *A.*   I was.  Yes, sir.

11  *Q.*   He reported directly to you?

12  *A.*   Yes, sir.

13  *Q.*   And on the night of May 30, 2020, day three of the

14  protests, you got a call from Lieutenant Kim Bowser from

15  District 3 about the allegations involving Lieutenant Chavez;

16  do you recall that?

17  *A.*   I do.  I don't believe she was in District 3.  I believe

18  she was assigned to headquarters as some type of an aide

19  downtown.

20  *Q.*   Okay.  But you do remember the phone call from Lieutenant

21  Bowser?

22  *A.*   I do.

23  *Q.*   Okay.  And she repeated to you some allegations made by

24  another officer -- a sergeant, actually -- about Lieutenant

25  Chavez's use of force on people that same night, day three; do

Aaron Sanchez – Direct

1    you recall that?

2    A.   It you want use of force.  She had -- she had called and

3    had said that she had at the time an anonymous sergeant

4    concerned about orders that had given to -- by Ken Chavez in

5    regards to fog and then advise -- fog and then cite.

6            The conversation went -- just a little bit of the

7    backdrop.  When I got the phone call, we were actually engaged

8    with a protest group that was trying to penetrate onto the

9    property of District 6.  My phone happened to be in my pocket,

10   and it vibrated.  I felt the vibration -- and I happened to

11   feel it, so I answered.  She said, not corroborated, however,

12   could you please tell Kenny to not give these orders.  She

13   explained them to me.  At the time I said, It sounds pretty

14   outlandish.  I don't believe he gave those, but I'll call him.

15           Got off the phone with Kim, and then I immediately

16   called Kenny and said, If you gave any such orders, stand down.

17   Those are not the orders of the day.  His comments back to me

18   were, I'm clear.  And then at that point, I notified my

19   division chief, Ron Thomas; and then we went back to the events

20   that we were dealing with at the time.

21   Q.   Okay.  What she specifically told you was that an officer

22   under Chavez's command had reported -- had called her, because

23   she was this officer's supervisor; right?

24   A.   She was -- well, she was in the command post.

25   Q.   Okay.  So an officer under Lieutenant Chavez's command had

Aaron Sanchez – Direct

1   reported to her that Lieutenant Chavez was ordering him and

2   others to deploy less-lethal weapons on protesters that were

3   not warranted by the situation; do you recall that?

4           MS. HOFFMAN:  Objection.  Hearsay.

5           THE COURT:  Overruled.

6           THE WITNESS:  I don't remember the exact verbiage.

7   The conversation was extremely short.  And I'm sorry, I don't

8   remember the exact verbiage.

9   BY MR. DOUGLAS:

10  Q.  Okay.  But after talking to Lieutenant Bowser, you called

11  Lieutenant Chavez immediately; right?

12  A.  Yes, sir.

13  Q.  And you told him that if he was doing that, I think you

14  just said, to stand down?

15  A.  Yes, sir.

16  Q.  Right?  Okay.  Did you ask him if he had, in fact, been

17  giving those orders?

18  A.  I did not.

19  Q.  Did you ask him who he had ordered less-lethal munitions to

20  be deployed against?

21  A.  No, sir.

22  Q.  Did you ask him where such less-lethal deployment was

23  occurring?

24  A.  No, sir.

25  Q.  Did you ask him why he had ordered the deployment on the

315

Aaron Sanchez – Direct

1  protesters?

2  A.  I did not.

3  Q.  In fact, you did nothing else to follow up on those

4  allegations, did you?

5  A.  I contacted -- I contacted my direct supervisor, Division

6  Chief Ron Thomas --

7  Q.  Okay.

8  A.  -- by telephone.  Because, again, I'm -- I'm in the middle

9  of -- I was at Clarkson and Colfax at the time, engaged in

10  this -- another event.

11  Q.  Okay.  And this is the same chief -- Division Chief Thomas

12  who is sitting in the courtroom today?

13  A.  Yes, sir.

14  Q.  Okay.  And other than notify Division Chief Thomas, you did

15  nothing to follow up on any details about the allegations that

16  were made against your direct report, Lieutenant Chavez;

17  correct?

18  A.  I did not.

19  Q.  But you know that -- you do know that Internal Affairs at

20  some point after this became aware of these allegations, and

21  they did investigate further the details of what was it all

22  about, don't you?

23  A.  Yes, sir.

24  Q.  Okay.  Because you gave a videotaped interview as part of

25  that Internal Affairs investigation; correct?

Aaron Sanchez – Direct

1    *A.*  I did.

2    *Q.*  Okay.

3         Mr. Bupp, if we could just show the witness

4    Exhibit 1094, please.

5         This is the first page of this document, but I'd like

6    to go to page 28.

7         There is a lot of stuff before, but if you take a look

8    at this page, do you recognize this to be the cover page of an

9    Internal Affairs investigation report involving Lieutenant

10   Kenneth Chavez?

11   *A.*  Yes, sir.

12        *MR. DOUGLAS:*  Your Honor, I would move Exhibit 1094

13   into evidence.

14        *MS. HOFFMAN:*  No objection.

15        *THE COURT:*  Admitted.

16        (Exhibit 1094 admitted.)

17   *BY MR. DOUGLAS:*

18   *Q.*  Okay.  Let's go to page 87 of this exhibit, please.  Do you

19   see here that we're looking at the portion of this

20   investigation file that is the statement, declaration, by

21   Lieutenant Bowser, who made the phone call to you that night?

22   *A.*  Yes, sir.

23   *Q.*  Okay.  Do you see at the bottom, she's dated and signed the

24   statement?

25   *A.*  Yes, sir.

Aaron Sanchez – Direct

1    *Q.*   July 2, 2020?

2    *A.*   July 2, 2020.

3    *Q.*   Okay.  Let's go up a little higher and call out the big

4    paragraph.

5         So she's talking here about when Sergeant --

6    Koenigsfeld is the sergeant we've been talking about who made

7    the initial report; correct?

8    *A.*   Yes, sir.

9    *Q.*   Am I pronouncing that name correctly, Koenigsfeld?

10   *A.*   Koenigsfeld.

11   *Q.*   Thank you.  She said, "Sergeant Koenigsfeld reached out to

12   me directly by telephone and asked for help.  He said that he

13   and his team had been removed from their post on the 16th

14   Street Mall by Lieutenant Ken Chavez and were now patrolling

15   the Capitol Hill neighborhood.  Sergeant Koenigsfeld was highly

16   concerned with the orders that were given to him and his team

17   by Lieutenant Chavez.  He stated that Lieutenant Chavez was

18   ordering them to pepper ball or pepper spray people in the

19   streets.  Sergeant Koenigsfeld was highly concerned that the

20   actions he was ordered to do were not warranted by the

21   situation and could cause him and his team to get into

22   trouble."

23         Do you see that?

24   *A.*   Yes, sir.

25             *MS. HOFFMAN:*  Your Honor, I'm just going to object.

Aaron Sanchez – Direct

1    My original indication that we didn't object to this exhibit

2    was because it was based on the fact that it was just the cover

3    sheet.  I did not realize the entire file was coming in.  The

4    file contains hearsay, including what is being read now, which

5    is total hearsay.

6         THE COURT:  The objection is overruled.

7         MR. DOUGLAS:  Let's go to the next paragraph, please.

8    BY MR. DOUGLAS:

9    Q.  So Lieutenant Bowser immediately got off the phone with

10   Sergeant Koenigsfeld and called you, who she knew to be

11   Lieutenant Chavez's supervisor; correct?

12   A.  Yes, sir.

13   Q.  And she said she relayed to you what she had heard from

14   Sergeant Koenigsfeld, which we just went through in the last

15   paragraph; correct?

16   A.  Yes, sir.

17   Q.  And that's the specific information that you didn't follow

18   up on at all, other than to notify Division Chief Thomas;

19   correct?

20   A.  Correct.

21        MR. DOUGLAS:  Very last sentence, if we could just go

22   to that.

23   BY MR. DOUGLAS:

24   Q.  "Shortly thereafter, I received a phone call from Commander

25   Sanchez, indicating that he had taken care of the situation."

319

Aaron Sanchez - Direct

1    Do you recall that?

2    A.   Yes --

3    Q.   Do you recall -- go ahead.

4    A.   Yes.

5              MR. DOUGLAS:   Okay.  Let's go to page 38 of

6    Exhibit 1094, please.  Let's go up higher so we can see what

7    this is.

8              Let's go to the prior page.  Sorry.

9    BY MR. DOUGLAS:

10   Q.   See at the very bottom it says, "A copy of the written

11   statement from Sergeant Koenigsfeld."  Do you see that?

12   A.   Yes.

13   Q.   For whatever reason, the actual signed statement isn't

14   here; but they say this is the copy of that.

15             So we'll take a look at that, if we go to the next

16   page.  So the middle paragraph -- let's just call out that

17   middle paragraph.

18             So Sergeant Koenigsfeld told Internal Affairs that at

19   that time, on May 30, when he was taken off of his shift to

20   accompany Lieutenant Chavez -- he says, "Lieutenant Chavez

21   informed me in person that a group was attempting to take over

22   the District 6 substation."  That's -- you made reference to

23   that a few minutes ago; correct?

24   A.   Yes, sir.

25   Q.   Okay.  He says, "He informed me that we were to prevent

320

Aaron Sanchez – Direct

1   this.  We traveled emergent to the station, but I never

2   observed any officers or protesters in the vicinity."  Do you

3   see that?

4   A.  Yes, sir.

5   Q.  He says, "This brought us into the Capitol Hill

6   neighborhood."  That's the streets immediately east of the

7   capitol, they run north and south from Colfax.  Lots of

8   residences around there?

9   A.  Yes.

10  Q.  Okay.  He says, "While in this area, we were instructed to

11  follow Lieutenant Chavez, who traveled through the

12  neighborhoods, alleys, and parking lots identifying targets to

13  engage with the pepper ball system."  Do you see that?

14  A.  I do.

15  Q.  "His orders to deploy were given on Primary 6."  Do you see

16  that?

17  A.  Yes, sir.

18  Q.  Okay.  And isn't it true that all of the officers working

19  on the protests were supposed to be on the same radio channel?

20  A.  I don't believe that to be true.

21  Q.  Okay.

22  A.  Well, I should -- all of the officers were on the channel.

23  I don't know that it's true that it was Primary 6.

24  Q.  Exactly.  That's my point.  So there was one radio channel

25  that everyone working the protest was supposed to be on so that

Aaron Sanchez – Direct

1  everyone could hear what was going on in different locations;

2  correct?

3  *A.*  Yes, sir.

4  *Q.*  And Lieutenant Chavez chose that night to have his people

5  use a different radio channel so he could communicate directly

6  with them and only with them; correct?

7  *A.*  I did not know that.

8  *Q.*  Isn't that what this would indicate, if he was using

9  Primary 6 with them?

10  *A.*  That's what I'm reading.  Yes, sir.

11  *Q.*  Okay.  It says, "During this time, Lieutenant Chavez

12  deployed one smoke CS grenade in the area of 14th and Logan.

13  When the grenade was deployed, there did not appear to be a

14  large group, nor did I observe any parties damaging property or

15  engaging in physical confrontations.  I further did not observe

16  any orders given to disperse."  Do you see that?

17  *A.*  Yes, sir.

18  *Q.*  He says, "On another occasion, I saw Lieutenant Chavez exit

19  his vehicle and order people who appeared to be on their own

20  property back into their homes while" --

21          Let's go to the next paragraph, please.

22          -- "pointing a fogger at them."  Do you see that?

23  *A.*  Yes.

24      *MR. DOUGLAS:*  And if we go to page 46 of this

25  document, please.

Aaron Sanchez – Direct

 1    *BY MR. DOUGLAS:*

 2    *Q.*  This -- I'll represent to you -- I don't think it's in

 3    dispute -- that this is a transcript of the videoed interview

 4    that Sergeant Koenigsfeld gave to Internal Affairs.

 5            Let's go to the second question by Rembert.  Do you

 6    understand that Sergeant Rembert was the Internal Affairs

 7    individual assigned to do this investigation?

 8    *A.*  I don't believe I knew that.

 9    *Q.*  Okay.

10    *A.*  I know he was assigned to IA.  I do not know that he was --

11    *Q.*  Okay.  The question by Rembert is, "You didn't observe

12    any -- okay.  At any point while you were in the convoy, did

13    you hear Lieutenant Chavez give a dispersal order, or did he

14    tell anybody it was an unlawful assembly?"

15            And Sergeant Koenigsfeld says, "No."  Then he

16    continues, "Sorry.  He did address that other group with --

17    when he got out the fogger.  It was, I want to say, the 1400

18    block of Pennsylvania."

19            Do you see that?

20    *A.*  Yes.

21            *MR. DOUGLAS:*  Okay.  I want to switch quickly to

22    Exhibit 1241, which is already in evidence.

23    *BY MR. DOUGLAS:*

24    *Q.*  Is this a map of the downtown area near the capitol?

25    *A.*  It is.  The capitol and then a few blocks to the east of

Aaron Sanchez - Direct

1    the capitol.

2              MR. DOUGLAS:  All right.  Your Honor, if I may, I want

3    to go old school and see if I can get the Elmo to work.  And I

4    hope that we can switch to that.  Is that --

5              Do we have an ability to --

6              COURTROOM DEPUTY:  That's me.

7              MR. DOUGLAS:  Oh, that's you.  Hi, Julie.

8              Ladies and gentlemen, this is how we used to do

9    things, and I guess still do.

10             THE COURT:  You don't even know how we used to do

11   things.

12             MR. DOUGLAS:  I'm going to go without auto focus.  I

13   apologize, Your Honor.

14   BY MR. DOUGLAS:

15   Q.  I think, though -- I don't know how well you know these

16   streets.  This is right by your district.  So if you see the

17   state capitol, the gold circle in the middle of that, the

18   capitol building, then you go one, two, three streets east, and

19   that's Grant, Logan, and then Pennsylvania; correct?

20   A.  Yes, sir.

21   Q.  So I'm going to draw -- this is Colfax -- Colfax is here,

22   and 14th is here; correct?

23   A.  Colfax should be the gold street.

24   Q.  Right.

25   A.  Yes.  And then 14th to the south.

Aaron Sanchez – Direct

1   *Q.*  So if I draw from here to here a nice squiggly line, is

2   that the 1400 block of Pennsylvania?

3   *A.*  Yes, sir.

4   *Q.*  Okay.  Thank you.  That was my moment.

5          And I would just -- for the record, I'd like to mark

6   the -- offer the marked version of 1241 as 1241A, Your Honor,

7   and offer that into evidence.

8          *MS. HOFFMAN:*  No objection.

9          *THE COURT:*  All right.  Admitted.

10          (Exhibit 1241A admitted.)

11          *MR. DOUGLAS:*  Let's go back to 1094, please.  Page 47.

12   *BY MR. DOUGLAS:*

13   *Q.*  So let's look at the middle question -- the second question

14   here from Rembert, and the answer of Koenigsfeld.

15          He asks, "So, more generally, what were the concerns

16   that you had about Lieutenant Chavez's actions and his orders,

17   just in general, in the convoy and the pepper-balling and the

18   gas?  Can you explain that a little bit more?"

19          Sergeant Koenigsfeld says, "Yeah.  Yeah.  So as we

20   were going on and not making arrests and not, you know,

21   deploying as a field force or anything like that -- I mean, it

22   was just a constant drive and pepper ball.  And, like I said, I

23   didn't see any of these law violations, so it made me think --

24   my perception was that the pepper-balling was happening for

25   curfew violation, which I didn't think was necessarily

Aaron Sanchez - Direct

```
 1    appropriate."

 2            Do you see that?

 3    A.  Yes, sir.

 4    Q.  Okay.  And then on page 43 --

 5            Yeah, that question.  That's perfect.

 6            He asks, "Okay.  When you deployed the pepper balls --

 7    when he gave the order to deploy the pepper balls or when

 8    Lieutenant Chavez did, what did your -- your convoy do?  Did

 9    you guys stop at all, or did you just keep going after you

10    pepper-balled?"

11            "Just kept going."

12            Do you see that?

13    A.  Yes, sir.

14    Q.  So it was drive-by pepper-balling; is that right?

15    A.  That's what it reads.  Yes, sir.

16    Q.  Okay.  Now, it wasn't just Sergeant Koenigsfeld who made

17    these allegations, was it?

18    A.  I don't know of anybody else.

19    Q.  You don't.  Okay.

20            Let's take a look at page 54 of this exhibit.  And if

21    you look at the number one, which is a brief synopsis from a

22    videoed interview with Officer Moxon --

23            Do you know Officer Tara Moxon?

24    A.  No, sir.  I don't.

25    Q.  Okay.  It says here that she was the driver of the vehicle
```

Aaron Sanchez – Direct

1   which was directly behind Lieutenant Chavez during this time.

2          *MS. HOFFMAN:*  Objection.  Foundation.  This witness

3   doesn't have any personal knowledge of this.

4          *THE COURT:*  Lay the foundation.

5   *BY MR. DOUGLAS:*

6   *Q.*  Commander Sanchez, if you had talked to Lieutenant Bowser

7   or Lieutenant Koenigsfeld about you learned –– what you heard

8   on May 30 and followed up on that, you would have learned that

9   other officers in the same vehicle as Sergeant Koenigsfeld had

10  additional information; correct?

11         *MS. HOFFMAN:*  Objection.  Speculation.

12         *THE COURT:*  Sustained.

13  *BY MR. DOUGLAS:*

14  *Q.*  Commander Sanchez, it was Internal Affairs' job here to

15  follow up on the allegations raised by Sergeant Koenigsfeld;

16  correct?

17  *A.*  Correct.

18  *Q.*  Okay.  And, again, Lieutenant Chavez was your direct

19  report; correct?

20  *A.*  Correct.

21  *Q.*  And, in fact, you went on vacation three days after May 30

22  and put Lieutenant Chavez in charge as your acting commander of

23  District 6 at that time; correct?

24  *A.*  Yes, sir.

25  *Q.*  Okay.  And would information about additional allegations

327

Aaron Sanchez – Direct

1    or what was behind what Sergeant Koenigsfeld was saying have

2    been important for you to know in your supervision of

3    Lieutenant Chavez and decision to put him in charge of

4    District 6?

5    A.   I -- had I known what --

6              MS. HOFFMAN:  Sorry.  I'm objecting to the question.

7              THE COURT:  Overruled.

8              THE WITNESS:  Had I known what you just had me read, I

9    would not have left him in that assigned position, so -- this

10   is information that I did not know at the time.

11   BY MR. DOUGLAS:

12   Q.   Right.  And it was information that you could have learned

13   had you further investigated what you heard on May 30?

14             MS. HOFFMAN:  Objection.  Speculation.

15             THE COURT:  Overruled.

16             THE WITNESS:  I -- the officers had that information,

17   and I did not follow up.

18   BY MR. DOUGLAS:

19   Q.   Okay.  And it would typically be the case that there was

20   more than one officer in a vehicle; correct?

21   A.   Yes.

22   Q.   Okay.  So Sergeant Koenigsfeld probably had other people

23   with him in the vehicle; correct?

24   A.   My assumption, yes.

25   Q.   Okay.  So if you had followed up with Lieutenant Bowser

Aaron Sanchez – Direct

1    about what Sergeant Koenigsfeld had said, you could also have

2    followed up on the details of this incident by talking to other

3    people who were in the car; correct?

4            MS. HOFFMAN:  Objection.  Speculation.

5            THE COURT:  Overruled.

6            THE WITNESS:  Reading this information, yes.

7    BY MR. DOUGLAS:

8    Q.  Yeah.

9            Your Honor, you, I believe this is -- there is a

10   foundation for him to discuss what he could have and should

11   have learned that Internal Affairs did --

12           THE COURT:  I think he's already answered your

13   questions.

14   BY MR. DOUGLAS:

15   Q.  All right.  Let's take a look at what Internal Affairs

16   learned from Officer Moxon.  It says here that she was the

17   driver of the vehicle which was directly behind Lieutenant

18   Chavez; correct?

19           MS. HOFFMAN:  Same objection.  Lack of foundation.

20   This witness has no personal knowledge.

21           THE COURT:  Overruled.  He just asked him if that's

22   what it says here.

23   BY MR. DOUGLAS:

24   Q.  It says --

25   A.  Yes.  I'm sorry.

Aaron Sanchez – Direct

1    Q.   Sorry.  Later in that paragraph it says, "After this

2    meeting with Lieutenant Chavez, the team began to follow the

3    lieutenant through both the downtown mall area and into the

4    Capitol Hill area.  During this action, Officer Moxon related

5    that she, Officer Matthews, and Sergeant Koenigsfeld became

6    uncomfortable with the actions of Lieutenant Chavez.  This was

7    due to both his orders and his actions with regard to

8    citizens."  Do you see that?

9    A.   Yes, sir.

10   Q.   And it says above that -- it identifies Officer Matthews as

11   being in the rear seat of that same car; correct?

12   A.   Officer Matthews was -- yes, sir.

13        MR. DOUGLAS:  All right.  Let's go to page 54.

14   BY MR. DOUGLAS:

15   Q.   Okay.  So Sergeant Rembert here notes that, "Officer Moxon

16   stated that she did not observe any criminal activity outside

17   of curfew with regard to the citizens Lieutenant Chavez ordered

18   to be pepper-balled."

19        That's what she told Internal Affairs; correct?

20   A.   Yes, sir.

21        MS. HOFFMAN:  Objection.  I'm going to make a

22   continued objection that all of this is hearsay and this

23   witness has no personal knowledge.

24        THE COURT:  Overruled.

25        THE WITNESS:  That's what I'm reading.  Yes, sir.

Aaron Sanchez – Direct

1   *BY MR. DOUGLAS:*

2   Q.  Okay.  The next sentence says, "Sergeant Rembert noted that

3   at 1440, Officer Moxon stated that no arrests were attempted of

4   those who were pepper-balled."  Correct?

5   A.  Yes, sir.

6           MR. DOUGLAS:  And then go to --

7           THE COURT:  I assume you're not going to use this

8   witness to have him confirm what these documents say.  You're

9   at some point going to ask him what he knows himself.

10          MR. DOUGLAS:  That's correct.

11          THE COURT:  We can all read it.

12          MR. DOUGLAS:  Right.  I'm establishing what he could

13   have learned, and I'm getting close.

14          Let's go to -- let's go to page 55 -- I'm sorry.  Yes,

15   55.  And 2150 -- yeah, second paragraph.

16   *BY MR. DOUGLAS:*

17   Q.  It says, "While in the Capitol Hill neighborhood at a

18   location Officer Moxon is unfamiliar with, Lieutenant Chavez

19   stopped and engaged with a group of citizens verbally.  He

20   deployed some type of chemical grenade near or into this group

21   of citizens."  Do you see that?

22   A.  Yes.

23   Q.  "Sergeant Rembert noted that Officer Moxon related that the

24   orders they were receiving were odd and that they didn't want

25   to be in that situation."  Do you see that?

331

Aaron Sanchez – Direct

 1   A.   Yes.

 2   Q.   "She said the sergeant was very nervous."  Do you see that?

 3   A.   Yes, sir.

 4   Q.   So you don't -- did you ever become aware of any of these

 5   allegations?

 6   A.   No, sir.

 7   Q.   And, in fact, on June 2, you went on vacation; correct?

 8   A.   That was a Tuesday?

 9           MS. HOFFMAN:  Objection.  Asked and answered.

10           THE COURT:  Well, she's right about that.

11           MR. DOUGLAS:  I didn't ask him how long it was, Your

12   Honor.  That's where I'm going.

13           THE COURT:  Why don't you ask him where he went and

14   did he have a good time.

15           MR. DOUGLAS:  No.  I just wanted to know how long

16   Lieutenant Chavez was in charge of District 6.

17           THE COURT:  All right.

18           THE WITNESS:  I don't recall -- what I can't remember

19   is -- I initially had a two-week vacation.  That vacation was

20   supposed to start that Sunday, the 31st, and run for a two-week

21   block, which is what our normal vacations run.  Because of the

22   protests that we were facing, I worked the Sunday and again on

23   the Monday.  And then on Tuesday, Lieutenant Chavez was the

24   acting -- what I don't remember is when I came back.  I know

25   that my vacation was shortened.  I can't remember if it was

Aaron Sanchez – Direct

1    that Friday or the following week, but it -- but it was

2    shortened.

3    *BY MR. DOUGLAS:*

4    *Q.*   Okay.  But during the entire time of your vacation, which

5    started three days after all of these allegations we have just

6    heard about, you put Lieutenant Chavez in charge of all of

7    District 6, the police station closest to the state capitol,

8    for the duration of your vacation; correct?

9    *A.*   Correct.

10   *Q.*   Shouldn't you have followed up in more detail on these

11   allegations before putting him in charge of District 6?

12   *A.*   So part of the -- part of the issues and concerns were,

13   these events were unprecedented.  And so, as we discussed a

14   little bit ago, with the incident command and then our regular

15   chain of command, your question to me was, was Pat Phelan my

16   direct supervisor?  And in a sense, yes, because of the actual

17   events; but my real chain of command is Division Chief Ron

18   Thomas.  So my answer to that is, outside of these types of

19   events, a situation like that came up, it would directly fall

20   upon me.  However, with this off-site command post, where you

21   have a commander and then a team of command officers, to

22   include Lieutenant Kim Bowser, that are receiving information

23   and phone calls on a realtime basis, it led me to believe that

24   information such as that with Lieutenant Ken Chavez may be

25   followed up by the incident command and the command post, as

Aaron Sanchez – Direct

 1   opposed to the operational chief and I guess boots on the

 2   ground.

 3              And that's where it got just a little bit foggy, and I

 4   guess that's where the lapse in my follow-up -- it was based

 5   more upon, this information was coming to the command post.

 6   The -- even the initial phone call seemed outlandish to me.

 7   Lieutenant Chavez is a 40-year Denver police command officer,

 8   as well as a lieutenant -- I'm sorry -- a colonel in the

 9   military.  So to take and receive orders -- because the orders

10   of the day were never to fog or gas first.  And, in fact, the

11   orders were to initially wait.  I believe curfew was 8 o'clock.

12   Don't do anything for, I want to say 30 minutes, an hour,

13   somewhere along those lines.  And then it was advise, advise.

14   Citations were a last resort.  Those were the orders of the

15   day.

16              And again, those decision-making -- I guess those were

17   some of the reasons that I didn't follow up, is the respect for

18   a 40-year command officer, a military war veteran that -- and

19   then I never received any other information that the initial

20   phone call Lieutenant Bowser had received were corroborated in

21   any way.

22   Q.  Well, you didn't make any attempt to corroborate it, did

23   you?

24   A.  I did not.

25   Q.  And I don't -- the question was, should you have done more?

Aaron Sanchez – Direct

1   Do you think you should have done more?

2   *A.*   Yes.

3   *Q.*   To your knowledge, did the Denver Police Department make

4   any effort to identify who was shot in these drive-by

5   pepper-ballings that Lieutenant Chavez ordered?

6   *A.*   I do not know that.

7   *Q.*   To your knowledge, did DPD make any effort to identify who

8   Lieutenant Chavez threw a grenade at?

9   *A.*   I don't know that.

10  *Q.*   To your knowledge, did the DPD make any effort to identify

11  who was pepper-sprayed or ordered to be pepper-sprayed by

12  Lieutenant Chavez?

13  *A.*   No, sir.

14  *Q.*   To your knowledge, did the Denver Police Department make

15  any effort to identify who was threatened on their own private

16  property by Lieutenant Chavez with OC fogger?

17  *A.*   I don't know the answer to that.

18  *Q.*   Was Lieutenant Chavez suspended for his actions taken the

19  night of May 30, 2020, to your knowledge?

20          *MS. HOFFMAN:*   Objection.  Foundation.

21          *THE COURT:*   Overruled.

22          *THE WITNESS:*   Lieutenant Chavez was transferred after

23  that.  Obviously, I know there was an Internal Affairs case.

24  The conclusions of that case, I'm not -- I'm not clear whether

25  it was -- he retired or it was complete or not.  I don't know

Aaron Sanchez – Direct

1    the answer.

2    *BY MR. DOUGLAS:*

3    Q.   Okay.  We'll get to that.  But he was transferred after

4    this to another position at the same rank of lieutenant;

5    correct?

6    A.   Correct.

7    Q.   He was assigned to the Denver Police City Safety and

8    Security Bureau; correct?

9    A.   Correct.

10   Q.   So he got to keep his rank; right?

11   A.   Yes.

12   Q.   So it's a lateral move, not a demotion?

13   A.   Lateral.

14   Q.   Any knowledge that his pay was cut or docked?

15   A.   Transfer would not be, no, sir.

16          *MR. DOUGLAS:*  Let's go back to Exhibit 1094, page 37,

17   please.

18   *BY MR. DOUGLAS:*

19   Q.   So this investigation continued into March of 2021; do you

20   see that?

21   A.   I do.

22   Q.   And you see here that Lieutenant Chavez refused to give a

23   statement -- declined to provide a statement to Internal

24   Affairs; correct?

25   A.   Correct.

Aaron Sanchez – Direct

1  Q.  And then a little over two weeks later, he retired;

2  correct?

3  A.  Yes, sir.

4  Q.  Okay.  And this is the timeline of the Internal Affairs

5  report.  You don't have any information that anything further

6  was done to investigate this after Lieutenant Chavez retired,

7  do you?

8  A.  I do not know.

9  Q.  And as his direct supervisor, do you have any reason to

10  believe that he didn't receive his full pension upon

11  retirement?

12  A.  I would not have been his direct supervisor at this point.

13  Q.  After the transfer?

14  A.  Right.

15  Q.  Okay.  Do you have any personal knowledge that he did or

16  did not receive his full pension on retirement?

17  A.   I would assume that he did.

18       MR. DOUGLAS:  Okay.  You can put that down.

19  BY MR. DOUGLAS:

20  Q.  Okay.  I want to move to a different subject -- actually --

21  let me ask one more thing.

22       Sergeant Koenigsfeld on May 30 of 2020 reported what

23  he believed to be inappropriate conduct by someone -- by his

24  direct supervisor that night who was higher ranked than him;

25  correct?

Aaron Sanchez – Direct

1    A.   Yes.

2    Q.   That's not an easy thing to do, is it?

3    A.   That would be his path, calling the crime lab -- so that

4    would be his path.  As far as an easy thing to do, I don't -- I

5    guess I would assume not.

6    Q.   Okay.  But he chose to do that that night.  And yet when

7    the information got to you, you didn't believe him; isn't that

8    true?

9         MS. HOFFMAN:  Objection.

10   BY MR. DOUGLAS:

11   Q.   You said it was outlandish?

12        THE COURT:  Overruled.

13        THE WITNESS:  At the time I did not know that it was

14   Sergeant Koenigsfeld.  It was an anonymous source; and it

15   wasn't corroborated, to include by myself.  The information was

16   not corroborated while I was in the field working.

17   BY MR. DOUGLAS:

18   Q.   Okay.  It was later corroborated, though.  We saw that;

19   right?

20   A.   At a later time.  Yes, sir.

21   Q.   Okay.  But when you heard it, it was so outlandish, you

22   didn't believe it; right?

23        MS. HOFFMAN:  Objection.  Asked and answered.

24        THE COURT:  Overruled.

25        THE WITNESS:  It was hard to believe that he gave

Aaron Sanchez – Direct

1    those orders.

2              MR. DOUGLAS:  Okay.  I want to go to Exhibit 787,

3    please.

4    BY MR. DOUGLAS:

5    Q.  Commander Sanchez, do you recognize this -- this is the top

6    chain -- the last email in the email chain, and this top

7    email was sent by you; correct?

8    A.  Yes, sir.

9    Q.  On June 18, 2020, a little after the protests?

10   A.  June 18, 2020.

11             MR. DOUGLAS:  Your Honor, I would offer Exhibit 787 in

12   evidence.

13             MS. HOFFMAN:  Objection.  Hearsay.

14             THE COURT:  Overruled.  Admitted.

15             (Exhibit 787 admitted.)

16   BY MR. DOUGLAS:

17   Q.  I want to start at the beginning of this email chain.  So

18   that's -- and this is -- it's a little wonky.  This is two

19   different copies of the same thread that went in different

20   directions.  I'm going to focus on the first ten pages, which

21   is the thread that made its way -- that you responded to?

22   A.  Okay.

23   Q.  We're going to page 10 of Exhibit 787, please.  It's

24   actually the end of it.  So page 9 is where the first email

25   in the chain starts.  It's from Robert -- is it Wyckoff?  Is

Aaron Sanchez – Direct

1  that how you say that?

2  A.  Robert Wyckoff.

3  Q.  Who is Robert Wyckoff?

4  A.  Lieutenant Wyckoff is a Denver police lieutenant assigned

5  to traffic.  I don't -- I don't recall where he was assigned at

6  the time.

7  Q.  Okay.

8  A.  He was assigned to me for a while, but I don't remember the

9  dates that -- I believe he had moved on by then.

10  Q.  Okay.  And he sends this email on Saturday, June 6, 5:03

11  p.m.  Do you see that?

12  A.  Yes.

13  Q.  And the subject is Floyd protest, UOF information.  Do you

14  see that?

15  A.  Yes.

16  Q.  UOF is use of force?

17  A.  Yes.

18  Q.  And I think the jury has heard a little bit about use of

19  force reports.  Those are reports that sometimes are filled out

20  by officers if they deploy or are supervising or order the

21  deployment -- authorize the deployment of less-lethal

22  munitions; correct?

23  A.  Correct.

24  Q.  Okay.  So he says to Matt Canino, Thomas Pine -- Matthew

25  Canino -- Matt and Tom -- those are lieutenants who were

Aaron Sanchez - Direct

1  working the protest?

2  A.  Matt and Tom were assigned to Metro SWAT.

3  Q.  He says, "Chief Archer and Chief Thomas have tasked Paul

4  Berdahl and I with gathering loads of data for an overall AAR

5  UOF report."  Do you see that?

6  A.  It is yes.

7  Q.  AAR is after-action report?

8  A.  Yes, sir.

9  Q.  Something that is written after the fact about some action

10  that was taken by the police?

11  A.  Correct.

12  Q.  Okay.  And if you look at the next page -- I'm not going to

13  go through this in detail, but I want to get this generally --

14  they were looking at -- for people to after this time fill out

15  use-of-force reports; correct?

16  A.  Correct.

17  Q.  Okay.  And what -- you agree that one of the purposes of

18  use-of-force reports is to help ensure that officers are

19  accountable for their uses of force; correct?

20  A.  Correct.

21  Q.  Okay.  Let's go to the next email up.  And this is from

22  Paul Berdahl.  He was referenced in the first email, saying,

23  "Paul and I have been tasked with gathering this information";

24  correct?

25  A.  Yes, sir.  Berdahl.

Aaron Sanchez – Direct

1   Q.   Berdahl.   Thank you.

2   A.   Yes.

3   Q.   And this is Tuesday, June 9, so three days later; right?

4   A.   That's correct.

5   Q.   Okay.   Yeah.   You're on here.   You received this email;

6   correct?

7   A.   Yes.

8   Q.   Okay.   If we go down to the first paragraph, it says,

9   "Please see the email from Lieutenant Wyckoff below" -- which

10  we just looked at -- "which explains the items required to

11  complete a use-of-force report for each date."   Do you see

12  that?

13  A.   I do.

14  Q.   The next sentence says, "These statements are to cover each

15  and every less-lethal deployment that occurred during an

16  officer's, sergeant's, or lieutenant's shift."   Do you see

17  that?

18  A.   I do.

19  Q.   Next paragraph, "It will be critical for all completing

20  statements to review our use-of-force policy and training

21  materials for less-lethal deployments.   I want to ensure that

22  the officers are using correct terms to avoid inconsistency and

23  problematic language."   Correct?

24  A.   Correct.

25  Q.   Problematic language like language that could be used

Aaron Sanchez - Direct

1    against the department in a lawsuit; correct?

2    A.   I -- I -- I would assume that's what he's talking about.

3            MR. DOUGLAS:   Let's -- can we go back just briefly to

4    the first email in the chain from Mr. Wyckoff, where he

5    writes -- the previous page.  Sorry.  All right.

6    BY MR. DOUGLAS:

7    Q.   So we talked about how Lieutenant Wyckoff sent this on

8    Saturday, June 6; right?

9    A.   Yes, sir.

10   Q.   Okay.  And that was the day after an injunction was entered

11   against Denver relating to the use of force at the protests;

12   correct?

13           MS. HOFFMAN:   Objection.  This is -- this is covered

14   by previous rulings of this court.

15           MR. DOUGLAS:   I don't believe there was a ruling.  I

16   think the door was opened in opening --

17           MS. HOFFMAN:   It's more prejudicial than probative.

18           THE COURT:   I think we talked about that before trial.

19           MR. DOUGLAS:   Well, there was a representation by the

20   City in opening that the reason it was on this date is because

21   officers had worked long shifts and were tired.  I think that

22   may have been one of the reasons, but there were other reasons.

23   I think we're entitled to give the jury a full context.

24           THE COURT:   All right.  So there was an injunction,

25   there is no dispute, it's public knowledge, on June 5.  Onward.

Aaron Sanchez – Direct

1              What's your question?

2    *BY MR. DOUGLAS:*

3    *Q.*  This email was written the day after that injunction was

4    issued; correct?

5              *THE COURT:*  June 6 is the day after June 5.  Onward.

6    *BY MR. DOUGLAS:*

7    *Q.*  And that was the first time that officers were being asked

8    to complete use-of-force statements relating to their

9    deployment of less-lethal weapons at the protest; correct?

10             *MS. HOFFMAN:*  Objection.  Foundation.  Personal

11   knowledge.

12             *THE COURT:*  Overruled.

13             *THE WITNESS:*  I don't know the date that the

14   injunction went -- I don't recall what day that was.

15   *BY MR. DOUGLAS:*

16   *Q.*  Okay.  We established that was June 5, the day before.  But

17   this question was, June 6, this email starting this process,

18   was the first time that officers working the protests were

19   asked to complete use-of-force reports for their deployments of

20   less-lethal munitions during those protests; correct?

21   *A.*  I don't know if it was the first time.  According to this,

22   they're asked on June 6 to do this.  That -- and, again, I was

23   on vacation that week.  I don't -- I don't know if officers

24   were asked prior to that.

25   *Q.*  Okay.  Fair enough.

Aaron Sanchez – Direct

1     Okay.  Next email up -- well, we looked at the next

2  one up from Berdahl.  Let's look at the one up above that.

3  That's the middle email here.  This is for District 6 -- this

4  is an email from Lieutenant Ken Chavez, who we just talked a

5  lot about; correct?

6  A.  Correct.

7  Q.  And he assigns Jesse Campion, a sergeant -- he was a

8  sergeant in District 6?

9  A.  He was a sergeant in District 6, and he was our training

10  sergeant.

11  Q.  Okay.  And he says, "Jesse, see all below and attached.

12  You are the District 6" -- POC is point of contact; right?

13  A.  Yes.

14  Q.  "You are the District 6 point of contact for this.  Sorry."

15  That's what he says; correct?

16  A.  Yes, sir.

17  Q.  Okay.  So Jesse, doing his job, sends an email to -- is

18  that all of the sergeants in District 6?

19  A.  I don't believe that's all of the sergeants.  Those are all

20  the sergeants that are -- well, it looks like all the sergeants

21  that would have had something to do with a protest-related

22  event.  Just looking at this, I don't -- there may be sergeants

23  not listed.

24  Q.  Okay.  That's fair.  And he writes to those sergeants,

25  "I've been delegated as the point of contact for collection of

Aaron Sanchez – Direct

1    officer statements for the use-of-force information related to

2    the George Floyd protests/riots."  And it says, "Please review

3    the below emails from Lieutenant Berdahl" -- which is the one

4    where he instructed them to put each and every use of force in

5    their statements; correct?

6    A.  Correct.

7    Q.  And if you look down at the bottom paragraphs -- no --

8    sorry.  These statements -- yeah, that paragraph.

9           Second sentence, "Please have your officers review all

10   of their" -- BWC is body-worn camera; right?

11   A.  Body-worn camera.

12   Q.  -- "review all of their body-worn camera for the day and

13   utilize HALO" -- those are the overhead camera, the jury has

14   seen some, that are on the signposts and streetlights and

15   things like that downtown?

16   A.  Yes, sir.

17   Q.  Okay.  "Please have your officers review all their

18   body-worn camera for the day and utilize HALO if possible to

19   try and refresh their memory."  Do you see that?

20   A.  Yes, sir.

21   Q.  Okay.

22          Okay.  You can put that down.

23          As Lieutenant Chavez's direct supervisor, you know

24   that Lieutenant Chavez filled out a use-of-force report for

25   May 30 of 2020, the night we've been talking a lot about;

Aaron Sanchez – Direct

1    correct?

2    A.   I don't recall.

3    Q.   You don't recall.  Okay.

4            Let's put up Exhibit 3114, please.

5            I apologize.  We had the wrong exhibit in our file.

6    Moment of indulgence while we pull up the right one.

7            Commander Sanchez, does this appear to be a

8    use-of-force statement filled out by -- with Lieutenant

9    Chavez's name on it, for the date -- no, that's not the right

10   one.  That's May 29.  So it might be --

11           I apologize.  I think it's the next page.  It's --

12   okay.  Next page -- next page, please.

13           There we go.

14           Okay.  Do you see here -- and in the summary of

15   statement, the actual body of the statement, he says, "During

16   the evening hours of May 30, 2020," this appears to be -- they

17   did one per day; right?

18   A.   Just to clarify, this is a general Denver police statement,

19   and you can add to a use of force.  But it could be used for a

20   number of different things.  Just a point of clarification,

21   it's a general DPD statement --

22   Q.   Okay.

23   A.   -- as opposed to, like, a DPD-12 I think is use of force.

24   Q.   Well, if you go back to the top, it's got Ken Chavez's name

25   on it; right?

Aaron Sanchez – Direct

1    *A.*  Correct.

2    *Q.*  And he filled this out on June 11, 2020?

3    *A.*  June 11, 2020.

4         *MR. DOUGLAS:*  Okay.  And then let's put up the whole

5    body, if we can, because it's one page.  It's three paragraphs.

6    Just blow up that part of it, please.

7         *COURTROOM DEPUTY:*  Mr. Douglas, you know the jury is

8    not seeing this; right?

9         *MR. DOUGLAS:*  Thank you for letting me know.

10   *BY MR. DOUGLAS:*

11   *Q.*  This appears to be what he wrote about May 30, 2020, which

12   is the night involving those allegations that we were

13   discussing; correct?

14   *A.*  Correct.

15        *MR. DOUGLAS:*  I would offer Exhibit 3114 into

16   evidence, please.

17        *MS. HOFFMAN:*  I believe it was stipulated to.

18        *MR. DOUGLAS:*  That's right.

19        *THE COURT:*  It's admitted.

20        (Exhibit 3114 admitted.)

21        *MR. DOUGLAS:*  Let's go back to the cover -- the top,

22   so that the jury can see what we're looking at.  I apologize.

23   *BY MR. DOUGLAS:*

24   *Q.*  And you said this is an official Denver Police Department

25   form used by officers to make statements about things,

Aaron Sanchez – Direct

1    including use of force; correct?

2    A.   Correct.

3    Q.   Okay.  And, again, Ken Chavez's name, top left?

4    A.   Correct.

5    Q.   You see the date he filled it out, June 11, 2020; right?

6    A.   Yes, sir.

7    Q.   Now let's go to the three paragraphs.  Okay.  The first

8    thing at the very top that Lieutenant Chavez writes about that

9    night is, "No BWC."  Do you see that?

10   A.   I do.

11   Q.   That means for all of his caravaning around and things we

12   heard about in those Internal Affairs report, he didn't turn on

13   his body-worn camera for any of that; correct?

14   A.   Correct.

15         MS. HOFFMAN:  Objection.  This witness has no personal

16   knowledge of Officer Chavez's -- what he's doing -- what he is

17   doing with his body-worn camera.

18         THE COURT:  Sustained.

19   BY MR. DOUGLAS:

20   Q.   Okay.  But what he writes here is, "No body-worn camera."

21   Correct?

22   A.   Correct.

23   Q.   And there is three paragraphs, which you can read probably

24   pretty quickly.  And I just want to ask you if you could

25   identify for me anywhere in here where Lieutenant Chavez -- his

Aaron Sanchez – Direct

1    use-of-force statement says anything about confronting

2    protesters with an OC fogger in the 1400 block of Pennsylvania.

3    A.   No.

4    Q.   Okay.  Does he even say one word about being in the Capitol

5    Hill neighborhood that night, driving around through the

6    streets and alleys, ordering people to be pepper-balled or

7    otherwise attacked?

8    A.   No.  Just the capitol -- just the state capitol itself.

9    Q.   Right.  That's different than Capitol Hill; right?

10   A.   Yes.

11   Q.   Does he say anything about giving others orders to pepper

12   ball people?

13   A.   He does not.

14   Q.   Does he say anything about his own deployment of a grenade

15   at people in the Capitol Hill neighborhood?

16   A.   No, sir.

17   Q.   After hearing on May 30 some allegations -- which I get you

18   thought were outlandish on May 30 -- did you ever think to

19   review Lieutenant Chavez's use-of-force report to see if it was

20   accurate?

21   A.   Sir, I believe the date of this was June the 11th; so this

22   would be 11 days after the allegations.  I believe I was -- I

23   was on vacation.  But even if I wasn't, these statements would

24   have gone to Internal Affairs and not back to me.

25   Q.   Okay.  But you never asked him or asked him if he filled

Aaron Sanchez – Direct

1    out a use-of-force report or in any way explored the

2    allegations after May 30; correct?

3              MS. HOFFMAN:  Objection.  Asked and answered.

4              THE COURT:  Sustained.

5              MR. DOUGLAS:  Okay.  I want to turn now --

6              Can we switch back to Mr. Bupp, please, Julie?

7              Exhibit 1177, for the witness and for defense counsel.

8    I'm not offering or showing -- we've substituted just the

9    picture from that exhibit.  It's an article, and we're not

10   offering the article.  I'm just offering it now as the picture

11   from the article.

12             MS. HOFFMAN:  Which exhibit?

13             MR. DOUGLAS:  1177.

14   BY MR. DOUGLAS:

15   Q.  Commander Sanchez, do you recognize this as a picture of

16   Lieutenant Ken Chavez?

17   A.  Yes, sir.

18             MR. DOUGLAS:  I would offer Exhibit 1177 into

19   evidence, Your Honor.

20             MS. HOFFMAN:  If it's just the picture, no objection.

21             THE COURT:  Okay.  Admitted.

22             (Exhibit 1177 admitted.)

23             MR. DOUGLAS:  That's all I'm going to do with that.

24   BY MR. DOUGLAS:

25   Q.  I did forget to ask you about the end of that email chain,

351

Aaron Sanchez - Direct

1  so let's go back to 787, please.

2          Let's go down to the next email.  And so we saw that

3  Sergeant Campion asked all of the sergeants who were at the

4  protest to have the officers complete the use-of-force

5  statements as requested by -- I don't mean to mess it up --

6  Berdahl?

7  A.   Yes.

8  Q.   The emphasis on the second.  I need it phonetically, I

9  guess.  And so this is -- that was June 11, I believe, he made

10 that request.  We can look.

11 A.   The initial request, I don't recall.  Campion sent that

12 June 18.

13 Q.   Right.  This one is June 18.  It's a follow-up.

14          Let's go back to Campion's first email.  I just want

15 to get the date right, because I can't remember it either.  Ah,

16 there it is.

17          June 11 is when Sergeant Campion made the request to

18 the sergeants who had worked the protest in District 6;

19 correct?

20 A.   Correct.

21 Q.   Okay.  Now if we go up to the next email, this is Jesse

22 Campion -- Sergeant Campion again following up one week later,

23 saying, "We'd like this to be completed next week.  Please

24 review this with your team and collect statements if they were

25 involved."  Do you see that?

Aaron Sanchez – Direct

1    *A.*  Yes.

2    *Q.*  Okay.  And you responded to this email and all the people

3    on it; correct?

4    *A.*  Correct.

5    *Q.*  And you said, "This is of the utmost importance to protect

6    you and your troops.  Thank you."  Correct?

7    *A.*  Correct.

8    *Q.*  When you wrote "protect your troops," you meant that the

9    statements were important to protect the Denver Police

10   Department and its officers from legal liability; correct?

11   *A.*  My reference in the -- the point of emphasis -- if you

12   could go to Lieutenant Berdahl's email.  My point of this is,

13   I'm giving more credence to Sergeant Campion because of the

14   date.  So there is a time stamp that Lieutenant Berdahl has --

15   has bolded and then increased the font.  So my reference to

16   that is more along the lines of, you have until this date to

17   turn this paperwork in.  The protection was along the lines of,

18   these are required documents; and, obviously there will be

19   internal consequences if you don't meet this date.  I believe

20   it was June 22.  So it was just a point of emphasis to get your

21   paperwork in, because Lieutenant Berdahl, who speaks for the

22   division chief of patrol, is making this -- this request.

23   *Q.*  So you're saying this is to protect you from internal

24   consequences, not protect them in the department from legal

25   liability.  That's your testimony; that's what you meant?

Aaron Sanchez – Direct

1    *A.*  Yeah.  And, again, I'm giving credence to Sergeant Jesse

2    Campion that this time stamp is extremely important to get your

3    documents in by that date that Lieutenant Berdahl has stated.

4    *Q.*  Okay.  And you see on this email, Sergeant Abeyta is one

5    of the people who you sent this to?

6    *A.*  Dave Abeyta.  Yes.

7    *Q.*  Would it surprise you that Sergeant Abeyta assumed that you

8    were conveying that the thing it's important to protect you

9    from -- meaning him -- is legal liability?

10            *MS. HOFFMAN:*  Objection.  Foundation.

11            *THE COURT:*  Sustained.

12   *BY MR. DOUGLAS:*

13   *Q.*  Well, you knew by the time you wrote this email that

14   Denver and the department were facing legal liability, didn't

15   you?

16   *A.*  I don't recall.

17            *MR. DOUGLAS:*  I don't have any further questions at

18   this time, Your Honor.

19            *THE COURT:*  All right.

20            Cross-examination.

21            *MS. HOFFMAN:*  Good morning, Your Honor.  Kate Hoffman

22   for the defendants.  May I proceed?

23            *THE COURT:*  Good morning.  Yes, of course.

24            *MS. HOFFMAN:*  Thank you.

25

Aaron Sanchez – Cross

1          **CROSS-EXAMINATION**

2     *BY MS. HOFFMAN:*

3     *Q.*   Good morning, Chief Sanchez.  How are you?

4     *A.*   I'm good, ma'am.  How are you?

5     *Q.*   Good.  So you were asked a number of questions about

6     Lieutenant Chavez's Internal Affairs file; correct?

7     *A.*   Correct.

8     *Q.*   And is it fair to say you read that for the first time

9     today?

10    *A.*   First time reading it.

11    *Q.*   So when Sergeant Koenigsfeld -- and I apologize if I

12    mispronounce that.  When Sergeant Koenigsfeld's interview was

13    read, had you ever read that before?

14    *A.*   No, ma'am.

15    *Q.*   And did you know the substance of the information contained

16    in Sergeant Koenigsfeld's interview before you sat here today?

17    *A.*   No, ma'am, I did not.

18    *Q.*   And I believe we also read some excerpts from Sergeant --

19    is it Sergeant Moxon?

20    *A.*   I think it's Officer Moxon.  I don't know her personally.

21    *Q.*   And had you read Officer Moxon's statements before?

22    *A.*   No, ma'am.

23    *Q.*   And did you know the substance of Officer Moxon's

24    statements before you sat here today?

25    *A.*   I did not.

Aaron Sanchez - Cross

1   Q.  I believe it was May 30, 2020 -- so Saturday of the

2   protests -- you testified you received a call from Kim Bowser?

3   A.  Lieutenant Kim Bowser.

4   Q.  Thank you.  And did Lieutenant Kim Bowser provide you all

5   of the information contained in Sergeant Koenigsfeld's

6   statement and Officer Moxon's statement on the phone to you?

7   A.  No.

8   Q.  Specifically, what information did Lieutenant Bowser give

9   you on the phone?

10  A.  It was a very, very short phone call.  I believe -- I don't

11  know verbatim, but it was somewhere along the lines of, not

12  corroborating information, could you please check and make sure

13  Lieutenant Chavez -- or these orders were not given, or

14  something along these lines.  Or if he did, please have him

15  stand down.  I don't remember exactly how the conversation

16  went, but it was an extremely short phone call.

17  Q.  And then after taking that call from Lieutenant Bowser, did

18  you then call Lieutenant Chavez, or did you do something else?

19  A.  I called Lieutenant Chavez.

20  Q.  And tell me about the substance of your conversation with

21  Lieutenant Chavez.

22  A.  Again, another extremely short phone call.  Somewhere along

23  the lines of, Kenny, if these orders were given, stand down.

24  The orders of the day are to advise and not to fog.

25  Something -- something extremely short.  His answer was, "I'm

Aaron Sanchez - Cross

1    clear."

2    Q.  So fair to say, you didn't inquire; you just told him to

3    stand down?

4    A.  Correct.

5    Q.  And he indicated he understood?

6    A.  Correct.

7    Q.  And then after that, you called Division Chief Thomas?

8    A.  Yes.

9    Q.  Okay.  And tell me about your conversation with Division

10   Chief Thomas.

11   A.  Another short phone call.  And I do believe I used

12   terminology as I stated before, allegations are kind of

13   outlandish.  This is what Lieutenant Bowser is telling me.  I

14   did contact Lieutenant Chavez and told him to stand down.

15   Q.  And is it your understanding as you sit here today that a

16   lot of the information that we read today in court came to

17   light through the Internal Affairs investigation of Lieutenant

18   Chavez?

19   A.  Yes, ma'am.

20   Q.  And were you involved in that Internal Affairs process?

21   A.  I was not.

22   Q.  And do you know if that information that we read today was

23   known when you left for vacation on June 2 and you made the

24   decision to put Lieutenant Chavez in charge?

25   A.  I don't believe any of that information was known at that

Aaron Sanchez - Cross

1    time.

2    Q.  And can you tell me how you decided to select Lieutenant

3    Chavez as acting commander?

4    A.  Yes, ma'am.  The -- what you try to do with the acting

5    commanders is you try to -- at a district station there is four

6    lieutenants.  Usually two are on a day-shift capacity, one is

7    the official day-shift shift commander, and then there is an

8    administrative lieutenant, swing-shift lieutenant, and then a

9    night-shift lieutenant.  You more often than not try to assign

10   the day-shift -- so usually the admin or the day-shift

11   lieutenant to the acting role because their hours coincide with

12   the division chief of patrol.  So that if business is being

13   conducted, those phone calls and conversations are being held

14   during the division chief's working hours.

15   Q.  And how long in total did you supervise Lieutenant Chavez?

16   A.  I started in the role as commander of District 6 in

17   July 2018, and he was the day-shift shift lieutenant throughout

18   that time.

19   Q.  And any issues to your knowledge with Lieutenant Chavez's

20   work performances prior to the protests?

21   A.  No, ma'am.  In fact, we had worked on several big projects

22   within that -- was it year and a half, two years, whatever it

23   was.  And his -- his work product was very good.

24   Q.  And do you have understanding of Denver Police Department

25   policy regarding the documentation of use of force?

Aaron Sanchez - Cross

1    *A.*   Yes, ma'am.

2    *Q.*   And what's your understanding of the purpose of that

3    policy?

4    *A.*   The purpose of it is to document a series of events leading

5    to a use of force so that it -- for transparency, but then to

6    be utilized in court cases, civil, criminal, and then just

7    documentation, and, again, transparency by the Denver Police

8    Department.

9    *Q.*   So transparency to the public?

10   *A.*   Yes, ma'am.

11   *Q.*   And is it your understanding of Denver Police Department

12   policy that officers have to document any uses of force they

13   take?

14   *A.*   Yes.

15   *Q.*   And do you have an understanding of whether or not officers

16   have to document uses of force in a protest situation?

17   *A.*   Yes.

18   *Q.*   What is your understanding of that?

19   *A.*   My understanding is that if it -- if a use of force does

20   occur during a protest, that is to be documented, just as other

21   uses of force would occur.  So I guess, *per se*, it doesn't

22   matter that the use of force occurred at a protest or at a

23   nightclub; it's just a use of force by a Denver police officer

24   needs to be documented you.

25   *Q.*   So just to make it really simple, it's your understanding

Aaron Sanchez - Cross

1  that all uses of force have to be documented?

2  A.  Correct.

3  Q.  And we looked at an email during your direct examination;

4  do you recall that email?

5  A.  I do.

6  Q.  That's the email where you said something to the effect

7  of, this is of utmost importance to protect troops?

8  A.  Yes.

9  Q.  And is it your understanding of Denver Police Department

10  policy that officers were required to document uses of force

11  with or without that email being sent?

12      MR. DOUGLAS:  Objection.  Leading.

13      THE COURT:  Sustained.  Rephrase your question.

14  BY MS. HOFFMAN:

15  Q.  Chief, do you think it made a difference that the email

16  was sent in terms of officers' actual requirement to document

17  uses of force?

18      MR. DOUGLAS:  Objection.  Leading.  Calls for

19  speculation.

20      THE COURT:  Overruled.

21      THE WITNESS:  Can you repeat that?

22  BY MS. HOFFMAN:

23  Q.  Wow.  Chief, did sending that email in your opinion make

24  a difference in terms of officers' requirement to document uses

25  of force?

360

Aaron Sanchez - Cross

1   *A.*  Yes, ma'am, it did.  And, again, that was my reference, the

2   utmost importance, is because -- so that at that point, it is

3   my assumption that there were officers who had not completed

4   those statements.  Lieutenant Berdahl, as the voice of the

5   division chief, is giving a date to correct any of those

6   statements or documentation that wasn't done at the time.  So,

7   again, that was -- the emphasis was that date that he had

8   bolded and he had increased the font.  That, to me, was, this

9   date is extremely important.  So I'm trying to relate that date

10  to get those statements is of utmost importance.

11  *Q.*  Great.  Thank you, Chief.

12        I'd like to move onto another subject.  Did you

13  actually work the George Floyd protests?

14  *A.*  Yes.

15  *Q.*  And you worked them, you testified, as operations chief but

16  also in your capacity as the District 6 commander; is that a

17  fair statement?

18  *A.*  Yes, ma'am.  And the two kind of blend together.  Right?

19  So we -- I referred to the operations chief because that is

20  ICS.  That is, you know, the training that we have learned.

21  But any given day it involved -- in any protest that we are

22  involved in, my role is as the District 6 commander.

23  *Q.*  And prior to the George Floyd protests, had you ever worked

24  any other protests or crowd management situations?

25  *A.*  Several.

Aaron Sanchez - Cross

1    Q.  Can you describe that for the Court?

2    A.  So, you know, being -- being at District 6, being downtown

3    Denver, and having the state capitol in that geographical

4    location, any number of protests occur -- I mean, throughout

5    the building being built.  We are used to having protests on a

6    weekly basis, if not on a routine monthly basis, we would have

7    protests.

8    Q.  And in your opinion, were the George Floyd protests

9    different than previous protests that you've handled?

10   A.  They were different than any other protests I have ever

11   been a part of.

12   Q.  How were they different?

13   A.  They were violent.  They were extremely aggressive towards

14   Denver police specifically.  We have had groups that were

15   extremely passionate about their cause, and we've had groups

16   that have been upset with the Denver Police Department.  These

17   groups were specifically upset with law enforcement, so being

18   in that area of the Denver Police Department.

19   Q.  And do you recall if you worked on May 28?

20   A.  I did.

21   Q.  Can you tell me about your workday.

22   A.  Yes, ma'am.  So that workday -- that was Thursday.  It was

23   a regular workday for me.  So I started the day in my capacity

24   at District 6.  I don't recall what I did during the day,

25   general duties.  However, that evening -- that afternoon I had

Aaron Sanchez - Cross

1   my -- we do a monthly CAB -- community advisory board --

2   meeting.  You have the community in, and you just go over

3   things in the neighborhood.  That is the third Thursday of

4   every month.  That was scheduled for that night, and those are

5   my duties of the evening, to schedule -- to run this CAB

6   meeting.  And I want to say that occurred, oh, 5:00, 5:30-ish

7   was the start time of the CAB.

8   Q.  And at some point in time did you become involved in the

9   city's protest response?

10  A.  Yes, ma'am.  I knew that there was a protest, and I knew it

11  was going to be a larger protest.  But, again, we do protests

12  on a routine basis; so at the time I had -- the administrative

13  lieutenant with me, Aaron Rebeterano.  And so as I was

14  preparing for the CAB -- because you go through statistics

15  and information you have to gather -- I assigned

16  Lieutenant Rebeterano to monitor the protests.  And so he went

17  out in the field on the protests, and then I ran the CAB

18  meeting.

19  Q.  And at what point in time did you start to take an active

20  role in the protest response?

21  A.  After the CAB meeting.

22  Q.  Okay.  Tell me how you became involved in the protest

23  response.

24  A.  Well, it's -- so I remember specifically, because my

25  college son was smoking ribs that day; so I was excited to go

363

Aaron Sanchez - Cross

1   home for the evening.  And I had called him, and I said, Hey,

2   put the ribs on.  I'll be home in a little bit.  I'm just going

3   to check on this protest.

4          As I'm driving down to the area of 13th and Lincoln so

5   I could take just a look at it -- because, we -- again, that

6   day we had a command post.  Commander Pat Phelan is running it,

7   so I didn't necessarily think that I needed to be there at that

8   time.  I was going to take a look at it.  I received a phone

9   call from Lieutenant Rebeterano, who had a group of protesters

10  who had marched to I believe the Millennium Bridge or the

11  highway or elsewhere.  He had called me, and he said, Hey,

12  Boss, this one feels different.  I think I need help.

13         I then turned the corner going up northbound Lincoln,

14  and I saw the large crowd.  And you can hear the chants; you

15  can hear the agitation of the crowd.  And then from that point

16  on, I knew I was going to stay and be involved in this protest.

17  Q.  Great.  A couple of follow-up questions there.  The

18  lieutenant informed you that he needed help at the District 6

19  station.  Did you give him any sort of advice regarding that

20  situation?

21  A.  No.  I'm sorry, ma'am.  He was -- he was on site, so he

22  was, I believe, at the Millennium Bridge, just down the 16th

23  Street Mall.  So he had a group of officers that was following

24  a number of protesters -- for a group that was marching in

25  protest.  And so they were at this off-site location.  In my

Aaron Sanchez - Cross

1    mind, I believe it was the Millennium Bridge.  It could have

2    been up near the highway.  He was just off site.

3    Q.   Thank you for clarifying that.

4    A.   Yes, ma'am.

5    Q.   And at this point in time, are you in the capitol area?  Do

6    I have that right?

7    A.   Yeah.  I am now at about 14th and Lincoln.

8    Q.   And what, if any, observations did you make of protest

9    activities in the capitol area?

10   A.   It was extremely loud.  The group was larger than maybe any

11   group I've seen, and the agitation of that group.

12   Q.   And did you have to take any actions -- any police actions

13   while you were in the capitol area?

14   A.   So at the time -- the initial actions that were taken that

15   I recall were -- there was a group -- and I want to say that

16   there were two District 3 police cars that were parked 14th --

17   so eastbound -- east of Lincoln and before Sherman -- right

18   around Sherman.  They were parked.  They had started to be

19   engulfed by the group, and there was a need to get those cars

20   out of -- out of this protest group.  So we were working and

21   coordinating with Commander Phelan to -- he was trying to get

22   vehicles in -- the RDVs -- rapid deployed vehicles -- the

23   vehicles where the officers stand on the rails -- to those --

24   to those police cars so that we can release those cars, get

25   them out safely.

Aaron Sanchez - Cross

1   Q.  And approximately how many individuals did you observe that

2   had surrounded the District 3 cars?

3   A.  The group in total was hundreds, if not thousands.  It

4   was -- it went from Colfax to 14th and then from Lincoln all

5   the way to the back side of -- or at least halfway -- so like

6   up about Sherman -- of the state capitol.  In the grassy area

7   is what I'm talking about.

8   Q.  And were you able to get the district cars out of -- out of

9   the larger crowd?  Were you able to free them?

10  A.  I was not so -- at the orders of Commander Phelan, he was

11  able to direct the RDVs through the crowd to those cars, and

12  then they were able to get out.

13  Q.  And did you do anything else at the capitol?

14  A.  Just observing at that point.

15  Q.  And did you -- where did you go, then, next?

16  A.  So this went on for a while.  And then at some point we

17  were receiving information -- I want to say that it was the

18  Third Precinct in Minneapolis -- there was a police station

19  that had been burned down, and we were -- I was getting

20  concerned because of the proximity of District 6 that those

21  same types of behaviors could carry over.  And, obviously,

22  because of the proximity, District 6 was the closest police

23  station.  And then I responded back to take command of the

24  district station -- the physical district station and the

25  officers that were assigned there.

Aaron Sanchez - Cross

1    Q.  And were there any protesters at the District 6 station

2    when you came back?

3    A.  Not when I initially got there.  No.

4    Q.  And at some point in time did protesters convene on the

5    District 6 station?

6    A.  They did.  And so the protest groups started to march.  And

7    Commander Phelan was calling it out, they started marching I

8    believe it was eastbound Colfax.  Showed the map a little bit

9    earlier, but it's Lincoln, Sherman, Grant, Logan, Penn, Pearl,

10   Washington, so it's about six blocks -- six-and-a-half blocks

11   to the station.  So the protest group started marching

12   eastbound that six-and-a-half, seven blocks, whatever that is.

13   And so I had about a six-block preparation period.

14   Q.  And can you tell me about what the protesters were doing

15   when they did finally arrive at the District 6 station?

16   A.  It was -- the protest group came eastbound, Colfax, turned

17   onto Washington.  At Washington, that is where the public

18   parking lot of District 6 is.  It's open, and so you can -- you

19   can come into the building, where we have the doors adjacent to

20   where the clerk sits.  So that was the open part.  That group

21   turned onto Washington and then immediately converged onto the

22   District 6 property, at which point we held -- we formed

23   together as best we could a skirmish line so that we could

24   prevent the crowded from converging into the building.

25   Q.  Did you --

Aaron Sanchez - Cross

1   *A.*   The group --

2   *Q.*   Sorry.

3   *A.*   The group was throwing rocks, bottles, and, again coming

4   aggressively towards the property.

5   *Q.*   When you say "coming aggressively towards the property,"

6   can you tell me what you mean by that?

7   *A.*   Again, it was a large number.  They were -- the chants --

8   and I don't recall what the chants were, but it -- it felt

9   hostile.  And, again, throwing rocks and bottles towards and at

10   the officers.

11   *Q.*   And you indicated that police officers formed a skirmish

12   line.  Can you tell me approximately how many officers were on

13   scene at this time?

14   *A.*   I want to say there was about ten to twelve.  We were

15   trying to -- again, so that there were so many protesters that

16   it almost made a human chain or snake.  So there was still a

17   large number of people at the state capitol, and then they had

18   flooded that six blocks to the district station.  So Commander

19   Phelan was trying to manage the state capitol, the route, and

20   then trying to give me personnel at the district station, which

21   took a number of minutes.  It wasn't so long, but we did have

22   to hold that line for ten minutes or so with the ten to twelve

23   officers.

24   *Q.*   When you say Command -- you worked with Commander Phelan to

25   get you some personnel, you mean that Commander Phelan was

Aaron Sanchez - Cross

 1   eventually able to, like, get SWAT and other units over to

 2   help?

 3   A.   Yes.   Utilizing the RDVs, and then we were -- at the same

 4   time we were calling district personnel to get as many bodies

 5   as we could to the station.

 6   Q.   Can you tell me approximately what time you're talking

 7   about right now?

 8   A.   It was dark, and so -- it was just getting dark.   So just

 9   looking at the time frame, in that time of year, my guess is

10   about 9 o'clock-ish.

11   Q.   And did you see any Denver officers use any force at this

12   location?

13   A.   So at this location, I did see officers utilize the pepper

14   ball guns to shoot pepper balls in the area of the protesters.

15   Q.   And did you see anything else besides the deployment of

16   pepper ball?

17   A.   No.

18   Q.   And what was your understanding of why officers were

19   deploying pepper ball?

20   A.   To prevent that aggressive crowd from continuing the

21   advancement.

22   Q.   And did you authorize any uses of force at that location?

23   A.   I did not.

24   Q.   And can you explain a little bit more of your role as the

25   District 6 commander during these protests?

Aaron Sanchez - Cross

1   *A.* Yes.  Yes.  So my role, you know, is really the overall

2   management.  So I have a number of lieutenants, command

3   officers, that are assigned to me.  They are given an area of

4   responsibility.  And then what we try to do is to have officers

5   receiving information from the fewest number of command

6   officers as possible so that they're not receiving conflicting

7   information.

8            The way that we managed the weekend -- and a lot of

9   those protests -- is that I would delegate, and I would assign

10  a lieutenant.  And most specifically, during the protests, it

11  just coincided that we -- I would assign a lieutenant to each

12  side of the building that we knew was going to have these

13  advancements.  So like this given day, Lieutenant Rebeterano

14  when he returned from his duties was then assigned to the west

15  side -- the Washington side of District 6.  And so routinely,

16  there would be a lieutenant on the west side, the east side --

17  or the north side and the east side.  We never assigned anyone

18  to the Colfax, because we -- it was a barrier by a big

19  building, and then our -- like a bar and stuff.

20  *Q.* Are you familiar with the term "dispersal order"?

21  *A.* Yes.

22  *Q.* What's your understanding of the term "dispersal order"?

23  *A.* So dispersal orders are given when you have a group; and

24  generally the officers are trying to get that group to move, to

25  leave.  Dispersal, meaning, you know, leaving the area, backing

Aaron Sanchez - Cross

1   up, doing something along those lines.

2   Q.  And did you give any dispersal orders while on scene at the

3   District 6 station on May 28?

4   A.  No, ma'am.

5   Q.  And why not?

6   A.  The -- at this point, the dispersal wasn't as if we were

7   giving commands.  This was self-defense.  This was my belief

8   that there was imminent danger to the officers at the building

9   and the building itself, and so officers would engage a pepper

10  ball to hold that advancement.  But it felt like an imminent

11  threat to person and to property.

12  Q.  And do you recall approximately how long the incident

13  between officers and protesters -- how long that ended up

14  taking place at the District 6 station on May 28?

15  A.  Maybe a half hour.  So we held that line, and then the

16  crowd retreated back onto Colfax, and then that group moved

17  westbound back towards the state capitol.

18  Q.  Did you and other District 6 personnel do anything with the

19  rocks and projectiles that were thrown at officers during this

20  incident?

21  A.  We did.

22  Q.  What did you do with those?

23  A.  Well, initially -- because at this point we knew there

24  would most likely be a series of days that we were going to

25  have protests, so what I wanted -- what I was wanting to

Aaron Sanchez - Cross

1    prevent was leaving rocks -- any type of weaponry that was out

2    and about.  So we would have the officers -- we would have in

3    the morning, the janitor the next day, go around the building,

4    and then collect any rocks, bottles, anything that could be

5    used as a throwing missile later on in the week.

6           So we collected those -- buckets.  We had buckets, and

7    we saved them for a number of months.  They might still be

8    there, in fact.  One of the ideas that the community resource

9    officers had was to -- this was after the fact -- was to take

10   those -- take those rocks and then go into community groups and

11   have elementary kids and school church groups paint those rocks

12   with positive messages, kind of as rebuilding and working on

13   the relationship with the community.  So we had those buckets

14   because we wanted to do this project with them.

15          THE COURT:  Anybody need a break?

16          (No response.)

17   BY MS. HOFFMAN:

18   Q.  Thank you.  I want to move on from May 28.  I believe on

19   your direct, you were asked a little bit about some briefings

20   that you attended over the course of the protests.  And I'm not

21   going to ask the same questions over again.  But do you recall

22   generally what days those briefings took place?

23   A.  Yes, ma'am.  Every day.

24   Q.  And what was discussed at those briefings?

25   A.  So most of the -- well, the briefings were supervisors and

Aaron Sanchez - Cross

1   above.  Other officers could show up; but the idea was for

2   Commander Phelan to give the orders of the day, assign people

3   areas of responsibility, and then, you know, what the objective

4   was to -- for the day.  And Commander Phelan has a great phrase

5   that he used at every -- every protest.  The group's actions

6   cause our reactions.  Meaning we, Denver Police Department --

7   we're not going out to -- our orders are not to go out to

8   actively engage in a fight.  Our orders are to act upon the

9   actions that are being caused by the group.

10  Q.  And was there any discussion about protocols about when to

11  use less-lethal munitions discussed at those briefings?

12  A.  They're discussed at every briefing.  Yes, ma'am.

13  Q.  And can you give us a brief summary of what was relayed to

14  supervisors at those briefings.

15  A.  Yeah.  And I'll give you, you know, just the general,

16  because I've, again, been a part of so many of them.  But,

17  again, that idea, their actions cause our reactions, But,

18  again, the point being, we do have, you know, responsibilities.

19  Uses of forces, you know, when to engage, reasons to, and just

20  kind of an overview of, you know -- if then, I guess is how I

21  would put it.  If a protest acts this way, then DPD will

22  conduct ourselves in this manner.

23  Q.  And did you do anything to relay what was discussed at the

24  briefing to all of the officers under your charge?

25  A.  Yes, ma'am.  So then the lieutenants and the sergeants who

373

Aaron Sanchez – Cross

1    were at that initial briefing, we would go back to the district

2    station and then have another briefing for the officers.  So

3    the idea being, every officer can't be at the crime lab for

4    these briefings.  Commander Phelan gives the orders,

5    supervisors and commanders and lieutenants go to their

6    respective officers and explain the orders given by Commander

7    Phelan.

8    Q.  And either in your capacity as the District 6 commander or

9    as operations chief, did you have any interactions with

10   community partners over the course of the protest?

11   A.  Yes, ma'am.  We did.  Several, in fact.  Because part of

12   District 6 is the 16th Street Mall.  And then several different

13   businesses and large community groups that -- again, I had

14   talked about, day one, I was at the CAB meeting.  So part of my

15   duties and responsibilities as a district commander are to

16   engage with the community.  So there were a lot of talks and

17   discussions -- you know, the concern especially along the mall,

18   how safe are we?  How safe are our employees?  What can I do to

19   make us safer?  What do I anticipate?  How long is this going

20   to go on?  So a series of those questions.  We held them on the

21   phone.  I was meeting with people in person and just trying to

22   give people some type of sense of, you know, what they could do

23   and what we, DPD, were going to do.

24   Q.  And can you specifically recall the names of any of these

25   community partners or businesses that you spoke with regarding

Aaron Sanchez - Cross

1   some of the concerns you just articulated?

2   *A.*   Yeah.  Probably Beth Moyski and the Downtown Denver

3   Partnership was one group.  And then the group that I worked

4   with a lot that day is Steve Chavez, I believe his title is

5   general manager or something with the 16th Street Pavilions.

6   And then Steve had kind of coordinated efforts to create a down

7   room for officers, where he -- he was going to provide pizzas

8   and sitting spaces and stuff so that officers could take off

9   helmets, some of their gear, sit down, and just be able to

10  relax for a few minutes.

11          So a lot of that, Saturday -- over the weekend,

12  Saturday, Sunday, a lot of that public engagement was trying to

13  set up these down rooms for the officers.

14  *Q.*   Are you aware of any damages caused during the protest to

15  private businesses?

16  *A.*   I am.

17  *Q.*   And can you specifically give us a little more information

18  about that.

19  *A.*   Yes, ma'am.  Most -- most of what we saw at least initially

20  was the graffiti on buildings, on windows, on doors, and then

21  broken windows.  Lots of broken windows along the mall and then

22  the general downtown area.

23  *Q.*   Are you aware of any vandalism or looting?

24  *A.*   I believe so.  I don't recall specifically.

25  *Q.*   I'd like to ask you about some of the other days of the

Aaron Sanchez - Cross

1  protests.  From May 29 until you left for vacation on June 1,

2  is it fair to say that based on your position as District 6

3  commander, at points in time you were always coming back to

4  District 6?

5  A.  Every day.

6  Q.  And do you recall an incident between May 28 and June 1 of

7  2020 where individuals were pushing a dumpster?

8  A.  I do.

9  Q.  Okay.  Can you tell me about that incident.

10  A.  So it was another day.  And referring back to that

11  Washington entrance that I was talking about, the group of

12  protesters were coming in -- directly across -- so on the west

13  side of the street is an apartment complex and then a bar that

14  faces Colfax.  They have one of the large industrial dumpsters,

15  the kind that a trash truck can pick up and dump.  Heavy metal

16  on big wheels.  Not one or two individuals could push.  But a

17  large number had freed that and were pushing that towards the

18  district station, across Washington into the open parking lot.

19  Q.  And what, if anything, was done by you or your officers in

20  response to that?

21  A.  So on this given day, Lieutenant Rebeterano was, again,

22  assigned.  His area of responsibility was that Washington side.

23  He gave orders to pepper ball in the area of the protesters

24  using -- utilizing that large dumpster --

25  Q.  And do you recall approximately what time of day that

Aaron Sanchez - Cross

 1   incident took place?

 2   A.  I believe that it was daylight, evening hours.  It wasn't

 3   dark yet.

 4   Q.  And through the use of pepper ball, were officers able to

 5   stop individuals from further pushing those dumpsters -- that

 6   dumpster?

 7   A.  Yes.  The dumpster did not make it to the Washington

 8   parking lot.

 9   Q.  And do you know if those individuals were apprehended?

10   A.  I don't believe that they were.

11   Q.  And do you know why they wouldn't have been apprehended?

12   A.  There were too many protesters, not enough officers to

13   engage in actually making an arrest at that point at the

14   district station.

15   Q.  And between May 28 and June 1, did you ever encounter any

16   fireworks at the District 6 station?

17   A.  Fireworks, yes.  And they were the commercial size, the

18   big -- the big ones, as you would see at kind of a bigger

19   fireworks show.  I can't think of the word -- you put them in

20   the dumpster, and they're -- they're the higher grade, so not

21   something you would see like a kid on the street.  These were

22   commercial sized, and they were fired at the station and in the

23   direction of the officers.

24   Q.  Not sparklers?

25   A.  Not sparklers.  No, ma'am.

Aaron Sanchez – Cross

1    Q.   Any other projectiles that you specifically recall being

2    directed at officers at any point in time between May 28 and

3    June 1?

4    A.   No, ma'am.  The fireworks, as we discussed, and then rocks

5    and bottles as I had just discussed on that Thursday night

6    continued throughout the evening.

7    Q.   Are you aware of any mutual aid agencies that assisted

8    Denver's protest response specifically in the area of

9    District 6?

10   A.   Yes, ma'am.

11   Q.   And can you tell me the names of some of those partners who

12   assisted specifically at District 6?

13   A.   There were a number of mutual aid departments.  The ones I

14   specifically remember are Douglas County and Arapahoe County.

15   I believe there was a Westminster team with us for a while; and

16   then every day we were working hand in hand with the Colorado

17   State Patrol.

18   Q.   And do you know why Denver requested the assistance of

19   these agencies?

20   A.   We just didn't have enough officers.  The length of the

21   protests, the number of hours of the protests, and so we just

22   needed more officers.

23   Q.   And do you happen to know from observation the less-lethal

24   munitions or other equipment that these mutual aid agencies who

25   were assisting with the defense of District 6 had?

Aaron Sanchez - Cross

1    A.   They appeared to be the same type of equipment that the

2    Denver police officers had.   I don't recall specifically what

3    they were.   I guess in my mind, right now, I don't -- nothing

4    jumps out as, you know, that's different, or I haven't seen

5    that before.   I'm sorry.   That's the best I can recall.

6    Q.   Did you attend any marches on June 1 of the protests?

7    A.   Yes, ma'am.

8    Q.   Can you tell me about that march.

9    A.   So that was in the afternoon and evening hours.   Chief

10   Pazen had been working with a number of individuals and --

11   well, a collective group, in regards to fixing things and

12   starting to work on rebuilding.   Chief Pazen had called me --

13   this is early evening, maybe 5:00, 5:30-ish.   He asked where I

14   was.   I said I was at the district station.   He said he was at

15   Civic Center Park, which is in between the state capitol and

16   the City and County Building.   And he said -- he wasn't quite

17   sure what he was going to do, but he wanted to work on

18   relationships.

19         At that -- he hung the phone up on me, and I called

20   Commander Phelan and asked him where Chief Pazen was.   And he

21   said, I think he is right here, referring to in the crime lab.

22   And he is like, he is not here.   This is where I think he is.

23   I immediately went to Civic Center, just to be with the chief.

24   And then when I got there, Chief Pazen was engaged in very

25   positive friendly conversations with a group.   And that there

379

Aaron Sanchez - Cross

1   was -- they were discussing this peace march, that did occur,

2   but the logistics of marching and everything.  And so I was

3   engaged, not by any of my doing, but by Chief Pazen of working

4   with this group.  And, in fact, the march did occur, hand in

5   hand, arm in arm, with Chief Pazen and myself.

6   Q.  How long was the march?

7   A.  The march was a while.  So the march went from the Civic

8   Center Park, down Colfax to Speer, five, six blocks, and then

9   around Speer, Sculpture Park at the DCPA, and then it came up

10  the 16th Street Mall, and then it came back to the state

11  capitol.

12  Q.  And did you see any property damage or any uses of -- or

13  any acts of violence by individuals with the protesters during

14  that march?

15  A.  None.

16  Q.  And did you see any DPD officers deploy any force during

17  that march?

18  A.  None.

19  Q.  And did you encounter any other completely peaceful protest

20  activities from May 28 to June 1?

21  A.  I did.

22  Q.  And when that happened, did you observe any DPD uses of

23  force in response?

24  A.  No.

25          THE COURT:  We'd better take a break here.  It's a

380

Aaron Sanchez - Cross

1  little after 11:00.  Are you almost finished?

2          MS. HOFFMAN:  I have less than five minutes of

3  questions.

4          THE COURT:  But there will be some redirect.

5          MR. DOUGLAS:  A little.

6          THE COURT:  Let's stop for ten minutes.

7          (Recess at 11:01 a.m.)

8          (In open court at 11:13 a.m.)

9          MR. RINGEL:  Your Honor, can I raise something with

10  the Court?

11          THE COURT:  Okay.

12          MR. RINGEL:  I just wanted to advise the Court of

13  something.  The next witness is the plaintiffs' expert, Norman

14  Stamper.  I've been working with Mr. Aro, who is going to

15  conduct the examination.  And I've stipulated to most of the

16  video that is going to be played, but I haven't stipulated to

17  all of it.  And I wanted to advise the Court of that, because

18  there is a few of the video that I need to make a record

19  related to.  And I was hoping I could come up and approach and

20  do it that way, if that was okay with the Court.

21          THE COURT:  Sure.

22          MR. RINGEL:  Okay.  I just wanted to let the Court

23  know before that started, while we have a break.

24          THE COURT:  Okay.

25          (Jury in at 11:15 a.m.)

Aaron Sanchez – Cross

1          *MS. HOFFMAN:*  May I proceed?

2          *THE COURT:*  What would you do if I said no?

3          Go.  Go.

4   *BY MS. HOFFMAN:*

5   *Q.*  Hello again, Chief.  I just have a couple more questions

6   for you.  Just going back to that march on June 1 that we were

7   discussing before we took a break.  Do you have an

8   understanding that some of the people you were meeting with at

9   that march were activists who were involved in organizing the

10  march?

11  *A.*  Yes, ma'am.  I believe that was Black Lives Matter.

12  *Q.*  And do you have an understanding if conversations were had

13  either with you or with another member of the department with

14  those Black Lives Matter activists?

15  *A.*  I don't know who all, but I do know that Chief Pazen

16  throughout Monday was engaged with this group.  Because by the

17  time that they got there, they all knew each other well.  And

18  it was very friendly, very cordial conversations, and they

19  had -- the conversations was as if they had been talking for a

20  number of hours.

21  *Q.*  Chief, did your Denver Police Department cruiser sustain

22  any damages from May 28 to June 1?

23  *A.*  Yes, ma'am.

24  *Q.*  Can you tell me about that?

25  *A.*  So this was Saturday night, the 30th.  It was late in the

Aaron Sanchez - Cross

1    evening.  Protests had been going on for a number of hours.

2    Four of our -- three of our Denver police officers were

3    severely injured, run over, along the Colfax corridor; and they

4    were transported to Denver Health Medical Center.  I received

5    that information over the radio.  And I was by myself.  I got

6    into my police cruiser, exited the Washington side of the

7    building onto Colfax.  Again, I was by myself.  When I hit

8    Colfax, I was bombarded with a number of projectiles, mostly

9    rocks, bottles, being thrown at the car.

10   Q.  I apologize if I missed this, but did you have a time that

11   that approximately occurred?

12   A.  It was late into the -- late night -- I believe it was

13   before midnight.  It could have been after midnight.  It was

14   late into the evening or early hours of Sunday morning.

15   Q.  And your car sustained damages as a result?

16   A.  Yes, ma'am.

17   Q.  Can you describe that?

18   A.  Cosmetic.  They did not break any of the windows out, but I

19   had huge dents and dings that the car took.

20   Q.  Are you aware of any other District 6 cruisers that

21   sustained any damages from May 28 to June 1?

22   A.  Yes, ma'am.  There were numerous cars that were damaged.  I

23   don't have the exact number.  The problem is COVID.  And so we

24   had a number of city employees that were not at work, so those

25   vehicles -- we just didn't have mechanics or teams that we

Aaron Sanchez – Cross

1    could down cars and get them fixed.  So a lot of these vehicles

2    just sustained damage that we ultimately lived with.  So there

3    were a number of cars in the parking lot that received damage

4    from rocks, boulders, things along these lines.

5    Q.  And you mentioned the night that your cruiser sustained

6    damages, that you were responding to the hospital for a report

7    of some officers being injured, did I get -- did I recall that

8    correctly?

9    A.  Yes, ma'am.

10   Q.  Do you have any personal knowledge about the reason why

11   those officers were injured?

12   A.  The officers were injured because an individual turned the

13   car and had driven into them along that Colfax corridor.  And

14   those three were hit, as they were along Colfax.

15   Q.  And were you able to visit those three individuals in the

16   hospital?

17   A.  I was.

18   Q.  And do you have an understanding of those three

19   individuals' injuries?

20   A.  Significant.  Yes, ma'am.  All three have significant

21   injuries.

22   Q.  Can you tell me about the significant injuries?

23   A.  Yes, ma'am.  The first officer sustained back injuries to

24   the point that two days ago, I believe -- he ultimately had to

25   depart from the Denver Police Department after, you know, a

Aaron Sanchez - Cross

1    year and a half of attempting to rehab.  He just separated from

2    the job because of his injuries.

3            The second officer, his injuries didn't look that bad;

4    but he sustained compartmental syndrome to the leg, to the

5    point that he had a number of procedures -- I don't know if

6    there was surgery or whatnot -- relieving pressure -- whatever

7    you do for compartment syndrome, he had to go through that, and

8    it was a number of months that he was out.

9            And then the third, I observed as I got there, his

10   foot was completely backwards.  The -- as I got there --

11   unfortunate timing for me -- the ER doctor was just getting

12   there and had told him, there was only one way to bring that

13   foot around, and physically grabbed it and forced the foot

14   somewhere in a normal condition.

15   Q.  Going back to the first officer you described, is it your

16   understanding that that officer despite rehabbing was just

17   never able to perform the essential functions of the job and

18   had to -- had to leave his position?

19   A.  Yes, ma'am.

20          MR. DOUGLAS:  Objection.  Leading.

21          THE WITNESS:  Yes, ma'am.

22          MS. HOFFMAN:  Nothing further.

23          Sorry.  Actually, can I confer briefly with

24   co-counsel?

25          THE COURT:  You said a couple of questions.  Is that

Aaron Sanchez - Redirect

1    like a couple of beers?

2              *MS. HOFFMAN:*  Nothing further now.

3              *THE COURT:*  All right.  Redirect.

4              *MR. DOUGLAS:*  Thank you, Your Honor.

5                        **REDIRECT EXAMINATION**

6    *BY MR. DOUGLAS:*

7    *Q.*  Chief Sanchez -- first of all, I think I slipped and I was

8    calling you Commander Sanchez because I only learned of your

9    promotion this morning.

10   *A.*  I'm still not used to the new title.

11   *Q.*  I didn't mean any disrespect by that.

12   *A.*  None taken.

13   *Q.*  First of all, I want to ask you very briefly about the

14   Lieutenant Chavez allegations.  We talked about that.  You

15   testified that you notified Division Chief Ron Thomas about

16   that.  Do you know if Division Chief Thomas followed up or

17   further investigated those allegations after you notified him

18   about them?

19   *A.*  No, sir.

20   *Q.*  Okay.  And you talked about your email about the use of

21   force reports, where you said, this is of the utmost importance

22   to protect you and your troops; do you recall that?

23   *A.*  Yes, sir.

24   *Q.*  And it's your testimony that what you meant was that the

25   officers could get into some sort of internal trouble if they

Aaron Sanchez – Redirect

1    didn't fill them out; right?

2    A.  And, again, specific to that date, that timeline.

3    Q.  Okay.  Do you know if anyone, even a single officer, was

4    disciplined for failure to complete a use-of-force report

5    relating to their use of less-lethal force during the protests?

6    A.  No.

7    Q.  You talked about your understanding, some observations of

8    various things, throwing rocks, bottles, graffiti, breaking

9    windows, so I want to ask you a few questions about that.

10           Do you have any information that would suggest that

11   any of the twelve plaintiffs in this case were involved in any

12   way in throwing rocks or bottles or anything else at officers?

13   A.  I do not know that.

14   Q.  Do you have any information that any of the twelve

15   plaintiffs were involved in any graffiti?

16   A.  No, sir.

17   Q.  Do you have any information that any of the plaintiffs were

18   involved in breaking any windows?

19   A.  I do not.

20   Q.  Do you have any information that any of the plaintiffs were

21   involved in that incident you talked about where people were

22   pushing a dumpster?

23   A.  No, sir.

24   Q.  Do you have any information that any of the plaintiffs in

25   this case shot any fireworks at the police?

Aaron Sanchez – Redirect

1    *A.*  No.

2    *Q.*  Do you have any information that any of the plaintiffs in

3    this case threw rocks or bottles at your car?

4    *A.*  No, sir.

5    *Q.*  And the plaintiffs were certainly not the people who were

6    driving that car that injured those three officers; right?

7    *A.*  They were not.

8    *Q.*  Okay.  By the way, was that driver arrested?

9    *A.*  He was arrested.

10   *Q.*  I'm glad to hear that.  Were you interviewed personally by

11   the Office of the Independent Monitor, Nick Mitchell and his

12   team?

13   *A.*  No, sir.

14   *Q.*  You realize -- you're aware that he produced a publicly

15   available report about his findings based on investigation of

16   the police responsible to the George Floyd protests?  You're

17   aware of that; right?

18          *MS. HOFFMAN:*  Objection.  This is outside the scope.

19          *THE COURT:*  Overruled.

20          *THE WITNESS:*  Yes, sir.  I did not read it.

21   *BY MR. DOUGLAS:*

22   *Q.*  You did not read it?

23   *A.*  No, sir.

24          *MR. DOUGLAS:*  Thank you.  I have no further questions.

25          *THE COURT:*  Any questions from the jurors for this

1    witness?

2              Yes.  Okay.

3              (Hearing commenced at the bench.)

4              THE COURT:  No. 3.

5              MS. HOFFMAN:  Can I think on that one for a second?

6              THE COURT:  Sorry.  What did you say?

7              MS. HOFFMAN:  I just asked if I could have a second on

8    that one.

9              THE COURT:  Yeah.

10             MS. HOFFMAN:  I mean, it's somewhat objectionable, but

11   that's -- we're not going to object.  That's fine.

12             THE COURT:  No objection?

13             MS. HOFFMAN:  That's fine.

14             MR. DOUGLAS:  None.

15             THE COURT:  No. 4.

16             MS. HOFFMAN:  That's fine.

17             MR. DOUGLAS:  Yeah.

18             THE COURT:  No. 5.

19             MS. HOFFMAN:  That's fine.

20             MR. DOUGLAS:  Yeah.

21             THE COURT:  No. 6.

22             MS. HOFFMAN:  That's fine.  Can I see the first one

23   one more time, Your Honor?

24             THE COURT:  Thank you.

25             MR. DOUGLAS:  Thank you, Your Honor.

1          (Hearing continued in open court.)

2          THE COURT:  All right.  Chief, we have some questions

3     for you from the jurors.

4          THE WITNESS:  I thought I was done.

5          THE COURT:  Not just yet.

6          THE WITNESS:  Okay.

7          THE COURT:  Question:  Do you believe that the

8     protesters were upset specifically with DPD before the first

9     evening of the protests or is it the escalation of force that

10    they were upset about?

11         THE WITNESS:  I believe that they were upset with

12    overall law enforcement, which stemmed from the George Floyd

13    incident.  So the answer is, yes, I believe the crowd was

14    already upset prior to any engagement with DPD specifically.

15         THE COURT:  Question:  What were the orders of the

16    day?

17         THE WITNESS:  The orders of the day -- and I'm

18    assuming are specific to -- in regards to Lieutenant Chavez.

19    The orders of the day were to advise first of the curfew order.

20    So I don't recall another time in my 30 years, 29 1/2 years on

21    the Denver Police Department that a curfew order had ever been

22    given.  So the orders of the day in regards to that were,

23    advise, advise, advise.  Citations and arrest as a last resort.

24         THE COURT:  Were they communicated to all officers

25    working the protests?

1      THE WITNESS:  They -- those orders were communicated

2  in my presence to all supervisors and commanders, and then

3  those -- specifically, sergeants took those orders back to

4  individual officers.  So my assumption is that the sergeants

5  did their job and reported that back to their officers.

6      THE COURT:  Question:  At what point during a protest

7  are less-lethal weapons deployed, or what actions by the

8  protesters justified less-lethal weapons  Sort of the same

9  question.

10      THE WITNESS:  Yes, sir.  And so specific to me, the

11  times that less-lethal was deployed was in regard to truly an

12  imminent threat to the personnel that were assigned at that

13  district station.  So the crowd was converging, and less-lethal

14  was deployed to prevent the crowd from overtaking the building.

15      THE COURT:  Do you limit your knowledge to just at

16  that building, or could you speak to it generally?

17      THE WITNESS:  So I know that there was other -- other

18  events, but they weren't specific to me.  And so when and how

19  and why they were deployed, I don't know.

20      THE COURT:  Question:  As a commanding officer, are

21  you required to follow -- sorry -- to follow up with complaints

22  against officers within a certain amount of time?

23      THE WITNESS:  So that's a very good question.  And,

24  again, this is a hybrid model of what the -- it was out of the

25  norm of what we do.  In any given situation, my follow-up would

Aaron Sanchez - Examination

1    be notifying my division chief and then working and making sure

2    there were -- Internal Affairs was included for the follow-up.

3    And, again, in this situation, so much was going on.  My

4    interpretation was that that follow-up would have been

5    conducted by Lieutenant Kim Bowser, who was at the crime lab

6    and receiving information, who later we found out was Sergeant

7    Ryan Koenigsfeld.  We didn't -- I didn't know who it was at the

8    time; I don't believe my division chief knew who that was at

9    the time; I believe that information came out later as to

10   specifically -- so in regards to that, because of the

11   situation, I had an understanding that the follow-up would have

12   been done and conducted by Kim Bowser.

13          THE COURT:  The question is:  As a commanding officer,

14   are you required to follow up with complaints against officers

15   within a certain amount of time?

16          THE WITNESS:  I don't know the answer to that.  I

17   don't know -- we are required to follow up specific amount of

18   time.  I don't -- I can't recall the specific time frame.

19          THE COURT:  Any other questions from the jurors?

20          (No response.)

21          Follow up, plaintiff?

22          MR. DOUGLAS:  One question, Your Honor, if I may.

23                          **EXAMINATION**

24   BY MR. DOUGLAS:

25   Q.  Chief Sanchez, you agree that each use of force against an

Norman Stamper – Direct

1   individual has to be justified by the specific situation and

2   actions of the person against whom it is deployed?

3   A.  Yes, sir.

4          MR. DOUGLAS:  Thank you.

5          THE COURT:  Follow up from the defendants' side?

6          MS. HOFFMAN:  Nothing further.

7          THE COURT:  Okay.  Thank you, Chief.

8          THE WITNESS:  Thank you.

9          THE COURT:  You're excused.  Free to go.

10         THE WITNESS:  Thank you.

11         THE COURT:  You're welcome to stay and watch if you

12  want.

13         THE WITNESS:  No, sir.  But thank you.

14         THE COURT:  I always get that response.

15         Okay.  Next.

16         MR. ARO:  Good morning, Your Honor.  Ed Aro of

17  Arnold & Porter for the Epps plaintiffs.  The plaintiffs now

18  call Captain Norman Stamper.

19              (**NORMAN STAMPER, PLAINTIFFS' WITNESS, SWORN**)

20         THE COURT:  Have a seat.

21         THE WITNESS:  Thank you.

22                     **DIRECT EXAMINATION**

23  BY MR. ARO:

24  Q.  Good morning.

25  A.  Good morning.

Norman Stamper - Direct

1   *Q.*  I already demoted you.  I meant to say Chief.

2         Would you say your name for the record, please.

3   *A.*  Yes.  My name is Norman Stamper, S-T-A-M-P-E-R.

4   *Q.*  Where do you live?

5   *A.*  I live in Orcas Island off the state of Washington.

6   *Q.*  Is it fair to describe you as a career police officer and

7   commander?

8   *A.*  Yes.

9   *Q.*  You're here today to talk about police practices and proper

10  crowd control techniques?

11  *A.*  Yes.

12  *Q.*  Did you help us put together a PowerPoint deck to contain

13  the video and the other materials that we're here to talk

14  about?

15  *A.*  I did.

16         *MR. ARO:*  May I publish that, Your Honor?

17         *THE COURT:*  I don't know what it is you're publishing.

18         *MR. RINGEL:*  I've never seen it.

19         *MR. ARO:*  So there -- there are two things.  There is

20  a deck that has sort of chapter headings that we're going to

21  talk about to help the jury follow how things relate, and a

22  brief summary of his background.  And then we put the videos

23  and the documents into it in a form that we've already

24  discussed with counsel.  And the -- all of the materials were

25  stipulated or was contained in his reports.  It's all fully

1    disclosed, and -- except for a couple of the exhibits that

2    Mr. Ringel was talking about earlier, which I will pause before

3    we play so that he can make his record.  That's what we have in

4    mind.

5            THE COURT:  To begin with, you have to put an exhibit

6    number on it.

7            MR. ARO:  There are exhibit numbers on everything;

8    there are times on everything.  Because he saw so many videos

9    and because he has so many videos to talk about, nearly 50, we

10   put them into a PowerPoint deck so that we could do it quickly,

11   as opposed to having to bring them up one by one.

12           THE COURT:  Okay.  So what's the exhibit number of the

13   PowerPoint deck?

14           MR. ARO:  I'd be happy to put an exhibit number on it.

15           1242, Your Honor.

16           MR. RINGEL:  I don't have an objection to the deck and

17   the usage of that for video; but to the -- you know, I haven't

18   seen any text or anything like that, so I can't stipulate now

19   to any other information other than the videos at that point.

20           THE COURT:  Okay.  Well, let's get started.  I'll

21   conditionally admit it.

22           But, Mr. Ringel, you may object to any portion of it

23   you want as we go forward.

24           MR. ARO:  I appreciate that, Your Honor.  Thank you.

25           MR. RINGEL:  Thank you, Your Honor.  I don't even know

Norman Stamper - Direct

1   if I'll have an objection.  It's not just something I've ever

2   seen.

3          *THE COURT:*  I know.  I get it.

4   *BY MR. ARO:*

5   *Q.*  I'd like to start before we get into your opinions with a

6   brief description of your background, starting when you first

7   entered the police profession.  How old were you when you first

8   joined the police force?

9   *A.*  Twenty-one.

10  *Q.*  And what year was that?

11  *A.*  1966.

12  *Q.*  Where did you join the police force at that time?

13  *A.*  San Diego.

14  *Q.*  And how long were you an officer and commander in

15  San Diego?

16  *A.*  Twenty-eight years there.

17  *Q.*  Without going through every single assignment you had,

18  would you describe for us the arc of your time with the

19  San Diego PD.

20  *A.*  Yes.  I was a police patrol officer, I did a couple of

21  undercover stints during that tenure, was promoted to sergeant,

22  formed a patrol planning unit, then promoted to lieutenant,

23  during which time I wrote a grant proposal for, actually, the

24  country's first community policing program.  I served in that

25  capacity as a lieutenant for four years, promoted to captain,

Norman Stamper - Direct

1    served in that capacity for eight months, at which time I

2    basically approached the chief and told him that I was going to

3    be resigning.  He then spoke to the city manager, and the two

4    offered me a job that was attractive to me, which I took.  And

5    that was --

6    Q.  Why were you thinking about resigning at that point?

7    A.  I had developed a real passion for police reform and

8    believed that -- on a national scale and believed that I could

9    do more and better work as a consultant, as a professor, and,

10   in fact, was talked out of that by the city manager and the

11   police chief.

12   Q.  What was the job that they offered you that enticed you to

13   rejoin the force?

14   A.  Organizational ombudsman.

15   Q.  And what did that role consist of?

16   A.  It involved participating in forming conflict management

17   mechanisms in the community and within the police department.

18   I studied at that time organization development and learned

19   what I could, forming a body of knowledge about what works and

20   what doesn't work in organizational change.

21   Q.  How long did you have that role?

22   A.  Six years.

23   Q.  And what was your next job with the San Diego PD?

24   A.  The next job was as an assistant chief.

25   Q.  How long did you hold the role of assistant chief?

397

Norman Stamper - Direct

1    A.   I held that role for approximately six or eight years, as I

2    recall.   I served in each of the bureaus of the department --

3    investigations, patrol, human resources or personnel services,

4    and the like.

5    Q.   What was your next job after that?

6    A.   The next job was as the number two officer in the

7    department, the assistant chief of police.

8    Q.   And roughly how many officers did the San Diego PD have at

9    the time that you became the number two?

10   A.   At that time, it was approximately 1,800, as well as 3 or

11   400 civilian personnel.

12   Q.   How long did you hold the job as the assistant chief?

13   A.   As the executive assistant chief, that was five years.

14   Q.   Okay.   And what was your next job?

15   A.   Seattle's police chief.

16   Q.   How was it that you became Seattle's police chief?

17   A.   I was recruited by an executive search firm and was

18   selected by the mayor of the City of Seattle.

19   Q.   I'll let you fill your cup.

20   A.   Thank you.

21   Q.   When did you become the chief of police in Seattle?

22   A.   That was 1994.

23   Q.   How long did you hold that role?

24   A.   Six years.

25   Q.   How big was the Seattle PD when you were chief?   How many

Norman Stamper - Direct

1   civilians and how many officers?

2   A.   There were about 1,300 sworn police officers and several

3   hundred, 4 to 500 civilian personnel.

4   Q.   Okay.   During the time that you were the chief of police in

5   Seattle, did you have any exposure to crowd control and crowd

6   management situations?

7   A.   I did.

8   Q.   Had you previously dealt with crowd control and crowd

9   management when you were working in San Diego?

10  A.   Yes.   At all levels.

11  Q.   How many times during your time in San Diego, the 28 years

12  you spent there, were you involved directly as an officer or a

13  commander in a crowd control situation in the nature of a

14  protest?

15  A.   Several dozen.   This was the '60s, so we were looking at

16  everything from campus unrest, to antiwar demonstrations, to

17  assorted labor actions, as well.

18  Q.   And during any of those protests were you a -- for lack of

19  a better word -- street cop in the front lines?

20  A.   The each of the levels.   I started as a patrol officer; in

21  control of the squad of officers during protests, as a

22  sergeant; as a field commander, lieutenant, responsible for the

23  police department reaction to protests.

24  Q.   And in any of those protest situations that you were

25  involved in in San Diego, was there violence on the part of

Norman Stamper - Direct

1    some of the people in the crowd?

2    A.   Yes.

3    Q.   People yelling, people throwing things, vandalism, that

4    kind of thing?

5    A.   That and other activities, like arson fires and the like.

6    Q.   Okay.  During the time that you were in Seattle, you also

7    had some involvement in crowd management in the nature of

8    public protest?

9    A.   That's correct.

10   Q.   Was there a particular public protest that you had

11   responsibility for during your time as the Seattle PD chief?

12   A.   Well, certainly the one that is -- was most significant

13   during my tenure was the so-called Battle of -- or in --

14   Seattle, which was the World Trade Organization

15   anti-globalization riots.

16   Q.   When did those happen?

17   A.   Late November, early December 1, 1999.

18   Q.   So this is the year before you left the department?

19   A.   Correct.

20   Q.   Are you aware of roughly how many protesters were involved

21   in the WTO protests, the event you just described?

22   A.   Sure.  Depending on day of week or time of day, the number

23   ranged from 40,000 to 60,000.

24   Q.   And was there violence among some of the people who were

25   protesting?

400

Norman Stamper - Direct

1   *A.*   There -- I'm sorry.  Yes, there was.

2   *Q.*   What kind of violence?

3   *A.*   The dumpster kind of action that was described earlier

4   today, we saw a fair amount of that; we saw arson fires; we saw

5   rocks and bottles thrown at police officers and at our horses;

6   we saw police cars torched; and a significant amount of

7   violence over the course of that week.

8          *MR. ARO:*  Your Honor --

9   *BY MR. ARO:*

10  *Q.*   Actually, two more questions.  Give me a brief thumbnail of

11  your education since high school.

12  *A.*   Since high school, an associate of arts -- associate of

13  science -- I'm sorry -- in what was then called police science,

14  and then criminal justice degrees at the baccalaureate and

15  master's level at San Diego State University, and then a Ph.D.

16  in leadership and human behavior from United States

17  International University, which is now known as Alliant

18  International University.  It merged with a school of

19  professional psychology.

20  *Q.*   What was your dissertation about?

21  *A.*   It was on the professed values versus the observed behavior

22  of American big city police chiefs.

23         *MR. ARO:*  At this time plaintiffs would tender Chief

24  Stamper to give expert testimony under Rule 702 concerning

25  police and crowd management practices.

Norman Stamper - Direct

1          MR. RINGEL:  No objections with that limited

2     designation.

3          THE COURT:  Okay.  Onward.

4          MR. ARO:  He also, Your Honor, will be tendered to

5     provide rebuttal testimony potentially at a later point in the

6     case.  I just wanted to make that clear.

7     BY MR. ARO:

8     Q.  What did you review to learn about what happened in Denver

9     and come to an understanding of the police practices that

10    you're here to testify about today?

11    A.  A very large number of depositions and declarations and

12    videotape.

13    Q.  How much videotape?

14    A.  I would have to say dozens and dozens of videos.

15    Q.  Okay.  And during the course of your evaluation of police

16    practices, did you receive everything that you feel like you

17    need to support the opinions that you're here to testify to

18    today?

19    A.  Yes, I do.

20    Q.  Okay.  And you wrote several extensive reports detailing

21    your conclusions that were provided to counsel for the City?

22    A.  Three reports.  Yes.

23          MR. ARO:  I'd like to review --

24          Your Honor, this is for purposes of transparency here.

25    The opinions that I'm going to put up in the PowerPoint all are

Norman Stamper - Direct

1   headlines from the reports that he wrote that were fully

2   disclosed before.  I'm just doing it so we can organize the

3   testimony.

4   *BY MR. ARO:*

5   *Q.*  I'd like to go through the things that you talked about

6   during the course of your evaluation, starting with an opinion

7   concerning the use of force by the DPD against protesters.  Is

8   that an issue that you evaluated?

9   *A.*  Yes.

10  *Q.*  And what was your conclusion with respect to that issue?

11  *A.*  My conclusion, as written here, is that the Denver Police

12  Department had a policy, practice, or custom of

13  indiscriminately and improperly using force against protesters.

14  *Q.*  So when we talk about indiscriminate in the context of the

15  use of force against people in a group, demonstration, or

16  protest, what does the word "indiscriminate" mean?

17  *A.*  I think the easiest way for me to explain that is to give

18  you an example.  Let's assume for a moment that there are 100

19  protesters, of which three or five may be throwing rocks,

20  bottles, or otherwise engaged in criminal behavior as the

21  others are peacefully protesting.  When less-lethal weapons,

22  munitions, tear gas, other chemical agents are used, I would

23  define that as indiscriminate.

24  *Q.*  When they're used against the people throwing rocks and

25  bottles?

403

Norman Stamper - Direct

1   A.  Well, indiscriminately.  If the agent, for example -- a

2   chemical agent is sprayed on everyone who is involved in that

3   crowd, with only a small handful engaged in the criminal

4   behavior, I would describe that as indiscriminate.

5   Q.  Did you also look at the question of the dispersal orders

6   that were given to or not given to protesters by DPD officers

7   involved in the George Floyd protests?

8   A.  Yes, I did.

9   Q.  And what was your opinion on that subject?

10  A.  My observation was that such dispersal orders were rarely

11  if ever given.  I had to actually hear someone say, no, there

12  is a case in which somebody can be heard saying to a group of

13  people, Disperse, disperse, or what have you.

14  Q.  Okay.

15  A.  I did not hear that one, and I don't have any evidence of

16  any other official announcements or dispersal orders.

17  Q.  Okay.  Did you also look at the extent of the discretion

18  that the DPD gave its officers with respect to the kind of

19  weapons that they would use against protesters and when to use

20  those weapons?

21  A.  I did.

22  Q.  What's your opinion on that subject?

23  A.  Again, my observation, accompanied by my opinion, is that

24  it appeared that the officers -- the line officers themselves

25  were essentially allowed to pick whatever weapon or tool they

Norman Stamper - Direct

1   chose and, in fact, to employ that against the protesters.

2   Q.  Okay.  Did you also look at the question of training and

3   the evidence of training that you see in the conduct of

4   officers who were involved in the George Floyd protests?

5   A.  Yes.

6   Q.  And what's your opinion on that topic?

7   A.  Based on what I observed of the performance and conduct of

8   the officers, I concluded that there was woefully inadequate

9   training of those officers.  I saw them as, essentially,

10  undisciplined and using techniques and methods that I know of

11  no other police department would permit.

12  Q.  Okay.  Did you also look at the question of DPD's efforts

13  to or not to hold officers accountable for improper conduct,

14  violations of policy, excessive use of force against

15  protesters?

16  A.  Yes.

17  Q.  And what's your opinion on that subject?

18  A.  There was, essentially, no discipline.  I have since

19  learned from the submission of my reports that there were one

20  or two, perhaps three officers who received some form of

21  discipline.  But in general, after looking at what I consider

22  to be acts of misconduct on the part of the officers, I was

23  asked repeatedly, do you -- was there any discipline

24  administered here or there?  And my response was, no.

25  Q.  Okay.  And did you also look at the question of

405

Norman Stamper - Direct

1   preparations by DPD both before George Floyd's murder and then

2   between the murder and the first day of protests in Denver --

3   preparations for potential demonstrations in Denver?

4   A.   I did.

5   Q.   And what is your opinion on that subject?

6   A.   My opinion on that is that from the time of the Derek

7   Chauvin murder of George Floyd, protests erupted globally, that

8   there were George Floyd protests in a thousand cities in the

9   United States, on all seven continents, now looking globally,

10  that there was a huge response on the part of people throughout

11  the world to what they had seen on May 25 of 2020 in

12  Minneapolis, and protests did in fact erupt everywhere.

13  Q.   What is your opinion about the efforts of the DPD, given

14  the circumstances you just described, to prepare for the

15  potential for those demonstrations to spread to Denver?

16  A.   Yes.   I apologize.   I -- I was describing I think what had

17  happened in the immediate wake of what the world saw on that

18  day and the time and opportunity for police agencies to come

19  together, to plan, to prepare for what I knew to be the

20  inevitable.   And I was told that Denver police officers

21  essentially said, this took us by surprise.   It was bigger than

22  anything we had ever seen.   We didn't have time to do the kind

23  of planning, preparation, and training that we would have liked

24  to have done.

25  Q.   And, lastly, in terms of the headlines, before we get into

Norman Stamper - Direct

1    the details, did you look at all the evidence that you saw and

2    try to identify a root cause for the errors and the improper

3    conduct of the officers that you saw on the video?

4    *A.*   Yes.

5    *Q.*   And what is your opinion on that subject?

6    *A.*   I saw what I would describe as a sweeping failure of

7    leadership, from the executive level to first-line supervision.

8    I saw a lack of training, education, a lack of accountability,

9    particularly in the form of discipline against individual

10   officers who had engaged in what was to me conspicuously

11   misconduct.

12        *MR. ARO:*   Your Honor, I know that we just took a

13   break; but we're about at noon.  I'm going to change subjects.

14   Is this a good time to break for lunch?

15        *THE COURT:*   I think that makes sense.

16        *MR. ARO:*   Okay.  Thank you.

17        *THE COURT:*   How much time for lunch today, folks?  Are

18   you going to say two hours again?  Are you going to say all

19   day?

20        *JUROR:*   Hour 15.

21        *THE COURT:*   Got it.

22        (Recess at 11:58 a.m.)

23        (In open court at 1:19 p.m.)

24        *THE COURT:*   Okay.

25        *MR. ARO:*   Okay to proceed, Your Honor?

Norman Stamper - Direct

1       *THE COURT:*  Yes.

2       *BY MR. ARO:*

3       Q.  Chief Stamper, I'd like to now get into the details behind

4       the opinions that you summarized for us before lunch, starting

5       with and really going in the order that you went through those

6       summary opinions, starting with the use of force against

7       protesters and the question of whether the DPD took steps to

8       isolate people who were violent or engaged in unlawful conduct

9       from people who were protesting peacefully.

10              And to get into that, I want to start with, what's the

11      idea -- when we're talking about isolating violent protesters

12      or people who commit acts of violence, who aren't protesting

13      anything, they're just taking advantage of the situation, what

14      is the idea of isolating those people from the group of

15      protesters who are protesting lawfully?

16      A.  Well, by definition, those who are protesting lawfully have

17      not committed any offenses.  Those who are committing criminal

18      offenses within the context of a protest should -- and any

19      number of authorities cite this -- be isolated and taken into

20      custody.

21      Q.  So you mentioned any number of authorities recognize that

22      idea.  Is there a sort of clearinghouse of good policy and

23      practice for police departments?

24      A.  Yes.  As a matter of fact, there is a model crowd control

25      policy promulgated by the International Association of Chiefs

Norman Stamper – Direct

1   of Police, also known as IACP.

2   Q.  So before we get to the policy, what is the IACP?

3   A.  It is an international association of police chiefs.

4   Q.  What kind of functions does it perform?

5   A.  It provides education and training; it drafts, circulates,

6   and alternately approves model policies for a variety of police

7   functions.

8   Q.  Is IACP a recognized body among police departments like

9   Seattle or Denver, San Diego, as a source of good ideas about

10  how to do policing?

11  A.  Yes.  In the company of the Police Executive Research

12  Forum, the Police Foundation, IACP is probably seen as the

13  premier organization for those kinds of proposed policies to be

14  adopted by local jurisdictions.

15  Q.  Do you know anything about whether the Denver Police

16  Department has taken guidance from or accepts guidance from

17  IACP in the development of policies?

18  A.  Yes.

19  Q.  What do you know about that?

20  A.  That they do, in fact, recognize IACP and embrace,

21  certainly, many of their model policies.

22       MR. ARO:  Okay.  Would you please put up Exhibit 1016.

23  Actually -- put it up on the screen there.

24  BY MR. ARO:

25  Q.  Do you recognize Exhibit 1016?

Norman Stamper - Direct

1    A.   I do.

2    Q.   What is it?

3    A.   It is the concepts and issues paper, Crowd Management

4    Proposed Policy, from IACP.

5            MR. ARO:  Any objection?

6            We'd like to offer 1016 without objection.

7            MR. RINGEL:  No objection.

8            THE COURT:  Admitted.

9            (Exhibit 1016 admitted.)

10           MR. ARO:  Does the jury have access to that now?

11   BY MR. ARO:

12   Q.   So this is an excerpt from this concepts and issues paper

13   from the IACP that talks about crowd management.  And I want to

14   walk through it quickly with a focus on this question of

15   isolating people who are violent from people who are exercising

16   their rights properly.

17           The statement starts out, "Prior to deployment, all

18   personnel engaged in crowd management or control should be made

19   aware of the ground rules for the use of force as part of their

20   briefing and any terms that may have been negotiated between

21   law enforcement and demonstration organizers."

22           Is it customary or done in police circles that before

23   a protest or even during a protest, communication is had

24   between the police and protesters to try to figure out rules of

25   engagement to reduce the risk of violence?

Norman Stamper - Direct

1    *A.*   Yes.

2    *Q.*   How does that happen?

3    *A.*   There is an initiative by either side, or perhaps even

4    both, to come to the table and discuss rules of engagement, or

5    the policies, procedures, and practices that would be employed

6    by local law enforcement in policing that protest.

7    *Q.*   "Officers providing support" -- and I'm again reading from

8    the policy.  "Officers providing support from other agencies

9    should always be briefed on policies related to the use of

10   force and crowd control."

11         Are we talking there about the idea of mutual aid

12   agencies, where Denver brings in Aurora or some other

13   jurisdiction's police to help with the demonstration?

14   *A.*   Yes.

15   *Q.*   And why is it important for there to be really good

16   coordination between different agencies who are working

17   together to respond to a particular situation?

18   *A.*   Well, it's understood that if a demonstration or a protest

19   is taking place in the city of Denver, that the Denver Police

20   Department and the city of Denver would essentially be

21   establishing the rules of engagement.

22   *Q.*   And making sure that these other agencies follow them?

23   *A.*   Absolutely.

24   *Q.*   The next line is -- says -- it's the one that is

25   highlighted on the screen -- "The fact that some individuals in

411

Norman Stamper - Direct

1    a crowd have engaged in unlawful conduct does not normally

2    provide blanket grounds for use-of-force countermeasures, crowd

3    dispersal, or declaration of an unlawful assembly."

4          Is it out of the ordinary for a few folks to show up

5    at a protest and use that as an opportunity to commit acts of

6    violence?

7    A.  Not at all.

8    Q.  Does it happen in lots of protests?

9    A.  I've seen it in virtually every protest I've witnessed over

10   the years.

11   Q.  So even if there are rules of engagement that speak to the

12   issue of peaceful protest and cooperation between a police

13   agency and the protesters, is it fair for police agencies to

14   anticipate some kind of violence?

15   A.  Yes.

16   Q.  In planning for that sort of a scenario, where you've got a

17   large group of people -- maybe very large -- anticipation of

18   violence, and the need to address that violence, what is the

19   proper police approach to isolating people who may take

20   advantage of the situation to just create mayhem?

21   A.  It's typically accomplished through arrest teams.  You have

22   a certain number of officers designated as an arrest team.

23   They are physically situated to one side or the other or

24   behind, for example, a skirmish line.  And their job is, in

25   fact, to conduct sort of a surgical operation, go into the

412

Norman Stamper – Direct

1  crowd and arrest those who are in fact engaged in unlawful

2  behavior.

3  Q.  You used the word "skirmish line."

4  A.  Yes.

5  Q.  And we will see some examples of this.  Is it fair to say a

6  skirmish line is a line of police officers shoulder to shoulder

7  who are standing in place to keep the crowd from moving where

8  they are?

9  A.  True.  Yes.

10  Q.  And it's not uncommon for officers in a skirmish line to be

11  wearing protective equipment?

12  A.  Often called hard gear.  Yes.

13  Q.  Helmets and chest protectors and other sorts of gear that

14  we'll see pictures of later?

15  A.  Helmets, chest protectors, face masks.  In the case of male

16  officers, groin cups.  In some instances, shin guards, as you

17  would see at Coors Field, for example.

18  Q.  Okay.  And when you said that an arrest team would be

19  situated either behind the skirmish line or off to the side,

20  what did those arrest team members –– first off, how many would

21  there be?  In a protest where there is, let's say, 1,000 people

22  collected in a public place, how many arrest teams and how many

23  members of each team would there typically be?

24  A.  It varies widely, given the nature of the demonstration or

25  the protest, as well as local resources.

413

Norman Stamper - Direct

1   Q.   Okay.  In the situation that I'm talking about, would you

2   have maybe one or two arrest teams, or would you have ten

3   arrest teams?

4   A.   I would add one more qualifier.  That is, given the nature

5   of the unlawful behavior, you may have as few as three or four

6   officers, you may have as many as 20 or 30.

7   Q.   Okay.  And would those officers typically be wearing

8   protective hard gear like you described?

9   A.   They'd be wearing their normal uniforms, which would in

10  almost all jurisdictions include a so-called bulletproof or a

11  ballistic vest.

12  Q.   Would they be wearing helmets, typically?

13  A.   In most cases they would be.

14  Q.   And describe the function in a scenario where you've got a

15  group of protesters, somebody throws a bottle, one person, what

16  would an arrest team in that scenario who had been staged and

17  trained properly do?

18  A.   They would go into the crowd and make that arrest.

19  Q.   What about the danger of them being struck by projectiles

20  that might be thrown by other protesters?

21  A.   That is the reason that they would be typically equipped

22  with a helmet.  And it's also understood that your arrest team

23  members are among the most physically fit, agile, and competent

24  police officers, known for their patience and for their

25  discipline.

414

Norman Stamper - Direct

1   Q.   Okay.  And would there typically be communication between

2   the officers in the skirmish line or their command and the

3   protesters announcing the presence of an arrest team?

4   A.   Yes.  Typically there would be.

5   Q.   How would that happen?

6   A.   The incident commander -- the field commander in a given

7   situation would be communicating with the lead of the arrest

8   team.  And if, as is always suggested, there is communication

9   between police leadership, field leadership, and protesters,

10  that all would be involved in that conversation.

11  Q.   Okay.  And would it -- tell me what the purpose of making

12  the arrest right after the offense -- the throwing of a

13  bottle -- what are we trying to accomplish as an arrest team at

14  that point?

15  A.   The sooner and the more effectively that is accomplished,

16  it sends a message to other protesters that you are permitted

17  to gather, to assemble, to express yourselves peacefully, not

18  violently; and if you engage in this violent unlawful behavior,

19  this will happen to you, as well.

20  Q.   Arresting these folks also removes them from the mix and

21  prevents them from throwing another rock or bottle?

22  A.   It does.

23  Q.   Okay.  Now I want to take a look at a particular scenario

24  where we see very clearly a protester throw a rock.

25            I'm going to offer first a still from and then a

Norman Stamper - Direct

1   video, Exhibit 644, Your Honor.  And it's being offered without

2   objection.

3          THE COURT:  All right.  Admitted.

4          (Exhibit 644 admitted.)

5          MR. ARO:  So do you see everybody on their screens a

6   picture with a circle on it?  All right.

7   BY MR. ARO:

8   Q.  So Chief Stamper, would you tell us what we're looking at

9   here, when and where and what?

10  A.  We are looking at a collection of protesters on the street

11  corner outside the capitol.  And circled is a woman who will

12  throw an object --

13  Q.  Okay.

14  A.  -- at the police.

15         MR. ARO:  All right.  So let's take a look at the

16  video itself.  For the record, it's 6:56 p.m. on day three,

17  which was May 30, Saturday afternoon.

18         (Video played.)

19  BY MR. ARO:

20  Q.  So first off, in this scenario that we just looked at, are

21  you aware of whether Denver had -- the Denver Police Department

22  had deployed an arrest team of the sort you talked about at

23  this location?

24  A.  There was no indication that an arrest team was used at all

25  during that week of demonstrations.

Norman Stamper - Direct

1    Q.  Okay.  And we see very clearly in the video the woman throw

2    the bottle at the officers.

3    A.  Yes.

4    Q.  And we have no idea whether it was liquid water or frozen

5    water; correct?

6    A.  I certainly don't.

7    Q.  And we agree that it's at least conceivable that a bottle

8    or a rock can hurt an officer, even if they have hard gear;

9    true?

10   A.  Yes.

11   Q.  So from the standpoint of what would have happened if there

12   had been an arrest team assigned to this location, what would

13   you have expected to see on this body-worn camera staring right

14   up those stairs?

15   A.  I would have expected to see not the use of a chemical

16   agent but, rather, the use of an arrest team.  Clearly, as soon

17   as she threw it, she ran.  But if you've got a physically fit,

18   agile arrest team, they would go after her, place her in flex

19   cuffs, and take her to the police facility.

20   Q.  Flex cuffs are sort of plastic, temporary handcuffs that

21   are used in crowd control situations?

22   A.  Yes.

23   Q.  Okay.  Are you aware of whether that individual was ever

24   arrested?

25   A.  I am not.

417
Norman Stamper - Direct

1    Q.  Do you have any idea whether that person was present at

2    later events where objects might have been thrown at the

3    police?

4    A.  I don't know.

5    Q.  Okay.  When you look at this video that we just showed from

6    a police standpoint and thinking about the idea of isolating

7    lawful protesters from people engaged in unlawful conduct, what

8    do you see here?

9    A.  What I saw was a police officer aim and fire his pepper

10   spray at a person who could be described as violent, having

11   committed a violent act.  But that spray hits not only her, by

12   apparent design; but as you can see from the video, the person

13   operating that particular weapon moves it about from one

14   direction to another and encompasses many others who have

15   nothing to do whatsoever with the throwing of that bottle.

16   Q.  Now, in your experience, having been at all sorts of levels

17   policing in demonstration situations over almost 40 years, what

18   happens to a crowd when people who are doing nothing but

19   protesting lawfully are subjected to less-lethal weapons, like

20   we just saw?

21   A.  What I have seen repeatedly is that when that happens, it

22   invites a growth in the number of people who are protesting, a

23   shift in emphasis from maybe a generalized protest agenda to a

24   specific one directed at the local police department.

25   Q.  And what effect does the application of chemical weapons

Norman Stamper - Direct

1    against people who did not engage in unlawful conduct have on

2    the violence that that crowd as a whole might direct towards

3    the officers?

4    *A.*   It has been my experience over the years that it will

5    invite additional levels and greater intensity in the violence

6    of attacks on officers.

7    *Q.*   So you mentioned earlier that when you were in Seattle, you

8    oversaw the Seattle police response to the WTO protests?

9    *A.*   Yes.

10   *Q.*   And how long after -- actually, let me ask this question

11   first:  Is it fair to say that the Seattle PD generally and you

12   in particular were roundly criticized for the initial police

13   response to those protests?

14   *A.*   It is.

15   *Q.*   How long after those protests ended did you leave the

16   Seattle Police Department?

17   *A.*   I essentially announced my resignation at the end of that

18   week.

19   *Q.*   And why did you announce your resignation at the end of

20   that week?

21   *A.*   Because I believe I had failed my officers and the

22   community.

23   *Q.*   And when you say that you failed your officers and your

24   community, was there a particular mistake that you think you

25   made in directing the police response to those protests?

419

Norman Stamper - Direct

1   *A.*   Yes.

2   *Q.*   What was that?

3   *A.*   Several hundred, perhaps 3 to 400 protesters on the very

4   first actual day of the WTO conference had assembled in an

5   intersection just outside the Sheraton Hotel downtown.  They

6   took a seat, they linked arms, in a couple of cases there were

7   sleeves attached between two and in some cases even more

8   protesters.  So the idea, essentially, was to engage in an act

9   of civil disobedience.

10          We had in advance of that moment agreed to make a

11   symbolic number of arrests, which would allow these

12   anti-globalization protesters to make a point, to be arrested,

13   to be escorted to a prisoner transport vehicle, and to be taken

14   from that intersection on Sixth Avenue outside the Sheraton.

15   *Q.*   And what happened next?

16   *A.*   We announced to them that because of the size of the

17   crowd -- I should point out, we expected many, many thousands

18   of protesters to be coming from around the world.  We also knew

19   that the President would be in town, that the Secretary of

20   State, that the chief trade negotiator for the United States,

21   and many other dignitaries would be present.  We knew that

22   there would be in addition to thousands of WTO ministers, many

23   tens of thousands of anti-globalization protesters, as well; so

24   we knew that it was going to be very, very large.  And we were

25   surprised by how many were present on that first day.  In

420

Norman Stamper - Direct

1   addition to those 3 or 400, we had additional contingents

2   converging on that very location from three or four or five

3   different cites surrounding the downtown area.

4   Q.   So you have got this group of folks who are blocking

5   traffic, sitting down locking their arms at an important

6   intersection in Seattle?

7   A.   Correct.

8   Q.   And the symbolic arrests take place?

9   A.   Yes.

10  Q.   And --

11  A.   Excuse me.   That was the plan.

12  Q.   Okay.   What decision did you make that you in retrospect

13  recognize as a mistake?

14  A.   Well, I think it's useful to point out that we, like many

15  other agencies, had both an incident commander in a command

16  post and a field commander, who is running operations on the

17  streets.   The two of them were in constant contact, mostly by

18  police radio.   I was also present at the scene.   I was

19  monitoring the back and forth between those two members of my

20  command staff.   And they had early on decided there were

21  altogether too many people for us to honor our pre-conference

22  commitment that we would make these symbolic

23  media-attention-grabbing arrests.   So we -- we conferred with

24  protest leaders; and we told them, all bets are off.   We cannot

25  do that.

421

Norman Stamper - Direct

1   Q.   And what decision was made that you later regretted?

2   A.   The decision was made to warn those who are on a sit-in

3   demonstration, basically, that they had to move; that if they

4   failed to move, they would be subjected to chemical weapons.

5   In this case, to CS gas.

6   Q.   CS gas is also sometimes called --

7   A.   Tear gas.

8   Q.   And what ended up happening?

9   A.   What ended up happening is that the field commander gave a

10   command through the bullhorn that he repeated I'm guessing

11   twelve, fifteen times over the course of a half an hour,

12   explaining, essentially, that we could not make, given the

13   sheer numbers of people we were looking at, physical custody

14   arrests, that we regretted not being able to do what we had

15   agreed to do, but that if they didn't get up and move, we would

16   use chemical agents to move them.

17   Q.   And they didn't move?

18   A.   They did not.

19   Q.   And what happened next?

20   A.   The warning was repeated, as I mentioned, many times over

21   the course of a half an hour in time.  I went to the far side

22   of that crowd to see whether or not I could hear clearly and

23   audibly the order that was being given by the police captain

24   who was at the scene.

25   Q.   And was gas ultimately deployed?

422

Norman Stamper - Direct

1    A.  It was.

2    Q.  And did it disperse the crowd?

3    A.  It was, as it, frankly, always does.  Gas works.

4    Q.  And you believe to this day that deploying gas was a

5    serious error; true?

6    A.  It took me five years, frankly, to come to that conclusion.

7    I announced my resignation on Saturday of that week, stuck

8    around for purposes of transition issues and so forth for --

9    actually, for two months.  I then entered retirement.  I was --

10   shortly thereafter, published a book, was on book tour,

11   listening to a lot of people who had come to Seattle for the

12   WTO conference protests.

13   Q.  And what did you ultimately conclude about the deployment

14   of gas on the first night of the WTO protests in Seattle and

15   why it was a mistake?

16   A.  That it was a huge mistake to use chemical agents against

17   those who were nonviolent and, indeed, nonthreatening.

18   Q.  And that act resulted in what outcome in the protest in

19   Seattle?

20   A.  In the protest, it cleared the intersection.  I mentioned

21   earlier, it's a rare occasion -- I don't know of any -- in

22   which tear gas does not accomplish the purpose that is

23   formulated at the time that you decide to use it.

24   Q.  So it works in the short term.  What does it do in the long

25   term?

Norman Stamper - Direct

1    *A.*  It works very well in the short term; it works very badly

2    in the long term.  If you are punishing -- and tear gas is

3    punishing to human beings.  It produces tears; it produces a

4    runny nose; it produces much more serious problems for those

5    with any kind of a pre-existing medical condition.  I think it

6    can be seen as cruel, and especially if there is no good

7    justification for its use, excessive.  It is clearly excessive

8    force, in my opinion.

9    *Q.*  And in Seattle, did that decision to deploy gas result in

10   avoidable violence?

11   *A.*  Absolutely.

12   *Q.*  I want to take a look at what happened on the first night

13   of the protests in Denver and ask you some questions about how

14   it affected the course of this -- this incident happened on

15   May 28, the first day of the protests in Denver, a little

16   before 10 o'clock.

17         On the first day of protest, was there a curfew in

18   place?

19   *A.*  No.

20         *MR. ARO:*  And I'm going to put up first Exhibit 596,

21   which I'll offer by stipulation, Your Honor.

22         *THE COURT:*  Admitted.

23         (Exhibit 596 admitted.)

24   *BY MR. ARO:*

25   *Q.*  And what we have here is a group of protesters that you can

424

Norman Stamper - Direct

1   see there in the middle of Lincoln Street, right in front of

2   the state capitol.

3   A.   Yes.

4   Q.   And I want to play a little bit of video from this view and

5   then take a couple of other looks at it.  This is from the

6   body-worn camera of DPD Officer Cain.

7            (Video played.)

8            Now, this is part of a much longer video that you've

9   looked at as part of your work here; correct?

10  A.   Yes.

11  Q.   Before the officers deployed tear gas and fired their

12  pepper ball weapons, systems, had you anything from that crowd

13  that involved violence directed towards the protesters?

14  A.   Towards --

15  Q.   Excuse me.  Towards the officers?

16  A.   I did not.  No.

17  Q.   Did you see any bottles being thrown, rocks being thrown?

18  A.   No.

19  Q.   Weapons being brandished?

20  A.   No.

21  Q.   And did you hear before the gas was deployed a dispersal

22  order that was audible to the crowd?

23  A.   No.

24  Q.   Now, you can't see because of the way that the officer is

25  facing who threw those cans, so we need to look at a different

Norman Stamper - Direct

1     video for that.

2              This is Exhibit 24, Your Honor, which we'd offer by

3     stipulation.

4              *THE COURT:*  All right.  Admitted.

5              (Exhibit 24 admitted.)

6     *BY MR. ARO:*

7     *Q.*  Now, this comes from a Colorado State Patrol camera that is

8     mounted above the -- on the top of the capitol, sort of looking

9     down on the protesters; correct?

10    *A.*  Yes.

11    *Q.*  And we can see right here -- I've circled on the screen --

12    the skirmish line of officers that we were just looking at a

13    body-worn camera from; correct?

14    *A.*  Correct.

15    *Q.*  The officer who had that camera is probably located over

16    there towards this side.

17             Now, as I play this, I want you to watch the vehicle

18    just entering the screen on the upper left-hand corner of the

19    screen.  Do you see that?

20    *A.*  Yes, I do.

21    *Q.*  Now, we see a white vehicle entering the screen that has

22    sort of dark sides on it.

23    *A.*  Yes.

24             *MR. ARO:*  Would you pause that for us.

25

Norman Stamper - Direct

1    *BY MR. ARO:*

2    *Q.*  Now, are you familiar with what we're looking at there,

3    that white vehicle?

4    *A.*  I am.

5    *Q.*  What is that?

6    *A.*  It's called commonly a rapid deployment vehicle.

7    *Q.*  And that's basically a big SUV that has rails and steps on

8    the outside for officers to hang onto?

9    *A.*  Yes.

10   *Q.*  It's a way to get officers quickly from one place to

11   another?

12   *A.*  Correct.

13   *Q.*  And what are the black things or gray things that we see on

14   the outside of the vehicle?

15   *A.*  Those would be people.  Those are the police officers.

16           (Video played.)

17   *Q.*  Okay.  So -- sorry.  We will -- we will continue to watch

18   the vehicle pull forward and watch as the officers step off the

19   vehicle and approach the line.

20           So we see people in green fatigues; right?

21   *A.*  Yes.

22   *Q.*  And look in this area here.  Do you see things being thrown

23   through the air?

24   *A.*  I do.

25   *Q.*  What are those?

Norman Stamper - Direct

1    *A.*  They appear to be flash-bangs.  I can't be absolutely

2    certain, but they are certainly chemical agents.

3    *Q.*  Of some kind?

4    *A.*  Of some kind.

5    *Q.*  Either gas --

6    *A.*  Either smoke or gas.  Yes.

7    *Q.*  And we see the explosions rising over to the right where

8    they land; correct?

9    *A.*  Correct.

10   *Q.*  All right.  So I want to go to another body-worn camera to

11   see what exactly happened when those officers got off and a

12   little bit of sound.

13          This is Exhibit 529, which plaintiffs offer by

14   stipulation.

15          *THE COURT:*  All right.  Admitted.

16          (Exhibit 529 admitted.)

17          (Video played.)

18   *BY MR. ARO:*

19   *Q.*  And there is an officer in fatigues circled in the lower

20   right-hand corner, just as a point of emphasis.  As we play the

21   video, watch what he does.  Then we see a number of other

22   officers lobbing munitions into the crowd.

23          Now, as you intimated earlier, clearly, the deployment

24   of these munitions had the intended effect of dispersing that

25   crowd?

Norman Stamper – Direct

1   *A.*  Yes.

2   *Q.*  Quickly?

3   *A.*  Yes.

4   *Q.*  We also see here that even after the crowd had dispersed,

5   additional chemical agents were thrown into the cloud?

6   *A.*  Right.

7   *Q.*  What's the legitimate police purpose behind throwing

8   additional chemical munitions into a cloud where everybody in

9   the site has already vacated?

10  *A.*  I cannot think of a single one.  I don't believe there is

11  any justification.

12  *Q.*  Okay.  One more view of this scene, again from a body-worn

13  camera.  And the principal purpose of this is to sort of see a

14  different perspective and also to listen to what is said.

15         Have you reviewed the audio recording of the order

16  that resulted in the deployment of gas on that group of

17  protesters?

18  *A.*  Yes.

19         *MR. ARO:*  And I'm going to offer this, Your Honor.

20  It's 598 by stipulation.  And the only thing that I want to

21  offer into evidence is the videotape itself.  The order is kind

22  of hard to hear, so we've added a subtitle across the screen so

23  the jury can follow it.

24         And I invite counsel to object if he think it's

25  inaccurate.

Norman Stamper – Direct

1          *THE COURT:*  All right.  598, no objection.  Admitted.

2               (Exhibit 598 admitted.)

3     *BY MR. ARO:*

4     *Q.*  So this is the other end of the skirmish line on the side

5     of the street near the capitol itself; right?

6     *A.*  Yes.

7     *Q.*  And we're looking at the same crowd.  And I'm going to just

8     play this video and ask you and the jury to listen for what the

9     officer says.

10               Do you know who the officer that gave this order is?

11    *A.*  I do.

12    *Q.*  Who is it?

13    *A.*  Commander Phelan.

14    *Q.*  Who is the incident commander?

15    *A.*  Who is the incident commander.

16               (Video played.)

17    *Q.*  To this point, had you seen anything on any of the video

18    views you had of provocation from the crowd towards the police?

19    *A.*  No.

20    *Q.*  To this day, do you have any idea why Commander Phelan gave

21    that order?

22    *A.*  I can speculate; but the short answer is, no, I do not.

23    *Q.*  So let's watch what happens in that video, then.

24               Can you play that for me?

25               (Video played.)

Norman Stamper - Direct

1            And shortly after this, the explosives start to rain

2    down on this crowd; is that fair?

3    A.   Yes.

4    Q.   We cut it short.  What's the predictable response of a

5    peaceful crowd to being tear-gassed under the circumstances

6    we've just seen?

7    A.   Well, as I mentioned, the first predictable response is

8    that they will, in fact, disperse.  They'll move this direction

9    and that direction.  They're generally blinded at that moment

10   and find it very difficult to actually see.  But then there is

11   an almost inevitable -- all but inevitable response to

12   reassemble.

13   Q.   And when they reassemble, what's their mood, typically?

14   A.   They're angry and hurt.  They typically feel betrayed, from

15   my conversations with many over the years.  We weren't doing

16   anything wrong.  We were chanting, for example, "Hands up.

17   Don't shoot," or "No justice, no peace," and we got a face full

18   of gas.

19   Q.   All right.  I want to move to another situation in which

20   chemical agents were deployed under circumstances that you

21   question.

22            This happened on the third day, May 30, that Saturday,

23   at about 5:45 in the afternoon on Lincoln just north of Colfax;

24   correct?

25   A.   Uh-huh.

Norman Stamper – Direct

1    *Q.* And the first view of this that we have is Exhibit 56 --

2    excuse me -- 656, which plaintiffs offer by stipulation.

3              *THE COURT:* Admitted.

4              (Exhibit 656 admitted.)

5    *BY MR. ARO:*

6    *Q.* And we see the crowd across the street, capitol on the

7    left, and the downtown city bus terminal on the right side of

8    the street; correct?

9    *A.* Yes.

10             (Video played.)

11   *Q.* So at this point we have -- the skirmish line is moving

12   forward; correct?

13   *A.* Yes.

14   *Q.* And is there a police term for the tactic of sort of using

15   a moving skirmish line to move a crowd?

16   *A.* I'm sure that there is one that escapes me.  But it's,

17   essentially, form a skirmish line, move -- the idea being to

18   move that crowd.

19   *Q.* So pushing them out of the way?

20   *A.* Absolutely.  Yes.

21   *Q.* Not using munitions but just the physical police presence?

22   *A.* Exactly.  Oftentimes batons are used in this particular

23   formation.

24   *Q.* So a baton is essentially a long stick?

25   *A.* Yes.

Norman Stamper - Direct

1   Q.  And in a push situation like this, that stick would be held

2   this way?

3   A.  It either could be held that way, which is described as

4   port arms, or it could be held straight out.  The idea is that

5   it is not being used, for example, as many might think, as a

6   club.  It isn't that being used to move a crowd.

7   Q.  Is this sort of technique, using a moving skirmish line to

8   relocate a crowd, an effective and approved tactic?

9   A.  It absolutely is.  Yes.

10  Q.  Commonly used by police departments?

11  A.  Yes.

12  Q.  When you're facing a situation like this, with the skirmish

13  line getting very close to the front line of the protesters, is

14  the proper police tactic to use that moving skirmish line

15  instead of a chemical agent or to use it in addition to

16  chemical agents to move the crowd?

17  A.  It is intended at that point to use it instead of chemical

18  agents.

19  Q.  Why?

20  A.  For reasons, really, that we have discussed.  That chemical

21  agents are painful, disorienting, and oftentimes backfire.

22  Have the effect of creating even more animosity toward the

23  police.

24  Q.  So let's see what these officers chose to do.

25          Would you keep playing that video from where we were.

433

Norman Stamper - Direct

1          (Video played.)

2          So at this point the officers, instead of using the

3    moving skirmish line to move the crowd, what happened?

4    A.  They advanced on the crowd, then pretty much stopped and

5    deployed chemical agents.  Pepper ball is very prominent in

6    this particular scenario.  You can see evidence of the pepper

7    balls on the asphalt.

8    Q.  So the little white things on the ground are the residue

9    from the pepper balls bouncing off the ground?

10   A.  Yes.

11   Q.  And these shots obviously were not fired directly at the

12   protesters; they were fired deliberately into the ground?

13   A.  Yes.

14   Q.  What's the technique called when you fire those pepper

15   balls into the ground?

16   A.  Well, that's a skip-firing process, the idea being to lay

17   down that chemical munition, not against people but, rather,

18   against the ground.  And then the smoke comes up and works its

19   magic.

20   Q.  We also see an officer on the right-hand side here standing

21   on top of the hill with a red can in his hand; correct?

22   A.  Yes.

23   Q.  What is that can?

24   A.  That would be CS -- excuse me.  That would be pepper spray.

25   Q.  Okay.  And we see that spray basically covering that area;

Norman Stamper - Direct

1   right?

2   *A.*   Yes.

3   *Q.*   Being aimed at the gentleman with what looks like a vest

4   with some kind of symbol on the back of it?

5   *A.*   It does to me.  Yes.

6   *Q.*   Did you see that protester do anything to justify being

7   sprayed with pepper spray here?

8   *A.*   No.

9   *Q.*   And is there any justification for an officer in a

10  crowd-moving scenario to spray somebody who is just standing

11  there?

12  *A.*   No.

13          MR. ARO:  If you would keep going with that video for

14  me.

15          (Video played.)

16  *BY MR. ARO:*

17  *Q.*   Did you see the officer deploy pepper ball behind the

18  retreating crowd?

19  *A.*   I did.

20  *Q.*   Is that an approved police tactic to keep the crowd moving?

21  *A.*   If the crowd was moving, if it's showing no sign of

22  stopping, the question I would have, and in this case do have,

23  is why?  Why use any chemical agent or other weapon or tool at

24  that moment?  The crowd is doing what you want it to do.

25  *Q.*   Okay.  Now, in this next vignette, we've got the guy in the

435

Norman Stamper - Direct

1    vest here on the right-hand side of the screen.  See the guy up
2    on top of that concrete structure?
3    A.   I do.
4    Q.   He's the next person I'd like you to watch as we move
5    forward.
6            Actually, before we do that, do you see this officer
7    right here --
8    A.   Yes.
9    Q.   -- on the right side of the screen?
10   A.   Yes.
11   Q.   What's he holding?
12   A.   Pepper ball gun.
13   Q.   And what does he appear to be doing with it?
14   A.   He's pointing it.  He's aiming it.
15   Q.   Okay.  Like Mr. Macdonald, I grew up in a family of
16   hunters; and I was taught, you don't point something at
17   something you're not going to shoot.  Is that also true with
18   police and less-lethal weapons?
19   A.   I think it's essentially true.  Yes.
20   Q.   So are you aware, having looked at this video many times,
21   of any justification for that officer to be pointing a
22   presumably loaded weapon -- a chemical weapon at a protester?
23   A.   No, I'm not.
24   Q.   What's the impact on a crowd when officers are pointing
25   weapons at them when they're complying with orders or not

436

Norman Stamper - Direct

 1   acting in violation of the law?

 2              *MR. RINGEL:*  Objection.   Speculation.

 3              *THE COURT:*  Sustained.

 4              *MR. ARO:*  Let's move on to the next section.   Would

 5   you play that forward.

 6              (Video played.)

 7   *BY MR. ARO:*

 8   *Q.*  So we see there the crowd is being driven towards Colfax;

 9   correct?

10   *A.*  Yes.

11              *MR. ARO:*  We'll take another look at that in a second,

12   but first I want to bring up Exhibit 42.   And I know there is

13   an objection to this, but I want to lay some foundation first.

14   *BY MR. ARO:*

15   *Q.*  Do you recognize Exhibit 42?   This is a still from the

16   beginning of a video, but do you recognize this as the

17   beginning of a video?

18   *A.*  Yes.

19   *Q.*  And have you looked at a lot of video of the events that

20   are being depicted here?

21   *A.*  I have.

22   *Q.*  Do you recognize this based on all of the video that you've

23   seen as depicting from an aerial standpoint, a helicopter

24   standpoint, the events that were happening on May 30, 2020, at

25   about 5:45 near Civic Center?

Norman Stamper - Direct

1    A.  Yes.

2    Q.  And you can identify this video as showing those events?

3    A.  Yes.

4         MR. ARO:  So we'd offer Exhibit 42 --

5    BY MR. ARO:

6    Q.  This is a video that you watched and relied on in forming

7    your opinions?

8    A.  That's correct.

9         MR. ARO:  We'd offer Exhibit 42.

10        MR. RINGEL:  May we approach?

11        THE COURT:  Sure.

12        (Hearing commenced at the bench.)

13        MR. RINGEL:  No problem with the video.  It's a 9News

14   video, so it doesn't have any time stamp on it.  I understand

15   he's trying to lay the foundation with it; but, fundamentally,

16   it doesn't have sufficient providence.  All of the HALO video,

17   all of the body-worn camera video have time stamps and date

18   stamps so we can tell when it is.

19        I don't necessarily doubt that this was the same

20   event, but there is nothing about this particular video that

21   demonstrates that it is what it purports to be.

22        MR. ARO:  So we subpoenaed 9News to provide a

23   foundation witness for this and a couple of other videos.  They

24   asked us if we would be satisfied with a declaration in lieu of

25   providing a live witness.  We talked to them.  They said that

Norman Stamper - Direct

1    they would stipulate to the authenticity of that video to spare

2    us from that.  So we have an unsigned declaration that we would

3    have had signed, but for their stipulation.  I'm happy to bring

4    that witness down here, but I can't get the witness here before

5    he testifies.  And it was their stipulation to the authenticity

6    of the 9News video that caused us to call him before we called

7    that authentication witness.

8         We were prepared to call the other witness first to

9    get this in before this examination, they stipped to it, and

10   now they're saying they can't agree to it.

11        THE COURT:  That doesn't sound like you.

12        MR. RINGEL:  I stipped to the authenticity, but that

13   doesn't mean that it's what it purports to be.  It's just that

14   I didn't think it was necessary for him to have a 9News person

15   to come in, but there isn't any time stamp on the video.  I

16   understand that this witness may have just provided sufficient

17   testimony to link it up based on his review of other video.

18   But my concern is it doesn't link itself up, and that's

19   different from all the other video we have in this case.

20        THE COURT:  Is there something in particular about

21   this video that is troublesome?

22        MR. RINGEL:  No.  It's the fact that it's -- no.

23   Compared to all of the other videos, no.  It's just -- it's the

24   principle of the news video being admitted into evidence in

25   this instance.  But there is no 403 issue or anything like

Norman Stamper - Direct

1    that, Your Honor.

2         *MR. ARO:*  And just for the Court's benefit, it's

3    silent.  It doesn't have any sound to it.  It's just a

4    helicopter video so you can see things, but there is no

5    commentary.

6         *THE COURT:*  All right.  Objection is overruled.

7         (Hearing continued in open court.)

8         *THE COURT:*  Okay.  Is Julie telling you stories over

9    there?  She's got a million of them.

10        *MR. ARO:*  It's Exhibit 42, Your Honor.

11        *THE COURT:*  42 is admitted.

12        (Exhibit 42 admitted.)

13        (Video played.)

14   *BY MR. ARO:*

15   *Q.*  So what we have here is an overhead video that is silent;

16   correct?

17   *A.*  Yes.

18   *Q.*  And what we see in the middle of the street --

19        Stop it, please.

20        -- is the skirmish line of officers that we were just

21   looking at; correct?

22   *A.*  Right.

23   *Q.*  So the officer whose camera we were looking at is probably

24   there or there walking over the dirt; right?

25   *A.*  I believe so.  Yes.

440

Norman Stamper - Direct

1    *Q.*  And we've got the line of protesters here that those

2    officers were walking towards; right?

3    *A.*  Correct.

4    *Q.*  So let's walk -- my bad.

5           Please play that.

6           (Video played.)

7           You see the officers moving forward?

8    *A.*  Correct.

9           *MR. ARO:*  Stop again, please.

10   *BY MR. ARO:*

11   *Q.*  We see here protesters in front of the police vehicle with

12   their hands up; right?

13   *A.*  Yes.

14   *Q.*  Is that unusual as a police -- as a protest tactic?

15   *A.*  It is not.

16   *Q.*  And --

17          *THE COURT:*  Where is the guy standing on the concrete?

18          *THE WITNESS:*  He is --

19          *MR. ARO:*  He'll come into view in just a moment, Your

20   Honor.  We'll see him in just a second.

21          *THE WITNESS:*  He's to the left.

22          *THE COURT:*  I'm only asking because the question was,

23   is this actually the same day?

24          *MR. ARO:*  We will see him in just a second.

25          If you would play that forward.

441

Norman Stamper - Direct

1          (Video played.)

2    *BY MR. ARO:*

3    *Q.* And in the middle of the screen in just a second, we'll

4    start to see the deployment of the pepper ball and see the

5    shots hit the ground.

6          You can stop it.

7          Now, we see the crowd very quickly retreat; correct?

8    *A.* Yes.

9          *MR. ARO:* And if you back up just a little bit.  I

10   didn't stop you quite quickly enough.  And play it from there.

11   *BY MR. ARO:*

12   *Q.* I'm going to circle an officer really quickly who I'd like

13   you to watch.

14         And then play it a little bit longer.

15         And we start to see chemical munitions on the ground

16   to the right; correct?

17   *A.* Yes.

18   *Q.* And then additional munitions being deployed?

19   *A.* Yes.

20   *Q.* Or pepper balls.

21         Stop there.

22         Your Honor, to answer your question, the guy on the

23   concrete structure is right there.

24         *THE COURT:* Thank you.

25

Norman Stamper - Direct

1    *BY MR. ARO:*

2    Q.   The protesters are retreating.  But is it fair to say we

3    continue to see more munitions being launched into the crowed?

4    A.   We do.

5    Q.   Any justification for that from a policing standpoint?

6    A.   Not that I can see.

7              MR. ARO:  Okay.  If we can get to where we were.

8              (Video played.)

9    *BY MR. ARO:*

10   Q.   Now, the skirmish line gets into this area.  I want to

11   focus particular attention on one officer, this guy right here.

12   See him?

13   A.   I do.

14   Q.   And you see him with a large black object in his hand, kind

15   of rousting those protesters?

16   A.   Yes.

17   Q.   And now he's walking towards the crowd?

18   A.   Yes.

19   Q.   Do you know what that object is that he's holding?

20   A.   I believe it's a 40-millimeter.

21   Q.   He puts it down and walks away.  And we see a guy with a

22   white hat walking toward him; right?

23   A.   Yes.

24   Q.   And then he turns and walks away; right?

25   A.   Correct.

Norman Stamper – Direct

1   Q.  All right.  Now, we're going to look at that officer's

2   body-worn camera in just a second.  But what do you see when

3   you see that officer break from the skirmish line and walk off

4   into the crowd?

5   A.  I see a lack of discipline, or a lack of training, or both.

6   Q.  Why is that -- why is what he did a problem?

7   A.  He was part of a skirmish line.  He was part of a team of

8   officers who whether we support their actions or not was

9   involved in what was supposed to have been a disciplined

10  skirmish line.  You don't break ranks.

11  Q.  Why is what he did a problem from an effective policing

12  standpoint?

13  A.  Well, he created a hole in that line, for one thing.  He

14  also in going off on his own theoretically put himself at some

15  risk, if in fact there were a physical threat.  To be clear, I

16  saw no physical threat or cause for concern about his safety.

17  But had there been a concern for his safety, he would have

18  jeopardized it and in the process, jeopardized the safety of

19  his fellow officers.

20      MR. ARO:  Okay.  Now, I want to go to the next

21  exhibit.  This one is Exhibit 648.  This one has not been

22  stipulated.  This is Officer Bolton's body-worn camera, and the

23  clip begins at 2347.

24      MR. RINGEL:  Yeah, I stipulated to 2348.

25      MR. ARO:  It's about that long.

1          *MR. RINGEL:*  I stipulate to that.

2          *MR. ARO:*  So Exhibit 648 we offer by stipulation, Your

3    Honor.

4          *THE COURT:*  All right.  Admitted.

5          *MR. ARO:*  Thank you.

6          (Exhibit 648 admitted.)

7    *BY MR. ARO:*

8    *Q.*  Thank you.  Just as a warning, the first 30 seconds or so

9    of this video is silent because the officer turned his camera

10   on later.  And when an officer turns his camera on, it

11   basically saves the video that it's already recorded but not

12   the sound that is already recorded for the preceding 30

13   seconds.  Is that your understanding?

14   *A.*  I'm aware of that.  Yes.

15   *Q.*  So we hear no sound at the beginning, but then we pick up

16   the sound about 30 seconds in.

17   *A.*  Yes.

18          (Video played.)

19   *Q.*  So the officer is pointing his 40 at these protesters;

20   right?

21   *A.*  Yes.

22   *Q.*  Do you see him using the barrel of the 40 to roust them?

23   *A.*  I do.

24   *Q.*  Is that an appropriate way to engage and move protesters?

25   *A.*  No.

Norman Stamper - Direct

1   *Q.*  Why not?

2   *A.*  Dangerous.  Reckless.

3   *Q.*  In what way?

4   *A.*  You're pointing a weapon that certainly can do major, major

5   damage to flesh and bone.

6   *Q.*  Okay.  And now we see him, he's walked a little bit.  And

7   I'm sorry, I was playing while you were answering.

8        So if you will go back just a little bit, Dan.  There

9   we go.

10        We see him walking towards folks in the crowd.  And

11   let's let it play from here.

12        (Video played.)

13        Did you hear what he said at the end of that video?

14   *A.*  I did.

15   *Q.*  When somebody says something like that in the presence of

16   protesters, what effect does that have on the public mood

17   towards policing?

18        *MR. RINGEL:*  Objection.  Calls for speculation.

19        *THE COURT:*  Sustained.

20   *BY MR. ARO:*

21   *Q.*  If you had watched this video of that officer's conduct,

22   leaving the skirmish line, engaging that protesters, using that

23   language, pointing his weapon at folks, what would have

24   happened to this officer?

25   *A.*  Pending an investigation and given an outcome of a

Norman Stamper – Direct

1    sustained complaint, I would terminate that officer.

2    Q.  To the best of your knowledge, as you sit here today, has

3    that officer ever been disciplined for anything he did during

4    the protests?

5    A.  To my knowledge, he hasn't been talked to.

6    Q.  All right.  Let's move on to the weapons.  We talked about

7    a couple of them.  And before we get into the use of these

8    weapons in other ways, the kinetic weapons and the chemical

9    weapons, I just want to talk about what they are.

10          Actually, I jumped ahead.  Excuse me.  This is

11   Exhibit 656 that we will offer by stipulation.  It's another

12   body-worn camera from the same scene.

13          THE COURT:  All right.  Admitted.

14          (Exhibit 656 admitted.)

15          (Video played.)

16   BY MR. ARO:

17   Q.  So we saw a number of pepper balls being fired into the

18   ground near the protesters in the street; right?

19   A.  Yes.

20   Q.  And behind those protesters we see cars?

21   A.  We do.

22   Q.  Now, was there active traffic on Colfax and Lincoln at the

23   time this event happened?

24   A.  There was.

25   Q.  And what direction were the DPD officers driving the

447

Norman Stamper - Direct

1   protesters by using the munitions they did?

2   A.  Directly into moving traffic.

3   Q.  Is that an accepted police practice in a crowd management

4   scenario?

5   A.  Absolutely not.

6   Q.  Why?

7   A.  For the obvious reason, that that person could get run

8   over, that there could be, in fact, a tragedy that need not

9   have happened.

10  Q.  All right.  Now, we see this guy standing up against the

11  pole; right?

12  A.  Yes.

13  Q.  And is that the same guy who got pepper-sprayed a couple of

14  minutes ago with the vest?

15  A.  Yes.

16  Q.  All right.  Let's look at what happens here.

17          (Video played.)

18          Did you hear what he said to those officers?

19  A.  "Being tyrants," as I recall.

20  Q.  "Do you enjoy being tyrants?"

21  A.  "Do you enjoy being tyrants?"  Yes.

22  Q.  And what was the police response to that statement?

23  A.  To fire on him with a pepper ball.

24  Q.  Which almost resulted in what?

25  A.  I flinch every time I see this still.  He turned around and

Norman Stamper - Direct

1    walked out into traffic.  And it was actually sort of backing

2    up, then turned around, and was almost -- almost struck by that

3    car.

4    Q.  Is what the officer did in driving him into traffic by

5    shooting him in response to what he said an appropriate police

6    tactic?

7    A.  It is not.

8    Q.  To this day, do you have any idea whether that officer

9    faced any discipline for what he did?

10   A.  I have been told that he has not.

11   Q.  All right.  Now I want to move to the description -- just

12   quick description of the weapons we're seeing here, just so

13   everybody understands what they are.

14           You examined the weapons -- the less-lethal weapons

15   that the DPD and its sister agencies used in connection with

16   the protests; correct?

17   A.  I did.

18   Q.  And you're familiar with those weapons from your own

19   experience?

20   A.  Well, some of those weapons have actually come along since

21   I retired; but I have certainly kept abreast of the weaponry

22   that is available to officers.

23   Q.  Do you in thinking about these weapons sort of separate

24   these weapons into kinetic weapons and chemical weapons?

25   A.  I do.

449

Norman Stamper - Direct

1    Q.   Generally, what is a kinetic weapon?

2    A.   A kinetic weapon is, essentially, a firearm, absent the

3    powder charge.  So it doesn't -- for example, in the case of

4    the 40-millimeter, which we've seen several times, does not

5    fire a live round.  What it fires is a munition that is

6    intended to hurt and to repel people but essentially not

7    penetrate them and, theoretically, not kill them.  I choose to

8    call so-called less-lethal potentially fatal weapons.  We have

9    too many examples of uses of these weapons, the kinetic

10   weapons, that have done major damage to people.

11   Q.   So all of these weapons we're seeing in some form in the

12   opening statement -- this is what we've talked about as a

13   40-millimeter launcher; right?

14   A.   Yes.

15   Q.   And we have two grips, one for the hand -- each of the

16   officer's hands; right?

17   A.   Yes.

18   Q.   And this area in the middle is a rotary magazine that holds

19   more than one round?

20   A.   Yes.

21   Q.   And a barrel over here, and this is this butt which fits up

22   on the officer's shoulder; correct?

23   A.   Correct.

24   Q.   Okay.  I want to look quickly at the projectile that these

25   weapons used.

1          Exhibit 656 is admitted, and this is just a screenshot

2     from it.

3          We see on this officer's sort of a bandolier, the

4     stock of his weapon, we see three 40-millimeter rounds; right?

5     A.   Yes.

6          *COURTROOM DEPUTY:* Sorry.  The jury is not seeing this

7     because I don't have 1039 as admitted.

8          *MR. ARO:* 1039, we offer by stipulation.  Thank you.

9          *THE COURT:* Okay.  It's admitted.

10         (Exhibit 1039 admitted.)

11    *BY MR. ARO:*

12    *Q.* We'll try that again.  In the picture on the left, we see

13    these three silver and blue objects that are attached to the

14    stock of a 40-millimeter weapon; right?

15    *A.* Yes.

16    *Q.* And there is a silver end, which is, essentially, the back

17    end that stays in the weapon after it's fired; correct?

18    *A.* Correct.

19    *Q.* And the blue part is the projectile?

20    *A.* Yes.

21    *Q.* So about that big around?

22    *A.* Yes.

23    *Q.* And it's a hard plastic projectile that has sort of a foam

24    cap that disintegrates after it's fired?

25    *A.* Yes.  I think it's important to clarify that that foam

Norman Stamper - Direct

1   sounds kind of innocuous, and it is not.

2   Q.  And generally speaking, that weapon is designed to knock

3   somebody down; right?

4   A.  That's correct.  Or to stop them.

5   Q.  Okay.  And on the right-hand side, we see -- in

6   Exhibit 1039, we see an officer -- this person is from the

7   Jefferson County Sheriff's Office -- wearing what you described

8   as the hard gear; right?

9   A.  Yes.

10  Q.  So the shin guards and the chest protector, sort of

11  shoulder pads and a ballistic helmet?

12  A.  Yes.

13  Q.  And he also in that picture has a 40-millimeter launcher

14  like we're talking about; right?

15  A.  He does.

16  Q.  Now, this is a still from a video that was shown yesterday

17  during Claire Sannier's testimony that I won't play the video

18  of, but I do want to talk about this particular picture.

19       You see up on the left-hand side an officer holding a

20  40 aimed at the man in the crosswalk; correct?

21  A.  Yes.

22  Q.  The guy in the crosswalk appears to be doing yoga or

23  stretching or something; right?

24  A.  Yes.  He's doing the splits, it looks like to me.

25  Q.  Whatever he's doing, he's not threatening the police?

Norman Stamper - Direct

1    A.   That's correct.

2    Q.   Is there any police justification for an officer standing

     in a skirmish line in front of a crowd like this, pointing a

4    40-millimeter launcher with projectiles this big at somebody

5    who is doing the splits in the middle of a crosswalk?

6    A.   No.

7    Q.   To the best of your knowledge, has this officer been

8    corrected or disciplined for aiming that weapon at an unarmed

9    nonviolent protester?

10   A.   No.

11   Q.   Would you consider what he's doing here to be an act of

12   misconduct?

13   A.   I would.

14   Q.   Okay.  Next weapon that we have that we've heard about in

15   Mr. Packard's testimony is the 12-gauge shotguns that were

16   used; correct?

17   A.   Yes.

18   Q.   And this was the weapon that was used to shoot him;

19   correct?

20   A.   That's correct.

21   Q.   And on the left-hand side --

22        Let me get these into evidence first.  Excuse me,

23   members of the jury.

24        We offer Exhibits 1039 and 1235 by stipulation.

25        THE COURT:  1039 was already admitted, and 1235 is

453

Norman Stamper - Direct

1   admitted.

2          *MR. ARO:*  Thank you, Your Honor.

3          (Exhibit 1235 admitted.)

4   *BY MR. ARO:*

5   *Q.*  Now, the shotguns we're talking about here are the weapons

6   that we see here and here and here; correct?

7   *A.*  Yes.

8   *Q.*  And are those weapons capable of firing a shotgun round

9   that you could use for hunting or to try to kill somebody if

10  they were breaking into your house?

11  *A.*  They could be full of shot; they could be full of slugs.

12  Yes.  Yes.

13  *Q.*  Okay.  Same weapons?

14  *A.*  It's the same weapon.

15  *Q.*  But they have different colored stocks -- bright orange

16  stocks?

17  *A.*  That intends to signify that it is a so-called less-lethal.

18  *Q.*  And that's because the ammunition that is loaded into that

19  gun is not conventional designed-to-kill ammunition.  It's

20  designed to be less than fully lethal?

21  *A.*  Yes.

22  *Q.*  We see on the right-hand side in Exhibit 1235 the shotgun

23  shells that are loaded into some kind of a holder; correct?

24  *A.*  Yes.

25  *Q.*  And, again, the brass part remains in the gun after the

454

Norman Stamper - Direct

1   round is fired.  The actual projectile is this thing up here;

2   right?

3   *A.*  Correct.

4   *Q.*  And is it fair to say that that projectile is a bag of a

5   fabric called Kevlar that is full of lead shot?

6   *A.*  Yes.

7   *Q.*  That's what hit Zach Packard in the eye?

8   *A.*  Correct.

9   *Q.*  All right.  The next weapon I want to talk about is the

10  pepper ball launcher.  We looked at a picture before.  We

11  see --

12          Exhibit 964 and 658 are both being offered by

13  stipulation.  658 is a screen grab from the video that is

14  stipulated.

15          *THE COURT:*  Admitted.

16          (Exhibits 964 and 658 admitted.)

17  *BY MR. ARO:*

18  *Q.*  So we see the pepper ball launcher over here; right?

19  *A.*  Yes.

20  *Q.*  And we've got a thing on the top that you put the pepper

21  balls in, and then there is a tank of compressed gas down there

22  that is used to propel them.  Correct?

23  *A.*  That's correct.

24  *Q.*  And we have the barrel that is used to aim is right there;

25  right?

Norman Stamper – Direct

1    A.  Right.

2    Q.  And upon -- in Exhibit 658, we've got a container with

3    pepper balls in it; right?

4    A.  Yes.

5    Q.  And I think they've been described before as sort of a

6    plastic or gelatin kind of capsule that contains a noxious

7    powder or can sometimes contain an inert powder; right?

8    A.  Exactly.

9    Q.  Okay.  Now is there an IACP policy that addresses the

10   question of using what are termed there impact projectiles?

11   A.  Yes.

12   Q.  And an impact projectile is anything that is fired out of a

13   gun that's designed not to just disperse something but to

14   actually to impact an offender or somebody in the crowd; right?

15   A.  Right.

16          MR. ARO:  We'd offer Exhibit 1015, Andrew.  It is a

17   call-out from the crowd management manual from the IACP.

18          MR. RINGEL:  No objection.

19          THE COURT:  All right.  It's admitted.

20          (Exhibit 1015 admitted.)

21   BY MR. ARO:

22   Q.  So we bring up Exhibit 1015.  This, again, comes from the

23   police sort of training clearinghouse for policies.  And this

24   particular policy deals with the use of impact projectiles;

25   right?

Norman Stamper - Direct

1   A.   That's right.

2   Q.   So it starts, "Impact projectiles shall not be fired

3   indiscriminately into crowds."

4        We talked earlier about what indiscriminately means in

5   this context.

6        "Non-direct skip-fired projectiles and munitions may

7   be used in civil disturbances where life is in immediate

8   jeopardy or the need to use the device outweighs the potential

9   risks involved."

10       So we're talking, for example, about using a pepper

11  ball where the projectile is aimed at the ground and all we're

12  doing is dispersing chemicals; right?

13  A.   That is correct.

14  Q.   And that is authorized under this model policy only where

15  life is in jeopardy or where somebody makes the judgment that

16  the need to use the device outweighs the potential risks

17  involved?

18  A.   Yes.

19  Q.   And with respect to pepper balls, these are not designed to

20  kill?

21  A.   Correct.

22  Q.   And you've seen lots of video where people have been struck

23  by them and didn't die; right?

24  A.   Yes.

25  Q.   What are the sorts of circumstances where deploying pepper

Norman Stamper - Direct

1   ball is appropriate where no life is in jeopardy and you use

2   the skip-fire technique?

3   A.  If no -- if no life is at risk, the question that I would

4   have is, why would pepper ball be used at all under those

5   circumstances?

6   Q.  Is the skip-fire technique we've seen a primary means --

7   appropriate primary means to move a crowd?

8   A.  Yes.

9   Q.  Okay.

10  A.  It certainly can be.  Yes.

11  Q.  All right.  "Direct-fired impact munitions" -- which would

12  include anything that is shot at a person --

13  A.  Right.

14  Q.  -- including pepper balls; correct?

15  A.  Correct.

16  Q.  -- "to include beanbag and related projectiles may be used

17  during civil disturbances against specific individuals who are

18  engaged in conduct that poses an immediate threat of death or

19  serious injury."

20  A.  Yes.

21  Q.  So is it fair to say that the idea here is you don't shoot

22  people, even with less-lethal munitions, unless there is an

23  immediate threat of death or serious injury?

24  A.  Exactly.

25  Q.  Okay.  And how about somebody saying, I have a right to be

458
Norman Stamper – Direct

1    on the street corner?

2    A.   That's an American expressing an opinion.  There is no

3    justification under those circumstances.  Those circumstances

4    only are the use of any level of force.

5    Q.   "A verbal warning should be given prior to the use of

6    impact projectiles when reasonably possible."  That makes

7    sense.

8    A.   Yes.

9    Q.   If you're going to shoot somebody, you say, "Stop, or I'm

10   going to shoot?"

11   A.   Yes.

12   Q.   Okay.  Now, Exhibit 75 is a photograph that was admitted

13   during the testimony of Zach Packard yesterday.  And I'm not

14   going to get too far into the situation, because the jury has

15   already heard the story.  But this is a picture right after he

16   was struck in the head with a Kevlar bag full of lead; right?

17            COURTROOM DEPUTY:  I actually have 76, not 75.

18            MR. ARO:  Okay.  We'll move 75.  I apologize.  I

19   thought it had been admitted.

20            MR. RINGEL:  No objection.

21            THE COURT:  All right.

22            (Exhibit 75 admitted.)

23   BY MR. ARO:

24   Q.   So Exhibit 75 is one of a series of photographs that was

25   taken of Zach Packard at the moment he was shot; correct?

459

Norman Stamper - Direct

1   *A.*  Yes.

2   *Q.*  And this one just happens to be right after he's struck,

3   because he's beginning to fall down.  Now, you've viewed video

4   of that situation and understand the circumstances of his

5   shooting; right?

6   *A.*  I believe I've seen a series of stills, as opposed to

7   video.  But, yes, I've seen that --

8   *Q.*  Okay.

9   *A.*  -- in succession, in rapid order.

10  *Q.*  And you understand that the basic circumstances are, he

11  kicked a tear-gas canister away from protesters 5 or 10 feet

12  and immediately was shot in the head.

13  *A.*  That's --

14          *MR. RINGEL:*  Objection.  Leading.

15          *THE COURT:*  Sustained.

16  *BY MR. ARO:*

17  *Q.*  Okay.  Would you describe --

18          I was trying to move quickly through what has --

19          *THE COURT:*  Well --

20  *BY MR. ARO:*

21  *Q.*  Would you describe what the circumstances were that

22  immediately preceded him being shot?

23  *A.*  Yes.  The circumstances were that a canister of gas had, in

24  fact, begun to release its chemical agent.  And he saw this; he

25  saw protesters; he kicked the can anywhere between 5 to

460
Norman Stamper - Direct

1   10 feet.

2   Q.  And was almost immediately struck?

3   A.  Exactly.

4   Q.  So under that IACP guideline we just talked about, was

5   anything he did -- could it be reasonably considered to involve

6   or pose an immediate threat of death or serious injury?

7   A.  No.

8   Q.  Under the IACP's conception of the use of direct-impact

9   weapons, was it appropriate for that officer to shoot Zach

10  Packard?

11  A.  No.

12  Q.  Now, we've seen this video just a second ago, and I'm not

13  going to play it again, but we've got a couple stills from

14  Exhibit 656, with the protester who was almost struck by a

15  vehicle after being shot.

16        Any justification for the deployment of pepper ball at

17  him in this circumstance?

18  A.  No.

19  Q.  Was he doing anything that created an immediate risk of

20  death or serious harm?

21  A.  Only to himself.

22        MR. ARO:  Another example.  This is 1127.  This is

23  offered by stipulation, Your Honor.

24        THE COURT:  All right.  Admitted.

25        (Exhibit 1127 admitted.)

461

Norman Stamper - Direct

1    *BY MR. ARO:*

2    *Q.*  Now, this is on May 30, day three, at about 6:11.  So this

3    happened about 15 minutes after the officers cleared the area

4    around the bus station.

5    *A.*  Right.

6           (Video played.)

7    *Q.*  And you can see they continue to try to move protesters

8    away from the area.

9           So what we see there is an officer with -- that's a

10   pepper ball system?

11   *A.*  I believe it is.  Yes.

12   *Q.*  And these two protesters are standing with their hands up.

13   And you heard the man say, "I'm not being a dick right now."

14   *A.*  I heard that.

15   *Q.*  And did you hear the officer say anything in response or

16   give a warning?

17   *A.*  I did not.

18   *Q.*  Any justification for the officer shooting those people?

19   *A.*  No.

20   *Q.*  Is shooting a pepper ball into the body of a protester in

21   this circumstance an approved use of force --

22   *A.*  No.

23   *Q.*  -- in any police department that you're aware of?

24   *A.*  I apologize.  No.

25   *Q.*  Has this officer been disciplined for what we just saw?

462

Norman Stamper - Direct

1   A.   No.

2   Q.   Now, moving from the kinetic weapons or the projectile

3   weapons to the explosive weapons.  You've -- you looked at the

4   use of blast grenades in connection with the protest; correct?

5   A.   I did.

6   Q.   And what is your opinion about how blast grenades were used

7   against protesters during the course of the protest in May and

8   early June of 2020?

9   A.   It is my belief that they were inappropriately used on

10  many, many occasions.

11  Q.   Now, as a general proposition, under the IACP model of the

12  use of these kinds of weapons, kinetic weapons can be used in

13  certain circumstances; correct?

14  A.   Yes.

15  Q.   Excuse me.  Not kinetic.  Explosive weapons --

16  A.   Yes.

17  Q.   -- like a blast grenade?

18  A.   Yes.

19  Q.   One situation where they might be used is when officers are

20  raiding a house, they use an explosive device as a diversionary

21  tactic?

22  A.   Yes.  And not merely diversionary, but to really distract,

23  disorient, and effectively immobilize someone as they're making

24  their entry.

25  Q.   Okay.  Are they approved for use against people in a

Norman Stamper - Direct

1    demonstration scenario?

2    A.   It depends on the local agency.  In general, the answer

3    would be no, at least in terms of policies, practices, customs,

4    training, no.

5    Q.   Are they typically deployed without warning against people

6    who are not resisting or defying a lawful order?

7    A.   They certainly ought not to be, but we've seen ample

8    evidence here that that was the case.

9    Q.   Okay.  Let's take a look at a blast grenade.  This is one

10   of the forms of grenades that was used during the George Floyd

11   protests in Denver; correct?

12   A.   Yes.

13          MR. ARO:  This is Exhibit 710.  We offer it without --

14   by stipulation.  It's a still from a video.

15          THE COURT:  Okay.  Admitted.

16          (Exhibit 710 admitted.)

17   BY MR. ARO:

18   Q.   And is it fair to say that these are -- this particular

19   weapon is fired by pulling a pin and throwing it, like you

20   might see in a movie?

21   A.   Classic grenade kind of effect.  Yes.

22   Q.   So I want to take a look at a couple of uses of grenades

23   during the protest.

24          The first is Exhibit 1190, which we offer by

25   stipulation.

Norman Stamper – Direct

1          *THE COURT:*  Admitted.

2              (Exhibit 1190 admitted.)

3    *BY MR. ARO:*

4    *Q.*  This is the body-worn camera of Officer Schaal of the DPD.

5    This was taken on Broadway near 13th Street over by the state

6    Supreme Court.  Have you visited that site?

7    *A.*  Yes.

8              (Video played.)

9    *Q.*  Okay.  And the beginning of this is a little bit hard to

10   see, so we're going to have to stop it a couple times.  We've

11   got moving traffic here and officers facing across the street.

12             Pause here.

13             Where we're going to be looking is in this area right

14   here.  You're going to see the officer throw something and it

15   land over in that area.

16             Could you play it from there now.

17             (Video played.)

18             Did you hear the officer or his partner react to that

19   explosion?

20   *A.*  I certainly heard somebody react to it.  Yes.

21   *Q.*  Did you hear any commentary or warnings from the officers

22   beforehand?

23   *A.*  None.

24   *Q.*  What do we see in that video immediately preceding the

25   explosion?

465

Norman Stamper - Direct

1    A.  We see moving traffic; we see an officer on this side of

2    the street who is apparently the person who threw that.

3    Q.  What are the people in the car they threw it at doing?

4    A.  From everything I can tell, they're doing nothing.  A woman

5    gets out -- a passenger gets out of the vehicle and is almost

6    instantly struck by that flash-bang.

7    Q.  Was that officer, Officer Schaal, disciplined over this

8    incident?

9    A.  No.

10   Q.  Now, this is another view of an incident that Stanford

11   Smith described yesterday, where an explosion went off near

12   another person who was right next to him.  And this is a view

13   from a body-worn camera of that particular explosion.  It

14   happens really quickly, so we're going to show two views, one

15   full speed, one slowed down.

16        This is Exhibit 626, which has already been admitted.

17        And the guy that we're looking for who is struck by

18   the munition is this guy right here, who is against the wall,

19   moves down here, and he's struck right about here.  And the

20   record reflects that at the time that happened, Mr. Smith was

21   right around the corner, filming the same event.

22        So watch at full speed first.

23        (Video played.)

24        Now, did you see anything that that protester did that

25   constituted resistance to the officers?

Norman Stamper - Direct

1   A.   No.

2   Q.   Did he do anything to provoke that?

3   A.   No.

4   Q.   Did he throw anything?

5   A.   No.

6   Q.   What was he doing at the time that explosion happened?

7   A.   He was walking.  Had reached the corner.

8   Q.   Okay.  Now, if you watch slowly, a question was raised

9   during the examination yesterday about whether this individual

10  was knocked unconscious.  Let's take a look at what the slow

11  motion video tells us.

12          (Video played.)

13          Now, understanding you weren't there at the time, what

14  appears to you to have happened?

15  A.   What appears to me to have happened is that that explosive

16  hit him either in the head or very close to his head.  I can't

17  tell for sure.  What I can tell is that the -- that his

18  reaction to it appeared to be immediate and revealing.  I mean,

19  he just went down.

20  Q.   Has that officer been disciplined?

21  A.   No.

22  Q.   This is another one that we need to take a couple of views

23  at to see exactly what happened.

24          The first is Exhibit 1129, and that's offered by

25  stipulation by the plaintiffs.

Norman Stamper - Direct

1           THE COURT:  Okay.  Admitted.

2           (Exhibit 1129 admitted.)

3    BY MR. ARO:

4    Q.  So this is headed south on Broadway, right near the Denver

5    Public Library at about 11 o'clock on the first day of the

6    protests -- a little after 11:00 that evening.  And the area

7    that we're going to be watching -- they're going to walk for a

8    little bit.  We're going to be watching sort of right in the

9    intersection about where I made that mark.

10          (Video played.)

11          Now, we know that this is a body-worn camera.  There

12   is a group of officers pushing people to the south; right?

13   A.  Yes.

14   Q.  Is anybody in this crowd resisting?

15   A.  No.

16   Q.  Is anybody throwing anything?

17   A.  No.

18          (Video played.)

19   Q.  So we can't see in that instance the officer who threw the

20   munition; correct?

21   A.  Correct.

22   Q.  But there is another view where we can.

23          This is Exhibit 1130, we offer by stipulation.

24          THE COURT:  Okay.

25          (Exhibit 1130 admitted.)

468

Norman Stamper - Direct

1        (Video played.)

2    *BY MR. ARO:*

3    *Q.*  So this officer is a little behind the front of the line,

4    behind the person we saw, in this area here.

5        Did you hear any warning from either of those

6    body-worn cameras before that explosive was deployed?

7    *A.*  No.

8    *Q.*  How close to the protesters that it almost hit did it land?

9    *A.*  Right there.

10   *Q.*  Any justification for what we just saw under any theory of

11   policing?

12   *A.*  Under no theory of policing is there justification.

13   *Q.*  Did anybody get disciplined as a result of this?

14   *A.*  No.

15   *Q.*  And to be clear, all video we saw is DPD body-worn camera?

16   *A.*  Yes.

17   *Q.*  Did you also look at the use by DPD of tear gas?

18   *A.*  I did.

19   *Q.*  And what was your opinion about how tear gas was used

20   against protesters during the George Floyd protests?

21   *A.*  I would characterize it as indiscriminate and excessive and

22   in many instances, no justification whatsoever.

23   *Q.*  Now, before we see an example of that, I just want to look

24   at the actual munitions we're talking about, starting with

25   Exhibit 1165.

Norman Stamper - Direct

1           Which is offered by stipulation.

2              *THE COURT:*  Admitted.

3              (Exhibit 1165 admitted.)

4    *BY MR. ARO:*

5    *Q.*  Now, what we see here are various cans that are used for

6    smoke and other gas munitions; right?

7    *A.*  Yes.

8    *Q.*  And on the left we see something called aerosol grenade;

9    correct?

10   *A.*  Correct.

11   *Q.*  And the one on the right -- I'm talking about the left-hand

12   picture says -- Jet-Lite CS Smoke?

13   *A.*  Yes.

14   *Q.*  When we see "CS," what does that designate?

15   *A.*  It designates tear gas as it's classically understood.

16   *Q.*  And sometimes officers also just throw smoke that doesn't

17   have tear gas; right?

18   *A.*  That's correct.

19   *Q.*  And smoke in that context would be smoke that is sort of

20   like wood smoke without the wood aroma?

21   *A.*  The best I understand it to be, yes, that's the case.

22   *Q.*  And is smoke -- what is smoke without CS gas intended to

23   do?  What's the purpose?

24   *A.*  Obscure situations.

25   *Q.*  So it's making it hard to see?

Norman Stamper - Direct

1   A.  Making it hard to see.

2   Q.  And the CS gas is intended to --

3   A.  It is intended to affect the person, to produce the extreme

4   pain to the eyes, the nose, the mouth, the throat.  It is

5   intended to disorient people, as well.

6   Q.  And these weapons are deployed -- they're a can of some

7   sort, and they're deployed by pulling a tab and tossing or

8   bowling them into a crowd.  Correct?

9   A.  Yes.  I think there are different delivery systems, but

10  that's essentially it.

11  Q.  That's what we saw in front of the capitol the first night

12  of protests when officers were kind of over-arm throwing them;

13  correct?

14  A.  That's correct.

15      MR. ARO:  All right.  And this is a still image,

16  Exhibit 645, which we offer by stipulation.

17      THE COURT:  Admitted.

18      (Exhibit 645 admitted.)

19  BY MR. ARO:

20  Q.  And this scene depicts an event outside the state capitol

21  during the protests.  And we see a canister in the lower left

22  that is emitting smoke; right?

23  A.  Yes.  Appears to be smoke.

24  Q.  And we see sort of a haze over the whole crowd?

25  A.  Yes.

Norman Stamper - Direct

1          *MR. ARO:*  And I want to talk a little bit about how

2    the IACP looks at this.

3          Offering Exhibit 1015, Andrew.  This is just their

4    policy on the use of CS.

5          *MR. RINGEL:*  No objection.

6          *THE COURT:*  It's already in.

7          *MR. ARO:*  Sorry about that, Your Honor.

8    *BY MR. ARO:*

9    *Q.*  All right.  So the IACP policy speaks to the use of CS

10   chemical agents as primarily offensive weapons that should be

11   used with the utmost caution?

12   *A.*  Yes.

13   *Q.*  What is an offensive versus a defensive weapon in a crowd

14   management situation?

15   *A.*  Well, if you can imagine a group of people who are being

16   threatened or who are being attacked to be able to actually, as

17   Commander Phelan suggested, lay down gas, that that would in

18   fact have the effect of dispersing people.

19   *Q.*  And the IACP policies speaks to the idea of using these

20   weapons with the utmost caution.  What's the idea -- obviously,

21   I understand what caution means; but why should these weapons

22   be used with the utmost caution?

23   *A.*  They can inflict serious injury.  They can have a lasting

24   effect on people and their health.

25          *MR. ARO:*  Okay.  Now, this is Exhibit 106, which is a

Norman Stamper - Direct

 1   video that was shot by Elisabeth Epps, which we offer by

 2   stipulation, Your Honor.

 3              THE COURT:  All right.  Admitted.

 4              (Exhibit 106 admitted.)

 5   BY MR. ARO:

 6   Q.  This video was shot on the first day of the protest, the

 7   first big gathering on the south side of the capitol; right?

 8   A.  Yes.

 9   Q.  And Ms. Epps will describe the circumstances of this later.

10   But, essentially, what she's doing here is interviewing

11   somebody livestream; correct?

12   A.  Correct.

13              (Video played.)

14   Q.  Now, you've looked at a lot of different video angles of

15   this event on the south steps of the capitol the first night of

16   the protest?

17   A.  Yes.  That's correct.

18   Q.  And at the time that the gas was deployed, were people

19   launching waves of bottles and rocks at the officers?

20   A.  I saw none.

21   Q.  Now, this is a minute later.  We just edited it to speed

22   things up a little bit.  This is continuation of Exhibit 106.

23              (Video played.)

24              Is what we see in her face characteristic of the way

25   tear gas affects people?

473

Norman Stamper - Direct

 1    *A.*  It is.

 2              (Video played.)

 3    *Q.*  In your opinion, having looked at the circumstances of this

 4    event, did DPD deploy CS gas at this site using the utmost

 5    care?

 6    *A.*  No.

 7    *Q.*  There has been a lot of discussion about pepper spray, and

 8    I think most of us have some familiarity with what this is.

 9    But before we get to what it is, what's your opinion about the

10    way DPD deployed pepper spray during the course of the George

11    Floyd protests?

12    *A.*  I guess I would characterize it as altogether too much of

13    it, under inappropriate circumstances.

14              *MR. ARO:*  Now, we'll offer Exhibit 1176 by

15    stipulation.  It's been combined and shown with the

16    demonstrative, which I believe is not objected to.

17              *THE COURT:*  Well, 1176 is admitted.

18              (Exhibit 1176 admitted.)

19              But I want to stop here and take a break.  It's

20    3 o'clock.

21              *MR. ARO:*  Okay.  Thank you.

22              *THE COURT:*  Let's take ten minutes.

23              (Recess at 2:59 p.m.)

24              (In open court at 3:14 p.m.)

25              *THE COURT:*  Okay.

Norman Stamper - Direct

1    *BY MR. ARO:*

2    *Q.*   When we broke, we had just begun talking about pepper

3    spray, and I just put up the image of Exhibit 1176.  We see in

4    the circle a red can that's a can of spray that's being

5    deployed towards that protesters; correct?

6    *A.*   Yes.

7    *Q.*   And on the right-hand side of that image, we see three

8    different containers of aerosol irritant; right?

9    *A.*   Yes.

10   *Q.*   On the right-hand side, we see a can of mace or some sort

11   of pepper spray that you could buy at 7-Eleven and people could

12   carry in their purse or their pocket; right?

13   *A.*   Well, probably shouldn't be able to buy it at 7-Eleven;

14   but, yes.

15   *Q.*   Okay.  But it's a personal protection and very common

16   instrument that people sometimes carry around?

17   *A.*   Correct.

18   *Q.*   All right.  To the left of that is the MK-9 police or

19   military grade pepper spray that we see in Exhibit 1176;

20   correct?

21   *A.*   Yes.

22   *Q.*   And then next to that, we see the MK-46H police or military

23   grade pepper ball device; right?  Excuse me -- pepper spray

24   device; right?

25   *A.*   Yes.  Pepper spray.

Norman Stamper - Direct

1    Q.  And describe for me how the contents of a police or

2    military grade pepper spray device differs from what you could

3    get at 7-Eleven or anyplace else?

4    A.  Well, clearly, just looking at the size of those two

5    devices on the left, you're looking at a much larger supply and

6    very much under higher pressure than what you would get with

7    the commercial version.  And they will generally spray much,

8    much further, much faster, and in greater quantity, those on

9    the left.

10   Q.  Okay.  Now, the IACP model policies also contain guidance

11   on the deployment of pepper spray; true?

12   A.  Yes.  That's correct.

13   Q.  And we see that in Exhibit 1015, where the IACP refers to

14   this device as aerosol restraint spray; right?

15   A.  Yes.

16   Q.  And they refer to it by its full name.  I call it OC

17   because I can't say the other words.  "Oleoresin capsicum" --

18   A.  Perfect.

19   Q.  -- "may be used against specific individuals engaged in

20   unlawful conduct or actively resisting arrest or as necessary

21   in a defensive capacity."

22   A.  Correct.

23   Q.  They're describing when it's appropriately used against a

24   particular individual.

25   A.  Yes.

476

Norman Stamper - Direct

1   *Q.* And they're saying it can be used if somebody is throwing a

2   rock, you can spray them?

3   *A.* Right.

4   *Q.* Or if somebody is attacking you, you can use it to deter

5   them?

6   *A.* Yes.

7   *Q.* The guidance then says, "OC spray shall not be used

8   indiscriminately against groups of people where bystanders

9   would be unreasonably affected or against passively resistant

10  individuals."

11         So we get the idea, bystanders -- you're not supposed

12  to spray bystanders who haven't done anything wrong?

13  *A.* That's right.

14  *Q.* What in police jargon is a person who is passively

15  resistant -- what is a person doing if they're passively

16  resisting?

17  *A.* Somebody who is essentially not paying attention to your

18  orders or your direction but who is not confronting you

19  physically.  Not attempting to attack you.

20  *Q.* So, for example, a little bit ago we saw a video of a guy

21  with a vest and the signal on the back who was standing on a

22  hill of dirt; the officers were pushing forward in a skirmish

23  line by the Denver bus station; he didn't move; and an officer

24  sprayed him.

25  *A.* Correct.

477

Norman Stamper - Direct

1   Q.  Was that guy engaged in passive resistance?

2   A.  He was.

3   Q.  Okay.  And this says OC spray should not be used against

4   somebody like that; right?

5   A.  Correct.

6   Q.  All right.  "High-volume OC delivery systems, such as MK-9

7   and MK-46" -- which are the big cannisters we just looked at --

8   "are designed for and may be used in civil disturbances against

9   groups of people engaged in unlawful acts or endangering public

10  safety and security when approved by the IC."  The IC in that

11  context is the incident commander?

12  A.  That's correct.

13  Q.  And what's the idea of requiring the approval of the

14  incident commander before these high-capacity, high-volume

15  delivery systems can be used against groups of people, all of

16  whom are engaging in some kind of unlawful conduct?

17  A.  That's an acknowledgement of the seriousness of this

18  munition in use in protest situations.  In theory, the incident

19  commander is going to be -- have a larger body of knowledge,

20  greater awareness of the impact of that protest activity on the

21  city and its residents, its visitors, as well as its police

22  officers.  So the idea is, you get authorization before you use

23  that from the incident commander.

24  Q.  So the officer on the ground sees a group of people engaged

25  in some sort of destructive behavior, calls the IC, says, we

Norman Stamper - Direct

1   think we need to use these high-volume systems to solve that

2   particular problem?

3   A.  Well, as a practical matter, I believe in most cases the IC

4   would say in advance, here are the one to six situations where

5   you can -- you are authorized to use it.

6   Q.  Only if there is a group that is endangering public safety

7   can you use it against a group?

8   A.  Exactly.

9   Q.  All right.  The last line is, "Whenever reasonably

10  possible, a verbal warning should be issued prior to the use of

11  these systems."  The idea there being, do what I say or else?

12  A.  Yes.

13  Q.  Okay.  Let's take a look at a couple of examples of DPD

14  deployment of these high-volume systems -- pepper spray

15  systems, starting with Exhibit 670.

16          Which we offer by stipulation.

17          THE COURT:  All right.

18          (Exhibit 670 admitted.)

19          MR. ARO:  Excuse me, Your Honor.  I didn't mean to cut

20  you off.

21  BY MR. ARO:

22  Q.  This was from about 8:20 p.m. on the third day of the

23  protests, May 30, on the steps of the Colorado Supreme Court,

24  right along 14th Avenue between Lincoln and Broadway.  This is

25  DPD Officer Hastings' body-worn camera.

479

Norman Stamper - Direct

1           (Video played.)

2           So in this situation, unfortunately, only saw it from

3    the side of the screen.  What did you see the officers do to

4    the woman that we now see in black with the black garment

5    around her waist?

6    A.   Pepper-sprayed her.

7    Q.   What was she doing when they did that?

8    A.   I couldn't tell you, other than being there.

9    Q.   Was she walking backwards?

10   A.   She was, as a matter of fact.

11   Q.   Was there any warning given that you heard on that

12   recording?

13   A.   I did not hear one.

14   Q.   Okay.  We see another example -- another view of this same

15   incident in Exhibit 672.

16           Which we offer by stipulation.

17           THE COURT:  Admitted.

18           (Exhibit 672 admitted.)

19   BY MR. ARO:

20   Q.   Same individual standing there, holding a little cardboard

21   sign.

22   A.   Yes.

23           (Video played.)

24           MR. ARO:  Can you play that for me again, please.

25           (Video played.)

Norman Stamper - Direct

1    *BY MR. ARO:*

2    *Q.*  Did it appear to you that two officers hit her at the same

3    time with the spray?

4    *A.*  That's how it appeared to me.  Yes.

5    *Q.*  Okay.  And was there any warning given to her before she

6    was sprayed?

7    *A.*  Only in the most general sense, and not a warning

8    specifically with respect to the spray.

9    *Q.*  They told her just to move along?

10   *A.*  They told her to move along.

11   *Q.*  Was she moving along?

12   *A.*  She was moving along.

13   *Q.*  Okay.  So we continue the same video, as we walk a little

14   further down the sidewalk.

15          Can you play the rest of it.

16          (Video played.)

17          So did you see there two officers spraying the same

18   woman again?

19   *A.*  Yes.

20   *Q.*  And when we look at the one in the center of the screen

21   there, what are those you see on his shoulder?

22   *A.*  Those are sergeant's chevrons.

23   *Q.*  And is it fair to say that in a police department, the

24   sergeant is the sort of first-line supervisor of regular street

25   officers -- patrol officers?

481

Norman Stamper - Direct

1    A.   Yes.

2    Q.   So a sergeant might supervise a group of eight or ten

3    officers?

4    A.   Exactly.

5    Q.   And when we see a supervisory officer like a sergeant

6    engaging in what we just saw, is there a message that is going

7    out to his or her subordinates?

8    A.   Yes.

9    Q.   What is that message?

10   A.   That message is, I am licensing you to do what I'm doing.

11   And even if there is no justification, as I view this

12   situation, for his use of the pepper spray, he's saying to all

13   of his officers, you can do the same.

14   Q.   When this woman was sprayed for the second time by two

15   officers, is it fair to say she was sort of standing recovering

16   from the first spray?

17   A.   I'm not sure she was recovering; but, yes.  I think she was

18   suffering the effects of that first spray when she was hit with

19   the second.

20   Q.   Was she doing anything aggressive or threatening towards

21   the officers?

22   A.   No.

23   Q.   As far as you know, had any of the officers involved in

24   this incident been disciplined for it?

25   A.   No.

Norman Stamper - Direct

1   Q.   Now, there obviously are officers all around this area;

2   correct?

3   A.   Yes.

4   Q.   When one officer sees another officer doing something

5   wrong -- whatever it is, applying excessive force, violating

6   some policy -- does the officer who sees that have any

7   obligation to report that behavior?

8   A.   Not merely report it but intervene and stop it, if that's

9   possible.

10  Q.   Okay.  And did you -- have you seen any evidence ever in

11  all of the videos you've watched of a DPD officer intervening

12  or trying to stop the use of any of the munitions or weapons

13  we've talked about by another DPD or mutual support agency?

14  A.   Yes.

15  Q.   When did that happen -- actually, we'll get to that in a

16  little bit.  Did it happen one time that you're aware of?

17  A.   Only once.

18  Q.   Okay.  Were there lots of times when lots of officers saw

19  the kind of thing we saw here and said nothing and intervened

20  not at all?

21  A.   Exactly.

22  Q.   Okay.  Now, I want to look at another incident along

23  similar lines that happened a little later the same day.  The

24  one we just looked at was at 8:20 in front of the Supreme

25  Court.  About five minutes later, just around the corner from

Norman Stamper - Direct

1    where we just saw what we saw, there is another incident that

2    happens on southbound Broadway.

3          This is represented in Exhibit 741, which we offer by

4    stipulation.

5          *THE COURT:*  It's admitted.

6          (Exhibit 741 admitted.)

7    *BY MR. ARO:*

8    *Q.*  And what we see here in the still is people walking

9    southbound on Broadway past the Denver Public Library; correct?

10   *A.*  Correct.

11   *Q.*  And the people that we're going to be looking at here start

12   out sort of over here.  And as they -- the video proceeds, they

13   kind of come this way.

14         And, actually, I think I did that wrong.  I think it's

15   these two who go over this way, and what we're going to be

16   looking for happens right there.

17         (Video played.)

18         Did you hear any warning?

19   *A.*  No.

20   *Q.*  Was there any resistance or aggression on the part of those

21   protesters?

22   *A.*  No.

23   *Q.*  Was there any justification for what that officer did?

24   *A.*  No.

25   *Q.*  Was that officer disciplined, to the best of your

Norman Stamper - Direct

1   knowledge?

2   *A.*   No.

3   *Q.*   Another situation that happened the first night of the

4   protests, 9:35 on May 28 -- this is about 15 minutes after the

5   tear-gassing that we saw Ms. Epps talk about at the corner of

6   14th and Lincoln.  So you see over here, this is the Supreme

7   Court building, where we --

8           *THE COURT:*  Hold on.  This is 562?

9           *MR. ARO:*  I'm sorry, Your Honor.  562, we offer by

10  stipulation.

11          *THE COURT:*  Got it.

12          (Exhibit 562 admitted.)

13  *BY MR. ARO:*

14  *Q.*   Let me try that again.  So this is at the corner of -- this

15  is 17th, this is 14th, and this is the state Supreme Court over

16  here, where we just saw that video from; right?

17  *A.*   Yes.

18  *Q.*   And the person that we're going to be looking at is this

19  guy right here.

20          (Video played.)

21          *MR. ARO:*  Stop for a second.

22  *BY MR. ARO:*

23  *Q.*   What is that gentleman that I'm directing you to appear to

24  have in his hands?

25  *A.*   A camera, it would appear to me.

Norman Stamper - Direct

1   Q.  He's pointing it up in the direction of the state capitol?

2   A.  I think perhaps originally, but at this point he's pointing

3   it appears to be down the street.

4   Q.  Okay.

5   A.  Or off to the side of the street.

6   Q.  Okay.

7           (Video played.)

8           Now, did you hear any warning before the pepper spray

9   was deployed?

10  A.  I did not.

11  Q.  Okay.  There was a "disperse" statement, one word,

12  afterwards; correct?

13  A.  Correct.

14  Q.  Was the guy taking photographs acting in a provocative

15  fashion?

16  A.  No.

17  Q.  Was that officer disciplined?

18  A.  No.

19  Q.  The last pepper spray incident that we're going to look at

20  in this sequence, this was shot on May 30, same night, a little

21  after midnight -- excuse me -- this was on the night of the

22  29th, the morning of the 30th, so this was at the end of day

23  two of the protests.  This is at Colfax and Broadway.

24          A body-worn camera that we've marked and will offer

25  as -- by stipulation as Exhibit 1126.

486

Norman Stamper – Direct

1          *THE COURT:*  All right.  Admitted.

2              (Exhibit 1126 admitted.)

3   *BY MR. ARO:*

4   *Q.*  And this officer will walk towards this vehicle, and what

5   we're going to be looking for happens right about there.

6              (Video played.)

7              He walked around and comes back around the other side

8   of the vehicle.

9              (Video played.)

10             Now, there was no warning before either of those

11  incidents; right?

12  *A.*  That's correct.

13  *Q.*  We see an officer right here with sergeant chevrons; right?

14  *A.*  Yes.

15  *Q.*  And we saw the same officer spray a driver through both

16  sides of a car; right?

17  *A.*  Correct.

18  *Q.*  Is there a particular concern about deploying pepper spray

19  into a motor vehicle that's actually in traffic?

20  *A.*  Oh, gosh, yes.

21  *Q.*  What's the problem?

22  *A.*  The problem is, that driver is very likely to be

23  temporarily blinded, as well as disoriented, and very much in

24  pain.  And he is behind the wheel of a 3,000, 4,000-pound

25  dangerous weapon.

Norman Stamper - Direct

1   Q.  Now, in this particular instance, there was an IA

2   investigation; true?

3   A.  I believe there was.  Yes.

4   Q.  And was the person fired or suspended for what he did?

5   A.  No.

6   Q.  What happened to him?

7   A.  As I recall, it was treated as an educational moment -- or

8   whatever language that the Denver Police Department uses for

9   a -- essentially a written record of the event.

10  Q.  And sort of saying, you could have done better here?

11  A.  Don't do that again.  You could have done better.

12  Q.  Now, we saw an incident earlier where DPD deployed pepper

13  balls into a guy who stepped off the curb nearly into the path

14  of a car; right?

15  A.  Yes.

16  Q.  Did you study the circumstances of the use of force in

17  consideration of DPD putting protesters in dangerous

18  situations?

19  A.  Yes.

20  Q.  Sometimes into traffic?  Yes?

21  A.  Yes.

22  Q.  And also into confined spaces with no means of egress?

23  A.  Exactly.  Yes.

24  Q.  So when we're talking about the use of chemical agents to

25  disperse a crowd -- and making reference again to the IACP,

488
Norman Stamper - Direct

1    Exhibit 1015, which is already in evidence -- that policy

2    speaks to using chemical agents, "shall be deployed at the

3    direction of the IC and only when avenues of egress are

4    available to the crowd."  What's the idea there?

5    A.  Actually, IACP is very, very clear in their model policy

6    recommendations, that is that you do not -- even when you're

7    wanting everyone to disperse from an area and thinking you may

8    wind up arresting them, to deny them an avenue of escape,

9    egress.  The reasoning is very, very clear; and that is that if

10   you have got somebody who is engaged in lawful -- or for that

11   matter, unlawful -- protest, you still want them to be able to

12   escape the chemical agents if they are to be used.

13   Q.  Why would you want them to be able to escape?

14   A.  Because of the danger, the harm that can be done to the

15   human body.

16   Q.  Okay.  And is deploying chemical weapons against a group of

17   people who are in a confined area, does that raise another

18   potential danger?

19   A.  It certainly does.

20   Q.  What's the danger that is raised by that scenario?

21   A.  That people who have been rendered unable to see, perhaps

22   even reason, in a confined quarters with others could panic,

23   could, in fact, run out into traffic, could create some other

24   kind of physical hazard to everyone within that group.

25   Q.  Okay.  Now, are you familiar with the situation that

Norman Stamper - Direct

1   happened on day four at about 9:40 -- it's on Sunday evening,

2   May 31, 2020, in front of the Basilica of the Immaculate

3   Conception near downtown?

4   A.  I am.

5   Q.  I want to go through that.  I know that Ms. Sannier

6   discussed that during her testimony yesterday, but I want to

7   look at it from a law enforcement perspective.

8           Are you familiar with the overhead view of the area in

9   which this incident occurred?

10  A.  Yes.

11  Q.  And I just want to sort of orient folks to the video.  This

12  street here that I just highlighted is Colfax; right?

13  A.  Yes.

14  Q.  And the state capitol is a couple blocks that direction;

15  correct?

16  A.  Yes.

17  Q.  This street is Pennsylvania?

18  A.  Yes.

19  Q.  And this street over here is Logan; correct?

20  A.  Yes.

21  Q.  Now, on the south side of Colfax in this block we have a

22  couple of buildings; right?

23  A.  Right.

24  Q.  And then between them there is an alleyway?

25  A.  Yes.

490

Norman Stamper - Direct

1   Q.   Have you been in that alleyway?

2   A.   I have.

3   Q.   How big is it?

4   A.   You get a car in it with maybe a foot or two on either side

5   to spare.

6   Q.   Any chance that two cars could pass each other in it?

7   A.   I couldn't imagine it.

8   Q.   Okay.  On the other side of the street, we have the

9   basilica itself; right?

10  A.   Yes.

11  Q.   And then here, there is a parking lot.  What surrounds that

12  parking lot?

13  A.   A tall iron fence.

14  Q.   What's the top of the fence, like this high?

15  A.   Probably, maybe even a little bit higher.  It's quite tall.

16  Q.   Seven feet?

17  A.   Yeah, probably.  It is tall.

18  Q.   Made out of?

19  A.   Wrought iron.

20  Q.   What's the top of the fence?

21  A.   Pointed -- the pointed ends of each wrought iron member.

22  Q.   And is there any effective way for somebody who is out here

23  to go this direction?

24  A.   No.

25  Q.   And on this side of the street, is there any way other than

Norman Stamper - Direct

1   that single alley for folks to exit?

2   A.   No.   It's wall to wall businesses.

3   Q.   All right.   So as Ms. Sannier discussed -- and I want to go

4   into it in a little more detail -- there are some cameras in --

5          Actually, let me back up.   Are you familiar with HALO

6   cameras?

7   A.   I am.

8   Q.   And, generally, without getting into a lot of technical

9   detail, what are they?

10  A.   Security cameras, in this case installed by the city.

11  Q.   And so Denver in various locations in downtown Denver has a

12  security camera that is sort of put on top of light posts,

13  basically?

14  A.   Usually, yes.

15  Q.   Are those cameras fixed in one direction, or can they move?

16  A.   They can move.

17  Q.   Okay.   And if somebody is monitoring them, they can move

18  around and zoom in?

19  A.   Yes.

20  Q.   Okay.   Now, there is a HALO cam, is there not, on this

21  corner?

22  A.   There is.

23  Q.   And at the beginning of the scene we're going to look at,

24  it's pointing this direction?

25  A.   Correct.

492

Norman Stamper - Direct

1    *Q.*  Up Colfax towards the next block?

2    *A.*  I'm sorry.  Yes.

3           *MR. ARO:*  Okay.  Now, this first video is -- from that

4    HALO camera is Exhibit 547, which we will offer by stipulation,

5    Your Honor.

6           *THE COURT:*  All right.  Admitted.

7           (Exhibit 547 admitted.)

8    *BY MR. ARO:*

9    *Q.*  So looking up Colfax to the east; right?

10   *A.*  Yes.

11   *Q.*  And up here, we see a group of officers?

12   *A.*  We do.

13   *Q.*  And there is a vehicle here; right?

14   *A.*  Yes.

15   *Q.*  And it's -- is it your experience that police departments

16   sometimes use vehicles in the middle of skirmish lines to give

17   them a little bit more heft?

18   *A.*  They can.  It has certainly been done.

19   *Q.*  Okay.  And do you know where these officers were from, what

20   agency?

21   *A.*  The Aurora Police Department.

22   *Q.*  So they're going to start moving this direction.

23   *A.*  Correct.

24   *Q.*  And HALO, just for everybody's information, doesn't have

25   sound; correct?

493

Norman Stamper - Direct

1    *A.*   Correct.

2           (Video played.)

3    *Q.*   So we see over on the right-hand side up here, some kind of

4    munition; right?

5    *A.*   Smoke or gas.  Yes.

6    *Q.*   Right.  And we see the officers advancing in the skirmish

7    line, and the protesters who are in the street, a few

8    protesters being sort of driven to the west; right?

9    *A.*   Correct.  Yes.

10   *Q.*   And we see there some kind of other munition deployed by

11   the officers?

12   *A.*   Yes.  That would be, once again, smoke or gas.

13   *Q.*   Looking at these, do you have any way of knowing whether

14   that was tear gas or smoke?

15   *A.*   I don't.  Somebody with a better understanding of the

16   distinction between those two in terms of their physical

17   appearance might; but it's notorious.  You see some footage,

18   and you don't know typically whether it is gas or smoke.

19   *Q.*   Okay.  So we see these officers sort of stop at the bottom

20   of the screen?

21   *A.*   Yes.

22   *Q.*   And is it your understanding that where they are set up at

23   that point is right along Pennsylvania?

24   *A.*   That's correct.

25   *Q.*   And they set up a skirmish line there; right?

494

Norman Stamper - Direct

1    *A.* Yes.

2    *Q.* And we see what appears to be a fairly large amount of

3    smoke --

4    *A.* We do.

5    *Q.* -- sort of wafting over them?

6    *A.* Yes.

7            *MR. ARO:* Now, the next video is from some of those

8    officers -- one of the officers from Aurora -- as they walk

9    towards the intersection.  This one does have a little bit of

10   sound.

11           This is Exhibit 372 that we offer by stipulation.

12           *THE COURT:* Admitted.

13           (Exhibit 372 admitted.)

14           (Video played.)

15   *BY MR. ARO:*

16   *Q.* So there is a lot of gas at this point or smoke.  We don't

17   know what it is.

18           Stop here.  Go back just a little bit.

19           We see here a dumpster, that yellow thing out in the

20   middle of the street; right?

21   *A.* Correct.

22   *Q.* And behind that -- and it's kind of hard to see because

23   she's behind people -- we have protesters who are coming from

24   the other direction; right?

25   *A.* Yes.

495
Norman Stamper - Direct

1    *Q.* And the building that we see over here is one of those

2    buildings that we saw on the south side of that block; correct?

3    *A.* Yes.

4    *Q.* And the basilica is this thing we can see right there?

5    *A.* Correct.

6         *MR. ARO:* All right. Now, the next video is shot from

7    another HALO cam up one block to the west, pointing towards the

8    east. So we are essentially pointing towards that line of

9    officers. This is at the same time frame, 9:41 that night.

10        This one is 546, which I believe has been admitted.

11   But if it hasn't, I will offer it, I believe by stipulation.

12        *THE COURT:* Yes. It's already admitted.

13   *BY MR. ARO:*

14   *Q.* So we're looking towards the east, and those Aurora

15   officers would be up here; right?

16   *A.* Correct.

17        *MR. ARO:* So -- and I'll just let the Court know,

18   because this has been played before, we advanced the speed just

19   in the interest of time. I'd be happy to play it regular speed

20   also.

21        Are you okay with me playing it double time?

22        *MR. RINGEL:* No problem.

23        (Video played.)

24   *BY MR. ARO:*

25   *Q.* So we see people who are marching essentially from the

496

Norman Stamper - Direct

1  state capitol towards the east?

2  *A.*  Yes.

3  *Q.*  Do you know what is behind them?

4  *A.*  I do.

5  *Q.*  What is?

6  *A.*  It's a line of Denver police officers.

7  *Q.*  Who were advancing in a skirmish line?

8  *A.*  Correct.

9  *Q.*  Okay.  And we see those folks start to fill in.  And at

10  this point do you see any sort of aggression towards either the

11  officers at the far end of the block or the officers behind

12  them?

13  *A.*  I do not.

14  *Q.*  People appear to be walking calmly?

15  *A.*  Yes.

16  *Q.*  And what I'll ask you to do is kind of look up here to see

17  what happens, so you get to this point.  People start to

18  collect.  That alleyway is over here; right?

19  *A.*  It is.

20  *Q.*  At about here, we start to see people moving away from the

21  Aurora lines; right?

22  *A.*  Yes.

23  *Q.*  What's going on up there?

24  *A.*  It -- it would appear that they are being pushed back this

25  way.

497

Norman Stamper - Direct

1   Q.  By physical force or by munitions?

2   A.  By physical force.  The line -- the skirmish line is

3   moving.

4   Q.  And we can see up there in the corner what?

5   A.  I'm sorry.  Which corner?

6   Q.  With the yellow circle around it.

7   A.  Yes.  That definitely appears to be a chemical weapon.

8   Q.  Okay.  So we've got chemicals being deployed on the other

9   end, protesters are coming back this direction, folks are still

10  coming from the capitol; right?

11  A.  Yes.

12  Q.  Okay.  At this point we don't have any signs either of

13  violence towards officers or of panic; true?

14  A.  That's true.

15  Q.  But we're still seeing more munitions being deployed up at

16  the top; correct?

17  A.  Yes, we are.

18  Q.  More people funneling into the block?

19  A.  Right.

20  Q.  Sorry about the pixelation there.

21          And we now see vehicles starting to enter this area

22  for unknown reasons.  They don't appear to be police vehicles;

23  correct?

24  A.  That's correct.

25  Q.  But at this point, we've got a lot of people in that area;

498
Norman Stamper - Direct

1  would you agree?

2  *A.*  I would agree.

3  *Q.*  And on one end we have Aurora, and on the other end we have

4  DPD?

5  *A.*  Yes.

6  *Q.*  And we continue to see munitions being deployed up here;

7  right?

8  *A.*  We do.  Yes.

9  *Q.*  Now I want to move -- there is another explosion.  We don't

10 know exactly what that was?

11 *A.*  Correct.

12 *Q.*  But the crowd reacted pretty quickly; right?

13 *A.*  Yes.

14 *Q.*  And we see more munitions here, some kind of smoke.

15 *A.*  Yeah.

16 *Q.*  All right.  Now, at the other end of the block -- we looked

17 at the HALO camera down here that's already been admitted.  If

18 we can go a little bit further into that video, we see the line

19 of the Aurora officers with this -- what's the big thing in the

20 middle, the vehicle?

21 *A.*  Often referred to as a bearcat.

22 *Q.*  Essentially, an armored personnel carrier?

23 *A.*  It's an armored personnel carrier.

24 *Q.*  We've got a couple of other armored vehicles back here?

25 *A.*  At least one -- two.  I apologize.

499

Norman Stamper - Direct

1   Q.   Now, this camera, as you said, can rotate.  In just a

2   second, we're going to see it turn towards the protesters.  You

3   see a lot of gas -- or some sort of -- something is in the air;

4   right?

5   A.   Yes.

6   Q.   And what are we seeing here on the back side being deployed

7   from the direction of the DPD officers?

8   A.   A lot of chemical agents deployed by DPD.  Yes.

9   Q.   And where are those people going right now?

10  A.   They are entering that alley that we identified earlier.

11  Q.   And as you look at this and see those people crowding into

12  the alley, as a person watching this, as an experienced

13  officer, if you were in the command post watching this, what's

14  your reaction to this situation?

15  A.   My reaction is, if they -- officers have decided to kettle

16  the protesters, to actually contain or encircle them, leaving

17  them that one very narrow egress.

18  Q.   Now, we saw the camera swing around and zoom in; right?

19  A.   Yes.

20  Q.   Does that connote that there was somebody watching it and

21  zooming in on that scene?

22  A.   Yes.

23  Q.   Are you aware of any order given by whoever was watching

24  that camera saying, Stop what you're doing because people are

25  in danger?

500

Norman Stamper - Direct

1   A.   No.

2   Q.   And you see -- as those people are packing into that

3   corner, we see more gas?

4   A.   We do.

5   Q.   Okay.  And Ms. Sannier was one of the people down there,

6   who described her experience yesterday, so I don't want to go

7   through that.

8        But the last piece of this that I want to ask you

9   about is the body-worn camera of a DPD officer who was down in

10  the skirmish line on the other end of the block, from Aurora,

11  in the location where you see the red dot.  This is about the

12  same time, a little bit after, because, as we're going to see

13  there weren't a lot of people left in that area.

14       MR. ARO:  I'm going to offer Exhibit 709 by

15  stipulation.

16          THE COURT:  Okay.

17          (Exhibit 709 admitted.)

18          (Video played.)

19       MR. ARO:  Could you start that over again.  Thank you

20  very much.

21          (Video played.)

22          Back it up just a little bit.

23  BY MR. ARO:

24  Q.   We're looking at the -- the basilica is basically right

25  here; correct?

501

Norman Stamper - Direct

1    *A.*  Yes.

2    *Q.*  And the officer is going to approach a white vehicle, and

3    you can hear an exchange between him and what sounds like a

4    woman's voice coming from the vehicle.

5              (Video played.)

6              What did you hear the officer say --

7    *A.*  I'm sorry, the woman --

8    *Q.*  What did you hear the woman say?

9    *A.*  That she was informing the officer of an individual with a

10   head injury.

11   *Q.*  And the officer responded?

12   *A.*  I could not make that out.

13             *MR. ARO:*  Would you back that up a little.  It kind of

14   pixelated right at the crucial moment.

15             (Video played.)

16   *BY MR. ARO:*

17   *Q.*  Did you hear it that time?

18   *A.*  I did.

19   *Q.*  Did he say, Get out of the F-ing way?

20   *A.*  Yes.

21   *Q.*  In that circumstance when a citizen is informing a police

22   officer of a head injury, where a guy is bleeding from his

23   head, even if that officer is assigned to secure the area, how

24   does his mission change when he hears about somebody with that

25   kind of injury?

Norman Stamper - Direct

1    *A.*  It changes profoundly to one of life saving.  His

2    responsibility -- first responsibility is protection of life

3    and property; and at this point, life has primacy.

4    *Q.*  Okay.  Did that officer respond as would somebody who is

5    properly trained?

6    *A.*  No.

7    *Q.*  To best of your knowledge, was Officer Hoffecker ever

8    disciplined for that?

9    *A.*  No.

10           *MR. ARO:*  Would you continue, please.

11           (Video played.)

12   *BY MR. ARO:*

13   *Q.*  He turns back towards Colfax?

14   *A.*  Yes.

15   *Q.*  And we --

16           Go ahead and play now.

17           (Video played.)

18           Pause it, please.

19           Off in the distance we see still more munitions being

20   deployed?

21   *A.*  Correct.

22   *Q.*  Would you say that this crowd is pretty well dispersed as

23   best they can?

24   *A.*  I would say exactly that.

25   *Q.*  Is there any justification you're aware of for continuing

503

Norman Stamper - Direct

1    to deploy chemical munitions against a crowd that is dispersing

2    by trying to escape through an alley?

3    A.   No.

4    Q.   And we see the remnants of the crowd right here headed

5    towards the alley we talked about; right?

6    A.   Yes.

7         MR. ARO:   Would you pick it up from there, show the

8    last probably 30 seconds of that clip.

9         (Video shown.)

10   BY MR. ARO:

11   Q.   So we've seen this long sequence of events.   And you

12   described a second ago, using the word "kettling."   To the best

13   of your knowledge, was anybody at DPD reprimanded or otherwise

14   disciplined for ordering or participating in what we just saw?

15   A.   No.

16   Q.   We also saw an example of an individual earlier -- the guy

17   with the symbol on his vest -- be pushed into traffic.   I want

18   to return to that idea.   Was that a single event, or did that

19   happen more than once?

20   A.   Certainly more than once.   Several times, at least.

21        MR. ARO:   I want to look at an example of that.   This

22   is Exhibit 623 that we'll offer by stipulation.

23        THE COURT:   Okay.   Admitted.

24        (Exhibit 623 admitted.)

25

504

Norman Stamper - Direct

1    *BY MR. ARO:*

2    *Q.*  And this is from a body-worn camera of Officer Valentine,

3    facing away from the capitol.  On the front steps of the

4    capitol, you see the obelisk monument across the street in

5    Liberty Park.  And we see an individual right down here, who is

6    going to be the person we're looking at.

7            (Video played.)

8            Did you see anything in the nature of provocation

9    there?

10   *A.*  No.

11   *Q.*  Obviously, danger that this guy might be hit or a person

12   driving might cause an accident trying to avoid him?

13   *A.*  Exactly.

14   *Q.*  And as far as you know, was this officer disciplined?

15   *A.*  No.

16   *Q.*  We have -- going back to one of the things we saw earlier.

17   This is a still image at this point of the dispersal of the

18   crowd on the first night of the protests in front -- basically

19   the same location, right in front of the capitol?

20   *A.*  Right.

21   *Q.*  And we talked before about the officers coming up from

22   behind the skirmish line and deploying the chemicals.  The

23   point I want to focus on here is where these people go.

24           Is that Colfax?

25   *A.*  Yes.

505

Norman Stamper - Direct

1   Q.   Is it an active traffic situation or location at that time?

2   A.   Yes.

3   Q.   And the munitions were deployed this way; correct?

4   A.   Correct.

5             (Video played.)

6   Q.   Let's take a look at what the protesters did.  We see --

7             Could you stop that, Dan.

8             We see a whole string of munitions that are deployed

9   kind of in a wave towards -- pushing them not just away from

10  where they were, but really far away; right?

11  A.   Yes.

12  Q.   And where are all of those protesters being driven?

13  A.   To Colfax.  Moving traffic on Colfax.

14  Q.   Raises the same concern?

15  A.   Certainly does.  Yes.

16  Q.   Did Commander Phelan receive any kind of discipline for

17  ordering the chemical deployment that resulted in that?

18  A.   No.

19  Q.   Anybody else disciplined on the DPD for what we just saw?

20  A.   No.

21            MR. ARO:   This is the incident that happened at

22  Lincoln and Colfax, same area, on the afternoon of day three.

23  This is, again, right after the officers cleared out the

24  protesters.  It's actually part of that whole scene from the

25  bus station.

506
Norman Stamper – Direct

1           This is Exhibit 14, which we offer by stipulation.

2           THE COURT:  Okay.  Admitted.

3           (Exhibit 14 admitted.)

4    BY MR. ARO:

5    Q.  This is a camera -- Colorado State Patrol camera.  They

6    have a number of security cameras around the state capitol;

7    correct?

8    A.  Yes.

9           (Video played.)

10   Q.  And this is just another angle of what we saw before.  We

11   see the police vehicles that were starting to disperse the

12   crowd there, and the camera kind of pulls back.  The crowd

13   starts to rush away from the officers who we saw earlier.

14          And you can stop it there.

15          This is Colfax; right?

16   A.  Yes.

17   Q.  A lot of traffic at that point?

18   A.  Yes.

19   Q.  And all of those people are running.

20          You can play it, Dan.

21          (Video played.)

22          And, again, being followed by a series of munitions;

23   right?

24   A.  Yes.

25   Q.  And this is the same basic traffic flow that we saw the guy

Norman Stamper - Direct

1   get pepper-balled and almost hit by a car; right?

2   A.   Correct.

3   Q.   Now, there is also a lot of chemical that is wafting across

4   this traffic lane; right?

5   A.   Yes.

6   Q.   Is there a concern about deploying gas and -- smoke and

7   tear gas into a place where drivers are going to be exposed to

8   it?

9   A.   Absolutely.

10  Q.   Particularly when there are people running in the clouds of

11  smoke and gas?

12  A.   Yes.

13  Q.   Obvious danger of somebody hitting something that they

14  don't want to hit; right?

15  A.   Correct.

16       MR. ARO:   If I might ask the Court a question.   I am

17  probably 45 minutes from done with my direct.   And I'm happy to

18  continue, but given your expression of concern about getting

19  folks out before traffic, I just wanted to know where you'd

20  like me to stop.

21       THE COURT:   Let's keep going a little while longer.

22       MR. ARO:   Okay.

23  BY MR. ARO:

24  Q.   Now, we talked a little bit earlier about dispersal orders

25  and the whole idea of dispersal orders and making sure the

508

Norman Stamper - Direct

1   dispersal orders are appropriately heard.  I want to return to

2   that idea.

3           You said earlier that there were certain -- many

4   circumstances in which DPD didn't offer effective dispersal

5   orders?

6   A.   Correct.

7   Q.   And when it comes to a group protest or group

8   demonstration, one of the problems that confronts the police is

9   noise; right?

10  A.   Correct.

11  Q.   Chanting, yelling, singing, doing whatever protesters are

12  doing?

13  A.   Yes.

14  Q.   All of which is perfectly legal, as long as it's not

15  accompanied by violence?

16  A.   Yes.  Or property destruction.

17  Q.   So police agencies often use bullhorns or other

18  magnification to make dispersal orders; right?

19  A.   Yes.

20  Q.   Is there a tactic or technique that police officers can use

21  to make sure not just that their voices are expressed, but that

22  the protesters hear what they are saying?

23  A.   Yes.

24  Q.   Have you used that tactic yourself in a large protest

25  situation?

Norman Stamper - Direct

1   *A.*   Yes, I have.

2   *Q.*   What's that tactic?

3   *A.*   During the World Trade Organization protests, given that

4   intersection that I described earlier, the sitdown

5   demonstration, when it was decided to order that group of

6   people to disperse, I went around to the far side to see if I

7   could hear my captain audibly and clearly and listened, as I

8   mentioned, to about 30 minutes of his dispersal order repeated

9   however many times.  Many, many times.

10  *Q.*   The first time you heard it, could you hear it clearly?

11  *A.*   I could.

12  *Q.*   And if you hadn't been able to hear it clearly, what would

13  you have done?

14  *A.*   I would have conveyed that to him.

15  *Q.*   Using what?

16  *A.*   I would have walked directly back to him and told him that

17  that the protesters at the far end of the crowd cannot hear

18  this.

19  *Q.*   Okay.  Could you also use a radio for that purpose?

20  *A.*   I could have.  Yes.

21  *Q.*   Now, this protest in Seattle, you said involved tens of

22  thousands of protesters?

23  *A.*   Yes.

24  *Q.*   That particular sit-in did not become violent, in the sense

25  of people hurling things at officers?

1   A.   That's correct.

2   Q.   Is there a safety concern for a uniformed police officer,

3   the chief of police, to walk through a throng of people to the

4   far side of a protest to hear for his own ears whether those

5   dispersal orders can be heard by the protesters?

6   A.   There is always the potential -- which is why it's

7   important to sort of size up the tenor of the crowd itself.

8   Q.   And if you feel like that crowd may pose a threat, can you

9   use a police vehicle to go around the back side?

10  A.   Yes, you could.

11  Q.   Or take people in hard gear?

12  A.   Yes.

13  Q.   Okay.  So is -- are you the only guy who has ever thought

14  of this idea of going to the back side of a crowd to make sure

15  that a dispersal order is heard?

16  A.   No, I am certainly not.

17  Q.   Is that a standard police tactic?

18  A.   It is.  It is part of the model policy of the IACP.  And,

19  in fact, they suggest sending two people to the back of the

20  crowd.

21  Q.   Why?

22  A.   So that if, for example, there is a discrepancy between the

23  two, you can sort of negotiate what was said there and

24  essentially come to a conclusion about whether that crowd can

25  hear what you're saying and hear it loudly enough and clearly

511

Norman Stamper - Direct

1   enough.

2   *Q.*  Did -- in looking at all of the video that you've looked at

3   of the DPD's handling of the George Floyd protests, did you try

4   to identify dispersal orders and try to identify whether the

5   crowd was able to hear them?

6   *A.*  I did.

7   *Q.*  And what is your opinion about whether DPD issued effective

8   dispersal orders before deploying chemical munitions or using

9   kinetic munitions against protesters?

10  *A.*  I think I would have to say that, number one, I rarely

11  heard a dispersal order at all before force was used -- before

12  chemical agents, for example, were used.  Someone recently did

13  point out to me that there was an example of an individual who

14  used a dispersal order.  That would have been the first that I

15  had heard.

16  *Q.*  Okay.  And the obvious concern here is, if you don't make a

17  dispersal order heard, people don't have a chance to respond

18  before being subjected to chemical munitions?

19  *A.*  That's one concern.  Yes.

20  *Q.*  What are the other concerns, from a policing standpoint?

21  *A.*  Another is that if one of your purposes is to arrest and

22  theoretically prosecute someone for disobeying that order, you

23  wouldn't have the kind of legal justification, the kind of

24  support necessary in court.

25  *Q.*  If we take a look at the IACP guidance on this, we see --

Norman Stamper - Direct

1   this, again, is Exhibit 1015, which is already in evidence --

2   "When the incident commander has made a determination that

3   crowd dispersal is required, he or she shall direct unit

4   commanders, where time and circumstances permit, to issue

5   warnings prior to taking action to disperse the crowd."

6          There is nothing controversial there?

7   A.   Right.

8   Q.   We then see some more specifics about what the dispersal

9   orders ought to be.  "The warning shall consist of an

10  announcement citing the offenses or violations being committed,

11  an order to disperse, and designated dispersal routes."

12         Why are the officers obligated to tell people where

13  their dispersal routes are located?

14  A.   Fundamentally, for safety purposes, to make sure that if,

15  in fact, a dispersal order is given and the crowd complies,

16  that they will move in a safe direction and not unnecessarily

17  face any kind of injury, for example.

18  Q.   So, like, don't run into Colfax?

19  A.   Don't run into Colfax comes to mind.

20  Q.   "A second and third warning should be issued at a

21  reasonable time" -- excuse me -- try that again.  "A second and

22  third warning should be issued at reasonable time intervals

23  before designated actions are taken to disperse the crowd."

24  Repetition increases the likelihood that folks hear it?

25  A.   Yes.

513

1   *Q.*  Lastly, "Where possible, the warnings should be audio or

2   video recorded and the time and names of the issuing officers

3   recorded in the IC's event log," so that you can later prove

4   it; right?

5   *A.*  Exactly.

6   *Q.*  Now, you're familiar with the operations plans that were

7   used by the DPD each day during the George Floyd protests;

8   correct?

9   *A.*  I am.

10  *Q.*  And we have an example here, Exhibit 472, of one of those

11  plans.  This one for the first day; right?

12  *A.*  Correct.

13          *MR. ARO:*  Do you have an objection to this, Andrew?

14          We'll offer Exhibit 472 by stipulation.

15          *THE COURT:*  It's admitted.

16          (Exhibit 472 admitted.)

17  *BY MR. ARO:*

18  *Q.*  And one of the things that these operations plans deal with

19  is this idea of dispersal orders; right?

20  *A.*  Yes.

21  *Q.*  And what we see the DPD saying is that in the event an

22  unlawful assembly is declared, the following dispersal order

23  must be given:  Three warnings will be given using an amplified

24  sound system.  All warnings and arrests will be videotaped.

25  The command officer that gives the dispersal order is required

514
Norman Stamper - Direct

1    to write a statement.  Copies of that statement should be

2    attached to the city attorney's copy of the paperwork.  The

3    order to disperse will be given by a lieutenant designated by

4    the IC.  Right?

5    *A.*  Yes.

6    *Q.*  Pretty much tracks the IACP concept; right?

7    *A.*  It does.

8    *Q.*  And we then have actually the text of the dispersal order

9    that is supposed to be issued by DPD; right?

10   *A.*  Yes.

11   *Q.*  Ballpark, how many times did you hear the text that is

12   specified in the operations plan of the DPD used during the

13   George Floyd protests before chemical munitions were deployed

14   on protesters?

15   *A.*  Not once.

16   *Q.*  Okay.  Now, we have the example that -- this is a still

17   photo.  We looked at this video earlier of the officers,

18   Officer Schaal, lobbing some sort of a grenade at the woman

19   across the street getting out of the car.  Was there a

20   dispersal order before that?

21   *A.*  No.

22   *Q.*  When there was a dispersal order, are you aware of any

23   circumstance in which DPD used the methodology that you talked

24   about to make sure it was heard?

25   *A.*  No.

515

Norman Stamper - Direct

1   Q.  So there is the one example we want to talk about -- and

2   then I'll ask you if there are others -- is, again that first

3   day of the protest, this is right before the deployment of some

4   sort of chemical munitions that was recorded by Elisabeth Epps

5   as she was livestreaming.

6   A.  Yes.

7   Q.  And what we see here is --

8           This is Exhibit 562, which we offer by stipulation.

9           THE COURT:  All right.  Admitted.

10          (Exhibit 562 admitted.)

11  BY MR. ARO:

12  Q.  The gentleman who is going to be sort of the centerpiece of

13  this is standing right here, inside that yellow circle, and --

14          (Video played.)

15          Now, if you'll listen carefully, you can hear a

16  dispersal order.  The officer -- some officer off screen said,

17  "All right, folks, for a third time."  And then listen to what

18  happens now.

19          (Video played.)

20          These announcements -- we see a DPD truck there.  Are

21  announcements of that sort usually made sort of in that area

22  behind the skirmish line?

23  A.  I would say generally from behind -- at or from behind the

24  skirmish line.  Yes.

25  Q.  And we don't have any idea where this individual was

1   standing, whoever was making whatever announcement he or she

2   was making?

3   *A.*   I certainly do not.

4   *Q.*   Okay.  But we know if we go back a little bit that this

5   area behind the skirmish line is -- keep going -- is literally

6   50 feet or so from this guy?

7   *A.*   I would say roughly, yes.

8         *MR. ARO:*   So go back to where we were with the truck

9   and play the rest of whatever is being said.

10         (Video played.)

11  *BY MR. ARO:*

12  *Q.*   So we're about a minute after whatever was said was said by

13  the PA system; right?

14  *A.*   Yes.

15        *MR. ARO:*   Stop there.

16  *BY MR. ARO:*

17  *Q.*   This is somebody who is in the crowd right by the skirmish

18  line?

19  *A.*   Yes.

20  *Q.*   And he asks the officer, "What did that guy on the PA say?"

21  *A.*   Right.

22  *Q.*   And the officer replies --

23  *A.*   They're --

24  *Q.*   -- "they're going to deploy gas."

25  *A.*   I'm sorry.  That's correct.

517

Norman Stamper - Direct

1   *Q.*  Now, that officer from that exchange could conclude what

2   about the effectiveness of the dispersal order?

3   *A.*  That it was ineffective; that the protesters did not hear

4   it.

5   *Q.*  Could that officer have done anything in that moment to

6   make sure that there was an effective dispersal order given?

7   *A.*  Yes.  Either in person or on the radio he could have

8   informed that particular supervisor exactly that, that the

9   crowd has not -- could not hear the order.

10  *Q.*  As best you know, was that done?

11  *A.*  No.

12  *Q.*  And shortly after that exchange, gas was deployed on that

13  crowd?

14  *A.*  Correct.

15  *Q.*  Was that a unique circumstance?

16  *A.*  No.

17          *THE COURT:*  Are you finished with your dispersal

18  questions?

19          *MR. ARO:*  I am, Your Honor.

20          *THE COURT:*  This would be a good place to stop.

21          *MR. ARO:*  Thank you very much, Your Honor.

22          *THE COURT:*  Ladies and gentlemen, thank you for your

23  service today.  It's been a long day, and you've worked hard.

24  I know you're tired.  Go home and have a nice meal, don't do

25  any research, don't talk to anybody.  Forget it.  We'll see you

1    at 9 o'clock in the morning.

2              (Jury out at 4:18 p.m.)

3              *THE COURT:*  4:18, the jury is out.  What do we want to

4    say on the record tonight?

5              *MR. ARO:*  Nothing from us, Your Honor.

6              *MR. RINGEL:*  Nothing from the defendants.

7              *THE COURT:*  Any depositions you need looked at

8    tonight?

9              *MR. MACDONALD:*  The next one, Your Honor, which I feel

10   will not be needed for tomorrow -- but the next one would be

11   Grothe, G-R-O-T-H-E.

12             *THE COURT:*  Thank you.  Have a nice evening.

13             (Recess at 4:19 p.m.)

14

15                          **I N D E X**

16   **Item**                                                  **Page**

17      AARON SANCHEZ
            Direct Examination By Mr. Douglas          308
18          Cross-examination By Ms. Hoffman           356
            Redirect Examination By Mr. Douglas        387
19          Examination By Mr. Douglas                 394
        NORMAN STAMPER
20          Direct Examination By Mr. Aro              395

21

22

23

24

25

```
 1                            EXHIBITS

 2     Exhibit      Offered   Received   Refused   Reserved   Withdrawn

 3
       14                     508
 4     24                     427
       42                     441
 5     75                     460
       106                    474
 6     372                    496
       472                    515
 7     529                    429
       547                    494
 8     562                    486
       562                    517
 9     596                    426
       598                    431
10     623                    506
       644                    417
11     645                    472
       648                    446
12     656                    433
       656                    448
13     658                    456
       670                    480
14     672                    481
       709                    502
15     710                    465
       741                    485
16     787                    340
       964                    456
17     1015                   457
       1016                   411
18     1039                   452
       1094                   318
19     1126                   488
       1127                   463
20     1129                   469
       1130                   470
21     1165                   471
       1176                   475
22     1177                   352
       1190                   466
23     1235                   455
       1241A                  326
24     3114                   349

25
```

520

REPORTER'S CERTIFICATE

     I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

     Dated at Denver, Colorado, this 31st day of March, 2022.

Therese Lindblom,CSR,RMR,CRR