1          IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF COLORADO
2
Civil Action No. 20-cv-01878-RBJ
3
ELISABETH EPPS,
4  AMANDA BLASINGAME,
ASHLEE WEDGEWORTH,
5  MAYA ROTHLEIN,
ZACH PACKARD,
6  HOLLIS LYMAN,
CIDNEY FISK,
7  STANFORD SMITH,
SARA FITOURI,
8  JACQUELYN PARKINS,
KELSEY TAYLOR,
9  JOE DERAS, and
CLAIRE SANNIER,
10
     Plaintiffs,
11
vs.
12
CITY AND COUNTY OF DENVER, and
13  JONATHAN CHRISTIAN,
14
     Defendants.
15  _____

16                    **REPORTER'S TRANSCRIPT**
                  TRIAL TO JURY - DAY FOUR
17
    _____
18

19          Proceedings before the HONORABLE R. BROOKE JACKSON,

20  Senior Judge, United States District Court for the District of

21  Colorado, continuing at 9:02 a.m., on the 10th day of March,

22  2022, in Courtroom A902, United States Courthouse, Denver,

23  Colorado.

24                  THERESE LINDBLOM, Official Reporter
                901 19th Street, Denver, Colorado 80294
25          Proceedings Reported by Mechanical Stenography
                Transcription Produced via Computer

1            **A P P E A R A N C E S**

2            TIMOTHY R. MACDONALD, ROBERT REEVES ANDERSON, and
EDWARD PACKARD ARO, Attorneys at Law, Arnold & Porter Kaye
3   Scholer LLP, 1144 Fifteenth Street, Suite 3100, Denver,
Colorado, 80202, appearing for the Plaintiffs.

4
            DIANA K. STERK, Attorney at Law, Arnold & Porter Kaye
5   Scholer LLP, 250 West 55th Street, New York, New York, 10019,
appearing for the Plaintiffs.

6
            ELIZABETH C. WANG, Attorney at Law, Loevy & Loevy,
7   2060 Broadway Street, Suite 460, Boulder, Colorado, appearing
for the Plaintiffs.

8
            MAKEBA RUTAHINDURWA, Attorney at Law, Loevy & Loevy,
9   311 North Aberdeen Street, Chicago, Illinois, 60607, appearing
for the Plaintiffs.

10
            ANDREW DAVID RINGEL, KATHERINE HOFFMAN, and ROBERT
11  ALAN WEINER, Attorneys at Law, Hall & Evans, 1001 Seventeenth
Street, Suite 300, Denver, Colorado, 80202, appearing for the
12  Defendants.

13          HOLLIE RENEE BIRKHOLZ and LINDSAY MICHELLE JORDAN,
Attorneys at Law, Denver City and County Attorney's Office, 201
14  West Colfax Avenue, Denver, Colorado, 80202, appearing for the
Defendants.

15
16                      *   *   *   *   *

17          **P R O C E E D I N G S**

18          (In open court at 9:02 a.m.)

19          *THE COURT:*  Good morning, everyone.

20          (Jury in at 9:03 a.m.)

21          *THE COURT:*  Good morning, ladies and gentlemen.  How

22  are the best jurors in Colorado today?

23          Okay.  Onward.

24          *MR. ARO:*  Good morning, Your Honor.

25          *THE COURT:*  Good morning.

1      (**NORMAN STAMPER, PLAINTIFFS' WITNESS, PREVIOUSLY SWORN**)

2                **DIRECT EXAMINATION CONTINUED**

3    *BY MR. ARO:*

4    *Q.*  Good morning, Chief.

5    *A.*  Good morning.

6    *Q.*  So did you take a look as you were examining what happened

7    during the George Floyd protests the way in which the DPD

8    limited or didn't limit the ability of officers to use whatever

9    weapons they chose to use in responding to the demonstrators?

10   *A.*  Yes.

11   *Q.*  And what's your opinion on that subject?

12   *A.*  My opinion is that it was an altogether very loose policy.

13   Officers were essentially permitted, it appears from all

14   accounts, to select whatever weapons or tools they wanted to

15   use, and did so.

16   *Q.*  Okay.  Is there a problem from a policing standpoint with

17   providing officers with that level of discretion to determine

18   what weapons to use?

19   *A.*  In my professional opinion, yes.

20   *Q.*  What's the problem?

21   *A.*  The problem is that in order to use any of these particular

22   weapons, you need to be very, very proficient in the policies,

23   procedures, and, of course, the mechanics of that particular

24   weapon.

25   *Q.*  And if folks pick weapons that they aren't proficient with

Norman Stamper - Direct

1    or pick weapons that they use simultaneously -- more than one

2    weapon at the same time -- is that a concern?

3    A.   Yes, it is.

4    Q.   What's the concern there?

5    A.   The concern, once again, is a lack of discipline, a lack of

6    accuracy, a lack of I would call it judgment under those

7    circumstances.

8    Q.   Let's look at a situation involving that sort of a

9    situation.  We're referring back to Exhibit 658, which is

10   already in evidence.  And I'm going to play this, and then

11   we'll pause it a couple times and ask you what we are seeing.

12             (Video played.)

13             We see in the upper right-hand corner of that video a

14   pepper ball system; correct?

15   A.   Yes.

16   Q.   Did it appear to you that the officer was carrying that in

17   his right hand?

18   A.   Yes.

19             MR. ARO:  And just for the record, this all comes from

20   the afternoon of day three, May 30, about 6:00 p.m.  You can

21   see the body-worn camera at the corner of Colfax and Lincoln.

22   It's a little bit after the officers cleared out the bus

23   station, pushed the protesters south of Colfax.

24             So if you want to continue that for me, Dan.  I'm

25   sorry.

Norman Stamper – Direct

1    *BY MR. ARO:*

2    *Q.* Actually, I should ask about that.  You saw the officer

3    refill his weapon or have it refilled with pepper ball;

4    correct?

5    *A.* Correct.

6    *Q.* Did there appear to be any effort by the officer who was

7    filling the device up to track how many pepper ball had been

8    deployed by that officer or how many were being added?

9    *A.* Not at all.

10   *Q.* Is that something that a properly deployed police force

11   would want to do?

12   *A.* Yes.

13   *Q.* Why?

14   *A.* Accountability.

15   *Q.* And in what respect?

16   *A.* In the sense that officers are allowed the discretion to

17   select whatever tool or weapon they choose, firing

18   indiscriminately -- I would point out that over and over and

19   over, I saw evidence of what I consider to be indiscriminate

20   use of pepper ball.  And it's inconceivable to me that you

21   wouldn't track that in order to assure accountability, officers

22   using the weapon as it's intended under the circumstances that

23   are approved.

24   *Q.* And if an officer was using an excessive volume of pepper

25   ball in a situation, and that was determined by the DPD, how

Norman Stamper - Direct

1    would that help assign accountability to that officer?

2    A.  Well, it very well could be that that might be an officer

3    who should be taken off the line.  If he is firing

4    indiscriminately in huge numbers of pepper ball, that would

5    suggest irresponsibility.

6    Q.  Did you see any evidence as you looked through the material

7    that you reviewed that DPD made any effort to track who was

8    shooting what weapons, at whom, and in what volumes?

9    A.  Not at all.

10   Q.  Okay.  So we're going back to the back of the truck as the

11   officer reaches inside.

12          Want to show that to us now.

13          (Video played.)

14          The officers retrieved something from the back of the

15   truck; right?

16   A.  Yes.

17   Q.  Is that an M-46, one of the big pepper ball sprayers?

18   A.  Yes.  It's huge.

19   Q.  And you said yesterday that the IACP guidelines suggest

20   that that sort of a device, those high-pressure pepper spray

21   deployment systems, should be used with the utmost caution?

22   A.  Yes.  I believe I heard you say pepper -- he was reaching

23   in for pepper ball.  He was reaching in for pepper spray.

24   Q.  That's my mistake.

25          Would you roll the tape a little further, Dan.

Norman Stamper – Direct

1              (Video played.)

2              So we see there the officer removing a pin from

3    that -- is that a safety device, to prevent it from being fired

4    accidentally?

5    A.  Yes.  It cannot be fired when that's in.

6              MR. ARO:  Okay.  If you'd continue.

7              (Video played.)

8    BY MR. ARO:

9    Q.  Now, we saw a different view of this incident that we're

10   looking at here.  This is shortly before a woman throws a water

11   bottle at the officers; correct?

12   A.  Correct.

13   Q.  And that woman, you can barely see her kind of right here

14   behind the gentleman with the tan pants.

15   A.  Yes.

16   Q.  In this instance, try to look at that, but also we're going

17   to be looking at the response of the officer and what weapon or

18   weapons he deploys in response to that bottle being thrown.

19              You can proceed, Dan.

20              (Video played.)

21              Now, do you have concerns from a proper policing

22   standpoint about how that particular officer deployed the

23   weapon systems in his hands during that incident?

24   A.  Yes, I do.

25   Q.  What's the concern?

Norman Stamper – Direct

1   A.   The concern is, he's holding in each hand a weapon and

2   firing both.  I've never seen anything like that.  It is

3   completely irresponsible and outside of the customs and

4   practices of a professional law enforcement agency.

5   Q.   So he had a pepper ball in one hand?

6   A.   Yes.

7   Q.   The high-volume sprayer in the other hand?

8   A.   Correct.

9   Q.   And did he appear to be targeting the individual who threw

10  that water bottle?

11  A.   Initially he did.

12  Q.   And then?

13  A.   He moved -- just literally moved from right to left and

14  left to right, encompassing many other protesters who had not

15  engaged in any unlawful conduct.

16  Q.   You have received weapons training over the course of your

17  police career?

18  A.   I did.

19  Q.   And based on your training and experience, both as a leader

20  and as a patrol officer, do you believe it's possible to

21  responsibly use two weapons simultaneously as you're going back

22  and forth like this in front of a crowd?

23  A.   Well, it's certainly possible; but it's definitely

24  irresponsible.

25  Q.   As far as you know, did this officer get disciplined for

Norman Stamper - Direct

1    what we just saw on the tape?

2    *A.*   No.

3    *Q.*   All right.   Now, the last set of videos that we're going to

4    look at addresses a question I think everybody reasonably has,

5    and that's whether what we have seen on these videos is an

6    aberration, sort of cherrypicking, or whether this is the

7    custom and practice and policy of the DPD to behave this way.

8         And we're going to focus on what occurred on May 30.

9    So the time frame that we just were talking about, between 6:48

10   and 7:33 -- so about 45 minutes -- right after the DPD officers

11   pushed the protesters from the bus station, through traffic,

12   into the area in front of the state capitol.

13   *A.*   Yes.

14   *Q.*   And you studied videotape about what happened with a small

15   group of officers during that period?

16   *A.*   I did.

17   *Q.*   We'll get to the video in just a second.   But for context,

18   what's your opinion about what we see in this 45 minutes of

19   activity by a small group of DPD officers in front of the state

20   capitol?

21   *A.*   What I saw was undisciplined, presumably untrained officers

22   engaging in what I would consider to be excessive force.

23   *Q.*   All right.   And was the excessive force you saw isolated?

24   *A.*   No.

25   *Q.*   Okay.   Now, to help sort of orient folks, we have the

Norman Stamper - Direct

 1   overhead picture, which is sort of zoomed in, and placed dots

 2   on the screen sort of where each of these incidents occurred,

 3   to help people keep track of the incidents and how they relate

 4   to one another.

 5           You're familiar with the first incident here that

 6   happened at 6:48 --

 7   A.   I --

 8   Q.   -- marked by No. 1?

 9   A.   I'm sorry.  I am.

10   Q.   Okay.  So as with prior videos that we've seen, the guy

11   that we're going to be looking at here is wearing a yellow

12   vest, circled in yellow there.  Can you see him?

13   A.   Yes.  I would call that an orange vest and circled in

14   yellow.

15           THE COURT:  He's not much of a Broncos fan.

16           MR. ARO:  Lifelong.  I just have tired eyes, Your

17   Honor.

18   BY MR. ARO:

19   Q.   What do you see on that protester's right hip?

20   A.   A megaphone.

21   Q.   Okay.  And we're going to watch and listen to what he says

22   and to the response of the officers to him.

23           (Video played.)

24           Does he appear to you to be reading from something?

25   A.   He does.

Norman Stamper – Direct

1    Q.  Do you know what he's reading from?

2    A.  I cannot recall.  I couldn't actually hear the words this

3    time.

4    Q.  With a little more volume, you were able to make them out

5    before?

6    A.  Yes.

7    Q.  Okay.  And is anything he's doing here in your view

8    provocative or outside the proper bounds of legitimate free

9    expression?

10   A.  No.

11              MR. ARO:  Go ahead and play that.

12              (Video played.)

13   BY MR. ARO:

14   Q.  Did you hear him say, "You have no authority over us"?

15   A.  I did.

16   Q.  And the response by the police was?

17   A.  To fire pepper balls, it appears, at him.

18   Q.  And those were fired, five or six of them, in that skip

19   technique that you talked about yesterday?

20   A.  Exactly.

21   Q.  So they didn't hit him?

22   A.  Correct.

23   Q.  But they deployed some kind of powder in his direction?

24   A.  Yes.

25   Q.  And stopped him from talking?

Norman Stamper - Direct

1   *A.*   Yes.

2   *Q.*   Backed him up?

3   *A.*   Yes.

4   *Q.*   Was there anything in what he was doing that represented

5   any sort of legitimate threat to the officers?

6   *A.*   No.

7   *Q.*   The next incident happens over on the corner here.  This is

8   the area where we just saw the officer deploying a couple of

9   different weapons.  And this incident involved the gentleman

10  who is sitting on the curb with his hands up.  Do you see him?

11  *A.*   I do.

12  *Q.*   You're familiar with this?

13  *A.*   Yes.

14  *Q.*   You're going to need to listen to what he says.  He's

15  asking the officers a question here, and we're going to be

16  looking for the police response.

17          (Video played.)

18          Pause.

19          Did you hear him -- what he said?

20  *A.*   I did not.

21          *MR. ARO:*  If you could play that back a little bit,

22  and if we might have just a little bit more volume.

23          *THE WITNESS:*  Please.

24          (Video played.)

25

Norman Stamper - Direct

1    *BY MR. ARO:*

2    *Q.*  Did you hear him that time say, "Which one of you all shot

3    me?"

4    *A.*  Yes, I did.

5              MR. ARO:  Let's play it forward from there.

6              (Video played.)

7    *BY MR. ARO:*

8    *Q.*  Did you see right at the end of that tape this woman yell

9    something at the police officers?

10   *A.*  I did.

11   *Q.*  She's saying "F" you?

12   *A.*  Yes.

13   *Q.*  That's the woman who threw the water bottle at the officers

14   a couple of minutes later?

15   *A.*  It appears to be.  Yes.

16   *Q.*  Is asking officers three times, "Which one of you all shot

17   me" an act that justifies the use of force we just saw?

18   *A.*  No.

19   *Q.*  Is asking, "Which one of you all shot me," a legitimate

20   inquiry for a citizen who believes that he had been subject to

21   excessive force at a protest?

22   *A.*  I believe so.  Yes.

23   *Q.*  And is spraying that person in response to that question a

24   means of interfering with him getting the information that

25   Denver has asked the protesters in this case to provide?

534

Norman Stamper - Direct

1    A.   It effectively shut him down.

2    Q.   Now, the next clip is, essentially, a continuation of the

3    same thing we were just looking at.  You can see in the circle

4    that I'm drawing right now, the guy that we just saw get

5    sprayed in the face sitting on the curb and the woman who

6    throws the bottle appears to be assisting him.

7    A.   Yes.

8    Q.   There is another woman in the yellow oval to the right who

9    we'll see in a minute is holding a megaphone.  I'd like you to

10   watch her and hear what she's saying and how the police respond

11   to her.

12        That incident is marked with the No. 3 that we see

13   here, just to the right of No. 2.

14            (Video played.)

15        Did you hear the guy in the brown shirt yell, "Hey,

16   Buddy, put your can of poison away"?

17   A.   I did.

18   Q.   And we now see the megaphone with the woman I had indicated

19   we're looking at right there.

20   A.   Yes.

21            MR. ARO:  Would you play that forward, Dan.

22            (Video played.)

23   BY MR. ARO:

24   Q.   Did you see the woman with the megaphone say something

25   through the megaphone, maybe yell something through the

Norman Stamper - Direct

1    megaphone, and get sprayed?

2    *A.*   Yes.

3    *Q.*   Did anything she did justify the use of force that we just

4    saw?

5    *A.*   No.

6    *Q.*   So the next incident happens in that corner right behind

7    the two that we just saw about a minute later.  And, again,

8    we're looking at the woman who appears to throw that bottle;

9    right?

10   *A.*   Yes.

11   *Q.*   And this is a view of the same incident that we've seen

12   with her throwing the same bottle in response.  It's a

13   different officer's camera that shows a different angle of what

14   we're seeing.

15           (Video played.)

16           There we see Officer Carmody with weapons in both

17   hands spraying the protesters; correct?

18   *A.*   Yes.

19   *Q.*   Based on how he's holding that pepper ball, does it look

20   like there is any way that he is actually able to sight that

21   weapon?

22   *A.*   I couldn't imagine it.  No.

23   *Q.*   Because it's kind of down here --

24   *A.*   Yes.

25   *Q.*   -- and he's shooting it like this; correct?

Norman Stamper - Direct

1   A.   Correct.

2   Q.   And at this point the woman who threw the bottle, she ran

3   up this direction; right?

4   A.   She did.

5   Q.   And who is Officer Carmody spraying right now?

6   A.   He has moved the spray, obviously, to the left and

7   definitely striking with it other protesters --

8   Q.   And --

9   A.   -- who were to the right of the woman that threw the water

10  bottle.

11  Q.   In any of the videos that you've seen of this incident from

12  any of the officers there, did you see any sort of projectiles

13  or violence directed to the officers coming from the direction

14  that he is currently shooting?

15  A.   I did not.

16  Q.   So the next episode happens out in the middle of the

17  crosswalk, indicated No. 5.  This is seven minutes after the

18  incident we just saw.  And, again, this is a still image from a

19  video that the jury saw two days ago during Claire Sannier's

20  testimony.

21       And we see here on the left-hand side an officer

22  aiming the .40 caliber weapon at the gentleman who appears to

23  be doing splits; right?

24  A.   Yes.

25  Q.   And you talked about this earlier as being improper?

Norman Stamper - Direct

 1   A.   Correct.

 2   Q.   In the context that we see here, with officers spraying and

 3   shooting people in what you've described as an indiscriminate

 4   fashion, is the act of pointing a weapon like the 40 at a

 5   nonviolent protester particularly provocative?

 6   A.   I believe it is.

 7   Q.   Why?

 8   A.   Because it is essentially a weapon that can do significant

 9   damage to a person.  And when there is no provocation, no arms,

10   no thrown objects or objects ready to be thrown, it just sends

11   a message that the police are using excessive force.

12   Q.   Okay.  Now, this is another still that reflects an incident

13   that the jury saw earlier with the protesters in the red jacket

14   and the lady with the megaphone again getting sprayed by an

15   officer.  You've watched this video?

16   A.   I have.

17   Q.   Did any of the people in that photograph engage in any sort

18   of unlawful conduct before this pepper spray was deployed on

19   them?

20   A.   No.

21   Q.   And that incident happened within seconds after the one we

22   just saw?

23   A.   That's correct.

24   Q.   The next incident I want to look at is indicated at the --

25   the location of it is indicated with No. 6 here.  It happened

Norman Stamper - Direct

1   two minutes after the one we just referred to.  Again, this is

2   a still from the image that was seen earlier with the protester

3   walking across the front of the police line, extending his

4   middle finger towards them.

5   A.   Correct.

6   Q.   Disrespectful by him?

7   A.   Disrespectful, sure.

8   Q.   Cause for any use of force?

9   A.   No.

10  Q.   And, for the record, this is Exhibit 666.  The still is

11  taken from that.  And you saw seconds after he displayed the

12  universal sign of contempt to the officers, he was sprayed in

13  the face; right?

14  A.   Correct.

15  Q.   Legitimate use of force?

16  A.   Illegitimate use of force.

17  Q.   So this is another still from that same body-worn camera of

18  the response following up the spraying.  Do you recall seeing

19  officers firing into a retreating crowd?

20  A.   I do.

21  Q.   Legitimate?

22  A.   No.

23  Q.   Another still.  And in this one we see this guy right over

24  here -- do you see him?

25  A.   I do.

539

Norman Stamper - Direct

1    *Q.*  And in the following sequence, we're going to be watching

2    what happens to him as he stands on the corner with his hands

3    in the air.  This is --

4           But before we do that, that guy standing right here --

5    we can see him -- before we do that, we're going to go over to

6    what happened shortly before what happens to this guy.

7           Incident 7, 7:06 p.m., you see a guy in a red

8    sleeveless shirt with crutches; correct?

9    *A.*  Yes.

10          *MR. ARO:*  And just making sure this one is in and the

11   jury can see it.  Thank you.

12          And we're going to watch what happens to the gentleman

13   with crutches.  In particular, pay attention to what he's doing

14   with his hands before he's shot.

15          (Video played.)

16          Pause it, please.

17   *BY MR. ARO:*

18   *Q.*  So did you see his hands kind of like this, pinching his

19   crutches to his sides and holding them up?

20   *A.*  I did.

21   *Q.*  Did he throw anything?

22   *A.*  Correct.

23   *Q.*  He did throw something?

24   *A.*  He did not.

25   *Q.*  Did he engage in any kind of provocation?

Norman Stamper - Direct

1    *A.*   No.

2    *Q.*   And we saw him get hit on the side with pepper ball?

3    *A.*   Yes.

4    *Q.*   Now we're going to move back to this gentleman, in the same

5    time sequence.  We can still see the guy on crutches lying on

6    the ground over here being assisted by other protesters?

7    *A.*   Correct.

8    *Q.*   We're going to shift our focus now to the gentleman in

9    black with his hands up.

10            (Video played.)

11            Now, some kind of a munition -- explosive munition --

12   was rolled at his feet; is that correct?

13   *A.*   That's correct.

14   *Q.*   Are you able sitting here to tell what that munition was?

15   *A.*   It appeared to be smoke, but it easily could have been gas.

16   I don't know.

17   *Q.*   Okay.  Did you see any justification for deploying smoke,

18   gas, or any other munitions towards that gentleman?

19   *A.*   I did not.

20   *Q.*   Let's see what happens next to the gentleman.  This is one

21   minute after that can exploded, same video, and he's been

22   joined now by a friend.

23            (Video played.)

24            Any justification for shooting those two people with

25   their hands up on the corner?

541

Norman Stamper – Direct

1   A.   No.

2   Q.   Watch what happens next.  In particular, I want you to

3   watch this guy's head as the tape rolls.

4          (Video played.)

5          Did you see him struck repeatedly around the top of

6   his head?

7   A.   I did.

8   Q.   Now, when officers are trained to use pepper ball, are they

9   trained -- at least properly trained officers, are they trained

10  to deploy it at an individual?

11  A.   They are trained not to point them at an individual.

12  Q.   They're trained to shoot it with skip; right?

13  A.   Yes.

14  Q.   And when you're dealing with kinetic weapons, what's the

15  danger of repeatedly shooting somebody who has already been

16  subjected to chemicals in the face and neck with multiple

17  pepper ball shots?

18  A.   There is at the extreme, a risk of death.  There is

19  certainly a risk of head or brain injury, eye injuries.  And

20  particularly with those -- any kind of a pre-existing medical

21  condition, the possibility of aggravation to an extreme degree

22  of those individuals.

23  Q.   If you'd been standing as a commander, leadership officer,

24  in this group on that evening and you saw these officers do

25  what you just did to those two protesters, what would you have

542

Norman Stamper - Direct

1    done?

2    *A.*  Put an immediate stop to it.

3    *Q.*  By doing what?

4    *A.*  Taking them off the line, particularly, if they had been

5    warned before.  Particularly, if they have received training.

6    And given what I just saw, I would -- I would question whether

7    they were actually trained in what they were supposed to be

8    doing with that weapon.

9           *MR. ARO:*  Now, this is another body-worn camera from

10   another officer, Exhibit 662.  And I want to play --

11          *COURTROOM DEPUTY:*  This is not in evidence.

12          *MR. ARO:*  We'll move 662 into evidence by stipulation.

13   I'm sorry.  I thought that one was in.

14          *THE COURT:*  All right.  Admitted.

15          (Exhibit 662 admitted.)

16   *BY MR. ARO:*

17   *Q.*  This is a slightly different perspective on what you just

18   saw.

19          (Video played.)

20          Pause.

21          We've seen a couple of incoming rocks on the left-hand

22   side or this, or bottles, or some kind of projectiles --

23   *A.*  Some kind of projectile.

24   *Q.*  Right?

25   *A.*  Yes.

Norman Stamper - Direct

1    *Q.*  And as we see this officer firing pepper balls, are those

2    pepper balls going in the direction from which those

3    projectiles came?

4    *A.*  No.

5            *MR. ARO:*  Can you continue the tape now.

6            (Video played.)

7    *BY MR. ARO:*

8    *Q.*  As far as you know, was that officer disciplined for what

9    she just did?

10   *A.*  No.

11           *MR. ARO:*  Now, the next episode is a second incident

12   involving the gentleman with the crutches and the red shirt

13   that happened two minutes after what we just saw.

14           Your Honor, this particular video is offered by

15   stipulation with a proviso.  And that is that we've agreed with

16   counsel for the City to remove a section from the overall

17   video.  The video itself is Exhibit 349.  And we move for

18   admission of that video by stipulation but with the segment

19   from the time stamp 19:12:22 through 19:12:53 removed from the

20   video.

21           And before the final exhibit is provided to the jury's

22   view, we'll review that with counsel for the City and make sure

23   the excised portion is --

24           *MR. RINGEL:*  That's the agreement, Your Honor.

25           *THE COURT:*  All right.

Norman Stamper - Direct

1              (Exhibit 349 admitted.)

2    *BY MR. ARO:*

3    *Q.* So before we do this one, I forgot to ask one question

4    about the gentleman we see here, who we just saw shot

5    repeatedly.

6              In listening to the videos, do you recall him saying

7    in the middle of the shooting, "I'm a goddamn United States

8    Marine"?

9    *A.* I did hear that.

10   *Q.* Does that stop the officers from shooting him?

11   *A.* No.

12   *Q.* Let's go back to the man with crutches.  This is a

13   body-worn camera from an Aurora Officer Shaker, who we have

14   several clips that we're going to show from.  The first, we see

15   again the man with the crutches.

16             And just so that the jury is oriented, the other

17   cameras that we saw were on officers there, kind of looking to

18   their right; correct?

19   *A.* Yes.

20   *Q.* And Officer Shaker appears to be just off the side of that

21   screen, looking at the action from a little further to the

22   right; yes?

23   *A.* Yes.

24   *Q.* All right.

25             (Video played.)

Norman Stamper - Direct

1            Now, we see here the mark from the pepper ball we saw

2    him hit with earlier; correct?

3    A.  Correct.  Or what appears to be.

4    Q.  It looks like -- it's consistent with pepper ball residue

5    on his shirt?

6    A.  Absolutely, yes.

7            MR. ARO:  Would you play it forward again.

8            (Video played.)

9    BY MR. ARO:

10   Q.  Did you hear him say, "You don't need to shoot"?

11   A.  I thought I heard, "Don't shoot."  But, yes, I heard that

12   comment.

13           MR. ARO:  Okay.  Drag it back just a little bit, Dan.

14   Play it forward.

15           (Video played.)

16           THE WITNESS:  Yes.

17   BY MR. ARO:

18   Q.  Anything provocative there?

19   A.  No.

20   Q.  Now, watch what happens to these protesters who are going

21   to his aid.  And after a bit, you'll see some shooting toward

22   them, and you'll hear a woman say something.  And you've got to

23   listen carefully for it, but you can hear it distinctly.  She

24   asks the officers a question.

25           (Video played.)

Norman Stamper - Direct

1          Did you hear her say -- what did you hear her say?

2    A.   I heard her say something before she said, "Are you

3    insane?"

4          MR. ARO:  You want to play it back a little bit?

5    BY MR. ARO:

6    Q.   Listen, and I'll ask you if you heard her say, "Do not

7    shoot the people who are helping this man."

8    A.   Sure.

9          (Video played.)

10   Q.   Did you hear it that time?

11   A.   Yeah.  "Do not shoot these people who are helping this man.

12   Are you insane?"

13   Q.   Did you hear an answer from the officers?

14   A.   No.  Not an audible or verbal answer.

15         MR. ARO:  Okay.  Let's play it forward.

16         (Video played.)

17         Pause it, please.

18   BY MR. ARO:

19   Q.   Now, Officer Shaker was approached by an officer wearing

20   green; true?

21   A.   Yes.

22   Q.   Do you recognize that officer wearing green as a member of

23   the Denver SWAT team?

24   A.   Metro SWAT team.  Yes.

25   Q.   What did the Metro SWAT team officer ask Officer Shaker to

Norman Stamper - Direct

1  do?

2  A.  I believe he was asking whether he should fire at those

3  individuals.

4  Q.  Okay.  And why did he want to fire at them?

5  A.  I couldn't tell you.  I don't know what was in his mind at

6  the time.

7  Q.  Let's back up, and he'll tell you exactly why he wanted to

8  deploy gas.

9        Would you back up just a little bit.

10        (Video played.)

11        "He's just mouthy?"

12  A.  Yes.

13  Q.  And Officer Shaker thankfully said, "No, we're good," I'm

14  not going to spray him?

15  A.  Correct.

16  Q.  Now, he's going to walk around a little bit, and then he's

17  going to walk over and talk to another Aurora officer.  And I

18  want you to listen to that discussion.

19        (Video played.)

20        Would you play that again?  It got a little digitized

21  there.  Just the last part, where the -- he explains -- Officer

22  Shaker explains what we need to do.

23        (Video played.)

24        You've seen that video a couple times; right?

25  A.  I have.  Yes.

Norman Stamper - Direct

1   *Q.*  And what he says is, "You guys in green are getting a

2   little out of hand, and it's starting to cause problems."

3   Right?

4   *A.*  "We need to reach out to command in order to do that."

5   *Q.*  Who are the guys in green?

6   *A.*  They are Denver Metro SWAT.

7        *MR. ARO:*  And is that the end of the clip, or do we

8   have a little bit more?

9        Now, the last incident that I want to play --

10  actually, two more incidents in this video montage.

11       This is -- pause and skip past that.  Sorry about

12  that.

13       We're going to look back now across the street, four

14  minutes after what we just saw; and we're going to be back on

15  this corner.  And what we're going to be looking for is a guy

16  with the skateboard who does something and the police response

17  to that.

18       And the guy with the skateboard comes in over on the

19  right-hand side here.  This is the guy that we're looking at.

20  All right?  And you can play it.

21       (Video played.)

22       *COURTROOM DEPUTY:*  I don't have this one admitted.

23       *MR. ARO:*  Apologize.  Exhibit 669 is offered by

24  stipulation, Your Honor.

25       *THE COURT:*  Okay.

549

Norman Stamper - Direct

1          (Exhibit 669 admitted.)

2          MR. ARO:  Let's start that again, please.  I

3   apologize.

4          (Video played.)

5   BY MR. ARO:

6   Q.  You see this guy here?

7          Go ahead.

8          (Video played.)

9          And we saw that guy kind of rear back and throw an

10  object with his hand; right?

11  A.  Yes.

12          MR. ARO:  All right.  Back up just a little bit and

13  then play it forward.

14          There you go.

15          (Video played.)

16  BY MR. ARO:

17  Q.  All right.  So I'm not sure what's wrong with the video,

18  but you've seen that many times; correct?

19  A.  I have.

20  Q.  And what happened is, the gentleman here throws the bottle

21  and then runs this direction up the stairs; correct?

22  A.  Correct.

23  Q.  And the DPD officers follow that up with a spray of pepper

24  ball; correct?

25  A.  Yes.

Norman Stamper - Direct

1  Q.  Now, when you are firing multiple pepper ball into a crowd,

2  where a person is running, trying to evade you, are you

3  creating a risk that somebody else is going to get hit?

4  A.  Absolutely.

5  Q.  And are you aware that one of the people that got hit by

6  one of the pepper balls was the plaintiff Elisabeth Epps?

7  A.  I am.

8  Q.  Okay.  We'll learn more about that when Ms. Epps testifies.

9      The last incident happened 17 minutes after what we

10  just saw, and it happened -- this cluster of dots that we see

11  on the screen is right at the intersection of Colfax and

12  Lincoln.  And now the action has moved about half a block to

13  the west, where we see a line of officers on the edge of the

14  sidewalk; right?

15  A.  Yes.

16  Q.  And the incident that occurred there that same day was

17  Dr. Smith being sprayed in the face with pepper spray, as he

18  described during his testimony; right?

19  A.  Right.

20  Q.  And this is a still from Exhibit 30, which is already in

21  evidence.  We're not going to play that video again.

22      So we've got this sequence of events that plays out

23  over about 45 minutes, same location.  Almost all of the

24  incidents involve a cluster of DPD officers at the

25  intersection.

Norman Stamper - Direct

 1          You've already talked about the lack of justification.

 2   I don't want to go back to that, but what do we learn when we

 3   look at a series of events like we've just seen in the video

 4   about the leadership and the training and the supervision and

 5   the accountability of officers at DPD who were involved in

 6   responding to the George Floyd protests?

 7   A.  I think we learn essentially the opposite of what you want

 8   to see in circumstances like these:  A breakdown of leadership,

 9   training, and certainly proper procedures.

10   Q.  Was this particular event selectively culled from all of

11   the stuff you looked at, or could we see the same sort of

12   repeated behaviors if we look at other events during these

13   protests?

14   A.  Unfortunately, you see the same pattern repeated over and

15   over.

16   Q.  As you looked at this -- actually, let me back up.

17          Would you agree with the idea that most cops are well

18   intentioned when they're put on the street to respond to this

19   sort of situation?

20   A.  I would.  Yes.

21   Q.  And would you also agree that most police departments, big

22   city police departments, are going to have some bad apples?

23   A.  Yes.

24   Q.  And I think everybody in this room agrees that bad apples

25   should be culled out of the barrel?

1    A.   Exactly.

2    Q.   I want to focus on what happens to good officers who are

3    put in the situation we just saw by leadership teams who don't

4    do their jobs.

5         Describe for me the situation that good officers face

6    in situations like we're looking at here when their leadership

7    fails them.

8    A.   A good police officer, knowledgeable, informed, highly

9    disciplined, well trained is going to get the job done,

10   oftentimes even absent effective leadership.  But in the

11   absence of effective leadership and supervision, it's sort of

12   important to point out that supervision is super-viewing the

13   work and correcting any problems that might exist on the part

14   of those people doing the job.  So we -- in my judgment, we

15   cheat good police officers when we deny them good leadership

16   and good supervision and adequate training, at least.

17   Q.   You were an officer for the better part of 40 years?

18   A.   Thirty-four years.

19   Q.   And you agree that being an officer, particularly in this

20   sort of situation that we're talking about here, is a

21   challenge; right?

22   A.   I do.

23   Q.   It's hot, people yelling at you, showing you the finger,

24   disrespecting you personally.

25   A.   Yes.

Norman Stamper - Direct

 1   Q.  Does bad leadership and supervision make that job harder?

 2   A.  Infinitely harder.  Yes.

 3   Q.  In what way?

 4   A.  In the sense that, coming from the people you expect to

 5   provide leadership and guidance and support, you get the

 6   opposite of that.  No matter how well intentioned you are, you

 7   are likely to be making mistakes, of the head and/or the heart.

 8   Q.  I want to shift to the question -- and we're sort of

 9   getting pretty close to the end here -- of accountability.  You

10   talked about that as an issue you looked at.

11           Did any of the officers who engaged in any of the

12   behavior we just saw face discipline for what they did --

13   A.  No.

14   Q.  -- as far as you know?

15   A.  I'm sorry.  No.

16   Q.  And did you look at the discipline process and what sort of

17   discipline was imposed on DPD officers following the George

18   Floyd protests?

19   A.  I looked for it.  Yes.

20   Q.  And I want to go through a couple of the factors that go

21   into holding people accountable when things go wrong.

22           Do you believe that DPD made a series of errors in

23   failing to accumulate the information they need to hold

24   officers accountable?

25   A.  I do.  Yes.

554

Norman Stamper - Direct

1   Q.  One of the things that we talked about briefly earlier was

2   developing or using a tracking system for chemical munitions.

3   Is that one of those errors?

4   A.  It is.

5   Q.  And if they had had that tracking system, I think you said

6   earlier they would have been able to identify people who were

7   using too many pepper ball?

8   A.  Yes.

9   Q.  And at least look at their body-worn camera and figure out

10  what they were doing with them; right?

11  A.  Yes.

12  Q.  Did DPD have any such system?

13  A.  No.

14  Q.  Now, we talked about giving officers discretion to

15  discharge their weapons the way that we've seen; correct?

16  A.  Correct.

17  Q.  Had they had supervision on site, watching what people were

18  doing and correcting them, would that have allowed them better

19  opportunity to hold officers accountable?

20  A.  Absolutely.

21  Q.  During the video of the incidents that we just saw for

22  45 minutes right in front of the state capitol, did you see any

23  command officers take any action to try to correct or impose

24  accountability on the officers who were doing what we just saw?

25  A.  No.

Norman Stamper - Direct

 1   Q.   Okay.  You also have opinions about the use of something

 2   called personnel rosters; right?

 3   A.   Yes.

 4   Q.   So in a crowd control situation -- we've talked and we've

 5   heard a lot of testimony about command posts; right?

 6   A.   Correct.

 7   Q.   The command post is sort of where the leadership sits

 8   watching everything from a bird's-eye view, trying to figure

 9   out how to do things well; is that fair?

10   A.   That is fair.  Yes.

11   Q.   What is the role of a personnel roster and the person who

12   keeps that roster in a command center during a crowd control

13   situation like the George Floyd protests?

14   A.   It is to be able to know where your people are at any given

15   moment.

16   Q.   Does a well-run police force assign that responsibility to

17   a particular person who works in the command post?

18   A.   Yes.

19   Q.   What person?

20   A.   We call that position scribe, but the IACP refers to it as

21   a recorder.  This is a person who is assigned to the command

22   post and monitors each and every movement of personnel, by

23   individual.

24   Q.   And do they record what they're monitoring?

25   A.   Yes.

Norman Stamper - Direct

1    *Q.*  How does having a scribe keeping track of personnel help

2    with the accountability of officers who may engage in

3    misconduct?

4    *A.*  It allows command -- it allows supervisors and managers to

5    look at -- for example, in the case of a situation that went

6    badly, who was there, doing what work under what circumstances.

7    *Q.*  And is -- is there any evidence that you've seen that

8    indicates that DPD employed a scribe or a recorder, as you've

9    just described?

10   *A.*  As I came to understand it, they did not do that.

11   *Q.*  All right.  And you're familiar with the Internal Affairs

12   records that showed the resolution of citizen complaints about

13   a number of DPD officers?

14   *A.*  Yes.

15   *Q.*  And is it fair to say a number of those were dismissed

16   because DPD could not identify which of its officers had

17   engaged in misconduct?

18   *A.*  Yes.

19   *Q.*  Would a scribe doing the function that you described

20   properly have limited the number of officers who engaged in

21   misconduct who got away with it because DPD didn't know who

22   they were?

23   *A.*  Yes.

24   *Q.*  There has been a lot of discussion about use-of-force

25   reports, when they were prepared, how they were prepared.  I

Norman Stamper - Direct

1   don't want to go back through all of that.  But you're familiar

2   with the circumstances under which the officers who are

3   involved in the policing of the George Floyd protests generated

4   sort of after-the-fact use-of-force reports?

5   A.  I am.

6   Q.  What role does a timely use-of-force report play in

7   accountability of officers who may engage in misconduct?

8   A.  In this case, it contributed to a lack of accountability.

9   Q.  How?

10  A.  DPD was unable night by night and upon conclusion of the

11  George Floyd protests to say who was where doing what under

12  what circumstances at all.

13  Q.  How would use-of-force reports that were prepared timely

14  have prevented that, or at least limited that?

15  A.  It would have been a record of what force was used, a

16  judgment presumably made as to whether or not that force was

17  within or outside department policy.

18  Q.  Now, you also looked at DPD policies concerning the use of

19  body-worn cameras?

20  A.  Yes.

21  Q.  And we've obviously seen lots of body-worn-camera footage;

22  correct?

23  A.  Correct.

24  Q.  And, in fact, some of the bad behavior we've seen was

25  recorded when the officer was actually using the body-worn

558

Norman Stamper - Direct

1  camera as intended; right?

2  *A.*  Right.

3  *Q.*  Was all of the -- was the entire DPD detachment that was

4  responsible for these protests consistently using their

5  body-worn cameras as they were supposed to?

6  *A.*  No.

7  *Q.*  Are you aware of significant gaps in the usage of body-worn

8  cameras?

9  *A.*  Yes.

10  *Q.*  And how does the failure of DPD to enforce the policies,

11  procedures, and customs around body-worn cameras by police

12  officers impair accountability?

13  *A.*  It can effectively gut accountability.  If you have a fully

14  operational body-worn camera policy with each and every

15  individual adhering to it, you then have a very complete record

16  of what happened.

17  *Q.*  Okay.  And the absence of body-worn camera prevents us from

18  knowing what particular officers did; right?  Or can?

19  *A.*  It is still possible to learn, in answer to that question.

20  But, generally, if the body-worn-camera policy is not being

21  followed, you will have huge gaps in the record -- in the

22  history of what took place.

23  *Q.*  Okay.  Now, you mentioned earlier in your testimony that

24  out of the many citizen and other complaints arising from the

25  George Floyd protests, there were fairly few officers that were

Norman Stamper - Direct

1  disciplined for what they did?

2  *A.*  Yes.

3  *Q.*  Is that true?

4  *A.*  Yes.

5  *Q.*  What does that tell us about the DPD leadership's attitude

6  about accountability for officers who don't do the right thing?

7  *A.*  I would characterize that as a breakdown in the discipline

8  of the higher-level officers, the command staff, the executives

9  of that department.  I don't -- I cannot imagine how any police

10  department can manage and control performance and conduct

11  without adequate mechanisms for recording what is going on --

12  *Q.*  Based --

13  *A.*  -- and reviewing and analyzing what is going on.

14  *Q.*  Based on what you've seen and all the video we've watched

15  today and the other materials you've seen, in your view, in

16  your opinion, should more officers have been disciplined than a

17  handful?

18  *A.*  Yes.

19  *Q.*  Many more?

20  *A.*  Many more.

21  *Q.*  What message does it send to the line officers and the

22  lower-level leadership officers -- sergeants and lieutenants --

23  when people who do the stuff we've seen get away with it with

24  no discipline?

25  *A.*  Well, my attitude and belief, based on all of my experience

Norman Stamper – Direct

1    and all of the research that I've done since my career, is that

2    officers are being told day in and day out, night in and night

3    out, what is okay, what's acceptable by the silence of

4    supervisors and managers or the commentary of supervisors and

5    managers.

6    Q.   Now, with respect to training, at various points you talked

7    about, you see evidence of a failure to train based on how

8    officers performed.  And I don't want to go back through all of

9    that.  But what is your opinion about the actual practice and

10   custom and policy of the DPD concerning training people for

11   group demonstrations and to deal with the situation we're

12   dealing with here, based on everything you've seen?

13   A.   Based on everything I've seen, what was communicated to me

14   is that both training and discipline were lacking throughout

15   the George Floyd protests, that the behavior of the officers on

16   the streets is what is accepted, what is acceptable.  And I

17   think what that conveys to the officers is a false impression

18   of what is -- of what is wanted and needed of them in a protest

19   situation.

20   Q.   Okay.  Related to the question of training is the question

21   of actual preparation, when there is something that you think

22   may happen, the efforts of leadership to figure out, how are we

23   going to respond to this potential situation?  And I want to

24   start the idea of the preparation testimony that you have

25   about -- I guess, two questions.

561

Norman Stamper - Direct

```
 1            Number one, do you believe that the command staff at

 2   the DPD failed to prepare for response to demonstrations or

 3   protests before George Floyd's murder?

 4   A.  I do.

 5   Q.  And do you also believe that in the time between the murder

 6   and the protests in Denver, DPD failed to take appropriate

 7   steps to prepare for what might happen?

 8   A.  I do.

 9   Q.  Okay.  I want to talk about those issues separately.

10   Should it be any surprise to leadership of a police force like

11   the Denver police force that there may be a large-scale civil

12   justice protest in America in 2020?

13   A.  I think it was utterly predictable and negligent on the

14   part of police department leaders that they did not prepare for

15   those eventualities.

16   Q.  Okay.  And we've heard testimony about how the officers in

17   DPD were surprised by the scale of these protests --

18   A.  Yes.

19   Q.  -- that involved -- I think the numbers we've heard are

20   several thousand people.  Is that consistent with your

21   understanding?

22   A.  Yes.

23   Q.  All right.  And you've mentioned that you've been involved

24   in planning for protests involving 20 times that; right?

25   A.  Correct.
```

Norman Stamper - Direct

1   Q.  Before a particular event that might spark a protest

2   occurs, what does a properly run police force leadership team

3   do to prepare and train the force for the eventuality of some

4   kind of a significant public protest?

5   A.  It accepts the responsibility, first, for understanding

6   that those kinds of events can and indeed will take place, that

7   the fewer instances of covering those kinds of events that

8   happens to exist in the history of a given department means the

9   greater the responsibility to be prepared.

10  Q.  So that's a little counterintuitive.

11  A.  Yes.

12  Q.  You said the less frequent there are big protests means the

13  more that you need to focus on preparation?

14  A.  Absolutely.

15  Q.  Why is that so?

16  A.  Because you get rusty, because you become over time less

17  well informed about what is taking place.  For example, even

18  before George Floyd, we had Laquan McDonald in Chicago; we had

19  Tamir Rice in Cleveland, the 12-year-old boy shot and killed by

20  police officers.  You have situations that virtually

21  guarantee -- Michael Brown in Ferguson, for example --

22  guarantee that there will be civil unrest as a result of those

23  catalytic events, those events that are captured by media and

24  broadcast coast to coast and border to border.  It becomes part

25  of the everyday life, really, of people and -- citizens,

1    really, across the country.

2    Q.  So understanding that one of those events can happen at any

3    time --

4    A.  Any time --

5    Q.  -- because police officers encounter citizens on the

6    streets of America every day --

7    A.  Yes.

8    Q.  -- what does a properly operated police force leadership

9    team do to prepare for the rare event that a particular

10   incident here or elsewhere will trigger a wide-spread reaction

11   from the populace in Denver?

12   A.  It conditions the workforce -- it conditions police

13   officers, the supervisors, the managers to the reality that it

14   can and likely will happen in our city.  And that means we need

15   to be prepared.

16   Q.  So --

17   A.  Need to be conscious.

18   Q.  I'm sorry.  I didn't mean to cut you off.

19   A.  I'm sorry.  We need to be conscious, and we need to be

20   providing continuous education and training.

21   Q.  So what are the components of preparation?  You said,

22   education, training.  Anything else?

23   A.  You need to look at your inventory; you need to look at

24   policies and procedures.  By inventory, of course, talking

25   about so-called less-lethal weapons and all other forms of

 1   munitions, equipment.  Pretty much everything under the sun.

 2   Anything that one can imagine being put to use during a

 3   demonstration needs to be inventoried.  And that inventory, by

 4   the way, needs to be kept up to date and fresh.

 5   Q.  Now, again, we've heard testimony that the DPD was

 6   surprised by the scale.  In your opinion, from the standpoint

 7   of a chief of police and a leadership team in a city the size

 8   of Denver, should they be surprised by 2,000 or 3,000

 9   protesting an event like the murder of George Floyd?

10   A.  Not at all.

11   Q.  Now, after George Floyd was murdered, unrest started that

12   same day up in Minneapolis and spread to other cities, as you

13   talked about earlier.  During the period between that murder

14   and the beginning of the demonstrations in Denver, what could

15   Denver have done to prepare better to respond to the protests?

16   A.  It could have -- and I do believe should have -- conducted

17   roll-call training around the clock with each officer.  Doesn't

18   have to be exhaustive.  Doesn't need to be preceded by

19   sophisticated lesson plans and curriculum designs and so forth.

20   Ten or fifteen minutes -- five or ten minutes at roll call,

21   dealing with, let's say, three questions per session.

22   Q.  So roll-call training would be training of line officers,

23   patrol officers by their sergeants, saying, if there is a

24   demonstration, here is what you need to do?

25   A.  Yes.

Norman Stamper - Direct

1   *Q.*  And you said two or three issues per session?

2   *A.*  Yes.

3   *Q.*  Why would you limit it to two or three issues?

4   *A.*  Time and focus.  You want officers to be completely on

5   board and understanding of the administration's philosophy and

6   its expectations.

7   *Q.*  Based on what you saw of the conduct of the officers at the

8   beginning and through the rest of the days at the protest, did

9   you see any evidence of effective roll-call training of those

10  officers in the days leading to the protests?

11  *A.*  I saw none.

12  *Q.*  Okay.  Now, during the course of the protests -- we looked

13  earlier at Exhibit 472, which is a daily operations plan for

14  the first day of the protest, May 28.  Are there also

15  operations plans for the second day, the third day, the fourth

16  day?

17  *A.*  Yes.

18  *Q.*  And you reviewed all of them?

19  *A.*  I did.

20  *Q.*  In a properly operated police command team, would there be

21  any effort in operations plans to reflect on what happened last

22  night and make plans so that tonight we do a better job than we

23  did last night?

24  *A.*  I view that as essential.

25  *Q.*  Because we want to learn from mistakes that were made and

Norman Stamper - Direct

1   do better?

2   *A.*   Yes.  And we want to capitalize on what was done right,

3   what was done well.

4   *Q.*   Did you see any evidence in the operations plans for the

5   second day and the third day and the fourth day and the fifth

6   day of the George Floyd protests in Denver that the command

7   staff of the Denver Police Department tried to capture lessons

8   learned from the previous night and apply them to the next

9   night's deployments?

10  *A.*   No.

11  *Q.*   What did you see instead in these operations plans?

12  *A.*   What I saw was boilerplate operations planning.  I've seen

13  it many times over the course of my adult life.  And it does,

14  to my way of thinking, reflect a failure to understand how

15  important it is to learn those lessons from one day to the

16  next.

17  *Q.*   And as you looked at the video from the first day and the

18  second day and the third day and the fourth day, did you see

19  any effort to adjust tactics or strategies so that the police

20  officers were reducing the number of mistakes they were making

21  as the protests went on?

22  *A.*   I did not.  My sense is that they doubled down on the very

23  behaviors that caused the problems --

24  *Q.*   What do you mean --

25  *A.*   -- from one night to the next.

Norman Stamper - Direct

1    Q.   What do you mean, "doubled down"?

2    A.   They -- I saw more, for example, instances of excessive

3    force or reckless behavior on the part of officers -- what I

4    would view as reckless behavior -- from one day to the next.

5    Intensification, a greater concentration of those kinds of

6    tactics and strategies that got them in trouble from one day to

7    the next.

8    Q.   The last question that I want to ask you is, as you sort of

9    look at the big picture here -- draw back from all of the

10   details that we've talked about, draw back from the specific

11   incidents and the failure to discipline, and so forth, and try

12   to get at the root cause of what went wrong in Denver -- what's

13   your opinion about what that root cause or those root causes

14   were?

15   A.   The root cause, from my perspective, was a failure of

16   leadership.  And in that context, I place leadership over --

17   over supervision, over discipline, over training, over

18   accountability.

19   Q.   What do you believe caused the injuries of the plaintiffs

20   in this case?  Bad patrol officers, or something else?

21   A.   This is difficult for me to express, so I'll try to do my

22   best.

23        I believe it began with a fundamental failure on the

24   part of rank and file and supervisory and executive-level

25   positions within the organization to comprehend what their job

Norman Stamper - Cross

1    was.  It was to protect those who assemble and express

2    themselves nonviolently.  I totally get, I totally understand

3    the need for force where force is reasonable and necessary,

4    objectively reasonable.  But what I got in reviewing everything

5    that I reviewed was a failure on the part of the Denver Police

6    Department to understand their purpose and what they were here

7    to do.

8          They were here to protect those protesters.  They were

9    here, for sure, to ensure that they did the best they could and

10   controlling for any kind of vandalism, damage, and certainly

11   personal injury caused by protesters.  But the overwhelming

12   challenge that they faced over the course of that week, as I

13   interpreted it from everything that I reviewed, was they didn't

14   get that they were here to help their fellow Americans carry

15   out a constitutional right that they had.

16         *MR. ARO:*  I don't have any further questions, Chief.

17         Thank you.

18         *THE COURT:*  Cross-examination.

19                     **CROSS-EXAMINATION**

20   *BY MR. RINGEL:*

21   *Q.*  Good morning.

22   *A.*  Good morning.

23   *Q.*  My name is Andrew Ringel.  I represent the defendants in

24   this case.

25         You and I have never met; correct?

Norman Stamper – Cross

1  A.  Correct.

2  Q.  We've never had an opportunity to have a conversation, have

3  we?

4  A.  That's correct.

5  Q.  Today is the first day that anybody from my side has asked

6  you any questions; right?

7  A.  Yes.

8  Q.  Okay.  I have some follow-up that I'd like to talk to you

9  about.  And I'll try to be organized about it and do it in

10  topic fashion, about the questions and the answers that were

11  provided and your opinions and the lengthy discussion you just

12  had with Mr. Aro.

13        So the first thing I wanted to talk a little about is

14  your background.  My understanding is the last time you served

15  in any official law enforcement capacity was February 8 of

16  2020; is that right?

17  A.  That's correct.

18  Q.  Okay.  And since that time, you've been a writer, a

19  speaker, a management consultant, and a trainer; right?

20  A.  Yes.

21  Q.  And an expert witness in lawsuits?

22  A.  Correct.

23  Q.  Okay.  And as the chief of police in Seattle, which was

24  your last position, your role as the chief with respect to the

25  World Trade Organization protests was not as the incident

Norman Stamper - Cross

1  commander; correct?

2  A.  That is correct.

3  Q.  It was not as the field commander or, as Chief Sanchez said

4  yesterday, the operations person; right?

5  A.  That's correct.

6  Q.  Okay.  As a chief under the incident command system, the

7  role of a chief is different than those things; right?

8  A.  It is.

9  Q.  Okay.  And so my understanding is, as chief -- which you

10  were for six years -- you weren't directly involved in planning

11  for or managing any protest in the city of Seattle; right?

12  A.  I would clarify that by saying that I was definitely

13  responsible in an oversight capacity in the planning.  I did

14  spend a considerable amount of time sitting in on table-talk

15  exercises and various planning sessions, as well as observing

16  the training that was being provided.

17  Q.  Understood.  As the chief of any department, you're

18  ultimately responsible for everything that happens in that

19  department; right?

20  A.  That's correct.

21  Q.  But with respect to a protest response or planning for a

22  protest, a chief is not responsible for actually himself or

23  herself doing all of the day-to-day activities.  There are

24  other people that do that; right?

25  A.  Yes.

Norman Stamper - Cross

 1  Q.  Okay.  In Seattle -- prior to being the chief in Seattle,

 2  you had a variety of different positions at the San Diego

 3  Police Department; right?

 4  A.  Yes.  That's correct.

 5  Q.  And towards the latter part of your career at the San Diego

 6  Police Department, you were in what I would consider

 7  supervisory and administrative roles; is that a fair way to

 8  think about it?

 9  A.  I wouldn't characterize it as supervisory in the terms that

10  we're all pretty much familiar with but, rather, executive

11  leadership, as the -- if you want to put it this way, the

12  operational commander of the department.

13  Q.  Okay.  Fair enough.  That makes sense to me.  So in

14  San Diego, did you ever have an incident command role for a

15  protest?

16  A.  I did.

17  Q.  What year was that, sir?

18  A.  Happened several times as a lieutenant.  I am sorry.  I

19  confused the field command job with the incident command.  I

20  was an incident commander several times during my tenure as the

21  field operations chief of the department.

22  Q.  Okay.  So what was the last time you were field operations

23  chief of the department?

24  A.  Probably early '80s, mid '80s.

25  Q.  Okay.  So at the -- the last time you served as a field

Norman Stamper - Cross

1   operations chief in any protest experience was approximately

2   1985?

3   A.   That's as good a guess as any; but it was a long time ago.

4   Yes.

5   Q.   Okay.  And then before that, you were -- as a lieutenant

6   for the San Diego Police Department, you did some sort of field

7   operations work in the context of protests; right?

8   A.   I did.

9   Q.   Okay.  And what time frame are we talking about that there,

10  sir?

11  A.   We are talking about the '70s, during that period.

12  Q.   All right.  So a very long time ago?

13  A.   Very long time ago.  Yes.

14  Q.   Okay.  You were hired in this case as an expert for the

15  plaintiffs; right?

16  A.   Correct.

17  Q.   What date were you hired?

18  A.   I don't recall.  A year ago, probably.

19  Q.   Okay.  And about how many hours have you spent working on

20  this project, in total?

21  A.   I would say countless.  Many, many hours.

22  Q.   Okay.  So what does that mean?  Does that mean 1,000 hours?

23  A.   No.  No.  Likely in the range of 80 to 100 to 150 hours.

24  I've kept records, I could produce those, but I don't recall

25  exactly how many.

Norman Stamper – Cross

1    Q.  Okay.  So you believe you've spent at the maximum 150

2    hours?

3    A.  Let's say yes.

4    Q.  Okay.  And you're being paid $450 per hour of your time;

5    right?

6    A.  I am.

7    Q.  So that -- if my math is right, that means that

8    approximately, you've been paid $80,000 for your work as an

9    expert in this case?

10   A.  I think it's substantially less than that.  It's not my --

11   it's not something that I pay as much attention to, probably,

12   as I should.  But --

13   Q.  Okay.  But, theoretically, your agreement is to be paid by

14   the hour; and if you spent the hour working on it, you were

15   able to under your agreement send a bill to counsel for the

16   plaintiffs?

17   A.  That's correct.

18   Q.  Okay.  I wanted to orient and understand your sort of

19   post-chief of police Seattle role.

20   A.  Yes.

21   Q.  And one of the things that I understand about your career,

22   sir, is that you regularly write, speak, and appear in public

23   on issues related to policing in the United States; true?

24   A.  Yes.

25   Q.  Okay.  Is it fair to consider you a critic of modern

Norman Stamper – Cross

1    policing?

2    *A.*   Yes.

3    *Q.*   Okay.   In 2016, you wrote a book called *To Protect and*

4    *Serve:   How to Fix America's Police*; right?

5    *A.*   Yes.

6    *Q.*   And one of the central tenets of that book is that the

7    police system in the United States is broken, in your view;

8    right?

9    *A.*   Yes.   The system is broken, in my view.

10   *Q.*   Right.   Policing in the United States, as of 2016 -- and

11   probably before, in your view -- is broken?

12   *A.*   Yes.   And to be clear, there are many police officers who

13   are dedicated, competent, effective at what they do.   My

14   criticism, my critique, of policing is definitely aimed at the

15   system -- the systemic obstacles to fair and effective policing

16   and treatment of police officers.

17   *Q.*   I understand.   So I wanted to read to you a summary of your

18   book*, To Protect and Serve:   How to Fix America's Police*, that

19   was promulgated by your publisher to see if you agree that this

20   is a fair summary of what your book is about.

21   *A.*   Sure.

22   *Q.*   Okay.   "American policing is in crisis.   The last decade

23   witnessed a vast increase in police aggression, misconduct, and

24   militarization, along with a corresponding reduction in

25   transparency and accountability.   Nowhere is this more

Norman Stamper – Cross

1    noticeable and painful than in African-American and other

2    ethnic minority communities.  Racism –– from raw,

3    individualized versions –– to insidious systemic examples,

4    appears to be on the rise in police departments.  Overall, our

5    police officers have grown more and more alienated from the

6    people they have been hired to serve.

7            "In *To Protect and Serve*, Norm Stamper offers new

8    insights into the conditions that have created this crisis,

9    reminding us that police in a democratic society belong to the

10   people and not the other way around.  *To Protect and Serve* also

11   delivers a revolutionary new model for American law

12   enforcement, the community-based police department.  It calls

13   for citizen participation in all aspects of police operations,

14   policymaking, program development, crime fighting, and service

15   delivery, entry-level and ongoing education and training,

16   oversight of police conduct, and –– especially relevant to

17   today's challenges –– joint community-police crisis management.

18   Nothing will ever change until the system itself is radically

19   restructured.  And, here, Norm Stamper shows us how."

20           Is that a fair summary of what that book is about?

21   *A.*  Yes, it is.

22   *Q.*  Okay.  You still believe what you wrote in your book;

23   right?

24   *A.*  I do.

25   *Q.*  And your views about policing in general impact your views

Norman Stamper – Cross

1    about what happened with respect to the Denver Police

2    Department and the George Floyd protests here in Denver; true?

3    *A.*  I certainly can't divorce those views from the observations

4    that I developed over time with respect to the Denver Police

5    Department.  Yes.

6    *Q.*  I mean, isn't that the lens that you look at policing

7    always now?  Isn't that your lens?

8    *A.*  It is the lens, certainly, of a critic who loves policing.

9    *Q.*  I understand.  But that's the perspective you bring to your

10   work as an expert in this case; isn't it?

11   *A.*  It is.

12   *Q.*  Okay.  And as an expert on police issues, you tend to work

13   for people that are suing the police, not the police; right?

14   *A.*  I have always been open to working for those who are sued

15   by citizens; but I have not been offered such a position, nor

16   have I in conversations with attorneys across the country

17   believed that I could fairly represent the defense in a variety

18   of these cases.

19   *Q.*  Okay.  Because of your perspective about the police

20   generally, or why?

21   *A.*  Well, certainly -- I believe I have the capacity -- I work

22   hard to demonstrate it -- to view objectively -- as objectively

23   as one human being can -- whether a particular allegation of

24   police misconduct, for example, is fair, accurate.  But, yes,

25   it is true that I do see the world through my own filter.

Norman Stamper - Cross

1    *Q.*  As everyone does; right?

2    *A.*  Certainly.

3    *Q.*  Okay.  One of the filters that you see the world from is

4    the so-called Battle for or Battle in Seattle; right?

5    *A.*  Yes.

6    *Q.*  Fair to say that was a formative experience in your police

7    career?

8    *A.*  It happened at the end of my career; so it's kind of

9    difficult, I think, to call it a formative experience.  But,

10   yes, I think that is a fair characterization; it was a very

11   significant event.

12   *Q.*  That's fair.  Formative means it formed you as a police

13   officer.  Is it fair to say that your experience with respect

14   to the WTO conference protests and the response of the Seattle

15   Police Department was in some ways formative as to how you

16   think about policing today?

17   *A.*  That's difficult for me to answer.  It's not that I haven't

18   thought about a whole host of issues that became relevant

19   during the WTO.  So I couldn't call them new or formative.

20   Most of them -- virtually all of them existed, with maybe two

21   or three exceptions, during that time frame.

22   *Q.*  Okay.  Fair enough.  I understand.

23        All right.  So to provide some context of the WTO

24   issue, the World Trade Organization conference of ministers was

25   in Seattle from November 22, 1999, until December 3 of 1999;

578

Norman Stamper - Cross

 1   correct?

 2   A.   That's correct.

 3   Q.   And it was an event that had been granted to Seattle at

 4   least several years before that; right?

 5   A.   No.  It was approximately eleven or twelve months before.

 6   Q.   Okay.  So you had eleven or twelve months to plan for and

 7   prepare for a planned event with planned locations?

 8   A.   Correct.

 9   Q.   And so it's kind of like planning for a political

10   convention; right?

11   A.   In some respects, yes.

12   Q.   Okay.  And you understand that Denver -- Denver had the

13   Democratic National Convention in 2008?

14   A.   I do.

15   Q.   Would you compare the kind of planning process that would

16   exist for a convention like the one in 2008 and the WTO

17   convention from a police response perspective?

18   A.   In general, yes.  The exceptions are important; but, yes.

19   Q.   Okay.  You said the exceptions are important.  What's an

20   important exception that you can identify?

21   A.   The distinction between the Republican party's convention,

22   the Democratic party's convention in an American city and the

23   World Trade Organization is that the WTO is an international

24   organization, dealing with very sensitive, controversial,

25   sometimes delicate issues, a whole range of issues that brought

579

Norman Stamper – Cross

1   protesters of differing political perspectives together in that

2   city.

3   Q.   Okay.   That would be true with respect to any political --

4   national political convention in the United States; right?

5   There would be protesters or people that would come to the

6   convention that are supportive of the particular party that is

7   holding the convention.   There would be people that would be

8   against the particular party that is holding the convention;

9   right?

10  A.   Certainly, in that sense, I would agree with you.   Yes.

11  Q.   Okay.   But the difference from your perspective about WTO

12  is the international component?

13  A.   The international component and the reach of the political

14  issues that were being addressed.

15  Q.   All right.   The distinction that I wanted to draw and see

16  if you agree with is, you had just talked to Mr. Aro about

17  planning for the George Floyd protests in Denver.   The ability

18  to plan for an event that is not scheduled and not planned is

19  different than the ability to plan for something like the WTO

20  or a political convention; right?

21  A.   Yes.   I agree.

22  Q.   Or a major event in a city like the Super Bowl?

23  A.   Of course.

24  Q.   The protests in Seattle were large; right?

25  A.   They were.

Norman Stamper - Cross

1   Q.  And during the protests, there were people that were

2   peacefully protesting in Seattle, and there were also people

3   who were agitators and maybe even anarchists in the crowds,

4   too; right?

5   A.  Yes.

6   Q.  And the Seattle police officers used -- police officers

7   under your command used pepper spray and tear gas and devices

8   that fired rubber pellets; right?

9   A.  That's correct.

10   Q.  Okay.  And the reason those were used was to clear the

11   streets of Seattle when that became necessary; right?

12   A.  Correct.

13   Q.  Okay.  And that was one of the common tactics that your

14   police department used in response to the WTO protests; true?

15   A.  Yes.

16   Q.  All right.  Now, there were lawsuits related to the WTO

17   events; right?

18   A.  Yes.

19   Q.  And you had your deposition taken probably multiple times;

20   true?

21   A.  It was several times; I don't recall how many.  Yes.

22   Q.  Okay.  So I wanted to reference to you -- and if you need

23   me to, I can show it to you -- but I've reviewed a deposition

24   of yours from January 26 of 2001, talking about the response of

25   the Seattle Police Department to the WTO protests.

Norman Stamper - Cross

1   A.   Yes.

2   Q.   Do you recall having a deposition?

3   A.   I certainly do recall having it taken.  Yes.

4   Q.   Okay.  And in that deposition, you indicated that you

5   thought that the -- your department had done an extraordinary

6   job against all odds; is that consistent with your belief?

7   A.   It is consistent with my overall belief.  Yes.

8   Q.   Okay.  And you also described that during your observations

9   of the response to the WTO protests, that you personally

10  witnessed your officers use remarkable restraint; right?

11  A.   I did.  Yes.

12  Q.   Okay.  You -- during a protest -- you're quoted on

13  December 1 in the *Seattle Times* as saying, quote, The

14  demonstrators, particularly those bent on violence and

15  destruction, used techniques that made it extremely difficult

16  for us to respond to the moment with anything resembling mass

17  arrests.

18          I'm not going to ask you if that's an accurate quote,

19  but is that accurate from your perspective about what you saw

20  at the WTO?

21  A.   It is.  I would clarify that it is because of conditions

22  that we helped to create that caused that reality.

23  Q.   And that's what you were talking about with respect to the

24  first event -- or the event that you described with Mr. Aro

25  yesterday?

Norman Stamper - Cross

1    *A.*   That's correct.

2    *Q.*   Okay.  In the deposition that I read, you characterized the

3    protesters at the WTO into three different categories.

4    *A.*   I did.

5    *Q.*   And one of the categories were people who assembled and

6    were peacefully expressing their opposition to the WTO?

7    *A.*   Yes.

8    *Q.*   A second category was people who were engaged in

9    destructive or violent activities?

10   *A.*   Correct.

11   *Q.*   And a third category is what you called recreational

12   rioters?

13   *A.*   Yes.

14   *Q.*   Okay.  Isn't it fair, sir, that those three categories of

15   people are generally present in protest crowds in the

16   United States?

17   *A.*   I would say generally, yes.

18   *Q.*   Okay.  Including the crowds in the George Floyd protests

19   here in Denver?

20   *A.*   That's a little bit more difficult for me to answer based

21   on everything that I read and viewed in the context of these

22   videos.  I did not see, with, perhaps, one or two very minor

23   exceptions, what I would call individuals or groups of

24   individuals who were engaged in what I perhaps flippantly call

25   recreational rioting.  People sitting in a tavern watching the

 1    news, deciding to go downtown and join the action without any

 2    kind of a political perspective.

 3    Q.  Okay.  In Seattle, there was difficulty with your officers

 4    differentiating between people that fell in any of those three

 5    groups at any given time; right?

 6    A.  Well -- I'm sorry.  May I ask, did I make that statement?

 7    Q.  Yeah, you made that statement.  That it was hard for the

 8    police to differentiate between the different categories of

 9    people.

10    A.  Yeah.  I was looking for the context.  You're right.  I

11    think it's sometimes difficult, for example, if you're on the

12    lines of a pitched battle that is going on between police and

13    protesters, to draw distinctions behind those who may be in

14    fact throwing rocks and bottles and those who are peacefully

15    assembled and expressing their views.

16    Q.  And you would agree that sometimes in a protest context,

17    people who are bent on aggression and agitation obscure their

18    participation in such things by being in the middle of a crowd

19    or things like that, that might otherwise be peaceful; right?

20    A.  I would say generally, yes.

21    Q.  That's a tactic that exists among people who are wanting to

22    engage in that kind of conduct in the context of a peaceful

23    protest?

24    A.  Once again, I would say, generally, yes.  I saw very little

25    of that in Denver, based on the materials that I reviewed.

Norman Stamper – Cross

1   Q.   Okay.  In your deposition in the Seattle case -- Seattle --

2   about the WTO, you talked about how it was not an effective

3   strategy to do what you said should have happened here in terms

4   of using arrest teams to go into the crowd and identify people

5   who were engaged in destructive and agitating behavior.  Do you

6   remember that?

7   A.   I do.

8   Q.   Okay.  And I take it that what you're saying now is, the

9   extent of the activities in Denver were different; and,

10  therefore, you think it could have been done?

11  A.   I do believe it could have been done.  Yes.

12  Q.   Okay.  But it couldn't have been done in Seattle?

13  A.   We were looking at crowds of -- in the tens of thousands,

14  so I would stand by that statement.

15  Q.   Okay.  One of the things that the lawsuits against you and

16  others with the Seattle Police Department alleged was that

17  there was an indiscriminate use of chemical agents on peaceful

18  protesters; right?

19  A.   Correct.

20  Q.   And another thing that they alleged is that there was a

21  failure of police officers to distinguish between those engaged

22  in peaceful protests and those engaged in violent and

23  destructive acts and how to respond to each of the different

24  categories of people; right?

25  A.   Correct.

Norman Stamper - Cross

1  Q.  The same criticisms that you're leveling against the Denver

2  Police Department here?

3  A.  Absolutely.

4  Q.  Okay.  When you were the chief of police in Seattle, you

5  were a member of an organization called the Major Cities Chiefs

6  Association?

7  A.  I was.

8  Q.  You would recognize that organization as a sort of

9  authoritative organization for policing in the United States?

10  A.  I believe so.  Yes.

11        MR. RINGEL:  Okay.  If we could, Mr. Atencio, put up

12  the -- just so that the witness can see -- the major -- the

13  first page of the Major Cities Chiefs Association report from

14  October.

15        THE COURT:  Does it have an exhibit number?

16        MR. RINGEL:  I'm just using it for purposes of

17  examining -- it's just for purposes of cross-examination.  It's

18  not an exhibit.

19        THE COURT:  So you don't want me or the jury to see

20  it?

21        MR. RINGEL:  I'm happy to make it an exhibit, but I

22  didn't know -- I haven't identified it as an exhibit.

23        MR. ARO:  As far as we know, Your Honor, it's never

24  been produced to us.

25        MR. RINGEL:  It's a publicly available document.

Norman Stamper – Cross

1          MR. ARO:  Still wasn't produced.  It wasn't on their

2     exhibit list.

3          THE COURT:  Let's use something else.

4          MR. RINGEL:  Your Honor, I can't use an authoritative

5     report to cross-examine an expert?

6          THE COURT:  You didn't identify it as an exhibit in

7     advance.

8          MR. RINGEL:  It's an authoritative report.  I should

9     be able to cross-examine an expert with any authoritative --

10         THE COURT:  Go ahead and cross-examine.

11         MR. RINGEL:  Okay.  You're not allowing me to use the

12    report?

13         THE COURT:  Are you objecting to the use of it?

14         MR. ARO:  We are objecting.

15         THE COURT:  Sustained.

16    BY MR. RINGEL:

17    Q.  One of the things that you don't talk about anywhere in

18    your report or anywhere in your discussions about the response

19    to the George Floyd protests is the context of protests all

20    over the United States; correct?

21    A.  I do believe that I have expressed on any number of

22    occasions in a variety of venues that the response to the

23    George Floyd protests was truly global in nature.  Every single

24    one of our states, thousands of our cities, all seven

25    continents, people generally reacting in protest around the

Norman Stamper – Cross

1    world to the Derek Chauvin murder of George Floyd.

2    Q.  I understand, and you did say that.  But nothing about your

3    report makes any effort to compare what happened in Denver to

4    what happened in any other city; correct?

5    A.  That is correct.  Yes.

6    Q.  Okay.  There were protests all over the United States and

7    Canada; right?

8    A.  Yes.

9    Q.  And they happened over days and months?

10   A.  In some cases, up to a year.

11   Q.  And you would agree that the level of protest activity in

12   the United States as a whole related to what happened to George

13   Floyd on May 25, 2020, and thereafter and responding to things

14   that happened before was unprecedented; right?

15   A.  Could you repeat the question?  I'm sorry.

16   Q.  Sure.  The scale of protest activity in the United States

17   following George Floyd's death was unprecedented; right?

18   A.  That is correct.

19   Q.  And --

20   A.  I'm sorry.

21   Q.  And protests throughout the United States were violent in

22   nature?

23   A.  Most experienced some degree of violence or property

24   destruction.  Not all.

25   Q.  Okay.  And Denver's was one of the most violent; right?

Norman Stamper - Cross

1  A.  I'm not sure I would say that.

2  Q.  Okay.

3  A.  If I were comparing, for example, Denver with Eugene or

4  Portland or Los Angeles, I -- I guess we could quibble over the

5  nature and the degree of violence, but it was present in a

6  number of cases.

7  Q.  Okay.  The protests were used by people all over the

8  country to exploit and to engage in violence; right?

9  A.  They were used by some in each of those instances, yes.

10  Q.  Right.  Including in Denver?

11  A.  Yes.  Correct.

12  Q.  The protests in the United States were characterized by the

13  use of a lot of different weapons; right?

14  A.  By police?

15  Q.  By people in the protest crowds.

16  A.  I'm not sure I would characterize it as "a lot."  I -- I

17  know rocks and bottles certainly were thrown.  That was

18  probably the most common use of personal violence.

19  Q.  Okay.  Have you done anything to study protests in any

20  other city other than Denver for any work that you have done?

21  A.  Well, certainly, in Seattle and San Diego, the answer would

22  be yes.  Other than Denver, in terms of my personal expert

23  witness work or consulting, the answer would be generally no.

24  I've done a number of organizational interventions and speeches

25  and so forth in various cities that have experienced

Norman Stamper – Cross

1    significant protest activity.

2            I hope that answers your question.  I'm sorry.

3    Q.  My question may have been confusing.  If it was, I

4    apologize.  You studied the response by the Denver Police

5    Department to the George Floyd protests; right?

6    A.  I did.

7    Q.  You've not studied the responses of any other jurisdiction

8    in the United States or Canada related to the George Floyd

9    protests?

10   A.  I think I would put it as, I've examined responses in

11   various other jurisdictions.  I certainly have not studied

12   them.

13   Q.  Okay.  So you've done nothing to analyze whether or not

14   things were different in Denver, either in terms of the nature

15   of the protests or the response?

16   A.  I'm sorry.  Could you repeat that?

17   Q.  You haven't analyzed whether anything about the protests in

18   Denver were different than other places in the United States?

19   A.  Correct, not as such.

20   Q.  And you haven't done anything to examine whether anything

21   in Denver, in terms of its response, was different or

22   consistent with protest responses from other jurisdictions in

23   the United States?

24   A.  In general, that would be correct.  Yes.

25   Q.  Okay.  How much violence do you think was in Denver?

Norman Stamper - Cross

1   *A.* I am at a loss to answer that question. I'm sorry. In

2   contrast, for example, to what was happening in Portland,

3   Oregon -- I would say that the level of violence here was

4   lower, certainly, than it was in Portland, perhaps even in

5   Seattle, as well as several other jurisdictions.

6   *Q.* Okay.

7   *A.* It's very, very hard for me to answer the question. I'm

8   sorry.

9   *Q.* All right. You -- the opinions you offered with Mr. Aro

10  didn't talk about the level of violence; did they?

11  *A.* I think they did, but I -- you know, video after video

12  after video showed what was described, certainly, as some form

13  of provocation. You know, that -- I guess what I would say is,

14  there were incidents, in my view, of provocation; and in

15  general, I think the response of the Denver Police Department

16  to that provocation was indiscriminate and excessive.

17  *Q.* You understand that more than 70 officers were injured as

18  part of the response to the protesters?

19  *A.* I do, and my heart goes out to them.

20  *Q.* Okay. And you understand that they were injured based on

21  the violent acts of other people, generally speaking; right?

22  *A.* I would describe that as a direct cause; but I would also

23  have to say that provocation on the part of the Denver Police

24  Department helped create those conditions in which they

25  sustained injury.

Norman Stamper - Cross

1    Q.  Okay.  So it's your opinion that there -- that absent the

2    actions of the Denver Police Department, there wouldn't have

3    been any injuries to the officers, because nobody who was

4    attending these protests was bent on violence and destruction?

5    A.  Not -- I'm not saying that at all.  I do believe that there

6    were individuals, for example, within various crowds over the

7    course of that week who were bent on violence.

8    Q.  Okay.  And some of those individuals succeeded in injuring

9    police officers; right?

10   A.  Yes.

11   Q.  Okay.  And other of those individuals succeeded in causing

12   mayhem, like starting a bunch of fires; right?

13   A.  I did see evidence of fires and window breaking, other

14   forms of what is often called vandalism.  But, yes, the answer

15   is yes.

16   Q.  Okay.  And you understand from materials that you have

17   reviewed that the Denver Fire Department responded to more than

18   200 calls for service for fires during this time frame?

19   A.  I actually think I'm hearing that for the first time, but

20   it wouldn't surprise me.

21   Q.  And do you understand that sometimes the police needed to

22   protect firefighters and EMT personnel to respond and do their

23   jobs as part of the protests?

24   A.  Yes.

25   Q.  When -- you understand that there were a variety of

Norman Stamper – Cross

1    firearms found as part of the crowds in the protests in Denver;

2    right?

3    A.   Correct.

4    Q.   Thirty-three, as identified by the Office of the

5    Independent Monitor?

6    A.   I believe I did see that figure.  I don't have an

7    independent recollection of it.

8    Q.   And there were shots -- there were gunshots fired at

9    various times as part of the protests?

10   A.   I did believe I heard that, as well.  I -- the natural

11   question that comes up for any cop is, how many of those

12   supposed gunshots were in fact flash-bangs or other munitions

13   employed by the police?

14   Q.   Okay.  You understand that there was extensive property

15   damage in the areas where the protests were; right?

16   A.   I do.

17   Q.   Millions of dollars of property damage?

18   A.   Yes.

19   Q.   Including to lots of private businesses up and down the

20   16th Street Mall?

21   A.   Yes.

22   Q.   One of the things that I wanted to see if you agreed with

23   me about was examining the totality of the evidence and

24   circumstances related to the protests and the response of the

25   police.  You would agree that that's an appropriate thing to

Norman Stamper – Cross

1    do; right?

2    A.   I do.

3    Q.   During your examination with Mr. Aro, we all looked at and

4    you described a variety of videos; right?

5    A.   Yes.

6    Q.   I didn't keep track, but I would estimate that the total

7    amount of video footage that you went over with Mr. Aro was

8    less than an hour; would you agree with that, as a basic

9    estimate?

10   A.   I really don't -- I really don't think I can answer that.

11   When I'm involved in it, I'm involved in it; I'm not, you know,

12   keeping time, so to speak.

13   Q.   Okay.  Fair enough.  There were approximately 50 clips that

14   we looked at?

15   A.   That sounds familiar.

16   Q.   Well, you were involved in the presentation -- preparation

17   of that presentation; right?

18   A.   Which presentation are you talking about?

19   Q.   The selection of the clips and the decisions to talk about

20   specific clips, that was something you were actively involved

21   with?

22   A.   I wrote three reports.  From those reports, the attorneys

23   established, essentially, the questioning that they were going

24   to subject me to.

25   Q.   Okay.  You didn't review that PowerPoint before your

Norman Stamper - Cross

1    testimony?

2    *A.*   Oh, yes, I certainly did.  Yes.

3    *Q.*   Okay.  And practiced your testimony?

4    *A.*   Yes.

5    *Q.*   I wanted to see if we could put those videos and the events

6    that you've talked about in a context of the overall scope of

7    the protests in Denver, in terms of size and extent and see if

8    we can establish a common understanding of what all of those

9    things are.

10           So the first thing that I would -- wanted to talk to

11   you about is the notion that not everything that happened in

12   the protest is on video; right?

13   *A.*   Correct.

14   *Q.*   Okay.  And I also wanted to talk to you about some of the

15   limitations on some of the video means that we've looked at;

16   right?

17   *A.*   Sure.

18   *Q.*   So body-worn camera is something that is worn on the chest

19   of a particular officer; right?

20   *A.*   Yes.

21   *Q.*   And what would you -- the field of vision of a body-worn

22   camera is limited; right?

23   *A.*   That's correct.

24   *Q.*   Okay.  So if I'm standing here, and I have a body-worn

25   camera on my chest, the field of vision of the body-worn camera

Norman Stamper - Cross

1    would be in the direction of the camera; right?

2    A.   In general, yes.

3    Q.   Right.

4    A.   I mean, it depends -- certainly, if you've got a body-worn

5    camera here, and you move like that, and you move like that,

6    you're going to pick up considerably more.  If you're staring

7    straight ahead, it would be less, by definition.

8    Q.   I understand.  But in comparison to the utility of a

9    person's eyes, a body-worn camera is more limited; is it not?

10   A.   Yes, it is.

11   Q.   When anyone -- your eyes can move in much different

12   directions, even when your head or your body is not moving;

13   right?

14   A.   Correct.

15   Q.   So the field of vision that an officer would have with his

16   or her eyes would be broader than the field of vision that you

17   would see on a body-worn camera; right?

18   A.   That's correct.

19   Q.   Okay.  The other thing that -- if you're present at a

20   particular event, you have the ability to use all of your other

21   senses to understand what is happening in the event different

22   from what is just reflected on a video of that event on a

23   body-worn camera; is that a fair --

24   A.   That's definitely fair.  Yes.

25   Q.   Okay.  And you would expect a well-trained police officer

Norman Stamper – Cross

1  to use all of those senses, and they talk about having a sixth

2  sense, to try to figure out what is behind you?  And that is

3  something that is very important for an officer to sort of

4  understand; right?

5  A.  I would agree with that.  Yes.

6  Q.  Okay.  And so there is an element of people -- particularly

7  within a crowd and unpredictability, that the officers are kind

8  of darting their eyes and looking around and keeping all of

9  their senses active to try to understand everything that is

10  going on; right?

11  A.  Ideally, yes.

12  Q.  I mean, that's what police officers should do all the time;

13  right?

14  A.  It -- it is.  It's also I think important to point out that

15  officers, like anyone else, can get tunnel vision and see less

16  than, for example, another officer might see.

17  Q.  I understand that.  And problems with tunnel vision happen

18  with officers, and they happen with everyone.  Right?

19  A.  Yes.

20  Q.  Including sometimes experts?

21  A.  I would have to agree with you.

22        THE COURT:  Is this a good time to break?

23        MR. RINGEL:  It is.  Thank you, Your Honor.

24        THE COURT:  Let's take about twelve minutes or so.

25        (Recess at 10:57 a.m.)

Norman Stamper – Cross

1          (In open court at 11:13 a.m.)

2              MR. RINGEL:  May I proceed, Your Honor?

3              THE COURT:  Of course.

4    BY MR. RINGEL:

5    Q.  When we were talking before the morning break we were

6    talking about the protests and all of the activities, and we

7    started a discussion about video, and we had talked about how

8    not everything was on video, and proceeded to look at

9    limitations of video, and then talked about body-worn camera.

10   So I wanted to continue that discussion.  Okay?

11   A.  Yes.

12   Q.  There are other types of videos that exist sort of in the

13   universe of videos that you've reviewed; right?

14   A.  Yes.  That's correct.

15   Q.  And another category of videos is the HALO camera; right?

16   A.  Yes.

17   Q.  And the HALO cameras are -- what does HALO stand for, sir?

18   A.  I don't know.  I can't remember now.

19   Q.  Okay.  When you were in active law enforcement, there were

20   no such thing as HALO cameras, at least in the United States?

21   A.  There were I would describe them as very primitive, early

22   generation versions of what today is called a HALO.

23   Q.  So a HALO camera is, essentially, a fixed camera that is at

24   a higher elevation on like a light post or streetlight or some

25   fixed location; right?

598

Norman Stamper – Cross

1  A.  Yes.

2  Q.  And when you walk around any city in the United States or,

3  frankly, in the world, you see a -- sort of a plastic half

4  bubble that has a camera in it; right?  You can't see the

5  camera when you're walking around, but those are what the HALO

6  cameras are; right?

7  A.  Correct.

8  Q.  And HALO cameras can be moved by the operators of the HALO

9  camera system; right?

10  A.  Yes.

11  Q.  And they can be focused, and the angle of it can be changed

12  if someone is monitoring that particular camera at that

13  particular moment and making that happen.  Fair?

14  A.  Correct.

15  Q.  Okay.  But there are some limitations of HALO cameras,

16  based on the nature of the technology; would you agree?

17  A.  I would.

18  Q.  One of the things is they don't have sound?

19  A.  Correct.

20  Q.  Another thing is the angles and the distance from a HALO

21  camera can sometimes make it hard to pick out things that are

22  farther away from the HALO camera or are not focused on by the

23  HALO camera; is that fair?

24  A.  I believe that is fair.  Yes.

25  Q.  Okay.  One of the things that I'm wondering if you agree

599

Norman Stamper - Cross

1   with me is that HALO cameras don't pick up solid objects that

2   are being thrown from the ground level up into the air at

3   night.

4   A.  I believe that that is generally true.  I'm not familiar

5   with the limitations -- capacities, really, of the HALO cameras

6   in that context.

7   Q.  Okay.  Fair enough.  You use HALO cameras in your work, and

8   you know that they exist, and you know that it's a tool that

9   law enforcement uses, but it's not something you drilled down

10  upon and sort of got into detail in your own studies about?

11  A.  Well, to clarify, I have never used HALOs in my career.

12  Q.  Okay.  But you used -- you -- in this case, you watched

13  HALO footage?

14  A.  Yes.

15  Q.  Have you ever had a case before where you had to look at

16  HALO footage?

17  A.  Nothing like this.

18  Q.  Okay.  One of the other pieces of video that we have or

19  categories of video is video from the Colorado State Patrol;

20  right?

21  A.  Yes.

22  Q.  And you understand that that's a fixed video camera system

23  that is directed at the state capitol building and the grounds

24  of the capitol, which are under the sort of oversight,

25  responsibility of the Colorado State Patrol?

Norman Stamper - Cross

1    A.   Correct.

2    Q.   Okay.  And those cameras also can be guided to a particular

3    event if an operator happens to be looking at that event;

4    right?

5    A.   I'll take that as accurate.  I'm not familiar, actually,

6    with that technology.

7    Q.   Okay.  Fair enough.  And would you agree with me that given

8    the position of the Colorado State Patrol cameras, a similar

9    issue exists as to whether you were able to see objects being

10   launched from the ground up into the air at night?

11   A.   Based on my limited experience, I would say that that is

12   true.

13   Q.   Okay.  Then the other sort of evidence that we have on

14   video is evidence from people who either take photographs or

15   take videos, principally on their cell phones; right?

16   A.   Sure.

17   Q.   We now live in an age where everybody takes -- everybody

18   has a nice camera in their pocket; right?

19   A.   Essentially, I say that's true.

20   Q.   And people can take videos of all sorts of things that

21   happen in their lives, including interactions with police at

22   protests; right?

23   A.   Yes.

24   Q.   Okay.  But there are limitations on how much that camera

25   shows, depending on the angle, depending on the quality, and

Norman Stamper - Cross

 1  depending on the ability of the photographer; fair?

 2  A.  I think that's fair.  Yes.

 3  Q.  All right.  But even talking about all of those videos,

 4  there is a lot of activity that happens at these protests that

 5  is not on video; right?

 6  A.  Right.

 7  Q.  So I wanted to see if we could drill down and if you and I

 8  could reach an agreement as to the general parameters of that.

 9  You would agree, would you not, that the protests, as a whole,

10  the sort of most concentrated protests were from May 28 through

11  June 2; is that fair?

12  A.  Yes.

13  Q.  And that's over six days, generally speaking?

14  A.  Generally, yes.

15  Q.  And I think you would agree that protests didn't last 24 --

16  all the time.  There were some times during the 24-hour period

17  of time when protests were not occurring?

18  A.  That's correct.

19  Q.  But is it -- would it be reasonable to you to suggest that

20  on average, there was protest activity approximately 16 hours

21  on each of those six days?

22  A.  I would accept that as a good generalization.

23  Q.  Yeah.  I'm just trying to be general here.

24  A.  Sure.

25  Q.  Okay.  So that's 96 hours of protests; right?

Norman Stamper - Cross

1   A.   Yes.

2   Q.   Okay.  And do you have any sense of how much that 96-hour

3   period of time is captured on video?

4   A.   No.

5   Q.   Okay.  You've not made an analysis of that issue at all?

6   A.   I have not.

7   Q.   All right.  And then a complicating factor is that for a

8   lot of those 96 hours, events are happening during the protest

9   at multiple locations at the same time?

10  A.   Correct.

11  Q.   Okay.  So if an event is happening -- if there is an event

12  happening at the District 6 station at Colfax and Washington

13  and an event happening at the capitol building at Colfax and

14  Sherman at the same moment in time, that would geometrically

15  mean that there is more content about what is happening in the

16  protests?

17  A.   I think that's fair.  Yes.

18  Q.   If there are 15 events happening at the same time, even

19  more?

20  A.   Even more.

21  Q.   Okay.  Essentially, there were a lot of different actors

22  that were acting in relationship to each other during the

23  protests?

24  A.   Yes.

25  Q.   Let me see if I can break down what I mean by that.

Norman Stamper – Cross

1    Approximately several hundred police officers were responding

2    to each day of these protests; is that fair?

3    A.   Yes.

4    Q.   And you think that there were approximately 3,000

5    protesters at any given time?

6    A.   I don't believe I have ever said that.

7    Q.   Okay.  How many protesters do you think would be a fair

8    estimate of the number of protesters that were present?

9    A.   I would describe, I guess, the level of protest

10   participation as at least several hundred in most cases, up to

11   perhaps a couple of thousand.  But I -- I haven't actually made

12   an estimate of the numbers of people involved.

13   Q.   Okay.  So -- and when you're saying several hundred to --

14   perhaps up to a thousand, that would be a particular event at a

15   particular time at a particular location?

16   A.   That's correct.

17   Q.   So, again, if there are multiple events happening at

18   different locations at the same time, there would be an order

19   of magnitude bigger; right?

20   A.   Yes.

21   Q.   Okay.  So given the fact that just -- so let's just -- even

22   if we use a conservative estimate of 1,000 protesters being

23   actively protesting at any given time -- if you have 1,000

24   protesters engaged in behavior and 200 police officers engaged

25   in behavior, there is a lot of different events that are

604

Norman Stamper - Cross

1  happening at any one period of time; right?

2  A.  I think that's fair.  Yes.

3  Q.  Okay.  And you haven't focused on the totality of all of

4  those interactions, have you?

5  A.  I'm not sure what you mean by that.  I certainly have

6  focused on the George Floyd protests, with the understanding

7  that there could be multiple venues.  And as such, I think it's

8  important to know what is going on at each and every one of

9  them.

10  Q.  Okay.  Fair enough.

11      Is it fair to say that one of the major focuses of

12  your analysis of what happened at the George Floyd protests was

13  video?

14  A.  Yes.

15  Q.  And you reviewed -- do you believe you reviewed all of the

16  video that is available related to the George Floyd protests?

17  A.  I don't know.

18  Q.  But you said earlier, I think, that you spent maybe about

19  80 hours on your work on this case?

20  A.  I don't recall -- I think I probably agreed with your

21  estimate, but I -- I couldn't confirm that.  I would say in

22  that vicinity.

23  Q.  Okay.  And you would agree that there is more than 80 hours

24  of video that exists?

25  A.  Yes.

Norman Stamper – Cross

1   Q.  Did anybody help you review the video?

2   A.  Could you explain what you mean by that?

3   Q.  So did anybody else working with you help you review the

4   video?

5   A.  I'm sorry, that -- that sounds like the same question, and

6   I -- I'm trying to seek clarity --

7   Q.  Okay.

8   A.  -- about what you mean by help.

9   Q.  All right.  Fair enough.  Fair enough.  You reviewed video;

10   true?

11   A.  I did.

12   Q.  You didn't have an assistant or multiple assistants

13   reviewing video and pointing out video to you as to things that

14   you should specifically look at?

15   A.  My personal assistants?

16   Q.  Right.

17   A.  That's correct.  I did not.

18   Q.  But would you get video -- were you -- was video that could

19   be of interest to you identified for you by counsel for the

20   plaintiffs?

21   A.  Yes, of course.

22   Q.  So the plaintiffs' lawyers were engaged in reviewing video,

23   and they provided you video from their review that you looked

24   at?

25   A.  That is correct.

Norman Stamper – Cross

1  *Q.* Did you do your own sort of general analysis of the video,

2  or did you rely principally on the video that was identified by

3  counsel for the plaintiffs?

4  *A.* Well, I certainly relied exclusively on video that was

5  provided to me by counsel.

6  *Q.* Okay. But my understanding is, you got all of the video

7  that was produced by the City and County of Denver in this

8  case; right?

9  *A.* I don't know that.

10  *Q.* Okay. You tried to be as comprehensive as possible in

11  reviewing everything that you thought necessary to review;

12  right?

13  *A.* I did. Yes.

14  *Q.* Okay. But you would agree that you -- well, let me back

15  up. How much time in total did you spend reviewing video

16  generally for yourself to sort of cut the wheat from the chaff?

17  *A.* I'm not sure that was my purpose or intention; but the

18  short answer is, many, many hours.

19  *Q.* Okay. How many?

20  *A.* I don't recall.

21  *Q.* Okay.

22  *A.* I certainly have a record of that, but I don't have it at

23  my fingertips now.

24  *Q.* Okay.

25  *A.* Dozens and dozens of hours.

Norman Stamper - Cross

1   Q.  Okay.  Fair enough.  And so you would say, okay, I'm going

2   to look at Officer Smith -- I'm going to look at all of Officer

3   Smith's body-worn camera for all of that officer's response to

4   the protests; is that how it would work?

5   A.  I would say no.  I was sent video and asked to look at and

6   analyze what I saw.  The question basically is -- is, what do

7   you see here?

8   Q.  Okay.  So, essentially, the video that you were asked to

9   look at was selected for you?

10  A.  Essentially, yes.  I might, for example, ask, do you have

11  any video of what I read in a document?

12  Q.  Okay.  But you weren't looking at all of the video and

13  making your own independent judgment of what the video in its

14  totality says or doesn't say; right?

15  A.  Right.

16  Q.  Okay.  You're focused on videos and events that are brought

17  to your attention?

18  A.  In general, yes.  Occasionally, as I mentioned, I would ask

19  if there was video.  If there was, it would certainly be sent

20  to me.

21  Q.  Okay.  So let me see if I can get an understanding and

22  maybe achieve some clarification related to this video.  One of

23  the incidents that you talked about yesterday was the incident

24  related to the basilica between Pennsylvania and Logan on

25  Colfax; right?

Norman Stamper - Cross

1  A.   Yes.

2  Q.   Do you believe you looked at every single bit of video

3  related to that incident?

4  A.   I don't know.

5  Q.   Okay.  Did you make an inquiry to know whether or not you

6  looked at every available video to understand the totality of

7  the circumstances related to that incident?

8  A.   I made a good faith assumption, was never disappointed in

9  that, that I was in fact sent everything that I needed to see.

10  Q.   Okay.  You relied on counsel for the plaintiffs to send you

11  their selection of what the video about that event showed;

12  true?

13  A.   Combined -- I apologize for repeating myself -- but

14  combined with any queries or requests that I may have had to

15  augment my understanding.

16  Q.   Okay.  But none of the queries or requests that you had

17  was, please send me every minute of video related to this

18  incident so that I could understand it in its totality?

19  A.   I never made that statement.

20  Q.   Did you listen to all of the radio traffic related to that

21  incident?

22  A.   Probably not.  There was a huge amount of radio traffic.  I

23  listened to that which was made available to me in the context

24  of the DPD's response, for example, to the basilica incident.

25  Q.   Okay.  So if there is radio related to the basilica, the

Norman Stamper - Cross

1    only radio that you reviewed with respect to that is radio that

2    was provided to you by counsel for the plaintiffs?

3    A.  Sure.  Yes.

4    Q.  So one of the things that we looked at related to that

5    incident was one statement on the radio by Commander Phelan;

6    right?

7    A.  Yes.

8    Q.  You don't know, do you, what Commander Phelan may have said

9    on the radio 15 minutes before that statement, do you?

10   A.  I do not.

11   Q.  Or maybe an hour before?

12   A.  I do not.  Yes.

13   Q.  And fair to say that of all the 50 incidents that we looked

14   at on video -- that you looked at video during Mr. Aro's

15   questioning of you, your understanding of what is on those

16   videos is limited to the information that was presented to you

17   by counsel for the plaintiffs?

18   A.  Yes.

19   Q.  You didn't with respect to any of those body camera -- so

20   we looked at -- this morning we looked at various events that

21   happened at the intersection of I believe it's Lincoln and

22   Colfax; right?

23   A.  I'm not sure what you're referring to.

24   Q.  Okay.  Mr. Aro stood here, and there were ten or eleven

25   incidents that you said over a 45-minute period demonstrated

Norman Stamper – Cross

1   some sort of pattern that you believed existed; do you remember

2   that?

3   A.  I certainly do.  Yes.

4   Q.  What was the intersection that was related to this?

5   A.  I don't recall at this moment which example you are talking

6   about.  We looked at, for example, the Aurora police aligned in

7   a skirmish line at one end of the block and Denver police

8   officers aligned in a similar skirmish line at the other end of

9   the block.

10  Q.  Right.  And that's related to the basilica; right?

11  A.  Yes.

12  Q.  I'm not talking about the basilica.  This morning, sir,

13  there were ten or eleven incidents that you looked at with

14  Mr. Aro.

15  A.  Correct.

16  Q.  Do you remember that?  He put on the screen these pretty

17  little things that said 1, 2, 3, 4, 5; do you remember that?

18  A.  Yes.

19  Q.  What intersection was that?

20  A.  I don't recall at the moment.

21  Q.  But you don't know -- you didn't review all of the

22  body-worn camera from all of the people at that intersection,

23  did you?

24  A.  I'm sure I didn't.  Although we certainly heard testimony

25  that a number of officers did not employ their body-worn

Norman Stamper - Cross

1   cameras during this protest -- or at certain places and times

2   during the process.

3   Q.  Right.  And I understand that.  But if you want to make an

4   opinion that a particular event or a series of events that

5   occurred at one location over a 45-minute period of time

6   created pattern and practice at the Denver Police Department --

7   that's your opinion; right?

8   A.  I'm sorry.  I didn't follow your question.

9   Q.  You have the opinion that those incidents at the

10  intersection that you cannot remember, that Mr. Aro put on the

11  screen and talked to you about, created a pattern and practice

12  of the police department; right?

13  A.  Yes.  That's correct.

14  Q.  You can't -- how is it fair, sir, to reach a pattern and

15  practice opinion like the one that you did without looking at

16  all of the video that exists related to that 45-minute period

17  of time?

18  A.  I'm sorry, but I don't believe I missed any video,

19  regardless of the origins of that video.  For example, that

20  described the incident we were talking about this morning.

21  That video was, in fact, furnished to me; and, of course, I

22  reviewed it.

23  Q.  Right.  But you didn't -- you don't -- you have not looked

24  at every video that is available related to those incidents,

25  have you?

612

Norman Stamper – Cross

 1   A.  I don't know.  My belief is, I have reviewed -- I know that

 2   I have reviewed everything that was sent to me.

 3   Q.  Okay.  But you don't know what exists that wasn't sent to

 4   you?

 5   A.  I certainly do not.  You're correct.

 6   Q.  Okay.  All right.  I wanted to talk to you about a concept

 7   that is from the field of psychology.  And you -- you have a

 8   Ph.D. in what, sir?

 9   A.  Leadership and human behavior in the school of psychology.

10   Q.  Right.  So I assume, sir, that you're familiar with the

11   psychological concept of confirmation bias?

12   A.  Sure.

13   Q.  And I have a working definition that I'd like to see if you

14   agree with from the American Psychological Association related

15   to confirmation bias.  Okay?

16   A.  Sure.

17   Q.  "Confirmation bias is the tendency to look for information

18   that supports rather than rejects one's perceptions, typically

19   by interpreting evidence to confirm existing beliefs while

20   rejecting or ignoring any conflicting data."

21        Is that a fair working definition of confirmation

22   bias?

23   A.  I believe it's a very good definition.  Yes.

24   Q.  Okay.  And you understand from your work in psychology that

25   confirmation bias does not have to be conscious?

Norman Stamper – Cross

1    *A.*  Almost by definition, it is usually not conscious.

2    *Q.*  And so when I have used the term "confirmation bias," it's

3    not the same thing as saying someone is biased against a

4    particular person because of their race or religion or

5    something like that; right?

6    *A.*  I'm sorry.  Could you repeat that?

7    *Q.*  Sure.  Bias in the context of confirmation bias is

8    different than bias in the context of discrimination?

9    *A.*  As we are discussing that this morning, I would say yes to

10   that.

11   *Q.*  Okay.  Fair enough.  You've written several expert reports

12   in this case; right?

13   *A.*  Yes.

14   *Q.*  And they total more than 100 hours -- they total more than

15   100 pages -- excuse me.

16   *A.*  Yes, they certainly do.

17   *Q.*  And you testified at length from starting at about 11:00

18   yesterday all the rest of the day and then into this morning

19   with Mr. Aro; right?

20   *A.*  Yes.

21   *Q.*  And nothing about any of your opinions addresses the

22   concept of confirmation bias, does it?

23   *A.*  No, it does not.

24   *Q.*  And you would agree that avoiding confirmation bias is an

25   important thing for experts to avoid?

Norman Stamper - Cross

1   A.   I believe it's critical.  Yes.

2   Q.   I wanted to sort of talk to you about some things that I

3   don't see as part of your opinions and see if you agree with me

4   that they're not part of your opinions.  Okay?

5   A.   Yes.

6   Q.   Your opinions do not try to place the protests in Denver in

7   the context of the other George Floyd protests throughout the

8   United States; true?

9   A.   Yes.  True.

10  Q.   You don't attempt to compare Denver's response to the

11  response of other jurisdictions?

12  A.   I don't attempt to do that.  I acknowledge that it's pretty

13  much inevitable that if you're looking at this country's

14  response to the murder of George Floyd and then individual law

15  enforcement agencies' response to protests arising out of that,

16  that you're going to do that.  You are in fact going to be

17  thinking about that.  So I do acknowledge that.

18  Q.   Right.  In the sense that at the beginning of your

19  report -- your first report in this case -- it talks about that

20  the protests here were in the context of protests in other

21  places; right?

22  A.   I'm sure I made a statement similar to that, yes.

23  Q.   Okay.  But you don't do a sort of comparative analysis to

24  say, here is how much OC Denver used, here is how much OC

25  Minneapolis used, here is the level of violence in these two

Norman Stamper - Cross

1   cities, and, therefore, it makes sense to me or it doesn't make

2   sense to me that Denver used this amount of OC?

3   A.   That's correct.

4   Q.   Okay.  Did anything prevent you from doing that?

5   A.   My understanding of the scope and nature of the assignment

6   that I undertook.

7   Q.   Okay.  And the assignment was defined by counsel for the

8   plaintiffs?

9   A.   Yes.

10  Q.   You don't believe as an expert that you have the right to

11  help define your assignment?

12  A.   Oh, I absolutely believe in that.

13  Q.   Okay.  So if you had thought that it was important to place

14  the protests in Denver in context -- in a broader context, that

15  is something that you could have suggested to counsel for the

16  plaintiffs; correct?

17  A.   Yes.

18  Q.   Not something that occurred to you?

19  A.   No.  I have to say, it wouldn't have.  I was not being

20  retained by Minneapolis or any other jurisdiction.

21  Q.   Okay.  But isn't -- isn't your use of terms that -- that

22  the use of a particular chemical is indiscriminate, isn't that

23  a relative term?

24  A.   Could you explain what you mean by that, please?

25  Q.   Sure.  Something is indiscriminate in comparison to

Norman Stamper – Cross

1    something else; right?

2    A.   Yes.  I think the answer is that indiscriminate use of a

3    particular chemical agent, for example, can be compared against

4    the history of that agency's use of that chemical agent.  It

5    could be compared beyond the scope of my involvement here with

6    other jurisdictions.

7    Q.   Okay.  Fair enough.  Your expert opinions don't talk about

8    all of the weapons that were found in the protests; right?

9    A.   They do not.

10   Q.   You understand that some -- depositions from various of the

11   people that were present at the protests were provided to you,

12   and you reviewed them; right?

13   A.   Yes.

14   Q.   Okay.  And among the depositions that you reviewed were

15   depositions of some of the lieutenants that were leading some

16   of these units to respond to the protests; right?

17   A.   Correct.

18   Q.   And those lieutenants, generally speaking, talked about all

19   of the things that they experienced related to the crowds;

20   right?

21   A.   There is no way I can answer that question.  I'm sorry.

22   Q.   Okay.  You recall reading deposition testimony from

23   lieutenants that talked about their experiences about things

24   that happened during the protests?

25   A.   Correct.  Yes.

Norman Stamper - Cross

1   Q.   Okay.  Do you recall testimony about the protesters or

2   people in the crowds, agitators, using lacrosse sticks to send

3   projectiles toward the police lines?

4   A.   I had heard about that -- read about that earlier.  That's

5   correct.

6   Q.   Have you -- do you recall as part of the testimony in those

7   depositions that agitators in the crowd were using tennis

8   rackets for the same purpose?

9   A.   Yes.

10  Q.   How about slingshots?

11  A.   I believe I read that, yes.

12  Q.   There was a fair amount of discussion about fireworks that

13  were used by people in the crowds; right?

14  A.   I guess a fair amount, yes.

15  Q.   Okay.  And none of those concepts or events made it

16  anywhere in your expert opinions; right?

17  A.   That's correct.

18  Q.   One of the things that was discussed at length in the

19  depositions is the intelligence that the Denver Police

20  Department had related to a potential effort to burn down the

21  District 6 police station at Colfax and Washington; right?

22  A.   I did hear of that, yes.

23  Q.   And on May 28 of 2020, a police station in Minneapolis was

24  burned to the ground; was it not?

25  A.   Yes, it was.

Norman Stamper - Cross

1    Q.  So it wasn't a flight of fancy by the Denver Police

2    Department to be concerned about that kind of intelligence;

3    right?

4    A.  I can't speak to the quality or origin of the intelligence,

5    but I would not call it unusual.  And I would, in fact, argue

6    that the police needed to be aware of such rumors and to treat

7    them seriously.

8    Q.  Right.  And so it was important for the police to keep a

9    presence by the District 6 police station to try to avoid the

10   notion of people overrunning the police station and potentially

11   burning it to the ground?

12   A.  I believe that's correct.  Yes.

13   Q.  Okay.  That's a reasonable tactical approach by the Denver

14   Police Department?

15   A.  I believe so.  Yes.

16   Q.  Based on the intelligence and based on the experience of

17   what happened at District 3 in Minneapolis?

18   A.  Yes.

19   Q.  None of your opinions talk about that issue; right?

20   A.  That's correct.

21   Q.  Okay.  We looked at -- you looked at yesterday video

22   related to the RTD Civic Center bus station.

23   A.  Uh-huh.

24   Q.  That's at the corner of Lincoln and Colfax; right?

25   A.  Correct.

Norman Stamper - Cross

1   Q.  Are you aware, sir, that there were a variety of problems

2   that the police experienced related to a rock pile that was

3   present in front of that RTD bus station?

4   A.  Certainly aware that there was a legitimate, in my

5   judgment, concern on the police about that rock pile.

6   Q.  Okay.  There was a pile of rocks there; right?

7   A.  Yes.

8   Q.  A large pile of rocks?

9   A.  Correct.

10  Q.  And it -- people who were agitators in the protests were

11  gathering those rocks and using them as projectiles against the

12  police; right?

13  A.  That's certainly what I heard, or that they could be doing

14  just that.

15  Q.  Okay.  And there was a major effort by the police to try to

16  prevent that from occurring?

17  A.  Correct.

18  Q.  And that included police lines and efforts to keep people

19  away from that location so that maintenance folks could

20  mitigate that risk; right?

21  A.  Yes.

22  Q.  And some of those pictures that we saw yesterday, there

23  is -- looks like there is gravel that is raised above the flat

24  surface of the ground; right?

25  A.  I saw it as dirt.  If it was gravel --

620

Norman Stamper - Cross

1  Q.  Maybe it's dirt, maybe it's gravel, but you know what I'm

2  talking about?

3  A.  I do.  Yes.

4  Q.  And in one particular corner -- on the sort of Broadway and

5  Colfax corner -- there is a big pile of dirt or gravel,

6  depending on which of us --

7  A.  Sure.  I agree.

8  Q.  Is it your understanding that that dirt is above a pile of

9  rocks?

10  A.  Yes.

11  Q.  And is it your understanding that the rest of those sort of

12  smaller piles of dirt or gravel are above piles of rocks?

13  A.  Same thing.  Yes.

14  Q.  Okay.  And so from a tactical perspective, does it make

15  sense to you for the police to worry about keeping protesters

16  away from that problematic area as a general matter?

17  A.  Yes.

18  Q.  Okay.  That seems perfectly rational to you; right?

19  A.  It does.

20  Q.  Okay.  And a legitimate tactical objective for the police

21  to have?

22  A.  Correct.

23  Q.  And that context of tactics isn't anywhere in any of your

24  opinions; right?

25  A.  I don't believe I made reference to that.

Norman Stamper - Cross

 1   Q.  All right.  One of the things that -- another thing that we

 2   talked -- that was referred to during Ms. Sannier's

 3   testimony -- were you here for that, sir?

 4   A.  I was not.

 5   Q.  Okay.  You're familiar with -- on the 28th of May, the

 6   first evening of the protests, an effort by people to access

 7   and protest on I-25?

 8   A.  Yes.

 9   Q.  That's not something that you talked about in any of your

10   opinions either; right?

11   A.  I'm -- I have a memory of acknowledging that that in fact

12   had happened.

13   Q.  Okay.  And you would agree that from a tactical

14   perspective, a police department trying to keep protesters from

15   accessing an interstate highway and blocking traffic is a

16   legitimate tactical goal?

17   A.  I do.

18   Q.  And you would agree that it's dangerous to allow protesters

19   to take over a highway?

20   A.  In support of that, two protesters during George Floyd

21   protests in Seattle were struck, one killed, the other

22   catastrophically injured, as a result of their having been on

23   the freeway.

24   Q.  Right.  And it's somewhat of a more modern protest tactic

25   to try to get highways; is that a fair way to put it?

622

Norman Stamper - Cross

1   *A.*  I would have to say no emphatically to that.

2   *Q.*  Okay.

3   *A.*  It's not new.

4   *Q.*  Okay.

5   *A.*  It's as dangerous today as it was many, many years ago.

6   *Q.*  From your time in San Diego, that was something that -- the

7   protesters would try to get the San Diego freeway, the 5,

8   sometimes?

9   *A.*  I actually do not have an independent memory of any effort

10  in San Diego.

11  *Q.*  Okay.

12  *A.*  I do remember reading about protests in the '60s in

13  Seattle, when demonstrators took to the -- basically,

14  University of Washington students who took the freeway in

15  Seattle, I-5, as a matter of fact.

16  *Q.*  Okay.  So you had discussed this morning related to some of

17  Mr. Aro's questions about -- he showed you a picture of the

18  operations plan.

19  *A.*  Yes.

20  *Q.*  And some of the -- some of the sort of basic operations

21  objectives that were articulated by Commander Phelan were,

22  we're going to keep protesters from the interstate?

23  *A.*  Yes.

24  *Q.*  And we're going to keep protesters from police stations?

25  *A.*  Yes.  I believe I read that.

623

Norman Stamper - Cross

1  Q.  And those are two legitimate objectives, from your

2  perspective?

3  A.  They are.

4  Q.  Okay.  I was struck by -- you know, you have a lot of

5  criticisms of the Denver Police Department in your opinions;

6  and we're going to talk about some of those with more

7  specificity as I continue my examination.  But nowhere in any

8  of your opinions do you talk about anything that the Denver

9  Police Department did right.

10  A.  My focus was clearly as an expert witness on policies,

11  procedures, equipment, training, supervision, and leadership

12  that I think were deserving of criticism.  It was certainly not

13  my intention to identify the many, many things that I think

14  that the Denver Police Department has earned praise.

15  Q.  Okay.  So you were not universally critical of the response

16  to the George Floyd protests by the Denver Police Department?

17  A.  I am pretty much universally critical.

18  Q.  Okay.

19  A.  But I'm not condemning or in any fashion criticizing the

20  men and women of that department or the intentions of people at

21  the various positions.

22  Q.  Okay.  So your criticism is how they performed in that

23  particular instance, but you're not criticizing -- well, we'll

24  leave it at that.  Your criticism is how people performed in

25  responding to the protests?

Norman Stamper – Cross

 1   *A.*  Positions taken, actions undertaken, that sort of thing.

     Yes.

 2   *Q.*  With the recognition that all of the people that made those

 3   different decisions are human beings?

 4

 5   *A.*  Absolutely.

 6   *Q.*  Okay.  One of the things that also is not part of your

 7   analysis is anything historical related to the Denver Police

 8   Department; fair?

 9   *A.*  It's certainly fair.  I don't recall having written that.

10   I'm well aware of Denver's response to political conventions,

11   Super Bowl victories and the like.

12   *Q.*  Okay.  You have a general sense of some of the -- you know,

13   part of the record of all of the information that you have is

14   other examples of protest gatherings, similar things that

15   happened in the City and County of Denver that the Denver

16   Police Department was responsible for responding to?

17   *A.*  Sure.  That's true.

18   *Q.*  But your opinions don't relate to those earlier events in

19   any way?

20   *A.*  Could you repeat that?  I'm sorry.  I didn't follow the

21   question.

22   *Q.*  Sure.  The opinions that you give in this case about the

23   response to the George Floyd protests are not related by you to

24   any prior events involving the Denver Police Department?

25   *A.*  That is correct.

1  *Q.*  All right.  Why?

2  *A.*  That's beyond the scope of my responsibilities as I saw

3  them.

4       *MR. RINGEL:*  Your Honor, I'm going to move to a

5  different topic.  I can keep going, but I thought since it's 5

6  to 12:00, I would give you a sense of what you want to do.

7       *THE COURT:*  This is fine.  Thank you.

8       How much time, folks?  Hour and 15.  Works for me.

9       (Jury out at 11:54 a.m.)

10      (Jury in at 1:19 p.m.)

11      *THE COURT:*  Mr. Ringel.

12  *BY MR. RINGEL:*

13  *Q.*  Good afternoon.

14  *A.*  Good afternoon.

15  *Q.*  As promised, we're going to shift topics now.  And I wanted

16  to focus on some of your opinions and talk to you about them.

17      The first one that I wanted to talk about is some of

18  the opinions you have related to the use of force with respect

19  to the George Floyd protests.  The first opinion I wanted to

20  talk about is that -- your opinion related to a failure to give

21  dispersal orders or at least audible dispersal orders before

22  the use of munitions.  Okay?

23  *A.*  All right.

24  *Q.*  First, the pattern and practice that you have identified is

25  solely and exclusively related to the -- this response to these

Norman Stamper - Cross

1   George Floyd protests; correct?

2   A.   I'm sorry.  I didn't understand the question.

3   Q.   Okay.  The pattern and practice that you've identified

4   that -- the substance of it is only based on your assessment of

5   the George Floyd protests response and nothing else that the

6   Denver Police Department has ever done; correct?

7   A.   That is correct.

8   Q.   In terms of the issue of dispersal orders, you indicated

9   that you did not hear dispersal orders all that often; right?

10  A.   Very rarely.  Yes.

11  Q.   Does that include all of the notifications related to

12  curfew, or do you put that in a separate --

13  A.   I don't put it in a separate category.

14  Q.   You do, or you do not?

15  A.   I do not.

16  Q.   Okay.  So you understand that there were all sorts of

17  notifications related to the curfew; right?

18  A.   Yes.  I've heard that.

19  Q.   Okay.  You know, for instance, that the City sent out a

20  cell-phone-wide notification that gave everybody alert on all

21  of their cell phones, kind of like when you get an Amber Alert?

22  You knew that?

23  A.   I did.

24  Q.   So if the cell phone was in the area where there were --

25  there was a notification, every cell phone would have pinged,

Norman Stamper - Cross

1   and everyone would have been notified about the curfew.  Right?

2   A.  Yes.

3   Q.  And you heard -- you have seen in various videos

4   notifications about curfew; right?

5   A.  Yes.

6   Q.  Okay.  So is it your opinion that there was just none or

7   that they were inadequate?

8   A.  It is my opinion that -- well, my observation is that

9   rarely did I hear a dispersal order before weapons, munitions

10  were employed to disperse a group.

11  Q.  Okay.  And it's my understanding of your opinion that you

12  believe that a dispersal order is required in every instance

13  when a -- something like pepper ball or gas is used for the

14  purpose of dispersal?

15  A.  That is my view -- my opinion.  Yes.

16  Q.  Okay.  Do you have the understanding, based on the

17  depositions that you read, that sometimes those tools were used

18  by Denver police officers and others for the purpose of officer

19  safety?

20  A.  I'm not -- I would ask you if you could repeat the

21  question, please.  I'm not following that.

22  Q.  Okay.  There are different purposes that one might use

23  something like gas; right?

24  A.  Sure.  Yes.

25  Q.  And the purpose that one uses gas, where a dispersal order,

Norman Stamper – Cross

1   my understanding, is necessary, is when you're doing it for the

2   specific purpose of dispersing a crowd?

3   *A.*   Yes.

4   *Q.*   Okay.  Another reason that one might use gas is for

5   purposes of officer safety; correct?

6   *A.*   Theoretically, yes.

7   *Q.*   Okay.  So, for example, if officers at Colfax and

8   Washington were feeling like they were getting pelted with

9   rocks, and they wanted to create distance between the crowd and

10   themselves on the line, because they couldn't differentiate

11   between those who were throwing rocks and those who weren't,

12   they might choose to use gas for that purpose; right?

13   *A.*   Yes.  Once again, theoretically, yes.

14   *Q.*   Okay.  And that purpose would be an officer-safety purpose,

15   and there may not be time in that kind of context to give a

16   dispersal order.   True?

17   *A.*   I certainly do believe that.   Under certain circumstances,

18   there is not time.

19   *Q.*   Okay.  And you would agree that the rationale for a

20   dispersal order, and as it's explained in the IACP guidance, is

21   when it's a formal dispersal order in the sense of what you

22   were talking about related to the WTO and the event that you

23   spoke of with Mr. Aro?

24   *A.*   I'm sorry.  I lost track of your unfolding the question.

25   My apologies.

Norman Stamper - Cross

1   Q.   Okay.  An issue with respect to the IACP standard related

2   to dispersal order has to do with a formal action of dispersing

3   a crowd; right?

4   A.   Yes.  The IACP.

5   Q.   The IACP.

6   A.   Correct.

7   Q.   And the IACP guidelines talk about dispersal similar to the

8   context that you talked about yesterday related to the WTO and

9   the half hour of dispersal orders that your underling gave that

10  you went to the back of the crowd and listened for?

11  A.   Correct.

12  Q.   Okay.  You would agree that in circumstances where things

13  are more immediate and when there is an officer safety

14  component, that there may not be time and the ability to give

15  that same kind of dispersal order?

16  A.   Certainly in theory, that's true.

17  Q.   Okay.  You talk about a pattern of indiscriminate and

18  inappropriate use of gas; right?

19  A.   Correct.

20  Q.   Okay.  And would -- my understanding of your methodology

21  is, you looked at a certain number of videos, you collected

22  incidents of what you consider to be inappropriate or

23  indiscriminate use of gas, collected them together, and reached

24  that conclusion; is that about right?

25  A.   It is.  I would add to the mix the numbers of depositions

Norman Stamper - Cross

1    and declarations coming from the officers that I read, as well.

2    Q.  Okay.  Fair enough.  In your testimony with Mr. Aro, you

3    didn't cite any deposition from any officer as evidence about

4    what the use of gas was; correct?

5    A.  That is correct.

6    Q.  Okay.  And you didn't -- you know, as we talked about

7    before, whether something is indiscriminate or not is a term

8    of -- it has to be in relation to something else; right?

9    A.  Could you maybe explain what you mean by that?  I'm sorry.

10   Q.  Okay.  If something is indiscriminate, you have to be

11   describing it in relationship to some kind of baseline, to some

12   kind of other thing.  And my understanding is that you were

13   using that term in the sense of analyzing the use of chemical

14   munitions based on what you think from your experience should

15   be the general use of chemical munitions?

16   A.  What I'm saying -- what I have said is that the use, for

17   example, of chemical agents against an entire crowd or a large

18   body of individuals, when, in fact, a threat, for example, may

19   have materialized between just a small group of people.

20   Q.  Okay.  I think I sort of understand.  But you didn't look

21   at every single incident of chemical usage and try to quantify

22   how many were appropriate and how many were inappropriate?

23   A.  I did not keep a count of the ones that I felt were

24   appropriate or inappropriate.

25   Q.  Right.  And in none of your testimony either yesterday or

Norman Stamper - Cross

1  today with Mr. Aro did you come up with -- did you talk about

2  any example of where, this is an appropriate use of chemical

3  munitions, and what the Denver Police Department did here was

4  correct and proper and something that they ought to do?

5  A.  I'm sorry.  Could you repeat that?

6  Q.  None of the example -- you never identified any example of

7  a correct usage of a gas by the Denver Police Department in any

8  of your opinions; correct?

9  A.  I believe that to be correct.  I can tell you that of all

10  of the uses of chemical agents that I observed in the materials

11  that I reviewed, I did not see justifiable use.  I saw, rather,

12  indiscriminate use.  Rarely, for example, was there a physical

13  threat or even a verbal threat to do harm to the officers.

14  Q.  Okay.  But we -- we established this morning, didn't we,

15  that you -- the quantum of video that you reviewed was selected

16  for you by counsel for the plaintiff?

17  A.  It was.  I have been made to understand that counsel sent

18  everything to me.

19  Q.  Okay.  But you haven't -- you haven't watched the thousands

20  and thousands of hours of video that exist, that's been

21  produced in this case, have you?

22  A.  No.  I have not watched thousand and thousands of hours,

23  no.

24  Q.  Okay.  With respect to your opinions about pepper balls,

25  your first opinion is that, again, the use of them was

632

Norman Stamper – Cross

1   indiscriminate and inappropriate; right?

2   A.   Yes.

3   Q.   Okay.  Would you agree that some usage of the pepper balls

4   was -- that you observed as part of your review of all of this

5   material was in fact appropriate?

6   A.   I cannot recall an instance where I believed that the use

7   of pepper ball was appropriate.

8   Q.   Okay.  There are two ways that the DPD used pepper balls;

9   correct?

10  A.   I would have to hear what -- what those two ways are,

11  but -- there are many ways that pepper ball can be used.

12  Q.   Okay.

13  A.   And only very few in which they were used appropriately.

14  Q.   One way that pepper ball was used was for the purposes of

15  area saturation in a crowd dispersement methodology; right?

16  A.   I would say that that is in fact what happened.  I

17  certainly wouldn't express approval of that.

18  Q.   Okay.  You don't believe that is a recognized way to use

19  pepper ball?

20  A.   I believe that if done properly and under circumstances

21  that would justify that level of force, that certainly could be

22  true; but what I saw was pepper ball being aimed at and fired

23  at individuals literally from head to toe, in some instances.

24  Q.   Okay.  Another way that one can use pepper ball is in the

25  face of active aggression, to target a particular individual to

633

Norman Stamper - Cross

1   stop active aggression; right?

2   A.   Absolutely.

3   Q.   Okay.   That's a recognized appropriate use of pepper ball?

4   A.   Or various other forms of force, yes.

5   Q.   Understood.   Okay.   And unlike with tear gas, you also

6   indicate that there was a problem with the adequacy of the

7   training relating to pepper balls; right?

8   A.   I'm not sure what you mean by the context of the tear gas

9   and pepper ball -- and pepper balls.

10   Q.   Okay.   You don't have an opinion in your expert report that

11   says there was inadequate training related to the use of tear

12   gas; true?

13   A.   Inadequate training?

14   Q.   Correct.

15   A.   My position is, the way those munitions were used, pepper

16   ball, pepper spray, tear gas, was a reflection either of a lack

17   of training or a decision to ignore that training.

18   Q.   Okay.   And the way that your analysis has worked, as I

19   understand it is, you look at the -- what you see in the

20   events, and then you try to understand what might have caused

21   what you see in the events, and one of the things that you

22   identify is the possibility of training being a problem.

23   A.   Yes.

24   Q.   Okay.

25   A.   Yes.

634

Norman Stamper – Cross

1   Q.  But you don't do as part of your opinion at all any

2   assessment of the actual training that's provided to the people

3   that operate pepper ball; right?

4   A.  That is correct.

5   Q.  And all those materials were available to you, were they

6   not?

7   A.  I'm sure they were.  I guess what I'm saying to you is,

8   with respect to the training, policies, procedures, tactics

9   being passed along to the officers, I saw no evidence of that.

10  I heard, on the contrary, that the department for various

11  reasons had minimized the significance -- the importance of

12  training.

13  Q.  Okay.

14       THE COURT:  So his question was just, those materials

15  were available to you?

16       THE WITNESS:  Yes, Your Honor.  Yes.  Sorry.

17       THE COURT:  I would ask that you just answer his

18  questions, please.

19       THE WITNESS:  Thank you.

20       Could you repeat the question, please.

21  BY MR. RINGEL:

22  Q.  Sure.  The training materials about pepper ball that were

23  used by the Denver Police Department were available to you;

24  correct?

25  A.  Yes.

Norman Stamper – Cross

1    *Q.*  And you did not assess them as part of your analysis?

2    *A.*  I actually did assess them as part of my analysis.

3    *Q.*  Okay.  There was no discussion in your colloquy with

4    Mr. Aro yesterday or today about the actual contents of, this

5    is the pepper ball training for the Denver Police Department,

6    and these are the deficiencies I see in that training; true?

7    *A.*  That is true.

8    *Q.*  Okay.  You have no opinion as to the number of hours that

9    pepper ball training is and whether that's adequate or not;

10   right?

11   *A.*  I -- I'm sorry.  I do not.

12   *Q.*  Okay.  So your assessment of the issue of training is not

13   based on the specificity of what the training that the

14   department -- that the Denver Police Department does about

15   pepper ball; right?

16   *A.*  I'm sorry.  I -- can you explain what you mean by that?

17   *Q.*  Okay.  Your analysis is, there is -- I've identified stuff

18   on video that I don't think is an appropriate use of pepper

19   ball?

20   *A.*  Correct.

21   *Q.*  And what I'm focused on is the secondary opinion that you

22   have, which is, these things I identified are based on a

23   failure of training.

24   *A.*  Correct.

25   *Q.*  Okay.  You don't have a specific assessment of what the

Norman Stamper – Cross

1   pepper ball training was and what was wrong with it; right?

2   A.  That is correct.

3   Q.  So isn't it just an assumption on your part that these are

4   the issues that exist that I see in these videos, and it must

5   be about training?  Because you've never assessed the training.

6   A.  I -- I have heard and read testimony from -- reports from

7   individual officers who challenge or criticize the adequacy of

8   training, particularly in crowd control, crowd management.

9   Q.  Okay.  Name one.

10  A.  I'll probably get her name wrong.  Sich, I believe is the

11  name.  The critic of the adequacy of the training, the

12  frequency, the relevance of the training.  She, for example,

13  made a statement to the effect that, if our officers did not

14  handle themselves well, how could we expect them to do that in

15  the absence of training -- adequate training?

16  Q.  Okay.  And the -- the information you were relying on is a

17  few paragraph report in an interview that someone did with

18  Captain Sich; right?

19  A.  That plus at least one other interview conducted of another

20  member of the department.

21  Q.  Okay.  And who is that?

22  A.  I can't recall at the moment.

23  Q.  These are interviews that were conducted by the Office of

24  the Independent Monitor?

25  A.  I believe they were.  Yes.

Norman Stamper - Cross

1  Q.  And the topic of training in each of them is at most a few

2  paragraphs; true?

3  A.  I would certainly accept that, based on what I've read,

4  what I've heard.

5  Q.  And neither of those two people had their depositions

6  taken; right?

7  A.  I don't recall.

8  Q.  Okay.  And there was an entire deposition taken of the

9  person who actually conducts the training related to

10 40 millimeters and pepper balls; right?

11 A.  Correct.

12 Q.  And I didn't hear you mention that person's name during any

13 of your testimony; right?

14 A.  I wasn't asked, and -- I would have to say that I have not

15 been asked about that either yesterday or today.

16 Q.  What's his name?

17 A.  I don't recall.

18 Q.  Who were the people at the Denver Police Department who are

19 authorized to use flash-bangs?

20 A.  I know for a fact that Metro SWAT is authorized to use

21 flash-bangs.

22 Q.  Okay.  And you also know for a fact that Metro SWAT has a

23 variety of different training than your ordinary officer;

24 right?

25 A.  Yes.

Norman Stamper - Cross

1    Q.  Okay.  And you would anticipate that, based on your

2    experience of what SWAT does; right?

3    A.  Correct.

4    Q.  Okay.  And you opine that there wasn't appropriate training

5    related to the use of that particular device; right?

6    A.  That is correct.

7    Q.  But, again, you didn't assess that the actual training that

8    the SWAT officers go through related to the use of that device;

9    right?

10   A.  That's correct.

11   Q.  And you also didn't assess or at least talk about the

12   context of what those SWAT officers said in their depositions

13   as to why they use those devices?

14   A.  I'm sorry.  Could you repeat the question?

15   Q.  Sure.  You're aware from the depositions that there were

16   different reasons why flash-bang devices were used as part of

17   the protests?

18   A.  That's correct.

19   Q.  And one of those reasons was for purposes of creating

20   distance; right?

21   A.  Yes.

22   Q.  And at least conceivably, that could be a legitimate reason

23   to use that kind of device; right?

24   A.  I don't believe that that -- I would not make that

25   statement.  No.

Norman Stamper - Cross

1    Q.  Okay.  Fair enough.  There is a couple other parts of your

2    opinion that I wanted to talk to you about.  One of them is

3    body-worn camera.  And when did the Denver Police Department

4    adopt body-worn camera?

5    A.  I want to say 2015 or thereabouts.

6    Q.  Okay.  Have you ever worked at a department that had

7    body-worn camera?

8    A.  No.

9    Q.  Okay.  Have you ever worn a body-worn camera?

10   A.  I have not.

11   Q.  Okay.  Have you ever operated one?

12   A.  I have not.

13   Q.  Okay.  You would agree that there is no body-worn camera

14   written policy as to when an officer was supposed to use his or

15   her body-worn camera in a protest response context?

16   A.  Not specifically in a protest response context.

17   Q.  Okay.

18   A.  No.

19   Q.  And prior to -- I mean, one of the things that you're

20   critical of is the amount of body-worn camera that exists;

21   right?

22   A.  No.

23   Q.  You -- I thought you -- I thought my understanding was that

24   you thought that there was a deficiency in the amount of

25   body-worn camera that should exist related to the protests.

Norman Stamper - Cross

1    A.  I never said that.  I'm sorry.

2    Q.  Okay.  You talked this morning, I believe -- or maybe it

3    was yesterday -- with Mr. Aro related to there being

4    inconsistency and gaps in body-worn-camera footage.  Do you

5    remember talking about that?

6    A.  Yes, I do.

7    Q.  So that strikes me that you're critical of the fact that

8    every minute by the officers responding to the protest wasn't

9    captured on body-worn camera?

10   A.  I haven't said that, and I don't believe that at all.

11   Q.  Okay.  Tell me what the problem is with respect to the

12   amount of body-worn camera.

13   A.  Body-worn cameras are intended to capture police activity.

14   And the individual officers have a personal responsibility to

15   make sure that those body-worn cameras are activated as they

16   are engaging in their police practices.

17   Q.  Okay.  And that's part of your overall theme related to

18   accountability?

19   A.  It is.  Yes.

20   Q.  Okay.  So I want to talk about a few things related to

21   that.  But with respect to body-worn camera, you didn't study

22   any usage rates of the Denver Police Department related to

23   body-worn camera, did you?

24   A.  That's correct.  I did not.

25   Q.  And you didn't examine whether there had ever been a

Norman Stamper - Cross

1   problem with respect to body-worn camera at a similar event

2   like these protests after the adoption of the body-worn-camera

3   policy?

4   A.   I know that I recall reading concerns being expressed by

5   department leaders about the consistency with which the

6   officers in their day-to-day work were activating their

7   cameras.

8   Q.   Okay.  It's a major difference for officers to learn how to

9   appropriately wear body-worn cameras; right?

10  A.   I'm sorry.  Major --

11  Q.   It's a major difference in the way police operate to

12  introduce body-worn cameras as to something that they need to

13  pay attention to; fair?

14  A.   I'm very sorry.  I don't understand the question.

15  Q.   Okay.  You never worked as a police officer with body-worn

16  cameras?

17  A.   Body-worn cameras came after I left police work, so the

18  answer is yes.

19  Q.   I understand that.  So would you agree that a lot of police

20  officers and a lot of police departments have had difficulty,

21  challenges, newness related to adopting and using body-worn

22  cameras?

23  A.   I would.  And I would add that once that program has been

24  introduced into that particular organizational culture, the

25  wrinkles get ironed out; policies are established, procedures,

Norman Stamper - Cross

 1   likewise; and departments find themselves operating

 2   efficiently, effectively, competently the body-worn camera

 3   program.

 4   Q.  I agree with you.  But in the absence of a prior event

 5   involving body-worn cameras and protective safety gear and

 6   protests, isn't it hard to evaluate whether the body-worn

 7   camera -- whether anyone at the department knew that the

 8   body-worn cameras were a problem prior to these protests?

 9   A.  I would say that -- I hope I'm getting your question

10   right -- if police officers have had body-worn camera since

11   2015, and given Denver's acknowledged frequency in handling

12   political and other protests, that those kinds of issues were

13   or certainly should have been ironed out years ago.

14   Q.  Okay.  But if -- if various people were to testify that

15   there was no knowledge that this was a particular problem

16   related to body-worn cameras, you wouldn't have any basis to

17   disagree with such testimony, because you've never studied the

18   prior body-worn camera usage; right?

19   A.  I would simply go back to the statement that I just made.

20   Q.  Okay.  With respect to body-worn cameras and also

21   use-of-force reports, those are tools of accountability; right?

22   A.  They are.

23   Q.  And when you talk about a tool of accountability, that's

24   making an officer accountable for an action that he or she has

25   already done; right?

643

Norman Stamper – Cross

1    A.   It certainly is after the fact, yes.

2    Q.   Right.  Whether or not someone clicks a body-worn camera on

3    or off before they take a particular police action isn't

4    determinative about whether they use excessive force in the

5    action that they take; right?

6    A.   Correct.  I would not call that determinative of their

7    decision.  It is a reflection, however, I believe, of the

8    officer's willingness to be transparent and accountable.

9    Q.   Okay.  So -- fair enough.  But it could also, could it not

10   be, just a simple fact of inadvertence or the body-worn camera

11   wasn't tapped the two times necessary to activate it?

12   A.   I believe that that is excusing policy violations.  That a

13   department that has had a program as long as Denver has had

14   BWCs -- body-worn cameras -- that there would not be any

15   plausible explanation for failure to activate under

16   circumstances that I reviewed.

17   Q.   Okay.  Fair enough.  But, again, whether there was a

18   body-worn camera for any incident doesn't mean that one way or

19   the other there was an excessive use of force or inappropriate

20   police activity on what wasn't filmed; right?

21   A.   I believe that if there is -- as I understand your

22   question -- a causal relationship there, that it would be

23   between an officer's motive in, for example, not activating the

24   body-worn camera and then engaging in what I and perhaps

25   everyone else would agree with would be excessive force.

Norman Stamper - Cross

1   *Q.*   Okay.  Fair enough.  Similarly -- and I want to see if you

2   think a similar analysis applies to the use -- the concept of a

3   use-of-force report.

4   *A.*   Sure.

5   *Q.*   A use-of-force report is also retrospective; right?

6   *A.*   It is.

7   *Q.*   So it doesn't say anything -- it doesn't impact the type or

8   level of force that is used in a particular event; it simply

9   reports on what happens and allows analysis of whether what is

10  contained in the report is appropriate use of force or not?

11  *A.*   I agree with that.  Yes.

12  *Q.*   Okay.  So, again, from a causal perspective, whether or not

13  someone used -- completes a use-of-force report doesn't cause

14  them one way or the other to use force in the underlying event;

15  right?

16  *A.*   I can tell you that I have viewed police officers' use of

17  force, read reports after the fact, and on occasion seeing no

18  relationship between what actually happened and what has been

19  reported.

20  *Q.*   I understand.  But that's a failure to report.  That's

21  not -- that doesn't say, necessarily, that the officer used

22  excessive force in the underlying event?

23  *A.*   I think there is the objective reality of the force that

24  was used -- a certain force was used by that officer and the

25  report.  The question is, is it accurate?  Is it thorough?  And

Norman Stamper - Cross

1    I would add, is it timely?

2    Q.  Understood.  And one could argue whether use-of-force

3    reports in relationship to the protests are accurate, thorough,

4    and timely; but whether the use-of-force reports were accurate,

5    thorough, and timely doesn't have a bearing on whether the

6    force that was used, that maybe should have been reported was

7    excessive or not.  That's a separate inquiry, isn't it?

8    A.  I certainly see that as a separate inquiry.  I would also

9    add that knowledge of a use-of-force reporting requirement

10   affects behavior.  It affects the behavior of an individual

11   officer and others who are either complying with that

12   use-of-force policy or defying that use-of-force policy.

13   Q.  Understood.  And that makes sense to me.  But one of the

14   things that you didn't look at was any potential failure to

15   complete use-of-force reports prior to the George Floyd

16   protests; right?

17   A.  I did not look at that at all.  Yes.

18   Q.  So just as -- bear with me for a second.  With respect to

19   the first day of the protests, May 28, 2020, for there to have

20   been created a culture of lack of accountability from there

21   being a problem related to use-of-force reporting in this

22   particular context involving protests, there would have to be

23   evidence that this was a problem prior to May 28, 2020; right?

24   A.  I'm sorry.  Are you asking me whether I believe there was a

25   problem with use-of-force reporting before the George Floyd

Norman Stamper - Cross

1    protests?

2    Q.   No.  I'm asking you -- you don't have any evidence that

3    there was a problem before the George Floyd protests, because

4    it's not something that you looked at?

5    A.   That is correct.

6    Q.   And from a causation perspective, as you talked about, for

7    there to be a causation related to use-of-force reports, there

8    has to be an event prior to the event in question to create the

9    lack of accountability that you're describing related to the

10   use-of-force reports; true?

11   A.   Once again, I apologize.  I had trouble tracking what you

12   were asking.  Could you repeat that?

13   Q.   Okay.  Time moves forward; right?  For one event to be

14   caused by another event, the first event has to happen before

15   the second event; right?

16   A.   Sure.

17   Q.   Okay.  You have May 28, 2020, first day of the protests;

18   right?

19   A.   Correct.

20   Q.   In order for there to be a problem that caused anything to

21   happen on the first day of the protests related to a failure to

22   complete use-of-force reports, there has to be that as an

23   identified problem sometime before; right?

24   A.   No.  At least as I understand your question, that problem

25   could have cropped up on day one, two, three, four, whatever,

Norman Stamper - Cross

1   of the George Floyd protests.  In other words -- I hope I'm

2   understanding what you're asking -- if the Denver Police

3   Department had a problem with its officers not complying with

4   use-of-force reporting before the George Floyd protests, then I

5   would say that is in one sense a separate issue, because we are

6   focused on the George Floyd protests here.  At least that's

7   been my role in helping to analyze what has gone on here.

8   Q.  Okay.  I understand that something could have developed

9   during the George Floyd protests; but no one would have known

10  it was a problem on 5/28, right, unless there was prior

11  evidence that it was a problem?

12  A.  I think supervisors who are attuned to the practices of

13  their officers would know that, essentially, on day one.  If

14  I'm a sergeant, for example, and you're working for me, I would

15  say, Did you use force?  Your obligation is to complete a

16  report on that use of force.

17  Q.  Okay.

18  A.  And at the end of the shift, if I don't have that report,

19  then I'd be at least questioning what happened, on day one.

20  Q.  Okay.  Fair enough.  Practically speaking, how would the

21  Denver Police Department possibly have completed use-of-force

22  reports for all of the incidents that happened on May 28, 2020,

23  in any kind of timely or comprehensive fashion and still been

24  able to have anyone available to police the protests on the

25  next day?

Norman Stamper - Cross

1   A.  Well, I'm certainly not talking about stepping off the line

2   or going back to the station or even to one's car to sit there

3   and do the reporting in the middle of that action.  What I am

4   suggesting is that when they go off shift -- before they go off

5   shift, they complete the reports.  And I totally appreciate

6   that that extends the day, that it is a headache.  As a

7   practical matter, it's a real problem for many officers who

8   have made arrests that night, for example, or used force that

9   night to submit the reports.  So the question that I would have

10  is, is this important enough to make sure that it gets done?

11  My answer to that -- the more, I guess, rhetorical question is,

12  yes, absolutely, if you want to be an accountable public

13  agency.

14  Q.  Okay.  So my understanding of your practical conception is,

15  the officers should have worked the entirety of their time on

16  the protest -- which was longer than a normal shift, into the

17  night -- and then gone back to wherever their station was and

18  spent several hours documenting all of the use of all of these

19  different tools that we've talked about at every single

20  instance that they may have used it during that particular day

21  of the protest?  That's your conception of what they should

22  have done?

23  A.  I certainly make provision for extending the time during

24  which an officer would be required to submit the reports under

25  the circumstances you're describing.  I'm very, very

Norman Stamper - Cross

1   sympathetic to that.  Officers worked long, they worked hard,

2   and have, in fact, been consumed in what has been going on.

3   But they also have a responsibility to make sure, in the

4   interest of justice, as well as accountability, that they do

5   their job, that they submit those reports.  I think the

6   department has a responsibility to those officers to provide

7   education, training, and, indeed, technology so that you can

8   ease that reporting requirement, that burden.

9   Q.  Okay.  But isn't it, effectively, a person-power problem

10  too?

11  A.  Is it what?

12  Q.  Isn't it a person-power problem?

13  A.  Absolutely, I agree with that.

14  Q.  Because for every minute you have someone on duty doing a

15  report, they can't rest, and then they can't be ready to

16  respond the next day to the protests that you're anticipating

17  are going to need a response?

18  A.  I do believe that that's a good frame for the challenge

19  that the agency faces, as well as individual officers.

20  Q.  Right.

21  A.  Yes.

22  Q.  And every agency has limitations on their available

23  resources?

24  A.  Correct.

25  Q.  Okay.  Let's shift to talking about discipline.

Norman Stamper - Cross

 1          One of the things that you were critical about -- and

 2   there were a lot of examples about it -- was whether or not a

 3   particular officer was disciplined for a particular event on a

 4   video that we watched; right?

 5   A.   Yes.

 6   Q.   Okay.  One of the things that you didn't talk about was the

 7   context of how discipline works in police departments; right?

 8   A.   That's correct.  I did not.

 9   Q.   And you're aware of the context of how discipline works in

10   police departments?

11   A.   I am.

12   Q.   Typically, discipline is a complaint-driven process; is it

13   not?

14   A.   Typically it is, yes.

15   Q.   It would -- that means some member of the public or a

16   fellow officer initiates a complaint about a particular event,

17   it gets referred to Internal Affairs, and then it goes through

18   all the different steps of a complaint process?

19   A.   Yes.  I would add, a supervisor very well could be viewing

20   the policy violation or other form of misconduct.  I would

21   simply add that to your initial list.

22   Q.   Absolutely.  That's either a fellow officer or a

23   supervisor.  Someone has to witness the potential violation,

24   generate a complaint of some kind, and then it gets referred to

25   IA?

651

Norman Stamper – Cross

1   A.  Correct.

2   Q.  IA doesn't spend its time looking at body-worn-camera video

3   to determine all of the different potential violations that

4   might have existed out in the street today or on May 28, 2020;

5   right?

6   A.  If a complaint has been made and that complaint has been

7   assigned for investigation to an individual officer, they

8   would, in fact, be reviewing body-worn-camera footage.

9   Q.  I understand that; but that wasn't my question, sir.  My

10  question was, it doesn't work in an IA system for there to be

11  generally IA folks just reviewing randomly or spot-check or

12  generally a bunch of body-worn-camera footage to determine if

13  there are any policy violations?

14  A.  No.  That is absolutely beyond the scope of internal

15  investigations.

16  Q.  Right.  Once there is a complaint, then IA would look at

17  every single body-worn-camera video that exists to get to the

18  bottom of what would happen with the complaint?

19  A.  Correct.

20  Q.  Okay.  So you don't have any idea, do you, whether or not

21  all or some or none of the events that you've identified have

22  even been part of any discipline looked at; right?

23  A.  Can you repeat the question, please?

24  Q.  Okay.  We've talked about that IA is a complaint-driven

25  process.

Norman Stamper – Cross

1    *A.*   It is reactive.

2    *Q.*   Correct.

3    *A.*   Yes.

4    *Q.*   So in order for any of the incidents that we watched to

5    generate a disciplinary process which starts with an IA

6    investigation, would require someone bringing that complaint to

7    the attention of IA; right?

8    *A.*   Yes.

9    *Q.*   Sitting here today, you have no idea what complaints were

10   brought to IA and which ones were not; right?

11   *A.*   I did read a number of IA responses to complaints; answers,

12   for example, from IA investigators to citizens who had filed

13   complaints.

14   *Q.*   I understand.  And there were a lot of citizen complaints

15   and there were a lot of other complaints.  But what I'm driving

16   at is, you don't have an idea of a specific incident that

17   you've identified that you talked with Mr. Aro about and then

18   said, this person hasn't been disciplined -- they would only

19   get disciplined if it was a complaint that was given to IA in

20   the first place; right?

21   *A.*   And if that complaint were accurately, thoroughly

22   investigated and an objective conclusion reached.  That is

23   correct.

24   *Q.*   Okay.  So the way that it -- IA with the Denver Police

25   Department is a complicated process; is it not?

653

Norman Stamper - Cross

 1    *A.*   I don't see it as particularly complicated.

 2    *Q.*   All right.   Things go to IA, then they go to something

 3    called conduct review office; right?

 4    *A.*   Yeah.   I didn't know the title of that position; but, yes.

 5    *Q.*   Okay.   And then it ultimately goes all the way to the

 6    executive director of the department of safety; right?

 7    *A.*   As I understand the system, yes.

 8    *Q.*   Okay.   And officers have the right to have counsel in those

 9    proceedings?

10    *A.*   They do, typically.

11    *Q.*   And they are generally sort of proceedings that the due

12    process clause of the United States Constitution applies to?

13    *A.*   I would assume that it certainly applies to that.

14    *Q.*   Okay.   And there are a lot of rules, and there is a lot of

15    things, and it takes a lot of time?

16    *A.*   Yes.

17    *Q.*   Okay.   And so that's part of the reason why it's a

18    complaint-driven process; right?

19    *A.*   I'm not sure I would say that's one of the reasons that

20    it's a complaint-driven process.   Unless an officer comes

21    forward and says, for example, I engaged in this conduct on

22    such and such a date and time, I think you should investigate

23    me -- I'm not trying to be silly here.   What I'm saying is, if

24    a complaint is made, then the investigation is launched under

25    normal circumstances.

654

Norman Stamper - Cross

1  Q.  Right.   There is no police department in the United States

2  that you're aware of that has a disciplinary process that's not

3  complaint based; correct?

4  A.  Correct.   That's correct.

5  Q.  That's how it works all over the place.   And from your

6  perspective, that's a reasonable way for people to do business?

7  A.  I agree.

8  Q.  Okay.  All right.   A couple more things to talk about, and

9  then I'm going to sit down.

10         In many of the videos that we watched, it seemed to me

11 that there was some sort of tactical objective that -- at least

12 sort of from an overall perspective of what the police were

13 trying to do in a particular instance; would you agree with

14 that?

15 A.  I'm not sure I would.

16 Q.  Okay.  So, for example, we watched videos related to an

17 effort to clear the entire park in front of the capitol.  Do

18 you remember that?

19 A.  I do.  Yes.

20 Q.  Okay.  So that was a tactical objective that was trying to

21 be met --

22 A.  Yes.

23 Q.  -- with those actions.  And one could argue whether -- and

24 I'm sure you do -- whether some of the individual events that

25 are part of that tactical objective are legitimate or not.  But

1    setting that aside, I was struck that none of your analysis of

2    any of these events had any consideration of the actual

3    tactical objectives of the police department.  Why is that,

4    sir?

5    A.  It was my conclusion based on my observation and analysis

6    that there were any number of several tactical situations in

7    which the only objective seemed to be to move people away from

8    a particular location.  And for me, that was problematic, given

9    the First Amendment; and it was problematic from the point of

10   view of the objectively unreasonable force that was used

11   against nonviolent and, indeed, nonthreatening citizens.

12   Q.  Okay.  So you didn't agree with the tactics, so you didn't

13   talk about the tactics at all; is that basically what I might

14   take away --

15   A.  That's not what I said and certainly not what I meant.

16   What I'm saying is that as I looked at case after case after

17   case, location after location after location, I was left

18   wondering, what are they trying to do?  What are my former

19   colleagues trying to do in this particular situation?

20          I'll cite one example.  There was a moment during the

21   life of this event in which officers were remarkably restrained

22   and disciplined.  They were not out in hard gear; they were in

23   their normal uniforms.  They happened to be wearing helmets,

24   which I approved of under those circumstances.  And for a very

25   long period of time, comparatively speaking -- 15 minutes,

Norman Stamper - Cross

1    maybe -- they were simply with -- they were simply accepting

2    the shouting, the chanting that was coming from the crowd.

3    There weren't any rocks; there weren't any bottles; nobody was

4    throwing anything at them; but they were, in fact, standing in

5    what I would consider to be very disciplined fashion and

6    observing.  That's what they were doing.

7            And then, unfortunately, toward the end of that time,

8    they actually did in fact go to a -- what I would consider to

9    be an objectively unreasonable use of force.

10   Q.  Okay.  I understand, I think.  We watched a lot of video

11   during your examination yesterday and today.

12   A.  Yes.

13   Q.  And of all of the video -- and correct me if I'm wrong

14   about this -- the only plaintiff that is shown in any of those

15   videos is Elisabeth Epps; right?

16   A.  I believe that to be true.  Yes.

17   Q.  And then there was a picture related to the event that

18   happened with Zachary Packard; right?

19   A.  That's correct.

20   Q.  Okay.  All of those other videos involve what you've

21   labeled inappropriate police conduct but not related to the

22   twelve plaintiffs that are here before the Court; right?

23   A.  I guess that's correct.  Yes.

24           MR. RINGEL:  Those are my questions for Mr. Stamper.

25   Let me just move my stuff out of the way.

1          Thank you, sir.

2              *THE WITNESS:*  Thank you.

3              *THE COURT:*  Redirect.

4              *MR. ARO:*  Briefly, Your Honor.

5                    **REDIRECT EXAMINATION**

6    *BY MR. ARO:*

7    *Q.*  I want to start right where Mr. Ringel left off.  You'll

8    recall this morning we went through the vignettes that played

9    out at Lincoln and Colfax on the third day of the protest, late

10   in the afternoon; right?

11   *A.*  Yes.

12   *Q.*  We looked at a bunch of numbers and correlated those two

13   events.  One of those events was Stanford Smith being sprayed

14   in the face; is that right?

15   *A.*  Exactly.

16   *Q.*  You were not present when Claire Sannier said she was

17   sitting in the front row of the protesters behind the yoga guy,

18   who had a 40-millimeter cannon pointed at him.  Do you remember

19   that?

20   *A.*  I do.

21   *Q.*  All right.  And is it also your understanding that a number

22   of other plaintiffs were in that crowd, right behind the people

23   who the officers of the DPD were being shot at?

24   *A.*  Yes.

25   *Q.*  Now, the situation that you were talking about where there

Norman Stamper - Redirect

1    were officers who were restrained and behaving as you would

2    expect officers to behave, it was the first night of the

3    protest; correct?

4    A.   That's correct.

5    Q.   It was the first major gathering of protesters on the south

6    side of the state capitol; right?

7    A.   Also correct.

8    Q.   You said for a long time officers stood with protesters

9    near them?

10   A.   Yes.

11   Q.   And the protesters were engaging the officers and directing

12   some insults and asking questions; true?

13   A.   Yes.

14   Q.   And you said there were no rocks, no bottles, no violence

15   by anybody in the crowd that was evident at that point;

16   correct?

17   A.   Correct.

18   Q.   And then you said that there was an excessive use of force

19   deployed on that crowd?

20   A.   Yes.

21   Q.   Isn't it true that that excessive use of force was the

22   tear-gas bombing of the crowd by officers without giving any

23   warning that could be heard by the crowd?

24   A.   Absolutely correct.

25   Q.   And that was the scene where we had the guy walk up to the

Norman Stamper – Redirect

1   officer and say, "What did that guy just say on the PA?"

2   A.  Exactly.

3   Q.  And two minutes later the DPD launched tear gas into the

4   crowd, which was doing nothing to provoke that; true?

5   A.  That's correct.

6   Q.  And moments after that, Elisabeth Epps was holding the

7   camera as that billowing cloud of tear gas approached her?

8   A.  Yes.

9   Q.  Was that the point where things started to change in the

10  crowd, from your review of all of the video you've seen?

11  A.  Absolutely.

12  Q.  Now, I want to ask also about the training questions that

13  Mr. Ringel was asking you.  He was talking about the -- your

14  review of training materials.  And he asked you some questions

15  about the training that is provided with respect to

16  flash-bangs; right?

17  A.  Yes.

18  Q.  And he asked you the name of the person who testified about

19  that question.  You said you couldn't recall?

20  A.  That's correct.

21  Q.  Does the name Ryan Grothe sound familiar to you?

22  A.  It certainly does now, yes.  Thank you.

23  Q.  You said you couldn't recall what Officer Grothe said about

24  the training that Metro SWAT received concerning the use of

25  flash-bangs?

Norman Stamper – Redirect

1    A.   That's correct.

2    Q.   Would your report where you address that issue help refresh

3    your recollection about what Officer Grothe said?

4    A.   It would.

5              MR. ARO:  May I approach, Your Honor?

6              THE COURT:  Sure.

7    BY MR. ARO:

8    Q.   I'm going to hand you, for the record, your report dated

9    December 22, 2021.  And I'll direct you to the report, page 6,

10   paragraphs 9C and D.  Please read those to yourself, and let me

11   know when you have done that.

12   A.   Thank you.

13   Q.   Let me take that back.

14        I think I may have misspoke.  I think I said Officer

15   Grothe was a SWAT officer.  I meant to say he is a patrol

16   officer.

17   A.   Yeah.  I think he's actually a technician, if I got that

18   right.

19   Q.   Okay.  Now, did reviewing the report that you wrote and

20   that was delivered to counsel for the City in December 2021

21   refresh your recollection about the training that was described

22   by Ryan Grothe?

23   A.   Yes.

24   Q.   It's your understanding that Ryan Grothe was the person put

25   forward by Denver as their representative to explain the

661

1    training that was provided to their officers?

2    *A.*   Yes.

3    *Q.*   Having your memory refreshed, what do you now recall about

4    the training that DPD provided to its officers concerning the

5    use of flash-bangs?

6    *A.*   He essentially said that there was no training, that use of

7    flash-bangs was covered in SWAT training, but he was unfamiliar

8    with it.

9    *Q.*   Okay.  And does having reviewed your report also refresh

10   your recollection about what SWAT Corporal Richard Ebberharder

11   said about the training he received using flash-bangs?

12   *A.*   Yes.

13   *Q.*   What did the SWAT technician, Corporal Ebberharder, say

14   about training that he as a SWAT member had received concerning

15   the use of flash-bangs?

16   *A.*   He had received none.

17   *Q.*   Did DPD's policies reflect or reference the use of Stinger

18   grenades?

19   *A.*   Yes.  And I -- I apologize.  Could you repeat that

20   question?

21   *Q.*   Sure.  Do you remember ever seeing anything in any of DPD's

22   policies relating to the use of Stinger grenades?

23   *A.*   No.  I was referring to that in the context of his saying

24   they had not received any training in Stingers.

25   *Q.*   All right.  Do you suppose that not training officers and

Norman Stamper - Redirect

1    SWAT officers on the use of Stinger grenades might have had

2    something to do with the deployment of Stinger grenades the way

3    that we witnessed in the videos that we saw yesterday and

4    today?

5    A.  Of course.  Inevitable that there would be problems and

6    issues associated with the complete absence of training in that

7    particular munition.

8    Q.  You also received a number of questions from counsel

9    concerning confirmation bias and the idea that maybe you just

10   looked only for what you were trying to find, which was

11   misconduct.

12   A.  I do remember that.  Yes.

13   Q.  And did you understand the implication of those questions

14   to be that there existed video that explained why DPD officers

15   did the things we've seen on tape the last two days?

16   A.  Sure.  Yes.

17   Q.  Do you remember him showing you any video that explained

18   why DPD officers blasted three people who were standing on a

19   street corner at Colfax and Lincoln repeatedly with pepper

20   balls?

21   A.  Did I -- could you repeat the question?

22   Q.  Sure.  Did you see any video that explained why DPD

23   officers did that?

24   A.  No.

25   Q.  Did you see any video from him?

663

Norman Stamper - Redirect

1   A.  Not on that issue.  No.

2   Q.  And do you suppose that counsel has access to all of the

3   body-worn camera and other video that was collected by DPD?

4   A.  That would be my assumption, yes.

5   Q.  And if anything existed that would exonerate those

6   officers, do you think he would have shown it to you?

7   A.  I do.

8   Q.  Last question about -- that I have is about the question of

9   discipline.  You mentioned that you had read a lot of IA files

10  that have been generated in this complaint-driven process that

11  was orchestrated -- used by DPD to review claims of officer

12  misconduct?

13  A.  Yes.

14  Q.  Do you remember, ballpark, hearing how many IA

15  investigations there were of various complaints of officer

16  misconduct concerning the George Floyd protests?

17  A.  Yeah.  And I guess the best estimate that I can provide

18  would be between a half a dozen or a dozen.

19  Q.  A dozen complaints?

20  A.  Complaints.

21  Q.  Or a dozen disciplines?

22  A.  On disciplines, dramatically fewer than that.

23  Q.  So when you say four or five complaints, you're saying that

24  only four or five complaints of misconduct were lodged with the

25  DPD after these protests?

Norman Stamper – Redirect

1  A.  Not at all.  There were a large number of complaints filed.

2  Q.  Does 120 or so sound correct?

3  A.  Yes.

4  Q.  And how many of those instances resulted in the imposition

5  of discipline against a DPD officer?

6  A.  Well, I don't have a -- any kind of evidence of the number

7  of complaints as such that generated discipline.

8  Q.  Uh-huh.

9  A.  Citizen complaints, I'm now talking about.

10  Q.  How many officers were disciplined?  That's a simpler

11  question.

12  A.  Three or four.

13  Q.  Okay.  And did you see officers, including officers in

14  leadership, standing in the videos behind the skirmish line at

15  Colfax and Lincoln watching what those officers were doing?

16  A.  I do remember that.

17  Q.  Did those officers, any of them, have the opportunity to

18  initiate a complaint if they saw something that they thought

19  was inconsistent with DPD's actual policy, practice, and

20  custom?

21  A.  They had the opportunity to keep that from happening, and

22  they certainly had the opportunity to take action against that

23  behavior.

24  Q.  And, in fact, you said that when an officer sees misconduct

25  of that sort, it's not just an opportunity to take action, but

1   the person has an obligation to do so?

2   A.   Absolutely.

3            MR. ARO:   I don't have anything further, Your Honor.

4   Thank you.

5            THE COURT:   Thank you.

6            How about the jurors, do you have any questions?

7            Yes.   Okay.

8            COURTROOM DEPUTY:   Your Honor, is it okay if we take a

9   quick break?

10            THE COURT:   Yeah.   Of course.

11            (Jury out at 2:22 p.m.)

12            (Hearing commenced at the bench.)

13            MR. ARO:   We don't have any objection to it, but --

14            THE COURT:   Are you objecting?

15            MR. RINGEL:   Well, it's asking about -- it says, "Do

16   chemical agents, pepper balls, pepper spray, tear gas, cause

17   lasting environmental impacts?"   I don't think that's relevant.

18   Yes, I'm objecting.   It's not relevant.

19            MR. ARO:   I will leave it to your discretion, Your

20   Honor.

21            THE COURT:   Coward.

22            MR. ARO:   Okay.   I'm going to oppose the objection

23   vociferously and also tell you, I'm not sure if he has any

24   idea.   But --

25            THE COURT:   Okay.   Objection is sustained.

1           *MR. ARO:*  No problem with that.

2           *MR. RINGEL:*  No objection.

3           *THE COURT:*  Okay.

4           *MR. ARO:*  No objection with that.

5           *MR. RINGEL:*  Let me read it.

6           No objection.

7           *THE COURT:*  Okay.

8           *MR. ARO:*  Thank you, Your Honor.

9           *THE COURT:*  Would you guys like a break?

10          *MR. ARO:*  Can we have seven minutes?

11          *THE COURT:*  Sure.

12          (Hearing continued in open court.)

13          *THE COURT:*  All right.  We'll take a break for

14  everybody here.

15          (Recess at 2:24 p.m.)

16          (In open court at 2:31 p.m.)

17          *THE COURT:*  So our ever-vigilant reporter wants you

18  all to know that baseball is back.

19          (Jury in at 2:32 p.m.)

20          *THE COURT:*  Mr. Stamper, the jurors have a few

21  questions for you.

22          Remember, folks, if I don't ask the question, that

23  doesn't mean it wasn't a good question.  It probably was.  In

24  fact, any question you ask is a good question, because you're

25  the jury.  But once in a while, I can't ask one, so -- that's

1    just the way it does work.

2           Now, let's see.  Question:  If the police followed the

3    IACP policies, would there be as many injuries to police?

4           THE WITNESS:  In my opinion, there would not be, that

5    there would be a dramatic reduction in injuries to officers.

6           THE COURT:  And why is that?

7           THE WITNESS:  Because those policies -- and I reviewed

8    them actually in the past, been part of the process of

9    formulating them -- really do anticipate all of the conceivable

10   questions, challenges, and so forth that are associated with

11   policies, especially in the area of use of force.  And I think

12   officers who abide by those recommendations, translated into

13   policies, are making themselves just so much more knowledgeable

14   and informed and effective at protecting themselves and

15   protecting people they've been hired to protect.

16          THE COURT:  Question:  Is the use of chemical weapons

17   on innocent protesters a cause of escalation on the part of the

18   other protesters who witnessed the events?

19          THE WITNESS:  I personally have seen that exactly that

20   as the outcome many times.

21          THE COURT:  Okay.  Question:  Do you believe that the

22   police's use of pepper balls on innocent protesters that first

23   day set the tone of police escalation of use of chemical means

24   of dispersal of lawful protesters?

25          THE WITNESS:  I believe that to be the case.

1    *THE COURT:*  Any other questions, ladies and gentlemen?

2    (No response.)

3    Follow-up questions, plaintiff?

4    *MR. ARO:*  Nothing from the plaintiffs, Your Honor.

5    *THE COURT:*  Mr. Ringel?

6    *MR. RINGEL:*  I have one area of inquiry, Your Honor.

7    *THE COURT:*  Sure.

8                              **EXAMINATION**

9    *BY MR. RINGEL:*

10   *Q.*  I haven't seen any assessment by you in any of your reports

11   or any of your opinions about any of the specific events

12   involving injury to officers; is that true?

13   *A.*  That is true.

14   *Q.*  So you don't really have a basis to analyze how or why any

15   of those officers were injured; right?

16   *A.*  That is correct.

17   *MR. RINGEL:*  Nothing further, Your Honor.

18   *THE COURT:*  All right.

19   Thank you, sir.

20   *THE WITNESS:*  Thank you, Your Honor.

21   *THE COURT:*  You are excused and free to leave or

22   welcome to stay, whichever you prefer.

23   *THE WITNESS:*  Thank you.

24   *THE COURT:*  Now, do you have any more witnesses?

25   *MS. RUTAHINDURWA:*  Plaintiffs call Sara Fitouri.

Sara Fitouri – Direct

1      (**SARA FITOURI, PLAINTIFFS' WITNESS, SWORN**)

2                        **DIRECT EXAMINATION**

3   *BY MS. RUTAHINDURWA:*

4   *Q.*  Good afternoon, Sara.  Can you please state your name and

5   spell your first and last name for the record.

6   *A.*  Yes.  Hello.  My name is Sara Fitouri.  My name is spelled

7   S-A-R-A.  Last name, F-I-T-O-U-R-I.

8   *Q.*  Where are you from?

9   *A.*  I'm from Colorado.  I grew up in Littleton and Castle Rock.

10  *Q.*  Where do you currently live?

11  *A.*  I live in Denver.

12  *Q.*  Have you ever lived outside of Colorado?

13  *A.*  I went to undergrad in Upstate New York.  I lived out of

14  state when I was in school.

15  *Q.*  But apart from that, you've lived in Colorado your whole

16  life?

17  *A.*  Yes.

18  *Q.*  What do you do for work?

19  *A.*  So I work for the Colorado Education Association.  I'm the

20  director of bargaining and organizing.

21  *Q.*  And can you explain to us what that means?

22  *A.*  Yeah.  Sure.  So the Colorado Education Association is the

23  teachers union.  And my job specifically is to support teachers

24  in bargaining their contracts.

25  *Q.*  Do you like your job?

Sara Fitouri – Direct

1    A.   Yeah.  I love my job.  I love working for teachers.

2    They're great people, and they do really good work for our

3    communities.

4    Q.   When did your interest in helping out teachers and public

5    education begin?

6    A.   Being from Colorado, I had a really great public education.

7    And then when I went to college, I went to a private school and

8    went really in debt for my undergrad; and it made me realize

9    how fortunate we were to have a strong public education for

10   K-12 and how student debt was a barrier for folks to continuing

11   their education.  And so, to me, public education is really

12   important.  And I got involved in activism work fighting the

13   student debt crisis.  That's where I really began to appreciate

14   how important our public education system is.

15         THE COURT:  You might help us a bit if you slow down

16   just a bit.

17         THE WITNESS:  Sure.

18   BY MS. RUTAHINDURWA:

19   Q.   You went to law school?

20   A.   Yes, I did.

21   Q.   Did you have a favorite class?

22   A.   I really liked my criminal defense clinic.  It was an

23   opportunity to put what I was learning into practice.  And also

24   it was an opportunity to work with indigent folks, oftentimes

25   who were facing crimes of poverty, crimes that they wouldn't

Sara Fitouri - Direct

1   have experienced if they had had better access to resources

2   that they needed.

3   Q.  What do you like to do for fun?

4   A.  I paddleboard, I have two dogs that I love to play with,

5   I'm learning guitar.  I'm not good at it, but I enjoy playing

6   it.  Yeah.

7   Q.  So let's turn to the protests.  Why did you file this

8   lawsuit?

9   A.  I have been to, like, a lot of protests.  I protest pretty

10  often.  And what I experienced around the George Floyd protests

11  blew my mind.  This was a use of force that I had never dreamed

12  I would experience, not even close to anything I had

13  experienced before or anything I could picture at a protest

14  scenario.  And I think about our teachers who are working on

15  educating our students.  And at the protests there were so many

16  kids there; and in my mind, I needed to make sure this never

17  happens again.

18  Q.  Have you -- so you mentioned you protested, and you've

19  attended prior protests before.  Can you briefly describe a

20  couple of the prior protests?

21  A.  Sure.  In the last few years, specifically, I attended the

22  Women's March in Denver; I also attended protests after Donald

23  Trump was elected.

24  Q.  And how large was the Women's March?

25  A.  The Women's March in Denver was the biggest protest I've

Sara Fitouri - Direct

1    ever seen.  It -- I think the news said it was over 100,000.

2    It was impossible to know how much, but it filled every inch of

3    Civic Center Park.

4    Q.  Were Denver police at that protest?

5    A.  Yes, they were.

6    Q.  How did they behave?

7    A.  More like, I guess, traffic monitors.  They were off in the

8    distance making sure traffic was stopped.  Really didn't see

9    much interaction with them at all.

10   Q.  And what were you hoping would happen by protesting George

11   Floyd's murder?

12   A.  I was hoping that we could continue to build a movement

13   that drew attention to police brutality and the murder of black

14   and brown people by police, elsewhere, but also here in Denver.

15   Q.  So let's turn to the first day, May 28.  How many days of

16   the protest did you attend?

17   A.  So I attended -- the first day I attended was May 28, and

18   I -- I think about 14 days, so two weeks -- the two weeks

19   immediately after.

20   Q.  And on the first day, what were you wearing?

21   A.  I was wearing a Black Lives Matter black T-shirt and then

22   leggings, probably tennis shoes.

23   Q.  Did you --

24   A.  And a mask.

25   Q.  Sorry.  Did you plan to meet anyone?

Sara Fitouri – Direct

1   A.   Yes.  I met up with Jackie Parkins, as well as Joe Deras,

2   and my friend Ben.

3   Q.   Can you describe your experience when you first joined the

4   march downtown.

5   A.   Yeah.  I remember there was a lot of energy and a lot of,

6   you know, rage at the murder that we had all witnessed, but

7   also a lot of hope, because there were people showing up who

8   had never been at those protests before.  Right?  A lot of new

9   folks who were fighting the forces for the first time.

10  Q.   Where did the march go?

11  A.   We marched -- I joined the march somewhere on the north

12  side of town, and the march marched towards the park that's

13  near the Highland Bridge.

14  Q.   What happened once you were at the park?

15  A.   As we came up to the park, there was a line of police

16  officers in, like, riot gear or SWAT gear blocking the

17  protesters from entering the park.

18  Q.   Were you ever able to get into the park?

19  A.   Yes.  After a few minutes of blocking us, they moved.

20  People were saying things to them like, Why can't we be in the

21  park?  There are people picnicking in the park.  Why can they

22  be in the park if we can't be in the park?  And so I don't know

23  whether it was those comments or something, but at some point

24  they moved.

25  Q.   And where did you go next?

Sara Fitouri – Direct

 1  | *A.*   I went to the Highland Bridge.

 2  | *Q.*   Okay.  So you've already heard prior testimony about the

 3  | incident at the Highland Bridge.  Where were you located?

 4  | *A.*   So when we arrived at the Highland Bridge, I went up onto

 5  | the pedestrian bridge.

 6  | *Q.*   Okay.  I'm showing you Exhibit 933.  Does this look

 7  | familiar to you?

 8  | *A.*   I'm not seeing anything.

 9  |         *THE COURT:*  It is admitted.

10  |         *MS. RUTAHINDURWA:*  I was going to lay the foundation.

11  |         *THE COURT:*  It's stipulated, isn't it?

12  |         *MS. RUTAHINDURWA:*  Move to admit.

13  |         *MR. WEINER:*  Stipulated.

14  |         *THE COURT:*  Admitted.

15  |         (Exhibit 933 admitted.)

16  | *BY MS. RUTAHINDURWA:*

17  | *Q.*   I'm going to play this video and ask you a couple

18  | questions.

19  |         (Video played.)

20  |         So you took this video?

21  | *A.*   Yes, I did.

22  | *Q.*   And what do you see the officer doing?

23  | *A.*   So at this moment, the officer in black is shooting at

24  | folks -- you can't see here on the screen, but they're on that

25  | ramp, if that's -- the ramp on the side of the highway.  That's

Sara Fitouri - Direct

1    where folks were running away, trying to get away off of the

2    highway.

3    Q.  So -- sorry.  Go ahead.

4    A.  You can't see in this video, but to my memory, off to the

5    side -- the bridge isn't very wide, and so there were folks

6    trying to push over to get off the highway.  And they were

7    having a hard time getting over; and they were being shot at in

8    the back, as they did that.

9    Q.  Did you hear police give warning before shooting at the

10   protesters?

11   A.  I did not.

12   Q.  Did you hear people on the bridge yelling at the officers?

13   A.  Yes, I did.

14   Q.  Were you one of those people?

15   A.  Yes, I was.

16   Q.  Why were you yelling?

17   A.  I was really shocked.  So I've been involved in protests

18   before that go on the highway.  To my knowledge, usually -- you

19   assume the worst thing that is going to happen is you get

20   arrested.  And how that would usually look is police would say,

21   Please leave the highway, or you'll be subject to arrest.  And

22   there would be a warning, and folks who refused to leave would

23   be arrested.  In this situation, there was no threat of arrest

24   or attempt to arrest, with few exceptions.  It was -- my memory

25   is they immediately jumped out of the car and began shooting at

Sara Fitouri – Direct

1    the folks.

2                MS. RUTAHINDURWA:  You can take the exhibit down.

3                I'm showing you Exhibit 934.  Move to admit.

4                THE COURT:  Any objection to 934?

5                MR. WEINER:  No objection.

6                (Exhibit 934 admitted.)

7                MS. RUTAHINDURWA:  If we could play the video and ask

8    a couple questions.

9                (Video played.)

10   BY MS. RUTAHINDURWA:

11   Q.  We paused at the five-second mark.  Did you see that white

12   puff of smoke?

13   A.  I did.

14   Q.  What do you recognize that to be?

15   A.  I recognized that to be an exploding pepper ball from a

16   pepper ball gun.

17   Q.  And how far away was that pepper ball from where you were

18   standing?

19   A.  Maybe 10 feet.

20   Q.  So did you inhale chemicals at this location?

21   A.  I did.  And that's how I first learned what this ammunition

22   was.  Previously, I didn't know what they were shooting.  They

23   just came out, and it just felt like live rounds were being

24   shot.  No one knew exactly what was going on.  And then we

25   started feeling the effects of the pepper balls up on the

Sara Fitouri - Direct

1   bridge.  Because this one was a little farther away, this day

2   it felt -- you know, like when you're chopping jalapenos and

3   you accidentally touch your face, it was that feeling all over

4   your face, just a stinging.  And every time you touch your face

5   again, you're re-reminded, yeah, of that feeling.

6   Q.  At this location, did you see any officers -- did you see

7   any protesters throw anything at the officers?

8   A.  No, I didn't.

9   Q.  Do you know how tall that fence is?

10  A.  I don't know exactly.  From my memory and judging by my

11  pictures, I would say 10 to 12 feet.

12      MS. RUTAHINDURWA:  We can take the exhibit down.

13  Thanks.

14  BY MS. RUTAHINDURWA:

15  Q.  Did you continue protesting on Thursday?

16  A.  I didn't after this.  So once we were on the bridge and

17  this incident happened, we got pushed to the Highlands side of

18  the bridge.  And the police shut down the bridge, so we

19  couldn't go back the way we had come.  At some point we walked

20  up to the car bridge on the south side and went around.  At

21  that point we were a little -- we were overwhelmed by the

22  response and were a little concerned how things were going to

23  escalate through the night.  We felt unprepared for what we

24  were experiencing, and so we decided to go home.

25  Q.  Prior to police shooting protesters on the bridge, how long

Sara Fitouri - Direct

1   had you intended to stay at the protest?

2   A.   I had planned to finish the march, at least, to go back to

3   the capitol with the protesters.  Planned to stay for the

4   night.

5   Q.   Can you tell us a little bit how you felt after your

6   experience the first day?

7   A.   I was -- it was really scary.  I made me -- I knew I was

8   going to go back.  This is an issue that has been really

9   important to me, something that I know that -- if I have the

10  privilege to be able to go, and I feel -- I as a person tend to

11  be safer from police than my black and brown colleagues.  Like,

12  I know that I have the privilege to protest in these spaces,

13  and I was going to keep going as long as I could.  But I

14  just -- it made me wonder, like, what are we going to

15  experience tomorrow, if this is what today looks like?  And it

16  felt like very minimal provocation, and things that had

17  happened before, and weren't met with that type of aggression.

18  And so I felt -- and it made me really scared for the next day.

19  Q.   Let's talk about the next day.  Did you do anything

20  differently to prepare?

21  A.   Yes, I did.

22  Q.   What did you do?

23  A.   So that night we did some online research to try to figure

24  out how to keep ourselves safe and our community safe.  And we

25  came up with the idea of having Milk of Magnesia in water

Sara Fitouri – Direct

1   bottles in order to wash tear gas and pepper spray out of eyes.

2   We soaked bandanas in apple cider vinegar and water and put

3   them in plastic bags to put over our face to cut the pepper.

4   And we found goggles to wear in order to protect our eyes.

5   Q.   And when you say "we," who is we?

6   A.   Myself and Jackie Parkins.

7   Q.   And did anyone else attend this day with you apart from you

8   and Jackie?

9   A.   On Saturday --

10  Q.   This is Friday.

11  A.   It was just Jackie and I.

12  Q.   Where did you park when you went downtown to the protest?

13  A.   So for this night and the following nights, I parked at the

14  Colorado Education Association, the building where I work when

15  it's not COVID.  We've been home now.  So it's across Colfax at

16  15th and Grant.

17  Q.   And is that building private property?

18  A.   Yes, it is.

19  Q.   You heard Ms. Sannier testify to her experience at Lincoln

20  and Colfax on this day.  Were you also present at that

21  location?

22  A.   Yes, I was.

23  Q.   I'm showing you Exhibit 1011A.  Do you recognize this?

24  A.   Yes, I do.

25  Q.   And were you at this location at the time it was

Sara Fitouri – Direct

1    tear-gassing?

2    A.  Yes, I was.

3           MS. RUTAHINDURWA:  At this time we'd like to move to

4    admit.

5           MR. WEINER:  No objection.

6           THE COURT:  It's admitted.

7           (Exhibit 1011A admitted.)

8    BY MS. RUTAHINDURWA:

9    Q.  Can you circle yourself in this video?

10   A.  Yeah.  It's kind of hard to see, but we're back here.

11   Q.  Okay.

12   A.  You can see Jackie and I with black bandanas over our

13   faces.

14          MS. RUTAHINDURWA:  So let's play the video.

15          (Video played.)

16   BY MS. RUTAHINDURWA:

17   Q.  Can you describe what was happening?

18   A.  This is one of the first gassings of the night.  And one of

19   the first gassings of the protest.  So if you notice, those

20   people are running away, including us.  Most people are very

21   unprepared.  People are wearing suit and tie, sandals, just

22   paper COVID masks.  And everyone is running as fast as they can

23   away from the cloud of gas.

24          I know it's been said before, but when you see a cloud

25   of gas, you can feel those effects way beyond where you can

Sara Fitouri - Direct

1  actually see the gas in the air.  And so at that point,

2  everyone in that crowd was experiencing the effects of that

3  tear gas.

4  Q.  And around what time was this at?

5  A.  It's about dusk, so I would say this one is between 7 and

6  8 o'clock.

7  Q.  I'm showing you Exhibit 1011C.  This is a screenshot of

8  Lincoln and Colfax and the second tear-gassing incident.  Do

9  you recognize this?

10 A.  Yeah.  This is a little after on the other side of the

11 street.  And you can see tear gas in the background from across

12 the street.

13        MS. RUTAHINDURWA:  We move to admit the screenshot and

14 also the video of this footage.

15        MR. WEINER:  Are they separately marked?

16        MS. RUTAHINDURWA:  This is a screenshot I took from

17 the video itself.

18        MR. WEINER:  From the prior video?  No objection, if

19 it's from the prior video.

20        MS. RUTAHINDURWA:  Yes, 1011C.

21        THE COURT:  Admitted.

22        (Exhibit 1011C admitted.)

23 BY MS. RUTAHINDURWA:

24 Q.  Can you point yourself out in this picture?

25 A.  I know I'm there, but I can't in this screen grab.  I

Sara Fitouri – Direct

1   apologize.

2   Q.  Do you recognize these two people?

3   A.  Yes, I do.

4   Q.  Which one are you?

5   A.  I would be the one on the left of the screen; Jackie is the

6   one on the right.

7        MS. RUTAHINDURWA:  Okay.  Let's take this down and

8   play the video.

9        Let's go back to the screenshot of the videos and

10  scroll down.

11  BY MS. RUTAHINDURWA:

12  Q.  On the second page, do you see yourself and Jackie?

13  A.  Yes, I do.

14  Q.  Can you circle yourself?

15       MR. WEINER:  This is a separate exhibit?

16       MS. RUTAHINDURWA:  No.  It's the same one we were

17  viewing.  It's just two pages.

18  BY MS. RUTAHINDURWA:

19  Q.  And can you tell us what was happening at this location?

20  A.  Yeah.  So this is, again, earlier in the night.  And the

21  tear gas -- the police began in the RTD parking lot across the

22  street; and at one point it spread out a little more across

23  Colfax.  You can see there is gas from many, many tear gas

24  canisters that were being thrown at protesters across the

25  street.

Sara Fitouri – Direct

1   *Q.*  I'm now going to show you Exhibit 1120.  This is a

2   body-worn camera of Officer Valentine from May 29 at 8:33 p.m.,

3   facing Lincoln and Colfax.  Do you recognize this?

4   *A.*  Yes, I do.

5   *Q.*  And were you present at that park at that time?

6   *A.*  Yes.  I was on the other side of the street.

7           *MS. RUTAHINDURWA:*  We move to admit this exhibit into

8   evidence.

9           *MR. WEINER:*  No objection.

10          *THE COURT:*  Admitted.

11  *BY MS. RUTAHINDURWA:*

12  *Q.*  Let's play a clip, and I'm going to ask you some questions.

13          (Video played.)

14          Did you see what that officer threw?

15  *A.*  Yes.  It looked like a flash-bang grenade.

16  *Q.*  Did you hear --

17          *MR. WEINER:*  Objection, Your Honor.  602.  I don't

18  think she knows what it is, unless she's had some expertise on

19  what it is.

20          *THE COURT:*  Let's have some foundation.

21  *BY MS. RUTAHINDURWA:*

22  *Q.*  During your time at the protests, were you exposed to

23  flash-bang grenades?

24  *A.*  Yes, I was.

25  *Q.*  How many times?

Sara Fitouri – Direct

1    A.  It's impossible to count.  Hundreds, if not thousands.

2    Flash-bang grenades were going off in that park at all times.

3    Q.  So in the video, what was the officer throwing?

4    A.  The officer was --

5         MR. WEINER:  I'm going to object, Your Honor.  I don't

6    think that's a proper foundation.  She doesn't know --

7         THE COURT:  Sustained.

8    BY MS. RUTAHINDURWA:

9    Q.  Did you hear any warning in this video prior to the officer

10   throwing something across the street?

11   A.  I did not.

12   Q.  And is this consistent with the experience you had at the

13   location on May 29?

14   A.  Yes, this was.

15        MS. RUTAHINDURWA:  Let's play the second clip.

16        (Video played.)

17   BY MS. RUTAHINDURWA:

18   Q.  What do you see happening here?

19   A.  It appears that an officer is learning -- was asked if they

20   wanted to try to throw it at the crowd across the street and

21   then learned how to use the grenade, and then lobbed it towards

22   the group of protesters I was in across the street.

23   Q.  Can you see this cloud of smoke here?

24   A.  I do.

25   Q.  What do you recognize that to be?

Sara Fitouri - Direct

1    A.  It's likely, in my experience --

2              MR. WEINER:  I'd object.  Lack of foundation.

3              THE COURT:  Overruled.

4              THE WITNESS:  In my experience, any time there was

5    smoke in the sky during these protests, it was tear gas.  You

6    could feel it the second you were anywhere near.  It was fiery

7    on your face.  I didn't experience smoke like that that wasn't

8    tear gas.

9    BY MS. RUTAHINDURWA:

10   Q.  And did you hear any warnings before the officers threw the

11   canister across the street?

12   A.  I did not.

13   Q.  How many -- do you know how many lanes are across Colfax?

14   A.  I do.  There is three lanes each direction.

15   Q.  And do you know if the street was closed off to the cars on

16   this date?

17   A.  No.  And, actually, that was something really weird about

18   this day.  Again, I've been at a lot of protests.  It's really

19   common for the police to shut down lanes of traffic, even for

20   crowds much smaller than were at this protest.  And this day,

21   Colfax stayed open at all times I was there, as well as Lincoln

22   and Broadway.  So when they were throwing things across the

23   street at us or were protesters had to retreat into the street

24   there was cars and traffic, a lot of which were driving through

25   clouds of tear gas.

Sara Fitouri – Direct

1      MS. RUTAHINDURWA:  You can take the video down.  Thank

2    you.

3    BY MS. RUTAHINDURWA:

4    Q.  At any point on Friday, May 29, were you given specific

5    orders to leave the park?

6    A.  No, I was not.

7    Q.  Were you told that you could not protest?

8    A.  No.

9    Q.  Did you throw anything?

10   A.  No.

11   Q.  Did you engage in any violence?

12   A.  No, I did not.

13   Q.  Did you destroy any property?

14   A.  No.

15   Q.  Did you see any people with lacrosse sticks?

16   A.  No.

17   Q.  Did you see anyone with tennis rackets?

18   A.  No.

19   Q.  Did you see any of these things on any of the nights of the

20   protest?

21   A.  No, I did not.

22   Q.  Did you take a picture of that night?

23   A.  I did.

24   Q.  I'm showing you Exhibit 930.  Did you take this picture?

25   A.  Yes, I did.

Sara Fitouri – Direct

1          MS. RUTAHINDURWA:  Your Honor, we move to admit and

2     publish.

3          MR. WEINER:  No objection.

4          THE COURT:  Admitted.

5          (Exhibit 930 admitted.)

6     BY MS. RUTAHINDURWA:

7     Q.  Can you describe this photo?

8     A.  Yeah.  So this photo is a little later in the evening.  You

9     see the capitol behind it.  It's from the west up to the steps,

10    leading up to the capitol from the west side.  And what you're

11    seeing is a whole bunch of tear gas that has been -- ammunition

12    that's been released.  The -- the police that night at some

13    point tried to clear us off of the capitol lawn.  And so they

14    came out from around the capitol and began firing tear gas and

15    pepper balls and flash-bang grenades.  And I took this picture

16    because I thought it was a -- like a chilling moment that I

17    wanted to remember.

18    Q.  When you say they came out to try and clear the capitol,

19    did they explain to you why they were doing?

20    A.  No, they did not.

21         MS. RUTAHINDURWA:  We can take this exhibit down.

22    BY MS. RUTAHINDURWA:

23    Q.  Did anything else happen after you took this photo?

24    A.  Yeah.  After we -- after we were pushed off of the capitol

25    lawn, we ended up marching down south.  And I can't remember

688

Sara Fitouri - Direct

1   exactly where, but we were in the south and southeast parts of

2   the town.  It's a little more residential in that area.  At one

3   point something that really stuck out to me was, there was

4   police coming from two different directions -- from the side

5   and behind us, and we were forced -- they started shooting and

6   using tear gas.  The only option we had is to run into cars

7   that were stopped at a stoplight and run through their cars.

8           It was particularly memorable because I just remember

9   how dangerous it felt.  I knew that light was going to turn

10  green at any moment and that those cars could start driving.  I

11  also knew that if they continued to throw tear gas at us, all

12  of the folks in those cars were going to get gassed, as well.

13  Q.  What happened after you were pushed into the street?

14  A.  We kind of weaved through the cars up a block and then were

15  able to turn out of the traffic.  And I continued marching with

16  those people.

17  Q.  Around what time did you leave?

18  A.  I believe that night I left at about 10:30.

19  Q.  What did you do when you went home?

20  A.  It kind of became a nightly ritual.  I went home, took off

21  everything that I had been wearing that day and immediately

22  threw it into the washer.  It would just be coated in tear gas.

23  Anything you touched would just be coated in this poison that

24  would burn if you touched it or touched other parts of your

25  body.  And then I immediately jumped in the shower.  I took a

Sara Fitouri - Direct

1   cold shower every night, because the heat on your skin would

2   cause a burning sensation if you took even a warm shower.  I

3   washed my hair, like, three or four times, trying to lather out

4   any of the chemical that was left, because you feel -- it would

5   instantly come down the side of your face, just burning.

6   Q.  How did you sleep that night?

7   A.  Not well.  I think that night and many nights since, I feel

8   like I would go home late, having spent the night running from

9   the police on the streets, and then I would spend the night

10  running from the police in my dreams.  It was a really haunting

11  scene.  It felt like if we didn't make the right decision at

12  the right moment, we could have gotten really hurt.  And so I

13  played out those scenarios in my dreams night after night, only

14  to wake up and go back again.

15  Q.  Do you still have nightmares from the protest?

16  A.  Not as often.  Being back in court and seeing all of this,

17  the last several nights, having the footage, I've been having

18  the dreams again.

19  Q.  But you returned the next day?

20  A.  Yes, I did.

21  Q.  What were you wearing?

22  A.  This was on Saturday.  I would have been wearing similar

23  clothing as on Friday.  So goggles, masks, bandanas, a Black

24  Lives Matter T-shirt, and leggings, and tennis shoes.

25  Q.  What did you do when you first arrived at the protest?

Sara Fitouri - Direct

1   A.   That day was the first day of the curfew.  And I had talked

2   to a lawyer friend of mine who was going to be doing jail

3   support if anyone was arrested.  So I met up with that friend.

4   They gave us -- we had arranged for them to bring Sharpies, and

5   we took tape and put her phone number with the word "lawyer" on

6   one of those Sharpies -- on many of those Sharpies.  And we

7   went around to the crowd and told folks, You should write this

8   number on your arm in case you're arrested.  This is a lawyer

9   that will provide jail support if you're arrested.

10  Q.   We heard this morning from Chief Stamper about police

11  violence on Lincoln and Colfax.  You heard Claire testify that

12  she was present at that location?

13  A.   Yes.

14  Q.   And did she identify any other plaintiffs that were present

15  at that location?

16  A.   Yes.  So I have come to learn that we were -- many of us

17  were at that location.

18  Q.   Can you give us a few examples of who you know were also at

19  that location?

20  A.   Yes.  So I was with Jackie Parkins and Joe Deras.  We

21  were -- if you -- try to describe it.  This is Lincoln.  Right?

22  And then there was the police line that we're all familiar with

23  at this point.  There is a tree maybe 50 feet back.  We were

24  somewhere around the back of that tree on the street and

25  sidewalk right there.  I know that closer to the front of the

Sara Fitouri - Direct

1    line was both Claire and Elle.  Additionally Youssef was --

2    sorry -- our friend Youssef was also there.

3    Q.  I'm showing you Exhibit 1225, which probably would have

4    been helpful as you were describing this.  Can you explain your

5    general location on that date.

6    A.  Yeah.  So we -- when we arrived, we --

7         MS. RUTAHINDURWA:  Oh, it's already been admitted into

8    evidence.  I think everyone can see it.

9         THE WITNESS:  When we arrived, we met up here.  And we

10   began talking to protesters and handing out the markers in this

11   area.  For the rest of -- for the next few hours until curfew,

12   we were primarily -- this tree right here, we were behind it

13   and in the street and then up in this grass area.

14        MS. RUTAHINDURWA:  We can take the exhibit down now.

15   Thank you.

16   BY MS. RUTAHINDURWA:

17   Q.  Can you briefly -- how long were at that location?

18   A.  I arrived I want to say -- I think I arrived around

19   5 o'clock that day, and we stayed at that location until

20   curfew.

21   Q.  So that's about three hours; correct?

22   A.  That's correct.

23   Q.  Can you briefly summarize your experience at that location.

24   A.  Yeah.  I was really surprised when I got there that there

25   was already tear gas and flash-bangs and pepper balls being

Sara Fitouri - Direct

1    used a lot.  The area was already covered in tear gas.  In

2    fact, the friend -- the lawyer friend that I was meeting up

3    with had her daughter with her, as well, and chose to leave,

4    because she felt like it was no longer safe for them to be

5    there, even though it was broad daylight at this point.

6            And after we had gotten folks -- we had handed out

7    markers, we were in the street right next to that tree, and a

8    flash-bang was thrown, as well as a canister of tear gas, both

9    in our direction near that hill.  And people were retreating at

10   the same time.  I had turned to move, and I felt the -- a

11   flash-bang canister bounce along the ground and stop at my

12   foot.  And it was one of those moments that it feels like time

13   slows down.  I knew that it could be really bad, and I just

14   turned to run, and it exploded on my foot as I turned.

15   Q.  Were you able to stop and check for your injuries?

16   A.  I wasn't.  At that moment, the tear gas canister -- the way

17   the wind was blowing, was blowing a huge -- like gas of tear

18   gas right where we were and up the hill where folks were

19   running.  We lost track of Joe, and Jackie and I started to

20   retreat up the hill.  And at that point, we -- there is a young

21   girl -- she told me later, she was a 17-year-old Cherry Creek

22   High School student who was -- she was hacking and coughing and

23   was on all fours and was about to get caught up in a mob of

24   people, but also a lot of gas.  So Jackie and I picked her up

25   and carried her up the hill.  When we got to the top of the

Sara Fitouri - Direct

1  hill we were able to sit down for a minute and check on her and

2  also my injuries.

3  Q.  Can you describe what your injuries were?

4  A.  Yeah.  My foot was numb, and there were a lot of red marks

5  up the side of my leg that felt like a burn.

6  Q.  How long did the red marks last?

7  A.  I'm honestly not sure.  The rest of the night, we didn't

8  stop moving.  It didn't feel safe to stop and check in.  I know

9  that they were still there at the end of the evening, but I

10  don't know beyond that.

11  Q.  I'm going to be showing you some clips from screenshots

12  from Officer Espinoza's and Officer Cunningham's body-worn

13  camera.

14         These have already been admitted into evidence as

15  Exhibit 666 and Exhibit 662.

16         And the first photo we're looking at here is time

17  stamped 7:06 p.m.  Were you in the crowd at this time?

18  A.  Yes, I was.  You can't see me, but you can see the tree I

19  was referencing.  So I would have been down here.  Apologize.

20  I don't know why --

21  Q.  I've been told to tell you there is a stylus that you can

22  use.

23  A.  It's the same.  But, yea.  So we would have been -- we've

24  all seen this picture.  We would have been behind the first row

25  of protesters, back a little ways.

Sara Fitouri - Direct

1        THE COURT:  Julie, why is it coming up in those kind

2   of broad lines?

3        COURTROOM DEPUTY:  I don't know, Your Honor; but I can

4   mess with it if you want to take a break and change it.  It is

5   on highlighter mode instead of line mode.  I don't know how it

6   got changed overnight.

7   BY MS. RUTAHINDURWA:

8   Q.  So you're at this location.  Were you impacted with police

9   weapons at this location?

10  A.  Yes.  That was -- I believe it's a little after this still

11  frame, but a part of the video that we've seen, when I was hit

12  by the tear-gas grenade and the flash-bang grenade.

13  Q.  And do you see this cloud of smoke here?

14  A.  I do.

15  Q.  Were you impacted by this tear gas at this time?

16  A.  Yes, I was.

17       MS. RUTAHINDURWA:  Can we scroll down to the second

18  page, please.

19  BY MS. RUTAHINDURWA:

20  Q.  Were you at this location at this time?  This is 7:08 p.m.?

21  A.  Yes.  I'm not in this screen, I would be in the same

22  location to the left.

23  Q.  This is Exhibit 626.  The first one is from Exhibit 666.

24       Do you recognize the person standing in the corner

25  with their hands up who the officer is pointing their weapon

Sara Fitouri - Direct

1    at?

2    A.  Yeah.  This right here is my friend Youssef.

3    Q.  How do you know Youssef?

4    A.  Youssef was a part of my community.  Actually, lived at my

5    house as a roommate for a while, prior to me moving.

6    Q.  Was Youssef a U.S. Marine?

7    A.  Yes, they were.

8         MS. RUTAHINDURWA:  Scrolling down to the third page.

9    BY MS. RUTAHINDURWA:

10   Q.  Were you present -- and this is Exhibit 666, again, from

11   Officer Espinoza's body-worn camera.  The time is 7:08:46

12   seconds.

13        You were present at this location?

14   A.  Yes, I was.

15   Q.  You see the big cloud of tear gas?

16   A.  Yes, I do.

17   Q.  Were you impacted by this tear gas?

18   A.  Yes, I was.  This would be around the time that we

19   retreated up the hill to try to get out of that cloud of smoke.

20        MS. RUTAHINDURWA:  You can take that exhibit down.

21   Thank you.

22   BY MS. RUTAHINDURWA:

23   Q.  Were you aware there was a curfew in effect starting at

24   8:00 p.m.?

25   A.  Yes, I was.

696

Sara Fitouri - Direct

1   Q.  Did you comply with the curfew order?

2   A.  No, I didn't.

3   Q.  Why not?

4   A.  I -- so when the curfew went into effect first, as someone

5   who went to law school, I questioned the legality of the curfew

6   and whether it would be upheld.  I knew people would challenge

7   it, because it really felt like it was really only being put in

8   place to try to stop us from protesting and to try to limit our

9   First Amendment rights.  I also think civil obedience is

10  important.  I know it was a civil order.  And that's why I was

11  writing a phone number on my arm.  I was prepared to be

12  arrested, and that was a risk I was willing to take because

13  this cause is really important to me.

14  Q.  Were you prepared to be met with force?

15  A.  I'm sorry?

16  Q.  Were you prepared to be met with force?

17  A.  At this point, I had come to expect it.  It's not what I

18  would anticipate a violation of a curfew order would be met

19  with, but it seemed like the police were escalating.

20  Q.  And did you ever observe the police selectively enforce the

21  curfew against protesters?

22          MR. WEINER:  Objection.  It's irrelevant.  401, 403.

23          THE COURT:  Rephrase.

24          MS. RUTAHINDURWA:  I'll move on and ask another

25  question.

Sara Fitouri – Direct

1   *BY MS. RUTAHINDURWA:*

2   Q.   So what happened at 8:00 p.m.?

3   A.   At 8:00 p.m., the curfew went into effect.  And almost

4   immediately, the police came out from either inside or around

5   the capitol building and began attacking us with -- in my

6   memory, almost any time one was used, all three were used.  If

7   you were -- if they were throwing tear gas canisters, they were

8   also throwing flash-bangs, and they were also using pepper ball

9   guns at the same time.  So they began attacking us with all

10  three.

11  Q.   Where did you go next?

12  A.   Our group had a rule so that we could stay together that we

13  always went to the south side of the capitol.  And so I moved

14  to the south side of the capitol and tried to stay with my

15  group.

16  Q.   After you met up with your group on the south side of the

17  capitol, did you go anywhere?

18  A.   Yes.  We began marching with a smaller group of the

19  protesters.  I know we went down to the Governor's mansion.

20  Q.   How was that march?

21  A.   It was quiet.  We didn't see any police officers, and we

22  weren't attacked.  Folks were chanting, taking video.  We went,

23  we did a few -- we -- I don't remember whether we circled the

24  Governor's mansion or spent some time in front of the

25  Governor's mansion, but we headed back.

Sara Fitouri - Direct

1  *Q.* And when you headed back to the capitol, did anything

2  happen?

3  *A.* Yeah. As we were heading back to the capitol, we were

4  already in a pretty small group. I would say 100, 200, max.

5  But as we were marching, half of our line had gone past a group

6  of police, and they began firing at the middle of the march.

7  It felt like they were trying to continually break us into

8  smaller groups.

9  *Q.* And what happened after that?

10  *A.* We -- I was able to stay with a few of our group, including

11  Jackie, Joe, and Youssef. And we turned into an alley to try

12  to run away from the pepper balls that were being shot at us.

13  *Q.* Were you yourself shot with pepper balls?

14  *A.* Yes, I was. It's hard to say exactly when. This whole

15  night just felt like we were being hunted in alleys. It felt

16  like they were trying to corner us in alleys in as small groups

17  as possible. We were horrified what would happen. We hadn't

18  seen a police officer try to arrest anyone. All we saw was

19  that if they got close enough to you, they shot you, and they

20  attacked you. So we were going through the alleys, trying to

21  find a way out, that there wasn't a police force ready to meet

22  us. And at one point, as we were turning, I was shot multiple

23  times with pepper balls.

24  *Q.* What neighborhood was this in?

25  *A.* This would have been in the -- it's the Capitol Hill

Sara Fitouri – Direct

1   neighborhood of Denver, area south of Colfax to the southeast

2   of the capitol.

3   Q.  Did you sustain any injuries from being shot with pepper

4   balls?

5   A.  Yes, I did.  I was shot in the back on my backpack, as well

6   as on my thigh.

7   Q.  I'm showing you Exhibit 931.  Do you recognize this photo?

8   A.  Yes, I do.

9   Q.  What is it a photo of?

10  A.  This is a photo that I took of the bruise on my leg.

11          MS. RUTAHINDURWA:  We move to admit.

12          MR. WEINER:  No objection.

13          THE COURT:  Admitted.

14          (Exhibit 931 admitted.)

15  BY MS. RUTAHINDURWA:

16  Q.  When did you take this photo?

17  A.  I took this photo a month after I was hit.

18  Q.  And so that would have been June 30?

19  A.  Yeah.  A friend had mentioned that she still had a welt on

20  her leg from getting hit; and so I took this picture to show

21  her that mine was still there, as well.

22  Q.  So approximately how long did your bruise remain?  One

23  month?

24  A.  Well, this would be one month.  I would say there was still

25  a bruise there for another two or three weeks.

Sara Fitouri – Direct

1        *MS. RUTAHINDURWA:*  We can take that exhibit down now.

2    Thank you.

3    *BY MS. RUTAHINDURWA:*

4    Q.  What happened after you were shot in the alleyways?

5    A.  We were -- we tried to go back to see -- the Colorado

6    Education Association where our cars were.  We -- the way we

7    tried to get back was by moving through alleys.  We were really

8    afraid that if we were caught with just a handful of us on the

9    street, we would be really injured; so we moved through the

10   alleys, like along the wall.

11   Q.  Did anyone help you get back to your parking lot?

12   A.  Yeah.  At one point there was some guys on the street.  I

13   don't think they were protesters; they were kind of wearing

14   casual clothes and hanging out on Colfax.  But we started to go

15   one direction; and they said, Don't go that way.  There is

16   police there.

17   Q.  How do you know these people weren't protesters?

18   A.  They -- well, first of all, they seemed very casual.  But

19   they also weren't afraid to be on the streets.  They seemed to

20   be suggesting that if they were to run into those same police,

21   it wouldn't be an issue.

22   Q.  So you're running through the alleyways.  Were you trying

23   to avoid being arrested for curfew violations?

24   A.  No.

25   Q.  What were you trying to do?

Sara Fitouri – Direct

1    *A.*  I was trying to make sure we weren't hurt.  I didn't know

2    what would happen to us if we were caught in an alley where

3    there was no one to witness.  I felt like the smaller the

4    group, the more escalated the violence was; and so I wanted us

5    to be safe.

6    *Q.*  Did you eventually make it back to the parking lot?

7    *A.*  We did.

8    *Q.*  And what happened at the parking lot?

9    *A.*  We started talking at our cars.  It's –– CEA has, like, an

10   overhang that has lights underneath; and so it's a pretty

11   well-lit area.  We were right next to our cars, and we were

12   talking to each other before leaving.  And as that happened, we

13   started hearing folks coming down the street, chanting.  So a

14   group had come back together who were protesting.  And within

15   seconds of hearing them, we started hearing those pepper balls

16   come again.  And a patrol car had come up behind them –– I

17   don't know what kind of car it was –– a car had come up behind

18   them with officers, who started shooting at them.

19   *Q.*  And what did you do?

20   *A.*  We immediately ducked behind our cars and hid.

21   *Q.*  When you say "we," who is we?

22   *A.*  This one was myself, Jackie Parkins, Joe Deras, and

23   Youssef.

24   *Q.*  I'm showing you Exhibit 676.  This is a video of body-worn

25   camera on May 30 at around 9:37 p.m.  Do you recognize the

Sara Fitouri – Direct

1   building in that photo?

2   *A.*   Yes.

3   *Q.*   What's that building?

4   *A.*   This is the Colorado Education Association.

5   *Q.*   And is this the -- the building you were just talking about

6   when you went back to your cars?

7   *A.*   Yes, it was.

8          *MS. RUTAHINDURWA:*   We move to admit.

9          *MR. WEINER:*   No objection.

10         *THE COURT:*   Admitted.

11         (Exhibit 676 admitted.)

12         *MS. RUTAHINDURWA:*   Let's play the video.

13         (Video played.)

14         There is no sound in the beginning because the

15  officer's body-worn camera was not on yet.  I believe that has

16  already been stipulated to.

17         (Video played.)

18  *BY MS. RUTAHINDURWA:*

19  *Q.*   Do you see your car in this screenshot?

20  *A.*   So a second ago, you saw one car already leave.  That was

21  Joe's car.  The next car right here, that's Jackie's car; and

22  then my car is that black car behind it.

23  *Q.*   And so is this the incident you were describing when Denver

24  officers pulled up and shooting at protesters?

25  *A.*   Yes, it is.

Sara Fitouri – Direct

1        *MS. RUTAHINDURWA:*  We can take this video down.

2    *BY MS. RUTAHINDURWA:*

3    Q.  So you leave the downtown area.  Where do you go next?

4    A.  We went to my house -- again, "we" being me, Youssef, Joe

5    and Jackie.  We wanted to process what happened.  I also knew

6    Jackie's husband was really concerned about what he had seen on

7    the news and what he had been hearing, so he came and spent

8    some time with us.  We were processing what had happened.

9    Also, Youssef had been really injured that day; and so we

10   wanted to check in on Youssef's injuries.

11   Q.  Did you see their injuries?

12   A.  I did.  So they had been shot with pepper balls when they

13   were standing on the corner with their hands in the air.  And

14   they had told me that they had been injured; but then when we

15   got home, they took their shirt off, and you could just see a

16   dozen, fifteen welts all over their chest, their face, arms.

17         *MS. RUTAHINDURWA:*  I'm showing you Exhibit 994, a

18   photo of Youssef's injuries from being pepper balled.  We move

19   to admit.

20         *MR. WEINER:*  Objection, Your Honor.  401.

21         *MS. RUTAHINDURWA:*  This goes to -- it's definitely

22   relevant to Plaintiff Fitouri's emotional state throughout the

23   protests, having just witnessed her friend be pepper-balled a

24   dozen times; and she continues protesting throughout the days.

25         *THE COURT:*  Did you say 994, 974?

Sara Fitouri – Direct

1          *MS. RUTAHINDURWA:*  994.

2          *THE COURT:*  994.  All right.  Admitted.  Overruled.

3          (Exhibit 994 admitted.)

4    *BY MS. RUTAHINDURWA:*

5    *Q.*  Does this photo accurately depict your friend Youssef's

6    injuries?

7    *A.*  Yeah.  This is a photo that Youssef took that night at my

8    house.  You can see the welts all over their chest here,

9    including on their face.

10   *Q.*  And how did seeing his injuries impact you?

11   *A.*  It was really hard to see.  It was hard to know that –– you

12   know, I was hit once, that I could feel –– I was hit multiple

13   times, but once hit my leg –– and that they had been hit twelve

14   times and then continued to have to run from the cops and

15   through the alleyways with these injuries.  Yeah, and just

16   the –– I can tell they were in a lot of pain, the way they were

17   describing and acting, that they were really hurt.

18   *Q.*  Did you go back out and protest the next day?

19   *A.*  Yes, I did.

20   *Q.*  What time did you arrive?

21          And we can take this photo down.

22   *A.*  I arrived on Sunday a bit before curfew.  I think around

23   7:00.

24   *Q.*  Did you attend the protests with anyone?

25   *A.*  Yes.  I met Jackie Parkins there.  We also had other

1    friends, as well.

2    Q.   And what were you wearing?

3    A.   I was wearing -- so the same as the day before, a COVID

4    mask and then a bandana over my face, as well as a Black Lives

5    Matter T-shirt, black leggings, tennis shoes.  This day we had

6    gotten helmets.  After seeing Youssef's injuries and seeing

7    many people getting hurt around us, we started to be concerned

8    about that we would hurt our heads, so we got helmets, as well.

9    Q.   Were you aware there was a curfew in effect on May 31?

10   A.   Yes.

11   Q.   Did you hear the curfew announcement?

12   A.   Yes, I did.

13   Q.   Did you stop protesting?

14   A.   No, I did not.

15   Q.   What did the announcement say?

16   A.   I honestly don't recall exactly.  It announced that there

17   was a curfew and the fact that anyone violating it could get in

18   trouble.

19   Q.   Did the announcement say -- warn you that force would be

20   used if you did not go home?

21   A.   No.

22   Q.   Did you ever hear any announcement from any officer

23   throughout your time at the protest that you could get shot

24   with pepper balls or tear gas if you did not go home?

25   A.   No.  This curfew order over the loud speaker was the only

Sara Fitouri - Direct

1   announcement I ever heard, and it was just warning us that a

2   curfew was going into effect.  I never heard from an officer

3   that they were going to use force or that they were asking us

4   to do anything.  We weren't given any orders.

5   *Q.*  Where did you go when you -- after curfew?

6   *A.*  So Sunday after curfew, we -- it was peaceful at the

7   capitol.  There were no police around right at curfew, and so

8   the group began to march down Colfax.

9   *Q.*  And can you describe the atmosphere of the crowd?

10  *A.*  Yeah.  It was similar to other days.  Something I noticed

11  different was that, typically, as soon as the police began

12  attacking us, a lot of people went home.  There were folks who

13  didn't stay out for that part of the night.  Because at this

14  point no force had been used, there were a lot more daytime

15  protesters who were part of the group.  A lot of families,

16  people wearing sandals -- it's the middle of summer -- who were

17  still a part of the group.  It was a large group going down

18  Colfax.

19  *Q.*  And how long were you marching down Colfax for?

20  *A.*  We marched -- it probably took us 15 minutes, maybe.  We

21  were marching to about Washington -- well, we were going to

22  continue to march, but we marched to Washington and Colfax.

23  *Q.*  And what made you stop continuing marching?

24  *A.*  So at the point we got to -- so we're marching down Colfax.

25  Washington and Colfax is where the police precinct at.  And at

Sara Fitouri – Direct

1   the time, half the march had passed the intersection.  We were

2   in the middle-ish of the march.  And right as we were

3   approaching the intersection, the police began tear-gassing and

4   pepper-balling and flash-banging the protesters in the

5   intersection.

6              *MS. RUTAHINDURWA:*  I'm showing you Exhibit 544.

7          This is stipulated into evidence.

8              *THE COURT:*  Okay.  Admitted.

9          (Exhibit 544 admitted.)

10  *BY MS. RUTAHINDURWA:*

11  *Q.*  I'm going to play a short clip of the -- what you just

12  described.

13             (Video played.)

14          So it's paused at 8:28 p.m.  Do you see yourself in

15  this screenshot?

16  *A.*  Yes, I do.

17  *Q.*  Can you circle yourself.

18  *A.*  We -- you can see our helmets.  We're the group down here.

19  *Q.*  When you say "we," are you referring to Jackie and Joe?

20  *A.*  Yeah.  At this time we had Jackie, Joe, myself, our friend

21  Rochelle and Emma were also with us.

22             *MS. RUTAHINDURWA:*  We can take this down.

23  *BY MS. RUTAHINDURWA:*

24  *Q.*  And I've taken screenshots of Exhibit 544, the video we

25  just watched.  Do you see yourself on this screen?  Do you

Sara Fitouri – Direct

1    recognize this to be the group that you were part of?

2    A.  Yes, I can see the -- the way I know that this is us is

3    there were three of us wearing hard hats and then one wearing a

4    regular bicycle helmet.  That's our group right there.

5           MS. RUTAHINDURWA:  Let's turn to the next page.

6    BY MS. RUTAHINDURWA:

7    Q.  Still around the same location?

8    A.  Yes.

9           MS. RUTAHINDURWA:  Next page.

10   BY MS. RUTAHINDURWA:

11   Q.  It's like where is Waldo?

12   A.  (Indicating.)

13   Q.  Thank you.

14           Next page.

15           Next page.

16           And what is happening here?

17   A.  It looks like things -- things are starting to get hectic.

18   I would imagine -- this is us here -- this was as the tear gas

19   and the flash-bangs began.

20           MS. RUTAHINDURWA:  Let's go to the next page.

21   BY MS. RUTAHINDURWA:

22   Q.  Do you recognize that bright light?

23   A.  Yeah.  That would be the -- in my experience, that is the

24   flash of a flash-bang.

25           MS. RUTAHINDURWA:  And the next page.

709
Sara Fitouri - Direct

1   *BY MS. RUTAHINDURWA:*

2   *Q.*  And you're right here?

3   *A.*  Yes, I am.

4   *Q.*  So you've been moving back?

5   *A.*  Yes.  I remember at this point we weren't sure what to do.

6   The march was broken in half, and the intersection was really

7   hard to get through.  It was very thick gas.  And so we weren't

8   sure whether we should turn around and march the other way or

9   try to connect back up with the rest of the march going

10  forward, so we paused for a bit.

11       *MS. RUTAHINDURWA:*  Let's go to the last page, page 9.

12  *BY MS. RUTAHINDURWA:*

13  *Q.*  Do you see this cloud of gas right here?

14  *A.*  Yes, I do.

15  *Q.*  Is this the tear gas you were describing that happened at

16  this intersection?

17  *A.*  Yes, that's some of it.  This tear gas in this section

18  continued for a while.  And we were all experiencing this

19  effect, including the ones who were on the left of the screen

20  here.

21       *MS. RUTAHINDURWA:*  We can take this exhibit down.

22  *BY MS. RUTAHINDURWA:*

23  *Q.*  So describe to us what happened after the march was

24  stopped, due to the tear gas?

25  *A.*  So at some point I got separated from Joe and Emma, and

710

Sara Fitouri - Direct

1   Jackie and Rochelle and I were -- you couldn't see it there,

2   but behind there is a parking lot for Good Times and a liquor

3   store.  And so we were looking for Joe around that area, by

4   trying to go wide to see where they ended up, if they ended up

5   pushed to the other side.  And at some point Joe reached out to

6   me, texting that he had been really hurt and that he was trying

7   to find a medic.

8   Q.  Did you meet up with Joe?

9   A.  I did.  I met up with him while he was talking to a medic.

10  They were recommending that we took him to the hospital because

11  they weren't sure if his was finger was broken or just really

12  messed up.  And so at that point we actually got pushed out of

13  the area, because they began pepper-balling and throwing tear

14  gas in the directions of the medics at that point.  And so we

15  tried to make our way back to CEA in order to get Joe to the

16  hospital.

17  Q.  Did you go with Joe to the hospital?

18  A.  I didn't.  Rochelle, who was with us, agreed to take Joe to

19  the hospital.

20  Q.  And what did you do?

21  A.  Jackie and I and Emma waited -- we went back up to CEA to

22  make sure they got on the way to the hospital, and then we

23  rejoined the march on Colfax, heading east.

24  Q.  What happened after you joined the march?

25  A.  So pretty quickly after we joined the march, we were in

Sara Fitouri – Direct

1   front of the basilica.  And this is what has been talked about

2   as the basilica kettling incident, but we didn't know that at

3   the time.  Right?  We started marching down the street, and we

4   were caught up kind of in a pretty big crowd.  And as we went

5   into the block, we noticed there were police in front of us.

6   And when we turned back, there was also a cloud of smoke and

7   police officers behind us, as well.

8        *MS. RUTAHINDURWA:*  I'm showing you Exhibit 546, which

9   has already been previously admitted.  And this depicts the

10  basilica kettling incident that we've discussed, starting at

11  9:40 p.m.  Let's play for a little bit.

12           (Video played.)

13           Actually, can you pause it.

14  *BY MS. RUTAHINDURWA:*

15  *Q.*  Do you see yourself in this still frame?

16  *A.*  I do.  So we are -- there is only three in our group now.

17  We're these three.

18  *Q.*  Great.

19           (Video played.)

20           What's the atmosphere of the crowd like as you're

21  marching?

22  *A.*  It's late enough in the night that folks have experienced a

23  lot of aggression, and so folks are -- there is anxiety in the

24  air, but not necessarily different than the other nights.

25  However, quickly, folks started to say, We're trapped, we're

Sara Fitouri - Direct

1    trapped, and folks were starting to realize that there were

2    police on both sides of us.

3    Q.   How did that make you feel?

4    A.   I was pretty panicked.  People started to run.  I knew a

5    lot of people trapped in a small space could be really

6    dangerous.  And then as this video is going on, we're seeing a

7    lot of tear gas.  So in almost every other situation when there

8    was a lot of gas, you could try to get out of it.  You could

9    try to walk away and get to a thinner area of gas where you

10   weren't as impacted.  Here, we were just held in this gas.  And

11   so you start to feel those -- all of those same symptoms coming

12   back -- eyes watering, hard to see, skin burning.

13          And we -- our group looked at the fence on the

14   basilica side, and we sized it up.  I could tell -- I looked at

15   Jackie, and I could tell by the look in her eyes that there was

16   no way we were going over that fence.  There were three of us.

17   It wasn't just one fence.  Right?  There is a fence, and then

18   there is grass, and then there is another fence.  So we would

19   have to all three of us get over that fence twice.  So we

20   turned back towards the alley.  I didn't want to go in that

21   alley.  I work right here, but I didn't know that alley, I

22   didn't -- all I could see is that it was really narrow, and I

23   didn't know when it opened up.

24          So we pushed behind the folks to join them in the

25   alley.  And at this point, people were fully panicking.  One

Sara Fitouri - Direct

1    woman was screaming, "We're going to die.  They're going to

2    kill us.  They're going to kill us."  Someone fell on the

3    ground, and we -- people picked her up.  Half the people

4    couldn't see, so folks were just grabbing people that they

5    could and helping them get through the alley.  And lucky -- we

6    were really lucky that right at that -- at that part of the

7    alley, it opens up, and there is a parking lot.  And folks just

8    immediately, the second they could, scattered through that

9    parking lot and got away.

10   Q.  So you mentioned that you first tried -- looked over to the

11   fence.  So can you describe generally where you were?

12   A.  It's really hard to see in this picture.  The basilica is

13   here, and then to the east, I guess, of the basilica is where

14   the grassy area is that is protected by these two giant black

15   fences with, like -- sorry -- it's been described before.  But

16   they're like spikes on the top, kind of the iron fence.  And we

17   were, as we were marching pretty, close to that fence.  And we

18   joined most -- basically, the back of the crowd going into the

19   line -- into the alley.

20   Q.  So we're watching the incident you just described where

21   people are going to start running to the right, towards the

22   alleyway after trying to get over the fence.

23            (Video played.)

24            Can you pause right here.

25            Do you see the helmets right here?

Sara Fitouri - Direct

1   *A.*  Yes, I do.

2   *Q.*  Do you recognize that to be an accurate depiction of where

3   you were heading at this time?

4   *A.*  Yes.  I believe that to be us.  I know it's not clear, but

5   that's about where we were.

6         *MS. RUTAHINDURWA:*  Let's continue.

7         (Video played.)

8   *BY MS. RUTAHINDURWA:*

9   *Q.*  So it looks like the last of the protesters who were trying

10  to get through was at 9:43 p.m.  Approximately how long in

11  total was that incident?

12  *A.*  It felt really long.  I don't know.  I'm guessing -- I'm

13  guessing the whole thing was only a minute or two, maybe three.

14  *Q.*  And you say it felt really long.  What do you mean by that?

15  *A.*  We were just immediately at a place of panic.  And it felt

16  like we were trying to make really important, rapid decisions

17  while also experiencing tear gas.  And so I -- it just -- it

18  felt like it went on forever.

19  *Q.*  What happened after you got through the alleyway?

20  *A.*  Once we were through the alleyway, we retreated -- like, we

21  were -- we ran through one of the parking lots that was right

22  there.

23  *Q.*  And did you continue protesting?

24  *A.*  We didn't.  At that point we were -- I was done.  I had

25  seen so -- like, Joe had gotten hurt, Youssef had gotten hurt.

Sara Fitouri – Direct

1   It just felt like we were so lucky we hadn't gotten more hurt

2   yet, and waiting -- we were just living on borrowed time, and

3   we weren't willing to risk it anymore.

4   Q.  Did you go out and protest any of the days following the

5   31st?

6   A.  I did.  I went out the next day and continued going out

7   for -- for a total of about two weeks.

8   Q.  Did you see any officers use force at this time?

9   A.  After that point, I didn't.

10  Q.  And why not?  Why do you think that is?

11        MR. WEINER:  Objection.  Calls for speculation.

12        THE COURT:  Sustained.

13  BY MS. RUTAHINDURWA:

14  Q.  What was different about the next several days of the

15  protests that allowed you to peacefully protest?

16  A.  The police stayed away.

17  Q.  Was there any protesters who were engaged in violence on

18  those days after the 31st that you witnessed?

19  A.  No, I didn't.

20  Q.  And so what was the atmosphere of the crowd?

21  A.  I wouldn't say it was, like, celebratory, because we were

22  still there for an important purpose.  Right?  If there --

23  there was somberness because of the murder of George Floyd,

24  Breonna Taylor, and other folks who had been recently killed by

25  the police; but there was also a lot of hope.  People felt safe

Sara Fitouri - Cross

1  for the first time.  There was -- some people were playing

2  music, some people had, like, sage and incense.  Folks were

3  sitting in circles and talking to people.  It was -- it was

4  maybe a sigh of relief.

5  *Q.*  What was your main takeaway from your experiences at these

6  protests?

7  *A.*  I guess I just -- you know, Denver is home.  It's always

8  been home.  And I've seen scenes like this on TV in other

9  countries, in other places, and I just -- I didn't think it

10 would ever happen here, and I didn't think it would happen to

11 me.  It was really -- it was scary to see our home that way.

12            *MS. RUTAHINDURWA:*  Can I have a minute, Your Honor?

13            *THE COURT:*  Pardon me?

14            *MS. RUTAHINDURWA:*  One minute.

15            No further questions at this time.  Thank you.

16            *THE COURT:*  Cross-examination.

17            *MR. WEINER:*  Thank you, Your Honor.

18                      **CROSS-EXAMINATION**

19 *BY MR. WEINER:*

20 *Q.*  Ms. Fitouri, you testified on direct a number of times that

21 you had attended various protests in the past; is that correct?

22 *A.*  Yes, it is.

23 *Q.*  Approximately how many protests have you attended?

24 *A.*  Dozens, if not more than that.

25 *Q.*  Okay.  And, in fact, you had even organized protests; have

Sara Fitouri – Cross

1    you not?

2    A.   Yes, I have.

3    Q.   And you had also mentioned on direct examination that you

4    are an attorney; correct?

5    A.   Yes, I am.

6    Q.   And you work for as, I understand it, the teachers union

7    here in the state of Colorado; correct?

8    A.   Yes, that's correct.

9    Q.   As part of your organization for various protests, can you

10   tell us a little bit about what those protests were?  What were

11   they regarding?  I know you said about the Women's March.  What

12   else?

13   A.   Sorry.  Can you repeat the question?

14   Q.   What other protests have you attended?

15   A.   Have I attended?  I -- a lot of different protests.

16   Specifically through work, a lot of union strikes, so picket

17   lines with workers and actions around that.

18   Q.   And all of those have been here in Colorado?

19   A.   I don't think all of them have been in Colorado.  No.

20   Q.   What other locations have you protested?

21   A.   I was in Chicago for something when the Chicago teachers'

22   strike was going on; so I know I picketed in Chicago, as well.

23   Q.   Okay.  So my understanding is, you have, in fact, assisted

24   in organizing protests; is that correct?

25   A.   Yes.

Sara Fitouri - Cross

1  Q.  Okay.  And, in fact, you have engaged in getting permits to

2  be able to protest; correct?

3  A.  I don't recall ever being the person who applied for the

4  permits.

5  Q.  Did you -- you assisted in the process, however; correct?

6  A.  I don't recall.

7  Q.  You're aware, most of these protests when you're dealing

8  with a union, you have to get a permit to protest; correct?

9  A.  Yes.

10  Q.  Okay.  And you're aware that part of the reason for that

11  permit process is because streets may have to be closed down.

12  You have to organize with the police department to make sure

13  there is appropriate security by police so that you can

14  protest; isn't that correct?

15  A.  That's correct.

16  Q.  Because, in fact, sometimes there may be other

17  organizations or other voices that disagree with what you're

18  protesting; correct?

19  A.  That is correct.

20  Q.  And so you need the assistance of the police department to

21  protect you and your First Amendment rights; isn't that

22  correct?

23  A.  Sometimes, yes.

24  Q.  Okay.  And my understanding is that -- and we're just going

25  to refer to the George Floyd protests.  And I believe you

Sara Fitouri - Cross

1   started on May 28, and you -- you protested for a couple of

2   weeks; correct?

3   A.  Correct.

4   Q.  And I believe the last incident that you had just testified

5   to occurred on June 1; correct?

6   A.  That's correct.

7   Q.  Okay.  And then after that, you continued to protest;

8   correct?

9   A.  Correct.

10  Q.  All right.  Now -- but you had testified on direct that

11  this was different; correct?

12  A.  Yes.

13  Q.  You've never had an issue with Denver Police Department or

14  your protests here in Colorado, in part because the Denver

15  Police Department was protecting you; correct?

16  A.  I wouldn't say "protecting."  They just weren't attacking

17  us.

18  Q.  Well, certainly, you wouldn't feel safe unless you had some

19  security; correct?

20  A.  No.

21  Q.  Okay.  And on those other occasions when you had permits,

22  it specifically allowed for certain streets to be closed down;

23  correct?

24  A.  I'm not sure what the permits said.

25  Q.  Okay.  Now, let's talk a little bit about May 28.  That is

Sara Fitouri - Cross

1   the first day; correct?

2   *A.*   Yes.

3   *Q.*   All right.  You get up, and at some point you make the

4   decision that you're going to go down and join this protest;

5   correct?

6   *A.*   Yes.

7   *Q.*   Did you get text messages to say that this was happening?

8   *A.*   I don't recall.  I think I found out about it from social

9   media.

10  *Q.*   Okay.  And what specific social media?

11  *A.*   Likely Instagram or Facebook.

12  *Q.*   Okay.  And it was, Let's go down and protest?  Tell us a

13  little bit about how that communication, that notice was.

14  *A.*   I don't recall.

15  *Q.*   You don't recall.  You just, then, went down to Denver, and

16  you dressed in shorts, I believe you mentioned, and a T-shirt?

17  *A.*   This is the one day I'm not super sure, but I think I was

18  wearing a black T-shirt and black leggings.

19  *Q.*   And you also went down there with a sign; correct?

20  *A.*   No.  That day I didn't have a sign.

21  *Q.*   You didn't have any kind of sign that day?

22  *A.*   Not that recall.

23  *Q.*   All right.  And my understanding is, when you first got

24  there and you joined the group that you now have talked about

25  through social media you found out about, that you had

Sara Fitouri - Cross

1   mentioned there was a lot of rage; correct?

2   A.   Yes.

3   Q.   So the rage preexisted any activity on the part of the

4   Denver Police Department; correct?

5   A.   Yes, sir.   There was outrage.

6   Q.   That rage was festering when you got there; correct?

7   A.   People were angry about the murder of George Floyd.

8   Q.   They were angry about the murder of George Floyd.   And

9   you're aware that no Denver Police Department officer was

10  involved in the murder of George Floyd; correct?

11  A.   Yes.

12  Q.   Okay.   But you were angry with -- and the group was angry

13  with police in general; correct?

14  A.   Yes.

15  Q.   You hate cops because of what they've done, and that's why

16  you're there protesting; correct?

17  A.   I don't think hate cops is the same as being angry at the

18  police.   What I noticed was a lot of folks were recognizing a

19  systemic problem, something bigger than any individual police

20  officer, something wrong with the system of policing in our

21  country specifically.

22  Q.   Okay.   But the rage at this point was directed at police

23  officers; correct?

24  A.   I think the rage was directed at police --

25  Q.   Police --

722

Sara Fitouri - Cross

1    A.   -- in general and the murder of George Floyd.

2    Q.   Police in general.  So you -- the group was looping all

3    police together in one big pile; correct?

4    A.   I --

5    Q.   Yes or no?

6    A.   I think maybe there is a nuance lost there.  I think the

7    group weren't -- I can't speak for the group.  I wasn't angry

8    at any individual police officer.  Maybe Derek Chauvin, I

9    guess.  What I was angry about was that we had a system of

10   policing that was repeatedly killing members of our community.

11   Q.   Okay.  And also members of the police community have been

12   killed; wouldn't you agree with that?

13   A.   Yes, I believe police have been killed.

14   Q.   Do you know how many cops have been killed in the last

15   year?

16   A.   I don't.

17   Q.   You didn't bother to check that?

18              MS. RUTAHINDURWA:  Objection, Your Honor.  Relevance.

19              MR. WEINER:  Goes to her bias and motive, Your Honor.

20              THE COURT:  Overruled.

21   BY MR. WEINER:

22   Q.   How many police officers have been killed in the line of

23   duty in the last year?

24   A.   I'm not aware.

25   Q.   You would agree with me, police officers have a right to

Sara Fitouri – Cross

1    self-defense?  You've gone to law school; correct?

2    A.  Yes, I've gone to law school.  And, yes, I believe police

3    officers have a right to self-defense.

4    Q.  Okay.  In this particular instance, this protest -- and

5    we're going to lump it together from May 28 until June 1 -- you

6    would agree with me that this wasn't a peaceful protest like

7    the other ones you participated in?

8    A.  No, I would not agree with that.

9    Q.  You think it was a peaceful protest?

10   A.  Yes, I do.

11   Q.  Okay.  Ms. Fitouri, do you believe that throwing urine on

12   another human being is peaceful protesting; yes or no?

13   A.  I think in that hypothetical, that would not be peaceful.

14   Q.  Do you think throwing feces on another human being is

15   peaceful protesting; yes or no?

16   A.  No.

17   Q.  Do you think running over another human being with a car is

18   peaceful protesting?

19   A.  Of course not.

20   Q.  Do you believe throwing rocks at police officers' heads is

21   peaceful protesting?

22   A.  No.

23   Q.  Do you believe throwing rocks with lacrosse sticks at

24   police officers is peaceful protesting?

25   A.  Again, as a hypothetical, no, I don't think that is

724

Sara Fitouri - Cross

1  peaceful.

2  *Q.*  Do you believe setting fires to dumpsters around your city

3  is peaceful protesting?

4  *A.*  So I don't --

5  *Q.*  Yes or no?

6  *A.*  To me, peaceful is complicated.  I don't think that that's

7  violence.  I think the contents of a dumpster is something

8  thrown away.  Now, is it a tactic I've done?  No.  It's not

9  something I want to do or I want to see other people do.  It's

10 not the same as hurting people.

11 *Q.*  Do you believe breaking store windows and looting is

12 peaceful protesting?

13 *A.*  I don't believe it's peaceful, no.

14 *Q.*  And, in fact, you saw some of that when you were walking

15 the streets of Denver during these protests; correct?

16 *A.*  No.

17 *Q.*  You certainly saw buildings -- I mean, we just watched

18 videos -- you just identified yourself in the video with

19 storefronts boarded up.  So you're aware that damage was being

20 done to your city; correct?

21 *A.*  I can speak to that specifically.  So our building was

22 boarded up as a precautionary measure.  A lot of those

23 buildings were boarded up not because windows were broken, but

24 in order to stop windows from being broken.

25 *Q.*  So your business, your employer, was concerned that

Sara Fitouri - Cross

1    protesters were going to do damage to your building, and they

2    took the proactive measure of boarding it up.  Is that correct?

3    *A.*  Yes.

4    *Q.*  Okay.  Do you believe it's peaceful protesting to break

5    into the Supreme Court of the state of Colorado?

6    *A.*  No.

7    *Q.*  Do you believe it's peaceful protesting to break into the

8    state capitol?

9    *A.*  No.

10   *Q.*  Do you believe it's peaceful protesting to write graffiti

11   all over the state capital?

12   *A.*  I think it's destructive.  I wouldn't say it's not

13   peaceful.

14   *Q.*  Well, certainly, you would agree that police officers --

15   just like they protected you in the other protests -- have a

16   right to protect -- in fact, a duty to protect the state

17   capitol; wouldn't you agree?

18   *A.*  I believe that human life is more important than any piece

19   of property.  And I believe that that capitol is sacred.  It's

20   important.  It's why we protest there.  I don't believe there

21   is a duty to protect at the expense of people.

22   *Q.*  So you think in your opinion that law enforcement officers

23   should have allowed protesters to break into the capitol and

24   just do whatever they wanted to?

25   *A.*  I don't know.

Sara Fitouri - Cross

1    Q.  You don't know?

2    A.  No, they shouldn't have been able to break into the capitol

3    and do whatever they want.

4    Q.  So officers had a duty, in fact, to protect the state

5    capitol, because, again, it's the state capitol.  It's not the

6    city of Denver.  It's the entire state; correct?

7    A.  Yes.  I guess I'm confused.  That didn't happen.

8    Q.  Okay.

9    A.  I didn't see that happening.

10   Q.  Right.  And it didn't happen because law enforcement

11   reacted -- law enforcement was on the stairs; law enforcement

12   prevented people from going in; that's why it didn't happen,

13   isn't that correct?

14   A.  I don't know.

15   Q.  You don't know.  Because you're not a law enforcement

16   officer, are you?

17   A.  No, I'm not.

18   Q.  And, in fact, you had testified quite a bit that you saw

19   something in front of you, but you had no idea what law

20   enforcement officers were seeing or reacting to; isn't that

21   correct?

22   A.  I was there, so I saw what I saw.  I was there quite a bit,

23   so I saw a lot.

24   Q.  Okay.

25   A.  But I did not see everything that happened at the protests.

Sara Fitouri - Cross

1   Q.  Right.  Because things were happening behind you; correct?

2   A.  Sure.

3   Q.  Okay.  Things were happening -- I mean, some of those

4   photographs we just looked at and videos -- I mean, there is

5   mobs of people in front of you; correct.

6   A.  Yes.

7   Q.  So you have no idea what officers saw that they were

8   reacting to; isn't that correct?

9   A.  I have some idea, because I saw quite a bit of what

10  happened there; but, no, I did not see everything.

11  Q.  Well, the last video we just watched, certainly you saw the

12  firecrackers going off; correct?

13  A.  I'm not sure.

14  Q.  Okay.  You saw flash-bangs, but you didn't see the

15  fireworks; is that your testimony?

16  A.  Can we clarify, the last video we saw was the basilica?

17  Q.  Yes, ma'am.

18  A.  I'm not sure if there were firecrackers in that video.

19  Q.  Okay.  And, again, as a plaintiff in this case, you've sat

20  in this courtroom; correct?

21  A.  Correct.

22  Q.  Have you been here all four days?

23  A.  I've been here for most of the time.  I had to step out a

24  few times.

25  Q.  You've seen most -- heard most of the testimony; correct?

728

Sara Fitouri - Cross

1    A.   Correct.

2    Q.   Okay.  And you have seen -- the way you testified, it

3    sounds like you've actually watched some of these videos;

4    correct?

5    A.   Yes.

6    Q.   Some of those videos are body-worn cameras; correct?

7    A.   Yes.

8    Q.   So they weren't videos that you took.  They're videos that

9    you were provided of officers; correct?

10   A.   Yes.

11   Q.   All right.  And so you're not coming in here in a vacuum.

12   You've seen information and heard information from other

13   people, not directly from your own eyes and ears; correct?

14   A.   Correct.

15   Q.   And, certainly, during the protest -- you know, how many

16   days it was, 28th to the 1st -- I'm not great with math -- you

17   have seen and you saw, in fact, some behavior on the part of

18   various protesters; correct?  You saw rocks being thrown at

19   police officers; correct?

20   A.   I never saw rocks being thrown.

21   Q.   Did you see canisters being kicked at officers?

22   A.   I saw canisters being kicked away from protesters.

23   Q.   Did you see graffiti --

24   A.   Yes.

25   Q.   -- being scribbled?

Sara Fitouri - Cross

1    A.   Yes.

2    Q.   Did you see any looting?

3    A.   No.

4    Q.   Did you see any rocks being thrown?

5    A.   No.

6    Q.   Okay.  Back to my other question.  Did you consider it

7    peaceful protesting when you actually have individuals firing

8    off guns at the capitol?  You're aware that happened; correct?

9    A.   Yes.

10   Q.   Okay.  And you know that there -- that wasn't police

11   officers shooting.  Those were protesters shooting; correct?

12   A.   I don't think those were protesters shooting.

13   Q.   At any point did you say to any of the protesters, Hey,

14   stop.  We are peaceful, and we don't do that.  We don't attack

15   police officers.  Because at that point, you had to know police

16   officers had been attacked; right?  Were you aware of that?

17   A.   No.

18   Q.   You're not aware of that?

19   A.   No.

20   Q.   Well, let's go back to the Highland Bridge incident.  The

21   police officers came after 50 some people were in that road

22   correct, on I-25?

23   A.   Yes.

24   Q.   Blocking people who were not protesting; correct?

25   A.   Yes.

Sara Fitouri - Cross

1   Q.  Wouldn't you agree that those people that were stopped on

2   the highway had a right to do what they wanted to do?

3   A.  I believe that blocking traffic is a form of civil

4   disobedience.

5   Q.  Oh, so their rights don't matter to you; right?  I mean,

6   their voices don't matter to you, because your right to civil

7   disobedience trumps theirs; is that your testimony?

8   A.  A big part of protest is that it has to be disruptive.

9   It's how change happens.  If folks are protesting in a place

10  where they're never seen, never heard, change isn't made that

11  way.

12  Q.  So it's okay to violate their rights, as long as you have

13  justification in your mind; is that your testimony?

14  A.  I think on this day, having just watched a man be murdered

15  after his knee was knelt on -- his head was knelt on for nine

16  minutes, there was a lot of righteous anger in the crowd, and

17  that folks were getting their message heard in a way that was

18  impactful for them.

19  Q.  Okay.  And so violence in any form without justification is

20  not acceptable; wouldn't you agree?

21  A.  I'm sorry.  I'm confused --

22  Q.  I mean, violence against any person is unacceptable unless

23  it's somehow justified; correct?

24  A.  Sure.

25  Q.  And at some point you had to be aware that there were

Sara Fitouri – Cross

1   police officers who were being hit with rocks, run over by

2   cars, punched with brass knuckles?  You had to be aware of

3   that.  And at any point did you say, No, we're not about that?

4   A.  I wasn't aware of that.  The only thing I saw were people

5   lobbing water bottles in the direction of the police.

6   Q.  Did you tell them to stop?

7   A.  No, I didn't.

8   Q.  Because –– did you tell them, if you're not speaking out,

9   by default, you're actually supporting this violence?  Did you

10  say that to them or anything to that effect?

11  A.  No.

12  Q.  You didn't say anything like that.  You didn't try to stop

13  those people?

14  A.  No.

15  Q.  Did you see individuals in the crowd who had their faces

16  obscured and that were running around with weapons?

17  A.  No.  To clarify, everyone's faces were obscured.  It was

18  COVID, so everyone was wearing a COVID mask or bandana.  But no

19  to the weapons.

20  Q.  And that's a good point.  It was COVID.  And, in fact,

21  COVID had –– the lockdown had began in March, correct?  And now

22  we're talking the end of May.  Would you agree with that?

23  A.  Yes.

24  Q.  So that's an extended period of lockdown.  And now all of a

25  sudden there is the rage; there is the George Floyd murder; the

Sara Fitouri - Cross

1    rage.  And now everybody is out; correct?

2    *A.*   Yes.

3    *Q.*   And there is a lot of pent-up rage and anger; correct?

4    *A.*   I'm confused -- honestly, the rage that I described is what

5    I stand by.  The rage I felt was in regard to the murder of

6    George Floyd.

7    *Q.*   And -- going back to the first day, I'm going to talk a

8    little bit more about the Highland Bridge situation.  You

9    indicated that when you got there, you walked to a park.  Could

10   you remember what park that was?

11   *A.*   Yeah.  I -- at the time I thought it was Confluence Park.

12   I looked at the map now and realized that Confluence Park

13   connects to another park.  I'm not certain the name of the

14   park, but it was the park right at the base of the Highland

15   Bridge.

16   *Q.*   Okay.  And at that point, officers were blocking that park?

17   *A.*   Correct.

18   *Q.*   But given the fact that you don't have any law enforcement

19   experience or tactical training, you don't know why they were

20   blocking that park; correct?

21   *A.*   Correct.

22   *Q.*   And they didn't do anything to you; correct?

23   *A.*   Correct.

24   *Q.*   They didn't pepper spray you, they didn't pepper ball you,

25   they didn't flash-bang you, anything; is that correct?

Sara Fitouri - Cross

1   *A.*   That's correct.

2   *Q.*   And, in fact, they let you go on your way until people

3   entered a state highway; correct?

4   *A.*   Kind of.  I mean, they did stop us at the park for several

5   minutes before letting us in.

6   *Q.*   Before letting you in.

7   *A.*   Yes.

8   *Q.*   And you got in?

9   *A.*   Yes.

10   *Q.*   And people were holding signs?

11   *A.*   Yes.

12   *Q.*   People clearly were expressing themselves over their anger

13   with regards to the George Floyd murder; correct?

14   *A.*   Yes.  They were chanting, holding signs.  Normal protest

15   behavior.

16   *Q.*   And police officers didn't do anything at that point;

17   correct?

18   *A.*   Yes.

19   *Q.*   It wasn't until, again, that protesters entered the state

20   highway over a fence; correct?

21   *A.*   It wasn't until then that --

22   *Q.*   That police officers reacted; correct?

23   *A.*   Yes.  That was the first time I saw a police officer using

24   the pepper ball guns.

25   *Q.*   Okay.  And then you guys -- those people have been told to

Sara Fitouri – Cross

1   get off the highway; correct?

2   A.   No.   Not to my knowledge.

3   Q.   Because you were up –- up on the top; correct?

4   A.   So I was right above where the folks were in the highway.

5   I would have been about the same distance they were from the

6   officer at the time that he began shooting.

7   Q.   And you're aware that rocks were being hurled, missiles

8   thrown at officers as they were trying to clear that road;

9   aren't you?

10  A.   No.   The only thing I saw was water bottles, one or two,

11  maybe.

12  Q.   One or two water bottles, but you didn't see the rocks

13  thrown?

14  A.   No.

15  Q.   Okay.   Well, when you saw those water bottles, certainly

16  you knew that it was illegal to throw things onto the highway,

17  as you knew it was illegal for people to be on the highway.   So

18  did you tell anybody at that time, Stop.   Again, if you remain

19  quiet, you are by default supporting it?   Did you say anything

20  like that?

21  A.   No.   We were –- at that point, we were pretty panicked.

22  There was an officer shooting below, and we were starting to

23  smell the tear gas.

24  Q.   Officers were using less-lethal to get people off of the

25  highway; correct?

Sara Fitouri – Cross

1    A.   Yes.

2    Q.   Okay.  You had testified again in -- another area you

3    testified to on direct examination, you were talking about the

4    basilica -- the basilica incident; correct?

5    A.   Yes.

6    Q.   Do you recall your testimony about that?

7    A.   Yes.

8    Q.   And as I recall, you had mentioned that there were some,

9    quote-unquote, medics who were tending to somebody; correct?

10   A.   Yes.

11   Q.   Do you recall that testimony?

12   A.   Yeah.  So, to clarify, the medics I was talking about was

13   actually before the basilica incident.  It was at the place

14   where Joe was hurt, at Colfax and Washington.

15   Q.   Okay.  Thank you for clarifying that.  And to be clear,

16   were those medics EMTs from a local emergency department, or

17   were they embedded EMTs for protesters?

18   A.   I don't know.

19   Q.   Okay.  Because you're aware that there were actually

20   individuals that called themselves medics who were embedded

21   with the protesters, who used tape to make themselves look like

22   medics, because they knew trouble was going to happen; correct?

23   Are you aware of that?

24   A.   So my only experience with medics -- there were people who

25   were healthcare providers who were off the clock who came out

1   to volunteer, folks who had sort of medical experience.  And,

2   yes, they used tape to signify they were a medic.  And they

3   kept us safe.  Any time someone was hurt, you would just yell,

4   "Medic."  And people would repeat that around you.  And

5   somebody with a bag of band-aids and Milk of Magnesia and other

6   things to help hurt people would come running.

7   Q.  So when you testified on direct, you made it sound like

8   police officers were lobbing gas at medics who were on duty

9   with an ambulance sitting there, but that's not correct; isn't

10  it?

11  A.  That's not what I intended it to sound like.

12  Q.  Okay.  I was --

13  A.  I described a medic who had come to help my friend Joe.

14  Q.  I'm sorry.  I cut you off.

15          Apologize, Madam Court Reporter.

16          Touch a little bit just on the curfew.  My

17  understanding was, is that you were in fact aware that there

18  was a curfew in place, but you just decided to ignore it;

19  correct?

20  A.  Yes, I knew there was a curfew in place.  And, yes, I chose

21  to continue protesting after the curfew.

22  Q.  So you continued to ignore it?

23  A.  Yes.

24  Q.  Okay.  And you certainly would agree with me that when the

25  sun went down, during your experience in the protests, the

Sara Fitouri – Cross

1    violence went up?

2    A.   Yes, I agree.  As it got dark and there were less

3    protesters there, the police were much more violent.

4    Q.   The protesters were more violent, or the police were more

5    violent?  Now, you don't know which came first, do you?

6    A.   I don't believe the protesters were different during the

7    day versus at night.

8    Q.   And that's based upon your impression that the protesters

9    weren't doing anything wrong; correct?

10   A.   It's from my experience protesting both during the day and

11   nighttime.

12   Q.   And, again, you didn't see -- you didn't see any of these

13   rocks being hurled at police officers?

14   A.   I did not.

15   Q.   Didn't see any of that.  Bottles -- frozen bottles, did you

16   see any of that?

17   A.   No.  The only bottles I saw thrown, they were the plastic

18   water bottles left on the side for protesters to pick up as

19   they were marching.

20   Q.   You didn't see the urine thrown on police officers?

21   A.   No.  Definitely not.

22   Q.   You didn't see the feces?

23   A.   No.

24   Q.   You didn't see the tennis rackets used to throw things --

25              THE COURT:  I think you've already gone over this,

Sara Fitouri – Cross

1    Mr. Weiner.

2    *BY MR. WEINER:*

3    *Q.*   Now, let's talk about a couple of specific incidents that

4    you had testified to.  The one when you were outside the

5    capitol; correct?  Do you recall that incident?  You were right

6    outside the capitol, and I believe that was when you had the

7    flash-bang?  You referred to as a flash-bang.

8    *A.*   Yes.

9    *Q.*   Okay.  You don't know what officers threw that, do you?

10   *A.*   Which specific officers?

11   *Q.*   You don't know if it was the Colorado State Patrol

12   protecting the capitol, or whether it was Aurora, or Jeffco, or

13   anything else?

14   *A.*   No.  I didn't see who threw it.

15   *Q.*   And when you were up by the basilica, and you were

16   testifying, you're aware that those were Aurora police officers

17   up there, having sat through the testimony; correct?

18   *A.*   Having sat -- yeah.  I didn't know at the time, but now I

19   do.

20   *Q.*   Fair enough.  At the time you did not know?

21   *A.*   Correct.

22        *MR. WEINER:*   I'm trying to speed up, Your Honor.  I

23   know we're getting late in the day.

24   *BY MR. WEINER:*

25   *Q.*   You would agree that police officers and the Denver Police

739

Sara Fitouri - Cross

1   Department had a right -- in fact, a duty -- to protect

2   District 6 police headquarters; wouldn't you agree?

3   A.  The -- yes.

4   Q.  I mean, certainly, you wouldn't -- it would not make sense

5   or be very smart to allow that district headquarters to be

6   taken over by protesters -- by agitators in the group; correct?

7   A.  Yes.

8   Q.  And you're aware that there are agitators in the group;

9   correct?

10  A.  I don't know.  What do you mean by agitators?

11  Q.  People that are just out to cause trouble?

12  A.  That wasn't my experience.

13  Q.  The incident when you hurt your foot with the flash-bang,

14  do you recall that, your testimony?

15  A.  Yes.

16  Q.  And you indicated that you had some burns on your foot and

17  marks on your legs; but your tennis shoes weren't even damaged,

18  were they?

19  A.  I don't think so.

20  Q.  Okay.  You had given a deposition in this case.  Do you

21  recall testifying that, in fact, there was no damage to your

22  tennis shoes; correct?

23  A.  I don't think there was any damage to my clothes.

24  Q.  Okay.  And that -- in fact, that night, you had testified

25  you couldn't sleep, you went home, you took a shower.  But then

740

Sara Fitouri - Cross

1    after that, you had a hot tub party, didn't you, with

2    Ms. Parkins and others?

3    A.   To clarify, I had got in the hot tub earlier, but the heat

4    on it wasn't on yet, so it was whatever the lukewarm

5    temperature of the hot tub.  And, yes we did go in our hot tub.

6    Q.   And you had mentioned earlier -- actually, at the very

7    beginning of the testimony, you had talked about, you went to a

8    small college in Ithaca -- Upstate New York, I believe you

9    testified to -- but it was Ithaca; correct?

10   A.   Yes.

11   Q.   And as part of that, you studied abroad in Palestine;

12   correct?

13   A.   Yes, I did.

14   Q.   You had talked about, in fact, to -- I believe it's called

15   the *Ithacan*.  Is that the name of the paper?

16   A.   Yes.  There is an *Ithacan* up there.

17   Q.   Okay.  You talked about your experience in Palestine, bombs

18   going off, and you referred to it as no big deal.  You just

19   went on with your day; correct?

20   A.   No.  I don't think that's ever been my description of what

21   I experienced there.

22   Q.   So you were misquoted in the paper?

23   A.   If you could help me give some context to the exact quote.

24   Otherwise, I can speak to you about how the bombs I experienced

25   affected me there, but --

Sara Fitouri – Cross

1    Q.   Okay.  So you had been subjected to bombing?

2    A.   No.  It wasn't -- so what I experienced there was -- I

3    taught at a school of girls.  And we were in a classroom one of

4    my first weeks there.  And it wasn't uncommon to hear fighter

5    jets or some sort of planes come over.  And so we were in the

6    classroom one day, and those planes started going over.  And

7    all of a sudden there was an explosion sound, and I was

8    noticeably shooken.  And my girls said to me, "Eadi."  And what

9    "eadi" means is normal.  And I have shared that reflection with

10   people, that it was haunting to me that the sound of a bomb

11   dropping was normal to my students.  That that was something

12   that was normal to them.

13   Q.   In that same article, do you recall at the very end of that

14   article giving this quote -- quote -- and this was referring to

15   the West Bank and the occupation of the West Bank.  Quote, As

16   much as people want to declare themselves neutral, if not

17   speaking out against the occupation, then you're by default

18   supporting it.  Correct?  Do you recall making that statement?

19   A.   I don't recall that.  It sounds like something I would say.

20   Q.   Yeah.  So not speaking out about the violence in this

21   protest against police officers, you're supporting it; wouldn't

22   you agree with your own quote?

23   A.   The reason I went back day after day was because I believed

24   that it was important that I spoke out against violence, the

25   violence against black and brown folks by our police

Sara Fitouri – Redirect

1    departments.

2    Q.  But violence against police officers is okay?

3    A.  I've expressed what I saw.  The only thing I saw against

4    police officers was water bottles being lobbed in the air.

5              MR. WEINER:  No further questions, Your Honor.

6              THE COURT:  Redirect examination.

7                        **REDIRECT EXAMINATION**

8    BY MS. RUTAHINDURWA:

9    Q.  Just a few questions.

10             When officers started shooting the protesters on the

11   Highland Bridge, most of the protesters were already off the

12   highway; right?

13             MR. WEINER:  Leading.  Objection.

14   BY MS. RUTAHINDURWA:

15   Q.  When officers started shooting protesters on the Highland

16   Bridge, where were most of the protesters at?

17   A.  So the police pulled up from one of the upper exits.  And

18   at the time people started seeing police cars coming quickly,

19   most of the time cleared -- almost all of the people cleared

20   the -- sorry.  I'm bad with directions -- the southbound lane.

21   There were still people running off of the northbound lane.

22   Q.  Did the officers who shot Youssef, were they protecting the

23   state capitol?

24             MR. WEINER:  Objection.  Calls for speculation.

25             THE COURT:  Overruled.

Sara Fitouri – Redirect

1   *BY MS. RUTAHINDURWA:*

2   Q.  You can answer.

3   A.  I didn't see that they were protecting the state capitol.

4   Their backs were not to the state capitol.  Youssef was nowhere

5   near the state capitol.  Youssef had their hands in the air and

6   was standing there doing nothing.

7   Q.  Were the officers who sprayed multiple people at the

8   intersection of Lincoln and Colfax protecting the state

9   capitol?

10          MR. WEINER:  Objection.  Calls for speculation.

11          THE COURT:  Overruled.

12          THE WITNESS:  There was no indication that they were

13   attacking us to protect the capitol.

14   *BY MS. RUTAHINDURWA:*

15   Q.  Was the officer who shot the guy with the crutches

16   protecting the state capitol?

17          MR. WEINER:  Objection.  Calls for speculation.

18          THE COURT:  Okay.  I think -- I think we get your

19   point.

20          MS. RUTAHINDURWA:  One last question.

21          Sorry.

22          THE COURT:  That's all right.  Why don't you have one

23   of your colleagues ask the question.

24

25

1                       **REDIRECT EXAMINATION**

2     *BY MS. WANG:*

3     *Q.*  Sara, was the police behavior at this protest different

4     because of your message?

5               *MR. WEINER:*  Objection.  Calls for speculation.

6     *BY MS. WANG:*

7     *Q.*  Compared to the other protests you've been to, which

8     Mr. Weiner asked you about?

9               *THE COURT:*  Overruled.

10              *THE WITNESS:*  Yes.  It felt like the only reason the

11    police were attacking us was because they felt like it was

12    directed at them.

13              *MS. WANG:*  Thank you.

14              *THE COURT:*  All right.  Now, ladies and gentlemen of

15    the jury, do you have any questions for the witness?

16              I don't think so.

17              All right.  Thank you for your testimony.  You're

18    excused and probably free to go, because we're going to stop

19    today, right here.

20              Thank you, ladies and gentlemen, for your service.

21    9 o'clock tomorrow.

22              (Jury out at 4:24 p.m.)

23              *THE COURT:*  The jury has been excused for the evening.

24              Plaintiffs' side, do you have anything you need to

25    tell me or put on the record?

1          MR. MACDONALD:  No, Your Honor.

2          THE COURT:  Defendants' side?

3          MR. RINGEL:  One item, just for purposes of the

4    record.  I understand the Court's ruling related to the picture

5    involving Mr. Amghar -- or Youssef Amghar.  But the Court may

6    not have understood, I just wanted to put on the record that

7    that individual was a plaintiff in this case who settled

8    claims.  I don't know if that matters for the Court, but we

9    believe that there is a 403 issue with respect to bringing out

10   evidence for settled plaintiffs.  If the Court is going to

11   allow such things to come into evidence, it makes it very hard

12   for the City and County of Denver to consider any settlements.

13         THE COURT:  All right.  Well, I'm not sure whether it

14   made a difference on that particular picture.  But if any of

15   you folks have a special reason for objecting that I might not

16   know, I invite you to come up to the bench and tell me, because

17   I don't know who these people are.

18         MR. RINGEL:  I understand that, Your Honor.  I'm not

19   sure that Mr. Weiner knew who that particular individual was

20   either.  And I am just raising it so the Court is aware.

21         How would the Court feel if in a situation like that,

22   even if I'm not questioning the witness, I ask to have a

23   sidebar?

24         THE COURT:  I'm okay with that.

25         MR. RINGEL:  Okay.  I didn't --

1          *THE COURT:*  You've got big teams on both sides, and

2     not every lawyer necessarily knows everything that every other

3     lawyer does, because you assign witnesses to different lawyers.

4          *MR. RINGEL:*  Exactly, Your Honor.  And, you know, I

5     understand that's a little unorthodox; but I wanted to raise

6     the issue so that we could get some direction from Your Honor.

7          *THE COURT:*  Well, Mr. Ringel, you sometimes are a

8     little bit unorthodox, in a way that I like very much, by the

9     way.

10         *MR. RINGEL:*  Are you referring to something specific,

11    Your Honor?

12         *THE COURT:*  No comment.

13         Anything else that you want to let me know or want me

14    to do or anything?

15         (No response.)

16         All right.  How about you, counsel over there?  Are

17    you all right?

18         *MR. MACDONALD:*  Real quick question.  I know we had

19    mentioned the designations of Grothe yesterday.  We obviously

20    didn't get to them today.  We have O'Donnell.  So given our

21    pacing, I suspect we wouldn't get to a video deposition of

22    Grothe, but that would be the only possibility.

23         *THE COURT:*  Just in case I have some time tonight, you

24    want me to take a look at that?

25         *MR. MACDONALD:*  That's not what I was suggesting, Your

747

```
 1   Honor.  But if the -- if the news of the baseball season

 2   inspires you to do one more thing, that would be it.

 3              THE COURT:  Ah, that could do it.

 4              Have a nice evening, everybody.

 5              (Recess at 4:28 p.m.)

 6                           I N D E X

 7   Item                                                  Page

 8      NORMAN STAMPER
             Direct Examination Continued By Mr. Aro        524
 9           Cross-examination By Mr. Ringel                569
             Redirect Examination By Mr. Aro               658
10           Examination By Mr. Ringel                     669
        SARA FITOURI
11           Direct Examination By Ms. Rutahindurwa         670
             Cross-examination By Mr. Weiner               717
12           Redirect Examination By Ms. Rutahindurwa       743
             Redirect Examination By Ms. Wang              744
13

14                           EXHIBITS

15   Exhibit       Offered  Received  Refused  Reserved  Withdrawn

16
     349                    544
17   544                    708
     662                    543
18   669                    549
     676                    703
19   930                    688
     931                    700
20   933                    675
     934                    677
21   994                    705
     1011A                  681
22   1011C                  682

23

24

25
```

1                        REPORTER'S CERTIFICATE

2            I certify that the foregoing is a correct transcript
   from the record of proceedings in the above-entitled matter.
3
             Dated at Denver, Colorado, this 2nd day of April,
4    2022.

5

6                                _____

7                                Therese Lindblom,CSR,RMR,CRR

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25