```
 1                IN THE UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF COLORADO
 2
      Civil Action No. 20-cv-01878-RBJ
 3
      ELISABETH EPPS,
 4    AMANDA BLASINGAME,
      ASHLEE WEDGEWORTH,
 5    MAYA ROTHLEIN,
      ZACH PACKARD,
 6    HOLLIS LYMAN,
      CIDNEY FISK,
 7    STANFORD SMITH,
      SARA FITOURI,
 8    JACQUELYN PARKINS,
      KELSEY TAYLOR,
 9    JOE DERAS, and
      CLAIRE SANNIER,
10
          Plaintiffs,
11
      vs.
12
      CITY AND COUNTY OF DENVER, and
13    JONATHAN CHRISTIAN,
14        Defendants.
```

---

**REPORTER'S TRANSCRIPT**
TRIAL TO JURY - DAY FIVE

---

Proceedings before the HONORABLE R. BROOKE JACKSON, Senior Judge, United States District Court for the District of Colorado, continuing at 9:00 a.m., on the 11th day of March, 2022, in Courtroom A902, United States Courthouse, Denver, Colorado.

THERESE LINDBLOM, Official Reporter
901 19th Street, Denver, Colorado 80294
Proceedings Reported by Mechanical Stenography
Transcription Produced via Computer

1              **A P P E A R A N C E S**

2              TIMOTHY R. MACDONALD, ROBERT REEVES ANDERSON, and
3    EDWARD PACKARD ARO, Attorneys at Law, Arnold & Porter Kaye
     Scholer LLP, 1144 Fifteenth Street, Suite 3100, Denver,
4    Colorado, 80202, appearing for the Plaintiffs.

5              DIANA K. STERK and MINDY AMANDA GORIN, Attorneys at
     Law, Arnold & Porter Kaye Scholer LLP, 250 West 55th Street,
6    New York, New York, 10019, appearing for the Plaintiffs.

7              ANDREAS E. MOFFETT, Attorney at Law, Arnold & Porter
     Kaye Scholer, 4100 33rd Street South, Arlington, Virginia,
8    22206, appearing for the Plaintiffs.

9              ELIZABETH C. WANG, Attorney at Law, Loevy & Loevy,
     2060 Broadway Street, Suite 460, Boulder, Colorado, appearing
10   for the Plaintiffs.

11             MAKEBA RUTAHINDURWA, Attorney at Law, Loevy & Loevy,
     311 North Aberdeen Street, Chicago, Illinois, 60607, appearing
12   for the Plaintiffs.

13             ANDREW DAVID RINGEL, KATHERINE HOFFMAN, and ROBERT
     ALAN WEINER, Attorneys at Law, Hall & Evans, 1001 Seventeenth
14   Street, Suite 300, Denver, Colorado, 80202, appearing for the
     Defendants.

15             HOLLIE RENEE BIRKHOLZ and LINDSAY MICHELLE JORDAN,
16   Attorneys at Law, Denver City and County Attorney's Office, 201
     West Colfax Avenue, Denver, Colorado, 80202, appearing for the
17   Defendants.

18                          *  *  *  *  *

19                      **P R O C E E D I N G S**

20             (In open court at 9:00 a.m.)

21             *THE COURT:*  Good morning.

22             (Jury in at 9:03 a.m.)

23             *THE COURT:*  Julie hasn't turned on my microphone yet.

24   Good morning, ladies and gentlemen.  How are you?  Everybody

25   good?

Maya Rothlein – Direct

```
 1              Excellent.  Let's go.

 2              MR. MOFFETT:  May I proceed, Your Honor?

 3              THE COURT:  Yes.

 4              MR. MOFFETT:  My name is Andreas Moffett.  I represent

 5    the Epps plaintiffs.

 6              Plaintiffs call Maya Rothlein.

 7          (MAYA ROTHLEIN, PLAINTIFFS' WITNESS, SWORN)

 8                     DIRECT EXAMINATION

 9    BY MR. MOFFETT:

10    Q.  Good morning, Maya.  How are you doing today?

11    A.  I'm doing pretty good.  Again, this seat is very

12    comfortable, so I'm doing great.  Thank you.

13    Q.  Is this your first time in front of a jury?

14    A.  Yes, it is.

15    Q.  We've got that in common.  And something that I think we

16    both need to learn is to stay a little bit farther back from

17    the mikes.

18    A.  I think so.

19    Q.  Maya, you're a plaintiff in this case?

20    A.  Yes, I am.

21    Q.  Do I understand correctly that you're engaged to Amanda

22    Blasingame, another plaintiff in this case?

23    A.  Happily engaged.  Yes.

24    Q.  How long have you two been together?

25    A.  Going on three years St. Patrick's Day, so very excited.
```

Maya Rothlein - Direct

1   Q.  If you don't mind me asking, have you picked a date for

2   your wedding yet?

3   A.  We're working towards that; but the pandemic definitely put

4   a couple of, you know, holes in that.  But definitely actively

5   looking.

6   Q.  No pressure to do that now.  What do you do for a living?

7   A.  I work at Alto Pharmacy.

8   Q.  And what do you do at Alto Pharmacy?

9   A.  I am in the fertility department, so I help people with

10  different fertility medications, I manage a lot of their

11  insurances, I do a lot of the middleman work, so I'm able to

12  help people get, like, the lowest cost price for fertility

13  medication.

14  Q.  Maya, what's your favorite part about your job?

15  A.  I get to help people have babies.  That's pretty amazing.

16  And every time I do something at my job, no matter if it's

17  minimal, a big task, I'm able to actually just make a

18  difference; and that really helps me keep going at my job.

19  Q.  Maya, when and why did you move to Denver?

20  A.  I moved to Denver in 2014.  I moved to Denver to take care

21  of my grandfather.  He had starting getting Parkinson's and had

22  gone through a traumatic brain injury back when I was in

23  California.  So we went ahead and moved to be closer to family,

24  so that while I was at work or at school during that time, my

25  grandmother and family could help support him, as well.

Maya Rothlein – Direct

1   Q.  So from approximately when to when did you live in Denver

2   supporting your grandfather?

3   A.  I lived in Denver from 2014 to 2020.

4   Q.  So in 2020, you were in Denver.  You were at the George

5   Floyd protests?

6   A.  Yes, I certainly was.

7   Q.  While you lived in Denver, where did you live?

8   A.  I lived in the Capitol Hill area on the 1400 Pennsylvania

9   block.

10          MR. MOFFETT:  It occurs to me that we've got an

11  exhibit for this.

12          Dan, could you please bring up Exhibit 1241.

13          And this is already in evidence, Your Honor.

14  BY MR. MOFFETT:

15  Q.  Maya, could you indicate where on the map you lived during

16  the George Floyd protests?

17  A.  Yes, I can.  We lived right over here in this building.

18  Q.  Where were you when you first decided to participate in the

19  George Floyd protests?

20  A.  I was at my house.  I was working from home at the time.

21  Q.  And you and Amanda both participated; correct?

22  A.  Yes, we did.

23  Q.  Why did you personally choose to participate in the George

24  Floyd protests?

25  A.  Sorry.  What I saw happening on the video that I saw on

Maya Rothlein - Direct

1   social media of George Floyd having a knee pressed to his neck

2   for nine minutes, begging for somebody to help him -- he

3   yelled, "I cannot breathe."  "I can't breathe."  Officers

4   watched him die, citizens watched him die, and nobody did

5   anything.  That's why I went.  Because what was done was

6   egregious, and it could have been done to anyone, and I just

7   couldn't stay silent for any longer.

8   Q.  So in not staying silent, let's talk about your experience

9   at the protests.  You attended the first day of the protest,

10  Thursday, May 28, with Amanda; correct?

11  A.  Yes, I did.

12  Q.  When did you and Amanda first arrive to the protest that

13  day?

14  A.  Amanda had been there earlier in the day, and then I ended

15  up showing up a little after 6:00 p.m., when I was off of work.

16  Q.  Where were you when you first arrived at the protest?

17  A.  We were over here in front of the -- I believe it's a bus

18  station or depot, transit place.  We met up right over here.

19  Q.  And where did you go next?

20  A.  Well, we followed the crowd really just around the

21  neighborhood.  So around this area and up 14th, and then we

22  went around the capitol a few times, and then eventually we

23  started to head towards the police station on Washington.

24  Q.  And that would be Colfax and Washington; right?

25  A.  Yes.  Colfax and Washington.

Maya Rothlein - Direct

1    *Q.*  Maya, when you arrived at the police station at Colfax and

2    Washington with the crowd, what did you see?

3    *A.*  I saw unity.  I had never participated in a protest, and

4    this was just something that was incredible to see so many

5    people.  I don't think I've ever seen that many people in my

6    life in one place; and I'm from California, so that's

7    definitely hard to say, occasionally.  But it was just a lot of

8    people in the intersection over here.  We had people -- we're

9    in the middle of the intersection at this point, and I had seen

10   a couple of people throw some rocks at the building over here

11   and breaking a couple of windows.

12           We were standing in the intersection for, I mean, you

13   know, a little while, for sure, just chanting, protesting.  A

14   lot of, you know, "Black Lives Matter," or, you know, "Justice

15   for George Floyd," occasionally some, "Hands up.  Don't shoot,"

16   protest chants, as well.  Because the police were in front of

17   the opening of the police station, so they have, like, a

18   parking lot that is available to the public.  And we were just

19   kind of over here.  People were over here.

20   *Q.*  Maya, to clarify, did you throw any rocks at the police

21   station?

22   *A.*  No, I would never.

23   *Q.*  Did Amanda throw any rocks at the police station?

24   *A.*  No, she did not.

25   *Q.*  Did anybody that you were near throw rocks at the police

Maya Rothlein – Direct

1   station?

2   *A.*   No.

3   *Q.*   What happened after that description?

4   *A.*   It wasn't too much longer until the police started making a

5   little bit more of their presence known.  I would say maybe 15,

6   20 minutes later, they started to leave --

7           Can I have this cleared, please?

8   *Q.*   Yeah.  Just tap on the right-hand side, lower corner.

9   *A.*   Okay.  So they took over this area -- actually, a couple

10  more times.

11          They made a line here with the protesters over here.

12  And then we were a little bit worried -- I personally was

13  scared, because I didn't know what was going to happen next,

14  because the police made their presence known pretty quickly

15  after that.  And then we ended up being in front of the

16  SliceWorks, which is this area right here.  We were on the

17  sidewalk at this point because somebody had told us in the

18  crowd, hey, if you're in front of a business, you won't get

19  subjected to chemical weapons, gassed or shot.  And at this

20  time I wanted to peacefully protest, so I decided to be in

21  front of the business for my safety and for Amanda's safety.

22  *Q.*   Maya, what happened next?

23  *A.*   I started hearing the pepper balls going off, going, bop,

24  bop, bop, bop, bop, bop, bop.  The crowd started to move

25  backwards.  Eventually the police started using chemical

1    weapons on us, throwing what seemed to look like, in my

2    experience, like grenades, like, from out of a movie.  And then

3    seeing clouds -- just smoke.  And very quickly, I learned it

4    wasn't just regular smoke.  My eyes started to burn; my throat

5    started to hurt.  I was in the middle of chanting, and it

6    just -- it engulfed everywhere.  It engulfed everybody in front

7    of the pizza place, because their windows were open.  And then

8    they started shooting protesters who were retreating; and then

9    we ended up retreating into the parking lot of the Argonaut.

10           *MR. MOFFETT:*  I'd like to mark for identification

11   Exhibit 54.  This, I believe, has been stipulated as authentic.

12   *BY MR. MOFFETT:*

13   *Q.*  Maya, do you recognize this photo?

14   *A.*  Yes, I do.

15   *Q.*  How do you recognize it?

16   *A.*  Amanda took the photo.

17           *MR. RINGEL:*  No objection.

18           *THE COURT:*  Admitted.

19           *MR. MOFFETT:*  I'd like to introduce Exhibit 54 into

20   evidence.

21           (Exhibit 54 admitted.)

22   *BY MR. MOFFETT:*

23   *Q.*  Maya, what is happening in this scene?

24   *A.*  The officers have just pushed back the crowd that was

25   funneled in front of the Romantix -- between the Romantix and

1    the police station on Washington.  They started pushing them

2    back, and this is right before they started releasing the

3    chemical agents -- the grenades I was speaking about earlier.

4    Q.  Before the officers released that chemical grenade on you,

5    did you hear any warning?

6    A.  No.  I heard no warning.  I was shocked.

7    Q.  Maya, describe what happened after you took this photo.

8    A.  Well, the gas, as I had explained earlier, started to

9    really irritate my throat and my eyes.  And then I ended up

10   retreating and trying to find, you know, some help for that in

11   the parking lot behind Argonaut, which is behind where we're at

12   in the photo.  So here is the sidewalk, then there is the

13   SliceWorks over here in this area, and we ended up going back

14   this way over to Argonaut, which is this big parking lot over

15   there.  It's a liquor store.  And there were some people with,

16   like, water and flushing people's eyes and trying to do, like,

17   immediate first aid.

18       MR. MOFFETT:  Dan, thank you.  You can take down

19   Exhibit 54.

20       Dan, do you mind bringing up Exhibit 1241 again.

21   BY MR. MOFFETT:

22   Q.  Maya, would you indicate the Argonaut parking lot on this

23   map?

24   A.  Yes, I can.  That's the parking lot.

25   Q.  Were you able to get away from the tear gas after you ran

1  to the Argonaut parking lot?

2  *A.*  No.  It was still abundantly in the air at this point.

3  There really wasn't much escaping it close by, but I was able

4  to get, like, some water and flush my eyes out, try to clear my

5  throat the best I could.  And then we were able -- the only way

6  we could get rid of the gas was to, you know, retreat.  And we

7  ended up retreating down this way, which is where the police

8  were pushing us, down Washington.

9  *Q.*  And what happened after the police pushed you down

10  Washington?

11  *A.*  We ended up -- I recall going back to our house for a

12  moment, because we live right off of 14th.  So at this point,

13  the protesters end up going this way.  And we lived -- again,

14  as I recall from earlier, we live right here.  So it was along

15  the trail.  And I -- you know, my -- we had our windows open.

16  At that point we lived at, like, a ground-level apartment.  And

17  we were worried the gas was going to get into the house, as

18  well as I needed, like, some time to recover before I could go

19  out and protest some more.

20  *Q.*  And on your way home, what did you see?

21  *A.*  I saw a lot of people who were going through a lot worse

22  than me, who were maybe closer up.  Just blood-red eyes, people

23  screaming, a lot of pain in people.  I was surprised, and I

24  thought the crowd really was surprised that this happened, the

25  reaction to us.  And then, again, we ended up going back home

1    for a moment before going out again.

2    *Q.*  Where did you go after you went home?

3    *A.*  After we left home, we were able to join the protest again.

4    At this point it was over on 14th and Sherman, so we were over

5    in this area on the sidewalk.

6    *Q.*  So that would be the south side of the capitol, 14th and

7    Sherman, on the first night?

8    *A.*  Yes.  That is correct.

9            *MR. MOFFETT:*  I'm marking for identification

10   Exhibit 9D, as in dog.  This is a Colorado State Patrol camera

11   footage video from May 28 at 14th and Sherman.  This has been

12   stipulated as admissible.

13           *THE COURT:*  Well --

14           *MR. RINGEL:*  No objection.

15           *THE COURT:*  I've got 9 on my list as capitol west

16   steps.  You said 9D?

17           *MR. RINGEL:*  What they've done, Your Honor, is out of

18   Exhibit 9, which is an entire video, they've excerpted certain

19   clips from it and separately identified them, A through F.  And

20   this is 9D.

21           *THE COURT:*  All right.  Thank you.  9D is admitted.

22           (Exhibit 9D admitted.)

23           *MR. MOFFETT:*  Dan, would you mind playing this video.

24           And to confirm, there is no sound.

25           (Video played.)

1           Dan, do you mind pausing?

2    *BY MR. MOFFETT:*

3    *Q.*  Maya, can you identify yourself and Amanda in this video?

4    *A.*  Yes, I can.  We are right here with our hands up, chanting,

5    "Hands up.  Don't shoot."  That was a popular chant at the

6    time.

7    *Q.*  How do you know it's you and Amanda?

8    *A.*  I recognize the bandana I'm wearing, as well as my hair.

9    And I recognize Amanda and her backpack that we had with us.

10    It was, like, a little pack.

11          *MR. MOFFETT:*  Thank you, Dan.  You could take down

12    Exhibit 9D.

13    *BY MR. MOFFETT:*

14    *Q.*  Maya, describe what happened after you and Amanda got to

15    the protest at 14th and Sherman south of the capitol steps.

16    *A.*  As we approached the capitol building -- from what had

17    happened earlier, I thought, just to keep us both safe, I would

18    go ahead and tell her, Hey, if anything happens like before --

19    we were expecting something to happen, most likely -- meet me

20    at one of the trees, so that way we would not get lost and to

21    make sure that she's safe, because I love her.

22          Once we found the tree that we were going to meet up

23    at, we ended up going a little bit closer to the protest, while

24    sitting on the sidewalk, to stay safe.  A lot of chanting.  So

25    I was helping, you know, with some of the chants, "Black Lives

Maya Rothlein - Direct

1    Matter."  "Hands up.  Don't shoot."  "Say their names."  We

2    would say, you know, the names of black people who were killed

3    by the police at this time.  We were -- I ended up going a

4    little bit closer to the crowd on the sidewalk area.  And the

5    police had, like, a line in the middle of the street, as you

6    saw in the last picture video.  And they were right up to the

7    protesters.  And that -- you know, there was some back and

8    forth, you know, because we're right in front of each other.

9    They're chanting, police looking like they didn't like what was

10   being said and were chanting back a little bit, a little

11   snippiness.

12          And then everything changed.  I saw what appeared to

13   be a, like, a half-drinken water bottle -- it definitely didn't

14   look to be full, from what I saw -- go into the officers' area.

15   And then immediately after that, I started seeing a bunch of

16   just grenades going off.  And I heard the bop, bop, bop, bop,

17   bop, bop, bop, bop.  I'll never forget that.

18          THE COURT:  I don't think we're ever going to forget

19   you either.

20          We got that now.

21          THE WITNESS:  Thank you, Your Honor.  I appreciate it.

22          So I heard, again, a lot of explosions; and I saw all

23   the gas going into the air.  It started to irritate my eyes and

24   my throat again.  At this point, I was really scared, because

25   everybody had started running and retreating down 14th, and we

1    did the same.

2            MR. MOFFETT:  I'm marking for identification the clip

3    Exhibit 9F, as in Frank.  Again, this is a few minutes later

4    from the same video.  This footage has been stipulated to as

5    admissible.  I'd like to move it into evidence.

6            THE COURT:  Okay.  Admitted.

7            (Exhibit 9F admitted.)

8            MR. MOFFETT:  Dan, would you mind playing the clip,

9    please.

10           (Video played.)

11   BY MR. MOFFETT:

12   Q.  Maya, is this video how you remember the scene when the

13   police tear-gassed you?

14   A.  Yes.

15           MR. MOFFETT:  Dan, thank you.  You could take down

16   Exhibit 9.

17           Do you mind pulling up Exhibit 1241, please.  Thank

18   you.

19   BY MR. MOFFETT:

20   Q.  Maya, what happened next?

21   A.  Well, everybody was being forced down 14th, so we ended up

22   going down the sidewalk area.  And we ended up making it to

23   this parking lot over here.  That would be on between, like,

24   Grant and 14th.  And the parking lot, we were at this point --

25   you know, we had brought some water with us, put it in the

Maya Rothlein – Direct

1    backpack, to help flush people's eyes out.  Because we had

2    gotten hit with some of it, but there was people that were much

3    more affected a little bit closer up.  It would have been

4    directly inside of the gas, that were just crying, screaming

5    from their experiences before.

6         And so after, you know, trying to help ourselves and

7    some others with flushing their eyes out with the water bottles

8    we had brought, I started to see the police continuing to throw

9    gas, which there was no protesters in the area where they were

10   throwing the gas canisters.  They were launching them into this

11   intersection over here.  And I just saw a cloud of smoke and

12   chemical weapons, just as high as I could see.  I couldn't see

13   through the other side, and that was –– I had never seen that

14   before.  And there was a lot more gas than was used at the

15   previous intersection in front of the police station at this

16   point.  They kept throwing it, and people were running

17   backwards.

18        At this point, the police started to move east on

19   14th, and they slowly started patrolling through with their

20   convoy.  They had officers in, like, the full riot gear or SWAT

21   gear.  They were just decked up from head to toe with helmets

22   and everything, hanging off these, like –– I would describe

23   them as maybe like trucks with the backs off them, so that way

24   they could hold on and have their weapons ready.  And as they

25   were going down the street on this area, they started firing on

Maya Rothlein - Direct

1   protesters on both sides of the sidewalk indiscriminately, just

2   firing, almost like a drive-by shooting.  And then I saw

3   something I had never thought -- I've seen a lot of things that

4   night, but I never thought I would see what happened next.

5   Q.  And what did happen next, Maya?

6   A.  In this intersection right here -- earlier on in the night

7   I had seen a gentleman on, like, a red motocross-looking bike,

8   you know.  And he was riding -- there is only one way to go on

9   14th.  It's a one-way street, so you have to travel east on it.

10  And he was basically retreating, leaving, going this way.  And

11  the -- I recall earlier telling you all about the police

12  officers hanging off of the truck.  Well, at this point, they

13  were both in this area right here, stopped.  And as the police

14  went over here -- of course, the light was green, so he started

15  going, as well; and then they shot him point-blank with a tear

16  gas canister.  I've never seen something like that before.  He

17  was literally on his motorcycle, and they shot him point-blank

18  in the chest.  I saw him wipe out, a bunch of -- a cloud of

19  smoke coming out of him.

20  Q.  Maya, after seeing that, what did you feel?

21  A.  I was scared for my life, because they were just shooting

22  people on the sidewalk who were trying to recover from the

23  chemical agents used on us.  And then seeing this guy get shot

24  point-blank with what I now know is a 40-millimeter gun thingy,

25  like, I was scared.  I didn't want to get hurt myself, and I

Maya Rothlein - Direct

1   just retreated back home.  So we ended up going -- after the

2   police had made a little bit of headway this way, we ended up

3   going back to our house over here.

4   Q.  Did the Denver police's violence cut short your protest

5   that night?

6   A.  Yeah.  I couldn't chant.  I was there to peacefully

7   protest, to find my voice.  I saw something that was wrong.

8   And every time they would use the chemical agents on me, it

9   hurt my throat.  All I wanted to do was just chant.  I didn't

10   bring a sign or anything; I was just there to chant.  You know,

11   to just like say, hey, this happened; and we need to do

12   something about it, because it's horrible.  And they just kept

13   gassing me, and I was doing nothing.

14   Q.  Maya, what did you do when you got home after the Denver

15   police cut short your protest?

16   A.  I immediately took off my clothing.  I had to wash

17   everything twice.  I could feel it still on the clothing and

18   myself, so I went ahead and showered a couple times.  And then

19   I tried to go to sleep; but, I mean, with what was going on,

20   all you heard all night were people just chanting.  And then

21   you would hear like, "Black Lives Matter, Black Lives Matter,"

22   and then you would hear the pepper balls going off -- I'm not

23   going to do the sounds for you this time -- then you would just

24   hear screaming.  Not just like regular screaming, like you

25   would just hear, like, people hurt.  And I was scared to go

Maya Rothlein - Direct

1    outside and help them, and I regret it.  But it was so bad.

2    You just hear screaming, like agony.  I know if I'm hearing it,

3    like, other people were hearing it.  Like, how were you

4    supposed to sleep during that?  I couldn't sleep whatsoever,

5    and I had a really bad night of sleep that night.

6    Q.  You didn't attend the second day of the protests, May 29,

7    did you?

8    A.  No, I did not.

9    Q.  Why was that, Maya?

10   A.  Because Amanda was studying for the Bar.  And because of

11   what had happened, like, she was really shooken up; and I

12   wanted to be there to support her.  I really did want to go out

13   and join the protest, but I needed to be there to support my

14   partner and my fiance.  So we just stayed home.  And, you know,

15   I tried my best to keep my mind right and just keep busy,

16   because there was a lot to think about and process, everything

17   that happened the night before that I never thought was going

18   to happen going to a protest.

19   Q.  And you didn't attend the protest on May 30, did you?

20   A.  On May 30, that was the Saturday; correct?

21   Q.  Correct.

22   A.  I did briefly.  Yes.

23   Q.  And that night, when you were home, were you able to avoid

24   the police at your own home?

25   A.  No.  I was not.  Unfortunately, I was not.

Maya Rothlein - Direct

1  *Q.*  Do you mind indicating again where your apartment is on

2  14th and Pennsylvania.

3  *A.*  Sure.  My apartment is right here.

4  *Q.*  Is this where you were when you encountered the police on

5  the night of May 30?

6  *A.*  Yes, I was.  We were home because of the curfew, and I

7  wanted to follow the law.  And we were at home, but we were on

8  our front porch or stoop area to peacefully protest on our

9  stoop area, which is private property.

10  *Q.*  You mentioned your stoop.

11        I would like to mark for identification Exhibit 56.

12  This has been stipulated to as authentic.

13        Maya --

14        *MR. RINGEL:*  No objection.

15        *MR. MOFFETT:*  Thank you.

16        *THE COURT:*  Admitted.

17        (Exhibit 56 admitted.)

18  *BY MR. MOFFETT:*

19  *Q.*  Do you recognize the picture in Exhibit 56, Maya?

20  *A.*  Yes, I do.  That's the stoop and our apartment building we

21  lived in at the time.

22  *Q.*  Maya, set the scene for us.  On Exhibit 56, where were you

23  standing when you first encountered the police on the night of

24  May 30?

25  *A.*  We were on -- like, behind our gate.  And we were in, like,

Maya Rothlein – Direct

1   this area over here.  I was over here at first, to start off.

2   And we were chanting.  We were just kind of done with all of

3   the chaos.  I had kind of spoken a little bit earlier about the

4   screaming and what was being done to our neighborhood by the

5   hands of the Denver Police Department.  So we were, you know,

6   yelling, "Get out of our neighborhood," please, like, leave.

7   Some people were yelling, "Get the fuck out of our

8   neighborhood" to the convoys of police officers that were going

9   down the line.  We were just tired of all of the destruction

10  that was being done and the chaos caused by the police.

11  Q.  Describe what happened to you after you raised your voices

12  to the Denver police that night.

13  A.  We had, you know, yelled at a couple of convoys, as I

14  mentioned before.  And this one was going down Pennsylvania.

15  And there was a white police car leading it, a couple of other

16  police cars, maybe SUVs, behind it, and then there was, like, a

17  SWAT vehicle in the back area.  And it had those people hanging

18  off with, like, the full SWAT gear I described earlier, or,

19  like, protective gear, or whatever you want to call it, on

20  them.

21         We were yelling, you know "Get out of our

22  neighborhood."  "Get out of our neighborhood."  And our

23  neighbors were, like, "Get the fuck out of our neighborhood."

24  And that's when they stopped.  And I didn't know why they

25  stopped, because nobody had stopped before.  But the lead white

Maya Rothlein – Direct

1    car I mentioned earlier stopped, and an officer got out of the

2    car and started to approach our stoop.

3    Q.  Maya, I'm going to identify Exhibits 1095B and C.  These

4    are screen clips from an exhibit that has been stipulated to as

5    authentic.  Do you recognize these photos?

6            THE COURT:  All right.  You say they are stipulated?

7    They're admitted.

8            (Exhibits 1095B and 1095C admitted.)

9            THE WITNESS:  Yes, I do.  That's the car that stopped.

10           MR. MOFFETT:  If we could publish these photos to the

11   jury, please.

12   BY MR. MOFFETT:

13   Q.  So after this car stopped and an officer got out, what

14   happened?

15   A.  Once the officer -- as you can see in the picture, like,

16   the way our street is set up, there is parking on the street

17   sides.  So the officer, like, passed the cars in front of the

18   neighborhood.  And as he approached our gate, he came up with

19   his hand on his pistol area, like -- on his pistol.  And he had

20   his hand on what looked like a pepper-like-spray can, but it

21   was giant.  It was like basically the size of this.  And he

22   walked up right to our gate.

23           And at this point, I was scared, because as he was

24   approaching, he said -- you'll have to excuse my language --

25   "Get the fuck inside."  He was yelling at us, "Get the fuck

Maya Rothlein - Direct

1   back.  Get the fuck inside your house."  And as he approached

2   the gate, I was scared for my life, because we locked eyes as

3   he came up.  And I was so afraid, because he had the canister

4   right in front of the gate.  So if you can imagine the scene,

5   officer here, gate here, we -- my neighbors and Amanda included

6   were right here.  And he had the -- the pepper spray, or

7   whatever you want to call it, right in the face of Amanda.  And

8   I was afraid that if he pulled the trigger, he would shoot us

9   point-blank.  And I had seen what had happened previously the

10  last day just with the gas.  And being that close up, I knew

11  something dangerous could happen.

12          So I retreated back -- I believe you saw the picture

13  previously of the stoop.  On the right side of the stoop area,

14  I ended up going into this area -- I didn't go into the crevice

15  area, but I retreated back, while my white neighbors were in

16  the front protecting me and yelling at this guy, telling him to

17  go away.  And as he was yelling at us, "Get the fuck back in

18  your house," Amanda -- who was studying for the Bar to be an

19  attorney at this time -- had yelled at him back, I'm an

20  attorney.  This is wrong.  It's against our constitutional

21  rights that you're doing this.  We're able to protest on our

22  own private property even though there is a curfew.  And our

23  other neighbors were yelling, "Get away from them.  Leave them

24  alone."  I mean, we have people on both sides of us who are

25  outside watching this happen, scared for us, yelling at the

772

Maya Rothlein - Direct

1   police to leave.

2          One of my neighbors was yelling at the police, "We're

3   going to record you.  We're going to record you."  And while

4   he's cursing us, "Get the fuck back in your house," keeping his

5   pepper spray right in our faces and threatening us, hearing the

6   threat of, I have you on videotape, he paused for a moment.

7   And then I started to see other officers -- I had mentioned

8   earlier, the officers who were on, like, the truck hanging off,

9   they started approaching us this time.  That is so scary.  Not

10  only having somebody -- an officer yelling at me, but I have

11  people in SWAT gear coming towards me.  I don't know what is

12  going to happen next.  I'm on my own private property, I know

13  my right to be there, and I don't know what is going to happen.

14         Then eventually he ended up retreating, going back to

15  his police vehicle.  And then the other officers had seen him

16  go back -- the ones I was mentioning earlier that came off the

17  truck in the SWAT gear -- ended up going back to their vehicle,

18  as well, and then eventually they ended up leaving.

19  Q.  From your recollection, Maya, around how many police

20  vehicles followed in that caravan behind the unmarked car that

21  stopped?

22  A.  I would say about six.  They filled up the entire block.

23  Q.  Maya, did you get a good look at the officer who was

24  threatening?

25  A.  Yes, I did.  We had our porch lights on, and that is a face

Maya Rothlein - Direct

1    I will never forget.

2    Q.  If you saw the officer who threatened you again, would you

3    recognize him?

4    A.  I certainly would.

5        MR. MOFFETT:  Dan, could you please bring up

6    Exhibit 1177, already in evidence.

7    BY MR. MOFFETT:

8    Q.  Maya, do you recognize the person in this photo?

9    A.  Yes.  That's the officer that threatened me.

10   Q.  How can you be certain?

11   A.  As I mentioned earlier, that's a face I will never forget.

12   Q.  A couple of days ago, Deputy Chief Sanchez testified that

13   this is a photo of a man named Lieutenant Ken Chavez.

14       So after Lieutenant Chavez threatened you that night

15   at the George Floyd protests on your own property, was that the

16   end of the night for you?

17   A.  It was not.

18   Q.  Why not go back inside after Lieutenant Chavez threatened

19   you on your own property?

20   A.  I'm not -- I was not going to let somebody stop me from

21   peacefully protesting on my own private property.  Not only

22   were I hearing people protest in the street, but I needed to

23   make my voice heard from that one place, following the rules,

24   following the law, and I was not going to let somebody stop me

25   from protesting.

Maya Rothlein - Direct

 1   *Q.*   What happened after that, Maya?

 2   *A.*   Well, we had continued to protest for about an hour, maybe

 3   an hour and a half more, just doing our chants.  And then

 4   eventually another caravan went by.  And each time a caravan of

 5   police went by, I started to get really anxious because of what

 6   had happened before.  But just we kept doing our chants, trying

 7   to tell the police, please get out of our neighborhood.

 8   Neighbors were again, you know, chanting what was said earlier,

 9   Get the "F" out of our neighborhood, as well as, you know,

10   please leave, like, you're causing more trouble.  We kept doing

11   that.  Then all of a sudden --

12         If you can pull up the map one more time.  I want to

13   point something out.

14         They were traveling -- this time they were going this

15   way on Pennsylvania.  And as you can see, our apartment is

16   right here.  As the caravan started to go through on a green

17   light, there was one of those white trucks I previously

18   mentioned earlier with the SWAT-type-looking officers hanging

19   off of it.  And then I heard the -- what sounded like the

20   pepper ball guns going off again, and I immediately started to

21   hear some impacts.  And one of our neighbors who lived in our

22   building who was with us at the time -- we were on the stoop.

23   There is a higher level right there, closer to, like, the front

24   door.  We were kind of up there a little bit further at this

25   point, and we were ducking and covering.  You could hear it,

Maya Rothlein – Direct

 1   just, bop, bop, bop, bop, going off.

 2          Sorry, Your Honor.

 3          And then we just kept -- it was just, like, so scary.

 4   I didn't think I would ever experience a drive-by shooting;

 5   secondly, I didn't think it would be by the Denver Police

 6   Department, or police in general.  I didn't know what they were

 7   shooting at us, but it sure did start making impacts.  And I

 8   heard it, and I ran inside my area.  Immediately after it

 9   started the impact, whatever was released from these balls was,

10   like, instantly hurting my eyes and my throat.  It was just so

11   instantaneous.

12          We ended up going into our mailroom, which has two

13   doors.  There is a glass door in the front and then the

14   mailroom, which it instantly was just flooded with whatever

15   chemicals were coming out of what they shot at us.  So it was

16   almost like we couldn't even find refuge there.  We started

17   coughing.  And then we ended up going into -- there is another

18   door in the mailroom to the top part of the apartments.  And

19   then we ended up retreating back to our ground-level apartment

20   and down the stairs, where the chemicals weren't as prevalent,

21   I would guess.  We couldn't feel those effects down there.  I

22   went into my apartment and instantly started to flush my eyes,

23   and, you know, tried to do something for my throat, you know,

24   started to drink some water, whatever I could to try to help

25   with it.  It was really strong, and it hurt.

Maya Rothlein - Direct

1   Q.  So when the police drove by your home and shot at you, did

2   that cut off your protest for that night?

3   A.  Yes.  The whole area that we were on our stoop was

4   uninhabitable.  We couldn't go back out there.  The mailroom

5   had whatever chemicals in it for almost a week.  It made it

6   hard to get our mail.  The whole -- no, we could not protest

7   the rest of the night.  I was scared.  I didn't want anything

8   worse to happen.  From the beginning, getting threatened on my

9   own property, to getting shot at an hour and a half later, I

10  was so scared.  I did not go back out that night.

11          MR. MOFFETT:  I'd like to mark for identification

12  Exhibits 59, 53, 58, and 60.  These have been stipulated to as

13  authentic.

14          MR. RINGEL:  No objection.

15          MR. MOFFETT:  Pardon?

16          MR. RINGEL:  No objection.

17          MR. MOFFETT:  Thank you.

18          THE COURT:  All right.  So you said 59, 58 --

19          MR. MOFFETT:  59, 58, 53, and 60.

20          THE COURT:  Okay.  Those are admitted.

21          (Exhibits 53 and 58-60 admitted.)

22          MR. MOFFETT:  Thank you, Your Honor.

23          First, can we pull up Exhibit 59.

24  BY MR. MOFFETT:

25  Q.  Maya, what's in this photo?

Maya Rothlein - Direct

1   *A.*   One of the pepper balls that was shot at us.  This was one

2   that was, like, I guess, shattered, as you can see.  It was on

3   our steps.  You saw the picture earlier, we had the steps, the

4   gray ones, on our stoop area.  This was in front of one of the

5   impact points.

6   *Q.*   So these are some remnants of the pepper balls the police

7   shot at you on Saturday the 30th?

8   *A.*   Yes.  Some of the ones that we found.

9   *Q.*   I'm a little color blind.  What color would you say those

10  fragments are?

11  *A.*   They are red and black.

12      *MR. MOFFETT:*   Dan, would you please bring up

13  Exhibit 53.

14  *BY MR. MOFFETT:*

15  *Q.*   What's this a photo of, Maya?

16  *A.*   That is the impact site of one of the pepper balls that was

17  shot at us.  This is our front door I mentioned earlier, the

18  glass door in front of the mailroom area.  That's that door.

19      *MR. MOFFETT:*   Dan, would you please bring up

20  Exhibit 58.

21  *BY MR. MOFFETT:*

22  *Q.*   Maya, what's this a photo of?

23  *A.*   Another impact from the drive-by shooting.  This was on our

24  stoop area, where we have those cement-looking like tiny

25  pillars, I would call them.  That's one area where they shot

Maya Rothlein - Direct

1    at, as well.

2         *MR. MOFFETT:*  Dan, could you please bring up

3    Exhibit 60.

4    *BY MR. MOFFETT:*

5    *Q.*  What's this a photo of?

6    *A.*  This is where the door was that we saw earlier, the glass

7    door to the mailroom.  This was on the -- if you're looking at

8    the apartment on the right side that has, like, wooden -- I

9    don't know what you call it.  I'm not really HGTV savvy.  But I

10   would definitely say it's, like, these wooden, like, beams,

11   kind of.  Like, they kind of supported the door and the glass.

12   And that's two impact points there, as well, from the drive-by

13   shooting.

14   *Q.*  Maya, are these all the impacts that the pepper balls had

15   on your property?

16   *A.*  I believe so.  I think there was one more pillar to the

17   left side of the building that had gotten shot, but those are

18   the ones that we had found.

19   *Q.*  Maya, how did it impact you to shot by -- shot at by the

20   police on your own property while you were protesting their

21   presence in your neighborhood?

22   *A.*  I was following the rules.  I wanted to be able to lend my

23   voice to the protest and to be able to peacefully protest in my

24   own yard.  Like, I thought I could do that.  I knew I could do

25   that.  And to have that taken from me -- not only had I had my

Maya Rothlein - Direct

1    voice taken from me previously, I had it taken again another

2    time.  And I was so scared.  Like, you don't understand.  Like,

3    you're just sitting on your porch, you're chanting, you're

4    yelling -- you're protesting; and then all of a sudden you just

5    get shot at.  You get threatened.  That's not right.  I did

6    nothing wrong to warrant that.  Anybody could -- this could

7    happen to anybody.  And I was thinking, why did it have to

8    happen to me?  I just wanted to lend my voice to this movement

9    and be able to just speak what I needed to speak; and for some

10   reason, they wanted to go ahead and shoot at me.

11        So it made me scared; it made me angry; it made me

12   nervous.  I didn't want to ever talk to a police officer again.

13   Like, how do you treat people that way?  You're supposed to be

14   there to protect the protest.  What was I doing wrong?

15   Q.  Maya --

16   A.  It's really just unforgivable.

17   Q.  I'm sorry for interrupting you.

18   A.  That's okay.

19   Q.  During any of the incidents that we talked about today, did

20   you hear any warning from the police?

21   A.  No, I heard no warning.

22   Q.  Did you throw anything?

23   A.  No, I did not throw anything.

24   Q.  Did Amanda throw anything?

25   A.  No, she did not.

780

Maya Rothlein – Direct

1  *Q.*  Were you violent?

2  *A.*  No, I was not violent.

3  *Q.*  Were you destroying any property?

4  *A.*  No, I did not destroy any property whatsoever.

5  *Q.*  Maya --

6  *A.*  My property was destroyed.

7  *Q.*  Again, I'm sorry for interrupting you, Maya.

8  *A.*  Yes.  That's okay.

9  *Q.*  Maya, were you here on the first day of this trial for

10  opening statements?

11  *A.*  Yes, I was.

12  *Q.*  Do you recall when the defendants -- I believe it was

13  Ms. Jordan, said in her opening statement -- and I just want to

14  make sure that I get this wording right -- "the First Amendment

15  affords many protections to those who want to exercise those

16  rights, and the City and County of Denver and its police

17  department honor those protections."  Do you recall that?

18  *A.*  Yes, I do.

19  *Q.*  Do you feel that the Denver Police Department honored your

20  First Amendment rights when they shot at you on your own

21  property?

22  *A.*  They most certainly did not.

23  *Q.*  Taking a step back, Maya, considering the totality of the

24  circumstances that you experienced and that we talked about

25  today, what impact have the Denver Police Department's actions

Maya Rothlein - Direct

1    in the George Floyd protests had on you?

2    *A.*   I will never call a police officer to help me.  I live in a

3    rural area now in Redding, California, where people like myself

4    who are transgender, black, as well as from the LGBTQ

5    community, have on record been harmed and threatened.  I can't

6    even call them to help me.  I'm afraid of them.  I do

7    everything I can to not have to interact with somebody who is

8    in a uniform, because I don't feel safe.

9         After all the explosions and things, I can't be around

10   fireworks anymore.  Last summer, when July 4th happened, I was

11   extremely anxious.  And I had to be in my house the whole time,

12   because I could just hear the fireworks going off and the

13   explosions and it just recalled back to me being in this crowd

14   and hearing that for no reason and just chanting.  I do

15   everything I can, you know, to stay on the right track and at

16   least try to, like, follow the rules the best that I can to my

17   ability.  But I -- I have zero trust in the police department

18   because of what was done to me.

19   *Q.*   Maya, thank you for your testimony and your candor.

20        I have no further questions at this time.

21        *THE COURT:*  All right.

22        Cross-examination.

23        *MR. RINGEL:*  Your Honor, there is an issue I need to

24   approach the Court about first, however.

25        *THE COURT:*  Okay.

 1          (Hearing commenced at the bench.)

 2          *MR. RINGEL:*  I need to impeach Ms. Rothlein with her

 3  interrogatory responses.  The issue is with respect to,

 4  Ms. Rothlein changed her name during the course of this

 5  lawsuit.  At the time that the Complaint was filed, she was

 6  known as Phillip Rothlein.  Now, of course, she's Maya

 7  Rothlein.  And unless I get a stipulation from counsel for the

 8  plaintiffs, I'm going to have to show the verification that

 9  says Phillip Rothlein.  I'm not trying to embarrass or harass

10  or anything like that this witness; but the discovery response

11  is critical evidence, because it's directly contrary to the

12  identification --

13          *MR. MACDONALD:*  Your Honor --

14          *THE COURT:*  It's his witness.

15          *MR. MOFFETT:*  Your Honor, Mr. Ringel makes a good

16  point that this could really dangerously embarrass

17  Ms. Rothlein.

18          *THE COURT:*  I don't think so, because she just

19  acknowledged that she was transgender.

20          *MR. MOFFETT:*  I understand that.  In the transgender

21  community --

22          *THE COURT:*  Why don't you just stipulate that's who it

23  is.  Rothlein.

24          *MR. MOFFETT:*  That's acceptable.

25          *MR. RINGEL:*  If you would stipulate page 25 is the

Maya Rothlein – Cross

1    description of the event she described.

2         MR. MOFFETT:  I'm fine with that.

3         THE COURT:  Okay.

4         (Hearing continued in open court.)

5         THE COURT:  Was Julie bothering you over there?

6                    **CROSS-EXAMINATION**

7    BY MR. RINGEL:

8    Q.  Good morning, Ms. Rothlein.

9    A.  Hello.

10   Q.  I have a few follow-up questions for you.  The first thing

11   I wanted to ask you about was your interactions with the

12   officer that you described on May 30 at your apartment at 1424

13   North Pennsylvania Street.  Okay?

14   A.  Is this regarding the drive-by?

15   Q.  This is the first event where an officer exited a vehicle.

16   A.  Okay.  Thank you for letting me know.

17        MR. RINGEL:  If we could put up Exhibit 3143, the

18   discovery responses, and page 25 specifically.

19   BY MR. RINGEL:

20   Q.  Ms. Rothlein, do you recall that there were some written

21   questions that were sent to you and all of the other plaintiffs

22   in the case that you answered and then verified your answer

23   under oath?  Do you remember that?

24   A.  Yes, I do.

25   Q.  Okay.  So Event No. 3 on page 25 describes --

Maya Rothlein - Cross

1          *THE COURT:*  Are those on the screen?

2          I'll take judicial notice of the interrogatories.

3          *MR. RINGEL:*  Can this be published to the jury?

4          *THE COURT:*  Sure.

5  *BY MR. RINGEL:*

6  *Q.*  Event No. 3 is your description of the event that you --

7  the event that you were just discussing on direct examination;

8  do you recall that?  Is that a correct statement?

9  *A.*  I do recall.

10  *Q.*  Okay.  And you would agree that this was the response that

11  you provided in your sworn discovery responses?

12  *A.*  Yes.  This is what I stated.

13  *Q.*  Excuse me?

14  *A.*  I said yes.

15  *Q.*  Okay.

16  *A.*  Sorry.

17  *Q.*  All right.  In the discovery responses, there is a sentence

18  that identifies the officer.  And it reads, "A white male

19  officer stepped out of the driver's side door of the vehicle

20  and approached the fence in front of plaintiff's home, coming

21  face to face with plaintiff and her neighbors on the other side

22  of the fence."

23          Did I read that correctly?

24  *A.*  Yes, you did.  And the officer I identified looked to be

25  white.  I would assume he's white.

785

Maya Rothlein - Cross

1   *Q.*  I understand that you -- can you focus on answering my

2   questions?

3   *A.*  Oh, I thought I did.  My mistake.  First time.  I'm sorry.

4   *Q.*  Do you generally have difficulty distinguishing between

5   white men and Latino men?

6   *A.*  I can tell that there are some people that are

7   white-passing, I would say, people who are fair skinned.  But,

8   yeah, people who are fair skinned can pass as white.

9   *Q.*  Do you recall being -- having your deposition taken in this

10   case?

11   *A.*  Yes, I do.

12   *Q.*  Okay.  Do you recall describing the officer who you

13   interacted with on May 30, 2020, during your deposition?

14          *MR. MOFFETT:*  Your Honor, may I get a page and line?

15          *THE COURT:*  Sure.

16          *MR. RINGEL:*  Page 39.

17          If we could pull up Ms. Rothlein's deposition, please.

18   Page 39.

19          *MR. MOFFETT:*  And the line, please.

20          *MR. RINGEL:*  23.

21          *THE COURT:*  I'll take judicial notice of that, if it's

22   not up already.

23          *THE WITNESS:*  I don't have it up on my screen.

24          *MR. RINGEL:*  We're working on it.

25          *THE COURT:*  Okay.  Just making sure.  Thank you.

Maya Rothlein - Cross

1          MR. RINGEL:  Page 39.  Down to line 23.

2          It must be page 49.  My apologies.

3          MR. MOFFETT:  Excuse me.  Is this being shown to the

4   jury?

5          MR. RINGEL:  Not yet.

6   BY MR. RINGEL:

7   Q.  So at -- on page 23 -- on page 49, line 23, you were

8   asked -- do you see where I am, Ms. Rothlein?

9   A.  Yes, I do now.

10  Q.  Okay.  It says, "Do you remember any detail about the

11  officer's physical appearance?"

12         And then your answer begins on line 25 and goes onto

13  the next page.

14         And go back up to --

15         The beginning of your answer says, "Mid to late 50s,

16  maybe about 5-8, bigger than average build.  So he had, like, a

17  gut, to an extent, gray hair, lighter on the sides, darker gray

18  on the top, kind of bigger cheeks, so I can assume he was a

19  little bit heavier set.  I can't recall eye color, but I

20  believe he had gray eyebrows, to an extent, to match the hair.

21  That's probably what I can recall so far."

22         Do you remember giving that testimony, Ms. Rothlein?

23  A.  Yes, I do.

24  Q.  Okay.  And your memory was better when you gave your

25  deposition than today about that event, would it not have been?

Maya Rothlein - Cross

1   A.  No.  I believe I described it very closely to that.

2   Q.  Okay.  You believe that this officer fixated on you during

3   his interactions with you and Ms. Blasingale [sic] and your

4   friends?

5   A.  Correction.  It's Blasingame.  Yes, I do know he fixated on

6   me.  That's why I retreated backward for my safety.

7   Q.  And why do you believe he fixated on you?

8   A.  I'm the only person that's visibly black on my stoop area.

9   And as he approached, he locked eyes.

10  Q.  And you believe he locked eyes on you because you're

11  African-American?

12  A.  I believe he locked eyes on me because I'm black, yes.

13  Q.  Okay.  Did he say anything to you to note your race?

14  A.  I'm glad he didn't, but he said a lot of other hurtful

15  things.  Yes.

16  Q.  And you've described everything he said during your direct

17  examination; is that correct?

18  A.  Yes, I did.

19  Q.  And let's be crystal clear, no -- at that moment in time,

20  there was nothing that he deployed.  He didn't use any pepper

21  spray on you or Ms. Blasingame or anyone else; correct?

22  A.  Thankfully, he didn't.  Because he had it directly in our

23  faces, and that would have been very bad.

24  Q.  All right.  You believe that the officer that you

25  encountered was wearing a standard Denver Police Department

Maya Rothlein - Cross

1    uniform at that moment in time?

2    A.   Yes.  I believe he was wearing something similar to that.

3    Q.   And you've seen Denver Police Department uniforms

4    previously?

5    A.   Yes.  I lived in downtown Denver, and they patrol

6    everywhere.  It's hard not to see them.

7    Q.   Okay.  All right.  Let's talk about earlier events that you

8    talked about in your direct examination.  The first event that

9    you talked about was at the police station at the intersection

10   of Colfax and Washington; correct?

11   A.   Yes.

12   Q.   And you indicated that there was a very large crowd there;

13   in fact, I think you said it was one of the biggest crowds that

14   you had ever seen.  And being from California, that said a lot

15   to you?

16   A.   Yeah.  Compared to, like -- for example, when I say

17   California, I used to go to Venice Beach a lot, which is one of

18   our biggest tourist attractions in the area.  And just walking

19   down, like, the sidewalk, you'd see a lot of crowds of people.

20   But this crowd just, like, enmassed me in the middle of it.

21   And it was just a lot of people beautifully chanting for what

22   they thought was right.

23   Q.   Okay.  So the crowd was large; correct?

24   A.   That's what I said.

25   Q.   The crowd was loud because they were chanting.  It was a

Maya Rothlein - Cross

1   protest?

2   A.   Yes.   They were protesting; correct.

3   Q.   Okay.   Would you agree that the crowd was loud?

4   A.   Of course.   Yes, I would agree with that.

5   Q.   Okay.   Would you agree that the crowd was too large for you

6   to see everything that was happening in the crowd?

7   A.   No.   I'm a pretty decent height, so I can see over people

8   pretty easily, and I know what I saw.

9   Q.   So you believe that you could see everything that everybody

10  in the crowd was doing, as a general matter?

11  A.   I saw everything that I testified to, yes.   I saw what I

12  saw.

13  Q.   I'm not trying to question what you testified to.

14  A.   I'm sorry.

15  Q.   I was trying to point out that you might not have seen

16  everything that the crowd was doing, given its size; is that

17  fair?

18  A.   I was very focused on the crowd and seeing what was going

19  on.

20  Q.   Okay.   There was crowd behind you; correct?

21  A.   There could have been.   I was looking in front and to the

22  side of where the people were, as well as where the officers

23  were lined up.   So I was focused on the alley down by the --

24  between the Romantix and the police station, as well as to the

25  right of me, which is where the police station was, with the

Maya Rothlein - Cross

1    glass windows, and into some of the crowds, really more or less

2    at the cars to the right of us, because they had to stop

3    traffic, and looking at all of that.

4    Q.  Okay.  So you're confident that you saw every single thing

5    that was happening in that entire crowd; is that correct?

6    A.  I said I saw everything that I testified to.

7    Q.  Okay.  You testified that you saw a few people throw rocks

8    at one of the windows of the police station; correct?

9    A.  Yes.  I saw a few people throw a couple of rocks at the

10   windows of the police station, smashing a couple of the

11   windows.

12   Q.  And those were the only rocks that you saw thrown during

13   any of the other time that you were present at that

14   intersection; is that right?

15   A.  That's right.

16   Q.  And you're confident, because you saw everything that

17   happened with respect to a large crowd; is that right?

18   A.  I had testified earlier that I saw everything that I had

19   testified to.  So from what I saw, I saw a couple of people

20   throw a few rocks at the windows; and then I didn't see anybody

21   throw any other rocks, from what I could see.

22   Q.  Okay.  And then I -- I understand.  How far were you from

23   where the gas or smoke landed?

24   A.  Well, as I had talked about earlier, the gas and smoke --

25   if we could pull up the map -- was in the intersection.  That's

Maya Rothlein - Cross

1   where they started throwing most of it.  So you could see

2   where -- the picture that was over there earlier, where the

3   officers were lined up on the street, closest to, like, the

4   Romantix and the police station, it was right in front of them,

5   in the middle of the intersection.  So the intersection is a

6   pretty decent size.  So they threw it and just gassed that

7   whole intersection out.  And the gas, along with the wind,

8   moved all of the gas into the buildings and the people in the

9   restaurant, who weren't protesting, as well as myself, who was

10  on the sidewalk at this point, thinking that we would be safe

11  there.

12  Q.  Okay.  Ms. Rothlein, I asked you a very simple question:

13  How far were you in distance from where the gas originally

14  landed?

15  A.  Well, I was over by the SliceWorks; and the gas was in the

16  intersection.  So I would say -- and I'm not really good at

17  distance.  It's not really my thing, to be perfectly honest

18  with you.  But I would say if I'm looking at the intersection

19  on the sidewalk that I was at, it was probably directly in the

20  middle of the intersection and to the right of the

21  intersection.  So I would say I was relatively, like, a decent

22  distance from the gas that was thrown.

23  Q.  Can you -- farther from between where you and I are apart

24  now?

25  A.  What was that?  I'm sorry.  I couldn't hear you.

Maya Rothlein – Cross

1  *Q.* Was it a farther distance from the distance between you and

2  I right now?

3  *A.* Well, let's go ahead and gauge the distance here, if we're

4  going to do it that way.  Thank you for giving me that example.

5  I appreciate it.

6          *THE COURT:*  The courtroom is 65 feet by 40 feet.

7          *THE WITNESS:*  Okay.  So I was about over here; and I

8  would say when I was looking at the gas canisters that were

9  coming down, they were about where Amanda Blasingame is over

10 there, where the plaintiffs are.  So not necessarily too far

11 from me, I would say.

12 *BY MR. RINGEL:*

13 *Q.* Okay.

14 *A.* Thank you.  I hope I answered your question.  I apologize.

15 First time.

16 *Q.* You went to the Argonaut Liquor Store parking lot and

17 regrouped and put water on your face and your eyes to help deal

18 with the issues of the exposure; correct?

19 *A.* Yes.  I made sure to flush my eyes; they were burning.

20 Down my throat to try to help gargle, spit out, whatnot.

21 *Q.* Okay.

22 *A.* I didn't know how to react.  I had never been gassed

23 before.

24 *Q.* Okay.  You understand that this event happened at

25 8:34 p.m.; is that correct?

Maya Rothlein - Cross

1    A.   It could have.

2    Q.   Excuse me?

3    A.   It could have.  I don't know the time exactly.  I don't

4    recall.

5    Q.   Okay.  Do you recall in your discovery responses that you

6    indicated that it was 8:34 p.m.?

7    A.   Yes.  That would be right.

8    Q.   Okay.

9    A.   Around that time.

10   Q.   And then you were talking -- the second event that we've

11   talked -- that you talked about with your counsel was an event

12   that happened on -- near the capitol.  And my understanding,

13   based on your discovery responses, is that event happened at

14   9:15; is that right?

15   A.   Around that time, I would say.

16   Q.   Okay.  So the intervening information that you described,

17   going home and all of that sort of stuff, happened in between

18   those two events; is that right?

19   A.   Yeah.  I quickly went home.  My house is on 14th, which is

20   where we were being led; so it was a pretty quick go home,

21   flush my eyes, close my windows, and then head back to the

22   protest.

23   Q.   Okay.  Let's talk about the event on May 28, 2020.  We saw

24   a still of the video from a Colorado State Patrol camera by the

25   capitol, where you identified where you were at one point in

Maya Rothlein - Cross

1  the sequence of events.  But then you testified you moved

2  around a lot; is that a fair understanding on my part?

3  *A.*  From where -- if you want to pull up, I can actually -- I

4  didn't move around a lot at all.  I moved maybe, like, 20 feet.

5  *Q.*  Okay.  So you moved some, but you're saying it was only

6  approximately 20 feet?

7  *A.*  About that much, I would say.  I'm not -- I told you

8  earlier, I'm not super great with, hey, this distance is this

9  amount.  I went relatively close to the crowd.  If you'd like

10  to pull the photo up, I can show you where I am.

11  *Q.*  I just want to understand how are you moved.

12  *A.*  Okay.  I just am trying to help the best I can.  I'm sorry.

13  *Q.*  After the gas was deployed, you ran away; right?

14  *A.*  Yes.  I retreated away because the gas was out there, yes.

15  *Q.*  Okay.  And you testified that after -- that you made your

16  way to a parking lot and then made your way home.  And you

17  talked about events that happened with respect to pepper ball

18  and some event that happened with somebody on a motorcycle or a

19  moped.  But none of those events involved you personally; isn't

20  that correct?

21  *A.*  I was shot at when I was in the parking lot, like I

22  mentioned earlier.  They were -- as they were going down 14th,

23  they were shooting people on both sides of the sidewalk, people

24  who weren't in the street anymore.  So they slowly started

25  going down the street, and they went ahead and were shooting at

Maya Rothlein - Cross

1    people on both sides.  After they had made it to the

2    Pennsylvania and 14th Avenue, like I had mentioned before,

3    that's when they started to go, and so did the motorcycle with

4    the one-way street, trying to leave.  And he was shot with one

5    of the gas canister thingies that I was talking about earlier.

6    And smoke did emit from him after he was shot.  And I did

7    witness that, yes.

8    Q.  Okay.  You were never struck, yourself, with a pepper ball;

9    correct?

10   A.  Thankfully, I wasn't, no.  I was able to dodge and not get

11   struck.

12   Q.  You were never struck with any projectile fired by anyone

13   on either May 28 or May 30; correct?

14   A.  I was not shot at, but I -- I was not shot at directly and

15   hit, no; but I did get the effect of the pepper balls that were

16   shot at my property during the drive-by shooting, as well as

17   during the time that I was protesting in front of the capitol

18   and while I was in the parking lot on 14th.  So, yes, I did get

19   the effects of it; but I was not shot directly, no.  I was

20   lucky enough to miss that.

21   Q.  Okay.

22        THE COURT:  Ms. Rothlein, just try to answer his

23   questions.

24        THE WITNESS:  I'm sorry.  I'm trying to do my best to

25   get the information needed.

Maya Rothlein - Cross

1          THE COURT:  The easiest thing is just to answer what

2    he asks.

3          THE WITNESS:  Okay.  I thought I was helping him.

4    Thank you for the advice, Your Honor.

5          THE COURT:  Okay.

6    BY MR. RINGEL:

7    Q.  On the event on May 30th at 10:07 p.m., when pepper ball

8    you say was discharged at your apartment complex, you were not

9    hit by anything that deployed; correct?

10   A.  Luckily, I was able to miss it.  Yes.  I was able to dodge

11   those pepper balls that were shot at me.  It's just a natural

12   reaction that I have.

13   Q.  Okay.  You were upset with all of the events that happened

14   to you on May 28 and May 30 that you've described; right?

15   A.  Rightfully so.  I was drive-by shot by the police.

16   Q.  And you identified the Denver Police Department as the

17   people who are responsible; right?

18   A.  Yes, I did.

19   Q.  You filed no complaint with the Denver Police Department;

20   correct?

21   A.  They shot me.  Why would I file a complaint with who shot

22   me?

23   Q.  You filed no --

24         THE COURT:  Don't make speeches.  Just answer his

25   questions.

Maya Rothlein - Cross

1      *THE WITNESS:*  Sorry, Your Honor.  I thought I was a

2  little bit shorter that time.  I am working on it, I promise.

3  First-time witness.  I apologize.

4  *BY MR. RINGEL:*

5  *Q.*  Ms. Rothlein, my questions can be answered generally yes or

6  no.  They're not particularly complicated, and I would

7  appreciate the respect of you listening to my question and

8  doing your best to focus on the actual answer to my question.

9  *A.*  Oh, I'm sorry.  I have seen previous testimony on the stand

10  where people answered some other ways.  I was just going off

11  what I know.  Again, no disrespect toward you whatsoever.  My

12  apologies.

13  *Q.*  I appreciate that.

14  *A.*  You're very welcome.

15  *Q.*  Ms. Rothlein, you filed no complaint with -- with the City

16  and County of Denver related to any of the events that happened

17  to you on either May 28 or May 30; true?

18  *A.*  Can you repeat that again?  I couldn't hear you.  My

19  apologies.

20  *Q.*  You did not file a complaint with the City and County of

21  Denver related to any of the events that happened to you on

22  either May 28 or May 30; correct?

23  *A.*  Thank you for that.  No, I did not.

24  *Q.*  And nothing prevented you from filing a complaint; right?

25  *A.*  I was shot at, so, no, I wasn't going to file a complaint.

Maya Rothlein - Cross

1    Q.  Okay.

2    A.  Sorry.  Was that wrong?  I wanted to make sure you were

3    okay with that.

4    Q.  After the events of May 28 and May 30, you did not receive

5    any medical treatment for anything that happened to you from

6    any doctor; correct?

7    A.  No.  I received first aid from people there, but not from a

8    doctor.

9    Q.  You did not go to urgent care; correct?

10   A.  No.  I did not go to an urgent care, luckily.

11   Q.  You did not go to the emergency room?

12   A.  No.  I can't take on the bills that go from that.  It's

13   very expensive.

14   Q.  Okay.  And the impact physically of the -- your exposure to

15   chemicals ended approximately a day later; correct?

16   A.  I would say about a day later, yes.  They eventually went

17   away after washing and whatnot.

18   Q.  Okay.  You have not received any counseling to address any

19   of the events that happened during the protests; true?

20   A.  Not regarding the protests, no.

21   Q.  Not regarding any of the experiences that you've testified

22   here today; correct?

23   A.  No, I have not.

24   Q.  Okay.  You haven't felt the need to talk to any mental

25   health professional about your experiences; correct?

Maya Rothlein - Cross

1   A.   That's not necessarily correct.  I do talk to somebody

2   about, like, my transition; and I try to seek therapy that way.

3   But it can be expensive for my end to do so.  And with my job,

4   with the hours I work -- most therapists are normally, like,

5   8:00 to 5:30; and I normally work 8:30 to 5:30.  So I don't

6   really have the most ability to get in to a therapist within

7   those times.  So I haven't really been able to at all, but I'm

8   working towards therapy for other reasons.

9   Q.   I don't want to hear about therapy for other reasons.

10  A.   That's fine.

11  Q.   That's not what I'm interested in.  I understand there may

12  be other reasons why you may want to talk to a mental health

13  professional.

14  A.   Yeah.

15  Q.   What I'm interested in is, you have never thought you

16  needed to talk to a mental health professional specifically

17  about the events that happened on either May 28 or May 30 of

18  2020; isn't that true?

19  A.   I would say that I don't try to bring those events up at

20  all.  So I would say, I haven't sought anybody to talk about

21  this.  I just don't like to bring it up after the fact.

22  Q.   Okay.

23  A.   Sorry.

24  Q.   You did not miss any work related to anything that happened

25  on May 28 or May 30; correct?

Maya Rothlein - Redirect

1   A.  No.  I went into work -- I worked from home at the point of

2   that time, so, no, I did not miss any work.  I went after work

3   to protest.  And my job also provided protest time, as well,

4   for PTO.  So if I wanted to use it, I could have.

5   Q.  I understand.  But you didn't miss any work; and,

6   therefore, you didn't miss any -- you didn't lose any wages as

7   a result of anything that happened as a result of the protests.

8   Right?

9   A.  Thankfully, I didn't.

10  Q.  Okay.  And isn't it also true that all of the events that

11  you described were also -- Ms. Blasingame was present at all of

12  them; isn't that right?

13  A.  Yes.

14        MR. RINGEL:  Those are my questions for Ms. Rothlein.

15        THE WITNESS:  Thank you.  It's Ms. Rothlein, just so

16  you know, not Mister.  Sorry.

17        MR. RINGEL:  I said Ms.

18        THE WITNESS:  I must have misheard you.  I'm sorry.

19        THE COURT:  Redirect.

20        MR. MOFFETT:  Just a couple of questions, Your Honor.

21                    **REDIRECT EXAMINATION**

22  BY MR. MOFFETT:

23  Q.  Hello, again, Maya.

24  A.  Hey.  How you doing?

25  Q.  Still nervous?

Maya Rothlein - Redirect

1    *A.*   Right.

2    *Q.*   Maya, Mr. Ringel asked you about how you never filed a

3    complaint with the Denver police.  Do you remember that?

4    *A.*   Yes, I do.

5    *Q.*   Why did you never file a complaint with the Denver police?

6    *A.*   Because why would I file a complaint with the people that

7    threatened and shot me?  To me, it didn't make sense.  I didn't

8    think that they would do anything about it.  I've never had

9    experience in filing a complaint before, and I didn't know how

10   to do so.  But I didn't trust filing a complaint with the same

11   people who abused me.

12   *Q.*   Secondly, Mr. Ringel brought up your deposition and the

13   issue of identifying Lieutenant Chavez.  After the deposition,

14   which you gave in July 2021, did you learn about the Internal

15   Affairs investigation that Chief Sanchez testified about on

16   Wednesday?

17   *A.*   Yes, I did.  I was blown away.

18   *Q.*   And this is the internal investigations file in which an

19   officer reported -- in fact, several officers reported -- that

20   Lieutenant Chavez approached a home in the 1400 block of

21   Pennsylvania and threatened the inhabitants with a fogger?

22   *A.*   Yes, I did.

23   *Q.*   And the same Lieutenant Chavez who ordered his men to

24   conduct a drive-by pepper-ball shooting -- again, Chief

25   Sanchez's description -- in the Capitol Hill neighborhood?

Amanda Blasingame – Direct

1    *A.*   Yes.

2    *Q.*   After learning the identity of Lieutenant Chavez, were you

3    shown a picture of him?

4    *A.*   Yes, I was.

5    *Q.*   And that's the picture you identified in court today?

6    *A.*   Yes, it is.  That was the man who threatened me.

7          *MR. MOFFETT:*  Thank you, Maya.

8          Thank you, Your Honor.  No further questions at this

9    time.

10         *THE WITNESS:*  Thank you.

11         *THE COURT:*  Any of the jurors have any questions for

12   this witness?

13         (No response.)

14         All right, then.  Thank you.

15         *THE WITNESS:*  Thank you.

16         *THE COURT:*  You may return to your seat.

17         *THE WITNESS:*  Your Honor, I just wanted to apologize

18   for messing up.  Sorry.  No disrespect.

19         *THE COURT:*  Okay.  Next witness.

20         *MS. GORIN:*  Good morning, Your Honor.  Mindy Gorin for

21   the plaintiffs.  And we'd like to call Amanda Blasingame.

22              (**AMANDA BLASINGAME, PLAINTIFFS' WITNESS, SWORN**)

23                        **DIRECT EXAMINATION**

24   *BY MS. GORIN:*

25   *Q.*   Amanda, can you state your name for the record, please.

1   A.   Yes.  My name is Amanda Blasingame.

2   Q.   And what's your role in this case?

3   A.   I'm a plaintiff in this case.

4   Q.   Where did you grow up?

5   A.   I grew up in a small town called Swansea in Massachusetts.

6   Q.   Can you tell us a little more about your background.

7   A.   Yeah.  So I grew up in Swansea.  Both of my parents are

8   veterans.  My mom was in the First Gulf War, my dad works for

9   the VA, so I had a pretty blue-collar family.  I'm sorry.  I'm

10   nervous.  And neither of my parents were able to graduate

11   college, so they -- I spent a lot of time focusing on school

12   and being encouraged to further my education because my parents

13   weren't able to.

14   Q.   And where do you live now?

15   A.   I now live in Redding, California, with my fiance, Maya.

16   Q.   And that's Maya Rothlein, who we just heard from; right?

17   A.   Yes.

18   Q.   Where do you work in Redding?

19   A.   So I work for Legal Services of Northern California.

20   Q.   What do you do there?

21   A.   So I provide free legal services to people who are low

22   income and/or seniors.  So I help them with things like

23   housing, public benefits.  I work with a lot of people who

24   otherwise wouldn't have an attorney when they're being evicted,

25   people who have, you know, been kicked off of benefits and need

Amanda Blasingame - Direct

1    to get back on, especially because a lot of them are disabled.

2    I work with a lot of people who have single incomes, and so

3    that income is really important to them, especially they're

4    single moms I work with who have three or four children and are

5    being evicted, and so I represent them in those cases.

6    Q.   And you mentioned being able to further your education, so

7    where did you go to college?

8    A.   So I got my undergraduate degree in sociology from

9    Bridgewater State University in Massachusetts.

10   Q.   And you work as a lawyer now; right?

11   A.   Yes, I do.

12   Q.   Where did you go to law school?

13   A.   I went to law school at the University of Colorado,

14   Boulder.

15   Q.   We heard that you had just graduated from law school in May

16   of 2020.

17   A.   Yes.

18   Q.   And where were you living in May of 2020?

19   A.   I was living in the Capitol Hill neighborhood of Denver.

20   My address at the time was 1424 Pennsylvania Street.

21   Q.   And that's where you lived with Maya, in Denver?

22   A.   Yes.

23   Q.   And you attended the George Floyd protests?

24   A.   Yes, I did.

25   Q.   And we have heard that that was on day one, Thursday, the

Amanda Blasingame - Direct

1   28th, and day three, Saturday, the 30th?

2   A.  Yes.

3   Q.  And why did you decide to go out and attend the protests on

4   those days?

5   A.  So there -- there is a lot of -- you know, personal

6   reasons.  I -- someone I love very much is black and has had

7   poor experiences with the police that have been shared with me.

8   That really bothered me.  And when I saw the video of George

9   Floyd, that -- that could have been Maya or could be Maya at

10  any point.  I also have cousins who are mixed race, who have

11  been targeted by the police, who have been harassed by police.

12  So it was personal to me, but also it was something that I

13  believed in and that I felt -- I have a lot of privilege as an

14  attorney and as a white woman, and so I felt like I needed to

15  use that to join everyone that was out there in solidarity.

16  Because even if it didn't -- especially for the black

17  community, even though it didn't happen directly to them, they

18  still felt that, and they still felt that fear and knew that at

19  any point it could be something that they could be subject to.

20  And so I felt it was important to join them and use my voice

21  and my privilege to support the message that they were sending.

22  Q.  And before protesting in May of 2020, had you attended

23  protests in any other capacity?

24  A.  I had attended some women's marches in the past, but no --

25  no protests that were directly in response to something that

Amanda Blasingame - Direct

1   had happened.

2   Q.  How about as a legal observer?

3   A.  Yeah.  So I -- I did some legal observing during the

4   occupation of the ICE detention facility in Aurora.  I -- one

5   of the days of that, I was there legal observing.

6   Q.  Can you tell what it means to legal observe?

7   A.  Yeah.  So it's a program through the National Lawyers

8   Guild.  We usually -- there is a training involved, and so

9   you're trained.  We work as a neutral third party at protests,

10  and so you don't get involved in the protest.  You aren't

11  participating.  The point is to kind of stand off to the side

12  where you can see what is going on, and then you can document

13  what is happening.  So that you can document -- you know, if

14  there are interactions between protesters and police, you're

15  there as a neutral third party to document that.  And so I went

16  through a training.  And then while we're there, we also wear,

17  like, bright green hats so that it's clear to everyone that we

18  are legal observing and not part of the protest.

19  Q.  And why did you decide to take that training to become a

20  legal observer?

21  A.  I took that training because I think the right to protest

22  is fundamental.  It's something that is ingrained in our

23  society, and it's one of the main ways that change happens.

24  And I think people's voices are important, and so I wanted to

25  be able to protect -- do what I could to protect people's right

Amanda Blasingame - Direct

1    under the First Amendment to go out and protest and speak.

2    Q.   And when you're, you know, out there working as a legal

3    observer, are you allowed to actually participate in the

4    protest that is going?

5    A.   No.  And that's part of why -- I never legal observed -- so

6    I didn't legal observe the George Floyd protests, because I

7    didn't legal observe anything that I would be, like, personally

8    attending or closely invested in, because that would defeat the

9    purpose of -- the role of a legal observer.

10   Q.   And so at the George Floyd protests, you were participating

11   in the protests.  You weren't legal observing; right?

12   A.   Correct.

13   Q.   Thank you.  And so now I want to talk through a little bit

14   more of your experience at the George Floyd protests.  And we

15   just heard from Maya, so I'm not going to ask you to, you know,

16   repeat a lot of the details.  But we heard that you were there

17   with Maya on day one, later in the evening; right?

18   A.   Yes, I was.

19   Q.   So was there a time on day one that you were there without

20   Maya?

21   A.   Yeah.  So I wasn't working at the time because I was

22   studying for the Bar, and so I had gone out -- I saw -- there

23   was a Facebook event or post at some point a few days before,

24   and so I had decided to go.  And I had talked to some of my

25   neighbors, and they were interested in going.  So I went to

Amanda Blasingame - Direct

1    that initial protest with two of my neighbors.

2    Q.  And when you arrived at the initial protest, can you

3    describe the general environment?

4    A.  Yeah.  So the initial protest -- it was -- there was --

5    there was a sense of mourning but also of solidarity.  So, you

6    know, people had signs, there were chants, but everyone was

7    kind of just there coming together as a community.  I have

8    never -- I have never felt that much of a sense of solidarity

9    and community before, and it was -- it was like a mix of a

10   really beautiful moment but also, you know, started because of

11   something tragic.  But protesters were just marching, chanting,

12   holding signs, and just really supporting each other.

13   Q.  And how did that environment change as the day went on on

14   day one?

15   A.  It changed when the presence of the police increased and

16   when the police tried to change -- it was -- in my opinion, the

17   police changed the tone of the protest that day.

18   Q.  And can you tell us more about how they changed the tone of

19   the protests?

20   A.  Yeah.  So, you know, we had been peaceful.  We were just

21   marching, using our voices.  And when -- when it really changed

22   for -- so I had been in that initial protest; but once the

23   protest got to the park before protesters entered the highway,

24   I actually turned around and had gone back to the capitol.

25   And, then, as Maya described, eventually, we marched with a

1    group to the police station.  And that's where it -- things

2    kind of got escalated and really changed.

3    *Q.*  Okay.  Just to back up and kind of make sure we have this

4    straight.  So you joined the initial protest at the capitol?

5    *A.*  Yes.

6    *Q.*  And then where did you go from there?

7    *A.*  So we marched down the 16th Street Mall.  We went -- there

8    is an underpass kind of over near Coors Field that we went by.

9    We were met with some police blocking the first ramp to the

10   freeway, and so we kept moving.  We went over -- there is like

11   a place you can walk up over one of the train stations to the

12   park.  And then once I got to that park right before the

13   pedestrian bridge that has been described before, I turned

14   around and took 16th Street back to the capitol.

15   *Q.*  When did Maya join you?

16   *A.*  Maya joined me when she got off work.  It was sometime in

17   the evening.

18   *Q.*  And that was at the capitol?

19   *A.*  Yes.

20   *Q.*  And, so, again, we just heard Maya testify; so, again, I'm

21   not going to ask you to repeat every detail.  But we heard her

22   talk about getting tear-gassed and experienced police weapons

23   at Colfax and Washington on the evening on day one.  Do you

24   have anything to add for us about that event from your

25   perspective?

1   *A.*  Yeah.  So I -- like Maya, I saw a few rocks fly in the air

2   at a building, but nothing more serious than that at the time.

3   And the -- you know, the police line kind of started and pushed

4   up to where that photo was taken.  And at the time, traffic

5   hadn't been stopped.  It was actually -- there were protesters

6   who had bicycles, and they were directing and stopping traffic.

7   You know, if cars needed to get through, they would let them

8   through.

9           I remember at one point there was a man that was

10   trying to get his pregnant wife to the hospital; and

11   protesters, like, worked together to make sure that people

12   moved to the side and that he could get through so that he

13   could get his wife to the hospital.

14           And then I -- as Maya described, you know, right

15   before we were -- they had used the gas, we were by that

16   SliceWorks.  And what I would like to add about that for those

17   that aren't familiar, this is -- there is businesses all over

18   this area.  But the SliceWorks, in particular, has all windows

19   in the front.  And all of those windows were open, and the

20   business was open.  And we -- so, you know, we thought that the

21   police would want to protect the business and not want to do

22   anything to it; and that's why we stood there.  But it turns

23   out we were wrong, because we were gassed.  And it didn't

24   matter if you were right in front of the line or further away.

25   That entire block was covered in gas.

Amanda Blasingame - Direct

1        I remember people who lived there reporting that,

2   like, gas had come in their windows, in their homes.  It was

3   just a huge cloud of it.  And like Maya, I had to recover from

4   the effects of that gas in the Argonaut parking lot.  Not

5   only -- I was -- not only were my eyes burning, my throat was

6   burning, but I was also just -- it's really disorienting.  It's

7   also shocking -- you know, you -- it was terrifying seeing the

8   line of officers in full gear with their -- with their guns.

9   But even then, I hadn't conceptualized what could happen.  It

10  was -- I just was in shock in what had -- that they had just

11  done that to us.

12  Q.  Maya also told us about later that evening experiencing

13  similar things on the south side of the capitol.  Can you tell

14  us about that from your perspective.

15  A.  Yeah.  So after we had arrived back at the south side of

16  the capitol, we -- we just went back there, because that's kind

17  of the main place people protest.  And we saw that the group

18  had headed back there; so we figured, you know, the protest was

19  just going to go back to the capitol.  And when we got there,

20  there was a crowd in front of a line of officers.  We had

21  stayed off to the side on the sidewalk; and there was, like,

22  the parking lot area for the capitol staff.  And so we were

23  standing off to the side there.  We were a little further back

24  at first, and then we moved a little further -- not far, but

25  where we were in that photo, with the video with our hands up

Amanda Blasingame - Direct

1   in the air.

2          And we were, you know, standing towards the back; but

3   we wanted to be able to see what was going on.  And so we were

4   just standing there with our hands in the air, saying, "Hands

5   up.  Don't shoot."  And just without -- I heard no warnings,

6   nothing.  I didn't -- I, like Maya, saw maybe a half-filled

7   plastic water bottle.  And it wasn't thrown at -- directly at

8   an officer.  It -- it was often just kind of throwing it into

9   the area.  And that was -- that came from the middle of the

10  crowd, and we were over here.  And that -- then all of a

11  sudden, they just started using the chemical weapons.  And some

12  of them went -- you know, the bottle came from here, and a lot

13  of the weapons that were used came towards us, off to the side.

14  Q.  So where were you in relation to the water bottle that you

15  saw?

16  A.  So the -- there was, like, the crowd and the police line,

17  and the water bottle came from here, and we were over off to

18  the side.

19  Q.  And what were the effects of the gas when it happened on

20  the south side of the capitol?

21  A.  Yeah.  So it's like I described before.  Your eyes burn;

22  your throat burns.  When the gas first gets thrown, you don't

23  even -- you can't -- it's -- it's hard to describe, other than

24  like your fight-or-flight response.  You don't think; you just

25  run.  That's your first instinct, because everything is

Amanda Blasingame - Direct

1    burning.  It's hard to breathe.  And this is also, like, during

2    the pandemic, so we had masks on, which would sometimes make it

3    worse, because the gas would be stuck on the mask, so there was

4    no way to get away from it.

5          Yeah, it was really -- it was hard to recover and try

6    to keep moving on.  But like Maya described, there were people

7    just screaming.  Their eyes were bloodshot; it was red.  They

8    were just crying, and like -- people were kind of just -- you

9    can't get it off of you.  But people were reacting, like,

10   trying to wipe things off of them.  Yeah.

11   Q.  At any time on day one, did you throw anything?

12   A.  No.  Never.

13   Q.  Did you engage in any sort of violence?

14   A.  Not at all.  I don't believe in violence.

15   Q.  Did you engage in any sort of property destruction?

16   A.  No, I did not.

17   Q.  And what about your friends or Maya, did they do any of

18   those things?

19   A.  No, they didn't.

20   Q.  And you said before that you had not heard warnings at any

21   of those times; right?

22   A.  I never heard any warnings or anything from the police.

23   Q.  And after these events had happened, what was your

24   reaction?

25   A.  I was in shock.  I -- I remember calling my mom the next

Amanda Blasingame – Direct

1  day and explaining to her what had happened, and she was scared

2  for me.  She asked me not to go out again, because she was

3  worried that something would happen to me if I did.  And I -- I

4  just couldn't believe that that had happened.  I mean, we

5  weren't -- I was on a sidewalk; I had my hands in the air; I

6  wasn't doing anything wrong.  And I'm -- I'm in a particular

7  position where I do know what my rights are; I do know what I

8  can and can't do and what the limits of the First Amendment

9  are.  And if I can't be out and safely protest, I couldn't

10  imagine what was happening to other people or what would

11  continue to happen.  I -- to sum it up the best way, it was

12  terrifying.

13  Q.  And so we've heard, again, from Maya that you both then

14  returned on day three, on the 30th.  Is there a reason why you

15  didn't attend on day two?

16  A.  Yeah.  So first off, after what had happened the night

17  before, I was still in shock.  I didn't know -- I didn't feel

18  prepared to go out; I didn't feel comfortable.  And I also

19  wanted to get in some studying for the Bar exam, because I was

20  studying for that at the time; and so I had tried to just stay

21  home and get some studying done instead of going out.

22  Q.  And by "Bar exam," you mean the exam you have to pass to

23  practice law?

24  A.  Yes.

25  Q.  And how did studying go that day?

Amanda Blasingame - Direct

1    *A.*  It didn't go well.  I could not focus.  Where we lived,

2    there was no way to get away from what was happening.  We were

3    kind of in the midst of it at all times.  I -- I tried to focus

4    and study; but, you know, I kept checking to see what was

5    happening in case maybe I wanted to go out later.  But I was

6    watching, you know, livestreams and videos of the police

7    continuing to just pepper spray people for no reason, gas

8    people for no reason, shoot pepper balls at them for no reason.

9    And it was really hard -- as someone who believes in, like,

10   solidarity in the community, it was really hard to stay home

11   and study, knowing that that was happening to my neighbors.

12   *Q.*  And why did you decide to go back out to protest on day

13   three?

14   *A.*  I went back on day three because -- for one, I felt really

15   strongly about the message.  And the police had only proved to

16   me that the message we were trying to convey was important,

17   because -- you know, we were there protesting police violence;

18   and we were met with violence from the police.  And so it

19   became very clear to me that this is -- you know, they proved

20   to me that this is an issue and this is an issue in Denver.

21   And so I -- and I also had friends who -- one friend that is

22   also very close to Maya who wanted to try to go out in support

23   but was scared to go out by herself and didn't know what -- how

24   to respond to chemical weapons or what to do.  And so she had

25   asked if I would go out with her because I had experienced it

Amanda Blasingame - Direct

1   the day before, and she didn't feel safe going otherwise.

2   Q.   And we heard from Maya that there were times she was not

3   with you on day three.

4   A.   Correct.

5   Q.   Right?  That was earlier in the day?

6   A.   Yes.

7   Q.   How was the environment on day three different than on day

8   one?

9   A.   It was -- people -- you know, people didn't show up with

10  just signs and their voices.  People had to show up with jugs

11  of water, first-aid kits, goggles, helmets, whatever the case

12  might be.  It -- it wasn't going out and speaking your voice on

13  the capitol lawn; that just wasn't an option.  So if you were

14  going to go protest and you wanted to do it safely, at that

15  point you had to be prepared.  So I had -- you know, that --

16  what was different for me that day is, I had more water in my

17  backpack.  I had a spray bottle with water, because it made it

18  easier to try to spray pepper spray or tear gas out of people's

19  eyes.  There was -- another protester had bought a bunch of

20  swim goggles from the Dollar Store or something and was handing

21  them out to other protesters who may not have been as prepared

22  or didn't know what to expect.

23       But the environment was -- there was -- the police

24  presence had greatly increased.  And not only their presence,

25  but what they were wearing, the weapons they were carrying, the

Amanda Blasingame – Direct

1    number of vehicles they had, the -- there was nowhere in the

2    capitol that you could go or be without confronting a large

3    group of armed police officers.

4    Q.  And did police officers use their weapons on day three?

5    A.  Yes, they did, almost regularly, constantly throughout the

6    day.

7         MS. GORIN:  I'd like to mark for identification

8    Exhibit 82, please.

9    BY MS. GORIN:

10   Q.  Amanda, do you recognize what this exhibit is?

11   A.  Yes, I do.  This is a still of a video that I took.

12        MR. RINGEL:  No objection.

13        THE COURT:  It's admitted.

14        (Exhibit 82 admitted.)

15        MS. GORIN:  Thank you.

16        Can we play the video, please.

17        (Video played.)

18   BY MS. GORIN:

19   Q.  Can you tell us what this video is depicting?

20   A.  Yeah.  So I was just -- I was on the capitol lawn.  This

21   was not too long after I had arrived.  I was -- I was there

22   with my friend, and we had -- I think my neighbor was there

23   with his friend, and we were just kind of -- people were

24   standing in the lawn with their signs.  And there was kind of a

25   group near the bus station; and an entire line of officers in

Amanda Blasingame - Direct

1   protective or SWAT gear, whatever the word for it is, marched

2   out of the capitol building and down a path towards the bus

3   station, in what felt to me like a show of force, because they

4   all kind of marched out holding whatever weapons they had and

5   marched across that intersection.

6   Q.  And what did you do after taking this video?

7   A.  Shortly after this video was taken, the police kind of went

8   back to the intersection and created a line on Lincoln.  And a

9   smaller group started to form in front of them in the street.

10  And so I went over to join that group who was chanting in front

11  of the line of police.

12       MS. GORIN:  Can we bring up Exhibit 41, please.

13  BY MS. GORIN:

14  Q.  Can we get oriented a little bit?  Can you show us where

15  you took the video and then where you traveled to?

16  A.  Yeah.  So I took the video from here, and then I -- this is

17  kind of where those officers walked, and they formed a line

18  probably about here, and I was standing in this area.

19  Q.  And have you been watching the testimony here in court?

20  A.  Yes, I have.

21  Q.  How many days?

22  A.  I've been here all day, every day.

23  Q.  And so I -- you were here for Chief Stamper's testimony?

24  A.  Yes, I was.

25  Q.  Do you remember him talking about the clearing of the bus

Amanda Blasingame - Direct

1    station on day three?

2    A.   Yes, I do.  It was familiar to me.

3    Q.   Why was it familiar to you?

4    A.   Because I was there during those events.

5    Q.   Can you show us where the bus station is in relation to

6    where you were?

7    A.   Yeah.  So this area -- this kind of whole area here is the

8    bus station.  This is -- this is the gravel area, and then this

9    is kind of like a raised, like, walkway area.  So this is the

10   bus station, and this is the line of police, and then I was

11   about here.

12        MS. GORIN:  So this actually may be a little more

13   helpful.  I'd like to bring up Exhibit 42A, please.  This was a

14   still that was taken from Exhibit 42, which was previously

15   admitted.

16        So this is taken from an aerial camera above the Civic

17   Center bus station on May 30 around 5:45.

18   BY MS. GORIN:

19   Q.   Amanda, can you tell us generally where you were in the

20   crowd.

21   A.   Yeah.  So I was -- after the first day, I made sure that --

22   because I was terrified of the chemical weapons, I made sure

23   that wherever I stood, I had some -- I had -- I had to identify

24   exit plans, basically, and identify a route.  So I was off in

25   probably around this area when I first got there.

Amanda Blasingame - Direct

1   Q.  Okay.  And when you got there, what were the protesters

2   doing?

3   A.  The protesters were standing in front of the line of the

4   police, chanting.  And then at one point, a lot of protesters

5   in that group there -- including myself -- once the police

6   started to come closer to us, holding their weapons, we got

7   down on our knees in the street and put our hands up in the air

8   and said, "Hands up.  Don't shoot."

9   Q.  Could you tell if everyone at the bus station stayed down

10  on their knees?

11  A.  I don't know if everyone did, but a good part of the crowd,

12  especially -- I wasn't too far back from where the police were,

13  and a good part of the crowd had been kneeling.

14  Q.  And what happened after the officers started advancing?

15  A.  At some point while I was on my knees with my hands in the

16  air saying, "Hands up.  Don't shoot," there was just -- it's

17  hard to know if it was pepper bullets, tear gas, smoke.  It

18  was -- I think it was -- it was a combination of multiple types

19  of weapons, just started to be used on the crowd.  So I got off

20  my knees and ran back toward the capitol.

21          MS. GORIN:  I'd like to bring up Exhibit 27, please.

22  And I believe a still from this exhibit had been admitted

23  before.  And, otherwise, it has been stipulated.

24          THE COURT:  Yes.  It's in.

25          MS. GORIN:  May we play it, please?

1      (Video played.)

2      Unfortunately, this video has no sound.  I apologize.

3  *BY MS. GORIN:*

4  *Q.* Do you see the time stamp -- oh, good.  Mine is working.

5  Do you see it says around 5:47 p.m.?

6  *A.* Yes.

7  *Q.* And the image we looked at before was around 5:45 p.m.?

8  *A.* Yes.

9  *Q.* So is this the same crowd that you were in that you said

10  you were towards the front of at the bus station?

11  *A.* Yes, it is.

12  *Q.* And right before, you know, what we saw happened, what were

13  the protesters doing?

14  *A.* They were peacefully protesting.  People were chanting.  As

15  I mentioned before, many of us -- including myself -- were on

16  our knees with our hands in the air, saying, "Hands up.  Don't

17  shoot."  Because from what we had experienced before, you know,

18  and you have a gun pointed at you -- I mean, getting on my

19  knees with my hands in the air saying, "Hands up.  Don't shoot"

20  was about as non-threatening as I could get.

21  *Q.* Did you see anyone throw rocks?

22  *A.* No, I didn't.

23  *Q.* Did you throw any rocks?

24  *A.* Absolutely not.

25  *Q.* After this happened, what did you do?

Amanda Blasingame - Direct

1    *A.* After this happened, I ran up towards -- I ran across

2    Colfax. I just -- I realized, you know -- watching this and

3    thinking back about it, I ran -- the traffic on Colfax was not

4    shut down. I -- but you just react, and I just ran across

5    Colfax. I didn't look. I probably wouldn't have been able to

6    see, anyway. I just ran across Colfax and went towards the

7    back of the capitol, where I thought I could find a space to

8    safely recover and meet back up with the friends I was with.

9    *Q.* And where did you go after the back of the capitol?

10   *A.* I then moved -- after I recovered -- it took a fair while

11   to recover from that -- the amount of gas that was there. And

12   it never actually fully goes away, especially -- because it

13   stays, you know, on your skin, in your mask, in the air. But I

14   wanted to try to continue to protest and maybe rejoin some

15   protesters. And so I moved to the grassy area in the front of

16   the capitol, because I thought I would be, you know, far enough

17   away that I wouldn't be near where the police were and where

18   they were using weapons.

19        *MS. GORIN:* May we pull up Exhibit 1241 again.

20   BY MS. GORIN:

21   *Q.* Amanda, can you show us what you described and where you

22   ended up in the grassy area of the capitol?

23   *A.* Yeah. So I had run across Colfax and then up here. And

24   I -- I was surprised that I ran that way up the hill, because I

25   do not run; but apparently in the moment, you have new skills.

Amanda Blasingame - Direct

1    So I kind of recovered in this area over here and then went

2    towards the front of the capitol and stopped kind of around

3    this area.

4    Q.  Did the police officers from the bus station follow the

5    crowd into that area?

6    A.  Yeah.  So the officers continued -- they kind of pushed

7    this way and were, you know, kind of holding a line here.  And

8    a lot of the protesters that they pushed had gone back into the

9    grassy areas, where we had often been and where we typically

10   do -- people do protest.  And so people kind of scattered

11   either into this park here or into the grassy area here.  There

12   was still some people in the street, as well; but a lot of

13   people had run into the grass.

14   Q.  And what were the officers doing while you were at this

15   location?

16   A.  I don't remember a point where they stopped using -- like,

17   completely stopped using weapons.  They kept moving forward.

18   And while I was in the grass area -- so let me -- so I was over

19   here; and the police were shooting into the grass, where

20   protesters had retreated to.  And so even in that area, I

21   was -- and it was really hard to tell where anything was coming

22   from.  So, you know, we were kind of, like, trying to stay low.

23   And there was just pepper bullets and other stuff just flying

24   into the grass, with no -- people were scattering -- there

25   wasn't even a crowd in the area I was in, but there were --

1  people were kind of scattered, and there were just weapons from

2  the police flying all over the grass.

3           MS. GORIN:  I'd like to mark for identification

4  Exhibit 1217, please.

5  BY MS. GORIN:

6  Q.  Amanda, do you recognize what this exhibit is?

7  A.  Yeah.  This is the beginning of a video I took from that

8  grass area.

9           MS. GORIN:  I'd like move this exhibit into evidence,

10 please.

11          MR. RINGEL:  No objection.

12          (Exhibit 1217 admitted.)

13          MS. GORIN:  May we play it, please?

14          THE COURT:  Terri, how are you doing?  Would you like

15 a break?

16          Let's take a break.  Let's say 11 o'clock.

17          (Recess at 10:50 a.m.)

18          (In open court at 11:03 a.m.)

19          MR. RINGEL:  Your Honor, one item, if I may, before

20 the jury.

21          THE COURT:  Okay.

22          MR. RINGEL:  I believe it's appropriate for plaintiffs

23 to not be referred to by their first names during examination

24 and would object to continued uses of first names, as opposed

25 to formality that a federal court should deserve.

Amanda Blasingame – Direct

1           MS. WANG:  I'm not sure what kind of objection that

2    is.

3           THE COURT:  It's a request.

4           MR. MACDONALD:  We oppose it, Your Honor.

5           THE COURT:  Why?

6           MR. MACDONALD:  A couple of reasons.  One, in our

7    interactions with our clients, we've always referred to them by

8    their first names, based on relationships we've had with them.

9    And Mr. Ringel's never raised this with us during the course of

10   this trial.  And raising it now, I think that's a possibility

11   of disrupting our junior members of our team if you can't use

12   the name you've been using with a witness.  I don't see any

13   legal prohibition on using client's first names.

14          THE COURT:  Well, my reaction to both the request and

15   response is, Really?  It comes down to this?  Use the last

16   names.

17          Let's get the jury in here.

18          You can start that with the next witness, though.

19   We've already crossed that bridge with this witness.

20          (Jury in at 11:05 a.m.)

21          THE COURT:  Continue with this witness.

22          I think we have a pretty good idea generally about the

23   videos and about what the complaints are, so I don't think we

24   need to necessarily repeat all of this with each witness.

25          Onward.

1          *MS. GORIN:*  May I proceed, Your Honor?

2          *THE COURT:*  Yes.

3          *MS. GORIN:*  Thank you.

4    *BY MS. GORIN:*

5    *Q.*  Ms. Blasingame, we were looking at Exhibit 1217.

6          May we play it, please.

7          (Video played.)

8          What was happening as you were taking this video?

9    *A.*  That is when the police had moved forward up Lincoln and

10   were firing weapons into the crowds who were in the grass.

11   *Q.*  And you mentioned before that you were in one of those

12   grassy areas --

13   *A.*  Yes.

14   *Q.*  -- of the capitol; right?

15   *A.*  Yes.

16   *Q.*  What did you see as you were standing in that area?

17   *A.*  I saw protesters who had retreated from what had just

18   happened near the bus station.  And as I explained before, they

19   ran off into the area in front of the capitol and then the park

20   across the street.  And from where I was, I could see

21   everything that was -- because it was raised, I could see what

22   was happening also in the park across the street.

23          And while I was there, I -- there was -- some

24   protesters had brought cones -- like those traffic cones with

25   them, and part of that was because we were constantly getting

Amanda Blasingame - Direct

1    hit with tear gas canisters.  And if you put a cone over them,

2    it kind of keeps that gas from dispersing and harming everyone

3    around the person it was aimed at.  And there was one protester

4    who -- because they were shooting the canisters or whatever

5    have you into the crowd, he had gone -- stepped forward with a

6    cone to put a cone over one of those canisters, because there

7    were protesters who were trying to run away that were going to

8    be impacted by that gas.  And at -- from where I stood, he ran

9    over to put the cone over that; and then you just see him go,

10   like, straight down, like he was knocked out.  There was

11   something that flew through the air and just knocked him right

12   down.

13           And he was unconscious, and I know this because he

14   wasn't moving.  And a bunch of other -- the police continued to

15   fire after that happened.  And a bunch of other protesters had

16   to come and run and drag him by his backpack to try to get him

17   out of the line of fire.  And both the unconscious person and

18   the people dragging him were being fired at with pepper bullets

19   by the police.

20   Q.  You mentioned you saw something fly through the air and hit

21   the protester in the head.  Can you describe more of what it

22   was, or what it looked like?

23   A.  Yeah.  So it was, like, something large.  I wasn't close

24   enough to see exactly what it was; but I was able to see the --

25   where it came from.  And it came from the line of police

Amanda Blasingame - Direct

1    officers.

2    Q.  And, Ms. Blasingame, have you seen a video of this

3    happening to this protester?

4    A.  Yes, I have.

5            MS. GORIN:  I would like to mark for identification

6    Exhibit 856, please.

7    BY MS. GORIN:

8    Q.  Do you recognize this exhibit?

9    A.  Yes.  This is a view from the other -- so I was kind of

10   over here.  This is the park across the street, so this is a

11   view from the other side of what I saw.

12           MS. GORIN:  I'd like to move this exhibit into

13   evidence, please.

14           MR. RINGEL:  Just a minute, please.

15           No objection.

16           THE COURT:  Admitted.

17           (Exhibit 856 admitted.)

18           MS. GORIN:  May we play it, please?

19           (Video played.)

20   BY MS. GORIN:

21   Q.  What was your reaction to seeing this happen?

22   A.  I was horrified.  You're told the police are there to

23   protect you, to protect the community, to protect citizens.

24   They -- not only were they the ones that harmed this person,

25   they didn't help him.  They didn't -- they -- in fact, they

1    shot at the people who did help him.  There is all of these

2    descriptions of protesters supposedly being violent, but the

3    violence was against the protesters from the police.  And the

4    only people that helped people when they were injured because

5    of the police were other protesters.  No one ever came to his

6    aid; no one did anything.  I -- I couldn't believe what had

7    happened.  I didn't stay out much longer after that.  I didn't

8    feel safe.  I later heard about other stories of people who

9    were hit by canisters, rubber bullets --

10            *MR. RINGEL:*  Objection.  Hearsay.

11            *THE COURT:*  Yes.  Sustained.

12            *THE WITNESS:*  So I was -- I was terrified of what

13   could happen to me.  I didn't want to be hit with one of those,

14   especially -- for me, personally, I was studying for the Bar

15   exam at the time.  It only happens twice a year, and so -- and

16   I do not come from a wealthy family.  I could not afford to not

17   pass it the first time and delay my career.  And so I -- I

18   didn't feel safe being out protesting.  An injury like that

19   could have really impacted my career.

20   *BY MS. GORIN:*

21   *Q.*  And you mentioned you had gone home not -- shortly after

22   these events.  Do you remember around what time?

23   *A.*  I don't remember the exact time, but I know specifically it

24   was before the curfew.  Again, because I was studying for the

25   Bar, I -- I knew that if I stayed out by curfew, I could be

Amanda Blasingame – Direct

1   subject to arrest; and it was a risk that I was not willing to

2   take.  I was in the -- I still hadn't completed my character

3   fitness process at the time, and so an arrest while that's

4   pending could have delayed my admission to the Bar.

5   *Q.*  And for those of us who are, perhaps, lucky enough to not

6   know what the character and fitness process is, can you explain

7   just a little bit more of what that means?

8   *A.*  Yeah.  So to become a licensed attorney, there is kind of

9   two major components.  So there is the Bar exam, which is the

10  test; and then there is character and fitness.  And character

11  and fitness is, basically, the state bar that you're being

12  admitted to -- which for me was California -- they basically

13  try -- they try to make a determination whether you're a

14  trustworthy person, whether you're fit to be an attorney, and

15  whether you should be licensed.  And one of the pieces of that

16  is disclosing all arrests.  And often there is some kind of --

17  there may be some kind of follow-up, and it can delay things.

18  *Q.*  Ms. Blasingame, at any time on day three did you hear

19  officers give a warning that they were going to be using

20  less-lethal weapons?

21  *A.*  No.  I never heard a warning at any point.

22  *Q.*  At any point on day three, did you or your friends throw

23  anything?

24  *A.*  Absolutely not.

25  *Q.*  Did you or your friends engage in any sort of violence?

Amanda Blasingame – Direct

1    *A.*  No.

2    *Q.*  And did you or your friends engage in any sort of property

3    destruction?

4    *A.*  No.  The only assaults on property I witnessed were by the

5    police.

6    *Q.*  Okay.  Then so you mentioned you went home after this;

7    right?

8    *A.*  Yes, I did.

9         *MS. GORIN:*  I'd like to bring up Exhibit 1241A,

10   please.  This is simply a scan of Exhibit 1241 that was marked

11   the other day with Commander -- excuse me -- Chief Sanchez.

12   *BY MS. GORIN:*

13   *Q.*  Ms. Blasingame, can you draw on this map where you went

14   home to, where your apartment was?

15   *A.*  Yes.  So this is -- as I said before, this was the building

16   that we were living at at the time.

17   *Q.*  And after you got home, did you have any other interactions

18   with the police?

19   *A.*  Yeah.  So I won't get into the same details Maya described,

20   but there was a convoy of officers.  They stopped; an officer

21   got out.  As Maya explained, she had backed up, but -- Maya was

22   there, and another one of our neighbors who is also black was

23   there and also my neighbors that I was out with knew I was

24   studying for the Bar, knew I had just graduated law school, so

25   they kind of looked at me as the officer approached to be the

Amanda Blasingame - Direct

1    one to talk -- to interact with him.  And so I -- I had stepped

2    forward and walked up to the fence to talk to the officer that

3    was approaching us, because I didn't know why he was

4    approaching us or anything.

5         And so I -- I met up with him.  He walked right up to

6    the fence.  I was on the other side of the fence on my

7    property.  And he -- we were maybe this far away, and he -- he

8    approached us, and he had what I believed at the time -- and

9    still believe -- to be pepper spray.  It was about maybe like

10   this large.  It had, you know, a handle with a thing.  And he

11   held it and pointed it directly in my face.  It was probably

12   about this far -- this far from my face.  And he screamed, "Get

13   the fuck back.  Get inside."

14        And I -- I was trying to talk to him.  I said, I don't

15   understand.  We're on private property.  We're not doing

16   anything wrong.  We're not breaking any laws.  And he continued

17   to point it at my face and scream at us.  And I think had

18   something like, I don't know if you've heard of the First

19   Amendment.  Like, we have a right to do this.  This is a right

20   that we have.  And at some point, you know, some neighbors and

21   other people had started yelling at the officers and said they

22   were recording; and that's what stopped the officer and made

23   him turn around.

24   Q.  What is your understanding of the identity of the officer

25   who came up to your fence?

1   A.   Yeah.  So I don't have as good of a memory as Maya of his

2   face, because I wasn't looking at his face.  I was focused on

3   the giant can of pepper spray pointed directly at my face.  So

4   all I remember, he had gray hair.  I remember he was of average

5   height.  He appeared -- he appeared to be -- his skin wasn't --

6   he wasn't black.  His skin wasn't dark, and -- but I -- I

7   didn't really -- I wasn't focused directly on his face, so I --

8   my description is based on what I saw when he was first walking

9   up, because, again, all I was focused on was the pepper spray

10  pointed directly in my face.

11  Q.   After having seen testimony in court today, is it your

12  understanding that that officer was Officer Chavez?

13  A.   Yes.

14       MS. GORIN:  I'd like to bring back up Exhibit 56,

15  which was previously admitted, please.

16  BY MS. GORIN:

17  Q.   I know we have seen this before with Maya, but I want to

18  get more of a sense of where you specifically were.  When

19  Officer Chavez came up to the fence, can you show us where you

20  were?

21  A.   Yes.  So at the time this gate was actually closed, because

22  there was a lot going on, there were people going around the

23  neighborhood, and we were trying to make it very clear that we

24  were on our property.  And so I was -- this piece of fence

25  here, I was standing on the other side of the fence, kind of

834

Amanda Blasingame - Direct

1    right here; and Officer -- the officer was standing right here,

2    up against the fence.

3    Q.  At any point did you step onto the other side of the fence?

4    A.  No, I didn't.  I stayed on the other side of the fence, on

5    my property the entire time.

6    Q.  And before Officer Chavez stopped his car and came up to

7    the fence, what were you and your neighbors and Ms. Rothlein

8    doing?

9    A.  Yeah.  So at this point I think everyone has seen enough

10   videos to know what the sounds were like, the pepper bullets,

11   the flash-bangs, the grenades, the screams.  You could hear

12   people scream when they got hit.

13         Living -- I live in the United States.  I didn't

14   expect to ever feel like I was living in a war zone.  You

15   couldn't sleep.  You couldn't be inside, but it sounded like a

16   war zone outside.  And the people in the neighborhood -- you

17   know, they claimed to be protecting the people in the

18   neighborhood.  And we tried to make it very clear, we didn't

19   want or need protection.  We were out there yelling, "Get out

20   of our neighborhood," like, please leave.  Some people were

21   saying, "Get the fuck out," because there were understandably

22   frustrated and angry.  And it wasn't -- you know, there were

23   people yelling -- that's what the neighborhood wanted.  There

24   were people yelling from their apartments, from their stoops.

25   They didn't want to have to keep hearing this -- they didn't

Amanda Blasingame - Direct

1    want to live in a war zone, which was created by the police.

2    No one had any issues when protesters were coming through the

3    neighborhood.  They supported the protesters, people had Black

4    Lives Matter signs in their windows, and -- sorry.

5    Q.  Thank you.  So you mentioned that you had spoken to

6    Officer Chavez about the First Amendment.  Did he say anything

7    to you?

8    A.  He just continued screaming at me to get back.  And I was

9    trying to talk and understand if -- like, if he thought I was

10   violating the law, I didn't know what law it was.  He didn't

11   tell me.  He didn't give me a reason for why he wanted to force

12   me to go outside.  And I was outside because at the time we

13   lived -- we lived in a garden-level apartment, and we didn't

14   have air conditioning.  So, for one, it was hot.  And we

15   couldn't have our windows open because our neighborhood was

16   filled with gas.  And we have a cat that we did not want

17   exposed to that, especially.

18           But also because being inside and not being -- hearing

19   all of those noises and not knowing where they're coming from

20   or what is happening was incredibly stressful and anxiety

21   inducing; and so I felt better to be outside with my neighbors

22   where I could see what was happening, because not being able to

23   see was -- it was worse to be inside.

24   Q.  And before Officer Chavez left your fence, did your

25   neighbor say anything to him?

Amanda Blasingame - Direct

1    *A.*  Yeah.  So I -- I'm really grateful that one of our

2    neighbors, you know, stepped forward and said -- I think she

3    said like, "I'm recording you."  I don't know what else she

4    said, but she started to yell, "I'm recording you."  And one of

5    my neighbors pulled up his phone -- I don't think he even had

6    time to turn the camera on, but we were just trying to

7    de-escalate the situation.  And so, like, he just held up his

8    phone was, like, "I'm recording you," like -- and at that

9    point, he eventually turned around and left.  But, again, he

10   didn't say anything about why he had stopped.

11   *Q.*  And after that -- a little after that, we heard

12   Ms. Rothlein talk about the drive-by shooting that you both

13   experienced on the night of day three.  Again, we're moving

14   this along, so I won't ask you to repeat all of the details.

15   But can you tell us about that event from your perspective?

16   *A.*  Yeah.  So after the first interaction, we had actually

17   moved to -- so, you know, there is the area, there is the

18   steps, and then there is kind of that top flat area in front of

19   the door.  After the first incident, we moved up there, because

20   it's well lit, and we -- we were scared and wanted to make it

21   very clear that we were sitting outside at our home.  But we

22   continued to protest.  We continued to ask the police to leave

23   our neighborhood.

24        And while we were out there, they -- as Maya

25   described, they did a drive-by shooting.  And I immediately --

Amanda Blasingame - Direct

1    I luckily was not in front of the opening.  I was behind the

2    pillars and was able to -- you know, I knew the sound of pepper

3    bullets, because they had been used on me before; and so I knew

4    what was happening -- I knew that I was being shot at with

5    them.  And so I immediately ducked behind so that I wouldn't be

6    hit with them, because they were -- you know, they were just

7    firing as they were driving by.  So I didn't know if I was

8    going to be hit, and so I ducked.

9         And then we had a neighbor that was putting her key in

10   the front door at the time to go inside when they did this; and

11   one of the pepper bullets had grazed her, which is why I was

12   grateful that I had been able to duck behind.  And then some of

13   the gas had gotten into our mailroom.

14   Q.  And, yeah, your neighbor who had been grazed by the pepper

15   ball, did she -- what was she experiencing, from your

16   perspective?

17   A.  Yeah.  So -- I mean, she wasn't even -- she didn't even say

18   anything or do anything.  She was literally just trying to go

19   inside, which apparently is what they had wanted us to do.  But

20   she was just trying to go inside.  And I remember talking to

21   her the next day, and she said she was up all night from the

22   effects of the pepper bullet.  And I remember, you know, like

23   Maya had said, we tried to retreat into the mailroom, but that

24   was also filled with the insides of pepper bullets, so we had

25   to go into the hallway.  And we all just stood there coughing

Amanda Blasingame - Direct

1   aggressively for a long time.  And our neighbor said she

2   actually coughed so much that she threw up that night.

3   Q.  That was the neighbor that got grazed, or a different

4   neighbor?

5   A.  Yeah.  No, it was the same neighbor that got grazed.  And I

6   had coughed to the point of almost throwing up, as well.

7   Q.  Ms. Blasingame, are you aware of a similar complaint that

8   was made to the DPD of a drive-by pepper ball shooting that

9   same night near 14th and Pennsylvania?

10  A.  Yes, I am.

11  Q.  And are you aware that that complaint was that a DPD car

12  drove by, an officer shot pepper balls and threw a flash-bang

13  at people at a private, fenced-in yard?

14  A.  Yes.

15  Q.  And are you aware that complaint was made by someone named

16  Jackie Bjelland?

17  A.  Yes.

18  Q.  Is Jackie Bjelland one of the neighbors that you were with

19  on the night of day three?

20  A.  No, she's not.  She wasn't one of my neighbors.  I think

21  she lived in a different building on our street.  There was

22  lots of people outside that night, for the same reasons we were

23  out there.

24  Q.  Did you know of Jackie Bjelland on the night of the

25  protests?

Amanda Blasingame - Direct

1    *A.*  No, I didn't.

2    *Q.*  So this is now a different person who has experienced a

3    drive-by pepper ball shooting on 14th and Pennsylvania?

4    *A.*  Yes, it was.

5    *Q.*  And what was your reaction when this drive-by happened?

6    *A.*  I -- I remember my first -- when I -- my first reaction

7    was, why?  Again, we didn't do anything; we weren't violating

8    any laws; there weren't -- there wasn't anyone around us

9    protesting -- there weren't even protesters around us; there

10   wasn't anyone damaging property; there was no violence.  I -- I

11   think at the time I had said that they -- they responded with

12   their egos.  They were upset that we didn't want them there;

13   they were upset by our message; they were upset that we didn't

14   go inside, even though we were within our right not to; and

15   they -- they reacted with what I believe to be their -- their

16   egos and with no constraint.

17            And I -- you know, I understand people yelling at you

18   is -- is not easy; but I don't -- you know -- if someone

19   yelling at you justifies force like that, then I think you're

20   in the wrong line of work.  You shouldn't be a police officer

21   if you don't have self-control, if you cannot separate yourself

22   from your job.

23            But I just -- you don't -- like Maya said, you don't

24   expect -- you know, we live in downtown Denver -- we lived in

25   downtown Denver.  There is crime; there is things that happen.

Amanda Blasingame - Direct

1  I didn't expect that an assault that I would experience or

2  shooting that I would experience there would be by the police.

3  And I -- I just -- I couldn't believe what had happened.  And

4  it wasn't something I could even get away from, because, as

5  Maya said, the pepper -- we couldn't even go outside the next

6  day because there was still remnants of the pepper.  And we

7  couldn't even go in our mailroom for about a week.  I just

8  avoided it, because every time I was exposed to it, it would

9  bring back what happened.  And so we just didn't -- we didn't

10  use that door, which is unfortunate, because the only other

11  door goes into a dark alley in the back.  But we couldn't even

12  exit from our front door for over a week.

13  *Q.*  And what toll have the events of the protests in Denver in

14  May of 2020 had on you?

15  *A.*  So I don't trust the police; I avoid them.  I can't think

16  of many instances where I would call them.  I -- because I

17  don't know what they're going to do.  I don't trust their

18  judgment.  I don't trust them to not think before they react.

19  And I wouldn't want something to happen to myself or my fiance,

20  Maya, especially it's -- loving someone who is black and

21  targeted by the police just makes that impact even stronger--

22  or that fear.

23        I don't talk -- even just people in any uniform that

24  look similar to police -- so like security -- they make me

25  uncomfortable.  Weapons make me uncomfortable anywhere I see

Amanda Blasingame - Direct

1   them.  I have not been to a protest since.  And there have been

2   protests even where we live now; I have not been to them.

3   Sorry.  I've been -- I said -- let me correct that.  I haven't

4   been to protests in a long time.  There was sometime after

5   that, that after, you know, really conceptualizing what

6   happened, it -- protests no longer feel the same as they did.

7   They don't feel safe.

8           I'm sensitive to loud noises.  As Maya described this

9   past -- I thought that, you know, sometimes you forget about

10  it.  You know, the human body tries to suppress traumatic

11  events, and so you don't think about it, and you try not to.

12  But this past Fourth of July, we were just sitting in our

13  living room, and fireworks started going off.  And I

14  immediately became anxious; and I was anxious the entire night,

15  because it just brought me back to those noises.  And so I

16  can't even go to fireworks.  That night, I had to -- you know,

17  I tried to block -- close my curtains, block the windows, do

18  what I could to not listen to it, because it just puts -- it

19  puts you into a complete panic.

20  Q.  How about any toll that you've experienced by bringing this

21  lawsuit?

22  A.  Yes.  So we live in Redding, California; so we've come here

23  for this lawsuit.  I'm here because it's important to me.  I

24  think -- you know, if what happened to me -- I don't think we

25  should have to wait until somebody is seriously injured or dies

1   before we hold the police accountable.  I think that -- I don't

2   think we should even -- I don't think this should have to

3   happen and hold them accountable in the first place; but if we

4   do, like, it's important to me to not -- to do this and to not

5   wait until someone is seriously injured or harmed or killed.

6   And I -- I'm here.  I'm away from my clients.  There are two

7   attorneys in my office for five counties.  When I'm there,

8   there is not enough of us to support the level of need and help

9   people.  So me being here means that there is less people being

10  helped and having legal representation.  But I believe that

11  this is important, not only to me, but to my -- my clients have

12  also had bad experiences with the police.

13          And then just sitting in this courtroom every single

14  day, watching these videos, listening to what happened,

15  having -- having to listen to people try to diminish what

16  happened to us and make excuses for it, it's incredibly hard.

17  Like, to say, well, you didn't get hit by something directly --

18  should I have to die or be put in the hospital before I speak

19  out or before I hold anyone accountable?  It's been really hard

20  to sit here and listen to that and to watch the videos.

21          I've -- I've even seen the other attorneys -- the

22  attorneys for the city laughing, smirking, smiling.  That's

23  incredibly hard to witness.  I -- yesterday I -- before I even

24  left this courtroom, I broke down in tears.  I've cried every

25  single night I've been here after being here.  It's just -- if

1    you haven't been through it, it's -- maybe it's easy to judge

2    or make excuses or talk about what other people -- I did

3    nothing wrong.  I wasn't violating any laws, and I knew I

4    wasn't violating any laws.  And if that's how I was treated, I

5    can't imagine what has happened to other people.  It's just

6    been -- sorry.

7           It's been incredibly hard to sit here and to have

8    people try to say what happened to you is not a big deal and to

9    make excuses.  And it's not something that people -- anyone

10   should have to go through, and I don't want anyone to have to

11   go through it.

12          *MS. GORIN:*  Thank you so much, Ms. Blasingame.  No

13   more questions at this time.

14          *THE COURT:*  Cross-examination.

**CROSS-EXAMINATION**

16   *BY MR. RINGEL:*

17   *Q.*  Good morning, Ms. Blasingame.

18   *A.*  Good morning.

19   *Q.*  You have strong feelings about the police; correct?

20   *A.*  Yes, I do.

21   *Q.*  You believe -- you are what is called a police

22   abolitionist; right?

23   *A.*  I do believe in replacing the system of policing that we

24   have now, yes.

25   *Q.*  Okay.  That means you want the police to be abolished;

844

Amanda Blasingame - Cross

1    right?

2    *A.*   As they exist now, yes.

3    *Q.*   You don't believe the police are necessary; true?

4    *A.*   I -- correct.  I don't believe they're necessary.

5    *Q.*   You're also a prison abolitionist; isn't that right?

6    *A.*   Yes, I am.

7    *Q.*   That means you don't believe that there should be any

8    prisons in the United States; right?

9    *A.*   I don't believe in putting human beings in cages.

10   *Q.*   Okay.  And you reached the conclusions to be a police

11   abolitionist and a prison abolitionist based on the study that

12   you did in law school about law enforcement and the criminal

13   justice system?

14   *A.*   In part, yes.

15   *Q.*   You also believe that the police are a system of oppression

16   that's based on white supremacy; right?

17   *A.*   Yes, I do.  If you study history, it came out of white

18   supremacy and slavery.

19   *Q.*   Okay.  And you don't believe the police provide much in

20   terms of public safety; right?

21   *A.*   They -- they made it unsafe for me, so, no.

22   *Q.*   Okay.  You recall that your deposition was taken in July of

23   last year; right?

24   *A.*   Yes.

25   *Q.*   And during that deposition, you were asked if you could

1   think of anything that the police did to benefit the community;

2   do you remember that?

3   A.   Yes.

4   Q.   And you could not think of anything the police did to

5   benefit the community; right?

6   A.   At the time, no, I didn't.  There was nothing I could think

7   of.

8   Q.   Okay.  I want to talk about the different events that you

9   experienced at the protests.  The first event was on May 28,

10  2020, at 8:34 p.m. at Colfax and Washington, near the

11  District 6 station; right?

12  A.   Yep.

13  Q.   You knew at the time that you were protesting outside a

14  police station?

15  A.   Yes.  I mean, that's who -- our message was directed at

16  policing.

17  Q.   I understand that.  I just was asking you whether you knew

18  that when you were standing at the SliceWorks, the building

19  across the street was in fact a police station?

20  A.   Yes, I knew that.

21  Q.   Okay.  And does it make sense to you that the police were

22  organized to try to defend a police station?

23  A.   Does it make sense to me?

24  Q.   Right.

25  A.   No.

Amanda Blasingame – Cross

1   Q.   Okay.  Were you aware at the time that you were protesting,

2   that on that same night a police station in Minneapolis,

3   Minnesota, burned to the ground?

4   A.   At the time, no.

5   Q.   You're aware of that now; right?

6   A.   Sure.

7   Q.   And you would agree that the police in Denver likely would

8   have been aware of that on that night; right?

9   A.   I can't speak to what they were aware of.  I don't know.

10  Q.   Okay.  What would be your suspicion?  Do you think that

11  they would likely be aware of something like a police station

12  burning to the ground in Minneapolis?

13          MS. GORIN:  Object.  Calls for speculation.

14          THE COURT:  Sustained.

15  BY MR. RINGEL:

16  Q.   You were standing near the SliceWorks restaurant when you

17  observed something being thrown into the crowd by police in a

18  police line; right?

19  A.   Can you repeat the question?

20  Q.   Sure.  When something was deployed into the crowd, you were

21  standing by the SliceWorks?

22  A.   Yes.

23  Q.   And you did not see who threw what was deployed into the

24  crowd?

25  A.   I saw that the police threw it.

Amanda Blasingame - Cross

1    Q.   Okay.  But you did not see any specific person; correct?

2    A.   There was no way I could have.

3    Q.   Okay.  And you believe that the canister was deployed

4    because a half-empty water bottle was thrown by someone in the

5    crowd; right?

6    A.   What -- which incident are you referring to?

7    Q.   We're still at Colfax and Washington.

8    A.   I don't recall.  I remember a water bottle being thrown at

9    the capitol, but I don't recall -- I'm not sure about that

10   incident.

11   Q.   Okay.  You don't remember testifying in your deposition

12   that the reason that the police took the action that they did

13   was because a half-empty water bottle was thrown by someone

14   into the crowd?

15   A.   I don't remember exactly what I said, but --

16   Q.   Okay.  You would agree with me that you could not perceive

17   every person's actions at the intersection of Washington and

18   Colfax; right?

19   A.   Personally, no.  I think that's impossible.

20   Q.   Right.  It was a large crowd, wasn't it?

21   A.   The crowd that actually pushed back of it.  If you look at

22   the photo I took outside of SliceWorks, there is no crowd in

23   front of the police line.

24   Q.   Okay.  You don't know how close you were when the canister

25   landed; right?

Amanda Blasingame - Cross

1    A.  I was close enough to feel the effects of it.

2    Q.  Okay.  You're not good at distance -- judging distance;

3    right?

4    A.  Not particularly.

5    Q.  Okay.  And you told us that in your deposition, that you

6    weren't good at judging distance; do you remember that?

7    A.  I'm not good at judging distance in terms of, like, the

8    number of feet.

9    Q.  Right.  Understood.  Okay.  When you -- when you inhaled

10   what was deployed, you went to the parking lot of the liquor

11   store, Argonaut, which is right next door to the SliceWorks?

12   A.  Yes.

13   Q.  And your eyes burned a little, but mostly it was your

14   throat that was burning, and you were coughing a lot.  Right?

15   A.  Yes.

16   Q.  You would agree that your initial reaction to the exposure

17   maybe lasted maybe two to three minutes?

18   A.  Maybe the strongest effects.  Not -- it doesn't completely

19   wear off that quickly.

20   Q.  Right.  The initial reaction was two to three minutes;

21   fair?

22   A.  I'm not -- I'm not sure -- it was -- I just reacted, and I

23   am not sure.

24   Q.  Okay.  You believe that the -- what motivated the police to

25   throw the canister was because the police value property more

849

Amanda Blasingame - Cross

1   than they do people; right?

2   A.   Yes, I do believe that.

3   Q.   And after the event at Colfax and Washington, you left the

4   area, but you did not go home; right?

5   A.   We -- I think we stopped home to get some water, but I

6   didn't stop protesting.

7        MR. RINGEL:   Okay.   If we could show Ms. Blasingame

8   her deposition and specifically, page 82.

9        MS. GORIN:   May I have a line, please?

10       MR. RINGEL:   24.

11   BY MR. RINGEL:

12   Q.   Do you see your deposition transcript, Ms. Blasingame?

13   A.   Yes, I do.

14   Q.   All right.   Directing your attention to the bottom of the

15   page, line 24.

16       Question:   "So after you left this area, you did not

17   go home, though; correct?"   And then it says, "You" -- and it

18   continues on to the next page -- "you continued protesting?"

19       Answer:   "Correct."

20       Did I read that correctly?

21   A.   Yes, you did.   But I think the question is taken a bit out

22   of context.   When she said, "You did not go home," I assume she

23   meant you did not stop protesting, not that I never stopped at

24   my home.

25   Q.   Okay.   You didn't ask her to clarify the question; right?

850

Amanda Blasingame – Cross

1   *A.*   No.

2   *Q.*   Okay.  You're a lawyer?

3   *A.*   I am, but I don't do depositions.

4   *Q.*   Okay.  But you understand that if a witness –– I assume

5   that there were instructions at the beginning of the deposition

6   that if you didn't understand a question, that you should tell

7   the lawyer asking you the questions that you didn't understand

8   it and get her to rephrase it or repeat it in some way?

9   *A.*   I'm not saying I didn't understand.  I'm saying I made an

10   assumption.

11   *Q.*   Okay.  All right.  So the next place that you were was on

12   the capitol steps, south side, nearby 14th and Sherman;

13   correct?

14   *A.*   Yes.

15   *Q.*   And that was at approximately 9:15; right?

16   *A.*   I believe so.  I wasn't paying close attention to the time,

17   but ––

18   *Q.*   Okay.  That sounds generally right to you?

19   *A.*   Yeah.

20        *MR. RINGEL:*  All right.  If we could show the witness

21   Exhibit No. 7, please.

22        And this is a plaintiffs' exhibit that we stipulated

23   to its admissibility, so I'd move its admission at this time.

24        *MS. GORIN:*  No objection.

25        *THE COURT:*  It's admitted.

1          (Exhibit 7 admitted.)

2          *THE WITNESS:*  I don't have anything on my screen.

3   *BY MR. RINGEL:*

4   *Q.*  We're working on it, Ms. Blasingame.

5   *A.*  Okay.

6   *Q.*  I wish it was instant like the Super Bowl, but it's not.

7          All right.  So what I wanted to -- this is a Colorado

8   State Patrol camera video of the corner of 14th and Sherman.

9   You see the two street signs?

10  *A.*  Yes.

11  *Q.*  And does this generally look familiar to you as a place

12  where you were?

13  *A.*  I wasn't in this area.  I was across the area in the

14  parking lot of the capitol.

15          *MR. RINGEL:*  Okay.  So let's go -- if we could go --

16  broaden back out and go to approximately 9:10:07.

17          All right.  So I believe that you and Ms. Rothlein are

18  in this video picture.  And I wanted to see if I could get you

19  to identify the two of you, but I'm having difficulty.

20          So why don't we -- I'll move on, and I will let

21  Mr. Atencio see if he can find it.  And if he can, I will come

22  back to it, so as not to waste the Court's time.

23  *BY MR. RINGEL:*

24  *Q.*  After the exposure to what you were exposed to at 14th and

25  Sherman, you had a little bit of irritation; is that right?

1   *A.* I wouldn't describe it as a little bit.

2           *MR. RINGEL:* Okay. Mr. Atencio, if you could --

3   *BY MR. RINGEL:*

4   *Q.* How would you describe it?

5   *A.* How was the effects of the gas?

6   *Q.* Well, first of all, you don't know what was deployed, do

7   you?

8   *A.* I don't know the exact thing, but it was some kind of

9   chemical that I could feel the effects of.

10  *Q.* Okay.

11  *A.* It wasn't nothing.

12  *Q.* And you recall in your deposition describing it as -- you

13  just had a little bit of irritation because you had put water

14  on your mask, and you ran away immediately. Do you remember

15  that?

16  *A.* I don't remember, but that may be.

17  *Q.* Is that in fact true? That's what happened?

18  *A.* I felt the effects of the gas.

19  *Q.* Okay. All right. After the events at 14th and Sherman,

20  you went home; right?

21  *A.* Yes, I did.

22  *Q.* Okay. And you didn't seek or obtain any medical attention

23  when you got home on the 28th?

24  *A.* No, I didn't.

25  *Q.* Okay. And as you talked about before, you did not join any

853

Amanda Blasingame – Cross

1    protests on the 29th; right?

2    A.  Correct.

3    Q.  Because you were studying for the upcoming California Bar

4    exam?

5    A.  Yes.

6    Q.  On the 30th, you testified about an event that happened at

7    the RTD Civic Center station, which is between Lincoln and

8    Broadway, and it fronts Colfax; right?

9    A.  Yes.

10   Q.  Okay.  Are you aware of issues with respect to rock piles

11   at the Civic Center station on previous days, Ms. Blasingame?

12   A.  I know there is a rock pile -- was a rock pile at the time.

13   Q.  Okay.  Are you aware of issues with respect to people

14   collecting rocks from that rock pile and using them as

15   projectiles towards the police?

16   A.  I was not -- I was not near the rock pile, and I didn't see

17   any rocks used.

18   Q.  I understand.  But were you aware that that was the case

19   from the 28th and the 29th?

20   A.  No.

21   Q.  Okay.  And my understanding is you were -- as you

22   described, you were protesting, and then you -- something

23   happened, and the next thing was that it sounded to you like

24   the police were using munitions on the crowd; right?

25   A.  I didn't just see it; I felt it.

Amanda Blasingame - Cross

1  Q.  Okay.  Were you hit by a pepper ball at that point in time,

2  or were you only exposed to either the chemical agent of a

3  pepper ball or a different kind of chemical agent?  I just want

4  to understand the details of your experience.

5  A.  I was exposed to the effects.

6  Q.  Okay.  An actual pepper ball did not hit your body; is that

7  a correct understanding on my part?

8  A.  No.  I was lucky enough to run away fast enough.

9  Q.  Okay.  And when you got back to the capitol grounds, you

10  put water in your eyes.  And approximately ten minutes later,

11  you started to feel better; is that fair?

12  A.  I felt better than I had initially felt.  I wouldn't say

13  completely better.

14  Q.  All right.  With respect to the event that you described

15  and we watched the video of a different protester being struck

16  with some sort of projectile, isn't it true that at that time

17  there were barricades on Lincoln, and that's what the police

18  were trying to get rid of, by moving the crowd and then going

19  onto Lincoln Street?

20  A.  I don't see what that has to do with the person in the

21  grass.

22  Q.  Okay.

23  A.  But I don't remember seeing any barricades.

24  Q.  Okay.  You don't remember any barricades on Lincoln, and

25  you don't remember the police taking steps to try to remove the

Amanda Blasingame - Cross

1    barricades?

2    A.  No.  I just remember them firing weapons into the grass and

3    at the crowd.

4    Q.  Okay.  You're not privy to generally why the police are

5    doing what they're doing; right?  You don't have an

6    understanding of their tactics; right?

7    A.  No.  I'm not an officer.

8    Q.  Right.  And you have no training in policing; right?

9    A.  No.  But I do have eyes.

10   Q.  Okay.  I understand you have eyes.  You're not privy to

11   what was being talked about on the police radio; correct?

12   A.  No.

13   Q.  All right.  Let's talk about -- after that event, you went

14   home.  And we talked about this interaction that occurred with

15   an officer.  You recall completing interrogatories; right?

16   A.  Yes.

17   Q.  Right.  And you were in law school at the time, and you

18   know what the meaning of an interrogatory is; right?

19   A.  Yes, I do.

20   Q.  It's a sworn statement under oath that an opposing party

21   can rely upon; can they not?

22   A.  I mean, I think its primary purpose is a discovery tool to

23   collect information; but, yes.

24   Q.  Right.  And in your interrogatory response is -- to the --

25   this event is identical to the one that I read this morning

856

Amanda Blasingame - Cross

1     with respect to on Ms. Rothlein; right?

2     *A.*   I believe so.

3     *Q.*   And so you specifically in that interrogatory response

4     identified the officer as a white male; did you not?

5     *A.*   Yes.  We said he was white, but I'm also aware that people

6     can be white-passing.

7     *Q.*   Okay.  And Ms. Rothlein mentioned that, too; and I

8     understand that.  Does -- is there anything in either of your

9     interrogatory responses that talks about the concept of

10     white-passing?

11     *A.*   No.  But we didn't know the identity of the officer at that

12     time or what had happened.  And, also, as someone who has a

13     trauma-influenced practice, I know that details can come out in

14     different ways, based on a traumatic event.  I mean, sometimes

15     you don't recall all of the details.  Again, what I -- I was

16     more -- my memory has been always stuck on that canister that

17     was pointed at my face.

18     *Q.*   I understand that, and that makes sense to me.  But in your

19     interrogatory response, you didn't say "white or Latino," did

20     you?

21     *A.*   I guess not.

22     *Q.*   And you didn't say "maybe white," did you?

23     *A.*   No.

24     *Q.*   You said "white officer"; correct?

25     *A.*   I believe so.

Amanda Blasingame - Cross

1  Q.  Okay.  You understand that interrogatory responses can be

2  amended; do you not, Ms. Blasingame?

3  A.  Sure.

4  Q.  You never amended your interrogatory responses, did you?

5  A.  I did not.

6  Q.  And Ms. Rothlein never amended her interrogatory responses

7  either, did she?

8  A.  Not that I know of.

9  Q.  Okay.  When you had gotten home on the 28th of May of 2020,

10  you may have had a glass of wine before the interaction with

11  this officer, but you don't know for sure.  Is that fair?

12  A.  I may -- yeah, I don't know for sure if I had a glass of

13  wine before or after.

14  Q.  Okay.  Fair enough.  You did not observe anything about the

15  officer's uniform, including its color, at the time; right?

16  A.  No.  I was not focused -- again, I was focused on the

17  pepper spray in my face.

18  Q.  Right.  You did notice that the officer did not have a

19  helmet on.  You remembered that; right?

20  A.  Sure.

21  Q.  Okay.  You did not see any name plate or badge?

22  A.  Not that I saw.

23  Q.  And you've watched the video.  Is there any insignia

24  designating the officer as being from the Denver Police

25  Department that is visible on that -- on the car or that

Amanda Blasingame - Cross

1   vehicle in the pictures that were taken by one of your friends

2   or neighbors?

3   A.   No.  They were driving unmarked vehicles.

4   Q.   Okay.  You recall that the officer was a little older and

5   was on the heftier side; right?

6   A.   Yeah.  And by "heftier," I meant, like, his shoulders were

7   kind of -- he had the stature to him.

8   Q.   Okay.  So you weren't commenting on his weight?

9   A.   I wasn't really looking below his waist or stomach.  I was

10  focused from here up.

11  Q.   Fair enough.  All right.  I want to talk to you about the

12  pepper ball incident at your apartment at 1424 North

13  Pennsylvania Street.  That occurred around 10 o'clock to

14  10:07 p.m.; is that right?

15  A.   I believe so.

16  Q.   Okay.  Do you know that at 14th and Pennsylvania at

17  approximately that time there was a group of 25 -- 20 to 25

18  people throwing rocks at the police?  Are you aware of that

19  information?

20  A.   They weren't doing that anywhere that I could see or

21  anywhere near my building.

22  Q.   Okay.  Is there anything that you saw on -- at 10:07 p.m.

23  that is inconsistent with the notion that up the block, there

24  was a group of people that were throwing rocks at the police?

25  A.   Maybe, but I don't see how that has anything to do with

Amanda Blasingame – Cross

1    aiming pepper balls directly at my apartment with no

2    protesters.

3    Q.   Okay.  So you -- I understand that you would like to focus

4    your answers on what you want to talk about; but I'm kind of

5    interested in having you answer my questions, at least at this

6    point.

7           There is nothing about the events that you experienced

8    that are inconsistent with the notion that there was a group of

9    protesters on the same block throwing rocks at the police;

10   true?

11   A.   I don't know.

12   Q.   Okay.  I want to talk about your damages.  And I want to

13   assure you, Ms. Blasingame, that my asking about your damages

14   and your experiences isn't to try to minimize them; it's

15   because you're asking this jury to give you money because of

16   your injuries.  Right?

17   A.   Okay -- I don't know what the question exactly is.  You

18   said a few things.

19   Q.   Okay.  You understand that as part of your claims in this

20   case, your lawyers are going to be asking the jury to give you

21   money in the form of damages related to the injuries and

22   experiences that you had related to the protests; right?

23   A.   That and the violation of my constitutional rights.  Yes.

24   Q.   Right.  And you understand, because you are a licensed

25   attorney, that that is how things work in the civil system in

Amanda Blasingame - Cross

1  the United States; right?

2  *A.*  Yes.

3  *Q.*  So it's not surprising to you that a lawyer representing

4  the person from whom -- the entity from whom you are seeking

5  money damages is going to ask you about your experiences and

6  try to talk about the nature of your damages; right?

7  *A.*  Of course, but I think there is a way to do that that's

8  respectful of the person's experiences and trauma.

9  *Q.*  Okay.  Have I been anything but respectful to you this

10 morning, Ms. Blasingame?

11 *A.*  Right now, this morning?  Sure.  But I -- I don't -- I

12 don't know if I'm able to give a full, honest answer to that,

13 because I -- I mean, if you want to hear, I think that your

14 entire team has not been respectful --

15 *Q.*  Okay.

16 *A.*  -- to us at all.

17 *Q.*  Okay.

18 *A.*  If that's what you're asking.

19 *Q.*  I was asking you -- my question is whether I've been

20 respectful in the questions that I've asked you this morning.

21 *A.*  Right now, in this moment, yes; but not prior.

22       *MR. RINGEL:*  Your Honor, I have enough that I think it

23 makes sense to take a break for lunch and then finish after.

24       *THE COURT:*  Okay.  1:15.

25       (Recess at 11:59 a.m.)

Amanda Blasingame – Cross

1          THE COURT:  The jury has been excused.  Anybody going

2     to have another preliminary matter before we resume?

3          MS. WANG:  No, Your Honor.

4          MR. RINGEL:  No, thank you, Your Honor.

5          THE COURT:  All right, then.  1:15.

6          (Recess at 12:00 p.m.)

7          (In open court at 1:20 p.m.)

8          THE COURT:  Before we get the jurors, would you tell

9     me where you think you are in your schedule?

10          MR. MACDONALD:  I think we're moving along pretty

11     well, Your Honor.  I think at this rate, hopefully, our case

12     will be over probably by Thursday.  Fingers crossed.

13          THE COURT:  What do you think?

14          MR. RINGEL:  I think that's possible, but I would say

15     that's a tad on the optimistic side.  I would say more than

16     likely Friday that the plaintiffs will finish.

17          THE COURT:  All right.  Well, let me give you some

18     advice.  Have a seat.

19          This case is very interesting -- it's interesting to

20     you; it's interesting to the public; it's interesting to the

21     media; it's interesting to me -- but it has the tendency to bog

22     down due to repetition.

23          Now, each of these plaintiffs is entitled to his or

24     her day in court, meaning, each of these plaintiffs is entitled

25     to take the stand and tell his or her story.  I get that.

1   Also, I observe and I appreciate, frankly, that you have been

2   giving some younger lawyers who haven't, perhaps, had many

3   opportunities to appear in court to -- which is kind of the way

4   it is these days, unfortunately -- to have a witness or two to

5   get some experience. Good for you. But in my opinion, we've

6   seen most of the videos now. We get the gist of what you're

7   claiming. And if it starts to get too repetitive, it's going

8   to get boring. I mean, it's already sort of tedious at times.

9        And so I think, as advocates, if nothing else, you

10  need to pick up the pace on the plaintiffs' side. I mean, we

11  don't have to hear from scratch the whole story twelve times.

12  So please try to do that, and maybe we can move this case at a

13  better pace as we go forward.

14       All right. Let's get the jury.

15            (Jury in at 1:23 p.m.)

16       THE COURT: Mr. Ringel, you may proceed.

17       MR. RINGEL: Thank you, Your Honor.

18  BY MR. RINGEL:

19  Q.  Good afternoon, Ms. Blasingame. I wanted to -- I have a

20  few areas that I wanted to finish my examination of you, and

21  then I will be finished.

22       If we could go back to Exhibit No. 7, I believe

23  I've -- that we solved my technical issue, I should say.

24       All right. Do you see Exhibit No. 7, this video, from

25  the event by the capitol that we've talked about this

1    morning -- or that you've talked about this morning?

2    A.   Yes, I do.

3    Q.   Okay.  What I'm going to do is ask Mr. Atencio to play it a

4    little bit.  And then I want you to look at sort of this part

5    of the screen, where I've just put my circle, and see if we

6    can -- if you can identify yourself and Ms. Rothlein.

7    A.   Yes, I can.

8    Q.   Okay.  So why don't you circle when you identify the two of

9    you.

10   A.   We're right here.  This is me.

11   Q.   Okay.  And Ms. Rothlein is where?

12   A.   Right here.

13   Q.   Okay.  Perfect.  Thank you.  I just want -- so is that a

14   fair representation of where you were, if you look at the

15   left-hand side of the screen, when the -- it looks like there

16   is something that is being deployed; right?

17   A.   I'm not sure what you're asking.

18   Q.   Okay.  Do you see on the left side of the screen, there is

19   something that looks --

20        MR. RINGEL:  I thought this was admitted into

21   evidence.

22        COURTROOM DEPUTY:  It is.  That was my error.  If you

23   want to start over.

24        MR. RINGEL:  Thank you, Mr. Macdonald.  I appreciate

25   that.

1          Thank you for letting us know.  You were supposed to

2     see this.

3          Let's try -- let's -- let's clear this screen, and

4     then now are you seeing it?

5          *JURY:*  Yes.

6          *MR. RINGEL:*  So to orient you, this is the second

7     event that Ms. Blasingame talked about at Sherman and 14th.

8     And what I asked her to do was circle herself and Ms. Rothlein.

9     *BY MR. RINGEL:*

10    *Q.*  So could you do that again so that the jury can see where

11    you were circling?

12    *A.*  Yeah.  So in this video, we're right here.  This is me, and

13    this is Maya.

14    *Q.*  Okay.  Perfect.  Thank you.  So, then, my question to

15    Ms. Blasingame is, on the left side of the screen, you see

16    what -- that sort of from the lay eye of mine, it looks like

17    maybe it is an explosion?

18    *A.*  That looks like a glare from the lights from the police

19    cars, to me.

20    *Q.*  Okay.  Fair enough.  All right.  So I'll ask the question

21    this way, then:  Do you believe that the location that you

22    appear on this video is a generally accurate reflection of

23    where you were when the gas or smoke or whatever was deployed

24    into the crowd was in fact deployed?

25    *A.*  No.

Amanda Blasingame - Cross

1   Q.   Okay.  Where do you think you were?

2   A.   At that point we -- we started off here, but we moved this

3   way, across the parking lot of the capitol.  And so we were

4   probably around -- I can't really see it, but somewhere in this

5   area when the gas was deployed.

6          MR. RINGEL:  Okay.  Why don't we watch this just a

7   little bit.

8          (Video played.)

9          Go ahead and stop that, Mr. Atencio.  Thank you.

10  BY MR. RINGEL:

11  Q.   I'd like to -- the next topic I wanted to talk to you about

12  was your -- is the issue of damages, Ms. Blasingame.  You did

13  not receive any medical treatment for anything related to the

14  inhalations that you experienced during the protests on either

15  the 28th or the 30th of May of the year 2020?

16  A.   I did not.

17  Q.   Okay.  And as you talked about before, you were not

18  working.  You were a recent law school graduate, studying for

19  the California Bar exam?

20  A.   Yes.

21  Q.   So you didn't have any lost wages as a result of anything

22  that happened with respect to the protests?

23  A.   Not wages, no.

24  Q.   Okay.  And then my understanding -- my understanding is

25  that you had had a pre-existing relationship with a behavioral

Amanda Blasingame - Cross

1  health therapist for some issues of generalized anxiety; is

2  that right?

3  A.  I didn't have a pre-existing -- I wouldn't say I had a

4  pre-existing relationship.  I had one session at one point --

5  it was actually after the protests, I had one session with a

6  behavioral health specialist.

7  Q.  Okay.  And during that one session, you spoke about your

8  experience in the protests?

9  A.  Briefly, yes, I did.

10  Q.  Okay.  And that was the only time that you have spoken to

11  any behavioral health person related to those experiences;

12  right?

13  A.  Yes.  I was moving shortly after, so I didn't really

14  want -- it takes a while to establish a relationship with

15  someone like that, and so I was moving.

16  Q.  I understand.  But since that time, since you moved to

17  Redding, California, you haven't started a therapeutic

18  relationship or a counseling relationship where you've had

19  discussions about the protest; is that fair?

20  A.  No, I have not.

21  Q.  Okay.  My understanding is that you did not file a

22  complaint with either the Denver Police Department or the City

23  and County of Denver related to the protests and what occurred

24  with respect to you; is that correct?

25  A.  That's correct.  I didn't file a complaint.

Amanda Blasingame – Cross

1   Q.   Okay.  Prior to the protests, you had filed a complaint

2   with the Denver Police Department; correct?

3   A.   Yes, I had.

4   Q.   Would you describe for the jury the nature of that

5   complaint.

6   A.   Yeah.  So the police were testing their gunshot system.

7   And I was sitting outside studying and heard rapid-fire

8   gunshots.  I didn't know that this was going to be happening.

9   We live in the day of mass shootings, so I immediately became

10  terrified when I heard that, because I just heard gunshots.

11  And so I filed a complaint because I believed that the police

12  department could have done better at warning citizens.

13  Especially as the child of veterans, I know people with PTSD

14  specifically from their time as veterans, it can be really

15  traumatic for them.  I think they should have warned the

16  neighborhood that that was happening.

17  Q.   Okay.  Thank you for explaining that.  To clarify what

18  you're talking about is a system that operates in parts of

19  Denver that is designed to detect when a gunshot goes off?

20  A.   Yes.

21  Q.   Okay.  And that was something that was being tested in your

22  neighborhood?

23  A.   Yes.

24  Q.   Okay.  When approximately was that, Ms. Blasingame?

25  A.   I don't remember exactly.  It was in May of 2020.

Amanda Blasingame - Cross

1  *Q.*  Okay.  So not too much prior to the time of the protests?

2  *A.*  Correct.

3  *Q.*  Okay.  And then, in addition, you filed a complaint with

4  the Colorado Highway Patrol related to a different protest that

5  you attended; right?

6  *A.*  Yes, I did.

7  *Q.*  And describe to the jury the nature of what you were

8  complaining about in that complaint.

9  *A.*  This was during the height of COVID -- I think it was

10  around June of 2020 -- and they were -- there were officers

11  that had gone to work at a protest, and none of -- a good

12  amount of them weren't wearing masks and were getting really

13  close and screaming in people's faces.  And so -- and at the

14  time, there was a mask mandate; and they were defying that and

15  weren't wearing masks.  So I had filed a complaint with the

16  State Patrol because those officers, some of them actually had

17  identifications, and I had photos, and I was able to file a

18  complaint.

19  *Q.*  Okay.  So those officers with this other protest happened

20  to be officers with the Colorado State Patrol?

21  *A.*  The officers there -- I don't know if all of them were; but

22  some of them, at least.

23  *Q.*  Okay.  And was this protest also by the Colorado capitol?

24  *A.*  Yes, it was.

25  *Q.*  Okay.

Hans Levens – Direct

1          Those are my questions for you, Ms. Blasingame.  Thank

2   you.

3          THE COURT:  Redirect?

4          MS. GORIN:  No further questions.  Thank you.

5          THE COURT:  Questions from the jury?

6          No.  Thank you.

7          All right.  Who is next?

8          MS. STERK:  The plaintiffs called Commander Hans

9   Levens.

10         For the record, I'm Diana Sterk, and I represent the

11  plaintiffs.

12              (**HANS LEVENS, PLAINTIFFS' WITNESS, SWORN**)

13         THE COURT:  Thank you.  Have a seat.

14         MS. STERK:  May I proceed?

15         THE COURT:  Sure.

16                     **DIRECT EXAMINATION**

17  BY MS. STERK:

18  Q.  Good morning, Commander Levens.

19  A.  Hi.

20  Q.  Can you state your name for the record.

21  A.  Commander Hans Levens.  It's L-E-V-E-N-S.

22  Q.  And you were a commander in the Denver Police Department?

23  A.  Yes, ma'am.

24  Q.  More specifically, you're a commander in the Conduct Review

25  Office; is that right?

Hans Levens – Direct

1   A.   Yes, ma'am.

2   Q.   Is that within Internal Affairs?

3   A.   It's actually a part of the process; it's not within

4   Internal Affairs.   Our Internal Affairs Bureau is separate.

5   They conduct investigation into alleged misconduct, and conduct

6   review takes that investigation and then determines whether or

7   not there is a policy violation.

8   Q.   So just to make sure that I'm on the same page with you,

9   internal investigations investigates complaints, and then your

10  department decides whether those complaints warrant discipline

11  of some sort?

12  A.   Correct.

13  Q.   How many people are there in the Internal Affairs

14  department?

15  A.   So in Internal Affairs, you have a commander -- that's

16  Commander Magen Dodge -- right now I believe they have nine

17  sergeants, who are all of the investigators, two police

18  technicians, and two lieutenants.

19  Q.   How many people in -- are in your department?

20  A.   In my department, it's myself, I have one sergeant, and

21  three civilian professional staff.

22  Q.   And you are the top person in your department; is that

23  right?

24  A.   Yes, ma'am.

25  Q.   And so you're the one who is making the decisions

871

Hans Levens – Direct

1   ultimately on whether someone receives discipline or not?

2   *A.*   From my office.  It still has an additional review process

3   after it leaves my office.

4   *Q.*   Who reviews the complaints after they leave your office?

5   *A.*   So after we review the case from Internal Affairs, we make

6   a recommendation as to whether or not the specifications, the

7   alleged misconduct, is either sustained or not sustained.  Any

8   case that results in a sustained finding then goes to the Chief

9   of Police for what we call the chief's meeting, which we do

10  once a week with all cases.

11  *Q.*   Internal Affairs opens investigations into complaints that

12  come in from a number of different sources; right?

13  *A.*   Correct.

14  *Q.*   And one of those sources is citizens' complaints?

15  *A.*   Yes, ma'am.

16  *Q.*   Another one is internal complaints received from officers?

17  *A.*   Yes.  Internal complaints anywhere from within the agency.

18  *Q.*   And officers within the department -- the Denver Police

19  Department can file complaints with the internal investigations

20  bureau?

21  *A.*   Yes, ma'am.

22  *Q.*   And you agree that they should do that if they see

23  something that they think might be misconduct?

24  *A.*   Yes, ma'am.

25  *Q.*   And one of the other sources of complaints is the office of

Hans Levens – Direct

1    internal monitor, or OIM?

2    *A.* Yes. Office of the Independent Monitor.

3    *Q.* Sorry. Independent monitor. Yes. And you are -- some

4    complaints may also be opened from lawsuits?

5    *A.* It has not -- there is not a policy regarding that a

6    complaint is opened in every lawsuit. Commander Dodge took

7    that position in Internal Affairs I believe in June of 2020.

8    With what was going on with the protests, she made it a

9    practice to look into any lawsuits that she was made aware of.

10   If those lawsuits involved an allegation of serious bodily

11   injury, she would try to check -- have her sergeants check to

12   see if they could locate a use-of-force report or anything

13   related to that described incident. If they could not, she was

14   having her supervisors open up a case and then reach out and

15   see if we could identify and speak with the individuals in

16   those lawsuits or through their attorneys.

17   *Q.* Okay. So Internal Affairs at this point, it's its

18   policy -- or at least its practice to open a complaint for

19   lawsuits only if the injuries are serious?

20   *A.* Well, and this was just a practice at the time related to

21   the George Floyd protests. This is not a practice for any

22   lawsuit.

23   *Q.* I see. And one of the other sources that the Internal

24   Affairs Bureau may open a complaint is from finding different

25   complaints on social media?

1    *A.*   Yes.  So we have a public information office in the

2    department.  And if they receive a complaint that they through

3    one of the social media websites –– or we have an email box

4    called DPD Listens, they receive that complaint –– that will be

5    forwarded to Internal Affairs for investigation.

6    *Q.*   Now, you had your deposition taken in this case; is that

7    right?

8    *A.*   Yes, ma'am.

9    *Q.*   And for your deposition, the City of Denver designated you

10   as its representative to testify relating to preventative

11   discipline on a number of topics; do you recall that?

12   *A.*   Yes, ma'am.

13   *Q.*   And those topics included discipline for use of excessive

14   force on protesters?

15   *A.*   Yes, ma'am.

16   *Q.*   And also discipline for suppression of First Amendment

17   rights of protesters?

18   *A.*   Yes, ma'am.

19   *Q.*   And discipline for suppression –– excuse me –– discipline

20   for misuse of less-lethal weapons?

21   *A.*   Yes, ma'am.

22   *Q.*   Discipline for untimely documentation of or failure to

23   document uses of force?

24   *A.*   Yes, ma'am.

25   *Q.*   And discipline for misuse of or failure to use body-worn

Hans Levens – Direct

1   cameras?

2   *A.*   Yes, ma'am.

3   *Q.*   And the City also designated you as its representative to

4   provide testimony related to the City's policies and practices

5   concerning documentation of use of force and body-worn cameras;

6   is that right?

7   *A.*   Yes, ma'am.

8   *Q.*   So I want to turn to the George Floyd protests in 2020.

9   There were 123 Internal Affairs investigations opened in

10  response to complaints concerning officer misconduct during

11  those protests; is that right?

12  *A.*   Yeah.  Since my last deposition, there have been a couple

13  of additional cases that have been added; so there are 127 now.

14  *Q.*   Okay.  So there have been five more since November that

15  have been added?

16  *A.*   There was 123, and there have been 4 cases that have been

17  added.

18  *Q.*   Thank you.  My math is wrong.

19          Okay.  And I'm going to talk first about the 123

20  complaints that were opened -- that had been opened by the time

21  of your deposition in November of 2021.

22          And before I get there, I just want to talk a little

23  bit about the process for complaints.  We heard yesterday in

24  testimony that the -- that Internal Affairs is a

25  complaint-driven process; do you agree with that?

Hans Levens – Direct

1   *A.*  Yes, ma'am.

2   *Q.*  And so, generally, you don't proactively seek out

3   misconduct without first getting a complaint?

4   *A.*  Correct.

5   *Q.*  And so those 123 Internal Affairs investigations, those

6   were all based on complaints that came into the Internal

7   Affairs office?

8   *A.*  There is a combination of citizen complaints -- which we

9   call P cases -- and internal complaints -- which are IC

10  complaints.

11  *Q.*  At the time of your deposition in November of 2021 -- so

12  four months ago, if I'm doing that right -- 12 of the 123 cases

13  were still open; is that right?

14  *A.*  Correct.

15  *Q.*  And so as of that time, November 2021, there were 111

16  closed cases relating to misconduct during the George Floyd

17  protests?

18  *A.*  Correct.

19  *Q.*  And of those 111 cases, there were three that resulted in

20  discipline, and then a fourth -- in a fourth case there was a

21  probationary officer who was fired for a social media post

22  before the investigation closed; is that right?

23  *A.*  Correct.  Formal discipline.

24  *Q.*  So of the -- again, sorry to do more math -- but I think

25  that leaves 107 closed cases for which there was no discipline;

Hans Levens – Direct

1  does that sound right?

2  *A.*  Yeah, the math is correct.

3  *Q.*  And there are still some open cases -- strike that.

4       And in those 107 cases that didn't result in

5  discipline, the Denver Police Department issued decline

6  letters; is that right?

7  *A.*  So for cases -- Internal Affairs, during the course of

8  their investigation, some of those cases were declined due to a

9  number of reasons.  There also may be -- there was cases that

10 made it to conduct review that were closed that did not have a

11 sustained finding.

12 *Q.*  Okay.  So some of the 107 cases had decline letters, and

13 some of them -- can you tell me again what the other --

14 *A.*  So if the case was not declined in the Internal Affairs

15 Bureau -- and there are several instances in which a case would

16 be declined.  If it was not declined, it would come to Conduct

17 Review Office, where we would review the investigation and

18 determine whether or not there is a preponderance of evidence

19 that the subject officer in the complaint violated policy.

20 *Q.*  Okay.  And if at that point -- if a case gets to conduct

21 review and you determine that it does not violate policy, is

22 there some memorialization of that, some written document that

23 gets made?

24 *A.*  Yes.  So we complete the same -- like cover letter or

25 document, whether it's sustained or not sustained.  That's

Hans Levens – Direct

1    contained in the case file for that case.

2    Q.   Okay.  And I just want to talk about decline letters

3    quickly.  So a decline letter is basically a letter saying that

4    the Department is declining to recommend discipline for any

5    particular officer; is that right?

6    A.   Well, it could be declined due to the fact that they can't

7    complete the investigation for a number of factors.

8    Q.   Okay.  So either it means they're not recommending

9    discipline, or that there is some reason why they can't

10   continue with the investigation, or can't figure out who did

11   it, or something like that?

12   A.   Correct.

13   Q.   Of the three instances in which -- out of the 123 -- I

14   guess out of the 111 that were closed, one of those officers

15   shot three rounds of pepper balls into a car that was moving

16   away from the protest on May 29, 2020, after the passenger

17   yelled at him; is that right?

18   A.   That's correct.

19   Q.   And he was given a six-day suspension?

20   A.   That's correct.

21   Q.   And then the second incident in which an officer was

22   disciplined was when an officer discharged an OC fogger at a

23   vehicle stuck in traffic; is that right?

24   A.   Yes, ma'am.  Can I add something to that first case?  Just

25   trying to remember the recollection.  I think that first case

Hans Levens – Direct

1    with the pepper ball that was fired at the vehicle that was

2    driving away from the scene, the final disciplinary order I

3    believe was a ten-day suspension on that one, if I'm correct.

4           MS. STERK:  Actually, can we bring up Exhibit 793.

5    And 793 is the Internal Affairs file of Officer Streeter, who

6    was the officer who was disciplined for shooting pepper balls

7    into a car.

8    BY MS. STERK:

9    Q.  Do you recognize this?

10   A.  Yes, ma'am.

11          MS. STERK:  I'd like to move Exhibit 793 into

12   evidence.

13          MS. JORDAN:  Is it just the letter or the entire IA

14   file?

15          MS. STERK:  It's the entire IA file.

16          MS. JORDAN:  I would object to moving in the entire

17   file because it contains hearsay statements.

18          THE COURT:  Contains what?

19          MS. JORDAN:  Hearsay statements.

20          THE COURT:  Do you want the whole file?

21          MS. STERK:  Yes, Your Honor.

22          THE COURT:  Objection is overruled.  It's admitted.

23          (Exhibit 793 admitted.)

24   BY MS. STERK:

25   Q.  Before we move on -- we see this is to Officer Derek

Hans Levens – Direct

1    Streeter.  Do you see that?

2    *A.*  Yes, ma'am.

3    *Q.*  And it has a P number.  Is that the Internal Affairs

4    complaint number?

5    *A.*  No, that is his badge number.

6    *Q.*  Thank you.  And then the Internal Affairs case number is

7    below; is that right?

8    *A.*  Yes.

9    *Q.*  The IC number?

10   *A.*  Yes, ma'am.

11   *Q.*  IC, can you tell us what that means, again?

12   *A.*  Internal complaint.  It was generated internally within the

13   department.

14        *MS. STERK:*  Thank you.  If we can go to the second

15   page.

16   *BY MS. STERK:*

17   *Q.*  And in the first paragraph we see it says, "This is before

18   the Chief of Police for disciplinary determination involving

19   Officer Derek Streeter."  Do you see that?

20   *A.*  Yes, ma'am.

21   *Q.*  And then the last sentence of that paragraph says, "A

22   penalty of six days, 48 hours, suspension is imposed for this

23   conduct category D violation."  Do you see that?

24   *A.*  That is correct.

25   *Q.*  So is it right that he was -- he received a penalty of a

Hans Levens – Direct

1  six-day suspension?

2  *A.*  No, ma'am.

3  *Q.*  No?  Okay.

4        Can we continue going down on in this document.

5        So that was -- so let's talk about that.  So a penalty

6  of six days is generally what is imposed for a category D

7  violation?

8  *A.*  Per our disciplinary handbook and the matrix, it places

9  specific rules and regulations in the ops manual of violations

10  within the handbook.  For the allegation of inappropriate

11  force, it starts at a category -- conduct category D.  It can

12  go as high as a conduct category F.

13  *Q.*  So here the category -- Officer Streeter was imposed a

14  ten-day suspension despite this saying that a six-day

15  suspension is generally imposed for conduct category D?

16  *A.*  I can clarify on that.  So as part of the process, when

17  there is a loss of time as part of the recommendation I present

18  to the Chief of Police, he still makes a recommendation of

19  whether or not he agrees with the recommendation from CRO.  But

20  then from that point, the case is not done.  The officer has

21  the opportunity to appeal the case.  If he's exhausted that, it

22  then goes to the Executive Director of Safety's office, who

23  then review the case; and they make the final determination.

24        So in this case, the recommended penalty from the

25  Chief's written command before going to the Executive Director

Hans Levens - Direct

1   of Safety's office was six days, but I believe that case

2   ultimately ended in a ten-day suspension.

3   Q.  Thank you for clarifying.  The second officer we talked

4   about, who used an OC fogger on vehicle traffic, is that

5   Officer Archuleta?

6   A.  Diego Archuleta.

7   Q.  Thank you.  And then the third officer who was disciplined

8   of the 111 closed cases, again, as of November was disciplined

9   for failing to turn on his body-worn camera during an arrest;

10  is that right?

11  A.  That's right.

12  Q.  And he received -- he didn't receive a suspension for that;

13  right?

14  A.  Just an oral reprimand.

15  Q.  Just to be clear, other than those three people -- sorry.

16  Let me back up.  The officer who was disciplined for failure to

17  activate his body-worn camera during arrest, that was Officer

18  O'Neill; is that right?

19  A.  Sergeant O'Neill.

20  Q.  Sergeant.  Sorry.  Thank you.  And other than those three,

21  Sergeant O'Neill, Officer Streeter, and Officer Archuleta,

22  there were no other officers disciplined in the closed case

23  files?

24  A.  For, yeah, formal discipline.

25  Q.  Thank you.  In order to investigate complaints that come

Hans Levens – Direct

1    into Internal Affairs -- or that came into Internal Affairs

2    during the George Floyd protests the Internal Affairs reviewers

3    looked at a number of different sources; is that right?

4    A.  Correct.

5    Q.  They would interview people involved?

6    A.  Correct.

7    Q.  They might interview the complainant.  So if a citizen

8    complained, they would interview the citizen?

9    A.  Yes.  That's paramount, to interview them.

10   Q.  And they would also interview the subject of the

11   investigation if there was a subject at that point?

12   A.  Correct.

13   Q.  And they also may interview other officers or other

14   witnesses?

15   A.  You're correct.

16   Q.  To the extent available, would they also look at

17   body-worn-camera footage?

18   A.  Yes.  And in every single case, they look for

19   body-worn-camera video related to the incident.  They also look

20   at HALO cameras.  We have a large number of HALO cameras in the

21   city that they also would go through to see if they could

22   research and find anything related to those particular

23   complaints.

24   Q.  And one other source would be looking at use-of-force

25   reports that officers filled out after the protests?

Hans Levens – Direct

1   A.  Correct.

2   Q.  In many instances you would agree that the citizens who are

3   complaining about officer conduct, they don't know which

4   specific officer that they're complaining about; is that right?

5   A.  Yes, ma'am.  There was a large number, they didn't have a

6   named officer in the complaint.

7   Q.  And you're aware that there are instances during the

8   protests where officers concealed their badges or their names?

9   A.  I'm not aware of officers concealing their badges or names.

10  I know they weren't visible on their outermost garment for

11  their riot gear.

12  Q.  Okay.  So you are aware that at least when officers had

13  riot gear on, they didn't -- often didn't have a name or badge

14  visible?

15  A.  Correct.

16  Q.  You agree that when events are happening quickly, the

17  citizen who may be complaining isn't necessarily trying to look

18  for an officer name or a badge number; is that right?

19          MS. JORDAN:  Objection.  Speculation.

20          THE COURT:  Sustained.

21  BY MS. STERK:

22  Q.  If you had just gotten pepper-sprayed in the face, would

23  the first thing on your mind be to look for an officer badge

24  number or name?

25          MS. JORDAN:  Objection.  Speculation.

Hans Levens – Direct

1            THE COURT:  Overruled.

2            THE WITNESS:  It would be to -- obviously, natural

3   reaction would be to wipe my eyes, but then try to see what

4   occurred and see who may have sprayed me with pepper spray.

5   BY MS. STERK:

6   Q.  Have you ever been sprayed with pepper spray?

7   A.  No, ma'am.

8   Q.  If you were having trouble breathing from tear gas, do you

9   think that it would be your first instinct to try to figure out

10  who was throwing the tear gas at you?

11           MS. JORDAN:  Objection.  Speculation.

12           THE COURT:  Sustained.

13  BY MS. STERK:

14  Q.  You agree that Denver and the Denver Police Department has

15  more information about its own officers than citizens do;

16  right?

17  A.  More information about officers, can you explain?

18  Q.  Yeah.  So Denver -- the police department has a roster of

19  its officers?

20  A.  Yes, ma'am.

21  Q.  So it knows the names of all of its officers?

22  A.  Yes, ma'am.

23  Q.  And it knows the districts that the officers work in?

24  A.  Yes, ma'am.

25  Q.  And it generally knows where its officers are deployed

Hans Levens – Direct

1    within the city?

2    A.  Under normal circumstances, yes.

3    Q.  And you agree that -- strike that.  So under normal

4    circumstances, the City would know where its officers are

5    deployed?

6    A.  Yes, ma'am.

7    Q.  But during the George Floyd protests, did the City know

8    where its officers were deployed?

9    A.  I was not in the command post, so I'm not privy to what

10   knowledge they had.  I know this was an extremely chaotic

11   event, so I know that officers were constantly being used to

12   move to different hotspots within downtown.  So I know there

13   were some challenges in trying to keep track of which officers

14   were where.

15   Q.  Well, in reviewing Internal Affairs investigations, were

16   you able to determine whether -- where any officer was at any

17   given point in time to try to narrow down who the complaint was

18   against?

19   A.  There was sometimes based on the location, if we had more

20   information that we could look for body-worn camera videos, or

21   there were some use-of-force reports that were done to try to,

22   you know, investigate that; but it was difficult.

23   Q.  And you predicted my next question.  So Denver and the

24   police department had body-worn cameras of its officers; right?

25   A.  Yes, ma'am.

Hans Levens - Direct

1    Q.  It had the use-of-force statements that the officers filled

2    out after the protests?

3    A.  Yes, ma'am.

4    Q.  You based your -- you based your review on -- of Internal

5    Affairs investigations -- strike that.  Excuse me.

6         Is it fair to say that there were a lot of -- many

7    decline letters that were issued on the basis that no officer

8    could be identified after the George Floyd protests?

9    A.  That is correct.

10   Q.  And you would agree that it was probably somewhere around

11   30 closed cases in which an officer couldn't be identified by

12   Internal Affairs out of that 111?

13   A.  I don't have an exact number.  I know that we had a large

14   number of cases.

15   Q.  It was a large number.  Would you say it's, like, a quarter

16   of the cases?

17   A.  Internal Affairs is under the command of Commander Magen

18   Dodge, so I don't know the exact numbers that were declined.

19   Q.  But you just know that it was many of them?

20   A.  Yes.

21   Q.  That's fine.  Thank you.  And when no officer can be

22   identified, then there can't be any disciplinary action taken

23   against an officer for that event; is that right?

24   A.  Not at that moment, unless additional information is

25   brought forth.

1  *Q.*  So I want to go through some of the decline letters where

2  no one could be identified, but first I want to talk a little

3  bit about what is in an Internal Affairs files.  Those files

4  generally include a complaint from whoever it is that is

5  complaining, whether it's a citizen or another officer or

6  agency?

7  *A.*  Yes, ma'am.

8  *Q.*  And there would be interviews in that file, if there were

9  any?

10  *A.*  Yes, ma'am.

11  *Q.*  There is statements of the officers who are involved,

12  again, if anyone knows who was involved?

13  *A.*  Yes, ma'am.

14  *Q.*  Okay.  And there is videos that were reviewed that would be

15  inside the file?

16  *A.*  Yes, ma'am.

17  *Q.*  There is also analyses of those videos or whatever other

18  evidence was looked at?

19  *A.*  Yes, ma'am.

20  *Q.*  And if there is discipline -- if an officer is disciplined,

21  there would also be a disciplinary action statement or letter?

22  *A.*  Yes, ma'am.

23  *Q.*  And we talked about, if there is no discipline, there would

24  either be a decline letter or something else coming from your

25  office saying that you weren't going -- that there was no

Hans Levens – Direct

 1   policy violation?

 2   *A.*   Correct.

 3   *Q.*   Okay.  I'm going to pull up Exhibit 1228.  And this is an

 4   Internal Affairs file -- a complaint filed -- excuse me -- an

 5   Internal Affairs file with a complaint filed submitted by

 6   somebody named Madeline Kelly.  Do you recognize this as an

 7   Internal Affairs file with case notes?

 8   *A.*   Yes, ma'am.

 9           *MS. STERK:*   And I would move to admit Exhibit 1228.

10           *MS. JORDAN:*   Is this the entire IA file?

11           *MS. STERK:*   Yes.

12           *MS. JORDAN:*   Again, I would object to the entire

13   IA file based on the hearsay statements that it contains.

14           *THE COURT:*   Overruled.  It's admitted.

15           (Exhibit 1228 admitted.)

16           *MS. STERK:*   So I want to start -- I want to start on,

17   actually, page 9 of this document, if we could go to that.

18   *BY MS. STERK:*

19   *Q.*   So on page 9, we see that this looks like an email.  Do you

20   see that?

21   *A.*   Yes, ma'am.

22   *Q.*   And the bottom chain of the chain in that email I think

23   is the first one.  And we see it says from Form Engine.  What

24   is that?

25   *A.*   So in looking at this email chain -- I don't know that

Hans Levens – Direct

1   site.  I believe it's probably self-generated.  I know this is

2   a complaint that came to the Office of Independent Monitor,

3   looking at the layout.

4   Q.  Is there a form online that citizens can fill out and then

5   submit to the OIM?

6   A.  Yes, ma'am.

7   Q.  Is that what this looks like to you?

8   A.  Yes, ma'am.

9   Q.  We can see this was sent on Wednesday June 3, 2020?

10   A.  Yes, ma'am.

11   Q.  And if we go down a little bit, we see it's from first name

12   Madeline, and then it goes on to the next page for the last

13   name Kelly.  Do you see that?

14   A.  Yes, ma'am.

15   Q.  So that would be the person who submitted the complaint?

16   A.  Correct.

17   Q.  Okay.  If we keep going down on this same page, we see that

18   the date of the incident was 5/29/2020 at 11:00 p.m. on the

19   capitol lawn.  Do you see that?

20   A.  Yes, ma'am.

21   Q.  Okay.  And I want to go to the -- there is a part on the

22   next page that has a summary of the actual complaint, so -- I

23   think it actually starts on 10 and goes into page 11.

24          So Ms. Kelly -- it says, "I was working as press

25   during the protest.  And I was walking alone with no protesters

Hans Levens - Direct

1    in sight.  I saw some officers knock a lone protester to the

2    ground and stand over him to continuously pepper spray and

3    shoot him as he lay on the ground.  I have photo evidence."  Do

4    you see that?

5    A.  Yes, ma'am.

6    Q.  She continues her complaint to say, "Then I was commanded

7    to leave.  As I turned to walk, I put my hands in the air and

8    had my press vest clearly visible.  Again, I was nowhere near

9    any groups of protesters.  After walking about 5 to 10 feet, I

10   was shot at point-blank range with a rubber bullet.  Then as I

11   ran from getting shot again, pepper balls were fired at me as

12   well."  Do you see that?

13   A.  Yes, ma'am.

14   Q.  And then she goes on to say that she has photo evidence of

15   where she was hit with the bullet, as well.  Do you see that?

16   A.  Yes, ma'am.

17   Q.  So below the complaint summary on page 11, do you see that

18   there is a part where it says, "Do you have any photos or

19   video?"

20   A.  Yes.

21   Q.  And it looks like she's attached a photo?

22   A.  Correct.

23   Q.  So this file has a photo attached on page -- pages 14 and

24   15.  If we can go to those.

25          And so 14, that looks like the picture of the bruise

Hans Levens – Direct

1   she said she had evidence of; does that sound right?

2   *A.*  Yes, ma'am.

3   *Q.*  And, then, page 15, we see an officer standing over

4   somebody who is lying on the ground.  Do you see that?

5   *A.*  Yes, ma'am.

6   *Q.*  About how far do you think he is from the pepper spray --

7   the pepper spray can is from the man's face on the ground?

8   *A.*  Best guesstimate, I would say 2 1/2, 3 feet.

9   *Q.*  And then we see another officer to the right with a pepper

10  ball gun in his hand.  Do you see that?

11  *A.*  Yes, ma'am.

12  *Q.*  Does the person who is on the ground look like a threat to

13  you?

14  *A.*  From the still photograph, no.  This person does not appear

15  to be a threat at this moment.

16  *Q.*  So I want to turn to the Internal Affairs investigation

17  portion of the file on page 2.  And so we see here that it

18  says, "Sergeant Molyneaux reviewed all use-of-force reports

19  made for May 29, 2020.  There were no reports found documenting

20  this incident."  Do you see that?

21  *A.*  Yes, ma'am.

22  *Q.*  And do you know who Sergeant Molyneaux is?

23  *A.*  Yes, ma'am.

24  *Q.*  Am I pronouncing that correct?

25  *A.*  That's correct.

Hans Levens – Direct

1   Q.  Who is he?

2   A.  It's a female sergeant --

3   Q.  She.

4   A.  -- investigator in the Internal Affairs Bureau.

5   Q.  Okay.  So she was trying to look for evidence of who may

6   have done this, and she couldn't find any in the use-of-force

7   reports; is that right?

8   A.  Correct.

9   Q.  And if we take that down, we see --

10          Sorry.  Put the page back up and take the callout

11  down.

12          We see closer to the top, right under July 3, 2020, it

13  says a review of the department's HALO surveillance was

14  completed.  There were no cameras in that area?

15  A.  Yes, ma'am.

16  Q.  Okay.  And we also don't see any mention -- we can scroll

17  through this if you'd like, but we don't see any mention of

18  body-worn-camera footage on here either; right?

19  A.  Correct.

20  Q.  If we turn to page 8 of this file, this is a letter to

21  Madeline Kelly from the police department.

22  A.  Yes, ma'am.

23  Q.  And the last -- this is on January 26, 2021; right?

24  A.  Yes, ma'am.

25  Q.  So this is seven months after she filed her complaint; is

Hans Levens – Direct

1    that right?

2    *A.*   Yeah.  I can't remember the exact date of --

3    *Q.*   I think she filed her complaint on January -- June 1 --

4    June 3, 2020.

5    *A.*   June.

6    *Q.*   So something like six or seven months?

7    *A.*   Okay.  Yes, ma'am.

8    *Q.*   And the letter in the last paragraph concludes, "Due to the

9    inability to identify an officer, no further disciplinary

10   review of the matter is possible."  Do you see that?

11   *A.*   Yes, ma'am.

12   *Q.*   And that's what you were talking about before, that there

13   are a number of different complaints where no officer could be

14   identified, and so there was no further action taken?

15   *A.*   Correct.

16   *Q.*   So I want to move on to Exhibit 1133.  And this is an

17   Internal Affairs file for a complaint opened on January 11,

18   2021, based on a request from the Office of Independent

19   Monitor.  Do you recognize this file as an Internal Affairs

20   file?

21   *A.*   I --

22   *Q.*   Can we actually go to the second page?  It might make your

23   life easier.

24         Do you recognize this as an Internal Affairs file?

25   *A.*   Yes, ma'am.

894

Hans Levens - Direct

1          MS. STERK:  At this point I would move to admit

2   Exhibit 1133 into evidence.

3          MS. JORDAN:  Objection based on the hearsay

4   statements, but I know where this is going.  For the record.

5          MS. STERK:  There will be a lot of these.

6          THE COURT:  Overruled.

7          (Exhibit 1133 admitted.)

8   BY MS. STERK:

9   Q.  So I want to go to page 2 of this document, which we're on

10  now.  We see that this is an internal complaint; right?

11  A.  Yes, ma'am.

12         MS. STERK:  If we can go down to -- can you put --

13  pull up the whole document.

14         Perfect, thank you.  If we could go down to where it

15  says incident, and just blow up that part -- portion.

16  BY MS. STERK:

17  Q.  And it says, "On May 30, 2020, officers were assigned to a

18  protest that turned into a riot in downtown Denver."  Then if

19  we keep going, it says, "Officers formed a skirmish line,

20  pushed a large, riotous crowd from 14th Avenue and Broadway to

21  13th Avenue.  While in the process of moving the crowd, two

22  unidentified people were pepper-sprayed in front of the Denver

23  Public Library."  Do you see that?

24  A.  Yes, ma'am.

25  Q.  And if we go down to the next portion, where it says

Hans Levens - Direct

1    "complaint," it says, "The complaint was initiated after

2    internal review of the body-worn camera -- that's BWC; right?

3    A.  Correct.

4    Q.  -- "of Officer Raelene Norris."  Is that correct?

5    A.  Yes, ma'am.

6    Q.  And it says that, "Approximately 1:53 into her BWC it shows

7    an unidentified officer in view of her camera pepper-sprays two

8    subjects."  Is that right?

9    A.  Yes.

10   Q.  So I want to play a video -- this is going to be

11   Exhibit 741, which is already admitted into evidence.  And

12   that's the video that is discussed in this complaint.  Chief

13   Norman Stamper yesterday testified that he saw no resistance,

14   no aggression, and no justification for what we're about to see

15   on this video.  I'm going to ask you after we watch it whether

16   you agree with him.

17            (Video played.)

18            Before we get to whether you agree with Chief Stamper,

19   I just want to ask you whether you see these people backing up

20   as the officers are asking them to back up.

21   A.  Yes, ma'am.

22   Q.  And you don't see any weapons in their hands?

23   A.  Not that I observed.  No.

24        MS. STERK:  Okay.  You can keep playing the video.

25   Thank you.

Hans Levens – Direct

1          (Video played.)

2    *BY MS. STERK:*

3    Q.   It states in the complaint that -- in the file we just read

4    that this happened while there was a skirmish line moving; is

5    that right?

6    A.   Yes, ma'am.

7    Q.   And about how many officers would you say are in a skirmish

8    line that's spanning this street?

9    A.   It's really dependent.  I would say roughly probably 20.

10   Q.   And here we can see in the video there is at least one

11   officer who is wearing the body-worn camera; right?

12   A.   Correct.

13   Q.   And then we see somebody to her right, or his right?

14   A.   You mean, to the officer's right --

15   Q.   To the officer's right.

16   A.   Yeah.

17   Q.   There is someone kind of on the side of the screen there?

18   A.   Yep.

19   Q.   And then we also see to the left, that's where the pepper

20   spray came from?

21   A.   Yes, ma'am.

22   Q.   So there is a number of officers in this area during this

23   event; is that right?

24   A.   Yes, ma'am.

25          *MS. STERK:*  Okay.  Keep playing.

1          (Video played.)

2     BY MS. STERK:

3     Q.  So after these -- well, let me get first to whether you

4     agree with Chief Stamper.  Do you see any justification for the

5     pepper-spraying in that video?

6     A.  Well, in looking at this video -- you know, it's one video

7     I can't tell, you know, whether or not this was justified

8     without trying to identify the officers involved that deployed

9     OC in this instance.  From that point of view, from Raelene

10    Norris, I could see, looks like a milk jug in the one

11    individual's hand; but I don't know what is in that container.

12    But there is nothing that I see in the video that would

13    indicate that these individuals posed some defensive resistance

14    or active aggression against the officers.

15    Q.  So at least from what you can see in the video, it doesn't

16    appear that there is any justification for the pepper spray?

17    A.  Yeah.  This video is concerning, just by itself; but I

18    think we have to look at any other videos or evidence.  But

19    just on this video alone, it raises some concern.

20    Q.  Okay.  You didn't see in that video any other officer

21    trying to stop that officer who is unidentified from spraying

22    those two people, did you?

23    A.  No, ma'am.

24    Q.  And you didn't see anyone try to tell that -- you didn't

25    see Raelene Norris try to tell that person, Hey, what are you

Hans Levens - Direct

1   doing?  Like, let's calm down?

2   A.  Correct.

3   Q.  And Detective -- is it Detective Norris; do I have that

4   right?

5   A.  Now it is.  At the time I believe it was officer.

6   Q.  Okay.  So Officer Norris was right next to the individual

7   who sprayed the pepper spray?

8   A.  It appears she was in close proximity.

9   Q.  And she didn't report it at all to Internal Affairs?

10  A.  I would have to -- not that I'm aware of, no.

11  Q.  So let's talk a little bit about the investigation.

12          If you can pull Exhibit 1133 back up and go to page 3.

13          So one of the things, if we look in the middle of the

14  page, it looks like what Internal Affairs did was look at a

15  spreadsheet for use of chemical agents deployed on this date.

16  Do you see that?

17  A.  Yes, ma'am.

18  Q.  What is that spreadsheet?

19  A.  In some of these cases, there was a spreadsheet with

20  information indicating when less-lethal munitions or OC agents

21  were deployed in some of these areas.

22  Q.  How was that created?

23  A.  I don't have knowledge of how that was created.

24  Q.  Okay.  But it was a tool that Internal Affairs used to try

25  to figure out where people were or what was being deployed at

Hans Levens – Direct

1  different points in time?

2  *A.*  Yes, ma'am.

3           *MS. STERK:*  So if we can go to pages 9 to 15.  I know

4  we can't fit them all on the screen, but we can go through

5  them.

6  *BY MS. STERK:*

7  *Q.*  This is the chemical deployment timeline; is that right?

8  *A.*  Yes, ma'am.

9  *Q.*  If we keep going, this looks like it goes on for several

10  pages.  Do you see that?

11  *A.*  Yes, ma'am.

12  *Q.*  This is all just for one day; is that right?

13  *A.*  Yes, ma'am.

14  *Q.*  And you highlight -- somebody highlighted on here the

15  officers who deployed pepper spray on the day of that video,

16  right, in Exhibit 741?

17           If we can go back to page -- we can go back to page

18  1133, the third page.  It says, "A spreadsheet has been

19  attached.  Any officer that is noted using a fogger or mace has

20  been highlighted on the spreadsheet."  Do you see that?

21  *A.*  Yes, ma'am.

22  *Q.*  And then it says, "All BWC was reviewed of the highlighted

23  officers.  Below is a summary."  Do you see that?

24  *A.*  Yes, ma'am.

25  *Q.*  And then there is a bunch of officers named.  And I counted

Hans Levens – Direct

1   earlier, I believe it's 15 officers between this page and the

2   next page.

3         If we can get three and four up on the screen

4   together.

5         Of the officers who are listed there, how many don't

6   have body-worn cameras on this date available?

7   A.  I have to count.  Nine -- it appears ten.

8   Q.  It looks like ten out of the fifteen police officers or

9   sergeants or lieutenants who were -- who had been recorded as

10  using a fogger or mace on that date didn't have any body-worn

11  camera available at all?

12  A.  Correct.

13  Q.  And Internal Affairs didn't end up identifying the officer

14  who sprayed the pepper spray at these people; is that right?

15  A.  I'd have to look at the entire case file.

16  Q.  Sure.  We can go to the -- we can go to that in a second.

17  I'm getting ahead of myself.  Sorry about that.

18        I want to go to page 5 of this first.  And it says,

19  "Additional BWC review."  And here it shows that they also

20  looked at several other teams that they thought were in the

21  area and looked at their body-worn cameras as well.  Do you see

22  that?

23  A.  Yes, ma'am.

24  Q.  And at the bottom, the last sentence, it says, "It would be

25  assumed that the officer that deployed the pepper spray did not

Hans Levens – Direct

1   have their body-worn camera activated or was an officer from

2   another jurisdiction."  Do you see that?

3   A.  Yes, ma'am.

4   Q.  Now, Internal Affairs interviewed Officer or Detective

5   Norris because this event was caught on her body-worn camera;

6   right?

7   A.  I'd have to look at the case file.

8           MS. STERK:  Okay.  If we can turn to page 47.

9   BY MS. STERK:

10  Q.  Do you see that there is a -- a statement from Raelene

11  Norris?

12  A.  Yes, ma'am.

13  Q.  So she was interviewed for this file?

14  A.  Yes, ma'am.

15  Q.  Do you know whether Internal Affairs interviewed any of the

16  people whose body-worn cameras were missing?

17  A.  Can you clarify?  Missing or not activated?

18  Q.  Well, there is ten officers we just counted --

19  A.  Right.

20  Q.  -- who didn't have any body-worn camera for that day;

21  right?

22  A.  Right.

23          MS. JORDAN:  Objection.  Misstates what the document

24  says.

25          THE COURT:  I don't know if it was nine or ten.  I

Hans Levens – Direct

 1 | don't remember.

 2 |         *MS. JORDAN:*  Well -- at the time of the incident, not

 3 | the day.

 4 |         *MS. STERK:*  We can go back to pages 2 and 3.

 5 |         *THE COURT:*  That shouldn't be a dispute.  I mean, it

 6 | is what it is.  I don't know what he said, nine or ten.  Do you

 7 | know?

 8 |         *MS. STERK:*  It was ten, I believe.

 9 |         *THE COURT:*  All right.  Fine.

10 | *BY MS. STERK:*

11 | *Q.*  Do you know if Internal Affairs interviewed all of the ten

12 | people that didn't have body-worn cameras available for that

13 | incident for that day?

14 | *A.*  So, again, this was a decline letter; so I'd have to look

15 | at the entire case file to see what additional interviews were

16 | conducted.  This is not something I observed.

17 |         *MS. STERK:*  You know what?  We might make life easier

18 | if I can give you a binder so you can look at documents.  Is

19 | that okay with you?

20 |         *THE WITNESS:*  Okay.

21 |         *MS. STERK:*  Your Honor, may I approach the witness?

22 |         *THE COURT:*  Sure.

23 |         *MS. STERK:*  I believe the exhibits go in number order,

24 | and we're on 1133.

25 |

Hans Levens – Direct

1    *BY MS. STERK:*

2    *Q.*  If you can look through that and let me know if you can see

3    any officers whose body-worn camera were not available for the

4    incident or the day, if any of those were interviewed.

5    *A.*  Right now, just looking at the case notes here, case

6    investigation summary report, it looked like there were some

7    witness officers' statements.  Sergeant Jason Burton here was

8    interviewed as it related to this.

9           Yes, there is a witness statement here from Sergeant

10   Jason Burton related to this case.

11   *Q.*  One from Sergeant Burton, and one from Raelene Norris?

12   *A.*  Yes, ma'am.

13   *Q.*  And so the rest of those ten people who we looked at who

14   didn't have body-worn camera were not interviewed?

15   *A.*  Does not appear so.

16   *Q.*  Okay.  And Internal Affairs also looked for use-of-force

17   reports -- if we go to page 5 -- they looked for use-of-force

18   reports but couldn't locate any for this incident; is that

19   right?

20   *A.*  Correct.

21   *Q.*  And you're aware that the request made by the Denver Police

22   Department more than a week after the protests for all

23   officers, sergeants, and lieutenants who deployed less-lethal

24   weapons to complete use-of-force reports, they were supposed to

25   include each and every instance in which use of force was

Hans Levens – Direct

1   deployed; is that right?

2   A.   Yes.   I'm not familiar with the timeline, but I do know

3   that reports were completed after the fact.

4   Q.   And those reports were supposed to include every instance

5   in which an officer, lieutenant, or sergeant used force?

6   A.   If they could recall, yes, ma'am.

7   Q.   But we don't see any use-of-force report with this; right?

8   With this incident.

9   A.   No, ma'am.

10  Q.   And then if we go to page 7, there is a section for subject

11  officer statements.   It says, "At the time of the

12  investigation, a subject officer has not been identified."   Is

13  that right?

14  A.   That's correct.

15  Q.   Okay.   And so the result of not being able to identify the

16  subject officer was that nobody was disciplined for

17  pepper-spraying those two people; right?

18  A.   Correct.

19  Q.   So as we've talked about, I know there are many -- you have

20  said there is many decline letters.   And I want to go through

21  some of them briefly, just to get a sense of what those look

22  like.

23         So if we can pull up Exhibit 731.   And this is a

24  complaint from Geoffry Fey, and the date of the event is

25  May 29, 2020, location is 14th and Broadway.   Do you recognize

1   this as a complaint that is filed with -- that was filed and

2   then sent to IA?

3   A.  Yes, ma'am.

4        MS. STERK:  I would like to admit Exhibit 731.  This

5   is just the complaint.

6        MS. JORDAN:  No objection.

7        THE COURT:  I was maybe going to sustain --

8        MS. JORDAN:  I changed my mind.

9        THE COURT:  All right.  It's admitted.

10       (Exhibit 731 admitted.)

11  BY MS. STERK:

12  Q.  Commander Levens, you see here that the date of the

13  incident is 5/29, time is 11:14 p.m., location is northeast

14  corner of 14th and Broadway?

15  A.  Yes, ma'am.

16  Q.  And if we go to the complaint itself, or the summary of

17  your experience section, the third paragraph down, it says, "On

18  Friday, 5/29/2020, between 11:13 to 11:17 p.m. I was shot in

19  the back at least three times from my tailbone to my shoulder

20  while near the corner of 14th and Broadway."  Do you see that?

21  A.  Yes, ma'am.

22  Q.  He says, "I was on the north sidewalk headed east towards

23  Lincoln Street, stopping to photo the state courthouse with

24  many Denver police officers standing on its steps, along with

25  one marked police SUV on the curb."  Continues, "Then I saw one

Hans Levens - Direct

1    officer unprovoked, without warning" -- I think that's warning.

2    Looks like it is missing an N -- "raise a rifle.  I turned,

3    then I was shot multiple times in the back."  Do you see that?

4    A.   Yes, ma'am.

5    Q.   And he continues that he doesn't know who that officer was.

6    Do you see that?

7    A.   Yes, ma'am.

8    Q.   If we continue down in the description of the complaint, he

9    says that, "At the time I was shot, there was no disturbances,

10   no large crowds, and no unlawful activity.  I would go as far

11   as saying it seemed like everyone had already gone home or

12   elsewhere."  Do you see that?

13   A.   Yes, ma'am.

14   Q.   And then towards the bottom in the next paragraph, he ends

15   with, "The experience was very painful physically and

16   emotionally.  I did not seek medical attention due to COVID and

17   don't believe it is necessary now.  I look forward to your

18   response."  Do you see that?

19   A.   Yes, ma'am.

20   Q.   I want to go to Exhibit 730, which is the decline letter

21   that Mr. Fey received.  And, again, does this look like a

22   letter -- do you recognize this as a letter to Mr. Fey from the

23   police department?

24   A.   Yes, ma'am.

25            MS. STERK:   And I move to admit Exhibit 730.  It's

Hans Levens – Direct

1     just the decline letter.

2             *MS. JORDAN:*  No objection, Your Honor.

3             *THE COURT:*  Admitted.

4             (Exhibit 730 admitted.)

5     *BY MS. STERK:*

6     *Q.*  If we go to the bottom of this letter, again, we see that

7     there is a paragraph that says, "Due to the inability to

8     identify an officer, no further disciplinary review of this

9     matter is possible."  Do you see that?

10    *A.*  Yes, ma'am.

11    *Q.*  So after this man was shot by police officers, nothing

12    could be done because nobody could identify those officers; is

13    that right?

14    *A.*  According to the decline letter.

15    *Q.*  Okay.  I'm going to move on to Exhibit 845, which is a

16    complaint from Emily Clementine.  And the date of the event was

17    5/28/2020 at the Civic Center.  Do you recognize this as a

18    complaint coming into Internal Affairs?

19    *A.*  Yes, ma'am.

20            *MS. STERK:*  I would move to admit Exhibit 845.

21            *MS. JORDAN:*  The objection would be cumulative, if we

22    are going to go through a bunch of these that are about

23    officers not being identified.

24            *MS. STERK:*  Your Honor, I would be happy to admit the

25    exhibits en masse and move forward, if that is easier.  I

Hans Levens – Direct

1    certainly have no need to go through every decline letter.

2              *MS. JORDAN:*  It would still be cumulative, Your Honor.

3              *THE COURT:*  All right.  I'll overrule it this time.

4    Let's do one more, and then maybe we've done enough.

5    *BY MS. STERK:*

6    Q.  Commander Levens, you see here that the date of the

7    incident is 5/28 at 7:30 p.m. at the Civic Center?

8    A.  Yes, ma'am.

9    Q.  Okay.  So moving on to the description of the complaint, we

10   see that Ms. Clementine says that, "Officers drove up to the

11   peaceful George Floyd protest in full riot gear."  Do you see

12   that?

13   A.  Yes, ma'am.

14   Q.  "The protest was completely peaceful and was being

15   monitored by a large numbered of plain-uniformed officers for

16   approximately two hours with no issues."  Do you see that?

17   A.  Yes, ma'am.

18   Q.  Then we go forward a sentence, and it says, "The police in

19   SWAT gear advanced from 14th and Broadway, set up a riot line,

20   and violently shoved protesters."  Do you see that?

21   A.  Yes, ma'am.

22   Q.  "Denver PD did not announce themselves, their intentions,

23   and did not give protesters the appropriate time or space to

24   leave the area.  The protesters were not disobeying lawful

25   orders because none were given.  Several protesters asked for

Hans Levens – Direct

1    badge numbers, but the officers would not provide them, nor

2    were they displayed.  I watched the SWAT team shove protesters

3    instead of guiding them backwards, elbow a woman in the face,

4    and drag a protester on the ground that had fallen."

5            The last sentence moves to say, "As things escalated,

6    the team opened fire on the crowd at a dangerously close range,

7    within 3 feet."  Do you see that?

8    A.  Yes, ma'am.

9    Q.  And the date of this complaint, if we go back to the first

10   page, looks like it was sent on June 9, 2020?

11   A.  Yes, ma'am.

12           MS. STERK:  Then if we can move to Exhibit 844, which

13   is the decline letter.

14           MS. JORDAN:  No objection.

15           THE COURT:  Admitted.

16           MS. STERK:  I move to admit 844.

17           THE COURT:  It's admitted.

18           (Exhibit 844 admitted.)

19   BY MS. STERK:

20   Q.  And we see this is dated on November 4, 2020?

21   A.  Yes, ma'am.

22   Q.  So this is a number of months after she filed her

23   complaint?

24   A.  Yes, ma'am.

25   Q.  And if we go down to the bottom, again, we see again, "Due

Hans Levens – Direct

1   to the inability to identify an officer, no further

2   disciplinary review of this matter is possible."  Correct?

3   A.  Yes, ma'am.

4   Q.  And here, Ms. Clementine had complained that the officers

5   were covering their badge numbers; right?

6   A.  I'm trying to see --

7   Q.  You can go back to Exhibit 845 as a reminder.

8   A.  Can you put it up, again, please?

9   Q.  Second page.

10          So in the middle, it says, "Several protesters asked

11   for badge numbers, but the officers would not provide them, nor

12   were they displayed."  Do you see that?

13   A.  Yes, ma'am.

14   Q.  So officers were -- according to her, were covering their

15   badge numbers; and, therefore, her complaint -- IA couldn't do

16   anything with her complaint because they didn't know who these

17   cops -- these officers were; is that right?

18   A.  This says, "Several protesters asked for badge numbers, but

19   the officers would not provide them, nor were they visibly

20   displayed on their outermost garment."

21   Q.  Right.  So she wasn't able to provide Internal Affairs with

22   their badge numbers if they weren't giving them out; right?

23   A.  Right.  There is no indication they were covering them up

24   from this statement, just the fact --

25   Q.  You're right.  Thank you.  Thank you for correcting me.  I

Hans Levens – Direct

1   misread it myself.

2           But officers were refused to providing them?

3   *A.*  According to the complaint, yes.

4   *Q.*  So here she is saying people are actually trying to get

5   officer identifies and were just unable?

6   *A.*  Correct.

7           *MS. STERK:*  So I have just one more of these to go

8   through.  If we could turn to 778 -- Exhibit 778.

9   *BY MS. STERK:*

10  *Q.*  And this is -- do you, again, recognize this as a complaint

11  that went into the Internal Affairs department?

12  *A.*  Yes, ma'am.

13          *MS. STERK:*  I move to admit Exhibit 778.

14          *MS. JORDAN:*  Objection.  Cumulative.

15          *THE COURT:*  Sustained.

16  *BY MS. STERK:*

17  *Q.*  So I want to talk a little bit -- we've been talking about

18  Internal Affairs investigations that resulted in no discipline

19  because no officer could be identified.  So I want to talk a

20  little bit about why that might be.

21          Denver Police Department policy was to turn on

22  body-worn cameras for arrests; right?

23  *A.*  Correct.

24  *Q.*  But there was nothing in the body-worn-camera policy at the

25  time of the George Floyd protests about spontaneous events or

Hans Levens – Direct

1    crowd control incidents?

2    *A.*   Correct.

3    *Q.*   And so there was no requirement at Denver Police Department

4    to turn on body-worn cameras at protests?

5    *A.*   There was -- there was no -- there was nothing in our

6    policy manual that specifically dealt with crowd control

7    incidents.  Like you indicated, for arrest, that language is in

8    there.

9    *Q.*   And so if it's not in the policy, it's, then, not going to

10   be a requirement for officers to turn it on during the

11   protests?

12   *A.*   In this instance -- if it's an arrest, the requirement

13   would be to turn it on, whether it's crowd control or not.

14   *Q.*   I see.  Thank you.  So during the protest, the only time

15   that police officers were required to turn on their body-worn

16   cameras is if they were making an arrest?

17   *A.*   There is several other policies in that section regarding

18   required activation.  One discusses if a contact encounters to

19   become adversarial is one.  When they make arrest -- there is

20   also a general one that says any time an officer feels it would

21   be beneficial.

22   *Q.*   Okay.  So if an officer thinks it would be beneficial,

23   they're supposed to turn on their body-worn camera?

24   *A.*   Yes, ma'am.

25   *Q.*   But there is nothing in the policy specifically about how

Hans Levens – Direct

1   to deal with that during crowd control?

2   *A.*  Correct.

3   *Q.*  And in your opinion, there is always a benefit to

4   activating body-worn cameras, both for the officers and for the

5   citizens involved?

6   *A.*  Yes, ma'am.

7   *Q.*  And that's because one of the points of body-worn cameras

8   is to take the he said, she said out of situations and give

9   everybody video of what actually happened?

10  *A.*  Yes, ma'am.

11  *Q.*  Do you agree that if all officers had been required to wear

12  and turn on their body-worn cameras during the whole protest,

13  Internal Affairs would have had more information to use in

14  investigating complaints?

15  *A.*  Yes, ma'am.

16  *Q.*  And you agree that the 20 to 30 or however many complaints

17  there were where no officer could be identified, that number

18  would have been smaller if all officers had been required to

19  turn on their body-worn cameras for the entire time?

20  *A.*  I can't say it would be fewer cases, but I would say it

21  would be more beneficial and give us additional leads to try to

22  identify those officers.

23  *Q.*  Do you also agree that when body-worn cameras are required

24  to be turned on, officers are less likely to misbehave because

25  they know that somebody is going to see their footage?

Hans Levens – Direct

1    *A.*  I would say officers should understand, they're always on

2    camera, whether it's from their own personal body-worn cameras

3    or from a member of the public photographing or videoing that.

4    So I -- they should be behaving whether they're on or off their

5    body-worn camera.

6    *Q.*  And I totally agree with you, they should be behaving

7    either way.

8    *A.*  Right.

9    *Q.*  But without body-worn cameras on, there is less likelihood

10   that they're going to get caught if they do something wrong?

11   *A.*  Every situation is dependent.  If there is other means to

12   identify an officer that is acting inappropriately, they may

13   still may be identified.  But it does make it difficult in

14   investigations if their body-worn camera is not activated if it

15   was required to be activated per policy.

16   *Q.*  We talked about Officer O'Neill before.  He was the one who

17   did get reprimanded -- or an oral reprimand for violating the

18   body-worn-camera policy during an arrest; is that right?

19   *A.*  Yes, ma'am.  Sergeant O'Neill.

20   *Q.*  And so even when body-worn cameras are required to be used

21   during an arrest, there is no suspension for violating that

22   policy?

23   *A.*  No, ma'am.  The -- that is considered scheduled discipline.

24   It's outlined in our Denver Police Department operations

25   manual, as well as I believe it's Appendix F in the

1   disciplinary handbook.  So there is a schedule for when

2   officers are sustained on that violation.  The first violation

3   within 12 months is an oral reprimand, the second violation

4   within 12 months is a written reprimand, and then it increases

5   from there.  So in the department it's called scheduled

6   discipline.

7   Q.  Okay.  And so the first time you violate the

8   body-worn-camera policy, it's just an oral reprimand?

9   A.  Within 12 months.  Yes, ma'am.

10        MS. STERK:  I want to turn to Exhibits 830 through

11  833.  And this is the Jaramillo file -- IA file.  And it's four

12  separate documents, but all part of the same internal

13  investigations file.

14  BY MS. STERK:

15  Q.  Do you, Commander Levens, recognize Exhibit 830?

16  A.  I have seen it before.

17        MS. STERK:  And at this point, I move all four

18  documents, Exhibits 830, 831, 832, and 833, into evidence.

19        MS. JORDAN:  Objection to the extent that it has

20  hearsay statements.

21        THE COURT:  Okay.  That objection is overruled.

22        (Exhibits 830-833 admitted.)

23  BY MS. STERK:

24  Q.  So I want to start with Exhibit 831, which is the complaint

25  itself.  So we see that this complaint was filed on June 15,

Hans Levens – Direct

1    2020.  Do you see that?

2    A.  Yes, ma'am.

3    Q.  If we turn to the next page, we see that this is from

4    Ms. Jaramillo.  Do you see that?

5    A.  Yes.

6    Q.  Hopefully I'm pronouncing that right.  And if we go down a

7    little bit further, we see the date of the incident was

8    5/31/2020, the time of the event was 10:00 p.m., and it was on

9    13th and Pennsylvania.  Do you see that?

10   A.  Yes, ma'am.

11   Q.  And Ms. Jaramillo, if we go to the next page, complained

12   that when she was arrested for being out after curfew, she was

13   tackled to the ground, resulting in a fractured wrist, and that

14   the officer, Officer Adam Bolton, put his knee on her back and

15   called her a piece of shit several times.  Do you see that?

16   A.  Yes, ma'am.

17          MS. STERK:  I want to turn to Exhibit 833, which is

18   the decline letter.

19          There we go.  Thank you.  830.

20   BY MS. STERK:

21   Q.  And so 830 is the decline letter, and it is from September.

22   So that was several months later?

23   A.  Yes, ma'am.

24   Q.  And if we go down to the bottom of this, it says,

25   "Following our review, there is no evidence found to support

Hans Levens - Direct

1  your allegations against the officer.  Further, there is no

2  reason to suspect the officer violated any department policy or

3  acted in such a manner that would be considered inconsistent

4  with their training."  Do you see that?

5  A.  Yes, ma'am.

6  Q.  So I'm sorry for jumping around.  These are all separate

7  exhibits but all in the same IA file.

8        So if we turn to Exhibit 832, we see that this is a

9  statement of Adam Bolton.  Do you see that?

10 A.  Yes, ma'am.

11 Q.  And on the second page, he was asked, "Did you activate

12 your body-worn camera for this incident?  If not, please

13 detail."  See that?

14 A.  Yes, ma'am.

15 Q.  He responds, "I thought I did activate my BWC but could not

16 find the BWC video after the notice of complaint."  Is that

17 right?

18 A.  Yes, ma'am.

19 Q.  And because he didn't activate his BWC, there was no

20 recording either confirming or disproving Ms. Jaramillo's

21 complaint?

22 A.  Yes, ma'am.

23 Q.  So I want to turn to Exhibit 833, which is the statement of

24 Sergeant Lombardi.  So he was interviewed as well; correct?

25 A.  Yes, ma'am.

Hans Levens – Direct

1    Q.  And he is asked, "When officers deployed off the RDV to

2    make arrest, did Officer Bolton tackle" -- I'm not going to try

3    this name -- "Ms. Jaramillo or use force to take her into

4    custody?"  Do you see that?

5    A.  Yes, ma'am.

6    Q.  He says, "I did not witness the arrest"?

7    A.  Correct.

8    Q.  And then if we look a little bit further down, he's asked,

9    "Did you hear Officer Bolton or any other officers call

10   Ms. Jaramillo a piece of shit or use any other profanity during

11   the incident.  If yes, please explain."

12          And he says, "No.  Officer Bolton was extremely

13   professional."  Right?

14   A.  Yes, ma'am.

15   Q.  So he says he didn't see the arrest, but he also says that

16   the officer was extremely professional; right?

17   A.  Yes, ma'am.

18   Q.  And that causes you to have some questions regarding

19   Sergeant Lombardi's statements; right?

20   A.  Yes.  This actually came up in my deposition.  Since this

21   was a decline case, I was not -- I never saw it within my

22   office.

23   Q.  And during your deposition, you said that this statement

24   caused you to have some questions; right?

25   A.  Correct.

Hans Levens – Direct

1   *Q.* So I want to turn to Exhibit 830, which is the decline

2   letter.  And in explaining why this was declined, it says, "The

3   officer denies using any inappropriate language during your

4   arrest.  This was corroborated by the officer's supervisor who

5   was present on scene and described the officer's behavior as

6   extremely professional."  Right?

7   *A.* Yes, ma'am.

8   *Q.* So the City found that what the sergeant said was truthful;

9   right?

10  *A.* Yes, ma'am.

11  *Q.* And he was backing up his officer, even though he admitted

12  that he hadn't seen the arrest?

13  *A.* Yes.  In looking at this case and reviewing it after my

14  deposition, I think some of the statements should have been

15  clarified from the sergeant.  At what point in time, what he

16  witnessed during this arrest, because he does indicate in the

17  statement that he didn't witness the physical arrest but

18  indicates that his officer was extremely professional.  Now, I

19  think Internal Affairs could have asked some additional

20  clarifying questions in this case to determine exactly at what

21  point -- I mean, is he referring to being extremely

22  professional after this individual's in custody and based on

23  the allegation that he was being discourteous?  So I do think

24  this is something that just needs further clarification.  But

25  on its face it could be concerning.

Hans Levens – Direct

1    Q.  And you agree that if Sergeant Lombardi didn't witness the

2    arrest, his statements can't corroborate what Officer Bolton

3    was saying he did or said?

4    A.  Well, Sergeant Lombardi may not have witnessed the original

5    arrest.  By the time you have to dismount from the RDV,

6    depending where he was at, he may not have seen the physical

7    arrest when this individual was taken into custody.  He may

8    have only observed the interaction between this female and

9    Officer Bolton after the fact.  So that needs to be clarified,

10   at what point he observed the contact.

11   Q.  And Internal Affairs didn't ask those questions or clarify

12   any of that in their questions of Officer Lombardi, did they?

13   A.  Sergeant Lombardi.  No.

14   Q.  Sergeant Lombard.  Sorry.  Thank you.  And instead,

15   Internal Affairs declined to do anything because they just

16   trusted what Sergeant Lombardi said without clarifying?

17   A.  Yeah.  There is more to this decline case.  It's my

18   understanding she didn't cooperate with the investigation, as

19   well, so she couldn't supply additional information regarding

20   her allegation.

21   Q.  But regardless, Sergeant Lombardi said he didn't witness

22   the arrest; and we see here, his corroboration was one of the

23   reasons this was declined.  Right?

24   A.  Yes, ma'am.

25   Q.  And Officer Bolton was not disciplined for failing to turn

Hans Levens - Direct

1    on his body-worn camera during this arrest; right?

2    A.   No, ma'am.

3    Q.   In fact, the -- in the next -- the next bullet, it

4    specifically says that, "There is no reason to suspect the

5    officer violated department policy or acted in such a manner

6    that would be considered inconsistent with training"?

7    A.   In reviewing this letter -- again, which I was not privy to

8    because this did not come to conduct review -- it says

9    "violate any department policy."  The allegation of the

10   inappropriate force cannot be corroborated, the discourtesy,

11   because we didn't have body-worn-camera video.  But this --

12   this is similar to the case with Sergeant O'Neill, where they

13   were making an arrest.  So had I seen this or -- you know, I

14   feel this would have been an appropriate case still to forward

15   to our Conduct Review Office for the body-worn-camera

16   specification.

17   Q.   So you think that Officer Bolton should have been

18   disciplined for not turning on his body-worn camera?

19   A.   In this instance, based on what I know of the case, yes,

20   ma'am.

21   Q.   But the department did not do that?

22   A.   Internal Affairs did not.  No, ma'am.

23   Q.   So I want to turn to use-of-force reports.  And we talked

24   about already that Internal Affairs and your department use

25   use-of-force reports to try to figure out who might have been

Hans Levens – Direct

1    involved in different events that are complained about?

2    A.   Yes, ma'am.

3    Q.   There was nothing in DPD -- in Denver Police Department's

4    policy at the time of the protests relating to use-of-force

5    statements for the use of flash-bangs; right?

6    A.   There was -- in the use-of-force policy, we did not have

7    any direction regarding the use of NFDDs, or flash-bangs.

8    Q.   And there has not been any officer who was disciplined for

9    failing to appropriately document their use of force during the

10   George Floyd protests; right?

11   A.   Correct.

12   Q.   So as we've discussed, it's part of your job to, you know,

13   review the investigations that Internal Affairs completes on

14   complaints; right?

15   A.   Yes.   Those that I receive.

16   Q.   And as part of your preparation for your deposition, you

17   were asked to review eight different incidents that the

18   plaintiffs had asked you to prepare -- be prepared to discuss;

19   right?

20   A.   Yes, ma'am.

21   Q.   And that included videos that were supplied to you for

22   eight different incidents?

23   A.   Yes, ma'am.

24   Q.   And you were designated by the City as its representative

25   to discuss whether those incidents were within Denver Police

Hans Levens – Direct

1    Department's policies?

2    *A.*  Yes, ma'am.

3    *Q.*  For each of the eight incidents relating to the plaintiffs

4    that you looked at, you, speaking for the City of Denver, could

5    not make a determination as to whether the events as they

6    relate to the plaintiffs were within or outside policy or

7    practice of Denver Police Department; is that right?

8    *A.*  That's correct.

9    *Q.*  And to your knowledge, the police department has not

10   disciplined a single officer for any of the eight events that

11   you viewed as they relate to the plaintiffs?

12   *A.*  No, ma'am.

13   *Q.*  One of the events that you were asked to review involved a

14   group of officers on Colfax Avenue walking towards the capitol

15   from the east and a group of protesters between groups in front

16   of the basilica; is that right?

17   *A.*  Yes, ma'am.

18   *Q.*  And you're familiar with the idea that it can be

19   problematic for multiple groups of police officers to corral

20   people into a confined space and then deploy less-lethal

21   munitions without a proper route to disperse them; right?

22   *A.*  Yes, ma'am.

23   *Q.*  Based on your review of the videos of that incident, you

24   were concerned about something that caused you to make a

25   referral to Internal Affairs; right?

Hans Levens – Direct

1  *A.*  Yes, ma'am.

2  *Q.*  And it wasn't the kettling that you were referring to

3  Internal Affairs; right?  It was something else?

4  *A.*  Yes, ma'am.  It was deployment of a pepper ball.

5  *Q.*  Okay.  So, specifically, when reviewing one of the videos,

6  you saw an incident with a protester pushing a bicycle?

7  *A.*  Yes, ma'am.

8  *Q.*  And the officer told the person pushing that bicycle that

9  he needed to leave.  And the individual said, "F you.  Point

10  your gun at me," and then you saw the protesters fleeing away,

11  and then the officer then shot him with pepper balls?

12  *A.*  Yeah.  What I remember from reviewing that video was when

13  the officer had told him he needed to go home, he indicated --

14  he had said, "F you," the officer closed distance on the

15  body-worn camera.  You could tell there was some short-lived

16  scuffle.  I don't know if it was just the body-worn camera

17  jostling around, but then you could see the individual pushing

18  his bicycle away from the officer, and the officer deployed his

19  pepper ball.

20  *Q.*  So let's pull up Exhibit 709.  This is the incident you're

21  describing.

22      And I move Exhibit 709 into evidence, the incident

23  that Commander Levens was just describing.

24      *MS. JORDAN:*  No objection.

25      (Exhibit 709 admitted.)

1          (Video played.)

2   *BY MS. STERK:*

3   *Q.*  So is that the event that you reported to Internal Affairs?

4   *A.*  Yes, ma'am.

5   *Q.*  Why did you refer this to Internal Affairs?

6   *A.*  So looking at this case, this officer is giving this

7   individual orders they needed to go home.  This individual

8   obviously disagrees, tells him, You don't need to tell me what

9   to do.  The mere fact that he is shooting this individual as

10  he's leaving -- as he's going away, he was shot in the back.

11  At that point he is complying, so to me the threat is moving

12  away from the officer.

13  *Q.*  And when did you refer this to Internal Affairs?

14  *A.*  In preparation, when I reviewed videos as part of my

15  deposition.

16  *Q.*  So in October or November of 2021?

17  *A.*  It was right before I was deposed.

18  *Q.*  And has this -- to your knowledge, has this officer been

19  disciplined?

20  *A.*  This case is still open and in Internal Affairs.

21  *Q.*  And it's been five months since you first referred it?

22          *THE COURT:*  I do that too.

23          *THE WITNESS:*  Yes, ma'am.

24  *BY MS. STERK:*

25  *Q.*  So I want to talk next about Colfax and Lincoln on May 30.

Hans Levens - Direct

1    We've heard some events throughout the trial so far about

2    that -- or we heard some testimony about the events on that day

3    during the protests.  Are you aware that approximately 30 or so

4    complaints regarding, you know, that approximate location and

5    approximate time were consolidated together in one IA file?

6    A.  I know there were several service complaints that had

7    multiple complainants, you know, contained within one

8    complaint.

9    Q.  Okay.  So there were -- that makes sense.  So it's not

10   surprising to you that there was one IA file that contained

11   something around 30 complaints relating to kind of a similar

12   event?

13   A.  I don't know exact numbers, but I know there was one with

14   several.

15          MS. STERK:  Thank you.  So I want to mark Exhibits 835

16   and 836, which are the decline letters and complaints that were

17   in file -- IA file SVC20200030.

18          MS. JORDAN:  Objection.  Cumulative.

19          MS. STERK:  Your Honor, this is going to be on a

20   different topic than we've recovered.

21          THE COURT:  Okay.  Admitted.

22          (Exhibits 835 and 836 admitted.)

23          Let's take a break here.  Five minutes after.

24          (Recess at 2:52 p.m.)

25          (Jury in at 3:08 p.m.)

1          THE COURT:  How are you folks holding up over there?

2          JUROR:  It's Friday.

3          THE COURT:  Did I tell you we were going to go all day

4     tomorrow, too?

5          JUROR:  I work regardless tomorrow, so doesn't make a

6     difference to me.

7          THE COURT:  We won't.

8          Okay.  Onward.

9     BY MS. STERK:

10    Q.  Before we took a break, Commander Levens, and before we

11    kind of moved topics, you had said you had referred to the IA

12    that incident we saw on the video with the man pushing a bike

13    and the officer shooting him in the back; right?

14    A.  Yes, ma'am.

15    Q.  And then we talked about five months since you had referred

16    that.  I wanted to just talk about the general process of how

17    long investigations usually take.  Prior to the George Floyd

18    protests, the goal in Internal Affairs was to close

19    investigations within 30 days; right?

20    A.  Yes, ma'am.

21    Q.  And when the George Floyd protests started, that goal

22    changed to about 45 days because there were more complaints

23    coming in during the protests?

24    A.  Yes, ma'am.

25    Q.  But then during the protests, the complaints you received

Hans Levens - Direct

1   were more than doubling than usual; is that right?

2   A.   Yes, ma'am.

3   Q.   And at that time the ballpark time for Internal Affairs to

4   get a final disciplinary order from the executive director's

5   office on investigations related to the George Floyd protests

6   has been somewhere around seven months; is that right?

7   A.   That is a response I gave in my deposition, with the best

8   guesstimate, thinking about the three sustained inappropriate

9   force cases.  And I believe that first case with the officer

10   firing the pepper ball at the car was around seven months.  But

11   every case is different based on the amount of body-worn camera

12   and video evidence that needed to be reviewed prior to the

13   discipline determination.

14   Q.   And you agree that since -- the complaints related to the

15   George Floyd protests certainly have not been closed in the

16   30-day goal; right?

17   A.   No, ma'am.

18   Q.   And they've also certainly not been closed in the 45-day

19   goal; right?

20   A.   No, ma'am.

21   Q.   And almost all, if not all, of the complaints that have

22   come in from the George Floyd protests have taken many months

23   to close?

24   A.   Yes, ma'am.

25   Q.   In fact, there are still, as we talked about earlier,

Hans Levens – Direct

1    eleven or twelve complaints that are still pending from the

2    George Floyd protests that occurred two years -- almost two

3    years ago?

4    A.  Yes.  There is twelve.

5    Q.  So I want to go back to talking about the Exhibits 835 and

6    836, which are the combined Internal Affairs file for all of

7    the events occurring on Lincoln and Colfax between around

8    5:30 p.m. and 8:00 p.m. on May 30, as Chief Stamper had been

9    describing the other day.

10          You understand that there were 20 or 30 or more

11   officers at -- around the Lincoln and Colfax intersection at

12   that time on May 30; right?

13   A.  Yes, ma'am.

14   Q.  So I want to turn to Exhibit 835, and I want to go to page

15   5 of that.  Again, 835 is the decline letters that are a

16   compilation of all of the decline letters from the one IA file

17   from Lincoln and Colfax between 5:30 and 8:00 p.m. on May 30.

18   We see this is dated January 2, 2021?

19   A.  Yes, ma'am.

20   Q.  And, again, that's about ten months or nine months after

21   the George Floyd protests?

22   A.  Yes, ma'am.

23   Q.  And it says in the third paragraph, "In your

24   correspondence, you state, there was no dispersal order, that

25   you did not initially see from your vantage point anything

1    thrown at the officers prior to your initial exposure to tear

2    gas.  You state that a short time later police and citizens

3    squared off.  You saw multiple bottles that you believed were

4    water thrown at the officers, who responded with crowd

5    munitions."  Do you see that?

6    *A.*  Yes, ma'am.

7    *Q.*  And then if we go to -- I think it's the second to last

8    paragraph in this -- in this decline letter -- the last

9    paragraph.  It says, "Based upon these evidentiary facts, the

10   deployment of crowd-control munitions, including chemical

11   munitions, were consistent with the Denver Police Department's

12   training and use-of-force policy."  Do you see that?

13   *A.*  Yes, ma'am.

14   *Q.*  And every single one of the decline letters from the events

15   at Lincoln and Colfax between 5:30 and 8:00 p.m. in the

16   consolidated IA file used the same language to decline each and

17   every one of those complaints; correct?

18   *A.*  I'd have to look at each decline letter again.

19   *Q.*  If you look in front of you, it's Exhibit 835 in the binder

20   in front of you.

21   *A.*  Okay.

22   *Q.*  And it's about 45 pages, I believe; and so there is 30 or

23   so different decline letters.  If you can take a quick look

24   through and let me know if there are any that don't say that

25   the complaint -- the issues complained about were within

Hans Levens – Direct

1   policy.

2   A.   I found a letter that I don't think has that same language

3   in it, I believe.

4   Q.   Which page are you looking at?

5   A.   It's going to be 31869.

6   Q.   Okay.  On 869 it says, "A comprehensive review of the

7   complaints stemming from the protests and the tactics police

8   officers used is being conducted by the OIM."  Do you see that?

9   A.   Yes, ma'am.

10  Q.   And so here it doesn't say that anything is within policy,

11  but it also doesn't say any officer is being disciplined;

12  right?

13  A.   I'm just reading it.  One second, ma'am.

14        You're correct.

15  Q.   So just to speed things up, because I know there is a lot

16  of documents in here, you haven't seen any complaints -- any

17  decline letters in Exhibit 835 that show that any officer was

18  disciplined?

19  A.   No, ma'am.

20  Q.   And except for the one that you just looked at so far, all

21  the ones that you've seen have language that the deployment of

22  crowed-control munitions were consistent with the Denver Police

23  Department's policies, training, and use-of-force policy?

24  A.   Yes, ma'am.

25  Q.   So I want to turn to page 54 of Exhibit 836, which is a

Hans Levens - Direct

1    complaint from William MacKenzie.  And this complaint we see

2    came in on Monday, June 1, 2020?

3    A.  Yes, ma'am.

4    Q.  And he starts by saying that he lives in East Denver and is

5    very concerned about police actions in regards to the protests.

6    Do you see that?

7    A.  Yes, ma'am.

8    Q.  And then he has a list here of several links of things that

9    he's complaining about?

10   A.  Yes, ma'am.

11   Q.  And the second link in that list is called "The cops who

12   pepper-balled a pregnant lady in her own car."  Do you see

13   that?

14   A.  Yes, ma'am.

15        MS. STERK:  I'd like to mark Exhibit 1136, the video

16   of police shooting into a car at the intersection of Colfax and

17   Broadway on May 30, where a man was yelling that they were

18   shooting his pregnant girlfriend in the passenger seat.

19        MS. JORDAN:  Objection, Your Honor.

20        Can we approach, please?

21        THE COURT:  Okay.

22        (Hearing commenced at the bench.)

23        MS. JORDAN:  I believe this is the video of another

24   plaintiff who has a pending case that is a part of this case,

25   so I would object --

1          THE COURT:  There are a lot of those.

2          MS. STERK:  I have no knowledge of being a plaintiff,

3     but it's part of the IA files.

4          THE COURT:  There is one plaintiff in this case that

5     is also a party to another.

6          MS. JORDAN:  Correct.

7          MS. STERK:  I don't see how that -- it's still

8     relevant to the facts here.  I don't see how it's prejudicial.

9          MS. JORDAN:  Because it makes it very difficult if all

10    of the other information from other pending cases are going to

11    be brought up in this case to be able to settle those cases.

12         THE COURT:  You're not going to do that.

13         MS. STERK:  I'm just going to play the video and ask

14    him if he's seen the video.

15         THE COURT:  If you want to bring out -- you probably

16    don't -- that this is a plaintiff in another case, you can do

17    that.

18         (Hearing continued in open court.)

19         MS. STERK:  Your Honor, I move Exhibit 1136 into

20    evidence.

21         THE COURT:  Admitted.

22         (Exhibit 1136 admitted.)

23         MS. STERK:  Could you play Exhibit 1136.

24         (Video played.)

25

Hans Levens – Direct

1   *BY MS. STERK:*

2   *Q.*  Commander Levens, do you recognize this as the intersection

3   of Colfax and Broadway?

4   *A.*  Yes, ma'am.

5   *Q.*  About how many officers do you see in this video so far?

6   *A.*  Five in this video frame.

7          *MS. STERK:*  Okay.  You can keep going.

8          (Video played.)

9          And, actually, can you stop it for one second.

10  *BY MS. STERK:*

11  *Q.*  The man in the back, I think we see a -- a triangle on

12  his --

13  *A.*  Chevrons?

14  *Q.*  What is that?

15  *A.*  Chevrons.  Those indicate that that individual is a

16  supervisor.  They appear to be corporal stripes.

17  *Q.*  Corporal stripes.  And so supervisor; and if they don't

18  have that, they're not a supervisor.  Is that right?

19  *A.*  Correct.

20  *Q.*  Okay.  Let's keep playing.

21          (Video played.)

22          Did you hear that guy just yelling, "Are you F-ing

23  pepper-balling my car with my pregnant girlfriend in it?"

24  *A.*  I could hear him yelling, but I would have to play it again

25  to listen to it.

Hans Levens – Direct

1            (Video played.)

2    *Q.*  Did you hear it that time?

3    *A.*  Yes, ma'am.

4    *Q.*  Okay.  As we go through, we're going to see these officers

5    start shooting at the car.  And I want you as we do that to try

6    to count how many times they shoot at the car.

7    *A.*  Okay.

8            (Video played.)

9    *Q.*  About how many shots do you --

10   *A.*  I'd say around 23.

11   *Q.*  Around 23.  Did you see the man in the car holding any

12   weapons?

13   *A.*  No, ma'am.

14   *Q.*  Did you see him throwing anything at the police?

15   *A.*  No, ma'am.

16   *Q.*  Did you see anyone else in the car throwing anything at the

17   police?

18   *A.*  No, ma'am.

19   *Q.*  You didn't see his pregnant girlfriend throwing anything or

20   threatening anyone?

21   *A.*  No, ma'am.

22   *Q.*  Do you see any justification for shooting at this car?

23   *A.*  Based on the video that was shown today, no.

24   *Q.*  And this is not one of the incidents in the -- excuse me.

25   Let me back up.

Hans Levens - Direct

 1          I want to go back to Exhibit 836 -- actually, before

 2    we do that, can you play the rest of the video.

 3          (Video played.)

 4          Do you know, Commander Levens, what the effects of

 5    pepper balls are?

 6    A.   Yeah.  They incapacitate an individual.

 7    Q.   And do you think it's a good idea to be shooting at a

 8    driver of a car with pepper balls?

 9    A.   No.

10    Q.   You saw that this man yelled that he had a pregnant wife --

11    pregnant girlfriend in the car, and the police shot at them

12    anyway.  Right?

13    A.   Yes, ma'am.

14    Q.   I want to turn back to 835, page 33.  And we see that this

15    is a letter to Mr. MacKenzie.  He was the one who complained

16    about the video of the -- that we just looked at; right?

17    A.   Yeah.  I don't know his name, but --

18    Q.   Well, let's go back to his complaint so that we make sure

19    that you know his name.

20    A.   There it is.

21    Q.   You see here, this is from William MacKenzie?

22    A.   Yes, ma'am.

23    Q.   If we go back to Exhibit 835, we see this is a letter to

24    Mr. McKenzie.  And it says in the last paragraph, "A

25    comprehensive review of the complaints stemming from these

Hans Levens – Direct

1   protests and the tactics police officers used is being

2   conducted by the Office of Independent Monitor."  Do you see

3   that?

4   A.  Yes, ma'am.

5   Q.  So there is nothing here about the officers in that video

6   being disciplined?

7   A.  No, not in this letter.

8   Q.  There were five different officers in that video; right?

9   A.  Yes.

10  Q.  That's about what we counted?

11  A.  Yes, ma'am.

12  Q.  And there was more than one officer shooting at that car?

13  A.  Yes, ma'am.

14  Q.  And none of the officers stopped any one of the others to

15  say, hey, don't shoot at the guy with pepper balls?

16  A.  Yeah.  We couldn't see that in the video frame.

17  Q.  And the letter here was December 22, 2020; right?

18  A.  Yes, ma'am.

19  Q.  And that was over a year ago?

20  A.  Yes, ma'am.

21  Q.  And that you're aware, there is not a closed file --

22  investigation file related to this incident?

23  A.  There is actually an open case file related to this.

24  Q.  Nobody has been disciplined to date?

25  A.  This case is still open.

Hans Levens – Direct

1    *Q.*  So nobody has been disciplined to date?

2    *A.*  Correct.

3    *Q.*  I want to turn to Exhibit 804.  804, if we turn to page 10,

4    this is an Internal Affairs correspondence.  Do you see that?

5    *A.*  Yes, ma'am.

6          *MS. STERK:*  I admit 804 of the IA file, dated

7    December 11, 2020, which was submitted for an event on May 30,

8    2020.

9          *MS. JORDAN:*  Objection to the hearsay statements.

10   Cumulative.

11         *THE COURT:*  Well, overruled.  But how many of these

12   are we going to do?

13         *MS. STERK:*  Well, this is going to make a different

14   point, Your Honor.  There are obviously a lot of Internal

15   Affairs files, and they were closed for a variety of reasons.

16         *THE COURT:*  Okay.  If you say it's going to make a

17   different point, it's admitted.

18         (Exhibit 804 admitted.)

19   *BY MS. STERK:*

20   *Q.*  If we can go to page 10 under the narrative section.  It

21   says, "On May 30, Officer Carmody was captured on body-worn

22   camera using a pepper ball gun on a protester."  Do you see

23   that?

24   *A.*  Yes, ma'am.

25   *Q.*  And on the next page, page 11, there is an Internal Affairs

Hans Levens - Direct

1   investigation summary.  And in that summary, the paragraph

2   starting with "Sergeant Franklin reviews" says that he reviewed

3   body-worn-camera footage from Officer Carmody -- it says he

4   reviewed Officer -- strike that.  I can read.  I swear.

5          He reviewed Officer Cunningham's and Officer Bolton's

6   body-worn camera.  Do you see that?

7   A.  Yes, ma'am.

8   Q.  And if we turn to the next page, page 12, it specifically

9   talks about reviewing Officer Carmody's body camera in the

10  third paragraph.  And it says, "At approximately 1320 he's

11  captured using a pepper ball gun on a protester after being

12  given an order by a supervisor to do so."  Do you see that?

13  A.  Yes, ma'am.

14         MS. STERK:  So I want to look at the video that is

15  referred to in that paragraph, which is Exhibit 659.  And I

16  would offer Exhibit 659, which is a video of what is captured

17  in that paragraph.

18         MS. JORDAN:  No objection.

19         THE COURT:  Admitted.

20         (Exhibit 659 admitted.)

21         (Video played.)

22  BY MS. STERK:

23  Q.  So here we see Sergeant Carmody -- Officer Carmody --

24  sorry -- shooting pepper balls at a protester?

25  A.  Yes, ma'am.

Hans Levens – Direct

1   Q.  And the protester had his hands up?

2   A.  Yes, ma'am.

3   Q.  And this is an instance where we actually know who the

4   officer was; right?  We see it in Officer Carmody's body cam,

5   him shooting that protester; right?

6   A.  Correct.

7   Q.  But he was not disciplined for shooting the protester; is

8   that correct?

9   A.  Correct.

10  Q.  And if we go to page 24, we see the finding, "exonerated,"

11  at the bottom.  And then that's your signature underneath;

12  right?

13  A.  Yes, ma'am.

14  Q.  Okay.  I'm going to turn to Exhibit 847.  This is going to

15  be my next and last example of a file where we know the officer

16  who took the actions, as opposed to ones where we -- where you

17  couldn't identify the officer.

18          So if we can pull up -- actually, if we can pull up

19  Exhibit 847.  Again, this is an Internal Affairs file; correct?

20  A.  Yes, ma'am.

21          MS. STERK:  And I move 847 into evidence.

22          MS. JORDAN:  You said it's the last one?

23          MS. STERK:  The last one on this topic.

24          MS. JORDAN:  No objection.

25          THE COURT:  It's admitted.

1          (Exhibit 847 admitted.)

2     *BY MS. STERK:*

3     *Q.* So on the third page of 847 there, is a case summary.  And

4     it talks about a driver in a black sedan who was sprayed by --

5     with pepper spray by officers.  And we actually -- is that

6     correct?

7     *A.* Yes, ma'am.

8     *Q.* We heard from Chief Stamper this week -- earlier this week

9     about the video, so I'm not going to replay the video on this.

10    But I do want to talk a little bit about the IA file.

11         Internal Affairs didn't discipline anyone for the

12    incident in Exhibit 847; is that right?

13    *A.* No, ma'am.

14    *Q.* And I want to go to page 14, where it says "findings."

15         *THE COURT:* You know, when you entered into

16    questioning with, "right," and he says, "no, ma'am," it's

17    potentially ambiguous as to what he is saying.

18         *MS. STERK:* Thank you, Your Honor.  You are completely

19    right.

20    *BY MS. STERK:*

21    *Q.* You agree with me that Officer Esquibel was not disciplined

22    for this incident.

23    *A.* I'd like to expand on this.  So what we have up in front of

24    the screen now is the -- called the review and findings

25    document.  He did not receive any formal discipline, as on the

Hans Levens – Direct

1   matrix.  In this case you'll see that the finding is an

2   informal finding, which is –– it is considered discipline.  And

3   informal finding is sent back to the district level, where he

4   is sat down, counseled about his actions.  It's documented and

5   put in his personnel file and then later can be used against

6   him in performance review.  But it was not formal discipline;

7   it was informal.

8   Q.  So it was more of a talking-to that he got after this

9   happened?

10  A.  Yeah.  Counseling, debriefed, discussion about this

11  incident.

12  Q.  But he wasn't suspended?

13  A.  No, ma'am.

14  Q.  Not fired?

15  A.  No, ma'am.

16  Q.  Didn't have to sit desk duty for some period of time?

17  A.  No, ma'am.

18  Q.  Didn't have a pay cut?

19  A.  No, ma'am.

20  Q.  So in this findings, we see that in the third paragraph it

21  says, "Officer Esquibel's OC deployments were ineffective.

22  They failed to accomplish the desired goal of getting traffic

23  moving."  Do you see that?

24  A.  Yes, ma'am.

25  Q.  And then if we can continue in the next paragraph, it says

Hans Levens – Direct

1  that the HALO cams actually caught the driver a little further

2  down the street.  Do you see that?

3  *A.*  Yes, ma'am.

4  *Q.*  And the driver had gotten out of the car and was leaning

5  against it with his hands on his face because he had taken so

6  much OC spray to the face that he wouldn't operate his vehicle;

7  is that right?

8  *A.*  Yes, ma'am.

9  *Q.*  And if we continue on to the next page, it also says that

10  two other vehicles stopped to render aid to that driver; right?

11  *A.*  Yes, ma'am.

12  *Q.*  And so instead of keeping traffic moving, Officer Esquibel

13  sprayed someone in the face who was driving, who had to pull

14  over and then stopped other vehicles that had to help him;

15  right?

16  *A.*  Yes, ma'am.

17  *Q.*  But he wasn't disciplined for that?

18  *A.*  Informally.

19  *Q.*  He got a talking-to.  Okay.

20       I want to talk about a file that was recently produced

21  to us.  You are aware that the plaintiffs asked for internal --

22  Internal Affairs investigations closed files over a year ago;

23  right?

24  *A.*  Yes, ma'am.

25  *Q.*  In November at your deposition, you had talked about a

Hans Levens – Direct

1    number of those.

2    *A.*   Yes, ma'am.

3    *Q.*   And you were criticized at your deposition for how few

4    people had gotten disciplined; right?

5    *A.*   Yes, ma'am.

6    *Q.*   And on Monday, this Monday, after opening statements, the

7    City just provided us with a new internal investigation file

8    that closed January 10, 2022.  Are you aware of that?

9    *A.*   I don't know which file.

10   *Q.*   It was Officer Trudel.

11   *A.*   Yes, ma'am.

12   *Q.*   And are you aware that that just got produced to the

13   plaintiffs on Monday?

14   *A.*   Yes, ma'am.

15   *Q.*   Even though it was closed January 2022?

16   *A.*   Yes, ma'am.

17   *Q.*   So I want to turn to Exhibit 1243.  And I want to go to

18   what is -- actually, before we get there -- I'm sorry.  That's

19   fine.

20           So this case file, if we go to -- ending in 759.

21           Now, you said that investigations typically take

22   30 days.  Here, your goal is 45, ended up being seven months.

23   Yet this one didn't close until January; is that right?

24   *A.*   That's correct.

25   *Q.*   And January 2022, so that was just a couple of months ago.

Hans Levens – Direct

1   *A.*  Yes, ma'am.

2          *MS. STERK:*  If we can go to the page actually ending

3   in 35750 -- sorry.  I forgot that this is not -- I move

4   Exhibit 1243 into evidence.

5          *MS. JORDAN:*  No objection.

6          *THE COURT:*  Admitted.

7          (Exhibit 1243 admitted.)

8          *MS. STERK:*  If we can put the whole page on the

9   screen.

10         And can we actually go back to the page ending in 50.

11  *BY MS. STERK:*

12  *Q.*  This is a departmental order of disciplinary action; is

13  that right?

14  *A.*  That's correct.

15  *Q.*  So Officer Trudel was disciplined in this case?

16  *A.*  Yes, ma'am.

17  *Q.*  And he -- if we go --

18         Can you put the whole document on the page.

19         Thank you.

20         If we go to the next page, and paragraph 2, we see

21  that it says "Officer Trudel's body-worn-camera footage

22  captured multiple deployments of OC spray in the early morning

23  hours of May 29, 2020."  Do you see that?

24  *A.*  Yes, ma'am.

25  *Q.*  By early morning hours, that means kind of after midnight,

Hans Levens – Direct

 1  May 28?

 2  A.  Yes, ma'am.

 3  Q.  And it goes on to say that "Officer Trudel warned other

 4  officers to watch out as if projectiles are being thrown at

 5  them.  It does not appear that the protesters in front of

 6  Officer Trudel are the ones attempting to throw items at the

 7  officers."  Do you see that?

 8  A.  Yes, ma'am.

 9  Q.  So I want to play -- actually, let's go to the fifth

10  paragraph.  And the conclusion here is that, "None of the

11  protesters appear to be holding weapons or attempting to cause

12  harm to any of the officers."  Do you see that?

13  A.  Yes, ma'am.

14  Q.  And it also says, "No audible warnings were given to the

15  crowd"?

16  A.  Not heard on the video.

17  Q.  In paragraph 6, the next paragraph, it talks about his

18  actual actions.  And it says, "At the 7:40-minute mark, Officer

19  Trudel lifts his OC spray into the air and says, 'I'm going to

20  fog this mother F-er.'"  Do you see that?

21  A.  Yes, ma'am.

22  Q.  And then it says, "At the 7:42-minute mark, a chemical

23  munition explodes behind the target of Officer Trudel's OC

24  spray, causing a sparking projectile to land at the feet of the

25  target.  Before the projectile explodes again, Officer Trudel

Hans Levens – Direct

1  deploys his OC spray in the face of a protester."  Do you see

2  that?

3  A.  Yes, ma'am.

4  Q.  "And the protester remains in the same position with his

5  hands down at his" -- "her sides."

6  A.  Yes, ma'am.

7  Q.  Okay.  So I want to play Exhibit 1243C.  And I'm going to

8  move that into evidence.  It is the video that is described

9  here.

10        MS. JORDAN:  No objection.

11        THE COURT:  Well, I think 1243 was admitted, so that's

12  part of it.

13        MS. STERK:  Just for easier reference for me, Your

14  Honor.

15        (Video played.)

16  BY MS. STERK:

17  Q.  And from this video, we can see that there is a line of

18  police officers here; right?

19  A.  Yes, ma'am.

20  Q.  Okay.  And so what we saw there is there is tear gas that

21  landed at this protester's feet; and as soon as the tear gas

22  landed, Officer Trudel sprayed him in the face; is that right?

23  A.  Yes, ma'am.

24  Q.  And when the tear gas was thrown at this protester, he

25  wasn't doing anything threatening; right?

Hans Levens – Direct

1    *A.*  No.

2    *Q.*  And was the person --

3              *THE COURT:*  Is it a he or a she?

4              *THE WITNESS:*  She.

5              *MS. STERK:*  Sorry.

6    *BY MS. STERK:*

7    *Q.*  Was the officer who threw that tear gas at this protester

8    disciplined?

9    *A.*  I -- I did receive this case, and I don't -- in this video,

10   I can see this was some type of sparking munition.  The officer

11   that deployed the tear gas was never identified in this case.

12   *Q.*  Okay.  So the officer wasn't identified, so he was not

13   disciplined?

14   *A.*  Correct.

15   *Q.*  And the officer was not identified because the officer was

16   not wearing -- did not activate the body-worn camera; correct?

17   *A.*  I don't know what officer would have thrown it or if the

18   body-worn camera was activated.

19   *Q.*  Well, if an officer had body-worn camera activated when

20   they threw it, you would have been able to identify the

21   officer; right?

22   *A.*  Yeah.  If it was in the case, you should be able to

23   identify the officer who threw the munition.

24              (Video played.)

25   *Q.*  And in that video, you didn't see any other officers there

Hans Levens – Direct

1   telling Officer Trudel not to spray that guy –– that woman in

2   the face?

3   *A.*   No.

4   *Q.*   And you're aware that there was another incident just a

5   minute or so later where Officer Trudel again sprayed the same

6   person and a group of people in the face?

7   *A.*   It was a different protester.

8   *Q.*   Okay.   But he did spray somebody else in the face at that

9   same corner?

10  *A.*   Yes, ma'am.

11          MS. STERK:   Can we play the –– let's –– this is,

12  again, part of the same file, so I –– it's already in evidence.

13          (Video played.)

14  *BY MS. STERK:*

15  *Q.*   Did you see the police officer on the right with the big

16  gun in his hand?

17  *A.*   Yes.

18  *Q.*   What's that gun?

19  *A.*   It's essentially a chemical agent –– a larger chemical

20  agent that can be deployed in crowd-control situations.

21          Are you saying right here in the video frame?

22  *Q.*   Yeah.

23  *A.*   It's a dark image.   From here, it almost looks maybe like a

24  40-millimeter, but I can't tell.

25  *Q.*   Pretty close to be holding a 40-millimeter up and ready to

Hans Levens - Direct

1   deploy that close to protesters; isn't it?

2   A.  He -- this officer -- you know, you have to be ready to

3   address any threats, so he's holding it in front of him in case

4   there is a threat that appears --

5   Q.  Do you see any threat so far in this video?

6   A.  Not in this video frame.  No.

7   Q.  He wasn't disciplined; right?

8   A.  No.

9           (Video played.)

10  Q.  How many people did you see spraying those protesters on

11  the corner?

12  A.  Two.

13  Q.  How many people have been disciplined for this event?

14  A.  One.  Officer Trudel.

15  Q.  The other person who was spraying the pepper spray or

16  whatever they were spraying was not disciplined?

17  A.  They were never identified.

18  Q.  Did you see the protesters there doing anything

19  threatening?

20  A.  No.

21  Q.  Not throwing anything?

22  A.  No.

23          (Video played.)

24  Q.  Do you see again two more sprays?

25  A.  Yes, ma'am.

Hans Levens – Direct

1   *Q.* Do you know if that was a third person spraying on the

2   right?

3   *A.* I can't see from this video frame.

4   *Q.* And that wasn't determined during the internal

5   investigation?

6   *A.* Correct.

7           *MS. STERK:* Keep playing.

8           (Video played.)

9   *BY MS. STERK:*

10  *Q.* So that officer we see on the right who just sprayed what

11  looked like a fire hose worth of chemical munitions at these

12  people, he has not been disciplined?

13  *A.* Correct.

14  *Q.* And the officer who is shooting pepper balls at the people

15  who have just been sprayed in the face with pepper spray, was

16  he disciplined?

17  *A.* No, ma'am.

18  *Q.* Do you see that that one person who is in the middle of the

19  street kind of crouching on the ground?

20  *A.* Yes, ma'am.

21  *Q.* Did you see any officers trying to help that person out of

22  the street so that they wouldn't get hit?

23  *A.* No, ma'am.

24  *Q.* And the street wasn't closed to moving traffic, was it?

25  *A.* No.

Hans Levens – Direct

1          (Video played.)

2    *Q.*  So that whole line of officers that was standing on

3    Broadway and 12th, one person has been disciplined?

4    *A.*  Yes, ma'am.

5    *Q.*  I'm getting close to done but I want to ask a couple

6    questions about the investigation into Officer Trudel.

7          If we can turn to page 756 of Exhibit 1243.

8          On the last paragraph, there are several mitigating

9    factors in the order of discipline that the police department

10   includes here; right?

11   *A.*  Yes, ma'am.  Just to clarify, this document is from the

12   Executive Director of Safety's office.

13   *Q.*  Sorry.  Thank you.  And one of the mitigating factors is

14   that he offered that his academy training did not prepare him

15   for the situation he faced.  Do you see that?

16   *A.*  Yes, ma'am.

17        *MS. STERK:*  So I want to turn to page 5780 of the same

18   document, which is Officer Trudel's statement.

19        You can zoom out so we can see the whole page.  Okay.

20        And if we go --

21   *BY MS. STERK:*

22   *Q.*  So you see that this is Officer Trudel's statement;

23   correct?

24   *A.*  Correct.

25   *Q.*  And if we turn to the last page of his statement, which I

1    think is the third page -- there we go.  The last question

2    says, "How much training have you received that applies to this

3    type of incident?"

4            And he answers, "During my 2018 to 2019 police

5    academy, we received an approximate total of four to eight

6    hours of training, which was nowhere near sufficient, nor did

7    it prepare me for this type of incident.  Most of our training

8    revolved around how to don our gear and gas masks.  We

9    practiced field force training for approximately one hour and

10   watched videos of the different types of coordinated

11   movements."  Do you see that?

12   *A.*  Yes, ma'am.

13   *Q.*  And the office of safety -- is that what you said -- had

14   done the discipline letter?

15   *A.*  The Executive Director of Safety's office.

16   *Q.*  Executive Director of Safety.  And they thought this was a

17   mitigating factor that should make it so he didn't get as long

18   of a suspension as he would have otherwise?

19   *A.*  It was considered one of several mitigating factors.

20   *Q.*  He ended up getting suspended for six days; is that right?

21   *A.*  Correct.

22   *Q.*  You are aware --

23           We can take that down.  Thank you.

24           You're aware of an Internal Affairs complaint saying

25   that Lieutenant Chavez engaged in drive by pepper-balling on

Hans Levens – Direct

1    the 1400 block of Pennsylvania; correct?

2    *A.*  Correct.

3        *MS. STERK:*  I want to turn to Exhibit 726 and 727,

4    which are a complaint and decline letter.  And I would move to

5    admit these into evidence.

6        *MS. JORDAN:*  No objection.

7        *THE COURT:*  Admitted.

8        (Exhibits 726 and 727 admitted.)

9    *BY MS. STERK:*

10   *Q.*  We see in Exhibit 727 that it's a complaint filed –- sent

11   on June 3, 2020?

12   *A.*  Yes, ma'am.

13   *Q.*  And it was sent to –- it was sent online by someone named

14   Jazmine Bjelland?

15   *A.*  Sounds good to me.

16   *Q.*  I'm going to call it Bjelland.  And if we go down to the

17   location and time, we see it's, date of incident, 5/31/2020, at

18   12:40 a.m., around 14th and Pennsylvania.  Do you see this?

19   *A.*  Yes, ma'am.

20   *Q.*  12:40 a.m. on 5/31, again, is like the night of the 30th,

21   but now it's after midnight; right?

22   *A.*  Yes, ma'am.

23   *Q.*  Okay.  I want to go to the next page, where it talks about

24   her complaint.

25        Ms. Bjelland says, "While sitting in the fenced–in

Hans Levens – Direct

1   yard of a private residence, one of your cars drove by and shot

2   pepper rounds at us.  We rushed inside but didn't manage to get

3   the door closed.  Your officers continued to fire pepper rounds

4   into the house, causing several people to have breathing

5   difficulties.  Your officers then proceeded to set off a flash

6   grenade in the yard.  Your officers also fired pepper rounds

7   into a car of people that were trying to leave the chaotic

8   area.  When they left the car because they couldn't breathe,

9   your officers continued to shoot at them with pepper rounds."

10  Do you see that?

11  A.  Yes, ma'am.

12  Q.  Now, I want to turn to Exhibit 26, which is the decline

13  letter issued for Ms. Bjelland's complaint.  You see this is

14  dated September 16, 2020; right?

15  A.  Yes, ma'am.

16  Q.  That was over three months after her complaint?

17  A.  Yes, ma'am.

18  Q.  And I want to go down to the bottom of this letter -- I'm

19  sorry -- the last page.  It says, "Due to the inability to

20  identify officers, no further disciplinary review of this

21  matter is possible."  Do you see that?

22  A.  Yes, ma'am.

23  Q.  Now, you're aware that Lieutenant Chavez was being

24  investigated for a drive-by pepper-balling prior to Exhibit 26

25  being sent to Ms. Bjelland; correct?

Hans Levens - Direct

1   *A.*  I do not have knowledge -- this is not a case that came

2   through Conduct Review Office.  I do have knowledge in speaking

3   with the commander of Internal Affairs -- Commander Magen

4   Dodge -- that there was an open complaint regarding Lieutenant

5   Chavez deploying pepper balls; but I don't know the sequence of

6   events, when that was communicated.  I just know the basic

7   information regarding the allegation.

8   *Q.*  That's fair.  We can walk through that together.

9          Let's take a look at Exhibit 1094, which is already in

10  evidence, and is the Internal Affairs report or file for

11  Lieutenant Chavez.

12         If we turn to page 36, we see that this is the

13  Internal Affairs case summary report; correct?

14  *A.*  Correct.

15         *MS. STERK:*  And if you can zoom out.  Okay.

16  *BY MS. STERK:*

17  *Q.*  And it says under "investigation," there is a date of

18  July 29, 2020.  Do you see that?

19  *A.*  Yes, ma'am.

20  *Q.*  And July 29, 2020, is before the September 16, 2020,

21  decline letter; right?

22  *A.*  Yes, ma'am.

23  *Q.*  Okay.  And that's when Internal Affairs started

24  investigating Sergeant Chavez -- Lieutenant Chavez.  Sorry.

25  *A.*  Yeah.  It was assigned on 7/29/2020.

Hans Levens - Direct

1    *Q.* So it was actually open before that, but assigned on

2    7/29/2020?

3    *A.* Yeah.  I don't know what date it was opened.

4    *Q.* But it would have been opened before 7/29?

5    *A.* That's correct.

6    *Q.* Okay.  And I want to turn to page 38, which is part of the

7    statement of Sergeant Koenigsfeld, that we have -- the jury at

8    least has seen somewhat before with Lieutenant -- with

9    Commander Chavez -- Chief Chavez -- Sanchez?

10   *A.* Lieutenant -- oh, Chief Sanchez.

11   *Q.* All right.  Too many names.  And you understand that

12   Sergeant Koenigsfeld was complaining about Lieutenant Chavez

13   ordering drive-by pepper-ballings; right?

14   *A.* Yes, ma'am.

15   *Q.* Okay.  If we go to page 46, we see that this is a

16   transcript of the interview with Koenigsfeld.  And he says,

17   towards the top that this happened on the 1400 block of

18   Pennsylvania; correct?

19   *A.* Yes, ma'am.

20   *Q.* And he says that Lieutenant Chavez got out of the car on

21   the 1400 block with a fogger; right?

22   *A.* Yes, ma'am.

23   *Q.* Are you aware that there are two plaintiffs in this case

24   who lived on the 1400 block of Pennsylvania and were approached

25   by Lieutenant Chavez with a fogger?

Hans Levens – Direct

1    A.  No, ma'am.

2    Q.  That's not something that Internal Affairs looked into?

3    A.  I can't answer that question.  Internal Affairs received

4    this investigation.  But this was never a case that made it to

5    Conduct Review Office, so I can't answer that, unfortunately.

6    Q.  So Internal Affairs closed the Bjelland complaint without

7    referencing the Chavez complaint; right?

8    A.  Looking at the decline letter, yeah, if they were able to

9    put two and two together, the decline letter did go out.

10   Q.  Now, I want to play Exhibit 1096, which is an interview

11   from Officer Matthews that was within the IA file for

12   Lieutenant Chavez.

13            MS. JORDAN:  Objection.  Hearsay.

14            THE COURT:  Overruled.  Admitted.

15            (Exhibit 1096 admitted.)

16            MS. STERK:  And there are two separate clips, and

17   we'll play them in a row.

18            (Video played.)

19   BY MS. STERK:

20   Q.  So before we play the next one, this complaint -- this

21   statement by Officer Matthews about what was happening in his

22   caravan of cars on the 1400 block of Pennsylvania sounds almost

23   exactly like Ms. Bjelland's complaint; correct?

24   A.  Similar, yes.

25   Q.  But that's not something that Internal Affairs put

Hans Levens – Direct

1    together.  Instead, they sent Ms. Bjelland the decline letter

2    saying they couldn't identify the officer; right?

3    A.  Yes, they sent the decline letter after the incident.

4    Q.  And this interview with Officer Matthews occurred on

5    August 24, 2020; correct?

6    A.  I didn't see the date on the interview.

7         MS. STERK:  If we can turn in Exhibit 720 -- 1094 --

8    sorry -- to page 39 -- sorry -- page 91.

9    BY MS. STERK:

10   Q.  We see that Officer Matthews was involved in signing this

11   by August 29 of 2020?

12   A.  2020; correct.

13   Q.  Okay.  And that was at least two weeks before the decline

14   letter was sent to Ms. Bjelland?

15   A.  Correct.

16        MS. STERK:  Would you play the second clip from 1098.

17        (Video played.)

18   BY MS. STERK:

19   Q.  Commander Levens, are drive-by pepper-balling complaints

20   against the Denver Police Department common?

21   A.  No, ma'am.

22   Q.  You don't see many complaints about drive-by

23   pepper-ballings at people's houses, I'm assuming?

24   A.  No, ma'am.

25   Q.  You don't see many complaints about police throwing

Hans Levens – Direct

1    grenades into people's front yards?

2    *A.*  No, ma'am.

3    *Q.*  And yet the Internal Affairs department of the Denver

4    Police Department couldn't put together that the complaints

5    that we just heard from Officer Matthews were related to

6    Ms. Bjelland's complaint about getting grenaded in her own

7    front yard?

8    *A.*  Yeah.  Like I said, I wasn't part of this investigation, so

9    I don't know, you know, the process or how they can correlate

10   to see if these were associated.

11   *Q.*  And Mr. -- Officer Matthews stated that he didn't think

12   that the drive-by pepper-balling or the grenading in the front

13   yard of someone's home was justified; correct?

14   *A.*  Correct.

15   *Q.*  And that was something that Internal Affairs was aware of,

16   as of August -- at least as of August 2020; correct?

17   *A.*  Yes.

18   *Q.*  So between August 2020 -- actually, let's back up.  I want

19   to go back to 1094.

20             Officer Chavez -- page 37.  Officer Chavez was not

21   asked for an interview until March 2021; is that right?

22   *A.*  Sorry.  I'm just looking at the case on here.  Yes, the

23   statement under Miranda.

24   *Q.*  So it wasn't until March 2020 that Lieutenant Chavez was

25   asked for an interview?

Hans Levens – Direct

1   A.  March 2021?

2   Q.  Excuse me.  Thank you.  March 2021.  So that was -- sorry

3   to keep using my fingers -- seven months after the interview of

4   Officer Matthews that we just saw?

5   A.  Correct.

6   Q.  And during that seven months, Lieutenant Chavez was

7   still -- was not disciplined; right?

8   A.  Correct.

9   Q.  And he was still acting as a lieutenant?

10  A.  I don't -- he was still a lieutenant.  Yes.

11  Q.  How many people does a lieutenant supervise?

12  A.  It's really dependent upon the assignment.  Lieutenant

13  Chavez during this time would have been a sector lieutenant

14  within a district, so he would have half of a patrol district

15  under his command.

16  Q.  Is that, like, 30 or 40 people?

17  A.  This is District 6, so it's -- rough estimate, it's

18  probably somewhere around 60.  Best guesstimate.

19  Q.  So for seven months after Internal Affairs heard the

20  accusations by Officer Matthews, by Sergeant Koenigsfeld,

21  Lieutenant Chavez continued to be in charge of 60 people?

22  A.  I don't know what his assignment was.  I don't know -- if I

23  vaguely remember, at some point he may have been reassigned

24  somewhere; but I don't have the particulars on it.

25  Q.  And he stayed as a lieutenant at the Denver Police

1  Department until his retirement on March 26, 2021; right?

2  A.  Yes, ma'am.

3  Q.  When more junior officers like Officer Matthews come

4  forward with a complaint about a superior's conduct, and they

5  see that superior isn't disciplined, what message does that

6  send to the officers?

7          MS. JORDAN:  Objection.  Speculation.

8          THE COURT:  Overruled.

9          THE WITNESS:  Internal Affairs cases are confidential.

10  So, you know, these cases do take some time, especially when

11  you're looking at criminal charges.  So I don't know, you know,

12  if individual officers would know what the discipline was of

13  this case or where it was at in the investigation.

14  BY MS. STERK:

15  Q.  Well, Officer Matthews would certainly know that Lieutenant

16  Chavez was still a lieutenant in the police department; right?

17  A.  Yes, ma'am.

18  Q.  And other officers who were involved in the incidents that

19  Officer Matthews described would also know that Lieutenant

20  Chavez was still a lieutenant at the Denver Police Department;

21  right?

22  A.  Yes, ma'am.

23  Q.  And Lieutenant Chavez retired with a full pension; right?

24  A.  Yes, ma'am.

25  Q.  When officers see that Lieutenant Chavez wasn't

1    disciplined, got to retire full pension after conducting

2    drive-by pepper-ballings and grenading of people's houses, does

3    it tell them that the conduct that he engaged in was something

4    bad, something they shouldn't do?

5           MS. JORDAN:  Objection.  Speculation.

6           THE COURT:  Overruled.

7           THE WITNESS:  I -- these officers did report and had

8    concerns about this.  You know, the course of an Internal

9    Affairs investigation takes longer and, specifically, when

10   you're looking at criminal charges.  So that's part of the

11   reason why these cases sometimes take so long, because it has

12   to be presented to a district attorney before the department

13   starts with the administrative investigation.

14   BY MS. STERK:

15   Q.  And you're talking about criminal charges.  But Lieutenant

16   Chavez wasn't even disciplined internally by the Denver Police

17   Department; right?

18   A.  Yeah.  The -- the internal administrative investigation

19   cannot occur until the case is presented to the DA for criminal

20   charges.  After that -- in this case, it looks like it was

21   refused, then is when the administrative investigation would

22   start.

23   Q.  And no charges were ever brought against Lieutenant Chavez;

24   correct?

25   A.  You had the DA refusal form up there.  I think it was

Hans Levens – Cross

1    marked refused.

2    Q.  So no charges were ever brought against Lieutenant Chavez?

3    A.  Correct.

4          MS. STERK:  No further questions.

5          THE COURT:  Cross-examination.

6          MS. JORDAN:  Before I proceed, I would seek permission

7    under 611(b) to exceed the scope of direct examination.

8          THE COURT:  Do what?

9          MS. JORDAN:  To exceed the scope of direct

10   examination.

11         THE COURT:  Okay.  You can do that.

12                        **CROSS-EXAMINATION**

13   BY MS. JORDAN:

14   Q.  Good afternoon, Commander Levens.  I'm going to just ask

15   you some follow-up questions to the examination you just gave.

16         First, could you please explain for the jury, what

17   happens when a complaint is initiated in IA?  What is the next

18   step after the complaint is initiated?

19   A.  So after the complaint is initiated in Internal Affairs,

20   depending on the nature of the allegation -- if it is an

21   allegation such as inappropriate force, in that case, there is

22   an initial investigation, and that's presented to the District

23   Attorney's Office for review.  At that point in time, they have

24   the opportunity to review the case, request additional

25   investigation as to the facts of the case, and then the

Hans Levens – Cross

1   district attorney -- the district attorney has to make a

2   determination as to whether or not they're going to accept

3   criminal charges.

4   *Q.*  And --

5   *A.*  After that case -- if they do accept criminal charges,

6   there is still no administrative investigation, and more than

7   likely this officer ends up being terminated as a result of

8   being charged with a felony.  If they refuse the case for

9   criminal prosecution, the administrative investigation then

10  continues.  During the administrative investigation, as is with

11  any other investigation, the sergeants contact witnesses, make

12  sure they obtain all of the additional information for the

13  investigation, and want HALO video, anything that would be

14  pertinent to the investigation, and ensure they have all the

15  statements of potential witness officers, and then they would

16  interview the subject officer for that complaint.

17  *Q.*  While the DA is evaluating the complaint, is IA furthering

18  its investigation?

19  *A.*  No, ma'am.

20  *Q.*  Why is that?

21  *A.*  Because they have to be -- the criminal case has to come

22  before, because they have to be interviewed under Miranda for

23  that case.  When they're providing a statement through an

24  administrative investigation, it's under *Garrity*.  So the

25  criminal investigation has to work itself through first before

Hans Levens – Cross

1   the department can conduct its administrative investigation.

2   Q.  And you were asked what your role is in part of the

3   discipline process.  And I believe your testimony was that if

4   you recommend discipline, it then goes to the chief of police;

5   is that correct?

6   A.  That is correct.

7   Q.  If you decline -- you don't recommend discipline, what

8   happens next?

9   A.  So there is kind of a more detailed process.  So if I can

10  explain that.  When I receive a complaint of misconduct, that

11  complaint is reviewed.  I have -- I formulate a recommendation

12  as to whether or not that complaint should be sustained.  If

13  any complaint that results in a sustained finding has to go in

14  front of the chief of police, there is other department members

15  there that also review the case.  I provide my recommendation

16  based on the rationale and analysis of that case.  If the

17  case -- if the chief of police agrees with the conduct review

18  recommendation, it's then -- the officer gets served with what

19  is called a contemplation of discipline letter.  At that point,

20  they have the process that they can appeal that disciplinary

21  recommendation, or they can sign off on it.  If they appeal it,

22  it goes through an appeal process.  And, then, ultimately,

23  after the appeal, if there is one, it goes to the Executive

24  Director of Safety for the final disciplinary determination.

25          So the chief of police is only making a

Hans Levens – Cross

1    recommendation.  The final disciplinary determination lies with

2    the Executive Director of Safety.

3    *Q.*  If there is no recommendation for discipline either by you

4    or the chief, is that complaint further reviewed?

5    *A.*  So we work with the Office of the Independent Monitor to

6    kind of explain the process.  So along with the Office of the

7    Independent Monitor's involvement in what is called the

8    investigative phase of Internal Affairs, they're also involved

9    with my office.  When I am able to draft the review and

10   findings document and analyze the specifications, I then send

11   that to the Office of the Independent Monitor for review.  They

12   will either agree with the recommendation, or they will

13   disagree with the recommendation.  Sometimes they bring up some

14   valid points, where we will modify our recommendation.  Once we

15   come to a consensus, we may agree or disagree, that case is

16   then presented to the chief of police.

17          There are instances where maybe my recommendation

18   would be a not-sustained finding, theirs would be a sustained

19   finding, either way, we want to make sure we get that right.  I

20   would still present that to the chief of police to determine

21   whether or not it should be a sustained finding.  But our

22   operations manual says any sustained finding will be presented

23   to the chief of police.

24   *Q.*  Before my next question -- I'm sure you just want to get

25   off the stand -- but I'll ask you to speak a little bit slower

Hans Levens – Cross

1    for our court reporter here.

2            So moving on, you were asked about the eleven closed

3    IA files that are related to the George Floyd protests.  And

4    your testimony was that four people had received formal

5    discipline; correct?

6    A.   Correct.

7    Q.   And then you mentioned that one person had received

8    informal discipline; correct?

9    A.   There is a couple of officers that received informal

10   discipline.

11   Q.   Well, I was just going to ask you a follow-up to that.

12   Other than the one you told counsel before I got up here, have

13   there been other officers that received informal discipline?

14   A.   Yes.  There were three.

15   Q.   Three total?

16   A.   Three total.

17   Q.   Okay.  And what forms of informal discipline can officers

18   receive?

19   A.   So informal discipline is usually handled on something more

20   minor in nature.  So like in the case we had seen earlier, that

21   case is then referred back to this officer's chain of command,

22   their district, to sit down, have a discussion, debrief about

23   the incident.  An informal finding essentially says that the

24   officer acted inappropriately, but it's better addressed

25   through informal means because it's a lower-level allegation of

Hans Levens – Cross

1    misconduct.

2          So when a supervisor sits down with the officer, they

3    discuss the incident, they document it in written form, that's

4    then placed in their personnel file.  And then, like I said,

5    that can be used as part of their performance evaluations for

6    that year.

7    Q.  You were asked about Lieutenant Chavez and his IA complaint

8    related to the George Floyd protests.  Do you remember that?

9    A.  Yes, ma'am.

10   Q.  And it was pointed out that he has not been disciplined for

11   that conduct; correct?

12   A.  Correct.

13   Q.  And why was he not disciplined?

14   A.  Because he resigned prior to the completion of the

15   investigation.

16   Q.  And are you telling the jury that he retired prior to the

17   completion of IA completing its investigation?

18   A.  Correct.

19   Q.  And had IA completed that investigation and they made a

20   finding that his behavior was out of policy, it would have then

21   gone to your office; is that correct?

22   A.  So Internal Affairs would not make a finding; they would

23   just complete the investigation.  Then that case would come to

24   my office, the Conduct Review Office, where we would review all

25   of the facts of the case and make a determination as to whether

Hans Levens – Cross

1   or not Lieutenant Chavez violated policy.

2   Q.   And I understand that you haven't fully reviewed it, you

3   haven't conducted a full investigation, but had IA referred

4   that case to your office for a conduct review, would discipline

5   have been recommended?

6          MS. STERK:   Objection.   Speculation.

7          THE COURT:   Overruled.

8          THE WITNESS:   So if an officer resigns prior to the

9   investigation being completed and the disciplinary

10  determination, if it results in sustained finding from the

11  Executive Director of Safety's office, that case at this time

12  was carried as not reviewed, resigned, I think is the

13  terminology.   So the investigation stops because we can't then

14  discipline an employee that is no longer employed with the

15  Denver Police Department.

16  BY MS. JORDAN:

17  Q.   Okay.   But had he not resigned, and IA had referred it to

18  on your office, based on what you know, would discipline have

19  been recommended?

20  A.   If we reviewed all the facts of the case and it was

21  determined that he did violate policy, yes, there would have

22  been a recommendation of sustained policy violation.

23  Q.   And you were asked questions about -- is it Sergeant Norris

24  that -- the pepper spray situation?

25  A.   Yeah.   Officer Norris at the time, now a detective.

Hans Levens - Cross

1   Q.  Okay.  Detective Norris.  And you were asked questions

2   about why -- if the other officers who didn't try to stop the

3   officer that was pepper-spraying, why they weren't disciplined.

4   A.  Yeah.  So when we review these cases, we can't say for sure

5   what other officers around Officer Norris at that time saw or

6   observed.  In an event like this, it's a rapidly evolving

7   situation, you have, you know, items being thrown.  We can't

8   say what each officer observed at the time of this OC

9   deployment.

10  Q.  And you were asked an extensive amount of questions

11  regarding the timing and length of completion of IA files for

12  the George Floyd protests.  Why is it taking so long to

13  complete these investigations?

14  A.  So there is a couple of factors that come into play.  About

15  four weeks prior to the George Floyd protests, Internal Affairs

16  was carrying about 55 open cases.  Sometime around mid-July,

17  Internal Affairs had 180 open cases.  So we're looking at a

18  227 percent increase in open cases with around nine

19  investigative sergeants to investigate those cases.

20          Also during this time, in -- normally, with the

21  average complaint that we received at Internal Affairs, we have

22  a named officer.  It's a lot easier to conduct that

23  investigation.  Several of these complaints had unidentified

24  officers named in these incidents.  Also there was a plethora

25  of HALO video, the available body-worn-camera video they had to

Hans Levens - Cross

1   go through, potentially private surveillance video.  Because

2   with some of the limited details that Internal Affairs had,

3   it's kind of looking for a needle in a haystack, trying to

4   identify and find out through HALO video, through

5   body-worn-camera video where this incident may have taken

6   place.

7           Also this is the same time during COVID, we had a

8   number of officers and people out on COVID leave, some

9   challenges in getting investigations completed, in interviewing

10  individuals, witnesses, because maybe they were infected with

11  COVID at the time.  So these are all things that hindered kind

12  of the timelines, you know -- to me, first and foremost, the

13  caseload, that's a very heavy caseload.  Also within Internal

14  Affairs, they did have one investigator that was on military

15  leave for quite some time throughout the course of these

16  investigations.  So coupled together with the increase in

17  caseload, COVID, the sergeants still had by contract to take

18  their scheduled vacations, and COVID, it just all compounded

19  and made it difficult to get these completed in a more timely

20  fashion.

21  Q.  And are you aware that officers from outside agencies were

22  requested to come in and help with the response to the George

23  Floyd protests?

24  A.  Yes, ma'am.

25  Q.  And what is the practice of IA if they determine that a

Hans Levens – Cross

1  complaint involves an officer from a mutual aid agency?

2  *A.* So if during the course of the investigation they identify

3  that the subject officer of the complaint is from another

4  agency, the Denver Police Department doesn't have authority to

5  discipline that officer, so that case is then forwarded on to

6  that agency for investigation.

7          And if -- just to add on to that.  It depends on the

8  nature of the allegation.  If the allegation is, say, excessive

9  force, that case is still being presented to our District

10  Attorney's Office first for criminal charges before that case

11  is then forwarded on to that other agency.

12 *Q.* And you were asked about videos that you reviewed in your

13 deposition that was taken back in November.  And you -- it was

14 brought to your attention that your testimony was, when you

15 looked at those videos, that you said that you could not make a

16 determination whether those actions of the officers that you

17 reviewed were within policy; is that correct?

18 *A.* Correct.

19 *Q.* And why is it that you were not able to make a

20 determination?

21 *A.* Because when you look at a case, you can't just look at one

22 still shot, you can't just look at one body-worn-camera video;

23 you have to look at everything involved, any available

24 evidence, whether it's body-worn-camera video, HALO video, you

25 have to identify potential civilian witnesses that observed

974

Hans Levens - Cross

1  this and interview them, you have to identify witness officers

2  prior to interviewing subject officers in this -- in these

3  complaints.  So to ensure that you have an accurate

4  investigation, you've collected all of the available evidence

5  before you interview potential subject officers and make a

6  determination as to whether or not that officer operated -- you

7  know, acted within or outside of policies.  So just to review

8  one video, it's hard to make that determination until you

9  complete -- conduct a complete investigation.

10 Q.  And if I remember your testimony correctly, that while you

11 were reviewing these videos, you did find some actions that you

12 found concerning, and you alerted IA; is that correct?

13 A.  Yes, ma'am.

14 Q.  And you were shown what was Exhibit 48, which was your

15 letter that exonerated -- I say his name wrong every time --

16 Officer Carmody.

17 A.  Carmody.

18 Q.  Why was he exonerated?

19 A.  So in that case, he was ordered by a supervisor to deploy

20 his pepper ball on that individual.  During the course of that

21 investigation -- you know, an officer has to trust that an

22 order by a supervisor is -- is a valid order.  You know, you're

23 standing in a line -- Officer Carmody may not have been able to

24 see exactly what this individual was doing, but he believed it

25 was a lawful order that was issued to him by a supervisor.

Hans Levens - Cross

1          In the HALO video, you can see that the supervisor --

2    even identifies with the chevrons on his shoulder -- leans in

3    and advises him to deploy his pepper ball, but we were unable

4    to identify that supervisor.

5    Q.  Now, going back, you were asked at length about many IA

6    files that were declined for the inability to identify the

7    officers.  Do you remember that testimony?

8    A.  Yes, ma'am.

9    Q.  And if information was then brought to the attention to IA

10   that could potentially -- after it's been declined, could

11   potentially identify those officers, would those files be

12   reopened?

13   A.  Yes, ma'am.

14   Q.  And forgive me if you already answered this, but what are

15   some of the issues that IA got -- that IA faced in trying to

16   identify officers for the complaints that they were receiving

17   related to the George Floyd protests?

18   A.  So some of the issues they found was, obviously, as we've

19   discussed, the officers were not readily identifiable through

20   body-worn-camera video or HALO video because they -- we

21   couldn't find the badge number on -- you know, clearly visible

22   on their riot gear.

23   Q.  Does having mutual aid partner officers involved in the

24   response also make it difficult to determine which officers are

25   involved in these complaints?

Hans Levens – Cross

1    *A.* It can be, yes.

2    *Q.* And as part of your preparation for your deposition, were

3    you aware of any of the -- actually, strike that.

4           On the first night of the protest, which was May 28,

5    2020, are you aware of any other law enforcement agencies that

6    were involved -- had a part in the George Floyd response?

7    *A.* I don't know on the first night.  I know later on, several

8    days later, we had assistance from mutual aid partners; but I

9    can't tell you on the 28th whether we had assistance or not.

10   *Q.* Are you aware that the Colorado State Patrol is assigned to

11   the state capitol?

12   *A.* Yes, ma'am.

13   *Q.* Okay.  And the Colorado State Patrol is not associated with

14   the -- is not a part of the Denver Police Department; correct?

15   *A.* Correct.

16   *Q.* Forgive me if this was asked and already answered.  If the

17   IA determines that it's going to decline a complaint for

18   whatever reason, is that the end of what happens to that file,

19   or is it reviewed by anyone?

20   *A.* No.  So part of the investigative process, like I

21   described -- Internal Affairs completes their investigation,

22   those cases can be actively monitored by members of the Office

23   of the Independent Monitor.  They can sit in on interviews,

24   they can request additional questioning of subject officers,

25   they can request adding additional specifications.  After that

Hans Levens – Cross

1    investigation is complete, if we are unable to identify a

2    subject officer, that complaint is still forwarded to the

3    Office of the Independent Monitor for review of the entire case

4    file.  And then they will communicate with the commander of

5    Internal Affairs that they feel the investigation was

6    appropriate, and it can then be declined.

7    Q.  And you had mentioned earlier that during the course of

8    investigation for IA, if they determine that the identity of

9    the officer was a mutual aid officer -- sorry -- that it gets

10   referred to that outside agency; correct?

11   A.  Correct.

12   Q.  Because Denver doesn't have the ability to discipline an

13   outside agency's officer; correct?

14   A.  Correct.

15   Q.  Does Denver have a responsibility to refer that complaint

16   to the mutual aid agency so they can investigate their own

17   officer?

18   A.  Yes, ma'am.

19          THE COURT:  So we're at 4:30.

20          MS. JORDAN:  And you are going to be surprised when I

21   say, those are all the questions I have.

22          THE COURT:  Okay.

23          Any redirect?

24          MS. STERK:  Very briefly, Your Honor.

25

1        **REDIRECT EXAMINATION**

2    *BY MS. STERK:*

3    *Q.*  So I want to go back to Lieutenant Chavez quickly.  And I

4    want to turn to page 1 of Exhibit 1094.  This is a DA case

5    filing form.  Do you see that?

6    *A.*  Yes, ma'am.

7    *Q.*  And at the bottom it says "refused."

8    *A.*  Yes, ma'am.

9    *Q.*  And that was 8/24/21?

10   *A.*  Yes, ma'am.

11   *Q.*  And, again, Lieutenant Chavez has not since that time had

12   his pension revoked that you're aware?

13   *A.*  Correct.

14        *COURTROOM DEPUTY:*  I'm sorry.  The jury was not seeing

15   that.

16        *MS. STERK:*  That's fine.

17   *BY MS. STERK:*

18   *Q.*  If I understand your testimony today, if IA -- Internal

19   Affairs -- determined that the subject officer is from another

20   jurisdiction, it's forwarded to that agency for investigation;

21   is that right?

22   *A.*  Yes, except for if -- like in the case of excessive force,

23   every single case was referred to the District Attorney's

24   Office, whether the officer was known or not.  But if there was

25   a potential criminal charge associated, that would be sent to

Hans Levens - Redirect

1   the District Attorney's Office first for review.  If that was

2   declined, then it would be referred to that partner agency,

3   because we cannot discipline officers from another

4   jurisdiction.

5   Q.  Was the incident where Plaintiff Zach Packard was shot in

6   the head by potentially Aurora officers presented to the Denver

7   DA for review of potential criminal charges?

8   A.  I would have to look at the case file to see if that DA

9   case filing form is in there, whether or not that was referred

10  on to the partnering agency.

11  Q.  So you don't know one way or the other?

12  A.  I do not know, ma'am.

13  Q.  Do you know if Zach Packard's incident was referred to the

14  Aurora Police Department?

15  A.  Do I know?

16  Q.  Yes.  Do you know if Zach Packard's incident was referred

17  to the Aurora Police Department?

18  A.  I do not know.

19  Q.  If the Denver Police Department had policies in place that

20  required officers to document every use of force in a timely

21  report and to activate their body-worn cameras during protests,

22  it would have been possible to hold officers behaving badly

23  accountable; right?

24  A.  Yes, it definitely would have assisted with the

25  investigation.

1          *MS. STERK:*  Nothing further, Your Honor.

2          *THE COURT:*  From the jury, any questions for this

3   witness?

4          Yes.  All right.

5          (Hearing commenced at the bench.)

6          *THE COURT:*  No. 11.

7          *MS. STERK:*  That's fine with me.

8          *MS. JORDAN:*  That's fine.

9          *THE COURT:*  No. 12.

10          *MS. JORDAN:*  That's fine.

11          *MS. STERK:*  That's fine.

12          Just those two, Your Honor?

13          *THE COURT:*  Okay.  Just two -- just these two?  Okay.

14          (Hearing continued in open court.)

15          *THE COURT:*  Question:  If the officer can't identify

16   the supervisor, why is it a lawful order to deploy pepper

17   balls?  If the supervisors were asked, Who gave said order, and

18   they all said, "I didn't," is it still a lawful order?

19          *THE WITNESS:*  I'm sorry, sir.  Can you repeat that?

20   It's kind of hard to hear with the mask.

21          *THE COURT:*  If the officer can't identify -- I guess

22   it means, if the IA officer -- can't identify the supervisor,

23   then why is it a lawful order to deploy pepper balls?  If the

24   supervisors were all asked, Who gave the order, and they all

25   say, I didn't, is it still a lawful order?

1          *THE WITNESS:*  So during the course of the

2     investigation, we have to try to identify who the supervisor

3     was that gave that order, and then we have to speak with the

4     supervisor, and they need to articulate based on the totality

5     of the circumstances why they gave that order to deploy pepper

6     ball.  In this instance, we were unable to identify the

7     supervisor that gave that order.  Officer Carmody was acting

8     upon direction given by a supervisor, who the supervisor,

9     depending on what he or she may have seen, may have believed

10     that to be an valid order.  And Officer Carmody, you know, has

11     to trust that his supervisor is giving him a valid order to

12     take action.

13          *THE COURT:*  But Carmody doesn't know who the

14     supervisor was?

15          *THE WITNESS:*  In that case, I don't believe the

16     supervisor was identified.

17          *THE COURT:*  By Carmody?

18          *THE WITNESS:*  By Carmody.

19          *THE COURT:*  And then the other part of the question

20     is, basically, so if you don't know, do you ask all the

21     supervisors?

22          *THE WITNESS:*  I -- we didn't have details as far as

23     who was where.  I know we've had some challenges with that

24     during the course of the investigation.  And during the course

25     of the investigation, Internal Affairs could not identify who

1    that supervisor was.

2          *THE COURT:*  How could Carmody not know what supervisor

3    told him to shoot?

4          *THE WITNESS:*  I can't answer that for Officer Carmody.

5    There is multiple supervisors.  They get embedded with these

6    teams.  Officer Carmody was part of a SORT team at the time.

7    There is multiple supervisors; so, unfortunately, I can't

8    answer that question.

9          *THE COURT:*  Okay.  All right.  Next question:  If an

10    officer is found to have violated policy, namely, in regards to

11    use of force, are they required to take additional training to

12    prevent another incident?

13          *THE WITNESS:*  So with the disciplinary process -- just

14    to expand on that a little bit.  So inappropriate force is Rule

15    and Regulation 306 in the operations manual.  And in the

16    disciplinary handbook -- the disciplinary handbook outlines the

17    type of discipline and where a specific allegation falls.

18    Inappropriate force starts at a conduct category D violation

19    and can go all the way through an F.  So that would be anything

20    from the presumptive penalty of a ten-day suspension up and

21    through termination.  If an officer is sustained for an

22    inappropriate force specification, it is common practice after

23    they receive their written disciplinary order that their

24    supervisor who is assigned to them will have a conversation

25    with them about how they can do better.  They'll review the

1    policies, and that usually occurs and is documented in written

2    form and placed in the personnel files at the station.

3              THE COURT:  So that's the training that they would

4    get?

5              THE WITNESS:  As far as inappropriate force.  Usually

6    that training would involve reviewing the use-of-force policy

7    again and ensuring that they understand that policy and

8    sometimes playing through some scenarios as to whether or not

9    they believe that using force in those instances would be

10   appropriate.

11             THE COURT:  Any other questions, folks?

12             (No response.)

13             How about follow-up questions from the plaintiff?

14             MS. STERK:  No, Your Honor.

15             MS. JORDAN:  No, Your Honor.

16             THE COURT:  All right, then.  Thank you, sir.

17             THE WITNESS:  Thank you, sir.

18             THE COURT:  You're done.

19             THE WITNESS:  Thank you.

20             THE COURT:  And we're all done, at 20 till 5:00.  Have

21   a nice weekend.  That's an order.

22             Now, is there anything we can do for you to make your

23   next week better?  Yes, sir.

24             JUROR:  My employer was asking for a --

25             COURTROOM DEPUTY:  I'll take care of that.

1          *THE COURT:*  Julie will take care of that.  Anything

2     else we can do for you?

3               (No response.)

4               Thank you so much for your service.

5               (Jury out at 4:40 p.m.)

6          *THE COURT:*  The jury has been excused.  Is there

7     anything either side wants to put on the record at this time?

8          *MR. MACDONALD:*  Not for us, Your Honor.

9          *MR. RINGEL:*  Nothing from the defense.  Thank you,

10    Your Honor.

11         *THE COURT:*  All right.  Have a nice weekend.

12         *MR. RINGEL:*  Thank you.  You too, Your Honor.

13         *THE COURT:*  Thank you.

14              (Recess at 4:41 p.m.)

15                            **I N D E X**

16    **Item**                                                    **Page**

17

18       MAYA ROTHLEIN
             Direct Examination By Mr. Moffett          752
             Cross-examination By Mr. Ringel            784
19           Redirect Examination By Mr. Moffett        801
         AMANDA BLASINGAME
20           Direct Examination By Ms. Gorin            803
             Cross-examination By Mr. Ringel            844
21       HANS LEVENS
             Direct Examination By Ms. Sterk            870
22           Cross-examination By Ms. Jordan            965
             Redirect Examination By Ms. Sterk          979

23

24

25

1                          EXHIBITS

2     Exhibit        Offered   Received   Refused   Reserved   Withdrawn

3
      7                         852
4     9D                        761
      9F                        764
5     53 and 58-60              777
      54                        758
6     56                        769
      82                        818
7     659                       940
      709                       925
8     726 and 727               955
      730                       908
9     731                       906
      793                       879
10    804                       939
      830-833                   916
11    835 and 836               927
      844                       910
12    847                       942
      856                       829
13    1095B and 1095C           771
      1096                      959
14    1133                      895
      1136                      934
15    1217                      825
      1228                      889
16    1243                      946

17

18                      REPORTER'S CERTIFICATE

19          I certify that the foregoing is a correct transcript
      from the record of proceedings in the above-entitled matter.
20
            Dated at Denver, Colorado, this 3rd day of April,
21    2022.

22

23                              _Therese Lindblom_
                                Therese Lindblom,CSR,RMR,CRR
24

25