UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Elisabeth Epps, *et al.*,

   v.

City and County of Denver, *et al*.

Civ. No. 1:20-cv-1878-RBJ (consol.)

**OPPOSITION TO DEFENDANT DENVER'S MOTION FOR JUDGMENT AS A MATTER OF LAW, NEW TRIAL, OR REMITTITUR**

After a three-week trial, an impartial jury rendered a verdict for Plaintiffs. The verdict was well supported. Denver's arguments are unsupported by citations to the record. This is forfeiture. "Judges are not like pigs, hunting for truffles" that might be buried in the record. *Gross v. Burggraf Const. Co.*, 53 F.3d 1531, 1546 (10th Cir. 1995); *Martinez v. Valdez*, 125 F. Supp. 3d 1190, 1196-97 (D. Colo. 2015) (failure to cite record warranted denying motion). Regardless, Denver's arguments are meritless. Plaintiffs presented substantial evidence. There was no error (let alone reversible prejudicial error) in admitting the testimony of Nicholas Mitchell and the OIM memos. And one stray comment of counsel was redressed by a curative instruction. As to damages, Denver has not met its high burden of showing that the jury award shocks the conscience.

Denver's lack of remorse for its institutional failures is palpable. The jury saw things differently, and Denver must take responsibility for the damages it caused.

**ARGUMENT**

"A party is entitled to judgment as a matter of law only if the evidence points but one way and is susceptible to no reasonable inferences supporting the party opposing the motion." *Brown v. Gray*, 227 F.3d 1278, 1285 (10th Cir. 2000). The Court must view the evidence in the light most favorable to the nonmoving party. *Tudor v. Se. Oklahoma State Univ.*, 13 F.4th 1019, 1031 (10th Cir. 2021). "The quantum of evidence necessary to defeat a JMOL motion is slight, such that

1

justifying the grant of a JMOL motion is difficult in practice." *Stroup v. United Airlines, Inc.*, 26 F.4th 1147, 1156-57 (10th Cir. 2022). As for a motion for a new trial under Rule 59(a), "a jury verdict will stand unless it was clearly, decidedly, or overwhelmingly against the weight of the evidence." *Cavanaugh v. Woods Cross City*, 718 F.3d 1244, 1250 (10th Cir. 2013).

**I. Extensive Evidence Supports the Jury's Verdict against Denver**

**Official Policy, Practice, or Custom:** The jury heard extensive evidence that Denver's policies, practices, and customs caused Plaintiffs' injuries. Chief Stamper testified that Denver had "a policy, practice, or custom of indiscriminately and improperly using force against protestors." Dkt. 388 at 402. Dr. Maguire testified that the DPD escalated violence and quashed lawful assembly. Dkt. 354 at 2042. There was a widespread practice or custom of officers improperly using pepperballs, launchers, other projectiles, explosives, and OC spray, Dkt. 388 at 432-36, 440-43, 458-68, 476-88; Dkt. 354 at 2037-38; indiscriminately and excessively using tear gas and smoke grenades, including driving people into traffic, Dkt. 388 at 423-29, 446-48, 468, 471-73, 487-503, 505-07; using force as a form of retaliation, *see id.* at 447; and failing to isolate violent individuals from peaceful protestors, *id.* at 407-18. Dispersal orders were rarely given, and when they were, they were not audible. *Id.* at 403, 508-17; Dkt. 350 at 1244-45; Dkt. 387 at 90. The jury saw video after video of officers using excessive and inappropriate force without consequence and in the presence (or with the approval of) supervisors. *E.g.*, Dkt. 388 at 423-517; Dkt. 389 at 529-51; Dkt. 390 at 934-35, 938-40; Dkt. 357 at 2648-50. These were not isolated incidents but representative of DPD's behavior throughout the protests. Dkt. 389 at 529-51. "[B]reakdown of leadership, training, and … proper procedures" caused the excessive use of force. *Id.* at 551. Denver knew what it needed to do to protect First Amendment rights and ensure proper limits on

2

the use of force, but it did not do those things. Dkt. 354 at 2043-44. Nicholas Mitchell corroborated the testimony of Stamper and Maguire. Dkt. 352 at 1715, 1718-19.

The jury heard the following evidence regarding Denver's official policies:

- Officers were not required to activate BWCs or timely complete use of force reports for protests. This resulted in vague, inaccurate reports and a gap in footage, and it negatively impacted officer accountability. Officers knew of these longstanding policies *prior* to the protests and were therefore aware they were unlikely to be held accountable for their use of force. Dkt. 356 at 2328-30, 2494, 2496-97; Dkt. 389 at 556-58, 642-49; Dkt. 390 at 911-13, 921-22; Dkt. 352 at 1762-66, 1793, 1795-98, 1824-25; Dkt. 354 at 2041; Dkt. 355 at 2107-08; Dkt. 357 at 2652-54; Dkt. 351 at 1466, 1473-75.[1] These policies caused officers to use excessive force on Plaintiffs. *E.g.,* Dkt. 387 at 90-92, 97-105, 108-10, 116-18, 122-23, 134-35, 152-55, 191-92, 227-30, 276-77, 280-82; Dkt. 389 at 675-77, 680-82, 687-88, 691-92, 696-98, 706-09; Dkt. 390 at 757, 811; Dkt. 349 at 996, 1000-04, 1007-10; Dkt. 351 at 1525-29, 1617-18; Dkt. 352 at 1681, 1867-69; Dkt. 354 at 1894-95, 1941, 1948.

- DPD policy provided unlimited discretion to officers to use less-lethal weapons as they saw fit. Dkt. 354 at 2000; Dkt. 350 at 1202-04; Ex. 1 (Tr. Ex. 1266) at 20, 40-41, 49-50, 54-56. This led to the indiscriminate use of force on Plaintiffs, including drive-by PepperBallings and being shot while chased through alleys. Dkt. 387 at 90-93, 95-97, 101-05, 112-14, 118-19, 123-24, 130-36, 152-55, 227-30, 276-77, 280-82; Dkt. 388 at 403-04; Dkt. 389 at 523-29, 553-54, 675-77, 680-82, 687-88, 691-92, 696-99, 701-02, 704, 706-09; Dkt. 390 at 757, 774-75, 801-02, 811, 836-39; Dkt. 349 at 997-98, 1002-05, 1007-08, 1013-14; Dkt. 351 at 1617, 1618; Dkt. 352 at 1545-46, 1550-52, 1555-57, 1561-63, 1666, 1674-80, 1867-69; Dkt. 354 at 1894-95, 1941, 1948.

- Phelan approved the use of 12-gauge shotguns, flashbangs, and other explosives, even though there was no policy or training on them, and they were not meant to be used for protests. All of these weapons were used during the protests, including on Plaintiffs. Dkt. 350 at 1195-97; Dkt. 352 at 1667-68, 1671, 1673-74, 1682-84, 1748-49, 1752-57, 1759-60; Dkt. 387 at 122, 133-35, 150-51, 191-92; Dkt. 389 at 683-84; 691-92, 696-97, 706-08; Dkt. 349 at 998, 1003-04, 1007, 1016; Dkt. 357 at 2651-52, 2720-21.

- DPD policy authorized kettling (or, as written in Crowd Management Manual, encircling for the purpose of arrest). Dkt. 350 at 1254-55; Dkt. 388 at 488-503. This caused Plaintiffs to be kettled on May 31. Dkt. 387 at 141-47; Dkt. 389 at 711-15; Dkt. 352 at 1684-86.

To prove their claim against Denver based on policy, practice, or custom, Plaintiffs did *not* need to show that there was a history of problems relating to use of force reporting, BWC use at

---

[1] Officers were directed to write statements well after the protests and to avoid "problematic language" in their reports. Ex. 2 (Tr. Ex. 787); Dkt. 388 at 340-43; Dkt. 356 at 2497-99.

protests, or any of the official policies. *See* Dkt. 340 at 20. This is because an official policy, practice or custom already requires a showing of deliberate action by policymakers or that the practice or custom is a "standard operating procedure." *Id.* Even so, Denver was aware—for years—of problems with inappropriate use of less-lethal weapons on protestors, BWC use, and use of force reporting. Denver did nothing to fix these problems. Dkt. 352 at 1709-10, 1815-24.

The jury was instructed, "Official policy for Denver includes any actions Commander Phelan took or instructed others to take during the protests …." Dkt. 340 at 20. Phelan authorized the use chemical agents at each of the daily supervisor briefings; ordered the use of less-lethal weapons to move protestors; authorized commanders to do so. Dkt. 350 at 1200-03, 1205. Phelan personally authorized use of force against Plaintiffs at the following incidents: May 28, 14th and Sherman and 14th and Lincoln; May 30, Lincoln and Colfax; and May 31, Basilica kettling. Dkt. 350 at 1238-42, 1246-60, 1264-65, 1268-71, 1277-78; Dkt. 351 at 1406-10, 1443-45.

**Failure to Train:** The evidence of failure to train and prepare for the protests was overwhelming and largely uncontested. Denver provided inadequate crowd control, crowd management and less-lethal weapons training, as well as inadequate supervision and leadership. Chief Pazen did not believe training was important. Dkt. 352 at 1723-36, 1740-41, 1749; Dkt. 389 at 560-67; Dkt. 354 at 2001-39; Dkt. 388 at 404-06; Ex. 3 (Tr. Ex. 861); Ex. 4 (Tr. Ex. 874). Field force training was reduced in 2016, and DPD's own training sergeant, Erik Knutson, admitted that there was too much reliance on PepperBall, and he was unsure whether DPD's one-hour refresher was effective. Dkt. 356 at 2414-17, 2422; Dkt. 352 at 1737-39, 1755. DPD officers admitted that crowd control and management were perishable skills. Dkt. 352 at 1531.

Denver did not train its officers on the Crowd Management Manual. Dkt. 355 at 2113-14; Dkt. 356 at 2411-12. Denver provided no training on use of flashbangs, Stingers, or any other explosive

4

devices for use in crowd control or protests. Dkt. 354 at 2026-30; Dkt. 355 at 2412; Dkt. 357 at 2543-45; Dkt. 349 at 1070. Denver allowed officers who were not certified in the use of 40mm launchers or PepperBall guns to use those weapons during the protest. Dkt. 357 at 2550. Moreover, Denver's training and "actual practices" were only "loosely connected" to its written policies. Dkt. 354 at 1999. Dr. Maguire testified, "the manual appears to just be written words on a page. … their policy in practice is just how they train their officers and what they did on the street." *Id.* at 2114. Commander O'Donnell corroborated this by refusing to say whether numerous patently excessive uses of force fell outside of DPD policy or training. Dkt. 355 at 2239-85. There was also no joint training with mutual-aid agencies for protests. Dkt. 350 at 1281-82; Dkt 352 at 1751, 1766.

These training failures caused Plaintiff's injuries. Dr. Maguire concluded that Denver's years-long failure to train officers in how to use reasonable force during protests presented an obvious potential for excessive use of force and violation of First Amendment rights of protestors. Dkt. 354 at 2044. Not only was there evidence that Denver had "actual or constructive notice" that specific deficiencies in training or supervision was "substantially certain to result in a constitutional violation, and consciously or deliberately chose to disregard the risk of harm," but Denver failed to train its employees "to handle recurring situations presenting an obvious potential to result in a constitutional violation." Dkt. 340 at 22.

**Ratification:** Plaintiffs presented significant evidence that officers' actions during the protest were consistent with and approved of by Denver. Chief Stamper testified, "There was, essentially, no discipline," a "sweeping failure of leadership," and "lack of accountability." Dkt. 388 at 404, 406. Very few officers were disciplined for their actions during the protests. Dkt. 389 at 558-60, 663-64; Dkt. 390 at 874-75, 881-82, 922-23. Officers not disciplined were acting within policy. Dkt. 390 at 887-88; Ex. 1 at 14-15. This was the message that Denver sent to its officers. Dkt. 389

5

at 559-60; Dkt. 354 at 2042. For example, DPD concluded, after reviewing about 30 complaints about the events of May 30, 2020, at Lincoln and Colfax, that the use of force and munitions was consistent with DPD training and policy. Dkt. 390 at 925-31.[2] DPD witnesses, including Phelan, agreed that officers did not violate any policies or training, including during incidents involving Plaintiffs. Dkt. 349 at 1071; Ex. 1 at 37-38; Dkt. 351 at 1482-83, 1532; Dkt. 355 at 2284; Dkt. 356 at 2330-31, 2500-05, 2520; Dkt. 357 at 2647-48, 2715-16; Dkt. 350 at 1224-26; Dkt. 340 at 23.

The Mayor and Chief Pazen ratified the use of force by officers at press conference on the second day of the protest, praising them for their "great" and "tremendous" "restraint." Dkt. 350 at 1227-28. Phelan agreed. *Id.* This authorized officers to continue their uses of force on subsequent days. The jury also saw an email from Director of Public Safety Murphy Robinson, to whom Chief Pazen reported. Robinson informed officers that the language of this Court's TRO was "not reflective of the dedicated service" that he witnessed from the officers on the front line. *Id.* at 1231-32. All of this was evidence that Denver's final policymakers ratified the conduct of the officers during the protests. The jury was instructed on what Plaintiffs had to prove to prevail on their ratification theory, Dkt. 340 at 23, and its verdict is robustly supported by the evidence.

**Causation:** Denver ignores the extensive evidence establishing causation between acts attributable to Denver and Plaintiffs' specific injuries. *See supra*, pp. 3-5. Chief Stamper and Dr. Maguire testified that Denver's policies, practices and customs, and failure to train and supervise, caused Plaintiffs' injuries. Dkt. 389 at 567-68; Dkt. 355 at 2115. Furthermore, each of the Plaintiffs presented evidence that they were only engaged in peaceful protest, yet they were subjected to DPD uses of force. Dkt. 387 at 80-155, 213-32, 255-84; Dkt. 389 at 672-16; Dkt. 390 at 754-81,

---

[2] Commander Levens conceded that if Denver had policies requiring officers to document every use of force and activate BWC, it would have assisted with IA investigations and accountability. Dkt. 390 at 913-14, 979. Because of Denver's inadequate policies, it could not hold officers accountable for any misconduct. *Id.* at 886, 893, 903-04, 907, 909-10, 916-17, 948, 950.

807-43, 994-1014; Dkt. 349 at 990-1014; Dkt. 351 at 1545-70, 1614-29; Dkt. 352 at 1665-89, 1837-69; Dkt. 354 at 1873-87, 1932-63. This evidence was uncontested.

## II. Extensive Evidence Supports the Jury's Verdict Holding Denver Liable for Actions of Mutual-Aid Agencies[3]

There was extensive evidence supporting the jury's finding that Denver may be liable for the acts of officers from other jurisdictions if they acted pursuant to policy, custom or practice of Denver that caused the violation of a constitutional right. Dkt. 340 at 24; Dkt. 343 at 3, 5. First, Denver policy was to allow mutual aid agencies to use their own policies and weapons, including the weapons that injured Plaintiffs Packard and Deras. Dkt. 350 at 1193-95, 1237; Dkt. 351 at 1428-31. Denver allowed such force even though these weapons are too dangerous for their own officers to use. Dkt. 350 at 1195; Ex. 1 at 45-46, 61. Second, all of the mutual-aid agencies operated under Phelan's direction. Dkt. 350 at 1191-93, 1235-37; Dkt. 357 at 2721. Third, there was a DPD supervisor embedded in every mutual aid unit, providing direction on how to deploy weapons through communications with the Command Post. Dkt. 350 at 1191-92; Dkt. 351 at 1431-34. This included the mutual-aid unit that shot Deras and Packard. Dkt. 357 at 2605-09, 2611-15. Denver ignores all this evidence, which must be viewed in the light most favorable to the verdict.

## III. Admission of Mitchell's Testimony and the OIM Memos Was Proper

Admissibility of evidence relating to the OIM's investigation is not subject to review under Rule 50(b) because Denver did not raise these arguments under Rule 50(a). *M.D. Mark, Inc. v. Kerr-McGee Corp.*, 565 F.3d 753, 762 (10th Cir. 2009); Dkt. 355 at 2118-32. Thus, review is limited to assessing under Rule 59(a) whether a new trial is warranted for an error that led to a verdict that is "clearly, decidedly or overwhelmingly against the weight of the evidence." *Elm Ridge Expl. Co.,*

---

[3] Plaintiffs incorporate herein the arguments on the law from their response to Denver's second trial brief. Dkt. 306.

*LLC v. Engle*, 721 F.3d 1199, 1216 (10th Cir. 2013). On appeal, evidentiary rulings are reviewed for abuse of discretion, and there must also be a showing a prejudice. *Stroup*, 26 F.4th at 1168.

The Court correctly rejected Denver's Rule 407 objection to the admissibility of Mitchell's testimony and the OIM memos. Rule 407 limits the introduction of subsequent remedial measures into evidence, but "post-event investigative tests and reports are not excluded by Rule 407." *Rocky Mountain Helicopters, Inc. v. Bell Helicopters Textron*, 805 F.2d 907, 918 (10th Cir. 1986). Post-incident investigations into police conduct are "relevant to the jury's fact-finding mission like any investigation of an accident after the fact" to the extent they address "findings as to the facts of what occurred." *Davies v. City of Lakewood*, 2016 WL 614434, *18 (D. Colo. Feb. 16, 2016). That is the exact purpose for which Plaintiffs presented Mitchell and the OIM memos: to establish the contours of DPD policies, practices, customs, and training as they existed during the George Floyd protests. Dkt. 352 at 1715-21, 1724-68. Neither Mitchell nor the OIM memos discussed subsequent remedial measures taken by DPD, rendering Rule 407 inapplicable.

Rule 403 likewise did not bar the admission of Mitchell's testimony or the OIM memos. The fact that Mitchell's findings and the OIM memos were critical of the DPD's response to the protests is not "unfair prejudice," nor does it outweigh the highly probative value of this evidence. The OIM's investigation was unquestionably probative as to identifying and assessing DPD's policies, practices, or customs in responding to the George Floyd protests. *See id.* There is nothing *unfairly* prejudicial about DPD supervisors and officers' own critical assessments of Denver's response and the policy and training failures that led to it.

As for Denver's Rule 701 objection, Mitchell indisputably had "personal knowledge" of his office's post-incident investigation and his own findings about the policies, practices, and customs of the DPD. *See Barrientos-Sanabria v. Holte*, 2012 WL 6107904, at *3 (D. Colo. Dec. 9, 2012)

(rejecting Rule 701 challenge to the "testimony [of] an investigator" because personal knowledge "may be based on what others told him"); *Klintworth v. Valley Forge Ins. Co.*, 2021 WL 816730, at *25 (N.D. Okla. Mar. 3, 2021). Denver does not identify any specific objectionable statement by Mitchell. Denver had ample opportunity to cross-examine Mitchell to attempt to cast doubt on his motives, knowledge, and findings. The jury was unpersuaded by Denver's attempt to discredit its own former Independent Monitor.

Finally, Denver's Rule 801(d)(2)(D) objection to the OIM memos is baseless. The interviewees were indisputably employees of Denver and were speaking on matters within the scope of their job responsibilities. Thus, their statements in the memos were not hearsay when offered against Denver. *Doe v. City of San Diego*, 35 F. Supp. 3d 1233, 1241 n.8 (S.D. Cal. 2014) (overruling hearsay objection to police interview memos from internal investigation under 801(d)(2)(D)); *accord Javier v. City of Milwaukee*, 2008 WL 2412980, at *7 (E.D. Wis. June 12, 2008); *Johnson v. City of Youngstown*, 2014 WL 667636, at *9 (N.D. Ohio Feb. 20, 2014).[4]

### IV. Counsel Did Not Engage in Misconduct and Her Comment Did Not Prejudice the Jury

"[C]ourts must exercise great caution in setting aside a jury's verdict due to an improper argument." *Racher v. Westlake Nursing Home Ltd. P'ship*, 871 F.3d 1152, 1168 (10th Cir. 2017). "A judgment will not be disturbed unless it clearly appears that the challenged remarks influenced the verdict." *Burke v. Regalado*, 935 F.3d 960, 1026 (10th Cir. 2019). In deciding whether the jury was influenced by a remark, courts consider the extent of the remark, whether it can be cured through jury instruction, and whether the remark had a prejudicial effect. *Racher*, 871 F.3d at 169.

---

[4] Denver's reliance (Mot. at 8) on *Cruz v. Farmers Insurance Exchange* is misplaced, as that case invokes the common-sense rule that statements of an employee cannot be attributed to his employer under the party-opponent rule in the context of an employment dispute. This is not an employment dispute.

Officer Cunningham testified that BWCs are limited and officers see more than what appears on BWC. Dkt. 357 at 2644. This testimony was not new: Denver's strategy was to taint the video evidence presented by Plaintiffs rather than present any video evidence corroborating their officers' testimony about violence. *Id.* at 2646, 2654; Dkt. 351 at 1511-12; Dkt. 349 at 1060-61, 1125-27, 1160-63. On cross-examination, counsel quoted Derek Chauvin's defense attorney, who said "the camera only sees what the camera sees." Dkt. 357 at 2655. Denver's objection was sustained. *Id.* "The timely objection and the sustaining of the objection certainly detracts from a conclusion of prejudice." *Abuan v. Level 3 Comms., Inc.*, 353 F.3d 1158, 1175 (10th Cir. 2003).

There was a sidebar. After the Court denied Denver's motion for a mistrial, Denver agreed to a curative instruction as the proper action. Dkt. 357 at 2656. The Court unambiguously instructed the jury to disregard counsel's comment. *Id.* at 2657. This single comment was cured by the Court's admonition and instruction. The jury sat through a dense three-week trial. They asked thoughtful questions throughout. *See* Dkts. 318-337. "We generally presume that juries follow the instructions given to them notwithstanding what has been said in court." *Cavanaugh v. Woods Cross City*, 718 F.3d 1244, 1250 (10th Cir. 2013). Denver offers no evidence that the jury considered this one comment in reaching its decision. At most, the jury may have questioned the credibility of Denver's defense that the video evidence was not an accurate portrayal of the protests. But that credibility was attacked on multiple fronts long before counsel's comment. *E.g.*, Dkt. 349 at 1060-61, 1125-27, 1160-63; Dkt. 356 at 2332-36. This is not grounds for a new trial.

**V.   Remittitur Must Be Denied Because the Verdict Does Not Shock the Conscience**

Notwithstanding Plaintiffs' extensive trial testimony recounting the severe physical and emotional injuries they suffered at the hands of Denver police, Denver asks this court to reduce

the jury's damages award by *ninety* percent. Denver offers no compelling rationale for remittitur, and Denver is not entitled to substitute its quantification of Plaintiffs' injuries for the jury's.

Because setting the quantum of damages in a civil case is a quintessential jury function, a jury's damages award is generally considered "inviolate." *Hill v. J.B. Hunt Transp., Inc.*, 815 F.3d 651, 668 (10th Cir. 2016). Juries have considerable latitude in choosing an award based on the evidence, and courts afford "wide discretion … to juries to fix the amount of noneconomic compensatory damages." *Burke v. Regalado*, 935 F.3d 960, 1036 (10th Cir. 2019). Remittitur is therefore appropriate only when the award is so excessive that it shocks the judicial conscience. *Murphy Oil USA, Inc. v. Wood*, 438 F.3d 1008, 1021 (10th Cir. 2006). Defendants fail to meet this heavy burden "in all but the most extreme and unusual circumstances." *Jackson v. Potter*, 587 F. Supp. 2d 1197, 1198 (D. Colo. 2008). This Court recognized the importance of the jury's role when it remarked, "I can't think of a case that I've had or that I'm even aware of in this court that more deserves the pulse of the people, the pulse of the community as reflected in the eight jurors that have heard the case." Dkt. 355 at 2142. Here, the jurors heard three weeks of testimony, asked thoughtful questions, and returned a nuanced verdict that aligned with the evidence laid out before them. They ruled for the Plaintiffs on some (but not all) claims, and awarded particularized, non-uniform damages to each Plaintiff. Their verdict was also in the range of (but ultimately less than) what Plaintiffs requested. *See* Dkt. 358 at 2972, 2987.

In dismissing Plaintiffs' injuries, Denver ignores voluminous trial testimony regarding Plaintiffs' physical injuries, which alone support the jury's award. Sannier testified about "extreme pain" and being "overwhelmed" by gas, being shot dozens of times, having explosives "lobbed" at her with one landing near her foot, getting tackled from behind, and inability to breathe. Dkt. 387 at 90-93, 97, 104-05, 109-10, 117-18, 122, 132-36, 141-46, 151-53. Packard was shot in the

11

head and knocked unconscious, suffered a fractured skull and jawbone, two broken discs in his neck, and brain bleeding—injuries that necessitated a four-day hospital stay costing over $180,000, forced him to wear a neck brace for nearly four months, and required him to find new employment. He described his pain after being shot in the head as "a nine or a ten," the "worst injury" he'd ever experienced, and "excruciating." *Id.* at 267-68, 277-83. Smith cried "in agonizing pain" after being pepper-sprayed in the face at point-blank range, suffering peeling skin and discomfort for seven days. *Id.* at 227-30. He "couldn't breathe" from gas and was hit by ricochets from PepperBalls. *Id.* at 216-17. Fitouri recounted "being hunted in alleys" as she was shot with PepperBalls, gassed while trapped in a small space, and a flashbang exploded at her foot. Dkt. 389 at 692-93, 698-99, 704, 711-14. Deras testified, "[t]here was no safe haven from the pain" after sustaining serious injuries from being shot in the head, hand, and back. Dkt. 349 at 1008-14. This was the "most pain [he] ever felt in [his] life." *Id.* at 1013. He wore a hand brace for 2-3 months, was unable to type for his job, dealt with hearing loss from a police explosive, and described inhaling gas as feeling like he was drowning. *Id.* at 996, 1001, 1012, 1016. Wedgeworth struggled to breathe from being gassed and suffered burning lungs, "[l]ots of chest pain," and disorientation. Dkt. 351 at 1617-18. Blasingame and Rothlein also described their throats and eyes burning from being gassed. Dkt. 390 at 757, 811. Taylor was shot with PepperBalls, leaving a lasting scar, struggled to breathe from being gassed (which was compounded by her asthma), and her skin burned. Dkt. 351 at 1545-46, 1561-64, 1567. Parkins inhaled gas that affected her eyes, throat, and lungs and was pushed into oncoming traffic by police weapons. Dkt. 352 at 1669-70, 1675, 1685. Epps suffered numerous bruises from being shot (one of which left a lasting scar) and described being gassed as "excruciating" and "one of the most painful things" she'd ever experienced. Dkt. 352 at 1867-69;

12

Dkt. 354 at 1894-95. Lyman was shot with PepperBalls and described the "awful" effects of pepper spray that caused her to vomit. Dkt. 354 at 1941, 1948.

Plaintiffs' emotional injuries were equally harrowing. Plaintiffs described feeling "scared," "shocked," "horrified," and "terrified," *e.g.*, Dkt. 387 at 97, 104-05, 110, 152-54, 216, 221; Dkt. 389 at 678; Dkt. 390 at 811; Dkt. 352 at 1673, 1685, 1857, 1866; Dkt. 351 at 1566, 1618, with several testifying that they feared for their lives, Dkt. 387 at 226, 280; Dkt. 390 at 765, 771; Dkt. 349 at 1014. The events led to psychological trauma, anxiety, insomnia, and nightmares. Dkt. 349 at 1003-04; Dkt. 387 at 110, 154; Dkt. 389 at 689; Dkt. 351 at 1629; Dkt. 354 at 1962-63; Dkt. 390 at 767; Dkt. 352 at 1682. Packard "felt like [his] life had fallen apart." Dkt. 387 at 280. Deras and Sannier sought professional help for the trauma they experienced. *Id.* at 200-01; Dkt. 349 at 1003-04, 1030-31. While some bruises healed, the emotional scars are permanent. Plaintiffs now live in fear of the police. Dkt. 387 at 154, 230-31, 283-84; Dkt. 351 at 1565-68, 1629; Dkt. 352 at 1681-82; Dkt. 354 at 1901, 1962; Dkt. 390 at 781, 840-41. Denver faults Plaintiffs for not presenting "evidence from any physician or mental health professional," but expert testimony is not required to prove emotional injury. *Osterhout v. Bd. of Cnty. Cmmn'rs of LeFlore Cnty.*, 10 F.4th 978, 997 (10th Cir. 2021) ("Mr. Osterhout didn't need Sigmund Freud to connect his later depression and anxiety to the beating that he'd experienced."). These physical and emotional injuries provide ample support for the jury's award. *See Burke*, 935 F.3d at 1036 (upholding denial of remittitur of $10 million for "purely noneconomic" injuries given the victim's "considerable pain and suffering"); *Osterhout*, 10 F.4th at 996-1000 (jury's award of $3 million in mostly noneconomic damages was not "grossly excessive").

In sum, Plaintiffs presented significant evidence of extensive physical and emotional injuries. A plaintiff's own testimony about their "helplessness, hopelessness, limitation, and loss" can

13

substantiate an award for emotional injury. *Prager*, 731 F.3d at 1063 (reversing remittitur of $2 million award based on plaintiff's testimony about emotional distress) *Kim v. Nash Finch Co.*, 123 F.3d 1046, 1065 (8th Cir. 1997). The jury properly credited Plaintiffs' testimony and exercised their judgment as fact-finder to determine what Plaintiffs' injuries were worth. Here, the jury's thoughtfulness in analyzing Plaintiffs' testimony carried over to the verdict—Wedgeworth, for example, received a smaller award of $750,000 because the jury found only her First Amendment rights were violated. Dkt. 343 at 6. The jury clearly understood that damages must be supported by evidence and correspond to actual injuries.

Denver attacks a strawman, arguing that claims for emotional distress alone do not warrant large damages awards. Each of the five cases Denver cites involve plaintiffs who claimed damages solely for emotional distress; not one of the plaintiffs was subjected to physical violence. *See Price v. City of Charlotte*, 93 F.3d 1241, 1250-57 (4th Cir. 1996) (hiring discrimination); *Schutts v. Feldman*, 1997 U.S. Dist. LEXIS 3428, at *13-18 (D. Conn. Feb 18, 1997) (lack of promotion); *Smith v. Nw. Fin. Acceptance, Inc.*, 129 F.3d 1408, 1416-17 (10th Cir. 1997) (verbal sexual harassment); *Wulf v. City of Wichita*, 883 F.2d 842, 874-75 (10th Cir. 1989) (wrongful termination); *Blangstad v. Snowmass-Wildcat Fire Prot. Dist.*, 642 F. Supp. 2d 1250, 1256-59 (D. Colo. 2009) (same). In contrast, Plaintiffs were shot, knocked unconscious, and repeatedly attacked with chemical munitions, all while attempting to exercise their First Amendment rights.

In any event, the Tenth Circuit discourages courts from assessing remittitur by comparing the jury's award to other cases because "comparisons yield no insight into the evidence the jurors heard and saw or how they used it during their deliberations." *Osterhourt*, F.4th at 999. And while exceptions exist when a previous case "is similar enough to serve as a meaningful benchmark," none of the other cases Denver cites fall within that narrow category. *Id.* (rejecting all of

14

defendant's proposed comparisons to *seventeen* cases). Three of the four additional cases Denver cites are inapposite, involving employment claims in which none of the plaintiffs suffered physical injuries. *See Chopra v. GE*, 527 F. Supp. 2d 230, 247 (D. Conn. 2007); *Watson v. E.S. Sutton, Inc.*, 2005 U.S. Dist. LEXIS 31578, at *44 (S.D.N.Y. Sept. 6, 2005); *Sooroojballie v. Port Auth. of New York*, 816 F. App'x 536 (2d Cir. 2020). In the sole case Denver relies on that involved physical injuries, the court *upheld* the $1.5 million award, emphasizing that the plaintiff's emotional injuries "were accompanied by significant physical injuries." *Small v. City of New York*, 2022 U.S. Dist. LEXIS 77603 at *45-51 (S.D.N.Y. Apr. 28, 2022). So too here. To the extent the Court views comparable cases as helpful, courts considering remittitur involving both physical and emotional injuries regularly preserve damages awards greater than or comparable to what the jury awarded here. *See, e.g., Dolenz v. United States*, 443 F.3d 1320 (10th Cir. 2006) (upholding $4 million in noneconomic damages); *Ibaenez v. Velasco*, 2002 WL 731778, at *10 (N.D. Ill. Apr. 25, 2002) (declining to remit $2.5 million compensatory damage award even though plaintiff's physical injuries "were not severe"); *Porter v. City of Philadelphia*, 337 F. Supp. 3d 530, 552 (E.D. Pa. 2018), *rev'd on other grounds*, 975 F.3d 374 (3d Cir. 2020) (upholding $750,000 compensatory damage award where plaintiff had been tackled and placed in a brief chokehold); *Jackson v. Tellado*, 2018 WL 4043150, at *5-6 (E.D.N.Y. Aug. 24, 2018) (remitting $12.5 million award to $2.75 million where plaintiff was pepper-sprayed in the face by police and struck with batons).

Dated: June 17, 2022                                              Respectfully submitted,

By: s/ Elizabeth Wang                                   By: s/ Timothy Macdonald
LOEVY & LOEVY                                            ARNOLD & PORTER KAYE SCHOLER LLP
2060 Broadway, Ste. 460, Boulder, CO     1144 Fifteenth St., Ste. 3100, Denver, CO
80302, O: 720.328.5642                               80202, O: 303.863.1000
elizabethw@loevy.com                                Timothy.Macdonald@arnoldporter.com

**CERTIFICATE OF SERVICE**

I hereby certify that on June 17, 2022, I served via CM/ECF the foregoing Opposition on all counsel of record. /s/ Elizabeth Wang