**Designation Run Report**

# Michael O'Donnell

---

**O'Donnell, Michael 10-15-2021**

---

**Our Designations  00:46:08**

**Total Time  00:46:08**



ID:MOD

Ex. 1266.001
Exhibit 1

| | MOD | |
|---|---|---|
| **Page/Line** | **Source** | **ID** |

| | | |
|---|---|---|
| 8:8 - 8:15 | **O'Donnell, Michael 10-15-2021 (00:00:19)** | MOD.42 |
| | 8:8 COURT REPORTER:  Okay. Please raise your right | |
| | 8:9 hand. I'm so sorry. Do you solemnly swear or | |
| | 8:10 affirm the testimony you're about to give in this | |
| | 8:11 case will be the truth, the whole truth, nothing but | |
| | 8:12 the truth so help you God? You cut out there, sir, | |
| | 8:13 I didn't hear you. | |
| | 8:14 THE WITNESS:  Sorry. I do. | |
| | 8:15 COURT REPORTER:  Okay. Thank you. | |
| 8:18 - 10:1 | **O'Donnell, Michael 10-15-2021 (00:01:56)** | MOD.1 |
| | 8:18   Q. Okay. Could you please state your name and | |
| | 8:19 spell it for the record? | |
| | 8:20   A. Yes. It's Mike O'Donnell. Full name is | |
| | 8:21 Michael, M-I-C-H-A-E-L. Last name is O'Donnell. That's | |
| | 8:22 O, apostrophe, D-O-N-N-E-L-L. | |
| | 8:23   Q. You're currently a commander with the Denver | |
| | 8:24 Police Department, correct? | |
| | 8:25   A. That's correct. | |
| | 9:1   Q. I'm showing you my screen. Can you see it? | |
| | 9:2   A. Yes. I do. | |
| | 9:3   Q. You've been designated by the defendant City | |
| | 9:4 and County of Denver to provide testimony on behalf of | |
| | 9:5 the city on topic 1A and B, shown to you on this screen | |
| | 9:6 in the rule 30(b)(6) notice, correct? | |
| | 9:7   A. That's correct. | |
| | 9:8   Q. You've also been designated by the defendant | |
| | 9:9 City and County of Denver to provide binding testimony | |
| | 9:10 on the city on topic 3A, as shown to you on the screen | |
| | 9:11 now on page 7 of the designation, correct? | |
| | 9:12   A. That's correct. | |
| | 9:13   Q. Okay. So let's start with, what documents did | |
| | 9:14 you review in preparation for this deposition? | |
| | 9:15   A. I reviewed my previous deposition testimony, | |
| | 9:16 the relevant portions of our crowd management policy, | |
| | 9:17 use of force policy, various training items. What else | |
| | 9:18 did I review? I -- I reviewed all the documents that | |
| | 9:19 the City Attorney's Office gave to me, as well. | |
| | 9:20   Q. And what were those? | |
| | 9:21   A. Relevant documents from FEMA crowd control | |
| | 9:22 training, our crowd control training, use of force, | |

Ex. 1266.002

| MOD | | |
|---|---|---|
| **Page/Line** | **Source** | **ID** |

| | 9:23 various operations plans, different training bulletins. | |
| | 9:24   Q. You reviewed a FEMA crowd control training | |
| | 9:25 document? | |
| | 10:1   A. That's correct. | |
| 10:18 - 11:18 | **O'Donnell, Michael 10-15-2021 (00:01:46)** | MOD.3 |
| | 10:18   Q. Okay. All right. What else do you have in | |
| | 10:19 that booklet? | |
| | 10:20   A. All the pages are numbered in sequence to | |
| | 10:21 DEN002026, and encompasses the training material that | |
| | 10:22 was based on the FEMA MCAT crowd control, and then at | |
| | 10:23 the end it has some of our Denver operations plans for | |
| | 10:24 those days. | |
| | 10:25   Q. Okay. Anything else? | |
| | 11:1   A. The other volume that I mentioned, that talks | |
| | 11:2 about Denver training specifically. | |
| | 11:3   Q. And what's in that volume? | |
| | 11:4   A. I'm sorry. One more time? | |
| | 11:5   Q. What's in that volume? | |
| | 11:6   A. This is the volume one that was shared. It's | |
| | 11:7 an outline of the lawsuit, different manuals, crowd | |
| | 11:8 control, use of force, recruit training, crowd control, | |
| | 11:9 field force training, 40-millimeter, crowd control, | |
| | 11:10 PepperBall, OC spray, and some specs from Safariland | |
| | 11:11 regarding the -- | |
| | 11:12   Q. Okay. | |
| | 11:13   A. -- less-lethal munitions. | |
| | 11:14   Q. Those crowd control, PepperBall and | |
| | 11:15 40-millimeter documents, those are like PowerPoint | |
| | 11:16 presentations? | |
| | 11:17   A. Yes. Everything is stuff that we shared with | |
| | 11:18 your office. | |
| 12:5 - 14:24 | **O'Donnell, Michael 10-15-2021 (00:03:50)** | MOD.4 |
| | 12:5   Q. Okay. So other than the training materials | |
| | 12:6 that you've referenced, what systematic or programmatic | |
| | 12:7 efforts are there by the City of Denver to identify or | |
| | 12:8 prevent the topic -- the types of misconduct described | |
| | 12:9 in 1A and 1B? | |
| | 12:10   A. The training program is -- starts in the | |
| | 12:11 academy, it is a foundation laid in the academy. It is | |
| | 12:12 ongoing and continual, referenced in all training | |

Ex. 1266.003

| MOD | | |
|---|---|---|
| **Page/Line** | **Source** | **ID** |

12:13 bulletins. It's also in our power one -- or PowerDMS,
12:14 which is an online data training source. It's trackable
12:15 to ensure the officers are receiving the latest changes
12:16 or refresher training on use of force, First Amendment.
12:17 First Amendment is clearly listed in the
12:18 academy.
12:19 Again, built upon throughout the officer's
12:20 career, specifically when it comes to our crowd control,
12:21 there's a section in there that relates to officer --
12:22 First
12:23 Amendment rights of protestors. Use of force policy is
12:24 built into the crowd control. It is consistent and
12:25 continual training that is provided throughout the year
13:1 with whatever training the officers or the academy
13:2 presents.
13:3   Q. Right. So my question was, other than the
13:4 training that you just described, and the documents that
13:5 you referenced in those binders you have on the table
13:6 behind you, what systematic or programmatic efforts are
13:7 there by the City of Denver to identify or prevent the
13:8 types of misconduct described in topics 1A or 1B?
13:9   A. Sure. The flip side of that coin would be
13:10 officers with -- that may have a complaint, the
13:11 discipline process that is continue -- training can be a
13:12 component of that as well. The officers are held to a
13:13 high standard that if they are found in violation of
13:14 something, it goes through the process, whatever
13:15 recommendation comes down. So discipline is another
13:16 strong reinforcement tool designed to keep the officers
13:17 from violating suppression of First Amendment rights or
13:18 use of force.
13:19   Q. Okay. So are you here to talk about the
13:20 discipline aspects of topic 1?
13:21   A. I am not.
13:22   Q. Okay. It's fair to say that discipline is
13:23 something that happens after a complaint is made and
13:24 it's investigated, right?
13:25   A. That's correct.
14:1   Q. Okay. That would not be considered a
14:2 preventative measure necessarily, correct?

| MOD | | |
|---|---|---|
| **Page/Line** | **Source** | **ID** |

14:3   A. I would say that it also can be preventative
14:4 if an officer violates a particular policy and they're
14:5 disciplined for it, other officers are going to learn
14:6 from that as well. So there is a smaller component of
14:7 that.
14:8   Q. Okay. So if an -- if an officer who commits
14:9 misconduct is held responsible for it and is disciplined
14:10 for it, that sets a good example of what the department
14:11 expects out of its officers for all the other officers,
14:12 right?
14:13   A. That's correct. We try to have the officers
14:14 be as professional at all times and impartial in that
14:15 continuation of training and presentations.
14:16   Q. And holding officers to account in a
14:17 particular instance in which they may have committed
14:18 misconduct, also may serve to prevent future misconduct
14:19 from that officer, right?
14:20   A. Yes. It can.
14:21   Q. Okay. So if the City of Denver does not hold
14:22 officers -- does not discipline officers for excessive
14:23 use of force, does that set a bad example -- would that
14:24 set a bad example for other officers?

**15:3 - 15:11**   **O'Donnell, Michael 10-15-2021 (00:00:23)**   **MOD.5**

15:3   A. I find a challenge with the way your question
15:4 is phrased. If an officer used force outside policy,
15:5 there would be discipline. If they didn't, there would
15:6 be no discipline, so there's -- I don't understand how
15:7 you're wording that question?
15:8   Q. Okay. So if an officer acts outside of
15:9 policy, they're disciplined and if they're not
15:10 disciplined, that shows that they were acting within
15:11 policy, correct?

**15:16 - 16:18**   **O'Donnell, Michael 10-15-2021 (00:01:52)**   **MOD.6**

15:16   A. That's correct.
15:17   Q. Okay. And you have an understanding of that
15:18 since -- how -- you've been with the department for how
15:19 many years?
15:20   A. Almost 30 years.
15:21   Q. Okay. And you're a commander, correct?
15:22   A. That's correct.

Ex. 1266.005

| MOD | | |
|---|---|---|
| Page/Line | Source | ID |

15:23   Q. Okay. Other than training and discipline, are
15:24 there any other systematic or programmatic efforts by
15:25 the City of Denver, to identify or prevent any of the
16:1 following types of misconduct during the protests as
16:2 described in topics 1A and 1B?
16:3   A. Those are the biggest and most continual
16:4 programs we have.
16:5   Q. Are there any others?
16:6   A. No.
16:7   Q. Let's talk about topic 4 -- or topic 3, sorry.
16:8 You've been designated to talk about topic 3 and so
16:9 topic 3 says, "The city's written and unwritten policies
16:10 and practices in effect from May 2015 through June 2020
16:11 relating to A, crowd management, crowd control, and
16:12 field force tactics including the management of
16:13 protests." So other than the use of force policy in the
16:14 operations manual and the DPD crowd management manual,
16:15 are there any other written policies of the city
16:16 relating to topic 3A?
16:17   A. I am unaware of any other policies that relate
16:18 specifically to this.

**16:19 - 19:4**     **O'Donnell, Michael 10-15-2021 (00:03:23)**     **MOD.37**

16:19   Q. Okay. I'm showing you the DPD crowd
16:20 management manual, the version that was in effect in
16:21 February of 2019. I'm showing you the first page here.
16:22 It says DEN001755. Let's -- did you review
16:23 this document in preparation for today's deposition?
16:24   A. Yes. I did.
16:25   Q. Okay. So let's talk about page 9, which is
17:1 DEN1763. Do you see this paragraph here that's been
17:2 highlighted about when a general dispersal order would
17:3 be given?
17:4   A. Yes, I do.
17:5   Q. Okay. How -- who -- who -- who's -- who has
17:6 the authority to give a general dispersal order?
17:7   A. It is situation specific. In some instances,
17:8 it is the incident commander. In some instances, it can
17:9 be the lieutenant supervisor, or whoever is at the scene
17:10 depending on circumstances.
17:11   Q. Okay. And then how -- depending on what

Ex. 1266.006

| Page/Line | Source | ID |
|-----------|--------|-----|

MOD

17:12 circumstances?

17:13   A. The actions of the crowd is the biggest

17:14 factor. If you have a violent crowd of three or more,

17:15 that is considered riotous conditions, and the policy

17:16 allows for a lot of flexibility in its preamble. The

17:17 officers can make that determination. In some cases,

17:18 even if it's a peaceful crowd, if it's a certain

17:19 severity of incidents, severity of -- of conditions that

17:20 are met, the officers would have to be able to explain

17:21 those, and why they would be giving an order to

17:22 disperse.

17:23   Q. Okay. So you said the people with authority

17:24 to give a general dispersal order, would be the incident

17:25 commander or who exactly on the scene?

18:1   A. As I mentioned, the policy has flexibility in

18:2 it. So in most cases where a large event is going to

18:3 be, the incident commander. There are certain

18:4 permissions in there that allow a lieutenant, a captain,

18:5 another commander that's on scene, even a supervisor,

18:6 depending upon the circumstances.

18:7   Q. But it has to be some kind of supervisor,

18:8 correct?

18:9   A. Yes.

18:10   Q. And why is that? Why does a supervisor --

18:11   A. They're the --

18:12   Q. -- have to make a general dispersal order and

18:13 not just some officer on the scene?

18:14   A. So let -- let me clarify. It -- it even has a

18:15 portion in there about the officer that is in charge.

18:16 So we could have a scenario where you have 15 to 20

18:17 individuals that are protesting and you would only have

18:18 an officer or a couple of officers monitoring them.

18:19 Typically, the senior officer meaning

18:20 seniority would be in charge of monitoring that. Now,

18:21 if certain conditions were to come about and they were

18:22 to deem that an unlawful assembly, they would have to be

18:23 able to articulate it. But -- so that -- just to

18:24 clarify on the officer piece, it is always, we want one

18:25 person that can make the determination and articulate

19:1 the need for an unlawful assembly order.

Ex. 1266.007

| MOD | | |
|---|---|---|
| Page/Line | Source | ID |

| | | |
|---|---|---|
| 19:5 - 19:13 | 19:2   Q. Where is that in the policy? That a senior<br>19:3 officer on the scene could give a general dispersal<br>19:4 order under certain circumstances?<br>**O'Donnell, Michael 10-15-2021 (00:00:36)**<br>19:5   A. Give me one second. Sorry. It's taking a few<br>19:6 minutes to find it, but it's in the matrix formula,<br>19:7 towards the end of the policy.<br>19:8   Q. The crowd management matrix?<br>19:9   A. Yes.<br>19:10   Q. Where it says, "Division or unit supervisor"?<br>19:11   A. Yeah.<br>19:12   Q. Okay. So let me -- let me ask you another<br>19:13 question. Why don't you -- okay. So the crowd | **MOD.38** |
| 19:14 - 20:22 | **O'Donnell, Michael 10-15-2021 (00:01:53)**<br>19:14 management manual does not necessarily -- or the<br>19:15 Denver -- policy of the Denver Police Department does<br>19:16 not necessarily require that an incident commander give<br>19:17 a general dispersal order. It could be a lieutenant, a<br>19:18 captain, a supervisor, or just the highest ranking<br>19:19 officer on the scene. Is that what you're saying?<br>19:20   A. That's correct.<br>19:21   Q. Okay. And then what does the policy provide<br>19:22 for as to when the authority to give a general dispersal<br>19:23 order can be given by somebody who is not the incident<br>19:24 commander and not even a command level officer?<br>19:25   A. As I mentioned, there is flexibility in this<br>20:1 policy and the -- in its preamble talks about it's a<br>20:2 guide. So each situation is different based on the<br>20:3 crowd behavior, crowd size, traffic conditions, a<br>20:4 variety of scenarios. So it's really up to the officers<br>20:5 -- supervisors, sergeants to evaluate, seek information<br>20:6 from their higher superiors time permitting but each of<br>20:7 these situations is unique and a variety of conditions<br>20:8 can occur.<br>20:9   Q. Okay. So the policy is just a guide because<br>20:10 it all depends on the circumstances; is that right?<br>20:11   A. That's correct.<br>20:12   Q. And it's really up to the officers to evaluate<br>20:13 to determine when and if they can give a general<br>20:14 dispersal order, right? | **MOD.39** |

| MOD | | |
|---|---|---|
| **Page/Line** | **Source** | **ID** |

20:15   A. That's correct.

20:16   Q. So the policy leaves it to the officer's

20:17 discretion to decide when a general dispersal order can

20:18 be given?

20:19   A. In most instances, it has to be higher

20:20 authority officers, command level, that kind of thing,

20:21 but it does carve out that flexibility and option for

20:22 that kind of situation.

**21:8 - 21:20**   **O'Donnell, Michael 10-15-2021 (00:00:33)**   **MOD.7**

21:8   Q. Okay. So taking another look at page 9 of the

21:9 crowd management manual it says, "A general dispersal

21:10 order will only be given under the following

21:11 circumstances," and it describes a significant number of

21:12 percentage of participants who basically are engaging in

21:13 violent conduct or failed to adhere to orders that have

21:14 been given, right?

21:15   A. Correct.

21:16   Q. Okay. So what is -- what is significant --

21:17 there's no numerical, you know, it doesn't say like 60 --

21:18 percent, it doesn't give a specific percentage or

21:19 number, right?

21:20   A. That's correct.

**23:7 - 25:22**   **O'Donnell, Michael 10-15-2021 (00:03:27)**   **MOD.8**

23:7   Q. And it's up to the discretion of the officers

23:8 or the supervisors to make that determination, whether

23:9 or not a significant number of participants would

23:10 trigger this general dispersal order, right?

23:11   A. Yes. That's correct.

23:12   Q. Let's take a look at page Denver 1773 of the

23:13 crowd management manual describing the PepperBall

23:14 system. So in summary, the PepperBall may be used

23:15 against individuals who are engaged in defensive

23:16 resistance, right?

23:17   A. I'm sorry. Can you repeat that? Your voice

23:18 cut out for a second.

23:19   Q. DPD policy is that PepperBalls can be used on

23:20 people who are engaged in defensive resistance; is that

23:21 right?

23:22   A. Yes. At that time, that is correct. Yes.

23:23   Q. Okay. And the policy provides that the,

| MOD | | |
|---|---|---|
| Page/Line | Source | ID |

23:24 "PepperBall projectile will not be deployed against a
23:25 specific individual in a crowd, without the approval of
24:1 division or unit supervisor"; do you see that?
24:2   A. Yes. I do.
24:3   Q. That's the policy of the city, correct?
24:4   A. That's correct.
24:5   Q. Additionally, "The PepperBall system will not
24:6 be used against a group or crowd without prior
24:7 authorization from the incident commander," that's also
24:8 the policy of the city at the time, right?
24:9   A. That's correct.
24:10   Q. Okay. How is that prior -- how does the prior
24:11 -- how is the prior authorization obtained?
24:12   A. That is typically with radio communication,
24:13 additional video sources from cameras that are in the
24:14 area, perhaps in some instances surveillance from our
24:15 police helicopter, giving updates, evaluating with the
24:16 incident commander. Now, I would also say that is the
24:17 policy but in the crowd control matrix, there's also
24:18 instances where there is permissions to supervisors to
24:19 direct PepperBall when certain conditions are met.
24:20 Again, it's a variable, so there is no -- it's only in
24:21 this instance, there is, again, this is a guide. This
24:22 is our general policy, so we try to strive to. But
24:23 understanding the human element that's involved, you
24:24 cannot outline every condition that may or may not
24:25 occur.
25:1   Q. Well, I mean, you -- so I mean, is it the rule
25:2 -- let me -- let me just stick with the first sentence
25:3 here. It says, "The PepperBall projectile will not be
25:4 deployed against a specific individual in a crowd,
25:5 without the approval of the division or unit
25:6 supervisor."
25:7 Are you saying that's the general rule but
25:8 there's all sorts of exceptions or that's the rule?
25:9   A. There is -- there is flexibility in this. I
25:10 realize what this is saying and -- and the officers do
25:11 too. But in a situation where you've got a violent
25:12 crowd that is doing something against the officers, and
25:13 they're trying to get separation, and there may not be

Ex. 1266.010

| MOD | | |
|---|---|---|
| **Page/Line** | **Source** | **ID** |

25:14 time to get that approval, there is a carve out for
25:15 that.
25:16   Q. Okay. Where does it say that? It doesn't say
25:17 that on this page?
25:18   A. No. It's down further in the crowd control
25:19 matrix portion.
25:20   Q. Okay. All right. It's in the crowd control
25:21 matrix? Okay. So --
25:22   A. That -- that's correct.

**25:23 - 26:3**   **O'Donnell, Michael 10-15-2021 (00:00:14)**   **MOD.36**

25:23   Q. -- the policy of
25:24 the city is not that the PepperBall projectile can only
25:25 be deployed against a specific individual with the
26:1 approval of a -- of a division or unit supervisor,
26:2 right? Because it depends on the circumstances and
26:3 there could be exceptions, right?

**26:6 - 27:15**   **O'Donnell, Michael 10-15-2021 (00:01:45)**   **MOD.9**

26:6   A. Yes. that's correct.
26:7   Q. Okay. And those exceptions -- the policy of
26:8 the city is that officers are provided discretion to
26:9 decide when an exception applies, right?
26:10   A. The term discretion is true, however, the
26:11 officers need to be able to clearly articulate the need
26:12 for such things, otherwise they face discipline.
26:13   Q. Okay. And so when -- when would it be
26:14 justified to deploy -- pursuant to policy, when would it
26:15 be justified to deploy a PepperBall against a specific
26:16 individual, without the approval of a division or unit
26:17 supervisor?
26:18   A. So your question calls for speculation. I --
26:19 I would say, again, it's -- it's situation
26:20 specific.
26:21 The officers have to clearly articulate that.
26:22 If there is a group, violent individuals that keep
26:23 encroaching on the officers or endangering their
26:24 particular officer safety and they are giving orders to
26:25 back up, back up, back up? They may not have the
27:1 opportunity to put some less lethal munitions into the
27:2 ground to get separation, they may -- based on the
27:3 officers' articulation or supervisor, whatever the case

| MOD | | |
|---|---|---|
| **Page/Line** | **Source** | **ID** |

|  | 27:4 may be, have that carve out to say that person can be | |
|  | 27:5 PepperBall-ed. | |
|  | 27:6   Q. Okay. | |
|  | 27:7   A. -- but, again, that has to be met by the | |
|  | 27:8 supervisor, officer, whoever was deploying that less | |
|  | 27:9 lethal system to be able to articulate it. | |
|  | 27:10   Q. Okay. In the example that you just gave -- | |
|  | 27:11 you gave an example of a group of people who are engaged | |
|  | 27:12 in violence, who are encroaching on an officer and an | |
|  | 27:13 officer is giving warning, telling them to back up and | |
|  | 27:14 then they don't comply, right? | |
|  | 27:15   A. That's correct. | |
| 28:8 - 28:14 | **O'Donnell, Michael 10-15-2021 (00:00:27)** | **MOD.10** |
|  | 28:8   Q. Okay. Now, let's say that instead of a group | |
|  | 28:9 of violent individuals, you've got a group of 100 people | |
|  | 28:10 and there's maybe three people in the crowd who are | |
|  | 28:11 throwing water bottles at the police officers, okay? | |
|  | 28:12 Does DPD policy allow for the deployment of | |
|  | 28:13 PepperBalls against the crowd as a group in a -- in the | |
|  | 28:14 form of area denial? | |
| 28:17 - 29:7 | **O'Donnell, Michael 10-15-2021 (00:00:52)** | **MOD.11** |
|  | 28:17   A. Generally in water bottles, if they are not | |
|  | 28:18 frozen, we would just try to have separation, further | |
|  | 28:19 distance so that it would limit the ability for those | |
|  | 28:20 individuals to throw the water bottles. Whether or not | |
|  | 28:21 they're frozen is a little bit different scenario. The | |
|  | 28:22 officers would by policy, try and focus the aim point at | |
|  | 28:23 those individuals committing that action, not against | |
|  | 28:24 the general group. | |
|  | 28:25   Q. Right. So if you had a group of 100 people | |
|  | 29:1 and there are three people who are throwing -- so let me | |
|  | 29:2 make sure I understand. If you had a group of 100 | |
|  | 29:3 protestors and there were three identifiable specific | |
|  | 29:4 individuals in the crowd who were throwing nonfrozen | |
|  | 29:5 water bottles, you're saying that's really not a | |
|  | 29:6 circumstance in which a PepperBall would be warranted at | |
|  | 29:7 all, because they're not frozen? | |
| 29:10 - 29:25 | **O'Donnell, Michael 10-15-2021 (00:00:51)** | **MOD.12** |
|  | 29:10   A. No. For clarification, that would be, again, | |
|  | 29:11 the articulation of the officers would have to explain | |

| MOD | | |
|---|---|---|
| **Page/Line** | **Source** | **ID** |

29:12 the need to use less lethal munitions in the form of
29:13 PepperBall. One option may, depending upon the
29:14 circumstances, be using it for area denial to get
29:15 further separation. In that scenario you described, my
29:16 feeling would be the officers would focus on the
29:17 activity of the individuals throwing the water bottles,
29:18 not the larger crowd.
29:19   Q. Okay. But would it be within policy or
29:20 outside of policy for -- in -- in a situation where you
29:21 have 100 individuals who are peaceful and there's three
29:22 people in the crowd who are throwing water bottles at
29:23 the officers for the -- would it be within policy or
29:24 not, for the officers to use PepperBall in the form of
29:25 area denial in that situation?

**30:3 - 30:4**          **O'Donnell, Michael 10-15-2021 (00:00:05)**          **MOD.13**

30:3   A. I would say with proper articulation, it is
30:4 with -- within policy.

**30:21 - 31:25**          **O'Donnell, Michael 10-15-2021 (00:01:39)**          **MOD.14**

30:21   Q. Well, what -- what would be the articulation
30:22 that an officer could give there, that would -- that you
30:23 as a supervisor would say, okay, that's within policy?
30:24   A. This is, again, a situation of theoretical
30:25 questioning, but I -- I -- again, it has to come back
31:1 down to that officer, supervisor, whatever to explain
31:2 why area denial was necessary. If they're against a
31:3 critical structure -- defending that structure, those
31:4 people continue to creep in, creep in, creep in, orders
31:5 have been given to move back and they're not complaint,
31:6 then, yes, they could put some area denial in there to
31:7 keep that group back. We are protected with
31:8 preservation of life and property. Those -- that's in
31:9 our preamble of our crowd control policy.
31:10   Q. When would an officer have to provide an
31:11 explanation, their articulation, as you say, of what
31:12 their justification was for using PepperBalls?
31:13   A. Typically, at the completion of this
31:14 operation, that form, the use of force report, the after
31:15 action report would have to be completed, that would
31:16 outline the articulation of why less lethal was
31:17 deployed.

Ex. 1266.013

| MOD | | |
|---|---|---|
| **Page/Line** | **Source** | **ID** |

31:18   Q. And then how -- how does that -- does the
31:19 supervisor review that?
31:20   A. Yes. The supervisor, then it goes to internal
31:21 affairs, as well, for additional review.
31:22   Q. Did that happen during the George Floyd
31:23 Protests? I mean, did all the officers write down in a
31:24 use of force report their articulation of all the
31:25 PepperBalls that they shot at people?

**32:3 - 32:8**   **O'Donnell, Michael 10-15-2021 (00:00:15)**   **MOD.15**

32:3   A. My understanding is that the officers did
32:4 complete all the necessary reports.
32:5   Q. Did a supervisor review them to determine
32:6 whether the officer properly and justifiably articulated
32:7 a reason for whatever force they used during the
32:8 protest?

**32:11 - 32:13**   **O'Donnell, Michael 10-15-2021 (00:00:08)**   **MOD.16**

32:11   A. It is my understanding that every use of force
32:12 report per policy is reviewed by a supervisor and then
32:13 an additional review by internal affairs.

**33:17 - 33:25**   **O'Donnell, Michael 10-15-2021 (00:00:28)**   **MOD.17**

33:17   Q. I'm just -- well, we were talking about the
33:18 officer statements, I understand what the officer
33:19 statements are. But are you -- when you say use of
33:20 force reports, is that -- that's separate than the
33:21 officer statements, right?
33:22   A. Yes. As I explained, the use of force report
33:23 is the -- completed by the involved officer in that less
33:24 lethal deployment. So whichever officer used it, does
33:25 the use of force report.

**37:23 - 38:1**   **O'Donnell, Michael 10-15-2021 (00:00:15)**   **MOD.18**

37:23 My question is, during the time that you were
37:24 involved in policing the George Floyd protests last
37:25 summer, you did not see any action by a Denver police
38:1 officer that was inconsistent with DPD policy?

**38:4 - 38:15**   **O'Donnell, Michael 10-15-2021 (00:00:37)**   **MOD.19**

38:4   A. I can only comment to the officers that were
38:5 under my purview at the time, which was the SORT team,
38:6 the gang unit. I did not see any actions that I
38:7 believed were outside of policy.
38:8   Q. Right. And you are the witness who has been

| MOD | | |
|---|---|---|
| **Page/Line** | **Source** | **ID** |

|  | 38:9 designated by the City of Denver to provide binding | |
|  | 38:10 testimony on what the city's policy is, correct? With | |
|  | 38:11 respect to crowd management and management of protests? | |
|  | 38:12   A. Yes. That's correct. However, internal | |
|  | 38:13 affairs is the one that goes through and determines if | |
|  | 38:14 things are in policy or out of policy and disciplined, | |
|  | 38:15 recognized, or -- or awarded. That's not my purview. | |
| 39:1 - 39:11 | **O'Donnell, Michael 10-15-2021 (00:00:36)** | **MOD.20** |
|  | 39:1 Let's -- let's look at -- let's take a look | |
|  | 39:2 back at Denver 1773. The PepperBall section. It says | |
|  | 39:3 here, "Use of the PepperBall system in crowd control | |
|  | 39:4 situations may be appropriate in the following | |
|  | 39:5 circumstances," and then there's five, six -- five | |
|  | 39:6 things enumerated, correct? | |
|  | 39:7   A. Yes. That's correct. | |
|  | 39:8   Q. Okay. Are there any other circumstances other | |
|  | 39:9 than those five things that are enumerated there, under | |
|  | 39:10 which the use of PepperBall in crowd control situations | |
|  | 39:11 is appropriate? | |
| 39:12 - 39:12 | **O'Donnell, Michael 10-15-2021 (00:00:04)** | **MOD.40** |
|  | 39:12   A. This looks pretty comprehensive. | |
| 40:1 - 40:21 | **O'Donnell, Michael 10-15-2021 (00:01:11)** | **MOD.21** |
|  | 40:1   Q. Okay. So it is not -- the policy of the DPD | |
|  | 40:2 is that PepperBall -- use of PepperBall in crowd control | |
|  | 40:3 situations can be used in one of these five | |
|  | 40:4 circumstances enumerated here on this page, or as long | |
|  | 40:5 as the officer can justify it, right? | |
|  | 40:6   A. Yes. That's correct. | |
|  | 40:7   Q. Okay. And there's no enumeration in this | |
|  | 40:8 manual or anywhere else of what other possible things | |
|  | 40:9 could justify the use of PepperBall, right? | |
|  | 40:10   A. That's correct. | |
|  | 40:11   Q. It's up to the officer's discretion depending | |
|  | 40:12 on the circumstances, right? | |
|  | 40:13   A. Discretion and articulation. | |
|  | 40:14   Q. Okay. And that's DPD policy, correct? | |
|  | 40:15   A. That's correct. | |
|  | 40:16   Q. Okay. And so when you say, "It's up to the | |
|  | 40:17 officer's articulation," I mean, as -- does it -- do you | |
|  | 40:18 mean the officer just has to give you a reason and | |

Ex. 1266.015

| MOD | | |
|---|---|---|
| **Page/Line** | **Source** | **ID** |

40:19 you'll accept it or the officer has to give you a
40:20 reason, and then you have to determine as a supervisor
40:21 whether or not that's consistent with policy?

40:24 - 41:15   **O'Donnell, Michael 10-15-2021 (00:00:51)**   MOD.22

40:24   A. To answer your question, it -- it's a
40:25 combination. So the officer has to have a clear and
41:1 definitive reason for -- or a rationale for deploying
41:2 less lethal outside of these parameters. It is reviewed
41:3 by the officer's supervisor and use of force report. It
41:4 then goes to internal affairs for additional review and
41:5 if there's -- if it's found to be outside of policy,
41:6 then the complaint is initiated. The officer is
41:7 ultimately subject to discipline.
41:8   Q. Okay. And if officers were not -- gave their
41:9 -- gave their statements of why, and when they used less
41:10 lethal weapons during the protest, and those were
41:11 written down in officer statements, and the city has not
41:12 -- they have not been disciplined in any way or held to
41:13 account for it not anyway, then that means that their
41:14 use of force was appropriate pursuant to policy,
41:15 correct?

41:18 - 42:16   **O'Donnell, Michael 10-15-2021 (00:01:38)**   MOD.23

41:18   A. Yes. That's correct.
41:19   Q. What is to, "Support the skirmish line," mean?
41:20   A. The skirmish line is essentially a resource
41:21 application of officers lined up. In some cases you may
41:22 move forward to move a crowd to particular a direction.
41:23 You may just put a skirmish line up to protect
41:24 critical infrastructure. PepperBall is brought up to
41:25 support that, so if folks keep coming up to the -- to
42:1 the line, we would prefer to keep that separation and
42:2 distance, so that's when you might consider area denial
42:3 into the ground kind of thing. In rare instances when
42:4 you've got the crowd closes and you've got people
42:5 throwing rocks at the officers, or bottles, concrete
42:6 chunks, what have you. The PepperBall can also be
42:7 utilized in that capacity to impact that individual.
42:8   Q. Does DPD policy allow officers to shoot
42:9 PepperBalls at somebody who's standing still with their
42:10 hands up?

Ex. 1266.016

| MOD | | |
|---|---|---|
| **Page/Line** | **Source** | **ID** |

42:11   A. It depends on the scenario. You're talking
42:12 one individual, that would not necessarily be within
42:13 policy. You've got a large group of people, orders have
42:14 been given to move back, move back, move back, move
42:15 back. Yes, at the time of this policy, that is -- could
42:16 be, with proper articulation, a use of less lethal.

43:4 - 43:8          **O'Donnell, Michael 10-15-2021 (00:00:15)**          **MOD.24**

43:4   Q. Okay. So it could be within DPD policy -- it
43:5 could be consistent with DPD policy for an officer to
43:6 shoot a person who's standing still with their hands up,
43:7 even if no orders to move back have been given, if there
43:8 wasn't enough time to give an order?

43:11 - 43:13          **O'Donnell, Michael 10-15-2021 (00:00:07)**          **MOD.25**

43:11   A. Again, there has to be proper rationale and
43:12 articulation as to why that occurred but it is possible
43:13 to be within policy.

43:22 - 46:11          **O'Donnell, Michael 10-15-2021 (00:03:25)**          **MOD.26**

43:22   Q. I'm showing you Denver 1774, section on 40-
43:23 millimeter launchers. The 40-millimeter launchers can
43:24 only be used on individuals who are engaged in active
43:25 aggression, correct?
44:1   A. That's correct.
44:2   Q. Okay. And this list here that says, "Use of
44:3 the 40-millimeter launcher in crowd control situations
44:4 may be appropriate in the following circumstances,"
44:5 there's a list of five items. Do you see that?
44:6   A. Yes. I do.
44:7   Q. Is that an exhaustive list of the
44:8 circumstances under which DPD policy allows the use of
44:9 the 40-millimeter launcher in crowd control situations?
44:10   A. Yes. It is.
44:11   Q. Okay. So there's no exceptions to this one?
44:12   A. Not on this one.
44:13   Q. Okay. Now, taking you back up for a moment,
44:14 this paragraph that says, "Only the 40-millimeter exact
44:15 impact or direct impact OC round will be used for crowd
44:16 control. Other impact munitions, baton rounds, rubber
44:17 buckshot, bean bag shotgun, et cetera, will not be used
44:18 without the approval of the incident commander." Do you
44:19 see that?

| MOD | | |
|---|---|---|
| **Page/Line** | **Source** | **ID** |

44:20   A. Yes. I do.

44:21   Q. Okay. So the direct impact OC round is, like

44:22 -- it's a -- it's a round that when you shoot it, it

44:23 explodes OC powder, right?

44:24   A. That's correct.

44:25   Q. And then what's the 40-millimeter exact

45:1 impact?

45:2   A. Exact impact is a foam-tipped round, designed

45:3 to get that person to comply with dropping whatever

45:4 weapon they may have or cease in their violent activity.

45:5   Q. Okay. What's the difference between the

45:6 foam-tipped round and a baton round?

45:7   A. The baton rounds are used in tactical

45:8 scenarios for --

45:9   Q. Are they also --

45:10   A. -- assisting in those kind of things.

45:11   Q. They -- are they harder, they're not foam?

45:12   A. That's correct.

45:13   Q. Okay. The ones that the DPD used during the

45:14 George Floyd protests, what were they?

45:15   A. The foam rounds, the exact impact.

45:16   Q. 40-millimeter exact impact?

45:17   A. That's correct.

45:18   Q. Okay. Rubber buck shot, are those rubber

45:19 pellets that shoot out?

45:20   A. Yes. We don't have those in an inventory for

45:21 the 40-millimeter system.

45:22   Q. Bean bag shotgun, those are led pellets in a

45:23 bean bag?

45:24   A. Yes. But that's another item we don't have in

45:25 -- in Denver Police Department inventory.

46:1   Q. Okay. Why is it that these other impact

46:2 munitions including the bean bag shotgun, will not be

46:3 used without the approval of the incident commander?

46:4   A. Those can be deadly and there's actually case

46:5 law on that which is why we removed them from our

46:6 inventory.

46:7   Q. Okay. It -- so it's because they're --

46:8 they're dangerous?

46:9   A. Yes. Well, any -- any less lethal platform

Ex. 1266.018

| MOD | | |
|---|---|---|
| **Page/Line** | **Source** | **ID** |

| | | |
|---|---|---|
| | 46:10 can be dangerous, that's why we try to use the lower | |
| | 46:11 impact devices. | |
| 47:25 - 48:18 | **O'Donnell, Michael 10-15-2021 (00:00:57)** | **MOD.27** |
| | 47:25   Q. Use of the 40-millimeter launcher on page 21, | |
| | 48:1 which is Bates stamped Denver 001775 says, "40- | |
| | 48:2 millimeter operators are responsible for every round | |
| | 48:3 they fire. They must ensure that innocent persons are | |
| | 48:4 not struck unintentionally, unless lethal force is | |
| | 48:5 warranted. An officer shall not intentionally deploy | |
| | 48:6 the 40-millimeter projectile as follows." And then | |
| | 48:7 there's a number of areas you cannot target including | |
| | 48:8 genitalia. Do you see that? | |
| | 48:9   A. Yes. I do. | |
| | 48:10   Q. Are there any exceptions to this? | |
| | 48:11   A. No. There's not. | |
| | 48:12   Q. Okay. And why is this the policy? | |
| | 48:13   A. The 40-millimeter even though it is designated | |
| | 48:14 less lethal can have serious impact and injury, if it's | |
| | 48:15 hit in any of these outside target areas, the head, the | |
| | 48:16 eyes, the throat, breasts of the female, genitalia, or | |
| | 48:17 spinal column. Also, a pregnant female -- can certainly | |
| | 48:18 cause undue injury to a child. | |
| 49:18 - 50:10 | **O'Donnell, Michael 10-15-2021 (00:00:56)** | **MOD.28** |
| | 49:18   Q. Okay. I'm putting back up on the screen | |
| | 49:19 Denver 1774 and 1775 which describes the circumstances | |
| | 49:20 under which a 40-millimeter launcher may be used in | |
| | 49:21 crowd control situations -- crowd control situations. Is it -- | |
| | 49:22 it is -- it is the case that if a person is not engaged | |
| | 49:23 in one of these activities -- is not committing one of | |
| | 49:24 the acts enumerated here, then using 40-millimeter | |
| | 49:25 launcher against them is -- would be outside of DPD | |
| | 50:1 policy? | |
| | 50:2   A. Typically, yes. Again, I would have to go | |
| | 50:3 back to if an officer can have a reasonable and rational | |
| | 50:4 articulation as to why it was used outside these | |
| | 50:5 parameters, it may fall within policy. But this is the | |
| | 50:6 general guideline of when you can use a 40-millimeter in | |
| | 50:7 crowd control situations. | |
| | 50:8   Q. Okay. So there are exceptions to this rule as | |
| | 50:9 well? | |

Ex. 1266.019

| MOD | | |
|---|---|---|
| **Page/Line** | **Source** | **ID** |

| | | |
|---|---|---|
| | 50:10   A. Yes. That's correct. | |
| 50:21 - 52:20 | **O'Donnell, Michael 10-15-2021 (00:02:16)** | **MOD.29** |
| | 50:21   Q. Well, yes, I mean if -- so you're saying -- | |
| | 50:22 okay. So this says, "Against subjects who are actively | |
| | 50:23 throwing objects at police officers." So you're just | |
| | 50:24 saying if somebody threw a Molotov cocktail at a police | |
| | 50:25 officer, the officer could use a 40-millimeter launcher | |
| | 51:1 against them? | |
| | 51:2   A. I'm using it as an example that it's not | |
| | 51:3 specifically enumerated in this. But even if an officer | |
| | 51:4 saw him loading up getting ready to throw a Molotov | |
| | 51:5 cocktail, that would be within policy. You know, he's | |
| | 51:6 not actively throwing. He's getting ready to harm the | |
| | 51:7 officers and a 40-millimeter would be within policy in | |
| | 51:8 this scenario. | |
| | 51:9   Q. Okay. So, I mean, we can talk -- I mean, it | |
| | 51:10 says throwing objects. We could talk about a million | |
| | 51:11 different objects, right? But whatever object it is, | |
| | 51:12 whether it's a rock, frozen water bottle, Molotov | |
| | 51:13 cocktail, that would all fall within what's listed here, | |
| | 51:14 right? | |
| | 51:15   A. Yes, that's correct. | |
| | 51:16   Q. And then you're saying the policy also | |
| | 51:17 includes somebody who is getting ready to throw an | |
| | 51:18 object at an officer? | |
| | 51:19   A. It would depend on the object, but, yes, it | |
| | 51:20 has a carve out. | |
| | 51:21   Q. So a Molotov cocktail, very dangerous, | |
| | 51:22 obviously that would qualify. A rock -- somebody | |
| | 51:23 getting ready to throw a rock? | |
| | 51:24   A. Depending upon the size of the rock, I would | |
| | 51:25 say yes. | |
| | 52:1   Q. Okay. If it's a pebble, then no? | |
| | 52:2   A. Pebble most likely not. | |
| | 52:3   Q. Okay. | |
| | 52:4   A. It has to be reasonable and be in good faith. | |
| | 52:5   Q. Okay. Unfrozen water bottle? | |
| | 52:6   A. I would say that would not fit in this | |
| | 52:7 parameter. | |
| | 52:8   Q. Okay. And why is that? | |

| MOD | | |
|---|---|---|
| **Page/Line** | **Source** | **ID** |

| | | |
|---|---|---|
| | 52:9   A. An unfrozen water bottle is not going to cause | |
| | 52:10 damage. Now, the -- the flip side of that is the | |
| | 52:11 officers are not going to know if it's frozen or not. | |
| | 52:12   Q. Okay. We're talking like a plastic water | |
| | 52:13 bottle, right? | |
| | 52:14   A. That's true. The other component of that is | |
| | 52:15 the officer has no idea what liquid is contained in | |
| | 52:16 there. So in the instance I mentioned earlier, liquid | |
| | 52:17 was thrown, it was flammable can actually impact the | |
| | 52:18 officers. And then they threw something else, another | |
| | 52:19 Molotov to light it, so you kind of have to be a case by | |
| | 52:20 case basis. You can't say always yes or always no. | |
| 54:19 - 55:2 | **O'Donnell, Michael 10-15-2021 (00:00:30)** | **MOD.30** |
| | 54:19 Let's -- let's go to page 1776 to 1777 on | |
| | 54:20 chemical munitions. This list on page 23, "Chemical | |
| | 54:21 use, agent use in crowd control situations may be | |
| | 54:22 appropriate in the following circumstances," and | |
| | 54:23 there's, again, a bullet point list, right? | |
| | 54:24   A. Yes. | |
| | 54:25   Q. Are there -- are there any other | |
| | 55:1 circumstances, under which chemical agent used in crowd | |
| | 55:2 control situations is appropriate per DPD policy? | |
| 55:3 - 56:15 | **O'Donnell, Michael 10-15-2021 (00:01:50)** | **MOD.41** |
| | 55:3   A. This would be another situation that's, you | |
| | 55:4 know, even though they're not enumerated, there's also | |
| | 55:5 flexibility and it is a guide. To our earlier | |
| | 55:6 discussions regarding a crowd moving back, you may have | |
| | 55:7 to move them with some sort of less lethal munitions, | |
| | 55:8 including chemical agent. | |
| | 55:9   Q. Okay. So this one, unlike the other ones | |
| | 55:10 says, "Any situation where the officer can clearly | |
| | 55:11 articulate the need for a deployment." Do you see that? | |
| | 55:12   A. I do. | |
| | 55:13   Q. Okay. Based on what you've testified about | |
| | 55:14 use of 40-millimeter launchers and PepperBalls, does | |
| | 55:15 this apply -- this is -- this is what you're talking | |
| | 55:16 about? | |
| | 55:17   A. I'm sorry. I'm not quite clear on the | |
| | 55:18 question. | |
| | 55:19   Q. Okay. | |

| MOD | | |
|---|---|---|
| **Page/Line** | **Source** | **ID** |

55:20   A. Could you repeat that?

55:21   Q. So the other ones, the written policy doesn't

55:22 list this bullet point here for 40-millimeter launcher

55:23 use and PepperBall use, okay.

55:24   A. Yes.

55:25   Q. It only lists it here for chemical agent use

56:1 that, "An officer can use chemical agents in any

56:2 situation where an officer can clearly articulate the

56:3 need for deployment." But based on what you've

56:4 testified to as the city's witness, off -- DPD policy is

56:5 that officers can use 40-millimeter launchers in any

56:6 situation where the officer can clearly articulate the

56:7 need for deployment, correct?

56:8   A. If you look in the matrix, it -- it references

56:9 that, so, yes, it is, again, within a carve out.

56:10   Q. Okay. And DPD policy is that officers may use

56:11 the PepperBall launcher in any situation where the

56:12 officer can clearly articulate the need for deployment,

56:13 correct?

56:14   A. Yes. Typically rising to the level of

56:15 defensive resistance.

| 57:6 - 57:25 | **O'Donnell, Michael 10-15-2021 (00:01:30)** | **MOD.31** |

57:6   Q. Hi Commander. Earlier we were talking about

57:7 different situations where DPD policy might allow an

57:8 officer to use some discretion in deciding whether to

57:9 deploy less lethal munitions like -- like PepperBall or

57:10 not. And if I can -- I'll try to refresh your

57:11 recollection about one particular question, to get us

57:12 back in that frame. You were asked, does DPD policy

57:13 allow officers to shoot PepperBalls at somebody who is

57:14 standing still with their hands up? And you had

57:15 responded, it depends on the scenario. You're talking

57:16 one individual, that would not necessarily be within

57:17 policy, if you have a large group of people, orders have

57:18 been given to move back, move back, move back. Yes, at

57:19 the time of this policy that -- that could be a proper -

57:20 - that could be within policy with proper articulation,

57:21 a use of less lethal.

57:22 Now, you know, I don't need you to confirm

57:23 that that's exactly what you said, but do you -- do you

| MOD | | |
|---|---|---|
| **Page/Line** | **Source** | **ID** |

57:24 recall that -- that discussion?

57:25  A. Yes, sir. I do.

**59:25 - 60:12**  **O'Donnell, Michael 10-15-2021 (00:00:47)**   **MOD.32**

59:25  Q. Earlier we were looking at the crowd

60:1 management manual and we identified -- we looked at a

60:2 part that talks about how officers cannot use bean bag

60:3 shotguns without approval of the incident commander.

60:4 Do you remember looking at that?

60:5  A. Yes, sir. I do.

60:6  Q. Was that the policy of the Denver Police

60:7 Department at the time of the George Floyd protests?

60:8  A. It was. And to clarify, I did not know the

60:9 chief and Commander Phelan had talked to those other

60:10 agencies about that. To my knowledge, none of those

60:11 were deployed. We don't have those in department

60:12 inventory.

**61:1 - 61:5**  **O'Donnell, Michael 10-15-2021 (00:00:19)**   **MOD.33**

61:1  Q. So as the city's representative regarding the

61:2 city's crowd management policy, are you able to testify

61:3 today that the incident commander authorized the use of

61:4 bean bag shotgun rounds by outside agencies such as the

61:5 Aurora Police Department?

**61:8 - 61:18**  **O'Donnell, Michael 10-15-2021 (00:00:49)**   **MOD.34**

61:8  A. Again, I would say, based on today's

61:9 information in the deposition, it sounds like Chief

61:10 Pazen and Commander Phelan authorized that. Therefore

61:11 it would be withing policy if it was approved by the

61:12 incident commander per our operations -- per our policy.

61:13  Q. Okay. So if indeed police officers from the

61:14 City of Aurora policing the George Floyd protests

61:15 deployed bean bag or sock rounds from less lethal

61:16 shotguns, it would have been at the -- with the

61:17 authorization of either Incident Commander Phelan or

61:18 police Chief Paul Pazen, right?

**61:22 - 61:24**  **O'Donnell, Michael 10-15-2021 (00:00:12)**   **MOD.35**

61:22  A. Sir, to answer your question, I -- given

61:23 today's testimony, I conclude that Chief Pazen and

61:24 Commander Phelan authorized that.

Ex. 1266.023

| MOD | | |
|-----|---|---|
| **Page/Line** | **Source** | **ID** |

Our Designations = 00:46:08
**Total Time = 00:46:08**

Ex. 1266.024