**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

ELISABETH EPPS, et al.,

    v.                                            Civ. No. 20-cv-01878-RBJ (consol.)

CITY AND COUNTY OF DENVER, et al.

**AURORA DEFENDANTS' REPLY ON SUMMARY JUDGMENT**

Aurora Defendants hereby submit their Reply in Support of Summary Judgment.

**Reply to Plaintiffs' Response to Statement of Fact Undisputed Facts:[1]** Plaintiffs' repeated general allegations that the protests and crowds were "not violent" and officers "indiscriminately" deployed less-lethal weapons are directly contradicted by the record. Particularly, in Plaintiffs' Response to Facts 9-13, the record reveals the crowds east of Broadway on Colfax kicked and threw rocks, bricks, cement, concrete and asphalt chunks, large fireworks and explosive devices, bottles, unknown liquids and Molotov cocktails, softballs, golf balls, and chemical canisters at Officers, sometimes using lacrosse sticks to hurl projectiles. Protesters started fires. Officers were in fear for themselves and others as they were struck with these projectiles. Protesters ignored lawful commands to disperse and continued to violate Denver's curfew.[2] Multiple orders to vacate the area were given, protesters were reminded of the curfew, and Officers were advised that rioters may try to take Denver's District 6 Police Station. Acts of arson, vandalism, and assault were witnessed by officers. **Ex. B** at 6, 8, 11, 13, 15, 17, 22, 24, 25, 27, 33, 38, 43, 46, 47, 49, 51, 54, 56, 58, 59, 61, 64, 66, 68, 71, 72, 74, 76, 78, 79, 81, 83, 85, 91, 93, 94, 96, 98, 100, and 105; **Ex. 21** to Plaintiffs' RMSJ. Regarding Facts 17, 20 and 21, there is no record

---

[1] Any facts admitted herein are admitted solely for the purposes of the summary judgment motion.
[2] Defendants acknowledge the issue of the applicability of the curfew was challenged, but at the time officers believed it to be in effect and they were tasked with enforcing it.

1

support that Plaintiff Duran was "targeted," nor that Plaintiff Packard was hit by a lead-filled Kevlar bag, and the claim as to Officers' reactions to Aurora policies is purely speculative. Regarding Facts 23-28 and 30, Plaintiffs improperly rely on assumptions, speculation, and legal conclusions drawn from expert reports, rather than facts.

**Response to Plaintiffs' Statement of Material Facts (PSMF):** Here, Plaintiffs allege multiple facts in each paragraph (*see* ¶¶s 1-23 of PSMF), making responses to each cumbersome and difficult. Many of the purported "facts" contain self-serving argument, mischaracterizations and conclusory statements insufficient to create triable fact issues. *Piercy v. Maketa*, 480 F.3d 1192, 1197-98 (10th Cir. 2007). The nonmovant's "evidence, including testimony, must be based on more than mere speculation, conjecture, or surmise." *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004); *see also Scott* v. *Harris*, 550 U.S. 372 (2002). Regarding PSMF 1-3, there is no record support that Officers "indiscriminately" used less-lethal munitions, nor that Aurora Officers were involved in that use either as a group or with specific respect to Plaintiff Packard. Regarding PSMF 4, the record reveals that Sgt. Serrant authorizes Officers to "hit" protestors who kick canisters (**Ex. 15** at 21:12:32) and multiple other orders can be heard between 21:06:22 and 21:12:19 on regarding curfew enforcement, vacating the area, and Officers repeatedly yelling warnings to "watch the rocks." At 21:10:33, two smoke canisters are kicked back toward Officers and, again, at 21:11:28-21:11:34 officers take more rocks, are asking where the rocks are coming from, and an Officer points across the street from the line. At 21:11:37-21:11:44, an Officer says "we might need to gas them and get them out." At 21:12:19 and 21:12:31, two more gas canisters are kicked back toward officers. On **Ex. 17** a rock is heard hitting an Officer, while another Officer repeatedly yells "rocks" at 21:10:56-21:11:07. Regarding PSMF 5, the record supports only that Officer McNamee deployed less-lethal bean bag rounds at protesters

2

attempting to pick up and throw gas canisters back at the police. There is no record evidence for the allegation that Officer McNamee "was the only officer firing less-lethal rounds" when Plaintiff Packard was injured. Sergeant Serrant's team was equipped with shotguns that shot "socks" (beanbags), and 40mm launchers that shot foam rounds**. Ex. J.** - Depo. Serrant, 124:6-23. In fact, other Officers were in the area at the time including James Queisner, carrying a less-lethal shotgun with beanbag rounds, **Ex. B**. at 79, and Officer Darren Martinez deployed less-lethal shotgun rounds toward protestors who threw unknown items at police or interfered with police "CS gas." *Id.* at 84. Officer Joshua Winters also deployed beanbag rounds at persons clearly observed throwing items and picking up deployed gas/smoke canisters and attempting to throw them back. *Id*. at 11. Regarding PSMF 7, the allegation that Sgt. Brukbacher instructed officers to fire less-lethal rounds if protestors merely "touched" gas canisters is unsupported by the record—the instruction was if protesters picked up gas munitions and threw them back at officers. *Id.* at 64-65. Moreover, the statement arose in the context of protesters on the ground and rooftop threatening Officer safety. **Ex. 19** at 21:18:29-21:19:05. Regarding PSMF 9, there is no record support for the claim that Duran was "standing near the south sidewalk" when he was struck. Defendants admit PSMF 11 but add that there were also Jefferson County Deputies on the right side of the Bearcat wearing green camouflage. **Ex. I -** Depo. Budaj, 115:8-15. Regarding PSMF 12, the allegation that Plaintiff Duran was struck at a time certain is purely speculation, as Plaintiffs admit that the timestamps on the various video evidence "vary slightly," and there is no indication of any timestamp on Plaintiff Duran's video. [ECF 383] at n.1; **Ex. 21**. In addition, Duran continued filming and chatting on his livestream feed about making a necklace or a "sex toy" out of the foam round. *Id.* at 22:55; 24:02. Regarding PSMF 13, there is no record support for the speculation that Officer Budaj was the only Officer present in the area or carrying a 40mm foam-round launcher at

3

the time Plaintiff Duran was struck. To the contrary, on May 31, 2020, Officers Smick, Bubna, Agent Snow, Sgt. Brukbacher, Glenn, Price were reportedly on the right or left side of the Bearcat and all were equipped with and using 40mm launchers to engage rioters. **Ex. B**, 108; 18; 96-97; 64-65; 86; and 16, respectively. Deputies from Jefferson County were also on the right side of the Bearcat. *See* Overhead Diagram, attached as **Exh. K**. Moreover, Officer Budaj testified he did not believe he was the Officer indicated by Plaintiffs as striking Plaintiff Duran, because that Officer's backpack appeared to be a "larger" and more "bulky" then the hydration pack he may have been wearing, and he carried his munitions in front rather than behind him. Additionally, the tape on the back of the Officer's helmet appeared to be multicolored, there is no record evidence to the contrary, and tactically Officer Budaj would not have launched a 40mm round with Officers in close proximity and in front of him. **Ex. I,** 59:2-25-60: 1-14. Furthermore, Plaintiff Duran was moving when he was struck, at times standing behind protesters whom were using the dumpsters to hide behind as they engaged in throwing fireworks and other projectiles at Officers and moving forward to kick or throw gas canisters back toward police. **Ex. 21** at 20:33-21:28. Regarding PSMF 17-22, Aurora's policy does not provide for unlimited discretion, but rather within the confines of legally permissible force. Additionally, Plaintiffs improperly rely on assumptions, speculation, and legal conclusions drawn from expert reports, rather than facts. And finally, PSMF 23 is a legal conclusion.

In light of the foregoing, it is important to note here that "[t]he non-moving party cannot avoid summary judgment by repeating conclusory opinions, allegations unsupported by specific facts, or speculation." *Colony Nat'l Ins. Co. v. Omer*, 2008 U.S. Dist. LEXIS 45838, at *1 n.11 (D. Kan. 2008) (citing Fed. R. Civ. P. 56(e) & *Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1199 (10th Cir. 2006)). "In responding to a motion for summary judgment 'a party

4

cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial.'" *Colony*, 2008 U.S. Dist. LEXIS 45838, at *1 n.13 (quoting *Conaway v. Smith*. 853 F.2d 789, 794 (10th Cir. 1988)).

## ARGUMENT

**1.     Plaintiffs have failed to demonstrate personal participation:** The claim that Officer Budaj shot Plaintiff Duran with a 40mm foam round is based on speculation that a Denver streetlight turned green—more than a city block away—and then an unidentifiable Officer launched a foam round some 12 seconds later. These attempts to identify the Officer as Budaj are simply insufficient to establish individual liability under § 1983. *Panaderia La Diana, Inc. v. Salt Lake City Corp*. 342 F.Supp.2d 1013, 1031 (D. Utah 2004). Moreover, there is no evidence that Duran was intentionally targeted, whether by Officer Budaj or any other Officer.

First, there is no timestamp on Duran's video, preventing the accurate coordination of timing with other events alleged on his own or other video. The footage begins at some unknown time and lasts 30:08 minutes—showing, at about 21 minutes, what appears to be Duran being hit with a foam round. *See* RMSJ Ex. 27. Moreover, what seem to be multiple 40mm rounds can be heard in the audio and people are seen running towards the dumpsters as multiple fireworks are being shot toward police. Plaintiff Duran states "we are in a firefight." When smoke is deployed, two people run toward the canister—one with a shield—to kick the canister back toward police. **Ex. 21** at 20:17-21:04. Multiple traffic lights can be seen cycling up and down the street, protestors are yelling "they are using live rounds" while fireworks continue to be shot at police. *Id.* at 21:15-21:24. At 21:26 Duran can be heard saying, "I just got hit in the dick," and a foam round can be seen on the ground.

5

Critically, Officer Budaj was not the only Officer in the vicinity, at the time, carrying a 40mm launcher. Although Duran points to an unknown Officer who raises a launcher on bodyworn video, Officer Budaj denies the Officer is him for a number of reasons, including the size of the backpack, the location of munitions, and tactical choices. And finally, there was not just one round fired from a single Officer carrying a 40mm launcher at a person standing alone—or even somewhat isolated—in the street. Rather, Duran's video, the police reports, and multiple bodyworn videos show multiple 40mm rounds being launched, Duran moving when he was hit, and at times standing directly behind an area where protesters had staged behind two dumpsters as they threw fireworks and other projectiles at police. During Officer Budaj's deposition, counsel reviewed the bodyworn videos from Officers Bubna and Smick, but not the other officers who were in the area at the time, including Officers Brukbacher, Glen and Price, all of whom were reportedly in the area, equipped with and using 40mm launchers to engage rioters. Deputies from Jefferson County were also in the area at the time and believed to be equipped with 40mm foam launchers.

Second, even if there was some way to trace the round directly to Officer Budaj—which there is not—there is no evidence in the record that Duran was purposely targeted. As such, Duran cannot establish a constitutional violation. *See County of Sacramento v. Lewis*, 523 U.S. 833, 848 (1998) (liability for negligence below the threshold of constitutional due process). Moreover, it was dark, Duran was more than a city block away from the Officers deploying 40mm launchers, he was moving, and was standing directly behind others engaged in unlawful conduct. Officer Budaj also testified that he did not shoot anyone wearing a helmet that said "media." **Ex. C**, 78:4-14. Furthermore, Duran was filming from his cellphone and it would not have been readily apparent that Duran was with a media outlet, particularly from some distance away. There is

simply no evidence that Officer Budaj was the Officer whose round struck Plaintiff Duran, nor any evidence that Plaintiff Duran was intentionally targeted by Officer Budaj or anyone else.

Finally, Duran's own statements dispel any notion that all protesters who were in the area that night were "peaceful," thereby suggesting the deployment of less-lethal force by Officers was unjustified and "indiscriminate." To the contrary, Duran characterizes Denver as a "war zone," with protesters engaged in a game of "cat and mouse." **Ex. 21**, at 24:44. He refers to a "showdown" at Wendy's (*id*. at 24:49) – estimating there were about 3-4 dozen officers to the "800-1,000 people, give or take." *Id.* 4:37-4:50. Duran even told his viewers that the police were trying to keep the protestors from "helping in a firefight down the street with a different group." *Id.* at 5:00. Duran also relays that he just got "another warning from curfew," *id.* at 6:16, and reiterates it is a definite game of "cat and mouse," *id*. at 10:00, that he is apparently enjoying when he says, "I am out here having fun getting chased." *Id***.** at 19:37. As Duran passes by a broken glass door, he notes it appears to be "freshly broken," *id*. at 15:08, and rioters can be seen in Duran's footage pushing large garbage dumpsters through the street to, in Duran's own words, "fight." *Id.* at 17:02. Rioters are also seen carrying fencing to create a barricade. *Id.* at 18:46. A female can be seen and heard saying they are on the "front lines" as she exclaims that they are throwing tear gas back at officers and begins to say more, but Duran tells her "don't admit it on camera." *Id.* at 19:50. Thus, by Plaintiff's own account it was not a peaceful protest, it was a "war," a "firefight," a "cat and mouse game" where protestors should not admit to their conduct "on camera." The foregoing is also evidenced by the accounts of the Officers as they reported being hit with rocks, bottles, fireworks, having mortars shot at them and canisters thrown or kicked back as the arduous efforts to disperse the crowd—moving a block at a time—was fraught with resistance made worse by darkness.

7

Regarding Officer McNamee, there is similarly no evidence that he was the Officer who allegedly shot Plaintiff Packard. Moreover, Packard admits that at the time he claims he was shot with a beanbag round, he was engaged in unlawful conduct justifying the use of such force—specifically, he kicked a deployed smoke canister back towards officers. Although he claims it was simply "reactionary" in nature, an alleged innocent intention does not negate the action. In addition, there is no evidence that Packard was the actual target of the force utilized, as it is not clear where the Officer alleged by Plaintiff was aiming or if contact was made with his target. Neither is there any testimony that a beanbag round was located in the area where Packard fell. Rocks and projectiles were being thrown at the time, and Packard can be seen holding a skateboard, kicking the canister and falling on the curb—which could have caused injury. In any event, less-lethal operators had been authorized to fire at protestors throwing canisters back toward police. And, as with Officer Budaj, Officer McNamee was in the company of multiple Officers with 40mm foam rounds and beanbag rounds, precluding the presumption that, assuming Packard was hit in the head with some type of less-lethal round, it was Officer McNamee's round.

Packard also claims Sgts. Brukbacher and Serrant violated his rights based on a supervisory claim teetering on the mischaracterization that they "ordered the use of force that injured Packard." [ECF 383] at 8. It is undisputed that Brukbacher and Serrant gave authority to use less-lethal force in instances where protesters attempted to throw canisters back at police. However, that direction was provided in the context of Officers' discretion—not an "order"—to lawfully utilize such force at a moment when canisters were being employed to address protesters refusing dispersal orders, some of whom were hurling fireworks, rocks and bricks at the police line and could not be individually identified without compromising officer safety. Officers were further facing extraordinary circumstances against a backdrop of buildings being vandalized, looted and, in some

8

instances, burned across the country. In this context, and put directly, neither Brukbacher nor Serrant gave permission to engage in unlawful activity or to use force in violation of the constitution. Thus, Plaintiff cannot establish a deliberate or intentional act on the part of Brukbacher or Serrant to violate the constitutional rights of protestors. Instead, their direction was specifically addressing concerns with officer safety related to individuals who, for whatever reason, were purposely interfering with gas deployment and efforts to keep such individual's activities from coming to fruition. Thus, even assuming that Plaintiffs can somehow establish the personal participation of each of the named Individual Aurora Defendants as to each constitutional violation alleged by each Plaintiff, their discrete claims still fail.

2. **Plaintiffs' First Amendment retaliation claims fail:** Plaintiffs' assertions that there are "factual disputes" about Officer motives precluding summary judgment are simply conclusory and find no support in the record. These claims hinge on the theory that Budaj "knew Duran was a journalist" based on the helmet he wore, and that Budaj could not have "negligently shot Duran." [ECF 383] at 9. As to Brukbacher, Serrant, and McNamee, Plaintiffs simply allege the Officers knew "Packard was protesting." *Id.* at 10. These cursory conclusions are insufficient to establish retaliatory motive as the "'but-for' cause, meaning that the adverse action against the plaintiff would not have been taken absent the retaliatory motive." *Nieves v. Bartlett*, 139 S. Ct. 1715, 1722 (2019) (citing *Hartman v. Moore*, 547 U.S. 250, 260 (2006) (it "may be dishonorable to act with an unconstitutional motive," an "action colored by some degree of bad motive does not amount to a constitutional tort if that action would have been taken anyway")). More directly, Plaintiffs must each show they were subject to force "because of … not merely in spite of" their activity. *Pahls v. Thomas*, 718 F.3d 1210, 1224 (10th Cir. 2013). With regard to Plaintiff Duran, there is no evidence that Officer Budaj saw, or could see, a hardhat with the word "media," at

9

night, through smoke, more than a city block away, while Duran was moving and positioned behind protesters engaged in unlawful activity. Budaj testified that he never saw anyone wearing a helmet with the word "media" on it or matching Plaintiff's description. The facts are thus insufficient to support an inference that Duran's protected activity was "a substantial or motivating factor" in Officer Budaj's conduct. In fact, by his own admission, Packard kicked a canister at officers, a justifiably motivating factor for using less-lethal force. And there is no support in the record that any Officers were simply firing less-lethal rounds at protestors who were doing nothing but peacefully protesting, much less that they were engaging in protected activity. *See* Pltf. Ex. 15 at 21:03:18 – 21:09:52. Instead, the less-lethal rounds were intended for those persons who posed a risk to the safety of officers and others because of, and directly tied to, their own actions.

The accounts of the Officers, backed up by videos and reports, show they lawfully responded to unlawful actions of agitators—directly contrary to the speculative and factually unsupported conclusion that "protected activities" caused Officers to use or authorize the use of less-lethal munitions. There is no evidence that any of the Officers held views or made comments against protestors, against Duran or Packard particularly, or that they were targeted in any specific fashion. As such, Plaintiffs are unable to establish a First Amendment retaliation claim.

**3.     The Individual Officers are entitled to Qualified Immunity:** Once qualified immunity is raised, Plaintiffs must demonstrate "(1) that the official violated a statutory or constitutional right, *and* (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731 (2011) (emphasis added). The plaintiff must make this demonstration "on the facts alleged." *Riggins v. Goodman*, 572 F.3d 1101, 1107 (10th Cir. 2009), and Plaintiff's factual recitation must find support in the record. *Thomson v. Salt Lake Cnty.*, 584

10

F.3d 1304, 1312 (10th Cir. 2009). Here, Plaintiffs have failed to establish both a constitutional violation and that Defendants violated clearly established law.

The Supreme Court recently reiterated and affirmed the well-established principles of qualified immunity when it re-emphasized the importance of not defining clearly established law at too high a level of generality. *City of Tahlequah v. Bond,* 2021 U.S. LEXIS 5310, at *11-12 (2021) (citations omitted). Relevant to this case, the Court admonishes that "[t]he general proposition … that an unreasonable search or seizure violates the Fourth Amendment is of little help in determining whether the violative nature of particular conduct is clearly established." *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011). Indeed, the "existing precedent must have placed the statutory or constitutional question beyond debate." *Id.* at 741. A court must "scrupulously adhere" to the longstanding duty to ascertain "clear law … that would apply to the situation at hand." *Mascorro v. Billings*, 656 F.3d 1198, 1208 (10th Cir. 2011) (citation omitted).

The *Tahlequah* Court stated that it "is not enough that a rule be suggested by then-existing precedent; the rule's contours must be *so well defined* that it is clear to a reasonable officer that his conduct was unlawful in the situation he confronted." 2021 U.S. LEXIS 5310 *11 (emphasis added) (citation omitted). Thus, "[t]he dispositive question is 'whether the violative nature of the *particular* conduct is clearly established,'" *Mullenix v. Luna*, 577 U.S. 7, 12 (2015), a precept the Court labelled more critical in the context of the 4th Amendment, *Tahlequah* at *12, because "it is sometimes difficult for an officer to determine how the relevant legal doctrine … will apply to the factual situation the officer confronts." *Id.* at *11-12 (citation omitted).

Just as the lower court's reliance on generalized cases did not "come close" to establishing the defendant officers' conduct was unlawful, so here, too, is Plaintiffs' reliance on *Fogerty v. Gallegos*, 523 F.2d 1147, 1159-62 (10th Cir. 2008) misplaced. First, in that case plaintiff did and

11

could not hear dispersal orders. *Id.* at 1151. Moreover, there remained but few demonstrations at the time the *Fogerty* plaintiff was subject to multiple uses of force—including less-lethal munitions, injurious arrest control techniques, dragging along the street, and refusal to recognize plaintiff's health distress—all based on plaintiff allegedly beating on a drum. *Id.* at 1159. The factual pattern in *Fogarty* is thus not remotely close to that presented here. In *Fogarty*, there were no claims that Officers were being pummeled with rocks, bricks, and mortars by a swelling crowd engaging in threatening behaviors. Nor were there any claims that property was being burned and vandalized, or that the situation confronting Officers was chaotic. *Fogerty* simply falls well short of meeting Plaintiffs' burden to show a controlling case or a robust consensus of cases informing Defendants that their actions were unconstitutional. Similarly, in *Buck v. City of Albuquerque*, 549 F.3d 1269 (10th Cir. 2008), also cited by Plaintiffs, plaintiff was first sitting down in the street and then laying down in the street, when she was repeatedly shot with pepper balls. In that case Plaintiff posed no threat to officers, was not engaged in apparently unlawful behavior, nor was she in the vicinity of other individuals against whom Officers were justifiably using force. Like *Fogarty*, *Buck* also falls short of meeting Plaintiff's qualified immunity burden.

In contrast, in *Epps v. City & Cnty. of Denver,* 2022 U.S. Dist. LEXIS 35895. (D. Colo. 2022), this Court distinguished between two officers: one who knelt down, aimed, and fired a less-lethal munition at an individual who was simply filming a protest; and an officer who saw a protestor throw an object at police and fired a less-lethal munition but missed and hit a peaceful person. There, as here, Plaintiffs provided no authority that an Officer who inadvertently strikes a bystander violates the Constitution. Here, Plaintiffs offer no case where protestors kick canisters at officers when officers are being pelted with rocks and other projectiles and are attempting to disperse a crowd of people where such projectiles are originating. *Epps* further recognizes that

less-lethal munitions may not always be accurate and Officers do not always hit their intended targets. Put directly, Plaintiffs do not provide legal authority clearly establishing a constitutional right in the circumstances of this matter such that a reasonable official would understand that what he is doing violates that right. *Wilson v. Montano*, 715 F.3d 847, 852 (10th Cir. 2013). Indeed, the uncertain nature of the law in the context of crowd dispersal by force functionally prevents Plaintiffs from presenting such authority, and mandates that the individual Defendants here are entitled to qualified immunity and the dismissal of Plaintiff's claims. *See, e.g., Buck v. City of Albuquerque*, 2007 U.S. Dist. LEXIS 105714, at *105-09 (D.N.M. 2007) (finding the law not clearly established and collecting and analyzing cases from other jurisdictions); *Alsaada v. City of Columbus*, 2021 U.S. Dist. LEXIS 82759, at *76, 116 (S.D. Ohio 2021) (noting difficult issues with qualified immunity and clearly established law following the George Floyd protests).

**4.     The undisputed material facts do not support municipal liability:** Plaintiffs fail to produce any record facts to suggest municipal liability under any theory. Plaintiffs first point to the Colorado Attorney General's report regarding the Aurora Police Department as evidence of a policy or practice of unconstitutional uses of force. This report—in addition to being issued after the incident at issue so unable to provide the required notice to Aurora for deliberate indifference—does not address protest situations, crowd management, or crowd control. Because the facts here are the result of unprecedented, highly unusual circumstances, prior uses of force are inapplicable and cannot provide a basis for practice or custom here.

Plaintiffs next argue ratification. However, neither of the incidents alleged by Plaintiffs were specifically identified in bodyworn camera footage, were not reviewed by Aurora officials, and Plaintiffs cannot point to any municipal policymaker who "affirmatively approved a subordinate's decision *and the basis for it*." *Dempsey v. City of Baldwin City*, 333 F.Supp.2d 1055,

1070 (D. Kan. 2004) (emphasis in original). "[T]here must be 'something more' than a single failure to discipline or the fact that a policymaker concluded that the defendant officer's actions were in keeping with the applicable policies and procedures." *Garcia v. City of Imperial*, 2010 WL 3911457, *2, (S.D. Cal. 2010) (citation omitted). A "mere failure to overrule a subordinate's actions, without more, is insufficient." *Id.* (citation omitted). Here, the facts simply do not support a finding that Plaintiffs have met those burdens.

Plaintiffs next claim that Aurora provides no training on crowd control or management and that such failure to train evidence constitutes a fact dispute regarding causation. These claims are contradicted by the record. Aurora *does* provide training on the specific factors at issue here: Aurora trains Officers to deploy less-lethal munitions only in circumstances where legally permitted, that Officers should not target certain areas of the body, that crowds or groups generally should not be targeted, and that verbal warnings should be given where possible. *See* **Ex. F,** 37:13-21; 45:22-24; 46:3-9; 57:13-22; 66:5-11; **Ex. G,** 28:21-25. Plaintiffs' municipal liability claim based on a failure to train is thus legally insufficient. Summary judgment should thus be granted as there is no fact basis demonstrating a policy or custom, no policymaker ratified the specific incidents at issue, and Aurora does provide training on the relevant topics.

**5.     The City of Denver is the proper *Monell* Defendant as a matter of law:[3]** Summary judgment should be granted in favor of Aurora because Plaintiffs have previously asserted that Denver is the relevant municipal entity which provided the relevant policies and customs for responding mutual aid jurisdictions. Further, a jury has found that responding mutual

---

[3] Because Plaintiffs' admissions occurred after the deadline to file the Aurora Defendants' Motion for Summary Judgment, this argument was not presented in their initial Motion. As such, Aurora Defendants recognize that Plaintiffs have not had an opportunity to respond to this argument and would not object to further briefing on this topic.

aid jurisdictions acted pursuant to an official policy, practice, or custom of Denver. As a result, *Monell* liability has been resolved and is no longer applicable to Aurora.

Plaintiffs asserted both in advance and during trial that Denver's policies, customs, and practices were responsible for the injuries sustained by Plaintiffs. Specifically, during the February 23, 2022 Trial Preparation Conference, the Court asked Plaintiffs whether "the theory would be the municipality for *Monell* purposes is Denver since Denver brought them [the mutual aid jurisdictions] in as part of the overall force." Plaintiffs' counsel responded, "Yes, Your Honor. That's right. It's consistent with the testimony of Commander Phelan in the *Abay* case in which he testified that Denver was, I think the words he used, responsible for the actions of the mutual aid partners." Trial Prep. Conf. Trans., 7:18-25 - 8:1-4. Plaintiffs' counsel went on to specifically attribute responsibility for Plaintiff Packard's injuries to Denver, stating that "right now we think there's one plaintiff who was shot, Mr. Packard, by an Aurora defendant. We think Denver is responsible for that on a *Monell* basis …" *Id.*, 11:19-23. And indeed, the jury concluded that Plaintiff Packard's injuries were attributable to Denver.[4] As such, the issue of *Monell* liability has previously been resolved against Denver and is no longer at issue with respect to Aurora. Summary judgment should thus be granted in favor of the City of Aurora.

Respectfully submitted this 13th day of July, 2022.

| | |
|---|---|
| *s/ Michael T. Lowe* | *s/ Isabelle S. Evans* |
| Bruno, Colin & Lowe, P.C. | Office of the City Attorney |
| 1999 Broadway, Suite 4300, Denver 80202 | 15151 E. Alameda Pkwy, Aurora 80012 |
| (303) 831-1099; mlowe@brunolawyers.com | (303) 739-7030; ievans@auroragov.org |

**CERTIFICATE OF SERVICE BY CM/ECF**
I certify that on July 13, 2022 I electronically filed the foregoing Reply using the CM/ECf with notification to all counsel for all parties.      *s/ Julie Bozeman*

---

[4] *See* [ECF 343] at Question 9, where the Jury indicated that they found that a mutual aid jurisdiction "acted pursuant to an official policy, or a practice or custom of Denver …"