IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 20-cv-1878-RBJ

ELISABETH EPPS, *et al.,*

Plaintiffs,

v.

CITY AND COUNTY OF DENVER, *et al.,*

Defendants.

## DECLARATION OF ELIZABETH WANG

Pursuant to 28 U.S.C. § 1746, I, Elizabeth Wang, declare as follows:

**Reasonableness of Hourly Rates Claimed**

1. Defense expert William Rogers' evaluation of the appropriate hourly rates for the plaintiffs' attorneys in this case (both Loevy & Loevy attorneys and the Arnold & Porter attorneys who represent the *Epps* plaintiffs) is based on nothing more than the 2017 CBA survey. The CBA Survey is seriously flawed, as several judges in this district have observed. *See also* Ex. 2 (Bardwell Report from *Stroup v. United Airlines*) at 18-21.

2. Mr. Rogers ignores Loevy & Loevy's civil rights experience, which is contrary to the law.

3. Mr. Rogers' calculations of how many years of experience my colleagues and I have are erroneous. I graduated from law school in 2005. I am a civil rights lawyer who has been practicing law for 17 years, not 12.

4. Other than my years clerking for federal judges in the Northern District of Illinois and the Ninth Circuit, I have spent my entire career representing plaintiffs in Section 1983 civil

EXHIBIT 1

rights cases. Immediately after law school, I was a Legal Fellow at the American Civil Liberties Union (ACLU), during which time I obtained significant experience working on civil rights cases, including writing substantial briefs and motions.

5. During the two years I was a law clerk for federal judges, I gained invaluable experience on federal and complex cases, including Section 1983 civil rights cases. That experience was as valuable—if not more valuable—than any other experience I have ever had as an attorney. There is no basis in law or fact for discounting it, as Mr. Rogers does.

6. Notably, while Mr. Rogers tries to reduce my years of experience by discounting my clerkships, he includes the clerkship that Mari Newman did after law school in characterizing her as having practiced for "over 25 years."[1]

7. Mr. Rogers also speculates that I was not a practicing attorney during my two years as a Lecturer in Law at the University of Chicago Law School in the Exoneration Project (from 2010-2012). This is wrong. The Exoneration Project is a *legal clinic* dedicated to the post-conviction representation of individuals were wrongfully convicted. I taught students how to litigate post-conviction cases.[2] Teaching law students at a top law school how to litigate requires experience and expertise in litigation. During the time that I held that position, I was also a full-time practicing attorney at Loevy & Loevy, where I continued to litigate Section 1983 civil rights cases. I obtained significant favorable results in cases I litigated during that time frame, such *Winfrey*, *Fox*, *Ortiz*, *Awalt*, *Hobson*, *Julian*, *Bell*, *Hill*, and *Elkins*. *See* Dkt. 380-2.

8. Mr. Rogers concedes that the rate of $595 per hour, awarded to attorneys Laura Menninger and Jeffrey Pagliuca, in *Valdez v. Motyka*, was appropriate. And although he tries to

---

[1] *See* https://www.kln-law.com/mari-newman.
[2] In the approximately 15 years since the Exoneration Project was founded by attorneys from Loevy & Loevy, attorneys with the Project have exonerated nearly 200 people who were wrongfully convicted. (Many of these were mass exonerations.)

distinguish the $650 and $600 per hour awarded to David Lane, Darold Killmer, and Mari Newman in *Willmeng* because it was an agreed order, the fact that it was agreed weighs in favor of accepting that rate for the top civil rights attorneys precisely because defendants agreed to it. In any event, these rates have been adopted in other recent decisions in this district. *See* Ex. 3 (*O'Neal* Order) at 5, 7 (accepting rate of $600 per hour for Newman and $650 per hour for Lane and Killmer, in 2020). And, in *Stroup*, 2018 WL 10613861, *6-8 (D. Colo. Dec. 5, 2018), a four-year-old decision, Judge Daniel reduced Killmer, Lane and Newman's requested rates only slightly, from the requested $650 and $600 per hour to $590 and $540 per hour. *Stroup* also noted that John Holland's rate was $650 per hour, Lynn Feiger's rate was $650 per hour, and Qusair Mohamedbhai's rate was $500 per hour.

9. Courts in this district have determined the reasonable rate for the top civil rights attorneys is $600-650 per hour. Defendants do not contest that. The question, then, is whether Jon Loevy, myself, Steven Art, and David Owens are of comparable skill and experience to the attorneys who have obtained those rates in this district. The answer is yes.

10. I invite the Court to examine the declarations we submitted and compare the accomplishments of Jon Loevy, Steven Art, David Owens, and myself to the accomplishments of David Lane, Darold Killmer and Mari Newman (or, for that matter, John Holland, Qusair Mohamedbhai, Lynn Feiger, Jeffrey Pagliuca, and Laura Menninger, all of whom have received similar rates to what we are requesting here), in order to determine whether we would qualify as among the top civil rights attorneys in the state (or the country).[3]

---

[3] *Compare* Dkts. 380-2, 380-4, 380-5, 380-6 *with* Ex. 4 (Lane Aff. from *Stroup*) (discussing experience of Lane, Killmer, and Newman); Ex. 5 (Pagliuca Aff. from *Valdez*) (discussing the experience of Pagliuca and Menninger); https://hheglaw.com/our-people/; https://rmlawyers.com/attorneys/qusair-mohamedbhai/; https://jgllp.com/attorneys/lynn-feiger.

3

11.     For example, I have obtained five (5) seven- and eight-figure jury verdicts in civil rights cases (not including this one). Dkt. 380-2 at 4-7. I have obtained eleven (11) seven- and eight-figure settlements in civil rights cases.[4] *Id.* I recently settled two civil rights cases in this district for seven-figure sums. One was *O'Connell v. Alejo*, No. 18-cv-1359-RBJ (involving due process claims arising from fabrication of evidence resulting in a wrongful conviction), and the other was *Stewart v. Frankenreiter*, No. 19-cv-1588-RMR-NYW (also involving due process claims arising from fabrication of evidence, resulting in a wrongful conviction). *Stewart* settled for $1.3 million, an impressive sum considering that plaintiff spent only 45 days in jail.[5] My wins have included verdicts for plaintiffs *on Monell claims*. I have won nearly all of the appeals I have briefed or argued, including persuading the Seventh Circuit to strike down a Chicago ordinance as facially unconstitutional under the First and Fourteenth Amendments. Such victories are rare.[6]

12.     Mr. Rogers' proposed rate for me ($400) is far lower than what was awarded to Ms. Menninger ($575) in *Valdez* or Ms. Newman ($600 or $540) in *Willmeng*, *O'Neal*, or *Stroup*. Yet, my accomplishments and experience compare favorably to theirs. Mr. Rogers also proposes a lower rate for me than for Timothy Macdonald or Matthew Douglas in this case. This is not appropriate, given my many years of experience in civil rights cases and prior success in civil rights trials. The specific expertise that I brought to this case—which helped Plaintiffs achieve their unprecedented victory—is uncontested.

---

[4] In addition to the cases listed on my declaration (Dkt. 380-2), such cases also include *Colon, Administrator of the Estate of Munive*, No. 12-cv-5481 (N.D. Ill.) ($3.5 million settlement for police shooting); *Harden v. Dixmoor, et al.*, No. 12-cv-8316 (N.D. Ill.) ($40 million settlement for 5 civil rights plaintiffs); and *Hill v. Coppleson*, No. 06-cv-6772 (N.D. Ill.) ($1 million settlement for civil rights plaintiff).

[5] Wrongful convictions my firm has successfully litigated typically result in $1-2 million of compensation per year of wrongful conviction when tried to verdict or about $500,000 per year of wrongful conviction when settled before trial. In addition, *Stewart* was a case that other top civil rights attorneys in this jurisdiction turned down because they did not see a path to victory. I took the case because I understood there was a path to victory, and I obtained a very favorable result for my client.

[6] I was also named a top civil rights lawyer in 5280 magazine in 2022.

4

13. Mr. Rogers tries to downplay the accomplishments of Jon Loevy by stating, "His declaration largely focuses on his economic successes." Dkt. 413-2 at 8. But Mr. Loevy's "economic successes" are *jury verdicts in civil rights cases*, which is exactly the issue under consideration. Mr. Loevy has won more than $250 million in jury verdicts, including more than 20 separate jury verdicts in excess of $1 million dollars, more than a *dozen* that exceeded $5 million, and five in excess of $20 million. Dkt. 380-4 at 3-9. In fact, these numbers need to be revised, because earlier this month, Mr. Loevy obtained a $33.5 million verdict for plaintiffs, one of the largest-ever verdicts in Illinois history in a police misconduct case.[7] Several of Mr. Loevy's trial wins were on *Monell* claims. Additionally, Mr. Loevy has won 18 out of the last 21 cases he argued in the federal appellate courts. *Id.* at 9. There can be little doubt that his hourly rate should be at the top of the field ($650 per hour).

14. Mr. Rogers states that because most of Mr. Loevy's trial successes were in Chicago and not in Colorado, those successes should be discounted. But he provides no evidence in support of this. To the contrary, in my experience, civil rights defense attorneys in Chicago are among the most aggressive, tenacious, and skilled trial attorneys in the country. And, the type of civil rights cases that Mr. Loevy (and Loevy & Loevy in general) are skilled at litigating—wrongful convictions—are particularly complex and difficult to win. We generally have to prove that police officers knowingly framed an innocent person or hid or fabricated evidence. This is difficult to do.

15. And, even under Mr. Rogers' rubric, which is that "judges are the marketplace" in civil rights cases, his proposed lower rate for Mr. Loevy makes no sense. If judges are the marketplace, then they have spoken about whether Mr. Loevy is a top-tier civil rights attorney

---

[7] https://chicago.suntimes.com/2022/8/4/23292288/jury-fatal-crash-dolton-police-miscoduct-car-chase-lawsuit

who should command the highest rates. *See Wells v. City of Chicago*, 925 F. Supp. 2d 1036, 1041 (N.D. Ill. 2013) (describing Jon Loevy as "an attorney whose experience, skill, and record of success in representing plaintiffs in police misconduct cases place him at the apex of attorneys who practice in that field."); *Jiminez v. City of Chicago*, 2012 WL 5512266, at *2 (N.D. Ill. Nov. 14, 2012) (stating that Jon Loevy is in the "top tier of civil rights trial attorneys in the Chicago area" who leads what "is fairly considered one of the premier Chicago-area law firms concentrating in plaintiff's section 1983 litigation."); *id.* (stating that Loevy & Loevy and Mr. Loevy have "an impressive record of success in plaintiff's civil rights litigation"). *See also* Dkt. 380-4 at 11.

16. Mr. Loevy was awarded $550 per hour four years ago by a federal judge in Chicago (Dkt. 380-4 at 13) for work performed years before 2018, the last time his rate was adjudicated. He is seeking a reasonable increase to $650 per hour (the rate given to attorneys of comparable skill and experience in this jurisdiction) for his modest number of hours (8.5) spent in this case. Mr. Rogers's proposal that Mr. Loevy's rate be reduced to $475 per hour from what he was last awarded by a federal judge ("the marketplace") has no factual basis.[8]

17. Although Mr. Loevy is only billing 8.5 hours in this case, those hours were indispensable to the result in this case. As demonstrated by his timesheet, Mr. Loevy provided advice and his expertise in winning civil rights cases to me at several important junctures in this case: at the beginning, at summary judgment, at trial, and in the post-trial motion stage. *See* Dkt. 380-4 at 15.

---

[8] Likewise, there is no rationale behind Mr. Rogers' proposal of $500 per hour for Arnold & Porter attorney Ed Aro and a lesser rate of $475 per hour for Jon Loevy, who has more experience and success in civil rights cases. *Compare* Dkt. 380-4 *with* Dkt. 378-1. Mr. Rogers' proposed rates for the Epps and Fitouri attorneys are based on the 2017 CBA Survey, to the apparent exclusion of any other factor.

18. Steven Art and David Owens are both seeking rates of $545 per hour, which is reasonable in light of their extensive accomplishments and experience and rates awarded to other attorneys in this jurisdiction with whom they favorably compare. *See Valdez*, 2022 WL 1092182, at *3 (awarding the requested $575 per hour to Ms. Menninger, who has been practicing civil rights litigation (but not exclusively) since 2008); Ex. 5 at 7.

19. Mr. Owens has been practicing for 12 years (including valuable clerkships), and he has obtained more than 10 settlements or verdicts in the seven- or eight-figure range in civil rights cases. Dkt. 380-5 at 3-5. He has successfully argued several civil rights appeals. Like myself, Mr. Owens was full-time practicing attorney at Loevy & Loevy during his time as a Lecturer in Law at the Exoneration Project. Mr. Owens has also represented clients in post-conviction criminal matters who have been exonerated through his work with the Exoneration Project, including a client who served more than 22 years wrongfully convicted of murder just this month. Mr. Owens has specific expertise in *Monell* claims, particularly in excessive force cases. For example, in the Southern District of Texas, Mr. Owens obtained the denial of a motion for summary judgment by the City of Houston in a police shooting case on behalf of Jordan Baker's family. *See Estate of Baker by & through Baker v. Castro*, 2018 WL 4762984, at *1 (S.D. Tex. Aug. 31, 2018), *report and recommendation adopted*, 2018 WL 4762958 (S.D. Tex. Oct. 2, 2018). This was a significant accomplishment not least because Texas is a difficult jurisdiction in which to litigate civil rights cases. Mr. Owens has also given CLEs on litigating *Monell* claims in 2020 and in a CLE sponsored by the Washington State Bar Association in Washington State in 2021.

20. Mr. Art has been practicing for 13 years (including a federal appellate clerkship for Judge Diane Wood of the Seventh Circuit). He has obtained 15 settlement or verdicts in the

seven- or eight-figure range in civil rights cases. Dkt. 380-6 at 2-3. Among those are a $20 million settlement for Juan Rivera, the largest pretrial wrongful conviction settlement in the United States at the time, and multiple trial verdicts exceeding $10 million. Mr. Art has specific expertise in post-trial motions, fee petitions, and appeals, which is why I consulted him for advice on those issues in this case. Specifically, Mr. Art has successfully defended numerous verdicts returned in favor of civil rights plaintiffs through post-trial motions, fee litigation, and appeal, including in *Fields v. City of Chicago*, 981 F.3d 534 (7th Cir. 2020) ($22 million plus verdict), *Burgess v. Baltimore Police Department*, 997 F.3d 541 (4th Cir. 2021) ($15 million verdict), *Rivera v. Guevara*, No. 12-cv-4428 (N.D. Ill.) ($17 million plus verdict). Like Mr. Owens, Mr. Art has represented clients in post-conviction criminal proceedings, including multiple victims of notorious Chicago Police detective Reynaldo Guevara, which led to the first mass judicial exoneration of wrongful murder convictions in U.S. history earlier this month.

21. Mr. Rogers' proposed rates for David Owens ($300 per hour) and Steven Art ($325 per hour) are unsupported in light of their accomplishments compared to other attorneys in this jurisdiction, or even in light of Mr. Rogers' rubric that judges are the marketplace. (Mr. Owens was last awarded $330 per hour by a federal judge in Missouri in 2017, five years ago. Dkt. 380-5 at 7. Mr. Art was last awarded $375 per hour by a federal judge in Chicago in 2018, four years ago. Dkt. 380-6 at 5.) Mr. Rogers has provided no explanation for *lowering* the rate that Mr. Owens and Mr. Art were awarded by judges several years ago.

22. Makeba Rutahindurwa's proposed rate of $375 an hour is entirely reasonable given: (1) the ability she demonstrated during this case (at trial, in her written work, and during discovery), which was belied by her years of experience; (2) the $375-per-hour-rate awarded to the associates in *Valdez* by Judge Martinez. Ms. Rutahindurwa, like myself and the other Loevy

8

& Loevy attorneys, graduated from a top law school (Stanford) and has valuable clerkship experience; and (3) the $375-per-hour rate awarded to Loevy & Loevy associate and 2018 graduate Merrick Wayne in a FOIA case in Illinois (*Calloway*). Dkt. 380-13 at 3.[9] Ms. Rutahindurwa provided important insights and perspective that contributed significantly to the result we obtained for our clients.

23. Likewise, Katie Roche's proposed rate of $375 per hour is reasonable in light of similar rates given to other associates with similar experience in this jurisdiction and the $375-per-hour rate given by judges to other Loevy & Loevy associates. *Stroup*, 2018 WL 10613861, at *8; Ex. 3 at 5, 7; Dkt. 380-13 at 3.

24. The proposed rate of $175 per hour for Brian Swift, who was a paralegal for 9 years, is also reasonable. It is less than the $200-per-hour rate given in *Calloway* to Loevy & Loevy paralegals. Dkt. 380-13 at 3. It is the same rate as that given to the paralegals in *Stroup*. *Stroup*, 2018 WL 10613861, at *8. And, it is in the same range ($100-200 per hour) as what was given to the paralegals in *Valdez*. 2022 WL 1092182, at *3. Mr. Rogers' only basis for disagreeing with this proposed rate is the 2017 CBA Survey. Dkt. 413-2 at 10.

### Exercise of Reasonable Billing Judgment: Importance of Conferrals and Consulting Other Experienced Attorneys

25. Fitouri Plaintiffs' fee petition reflects time billed *after* the exercise of professional billing judgment. This case was very leanly staffed by Loevy & Loevy. We had one partner (me),

---

[9] Mr. Rogers offers little to distinguish the rates given in the *Calloway* FOIA case to Loevy & Loevy attorneys. Dkt. 413-2 at 13. Cases brought under the Illinois FOIA statute are simpler to litigate than Section 1983 cases. And, the factors that Illinois courts consider in awarding attorneys' fees in FOIA cases are similar to the factors federal courts consider in Section 1983 cases. *See* Dkt. 380-13 at 1. The rate awarded to Matthew Topic, a 2006 graduate, was $525 per hour ($125 more than what Mr. Rogers proposes for me), and the rate awarded to Joshua Burday, a 2015 graduate, was $450 per hour (more than the $300 and $325 per hour rate Mr. Rogers proposes for David Owens and Steven Art). *Calloway* provides additional support for the rates requested here.

one associate (Ms. Rutahindurwa), and one paralegal (Mr. Swift).[10] Because it was so leanly staffed, I occasionally consulted with other experienced attorneys at my firm (namely, Mr. Loevy, Mr. Owens, and Mr. Art) at a few important junctures (primarily claim construction, summary judgment, trial, and post-trial motions). We are only seeking 8.5 hours for Mr. Loevy, 3.25 hours for Mr. Owens, and 2.5 hours for Mr. Art, but this is time that was important to the result in this case.

26. Defendants and Mr. Rogers object to time entries relating to more than one timekeeper being present and billing for a meeting or conference. I have litigated dozens of complex cases that require the assistance of more than one lawyer and one support person. Brief, targeted team meetings are a common and effective method of communicating information. The identified meetings were necessary, normal, and it is customary for all attendees to bill for this time. *See* Ex. 6 (listing all conferrals, meetings, and phone calls and providing justification for each of them); Ex. 7 (responding to Defendants' specifically-identified objections). Complex cases necessarily involve more than one lawyer or paralegal and it is more efficient to meet to receive and give input on work in progress and work to be done. In this case, the meetings were not excessive, not long, and normally involved only one other person.

27. It is also normal, customary, and prudent to have more than one lawyer meet with the client to prepare the case and prepare the client. Ms. Rutahindurwa and I prepared some of our clients for their depositions in a meeting together, and we prepared some of them for their trial testimony in a meeting together. (There were also times—as reflected on our timesheets—that we did such preparation on our own, after having coordinated our thoughts and strategy.) Again, this is an efficient way to obtain and provide information and does not result in redundant or duplicative billing. The number, length, and purpose of the meetings were reasonable, necessary,

---

[10] As discussed below, we utilized associate Katie Roche only for a limited purpose in this case.

and customary for the Denver legal community.

28. At various times, I gave Ms. Rutahindurwa guidance on tasks that needed to be completed. She also provided me with valuable insights on strategy and ideas during the case. Likewise, I sought the advice and counsel of partner David Owens a few times during the case (such as summary judgment and trial), especially because he has specific expertise in litigating *Monell* claims. I sought founding partner Jon Loevy's expertise at all the important junctures in this case, because of his unparalleled experience in winning civil rights cases. I sought partner Steven Art's expertise mostly after the trial, based on his undisputed expertise in appeals, post-trial motions, and fee petitions.

29. Defendants only manage to identify a few "examples" of meetings to which they object and propose a 2.5% across-the-board reduction for every inter- and intraoffice communication. There is no factual basis for an across-the-board percentage reduction. In Exhibit 6, I have done the work that Defendants should have done and provided justifications for each entry.

30. As Defendants would have it, the Fitouri Plaintiffs and Epps Plaintiffs' counsel should not be compensated for *any* of their time spent in any meetings, phone calls or deposition or trial preparation. This is factually and legally unsupportable. Because this was a consolidated case, the co-plaintiffs had to work together. We had a limited amount of discovery allotted to us, and we had to coordinate our efforts. We had to propose experts together. We had to prepare for trial together. We split up the witnesses at the trial, and we split up trial preparation tasks. None of this could have been done without coordination. And, as discussed below, the amount of time for which the Fitouri Plaintiffs have billed for this inter-office communication was *miniscule* compared to what we excluded from the petition.

11

**Exercise of Reasonable Billing Judgment: Exclusion of Significant Amounts of Time**

31. I opted not to bill any law clerk or summer associate time spent in this matter (such as hours spent assisting in the preparation for a deposition of the defense expert). The petition entirely excludes time for several timekeepers, specifically partners Tara Thompson, Dan Twetten, Scott Rauscher, Michael Kanovitz, and Arthur Loevy.[11] The petition also does not reflect all the time that the remaining timekeepers spent on the case, such as all the hours of intra-office conferences, emails and phone calls involved in litigating this matter (as detailed further below).

32. Defendants make no mention of the fact that we excluded from our petition significant amounts of time on claims that have not yet been tried or that were dismissed at summary judgment (such as against the Jefferson County Defendants) or settled. We excluded over 830 hours spent solely on claims against the Aurora Defendants and the Curfew Arrest Class claims and over 120 hours spent solely on claims that were settled or dismissed. This totals over 950 hours of time (spent up to June 1, 2022, the date the petition was filed) excluded from this fee petition.

33. We also excluded over 70 hours from paralegal Brian Swift's timesheet involving downloading of videos from Denver and Aurora. *See* Dkt. 380-9 (Swift Timesheet) at 16 (note at the end). Because Denver and Aurora's counsel insisted on producing the videos through sharefile links rather than external hard drives, it took an extraordinary amount of time to download the videos. Despite this time being incurred because of Defendants' maneuvering over Plaintiffs' objections, we still excluded most of the time it took to obtain this discovery.

---

[11] Most of Scott Rauscher's and Tara Thompson's time was spent strategizing with me on the Curfew Arrest Class claims, which have not yet been tried. Thus, their time was excluded from this petition. Both Mr. Rauscher and Ms. Thompson have significant experience litigating and trying civil rights class action cases. Arthur Loevy, Dan Twetten, and Michael Kanovitz spent a small number of hours on this case, and I excluded their time from the petition.

34. Moreover, a further review of my emails and files shows that hundreds of additional hours were excluded from the petition, on top of the over 1,020 hours described above.

35. For example, just focusing on the enormous amount of time I spent conferring over email: I sent over 500 emails to defense counsel, over 2,000 emails to Epps plaintiffs' counsel, over 1,800 emails with "Epps" in the subject line, and over 2,200 emails with "Fitouri" in the subject line. Some of these emails overlap, but a conservative estimate is that I sent over 2,200 emails in this case. Likewise, I received over 1,000 emails from Epps plaintiffs' attorneys, and I likely exchanged over 1,000 emails with Ms. Rutahindurwa and Mr. Swift in this case.

36. We billed for only a tiny fraction of these email communications. For example, on my timesheet, there are 42 entries concerning internal email communications with my team or Epps plaintiffs' counsel; 18 entries regarding emailing opposing counsel; and 3 entries about emailing clients. Ms. Rutahindurwa's timesheet contains only <u>3</u> entries about emailing me or Epps plaintiffs' counsel. Dkts. 380-2, 380-3.

37. Similarly, I billed for fewer than 80 entries about calls or meetings with my team or Epps plaintiffs' counsel (excluding time spent strategizing during the 3-week trial). This is a small number, given that my timesheet contains 1,022 entries spanning two years, and that I conferred extensively with my team and Epps plaintiffs' counsel in order to coordinate our efforts and strategy. For instance, during discovery, I spoke to Arnold & Porter attorney Patrick Reidy and/or Ms. Rutahindurwa on the phone on a weekly basis (probably 5-8 times a month) to confer about strategy. These were generally short phone calls. I excluded most of them from our fee petition. I also met with Mr. Swift multiple times a week about various tasks to be completed, including guiding him on his video review, which was undisputedly essential to the case. These in-person meetings were also excluded, with very few exceptions.

38. Instead, the fee petition seeks only compensation for the most important or lengthy meetings, conferrals, and emails. Although Defendants have failed to identify the specific intra-office communications to which they object, Plaintiffs have identified all conferrals, meetings, and other such communications in Exhibit 6 and provided justifications. In sum, there is no basis for Defendants' proposed 5% across-the-board reduction for lack of exercise of billing judgment.

**Exercise of Reasonable Billing Judgment: Allegedly Duplicative or Excessive Time**

39. Defendants and Mr. Rogers assert that Ms. Rutahindurwa spent 49.75 hours that were duplicative and unnecessary. Dkt. 413-2 at 16. First, the entries they identify total 48.75, not 49.75, hours. More important, none of the entries were duplicative or unnecessary. The attached Exhibit 7 provides responses for each of these entries.

40. Defendants and Mr. Rogers assert that the time we spent reviewing video was excessive and duplicative. Specifically, Mr. Rogers claims that Mr. Swift and Ms. Rutahindurwa reviewed the same video. Dkt. 413-2. This is incorrect.

41. The individuals who reviewed video were myself, Mr. Swift, Ms. Rutahindurwa, and associate Katie Roche. As the lead attorney, I gave each of them assignments on what video to review, what to look for and what kind of notes to take, and we divided it up. I assigned Ms. Roche the task of reviewing Denver BWC video for 5/29/2020. Generally, I reviewed the most important video.

42. Multiple people did not review the same video. That would have been silly, and it would have been impossible to do given how small our team was and the amount of information that we had to digest during discovery and in preparation for trial. Given how we were staffed, how much work we had to do, and how many *other* cases we had to work on at the same time, we

did not have the luxury of wasting time by duplicating tasks. I have been litigating civil rights cases on contingency for plaintiffs for 14 years. There is no room and no time to waste time in any of our cases, including this one. We have to be efficient, and we were.

43. There was over 1,000 hours of video produced in this case. We spent a total of 825.25 hours reviewing that video. I spent 74 hours reviewing video, Mr. Swift spent 590.75 hours reviewing video, Ms. Rutahindurwa spent 132 hours reviewing video, and Ms. Roche spent 28.5 hours reviewing video. Dkts. 380-2, 380-3, 380-7, 380-9. We spent less time reviewing video than there were hours of video. This was a reasonable and appropriate amount of time to spend reviewing video in this case. Defendants do not contest that the video evidence was crucial to the verdict.

44. Defendants are also mistaken about the other examples of allegedly excessive or duplicative time, most of which involve Ms. Rutahindurwa, a lower-billing-rate attorney: (1) 29.25 hours spent preparing a *Daubert* motion related to defense expert Steve Ijames; (2) 11.75 hours to prepare for and conduct the deposition of Keith Valentine; (3) 9.25 to prepare for and conduct the deposition of Jonathan Christian; (4) preparation of the opening statement; and (5) preparation of Jackie Parkins's testimony. Notably, Defendants' own expert does not opine that any of this was excessive or duplicative time. The time we spent on these tasks was reasonable, as discussed below:

    a. *Daubert* motion against Ijames: Defendants' calculations concerning the Ijames *Daubert* motion are incorrect. Some of the entries they cite pertain to motions *in limine*, not the *Ijames Daubert* motion. Ms. Rutahindurwa spent 22.5 hours researching and drafting the *Daubert* motion against Ijames, and I spent a little over 2.5 hours reviewing her motion and reviewing research conducted by a law student (whose time we

15

did not bill). Not only was this an entirely appropriate division of labor (lower-billing-rate associate drafting a motion and higher-billing-rate partner reviewing/revising that work), but it was a reasonable amount of time given that Ijames's report was an extremely dense *78-single-spaced pages*. Dkt. 244-1. A 13-page motion researched and written by a junior associate in 22.5 hours is entirely reasonable and not suggestive of waste of time.

      b.    <u>Valentine deposition</u>: Valentine's deposition lasted from 9:07 a.m. until 2:20 p.m. Dkt. 413-3. It was thus 5.25 hours long with 4.25 hours of on-the-record time. Ms. Rutahindurwa spent 5.25 hours attending and taking the deposition and 6.5 hours preparing for the deposition, including 15 minutes (0.25 hours) conferring with me about areas of questioning and strategy. Dkt. 380-3 at 9. *Id*. In preparation for the deposition, she had to review documents, training materials, and several BWC videos from Valentine and officers standing near him. Moreover, because Valentine's deposition was one of the earlier depositions, it took more time to prepare for that deposition than subsequent depositions. In addition, Ms. Rutahindurwa's questions during the deposition proved to be useful at trial. The number of pages that her questions took up in the transcript shed no light on the relative importance of her questions, which were relevant to the *Monell* claim. In sum, the 11.75 hours that Ms. Rutahindurwa spent preparing for and taking Valentine's deposition was reasonable.[12]

      c.    <u>Christian deposition</u>: Officer Christian's deposition lasted from 12:33 to 4:06 p.m., or about 3.5 hours total (with 2 hours 58 minutes of on-the-record time). Dkt. 413-4. Defendants argue that 9.25 hours to prepare and take the deposition was excessive.

---

[12] This is comparable to the amount of time Mr. Reidy spent preparing for Valentine's deposition. Dkt. 378-2 at 53 (5/10/21 and 5/11/21 entries).

But this was reasonable given the amount of material to review, including video. And again, questions that Ms. Rutahindurwa asked of Officer Christian at the deposition were useful at trial. The number of pages that her questions took up in Christian's deposition has no bearing on the relative importance of her questions.[13]

      d.      <u>Opening statement preparation:</u> Defendants are wrong about the amount of time preparation of opening statement took. It took 19 total hours (4+12+2 = 18 hours for Ms. Rutahindurwa to prepare it and 1.0 hours for me to review it and provide feedback), not 23.25. Dkt. 380-2 at 39 (3/6/22 entry); Dkt. 380-3 at 12 (3/5/22, 3/6/22, 3/7/22 entries). Given that we represented 5 plaintiffs at a 3-week trial with multiple issues concerning municipal liability, this was a reasonable amount of time to spend on preparing opening statement and the labor-intensive Powerpoint presentation that went with it.

      e.      <u>Jackie Parkins's testimony</u>: Defendants miscalculate again concerning Jackie Parkins's testimony. First, her testimony at trial lasted from 9:11 to 10:13 a.m. Dkt. 352 at 1661, 1703. The direct examination itself may have been 41 minutes, but no (good) lawyer prepares a client for only direct examination with no preparation for cross or redirect. In any event, the length of an examination at trial is a poor proxy for how much time it would reasonably take to prepare a client for that testimony.[14] Second, Ms. Rutahindurwa and I spent a total of 16.5 hours preparing Ms. Parkins for her testimony. Dkt. 380-2 at 40 (3/16/22 entry); Dkt. 380-3 at 12. This included a group meeting with Mr. Parkins, Plaintiff Sara Fitouri, and Plaintiff Joe Deras (Dkt. 380-3 at 12, 2/18/22

---

[13] Andreas Moffett, Epps plaintiffs' counsel who questioned Christian first at the deposition, spent 25.3 hours for preparing and taking the deposition. Dkt. 378-2 at 45 (6/2/21, 6/3/21, and 6/4/21 entries).
[14] Also, given that Ms. Parkins was one of the later plaintiffs to testify at trial, and she testified after Ms. Fitouri and Mr. Deras, who experienced similar events, her examination was shortened from its original length.

entry), which was an efficient use of time, and it included drafting the outline of the examination and selection of what exhibits would be used during the examination. This was a very short amount of time to spend preparing a client for trial testimony.

45.     In sum, there is no factual basis for Defendants' request of a 2.5% across-the-board reduction for duplicative or excessive time.

### Exercise of Reasonable Billing Judgment: Quarter-Hour Billing

46.     Defendants and Mr. Rogers object to Loevy & Loevy's use of quarter-hour billing because "billing fifteen minutes for any task, regardless of how long the task actually takes, inevitably increases the amount of a bill." Dkt. 413-2 at 14.

47.     Defendants are mistaken about our billing practices. We do not bill for a minimum of fifteen minutes even if the task took only a few minutes. We do not simply round up to the nearest quarter hour. Instead, we round up *or down* to the nearest quarter hour. For example, if a task took 55 minutes, we billed for one hour. If a task took 50 minutes, we billed for 0.75 hour. And if a task took less than 10 minutes, the nearest quarter hour is zero, so we do not bill for it at all. This means that thousands of emails and phone calls sent/received in this case by myself and other timekeepers were not included in the petition.

48.     Because we rounded down as much as we rounded up to the nearest quarter hour, Defendants' assumption that Loevy & Loevy's quarter-hour billing increments overstates the amount of time spent on tasks across the board is wrong. Loevy & Loevy's use of quarter-hour-billing has been approved by federal judges in other fee petitions. There is no factual basis for an across-the-board 15% cut of all the hours requested.

### Reasonableness of the Timesheets Submitted

49.     Mr. Rogers objects to the fact that we submitted timesheets by timekeeper as

opposed to monthly billing statements and argues that this warrants a "wholesale 5% reduction" of all our time entries. Dkt. 413-2 at 15. There is no basis for this. Mr. Rogers' opinion is inconsistent with the Local Rules and Tenth Circuit law. The Local Rules require that a motion for attorney fees be supported by affidavit, which includes "(b) for each person for whom fees are claimed: (1) a summary of relevant qualifications and experience; and (2) a detailed description of the services rendered, the amount of time spent, the hourly rate charged, and the total amount claimed." D.Colo.LR 54.3. Our timesheets and declarations comply with Local Rule 54.3 and Tenth Circuit law. There is nothing unusual about how we submitted our time records. This how Loevy & Loevy normally submits their time records for fee petitions (which have been routinely approved by federal judges), and it is how plaintiffs' attorneys normally submit their time records in fee-shifting cases in this jurisdiction. *See, e.g.*, Ex. 8 (Lane and Killmer timesheets from *Stroup*); Ex. 5 (timesheets submitted in *Valdez*). The fact that Mr. Rogers has never seen it done this way shows that he is not familiar with how fee petitions are done in this district.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on August 30, 2022

Elizabeth Wang