IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge R. Brooke Jackson

Civil Action No. 1:20-cv-01878-RBJ
*Consolidated with 1:20-cv-01922-RBJ-MEH*

ELISABETH EPPS,
ASHLEE WEDGEWORTH,
AMANDA BLASINGAME,
MAYA ROTHLEIN,
ZACH PACKARD,
HOLLIS LYMAN,
CIDNEY FISK,
STANFORD SMITH,
SARA FITOURI,
JACQUELYN PARKINS,
KELSEY TAYLOR,
YOUSSEF AMGHAR,
JOE DERAS,
JOHNATHAEN DURAN,
MICHAEL ACKER and
CLAIRE SANNIER,

      Plaintiffs,

v.

CITY AND COUNTY OF DENVER,
DANIEL FELKINS,
DAVID ABEYTA,
CITY OF AURORA,
CORY BUDAJ,
BOARD OF COUNTY COMMISIONERS FOR JEFFERSON COUNTY, COLORADO,
JONATHAN CHRISTIAN,
KEITH VALENTINE,
DAVID MCNAMEE,
PATRICIO SERRANT,
MATTHEW BRUKBACHER,
J. LNU,
JOHN AND JANE DOES 1-100, and
JOHN AND JANE BOES 1-50,

      Defendants.

## ORDER ON THE MOTIONS FOR JUDGMENT AS A MATTER OF LAW, NEW TRIAL, OR REMITTITUR AS TO DEFENDANTS DENVER AND JONATHAN CHRISTIAN

This matter is before the Court on Denver and Jonathan Christian's motions for judgment as a matter of law, new trial, and remittitur (ECF Nos. 373, 374). For the reasons discussed below, Denver's motion is DENIED. Mr. Christian's motion is GRANTED IN PART and DENIED IN PART.

## I.  BACKGROUND

This case is a consolidation of claims arising from police-protestor interactions during demonstrations following George Floyd's murder. It was tried to a jury from March 7 through March 25, 2022. The jury returned a verdict in favor of the plaintiffs on almost every claim. The jury found Denver liable for violating Ms. Wedgeworth's First Amendment rights and awarded her $750,000 in compensatory damages. ECF No. 343 at 6. The jury found Denver liable for violating all the other plaintiffs' First and Fourth Amendment rights. *See* ECF No. 343. It awarded each of these plaintiffs, other than Mr. Packard, $1 million in compensatory damages. *Id*. It awarded Mr. Packard $3 million in compensatory damages. *Id*. at 3. Mr. Packard and Mr. Deras suffered injuries because of the actions of Aurora officers, who came to aid Denver's protest response as mutual aid officers. The jury found that Denver was liable for the actions of these mutual aid officers. *Id*. at 3, 5. Ms. Epps brought a claim against individual defendant Jonathan Christian, in addition to her claims against Denver. The jury found that Mr. Christian had violated Ms. Epps Fourth Amendment rights and awarded the $1 million in compensatory damages against Denver and Mr. Christian. *Id*. at 8. In addition, the jury awarded Ms. Epps $250,000 in punitive damages against Mr. Christian.

## II.    JUDGMENT AS A MATTER OF LAW OR NEW TRIAL

### A. <u>Standard of Review</u>

1. <u>Judgment as a Matter of Law (JMOL)</u>

"A party is entitled to JMOL only if the court concludes that all of the evidence in the record reveals no legally sufficient evidentiary basis for a claim under the controlling law." *ClearOne Commc'ns, Inc. v. Bowers*, 643 F.3d 735, 771 (10th Cir. 2011) (brackets and ellipsis omitted).  All reasonable inferences should be drawn in favor of the nonmoving party.  *See id.* at 772.  Judgment as a matter of law is not warranted unless all evidence points in one direction, and the evidence is not susceptible to any reasonable inferences supporting the nonmoving party's position.  *Id.*  "The question is not whether there is literally no evidence supporting the [nonmoving] party . . . but whether there is evidence upon which the jury could properly find [for that party]."  *Century 21 Real Est. Corp. v. Meraj Int'l Inv. Corp.*, 315 F.3d 1271, 1278 (10th Cir. 2003).  At bottom, the question in determining whether a motion for judgment as a matter of law should be granted is "whether there is any [evidence] upon which a jury could properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986).

Federal Rule of Civil Procedure 50(a)(2) requires a party to make any motion challenging the sufficiency of the evidence prior to the case being submitted to the jury.  *See Mountain Dudes v. Split Rock Holdings, Inc.*, 946 F.3d 1122, 1130–31 (10th Cir. 2019).  The moving party must "specify the judgment sought and the law and the facts on which the moving party is entitled to the judgment."  Fed. R. Civ. P. 50(a)(2).  A party can renew its motion for judgment as a matter of law under Rule 50(b) after the jury returns a verdict.  Fed. R. Civ. P. 50(b).  A Rule 50(b) movant, however, can only reassert the same grounds for judgment as a matter of law

that he first asserted in his pre-deliberation Rule 50(a) motion.  *Mountain Dudes*, 946 F.3d at 1131.

    2.  <u>New Trial</u>

Under Federal Rule of Civil Procedure 59, a court may grant a new trial after a jury trial, "for any reason for which a new trial has heretofore been granted in an action at law in federal court."  A new trial may be granted if prejudicial error has occurred or if the verdict is against the weight of the evidence.  *Anderson v. Phillips Petroleum Co.*, 861 F.2d 631, 637 (10th Cir.1988).  A new trial may also be granted if damages are excessive.  See *Montgomery Ward & Co. v. Duncan*, 311 U.S. 243, 251 (1940).  "A motion for new trial on the grounds that the jury verdict is against the weight of the evidence normally involves a review of the facts presented at trial, and thus involves the discretion of the court."  *Black v. Hieb's Enter., Inc.*, 805 F.2d 360, 363 (10th Cir.1986).  The Court must grant a new trial if it determines that excessiveness in the amount of the award gives rise to the inescapable inference that it resulted from passion or prejudice on the part of the jury, since the prejudice may have infected the jury's liability determination as well.  *See Malandris v. Merrill Lynch*, 703 F.2d 1152, 1168 (10th Cir.1981).

**B.  <u>Analysis of Denver's Motion for Judgment as a Matter of Law</u>**

Denver seeks judgment as a matter of law or a new trial because it believes the jury's verdict was not supported by the evidence in this case.  As an initial matter, plaintiffs pursued three theories of liability against Denver: (1) policy, custom, or practice, (2) failure to train, and (3) ratification.  Any of these theories on their own would be sufficient to support liability against Denver, and the jury found Denver liable for each plaintiff's injuries under all three theories.

1.      Denver is Not Entitled to a Judgment as a Matter of Law or a New Trial on Plaintiffs'
        Claims Under an Official Policy, Practice, or Custom Theory

First, Denver argues that there was no evidence of a direct causal link between any

municipal policy and plaintiffs' injuries.  It argues that "a municipal policy must be the moving

force behind the constitutional violation."  ECF No. 373 at 2 (quoting *Bd. of Cnty. Comm'rs of*

*Bryan Cty., Okla. v. Brown,* 520 U.S. 397 (1997)).  It says there was no evidence that, "[f]or

example, with respect to Mr. Christian's use of PepperBall in the direction of Ms. Epps . . . Mr.

Christian specifically acted pursuant to an unconstitutional formal policy or an informal custom,

he was a final policymaker for Denver, any final policymaker specifically ratified Mr.

Christian's actions, or there was a specific known deficiency in Denver's training concerning

PepperBall use."  *Id*.  Denver argues that the same logic applies to all plaintiffs; there was no

evidence that a municipal policy was the moving force behind constitutional violations.

Plaintiffs respond that significant evidence was presented on causation.

I agree with plaintiffs.  There was evidence presented that the officers who violated

plaintiffs' constitutional rights acted pursuant to an unconstitutional policy.  The evidence

supported a conclusion that Denver Police Department (DPD) policy gave command officers

virtually limitless discretion to authorize officers to use less-lethal weapons in protest situations.[1]

ECF No. 350 at 1202–04.  In addition to the mountain of video evidence from which a

reasonable jury could have inferred this policy's existence, Commander Phelan testified that he

did not see any police actions during the protests that did not fall within DPD policy.  *See* ECF

No. 350 at 44.  There was also evidence that the use of less-lethal weapons resulted in harm to

protesters, including plaintiffs.  *See e.g.,* ECF No. 387 at 90–91 (Sannier), 153–55 (Smith), 195

---

[1] This order is based on my recollections of the testimony and evidence presented at trial, as well as a
review of the certified transcript.

(Packard); ECF No. 389 at 156 (Fitouri); ECF No. 390 at 10–11 (Rothlein), 62–63 (Blasingame); ECF No. 349 at 10–11 (Deras); ECF No. 351 at 160–62 (Taylor), 223 (Wedgeworth); ECF No. 352 at 1666 (Parkins), 191–93 (Epps); ECF No. 354 at 74 (Lyman).

As I said in ruling on the initial motion for judgment as a matter of law made at the close of plaintiffs' evidence, on the issue of causation, "the overreaction of the cops, the excessive application of PepperBalls and tear gas and sometimes some of the other projectiles . . . if you construe in favor of the plaintiff, which I have to do, was what led to the exposure of the plaintiffs to PepperBalls and tear gas, notwithstanding their peaceful protesting." ECF No. 344 at 31–32. As in the Rule 50(a) order, I must construe everything in favor of the plaintiffs in this order. A reasonable jury could find, and this jury did find, that Denver caused plaintiffs' specific injuries. As the jury's finding on causation was supported by evidence, Denver's motion for judgment as a matter of law or a new trial is denied on the issue of causation.

Second, Denver complains that plaintiffs failed to specify "precisely what formal policy of Denver violated any of their constitutional rights" and how such a formal policy violated their rights. ECF No. 373 at 3. Plaintiffs respond that evidence was presented regarding "Denver's official policies" of not requiring officers to activate body-worn cameras (BWCs), not requiring officers to timely complete use of force reports for protests, allowing "unlimited discretion to officers to use less lethal weapons as they saw fit," and allowing the use of 12-guage shotguns, flashbangs, and other explosives, and kettling. ECF No. 392 at 2–4.

Denver insists in its reply that plaintiffs have "failed to respond" to its argument that plaintiffs never specified any formal Denver policy violative of their constitutional rights. ECF No. 406 at 2. I disagree. Plaintiffs, in their presentation of evidence, specified several policies that caused violations of their First and Fourth Amendment rights and reiterated those policies in

their response to the instant motion.  One policy emphasized by plaintiffs was Denver's policy of permitting mutual aid partners to proceed under their own use-of-force policies, rather than requiring that they follow Denver's use-of-force policy.  *See* ECF No. 350 at 13–15.  Another was Denver's policy to permit use of less-lethal weapons against protesters on a discretionary basis.  *See id*. at 44.  Plaintiffs made sufficiently specific articulations of the Denver policies to which they objected.  I outlined above the evidence that could lead a reasonable juror to conclude that these policies caused plaintiffs' injuries.  This argument does not warrant judgment as a matter of law or a new trial.

Third, Denver argues that plaintiffs could not have alleged a practice or custom because they only introduced evidence from the first six days of the George Floyd protests.  ECF No. 373 at 3–4.  It cites *Carney v. City and Cty. of Denver*, 534 F.3d 1269, 1274 (10th Cir. 2008) for the proposition that "[i]n order to establish a custom, the actions of the municipal employees must be 'continuing, persistent and widespread."  *Id*. (internal quotations omitted).  Denver concludes that no practice or custom could have been established over such a short period.  Plaintiffs respond that they "did *not* need to show that there was a history of problems relating to use of force reporting, BWC camera use at protests, or any of the official policies" because as an official policy, practice, or custom requires either a showing of deliberate action by policymakers or that the practice or custom is a "standard operating procedure."  ECF No. 392 at 3–4.  Denver asserted in its reply that plaintiffs did not respond to this argument.

Once again, I disagree with Denver.  I need not reach Denver's arguments about its customs or practices because a reasonable juror could have found that certain *policies* of Denver caused plaintiffs' injuries.  As plaintiffs would be entitled to recover if they showed a policy, practice, *or* custom of Denver's caused their injuries, it does not matter whether the six-day

period at issue would be sufficient to establish a custom or practice—there was sufficient evidence to support that Denver had a policy that caused the constitutional violations, which is enough to support the jury's verdict.  The evidence about Denver's policies would, however, also be powerful evidence of identical practices or customs.

Fourth, Denver argues that there is no evidence to support liability against it on plaintiffs' "policy, practice, or custom" theory because the final policymaker relied on by plaintiffs, Commander Phelan, has not been shown to have "personally participated in the specific events involving each plaintiff."  ECF No. 373 at 4.  Denver posits that Commander Phelan's orders as a final policymaker cannot be causally linked to the injuries suffered by plaintiffs.  Plaintiffs respond that because Commander Phelan authorized use of chemical munitions each day, authorized the use of less-lethal weapons to move protestors and ordered commanders to use less-lethal weapons against protestors, each of these decisions directly resulted in injuries to the plaintiffs.  ECF No. 392 at 4.  Plaintiffs also identify several incidents where plaintiffs were injured, and Commander Phelan authorized use of force.  *Id.*

Denver claims that the even if Commander Phelan was a final policymaker for the specific incidents cited, there remains no evidence of his participation as the final policymaker in the remaining incidents.  I must reject this argument because most of the policies identified by plaintiffs were orders of Commander Phelan.  A reasonable juror could find a causal link between the actions of Commander Phelan and the injuries suffered by plaintiffs on the evidence presented at trial.  Every plaintiff was injured by the inhalation of CS gas (2-chlorobenzylidene malononitrile, commonly called tear gas) from less lethal weaponry.  *See* ECF No. 387 at 90–91 (Sannier), 153–55 (Smith), 159-60 (Packard); ECF No. 389 at 156 (Fitouri); ECF No. 390 at 10–11 (Rothlein), 62–63 (Blasingame); ECF No. 349 at 10–11 (Deras); ECF No. 351 at 160–62

(Taylor), 223 (Wedgeworth); ECF No. 352 at 1666 (Parkins), 191–93 (Epps); ECF No. 354 at 74 (Lyman).  Commander Phelan authorized use of chemical munitions at each daily supervisor briefing during the six-day period at issue.  ECF No. 350 at 21.

The jury was instructed that "[o]fficial policy for Denver includes any actions Commander Phelan took or instructed others to take during the protests."  ECF No. 340 at 20.  In light of those two facts and that instruction, there is sufficient evidence to conclude that Commander Phelan's orders caused plaintiffs' injuries.  But for his authorization of the use of CS gas, plaintiffs would not have been injured by the inhalation and interaction with CS gas. There is additional evidence linking Commander Phelan's actions to specific injuries sustained by plaintiffs, but the authorization of chemical munitions alone is sufficient for a reasonable juror to conclude that some of plaintiffs' injuries were caused by Commander Phelan's actions as policies of Denver.

Denver also argues that there is insufficient evidence to support the jury's finding of liability under the "ratification" and "failure to train" theories.  However, as I found above that there was sufficient evidence on the "policy, practice, or custom" theory to support the jury's finding of liability, I need not determine whether there was sufficient evidence to support these other theories.  For judgment as a matter of law to be warranted, Denver would have had to show that *no* theory of liability supported the jury's verdict.  As it has not done so, I will not address the remaining theories.

2.  <u>Denver is Not Entitled a Judgment as a Matter of Law or a New Trial on the Mutual Aid Officer Issue</u>

Denver next argues that "there is no legal support for the proposition one municipality can be held liable under a municipal liability theory for the actions of an officer of another municipality pursuant to 42 U.S.C. § 1983."  ECF No. 373 at 6.  It also argues that even if this

were a viable legal theory, it was not supported by sufficient evidence. *Id.* Plaintiffs respond

that there was "extensive evidence" to support the jury's finding on this point, including

evidence of Denver's policy to "allow mutual aid agencies to use their own policies and

weapons," evidence that the mutual aid agencies "operated under Phelan's direction," and

evidence that a DPD supervisor was embedded with each mutual aid unit and "provided direction

on how to deploy weapons through communications with the Command Post." ECF No. 392 at

7.

   This issue was hashed out at length during the jury instruction conference. ECF No. 357

at 222–233. At that time, the Court and the parties discussed the best way to ensure that the jury

would understand that they could only hold Denver liable for acts committed by officers from

other jurisdictions if they found that those mutual aid officers were acting pursuant to a policy,

practice, or custom of *Denver*. There is a great deal of law supporting the proposition that a

municipality can be liable for officers' actions that violate citizens' rights committed pursuant to

an official policy, practice, or custom of the municipality. *See e.g., City of Canton, Ohio v.

Harris*, 489 U.S. 378, 385 (1989). That is exactly what the jury was instructed. *See* ECF No.

340 at 24. Denver cannot escape liability for officers who acted pursuant to its policies simply

because those officers were not Denver officers—liability attaches because it was Denver's

policy that caused the injury, not based on whether offending officers were on Denver's payroll.

   Additionally, I find the evidence presented sufficient to support the jury's verdict that

Denver was liable for the injuries caused by mutual aid officers. Commander Phelan testified

that officers from mutual aid agencies were under his direction during the George Floyd protests.

ECF No. 350 at 12–13. He also testified that Denver's policy was to allow mutual aid officers to

follow the policies of their home jurisdictions and use weapons authorized for use in their home

jurisdictions. *Id*. at 13–14. Mr. Packard and Mr. Deras were hit with munitions from 12-guage shotguns shot by members of the Aurora police department. ECF No. 387 at 195. The DPD did not use these weapons. ECF No. 350 at 15. But for Denver's policy of permitting mutual aid agencies to follow their own use-of-force policies and use their own weapons, Mr. Packard and Mr. Deras could not have suffered the injuries that they did. This evidence supports the jury's finding that Denver's policy of permitting mutual aid partners to use their own less-lethal weapons caused at least some of the injuries inflicted on plaintiffs. Judgment as a matter of law is not warranted on this issue.

### 3.   Admission of Testimony of Nicholas Mitchell Does Not Warrant a New Trial

Mr. Mitchell was the independent monitor in Denver during the time of the protests. His office conducted a review of the actions of the DPD at the George Floyd protests and produced a report with its findings. Denver argues that Mr. Mitchell's testimony should have been inadmissible for two reasons. First, it argues that his testimony regarding the Office of Independent Monitor's (OIM) report was evidence of subsequent remedial measures and thus inadmissible under FRE 407. ECF No. 373 at 7. Second, it argues Mr. Mitchell's testimony was inadmissible because Mr. Mitchell had no personal knowledge of anything that occurred at the protests, and he was not endorsed as an expert witness. *Id*. at 7–8. Finally, they argue that any probative value of Mr. Mitchell's testimony was far outweighed by the prejudice to Denver. *Id*. at 8. Plaintiffs respond that because these evidentiary issues with Mr. Mitchell's testimony were not raised in Denver's Rule 50(a) motion, they cannot be raised in Denver's Rule 50(b) motion. ECF No. 392 at 7–8. Rather, plaintiffs argue, this alleged error can only be considered under the Rule 59(a), where the grant of a new trial is appropriate "only where an error that led to a verdict that is 'clearly, decidedly or overwhelmingly against the weight of the evidence.'" *Id*. at 8

(quoting *Elm Ridge Expl. Co., LLC v. Engle*, 721 F.3d 1199, 1216 (10th Cir. 2013)).  Denver did not respond to this argument in its reply and instead reiterates the argument it made in its original motion.  ECF No. 406 at 4.

I agree with plaintiffs that Denver did not raise this issue in its Rule 50(a) motion.  Even if I were to assume for this purpose that the admission of Mr. Mitchell's testimony was an error, to find that a new trial is warranted I would have to find that the admission of Mr. Mitchell's testimony led to a verdict decidedly against the evidence.  *See Anderson*, 861 F.2d at 637.  I cannot make such a finding.  There was substantial evidence supporting the verdict, including the testimony of plaintiffs, plaintiffs' expert witnesses, Commander Phelan, and numerous videos and pictures.  As I discussed at length above, the jury's verdict was not contrary to the weight of the evidence.  A new trial is not warranted due to the admission of Mr. Mitchell's testimony (which in any event I believe to have been proper).

### 4.  Admission of OIM Memos Does Not Warrant a New Trial

The memos objected to in this section were created by the OIM in its process of reviewing DPD actions at the George Floyd protests.  Denver argues that the admission of the OIM memos was improper for three reasons.  First, it argues the OIM memos contain evidence of subsequent remedial measures, which are inadmissible under Federal Rule of Evidence 407.  ECF No. 373 at 8.  Second, it argues that the memos were hearsay that did not fall within any exception because the OIM did not have an agency relationship with Denver.  *Id*.  Third, it argues that any probative value of the OIM memos was substantially outweighed by the prejudice to Denver.  *Id*.  Plaintiffs respond first that Denver did not raise this issue in its Rule 50(a) motion, and so it can only proceed on a new trial motion with this issue and not under its renewed judgment as a matter of law motion, and second, that the officers interviewed by the

OIM were agents of Denver because they were employees acting within the scope of their responsibilities.  ECF No. 392 at 9.  Denver does not respond to plaintiffs' argument that this issue was not raised in its Rule 50(a) motion.

I agree with plaintiffs that Denver did not raise the admissibility of the OIM memos in its Rule 50(a) motion.  A new trial is not warranted on this issue.  Even assuming it was error to admit the OIM memos, I cannot find that their admission led to a verdict decidedly against the weight of the evidence.  Moreover, the Court went through these memos carefully and in detail before trial and redacted information that it found to be protected by a privilege, including the law enforcement privilege.

### 5.   Plaintiff Counsel's Misconduct Does not Warrant a New Trial

Next, Denver argues that Ms. Wang's (the Fitouri plaintiff counsel) reference to comments made by Derek Chauvin's lawyer during her examination of Officer Cunningham warrants a new trial.  ECF No. 373 at 9.  Plaintiffs respond that counsel's comment was not inappropriate, and even if it was, does not warrant a new trial.  Ms. Wang asked Officer Cunningham, "[w]ould you agree that there's a limitation to cameras, that the camera only sees what the camera sees?"  ECF No. 357 at 119.  After Officer Cunningham responded in the affirmative, Ms. Wang asked, "[a]re you aware that the person who said that led Derek Chauvin's defense in his trial for the murder of George Floyd?"  *Id*.  The defense objected and that objection was immediately sustained.  *Id*.

A judgment will not be disturbed for inappropriate remarks "unless it clearly appears that the challenged remarks influenced the verdict."  *Burke v. Regalado*, 935 F.3d 960, 1026 (10th Cir. 2019).  In deciding whether the jury was influenced by a remark, courts consider the extent of the remark, whether it can be cured through jury instruction, and whether the remark had a

prejudicial effect." *Racher v. Westlake Nursing Home Ltd. P'ship*, 871 F.3d 1152, 1169 (10th Cir. 2017).

This Court made extremely clear that Ms. Wang's reference to the Chauvin trial was inappropriate. ECF No. 357 at 119–21. The Court immediately sustained Denver's objection to that question. *Id*. at 119. However, the remark was not extensive. It consisted of one question. *Id*. And within minutes, the Court issued a curative jury instruction. It stated:

> Ladies and gentlemen, you probably could tell from the tone of my sustaining that last objection that I was not amused. There is no basis whatsoever for counsel to have asked a question that suggests a comparison of what happened in Denver to what happened in the Chauvin case in Minnesota. Please don't be prejudiced by that in any way. This case stands on its own evidence, its own facts, and I don't want any counsel to be suggesting something different than that to you.

*Id*. at 121.

Denver argues that counsel's statement was not remedied by instruction because counsel's question equated all police officers with Mr. Chauvin would inflame the passions of the jury in a way that could not be remedied. ECF No 373 at 10. However, jurors are presumed to follow instructions, and there is no reason to believe that any prejudice Denver suffered could not be cured by this instruction or that it was not cured by this instruction. *See CSX Transp., Inc. v. Hensley*, 556 U.S. 838, 341 (2009).

### C. Analysis of Mr. Christian's Motion for Judgment as a Matter of Law and for a New Trial

Mr. Christian first argues that there was not sufficient evidence to support the jury's verdict against Mr. Christian because all the evidence indicated that his action in shooting a PepperBall at Ms. Epps as she crossed the street was objectively reasonable. ECF No. 374 at 4. He therefore requests judgment as a matter of law or a new trial. Second, he argues that he was entitled to qualified immunity because Ms. Epps did not sufficiently define which of her constitutional rights were violated by Mr. Christian's actions. *Id*. at 4–5. Third, he argues that

he was entitled to judgment as a matter of law on the question of punitive damages because plaintiffs presented no evidence of the reckless or callous intent required to support a punitive damage award. *Id.* at 5. Fourth, Mr. Christian argues that he was prejudiced by the Court's denial of his motion for bifurcation and is entitled to a new trial because of that prejudice. *Id.* at 6. I will proceed through these arguments in turn.

1. Sufficiency of the Evidence

Mr. Christian first argues that judgment as a matter of law or a new trial is warranted because all the evidence indicated that his shooting a PepperBall at Ms. Epps was objectively reasonable. ECF No. 374 at 4. Ms. Epps responds that there was video of the incident showing that as Ms. Epps peacefully crossed the street, Mr. Christian, got on one knee and shot at her, and was subsequently told by another officer not to shoot at her anymore. ECF No. 391 at 2.

As Mr. Christian stated in his motion, "[w]hether Mr. Christian's use of force against Ms. Epps violated the Fourth Amendment turns on whether his actions were objectively reasonable and requires a totality of the circumstances analysis considering the severity of the crime at issue, whether Ms. Epps posed an immediate threat to the safety of the officers or others, and whether Ms. Epps was actively resisting or attempting to evade arrest by flight." ECF No. 374 at 4 (citing *Graham v. Connor,* 490 U.S. 386, 396 (1989); *Simpson v. Little,* 16 F.4th 1353, 1360-61 (10th Cir. 2021)). Based on those considerations, I find that the weight of the evidence is sufficient to support to jury's finding in favor of Ms. Epps. Ms. Epps' crime was not severe; she was, at most, jaywalking. There was no evidence that she posed an immediate threat to anyone other than the fact that she was crossing the street at night and not at the crosswalk. Mr. Christian argues that he "reasonably perceived Ms. Epps posed a danger to herself and the public in the traveling vehicles." ECF No. 374 at 4. However, whether Mr. Christian's perception of Ms. Epps as a threat was *reasonable* was a question of fact for the jury, not an issue that can be

determined by a conclusory statement by Mr. Christian in a motion.  Further, there was no evidence that she was fleeing or actively resisting the officers.  There is sufficient evidence to support the jury's conclusion that Mr. Christian's actions were not objectively reasonable— neither judgment as a matter of law nor a new trial is appropriate.

2.  Qualified Immunity

Second, Mr. Christian argues that he was entitled to qualified immunity because Ms. Epps did not sufficiently define which of her constitutional rights were violated by Mr. Christian's actions.  ECF No. 374 at 4–5.  He argues that the two cases most relied on in the Court's order on Mr. Christian's motion for summary judgment likewise did not identify the constitutional right violated with sufficient specificity.  *Id*. at 5.  Ms. Epps responds that the right violated was sufficiently defined in those cases, and that those cases are analogous to this case— those cases "involved Fourth Amendment claims for the use of force, including the use of PepperBalls, on peaceful protestors."  ECF No. 391 at 3.

I agree with plaintiffs for largely the same reasons I identified in my order on Denver's motion for summary judgment.  *See* ECF No. 304 at 15–16.  In *Buck v. City of Albuquerque*, 549 F.3d 1269, 1290 (10th Cir. 2008), plaintiffs engaging in peaceful protest were subjected to tear gas and PepperBall shots.  Ms. Epps behavior was even less likely than the plaintiffs in *Buck* to cause any danger from others.  While some plaintiffs in *Buck* remained in the street to obstruct traffic, Ms. Epps was in the process of crossing the street when Mr. Christian shot at her, with no indication that she was going to stop in the street or was attempting to obstruct traffic.  *See id*.; ECF No. 352 at 199.  The illegality of actions like Mr. Christian's have been specifically outlined in past Tenth Circuit cases, and he is not entitled to judgment as a matter of law or a new trial on this issue.

3.   Punitive Damages

Third, Mr. Christian argues that he was entitled to judgment as a matter of law on the question of punitive damages because plaintiffs presented no evidence of the reckless or callous intent required to support punitive damages.  *Id*. at 5.  Ms. Epps responds that there was evidence of Mr. Christian's reckless or callous intent: the videos that show him shooting at Ms. Epps and Ms. Epps' testimony recounting what she saw when Mr. Christian shot at her.  Mr. Christian argues that the only evidence regarding his intent is his own testimony.  ECF No. 374 at 5–6.  However, intent can be inferred from a variety of evidence, including video evidence and the testimony of others, both of which Ms. Epps presented.  I cannot agree with Mr. Christian that there is no evidence to support the jury's finding that he acted with a reckless or callous intent.

Mr. Christian also argues that there is no evidence that Mr. Christian "perceived" the risk that his actions would violate Ms. Epps' constitutional rights.  He cited *Eisenhour v. Cnty.*, 897 F.3d 1272, 1281 (10th Cir. 2018) for the proposition that "'reckless or callous indifference' requires that the defendant have acted 'in the face of a perceived risk that its actions will violate federal law.'"  *Id*. (quoting *Kolstad v. American Dental Ass'n*, 527 U.S. 526, 536 (1999)).  However, upon a review of that case, it seems that the perception requirement is another way of requiring that the law be clearly established.  The *Eisenhour* Court explained the perception requirement by stating that, in the employment discrimination context, even where there has been intentional discrimination, there may not be liability because "the underlying theory of discrimination may be novel or otherwise poorly recognized, or an employer may reasonably believe that its discrimination satisfies a bona fide occupational qualification defense or other statutory exception to liability."  *Id*. (quoting *Kolstad*, 527 U.S. at 536–37).  As I explained in the order on Mr. Christian's motion for summary judgment and above, the law was sufficiently

established for liability, and Mr. Christian's hair-splitting legal argument on the perception requirement does not persuade me otherwise.

4. Bifurcation

Fourth, Mr. Christian argues that he was prejudiced by the Court's denial of his motion for bifurcation.  ECF No. 374 at 6.  Specifically, he claims that "the steady parade of video evidence involving other Denver police officers and other people and the allegations those actions were caused by failures by Denver itself were profoundly prejudicial to Mr. Christian." *Id*.  Mr. Christian also argues that he should not have been made to proceed with Denver under *Tanburg v. Sholtis,* 401 F.3d 1151 (10th Cir. 2005), which stands for the proposition that evidence showing that an officer did not comply with department policy cannot be introduced to show that the officer violated a plaintiff's constitutional rights.

Ms. Epps responds that the jury did not just lump Mr. Christian in with Denver—it found Denver liable for violating Ms. Epps' Fourth and First Amendment rights but found Mr. Christian liable only for violation of Ms. Epps' Fourth Amendment rights.  She also argues that evidence of Denver's policies and training was not prejudicial to Mr. Christian because the jury was instructed specifically on that issue.  Instruction 10 stated, "[a]s you consider those instructions, you must bear in mind that in order for the plaintiffs to prove a constitutional violation, it is not enough to show that an officer violated a policy, regulation, rule, training, or practice."  ECF No. 340 at 12.  On the *Tanburg* issue, Ms. Epps responds that as plaintiffs did not argue or seek to argue that Mr. Christian's actions in shooting Ms. Epps were outside of Denver policy, *Tanburg* was inapplicable.

I agree with Ms. Epps on the *Tanburg* issue.  Ms. Epps never argued that Mr. Christian's actions were outside of policy—she argued to the contrary, that Mr. Christian's actions were

18

exactly in line with Denver's use-of-force policy, a policy that she and her co-plaintiffs argued was far too discretionary. *Tanburg* is not a consideration that would require the Court to bifurcate Ms. Epps' case against Mr. Christian, and it is not a reason that Mr. Christian would be entitled to judgment as a matter of law or a new trial.

I also agree with Ms. Epps that the denial of Mr. Christian's request to bifurcate did not unfairly prejudice the jury against him. There is no reason to believe that the jury did not follow the instruction "in order for the plaintiffs to prove a constitutional violation, it is not enough to show that an officer violated a policy, regulation, rule, training, or practice," especially because jurors are presumed to follow jury instructions. ECF No. 340 at 12. Further, the jury's determination that Mr. Christian violated Ms. Epps' Fourth Amendment but not her First Amendment rights shows that the jury did not simply lump Mr. Christian's actions in with Denver's—had they done so, they would have found Mr. Christian liable for First Amendment violations against Ms. Epps, as they found Denver was liable for First Amendment violations against Ms. Epps. *See* ECF No. 343 at 7–8. This jury was extremely diligent throughout this case. They asked thoughtful questions and engaged in a lengthy deliberation, and they were instructed to consider Mr. Christian's liability separately from Denver's. *See* ECF No. 340 at 13–17, 18–23. I presume that they followed those instructions, and Mr. Christian has presented no evidence that they did not, other than the fact of the award against him. As there is no reason to believe that, even if the failure to bifurcate was error, such an error was prejudicial to Mr. Christian, he is entitled to neither judgment as a matter of law nor a new trial.

## III.   REMITTITUR

### A.  <u>Standard of Review</u>

Remittitur is appropriate only when "the jury award is so excessive . . . as to shock the judicial conscience and to raise an irresistible inference that passion, prejudice, corruption or

another improper cause invaded the trial." *Murphy Oil USA, Inc. v. Wood*, 438 F.3d 1008, 1021 (10th Cir. 2006) (quotations omitted). "The [] court may order a remittitur and alternatively direct a new trial if the plaintiff refuses to accept the remittitur, a widely recognized remedy." *Malandris v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 703 F.2d 1152, 1168 (10th Cir. 1981). Courts evaluating emotional distress compensatory damages awards focus on the specific testimony of the plaintiff, whether medical or other healthcare assistance was sought, and corroborating objective evidence supporting the plaintiff's testimony. *Smith v. Nw. Fin. Acceptance, Inc.*, 129 F.3d 1408, 1416–17 (10th Cir. 1997).

### B. Denver's Request for Remittitur

Denver argues that the damages awarded by the jury against Denver are so excessive that they cannot be compensatory. The jury awarded $1,000,000 per plaintiff, except for Ms. Wedgeworth ($750,000) and Mr. Packard ($3,000,000). Denver argues that the only reasonable explanation of the jury award is that the award was based on "its determination Denver's overall response to the protests was inappropriate and violative of people's constitutional rights generally." ECF No. 373 at 14. It asks the court to order remitter to $100,000 per plaintiff except Ms. Wedgeworth $75,000 and Mr. Packard $500,000.

Plaintiffs respond that they presented evidence of physical injuries for each plaintiff that would be sufficient to support the jury's award in favor of each plaintiff against Denver. However, they argue, even if the physical injuries were insufficient, the evidence of plaintiffs' emotional damages would be more than sufficient to support the award.

Each plaintiff presented testimony that they suffered, at minimum, from the inhalation of CS gas. *See e.g.*, ECF No. 387 at 90–91 (Sannier), 153–55 (Smith), 195 (Packard); ECF No. 389 at 156 (Fitouri); ECF No. 390 at 10–11 (Rothlein), 62–63 (Blasingame); ECF No. 349 at 10–11

(Deras); ECF No. 351 at 160–62 (Taylor), 223 (Wedgeworth); ECF No. 352 at 1666 (Parkins), 191–93 (Epps); ECF No. 354 at 74 (Lyman).  Almost all testified that they were chased through the streets, shot at or hit with PepperBalls or other less-lethal projectiles.  Denver is correct that, other than Mr. Packard, none of the plaintiffs presented evidence that their physical injuries were extensive.  However, physical damages are not the only damages suffered in this case.

Plaintiffs also testified at length regarding the emotional distress they suffered because of the police actions they experienced at the protests.  Plaintiffs described the distress that they felt at the time, and the distress that they felt in the days, weeks, and months that followed their experiences at the protest.  Plaintiffs did not testify to seeking much, if any, medical attention for their emotional distress, nor did any receive a diagnosis regarding their emotional distress.

However, measuring damages for emotional distress is not an exact science.  The jurors observed the testimony of the plaintiffs regarding how their experiences at these protests affected them.  The jurors, as judges of the facts, determined that the emotional distress suffered by the plaintiffs was significant.  More than just the words that plaintiffs spoke, the jurors were able to observe the demeanor of plaintiffs as they spoke about their distress.  And even without a diagnosis or significant long-term symptoms of that distress, there was evidence in the form of plaintiffs' testimony of significant distress suffered during the protests and in their immediate aftermath.

Remittitur is an extreme remedy and one that this Court would not engage in without a verdict that shocked the judicial conscience.  This is not such a verdict.  The plaintiffs testified about the impact that their experiences at the hands of the police while they peacefully protested had on them.  It is clear from the verdict that the jury believed that testimony and assessed damages that they believed were warranted in light of that impact.  The Court might have

awarded less.  However, the jury is the conscience of the community.  This was an attentive and thoughtful jury, and I do not find that its decision was shocking or the result of passion, prejudice, or impropriety.  The police no doubt faced a very difficult situation, as there were individuals in the crowds who threw rocks, full water bottles, and other objects at officers throughout the protests.  However, Denver's stubborn instance that the police did nothing wrong in the face of overwhelming video evidence to the contrary, coupled with evidence that each plaintiff was peaceful but sustained injuries as a result of the misconduct, was sufficient to support the jurors' verdict.  The Court will not exercise its discretion to remit the awards against Denver.

### C.  Mr. Christian's Request for Remittitur

Mr. Christian argues that the punitive damages awarded against him are excessive, unfair, and in violation of the due process clause, and he requests that the Court remit the punitive damage award against him.  More specifically, Mr. Christian argues that as the jury did not order any compensatory damages against him, the punitive damages are extremely excessive, as many courts have held that punitive damages should be held around a 1:1 ratio with compensatory damages.  Ms. Epps responds that there was a compensatory award against Mr. Christian—after inquiring whether Denver was liable for the claims against it and whether Mr. Christian was liable for the claims against him, the verdict form asked the jurors only, "[w]hat amount of compensatory damages do you award to Elisabeth Epps?" and then "[w]hat amount of punitive damages do you award to Elisabeth Epps against Jonathan Christian?".  ECF No. 391 at 8–10 (quoting ECF No. 343 at 8).  The jury answered the compensatory damages question with an award of $1 million, not specifying which compensatory damages were against Denver and which were against Mr. Christian.

I agree with Ms. Epps that the jury did award compensatory damages against Mr. Christian, and that he is jointly and severally liable with Denver for the compensatory award in favor of Ms. Epps.  However, I agree with Mr. Christian that the punitive damages awarded against him are excessive.  Mr. Christian shot one PepperBall at Ms. Epps as she crossed the street.  He should not have done that, and the jury found that by doing so, he violated her Fourth Amendment rights.  However, the evidence was unclear as to whether the PepperBall hit her; at most, it caused a bruise.  Compared to the other injuries that Ms. Epps suffered during the protests, Mr. Christian's shooting caused minimal damage.  Ms. Epps was shot with PepperBalls and exposed to CS gas on numerous occasions, and from an objective standpoint, and considering those other shootings and exposures, Mr. Christian's actions do not warrant a punitive damage award of $250,000.

While I have immense respect and appreciation for the jury's work in deciding this case, the punitive damages as to Mr. Christian are excessive.  Using my discretion, I will remit the punitive damage award against Mr. Christian to $50,000.  I believe that would be a fair and not excessive punishment for the wrong he committed against Ms. Epps.  If Ms. Epps is unwilling to accept that amount, then I will grant a new trial as to her claims against Mr. Christian.

ORDER

1. Defendant the City and County of Denver's motion for judgment as a matter of law, or a new trial, or remittitur, ECF No. 373, is DENIED.

2. Defendant Jonathan Christian's motion for judgment as a mater of law, or a new trial, or remittitur, ECF No. 374, is GRANTED IN PART and DENIED IN PART.  It is granted to the extent that the Court orders that the punitive

damages award be remitted to $50,000; and if that is not accepted by plaintiff

Epps, then the Court orders a new trial as to her claims against Mr. Christian.

DATED this 19th day of September, 2022.

BY THE COURT:

R. Brooke Jackson
United States District Judge