UNITED STATES COURT OF APPEALS FOR THE TENTH CIRCUIT
Byron White United States Courthouse
1823 Stout Street
Denver, Colorado 80257
(303) 844-3157
Clerk@ca10.uscourts.gov

Christopher M. Wolpert
Clerk of Court

Jane K. Castro
Chief Deputy Clerk

April 21, 2026

To Counsel of Record

**RE: 24-1367, Packard, et al v. City and County of Denver, et al**
Dist/Ag docket: 1:20-CV-01878-RBJ

Dear Counsel:

Enclosed is a copy of the opinion of the court issued today in this matter. The court has entered judgment on the docket pursuant to Fed. R. App. P. Rule 36.

Pursuant to Fed. R. App. P. 40(d)(1), any petition for rehearing must be filed within 14 days after entry of judgment. Please note, however, that if the appeal is a civil case in which the United States or its officer or agency is a party, any petition for rehearing must be filed within 45 days after entry of judgment. Parties should consult both the Federal Rules and local rules of this court with regard to applicable standards and requirements. In particular, petitions for rehearing may not exceed 3900 words or 15 pages in length, and no answer is permitted unless the court enters an order requiring a response. *See* Fed. R. App. P. Rule 40 and 10th Cir. R. 40 for further information governing petitions for rehearing.

Please contact this office if you have questions.

Sincerely,

Christopher M. Wolpert
Clerk of Court

CMW/klp

FILED
United States Court of Appeals
Tenth Circuit

April 21, 2026

Christopher M. Wolpert
Clerk of Court

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

---

ZACH PACKARD; AMANDA BLASINGAME; JOE DERAS; JACQUELYN PARKINS; SARA FITOURI; ELISABETH EPPS; HOLLIS LYMAN; CLAIRE SANNIER; MAYA ROTHLEIN; KELSEY TAYLOR; STANFORD SMITH; ASHLEE WEDGEWORTH,

Plaintiffs - Appellees,

and

CIDNEY FISK,

Plaintiff,

v.

CITY AND COUNTY OF DENVER,

Defendant - Appellant,

and

CORY BUDAJ; PATRICIO SERRANT; DAVID MCNAMEE; CITY OF AURORA; JONATHAN CHRISTIAN; KEITH VALENTINE; MATTHEW BRUKBACHER; TIMOTHY DREITH; ANTHONY HAMILTON,

Defendants.

No. 24-1367

---

**Appeal from the United States District Court**
**for the District of Colorado**
**(D.C. No. 1:20-CV-01878-RBJ)**

---

Frederick R. Yarger, Wheeler Trigg O'Donnell LLP (William D. Hauptman and Miranda B. Worthington, Wheeler Trigg O'Donnell LLP and Andrew D. Ringel and Robert A. Weiner, Hall & Evans L.L.C., with him on the briefs), Denver, Colorado, for Defendant-Appellant.

Robert Reeves Anderson, Arnold & Porter Kaye Scholer LLP (Matthew J. Douglas, Brian M. Williams, and Emily M. Sartin, Arnold & Porter Kaye Scholer LLP, Denver, Colorado, Timothy Macdonald and Sara R. Neel, American Civil Liberties Union of Colorado, Denver, Colorado, Orion de Nevers, Arnold & Porter Kaye Scholer LLP, Washington, DC, and Mindy Gorin, Arnold & Porter Kaye Scholer LLP, New York, New York, with him on the brief), Denver, Colorado, for the Epps Plaintiffs-Appellees.

Elizabeth Wang, Loevy & Loevy, Boulder, Colorado, for the Fitouri Plaintiffs-Appellees.

---

Before **CARSON**, **EBEL**, and **FEDERICO**, Circuit Judges.

---

**EBEL**, Circuit Judge.

---

The death of George Floyd at the hands of police officers in Minneapolis sparked demonstrations throughout the United States and around the world protesting against police brutality, particularly police brutality against black people. In Denver, thousands protested for several consecutive days, from May 28 through June 2, 2020, with demonstrations lasting up to sixteen hours a day. At times and places during these demonstrations, some among the protestors acted violently, assaulted police officers, looted, and destroyed property. "[T]he Denver Police Department faced a Herculean task" in policing the demonstrations. (R. v. 25, p. 59.) There were also

times when some Denver police officers, and some officers from nearby jurisdictions who were aiding the Denver Police Department ("DPD"), indiscriminately and unjustifiably used force against those who were peacefully protesting. This appeal addresses police use of force against peaceful protestors. After a three-week trial, a jury found that the City and County of Denver was liable for the unconstitutional force officers used against the twelve protestors who brought the 42 U.S.C. § 1983 claims at issue in this appeal. Denver challenges the jury's verdict, asserting a number of grounds for relief. We reject Denver's arguments and uphold the jury's verdict. We do so based specifically on the jury's finding that Denver inadequately trained its officers. Therefore, having jurisdiction under 28 U.S.C. § 1291, we AFFIRM.

## I. FACTUAL BACKGROUND

Summarizing the evidence presented at the three-week trial, viewed in the light most favorable to the jury's verdict, see Harris v. City Cycle Sales, Inc., 112 F.4th 1272, 1275 (10th Cir. 2024), indicated that DPD officers, and officers from other jurisdictions who were aiding DPD (collectively "officers"[1]), excessively and indiscriminately used less-lethal munitions against peaceful protestors, including Plaintiffs.

[1] On appeal, Denver does not challenge the jury's finding that it was responsible for the actions of officers from other jurisdictions who were assisting DPD during the protests and who were acting under DPD's direction.

"Less-lethal" munitions include chemical munitions like tear gas and pepper spray, which DPD deployed, often without adequate warning, on groups that were protesting peacefully. In addition, officers, without justification, sprayed tear gas into cars driving down the street and deployed chemical munitions into an apartment building entrance.

Officers also deployed chemical munitions directly at individuals who were acting peacefully. For example, when Plaintiff Stanford Smith walked with his hands up, between a line of protestors and a line of police officers, urging everyone to remain peaceful, a police officer, without warning, came up from behind Dr. Smith and sprayed him directly in the face with tear gas.

Officers also shot peaceful protestors with less-lethal projectiles, including pepper balls, Kevlar bags filled with lead shot, and rubber-tipped projectiles. Pepper balls often contain a noxious acid which they emit upon impact. These projectiles are generally not to be fired directly at someone, unless that person presents a direct risk of harm to officers or others, because these projectiles, although labeled "less lethal," are capable of causing serious harm or even death. Nonetheless, officers fired these projectiles at the head, face, and bodies of individuals who were peacefully protesting.

For example, Plaintiff Zach Packard was peacefully protesting with others when police, without warning or cause, launched a tear gas canister toward the protestors. When Packard kicked the canister away from his group, he was shot in the head with a lead-filled Kevlar bag. That less-lethal shot fractured his skull, broke

his neck, and rendered him unconscious. Similarly, when Plaintiff Joe Deras kicked away a canister of tear gas that had been thrown at him and other protestors, officers also shot him with Kevlar shotgun rounds, hitting him in the head, back, and hand. This was done at the DPD Command Post's direction to officers to "shoot up" the crowd for "traffic control." (R. v. 27, pp. 76–77; Ex. 528.)

Officers also threw less-lethal grenades at protestors, including Stinger grenades, which emit a bright flash, a loud noise, and rubber balls; and flash bang devices, which emit a bright flash, loud noise, and extreme heat, causing disorientation, temporary blindness, and severe burns. Flash bang grenades, in particular, should not be used to disperse crowds because they are designed to disorient and temporarily blind those in the explosion's vicinity, making those affected unable to disperse. Several Plaintiffs, including Deras and Sara Fitouri, had grenades thrown at their feet on several occasions.

Officers often used all of these less-lethal munitions together against peaceful protestors. Sometimes, officers did so without any warning, simply to move peaceful protestors who had gathered, for example, in a street. At other times, responding to a protestor in the crowd who unlawfully threw some object at them, officers indiscriminately fired pepper balls and other less-lethal weapons at the entire crowd or at individual non-threatening protestors. On occasion, officers used these weapons to force peaceful protestors, including Plaintiffs Fitouri and Jacquelyn Parkins, into oncoming traffic.

On one occasion, DPD's incident commander, Commander Patrick Phelan, directed officers to "kettle" a group of protestors, including Plaintiffs Fitouri, Parkins, Claire Sannier and Ashlee Wedgeworth, who were peacefully marching up Colfax Avenue. That is, Commander Phelan ordered officers to surround these peaceful protestors and deploy tear gas and throw flash grenades at them, forcing hundreds of protestors to try to escape the gas by fleeing down a narrow alley where officers continued to deploy chemical weapons, chased them as they exited that alley, and fired pepper balls at them as they fled.

Plaintiff Sonnier was shot with pepper balls for filming a black man talking with several police officers. Plaintiffs Amanda Blasingame and Maya Rothlein were in the fenced-in front yard of their apartment building when a DPD sergeant threatened to spray them with a chemical munition if they did not go inside. Officers later drove by and fired pepper balls at the group, shooting some of those pepper balls into the apartment building's entrance.

Officers' indiscriminate and excessive use of less-lethal munitions against peaceful protestors was captured by numerous video recordings shown to the jury. Those recordings were taken by protestors, police officers' body-worn cameras, and Denver's fixed cameras located throughout the city. After seeing many of these videos of officers using force indiscriminately and excessively against peaceful protestors, DPD superiors, including Commander Phelan, testified that all officers' actions against protestors were taken according to DPD policy.

Those DPD policies included distributing less-lethal weapons to its officers, some of whom were not trained to use them, and giving its officers discretion to choose which less-lethal munitions to use and when to deploy them against protestors. DPD did not keep track of officers' use of less-lethal munitions. On the first day of protests, DPD exhausted its supply of 30,000 pepper balls and had to restock. DPD did not require officers to activate their body worn cameras during the protests or to complete department use-of-force statements that officers would ordinarily have to complete when they used force while on duty.[2]

## II. PROCEDURAL BACKGROUND

Twelve Plaintiffs[3] sued the City and its officers under 42 U.S.C. § 1983, alleging officers injured Plaintiffs while they peacefully protested. Plaintiffs specifically alleged: First, that officers violated their First and Fourth Amendment rights by unjustifiably using less-lethal munitions against them. Second, that Denver was liable for its officers violating Plaintiffs' constitutional rights under alternate theories: 1) Denver's official policies, or practices and customs, caused those constitutional violations, 2) Denver's failure to train its officers caused those

[2] After the City was sued, DPD asked its officers to complete use-of-force forms several weeks after the protests.

[3] The district court dismissed at trial the claim asserted by a thirteenth Plaintiff, Cidney Fisk, for failure to prosecute.

violations, and 3) Denver's final policymakers ratified its officers' unconstitutional conduct.

During a fifteen-day trial, Plaintiffs presented evidence, including numerous video recordings from which a jury could find that police officers used less-lethal munitions indiscriminately and unjustifiably against non-threatening peaceful protesters; Plaintiffs' testimony about officers using excessive force against each of them, despite the fact that they were protesting peacefully and not engaging in any destructive, violent or aggressive behavior; interviews conducted by the City's Office of Independent Monitor ("OIM"), headed by Independent Monitor Nicholas Mitchell, with patrol and command officers, who told OIM that they needed more training and better leadership during the protests; and two expert witnesses who testified, among other things, that DPD had a policy of using indiscriminate and excessive force against protestors.

In its defense, Denver contended that its officers had acted reasonably in response to the unprecedented circumstances they encountered during the protests, which occurred over multiple days and involved "violent and destructive behavior" by the crowds. (R. v. 11, p. 142 (Instruction No. 1).) Denver further contended that its "officers were fully and properly trained, and that Denver's official policies, and its practices and customs applicable at the time" conformed "with established constitutional law." (Id.)

At the conclusion of the trial, the jury found that 1) individual officers had violated each Plaintiff's First and/or Fourth Amendment rights, and 2) that Denver

was liable to Plaintiffs for those constitutional violations under each of the three alternative municipal liability theories that Plaintiffs presented. The jury awarded each Plaintiff compensatory damages. After this verdict, the district court denied Denver's post-verdict motions for judgment as a matter of law in its favor or, alternatively, for a new trial or remittitur. Denver appeals the jury verdict and the denial of its post-trial motions for relief from that verdict.

## III. DISCUSSION

Denver asserts six arguments on appeal: 1) The district court erred in instructing jurors on First Amendment violations. 2) The district court failed to instruct that deliberate indifference is an element of all Plaintiffs' municipal liability theories. 3) The district court erred in instructing on Plaintiffs' failure-to-train theory of municipal liability. 4) The district court abused its discretion in admitting the Independent Monitor's testimony. 5) There was insufficient evidence to support the jury's verdict that Denver's failure to train its officers caused officers to violate Plaintiffs' constitutional rights. 6) The district court abused its discretion in denying Denver's post-trial motion to remit the compensatory damages. We conclude that none of Denver's arguments warrant relief and we, therefore, affirm the jury's verdict.

### A. Any error in instructing on First Amendment violations was harmless

Denver challenges the jury's finding that officers violated each of the twelve Plaintiffs' First Amendment rights, arguing the district court erred in instructing

jurors on the elements of a First Amendment violation.[4] "We review a properly preserved claim of error in jury instructions for an abuse of discretion." United States v. Thompson, 133 F.4th 1094, 1097 (10th Cir.), cert. denied, 146 S. Ct. 274 (2025). But "[t]o determine whether the 'court properly exercised its discretion, we review the jury instructions de novo to determine whether, as a whole, they accurately state the governing law and provide the jury with an accurate understanding of the relevant legal standards and factual issues in the case.'" United States v. Sjodin, 139 F.4th 1188, 1197 (10th Cir. 2025) (quoting United States v. Moran, 503 F.3d 1135, 1146 (10th Cir. 2007)). "'[I]instructional errors are subject to harmless error review.'" United States v. Woodmore, 135 F.4th 861, 879 (10th Cir. 2025) (quoting United States v. Benvie, 18 F.4th 665, 670 (10th Cir. 2021)). An "'error is harmless when the erroneous instruction could not have changed the result of the case.'" World Wide Ass'n of Specialty Programs v. Pure, Inc., 450 F.3d 1132, 1139 (10th Cir. 2006) (quoting Lusby v. T.G. & Y. Stores, Inc., 796 F.2d 1307, 1310 (10th Cir. 1986)).

Here, the district court instructed the jurors that, to find that an officer violated a plaintiff's First Amendment rights, jurors had to find three elements by a preponderance of the evidence: 1) "The plaintiff engaged in speech or conduct protected by the First Amendment," which included "participating peacefully in a protest." 2) "The officer's actions would chill a similarly situated person of ordinary

---

[4] Denver does not challenge the jury's finding that officers violated eleven of the twelve Plaintiffs' Fourth Amendment rights.

firmness from continuing to engage in the protected activity." And 3) "[t]he plaintiff's participation in the protected activity was a substantial or motivating factor in the officer's decision to take an action against the plaintiff. A substantial or motivating factor is a significant factor, though not necessarily the only factor." (R. v. 11. p. 153 (Instruction No. 11) (emphasis added).) Focusing on that third element, Denver contends that the district court should have used the phrase "substantially motivating" instead of "substantial or motivating."

We need not decide whether that was error because, here, even if that seemingly semantic difference was error, it would be harmless. See Woodmore, 135 F.3d at 879. That is, any such error in the instruction "could not have changed the result of the case." World Wide Ass'n of Specialty Programs, 450 F.3d at 1139 (quoting Lusby, 796 F.2d at 1310).

The phrases at issue—"substantial or motivating" and "substantially motivating"—while not identical, are very similar. See Hedquist v. Beamer, 763 F. App'x 705, 712 (10th Cir. 2019) (unpublished).[5] Furthermore, in this case, the district court went on to define "[a] substantial or motivating factor" to be "a significant factor, though not necessarily the only factor." (R. v. 11, p. 153 (Instruction No. 11).) That additional language insured that the jury had to find that a motivating factor was "significant" before it could support a finding of a First Amendment violation. That additional language aligns closely with the phrase

[5] Although not binding, we cite this unpublished decision for the persuasive value of its analysis.

"substantially motivating factor." We, therefore, conclude that, even if the district court erred in using the "substantial or motivating" language, that error was harmless.

**B. Because we can affirm the jury's verdict on Plaintiffs' failure-to-train claim, which included a deliberate indifference element, we need not decide whether deliberate indifference is an element of Plaintiffs' other municipal liability theories**

After finding that the officers violated each Plaintiff's First and/or Fourth Amendment rights, the jury found that Denver was liable for its officers violating those Plaintiffs' constitutional rights under three alternate theories: 1) Denver had official policies or practices or customs that caused the officers' unconstitutional conduct; 2) Denver insufficiently trained its officers, thereby causing Plaintiffs' injuries; and 3) Denver's final policymakers ratified its officers' unconstitutional actions. See Monell v. Department of Social Services, 436 U.S. 658, 663, 690–95 (1978); see also Thao v. Grady Cnty. Crim. Just. Auth., 159 F.4th 1214, 1227 (10th Cir. 2025). Denver contends that the district court erred in failing to instruct jurors that they had to find, for each theory of municipal liability, that the City acted with deliberate indifference. (Aplt. Br. 15–17.) We need not address this argument because the district court did include Denver's deliberate indifference as an element

when it instructed on Plaintiffs' failure-to-train claim,[6] and the damages award against Denver can be sustained on that basis alone.[7]

**C. The district court did not err in instructing jurors on failure to train**

For the first time on appeal, Denver challenges the failure-to-train instruction the district court gave jurors. (Aplt. Br. 17–18.) That instruction, resulting from revisions to the instruction that were drafted by Denver, combined a failure-to-train and a failure-to-supervise theory of municipal liability, both of which require proof that the City acted with deliberate indifference. See Thao, 159 F.4th at 1228. The challenged instruction pertaining to Denver's liability for the conduct of its officers required jurors to find deliberate indifference, under either a failure-to-train or a failure-to-supervise theory. But sufficient for our purposes, the plain reading of the jury instruction, coupled with the clear expression of the jury in filling out the verdict form, leaves us with a clear and confident conclusion that the jury was required to

[6] See Connick v. Thompson, 563 U.S. 51, 61–62 (2011) (stating that failure-to-train theory requires showing that municipality acted with deliberate indifference); see also Waller v. City & Cnty. of Denver, 932 F.3d 1277, 1284 (10th Cir. 2019) (noting deliberate indifference requirement has been applied to municipal liability theories that are, like failure-to-train claims, based on a city's omissions, such as failure to supervise and hire adequately).

[7] See R. v. 11, p. 158 (Instruction No. 14) (instructing jurors that "[i]f you find that a plaintiff has proved the elements on any one of these [municipal liability] theories against Denver, your verdict should be for that plaintiff."); see also Bradshaw v. Freightliner Corp., 937 F.2d 197, 203 (5th Cir. 1991) (holding any error in instructing on strict liability was harmless where jury also returned verdict for plaintiffs on negligence, an alternate theory of recovery).

find, and did find, that Denver acted with deliberate indifference in the training of its officers in preparation for a known and likely event similar to the Denver George Floyd protests. The instruction, entitled "Failure to Train," provided:

> The plaintiffs' second theory of its claim against Denver is that plaintiffs were deprived of constitutional rights as a result of Denver's failure to train its officers and that this alleged failure can be considered to be the official policy of Denver. To recover on this theory against Denver, plaintiffs must prove each of the following by a preponderance of the evidence:
>
> 1. An act of one or more officers deprived the plaintiff of a constitutional right as explained in Instructions 11 and 12.
>
> 2. Denver had insufficient training or supervision that relate to the alleged constitutional violations of plaintiffs. Plaintiffs must identify specific deficiencies in Denver's training or supervision that relate to the alleged constitutional violations of plaintiffs.
>
> 3. The deficient training or supervision caused the deprivation of the plaintiff's rights; that is, the City's deficient training or supervision is closely related to the deprivation of the plaintiff's rights so as to be the moving force that caused the ultimate injury; and
>
> 4. Denver adopted its policy of deficient training with deliberate indifference.
>
> "Deliberate indifference" to the rights of others is the conscious or reckless disregard of consequences of one's acts or omissions. Deliberate indifference requires more than negligence or ordinary lack of due care. It requires a showing that Denver's policymakers had actual or constructive notice that the specific deficiency in training or supervision identified was substantially certain to result in a constitutional violation, and consciously or deliberately chose to disregard the risk of harm. Moreover, deliberate indifference can occur when a city fails to train its employees to handle recurring situations presenting an obvious potential to result in a constitutional violation.

(R. vol. 11, p.161 (Instruction 16) (emphasis added).) The special verdict form required jurors to enter a verdict specifically upon Plaintiffs' theory of "failure to train." (R. vol. 11, pp. 169–77.)

Denver contends on appeal that, because the jury instruction sometimes combined the term "supervision" with the term "train," jurors may have found Denver liable on a failure-to-supervise theory without finding that Denver acted with deliberate indifference. (Aplt. Br. 15, 17; Aplt. Reply Br. 3–4.) That argument disregards the jury verdict and does not give a plausible reading to the jury instruction. Among other things, the language in paragraph 4 of the jury instruction required the jury to find deliberate indifference before it could return a verdict for Plaintiffs. Both parties agreed at the jury instruction conference that deliberate indifference was an element of both a failure-to-train and a failure-to-supervise theory of municipal liability (id. at 210–12). We find no reversible error on the failure-to-train instruction.[8]

[8] To the extent that Denver is challenging the special verdict form, which permitted jurors to find Denver liable for failure to train, but did not provide a separate opportunity for jurors to find that the City failed to supervise its officers, we note that both sides worked on drafting, and ultimately agreed to, that verdict form. (R. vol. 28, pp. 65–67.) See United States v. Cornelius, 696 F.3d 1307, 1319 (10th Cir. 2012) ("Under the invited error doctrine, this Court will not engage in appellate review when a defendant has waived his right to challenge a jury instruction by affirmatively approving it at trial.").

**D. The district court did not abuse its discretion in admitting testimony from Denver's former independent monitor, Nicholas Mitchell**

Denver asserts a scattershot of arguments challenging the district court's decision to allow the City's former independent monitor, Nicholas Mitchell, to testify about an investigation he conducted on DPD's response during the George Floyd protests. Reviewing for an abuse of discretion, see United States v. Rudolph, 152 F.4th 1197, 1229 (10th Cir. 2025), cert. denied, 2026 WL 79716 (U.S. Jan. 12, 2026) (No. 25-675), we find no error.[9]

**1. Background**

Denver's Charter provides for an independent monitor, whose duties include investigating and overseeing investigations of complaints regarding police misconduct, issuing annual public reports, and recommending policy changes. The independent monitor has a staff to assist him. The monitor is independent because he reports to the mayor, rather than the police chief or the City's director of safety.

Mitchell was the City's independent monitor at the time of the George Floyd protests, on May 28 through June 2, 2020. A few days later, on June 5, 2020, and before the filing of this lawsuit, the Denver City Council requested that Mitchell

---

[9] Denver has not asserted any hearsay objection to Mitchell's testimony and we, therefore, do not address hearsay. It is likely Denver did not object in light of Federal Rule of Evidence 803(8), which provides, in relevant part, that "[a] record or statement of a public office" is "not excluded by the rule against hearsay, regardless of whether the declarant is available as a witness," "if . . . it sets out . . . in a civil case . . . factual findings from a legally authorized investigation[,] and . . . the opponent does not show that the source of the information or other circumstances indicate a lack of trustworthiness."

investigate DPD's response to the protests. Mitchell, with his staff, spent several months gathering information, including viewing all video from body-worn and stationary cameras, interviewing DPD officers, reviewing documents, and considering research on "the challenges of policing protests that involve[] allegations of police misconduct" (R. v. 23, p. 63). Using that information, Mitchell issued a fifty-plus-page public report in November 2020.

That report was not admitted into evidence at trial. But the district court allowed Mitchell to testify as to how he went about gathering the information underlying the report and to testify about the report's contents. The district court did not, however, permit Plaintiffs to inquire into any specific recommendations that Mitchell made in his report for policy changes. Further, because Mitchell was not endorsed as an expert witness, the district court did not allow him to give any "new opinions" at trial that Mitchell had not included in the report. (R. v. 23, p. 54.)

**2. Mitchell's testimony did not exceed that permitted by a lay witness under Fed. R. Evid. 701**

Rule 701 provides:

> If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is:
>
> **(a)** rationally based on the witness's perception;
>
> **(b)** helpful to clearly understanding the witness's testimony or to determining a fact in issue; and
>
> **(c)** not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

Fed. R. Evid. 701.

Denver focuses on the first of those requirements, contending that Mitchell's testimony was not "rationally based on [his] perception" because Mitchell was not present during the protests and was not involved in DPD's response to the protests.[10] (Aplt. Br. 28.) We disagree. "If the witness is asked to base her opinion on matters she personally investigated and perceived, the opinion is 'based on the perception of the witness.'" Victor Gold, 29 Federal Practice & Procedure (Wright & Miller) § 6254 (updated Sept. 2025).

Mitchell testified to matters that were rationally based on his perception as a fact gatherer, even though his perceptions were not first-hand observations of the protests themselves. He testified, for example, about his duties as Denver's independent monitor, why he investigated DPD's response to the George Floyd protests, how he and his staff went about their investigation, and the information he obtained through his investigation. Mitchell had first-hand personal knowledge of all of these fact-gathering matters.

In this respect, Mitchell's testimony is analogous to testimony from law enforcement officers who, although they did not witness the criminal activity at issue in a given case, are permitted under Rule 701 to testify as to their investigation of

[10] Rule 701(a)'s requirement that lay opinion testimony be rationally based on the witness's perception is derived from Fed. R. Evid. 602, which provides in relevant part that, "A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter." See United States v. Bush, 405 F.3d 909, 915–16 (10th Cir. 2005).

that criminal activity, see United States v. Cristerna-Gonzalez, 962 F.3d 1253, 1259 (10th Cir. 2020) (stating that "law-enforcement officer's testimony based on knowledge derived from the investigation of the case at hand is typically regarded as lay testimony"); see also, e.g., United States v. Marquez, 898 F.3d 1036, 1049–50 (10th Cir. 2018). Mitchell's testimony is similarly analogous to lay testimony allowed under Rule 701 from individuals who, although they did not witness an accident, investigated it. See Vincent v. Nelson, 51 F.4th 1200, 1214–15 (10th Cir. 2022) (witnesses properly gave lay testimony as to the "details from [the] investigation of the accident scene," the location of the vehicles immediately after the accident, interviews with the drivers, measurements taken at the scene, identification of the accident site from an aerial map, and fact that the general layout of the mine pit remained the same in the 20 days following the accident).

Denver specifically challenges Mitchell's testimony "that there were deficiencies in Denver's training, internal controls, and use of mutual-aid partners, and that Denver officers deployed less-lethal munitions in 'extremely troubling ways.'"[11] (Aplt. Br. 29.) In its reply brief, Denver also specifically challenges

---

[11] Denver specifically points to three brief statements Mitchell made during his testimony. "We concluded that there were deficient internal controls on officer use of force during the George Floyd protests in Denver." (R. v. 23, p. 65.) Mitchell also "concluded as part of [his] investigation that the DPD's use of the mutual aid partnerships during the George Floyd protests was deficient in certain ways," including "[t]he lack of joint training amongst agencies." (Id. p. 116.) Mitchell further agreed that it "is critical in protest management" to track the use of less-lethal munitions effectively, explained why that is the case, and testified that Denver did not initially track its officers use of less-lethal munitions, (Id. p. 116–17.) Denver did not contemporaneously object to any of those statements at trial. Nonetheless,

Mitchell's testimony that there was "a 'gap' in body-worn camera footage recorded by its officers."

This testimony, however, was also based on information that Mitchell obtained during his investigation. For example, DPD officers that Mitchell interviewed told Mitchell about deficiencies in Denver's training of its officers on crowd control, field force for use in policing protests, and use of less-lethal munitions; deficiencies in training with mutual aid agencies; and deficiencies in internal controls, such as failing to require officers to complete use-of-force reports in a timely manner.[12] See Vincent, 51 F.4th at 1215 (allowing under Rule 701 lay testimony regarding information obtained during investigation of accident, including interviews with drivers).

Mitchell's review of the video taken from officers' body-warn cameras indicated that many officers were not using those cameras, which is often an important means of internal control of officers' conduct. See Marquez, 898 F.3d at 1049 (allowing officer's testimony under Rule 701 regarding the defendant's role in the conspiracy, which was based on the officer's "personal knowledge" "gleaned from personally listening to '[h]undreds of hours of [intercepted] calls.'").

---

whether we review Denver's challenges to these statements for an abuse of discretion or plain error, we conclude there was no error in allowing this testimony.

[12] Denver does not challenge, on appeal, the district court's decision to admit into evidence several memoranda documenting Mitchell's interviews with DPD officers.

It was during Mitchell's review of video from the protests that he saw "examples of DPD officers deploying less-lethal munitions in ways that were extremely troubling." (R. v. 23, p. 68.) Mitchell described some of those examples: Officers deploying chemical munitions and pepper balls at people who were only verbally protesting; deploying pepper balls and other projectiles at prohibited body areas, such as the head, face, and groin; deploying munitions at protestors who had already begun to disperse; throwing explosives at people and into lanes of traffic; and spraying chemical munitions at individuals while they were driving. DPD officers Mitchell interviewed also discussed similar incidents. After considering Denver's arguments, we cannot conclude that Mitchell's testimony violated Rule 701.[13]

**3. Mitchell's testimony did not violate Federal Rule of Evidence 407**

Next, Denver contends that Mitchell's testimony about his investigation and report violated Federal Rule of Evidence 407, which provides:

> When measures are taken that would have made an earlier injury or harm less likely to occur, evidence of the subsequent measures is not admissible to prove:
>
> • negligence;
> • culpable conduct;

[13] Even if the district court had abused its discretion in admitting Mitchell's testimony, it would not warrant relief. See United States v. Yeley-Davis, 632 F.3d 673, 685 (10th Cir. 2011). The few specific excerpts of Mitchell's testimony that Denver specifically challenges on appeal were brief and in each case there was other similar evidence before the jury. Further, the reported information relied on by Mitchell often came from Denver's own officers or is based unambiguously on unchallenged videos that are real-time recordings of the events. Any error in admitting Mitchell's testimony would be harmless.

> • a defect in a product or its design; or
> • a need for a warning or instruction.
>
> But the court may admit this evidence for another purpose, such as impeachment or--if disputed--proving ownership, control, or the feasibility of precautionary measures.

The OIM report itself was not admitted into evidence. Mitchell did not testify as to any subsequent remedial measures that Denver may have taken after the protests to ensure that its officers do not, in the future, violate peaceful protestors' constitutional rights. Nor did Mitchell testify as to recommendations that he made in his report for remedial measures Denver might consider in order to prevent its officers' unconstitutional conduct during future protests.

Denver argues on appeal that Mitchell's testimony about deficiencies in Denver's response to the George Floyd protests violated Rule 407. Denver asserts, for example, that although Mitchell's testimony

> did not specifically address the remedial recommendations he included in his report, his "conclusions" necessarily implied what [Mitchell's] recommendations were. For example, [Mitchell's] conclusion that "there were deficient internal control on officer use of force" during the protest, implies a need for better internal controls. His conclusion that the department's use of mutual-aid partners and lack of joint training was deficient, implies a need for joint training.

(Aplt. Br. 31 (record cites omitted).) We are not persuaded.

Evidence regarding

> [p]ost-event tests or reports are generally outside the scope of Rule 407, and thus admissible, on the basis that they are conducted or prepared for the purpose of investigating the cause of the accident, and can rarely be characterized as 'measures' which, if conducted previously, would have reduced the likelihood of the accident.

Weinstein's Fed. Evidence § 407.06.[14]

This court reached a similar conclusion in Rocky Mountain Helicopters, Inc. v. Bell Helicopters Textron, 805 F.2d 907 (10th Cir. 1986). That case involved a jury trial concerning a helicopter crash. 805 F.3d at 909. The primary issue at trial was whether the crash had been caused by pilot error or "fatigue failure of the 'trunnion,' a part of the helicopter that connected the mast with the rotor blades." Id. at 910. After the crash, the manufacturer, Bell, redesigned the trunnion. Id. at 918. The district court precluded any evidence of that subsequent redesign. Id. But the court admitted evidence from a "Photoelastic Study of Stress in 214 Trunnions" that Bell conducted after the accident. Id. This court rejected Bell's argument that Rule 407 also precluded evidence of the Photoelastic Study, holding that post-event investigative tests or reports are generally not subsequent remedial measures that Rule 407 precludes. Id. at 918–19.

> It would strain the spirit of the remedial measure prohibition in Rule 407 to extend its shield to evidence contained in post-event tests or reports. It might be possible in rare situations to characterize such reports as "measures" which, if conducted previously, would reduce the likelihood of the occurrence. Yet it is usually sounder to recognize that such tests

---

[14] See also Jones on Evidence § 21:13 (7th ed. Nov. 2025 update) (stating that "most courts have interpreted Fed. R. Evid. 407 and state equivalents as excluding only evidence of the actual implementation of a safety improvement, but not the reports or memoranda that lead up to the improvements"; noting that "[a] careful reading of the rule . . . supports this interpretation: To be excluded under the rule, the measure at issue must be one that could have been taken before the event that gave rise to the claim. One cannot investigate an accident before it occurs, so an investigation and report of the cause of an accident, . . . cannot be a measure that is excluded from evidence under the rule.") (internal quotation marks omitted).

> are conducted for the purpose of investigating the occurrence to discover what might have gone wrong or right. Remedial measures[, on the other hand,] are those actions taken to remedy any flaws or failures indicated by the test. In this case, the remedial measure was not the Photoelastic Study of the trunnion but rather the subsequent redesign of the trunnion. As noted above, references to redesign were excluded at trial.
>
> We believe that the policy considerations that underlie Rule 407, such as encouraging remedial measures, are not as vigorously implicated where investigative tests and reports are concerned. To the extent that such policy concerns are implicated, they are outweighed by what the Westmoreland court referred to as the danger of depriving "injured claimants of one of the best and most accurate sources of evidence and information."

Id. (quoting Westmoreland v. CBS, Inc., 601 F. Supp. 66, 68 (S.D. N.Y. 1984)).

Denver further argues that Mitchell's testimony violated Rule 407 because jurors knew Mitchell's investigation of Denver's response to the George Floyd protests occurred after the protests.[15] That argument is nonsensical and flies in the face of the authority just cited, including our holding in Rocky Mountain Helicopters, indicating that evidence of post-accident investigations generally does not violate Rule 407. All "post-accident" investigations by very definition must occur after the event being investigated.[16] We, therefore, conclude that the district court did not

---

[15] It is not clear that Denver presented this particular timing argument to the district court. In any event, we do not find it persuasive, as we explain.

[16] Denver bases its argument on language in Rocky Mountain Helicopter that is inapposite here. In that case, although the Photoelastic Study had been conducted after the crash, the helicopter manufacturer could have conducted such a test before the crash. That is very different than the report at issue here, which logically could only have analyzed DPD's response to the George Floyd protests after those protests occurred. In Rocky Mountain Helicopters, after holding the post-crash trunnion study could be admitted without violating Rule 407, this court went on to hold that

abuse its discretion in allowing Mitchell's testimony about his investigation into DPD's response to the protests.[17]

**4. Mitchell's testimony was not inadmissible under Federal Rule of Evidence 403**

Lastly, Denver asserts Mitchell's testimony was inadmissible under Federal Rule of Evidence 403, which provides:

> The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence.

The district court did not abuse its discretion in rejecting that argument.

At trial, Denver acknowledged that all of the facts about which Mitchell testified could have been presented to the jury through other evidence. But Denver contends that it was unfairly prejudicial to the City to present these facts through

---

counsel harmlessly erred during closing argument by asserting that the fact that the manufacturer conducted the trunnion study after the crash was an admission by the manufacturer that it was negligent for not conducting such a study before the crash because it might have prevented the crash. 805 F.3d at 919. In that way, "[t]hough the test was not itself a remedial measure under Rule 407, the attorney's remarks had the effect of characterizing it as such." Id. It is in that context that this court stated: "The correct procedure is to refer to the results of such tests or reports without referring to their post-event time frame, unless one of the exceptions to Rule 407 applies." Id. Those circumstances and, thus, the suggested proper procedure there, are very different from the circumstances at issue here and that reasoning does not apply to the issue presented by this case.

[17] Although we find no error under Rule 407, we note that any such error involving Mitchell's testimony about, for example, deficiencies in DPD's internal controls and training with mutual aid agencies would not require reversal because it was cumulative of other evidence before the jury.

Mitchell, whose criticisms of Denver's response to the protests were "cloaked in unique authority by virtue of [his] past service as Denver's Independent Monitor." (Aplt. Br. 32.) Denver further argues that, because Mitchell, as the independent monitor, had been employed by the City, his testimony suggested that Denver was admitting wrongdoing. Denver asserts that this would have confused and misled jurors. We are not persuaded.

Mitchell's testimony was probative regarding, for example, Denver's policies and training. While Mitchell's testimony likely prejudiced Denver, it did not do so unfairly. Nor does Denver specifically point to what about Mitchell's testimony would have created possible confusion for jurors. Mitchell's status as an "independent" monitor made clear that his report did not constitute an admission of wrongdoing by Denver.

**5. Conclusion as to Mitchell's testimony**

For the foregoing reasons, we conclude that the district court did not abuse its discretion in admitting Mitchell's testimony.

**E. There was sufficient evidence to support the jury's finding that Denver was liable for officers violating Plaintiffs' constitutional rights**

Next, Denver argues that the district court erred in rejecting the City's Federal Rule of Civil Procedure 50(b) motion for judgment as a matter of law, which asserted that there was insufficient evidence to support the jury's finding the City liable for its officers violating Plaintiffs' constitutional rights. As we previously explained, in

considering this argument, we focus on the jury's finding that Denver's failure to train its officers caused these constitutional violations.

**1. Standard of review**

This court reviews the district court's Rule 50 decision de novo. See Murphy v. Schaible, 108 F.4th 1257, 1264 (10th Cir. 2024).

> "A party is entitled to judgment as a matter of law only if the court concludes that all of the evidence in the record reveals no legally sufficient evidentiary basis for a claim under the controlling law. . . . The court draws all reasonable inferences in favor of the nonmoving party and does not weigh evidence, judge witness credibility, or challenge the factual conclusions of the jury."

Id. (quoting Bill Barrett Corp. v. YMC Royalty Co., 918 F.3d 760, 766 (10th Cir. 2019)).

**2. There was sufficient evidence for a reasonable jury to find that Denver acted with deliberate indifference in failing to train its officers adequately**

The district court instructed jurors that to find Denver liable under Plaintiffs' failure-to-train theory, they had to find the following four elements:

1. "An act of one or more officers deprived the plaintiff of a constitutional right."

2. Specific deficiencies in Denver's training its officers that relate to those constitutional violations.

3. The deficient training was the "moving force that caused the ultimate injury."

4. "Denver adopted its policy of deficient training with deliberate indifference."

(R. v. 11, p. 161 (Instruction 16).) Plaintiffs presented evidence and argued to jurors that Denver had failed to train its officers on crowd control and use of less-lethal munitions during protests. Denver contends there was no evidence from which a reasonable jury could have found the fourth required element—that Denver acted with deliberate indifference in adopting its policy of failing to train its officers adequately. We disagree.

Plaintiffs can prove deliberate indifference by showing either that the City failed to train its officers adequately 1) in the face of "[a] pattern of similar constitutional violations by untrained [or undertrained] employees," or 2) based on a single-incident when "the unconstitutional consequences of failing to train" are "patently obvious." Thao, 159 F.4th at 1231 (quoting Connick, 563 U.S. at 62, 64). There was evidence presented at trial from which a reasonable jury could have found for Plaintiffs under either theory.

First, regarding a failure to train in the face of a pattern of similar constitutional violations by untrained or undertrained employees, Plaintiffs presented the following evidence: In 2012, the Office of Independent Monitor issued a report indicating that DPD's tactics during the Occupy Denver protests caused unnecessary injuries to officers and protestors. Denver thereafter trained its officers for several years on crowd control during protests. But Denver stopped this training when a new police chief decided to de-emphasize training, which interfered with officers' other duties. Both Plaintiffs' experts testified that, at the time of the George Floyd protests, DPD officers were inadequately trained. Stamper testified, for example,

that DPD officers were "woefully" inadequately trained, "undisciplined and using techniques and methods that . . . no other police department would permit." (R. v. 17, p. 102.) Dr. McGuire testified that Denver "routinely fail[ed] to train its officers in the several years before the protests about how to not use excessive amounts of force during protests" and that those "repeated failure[s]" to train its officers "present[ed] an obvious potential for excessive use of force" and "an obvious potential for violation of First [A]mendment rights of protestors." (R. v. 24, p. 175.)

Alternatively, there was also sufficient evidence to support a reasonable jury finding that Denver was deliberately indifferent in failing to train its officers, based on the single incident of the George Floyd protests. To succeed on such a theory, Plaintiffs had to show: "(1) the existence of a [municipal] policy or custom involving deficient training; (2) an injury caused by the policy that is obvious and closely related; and (3) that the municipality adopted the policy or custom with deliberate indifference to the injury." Thao, 159 F.4th at 1231 (quoting Valdez v. Macdonald, 66 F.4th 796, 816–17 (10th Cir. 2023)). Denver does not challenge the sufficiency of the evidence as to the first two elements. On the third element—that the municipality acted with deliberate indifference—we have adopted the Second Circuit's test, which is satisfied when (1) the municipality's "policymakers 'know to a moral certainty that their employees will confront a given situation'"; (2) "the situation 'presents the employee with a difficult choice of the sort that training or supervision will make less difficult'"; and (3) "[t]he wrong choice will frequently cause the deprivation of a citizen's constitutional rights." Id. (quoting Valdez, 66 F.4th at 817) (additional

internal quotation marks omitted). There was sufficient evidence, including from Plaintiffs' two experts, that Denver policymakers knew its officers would have to confront a civil rights protest. Plaintiffs' expert Stamper, for example, testified that it was "utterly predictable" that DPD would need to prepare for "a large scale civil justice protest." (R. v. 18, p. 42.) To counter that testimony, Denver presented evidence that the George Floyd protests were unprecedented and, therefore, unforeseeable. But the jury was not required to believe Denver's evidence to the exclusion of Plaintiffs' contrary testimony. Plaintiffs presented sufficient evidence for a reasonable jury to find that the City was deliberately indifferent in not training its officers adequately on crowd control and the use of less-lethal munitions during protests. The district court, therefore, did not err in denying Denver's Rule 50 motions for judgment as a matter of law on Plaintiffs' failure-to-train claims.

**F. The district court did not abuse its discretion in denying Denver's post-trial request for remittitur of the compensatory damages the jury awarded Plaintiffs**

Lastly, Denver contends that the district court abused its discretion, see Fresquez v. BNSF Ry., 52 F.4th 1280, 1314 (10th Cir. 2022), in denying the City's post-verdict motion for remittitur of the jury's compensatory damages award. "'To determine whether remittitur is appropriate, courts must evaluate whether the evidence supports the verdict,'" viewing the evidence in the light most favorable to the prevailing party. Id. at 1314–15 (quoting Burke v. Regalado, 935 F.3d 960, 1035 (10th Cir. 2019)). "'The jury has wide latitude to choose an award based on the evidence.' . . . 'Remittitur is appropriate only

when the jury award is so excessive . . . as to shock the judicial conscience and to raise an irresistible inference that passion, prejudice, corruption or another improper cause invaded the trial.'" Id. at 1315 (quoting Burke, 935 F.3d at 1035).

The jury awarded the Plaintiff who suffered the most serious medical injuries, Zachary Packard, $3 million in compensatory damages; Plaintiff Wedgeworth $750,000; and the other ten Plaintiffs $1 million each. The district court, in denying Denver's motion for remittitur, accurately described Plaintiffs' evidence of their physical injuries and emotional distress to include the following:

> Each plaintiff presented testimony that they suffered, at minimum, from the inhalation of CS [tear] gas. Almost all testified that they were chased through the streets, shot at or hit with PepperBalls or other less-lethal projectiles. . . . [O]ther than Mr. Packard, none of the plaintiffs presented evidence that their physical injuries were extensive. . . .
>
> Plaintiffs also testified at length regarding the emotional distress they suffered because of the police actions they experienced at the protests. Plaintiffs described the distress that they felt at the time, and the distress that they felt in the days, weeks, and months that followed their experiences at the protest. Plaintiffs did not testify to much, if any, medical attention for their emotional distress, nor did any receive a diagnosis regarding their emotional distress.

(R. v. 12, pp. 99–100 (record citations omitted).) In denying remittitur, the district court held:

> [M]easuring damages for emotional distress is not an exact science. The jurors observed the testimony of the plaintiffs regarding how their experiences at the protests affected them. The jurors . . . determined that the emotional distress suffered by the plaintiffs was significant. More than just the words that plaintiffs spoke, the jurors were able to observe the demeanor of plaintiffs as they spoke about their distress. And even without a diagnosis or significant long-term symptoms of that distress,

> there was evidence in the form of plaintiffs' testimony of significant distress suffered during the protests and in their immediate aftermath.

(Id. p. 100.) The district court concluded that, while it "might have awarded less," the jury's compensatory damages award did not shock the judicial conscience. (Id. pp. 100–01.) "The plaintiffs testified about the impact that their experiences at the hands of police while they peacefully protested had on them. It is clear from the verdict that the jury believed that testimony and assessed damages that they believed were warranted in light of that impact." (Id. p. 100.) The district court's decision to deny remittitur was not an abuse of discretion.

Denver's complaint—that the only evidence of most of the Plaintiffs' injuries was their own testimony—is unavailing because a party's testimony about his or her injuries is relevant and sufficient evidence to support an award of compensatory damages. See, e.g., Osterhout v. Bd. of Cnty. Comm'rs, 10 F.4th 978, 997 (10th Cir. 2021); Dodoo v. Seagate Tech., Inc., 235 F.3d 522, 532 (10th Cir. 2000). There was, in any event, additional evidence presented at trial to support Plaintiffs' testimony about their injuries, including photographs and videos of the force officers used against them and the resulting physical injuries.

In addition, most Plaintiffs testified to suffering very similar physical and emotional injuries. Finally, Denver's attempt to compare the emotional distress awards here with those entered in other cases is not helpful.[18]

[18] See Osterhout, 10 F.4th at 999 (noting, in considering whether compensatory damages award was excessive, that, "[i]n general," comparisons with other cases "'yield no insight into the evidence the jurors heard and saw or how they used it in

## IV. CONCLUSION

We AFFIRM the jury's verdict holding Denver liable for its officers violating Plaintiffs' constitutional rights.

deliberations' and 'detract from the appropriate inquiry, which is whether the verdict is against the weight of the evidence'" (quoting Burke, 935 F.3d at 1036 n.6)).